SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Ron E. Meisler
Christopher M. Dressel (*pro hac vice* pending)
Bryan V. Uelk
Jennifer Madden (*pro hac vice* pending)
320 S. Canal Street
Chicago, Illinois 60606
Telephone: (312) 407-0700
Fax: (312) 407-0411

– and –

SKADDEN, ARPS, SLATE, MEAGHER & FLOM (UK) LLP
Peter K. Newman
Nicole Stephansen
22 Bishopsgate
London EC2N 4BQ
Telephone: +44 20 7519 7000
Fax: +44 20 7519 7070
*Counsel to the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | **Chapter 15** |
| **NFE Global Holdings Limited,** *et al.*, | **Case No. 26-11268 (___)** |
| **Debtors in a Foreign Proceeding.**[1] | **(Joint Administration Requested)** |

**VERIFIED PETITION FOR (I) RECOGNITION OF FOREIGN
MAIN PROCEEDING, (II) RECOGNITION OF FOREIGN REPRESENTATIVE,
AND (III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

Christopher Boas, in his capacity as the authorized foreign representative

(the "**Foreign Representative**") of the above-captioned foreign debtors (the "**Debtors**") that are

---

[1]   The Debtors and the last four digits of their foreign identification numbers are NFE Global Holdings Limited (9588) and NFE Brazil Newco Limited (1053).  The address of NFE Global Holdings Limited's registered office is Suite 1, 7th Floor, 50 Broadway, London SW1H 0BL, United Kingdom, and the address of NFE Brazil Newco Limited's registered office is Suite 1, 7th Floor, 50 Broadway, London SW1H 0DB, United Kingdom.

the subject of proceedings (the "**English Proceedings**") currently pending before the High Court of Justice of England and Wales (the "**English Court**") concerning two restructuring plans (collectively, the "**Restructuring Plans**") proposed pursuant to Part 26A of the Companies Act of 2006 (as amended, the "**Companies Act**"), by and through his undersigned counsel, respectfully submits this chapter 15 verified petition (the "**Verified Petition**") and requests recognition of the English Proceedings as "foreign main proceedings" as well as certain related relief.

In support of this Verified Petition, the Foreign Representative has filed contemporaneously herewith the (i) *Declaration of Christopher Boas in Support of the Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "**Boas Declaration**"); (ii) *Declaration of Nicole Stephansen in Support of the Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "**Stephansen Declaration**," and together with the Boas Declaration, the "**Declarations**"); and (iii) official form petitions for each Debtor with all required attachments, including the *Statement Pursuant to Bankruptcy Code Section 1515(c) and Bankruptcy Rule 1007(a)(4)* (collectively the "**Chapter 15 Petitions**"), each of which is incorporated herein by reference.[2]  In further support of the relief requested herein, the Foreign Representative respectfully represents as follows:

---

[2]   A detailed description of the facts and circumstances supporting this Verified Petition are set forth in the Explanatory Statement in Relation to the Restructuring Plans (the "**Explanatory Statement**"), attached to the Stephansen Declaration as Exhibit F.  To the extent any of the descriptions herein conflict with those provided in the Explanatory Statement, the Explanatory Statement shall control in all respects.  The Restructuring Plans are Appendix 1 of the Explanatory Statement.

**PRELIMINARY STATEMENT**

1.      New Fortress Energy Inc. (the "**Parent**"), together with the Debtors and its other direct and indirect subsidiaries (collectively the "**Group**"), operate a global energy infrastructure business founded to address energy poverty and accelerate the world's transition to reliable, affordable, and clean energy.  In recent years, the Group has experienced financial headwinds brought on by an unfavorable pricing environment for liquefied natural gas ("**LNG**") and significant capital expenditures for projects that have not come online within expected timeframes and budgets.

2.      In light of these challenges, in the second half of 2025, the Group began negotiating with its key creditor constituencies regarding the terms of a recapitalization of the Group's balance sheet.  On March 17, 2026, these negotiations culminated in the Group's entry into a restructuring support agreement (as may be amended from time to time, the "**RSA**")[3] with the overwhelming majority of its key creditor constituencies.   As of the date hereof, approximately ninety-seven (97) percent of the holders of the Group's funded debt obligations by value and creditors in excess of seventy-five (75) percent by value of each proposed class of Plan Creditors (as defined herein) under the Restructuring Plans have agreed to support the Group's restructuring by signing the RSA.[4]  The restructuring contemplated by the RSA (the "**Restructuring**") will (i) reduce the Group's funded debt owed to creditors outside the Group from $5.7 billion to less than $1 billion, (ii) exchange existing debt obligations for a combination of new debt and preferred and common equity (the "**Plan Consideration**"), and (iii) separate the Group into two independent companies: one company comprising the Group's

---

[3]    A copy of the RSA is attached to the Stephansen Declaration as Exhibit B.

[4]    In addition to the Supporting Creditors (as defined in the RSA) who have signed the RSA, Additional Supporting Creditors (as defined in the RSA) may later join the RSA in accordance with the terms thereof. Kroll Issuer Services Limited, as information agent, has also signed the RSA in a limited capacity.

Brazilian operations ("**BrazilCo**"), which will be owned by certain of the Group's creditors, and another company comprising the Group's remaining operations ("**CoreCo**"), which will become 65% owned by the Group's creditors, while existing shareholders retain 35% (pre-dilution from the MIP and the convertible preferred equity being issued as Plan Consideration).   The Restructuring Plans will bind all Plan Creditors, and release the obligations of the Group under the instruments governing the debt being restructured by the Restructuring Plans.

3.    On March 24, 2026 and April 10, 2026, respectively, Debtor NFE Global Holdings Limited ("**NFE Global**") and Debtor NFE Brazil Newco Limited ("**NFE Brazil**"), both of which are private companies limited by shares and incorporated under the laws of England and Wales, initiated the English Proceedings to implement the Restructuring through the Restructuring Plans.    On May 14, 2026, the English Court made an order (the "**Convening Order**"), among other things, confirming the Foreign Representative's appointment, convening meetings of Plan Creditors to consider approval of the Restructuring Plans (the "**Plan Meetings**"), and scheduling a hearing to consider sanctioning of the Restructuring Plans for June 18, 2026 (the "**Sanction Hearing**").    Once sanctioned by the English Court, the Restructuring Plans will allow the Debtors to address their liquidity and operational challenges while providing runway for the Group's portfolio of development projects and opportunities that are expected to generate significant revenue and liquidity in the future.

4.    As described herein, all requirements for recognition of the English Proceedings as foreign main proceedings are satisfied.  The center of main interests ("**COMI**") of both of the Debtors is in England.  The registered office of both of the Debtors is located in London, England, creating a statutory presumption that their COMI is in England.  This presumption is reinforced by the centralization of restructuring activities in England, including through

appointment of the UK based Foreign Representative to administer the Debtors' restructuring activities in England, the English Court's active role in supervising the English Proceedings, the selection of English law as the governing law of the key restructuring documents, the Debtors' location in the UK being readily ascertainable to creditors, and the clear public messaging, as supported by an overwhelming majority of creditors who signed the RSA, that the Restructuring will be implemented through UK Restructuring Plans.

5.      The Foreign Representative also seeks recognition and enforcement of the Restructuring Plans, including certain releases of claims and liabilities provided for under the Restructuring Plans (the "**Plan Releases**").   The Plan Releases fall into two categories: (i) releases of the Debtors and other Group companies of the Plan Claims,[5] and (ii) exculpation of Group companies, supporting creditors, advisors and related parties (including directors, officers and employees) from any liability related to the negotiation and implementation of the Restructuring.  The Plan Releases carve out claims for criminal acts, fraud, gross negligence, or willful misconduct.  In this case, the Plan Releases are narrow and only provide for third party releases with respect to Plan Claims and/or the Restructuring.  Enforcement of the Plan Releases in the U.S. is consistent with well-established Chapter 15 precedent, furthers the interests of comity, and represents an appropriate exercise of this Court's discretion.   Importantly, enforcement of the Plan Releases is not prohibited by the Supreme Court's decision in

---

[5]  "Plan Claims" means any (direct or indirect) claim of a Plan Creditor (as defined herein) in respect of any liability of the Debtors or the Parent and its subsidiaries, whether as principal obligor, guarantor, indemnifier or security provider, in relation to, or arising out of or in connection with, the Debt Documents (as defined in the Explanatory Statement) or the Plan Debt (as defined herein), arising on or before the date on which the conditions precedent to the Restructuring are satisfied or duly waived and the Restructuring has been fully implemented (the "**Restructuring Effective Date**"), but excluding any claim of a Plan Creditor in respect of any liability of the Debtors or the Parent and its subsidiaries to any Plan Creditor arising directly or indirectly in relation to, or arising out of or in connection with, a failure to comply with the terms of the Restructuring Plans, the transaction implementation deed (the "**Transaction Implementation Deed**") or any other Implementation Documents (as defined in the Transaction Implementation Deed).

*Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024)—which was expressly limited to Chapter 11 and concerned releases unlike the Plan Releases—or United States public policy.

6.     The Debtors initiated these chapter 15 cases (the "**Chapter 15 Cases**") through their Foreign Representative seeking an order recognizing the English Proceedings as foreign main proceedings under 11 U.S.C. § 1502(4) to ensure that the Restructuring Plans have full force and effect within the territorial jurisdiction of the United States.  Further, under the RSA, recognition of the English Proceedings is a condition precedent to the effectiveness of the Debtors' Restructuring.  Thus, failure to grant recognition of the English Proceedings could cause tremendous harm to the Group and all of the creditors that signed the RSA.  It would also have a materially adverse effect on the Parent's stockholders whose shares could be worth nothing if the Restructuring does not proceed.  For these reasons and those discussed below, the Foreign Representative respectfully requests that the Court grant the relief requested herein.

<strong>RELIEF REQUESTED</strong>

7.     The Foreign Representative requests entry of an order, substantially in the form attached hereto as **Exhibit A** (the "**Recognition and Enforcement Order**"):

(a)     recognizing the English Proceedings (i) as "foreign main proceedings" pursuant to section 1517(b)(1) of title 11 of the United States Code (the "**Bankruptcy Code**") and granting all relief included therewith as provided in section 1520 of the Bankruptcy Code (including, without limitation, imposing the automatic stay under section 362 of the Bankruptcy Code), or (ii) in the alternative, should the Court decline to recognize the English Proceedings as foreign main proceedings, as foreign nonmain proceedings pursuant to section 1517(b)(2) of the Bankruptcy Code;[6]

(b)     recognizing the Foreign Representative as the "foreign representative" of the Debtors as defined in section 101(24) of the Bankruptcy Code;

---

[6]   In the event that the Court, in lieu of granting foreign main recognition, recognizes the English Proceedings as foreign nonmain proceedings for one or both of the Debtors, the Foreign Representative reserves the right to request additional relief, including pursuant to section 1521 of the Bankruptcy Code.

(c)     finding that the Verified Petition meets the requirements of section 1515 of the Bankruptcy Code;

(d)     subject to the English Court's entry of an order sanctioning the Restructuring Plans (the "**Sanction Order**"), giving full force and effect to the Sanction Order and the Restructuring Plans, including the Plan Releases, pursuant to sections 105(a), 1504, 1507, 1510, 1515, 1517, 1520, 1521, 1525, and 1527 of the Bankruptcy Code; and

(e)     granting such other and further relief as the United States Bankruptcy Court for the Southern District of New York (the "**Court**") deems just and proper.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction to consider this Verified Petition pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the *Amended Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.).   This is a core proceeding under 28 U.S.C. § 157(b)(2)(P). Venue is proper under 28 U.S.C. § 1410.

9.     These Chapter 15 Cases have been properly commenced by the Foreign Representative pursuant to sections 1504 and 1509 of the Bankruptcy Code by the filing of the Chapter 15 Petitions on behalf of the Debtors.

10.     The legal predicates for the relief requested herein are Bankruptcy Code sections 101(23)-(24), 105, 1501, 1502, 1504, 1507, 1508, 1509, 1510, 1512, 1515, 1516, 1517, 1520, 1521, and 1522; rules 2002(l), 2002(m), 2002(p), 2002(q), and 9007 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"); and rules 2002-4 and 9013-1(a) of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**").

# BACKGROUND

I.   **General Background**

A.   **The Group's Business**[7]

11.   The Group is an integrated gas-to-power energy infrastructure company that owns and operates natural gas and LNG infrastructure, along with an integrated fleet of ships and logistics assets to deliver turnkey energy solutions to global markets. *See* New Fortress Energy Inc., Form 10-K 2025 ("**10-K**"),[8] at Items 1-2. Additionally, it builds modular LNG manufacturing facilities which can be deployed around the world and used to liquify natural gas cheaply and efficiently. Explanatory Statement at 2.8. The Group's mission is to provide modern infrastructure solutions to create cleaner, reliable energy capable of being delivered worldwide. 10-K at Items 1-2. The Group's operations are located in, among other locations, the United States (including Puerto Rico), Brazil, Mexico, Ireland, and Nicaragua. Explanatory Statement at 2.6.

12.   The Group's principal business activities are divided among two operating segments, (i) 'Terminals and Infrastructure' and (ii) 'Ships'. 10-K at Items 1-2. The Terminals and Infrastructure segment includes the entire production and delivery chain for LNG, spanning natural gas procurement and liquefaction to logistics, facilities, and conversion or development of natural gas-fired power generation. *Id.* The Group's Ships segment charters the Group's vessels under long-term or spot (short-term) arrangements with third parties in the LNG logistics industry. *See* 10-K at Items 1-2. The Group's long-term business model is distinctive in that it plans to span the entire production and delivery chain, from natural gas procurement and

---

[7]   Further information regarding the Group, including financial information, can be obtained from the Group's investor relations website at *https://ir.newfortressenergy.com/investor-relations*.

[8]   A copy of the 10-K is attached to the Boas Declaration as Exhibit A.

liquefaction to shipping, logistics, facilities, and conversion or development of natural gas-fired power generation. *See id.*

13.     Central to the Group's overall strategy is Fast LNG, ("**FLNG**"), the Group's proprietary modular liquefaction technology designed to convert natural gas into liquefied natural gas. *See* Explanatory Statement at 4.1.8.  The Group's first operational FLNG unit ("**FLNG Facility 1**") is deployed off the coast of Altamira, Tamaulipas, Mexico. *See id.*  A second FLNG project ("**FLNG Facility 2**") is in development. *See id.*

14.     In addition to its FLNG projects, the Group has also made substantial capital investments in, and operates LNG terminals, power plants, and related natural gas infrastructure across, Brazil, Nicaragua, and Puerto Rico. *See id.* at 4.1-4.1.9.

