**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| *In re* | **Chapter 15** |
| **NFE Global Holdings Limited *et al.*,** | **Case No. 26-11268 (___)** |
| **Debtors in a Foreign Proceeding.[1]** | **(Joint Administration Requested)** |

**DECLARATION OF NICOLE STEPHANSEN**
**IN SUPPORT OF THE VERIFIED PETITION FOR**
**(I) RECOGNITION OF FOREIGN MAIN PROCEEDING,**
**(II) RECOGNITION OF FOREIGN REPRESENTATIVE, AND**
**(III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

Pursuant to 28 U.S.C. § 1746, I, Nicole Stephansen, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.      I am a solicitor duly admitted to practice in England and Wales, an attorney-at-law duly admitted to practice in the state of New York, and a partner in the corporate restructuring group of the law firm Skadden, Arps, Slate, Meagher & Flom (UK) LLP ("**Skadden U.K.**"). Skadden U.K. is English counsel to the above-captioned foreign debtors (the "**Debtors**"), both of which are private companies limited by shares and organized under the laws of England and Wales.

2.      I submit this declaration (this "**Declaration**") in support of the *Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and*

---

[1]    The Debtors and the last four digits of their respective foreign identification numbers are NFE Global Holdings Limited (9588) and NFE Brazil Newco Limited (1053).  The address of NFE Global Holdings Limited's registered office is Suite 1, 7th Floor, 50 Broadway, London SW1H 0BL, United Kingdom, and the address of NFE Brazil Newco Limited's registered office is Suite 1, 7th Floor, 50 Broadway, London SW1H 0DB, United Kingdom.

*(III) Related Relief Under Chapter 15 of the Bankruptcy Code* ("**Verified Petition**"), filed contemporaneously herewith.[2]

3.      As of the date hereof, the Debtors are the subject of proceedings (the "**English Proceedings**") currently pending before the High Court of Justice of England and Wales (the "**English Court**") concerning restructuring plans (the "**Restructuring Plans**") pursuant to Part 26A of the Companies Act 2006 (as modified, amended or re-enacted from time to time, the "**Companies Act**").

4.      I am over the age of 18 and, except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my opinion based upon my experience and knowledge of the Group, and my review of relevant documents or information supplied to me.  In preparing this Declaration, I have reviewed, among others, (a) the Chapter 15 Petitions, (b) the Verified Petition, (c) documents prepared or filed in connection with the English Proceedings, and (d) Part 26A of the Companies Act and other relevant provisions of English law.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.

5.      This Declaration comprises matters that are statements of my view of English law or statements of fact.  Where the matters stated in this Declaration are statements regarding English law, such statements represent my view of English law as a solicitor admitted and authorized to practice in England and Wales.  Where the matters stated in this Declaration are statements of fact that are within my personal knowledge, they are true.  Where the matters stated in this Declaration are statements of fact that are not within my personal knowledge, they are derived, as appropriate, from documents maintained by Skadden U.K. as a result of advising the Group in connection with

---

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Verified Petition.

the English Proceedings, or from information supplied to me by or on behalf of the Debtors, and are true to the best of my knowledge, information, and belief.

6. Although this Declaration only contains my view of English law, I am a U.S. attorney admitted to practice in the state of New York and am fairly acquainted with chapter 15 of the Bankruptcy Code.

## PROFESSIONAL BACKGROUND

7. I received my J.D. from American University Washington College of Law in 2008 and my B.A. in Political Science and History from Miami University of Ohio in 2004. I am admitted to practice in New York and in England and Wales. I began my career as an associate at Cadwalader, Wickersham & Taft LLP in New York City in August 2008, where I practised for over five years before relocating to the firm's London office in September 2013. I continued at Cadwalader until April 2018, having been promoted to Special Counsel. I then joined Milbank LLP in London as Special Counsel in the Financial Restructuring group, where I practised from April 2018 to April 2021. In April 2021, I joined Skadden U.K. in London as Counsel in the Corporate Restructuring group, and I was promoted to Partner in April 2022.

8. My practice concentrates on debt restructuring and reorganisation, including matters involving contingency planning, insolvency and options analysis, and special situations financings. I represent a diverse range of stakeholders, including companies, boards of directors, debt and equity investors, buy-side and distressed investors, and creditor committees, in complex cross-border transactions. I have extensive experience in matters of English insolvency law and have helped clients navigate the English and various other insolvency and reorganisation processes around the globe. In recognition of my work, I have been named one of Lawdragon's 500 Leading Global Bankruptcy & Restructuring Lawyers.

