# EXHIBIT D

## Practice Statement Letter

THIS DOCUMENT AND ITS CONTENTS ARE NOT FOR RELEASE, PUBLICATION OR DISTRIBUTION, IN WHOLE OR IN PART, DIRECTLY OR INDIRECTLY, IN ANY JURISDICTION WHERE SUCH DISTRIBUTION WOULD BE UNLAWFUL OR TO ANY OTHER PERSON.

THIS PRACTICE STATEMENT LETTER REQUIRES YOUR IMMEDIATE AND URGENT ATTENTION AS IT RELATES TO RESTRUCTURING PLANS PROPOSED BY EACH OF (I) NFE GLOBAL HOLDINGS LIMITED, AND (II) NFE BRAZIL NEWCO LIMITED, WHICH WILL BE CONSIDERED BY THE HIGH COURT OF JUSTICE OF ENGLAND AND WALES.

THE SPECIFIC DETAILS OF THE CONVENING HEARING (INCLUDING THE DATE AND TIME) WILL BE CONFIRMED TO ALL PLAN CREDITORS IN THE NOTICE OF THE CONVENING HEARING.  THIS NOTICE WILL BE SENT TO ALL PLAN CREDITORS BEFORE THE CONVENING HEARING AND WILL BE MADE AVAILABLE TO PLAN CREDITORS AT THE PLAN WEBSITE (AT HTTPS://DEALS.IS.KROLL.COM/NFE).

YOU ARE BEING CONTACTED AS NFE GLOBAL HOLDINGS LIMITED AND/ OR NFE BRAZIL NEWCO LIMITED BELIEVE THAT YOU ARE A CORECO PLAN CREDITOR AND/ OR A BRAZILCO PLAN CREDITOR AND WILL THEREFORE BE AFFECTED BY THE PROPOSED PLANS.

CORECO PLAN CREDITORS AND BRAZILCO PLAN CREDITORS MUST RELY ON THEIR OWN EXAMINATION OF THE TERMS OF THE PLANS, INCLUDING THE MERITS AND RISKS INVOLVED.

THIS PRACTICE STATEMENT LETTER CONCERNS MATTERS WHICH MAY AFFECT YOUR LEGAL RIGHTS AND ENTITLEMENTS AND YOU SHOULD TAKE APPROPRIATE LEGAL ADVICE ON ITS CONTENTS.

NOTHING IN THIS PRACTICE STATEMENT LETTER CONSTITUTES OR FORMS PART OF ANY OFFER OR INVITATION TO SELL, EXCHANGE OR ISSUE, OR ANY SOLICITATION OF ANY OFFER TO PURCHASE OR SUBSCRIBE FOR, ANY SECURITIES IN THE UNITED STATES OR ANY OTHER JURISDICTION OR TO OR FROM ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE ANY SUCH OFFER OR INVITATION OR SOLICITATION IN SUCH JURISDICTION. NONE OF THE SECURITIES REFERRED TO IN THIS DOCUMENT MAY BE SOLD, ISSUED OR TRANSFERRED IN THE UNITED STATES ABSENT REGISTRATION OR AN EXEMPTION FROM REGISTRATION OR IN ANY OTHER JURISDICTION IN CONTRAVENTION OF APPLICABLE LAW.

SECURITIES THAT MAY BE ISSUED PURSUANT TO THE PLANS WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED ("SECURITIES ACT") OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION OF THE UNITED STATES OR ANY OTHER APPLICABLE JURISDICTION, AND SUCH SECURITIES MAY NOT BE OFFERED OR SOLD WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, "U.S. PERSONS" (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT), EXCEPT PURSUANT TO EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH ALL APPLICABLE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION OF THE UNITED STATES AND ANY OTHER

i

**JURISDICTION. HAVING TAKEN LEGAL ADVICE, NFE GLOBAL HOLDINGS LIMITED AND NFE BRAZIL NEWCO LIMITED CONSIDER THAT THE ISSUANCE OF CERTAIN SECURITIES PURSUANT TO THE PLANS IS LIKELY TO BE MADE IN RELIANCE UPON THE EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT PROVIDED BY SECTION 3(A)(10) THEREOF. NFE GLOBAL HOLDINGS LIMITED AND NFE BRAZIL NEWCO LIMITED HAVE BEEN ADVISED THAT THE SANCTION OF THE PLANS BY THE HIGH COURT OF JUSTICE OF ENGLAND AND WALES, FOLLOWING NOTICE TO AFFECTED STAKEHOLDERS AND AN OPPORTUNITY TO BE HEARD, WILL SATISFY THE FAIRNESS HEARING REQUIREMENTS OF SECTION 3(A)(10). ACCORDINGLY, NO REGISTRATION OF SUCH SECURITIES UNDER THE SECURITIES ACT IS EXPECTED TO BE REQUIRED.**

**THIS PRACTICE STATEMENT LETTER WILL NOT BE FILED WITH THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY STATE SECURITIES AUTHORITY AND THE PLAN DOCUMENTATION WILL NOT BE REVIEWED BY THE SEC OR ANY SECURITIES AUTHORITY OF ANY OTHER JURISDICTION AND NONE OF THEM HAS OR WILL APPROVE, DISAPPROVE, PASS UPON OR ENDORSE THE MERITS OF THE PLANS OR THE ACCURACY, ADEQUACY OR COMPLETENESS OF THIS PRACTICE STATEMENT LETTER OR THE PLAN DOCUMENTATION. IT IS UNLAWFUL TO MAKE ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.**

**Table of Contents**

1    PURPOSE OF THIS LETTER.................................................. 1

2    WHAT IS A RESTRUCTURING PLAN?.................................5

3    WHO IS ENTITLED TO VOTE?.............................................6

4    BACKGROUND TO THE PLAN COMPANIES AND THE GROUP .......7

5    DEBT CAPITAL STRUCTURE OF THE GROUP ..................................9

6    BACKGROUND TO THE GROUP'S FINANCIAL DIFFICULTIES...... 15

7    OBJECTIVES OF THE PLANS ............................................. 21

8    OVERVIEW OF THE RESTRUCTURING ........................................... 22

9    RIGHTS SUBJECT TO THE PLANS ......................................... 29

10   PROPOSED CLASS CONSTITUTION OF PLAN CREDITORS ............ 37

11   CONSEQUENCES IF THE PLANS ARE NOT SUCCESSFUL .............. 44

12   RECOMMENDATION OF THE BOARDS ............................................ 46

13   JURISDICTION AND RECOGNITION .................................... 47

14   CREDITOR ISSUES ............................................................. 48

15   CONVENING HEARING......................................................... 49

16   STEPS FOLLOWING THE CONVENING HEARING........................... 50

17   THE PLAN MEETINGS ......................................................... 51

18   SANCTION HEARING ......................................................... 51

19   EFFECTIVENESS OF THE PLANS ........................................... 52

20   ENQUIRIES AND FURTHER INFORMATION ................................. 53

21   PLAN WEBSITE ................................................................. 53

Schedule 1– Definitions and Interpretation ........................................ 56

1    Definitions................................................................... 56

2    Interpretation ............................................................... 69

Schedule 2– Restructuring Effective Date Plan Consideration ............ 71

**PRACTICE STATEMENT LETTER**

**From**: NFE Global Holdings Limited ("**NFE Global**") and NFE Brazil Newco Limited ("**NFE Brazil Newco**") (together the "**Plan Companies**" and each a "**Plan Company**")

**To**:     The CoreCo Plan Creditors and the BrazilCo Plan Creditors

**Copy**: The Information Agent

**Date**:  20 April 2026

**THIS LETTER CONCERNS MATTERS WHICH MAY AFFECT YOUR LEGAL RIGHTS AND ENTITLEMENTS AND YOU MAY THEREFORE WISH TO TAKE APPROPRIATE LEGAL ADVICE ON ITS CONTENTS.**

Dear Sir or Madam,

**Proposed Restructuring Plans under Part 26A of the Companies Act 2006 (as amended) (the "Act") between (i) NFE Global and the CoreCo Plan Creditors, and (ii) NFE Brazil Newco and the BrazilCo Plan Creditors**

1      **PURPOSE OF THIS LETTER**

1.1    Each of the Plan Companies is proposing a restructuring plan under Part 26A of the Act.

1.2    The Plan Companies are sending you this letter in accordance with the Practice Statement (*Companies*: *Schemes of Arrangement and Restructuring Plans under Parts 26 and 26A of the Companies Act 2006*) issued on 18 September 2025 by the Chancellor of the Court (the "**Practice Statement**") in relation to two, inter-conditional restructuring plans proposed by (i) NFE Global in respect of the CoreCo Plan Creditors, and (ii) NFE Brazil Newco in respect of the BrazilCo Plan Creditors.

1.3    Capitalised terms in this letter shall have the meanings given to them under, and general terms shall be construed in accordance with, Schedule 1 (*Definitions and Interpretation*) to this letter, unless otherwise defined herein.

1.4    You are being contacted as the Plan Companies believe that you are a CoreCo Plan Creditor and/or a BrazilCo Plan Creditor, who is or may be entitled to vote on one or both of the Plans. The claims of each Plan Creditor against the relevant Plan Company, together with certain related rights in respect of such claims, will be affected by the relevant Plan.

1.5    In accordance with the Practice Statement, the purpose of this letter is to inform you:

1.5.1    that the Plan Companies intend to promote the CoreCo Plan and the BrazilCo Plan respectively, which will together enable the implementation of the Recapitalisation Transaction (see further Section 8 (*Overview of the Restructuring*));

1

1.5.2   of the background to, and the purpose and effect of, the Plans (see further Section 7 (*Objectives of the Plans*));

1.5.3   of the proposed Plan Meetings and the proposed composition of the classes of Plan Creditors for voting on the Plans (see further Section 10 (*Proposed Class Constitution of Plan Creditors*));

1.5.4   of other matters that are proposed to be addressed at the Convening Hearing, including any Creditor Issues (see Section 14 (*Creditor Issues*));

1.5.5   that the Plan Companies each intend to apply to the Court at a joint Convening Hearing for an order granting each of the Plan Companies certain directions in relation to the Plans, including permission to convene the Plan Meetings for the purpose of the Plan Creditors considering and, if thought fit, approving the Plans. The date of the Convening Hearing is expected to be 14 May 2026 and the time of the Convening Hearing will be confirmed to Plan Creditors by the Information Agent (and details will also be available on the Plan Website) (see further Section 15 (*Convening Hearing*));

1.5.6   of the reasons why the Plan Companies consider the Court has jurisdiction to sanction the Plans (see further Section 0 (*Jurisdiction and Recognition*));

1.5.7   that you are entitled to attend the Convening Hearing and the Sanction Hearing (see further Sections 15 (*Convening Hearing*) and 18 (*Sanction Hearing*)); and

1.5.8   how you may make further enquiries about the Plans (see further Section 20 (*Enquiries and Further Information*)).

1.6   The CoreCo Plan relates to rights, liabilities and obligations arising under:

1.6.1   the 2026 Legacy Notes Debt;

1.6.2   the 2029 Legacy Notes Debt;

1.6.3   the R-1 Revolving Credit Facility Debt;

1.6.4   the R-2 Revolving Credit Facility Debt;

1.6.5   the Term Loan B Debt;

1.6.6   the Term Loan A Debt;

1.6.7   the Series I Loan Debt; and

1.6.8   the Series II Loan Debt,

(together, the "**CoreCo Plan Debt**" and together with the Letter of Credit Facility, the "**Corporate Debt**").

1.7   The BrazilCo Plan relates to rights, liabilities and obligations arising under the 2029 New Notes Debt (the 2029 New Notes Debt together with the CoreCo Plan Debt, being the "**Plan Debt**").

1.8    Pursuant to the Plans, the Plan Creditors will release their existing claims against the Group in return for Plan Consideration comprising a mix of debt, preferred equity and common equity. The Plan Consideration is allocated in accordance with the Plan Creditors' existing rights against various Collateral Pools. The respective Plan Classes, Collateral Pool interests and Plan Consideration are summarised in the table below:

| Class | Plan Debt | Collateral Pool(s)[1] | Plan Consideration Instrument(s) |
|---|---|---|---|
| Legacy Notes Class | 2026 Legacy Notes Debt<br>2029 Legacy Notes Debt | Common Collateral | CoreCo Common Stock<br>CoreCo Preferred Stock |
| Series I and Series II Class | Series I Loan Debt<br>Series II Loan Debt | Common Collateral | CoreCo Common Stock<br>CoreCo Preferred Stock |
| R-1 Class | R-1 Revolving Credit Facility Debt | Common Collateral<br>F1 Collateral<br>F2 Collateral<br>Account Collateral | CoreCo Common Stock<br>CoreCo Preferred Stock<br>New CoreCo Term Loans<br>FLNG 2 Term Loans<br>FLNG 2 Preferred Equity |
| R-2 Class | R-2 Revolving Credit Facility Debt | Common Collateral<br>F1 Collateral<br>F2 Collateral<br>Account Collateral<br>Brazil Collateral | CoreCo Common Stock<br>CoreCo Preferred Stock<br>New CoreCo Term Loans<br>FLNG 2 Term Loans<br>FLNG 2 Preferred Equity<br>RCF-2 / TLA BrazilCo Equity Pool |
| TLA Class | Term Loan A Debt | Common Collateral<br>F2 Collateral<br>Account Collateral<br>Brazil Collateral | CoreCo Common Stock<br>CoreCo Preferred Stock<br>New CoreCo Term Loans<br>FLNG 2 Term Loans<br>FLNG 2 Preferred Equity<br>RCF-2 / TLA BrazilCo Equity Pool |
| TLB Class | Term Loan B Debt | Common Collateral | CoreCo Common Stock |

---

[1]    Note: Collateral Pools exclude security and other interests in respect of Plan Debt which are not expected to be shown to provide any recovery to Plan Creditors in the Relevant Alternative Report. Such excluded security and other interests include the Brazil 2L Lien and the Residual FLNG Proceeds Claims.

3

| Class | Plan Debt | Collateral Pool(s)[1] | Plan Consideration Instrument(s) |
|-------|-----------|----------------------|----------------------------------|
|  |  | F1 Collateral<br><br>F2 Collateral | CoreCo Preferred Stock<br><br>New CoreCo Term Loans<br><br>FLNG 2 Term Loans<br><br>FLNG 2 Preferred Equity |
| 2029 New Notes Class | 2029 New Notes Debt | Brazil Collateral | BrazilCo Common Equity |

1.9    The Plan Companies have received indications of support for the Plans and the Restructuring from Plan Creditors holding, in aggregate, more than 75 per cent. in value of each proposed class of Plan Debt and approximately 97 per cent. of the Plan Debt by value.

1.10    Neither Plan constitutes a compromise or arrangement between the relevant Plan Company and holders of the GLP Preferred Units. As such, claims under the GLP Preferred Units will not be Plan Debt for the purposes of the Plans, and holders of GLP Preferred Units will not be Plan Creditors. The Plans do not affect the rights of the holders of GLP Preferred Units.

1.11    For more detail on the debt instruments to which the Plans relate, please refer to Section 5 (*Debt Capital Structure of the Group*). The proposed compromise of the debt instruments is set out in detail at Section 9 (*Rights Subject to the Plans*) and the allocation of the Plan Consideration is described in further detail at Schedule 2 (*Restructuring Effective Date Plan Consideration*).

1.12    This letter is being sent to the Information Agent via email in its capacity as "Information Agent" under the Plans for the purposes of making it available to Plan Creditors by:

1.12.1    making it available on the Plan Website (https://deals.is.kroll.com/nfe) (see further Section 21 (*Plan Website*));

1.12.2    distributing it to the RCF Agent, the TLB Agent, the TLA Agent, the Series I Agent and the Series II Agent to send on to their respective Plan Creditors; and

1.12.3    with respect to each of the 2026 Legacy Notes, 2029 Legacy Notes and 2029 New Notes, publishing an announcement to the respective Plan Creditors via DTC.

1.13    The date of the Plan Meetings will be confirmed in the Explanatory Statement which, provided the Court gives its permission to convene the Plan Meetings, will be circulated to Plan Creditors shortly after the Court has granted permission for the Plan Meetings to be convened at the Convening Hearing. A notice will also be sent to Plan Creditors with the details of the Plan Meetings and how to join them.

4

## 2    WHAT IS A RESTRUCTURING PLAN?

2.1    A restructuring plan is a formal, court-sanctioned legal procedure (under Part 26A of the Act) designed to help companies facing financial distress, generally, to avoid terminal insolvency proceedings or value destructive enforcement or other processes.

2.2    In accordance with Part 26A of the Act, a restructuring plan can be proposed by a company which has encountered, or is likely to encounter, financial difficulties that are affecting, or will or may affect, its ability to carry on its business as a going concern. A restructuring plan enables a company to agree a compromise or arrangement with its creditors or any class of its creditors and its members or any class of its members in respect of its debts or obligations owed to those creditors or members. The purpose of the proposed compromise or arrangement must be to eliminate, reduce or prevent, or mitigate the effect of, any of the financial difficulties currently faced by the plan company.

2.3    A restructuring plan will become effective if:

2.3.1    either:

(i)    **approval of each class**: the restructuring plan is approved by at least 75 per cent. in value of each class of creditors and/or members of the plan company present in person or by proxy and voting at each meeting convened to approve the restructuring plan; or

(ii)    **cross-class cram down**: if the restructuring plan is not approved by the requisite majority of creditors in each class (any such class not approving being a "**Dissenting Class**"):

(a)    the Court is satisfied that, if the restructuring plan is sanctioned, none of the members of any Dissenting Class would be any worse off than they would be in the event of the '*relevant alternative*'. The relevant alternative is whatever the Court considers to be the most likely alternative if the restructuring plan is not sanctioned; and

(b)    the restructuring plan has been approved by at least 75 per cent. in value of one or more classes that would receive a payment, or have a genuine economic interest in the plan company, in the event of the relevant alternative;

2.3.2    the Court approves the restructuring plan by making an order sanctioning the restructuring plan; and

2.3.3    (in the case of companies registered in England and Wales) a copy of the order sanctioning the restructuring plan is delivered to the Registrar of Companies.

2.4    Once effective, a restructuring plan will bind all the creditors and members subject to it, whether or not those creditors or members voted in favour of it or voted against it or did not vote at all and, in each case, their successors and assigns.

2.5    The arrangements and compromises in respect of:

5

2.5.1 the CoreCo Plan Creditors are proposed to be implemented by way of a restructuring plan proposed by NFE Global (i.e., the CoreCo Plan) in respect of the CoreCo Plan Debt; and

2.5.2 the BrazilCo Plan Creditors are proposed to be implemented by way of a restructuring plan proposed by NFE Brazil Newco (i.e., the BrazilCo Plan) in respect of the 2029 New Notes.

## 3   WHO IS ENTITLED TO VOTE?

3.1 The creditors who are proposed to be bound by the terms of, and who will therefore be entitled to vote on, the CoreCo Plan are:

3.1.1 the ultimate beneficial holders of the 2026 Legacy Notes Debt (the "**2026 Legacy Noteholders**");

3.1.2 the ultimate beneficial holders of the 2029 Legacy Notes Debt (the "**2029 Legacy Noteholders**" and together with the 2026 Legacy Noteholders, the "**Legacy Noteholders**");

3.1.3 the lenders of record under the R-1 Revolving Credit Facility Debt (the "**R-1 Lenders**");

3.1.4 the lenders of record under the R-2 Revolving Credit Facility Debt (the "**R-2 Lenders**" and together with the R-1 Lenders, the "**RCF Lenders**");

3.1.5 the lenders of record under the Term Loan B Debt (the "**TLB Lenders**");

3.1.6 the lenders of record under the Term Loan A Debt (the "**TLA Lenders**");

3.1.7 the lender of record under the Series I Loan Debt (the "**Series I Lender**"); and

3.1.8 the lender of record under the Series II Loan Debt (the "**Series II Lender**"),

(each a "**CoreCo Plan Creditor**" and together, the "**CoreCo Plan Creditors**").

3.2 The creditors who are proposed to be bound by the terms of, and who will therefore be entitled to vote on, the BrazilCo Plan are the ultimate beneficial holders of the 2029 New Notes Debt (the "**2029 New Noteholders**") (each a "**BrazilCo Plan Creditor**" and together, the "**BrazilCo Plan Creditors**", and together with the CoreCo Plan Creditors, the "**Plan Creditors**").

3.3 To avoid double counting, and notwithstanding that they may be creditors under the Plan Debt, it is not intended that any of the Administrative Parties will exercise any voting rights at any Plan Meeting.

3.4 Under the terms of the Series I Loan and the Series II Loan, certain amendments and actions (including voting) require the consent of, or may be directed by, a majority of the 2029 New Noteholders. For the purposes of voting in the CoreCo Plan, the Series I Lender and Series II Lender will vote in respect of 100 per cent. of the Series I Loan Debt and Series II Loan Debt respectively, having been directed with, and

6

subsequently ratifying, any such votes in accordance with the instruments relating to the 2029 New Notes Debt.

