**EXHIBIT E**

**Skeleton Argument**

**CR-2026-002385 and CR-2026-002886**

<u>**IN THE HIGH COURT OF JUSTICE**</u>

<u>**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**</u>

<u>**INSOLVENCY AND COMPANIES LIST (ChD)**</u>

**IN THE MATTER OF NFE GLOBAL HOLDINGS LIMITED**

**AND IN THE MATTER OF NFE BRAZIL NEWCO LIMITED**

**AND IN THE MATTER OF THE COMPANIES ACT 2006**

---

**SKELETON ARGUMENT ON BEHALF OF THE PLAN COMPANIES**

---

**Hearing time estimate: ½ day.**

**Time estimate for pre-reading: ½ to one day.**

**Pre-reading list: see paragraphs 11 to 13 below.**

**There are four hearing bundles – a core bundle ("CB"), a supplemental core bundle ("SCB"), an exhibit bundle ("EB") and a transactional documents bundle ("TB"). Bundle references are set out in the form {bundle/tab/page}.**

**The supplemental core bundle contains: (i) key implementation documents (including the Plans themselves) that are otherwise difficult to locate in the very long exhibit bundle; and (ii) the second witness statement of Mr Hilty dated 11 May 2025.**

**A.    Introduction**

1.    This skeleton argument is filed on behalf of NFE Global Holdings Limited ("NFE Global") and NFE Brazil NewCo Limited ("NFE Brazil NewCo") (together, the "Plan Companies"). The Plan Companies seek permission to convene meetings of certain of their creditors (the "Plan Creditors") for the purpose of considering two proposed

1

restructuring plans (the "CoreCo Plan" and the "BrazilCo Plan"; together, "the Plans") under Part 26A of the Companies Act 2006 ("CA 2006").

2. The Plan Companies are part of the New Fortress Energy group of companies (the "Group"), headed by a Delaware company called New Fortress Energy Inc (the "Parent"). The Group, which is in the energy sector and operates facilities relating to liquefied natural gas ("LNG"), is in considerable financial distress and owes debts to external Plan Creditors of approximately US$6.5 billion.

3. The Group has been in extensive negotiations with its creditors since July 2025. Notwithstanding the complexity of the capital structure, the difficulty of the negotiations and the technical complexity of the proposed restructuring, the Group has reached agreement with 778 creditors, representing approximately 97% of the liabilities within the scope of the Plans. The Plans reflect a "*genuine attempt to formulate and negotiate a reasonable compromise between all stakeholders*" (to adopt the language used by the Court of Appeal in Re Petrofac Ltd [2025] EWCA Civ 821, [2025] BCC 1045 at [191]) and demonstrate that Part 26A of the CA 2006 is, as the Court of Appeal envisaged in Re Petrofac, capable of delivering fair commercial compromises even in the context of a group as large and complex as this one.

4. At their heart, the Plans will rescue the Group by converting most of the Group's unmanageable debt burden into equity (plus a relatively small amount of new debt). Ownership of the Group will be taken into the hands of the creditors.

5. There will also be a separation of what is called the "BrazilCo Group" (the business and assets in Brazil) from what is called the "CoreCo Group" (the business and assets outside Brazil). The creditors will own: (i) all the preferred equity and most of the common equity in the CoreCo Group (plus new debt instruments of approximately US$971 million); (ii) all the equity in the BrazilCo Group. As a result, the Group will be able to carry on business as a solvent going concern.

6. The "relevant alternative" to the Plans would involve the commencement of proceedings under Chapter 11 of the US Bankruptcy Code for various entities within the Group, leading to an accelerated sale of various business units at a substantial discount.

7. The creditors have security over different assets of the Group called "Collateral Pools". In the relevant alternative, the creditors would receive returns by reference to the value

of the assets that are realised within their Collateral Pool(s). If the Plans are sanctioned (such that the Group is rescued), then each Collateral Pool will be worth considerably more than it would be worth in the relevant alternative. The uplift in the value of each Collateral Pool will, in broad terms, be allocated rateably to the creditors whose claims are secured against the relevant Collateral Pool. As a result, all Plan Creditors will receive a better outcome under the Plans than they would receive in the relevant alternative.

8.    In light of the significant support for the Plans, the Plan Companies do not expect there to be opposition at either the convening or the sanction stage. In addition, the Plan Companies do not expect that there will be any need to apply for cross-class cramdown under section 901G: all of the classes in both Plans are expected to vote in favour of the Plans by the requisite statutory majority (having regard to the very large majority of creditors who have already locked up to support the Plans within each class). Thus, although the Plans are proposed under Part 26A of the CA 2006, they could have been proposed under Part 26. To that extent, the Plans are notably different from cases such as <u>Re Petrofac</u> in which the Court was asked to exercise its discretion to cram down one or more dissenting classes.

9.    Furthermore, the Plan Companies do not contend that any of the Plan Creditors are "out of the money", let alone that any of the Plan Creditors can be excluded from the benefits of the restructuring (an approach that has now been decisively rejected by the Court of Appeal). As explained below, the Plans involve a fair and equitable distribution of the benefits of the restructuring (represented by the increase in value of the various Collateral Pools) to all Plan Creditors.

10.    For the reasons set out below, it is submitted that:

(1)    The Court has jurisdiction in relation to each of the Plans.

(2)    There are no roadblocks that stand in the way of convening meetings of the Plan Creditors to vote on the Plans (the "Plan Meetings");

(3)    In relation to the CoreCo Plan, the Plan Creditors should vote in six classes; and

(4)    In relation to the BrazilCo Plan, the Plan Creditors should vote in a single class.

11. The essential items for pre-reading are the first witness statement of Christopher Guinta ({CB/5/19-74}), the first and second witness statements of David Hilty ({CB/7/89-111} and {SCB/3/305-315}) and the first witness statement of Alessandro Zorza ({CB/6/75-88}).

12. The Plan Companies have also filed expert evidence on various issues of valuation and international recognition. These expert reports are mainly relevant to the sanction hearing, but the Court is asked briefly to pre-read them if time allows and to grant permission to the Plan Companies to rely upon them: see the expert report of Richard Fleming (of Alvarez and Marsal ("A&M")) on the likely outcome in the relevant alternative (the "Relevant Alternative Report") {CB/8/112-173}; the expert report of Richard Bibby (also of A&M) on the post-restructuring enterprise value of the Group, to be read alongside the supplement thereto (together, the "Valuation Report") {CB/9-10/174-296}; and the expert evidence as to the recognition of the Plans in the United States of America {CB/12/331-389} and Mexico {CB/11/297-330}.

13. The other key documents are the draft Explanatory Statement {CB/14/464-617}, the Practice Statement Letter (the "PSL") {CB/13/390-463} and the Plans ({SCB/1/3-36} and {SCB/1/37-67}). These documents have been subject to some (relatively minor) modifications since they were originally filed at Court on 30 April 2026, and the most up-to-date versions are those in the supplementary core bundle, as exhibited to the witness statement of Ms Stephansen.

14. There is (inevitably) a significant degree of overlap between the evidence, the PSL, the draft Explanatory Statement and this skeleton argument.

15. The remainder of this skeleton argument is structured as follows:

    (1) **Section B** summarises the factual background;

    (2) **Section C** sets out the key features of the Plans;

    (3) **Section D** addresses the purpose of the convening hearing and the manner in which the Plan Creditors were notified of the convening hearing;

    (4) **Section E** deals with various issues of jurisdiction, including the conditions laid down by section 901A of the CA 2006;

4

(5)   **Section F** summarises the principles of class composition and explains how the classes should be constituted in the present case; and

(6)   **Section G** considers the proposed timetable for the Plan Meetings and the direction for the sanction hearing.

## B.   Background

(1)   <u>The Group</u>

16.   The Group owns and operates LNG infrastructure and an integrated fleet of ships and logistics assets. Amongst other things, the Group provides natural gas procurement and liquefaction to shipping, logistics and conversion or development of natural gas-fired power generation facilities.

17.   At the top of the Group is the Parent, which is listed on the Nasdaq stock exchange. In simple terms, the Group can be seen as containing: (i) a business based in Brazil (including two LNG terminals and two power plants that the Group is constructing); and (ii) a business outside of Brazil. The Brazil business currently operates under an intermediate holding company called NFE Brazil Investments LLC (the "Brazil Parent"). The non-Brazil business (which does not have any specific intermediate holding company) consists of businesses and assets in, among other places, Puerto Rico, Mexico and Nicaragua.

18.   Within the non-Brazil business, there are two projects described in the evidence as being "Fast LNG" or "FLNG" projects. FLNG refers to a liquefaction unit (liquefaction being the process of cooling natural gas so as to reduce its volume for storage and transportation). There are two FLNG projects that are relevant to this restructuring:

(1)   "FLNG 1", a completed facility that is nine miles offshore of the coast of Altamira, Tamaulipas, Mexico. The assets in respect of FLNG 1 sit under an intermediate holding company called NFE FLNG 1 Issuer LLC that is indirectly solely owned by the Parent.; and

(2)   "FLNG 2", an uncompleted facility. The assets in respect of FLNG 2 sit under an intermediate holding company called NFE FLNG 2 LLC (the "FLNG 2 Parent") that is indirectly solely owned by the Parent.

(2)   The Collateral Pools and the Plan Debt

19.   For the purposes of these Plans, there are five relevant Collateral Pools:

(1)   The "Common Collateral" consists of the business and assets of the Group that do not fall within the other Collateral Pools identified below. In effect, the Common Collateral consists of the Group's business and assets in Puerto Rico, Mexico (other than FLNG 1 and FLNG 2) and Nicaragua.

(2)   The "F1 Collateral" consists of the business and assets associated with FLNG1.

(3)   The "F2 Collateral" consists of the business and assets associated with FLNG2.

(4)   The "Brazil Collateral" consists of the business and assets of the Brazil business.

(5)   The "Account Collateral" consists of cash in certain of the Group's bank accounts (amounting to approximately US$62 million).