**B.     Corporate Structure**

15.     The Parent is the ultimate parent of each of the other entities in the Group, including the Debtors.  Boas Decl. at ¶ 7.  As of December 31, 2025, affiliates of certain entities controlled by Wesley R. Edens (co-founder, CEO and board member of the Parent), Randal A. Nardone (co-founder and board member of the Parent), and affiliates of Fortress Investment Group LLC owned an aggregate of approximately 92,230,509 shares of Class A common stock, representing approximately 32.8 percent of total voting power in respect of the Parent. *Id.*  Also as of December 31, 2025, affiliates of Energy Transition Holdings LLC owned an aggregate of approximately 25,559,846 shares of Class A common stock, representing approximately 9.0 percent of total voting power. *Id.*

16.     NFE Global is a private company limited by shares, which was incorporated under the laws of England and Wales on October 14, 2021. *Id.*  NFE Global's registered office address is Suite 1, 7th Floor, 50 Broadway, London SW1H 0BL, United Kingdom. *Id.*  NFE

Global is an existing guarantor of the 2026 Legacy Notes, 2029 Legacy Notes, Revolving Credit Facility, Term Loan A Facility, Term Loan B Facility, Series I Intercompany Loan Facility and Series II Intercompany Loan Facility. *Id.* NFE Brazil is a private company limited by shares, which was incorporated under the laws of England and Wales on April 7, 2026. *Id.* NFE Brazil's registered office address is Suite 1, 7th Floor, 50 Broadway, London SW1H 0DB, United Kingdom. *Id.* NFE Brazil was formed specifically for the purpose of promoting the restructuring of BrazilCo. *Id.* In furtherance of that purpose, NFE Brazil became a guarantor in respect of the obligations under the New 2029 Notes (as defined herein) on April 9, 2026. *Id.* The boards of both Debtors are comprised of four directors, one of whom is the Foreign Representative and a UK resident that does not sit on the board of any other Group entity. *Id.* In addition, the Debtors' books and records are maintained in the UK, each Debtor maintains a bank account in the UK, and Vistra Cosec Limited, a UK company, serves as the corporate secretary for both Debtors. *Id.*

17.    A structure chart depicting the Group's organizational structure is attached hereto as **Exhibit B**.

C.    **Capital Structure**

18.    As of the date hereof, the Debtors have guaranteed external funded debt (i.e., funded debt owed to creditors outside the Group) in a total outstanding principal amount of approximately $5.7 billion and NFE Global is also an obligor on intercompany obligations with a total outstanding principal amount of approximately $2.4 billion. *Id.* at ¶ 9. All of the aforementioned    external    funded    debt    and    intercompany    obligations (collectively, the "**Plan Debt**," and the holders of such debt, the "**Plan Creditors**") is denominated in U.S. dollars and addressed by the Restructuring Plans. *Id.* NFE Brazil is a guarantor on the New 2029 Notes (as defined herein) (the "**BrazilCo Plan Debt**") and NFE

10

Global is a guarantor on all other Plan Debt (the "**CoreCo Plan Debt**"). *Id.* The following table summarizes the Debtors' external funded debt, which, along with the Debtors' intercompany obligations, are described in further detail below:

| Obligation | Principal Amount Outstanding | Collateral and Priority | Maturity Date |
|---|---|---|---|
| **CoreCo Plan Debt[9]** | | | |
| 2026 Legacy Notes | $510,879,463 | Common Collateral (*Pari passu* first lien claim) | September 30, 2026 |
| 2029 Legacy Notes | $236,728,231 | Common Collateral (*Pari passu* first lien claim) | March 15, 2029 |
| R-1 Revolving Credit Facility | $100,000,000 | Common Collateral FLNG 1 Collateral FLNG 2 Collateral Account Collateral (*Pari passu* first lien claims) Brazil Collateral (*Pari passu* second lien claim) | April 15, 2026 |
| R-2 Revolving Credit Facility | $560,400,000 | Common Collateral FLNG 1 Collateral FLNG 2 Collateral Account Collateral Brazil Collateral (*Pari passu* first lien claim) Brazil Collateral (*Pari passu* second lien claim) | October 15, 2027 |
| Term Loan A | $294,999,563 | Common Collateral FLNG 2 Collateral Account Collateral Brazil Collateral (*Pari passu* first lien claim) Brazil Collateral (*Pari passu* second lien claim) | July 19, 2027 |

---

[9]    Excludes CoreCo's intercompany obligations.

11

| Obligation | Principal Amount Outstanding | Collateral and Priority | Maturity Date |
|---|---|---|---|
| Term Loan B | $1,266,077,800 | Common Collateral FLNG 1 Collateral FLNG 2 Collateral Account Collateral (*Pari passu* first lien claim) | October 30, 2028 |
| **BrazilCo Plan Debt** | | | |
| New 2029 Notes | $2,730,126,770 | Brazil Collateral (*Pari passu* first lien claim) | November 15, 2029 |
| **Total:** | **$5,699,211,827** | | |

### a.    2026 Legacy Notes

19.     Pursuant to that certain Indenture, dated April 12, 2021 (as amended, restated, supplemented or otherwise modified from time to time), by and among the Parent, as issuer, certain of the Parent's wholly-owned, direct and indirect subsidiaries as guarantors from time to time party thereto (collectively, including NFE Global, the "**Common Guarantors**"), and U.S. Bank Trust Company, National Association (as successor in interest to U.S. Bank, National Association), as trustee and notes collateral agent, the Parent issued approximately $1.5 billion of 6.500% senior secured notes due September 30, 2026 (the "**2026 Legacy Notes**" and the holders of 2026 Legacy Notes the "**2026 Legacy Noteholders**").  Boas Decl. at ¶ 10.  The obligations under the 2026 Legacy Notes are guaranteed, jointly and severally, by the Common Guarantors and secured by a first priority lien on substantially all of the assets of the Parent and the Common Guarantors (the "**Common Collateral**"), which is *pari passu* with the first priority liens on the Common Collateral securing the other Plan Debt, as applicable.  *Id.*

12

b.      **2029 Legacy Notes**

20.      Pursuant to that certain Indenture, dated March 8, 2024 (as amended, restated, supplemented or otherwise modified from time to time), by and among the Parent, as issuer, the Common Guarantors, and U.S. Bank Trust Company, National Association, as trustee and collateral agent, the Parent issued approximately $750 million of 8.750% senior notes due March 15, 2029 (the "**2029 Legacy Notes**" and the holders of 2029 Legacy Notes the "**2029 Legacy Noteholders**, and the 2029 Legacy Notes, together with the 2026 Legacy Notes, the "**Legacy Notes**"). *Id.* at ¶ 11. The obligations under the 2029 Legacy Notes are guaranteed, jointly and severally, by the Common Guarantors and secured by a first priority lien on the Common Collateral, which is *pari passu* with the first priority liens on the Common Collateral securing the other Plan Debt, as applicable. *Id.*

c.      **New 2029 Notes**

21.      On November 6, 2024, NFE Financing LLC, an indirect subsidiary of the Parent ("**NFE Financing**"), and Bradford County Real Estate Partners LLC, a wholly owned subsidiary of NFE Financing ("**Bradford Partners**"), entered into an exchange and subscription agreement with certain holders of the then outstanding Legacy Notes, which related to a series of transactions intended to extend the maturity profile of the Group's indebtedness and enhance liquidity (the "**2024 Refinancing**"). *Id.* at ¶ 12. In accordance with the 2024 Refinancing transactions, NFE Financing also issued approximately $2.73 billion of 12.000% secured notes due November 15, 2029 (the "**New 2029 Notes**"), which is governed by that certain Indenture, dated November 22, 2024 (as amended, restated, supplemented or otherwise modified from time to time), between NFE Financing, as issuer, Bradford Partners and NFE Brazil, as guarantors, and Wilmington Savings Fund Society, FSB, as trustee and notes collateral agent. *Id.* The obligations under the New 2029 Notes are jointly and severally guaranteed by Bradford Partners,

13

which owns land in Wyalusing, Pennsylvania ("**PA Land**"), and NFE Brazil.  *Id.*  The collateral provided in connection with securing the New 2029 Notes consisted of NFE Financing's interest in (i) approximately 45% of the Group's Brazilian business, (ii) proceeds of NFE Financing's interest in the Series II Intercompany Loan Facility, (iii) the Brazilian Intercompany Loan Facility (which in turn is secured by the Brazilian Parent's approximately 55% equity interest in the Group's Brazil business and its interest in the proceeds of the Series I Intercompany Loan Facility), and (iv) the PA Land (collectively, the "**NFE Financing Collateral**").  *Id.*

### d.      Revolving Facility

22.     On April 15, 2021, the Parent entered into that certain Credit Agreement (as amended, restated, supplemented or otherwise modified from time to time prior to, the date hereof, the "**Revolving Credit Facility**" and the lenders under the Revolving Credit Facility the "**RCF Lenders**"), by and among the Parent, the Common Guarantors, FLNG 1 LLC and its direct subsidiaries (collectively, "**FLNG 1**"), FLNG 2 LLC and its direct subsidiaries (collectively, "**FLNG 2**"), as guarantors, the lenders and issuing banks from time to time party thereto and MUFG Bank, Ltd., as administrative agent and collateral agent, which provided for a senior secured revolving credit facility.  *Id.* at ¶ 13.  Pursuant to amendments made in connection with the 2024 Refinancing, the Revolving Credit Facility is currently comprised of two tranches: (i) a tranche in an aggregate principal amount of $100 million, with a scheduled maturity on April 15, 2026 (the "**R-1 Revolving Facility**") and (ii) a tranche in an aggregate principal amount of $560.4 million, maturing on October 15, 2027 (the "**R-2 Revolving Facility**").  *Id.*

23.     The obligations under the R-1 Revolving Facility and the R-2 Revolving Facility are guaranteed, jointly and severally, by the Common Guarantors, FLNG 1 and FLNG 2.  *Id.* at ¶ 14.  The obligations under the R-1 Revolving Facility and R-2 Revolving Facility are secured by (i) a first priority lien against (w) the Common Collateral *pari passu* with the other

corporate debt claims, (x) substantially all of the assets held by FLNG 1 (the "**FLNG 1 Collateral**") *pari passu* with claims under the Term Loan B Facility and letter of credit and reimbursement agreement, dated July 16, 2021, for the issuance of letters of credit for an aggregate amount of up to $195 million (as amended, restated, supplemented or otherwise modified from time to time, the "**Letter of Credit Facility**"), (y) certain natural gas liquefaction assets and other assets of FLNG 2 (the "**FLNG 2 Collateral**"), which is *pari passu* with the first priority liens on the FLNG 2 Collateral securing the Letter of Credit Facility, Term Loan A Facility (as defined below) and Term Loan B Facility (as defined below) and (z) certain deposit and securities accounts that are *pari passu* with the holders of claims under the Letter of Credit Facility and the Term Loan A Facility (as defined below) (the "**Account Collateral**"), and (ii) a second lien on the NFE Financing Collateral excluding the PA Land for claims in excess of $200 million (the "**Second Lien NFE Financing Collateral Rights**"). *Id.* In addition, solely with respect to the R-2 Revolving Facility, the obligations thereunder are secured by a first priority lien on the NFE Financing Collateral excluding the PA Land up to $200 million that is *pari passu* with the first priority liens on the NFE Financing Collateral securing the Term Loan A Facility, the Letter of Credit Facility and the New 2029 Notes (the "**First Priority Lien NFE Financing Collateral Rights**" and such collateral together with the NFE Financing Collateral the "**Brazil Collateral**"). *Id.*

### e. Term Loan A Facility

24. On July 19, 2024, the Parent entered into that certain Credit Agreement (as amended, restated, supplemented or otherwise modified from time to time), by and among the Parent, the Common Guarantors and FLNG 2, as guarantors, the lenders from time to time party thereto and Wilmington Trust, National Association (as successor in interest to Morgan Stanley Senior Funding, Inc.), as administrative agent and collateral agent, which provided for a senior

secured, multi-draw term loan facility in an initial aggregate principal amount of up to $700 million, which was subsequently reduced on March 3, 2025 to $350 million when the unused commitments were terminated (the "**Term Loan A Facility**" and the lenders under the Term Loan A Facility the "**TLA Lenders**"). *Id.* at ¶ 15.  The obligations under the Term Loan A Facility are guaranteed, jointly and severally, by the Common Guarantors and FLNG 2 and are secured by a first priority lien on the Common Collateral, the FLNG 2 Collateral, the First Priority Lien NFE Financing Collateral Rights, and the Second Lien NFE Financing Collateral Rights. *Id.*

### f.      Term Loan B Facility

25.      On October 30, 2023, the Parent entered into that certain Credit Agreement (as amended, restated, supplemented or otherwise modified from time to time), by and among the Parent, the Common Guarantors, FLNG 1 and FLNG 2, as guarantors, the lenders from time to time party thereto and Wilmington Trust, National Association (as successor in interest to Morgan Stanley Senior Funding, Inc.), as administrative agent and collateral agent, pursuant to which the lenders funded term loans in an aggregate principal amount of $1.266 billion (the "**Term Loan B Facility**"). *Id.* at ¶ 16.  The obligations under the Term Loan B Facility are guaranteed, jointly and severally, by the Common Guarantors, FLNG 1 and FLNG 2. *Id.*  Term Loan B is secured by a first priority lien on (i) the Common Collateral, which lien is *pari passu* with the first priority liens on the Common Collateral securing the other Plan Debt, (ii) the FLNG 1 Collateral, which is *pari passu* with the first priority liens on the FLNG 1 Collateral securing the Revolving Credit Facility and Letter of Credit Facility, and (iii) the FLNG 2 Collateral, which is *pari passu* with the first priority liens on the FLNG 2 Collateral securing the Revolving Credit Facility, Letter of Credit Facility, and Term Loan A Facility. *Id.*

16

**g.      Brazilian Intercompany Loan Facility**

26.      On November 22, 2024, in connection with the 2024 Refinancing, NFE Brazil Investments LLC (the "**Brazilian Parent**") entered into that certain Credit Agreement (as amended, restated, supplemented or otherwise modified from time to time), between the Brazilian Parent, as borrower, NFE Financing as lender, the other lenders from time to time party thereto and Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent, which provided for a senior secured term loan facility of approximately $970 million (the "**Brazilian Intercompany Loan Facility**"). *Id.* at ¶ 17.  The obligations under the Brazilian Intercompany Loan Facility are secured by substantially all of Brazilian Parent's assets.  *Id.*

**h.      Series I Intercompany Loan Facility**

27.      On November 22, 2024, the Parent entered into that certain Credit Agreement (as amended, restated, supplemented or otherwise modified from time to time), by and among the Parent, as borrower, the Common Guarantors, the Brazilian Parent, as lender, and Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent, which provided for a senior secured, multiple-draw term loan facility of $970 million (the "**Series I Intercompany Loan Facility**"). *Id.* at ¶ 18.  The obligations under the Series I Intercompany Loan Facility are guaranteed, jointly and severally, by the Common Guarantors and secured by a first priority lien on the Common Collateral, which is *pari passu* with the first priority liens on the Common Collateral securing the other Plan Debt, as applicable.  *Id.*

**i.      Series II Intercompany Loan Facility**

28.      On December 6, 2024, the Parent entered into that certain Credit Agreement (as amended, restated, supplemented or otherwise modified from time to time), by and among the Parent, as borrower, the Common Guarantors, NFE Financing, as lender, and Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent, providing for a

17

senior secured term loan facility of approximately $1.43 billion (the "**Series II Intercompany Loan Facility**"). *Id.* at ¶ 19. The obligations under the Series II Intercompany Loan Facility are guaranteed by the Common Guarantors and secured by a first priority lien on the Common Collateral, which is *pari passu* with the first priority liens on the Common Collateral securing the other Plan Debt, as applicable. *Id.*

### D.    The Debtors' U.S. Assets

29. The Debtors have property in the United States in the form of a retainer held in an account maintained in New York, New York by Skadden, Arps, Slate, Meagher & Flom LLP ("**Skadden**"). *Id.* at ¶ 20. In addition, the Debtors are obligors on U.S. dollar-denominated debt that is governed by New York law, including under the instruments related to the Legacy Notes, the Term Loan A Facility, the Term Loan B Facility, the Revolving Credit Facility, the Series I Intercompany Loan Facility, the Series II Intercompany Loan Facility, and the New 2029 Notes. *Id.*

## II.    Events Leading to the English Proceedings

### A.    Challenges Facing the Debtors' Business

30. The Group's business model historically required significant capital and operating expenditures to design, construct, procure and develop supply chain infrastructure and service its customer base in a timely manner. Explanatory Statement at 4.2. In some instances, the Group could not recoup capital outlay and generate income from customers until after the completion of construction of LNG terminal infrastructure, storage facilities and power plants. *Id.* Moreover, most projects are completed in stages and are subject to risks of delay beyond the Group's control, including: (i) the need for specialized oil and gas regulatory permits and governmental authorizations, bespoke design and engineering solutions, environmental or geological problems related to location; (ii) shortages or delays in the delivery of equipment and supplies; (iii) failure

18

to meet technical specifications or adjustments being required based on testing or commissioning; (iv) weather interference; and (v) potential labor shortages, work stoppages or labor union disputes. *Id.* Further, where the Group successfully develops a project and/or executes on a customer contract, it faces the risk that customers may not fulfill their payment obligations. These risks are particularly pronounced in many of the non-U.S. jurisdictions in which the Group operates. *Id.* Due to these factors, the Group has experienced time delays and cost overruns in a number of its development and construction projects. *Id.*

31. The Group's liquidity position and ability to generate revenue from projects and customer contracts have been adversely impacted or delayed by:

(a) unanticipated delays in the permitting, construction or commencement of operations of the San Juan Terminal, La Paz Facility, Santa Catarina Terminal and the Puerto Sandino Facility;

(b) the development of a first-in-kind, offshore modular FLNG 1, which experienced permitting and construction delays, and equipment failures that ultimately delayed the commencement of commercial operations;

(c) a number of challenges in relation to the Group's Puerto Rico business, including, in 2023 the Group provided services to the U.S. Army Corps of Engineers to provide services in Puerto Rico in connection with the territory's grid stabilization project. The services were terminated in March 2024, following which the Group has been pursuing a request to the Federal Emergency Management Agency ("**FEMA**") for equitable adjustment to recover its unreimbursed costs and liabilities of approximately $659 million related to the early termination of services. By April 2026, the Group had received final settlement payments in connection with work undertaken for FEMA in an amount of $142 million in total (before payment of certain taxes and costs). This process has taken considerable time and not all costs could be recouped, which has impacted liquidity significantly;

(d) delays to certain scheduled power auctions in Brazil;

(e) fluctuations in natural gas feedstock, increases in the costs of construction materials, and swings in the shipping and freight markets, which have adversely impacted the Group's margins; and

(f) significant environmental activist opposition and governmental permitting denials, which have delayed the Group's proposed LNG terminal in Shannon, Ireland.