9.     I, together with other partners and attorneys at Skadden U.K. and at various Skadden offices in the U.S. ("**Skadden U.S.**"), have been advising the Group on various aspects of the Group's restructuring.

## OVERVIEW OF PART 26A OF THE COMPANIES ACT

10.     Part 26A of the Companies Act was introduced into the laws of England and Wales by the Corporate Insolvency and Governance Act 2020, which was enacted on June 25, 2020, and the vast majority of its provisions (including the new Part 26A) came into effect on June 26, 2020. A true and correct copy of Part 26A of the Companies Act is attached to this Declaration as **Exhibit A**.   Provided that certain conditions are met, Part 26A of the Companies Act allows English companies (and certain foreign companies) to use a statutory tool known as a restructuring plan to impose a compromise or arrangement (including a restructuring of liabilities) agreed with the requisite statutory majority of a company's creditors or members (or any class of its creditors or members) upon each and every creditor or member of the relevant class subject to the restructuring plan.

11.     Unlike a scheme of arrangement under Part 26 of the Companies Act (which the restructuring plan shares many similarities with and was largely based upon), there are two additional threshold conditions that must be satisfied in order for a company to be subject to a restructuring plan.  The additional conditions are that:

(a)     Condition A: the company has encountered, or is likely to encounter, financial difficulties that are affecting, or will or may affect, its ability to carry on business as a going concern; and

(b)     Condition B: (i) a compromise or arrangement is proposed between the company and (x) its creditors, or any class of them, or (y) its members, or any class of them; and (ii) the purpose of the proposed compromise or arrangement is to eliminate, reduce or prevent, or mitigate the effect of, any of those financial difficulties mentioned in condition A above.

4

12.     As with a scheme of arrangement, the restructuring plan can be commenced by a company, any creditor or member of a company, a liquidator of a company being wound up, or an administrator of a company in administration.   In this case, the Restructuring Plans were commenced by the Debtors.   The procedure for initiating a restructuring plan and setting a convening hearing under Part 26A of the Companies Act is governed by the new practice statement issued by the Chancellor of the High Court on September 18, 2025 (the "**New Practice Statement**") which came into force on January 1, 2026.  Pursuant to the New Practice Statement, a company first issues a claim form under CPR Part 8, plus a "listing note" and then can request a hearing known as a convening hearing at which permission is sought to convene meetings of each class of the company's creditors and/or members proposed to be subject to the restructuring plan to enable them to consider and vote on the proposed compromise or arrangement.

13.     Once a claim form is filed, the applicant will circulate a letter known as a practice statement letter to the creditors and/or members of the relevant company who will be subject to the compromise or arrangement contemplated by the proposed restructuring plan.  Among other things, the practice statement letter will typically set out the applicant's proposed classes and the applicant's case for why the English court has jurisdiction in relation to the sanctioning of the restructuring plan.  The practice statement letter will notify the recipient creditors and/or members that they have the right to attend the court hearings for the restructuring plan and to raise any concerns they might have regarding the restructuring plan.

14.     Under English law, creditors and/or members of a company will form a class for the purpose of voting on the restructuring plan if those creditors' and/or members' rights against the company, both before and after the compromise or arrangement in the proposed restructuring

plan is implemented, are not so dissimilar as to make it impossible for them to consult together in relation to the proposed compromise or arrangement with a view to their common interest.  The applicant for the restructuring plan will propose the classes of creditors and members to the English court as part of its application for the convening hearing, but the decision as to whether or not the class constitution is correct is ultimately one for the English court to determine at the convening hearing.  Creditors and members are given notice of, and entitled to attend, the convening hearing to voice any concerns regarding the proposed restructuring plan, including the composition of the proposed class(es).