3.5 If you are, or were, a Plan Creditor and you have assigned, sold or otherwise transferred your interests as a Plan Creditor (in whole or in part) or intend to do so before the Plan Meetings, you should forward a copy of this letter to the person or persons to whom you have assigned, sold or otherwise transferred, or the person or persons to whom you intend to assign, sell or transfer, such interests.

## 4 BACKGROUND TO THE PLAN COMPANIES AND THE GROUP

### (A) NFE GLOBAL HOLDINGS LIMITED

4.1 NFE Global is a private company limited by shares incorporated in England and Wales under registered number 13679588 and with its registered office address at Suite 1, 7th Floor, 50 Broadway, London SW1H 0BL, United Kingdom. NFE Global was incorporated on 14 October 2021. NFE Global is a member of the Group, a direct wholly-owned subsidiary of NFE International Holdings Limited (a Bermudian company) and an indirect wholly-owned subsidiary of the Parent. NFE Global has no material assets.

4.2 NFE Global is a guarantor in respect of the Corporate Debt. The other guarantors of the Corporate Debt have existing rights of contribution against NFE Global in accordance with the Corporate Debt documents and the general law of guarantees. Additionally, and to assist with the CoreCo Plan (in circumstances in which, absent it facing a contribution claim from the primary obligor, it may not be possible for a guarantor to bring about the release of a primary obligor through a restructuring plan promulgated by it), NFE Global entered into a deed of contribution prior to the date of this letter, pursuant to which the Parent has rights of contribution against NFE Global in connection with the CoreCo Plan Debt. By virtue of the Parent's and other guarantors' rights of contribution, for NFE Global effectively to obtain a release or variation of the Plan Creditors' rights against it in respect of the CoreCo Plan Debt, there must be a corresponding release or variation of the CoreCo Plan Creditors' rights against the Parent and the other guarantors of the CoreCo Plan Debt.

### (B) NFE BRAZIL NEWCO LIMITED

4.3 NFE Brazil Newco is a private company limited by shares incorporated in England and Wales under registered number 17141053 and with its registered office address at Suite 1, 7th Floor, 50 Broadway, London SW1H 0BL, United Kingdom. NFE Brazil Newco was incorporated on 7 April 2026. NFE Brazil Newco is a member of the Group, a direct wholly-owned subsidiary of NFE Financing LLC (a Delaware limited liability company) and an indirect wholly-owned subsidiary of the Parent.

4.4 NFE Brazil Newco was incorporated with the consent of the majority of the holders of the 2029 New Notes for the express purpose of promoting the BrazilCo Plan to enable the restructuring of the 2029 New Notes. NFE Brazil Newco became a guarantor in respect of the obligations under the 2029 New Notes on 9 April 2026. The other guarantors of the 2029 New Notes have rights of contribution against NFE Brazil Newco in connection with the 2029 New Notes Debt in accordance with the Corporate Debt documents and the general law of guarantees. Additionally, and for the same reason as that identified in paragraph 4.2 above, NFE Brazil Newco has

entered into a deed of contribution with NFE Financing prior to the date of this letter, pursuant to which NFE Financing has rights of contribution against NFE Brazil Newco. By virtue of NFE Financing's and the other guarantors' rights of contribution, for NFE Brazil Newco effectively to obtain a release or variation of the Plan Creditors' rights against it in respect of the 2029 New Notes Debt, there must be a corresponding release or variance of the BrazilCo Plan Creditors' rights against NFE Financing and the other guarantors of the 2029 New Notes Debt.

4.5    These matters will be brought to the attention of the Court at the Convening Hearing and it will be explained that the steps described in paragraphs 4.2 and 4.4 above which were taken to satisfy certain requirements of Part 26A of the Act were taken in the interests of the Plan Creditors generally to facilitate the Plans.

**(C)    BUSINESS OF THE NFE GROUP**

4.6    The Group is a global energy infrastructure business. The Group's business model spans the entire production and delivery chain from natural gas procurement and liquefaction to shipping, logistics, facilities and conversion or development of natural gas-fired power generation.

4.7    The Group delivers targeted energy solutions by employing an integrated LNG supply and delivery model summarised as follows:

4.7.1    ***LNG and Natural Gas Supply and Liquefaction***: the Group supplies liquefied natural gas ("**LNG**") and natural gas regasified from LNG to its own power plants and to its customers. The Group's first floating liquefaction unit, FLNG 1, began producing LNG in July 2024, and the Group sources a significant portion of its LNG needs from this facility. Currently, demand for LNG above FLNG 1's capacity is acquired from third-party suppliers in open market purchases.

4.7.2    ***Shipping***: the Group leases, owns or operates a fleet of two floating storage and regasification units and five liquefied natural gas carriers, two of which operate as additional floating storage units. Six vessels are owned by Energos Infrastructure ("**Energos**"), and the Group also charters vessels to and from third parties.

4.7.3    ***Facilities***: through its network of current and planned downstream facilities and logistics assets, the Group is strategically positioned to deliver gas and power solutions to its customers seeking either to transition from environmentally dirtier distillate fuels such as automotive diesel oil and heavy fuel oil, or to purchase natural gas to meet their current fuel needs.

4.8    Additionally, the Group builds modular LNG manufacturing production facilities that can be deployed in various locations globally to liquify natural gas cheaply and efficiently.

**(D)    SHAREHOLDING STRUCTURE**

4.9    The Parent is a Delaware corporation and is the ultimate holding company of the Group. As of 31 March 2026, the Parent had 285,634,650 shares of Class A common stock outstanding. The Class A common stock is listed on the Nasdaq Global Select Market and carries voting rights.

8

4.10    As of 31 December 2025, affiliates of certain entities controlled by Wesley R. Edens (co-founder, CEO and board member of the Parent), Randal A. Nardone (co-founder and board member of the Parent), and affiliates of Fortress Investment Group LLC owned an aggregate of approximately 92,230,509 shares of Class A common stock, representing approximately 32.8 per cent. of total voting power in respect of the Parent. Also as of 31 December 2025, affiliates of Energy Transition Holdings LLC owned an aggregate of approximately 25,559,846 shares of Class A common stock, representing approximately 9.0 per cent. of total voting power.

4.11    Plan Creditors can obtain further information on the Group, including financial information, from the Group's investor relations website at *https://ir.newfortressenergy.com/investor-relations*.

## 5    DEBT CAPITAL STRUCTURE OF THE GROUP

5.1    The Group has a number of different sources of financial indebtedness which will be summarised in more detail in the Explanatory Statement. The Plans will not compromise secured or unsecured financial liabilities of the Group generally, other than the Plan Debt. This section provides a summary of the Plan Debt and the Letter of Credit Facility.

### (A)    LEGACY NOTES

5.2    On 12 April 2021, the Parent issued $1.5 billion of 6.500% senior secured notes due 2026, of which approximately $511 million of principal is outstanding as at the date of this letter, in a private offering pursuant to Rule 144A under the Securities Act (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**2026 Legacy Notes**").

5.3    On 8 March 2024, the Parent issued $750 million of 8.750% senior secured notes due 2029, of which approximately $237 million of principal is outstanding as at the date of this letter, in a private offering pursuant to Rule 144A under the Securities Act (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**2029 Legacy Notes**" and together with the 2026 Legacy Notes, the "**Legacy Notes**"). Each indenture (each a "**Legacy Notes Indenture**") pursuant to which the Legacy Notes were issued is governed by New York law.

5.4    The Legacy Notes are guaranteed by substantially all wholly-owned direct and indirect subsidiaries of the Parent other than: (i) the FLNG 1 Guarantors and the FLNG 2 Guarantors and the subsidiaries of each; (ii) certain immaterial subsidiaries; (iii) NFE Financing, the Brazil Parent and the subsidiaries of each; and (iv) certain other immaterial exceptions (each, a "**Common Guarantor**" and collectively, the "**Common Guarantors**"). Each of the Parent and the Common Guarantors has granted security interests over all of its assets and property (subject to certain excluded assets) (the "**Common Collateral**") to secure the obligations under each respective Legacy Notes series. The secured parties under each of the Legacy Notes have a first lien claim against the Common Collateral which ranks *pari passu* with the other Corporate Debt claims.

5.5    Pursuant to the 2024 Refinancing Transactions, recoveries (if any) to the Legacy Noteholders from any residual proceeds of assets of FLNG 1 or FLNG 2 after the discharge of the F1 Collateral or F2 Collateral (the "**Residual FLNG Proceeds**

**Claims**") are contractually subordinated to the Series I Loan and Series II Loan. The Residual FLNG Proceeds Claims are "out-of-the-money" claims in terms of the value of the assets in both the Relevant Alternative (which is described more fully at paragraph 11.5 below) and in the CoreCo Plan.

**(B)   REVOLVING CREDIT FACILITY**

5.6   On 15 April 2021, the Parent and certain of its wholly-owned direct and indirect subsidiaries entered into a New York law-governed credit agreement (such credit agreement, as amended, restated, amended and restated, supplemented or otherwise modified from time to time, being the "**Revolving Credit Facility Agreement**") providing for syndicated senior secured revolving credit facilities. As at the date of this letter, the facilities advanced under the Revolving Credit Facility Agreement comprise: (i) a facility drawn at approximately $100 million at the date of this letter (the "**R-1 Revolving Credit Facility**") and (ii) a facility drawn at approximately $560 million at the date of this letter (the "**R-2 Revolving Credit Facility**" and together with the R-1 Revolving Credit Facility, the "**Revolving Credit Facility**").

5.7   The Revolving Credit Facility includes a letter of credit facility pursuant to which letters of credit in an aggregate amount of $70 million have been issued and are undrawn as at 26 February 2026. All letters of credit currently outstanding under the Revolving Credit Facility Agreement will be replaced under the New CoreCo LC Facility or the New BrazilCo LC Facility, as applicable.

5.8   The obligations under the Revolving Credit Facility are:

5.8.1   guaranteed by the Common Guarantors and secured by a first lien claim against the Common Collateral *pari passu* with the other Corporate Debt claims;

5.8.2   guaranteed by the subsidiaries of the Parent that own and operate the FLNG 1 rigs (the "**FLNG 1 Guarantors**") and secured by certain natural gas liquefaction assets and other assets of the FLNG 1 Guarantors (the "**F1 Collateral**") on terms such that claims under the Revolving Credit Facility rank *pari passu* with claims under the Term Loan B Facility and the Letter of Credit Facility;

5.8.3   guaranteed by the subsidiaries of the Parent that own FLNG 2 ("**FLNG 2 Guarantors**") and secured by certain natural gas liquefaction assets and other assets of the FLNG 2 Guarantors ("**F2 Collateral**") on terms such that claims under the Revolving Credit Facility rank *pari passu* with claims under the Term Loan B Facility, the Letter of Credit Facility and the Term Loan A Facility;

5.8.4   in addition to the security and guarantees above, secured by:

(i)   in respect of the R-2 Revolving Credit Facility only, the NFE Financing Collateral Assets pursuant to, and solely to the extent of, the Brazil $200m Pari Lien; and

(ii)   in respect of the R-1 Revolving Credit Facility and R-2 Revolving Credit Facility, the NFE Financing Collateral Assets pursuant to, and solely to the extent of, the Brazil 2L Lien,

10

the collateral described in (i) and (ii) including the limitations thereon relating to the Brazil \$200m Pari Lien and the Brazil 2L Lien, being the "**Brazil Bank Collateral**"; and

5.8.5   further secured by a security interest over certain of the Group's accounts *pari passu* with the holders of claims under the Letter of Credit Facility and the Term Loan A Facility (the "**Account Collateral**").

## (C)   TERM LOAN B FACILITY

5.9   On 30 October 2023, the Parent and certain of its wholly-owned subsidiaries entered into a New York law-governed credit agreement (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, being the "**Term Loan B Agreement**") pursuant to which the lenders funded term loans in an initial aggregate principal amount of \$856 million which was increased by \$425 million following amendments to the Term Loan B Agreement dated 6 December 2024 and 3 March 2025, of which approximately \$1,266 million of principal is outstanding as at the date of this letter (the "**Term Loan B Facility**") (the loans and other extensions of credit made under the Term Loan B Agreement being the "**Term Loan B**").

5.10   The obligations under the Term Loan B Facility are:

5.10.1   guaranteed by the Common Guarantors and secured by the Common Collateral;

5.10.2   guaranteed by the FLNG 1 Guarantors and secured by the F1 Collateral; and

5.10.3   guaranteed by the FLNG 2 Guarantors and secured by the F2 Collateral.

## (D)   TERM LOAN A FACILITY

5.11   On 19 July 2024, the Parent and certain of its wholly-owned subsidiaries entered into a New York law-governed credit agreement (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, being the "**Term Loan A Agreement**") pursuant to which the lenders party thereto committed to advance term loans from time to time in an initial aggregate principal amount of up to \$700 million of which approximately \$295 million of principal is outstanding as at the date of this letter (the "**Term Loan A Facility**") (the loans and other extensions of credit made under the Term Loan A Agreement being the "**Term Loan A**").

5.12   The obligations under the Term Loan A Facility are:

5.12.1   guaranteed by the Common Guarantors and secured by the Common Collateral;

5.12.2   guaranteed by the FLNG 2 Guarantors and secured by the F2 Collateral;

5.12.3   secured by the Brazil Bank Collateral; and

5.12.4   secured by the Account Collateral.

11

**(E)    2029 NEW NOTES**

5.13    On 6 November 2024, the Parent entered into an exchange and subscription agreement with certain holders of then outstanding Legacy Notes, which related to a series of transactions intended to extend the maturity profile of the Group's indebtedness and enhance liquidity. Pursuant to the transactions, NFE Financing was interposed as a holding company for approximately 45 per cent. of the Group's Brazilian business and, on 22 November 2024, issued approximately $2.73 billion 12.000% senior secured notes due 2029 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**2029 New Notes**"). The proceeds of the 2029 New Notes were used to repay in full certain 6.750% notes due 2025 issued by the Parent (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**2025 Notes**"), to exchange a portion of the Legacy Notes, and for general corporate purposes (such transactions being the "**2024 Refinancing Transactions**").

5.14    The indenture pursuant to which the 2029 New Notes were issued is governed by New York law.

5.15    The 2029 New Notes are guaranteed by PA Land and NFE Brazil Newco, and secured by first-ranking liens over the NFE Financing Collateral Assets (and such collateral that is subject to such first-ranking liens together with the Brazil $200m Pari Lien, the "**Brazil Collateral**").

5.16    The Brazil Collateral, the Common Collateral, the Account Collateral, the F1 Collateral and the F2 Collateral, together being the "**Collateral Pools**".

**(F)    INTERCOMPANY LOANS**

*Brazil Parent Intercompany Loan Facility*

5.17    In connection with the 2024 Refinancing Transactions, on 22 November 2024 NFE Financing, as lender, entered into a New York law-governed credit agreement (the "**Brazil Parent Credit Agreement**") with NFE Brazil Investments LLC ("**Brazil Parent**"), as borrower, which provides for a senior secured term loan facility initially drawn in an amount of approximately $970 million ("**Brazil Parent Intercompany Loan Facility**") (the loans and other extensions of credit made under the Brazil Parent Credit Agreement being the "**Brazil Parent Intercompany Loan**").

5.18    The Brazil Parent Credit Agreement is secured by substantially all assets of Brazil Parent (including the Series I Loan and the approximately 55 per cent. equity interest in the Group's Brazilian business held by Brazil Parent).

5.19    The obligations under the Brazil Parent Intercompany Loan Facility are not Plan Debt. In connection with the Restructuring, it is proposed that the Brazil Parent Intercompany Loan Facility will be released in full or otherwise discharged.

*Series I Loan*

5.20    On 22 November 2024, Brazil Parent, as lender, and the Parent, as borrower, and certain of the Parent's subsidiaries, as guarantors, entered into a New York law-governed senior secured, credit agreement ("**Series I Loan Agreement**") drawn in

an amount of approximately $970 million (such loans made under the Series I Loan Agreement being the "**Series I Loan**").

5.21    The Series I Loan was funded using the proceeds of the Brazil Parent Intercompany Loan Facility.

5.22    The obligations under the Series I Loan Agreement are guaranteed by the Common Guarantors and are secured by the Common Collateral.

### *Series II Loan*

5.23    On 6 December 2024, NFE Financing, as lender, the Parent, as borrower, and certain of the Parent's subsidiaries, as guarantors, entered into a New York law-governed senior secured term loan credit agreement ("**Series II Loan Agreement**") drawn in an amount of approximately $1.43 billion (the loan made under the Series II Loan Agreement being the "**Series II Loan**" and together with the Series I Loan and the Brazil Parent Intercompany Loan, the "**2024 Intercompany Loans**") in connection with the 2024 Refinancing Transactions.

5.24    The obligations under the Series II Loan Agreement are guaranteed by the Common Guarantors and are secured by the Common Collateral.

5.25    Pursuant to the terms of the 2024 Intercompany Loans, NFE Financing is the ultimate recipient of the proceeds from the Series I Loan and the Series II Loan and such proceeds form part of the NFE Financing Collateral Assets. The R-2 Lenders, the TLA Lenders and the 2029 New Noteholders therefore have an indirect interest in the proceeds of the Series I Loan and the Series II Loan as part of the Brazil Collateral.

### (G)    LETTER OF CREDIT FACILITY

5.26    On 16 July 2021, the Parent and certain of its wholly-owned subsidiaries entered into a New York law-governed uncommitted letter of credit and reimbursement agreement (such credit and reimbursement agreement, as amended from time to time, being the "**Letter of Credit Agreement**") with a bank for the issuance of letters of credit (the "**Letter of Credit Facility**"). Claims under the Letter of Credit Facility will not be compromised under the Plans and do not form part of the Plan Debt. With effect from the Restructuring Effective Date and following the separation of the Group (as described at paragraph 8.2 below), the Letter of Credit Facility will be replaced with:

5.26.1    an amended letter of credit facility agreement for letters of credit required by the CoreCo Group; and

5.26.2    a new letter of credit facility agreement required by the BrazilCo Group.

5.27    The obligations under the Letter of Credit Facility are:

5.27.1    guaranteed by the Common Guarantors and secured by the Common Collateral;

5.27.2    guaranteed by the FLNG 1 Guarantors and secured by the F1 Collateral;

13

5.27.3 guaranteed by the FLNG 2 Guarantors and secured by the F2 Collateral;

5.27.4 secured by the Brazil Bank Collateral; and

5.27.5 secured by the Account Collateral.

**(H)   SECURITY, RANKING AND PRIORITY**

5.28   The ranking of claims and security of the Group in respect of the various Plan Debt instruments and the Letter of Credit Facility obligations described above is regulated by:

5.28.1 an intercreditor agreement dated 12 April 2021 (as amended from time to time) (the "**Equal Priority Intercreditor Agreement**") in respect of the Corporate Debt;

5.28.2 an intercreditor agreement dated 6 December 2024 (the "**Brazil Parent ICA**") that regulates recoveries under the first priority liens in respect of the Brazil Collateral; and

5.28.3 an intercreditor agreement dated 22 November 2024 (the "**Brazil Junior ICA**") that establishes the priority of the first priority liens and second priority liens in respect of the Brazil Collateral.

5.29   Under the terms of the Equal Priority Intercreditor Agreement, the RCF Agent has the exclusive right to direct enforcement of the Shared Collateral once it becomes enforceable, if so directed by the RCF Lenders.