20.   There are seven groups of Plan Creditors within the scope of the Plans, which have recourse to different combinations of Collateral Pools. The first six groups are in the CoreCo Plan, and the seventh group is the sole class in the BrazilCo Plan.

21.   First, there are the "R-1 Lenders":

(1)   The R-1 Lenders are the lenders under one of the facilities in a revolving credit facility agreement dated 15 April 2021 (the "RCF Agreement") executed by the Parent and many other Group companies.

(2)   The amount owed to the R-1 Lenders is approximately US$106 million. NFE Global is a guarantor in respect of the debt owed to the R-1 Lenders.

(3)   The R-1 Lenders have security over the Common Collateral, the F1 Collateral, the F2 Collateral and the Account Collateral.

22.   Secondly, there are the "R-2 Lenders":

(1)   The R-2 Lenders are the lenders under a different facility in respect of the RCF Agreement.

(2)   The amount owed to the R-2 Lenders is approximately US$596 million. NFE Global is a guarantor in respect of the debt owed to the R-2 Lenders.

(3)  The R-2 Lenders have security over the Common Collateral, the F1 Collateral, the F2 Collateral, the Account Collateral and (up to a US$200 million cap) the Brazil Collateral.

23.  Thirdly, there are the "TLB Lenders":

(1)  The TLB Lenders are the lenders under a loan agreement dated 30 October 2023 executed by the Parent and many other Group companies.

(2)  The amount owed to the TLB Lenders is approximately US$1.363 billion. NFE Global is a guarantor in respect of the debt owed to the TLB Lenders.

(3)  The TLB Lenders have security over the Common Collateral, the F1 Collateral and the F2 Collateral.

24.  Fourthly, there are "TLA Lenders":

(1)  The TLA Lenders are the lenders under a loan agreement dated 19 July 2024 executed by the Parent and other Group companies.

(2)  The amount owed to the TLA Lenders is approximately US$318 million. NFE Global is a guarantor in respect of the debt owed to the TLA Lenders.

(3)  The TLA Lenders have security over the Common Collateral, the F2 Collateral, the Account Collateral and (up to a US$200 million cap) the Brazil Collateral.

25.  Fifthly, there are the "Legacy Noteholders":

(1)  The Legacy Notes consist of: (i) certain 6.5% senior secured notes issued by the Parent in April 2021 and due in 2026; and (ii) certain 8.75% senior secured notes issued by the Parent in March 2024 and due in 2029.

(2)  The Legacy Notes are dematerialised securities which are held and traded through the clearing systems. In accordance with the established practice under Part 26 schemes and Part 26A plans, the beneficial owners of the Legacy Notes are treated as Plan Creditors (and are referred to herein as the "Legacy Noteholders"). This is because the beneficial owners are contractually entitled to obtain definitive notes (i.e. notes payable directly to them) in certain circumstances, such that they are contingent creditors of the issuer and guarantors of the notes: see Re Noble Group Ltd [2019] BCC 349 (convening judgment) at [161]-[164] per Snowden J.

7

(3) The amount owed to the Legacy Noteholders is approximately US$789 million. NFE Global is a guarantor in respect of the debt owed to the Legacy Noteholders.

(4) The Legacy Noteholders have security over the Common Collateral.

26. Sixthly, there are the "Series I and II Lenders":

(1) The Series I Lender is the Brazil Parent. It is the lender under a loan agreement dated 22 November 2024 with the Parent and other Group companies (the "Series I Loan").

(2) The Series II Lender is a group company called NFE Financing LLC. It is the lender under a loan agreement dated 6 December 2024 with the Parent and other Group companies (the "Series II Loan").

(3) The amount owed to the Series I and II Lenders is approximately US$3.084 billion. NFE Global is a guarantor in respect of the debt owed to the Series I and II Lenders.

(4) The Series I and II Lenders have security over the Common Collateral.

27. Seventhly, there are the "2029 New Noteholders":

(1) The 2029 New Notes are certain 12.0% senior secured notes issued by NFE Financing LLC and due in 2029.

(2) Like the Legacy Notes, the 2029 New Notes are dematerialised securities which are held and traded through the clearing systems. In line with the authorities referred to above, the beneficial owners of the Legacy Notes are treated as Plan Creditors (and are referred to herein as the "Legacy Noteholders"). As in the case of the Legacy Notes, the beneficial owners of the 2029 New Notes are contractually entitled to obtain definitive notes (i.e. notes payable directly to them) in certain circumstances, such that they are contingent creditors of the issuer and guarantors of the notes.

(3) The money raised by the issuance of the 2029 New Notes was used to fund the Series I and II Loans. As a result, the 2029 New Noteholders hold security over the benefit of the Series I and II Loans (and the Brazil Collateral more generally).

8

They also have a have a contractual right to instruct the Series I and II Lenders as to the exercise of their voting rights in respect of the CoreCo Plan.

(4) The amount owed to the 2029 New Noteholders is approximately US$3.339 billion. NFE Brazil NewCo is a guarantor in respect of the debt owed to the 2029 New Noteholders.

28. In respect of the security described above and disregarding certain subordinated security rights described below, in each case all creditors with security against a Collateral Pool rank *pari passu*.

29. The table below summarises the position:

| Creditor group | Debt | Collateral Pools |
|---|---|---|
| | | |
| **CoreCo** | | |
| R-1 Lenders | US$106m | Common Collateral, F1 Collateral, F2 Collateral and Account Collateral |
| R-2 Lenders | US$596m | Common Collateral, F1 Collateral, F2 Collateral, Account Collateral and (up to a US$200m cap) Brazil Collateral |
| TLB Lenders | US$1,363m | Common Collateral, F1 Collateral and F2 Collateral. |
| TLA Lenders | US$318m | Common Collateral, F2 Collateral, Account Collateral and (up to a US$200m cap) Brazil Collateral |
| Legacy Noteholders | US$789m | Common Collateral |
| Series I and II Lenders | US$3,084m | Common Collateral |
| **TOTAL** | **US$6,256m** | |
| | | |
| **BrazilCo** | | |
| 2029 New Noteholders | US$3,339m | Brazil Collateral |
| **TOTAL** | **US$3,339m** | |

30. In addition to the security interests referred to above, several classes of Plan Creditors have subordinated security rights in respect of additional Collateral Pools. For example, the R-1 Lenders, R-2 Lenders and TLA Lenders have subordinated security rights in respect of the Brazil Collateral, and the Legacy Noteholders have subordinated security rights in respect of the F1 Collateral and the F2 Collateral. These subordinated security rights are worthless (and they will generate no return to the Plan Creditors in the relevant alternative or under the Plans).

31. The liabilities owing to the R-1 Lenders, the R-2 Lenders, the TLB Lenders, the TLA Lenders, the Legacy Noteholders and the Series I and II Lenders are collectively referred to herein as the "CoreCo Plan Debt".

32. The liabilities owing to the 2029 New Noteholders are referred to herein as the "BrazilCo Plan Debt". Together, the CoreCo Plan Debt and the BrazilCo Plan Debt comprise the "Plan Debt".

33. All of the Plan Debt is governed by New York law.

34. There is also a letter of credit ("LC") facility that the Parent entered into on 16 July 2021 and in respect of which NFE Global is a guarantor. The LC facility is not included in the CoreCo Plan because: (i) there have been no drawings on the facility by any counterparty such that no Group entity is presently indebted under it; and (ii) following the restructuring of the Group, the facility is to be replaced by two new LC facilities for the restructured CoreCo business and the restructured BrazilCo business.

(3) Financial difficulties

35. As explained in the evidence of Mr Guinta, the Group has been involved in the construction of ambitious energy projects on a significant scale. The Group has been constructing LNG terminal infrastructure, storage facilities and power plants across South and Central America.

36. As is apparent from the value of the liabilities that are the subject of the Plans (approximately US$6.5 billion of external debt), the Group has borrowed very significant sums of money as it has sought to deliver its projects. Unfortunately, it has faced significant operational difficulties including substantial time delays and cost overruns. The Valuation Report explains that the market capitalisation of the Group has declined by 91% between March 2025 and March 2026 {CB/9/199}.

37. By November 2025, the Group was unable to pay over US$200 million of debts that had become due, including US$163.8 million of interest to the 2029 New Noteholders. Although short-term forbearances were agreed, in order to provide time to formulate restructuring proposals, the Group did not and does not have the cash to pay the unpaid interest, let alone to continue to meet its ongoing obligations in respect of the Plan Debt.

(4) The relevant alternative

10

38. By section 901G(4) of the CA 2006, the "relevant alternative" is defined as "*whatever the court considers would be most likely to occur in relation to the company if the compromise or arrangement were not sanctioned under section 901F*". The relevant alternative is relevant for a number of purposes, including class composition and fairness.

39. The Plan Companies have instructed Mr Fleming of A&M to prepare the Relevant Alternative Report {CB/8/112-173}, which contains a detailed analysis of the most likely outcome if the Plans are not sanctioned. Mr Fleming's conclusions are as follows.

40. In respect of the companies that operate the CoreCo Group:

    (1) If the Plans (which are the product of the extensive negotiations discussed below) were to fail, there is no real prospect of a further consensual restructuring and the CoreCo Group would be unable to pay its debts and would be cash flow insolvent.

    (2) Further, there is no real prospect of the CoreCo Group being sold as a going concern.

    (3) As a result, the only real option would be for the relevant directors of the companies that operate the CoreCo Group to commence bankruptcy proceedings under Chapter 11 of the US Bankruptcy Code.

    (4) The business units within the CoreCo Group would then be sold through an accelerated sales process, with significant distressed discounts, as part of the Chapter 11 bankruptcy process.

41. Mr Fleming considers that the BrazilCo Group would likely avoid Chapter 11 bankruptcy (although there are considerable risks in this regard). Instead, it is likely that the BrazilCo Group would be sold as a going concern through an accelerated sales process outside a Chapter 11 bankruptcy. The reason for this is that the BrazilCo Group has already been separated, to a significant extent, from the CoreCo Group, and the BrazilCo Group's management has put in place contingency plans to obtain funding to allow for an accelerated sales process: see page 14 of the Relevant Alternative Report {CB/8/125}. In contrast, the financial position of the CoreCo Group is considerably worse, and there is no way for the CoreCo Group to avoid a Chapter 11 bankruptcy in the event that the Plans are not sanctioned.