19

*See id.* at 4.3-4.3.6.

32.    These challenges delayed the commencement of revenue-generating operations for the affected projects and, collectively, had a material impact on the Group's liquidity. *Id.* at 4.4.

### B.    The 2024 Refinancing

33.    On November 6, 2024, the Group entered into an exchange and subscription agreement with certain holders of its outstanding 2026 Legacy Notes and 2029 Legacy Notes, which related to a series of transactions intended to extend the maturity profile of the Group's indebtedness and enhance liquidity.  *Id.* at 3.26.  Pursuant to this agreement, NFE Financing (i) sold approximately $1.21 billion in aggregate principal amount of New 2029 Notes and (ii) issued approximately $1.52 billion in aggregate principal amount of New 2029 Notes in a dollar-for-dollar exchange for a portion of the Group's 2026 Legacy Notes and 2029 Legacy Notes.  *See id.*  The collateral provided in connection with securing the New 2029 Notes consisted of NFE Financing's interest in (i) approximately 45% of the Group's Brazilian business; (ii) proceeds of NFE Financing's interest in the Series II Intercompany Loan Facility; (iii) the Brazilian Intercompany Loan Facility (which in turn is secured by the Brazilian Parent's approximately 55% equity interest in the Group's Brazil business and its interest in the proceeds of the Series I Intercompany Loan Facility); and (iv) the PA Land.  *See id.* at 1.1, 3.26.  The Group utilized proceeds from the subscription transactions to redeem in full the outstanding aggregate principal amount of such notes.  *See id.* at 1.1, 3.26.

### C.    The Restructuring Support Agreement

34.    In June and July 2025, the Group engaged restructuring professionals, including Skadden and Houlihan Lokey Capital, Inc., to explore possible restructuring transactions.  Boas Decl. at ¶ 21.  In late September and early October 2025, the Group's advisors presented the

20

Group's key creditor constituencies with the terms of a proposed restructuring that involved spinning off the Group's Brazilian business. *Id.* While restructuring negotiations were underway with creditors, the Group entered into temporary waivers and forbearances with certain of its creditors beginning in November 2025 with respect to ongoing events of default under the relevant debt documents. *Id.* These temporary waivers and forbearances provided the Group with a stable platform on which to negotiate with creditors on the terms of a restructuring that would provide a comprehensive solution to the Group's capital structure. *Id.*

35. On March 17, 2026, following lengthy and thorough consideration, consultation, and negotiation, the Parent, NFE Global, certain other members of the Group, and members of an ad hoc group of New 2029 Noteholders, certain TLA Lenders, members of an ad hoc group of TLB Lenders, members of an ad hoc group of RCF Lenders, and members of an ad hoc group of 2026 Legacy Noteholders and 2029 Legacy Noteholders (collectively, the "**RSA Parties**") entered into the RSA that sets forth the principal terms of a comprehensive restructuring of the Group's principal funded debt obligations. *Id.* at ¶ 22. The RSA has been acceded to by 100% of the RCF Lenders, 100% of the TLA Lenders, approximately 97% of the TLB Lenders, approximately 85% of the 2026 Legacy Noteholders, approximately 87% of the 2029 Legacy Noteholders, and approximately 99% of the New 2029 Noteholders. *Id.* NFE Brazil acceded to the RSA on April 9, 2026. Pursuant to the RSA, the RSA Parties have agreed to support the Restructuring Plans and forbear from exercising remedies while the RSA is in effect. *Id.*

III. **The Restructuring Plans**

36. The key terms of the Restructuring Plans are set forth in the table below:[10]

---

[10] The summary contained herein is provided for illustrative purposes only and is qualified in its entirety by reference to the full text of the Restructuring Plans. In the event of any inconsistency between this summary table and the Restructuring Plans, the Restructuring Plans or the relevant underlying implementation

*(cont'd)*

| Key Terms of the Restructuring Plans | |
|---|---|
| Overview | The Restructuring Plans will provide for the following:<br><br>• The Group will separate into two independent companies: (i) New BrazilCo Parent and its direct and indirect subsidiaries ("**BrazilCo Group**"), and (ii) NFE and its direct and indirect subsidiaries other than BrazilCo Group (collectively, "**CoreCo Group**").<br><br>• Obligations under the 2026 Legacy Notes, 2029 Legacy Notes, Term Loan A Agreement, Term Loan B Agreement, Revolving Credit Facility Agreement, New 2029 Notes, and Intercompany Credit Agreements will be exchanged (in each case on a ratable basis), as applicable, for BrazilCo Common Equity, New CoreCo Term Loans, CoreCo Preferred Stock, CoreCo Common Stock, the FLNG 2 Term Loans, and/or the FLNG 2 Preferred Equity.<br><br>• NFE, as borrower, and each other CoreCo Group entity, as a guarantor shall enter into a senior secured, first-priority term loan credit facility for CoreCo Group in accordance with the New CoreCo Credit Facility Term Sheet.  All letters of credit issued under the existing Letter of Credit Facility or Revolving Credit Facility will be backstopped, rolled into, or replaced by letters of credit issued under separate new fully committed letter of credit facilities for each of CoreCo Group and BrazilCo Group (or, in the case of CoreCo Group, remain outstanding under an amended, amended and restated, or otherwise modified Letter of Credit Facility Agreement).<br><br>• BrazilCo Group shall enter into one or more financing arrangements to provide liquidity for New BrazilCo on or prior to the Restructuring Effective Date.  Local Brazilian Debt Facilities shall, at the election of the Company Parties and with the consent of the majority of the ad hoc group of certain unaffiliated holders of New 2029 Notes represented by Paul Weiss, Rifkind, Wharton & Garrison LLP and Perella Weinberg Partners LP, be refinanced in full or remain outstanding on their existing terms (subject to the elimination of the NFE corporate guarantee and any other obligations tied to CoreCo).<br><br>• Existing NFE Stockholders shall retain shares of NFE's common |

---

*(cont'd from previous page)*

documentation will control in all respects.  Capitalized terms used in this table that are not otherwise defined shall have the meanings ascribed to such terms in the Explanatory Statement.

| Key Terms of the Restructuring Plans | |
|---|---|
| | stock representing 35 percent of the CoreCo Common Stock issued and outstanding as of the Restructuring Effective Date, immediately before giving effect to the CoreCo MIP or any conversion of the CoreCo Preferred Stock into CoreCo Common Stock. |
| Plan Consideration | Pursuant to the Restructuring Plans, the Plan Creditors will release their existing Plan Debt claims against the Group in return for Plan Consideration as set forth below. |

| Plan Debt | Plan Consideration |
|---|---|
| Legacy Notes | CoreCo Common Stock<br>CoreCo Preferred Stock |
| New 2029 Notes | BrazilCo Common Equity |
| Series I Intercompany Loan Facility[11] | CoreCo Common Stock<br>CoreCo Preferred Stock |
| Series II Intercompany Loan Facility | CoreCo Common Stock<br>CoreCo Preferred Stock |
| R-1 Revolving Credit Facility | CoreCo Common Stock<br>CoreCo Preferred Stock<br>New CoreCo Term Loans<br>FLNG 2 Term Loans<br>FLNG 2 Preferred Equity |
| R-2 Revolving Credit Facility | CoreCo Common Stock<br>CoreCo Preferred Stock<br>New CoreCo Term Loans<br>FLNG 2 Term Loans<br>FLNG 2 Preferred Equity<br>RCF-2 / TLA BrazilCo Equity Pool |

---

[11] By virtue of the Brazilian Intercompany Loan Facility, the proceeds of the Series I Intercompany Loan Facility would ultimately be payable to NFE Financing and, alongside proceeds of the Series II Intercompany Loan Facility, would form part of the Brazil Collateral.  For efficiency, Plan Consideration in respect of the Series I Intercompany Loan Facility and Series II Intercompany Loan Facility will be distributed directly to those Plan Creditors with recourse to the Brazil Collateral (in addition to any other Plan  Consideration received by such Plan Creditors).

| Key Terms of the Restructuring Plans | | |
| --- | --- | --- |
| | Term Loan A | CoreCo Common Stock<br>CoreCo Preferred Stock<br>New CoreCo Term Loans<br>FLNG 2 Term Loans<br>FLNG 2 Preferred Equity<br>RCF-2 / TLA BrazilCo Equity Pool |
| | Term Loan B | CoreCo Common Stock<br>CoreCo Preferred Stock<br>New CoreCo Term Loans<br>FLNG 2 Term Loans<br>FLNG 2 Preferred Equity |
| Certain Shareholder Approvals | The Company shall, in accordance with the Restructuring Milestones and the other provisions of the RSA, obtain the approval of holders of a majority of its existing common stock to, among such other matters as the Company and the Majority Supporting Creditors may determine advisable, (a) issue greater than 20% of its existing common stock, (b) amend its organizational documents to, among other things, authorize additional shares of common stock, (c) grant NFE's board of directors authority to effect a reverse stock split, and (d) approve the issuance of shares in respect of the CoreCo MIP, in each case, as required by applicable securities laws and exchange rules. | |
| Releases | The Restructuring Plans and the Transaction Implementation Deed provide for the Plan Releases. With effect on and from the Restructuring Effective Date, each "Plan Party" (defined as each of the Plan Companies, each Undertaking Party[12] and each Plan Creditor) irrevocably, unconditionally, fully and absolutely waives, releases and forever discharges (i) any and all actions, proceedings, claims, damages, counterclaims, complaints, liabilities, liens, rights, demands and set-offs against each Released Party, whether present or future, prospective or contingent, of whatsoever nature and howsoever arising, whether in law or in equity, in contract (including, but not limited to, breaches or non-performance of contract), in statute or in tort (including, but not limited to, negligence and misrepresentation) or in any other manner whatsoever, breaches of statutory duty, for contribution, or for interest and/or costs and/or disbursements, whether or not for a fixed or unliquidated amount, whether filed or unfiled, whether asserted or unasserted, whether or not presently known to the parties or to the law, in each case, that it ever had, may have or hereafter can, shall or may have, arising out of actions, omissions or circumstances on or prior to the Restructuring Effective Date against each and any Released Party (as defined below) whatsoever or | |

---

[12] "Undertaking Parties" include: the Parent, NFE Financing, FLNG 2 LLC, the Debtors, certain direct and indirect subsidiaries of the Parent, and certain trustees and agents of Plan Debt instruments.

| Key Terms of the Restructuring Plans |
|---|
| howsoever arising (and notwithstanding any subsequent facts or information becoming known following the Restructuring Effective Date), in relation to or arising directly or indirectly out of or in connection with (a) the negotiation, preparation, sanction or implementation of the Plans and/or the Restructuring or (b) the Plan Claims (including the negotiation, preparation, sanction, execution or implementation of any Implementation Documents); and (ii) all rights, title and interest it has in the Plan Claims, and all Liabilities owed by a Group Company to any Plan Party in relation to such Plan Claims.[13]<br><br>• Released parties (the "**Released Parties**" each individually a "**Released Party**") include: (a) each of the Plan Companies and each member of the Group, and their respective direct and indirect subsidiaries from time to time; (b) the Plan Creditors party to or bound by the Plans and each Nominee (as applicable); (c) each Undertaking Party; (d) the Released Advisors,[14] each Advisor Released Person,[15] and any person acting on the instructions of the foregoing in connection with the Plans or the Restructuring; (e) each Affiliate of the persons listed in (a)-(d) above; and (f) each of the respective officers, directors, employees, partners, executives and agents of the persons listed in (a)-(e) above.<br><br>• The Plan Releases are subject to customary carve-outs, including for: (i) the Excluded Liabilities (as defined below); (ii) rights arising under or in connection with the Implementation Documents; and (iii) claims which may arise or accrue in relation to acts, omissions or circumstances occurring after the Restructuring Effective Date.<br><br>• Excluded liabilities ("**Excluded Liabilities**") include liabilities: (i) arising from criminal acts, fraud, gross negligence or willful misconduct, as determined by a judgment issued by a court of |

---

[13]  "Implementation Documents" include: the Plan document(s); the Transaction Implementation Deed; the New CoreCo Credit Agreement; the FLNG 2 Term Loan Credit Facility Agreement; the CoreCo Intercreditor Agreement; the CoreCo Stockholders' Agreement; the BrazilCo Stockholders' / LLC Agreement; the FLNG 2 Parent LLCA; the Holding Period Trust Deed; and all other documents, agreements and instruments necessary or desirable to implement or consummate the Restructuring in accordance with the RSA, the Restructuring Plans and the Transaction Implementation Deed (each as defined in the Explanatory Statement).

[14]  "Released Advisors" include: Skadden; Daniel Bayfield KC, Ryan Perkins and Jon Colclough of South Square Chambers (as English counsel); Houlihan Lokey Capital, Inc. and Alvarez & Marsal Europe LLP, as financial Advisors to the Debtors and the Group; advisors to the various ad hoc groups of lenders and the various agents and trustees; and any local counsel of any of the foregoing.

[15]  "Advisor Released Person" means each of the current and former respective officers, directors, employees, executives, attorneys and agents (or equivalents) of each Released Advisor and each Affiliate of each Released Advisor.

| Key Terms of the Restructuring Plans |
| --- |

|  | competent jurisdiction; (ii) arising from a Released Advisor's duty of care to its client; (iii) of accounting, restructuring, or tax advisors subject to reliance letters; (iv) of outstanding professional advisor fees and costs properly incurred in connection with the Restructuring; (v) created by the Implementation Documents, the Restructuring Plans, or ancillary documents; (vi) indemnity or reimbursement obligations owed by lenders to their respective agents under the relevant facility agreements; (vii) in the case of a Group Company, liabilities of directors or Group Advisors arising from negligence, default, or breach of duty, or that would be available upon the insolvency of such Group Company; and (viii) of one Group Company to another Group Company that is expressly not released under the terms of the Separation Agreement or any other Implementation Document.<br><br>• Each Plan Party also undertakes not to commence or continue any proceedings against any Released Party in respect of the released claims.  Pursuant to the Restructuring Plans, NFE Global Holdings Limited shall, on behalf of itself and the CoreCo Plan Creditors, and NFE Brazil Newco Limited shall, on behalf of itself and the BrazilCo Plan Creditors, enter into the releases on the terms set out in the Transaction Implementation Deed. |

*Id.* at ¶ 23.