15. The restructuring plan application is supported by witness evidence and an explanatory statement, which is the principal disclosure document for creditors and/or members, as described at paragraphs 18 and 33 in more detail.  At the convening hearing, the English court will decide whether to grant the applicant permission to convene a meeting or meetings of the relevant class(es) to consider and vote upon the proposed compromise or arrangement.  In making its decision, the English court will consider (i) jurisdictional issues, (ii) whether the creditors and/or members have been given sufficient notice of the convening hearing, (iii) the composition of the proposed voting class(es), and (iv) any issues not going to the merits or fairness of the proposed restructuring plan which might cause a roadblock to sanction of the proposed restructuring plan.  In determining the jurisdictional issues, the English court must be satisfied that: (i) the applicant is a company liable to be wound-up under the Insolvency Act 1986, which captures companies registered under the Companies Act in England and Wales, and (ii) the additional conditions outlined at paragraph 11 above.

16. In assessing the composition of the proposed voting classes for restructuring plans, the English court will consider whether creditors' or members' rights are not so dissimilar that

they cannot consult together and should be separated into separate classes, and whether those creditors or members whose rights are sufficiently similar and who can properly consult together should be required to do so, to avoid giving a veto to a minority group of those creditors or members. The question of class is a matter of judgement for each particular case, but the English court has adopted a broad approach to class composition such that the differences between the relevant creditors or members may be material without leading to separate classes being required.

17. The general rule is that every creditor or member whose rights are affected by the proposed restructuring plan must be permitted to participate in a meeting to vote on the restructuring plan. However, the applicant may apply to remove this right in relation to any class of creditors or members, in which case, the English court must be satisfied that none of the members of that class has a "genuine economic interest" in the company (section 901C(4) Companies Act). This expression is not defined for the purposes of section 901C(4) of the Companies Act and there is only a brief mention of the expression in the Explanatory Notes[3] (prepared by the UK Government to assist readers of the primary legislation), where the expression is said to refer to an "out of the money" class. This is not relevant here and the Debtors have made no application under 901C(4) of the Companies Act in connection with the Restructuring Plans.

18. Once the order convening the meeting(s) is issued, notice of the meeting(s) must be given to all creditors and members who are to be affected by the restructuring plan prior to the meeting(s) in accordance with the order. Such notice of the meeting(s) must be accompanied by the explanatory statement. The explanatory statement is a prescribed disclosure document under section 901D of the Companies Act that must contain sufficient information regarding the

---

[3] Explanatory Notes, Corporate Insolvency and Governance Act 2020, Ch. 12, https://www.legislation.gov.uk/ukpga/2020/12/pdfs/ukpgaen_20200012_en.pdf.

company and the effects of the proposed compromise or arrangement so as to allow a typical

creditor or member to make a reasonable decision regarding whether or not to support the proposed

restructuring plan for the purpose of voting at the meeting(s). The explanatory statement is

comparable to the disclosure statement required under section 1125 of the Bankruptcy Code for

solicitation of votes on a chapter 11 plan.

19. The creditors and members to whom the restructuring plan is proposed are entitled

to attend the meetings in person or by proxy and to ask questions regarding the proposed

restructuring plan. Each class of restructuring plan creditors and members will consider and vote

on the proposed restructuring plan separately. A number representing at least 75% in value of that

class of creditors or members present and voting in person or by proxy at the relevant meeting

must approve the restructuring plan in order for that class to approve the restructuring plan, known

as the requisite statutory majority of each class.

20. The voting majorities are confirmed by a chairperson appointed for the purposes of

the restructuring plan meeting(s). To confirm the voting majorities, the chairperson, often with

the assistance of a tabulation and calculation agent appointed specifically to assist the company

with this task, tabulates the votes of creditors and members submitted. The value of each claim

for voting purposes will typically be the face value of the actual and contingent claim of that

creditor or member against the company as at a specific date fixed prior to the restructuring plan

meetings, referred to as the record date. If the requisite statutory majorities of attending and voting

creditors and members approve the restructuring plan, the chairperson provides a sworn statement

to the court as evidence of the result.

21. Following the meeting(s), the applicant will apply to the English court to sanction

the restructuring plan. The restructuring plan will only become legally binding on the company

and on all the creditors or members in the relevant class(es) if sanctioned by the English court at a second court hearing, referred to as the sanction hearing, and delivered to the Registrar of Companies of England and Wales, or, in the case of an overseas company, published in The Gazette. The sanction hearing is comparable to a confirmation hearing on a chapter 11 plan of reorganization under section 1128 of the Bankruptcy Code.