5.30   The collateral and priority arrangements under the Equal Priority Intercreditor Agreement, the Brazil Parent ICA and the Brazil Junior ICA can be summarised as follows:

| Collateral | Priority |
|---|---|
| Common Collateral | *Pari passu* **first lien claims** in respect of the:<br>• Legacy Notes Debt;<br>• Revolving Credit Facility Debt;<br>• Letter of Credit Facility Debt;<br>• Term Loan B Debt;<br>• Term Loan A Debt;<br>• Series I Loan Debt; and<br>• Series II Loan Debt. |
| F1 Collateral | *Pari passu* **first lien claims** in respect of the:<br>• Revolving Credit Facility Debt;<br>• Letter of Credit Facility Debt; and<br>• Term Loan B Debt. |

| Collateral | Priority |
|---|---|
| F2 Collateral | ***Pari passu* first lien claims** in respect of the:<br><br>• Revolving Credit Facility Debt;<br><br>• Letter of Credit Facility Debt;<br><br>• Term Loan B Debt; and<br><br>• Term Loan A Debt. |
| Brazil Collateral | ***Pari passu* first lien claims** in respect of the:<br><br>• R-2 Revolving Credit Facility Debt, Letter of Credit Facility Debt and Term Loan A Debt, subject to an aggregate $200 million cap; and<br><br>• 2029 New Notes Debt.<br><br>***Pari passu* second lien claims** in respect of the:<br><br>• Revolving Credit Facility Debt<br><br>• Letter of Credit Facility Debt; and<br><br>• Term Loan A Debt. |
| Account Collateral | ***Pari passu* first lien claims** in respect of the:<br><br>• Revolving Credit Facility Debt;<br><br>• Letter of Credit Facility Debt; and<br><br>• Term Loan A Debt. |

# 6    BACKGROUND TO THE GROUP'S FINANCIAL DIFFICULTIES

## (A)    KEY PROJECTS

6.1    The key projects and other key assets in operation or development for the Group include:

6.1.1    ***San Juan Terminal***: a landed micro-fuel handling terminal located in the Port of San Juan, Puerto Rico, which has been fully operational since the third quarter of 2020 and supports the Group's significant arrangements with the Puerto Rico Electric Power Authority ("**PREPA**") (the "**San Juan Terminal**");

6.1.2    ***La Paz Facility***: an LNG receiving facility located in the Port of Pichilingue in Baja California Sur, Mexico, which also supplies the Group's gas-fired 135 MW power plant located adjacent to the facility (the "**La Paz Facility**"). The La Paz Facility has been in commercial operation since the fourth quarter of 2021 and supports the Group's arrangements with CFEnergia, a subsidiary of Federal Electricity Commission (Comisión Federal de Electricidad);

6.1.3    ***Barcarena Terminal***: an LNG receiving facility comprising a floating storage and regasification unit and associated infrastructure, including

15

mooring and offshore and onshore pipelines, located in Pará, Brazil (the "**Barcarena Terminal**"), which supports a long-term gas supply agreement the Group has entered into with a subsidiary of Norsk Hydro ASA and will also supply gas to two natural gas-fired power plants that the Group is constructing adjacent to the Barcarena Terminal, the Barcarena Power Plant and the PortoCem Power Plant;

6.1.4   *Santa Catarina Terminal*: a facility, which was placed into service in the fourth quarter of 2024, located on the southern coast of Brazil (the "**Santa Catarina Terminal**"). It is in service and connected to Brazil's national gas grid;

6.1.5   *Barcarena Power Plant*: a natural gas-fired power plant that the Group is constructing adjacent to the Barcarena Terminal (the "**Barcarena Power Plant**"), which is fully contracted under multiple 25-year power purchase agreements to supply electricity to Brazil's national grid;

6.1.6   *PortoCem Power Plant*: the second natural gas-fired power plant that the Group is constructing adjacent to the Barcarena Terminal (the "**PortoCem Power Plant**");

6.1.7   *Puerto Sandino Facility*: the Group is developing an LNG receiving, transloading and regasification terminal in Puerto Sandino, Nicaragua (the "**Puerto Sandino Facility**"), which is in its final stages of construction, as well as a pipeline connecting the facility with the Group's nearby power plant, construction of which has already been completed. In connection with this project, the Group has entered into a 25-year power purchase agreement with Nicaragua's electricity distribution companies;

6.1.8   *FLNG*: the Group developed a first-in-kind modular liquefaction unit – referred to as 'Fast LNG' or "**FLNG**" – to provide a source of low-cost LNG to customers which the Group believes is faster and more economical to construct than many traditional liquefaction solutions. The Group's first FLNG unit ("**FLNG 1**"), comprised of three offshore fixed platforms and a floating storage unit, has been deployed 9 miles offshore of the coast of Altamira, Tamaulipas, Mexico, and was placed into service in the fourth quarter of 2024. The Group also owns an uncompleted, second FLNG project ("**FLNG 2**"); and

6.1.9   *Other assets*: the Group has contracted to lease certain gas turbines (the "**Turbines**").

## (B)   FINANCIAL DIFFICULTIES

6.2   The Group's business model historically required significant capital and operating expenditures to design, construct, procure and develop supply chain infrastructure and service its customer base. In some instances, the Group could not recoup capital outlay and generate income from customers until after the completion of construction of LNG terminal infrastructure, storage facilities and power plants. Moreover, most projects are completed in stages and are subject to risks of delay beyond the Group's control, including: (i) the need for specialised oil and gas regulatory permits and governmental authorisations, bespoke design and engineering solutions,

16

environmental or geological problems related to location; (ii) shortages or delays in the delivery of equipment and supplies; (iii) failure to meet technical specifications or adjustments being required based on testing or commissioning; (iv) weather interference; and (v) potential labour shortages, work stoppages or labour union disputes. Further, where the Group successfully develops a project and/ or executes on a customer contract, it faces the risk that customers may not fulfil their payment obligations. These risks are particularly pronounced in many of the non-U.S. jurisdictions in which the Group operates. Due to these factors the Group has experienced time delays and cost overruns in a number of its development and construction projects.

6.3    The Group's liquidity position and ability to generate revenue from projects and customer contracts have been adversely impacted or delayed by the following:

6.3.1    unanticipated delays in the permitting, construction or commencement of operations of the San Juan Terminal, La Paz Facility, Santa Catarina Terminal and the Puerto Sandino Facility;

6.3.2    the development of a first-in-kind, offshore modular FLNG 1, which experienced permitting and construction delays, and equipment failures that ultimately delayed the commencement of commercial operations;

6.3.3    the Group has experienced a number of challenges in relation to its Puerto Rico business:

(i)    local authorities' decision to discontinue the allowance of ship-to-ship transfers of LNG within San Juan port necessitated the Group switching operational plans to less efficient and more costly means of delivery; and

(ii)    in 2023 it entered into a customer contract with the U.S. Army Corps of Engineers to provide services in Puerto Rico in connection with the territory's grid stabilisation project. This contract was terminated by the counterparty in March 2024, following which the Group has been pursuing a request to the Federal Emergency Management Agency ("**FEMA**") for equitable adjustment to recover its unreimbursed costs and liabilities of approximately $659 million related to the early termination of this contract. In April 2026, the Group received a final settlement in connection with work undertaken for FEMA in an amount of $142 million (before payment of certain taxes and costs). This process has taken considerable time and not all costs could be recouped, which has impacted liquidity significantly;

6.3.4    delays to certain scheduled power auctions in Brazil;

6.3.5    the Group's margins have been adversely impacted by fluctuations in natural gas feedstock, increases in the costs of construction materials, and swings in the shipping and freight markets; and

6.3.6    the Group's proposed LNG terminal in Shannon, Ireland has faced delays due to significant environmental activist opposition and governmental permitting denials.

17

6.4    The challenges above delayed the commencement of revenue-generating operations for the affected projects and, collectively, had a material impact on the Group's liquidity. The 2024 Refinancing Transactions (see paragraph 5.13 of this letter) improved near-term liquidity and addressed the maturities of the 2025 Notes. However, many of the operational challenges described above have persisted since the 2024 Refinancing Transactions and continue to impact the Group's revenue-generation and its ability to service its indebtedness.

6.5    The liquidity challenges became critical in November 2025 by which point the Group had insufficient liquidity to make the following interest payments:

6.5.1    $163.8 million of interest due on the 2029 New Notes on 15 November 2025;

6.5.2    $13.1 million of interest due on the Revolving Credit Facility on 28 November 2025;

6.5.3    $30.6 million of interest due on Term Loan B on 10 December 2025; and

6.5.4    $1.6 million of interest due on Term Loan A on 10 December 2025.

6.6    The Group entered into short-term, rolling waivers and forbearances in respect of the interest payments with certain Plan Creditors to allow multilateral restructuring discussions to take place. On 17 March 2026, the Parent, NFE Global and certain Plan Creditors entered into the Restructuring Support Agreement, which among other things and subject to conditions and termination rights, extended forbearances on interest payments and other events of default to allow the Plan Companies to launch and implement the Plans. If the Plan Companies are unsuccessful or materially delayed in implementing the Plans, certain Plan Creditors will have the right to terminate the Restructuring Support Agreement, demand repayment and enforce rights in respect of the Plan Debt, including against the Plan Companies. Given the complexity of the capital structure and the number of different Plan Debt instruments and creditor groups, the Plan Companies consider that it would be extremely challenging to negotiate further extensions to forbearances if the Restructuring Support Agreement terminated. See Section 11 (*Consequences if the Plans are Not Successful*) for further detail on the consequences if the Plans are not successful.

6.7    The Group has very significant financial liabilities, including over $6 billion of Plan Debt owed to third parties. If the Plans are not sanctioned and the Restructuring is not implemented, there is substantial doubt as to the Group's ability to continue as a going concern. If Plan Creditors demanded the unpaid interest on Plan Debt from the Group, the Plan Companies would not have sufficient liquidity to meet the demands. In the Relevant Alternative, recoveries from the Group's assets would be insufficient to meet the financial liabilities under the Plan Debt in full. In order to resolve the very significant cash flow and balance sheet issues, there is an urgent need for a material balance sheet restructuring to convert a large proportion of Plan Debt into equity or preferred equity.

6.8    Following the Restructuring, the CoreCo Group and the BrazilCo Group will each have a portfolio of additional development projects and opportunities that are expected to generate revenue following the Restructuring. The realisation of these projects in the near- to medium-term is expected to significantly improve each of the CoreCo Group's and BrazilCo Group's revenues and liquidity. The purpose of the

18

Restructuring is to provide the CoreCo Group and BrazilCo Group with the necessary liquidity and capital to complete and capitalise on their development projects and opportunities by reducing their debt service burden, allowing new money financing and aligning each of the CoreCo Group's and BrazilCo Group's capital structures with their respective revised expectations for revenue once their respective projects and customer agreements become cash generative.

**(C)   SUPPORT FOR THE PLANS: RESTRUCTURING SUPPORT AGREEMENT**

6.9   Each Plan Creditor who is a party to the Restructuring Support Agreement agrees, subject to certain qualifications and limitations, to support the implementation of the Plans and the Restructuring and, among other things, has agreed:

6.9.1   to use commercially reasonable efforts to support, facilitate, implement, consummate or otherwise give effect to the Restructuring and the Plans including voting in favour of the Plans at each relevant Plan Meeting;

6.9.2   not to take any action, a substantial purpose of which is to object to or interfere with, impede, obstruct, hinder or materially delay the implementation or consummation of the Restructuring or the Plans;

6.9.3   not to sell their interests in the Plan Debt to any party who is not party to the Restructuring Support Agreement as a Supporting Creditor or who does not agree to become a party to the Restructuring Support Agreement as a Supporting Creditor; and

6.9.4   to forbear from exercising certain rights or remedies it may have against any member of the Group in respect of any Plan Debt.

6.10   The Restructuring Support Agreement may be terminated by the Parent and/ or the Supporting Creditors, as applicable, upon the occurrence of specified events defined in the Restructuring Support Agreement.

6.11   Recognising the urgency of the situation, as of 20 April 2026, the Restructuring Support Agreement has been signed or supported by creditors certifying that they represent, on a reconciled basis:

(i)      100.0 per cent. by value of the R-1 Revolving Credit Facility Debt;

(ii)     99.9 per cent. by value of the R-2 Revolving Credit Facility Debt;

(iii)    97.1 per cent. by value of the Term Loan B Debt;

(iv)    100 per cent. by value of the Term Loan A Debt;

(v)     84.6 per cent. by value of the 2026 Legacy Notes Debt;

(vi)    87.2 per cent. by value of the 2029 Legacy Notes Debt;

(vii)   100.0 per cent. by value of the Series I Loan Debt;

(viii)  100.0 per cent. by value of the Series II Loan Debt; and

(ix)    99.1 per cent. by value of the 2029 New Notes Debt.

19

6.12    The Restructuring Support Agreement has been notified and made available:

6.12.1  to all Plan Creditors via the Information Agent posting it on the Plan Website and by distributing it to Plan Creditors directly or via their respective agents, trustees and legal representatives;

6.12.2  to the 2026 Legacy Noteholders, 2029 Legacy Noteholders and 2029 New Noteholders, by publishing an announcement of its availability to Plan Creditors via DTC; and

6.12.3  to all Plan Creditors generally by issuing an announcement of its availability through a press release and filing a Form 8-K with the SEC.

6.13    Plan Creditors who have not yet signed up to the Restructuring Support Agreement may still do so.

*Early Consent Fee*

6.14    Under the terms of the Restructuring Support Agreement, each eligible Supporting Creditor that was a party to the Restructuring Support Agreement as at 5.00 p.m. (New York time) on 8 April 2026 (the "**Early Consent Deadline**", as originally extended from 31 March 2026) (or, in accordance with the Restructuring Support Agreement, becomes a Supporting Creditor after the Early Consent Deadline by acquiring Plan Debt that is eligible for the Early Consent Fee) will be entitled to a fee (the "**Early Consent Fee**") equal to 0.75 per cent. of the principal amount of such Supporting Creditors' *pro rata* claim, as at the Record Time, in:

6.14.1  the principal outstanding under the 2026 Legacy Notes for holders of the 2026 Legacy Notes;

6.14.2  the principal outstanding under the 2029 Legacy Notes for holders of the 2029 Legacy Notes;

6.14.3  the principal outstanding under Term Loan B for TLB Lenders;

6.14.4  the principal outstanding under the R-1 Revolving Credit Facility for R-1 Lenders;

6.14.5  for R-2 Lenders: (i) the principal outstanding under the R-2 Revolving Credit Facility, plus (ii) the portion of the principal outstanding under the Series I Loan and the Series II Loan that is equivalent to their *pro rata* share of the Brazil Collateral pursuant to the Brazil Parent ICA;

6.14.6  for TLA Lenders: (i) the principal outstanding under the Term Loan A, plus (ii) the portion of the principal outstanding under the Series I Loan and the Series II Loan that is equivalent to their *pro rata* share of the Brazil Collateral pursuant to the Brazil Parent ICA; and

6.14.7  for 2029 New Noteholders, the portion of the principal outstanding under the Series I Loan and the Series II Loan that is equivalent to their *pro rata* share of the Brazil Collateral pursuant to the Brazil Parent ICA.

20

6.15    The Early Consent Fee will be paid in the form of CoreCo Preferred Stock on the Restructuring Effective Date if the relevant conditions are satisfied. NFE Global believes that the Early Consent Fee is in line with market rates for such fees and is a reasonable fee for the benefit to the Group of having a significant number of Supporting Creditors in each class of Plan Debt committed to the Restructuring pursuant to the Restructuring Support Agreement before launching the Plans. Payment of the Early Consent Fee in the form of CoreCo Preferred Stock is appropriate because it preserves the liquidity of the Group and is a form of Plan Consideration payable to all Plan Creditors under the Recapitalisation Transaction (including to 2029 New Noteholders through their interests in the Series I Loan and the Series II Loan, as described at paragraph 5.25 above).

*Standstill Fee*

6.16    The Parent has agreed to pay a fee (the "**Standstill Fee**") to each RCF Lender that agreed in writing to forbear in an amount equal to 2.0 per cent. of the Revolving Credit Facility Debt held by such RCF Lender in consideration for such forbearance until the Plans become effective (or the Plan Companies cease to pursue the Plans). Under the terms of the Equal Priority Intercreditor Agreement, the RCF Agent has the exclusive right to enforce the Common Collateral, F1 Collateral, F2 Collateral and Account Collateral for an initial period of time and may impose a standstill on other secured parties holding the Corporate Debt during this time. The Standstill Fee will be paid in the form of New CoreCo Term Loans on the Restructuring Effective Date or will become a payment obligation of the Parent on the termination of the Restructuring Support Agreement. The Plan Companies believe that the Standstill Fee is in line with market rates for such fees and is a reasonable fee to ensure that no secured creditor takes enforcement action with respect to the Collateral Pools while the Plan Companies promulgate the Plans.

## 7    OBJECTIVES OF THE PLANS

7.1    The purposes and objectives of the Plans are to:

7.1.1    restructure the Plan Companies' and the Group's balance sheets;

7.1.2    address approaching maturities under the Plan Debt and replace existing debt with new debt and preferred equity finance arrangements that provide the Group and the Plan Companies with a sustainable capital structure;

7.1.3    enable access to new money financing to address each of the CoreCo Group's and the BrazilCo Group's near- to medium-term liquidity needs, to the extent required; and

7.1.4    facilitate the holistic restructuring of the Group, including the BrazilCo Separation, pursuant to the Restructuring.

7.2    The Plans will:

7.2.1    with effect from the Restructuring Effective Date, authorise the Plan Companies to implement the Restructuring;

7.2.2    grant authority to the Plan Companies to execute the documents required to implement the transactions contemplated by the Plans to which the Plan

Creditors (or certain of them) are party in their capacity as Plan Creditors, on behalf of the relevant Plan Creditors, including (without limitation):

(i)      the Plans;

(ii)     the Transaction Implementation Deed;

(iii)    the New CoreCo Credit Agreement;

(iv)     the FLNG 2 Term Loan Credit Facility Agreement;

(v)      the CoreCo Intercreditor Agreement;

(vi)     the CoreCo Registration Rights Agreement;

(vii)    the BrazilCo Stockholders' / LLC Agreement;

(viii)   the FLNG 2 Parent LLCA;

(ix)     the Holding Period Trust Deed; and

(x)      all other documents, agreements and instruments to which the Plan Creditors are party in their capacity as Plan Creditors necessary or desirable to implement or consummate the Restructuring in accordance with the Restructuring Support Agreement, the Plans and the Transaction Implementation Deed,

(together, the "**Implementation Documents**");

7.2.3   implement certain of the transactions contemplated by the Plans, as described at Section 8 (*Overview of the Restructuring*); and

7.2.4   set out the order in which the steps required to implement the Restructuring will take place.

7.3   The material Implementation Documents will be attached to, or described in, the Explanatory Statement and made available to Plan Creditors via the Plan Website following the Convening Hearing.

7.4   Following the implementation of the Restructuring, the Plan Companies expect that any new financing, combined with cash generated from its operations, releases of claims under the Plans and the deleveraging effected by the Recapitalisation Transaction, will be sufficient to enable the Plan Companies and the wider Group to continue operating in the normal course and fulfil the Group's commitments to its stakeholders, including creditors, customers, suppliers, joint venture partners, business partners and employees.

## 8      OVERVIEW OF THE RESTRUCTURING

8.1   The terms of the Restructuring are described in the Restructuring Term Sheet (including appendices). The Restructuring comprises the following steps:

8.1.1   the Group will be separated into two separate, standalone businesses:

(i)      a business comprising New BrazilCo Parent and its direct and indirect subsidiaries, comprising the Group's Brazilian business and PA Land, ("**BrazilCo Group**"); and

(ii)    a business comprising the Parent and its direct and indirect subsidiaries other than the BrazilCo Group ("**CoreCo Group**");

8.1.2    the Plan Creditors will release their existing claims against the Group in return for their allocation of the Plan Consideration as set out in Schedule 2 (*Restructuring Effective Date Plan Consideration*) (the "**Exchange Consideration Chart**");

8.1.3    the Parent, as borrower, and each other CoreCo Group entity, as a guarantor, will enter into a senior secured term loan credit facility for the CoreCo Group (described further below);

8.1.4    all letters of credit issued under the existing Letter of Credit Facility or Revolving Credit Facility will be replaced by letters of credit issued under separate new letter of credit facilities for each of the CoreCo Group and the BrazilCo Group (or, in the case of the CoreCo Group, remain outstanding under an amended, amended and restated, or otherwise modified Letter of Credit Agreement);

8.1.5    the Local Brazilian Debt Facilities will be refinanced in full or remain outstanding on their existing terms (subject to the release of the Parent corporate guarantee and any other obligations tied to the CoreCo Group);

8.1.6    the Brazil Parent Intercompany Loan Facility will be terminated and the Brazil Parent Intercompany Debt will be released in full or otherwise discharged;

8.1.7    the Existing NFE Stockholders will retain shares of the Parent's Class A common stock representing 35.0 per cent. of the CoreCo Common Stock issued and outstanding as of the Restructuring Effective Date, immediately before giving effect to the CoreCo MIP and before the conversion of CoreCo Preferred Stock into CoreCo Common Stock (which will automatically convert into 87 per cent. of *pro forma* CoreCo Common Stock on the third anniversary of their issue, and subject to a *pro rata* reduction in amount of converted CoreCo Common Stock issued relative to the amount of CoreCo Preferred Stock redeemed prior to that date) (as discussed further at paragraph 8.12 below);

8.1.8    certain management and employee incentive plans will be entered into as set out in more detail at paragraphs 8.14 to 8.16 below; and

8.1.9    to the extent required to satisfy the Minimum Liquidity Condition on the Restructuring Effective Date, the Parent will raise additional debt finance as described in more detail at paragraphs 8.20 to 8.23 below,

in each case on the terms and subject to the conditions set out in the Restructuring Support Agreement, including the Restructuring Term Sheet and the appendices and exhibits thereto (together, the "**Restructuring**").

### *Separation of the Group*

8.2    On the Restructuring Effective Date, the Group will separate the BrazilCo Group from the CoreCo Group and the BrazilCo Group will operate on a stand-alone basis

(the "**BrazilCo Separation**"). As part of the BrazilCo Separation, the BrazilCo Group will (a) secure a new long-term dedicated vessel, and (b) cause the BrazilCo GSA to become effective. The CoreCo Group and the BrazilCo Group will enter into the CoreCo–BrazilCo Transition Services Agreement.

8.3    Subject to the terms of a separation agreement, the CoreCo Group will retain ownership of all assets and liabilities (other than the BrazilCo Group and the assets and liabilities (including taxes) of the BrazilCo Group's business), including, without limitation, FLNG 1, FLNG 2, the assets and liabilities relating to the Group's businesses in Puerto Rico, Mexico and Nicaragua, the Turbines, the Group's claims against FEMA, and certain other non-core assets.