42. The estimated returns to the Plan Creditors in the relevant alternative are set out in the table below {CB/8/128}:

| Creditor group | Amount | Recovery ($) | Recovery (%) |
|---|---|---|---|
| | | | |
| **CoreCo** | | | |
| R-1 Lenders | US$106m | US$57m | 54% |
| R-2 Lenders | US$596m | US$342m | 57% |
| TLB Lenders | US$1,363m | US$687m | 50% |
| TLA Lenders | US$318m | US$102m | 32% |
| Legacy Noteholders | US$789m | US$99m | 13% |
| Series I and II Lenders | US$3,084m | US$389m | 13% |
| **TOTAL** | **US$6,256m** | | |
| | | | |
| **BrazilCo** | | | |
| 2029 New Noteholders | US$3,339m | US$593m | 18% |
| **TOTAL** | **US$3,339m** | | |

## C.   Overview of the Plans

43. The purpose of the CoreCo Plan {SCB/1/3-36} is to compromise the CoreCo Plan Debt, and the purpose of the BrazilCo Plan {SCB/1/37-67} is to compromise the BrazilCo Plan Debt.

44. The Plans operate by conferring a power of attorney on the Plan Companies to execute a suite of "Implementation Documents", the most important of which is the "Transaction Implementation Deed" (the "TID") {SCB/1/151-224}. The overall effect of the Plans, the TID and the other Implementation Documents is summarised below.

45. Stripped back to its most fundamental features, the overall restructuring involves: (i) the formal separation of the Group into the CoreCo Group and the BrazilCo Group; (ii) the extinguishment of US$9.6 billion of Plan debt (of which c.US$6.5 billion is owed to Plan Creditors other than the Series I and II Lenders); and (iii) the creditors receiving consideration in the form of new equity instruments plus US$971 million of new debt instruments.

46. The new equity and debt instruments comprise the following (ranking from highest to lowest in the post-restructuring capital structure) (together, the "Plan Consideration"):

(1)   In the CoreCo Plan:

12

(a)   The "New CoreCo Term Loans" in the aggregate principal amount of US$571 million for which the Parent will be the primary obligor;

(b)   The "FLNG 2 Term Loans" in the aggregate principal amount of US$400 million for which the FLNG 2 Parent will be the primary obligor;

(c)   The "CoreCo Preferred Stock", being preferred equity in the Parent;

(d)   The "FLNG 2 Preferred Equity", being preferred equity in the FLNG 2 Parent;

(e)   The "CoreCo Common Stock", being common equity in the Parent; and

(f)   The "R-2 / TLA BrazilCo Equity Pool", being approximately 6% of the common equity in the new holding company of the BrazilCo Group.[1] This is a specific instrument created to reflect the fact that, as explained above, the R-2 Lenders and the TLA Lenders enjoy security in respect of the Brazil Collateral up to a US$200 million cap and they are therefore entitled to share in some of the proceeds of the Brazil Collateral.

(2)   In the BrazilCo Plan, the "Brazil Common Equity", being approximately 94%[2] of the common equity in the new holding company of the BrazilCo Group once separated following the restructuring.

47.   The table below summarises the Plan consideration that is to be allocated in respect of each Collateral Pool {CB/5/44}:

| Collateral Pool | Plan consideration |
|---|---|
|  |  |
| Common Collateral | 55.25% of CoreCo Common Stock<br>85% of CoreCo Preferred Stock |
| F1 Collateral | 9.75% of CoreCo Common Stock<br>15% of CoreCo Preferred Stock<br>$475m New CoreCo Term Loans |
| F2 Collateral | $400m FLNG 2 Term Loans |

---

[1] The R-2 Lenders and the TLA Lenders have an opportunity to convert this equity into cash (a total of US$45 million) through what is called the BrazilCo Cash Pool Election. 99.56% of the R-2 Lenders and the TLA Lenders have elected to convert. The cash is to be paid by the BrazilCo Group. The effect on the 2029 New Noteholders (as the sole Plan Creditors in the BrazilCo Plan) is neutral because: (i) the BrazilCo Group will be worth c. US$45 million less as a result of the cash being used for the BrazilCo Cash Pool Election; but in return (ii) the 2029 New Noteholders will own the equity that otherwise would have been paid to the R-2 Lenders and the TLA Lenders through the R-2 / TLA BrazilCo Equity Pool.

[2] This figure is before the effect of the BrazilCo Cash Pool Election. As a result of the elections described in the previous footnote, the Brazil Common Equity will in fact constitute 99.98% of the common equity in the new holding company.

|  | $200m FLNG 2 Preferred Equity |
|---|---|
| Account Collateral | $52.5m New CoreCo Term Loans |
| Brazil Collateral | BrazilCo Common Equity |

48. The expert evidence indicates that Plan Creditors would receive US$1.88 billion in the relevant alternative: {CB/8/128}. Through the Plans, the expert evidence indicates that they will receive consideration valued at US$3.32 billion, being the post-restructuring value of the interests described in the previous paragraph: {CB/8/129}. The difference between these two figures (which arises because the Plans will save the Group from collapsing into Chapter 11 proceedings and selling assets at a substantial discount) is **US$1.44 billion**. That is one way of measuring the benefit of the restructuring.

49. The uplift in value of each Collateral Pool will, in broad terms, be allocated rateably to the creditors whose claims are secured against the relevant Collateral Pool. The qualification "in broad terms" is used because the Plans also reflect the give and take that has taken place as part of the eight-month negotiation process.

50. More precisely, value will be allocated between the different creditor groups as follows (see Plan returns at{CB/8/129}):

| Creditor group | Debt | Plan consideration | RA return | Plan return |
|---|---|---|---|---|
|  |  |  |  |  |
| **CoreCo** |  |  |  |  |
| R-1 Lenders | US$106m | CoreCo Common Stock, CoreCo Preferred Stock, New CoreCo Term Loans, FLNG 2 Term Loans and FLNG 2 Preferred Equity | 54% | 86% |
| R-2 Lenders | US$596m | CoreCo Common Stock, CoreCo Preferred Stock, New CoreCo Term Loans, FLNG 2 Term Loans, FLNG 2 Preferred Equity and R-2 / TLA BrazilCo Equity Pool | 57% | 94% |
| TLB Lenders | US$1,363m | CoreCo Common Stock, CoreCo Preferred Stock, New CoreCo Term Loans, FLNG 2 Term Loans and FLNG 2 Preferred Equity | 50% | 81% |
| TLA Lenders | US$318m | CoreCo Common Stock, CoreCo Preferred Stock, New CoreCo Term Loans, FLNG 2 Term Loans, FLNG 2 Preferred Equity and R-2 / TLA BrazilCo Equity Pool | 32% | 58% |

| | | | | |
|---|---|---|---|---|
| Legacy Noteholders | US$789m | CoreCo Common Stock and CoreCo Preferred Stock | 13% | 26% |
| Series I and II Lenders[3] | US$3,084m | CoreCo Common Stock and CoreCo Preferred Stock | 13% | 26% |
| **TOTAL** | **US$6,256m** | | | |
| | | | | |
| **BrazilCo** | | | | |
| 2029 New Noteholders | US$3,339m | BrazilCo Common Equity | 18% | 35% |
| **TOTAL** | **US$3,339m** | | | |

51. If the Plans are approved by the Court, and once the broader restructuring is brought into effect, then the position will be as follows.

52. First, there will be the CoreCo Group headed by the Parent:

(1) Instead of the existing external debts of US$6.256 billion, there will be: (i) $571 million of New CoreCo Term Loans; and (ii) $400 million of FLNG 2 Term Loans.

(2) There will be CoreCo Preferred Stock owned entirely by the CoreCo Plan Creditors; and additional FLNG 2 Preferred Equity owned entirely by the CoreCo Plan Creditors.

(3) The CoreCo Common Stock will be held: (i) 65% by the CoreCoPlan Creditors; and (ii) 35% by the existing shareholders.[4] Although the existing shareholders will retain 35% of the CoreCo Common Stock, this is subject to two important qualifications:

(a) If the CoreCo Preferred Stock is not redeemed within three years, it will automatically convert into 87% of CoreCo Common Stock such that the existing shareholders will be diluted to less than 5%.

(b) Moreover, the Plan Companies' expert evidence is that the CoreCo Common Stock will be worth nil on day one post-restructuring (as the

---

[3] As explained above, the rights of the Series I and II Lenders in respect of the Series I and II Loans form part of the Brazil Collateral. Therefore, the returns to the Series I and II Lenders are, in substance returns to the creditors that have interests in the Brazil Collateral (being the R-2 Lenders and the TLA Lenders up to US$200 million and the 2029 New Noteholders generally) and are to be paid to them.

[4] These numbers, and the numbers in respect of the BrazilCo Group common equity below, are prior to the effect of any management incentive plan, which the restructured CoreCo Group and BrazilCo Group (both under the control of the Plan Creditors) intend to put in place.

enterprise value of the Group is such that only the debt and the CoreCo Preferred Stock will have any value – see {CB/8/129}). It follows that the shareholders will in fact retain no concrete value, although they will retain a hope that the restructured Group will outperform expectations and that the retained equity may be of some value in the future.

(4)  The justification for allowing the existing shareholders to retain 35% of the CoreCo Common Stock is that, to give effect to the restructuring, it is necessary for the shareholders of the Parent to approve proposals for the issuance of the new equity instruments {CB/5/50¶107}. This is required under the Nasdaq rules and under Delaware corporate law. As a result, the existing shareholders must be given *something* in order to ensure that they vote in favour of the requisite resolutions. Similar justifications have been accepted by the Court in other cases: see e.g. Re Sino-Ocean Group Holding Ltd [2026] 1 BCLC 318 at [10], [120] and [127]-[128] per Thompsell J. Any fairness issues relating to the treatment of the shareholders will be a matter for the sanction hearing.