## IV.    The English Proceedings

37.    On March 24, 2026 and April 10, 2026, respectively, NFE Global and NFE Brazil each formally commenced the English Proceedings by filing a Part 8 claim form (a "**Part 8 Claim Form**") and listing note with the English Court, copies of which are attached to the Stephansen Declaration as Exhibit C.  Stephansen Decl. at ¶ 31.  Thereafter, on April 20, 2026, the Debtors issued the Practice Statement Letter (the "**Practice Statement Letter**") to Plan Creditors, with a copy sent to all Plan Creditors and also made available on the website maintained by Kroll as information agent for the Debtors (the "**Information Agent**"), a copy of which is attached to the Stephansen Declaration as Exhibit D.  *Id.*

26

38.     Among other things, the Practice Statement Letter notified the Plan Creditors of the Debtors' intention to propose the Restructuring Plans, the Debtors' intention to apply to the English Court for permission to convene the Plan Meetings for the purpose of voting on the Restructuring Plans, the proposed date of the convening hearing in respect of the Restructuring Plans (the "**Convening Hearing**") and the composition of the proposed classes of Plan Creditors. *Id.* As set out more fully in the Practice Statement Letter, after considering the rights of the various Plan Creditors in connection with Restructuring Plans, the Debtors concluded that it would be appropriate, in respect of the Restructuring Plan proposed by NFE Global, to convene six separate meetings of the relevant classes of Plan Creditors (related to the various collateral pools against which each group of Plan Creditors has rights and will receive Plan Consideration) and in respect of the Restructuring Plan proposed by NFE Brazil, one meeting of the relevant class of Plan Creditors. *Id.*

39.     On April 30, 2026, the Debtors filed their evidence (which was available to all Plan Creditors) ahead of the Convening Hearing. *Id.* at ¶ 32. On May 11, 2026, the Debtors filed the skeleton argument in connection with the Convening Hearing (the "**Skeleton Argument**"), which sets out the Debtors' arguments in favor of allowing the Plan Meetings to be convened. *Id.* A copy of the Skeleton Argument is attached to the Stephansen Declaration as Exhibit E.

40.     The Convening Hearing was held on May 14, 2026. *Id.* at ¶ 33. At the Convening Hearing, Mr. Justice Hildyard considered the proposed Restructuring Plans, as well as other issues, including questions of jurisdiction, creditor notice, composition of the creditor class, and any roadblocks to the sanctioning of the Restructuring Plans. *Id.*

41.     Two investors holding approximately 4% of the certain securities (the "**GLP Preferred Units**") issued by Golar LNG Partners LP ("**GLP**"), an indirect subsidiary of the Parent and an affiliate of the Debtors, appeared at the Convening Hearing. *Id.* at ¶ 35. As indicated in the Practice Statement Letter, the holders of GLP Preferred Units are not Plan Creditors. *Id.* The holders of GLP Preferred Units filed a skeleton argument and appeared at the Convening Hearing. *Id.* While the holders had previously threatened to object to the Restructuring Plan and make a disclosure application at the Convening Hearing (notwithstanding that they had refused at that point to identify themselves or their holdings), at the Convening Hearing they did not pursue either an objection or disclosure application. *Id.*

42.     On May 14, 2026, the English Court made the Convening Order, permitting the Debtors to convene seven Plan Meetings on June 15, 2026. *Id.* at ¶ 33. In accordance with the terms of the Convening Orders, the Debtors made available to all Plan Creditors a notice of the Plan Meetings and the Explanatory Statement on the Information Agent's website, and notices of the same were distributed to Plan Creditors. *Id.*

43.     Following the May 14th Convening Hearing, Skadden provided counsel to the holders of the GLP Preferred Units with copies of the Convening Hearing court documents and the Explanatory Statement. *Id.* at ¶ 37. Subsequently Skadden received another letter from the holders of the GLP Preferred Units noting concerns with respect to certain asset sales and dividends made by GLP and reserving their rights to challenge the Chapter 15 Cases on public policy grounds and with respect to the Plan Releases. *Id.* The holders of the GLP Preferred Units ultimately did not file an objection to the Restructuring Plans by the deadline to do so set out in the Convening Order. *Id.*

44.    The Sanction Hearing is currently scheduled for June 18, 2026. *Id.* at ¶ 37.  The Convening Order sets out a timetable for Plan Creditors to submit any challenges to be heard at the Sanction Hearing, with notice of any objections to be submitted on May 21, 2026 and skeleton arguments from the challengers due on May 28, 2026.  A copy of the Explanatory Statement is attached to the Stephansen Declaration as Exhibit F.  The Plan Meetings are scheduled to begin at 10 a.m. prevailing Eastern Time on June 15, 2026, in person in London, England (with remote access also available). *Id.*

45.    If the English Court approves the Restructuring Plans, issues a Sanction Order, and a sealed copy of the Sanction Order is delivered to the Registrar of Companies of England and Wales, the Restructuring Plans will become effective and binding as a matter of English law on all Plan Creditors. *Id.* at ¶ 40.  While the Restructuring Plans will become effective at this time, in accordance with the terms of the Restructuring Plans, the Restructuring will not be implemented unless and until all conditions precedent have been satisfied. *Id.*

## V.    The Chapter 15 Cases

46.    Recognition of the English Proceedings in these Chapter 15 Cases is a condition precedent to the effectiveness of the Restructuring, and failure to obtain an order approving recognition is a termination event under the RSA.  RSA §§ 10(o), 11(j)(13) (requiring that "an order approving the recognition of the Sanction Orders shall have been made in the Chapter 15 Proceedings" on or before the date falling forty-five days after entry of the Sanction Orders).

47.    On April 17, 2026, the board of directors of each of the Debtors adopted resolutions appointing Christopher Boas as the Foreign Representative.  Boas Decl. at ¶ 2.  On May 14, 2026, pursuant to the Convening Order, the Foreign Representative was recognized as such by the English Court. *Id*.  On May 18, 2026, the board of directors of each Debtor authorized the Foreign Representative to file the Chapter 15 Petitions, Verified Petition, and

attendant motions seeking recognition and enforcement of the English Proceedings for the Debtors. *Id.* Copies of the resolutions of the boards of directors of the Debtors appointing the Foreign Representative and authorizing him to file the Chapter 15 Petitions, Verified Petition, and attendant motions are attached to the Chapter 15 Petitions as Exhibit B. *Id.*

**BASIS FOR RELIEF REQUESTED AND APPLICABLE AUTHORITY**

48. Chapter 15 of the Bankruptcy Code is designed to, among other things, promote cooperation and comity between courts in the United States and foreign courts, to protect and maximize the value of a debtor's assets, and to facilitate the rehabilitation and reorganization do businesses. *See* 11 U.S.C. § 1501. The relief afforded to a foreign debtor under chapter 15 is intended to avoid disruptions that could otherwise derail a debtor's restructuring in a foreign proceeding.

49. Consistent with these principles, the Foreign Representative commenced these Chapter 15 Cases to obtain recognition of the English Proceedings and to give full force and effect to the Sanction Order and the Restructuring Plans, including the Plan Releases. As set forth below, the Foreign Representative has satisfied the requirements for recognition of the English Proceedings and enforcement of the Restructuring Plans and the Sanction Order.

**I.     The Debtors Meet the General Eligibility Requirements of Section 109(a) of the Bankruptcy Code**

50. To be eligible for chapter 15 relief, the Debtors must meet the general eligibility requirements under section 109(a) of the Bankruptcy Code. *See Drawbridge Special Opportunities Fund LP v. Barnet* (*In re Barnet*), 737 F.3d 238, 251 (2d Cir. 2013) (finding that section 109(a) of the Bankruptcy Code applies to the debtor in a foreign main proceeding under Chapter 15 of the Bankruptcy Code); *but see In re Bemarmara Consulting A.S.*, Case No. 13-13037-KG (Bankr. D. Del. Dec. 17, 2013) (holding that section 109 property requirements do

30

not apply to chapter 15 debtors); *In re MMX Sudeste Mineração S.A.*, Case No. 17-16113-RAM, Docket No. 9 (Bankr. S.D. Fla. June 12, 2017), *appeal dismissed sub nom*; *Batista v. Alvarenga Mendes* (I*n re MMX Sudeste Mineração S.A.*), Case No. 17-24038-RNS (S.D. Fla. Apr. 2, 2018) (same). As demonstrated below, the Debtors meet all eligibility requirements in the Southern District of New York and the relief sought herein is appropriate under chapter 15.

51. Section 109(a) of the Bankruptcy Code provides that "[n]otwithstanding any other provision of this section, only a person that resides or has a domicile, a place of business, or property in the United States, or a municipality, may be a debtor under this title." 11 U.S.C. § 109(a). Thus, under section 109(a), a foreign debtor must reside, have a domicile, or place of business, or property in the United States to be eligible to file a chapter 15 petition. *See In re Barnet*, 737 F.3d at 250.

52. Section 109(a) of the Bankruptcy Code does not require a specific quantum of property in the United States, nor does it indicate when or for how long such property must have a U.S. situs. *See, e.g.*, *In re Berau Cap. Res. Pte Ltd.*, 540 B.R. 80, 82 (Bankr. S.D.N.Y. 2015). Decisions applying section 109(a) of the Bankruptcy Code to foreign debtors under other chapters of the Bankruptcy Code hold a nominal amount of property in the United States suffices to satisfy the section 109 requirement. *See, e.g.*, *GMAM Inv. Funds Tr. I v. Globo Comunicacoes e Participacoes S.A.* (*In re Globo Comunicacoes e Participacoes S.A.*), 317 B.R. 235, 249 (S.D.N.Y. 2004) ("For a foreign corporation to qualify as a debtor under Section 109, courts have required only nominal amounts of property to be located in the United States, and have noted that there is 'virtually no formal barrier' to having federal courts adjudicate foreign debtors' bankruptcy proceedings." (quoting *In re Aerovias Nacionales de Colom. S.A.* (*In re Avianca*), 303 B.R. 1, 9 (Bankr. S.D.N.Y. 2003))); *In re Paper I Partners, L.P.*, 283 B.R. 661,

31

674 (Bankr. S.D.N.Y. 2002) ("[T]here is no statutory requirement as to the property's minimum value."). Effectively, if a debtor has any property in the United States, section 109(a) is satisfied.

53.     For example, attorney retainers deposited in New York satisfy the "property in the United States" eligibility requirement of section 109(a) of the Bankruptcy Code. *See, e.g.*, *In re Olinda Star Ltd.*, 614 B.R. 28, 39–40 (Bankr. S.D.N.Y. 2020) (holding that a small retainer in the United States satisfies eligibility requirements under section 109(a)); *In re Avanti Commc'ns Grp. PLC*, 582 B.R. 603, 612 (Bankr. S.D.N.Y. 2018) (holding that a retainer in United States and rights under a United States law-governed note satisfy section 109(a)); *In re Cell C Proprietary Ltd.*, 571 B.R. 542, 551 (Bankr. S.D.N.Y. 2017) (concluding that a retainer in the United States satisfies section 109(a)); *In re Ocean Rig UDW Inc.*, 570 B.R. 687, 700 (Bankr. S.D.N.Y. 2017) (citing a retainer held by New York counsel in a New York account as a factor satisfying section 109(a) of the Bankruptcy Code), *appeal dismissed*, 585 B.R. 31 (S.D.N.Y. 2018), *aff'd*, 764 F. App'x 46 (2d Cir. 2019); *In re U.S. Steel Can. Inc.*, 571 B.R. 600, 611 (Bankr. S.D.N.Y. 2017) (granting recognition of a case where the foreign representative had cited the presence of a retainer in New York); *In re Octaviar Admin. Pty Ltd.*, 511 B.R. 361, 373–74 (Bankr. S.D.N.Y. 2014) (finding that the debtor "had property in the United States in the form of a retainer . . . that is sufficient to satisfy the requirements of section 109(a) of the Bankruptcy Code").

54.     Moreover, a debtor's contract rights, including rights pursuant to debt that is governed by New York law and contains a New York forum selection clause, constitute property of the debtor in New York for purposes of section 109(a) of the Bankruptcy Code. *See, e.g.*, *In re Olinda Star Ltd.*, 614 B.R. at 40 (holding that foreign debtor was a "debtor" for purposes of section 109(a) of the Bankruptcy Code because of intangible contract rights under a New York law-governed indenture); *In re Serviços de Petróleo Constellation S.A.*, 600 B.R. 237, 269

(Bankr. S.D.N.Y. 2019) (holding that contract rights, including rights under debt documents containing New York governing-law and forum-selection clauses, constitute intangible property in New York for purposes of section 109(a)); *In re Avanti Commc'ns Grp. PLC*, 582 B.R. at 612–13 (holding that debt documents governed by New York law and containing New York forum selection clauses satisfied the eligibility requirement under section 109(a)); *In re Suntech Power Holdings Co.*, 520 B.R. 399, 412–13 (Bankr. S.D.N.Y. 2014) (holding that a New York bank account opened before commencement of the chapter 15 proceeding satisfied section 109(a)).

55.   Here, the Debtors satisfy the eligibility requirement of section 109(a) because they have property in the United States.  The Debtors have an interest in certain funds deposited with Skadden as a retainer for its services, which funds are held in a client trust account in New York.  *Id.*  Furthermore, the Debtors are obligors on U.S. dollar denominated debt, which is governed by New York law and contains New York law forum selection clauses.  *Id.*  The retainer and the New York law-governed indebtedness are independent bases for jurisdiction and satisfy the "property" requirement of section 109(a) of the Bankruptcy Code.  *See In re Cell C Proprietary Ltd.*, 571 B.R. at 551.  Accordingly, the Debtors meet the general eligibility requirements of section 109(a) of the Bankruptcy Code.

## II.   The Requirements of Section 1517(a) of the Bankruptcy Code Are Satisfied

56.   Section 1517(a) of the Bankruptcy Code provides that, subject to the public policy exception contained in section 1506, an order recognizing a foreign proceeding shall be entered if (1) such foreign proceeding "is a foreign main proceeding or a foreign nonmain proceeding within the meaning of section 1502; (2) the foreign representative applying for recognition is a person or body; and (3) the [person] meets the requirements of section 1515." *See* 11 U.S.C. § 1517(a).  Recognition is mandatory if all three requirements of section 1517(a) are met. *See In*

33

*re Millard*, 501 B.R. 644, 653–54 (Bankr. S.D.N.Y. 2013). Here, as set forth below, each of the

requirements of section 1517(a) is met. Therefore, the English Proceedings must be recognized

as foreign main proceedings.

A. **The English Proceedings are Foreign Main Proceedings or, in the Alternative, Foreign Nonmain Proceedings, Within the Meaning of Section 1502 of the Bankruptcy Code**

57. The English Proceedings are foreign main proceedings or, in the alternative,

foreign nonmain proceedings, for the Debtors. As such, the English Proceedings satisfy the first

condition for entry of a recognition order under section 1517(a) of the Bankruptcy Code.

58. The English Proceedings satisfy the definition of a "foreign proceeding." *See*

11 U.S.C. § 101(23). Specifically, section 101(23) of the Bankruptcy Code defines a "foreign

proceeding" as:

> a collective judicial or administrative proceeding in a foreign country, including
> an interim proceeding, under a law relating to insolvency or adjustment of debt in
> which proceeding the assets and affairs of the debtor are subject to control or
> supervision by a foreign court, for the purpose of reorganization or liquidation.

*See id.* A "foreign court" is defined as "a judicial or other authority competent to control or

supervise a foreign proceeding." 11 U.S.C. § 1502(3).