22. At the sanction hearing, the English court will consider whether to sanction the restructuring plan and make the compromise or arrangement binding on all of the creditors and members to be subject to the restructuring plan whether or not they voted in favor of it (provided the requisite statutory majority is satisfied for each class or an applicable consenting class if the cross-class cramdown mechanism is to be utilized, as described below). All creditors and members who are affected by the restructuring plan have an opportunity to raise questions and objections to the restructuring plan and present evidence at the sanction hearing.

23. The English court may only sanction the restructuring plan if:

(a)     a number representing at least 75% in value of each class of creditors or members (as the case may be), of those present and voting (in person or by proxy), approve the restructuring plan at the meeting for that class; or

(b)     in the event that one or more classes of creditors or members does not approve the restructuring plan in accordance with the voting threshold and process referred to above, the English court is satisfied that: (i) none of the members of the dissenting class would be any worse off if the restructuring plan were sanctioned than they would be in the event of the relevant alternative; and (ii) the compromise or arrangement has been agreed upon in accordance with the 75% voting threshold referred to above by at least one class of creditors or members who would receive a payment or have a genuine economic interest in the company in the event of the relevant alternative. This process is referred to as "cross-class cramdown".

24. The relevant alternative is whatever scenario the English court considers would be most likely to occur in relation to the company if the compromise or arrangement were not sanctioned by the English court. The applicant will provide evidence to the English court as to

9

what the relevant alternative is likely to be, typically an insolvency proceeding such as a liquidation or administration; however I would note that this is not the case in this matter.

25.    As noted above, even if there is one or more dissenting classes from the voting at the plan meeting(s), the English court may still sanction the restructuring plan, using cross-class cramdown, so long as the other conditions are satisfied by the applicant.  In such case, non-consenting classes of creditors or members can be "crammed down" and bound by the terms of the restructuring plan.  Here, the Debtors are not proposing to use the cross-class cramdown mechanism because creditors in excess of 75% of each proposed class have signed the RSA.

26.    The English court may sanction the restructuring plan unconditionally or conditionally upon certain modifications or amendments to it, or may refuse to sanction it altogether.  The use of the word "may" in section 901F of the Companies Act in relation to this power to sanction a restructuring plan makes clear that the English court has discretion regarding whether or not to sanction the restructuring plan, but Part 26A does not specify the factors that the English court will take into account when deciding whether or not it should exercise that discretion.  However, paragraph 190 of the Explanatory Notes to the Corporate Insolvency and Governance Act 2020 (the "**Explanatory Notes**")[4] suggests that the English court has absolute discretion and will draw on the "well-established principles" that apply in relation to the sanction of schemes of arrangement and restructuring plans.[5]

27.    In restructuring plan cases where the utilization of the cross-class cramdown mechanism is not proposed, the relevant principles that pertain to the sanction of restructuring

---

[4]    Corporate Insolvency and Governance Act, Ch. 12,
https://www.legislation.gov.uk/ukpga/2020/12/pdfs/ukpga_20200012_en.pdf.

[5]    Explanatory Notes, *supra* note 3, ¶ 190.

10

plans, as developed and adopted from cases concerning schemes of arrangement, that should be

considered by the English court are summarized as follows:[6]

(a)      At the first stage, the English court must consider whether the provisions of the Companies Act have been complied with.  This will include questions of class composition, whether the requisite statutory majorities were obtained at the meeting(s), and whether an adequate explanatory statement was distributed to the applicable creditors or members in the relevant class(es).

(b)      At the second stage, the English court must consider whether each class was fairly represented by persons present and voting at the meeting, and whether the majority were coercing the minority in order to promote interests adverse to the relevant class whom they purported to represent.

(c)      At the third stage, the English court must consider whether the restructuring is a fair restructuring which a creditor could reasonably approve.  The English court is not concerned to decide whether the restructuring plan is the only fair restructuring plan or even the best restructuring plan.

(d)      At the fourth stage, the English court must consider whether there is any "blot", "roadblock" or defect in the restructuring plan that would, for example, make it unlawful or in any other way inoperable.

28.      Where a large proportion of the company's creditors and/or members are located

outside of England and Wales or their claims are not governed by English law, the English court

is also likely to consider, in exercising its discretion, whether there is a reasonable possibility that

the restructuring plan will be recognized and given effect in each relevant foreign jurisdiction

where the company (and any obligors that will be released from their obligations pursuant to the

restructuring plan) has material assets or liabilities.