8.4    FLNG 2 Parent and its subsidiaries will remain wholly-owned subsidiaries of the Parent but will operate on an arm's length basis *vis-à-vis* the other CoreCo Group entities. On the Restructuring Effective Date, FLNG 2 Parent will incur $400 million of FLNG 2 Term Loans and issue $200 million of FLNG 2 Preferred Equity as set out in the Exchange Consideration Chart.

### *New CoreCo Credit Facilities*

8.5    The Parent, as borrower, and certain other CoreCo Group entities, as guarantors, will enter into the following credit facilities:

8.5.1    a term loan credit facility, secured by first-priority liens (except that such liens will rank junior to the liens securing the New CoreCo LC Facility and other permitted first-lien indebtedness) on substantially all assets of the CoreCo Group in accordance with the New CoreCo Credit Facility Term Sheet (the "**New CoreCo Credit Facility**" and the loans thereunder, the "**New CoreCo Term Loans**"), in an aggregate principal amount equal to the sum of (w) up to $475 million, (x) the aggregate principal amount of Incremental New CoreCo Term Loans, (y) the aggregate principal amount of Incremental Equity-for-Debt Exchange Election New CoreCo Term Loans, and (z) to the extent necessary to meet the Minimum Liquidity Condition, up to $35 million in aggregate principal amount of Capital Raise New CoreCo Term Loans (plus additional principal to reflect any original issue discount) and Capital Raise New CoreCo Junior Term Loans if necessary; and

8.5.2    a new letter of credit facility (or an amendment, amendment and restatement, or other modification to the Letter of Credit Agreement) (the "**New CoreCo LC Facility**"). The New CoreCo LC Facility will have the same guarantors as the New CoreCo Term Loans and rank senior in priority against collateral.

8.6    In addition, on the Restructuring Effective Date, FLNG 2 Parent, as borrower, will enter into a non-recourse term loan facility in the aggregate principal amount of $400 million (the "**FLNG 2 Term Loan Facility**", and the loans made thereunder, the "**FLNG 2 Term Loans**").

8.7    The intercreditor arrangements as between the New CoreCo Credit Facility and the New CoreCo LC Facility will be governed by the CoreCo Intercreditor Agreement, pursuant to which the obligations under the New CoreCo LC Facility will rank senior to the obligations under the New CoreCo Credit Facility.

24

***BrazilCo Liquidity Arrangements***

8.8     In April 2026, certain BrazilCo Plan Creditors provided $50 million of interim financing to the BrazilCo Group for liquidity purposes (the "**Interim Brazil Financing**"). The Interim Brazil Financing documentation provided that the other BrazilCo Plan Creditors would be offered the opportunity to participate in such financing on a *pro rata* basis. The Interim Brazil Financing will not be part of the Plan Debt, and is anticipated to be refinanced by the New BrazilCo Financing Arrangements in due course. Further information will be provided in the Explanatory Statement.

***New BrazilCo Financing Arrangements***

8.9     On or before the Restructuring Effective Date, the BrazilCo Group will enter into:

8.9.1   arrangements to refinance certain existing financial indebtedness (which is not Plan Debt), fund the RCF-2 / TLA BrazilCo Cash Pool, and provide additional working capital for the BrazilCo Group (the "**New BrazilCo Financing Arrangements**"); and

8.9.2   a new letter of credit facility (the "**New BrazilCo LC Facility**"),

each, on terms satisfactory to the management and stakeholders of the separated BrazilCo Group. Further information on the New BrazilCo Financing Arrangements and New BrazilCo LC Facility will be provided in the Explanatory Statement.

***Brazil Parent Intercompany Loan***

8.10    The Brazil Parent Intercompany Loan Facility will be terminated and the Brazil Parent Intercompany Debt will be released in full.

***Other BrazilCo–CoreCo Intercompany Claims***

8.11    All valid net intercompany claims of the CoreCo Group against the BrazilCo Group (other than claims arising under the 2024 Intercompany Loans) (such claims, the "**Net BrazilCo–CoreCo Intercompany Claim**") will be replaced with a debt instrument in an aggregate principal amount equal to the Net BrazilCo–CoreCo Intercompany Claim, which will bear interest at a rate of 8.00% per annum, payable quarterly in cash with a three-year term.

***Existing NFE Stockholders***

8.12    As discussed at paragraph 8.1.7 above, pursuant to the Plans, the Existing NFE Stockholders will retain shares of the Parent's Class A common stock. The Plan Companies consider that the retention of stock by the Existing NFE Stockholders is an appropriate compromise based on, among other things: the expected valuation in the Relative Alternative Report for the common stock on the Restructuring Effective Date, the need to incentivise the Existing NFE Stockholders to approve certain proposals (described at paragraph 8.25.1 below), and the benefit of maintaining the current Nasdaq listing of the Parent's Class A common stock. If the proposals to shareholders are not approved, then the Plans will not be approved and the likely outcome will be the Relevant Alternative, which will lead to a worse outcome for Plan Creditors.

25

***BrazilCo Equity Interests***

8.13   100 per cent. of the BrazilCo Common Equity will be distributed to the holders of the 2029 New Notes in partial exchange for the 2029 New Notes Debt subject to dilution by (a) the issuance of BrazilCo Common Equity to holders of the R-2 Revolving Credit Facility Debt and Term Loan A Debt to the extent such holders elect to receive their *pro rata* share of the RCF-2 / TLA BrazilCo Equity Pool, and (b) the BrazilCo MIP.

***CoreCo MIP***

8.14   Promptly, and in any event no later than 120 days after the Restructuring Effective Date, the new board of directors of the Parent (the "**New CoreCo Board**") will adopt an equity incentive plan for directors, officers, and other employees of CoreCo (the "**CoreCo MIP**"). Ten per cent. of the CoreCo Common Stock and seven per cent. of the CoreCo Preferred Stock will be reserved for issuance in connection with the CoreCo MIP, on terms to be determined by the New CoreCo Board.

***FLNG 2 MIP***

8.15   The Parent will adopt a cash incentive plan for officers and other employees of the CoreCo Group that are involved in the development of FLNG 2 (the "**FLNG 2 MIP**") based on cash proceeds of any FLNG 2 Sale before deducting any such cash proceeds applied, or required to be applied, to pay amounts owing to the CoreCo Group under the CoreCo-FLNG 2 Management Agreement or otherwise (but net of other transactions expenses and customary deductions) ("**FLNG 2 Sale Proceeds**"), equal to the sum of: (i) 2.0 per cent. of every dollar of FLNG 2 Sale Proceeds up to and including $200,000,000, *plus* (ii) 3.0 per cent. of every dollar of FLNG 2 Sale Proceeds above $200,000,000 up to and including $400,000,000, *plus* (iii) 5 per cent. of every dollar of FLNG 2 Sale Proceeds above $400,000,000.

***BrazilCo MIP***

8.16   After the Restructuring Effective Date, the new board of directors of New BrazilCo Parent will adopt an equity incentive plan for directors, officers, and employees of the BrazilCo Group (the "**BrazilCo MIP**").

***CoreCo Governance***

8.17   The governance of the Parent after the Restructuring Effective Date is set out in the CoreCo Governance Term Sheet. In summary:

8.17.1   The Parent will remain a Delaware corporation, managed on a day-to-day basis by its chief executive officer and other senior executive officers with oversight from the New CoreCo Board.

8.17.2   The Parent will use its commercially reasonable efforts to continue as an SEC public reporting company. After the Restructuring Effective Date, if the CoreCo Common Stock and CoreCo Preferred Stock are not then listed on the Nasdaq Global Select Market or another National Securities Exchange, the holders of a majority of the issued and outstanding CoreCo Preferred Stock can require the Parent to use commercially reasonable efforts to cause the CoreCo Common Stock and, after the Parent satisfies applicable listing

26

standards, the CoreCo Preferred Stock, to be listed on a National Securities Exchange as promptly as reasonably practicable.

8.17.3  Immediately following the Restructuring Effective Date, the New CoreCo Board will be comprised of seven directors: (i) Wesley R. Edens, (ii) to the extent RCF Lenders receive at least seven per cent. of the voting equity of the Parent, one director selected by the holders of a majority of the outstanding Revolving Credit Facility Debt (the "**Majority RCF Lenders**"), which director (if any) must have knowledge of or experience in the industry and satisfy Nasdaq independence rules (it being understood that such director will neither be an employee nor an affiliate of any holder of Revolving Credit Facility Debt), and (iii) the remaining five directors (or (x) six directors to the extent no director is selected pursuant to (ii) or (y) seven directors if the size of the Board is increased to nine directors pursuant to this paragraph) selected by holders of a majority of the outstanding Term Loan B Debt (the "**Majority TLB Lenders**") and holders of a majority of the outstanding 2029 New Notes Debt (the "**Majority 2029 New Noteholders**") in satisfaction of Nasdaq independence rules (including committee composition). The Majority TLB Lenders, the Majority 2029 New Noteholders and the Majority RCF Lenders, may consent to increase the size of the board to up to nine directors. The members of the New CoreCo Board will serve until the Parent's next annual meeting following the Restructuring Effective Date, following which the New CoreCo Board will be nominated/ elected in accordance with standard public company board procedures (i.e., no ongoing right to serve, elected by majority vote of stockholders).

8.17.4  The chairperson of the New CoreCo Board will be an independent director initially selected collectively by the Majority TLB Lenders and Majority 2029 New Noteholders and, thereafter, by a majority vote of the New CoreCo Board, provided that such chairperson (i) will not also serve as the chief executive officer and (ii) will at all times be an independent director in accordance with SEC and Nasdaq independence rules.

8.17.5  The CoreCo Common Stock and CoreCo Preferred Stock will be freely transferable following the Restructuring Effective Date, subject to compliance with applicable securities laws as determined by the Parent with the consent of the Majority Supporting Creditors.

8.17.6  Amendments and approvals will be in accordance with applicable law and any applicable listing rules and regulations.

*BrazilCo Governance*

8.18  Further details on the governance of the New BrazilCo Parent will be disclosed to Plan Creditors in the Explanatory Statement.

*FLNG 2 Sale*

8.19  In the event that FLNG 2 is sold following the Restructuring Effective Date (an "**FLNG 2 Sale**"), CoreCo Group will retain any proceeds from such sale, transfer, or disposal of FLNG 2 in excess of the sum of (a) the outstanding obligations under the

FLNG 2 Term Loan Facility and (b) the FLNG 2 Preferred Equity amount, after giving effect to the FLNG 2 MIP.

### *Capital Raise*

8.20 If required to satisfy the Minimum Liquidity Condition on the Restructuring Effective Date (which may be determined after the Plan Meetings), the Parent will seek to raise (x) first, up to an initial $35 million in aggregate principal amount (after giving effect to any original issue discount) of additional New CoreCo Term Loans (the "**Capital Raise New CoreCo Term Loans**") and (y) to the extent the Minimum Liquidity Condition would not be satisfied after giving effect to funding commitments in respect of the Capital Raise New CoreCo Term Loans, additional New CoreCo Term Loans which are second ranking to the Capital Raise New CoreCo Term Loans described in (x) above, ("**Capital Raise New CoreCo Junior Term Loans**" collectively, as applicable, the "**Capital Raise**"), in each case on terms and conditions substantially similar to those under the New CoreCo Credit Facility Term Sheet, and, with respect to the Capital Raise New CoreCo Junior Term Loans, adjusted as appropriate for the Initial Terms (as described below) and similar second lien credit facilities of this size, type and purpose. The Plan Companies consider that the Capital Raise will enable the Group to raise additional funds (if required) to satisfy Minimum Liquidity Condition.

8.21 Following the Parent's final determination of the required amount (if any) of the Capital Raise, each Plan Creditor receiving New CoreCo Term Loans pursuant to the Plans will be offered the right to provide its *pro rata* share of the Capital Raise New CoreCo Term Loans. If required, each Plan Creditor will be offered the right to provide its *pro rata* share of Capital Raise New CoreCo Junior Term Loans relative to its share of initially allocated CoreCo Preferred Stock, at an interest rate and original issue discount based on market terms (the "**Initial Terms**"). Plan Creditors, and other third parties acceptable to the Plan Companies and the Parent, may offer to participate in unsubscribed allocations of the Capital Raise through a competitive pricing process.

8.22 The aggregate principal amount of Capital Raise New CoreCo Term Loan subscriptions accepted by the Parent will not exceed $35 million after giving effect to any original issue discount. The aggregate principal amount of the total Capital Raise will not exceed the minimum amount required to satisfy the Minimum Liquidity Condition on the Restructuring Effective Date, after giving effect to any original issue discount.

8.23 The issuance of the Capital Raise New CoreCo Junior Term Loans may be backstopped by prospective participants of such Capital Raise on market terms prior to the Capital Raise. It is not anticipated that the issuance of the Capital Raise New CoreCo Term Loans will be backstopped.

8.24 A more detailed summary of the procedure for the allocation of participation in the Capital Raise is set out in the Restructuring Support Agreement, including the Restructuring Term Sheet. Additional terms, conditions, and procedures for the Capital Raise, including the terms of any backstop, may be determined by the Parent in consultation with, and with the consent of, the Majority Supporting Creditors. Further information will be provided in the Explanatory Statement.

*Other terms of the Restructuring*

8.25    There will also be a number of other conditions and steps to be completed prior to the implementation of the Restructuring, including:

    8.25.1 the Existing NFE Stockholders approving the following proposals for the purposes of the Restructuring at a shareholder meeting to be held on or around the date of the Sanction Hearing:

        (i)     to amend the Parent's certificate of incorporation to increase the total number of authorised shares of the Parent's Class A common stock as required to issue the Plan Consideration pursuant to the Restructuring;

        (ii)    to issue shares of the Parent's Class A common stock in excess of 20 per cent. of the Parent's outstanding Class A common stock for the purposes of complying with the Nasdaq Listing Rule 5635(d);

        (iii)   to amend the 2019 Omnibus Incentive Plan to increase the total number of authorised shares of the Parent's Class A common stock available for grant thereunder, to implement the CoreCo MIP; and

        (iv)    to amend the Parent's certificate of incorporation to effect a reverse stock split of the Parent's Class A common stock, subject to the Parent's board of directors' authority to abandon the amendment;

    8.25.2 Mexican antitrust approval in respect of the CoreCo Group;

    8.25.3 other regulatory consents and approvals required for the continued operations of the CoreCo Group and BrazilCo Group;

    8.25.4 consents for change of control and related amendments under certain agreements with third parties; and

    8.25.5 other customary conditions precedent to the implementation of the Restructuring, including the inter-conditionality of the Plans.

8.26    The Plan Companies and the Group are seeking the necessary consents and approvals. As at the date of this letter, the Plan Companies are not aware of any likely impediments to fulfilling the relevant conditions or completing the relevant steps.

8.27    The Plans are an integral part of the wider Restructuring as, if approved by the requisite Plan Creditors and sanctioned by the Court, they will allow the Group to implement those aspects of the Recapitalisation Transaction which cannot be achieved on a fully consensual basis. The key terms of the Recapitalisation Transaction and the Plans are set out in detail at Section 9 (*Rights Subject to the Plans*) below.

8.28    Further detail as to the Restructuring, including conditions precedent, will be detailed in the Explanatory Statement.

9       **RIGHTS SUBJECT TO THE PLANS**

9.1     The key elements of the Plans are set out below.

29

**(A)    RECAPITALISATION TRANSACTION**

9.2    Recapitalisation Transaction:

9.2.1    pursuant to the CoreCo Plan and as set out in the Exchange Consideration Chart, on the Restructuring Effective Date:

(i)    ***Series I Loan and Series II Loan***: all claims under or in connection with the Series I Loan Debt and Series II Loan Debt will be released in full in exchange, on a *pro rata* basis, for CoreCo Preferred Stock and CoreCo Common Stock. The Plan Creditors in respect of the Series I Loan Debt and Series II Loan Debt are the Brazil Parent and NFE Financing, respectively. By virtue of the Brazil Parent Intercompany Loan, the proceeds of the Series I Loan Debt would ultimately be payable to NFE Financing and, alongside proceeds of the Series II Loan Debt, would form part of the Brazil Collateral. The Series I Lender and the Series II Lender will vote at the Plan Meeting in respect of the Series I Loan Debt and the Series II Loan Debt in accordance with voting direction by the 2029 New Noteholders in accordance with the instruments under the 2029 New Notes Debt. For efficiency, Plan Consideration in respect of the Series I Loan Debt and Series II Loan Debt will be distributed directly to those Plan Creditors with recourse to the Brazil Collateral (in addition to any other Plan Consideration received by such Plan Creditors);

(ii)    ***Legacy Notes***: all claims under or in connection with the 2026 Legacy Notes Debt and the 2029 Legacy Notes Debt will be released in full in exchange, on a *pro rata* basis, for CoreCo Preferred Stock and CoreCo Common Stock;

(iii)    ***Revolving Credit Facility***: the Revolving Credit Facility Agreement and all RCF Commitments will be terminated and released in full in exchange, on a *pro rata* basis, as follows (and all letters of credit currently outstanding under the Revolving Credit Facility Agreement will be backstopped or replaced):

(a)    each R-1 Lender will exchange its R-1 Revolving Credit Facility Debt for its *pro rata* share of the $475 million New CoreCo Term Loans, CoreCo Preferred Stock, CoreCo Common Stock, FLNG 2 Term Loans and FLNG 2 Preferred Equity to be distributed to R-1 Lenders;

(b)    each R-2 Lender will exchange its R-2 Revolving Credit Facility Debt for its *pro rata* share of: (i) the $475 million New CoreCo Term Loans, CoreCo Preferred Stock, CoreCo Common Stock, FLNG 2 Term Loans and FLNG 2 Preferred Equity to be distributed to R-2 Lenders and (ii) its *pro rata* share of the RCF-2 / TLA BrazilCo Equity Pool; and

(c)    each RCF Lender will be entitled to receive its *pro rata* share of incremental New CoreCo Term Loans in an aggregate principal amount of $35 million (such incremental New

30

CoreCo Term Loans, together with any incremental New CoreCo Term Loans incurred pursuant to sub-paragraph (c) of paragraph (iv) below, the "**Incremental New CoreCo Term Loans**");

(iv)   ***Term Loan A Facility***: all claims under or in connection with the Term Loan A Debt will be released in full in exchange for:

(a)   each TLA Lender's *pro rata* share of CoreCo Preferred Stock, CoreCo Common Stock, FLNG 2 Term Loans and FLNG 2 Preferred Equity to be distributed to TLA Lenders, in each case, as set out in the Exchange Consideration Chart;

(b)   each TLA Lender's *pro rata* share of the RCF-2 / TLA BrazilCo Equity Pool; and

(c)   each TLA Lender's *pro rata* share of Incremental New CoreCo Term Loans in an aggregate principal amount of $17.5 million; and

(v)   ***Term Loan B Facility***: all claims under or in connection with the Term Loan B Debt will be released in full in exchange on a *pro rata* basis, for its share of the $475 million New CoreCo Term Loans, CoreCo Preferred Stock, CoreCo Common Stock, FLNG 2 Term Loans and FLNG 2 Preferred Equity;

9.2.2   pursuant to the BrazilCo Plan, on the Restructuring Effective Date:

(i)   ***2029 New Notes***: all claims under or in connection with the 2029 New Notes Debt will be released in full in exchange, on a *pro rata* basis, for BrazilCo Common Equity to be distributed to holders of 2029 New Notes as set out in the Exchange Consideration Chart; and

9.2.3   eligible Plan Creditors will receive the Early Consent Fee, and/or the Standstill Fee, as described at paragraphs 6.14 to 6.16 above,

(together, the "**Recapitalisation Transaction**").

## (B)   ELECTIONS

9.3   A number of the RCF Lenders and TLA Lenders are regulated banks and the effect of certain banking regulation and capital adequacy rules is that it may be more costly for such Plan Creditors to hold Equity Plan Consideration compared with Debt Plan Consideration. Such Plan Creditors are free to sell any equity (or other) instruments on the Restructuring Effective Date. To give these Plan Creditors comfort that they can dispose of Equity Plan Consideration on the Restructuring Effective Date regardless of market conditions, the Plan Companies and certain creditors offered the TLA Lenders and RCF Lenders a discounted exchange of certain instruments, to be exercised by the Election Deadline. The Election Deadline has passed, with all TLA Lenders and all RCF Lenders exercising their elections (other than one RCF Lender holding less than 1 per cent. of the Revolving Credit Facility Debt).