53.  Secondly, there will be a BrazilCo Group headed by a new holding company:

(1)  The existing 2029 New Notes Debt of US$3.339bn (owed to the 2029 New Noteholders) will be entirely extinguished.

(2)  The equity in the BrazilCo Group will be owned by the BrazilCo Plan Creditors, i.e. the 2029 New Noteholders.

54.  Both of the Plans will thereby achieve a very significant balance sheet restructuring that, in effect, exchanges billions of dollars of debt for equity and takes ownership of the Group into the hands of the creditors.

**D.  The convening hearing**

(1)  Purpose of the convening hearing

55.  Section 901C(1) of the CA 2006 provides:

> "*The court may, on an application under this subsection, order a meeting of the creditors or class of creditors, or of the members of the company or class of*

*members (as the case may be), to be summoned in such manner as the court directs.*"

56. The Court's function at the convening hearing is to consider (i) whether the relevant creditors have been given sufficient notice of the convening hearing; (ii) whether the jurisdictional conditions laid down by section 901A are satisfied (and whether there is any other roadblock that would unquestionably prevent the Court from sanctioning the plan); and (iii) whether the class meetings proposed by the company are properly constituted. The function of the Court at the convening hearing is "*emphatically not*" to consider the merits or fairness of the plan, which will arise for consideration at the future sanction hearing if the plan is approved by at least one of the plan meetings: see Re Telewest Communications plc [2004] BCC 342 at [14] per David Richards J.

57. The procedure for a convening hearing under Part 26A of the CA 2006 is governed by the new practice statement issued by the Chancellor of the High Court on 18 September 2025 (the "New Practice Statement"). The New Practice Statement came into force on 1 January 2026, and it is understood that the present hearing is the third occasion on which the Court has been required to consider whether the requirements laid down by the New Practice Statement are satisfied in relation to a Part 26A plan.

58. In many respects, the core features of the New Practice Statement are similar to the previous Practice Statement dated 26 June 2020 (the "Old Practice Statement"), but there are also a number of differences. By way of example:

(1) Convening and sanction hearings cannot be listed unless the company first issues a claim form under CPR Part 8, plus a "listing note" (see paragraphs 5 to 7). The Plan Companies complied with this requirement.

(2) The company's evidence is required to be filed, and made available to creditors, ahead of the convening hearing, "*normally ... at least 14 days before the date of the convening hearing*" (paragraph 17). The Plan Companies complied with this requirement, save that:

(a) The Relevant Alternative Report and the Valuation Report were only filed on 8 May 2026. As to this:

(i) The delay was the result of the fact that the terms of the New BrazilCo Financing Arrangements (explained in paragraphs 118 to

125 below) were moving until immediately prior to 8 May 2026. The New BrazilCo Financing Arrangements are relevant to the figures contained in the Relevant Alternative Report and the Valuation Report.

(ii) No one has been prejudiced by the late filing of the Relevant Alternative Report and the Valuation Report. These reports are mainly relevant to the sanction hearing. In addition, the Plan Companies notified the Plan Creditors that they could request copies of the evidence (and the Relevant Alternative Report and the Valuation Report could have been provided in draft if so requested prior to 8 May 2026), but no copies of the evidence were requested by any of the Plan Creditors.

(b) In addition, the Plan Companies have, as a result of continuing consultation with the Plan Creditors, made some (relatively minor) drafting changes to the Plans in the period between 30 April 2026 (when the original drafts were filed at Court and made available to creditors) and 8 May 2026 (when the hearing bundle was lodged). The updated versions of the documents are exhibited to Ms Stephansen's witness statement and are contained in the supplementary core bundle. These (and redlines showing the changes) have also been made available to the Plan Creditors.

(c) In a complex restructuring of a distressed corporate group (negotiated between multiple law firms and hundreds of creditors, with dozens of implementation documents running to thousands of pages), it is virtually inevitable that some changes will need to be made in the period leading up to the convening hearing. Nevertheless, it is respectfully submitted that the overall approach taken by the Plan Companies reflects the spirit of the New Practice Statement.

(3) If anyone wishes to object to the sanction of the plan, they are expected to articulate their objection in advance of the convening hearing (see paragraph 20) so that the Court can give suitable directions for the sanction hearing. In the present case, there is no indication that anyone wishes to object to the sanction of

18

the Plans, and the Plan Companies do not believe that there will be any dissenting classes.

(2)   <u>Notification and consultation</u>

59.   Companies are required to notify their creditors of the convening hearing, and they are also expected to consult with their creditors. As explained below, notification and consultation are related, but distinct, concepts.

*Notification of the convening hearing*

60.   Creditors are notified of the convening hearing by receiving a Practice Statement Letter (the PSL). In common with the Old Practice Statement, the New Practice Statement does not specify any particular deadline for circulating the PSL. The authorities under the Old Practice Statement emphasise that the appropriate period of notice is a fact-sensitive matter; it depends on the complexity of the plan, the urgency of the company's financial position, the sophistication of the creditors and other such factors: see <u>Re Selecta Finance UK Ltd</u> [2021] BCC 168 at [37]-[41] per Adam Johnson J.

61.   In the present case, the PSL was circulated to the Plan Creditors on 20 April 2026, i.e. 24 days before the convening hearing. This exceeds the 21-day period which has now become a relatively standard period of notice in the context of Part 26A plans. As explained by Marcus Smith J in <u>Re Petrofac Ltd</u> [2025] EWHC 859 (Ch) at [20]:

> "*In previous cases, the court has stated that it is the usual practice to provide 14 to 21 days' notice of the convening hearing, unless there is evidence of urgency: see for example Re House of Fraser (Funding) plc, [2018] EWHC 1906 (Ch) per Birss J (where 12 days' notice was adequate); Re NN2 Newco, per Norris J (where 21 days' and 7 days' notice for each of the interconditional schemes was adequate); Re Noble Group Ltd, [2019] BCC 349 (convening judgment) per Snowden J (where 21 days' notice was adequate); Re Virgin Atlantic Airways Ltd, [2020] BCC 997 (convening judgment) per Trower J (where 21 days' notice was adequate).*"

62.   The methods of circulating the PSL are addressed in the evidence of Mr Zorza {CB/6/75-88}. As explained by Mr Zorza, the Plan Companies have also set up a dedicated Plan Website to which all Plan Creditors have access. On 30 April 2026 (14 days prior to the convening hearing), the Plan Companies filed their evidence and posted a notice on the Plan Website explaining that the evidence could be provided to any Plan Creditor that requested it.

63. The Plans are plainly urgent (given that the Group is relying on forbearances for due interest payments and needs to implement a major balance sheet restructuring as soon as possible), and the timetable has to be viewed in that light. The timing of the circulation of the PSL also needs to be viewed in light of the extensive prior consultation of the Plan Creditors (see below). The great majority of the Plan Creditors are sophisticated financial institutions represented by leading law firms, and they have had more than enough time to consider their position ahead of the convening hearing.

*Consultation of creditors*

64. It is not enough for a company simply to send the PSL to its creditors. It has become clear that companies should also endeavour to consult with their creditors to discuss the restructuring proposals (or at least to invite their creditors to participate in such a discussion) both before and after the convening hearing.

65. In some previous cases, companies attempted to impose Part 26A plans on multiple classes of dissenting creditors with little or no consultation, in the expectation that further negotiations might subsequently take place. This practice was deprecated in a series of authorities (see e.g. Re Speciality Steel Ltd [2024] EWHC 3355 (Ch) at [3]*ff* per Hildyard J). The Court now expects companies to explain precisely what they have done to consult with their creditors, and material changes to the Explanatory Statement are not permitted without the permission of the Court (see paragraph 18).

66. Detailed evidence of the extensive negotiations that have taken place is set out in the witness statement of Mr Hilty {CB/7/89-111}. Mr Hilty works for Houlihan Lokey, the investment bank that has acted for the Group in the negotiations.

67. Outreach with the Group's creditors started in July 2025. In August 2025, searches were undertaken to identify the beneficial holders of the Group's debt instruments (the way in which modern debt instruments are held and traded means that a corporate debtor often does not know who owns its debts).

68. The Group has been successful in contacting a very large number of its creditors. In response, various creditor groups have formed representing the interests of the different classes of creditors that are included in the Plans. Those groups are: (i) the "PW Group" (2029 New Noteholders represented by Paul Weiss); (ii) the "Akin Group" (TLB Lenders represented by Akin Gump); (iii) the "Sidley Group" (R-1 Lenders and R-2

Lenders represented by Sidley Austin; members of this group also hold 63% of the TLA Debt though are not represented by Sidley Austin in that capacity); and (iv) the "Legacy Group" (Legacy Noteholders represented by Paul Hastings).

69. There was a very high level of engagement with the negotiation process. As explained by Mr Hilty in paragraph 36 of his statement {CB/7/96}:

> "*In total, Houlihan Lokey was in contact, either directly or via their advisors, with holders of at least 85% of the total Plan Debt during the negotiation of the Restructuring. In my experience, it is difficult to establish a dialogue, either bilaterally or through advisors, with 100% of creditors for a transaction of this nature, size and complexity. In fact, this transaction was notable for the very high levels of active engagement with creditors during the negotiations.*"

70. Negotiations have been ongoing since July 2025. A virtual data room containing business plan models, liquidity updates, corporate documentation, material contracts, debt documentation and employee matters was set up for creditors. There have been very many meetings between the Group and the creditors and meetings between the various creditor groups. Competing proposals have been advanced. As Mr Hilty explains {CB/7/98¶45}: "*[t]hese negotiations lasted for eight months and were difficult, complex and multilateral, requiring substantial compromise to reach consensus with several different creditor groups (and with support from the largest shareholders)*".