59. Courts have held that a foreign proceeding is one in which "acts and formalities

[are] set down in law so that courts, merchants and creditors can know them in advance, and

apply them evenly in practice." *In re Betcorp Ltd.*, 400 B.R. 266, 278 (Bankr. D. Nev. 2009); *cf.*

*In re Carmona*, 580 B.R. 690, 708–09 (Bankr. S.D. Tex. 2018) (holding that a foreign

proceeding must be conducted under a foreign judicial system that is "fundamentally fair" and

"not offend against basic fairness" (quoting *Soc'y of Lloyd's v. Turner*, 303 F.3d 325, 330 (5th

Cir. 2002))); *see also In re Xacur*, 216 B.R. 187, 195 (Bankr. S.D. Tex. 1997) ("A foreign

proceeding under the Bankruptcy Code is a 'proceeding . . . for the purpose of liquidating an

34

estate, adjusting debts by composition, extension, or discharge, or effecting a reorganization."

(quoting 11 U.S.C. § 101(23))).   In determining whether a specific proceeding is a "foreign

proceeding" under section 101(23) of the Bankruptcy Code, courts look to the following criteria:

> (i) [the existence of] a proceeding; (ii) that is either judicial or administrative; (iii) that is collective in nature; (iv) that is in a foreign country; (v) that is authorized or conducted under a law related to insolvency or the adjustment of debts; (vi) in which the debtor's assets and affairs are subject to the control or supervision of a foreign court; and (vii) which proceeding is for the purpose of reorganization and or liquidation.

*In re Betcorp Ltd.*, 400 B.R. at 277.

60.     Courts considering chapter 15 petitions have regularly found that proceedings

commenced pursuant to Part 26 and Part 26A of the Companies Act are foreign proceedings.[16]

For the reasons set forth below, the English Proceedings are "foreign proceedings" that satisfy

the requirements of section 101(23).

### 1.   The English Proceedings Are "Proceedings"

61.     The hallmark of a "proceeding" within the meaning of section 101(23) of the

Bankruptcy Code is a "statutory framework that constrains a company's actions and that

regulates the final distribution of a company's assets" and includes "acts and formalities set

---

[16]     *See e.g., In re Fossil (UK) Glob. Servs. Ltd*, No. 25-90525 (Bankr. S.D. Tex. Nov. 12, 2025); *In re Mega Newco Ltd.*, No. 24-12031 (Bankr. S.D.N.Y. Nov. 25, 2024); *In re CB&I UK Ltd.*, No. 23-90795 (Bankr. S.D. Tex. Mar. 22, 2024); *In re DTEK Fin. PLC*, No. 21-10735 (Bankr. S.D.N.Y. May 20, 2021); *In re Swissport Fuelling Ltd.*, No. 20-12990 (Bankr. D. Del. Dec. 11, 2020); *In re New Look Fin. plc*, No. 20-12297 (Bankr. S.D.N.Y. Oct. 29, 2020); *In re PizzaExpress Fin. 2 PLC*, No. 20-34868 (Bankr. S.D. Tex. Oct. 4, 2020); *In re Codere Fin. 2 (UK) Ltd.*, No. 20-12151 (Bankr. S.D.N.Y. Oct. 9, 2020); *In re Virgin Atl. Airways Ltd.*, No. 20-11804 (Bankr. S.D.N.Y. Sept. 3, 2020); *In re Matalan Fin. PLC*, No. 20-11749 (Bankr. S.D.N.Y. Sept. 2, 2020); *In re Swissport Fuelling Ltd.*, No. 20-11524, Doc. No. 37 (Bankr. D. Del. July 6, 2020); *In re Lecta Paper UK Ltd.*, No. 19-13990 (Bankr. S.D.N.Y. Feb. 4, 2020); *In re New Look Secured Issuer plc*, No. 19-11005 (Bankr. S.D.N.Y. May 3, 2019); *In re Stripes US Holding, Inc.*, No. 18-12388 (Bankr. D. Del. Nov. 13, 2018); *In re Lehman Bros. Int'l (Eur.) (in administration)*, No. 18-11470 (Bankr. S.D.N.Y. June 19, 2018); *In re Bibby Offshore Servs. PLC*, No. 17-13588 (Bankr. S.D.N.Y. Jan. 18, 2018); *In re YH Ltd.*, No. 16-12262 (Bankr. S.D.N.Y. Sept. 8, 2016); *In re Codere Fin. (U.K.) Ltd.*, No. 15-13017 (Bankr. S.D.N.Y. Dec. 22, 2015); *In re Towergate Fin. plc*, No. 15-10509 (Bankr. S.D.N.Y. Mar. 27, 2015); *In re Zlomrex Int'l Fin. S.A.*, No. 13-14138 (Bankr. S.D.N.Y. Jan. 31, 2014); *In re Allianz Glob. Corp. & Specialty (Fr.)*, No. 10-14990 (Bankr. S.D.N.Y. Nov. 4, 2011); *In re Tokio Marine Eur. Ins. Ltd.*, No. 11-13420 (Bankr. S.D.N.Y. Sept. 8, 2011).

down in law so that courts, merchants and creditors can know them in advance, and apply them evenly in practice." *In re Betcorp Ltd.*, 400 B.R. at 277–78.

62.     The Debtors commenced the English Proceedings pursuant to Part 26A of the Companies Act, a restructuring procedure that became law in the UK by the Corporate Insolvency and Governance Act 2020.  *See* Stephansen Decl. at ¶ 10.  Part 26A allows companies to restructure their financial obligations through a "restructuring plan," which permits companies to impose a compromise or arrangement (including a restructuring of liabilities) agreed with a statutory majority of creditors or members (or any class of creditors or members) upon each and every creditor or member of the relevant class(es) subject to the restructuring plan, provided certain conditions are met.  *Id.*  The restructuring plan is largely based on the well-known "scheme of arrangement" procedure under Part 26 of the Companies Act with the main difference being that, for a scheme of arrangement, each and every class of creditors or members that is subject to the scheme must approve it by the applicable statutory majority, whereas a restructuring plan can bind dissenting classes in a manner analogous to "cramdown" under chapter 11 of the Bankruptcy Code.  *See id.* at ¶¶ 10-11.[17]  Importantly, though sanction of the Restructuring Plans is possible even if there are one or more dissenting classes from the voting at the plan meeting(s) via cross-class cramdown, due to the overwhelming levels of creditor support the Debtors are not proposing to cram down any classes of creditors, and, given the consensual nature of the English Proceedings, the same Restructuring could be implemented under a scheme of arrangement pursuant to Part 26 of the Companies Act.  *See id.* at ¶ 25.  Because the English Proceedings operate under the same statutory framework repeatedly recognized and afforded

---

[17]    This is permitted where the English court is satisfied that dissenting creditors would be no worse off than in the relevant alternative to the restructuring plan and that at least one class of creditors that would receive a payment or retain a genuine economic interest in the company in the relevant alternative has voted to approve the restructuring plan by the applicable consent threshold.  *See* Stephansen Decl. at ¶¶ 10-11.

comity by this Court and other United States bankruptcy courts, the English Proceedings satisfy the first factor of section 101(23) of the Bankruptcy Code.

### 2. The English Proceedings Are Judicial

63. The English Proceedings are judicial in character because there has been, and will continue to be, judicial involvement and supervision in the process. *See In re Bd. of Dir. of Hopewell Int'l Ins. Ltd.*, 238 B.R. 25, 52 (Bankr. S.D.N.Y. 1999) (finding a foreign scheme of arrangement to be judicial in character due to "significant judicial involvement in [the] scheme process[es]," based on mandatory court appearances for the convening hearing and the sanction hearing, and sufficient opportunities for creditors to object prior to sanction of the scheme), *aff'd*, 275 B.R. 699 (S.D.N.Y. 2002).

64. Here, the English Court entered the Convening Order on May 14, 2026, following which the Plan Meetings will be convened, and, under section 901F of the Companies Act, the Restructuring Plans must ultimately be sanctioned by the English Court to become effective. *See* Stephansen Decl. at ¶¶ 26, 33. The English Court, as a judicial body of England and Wales, oversees the English Proceedings and exercises its statutory functions at both the convening and sanction stages, including determining issues relating to jurisdiction, compliance with the requirements of Part 26A, class composition, the adequacy of the explanatory statement, and, at the Sanction Hearing, whether the statutory conditions for approval are satisfied and whether it is appropriate to exercise its discretion to sanction the Restructuring Plans. *See id.* at ¶¶ 10–28. Thus, due to the English Court's involvement and supervisory role in overseeing the English Proceedings, the English Proceedings are judicial in character.

### 3. The English Proceedings Are Collective in Nature

65. "A proceeding is collective if it considers the rights and obligations of all creditors." *In re ABC Learning Ctrs. Ltd.*, 445 B.R. 318, 328 (Bankr. D. Del. 2010) (citing *In re*

*Betcorp Ltd.*, 400 B.R. at 281), *aff'd*, 728 F.3d 301 (3d Cir. 2013). "The 'collective proceeding' requirement is intended to limit access to chapter 15 to proceedings that benefit creditors generally and to exclude proceedings that are for the benefit of a single creditor." 8 Collier on Bankruptcy ¶ 1501.03 (16th ed. 2024). Courts in the United States have held foreign proceedings to be collective in nature where all affected creditors had a right to object to the proposed restructuring and where the court was involved in approving the transactions contemplated by the foreign proceedings. *See In re Avanti Commc'ns Grp. PLC*, 582 B.R. at 613; *see also In re Poymanov*, 571 B.R. 24, 33 (Bankr. S.D.N.Y. 2017) ("A proceeding is collective if it considers the rights and obligations of all of a debtor's creditors, rather than a single creditor.").

66.    Here, the English Proceedings are "collective" in nature as all Plan Creditors subject to the English Proceedings were afforded proper notice through the circulation of the Practice Statement Letter and an opportunity to object to the Restructuring Plans and be heard. Stephansen Decl. at ¶¶ 30-31. At the Convening Hearing, the English Court considered the composition of creditors entitled to vote on the Restructuring Plans. *See id.* at ¶ 33. When the English Court later considers whether to enter the Sanction Order, the English Court will consider whether the Plan Creditors were fairly represented by those present and voting at the Plan Meetings. *See id.* at ¶ 27. Additionally, the English Court will only consider sanctioning the Restructuring Plans if they are approved by a number of voting class creditors representing at least 75 percent in value of the claims present and voting at the Plan Meetings in respect of each Restructuring Plan (as no cram-down is contemplated in respect of the Restructuring Plans).[18]

---

[18]    Or, although unnecessary here given overwhelming creditor support for the Restructuring Plans, via cross-class cram down if the English court is satisfied that dissenting creditors would be no worse off than in the relevant alternative to the restructuring plan and that at least one class of creditors that would receive a payment or retain

*(cont'd)*

*Id.* at ¶¶ 22-23.   After becoming effective, the Restructuring Plans will bind all Plan Creditors.

*Id.* at ¶ 40.   Accordingly, the English Proceedings are collective in nature because they take into

account the rights of all Plan Creditors.

### 4.   The English Proceedings Are Located in a Foreign Country

67.   The English Proceedings are located in England and are being prosecuted before

the English Court in England, a foreign country.   Boas Decl. at ¶ 29; Stephansen Decl. at ¶ 3.

### 5.   The English Proceedings Relate to Adjustment of Debts

68.   The English Proceedings are being conducted pursuant to laws relating to

insolvency or the adjustment of debts.   Part 26A of the Companies Act sets forth the process for

proposing and obtaining court approval of a plan that restructures a debtor's obligations in

exchange for treatment provided under the plan.   *See* Stephansen Decl. at ¶¶ 10-29.   Proceedings

conducted pursuant to Part 26A include classic elements of debt adjustment laws, such as:

(i) enabling creditors of a company to form classes for the purpose of voting on the restructuring

plan if those creditors' rights against the company, both before and after the compromise or

arrangement in the proposed restructuring plan is implemented, are not so dissimilar as to make

it impossible for them to consult together in relation to the proposed compromise or arrangement

with a view to their common interest; and (ii) giving creditors notice of, and the opportunity to

voice concerns regarding the debtor's proposed adjustment of debts, including the composition

of the proposed class(es).   *Id.*

---

*(cont'd from previous page)*

    a genuine economic interest in the company in the relevant alternative has voted to approve the restructuring
    plan by the applicable supermajority threshold.   *See* Stephansen Decl. at ¶ 23.

39

**6. The English Proceedings Subject the Debtors to Supervision of Foreign Court**

69.     The Debtors' affairs relating to the restructuring of their liabilities are subject to the supervision of the English Court during the pendency of the English Proceedings. *See id.* As discussed above, the restructuring of the Debtors' liabilities is subject to the English Court entering the Sanction Order and approving the Restructuring Plans. Thus, the English Court has supervision over the Debtors' affairs affected by the English Proceedings.

**7. The English Proceedings Are Intended to Facilitate the Debtors' Reorganization**

70.     The English Proceedings are intended to protect the Debtors so that they may, following sanction of the Restructuring Plans by the English Court, address their liquidity and operational challenges, while providing runway for the Group's portfolio of development projects and opportunities that are expected to generate significant revenue and liquidity in the future. *See* Boas Decl. at ¶ 29; *see also Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1070 (2d Cir. 1983) ("[T]he purpose of a business reorganization is to restructure a business' finances to enable it to operate productively, provide jobs for its employees, pay its creditors and produce a return for its stockholders.").

**8. The English Proceedings Are "Foreign Main Proceedings"**

**a.     COMI**

71.     The English Proceedings are "foreign main proceedings" as defined in section 1502(4) of the Bankruptcy Code. A "foreign main proceeding" is "a foreign proceeding pending in the country where the debtor has the center of its main interests[.]" 11 U.S.C. § 1502(4); *see also id.* § 1517(b)(1) (providing that an order of recognition as a foreign main proceeding will be entered if the foreign proceeding "is pending in the country where the debtor has the center of its main interests"); *see also, e.g., In re Mega Newco Ltd.*, No. 24-12031

40

(MEW), 2025 WL 601463, at *2–3 (Bankr. S.D.N.Y. Feb. 24, 2025) (recognizing an English scheme proceeding as a "foreign main proceeding" where the debtor subsidiary was incorporated in England shortly before commencing the chapter 15 case, and its parent had no registered office, business operations, or facilities in the UK (citation omitted)); *In re Suntech Power Holdings Co.*, 520 B.R. at 416–17 (overruling objection and holding that COMI of Cayman Islands exempted company was in the Cayman Islands even though COMI had been transferred to the Cayman Islands only months prior to the commencement of the schemes).

### b.      Registered Office in England

72.      The Debtors' registered office is located in England, creating a presumption that England is the COMI of the Debtors. *See* 11 U.S.C. § 1516(c) ("In the absence of evidence to the contrary, the debtor's registered office . . . is presumed to be the center of the debtor's main interests."); Boas Decl. at ¶ 31; *see also In re Gerova Fin. Grp., Ltd.*, 482 B.R. 86, 91 (Bankr. S.D.N.Y. 2012).

73.      Where, as here, the debtor is entitled to the registered office presumption, courts have consistently found COMI in the jurisdiction of the debtor's registered office. *See, e.g., In re Mega Newco Ltd.*, 2025 WL 601463, at *3–4 (finding COMI in the location of the debtor's registered office where the debtor was a newly formed English company created specifically to enable a restructuring of its parent's U.S. note obligations through a UK scheme of arrangement in part because the process was carried out with the involvement and consent of the affected creditors); *In re Fossil (UK) Glob. Servs. Ltd*, Case No. 25-90525 (CML) (Bankr. S.D. Tex. Nov. 12, 2025) (finding COMI in the location of the debtor's registered office where the debtor was a non-operating subsidiary guarantor with no independent business operations, and management of the broader company group was conducted from the group's headquarters in the United States). Courts have departed from the registered office presumption only in unusual

41

cases, for example where the court has found evidence of bad faith manipulation and competing creditor-initiated proceedings, or a general absence of ties to the registered jurisdiction.[19] No such distinguishing facts are present here.