29.      If the English court sanctions a restructuring plan, the restructuring plan will only

take effect once a certified copy of the English court's order sanctioning the restructuring plan,

known as the sanction order, has been delivered to the Registrar of Companies of England and

---

[6]      *Kington S.A.R.L. v. Thames Water Utilities Holdings Ltd.* [2025] EWCA (Civ) 475 [100] (Eng.), quoting *Re Noble Group (No.2) Ltd* [2019] 2 BCLC 548 [17] (Eng.), https://www.judiciary.uk/judgments/kingston-s-a-r-l-thames-water-and-another-v-thames-water-utilities-holdings-and-others/.

Wales, or, in the case of an overseas company, published in The Gazette. Upon completion of such action, the restructuring plan becomes binding and effective according to its terms on all creditors and members intended to be subject to the restructuring plan, irrespective of notice and their participation or vote at any meeting.

## STATUS OF THE ENGLISH PROCEEDINGS

30. The Debtors have proposed the Restructuring Plans in respect of the Plan Debt, as contemplated by the RSA. A copy of the RSA is attached hereto as **Exhibit B**.

31. On March 24, 2026, and April 10, 2026, respectively, NFE Global and NFE Brazil each formally commenced the English Proceedings by filing a Part 8 Claim Form and listing note with the English Court. Copies of the Part 8 Claim Forms and listing notes are attached hereto as **Exhibit C**. Thereafter, on April 20, 2026, the Debtors issued the Practice Statement Letter to Plan Creditors, with a copy sent to all Plan Creditors and also made available on the website maintained by Kroll as information agent for the Debtors (the "**Information Agent**"). A copy of the Practice Statement Letter is attached hereto as **Exhibit D**. Among other things, the Practice Statement Letter notified the Plan Creditors of the Debtors' intention to propose the Restructuring Plans, the Debtors' intention to apply to the English Court for permission to convene meetings of the Plan Creditors for the purpose of voting on the Restructuring Plans, the proposed date of the Convening Hearing and the composition of the proposed classes of Plan Creditors. As set out more fully in the Practice Statement Letter, after considering the rights in and rights out of the various Plan Creditors in connection with Restructuring Plans, the Debtors concluded that it would be appropriate, in respect of the CoreCo Plan, to convene six separate meetings of the relevant classes of Plan Creditors (related to the various collateral pools against which each group of Plan Creditors

has rights and will receive plan consideration) and in respect of the BrazilCo Plan, one meeting of the relevant class of Plan Creditors.

32.     On April 30, 2026, the Debtors filed their evidence (which was available to all Plan Creditors) ahead of the Convening Hearing.  On May 11, 2026, in accordance with the New Practice Statement, the Debtors filed the skeleton argument in connection with the Convening Hearing (the "**Skeleton Argument**").  The Skeleton Argument sets out the Debtors' arguments in favor of allowing the Plan Meetings to be convened.  A copy of the Skeleton Argument is attached hereto as **Exhibit E.**

33.     The Convening Hearing was held on May 14, 2026.  At the Convening Hearing, Mr. Justice Hildyard considered the proposed Restructuring Plans, and the issues described in paragraph 15 above, such as questions of jurisdiction, creditor notice, composition of the creditor class, and any roadblocks to the sanctioning of the Restructuring Plans.  On May 14, 2026, Mr. Justice Hildyard made the Convening Order permitting the Debtors to convene seven Plan Meetings on June 15, 2026.  In accordance with the terms of the Convening Orders, the Debtors' made available to all Plan Creditors a notice of the Plan Meetings and the Explanatory Statement on the Information Agent's website, and notices of the same were distributed to Plan Creditors.  A copy of the Explanatory Statement is attached hereto as **Exhibit F.**  The Plan Meetings are expected to begin at 10 a.m. prevailing Eastern Time on June 15, 2026 in person at the offices of Skadden U.K. in London, England and remotely, via a video conference platform which will operate in the manner described in the draft Notice of the Plan Meetings set out in Appendix 4 of the Explanatory Statement.

34.     Plan Creditors will have a full and fair opportunity to be heard in the English Proceedings with respect to the Restructuring Plans, in a manner consistent with due process

standards in the United States.  Plan Creditors have multiple opportunities to participate and raise issues in the English Proceedings.  Initially, Creditors were entitled to attend and be represented at the Convening Hearing, where they were able raise any issues regarding the constitution of the Plan Meetings, the Court's jurisdiction, or any other matter that might affect the Court's decision to sanction the Restructuring Plans.