9.4   The terms of the elections are that:

31

9.4.1    each RCF Lender can exchange all or, subject to the terms of the Restructuring Support Agreement, a portion of its shares of CoreCo Preferred Stock (and a proportionate number of shares of CoreCo Common Stock) for the right to receive incremental New CoreCo Term Loans at a rate of 50.0 per cent. of the liquidation preference of the CoreCo Preferred Stock, up to a cap (the "**Equity-for-Debt Exchange Election**") (any shares of CoreCo Preferred Stock in respect of which Equity-for-Debt Exchange Elections are exercised, the "**Equity-for-Debt Exchanged Preferred Shares**" and any incremental New CoreCo Term Loans incurred, the "**Incremental Equity-for-Debt Exchange Election New CoreCo Term Loans**");

9.4.2    each R-2 Lender can receive its *pro rata* share of the RCF-2 / TLA BrazilCo Cash Pool *in lieu* of its *pro rata* share of the RCF-2 / TLA BrazilCo Equity Pool;

9.4.3    each TLA Lender can receive its *pro rata* share of the RCF-2 / TLA BrazilCo Cash Pool *in lieu* of its *pro rata* share of the RCF-2 / TLA BrazilCo Equity Pool; and

9.4.4    certain Management Investors and such other investors as may be selected by the Management Investors, have offered to purchase from RCF Lenders and TLA Lenders the shares of CoreCo Preferred Stock allocated to such holders (and a proportional number of shares of CoreCo Common Stock) for a cash purchase price of 25.0 per cent. of the liquidation preference of the CoreCo Preferred Stock, up to a cap (the "**CoreCo Preferred Stock Cash Purchase Election**").

9.5    Each Plan Creditor that did not participate in either the Equity-for-Debt Exchange Election or the CoreCo Preferred Stock Cash Purchase Election and is entitled to receive CoreCo Preferred Stock pursuant to the Plans (an "**Eligible Non-Exchanging Creditor**") is entitled to receive its *pro rata* share of an incremental number of shares of CoreCo Preferred Stock equal to one-half the aggregate number of Equity-for-Debt Exchanged Preferred Shares.

9.6    The reallocation of the CoreCo Preferred Stock will be made based on each Eligible Non-Exchanging Creditor's CoreCo Preferred Stock holdings after taking into consideration *pro forma* adjustments for the Equity-for-Debt Exchange Election and the CoreCo Preferred Stock Cash Purchase Election.

9.7    CoreCo Common Stock held by Plan Creditors that make the Equity-for-Debt Exchange Election will be adjusted on a *pro rata* basis.

**(C)    NEW CORECO TERM LOANS**

9.8    The New CoreCo Term Loans will be made available as part of the New CoreCo Credit Facility. The proposed key terms of the New CoreCo Term Loans are set out in the New CoreCo Credit Facility Term Sheet and are summarised below:

| Item | Proposed term |
| --- | --- |
| Quantum and overview | Senior secured term loan facility, in an aggregate principal amount equal to the sum of (w) up to $475 |

| Item | Proposed term |
|---|---|
| | million, (x) \$52.5 million of Incremental New CoreCo Term Loans incurred, (y) approximately \$43.8 million of Incremental Equity-for-Debt Exchange Election New CoreCo Term Loans and (z) solely to the extent necessary to meet the Minimum Liquidity Condition on the Restructuring Effective Date, up to \$35 million of Capital Raise New CoreCo Term Loans.<br><br>New CoreCo Term Loans will be incurred by the borrower on the Restructuring Effective Date and (save for any Capital Raise New CoreCo Term Loans) applied to refinance, on a cashless basis, certain of the loans and other obligations outstanding under the Revolving Credit Facility and the Term Loan B Facility, as described in more detail in paragraph 9.2 above. |
| Maturity | 5 years after the Restructuring Effective Date.<br><br>Amortisation at a rate of 1 per cent. per annum, paid quarterly. |
| Borrower | Parent. |
| Guarantors | Each existing and subsequently acquired or organised, direct and indirect subsidiary of the borrower (subject to customary exclusions and other exclusions to be agreed). |
| Ranking and collateral | The borrower's obligations and each guarantor's guarantees will be secured by first-priority liens on substantially all of the assets of the borrower and the guarantors (subject to certain exceptions as listed below).<br><br>The collateral will not include (i) the "FLNG2 Collateral" (as defined in the Term Loan B Agreement) to the extent such FLNG 2 Collateral constitutes "Collateral" under the FLNG 2 Term Loan Facility, and (ii) other assets to be agreed.<br><br>The obligations under the facility will be secured by the collateral on a junior basis to the liens securing the obligations under the New CoreCo LC Facility and subject to an intercreditor agreement with respect to the liens securing the New CoreCo LC Facility (which liens will be super priority). |
| Interest | Fixed rate per annum equal to Term SOFR plus 6.125 per cent., payable in cash. |

33

| Item | Proposed term |
| --- | --- |
|  | Borrower's option to pay interest in kind during the period commencing on the Restructuring Effective Date and ending on the last day of the first full fiscal quarter after the 18-month anniversary thereof, at a rate equal to the cash interest rate plus 150 basis points, compounding at the end of the applicable interest period (but at least quarterly). |
| Governing law | New York. |

**(D)    FLNG 2 TERM LOANS**

9.9    The FLNG 2 Term Loans will be made available as part of the FLNG 2 Term Loan Facility. The proposed key terms of the FLNG 2 Term Loans are set out in the FLNG 2 Term Loan Term Sheet and are summarised below:

| Item | Proposed term |
| --- | --- |
| Quantum and overview | Non-recourse senior secured term loan facility in the aggregate principal amount of $400 million, the proceeds of which shall be used to refinance, on a cashless basis, certain loans and other obligations outstanding under the Revolving Credit Facility, Term Loan A Facility and Term Loan B Facility, as described in more detail in paragraph 9.2 above. |
| Maturity | 3 years after the Restructuring Effective Date. No amortisation. |
| Borrower | FLNG 2 Parent. |
| Guarantors | Each subsidiary of the borrower. |
| Ranking and collateral | Secured by first-priority liens on substantially all of the assets of the borrower and the guarantors (subject to customary exclusions and other exclusions to be agreed). |
| Interest | Paid-in-kind at fixed rate per annum equal to Term SOFR plus 3.00 per cent. |
| Governing law | New York. |

**(E)    CORECO PREFERRED STOCK**

9.10    The proposed key terms of the CoreCo Preferred Stock are set out in the CoreCo Preferred Stock Term Sheet and are summarised below:

34

| Item | Proposed term |
|---|---|
| Issuer | Parent. |
| Securities | Mandatorily convertible preferred stock with a par value of $0.01. <br><br> Automatically convert into Class A common stock upon the third anniversary of the issue date. |
| Ranking | Subordinated to all existing and future indebtedness of the Parent. <br><br> Senior to all existing and future equity securities of the Parent with respect to rights to the payment of dividends and the distribution of assets upon liquidation, dissolution or winding up. |
| Liquidation Preference | Liquidation preference of a per share amount in cash equal to $1,000 per each share plus the amount of accrued but unpaid preferred dividends. |
| Dividends | Cumulative quarterly compounding dividend, which will accrue via an increase to the liquidation preference, with a cumulative per annum preferred return of 3.0 per cent. in Year 1, 5.0 per cent. in Year 2 and 7.0 per cent. in Year 3. CoreCo Preferred Stock will participate on an as-converted basis in any dividends and distributions on the CoreCo Common Stock. |
| Anti-Dilution Protections | Subject to: (a) mechanical adjustments to proportionally adjust the conversion rate and number of shares of CoreCo Common Stock issuable upon conversion in the event of any split, reverse split, combination or subdivision, stock dividend, recapitalisation or similar event, and (b) weighted average anti-dilution protection on future issuances of CoreCo Common Stock at a price less than the then current fair market value. |
| Consent Rights | Consent from holders of two thirds of the CoreCo Preferred Stock with respect to certain actions of the Parent and its subsidiaries. |
| Voting | On an "as converted" basis together with the CoreCo Common Stock as a single class. |
| Listing | Parent to use commercially reasonable efforts to list on the Nasdaq Global Select Market or another National Securities Exchange. |

35

| Item | Proposed term |
| --- | --- |
| Governing Law | Delaware. |
| Transfer Restrictions | Freely tradable, subject to applicable securities laws. |

## (F)   CORECO COMMON STOCK

9.11   The key terms of the CoreCo Common Stock are summarised below:

| Item | Term |
| --- | --- |
| Issuer | Parent. |
| Securities | The Parent's existing Class A common stock with a par value of $0.01. |
| Listing | Parent to use commercially reasonable efforts to list on the Nasdaq Global Select Market or another National Securities Exchange. |
| Governing Law | Delaware. |

## (G)   FLNG 2 PREFERRED EQUITY

9.12   The proposed key terms of the FLNG 2 Preferred Equity are set out in the FLNG 2 Preferred Equity Term Sheet and are summarised below:

| Item | Proposed term |
| --- | --- |
| Issuer | FLNG 2 Parent. |
| Securities | $200m nonconvertible non-voting perpetual preferred limited liability company membership interests. |
| Ranking | Subordinated to all existing and future indebtedness of the FLNG 2 Parent.<br><br>Senior to all existing and future equity securities of the FLNG 2 Parent with respect to rights upon any liquidation. |
| Liquidation Preference | Liquidation preference of a per share amount in cash equal to $1,000, unless a lower amount is agreed by the holders of a majority of FLNG 2 Preferred Equity. |
| Dividends | None. |

| Item | Proposed term |
|------|---------------|
| Consent Rights | Consent from holders of a majority of units with respect to certain actions of FLNG 2 Parent and its subsidiaries. |
| Governing Law | Delaware. |
| Transfer Restrictions | Freely tradable, subject to applicable securities laws. |

**(H)    BRAZILCO COMMON EQUITY**

9.13    The key terms of the BrazilCo Common Equity will be disclosed to Plan Creditors in the Explanatory Statement.

**(I)    FURTHER DETAILS**

9.14    Further details of the Plans, and the documentation reflecting the matters provided for above, will be set out in the Explanatory Statement. For details on the circulation of the Explanatory Statement and other related material, please refer to Section 16 (*Steps Following the Convening Hearing*).

9.15    Provided the Court gives its permission to the Plan Companies to convene the Plan Meetings, the Plan Companies will notify the Plan Creditors in accordance with the directions of the Court of the time, date and venue of the Plan Meetings, set out how any Plan Creditors may vote at the Plan Meetings and provide further details of the terms of the Plans via the Information Agent and the Plan Website and will communicate any change in the same manner.

9.16    Any further details regarding the Plans and the Convening Hearing or Sanction Hearing dates will be made available on the Plan Website.

**10    PROPOSED CLASS CONSTITUTION OF PLAN CREDITORS**

10.1    Under the Practice Statement, it is the responsibility of each Plan Company to formulate the class or classes of Plan Creditors for the purpose of convening properly constituted meetings to consider and, if thought fit, approve the relevant Plans.

10.2    If the rights of creditors affected by the relevant Plan are so dissimilar or would be affected in such a different manner by the relevant Plan as to make it impossible for them to consult together with a view to their common interest, they must be divided into separate classes and a separate meeting must be held for each class of creditors. The final decision on the appropriate composition of any meetings convened to consider the Plans will be a matter for the Court.

10.3    Each Plan Company has considered: (i) the relevant rights of the Plan Creditors against it in the Relevant Alternative if the Plans and the Restructuring were not to be implemented, and (ii) how the Plan Creditors' current rights are proposed to be compromised under the Plans. Having taken legal advice (privilege in respect of which is not and has not been waived):

10.3.1 NFE Global has concluded that the CoreCo Plan Creditors fall into six classes for the purposes of voting on the CoreCo Plan, as follows:

(i)      the R-1 Lenders (the "**R-1 Class**");

(ii)     the R-2 Lenders (the "**R-2 Class**");

(iii)    the TLB Lenders (the "**TLB Class**");

(iv)    the TLA Lenders (the "**TLA Class**");

(v)     the Legacy Noteholders (the "**Legacy Notes Class**"); and

(vi)    each of the Series I Lender and the Series II Lender (the "**Series I and Series II Class**"),

(each a "**CoreCo Plan Class**" and together, the "**CoreCo Plan Classes**").

10.3.2 NFE Brazil Newco has concluded that the BrazilCo Plan Creditors fall into one class for the purposes of voting on the BrazilCo Plan, as follows (and for the reasons outlined below):

(i)      the 2029 New Noteholders (the "**2029 New Notes Class**" and together with each CoreCo Plan Class, each a "**Plan Class**" and together, the "**Plan Classes**").

10.4 The Legacy Notes and the 2029 New Notes are currently held in global form, however the Legacy Notes Indentures and the indenture governing the 2029 New Notes each include provisions whereby holders of Legacy Notes and 2029 New Notes can be issued with definitive notes in certain circumstances, which would create a direct contractual right for the ultimate beneficial holders against the Parent and NFE Financing, respectively. Accordingly, the ultimate beneficial holders of the Legacy Notes and the 2029 New Notes will vote in the Plan Meetings for the Legacy Notes Class and the 2029 New Notes Class, respectively.

*"Rights in" and "rights out" analysis*

10.5 As the value of recoveries in the Relevant Alternative and the Plan Consideration is determined by the collateral rights of the respective Plan Creditors, the Plan Companies have separated Plan Creditors who have recourse to a different combination of Collateral Pools into the different classes described above.

10.6 In relation to the current rights of each of the CoreCo Plan Creditors against NFE Global and the proposed rights of each of the CoreCo Plan Creditors as part of the CoreCo Plan:

10.6.1 *R-1 Class*: Each R-1 Lender has provided loans on identical terms under the Revolving Credit Facility Agreement and therefore has identical rights against NFE Global. If the CoreCo Plan becomes effective, the rights of each R-1 Lender will be compromised in the same way as those of each other R-1 Lender as described in Section 9 (*Rights Subject to the Plans*) above. In addition to the Common Collateral, Plan Creditors in the R-1 Class have recourse to:

38

    (i)      F1 Collateral, to which Plan Creditors in the Legacy Notes Class, the Series I and Series II Class and the TLA Class do not have recourse;

    (ii)     F2 Collateral, to which Plan Creditors in the Legacy Notes Class and the Series I and Series II Class do not have recourse; and

    (iii)    Brazil 2L Lien and Account Collateral, to which Plan Creditors in the Legacy Notes Class, the Series I and Series II Class and the TLB Class do not have recourse,

and, in each case, the difference in collateral rights leads to a different return in the Relevant Alternative and a difference in the value of the Plan Consideration allocated to creditors in the R-1 Class (compared with other Plan Classes).

10.6.2 ***R-2 Class***: Each R-2 Lender has provided loans on identical terms under the Revolving Credit Facility Agreement and therefore has identical rights against NFE Global. If the CoreCo Plan becomes effective, the rights of each R-2 Lender will be compromised in the same way as those of each other R-2 Lender as described in Section 9 (*Rights Subject to the Plans*) above. In addition to the Common Collateral, Plan Creditors in the R-2 Class have recourse to:

    (i)      Brazil Collateral, to which Plan Creditors in the Legacy Notes Class, the Series I and Series II Class, R-1 Class and the TLB Class do not have recourse;

    (ii)     F1 Collateral, to which Plan Creditors in the Legacy Notes Class, the Series I and Series II Class and the TLA Class do not have recourse;

    (iii)    F2 Collateral, to which Plan Creditors in the Legacy Notes Class and the Series I and Series II Class do not have recourse; and

    (iv)    Account Collateral, to which Plan Creditors in the Legacy Notes Class, the Series I and Series II Class and the TLB Class do not have recourse,

and, in each case, the difference in collateral rights leads to a different return in the Relevant Alternative and a difference in the value of the Plan Consideration allocated to creditors in the R-2 Class (compared with other Plan Classes).

10.6.3 ***TLB Class***: Each TLB Lender has made available loans on identical terms under the Term Loan B Agreement and therefore has the same rights against NFE Global. If the CoreCo Plan becomes effective, the rights of each TLB Lender will be compromised in the same way as those of each other TLB Lender as described in Section 9 (*Rights Subject to the Plans*) above. In addition to the Common Collateral, Plan Creditors in the TLB Class have recourse to:

    (i)      F1 Collateral, to which Plan Creditors in the Legacy Notes Class, the Series I and Series II Class and the TLA Class do not have recourse; and

(ii)    F2 Collateral, to which Plan Creditors in the Legacy Notes Class and the Series I and Series II Class do not have recourse;

and, in each case, the difference in collateral rights leads to a different return in the Relevant Alternative and a difference in the value of the Plan Consideration allocated to creditors in the TLB Class (compared with other Plan Classes).

10.6.4  *TLA Class*: Each TLA Lender has made available loans on identical terms under the Term Loan A Agreement and therefore has identical rights against NFE Global. If the CoreCo Plan becomes effective, the rights of each TLA Lender will be compromised in the same way as those of each other TLA Lender as described in Section 9 (*Rights Subject to the Plans*) above. Wesley R. Edens holds approximately 37.0 per cent. of the Term Loan A Debt, but on identical terms to all other Term Loan A Debt, and consequently NFE Global does not consider it necessary to place him in a separate class. In addition to the Common Collateral, Plan Creditors in the TLA Class have recourse to:

(i)    Brazil Collateral, to which Plan Creditors in the Legacy Notes Class, the Series I and Series II Class, R-1 Class and the TLB Class do not have recourse;

(ii)    F2 Collateral, to which Plan Creditors in the Legacy Notes Class and the Series I and Series II Class do not have recourse; and

(iii)    Account Collateral, to which Plan Creditors in the Legacy Notes Class, the Series I and Series II Class and the TLB Class do not have recourse,

and, in each case, the difference in collateral rights leads to a different return in the Relevant Alternative and a difference in the value of the Plan Consideration allocated to creditors in the TLA Class (compared with other Plan Classes).

10.6.5  *Legacy Notes Class*:

(i)    The claims under the Legacy Notes are guaranteed by the same group of obligors (i.e., the Parent and the Common Guarantors) and are secured by the same pool of common security (i.e., the Common Collateral) on a *pari passu* basis. NFE Global therefore expects that the creditors under the Legacy Notes would receive similar *pro rata* recoveries if the CoreCo Plan was not sanctioned and the Relevant Alternative scenario transpired.

(ii)    If the CoreCo Plan becomes effective, the rights of each of the creditors under the Legacy Notes will be compromised in the same way as each other such creditor's as described in Section 9 (*Rights Subject to the Plans*) above.

(iii)    The terms of the Legacy Notes are not identical and, in particular, the interest rates, maturities and events of default and covenant regimes

differ across the instruments. However, NFE Global does not consider these differences to be material for the purposes of class composition.

(iv)  The Residual FLNG Proceeds Claims are contractually subordinated to the Series I Loan and Series II Loan. NFE Global considers that, in the Relevant Alternative, realisations in respect of the Group's FLNG 1 and FLNG 2 gas liquefication facilities would be insufficient to pay the senior ranking debt in full meaning that the Legacy Noteholders would receive no return in respect of the Residual FLNG Proceeds Claims. Accordingly, no Plan Consideration is allocated in respect of the Residual FLNG Proceeds Claims.

(v)  As described above, the Legacy Notes, the Series I Loan and the Series II Loan share the same guarantors and security. However, NFE Global believes that it is appropriate that the Plan Creditors in respect of (i) the Legacy Notes, and (ii) the Series I Loan and the Series II Loan, vote in separate classes, for the following reasons:

(a)  the Series I Lender and the Series II Lender enjoy higher ranking security in respect of the proceeds from the Group's FLNG 1 and FLNG 2 gas liquification facilities – albeit in the Relevant Alternative, neither: (i) the Series I Lender and the Series II Lender, nor (ii) the Legacy Noteholders would receive any payment in respect of their security as realisations in respect of the assets would be insufficient to pay the senior ranking debt in full;

(b)  security has been granted over the rights enjoyed by the Series I Lender and the Series II Lender under the Series I Loan and the Series II Loan pursuant to the Brazil Collateral. The 2029 New Noteholders enjoy the economic benefit of that security (by way of a lien) and have a contractual right to instruct the Series I Lender and the Series II Lender as to the exercise of their voting rights in respect of the CoreCo Plan;

(c)  the Series I Loan and the Series II Loan contain certain "make-whole" provisions. Under these provisions, an additional sum of money becomes due to the Series I Lender and the Series II Lender upon prepayment or acceleration of the loans, in addition to the accrued interest and principal. This may motivate the Series I Lender and the Series II Lender to prefer acceleration and enforcement of their claims as compared to creditors that do not enjoy such a contractual right. The Legacy Noteholders do not enjoy such a clear contractual right;

(d)  NFE Global recognises that there are arguments as to whether these differences between (i) the Legacy Noteholders, and (ii) the Series I Lender and the Series II Lender are sufficiently material (and, relatedly, whether they relate to the rights of the creditors as creditors or whether they relate to collateral

41

"interests") so as to require the creditors to be divided into different classes; and

(e) however, the board of NFE Global wishes to avoid the risk of potential prejudice to any Plan Creditor of a dissenting creditor seeking to argue that the Legacy Noteholders and the Series I Lender and the Series II Lender should be in separate classes. NFE Global therefore proposes to take a pragmatic approach to class composition and invites the court to order separate meetings for: (i) the Legacy Notes Class; and (ii) the Series I and Series II Class.

(vi) Having considered this and taken legal advice (privilege in respect of which is not and has not been waived), NFE Global has concluded that, due to the high degree of similarity of "rights in" against NFE Global and "rights out" under the CoreCo Plan, the differences between the rights of the Legacy Noteholders are not so dissimilar as to make it impossible for them to consult together with a view to their common interest and, accordingly, it is appropriate for all such Legacy Noteholders to consider and, if thought fit, approve the CoreCo Plan at the same Plan Meeting.