71. The negotiations were ultimately successful and, on 17 March 2026 a restructuring support agreement ("RSA") was signed. The RSA commits the supporting creditors to support the restructuring and the Plans. As at the date of this skeleton argument, the RSA has been signed by 778 creditors, representing approximately 97% of the liabilities within the scope of the Plans and in excess of 75% by value of each proposed class of Plan Creditor. Indeed, the locked-up creditors within each class exceed 97% by value, save for the Legacy Noteholders (where the locked-up creditors represent c.85% by value, reflecting the fact that they are a somewhat more diverse and difficult-to-contact group of creditors).

72. Mr Hilty summarises what has taken place in paragraphs 54 and 55 of his witness statement {CB/7/101-102}:

> "*On the basis of the outreach described above, I believe that the Plans represent a genuine commercial compromise between the affected stakeholders. In my view, the Plans were developed transparently by the Group in consultation with affected Plan Creditors, who were notified well in advance of the Group's plans, and*

*provided with a significant and meaningful opportunity to engage and provide
feedback in relation to the Plans. In addition, the negotiations to reach broad
consensus developed over the course of an extended period of time, with
exhaustive due diligence information provided (via the VDR and via telephone
calls and in-person meetings).*

*The negotiations were extremely complex, owing to the large and complex nature
of the Group and its capital structure. The Group and its advisors, and the Plan
Creditors and their advisors, spent a considerable amount of time to push towards
a restructuring that would be broadly supported by the various affected
stakeholders.*"

73. In all the circumstances, it is submitted that the consultation process has been entirely
adequate.

## E.    Jurisdiction

74. At the convening hearing, the Court may "*indicate whether it is obvious that it has no
jurisdiction to sanction the scheme, or whether there are other factors which would
unquestionably lead the court to refuse to exercise its discretion to sanction the
scheme*": see Re Noble Group Ltd [2019] BCC 349 (convening judgment) at [76] per
Snowden J. The Court must also consider whether Conditions A and B under section
901A of the CA 2006 are satisfied. These points are addressed below.

(1)    "*Companies*" and "*creditors*"

75. There are two Plan Companies (NFE Global and NFE Brazil NewCo). The former is a
guarantor of the CoreCo Plan Debt, and the latter is a guarantor of the BrazilCo Plan
Debt. It follows that the CoreCo Plan Creditors are "*creditors*" of NFE Global, and the
BrazilCo Plan Creditors are "*creditors*" of NFE Brazil NewCo.

76. Both of the Plan Companies are incorporated in England. It follows that the Plan
Companies are "*companies*" as defined in section 901A(4) of the CA 2006, since they
are both "*liable to be wound up under the Insolvency Act 1986*". Since the Plan
Companies are incorporated in England, there is no requirement to establish any further
"*sufficient connection*" with England: see Re Dundee Pikco Ltd [2020] EWHC 89 (Ch)
at [24] per Zacaroli J.

22

(2)    <u>Forum shopping and artificiality</u>

77.    NFE Global has been a guarantor of the CoreCo Plan Debt since it was incorporated in 2021, but it is not an economically significant entity within the Group. NFE Global has been chosen as a Plan Company because it is incorporated in England.

78.    NFE Brazil NewCo was incorporated in 2026 for the purpose of promulgating the BrazilCo Plan. It has acceded to the indenture in respect of the 2029 New Notes as a guarantor with the consent of the requisite majority of the 2029 New Noteholders under the indenture. In his expert evidence of New York law, Mr Glosband confirms that NFE Brazil NewCo has validly acceded to the 2029 New Notes as a guarantor {CB/12/388⁋118}. Like NFE Global, NFE Brazil NewCo has been chosen as a Plan Company because it is incorporated in England.

79.    Similar structures have been adopted in many other cases, including <u>Re Codere Finance (UK) Ltd</u> [2015] EWHC 3778 (Ch). In the latter case, Newey J said at [18]:

> "*In a sense, of course ... what is sought to be achieved in the present case ... is forum shopping. Debtors are seeking to give the English court jurisdiction so that they can take advantage of the scheme jurisdiction available here and which is not widely available, if available at all, elsewhere. Plainly forum shopping can be undesirable. That can potentially be so, for example, where a debtor seeks to move his COMI with a view to taking advantage of a more favourable bankruptcy regime and so escaping his debts. In cases such as the present, however, what is being attempted is to achieve a position where resort can be had to the law of a particular jurisdiction, not in order to evade debts but rather with a view to achieving the best possible outcome for creditors. If in those circumstances it is appropriate to speak of forum shopping at all, it must be on the basis that there can sometimes be good forum shopping.*"

80.    See also <u>Re Gategroup Guarantee Ltd</u> [2021] BCC 549, where a newly-incorporated English SPV unilaterally assumed liability for various foreign law debts by executing a deed poll, solely for the purpose of proposing a Part 26A plan. Zacaroli J said at [174]:

> "*… it is possible to envisage a case where the artificial structure is the only solution to enable a restructuring to be effected, all other possible alternatives having been explored and rejected for one or other reason of law or practicability; where the alternative is a value-destructive liquidation; and where the terms of the restructuring demonstrably benefit the affected creditors. In such a case, there would be a powerful argument that the artificiality of the structure should not prevent the company and its creditors being able to take advantage of the English scheme or plan jurisdiction.*"

(In the sanction judgment, Zacaroli J concluded that "*this is … such a case*": see [2021] BCC 722 at [15].)

81.  In Re AGPS Bondco plc [2024] Bus LR 745 at [33]-[34], Snowden LJ said that "*the technique of inserting a newly incorporated English company as a substitute obligor or co-obligor of debt owed by a foreign company in order to engage the jurisdiction of the English court under Part 26 or Part 26A has been used in a number of schemes and plans that have been sanctioned at first instance over the last few years*" (citing Re Codere and Re Gategroup). He cautioned, however, that this technique "*has not been the subject of consideration at appellate level*" and that:

> "*For the avoidance of doubt, and without expressing a view one way or the other, I would wish to make it clear that the fact that this judgment does not deal with this issue should not be taken as an endorsement of the technique for future cases.*"

82.  Issues of forum shopping and artificiality will be addressed at the sanction hearing in due course; they do not arise for determination at the convening hearing: see Re ColourOz Investment 2 LLC [2020] BCC 926 at [52] and [57] per Snowden J.

83.  At the sanction hearing, the Plan Companies will contend that the reasoning in Re Codere and Re Gategroup is correct and should be followed. In summary:

(1)  Many techniques can be used to enable a foreign corporate group to access the English restructuring regime. For example, the Court has held (after hearing extensive adversarial argument) that it may be permissible to create a connection with England by changing the governing law of the debt to English law (see Re APCOA Parking Holdings GmbH [2015] Bus LR 374 at [250]-[256] per Hildyard J) and by moving the company's COMI to England (see Re Project Lietzenburger Strasse HoldCo SARL [2025] Bus LR 2473 at [225]*ff* per Richards J). These techniques are not inherently abusive, even if they have an element of artificiality.

(2)  In principle, there is no difference between a COMI-shift or a change of governing law (on the one hand) and the use of an English SPV to promulgate the plan (on the other): all such techniques may involve "*good forum shopping*", depending on the facts.

(3)  The present case is an example of "*good forum shopping*". A corporate group has come to England to implement a restructuring for the benefit of its creditors (97%

24

of whom already support the deal). It is true that the Group had limited connections with England prior to the restructuring process, but that is not a good reason for the Court to refuse to sanction the Plans.

84. For present purposes, the Court can be satisfied that there is no roadblock that stands in the way of convening the Plan Meetings.

(3)   The requirement for a "*compromise or arrangement*"

85. A Part 26A restructuring plan must be a "*compromise or arrangement*" between a company and its creditors: see section 901A(3)(a).

86. The word "*arrangement*" under section 901A of the CA 2006 has been construed in a very broad manner (in line with the authorities under Part 26); it simply requires an element of "*give and take*" between the company and the relevant class: see Re Virgin Atlantic Airways Ltd [2020] BCC 997 at [38] per Trower J.

87. In the present case, each Plan plainly amounts to an "*arrangement*" (since there is an element of "*give and take*" between each Plan Company and all of its Plan Creditors). The Plan Creditors will give up their existing claims in return for new instruments, mostly in the form of equity.

88. It has been held that an "*arrangement*" can include the release of creditors' rights against third parties: see Re T&N Ltd [2007] Bus LR 1411 at [53] per David Richards J. As to this:

(1)   Many companies in the Group are liable for the Plan Debt, as primary or secondary obligors. The Plans will release the claims of the Plan Creditors against *all* obligors in respect of the Plan Debt, including (but not limited to) the Plan Companies.

(2)   Third party releases are within the proper jurisdictional scope of Part 26 and Part 26A, provided that such releases are "*necessary in order to give effect to the arrangement proposed for the disposition of the debts and liabilities of the company to its own creditors*": see Re Thames Water Utilities Holdings Ltd [2025] Bus LR 2108 at [240] per Sir Julian Flaux C, Zacaroli LJ and Sir Nicholas Patten, citing Re Lehman Brothers International (Europe) (No 2) [2010] Bus LR 489 at [65] per Patten LJ.

25

(3)   It would be pointless to compromise the Plan Creditors' claims against the Plan Companies alone. The Group cannot carry on as a going concern, and the restructuring cannot achieve its purpose, unless the Plan Debt is released against all Group obligors. On that basis alone, it is submitted that such releases are "*necessary in order to give effect to the arrangement*" between the Plan Companies and the Plan Creditors.

(4)   A degree of complication arises from the fact that the Plan Companies are guarantors of the Plan Debt. Under the general law, a guarantor is not ordinarily exposed to the risk of a "ricochet claim" by the primary obligors (i.e. a claim for a contribution or indemnity). The risk of a ricochet claim against the company is an established justification for releasing a third party who might otherwise make such a claim: see Re Thames Water at [239].

(5)   To address this issue, the Plan Companies have executed deeds of contribution in favour of the primary obligors of the Plan Debt. The deeds of contribution operate to confer rights of contribution on the primary obligors against the Plan Companies, thereby *creating* the risk of a ricochet claim. To the extent necessary, this creates a justification for the release of the primary obligors' liabilities in respect of the Plan Debt pursuant to the Plans.