### c.     Organized Under the Laws of England and Wales, Location of Administrative Documents and Corporate Records

74.     As set forth above, the Debtors are private companies limited by shares incorporated under the laws of England and Wales.  Further, NFE Global was incorporated under the laws of England and Wales on October 14, 2021, and thus existed for years prior to, and was not formed as part of, or for the purpose of effectuating, the Restructuring. *See* Boas Decl. at ¶¶ 7, 31.  Additionally, the Debtors' books and records are maintained in England, each Debtor maintains bank accounts in England, a UK company (Vistra Cosec Limited) serves as the corporate secretary for both Debtors, and Christopher Boas, the Foreign Representative and an English citizen and resident in England, serves as a director of both Debtors (and does not serve as a director of any other Group entity).  *Id.* at ¶¶ 31, 41.

### d.     Restructuring Activities Centralized in England

75.     COMI should be determined based on the debtor's activities "at or around the time the Chapter 15 petition is filed."  *See In re Fairfield Sentry Ltd.*, 714 F.3d at 137.  The restructuring or liquidation activities of the chapter 15 debtor up to the date of the chapter 15 filing are properly considered in determining its COMI.  *See id.* at 132-139 (considering the

---

[19]   *See In re OAS S.A.*, 533 B.R. 83, 101 (Bankr. S.D.N.Y. 2015) (granting foreign main recognition and finding COMI outside the jurisdiction of the debtor's registered office, where the debtor asserted its COMI was in a different jurisdiction); *In re Oi Brasil Holdings Coöperatief U.A.*, 578 B.R. 169 (Bankr. S.D.N.Y. 2017) (applying a nerve center analysis to find COMI outside the registered office jurisdiction where the debtor was not seeking a determination that its COMI was in its jurisdiction of incorporation and creditors had initiated competing insolvency proceedings that were intended to derail previously recognized proceedings); *In re InterCement Brasil S.A.*, 668 B.R. 802, 818–24 (Bankr. S.D.N.Y. 2025) (finding COMI outside the registered office jurisdiction where the debtors asserted their COMI was in the jurisdiction of their pre-petition restructuring activities, not the jurisdiction of their registered office).

activities of the pre-filing liquidating committee in winding down the debtor's operations, as well as the actions of liquidators appointed under British Virgin Islands law in determining the entity's COMI). The following factors indicate that the Debtors' restructuring activities are centralized in England as of the date hereof:

(a)      commencement of the English Proceedings in England and the English Court's (i) holding of the Convening Hearing, (ii) entry of the Convening Order, (iii) scheduling of the Sanction Hearing, and (iv) exclusive jurisdiction to hear and determine any proceeding and to settle any dispute in connection with the Restructuring Plans;

(b)      activities of the Debtors' restructuring professionals, including the Debtors' English counsel (Skadden U.K. and their barrister team), which have been ongoing for nearly one year, and who on behalf of the Debtors: (i) have circulated the Practice Statement Letter, (ii) have filed the Explanatory Statement with the English Court, (iii) have prepared for and appeared at the Convening Hearing before the English Court, and (iv) will appear at the Sanction Hearing before the English Court.

(c)      engagement of Kroll Issuer Services Limited, a UK-based information agent located in London, to serve as the Information Agent for the English Proceedings,[20] which will involve facilitating communications with Plan Creditors, distributing restructuring-related documentation, and fielding queries from Plan Creditors;

(d)      appointment of the Foreign Representative, who is a resident of England, as a director on the boards of each Debtor, and the Foreign Representative's involvement in the aspects of the English Proceedings that are governed under and in accordance with the laws of England and Wales, including, pursuant to the Convening Order, serving as chairman of the Plan Meetings, which will be held as hybrid physical and virtual meetings, with the physical meetings being held at the Skadden offices in London; and

(e)      several key agreements entered into in connection with the Group's reorganization are governed by English law, including the RSA (with respect to matters arising in connection with the Restructuring Plans) and other documents necessary to effectuate the transactions contemplated by the RSA and the Restructuring Plans.

*See* Stephansen Decl. at ¶¶ 30-35; Boas Decl. at ¶¶ 35-39.

---

[20]   Kroll Restructuring Administration LLC has been engaged as noticing agent for service of documents in the Chapter 15 Cases.

### e.   Support and Expectations of the Plan Creditors

76.   Courts have relied upon high levels of supporting creditors in finding COMI in a debtor's intended jurisdiction, including where other factors might otherwise militate against such a finding. *See In re Mod. Land*, 641 B.R. at 789–90 (finding COMI in the Cayman Islands despite debtor having no employees or physical presence there, where approximately 99% of Scheme Creditors "voted in favor of the Scheme"). Conversely, the absence of creditor support, or the presence of creditor opposition, has been a significant factor weighing against recognition of a debtor's proposed COMI. *See, e.g.*, *In re Oi Brasil Holdings Coöperatief U.A.*, 578 B.R. at 210 (declining to recognize a creditor-initiated competing Dutch proceeding as a foreign main proceeding or modify prior recognition of the Brazilian proceeding where creditors sought to shift COMI from Brazil to the Netherlands). On this factor, "[b]ecause their money is ultimately at stake, one generally should defer . . . to the creditors' acquiescence in or support of a proposed COMI." *In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006), *aff'd sub nom.*, *Krys v. Off. Comm. of Unsecured Creditors of Refco Inc. (In re SPhinX Ltd.)*, 371 B.R. 10 (S.D.N.Y. 2007). Indeed, "when a court considers COMI factors, the protection of the creditors' interests is paramount." *In re Mod. Land (China) Co.*, 641 B.R. 768, 788-89 (Bankr. S.D.N.Y. 2022) ("Given the proclivity of Courts in the Second Circuit to consider creditor expectations when making a COMI determination, therefore, this factor supports a finding of the Cayman Islands being the Debtor's COMI."). Here, the Restructuring is highly consensual, with over 97% of creditors having actively consented to the English Proceedings by signing the RSA, and no creditor has challenged the Debtors' COMI in England. *See* Boas Decl. at ¶ 32. This level of support weighs heavily in favor of a finding of COMI in England. *See In re Mega Newco Ltd.*, 2025 WL 601463, at *4 ("It would be absurd for me to thwart the creditors' constructive desires and expectations in the guise of supposedly protecting them.").

77.     Furthermore, as part of their COMI analysis, courts have examined whether there exists objective evidence that would have provided creditors with notice that a debtor's COMI is in a particular jurisdiction. *See In re Fossil (UK) Glob. Servs. Ltd*, Case No. 25-90525 (CML) (Bankr. S.D. Tex. Nov. 12, 2025) (finding COMI in England where, prior to commencement of the chapter 15 case, the foreign debtor acceded as a guarantor through a supplemental indenture, a consent solicitation was launched, and the company group published notices of the UK proceeding); *Morning Mist Holdings Ltd. v. Krys* (*In re Fairfield Sentry Ltd.*), 714 F.3d 127, 136–39 (2d Cir. 2013).

78.     Such evidence exists here.  The RSA indicates a UK address for the Debtors, and upon execution of the RSA on March 17, 2026, creditors were provided with NFE Global's UK contact details for all restructuring-related communications.  Boas Decl. at ¶¶ 33-34.  Creditors under all major debt instruments were also sent notices of NFE Global's address, on March 25, 2026, directing all future communications to NFE Global's UK address, and, on April 9, 2026, the NFE Brazil Plan Creditors were sent notices directing all future communications to NFE Brazil's UK address.  *Id.*  Additionally, the Parent filed an 8-K and press release on March 17, 2026, announcing the RSA and its intention to implement the restructuring in England through restructuring plans and to seek recognition under chapter 15, and issued a further press release on April 1, 2026, announcing the results of a consent solicitation with respect to amendments to the indenture governing the New 2029 Notes.  *Id.*  On May 18, 2026 the Parent also filed a press release announcing the date of the plan creditor meetings and that the meetings would be held in London, England at the offices of Skadden, and that creditors could attend in person or virtually through an online meeting room.  *Id.*  Thus, the RSA and related documents made clear the requirements and application of English law to the Debtors, and the Plan Creditors who signed

45

the RSA knew they were entering into a restructuring with UK-incorporated debtors and that the restructuring would be implemented through the Restructuring Plans in England.

**f.      The Debtors' COMI Is in England Notwithstanding Their Status as Non-Operating Entities**

79.      Although courts have recognized that the application of a COMI analysis to non-operating entities, like the Debtors, proves "less straightforward than the typical case" due to their limited operations, the Debtors' COMI is nevertheless in England. *In re Oi Brasil Holdings Coöperatief U.A.*, 578 B.R. at 225 (quoting *In re OAS S.A.*, 533 B.R. 83 at 101). In the case of non-operating entities, some courts have looked to the corporate "nerve center" of the broader group. *Id.* Courts have consistently recognized that, in the case of entities, like the Debtors, whose primary business activity is restructuring, the location of restructuring activities may supersede the traditional nerve center analysis. *See In re Mod. Land*, 641 B.R. at 790; *In re InterCement Brasil S.A.*, 668 B.R. 802, 819 (Bankr. S.D.N.Y. 2025); Boas Decl. at ¶ 36.

80.      Recognition of the debtor's foreign proceeding in *Fossil* provides an example of this principle. There, like the Debtors, the foreign debtor was a non-operating subsidiary guarantor with no independent business operations, and the broader company group's management was conducted from the group's headquarters in the United States. Nevertheless, the court found COMI in England. *In re Fossil (UK) Glob. Servs. Ltd*, Case No. 25-90525 (CML) (Bankr. S.D. Tex. Nov. 12, 2025). Additionally, NFE Brazil's formation for the purpose of promoting the BrazilCo Plan is closely analogous to the structure considered by the court in *In re Mega Newco Ltd.*, where the debtor was a newly formed English company created specifically to enable a restructuring of its parent's U.S. note obligations through an English scheme of arrangement. 2025 WL 601463, at *1. In finding that the debtor's COMI was in England, the *Mega Newco* court noted that, critically, the process was carried out "with the involvement and

consent of the affected creditors," and held that if COMI manipulation is a concern, "one of the main factors I ought to consider, in deciding whether such a manipulation has occurred, is whether the affected creditors have asserted any objection." *Id.* at *3–4. Here, as discussed above and as in *Mega Newco*, the Group's restructuring is being implemented with the overwhelming support of the Group's funded debt holders.

81.     Moreover, as described above, in cases where a nerve center analysis led to a COMI finding outside the registered office jurisdiction, the facts were materially distinguishable from those at issue in the instant case. In those cases, the debtors asserted their COMI was outside of the jurisdiction of their registered office, and creditors initiated competing insolvency proceedings in the debtor's registered office jurisdiction, or argued the debtors' COMI should be in their registered office jurisdiction, which caused courts to consider the location of those parallel proceedings, and the creditors' expectations, against the debtor's asserted COMI, before ultimately finding COMI in the Debtors' asserted jurisdiction. *See In re OAS S.A.*, 533 B.R. at 100-03 (finding COMI in Brazil for Austrian-incorporated SPV where creditors argued COMI was in Austria and initiated competing BVI proceedings against a related entity, but the debtor's nerve center was in Brazil and creditors had warning of a Brazilian bankruptcy risk in offering memoranda); *In re Oi Brasil*, 578 B.R. at 225–45 (declining to shift COMI from Brazil to the Netherlands where creditors had initiated competing Dutch insolvency proceedings as part of a strategy to derail the Brazilian restructuring and creditors' expectations pointed to Brazil as the center of restructuring activity); *In re InterCement*, 668 B.R. at 818–24 (finding COMI in Brazil for Netherlands-incorporated SPV where creditors had initiated competing Dutch proceedings but the debtor's pre-petition restructuring activities were centered in Brazil and offering memoranda identified Brazil as the source of repayment). Here, by contrast, the Debtors are

seeking, and have asserted that, COMI in the jurisdiction of their registered office, and no creditor has initiated or threatened competing proceedings in any other jurisdiction. *See* Boas Decl. at ¶ 35.

### g. Goals of Chapter 15

82. Recognition of the English Proceedings as foreign main proceedings comports with the goals of chapter 15. Indeed, section 1508 of the Bankruptcy Code requires that courts "consider [the] international origin of [chapter 15] and the need to promote an application of [chapter 15] that is consistent with the application of similar statutes adopted by foreign jurisdictions." 11 U.S.C. § 1508. Accordingly, considerations of judicial cooperation and support for the foreign main proceedings in the UK dictate that the Debtors should be allowed to avail themselves of the protections set forth under chapter 15, and obtain recognition of the English Proceedings as foreign main proceedings.

83. Recognition of the English Proceedings is a condition precedent to the effectiveness of the RSA. *See* RSA § 11(j)(13). Thus, failure to grant recognition of the English Proceedings would (i) jeopardize the overall transaction contemplated by the RSA, (ii) lead to a value destructive alternative, (iii) upset creditor expectations, and (iv) undermine these highly consensual restructuring transactions designed to de-lever the Group and facilitate their corporate renewal. Boas Decl. at ¶ 41. "Such an outcome would . . . diverge from Chapter 15's stated goal of maximizing the value of the debtor's assets, as well as facilitating the rescue of a financially troubled business" because it "would divert additional funds towards an entirely new insolvency process in an effort to potentially achieve the relief requested" herein. *In re Mod. Land*, 641 B.R. at 787 (citation omitted). As demonstrated herein, the interests of the Plan Creditors have been and will continue to be protected in the English Proceedings, and to hinder the implementation of the Restructuring, including the transactions under the Restructuring Plans, by

48

not recognizing the English Proceedings as foreign main proceedings would serve no purpose. *See, e.g., In re Suntech*, 520 B.R. at 413 ("Shutting the door on the Debtor, where it has no other access, will hinder the restructuring of this multi-national business as contemplated by chapter 15."). Accordingly, recognition of the Debtors' COMI in England promotes the goals of chapter 15. *See In re Mod. Land*, 641 B.R. at 787 (recognizing Cayman Islands proceeding as a foreign main proceeding and stating that "recognition of the Cayman Proceeding would promote cooperation between the American and Cayman Courts, by helping facilitate the Cayman Proceeding and maximizing the chances of a successful reorganization").

**9.   In the Alternative, the Court Should Determine the English Proceedings Are Foreign Nonmain Proceedings and Grant Discretionary Relief**

84.     While the English Proceedings satisfy the statutory requirement for foreign main proceedings for the reasons set forth above, out of an abundance of caution, the Debtors seek, in the alternative, recognition of the English Proceedings as "foreign nonmain proceedings."

**a.     Each of the Debtors Has an Establishment in the UK and Therefore Qualifies for Foreign Nonmain Recognition**

85.     A "foreign nonmain proceeding," is defined as "a foreign proceeding, other than a foreign main proceeding, pending in a country where the debtor has an establishment." *See* 11 U.S.C. § 1502(5); *see also id.* § 1517(b)(2) (providing that an order of recognition as a "foreign nonmain proceeding" shall be entered "if the debtor has an establishment within the meaning of section 1502 in the foreign country where the proceeding is pending"). An establishment is "any place of operations where the debtor carries out a nontransitory economic activity." *Id.* § 1502(2). "Nontransitory economic activity" has been construed as a "local place of business." *See In re Creative Fin. Ltd.*, 543 B.R. 498, 520 (Bankr. S.D.N.Y 2016) (holding that in order to have an establishment in a country a debtor must "conduct business in that country"); *see also In*

49

*re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 127, 131 (Bankr. S.D.N.Y. 2007), *aff'd*, 389 B.R. 325 (S.D.N.Y. 2008).