35.     Two investors holding    approximately 4% of the certain securities (the "**GLP Preferred Units**") issued by Golar LNG Partners LP ("**GLP**" ), an indirect subsidiary of the Parent and an affiliate of the Debtors, appeared at the Convening Hearing.  As indicated in the Practice Statement Letter, the holders of GLP Preferred Units are not Plan Creditors.  The holders of GLP Preferred Units filed a skeleton argument and appeared at the Convening Hearing. While the holders had previously threatened to object to the Restructuring Plan and make a disclosure application at the Convening Hearing (notwithstanding that they had refused at that point to identify themselves or their holdings), at the Convening Hearing they did not pursue either an objection or disclosure application.

36.     The Explanatory Statement is now available for review by Plan Creditors, and Plan Creditors are entitled to consult together and vote on the Restructuring Plans at the Plan Meetings on June 15, either in person, by video conference, or by proxy.

37.     A    sanction    hearing    is    currently    scheduled    for    June 18,    2026 (the "**Sanction Hearing**"), which is similar to a confirmation hearing in chapter 11. At the Sanction Hearing the English Court will determine whether to enter a Sanction Order approving the Restructuring Plans.  The Convening Order sets out a timetable for Plan Creditors to submit any challenges to be heard at the Sanction Hearing, with notice of any objections to be submitted on May 21, 2026 and skeleton arguments from the challengers due on May 28, 2026.  Following

14

the May 14th Convening Hearing, Skadden provided counsel to the holders of the GLP Preferred Units with copies of the Convening Hearing court documents and the Explanatory Statement. Subsequently Skadden received another letter from the holders of the GLP Preferred Units noting concerns with respect to certain asset sales and dividends made by GLP reserving their rights to challenge the Chapter 15 Cases on public policy grounds and with respect to the Plan Releases. The holders of the GLP Preferred Units ultimately did not file an objection to the Restructuring Plans by the deadline to do so set out in the Convening Order.

38. The Restructuring Plans include the Plan Releases. The Plan Releases are customary in their scope and substantially similar releases are regularly approved by the English Court. The Plan Releases fall into two categories: (i) releases of the Debtors and other Group companies of the Plan Claims, and (ii) exculpation of Group companies, supporting creditors, advisors and related parties (including directors, officers and employees) from any liability related to the negotiation and implementation of the Restructuring. In this case, the Plan Releases are narrow and only provide for third party releases with respect to Plan Claims and/or the Restructuring

39. Plan Creditors are advised of the effect of the releases in the Explanatory Statement, the releases will be specifically addressed at the Sanction Hearing and the Plan Creditors are advised that the specific purpose of the Restructuring Plans on which they are being asked to vote will provide for (among other things) the release of the Released Parties, including certain professional advisers and other persons, from any claims or liability in connection with the negotiation and implementation of the restructuring (including the Plan Creditors themselves). Accordingly, all creditors subject to the Plan Releases will have notice of the releases, the ability

15

to vote on the Restructuring Plans, and an opportunity to raise any concerns they might have regarding the Restructuring Plans to the English Court at the Sanction Hearing.

40.     If the English Court approves the Restructuring Plans, issues a Sanction Order, and a sealed copy of the Sanction Order is delivered to the Registrar of Companies of England and Wales, the Restructuring Plans will become effective and binding as a matter of English law on all Plan Creditors.  While the Restructuring Plans will become effective at this time, in accordance with the terms of the Restructuring Plans, the Restructuring will not be implemented unless and until all conditions precedent have been satisfied.

41.     Accordingly, based on discussions with members of Skadden U.S., I understand that the relief requested by the Foreign Representative under chapter 15 of the Bankruptcy Code is necessary to (i) give effect to the Restructuring Plans in the United States; and (ii) will best assure an economical, expeditious, and fair and efficient administration of the Restructuring Plans that protects the interests of the Debtors and the Plan Creditors.  Based on the foregoing, I believe that the relief requested in the Verified Petition should be granted in full.

*[Remainder of Page Intentionally Left Blank]*

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge, information, and belief.


Dated: May 28, 2026
         London, United Kingdon


/s/ Nicole Stephansen
Nicole Stephansen
Partner
Skadden, Arps, Slate, Meagher
& Flom UK LLP