10.6.6 *Series I and Series II Class*:

(i) The claims under each of the Series I Loan and Series II Loan are guaranteed by the same group of obligors (i.e., the Parent and the Common Guarantors) and are secured by the same pool of common security (i.e., the Common Collateral) on a *pari passu* basis. NFE Global therefore expects that the creditors under the Series I Loan and Series II Loan would receive similar *pro rata* recoveries if the CoreCo Plan was not sanctioned and the Relevant Alternative scenario transpired.

(ii) If the CoreCo Plan becomes effective, the rights of each of the creditors under the Series I Loan and Series II Loan will be compromised in the same way as each other such creditor's as described in Section 9 (*Rights Subject to the Plans*) above.

(iii) The terms of the Series I Loan and Series II Loan are not identical and, in particular, the interest rates and maturities differ across the instruments. However, NFE Global does not consider these differences to be material for the purposes of class composition.

(iv) As described above, the Legacy Notes, the Series I Loan and the Series II Loan share the same guarantors and security. However, for the reasons set out above, NFE Global believes that it is appropriate that the Plan Creditors in respect of (i) the Legacy Notes, and (ii) the Series I Loan and the Series II Loan, vote in separate classes.

(v) Having considered this and taken legal advice (privilege in respect of which is not and has not been waived), NFE Global has concluded that, due to the high degree of similarity of "rights in" against NFE

42

Global and "rights out" under the CoreCo Plan, the differences between the rights of the Series I Lender and the Series II Lender are not so dissimilar as to make it impossible for them to consult together with a view to their common interest and, accordingly, it is appropriate for the Series I Lender and the Series II Lender to consider and, if thought fit, approve the CoreCo Plan at the same Plan Meeting.

10.7   In relation to the current rights of each of the BrazilCo Plan Creditors against NFE Brazil Newco and the proposed rights of each of the BrazilCo Plan Creditors as part of the BrazilCo Plan:

10.7.1   *2029 New Notes Class*: Each 2029 New Noteholder holds its 2029 New Notes on identical terms pursuant to the 2029 New Notes' indenture and therefore has the same rights against NFE Brazil Newco. If the BrazilCo Plan becomes effective, the rights of each 2029 New Noteholder will be compromised in the same way as those of each other 2029 New Noteholder as described in Section 9 (*Rights Subject to the Plans*) above.

***Impact of Early Consent Fee, Standstill Fee and payment of certain professional fees***

10.8   The Plan Companies do not consider that Plan Creditors who are entitled to receive the Early Consent Fee need to be put in a separate class or classes for the purpose of voting on the CoreCo Plan or the BrazilCo Plan (as applicable) from Plan Creditors not so entitled, because all Plan Creditors have had adequate opportunity to sign or accede to the Restructuring Support Agreement ahead of the Early Consent Deadline, and thereby become entitled to the Early Consent Fee. Further, and in any event, the Early Consent Fee is a modest amount that is unlikely of itself to persuade any Plan Creditor to vote in favour of the Plans or to have any material influence on that decision.

10.9   NFE Global does not consider that R-1 Lenders and R-2 Lenders who are entitled to receive the Standstill Fee need to be put in separate classes for the purpose of voting on the CoreCo Plan, from respectively, R-1 Lenders and R-2 Lenders not so entitled. The Standstill Fee is available to all RCF Lenders who agree to forbear and as of the date of this letter, all bar one of the RCF Lenders (holding less than 1 per cent. of the Revolving Credit Facility Debt) have agreed to the forbearance. Each RCF Lender who agreed to forbear will be entitled to the Standstill Fee. The Standstill Fee is not a payment for consent or a success fee. The Standstill Fee is payable whether or not the Restructuring is completed and is non-refundable. Accordingly, the Standstill Fee is not considered to be material in terms of persuading any particular RCF Lender to vote in favour of the CoreCo Plan (and in any event it was not a condition to the Standstill Fee that the relevant RCF Lenders signed the Restructuring Support Agreement or supported the Restructuring).

10.10   A number of the Plan Creditors and Administrative Parties (including ad hoc groups of the Legacy Noteholders, the TLB Lenders, the 2029 New Notes, the TLA Lenders and the RCF Agent) will have certain professional fees of their advisors met by the Group in respect of the negotiation and documentation of the Restructuring. The payment of these professional fees will occur independently from the process of the Plans and will not be contingent upon the sanction of the Plans. As such, the Plan

43

Companies have been advised and believe that these Plan Creditors are not required to be placed in a separate class from other Plan Creditors.

### Impact of Capital Raise

10.11    The Plan Companies do not consider that the Plan Creditors that may participate in the Capital Raise need to be put in separate classes for the purpose of voting on the Plans from those that do not so participate. If the relevant conditions for the Capital Raise are triggered, each Plan Creditor receiving New CoreCo Term Loans pursuant to the Plans (i.e., the RCF Lenders and the TLB Lenders) is entitled to participate in the Capital Raise New CoreCo Term Loans, and all Plan Creditors are entitled to participate in the Capital Raise New CoreCo Junior Term Loans on a *pro rata* basis according to their share of CoreCo Preferred Stock. The Capital Raise (and the terms of any backstop) if required, will be raised through a competitive pricing process aimed at achieving market terms within the parameters set by the Group and may not be agreed until after the Sanction Hearing has occurred. Accordingly, the right to participate in the Capital Raise (and any backstop) is not considered to be material in terms of persuading any particular Plan Creditor to vote in favour of the Plans and, in any case, there is no difference as to participation rights between creditors within each proposed Plan Class.

### Impact of Elections

10.12    NFE Global does not consider that the R-1 Lenders, R-2 Lenders and TLA Lenders that made the elections referred to at paragraphs 9.3 to 9.7 above need to be put in separate classes for the purpose of voting on the CoreCo Plan. The relevant elections were open to all RCF Lenders and TLA Lenders. Further, the CoreCo Preferred Stock Cash Purchase Election is a trading arrangement between third parties that Plan Creditors can elect into. Consequently, as the same rights were offered to each of the members of the R-1 Class, the R-2 Class and the TLA Class, NFE Global has been advised and believes that those Plan Creditors that participated in such elections are not required to be placed in a separate class from the other members of the R-1 Class, the R-2 Class and the TLA Class, respectively. Further, those Plan Creditors that will be reallocated CoreCo Preferred Stock need not be placed in a separate class from the other members of such class, as all reallocations are made on a *pro rata* basis.

### Conclusions

10.13    Both NFE Global and NFE Brazil Newco have placed particular reliance on the matters set out above when reaching the conclusion that it is appropriate for the Plan Classes to vote in the stipulated class meetings.

10.14    If any Plan Creditor has comments as to the proposed class constitution of Plan Creditors, or any other concerns which they consider should be raised with the Court, they should in the first instance contact the Information Agent and Skadden, legal advisers to the Plan Companies, using the contact details set out at the end of this letter as soon as practicable.

## 11    CONSEQUENCES IF THE PLANS ARE NOT SUCCESSFUL

11.1    In light of the conditions affecting the Group, it is the view of the Boards that if the Plans are not sanctioned and the Restructuring is not implemented, the Group will be

unable to meet its outstanding and upcoming payment obligations to creditors and the Group will not have sufficient liquidity to continue as a going concern.

11.2    If the Plans are not sanctioned, the Restructuring Support Agreement will most likely terminate and the forbearances contained therein will fall away. In such circumstances, the Group will promptly face a number of events of default under the Plan Debt, including (without limitation) material payment defaults under each of the Plan Debt instruments. The Group will not have sufficient liquidity to meet the relevant payment obligations and would not have a realistic prospect of finding additional liquidity on a timely basis. Accordingly, it is likely that the termination of the Restructuring Support Agreement would result in the Group, including the Plan Companies, facing imminent action by creditors to accelerate debt, call guarantees and seek to enforce security rights under their respective instruments, including under certain Plan Debt instruments, which in turn will likely trigger cross-defaults under other instruments (including under other Plan Debt instruments).

11.3    Furthermore, if the Plans are not sanctioned, many of the Group's business and trade counterparties, some of which have agreed to defer or reduce certain accounts payable to support the Restructuring, may withdraw credit terms, terminate existing contracts and commence litigation, or take enforcement actions against Group assets located in jurisdictions all around the world.

11.4    In order to assist the Plan Companies in considering the Relevant Alternative, Richard Fleming and Richard Bibby, each of Alvarez & Marsal, were engaged to:

11.4.1    identify the scenario(s) that are likely in the event that the Plans and the Restructuring were unsuccessful; and

11.4.2    prepare a report estimating the financial return to the Plan Creditors in such scenario(s).

11.5    The relevant alternative if the Plans are not sanctioned will be whatever the Court considers to be most likely to occur (the "**Relevant Alternative**"). This will depend on the circumstances at the time and the options available to stakeholders. The Relevant Alternative is a hypothetical assessment of the most realistic counterfactual – it is not the theoretical worst case, nor does it favour certain stakeholders. Each of the Boards considers, with the support of the Group's advisors, that if the Plans are not sanctioned and the Restructuring is not implemented then the Relevant Alternative is that:

11.5.1    events of default will occur under the Plan Debt instruments and the respective Plan Creditors will become entitled to accelerate the relevant Plan Debt; the Plan Companies and the other obligors under the Plan Debt will be unable to meet demands for repayment following any such acceleration;

11.5.2    the Group (other than the Brazilian business), acting through their respective directors, will commence voluntary proceedings under chapter 11 of the U.S. Bankruptcy Code to facilitate sales of the assets and separable business units within the Group to maximise recoveries to creditors pursuant to section 363 of the U.S. Bankruptcy Code; and

11.5.3 assuming temporary forbearance from local creditors and the 2029 New Noteholders, the subsidiaries of NFE Financing and the Brazil Parent that comprise the Group's Brazilian business will most likely not commence voluntary proceedings under chapter 11 of the U.S. Bankruptcy Code (although the risk cannot be completely eliminated) and the Brazilian business will be sold in an accelerated sales process. The proceeds of such sale will not be sufficient to discharge the 2029 New Notes Debt. The Brazilian business will likely be negatively impacted by a chapter 11 filing of the rest of the Group.

11.6    This analysis will be detailed in a report (the "**Relevant Alternative Report**") and described in more detail in the Explanatory Statement.

11.7    The Plan Companies expect that the final Relevant Alternative Report will indicate that each Plan Creditor will be better off should the Plans be sanctioned and the Restructuring be implemented than it would in the applicable Relevant Alternative.

11.8    The Plan Companies, together with Alvarez & Marsal, have also considered the allocation of the incremental value preserved by the Recapitalisation Transaction as compared with the Relevant Alternative (the "**Restructuring Surplus**"). The Boards consider that the allocation of the Plan Consideration represents a fair allocation of the Restructuring Surplus in light of each class of Plan Creditor's entitlement to proceeds from the respective Collateral Pools as outlined above. Further detail will be included in the Relevant Alternative Report.

## 12    RECOMMENDATION OF THE BOARDS

12.1    Each of the Boards considers the Restructuring and the Plans to be in the best interests of the Plan Companies and all Plan Creditors. Each Board has arrived at this conclusion on the basis of (without limitation):

12.1.1 the benefits to the Plan Companies and the Group of addressing certain near-term and longer-term maturities under certain of the Plan Debt instruments, achieving a deleveraged and sustainable capital structure and obtaining access to liquidity and new letter of credit facilities;

12.1.2 that all Plan Creditors are expected to be no worse off if the Plans are sanctioned and the Restructuring is implemented than would be the case in the Relevant Alternative; and

12.1.3 the high levels of support already received for the Restructuring and the Plans through the approvals provided in connection with the Restructuring Support Agreement entered into by various Plan Creditors, as described above.

12.2    Accordingly, the Boards unanimously recommend that the Plan Creditors vote in favour of the Plans at the Plan Meetings.

## 13   JURISDICTION AND RECOGNITION

### (A)   JURISDICTION

13.1   The Plan Companies consider that the Court has jurisdiction under Part 26A of the Act in relation to the Plan Companies, and that the Court should exercise such jurisdiction, on the basis of:

13.1.1   **Plan Companies liable to be wound up**: the Plan Companies are incorporated under the laws of England and Wales and are liable to be wound up under the Insolvency Act 1986;

13.1.2   **Financial difficulties**: each of the Plan Companies has encountered or is likely to encounter significant financial difficulties for the reasons described above in Section 6 (*Background to the Group's Financial Difficulties*), which are affecting, or will affect its (and the Group's) ability to carry on business as a going concern and, absent the Plans, each Plan Company is expected to face the Relevant Alternative;

13.1.3   **Purpose**: as explained above in Section 7 (*Objectives of the Plans*), the purpose of the Plans is to eliminate, reduce or mitigate the effect of the Plan Companies' (and the Group's) financial difficulties; and

13.1.4   **Compromise or arrangement**: it is necessary for the proposals under the Plans to be a "compromise" or "arrangement" between the relevant Plan Company and the relevant Plan Creditors. The Plans contain the requisite elements of "give and take" in respect of each class of Plan Creditors in order to constitute a "compromise" or "arrangement" for these purposes.

13.2   Given the matters described above, the Plan Companies consider that the Court has jurisdiction to sanction the compromise and arrangement in respect of the claims and liabilities set out in the respective Plans (provided the requisite statutory requirements are satisfied).

### (B)   RECOGNITION

13.3   The United States (including Puerto Rico) is a material jurisdiction to the Group in terms of its assets, operations and management and certain of the Plan Creditors are expected to be U.S. persons. The Plan Companies will therefore seek recognition of the Plans in the United States (including Puerto Rico) under chapter 15 of the U.S. Bankruptcy Code ("**Chapter 15 Recognition**").

13.4   Each of the Plan Companies intends to appoint a foreign representative in respect of proceedings in relation to the Chapter 15 Recognition (and any other recognition proceedings). At the Convening Hearing, each of the Plan Companies will request a declaration from the Court that the foreign representative has been validly appointed for the purposes of such recognition proceedings.

13.5   To seek the Chapter 15 Recognition, the Plan Companies, through their duly appointed foreign representatives, will file a petition (the "**Chapter 15 Petition**") in the United States Bankruptcy Court for the Southern District of New York or other court of competent jurisdiction (the "**U.S. Bankruptcy Court**") seeking an order (i) recognising the Plans as a foreign main proceeding under chapter 15 of the U.S.

Bankruptcy Code and (ii) providing that the Plans and the Sanction Order are entitled to full force and effect in the United States in accordance with their terms for recognition and enforcement of the Plans (and any order sanctioning the Plans) under chapter 15 of the U.S. Bankruptcy Code.

13.6 The Plan Companies will publish notice of the filing of the Chapter 15 Petition on the Plan Website.

13.7 If the Plans are approved by the Plan Creditors and sanctioned by the Court, the Plan Companies expect that the U.S. Bankruptcy Court will grant the relief sought in the Chapter 15 Petition. The Plan Companies will obtain and file with the Court in advance of the Sanction Hearing (at the latest):

13.7.1 an opinion from an independent expert on certain matters of U.S. Federal law and New York State law, including whether the Plans are likely to be recognised by the U.S. Bankruptcy Court as a foreign main proceeding under chapter 15 of the U.S. Bankruptcy Code and, if sanctioned, be given full force and effect in the United States; and

13.7.2 as the Group has significant assets and operations in Mexico, an opinion from an independent expert on Mexican law that the Plans are likely to be recognised and given effect to in Mexico.

13.8 Certain subsidiaries of the Group hold significant assets in Brazil. However, those subsidiaries are not issuers or guarantors of the 2029 New Notes Debt or CoreCo Plan Debt. Neither NFE Brazil Newco nor the issuers or guarantors of the 2029 New Notes Debt are incorporated in Brazil. The Plan Companies do not consider that a legal opinion on matters of Brazilian law would assist the Court.

## 14 CREDITOR ISSUES

14.1 This letter is intended to provide Plan Creditors with sufficient information regarding the Plans and the proposals for convening the Plan Meetings of the Plan Creditors, so that, should they wish to raise:

14.1.1 any issues which may arise as to the constitution of the Plan Meetings, or which otherwise affect the conduct of those Plan Meetings;

14.1.2 any issues as to the existence of the Court's statutory jurisdiction to sanction the Plans;

14.1.3 any issues relevant to the conditions to be satisfied pursuant to section 901A of the Act;

14.1.4 any issues as to the Court's international jurisdiction in respect of the Plans; or

14.1.5 any other issue not going to the merits or fairness of the Plans, but which might lead the Court to refuse to sanction the Plans,

(together, "**Creditor Issues**"), they may attend and be represented before the Court at the Convening Hearing. Details of the Convening Hearing are set out in Section 15 (*Convening Hearing*) of this letter.

48

14.2    Plan Creditors should consider taking advice from their professional advisers if they have any concerns in relation to the matters set out in this letter.

14.3    Plan Creditors should be aware that, under the terms of the Practice Statement, the Court has indicated that Creditor Issues should be raised at the Convening Hearing. If Plan Creditors fail to raise these matters at the Convening Hearing, whilst they will still be able to appear and raise objections at the Sanction Hearing, the Court at the Sanction Hearing will expect those Plan Creditors to provide good reason why they did not raise any Creditor Issues at an earlier stage.

14.4    If any Plan Creditor has Creditor Issues which they consider should be raised with the Court, they should in the first instance contact the Information Agent and Skadden, legal advisers to the Plan Companies, using the contact details set out at Section 20 (*Enquiries and Further Information*) below as soon as practicable and in any event by no later than seven days in advance of the date of the Convening Hearing.

14.5    As more than 75 per cent. by value of Plan Creditors in each of the proposed Plan Classes have executed the Restructuring Support Agreement, thereby agreeing to vote in favour of the Plans, the Plan Companies do not envisage that there will be any Dissenting Class.

## 15    CONVENING HEARING

15.1    The Convening Hearing is expected to be held on 14 May 2026 in the Companies Court, Royal Courts of Justice, 7 Rolls Building, Fetter Lane, London EC4A 1NL and at which the Plan Companies will seek an order granting directions in relation to the Plans, including permission to convene the Plan Meetings of Plan Creditors for the purpose of considering and, if thought fit, approving the Plans.

15.2    Confirmation of the time and other details of the Convening Hearing will be sent to you via the Information Agent and the Plan Website in advance of the Convening Hearing.

15.3    Plan Creditors are entitled to attend the Convening Hearing in person or through counsel and to make representations at the Convening Hearing, although they are not obliged to do so. Plan Creditors who wish to attend the Convening Hearing in-person or through counsel should contact the Information Agent and Skadden, legal advisers to the Plan Companies, using the contact details set out at Section 20 (*Enquiries and Further Information*) below as soon as practicable to obtain instructions for attending the Convening Hearing.

15.4    At the Convening Hearing, the Court will consider whether or not to make an order convening the Plan Meetings of the Plan Creditors. In doing so, the Court will consider, among other things:

15.4.1    the purpose and effects of the Plans and the Restructuring (as to which see Section 7 (*Objectives of the Plans*), Section 8 (*Overview of the Restructuring*) and Section 9 (*Rights Subject to the Plans*));

15.4.2    the Relevant Alternative to the Plans (see Section 11 (*Consequences if the Plans are not Successful*));

15.4.3 whether it has jurisdiction to convene the Plan Meetings (see Section 0 (*Jurisdiction and Recognition*));

15.4.4 class composition (see Section 10 (*Proposed Class Constitution of Plan Creditors*)); and

15.4.5 any considerations or "roadblocks" that might preclude the Court from exercising its discretion to sanction the Plans at the Sanction Hearing.

15.5    The Plan Companies will also draw to the Court's attention:

15.5.1 any Creditor Issues (see Section 14 (*Creditor Issues*)); and

15.5.2 any other issues raised by any Plan Creditor in response to this letter.

16      **STEPS FOLLOWING THE CONVENING HEARING**

16.1    If permission to convene the Plan Meetings is granted by the Court at the Convening Hearing, the Plan Companies will:

16.1.1 convene the Plan Meetings by notifying the respective Plan Creditors in accordance with the directions of the Court of the time and date of and means of attending the Plan Meetings; and

16.1.2 make available to Plan Creditors the following important documents relating to the Plans:

(i)      the Explanatory Statement;

(ii)     the Plans;

(iii)    the notices convening the Plan Meetings;

(iv)    a Plan Creditor Letter that the Plan Creditors will need to complete to vote at, or appoint a proxy to attend and vote on their behalf at, the Plan Meetings; and

(v)     the principal agreements and other related documents that will document the terms of the Restructuring,

(together the "**Plan Documentation**").

16.2    Plan Creditors will receive the Plan Documentation by email from the Information Agent and be able to view and download the Plan Documentation in electronic format via the Plan Website. A notice in this regard will be circulated to Plan Creditors via the Information Agent shortly after the Convening Hearing. In addition, a notice directing Plan Creditors to the copies of the Plan Documentation will be available on the Plan Website.

16.3    Any of the Plan Documentation provided to Plan Creditors on the Plan Website can also be provided in hard copy free of charge if so requested by a Plan Creditor. Any such request should be made to the Information Agent and Skadden, legal advisers to the Plan Companies, at the contact details set out at Section 20 (*Enquiries and Further Information*) below.