(6)   Similar deeds of contribution have been executed in many other cases: for a detailed recent discussion, see Re SWS Holdings Ltd [2026] BCC 132 at [33]*ff* per Richards J. There is an obvious element of artificiality of creating the risk of a ricochet claim to justify the inclusion of a third party release in a scheme/plan. However, the Court has repeatedly held that any such artificiality is not inherently problematic: see Re Gategroup (convening judgment) at [21], [166], [170] and [174] per Zacaroli J. This is part of a broader acceptance by the Court that a company can take deliberate steps to access the restructuring tools available under the CA 2006: see above.

(7)   For present purposes, the Court can be satisfied that there is no roadblock that stands in the way of convening the Plan Meetings. The points addressed above will be revisited at the sanction hearing.

89. It should also be noted that the TID provides for a customary release of certain professional advisers and other persons involved in the negotiation of the restructuring (including the Plan Creditors themselves) from any liability arising out of the negotiation and implementation of the restructuring: {SCB/1/189-190}. This is a common provision to include in a scheme/plan which was approved by Snowden J in Re Noble Group Ltd [2019] BCC 349 (sanction judgment) at [20]-[30]. However, in line with the comments of the Court of Appeal in Re Thames Water at [238]*ff*, there is a specific exclusion (definition of "Excluded Liabilities" at {SCB/1/164-165}) to ensure that the directors and advisers are not released from any claims that would be available against them in an insolvency scenario.

(3)    Conditions A and B

90. Section 901A CA 2006 provides as follows:

> "*(1) The provisions of this Part apply where conditions A and B are met in relation to a company.*
>
> *(2) Condition A is that the company has encountered, or is likely to encounter, financial difficulties that are affecting, or will or may affect, its ability to carry on business as a going concern.*
>
> *(3) Condition B is that—*
>
> *(a) a compromise or arrangement is proposed between the company and—*
>
> *(i) its creditors, or any class of them, or*
>
> *(ii) its members, or any class of them, and*
>
> *(b) the purpose of the compromise or arrangement is to eliminate, reduce or prevent, or mitigate the effect of, any of the financial difficulties mentioned in subsection (2).*"

91. The Court has often noted that these conditions are not difficult to satisfy: see Re Hurricane Energy Plc [2021] EWHC 1418 (Ch) at [22] per Zacaroli J (where it was said that the threshold for satisfying Condition A is "*relatively low*") and Re Virgin Atlantic Airways Ltd [2020] BCC 997 at [39] per Trower J (where Condition B was said to contain "*broad language which was intended to be expansively construed*").

92. As to Condition A:

(1)    There are two Plan Companies (NFE Global and NFE Brazil NewCo). The Court must be satisfied that each Plan Company satisfies Conditions A and B.

27

(2) NFE Global is a guarantor of the CoreCo Plan Debt, which amounts to US$6.256 billion. Despite the vast scale of its liabilities, NFE Global has virtually no assets (and, as noted above, NFE Global was selected as a Plan Company simply because it is incorporated in England). There is no prospect that NFE Global will ever be able to satisfy its debts, or even a small part of them.

(3) Likewise, NFE Brazil NewCo is a guarantor of the BrazilCo Plan Debt, which amounts to approximately US$3.339 billion. NFE Brazil NewCo is an SPV which was incorporated in 2026 for the sole purpose of promulgating the BrazilCo Plan. It has virtually no assets. There is no prospect that NFE Brazil NewCo will ever be able to satisfy its debts, or even a small part of them.

(4) Moreover, the Plan Companies are part of a corporate group which is cashflow insolvent and has no prospect of being able to repay its liabilities in full absent a restructuring. As explained by Mr Fleming in the Relevant Alternative Report {CB/8/122}:

> "*The Group is cashflow insolvent and reliant upon ongoing forbearance from its secured lenders (the Plan Creditors). If the RPs are not sanctioned, the Restructuring Support Agreement ("RSA") will likely terminate so the Group will face defaults under its corporate debt and there is no prospect of being able to repay the secured loans. The Group would also face increasing supplier pressure and difficulty winning / delivering new contracts (and face other potential risks discussed later).*"

(5) It follows that Condition A is satisfied in relation to each of the Plan Companies.

93. As to Condition B:

(1) Each Plan is an arrangement between the relevant Plan Company and its Plan Creditors (see above).

(2) There can be no doubt that the purpose of each Plan is to "*reduce or prevent, or mitigate the effect of, any of the financial difficulties mentioned in subsection (2)*". The Plan is designed to enable the Plan Companies, and the Group as a whole, to carry on business as a going concern. The Plan Companies will benefit from a release of their liabilities and will become part of a solvent corporate group.

94. In <u>Re Gategroup Guarantee Ltd</u> [2021] BCC 549, Zacaroli J held that Conditions A and B can be satisfied even if the plan company is an SPV with no assets (which only fell

into financial distress because it chose to assume liability for the relevant debts by executing a deed poll). He stated at [177]-[180]:

> "*The next objection taken by Hestia [an opposing creditor] was that the plan company's voluntary assumption of liabilities under the deed poll two days after its incorporation, and its lack of any assets or business, means that it is not in "financial difficulties" which might threaten its ability to carry on in business as a going concern, as required by Threshold Condition A and that the plan is not required to address those difficulties. While the group and the issuer could clearly satisfy the Threshold Conditions, the plan company cannot.*
>
> *In substance, I think this is a variation of the artificiality point I have just dealt with. The consequence of the deed poll is, as a matter of law, that the plan company is in fact insolvent. That clearly means it is in financial difficulties.*
>
> *While it had no business at all prior to its entry into the deed poll, its very existence is for the purpose of enabling the restructuring as a whole to take place. It is an essential component. If the plan is sanctioned, and assuming the group's business resumes as planned, then the plan company's recently assumed liabilities will be satisfied (it is proposed that the plan company remains in existence until the end of the maturity extension period). In other words, the plan will have addressed its financial difficulties and its purpose—to enable the restructuring of the group—will have been achieved.*
>
> *Accordingly, I consider that Threshold Conditions A and B are satisfied.*"

95. The same analysis applies in the present case.

### F.   Class composition

(1)   Basic principles of class composition

96. The essential principles of class composition are very well established by the authorities: see Re AGPS Bondco plc [2024] Bus LR 745 at [109]-[114] per Snowden LJ. A recent summary of the case law was provided by Hildyard J in Re HSE Finance SARL [2025] EWHC 1386 (Ch) at [85]-[91].

97. The basic rule is that a class "*must be confined to those persons whose rights are not so dissimilar as to make it impossible for them to consult together with a view to their common interest*": see Sovereign Life Assurance v Dodd [1892] 2 QB 573 at 583 per Bowen LJ, and approved and applied by Chadwick LJ in the Court of Appeal in Re Hawk Insurance Co Ltd [2002] BCC 300 at [30] and by Lord Millett NPJ in the Privy Council in Re UDL Holdings Ltd [2002] 1 HKC 172 at 184-185.

98. In <u>Re Hawk</u>, Chadwick LJ explained that the relevant "*rights*" for these purposes are both the existing rights of the relevant creditors and the rights that will be conferred on them by the scheme/plan. See [30]:

> "*In each case the answer to that question [viz. the question of class composition] will depend upon analysis (i) of the rights which are to be released or varied under the scheme **and (ii) of the new rights (if any) which the scheme gives, by way of compromise or arrangement, to those whose rights are to be released or varied**. It is in the light of that analysis that the test formulated by Bowen LJ in order to determine which creditors fall into a separate class–that is to say, that a class 'must be confined to those persons whose rights are not so dissimilar as to make it impossible for them to consult together with a view to their common interest'–has to be applied.*" (emphasis added)

99. See also [34]:

> "*Were separate class meetings required in the present case? As I have indicated the answer to that question depends upon analysis (i) of the rights which are to be released or varied under the scheme **and (ii) of the new rights (if any) which the scheme gives, by way of compromise or arrangement, to those whose rights are to be released or varied**.*" (emphasis added)

100. In <u>Re OQ Chemicals Holding Drei GmbH</u> [2024] EWHC 2036 (Ch) at [38]-[40], Trower J succinctly identified the three most important principles of class composition:

> "*There are three important principles which it is worth emphasising. The first is that, in answering that question, the court is required to carry out a comparative exercise. The court must consider and compare the position that creditors will be in if the schemes do not become effective and the position they will be in if they do become effective. For that purpose the proper comparator, akin to the relevant alternative in the context of a part 26A restructuring plan, must be identified.*
>
> *The second is that the court must ask whether there is any difference between the creditors' strict legal rights and, if there is, to consider whether, objectively speaking, there would be more to unite than divide those creditors in the proposed class, ignoring for these purposes any personal or extraneous motivation operating in the case of any particular creditor.*
>
> *The third is that material differences in the rights of creditors do not necessarily fracture the class. A proliferation of classes should be avoided if possible and the court should be careful to ensure that the test is not applied in such a manner that it becomes an instrument of oppression by a minority.*"

101. Or as Hildyard J put it in <u>Re APCOA Parking Holdings GmbH</u> [2015] Bus LR 374 at [52]:

> "*The modern approach ... is to break the question into two parts, and ask first whether there is any difference between the creditors in point of strict legal right ... and if there is, to postulate, by reference to the alternative if the scheme were to*

*fail, whether objectively there would be more to unite than divide the creditors in the proposed class, ignoring for that purpose any personal or extraneous motivation operating in the case of any particular creditor(s).*"

(2)    The present case

102. Applying the foregoing principles, it is submitted that the Plan Creditors should vote in the following classes:

(1)    In relation to the CoreCo Plan, six classes are proposed: (i) the R-1 Lenders; (ii) the R-2 Lenders; (iii) the TLB Lenders; (iv) the TLA Lenders; (v) the Legacy Noteholders; and (vi) the Series I and II Lenders.