86.     Several factors "contribute to identifying an establishment: the economic impact of the debtor's operations on the market, the maintenance of a 'minimum level of organization' for a period of time, and the objective appearance to creditors whether the debtor has a local presence." *See In re Millennium Glob. Emerging Credit Master Fund Ltd.* (*Millennium Glob. I*) 458 B.R. 63, 85 (Bankr. S.D.N.Y. 2011) (citation omitted).   Showing impact of the debtor's activities on the foreign jurisdiction involves a "showing of a local effect on the marketplace[.]" *In re Creative Fin.*, 543 B.R. at 520.[21]   This is evidenced by, among other things, engagement of "local counsel and commitment of capital to local banks." *Millennium Glob. I*, 458 B.R. at 85.[22]

87.     As set forth above, the Restructuring Plans have centralized the Debtors' restructuring activities in the UK.   These activities are primarily being conducted by English actors, including the Debtors' English counsel and the Foreign Representative, a resident of England, who, among other things, will oversee the Plan Meetings.   Boas Decl. at ¶ 43. Additionally, the Debtors maintain a registered office in England to which all communications may be addressed or served.   *Id*.   The Debtors' registered office is also where annual filings are administered, the payment of annual fees are registered, and where the Debtors' accounting,

---

[21]   In *In re Creative Finance*, this Court found that the minimal acts performed by the liquidator were insufficient to support a BVI establishment.   543 B.R. at 501.   Those concerns are inapplicable to this case because the Foreign Representative has diligently undertaken the tasks that the English Court authorized him to perform, as discussed above.   Importantly, the *Creative Finance* Court premised its decision on certain findings of bad faith. *Id.* at 513 ("the Debtors . . . were guilty of bad faith in numerous respects [including] . . . attempting . . . to control a BVI liquidator, who was supposed to act as an independent fiduciary, by the purse strings; failing to respond to the Liquidator's inquiries; depriving the Liquidator of the resources he needed to properly do his job; and orchestrating this entire chapter 15 case to deprive their only noninsider creditor of much or all of the fruits of its judgments.").   These facts are not present here.

[22]   The determination of whether a debtor has an establishment in a country is determined as of the time of the filing of a chapter 15 petition.   *See Lavie v. Ran*, 406 B.R. 277, 284–85 (S.D. Tex. 2009), *aff'd sub nom*, *In re Ran*, 607 F.3d 1017 (5th Cir. 2010).

books, and records are maintained. *Id.* These facts are sufficient to support the finding of an "establishment" in England. *See, e.g.*, *In re Serviços de Petróleo Constellation S.A.*, 600 B.R. at 279 (finding certain debtor subsidiaries had nontransitory ties to Brazil sufficient to create an establishment for a Luxembourg-based parent).[23]

88.     Denying recognition of the English Proceedings as either a foreign main or nonmain proceeding would leave the Debtors without access to U.S. courts. Such a result would be at odds with the purpose of chapter 15 of the Bankruptcy Code—to engender cooperation among foreign courts with respect to restructuring and insolvency proceedings. *See Millennium Glob. I*, 458 B.R. at 69, 81–82.

**B.     The Chapter 15 Cases Have Been Commenced by a Duly Authorized Foreign Representative**

89.     The second requirement for recognition of a foreign proceeding under section 1517(a) of the Bankruptcy Code is that the foreign representative applying for recognition be a "person or body." 11 U.S.C. § 1517(a)(2). Section 1516(a) of the Bankruptcy Code provides that a bankruptcy court may presume that the person petitioning for chapter 15 recognition is a foreign representative if the decision or certificate from the foreign court so indicates. *See* 11 U.S.C. § 1516(a) ("If the decision or certificate . . . [commencing or affirming the existence of a foreign proceeding and appointing the foreign representative] indicates that the foreign proceeding is a foreign proceeding and that the person or body is a foreign representative, the court is entitled to so presume."). The term "foreign representative" is defined in section 101(24) of the Bankruptcy Code as:

---

[23]  *But see In re Mod. Land*, 641 B.R. at 785. In *In re Modern Land*, this Court granted foreign main recognition of the Cayman Islands proceeding, but denied recognition as a nonmain proceeding because "neither the bankruptcy proceeding itself nor the Debtor's bookkeeping activities constitute[d] nontransitory economic activity, and the Debtor does not otherwise affect the local marketplace in the Cayman Islands." *Id.*

a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24).

90.    The Foreign Representative in this case is an individual who has been duly appointed by each of the Debtors' governing bodies to act as the foreign representative on behalf of the Debtors in connection with the English Proceedings and, pursuant to the Convening Order, the Foreign Representative was recognized as such by the English Court.  Boas Decl. ⁋ 2, 44. Courts have found that a foreign representative who has been appointed as such is a "foreign representative" within the meaning of section 101(24) of the Bankruptcy Code.  *See In re Serviços de Petróleo Constellation S.A.*, 600 B.R. at 270 (finding a foreign representative appointed pursuant to resolution of the debtors' boards is a proper "foreign representative" within the meaning of section 101(24) of the Bankruptcy Code meeting the requirements of 1517(a)(2) of the Bankruptcy Code); *In re OAS S.A.*, 533 B.R. at 93–95 (holding that the Bankruptcy Code does not require the judicial authorization or appointment of the foreign representative); *In re Compania Mexicana de Aviacion, S.A. de C.V.*, No. 10-14182 (MG) (Bankr. S.D.N.Y. Nov. 8, 2010) (same).   Accordingly, the Foreign Representative is a "foreign representative" within the meaning of section 101(24) of the Bankruptcy Code.

### C.    The Verified Petition Meets the Requirements of Section 1515 of the Bankruptcy Code and Bankruptcy Rule 1007(a)(4)

91.    The third requirement under section 1517(a) of the Bankruptcy Code is that the petition meets the requirements of section 1515 of the Bankruptcy Code.  Here, these Chapter 15 Cases were duly and properly commenced as required by section 1504 of the Bankruptcy Code by the Foreign Representative filing a petition for recognition under section 1515(a) of the Bankruptcy Code.

52

92.     Pursuant to section 1515(b) of the Bankruptcy Code, a petition for recognition must be accompanied by one of the following: (i) "a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative"; (ii) "a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative"; or (iii) "in the absence of evidence referred to in" clauses (i) and (ii), "any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative." *See* 11 U.S.C. § 1515(b). Moreover, the Bankruptcy Rules require that certain documents be attached to the Verified Petition.

93.     Here, the Foreign Representative duly and properly commenced these Chapter 15 Cases by filing the Chapter 15 Petitions accompanied by all fees, documents, and information required by the Bankruptcy Code and the Bankruptcy Rules, including: (i) a corporate ownership statement containing the information described in Bankruptcy Rule 7007.1; (ii) a list containing (a) the names and addresses of all persons or bodies authorized to administer the English Proceedings (aside from the Foreign Representative, none), (b) all parties to litigation pending in the United States in which a Debtor is a party at the time of the filing of the Chapter 15 Petitions (here, none), and (c) all entities against whom provisional relief is being sought under section 1519 of the Bankruptcy Code (here, none); (iii) a certified copy of the Convening Order, which serves as the decision commencing the foreign proceeding and recognizing the foreign representative as such; and (iv) copies of the written resolutions of the boards of directors of the Debtors appointing the Foreign Representative and authorizing the Foreign Representative to file

the Chapter 15 Petitions, the Verified Petition, and attendant motions seeking recognition and enforcement of the English Proceedings for the Debtors.[24]  Boas Decl. at ¶ 46.

94.    Having filed the above-referenced documents, and because the Court is entitled to presume the authenticity of such documents filed in connection with the Chapter 15 Petitions under section 1516(b) of the Bankruptcy Code, the requirements of section 1515 of the Bankruptcy Code and Bankruptcy Rule 1007(a)(4) have been met and these Chapter 15 Cases were properly commenced.  *See* 11 U.S.C. §§ 1504, 1509(a), 1515; Fed. R. Bankr. P. 1007(a)(4).

**III.    Enforcement of the Restructuring Plans, Including the Plan Releases, and the Sanction Order is Proper**

    **A.    Enforcement Pursuant to Section 1521 is Necessary and Appropriate**

95.    If the English Proceedings are recognized under section 1517 as foreign main proceedings or foreign nonmain proceedings, enforcement of the Restructuring Plans, including the Plan Releases, is appropriate under section 1521 of the Bankruptcy Code.  The bankruptcy court may broadly grant "any appropriate relief" "necessary to effectuate the purpose of [chapter 15] and to protect the assets of the debtor or the interests of the creditors."  11 U.S.C. § 1521(a); *see, e.g.*, *In re Avanti Commc'ns Grp. PLC*, 582 B.R. at 612 ("The discretion that is granted is 'exceedingly broad,' since a court may grant 'any appropriate relief' that would further the purposes of chapter 15 and protect the debtor's assets and the interests of creditors." (citation omitted)).  For example, appropriate relief under section 1521 includes enforcing a foreign confirmation order.  *See In re Rede Energia S.A.*, 515 B.R. 69, 89 (Bankr. S.D.N.Y. 2014).

---

[24]    Because the Debtors are subject only to the English Proceedings before the English Court, a statement identifying additional countries in which a foreign proceeding by, regarding, or against the Debtors is pending was not applicable.

96. Recognition and enforcement of the Restructuring Plans (including the Plan Releases) and the Sanction Order, and an injunction enforcing the terms thereof in the United States, is "appropriate relief" under section 1521 of the Bankruptcy Code because the relief is necessary to ensure that the Restructuring Plans, which have the support of the vast majority of Plan Creditors, can be implemented without disruption or adverse actions being brought in the United States. Boas Decl. at ¶ 47; *see also In re Garcia Avila*, 296 B.R. at 114 ("[I]rreparable harm is present when the failure to enjoin local actions will disrupt the orderly reconciliation of claims and the fair distribution of assets in a single, centralized forum[.]" (citation omitted)). Specifically, enforcement of the Restructuring Plans is appropriate because if certain Plan Creditors could effectively evade the terms of the Restructuring Plans by commencing actions in the United States, the purpose of the Restructuring Plans could be thwarted. Boas Decl. at ¶ 48. Allowing creditors to re-litigate issues resolved under the Restructuring Plans and Sanction Order would threaten the success of the English Proceedings and cause "irreparable harm" to the Debtors. *Id.* Courts in this District routinely grant recognition and enforcement of foreign court orders approving a foreign debtor's proceedings under the Companies Act. *See, e.g.*, *In re Mega Newco Ltd.*, 2025 WL 601463, at *1-2; *In re Avanti Commc'ns Grp. PLC*, 582 B.R. at 619 (recognizing and enforcing UK scheme and order of English court sanctioning same).

97. Relief under section 1521 of the Bankruptcy Code will be granted "only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. § 1522(a). These interests include (i) "the just treatment of all holders of claims against the bankruptcy estate," (ii) "the protection of U.S. claimants against prejudice and inconvenience in the processing of claims in the foreign proceeding," and (iii) "the distribution

of proceeds of the foreign estate substantially in accordance with the order prescribed by U.S. law." *See In re ENNIA Caribe Holding N.V.*, 596 B.R. 316, 322–23 (Bankr. S.D.N.Y. 2019).

### 1. Just Treatment of All Holders of Claims Against or Interests in the Debtors' Property

98.     The requirement to reasonably assure "just treatment" of all claimholders is satisfied where the applicable foreign insolvency law provides a comprehensive procedure for the orderly resolution of claims and the equitable distribution of assets among all the creditors in one proceeding. *See, e.g., In re Bd. of Dirs. of Telecom Arg., S.A.*, 528 F.3d 162, 170 (2d Cir. 2008).

99.     Here, the interests of the creditors and the Debtors are sufficiently protected. In particular, pursuant to the RSA, there is overwhelming support for the Restructuring Plans from Plan Creditors. Boas Decl. at ¶ 49. Furthermore, the implementation of the Restructuring Plans will result in the Plan Creditors receiving the Plan Consideration, which is preferable to liquidation because liquidation would likely result in a substantially lower return to Plan Creditors as compared to the Plan Consideration. *Id.* The Restructuring Plans will result in the same compromise or arrangement between the Debtors and each Plan Creditor as other similarly situated Plan Creditors. *Id.* Moreover, the terms of the Restructuring Plans require approval of the English Court in the form of orders sanctioning the Restructuring Plans. *Id.* Hence, the Restructuring Plans and the Sanction Order, once entered,[25] will be the result of a proceeding in which all creditors were treated fairly in compliance with English law. *Id.*

---

[25]   The Foreign Representative will update this Court following the Sanction Hearing to inform this Court of the outcome of that hearing, and the Sanction Order will be filed on the docket.

## 2. Protection of U.S. Claimants

100. With regard to the protection of U.S. claimants, this factor is satisfied where creditors are given adequate notice of timing and procedures for filing claims, and such procedures do not create any additional burdens for a foreign creditor to file a claim. *See In re Treco*, 240 F.3d 148, 158 (2d Cir. 2001); *In re Hourani*, 180 B.R. 58, 68 (Bankr. S.D.N.Y. 1995). The Restructuring Plans address and restructure only the claims of the Plan Creditors (who are the only affected creditors) and do not contemplate any other class of creditors other than the Plan Creditors being affected. Boas Decl. at ¶ 50. All of the Plan Creditors have been and will be given adequate notice of the Restructuring Plans, and the process for participating in or objecting to the Restructuring Plans is the same for United States creditors as all other creditors. Stephansen Decl. at ¶¶ 14, 18. This is sufficient to satisfy this factor of the analysis.

## 3. Distribution of Proceeds Substantially in Accordance With U.S. Law

101. Finally, the third interest considered is whether distribution of a debtor's property will substantially accord with the order of distribution available under the Bankruptcy Code. The "substantially in accordance" factor does not require that the foreign distribution be identical to United States bankruptcy law. *In re Ionica PLC*, 241 B.R. 829, 836 (Bankr. S.D.N.Y. 1999) ("Section 304(c)(4) . . . does not have to mirror the [U.S.] distribution rules.").

102. Here, the Debtors seek to restructure the Debtors' and the Group's funded debt obligations, and the contractual terms of other classes of creditors or of other non-Plan Creditors are not the subject of the English Proceedings. *See* Boas Decl. at ¶ 50. Accordingly, the Foreign Representative submits that recognition and enforcement of the Restructuring Plans is necessary and appropriate and that the interests of creditors and other interested entities, including the Debtors, are sufficiently protected.

57

**B.      Enforcement of the Restructuring Plans and the Sanction Order Is Also Proper Under Section 1507 as Additional Assistance**

103.      The Court may also provide "additional assistance" to foreign representatives under the Bankruptcy Code or under the other laws of the United States, provided that such assistance is "consistent with the principles of comity" and cooperation with foreign courts.  11 U.S.C. § 1507; *see also e.g.*, *In re Metcalfe & Mansfield Alt. Invs.*, 421 B.R. 685, 696 (Bankr. S.D.N.Y. 2010); *In re Atlas Shipping A/S*, 404 B.R. 726, 738 (Bankr. S.D.N.Y. 2009) (noting that post-recognition relief is "largely discretionary and turns on subjective factors that embody principles of comity" (quoting *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 333 (S.D.N.Y. 2008))).  As discussed above, enforcement of the Restructuring Plans and the Sanction Order—whether the English Proceedings are recognized as foreign main proceedings or foreign nonmain proceedings—is consistent with the goals of international cooperation and assistance to foreign courts embodied in chapter 15 and is necessary to the implementation of the Restructuring Plans.

**C.      The Restructuring Plans and the Sanction Order Are Entitled to Enforcement as a Matter of Comity**

104.      In determining whether to recognize and enforce a foreign judgment, courts also consider general comity principles.  *See In re Metcalfe*, 421 B.R. at 698.  In that regard, a foreign judgment should not be challenged in the United States if the procedures in the foreign forum comport with traditional due process and fundamental fairness principles.  *See Hilton v. Guyot*, 159 U.S. 113, 202–03 (1895).[26]  This is so even if a plan includes relief that would not be available under the Bankruptcy Code or other provisions of U.S. law.[27]

---

[26]      *See also In re Avanti Commc'ns Grp. PLC*, 582 B.R. at 610 (extending comity to a sanctioned scheme that: complied with applicable statutory requirements; fairly represented creditors in classification; found "the majority acted in a *bona fide* manner"; "was one that an intelligent and honest man, acting in respect of his interest as a creditor, might reasonably approve"; and was sanctioned by a court with proper jurisdiction); *In re*
(cont'd)

105.     Here, the English Proceedings meet the standard for extending comity.  Plan

Creditors have had, and will continue to have, a full and fair opportunity in the English

Proceedings to vote on and be heard in connection with the Restructuring Plans in a manner

consistent with U.S. standards of due process.  Stephansen Decl. at ¶ 34.