50

17      **THE PLAN MEETINGS**

17.1    The Plan Companies currently expect that the Plan Meetings of the Plan Creditors in respect of the Plans will be set out in the Explanatory Statement. The date and time at which the claims of Plan Creditors under the Plans are to be determined by the Plan Companies will be the Record Time, which will be set out in the Explanatory Statement.

17.2    Further details with respect to the Plan Meetings will be provided in the Plan Documentation, which will likely allow remote attendance via a video-conference platform.

18      **SANCTION HEARING**

18.1    Following the Plan Meetings, provided that the requisite majorities of Plan Creditors vote in favour of the Plans, the Plan Companies intend to apply at the Sanction Hearing for an order sanctioning the Plans.

18.2    The Sanction Hearing is expected to be held in the Companies Court, Royal Courts of Justice, 7 Rolls Building, Fetter Lane, London EC4A 1NL.

18.3    Confirmation of the date and time of the Sanction Hearing will be sent to you via the Information Agent and the Plan Website in advance of the Sanction Hearing.

18.4    Plan Creditors are entitled to attend the Sanction Hearing in person or through counsel and to make representations at the Sanction Hearing, although they are not obliged to do so. Plan Creditors who wish to attend the Sanction Hearing in person or through counsel should contact Skadden, legal advisers to the Plan Companies, using the contact details set out at Section 20 (*Enquiries and Further Information*) below as soon as practicable to obtain instructions for attending the Sanction Hearing.

18.5    At the Sanction Hearing, the Court will consider whether or not to make an order sanctioning the Plans. In doing so, the Court will consider, among other things, whether:

18.5.1  the provisions of the statute have been complied with. This will include questions of class composition, whether the statutory majorities were obtained, and whether an adequate explanatory statement was distributed to the creditors;

18.5.2  the classes of Plan Creditors were fairly represented by those who attended the Plan Meetings and the statutory majority in each assenting class were acting in a *bona fide* manner;

18.5.3  each of the Plans are, respectively, a fair restructuring plan which a creditor could reasonably approve;

18.5.4  if there is a Dissenting Class in the CoreCo Plan, it is fair in all the circumstances to impose the CoreCo Plan on such Dissenting Class, including whether the Restructuring Surplus has been fairly allocated among Plan Classes, taking account of their respective contributions to the Restructuring Surplus (as noted at paragraph 14.5 above, NFE Global does not anticipate that there will be any Dissenting Class); and

18.5.5 there is any "blot" or defect in the Plans that would, for example, make it unlawful or in any other way inoperable.

18.6 The Plan Companies will also draw the Court's attention to:

18.6.1 objections raised as to Creditor Issues. However, as noted in Section 14 (*Creditor Issues*), if any such Creditor Issues were not raised prior to the Sanction Hearing then the Court is likely to expect relevant Plan Creditors to provide good reason why they did not raise such Creditor Issues at an earlier stage; and

18.6.2 other matters pertaining to the points set out above, including, for example, whether a Plan Creditor has indicated that it has not had adequate notice of the Plan Meetings.

18.7 Plan Creditors who have any comments or objections relating to the matters to be dealt with at the Sanction Hearing, as detailed above, should contact the Information Agent and Skadden, legal advisers to the Plan Companies, using the contact details set out at Section 20 (*Enquiries and Further Information*) below as soon as practicable setting out any concerns.

## 19 EFFECTIVENESS OF THE PLANS

19.1 Pursuant to the Plans, following:

19.1.1 in respect of the CoreCo Plan, either: (i) approval of the CoreCo Plan by a number representing at least 75 per cent. in value of each of the CoreCo Plan Classes present (in person or by proxy) and voting at each relevant Plan Meeting or (ii) approval of the CoreCo Plan by a number representing at least 75 per cent. in value of one or more (but not all) CoreCo Plan Classes present (in person or by proxy) and voting at the relevant Plan Meeting and reliance on the cross-class cram down feature in respect of the Dissenting Class(es);

19.1.2 in respect of the BrazilCo Plan: approval of the BrazilCo Plan by a number representing at least 75 per cent. in value of the 2029 New Notes Class present (in person or by proxy) and voting at the relevant Plan Meeting; and

19.1.3 in respect of both Plans:

(i)      the granting by the Court of the Sanction Order; and

(ii)     the delivery of a copy of the Sanction Order to the Registrar of Companies in England and Wales for registration,

the Plans will become effective in accordance with their terms and will be implemented once the conditions precedent to implementation are satisfied.

19.2 If the CoreCo Plan becomes effective and is implemented in accordance with its terms, all CoreCo Plan Creditors (including those who did not vote in favour of the CoreCo Plan or those who did not vote at all) will be bound by the terms of the CoreCo Plan as a matter of English law, irrespective of the jurisdiction in which the CoreCo Plan Creditor resides or has their seat, along with NFE Global.

52

19.3  If the BrazilCo Plan becomes effective and is implemented in accordance with its terms, all BrazilCo Plan Creditors (including those who did not vote in favour of the BrazilCo Plan or those who did not vote at all) will be bound by the terms of the BrazilCo Plan as a matter of English law, irrespective of the jurisdiction in which the BrazilCo Plan Creditor resides or has their seat, along with NFE Brazil Newco.

19.4  The effectiveness of the CoreCo Plan will be conditional on the BrazilCo Plan being sanctioned by the Court and the effectiveness of the BrazilCo Plan will be conditional on the CoreCo Plan being sanctioned by the Court. Each Plan will, once sanctioned, also be subject to certain other conditions precedent to implementation, as described further at paragraph 8.25 above.

19.5  As at the date of this letter, the Restructuring Effective Date is expected to be in mid 2026.

20  **ENQUIRIES AND FURTHER INFORMATION**

20.1  If you have any questions in relation to this letter or the Plans, please contact Skadden using the following contact details:

**Legal advisers to the Plan Companies**

Skadden, Arps, Slate, Meagher & Flom (UK) LLP
22 Bishopsgate
London
EC2N 4BQ
United Kingdom

Attention:  Peter Newman and Nicole Stephansen
E-mail:  DLLADYUK@skadden.com
Phone:  +44 20 7519 7000

**Information Agent**

Kroll Issuer Services Limited
The News Building
3 London Bridge Street
London
SE1 9SG
United Kingdom

Attention:  Alessandro Zorza/ Sunjeeve Patel
E-mail:  nfe@is.kroll.com
Phone:  +44 20 7089 0909
Plan Website: https://deals.is.kroll.com/nfe

20.2  Skadden, as legal advisers to the Plan Companies rather than the Plan Creditors, will be unable to offer legal advice to Plan Creditors relating to the Plans.

21  **PLAN WEBSITE**

21.1  The Information Agent has set up the Plan Website to disseminate information and communications about the Plans and to facilitate the implementation of the Plans. Plan Creditors may download documents relating to the Plans from the Plan Website (at https://deals.is.kroll.com/nfe).

53

21.2    For any questions regarding access to the Plan Website, or if a Plan Creditor encounters any technical difficulties accessing any Plan Documentation via the Plan Website, please contact the Information Agent using the contact details set out above.

Yours faithfully,

**Signed by:**

4D5C907FC340418...

Christopher Boas

Director of NFE Global Holdings Limited


**Signed by:**

4D5C907FC340418...

Christopher Boas

Director of NFE Brazil Newco Limited


[*Signature Page to the Practice Statement Letter*]

**Schedule 1– Definitions and Interpretation**

1      **DEFINITIONS**

"**2019 Omnibus Incentive Plan**" means the Parent's existing employee incentive plan.

"**2024 Intercompany Loans**" has the meaning given to it in paragraph 5.23 of this letter.

"**2024 Refinancing Transactions**" has the meaning given to it in paragraph 5.13 of this letter.

"**2025 Notes**" has the meaning given to it in paragraph 5.13 of this letter.

"**2026 Legacy Noteholders**" has the meaning given to it in paragraph 3.1.1 of this letter.

"**2026 Legacy Notes**" has the meaning given to it in paragraph 5.2 of this letter.

"**2026 Legacy Notes Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the holders of the 2026 Legacy Notes under or in connection with the 2026 Legacy Notes (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise.

"**2026 Legacy Notes Trustee**" means U.S. Bank Trust Company, National Association, in its capacity as trustee under the 2026 Legacy Notes, or any successor thereof.

"**2029 Legacy Noteholders**" has the meaning given to it in paragraph 3.1.2 of this letter.

"**2029 Legacy Notes**" has the meaning given to it in paragraph 5.3 of this letter.

"**2029 Legacy Notes Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the holders of the 2029 Legacy Notes under or in connection with the 2029 Legacy Notes (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise).

"**2029 Legacy Notes Trustee**" means U.S. Bank Trust Company, National Association, in its capacity as trustee under the 2029 Legacy Notes, or any successor thereof.

"**2029 New Noteholders**" has the meaning given to it in paragraph 3.2 of this letter.

"**2029 New Notes**" has the meaning given to it in paragraph 5.13 of this letter.

"**2029 New Notes Class**" has the meaning given to it in paragraph 10.3.2(i) of this letter.

"**2029 New Notes Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the holders of the

56

2029 New Notes under or in connection with the 2029 New Notes (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise).

"**2029 New Notes Trustee**" means Wilmington Savings Fund Society, FSB, in its capacity as trustee under the 2029 New Notes, or any successor thereof.

"**Account Collateral**" has the meaning given to it in paragraph 5.8.5 of this letter.

"**Act**" has the meaning given to it in the Preamble of this letter.

"**Administrative Parties**" means the RCF Agent, the TLA Agent, the TLB Agent, the Series I Agent, the Series II Agent, the Common Representative, the 2026 Legacy Notes Trustee, the 2029 Legacy Notes Trustee, the 2029 New Notes Trustee, DTC and Cede & Co.

"**Alvarez & Marsal**" means Alvarez & Marsal Europe LLP.

"**Barcarena Power Plant**" has the meaning given to it in paragraph 6.1.5 of this letter.

"**Barcarena Terminal**" has the meaning given to it in paragraph 6.1.3 of this letter.

"**BNDES Term Loan**" means an up to $355.566 million loan facility made pursuant to a credit agreement dated October 2023 with BNDES, the Brazilian Development Bank.

"**Boards**" means the respective board of directors of each Plan Company.

"**Brazil**" means the Federative Republic of Brazil.

"**Brazil $200m Pari Lien**" means a first lien over the NFE Financing Collateral Assets, excluding certain real estate in Pennsylvania, U.S.A. owned by PA Land, on terms such that the secured first lien obligations in respect of the R-2 Revolving Credit Facility, the Letter of Credit Facility and the Term Loan A Facility are subject to an aggregate cap of $200 million and rank *pari passu* as between themselves, and, in turn, rank *pari passu* with the secured claims of the 2029 New Notes in respect of the NFE Financing Collateral Assets.

"**Brazil 2L Lien**" means, an uncapped, second lien over the NFE Financing Collateral Assets, excluding certain real estate in Pennsylvania, U.S.A. owned by PA Land (and after amounts owing under the 2029 New Notes have been repaid), shared *pari passu* between the Revolving Credit Facility, Term Loan A Facility and Letter of Credit Facility.

"**Brazil Bank Collateral**" has the meaning given to it in paragraph 5.8.4 of this letter.

"**Brazil Collateral**" has the meaning given to it in paragraph 5.15 of this letter.

"**Brazil Financing Notes**" means the up to $350 million aggregate principal amount of 15.00% Senior Secured Notes due 2029 issued in February 2025 by one of the Parent's consolidated subsidiaries.

"**Brazil Junior ICA**" has the meaning given to it in paragraph 5.28.3 of this letter.

57

"**Brazil Parent**" has the meaning given to it in paragraph 5.17 of this letter.

"**Brazil Parent Credit Agreement**" has the meaning given to it in paragraph 5.17 of this letter.

"**Brazil Parent ICA**" has the meaning given to it in paragraph 5.28.2 of this letter.

"**Brazil Parent Intercompany Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the lenders of the Brazil Parent Intercompany Loan under or in connection with the Brazil Parent Intercompany Loan (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise).

"**Brazil Parent Intercompany Loan**" has the meaning given to it in paragraph 5.17 of this letter.

"**Brazil Parent Intercompany Loan Facility**" has the meaning given to it in paragraph 5.17 of this letter.

"**BrazilCo Common Equity**" means all common equity interests of New BrazilCo Parent from and after the Restructuring Effective Date.

"**BrazilCo Group**" has the meaning given to it in paragraph 8.1.1(i) of this letter.

"**BrazilCo GSA**" means a sale and purchase agreement for the purchase by CELBA-1 Centrais Electricas Barcarena S.A. from a third party of liquefied natural gas.

"**BrazilCo MIP**" has the meaning given to it in paragraph 8.16 of this letter.

"**BrazilCo Plan**" means the restructuring plan proposed by the NFE Brazil Newco under Part 26A of the Act.

"**BrazilCo Plan Creditors**" has the meaning given to it in paragraph 3.2 of this letter.

"**BrazilCo Separation**" has the meaning given to it in paragraph 8.2 of this letter.

"**BrazilCo Stockholders' / LLC Agreement**" means the document to be entered into pursuant to the Restructuring governing the terms of the BrazilCo Common Equity.

"**Capital Raise**" has the meaning given to it in paragraph 8.20 of this letter.

"**Capital Raise New CoreCo Junior Term Loans**" has the meaning given to it in paragraph 8.20 of this letter.

"**Capital Raise New CoreCo Term Loans**" has the meaning given to it in paragraph 8.20 of this letter.

"**Cash Plan Consideration**" means each relevant Plan Creditor's entitlement, pursuant to the Plans, to the RCF-2 / TLA BrazilCo Cash Pool.

58

"**Cede & Co.**" means Cede & Co. as nominee for DTC and as registered holder of the 2026 Legacy Notes, the 2029 Legacy Notes and the 2029 New Notes, or any successor thereof.

"**Chapter 15 Petition**" has the meaning given to it in paragraph 13.5 of this letter.

"**Chapter 15 Recognition**" has the meaning given to it in paragraph 13.3 of this letter.

"**Collateral Pools**" has the meaning given to it in paragraph 5.16 of this letter.

"**Common Collateral**" has the meaning given to it in paragraph 5.4 of this letter.

"**Common Guarantors**" has the meaning given to it in paragraph 5.4 of this letter.

"**Common Representative**" means U.S. Bank, National Association, in its capacity as initial common representative under the terms of the Equal Priority Intercreditor Agreement, or any successor thereof.

"**Consolidated Liquidity**" means, as of any date of determination, an amount determined for CoreCo, on a consolidated basis, equal to the sum of: (x) unrestricted cash and cash equivalents, and (y) available committed capacity under the Exit LNG Facility.

"**Convening Hearing**" means the hearing expected to be held in the Companies Court, Royal Courts of Justice, 7 Rolls Building, Fetter Lane, London EC4A 1NL for an order granting the Plan Companies certain directions in relation to the Plans, including permission to convene the Plan Meetings for the purpose of Plan Creditors considering and, if thought fit, approving, the Plans.

"**CoreCo–BrazilCo Transition Services Agreement**" means a transition services agreement to be entered into on the Restructuring Effective Date, between, among others, the Parent and New BrazilCo Parent, pursuant to which the CoreCo Group will provide certain transition services to the BrazilCo Group.

"**CoreCo Common Stock**" means the common stock of the Parent from and after the Restructuring Effective Date.

"**CoreCo Governance Term Sheet**" means the term sheet appended to the Restructuring Term Sheet setting out the material terms and conditions regarding the governance of the Parent on and after the Restructuring Effective Date, including, but not limited to, the composition of the New CoreCo Board.

"**CoreCo Group**" has the meaning given to it in paragraph 8.1.1(ii) of this letter.

"**CoreCo Intercreditor Agreement**" means the intercreditor agreement to be entered into pursuant to the Restructuring in respect of the New CoreCo Credit Facility and New CoreCo LC Facility.

"**CoreCo MIP**" has the meaning given to it in paragraph 8.14 of this letter.

"**CoreCo Plan**" means the restructuring plan proposed by the NFE Global under Part 26A of the Act.

"**CoreCo Plan Class**" has the meaning given to it in paragraph 10.3.1 of this letter.

"**CoreCo Plan Creditors**" has the meaning given to it in paragraph 3.1 of this letter.

"**CoreCo Plan Debt**" has the meaning given to it in paragraph 1.6 of this letter.

"**CoreCo Preferred Stock**" means a series of convertible preferred stock of the Parent from and after the Restructuring Effective Date, which shall have the terms set out in the CoreCo Preferred Stock Term Sheet.

"**CoreCo Preferred Stock Cash Purchase Election**" has the meaning given to it in paragraph 9.4 of this letter.

"**CoreCo Preferred Stock Term Sheet**" means the term sheet appended to the Restructuring Term Sheet setting out the material terms and conditions of the CoreCo Preferred Stock.

"**CoreCo Registration Rights Agreement**" means the document to be entered into pursuant to the Restructuring governing the registration rights in respect of the CoreCo Common Stock and CoreCo Preferred Stock.

"**Corporate Debt**" has the meaning given to it in paragraph 1.6 of this letter.

"**Court**" means the High Court of Justice of England and Wales and any appellate court in England and Wales having jurisdiction in connection with the Restructuring (including the Court of Appeal and the Supreme Court).

"**Creditor Issues**" has the meaning given to it in paragraph 14.1 of this letter.

"**Debt Plan Consideration**" means each relevant Plan Creditor's entitlement, pursuant to the Plans, to New CoreCo Term Loans and/or FLNG 2 Term Loans as applicable.

"**Dissenting Class**" has the meaning given to it in paragraph 2.3.1(ii) of this letter.

"**DTC**" means the Depository Trust Company, or any successor thereof.

"**Early Consent Deadline**" has the meaning given to it in paragraph 6.14 of this letter.

"**Early Consent Fee**" has the meaning given to it in paragraph 6.14 of this letter.

"**Election Deadline**" means 5.00pm (New York time) on 8 April 2026.

"**Eligible Non-Exchanging Creditor**" has the meaning given to it in paragraph 9.5 of this letter.

"**Energos**" has the meaning given to it in paragraph 4.7.2 of this letter.

"**Equal Priority Intercreditor Agreement**" has the meaning given to it in paragraph 5.28.1 of this letter.

"**Equity-for-Debt Exchange Election**" has the meaning given to it in paragraph 9.4.1 of this letter.

"**Equity-for-Debt Exchanged Preferred Shares**" has the meaning given to it in paragraph 9.4.1 of this letter.

"**Equity Plan Consideration**" means each relevant Plan Creditor's entitlement, pursuant to the Plans, to CoreCo Preferred Stock, CoreCo Common Stock, FLNG 2 Preferred Equity and/or BrazilCo Common Equity as applicable.

"**Exchange Consideration Chart**" has the meaning given to it in paragraph 8.1.2 of this letter.

"**Existing NFE Stockholders**" means the holders of common stock of the Parent as of the Record Time.

"**Exit LNG Facility**" has the meaning given to it in the Restructuring Support Agreement.

"**Explanatory Statement**" means the explanatory statement to the Plans required to be provided to the Plan Creditors pursuant to section 901D of the Act (which will include a notice setting out the relevant details for Plan Meetings), including any appendices, schedules or other documents attached thereto and any supplemental, revised or replacement explanatory statement issued in connection with the Plans.

"**F1 Collateral**" has the meaning given to it in paragraph 5.8.2 of this letter.

"**F2 Collateral**" has the meaning given to it in paragraph 5.8.3 of this letter.

"**FEMA**" has the meaning given to it in paragraph 6.3.3(ii) of this letter.

"**FLNG**" has the meaning given to it in paragraph 6.1.8 of this letter.

"**FLNG 1**" has the meaning given to it in paragraph 6.1.8 of this letter.

"**FLNG 1 Guarantors**" has the meaning given to it in paragraph 5.8 of this letter.

"**FLNG 2**" has the meaning given to it in paragraph 6.1.8 of this letter.

"**FLNG 2 Guarantors**" has the meaning given to it in paragraph 5.8 of this letter.

"**FLNG 2 MIP**" has the meaning given to it in paragraph 8.15 of this letter.

"**FLNG 2 Parent**" means NFE FLNG 2 LLC, a Delaware limited liability company.

"**FLNG 2 Parent LLCA**" means the Amended and Restated Limited Liability Company Agreement of FLNG 2 Parent.

"**FLNG 2 Preferred Equity**" means all preferred equity interests of FLNG 2 Parent from and after the Restructuring Effective Date, which shall have the terms set out in the FLNG 2 Preferred Equity Term Sheet.

"**FLNG 2 Preferred Equity Term Sheet**" means the term sheet appended to the Restructuring Term Sheet setting forth the material terms and conditions of the FLNG 2 Preferred Equity.

61

"**FLNG 2 Sale**" has the meaning given to it in paragraph 8.19 of this letter.

"**FLNG 2 Sale Proceeds**" has the meaning given to it in paragraph 8.15 of this letter.