(2)    In relation to the BrazilCo Plan, a single class is proposed (consisting of the 2029 New Noteholders).

103. This approach is designed to reflect the fact that each proposed class has recourse to different Collateral Pools (and, as a result, have different rights in the relevant alternative and under the Plans).

104. It should be noted that the Series I and II Lenders have recourse to the same Collateral Pools as the Legacy Noteholders (subject to some minor differences explained in Mr Guinta's first witness statement at [151] {CB/5/65}). It might, therefore, have been possible to put the Series I and II Lenders in the same class as the Legacy Noteholders. However:

(1)    The difficulty with this approach is that the Series I and II Lenders are entities within the Group which are contractually required to vote on the instructions of the 2029 New Noteholders (and the 2029 New Noteholders hold security over the Series I and II Loans). That being so, it is far from clear that the Series I and II Lenders should in fact vote in the same class as the Legacy Noteholders: the economic reality is that the Series I and II Loans are controlled by the 2029 New Noteholders, whose overall package of rights are very different from those of the Legacy Noteholders.

(2)    To avoid the need to litigate this point, the Plan Companies would prefer to adopt the pragmatic solution of agreeing to place the Series I and II Lenders into a separate class from the Legacy Noteholders.

(3)   A company can agree to constitute two classes for pragmatic reasons: see <u>Re Stemcor Trade Finance Ltd</u> [2016] BCC 194 at [22] per Snowden J. This approach could only give rise to a problem if the company was seeking to create an artificial assenting class to cram down other dissenting classes. That is certainly not the position in the present case, since creditors exceeding the requisite statutory majority in every class have already signed the RSA and agreed to vote in favour of the Plans (such that cross-class cramdown will not be required).

105.   The only question, therefore, is whether *more* than seven classes should be constituted. It is submitted that there is no justification for directing the Plan Creditors to vote in more than seven classes. There is also no indication that any Plan Creditor disagrees with the Plan Companies' proposals on class composition. Nevertheless, in accordance with the Plan Companies' duty of full and frank disclosure, a full treatment of the issues relating to class composition is set out below.

(3)   <u>The Early Consent Fee</u>

106.   Under the terms of the RSA, each supporting creditor (save for the Series I and II Lenders, which are Group companies and are not being paid a consent fee) who acceded to the RSA by 8 April 2026 is entitled to receive a fee equal to 0.75% of that creditor's claim.[5] The fee will be paid in the form of CoreCo Preferred Stock on the Restructuring Effective Date (the "Early Consent Fee").

107.   Consent fees of this type are very common (and such fees are often higher than 0.75%). The Early Consent Fee has been set at a modest level in the present case and plainly does not fracture any of proposed classes. As to this:

(1)   In every case to date, the Court has held that the recipients of a consent fee are not required to vote in a separate class. A number of different strands of reasoning can be found in the authorities.

(2)   Some of the authorities suggest that, where a consent fee is made available to all creditors in advance of the scheme or plan meeting, it cannot fracture the class. If each creditor had a right to obtain the fee, then there is no difference in rights that

---

[5] In the case of the 2029 New Noteholders, the Early Consent Fee is not 0.75% of the principal debt but is 0.75% of the portion of the principal outstanding under the Series I Loan and the Series II Loan that is equivalent to their pro rata share of the Brazil Collateral.

is capable of fracturing the class: see <u>Re HEMA UK I Ltd</u> [2020] EWHC 2219 (Ch) at [36]-[37] per Falk J and <u>Re Swissport Fuelling Ltd</u> [2020] EWHC 3064 (Ch) at [72] per Trower J, among many other cases.

(3)    On the other hand, some of the authorities suggest that even if a consent fee were to have been made available to all, it is necessary to consider whether the quantum of the consent fee is material. If a consent fee would be unlikely to exert a material influence on the relevant creditors' voting decisions, then the fee does not fracture the class: see <u>Re Primacom Holding GmbH</u> [2013] BCC 201 at [57] per Hildyard J, among many other cases.

(4)    In the present case:

(a)    All of the Plan Creditors (save for the Series I and II Lenders, which are Group entities that will vote in a class of their own) were given an opportunity to sign the RSA and receive the Early Consent Fee. The RSA was extensively publicised to the market from 17 March 2026 onwards.

(b)    Further and in any event, there is no basis for concluding that the modest Early Consent Fee (which represents only 0.75% of the debt held by the relevant Plan Creditor) would exert a material influence on the Plan Creditors' voting decisions. When deciding whether to vote for the Scheme, the Plan Creditors will be focused on whether they support the restructuring as a whole, which involves a fundamental change to the Group's balance sheet and a debt-for-equity swap. The expected returns under the Plans are far better than the expected returns in the relevant alternative: see the table at paragraph 50 above. It would be fanciful to suppose that anyone would vote for the Plans in order to receive the Early Consent Fee irrespective of their views on the merits of the Plans.

(4)    <u>The Standstill Fee</u>

108.    The Parent has agreed to pay a fee (the "Standstill Fee") to each R-1 or R-2 Lender that agreed to forbear on enforcing the collateral. The Standstill Fee is equal to 2% of the debt held by the relevant R-1 or R-2 Lender. The payment of the Standstill Fee is not conditional on the sanction of the Plans, and it will be payable even if the Plans are not sanctioned (although it will be payable in the form of New CoreCo Term Loans if the

33

Plans are sanctioned). There was no condition attached to the Standstill Fee requiring a R-1 or R-2 Lender to support the restructuring. An R-1 or R-2 Lender could have obtained the Standstill Fee and now vote against the Plans.

109. The basic justification for the Standstill Fee is that the R-1 and R-2 Lenders have the exclusive contractual right to give instructions for the enforcement of several Collateral Pools (the Common Collateral, the F1 Collateral, the F2 Collateral and the Account Collateral). That being so, in order to avoid the risk of a security enforcement that could prevent an orderly restructuring process, it was necessary for the Parent to reach agreement with the R-1 and R-2 Lenders that they would forbear on enforcement.

110. On the Plan Companies' proposals, the R-1 Lenders and the R-2 Lenders will already vote in two classes (separate from the other classes of Plan Creditors). In addition, all of the R-1 Lenders and virtually all of the R-2 Lenders (99.9%) have already signed the RSA and have agreed to vote in favour of the Plans. Furthermore, all but one of the R-1 and R-2 Lenders agreed to forbear on enforcement and are entitled to receive the Standstill Fee. The one R-2 Lender that did not agree to forbear on enforcement holds only 0.1% of the R-2 debt. This is the same lender that is described in Mr Guinta's first statement as "the 37% TLA Lender" as it previously held 37% of the TLA debt {CB/5/37⁋64(a)}. The 37% TLA Lender refused to engage substantively in negotiations and on 31 March 2026 sold its 37% TLA debt to Mr Edens (the Group CEO) but retained its very small 0.1% holding of the R-2 debt {CB/5/38⁋69}.

111. In these circumstances, the only question that arises at the convening hearing is whether the 37% TLA Lender (in its capacity as an R-2 Lender) should vote in a separate class. The answer to that question is obvious: it would be wrong to constitute a separate class of the 37% TLA Lender. As to this:

(1) All of the R-1 and R-2 Lenders were entitled to receive the Standstill Fee if they agreed to forbear on enforcement. The 37% TLA Lender simply failed to respond.

(2) The Standstill Fee is not conditional on the Plans; it is payable whether or not the Plans are sanctioned. More generally, no one would vote in favour of the Plans in order to obtain the Standstill Fee.

(3) If a separate class of the 37% TLA Lender were to be constituted, a wholly unjustifiable hold-out position would thereby be created – contrary to the clear policy in the authorities that classes should not be unnecessarily proliferated.

(5) Elections

112. The R-1 Lenders, R-2 Lenders and TLA Lenders were entitled to elect to receive part of their Plan Consideration in the form of discounted cash or debt rather than equity (the "Elections"). This is because many of the R-1 Lenders, R-2 Lenders and TLA Lenders are banks which often prefer to receive cash or debt rather than equity, even if the cash or debt has a discounted value compared to the equity.

113. The precise terms of the Elections are set out in the draft Explanatory Statement at {CB/14/509}. The key point, for present purposes, is that the Elections were open to all R-1 Lenders, R-2 Lenders and TLA Lenders on the same terms. The "Election Deadline" was 8 April 2026.

114. With one exception, all of the R-1 Lenders, R-2 Lenders and TLA Lenders made their Elections by the Election Deadline. The only exception is the 37% TLA Lender (in its capacity as an R-2 Lender), which simply did not respond. The 37% TLA Lender will receive the standard package of Plan Consideration without exchanging the equity instruments for discounted cash or debt.

115. Once again, there is no justification for putting the 37% TLA Lender into a separate class. It is apparent that the 37% TLA Lender is unwilling actively to participate in the restructuring process, but it was entitled to make the Elections in just the same way as the other Plan Creditors.

116. The fact that the Election Deadline fell prior to the date of the Plan Meetings does not create a class issue. There are several cases in which similar deadlines have been imposed without fracturing the class: see Re New Look Financing plc [2020] EWHC 2793 (Ch) at [40] per Miles J and Re Sprint Bidco BV [2024] EWHC 3455 (Ch) at [37] per Thompsell J. In the latter case, the deadline related to the right to participate in a new money issuance (although the same analysis applies to an election relating to the form of the plan consideration). Thompsell J said:

> "*The cases establish that the company is entitled to set a reasonable deadline for creditors to elect to participate in the new money and the existence of a deadline*

*does not fracture the class. Moreover, the deadline may be prior to the convening hearing: see Re New Look Financing plc [2020] EWHC 2793 (Ch) at [40].*"

117. In the present case, the Election Deadline was fixed at 8 April 2026 in order to ensure that all parties have certainty as to the amount of equity, debt and cash that will be allocated pursuant to the restructuring. This is fundamental to the post-restructuring financial position of the Group, and the details needed to be set out in the Explanatory Statement. That is a reasonable justification for the Election Deadline, and there is no suggestion that the 37% TLA Lender required any further time to make the Elections.