**D.       The Court Should Enforce the Plan Releases**

106.     As described above, the Restructuring Plans provide for the resolution of claims

under the Plan Debt and facilitate the financial restructuring of the Debtors.  As part of this

restructuring, the Restructuring Plans contemplate providing releases to Released Parties

essential to the Restructuring.  Boas Decl. at ¶ 51.  Whether the English Proceedings are

recognized as foreign main proceedings or foreign nonmain proceedings, enforcement of the

Restructuring Plans, including the Plan Releases, is appropriate.

**a.       The Plan Releases are Customary, of the Type that are Regularly
Approved, and Creditors Will be Afforded Due Process in the English
Proceedings With Respect to the Plan Releases**

107.     The Plan Releases are more narrowly tailored than releases approved in other

chapter 15 cases and only provide for third party releases with respect to Plan Claims and the

Restructuring.  *Id.*; Stephansen Decl. at ¶ 38.  The Plan Releases comprise only (i) an exculpation

of acts taken in connection with the negotiation, preparation, sanction or implementation of the

---

*(cont'd from previous page)*

    *Metcalfe & Mansfield Alt. Invs.*, 421 B.R. 685, 698 (Bankr. S.D.N.Y. 2010) (holding that a Canadian order approving a release and injunction was enforceable in chapter 15 under principles of comity because "[t]he U.S. and Canada share the same common law traditions and fundamental principles of law.  Canadian courts afford creditors a full and fair opportunity to be heard in a manner consistent with standards of U.S. due process.  U.S. federal courts have repeatedly granted comity to Canadian proceedings."); *In re Sino-Forest Corp.*, 501 B.R. 655, 663–64 (Bankr. S.D.N.Y. 2013).

[27]   *See In re Vitro S.A.B. de C.V.*, 701 F.3d 1031, 1053 (5th Cir. 2012) ("Given Chapter 15's heavy emphasis on comity, it is not necessary, nor to be expected, that the relief requested by a foreign representative be identical to, or available under, United States law.").

Restructuring Plans and/or the Restructuring and (ii) releases of Group entities and related parties from claims arising from or related to the Plan Debt.  Boas Decl. at ¶ 51.

108.    The Plan Releases are an integral part of the implementation of the Restructuring Plans, providing a mechanism for the Plan Creditors to release their claims against the Parent, the Debtors, and the other Released Parties in exchange for the Plan Creditors receiving their Plan consideration.  *Id.* at ¶ 52.  The Plan Releases are necessary to give commercial effect to the Restructuring; if the Plan Releases are not implemented, this would undermine the Restructuring because all claims of the existing creditors under the Plan Debt would not be extinguished.  *Id.* The Plan Releases are also customary in their scope and substantially similar releases are regularly approved by the English Court.  Stephansen Decl. at ¶ 38.

109.    In addition, Plan Creditors will have a full and fair opportunity to be heard in the English Proceedings with respect to the Restructuring Plans, in a manner consistent with due process standards in the United States.  *Id.* at ¶ 34.  Plan Creditors have multiple opportunities to participate and raise issues in the English Proceedings.  *Id.*  Initially, Plan Creditors were entitled to attend and be represented at the Convening Hearing, where they were able raise any issues regarding the constitution of the Plan Meetings, the English Court's jurisdiction, or any other matter that might affect the English Court's decision to sanction the Restructuring Plans.  *Id.* The Explanatory Statement is now available for review by Plan Creditors, and Plan Creditors are entitled to consult together and vote on the Restructuring Plans at the Plan Meetings, either in person, by video conference, or by proxy.  *Id.*

110.    Further, Plan Creditors are advised of the effect of the releases in the Explanatory Statement, the releases will be specifically addressed at the Sanction Hearing and the Plan Creditors are advised that the specific purpose of the Restructuring Plans on which they are

being asked to vote will provide for (among other things) the release of the Released Parties, including certain professional advisers and other persons, from any claims or liability in connection with the negotiation and implementation of the restructuring (including the Plan Creditors themselves). *Id.* at ¶ 39. Accordingly, all creditors subject to the Plan Releases will have notice of the releases, the ability to vote on the Restructuring Plans, and an opportunity to raise any concerns they might have regarding the Restructuring Plans to the English Court at the Sanction Hearing. *Id.*

111.   The exculpation component of the Plan Releases is well supported by established case law. "Exculpation provisions are designed to 'insulate court-supervised fiduciaries and some other parties from claims that are based on actions that relate to the restructuring,'" and "[i]t is well established in [the Southern District of New York] that, under the proper circumstances, exculpation is not limited to estate fiduciaries." *In re Genesis Glob. Holdco, LLC*, 660 B.R. 439, 527–28 (Bankr. S.D.N.Y. 2024) (quoting *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 720–21 (Bankr. S.D.N.Y. 2019)); *In re Azul S.A.*, 676 B.R. 277, 287–88 (Bankr. S.D.N.Y. 2026) (approving exculpation of non-fiduciaries who made "material contributions" to the case, including formulating, preparing, negotiating, and executing confirmation of the plan); *In re LATAM Airlines Grp. S.A.*, No. 20-11254 (JLG), 2022 WL 2206829, at *50 (Bankr. S.D.N.Y. June 18, 2022) (extending exculpation to non-estate fiduciaries who "have been actively involved in all aspects of these Chapter 11 Cases and have made significant contributions to the success of these cases."); *In re Voyager Digital Holdings, Inc.*, 649 B.R. 111, 134 (Bankr. S.D.N.Y. 2023) (approving exculpation provisions that "make clear that exculpated parties would not have liability for having done things that [the bankruptcy court] had approved or for doing what a confirmed Plan would require them to do."); *see also In*

*re Murray Metallurgical Coal Holdings, LLC*, 623 B.R. 444, 504–05 (Bankr. S.D. Ohio 2021) (approving an exculpation provision protecting pre-petition RSA negotiations *and* reasoning that "[g]ood faith prepetition negotiations and actions related to the formulation of a restructuring support agreement fall squarely within the type of conduct that may be protected by an appropriately tailored plan exculpation provision"). Here, the exculpation provisions in the Plan Releases are consistent with the foregoing precedent because they are narrowly tailored to protect the Released Parties from liability arising from the negotiation and implementation of the Restructuring, subject to carve-outs for criminal acts, fraud, gross negligence, and willful misconduct. The exculpation provisions of the Plan Releases are therefore appropriate and should be enforced.

112. The release of Plan Creditors' claims against co-obligors of the Plan Debt, including guarantors and other Group entities, is likewise well established in chapter 15 proceedings involving UK schemes of arrangement. As explained by Judge Glenn in *In re Avanti Commc'ns Grp. PLC*, 582 B.R. 603, 606 (Bankr. S.D.N.Y. 2018), "[s]chemes of arrangement are used to restructure balance sheets of foreign companies that often include US dollar-denominated debt" and "[w]hen the debt is restructured, the scheme of arrangement often provides that the affiliate-guarantees are released, even though the affiliates are not parties to the scheme proceeding." The *Avanti* court held that "schemes of arrangements sanctioned under UK law that provide third-party non-debtor guarantor releases should be recognized and enforced under chapter 15 of the Bankruptcy Code" because UK law "expressly authorizes third-party releases in scheme proceedings, particularly the release of affiliate-guarantees," and the creditors "had a full and fair opportunity to vote on, and be heard in connection with, the Scheme." *Id.* at 616–19. This principle has been consistently applied in chapter 15 cases in this Court. *See, e.g.,*

*In re Mega Newco Ltd.*, 2025 WL 601463, at \*4–5 (recognizing and enforcing UK scheme of arrangement that resolved noteholders' claims against both the debtor and its non-debtor parent); *In re New World Res. N.V.*, No. 14-12226 (SMB) (Bankr. S.D.N.Y. Sept. 9, 2014) (giving full force and effect to a UK scheme that included releases of the debtor's wholly-owned operating subsidiary guarantors); *In re Codere Fin. (UK) Ltd.*, No. 15-13017 (JLG) (Bankr. S.D.N.Y. Dec. 22, 2015) (recognizing UK scheme with third-party releases, including in favor of co-issuer and affiliated guarantors); *In re Magyar Telecom B.V.*, No. 13-13508 (SHL) (Bankr. S.D.N.Y. Dec. 11, 2013) (granting recognition and giving full force and effect to UK scheme of arrangement in which scheme claims, including guarantee claims of group guarantor companies, were irrevocably released). Here, as in those cases, without releasing the co-obligors' guarantees, "it would be difficult to restructure the debt because the collective assets and earnings of the group are needed to support the restructured debt without the risk of some creditors that hold the guarantees separately reaching the assets of the affiliates, endangering the ability of the group to meet its restructured debt obligations." *In re Avanti Commc'ns Grp. PLC*, 582 B.R. at 606. Accordingly, the Plan Releases are essential to give commercial effect to the Restructuring and should be enforced in the United States.

### b. The Plan Releases Are Consistent With Those Regularly Approved in Chapter 15 Cases and Do Not Violate *Purdue*

113. Under principles of comity, this Court should recognize and enforce the Restructuring Plans and the Sanction Order *in toto* in connection with its recognition of the English Proceedings as either foreign main proceedings or, in the alternative, foreign nonmain proceedings. The granting of such relief is consistent with the goals of international cooperation and assistance to foreign courts embodied in chapter 15 of the Bankruptcy Code and is necessary

63

to give effect to the English Proceedings and Restructuring Plans.  If granted, such relief would promote the legislatively enumerated objectives of section 1501(a) of the Bankruptcy Code.

114.    The Supreme Court's decision in *Harrington v. Purdue Pharma L. P.* does not compel a different result.  *See* 603 U.S. 204 (2024).  In *Purdue*, the Supreme Court held that chapter 11 of the Bankruptcy Code did not authorize nonconsensual, third-party releases.  *See id.* at 206-07.  In doing so, the Supreme Court was careful to ground its ruling on whether such releases were statutorily authorized, expressly limiting its ruling to those cases commenced under chapter 11:

> Confining ourselves to the question presented, we hold only that the bankruptcy code does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of affected claimants.

*Id.* at 227.

115.    Following the *Purdue* decision, bankruptcy courts continue to recognize and enforce nonconsensual third-party releases in the context of a chapter 15 case.  *See In re Crédito Real, S.A.B. de C.V., SOFOM, E.N.R.*, 670 B.R. 150, 164–65, 168–72 (Bankr. D. Del. 2025), *aff'd*, Civ. No. 25-371 (CFC), 2026 WL 881444, at *5–7 (D. Del. Mar. 31, 2026) (holding that *Purdue* does not limit chapter 15 relief and that chapter 15 authorizes enforcement of nonconsensual third-party releases approved by foreign courts where the foreign proceeding was fair and recognition is not manifestly contrary to U.S. public policy); *In re Odebrecht Engenharia e Construção S.A.*, 669 B.R. 457, 473–74 (Bankr. S.D.N.Y. 2025) (holding that U.S. bankruptcy courts may issue chapter 15 orders enforcing nonconsensual third-party releases, even where the releases are not contained in a foreign debtor's plan).

116.    Accordingly, the post-*Purdue* case law on the enforcement of nonconsensual third-party releases has not changed the long-established principles of chapter 15, which permit

bankruptcy courts to approve a foreign plan of reorganization even where that same plan may be subject to challenge if it were proposed in a plenary chapter 11 proceeding. *See In re Avanti Commc'ns. Grp. PLC*, 582 B.R. at 606 ("[T]hird-party releases in Chapter 15 cases have received a different analysis than in chapter 11 cases, focusing primarily on the foreign court's authority to grant such relief."); *In re Vitro S.A.B. de C.V.*, 701 F.3d at 1053 (acknowledging that Chapter 15's "heavy emphasis on comity" made it "not necessary, nor to be expected, that the relief requested by a foreign representative be identical to, or available under, United States law"); *In re Bd. of Dirs. of Multicanal S.A.*, 314 B.R. 486, 506 (Bankr. S.D.N.Y. 2004) ("[C]ases do not require that a distribution in a foreign proceeding match the distribution that would be available in a hypothetical U.S. case, or that U.S. creditors receive the precise recovery or treatment to which they would be entitled under Chapter 11."). Therefore, chapter 15 permits the enforcement of third-party releases granted in foreign proceedings even if such releases were imposed on a non-consensual basis, assuming that such third-party releases were permitted under the governing law of the foreign proceedings and there were no improprieties in the conduct of the foreign proceedings.

**E.      The Relief Requested Herein is Consistent with United States Public Policy**

117.    Section 1506 of the Bankruptcy Code provides that nothing in chapter 15 shall prevent the Court from refusing to take an action otherwise required therein if such action would be manifestly contrary to the public policy of the United States. The public policy exception is narrowly construed. *See, e.g., In re Sino-Forest*, 501 B.R. at 665; *In re Metcalfe*, 421 B.R. at 697; *In re Vitro S.A.B. de C.V.*, 701 F.3d at 1069; *Crédito Real*, 2026 WL 881444, at *8 ("Section 1506's public policy exception provides a narrow remedy for genuine threats to core U.S. constitutional or statutory rights, as opposed to mere discrepancies between domestic and foreign law. The public policy exception applies only when actions offend 'the most

fundamental policies of the United States' and is 'invoked only "under exceptional circumstances concerning matters of fundamental importance for the [United States]."' (citation omitted) (alterations in original)).

118.    Importantly, as the *Crédito Real* district court noted, "*Purdue* did not establish that nonconsensual third-party releases violate U.S. public policy" rather, "the Supreme Court's analysis focused on statutory interpretation under provisions of Chapter 11," and the Supreme Court expressly acknowledged that "Congress may authorize" such releases. 2026 WL 881444, at *9 ("The Supreme Court's acknowledgment of the policy arguments supporting such releases undermines [Appellant's] claim they are manifestly contrary to fundamental U.S. policy."). Here, the English Proceedings provided for a fundamentally fair process that accords with due process standards in the United States. *See* Stephansen Decl. at ¶ 34. As such, recognition of the English Proceedings as foreign main proceedings or foreign nonmain proceedings and enforcement of the Restructuring Plans, including the Plan Releases, and the Sanction Order is not manifestly contrary to U.S. public policy.

**NOTICE**

119.    Notice of this Motion will be provided to: (a) the Debtors; (b) the Foreign Representative; (c) counsel to each of the RSA Parties; (d) all entities against whom provisional relief is being sought under Bankruptcy Code section 1519; (e) all parties to litigation pending in the United States in which the Debtors are a party at the time of the filing of the Chapter 15 Petitions; (f) the Office of the United States Trustee for the Southern District of New York; (g) all parties that request notice in these cases pursuant to Bankruptcy Rule 2002 prior to the date of service; (h) all parties the Foreign Representative believes to be affected by the relief requested in this Motion pursuant to Local Bankruptcy Rule 9013-1; and (i) all other parties that

66

this Court may direct.    The Foreign Representative submits that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

**NO PRIOR REQUEST**

120.    No previous request for the relief sought herein has been made to the Court or any other court.

*[Remainder of Page Intentionally Left Blank]*

## CONCLUSION

**WHEREFORE**, the Foreign Representative respectfully requests entry of the Recognition and Enforcement Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and such other and further relief as is just and proper.

Dated: May 28, 2026
       Chicago, Illinois

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

/s/ *Ron E. Meisler*
Ron E. Meisler
Christopher M. Dressel (*pro hac vice* pending)
Bryan V. Uelk
Jennifer Madden (*pro hac vice* pending)
320 S. Canal Street
Chicago, Illinois 60606
Telephone: (312) 407-0700
Fax: (312) 407-0411

– and –

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM (UK) LLP

Peter K. Newman
Nicole Stephansen
22 Bishopsgate
London EC2N 4BQ
Telephone: +44 20 7519 7000
Fax: +44 20 7519 7070

*Counsel to the Foreign Representative*