"**FLNG 2 Term Loan Credit Facility Agreement**" means the credit agreement governing the FLNG 2 Term Loan Facility, to be entered into on the Restructuring Effective Date among the FLNG 2 Parent, the guarantors party thereto, the lenders party thereto, and the administrative agent for such lenders, on the terms set out in the FLNG 2 Term Loan Term Sheet.

"**FLNG 2 Term Loan Facility**" has the meaning given to it in paragraph 8.6 of this letter.

"**FLNG 2 Term Loan Term Sheet**" means the term sheet appended to the Restructuring Term Sheet setting forth the material terms and conditions of the FLNG 2 Term Loans.

"**FLNG 2 Term Loans**" has the meaning given to it in paragraph 8.6 of this letter.

"**GLP Preferred Units**" means the GLP 8.75% Series A cumulative redeemable preferred units issued by Golar LNG Partners LP.

"**Group**" means the Parent and its direct and indirect subsidiaries.

"**Holding Period Trust Deed**" means the trust deed to be entered into on or prior to the Restructuring Effective Date between, among others, the Plan Companies and the Holding Period Trustee (as defined therein) and attached to the Transaction Implementation Deed.

"**Implementation Documents**" has the meaning given to it in paragraph 7.2.2 of this letter.

"**Incremental Equity-for-Debt Exchange Election New CoreCo Term Loans**" has the meaning given to it in paragraph 9.4.1 of this letter.

"**Incremental New CoreCo Term Loans**" has the meaning given to it in paragraph 9.2.1(iii)(c) of this letter.

"**Information Agent**" means Kroll Issuer Services Limited, appointed by the Plan Companies in respect of the Plans (and any successor information agent).

"**Initial Terms**" has the meaning given to it in paragraph 8.21 of this letter.

"**Interim Brazil Financing**" has the meaning given to it in paragraph 8.8 of this letter.

"**La Paz Facility**" has the meaning given to it in paragraph 6.1.2 of this letter.

"**Legacy Noteholders**" has the meaning given to it in paragraph 3.1.2 of this letter.

"**Legacy Notes**" has the meaning given to it in paragraph 5.3 of this letter.

"**Legacy Notes Class**" has the meaning given to it in paragraph 10.3.1(v) of this letter.

"**Legacy Notes Debt**" means the 2026 Legacy Notes Debt and the 2029 Legacy Notes Debt.

"**Legacy Notes Indenture**" has the meaning given to it in paragraph 5.3 of this letter.

"**Letter of Credit Agreement**" has the meaning given to it in paragraph 5.26 of this letter.

"**Letter of Credit Facility**" has the meaning given to it in paragraph 5.26 of this letter.

"**Letter of Credit Facility Debt**" means all present and future moneys, obligations, debts and liabilities, whether actual or contingent, direct or indirect, due, to become due, or that may become due, or otherwise incurred or outstanding from time to time by any member of the Group to any agent, any issuing bank, any lender or any lender counterparty of the Letter of Credit Facility under or in connection with the Letter of Credit Facility (in each case, whether alone or jointly, or jointly and severally, with any other person, and whether as principal, surety or otherwise).

"**LNG**" has the meaning given to it in paragraph 4.7.1 of this letter.

"**Local Brazilian Debt Facilities**" means the PortoCem Debentures, the Brazil Financing Notes and the BNDES Term Loan.

"**Majority 2029 New Noteholders**" has the meaning given to it in paragraph 8.17.3 of this letter.

"**Majority RCF Lenders**" has the meaning given to it in paragraph 8.17.3 of this letter.

"**Majority Supporting Creditors**" has the meaning given to that term in the Restructuring Support Agreement.

"**Majority TLB Lenders**" has the meaning given to it in paragraph 8.17.3 of this letter.

"**Management Investors**" has the meaning given to it in the Restructuring Support Agreement.

"**Mexico**" means the United Mexican States.

"**Minimum Liquidity Condition**" means a minimum liquidity condition, whereby the CoreCo Group shall have (i) Consolidated Liquidity of not less than $100 million on the Restructuring Effective Date (*pro forma* for the Restructuring) and (ii) projected Consolidated Liquidity of not less than $100 million as of the end of each monthly period projected by a business plan which is reasonably acceptable to the Majority Supporting Creditors.

"**Nasdaq**" means the National Association of Securities Dealers Automated Quotations.

"**National Securities Exchange**" means The New York Stock Exchange, The Nasdaq Global Select Market or the Nasdaq Global Market.

"**Net BrazilCo–CoreCo Intercompany Claim**" has the meaning given to it in paragraph 8.11 of this letter.

"**New BrazilCo Financing Arrangements**" has the meaning given to it in paragraph 8.9.1 of this letter.

"**New BrazilCo LC Facility**" has the meaning given to it in paragraph 8.9.2 of this letter.

"**New BrazilCo Parent**" means NFE Brazil Holdings Limited, or a newly formed parent entity thereof, from and after the Restructuring Effective Date.

"**New CoreCo Board**" has the meaning given to it in paragraph 8.14 of this letter.

"**New CoreCo Credit Agreement**" means the credit agreement governing the New CoreCo Credit Facility, to be entered into on the Restructuring Effective Date among the Parent, the guarantors party thereto, the lenders party thereto, and the administrative agent for such lenders, on the terms set out in the New CoreCo Credit Facility Term Sheet.

"**New CoreCo Credit Facility**" has the meaning given to it in paragraph 8.5.1 of this letter.

"**New CoreCo Credit Facility Term Sheet**" means the term sheet setting forth the material terms and conditions of the New CoreCo Credit Facility, appended to the Restructuring Term Sheet.

"**New CoreCo LC Facility**" has the meaning given to it in paragraph 8.5.2 of this letter.

"**New CoreCo Term Loans**" has the meaning given to it in paragraph 8.5.1 of this letter.

"**NFE Brazil Newco**" means NFE Brazil Newco Limited, a private company limited by shares incorporated in England and Wales under registered number 17141053, whose registered address is Suite 1, 7th Floor, 50 Broadway, London SW1H 0BL, United Kingdom.

"**NFE Financing**" means NFE Financing LLC, a Delaware limited liability company.

"**NFE Financing Collateral Assets**" means certain assets of NFE Financing including: (A) approximately 45 per cent. of the equity in the Group's Brazil business, (B) proceeds of NFE Financing's interest in the Series II Loan, and (C) NFE Financing's interest in the Brazil Parent Intercompany Loan (which in turn is secured by the Brazil Parent's approximately 55 per cent. of the equity in the Group's Brazil business and its interest in the proceeds of the Series I Loan) and certain real estate in Pennsylvania, U.S.A. owned by PA Land.

"**NFE Global**" means NFE Global Holdings Limited, a private company limited by shares incorporated in England and Wales under registered number 13679588, whose registered address is Suite 1, 7th Floor 50 Broadway, London SW1H 0BL, United Kingdom.

64

"**PA Land**" means Bradford County Real Estate Partners LLC.

"**Parent**" means New Fortress Energy Inc., a Delaware corporation.

"**Plan Class**" has the meaning given to it in paragraph 10.3 of this letter.

"**Plan Companies**" means NFE Global and NFE Brazil Newco, each a "**Plan Company**".

"**Plan Consideration**" means the Debt Plan Consideration, the Equity Plan Consideration and/or the Cash Plan Consideration, as applicable.

"**Plan Creditor Letter**" means a plan creditor letter, the form of which will be appended to the Explanatory Statement.

"**Plan Creditors**" has the meaning given to it in paragraph 3.2 of this letter.

"**Plan Debt**" has the meaning given to it in paragraph 1.7 of this letter.

"**Plan Documentation**" has the meaning given to it in paragraph 16.1 in this letter.

"**Plan Meetings**" means each of the meetings of the Plan Creditors that the Court has granted the Plan Companies permission to convene (including any adjournment thereof).

"**Plan Website**" means https://deals.is.kroll.com/nfe.

"**Plans**" means the BrazilCo Plan and the CoreCo Plan and each a "**Plan**".

"**PortoCem Debentures**" means the R$4.5 billion debentures issued by Portocem Geração de Energia S.A. in November 2024.

"**PortoCem Power Plant**" has the meaning given to it in paragraph 6.1.6 of this letter.

"**Practice Statement**" has the meaning given to it in paragraph 1.2 of this letter.

"**PREPA**" has the meaning given to it in paragraph 6.1.1 of this letter.

"**Puerto Rico**" means the Commonwealth of Puerto Rico.

"**Puerto Sandino Facility**" has the meaning given to it in paragraph 6.1.7 of this letter.

"**R-1 Class**" has the meaning given to it in paragraph 10.3.1 of this letter.

"**R-1 Lenders**" means the lenders under the R-1 Revolving Credit Facility.

"**R-1 Loans**" means the loans made pursuant to the R-1 Revolving Credit Facility.

"**R-1 Revolving Credit Facility**" has the meaning given to it in paragraph 5.6 of this letter.

"**R-1 Revolving Credit Facility Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to any

65

agent, any issuing bank, any lender or any lender counterparty of the R-1 Revolving Credit Facility under or in connection with the R-1 Revolving Credit Facility (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise).

"**R-2 Class**" has the meaning given to it in paragraph 10.3.1 of this letter.

"**R-2 Lenders**" means the lenders under the R-2 Revolving Credit Facility.

"**R-2 Loans**" means the loans made pursuant to the R-2 Revolving Credit Facility.

"**R-2 Revolving Credit Facility**" has the meaning given to it in paragraph 5.6 of this letter.

"**R-2 Revolving Credit Facility Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to any agent, any issuing bank, any lender or any lender counterparty of the R-2 Revolving Credit Facility under or in connection with the R-2 Revolving Credit Facility (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise).

"**RCF-2 / TLA BrazilCo Cash Pool**" means $45 million of cash, which cash pool shall be funded with proceeds of the New BrazilCo Financing Arrangements.

"**RCF-2 / TLA BrazilCo Equity Pool**" means a number of shares of BrazilCo Common Equity equal to 5.8 per cent. of the aggregate amount of BrazilCo Common Equity to be distributed to holders of 2029 New Notes, R-2 Revolving Credit Facility Debt, and holders of Term Loan A Debt pursuant to the Restructuring on the Restructuring Effective Date. For the avoidance of doubt, the BrazilCo Common Equity that comprises the RCF-2 / TLA BrazilCo Equity Pool is subject to dilution by the BrazilCo MIP.

"**RCF Agent**" means MUFG Bank. Ltd., in its capacity as administrative agent under the Revolving Credit Facility, or any successor thereof.

"**RCF Commitments**" means "Commitments" as that term is defined under the Revolving Credit Facility Agreement.

"**RCF Lenders**" has the meaning given to it in paragraph 3.1.4 of this letter.

"**Recapitalisation Transaction**" has the meaning given to it in paragraph 9.2 of this letter.

"**Record Time**" means the date and time at which the Plan Creditors' entitlement to vote in the Plans and the value of their Plan Debt claims shall be assessed.

"**Relevant Alternative**" has the meaning given to it in paragraph 11.5 of this letter.

"**Relevant Alternative Report**" has the meaning given to it in paragraph 11.6 of this letter.

"**Residual FLNG Proceeds Claims**" has the meaning given to it in paragraph 5.5 of this letter.

"**Restructuring**" has the meaning given to it in paragraph 8.1 of this letter.

"**Restructuring Effective Date**" means the date on which each of the conditions precedent to the Restructuring (as described in the Restructuring Support Agreement) are satisfied or duly waived and the Restructuring has been fully implemented.

"**Restructuring Support Agreement**" means the Restructuring Support Agreement dated 17 March 2026 originally entered into between, *inter alios*, the Parent, NFE Global, and the Supporting Creditors, as amended, supplemented and/or restated from time to time.

"**Restructuring Surplus**" has the meaning given to it in paragraph 11.8 of this letter.

"**Restructuring Term Sheet**" means the term sheet appended to the Restructuring Support Agreement relating to the Restructuring.

"**Revolving Credit Facility**" has the meaning given to it in paragraph 5.6 of this letter.

"**Revolving Credit Facility Agreement**" has the meaning given to it in paragraph 5.6 of this letter.

"**Revolving Credit Facility Debt**" means the R-1 Revolving Credit Facility Debt and the R-2 Revolving Credit Facility Debt.

"**San Juan Terminal**" has the meaning given to it in paragraph 6.1.1 of this letter.

"**Sanction Hearing**" means the hearing of the Court for the purpose of sanctioning the Plans pursuant to the order of the Court under Section 901F of the Act expected to be held at the Companies Court, Royal Courts of Justice, 7 Rolls Building, Fetter Lane, London EC4A 1NL.

"**Sanction Order**" means an order of the Court sanctioning the Plans under section 901F of the Act.

"**Santa Catarina Terminal**" has the meaning given to it in paragraph 6.1.4 of this letter.

"**Securities Act**" has the meaning given to it in the Preamble of this letter.

"**Series I Agent**" means Wilmington Savings Fund Society, FSB, in its capacity as administrative agent under the Series I Loan, or any successor thereof.

"**Series I and Series II Class**" has the meaning given to it in paragraph 10.3.1(vi) of this letter.

"**Series I Lender**" has the meaning given to it in paragraph 3.1.7 of this letter.

"**Series I Loan**" has the meaning given to it in paragraph 5.20 of this letter.

67

"**Series I Loan Agreement**" has the meaning given to it in paragraph 5.20 of this letter.

"**Series I Loan Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the lenders of the Series I Loan under or in connection with the Series I Loan (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise).

"**Series II Agent**" means Wilmington Savings Fund Society, FSB, in its capacity as administrative agent under the Series II Loans, or any successor thereof.

"**Series II Lender**" has the meaning given to it in paragraph 3.1.8 of this letter.

"**Series II Loan**" has the meaning given to it in paragraph 5.23 of this letter.

"**Series II Loan Agreement**" has the meaning given to it in paragraph 5.23 of this letter.

"**Series II Loan Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the lenders of the Series II Loan under or in connection with the Series II Loan (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise).

"**Shared Collateral**" has the meaning given to it in the Equal Priority Intercreditor Agreement.

"**Skadden**" means Skadden, Arps, Slate, Meagher & Flom (UK) LLP, legal advisers to the Plan Companies.

"**Standstill Fee**" has the meaning given to it in paragraph 6.16 of this letter.

"**Supporting Creditors**" means each Plan Creditor that has executed the Restructuring Support Agreement as a supporting creditor or has executed a joinder to the Restructuring Support Agreement as an additional supporting creditor.

"**Term Loan A**" has the meaning given to it in paragraph 5.11 of this letter.

"**Term Loan A Agreement**" has the meaning given to it in paragraph 5.11 of this letter.

"**Term Loan A Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the lenders of the Term Loan A under or in connection with the Term Loan A (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise).

"**Term Loan A Facility**" has the meaning given to it in paragraph 5.11 of this letter.

"**Term Loan B**" has the meaning given to it in paragraph 5.9 of this letter.

"**Term Loan B Agreement**" has the meaning given to it in paragraph 5.9 of this letter.

"**Term Loan B Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the lenders of the Term Loan B under or in connection with the Term Loan B (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise).

"**Term Loan B Facility**" has the meaning given to it in paragraph 5.9 of this letter.

"**TLA Agent**" means the administrative agent under the Term Loan A Facility, or any successor thereof.

"**TLA Class**" has the meaning given to it in paragraph 10.3.1(iv) of this letter.

"**TLA Lenders**" has the meaning given to it in paragraph 3.1 of this letter.

"**TLB Agent**" means the administrative agent under the Term Loan B Facility, or any successor thereof.

"**TLB Class**" has the meaning given to it in paragraph 10.3.1(iii) of this letter.

"**TLB Lenders**" has the meaning given to it in paragraph 3.1.5 of this letter.

"**Transaction Implementation Deed**" means the deed to give effect to the terms of the Plans to be entered into by, *inter alios*, the Plan Companies and the Plan Creditors.

"**Turbines**" has the meaning given to it in paragraph 6.1.9 of this letter.

"**U.S.**" or "**U.S.A.**" means the United States of America.

"**U.S. Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. § 101, *et seq.*, as amended from time to time.

"**U.S. Bankruptcy Court**" has the meaning given to it in paragraph 13.5 of this letter.

2      **INTERPRETATION**

2.1    In this letter, unless the context otherwise requires or otherwise expressly provides for:

2.1.1   references to a "person" include references to an individual, firm, partnership, company, corporation, unincorporated body of persons or any state or state agency;

2.1.2   references to a statute or statutory provision include the same as subsequently modified, amended or re-enacted from time to time;

2.1.3   references to a document include the same as subsequently supplemented, amended and/or restated from time to time;

2.1.4   references to a time of the day are references to the time in London, United Kingdom;

2.1.5    a reference to a Plan Company, a Plan Creditor or any other person includes its successors in title, permitted assigns and permitted transferees;

2.1.6    to the extent there is any conflict or inconsistency between the terms of this letter and the Plans, the terms of the Plans shall prevail;

2.1.7    the singular includes the plural and *vice versa* and words importing one gender shall include the other gender;

2.1.8    the term "including" means "including, without limitation"; and

2.1.9    "$" means the lawful currency for the time being of the U.S.A.

**Schedule 2– Restructuring Effective Date Plan Consideration**

1.  The following table sets out allocations of base Plan Consideration (without giving effect to any elections), without any Early Consent Fee or Standstill Fee:

| ($ in actuals) | New 2029s | TLB | TLA | R-1 RCF | R-2 RCF | Legacy 2026s | Legacy 2029s | Total To Lenders | Existing Equity |
|---|---|---|---|---|---|---|---|---|---|
| **Principal Claims** | $ 2,730,126,770 | $ 1,266,077,800 | $ 294,999,563 | $ 100,000,000 | $ 560,400,000 | $ 510,879,463 | $ 236,728,231 | $ 5,699,211,827 | |
| **BrazilCo** | | | | | | | | | |
| BrazilCo Common Equity (%) | 94.2977% | - | - | - | - | - | - | 94.2977% | - |
| RCF-2 / TLA BrazilCo Equity Pool | - | - | 1.9719% | - | 3.7305% | - | - | 5.7023% | - |
| RCF-2 / TLA BrazilCo Cash Pool | - | - | - | - | - | - | - | - | - |
| **CoreCo** | | | | | | | | | |
| New CoreCo Term Loans | - | $313,094,462.12 | $17,500,000.00 | $27,662,978.52 | $156,034,559.36 | - | - | $514,292,000.00 | - |
| CoreCo Preferred Stock (Initial) | $973,824,550.04 | $698,372,912.27 | $125,104,942.51 | $54,393,677.87 | $345,226,895.54 | $178,438,630.25 | $83,907,200.66 | $2,459,268,809.15 | - |
| CoreCo Common Stock (%) | 25.7721% | 18.4046% | 3.3197% | 1.4337% | 9.1031% | 4.7390% | 2.2277% | 65.0000% | 35.0000% |
| FLNG 2 Term Loans | - | $228,666,186.86 | $53,087,320.60 | $17,813,329.20 | $100,433,163.33 | - | - | $400,000,000.00 | - |
| FLNG 2 Preferred Equity | - | $114,333,093.43 | $26,543,660.30 | $8,906,664.60 | $50,216,581.67 | - | - | $200,000,000.00 | - |

2.  The following table sets out allocations of Plan Consideration (without giving effect to any elections) assuming all Plan Creditors earn the Early Consent Fee and Standstill Fee:

| ($ in actuals) | New 2029s | TLB | TLA | R-1 RCF | R-2 RCF | Legacy 2026s | Legacy 2029s | Total To Lenders | Existing Equity |
|---|---|---|---|---|---|---|---|---|---|
| **Principal Claims** | $2,730,126,770 | $1,266,077,800 | $294,999,563 | $100,000,000 | $560,400,000 | $510,879,463 | $236,728,231 | $5,699,211,827 | |
| **BrazilCo** | | | | | | | | | |
| BrazilCo Common Equity (%) | 94.2977% | - | - | - | - | - | - | 94.2977% | - |
| RCF-2 / TLA BrazilCo Equity Pool | - | - | 1.9719% | - | 3.7305% | - | - | 5.7023% | - |
| RCF-2 / TLA BrazilCo Cash Pool | - | - | - | - | - | - | - | - | - |
| **CoreCo** | | | | | | | | | |
| New CoreCo Term Loans | - | $313,094,462.12 | $17,500,000.00 | $29,662,978.52 | $167,242,559.36 | - | - | $527,500,000.00 | - |
| CoreCo Preferred Stock (Initial) | $991,234,783.35 | $707,868,495.77 | $127,681,503.83 | $55,143,677.87 | $350,118,650.56 | $182,270,226.22 | $85,682,662.39 | $2,500,000,000.00 | - |
| CoreCo Common Stock (%) | 25.7721% | 18.4046% | 3.3197% | 1.4337% | 9.1031% | 4.7390% | 2.2277% | 65.0000% | 35.0000% |
| FLNG 2 Term Loans | - | $228,666,186.86 | $53,087,320.60 | $17,813,329.20 | $100,433,163.33 | - | - | $400,000,000.00 | - |
| FLNG 2 Preferred Equity | - | $114,333,093.43 | $26,543,660.30 | $8,906,664.60 | $50,216,581.67 | - | - | $200,000,000.00 | - |