(6)  <u>New money</u>

118. As set out in the second statement of Mr Hilty {SCB/3/305-315}, the BrazilCo Group expects shortly to reach agreement on a new money issuance, which will take place before the Plans are sanctioned and before the Plan Meetings take place (on or about 22 May 2026). The new money is expected to take the form of an US$885 million note issuance (the "New Brazil Notes") by a company in the BrazilCo Group called NFE Brazil Financing Limited. NFE Brazil NewCo will not be an obligor in respect of the New Brazil Notes.

119. Only BrazilCo Plan Creditors (i.e. the 2029 New Noteholders) are eligible to participate. As Mr Hilty explains in paragraph 32 of his second statement {SCB/3/312}:

> "*As the court will be aware, if the BrazilCo Plan is sanctioned, the BrazilCo Group will become 99.98% owned by the 2029 New Noteholders. It is in the interests of the 2029 New Noteholders (as the future owners of the BrazilCo Group if the Plans are sanctioned) to protect and maximise the value of the BrazilCo Group. It is the 2029 New Noteholders (as the future owners of the BrazilCo Group if the Plans are sanctioned) that will be most adversely affected if the BrazilCo Group were to default on its debt obligations or lose or delay opportunities to pursue new projects. It is also the 2029 New Noteholders (as the future owners of the BrazilCo Group if the Plans are sanctioned) that will be most adversely affected if the New BrazilCo Financing Arrangements were on commercially disadvantageous terms. It is in the interests of the Group as a whole, in its current form, to ensure the BrazilCo Group has sufficient liquidity to implement the Restructuring.*"

120. In contrast to many recent cases, the issuance of the New Brazil Notes is not conditional on the sanction of the Plans and does not form part of the restructuring that will be given effect by the Plans. Rather, the New Brazil Notes will be issued and funded prior to the sanction of the Plans (and prior to the Plan Meetings). The New Brazil Notes are required to refinance various tranches of structurally senior liabilities which will not be

compromised by the Plans, and to provide US$368 million of working capital for the BrazilCo Group. This is necessary to ensure that the BrazilCo Group has sufficient capital to make certain near-term operational payments, project debt service payments, payments for LNG supply procured by members of the Group and certain capital expenditure and deposits related to new projects, regardless of whether the Plans are sanctioned, and regardless of whether the Plans are recognised in the US under Chapter 15 of the US Bankruptcy Code.

121. Since the New Brazil Notes are not conditional on the Plans, they do not give rise to potential class or fairness issues in the same way as other new money structures in other recent cases. When the Plan Meetings take place, the New Brazil Notes will already have been issued (and likewise for the sanction hearing). It is therefore difficult to see how the New Brazil Notes could be relevant to class composition or fairness.

122. Nevertheless, the New Brazil Notes have been offered up to all of the Plan Creditors in respect of the BrazilCo Plan (i.e. the single class of 2029 New Noteholders), all of whom will be permitted to participate in the New Brazil Notes on a *pro rata* basis. There are no special fees that will be restricted to any particular group of creditors: for example, there is a commitment fee of 10% to which anyone who participates in the New Brazil Notes will be entitled.

123. The *pro rata* availability of the New Brazil Notes should suffice to prevent a class issue from arising. As Hildyard J said in Re Primacom [2013] BCC 201 at [53]:

> "*Fourthly, an issue arises by reference to one of the provisions included within the scheme. One of the provisions, and indeed advantages, of the scheme is that there are to be made available bridge facilities in the amount, I think, of €20 million, which will eventually be translated into a new senior facility A loan. All senior creditors will be entitled to participate in the bridge facility and those that do will become participants in the new senior facility A loan. The question arises whether this of itself, that is whether the possibility that some senior creditors will not be involved in the bridge facility, of itself causes a reason for a different class composition*. **I accept for present purposes that given the provision for all senior creditors to participate in the bridge facility and thereby to secure for themselves the opportunity also to participate in the new senior facility A loan is sufficient to avoid any class problem which might otherwise arise**." (emphasis added)

124. That reasoning applies *a fortiori* in the present case, since the New Brazil Notes are not conditional on the Plans (in contrast to Re Primacom, where the bridge facilities were

conditional on the scheme and formed part of the overall restructuring transaction which the creditors and the Court would be asked to approve).

125. In addition, the Plan Companies have adduced evidence to satisfy the Court that the New Brazil Notes have been fairly and appropriately priced (in line with the guidance of the Court of Appeal in <u>Re Petrofac Ltd</u> [2025] EWCA Civ 821 at [165]*ff*). This will be a matter for the sanction hearing in due course.

## G.  Timetable and directions

126. The proposed directions as to the summoning and conduct of the Plan Meetings are set out in the draft convening order {CB/15/618-624}. The proposed timetable is as follows:

| Event | Date |
|---|---|
| Plan documentation (including Explanatory Statement, notice of Plan Meetings and voting forms) to be circulated to the Plan Creditors | As soon as reasonably practicable after the convening hearing |
| Deadline for submission of the voting registration and proxy forms by the Plan Creditors | 9 June 2026 |
| Plan Meetings | 15 June 2026 |
| Sanction hearing | 18 June 2026 |

127. The sanction hearing has been listed with the standard time estimate of one day. If any unexpected opposition were to emerge, then the Court would of course be informed (and any changes to the time estimate will promptly be brought to the Court's attention).

## H.  Conclusion

128. In all the circumstances, the Court is respectfully asked to make an order in the terms of the draft convening order {CB/15/618-624}.

129. The following points relating to the convening order should be drawn to the Court's attention.

130. First, the Plan Meetings will be hybrid meetings (with a physical venue at Skadden's offices in London and remote video link). The Plan Companies respectfully agree with Hildyard J's observation (in the recent case of Re Iguanas Holdings) that fully-remote meetings may not always be appropriate in the post-COVID world, and that hybrid meetings are generally to be preferred.

131. Secondly, the Notice of Plan Meetings (paragraph 3 at {SCB/1/122}) has been drafted in the manner recommended by Hildyard J in Re Iguanas Holdings and Re Poundstretcher. The drafting makes it clear that Plan Creditors who have missed the voting registration deadline, but who nevertheless wish to attend the meetings, can still be admitted to the meetings (if practical).

132. Thirdly, the convening order contains the following recital:

> "*UPON the Court having been informed that the Plan Companies intend to rely upon the Restructuring Plans as falling within the exemption from registration contained in section 3(a)(10) of the US Securities Act of 1933 such that, assuming that the exemption does apply, the Equity Plan Consideration will not be required to be registered under section 5 of the US Securities Act of 1933 …*"

133. A similar recital has been included in many convening orders. In Re Argo Blockchain plc [2025] EWHC 3395 (Ch) at [204]-[207], Hildyard J said:

> "*The issue of new shares pursuant to the Plan is, nevertheless, potentially caught by the US Securities Act of 1933 which imposes various registration requirements. The Plan Company intends to rely on the exemption from registration contained in section 3(a)(10) of that Act.*
>
> *To meet the requirements of section 3(a)(10), nothing need be included in the sanction order. However, Mr Abraham told me that in member schemes it has become common practice to ask the judge at sanction to set out in their judgment the confirmations required, and in particular that sufficient notification had been given and that the Court had been informed that the company intends to rely on the sanction of the schemes as a fairness hearing for s 3(a)(10) purposes. Mr Abraham requested that the Court set out this confirmation in its judgment and offered as an example of the wording desired appears in Re Van Gansewinkel Groep BV [2016] BCC 172 at [77]. I did so in my earlier, brief ruling on this matter.*
>
> *The Plan Company cavilled at my suggestion that it might be appropriate to obtain independent expert evidence in order to satisfy the Court that the process at the sanction hearing is sufficient to meet the above mentioned requirement of section 3(a)(10) that the Court had been given sufficient notification and had being informed of the company's intention to rely on s 3(a)(10) . Mr Abraham submitted that it has long been the practice to treat evidence of this matter as evidence of fact rather than law, and told me that such evidence has in numerous*

*cases been given by the scheme company's US attorneys. In that connection, he cited cases of my own as showing a somewhat inconsistent approach. I should point out however, that the fact that CPR 35 applies in the context of schemes and plans as in any other civil proceeding in these courts has tended to be ignored, wrongly.*

*As to the status and sufficiency of the evidence presented to the Court of the satisfaction, as a matter of US law, of the elements of section 3(a)(10) referred to above, I must admit to some equivocation. In the Convening Judgment, I did not formally require expert evidence to be provided, but allowed the Plan Company to obtain it if so advised. Ultimately, the Plan Company has procured a witness statement from Mr O'Grady (a US attorney for the Company) explaining the application of the section and drawing to the Court's attention specifically (as required in the US) that the sanction of the Plan will be relied upon in the US. Mr Grady is not an independent expert, though I do not have any reason to doubt his expertise. Ordinarily, the Court expects any question of foreign law to be the subject of a report from an independent expert. The boundary between an issue of foreign practice and an issue of foreign law is not easy to draw definitively. I still tend to the view that the safer view is that expert evidence is the appropriate course. But in the circumstances, and given that the position under US law in this particular respect is well-known, I am content to proceed on the basis of Mr Grady's evidence."*

134. In accordance with Hildyard J's guidance, the Plan Companies have obtained independent expert evidence under CPR Part 35 from Mr Glosband on this point. Mr Glosband explains the background to section 3(a)(10) of the US Securities Act and why it applies in the present case: see paragraphs 23 to 27 of Mr Glosband's report {CB/12/342-344}. The Court is asked to read that evidence. The Court should also note that it is not being asked to grant a declaration that section 3(a)(10) is engaged (which would not be a matter for the English Court): rather, it is only being asked to recite that it has been informed that the Plan Companies intend to rely on section 3(a)(10).

DANIEL BAYFIELD KC

RYAN PERKINS

JON COLCLOUGH

SOUTH SQUARE

GRAY'S INN

12 MAY 2026