# EXHIBIT F

## Explanatory Statement

**THIS DOCUMENT IS IMPORTANT AND REQUIRES YOUR IMMEDIATE ATTENTION.**

THIS DOCUMENT IS AN EXPLANATORY STATEMENT PURSUANT TO SECTION 901D OF THE COMPANIES ACT 2006 (the "**Explanatory Statement**").  This Explanatory Statement and its contents are not for release, publication or distribution, in whole or in part, directly or indirectly, in any jurisdiction where such distribution would be unlawful or to any other person.  This document was not filed with the Securities and Exchange Commission or any state authority and neither the Securities and Exchange Commission nor any state authority has passed upon the accuracy or adequacy of this document or upon the merits of the Plans.  Neither this document nor the solicitation of votes to accept or reject the Plans constitutes or forms part of any offer or invitation to sell, exchange or issue, or any solicitation of any offer to purchase or subscribe for, any securities in the United States or any other jurisdiction or to or from any person to whom it is unlawful to make any such offer or invitation or solicitation in such jurisdiction.  None of the securities referred to in this document may be sold, issued or transferred in the United States absent registration or an exemption from registration or in any other jurisdiction in contravention of applicable law.  Securities that may be issued pursuant to the Plans (as defined herein) will not be registered under the U.S. Securities Act of 1933, as amended (the "**Securities Act**") or the securities laws of any state or other jurisdiction of the United States or any other applicable jurisdiction, and are expected to be issued and delivered in reliance upon an exemption from the registration requirements of the Securities Act.

This Explanatory Statement is being sent to persons who are believed to be Plan Creditors as at the date of this Explanatory Statement.  If you have assigned, sold or otherwise transferred, or intend to assign, sell or otherwise transfer, your interests as a Plan Creditor before the Record Time, you should (subject to the below) forward this Explanatory Statement and the accompanying documents to the person or persons to whom you have assigned, sold or otherwise transferred, or intend to assign, sell or otherwise transfer, your interests as a Plan Creditor.  The distribution of this Explanatory Statement may be restricted by law in certain jurisdictions.  Neither the Plan Companies nor the Information Agent represents that this Explanatory Statement may be lawfully distributed in compliance with any applicable registration or other requirements in any such jurisdiction, or pursuant to an exemption available thereunder, or assumes any responsibility for facilitating such distribution.  The distribution of this Explanatory Statement to or in certain jurisdictions may be restricted by law or regulation in such jurisdictions and persons into whose possession this Explanatory Statement comes are requested to inform themselves about, and to observe, any such restrictions.  Failure to comply with any such restrictions could result in a violation of the laws of such jurisdictions.

This Explanatory Statement concerns matters which may affect your legal rights and entitlements related to the Plan Debt and you should take appropriate legal advice on its contents.  Plan Creditors must rely on their own examination of the terms of the Plan, including the merits and risk involved.  If you are in any doubt as to the contents of this Explanatory Statement or the documents that accompany it or what action you should take, you are recommended to seek your own independent financial, legal and tax advice immediately from your financial, legal and/or tax adviser who, if you are taking advice in the United Kingdom, is authorised pursuant to the Financial Services and Markets Act 2000 or by an appropriate regulatory body, or from another appropriately authorised independent professional adviser if you are in a territory outside the United Kingdom.

This Explanatory Statement should be read as a whole.  This Explanatory Statement is accompanied by a Plan Creditor Letter for use by Plan Creditors.  Plan Creditors are advised to complete and return the Plan Creditor Letter in accordance with the instructions contained therein and in Appendix 2 (*Instructions and Guidance for Plan Creditors*).Further copies of this Explanatory Statement can be obtained by accessing the Plan Website (https://deals.is.kroll.com/nfe) or by contacting the Information Agent via email at nfe@is.kroll.com.  Any amendments to this Explanatory Statement and/ or documents appended thereto will be published on the Plan Website, and notice will be provided to Plan Creditors using the same manner of distribution as this Explanatory Statement.



## EXPLANATORY STATEMENT IN RELATION TO RESTRUCTURING PLANS

under Part 26A of the Companies Act 2006

between each of

### NFE GLOBAL HOLDINGS LIMITED ("NFE GLOBAL") AND THE CORECO PLAN CREDITORS

(as defined in this Explanatory Statement)

and

### NFE BRAZIL NEWCO LIMITED ("NFE BRAZIL NEWCO") AND THE BRAZILCO PLAN CREDITORS

(as defined in this Explanatory Statement)

**Date:  15 May 2026**

---

The Record Time for determining the value of Plan Claims is 10:00 p.m. (London time)/ 5:00 p.m. (New York time) on 10 June 2026.

The Plan Meetings of the Plan Creditors to consider and vote on the Plans will be held as hybrid physical and virtual meetings on 15 June 2026.

The notice convening the Plan Meetings is set out in Appendix 4 (*Notice of Plan Meetings*) of this Explanatory Statement.  In order for Plan Creditors to vote at the relevant Plan Meeting(s), a validly completed and executed Plan Creditor Letter, together with any accompanying documents or evidence, should be submitted to the Information Agent by online form via the Plan Website (https://deals.is.kroll.com/nfe) as soon as possible, and, in any event, by no later than 10:00 p.m. (London time)/ 5:00 p.m. (New York time) on 9 June 2026 which is the Voting Instructions Deadline. More detailed instructions about actions to be taken by Plan Creditors preceding the Plan Meetings are set out in Appendix 2 (*Instructions and Guidance for Plan Creditors*) and summarised in the section "*Summary of Action to be Taken by Plan Creditors*" of this Explanatory Statement.

**Whether or not you intend to attend a Plan Meeting, you are requested to ensure that a Plan Creditor Letter which accompanies this Explanatory Statement is completed in accordance with the instructions printed thereon as soon as possible and, in any event, returned to the Information Agent no later than the deadlines specified therein.**

**The Plan Creditor Letter is an important document.  Certain sections of the Plan Creditor Letter will need to be completed in order to (among other things):  (a) provide certain information for the purposes of voting at the relevant Plan Meetings; and (b) make certain elections and confirmations concerning the Plan Consideration.  Plan Creditors are advised to review the Plan Creditor Letter carefully.**

THE PLANS DO NOT CONSTITUTE OR FORM PART OF ANY OFFER OR INVITATION TO SELL, EXCHANGE OR ISSUE, OR ANY SOLICITATION OF ANY OFFER TO PURCHASE OR

SUBSCRIBE FOR, ANY SECURITIES IN THE UNITED STATES OR ANY OTHER JURISDICTION OR TO OR FROM ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE ANY SUCH OFFER OR INVITATION OR SOLICITATION IN SUCH JURISDICTION.  NONE OF THE SECURITIES REFERRED TO IN THE PLANS MAY BE SOLD, ISSUED OR TRANSFERRED IN THE UNITED STATES ABSENT REGISTRATION OR AN EXEMPTION FROM REGISTRATION OR IN ANY OTHER JURISDICTION IN CONTRAVENTION OF APPLICABLE LAW. SECURITIES THAT MAY BE ISSUED PURSUANT TO THE PLANS WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION OF THE UNITED STATES OR ANY OTHER APPLICABLE JURISDICTION, AND SUCH SECURITIES MAY NOT BE OFFERED OR SOLD WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, "U.S. PERSONS" (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT), EXCEPT PURSUANT TO EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH ALL APPLICABLE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION OF THE UNITED STATES AND ANY OTHER JURISDICTION. HAVING TAKEN LEGAL ADVICE, NFE GLOBAL HOLDINGS LIMITED AND NFE BRAZIL NEWCO LIMITED INTEND THAT THE ISSUANCE OF THE SECURITIES PURSUANT TO THE PLANS WILL BE MADE IN RELIANCE UPON THE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT PROVIDED BY SECTION 3(A)(10) THEREOF. NFE GLOBAL HOLDINGS LIMITED AND NFE BRAZIL NEWCO LIMITED HAVE BEEN ADVISED THAT THE SANCTION OF THE PLANS BY THE HIGH COURT OF JUSTICE OF ENGLAND AND WALES AS TO THE FAIRNESS OF THE TERMS AND CONDITIONS OF THE ISSUANCE, FOLLOWING ADEQUATE NOTICE TO AFFECTED STAKEHOLDERS AND AN OPPORTUNITY TO BE HEARD, WILL SATISFY THE FAIRNESS HEARING REQUIREMENTS OF SECTION 3(A)(10). ACCORDINGLY, NO REGISTRATION OF SUCH SECURITIES UNDER THE SECURITIES ACT IS EXPECTED TO BE REQUIRED.

THE PLAN CREDITORS MUST RELY ON THEIR OWN EXAMINATION OF THE TERMS OF THE PLANS, INCLUDING THE MERITS AND RISKS INVOLVED.  THE PLANS WILL NOT BE FILED WITH THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "**SEC**") OR ANY STATE SECURITIES AUTHORITY AND NEITHER THIS EXPLANATORY STATEMENT NOR THE PLAN DOCUMENTATION WILL BE REVIEWED BY THE SEC OR ANY STATE SECURITIES AUTHORITY OF ANY OTHER JURISDICTION AND NONE OF THEM HAS OR WILL APPROVE, DISAPPROVE, PASS UPON OR ENDORSE THE MERITS OF THE PLAN OR THE ACCURACY, ADEQUACY OR COMPLETENESS OF THIS EXPLANATORY STATEMENT OR THE PLAN DOCUMENTATION.  IT IS UNLAWFUL TO MAKE ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

Further important information is set out under "*Important Notice to Plan Creditors*" on pages 2 to 7 of this Explanatory Statement.

**Table of Contents**

**Contents**                                                                                          **Page**

EXPECTED TIMETABLE OF PRINCIPAL EVENTS ................................................................1
IMPORTANT NOTICE TO PLAN CREDITORS ..........................................................................2
ARE YOU A PLAN CREDITOR?...............................................................................................8
SUMMARY OF ACTION TO BE TAKEN BY PLAN CREDITORS....................................... 11
PART 1 :  BACKGROUND TO AND REASONS FOR THE PLANS......................................... 14
PART 2 :  SUMMARY OF THE RESTRUCTURING AND THE RECAPITALISATION
        TRANSACTION (INCLUDING THE PLANS) ...............................................................38
PART 3 :  SUMMARY OF THE TERMS OF CERTAIN KEY IMPLEMENTATION DOCUMENTS
        AND EQUITY INSTRUMENTS .................................................................................63
PART 4 :  CERTAIN LEGAL ASPECTS OF THE PLANS .......................................................84
PART 5 :  RISK FACTORS .........................................................................................................97
APPENDIX 1 THE PLANS ........................................................................................................1-1
APPENDIX 2 INSTRUCTIONS AND GUIDANCE FOR PLAN CREDITORS ............................2-1
APPENDIX 3 FORM OF PLAN CREDITOR LETTER ...............................................................3-1
APPENDIX 4 NOTICE OF PLAN MEETINGS ...........................................................................4-1
APPENDIX 5 PART A:  SIMPLIFIED GROUP STRUCTURE CHART ........................................5-1
APPENDIX 5  PART B:  UPDATED GROUP STRUCTURE CHART ..........................................5-2
APPENDIX 6 DEFINITIONS AND INTERPRETATION .............................................................6-1
APPENDIX 7 PART A – RELEVANT ALTERNATIVE REPORT .................................................7-1
APPENDIX 7  PART B – EV REPORT ........................................................................................7-2
APPENDIX 8 KEY IMPLEMENTATION DOCUMENTS ............................................................8-1

**EXPECTED TIMETABLE OF PRINCIPAL EVENTS**

| EVENT | DATE AND TIME |
|---|---|
| **Voting Instructions Deadline** – the latest date and time by which Plan Creditors must make their elections in respect of voting at the relevant Plan Meeting(s) and appoint Nominees to receive their Plan Consideration, if applicable. | 10:00 p.m. (London)/ 5:00 p.m. (New York) on 9 June 2026 |
| **Custody Instructions Deadline** – the latest date and time by which the relevant Plan Creditors must submit Custody Instructions to block trading on the Legacy Notes and/ or 2029 New Notes.<br><br>Only applicable to Plan Creditors who are Legacy Noteholders and/ or 2029 New Noteholders. | 10:00 p.m. (London)/ 5:00 p.m. (New York) on 10 June 2026 |
| **Record Time** – the date and time at which Plan Creditors' entitlement to vote (either in person or by proxy) on the Plans and the value of their Plan Claims will be assessed. | 10:00 p.m. (London)/ 5:00 p.m. (New York) on 10 June 2026 |
| **Plan Meetings** – the date of the meetings of Plan Creditors to vote (either in person or by proxy) on the Plans. | Starting from 3:00 p.m. (London)/ 10:00 a.m. (New York) on 15 June 2026 |
| **Sanction Hearing** – Court hearing to sanction the Plans. | On or around 18 June 2026 |
| **Plan Effective Date** – the date on which the Plans are anticipated to become effective (if sanctioned by the Court). | On or around 19 June 2026 |
| **Restructuring Effective Date** – the date on which the Restructuring is anticipated to be implemented. | Expected to be by the third quarter of 2026 |

**Unless otherwise stated, all references in this Explanatory Statement to times are to London time.**

**The dates given are based on current expectations and may be subject to change. If any of the expected dates change, adequate notice of the change will be given to the Plan Creditors by such notice being made available on the Plan Website. Plan Creditors are encouraged to monitor the Plan Website regularly for any updates.**

You are advised to act well in advance of the above deadlines in order to make sure all the necessary procedures are completed in advance of the relevant deadlines.

If the Plan Effective Date occurs, the Plans will become effective and binding on all relevant Plan Creditors in accordance with their terms, regardless of whether you voted in favour of, or against, the relevant Plan.

If you do not validly complete and submit all relevant sections of the Plan Creditor Letter by the prescribed deadlines: (i) your Plan Consideration may be issued and delivered to the Holding Period Trustee on the Restructuring Effective Date; and/ or (ii) if you are therefore unable to vote in the relevant Plan Meeting(s), you may lose any right to receive any Early Consent Fee.

**IMPORTANT NOTICE TO PLAN CREDITORS**

**Unless the context otherwise requires, all capitalised terms used in this Explanatory Statement shall have the meanings set out in Appendix 6 (*Definitions and Interpretation*) to this Explanatory Statement.  The appendices to this Explanatory Statement form an integral part of it and, unless expressly stated otherwise, references to this Explanatory Statement shall be construed as references to the Explanatory Statement including the appendices to it.**

**Information**

This Explanatory Statement has been prepared in connection with the proposed Plans under Part 26A of the Act between each of NFE Global and the CoreCo Plan Creditors and between NFE Brazil Newco and the BrazilCo Plan Creditors and has been prepared solely for the purpose of providing information to Plan Creditors in relation to the Plans.

Nothing in this Explanatory Statement or any other document issued with or appended to it should be relied on by the Plan Creditors for any purpose other than to consider and/ or make an informed decision in respect of the Plans and except as provided herein, the Plan Creditors may not reproduce or distribute this Explanatory Statement, in whole or in part, and may not disclose any of the contents of this Explanatory Statement or use any information herein for any purpose other than considering and/or making an informed decision in respect of the Plans.  In particular, and without limitation, nothing in this Explanatory Statement or any other document issued with or appended to it should be relied on in connection with the purchase or acquisition of any shares, warrants, loan participations, bonds, notes, debts, other financial instruments or assets in or of any company or person.

Nothing contained in this Explanatory Statement shall constitute a warranty or guarantee of any kind, express or implied, and nothing contained in this Explanatory Statement shall constitute any admission of any fact or liability on the part of either Plan Company or any other member of the Group or any other of either Plan Company's affiliates with respect to any asset to which it or they may be entitled or any claim against it or them.  Without prejudice to the generality of the foregoing, nothing in the Plans or this Explanatory Statement or the distribution thereof evidences to any person, or constitutes any admission by either Plan Company or any other member of the Group or any other of either Plan Company's affiliates, that a liability is owed to any person in respect of any claim (including without limitation any Plan Claim) or that any person is or may be a Plan Creditor.  The failure to distribute this Explanatory Statement to any Plan Creditor shall not constitute an admission by either of the Plan Companies that such person is not a Plan Creditor.

No person has been authorised by either Plan Company or the Information Agent to give any information or make any representations concerning the Plans (including concerning each Plan Company or any other member of the Group) which are inconsistent with the statements contained in this Explanatory Statement and, if made, such representations may not be relied upon as having been so authorised.  This Explanatory Statement is issued solely in connection with the Plans.

The information contained in this Explanatory Statement has been prepared based upon information available to the Plan Companies as at the date of this Explanatory Statement.  The delivery of this Explanatory Statement does not imply that, unless otherwise stated, the information herein is correct as at any time subsequent to the date of this Explanatory Statement.  Save as otherwise agreed, or as required by law, neither of the Plan Companies nor the Information Agent has any obligation whatsoever to update or revise any of the information, forward-looking statements or the conclusions contained herein or to reflect new events or circumstances or to correct any inaccuracies which may become apparent subsequent to the date of this Explanatory Statement.  To the best of each Plan Company's knowledge, information and belief, the information contained in this document is in accordance with the facts existing as at the date of this Explanatory Statement and does not omit anything likely to affect the import of such information.  The Plan Companies have taken all reasonable steps to ensure that this Explanatory Statement contains the information reasonably necessary to enable Plan Creditors to make an informed decision about the effect of the Plans on them.

All amounts contained in this Explanatory Statement, including as regards any liabilities of the Plan Companies to any Plan Creditor or group of Plan Creditors, are approximate figures only and are based on the books and records of the Plan Companies, and other information that is available to or has been provided to the Plan Companies as at the date of this Explanatory Statement.  None of the Plan Creditors nor their advisers have authorised the content of this Explanatory Statement or any part of it, nor do the Plan Creditors accept any responsibility for the accuracy, completeness or reasonableness of the statements contained within it.

In making a decision in respect of the Plans, each Plan Creditor must rely on its own examination, analysis and inquiry of the Plan Companies and the terms of the Plans, including the merits and risks involved.  None of the Plan Companies' advisers has verified that the information contained in this Explanatory Statement is in accordance with the facts existing as at the date of this Explanatory Statement and does not omit anything likely to affect the import of such information, and each of those persons expressly disclaims responsibility for such information.  Each Plan Creditor acknowledges that:

(a)  it has not relied on the Information Agent or any of its advisers or any of the Plan Companies' advisers in connection with any investigation of the accuracy of any information contained in this Explanatory Statement or its investment decision (including any decision in connection with the Plans); and

(b)  it may rely only on the information contained or incorporated in this Explanatory Statement from the Plan Companies for the purpose of making a decision on voting under the Plans.

This Explanatory Statement has not been reviewed, verified or approved by any rating agency or any regulatory authority.  Without prejudice to the representations and warranties given by the Plan Companies or any other member of the Group, or any directors or officers of any member of the Group elsewhere, to the fullest extent permitted by law, neither the Plan Companies nor any other member of the Group, nor any directors or officers of the Plan Companies or any other member of the Group, will have any tortious, contractual or any other liability to any person in connection with the use of this Explanatory Statement, and the Plan Companies and all other members of the Group do not accept any liability whatsoever to any person, regardless of the form of action, for any lost profits or lost opportunity, or for any indirect, special, consequential, incidental or punitive damages arising from any use of this Explanatory Statement, its contents or preparation or otherwise in connection with it, even if the Plan Companies or other member of the Group (as applicable) has been advised of, or has advised of, the possibility of such damages.

For further information about the Group, Plan Creditors are advised to refer to the Parent's public disclosure statements filed with the SEC, and in particular the Group's most recent form 10-K filed 13 April 2026.

**Tax**

In view of the number of different jurisdictions where tax laws may apply to Plan Creditors, this Explanatory Statement does not discuss the tax consequences for Plan Creditors arising from the implementation of the Plans or the Restructuring.  Plan Creditors are liable for their own taxes and have no recourse to the Plan Companies, the Information Agent or any other entity or person named in this Explanatory Statement with respect to taxes arising in connection with the Plans or the Restructuring.  Plan Creditors who are in any doubt as to the effect of implementation of the Plans or the Restructuring are urged to consult their own professional advisers regarding the possible tax consequences under the laws of the jurisdictions that apply to them.

**Electronic form**

If this Explanatory Statement has been sent to you in an electronic form, you are reminded that documents transmitted via this medium may be altered or changed during the process of transmission and consequently neither the Plan Companies nor any member of the Group, the Information Agent or

3

any person who controls, or is a director, officer, employee, agent or any affiliate of any such person accepts any liability or responsibility whatsoever in respect of any difference between the Explanatory Statement distributed to you in electronic format and the hard copy version available to you on request from the Information Agent.

You are reminded that the Explanatory Statement has been delivered to you on the basis that you are a person into whose possession it may be lawfully delivered in accordance with the laws of the jurisdiction in which you are located.  If you are not the named addressee to whom this Explanatory Statement has been delivered, please notify the sender immediately.

**Restrictions**

The distribution of this Explanatory Statement may be restricted by law in certain jurisdictions.  Neither the Plan Companies nor the Information Agent represents that this Explanatory Statement may be lawfully distributed in compliance with any applicable registration or other requirements in any such jurisdiction, or pursuant to an exemption available thereunder, or assumes any responsibility for facilitating such distribution.

The distribution of this Explanatory Statement to or in certain jurisdictions may be restricted by law or regulation in such jurisdictions and persons into whose possession this Explanatory Statement comes are requested to inform themselves about, and to observe, any such restrictions.  Failure to comply with any such restrictions could result in a violation of the laws of such jurisdictions.

**Summary only**

The summary of the principal provisions of the Plans contained in this Explanatory Statement is qualified in its entirety by reference to the Plans themselves, the full text of which is set out in Appendix 1 (*The Plans*) to this Explanatory Statement.  Similarly, the summary provisions of the Implementation Documents contained in this Explanatory Statement are qualified in their entirety by reference to the full text of the key Implementation Documents set out in Appendix 8 (*Key Implementation Documents*) to this Explanatory Statement.

Each Plan Creditor is advised to read and consider carefully the text of the Plans and the Implementation Documents appended to this Explanatory Statement.  This Explanatory Statement has been prepared solely to assist the Plan Creditors in respect of voting on the Plans.

**IN THE EVENT OF A CONFLICT BETWEEN THE INFORMATION AND TERMS DESCRIBED IN THIS EXPLANATORY STATEMENT AND:  (1) THE PLANS, THE TERMS OF THE PLANS SHALL PREVAIL; AND (2) THE IMPLEMENTATION DOCUMENTS, THE TERMS OF THE IMPLEMENTATION DOCUMENTS SHALL PREVAIL.**

**Prospectus and Financial Promotions**

This Explanatory Statement has been prepared on the basis that any offer of securities in connection with the Plans or the Restructuring (i) in any Member State of the EEA either does not constitute an offer of transferable securities to the public for the purposes of the Prospectus Regulation or is made pursuant to an exemption under the Prospectus Regulation from the requirement to publish a prospectus for offers of securities; and (ii) in the United Kingdom either does not constitute an offer of relevant securities to the public or is made pursuant to an exception under the UK POATRs.  Accordingly, this Explanatory Statement is not a prospectus within the meaning and for the purposes of the Prospectus Regulation or the UK POATRs.

In addition, in the United Kingdom, this communication is only being distributed to and is only directed at persons to whom it may lawfully be communicated for the purposes of section 21 of the Financial Services and Markets Act 2000 (including, without limitation, under Article 43 of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 (as amended) ("**relevant persons**").  This

communication must not be acted on or relied on by anyone who is not a relevant person.  Any investment or investment activity to which it relates is available only to relevant persons and will be engaged in only with relevant persons.

**Forward-looking statements**

Nothing contained in this Explanatory Statement shall be deemed to be a forecast, projection or estimate of the Plan Companies' or the Group's or any Group member's future financial performance, except where otherwise specifically stated.  This Explanatory Statement contains certain statements, statistics and projections that are, or may be, forward-looking.  The accuracy and completeness of all such statements, including, without limitation, statements regarding the Plan Companies' or the Group's or any Group member's future financial position, strategy, plans and objectives for the management of future operations, is not warranted or guaranteed.

This Explanatory Statement contains statements, estimates, opinions and projections with respect to the Plan Companies and/or the Group and/or members of the Group.  These forward-looking statements can be identified by the fact that they do not relate only to historical or current facts.  Forward-looking statements often use words such as "anticipate," "target," "expect," "estimate," "intend," "plan," "goal," "believe," "will," "may," "should," "would," "could" or other words of similar import.  These statements are based on numerous assumptions and assessments made by the Plan Companies and/or any other member of the Group as appropriate in light of their experience and their perception of historical trends, current conditions, expected future developments and other factors which they believe appropriate.  Although the Plan Companies and/or any other member of the Group, as appropriate, believe that the expectations reflected in such statements are reasonable, no assurance can be given that such expectations will prove to be correct.  Forward-looking statements involve significant risks and uncertainties, should not be read as guarantees of future performance or results, and will not necessarily be accurate indications of whether or not such results will be achieved.  Such forward-looking statements only speak as at the date of this Explanatory Statement.  A number of factors could cause actual results to necessarily differ materially from the results discussed in the forward-looking statements, including, but not limited to, future performance being lower than expected, deterioration in general economic conditions, changes in the regulatory environment, fluctuations in interest and exchange rates, the outcome of litigation, government actions and the other factors set out or referred to in Part 5 (*Risk Factors*) of this Explanatory Statement.  It is up to the recipient of this Explanatory Statement to make its own assessment of the validity of such forward-looking statements and assumptions and no liability is accepted by the Plan Companies or any other member of the Group in respect of the achievement of such forward-looking statements and assumptions.  Should one or more of these risks or uncertainties materialise, or should underlying assumptions prove incorrect, actual results may vary materially from those described in this Explanatory Statement.

**Risk factors**

**PLAN CREDITORS' ATTENTION IS DRAWN TO CERTAIN RISKS ASSOCIATED WITH THE PLANS AND THE RESTRUCTURING THAT ARE SET OUT OR REFERRED TO IN PART 5 (*RISK FACTORS*) OF THIS EXPLANATORY STATEMENT.**

**Legal, tax and financial advice**

Plan Creditors should not construe the contents of this Explanatory Statement as legal, tax, financial or other advice.

This Explanatory Statement has been prepared without taking into account the objectives, financial situation or needs of any particular recipient of it, and consequently, the information contained in this Explanatory Statement may not be sufficient or appropriate for the purpose for which a recipient might use it.  Any such recipients should conduct their own due diligence and consider the appropriateness of the information in this Explanatory Statement having regard to their own objectives, financial situations and needs.

**PLAN CREDITORS ARE RECOMMENDED TO CONSULT THEIR OWN PROFESSIONAL ADVISERS AS TO LEGAL, TAX, FINANCIAL OR OTHER MATTERS RELEVANT TO THE ACTION PLAN CREDITORS MAY TAKE IN RELATION TO THE PLANS, OR THE IMPLICATIONS/CONSEQUENCES OF THOSE ACTIONS.**

**Notice to Investors in the United States**

The Plans described in this Explanatory Statement will not be filed with the U.S. Securities and Exchange Commission (the "**SEC**") or any state securities authority and neither this Explanatory Statement nor the Plan Documentation will be reviewed by the SEC or any state securities authority of any other jurisdiction and none of them has or will approve, disapprove, pass upon or endorse the merits of the Plans or the accuracy, adequacy or completeness of this Explanatory Statement or the Plan Documentation. Any representation to the contrary is unlawful.

The issuance of the securities pursuant to the Plans has not been and will not be registered under the Securities Act or any securities laws of any state or other jurisdiction of the United States or any other applicable jurisdiction and such securities may not be offered or sold within the United States or to, or for the account or benefit of, "U.S. persons" (as defined in Regulation S under the Securities Act), except pursuant to exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and in accordance with all applicable securities laws of any state or other jurisdiction of the United States and any other jurisdiction absent registration or an applicable exemption from registration under the Securities Act. Having taken legal advice, the Plan Companies intend that the issuance of the securities pursuant to the Plans will be made in reliance upon the exemption from the registration requirements of the Securities Act provided by Section 3(a)(10) thereof. The Plan Companies have been advised that the sanction of the Plans by the Court as to the fairness of the terms and conditions of the issuance, following adequate notice to affected stakeholders and an opportunity to be heard, will satisfy the fairness hearing requirements of Section 3(a)(10). The Plan Companies will, at or prior to the Sanction Hearing, expressly advise the Court that its sanction of the Plans will be relied upon for purposes of satisfying the fairness hearing requirements of Section 3(a)(10). Plan Creditors, as the persons to whom the securities will be issued, will be given notice of the Sanction Hearing and the opportunity to attend and be heard as to the fairness of the terms and conditions of the issuance. Securities issued to Plan Creditors that are not "affiliates" of the relevant issuer (within the meaning of Rule 144 under the Securities Act) will be issued without restrictive legend and will be freely transferable.

The Plan Companies and other members of the Group do not intend to register any portion of the Plans or any related securities offering (except as may be required by the CoreCo Registration Rights Agreement with respect to the resale of such securities) in the United States or to conduct a public offering of securities in the United States.

U.S. investors should consult their own legal, tax, and financial advisers regarding the Plans, including the consequences of participating in the Plans under U.S. federal and state securities laws.

**Other jurisdictions**

The implications of the Plans for Plan Creditors who are residents or citizens of jurisdictions other than the United Kingdom may be affected by the laws of the relevant jurisdictions. Such overseas Plan Creditors should inform themselves about and observe any applicable legal requirements. Any person outside the United Kingdom who is resident in, or who has a registered address in, or is a citizen of, an overseas jurisdiction should consult independent professional advisers and satisfy themselves as to the full observance of the laws of the relevant jurisdiction in connection with the Plans, including obtaining any requisite governmental or other consents, observing any other requisite formalities and paying any issue, transfer or other taxes due in such jurisdiction.

**THIS EXPLANATORY STATEMENT DOES NOT CONSTITUTE OR FORM PART OF ANY OFFER OR INVITATION TO SELL, EXCHANGE OR ISSUE, OR ANY SOLICITATION OF**

6

**ANY OFFER TO PURCHASE OR SUBSCRIBE FOR, ANY SECURITIES IN THE UNITED STATES OR ANY OTHER JURISDICTION OR TO OR FROM ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE ANY SUCH OFFER OR INVITATION OR SOLICITATION IN SUCH JURISDICTION. NONE OF THE SECURITIES REFERRED TO IN THIS EXPLANATORY STATEMENT MAY BE SOLD, ISSUED OR TRANSFERRED IN THE UNITED STATES ABSENT REGISTRATION OR AN EXEMPTION FROM REGISTRATION OR IN ANY OTHER JURISDICTION IN CONTRAVENTION OF APPLICABLE LAW.**

## ARE YOU A PLAN CREDITOR?

1.1    The creditors who are proposed to be bound by the terms of, and who will therefore be entitled to vote on, the CoreCo Plan are:

1.1.1    the ultimate beneficial holders of the 2026 Legacy Notes Debt (the "**2026 Legacy Noteholders**");

1.1.2    the ultimate beneficial holders of the 2029 Legacy Notes Debt (the "**2029 Legacy Noteholders**" and together with the 2026 Legacy Noteholders, the "**Legacy Noteholders**");

1.1.3    the lenders of record under the R-1 Revolving Credit Facility Debt (the "**R-1 Lenders**");

1.1.4    the lenders of record under the R-2 Revolving Credit Facility Debt (the "**R-2 Lenders**" and together with the R-1 Lenders, the "**RCF Lenders**");

1.1.5    the lenders of record under the Term Loan B Debt (the "**TLB Lenders**");

1.1.6    the lenders of record under the Term Loan A Debt (the "**TLA Lenders**");

1.1.7    the lender of record under the Series I Loan Debt (the "**Series I Lender**"); and

1.1.8    the lender of record under the Series II Loan Debt (the "**Series II Lender**"),

(each a "**CoreCo Plan Creditor**" and together, the "**CoreCo Plan Creditors**").

1.2    The creditors who are proposed to be bound by the terms of, and who will therefore be entitled to vote on, the BrazilCo Plan are the ultimate beneficial holders of the 2029 New Notes Debt (the "**2029 New Noteholders**") (each a "**BrazilCo Plan Creditor**" and together, the "**BrazilCo Plan Creditors**", and together with the CoreCo Plan Creditors, the "**Plan Creditors**").

1.3    To avoid double counting, and notwithstanding that they may be creditors under the Plan Debt, it is not intended that any of the Administrative Parties will exercise any voting rights at any Plan Meeting.

1.4    Under the terms of the Series I Loan and the Series II Loan, certain amendments and actions (including voting) require the consent of, or may be directed by, a majority of the 2029 New Noteholders. For the purposes of voting in the CoreCo Plan, the Series I Lender and Series II Lender will vote in respect of 100 per cent. of the Series I Loan Debt and Series II Loan Debt respectively, which votes shall be directed and ratified in accordance with the instruments relating to the 2029 New Notes Debt.

1.5    If you are, or were, a Plan Creditor and you have assigned, sold or otherwise transferred your interests as a Plan Creditor (in whole or in part) or intend to do so before the Plan Meetings, you should forward a copy of this Explanatory Statement to the person or persons to whom you have assigned, sold or otherwise transferred, or the person or persons to whom you intend to assign, sell or transfer, such interests.

1.6    The number of Plan Creditors voting and the votes cast by them at the relevant Plan Meeting(s) will be taken into account for value purposes in relation to the Plans in determining whether the relevant voting majorities have been met. Plan Creditors are required, for the purposes of voting on the Plans, to submit a Plan Creditor Letter.

1.7    Plan Creditors are referred to Appendix 2 (*Instructions and Guidance for Plan Creditors*) of this Explanatory Statement for more information.

**2029 New Noteholders and Legacy Noteholders**

1.8    For the purposes of voting on the Plans, 2029 New Noteholders and Legacy Noteholders are those persons at the Record Time with the ultimate beneficial interest in any of the 2029 New Notes or Legacy Notes (as applicable), held through DTC at the Record Time. As noted below, Account Holders and Intermediaries can be 2029 New Noteholders or Legacy Noteholders where they hold the ultimate beneficial interest in any of the 2029 New Notes or Legacy Notes (as applicable) on their own account.

1.9    The following persons have interests in the 2029 New Notes or Legacy Notes:

   1.9.1    **Account Holders (DTC Participants)**: You are an Account Holder if you are recorded directly in the records of DTC as holding an interest in the 2029 New Notes or Legacy Notes in an account held with DTC.

   1.9.2    **Intermediaries**: You are an Intermediary if you hold an interest in the 2029 New Notes or Legacy Notes on behalf of another person or other persons, and you do not hold that interest as an Account Holder.

   1.9.3    **2029 New Noteholders and Legacy Noteholders**: You are a 2029 New Noteholder or Legacy Noteholder if you hold the ultimate beneficial interest in any of the 2029 New Notes or Legacy Notes (as applicable) held through DTC at the Record Time (being 10:00 p.m. (London time)/ 5:00 p.m. (New York time) on 10 June 2026). For the avoidance of doubt, a person who is an Account Holder or an Intermediary may also be a 2029 New Noteholder or Legacy Noteholder where they hold the ultimate beneficial interest in any of the 2029 New Notes or Legacy Notes on their own account.

   1.9.4    Certain other persons, including, the Trustees, DTC, Cede & Co. as nominee for DTC and any other depositories for them.

1.10    To avoid double counting and as they are not Plan Creditors, the Trustees, DTC and Cede & Co. will not attend the Plan Meetings or vote on the Plans.

1.11    Account Holders are not Plan Creditors unless and to the extent that they are also 2029 New Noteholders or Legacy Noteholders. However, as described below and in Appendix 2 (*Instructions and Guidance for Plan Creditors*) of this Explanatory Statement, the assistance and involvement of Account Holders will be required to arrange for the 2029 New Notes and Legacy Notes to be blocked in accordance with the instructions contained in this Explanatory Statement. Without such assistance, such Plan Creditor Letter submitted by 2029 New Noteholders and/ or Legacy Noteholders will not be deemed valid and, therefore, (i) the voting instructions of such 2029 New Noteholders and/ or Legacy Noteholders may be disregarded for the purposes of voting at the relevant Plan Meeting(s), (ii) they may lose the right to receive any related Early Consent Fee, and/ or (iii) their Plan Consideration may be issued and delivered to the Holding Period Trustee on the Restructuring Effective Date.

1.12    Intermediaries are not Plan Creditors unless and to the extent that they are also 2029 New Noteholders or Legacy Noteholders. However, the assistance and involvement of Intermediaries may be required to allow 2029 New Noteholders and Legacy Noteholders to validly complete their Plan Creditor Letter.

1.13    If you are a 2029 New Noteholder or Legacy Noteholder that is not an Account Holder, you should contact your Account Holder (through any Intermediaries, if applicable) to ensure that your Account Holder takes the appropriate action described in this Explanatory Statement.

**Economically Interested Parties**

1.14    It is recommended that sub-participants, parties to unsettled trades, and other entities who are economic owners of (and control voting rights in respect of) the relevant debt without being a lender of record should contact the party holding their positions as lender of record to ensure that the lender of record is taking the appropriate actions in connection with the Plans.

**Plan Claims**

1.15    Plan Claims for the purposes of voting at the Plan Meetings will be calculated for each Plan Creditor with 2026 Legacy Notes, 2029 Legacy Notes, the R-1 Revolving Credit Facility, the R-2 Revolving Credit Facility, the Term Loan A Facility, the Term Loan B Facility, 2029 New Notes, the Series I Loan and the Series II Loan, by reference to its aggregate outstanding total amount of the 2026 Legacy Notes Debt, 2029 Legacy Notes Debt, R-1 Revolving Credit Facility Debt, R-2 Revolving Credit Facility Debt, Term Loan A Debt, Term Loan B Debt, 2029 New Notes Debt, Series I Loan Debt and Series II Loan Debt (as applicable) as at the Record Time.

1.16    The above-calculated Plan Claims will, absent a manifest error, be deemed final and conclusive for the purposes of voting at the Plan Meetings.  However, if a Plan Creditor has any queries and/ or concerns relating to the above-described calculation methodology, such Plan Creditor should contact the Information Agent as soon as possible and in any event prior to the Record Time.  A Plan Creditor may submit evidence (i) as to its status as a Plan Creditor, and/ or (ii) the amount of its Plan Claim, for voting purposes to the Information Agent, provided that such submission occurs prior to the Record Time.

1.17    The Chairperson will retain overall discretion as to the valuation of Plan Claims for the purposes of voting at the Plan Meetings, and will act on information provided to him by the Plan Companies, the Information Agent and the Plan Creditors (as applicable).

**Assignments or transfers**

1.18    Only Plan Creditors as at the Record Time (being 10:00 p.m. (London time)/ 5:00 p.m. (New York time) on 10 June 2026) will be entitled to attend and vote on the relevant Plan.

1.19    The Plan Companies shall be under no obligation to recognise any assignment or transfer of rights, benefits or interests in Plan Debt after the Record Time for the purposes of calculating entitlements to receive Plan Consideration under the relevant Plan and have no obligations to any person other than their applicable Plan Creditors on the Record Time, provided that, where the relevant Plan Company has received from the relevant parties notice in writing of such assignment or transfer prior to the Restructuring Effective Date, the relevant Plan Company may, in its sole discretion and subject to the production of such other evidence in relation to such assignment or transfer as it may reasonably require and to any other terms and conditions which the relevant Plan Company may consider necessary or desirable, acting reasonably, agree to recognise such assignment or transfer for the purposes of calculating entitlements to receive Plan Consideration under the relevant Plan.

1.20    Any assignee or transferee of the interests in Plan Debt recognised by the relevant Plan Company shall be bound by the terms of the relevant Plan as a Plan Creditor and shall produce such evidence as the relevant Plan Company may reasonably require to confirm that it has agreed to be bound by the terms of the relevant Plan.

**SUMMARY OF ACTION TO BE TAKEN BY PLAN CREDITORS**

**1      SUMMARY**

1.1     Before the Plans can become effective and binding on the Plan Companies and the Plan Creditors, the CoreCo Plan must be approved by at least one class of the CoreCo Plan Creditors and the BrazilCo Plan must be approved by the one class of the BrazilCo Plan Creditors and both Plans must be sanctioned by the Court as set out in paragraph 1 of Part 4 (*Certain Legal Aspects of the Plans*) below.

1.2     Please read the preceding section "*Are you a Plan Creditor?*" and Appendix 2 (*Instructions and Guidance for Plan Creditors*) of this Explanatory Statement carefully for detailed instructions on the actions to be taken by Plan Creditors in order to attend and/ or vote at the relevant Plan Meeting(s).  A summary of such actions is set out below:

(a)     Read this Explanatory Statement as a whole, in conjunction with the documents that accompany it (including the Plan Creditor Letter).

(b)     It is important that as many votes as possible are cast at each Plan Meeting so that the Court may be satisfied that there is a fair and reasonable representation of the opinion of the Plan Creditors in each class.  You are therefore strongly urged to complete and submit your Plan Creditor Letter to the Information Agent, together with the relevant corporate authorisations and Identification Documents (as applicable) for the natural person named in Part 3 (*Voting Instructions*) of the Plan Creditor Letter to act as representative of the Plan Creditor or as proxy (if applicable), via the online form on the Plan Website at https://deals.is.kroll.com/nfe, as soon as possible and, in any event, no later than the Voting Instructions Deadline (being 10:00 p.m. (London time)/ 5:00 p.m. (New York time) on 9 June 2026), whether or not you intend to attend and vote at the relevant Plan Meeting(s).  In any case, only one individual person may vote and speak at the relevant Plan Meeting(s) on behalf of a Plan Creditor.  A form of Plan Creditor Letter is enclosed at Appendix 3 (*Form of Plan Creditor Letter*) to this Explanatory Statement.

(c)     If you are eligible to receive the Early Consent Fee, please refer to paragraph 2.1 below.

1.3     If you do not validly complete and submit a Plan Creditor Letter (and the relevant evidence of corporate authority (if applicable)) on or before the Voting Instructions Deadline (being 10:00 p.m. (London time)/ 5:00 p.m. (New York time) on 9 June 2026), your admission to the relevant Plan Meeting(s) (following the submission of your Identification Documents) to vote on the relevant Plan will be at the discretion of the Chairperson (although where practical, the Information Agent will endeavour to process and verify any Plan Creditor Letters, evidence of corporate authority and/ or Identification Documents received after the Voting Instruction Deadline but prior to the opening of the relevant Plan Meeting).

1.4     Plan Creditors that are corporate persons are required to provide to the Information Agent evidence of the authority granted to the individual named as authorised representative of the Plan Creditor or proxy (other than the Chairperson) in their Plan Creditor Letter by no later than the Voting Instructions Deadline in order to be provided with access details for the relevant Plan Meeting(s).  Such evidence may include, for example, a valid power of attorney and/ or board minutes.

1.5     Each Plan Creditor who has indicated by the Voting Instructions Deadline that it wishes to attend the relevant Plan Meeting (in person (physically or via video conference) or by a proxy other than the Chairperson) shall be entitled to submit its vote during the relevant Plan Meeting(s).  The completion and submission of a Plan Creditor Letter will not prevent you from

11

attending and voting at the relevant Plan Meeting(s) or any adjournment thereof, if you so wish and are so entitled.  In those circumstances, you must, however, by the Voting Instructions Deadline, submit a Plan Creditor Letter to the Information Agent and you must provide (i) the completed Part 3 (*Voting Instructions*) of the Plan Creditor Letter, (ii) Identification Documents, and (iii) evidence of corporate authority if acting on behalf of a Plan Creditor that is a corporation.  Please refer to Appendix 2 (*Instructions and Guidance for Plan Creditors*) for further information.

1.6 If you are in any doubt as to what action you should take in connection with this Explanatory Statement, the proposals contained in it or the documents that accompany it, you are recommended to seek your own independent financial, legal and tax advice immediately from your financial, legal and/ or tax adviser who is authorised by an appropriate regulatory body.

1.7 The nominal amount of the Plan Claim for voting purposes of each Plan Creditor will be determined as at the Record Time.

## 2 COMPLETION OF A PLAN CREDITOR LETTER

2.1 **To vote in the relevant Plan, receive the Early Consent Fee (where applicable) and receive the Plan Consideration (or elect a Nominee to receive the Plan Consideration):**

2.1.1 Plan Creditors are required to **submit a Plan Creditor Letter** to the Information Agent by online form via the Plan Website (https://deals.is.kroll.com/nfe) by no later than the **Voting Instructions Deadline being 10:00 p.m. (London time)/ 5:00 p.m. (New York time) on 9 June 2026**.

2.1.2 Upon submission of a Plan Creditor Letter, Plan Creditors will receive an email from the Information Agent with their respective Unique Instruction Reference ("**UIR**").

2.1.3 Plan Creditors that are 2029 New Noteholders and Legacy Noteholders are required to submit Custody Instructions to block trading on the Legacy Notes and/ or 2029 New Notes (as applicable) by the **Custody Instructions Deadline, being 10:00 p.m. (London time)/ 5:00 p.m. (New York time) on 10 June 2026, ensuring that their Account Holders or Intermediaries include their respective UIR. Custody Instructions received without a UIR may be deemed invalid**.

2.2 Plan Creditors must validly complete a Plan Creditor Letter by the prescribed deadlines, as described above.  Any Plan Creditor who fails to submit a validly completed Plan Creditor Letter to the Information Agent before the Voting Instructions Deadline:

2.2.1 may not be able to attend or vote at the relevant Plan Meeting(s);

2.2.2 may not be able to elect a Nominee to receive their applicable Plan Consideration; and

2.2.3 may be subject to having their Plan Consideration issued and delivered to the Holding Period Trustee on the Restructuring Effective Date.

2.3 Any Plan Creditor who fails to provide satisfactory evidence that it is an Eligible Person before the Voting Instructions Deadline may have their Plan Consideration issued and delivered to the Holding Period Trustee on the Restructuring Effective Date. Plan Creditors who are not Eligible Persons or who are Unadmitted Plan Creditors are, in each case, entitled to elect for their entitlement to the Plan Consideration to be issued or allocated (as applicable) to their Nominee(s) (if such Nominee is an Eligible Person and has delivered a confirmation deed (as set out at Part 6 (*Confirmation Deed*) of the Plan Creditor Letter) to the Information Agent on

or prior to the Voting Instructions Deadline in accordance with the provisions of the Plan Creditor Letter).

2.4    Plan Creditors who are Early Consent Fee Creditors who fail to validly complete a Plan Creditor Letter by the prescribed deadlines, as a result of which they are unable, and therefore fail, to vote at the relevant Plan Meeting(s), shall lose their entitlement to the Early Consent Fee in accordance with the Restructuring Support Agreement.

**PART 1: BACKGROUND TO AND REASONS FOR THE PLANS**

**1       INTRODUCTION**

1.1     You are being sent this Explanatory Statement as a Plan Creditor.  The Plan Companies have proposed the Plans to their respective Plan Creditors in light of the circumstances described from paragraph 4 (*Background to the Group's Financial Difficulties*) of this Part 1.

1.2     The Plans are being proposed to Plan Creditors with the primary objective of facilitating the implementation of the Recapitalisation Transaction as part of the Restructuring.  To achieve this, the Plans aim to deliver the consents of the Plan Creditors required to facilitate the execution of all requisite documentation to bind the parties therein to perform the steps required to implement the Recapitalisation Transaction.

1.3     The purpose of this Explanatory Statement, which is provided pursuant to section 901D of the Act, is to provide you with sufficient information to make an informed decision on whether or not to approve the relevant Plan.

1.4     In considering the relevant Plan and whether to vote in favour of the relevant Plan you should not rely only on this Part but you should also consider the more detailed information contained in the remainder of the Explanatory Statement and the terms of the Plans and the Implementation Documents appended to the Explanatory Statement.

1.5     This Explanatory Statement contains Parts 1 to 5 and the Appendices:

1.5.1    this Part 1 sets out the background to and the financial position of the Group and the reasons for the Plans;

1.5.2    Part 2 (*Summary of the Restructuring and the Recapitalisation Transaction (Including the Plans)*) provides a summary of the Restructuring (including the Recapitalisation Transaction and the Plans);

1.5.3    Part 3 (*Summary of the Terms of Certain Key Implementation Documents and Equity Instruments*) provides a summary of the terms of certain key Implementation Documents and equity instruments to be issued pursuant to the Recapitalisation Transaction;

1.5.4    Part 4 (*Certain Legal Aspects of the Plans*) sets out certain legal aspects of the Plans; and

1.5.5    Part 5 (*Risk Factors*) provides a summary of certain risk factors in relation to the Plans.

1.6     The CoreCo Plan relates to rights, liabilities and obligations arising under:

1.6.1    the 2026 Legacy Notes Debt;

1.6.2    the 2029 Legacy Notes Debt;

1.6.3    the R-1 Revolving Credit Facility Debt;

1.6.4    the R-2 Revolving Credit Facility Debt;

1.6.5    the Term Loan B Debt;

1.6.6    the Term Loan A Debt;

1.6.7    the Series I Loan Debt; and

1.6.8    the Series II Loan Debt,

(together, the "**CoreCo Plan Debt**" and together with the Letter of Credit Facility, the "**Corporate Debt**").

1.7    The BrazilCo Plan relates to rights, liabilities and obligations arising under the 2029 New Notes Debt (the 2029 New Notes Debt together with the CoreCo Plan Debt, being the "**Plan Debt**").

1.8    Pursuant to the Plans, the Plan Creditors will release their existing claims against the Group in return for Plan Consideration comprising a mix of debt, preferred equity and common equity. The Plan Consideration is allocated in accordance with the Plan Creditors' existing rights against various Collateral Pools.  The respective Plan Classes, Collateral Pool interests and Plan Consideration are summarised in the table below:

| Class | Plan Debt | Collateral Pool(s)[1] | Plan Consideration Instrument(s) |
|---|---|---|---|
| Legacy Notes Class | 2026 Legacy Notes Debt<br>2029 Legacy Notes Debt | Common Collateral | CoreCo Common Stock<br>CoreCo Preferred Stock |
| Series I and Series II Class | Series I Loan Debt<br>Series II Loan Debt | Common Collateral | CoreCo Common Stock<br>CoreCo Preferred Stock |
| R-1 Class | R-1 Revolving Credit Facility Debt | Common Collateral<br>F1 Collateral<br>F2 Collateral<br>Account Collateral | CoreCo Common Stock<br>CoreCo Preferred Stock<br>New CoreCo Term Loans<br>FLNG 2 Term Loans<br>FLNG 2 Preferred Equity |
| R-2 Class | R-2 Revolving Credit Facility Debt | Common Collateral<br>F1 Collateral<br>F2 Collateral<br>Account Collateral<br>Brazil Collateral | CoreCo Common Stock<br>CoreCo Preferred Stock<br>New CoreCo Term Loans<br>FLNG 2 Term Loans<br>FLNG 2 Preferred Equity<br>RCF-2 / TLA BrazilCo Equity Pool |
| TLA Class | Term Loan A Debt | Common Collateral<br>F2 Collateral<br>Account Collateral<br>Brazil Collateral | CoreCo Common Stock<br>CoreCo Preferred Stock<br>New CoreCo Term Loans<br>FLNG 2 Term Loans<br>FLNG 2 Preferred Equity |

---

[1]    Note:  Collateral Pools exclude security and other interests in respect of Plan Debt which are not expected to be shown to provide any recovery to Plan Creditors in the Relevant Alternative Report.  Such excluded security and other interests include the Brazil 2L Lien and the Residual FLNG Proceeds Claims.

| Class | Plan Debt | Collateral Pool(s)[1] | Plan Consideration Instrument(s) |
|---|---|---|---|
| | | | RCF-2 / TLA BrazilCo Equity Pool |
| TLB Class | Term Loan B Debt | Common Collateral F1 Collateral F2 Collateral | CoreCo Common Stock CoreCo Preferred Stock New CoreCo Term Loans FLNG 2 Term Loans FLNG 2 Preferred Equity |
| 2029 New Notes Class | 2029 New Notes Debt | Brazil Collateral | BrazilCo Common Equity |

1.9    The Plan Companies have received indications of support for the Plans and the Restructuring from Plan Creditors holding, in aggregate, more than 75 per cent. in value of each proposed class of Plan Debt and approximately 97 per cent. of the Plan Debt by value.

1.10    Neither Plan constitutes a compromise or arrangement between the relevant Plan Company and holders of the GLP Preferred Units.  As such, claims under the GLP Preferred Units will not be Plan Debt for the purposes of the Plans, and holders of GLP Preferred Units will not be Plan Creditors.  The Plans do not affect the rights of the holders of GLP Preferred Units.

1.11    For more detail on the debt instruments to which the Plans relate, please refer to Section 3(A) (*The Group's Financing Arrangements Which are Subject to the Plans*) below.  The proposed compromise of the debt instruments is set out in detail at Section 1(C) (*Recapitalisation Transaction*) of Part 2 (*Summary of the Restructuring and the Recapitalisation Transaction (Including the Plans)*)) and the allocation of the Plan Consideration is as set out in the below tables.

1.12    The following table sets out allocations of base Plan Consideration, without any Early Consent Fee or Standstill Fee and prior to any elections (the "**Base Exchange Consideration Chart**"):

## Base Consideration Receivable by Stakeholders

- Represents allocations prior to Early Consent Fee and Standstill Fee
- The table below is prior to the CoreCo Preferred Stock for New CoreCo Term Loan exchange and CoreCo Preferred Stock cash out. The table also is also prior to any conversion of CoreCo Preferred Stock to Common Stock

| ($ in actuals) | New 2029s | TLB | TLA | R-1 RCF | R-2 RCF | Legacy 2026s | Legacy 2029s | Total To Lenders | Pref. Cash Election Buyer | Total To Lenders & Pref. Cash Election Buyer | Existing Equity |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Principal Claims [(1)] | $2,730,126,769.98 | $1,266,077,800.00 | $294,999,563.37 | $100,000,000.00 | $560,400,000.00 | $510,879,463.00 | $236,728,231.00 | $5,699,211,827.35 | | $5,699,211,827.35 | |
| **BrazilCo** | | | | | | | | | | | |
| BrazilCo Common Equity (%) | 94.2977% | - | - | - | - | - | - | 94.2977% | - | 94.2977% | - |
| RCF-2 / TLA BrazilCo Equity Pool | - | - | 1.9719% | - | 3.7305% | - | - | 5.7023% | - | 5.7023% | - |
| RCF-2 / TLA BrazilCo Cash Pool | - | - | - | - | - | - | - | - | - | - | - |
| **CoreCo** | | | | | | | | | | | |
| New CoreCo Term Loans | - | $313,094,462.12 | $17,500,000.00 | $27,662,978.52 | $156,034,559.36 | - | - | $514,292,000.00 | - | $514,292,000.00 | - |
| CoreCo Preferred Stock (Initial) | $973,824,550.04 | $698,372,912.27 | $125,104,942.51 | $54,393,677.87 | $345,226,895.54 | $178,438,630.25 | $83,907,200.66 | $2,459,268,809.15 | - | $2,459,268,809.15 | - |
| CoreCo Common Stock (%) | 25.7721% | 18.4046% | 3.3197% | 1.4337% | 9.1031% | 4.7390% | 2.2277% | 65.0000% | - | 65.0000% | 35.0000% |
| FLNG 2 Term Loans | - | $228,666,186.86 | $53,087,320.60 | $17,813,329.20 | $100,433,163.33 | - | - | $400,000,000.00 | - | $400,000,000.00 | - |
| FLNG 2 Preferred Equity | - | $114,333,093.43 | $26,543,660.30 | $8,906,664.60 | $50,216,581.67 | - | - | $200,000,000.00 | - | $200,000,000.00 | - |

1.13    The following table sets out allocations of Plan Consideration post-elections and assuming all Plan Creditors earn the Early Consent Fee and Standstill Fee as applicable (the "**Post-Elections**

**Exchange Consideration Chart**" and together with the Base Exchange Consideration Chart, the "**Exchange Consideration Charts**"):

## Aggregate Consideration Receivable by Stakeholders (Post-Elections)

- The table below shows the total consideration received by stakeholders and illustratively assumes 100% of stakeholders earn the Early Consent Fee and Standstill Fee as applicable
- The table below reflects the impact of the Equity-for-Debt Exchange Election, CoreCo Preferred Stock Cash Purchase Election, and the RCF- / TL BrazilCo Cash Pool election
- The table is prior to any conversion of CoreCo Preferred Stock to Common Stock

| ($ in actuals) | New 2029s | TLB | TLA | R-1 RCF | R-2 RCF | Legacy 2026s | Legacy 2029s | Total To Lenders | Pref. Cash Election Buyer | Total To Lenders & Pref. Cash Election Buyer | Existing Equity |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Principal Claims [1] | $2,730,126,769.98 | $1,266,077,800.00 | $294,999,563.37 | $100,000,000.00 | $560,400,000.00 | $510,879,463.00 | $236,728,231.00 | $5,699,211,827.35 | - | $5,699,211,827.35 | |
| **BrazilCo** | | | | | | | | | | | |
| BrazilCo Common Equity (%) | 99.9751% | - | - | - | - | - | - | 99.9751% | - | 99.9751% | - |
| RCF-2 / TLA BrazilCo Equity Pool | - | - | - | - | 0.0249% | - | - | 0.0249% | - | 0.0249% | - |
| RCF-2 / TLA BrazilCo Cash Pool | ($44,803,740) | - | $15,560,982 | - | $29,242,758 | - | - | - | - | - | - |
| **CoreCo** | | | | | | | | | | | |
| New CoreCo Term Loans | - | $313,094,462.12 | $17,500,000.00 | $45,412,975.78 | $195,313,987.97 | - | - | $571,321,425.87 | - | $571,321,425.87 | - |
| CoreCo Preferred Stock (Initial) | $1,009,290,895.36 | $720,762,870.61 | $130,007,321.46 | $24,074,371.42 | $292,537,316.26 | $185,590,420.06 | $87,243,438.68 | $2,449,506,634.05 | $6,671,940.08 | $2,456,178,574.13 | - |
| CoreCo Common Stock (%) | 26.7097% | 19.0742% | 3.4405% | 0.6371% | 7.7417% | 4.9114% | 2.3088% | 64.8234% | 0.1766% | 65.0000% | 35.0000% |
| FLNG 2 Term Loans | - | $228,666,186.86 | $53,087,320.60 | $17,813,329.20 | $100,433,163.33 | - | - | $400,000,000.00 | - | $400,000,000.00 | - |
| FLNG 2 Preferred Equity | - | $114,333,093.43 | $26,543,660.30 | $8,906,664.60 | $50,216,581.67 | - | - | $200,000,000.00 | - | $200,000,000.00 | - |

## 2    OVERVIEW OF THE BUSINESS

### (A)    NFE GLOBAL HOLDINGS LIMITED

2.1    NFE Global is a private company limited by shares incorporated in England and Wales under registered number 13679588 and with its registered office address at Suite 1, 7th Floor, 50 Broadway, London SW1H 0BL, United Kingdom.  NFE Global was incorporated on 14 October 2021.  NFE Global is a member of the Group, a direct wholly-owned subsidiary of NFE International Holdings Limited (a Bermudian company) and an indirect wholly-owned subsidiary of the Parent.  NFE Global has no material assets.

2.2    NFE Global is a guarantor in respect of the Corporate Debt.  The other guarantors of the Corporate Debt have existing rights of contribution against NFE Global in accordance with the Corporate Debt documents and the general law of guarantees.  Additionally, and to assist with the CoreCo Plan (in circumstances in which, absent it facing a contribution claim from the primary obligor, it may not be possible for a guarantor to bring about the release of a primary obligor through a restructuring plan promulgated by it), NFE Global entered into a deed of contribution prior to the date of this Explanatory Statement, pursuant to which the Parent has rights of contribution against NFE Global in connection with the CoreCo Plan Debt.  By virtue of the Parent's and other guarantors' rights of contribution, for NFE Global to effectively obtain a release or variation of the Plan Creditors' rights against it in respect of the CoreCo Plan Debt, there must be a corresponding release or variation of the CoreCo Plan Creditors' rights against the Parent and the other guarantors of the CoreCo Plan Debt.

### (B)    NFE BRAZIL NEWCO LIMITED

2.3    NFE Brazil Newco is a private company limited by shares incorporated in England and Wales under registered number 17141053 and with its registered office address at Suite 1, 7th Floor, 50 Broadway, London SW1H 0DB, United Kingdom.  NFE Brazil Newco was incorporated on 7 April 2026.  NFE Brazil Newco is a member of the Group, a direct wholly-owned subsidiary of NFE Financing LLC (a Delaware limited liability company) and an indirect wholly-owned subsidiary of the Parent.

2.4    NFE Brazil Newco was incorporated with the consent of the majority of the holders of the 2029 New Notes for the express purpose of promoting the BrazilCo Plan to enable the restructuring of the 2029 New Notes.  NFE Brazil Newco became a guarantor in respect of the obligations

under the 2029 New Notes on 9 April 2026.  The other guarantors of the 2029 New Notes have rights of contribution against NFE Brazil Newco in connection with the 2029 New Notes Debt in accordance with the Corporate Debt documents and the general law of guarantees. Additionally, and for the same reason as that identified in paragraph 2.2 above, NFE Brazil Newco has entered into a deed of contribution with NFE Financing prior to the date of this Explanatory Statement, pursuant to which NFE Financing has rights of contribution against NFE Brazil Newco.  By virtue of NFE Financing's and the other guarantors' rights of contribution, for NFE Brazil Newco to effectively obtain a release or variation of the Plan Creditors' rights against it in respect of the 2029 New Notes Debt, there must be a corresponding release or variation of the BrazilCo Plan Creditors' rights against NFE Financing and the other guarantors of the 2029 New Notes Debt.

2.5    These matters were brought to the attention of the Court at the Convening Hearing and it was explained that the steps described in paragraphs 2.2 and 2.4 above which were taken to satisfy certain requirements of Part 26A of the Act were taken in the interests of the Plan Creditors generally to facilitate the Plans.

**(C)    BUSINESS OF THE NFE GROUP**

2.6    The Group is a global energy infrastructure business.  The Group's business model spans the full liquefied natural gas ("**LNG**") value chain — from supply and liquefaction through its first-in-kind modular "Fast LNG" or "FLNG" units, to shipping via a fleet of floating storage and regasification units and LNG carriers, to downstream delivery through a network of terminals and power assets across the Americas, including facilities in Puerto Rico, Mexico, Brazil, and Nicaragua supported by long-term customer arrangements and power purchase agreements.

2.7    The Group delivers targeted energy solutions by employing an integrated LNG supply and delivery model summarised as follows:

    2.7.1    ***LNG and Natural Gas Supply and Liquefaction***:  the Group supplies LNG and natural gas regasified from LNG to its own power plants and to its customers.  The Group's first floating liquefaction unit, FLNG 1, began producing LNG in July 2024, and the Group sources a significant portion of its LNG needs from this facility.  Currently, demand for LNG above FLNG 1's capacity is acquired from third-party suppliers in open market purchases.

    2.7.2    ***Shipping***:  the Group leases, owns or operates a fleet of two floating storage and regasification units and five LNG carriers, two of which operate as additional floating storage units.  Six vessels are owned by Energos Infrastructure ("**Energos**"), and the Group also charters vessels to and from third parties.

    2.7.3    ***Facilities***:  through its network of current and planned downstream facilities and logistics assets, the Group is strategically positioned to deliver gas and power solutions to its customers seeking either to transition from environmentally dirtier distillate fuels such as automotive diesel oil and heavy fuel oil, or to purchase natural gas to meet their current fuel needs.

2.8    Additionally, the Group builds modular LNG manufacturing production facilities that can be deployed in various locations globally to liquify natural gas cheaply and efficiently.

2.9    As of 31 December 2025, the Parent had 596 full-time employees, and its wholly-owned subsidiary Genera PR LLC had 699 full-time employees.

**(D)      SHAREHOLDING STRUCTURE**

2.10     The Parent is a Delaware corporation and is the ultimate holding company of the Group.  As of 30 April 2026, the Parent had 285,634,650 shares of Class A common stock outstanding.  The Class A common stock is listed on the Nasdaq Global Select Market and carries voting rights.

2.11     A simplified Group structure chart showing the relationship between certain members of the Group is set out in Part A of Appendix 5 (*Simplified Group Structure Chart*) to this Explanatory Statement.   Part B of Appendix 5 (*Updated Group Structure Chart*) shows the anticipated corporate structure of the Group following the implementation of the Restructuring.

2.12     As of 31 December 2025, affiliates of certain entities controlled by Wesley R. Edens (co-founder, CEO and board member of the Parent), Randal A. Nardone (co-founder and board member of the Parent), and affiliates of Fortress Investment Group LLC owned an aggregate of approximately 92,230,509 shares of Class A common stock, representing approximately 32.8 per cent. of total voting power in respect of the Parent.  Also as of 31 December 2025, affiliates of Energy Transition Holdings LLC owned an aggregate of approximately 25,559,846 shares of Class A common stock, representing approximately 9.0 per cent. of total voting power.

2.13     Plan Creditors can obtain further information on the Group, including financial information, from the Group's investor relations website at https://ir.newfortressenergy.com/investor-relations.

**3        DEBT CAPITAL STRUCTURE OF THE GROUP**

3.1      The Group has a number of different sources of financial indebtedness, some (but not all) of which are to be compromised under the Plans.  The Group's debt that is subject to the Plans is described at paragraphs 3.2 to 3.44 below.  The Group's material debt that is not subject to the Plans is described in paragraphs 3.45 to 3.83 below.

**(A)      THE GROUP'S FINANCING ARRANGEMENTS WHICH ARE SUBJECT TO THE PLANS**

**Legacy Notes**

3.2      On 2 September 2020, the Parent issued $1 billion of 6.750% senior secured notes due 2025 in a private offering pursuant to Rule 144A under the Securities Act.  On 17 December 2020, the Parent issued $250 million of additional notes on the same terms and governed by the same indenture as the original 2025 notes (collectively, the "**2025 Notes**").  As a result of the transactions described below, no principal is outstanding under the 2025 Notes as of the date of this Explanatory Statement.

3.3      On 12 April 2021, the Parent issued $1.5 billion of 6.500% senior secured notes due 2026, of which approximately $511 million of principal is outstanding as at the date of this Explanatory Statement, in a private offering pursuant to Rule 144A under the Securities Act (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**2026 Legacy Notes**").  Interest on the 2026 Legacy Notes is payable semi-annually in arrears on 31 March and 30 September of each year, commencing on and from 30 September 2021; no principal payments on the 2026 Legacy Notes are due until their maturity on 30 September 2026.

3.4      On 8 March 2024, the Parent issued $750 million of 8.750% senior secured notes due 2029, of which approximately $237 million of principal is outstanding as at the date of this Explanatory Statement, in a private offering pursuant to Rule 144A under the Securities Act (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**2029 Legacy Notes**" and together with the 2026 Legacy Notes, the "**Legacy Notes**").  Interest

on the 2029 Legacy Notes is payable semi-annually in arrears on 15 March and 15 September of each year, commencing on and from 15 September 2024; no principal payments on the 2029 Legacy Notes are due until their maturity on 15 March 2029.  Each indenture (each a "**Legacy Notes Indenture**") pursuant to which the Legacy Notes were issued is governed by New York law.

3.5   In connection with the offering of the 2029 Legacy Notes, the Parent completed a cash tender offer to repurchase $375 million of the outstanding 2025 Notes, for an aggregate repurchase price of $376.9 million.  The tender offer was closed and the partial repurchase of the 2025 Notes was completed in March 2024.  The remainder of the outstanding 2025 Notes were repaid in full pursuant to the 2024 Refinancing Transactions (see paragraph 3.26 below).

3.6   The Legacy Notes are guaranteed by substantially all wholly-owned direct and indirect subsidiaries of the Parent other than:  (i) the FLNG 1 Guarantors and the FLNG 2 Guarantors and the subsidiaries of each; (ii) certain immaterial subsidiaries; (iii) NFE Financing, the Brazil Parent and the subsidiaries of each; and (iv) certain other immaterial exceptions (each, a "**Common Guarantor**" and collectively, the "**Common Guarantors**").  Each of the Parent and the Common Guarantors has granted security interests over all of its assets and property (subject to certain excluded assets) (the "**Common Collateral**") to secure the obligations under each respective Legacy Notes series.  The secured parties under each of the Legacy Notes have a first lien claim against the Common Collateral which ranks *pari passu* with the other Corporate Debt claims.

3.7   Pursuant to the 2024 Refinancing Transactions, recoveries (if any) to the Legacy Noteholders from any residual proceeds of assets of FLNG 1 or FLNG 2 after the discharge of the F1 Collateral or F2 Collateral (the "**Residual FLNG Proceeds Claims**") are contractually subordinated to the Series I Loan and Series II Loan.  The Residual FLNG Proceeds Claims are "out-of-the-money" claims in terms of the value of the assets in both the Relevant Alternative (which is described more fully at paragraph 3.5 of Part 2 (*Summary of the Restructuring and the Recapitalisation Transaction (Including the Plans)*) below and in the CoreCo Plan.

**Revolving Credit Facility**

3.8   On 15 April 2021, the Parent and certain of its wholly-owned direct and indirect subsidiaries entered into a New York law-governed credit agreement (such credit agreement, as amended, restated, amended and restated, supplemented or otherwise modified from time to time, being the "**Revolving Credit Facility Agreement**") providing for syndicated senior secured revolving credit facilities.  As at the date of this Explanatory Statement, the facilities advanced under the Revolving Credit Facility Agreement comprise:  (i) a facility drawn at approximately $100 million at the date of this Explanatory Statement (the "**R-1 Revolving Credit Facility**") and (ii) a facility drawn at approximately $560 million at the date of this Explanatory Statement (the "**R-2 Revolving Credit Facility**" and together with the R-1 Revolving Credit Facility, the "**Revolving Credit Facility**").

3.9   In 2022, the Revolving Credit Facility Agreement was amended twice to increase the total RCF Commitments by a total of $240 million, and in the year ended 31 December 2023, the Parent entered into additional amendments which increased the borrowing capacity by $510 million.  On 3 May 2024, the Revolving Credit Facility Agreement was amended to increase the total RCF Commitments by an additional $50 million, to $1 billion.  The amendments did not impact the interest rate or term of the Revolving Credit Facility, and no deferred costs were written off.  During the second quarter of 2024, the Parent drew the additional capacity on the Revolving Credit Facility, and $1 billion was outstanding as of 30 June 2024.

3.10   Pursuant to amendments to the Revolving Credit Facility Agreement entered into in connection with the 2024 Refinancing Transactions, the Revolving Credit Facility is currently comprised of two tranches:  (i) the R-1 Revolving Credit Facility, which has aggregate commitments of

$100 million with a stated maturity date of 15 April 2026 (the loans advanced under the R-1 Revolving Credit Facility, the "**R-1 Loans**"); and (ii) the R-2 Revolving Credit Facility, which has aggregate commitments of $900 million with a maturity date of the earliest to occur of (x) 15 October 2027 and (y) 91 days prior to the earliest of the maturity of each of the 2029 New Notes, the 2026 Legacy Notes, the Term Loan A Facility or certain other indebtedness for borrowed money of the Group with an aggregate principal amount greater than $100 million (the loans advanced under the R-2 Revolving Credit Facility, the "**R-2 Loans**").  Under the terms of the Revolving Credit Facility Agreement, on 30 September 2025 the aggregate commitments under the R-2 Revolving Credit Facility automatically reduced to $630 million.

3.11    The Revolving Credit Facility provides for a letter of credit facility pursuant to which letters of credit in an aggregate amount of approximately $70 million have been issued and are undrawn as at the date of this Explanatory Statement.  All letters of credit currently outstanding under the Revolving Credit Facility Agreement are expected to be backstopped, rolled into or replaced under the New CoreCo LC Facility or the New BrazilCo LC Facility, as applicable.

3.12    The obligations under the Revolving Credit Facility are:

    3.12.1    guaranteed by the Common Guarantors and secured by a first lien claim against the Common Collateral *pari passu* with the other Corporate Debt claims;

    3.12.2    guaranteed by the subsidiaries of the Parent that own and operate the FLNG 1 rigs (the "**FLNG 1 Guarantors**") and secured by certain natural gas liquefaction assets and other assets of the FLNG 1 Guarantors (the "**F1 Collateral**") on terms such that claims under the Revolving Credit Facility rank *pari passu* with claims under the Term Loan B Facility and the Letter of Credit Facility;

    3.12.3    guaranteed by the subsidiaries of the Parent that own FLNG 2 (the "**FLNG 2 Guarantors**") and secured by certain natural gas liquefaction assets and other assets of the FLNG 2 Guarantors (the "**F2 Collateral**") on terms such that claims under the Revolving Credit Facility rank *pari passu* with claims under the Term Loan B Facility, the Letter of Credit Facility and the Term Loan A Facility;

    3.12.4    in addition to the security and guarantees above, secured by:

        (i)    in respect of the R-2 Revolving Credit Facility only, the NFE Financing Collateral Assets pursuant to, and solely to the extent of, the Brazil $200m Pari Lien; and

        (ii)    in respect of the R-1 Revolving Credit Facility and R-2 Revolving Credit Facility, the NFE Financing Collateral Assets pursuant to, and solely to the extent of, the Brazil 2L Lien,

    the collateral described in (i) and (ii) including the limitations thereon relating to the Brazil $200m Pari Lien and the Brazil 2L Lien, being the "**Brazil Bank Collateral**"; and

    3.12.5    further secured by a security interest over certain of the Group's accounts *pari passu* with the holders of claims under the Letter of Credit Facility and the Term Loan A Facility (the "**Account Collateral**").

3.13    The Revolving Credit Facility Agreement contains usual and customary representations and warranties, affirmative and negative covenants, and events of default for a facility of its kind.

3.14    Under the Revolving Credit Facility Agreement the Parent is required to comply with certain financial maintenance covenants tested quarterly.

**Term Loan B Facility**

3.15    On 30 October 2023, the Parent and certain of its wholly-owned subsidiaries entered into a New York law-governed credit agreement (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, being the "**Term Loan B Agreement**") pursuant to which the lenders funded term loans in an initial aggregate principal amount of $856 million which was increased by $425 million following amendments to the Term Loan B Agreement dated 6 December 2024 and 3 March 2025, of which approximately $1,266 million of principal is outstanding as at the date of this Explanatory Statement (the "**Term Loan B Facility**") (the loans and other extensions of credit made under the Term Loan B Agreement being the "**Term Loan B**"). Initial borrowings under the Term Loan B Facility were issued at a discount, and the Parent received proceeds of $787.5 million. The initial proceeds from the Term Loan B Facility issuance were used to repay certain indebtedness and for working capital and other general corporate purposes. The Term Loan B Facility will mature on: (i) 30 October 2028, if the 2026 Legacy Notes are refinanced prior to their maturity; or (ii) 31 July 2026, if any of the 2026 Legacy Notes remain outstanding as of such date.

3.16    In March 2025, the Parent and certain of its wholly-owned subsidiaries entered into an amendment to the Term Loan B Agreement to, among other things, permit the incurrence of $425 million of incremental loans under the Term Loan B Facility (the original $150 million cap on incremental term loans was increased pursuant to the amendment) and the exchange of $847 million in term loans by participating lenders for new exchanged term loans, following which the Term Loan B Facility had $1.272 billion of aggregate outstanding term loans.

3.17    As of March 2025, the Term Loan B Facility bears interest at a per annum rate equal to, at the Parent's option, Term SOFR (as defined in the Term Loan B Agreement) plus 5.50 per cent. or the Base Rate (as defined in the Term Loan B Agreement) plus 4.50 per cent. Quarterly principal amortisation payments of approximately $2.1 million became payable from March 2024, increasing to $3.181 million on and from June 2025.

3.18    The obligations under the Term Loan B Facility are:

3.18.1    guaranteed by the Common Guarantors and secured by the Common Collateral;

3.18.2    guaranteed by the FLNG 1 Guarantors and secured by the F1 Collateral; and

3.18.3    guaranteed by the FLNG 2 Guarantors and secured by the F2 Collateral.

3.19    The Term Loan B Agreement contains usual and customary representations and warranties, affirmative and negative covenants, and events of default for a facility of its kind.

3.20    The Term Loan B Agreement does not contain any financial maintenance covenants.

**Term Loan A Facility**

3.21    On 19 July 2024, the Parent and certain of its wholly-owned subsidiaries entered into a New York law-governed credit agreement (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, being the "**Term Loan A Agreement**") pursuant to which the lenders party thereto committed to advance term loans from time to time in an initial aggregate principal amount of up to $700 million of which approximately $295 million of principal is outstanding as at the date of this Explanatory Statement (the "**Term Loan A Facility**") (the loans and other extensions of credit made under the Term Loan A Agreement being the "**Term Loan A**"). The term loans under the Term Loan A Facility were permitted to be made in multiple borrowings until 3 March 2025, when outstanding commitments were terminated. The proceeds from the Term Loan A Facility were used to fund project costs related to the development of FLNG 2. The initial borrowing under the Term Loan A Facility was

22

subject, among other things, to the achievement of LNG production at FLNG 1. The Term Loan A Facility will mature on the earliest of:  (i) 19 July 2027, or (ii) 60 days prior to the maturity date of the 2026 Legacy Notes if certain refinancing conditions have not been satisfied.  The Term Loan A Facility does not amortise.

3.22   As of March 2025, the Term Loan A Facility bears interest at a per annum rate equal to, at the Parent's option, Term SOFR (as defined in the Term Loan A Agreement) plus 6.70 per cent. or the Base Rate (as defined in the Term Loan A Agreement) plus 5.70 per cent.

3.23   The obligations under the Term Loan A Facility are:

   3.23.1   guaranteed by the Common Guarantors and secured by the Common Collateral;

   3.23.2   guaranteed by the FLNG 2 Guarantors and secured by the F2 Collateral;

   3.23.3   secured by the Brazil Bank Collateral; and

   3.23.4   secured by the Account Collateral.

3.24   The Term Loan A Agreement contains usual and customary representations and warranties, affirmative and negative covenants, and events of default for a facility of its kind.  The Term Loan A Agreement also contains certain representations and warranties and covenants that are specific to FLNG 2.

3.25   Under the Term Loan A Agreement the Parent is required to comply with certain financial maintenance covenants tested quarterly.

**2024 Refinancing Transactions and the 2029 New Notes**

3.26   On 6 November 2024, the Parent entered into an exchange and subscription agreement (the "**Exchange and Subscription Agreement**") with certain holders (the "**Supporting Holders**") of then outstanding Legacy Notes, which related to a series of transactions intended to extend the maturity profile of the Group's indebtedness and enhance liquidity.  Pursuant to the transactions, NFE Financing was interposed as a holding company for approximately 45 per cent. of the Group's Brazilian business and, on 22 November 2024, issued approximately $2.73 billion 12.000% senior secured notes due 2029 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**2029 New Notes**").  The proceeds of the 2029 New Notes were used to repay in full the 2025 Notes, to exchange a portion of the Legacy Notes, and for general corporate purposes (such transactions being the "**2024 Refinancing Transactions**").

3.27   The indenture pursuant to which the 2029 New Notes were issued is governed by New York law.

3.28   Pursuant to the Exchange and Subscription Agreement, upon consummation of the 2024 Refinancing Transactions, the Supporting Holders received a commitment fee equal to either: (i) 5 per cent. of the aggregate principal amount of such Supporting Holder's 2029 New Notes, payable in shares of Class A common stock of the Parent, at a price of $8.63 per share (the "**Commitment Fee Shares**"); (ii) 2 per cent. of the aggregate principal amount of such Supporting Holder's 2029 New Notes, payable in kind in the form of additional 2029 New Notes (the "**Commitment Fee Notes**"); or (iii) a combination of the foregoing.  The Parent issued 15,700,998 Commitment Fee Shares to the Supporting Holders in satisfaction of its commitment fee obligations under the Exchange and Subscription Agreement, and $5.4 million Commitment Fee Notes were issued and included in the total 2029 New Notes issuance.

3.29 Interest on the 2029 New Notes is payable semi-annually in arrears at a rate of 12.000 per cent. per annum on 15 May and 15 November of each year, beginning on 15 May 2025. The 2029 New Notes will mature on 15 November 2029, provided that the maturity date shall be accelerated to the date that is 91 days prior to the stated maturity date of any of the Parent's other indebtedness, subject to certain exceptions as described in the 2029 New Notes indenture, if more than $100 million aggregate principal amount of such other indebtedness remains outstanding on such date.

3.30 The 2029 New Notes are guaranteed by Bradford County and NFE Brazil Newco, and secured by first-ranking liens over the NFE Financing Collateral Assets (and such collateral that is subject to such first-ranking liens together with the Brazil $200m Pari Lien, the "**Brazil Collateral**").

3.31 The Brazil Collateral, the Common Collateral, the Account Collateral, the F1 Collateral and the F2 Collateral, together being the "**Collateral Pools**".

3.32 The 2029 New Notes indenture contains usual and customary affirmative and negative covenants and events of default for an instrument of its kind.

3.33 In conjunction with the 2024 Refinancing Transactions, the Supporting Holders agreed to consent to certain amendments to the Legacy Notes Indentures. These amendments permitted the Parent to subordinate the liens on any residual value from the F1 Collateral and F2 Collateral securing the obligations under each of the 2026 Legacy Notes and 2029 Legacy Notes to the liens on the same collateral securing certain intercompany loans due to NFE Financing, and to remove certain covenants and events of default (the "**Legacy Indenture Amendments**"). The adoption of the Legacy Indenture Amendments required the consent of holders of at least 66.67 per cent. of the outstanding principal amount of each of the 2026 Legacy Notes and 2029 Legacy Notes. The Parent received the required levels of consent and effected the Legacy Indenture Amendments by executing a supplemental indenture to each Legacy Notes Indenture. These supplemental indentures became effective on 5 December 2024.

**Series I Loan**

3.34 On 22 November 2024, Brazil Parent, as lender, and the Parent, as borrower, and certain of the Parent's subsidiaries, as guarantors, entered into a New York law-governed senior secured, credit agreement ("**Series I Loan Agreement**") drawn in an amount of approximately $970 million (such loans made under the Series I Loan Agreement being the "**Series I Loan**"). The Series I Loan bears interest at a cash rate of 16.5997 per cent. per annum, plus 2.00 per cent. interest being paid-in-kind, payable semi-annually in arrears on 15 May and 15 November of each year, beginning on 15 May 2025. The Series I Loan will mature on 15 November 2029 and will be payable in full on the maturity date.

3.35 The Series I Loan was funded using the proceeds of the Brazil Parent Intercompany Loan Facility (as described at paragraph 3.60 below).

3.36 The obligations under the Series I Loan Agreement are guaranteed by the Common Guarantors and are secured by the Common Collateral.

3.37 The Series I Loan Agreement contains usual and customary representations and warranties, affirmative and negative covenants, and events of default for a loan of its kind.

**Series II Loan**

3.38 On 6 December 2024, NFE Financing, as lender, the Parent, as borrower, and certain of the Parent's subsidiaries, as guarantors, entered into a New York law-governed senior secured term loan credit agreement ("**Series II Loan Agreement**") drawn in an amount of approximately

$1.43 billion (the loan made under the Series II Loan Agreement being the "**Series II Loan**" and together with the Series I Loan and the Brazil Parent Intercompany Loan, the "**2024 Intercompany Loans**") in connection with the 2024 Refinancing Transactions.  The proceeds of the Series II Loan were used by the Parent to consummate transactions contemplated by the Exchange and Subscription Agreement.  The Series II Loan bears interest at a cash rate of 13.665 per cent. per annum, plus 2.00 per cent. interest being paid-in-kind, payable semi-annually in arrears on 15 May and 15 November of each year, beginning on 15 May 2025.  The Series II Loan will mature on 15 November 2029 and is payable in full on the maturity date.

3.39   Pursuant to the terms of the 2024 Intercompany Loans, NFE Financing is the ultimate recipient of the proceeds from the Series I Loan and the Series II Loan and such proceeds form part of the NFE Financing Collateral Assets.  The R-2 Lenders, the TLA Lenders and the 2029 New Noteholders therefore have an indirect interest in the proceeds of the Series I Loan and the Series II Loan as part of the Brazil Collateral.

3.40   The obligations under the Series II Loan Agreement are guaranteed by the Common Guarantors and are secured by the Common Collateral.

3.41   The Series II Loan Agreement contains usual and customary representations and warranties, affirmative and negative covenants, and events of default for a loan of its kind.

**Security, ranking and priority**

3.42   The ranking of claims and security of the Group in respect of the various Plan Debt instruments and the Letter of Credit Facility obligations described above are regulated by:

3.42.1   an intercreditor agreement dated 12 April 2021 (as amended from time to time) (the "**Equal Priority Intercreditor Agreement**") in respect of the Corporate Debt;

3.42.2   an intercreditor agreement dated 6 December 2024 (the "**Brazil Parent ICA**") that regulates recoveries under the first priority liens in respect of the Brazil Collateral; and

3.42.3   an intercreditor agreement dated 22 November 2024 (the "**Brazil Junior ICA**") that establishes the priority of the first priority liens and the second priority liens in respect of the Brazil Collateral.

3.43   Under and subject to the terms of the Equal Priority Intercreditor Agreement, the RCF Agent has the exclusive right to direct enforcement of the Shared Collateral (as defined therein) once it becomes enforceable, if so directed by the RCF Lenders.

3.44   The collateral and priority arrangements under the Equal Priority Intercreditor Agreement, the Brazil Parent ICA and the Brazil Junior ICA can be summarised as follows:

| Collateral | Priority |
|---|---|
| Common Collateral | *Pari passu* **first lien claims** in respect of the:<br>• Legacy Notes Debt;<br>• Revolving Credit Facility Debt;<br>• Letter of Credit Facility Debt;<br>• Term Loan B Debt;<br>• Term Loan A Debt;<br>• Series I Loan Debt; and |

| Collateral | Priority |
|---|---|
| | • Series II Loan Debt. |
| F1 Collateral | *Pari passu* **first lien claims** in respect of the:<br>• Revolving Credit Facility Debt;<br>• Letter of Credit Facility Debt; and<br>• Term Loan B Debt. |
| F2 Collateral | *Pari passu* **first lien claims** in respect of the:<br>• Revolving Credit Facility Debt;<br>• Letter of Credit Facility Debt;<br>• Term Loan B Debt; and<br>• Term Loan A Debt. |
| Brazil Collateral | *Pari passu* **first lien claims** in respect of the:<br>• R-2 Revolving Credit Facility Debt, Letter of Credit Facility Debt and Term Loan A Debt, subject to an aggregate $200 million cap; and<br>• 2029 New Notes Debt.<br>*Pari passu* **second lien claims** in respect of the:<br>• Revolving Credit Facility Debt<br>• Letter of Credit Facility Debt; and<br>• Term Loan A Debt. |
| Account Collateral | *Pari passu* **first lien claims** in respect of the:<br>• Revolving Credit Facility Debt;<br>• Letter of Credit Facility Debt; and<br>• Term Loan A Debt. |

**(B)   THE GROUP'S FINANCING ARRANGEMENTS WHICH ARE NOT SUBJECT TO THE PLANS**

3.45   The sources of material financial indebtedness of the Group which are not to be compromised under the Plans include:

3.45.1   the Letter of Credit Facility;

3.45.2   the Brazil Bridge Term Loan Facility;

3.45.3   the Brazil Parent Intercompany Loan Facility;

3.45.4   the PortoCem Debentures;

3.45.5   the BNDES Term Loan;

3.45.6   the Brazil Financing Notes;

26

3.45.7   the EB-5 Loan;

3.45.8   the Turbine Sale-Leaseback; and

3.45.9   the Existing Intermediation Facility.

3.46   NFE Brazil Newco is neither a borrower nor a guarantor of any of the debt listed above.  NFE Global is only a guarantor of the Letter of Credit Facility.

**Letter of Credit Facility**

3.47   In July 2021, the Parent entered into an uncommitted letter of credit and reimbursement agreement (the "**Letter of Credit Agreement**") with a bank for the issuance of letters of credit for an aggregate amount of up to $75 million (the "**Letter of Credit Facility**").  Through 31 December 2023, the Letter of Credit Facility was amended multiple times to increase the availability to $350 million.  In 2025, the Letter of Credit Facility was amended multiple times to reduce the availability to $195 million.  As of 31 December 2025, the Parent had $195 million of letters of credit outstanding under the Letter of Credit Facility, none of which have been drawn.

3.48   The Letter of Credit Agreement was amended on 19 March 2026 to extend its maturity to 15 September 2026.  As of the date of this Explanatory Statement, the total limit of the Letter of Credit Facility is $195 million.

3.49   The obligations under the Letter of Credit Facility are:

3.49.1   guaranteed by the Common Guarantors and are secured by the Common Collateral;

3.49.2   guaranteed by the FLNG 1 Guarantors and are secured by the F1 Collateral;

3.49.3   guaranteed by the FLNG 2 Guarantors and are secured by the F2 Collateral;

3.49.4   secured by the Brazil Bank Collateral; and

3.49.5   secured by the Account Collateral.

3.50   The Letter of Credit Agreement contains usual and customary representations and warranties, affirmative and negative covenants, and events of default for a facility of its kind.

3.51   Under the Letter of Credit Agreement the Parent is required to comply with certain financial maintenance covenants tested quarterly.

3.52   The letters of credit provided under the Letter of Credit Facility will not be compromised under the Plans and do not form part of the Plan Debt. No letter of credit has been drawn and no amounts are owing by any member of the Group to any issuer of letters of credit issued under the Letter of Credit Facility, and this is not an obligation subject to compromise.  The Group has been renegotiating the terms of the Letter of Credit Facility on a bilateral basis, and the Parent is in advanced negotiations with its creditors to agree to the New CoreCo LC Facility, which is expected to be available on a fully committed basis by the Restructuring Effective Date. All letters of credit currently outstanding under the Revolving Credit Facility Agreement are expected to be rolled into or replaced under the New CoreCo LC Facility or the New BrazilCo LC Facility, as applicable.

**Brazil Bridge Term Loan Facility**

3.53   On 14 April 2026, the NFE Brazil entered into a bridge loan credit agreement (the "**Brazil Bridge Credit Agreement**") with Wilmington Savings Fund Society, FSB, as administrative

agent and collateral agent, and the lenders party thereto. The Brazil Bridge Credit Agreement provides for a senior secured, multiple draw term loan facility of $50 million (the "**Brazil Bridge Term Loan Facility**"). The Brazil Bridge Term Loan Facility matures on the earliest to occur of (a) the closing date of any refinancing of the Brazil Financing Notes, (b) the date on which the Restructuring Support Agreement is terminated with respect to members of the PW/PWP AHG, (c) the Restructuring Effective Date, or (d) 15 September 2026 (the "**Stated Maturity Date**", unless the Long-Stop Date (as defined in the Restructuring Support Agreement) is extended to either 14 December 2026 or 31 December 2026, in each case pursuant to the terms of the Restructuring Support Agreement, in which case the Stated Maturity Date shall be 14 December 2026 or 31 December 2026, as applicable.

3.54 The obligations under the Brazil Bridge Credit Agreement are secured by substantially all assets of NFE Brazil.

3.55 The Brazil Bridge Term Loan Facility bears interest at a rate of 10 per cent. paid-in-kind per annum, capitalised on the last business day of March, June, September and December of each year, commencing on the first such date to occur after the closing date of the Brazil Bridge Term Loan Facility.

3.56 NFE Brazil may prepay the Brazil Bridge Term Loan Facility at its option without premium or penalty at any time subject to customary conditions. In addition, NFE Brazil will be required to prepay the Brazil Bridge Term Loan Facility upon the occurrence of certain events (subject to certain premiums as applicable and set out in the Brazil Bridge Credit Agreement), including any change of control and the incurrence or issuance of indebtedness by NFE Brazil or any of its subsidiaries, subject to certain exceptions.

3.57 The Brazil Bridge Credit Agreement contains usual and customary representations and warranties, affirmative and negative covenants, and events of default for a facility of its kind.

3.58 The Brazil Bridge Credit Agreement is governed by New York law.

3.59 Liabilities arising under the Brazil Bridge Term Loan Facility are not an obligation of the Plan Companies and do not constitute Plan Debt. The Brazil Bridge Term Loan Facility was required to meet the urgent liquidity needs of the Brazilian business after the Restructuring Support Agreement was signed and pending completion of the Restructuring. The Brazil Bridge Term Loan Facility was provided on the basis that it would not be compromised by the Restructuring and it is anticipated that it will be refinanced by the New BrazilCo Notes on or prior to the Restructuring Effective Date.

**Brazil Parent Intercompany Loan Facility**

3.60 In connection with the 2024 Refinancing Transactions, on 22 November 2024 NFE Financing, as lender, entered into a New York law-governed credit agreement (such credit agreement, as amended from time to time, being the "**Brazil Parent Intercompany Loan Agreement**") with NFE Brazil Investments LLC (the "**Brazil Parent**"), as borrower, which provides for a senior secured term loan facility initially drawn in an amount of approximately $970 million ("**Brazil Parent Intercompany Loan Facility**") (the loans and other extensions of credit made under the Brazil Parent Intercompany Loan Facility being the "**Brazil Parent Intercompany Loan**"). The Brazil Parent Intercompany Loan matures on 15 November 2029. The stated maturity date will be accelerated to a date that is 91 days prior to the stated maturity date of any other indebtedness of the Parent or any of its subsidiaries for borrowed money (including indebtedness deemed issued in a debt exchange), excluding indebtedness under the Letter of Credit Facility, if more than $100 million in aggregate principal amount of such indebtedness remains outstanding at such time. The Brazil Parent Intercompany Loan bears interest at a cash rate of 16.5997 per cent. per annum, plus 2.00 per cent. interest being paid-in-kind, in each case

payable semi-annually in arrears on 15 May and 15 November of each year, beginning on 15 May 2025.

3.61    On 22 November 2024, Brazil Parent borrowed $875 million of the Brazil Parent Intercompany Loan; on 6 December 2024, Brazil Parent borrowed the remaining $95 million from the Brazil Parent Intercompany Loan Facility.  The proceeds of the Brazil Parent Intercompany Loan were used to fund the Series I Loan (as described above).

3.62    The Brazil Parent Intercompany Loan Agreement is secured by substantially all assets of Brazil Parent (including the Series I Loan and the approximately 55 per cent. equity interest in the Group's Brazilian business held by Brazil Parent).

3.63    The Brazil Parent Intercompany Loan Agreement contains usual and customary representations and warranties, affirmative and negative covenants, and events of default for a facility of its kind.

3.64    The obligations under the Brazil Parent Intercompany Loan Facility are not Plan Debt.  In connection with the Restructuring, the Brazil Parent Intercompany Loan Facility will be released in full or otherwise discharged.

**PortoCem Debentures**

3.65    In November 2024, one of the Group's Brazilian subsidiaries, Portocem Geração de Energia S.A. ("**PortoCem**"), issued R$4.5 billion ($817.875 million based on exchange rates in effect at 31 December 2025) of debentures ("**PortoCem Debentures**").  Borrowings bear interest at 9.15% per annum.  No principal or interest payments are due until September 2027; at that point, PortoCem will begin to make semi-annual payments until maturity in September 2040.  Proceeds received were utilised to repay a previously outstanding bridge loan, and the remaining proceeds are restricted to fund the construction of the PortoCem Power Plant.

3.66    The Group had approximately $849 million outstanding under the PortoCem Debentures as at 31 December 2025.

3.67    The PortoCem Debentures contain usual and customary representations and warranties, and usual and customary affirmative and negative covenants.

3.68    The PortoCem Debentures are not liabilities of the Plan Companies and do not constitute Plan Debt.  The Group has sought to negotiate with the relevant creditors on a bilateral basis in relation to the Restructuring.  On or before the Restructuring Effective Date, the PortoCem Debentures will, at the election of the Group and with the consent of the Majority PW/PWP AHG Members, be refinanced in full or remain outstanding on their existing terms, provided that any guarantees or obligations of the Parent or other CoreCo Group entities thereunder will be terminated.

**BNDES Term Loan**

3.69    In October 2023 the owner of the Barcarena Power Plant entered into a credit agreement with BNDES, the Brazilian Development Bank (the "**BNDES Credit Agreement**"). The Group is able to borrow up to $355.566 million under the BNDES Credit Agreement, segregated into three tranches based on the use of proceeds ("**BNDES Term Loan**"). Each tranche bears a different rate of interest ranging from 2.61 to 4.41 per cent. plus the fixed rate announced by BNDES per annum. Interest payments prior to April 2026 were made through an increase in the outstanding principal amount and are due quarterly thereafter. The BNDES Term Loan amortises from April 2026 until maturity in 2045. The outstanding balance on the BNDES Term Loan as at 31 December 2025 was $376.923 million.

3.70   The obligations under the BNDES Credit Agreement are guaranteed by certain indirect Brazilian subsidiaries that are constructing the Barcarena Power Plant, and are secured by the Barcarena Power Plant and receivables under the Barcarena Power Plant's power purchase agreements.  These Brazilian subsidiaries are required to comply with customary affirmative and negative covenants, and the BNDES Credit Agreement also provides for customary events of default, prepayment and cure provisions.

3.71   The BNDES Term Loan are not liabilities of the Plan Companies and do not constitute Plan Debt.  The Group has sought to negotiate with the relevant creditors on a bilateral basis in relation to the Restructuring.  On the Restructuring Effective Date, the BNDES Term Loan, will, at the election of the Group and with the consent of the Majority PW/PWP AHG Members, be refinanced in full or remain outstanding on its existing terms, provided that any guarantees or obligations of the Parent or other CoreCo Group entities thereunder will be terminated.

**Brazil Financing Notes**

3.72   In February 2025, one of the Parent's wholly-owned indirect subsidiaries, NFE Brazil Financing Limited ("**NFE Brazil Financing**") issued 15.00% Senior Secured Notes due 2029 (the "**Brazil Financing Notes**") in the aggregate principal amount of $350 million at a purchase price of 97.75 per cent. of par.  The Brazil Financing Notes mature on 30 August 2029; the principal is due in full on the maturity date.  Interest has been payable quarterly in arrears since 30 June 2025, and for the first 30 months that the Brazil Financing Notes are outstanding, so long as no event of default has occurred and is continuing, interest due can be paid-in-kind and added to the principal amount.  To date, interest has been paid-in-kind and added to the aggregate principal amount of the Brazil Financing Notes, such that the aggregate amount outstanding on the Brazil Financing Notes as at 30 June 2026 is expected to be approximately $426 million.

3.73   The Parent has provided a parent company guarantee of the Brazil Financing Notes to holders of the Brazil Financing Notes, and certain of NFE Brazil Financing's subsidiaries (namely, LNG Power Limited, NFE Power Brasil Participacoes S.A., NFE Power Latam Participacoes e Comercio Ltda., and Celba - Centrais Eletricas Barcarena S.A. (collectively, the "**NFE Brazil Financing Guarantors**")) have guaranteed the Brazil Financing Notes.

3.74   The Brazil Financing Notes are not liabilities of the Plan Companies and do not constitute Plan Debt.  The Group has sought to negotiate with the relevant creditors on a bilateral basis in relation to the Restructuring.  It is anticipated that the Brazil Financing Notes will be refinanced by the New BrazilCo Notes on or prior to the Restructuring Effective Date.

**EB-5 Loan**

3.75   In July 2023, ZeroPark I LLC ("**ZeroPark**"), a wholly-owned subsidiary of the Parent, entered into a loan agreement under the U.S. Citizenship and Immigration Service's EB-5 Program ("**EB-5 Loan Agreement**") to pay for the development and construction of a new green hydrogen facility in Texas.  The maximum aggregate principal amount available under the EB-5 Loan Agreement is $100 million, and outstanding borrowings bear interest at a fixed rate of 4.75 per cent. per annum.  The loan matures in five years from the initial advance with an option to extend the maturity by two one-year periods.

3.76   The loan is secured by land that would be the location of the Group's green hydrogen facility once developed, and the Parent has provided a guarantee of the obligations under the EB-5 Loan Agreement.  The EB-5 Loan Agreement has been drawn in an aggregate principal amount of $100 million (the "**EB-5 Loan**").

3.77   On 13 March 2026, the Parent and certain of its wholly-owned subsidiaries, including ZeroPark, entered into a term sheet (the "**EB-5 Term Sheet**") with a counterparty in respect of the EB-5

Loan Agreement that contemplates, among other things, the incurrence by the Parent of a new unsecured note in the aggregate principal amount of $22.5 million, with an interest rate of 7.00 per cent. per annum on a quarterly basis, with the option to pay interest in kind, which matures on 31 December 2029. After completion of the transactions contemplated by the EB-5 Term Sheet, the Group would no longer own the green hydrogen development project and, other than the new unsecured note, the Parent would be released from its obligations under the EB-5 Loan.

3.78    The EB-5 Loan Agreement contains usual and customary representations and warranties and affirmative and negative covenants for a facility of its kind.

3.79    The EB-5 Loan is not a liability of the Plan Companies and does not constitute Plan Debt. The Group has sought to negotiate with the relevant creditor on a bilateral basis in relation to the Restructuring. If the transactions contemplated under the EB-5 Term Sheet are consummated on or before the Restructuring Effective Date, the Group will have no ongoing liability in respect of the EB-5 Loan other than the unsecured note issued by the Parent. Otherwise, the EB-5 Loan will remain outstanding on its existing terms.

**Turbine Sale-Leaseback**

3.80    On 1 April 2026, certain members of the Group entered into an asset purchase agreement (the "**Turbine Purchase Agreement**") and master lease agreement (the "**Turbine Lease**"), pursuant to which the parties agreed to consummate a sale and leaseback transaction with respect to nine of the Turbines. On 1 April 2026, the Group completed the sale of these turbines. The Turbine Lease has a 10-year term, which is expected to begin on 1 July 2026. The Parent entered into a parent guarantee in respect of the lessee's obligations pursuant to the Turbine Lease (the "**Turbine Lease Guarantee**") and the Parent guarantees the seller's obligations pursuant to the Turbine Purchase Agreement.

**Existing Intermediation Facility**

3.81    On 11 June 2025, NFE North Trading LLC ("**NFE North**") a wholly-owned subsidiary of the Parent, and an intermediation facility provider (the "**Intermediation Facility Counterparty**") entered into a "Master LNG Sale and Purchase Agreement" (the "**Existing Intermediation Facility**") pursuant to which the parties agreed to enter into certain confirmation agreements to sell to and/ or purchase quantities of LNG from each other.

3.82    The Parent has provided a parent guarantee of the obligations of NFE North under the Existing Intermediation Facility in favour of the counterparty under the Intermediation Facility Counterparty.

3.83    The liabilities under the Existing Intermediation Facility are not liabilities of the Plan Companies and do not constitute Plan Debt. The Group has sought to negotiate with the relevant creditor on a bilateral basis in relation to the Restructuring. By the Restructuring Effective Date, the Existing Intermediation Facility is expected to be amended or refinanced.

**4       BACKGROUND TO THE GROUP'S FINANCIAL DIFFICULTIES**

**(A)     KEY PROJECTS**

4.1     The key projects and other key assets in operation or development for the Group include:

4.1.1   *San Juan Terminal*: a landed micro-fuel handling terminal located in the Port of San Juan, Puerto Rico, which has been fully operational since the third quarter of 2020 and supports the Group's significant arrangements with the Puerto Rico Electric Power Authority ("**PREPA**") (the "**San Juan Terminal**");

4.1.2   ***La Paz Facility***:  an LNG receiving facility located in the Port of Pichilingue in Baja California Sur, Mexico, which also supplies the Group's gas-fired 135 MW power plant located adjacent to the facility (the "**La Paz Facility**").  The La Paz Facility has been in commercial operation since the fourth quarter of 2021 and supports the Group's arrangements with CFEnergia ("**CFE**"), a subsidiary of Federal Electricity Commission (Comisión Federal de Electricidad);

4.1.3   ***Barcarena Terminal***:  an LNG receiving facility comprising a floating storage and regasification unit and associated infrastructure, including mooring and offshore and onshore pipelines, located in Pará, Brazil (the "**Barcarena Terminal**"), which supports a long-term gas supply agreement the Group has entered into with a subsidiary of Norsk Hydro ASA and will also supply gas to two natural gas-fired power plants that the Group is constructing adjacent to the Barcarena Terminal, the Barcarena Power Plant and the PortoCem Power Plant;

4.1.4   ***Santa Catarina Terminal***:  a facility, which was placed into service in the fourth quarter of 2024, located on the southern coast of Brazil (the "**Santa Catarina Terminal**").  It is in service and connected to Brazil's national gas grid;

4.1.5   ***Barcarena Power Plant***:  a natural gas-fired power plant that the Group is constructing adjacent to the Barcarena Terminal (the "**Barcarena Power Plant**"), which is fully contracted under multiple 25-year power purchase agreements to supply electricity to Brazil's national grid;

4.1.6   ***PortoCem Power Plant***:  the second natural gas-fired power plant that the Group is constructing adjacent to the Barcarena Terminal (the "**PortoCem Power Plant**");

4.1.7   ***Puerto Sandino Facility***:  the Group is developing an LNG receiving, transloading and regasification terminal in Puerto Sandino, Nicaragua (the "**Puerto Sandino Facility**"), which is in its final stages of construction, as well as a pipeline connecting the facility with the Group's nearby power plant, construction of which has already been completed.  In connection with this project, the Group has entered into a 25-year power purchase agreement with Nicaragua's electricity distribution companies;

4.1.8   ***FLNG***:  the Group developed a first-in-kind modular liquefaction unit –referred to as 'Fast LNG' or "**FLNG**" – to provide a source of low-cost LNG to customers which the Group believes is faster and more economical to construct than many traditional liquefaction solutions.  The Group's first FLNG unit ("**FLNG 1**"), comprised of three offshore fixed platforms and a floating storage unit, has been deployed 9 miles offshore of the coast of Altamira, Tamaulipas, Mexico, and was placed into service in the fourth quarter of 2024.  The Group also owns an uncompleted, second FLNG project ("**FLNG 2**"); and

4.1.9   ***Other assets***:  the Group has contracted to lease certain gas turbines (the "**Turbines**").

**(B)**   **FINANCIAL DIFFICULTIES**

4.2   The Group's business model historically required significant capital and operating expenditures to design, construct, procure and develop supply chain infrastructure and service its customer base in a timely manner.  In some instances, the Group could not recoup capital outlay and generate income from customers until after the completion of construction of LNG terminal infrastructure, storage facilities and power plants.  Moreover, most projects are completed in stages and are subject to risks of delay beyond the Group's control, including:  (i) the need for specialised oil and gas regulatory permits and governmental authorisations, bespoke design and engineering solutions, environmental or geological problems related to location; (ii) shortages or delays in the delivery of equipment and supplies; (iii) failure to meet technical specifications

or adjustments being required based on testing or commissioning; (iv) weather interference; and (v) potential labour shortages, work stoppages or labour union disputes.  Further, where the Group successfully develops a project and/or executes on a customer contract, it faces the risk that customers may not fulfil their payment obligations.   These risks are particularly pronounced in many of the non-U.S. jurisdictions in which the Group operates.  Due to these factors the Group has experienced time delays and cost overruns in a number of its development and construction projects.

4.3   The Group's liquidity position and ability to generate revenue from projects and customer contracts have been adversely impacted or delayed by the following:

4.3.1   unanticipated delays in the permitting, construction or commencement of operations of the San Juan Terminal, La Paz Facility, Santa Catarina Terminal and the Puerto Sandino Facility;

4.3.2   the development of a first-in-kind, offshore modular FLNG 1, which experienced permitting and construction delays, and equipment failures that ultimately delayed the commencement of commercial operations;

4.3.3   the Group has experienced a number of challenges in relation to its Puerto Rico business:

(i)   local authorities' decision to discontinue the allowance of ship-to-ship transfers of LNG within San Juan port necessitated the Group switching operational plans to less efficient and more costly means of delivery; and

(ii)   in 2023 the Group provided services to the U.S. Army Corps of Engineers to provide services in Puerto Rico in connection with the territory's grid stabilisation project.  The services were terminated in March 2024, following which the Group has been pursuing a request to the Federal Emergency Management Agency ("**FEMA**") for equitable adjustment to recover its unreimbursed costs and liabilities of approximately $659 million related to the early termination of services.  By April 2026, the Group had received final settlement payments in connection with work undertaken for FEMA in an amount of $142 million in total (before payment of certain taxes and costs).  This process has taken considerable time and not all costs could be recouped, which has impacted liquidity significantly;

4.3.4   delays to certain scheduled power auctions in Brazil;

4.3.5   the Group's margins have been adversely impacted by fluctuations in natural gas feedstock, increases in the costs of construction materials, and swings in the shipping and freight markets; and

4.3.6   the Group's proposed LNG terminal in Shannon, Ireland has faced delays due to significant environmental activist opposition and governmental permitting denials.

4.4   The challenges above delayed the commencement of revenue-generating operations for the affected projects and, collectively, had a material impact on the Group's liquidity.  The 2024 Refinancing Transactions (see paragraph 3.26 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement) improved near-term liquidity and addressed the maturities of the 2025 Notes.  However, many of the operational challenges described above have persisted since the 2024 Refinancing Transactions and continue to impact the Group's revenue-generation and its ability to service its indebtedness.

4.5     The liquidity challenges became critical in November 2025 by which point the Group had insufficient liquidity to make the following interest payments:

    4.5.1     $163.8 million of interest due on the 2029 New Notes on 15 November 2025;

    4.5.2     $13.1 million of interest due on the Revolving Credit Facility on 28 November 2025;

    4.5.3     $30.6 million of interest due on Term Loan B on 10 December 2025; and

    4.5.4     $1.6 million of interest due on Term Loan A on 10 December 2025.

4.6     The Group entered into short-term, rolling waivers and forbearances in respect of the interest payments with certain Plan Creditors to allow multilateral restructuring discussions to take place.  On 17 March 2026, the Parent, NFE Global and certain Plan Creditors entered into the Restructuring Support Agreement, which among other things and subject to conditions and termination rights, extended forbearances on interest payments and other events of default to allow the Plan Companies to launch and implement the Plans.  If the Plan Companies are unsuccessful or materially delayed in implementing the Plans, certain Plan Creditors will have the right to terminate the Restructuring Support Agreement, demand repayment and enforce rights in respect of the Plan Debt, including against the Plan Companies.  Given the complexity of the capital structure and the number of different Plan Debt instruments and creditor groups, the Plan Companies consider that it would be extremely challenging to negotiate further extensions to forbearances if the Restructuring Support Agreement terminated See section 3 (*Consequences if the Plans are Not Successful*) of Part 2 (*Summary of the Restructuring and the Recapitalisation Transaction (Including the Plans)*) for further detail on the consequences if the Plans are not successful.

4.7     The Group has very significant financial liabilities, including over $6 billion of Plan Debt owed to third parties.  If the Plans are not sanctioned and the Restructuring is not implemented, there is substantial doubt as to the Group's ability to continue as a going concern.  If Plan Creditors demanded the unpaid interest on Plan Debt from the Group, the Plan Companies would not have sufficient liquidity to meet the demands.  In the Relevant Alternative, recoveries from the Group's assets would be insufficient to meet the financial liabilities under the Plan Debt in full.  In order to resolve the very significant cash flow and balance sheet issues, there is an urgent need for a material balance sheet restructuring to convert a large proportion of Plan Debt into equity or preferred equity.

4.8     The purpose of the Restructuring is to provide the CoreCo Group and BrazilCo Group with the necessary liquidity and capital to complete and capitalise on their development projects and explore opportunities by reducing their debt service burden, allowing new money financing and aligning each of the CoreCo Group's and BrazilCo Group's capital structures with their respective revised expectations for revenue. Following the Restructuring, the CoreCo Group will consider and evaluate further opportunistic strategies that seek to optimise the value of its portfolio, which may include the sale of CoreCo Group assets, capital raising transactions or other strategic transactions. However, there are inherent uncertainties regarding the ability of CoreCo Group to effect any such transactions, and substantial risks relating to the ability of the CoreCo Group to realise the anticipated benefits of pursuing one or more of these strategies.

**(C)     SUPPORT FOR THE PLANS:  RESTRUCTURING SUPPORT AGREEMENT**

4.9     Each Plan Creditor who is a party to the Restructuring Support Agreement agrees, subject to certain qualifications and limitations, to support the implementation of the Plans and the Restructuring and, among other things, has agreed:

4.9.1 to use commercially reasonable efforts to support, facilitate, implement, consummate or otherwise give effect to the Restructuring and the Plans including voting in favour of the Plans at each relevant Plan Meeting;

4.9.2 not to take any action, a substantial purpose of which is to object to or interfere with, impede, obstruct, hinder or materially delay the implementation or consummation of the Restructuring or the Plans;

4.9.3 not to sell their interests in the Plan Debt to any party who is not party to the Restructuring Support Agreement as a Supporting Creditor or who does not agree to become a party to the Restructuring Support Agreement as a Supporting Creditor; and

4.9.4 to forbear from exercising certain rights or remedies it may have against any member of the Group in respect of any Plan Debt.

4.10 The Restructuring Support Agreement may be terminated by the Parent and/or the Supporting Creditors, as applicable, upon the occurrence of specified events defined in the Restructuring Support Agreement, including, without limitation, if (1) a material, uncured breach of certain parties' representations, warranties, covenants, or obligations under the Restructuring Support Agreement occurs, (2) any of the conditions to the closing of the Restructuring (including the process "milestones" prescribed in the Restructuring Support Agreement) is not satisfied or waived in a timely manner or by applicable deadlines, (3) certain issued letters of credit are drawn or (4) the Restructuring has not completed by 15 September 2026 (which date may be automatically extended by up to 90 calendar days in certain circumstances and further extended with the consent of certain parties in accordance with the terms of the Restructuring Support Agreement through to 31 December 2026). In addition, the Parent may terminate the Restructuring Support Agreement if the Parent's board of directors determines, upon the advice of its legal advisors, that the Parent's continued performance under the Restructuring Support Agreement would be inconsistent with the fiduciary duties of the Parent's directors.

4.11 Recognising the urgency of the situation, as of 7 May 2026, the Restructuring Support Agreement has been signed or supported by 778 creditors representing, on a reconciled basis:

4.11.1 100.0 per cent. by value of the R-1 Revolving Credit Facility Debt;

4.11.2 99.9 per cent. by value of the R-2 Revolving Credit Facility Debt;

4.11.3 97.1 per cent. by value of the Term Loan B Debt;

4.11.4 100.0 per cent. by value of the Term Loan A Debt;

4.11.5 84.6 per cent. by value of the 2026 Legacy Notes Debt;

4.11.6 87.2 per cent. by value of the 2029 Legacy Notes Debt;

4.11.7 100.0 per cent. by value of the Series I Loan Debt;

4.11.8 100.0 per cent. by value of the Series II Loan Debt; and

4.11.9 99.1 per cent. by value of the 2029 New Notes Debt.

4.12 Wesley R. Edens, who holds 37 per cent. of the Term Loan A Debt, has indicated his support for the Plans.

4.13 The Restructuring Support Agreement has been notified and made available:

4.13.1   to all Plan Creditors via the Information Agent posting it on the Plan Website and by distributing it to Plan Creditors directly or via their respective agents, trustees and legal representatives;

4.13.2   to the 2026 Legacy Noteholders, 2029 Legacy Noteholders and 2029 New Noteholders, by publishing an announcement of its availability to Plan Creditors via DTC; and

4.13.3   to all Plan Creditors generally by issuing an announcement of its availability through a press release and filing a Form 8-K with the SEC.

4.14   Plan Creditors who have not yet signed up to the Restructuring Support Agreement may still do so.

**Early Consent Fee**

4.15   Under the terms of the Restructuring Support Agreement, each eligible Supporting Creditor that was a party to the Restructuring Support Agreement as at 5.00 p.m. (New York time) on 8 April 2026 (the "**Early Consent Deadline**", as originally extended from 31 March 2026) (or, in accordance with the Restructuring Support Agreement, becomes a Supporting Creditor after the Early Consent Deadline by acquiring Plan Debt that is eligible for the Early Consent Fee) will be entitled to a fee (the "**Early Consent Fee**") equal to 0.75 per cent. of the principal amount of such Supporting Creditors' *pro rata* claim, as at the Record Time, in:

4.15.1   the principal outstanding under the 2026 Legacy Notes for holders of the 2026 Legacy Notes;

4.15.2   the principal outstanding under the 2029 Legacy Notes for holders of the 2029 Legacy Notes;

4.15.3   the principal outstanding under Term Loan B for TLB Lenders;

4.15.4   the principal outstanding under the R-1 Revolving Credit Facility for R-1 Lenders;

4.15.5   for R-2 Lenders:  (i) the principal outstanding under the R-2 Revolving Credit Facility, plus (ii) the portion of the principal outstanding under the Series I Loan and the Series II Loan that is equivalent to their *pro rata* share of the Brazil Collateral pursuant to the Brazil Parent ICA;

4.15.6   for TLA Lenders:  (i) the principal outstanding under the Term Loan A, plus (ii) the portion of the principal outstanding under the Series I Loan and the Series II Loan that is equivalent to their *pro rata* share of the Brazil Collateral pursuant to the Brazil Parent ICA; and

4.15.7   for 2029 New Noteholders, the portion of the principal outstanding under the Series I Loan and the Series II Loan that is equivalent to their *pro rata* share of the Brazil Collateral pursuant to the Brazil Parent ICA.

4.16   The Early Consent Fee will be paid in the form of CoreCo Preferred Stock on the Restructuring Effective Date if the relevant conditions are satisfied.  NFE Global believes that the Early Consent Fee is in line with market rates for such fees and is a reasonable fee for the benefit to the Group of having a significant number of Supporting Creditors in each class of Plan Debt committed to the Restructuring pursuant to the Restructuring Support Agreement before launching the Plans.  Payment of the Early Consent Fee in the form of CoreCo Preferred Stock is appropriate because it preserves the liquidity of the Group and is a form of Plan Consideration payable to all Plan Creditors under the Recapitalisation Transaction (including to 2029 New

Noteholders through their interests in the Series I Loan and the Series II Loan, as described at paragraph 3.39 of Part 1 (*Background to and Reasons for the Plans*) above.

**Standstill Fee**

4.17    The Parent has agreed to pay a fee (the "**Standstill Fee**") to each RCF Lender that agreed in writing to forbear in an amount equal to 2.0 per cent. of the Revolving Credit Facility Debt held by such RCF Lender in consideration for such forbearance until the Plans become effective (or the Plan Companies cease to pursue the Plans).    Under the terms of the Equal Priority Intercreditor Agreement, the RCF Agent has the exclusive right to enforce the Common Collateral, the F1 Collateral, the F2 Collateral and the Account Collateral for an initial period of time and may impose a standstill on other secured parties holding the Corporate Debt during this time.    The Standstill Fee will be paid in the form of New CoreCo Term Loans on the Restructuring Effective Date or will become a payment obligation of the Parent on the termination of the Restructuring Support Agreement.    The Plan Companies believe that the Standstill Fee is in line with market rates for such fees and is a reasonable fee to ensure that no secured creditor takes enforcement action with respect to the Collateral Pools while the Plan Companies promulgate the Plans.

**(D)    ENGAGEMENT WITH OTHER PLAN CREDITORS**

4.18    In the period prior to executing the Restructuring Support Agreement, the Plan Companies and members of the Group engaged in over eight months of extensive negotiations with organised *ad hoc* groups and steering committees of Plan Creditors and their advisors, who together held approximately 97 per cent. of the Plan Debt.    The Plan Companies have not received objections or indications of opposition from any Plan Creditor and are not expecting to seek a cross-class cramdown pursuant to section 901G of the Act.

**PART 2: SUMMARY OF THE RESTRUCTURING AND THE RECAPITALISATION TRANSACTION (INCLUDING THE PLANS)**

**This section contains a brief overview of the Restructuring, the Recapitalisation Transaction and the Plans. The summary information contained herein does not purport to be complete and should be read in conjunction with, and is qualified in its entirety by reference to, the more detailed information presented elsewhere in this Explanatory Statement, including, without limitation, the Plans appended at Appendix 1 (*The Plans*) and the Key Implementation Documents appended at Appendix 8 (*Key Implementation Documents*). Any summary information contained in this Explanatory Statement is qualified in its entirety by reference to the Plans and the Implementation Documents.**

**1      OVERVIEW OF THE RESTRUCTURING**

**(A)      OBJECTIVES OF THE PLANS**

1.1      The purposes and objectives of the Plans are to:

      1.1.1      restructure the Plan Companies' and the Group's balance sheets;

      1.1.2      address approaching maturities under the Plan Debt and replace existing debt with new debt and preferred equity finance arrangements that provide the Group and the Plan Companies with a sustainable capital structure;

      1.1.3      enable access to new money financing to address each of the CoreCo Group's and the BrazilCo Group's near- to medium-term liquidity needs, to the extent required; and

      1.1.4      facilitate the holistic restructuring of the Group, including the BrazilCo Separation, pursuant to the Restructuring.

1.2      The Plans will:

      1.2.1      with effect from the Plan Effective Date, authorise the Plan Companies to implement the Recapitalisation Transaction in accordance with the Plans (subject to the satisfaction or waiver of certain conditions precedent set out in the Transaction Implementation Deed);

      1.2.2      grant authority on behalf of the Plan Creditors to the Plan Companies to execute the documents required to implement the transactions contemplated by the Plans to which the Plan Creditors (or certain of them) are party in their capacity as Plan Creditors, including (without limitation):

            (i)      the Transaction Implementation Deed;

            (ii)      the New CoreCo Credit Agreement;

            (iii)      the FLNG 2 Term Loan Credit Facility Agreement;

            (iv)      the CoreCo Intercreditor Agreement;

            (v)      the CoreCo Registration Rights Agreement;

            (vi)      the New BrazilCo Governance Documents;

            (vii)      the FLNG 2 Parent LLCA;

            (viii)      the Holding Period Trust Deed; and

38

(ix)     all other documents, agreements and instruments to which the Plan Creditors are party in their capacity as Plan Creditors necessary or desirable to implement or consummate the Restructuring in accordance with the Restructuring Support Agreement, the Plans and the Transaction Implementation Deed,

(together with the other documents, agreements and instruments necessary or desirable to implement the Restructuring, the "**Key Implementation Documents**"); and

1.2.3    set out the order in which the steps required to implement the Recapitalisation Transaction will take place.

1.3    The primary Implementation Documents that the Plan Companies currently expect to be executed on the Restructuring Effective Date are appended at Appendix 8 (*Key Implementation Documents*) and available to Plan Creditors via the Plan Website.

1.4    Following the implementation of the Restructuring, the Plan Companies expect that any new financing, combined with cash generated from the Group's operations, releases of claims under the Plans and the deleveraging effected by the Recapitalisation Transaction, will be sufficient to enable the Plan Companies and the wider Group to continue operations in light of the Group's ongoing commitments to its stakeholders, including creditors, customers, suppliers, joint venture partners, business partners and employees.

**(B)    OVERVIEW OF THE RESTRUCTURING**

1.5    The Restructuring comprises the following steps:

1.5.1    the Group will be separated into two separate, standalone businesses:

(i)     a business comprising New BrazilCo Parent and its direct and indirect subsidiaries, comprising the Group's Brazilian business, and Bradford County (the "**BrazilCo Group**"); and

(ii)    a business comprising the Parent and its direct and indirect subsidiaries other than the BrazilCo Group (the "**CoreCo Group**");

1.5.2    the Plan Creditors shall release their existing claims against the Group in return for their allocation of Plan Consideration as set out in the Exchange Consideration Charts;

1.5.3    the Parent, as borrower, and each other CoreCo Group entity, as a guarantor, will enter into a senior secured term loan credit facility for the CoreCo Group (described further below);

1.5.4    all letters of credit issued under the existing Letter of Credit Facility or Revolving Credit Facility are expected to be backstopped, rolled into or replaced under separate new letter of credit facilities for each of the CoreCo Group and the BrazilCo Group (or, in the case of the CoreCo Group, backstopped, rolled into or remain outstanding under an amended, amended and restated, or otherwise modified Letter of Credit Agreement);

1.5.5    the Local Brazilian Debt Facilities are expected to be refinanced in full or remain outstanding on their existing terms with the consent of the creditors thereto (subject to the release of the Parent corporate guarantee and any other obligations tied to the CoreCo Group) as described further at paragraphs 3.65 to 3.74 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement;

1.5.6    the Brazil Parent Intercompany Loan Facility will be terminated and the Brazil Parent Intercompany Debt will be released in full or otherwise discharged;

1.5.7   the Existing NFE Stockholders will retain shares of the Parent's Class A common stock representing 35.0 per cent. of the CoreCo Common Stock issued and outstanding as of the Restructuring Effective Date, immediately before giving effect to the CoreCo MIP and before the conversion of CoreCo Preferred Stock into CoreCo Common Stock (which will automatically convert into 87 per cent. of *pro forma* CoreCo Common Stock on the third anniversary of their issue, and subject to a pro rata reduction in amount of converted CoreCo Common Stock issued relative to the amount of CoreCo Preferred Stock redeemed prior to that date) (as discussed at paragraph 2.43 of this Part 2;

1.5.8   certain management and employee incentive plans shall be adopted as set out in more detail at paragraphs 2.46 to 2.49 of this Part 2;

1.5.9   to the extent required to satisfy the Minimum Liquidity Condition on the Restructuring Effective Date, the Parent will raise additional debt finance as described in more detail at paragraphs 2.38 to 2.42 of this Part 2; and

1.5.10   the BrazilCo Group are expected to enter into the New BrazilCo Notes and the New BrazilCo LC Facility as described in more detail at paragraph 2.35 to 2.36 of this Part 2,

in each case on the terms and subject to the conditions set out in the Restructuring Support Agreement, including the Restructuring Term Sheet and the appendices and exhibits thereto (together, the "**Restructuring**").

## (C)   RECAPITALISATION TRANSACTION

1.6   The Recapitalisation Transaction provides that:

1.6.1   pursuant to the CoreCo Plan and as set out in the Exchange Consideration Charts, on the Restructuring Effective Date:

(i)   *Series I Loan and Series II Loan*:  all claims under or in connection with the Series I Loan Debt and Series II Loan Debt will be released in full in exchange, on a pro rata basis, for CoreCo Preferred Stock and CoreCo Common Stock. The Plan Creditors in respect of the Series I Loan Debt and Series II Loan Debt are the Brazil Parent and NFE Financing, respectively.  By virtue of the Brazil Parent Intercompany Loan, the proceeds of the Series I Loan Debt would ultimately be payable to NFE Financing and, alongside proceeds of the Series II Loan Debt, would form part of the Brazil Collateral.  The Series I Lender and the Series II Lender will vote at the Plan Meeting in respect of the Series I Loan Debt and the Series II Loan Debt in accordance with voting direction by the 2029 New Noteholders in accordance with the instruments under the 2029 New Notes Debt.  For efficiency, Plan Consideration in respect of the Series I Loan Debt and Series II Loan Debt will be distributed directly to those Plan Creditors with recourse to the Brazil Collateral (in addition to any other Plan Consideration received by such Plan Creditors);

(ii)   *Legacy Notes*:  all claims under or in connection with the 2026 Legacy Notes Debt and the 2029 Legacy Notes Debt will be released in full in exchange, on a *pro rata* basis, for CoreCo Preferred Stock and CoreCo Common Stock;

(iii)   *Revolving Credit Facility*:  the Revolving Credit Facility Agreement, all claims under the Revolving Credit Facility Debt and all RCF Commitments will be terminated and released in full in exchange, on a *pro rata* basis, as follows (and all letters of credit currently outstanding under the Revolving Credit Facility

40

Agreement are expected to be backstopped, rolled into a new facility or replaced):

(A)     each R-1 Lender will exchange its R-1 Revolving Credit Facility Debt for its *pro rata* share of the $475 million New CoreCo Term Loans, CoreCo Preferred Stock, CoreCo Common Stock, FLNG 2 Term Loans and FLNG 2 Preferred Equity to be distributed to R-1 Lenders;

(B)     each R-2 Lender will exchange its R-2 Revolving Credit Facility Debt for its *pro rata* share of: (i) the $475 million New CoreCo Term Loans, CoreCo Preferred Stock, CoreCo Common Stock, FLNG 2 Term Loans and FLNG 2 Preferred Equity to be distributed to R-2 Lenders and (ii) the RCF-2 / TLA BrazilCo Equity Pool; and

(C)     each RCF Lender will be entitled to receive its *pro rata* share of incremental New CoreCo Term Loans in an aggregate principal amount of $35 million (such incremental New CoreCo Term Loans, together with any incremental New CoreCo Term Loans incurred pursuant to sub-paragraph (C) of paragraph (iv) below, the "**Incremental New CoreCo Term Loans**");

(iv)    *Term Loan A Facility*:  all claims under or in connection with the Term Loan A Debt will be released in full in exchange for:

(A)     each TLA Lender's *pro rata* share of CoreCo Preferred Stock, CoreCo Common Stock, FLNG 2 Term Loans and FLNG 2 Preferred Equity to be distributed to TLA Lenders, in each case, as set out in the Exchange Consideration Charts;

(B)     each TLA Lender's *pro rata* share of the RCF-2 / TLA BrazilCo Equity Pool; and

(C)     each TLA Lender's *pro rata* share of Incremental New CoreCo Term Loans in an aggregate principal amount of $17.5 million; and

(v)     *Term Loan B Facility*:  all claims under or in connection with the Term Loan B Debt will be released in full in exchange on a pro rata basis, for its share of the $475 million New CoreCo Term Loans, CoreCo Preferred Stock, CoreCo Common Stock, FLNG 2 Term Loans and FLNG 2 Preferred Equity;

1.6.2   pursuant to the BrazilCo Plan, on the Restructuring Effective Date:

(i)     *2029 New Notes*:  all claims under or in connection with the 2029 New Notes Debt will be released in full in exchange, on a *pro rata* basis, for BrazilCo Common Equity to be distributed to holders of 2029 New Notes as set out in the Exchange Consideration Charts; and

1.6.3   eligible Plan Creditors will receive the Early Consent Fee, and/ or the Standstill Fee, as described at paragraphs 4.15 to 4.17 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement,

(together, the "**Recapitalisation Transaction**").

41

**(D)  ELECTIONS**

1.7  A number of the RCF Lenders and TLA Lenders are regulated banks and the effect of certain banking regulation and capital adequacy rules is that it may be more costly for such Plan Creditors to hold Equity Plan Consideration compared with Debt Plan Consideration.  The Plan Companies and certain creditors offered the TLA Lenders and RCF Lenders a discounted exchange of certain instruments, to be exercised by the Election Deadline.  The Election Deadline has passed, with all TLA Lenders and all RCF Lenders submitting elections (other than one RCF Lender holding less than one per cent. of the Revolving Credit Facility Debt who chose not to submit an election).

1.8  The terms of the elections are that:

1.8.1  each RCF Lender can exchange all or, subject to the terms of the Restructuring Support Agreement, a portion of its shares of CoreCo Preferred Stock (and a proportionate number of shares of CoreCo Common Stock) for the right to receive incremental New CoreCo Term Loans at a rate of 50.0 per cent. of the liquidation preference of the CoreCo Preferred Stock, up to a cap (the "**Equity-for-Debt Exchange Election**") (any shares of CoreCo Preferred Stock in respect of which Equity-for-Debt Exchange Elections are exercised, the "**Equity-for-Debt Exchanged Preferred Shares**" and any incremental New CoreCo Term Loans incurred, the "**Incremental Equity-for-Debt Exchange Election New CoreCo Term Loans**");

1.8.2  each R-2 Lender can receive its *pro rata* share of the RCF-2 / TLA BrazilCo Cash Pool *in lieu* of its *pro rata* share of the RCF-2 / TLA BrazilCo Equity Pool (the "**BrazilCo Cash Pool Election**");

1.8.3  each TLA Lender can receive its *pro rata* share of the RCF-2 / TLA BrazilCo Cash Pool *in lieu* of its *pro rata* share of the RCF-2 / TLA BrazilCo Equity Pool; and

1.8.4  certain Management Investors and such other investors as may be selected by the Management Investors, have offered to purchase from RCF Lenders and TLA Lenders the shares of CoreCo Preferred Stock allocated to such holders (and a proportional number of shares of CoreCo Common Stock) for a cash purchase price of 25.0 per cent. of the liquidation preference of the CoreCo Preferred Stock, up to a cap (the "**CoreCo Preferred Stock Cash Purchase Election**").  Each RCF Lender and TLA Lender could elect to participate in the CoreCo Preferred Stock Cash Purchase Election.

1.9  Each Plan Creditor that did not participate in either the Equity-for-Debt Exchange Election or the CoreCo Preferred Stock Cash Purchase Election and is entitled to receive CoreCo Preferred Stock pursuant to the Plans (an "**Eligible Non-Exchanging Creditor**") is entitled to receive its pro rata share of an incremental number of shares of CoreCo Preferred Stock equal to one-half the aggregate number of Equity-for-Debt Exchanged Preferred Shares.

1.10  The reallocation of the CoreCo Preferred Stock will be made based on each Eligible Non-Exchanging Creditor's CoreCo Preferred Stock holdings after taking into consideration pro forma adjustments for the Equity-for-Debt Exchange Election and the CoreCo Preferred Stock Cash Purchase Election.

1.11  CoreCo Common Stock held by Plan Creditors that make the Equity-for-Debt Exchange Election will be adjusted on a pro rata basis.

1.12  The results of the elections are as set out below by reference to the percentages by value of the Relevant Plan Debt and the allocation of the Plan Consideration as a result of the elections is set out in the Post-Elections Exchange Consideration Chart:

| Election | Yes | No |
|---|---|---|
| Equity-for-Debt Exchange Election | 38% | 62% |
| BrazilCo Cash Pool Election | 99.56% | 0.44% |
| CoreCo Preferred Stock Cash Purchase Election | 2% | 98% |

**(E)    TERMS OF THE PLANS**

1.13   The terms of the Key Implementation Documents and equity instruments issued as Plan Consideration are summarised in Part 3 of this Explanatory Statement.

1.14   The Plans (appended in their proposed final form at Appendix 1 (*The Plans*)) will also provide for the following elements of the Recapitalisation Transaction:

1.14.1   granting authority to the Plan Companies to execute the Implementation Documents to which the Plan Creditors are party via power of attorney on behalf of each Plan Creditor and to notarise such documents on behalf of each Plan Creditor where relevant;

1.14.2   a standstill from the Plan Effective Date until the Restructuring Effective Date, pursuant to which Plan Creditors will be restrained from enforcing their rights against the Plan Companies or the Obligors under the Debt Documents or taking any steps which would, or would reasonably be expected to, impede, delay or frustrate the implementation of the transactions contemplated by the Plans; and

1.14.3   the releases and waivers summarised in paragraph 8 of Part 4 (*Certain Legal Aspects of the Plans*) of this Explanatory Statement to be effective on the Restructuring Effective Date and a prohibition on the commencement or continuation, or instruction, direction, or authorisation of any other person to commence or continue, any Proceedings against any Released Party in respect of actions ratified or the waivers, releases and discharges granted under the Plans.

1.15   The Plans shall terminate if (i) the Restructuring Effective Date does not occur on or before the Restructuring Long-Stop Time; or (ii) the Transaction Implementation Deed terminates in accordance with its terms prior to the Restructuring Effective Date (as described in Part 3 (*Summary of the Terms of Certain Key Implementation Documents and Equity Instruments*)) (other than as a result of the Restructuring Effective Date having occurred). Upon termination of the Plans:

1.15.1   the terms of and the obligations on, and rights granted to, the Plan Parties under or pursuant to the Plans and any Implementation Document shall lapse and be of no further force or effect;

1.15.2   the rights and obligations of the Plan Creditors shall remain unaffected by the Plans and shall be reinstated;

1.15.3   all compromises, arrangements and releases provided for pursuant to the Plans and any Implementation Document shall be of no effect;

1.15.4   any defaults under any agreement governing the terms of any Plan Claim, and any consequences thereof shall be reinstated; and

1.15.5   and any release, standstill, power of attorney, instruction or authority granted pursuant to the Plans or any Implementation Document shall be automatically revoked and terminated.

43

**2    OTHER TERMS OF THE RESTRUCTURING**

***Separation of the Group***

2.1    The Parent intends to enter into a separation agreement (the "**Separation Agreement**") with New BrazilCo Parent and Bradford County (or a holding company or holding companies thereof, if applicable) (together with New BrazilCo Parent, "**BrazilCo**") substantially concurrently with the consummation of the Restructuring, which will set forth the Parent's agreements with BrazilCo regarding the principal actions to be taken in connection with the separation of the Parent's Brazil business from its other businesses and the transfer of the BrazilCo Common Equity to the 2029 New Noteholders, the R-2 Lenders and the TLA Lenders, as applicable, pursuant to the Restructuring Support Agreement and the Implementation Documents (collectively, the "**BrazilCo Separation**"). It will also set forth other agreements that govern certain aspects of the Parent's relationship with BrazilCo following the BrazilCo Separation.

2.2    The Separation Agreement will identify categories of assets and liabilities to be contractually allocated to each of the Parent and BrazilCo as part of the BrazilCo Separation. In particular, the Separation Agreement will provide, among other things and subject to the terms and conditions contained in the Separation Agreement, for the following:

2.3    *Assets*:

    2.3.1    Generally, assets primarily or exclusively related to the Brazil business will be contractually allocated to BrazilCo, and all other assets of the Parent will be contractually retained by the Parent;

    2.3.2    BrazilCo will be contractually allocated the equity interests of certain subsidiaries and joint ventures and other minority equity interests intended to be owned by BrazilCo after the BrazilCo Separation, which, in each case, generally consist of BrazilCo's current subsidiaries, joint ventures and other minority equity interests, and the Parent will contractually retain all other subsidiaries, joint ventures and other minority equity interests;

    2.3.3    BrazilCo will be contractually allocated certain real property owned or leased by BrazilCo or its subsidiaries and as set forth on a schedule (including owned and leased property set forth therein), and the Parent will contractually retain all other owned and/or leased real property;

    2.3.4    BrazilCo will be contractually allocated certain (i) contracts that are exclusively related to the Brazil business, assets and/ or liabilities, (ii) contracts to which the Parent or any of its subsidiaries was a party that are not related (other than in a *de minimis* respect) to either the Parent or BrazilCo and are set forth on a schedule, and (iii) shared contracts (or portions thereof) set forth on a schedule, and the Parent will contractually retain all other contracts;

    2.3.5    BrazilCo will be contractually allocated certain trademarks and patents set forth on a schedule and other intellectual property that is exclusively related to, or exclusively used or held for use in, the conduct of the Brazil business, and the Parent will contractually retain the NFE name and will be contractually allocated all other intellectual property, trademarks and patents;

    2.3.6    Employees and/ or other service providers who provide services to BrazilCo and are employed by BrazilCo will remain employees of BrazilCo;

2.3.7   BrazilCo will contractually retain the sponsorship of and all assets of any BrazilCo employee benefit plan, and the Parent will contractually retain the sponsorship of and all assets of any Parent employee benefit plan;

2.3.8   BrazilCo will be contractually allocated certain IT assets that are exclusively related to, or exclusively used or held for use in, the Brazil business (subject to certain limited exceptions), and the Parent will contractually retain all other IT assets;

2.3.9   BrazilCo will be contractually allocated all tax refunds and tax attributes of BrazilCo;

2.3.10   BrazilCo will be contractually allocated financial assets to the extent related to the Brazil business and/ or that are owned by BrazilCo or one of its subsidiaries, and the Parent will generally be contractually allocated all other financial assets; and

2.3.11   BrazilCo will be contractually allocated certain other assets set forth on a schedule.

2.4   *Liabilities*:

2.4.1   Generally, liabilities to the extent related to the Brazil business (and solely such portion of such liabilities) will be contractually allocated to BrazilCo, and all other liabilities of the Parent will be contractually retained by the Parent;

2.4.2   Each of the Parent and BrazilCo will be contractually allocated liabilities to the extent relating to any of their respective financing arrangements;

2.4.3   BrazilCo will generally be contractually allocated liabilities (including environmental liabilities) to the extent related to businesses and operations of BrazilCo that were previously discontinued or divested that were, at the time of discontinuation or divestment, managed in all but *de minimis* respects by or exclusively associated with the Brazil business or any portion thereof as then conducted, or set forth on a schedule;

2.4.4   In respect of other environmental liabilities not already covered by the above, BrazilCo will be contractually allocated (i) any environmental liabilities to the extent relating to any real property contractually allocated to BrazilCo, (ii) any environmental liabilities relating to any legacy sites that were managed in all but *de minimis* respects by or exclusively associated with the Brazil business or set forth on a schedule, (iii) any environmental liabilities to the extent related to, arising out of or resulting from the operation or conduct of the Brazil business and (iv) any offsite environmental liabilities to the extent related to, arising out of or resulting from wastes generated at such properties or by the Brazil business;

2.4.5   BrazilCo and its applicable subsidiaries will be contractually allocated liabilities for borrowed money, interest rate swaps and similar arrangements and indebtedness that were incurred or guaranteed by BrazilCo or any of such subsidiaries;

2.4.6   BrazilCo will contractually retain all liabilities related to, arising out of or resulting from (i) any current or former employee or other service provider of BrazilCo, whether occurring prior to, on or following the BrazilCo Separation, and (ii) BrazilCo employee benefit plans, and the Parent will contractually retain all liabilities related to, arising out of or resulting from (x) any current or former employee or other service provider of the Parent, whether occurring prior to, on or following the BrazilCo Separation, and (y) Parent employee benefit plans;

2.4.7   BrazilCo will generally retain, assume or be contractually allocated other financial liabilities to the extent related to the Brazil business;

45

2.4.8 BrazilCo will generally retain liabilities for taxes of BrazilCo, and will assume or be contractually allocated liabilities for at least 50 per cent. of any transfer taxes arising in connection with the BrazilCo Separation;

2.4.9 BrazilCo will be contractually allocated liabilities related to, arising out of or resulting from (i) any indemnification obligations to any of its or its subsidiaries' current or former directors or officers and/or (ii) ownership of any specified joint venture or other minority equity interests owned by BrazilCo after the BrazilCo Separation; and

2.4.10 BrazilCo will be contractually allocated certain other liabilities set forth on a schedule.

2.5 Except as may expressly be set forth in the Separation Agreement or any ancillary agreement, all assets will be transferred on an "as is," "where is" basis and the respective transferees will bear the economic and legal risks that (i) any conveyance will prove to be insufficient to vest in the transferee good title, free and clear of any security interest, and (ii) any necessary consents or governmental approvals are not obtained or that any requirements of laws or judgments are not complied with. In general, neither the Parent nor BrazilCo will make any representations or warranties regarding any assets or liabilities transferred or contractually allocated pursuant to the Separation Agreement, any consents or governmental approvals that may be required in connection with such transfers or contractual allocations, or any other matters.

2.6 Information in this Explanatory Statement with respect to the assets and liabilities of the parties following the BrazilCo Separation is presented based on the anticipated contractual allocation of such assets and liabilities pursuant to the Separation Agreement, unless the context otherwise requires. Certain of the liabilities and obligations to be contractually allocated to one party or for which one party will have an indemnification obligation under the Separation Agreement and the other agreements relating to the BrazilCo Separation are, and following the BrazilCo Separation may continue to be, the legal or contractual liabilities or obligations of another party. Each such party that continues to be subject to such legal or contractual liability or obligation will rely on the applicable party that was contractually allocated the liability or obligation or the applicable party that undertook an indemnification obligation with respect to the liability or obligation, as applicable, under the Separation Agreement, to satisfy the performance and payment obligations or indemnification obligations with respect to such legal or contractual liability or obligation.

2.7 ***Further Assurances; Wrong Pockets***:

2.7.1 To the extent that any transfers of assets or contractual allocations of liabilities contemplated by the Separation Agreement have not been consummated on or prior to the BrazilCo Separation, the parties will agree to cooperate with each other to effect such transfers or assumptions while holding such assets or liabilities for the benefit or burden of the appropriate party so that all the benefits and burdens relating to such asset or liability inure to the party contractually allocated such asset or liability. Each party will agree to use commercially reasonable efforts to take or to cause to be taken all actions, and to do, or to cause to be done, all things reasonably necessary under applicable law or contractual obligations to consummate and make effective the transactions contemplated by the Separation Agreement.

***2.7.2*** Except as otherwise provided in the Separation Agreement, if at any time within twenty-four months following the BrazilCo Separation, either party discovers that an asset contractually allocated to it under the Separation Agreement is held by the other party (or one of its subsidiaries), the parties will cooperate to promptly transfer such asset to the party to which it was contractually allocated, without additional consideration. If at any time within twenty-four months following the BrazilCo Separation, an asset is determined in good faith by both parties to more appropriately belong to the other party, or to be intended for the continued use of the other party, the

46

parties will take commercially reasonable steps to effect a transfer or grant appropriate use rights so that the asset is held or used by the appropriate party.

2.8    ***Shared Contracts***:

2.8.1    Generally, shared contracts will be assigned in part if so assignable, or amended, bifurcated or replicated to facilitate the BrazilCo Separation so that the appropriate party is contractually allocated the rights, benefits and the related portion of any liabilities inuring to the business of the appropriate party, and each party will use commercially reasonable efforts to obtain the consents required to partially assign, amend, bifurcate or replicate any shared contract.

2.9    ***Intercompany Accounts***:

2.9.1    The Separation Agreement will provide that, subject to certain specified exceptions in the Separation Agreement, schedules or any ancillary agreement, certain accounts that were formerly intercompany accounts within the Parent will be settled prior to the BrazilCo Separation and, if not settled, will be terminated and released at such time.

2.10    ***Release of Claims and Indemnification***:

2.10.1    Except as otherwise provided in the Separation Agreement and subject to customary exceptions for gross negligence, fraud or willful misconduct, each party will fully release and forever discharge the other parties and their respective subsidiaries and affiliates from all liabilities existing or arising from any acts or events occurring or failing to occur or alleged to have occurred or to have failed to occur or any conditions existing or alleged to have existed on or before the BrazilCo Separation. The releases will not extend to obligations or liabilities under any agreements between the parties that remain in effect following the BrazilCo Separation pursuant to the Separation Agreement or any ancillary agreement. These releases will be subject to certain exceptions set forth in the Separation Agreement.

2.10.2    The Separation Agreement will provide for cross-indemnities that, except as otherwise provided in the Separation Agreement, are principally designed to place financial responsibility for the obligations and liabilities contractually allocated to the Parent under the Separation Agreement with the Parent and financial responsibility for the obligations and liabilities contractually allocated to BrazilCo under the Separation Agreement with BrazilCo. Specifically, each party will indemnify, defend and hold harmless the other parties, their respective affiliates and subsidiaries and each of their respective officers, directors, employees and agents (and each of the heirs, executors, successors and assigns of any of the foregoing) for any losses to the extent relating to, arising out of or resulting from:

(i)    the liabilities each party was contractually allocated pursuant to the Separation Agreement (or any third-party claim that would, if resolved in favour of the claimant, constitute such a liability); and

(ii)    any breach by such party of any provision of the Separation Agreement.

***2.10.3***    Each party's indemnification obligations with respect to such liabilities pursuant to the Separation Agreement or such breach will be uncapped; provided that the amount of each party's indemnification obligations will be subject to reduction by any insurance proceeds or other third-party proceeds received by the party being indemnified that reduce the amount of the loss. The Separation Agreement will also specify procedures with respect to claims subject to indemnification and related matters.

47

2.11   ***Legal Matters***:

2.11.1   Except as otherwise set forth in the Separation Agreement, BrazilCo will be contractually allocated liabilities relating to legal matters that are exclusively related to the Brazil business, assets, or the liabilities contractually allocated to BrazilCo or, for liabilities relating to legal matters shared between the Parent and BrazilCo, liabilities relating to such legal matters to the extent related to the Brazil business, assets or the liabilities contractually allocated to BrazilCo, and the Parent will be contractually allocated all other liabilities relating to legal matters. Each party to the Separation Agreement will indemnify the other party for its respective indemnifiable losses, if any, arising out of or resulting from such legal matters allocated to such party, as well as, following the BrazilCo Separation, for those arising out of or resulting from any legal matters related to the liabilities such party has been contractually allocated or (unless contractually allocated specifically to the other party) its ongoing business. Each party to a claim will agree to cooperate in defending any claims against both parties for events that took place prior to, on or after the date of the BrazilCo Separation.

2.12   ***Insurance***:

2.12.1   Following the BrazilCo Separation, BrazilCo generally will be responsible for obtaining and maintaining, at its own cost, its own insurance coverage for liabilities for which it is assuming responsibility, although BrazilCo will continue to have coverage under certain insurance policies issued to the Parent and its subsidiaries (after giving effect to the BrazilCo Separation) for certain matters arising from occurrences, acts, omissions or other matters occurring at or prior to the BrazilCo Separation, subject to the terms, conditions and exclusions of such policies.

2.13   ***Dispute Resolution***:

***2.13.1***   Except as otherwise set forth in the Separation Agreement, if a dispute arises between the Parent and BrazilCo under the Separation Agreement, the general counsels of the parties and/or such other executive officers as the parties may designate will negotiate to resolve any disputes for a reasonable period of time. If the parties are unable to resolve the dispute in this manner, then the dispute will be resolved through binding arbitration. If either party files a judicial proceeding to resolve a dispute in contravention of the arbitration provisions included in the Separation Agreement, the other party will be entitled to any costs they may incur in defending such an action, including a $10 million punitive fee (subject to an annual adjustment to account for inflation of 5 per cent.) and any additional punitive, exemplary, treble or similar damages as may be awardable under applicable law. Each of the Parent and BrazilCo will acknowledge and agree that if any party files an action in contravention of the arbitration provisions included in the Separation Agreement, the non-breaching party shall suffer reputational loss as a direct consequence of such action for which it is entitled to damages.

2.14   ***Term, Termination and Amendment***:

***2.14.1***   Upon the consummation of the BrazilCo Separation, the term of the Separation Agreement will be indefinite and it may only be terminated or modified with the prior written consent of both BrazilCo and the Parent.

2.15   ***Other Matters Governed by the Separation Agreement***:

2.15.1   Other matters to be governed by the Separation Agreement will include, among others, access to financial and other information, confidentiality, access to and provision of records and separation of guarantees and other credit support instruments.

2.16    ***Transition Services Agreement:***

    2.16.1    In connection with the BrazilCo Separation, the Parent and BrazilCo will enter into a transition services agreement pursuant to which the Parent will provide certain transitional services to BrazilCo. The services, including, without limitation, information technology support, trademark management support, and logistics support, will be provided for a limited time following the consummation of the BrazilCo Separation, and will be provided for specified fees as mutually agreed by the Parent and BrazilCo.

***Other BrazilCo–CoreCo Intercompany Claims***

2.17    All valid net intercompany claims of the CoreCo Group against the BrazilCo Group (other than claims arising under the 2024 Intercompany Loans) (such claims, the "**Net BrazilCo–CoreCo Intercompany Claims**") will be replaced with one or more debt instruments in an aggregate principal amount equal to the Net BrazilCo–CoreCo Intercompany Claims, which will bear interest at a rate of 8.00 per cent. per annum, payable quarterly in cash with a three-year term (the "**New BrazilCo–CoreCo Notes**").

***Other Intercompany Obligations***

2.18    On the Restructuring Effective Date, all other intercompany obligations between any CoreCo Group entity, on the one hand, and any BrazilCo Group entity, on the other hand, shall be terminated, including, but not limited to, those specified material contracts between any CoreCo Group entity, on the one hand, and any BrazilCo Group entity, on the other hand; *provided* that ordinary-course trade payables between any CoreCo Group entity, on the one hand, and any BrazilCo Group entity, on the other hand, shall remain outstanding without modification and be paid in the ordinary course of business on the Restructuring Effective Date.

2.19    On the Restructuring Effective Date, all other intercompany obligations between any CoreCo Group entity (other than FLNG 2 Parent and its direct subsidiaries), on the one hand, and FLNG 2 Parent and its direct subsidiaries, on the other hand, shall be terminated; *provided* that ordinary-course trade payables between any CoreCo Group entity (other than FLNG 2 Parent and its direct subsidiaries), on the one hand, and FLNG 2 Parent and its direct subsidiaries, on the other hand, shall remain outstanding without modification and be paid in the ordinary course of business on or after the Restructuring Effective Date.

2.20    For the avoidance of doubt, from and after the Restructuring Effective Date, all transactions between any BrazilCo Group entity or FLNG 2 Parent or its direct subsidiaries, on the one hand, and any CoreCo Group entity, on the other hand, shall be on arm's-length terms.

2.21    Part B of Appendix 5 (*Updated Group Structure Chart*) shows the anticipated corporate structure of the Group following the implementation of the Recapitalisation Transaction and the BrazilCo Separation.

***New CoreCo Credit Facilities***

2.22    The Parent, as borrower, and certain other CoreCo Group entities, as guarantors, will enter into the following credit facilities:

    2.22.1    a term loan credit facility, secured by first-priority liens (except that such liens shall rank junior to the liens securing the New CoreCo LC Facility) on substantially all assets of the CoreCo Group in accordance with the New CoreCo Credit Facility Term Sheet (the "**New CoreCo Credit Facility**" and the loans thereunder, the "**New CoreCo Term Loans**"), in an aggregate principal amount equal to the sum of (w) up to $475 million, (x) $52.5 million of Incremental New CoreCo Term Loans incurred, (y) approximately

$43.8 million of Incremental Equity-for-Debt Exchange Election New CoreCo Term Loans, and (z) to the extent necessary to meet the Minimum Liquidity Condition, up to $35 million in aggregate principal amount of Capital Raise New CoreCo Term Loans (plus additional principal to reflect any original issue discount) and Capital Raise New CoreCo Junior Term Loans if necessary; and

2.22.2   an amendment and restatement to the Letter of Credit Agreement (the "**New CoreCo LC Facility**").

2.23   In addition, on the Restructuring Effective Date, FLNG 2 Parent, as borrower, will enter into a non-recourse term loan facility in the aggregate principal amount of $400 million (the "**FLNG 2 Term Loan Facility**", and the loans made thereunder, the "**FLNG 2 Term Loans**").

2.24   The intercreditor arrangement as between the New CoreCo Credit Facility and the New CoreCo LC Facility will be governed by the CoreCo Intercreditor Agreement, pursuant to which the obligations under the New CoreCo LC Facility will rank senior on a super priority basis to the obligations under the New CoreCo Credit Facility.

*New CoreCo LC Facility*

2.25   The Parent and certain of its subsidiaries, as guarantors, anticipate entering into an amendment and restatement to the existing Letter of Credit Agreement (the "**New CoreCo LC Facility Agreement**"). Subject to the terms and conditions provided for therein and in the documents relating thereto, the Parent anticipates that the New CoreCo LC Facility Agreement will be executed on or before the Restructuring Effective Date and, subject to the satisfaction in full of the conditions precedent to the effectiveness thereof, become effective as of the Restructuring Effective Date. The representations, covenants and defaults of the New CoreCo LC Facility Agreement are anticipated to be conformed with those in the New CoreCo Credit Agreement (excluding any and all provisions relating to the super priority status of the liens securing the borrower and guarantor obligations under the New CoreCo LC Facility Agreement (the "**Super Priority Obligations**") to the junior priority liens securing the borrower and guarantor obligations under the New CoreCo Credit Facility (the "**Senior Obligations**")). The Parent anticipates that all letters of credit currently outstanding under the Revolving Credit Facility Agreement would be rolled into or replaced under the New CoreCo LC Facility (as defined below), other than those rolled into or replaced under the New BrazilCo LC Facility.

2.26   Subject to the conditions precedent to the effectiveness thereof and the other terms and conditions provided for therein and in the documents relating thereto, upon the effectiveness of the New CoreCo LC Facility Agreement the Parent anticipates that the existing commitments under the existing Letter of Credit Agreement would be increased under the New CoreCo LC Facility by up to about $55 million for an aggregate principal amount of up to $250 million and the maturity date would be extended from 15 September 2026 until 15 March 2028. The Parent anticipates that the New CoreCo LC Facility would provide for up to three annual, one-year extensions of the maturity date (for up to an additional three years in the aggregate), in each case, at the sole and absolute discretion of the extending lenders. The New CoreCo LC Facility Agreement will be required to be guaranteed, jointly and severally, and on a super priority senior secured basis, by each subsidiary of the Parent that is a guarantor under the New CoreCo Credit Facility on the Restructuring Effective Date (or that becomes a guarantor thereunder thereafter).

2.27   The Super Priority Obligations will be secured by all assets of the Parent and the guarantors (subject to customary and immaterial exclusions to be mutually agreed with the lenders under the New CoreCo LC Facility and the New CoreCo Credit Facility) on a super priority to the liens securing the Senior Obligations, as provided in a new CoreCo Intercreditor Agreement which will establish the super priority status of the liens securing the New CoreCo LC Facility and the junior status of the liens securing the New CoreCo Credit Facility.

2.28 The Parent anticipates that it will be expected to pay the following fees and interest related to the New CoreCo LC Facility:

    2.28.1 letter of credit fee: for the ratable benefit of each lender under the New CoreCo LC Facility, the average daily stated amount of outstanding letters of credit multiplied by 2.50 per cent;

    2.28.2 interest rate: payable at the "base rate plus applicable margin" provided for in the existing Letter of Credit Agreement;

    2.28.3 fronting fee: the fee will be between 0.35 and 0.50 per cent. payable to the applicable issuing bank on the average daily stated amount of its outstanding letters of credit; and

    2.28.4 commitment fee: for the ratable benefit of each lender under the New CoreCo LC Facility, 1.00 per cent multiplied by the average daily unused portion of the New CoreCo LC Facility.

2.29 The Parent anticipates that it will be required, at a minimum, to cash collateralise 102% of the commitments and the "LC Exposure" with respect to all letters of credit issued and outstanding thereunder (i.e. the sum of (a) the aggregate undrawn amount of all outstanding letters of credit at such time and (b) the aggregate amount of all payments made by the applicable issuing bank pursuant to such letter of credit that have not yet been reimbursed by or on behalf of the Parent at such time) if, subject to certain conditions, (x) as a result of the issuance or amendment of a letter of credit (other than the issuance of the existing letters of credit), there is a reduction or termination of the total letter of credit commitments or the LC Exposure and exceeds certain thresholds, (y) if a letter of credit is to remain outstanding on or after the maturity date, or (z) if there is an default or event of default or other provision in the New CoreCo LC Facility Agreement which requires such cash collateralisation. Proceeds of certain asset sales will be used to repay certain existing indebtedness of Parent.

2.30 The Parent anticipates that the New CoreCo LC Facility Agreement will include representations and warranties and affirmative and negative covenants substantially similar to the New CoreCo Credit Agreement, in each case, subject to applicable materiality qualifiers, thresholds and exceptions as set forth in the New CoreCo LC Facility Agreement (and excluding any and all provisions relating to the super priority status of the liens securing the Super Priority Obligations to the liens securing the Senior Obligations). The Parent anticipates that the affirmative covenants will include, among other things, the delivery of financial statements and notices, payment of taxes and other obligations, preservation of existence and compliance with applicable laws and regulations, maintenance of property and insurance, and compliance with the use of proceeds.

2.31 The Parent anticipates that the negative covenants will include, among other things, limitations on restricted payments, paying dividends and making other payments affecting restricted subsidiaries, limitations on the incurrence of indebtedness and the creation of new liens, limitations of effectuating assets sales, mergers, or the consolidation or sale of all or substantially all assets and limitations on transactions with affiliates.

2.32 The Parent anticipates that the New CoreCo LC Facility Agreement will include usual and customary events of default. These include, among other things, non-payment of principal, interest, fees or other amounts, material breach of representations or warranties, covenant defaults, cross-defaults with respect to other material debt, material judgements, bankruptcy or insolvency, ERISA-related defaults and impairment of security.

2.33 The New CoreCo LC Facility Agreement will be governed by the laws of the State of New York.

***BrazilCo Liquidity Arrangements***

2.34    As described at paragraph 3.53 of Part 1 (*Background to and Reasons for the Plans*) above, on 14 April 2026, the New BrazilCo Parent entered into the Brazil Bridge Credit Agreement, that provides for the $50 million Brazil Bridge Term Loan Facility. The Brazil Bridge Term Loan Facility will not be part of the Plan Debt, and is anticipated to be refinanced by the New BrazilCo Notes in due course.

***New BrazilCo Financing Arrangements***

2.35    The BrazilCo Group is expected to:

2.35.1    issue new notes to refinance the Brazil Bridge Term Loan Facility and the Brazil Financing Notes (which are not Plan Debt); fund the RCF-2 / TLA BrazilCo Cash Pool; pay trade payables; and fund operations, capital expenditures, working capital and transaction costs (the "**New BrazilCo Notes**") prior to the sanction of the Plans; and

2.35.2    enter into a new letter of credit facility (the "**New BrazilCo LC Facility**") prior to, or on, the Restructuring Effective Date,

on terms satisfactory to the management and stakeholders of the separated BrazilCo Group on or prior to the Restructuring Effective Date.

2.36    On 11 May 2026, the Group entered into a commitment letter and term sheet in relation to the New BrazilCo Notes. In summary, the terms of these provide that:

2.36.1    NFE Brazil Financing Limited, a private company limited by shares incorporated in England and Wales (the "**New BrazilCo Notes Issuer**") will issue $885 million 12.000% New BrazilCo Notes with a three year term;

2.36.2    the New BrazilCo Notes will be guaranteed and secured by first priority liens substantially consistent with the Brazil Financing Notes, in addition, the New Brazil Notes will benefit from additional credit support, subject to no conflicts with other material indebtedness, from NFE Brazil Holdings LLC and Barcarena Offshore Capital LLC; the Parent and NFE Brazil Funding LP will not provide any credit support or be a party to the financing documents in respect of the Notes;

2.36.3    prior to the repayment in full of the New BrazilCo–CoreCo Notes, any payments intended to be made by the New BrazilCo Notes Issuer to holders of the New BrazilCo Notes in respect of their claims under the New BrazilCo Notes shall be subject to a turnover provision in favour of the holder(s) of the New BrazilCo–CoreCo Notes whereby the New BrazilCo Notes Issuer shall identify and turnover a ratable portion of such payments (such ratable portion, calculated based on the relative proportion that the proceeds from the New BrazilCo Notes that were not used to refinance the Brazil Financing Notes (collectively, the "**Non-Refinancing BrazilCo Notes Ratable Proceeds**") bears to the total amount of proceeds from the New BrazilCo Notes, the "**Non-Refinancing BrazilCo Notes Ratable Portion**"); provided, that any conversion or exchange of the New BrazilCo Notes into equity or equity-linked securities (following their subsequent conversion into equity) of the New BrazilCo Notes Issuer or another parent company of the Parent's Brazil operations as set forth below in paragraph 2.36.6 shall reduce, on a dollar-for-dollar basis, the Non-Refinancing BrazilCo Notes Ratable Proceeds in respect of the calculation of the Non-Refinancing BrazilCo Notes Ratable Portion;

2.36.4    the New BrazilCo Notes will not have any financial covenants or call protection;

2.36.5   the New BrazilCo Notes will not amortise and interest will be payable-in-kind, semi-annually;

2.36.6   the New BrazilCo Notes will be convertible into, exchangeable into, or replaceable with debt and/ or equity securities of the New BrazilCo Notes Issuer or another parent company of the Parent's Brazil operations upon terms to be mutually agreed, if so approved by the new (post-Restructuring) board of directors of New BrazilCo Parent and the holders of 66.67 per cent. in outstanding principal amount of the New BrazilCo Notes with the New BrazilCo Notes Issuer's consent;

2.36.7   a commitment premium of 10.0 per cent. of the principal amount of the New Brazil Notes is payable-in-kind for 2029 New Noteholders who commit to the issuance of the New Brazil Notes; to earn the commitment premium, the relevant finance providers must commit to participating in the New Brazil Notes by signing a joinder to the commitment letter within a five business day period following the announcement of the New Brazil Notes; and

2.36.8   the indenture for the New BrazilCo Notes will be governed by New York law.

2.37   The New BrazilCo Notes are expected to be issued on or around 22 May 2026. The New BrazilCo Notes will be contractual, new money financing arrangements between the relevant Group Companies and the participating New 2029 Noteholders.  The New BrazilCo Notes are not intended to form part of the Plan Consideration, or otherwise compensate the compromise of Plan Debt under the Plans.  Any New BrazilCo Notes in place before the Restructuring Effective Date will not be compromised by the Restructuring and will not constitute Plan Debt. The New BrazilCo Notes require the consent of the 2029 New Noteholders, the RCF Lenders, the TLB Lenders and the TLA Lenders.

### *Capital Raise*

2.38   If required to satisfy the Minimum Liquidity Condition on the Restructuring Effective Date (which may be determined after the Plan Meetings), the Parent will seek to raise (x) first, up to an initial $35 million in aggregate principal amount (after giving effect to any original issue discount) of additional New CoreCo Term Loans (the "**Capital Raise New CoreCo Term Loans**") and (y) to the extent the Minimum Liquidity Condition would not be satisfied after giving effect to funding commitments in respect of the Capital Raise New CoreCo Term Loans, additional New CoreCo Term Loans which are second ranking to the Capital Raise New CoreCo Term Loans described in (x) above, ("**Capital Raise New CoreCo Junior Term Loans**" collectively, as applicable, the "**Capital Raise**"), in each case on terms and conditions substantially similar to those under the New CoreCo Credit Facility Term Sheet, and, with respect to the Capital Raise New CoreCo Junior Term Loans, adjusted as appropriate for the Initial Terms (as described below) and similar second lien credit facilities of this size, type and purpose.  The Plan Companies consider that the Capital Raise will enable the Group to raise additional funds (if required) to satisfy the Minimum Liquidity Condition to be met.

2.39   Following the Parent's final determination of the required amount (if any) of the Capital Raise, each Plan Creditor receiving New CoreCo Term Loans pursuant to the Plans will be offered the right to provide its *pro rata* share of the Capital Raise New CoreCo Term Loans.  If required, each Plan Creditor will be offered the right to provide its *pro rata* share of Capital Raise New CoreCo Junior Term Loans relative to its share of initially allocated CoreCo Preferred Stock, at an interest rate and original issue discount based on market terms (the "**Initial Terms**").  Plan Creditors, and other third parties acceptable to the Plan Companies and the Parent, may offer to participate in unsubscribed allocations of the Capital Raise through a competitive pricing process.

2.40    The aggregate principal amount of Capital Raise New CoreCo Term Loan subscriptions accepted by the Parent will not exceed $35 million after giving effect to any original issue discount.  The aggregate principal amount of the total Capital Raise will not exceed the minimum amount required to satisfy the Minimum Liquidity Condition on the Restructuring Effective Date, after giving effect to any original issue discount.

2.41    The issuance of the Capital Raise New CoreCo Junior Term Loans may be backstopped by prospective participants of such Capital Raise on market terms prior to the Capital Raise.  It is not anticipated that the issuance of the Capital Raise New CoreCo Term Loans will be backstopped.

2.42    Additional terms, conditions, and procedures for the Capital Raise, including the terms of any backstop, may be determined by the Parent in consultation with, and with the consent of, the Majority Plan Creditors.

*Existing NFE Stockholders*

2.43    As discussed at paragraph 1.5.7 above, pursuant to the Plans, the Existing NFE Stockholders will retain shares of the Parent's Class A common stock.  Such existing shares will represent 35 per cent. of the Parent's Class A common stock, on a fully diluted basis, after giving effect to the exchanges contemplated hereby, but before giving effect to the CoreCo MIP, any conversion of the CoreCo Preferred Stock, or the cancellation, termination, and/ or settlement of any existing equity grants, restricted stock units, or similar awards or instruments.  Conversion of the CoreCo Preferred Stock, together with the issuance of CoreCo Common Stock on the Restructuring Effective Date and assuming the issuance in full of the CoreCo Common Stock and the CoreCo Convertible Preferred Stock under the Amended and Restated CoreCo Equity Plan, would result in a dilution of the stake retained by Existing NFE Stockholders to less than 5 per cent. of the total CoreCo Common Stock.

2.44    The Plan Companies consider that the retention of Class A common stock by the Existing NFE Stockholders is an appropriate compromise based on, among other things:  the expected valuation in the Relevant Alternative Report for the common stock on the Restructuring Effective Date, the need to incentivise the Existing NFE Stockholders to approve certain proposals (described at paragraph 2.60 of Part 2 (*Summary of the Restructuring and the Recapitalisation Transaction (Including the Plans))* of this Explanatory Statement) and the benefit of maintaining the current Nasdaq listing of the Parent's Class A common stock.  If the proposals to shareholders are not approved, then the Plans will not be approved and the likely outcome will be the Relevant Alternative, which will lead to a worse outcome for Plan Creditors (and also Existing NFE Stockholders).

*BrazilCo Equity Interests*

2.45    100 per cent. of the BrazilCo Common Equity will be distributed to the holders of the 2029 New Notes in partial exchange for the 2029 New Notes Debt subject to dilution by (a) the issuance of BrazilCo Common Equity to holders of the R-2 Revolving Credit Facility Debt and Term Loan A Debt to the extent such holders elect to receive their *pro rata* share of the RCF-2 / TLA BrazilCo Equity Pool and (b) the BrazilCo MIP.

*CoreCo MIP*

2.46    As discussed at paragraph 2.60.1 of this Part 2, the Existing NFE Stockholders are being asked to approve an amendment and restatement of the 2019 Omnibus Incentive Plan (the "**Amended and Restated CoreCo Equity Plan**") to facilitate the implementation of an equity incentive programme for directors, officers and other employees of the CoreCo Group (the "**CoreCo MIP**").  Promptly, and in any event, not later than 120 days after the Restructuring Effective Date, the New CoreCo Board will adopt the CoreCo MIP.  The proposed Amended and Restated

54

CoreCo Equity Plan will, among other things, (i) remove the evergreen provision and include a fixed maximum aggregate number of shares of the Parent's Class A common stock to be reserved for issuance thereunder equal to 10 per cent. of the CoreCo Common Stock on a fully diluted basis as of the Restructuring Effective Date (prior to giving effect to any conversion of the shares of CoreCo Preferred Stock into shares of CoreCo Common Stock) which will be in addition to the number of shares of CoreCo Common Stock subject to outstanding equity awards granted under the Plans as of the Restructuring Effective Date (the "**New CoreCo Common Stock Share Reserve**"), (ii) provide for a new reserve of shares of CoreCo Preferred Stock for issuance thereunder equal to 7 per cent. of the CoreCo Preferred Stock outstanding as of the Restructuring Effective Date (together with the New CoreCo Common Stock Share Reserve, the "**New Share Reserve**"), (iii) extend the term of the Amended and Restated Equity Plan to the tenth anniversary of the Restructuring Effective Date, and (iv) certain other updates, including an updated definition of "change in control".

2.47    The New Share Reserve will be used to grant awards under the CoreCo MIP. The participants of the CoreCo MIP, the allocations, the reservation for future issuances, the form of equity-based compensation to such participants (including the amount of allocations and the timing of the grant of the equity-based compensation) and the terms and conditions of such equity-based compensation (including vesting, exercise prices, base values, hurdles, forfeiture, repurchase rights and transferability) will be determined by the New CoreCo Board.  The anticipated New CoreCo Board will, as soon as reasonably practicable following its selection, engage a compensation consultant to assist the anticipated New CoreCo Board in evaluating and determining the terms and conditions of the equity-based compensation to be awarded under the CoreCo MIP.  Awards granted under the CoreCo MIP will be issued under the Amended and Restated CoreCo Incentive Plan, if the Amended and Restated CoreCo Incentive Plan and the other proposals are approved by Existing NFE Stockholders. Subject to such approval, the Amended and Restated CoreCo Incentive Plan will become effective as of the Restructuring Effective Date.

### *FLNG 2 MIP*

2.48    The Parent will adopt a cash incentive plan in the form of cash awards granted pursuant to the Parent's amended and restated 2019 Omnibus Incentive Plan (as may be further amended and/or restated from time to time) for officers and other employees of the CoreCo Group that are involved in the development of FLNG 2 (the "**FLNG 2 MIP**") based on cash proceeds of any FLNG 2 Sale before deducting any such cash proceeds applied, or required to be applied, to pay amounts owing to the CoreCo Group under the CoreCo–FLNG 2 Management Agreement or otherwise (but net of other transactions expenses and customary deductions) ("**FLNG 2 Sale Proceeds**"), equal to the sum of:  (i) 2.0 per cent. of every dollar of FLNG 2 Sale Proceeds up to and including $200,000,000, *plus* (ii) 3.0 per cent. of every dollar of FLNG 2 Sale Proceeds above $200,000,000 up to and including $400,000,000, *plus* (iii) 5 per cent. of every dollar of FLNG 2 Sale Proceeds above $400,000,000.

### *BrazilCo MIP*

2.49    After the Restructuring Effective Date, the BrazilCo Board shall adopt an equity incentive plan for directors, officers, and employees of the BrazilCo Group (the "**BrazilCo MIP**").  Up to six per cent. of the BrazilCo Common Equity shall be reserved for issuance in connection with the BrazilCo MIP, on terms to be determined by the BrazilCo Board.

### *CoreCo Governance*

2.50    The governance of the Parent after the Restructuring Effective Date will be as set out in the following summary:

2.50.1   The Parent will remain a Delaware corporation, managed on a day-to-day basis by its chief executive officer and other senior executive officers with oversight from the New CoreCo Board.

2.50.2   The Parent will use its commercially reasonable efforts to continue as an SEC public reporting company.  After the Restructuring Effective Date, if the CoreCo Common Stock and CoreCo Preferred Stock are not then listed on the Nasdaq Global Select Market or another National Securities Exchange, the holders of a majority of the issued and outstanding CoreCo Preferred Stock can require the Parent to use commercially reasonable efforts to cause the CoreCo Common Stock and, after the Parent satisfies applicable listing standards, the CoreCo Preferred Stock, to be listed on a National Securities Exchange as promptly as reasonably practicable.

2.50.3   Immediately following the Restructuring Effective Date, the Parent's board of directors (the "**New CoreCo Board**") will be comprised of seven directors:  (i) Wesley R. Edens, (ii) to the extent RCF Lenders receive at least seven per cent. of the voting equity of the Parent, one director selected by the holders of a majority of the outstanding Revolving Credit Facility Debt (the "**Majority RCF Lenders**"), which director (if any) must have knowledge of or experience in the industry and satisfy Nasdaq independence rules (it being understood that such director will neither be an employee nor an affiliate of any holder of Revolving Credit Facility Debt), and (iii) the remaining five directors (or (x) six directors to the extent no director is selected pursuant to (ii) or (y) seven directors if the size of the New CoreCo Board is increased to nine directors pursuant to this paragraph) selected by holders of a majority of the outstanding Term Loan B Debt (the "**Majority TLB Lenders**") and holders of a majority of the outstanding 2029 New Notes Debt (the "**Majority 2029 New Noteholders**") in satisfaction of Nasdaq independence rules (including committee composition) (it being understood that the directors appointed by the Majority TLB Lenders and Majority 2029 New Noteholders shall neither be employees nor Affiliates of any holder of Term Loan B Debt or 2029 New Notes Debt).  The Majority TLB Lenders, the Majority 2029 New Noteholders and the Majority RCF Lenders, may consent to increase the size of the board to up to nine directors.  The members of the New CoreCo Board will serve until the Parent's next annual meeting following the Restructuring Effective Date, following which the New CoreCo Board will be nominated/elected in accordance with standard public company board procedures (i.e., no ongoing right to serve, elected by majority votes cast of stockholders entitled to vote).  The New CoreCo Board will not be staggered or classified.

2.50.4   The chairperson of the New CoreCo Board will be an independent director initially selected collectively by the Majority TLB Lenders and Majority 2029 New Noteholders and, thereafter, by a majority vote of the New CoreCo Board, provided that such chairperson (i) will not also serve as the chief executive officer and (ii) at all times will be an independent director in accordance with SEC and Nasdaq independence rules.

2.50.5   The CoreCo Common Stock and CoreCo Preferred Stock will be freely transferable following the Restructuring Effective Date, subject to compliance with applicable securities laws as determined by the Parent with the consent of the Majority Plan Creditors.

2.50.6   The Amended and Restated Certificate of Incorporation and Amended and Restated By-Laws will generally be capable of amendment only with approval of a majority of the issued and outstanding equity on an as-converted basis, unless another provision of the Amended and Restated Certificate of Incorporation or Amended and Restated By-Laws, law, or exchange rules require a greater percentage, but in the case of the Amended and Restated By-Laws, subject to certain specified exceptions for which only

56

approval of the New CoreCo Board is required. Amendments to certain of the amendment provisions of the Amended and Restated Certificate of Incorporation and Amended and Restated By-Laws themselves require two-thirds approval.

2.50.7 The CoreCo Registration Rights Agreement will generally be capable of amendment only with approval of a majority of the holders of equity subject to the CoreCo Registration Rights Agreement.

2.50.8 Other holder approvals shall be limited to those required by Delaware law, such as mergers or a sale of substantially all assets.

2.51 On the Restructuring Effective Date, the certificate of incorporation and by-laws of the Parent will be amended and restated in their entirety, in the forms attached at Appendix 8 (*Key Implementation Documents*) to reflect, among other things, the applicable governance terms set out in this Explanatory Statement, the removal of references to the Parent's Class B common stock, and other customary terms, including, without limitation, the time, place and manner of calling of regular and special meetings of the stockholders and the New CoreCo Board, that actions may be taken by the New CoreCo Board or stockholders without a meeting by written consent, the titles and duties of officers of the Parent and the manner of appointment, removal and replacement thereof, and indemnification and exculpation of directors, officers and other appropriate persons; and the other changes set forth therein.

### *BrazilCo Governance*

2.52 The governance of New BrazilCo Parent after the Restructuring Effective Date will be as set out in the following summary:

2.53 New BrazilCo Parent will be managed by a board of directors or similar governing body (the "**BrazilCo Board**"), which will be responsible for overseeing the operation of the BrazilCo Group's business. New BrazilCo Parent and the BrazilCo Group's business will be managed on a day-to-day basis by its CEO and other senior executive officers with oversight from the BrazilCo Board.

2.54 The BrazilCo Board initially will be comprised of directors selected by holders of a majority of the outstanding 2029 New Notes Debt. The members of the BrazilCo Board will serve until the New BrazilCo Parent's next annual meeting following the Restructuring Effective Date, subject to a director's earlier resignation, removal, death or incapacity (the "**BrazilCo Board Initial Term**"). Following expiration of the of the BrazilCo Board Initial Term, the entire Board will be elected by a majority vote of stockholders at each annual meeting in accordance with customary procedures for a public company. There will be no cumulative voting for directors of New BrazilCo Parent, and the BrazilCo Board will not be staggered or classified.

2.55 The Chairperson of the BrazilCo Board shall be a director initially selected by holders of a majority of the outstanding 2029 New Notes Debt. Thereafter, the chairperson will be determined by a majority vote of the BrazilCo Board.

2.56 Upon the resignation, removal with or without cause, death or incapacity of a director, the vacancy resulting from such resignation, removal with or without cause, death or incapacity of a director will be filled by a majority of the directors of New BrazilCo Parent then in office, in each case, to serve until the next annual meeting of stockholders.

2.57 The composition of any committee of the BrazilCo Board will be subject to agreement by a majority of the directors of New BrazilCo Parent then in office, subject to compliance with applicable legal and exchange requirements.

*CoreCo–FLNG 2 Management Agreement*

2.58    On the Restructuring Effective Date, CoreCo Group and FLNG 2 shall enter into a management services agreement pursuant to which CoreCo Group will provide management services to FLNG 2 (the "**CoreCo–FLNG 2 Management Agreement**").

*FLNG 2 Sale*

2.59    In the event that FLNG 2 is sold following the Restructuring Effective Date (an "**FLNG 2 Sale**"), CoreCo Group will retain any proceeds from such sale, transfer, or disposal of FLNG 2 in excess of the sum of (a) the outstanding obligations under the FLNG 2 Term Loan Facility and (b) the FLNG 2 Preferred Equity amount, after payment of certain transactional and operational costs and expenses and after giving effect to the FLNG 2 MIP.

*Additional Conditions and Steps*

2.60    There will also be a number of other conditions and steps to be completed prior to the implementation of the Restructuring, including:

2.60.1    the Existing NFE Stockholders approving the following proposals for the purposes of the Restructuring at a shareholder meeting which is expected to be held on or prior to the date of the Sanction Hearing:

(i)      to issue shares of the Parent's Class A common stock in excess of 20 per cent. of the Parent's outstanding Class A common stock for the purposes of complying with the Nasdaq Listing Rule 5635(d);

(ii)     to amend and restate the 2019 Omnibus Incentive Plan to, among other things, (i) remove the evergreen provision and include a fixed maximum aggregate number of shares of the Parent's Class A common stock to be reserved for issuance equal to 10 per cent. of the total number of shares of the Parent's Class A common stock outstanding as of the Restructuring Effective Date (in addition to the number of shares of the Parent's Class A common stock subject to outstanding equity awards granted under the plan as of the Restructuring Effective Date) and (ii) provide for a new reserve of shares of CoreCo Preferred Stock for issuance thereunder equal to 7 per cent. of the CoreCo Preferred Stock outstanding as of the Restructuring Effective Date; and

(iii)    to amend and restate the Parent's certificate of incorporation in its entirety in substantially the form of the Amended and Restated Certificate of Incorporation attached at Appendix 8 (*Key Implementation Documents*) to this Explanatory Statement, and through such amendment and restatement, among other things, to effect a reverse stock split of the Parent's Class A common stock, subject to the Parent's board of directors' authority to abandon the amendment;

2.60.2    Mexican antitrust approval in respect of the CoreCo Group;

2.60.3    other regulatory consents and approvals required for the continued operations of the CoreCo Group and BrazilCo Group; and

2.60.4    other customary conditions precedent to the implementation of the Restructuring, including the inter-conditionality of the Plans and the conditions precedent listed in the Transaction Implementation Deed.

2.61    The Plan Companies and the Group are seeking the necessary consents and approvals.  As at the date of this Explanatory Statement, the Plan Companies are not aware of any likely impediments to fulfilling the relevant conditions or completing the relevant steps in order to obtain such consents and approvals.

## 3    CONSEQUENCES IF THE PLANS ARE NOT SUCCESSFUL

3.1    In light of the conditions affecting the Group, it is the view of each of the Boards that if the Plans are not sanctioned and the Restructuring is not implemented, the Group will be unable to meet its outstanding and upcoming payment obligations to creditors and the Group will not have sufficient liquidity to continue as a going concern.

3.2    If the Plans are not sanctioned, the Restructuring Support Agreement will most likely terminate and the forbearances contained therein will fall away.  In such circumstances, the Group will promptly face a number of events of default under the Plan Debt, including (without limitation) material payment defaults under each of the Plan Debt instruments.  The Group will not have sufficient liquidity to meet the relevant payment obligations and would not have a realistic prospect of finding additional liquidity on a timely basis.  Accordingly, it is likely that the termination of the Restructuring Support Agreement would result in the Group, including the Plan Companies, facing imminent action by creditors to accelerate debt, call guarantees and seek to enforce security rights under their respective instruments, including under certain Plan Debt instruments, which in turn will likely trigger cross-defaults under other instruments (including under other Plan Debt instruments).

3.3    Furthermore, if the Plans are not sanctioned, many of the Group's business and trade counterparties, some of which have agreed to defer or reduce certain accounts payable to support the Restructuring, may withdraw credit terms, terminate existing contracts and commence litigation, or take enforcement actions against Group assets located in jurisdictions all around the world.

3.4    The relevant alternative if the Plans are not sanctioned will be whatever the Court considers to be most likely to occur (the "**Relevant Alternative**").  In order to assist the Plan Companies in considering the Relevant Alternative, the Parent commissioned:

3.4.1    Richard Fleming of Alvarez & Marsal to prepare an independent report, which considers the most likely scenario should the Plan not be sanctioned by the Court (the "**Relevant Alternative Report**"); and

3.4.2    Richard Bibby of Alvarez &  Marsal to prepare an enterprise valuation (the "**EV Report**") of the Group and its constituent business units to inform the findings in the Relevant Alternative Report.

3.5    The analysis prepared by Richard Fleming in the Relevant Alternative Report is appended at Part A (*Relevant Alternative Report*) of Appendix 7 of this Explanatory Statement and that of Richard Bibby in EV Report is appended at Part B (*EV Report*) of Appendix 7 of this Explanatory Statement.

3.6    The relevant alternative will depend on the circumstances at the time and the options available to stakeholders.  The Relevant Alternative is a hypothetical assessment of the most realistic counterfactual – it is not the theoretical worst case, nor does it favour certain stakeholders.  The respective Boards of the Plan Companies consider, with the support of their advisors, that if the Plans are not sanctioned and the Restructuring is not implemented then, based on what is most likely to occur, the Relevant Alternative is that:

3.6.1    events of default will occur under the Plan Debt instruments and the respective Plan Creditors will become entitled to accelerate the relevant Plan Debt;

59

3.6.2   the Plan Companies and the other obligors under the Plan Debt will be unable to meet demands for repayment following any such acceleration;

3.6.3   the Group (other than the Brazilian business), acting through their respective directors (or analogous governing persons), will commence voluntary proceedings under chapter 11 of the U.S. Bankruptcy Code to facilitate sales of the assets and separable business units within the Group pursuant to section 363 of the U.S. Bankruptcy Code to maximise recoveries to creditors; and

3.6.4   assuming temporary forbearance from local creditors and the 2029 New Noteholders, the subsidiaries of NFE Financing and the Brazil Parent that comprise the Group's Brazilian business will most likely not commence formal, voluntary proceedings under chapter 11 of the U.S. Bankruptcy Code (although the risk cannot be completely eliminated) and the Brazilian business will be sold in an accelerated sales process. Proceeds of such a sale will not be sufficient to discharge the 2029 New Notes Debt. The Brazilian business will likely be negatively and materially impacted by a chapter 11 filing in respect of the rest of the Group.

3.7   In considering the Relevant Alternative, the Plan Companies also considered a number of other possibilities including a consensual alternative deal, a global plan of reorganisation or whole group sale following a filing under chapter 11 of the US Bankruptcy Code and a global liquidation. The Plan Companies expect that there would be significant instability if the Plans failed and unanimous or near unanimous creditor support required for a consensual deal would be unlikely in such circumstances. The Board of NFE Global considers that a chapter 11 filing in respect of the CoreCo Group would lead to significant process costs and value destruction. Based on the analysis carried out by Alvarez & Marsal for the Relevant Alternative Report, the Board of NFE Global are of the view that:

3.7.1   the quickest, lowest cost and most likely path to recoveries for creditors following a chapter 11 would be a series of sales of the individual business units of the CoreCo Group on a going concern basis; and

3.7.2   a Plan of Reorganization for a whole Group restructuring or whole Group business sale would be more difficult to achieve than business unit sales and would also lead to additional process costs and value destruction associated with a chapter 11 filing.

3.8   Another alternative if the Plans failed would be an uncoordinated, global insolvency of the Group entities which would be the most value destructive scenario. While this is a plausible outcome, on balance, the Plan Companies consider the events described in paragraph 3.6 above to be the most likely to occur if the Plans are not sanctioned.

3.9   The Relevant Alternative Report indicates that each class of Plan Creditors will be better off should the applicable Plan be sanctioned and the Restructuring be implemented than it would in the Relevant Alternative.

3.10   Based on the Relevant Alternative Report, the allocation of Plan Consideration compared to expected recovery in the Relevant Alternative, per class, is summarised in the table below.

| Class | Plan Consideration instrument (*pro rata share*) | Recovery in Relevant Alternative (% of claim) | Recovery from the Plans[2] (% of claim) |
|---|---|---|---|
| Legacy Notes Class | CoreCo Common Stock<br>CoreCo Preferred Stock | 13% | 26% |
| Series I and Series II Class | CoreCo Common Stock<br>CoreCo Preferred Stock | 13% | 26% |
| R1-Class | CoreCo Common Stock<br>CoreCo Preferred Stock<br>New CoreCo Term Loans<br>FLNG 2 Term Loans<br>FLNG 2 Preferred Equity | 54% | 86% |
| R2-Class | CoreCo Common Stock<br>CoreCo Preferred Stock<br>New CoreCo Term Loans<br>FLNG 2 Term Loans<br>FLNG 2 Preferred Equity<br>RCF-2 / TLA BrazilCo Equity Pool | 57% | 94% |
| TLA Class | CoreCo Common Stock<br>CoreCo Preferred Stock<br>New CoreCo Term Loans<br>FLNG 2 Term Loans<br>FLNG 2 Preferred Equity<br>RCF-2 / TLA BrazilCo Equity Pool | 32% | 58% |
| TLB Class | CoreCo Common Stock<br>CoreCo Preferred Stock<br>New CoreCo Term Loans<br>FLNG 2 Term Loans<br>FLNG 2 Preferred Equity | 50% | 81% |
| 2029 New Notes Class | BrazilCo Common Equity | 18% | 35% |

---

[2]   Recovery shown is total recoveries from both Plans (excluding the effect of the Elections and including the Early Consent Fee and Standstill Fee). Recoveries for the TLA Class, the R2-Class and the 2029 New Notes Class include recoveries to those classes under the Series I Loans and the Series II Loans. For further detail see the Relevant Alternative Report.

3.11   Each Board agrees with the conclusions in the Relevant Alternative Report.  The Plan Companies consider that the failure to have the Plans sanctioned will lead to material value destruction for the Group and its stakeholders.

3.12   The Plan Companies, together with Alvarez & Marsal, have also considered the allocation of the incremental value preserved by the Recapitalisation Transaction as compared with the Relevant Alternative (the "**Restructuring Surplus**").  The Boards consider that the allocation of the Plan Consideration represents a fair allocation of the Restructuring Surplus in light of each class of Plan Creditor's existing entitlement to proceeds from the respective Collateral Pools as outlined above.  Further detail is included in the Relevant Alternative Report.

## 4   RECOMMENDATION OF THE BOARDS

4.1   Each of the Boards considers the Restructuring and the Plans to be in the best interests of the Plan Companies and their respective Plan Creditors.  Each Board has arrived at this conclusion on the basis of (without limitation):

4.1.1   the benefits to the Plan Companies and the Group of addressing certain near-term and longer-term maturities under certain of the Plan Debt instruments, achieving a deleveraged and sustainable capital structure and obtaining access to liquidity and new letter of credit facilities (by virtue of the Capital Raise, the New CoreCo LC Facility and the New BrazilCo Notes);

4.1.2   that all Plan Creditors are expected to be no worse off if the Plans are sanctioned and the Restructuring is implemented than would be the case in the Relevant Alternative; and

4.1.3   the high levels of support already received for the Restructuring and the Plans through the approvals provided in connection with the Restructuring Support Agreement entered into by various Plan Creditors, as described above.

4.2   Accordingly, the Boards unanimously recommend that the Plan Creditors vote in favour of the Plans at the Plan Meetings.

**PART 3:  SUMMARY OF THE TERMS OF CERTAIN KEY IMPLEMENTATION
DOCUMENTS AND EQUITY INSTRUMENTS**

**1      SUMMARY OF KEY IMPLEMENTATION DOCUMENTS**

1.1      This Part 3 contains detailed summaries of the following Key Implementation Documents:

  1.1.1    the Transaction Implementation Deed;

  1.1.2    the New CoreCo Credit Agreement;

  1.1.3    the FLNG 2 Term Loan Credit Facility Agreement;

  1.1.4    the CoreCo Intercreditor Agreement;

  1.1.5    the CoreCo Registration Rights Agreement;

  1.1.6    the New BrazilCo Governance Documents;

  1.1.7    the FLNG 2 Parent LLCA;

  1.1.8    the Holding Period Trust Deed; and

  1.1.9    the Deeds of Undertaking.

1.2      This section contains summaries of the key documents required as part of the Recapitalisation Transaction based on its current terms but is not intended to summarise all of the documents or arrangements required as part of the Recapitalisation Transaction.

1.3      Copies of the documents referred to above and the Restated Certificate of Incorporation, Amended and Restated By-Laws and Certificate of Designation can be obtained from the Plan Website (https://deals.is.kroll.com/nfe).

1.4      All other documents necessary to implement the Restructuring will also be made available to Plan Creditors on request.  Any Plan Creditor wishing to receive a copy of any document should check the Plan Website or e-mail the Information Agent at nfe@is.kroll.com (Attention: Alessandro Zorza/ Sunjeeve Patel).  Plan Creditors are recommended to review these documents and, when they feel it is appropriate or necessary, to consult with their legal and tax advisers.

**2      TRANSACTION IMPLEMENTATION DEED**

2.1      The Transaction Implementation Deed will be entered into on or around the Plan Effective Date.

2.2      A copy of the form of the Transaction Implementation Deed is attached at Appendix 8 (*Key Implementation Documents*) to this Explanatory Statement.

2.3      A summary of the Transaction Implementation Deed is set out below.  In case of an inconsistency between this Part 3 and the full form Transaction Implementation Deed, the full form Transaction Implementation Deed shall prevail.

2.4      Terms capitalised in the table below and not otherwise defined herein have the meanings given to them in the Transaction Implementation Deed.

**Summary**

2.5     The Transaction Implementation Deed will be entered into between, among others, the Plan Companies (for themselves, the other Group companies, and on behalf of the Plan Creditors by virtue of the powers of attorney granted pursuant to the Plans) and the Administrative Parties.

2.6     The Transaction Implementation Deed sets out the necessary steps to be taken for the Restructuring Effective Date to occur and the Restructuring to be implemented, including execution and release of documents, and the instructions, directions, conditions precedent, steps and sequencing required in order for the Restructuring to take effect.

**Closing Steps**

2.7     The Transaction Implementation Deed sets out the Closing Steps to completion of the Restructuring. The Closing Steps will occur sequentially on the Closing Date. The Closing Steps are inter-conditional and, among other things, set out the mechanical steps necessary to discharge Plan Claims and distribute the Plan Consideration to Plan Creditors.

2.8     The Closing Date shall take place one Business Day following the date (which shall be a Business Day) on which:

2.8.1     the Majority Plan Creditors confirm to the Plan Companies in writing that each of the Closing Conditions Precedent has been satisfied or will be satisfied by virtue of completing the Closing Steps on the Closing Date, or that the Majority Plan Creditors duly waive any unsatisfied Closing Condition Precedent; and

2.8.2     the Plan Companies confirm to the Information Agent in writing that they have received such confirmation.

2.9     Immediately following the completion of the final Closing Step, the Plan Companies shall notify the Information Agent that each of the Closing Steps has completed and of the occurrence of the Restructuring Effective Date, and the Information Agent shall make such notice available on the Plan Website.

**Releases**

2.10     The Transaction Implementation Deed (and the Plans) implement the releases described at Section 8 (*Releases and Waivers*) of Part 4 (*Certain Legal Aspects of the Plans*) of this Explanatory Statement.

**Allocation and Distribution of Plan Consideration**

2.11     The Transaction Implementation Deed implements the allocation and distribution of Plan Consideration.

2.12     The Information Agent and each Plan Company (as applicable) shall make the necessary calculations to prepare the Allocations and Entitlements Table as defined in the Transaction Implementation Deed, setting out each Plan Creditor's entitlement under the Plans (including, without limitation, each Plan Creditor's entitlement to receive the Plan Consideration, including the Early Consent Fee payable to Early Consent Fee Creditors and the Standstill Fee to Standstill Fee Creditors) at the Record Time and shall notify the Plan Creditors, the Parent, FLNG 2 Parent and New BrazilCo Parent of those entitlements as at the Record Time on or before the Business Day falling after the date of the Transaction Implementation Deed.  The allocation of each Plan Creditor shall be calculated in accordance with the terms of Clause 11 (*Allocation and Distribution of Plan Consideration and Fees*) and Schedule 4 (*Aggregate Base Consideration*) of the Transaction Implementation Deed.

2.13    Any Plan Consideration not distributed to Plan Creditors at the Restructuring Effective Date will be transferred to the Holding Period Trust.

**Termination**

2.14    The Transaction Implementation Deed will terminate:

2.14.1    automatically and without the need for any further action by or on behalf of any person or Party:

(i)    on the occurrence of the Restructuring Effective Date; or

(ii)    on the Restructuring Long-Stop Time if the Restructuring Effective Date has not occurred on or before the Restructuring Long-Stop Time;

2.14.2    automatically if the Restructuring Support Agreement is terminated by any Terminating Group (as defined in the Restructuring Support Agreement) with respect to itself in connection with an RSA Termination Event (as defined in the Restructuring Support Agreement) pursuant to section 11(e) (*Termination of Obligations by Supporting Creditors*) of the Restructuring Support Agreement;

2.14.3    automatically if the Restructuring Support Agreement terminates pursuant to section 12 (*Termination of Obligations by the Company*), section 13 (*Automatic Termination*), or section 14 (*Termination by Mutual Consent*) of the Restructuring Support Agreement; or

2.14.4    upon notice from each Plan Company if, following an order of a governmental body or court of competent jurisdiction restraining or otherwise preventing the implementation of the Restructuring, such Plan Company has consulted with the Majority Plan Creditors and agreed with the Majority Plan Creditors (each acting reasonably and in good faith) that it is not possible to undertake the Restructuring as contemplated by the Transaction Implementation Deed before the Restructuring Long-Stop Time.

3    **NEW CORECO CREDIT AGREEMENT**

3.1    The Parent, as borrower, and certain other CoreCo Group entities, as guarantors, shall enter into a term loan credit facility, secured by first-priority liens (except that such liens shall rank junior to the liens securing the New CoreCo LC Facility) on substantially all assets of the CoreCo Group in accordance with the New CoreCo Credit Facility Term Sheet, in an aggregate principal amount equal to the sum of (w) up to $475 million, (x) $52.5 million of Incremental New CoreCo Term Loans incurred, (y) approximately $43.8 million of Incremental Equity-for-Debt Exchange Election New CoreCo Term Loans, and (z) solely to the extent necessary to meet the Minimum Liquidity Condition, up to $35 million in aggregate principal amount of Capital Raise New CoreCo Term Loans (plus additional principal to reflect any original issue discount) and Capital Raise New CoreCo Junior Term Loans if necessary.

3.2    The New CoreCo Credit Agreement will be entered into on the Restructuring Effective Date in accordance with the Closing Steps.

3.3    New CoreCo Term Loans will be incurred by the Parent on the Restructuring Effective Date (provided that Capital Raise New CoreCo Term Loans may be incurred prior to the Restructuring Effective Date) and (save for any Capital Raise New CoreCo Term Loans) applied to refinance, on a cashless basis, certain of the loans and other obligations outstanding under the Revolving Credit Facility and the Term Loan B Facility, as described in more detail in paragraph 1.6 of Part 2 (*Summary of the Restructuring and the Recapitalisation Transaction (Including The Plans)*) of this Explanatory Statement.

3.4    A copy of the form of the New CoreCo Credit Agreement is attached at Appendix 8 (*Key Implementation Documents*) to this Explanatory Statement.

3.5    A summary of the New CoreCo Credit Agreement is set out below.  In case of an inconsistency between this Part 3 and the full form New CoreCo Credit Agreement, the full form New CoreCo Credit Agreement shall prevail.

3.6    Terms capitalised below and not otherwise defined herein have the meanings given to them in the New CoreCo Credit Agreement .

3.7    The New CoreCo Term Loans shall be made available as part of the New CoreCo Credit Facility.

**Maturity**

3.8    The New CoreCo Term Loans will mature five years after the Restructuring Effective Date (subject to extension) and will amortise at a rate of 1 per cent. per annum.

**Guarantors and Security**

3.9    The New CoreCo Term Loans will be guaranteed, jointly and severally, on a senior secured basis (but junior to the obligations under the New CoreCo LC Facility) by each subsidiary of the Parent that is a guarantor under the New CoreCo LC Facility and will be secured by the same collateral as the collateral that secures the New CoreCo LC Facility.

3.10    The obligations under the facility will be secured by the collateral on a junior basis to the liens securing the obligations under the New CoreCo LC Facility and subject to the CoreCo Intercreditor Agreement with respect to the liens securing the New CoreCo LC Facility (which liens will be senior and have super priority).

**Interest**

3.11    The New CoreCo Term Loans will bear interest at a rate per annum equal to Term SOFR plus 6.125 per cent., payable in cash.

3.12    The Parent will be permitted to, at its option, pay interest in kind during the period commencing on the Restructuring Effective Date and ending on the last day of the first full fiscal quarter after the 18-month anniversary thereof, at a rate equal to the cash interest rate plus 150 basis points, compounding at the end of the applicable interest period (but at least quarterly).

**Prepayment**

3.13    The Parent will be permitted to voluntarily prepay the New CoreCo Term Loans, in whole or in part, subject to a prepayment premium for optional prepayments equal to 102 per cent. of the aggregate principal amount of such term loan prepaid plus accrued and unpaid interest during the first year after the Restructuring Effective Date, and at par plus accrued and unpaid interest thereafter.  The Parent will be required to prepay the New CoreCo Term Loans at par with the net proceeds of non-ordinary course asset sales, property/insurance claims, condemnation proceedings and certain other events enumerated in the New CoreCo Credit Agreement.

**Covenants and Events of Default**

3.14    The New CoreCo Credit Agreement contains usual and customary representations and warranties for transactions of this type, and usual and customary affirmative and negative covenants for transactions of this type, in each case, subject to applicable materiality qualifiers, thresholds and exceptions as set forth in the New CoreCo Credit Agreement .  The affirmative covenants include, among other things, the delivery of financial statements and notices,

payment of taxes and other obligations, preservation of existence and compliance with applicable laws and regulations, maintenance of property and insurance, and compliance with the use of proceeds.

3.15    The negative covenants include, among other things, limitations on restricted payments, paying dividends and making other payments affecting restricted subsidiaries, limitations on the incurrence of indebtedness and the creation of new liens, limitations of effectuating assets sales, mergers, or the consolidation or sale of all or substantially all assets and limitations on transactions with affiliates.

3.16    The New CoreCo Credit Agreement includes usual and customary events of default for transactions of this type.  These include, among other things, non-payment of principal, interest, fees or other amounts, material breach of representations or warranties, covenant defaults, cross-defaults with respect to other material debt, material judgements, bankruptcy or insolvency, ERISA-related defaults and impairment of security.

**Capital Raise**

3.17    As described at paragraph 2.38 of Part 2 (*Summary of the Restructuring and the Recapitalisation Transaction (Including the Plans)*) of this Explanatory Statement, if required to satisfy the Minimum Liquidity Condition on the Restructuring Effective Date, the Parent will seek to raise Capital Raise New CoreCo Term Loans and (if required) Capital Raise New CoreCo Junior Term Loans.

**Administrative Agent and Collateral Agent**

3.18    Wilmington Trust, National Association, will act as the administrative agent and the collateral agent under the New CoreCo Credit Agreement (the "**New CoreCo Term Loan Agent**").

**Governing Law**

3.19    The New CoreCo Credit Agreement will be governed by the laws of the State of New York.

**4       FLNG 2 TERM LOAN CREDIT FACILITY AGREEMENT**

4.1     FLNG 2 Parent and certain of its subsidiaries shall enter into a new non-recourse senior secured term loan agreement in an aggregate principal amount of approximately $400 million.

4.2     The FLNG 2 Term Loan Credit Facility Agreement will be entered into on the Restructuring Effective Date.

4.3     FLNG 2 Term Loans will be incurred by FLNG 2 Parent on the Restructuring Effective Date and applied to refinance, on a cashless basis, certain of the loans and other obligations outstanding under the Revolving Credit Facility, the Term Loan B Facility and the Term Loan A Facility, as described in more detail in paragraph 1.6 of Part 2 (*Summary of the Restructuring and the Recapitalisation Transaction (Including The Plans)*) of this Explanatory Statement.

4.4     A copy of the form of the FLNG 2 Term Loan Credit Facility Agreement is attached at Appendix 8 (*Key Implementation Documents*) to this Explanatory Statement.

4.5     A summary of the FLNG 2 Term Loan Credit Facility Agreement is set out below.  In case of an inconsistency between this Part 3 and the full form FLNG 2 Term Loan Credit Facility Agreement, the full form FLNG 2 Term Loan Credit Facility Agreement shall prevail.

4.6     Terms capitalised below and not otherwise defined herein have the meanings given to them in the FLNG 2 Term Loan Credit Facility Agreement.

67

4.7     The FLNG 2 Term Loans shall be made available as part of the FLNG 2 Term Loan Facility.

**Maturity**

4.8     The FLNG 2 Term Loans will have no amortisation and will be due and payable in full three years after the Restructuring Effective Date.

**Guarantors and Security**

4.9     The FLNG 2 Term Loans will be guaranteed, jointly and severally, on a senior secured basis by the FLNG 2 Parent and each of its subsidiaries and will be secured by first-priority liens on all of the assets of the FLNG 2 Loan Parties, subject to certain exceptions.

**Interest**

4.10    The FLNG 2 Term Loans will bear interest at a rate per annum equal to Term SOFR plus 3.00 per cent, payable-in-kind and capitalised on the last day of each interest period (which will be at least quarterly) and which may be paid in cash at the option of the FLNG 2 Parent.

**Prepayment**

4.11    The FLNG 2 Parent will be permitted to voluntarily prepay the FLNG 2 Term Loans, in whole or in part, subject to a prepayment premium for voluntary prepayments equal to 103 per cent. of the aggregate principal amount of such term loans prepaid plus accrued and unpaid interest during the third year following the Restructuring Effective Date.  There will be no prepayment premium if prepaid during the first or second year following the Restructuring Effective Date.  The FLNG 2 Parent will be required to prepay the FLNG 2 Term Loans at par with the net proceeds of non-ordinary course asset sales, property/insurance claims, condemnation proceedings and certain other events enumerated in the FLNG 2 Term Loan Credit Facility Agreement, only after payment in full of all obligations owing by any FLNG 2 Loan Party in respect of permitted management services provided by the Loan Parties (as defined in the New CoreCo Credit Agreement) to any FLNG 2 Loan Party (including the payment of costs and expenses relating thereto or in connection therewith) and cash payments in respect of awards under the FLNG 2 MIP.

**Covenants and Events of Default**

4.12    The FLNG 2 Term Loan Credit Facility Agreement contains limited representations and warranties and affirmative and negative covenants, in each case, subject to applicable materiality qualifiers, thresholds and exceptions as set forth in the FLNG 2 Term Loan Credit Facility Agreement.  The affirmative covenants include, among other things, the delivery of financial statements and notices, payment of taxes and other obligations, preservation of existence and compliance with applicable laws and regulations, maintenance of property and insurance, and compliance with the use of proceeds.

4.13    The negative covenants include, among other things, limitations on restricted payments, paying dividends and making other payments affecting restricted subsidiaries, limitations on the incurrence of indebtedness and the creation of new liens, limitations of effectuating assets sales, mergers, or the consolidation or sale of all or substantially all assets and limitations on transactions with affiliates.

4.14    The FLNG 2 Term Loan Credit Facility Agreement includes usual and customary events of default.  These include, among other things, non-payment of principal, interest, fees or other amounts, material breach of representations or warranties, covenant defaults, cross-defaults with respect to other material debt, material judgements, bankruptcy or insolvency, ERISA-related defaults and impairment of security.

**Administrative Agent and Collateral Agent**

4.15    Wilmington Trust, National Association, will act as the administrative agent and the collateral agent under the FLNG 2 Term Loan Credit Facility Agreement (the "**FLNG 2 Term Loan Agent**").

**Governing Law**

4.16    The FLNG 2 Term Loan Facility will be governed by the laws of the State of New York.

**5        CORECO INTERCREDITOR AGREEMENT**

5.1    In connection with the New CoreCo Credit Facility, the Parent and certain of its subsidiaries shall acknowledge the CoreCo Intercreditor Agreement, anticipated to be entered into among Natixis, New York Branch, as collateral agent for the super priority lien secured parties, Wilmington Trust, National Association, as collateral agent for the senior lien secured parties, Natixis, New York Branch, in its capacity as common representative for the secured parties, and Natixis, New York Branch, in its capacity as controlling authorised representative for the secured parties.  The CoreCo Intercreditor Agreement will, among other things, govern priority as between the New CoreCo Credit Facility and the New CoreCo LC Facility.

5.2    A summary of the CoreCo Intercreditor Agreement is set out below.  In case of an inconsistency between this Part 3 and the full form CoreCo Intercreditor Agreement, the full form CoreCo Intercreditor Agreement shall prevail.

5.3    Terms capitalised below and not otherwise defined herein have the meanings given to them in the CoreCo Intercreditor Agreement.

**Summary**

5.4    The CoreCo Intercreditor Agreement is expected to be entered into on the Restructuring Effective Date and will govern the relationship between the secured parties under the New CoreCo Credit Facility (the "**Senior Lien Secured Parties**") and the secured parties under the New CoreCo LC Facility (the "**Super Priority Lien Secured Parties**", and together with the Senior Lien Secured Parties, the "**Secured Parties**"), including with respect to the assets that will secure the obligations (including guarantor obligations) under both of the New CoreCo Term Loan and the New CoreCo LC Facility (the "**Shared Collateral**") and the priority of liens securing respective obligations.  The Parent and certain of its subsidiaries (the "**Grantors**") will acknowledge the CoreCo Intercreditor Agreement, entered into by and among Natixis, New York Branch, as collateral agent for the Super Priority Lien Secured Parties (in such capacity, the "**Super Priority Lien Collateral Agent**"), Wilmington Trust, National Association, as collateral agent for the Senior Lien Secured Parties (in such capacity, the "**Senior Lien Collateral Agent**"), Natixis, New York Branch, in its capacity as common representative for the secured parties, and Natixis, New York Branch, in its capacity as controlling authorized representative for the secured parties (in such capacity, the "**Controlling Authorized Representative**"). As used herein, (1) "Common Representative" means (i) Natixis, New York Branch, as the initial common collateral agent, with respect to (x) each asset pledge agreement and equity interest pledge agreement in effect on the Restructuring Effective Date governed by the laws of Mexico and executed in favor of the Super Priority Lien Collateral Agent, and (y) each other single lien security document to which it is a party, and (ii) each additional common representative, with respect to each single lien security document to which it is a party; (2) "Authorized Representative" means (i) in the case of any Super Priority Lien Obligations or the Super Priority Lien Secured Parties, the Super Priority Lien Collateral Agent and (ii) in the case of the Senior Lien Obligations or the Senior Lien Secured Parties, the Senior Loan Collateral Agent and (iii) in the case of any single lien security document, the Common Representative party to such document; (3) "Non-Controlling Authorized Representative" means, at any time

with respect to any Shared Collateral, any Authorized Representative that is not the Controlling Authorized Representative at such time with respect to such Shared Collateral; (4) "Controlling Secured Parties" means, with respect to any Shared Collateral, the Secured Parties whose Authorized Representative is the Controlling Authorized Representative for such Shared Collateral; (5) "Non-Controlling Secured Parties" means, with respect to any Shared Collateral, the Secured Parties which are not Controlling Secured Parties with respect to such Shared Collateral; and (6) "Collateral" means all assets and properties subject to liens created pursuant to any Shared Collateral Document (defined below) to secure any Secured Obligations (defined below).

**Priority of Liens with Respect to Shared Collateral**

5.5    The liens on the Shared Collateral that secure the obligations under the New CoreCo LC Facility (the "**Super Priority Lien Obligations**") will rank senior in priority to the liens on the Shared Collateral that secure the obligations under the New CoreCo Term Loan (the "**Senior Lien Obligations**"), and the liens on the Shared Collateral securing the Senior Lien Obligations will be junior to the liens on the Shared Collateral securing the Super Priority Lien Obligations.

**Priority of Claims with Respect to Shared Collateral**

5.6    If an event of default under any of the Super Priority Lien Debt Documents (defined below) or Senior Lien Debt Documents (defined below) occurs and is continuing and (i) the Controlling Authorized Representative is taking action to enforce the rights in respect of the Shared Collateral, and/or (ii) any distribution is made in respect of any Shared Collateral in any Insolvency or Liquidation Proceeding (as defined below) of any Grantor, and/or (iii) any Secured Party receives any payment pursuant to any intercreditor agreement (other than the CoreCo Intercreditor Agreement) with respect to any Shared Collateral, then the proceeds of any sale, collection, or other disposition or distribution of the Shared Collateral are expected to be applied by the Controlling Authorized Representative in the following order: (1) to the payment of all reasonable fees, costs and expenses incurred by the Controlling Authorized Representative in connection with such collection, sale or other disposition (or otherwise); (2) to the payment in full of the Super Priority Lien Obligations and in accordance with the terms of the applicable New CoreCo LC Facility documents (the "**Super Priority Lien Debt Documents**"); (3) following the discharge of the Super Priority Lien Obligations, to the payment of all reasonable fees, costs and expenses incurred by the Senior Lien Collateral Agent in connection with such collection, sale, or other disposition (or otherwise); (4) to the payment in full of the Senior Lien Obligations and in accordance with the terms of the applicable New CoreCo Term Loan Facility documents (the "**Senior Lien Debt Documents**"); and (5) following the discharge of the Senior Lien Obligations, to the Grantors or their successors or assigns, as their interests may appear, or to whomever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

**Authority of Controlling Authorized Representative; Actions with Respect to the Shared Collateral**

5.7    With respect to any Shared Collateral, only the Controlling Authorized Representative will have the right to act or to refrain from acting with respect to the Shared Collateral and no other Authorized Representative or other Secured Party will have the right to instruct the Controlling Authorized Representative to exercise any right or remedy or to take any other action with respect to any Shared Collateral.

5.8    Each of the Authorized Representatives will agree not to accept any lien on Shared Collateral other than pursuant to any security agreements or other collateral documents entered into in connection with the New CoreCo Credit Facility and the New CoreCo LC Facility, as applicable (such documents, excluding for the avoidance of doubt the Existing Control Agreement (as defined in the Letter of Credit Agreement)), the "**Shared Collateral Documents**").

70

5.9 Each of the Authorized Representatives, on behalf of itself and the other applicable Secured Parties that it represents, will agree not to contest, or support any other person in contesting, any bankruptcy or insolvency proceeding, liquidation, or similar proceeding (an "**Insolvency or Liquidation Proceeding**") or the perfection, priority or enforceability of a lien held by or on behalf of any of the Secured Parties relating to the Shared Collateral.

5.10 Each Authorized Representative, on behalf of itself and the other applicable Secured Parties that it represents, will agree that, if it shall obtain possession of any Shared Collateral or shall realize any proceeds or payment in respect of any such Shared Collateral (other than any reorganization securities distributed pursuant to a plan of reorganization or similar restructuring plan that satisfy the requirements of the CoreCo Intercreditor Agreement) at any time prior to the discharge of the Super Priority Lien Obligations, then it will hold such Shared Collateral, proceeds or payment in trust for the other Secured Parties and promptly transfer such Shared Collateral, proceeds or payment, as the case may be, to the Controlling Authorized Representative, to be distributed by the Controlling Authorized Representative in accordance with the terms of the CoreCo Intercreditor Agreement.

5.11 The Controlling Authorized Representative will agree to hold any Shared Collateral constituting possessory collateral or control collateral in its possession or control (or in the possession or control of its agents or bailees) as gratuitous bailee and/or gratuitous agent for the benefit of and on behalf of each other Secured Party and any assignee solely for the purpose of perfecting the security interest granted in such possessory collateral or control collateral, if any.

5.12 The CoreCo Intercreditor Agreement may also contain provisions granting the Senior Lien Secured Parties the right (following the expiration of a customary standstill period and subject to other customary limitations) to exercise certain rights and remedies with respect to Shared Collateral in the event the Super Priority Lien Secured Parties either decline to exercise such rights and remedies or the applicable standstill expires, although  any such terms (if agreed) remain subject to continued negotiations among, and the mutual agreement of, the Super Priority Lien Secured Parties and the Senior Lien Secured Parties.

**Certain Agreements with Respect to Insolvency or Liquidation Proceedings**

5.13 Although the Super Priority Lien Secured Parties and the Senior Lien Secured Parties continue to negotiate their rights and undertakings with respect to Insolvency or Liquidation Proceedings and DIP Financings, as provided below, the CoreCo Intercreditor Agreement is expected to address circumstances where any Grantor becomes subject to a case under Title 11 of the U.S. Bankruptcy Code and shall, as debtor(s)-in-possession, move for approval of financing ("**DIP Financing**") to be provided by one or more lenders under Section 364 of the Bankruptcy Code or the use of cash collateral under Section 363 of the Bankruptcy Code.  Under such circumstances, subject to the mutual agreement of the Secured Parties (and any other rights and undertakings agreed in the final CoreCo Intercreditor Agreement), it is expected that:

5.13.1 the Non-Controlling Authorized Representative on behalf of itself and the other applicable Non-Controlling Secured Parties, will agree not to object to any such financing or to the liens on the Shared Collateral securing the same ("**DIP Financing Liens**") or to any use of cash collateral that constitutes Shared Collateral, unless the Controlling Authorized Representative or any Controlling Secured Party with respect to such Shared Collateral opposes or objects to such DIP Financing or such DIP Financing Liens or use of cash collateral, and

5.13.2 each Non-Controlling Authorized Representative, on behalf of itself and the other applicable Non-Controlling Secured Parties, will agree that it will not (and will waive any right to) object to or oppose: (i) any motion for relief from the automatic stay or from any injunction against foreclosure or enforcement in respect of the Super Priority

71

Lien Obligations made by the Controlling Authorized Representative or any Super Priority Lien Secured Party; (ii) any exercise by any Super Priority Lien Secured Party of the right to credit bid its obligations at any sale or foreclosure of Shared Collateral; (iii) any other request for judicial relief made in any court by any Super Priority Lien Secured Party relating to the lawful enforcement of any lien on Shared Collateral; or (iv) any order relating to a sale or other disposition of Shared Collateral to which the Controlling Authorized Representative has consented or not objected that provides that the liens securing the Super Priority Lien Obligations and the Senior Lien Obligations (such Senior Lien Obligations, together with the Super Priority Lien Obligations, the "**Secured Obligations**") shall attach to the proceeds of such sale on the same basis of priority as existed immediately prior to such sale. Notwithstanding the foregoing, the Senior Lien Collateral Agent (either directly or via one or more acquisition vehicles and at the direction of the Required Lenders (as such term is defined in the Senior Lien Debt Agreement)) or the other Senior Lien Secured Parties may bid for or purchase Shared Collateral in any such sale or foreclosure; provided that, to the extent any such bid includes a credit bid of Senior Lien Obligations, the cash portion of such bid shall be sufficient to result in the discharge of the Super Priority Lien Obligations.

**Release of Liens; Etc.**

5.14    If at any time the Controlling Authorized Representative forecloses or otherwise exercises remedies with respect to any Shared Collateral, then the liens in favor of each Authorized Representative for the benefit of each of the Secured Parties upon such Shared Collateral shall be automatically, unconditionally and irrevocably released and discharged, without any further action, consent or authorization by any person being required by the CoreCo Intercreditor Agreement in order for such release and discharge to be effective; provided that any proceeds of any Shared Collateral realized therefrom shall be applied pursuant to priority of claims in accordance with the relevant provisions of the CoreCo Intercreditor Agreement. Each Non-Controlling Authorized Representative appoints the Controlling Authorized Representative as its attorney-in-fact, coupled with an interest, to execute and file any UCC termination statements or other instruments evidencing such release and discharge, which appointment shall survive any Insolvency or Liquidation Proceeding.

5.15    If, in connection with any sale, lease, exchange, transfer or other disposition of any Shared Collateral permitted under the terms of the Super Priority Lien Debt Documents and the Senior Lien Debt Documents (whether or not an event of default thereunder has occurred and is continuing), the Controlling Authorized Representative, for itself or on behalf of the Controlling Secured Parties, will release any of its liens on any part of the Shared Collateral, then the liens, if any, of each Non-Controlling Authorized Representative on such Shared Collateral (but not the proceeds thereof, which shall be subject to the priorities set forth in the CoreCo Intercreditor Agreement) shall be automatically, unconditionally and simultaneously released, and each Non-Controlling Authorized Representative will execute, if applicable, at the Grantors' sole cost and expense and without recourse, representation or warranty, termination statements, releases, authorizations and other documents and instruments evidencing such release and discharge prepared by the Controlling Authorized Representative or the Grantors as the Controlling Authorized Representative may reasonably request.

5.16    The Controlling Authorized Representative may, without the consent of any Non-Controlling Authorized Representative or any other Secured Party and without the consent of any Grantor (except to the extent expressly required under the applicable Super Priority Lien Debt Documents and/or Senior Lien Debt Documents), enter into, agree to or effect any amendment, restatement, supplement, modification, waiver or release under any Shared Collateral Document, including any amendment or release relating to the scope of the Collateral or the liens securing the Secured Obligations, so long as such amendment, restatement, supplement, modification, waiver or release does not materially and adversely affect the priority of the liens

72

securing the Secured Obligations as expressly set forth in the CoreCo Intercreditor Agreement; provided, however, no such consent, approval or direction shall affect the rights, duties, protections, immunities, indemnities or obligations of the Senior Collateral Agent or the Senior Administrative Agent without the consent of the Senior Collateral Agent or the Senior Administrative Agent, as applicable.

**Amendments to the CoreCo Intercreditor Agreement**

5.17   Except under the circumstances described above in the last paragraph under the heading "Release of Liens, Etc.", the CoreCo Intercreditor Agreement may only be amended, waived, supplemented or otherwise modified by an agreement or agreements in writing entered into by each Authorized Representative (or its authorised agent), and acknowledged by, the Parent and each other affected Grantor.

**Purchase Right**

5.18   Although the Super Priority Lien Secured Parties and the Senior Lien Secured Parties continue to negotiate their rights and undertakings with respect thereto, if mutually agreed the CoreCo Intercreditor Agreement may contain provisions granting the Senior Lien Secured Parties the option to purchase Super Priority Lien Obligations following the occurrence of certain events; provided that (among other things) the purchase price includes all Super Priority Lien Obligations (including principal, interest, fees and expenses).

## 6   CORECO REGISTRATION RIGHTS AGREEMENT

6.1   The CoreCo Registration Rights Agreement will be entered into on the Restructuring Effective Date.

6.2   A copy of the form of the CoreCo Registration Rights Agreement is attached at Appendix 8 (*Key Implementation Documents*) to this Explanatory Statement.

6.3   A summary of the CoreCo Registration Rights Agreement is set out below.  In case of an inconsistency between this Part 3 and the full form CoreCo Registration Rights Agreement, the full form CoreCo Registration Rights Agreement shall prevail.

**Summary**

6.4   The Parent will enter into the CoreCo Registration Rights Agreement with each Plan Company on behalf of each Plan Creditor, providing customary registration rights for any CoreCo Common Stock and CoreCo Preferred Stock (including the shares of CoreCo Common Stock underlying the CoreCo Preferred Stock ) (such securities, together with any securities issued or issuable in respect of such shares by way of conversion, exchange, stock dividend, split or combination, recapitalisation, merger, consolidation or otherwise, the "**Registrable Securities**") received pursuant to the Recapitalisation Transaction.

6.5   The Registrable Securities will cease to be Registrable Securities on the first date that (i) a registration statement with respect to the sale of such securities has become effective under the Securities Act and such securities are disposed of in accordance with such registration statement, (ii) such securities are sold in accordance with Rule 144 under the Securities Act or any successor provision ("**Rule 144**") or an applicable exemption from registration under the Securities Act, (iii) such securities have become freely tradeable under Rule 144 without a holding period, current public information requirement, limitation on volume, manner of sale restrictions or notice requirements and any and all securities law restrictive legends and "stop transfer" notations associated with such securities have been removed, or (iv) such securities are sold to the Parent.

**Shelf Registration**

6.6     Pursuant to the CoreCo Registration Rights Agreement, the Parent will, on or as soon as reasonably practicable after the Restructuring Effective Date, but in no event greater than ten business days after the Restructuring Effective Date, file a registration statement on Form S-1 (or applicable successor form) to register all of the Registrable Securities (the "**Initial Registration Statement**").

6.7     The Parent will use commercially reasonable efforts to have the Initial Registration Statement declared effective as soon as practicable after filing, but no later than thirty calendar days after filing (or ninety calendar days after filing if the SEC notifies the Parent that it will "review" the Initial Registration Statement).

6.8     The Initial Registration Statement will provide for offerings on a delayed or continuous basis pursuant to Rule 415 under the Securities Act.  The Parent will use commercially reasonable efforts to keep the Initial Registration Statement effective until the earliest of (i) the date that all Registrable Securities cease to be Registrable Securities or (ii) the date the S-3 Resale Shelf (as defined below) has become effective.

6.9     Once the Parent is eligible to file a shelf registration statement on Form S-3 or a successor form, the Parent will use commercially reasonable efforts to, as soon as reasonably practicable, (i) convert the Initial Registration Statement into a registration statement on Form S-3, or (ii) if the Parent does not have an outstanding registration statement on Form S-1 at such time, file a shelf registration statement on Form S-3 or a successor form, covering the remaining Registrable Securities that have not been sold pursuant to Rule 144 or a registration statement (the "**S-3 Resale Shelf**").  The Parent will use commercially reasonable efforts to keep the S-3 Resale Shelf effective until the earlier of (i) the date that all Registrable Securities cease to be Registrable Securities, and (ii) the date that all such Registrable Securities have been sold pursuant to Rule 144 or a registration statement.

**Demand Registration**

6.10    If a registration statement is unavailable during any period following its effectiveness (a "**Demand Registration Period**"), holders of Registrable Securities representing at least ten per cent. of the then-outstanding Registrable Securities (the "**Demanding Holders**") may make written demands to effect one or more registration statements under the Securities Act (each, a "**Demand Registration**"). The Demanding Holders shall be entitled to request (and the Parent shall be required to effect) an unlimited number of Demand Registrations.

6.11    If requested by the Demanding Holders, the Parent will conduct an underwritten offering off of the Initial Registration Statement or S-3 Resale Shelf, as applicable, covering CoreCo Common Stock and, if applicable, CoreCo Preferred Stock requested by such holders (a "**Shelf Underwriting**"); provided the gross proceeds from such offering are reasonably expected to exceed, in the aggregate, the lower of (i) $25,000,000 and (ii) ten per cent. of the aggregate amount of then-outstanding Registrable Securities. The Parent will not be obligated to undertake more than five Shelf Underwritings in the aggregate and no more than two Shelf Underwritings in any twelve-month period. The Demanding Holders may specify the type of offering to be covered by the Shelf Underwriting, such as an underwritten offering or registered block trade.

6.12    The rights to demand registration will be subject to usual and customary exceptions and limitations (including, without limitation, priority and cutbacks).

**Piggyback Registration**

6.13   Each holder of Registrable Securities representing at least five per cent. of the then-outstanding Registrable Securities will have the right to request the inclusion of its CoreCo Preferred Stock and CoreCo Common Stock in a registration statement by the Parent each time the Parent proposes for any reason (subject to limited exceptions) to register CoreCo Preferred Stock and/ or CoreCo Common Stock under the Securities Act.

6.14   The rights to piggyback registration may be exercised an unlimited number of occasions and will be subject to usual and customary exceptions and limitations (including, without limitation, exceptions for employee plan S-8 filings and acquisition transactions, and limitations on the selection of underwriters, priority and cutbacks).

**Registration Procedures**

6.15   The CoreCo Registration Rights Agreement will also contain customary provisions relating to registration procedures to be followed by the Parent, indemnification obligations, delay and suspension rights, selection of underwriters, priority, cutbacks, lock-ups (to the extent requested by an applicable underwriter) and payment of expenses of registrations by the Parent (including reasonable fees and disbursements of one counsel for the selling holders of Registrable Securities, but excluding underwriter discounts and commissions).

**Other Obligations**

6.16   Following the Restructuring Effective Date, the Parent will use commercially reasonable efforts to continue as an SEC public reporting company and to timely file all reports required thereunder.

6.17   If the CoreCo Common Stock and CoreCo Preferred Stock are not then listed on the Nasdaq Global Select Market or another national securities exchange, the holders of a majority of the number of shares of CoreCo Preferred Stock outstanding on the Restructuring Effective Date can require the Parent to use commercially reasonable efforts to cause the CoreCo Common Stock and, after the Parent satisfies applicable listing standards, the CoreCo Preferred Stock, to be listed on a national securities exchange as soon as reasonably practicable.

## 7   NEW BRAZILCO GOVERNANCE DOCUMENTS

7.1   The New BrazilCo Governance Documents will be entered into on the Restructuring Effective Date.

7.2   A summary of the New BrazilCo Governance Documents is set out below.   In case of an inconsistency between this Part 3 and the full form New BrazilCo Governance Documents, the full form New BrazilCo Governance Documents shall prevail.

7.3   The New BrazilCo Governance Documents will provide for other customary terms, including, without limitation, the time, place and manner of calling of regular and special meetings of stockholders and the BrazilCo Board, that actions may be taken by the BrazilCo Board or stockholders without a meeting by written consent, the titles and duties of officers of the New BrazilCo Parent and the manner of appointment, removal and replacement thereof, and indemnification and exculpation of directors, officers and other appropriate persons.   The scope of actions subject to stockholder approval will be only as required under applicable law except as may otherwise be set forth in the New BrazilCo Governance Documents.

7.4   The New BrazilCo Governance Documents will not be amended, modified or waived without the approval of the BrazilCo Board and a majority of the issued and outstanding equity of New BrazilCo Parent on an as-converted basis, unless a greater percentage is required under the New

BrazilCo Governance Documents, applicable law or the rules and regulations of any exchange or quotation system on which New BrazilCo Parent's securities are listed or quoted for trading. Amendments to the amending provisions in the New BrazilCo Governance Documents will require approval by at least a majority of the issued and outstanding equity of New BrazilCo Parent on an as-converted basis.

**8   FLNG 2 PARENT LLCA**

8.1   The FLNG 2 Parent LLCA will be entered into on the Restructuring Effective Date.

8.2   A copy of the form of the FLNG 2 Parent LLCA is attached at Appendix 8 (*Key Implementation Documents*) to this Explanatory Statement.

8.3   A summary of the FLNG 2 Parent LLCA is set out below.  In case of an inconsistency between this Part 3 and the full form FLNG 2 Parent LLCA, the full form FLNG 2 Parent LLCA shall prevail.

8.4   Terms capitalised below and not otherwise defined herein have the meanings given to them in the FLNG 2 Parent LLCA.

**Summary**

8.5   Effective as of the Restructuring Effective Date, the Parent as managing member of the FLNG 2 Parent (the "**Managing Member**") intends to amend and restate the FLNG 2 Parent LLCA to, among other things, establish the terms of the FLNG 2 Preferred Equity.

8.6   Following the Recapitalisation Transaction, the FLNG 2 Parent and its subsidiaries will remain subsidiaries of the Parent but shall operate on an arm's-length basis *vis-à-vis* the Parent.  On the Restructuring Effective Date, the FLNG 2 Parent shall incur $400 million of FLNG 2 Term Loans and issue $200 million of FLNG 2 Preferred Equity.

8.7   In the event that the FLNG 2 Parent is sold, transferred, or disposed (however such sale, transfer, or disposal is structured, including, without limitation, any sale of the equity interests of the FLNG 2 Parent or any direct or indirect subsidiary thereof or any of its or their respective assets) following the Restructuring Effective Date, the Parent shall retain any proceeds from such sale, transfer, or disposal of the FLNG 2 Parent in excess of the sum of (a) the outstanding obligations under the FLNG 2 Term Loan Facility, and (b) the FLNG 2 Preferred Equity, after giving effect to the FLNG 2 MIP.

8.8   Under the FLNG 2 Parent LLCA, management of the FLNG 2 Parent will be fully reserved to the Parent as managing member, which has sole authority to direct the business and affairs of FLNG 2 Parent and to make all decisions and take all actions on its behalf.

**9   HOLDING PERIOD TRUST DEED**

9.1   The Holding Period Trust Deed will be entered into on the Restructuring Effective Date.

9.2   A copy of the form of the Holding Period Trust Deed is attached at Appendix 8 (*Key Implementation Documents*) to this Explanatory Statement.

9.3   A summary of the Holding Period Trust Deed is set out below.  In case of an inconsistency between this Part 3 and the full form Holding Period Trust Deed, the full form Holding Period Trust Deed shall prevail.

9.4   Terms capitalised below and not otherwise defined herein have the meanings given to them in the Holding Period Trust Deed.

**Summary**

9.5    In order to receive its Plan Consideration on the Restructuring Effective Date, each Plan Creditor must complete (or procure that their Account Holder completes) a Plan Creditor Letter and deliver it to the Information Agent and provide satisfactory evidence that they are Eligible Persons on or before the Voting Instructions Deadline.

9.6    The relevant Plan Consideration of any Plan Creditor who (i) fails to submit a validly completed Plan Creditor Letter to the Information Agent, and/ or (ii) fails to provide satisfactory evidence that it is an Eligible Person before the Voting Instructions Deadline shall, in each case, be issued and delivered on the Restructuring Effective Date to the Holding Period Trustee to be held on bare trust in the Holding Period Trust for the benefit of the relevant Plan Creditor (or its Nominee) in accordance with the terms of the Holding Period Trust Deed.

9.7    Plan Creditors who are not Eligible Persons or who are Unadmitted Plan Creditors are, in each case, entitled to elect for their entitlement to the Plan Consideration to be issued or allocated (as applicable) to their Nominee (if such Nominee is an Eligible Person and has delivered a confirmation deed (as set out at Part 6 (*Confirmation Deed*) of the Plan Creditor Letter) to the Information Agent on or prior to the Voting Instructions Deadline in accordance with the provisions of the Plan Creditor Letter).

9.8    Following the last day of the period of twelve months commencing on the Restructuring Effective Date (the "**Holding Period**") the Holding Period Trustee will, as soon as reasonably practicable thereafter, use reasonable endeavours, including through an independent broker or any other reputable institution with relevant experience, to sell or otherwise dispose of all remaining Plan Consideration which does not result from any rounding up or down of a fractional entitlement on arm's length terms for such consideration as it is able to obtain in the market at the time of sale. The Holding Period Trustee shall pay the consideration received by it in respect of the sale or disposal of any Plan Consideration (net of any taxes, withholding, deductions, commissions, other fees or other costs or any other expenses or liabilities, in each case, in connection with or arising out of such sale or disposal) and any Related Rights in cash form related to the Plan Consideration so disposed to the relevant Plan Creditors (or their Nominee) that are entitled to the relevant Plan Consideration sold or otherwise disposed of by the Holding Period Trustee. Any net consideration received by the Holding Period Trustee with respect to any such sale or disposal shall be held by the Holding Period Trustee for a further period of six months following the Holding Period Expiry Date.

9.9    Following that further period of six months, if the Holding Period Trustee has been unable to sell or otherwise dispose of the assets in the Holding Period Trust, or there are any remaining assets in the Holding Period Trust that could not be transferred to those entitled thereto (for any reason whatsoever, including because a Plan Creditor did not claim their entitlement to the Plan Consideration), then the Holding Period Trustee will, as soon as reasonably practicable thereafter, sell or otherwise dispose of such assets and take all such steps as are necessary to donate any net consideration realised from such sale or disposal as well as any remaining trust assets to a charity to be designated by the Plan Companies at that time.

## 10    DEEDS OF UNDERTAKING

10.1    Each Deed of Undertaking will be entered into prior to the Plan Effective Date.

10.2    A copy of the forms of the Deeds of Undertaking are attached at Appendix 8 (*Key Implementation Documents*) to this Explanatory Statement.

10.3    A summary of the Deeds of Undertaking are set out below. In case of an inconsistency between this Part 3 and the full form Deeds of Undertaking, the full form Deeds of Undertaking shall prevail.

10.4    In order to successfully implement the Recapitalisation Transaction, participation is required from, among others, the Undertaking Parties.  Each of the Undertaking Parties is expected to execute and deliver prior to the Sanction Hearing a Deed of Undertaking in favour of one or both of the Plan Companies and the Plan Creditors, pursuant to which each such Undertaking Party will irrevocably and severally agree and undertake (subject to the Plans being sanctioned by the Court):

10.4.1    to be bound by and comply with the obligations expressed to apply to it in the Plans (in such form as may be sanctioned by the Court);

10.4.2    on and from the Plan Effective Date, to promptly do or procure to be done all such acts and things reasonably necessary for the purpose of giving effect to the Plans (in such form as may be sanctioned by the Court); and

10.4.3    to execute as soon as reasonably practicable, and be bound by, the Implementation Documents to which it is party.

## 11    SUMMARY OF EQUITY INSTRUMENTS ISSUED AS PLAN CONSIDERATION

11.1    In addition, this Part 3 contains summaries of key terms relating to the following instruments to be issued to Plan Creditors as part of the Plan Consideration, which instruments are governed by, and subject to the terms of, the Amended and Restated Certificate of Incorporation, Amended and Restated By-Laws and Certificate of Designation (as well as the FLNG 2 Parent LLCA and New BrazilCo Governance Documents described above), as applicable, which are available on the Plan Website:

11.1.1    the CoreCo Common Stock;

11.1.2    the CoreCo Preferred Stock;

11.1.3    the FLNG 2 Preferred Equity; and

11.1.4    the BrazilCo Common Equity.

## 12    CORECO COMMON STOCK

12.1    The CoreCo Common Stock is the Class A common stock of the Parent from and after the Restructuring Effective Date, with a par value of $0.01 per share.

**Listing and Trading**

12.2    The Parent expects the CoreCo Common Stock to be DTC-eligible and freely tradable following the Restructuring Effective Date, subject to applicable securities laws.

12.3    The Parent will use commercially reasonable efforts to maintain the listing of the CoreCo Common Stock on the Nasdaq Global Select Market or another National Securities Exchange.

**Equity Agent**

12.4    Equiniti Trust Company, LLC acts as the agent for the CoreCo Common Stock (the "**CoreCo Common Stock Agent**").

**Governing Law**

12.5    The governing law of the CoreCo Common Stock will be the law of the State of Delaware.

## 13    CORECO PREFERRED STOCK

13.1    The terms of the CoreCo Preferred Stock are summarised below and described in the Proxy Statement.

13.2    The CoreCo Preferred Stock will comprise cumulative convertible preferred stock of the Parent, authorised as up to 2,641,052 shares of preferred stock with a par value of $0.01 per share, to be issued in registered book-entry form on the Restructuring Effective Date pursuant to the terms set forth in a certificate of designations to be filed with the Secretary of State of the State of Delaware.

### Ranking

13.3    The CoreCo Preferred Stock will be subordinated to all existing and future indebtedness of the Parent and senior to all existing and future equity securities of the Parent with respect to rights to the payment of dividends and the distribution of assets upon liquidation, dissolution or winding up, bearing an original liquidation preference of a per share amount in cash equal to $1,000 per each share plus the amount of accrued but unpaid preferred dividends (together, the "**Liquidation Preference**").

### Mandatory Conversion

13.4    Each share of CoreCo Preferred Stock will automatically convert upon the third anniversary of the issue date into shares of CoreCo Common Stock at a conversion rate equal to the Liquidation Preference divided by the conversion rate then in effect (subject to adjustment as described below).

13.5    When issued, the CoreCo Preferred Stock and any shares of CoreCo Common Stock issued upon the conversion of the CoreCo Preferred Stock will be fully paid and non-assessable, free from pre-emptive rights and free of any lien or adverse claim (except to the extent of any lien or adverse claim created by the action or inaction of the applicable holder).

13.6    Cash shall be paid *in lieu* of any fractional shares of CoreCo Common Stock otherwise issuable upon conversion.

### Anti-Dilution Protections

13.7    The CoreCo Preferred Stock is subject to:  (i) mechanical adjustments to proportionally adjust the conversion rate and number of shares of CoreCo Common Stock issuable upon conversion in the event of any split, reverse split, combination or subdivision, stock dividend, recapitalisation or similar event; and (ii) weighted average anti-dilution protection on future issuances of CoreCo Common Stock at a price less than the then current fair market value.

### Dividends

13.8    The CoreCo Preferred Stock will bear a cumulative quarterly compounding dividend, which will accrue via an increase to the Liquidation Preference, with a cumulative per annum preferred return of 3.0 per cent. in Year 1, 5.0 per cent. in Year 2 and 7.0 per cent. in Year 3. Holders of CoreCo Preferred Stock will participate on an as-converted basis in any dividends and distributions on the CoreCo Common Stock.

13.9    Without the prior written consent of holders constituting at least two-thirds of the outstanding voting power of the CoreCo Preferred Stock, no dividends or distributions may be declared or paid on, and no shares of, CoreCo Common Stock or other equity ranking junior to or on parity with the CoreCo Preferred Stock may be redeemed or acquired (subject to customary exceptions).

**Liquidation**

13.10    Upon any voluntary or involuntary liquidation, dissolution or winding up of the Parent, any bankruptcy or insolvency event, or any deemed liquidation event (including mergers or consolidations in which the Parent's stockholders cease to hold a majority of the surviving entity's voting stock, dispositions of 80% or more of consolidated assets, and acquisitions by a third party of more than 50% of the Parent's outstanding voting stock), holders shall receive the Liquidation Preference plus accrued and unpaid dividends before any distribution to holders of equity ranking junior to the CoreCo Preferred Stock.  If the assets available for distribution are insufficient to pay the full preference, distributions shall be made ratably among holders of CoreCo Preferred Stock and equity ranking on parity with the CoreCo Preferred Stock in proportion to the full amounts to which each is entitled.

**Redemption**

13.11    The Parent shall have the right, but not the obligation, to redeem outstanding CoreCo Preferred Stock at any time, in full or in part, at a redemption price equal to the Liquidation Preference, upon not less than ten nor more than sixty calendar days' prior written notice.  All redemptions shall be made on a *pro rata* basis among all holders of CoreCo Preferred Stock.

13.12    The Parent, its subsidiaries and its affiliates may, subject to prior authorisation of the Parent's Board of Directors, repurchase CoreCo Preferred Stock in open market purchases or in negotiated transactions without delivering prior notice to the holders of CoreCo Preferred Stock.

**Consent and Voting Rights**

13.13    The prior affirmative vote, consent or waiver of holders constituting at least two-thirds of the outstanding voting power of the CoreCo Preferred Stock shall be required with respect to:  (i) amendments to the Parent's certificate of incorporation or bylaws that disproportionately and adversely affect the CoreCo Preferred Stock; (ii) issuances of, or reclassifications of existing equity interests into, equity ranking senior to or on parity with the CoreCo Preferred Stock; (iii) increases or decreases in authorised but unissued shares of CoreCo Preferred Stock; and (iv) any mandatory exchange, reclassification or cancellation of CoreCo Preferred Stock, in each case subject to customary exceptions (including increases for initial issuances and incentive plan awards, creation of other stock classes, correction of ambiguities or defects, and application of certain common stock change event provisions).

13.14    Without prejudice to the consent rights referred to in the preceding sentence, the CoreCo Preferred Stock will vote on an "as converted" basis together with the CoreCo Common Stock as a single class.

**Listing and Trading**

13.15    The Parent expects the CoreCo Preferred Stock to be DTC-eligible and freely tradable following the Restructuring Effective Date, subject to applicable securities laws.

13.16    Pursuant to the CoreCo Registration Rights Agreement, the Parent will use commercially reasonable efforts to list the CoreCo Preferred Stock on the Nasdaq Global Select Market or another national securities exchange.

**Equity Agent**

13.17    Equiniti Trust Company, LLC acts as agent for the for the CoreCo Preferred Stock (the "**CoreCo Preferred Stock Agent**").

**Governing Law**

13.18    The governing law of the CoreCo Preferred Stock will be the law of the State of Delaware.

**14    FLNG 2 PREFERRED EQUITY**

14.1    The terms of the FLNG 2 Preferred Equity are summarised below and described in the Proxy Statement.

14.2    The FLNG 2 Preferred Equity will comprise non-convertible, non-voting perpetual preferred limited liability company membership interests in the FLNG 2 Parent (referred to in the FLNG 2 Parent LLCA as the "**Preferred Interests**") to be transferred to certain Plan Creditors by the Managing Member on the Restructuring Effective Date.

14.3    The equity interests of the FLNG 2 Parent will consist of one class of 100 common interests (the "**Common Interests**") and one class of 200,000 Preferred Interests.

14.4    The Plan Companies are reviewing tax considerations related to the structure of the Common Interests and Preferred Interests in the FLNG 2 Parent. The Plan Companies are considering structures in which the relevant Plan Creditors will hold the Preferred Interests directly in NFE FLNG 2 LLC or, alternatively, through a holding company. In either case, relevant Plan Creditors are expected to hold equity in an entity classified as a corporation for U.S. federal income tax purposes.

**Ranking**

14.5    The FLNG 2 Preferred Equity will be subordinated to all existing and future indebtedness of the FLNG 2 Parent and will be, with respect to rights upon any liquidation, senior to all existing and future equity securities of the FLNG 2 Parent (including the Common Interests), bearing a direct or indirect liquidation preference in NFE FLNG 2 LLC of an amount in cash equal to $1,000 per Preferred Interest (the "**FLNG 2 Liquidation Preference**").

**Conversion**

14.6    The Preferred Interests shall be non-convertible.  The FLNG 2 Parent LLCA will not contain any voluntary or mandatory conversion provisions with respect to the Preferred Interests.

**Distributions**

14.7    The Managing Member shall determine profits available for distribution.  Distributions shall be made, directly or indirectly, (i) first, to holders of Preferred Interests (the "**Preferred Members**") until each has received an amount equal to the FLNG 2 Liquidation Preference, and (ii) second, to the holders of Common Interests.

14.8    No dividend shall accrue or be paid in respect of the FLNG 2 Preferred Equity.

**Liquidation**

14.9    The FLNG 2 Parent shall be dissolved upon (i) a Managing Member vote for dissolution, (ii) judicial dissolution under Section 18-802 of the Delaware Limited Liability Company Act, or (iii) termination of the last remaining holder of interests.  Upon dissolution, proceeds shall be applied first to creditors and then to members in accordance with the distribution waterfall. In the event of any Deemed Liquidation Event (as defined in the FLNG 2 Parent LLCA), holders of at least a majority of the Preferred Interests may agree, on behalf of all Preferred Members, that the amount per Preferred Interest payable in connection with any such Deemed Liquidation Event shall be less than $1,000 per Preferred Interest.

**Redemption**

14.10    The FLNG 2 Parent shall have the right, but not the obligation, to redeem outstanding Preferred Interests in cash at any time, in full or in part, at a redemption price equal to the FLNG 2 Liquidation Preference, upon not less than ten nor more than sixty calendar days' prior notice. All redemptions shall be made on a *pro rata* basis among all holders of Preferred Interests.

14.11    The FLNG 2 Parent shall be required to redeem the outstanding Preferred Interests on a *pro rata* basis with any proceeds from asset sales, net of certain fees and expenses, remaining after the paydown in full of amounts outstanding under the FLNG 2 Credit Agreement.

**Management**

14.12    The management of the FLNG 2 Parent is fully reserved to the Managing Member.

**Consent and Voting Rights**

14.13    The Preferred Members have no voting rights in NFE FLNG 2 LLC.  If the FLNG 2 Parent is a holding company, the Preferred Interests will have one hundred percent of the voting rights of the FLNG 2 Parent. The FLNG 2 Parent LLCA will contain certain protective consent rights requiring the prior affirmative vote or written consent of the holders of at least a majority of the Preferred Interests (the "**Required Preferred Members**") for specified actions, as described below.

14.14    For so long as any Preferred Interest is outstanding, the prior affirmative vote or written consent of the Required Preferred Members shall be required with respect to the following actions of the FLNG 2 Parent and its subsidiaries:  (i) amendments that disproportionately and adversely affect the Preferred Interests; (ii) issuances of equity securities ranking senior to, junior to, or *pari passu* with the Preferred Interests; (iii) transfers of Common Interests by common members, (iv) increases or decreases in the number of authorised Preferred Interests; (v) redemptions or acquisitions of junior or parity equity securities (subject to customary exceptions) and (vi) entry into agreements that would restrict or require approval or consent with respect to a disposition of FLNG 2 Parent or one of its subsidiaries.

**Listing and Trading**

14.15    The FLNG 2 Parent expects the FLNG 2 Preferred Equity to be DTC-eligible and freely tradable following the Restructuring Effective Date, subject to applicable securities laws.

14.16    The FLNG 2 Parent is not obliged to seek any listing of the FLNG 2 Preferred Equity.

**Equity Agent**

14.17    Equiniti Trust Company, LLC will act as the agent for the FLNG 2 Preferred Equity (the "**FLNG 2 Preferred Equity Agent**").

**Governing Law**

14.18    The governing law of the FLNG 2 Preferred Equity will be the law of the State of Delaware.

**15    BRAZILCO COMMON EQUITY**

**Listing**

15.1    The BrazilCo Common Equity initially will not be listed on a National Securities Exchange.

**DTC Eligibility**

15.2    The BrazilCo Common Equity will be DTC-eligible and issued through DTC other than any shares of BrazilCo Common Equity required to bear a "restricted" legend under applicable securities laws (which shall be issued through DTC under a restricted CUSIP if feasible and otherwise, in book entry form).  New BrazilCo Parent shall use commercially reasonable efforts to remove any such restricted legends when permitted under applicable securities laws, including obtaining any necessary legal opinions.

**Transferability**

15.3    The BrazilCo Common Equity will be freely transferable following the Restructuring Effective Date, subject to compliance with applicable securities laws and the terms of the New BrazilCo Governance Documents.

**BrazilCo Preferred Equity**

15.4    Any preferred equity issued by New BrazilCo Parent (the "**BrazilCo Preferred Equity**") will have customary designations, preferences, limitations and relative rights, including preferences over the BrazilCo Common Equity with respect to dividends and distributions.  Holders of convertible BrazilCo Preferred Equity will have the right to vote their shares of BrazilCo Preferred Equity on an as-converted basis.

**PART 4:  CERTAIN LEGAL ASPECTS OF THE PLANS**

**1      PART 26A RESTRUCTURING PLAN OVERVIEW**

1.1     A restructuring plan is a formal, court-sanctioned legal procedure (under Part 26A of the Act) designed to help companies facing financial distress, generally, to avoid terminal insolvency proceedings or value destructive enforcement or other processes.

1.2     In accordance with Part 26A of the Act, a restructuring plan can be proposed by a company which has encountered, or is likely to encounter, financial difficulties that are affecting, or will or may affect, its ability to carry on its business as a going concern.  A restructuring plan enables a company to agree a compromise or arrangement with its creditors or any class of its creditors and its members or any class of its members in respect of its debts or obligations owed to those creditors or members.  The purpose of the proposed compromise or arrangement must be to eliminate, reduce or prevent, or mitigate the effect of, any of the financial difficulties currently faced by the plan company.

1.3     A restructuring plan will become effective if:

    1.3.1     either:

        (i)      **approval of each class**:  the restructuring plan is approved by at least 75 per cent. in value of each class of creditors and/ or members of the plan company present in person or by proxy and voting at each meeting convened to approve the restructuring plan; or

        (ii)     **cross-class cram down**:  if the restructuring plan is not approved by the requisite majority of creditors and/ or members in each class (any such class not approving being a "**Dissenting Class**"):

            (A)      the Court is satisfied that, if the restructuring plan is sanctioned, none of the members of any Dissenting Class would be any worse off than they would be in the event of the '*relevant alternative*' (the "**No Worse Off Condition**").  The relevant alternative is whatever the Court considers to be the most likely alternative if the restructuring plan is not sanctioned; and

            (B)      the restructuring plan has been approved by at least 75 per cent. in value of one or more classes that would receive a payment, or have a genuine economic interest in the plan company, in the event of the relevant alternative (the "**Genuine Economic Interest Condition**");

        (iii)    the Court approves the restructuring plan by making an order sanctioning the restructuring plan; and

        (iv)     (in the case of companies registered in England and Wales) a copy of the order sanctioning the restructuring plan is delivered to the Registrar of Companies.

1.4     Once effective, a restructuring plan will bind all the creditors and members subject to it, whether or not those creditors or members voted in favour of it or voted against it or did not vote at all and, in each case, their successors and assigns.

1.5     The arrangements and compromises in respect of:

1.5.1    the CoreCo Plan Creditors are proposed to be implemented by way of a restructuring plan proposed by NFE Global (i.e., the CoreCo Plan) in respect of the CoreCo Plan Debt; and

1.5.2    the BrazilCo Plan Creditors are proposed to be implemented by way of a restructuring plan proposed by NFE Brazil Newco (i.e., the BrazilCo Plan) in respect of the 2029 New Notes.

## 2    IDENTITY OF THE PLAN CREDITORS

2.1    The creditors who are proposed to be bound by the terms of the Plans, if they become effective, are referred to in the Plans as Plan Creditors.  You will be a CoreCo Plan Creditor if you are a Legacy Noteholder, the Series I Lender, the Series II Lender, an RCF Lender, a TLA Lender or a TLB Lender, and a BrazilCo Plan Creditor if you are a 2029 New Noteholder.  The Plan Creditors are as identified in the section "*Are you a Plan Creditor?*" of this Explanatory Statement.

2.2    Neither Plan Company shall be under any obligation to recognise any assignment or transfer of Plan Claims after the Record Time for the purpose of voting on the Plans or calculating any entitlement by reference to the Record Time; provided that, where the relevant Plan Company has received from the relevant parties written notice of such assignment or transfer, the relevant Plan Company may in its absolute discretion, and subject to such evidence as it may reasonably require, agree to recognise such assignment or transfer, subject to the assignee or transferee agreeing to be bound by the terms of the relevant Plan and to be treated as having been a Plan Creditor for the purposes of the relevant Plan.  The actions required of the Plan Creditors in connection with the Plans are set out in detail in Appendix 2 (*Instructions and Guidance for Plan Creditors*) to this Explanatory Statement, to which all Plan Creditors should refer.

## 3    PLAN CLASSES

3.1    Under the Practice Statement, it is the responsibility of each Plan Company to formulate the class or classes of Plan Creditors for the purpose of convening properly constituted meetings to consider and, if thought fit, approve the relevant Plans.

3.2    If the rights of creditors affected by the relevant Plan are so dissimilar or would be affected in such a different manner by the relevant Plan as to make it impossible for them to consult together with a view to their common interest, they must be divided into separate classes and a separate meeting must be held for each class of creditors.  The final decision on the appropriate composition of any meetings convened to consider the Plans is a matter for the Court.

### *Classes of Plan Creditors*

3.3    The Plan Companies provided their rationale for the composition of six classes of CoreCo Plan Creditors and one class of BrazilCo Plan Creditors in Section 10 (*Proposed Class Constitution of Plan Creditors*) of the Practice Statement Letter.  The Court has permitted the convening of the meetings sought by the Plan Companies, consistent with the submissions made by the Plan Companies.

3.4    The CoreCo Plan Creditors fall into six classes for the purposes of voting on the CoreCo Plan, as follows:

(i)    the R-1 Lenders (the "**R-1 Class**");

(ii)    the R-2 Lenders (the "**R-2 Class**");

(iii)    the TLB Lenders (the "**TLB Class**");

85

(iv)     the TLA Lenders (the "**TLA Class**");

(v)      the Legacy Noteholders (the "**Legacy Notes Class**"); and

(vi)     each of the Series I Lender and the Series II Lender (the "**Series I and Series II Class**"),

(each a "**CoreCo Plan Class**" and together, the "**CoreCo Plan Classes**").

3.5    The BrazilCo Plan Creditors fall into one class for the purposes of voting on the BrazilCo Plan, as follows:

(a)      the 2029 New Noteholders (the "**2029 New Notes Class**" and together with each CoreCo Plan Class, each a "**Plan Class**" and together, the "**Plan Classes**").

## 4    PLAN MEETINGS

4.1    Before the Plans can become effective and binding on the Plan Companies and the Plan Creditors, among other things, the CoreCo Plan must be passed by the requisite majority of the CoreCo Plan Creditors at one or more of the CoreCo Plan Meetings and the BrazilCo Plan must be passed by the requisite majority of the BrazilCo Plan Creditors at the BrazilCo Plan Meeting. The Plans are inter-conditional.

4.2    The Court has granted (i) NFE Global permission to convene six Plan Meetings, and (ii) NFE Brazil Newco permission to convene one Plan Meeting, to be held at the offices of Skadden, Arps, Slate, Meagher & Flom (UK) LLP and by way of video conference, as described further in the table below.  Formal notices of the Plan Meetings are set out in Appendix 4 (*Notice of Plan Meetings*) to this Explanatory Statement.

| Plan Meeting | CoreCo Plan or BrazilCo Plan | Plan Creditors entitled to attend and vote | Date & Time of Plan Meeting |
|---|---|---|---|
| R-1 Class Plan Meeting | CoreCo Plan | R-1 Lenders | 3:00 p.m. (London) / 10:00 a.m. (New York) on 15 June 2026 |
| R-2 Class Plan Meeting | CoreCo Plan | R-2 Lenders | 3:15 p.m. (London) / 10:15 a.m. (New York) on 15 June 2026, or as soon as possible thereafter |
| TLB Class Plan Meeting | CoreCo Plan | TLB Lenders | 3:30 p.m. (London) / 10:30 a.m. (New York) on 15 June 2026, or as soon as possible thereafter |
| TLA Class Plan Meeting | CoreCo Plan | TLA Lenders | 3:45 p.m. (London) / 10:45 a.m. (New York) on 15 June 2026, or as soon as possible thereafter |
| Legacy Notes Class Plan Meeting | CoreCo Plan | 2026 Legacy Noteholders | 4:00 p.m. (London) / 11:00 a.m. (New York) on 15 June |

86

| Plan Meeting | CoreCo Plan or BrazilCo Plan | Plan Creditors entitled to attend and vote | Date & Time of Plan Meeting |
|---|---|---|---|
| | | 2029 Legacy Noteholders | 2026, or as soon as possible thereafter |
| Series I and Series II Class Plan Meeting | CoreCo Plan | Series I Lender Series II Lender | 4:15 p.m. (London) / 11:15 a.m. (New York) on 15 June 2026, or as soon as possible thereafter |
| 2029 New Notes Class Plan Meeting | BrazilCo Plan | 2029 New Noteholders | 4:30 p.m. (London) / 11:30 a.m. (New York) on 15 June 2026, or as soon as possible thereafter |

4.3     Any person with a Plan Claim as at the Record Time (being 10:00 p.m. (London time)/ 5:00 p.m. (New York time) on 10 June 2026) will be entitled to attend and vote at the applicable Plan Meeting in person (physically or via video conference) or by proxy, subject to compliance with the instructions for voting contained in Appendix 2 (*Instructions and Guidance for Plan Creditors*), which includes validly completing a Plan Creditor Letter and submitting the same to the Information Agent via the Plan Website (https://deals.is.kroll.com/nfe) by no later than 10:00 p.m. (London time)/ 5:00 p.m. (New York time) on 9 June 2026 (being the Voting Instructions Deadline).

4.4     Plan Creditors should be aware that they have previously been afforded an opportunity to raise any issues in relation to the constitution of the Plan Meetings at the Convening Hearing, as stated in the Practice Statement Letter dated 20 April 2026 sent to the Plan Creditors. If Plan Creditors have not already raised any such issues, the Court will expect any Plan Creditors doing so at the Sanction Hearing to show good reason why such issues were not raised at the Convening Hearing.

4.5     Plan Creditors should refer to the detailed instructions in relation to voting at the Plan Meetings in Appendix 2 (*Instructions and Guidance for Plan Creditors*) to this Explanatory Statement.

5       **EFFECTIVENESS OF THE PLANS**

5.1     Before (i) the CoreCo Plan can become effective and binding on NFE Global and the CoreCo Plan Creditors, and (ii) the BrazilCo Plan can become effective and binding on NFE Brazil Newco and the BrazilCo Plan Creditors, the Court must sanction the Plans at the Sanction Hearing. The effectiveness of the CoreCo Plan will be conditional upon the BrazilCo Plan being sanctioned by the Court, and the effectiveness of the BrazilCo Plan will be conditional upon the CoreCo Plan being sanctioned by the Court.

5.2     The Sanction Hearing will take place after the Plan Meetings. The Plan Companies expect that the Sanction Hearing will take place on or around 18 June 2026 at the Court. The exact time and date of the Sanction Hearing will be announced at the Plan Meetings to the extent then known or otherwise notified to the Plan Creditors. A notice regarding the date and time of the Sanction Hearing will be circulated once the hearing has been scheduled.

5.3     Any person with a Plan Claim as at the Record Time (being 10:00 p.m. (London time)/ 5:00 p.m. (New York time) on 10 June 2026) is entitled to appear at the Sanction Hearing in person or through counsel to support or oppose the sanction of the Plans, although they are not obliged to do so. Plan Creditors who wish to attend the Sanction Hearing in person or through counsel

87

should contact Skadden, Arps, Slate, Meagher & Flom (UK) LLP, legal advisers to the Plan Companies, using the contact details set out at section 10 (*Questions and Contact Details*) below as soon as practicable to obtain instructions for attending the Sanction Hearing.

5.4     The Plan Companies may, subject to the terms of the Restructuring Support Agreement (including the consent rights contained therein), at the Sanction Hearing and acting reasonably and in good faith, consent on behalf of the Plan Creditors to any modification, amendment, variation or supplement to the Plans, the Transaction Implementation Deed or any other Implementation Document on such terms or conditions as the Court may approve or impose for the purpose of consummating or implementing the Plans, provided that such modification, amendment, variation or supplement cannot reasonably be expected to directly or indirectly:

     5.4.1     materially and adversely affect, or disproportionately affect relative to the other Plan Creditors rights or interests of any Plan Creditor under the Plans or any Implementation Document; or

     5.4.2     alter any right or obligation, or impose any additional or new material obligation on any Plan Creditor (by reference to such rights or obligations as contemplated as at the Record Time),

     5.4.3     in each case unless the relevant Plan Creditor has provided its prior written consent.

5.5     No modification, amendment, variation or supplement shall be made to any Implementation Document unless: (a) such modification, amendment, variation or supplement is necessary for the implementation of the Restructuring and is of a minor, technical or administrative nature, or is required to correct a manifest error; or (b) the prior written consent of each affected Plan Creditor has been obtained to the extent that such modification, amendment, variation or supplement would directly or indirectly: (i) materially and adversely affect, or disproportionately affect relative to the other Plan Creditors, the rights or interests of any Plan Creditor; or (ii) alter any right or obligation, or impose any additional or new material obligation on any Plan Creditor (by reference to such rights or obligations as contemplated as at the Record Time).

5.6     At the Sanction Hearing, the Court will consider whether or not to make an order sanctioning the Plans.  In doing so, the Court will consider whether:

     5.6.1     the provisions of the statute have been complied with.  This will include questions of class composition, whether the statutory majorities were obtained, and whether an adequate explanatory statement was distributed to the creditors;

     5.6.2     the classes of Plan Creditors were fairly represented by those who attended the Plan Meetings and the statutory majority were acting in a *bona fide* manner;

     5.6.3     each Plan is a fair restructuring plan which a creditor could reasonably approve; and

     5.6.4     there is any "blot" or defect in the Plans that would, for example, make it unlawful or in any other way inoperable.

5.7     The Plan Companies will also draw the Court's attention to:

     5.7.1     objections raised as to Creditor Issues (as defined in the Practice Statement Letter). However, as noted in Section 15 (*Creditor Issues*) of the Practice Statement Letter, if any such Creditor Issues were not raised prior to the Sanction Hearing then the Court is likely to expect relevant Plan Creditors to provide good reason why they did not raise such Creditor Issues at an earlier stage; and

5.7.2    other matters pertaining to the points set out above, including, for example, whether a Plan Creditor has indicated that it has not had adequate notice of the Plan Meetings.

**(A)    Plan Effective Date**

5.8    The effectiveness of the CoreCo Plan will be conditional on the BrazilCo Plan being sanctioned by the Court and the effectiveness of the BrazilCo Plan will be conditional on the CoreCo Plan being sanctioned by the Court.  Each Plan will, once sanctioned, also be subject to certain other conditions precedent to implementation, as described further at paragraph 2.60 of Part 2 *(Summary of the Restructuring and the Recapitalisation Transaction (Including the Plans)* above.

5.9    Following:

(i)    the granting by the Court of the Sanction Order approving both Plans; and

(ii)    the delivery of a copy of the Sanction Order approving both Plans to the Registrar of Companies in England and Wales for registration,

the Plans will become effective in accordance with their terms and will be implemented once the conditions precedent to implementation (described at paragraph 2.60 of Part 2 (*Summary of the Restructuring and the Recapitalisation Transaction (Including the Plans))* of this Explanatory Statement) and in the Transaction Implementation Deed are satisfied.

5.10    If the CoreCo Plan becomes effective and is implemented in accordance with its terms, all CoreCo Plan Creditors (including those who did not vote in favour of the CoreCo Plan or those who did not vote at all) will be bound by the terms of the CoreCo Plan as a matter of English law, irrespective of the jurisdiction in which the CoreCo Plan Creditor resides or has their seat, along with NFE Global.

5.11    If the BrazilCo Plan becomes effective and is implemented in accordance with its terms, all BrazilCo Plan Creditors (including those who did not vote in favour of the BrazilCo Plan or those who did not vote at all) will be bound by the terms of the BrazilCo Plan as a matter of English law, irrespective of the jurisdiction in which the BrazilCo Plan Creditor resides or has their seat, along with NFE Brazil Newco.

5.12    As at the date of this Explanatory Statement, the Plan Effective Date is expected to be on or around 19 June 2026 and the Restructuring Effective Date is expected to be by the third quarter of 2026.

**(B)    Availability of Cross-Class Cram Down**

5.13    As more than 75 per cent. by value of Plan Creditors in each of the proposed Plan Classes have executed the Restructuring Support Agreement, thereby agreeing to vote in favour of the Plans, the Plan Companies do not envisage that there will be any Dissenting Class and therefore no need to seek the cross-class cram down of any Plan Class in the CoreCo Plan.  As there is only a single class in the BrazilCo Plan, cross-class cram down is not available (but more than 75 per cent. by value of Plan Creditors in the 2029 New Notes Class have similarly executed the Restructuring Support Agreement, thereby agreeing to vote in favour of the BrazilCo Plan, so this should not be an issue).

5.14    In respect of the CoreCo Plan, NFE Global considers that, in the event that one or more (but not all) of the CoreCo Plan Classes approve the CoreCo Plan at the relevant Plan Meeting(s), then the No Worse Off Condition and the Genuine Economic Interest Condition will be satisfied

in each case (and therefore the CoreCo Plan will still be capable of being sanctioned by the Court), principally because:

5.14.1  in respect of the No Worse Off Condition, the Relevant Alternative Report concludes that no CoreCo Plan Creditor is likely to be worse off under the CoreCo Plan than in the Relevant Alternative; and

5.14.2  in respect of the Genuine Economic Interest Condition, NFE Global considers that in the event of the Relevant Alternative, the CoreCo Plan Creditors will (i) receive a payment, and/or (ii) have a genuine economic interest in NFE Global, on the basis that the Relevant Alternative Report shows that the CoreCo Plan Creditors would recover less in the event of the Relevant Alternative (it being noted that only one, and not both, of these conditions need to be satisfied to meet the Genuine Economic Interest Condition).

5.15  Please refer to Part A (*Relevant Alternative Report*) of Appendix 7 for further details.

## 6    JURISDICTION AND RECOGNITION

### (A)    Jurisdiction

6.1  The Plan Companies consider that the Court has jurisdiction under Part 26A of the Act in relation to the Plan Companies, and that the Court should exercise such jurisdiction, on the basis of:

6.1.1  **Plan Companies liable to be wound up**:  the Plan Companies are incorporated under the laws of England and Wales and are liable to be wound up under the Insolvency Act 1986.

6.1.2  **Financial difficulties**:  each of the Plan Companies has encountered or is likely to encounter significant financial difficulties for the reasons described above in section 4 (*Background To The Group's Financial Difficulties*) of Part 1 of this Explanatory Statement, which are affecting, or will affect its (and the Group's) ability to carry on business as a going concern and, absent the Plans, each Plan Company is expected to face in the Relevant Alternative.

6.1.3  **Purpose**:  as explained above in section 1.1 (*Objectives of The Plan*) of Part 2 of this Explanatory Statement, the purpose of the Plans is to eliminate, reduce or mitigate the effect of the Plan Companies' (and the Group's) financial difficulties.

6.1.4  **Compromise or arrangement**:  it is necessary for the proposals under the Plans to be a "compromise" or "arrangement" between the relevant Plan Company and the relevant Plan Creditors.  The Plans contain the requisite elements of "give and take" in respect of each class of Plan Creditors in order to constitute a "compromise" or "arrangement" for these purposes.

6.2  Given the matters described above, the Plan Companies consider that the Court has jurisdiction to sanction the compromise and arrangement in respect of the claims and liabilities set out in the Plans (provided the requisite statutory requirements are satisfied).

### (B)    Recognition

6.3  The centre of main interests of each of the Plan Companies is in England and Wales.  As to this:

6.3.1  NFE Global is incorporated in, and is tax resident in, England and Wales.  Its registered office is in London, one of its directors is resident in England and Wales, and its

accounting, books and records and a bank account are maintained there. NFE Global's restructuring counsel and the Information Agent are also based in England and Wales, and their respective engagement letters were executed there. Prior to the launch of the Practice Statement Letter, NFE Global formally notified all of its creditors of its address in England and Wales, and that restructuring-related discussions were conducted there. NFE Global's address for notices under the Restructuring Support Agreement is in England and Wales. NFE Global held a board meeting in London on 9 April 2026 to consider the restructuring and approve the promulgation of the CoreCo Plan and a further board meeting in London on 17 April 2026 to consider appointing a foreign representative for the purpose of application under chapter 15 of the U.S. Bankruptcy Code and to approve the draft Practice Statement Letter.

6.3.2    NFE Brazil Newco is incorporated in, and is tax resident in, England and Wales. Its registered office is in London, one of its directors is resident in England and Wales, and its accounting, books and records and a bank account are maintained there. NFE Brazil Newco's restructuring counsel and the Information Agent are also based in England and Wales, and their respective engagement letters were executed there. Prior to the launch of the Practice Statement Letter, NFE Brazil Newco formally notified all of its creditors of NFE Brazil Newco's address in England and Wales, and that restructuring-related discussions were conducted there. NFE Brazil Newco's address for notices under the Restructuring Support Agreement is in England and Wales. NFE Brazil Newco held a board meeting in London on 9 April 2026 to consider the restructuring and approve the promulgation of the BrazilCo Plan and a further board meeting in London on 17 April 2026 to consider appointing a foreign representative for the purpose of application under chapter 15 of the U.S. Bankruptcy Code and to approve the draft Practice Statement Letter.

### *United States of America*

6.4    The United States (including Puerto Rico) is a material jurisdiction to the Group in terms of its assets, operations and management and certain of the Plan Creditors are expected to be U.S. persons. The Plan Companies will therefore seek recognition of the Plans in the United States (including Puerto Rico) under chapter 15 of the U.S. Bankruptcy Code (the "**Chapter 15 Recognition**").

6.5    The Plan Companies will obtain and file with the Court in advance of the Sanction Hearing (at the latest) an opinion from an independent expert on the law of the United States that the Plans are likely to be recognised and given effect in the United States. The Plan Companies are advised and believe that the Plans will be recognised in the United States.

6.6    Each of the Plan Companies has appointed a foreign representative in respect of proceedings in relation to the Chapter 15 Recognition (and any other recognition proceedings). At the Convening Hearing, the Court granted a request from each of the Plan Companies for a declaration from the Court that the foreign representative has been validly appointed for the purposes of such recognition proceedings.

6.7    To seek the Chapter 15 Recognition, the Plan Companies, through their duly appointed foreign representatives, have filed a petition (the "**Chapter 15 Petition**") in the United States Bankruptcy Court for the Southern District of New York (the "**U.S. Bankruptcy Court**") seeking an order (i) recognising the Plans as a foreign main proceeding under chapter 15 of the U.S. Bankruptcy Code and (ii) providing that the Plans and the Sanction Order are entitled to full force and effect in the United States in accordance with their terms for recognition and enforcement of the Plans (and any order sanctioning the Plans) under chapter 15 of the U.S. Bankruptcy Code.

6.8    The Plan Companies will publish a notice of the filing of the Chapter 15 Petition on the Plan Website.

6.9    If the Plans are approved by the Plan Creditors and sanctioned by the Court, the Plan Companies expect that the U.S. Bankruptcy Court will grant the relief sought in the Chapter 15 Petition. The Plan Companies will obtain and file with the Court in advance of the Sanction Hearing (at the latest) an opinion from an independent expert on certain matters of U.S. Federal law and New York State law, including whether the Plans are likely to be recognised by the U.S. Bankruptcy Court as a foreign main proceeding under chapter 15 of the U.S. Bankruptcy Code and, if sanctioned, be given full force and effect in the United States.

6.10   Having taken legal advice, the Plan Companies consider that the issuance of certain securities pursuant to the Plans is likely to be made in reliance upon the exemption from registration under the Securities Act provided by Section 3(a)(10) thereof. The Plan Companies have been advised that the sanction of the Plans by the Court as to the fairness of the terms and conditions of the issuance, following adequate notice to affected stakeholders and an opportunity to be heard, will satisfy the fairness hearing requirements of Section 3(a)(10).  The Plan Companies will, at or prior to the Sanction Hearing, expressly advise the Court that its sanction of the Plans will be relied upon for purposes of satisfying the fairness hearing requirements of Section 3(a)(10). Plan Creditors, as the persons to whom the securities will be issued, will be given notice of the Sanction Hearing and the opportunity to attend and be heard as to the fairness of the terms and conditions of the issuance. If the exemption pursuant to Section 3(a)(10) is not available, then any securities issued pursuant to the Plans will be issued in reliance upon another exemption from registration under the Securities Act, which may include Section 4(a)(2) thereof. Accordingly, no registration of such securities under the Securities Act is expected to be required.

*Mexico*

6.11   Mexico is also a material jurisdiction to the Group in terms of its assets and operations.  The Plan Companies will obtain and file with the Court in advance of the Sanction Hearing (at the latest) an opinion from an independent expert on Mexican law that the Plans are likely to be recognised and given effect in Mexico.  The Plan Companies are advised and believe that the Plans will be recognised in Mexico.

*Brazil*

6.12   Certain subsidiaries of the Group hold significant assets in Brazil.  However, those subsidiaries are not issuers or guarantors of the 2029 New Notes Debt or CoreCo Plan Debt.  Neither NFE Brazil Newco nor the issuers or guarantors of the 2029 New Notes Debt are incorporated in Brazil.  The Plan Companies do not consider that a legal opinion on matters of Brazilian law would assist the Court.

**7      THE RESTRUCTURING EFFECTIVE DATE**

7.1    The Restructuring Effective Date shall occur once the final Closing Step (as set out in the Transaction Implementation Deed) has been completed. Immediately following the completion of the final Closing Step, the Plan Companies shall notify the Information Agent that each of the Closing Steps has completed and of the occurrence of the Restructuring Effective Date, and the Information Agent shall make such notice available on the Plan Website.

7.2    See Part 3 (*Summary of the Terms of Certain Key Implementation Documents and Equity Instruments*) for further information on the Closing Steps and Restructuring Effective Date.

**8       RELEASES AND WAIVERS**

8.1     The terms of the Plans and the Transaction Implementation Deed include mutual releases that will, among other things, release all rights and claims relating to any Plan Debt.  The full terms of the releases can be found in the Plans and the Transaction Implementation Deed appended at Appendix 1 (*The Plans*) and Appendix 8 (*Key Implementation Documents*) which the Plan Companies will enter into on behalf of themselves and their respective Plan Creditors.

8.2     In summary, with effect on and from the Restructuring Effective Date, each Plan Party (including each of the Plan Companies and each Plan Creditor) will, in favour of each Released Party (including each of the Plan Companies, each member of the Group, each Plan Creditor, each advisor and their respective employees, officers and affiliates):

8.2.1     ratify the actions of each Released Party carried out in accordance with the terms of the Restructuring or the Plans or related to the Plan Claims;

8.2.2     waive, release and discharge any and all rights and claims, whether present or future, prospective or contingent, in any jurisdiction and under any law against each and any Released Party, in relation to any action or step taken on or prior to the Restructuring Effective Date in relation to (a) the negotiation, preparation, sanction or implementation of the Plans and/ or the Restructuring or (b) the Plan Claims;

8.2.3     waive, release and discharge all rights, title and interest in the Plan Claims, and all Liabilities owed by a Group Company to any Plan Party in relation to such Plan Claims; and

8.2.4     undertake to the Released Parties that it will not commence or continue any proceedings against any Released Party in respect of actions released or ratified above.

8.3     Nothing in the terms of the Plans or the Transaction Implementation Deed shall, among other things, discharge, limit, vary, impact, compromise or otherwise affect in any way:

8.3.1     any obligation under the Plans or any Implementation Documents with respect to any step or action required to be undertaken in accordance with the terms of the Plans or the Implementation Documents;

8.3.2     any rights of any Plan Party arising under or in connection with the Implementation Documents (including guarantees or security interests or other obligations and any rights to submit claims and, if eligible, receive distributions in accordance with the Plans or any Implementation Document);

8.3.3     any claims of any Plan Party which may arise or accrue in relation to acts, omissions or circumstances occurring after the Restructuring Effective Date;

8.3.4     any liability with respect to outstanding fees, costs and/ or expenses in connection with the Plans, the Restructuring or the Implementation Documents; or

8.3.5     any actions or claims:

(i)      arising or resulting from criminal acts, fraud, gross negligence or wilful misconduct on the part of such Released Party;

(ii)     arising out of or in connection with any breach by any Released Party of any terms of the Implementation Documents or any documents entered into pursuant to the foregoing;

(iii)   any duty of care owed to an advisor's client or arising under a duty of care to another person which has been specifically and expressly accepted or acknowledged in writing by that advisor; or

(iv)   in the case of a Group Company: (i) any Liability of any director of such Group Company that would otherwise attach to that director in connection with any negligence, default, breach of duty or breach of trust, or that would be available upon the insolvency of such Group Company; and (ii) any Liability of a Group advisor (solely in its capacity as advisor to such Group Company) that would otherwise attach to such Group advisor in connection with any negligence, default, breach of duty or breach of trust, or that would be available upon the insolvency of such Group Company.

## 9   ADDITIONAL INFORMATION RELATING TO THE PLANS

### (C)   Material interests of directors

9.1   The current directors of NFE Global and their functions are:

| Name | Position |
| --- | --- |
| Christopher Guinta | Director |
| Matthew Reinhard | Director |
| Kevin Sullivan | Director |
| Christopher Boas | Director |

9.2   The current directors of NFE Brazil Newco and their functions are:

| Name | Position |
| --- | --- |
| Christopher Guinta | Director |
| Matthew Reinhard | Director |
| Kevin Sullivan | Director |
| Christopher Boas | Director |

9.3   Save as disclosed in paragraphs 9.4 through 9.8 below:

9.3.1   none of the directors of the Plan Companies has any material interest (whether as a director, member, creditor or otherwise) in any member of the Group;

9.3.2   none of the directors of the Plan Companies has any material interest (whether as a director, member, creditor or otherwise) in the Plans; and

9.3.3   the effect of the Plans on interests of the Plan Companies' directors will not be different from the effect on like interests of other persons.

9.4   All of the Plan Companies' directors:

9.4.1   benefit from the releases granted by the Plan Creditors described in paragraph 8 (*Releases and Waivers*) of this Part 4; and

9.4.2   have the benefit of existing directors' and officers' liability insurance.

9.5     Christopher Guinta, Matthew Reinhard and Kevin Sullivan also act as directors of certain other members of the Group.   Christopher Guinta, Matthew Reinhard and Kevin Sullivan are employees of the Parent, the indirect shareholder of the Plan Companies, and:

9.5.1    are paid a salary by the Parent, payable in any event and not dependent on or linked to the Plans or the Recapitalisation Transaction;

9.5.2    eligible to participate in the 2019 Omnibus Incentive Plan; and

9.5.3    may also receive future grants under the CoreCo MIP and/or in respect of the FLNG 2 MIP.

9.6     In September 2025, the Parent entered into a retention award agreement with Christopher Guinta providing for, among other things, a $3,000,000 restructuring incentive payment. The restructuring incentive payment was paid on 1 January 2026, subject to a clawback provision that lapsed on 15 March 2026.

9.7     Christopher Boas is paid a monthly fee by the Plan Companies in consideration for his services as a director of each of the Plan Companies.

9.8     As of the date of this Explanatory Statement:

9.8.1    Christopher Guinta, Matthew Reinhard and Kevin Sullivan each hold less than 0.2% of the Parent's Class A common stock; and

9.8.2    Christopher Boas holds no shares of the Parent's Class A common stock.

9.9     Neither Wesley R. Edens nor Randal A. Nardone are directors of the Plan Companies.

**(D)     Material interests of the Trustees and Depositories**

9.10    The Trustees, DTC, Cede & Co. have a material interest in the Plans through their interests in the Legacy Notes and 2029 New Notes as further described in the "*Are you a Plan Creditor?*" section of this Explanatory Statement.

9.11    On the Restructuring Effective Date, the Trustees, DTC and Cede & Co. will benefit from the releases granted by the Plan Creditors described in paragraph 8 (*Releases and Waivers*) above.

**(E)     Litigation and Investigations**

9.12    The Group is involved in the material disputes described under "*Legal Proceedings*" at Part 5 (*Risk Factors*).  The Group is not involved in any material investigations.

**10     QUESTIONS AND CONTACT DETAILS**

10.1    The Plan Documentation can be found on and downloaded by Plan Creditors from the Plan Website at https://deals.is.kroll.com/nfe.

10.2    For any questions regarding access to the Plan Website, the voting procedure, access to the relevant Plan Meeting, or if you encounter any technical difficulties, please contact the Information Agent using the details below:

**Kroll Issuer Services Limited**
The News Building
3 London Bridge Street
London
SE1 9SG

United Kingdom
**Attention**:  Alessandro Zorza/ Sunjeeve Patel
**E-mail**:  nfe@is.kroll.com
**Phone**:  +44 20 7089 0909

10.3   Plan Creditors who wish to ask any questions in advance of the Plan Meetings or the Sanction Hearing are encouraged to contact the Information Agent using the details above.

10.4   If you have any questions in relation to this Explanatory Statement or the Plans generally, please contact the Plan Companies' legal advisers using the details below:

**Skadden, Arps, Slate, Meagher & Flom (UK) LLP**
22 Bishopsgate
London
EC2N 4BQ
United Kingdom
**Attention**:  Peter Newman and Nicole Stephansen
**E-mail**:  DLLadyUK@Skadden.com
**Phone**:  +44 20 7519 7000

10.5   Skadden, Arps, Slate, Meagher & Flom (UK) LLP, as legal advisers to the Plan Companies rather than the Plan Creditors, will be unable to offer legal advice to Plan Creditors relating to the Plans.

10.6   Additionally, Plan Creditors will have the opportunity at the Plan Meetings to raise any questions or issues they may have in relation to the Plans.

**PART 5:  RISK FACTORS**

*All statements in this Explanatory Statement are to be read subject to, and are qualified in their entirety by, the matters referred to in this Part 5.*

*The risk factors described below are those that the Plan Companies believe are potentially significant, but this should not be regarded as a comprehensive statement of all potential risks and uncertainties relating to the Recapitalisation Transaction, the Restructuring, or the Plans.  Additional risks and uncertainties not presently known to the Plan Companies and the Group, or that the Plan Companies and the Group currently considers to be immaterial, may also have an adverse effect on the Restructuring, the Recapitalisation Transaction, the Plans, the Plan Companies and/ or the Group, and no assurance can be given that all material risks relating to the Group are set out below.  Plan Creditors should carefully consider these risk factors and the other information set out in this Explanatory Statement.*

*This Explanatory Statement also contains forward-looking statements that include risks and uncertainties.  Actual results may differ from those anticipated in these forward-looking statements as a result of various factors, including the risks described below and elsewhere in this Explanatory Statement.*

*If a Plan Creditor is in any doubt about the action it should take, such Plan Creditor is advised to consult appropriately authorised independent professional advisers.*

*For further information about risks related to the Group, Plan Creditors are advised to refer to the Parent's public disclosure statements filed with the SEC, and in particular the Group's most recent 10-K filed 13 April 2026.*

**RISKS RELATING TO THE PLANS**

*Effectiveness of the Plans requires the approval of Plan Creditors.*

Pursuant to Part 26A of the Act, in order for:

(i)    the CoreCo Plan to become legally binding on NFE Global and the CoreCo Plan Creditors, either (a) a majority representing 75 per cent. in value of each class of CoreCo Plan Creditors present and voting (either in person or by proxy) at the meeting ordered to be summoned by the Court votes in favour of the CoreCo Plan; or (b) a majority representing 75 per cent. in value of at least one class of CoreCo Plan Creditors votes in favour of the CoreCo Plan and the Court is satisfied that (i) that class would receive a payment and/or have a genuine economic interest in NFE Global in the relevant alternative, and (ii) each dissenting class would be no worse off under the CoreCo Plan than in the relevant alternative; and

(ii)    the BrazilCo Plan to become legally binding on NFE Brazil Newco and the BrazilCo Plan Creditors, a majority representing 75 per cent. in value of the class of BrazilCo Plan Creditors present and voting (either in person or by proxy) at the meeting ordered to be summoned by the Court votes in favour of the BrazilCo Plan,

(the "**Requisite Approval**").  In order for the Plans to become effective, the Plans must then be sanctioned by an order of the Court, and an official copy of the order must be delivered to the Registrar of Companies for registration.  The Plans are interconditional upon each other.

If the Requisite Approval is obtained, the Plans are expected to be made effective on or around 19 June 2026 by the delivery of copies of the Sanction Order to the Registrar of Companies.  If the Plans become effective (i) the CoreCo Plan Creditors will be bound by the terms of the CoreCo Plan, and (ii) the BrazilCo Plan Creditors will be bound by the terms of the BrazilCo Plan, in both cases from the Plan Effective Date.

97

Although Plan Creditors that are party to the Restructuring Support Agreement are expected to vote in favour of the Plans, in the event that the Restructuring Support Agreement was terminated in accordance with its terms, any Plan Creditor that was party to the Restructuring Support Agreement would cease to be bound by its obligation to support the Plans.

If the Requisite Approval is not obtained, neither Plan will become effective and the Recapitalisation Transaction will not be implemented.

***Even if the CoreCo Plan Creditors approve the CoreCo Plan and the BrazilCo Plan Creditors approve the BrazilCo Plan, the Plans may be objected to and may not be completed.***

If the CoreCo Plan is approved at the CoreCo Plan Meetings and the BrazilCo Plan is approved at the BrazilCo Plan Meeting, it is possible for a person with an interest in the relevant Plan (whether a Plan Creditor or otherwise) to lodge objections to the relevant Plan with the Court, and, if such objections have been lodged, to attend or be represented at the Sanction Hearing to make representations that the relevant Plan should not be approved and/or to appeal against the granting of the Sanction Order. Therefore, there can be no assurance that objections will not be made at or before the Sanction Hearing, or that an appeal will not be made against the grant of the Sanction Order and that any such objections or appeal will not delay or possibly prevent the Recapitalisation Transaction.

***Effectiveness of the Plans requires the sanction of the Court.***

In order for the Plans to become effective, they must receive the sanction of the Court. The Court will not sanction the Plans unless it is satisfied that the correct procedures have been followed, the proposed arrangements are fair and that there are no other reasons why the Plans should not be approved. There can be no assurance that the Court will determine that the Plans are fair or that the Court will not conclude that there are other reasons why the Plans should not be sanctioned. If the Court does not exercise its discretion to sanction the Plans, or sanctions either Plan subject to conditions or amendments which: (i) the Group or Majority Plan Creditors deem unacceptable; or (ii) would have (directly or indirectly) an adverse effect on the interests of any Plan Creditor and such conditions or amendments are not approved by the requisite Plan Creditors, the Plans will not become effective and the Recapitalisation Transaction will not be implemented.

***If the Closing Conditions Precedent are not satisfied or waived, the Plans may not be completed.***

The Closing Steps cannot be commenced unless the Closing Conditions Precedent are satisfied or waived in accordance with the terms of the Plans, the Restructuring Support Agreement or the Implementation Documents (as applicable). If this does not occur, it will not be possible to complete the Recapitalisation Transaction. While there is a risk that the relevant parties to the Implementation Documents may disagree as to when a condition precedent has been satisfied or waived (or will refuse to waive a condition precedent), the Plan Companies anticipate that most of the Closing Conditions Precedent are capable of being satisfied prior to the Plan Effective Date or will be satisfied by actions to take place on the Plan Effective Date.

***Plan Creditors are responsible for complying with the procedures set out in this Explanatory Statement.***

Plan Creditors are solely responsible for complying with all of the procedures of the Plans, including, but not limited to, submitting a Plan Creditor Letter in accordance with the instructions and information provided to Plan Creditors in this Explanatory Statement. The Plan Creditor Letter sets out the process in relation to certain aspects of the Plans, such as voting on the Plans. Further details on voting at the relevant Plan Meeting are set out in Appendix 2 (*Instructions and Guidance for Plan Creditors*) to this Explanatory Statement.

***Plan Creditors are independently responsible for assessing the merits of the Recapitalisation Transaction and the Plans.***

Each Plan Creditor is responsible for independently assessing the merits of the Recapitalisation Transaction and the Plans. This Explanatory Statement has been prepared without taking into account the objectives, financial situation or needs of any particular recipient of it and, consequently, the information contained in this Explanatory Statement may not be sufficient or appropriate for the purpose for which a recipient might use it. Any such recipients should conduct their own due diligence and consider the appropriateness of the information in this Explanatory Statement, having regard to their own objectives, financial situations and needs to make an assessment of how this Explanatory Statement and the Plans will affect them.

***The Plans do not guarantee the viability of the business.***

While it is anticipated that the Plans, the Recapitalisation Transaction and the Restructuring will help to ensure the continued viability of the Group's business, there may be other factors which have an impact on its financial performance, business, affairs and continued progress.

The successful implementation of the Plans, the Recapitalisation Transaction and the Restructuring cannot be taken as an indication or guarantee of the continued viability of the Group's business.

***Plan Creditors are responsible for consulting with their advisers.***

Plan Creditors should consult with their own tax, accounting, financial, legal and other advisers regarding the suitability to themselves of the tax, accounting, financial, legal and other consequences of participating in the Recapitalisation Transaction or declining to vote in favour of the relevant Plan. Each Plan Creditor must determine, based on its own independent review and such professional advice as it deems appropriate under the circumstances, that participation in the Recapitalisation Transaction or the relevant Plan is fully consistent with its objectives and that it complies and is fully consistent with all internal policies, guidelines and restrictions applicable to it, and is a fit, proper and suitable action for it.

***The Plans may not be implemented in accordance with the timeline envisaged in this Explanatory Statement.***

Factors unknown to the Plan Companies at the date of this Explanatory Statement may result in delays to the implementation of the Plans.

***Certain of the Group's contracts may contain termination clauses which could be triggered by the Plans.***

The Group may be party to certain contracts that contain termination provisions which may be triggered by the Plans (in particular, if a view is taken that the Recapitalisation Transaction constitutes a "reorganisation" of either Plan Company). Certain of these material contracts might also be terminable as a result of insolvency-related events. While the Group has sought to identify and mitigate the risk of any material contract terminations, there can be no assurance that the Group has identified all contracts material to its business with termination clauses that may be triggered by the Plans or insolvency-related events. If the Group triggers such a termination clause in any of its material contracts (or in a number of contracts that, when looked at together, are material to its business) and a consent or waiver is not obtained from the relevant counterparty, such counterparty may terminate or threaten to terminate the contract, which could have a material adverse effect on the Group's business, operating results, financial condition or prospects.

99

***The Plans may not be recognised or enforced in the United States.***

It is contemplated that the Plan Companies will seek recognition of the Plans under chapter 15 of the U.S. Bankruptcy Code.  However, there is a possibility that the U.S. Bankruptcy Court will not recognise the Plans under chapter 15 of the U.S. Bankruptcy Code.  Notwithstanding the view expressed in the foreign expert opinion obtained by the Plan Companies from Mr. Daniel M. Glosband, if the U.S. Bankruptcy Court declines to issue the U.S. Chapter 15 Recognition Order, the Plans may not be recognised or be enforceable against a Plan Creditor in the United States.  In these circumstances, the Plan Creditors would not be prevented from trying to enforce their rights in the applicable courts, as they otherwise would be if the U.S. Chapter 15 Recognition Order were granted.

***The Plans may not be recognised or enforced in Mexico.***

The Plan Companies have obtained a foreign expert opinion from Mr. Alejandro Sainz of Sainz Abogados, S.C., that if the Plan Companies seek recognition and enforcement of the Plans in Mexico, the Plans would likely be recognised under Mexican law.  Notwithstanding the view expressed in the foreign expert opinion from Mr. Sainz, the Plans may not be recognised or be enforceable against a Plan Creditor in Mexico.  In these circumstances, the Plan Creditors would not be prevented from trying to enforce their rights in the applicable courts.

***Section 3(a)(10) of the Securities Act may not be available.***

As described in the securities-law legend on the cover page of the Plan Creditor Letter and in this Explanatory Statement, the Plan Companies intend that the issuance of the Securities pursuant to the Plans will be made in reliance upon the exemption from registration under the Securities Act provided by Section 3(a)(10). The availability of that exemption depends on, among other things, the Court being advised at or prior to the Sanction Hearing that its sanction of the Plans will be relied upon for purposes of Section 3(a)(10), the Court sanctioning the Plans as to the fairness of the terms and conditions of the issuance following adequate notice to affected stakeholders and an opportunity to be heard, and the satisfaction of other applicable legal requirements. There can be no assurance that the exemption will be available for all Securities, all Plan Creditors, all recipients or all subsequent transfers. If the exemption is not available, is determined not to apply or is successfully challenged, the issuance or resale of the Securities may require registration under the Securities Act or another available exemption from, or transaction not subject to, registration, and holders may be subject to transfer restrictions, restrictive legends, delayed settlement or other limitations. Securities issued to Plan Creditors or other recipients that are "affiliates" of the relevant issuer within the meaning of Rule 144 under the Securities Act, or that become affiliates of the relevant issuer, may be subject to additional restrictions on resale under the Securities Act and may not be freely transferable absent registration or an available exemption from, or transaction not subject to, registration. Each Plan Creditor and any other person designated to receive Securities should consult its own legal advisers regarding the availability and effect of the Section 3(a)(10) exemption, any restrictions on resale, and the application of U.S. federal, state, non-U.S., contractual, clearing-system and other transfer requirements.

## RISKS RELATING TO THE RESTRUCTURED GROUP

### Risks Related to the Business

***The ability of the restructured Group to continue as a going concern is dependent upon its ability to complete certain transactions and delay capital expenditures.***

Even if the Recapitalisation Transaction is completed, the Group will continue to face substantial risks. Its future performance will depend on its ability to execute its revised business plan, which may be subject to operational, regulatory, and market risks, and it may require additional funding in the future to support operations, capital expenditures, or growth initiatives.  There is no assurance that such funding will be available on favourable terms, or at all.  The new debt and equity instruments issued in the Restructuring may impose significant restrictions on the Group's operations, including limitations

on incurring additional indebtedness, asset sales, and distributions.  The Restructuring will result in significant dilution to existing equity holders, and the value of new equity securities may be volatile and subject to further decline.  Even if the Recapitalisation Transaction is completed, substantial risks will remain that could adversely affect the Group's financial condition, results of operations, and ability to continue as a going concern.

***The separation of the Group into two independent entities as part of the Recapitalisation Transaction may result in operational, financial, tax and other risks, and there can be no assurance that the anticipated benefits of the separation will be realised.***

If consummated, the Recapitalisation Transaction will result in a substantial reduction of the Group's indebtedness, as well as the divestiture in full of the Group's Brazil business.  The loss of the Brazil business will materially reduce the CoreCo Group's asset base, revenue streams, and geographic diversification. The Brazil business includes major facilities such as the Barcarena Terminal, the Barcarena Power Plant, and the PortoCem Power Plant, all of which are either operational or in advanced stages of development and are expected to generate substantial revenues under long-term contracts. Upon completion of the Recapitalisation Transaction, the Parent will no longer own or consolidate the results of these businesses, which will have a material effect on its consolidated results of operations and financial condition.  The planned separation, including the transfer of equity interests in certain subsidiaries to creditors or third parties, introduces significant operational, financial, and legal uncertainties.  The divestiture of a core business may disrupt ongoing operations, result in the loss of key personnel, customers, or suppliers associated with the Brazil business, and require substantial management attention and resources to manage the transition.  The Parent may also face challenges in reallocating resources, restructuring remaining operations, and maintaining relationships with stakeholders who may perceive the CoreCo Group as less diversified or less stable following the loss of a major business segment.  There is no assurance that the separation will achieve its intended benefits, and the Parent may face challenges in executing the separation efficiently or in a manner that preserves value for stakeholders.  In addition, the CoreCo Group may be exposed to additional risks related to the allocation of liabilities, potential disputes with creditors or counterparties, and the need to comply with regulatory and contractual obligations arising from the separation.

***The Group has identified material weaknesses in its internal control over financial reporting, including material weaknesses identified as part of the restatement of its financial statements for the years ended 31 December 2024 and 31 December 2023 and the interim periods in the years ended 31 December 2025 and 31 December 2024, and the Group's management has concluded that the Group's disclosure controls and procedures were not effective as of 31 December 2025.  Failure to remediate the material weaknesses or any other material weaknesses identified in the future, or failure to otherwise maintain an effective system of internal controls, could result in material misstatements in the Group's financial statements and impact its ability to accurately or timely report its financial condition or results of operations.  In addition, investors may lose confidence in the accuracy and completeness of the Group's financial reports and the trading price of the Parent's Class A common stock may decline.***

Pursuant to Section 404 of the Sarbanes-Oxley Act of 2002, as amended, the Group's management is required to report on, and the Group's independent registered public accounting firm is required to attest to, the effectiveness of the Group's internal control over financial reporting.  The rules governing the standards that must be met for management to assess the Group's internal control over financial reporting are complex and require significant documentation, testing and possible remediation.  In addition, if the Group fails to maintain adequate internal control over financial reporting, its management will not be able to conclude on an ongoing basis that the Group has effective internal control over financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act of 2002.  If the Group fails to achieve and maintain an effective internal control environment, the Group could suffer misstatements in its financial statements and fail to meet its reporting obligations, which would likely cause investors to lose confidence in its reported financial information.  This could result in

significant expenses to remediate any internal control deficiencies and lead to a decline in the Parent's stock price.

The Group has identified material weaknesses in its internal control over financial reporting, including material weaknesses identified as part of the restatement of the Group's financial statements for the years ended 31 December 2024 and 31 December 2023 and the interim periods in the years ended 31 December 2025 and 31 December 2024, and concluded that its disclosure controls and procedures were not effective as of 31 December 2025.  A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Group's annual or interim financial statements will not be prevented or detected on a timely basis.

The Group is in the process of implementing remediation plans intended to address these material weaknesses.  However, the Group may not be successful in remediating the material weaknesses identified by management, or be able to identify and remediate additional control deficiencies, including material weaknesses, in the future.  If not remediated, the Group's failure to establish and maintain effective disclosure controls and procedures and internal control over financial reporting could result in material misstatements in its financial statements and a failure to meet reporting and financial obligations, including stock exchange listing requirements and debt instruments' covenants regarding the timely filing of periodic reports, and adversely impact the Group's liquidity, access to capital markets and perceptions of the Group's creditworthiness, each of which could have a material adverse effect on the Group's financial condition and the trading price of the Parent's Class A common stock or, subject to its listing, preferred stock or cause investors or customers to lose confidence in the Group's reported financial information.

***The terms of the debt and/or preferred stock instruments may restrict the Group's current and future operations.***

After giving effect to the Recapitalisation Transaction, the Parent will have approximately $571 million aggregate principal amount of indebtedness (and any additional indebtedness incurred in connection with the Capital Raise) outstanding on a consolidated basis (which does not include any unconsolidated debt) and approximately 2.5 million shares of CoreCo Preferred Stock outstanding.  The terms and conditions of the indebtedness, including the New CoreCo Term Loans, include restrictive covenants that may limit the CoreCo Group's ability to operate its business, to incur or refinance debt, pay dividends or make distributions or make certain other restricted payments, create liens on the Parent's or its subsidiaries' assets, sell or otherwise dispose of assets, engage in certain transactions, and require the Parent to maintain certain financial ratios, among others, any of which may limit the Group's ability to finance future operations and capital needs, react to changes in its business and in the economy generally, and to pursue business opportunities and activities.  Additionally, the terms and conditions of the CoreCo Preferred Stock grant the holders thereof certain consent rights, including with respect to issuance of equity securities senior to or equal in priority with the CoreCo Preferred Stock and redemptions of equity securities.

The Parent's ability to service its existing and any future debt will depend on the CoreCo Group's performance and operations, which is subject to factors that are beyond the CoreCo Group's control, and compliance with covenants in the agreements governing such debt.  The Group may be unable to maintain a level of cash flows from operating activities sufficient to permit it to fund day-to-day operations or to pay the principal, premium, if any, and interest on its indebtedness.  If the CoreCo Group's cash flows and capital resources are insufficient to fund the Parent's debt service obligations and other cash requirements, the CoreCo Group could face substantial liquidity problems and could be forced to reduce or delay investments and capital expenditures or to sell assets or operations, seek additional capital or restructure or refinance its operations or indebtedness.  If the Parent cannot make scheduled payments on its debt, it will be in default and, as a result, lenders under and holders of any of its existing and future indebtedness could declare all outstanding principal and interest to be due and payable, the lenders under its debt instruments could terminate their commitments to loan money, its

secured lenders could foreclose against the assets securing such borrowings and the Parent and/or CoreCo Group could be forced into bankruptcy, insolvency or liquidation. The CoreCo Group may also incur additional debt to fund its business and strategic initiatives. If the CoreCo Group incurs additional debt and other obligations, the risks associated with its leverage and the ability to service such debt would increase, which could have a material adverse effect on the CoreCo Group's business, results of operation and financial condition.

***The Group's ability to implement its business strategy may be materially and adversely affected by many known and unknown factors.***

The Group's business strategy relies on a variety of factors, including its ability to successfully market LNG, natural gas, steam, and power to its customers, develop and maintain cost-effective logistics in its supply chain and construct, develop and operate energy-related infrastructure in the countries where it operates, and expand its projects and operations to other countries where it does not currently operate, among others. These factors are subject to significant economic, competitive, regulatory and operational uncertainties, contingencies and risks, many of which are beyond the Group's control, including, among others:

- inability to achieve target costs for the purchase, liquefaction and export of natural gas and/or LNG and target pricing for long-term contracts;

- failure to develop strategic relationships;

- failure to obtain required governmental and regulatory approvals for the construction and operation of these projects and other relevant approvals;

- unfavourable laws and regulations, changes in laws or unfavourable interpretation or application of laws and regulations; and

- uncertainty regarding the timing, pace and extent of economic growth in the United States, the other jurisdictions in which the Group operates and elsewhere, which in turn will likely affect demand for crude oil and natural gas.

Furthermore, as part of its business strategy, the Group targets customers who have not been traditional purchasers of natural gas, including customers in developing countries, and these customers may have greater credit risk than typical natural gas purchasers. Therefore, the Group may be exposed to greater customer credit risk than other companies in the industry. The Group's credit procedures and policies may be inadequate to sufficiently eliminate risks of nonpayment and non-performance.

The Group's strategy may evolve over time. The Group's future ability to execute its business strategy is uncertain, and it can be expected that one or more of its assumptions will prove to be incorrect and that it will face unanticipated events and circumstances that may adversely affect its ability to execute its business strategy and adversely affect its business, financial condition and results of operations.

***The Group is subject to various construction risks.***

The Group is involved in the development of complex small-, medium- and large-scale engineering and construction projects, including its facilities, liquefaction facilities, power plants, and related infrastructure, which are often developed in multiple stages involving commercial and governmental negotiations, site planning, due diligence, permit requests, environmental impact studies, permit applications and review, marine logistics planning and transportation and end-user delivery logistics. In addition to the Group's facilities, these infrastructure projects can include the development and construction of facilities as part of its customer contracts. Projects of this type are subject to a number of risks including, among others:

- engineering, environmental or geological problems;

103

- shortages or delays in the delivery of equipment and supplies;

- government or regulatory approvals, permits or other authorisations;

- failure to meet technical specifications or adjustments being required based on testing or commissioning;

- construction, commissioning or operating accidents that could result in personal injury or loss of life;

- lack of adequate and qualified personnel to execute the project;

- weather interference; and

- potential labour shortages, work stoppages or labour union disputes.

Furthermore, because of the nature of the Group's infrastructure, the Group is dependent on interconnection with transmission systems and other infrastructure projects of third parties, including its customers and governmental entities. Such third-party projects can be greenfield or brownfield projects, including modifications to existing infrastructure or increases in capacity to existing facilities, among others, and are subject to various construction risks and additional operational monitoring and balancing requirements that may impact the design of facilities to be constructed. Delays from such third parties or governmental entities could prevent connection to Group projects and generate delays in the Group's ability to develop its own projects. In addition, a primary focus of the Group's business is the development of projects in certain non-U.S. jurisdictions, including in locations where it has no prior development experience, and the Group expects to continue expanding into new jurisdictions in the future. These risks can be increased in jurisdictions where legal processes, language differences, cultural expectations, currency exchange requirements, political relations with the U.S. government, changes in the political views and structure, government representatives, new regulations, regulatory reviews, employment laws and diligence requirements can make it more difficult, time-consuming and expensive to develop a project. See "*–Risks Related to the Jurisdictions in Which the Group Operates— The Group is subject to the economic, political, social and other conditions in the jurisdictions in which it operates*."

The occurrence of any one of these factors, whatever the cause, could result in unforeseen delays or cost overruns to Group projects. Delays in the development beyond estimated timelines, or amendments or change orders to construction contracts, could result in increases to development costs beyond the Group's original estimates, which could require the Group to obtain additional financing or funding and could make the project less profitable than originally estimated or possibly not profitable at all. Further, any such delays could cause a delay in the anticipated receipt of revenues, a loss of one or more customers, and an inability to meet milestones or conditions precedents in customer contracts, which could lead to delay penalties and potentially a termination of agreements with customers. The Group has experienced time delays and cost overruns in the construction and development of projects as a result of the occurrence of various of the above factors, including with the first Fast LNG project in Altamira, Mexico, and no assurance can be given that the Group will not continue to experience in the future similar events, any of which could have a material adverse effect on its business, operating results, cash flows and liquidity.

***Operation of Group infrastructure, facilities and vessels involves significant risks.***

The Group's existing infrastructure, facilities and vessels and expected future operations and businesses face operational risks, including, but not limited to, the following:

- performing below expected levels of efficiency or capacity or required changes to specifications for continued operations;

- breakdowns or failures of equipment or shortages or delays in the delivery of supplies;

- operational errors by trucks, including trucking accidents while transporting natural gas, LNG or any other chemical or hazardous substance;

- risks related to operators and service providers of tankers or tugs used in Group operations;

- operational errors by the Group or any contracted facility, port or other operator of related third-party infrastructure;

- failure to maintain the required government or regulatory approvals, permits or other authorisations;

- accidents, fires, explosions or other events or catastrophes;

- lack of adequate and qualified personnel;

- potential labour shortages, work stoppages or labour union disputes;

- weather-related or natural disaster interruptions of operations;

- pollution, release of or exposure to toxic substances or environmental contamination affecting operations;

- inability, or failure, of any counterparty to any facility-related agreements to perform their contractual obligations;

- decreased demand by customers; and

- planned and unplanned power outages or failures to supply due to scheduled or unscheduled maintenance.

In particular, the Group is subject to risks related to the operation of power plants, liquefaction facilities, marine and other LNG operations with respect to its facilities, Floating Storage and Regasification Units ("**FSRUs**") and LNG carriers, which operations are complex and technically challenging and subject to mechanical risks and problems.  In particular, marine LNG operations are subject to a variety of risks, including, among others, marine disasters, piracy, bad weather, mechanical failures, environmental accidents, epidemics, grounding, fire, explosions and collisions, human error, and war and terrorism. An accident involving the Group's cargos or any of its chartered vessels could result in death or injury to persons, loss of property or environmental damage; delays in the delivery of cargo; loss of revenues; termination of charter contracts; governmental fines, penalties or restrictions on conducting business; higher insurance rates; and damage to its reputation and customer relationships generally.  Any of these circumstances or events could increase the Group's costs or lower its revenues.  If the Group's chartered vessels suffer damage as a result of such an incident, they may need to be repaired.  Repairs and maintenance costs for existing vessels are difficult to predict and may be substantially higher than for vessels the Group has operated since they were built and result in higher than anticipated operating expenses or require additional capital expenditures.  The loss of earnings while these vessels are being repaired would decrease the results of operations.  If a vessel the Group charters were involved in an accident with the potential risk of environmental impacts or contamination, the resulting media coverage could have a material adverse effect on the Group's reputation, business, results of operations and cash flows and weaken the Group's financial condition.  The Group's offshore operating expenses depend on a variety of factors including crew costs, provisions, deck and engine stores and spares, lubricating oil, insurance, maintenance and repairs and shipyard costs, many of which are beyond its control.  Other factors, such as increased cost of qualified and experienced seafaring crew and changes in regulatory requirements, could also increase operating expenditures.  Future increases to operational costs are likely to occur.  If costs rise, they could materially and adversely affect the results of operations.

In addition, operational problems may lead to loss of revenue or higher than anticipated operating expenses or require additional capital expenditures.  Any of these results could harm the Group's business, financial condition and results of operations.

The Group cannot assure investors that future occurrences of any of the events listed above or any other events of a similar or dissimilar nature would not significantly decrease or eliminate the revenues from, or significantly increase the costs of operating, the Group's facilities or assets.

### *The Group depends on third-party contractors, operators and suppliers.*

The Group relies on third-party contractors, equipment manufacturers, suppliers and operators for the development, construction and operation of projects and assets.  The Group has not yet entered into binding contracts for the construction, development and operation of all of its facilities and assets, and cannot assure you that it will be able to enter into the contracts required on commercially favourable terms, if at all, which could expose it to fluctuations in pricing and potential changes to its planned schedule.  If the Group is unable to enter into favourable contracts, it may not be able to construct and operate these assets as expected, or at all.  Furthermore, these agreements are the result of arms-length negotiations and subject to change.  There can be no assurance that contractors and suppliers will perform their obligations successfully under their agreements with the Group.  If any contractor is unable or unwilling to perform according to the negotiated terms and timetable of its respective agreement for any reason or terminates its agreement for any reason, the Group would be required to engage a substitute contractor, which could be particularly difficult in certain of the markets in which it plans to operate.  Although some agreements may provide for liquidated damages if the contractor or supplier fails to perform in the manner required with respect to its obligations, the events that trigger such liquidated damages may delay or impair the completion or operation of the facility, and any liquidated damages received may be delayed or insufficient to cover the damages that the Group suffers as a result of any such delay or impairment, including, among others, any covenants or obligations by the Group to pay liquidated damages or penalties under its agreements with its customers, development services, the supply of natural gas, LNG or steam and the supply of power, as well as increased expenses or reduced revenue.  Such liquidated damages may also be subject to caps on liability, and the Group may not have full indemnification from its contractors to compensate it for such payments and other consequences.  The Group may hire contractors to perform work in jurisdictions where they do not have previous experience, or contractors it has not previously hired to perform work in jurisdictions it is beginning to develop, which may lead to such contractors being unable to perform according to their respective agreements.  Furthermore, the Group may have disagreements with its contractors about different elements of the construction process, which could lead to the assertion of rights and remedies under their contracts and increase the cost of the applicable facility or result in a contractor's unwillingness to perform further work.  If the Group is unable to construct and commission facilities and assets as expected, or, when and if constructed, they do not accomplish the Group's goals or performance expectations, or if the Group experiences delays or cost overruns in design, construction, commissioning or operation, its business, operating results, cash flows and liquidity could be materially and adversely affected.

### *Failure of LNG to be a competitive source of energy in the markets in which the Group operates, and seeks to operate, could adversely affect its expansion strategy.*

The Group's operations are, and will be, dependent upon LNG being a competitive source of energy in the markets in which it operates.  In the United States, due mainly to a historic abundant supply of natural gas and discoveries of substantial quantities of unconventional or shale natural gas, imported LNG has not developed into a significant energy source.  The success of the domestic liquefaction component of the CoreCo Group's business plan is dependent, in part, on the extent to which natural gas can, for significant periods and in significant volumes, be produced in the United States at a lower cost than the cost to produce some domestic supplies of other alternative energy sources, and that it can be transported at reasonable rates through appropriately scaled infrastructure.  LNG prices have increased materially in the past, including in August 2021 through the end of 2022, and global events,

106

such as Russia's invasion of Ukraine and global inflationary pressures, have generated further energy pricing volatility, which have had and may in the future have an adverse effect on market pricing of LNG and global demand for the Group's products, as well as its ability to remain competitive in the markets in which it operates. Potential expansion in the Caribbean, Latin America and other parts of the world where the Group may operate is primarily dependent upon LNG being a competitive source of energy in those geographical locations. For example, in the Caribbean, due mainly to a lack of regasification infrastructure and an underdeveloped international market for natural gas, natural gas has not yet developed into a significant energy source. In Brazil, hydroelectric power generation is the predominant source of electricity and LNG is one of several other energy sources used to supplement hydroelectric generation. The success of the Group's operations is dependent, in part, on the extent to which LNG can, for significant periods and in significant volumes, be produced internationally and delivered to customers at a lower cost than the cost to deliver other alternative energy sources.

Political instability in non-U.S. countries that export LNG, or strained relations between such countries and countries in the Caribbean and Latin America, may also impede the willingness or ability of LNG suppliers and merchants in such countries to export LNG to the Caribbean, Latin America and other countries where the Group operates or seeks to operate. Furthermore, some non-U.S. suppliers of LNG may have economic or other reasons to direct their LNG to other markets or from or to the Group's competitors' LNG facilities. Natural gas also competes with other sources of energy, including coal, oil, nuclear, hydrogen, hydroelectric, wind and solar energy, which may become available at a lower cost in certain markets. As a result of these and other factors, natural gas may not be a competitive source of energy in the markets the Group intends to serve or elsewhere. The failure of natural gas to be a competitive supply alternative to oil and other alternative energy sources could adversely affect the Group's ability to deliver LNG or natural gas to customers on a commercial basis, which could have a material adverse effect on its business, ability to realise benefits from future projects, results of operations, financial condition, liquidity and prospects.

***The Group operates in a highly regulated environment and its operations could be adversely affected by actions by governmental entities or changes to regulations and legislation.***

The Group's business is highly regulated and subject to numerous governmental laws, rules, regulations and requires permits, authorisations and various governmental and agency approvals, in the various jurisdictions in which it operates, that impose various restrictions and obligations that may have material effects on its business and results of operations. Each of the applicable regulatory requirements and limitations is subject to change, either through new regulations enacted on the federal, state or local level, or by new or modified regulations that may be implemented under existing law. The nature and extent of any changes in these laws, rules, regulations and permits may be unpredictable, have retroactive effects, and may have material effects on the Group's business. Future legislation and regulations or changes in existing legislation and regulations, or interpretations thereof, such as those relating to power, natural gas or LNG operations, including exploration, development and production activities, liquefaction, regasification or transportation of the Group's products, could cause additional expenditures, restrictions and delays in connection with the Group's operations as well as other future projects, the extent of which cannot be predicted and which may require it to limit substantially, delay or cease operations in some circumstances.

In addition, these rules and regulations are assessed, managed, administered and enforced by various governmental agencies and bodies, whose actions and decisions could adversely affect the Group's business or operations. In the United States (including Puerto Rico) approvals of the U.S. Department of Energy (the "**DOE**") under Section 3 of the U.S. Natural Gas Act of 1938, as amended (the "**NGA**"), as well as several other material governmental and regulatory permits, approvals and authorisations, including under the U.S. Clean Air Act ("**CAA**") and the U.S. Clean Water Act ("**CWA**") and their state analogues, may be required in order to construct and operate an LNG facility and export LNG. Permits, approvals and authorisations obtained from the DOE and other federal and state regulatory agencies also contain ongoing conditions, and additional requirements may be imposed. On 17 December 2024, the DOE publicly released a multi-volume study of its view of the potential effects of U.S. LNG exports

on the domestic economy (the "**2024 LNG Export Study**"); U.S. households and consumers; communities that live near locations where natural gas is produced or exported; domestic and international energy security, including effects of U.S. trading partners; and the environment and climate.  The DOE stated that it intends to use this study to inform its public interest review of and future decisions regarding exports to non-FTA nations.  On 19 May 2025, the DOE released its Response to Comments on the 2024 LNG Export Study.  While the current U.S. administration supports and is widely expected to continue to support LNG exports, there can be no assurance as to its future policies, or the impact of those policies on the Group's existing and future projects.

Certain federal permitting processes may trigger the requirements of the National Environmental Policy Act ("**NEPA**"), which requires federal agencies to evaluate major agency actions that have the potential to significantly impact the environment.  Compliance with NEPA may extend the time and/or increase the costs for obtaining necessary governmental approvals associated with the Group's operations and create independent risk of legal challenges to the adequacy of the NEPA analysis, which could result in delays that may adversely affect the Group's business, contracts, financial condition, operating results, cash flow, liquidity and profitability.  On 15 July 2020, the White House Council on Environmental Quality issued a final rule revising its NEPA regulations.  The Council on Environmental Quality has announced that it is engaged in an ongoing and comprehensive review of the revised regulations and is assessing whether and how the Council may ultimately undertake a new rulemaking to revise the regulations.  The impacts of any such future revisions that may be adopted are uncertain and indeterminable for the foreseeable future.  On 18 June 2020, the Group received an order from the Federal Energy Regulatory Commission ("**FERC**"), which asked it to explain why the San Juan Terminal is not subject to FERC's jurisdiction under section 3 of the NGA.  On 19 March 2021, as upheld on rehearing on 15 July 2021, FERC determined that the San Juan Terminal is subject to its jurisdiction and directed the Group to file an application for authorisation to operate the San Juan Terminal but also found that allowing operation of the San Juan Terminal to continue during the pendency of an application is in the public interest.  In order to comply with the FERC's directive, on 15 September 2021, the Group filed an application for authorisation to operate the San Juan Terminal, which remains pending.

The Group may not comply with each of these requirements in the future, or at all times, including any changes to such laws and regulations or their interpretation.  The failure to satisfy any applicable legal requirements may result in the suspension of the Group's operations, the imposition of fines and/or remedial measures, suspension or termination of permits or other authorisation, as well as potential administrative, civil and criminal penalties, which may significantly increase compliance costs and the need for additional capital expenditures.

***Failure to obtain and maintain permits, approvals and authorisations from governmental and regulatory agencies and third parties on favourable terms could impede operations and construction.***

The design, construction and operation of the Group's infrastructure, facilities and businesses, including its FSRUs, FLNG units and LNG carriers, the import and export of LNG, exploration and development activities, and the transportation of natural gas, among others, are highly regulated activities at the national, state and local levels and are subject to various approvals and permits.  The process to obtain the permits, approvals and authorisations needed to conduct the Group's business, and the interpretations of those rules, is complex, time-consuming, challenging and varies in each jurisdiction in which the Group operates.  The Group may be unable to obtain such approvals on terms that are satisfactory for its operations and on a timeline that meets its commercial obligations.  Many of these permits, approvals and authorisations require public notice and comment before they can be issued, which can lead to delays due to the need to respond to such comments, and even potentially to revise the permit application.  Jurisdiction-specific employment, labour, and subcontracting laws may also affect contracting strategies and impact construction and operations.  The Group may also be (and has been in select circumstances) subject to local opposition, including citizens groups or non-governmental organisations such as environmental groups, which may create delays and challenges in the permitting process and may attract negative publicity, which may create an adverse impact on the Group's

reputation.    In addition, such rules change frequently and are often subject to discretionary interpretations, including administrative and judicial challenges by regulators, all of which may make compliance more difficult and may increase the length of time it takes to receive regulatory approval for the Group's operations, particularly in countries where it operates, such as Mexico and Brazil.  No assurance can be given that the Group will be able to obtain approval of all applications or receive the required permits, approvals and authorisations from governmental and regulatory agencies related to its projects with favourable terms on a timely basis or at all.  The Group cannot make any assurance as to if or when it will receive these permits, which are needed prior to commencing certain construction activities related to the Group's projects.  Any administrative and judicial challenges to the Group's permits can delay and protract the process for obtaining and implementing permits and can also add significant costs and uncertainty.  The Group cannot control the outcome of any review or approval process, including whether or when any such permits and authorisations will be obtained, the terms of their issuance, or possible appeals or other potential interventions by third parties that could interfere with the Group's ability to obtain and maintain such permits and authorisations or the terms thereof.  Furthermore, the Group is developing new technologies and operates in jurisdictions that may lack mature legal and regulatory systems and may experience legal instability, which may be subject to regulatory and legal challenges, instability or clarity of application of laws, rules and regulations to the Group's business and new technology, which can result in difficulties and instability in obtaining or securing required permits or authorisations.  In addition, the Group's LNG transportation activities are subject to a broad array of regulations, and its operations are dependent upon obtaining and maintaining required permits and authorisations.  For example, the United States Coast Guard ("**USCG**") regulates the navigable waterways through which vessels the Group owns, leases or directs must traverse to supply LNG in Puerto Rico.  The Group's business in Puerto Rico must comply with all applicable USCG regulations.  If the Group is incorrect in its interpretation of applicable requirements, of if there is a change in the interpretation or application of those requirements, the USCG could determine that the Group has not complied with applicable requirements, which could lead to fines or restrictions on the Group's operations.  For example, on 26 September 2024, the Group received a letter from the USCG alleging that some aspects of its vessel operations may not comply with all applicable requirements.  On 21 October 2024, the Group filed an appeal with USCG under 33 CFR 160.7.  However, in December 2024 and February 2025, the Group submitted an updated Letter of Intent and Waterway Suitability Assessments detailing its alternative operational plans to the USCG.  In concert with its collaboration with the USCG regarding the Group's new operational plans, the Group withdrew its appeal on 14 February 2025.  On 12 January 2026, the Acting Captain of the Port of San Juan for the USCG issued a Letter of Recommendation ("**LOR**") in response to the Group's filings.  The LOR determined that the Port of San Juan waterway is suitable for the transit and docking of larger LNG carriers.

There is no assurance that in the future the Group will obtain and maintain required permits and authorisations on favourable terms, or that it will be able to obtain them on a timely basis, and it may not be able to complete its projects, start or continue its operations, recover its investment in its projects and may be subject to financial penalties or termination under its customer and other agreements, which could have a material adverse effect on its business, financial condition, operating results, liquidity and prospects.

***When the Group invests significant capital to develop a project, it is subject to the risk that the project is not successfully developed and that its customers do not fulfil their payment obligations following its capital investment in a project.***

A key part of the Group's business strategy is to attract new customers by agreeing to finance and develop new facilities, power plants, liquefaction facilities and related infrastructure in order to win new customer contracts for the supply of natural gas, LNG, steam or power.  This strategy requires the Group to invest capital and time to develop a project in exchange for the ability to sell its products and generate fees from customers in the future.  When the Group develops these projects, its required capital expenditure may be significant, and it typically does not generate meaningful fees from customers until the project has commenced commercial operations, which may take a year or more to achieve.  If the

109

project is not successfully developed for any reason, the Group faces the risk of not recovering some or all of its invested capital, which may be significant.  If the project is successfully developed, the Group faces the risks that its customers may not fulfil their payment obligations or may not fulfil other performance obligations that impact the Group's ability to collect payment.  The Group's customer contracts and development agreements do not fully protect it against this risk and, in some instances, may not provide any meaningful protection from this risk.  This risk is heightened in non-U.S. jurisdictions, particularly if the counterparty is a government or government-related entity because any attempt to enforce the Group's contractual or other rights may involve long and costly litigation where the ultimate outcome is uncertain.  If the Group invests capital in a project where it does not receive the payments it expects, it will have less capital to invest in other projects, its liquidity, results of operations and financial condition could be materially and adversely affected, and it could face the inability to comply with the terms of its existing debt or other agreements, which would exacerbate these adverse effects.

***Failure to maintain sufficient working capital could limit the Group's growth and harm its business, financial condition and results of operations.***

The Group has significant working capital requirements, primarily driven by the time difference between the time when it incurs costs to build and/ or purchase its facilities and other projects and the time in which it receives revenues from customers after such facilities and other projects are complete. The Group also experiences timing date differences between the date it pays for natural gas and the payment dates it offers its customers.  Differences between the date when the Group pays its suppliers and the date when it receives payments from customers may adversely affect its liquidity and cash flows.  The Group expects its working capital needs to increase as its total business increases.  If the Group does not have sufficient working capital, it may not be able to pursue its growth strategy, respond to competitive pressures or fund key strategic initiatives, such as the development of its facilities, which may harm its business, financial condition and results of operations.

***The Group's ability to generate revenues is substantially dependent on its current and future long-term agreements and the performance by customers under such agreements.***

The Group's business strategy relies upon its ability to successfully market its products to existing and new customers and enter into or replace long-term supply and services agreements for the sale of natural gas, LNG, steam and power.  If the Group contracts with its customers on short-term contracts, its pricing can be subject to more fluctuations and less favourable terms, and its earnings are likely to become more volatile. An increasing emphasis on the short-term or spot LNG market may in the future require the Group to enter into contracts based on variable market prices, as opposed to contracts based on a fixed rate, which could result in a decrease in the Group's cash flow in periods when the market price for shipping LNG is depressed or insufficient funds are available to cover the Group's financing costs for related vessels.  The Group's ability to generate cash is dependent on these customers' continued willingness and ability to continue purchasing the Group's products and services and to perform their obligations under their respective contracts.  Their obligations may include certain nomination or operational responsibilities, construction or maintenance of their own facilities which are necessary to enable the Group to deliver and sell natural gas or LNG, and compliance with certain contractual representations and warranties.  Further, adverse economic conditions in the Group's industry, including as a result of changing trade policies and tariffs and the related uncertainty thereof, increase the risk of nonpayment and non-performance by customers, particularly customers that have sub-investment grade credit ratings.  In addition, PREPA is currently subject to bankruptcy proceedings pending in the U.S. District Court for the District of Puerto Rico.  As a result, PREPA's ability to meet its payment obligations under its contracts will be largely dependent upon funding from federal sources. Specifically, PREPA's contracting practices in connection with restoration and repair of PREPA's electrical grid in Puerto Rico, and the terms of certain of those contracts, have been subject to comment and are the subject of review and hearings by U.S. federal and Puerto Rican governmental entities. Certain of the Group's subsidiaries are counterparties to contracts with governmental entities, including PREPA.  Although these contracts require payment and performance of certain obligations, the Group

110

remains subject to the statutory limitations on enforcement of those contractual provisions that protect these governmental entities.  In the event that PREPA or any applicable governmental counterparty does not have or does not obtain the funds necessary to satisfy their obligations to the Group under its agreements, or if they terminate such agreements prior to the end of the agreed term, the Group's financial condition, results of operations and cash flows could be materially and adversely affected.  If any of these customers fails to perform its obligations under its contract for the reasons listed above or for any other reason, the Group's ability to provide products or services and ability to collect payment could be negatively impacted, which could materially adversely affect the Group's operating results, cash flow and liquidity, even if it is ultimately successful in seeking damages from such customer for a breach of contract.

***The Group's current lack of asset and geographic diversification could have an adverse effect on its business, contracts, financial condition, operating results, cash flow, liquidity and prospects.***

The Group's results of operations for the year ended 31 December 2025 include its San Juan Terminal, La Paz Facility and certain industrial end-users and exclude developments in its Puerto Sandino Facility, Barcarena Facility, Santa Catarina Facility and Ireland Facility.  Mexico and Puerto Rico have historically experienced economic volatility and the general condition and performance of their economies, over which the Group has no control, may affect the Group's business, financial condition and results of operations.  Mexico and Puerto Rico are subject to acts of terrorism or sabotage and natural disasters, in particular hurricanes, extreme weather conditions, crime and similar other risks which may negatively impact the Group's operations in the region.  See "—*Risks Related to the Jurisdictions in Which the Group Operates—The Group is subject to the economic, political, social and other conditions in the jurisdictions in which it operates.*"  The Group may also be affected by trade restrictions, such as tariffs or other trade controls.  For instance, there continues to be significant uncertainty about the future relationship between the United States and other countries, including with respect to trade policies, treaties, government regulations, sanctions, tariffs, and application thereof.  For example, in April 2025, the U.S. government began imposing tariffs intended to address trade deficits and inconsistent economic treatment of importation between the United States and other countries.  In response, China, among others, has announced retaliatory tariffs against certain imports from the United States.  Although the Group is continuing to evaluate the impact of these evolving developments, it cannot provide any assurance about the ultimate outcome or impact of these developments or other changes in trade policies, including the imposition or application or enforceability of tariffs between the United States and other countries.  Furthermore, changes to trade policies, retaliatory measures, the ability to obtain refunds for previously paid tariffs that have subsequently been invalidated or prolonged uncertainty in trade relationships may negatively impact the Group's operations and financial results, including through resulting supply chain disruptions, increased economic nationalism, negative macroeconomic conditions and increased operational complexity and costs.

Additionally, tourism is a significant driver of economic activity in these geographies and directly and indirectly affects local demand for the Group's LNG and therefore its results of operations.  Trends in tourism in these geographies are primarily driven by the economic condition of the tourists' home country or territory, the condition of their destination, and the availability, affordability and desirability of air travel and cruises.  Additionally, unexpected factors could reduce tourism at any time, including local or global economic downturns, recessions, terrorism, travel restrictions, pandemics, severe weather or natural disasters.  Due to the Group's current lack of asset and geographic diversification, an adverse development at its operating facilities, in the energy industry or in the economic conditions in these geographies, would have a significantly greater impact on the Group's financial condition and operating results than if the Group maintained more diverse assets and operating areas.

***Because the Group is currently dependent upon a limited number of customers, the loss of a significant customer could adversely affect its operating results.***

The Group's current results of operations and liquidity are, and will continue to be in the near future, substantially dependent upon a limited number of customers, including CFE and PREPA, which have each entered into long-term gas sale agreements ("**GSAs**"). The Group's operating results are currently contingent on its ability to maintain LNG, natural gas, steam and power sales to these customers. The Group's near-term ability to generate cash is dependent on these customers' continued willingness and ability to continue purchasing the Group's products and services and to perform their obligations under their respective contracts. The loss of any of these customers or the early termination of any of these contracts could have an adverse effect on the Group's revenues and it may not be able to enter into a replacement agreement on terms as favourable as the terminated agreement. The Group may be unable to accomplish its business plan to diversify and expand its customer base by attracting a broad array of customers, which could negatively affect its business, results of operations and financial condition.

***The Group may not be able to convert its anticipated customer pipeline into binding long-term contracts, and if it fails to convert potential sales into actual sales, it will not generate the revenues and profits it anticipates.***

The Group is actively pursuing a significant number of new contracts for the sale of LNG, natural gas, steam, and power with multiple counterparties in multiple jurisdictions. Counterparties commemorate their purchasing commitments for these products in various degrees of formality ranging from traditional contracts to less formal arrangements, including non-binding letters of intent, non-binding memorandums of understanding, non-binding term sheets and responses to requests for proposals with potential customers. These agreements and any award following a request for proposals are subject to negotiating final definitive documents. The negotiation process may cause the Group or its potential counterparty to adjust the material terms of the agreement, including the price, term, schedule and any related development obligations. The Group cannot assure investors if or when it will enter into binding definitive agreements for transactions initially described in non-binding agreements, and the terms of binding agreements may differ materially from the terms of the related non-binding agreements. In addition, the effectiveness of the Group's binding agreements can be subject to a number of conditions precedent that may not materialise, rendering such agreements non-effective. Moreover, while certain of the Group's long-term contracts contain minimum volume commitments, expected sales to customers under existing contracts may be substantially in excess of such minimum volume commitments. The Group's near-term ability to generate cash is dependent on these customers' continued willingness and ability to nominate in excess of such minimum quantities and to perform their obligations under their respective contracts. Given the variety of sales processes and counterparty acknowledgements of the volumes they will purchase, the Group sometimes identifies potential sales volumes as being either "Committed" or "In Discussion." "Committed" volumes generally refer to the volumes that management expects to be sold under binding contracts or awards under requests for proposals. "In Discussion" volumes generally refer to volumes related to potential customers that management is actively negotiating, responding to a request for proposals, or with respect to which management anticipates a request for proposals or competitive bid process to be announced based on discussions with potential customers. Management's estimations of "Committed" and "In Discussion" volumes may prove to be incorrect. Accordingly, the Group cannot assure investors that "Committed" or "In Discussion" volumes will result in actual sales, and such volumes should not be used to predict the Group's future results. The Group may never sign a binding agreement to sell its products to the counterparty, or may sell much less volume than estimated, which could result in an inability to generate the revenues and profits the Group anticipates, having a material adverse effect on its results of operations and financial condition.

***The Group's contracts with its customers are subject to termination under certain circumstances.***

The Group's contracts with its customers contain various termination rights.  For example, each of the Group's long-term customer contracts, including the contracts with PREPA, contain various termination rights allowing its customers to terminate the contract, including, without limitation:

- upon the occurrence of certain events of force majeure;

- if the Group fails to make available specified scheduled cargo quantities;

- the occurrence of certain uncured payment defaults;

- the occurrence of an insolvency event; and

- the occurrence of certain uncured, material breaches.

In addition, the Group has short-term customer contracts with renewal rights which the customer may choose not to renew.  The Group may not be able to replace these contracts on desirable terms, or at all, if they are terminated.  Contracts that the Group enters into in the future may contain similar provisions.  If any of the Group's current or future contracts are terminated, such termination could have a material adverse effect on the Group's business, contracts, financial condition, operating results, cash flows, liquidity and prospects.

***Competition in the LNG industry is intense, and some of the Group's competitors have greater financial, technological and other resources than the Group currently possesses.***

A substantial majority of the Group's revenue is dependent upon LNG sales to third parties.  The Group operates in the highly competitive industry for LNG and faces intense competition from independent, technology-driven companies as well as from both major and other independent oil and natural gas companies and utilities, in the various markets in which the Group operates and many of which have been in operation longer than the Group.  Various factors relating to competition may prevent the Group from entering into new or replacement customer contracts on economically comparable terms to existing customer contracts, or at all, including, among others:

- increases in worldwide LNG production capacity and availability of LNG for market supply;

- increases in demand for natural gas but at levels below those required to maintain current price equilibrium with respect to supply;

- increases in the cost to supply natural gas feedstock to the Group's liquefaction projects;

- increases in the cost to supply LNG feedstock to the Group's facilities;

- decreases in the cost of competing sources of natural gas, LNG or alternate fuels such as coal, heavy fuel oil and automotive diesel oil ("**ADO**");

- decreases in the price of LNG; and

- displacement of LNG or fossil fuels more broadly by alternate fuels or energy sources or technologies (including but not limited to nuclear, wind, hydrogen, solar, biofuels and batteries) in locations where access to these energy sources is not currently available or prevalent.

In addition, the Group may not be able to successfully execute on its strategy to supply existing and future customers with LNG produced primarily at its own liquefaction facilities and GSAs.  Various competitors have and are developing LNG facilities in other markets, which will compete with the Group's LNG facilities, including its Fast LNG solution.  Some of these competitors have longer

113

operating histories, more development experience, greater name recognition, larger staffs, larger and more versatile fleets, and substantially greater financial, technical and marketing resources than the Group currently possesses.  The Group also faces competition for the contractors needed to build its facilities and skilled employees.  See "—*The Group may experience increased labour costs and regulation, and the unavailability of skilled workers or the Group's failure to attract and retain qualified personnel, as well as its ability to comply with such labour laws, could adversely affect it.*"  The superior resources that some of these competitors have available for deployment could allow them to compete successfully against the Group, which could have a material adverse effect on the Group's business, ability to realise benefits from future projects, results of operations, financial condition, liquidity and prospects.  The Group anticipates that an increasing number of offshore transportation companies, including many with strong reputations and extensive resources and experience will enter the LNG transportation market and the FSRU market.  This increased competition may cause greater price competition for the Group's products.  As a result of these factors, the Group may be unable to expand its relationships with existing customers or to obtain new customers on a favourable basis, if at all, which would have a material adverse effect on the Group's business, results of operations and financial condition.

***Cyclical or other changes in the demand for and price of LNG and natural gas may adversely affect the Group's business and the performance of its customers.***

The Group's business and the development of energy-related infrastructure and projects generally is based on assumptions about the future availability and price of natural gas and LNG and the prospects for international natural gas and LNG markets.  Natural gas and LNG prices have at various times been and may become volatile due to one or more of the following factors:

- additions to competitive regasification capacity in North America, Brazil, Europe, Asia and other markets, which could divert LNG or natural gas from the Group's business;

- changing trade policies and tariffs and the related uncertainty thereof, including the imposition and enforceability of tariffs by China or any other jurisdiction on imports of LNG from the United States, trade wars, barriers or restrictions, or threats of such actions;

- insufficient or oversupply of natural gas liquefaction or export capacity worldwide;

- insufficient LNG tanker capacity;

- weather conditions and natural disasters;

- reduced demand and lower prices for natural gas;

- increased natural gas production deliverable by pipelines, which could suppress demand for LNG;

- decreased oil and natural gas exploration activities, including shut-ins and possible proration, which may decrease the production of natural gas;

- cost improvements that allow competitors to offer LNG regasification services at reduced prices;

- changes in supplies of, and prices for, alternative energy sources, such as coal, oil, nuclear, hydroelectric, wind and solar energy, which may reduce the demand for natural gas;

- changes in regulatory, tax or other governmental policies regarding imported or exported LNG, natural gas or alternative energy sources, which may reduce the demand for imported or exported LNG and/or natural gas;

114

- political conditions in natural gas producing regions;

- adverse relative demand for LNG compared to other markets, which may decrease LNG imports into or exports from North America; and

- cyclical trends in general business and economic conditions that cause changes in the demand for natural gas.

Adverse trends or developments affecting any of these factors, including the timing of the impact of these factors in relation to the Group's purchases and sales of natural gas and LNG could result in increases in the prices the Group has to pay for natural gas or LNG, which could materially and adversely affect the performance of the Group's customers, and could have a material adverse effect on the Group's business, contracts, financial condition, operating results, cash flows, liquidity and prospects. Certain actions by the Organization of Petroleum Exporting Countries ("**OPEC**") related to the supply of oil in the market have caused volatility and disruption in the price of oil which may negatively impact the Group's potential customers' willingness or ability to enter into new contracts for the purchase of natural gas. Additionally, in situations where the Group's supply chain has capacity constraints and as a result the Group is unable to receive all volumes under its long-term LNG supply agreements, the Group's supplier may sell volumes of LNG in a mitigation sale to third parties. In these cases, the factors above may impact the price and amount the Group receives under mitigation sales and the Group may incur losses that would have an adverse impact on its financial condition, results of operations and cash flows. Conversely, as in recent years, market conditions may increase LNG values to historically high levels. These elevated market values increase the economic incentives an LNG seller has to fail to deliver LNG cargos to the Group if they can sell the same LNG cargos at a higher price to another buyer in the market after giving effect to any contractual penalties the seller would owe to the Group for failing to deliver. The Group's contracts may not require an LNG seller to compensate the Group for the full current market value of an LNG cargo that the Group has purchased, and if so, the Group may not be contractually entitled to receive full economic indemnification upon an LNG seller's failure to deliver an LNG cargo to it. Recently, the LNG industry has experienced increased volatility. If market disruptions and bankruptcies of third-party LNG suppliers and shippers negatively impacts the Group's ability to purchase a sufficient amount of LNG or significantly increases the Group's costs for purchasing LNG, the Group's business, operating results, cash flows and liquidity could be materially and adversely affected. There can be no assurance the Group will achieve its target cost or pricing goals. In particular, because the Group has not currently procured fixed-price, long-term LNG supply to meet all future customer demand, increases in LNG prices and/or shortages of LNG supply could adversely affect the Group's profitability. The Group's actual costs and any profit realised on the sale of LNG may vary from the estimated amounts on which the Group's contracts for feed gas were originally based. There is inherent risk in the estimation process, including significant changes in the demand for and price of LNG as a result of the factors listed above, many of which are outside of the Group's control. If LNG were to become unavailable for current or future volumes of natural gas due to repairs or damage to supplier facilities or tankers, lack of capacity, impediments to international shipping or any other reason, the Group's ability to continue delivering natural gas, power or steam to end-users could be restricted, thereby reducing the Group's revenues. Any permanent interruption at any key LNG supply chains that caused a material reduction in volumes transported on or to the Group's tankers and facilities could have a material adverse effect on the Group's business, financial condition, operating results, cash flow, liquidity and prospects.

***Developments related to the ongoing war between Russia and Ukraine and the ongoing conflicts in the Middle East, as well as geopolitical instability in Venezuela, could adversely affect the Group's business, contracts, financial condition, operating results, cash flows, liquidity and prospects.***

Recent and ongoing geopolitical tensions and conflicts in key oil- and gas-producing regions, including Iran, Venezuela, the Middle East, and Eastern Europe, have created significant uncertainty and volatility in global energy markets. The Group's business, financial condition, results of operations, and prospects could be materially and adversely affected by developments in these regions, including but not limited

to: military conflicts, sanctions, retaliatory measures, disruptions to energy infrastructure, and changes in global supply and demand dynamics for LNG and related commodities.

For example, the escalation of hostilities involving Iran—including direct military actions, attacks on shipping vessels in the Strait of Hormuz (a critical chokepoint for global LNG and oil transport), and retaliatory strikes by or against Iran and its regional allies—has resulted in, and may continue to result in, increased shipping and insurance costs, supply chain disruptions, heightened security risks, and significant volatility in global energy prices. A prolonged or expanded conflict in the region could further disrupt international energy trade flows, constrain access to or increase the cost of imported energy and feedstock supplies, and negatively impact demand for LNG and other energy commodities. Similarly, Venezuela, which holds some of the world's largest proven oil reserves, has experienced significant political, economic, and social instability, compounded by extensive international sanctions, including on its state-owned oil company. Any changes in the status of these sanctions, or a material increase in Venezuelan hydrocarbon production, could alter global supply dynamics and exert downward pressure on oil and LNG prices, adversely affecting the Group's competitive position and financial performance.

In addition, the imposition, expansion, or relaxation of sanctions or other trade restrictions by the United States, EU, or other governments in response to geopolitical events in Iran, Venezuela, or other regions may impact the Group's ability to source, transport, or sell LNG and related products, or may increase compliance costs and operational complexity. The Group's vessels, supply chain, and customer relationships could be adversely affected by disruptions in global shipping routes, increased risk of vessel seizures or attacks, or changes in insurance market conditions, including the potential loss or increased cost of war-risk coverage for vessels operating in or near conflict zones. The Group cannot predict the extent or duration of these geopolitical risks, nor their potential impact on global energy markets, LNG prices, or the Group's operations. Any material escalation or regional expansion of conflicts, or significant changes in the regulatory or sanctions environment, could have a material adverse effect on the Group's business, financial condition, results of operations, cash flows, and future growth prospects.

***The Group's risk management strategies cannot eliminate all LNG price and supply risks. In addition, any non-compliance with the Group's risk management strategies could result in significant financial losses.***

The Group's strategy is to maintain a manageable balance between LNG purchases, on the one hand, and sales or future delivery obligations, on the other hand. Through these transactions, the Group seeks to earn a margin for the LNG purchased by selling LNG for physical delivery to third-party users, such as public utilities, shipping/marine cargo companies, industrial users, railroads, trucking fleets and other potential end-users converting from traditional ADO or oil fuel to natural gas. These strategies cannot, however, eliminate all price risks. For example, any event that disrupts the Group's anticipated supply chain could expose the Group to risk of loss resulting from price changes if it is required to obtain alternative supplies to cover these transactions. The Group is also exposed to basis risks when LNG is purchased against one pricing index and sold against a different index. Moreover, the Group is also exposed to other risks, including price risks on LNG it owns, which must be maintained in order to facilitate transportation of the LNG to its customers or to its facilities. If the Group were to incur a material loss related to commodity price risks, it could have a material adverse effect on the Group's financial position, results of operations and cash flows.

***Any use of hedging arrangements may adversely affect the Group's future operating results or liquidity.***

To reduce the Group's exposure to fluctuations in the price, volume and timing risk associated with the purchase of natural gas, the Group has entered and may in the future enter into futures, swaps and option contracts traded or cleared on the Intercontinental Exchange and the New York Mercantile Exchange or over-the-counter ("**OTC**") options and swaps with other natural gas merchants and financial

institutions. Hedging arrangements would expose the Group to risk of financial loss in some circumstances, including when expected supply is less than the amount hedged, the counterparty to the hedging contract defaults on its contractual obligations, or there is a change in the expected differential between the underlying price in the hedging agreement and actual prices received. The use of derivatives also may require the posting of cash collateral with counterparties, which can impact working capital when commodity prices change.

***The Group is dependent on third-party LNG suppliers and the development of its own portfolio is subject to various risks and assumptions.***

Under the Group's GSAs, power purchase agreements ("**PPAs**"), capacity reservation agreements and steam supply agreements ("**SSAs**"), the Group is required to deliver to its customers specified amounts of LNG, natural gas, power and steam, respectively, at specified times and within certain specifications, all of which requires the Group to obtain sufficient amounts of LNG from third-party LNG suppliers or its own portfolio. The Group may not be able to purchase or receive physical delivery of sufficient quantities of LNG to satisfy those delivery obligations, which may provide a counterparty with the right to terminate its GSA, PPA, capacity reservation agreement or SSA, as applicable, or subject the Group to remedial obligations under those agreements. While the Group has entered into supply agreements for the purchase of LNG between 2026 and 2047, it may need to purchase significant additional LNG volumes to meet its delivery obligations to its downstream customers. Price fluctuations in natural gas and LNG may make it expensive or uneconomical for the Group to acquire adequate supply of these items or to sell its inventory of natural gas or LNG at attractive prices. Failure to secure contracts for the purchase of a sufficient amount of LNG or at favourable prices could materially and adversely affect the Group's business, operating results, cash flows and liquidity.

The development of the Group's own portfolio of LNG is subject to various risks and assumptions. In particular, the estimation of proved gas reserves involves subjective judgements and determinations based on available geological, technical, contractual, and economic information. Estimates can change over time because of new information from production or drilling activities, changes in economic factors, such as oil and gas prices, alterations in the regulatory policies of host governments, or other events. Estimates also change to reflect acquisitions, divestments, new discoveries, extensions of existing fields and mines, and improved recovery techniques. Published proved gas reserves estimates could also be subject to correction because of errors in the application of rules and changes in guidance. Downward adjustments could indicate lower future production volumes and could also lead to impairment of assets. This could have a material adverse effect on the Group's business, operating results, cash flows and liquidity. There is also a risk that one or more of the Group's existing supply agreements could be cancelled by its counterparties, particularly if there are concerns regarding the Group's ability to perform its obligations under such agreements or due to other contractual provisions. The cancellation of any of the Group's supply agreements could significantly reduce its access to LNG, disrupt its ability to fulfil its commitments to downstream customers, and have a material adverse effect on the Group's business, financial condition, results of operations, and liquidity.

Additionally, the Group is dependent upon third-party LNG suppliers and shippers and other tankers and facilities to provide delivery options to and from the Group's tankers and energy-related infrastructure. If any third parties were to default on their obligations under the Group's contracts or seek bankruptcy protection, the Group may not be able to replace such contracts or purchase LNG on the spot market or receive a sufficient quantity of LNG in order to satisfy its delivery obligations under its GSAs, PPAs, capacity reservation agreements and SSAs or at favourable terms. Under tanker charters, the Group is obligated to make payments for its chartered tankers regardless of use. The Group may not be able to enter into contracts with purchasers of LNG in quantities equivalent to or greater than the amount of tanker capacity it has purchased, as the Group's vessels may be too small for those obligations. Any such failure to purchase or receive delivery of LNG or natural gas in sufficient quantities could result in the Group's failure to satisfy its obligations to its customers, which could lead to losses, penalties, indemnification and potentially a termination of agreements with its customers. Furthermore, the Group may seek to litigate any such breaches by its third-party LNG suppliers and

117

shippers.  Such legal proceedings may involve claims for substantial amounts of money and the Group may not be successful in pursuing such claims.  Even if the Group is successful, any litigation may be costly and time-consuming.  If any such proceedings were to result in an unfavourable outcome, the Group may not be able to recover its losses (including lost profits) or any damages sustained from its agreements with its customers.  See "—*General Risks—The Group is and may be involved in legal proceedings and may experience unfavourable outcomes*."  These actions could also expose the Group to adverse publicity, which might adversely affect its reputation and therefore, its results of operations.  Further, it could have an adverse effect on the Group's business, operating results, cash flows and liquidity, which could in turn materially and adversely affect the Group's liquidity to make payments on its debt or comply with its financial ratios and other covenants.  See "—*The Group has incurred, and may in the future incur, a significant amount of debt*."

### *LNG that is processed, transported and/or stored on FSRUs and transported via pipeline is subject to risk of loss or damage.*

LNG processed, transported and stored on FSRUs may be subject to loss or damage resulting from equipment malfunction, faulty handling, cargo aging or otherwise.  Where the Group has chartered in, but subsequently not out chartered, an FSRU, which in turn results in the Group being unable to transfer risk of loss or damage, the Group could bear the risk of loss or damage to all those volumes of LNG for the period of time during which those applicable volumes of LNG are stored on an FSRU or are dispatched to a pipeline.  Any such disruption to the supply of LNG and natural gas may lead to delays, disruptions or curtailments in the production of power at the Group's facilities, which could materially and adversely affect the Group's revenues, financial condition and results of operations.

### *The Group relies on tankers and other vessels outside of its fleet for its LNG transportation and transfer.*

In addition to the Group's own fleet of vessels, it relies on third-party ocean-going tankers and freight carriers (for International Organization for Standardization intermodal containers ("**ISO containers**")) for the transportation of LNG and uses ship-to-ship kits to transfer LNG between ships.  The Group may not be able to successfully enter into contracts or renew existing contracts to charter tankers on favourable terms or at all, which may result in the Group not being able to meet its obligations.  The Group's ability to enter into contracts or renew existing contracts will depend on prevailing market conditions upon expiration of the contracts governing the leasing or charter of the applicable assets.  Therefore, the Group may be exposed to increased volatility in terms of charter rates and contract provisions.  Fluctuations in charter rates result from changes in the supply of LNG tankers and demand for capacity and changes in the demand for seaborne carriage of commodities.  Because the factors affecting the supply and demand are outside of the Group's control and are highly unpredictable, the nature, timing, direction and degree of changes in industry conditions are also unpredictable.  Likewise, the Group's counterparties may seek to terminate or renegotiate their charters or leases with the Group.  If the Group is not able to renew or obtain new charters or leases in direct continuation, or if new charters or leases are entered into at rates substantially above the existing rates or on terms otherwise less favourable compared to existing contractual terms, the Group's business, prospects, financial condition, results of operations and cash flows could be materially adversely affected.

Furthermore, the Group's ability to provide services to its customers could be adversely impacted by shifts in tanker market dynamics, shortages in available cargo carrying capacity, changes in policies and practices such as scheduling, pricing, routes of service and frequency of service, or increases in the cost of fuel, taxes and labour, emissions standards, maritime regulatory changes, sanctions and other factors not within the Group's control.  The availability of the tankers could be delayed to the detriment of the Group's LNG business and its customers because the construction and delivery of LNG tankers require significant capital and long construction lead times.  Changes in ocean freight capacity, which are outside the Group's control, could negatively impact the Group's ability to provide natural gas if LNG shipping capacity is adversely impacted and LNG transportation costs increase because the Group may bear the risk of such increases and may not be able to pass these increases on to its customers.

The operation of ocean-going tankers and kits carries inherent risks. These risks include the possibility of natural disasters; mechanical failures; grounding, fire, explosions and collisions; piracy; human error; epidemics; and war and terrorism. The Group does not currently maintain a redundant supply of ships, ship-to-ship kits or other equipment. As a result, if the Group's current equipment fails, is unavailable or insufficient to service its LNG purchases, production, or delivery commitments the Group may need to procure new equipment, which may not be readily available or be expensive to obtain. Any such occurrence could delay the start of operations of facilities the Group intends to commission, interrupt existing operations and increase operating costs. Any of these results could have a material adverse effect on the Group's business, financial condition and operating results.

***Hire rates for FSRUs and LNG carriers may fluctuate substantially. If rates are lower when the Group is seeking a new charter, the Group's earnings may decline.***

Hire rates for FSRUs and LNG carriers fluctuate over time as a result of changes in the supply-demand balance relating to the market requirements for FSRUs and LNG carries and future FSRU and LNG carrier capacity. This supply-demand relationship largely depends on a number of factors outside of the Group's control. For example, driven in part by an increase in LNG production capacity, the market supply particularly of LNG carriers has been increasing. The Group believes that this and any future expansion of the global LNG carrier fleet may have a negative impact on charter hire rates, vessel utilisation and vessel values, the impact of which could be amplified if the expansion of LNG production capacity does not keep pace with fleet growth. The LNG market is also closely connected to world natural gas and LNG prices and energy markets, which the Group cannot predict. A substantial or extended decline in demand for natural gas or LNG could adversely affect the Group's ability to charter or re-charter its vessels at acceptable rates or to acquire and profitably operate new vessels. Accordingly, this could have a material adverse effect on the Group's earnings, financial condition, operating results and prospects.

***The Group may not be able to fully utilise the capacity of its FSRUs and other facilities.***

The Group's FSRU facilities have excess capacity that is currently not dedicated to a particular anchor customer. Part of the Group's business strategy is to utilise undedicated excess capacity of its FSRU facilities to serve additional downstream customers in the regions in which it operates. However, the Group has not secured, and may be unable to secure, commitments for all of its excess capacity. Factors which could cause the Group to contract less than full capacity include difficulties in negotiations with potential counterparties, timing of start-up of new third party projects and factors outside of the Group's control such as the price of and demand for LNG for a particular project. Failure to secure commitments for less than full capacity could impact the Group's future revenues and materially adversely affect its business, financial condition and operating results.

***The operation of the Group's vessels is dependent on its ability to deploy its vessels to an NFE terminal or to long-term charters.***

The Group's principal strategy for its FSRU and LNG carriers is to provide steady and reliable shipping, regasification and offshore operations to NFE terminals and, to the extent favourable to its business, replace or enter into new long-term carrier time charters for its vessels. For new LNG projects, LNG ships continue to be provided on a long-term basis, though the level of spot voyages and short-term time charters of less than 12 months in duration together with medium term charters of up to five years has increased in recent years. This trend is expected to continue as the spot market for LNG expands and becomes more liquid. More frequent changes to vessel sizes, propulsion technology and emissions profile, retirements of older vessels, together with an increasing desire by charterers to access modern tonnage could also reduce the appetite of charterers to commit to long-term charters that match their full requirement period. As a result, the duration of long-term charters could also decrease over time. The Group may also face increased difficulty entering into long-term time charters upon the expiration or early termination of the Group's contracts. The process of obtaining long-term charters for FSRUs and LNG carriers is highly competitive and generally involves an intensive screening process and

competitive bids, and often extends for several months.  If the Group loses any of its charterers and is unable to re-deploy the related vessel to a NFE terminal or into a new replacement contract for an extended period of time, the Group will not receive any revenues from the deliveries from that vessel, but will be required to pay expenses necessary to maintain the vessel in seaworthy operating condition.

***Vessel values may fluctuate substantially and, if these values are lower at a time when the Group is attempting to dispose of vessels, the Group may incur a loss.***

Vessel values can fluctuate substantially over time due to a number of different factors, including:

- prevailing economic conditions in the natural gas and energy markets;

- a substantial or extended decline in demand for LNG;

- increases in the supply of vessel capacity without a commensurate increase in demand;

- the size, tank type and age of a vessel; and

- the cost of retrofitting, steel prices or modifying existing vessels, as a result of technological advances in vessel design or equipment, changes in applicable environmental or other regulations or standards, customer requirements or otherwise.

As the Group's owned or chartered vessels age, the expenses associated with maintaining and operating them are expected to increase, which could have an adverse effect on the Group's business and operations if it does not maintain sufficient cash reserves for maintenance and replacement capital expenditures.  Moreover, the cost of a replacement vessel could be significant and subject to market pricing.

During the period a vessel is subject to a charter, the Group will not be permitted to sell it to take advantage of increases in vessel values without the charterers' consent.  If a charter terminates, the Group may be unable to re-deploy the affected vessels at market rates or for its operations and, rather than continue to incur costs to maintain and finance them, it may seek to dispose of them.  When vessel values are low, the Group may not be able to dispose of vessels at a reasonable price when it wishes to sell vessels, and conversely, when vessel values are elevated, the Group may not be able to acquire additional vessels at attractive prices when it wishes to acquire additional vessels, which could adversely affect its business, results of operations, cash flow, and financial condition.

The carrying values of the Group's vessels may not represent their fair market value at any point in time because the market prices of second hand vessels tend to fluctuate with changes in charter rates, vessel availability and the cost of new build vessels, steel prices and foreign exchange rates.  The Group's vessels are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount may not be recoverable.  The Group recognised an impairment charge on one of its vessels for the year ended 31 December 2023 and cannot assure investors that it will not recognise impairment losses on its vessels in future years.  Any impairment charges incurred as a result of declines in charter rates could negatively affect the Group's business, financial condition, or operating results.

***Maritime claimants could arrest the Group's vessels, which could interrupt the Group's cash flow.***

If the Group is in default on certain kinds of obligations related to its vessels, such as those to its lenders, crew members, suppliers of goods and services to its vessels or shippers of cargo, these parties may be entitled to a maritime lien against one or more of its vessels.  In many jurisdictions, a maritime lien holder may enforce its lien by arresting a vessel through foreclosure proceedings.  In a few jurisdictions, claimants could try to assert "sister ship" liability against one vessel in the Group's fleet for claims relating to another of its vessels.  The arrest or attachment of one or more of the Group's vessels could interrupt its cash flow and require it to pay to have the arrest lifted.  Under some of the Group's present charters, if the vessel is arrested or detained (for as few as 14 days in the case of one of the Group's

120

charters) as a result of a claim against it, it may be in default of its charter and the charterer may terminate the charter.  This would negatively impact the Group's revenues and cash flows.

***The Group seeks to develop innovative and new technologies as part of its strategy that are not yet proven and may not realise the time and cost savings the Group expects to achieve.***

The Group analyses and seeks to implement innovative and new technologies that complement its businesses to reduce its costs, achieve efficiencies for its business and its customers and advance its long-term goals, such as its ISO container distribution system, Fast LNG solution and green hydrogen project.  The success of the Group's current operations and future projects will depend in part on its ability to create and maintain a competitive position in the natural gas liquefaction industry.  The Group has developed its Fast LNG strategy to procure and deliver LNG to its customers more quickly and cost-effectively than traditional LNG procurement and delivery strategies used by other market participants.  See "—*The Group's Fast LNG technology is a new strategy and may encounter unforeseen or unknown operational risks.*"  The Group continues to develop its ISO container distribution systems in the various markets where it operates.  The Group expects to make additional investments in this field in the future.  Because these technologies are innovative, the Group may be making investments in unproven business strategies and technologies with which it has limited or no prior development or operating experience.  As an investor in these technologies, it is also possible that the Group could be exposed to claims and liabilities, expenses, regulatory challenges and other risks.  The Group may not be able to successfully develop these technologies, and even if it succeeds, may ultimately not be able to realise the time, revenues and cost savings it currently expects to achieve from these strategies, which could adversely affect the Group's financial results.

***Technological innovation may impair the economic attractiveness of the Group's projects.***

The success of the Group's current operations and future projects will depend in part on its ability to create and maintain a competitive position in the natural gas liquefaction industry, including using technologies.  Such technologies may be rendered obsolete or uneconomical by legal or regulatory requirements, technological advances, more efficient and cost-effective processes or entirely different approaches developed by one or more of the Group's competitors or others, which could materially and adversely affect the Group's business, ability to realise benefits from future projects, results of operations, financial condition, liquidity and prospects.

***The Group's Fast LNG technology is a new strategy and may encounter unforeseen or unknown operational risks.***

The Group has developed its Fast LNG strategy to procure and deliver LNG to its customers more quickly and cost-effectively than traditional LNG procurement and delivery strategies used by other market participants.  The Group's ability to create and maintain a competitive position in the natural gas liquefaction industry may be adversely affected by unforeseen and unknown operational risks.  The Group has commenced operations at its first Fast LNG facility.   The Group is also exploring opportunities to sell and complete development of its second Fast LNG facility and is therefore subject to construction risks, risks associated with third-party contracting (including the risk that it will not be able to execute contracts with third parties that are necessary to develop the project) and service providers, permitting and regulatory risks.  See "—*The Group is subject to various construction risks*" and "—*The Group depends on third-party contractors, operators and suppliers*."  Because the Group's Fast LNG technology is a new strategy, the Group is also exposed to unknown and unforeseen risks associated with the development of new technologies, including failure to meet design, engineering, or performance specifications, incompatibility of systems, inability to contract or employ third parties with sufficient experience in technologies used or inability by contractors to perform their work, delays and schedule changes, high costs and expenses that may be subject to increase or difficult to anticipate, regulatory and legal challenges, instability or clarity of application of laws, rules and regulations to the technology, and added difficulties in obtaining or securing required permits or authorisations, among others.  For example, in April 2024, the Group experienced an incident involving equipment failure

121

during the commissioning of its Fast LNG project in Altamira, Mexico, which delayed its commencement of operations and resulted in increased costs and delay of commencement of revenue generating activity. See "—*Failure to obtain and maintain permits, approvals and authorisations from governmental and regulatory agencies and third parties on favourable terms could impede operations and construction*." The success and profitability of the Group's Fast LNG technology is also dependent on the volatility of the price of natural gas and LNG compared to the related levels of capital spending required to implement the technology. Natural gas and LNG prices have at various times been and may become volatile due to one or more factors. Volatility or weakness in natural gas or LNG prices could render the Group's LNG procured through Fast LNG too expensive for its customers, and the Group may not be able to obtain its anticipated return on its investment or make its technology profitable. In addition, the Group may seek to construct and develop liquefaction units as part of its Fast LNG in jurisdictions which could potentially expose it to increased political, economic, social and legal instability, a lack of regulatory clarity of application of laws, rules and regulations to its technology, or additional jurisdictional risks related to currency exchange, tariffs and other taxes, changes in laws, civil unrest, and similar risks. See "—*Risks Related to the Jurisdictions in Which The Group Operates—The Group is subject to the economic, political, social and other conditions in the jurisdictions in which it operates*." Furthermore, as part of the Group's business strategy for Fast LNG, it may enter into tolling agreements with third parties, including in developing countries, and these counterparties may have greater credit risk than typical. Therefore, the Group may be exposed to greater customer credit risk than other companies in the industry. The Group's credit procedures and policies may be inadequate to sufficiently eliminate risks of nonpayment and non-performance. The Group may not be able to continue to successfully develop, construct and implement its Fast LNG projects, and even if it succeeds in continuing to develop and construct the technology, it may ultimately not be able to realise the cost savings and revenues it currently expects to achieve from them, which could result in a material adverse effect upon the Group's operations and business.

***The Group has incurred, and may in the future incur, a significant amount of debt. The agreements governing the Group's indebtedness place restrictions on it, reducing operational and financing flexibility and creating default risks.***

The Group's ability to service its existing and any future debt will depend on its performance and operations, which are subject to factors that are beyond its control and compliance with covenants in the agreements governing such debt. The Group may be unable to maintain a level of cash flows from operating activities sufficient to permit it to fund its day-to-day operations or to pay the principal, premium, if any, and interest on its indebtedness. If the Group's cash flows and capital resources are insufficient to fund its debt service obligations and other cash requirements, the Group could face substantial liquidity problems and could be forced to reduce or delay investments and capital expenditures or to sell assets or operations, seek additional capital or restructure or refinance its operations or indebtedness. If the Group cannot make scheduled payments on its debt, it will be in default and, as a result, lenders under and holders of any of its existing and future indebtedness could declare all outstanding principal and interest to be due and payable, the lenders under the Group's debt instruments could terminate their commitments to loan money, the Group's secured lenders could foreclose against the assets securing such borrowings and the Group could be forced into bankruptcy, insolvency or liquidation. The Group may also incur additional debt to fund its business and strategic initiatives. If the Group incurs additional debt and other obligations, the risks associated with its leverage and the ability to service such debt would increase, which could have a material adverse effect on the Group's business, results of operation and financial condition.

***The Group will be permitted to incur additional indebtedness in the future. This could further exacerbate the risks associated with the Group's indebtedness.***

In addition, as the Group's existing indebtedness matures, it may need to refinance that indebtedness with new indebtedness that may have a higher interest rate, which will increase the Group's fixed costs. In accordance with the Recapitalisation Transaction, the CoreCo Group will incur up to an aggregate amount of (i) $475 million of new term loans, $52.5 million of Incremental New CoreCo Term Loans,

approximately $43.8 million of Incremental Equity-for-Debt Exchange Election New CoreCo Term Loans, and, solely to the extent necessary to meet the Minimum Liquidity Condition, up to $35 million in aggregate principal amount of Capital Raise New CoreCo Term Loans (plus additional principal to reflect any original issue discount) and if necessary, Capital Raise New CoreCo Junior Term Loans, each under the New CoreCo Credit Facility and (ii) $400 million of new term loans under the FLNG 2 Credit Facility.

Although the instruments governing the Group's indebtedness contain restrictions on the incurrence of additional indebtedness, these restrictions are subject to a number of qualifications and exceptions and the indebtedness incurred in compliance with these restrictions could be substantial. If the Group incurs additional debt and other obligations, the risks associated with the Group's leverage and the ability to service such debt would increase, which could have a material adverse effect on the Group's business, results of operation and financial condition.

***The Group has entered into, and may in the future enter into or modify existing, joint ventures that might restrict its operational and corporate flexibility or require credit support.***

The Group has entered into, and may in the future enter into, joint venture arrangements with third parties in respect of its projects and assets. For example, in August 2022, the Group established Energos, as a joint venture platform with certain funds or investment vehicles managed by Apollo, for the development of a global marine infrastructure platform, of which the Group owned 20 per cent. prior to the sale of approximately all of its 20 per cent. stake in February 2024. As the Group does not operate the assets owned by these joint ventures, the Group's control over their operations is limited by provisions of the agreements the Group has entered into with its joint venture partners and by its percentage ownership in such joint ventures. Because the Group does not control all of the decisions of its joint ventures, it may be difficult or impossible for the Group to cause the joint venture to take actions that it believes would be in its or the joint venture's best interests. For example, the Group cannot unilaterally cause the distribution of cash by its joint ventures. Additionally, as the joint ventures are separate legal entities, any right the Group may have to receive assets of any joint venture or other payments upon their liquidation or reorganisation will be effectively subordinated to the claims of the creditors of that joint venture (including tax authorities, trade creditors and any other third parties that require such subordination, such as lenders and other creditors). Moreover, joint venture arrangements involve various risks and uncertainties, such as the Group's commitment to fund operating and/or capital expenditures, the timing and amount of which the Group may not control, and the Group's joint venture partners may not satisfy their financial obligations to the joint venture. The Group has provided and may in the future provide guarantees or other forms of credit support to its joint ventures and/or affiliates. Failure by any of the Group's joint ventures, equity method investees and/or affiliates to service their debt requirements and comply with any provisions contained in their commercial loan agreements, including paying scheduled instalments and complying with certain covenants, may lead to an event of default under the related loan agreement. As a result, if the Group's joint ventures, equity method investees and/or affiliates are unable to obtain a waiver or do not have enough cash on hand to repay the outstanding borrowings, the relevant lenders may foreclose their liens on the relevant assets or vessels securing the loans or seek repayment of the loan from the Group, or both. Either of these possibilities could have a material adverse effect on the Group's business. Further, by virtue of the Group's guarantees with respect to its joint ventures and/or affiliates, this may reduce the Group's ability to gain future credit from certain lenders.

***The swaps regulatory and other provisions of the Dodd-Frank Act and the rules adopted thereunder and other regulations, including EMIR and REMIT, could adversely affect the Group's ability to hedge risks associated with its business and its operating results and cash flows.***

The Group has entered and may in the future enter into futures, swaps and option contracts traded or cleared on the Intercontinental Exchange and the New York Mercantile Exchange or OTC options and swaps with other natural gas merchants and financial institutions. Title VII of the Dodd-Frank Act established federal regulation of the OTC derivatives market and made other amendments to the

Commodity Exchange Act that are relevant to the Group's business.  The provisions of Title VII of the Dodd-Frank Act and the rules adopted thereunder by the Commodity Futures Trading Commission (the "**CFTC**"), the SEC and other federal regulators may adversely affect the cost and availability of the swaps that the Group may use for hedging, including, without limitation, rules setting limits on the positions in certain contracts, rules regarding aggregation of positions, requirements to clear through specific derivatives clearing organisations and trading platforms, requirements for posting of margins, regulatory requirements on swaps market participants.  The Group's counterparties that are also subject to the capital requirements set out by the Basel Committee on Banking Supervision in 2011, commonly referred to as "Basel III," may increase the cost to the Group of entering into swaps with them or, although not required to collect margin from the Group under the margin rules, require the Group to post collateral with them in connection with such swaps in order to offset their increased capital costs or to reduce their capital costs to maintain those swaps on their balance sheets.  The Group's subsidiaries and affiliates operating in Europe and the Caribbean may be subject to the European Market Infrastructure Regulation ("**EMIR**") and the Regulation on Wholesale Energy Market Integrity and Transparency ("**REMIT**") as wholesale energy market participants, which may impose increased regulatory obligations, including a prohibition to use or disclose insider information or to engage in market manipulation in wholesale energy markets, and an obligation to report certain data, as well as requiring liquid collateral.  These regulations could significantly increase the cost of derivative contracts (including through requirements to post margin or collateral), materially alter the terms of derivative contracts, reduce the availability of derivatives to protect against certain risks that the Group encounters, and reduce the Group's ability to monetise or restructure derivative contracts and to execute its hedging strategies.  If, as a result of the swaps regulatory regime discussed above, the Group were to forgo the use of swaps to hedge its risks, such as commodity price risks that it encounters in its operations, the Group's operating results and cash flows may become more volatile and could be otherwise adversely affected.

***The Group may incur impairments to long-lived assets.***

The Group tests its long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of these assets may not be recoverable.  Significant negative industry or economic trends, decline of the Group's market capitalisation, reduced estimates of future cash flows for the Group's business segments or disruptions to the Group's business, or adverse actions by governmental entities, changes to regulation or legislation have in the past and could in the future lead to an impairment charge of the Group's long-lived assets.  The Group's valuation methodology for assessing impairment requires management to make judgments and assumptions based on historical experience and to rely heavily on projections of future operating performance.  Projections of future operating results and cash flows may vary significantly from results.  In addition, if the Group's analysis results in an impairment to its long-lived assets, the Group may be required to record a charge to earnings in its consolidated financial statements during a period in which such impairment is determined to exist, which may negatively impact its operating results.

***Weather events or other natural or manmade disasters or phenomena, some of which may be adversely impacted by global climate change, could have a material adverse effect on the Group's operations and projects, as well as on the economies in the markets in which the Group operates or plans to operate.***

Weather events such as storms and related storm activity and collateral effects, or other disasters, accidents, catastrophes or similar events, natural or manmade, such as explosions, fires, seismic events, floods or accidents, could result in damage to the Group's facilities, liquefaction facilities, or related infrastructure, interruption of the Group's operations or supply chain, as well as delays or cost increases in the construction and the development of the Group's proposed facilities or other infrastructure. Changes in the global climate may have significant physical effects, such as increased frequency and severity of storms, floods and rising sea levels; if any such effects were to occur, they could have an adverse effect on the Group's onshore and offshore operations.  Due to the nature of its operations, the Group is particularly exposed to the risks posed by hurricanes, tropical storms and their collateral

effects, in particular with respect to fleet operations, floating offshore liquefaction units and other infrastructure the Group may develop in connection with its Fast LNG technology. In particular, the Group may seek to construct and develop floating offshore liquefaction units as part of its Fast LNG in locations that are subject to risks posed by hurricanes and similar severe weather conditions or natural disasters or other adverse events or conditions that could severely affect the Group's infrastructure, resulting in damage or loss, contamination to the areas, and suspension of the Group's operations. For example, the Group's operations in coastal regions in the Gulf of America and Latin America are frequently exposed to natural hazards such as sea-level rise, coastal flooding, cyclones, extreme heat, hurricanes, and earthquakes. These climate risks can affect the Group's operations, potentially even damaging or destroying the Group's facilities, leading to production downgrades, costly delays, reduction in workforce productivity, and potential injury to the Group's people. In addition, jurisdictions with increased political, economic, social and legal instability, lack of regulatory clarity of application of laws, rules and regulations to the Group's technology, and could potentially expose the Group to additional jurisdictional risks related to currency exchange, tariffs and other taxes, changes in laws, civil unrest, and similar risks. In addition, because of the location of some of the Group's operations, it is subject to other natural phenomena, including earthquakes, such as the one that occurred near Puerto Rico in January 2020, which resulted in a temporary delay of development of the Group's Puerto Rico projects, hurricanes and tropical storms. If one or more tankers, pipelines, facilities, liquefaction facilities, vessels, equipment or electronic systems that the Group owns, leases or operates or that deliver products to the Group or that supply its facilities, liquefaction facilities, and customers' facilities are damaged by severe weather or any other disaster, accident, catastrophe or similar event, the Group's construction projects and operations could be significantly interrupted, damaged or destroyed. These delays, interruptions and damages could involve substantial damage to people, property or the environment, and repairs could take a significant amount of time, particularly in the event of a major interruption or substantial damage. The Group does not, nor does it intend to, maintain insurance against all of these risks and losses. The Group may not be able to maintain desired or required insurance in the future at rates that it considers reasonable. See "—*The Group's insurance may be insufficient to cover losses that may occur to its property or result from its operations.*" The occurrence of a significant event, or the threat thereof, could have a material adverse effect on the Group's business, contracts, financial condition, operating results, cash flow, liquidity and prospects.

***Existing and future environmental, social, health and safety laws and regulations could result in increased or more stringent compliance requirements, which may be difficult to comply with or result in additional costs and may otherwise lead to significant liabilities and reputational damage.***

The Group's business is now and will in the future be subject to extensive national, federal, state, municipal and local laws, rules and regulations, in the United States and in the jurisdictions where it operates, relating to the environment, social, health and safety and hazardous substances. These requirements regulate and restrict, among other things: the siting and design of the Group's facilities; discharges to air, land and water, with particular respect to the protection of human health, the environment and natural resources and safety from risks associated with storing, receiving and transporting LNG, natural gas and other substances; the handling, storage and disposal of hazardous materials, hazardous waste and petroleum products; and remediation associated with the release of hazardous substances. Many of these laws and regulations, such as the CAA and the CWA, and analogous laws and regulations in the jurisdictions in which the Group operates, restrict or prohibit the types, quantities and concentrations of substances that can be emitted into the environment in connection with the construction and operation of the Group's facilities and vessels, and require the Group to obtain and maintain permits and provide governmental authorities with access to its facilities and vessels for inspection and reports related to its compliance. Changes or new environmental, social, health and safety laws and regulations could cause additional expenditures, restrictions and delays in the Group's business and operations, the extent of which cannot be predicted and which may require the Group to limit substantially, delay or cease operations in some circumstances. For example, in October 2017, the U.S. Government Accountability Office issued a legal determination that a 2013 interagency guidance document was a "rule" subject to the Congressional Review Act ("**CRA**"). This legal determination could open a broader set of agency guidance documents to potential disapproval

125

and invalidation under the CRA, potentially increasing the likelihood that laws and regulations applicable to the Group's business will become subject to revised interpretations in the future that the Group cannot predict.  Revised, reinterpreted or additional laws and regulations that result in increased compliance costs or additional operating or construction costs and restrictions could have a material adverse effect on the Group's business, contracts, financial condition, operating results, cash flow, liquidity and prospects.

Any failure in environmental, social, health and safety performance from the Group's operations may result in an event that causes personal harm or injury to the Group's employees, other persons, and/or the environment, as well as the imposition of injunctive relief and/or penalties or fines for non-compliance with relevant regulatory requirements or litigation.  Such a failure, or a similar failure elsewhere in the energy industry (including, in particular, LNG liquefaction, storage, transportation or regasification operations), could generate public concern, which may lead to new laws and/or regulations that would impose more stringent requirements on the Group's operations, have a corresponding impact on the Group's ability to obtain permits and approvals, and otherwise jeopardise the Group's reputation or the reputation of its industry as well as its relationships with relevant regulatory agencies and local communities.  As the owner and operator of the Group's facilities and owner or charterer of its vessels, the Group may be liable, without regard to fault or the lawfulness of the original conduct, for the release of certain types or quantities of hazardous substances into the environment at or from the Group's facilities and for any resulting damage to natural resources, which could result in substantial liabilities, fines and penalties, capital expenditures related to cleanup efforts and pollution control equipment, and restrictions or curtailment of the Group's operations.  Any such liabilities, fines and penalties could exceed the limits of the Group's insurance coverage.  See "—*The Group's insurance may be insufficient to cover losses that may occur to its property or result from its operations*."  Individually or collectively, these developments could adversely impact the Group's ability to expand its business, including into new markets.

*Greenhouse Gases/Climate Change*.  The threat of climate change continues to attract considerable attention in the United States and around the world.  Numerous proposals have been made and could continue to be made at the international, national, regional and state government levels to monitor and limit existing and future greenhouse gas "**GHG**" emissions.  As a result, the Group's operations are subject to a series of risks associated with the processing, transportation, and use of fossil fuels and emission of GHGs.  In the United States to date, no comprehensive climate change legislation has been implemented at the federal level, although various individual states and state coalitions have adopted or considered adopting legislation, regulations or other regulatory initiatives, including GHG cap and trade programs, carbon taxes, reporting and tracking programs, and emission restrictions, pollution reduction incentives, or renewable energy or low-carbon replacement fuel quotas.  At the international level, the United Nations-sponsored "Paris Agreement" was signed by 197 countries who agreed to limit their GHG emissions through non-binding, individually-determined reduction goals every five years after 2020.  On 20 January 2025, the current U.S. administration signed an executive order announcing the withdrawal of the United States from the Paris Agreement.  Though most other countries (including those where the Group operates or plans to operate) have signed or acceded to this agreement.  In addition, in January 2026, the current U.S. administration announced that the United States was withdrawing from the United Nations Framework Convention on Climate Change and the various climate-related programs under this Framework.  The scope of future climate and GHG emissions-focused regulatory requirements, if any, remains uncertain.  Governmental, scientific, and public concern over the threat of climate change arising from GHG emissions has resulted in increasing political uncertainty in the United States and worldwide.  For example, based in part on the publicised climate plan and pledges by the U.S. government, there may be significant legislation, rulemaking, or executive orders that seek to address climate change, incentivise low-carbon infrastructure or initiatives, or ban or restrict the exploration and production of fossil fuels.  Executive orders may be issued or federal legislation or regulatory initiatives may be adopted to achieve U.S. goals under the Paris Agreement.  The current U.S. administration, however, has generally expressed opposition to regulatory initiatives aimed at restricting oil and gas operations and the impact the administration will have on any of these initiatives cannot be predicted.

Climate-related litigation and permitting risks are also increasing, as a number of cities, local governments and private organisations have sought to either bring suit against oil and natural gas companies in state or federal court, alleging various public nuisance claims, or seek to challenge permits required for infrastructure development. Fossil fuel producers are also facing general risks of shifting capital availability due to stockholder concern over climate change and potentially stranded assets in the event of future, comprehensive climate and GHG-related regulation. While several of these cases have been dismissed, there is no guarantee how future lawsuits might be resolved.

The adoption and implementation of new or more comprehensive international, federal or state legislation, regulations or other regulatory initiatives that impose more stringent restrictions on GHG emissions could result in increased compliance costs, and thereby reduce demand for or erode value for, the natural gas that the Group processes and markets. The potential increase in the Group's operating costs could include new costs to operate and maintain the Group's facilities, install new emission controls on the Group's facilities, acquire allowances to authorise the Group's GHG emissions, pay taxes related to the Group's GHG emissions, and administer and manage a GHG emissions program. The Group may not be able to recover such increased costs through increases in customer prices or rates. In addition, changes in regulatory policies that result in a reduction in the demand for hydrocarbon products that are deemed to contribute to GHGs, or restrict their use, may reduce volumes available to the Group for processing, transportation, marketing and storage. Furthermore, political, litigation, and financial risks may result in reduced natural gas production activities, increased liability for infrastructure damages as a result of climatic changes, or an impaired ability to continue to operate in an economic manner. One or more of these developments could have a material adverse effect on the Group's business, financial condition and results of operation.

*Fossil Fuels.* The Group's business activities depend upon a sufficient and reliable supply of natural gas feedstock, and are therefore subject to concerns in certain sectors of the public about the exploration, production and transportation of natural gas and other fossil fuels and the consumption of fossil fuels more generally. For example, the Pipeline and Hazardous Materials Safety Administration ("**PHMSA**") has promulgated detailed regulations governing LNG facilities under its jurisdiction to address siting, design, construction, equipment, operations, maintenance, personnel qualifications and training, fire protection and security. None of the Group's LNG facilities currently under development are subject to PHMSA's jurisdiction, but regulators and governmental agencies in the other jurisdictions in which the Group operates can impose similar siting, design, construction and operational requirements that can affect the Group's projects, facilities, infrastructure and operations. Legislative and regulatory action, and possible litigation, in response to such public concerns may also adversely affect the Group's operations. The Group may be subject to future laws, regulations, or actions to address such public concern with fossil fuel generation, distribution and combustion, greenhouse gases and the effects of global climate change. The Group's customers may also move away from using fossil fuels such as LNG for their power generation needs for reputational or perceived risk-related reasons. These matters represent uncertainties in the operation and management of the Group's business, and could have a material adverse effect on the Group's financial position, results of operations and cash flows.

*Hydraulic Fracturing.* Certain of the Group's suppliers of natural gas and LNG employ hydraulic fracturing techniques to stimulate natural gas production from unconventional geological formations (including shale formations), which currently entails the injection of pressurised fracturing fluids (consisting of water, sand and certain chemicals) into a well bore. Moreover, hydraulically fractured natural gas wells account for a significant percentage of the natural gas production in the U.S.; the U.S. Energy Information Administration reported in 2016 that hydraulically fractured wells provided two-thirds of U.S. marketed gas production in 2015. Hydraulic fracturing activities can be regulated at the national, federal or local levels, with governmental agencies asserting authority over certain hydraulic fracturing activities and equipment used in the production, transmission and distribution of oil and natural gas, including such oil and natural gas produced via hydraulic fracturing. Such authorities may seek to further regulate or even ban such activities. For example, the Delaware River Basin Commission ("**DRBC**"), a regional body created via interstate compact responsible for, among other things, water quality protection, water supply allocation, regulatory review, water conservation initiatives, and

watershed planning in the Delaware River Basin, has implemented a de facto ban on hydraulic fracturing activities in that basin since 2010 pending the approval of new regulations governing natural gas production activity in the basin.  More recently, the DRBC has stated that it will consider new regulations that would ban natural gas production activity, including hydraulic fracturing, in the basin.  If additional levels of regulation or permitting requirements were imposed on hydraulic fracturing operations, natural gas prices in North America could rise, which in turn could materially adversely affect the relative pricing advantage that has existed in recent years in favour of domestic natural gas prices (based on Henry Hub pricing).

The requirements for permits or authorisations to conduct these activities vary depending on the location where such drilling and completion activities will be conducted.  Several jurisdictions have adopted or considered adopting regulations to impose more stringent permitting, public disclosure or well construction requirements on hydraulic fracturing operations, or to ban hydraulic fracturing altogether.  As with most permitting and authorisation processes, there is a degree of uncertainty as to whether a permit will be granted, the time it will take for a permit or approval to be issued and any conditions which may be imposed in connection with the granting of the permit.  See "—*Failure to obtain and maintain permits, approvals and authorisations from governmental and regulatory agencies and third parties on favourable terms could impede operations and construction*."  Certain regulatory authorities have delayed or suspended the issuance of permits or authorisations while the potential environmental impacts associated with issuing such permits can be studied and appropriate mitigation measures evaluated.  In addition, some local jurisdictions have adopted or considered adopting land use restrictions, such as city or municipal ordinances, that may restrict the performance of or prohibit the well drilling in general and/or hydraulic fracturing in particular.  Increased regulation or difficulty in permitting of hydraulic fracturing, and any corresponding increase in domestic natural gas prices, could materially adversely affect demand for LNG and the Group's ability to develop commercially viable LNG facilities.

*Indigenous Communities*.    Indigenous communities—including, in Brazil, Afro-indigenous ("**Quilombola**") communities—are subject to certain protections under international and national laws. Brazil has ratified the International Labour Organization's Indigenous and Tribal Peoples Convention ("**ILO Convention 169**"), which states that governments are to ensure that members of tribes directly affected by legislative or administrative measures, including the grant of government authorisations, such as are required for the Group's Brazilian operations, are consulted through appropriate procedures and through their representative institutions, particularly using the principle of consultation and participation of indigenous and traditional communities under the basis of free, prior, and informed consent ("**FPIC**").  Brazilian law does not specifically regulate the FPIC process for indigenous and traditional people affected by undertakings, nor does it set out that individual members of an affected community shall render their FPIC on an undertaking that may impact them.  However, in order to obtain certain environmental licences for its operations, the Group is required to comply with the requirements of, consult with, and obtain certain authorisations from a number of institutions regarding the protection of indigenous interests:  The Brazilian Institute of Environment and Renewable Resources, local environmental authorities in the localities in which the Group operates, the Federal Public Prosecutor's Office and the National Indian Foundation (*Fundação Nacional do Índio* or "**FUNAI**") (for indigenous people) or Palmares Cultural Foundation (*Fundação Cultural Palmares*) (for Quilombola communities).

Additionally, the American Convention on Human Rights ("**ACHR**"), to which Brazil is a party, sets forth rights and freedoms prescribed for all persons, including property rights without discrimination due to race, language, and national or social origin.  The ACHR also provides for consultation with indigenous communities regarding activities that may affect the integrity of their land and natural resources.  If Brazil's legal process for consultation and the protection of indigenous rights is challenged under the ACHR and found to be inadequate, it could result in orders or judgments that could ultimately adversely impact the Group's operations.  For example, in February 2020, the Interamerican Court of Human Rights ("**IACtHR**") found that Argentina had not taken adequate steps, in law or action, to ensure the consulting of indigenous communities and obtaining those communities' free prior and

128

informed consent for a project impacting their territories.  IACtHR further found that Argentina had thus violated the ACHR due to infringements on the indigenous communities' rights to property, cultural identity, a healthy environment, and adequate food and water by failing to take effective measures to stop harmful, third-party activities on the indigenous communities' traditional land.  As a result, IACtHR ordered Argentina, among other things, to achieve the demarcation and grant of title to the indigenous communities over their territory and the removal of third parties from the indigenous territory.  The Group cannot predict whether this decision will result in challenges regarding the adequacy of existing Brazilian legal requirements related to the protection of indigenous rights, changes to the existing Brazilian government body consultation process, or impact the Group's existing development agreements or negotiations for outstanding development agreements with indigenous communities in the areas in which the Group operates.

There are several indigenous communities that surround the Group's operations in Brazil.  Certain of the Group's subsidiaries have entered into agreements with some of these communities that mainly provide for the use of their land for the Group's operations, provide compensation for any potential adverse impact that such operations may indirectly cause to them, and negotiations with other such communities are ongoing.  If the Group is not able to timely obtain the necessary authorisations or obtain them on favourable terms for its operations in areas where indigenous communities reside, the Group's relationship with these communities deteriorates in future, or such communities do not comply with any existing agreements related to the Group's operations, the Group could face construction delays, increased costs, or otherwise experience adverse impacts on its business and results of operations.

*Offshore operations.*  The Group's operations in international waters and in the territorial waters of other countries are regulated by extensive and changing international, national and local environmental protection laws, regulations, treaties and conventions in force in international waters, the jurisdictional waters of the countries in which the Group operates, as well as the countries of the Group's vessels' registration, including those governing oil spills, discharges to air and water, the handling and disposal of hazardous substances and wastes and the management of ballast water.  The International Maritime Organization ("**IMO**") International Convention for the Prevention of Pollution from Ships of 1973, as amended from time to time, and generally referred to as "**MARPOL**", can affect operations of the Group's chartered vessels.  In addition, the Group's chartered LNG vessels may become subject to the International Convention on Liability and Compensation for Damage in Connection with the Carriage of Hazardous and Noxious Substances by Sea (the "**HNS Convention**"), adopted in 1996 and subsequently amended by a Protocol to the HNS Convention in April 2010.  Other regulations include, but are not limited to, the designation of Emission Control Areas under MARPOL, the IMO International Convention on Civil Liability for Oil Pollution Damage of 1969, as amended from time to time, the International Convention on Civil Liability for Bunker Oil Pollution Damage, the IMO International Convention for the Safety of Life at Sea of 1974, as amended from time to time, the International Safety Management Code for the Safe Operations of Ships and for Pollution Prevention, the IMO International Convention on Load Lines of 1966, as amended from time to time and the International Convention for the Control and Management of Ships' Ballast Water and Sediments in February 2004.

In particular, development of offshore operations of natural gas and LNG are subject to extensive environmental, industry, maritime and social regulations.  For example, the development and operation of the Group's FLNG facility off the coast of Altamira, State of Tamaulipas, is subject to regulation by Mexico's Ministry of Energy (*Secretaría de Energía*) ("**SENER**"), Mexico's National Hydrocarbon Commission ("**CNH**") and the National Agency of Industrial Safety and Environmental Protection of the Hydrocarbons Sector ("**ASEA**"), among other relevant Mexican regulatory bodies.  The laws and regulations governing activities in the Mexican energy sector have undergone significant reformation over the past decade, and the legal regulatory framework continues to evolve as SENER, the CNH and other Mexican regulatory bodies issue new regulations and guidelines as the industry develops.  Such regulations are subject to change, so it is possible that SENER, the CNH or other Mexican regulatory bodies may impose new or revised requirements that could increase the Group's operating costs and/or

capital expenditures for operations in Mexican offshore waters. In addition, the Group's operations in waters off the coast of Mexico are subject to regulation by ASEA. The laws and regulations governing the protection of health, safety and the environment from activities in the Mexican energy sector are also relatively new, having been significantly reformed in 2013 and 2014, and the legal regulatory framework continues to evolve as ASEA and other Mexican regulatory bodies issue new regulations and guidelines as the industry modernises and adapts to market changes. Such regulations are subject to change, and it is possible that ASEA or other Mexican regulatory bodies may impose new or revised requirements that could increase the Group's operating costs and/or capital expenditures for operations in Mexican offshore waters.

Moreover, the overall trends are towards more regulations and more stringent requirements which are likely to add to the Group's costs of doing business. For example, IMO regulations limit the sulphur content of fuel oil for ships to 0.5 weight percent starting thus increasing the cost of fuel and increasing expenses for the Group. Similarly, the EU extended its emissions trading scheme to maritime transport to reduce GHG emissions from vessels. The Group contracts with industry leading vessel providers in the LNG market and looks for them to take the lead in maintaining compliance with all such requirements, although the terms of the Group's charter agreements may call for the Group to bear some or all of the associated costs. While the Group believes it is similarly situated with respect to other companies that charter vessels, it cannot assure investors that these requirements will not have a material effect on its business.

The Group's chartered vessels operating in U.S. waters, now or in the future, will also be subject to various federal, state and local laws and regulations relating to protection of the environment, including the U.S. Oil Pollution Act, the U.S. Comprehensive Environmental Response, Compensation and Liability Act, the CWA and the CAA. In some cases, these laws and regulations require governmental permits and authorisations before conducting certain activities. These environmental laws and regulations may impose substantial penalties for noncompliance and substantial liabilities for pollution. Failure to comply with these laws and regulations may result in substantial civil and criminal fines and penalties. As with the industry generally, the Group's chartered vessels' operations will entail risks in these areas, and compliance with these laws and regulations, which may be subject to frequent revisions and reinterpretation, may increase the Group's overall cost of business.

***The Group is subject to numerous governmental export laws, and trade and economic sanctions laws and regulations, and anti-corruption laws and regulation.***

The Group conducts business throughout the world, and its business activities and services are subject to various applicable import and export control laws and regulations of the United States and other countries, particularly countries in the Caribbean, Latin America, Europe and the other countries in which it seeks to do business. The Group must also comply with trade and economic sanctions laws, including the U.S. Commerce Department's Export Administration Regulations and economic and trade sanctions regulations maintained by the U.S. Treasury Department's Office of Foreign Assets Control. For example, in 2018, U.S. legislation was approved to restrict U.S. aid to Nicaragua and between 2018 and 2022, U.S. and European governmental authorities imposed a number of sanctions against entities and individuals in or associated with the governments of Nicaragua and Venezuela. Following the invasion of Ukraine by Russia in 2022, U.S., European, U.K. and other governmental authorities imposed a number of sanctions against entities and individuals in Russia or connected to Russia, including sanctions specifically targeting the Russian oil and gas industry. Violations of governmental export control and economic sanctions laws and regulations could result in negative consequences to the Group, including government investigations, sanctions, criminal or civil fines or penalties, more onerous compliance requirements, loss of authorisations needed to conduct aspects of the Group's international business, reputational harm and other adverse consequences. Moreover, it is possible that the Group could invest both time and capital into a project involving a counterparty who may become subject to sanctions. If any of the Group's counterparties becomes subject to sanctions as a result of these laws and regulations, changes thereto or otherwise, the Group may face an array of issues, including, but not limited to, (i) having to suspend development or operations on a temporary or

130

permanent basis, (ii) being unable to recuperate prior invested time and capital or being subject to lawsuits, or (iii) investigations or regulatory proceedings that could be time-consuming and expensive to respond to and which could lead to criminal or civil fines or penalties.

The Group is also subject to anti-corruption laws and regulations, including the U.S. Foreign Corrupt Practices Act ("**FCPA**") the U.K. Bribery Act and local anti-bribery laws, which generally prohibit companies and their intermediaries from making improper payments to foreign officials for the purpose of obtaining or keeping business and/or other benefits. Some of the jurisdictions in which the Group currently operates present heightened risks for FCPA issues, such as Nicaragua, Jamaica, Brazil and Mexico. Furthermore, the Group's strategy has been, and continues to be, dependent in part on its ability to expand its operations in additional emerging markets, including in Latin America, Asia and Africa. Efforts to expand the Group's operations in these markets could expose the Group to additional risks related to anti-corruption laws and regulations. Although the Group has adopted policies and procedures that are designed to assist the Group, its officers, directors, employees and other intermediaries in complying with the FCPA and other anti-corruption laws and regulations, developing, implementing and maintaining policies and procedures is a complex endeavour, particularly given the high level of complexity of these laws and regulations. There is no assurance that these policies and procedures have or will work effectively all of the time or protect the Group against liability under anti-corruption laws and regulations, including the FCPA, for actions taken by the Group's officers, directors, employees and other intermediaries with respect to the Group's business or any businesses that the Group may acquire, particularly in high-risk jurisdictions.

Failure to comply with trade and economic sanctions laws and anti-corruption laws and regulations, including the FCPA, the U.K. Bribery Act and local anti-bribery laws, may subject the Group to costly and intrusive criminal and civil investigations as well as significant potential criminal and civil penalties and other remedial measures, including changes or enhancements to the Group's procedures, policies and controls, the imposition of an independent compliance monitor, as well as potential personnel changes and disciplinary actions. In addition, non-compliance with such laws could constitute a breach of certain representations, warranties and covenants in the Group's commercial or debt agreements, and cross-default provisions in certain of those agreements could mean that an event of default under certain of the Group's commercial or debt agreements could trigger an event of default under the Group's other agreements, including its debt agreements. Any adverse finding against the Group could also negatively affect its relationship and reputation with current and potential customers and regulators. In addition, in certain countries the Group serves or expect to serve its customers through third-party agents and other intermediaries. On occasion, the Group also uses third-party agents and other intermediaries to assist it in exploring and entering new markets and to retain business. Violations of applicable import, export, trade and economic sanctions, and anti-corruption laws and regulations by these third-party agents or intermediaries may also result in adverse consequences and repercussions to the Group. The occurrence of any of these events could have a material adverse impact on the Group's business, results of operations, financial condition, reputation, liquidity and future business prospects. The U.S. sanctions and embargo laws and regulations vary in their application, as they do not all apply to the same covered persons or proscribe the same activities, and such sanctions and embargo laws and regulations may change and be amended or strengthened over time.

Any such violation of applicable sanctions, embargo and anti-corruption laws and regulations could result in fines, penalties or other sanctions that could severely impact the Group's ability to access U.S. capital markets and conduct its business. In addition, certain financial institutions may have policies against lending or extending credit to companies that have contracts with U.S. embargoed countries or countries identified by the U.S. government as state sponsors of terrorism, which could adversely affect the Group's ability to access funding and liquidity, its financial condition and prospects.

***The Group's charterers may inadvertently violate applicable sanctions and/or call on ports located in, or engage in transactions with, countries that are subject to restrictions imposed by the U.S. or other governments, which could adversely affect their business.***

None of the Group's vessels have called on ports located in countries subject to comprehensive sanctions and embargoes imposed by the U.S. government or countries identified by the U.S. government as state sponsors of terrorism.  When the Group charters its vessels to third parties it conducts comprehensive due diligence of the charterer and includes contractual prohibitions on the charterer calling on ports in countries subject to comprehensive U.S. sanctions or otherwise engaging in commerce with such countries.  However, the Group's vessels may be sub-chartered out to a sanctioned party or call on ports of a sanctioned nation on charterers' instruction, and without the Group's knowledge or consent.  If the Group's charterers or sub-charterers violate applicable sanctions and embargo laws and regulations as a result of actions that do not involve the Group, those violations could in turn negatively affect the Group's reputation and cause it to incur significant costs associated with responding to any investigation into such violations, or have other negative consequences for the Group.

***Increasing transportation regulations may increase the Group's costs and negatively impact its results of operations.***

The Group is developing a transportation system specifically dedicated to transporting LNG using ISO tank containers and trucks to its customers and facilities.  This transportation system may include trucks that the Group or its affiliates own and operate.  Any such operations would be subject to various trucking safety regulations in the various countries where the Group operates, including those which are enacted, reviewed and amended by the Federal Motor Carrier Safety Administration ("**FMCSA**").  These regulatory authorities exercise broad powers, governing activities such as the authorisation to engage in motor carrier operations, driver licensing, insurance requirements, and transportation of hazardous materials.  To a large degree, intrastate motor carrier operations are subject to state and/or local safety regulations that mirror federal regulations but also regulate the weight and size dimensions of loads.  Any trucking operations would be subject to possible regulatory and legislative changes that may increase the Group's costs.  Some of these possible changes include changes in environmental regulations, changes in the hours of service regulations which govern the amount of time a driver may drive or work in any specific period, onboard black box recorder device requirements, requirements to use electric vehicles or limits on vehicle weight and size.  In addition to increased costs, fines and penalties, any non-compliance or violation of these regulations, could result in the suspension of the Group's operations, which could have a material adverse effect on the Group's business and consolidated results of operations and financial position.

***The Group's chartered vessels operating in certain jurisdictions, including the United States, now or in the future, may be subject to cabotage laws, including the Merchant Marine Act of 1920, as amended (the "Jones Act").***

Certain activities related to the Group's logistics and shipping operations may constitute "coastwise trade" within the meaning of laws and regulations of the U.S. and other jurisdictions in which the Group operates.  Under these laws and regulations, often referred to as cabotage laws, including the Jones Act in the U.S., only vessels meeting specific national ownership, crewing and registration requirements or which are subject to an exception or exemption, may engage in such "coastwise trade."  When the Group operates or charters foreign-flagged vessels, it does so within the current interpretation of such cabotage laws with respect to permitted activities for foreign-flagged vessels.  Significant changes in cabotage laws or to the interpretation of such laws in the places where the Group operates could affect the Group's ability to operate or charter, or competitively operate or charter, its foreign-flagged vessels in those waters.  If the Group does not continue to comply with such laws and regulations, it could incur severe penalties, such as fines or forfeiture of any vessels or their cargo, and any noncompliance or allegations of noncompliance could disrupt the Group's operations in the relevant jurisdiction.  Any noncompliance

132

or alleged noncompliance could have a material adverse effect on the Group's reputation, business, results of operations and cash flows, and could weaken the Group's financial condition.

***The Group may not own the land on which its projects are located and the Group is subject to leases, rights-of-ways, easements and other property rights for its operations.***

The Group has obtained long-term leases and corresponding rights-of-way agreements and easements with respect to the land on which various of its projects are located, including the San Juan Terminal, facilities in Brazil such as the Garuva-Itapoa pipeline connecting the TBG pipeline to the Sao Francisco do Sul terminal, rights of way to the Petrobras/Transpetro OSPAR oil pipeline facilities, among others. In addition, the Group's operations will require agreements with ports proximate to its facilities capable of handling the transload of LNG direct from the Group's occupying vessel to its transportation assets. The Group may not own the land on which these facilities are located. As a result, the Group is subject to the possibility of increased costs to retain necessary land use rights as well as applicable law and regulations, including permits and authorisations from governmental agencies or third parties. If the Group were to lose these rights or be required to relocate, it would not be able to continue its operations at those sites and its business could be materially and adversely affected. If the Group is unable to enter into favourable contracts or to obtain the necessary regulatory and land use approvals on favourable terms, it may not be able to construct and operate its assets as anticipated, or at all, which could negatively affect its business, results of operations and financial condition.

***The Group could be negatively impacted by sustainability-related matters.***

Governments, investors, customers, employees and other stakeholders are increasingly focusing on corporate sustainability practices and disclosures, and expectations, laws and regulations in this area continue to evolve. The Group has announced, and may in the future announce, sustainability-focused goals, initiatives, investments and partnerships. These initiatives, aspirations, targets or objectives reflect the Group's current plans and aspirations and are not guarantees that the Group will be able to achieve them. The Group's efforts to accomplish and accurately report on these initiatives and goals present numerous operational, regulatory, reputational, financial, legal, and other risks, any of which could have a material negative impact, including on the Group's reputation and stock price.

In addition, the standards for tracking and reporting on sustainability matters are relatively new, have not been harmonised and continue to evolve. The Group's selection of disclosure frameworks that seek to align with various voluntary reporting standards may change from time to time and may result in a lack of comparative data from period to period. Moreover, the Group's processes and controls may not always align with evolving voluntary standards for identifying, measuring, and reporting sustainability metrics, the Group's interpretation of reporting standards may differ from those of others, and such standards may change over time, any of which could result in significant revisions to the Group's goals or reported progress in achieving such goals. In this regard, the criteria by which the Group's sustainability practices and disclosures are assessed may change due to the quickly evolving landscape, which could result in greater expectations of the Group and cause the Group to undertake costly initiatives to satisfy such new criteria. The increasing attention to corporate sustainability initiatives could also result in increased investigations and litigation or threats thereof. If the Group is unable to satisfy such new criteria, investors may conclude that its sustainability practices are inadequate. On the other hand, state attorneys general and other governmental authorities may take action against certain sustainability policies or practices, and the Group may become subject to restrictions on sustainability initiatives. If the Group fails or is perceived to have failed to achieve previously announced initiatives or goals or comply with various sustainability practices and regulations, or to accurately disclose its progress on such initiatives or goals, the Group's reputation, business, financial condition and results of operations could be adversely impacted.

***Information technology failures and cyberattacks could affect us significantly.***

The Group relies on electronic systems and networks to communicate, control and manage its operations and prepare its financial management and reporting information. If the Group records inaccurate data

or experiences infrastructure outages, its ability to communicate and control and manage its business could be adversely affected. The Group faces various security threats, including cybersecurity threats from third parties and unauthorised users to gain unauthorised access to sensitive information or to render data or systems unusable, threats to the security of its facilities, liquefaction facilities, and infrastructure or third-party facilities and infrastructure, such as processing plants and pipelines, and threats from terrorist acts, any of which could be enhanced or facilitated by artificial intelligence. The Group's network systems and storage and other business applications, and the systems and storage and other business applications maintained by its third-party providers, have been in the past, and may be in the future, subjected to attempts to gain unauthorised access to the Group's network or information, malfeasance or other system disruptions.

The Group's implementation of various technologies, procedures and controls to monitor and mitigate security threats and to increase security for its information, facilities, liquefaction facilities, and infrastructure may result in increased capital and operating costs. Moreover, there can be no assurance that such procedures and controls will be sufficient to prevent security breaches from occurring. If security breaches were to occur, they could lead to losses of sensitive information, critical infrastructure or capabilities essential to the Group's operations. If the Group were to experience an attack and its security measures failed, the potential consequences to its business and the communities in which it operates could be significant and could harm the Group's reputation and lead to financial losses from remedial actions, loss of business or potential liability.

***Concerns relating to the responsible use of new and evolving technologies, such as artificial intelligence (AI), may result in reputational or financial harm and liability for the Group.***

While the use of new and evolving technologies such as AI provide significant benefits, these technologies presents a unique set of risks and challenges, including but not limited to dependency on accurate intelligence performance, potential security breaches, challenges in regulatory compliance, ethical considerations, potential workforce disruption, risks of intellectual property infringement, and other emerging technology, legal, social, and ethical risks. If the Group utilises AI solutions that have unintended consequences or may be deemed controversial, or if it is unable to develop effective internal policies and frameworks relating to the responsible use of AI, the Group may experience brand or reputational harm as well as potential legal liability. The use of AI could also increase the Group's cost of doing business, and may change the way it operates in certain jurisdictions or impede its ability to do business in certain jurisdictions if it is unable to comply with regulations.

***The Group's insurance may be insufficient to cover losses that may occur to its property or result from its operations.***

The Group's current operations and future projects are subject to the inherent risks associated with construction of energy-related infrastructure, LNG, natural gas, power and maritime operations, shipping and transportation of hazardous substances, including explosions, pollution, release of toxic substances, fires, seismic events, hurricanes and other adverse weather conditions, acts of aggression or terrorism, and other risks or hazards, each of which could result in significant delays in commencement or interruptions of operations and/or result in damage to or destruction of the facilities, liquefaction facilities and assets or damage to persons and property. The Group does not, nor does it intend to, maintain insurance against all of these risks and losses. In particular, the Group does not generally carry business interruption insurance or political risk insurance with respect to political disruption in the countries in which it operates and that may in the future experience significant political volatility. Therefore, the occurrence of one or more significant events not fully insured or indemnified against could create significant liabilities and losses or delays to the Group's development timelines, which could have a material adverse effect on the Group's business, contracts, financial condition, operating results, cash flow, liquidity and prospects. Even if the Group chooses to carry insurance for these events in the future, it may not be adequate to protect the Group from loss, which may include, for example, losses as a result of project delays or losses as a result of business interruption related to a political disruption. Any attempt to recover from loss from political disruption may be time-consuming and

expensive, and the outcome may be uncertain. In addition, the Group's insurance may be voidable by the insurers as a result of certain of the Group's actions. Furthermore, the Group may be unable to procure adequate insurance coverage at commercially reasonable rates in the future. For example, environmental regulations have led in the past to increased costs for, and in the future may result in the lack of availability of, insurance against risks of environmental damage or pollution. Changes in the insurance markets attributable to terrorist attacks or political change may also make certain types of insurance more difficult or costly for the Group to obtain.

***The Group's success depends on key members of its management, the loss of any of whom could disrupt its business operations.***

The Group depends to a large extent on the services of its chief executive officer, Wesley R. Edens, its other executive officers and other key employees. Mr. Edens does not have an employment agreement with the Group. The loss of the services of Mr. Edens or one or more of the Group's other key executives or employees could disrupt the Group's operations and increase its exposure to the other risks described in this Part 5 (*Risk Factors*). The Group does not maintain key man insurance on Mr. Edens or any of its employees. As a result, the Group is not insured against any losses resulting from the death of its key employees.

***The Group may experience increased labour costs and regulation, and the unavailability of skilled workers or the Group's failure to attract and retain qualified personnel, as well as its ability to comply with such labour laws, could adversely affect it.***

The Group is dependent upon the available labour pool of skilled employees for the construction and operation of its facilities and liquefaction facilities, as well as its FSRUs, FLNGs and LNG carriers. The Group competes with other energy companies and other employers to attract and retain qualified personnel with the technical skills and experience required to construct and operate the Group's infrastructure and assets and to provide the Group's customers with the highest quality service. In addition, the tightening of the labour market due to the shortage of skilled employees may affect the Group's ability to hire and retain skilled employees, impair the Group's operations and require it to pay increased wages. The Group is subject to labour laws in the jurisdictions in which it operates and hires its personnel, which can govern such matters as minimum wage, overtime, union relations, local content requirements and other working conditions. For example, Brazil, where some of the Group's vessels operate, requires that the Group hire a certain portion of local personnel to crew its vessels. Any inability to attract and retain qualified local crew members could adversely affect the Group's operations, business, results of operations and financial condition. In addition, jurisdiction-specific employment, labour, and subcontracting laws may affect contracting strategies and impact construction and operations. A shortage in the labour pool of skilled workers or other general inflationary pressures or changes in applicable laws and regulations, could make it more difficult for the Group to attract and retain qualified personnel and could require an increase in the wage and benefits packages that the Group offers, thereby increasing the Group's operating costs. Any increase in the Group's operating costs could materially and adversely affect its business, financial condition, operating results, liquidity and prospects.

***The Group's business could be affected adversely by labour disputes, strikes or work stoppages.***

Some of the Group's employees, particularly those in its Latin American operations, are represented by a labour union and are covered by collective bargaining agreements pursuant to applicable labour legislation. As a result, the Group is subject to the risk of labour disputes, strikes, work stoppages and other labour-relations matters. The Group could experience a disruption of its operations or higher ongoing labour costs, which could have a material adverse effect on the Group's operating results and financial condition. Future negotiations with the unions or other certified bargaining representatives could divert management attention and disrupt operations, which may result in increased operating expenses and lower net income. Moreover, future agreements with unionised and non-unionised employees may be on terms that are not as attractive as the Group's current agreements or comparable

135

to agreements entered into by the Group's competitors.  Labour unions could also seek to organise some or all of the Group's non-unionised workforce.

**Risks Related to the Jurisdictions in Which the Group Operates**

***The Group is subject to the economic, political, social and other conditions in the jurisdictions in which it operates.***

The Group's projects are located in the United States (including Puerto Rico), the Caribbean, Brazil, Mexico, Ireland, Nicaragua and other geographies and it has operations and derives revenues from additional markets.  Furthermore, part of the Group's strategy consists in seeking to expand its operations to other jurisdictions.  As a result, the Group's projects, operations, business, results of operations, financial condition and prospects are materially dependent upon economic, political, social and other conditions and developments in these jurisdictions.  Some of these countries have experienced political, security, and social economic instability in the recent past and may experience instability in the future, including changes, sometimes frequent or marked, in energy policies or the personnel administering them, expropriation of property, cancellation or modification of contract rights, changes in laws and policies governing operations of foreign-based companies, including changing trade policies and tariffs and the related uncertainty thereof, unilateral renegotiation of contracts by governmental entities, redefinition of international boundaries or boundary disputes, foreign exchange restrictions or controls, currency fluctuations, royalty and tax increases and other risks arising out of governmental sovereignty over the areas in which the Group's operations are conducted, as well as risks of loss due to acts of social unrest, terrorism, corruption and bribery.  For example, in 2019, public demonstrations in Puerto Rico led to the governor's resignation and the resulting political change interrupted the bidding process for the privatisation of PREPA's transmission and distribution systems. While the Group's operations to date have not been materially impacted by the demonstrations or political changes in Puerto Rico, any substantial disruption in the Group's ability to perform its obligations under any agreements with PREPA and/or Puerto Rico Public - Private Partnerships Authority (P3A) could have a material adverse effect on the Group's financial condition, results of operations and cash flows.  Furthermore, the Group cannot predict how its relationship that one of its subsidiaries, as agent of PREPA, could change their role as operator of PREPA's legacy generation assets.  Additionally, PREPA may seek to find alternative power sources or purchase substantially less natural gas from the Group than what it currently expects to sell to PREPA.  In addition, the Group cannot predict how local sentiment and support for its subsidiaries' operations in Puerto Rico could change now that Puerto Rico's power generation systems have been privatised.  Should the Group's operations face material local opposition, it could materially adversely affect the Group's ability to perform its obligations under its contracts or could materially adversely impact PREPA or any applicable governmental counterparty's performance of its obligations to the Group.  The governments in these jurisdictions differ widely with respect to structure, constitution and stability and some countries lack mature legal and regulatory systems. As the Group's operations depend on governmental approval and regulatory decisions, the Group may be adversely affected by changes in the political structure or government representatives in each of the countries in which it operates.  In addition, these jurisdictions, particularly emerging countries, are subject to risk of contagion from the economic, political and social developments in other emerging countries and markets.

Furthermore, some of the regions in which the Group operates have been subject to significant levels of terrorist activity and social unrest, particularly in the shipping and maritime industries.  Past political conflicts in certain of these regions have included attacks on vessels, mining of waterways and other efforts to disrupt shipping in the area.  In addition to acts of terrorism, vessels trading in these and other regions have also been subject, in limited instances, to piracy.  Tariffs, trade embargoes and other economic sanctions by the United States or other countries against countries in the Middle East, Southeast Asia, Africa or elsewhere as a result of terrorist attacks, hostilities or otherwise may limit trading activities with those countries.  See "—*The Group's Charterers may inadvertently violate applicable sanctions and/or call on ports located in, or engage in transactions with, countries that are subject to restrictions imposed by the U.S. or other governments, which could adversely affect their*

*business*." The Group does not, nor does it intend to, maintain insurance (such as business interruption insurance or terrorism) against all of these risks and losses. Any claims covered by insurance will be subject to deductibles, which may be significant, and the Group may not be fully reimbursed for all the costs related to any losses created by such risks. See "—*The Group's insurance may be insufficient to cover losses that may occur to its property or result from its operations.*" As a result, the occurrence of any economic, political, social and other instability or adverse conditions or developments in the jurisdictions in which the Group operates, could have a material adverse effect on the Group's business, contracts, financial condition, operating results, cash flow, liquidity and prospects.

***The Group's financial condition and operating results may be adversely affected by foreign exchange fluctuations.***

While the Group's consolidated financial statements are presented in U.S. dollars, the Group generates revenues and incurs operating expenses and indebtedness in local currencies in the countries where it operates, such as, among others, the euro, the Mexican peso and the Brazilian real. The amount of the Group's revenues denominated in a particular currency in a particular country typically varies from the amount of expenses or indebtedness incurred by its operations in that country given that certain costs may be incurred in a currency different from the local currency of that country, such as the U.S. dollar. Therefore, fluctuations in exchange rates used to translate other currencies into U.S. dollars could result in potential losses and reductions in the Group's margins resulting from currency fluctuations, which may impact the Group's reported consolidated financial condition, results of operations and cash flows from period to period. These fluctuations in exchange rates will also impact the value of the Group's investments and the return on its investments. Additionally, some of the jurisdictions in which the Group operates may limit the Group's ability to exchange local currency for U.S. dollars and elect to intervene by implementing exchange rate regimes, including sudden devaluations, periodic mini devaluations, exchange controls, dual exchange rate markets and a floating exchange rate system. There can be no assurance that non-U.S. currencies will not be subject to volatility and depreciation or that the current exchange rate policies affecting these currencies will remain the same. For example, the Mexican peso and the Brazilian real have experienced significant fluctuations relative to the U.S. dollar in the past. The Group may choose not to hedge, or may not be effective in efforts to hedge, this foreign currency risk. See "—*Risks Related to the Group's Business—Any use of hedging arrangements may adversely affect the Group's future operating results or liquidity.*" Depreciation or volatility of these currencies against the U.S. dollar could cause counterparties to be unable to pay their contractual obligations under the Group's agreements or to lose confidence in the Group and may cause the Group's expenses to increase from time to time relative to its revenues as a result of fluctuations in exchange rates, which could affect the amount of net income that the Group reports in future periods.

**Risks Related to Ownership of the Parent's Class A Common Stock**

***The market price and trading volume of the Parent's Class A common stock has in the past and may continue to be volatile, which has subjected and may in the future subject the Parent to securities class action litigation and could result in rapid and substantial losses for its stockholders.***

The market price of the Parent's Class A common stock has in the past been, and may continue after the Recapitalisation Transaction to be, highly volatile and could be subject to wide fluctuations. In addition, the trading volume in the Class A common stock may fluctuate and cause significant price variations to occur. If the market price of the Class A common stock declines significantly, investors may be unable to resell their shares at or above their purchase price, if at all. The market price of the Parent's Class A common stock may fluctuate or decline significantly in the future. Some of the factors that could negatively affect the Parent's share price or result in fluctuations in the price or trading volume of the Class A common stock include:

- a shift in the Parent's investor base;

- the Parent's quarterly or annual earnings, or those of other comparable companies;

- actual or anticipated fluctuations in the Parent's operating results;

- changes in accounting standards, policies, guidance, interpretations or principles;

- announcements by the Group or its competitors of significant investments, acquisitions or dispositions;

- the failure of securities analysts to cover the Class A common stock;

- changes in earnings estimates by securities analysts or the Group's ability to meet those estimates;

- the operating and share price performance of other comparable companies;

- overall market fluctuations;

- general economic conditions; and

- developments in the markets and market sectors in which the Group participates.

Stock markets in the United States have experienced extreme price and volume fluctuations. Market fluctuations, as well as general political and economic conditions such as acts of terrorism, prolonged economic uncertainty, changing trade policies and tariffs, and the related uncertainty thereof, including the imposition of and enforceability of tariffs, trade wars, barriers or restrictions, or threats of such actions, the potential for worsening economic conditions, economic downturn, a recession or interest rate or currency rate fluctuations, could adversely affect the market price of the Class A common stock.

In addition, the completion of the Recapitalisation Transaction will result in significant dilution to existing holders of the Class A common stock. Upon consummation of the Recapitalisation Transaction, all shares of the Class A common stock outstanding immediately prior to the Recapitalisation Transaction will represent only 35 per cent. of the outstanding Class A common stock, with the remaining 65 per cent. being issued to creditors and other stakeholders as part of the restructuring. Furthermore, the mandatory conversion of the CoreCo Preferred Stock into Class A common stock on the third anniversary of the Restructuring Effective Date into a number of shares of Class A common stock representing 87 per cent. of the fully-diluted Class A common stock outstanding as of the closing of the Recapitalisation Transaction (after giving effect to the shares of the Parent's Class A common stock to be issued on the Restructuring Effective Date and shares authorised under the CoreCo MIP), will result in the issuance of additional shares, further diluting the ownership interests of existing stockholders. The potential for future issuances of common stock upon conversion of preferred equity or in connection with incentive plans may also increase the number of shares outstanding and place downward pressure on the market price of the Class A common stock.

In the past, securities class action litigation has often been brought against companies following periods of volatility in the market price of their securities. The Parent is currently subject to a putative securities class action complaint relating to a drop in its share price and could become involved in additional litigation of this type in the future if the share price is volatile for any reason. This type of litigation could result in reputational damage, substantial costs and a diversion of management's attention and resources needed to successfully run the Group's business.

***Future sales and issuances of the Class A common stock, securities convertible or exchangeable into the Class A common stock or rights to purchase the Class A common stock could result in additional dilution of the percentage ownership of the Parent's shareholders and may cause the Parent's share price to fall.***

To raise capital, the Parent may sell substantial amounts of Class A common stock or securities convertible into or exchangeable for Class A common stock. These future issuances of Class A common

stock or Class A common stock-related securities to purchase Class A common stock, together with the exercise of outstanding restricted stock units and any additional shares issued in connection with other transactions, if any, may result in material dilution to investors.  Such sales may also result in material dilution to the Parent's existing shareholders, and new investors could gain rights, preferences and privileges senior to those of holders of the Class A common stock.  In particular, the completion of the Recapitalisation Transaction will result in significant dilution to existing holders of the Class A common stock.  Upon consummation of the Recapitalisation Transaction, all shares of the Class A common stock outstanding immediately prior to the Recapitalisation Transaction will represent only 35 per cent. of the outstanding Class A common stock of the Parent, with the remaining 65 per cent. being issued to creditors and other stakeholders as part of the restructuring.  Furthermore, the mandatory conversion of the CoreCo Preferred Stock into Class A common stock on the third anniversary of the Restructuring Effective Date into a number of shares of Class A common stock representing 87 per cent. of the fully-diluted Class A common stock outstanding as of the closing of the Recapitalisation Transaction (after giving effect to the shares of the Parent's Class A common stock to be issued on the Restructuring Effective Date and shares authorised under the CoreCo MIP), will result in the issuance of additional shares, further diluting the ownership interests of existing stockholders.

***The Parent's certificate of incorporation and by-laws, as well as Delaware law, contain provisions that could discourage acquisition bids or merger proposals, which may adversely affect the market price of the Class A common stock and could deprive investors of the opportunity to receive a premium for their Class A common stock.***

The Parent's Certificate of Incorporation and By-Laws authorise its board of directors to issue preferred stock (including the Series B Convertible Preferred Stock) without stockholder approval in one or more series, designate the number of stock constituting any series, and fix the rights, preferences, privileges and restrictions thereof, including dividend rights, voting rights, rights and terms of redemption, redemption price or prices and liquidation preferences of such series.  If the Parent's board of directors elects to issue preferred stock, it could be more difficult for a third party to acquire the Parent.  In addition, some provisions of the Parent's Certificate of Incorporation and By-Laws could make it more difficult for a third party to acquire control of the Parent, even if the change of control would be beneficial to the Parent's security holders.  These provisions include:

- dividing the board of directors into three classes of directors, with each class serving staggered three-year terms;

- providing that any vacancies may, except as otherwise required by law, or, if applicable, the rights of holders of a series of preferred stock, only be filled by the affirmative vote of a majority of directors then in office, even if less than a quorum (provided that vacancies that result from newly created directors require a quorum);

- permitting special meetings of the Parent's stockholders to be called only by (i) the chairman of the board of directors, (ii) a majority of the board of directors, or (iii) a committee of the board of directors that has been duly designated by the board of directors and whose powers include the authority to call such meetings;

- prohibiting cumulative voting in the election of directors;

- establishing advance notice provisions for stockholder proposals and nominations for elections to the board of directors to be acted upon at meetings of the stockholders; and

- providing that the board of directors is expressly authorised to adopt, or to alter or repeal certain provisions of the Parent's organisational documents to the extent permitted by law.

Additionally, the Parent's Certificate of Incorporation provides that it has opted out of Section 203 of the Delaware General Corporation Law.  However, the Parent's Certificate of Incorporation includes a

139

similar provision, which, subject to certain exceptions, prohibits the Parent from engaging in a business combination with an "interested stockholder," unless the business combination is approved in a prescribed manner. Subject to certain exceptions, an "interested stockholder" means any person who, together with that person's affiliates and associates, owns 15 per cent. or more of the Parent's outstanding voting stock or an affiliate or associate of the Parent who owned 15 per cent. or more of the Parent's outstanding voting stock at any time within the previous three years, but shall not include any person who acquired such stock from the Founder Entities or Energy Transition Holdings LLC (except in the context of a public offering) or any person whose ownership of stock in excess of 15 per cent. of the Parent's outstanding voting stock is the result of any action taken solely by the Parent. The Parent's Certificate of Incorporation provides that the Founder Entities and Energy Transition Holdings LLC and any of their respective direct or indirect transferees, and any group as to which such persons are a party, do not constitute "interested stockholders" for purposes of this provision.

***The Parent's By-Laws designate the Court of Chancery of the State of Delaware as the sole and exclusive forum for certain types of actions and proceedings that may be initiated by the Parent's stockholders, which could limit such stockholders' ability to obtain a favourable judicial forum for disputes with the Parent or its directors, officers, employees or agents.***

The Parent's By-Laws provide that, unless it consents in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware is, to the fullest extent permitted by applicable law, the sole and exclusive forum for (i) any derivative action or proceeding brought on its behalf, (ii) any action asserting a claim of breach of a fiduciary duty owed by any of its directors, officers, employees or agents to the Parent or its stockholders, (iii) any action asserting a claim against it or any of its directors, officers or employees arising pursuant to any provision of its organisational documents or the Delaware General Corporation Law, or (iv) any action asserting a claim against it or any of its directors, officers or employees that is governed by the internal affairs doctrine, in each such case subject to such Court of Chancery having personal jurisdiction over the indispensable parties named as defendants therein. Any person or entity purchasing or otherwise acquiring any interest in the Parent's stock will be deemed to have notice of, and consented to, the provisions described in the preceding sentence. This choice of forum provision may limit a stockholder's ability to bring a claim in a judicial forum that it considers more likely to be favourable for disputes with the Parent or its directors, officers, employees or agents, which may discourage such lawsuits against the Parent and such persons. Alternatively, if a court were to find these provisions of the Parent's organisational documents inapplicable to, or unenforceable in respect of, one or more of the specified types of actions or proceedings, the Parent may incur additional costs associated with resolving such matters in other jurisdictions, which could adversely affect the Group's business, financial condition, results of operations or prospects.

***The declaration and payment of dividends to holders of the Class A common stock is at the discretion of the Parent's board of directors and the Parent does not expect to pay dividends for the foreseeable future.***

The Parent does not expect to pay dividends for the foreseeable future. Any future declaration and payment of dividends to holders of the Class A common stock will be at the discretion of the Parent's board of directors in accordance with applicable law and significant restrictions imposed by the Group's debt agreements, and after taking into account various factors, including actual results of operations, liquidity and financial condition, net cash provided by operating activities, restrictions imposed by applicable law, restrictions imposed by the Group's debt agreements, the Group's taxable income, operating expenses and other factors the Parent's board of directors deem relevant. Because the Parent is a holding company and has no direct operations, it will only be able to pay dividends in the future from its available cash on hand and any funds it receives from its subsidiaries and its ability to receive distributions from its subsidiaries may be limited by the financing agreements to which they are subject.

***The incurrence or issuance of debt which ranks senior to the Class A common stock upon the Parent's liquidation and future issuances of equity or equity-related securities, which would dilute the holdings of the existing Class A common stockholders and may be senior to the Class A common stock for the purposes of making distributions, periodically or upon liquidation, may negatively affect the market price of the Class A common stock.***

The Parent has incurred and may in the future incur or issue debt or issue equity or equity-related securities to finance its operations, acquisitions or investments. Upon the Parent's liquidation, lenders and holders of its debt and holders of its preferred stock, such as the CoreCo Preferred Stock to be issued upon closing of the Recapitalisation Transaction, would receive a distribution of the Parent's available assets before Class A common stockholders. Any future incurrence or issuance of debt would increase the Parent's interest cost and could adversely affect its results of operations and cash flows. The Parent is not required to offer any additional equity securities to existing Class A common stockholders on a preemptive basis. Therefore, additional issuances of Class A common stock, whether directly, through convertible securities, such as the CoreCo Preferred Stock, or exchangeable securities (including limited partnership interests in the Parent's operating partnership), warrants or options, will dilute the holdings of the existing Class A common stockholders and such issuances, or the perception of such issuances, may reduce the market price of the Class A common stock. Any preferred stock issued by the Parent would likely, and the CoreCo Preferred Stock will, have a preference on distribution payments, periodically or upon liquidation, which could eliminate or otherwise limit the Parent's ability to make distributions to Class A common stockholders. Because the Parent's decision to incur or issue additional debt or equity or equity-related securities (other than the CoreCo Preferred Stock) in the future will depend on market conditions and other factors beyond its control, the Parent cannot predict or estimate the amount, timing, nature or success of its future capital raising efforts. Thus, Class A common stockholders bear the risk that the Parent's future incurrence or issuance of debt or issuance of equity or equity-related securities will adversely affect the market price of the Class A common stock.

***Sales or issuances of the Class A common stock could adversely affect the market price of the Class A common stock.***

Sales of substantial amounts of the Class A common stock in the public market, or the perception that such sales might occur, including in connection with the proposed equity issuance in the Recapitalisation Transaction, could adversely affect the market price of the Class A common stock. The issuance of the Class A common stock in connection with property, portfolio or business acquisitions or the exercise of outstanding options or otherwise could also have an adverse effect on the market price of the Class A common stock.

***An active, liquid and orderly trading market for the Class A common stock may not be maintained and the price of the Class A common stock may fluctuate significantly.***

An active, liquid and orderly trading market for the Class A common stock may not be maintained. Active, liquid and orderly trading markets usually result in less price volatility and more efficiency in carrying out investors' purchase and sale orders. The market price of the Class A common stock could vary significantly as a result of a number of factors, some of which are beyond the Parent's control. In the event of a drop in the market price of the Class A common stock, investors could lose a substantial part or all of their investment in the Class A common stock.

***In certain instances, Nasdaq may delist the Class A common stock from quotation on its exchange, which could limit investors' ability to sell and purchase the Parent's securities and subject the Parent to trading restrictions.***

The Class A common stock is currently listed on the Nasdaq under the trading symbol "NFE." However, if the price of shares of Class A common stock drops and if the average closing price of shares of Class A common stock is less than $1.00 over a consecutive 30 trading-day period, the Class A common stock may be suspended and/or delisted in accordance with Nasdaq's listing standards. If the Class A common

stock is not listed on Nasdaq, the Parent could face significant material adverse consequences, including:

- a limited availability of market quotations for its securities;

- reduced liquidity;

- a determination that the Class A common stock is a "penny stock," which will require brokers trading in its shares to adhere to more stringent rules, possibly resulting in reduced trading activity;

- a limited amount of news and analyst coverage; and

- a decreased ability to issue additional securities or obtain additional financing in the future.

***If the Class A common stock becomes subject to the penny stock rules, it would become more difficult to trade the Parent's shares.***

The SEC has adopted rules that regulate broker-dealer practices in connection with transactions in penny stocks. Penny stocks are generally equity securities with a price of less than $5.00, other than securities registered on certain national securities exchanges or authorised for quotation on certain automated quotation systems, provided that current price and volume information with respect to transactions in such securities is provided by the exchange or system. If the Parent does not retain a listing on the NASDAQ, and if the price of the Class A common stock is less than $5.00, the Class A common stock will be deemed a penny stock. The penny stock rules require a broker-dealer, before a transaction in a penny stock not otherwise exempt from those rules, to deliver a standardised risk disclosure document containing specified information. In addition, the penny stock rules require that before effecting any transaction in a penny stock not otherwise exempt from those rules, a broker-dealer must make a special written determination that the penny stock is a suitable investment for the purchaser and receive (i) the purchaser's written acknowledgement of the receipt of a risk disclosure statement; (ii) a written agreement to transactions involving penny stocks; and (iii) a signed and dated copy of a written suitability statement. These disclosure requirements may have the effect of reducing the trading activity in the secondary market for the Class A common stock, and therefore the Parent's stockholders may have difficulty selling their shares.

### *Risks Relating to Ownership of the CoreCo Preferred Stock*

Holders will bear the risk of a decline in the market price of the Parent's Class A common stock between the issue date of the CoreCo Preferred Stock and their mandatory conversion.

The number of shares of the Parent's Class A common stock that a holder will receive upon mandatory conversion of the CoreCo Preferred Stock is fixed (subject to customary anti-dilution adjustments). If the share price of the Parent's Class A common stock is less than the quotient of $1,000 divided by the conversion rate on the date of mandatory conversion, holders of CoreCo Preferred Stock will effectively be paying more for shares of Class A Common Stock than the market price on the date of mandatory conversion and receive fewer shares of the Parent's Class A common stock than if the conversion rate depended on the market price of the Parent's Class A common stock on the mandatory conversion date. Accordingly, a holder will bear the risk of a decline in the market price of the Class A common stock. Any such decline could be substantial.

***Sales or issuances of the Parent's Class A common stock in the public market, or the perception that these sales or issuances may occur, or the conversion or redemption of the CoreCo Preferred Stock, could affect the market price of the CoreCo Preferred Stock.***

Sales or issuances of substantial amounts of the Parent's Class A common stock or other securities convertible or exchangeable into shares of Class A common stock, including securities issued in

connection with the Recapitalisation Transaction, in the public market or the conversion or redemption of the CoreCo Preferred Stock, could cause the market price of the CoreCo Preferred Stock or the Parent's Class A common stock to decline.

***Regulatory actions may adversely affect the trading price and liquidity of the CoreCo Preferred Stock.***

Owners of the CoreCo Preferred Stock who employ, or seek to employ, a convertible arbitrage strategy with respect to the CoreCo Preferred Stock may be adversely impacted by regulatory developments that may limit or restrict such a strategy. The SEC and other regulatory and self-regulatory authorities have implemented various rules and may adopt additional rules in the future that restrict and otherwise regulate short selling and over-the-counter swaps and security-based swaps, which restrictions and regulations may adversely affect the ability of investors in, or potential purchasers of, the CoreCo Preferred Stock to conduct a convertible arbitrage strategy with respect to the CoreCo Preferred Stock. This could, in turn, adversely affect the trading price and liquidity of the CoreCo Preferred Stock.

***The Liquidation Preference may not adequately compensate a holder for the loss as a result of early conversion upon a liquidation event.***

If a liquidation event occurs prior to the mandatory conversion date (subject to the rights of certain creditors of the Parent), holders of CoreCo Preferred Stock will be entitled to receive payment of the Liquidation Preference. Payment of the Liquidation Preference may not fully compensate holders for any loss suffered in connection with a liquidation event.   In addition, the agreements governing any of the Parent' existing or future indebtedness may limit its ability to pay cash to holders upon a liquidation event unless it can repay or refinance the amounts outstanding under such agreements.

***The conversion rate of the CoreCo Preferred Stock is fixed and may not be adjusted for all dilutive events that may adversely affect the market price of the CoreCo Preferred Stock or the common stock issuable upon conversion of the CoreCo Preferred Stock.***

The conversion rate of the CoreCo Preferred Stock is subject to adjustment only for the issuance of certain stock dividends on the Parent's Class A common stock, subdivisions or combinations of the Parent's Class A common stock or the issuance of certain equity interests. Subject to certain requirements, the Parent may also voluntarily increase the conversion rate if such increase is in the Parent's best interest or that such increase is advisable to avoid or diminish any income tax imposed on holders of the Parent's Class A common stock or rights to purchase common stock as a result of any dividend or distribution of shares of common stock or any similar event. However, other events, such as employee and director grants that are settled in common stock and option grants or offerings of the Parent's Class A common stock or securities convertible into shares of the Parent's Class A common stock for cash or in connection with acquisitions, or third-party tender or exchange offers, which may adversely affect the market price of common stock, may not result in any adjustment. Further, if any of these other events adversely affects the market price of common stock, it may also adversely affect the market price of the CoreCo Preferred Stock. In addition, the terms of the CoreCo Preferred Stock do not restrict the Parent's ability to offer common stock or securities convertible into common stock in the future or to engage in other transactions that could dilute common stock. The Parent has no obligation to consider the specific interests of the holders of the CoreCo Preferred Stock in engaging in any such offering or transaction.

***Holders of the CoreCo Preferred Stock may be adversely affected upon the issuance of a new series of preferred stock ranking senior or equally with the CoreCo Preferred Stock.***

The Parent's certificate of incorporation authorises the Parent's board of directors, without the approval of stockholders, to issue additional shares of preferred stock (including the CoreCo Preferred Stock), subject to limitations prescribed by applicable law, rules and regulations and the provisions of the Parent's certificate of incorporation (and the Certificate of Designations), as shares of preferred stock in series, to establish from time to time the number of shares to be included in each such series and to fix the designation, powers, preferences and rights of the shares of each such series and the

143

qualifications, limitations or restrictions thereof. With the consent of at least two-thirds in voting power of the outstanding shares of the CoreCo Preferred Stock, these additional series of preferred stock may be on parity with or senior to, the CoreCo Preferred Stock, which may reduce its value.

***The CoreCo Preferred Stock will rank junior to all of the Parent's and its subsidiaries' consolidated liabilities and shares of capital stock, and may rank junior to future classes or series of capital stock.***

In the event of a bankruptcy, liquidation, dissolution or winding-up, the Parent's assets will be available to pay obligations on the CoreCo Preferred Stock only after all of our consolidated liabilities have been paid. In addition, the CoreCo Preferred Stock will rank (i) structurally junior to all existing and future liabilities and shares of capital stock of our subsidiaries, including the FLNG 2 Preferred Equity and the FLNG 2 Term Loans and (ii) junior to each class or series of the Parent's capital stock established after the issue date the terms of which expressly provide that such class or series will rank senior to the CoreCo Preferred Stock with respect to dividends and distributions of assets upon liquidation, dissolution or winding up of the Parent or certain other events. Holders rights to participate in the assets of the Parent's subsidiaries upon any bankruptcy, liquidation, dissolution or winding up of any subsidiary will rank junior to the prior claims of that subsidiary's creditors. In the event of a bankruptcy, liquidation, dissolution or winding-up, there may not be sufficient assets remaining, after paying the Parent's and its subsidiaries' liabilities, to pay amounts due on any or all of the CoreCo Preferred Stock then outstanding.

***The Parent does not expect to pay cash dividends on the CoreCo Preferred Stock for the foreseeable future.***

The Parent does not expect to pay dividends for the foreseeable future. Any future declaration and payment of dividends to holders of the CoreCo Preferred Stock will be at the discretion of the Parent's board of directors in accordance with applicable law and significant restrictions imposed by the Parent's debt agreements, and after taking into account various factors, including actual results of operations, liquidity and financial condition, net cash provided by operating activities, restrictions imposed by applicable law, restrictions imposed by debt agreements, taxable income, operating expenses and other factors the Parent's board of directors deem relevant. Because the Parent is a holding company and has no direct operations, the Parent will only be able to pay dividends in the future from available cash on hand and any funds received from subsidiaries and the Parent's ability to receive distributions from subsidiaries may be limited by the financing agreements to which they are subject.

***Holders may be subject to tax upon an adjustment to the conversion rate of the CoreCo Preferred Stock or upon a distribution paid in shares of the Parent's Class A common stock even though holders do not receive a corresponding cash distribution.***

The conversion rate of the CoreCo Preferred Stock is subject to anti-dilution adjustment in certain circumstances. If and to the extent that certain adjustments to the conversion rate increase the proportionate interest of a U.S. holder in the Parent's assets or earnings and profits, such holder may be treated as having received a deemed distribution includable in income as a dividend without a corresponding receipt of any cash or property. In addition, the Parent may make distributions to holders of the CoreCo Preferred Stock that are paid in shares of the Parent's Class A common stock, and any such distribution is expected to be taxable for U.S. federal income tax purposes in the same manner as a cash distribution of the same amount. In these circumstances and possibly others, a holder of CoreCo Preferred Stock may be subject to tax even though it has received no cash with which to pay that tax, thus giving rise to an out-of-pocket expense.

If you are a Non-U.S. holder, any of these deemed dividends or distributions made in common stock generally will be subject to U.S. federal withholding tax (currently at a 30% rate, or such lower rate as may be specified by an applicable treaty), which may be withheld from cash, shares of the Parent's Class A common stock, or sales proceeds otherwise payable to you by the applicable withholding agent.

***An active trading market for the CoreCo Preferred Stock does not exist and may not develop.***

The CoreCo Preferred Stock is a new issue of securities with no established trading market. The liquidity of the trading market in the CoreCo Preferred Stock, and the market price quoted for the CoreCo Preferred Stock, may be adversely affected by changes in the overall market for this type of security and by changes in financial performance or prospects or in the prospects for companies in the Group's industry generally. While the Parent intends to apply to list the CoreCo Preferred Stock on Nasdaq, if an active trading market does not develop or is not maintained, the market price and liquidity of the CoreCo Preferred Stock may be adversely affected. In that case, holders may not be able to sell their CoreCo Preferred Stock at a particular time or they may not be able to sell their CoreCo Preferred Stock at a favorable price. In addition, as shares of the CoreCo Preferred Stock are converted or redeemed, the liquidity of the CoreCo Preferred Stock that remains outstanding may decrease.

***The market price and trading volume of the Parent's Class A common stock may be volatile, which will directly affect the market price for the CoreCo Preferred Stock.***

The market price of the Parent's Class A common stock may be highly volatile and could be subject to wide fluctuations. The Group expects that, generally, the market price of the Parent's Class A common stock will significantly affect the market price of the CoreCo Preferred Stock. This may result in greater volatility in the market price of the CoreCo Preferred Stock than would be expected for nonconvertible preferred stock. In addition, the Parent expects that the market price of the CoreCo Preferred Stock will be influenced by yield and interest rates in the capital markets, the time remaining to the CoreCo conversion date, creditworthiness and the occurrence of certain events affecting the Group that do not require an adjustment to the conversion rate. Fluctuations in yield rates in particular may give rise to arbitrage opportunities based upon changes in the relative values of the CoreCo Preferred Stock and the Parent's Class A common stock. Any such arbitrage could, in turn, affect the market prices of the Parent's Class A common stock and the CoreCo Preferred Stock. The market price of the Parent's Class A common stock could also be affected by possible sales of the Parent's Class A common stock by investors who view the CoreCo Preferred Stock as a more attractive means of equity participation and by hedging or arbitrage trading activity that the Group expects to develop involving the Parent's Class A common stock. This trading activity could, in turn, affect the market price of the CoreCo Preferred Stock.

### Risks Related to the FLNG 2 Preferred Equity

***Interests in FLNG 2 Preferred Equity represent perpetual equity interests in FLNG 2 Parent, and holders of interests in FLNG 2 Preferred Equity should not expect FLNG 2 Parent to redeem any Interests in FLNG 2 Preferred Equity on any particular date.***

The Interests in FLNG 2 Preferred Equity are perpetual equity securities. This means that they have no maturity or mandatory redemption date and are not redeemable at the option of holders. The FLNG 2 Preferred Equity may be redeemed by FLNG 2 at its option at any time and from time to time, in whole or in part, at a redemption price equal to $1,000 per preferred interest (subject to adjustment to account for any interest split, reverse split, interest dividend or similar transaction), unless holders of at least the majority interest in the FLNG 2 Preferred Equity agree to a lesser amount. Any decision FLNG 2 Parent may make at any time to redeem the interests in FLNG 2 Preferred Equity will be determined by FLNG 2 Parent in its sole discretion and depend upon, among other things, an evaluation of its capital position, the composition of its shareholders' equity, its outstanding indebtedness and general market conditions at that time.

***The Interests in FLNG 2 Preferred Equity will rank junior to all of FLNG 2 Parent's and its subsidiaries' liabilities.***

In the event of a bankruptcy, liquidation, dissolution or winding-up, the assets of FLNG 2 Parent will be available to pay obligations on the interests in FLNG 2 Preferred Equity only after all of FLNG 2 Parent's liabilities have been paid. In addition, the Interests in FLNG 2 Preferred Equity will rank

145

structurally junior to all existing and future liabilities of FLNG 2 Parent's subsidiaries. Holders of Interests in FLNG 2 Preferred Equity right to participate in the assets of FLNG 2 Parent's subsidiaries upon any bankruptcy, liquidation, dissolution or winding up of any subsidiary will rank junior to the prior claims of that subsidiary's creditors. In the event of a bankruptcy, liquidation, dissolution or winding-up, there may not be sufficient assets remaining, after paying FLNG 2 Parent and its subsidiaries' liabilities, to pay amounts due on any or all of the interests in FLNG 2 Preferred Equity then outstanding. After the consummation of the Recapitalisation Transaction, FLNG 2 Parent expects to have $400 million in indebtedness under the FLNG 2 Term Loans.

***FLNG 2 Parent does not expect to pay cash distributions on the Interests in FLNG 2 Preferred Equity for the foreseeable future.***

FLNG 2 Parent does not expect to pay distributions for the foreseeable future. Any future declaration and payment of distributions to holders of the interests in FLNG 2 Preferred Equity will be at the discretion of FLNG 2 Parent in accordance with applicable law and significant restrictions imposed by its debt and operational agreements, and after taking into account various factors, including actual results of operations, liquidity and financial condition, net cash provided by operating activities, restrictions imposed by applicable law, restrictions imposed by FLNG 2 Parent's debt agreements, including the FLNG 2 Term Loans, its taxable income, its operating expenses and other factors FLNG 2 Parent deems relevant.

***An active trading market for the FLNG 2 Preferred does not exist and may not develop.***

The interests in FLNG 2 Preferred Equity represent a new issue of securities with no established trading market. The liquidity of the trading market in the interests in FLNG 2 Preferred Equity, and the market price quoted for the interests in FLNG 2 Preferred Equity, may be adversely affected by changes in the overall market for this type of security and by changes in FLNG 2 Parent's financial performance or prospects or in the prospects for companies in the Group's industry generally. FLNG 2 Parent does not intend to apply to list the interests in FLNG 2 Preferred Equity on any securities exchange. If an active trading market does not develop or is not maintained, the market price and liquidity of the interests in FLNG 2 Preferred Equity may be adversely affected. In that case holders may not be able to sell their interests in FLNG 2 Preferred Equity at a particular time or they may not be able to sell their interests in FLNG 2 Preferred Equity at a favorable price. In addition, as the interests in FLNG 2 Preferred Equity are redeemed, the liquidity of the FLNG 2 Preferred Equity that remains outstanding may decrease.

***The terms of the interests in FLNG 2 Preferred Equity do not limit FLNG 2 Parent's ability to incur indebtedness or other liabilities.***

The terms of the interests in FLNG 2 Preferred Equity will not limit FLNG 2 Parent's ability to incur indebtedness or other liabilities. As a result, FLNG 2 Parent and its subsidiaries may incur indebtedness or other liabilities that will rank senior to the interests in FLNG 2 Preferred Equity. The incurrence of indebtedness or other liabilities that will rank senior to the interests in FLNG 2 Preferred Equity may reduce the amount available for distributions and the amount recoverable by holders of the interests in FLNG 2 Preferred Equity in the event of FLNG 2 Parent's liquidation, dissolution or winding-up.

**General Risks**

***The Parent is a holding company and its operational and consolidated financial results are dependent on the results of its subsidiaries, affiliates, joint ventures and special purpose entities in which it invests.***

The Parent conducts its business mainly through its operating subsidiaries and affiliates, including joint ventures and other special purpose entities, which are created specifically to participate in projects or manage a specific asset. The Parent's ability to meet its financial obligations is therefore related in part to the cash flow and earnings of its subsidiaries and affiliates and the ability or willingness of these entities to make distributions or other transfers of earnings to the Parent in the form of dividends, loans

146

or other advances and payments, which are governed by various shareholder agreements, joint venture financing and operating arrangements.  In addition, some of the Parent's operating subsidiaries, joint venture and special purpose entities are subject to restrictive covenants related to their indebtedness, including restrictions on dividend distributions.  Any additional debt or other financing could include similar restrictions, which would limit their ability to make distributions or other transfers of earnings to the Parent in the form of dividends, loans or other advances and payments.  Similarly, the Group may fail to realise anticipated benefits of any joint venture or similar arrangement, which could adversely affect the Parent's financial condition and results of operation.

***The Group has and may in the future continue to engage in mergers, sales and acquisitions, divestments, reorganisations or similar transactions related to its businesses or assets and it may fail to successfully complete such transactions or to realise the expected value.***

In furtherance of its business strategy, the Group has in the past and may continue to engage in mergers, purchases or sales, divestments, reorganisations or other similar transactions related to its businesses or assets in the future.  Any such transactions have and may be subject to significant risks and contingencies, including the risk of integration, valuation and successful implementation, and the Group may not be able to realise the benefits of any such transactions.  The Group has in the past and may continue to also engage in sales of its assets or sale and leaseback transactions that seek to monetise its assets and there is no guarantee that such sales of assets have or will be executed at the prices the Group desires or higher than the values it has or currently carry these assets at on its balance sheet.  The Group does not know if it will be able to successfully complete any such transactions or whether it will be able to retain key personnel, suppliers or distributors.  The Group's ability to successfully implement its strategy through such transactions depends upon its ability to identify, negotiate and complete suitable transactions and to obtain the required financing on terms acceptable to it.  These efforts could be expensive and time consuming, disrupt the Group's ongoing business and distract management.  If the Group is unable to successfully complete its transactions, its business, financial condition, results of operations and prospects could be materially adversely affected.

***The disposition of the Group's Jamaica business is expected to have a material adverse effect on the Group's consolidated results of operations and consolidated financial condition and the Group may not be able to realise some or all of the anticipated benefits from the transaction.  Failure to replace the earnings from the Group's Jamaica business could have a material adverse effect on the Group's business, liquidity, consolidated results of operations and consolidated financial condition.***

On 14 May 2025, the Group completed the sale of its Jamaica business.  After the repayment of all outstanding bonds issued by NFE South Power Holdings Limited, a wholly owned subsidiary of the Parent (the "**South Power Bonds**"), in the amount of approximately $227.2 million and payment of certain transaction costs, the Group received net cash proceeds of approximately $678.5 million, with an additional $98.6 million of proceeds held in escrow and to be returned to the Group based on the terms of the sale agreement.  During the fourth quarter of 2025, the Group and Excelerate Energy Limited Partnership ("**EELP**"), a subsidiary of Excelerate Energy, Inc., agreed on a final closing statement and final purchase price for the sale of the Jamaica business of approximately $1.03 billion, resulting in a $28.7 million payment due to EELP, which was paid using certain proceeds released from the escrow accounts.  As of 31 December 2025, the Group had proceeds held in escrow of $41.0 million relating to certain indemnification matters, which are expected to resolve within the next twelve months.  The remaining proceeds held in escrow of $17.0 million relating to indemnifications for certain tax related matters are expected to be released to the Group prior to the fiscal year ending 31 December 2029.  The Group expects to benefit from the remaining net proceeds realised from such sale, including through repaying a portion of the Group's corporate debt and reinvestment in its business.  However, the Group's consolidated results of operations and consolidated financial condition has been and is expected to be materially adversely affected by the disposition of this revenue generating asset.  The loss of earnings from the Group's Jamaica business may diminish the Group's ability to service its indebtedness and repay its indebtedness at maturity.

Furthermore, there can be no assurances that the Group will be able to realise the anticipated benefits from the transaction, including benefits related to a reduction in its corporate debt and its ability to reinvest the proceeds profitably.

The Group expects revenue streams from its projects in Nicaragua and Puerto Rico, as well as in Brazil under the new BrazilCo Group structure, which it continues to develop as previously disclosed, to help offset the loss of revenue from the Group's Jamaica business, but there is no guarantee that the Group can successfully commence operations on its currently anticipated timelines or at all or that once operations commence such operations will be profitable.  In the future, the Group's capital expenses and operational expenses may increase due to expected increased sales, operational costs, and general and administrative costs and, therefore, the Group's operating losses may continue or even increase after completion of these projects.  If these projects do not successfully replace the revenues lost due to the disposition of the Group's Jamaica business, the Group's business, liquidity, consolidated results of operations and consolidated financial condition could be materially and adversely affected.

***A change in tax laws in any country in which the Group operates could adversely affect it.***

Tax laws, regulations and treaties are highly complex and subject to interpretation.  Consequently, the Group is subject to changing laws, treaties and regulations in and between the countries in which it operates.  The Group's tax expense is based on its interpretation of the tax laws in effect at the time the expense was incurred.  A change in tax laws, regulations, or treaties, or in the interpretation thereof, could result in a materially higher tax expense or a higher effective tax rate on the Group's earnings.  The Group's after-tax profitability could be affected by numerous factors, including the availability of tax credits, exemptions and other benefits to reduce the Group's tax liabilities, changes in the relative amount of the Group's earnings subject to tax in the various jurisdictions in which it operates, the potential expansion of its business into or otherwise becoming subject to tax in additional jurisdictions, changes to its existing businesses and operations, the extent of its intercompany transactions and the extent to which taxing authorities in the relevant jurisdictions respect those intercompany transactions.  The Group's after-tax profitability may also be affected by changes in the relevant tax laws and tax rates, regulations, administrative practices and principles, judicial decisions, and interpretations, in each case, possibly with retroactive effect.  For example, the Organization for Economic Cooperation and Development is coordinating negotiations among more than 140 countries with the goal of achieving consensus around substantial changes to international tax policies, including the implementation of a minimum global effective tax rate of 15 per cent.  Various countries have implemented the legislation and others may in the future, which could increase the Group's effective tax rate.

***The Group is currently and may in the future be involved in legal proceedings and may experience unfavourable outcomes.***

The Group is currently and may in the future be subject to material legal proceedings in the course of its business or otherwise, including, but not limited to, actions relating to contract disputes, business practices, intellectual property, real estate and leases, and other commercial, tax, regulatory and permitting matters. The Parent is currently subject to a putative securities class action complaint relating to a drop in its share price and could become involved in additional litigation of this type in the future if its share prices is volatile for any reason.  Such legal proceedings may involve claims for substantial amounts of money or for other relief or might necessitate changes to the Group's business or operations, and the defence of such actions may be both time-consuming and expensive.  Moreover, the process of litigating requires substantial time, which may distract the Group's management.  Even if the Group is successful, any litigation may be costly, and may approximate the cost of damages sought.  These actions could also expose the Group to adverse publicity, which might adversely affect its reputation and therefore, its results of operations.  Further, if any such proceedings were to result in an unfavourable outcome, it could have an adverse effect on the Group's business, financial position and results of operations.

***If the Group fails to develop or maintain an effective system of internal controls, it may not be able to accurately report its financial results or prevent fraud. As a result, current and potential stockholders could lose confidence in the Group's financial reporting, which would harm the Group's business and the trading price of the Class A common stock.***

Effective internal controls are necessary for the Parent to provide reliable financial reports, prevent fraud and operate successfully as a publicly traded company. If the Parent cannot provide reliable financial reports or prevent fraud, the Group's reputation and operating results would be harmed. The Group has previously identified material weaknesses in its internal control over financial reporting, and as a result, the Group has restated certain of its previously issued financial statements. There can be no assurance that additional material weaknesses will not be identified in the future or that the Group will not be required to restate its financial statements for other periods. The Group cannot be certain that it will be able to maintain adequate controls over its financial processes and reporting in the future or that it will be able to comply with its obligations under Section 404 of the Sarbanes-Oxley Act. Any failure to develop or maintain effective internal controls, or difficulties encountered in implementing or improving the Group's internal controls, could result in additional material weaknesses, harm the Group's operating results or cause the Group to fail to meet its reporting obligations. Ineffective internal controls could also cause investors to lose confidence in the Group's reported financial information, which would likely have a negative effect on the trading price of the Class A common stock.

***If securities or industry analysts do not publish research or reports about the Group's business, if they adversely change their recommendations regarding the Class A common stock or if the Group's operating results do not meet their expectations, the Parent's share price could decline.***

The trading market for the Class A common stock will be influenced by the research and reports that industry or securities analysts publish about the Group or its business. If one or more of these analysts cease coverage of the Group or fail to publish reports on it regularly, the Group could lose viability in the financial markets, which in turn could cause the Parent's share price or trading volume to decline.

**Legal Proceedings**

From time to time, the Group is involved in, and may in the future become involved in, various legal and regulatory claims and proceedings relating to claims arising out of its operations and activities in the normal course of business. If the Group becomes a party to proceedings in the future, it may be unable to predict with certainty the ultimate outcome of such claims and proceedings. These matters also include the following:

***In re New Fortress Energy Inc. Securities Litigation, 24-cv-07032 (S.D.N.Y.)***

On 17 September 2024, plaintiff Mikolaj Bojdol filed a putative class action lawsuit in the U.S. District Court for the Southern District of New York against the Parent and certain officers alleging violations of Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 and certain rules promulgated thereunder relating to statements concerning the Group's FLNG project in Altamira, Mexico. On 1 November 2024, plaintiff Taylor Anderson filed a similar class action lawsuit also in the U.S. District Court for the Southern District of New York. The cases were consolidated and a lead plaintiff was appointed on 17 December 2024. The lead plaintiff filed an amended complaint on 18 February 2025 asserting claims on behalf of persons and entities that purchased the Parent's securities between 20 September 2022 and 8 August 2024 and seeks compensatory damages, interest, fees, and costs. On 19 February 2026, the Court denied the defendants' motion to dismiss. The Group believes the claims are without merit and intends to vigorously defend against this lawsuit.

***Derivative Cases***

On 11 June 2025, John Weis filed a shareholder derivative action against current and former members of the Board of Directors of the Parent in the U.S. District Court for the Southern District of New York. On 13 June 2025, Robert Troha also filed a shareholder derivative action against certain of the Parent's

executive officers and current and former members of the Board of Directors of the Parent in the U.S. District Court for the Southern District of New York.  On 26 June 2025, Adrian Little similarly filed a shareholder derivative action against certain of the Parent's executive officers and current and former members of the Board of Directors of the Parent in the U.S. District Court for the Southern District of New York and on 2 July 2025, Alexander Smith filed a similar shareholder derivative action against certain of the Parent's executive officers and current and former members of the Board of Directors of the Parent in the U.S. District Court for the Southern District of New York.  All plaintiffs seek to allege on behalf of the Parent that defendants breached fiduciary duties by allegedly making false or misleading statements, approving the making of false or misleading statements, and/or withholding information regarding the Altamira FLNG project.  The actions allege violations of Section 14(a) of the Securities and Exchange Act of 1934 and Rule 14a-9 with respect to the 2023 and 2024 Proxy Statements, Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934, breaches of fiduciary duties, gross mismanagement, aiding and abetting breaches of fiduciary duties, unjust enrichment and waste of corporate assets.  The actions were consolidated on 6 August 2025.  The action was stayed on 7 October 2025.

If the Group becomes a party to proceedings in the future, it may be unable to predict with certainty the ultimate outcome of such claims and proceedings.

**APPENDIX 1**

**THE PLANS**

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF**
**ENGLAND AND WALES**
**INSOLVENCY AND COMPANIES LIST (ChD)**

**IN THE MATTER OF NFE GLOBAL HOLDINGS LIMITED**

**-and-**

**IN THE MATTER OF THE COMPANIES ACT 2006**

_____

**RESTRUCTURING PLAN**
(under Part 26A of the Companies Act 2006)

- between –

NFE GLOBAL HOLDINGS LIMITED

- and –

THE CORECO PLAN CREDITORS
(as defined herein)

_____

**Table of Contents**

1    Definitions and Interpretation.................................................................................2

2    Application and Effectiveness of the Restructuring Plan ..................................15

3    Grant of Authority to Execute the Implementation Documents.......................16

4    Deeds of Undertaking.........................................................................................20

5    Closing Steps and Plan Consideration ..............................................................21

6    Modifications of this Restructuring Plan...........................................................23

7    Releases ..............................................................................................................24

8    Termination .........................................................................................................25

9    General Restructuring Plan Provisions..............................................................26

10    Notice ................................................................................................................28

11    Plan Parties .......................................................................................................31

12    Governing Law and Jurisdiction ......................................................................31

Schedule 1 – Undertaking Parties ...........................................................................32

i

**RESTRUCTURING PLAN**

**Between:**

(1) NFE GLOBAL HOLDINGS LIMITED, a company incorporated under the laws of England and Wales (company number 13679588) (the "**Plan Company**"); and

(2) THE CORECO PLAN CREDITORS (as hereinafter defined).

**Recitals**

(A)     The Plan Company was incorporated and registered in England and Wales on 14 October 2021, with registered number 13679588, as a private company limited by shares under the Act (as defined below). The Plan Company's registered office is at Suite 1, 7th Floor, 50 Broadway, London, United Kingdom, SW1H 0BL. The Plan Company is an indirect subsidiary of NFE Inc. (as defined below).

(B)     The purpose of this Restructuring Plan (as defined below) is to effect a compromise and arrangement between the Plan Company and the CoreCo Plan Creditors (as defined below) to facilitate the implementation of the Restructuring (as defined below). The CoreCo Plan Creditors are the Legacy Noteholders, the RCF Lenders, the TLA Lenders, the TLB Lenders, the Series I Lender and the Series II Lender (each as defined below).

(C)     To effect such compromise and arrangement, each CoreCo Plan Creditor will pursuant to the terms of this Restructuring Plan, grant a power of attorney to the Plan Company to execute the Transaction Implementation Deed and the applicable Implementation Documents to which such CoreCo Plan Creditor is a party on its behalf (each as defined below).

(D)     In order to successfully implement the Restructuring, participation is required from, among others, the Undertaking Parties. Each of the Undertaking Parties has severally agreed, upon the sanctioning of this Restructuring Plan by the Court (as defined below), to be bound by and comply with the obligations expressed to apply to it under this Restructuring Plan and, on and from their release in accordance with the Restructuring Plan, the Implementation Documents to which it is a party pursuant to the provisions of such person's Deed of Undertaking (as defined below).

(E)     This Restructuring Plan and the BrazilCo Plan (as defined below) are inter-conditional such that this Restructuring Plan and the BrazilCo Plan shall become effective and legally binding at the same time (or not at all).

1

# 1    DEFINITIONS AND INTERPRETATION

## 1.1    Definitions

**1.1.1**    In this Restructuring Plan, the following terms shall, unless the context otherwise requires, have the following meanings:

"**2026 Legacy Noteholders**" means the ultimate beneficial holders of the 2026 Legacy Notes Debt;

"**2026 Legacy Notes**" means the 6.500% senior secured notes due 2026 issued by NFE Inc. pursuant to the 2026 Legacy Notes Indenture;

"**2026 Legacy Notes Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the 2026 Legacy Noteholders under or in connection with the 2026 Legacy Notes (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise);

"**2026 Legacy Notes Indenture**" means the indenture entered into by, among others, NFE Inc. as issuer and U.S. Bank Trust Company, National Association, as trustee and collateral agent, on 12 April 2021 (as amended, supplemented or otherwise modified from time to time);

"**2029 Legacy Noteholders**" means the ultimate beneficial holders of the 2029 Legacy Notes Debt;

"**2029 Legacy Notes**" means the 8.750% senior secured notes due 2029 issued by NFE Inc. pursuant to the 2029 Legacy Notes Indenture;

"**2029 Legacy Notes Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the 2029 Legacy Noteholders under or in connection with the 2029 Legacy Notes (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise);

"**2029 Legacy Notes Indenture**" means the indenture entered into by, among others, NFE Inc. as issuer and U.S. Bank Trust Company, National Association, as trustee and collateral agent, on 8 March 2024 (as amended, supplemented or otherwise modified from time to time);

"**2029 New Noteholders**" means the ultimate beneficial holders of the 2029 New Notes Debt;

"**2029 New Notes**" means the 12.000% senior secured notes due 2029 issued by NFE Financing pursuant to the 2029 New Notes Indenture;

"**2029 New Notes Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the holders of the 2029 New Notes under or in connection with the 2029 New Notes (in each

case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise);

"**2029 New Notes Indenture**" means the indenture entered into by, among others, NFE Financing, as issuer and Wilmington Savings Fund Society, FSB, as trustee and collateral agent, on 22 November 2024 (as amended, supplemented or otherwise modified from time to time);

"**2029 New Notes Trustee**" means Wilmington Savings Fund Society, FSB in its capacity as trustee and the collateral agent in respect of the 2029 New Notes;

"**2029 New Notes Trustee Advisors**" means Winston & Strawn LLP, and Taylor Wessing LLP, in each case as counsel to the 2029 New Notes Trustee;

"**Act**" means the Companies Act 2006 (as amended from time to time);

"**Ad Hoc Groups**" means, collectively, the Akin/Evercore AHG, the PW/PWP AHG and the Legacy Notes AHG;

"**Administrative Party**" has the meaning given to it in the Transaction Implementation Deed;

"**Advisor Released Person**" means each of the current and former respective officers, directors, employees, executives, attorneys and agents (or equivalents) of each Released Advisor and each Affiliate of each Released Advisor;

"**Advisors**" means, collectively, the Akin/Evercore AHG Advisors, the PW/PWP AHG Advisors, the RCF Advisors, the TLA Advisors, the TLB Advisors, the Legacy Notes Advisors, the Legacy Notes Trustee Advisors, 2029 New Notes Trustee Advisors, the RCF Agent, the TLB Agent, the TLA Agent, the New CoreCo Term Loan Facility Agent, the FLNG 2 Term Loan Agent, the Legacy Notes Trustee, the 2029 New Notes Trustee, and any additional advisors or consultants engaged by any of the Ad Hoc Groups and (in each case) any successor professional advisors to each of the foregoing, in each case as advisors in connection with the Restructuring;

"**Affiliate**" means, with respect to a person, any other person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such person and, for the purposes of this definition, "control" shall mean the power, direct or indirect, to (a) vote on more than 50 per cent. of the securities having ordinary voting power for the election of directors of such person, or (b) direct or cause the direction of the management and policies of such person whether by contract or otherwise;

"**Agreed Form**" means:

(a)     in respect of documents appended to the Explanatory Statement, the form so appended to the Explanatory Statement or as otherwise amended pursuant to (and in accordance with) this Restructuring Plan or the Transaction Implementation Deed;

(b)     in respect of any other Implementation Document, in the form agreed between the Plan Company and the Majority Plan Creditors; or

(c)    in respect of any document which is not an Implementation Document or otherwise appended to the Explanatory Statement but which is required herein or in the Transaction Implementation Deed to be in the Agreed Form, in the form agreed between the Plan Companies and the Majority Plan Creditors,

provided that, notwithstanding any provision of this definition of Agreed Form, any documents that are to be agreed between a Company Party and one or more Ad Hoc Groups or other creditor groups pursuant to the Restructuring Support Agreement shall be deemed to be in "Agreed Form" if such documents are in form and substance acceptable to such specified parties only, and, to the extent any Administrative Party is party to a document as administrative agent, in form and substance satisfactory to such Administrative Party;

"**Akin/Evercore AHG**" means the ad hoc group of certain unaffiliated holders of Term Loan B Debt represented by the Akin/Evercore AHG Advisors;

"**Akin/Evercore AHG Advisors**" means, collectively, Akin Gump Strauss Hauer & Feld LLP and Evercore Group L.L.C., and their Affiliates as counsel and financial advisor, respectively, to the Akin/Evercore AHG, as well as other regulatory, local, foreign, barristers and special counsel (in each case as notified to the Plan Company), in their respective capacities as counsel to the Akin/Evercore AHG;

"**Brazil Parent**" means NFE Brazil Investments LLC;

"**BrazilCo Plan**" means the restructuring plan proposed by NFE Brazil Newco in substantially the form attached to the Explanatory Statement (or appended to any supplemental explanatory statements made available to the CoreCo Plan Creditors prior to the Plan Meetings) or with, or subject to, any modification, addition or condition which the Court may think fit to approve or impose, as appropriate;

"**BrazilCo Plan Creditors**" means the 2029 New Noteholders;

"**Business Day**" means a day other than a Saturday, Sunday, or other day on which commercial banks are authorised to close under the laws of, or are in fact closed in, the State of New York, United States of America or in London, United Kingdom;

"**Closing Steps**" has the meaning given to it in Clause 5.1.2;

"**Company Party**" has the meaning given to it in the Transaction Implementation Deed;

"**Confirmation Deed**" means, in respect of a CoreCo Plan Creditor that has appointed one or more Nominees, a confirmation deed completed by such Nominee(s) and submitted to the Information Agent, in the form appended to the Plan Creditor Letter;

"**CoreCo Plan Claims**" means any (direct or indirect) claim of a CoreCo Plan Creditor in respect of any Liability of the Plan Company or any other Group Company, whether as principal obligor, guarantor, indemnifier or security provider, in relation to, or arising out of or in connection with, the Debt Documents or the CoreCo Plan Debt, arising on or before the Restructuring Effective Date, but

excluding any claim of a CoreCo Plan Creditor in respect of any Liability of the Plan Company or any other Group Company to any CoreCo Plan Creditor arising directly or indirectly in relation to, or arising out of or in connection with, a failure to comply with the terms of this Restructuring Plan, the Transaction Implementation Deed or any other Implementation Document;

"**CoreCo Plan Creditors**" means each of the Legacy Noteholders; the RCF Lenders; the TLB Lenders; the TLA Lenders; the Series I Lender; and the Series II Lender;

"**CoreCo Plan Debt**" means the 2026 Legacy Notes Debt, the 2029 Legacy Notes Debt, the R-1 Revolving Credit Facility Debt, the R-2 Revolving Credit Facility Debt, the Term Loan A Debt, the Term Loan B Debt, the Series I Loan Debt, and the Series II Loan Debt;

"**Court**" means the High Court of Justice of England and Wales and any appellate court in England and Wales having jurisdiction in connection with the Restructuring (including the Court of Appeal and the Supreme Court);

"**Debt Documents**" means the Term Loan A Agreement, Term Loan B Agreement, Revolving Credit Facility Agreement, Series I Loan Agreement, Series II Loan Agreement, the 2026 Legacy Notes Indenture, the 2029 Legacy Notes Indenture, the Finance Documents (as defined in or the equivalent of in each of these Debt Documents) and any related security and ancillary documents;

"**Deed of Undertaking**" means a deed of undertaking to the Plan Company in the form agreed by the parties thereto pursuant to which each of the parties thereto agrees to execute or procure to be executed all such documents, and to do or procure to be done all such acts and things as may be reasonably necessary or desirable to be done by it to implement the Restructuring as described in this Restructuring Plan and to be bound by and perform the terms of this Restructuring Plan and the Transaction Implementation Deed;

"**E-Mail Error Message**" means, with respect to an e-mail sent by one person to another under or in connection with this Restructuring Plan, an automatic error message received from an intended recipient (or the server by which such intended recipient is provided e-mail service) that:

(a)     such e-mail is undeliverable; or

(b)     there has been a failure to deliver such e-mail;

"**English Company Counsel**" means Daniel Bayfield KC, Ryan Perkins and Jon Colclough of South Square Chambers, instructed by the Group Legal Advisor to appear on behalf of the Plan Company before the Court in respect of the Restructuring Plan, or such other barrister as may be instructed by the Group Legal Advisor;

"**Excluded Liabilities**" means:

(a)     any Liability arising from criminal acts, fraud, gross negligence or wilful misconduct on the part of a Released Party, as determined by a judgment issued by a court of competent jurisdiction;

5

(b)    any Liability of any Released Advisor to its client arising under a duty of care which has been expressly assumed or acknowledged in writing by the relevant Advisor or which can only be excluded in accordance with applicable law and has not been so excluded, or which cannot be released, waived or excluded under applicable law;

(c)    any Liability of any accounting, restructuring or tax advisor of the Plan Company or any other member of the Group to the Released Parties or any other member of the Group and subject to the terms of any reliance letter, in relation to any report, memorandum or opinion provided by such advisor on which a Released Party is expressly entitled to rely pursuant to an executed reliance letter;

(d)    any Liability of the Plan Company or any other member of the Group with respect to any outstanding fees, costs and/or expenses properly incurred by any party's professional advisors (including the Advisors) in accordance with the terms of any such advisors' fee letters, engagement letters or other form of written agreement entered into by any member of the Group in connection with the Restructuring;

(e)    any Liabilities created by the Implementation Documents, the Restructuring Plan or any ancillary document thereto, including as a result of a failure by any party to comply with such documents;

(f)    any indemnity or reimbursement obligation owed (i) by a TLA Lender to the TLA Agent under the terms of Term Loan A Agreement, (ii) by a TLB Lender to the TLB Agent under the terms of the Term Loan B Agreement, or (iii) by a Revolving Facility Lender to the RCF Agent under the terms of the Revolving Credit Facility Agreement;

(g)    in the case of a Group Company: (i) any Liability of any director of such Group Company that would otherwise attach to that director in connection with any negligence, default, breach of duty or breach of trust, or that would be available upon the insolvency of such Group Company; and (ii) any Liability of a Group Advisor (solely in its capacity as advisor to such Group Company) that would otherwise attach to such Group Advisor in connection with any negligence, default, breach of duty or breach of trust, or that would be available upon the insolvency of such Group Company; and

(h)    any Liability of one Group Company to another Group Company that is expressly not released under the terms of the Separation Agreement or any other Implementation Document, which in each case, shall be solely governed by the terms and conditions thereunder;

"**Existing Obligor**" means each obligor under the Debt Documents from time to time;

"**Explanatory Statement**" means the explanatory statement dated 15 May 2026 relating to and issued by the Plan Company and NFE Brazil Newco in connection with this Restructuring Plan and the BrazilCo Plan pursuant to section 901D of the Act;

"**Group**" means NFE Inc. and its Subsidiaries (including the Plan Company) from time to time, with each being a "**Group Company**";

"**Group Advisor**" means:

(a)    the Group Legal Advisor;

(b)    English Company Counsel;

(c)    Houlihan Lokey Capital, Inc. and Alvarez & Marsal Europe LLP, as financial advisors to the Plan Company and the Group;

(d)    any local or specialist counsel engaged by any of the foregoing; and

(e)    any successors to the foregoing;

"**Group Legal Advisor**" means Skadden, Arps, Slate, Meagher & Flom LLP and its affiliates, as legal counsel to the Group, or any successor legal counsel to the Group, in respect of the Plans;

"**Holding Period Trust**" has the meaning given to it in the Holding Period Trust Deed;

"**Holding Period Trust Deed**" has the meaning given to it in the Transaction Implementation Deed;

"**Implementation Documents**" has the meaning given to it in the Transaction Implementation Deed;

"**Indebtedness**" has the meaning given to it in the Transaction Implementation Deed;

"**Information Agent**" means Kroll Issuer Services Limited in its capacity as information agent in connection with the Plans (and any successor information agent);

"**Legacy Noteholders**" means the 2026 Legacy Noteholders and the 2029 Legacy Noteholders;

"**Legacy Notes**" means the 2026 Legacy Notes and the 2029 Legacy Notes.

"**Legacy Notes Advisors**" means Paul Hastings LLP, as counsel to the Legacy Notes AHG;

"**Legacy Notes AHG**" means the ad hoc group of certain unaffiliated holders of Legacy Notes represented by Paul Hastings LLP as counsel;

"**Legacy Notes Trustee**" means U.S. Bank Trust Company, National Association in its capacity as trustee and the collateral agent in respect of the 2026 Legacy Notes and the 2029 Legacy Notes;

"**Legacy Notes Trustee Advisors**" means Greenberg Traurig, LLP, and Thompson Hine LLP, in each case as counsel to the Legacy Notes Trustee;

7

"**Liability**" means any present or future payment and discharge obligation, liability, claim, debt, claims for specific performance, damages or restitution, counterclaims, suits, rights of action, or rights whatsoever or howsoever arising, including, without limitation, for the payment of money or the performance of an act or obligation (whether deliberate or otherwise) or any failure to perform any obligation or any omission, whether for negligence, breach of duty, breach of trust or misrepresentation or otherwise, whether in respect of principal, interest or otherwise, whether actual or contingent, whether fixed or undetermined, whether admitted or disputed, whether known or unknown, whether owed jointly or severally and whether owed as principal, surety or in any capacity whatsoever and whether it arises at common law, in equity or by statute, in England and Wales or in any other jurisdiction under whatever applicable law, under any legal theory, and in any manner whatsoever, and "**Liabilities**" shall be construed accordingly;

"**Majority Akin/Evercore AHG Members**" means, as of any relevant time, members of the Akin/Evercore AHG that are Supporting Creditors holding, in the aggregate, greater than 50.0% of the aggregate outstanding principal amount of Term Loan B Debt then held by the members of the Akin/Evercore AHG that are Supporting Creditors;

"**Majority Legacy Notes Supporting Creditors**" means, as of any relevant time, members of the Legacy Notes AHG that are Supporting Creditors holding, in the aggregate, greater than 50.0% of the aggregate outstanding principal amount of the Legacy Notes then held by the members of the Legacy Notes AHG that are Supporting Creditors;

"**Majority Plan Creditors**" means, collectively, as of any relevant time, (i) the Majority Akin/Evercore AHG Members, (ii) the Majority PW/PWP AHG Members, (iii) the Majority RCF Supporting Creditors, (iv) solely with respect to any matter that (x) materially and adversely alters (1) the treatment of the 2026 Legacy Notes Debt or the 2029 Legacy Notes Debt, as applicable, under the Restructuring or (2) the rights or obligations of the Supporting Creditors who hold 2026 Legacy Notes Debt or 2029 Legacy Notes Debt, as applicable, under this Restructuring Plan, or (y) disproportionately alters the allocation of consideration to the holders of the 2026 Legacy Notes Debt or the 2029 Legacy Notes Debt as set forth on the Exchange Consideration Chart attached to the Restructuring Term Sheet, whether by decreasing the consideration allocated to holders of 2026 Legacy Notes Debt or the 2029 Legacy Notes Debt or increasing (including in the form of additional fees) the consideration allocated to holders of other Indebtedness, the Majority Legacy Notes Supporting Creditors and (v) solely with respect to any matter that (x) materially and adversely alters (1) the treatment of the Term Loan A Debt under the Restructuring or (2) the rights or obligations of the holders of Supporting Term Loan A Debt under this Restructuring Plan, or (y) disproportionately alters the allocation of consideration to the holders of the Term Loan A Debt as set forth on the Exchange Consideration Chart attached to the Restructuring Term Sheet, whether by decreasing the consideration allocated to holders of Term Loan A Debt or increasing (including in the form of additional fees) the consideration allocated to holders of other Indebtedness, the Majority TLA Supporting Creditors;

"**Majority Plan Creditors' Advisors**" means the Akin/Evercore AHG Advisors, the PW/PWP AHG Advisors and the RCF Advisors on behalf of, respectively, the Majority Akin/Evercore AHG Members, the Majority PW/PWP AHG Members

8

and the Majority RCF Supporting Creditors and, to the extent required, the TLA Advisors on behalf of the Majority TLA Supporting Creditors and the Legacy Notes Advisors on behalf of the Majority Legacy Notes Supporting Creditors;

"**Majority PW/PWP AHG Members**" means, as of any relevant time, members of the PW/PWP AHG that are Supporting Creditors holding, in the aggregate, greater than 50.0% of the aggregate outstanding principal amount of 2029 New Notes Debt then held by the members of the PW/PWP AHG that are Supporting Creditors;

"**Majority RCF Supporting Creditors**" means, as of any relevant time, holders of Revolving Credit Facility Debt that are Supporting Creditors holding, in the aggregate, greater than 50.0% of the aggregate outstanding principal amount of Revolving Credit Facility Debt then held by holders of Revolving Credit Facility Debt that are Supporting Creditors;

"**Majority TLA Supporting Creditors**" means, as of any relevant time, holders of Term Loan A Debt that are Supporting Creditors holding, in the aggregate, greater than 50.0% of the aggregate outstanding principal amount of Term Loan A Debt then held by such holders of Term Loan A Debt that are Supporting Creditors;

"**NFE Brazil Newco**" means NFE Brazil Newco Limited, a private company limited by shares incorporated in England and Wales;

"**NFE Financing**" means NFE Financing LLC, a Delaware limited liability company;

"**NFE Inc**." means New Fortress Energy Inc., a Delaware corporation;

"**Nominee**" means in respect of a CoreCo Plan Creditor, one or more persons or entities nominated by that CoreCo Plan Creditor pursuant to the Plan Creditor Letter to receive all or any part of the Plan Consideration on its behalf;

"**Notice**" means any notice or other written communication to be given under or in relation to the Restructuring Plan;

"**Notice Records**" means the names and addresses (including email addresses) contained in the Plan Company's records for a CoreCo Plan Creditor at 5:00 p.m. (London time) two Business Days before the date of a relevant Notice;

"**Plan Company**" has the meaning given to it in the Parties section.

"**Plan Consideration**" means the consideration to be received by each CoreCo Plan Creditor pursuant to this Restructuring Plan and in accordance with the Transaction Implementation Deed;

"**Plan Creditor Letter**" means a plan creditor letter, to be submitted online via the Plan Website to the Information Agent, in the form appended to the Explanatory Statement with such minor or technical amendments as the Court may approve;

"**Plan Creditors**" means, collectively, the BrazilCo Plan Creditors and the CoreCo Plan Creditors;

"**Plan Effective Date**" has the meaning given to that term in Clause 2.2;

"**Plan Meeting**" means a meeting of a class of CoreCo Plan Creditors convened in accordance with the permission of the Court pursuant to section 901C of the Act to consider and, if thought fit, approve this Restructuring Plan, including any adjournment thereof;

"**Plan Party**" or "**Party**" means the Plan Company, each CoreCo Plan Creditor and each Undertaking Party, and "**Plan Parties**" and "**Parties**" shall be construed accordingly;

"**Plan Sanction Order**" means the order or orders of the Court sanctioning the Restructuring Plan;

"**Plan Website**" means the website at https://deals.is.kroll.com/nfe;

"**Plans**" means, collectively, this Restructuring Plan and the BrazilCo Plan;

"**Proceedings**" means any process, action or other legal proceedings (including, without limitation, any demand, arbitration, alternative dispute resolution, judicial review, adjudication, execution, seizure, distraint, forfeiture, re-entry lien, enforcement of judgment or enforcement of any security), whether arising in connection with the Restructuring or otherwise;

"**PW/PWP AHG**" means the ad hoc group of certain unaffiliated 2029 New Noteholders represented by the PW/PWP AHG Advisors;

"**PW/PWP AHG Advisors**" means, collectively, Paul, Weiss, Rifkind, Wharton & Garrison LLP and Perella Weinberg Partners LP, as counsel and financial advisor, respectively, to the PW/PWP AHG, as well as other regulatory, tax, local, foreign, barristers (including Stephen Robins KC) and special counsel (in each case as notified to the Plan Company), in their respective capacities as counsel to the PW/PWP AHG;

"**R-1 Revolving Credit Facility**" means the facility drawn at approximately US$100 million as of the date of this Restructuring Plan under the Revolving Credit Facility Agreement;

"**R-1 Revolving Credit Facility Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to any agent, any issuing bank, any lender or any lender counterparty of the R-1 Revolving Credit Facility under or in connection with the R-1 Revolving Credit Facility (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise);

"**R-2 Revolving Credit Facility**" means the facility drawn at approximately US$560 million as of the date of this Restructuring Plan under the Revolving Credit Facility Agreement;

"**R-2 Revolving Credit Facility Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to any agent, any issuing bank, any lender or any lender counterparty of the R-2

10

Revolving Credit Facility under or in connection with the R-2 Revolving Credit Facility (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise);

"**RCF Advisors**" means Sidley Austin LLP, as counsel (together with any external counsel instructed by them in relation to the Restructuring Plan (including Felicity Toube KC and Matthew Abraham of South Square Chambers)) and FTI Consulting, Inc. and Moelis & Company as financial advisors, to the agent under the Revolving Credit Facility Agreement and each of their Affiliates and any other advisors retained by any of the foregoing in connection with the Restructuring in accordance with the Revolving Credit Facility Agreement;

"**RCF Agent**" means MUFG Bank, LTD, in its capacity as the administrative agent and as the collateral agent under the terms of the Revolving Credit Facility Agreement, or any successor thereof;

"**RCF Lenders**" means the lenders of record under the Revolving Credit Facility Agreement;

"**Record Date**" means the date on which the CoreCo Plan Creditors' entitlement to vote on this Restructuring Plan and the value of their CoreCo Plan Claims will be assessed, being 10 June 2026;

"**Released Advisors**" means:

(a)     the Group Legal Advisor;

(b)     English Company Counsel;

(c)     Houlihan Lokey Capital, Inc. and Alvarez & Marsal Europe LLP, as financial advisors to the Plan Company and the Group;

(d)     the Advisors;

(e)     any local or specialist counsel engaged by any of the foregoing; and

(f)     any successors to the foregoing;

"**Released Parties**" means, each in their various respective capacities as such in connection with the Restructuring and the Restructuring Plan:

(a)     the Plan Company;

(b)     each Group Company;

(c)     each Undertaking Party;

(d)     each Plan Creditor and each Nominee (as applicable);

(e)     each: (i) Released Advisor; (ii) Advisor Released Person; and (iii) any person acting on the instructions of, or providing services to, any of the foregoing in connection with the Restructuring Plan or the Restructuring;

11

(f)     each Affiliate of the persons listed at (a) to (e) above; and

(g)     each of the respective officers, directors, employees, partners, executives and agents (or equivalents) of the persons listed in (a) to (f) above (each, a "**Representative**");

"**Restructuring**" has the meaning given to it in the Transaction Implementation Deed;

"**Restructuring Effective Date**" has the meaning given to it in the Transaction Implementation Deed;

"**Restructuring Long-Stop Time**" has the meaning given to it in the Transaction Implementation Deed;

"**Restructuring Plan**" means this restructuring plan proposed by the Plan Company under Part 26A of the Act (including the compromise and arrangement pursuant thereto) in the present form as set out herein or with, or subject to, any modification, addition or condition which the Court may think fit to approve or impose, as appropriate, provided any such modification, addition or condition is approved by the Majority Plan Creditors to the extent required pursuant to Clause 6 (*Modifications of this Restructuring Plan*) herein;

"**Restructuring Support Agreement**" means the Restructuring Support Agreement dated 17 March 2026 originally entered into between, among others, NFE Inc., the Plan Company and the Supporting Creditors (as defined therein) and acceded to by NFE Brazil Newco on 9 April 2026 and as amended, supplemented and/or restated from time to time;

"**Restructuring Term Sheet**" means the term sheet relating to the Restructuring appended to the Restructuring Support Agreement;

"**Revolving Credit Facility Agreement**" means the Credit Agreement, dated as of 15 April 2021, by and among NFE Inc., the guarantors from time to time party thereto, the lenders and issuing banks from time to time party thereto, and MUFG Bank Ltd., as administrative agent and collateral agent (as amended, supplemented or otherwise modified from time to time);

"**Revolving Credit Facility Debt**" means the R-1 Revolving Credit Facility Debt and the R-2 Revolving Credit Facility Debt;

"**Revolving Facility Lenders**" means the lenders of record under the Revolving Credit Facility Agreement;

"**Separation Agreement**" has the meaning given to it in the Transaction Implementation Deed;

"**Series I Lender**" means the lender under the Series I Loan Agreement;

"**Series I Loan**" means the loan made under the Series I Loan Agreement;

"**Series I Loan Agreement**" means the senior secured credit agreement entered into between, among others, the Brazil Parent as lender and NFE Inc. as borrower on 22 November 2024;

"**Series I Loan Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the lenders of the Series I Loan under or in connection with the Series I Loan Agreement (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise);

"**Series II Lender**" means the lender under the Series II Loan Agreement;

"**Series II Loan**" means the loan made under the Series II Loan Agreement;

"**Series II Loan Agreement**" means the senior secured credit agreement entered into between, among others, NFE Financing as lender and NFE Inc. as borrower on 6 December 2024;

"**Series II Loan Debt**" means present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the lenders of the Series II Loan under or in connection with the Series II Loan Agreement (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise);

"**Subsidiary**" means, in respect of an entity, any entity in respect of which it has direct or indirect control or owns directly or indirectly more than 50% of the voting rights, voting capital or similar rights of ownership, and "control" for this purpose means the power to direct the management and the policies of the entity whether through the ownership of voting capital, by contract or otherwise;

"**Supporting Creditor**" has the meaning given to it in the Transaction Implementation Deed;

"**Supporting Term Loan A Debt**" has the meaning given to it in the Restructuring Support Agreement;

"**Term Loan A**" means the loans and other extensions of credit made under the Term Loan A Agreement;

"**Term Loan A Agreement**" means the credit agreement entered into between, among others, NFE Inc., the TLA Agent and the lenders from time to time party thereto on 19 July 2024, as amended from time to time;

"**Term Loan A Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the lenders of the Term Loan A under or in connection with the Term Loan A Agreement (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise);

"**Term Loan B**" means the loans and other extensions of credit made under the Term Loan B Agreement;

13

"**Term Loan B Agreement**" means the credit agreement entered into between, among others, NFE Inc., the TLB Agent, and the lenders from time to time party thereto on 30 October 2023, as amended from time to time;

"**Term Loan B Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the lenders of the Term Loan B under or in connection with the Term Loan B Agreement (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise);

"**TLA Advisors**" means Seward & Kissel LLP, as counsel to the TLA Agent under the Term Loan A Agreement;

"**TLA Agent**" means Wilmington Trust, National Association, in its capacity as administrative agent and collateral agent under the Term Loan A Agreement, or any successor thereof;

"**TLA Lenders**" means the lenders of record under the Term Loan A Agreement;

"**TLB Advisors**" means Seward & Kissel LLP, as counsel to the TLB Agent under the Term Loan B Agreement;

"**TLB Agent**" means Wilmington Trust, National Association, in its capacity as administrative agent and collateral agent under the Term Loan B Agreement, or any successor thereof;

"**TLB Lenders**" means the lenders of record under the Term Loan B Agreement;

"**Transaction Implementation Deed**" means the transaction implementation deed to be entered into on (or around) the Plan Effective Date between, among others, the Plan Company, NFE Brazil Newco, the CoreCo Plan Creditors and the creditors of NFE Brazil Newco subject to the BrazilCo Plan, in Agreed Form; and

"**Undertaking Party**" means each of the entities listed in Schedule 1.

## 1.2   Interpretation

1.2.1   In this Restructuring Plan, unless the context otherwise requires or as otherwise expressly provided:

(a) references to Clauses and Schedules are references to the Clauses of, and Schedules to, the Restructuring Plan and a reference to this "Restructuring Plan" includes a reference to each of the Schedules to this Restructuring Plan;

(b) references to a statute or statutory provision include the same as subsequently modified, amended, supplemented or re-enacted from time to time;

(c) references to the Information Agent, the Plan Company, a CoreCo Plan Creditor, an Undertaking Party, or any other person shall be construed so as to include its and any subsequent successors in title, permitted assigns and permitted transferees;

(d) where references to any actions, provisions or terms are stated as requiring the consent of the Majority Plan Creditors, such consent shall be deemed to be granted

14

if it has been provided in writing (including by e-mail) by the Majority Plan Creditors' Advisors;

(e)    references to a person include references to an individual, firm, partnership, company, corporation, unincorporated body of persons or any state or state agency;

(f)    references to an agreement, deed or document will be deemed also to refer to such agreement, deed or document as amended, supplemented, restated, varied, verified, replaced and/or novated (in whole or in part) from time to time and to any agreement, deed or document executed pursuant thereto, provided that such amendment, supplement, restatement, variation, verification, replacement and/or novation has, to the extent it relates to an Implementation Document or this Restructuring Plan, been made in accordance with the terms of this Restructuring Plan, the Transaction Implementation Deed or otherwise the terms of such Implementation Document;

(g)    references to an agreement, deed or document shall include any schedules, annexes and appendices to such agreement, deed or document;

(h)    references to (or to any specified provision of) the Restructuring Plan shall be construed as references to the Restructuring Plan as in force for the time being;

(i)    references to a CoreCo Plan Creditor shall be references to a CoreCo Plan Creditor in its capacity as a CoreCo Plan Creditor and an obligation or Liability of a CoreCo Plan Creditor shall apply to its successors, transferees and assigns (as applicable);

(j)    the singular includes the plural and vice versa and words importing one gender shall include all genders;

(k)    headings to Clauses are for ease of reference only and shall not affect the interpretation of the Restructuring Plan;

(l)    unless otherwise stated, all references in the Restructuring Plan to dates and times are to the date and time prevailing in London, United Kingdom;

(m) "including" or "include" shall be deemed to mean including or include without limitation;

(n)    "or" is not exclusive;

(o)    general words introduced by the word "other" shall not be given a restrictive meaning by reason of the fact that they are preceded by words indicating a particular class of acts, matters or things and general words shall not be given a restrictive meaning by reason of the fact that they are followed by particular examples intended to be embraced by the general words; and

(p)    "**US$**" denotes the lawful currency of the United States of America.

**2    APPLICATION AND EFFECTIVENESS OF THE RESTRUCTURING PLAN**

2.1    As soon as reasonably practicable following, and in any event within two Business Days of, the granting of the Plan Sanction Order (or such later date as agreed between the Plan Company and the Majority Plan Creditors' Advisors, each acting reasonably), the Plan

15

Company shall deliver a certified copy of the Plan Sanction Order to the Registrar of Companies in England and Wales for registration in accordance with section 901F of the Act.

**2.2** Unless otherwise stated and subject to Clause 8.1, the Restructuring Plan shall become effective and legally binding on the Plan Company and each of the CoreCo Plan Creditors in accordance with its terms on and from the date certified copies of the Plan Sanction Order and the order or orders of the Court sanctioning the BrazilCo Plan are delivered to the Registrar of Companies for registration (the "**Plan Effective Date**").

**2.3** The compromises and arrangements effected by the Restructuring Plan will bind:

**2.3.1** all CoreCo Plan Creditors and all of their respective rights, title and interests to CoreCo Plan Claims and, in each case, their respective permitted successors and assigns;

**2.3.2** the Plan Company and its respective permitted successors and assigns;

**2.3.3** subject to the terms of the applicable Deed of Undertaking, each Undertaking Party and its respective permitted successors and assigns; and

**2.3.4** each other person that has undertaken to be bound by the terms of this Restructuring Plan and their respective permitted successors and assigns.

**2.4** The Plan Company shall notify the Information Agent in accordance with Clause 10 (*Notice*) as soon as reasonably practicable following the occurrence of the Plan Effective Date, and the Information Agent shall make such notice available on the Plan Website.

**3** **GRANT OF AUTHORITY TO EXECUTE THE IMPLEMENTATION DOCUMENTS**

**3.1** **Plan Company's Authority to Execute and Give Effect to the Implementation Documents**

**3.1.1** Subject to the terms of this Clause 3 and Clause 8 (*Termination*) below, with effect on and from the Plan Effective Date, in consideration of the rights and benefits conferred on the CoreCo Plan Creditors under this Restructuring Plan and solely for the purpose of giving effect to the terms of this Restructuring Plan (and the transactions contemplated by it), notwithstanding any term of any other agreement, instrument or arrangement whatsoever (other than the Implementation Documents), each CoreCo Plan Creditor and, if applicable, each Nominee, hereby irrevocably appoints the Plan Company as its true and lawful attorney and agent, acting by any director, officer, employee or other duly authorised representative, for and on its behalf and in its name, and irrevocably authorises, directs, empowers and instructs the Plan Company, to:

(a) enter into, execute and deliver as a deed, on behalf of each CoreCo Plan Creditor in its capacity as a CoreCo Plan Creditor, the Transaction Implementation Deed, such that each CoreCo Plan Creditor will become a party to and be bound by the Transaction Implementation Deed;

(b) enter into, sign, execute, notarise, acknowledge, release, deliver (whether as a deed or otherwise) and, where applicable, file each Implementation Document to which

16

such CoreCo Plan Creditor is expressed to be a party, such that such CoreCo Plan Creditor shall be a party to and bound by each such document as if it had executed it personally, in each case in its capacity as CoreCo Plan Creditor;

(c)    enter into, sign, execute and deliver all deeds, agreements, instruments, certificates, confirmations, notices, elections, transfers, assignments, releases, directions, instructions and filings (including security, guarantee, escrow, perfection and regulatory filings) which are scheduled to, contemplated by, or expressly referred to in, or reasonably required to implement or give effect to this Restructuring Plan or any Implementation Document to which such CoreCo Plan Creditor is expressed to be a party;

(d)    agree, consent to and effect, on behalf of such CoreCo Plan Creditor, any amendment, waiver, modification or supplement to any Implementation Document or ancillary document (to which such CoreCo Plan Creditor is expressed to be a party) which the Plan Company considers necessary or reasonably desirable in connection with the Restructuring provided that any such amendment, modification or supplement is made in accordance with Clause 6 (*Modifications of this Restructuring Plan*);

(e)    give all notices, confirmations, directions and instructions to any trustee, agent, paying agent, information agent, clearing system, registrar, custodian or Administrative Party as may be required or desirable to give effect to this Restructuring Plan and the Implementation Documents;

(f)    execute and deliver any release, discharge or waiver required to implement the releases and compromises and extinguishment of claims contemplated by this Restructuring Plan and grant the releases under and in accordance with the Transaction Implementation Deed;

(g)    take any step, make any determination and do any act which the Plan Company considers necessary to carry out, enforce or consummate this Restructuring Plan and the transactions contemplated by it, including actions required under the laws of any jurisdiction (acting reasonably and, with respect to any step, determination or action not contemplated by the Transaction Implementation Deed, with the consent of the Majority Plan Creditors (unless such step, determination or action is required by applicable law, in which case no such consent shall be required but if permitted, the Plan Company shall provide written notice of any such step, determination or action being undertaken to the CoreCo Plan Creditors)), provided that such related or ancillary actions do not change any right or obligation of, or impose an additional obligation (by reference to such rights or obligations as are contemplated as at the Plan Effective Date) on, a CoreCo Plan Creditor and do not adversely affect any CoreCo Plan Creditor;

(h)    grant powers of attorney or authorities (under English law or any other applicable law) with equivalent or lesser scope to the power of attorney granted by this Clause 3 to any person selected by the Plan Company for the purposes of implementing the documents and steps set out in this Clause 3.1.1; and

(i)    do all such other related or ancillary acts and things as the Plan Company considers (acting reasonably and, with respect to any action not contemplated by the Transaction Implementation Deed, with the consent of the Majority Plan Creditors) to be reasonably necessary or desirable to the full and timely implementation of this

17

Restructuring Plan and the transactions contemplated by it, provided that such other acts or things do not change any right or obligation of, or impose an additional obligation (by reference to such rights or obligations as are contemplated as at the Plan Effective Date) on, a CoreCo Plan Creditor and do not adversely affect any CoreCo Plan Creditor.

3.2    Subject to the terms of this Clause 3 and Clause 8 (*Termination*) below, the authority and power of attorney granted pursuant to this Clause 3 is irrevocable, being granted for valuable consideration and to secure the performance of obligations under this Restructuring Plan.

3.3    Each CoreCo Plan Creditor waives any right to revoke or terminate such authority except as expressly provided in this Restructuring Plan.

3.4    Each CoreCo Plan Creditor and, pursuant to the applicable Confirmation Deed, each respective Nominee (as applicable) irrevocably agrees that it shall be bound by, and shall comply with, each Implementation Document and any ancillary document to which such CoreCo Plan Creditor or Nominee is a party (as if it were an original executing party) after such document has been fully executed, dated, released and delivered by the Plan Company on its behalf pursuant to, and in accordance with, this Clause 3 and the Transaction Implementation Deed.

3.5    The authority granted pursuant to this Clause 3 shall:

3.5.1    continue until the earlier of (i) Restructuring Effective Date or (ii) such other termination date as expressly provided in this Restructuring Plan, at which time it shall automatically expire; and

3.5.2    automatically lapse in respect of any Implementation Document or ancillary document once that document has been fully executed, released and delivered, whereupon it may thereafter be amended only in accordance with its terms.

3.6    Nothing in this Clause 3 authorises or permits the Plan Company to commence any Proceedings in the name of, or on behalf of, any CoreCo Plan Creditor.

3.7    Promptly following any amendments, modification or variations being made to any Implementation Document pursuant to this Clause 3, the Plan Company shall procure that such Implementation Document (as amended, modified or varied) is promptly made available to the CoreCo Plan Creditors and each relevant Undertaking Party via the Plan Website and in accordance with the notice provisions of the applicable Deed of Undertaking (if any).

3.8    **Administrative Parties' Authority**

3.8.1    Subject to the terms of any Deed of Undertaking or applicable Implementation Document, with effect on and from the Plan Effective Date, each of the CoreCo Plan Creditors hereby irrevocably authorises and instructs each applicable Administrative Party, as their agent and attorney (acting by any one of their duly appointed representatives) to:

(a)    enter into, execute, deliver and perform (whether as a deed or otherwise) each Implementation Document to which such Administrative Party is expressed to be a party, provided that such Implementation Documents (other than the Transaction

18

Implementation Deed) shall only become effective in accordance with their respective terms and as provided in the Transaction Implementation Deed and this Restructuring Plan, whereupon they shall become binding on all parties thereto;

(b) take all steps and do all other things as may be necessary or reasonably desirable to give effect to or implement the Restructuring, this Restructuring Plan and the transactions contemplated by it, including entering into, executing and delivering all such documents as the Plan Company reasonably requests or the relevant Administrative Party considers reasonably necessary or desirable for such purpose, and taking any step expressed in this Restructuring Plan or any Implementation Document to be taken by such Administrative Party;

(c) act and rely, without further verification, on any written instruction from the Plan Company (acting on behalf of the CoreCo Plan Creditors pursuant to Clause 3.1) to take any action referred to in this Clause 3.8 or otherwise under this Restructuring Plan, and be entitled to assume that any such instruction complies with the terms of this Restructuring Plan and the Implementation Documents;

(d) give all such instructions, consents or confirmations to any trustee, agent, security agent, paying agent, registrar, clearing system or other Administrative Party as are reasonably requested by the Plan Company (in accordance with the authority granted to it under this Restructuring Plan, where applicable), and any other directions that may reasonably be requested by the Plan Company (in accordance with the authority granted to it under this Restructuring Plan, where applicable), for the purposes of implementing any step contemplated by the Restructuring or this Restructuring Plan; and

(e) take each step under this Restructuring Plan or any Implementation Document expressed to be taken by the relevant Administrative Party, including the giving, execution, delivery and performance of any obligations, consents, confirmations, acknowledgements, agreements, waivers or authorizations, in each case as reasonably requested by the Plan Company (in accordance with the authority granted to it under this Restructuring Plan, where applicable) for the purposes of implementing this Restructuring Plan and subject to applicable law and the terms of the relevant Implementation Documents, and

each CoreCo Plan Creditor acknowledges and irrevocably confirms, authorizes, directs, and ratifies any such action taken by any Administrative Party on or prior to the Plan Effective Date, and in each case provided that each Administrative Party shall have all of the protections, immunities, rights, powers, authorities, indemnities, exculpations, exclusions or limitations of liability and/or benefits conferred on it under and by the applicable Debt Documents governing its appointment and, upon such document's effectiveness and in respect of actions taken after the effectiveness thereof, the Implementation Documents.

3.8.2   No Administrative Party shall have any Liability to the Plan Company, any CoreCo Plan Creditor or any of their respective Affiliates for any action taken, document executed or reliance placed on any instruction given to it in accordance with Clause 3.8.1 above, except to the extent arising from its fraud, gross negligence or willful misconduct as determined by a final non-appealable judgment issued by a court of competent jurisdiction.

**3.8.3**    In complying with any authorisations, instructions or requests pursuant to this Clause 3.8, each Administrative Party:

(a)    shall be entitled to assume that any instructions received by it pursuant to this Restructuring Plan have been duly given in accordance with its terms and the relevant Debt Documents or Implementation Documents;

(b)    shall be entitled to assume that, unless it has received notice to the contrary, such instructions have not been revoked;

(c)    shall not be obliged to do or omit to do anything if it would, or might in its reasonable opinion, constitute a breach of any applicable law, regulation or contractual obligation or any duty binding upon it;

(d)    shall have only those duties, obligations and responsibilities as are expressly specified in this Restructuring Plan and the Implementation Documents to which it is a party (and no others shall be implied), and such duties shall be of a mechanical and administrative nature;

(e)    shall not be responsible for the legality, validity, effectiveness, adequacy or enforceability of any Implementation Document or any transaction contemplated by this Restructuring Plan; and

(f)    shall not be liable (other than in the case of fraud, gross negligence or willful misconduct on the part of such Administrative Party as determined by a final non-appealable judgment issued by a court of competent jurisdiction) for any loss, Liability or damage, or any failure or delay in the performance of its obligations, arising out of or in connection with:

(i)    any action taken or omitted to be taken in accordance with instructions received pursuant to this Restructuring Plan;

(ii)    the exercise or non-exercise of any right, power, authority or discretion conferred on it; or

(iii)    any event or circumstance beyond its reasonable control, including (without limitation) governmental action, market disruption, failure of systems or communications, natural events or industrial action.

**3.9**    The authorities, appointments and instructions granted in Clauses 3.1 and 3.8 shall be treated, for all purposes whatsoever and without limitation, as having been granted by deed.

## 4    DEEDS OF UNDERTAKING

**4.1**    Subject to Clause 8 (*Termination*) and the terms of the Deeds of Undertaking executed by them, each of the Undertaking Parties severally undertakes, with effect on and from the Plan Effective Date: (i) to be bound by, and to comply with, and to perform, the obligations expressed to apply to it in this Restructuring Plan and the Undertakings (as defined therein) set out in its Deed of Undertaking, and (ii) to take all steps and execute all such documents as may be necessary or reasonably desirable for the purpose of giving effect to this Restructuring Plan, including executing and delivering (through power of attorney appointed under the Deed of Undertaking or otherwise) the Implementation Documents to which they will be a party and the documentary conditions precedent (if any) applicable to

20

them. Each CoreCo Plan Creditor (in respect of the applicable Administrative Parties who are Undertaking Parties only) and the Plan Company ratifies the execution by each Undertaking Party of its Deed of Undertaking and the taking of any actions by such Undertaking Party pursuant to this Clause 4.1.

## 5   CLOSING STEPS AND PLAN CONSIDERATION

### 5.1   Closing Steps

**5.1.1**   As soon as reasonably practicable following the Plan Effective Date, the Plan Company shall execute the Transaction Implementation Deed for and on behalf of itself, the applicable Undertaking Parties as attorney for such Undertaking Parties in accordance with their Deeds of Undertaking, and, in accordance with Clause 3 (*Grant of Authority to Execute the Implementation Documents*), on behalf of the CoreCo Plan Creditors.

**5.1.2**   The steps to be taken to implement the Restructuring and the transactions contemplated in the Plans (the "**Closing Steps**") shall take place in accordance with, and in the order and at the times specified in, the terms of the Transaction Implementation Deed.

**5.1.3**   The applicable Implementation Documents shall be signed, dated and released in accordance with the Transaction Implementation Deed.

### 5.2   Plan Consideration

**5.2.1**   The CoreCo Plan Creditors acknowledge and agree that the CoreCo Plan Creditors shall:

(a)   receive their Plan Consideration in accordance with the terms set out in the Transaction Implementation Deed; and

(b)   give the authorities, instructions, undertakings, releases, ratifications, and waivers in favour of the Plan Company and the Released Parties, where applicable, in consideration of the rights provided to each CoreCo Plan Creditor under this Restructuring Plan and the Transaction Implementation Deed.

**5.2.2**   The Plan Consideration of the CoreCo Plan Creditors shall be calculated and paid (or issued, as applicable) in accordance with the Transaction Implementation Deed, including that a CoreCo Plan Creditor may receive Plan Consideration via the Holding Period Trust if necessary and in accordance with the terms of the Holding Period Trust Deed, and shall include the following Plan Consideration Instruments (each as defined in the Transaction Implementation Deed):

| CoreCo Plan Debt | Plan Consideration Instruments |
| --- | --- |
| 2026 Legacy Notes Debt | CoreCo Common Stock |
| 2029 Legacy Notes Debt | CoreCo Preferred Stock |
| Series I Loan Debt | CoreCo Common Stock |
| Series II Loan Debt | CoreCo Preferred Stock |

| CoreCo Plan Debt | Plan Consideration Instruments |
|---|---|
| R-1 Revolving Credit Facility Debt | CoreCo Common Stock<br>CoreCo Preferred Stock<br>New CoreCo Term Loans<br>FLNG 2 Term Loans<br>FLNG 2 Preferred Equity |
| R-2 Revolving Credit Facility Debt | CoreCo Common Stock<br>CoreCo Preferred Stock<br>New CoreCo Term Loans<br>FLNG 2 Term Loans<br>FLNG 2 Preferred Equity<br>RCF-2 / TLA BrazilCo Equity Pool |
| Term Loan A Debt | CoreCo Common Stock<br>CoreCo Preferred Stock<br>New CoreCo Term Loans<br>FLNG 2 Term Loans<br>FLNG 2 Preferred Equity<br>RCF-2 / TLA BrazilCo Equity Pool |
| Term Loan B Debt | CoreCo Common Stock<br>CoreCo Preferred Stock<br>New CoreCo Term Loans<br>FLNG 2 Term Loans<br>FLNG 2 Preferred Equity |

## 5.3   Standstill

5.3.1   On and from the Plan Effective Date until the Restructuring Effective Date, or if earlier, until the termination of this Restructuring Plan in accordance with Clause 8 (*Termination*), each CoreCo Plan Creditor shall not (and no person or entity shall be entitled to, on behalf of such CoreCo Plan Creditor), in any jurisdiction:

(a)   exercise or seek to exercise any rights, remedies, powers or discretions (including any right to accelerate, enforce any guarantee or make any demand in respect of any Liability) under or in connection with the Debt Documents, or instruct or direct any other person to do so;

(b)   commence, continue or take any step in relation to any legal, judicial, administrative, arbitral or other proceedings against the Plan Company or any other Existing Obligor or their respective assets or proceeds thereof (including the

enforcement of any judgment, order, award, lien or security), or instruct or direct any other person to do so, in each case in connection with the Debt Documents (other than any action taken in response to, or in connection with, any proceedings commenced by or on behalf of any member of the Group);

(c) take any step to enforce, attach, sequester or levy execution against any asset of the Plan Company or any other Existing Obligor, or to enforce or realise any security or other encumbrance, or instruct or direct any other person to do so, in each case in connection with the Debt Documents; or

(d) take any action which would, or would reasonably be expected to, impede, delay or frustrate the implementation of the transactions contemplated by this Restructuring Plan,

in each case, other than as expressly contemplated by, and in accordance with, this Restructuring Plan, the Transaction Implementation Deed or any other Implementation Document, or where such action is taken for the purpose of giving effect to the Restructuring.

## 6    MODIFICATIONS OF THIS RESTRUCTURING PLAN

6.1    The Plan Company may, subject to the terms of the Restructuring Support Agreement (including the consent rights contained therein), at any hearing to sanction this Restructuring Plan, acting reasonably and in good faith, consent on behalf of the CoreCo Plan Creditors to any modification, amendment, variation or supplement to or of this Restructuring Plan, the Transaction Implementation Deed or any other Implementation Document on terms or conditions that the Court may think fit to approve or impose for the purpose of consummating or implementing this Restructuring Plan, provided that such modification, amendment, variation or supplement cannot reasonably be expected to, directly or indirectly: (i) have a material and adverse or, relative to the other CoreCo Plan Creditors, disproportionate effect on the rights or interests of a CoreCo Plan Creditor under this Restructuring Plan or any Implementation Document; or (ii) alter any right or obligation, or impose any additional or new material obligation on any CoreCo Plan Creditor (by reference to such rights or obligations as contemplated as at the Record Date), in each case unless such CoreCo Plan Creditor consents in writing.

6.2    After the Plan Sanction Order has been granted, the terms of this Restructuring Plan may be amended, waived or supplemented with the consent of the Plan Company and the Majority Plan Creditors, provided that such amendment, waiver or supplement is only of a technical or non-material nature or to correct a manifest error, and provided further that any such proposed amendment, waiver or supplement cannot reasonably be expected to, directly or indirectly: (i) have a material and adverse or, relative to the other CoreCo Plan Creditors, disproportionate effect on the rights or interests of a CoreCo Plan Creditor under this Restructuring Plan or any Implementation Document; or (ii) alter any right or obligation, or impose any additional or new material obligation on any CoreCo Plan Creditor (by reference to such rights or obligations as contemplated as at the Record Date), in each case unless such CoreCo Plan Creditor consents in writing.

6.3    No modification, amendment, variation or supplement shall be made to this Clause 6 without the consent of each CoreCo Plan Creditor, and no modification, amendment or variation to the designation of documents as Implementation Documents hereunder shall be made without the consent of the Majority Plan Creditors. No modification, amendment,

variation or supplement that affects the rights or duties of any Administrative Party shall be made without the consent of such Administrative Party.

6.4     The Plan Company shall promptly notify the CoreCo Plan Creditors (by notice to the Majority Plan Creditors' Advisors and by the Information Agent making such notice available on the Plan Website) and each Administrative Party (in accordance with the notice provisions of the applicable Deed of Undertaking) of the occurrence of any modification, amendment or variation made to this Restructuring Plan or any Implementation Document in accordance with this Clause 6.

6.5     Nothing in this Restructuring Plan or the Transaction Implementation Deed shall govern the modification, amendment or waiver of any Implementation Document once such document becomes effective in accordance with its terms.

## 7     RELEASES

7.1     Subject to Clause 7.2, with effect from the Restructuring Effective Date, each Plan Party (on behalf of itself and each of its permitted successors and assigns) irrevocably, unconditionally, fully and absolutely:

7.1.1     pursuant to this Restructuring Plan, waives, releases and forever discharges any and all actions, proceedings, claims, damages, counterclaims, complaints, liabilities, liens, rights, demands, causes of action, set-offs or other obligations, whether present or future, prospective or contingent, whether in this jurisdiction or any other or under any law, of whatsoever nature and howsoever arising, whether in law or in equity, in contract (including, but not limited to, breaches or non-performances of contract), in statute or in tort (including, but not limited to, negligence and misrepresentation) or in any other manner whatsoever, breaches of statutory duty, for contribution, or for interest and/or costs and/or disbursements, whether or not for a fixed or unliquidated amount, whether filed or unfiled, whether asserted or unasserted, whether or not presently known to the parties or to the law, in each case that it ever had, may have or hereafter can, shall or may have arising out of actions, omissions or circumstances occurring on or prior to the Restructuring Effective Date against each and any Released Party whatsoever or howsoever arising (and notwithstanding any subsequent facts or information becoming known following the Restructuring Effective Date), in relation to or arising directly or indirectly out of or in connection with: (a) the negotiation, preparation, sanction or implementation of the Plans and/or the Restructuring; or (b) the CoreCo Plan Claims (in each case, including, without limitation, the negotiation, preparation, sanction, execution or implementation of any Implementation Documents);

7.1.2     pursuant to this Restructuring Plan, waives, releases and forever discharges all rights, title and interest it has in the CoreCo Plan Claims, and all Liabilities owed by a Group Company to any Plan Party in relation to such CoreCo Plan Claims; and

7.1.3     undertakes to the Released Parties that it will not commence or continue, or instruct, direct or authorise any other person to commence or continue, any process, action, other legal proceedings (including, without limitation, any demand, arbitration, alternative dispute resolution, judicial review, adjudication, execution, seizure, distraint, forfeiture, re-entry, lien, enforcement of judgment or enforcement of any security), in any jurisdiction whatsoever against any Released Party in respect of

24

the actions ratified or the waivers, releases, and discharges referred to in Clauses 7.1.1 and 7.1.2 above.

**7.2** Clause 7.1 shall not discharge, limit, vary, impact, compromise or otherwise affect in any way: (i) the Excluded Liabilities, (ii) any rights of any Plan Party arising under or in connection with the Implementation Documents (including guarantees or security interests or other obligations and any rights to submit claims and, if eligible, receive distributions in accordance with the Restructuring Plan or any Implementation Document), or (iii) any claims of any Plan Party which may arise or accrue in relation to acts, omissions or circumstances occurring after the Restructuring Effective Date.

**7.3** Nothing in this Restructuring Plan shall prevent a CoreCo Plan Creditor from responding to or taking any action to defend itself in any claims or Proceedings which are asserted against it or any of its Representatives.

## 8    TERMINATION

**8.1** This Restructuring Plan shall terminate with immediate effect upon the occurrence of any of the following events:

**8.1.1** the Restructuring Effective Date does not occur on or before the Restructuring Long-Stop Time; or

**8.1.2** the Transaction Implementation Deed terminates in accordance with its terms prior to the Restructuring Effective Date (other than as a result of the Restructuring Effective Date having occurred).

**8.2** Upon termination of this Restructuring Plan pursuant to Clause 8.1:

**8.2.1** the terms of and the obligations on, and rights granted to, the Plan Parties under or pursuant to this Restructuring Plan and any Implementation Document shall lapse and be of no further force or effect;

**8.2.2** all compromises, arrangements and releases provided for under or pursuant to this Restructuring Plan and each other Implementation Document shall be of no effect and shall be construed as if this Restructuring Plan and each other Implementation Document had never become effective;

**8.2.3** the rights and obligations of the CoreCo Plan Creditors shall remain unaffected by this Restructuring Plan and shall be reinstated and remain in full force and effect as they applied immediately prior to the Plan Effective Date; and

**8.2.4** any defaults under any agreement governing the terms of any CoreCo Plan Claim, including the Debt Documents, and any consequences thereof (including any alleged deemed or actual acceleration) shall be reinstated as if such default had been continuing since the date on which it originally occurred or was deemed to occur.

**8.3** Promptly following termination of this Restructuring Plan, the Plan Parties shall execute such documents and perform such acts and things as are reasonably necessary and/or

desirable to give effect to Clause 8.2 and 8.4 (including, where applicable, reversing any steps taken in contemplation of the implementation of the Restructuring).

8.4     In the event of termination of this Restructuring Plan pursuant to this Clause 8, the Plan Company shall promptly notify all CoreCo Plan Creditors (by notice to the Majority Plan Creditors' Advisors and by the Information Agent making such notice available on the Plan Website) and the Administrative Parties, and any release, standstill, power of attorney, instruction or authority granted pursuant to this Restructuring Plan or any Implementation Document shall be automatically revoked and terminated. Any action taken under any power of attorney granted pursuant to this Restructuring Plan shall be automatically void and of no further force or effect.

8.5     This Clause 8, Clause 1 (*Definitions and Interpretation*) and Clause 12 (*Governing Law and Jurisdiction*) shall survive any termination of this Restructuring Plan.

## 9      GENERAL RESTRUCTURING PLAN PROVISIONS

### 9.1     Ratification

9.1.1     In consideration for its rights and entitlements under this Restructuring Plan, and subject to the occurrence of, the Restructuring Effective Date:

(a)     each Plan Party hereby irrevocably ratifies and confirms everything which:

(i)     the Plan Company and its respective directors, officers or other duly appointed representatives have lawfully done or caused to be done, to the extent compliant with the terms of this Restructuring Plan and the Implementation Documents;

(ii)     was lawfully done or caused to be done by any Undertaking Party or its representatives pursuant to any authority conferred by this Restructuring Plan or the Implementation Documents; and

(iii)    the Information Agent and its respective directors, managers, officers or other duly appointed representatives has each lawfully done or caused to be done or purported to be done, in each case to the extent in compliance with this Restructuring Plan or the Implementation Documents,

in each case on or prior to the Restructuring Effective Date; and

(b)     each CoreCo Plan Creditor hereby irrevocably undertakes to the Plan Parties to treat all CoreCo Plan Claims and the (direct and indirect) rights and obligations of each CoreCo Plan Creditor under the Debt Documents as having been effectively varied and/or released in the manner envisaged by this Restructuring Plan, the Transaction Implementation Deed and the Implementation Documents.

### 9.2     Costs

9.2.1     The Plan Company or another Group Company will pay in full all costs, charges, expenses, and disbursements incurred by it in connection with the negotiation, preparation, and implementation of this Restructuring Plan as and when they arise, including, but not limited to, the costs of holding the Plan Meetings, the costs of

obtaining the sanction of the Court and the costs of placing notices (if any) required by this Restructuring Plan.

**9.3     Record Date**

**9.3.1**     For the purposes of calculating entitlements to receive Plan Consideration, all CoreCo Plan Claims shall be determined by the Plan Company, acting on information provided by the Information Agent, in accordance with the methodology set out in the Transaction Implementation Deed, as at the Record Date.

**9.4     Assignments or transfers**

**9.4.1**     The Plan Company shall be under no obligation to recognise any assignment or transfer of rights, benefits or interests in the Debt Documents after the Record Date for the purposes of calculating entitlements to receive Plan Consideration under this Restructuring Plan and has no obligations hereunder to any person other than the CoreCo Plan Creditors on the Record Date, provided that, where the Plan Company has received from the relevant parties notice in writing of such assignment or transfer prior to the Restructuring Effective Date, the Plan Company may, in its sole discretion and subject to the production of such other evidence in relation to such assignment or transfer as it may reasonably require and to any other terms and conditions which the Plan Company may consider necessary or desirable, acting reasonably, agree to recognise such assignment or transfer for the purposes of calculating entitlements to receive Plan Consideration under this Restructuring Plan.

**9.4.2**     Any assignee or transferee of the interests in the Debt Documents recognised by the Plan Company pursuant to this Clause 9.4 shall be bound by the terms of the Restructuring Plan as a CoreCo Plan Creditor and shall produce such evidence as the Plan Company may reasonably require to confirm that it has agreed to be bound by the terms of this Restructuring Plan.

**9.5     Obligations on days other than a Business Day**

**9.5.1**     If any obligation is to be performed under the terms of the Restructuring Plan on a date other than a Business Day, the relevant obligation shall be performed on the next Business Day.

**9.6     Exercise of discretion**

**9.6.1**     Where, under or pursuant to any provision of this Restructuring Plan, a matter is to be determined by the Plan Company, it will be determined by the directors of the Plan Company in their discretion in such manner as they may consider fair and reasonable.

**9.7     Severability**

**9.7.1**     If at any time any provision of this Restructuring Plan is or becomes illegal, invalid or unenforceable in any respect under the law of any jurisdiction, such provision shall be severed from the Restructuring Plan for the purposes of that jurisdiction, and neither the legality, validity or enforceability of that provision under the law of any other jurisdiction nor the legality, validity or enforceability of any other

27

provision of this Restructuring Plan under the law of that or any other jurisdiction will in any way be affected or impaired thereby, and the rest of the Restructuring Plan shall continue in full force and effect in that jurisdiction as if the severed provision had not been included.

**9.8   CoreCo Plan Creditors' obligations**

9.8.1   The obligations of each CoreCo Plan Creditor under this Restructuring Plan are several.

**9.9   Conflict**

9.9.1   In the case of any conflict or inconsistency between the terms of this Restructuring Plan and the terms of the Explanatory Statement, the terms of this Restructuring Plan will prevail.

**10   NOTICE**

10.1   Any notices (including any service of process in connection with a breach of the Restructuring Plan) shall be given in writing and shall be deemed to have been duly given if it is uploaded to the Plan Website *and* delivered by hand, pre-paid first class post, airmail or electronically to the following parties:

(a) if to the Plan Company, to:

NFE Global Holdings Limited
Suite 1, 7th Floor 50 Broadway
London SW1H 0BL
United Kingdom
Email: NFEGlobalUK@newfortressenergy.com
Attention: Office of the General Counsel

with copies (which shall not constitute notice) to:

Skadden, Arps, Slate, Meagher & Flom (UK) LLP
22 Bishopsgate
London EC2N 4BQ
United Kingdom
Email: Peter.Newman@Skadden.com;
Christopher.Dressel@skadden.com; and DLPLady@Skadden.com
Attention: Peter Newman; Christopher Dressel

(b) if to a CoreCo Plan Creditor, to its last known address, fax number or email address stated in the Plan Creditor Letter or failing that according to the Notice Records, and:

(i) if to any member of the Akin/Evercore AHG, with copies (which shall not constitute notice) to:

28

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
Attention: Michael Stamer
Email: mstamer@akingump.com

and

Akin Gump Strauss Hauer & Feld LLP
2001 K Street, NW
Washington, DC 20006
Attention: James Savin; Iain Wood
Email: jsavin@akingump.com; iwood@akingump.com

(ii) if to any member of the Legacy Notes AHG, with copies (which shall not constitute notice) to:

Paul Hastings LLP
200 Park Avenue
New York, NY  10166
Attention: Sayan Bhattacharyya and Matthew Friedrick
Email: sayanbhattacharyya@paulhastings.com;
matthewfriedrick@paulhastings.com

(iii) if to any Supporting Creditor that is a holder of Revolving Credit Facility Debt, with copies (which shall not constitute notice) to:

Sidley Austin LLP
1000 Louisiana Street
Suite 5900
Houston, TX 77002
Attention: Duston K. McFaul; Brian E. Minyard; Maegan Quejada
Email: dmcfaul@sidley.com; bminyard@sidley.com;
mquejada@sidley.com; NFEProjectTemplarSidleyTeam@sidley.com

and

Sidley Austin LLP
One South Dearborn
Chicago, IL 60603
Attention: Matthew A. Clemente
Email: mclemente@sidley.com

(iv) if to the Series I Lender or Series II Lender, to:

NFE Brazil Investments LLC / NFE Financing LLC
C/o New Fortress Energy Inc.
111 W. 19th Street, 8th Floor
New York, NY 10011
Attention: Office of the General Counsel
Telephone: 516-268-7406
Email: legal@newfortressenergy.com

with copies (which shall not constitute notice) to:
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Attention: Andrew Rosenberg; Sung Pak; Kyle R. Satterfield
Email: arosenberg@paulweiss.com; spak@paulweiss.com;
ksatterfield@paulweiss.com

(c) if to the Information Agent, to:

Kroll Issuer Services Limited
The News Building 3 London Bridge Street
London SE1 9SG
United Kingdom
Attention: Ivan Santek/ Alessandro Zorza
E-mail: nfe@is.kroll.com
Phone: +44 20 7089 0909
Plan Website: https://deals.is.kroll.com/nfe

**10.2**   CoreCo Plan Creditors and any Administrative Party shall have the right to request a paper copy of any Notice by contacting the Information Agent. The Information Agent shall send such requested documents by first class post in respect of CoreCo Plan Creditors whose address is in the UK and by "international standard post" in respect of CoreCo Plan Creditors whose address is outside the UK.

**10.3**   Any Notice shall be deemed to have been delivered and served:

(a)   if by way of e-mail:

(i)   subject to Clause 10.3(a)(ii), when sent; and

(ii)   if one or more E-Mail Error Messages are sent from and with respect to a person's e-mail address for the purposes of Notices within one hour of such e-mail being sent, the e-mail shall not be deemed to be delivered and effective unless the intended recipient confirms receipt (but failure of an e-mail to be deemed delivered and effective shall not affect other or subsequent e-mails, or delivery of a communication or document pursuant to another method permitted under this Clause 10);

(b)   if by way of letter, five Business Days after being deposited in the post postage prepaid in an envelope and addressed correctly;

(c)   if delivered by hand or courier, on the first Business Day following delivery; and

(d)   if by way of upload to the Plan Website, when viewable on the Plan Website (written notice of which shall be distributed by the Plan Company to each Plan Party); and, if a particular department or officer is specified as part of the address details provided under this Clause 10, if addressed to that department or officer (other than with respect to Clause 10.3(d)).

**10.4**    In proving service, it shall be sufficient proof, in the case of a Notice sent by post, that the envelope was properly stamped, addressed and placed in the post.

**10.5**    The accidental omission to send any Notice, written communication or other document in accordance with this Clause 10, or the non-receipt of any such Notice by any CoreCo Plan Creditor, shall not affect the provisions of the Restructuring Plan or their effectiveness.

**11    PLAN PARTIES**

**11.1**    Each Plan Party and each Nominee as applicable shall enjoy the benefit and be entitled to enforce the terms of this Restructuring Plan.

**11.2**    Except as provided in this Restructuring Plan, no rights are conferred on any person under the Contracts (Rights of Third Parties) Act 1999 to enforce the terms of this Restructuring Plan.

**12    GOVERNING LAW AND JURISDICTION**

**12.1    Subject to Clause 12.2**:

**12.1.1**    the Restructuring Plan and any non-contractual obligations arising out of or in connection with the Restructuring Plan shall be governed by, and construed in accordance with, the laws of England and Wales; and

**12.1.2**    the CoreCo Plan Creditors hereby agree that the Court shall have exclusive jurisdiction to hear and determine any suit, action or proceeding and to settle any dispute which may arise out of or in connection with the Restructuring Plan, or out of any action taken or omitted to be taken under the Restructuring Plan or any non-contractual obligations arising out of or in connection with the Restructuring Plan. For such purposes the CoreCo Plan Creditors irrevocably submit to the jurisdiction of the Court.

**12.2**    Nothing in this Clause 12 shall:

**12.2.1**    affect the validity of other provisions of the Implementation Documents (from and after the date such documents become effective) determining governing law and jurisdiction as between the Plan Company and the CoreCo Plan Creditors, whether contained in any contract or otherwise; or

**12.2.2**    prevent the Plan Company from relying upon the provisions of this Restructuring Plan in any foreign court or in any foreign proceedings.

**12.3**    The Restructuring Plan shall take effect subject to any prohibition or condition imposed by applicable law.

[*The remainder of this page is intentionally left blank*]

31

**Schedule 1 – Undertaking Parties**

Entities accompanied by an asterisk are planned to be dissolved within 30 or 60 days following the Restructuring Effective Date. In order to comply with that timeframe, the dissolution of certain of these entities may be commenced or completed prior to the sanction hearing in relation to the Plans. To the extent this occurs, an updated list will be filed with the court in advance of the sanction hearing with any such entities flagged.

1.  Amaunet, S. de R.L. de C.V.

2.  American Energy Logistics Solutions LLC *

3.  Atlantic Energy Holdings LLC

4.  Atlantic Pipeline Holdings SRL *

5.  Bradford County Development Holdings LLC *

6.  Bradford County GPF Holdings LLC *

7.  Bradford County GPF Partners LLC *

8.  Bradford County Power Holdings LLC *

9.  Bradford County Power Partners LLC *

10. Bradford County Real Estate Partners LLC

11. Bradford County Transport Holdings LLC *

12. Bradford County Transport Partners LLC *

13. Encanto East LLC *

14. Encanto Power West LLC *

15. Encanto West LLC *

16. Island LNG LLC *

17. LA Development Holdings LLC *

18. LA Real Estate Holdings LLC *

19. LA Real Estate Partners LLC

20. LNG Holdings LLC *

21. Mexico FLNG Onshore S. de R.L. de C.V.

22. New Fortress Energy Holdings LLC

23. New Fortress Energy Inc.

24.     New Fortress Energy Marketing LLC

25.     New Fortress Intermediate LLC

26.     NFE Altamira Onshore S. de R.L. de C.V.

27.     NFE Andromeda Chartering LLC

28.     NFE Angola Holdings LLC *

29.     NFE Atlantic Holdings LLC

30.     NFE BCS Holdings (A) LLC

31.     NFE BCS Holdings (B) LLC

32.     NFE BCS Mexico Holdings, S. de R.L. de C.V.

33.     NFE Bermuda Holdings Limited

34.     NFE Brazil Newco Limited

35.     NFE Equipment Holdings LLC *

36.     NFE Equipment Partners LLC

37.     NFE Financing LLC

38.     NFE FLNG 1 Issuer LLC

39.     NFE FLNG 2 LLC

40.     NFE Ghana Holdings LLC *

41.     NFE Ghana Partners LLC *

42.     NFE Global Holdings Limited

43.     NFE Global Shipping LLC *

44.     NFE GP LLC

45.     NFE Grand Shipping LLC

46.     NFE Honduras Holdings LLC *

47.     NFE International Holdings

48.     NFE International Holdings 1 Limited

49.     NFE International Holdings 2 Limited

50.     NFE International Holdings Limited

51.     NFE International LLC

33

52.   NFE International Shipping LLC

53.   NFE ISO Holdings LLC *

54.   NFE ISO Partners LLC

55.   NFE Jamaica GP LLC *

56.   NFE Logistics Holdings LLC *

57.   NFE Management LLC

58.   NFE Mexico Holdings Parent S. à R.L.

59.   NFE Mexico Holdings S. à R.L.

60.   NFE Mexico Power Holdings Limited

61.   NFE Mexico Terminal Holdings Limited

62.   NFE Nicaragua Development Partners LLC

63.   NFE Nicaragua Development Partners LLC, Sucursal Nicaragua

64.   NFE Nicaragua Holdings LLC

65.   NFE North Trading LLC

66.   NFE Pacifico LAP, S. de R.L. de C.V.

67.   NFE Pioneer 1 LLC

68.   NFE Pioneer 2 LLC

69.   NFE Pioneer 3 LLC

70.   NFE Plant Development Holdings LLC *

71.   NFE Power PR LLC

72.   NFE Shannon Holdings Limited

73.   NFE South Power Holdings LLC

74.   NFE South Power Trading Limited

75.   NFE Sub LLC

76.   NFE Transport Holdings LLC *

77.   NFE Transport Partners LLC

78.   NFE UK Holdings Limited

79.   NFE US Holdings LLC

34

80.    Nfenergia GN de BCS, S. de R.L. de C.V.

81.    NFENERGÍA LLC

82.    Nfenergia Mexico, S. de R.L. de C.V.

83.    PA Development Holdings LLC *

84.    PA Real Estate Holdings LLC *

85.    PA Real Estate Partners LLC *

86.    Soluciones de Energia Limpia PR LLC

87.    Tico Development Partners Holdings LLC *

88.    Tico Development Partners LLC *

89.    NFE Brazil Funding LP *

90.    NFE Brazil Funding LLC *

91.    Hygo Energy Transition Ltd.

92.    NFE Brazil Financing Limited

93.    LNG Power Limited (UK)

94.    NFE Power Brasil Participações S.A.

95.    NFE Power Latam Participações e Comércio Ltda.

96.    CELBA – Centrais Elétricas Barcarena S.A.

97.    Barcarena Offshore Capital LLC

98.    NFE Power SSLNG Participações Ltda.

99.    NFE Power Distribuidora de Gás Natural Ltda.

100.    NFE Brazil Holdings Limited

101.    NFE Brazil Holdings LLC

102.    Shannon LNG Energy Limited

103.    Shannon LNG Limited

104.    NFE Brazil Investments LLC

105.    U.S. Bank Trust Company, National Association as 2026 Legacy Notes Trustee, 2029 Legacy Notes Trustee and Initial Common Representative

106.    Wilmington Savings Fund Society, FSB as 2029 New Notes Trustee, Series I Agent, Series II Agent, and Brazil Parent Intercompany Agent

107.    MUFG Bank, Ltd as RCF Agent and Second Additional Common Representative

108.    Wilmington Trust, National Association, as TLA Agent, TLB Agent, First Equal Priority
Agent, Second Equal Priority Agent, New CoreCo Term Loan Facility Agent and FLNG 2
Term Loan Agent

109.    Natixis, New York Branch as New Common Representative

110.    Kroll Issuer Services Limited as Holding Period Trustee and Information Agent.

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF**
**ENGLAND AND WALES**
**INSOLVENCY AND COMPANIES LIST (ChD)**

**IN THE MATTER OF NFE BRAZIL NEWCO LIMITED**

**-and-**

**IN THE MATTER OF THE COMPANIES ACT 2006**

_____

**RESTRUCTURING PLAN**
(under Part 26A of the Companies Act 2006)

- between –

NFE BRAZIL NEWCO LIMITED

- and –

THE BRAZILCO PLAN CREDITORS
(as defined herein)

_____

**Table of Contents**

1       Definitions and Interpretation..................................................................................2

2       Application and Effectiveness of the Restructuring Plan....................................15

3       Grant of Authority to Execute the Implementation Documents..........................16

4       Deeds of Undertaking.........................................................................................20

5       Closing Steps and Plan Consideration................................................................20

6       Modifications of this Restructuring Plan............................................................22

7       Releases ..............................................................................................................23

8       Termination .........................................................................................................24

9       General Restructuring Plan Provisions...............................................................25

10      Notice .................................................................................................................27

11      Plan Parties .........................................................................................................29

12      Governing Law and Jurisdiction ........................................................................29

Schedule 1 – Undertaking Parties ..................................................................................30

## RESTRUCTURING PLAN

**Between:**

(1) **NFE BRAZIL NEWCO LIMITED**, a company incorporated under the laws of England and Wales (company number 17141053) (the "**Plan Company**"); and

(2) **THE BRAZILCO PLAN CREDITORS** (as hereinafter defined).

**Recitals**

(A)     The Plan Company was incorporated and registered in England and Wales on April 2026, with registered number 17141053, as a private company limited by shares under the Act (as defined below). The Plan Company's registered office is at Suite 1, 7th Floor, 50 Broadway, London, United Kingdom, SW1H 0DB. The Plan Company is an indirect subsidiary of NFE Inc. (as defined below).

(B)     The purpose of this Restructuring Plan (as defined below) is to effect a compromise and arrangement between the Plan Company and the BrazilCo Plan Creditors (as defined below) to facilitate the implementation of the Restructuring (as defined below). The BrazilCo Plan Creditors are the 2029 New Noteholders (as defined below).

(C)     To effect such compromise and arrangement, each BrazilCo Plan Creditor will pursuant to the terms of this Restructuring Plan, grant a power of attorney to the Plan Company to execute the Transaction Implementation Deed and the applicable Implementation Documents to which such BrazilCo Plan Creditor is a party on its behalf (each as defined below).

(D)     In order to successfully implement the Restructuring, participation is required from, among others, the Undertaking Parties. Each of the Undertaking Parties has severally agreed, upon the sanctioning of this Restructuring Plan by the Court (as defined below), to be bound by and comply with the obligations expressed to apply to it under this Restructuring Plan and, on and from their release in accordance with the Restructuring Plan, the Implementation Documents to which it is a party pursuant to the provisions of such person's Deed of Undertaking (as defined below).

(E)     This Restructuring Plan and the CoreCo Plan (as defined below) are inter-conditional such that this Restructuring Plan and the CoreCo Plan shall become effective and legally binding at the same time (or not at all).

1

# 1     DEFINITIONS AND INTERPRETATION

## 1.1    Definitions

1.1.1    In this Restructuring Plan, the following terms shall, unless the context otherwise requires, have the following meanings:

"**2026 Legacy Noteholders**" means the ultimate beneficial holders of the 2026 Legacy Notes Debt;

"**2026 Legacy Notes**" means the 6.500% senior secured notes due 2026 issued by NFE Inc. pursuant to the 2026 Legacy Notes Indenture;

"**2026 Legacy Notes Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the 2026 Legacy Noteholders under or in connection with the 2026 Legacy Notes (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise);

"**2026 Legacy Notes Indenture**" means the indenture entered into by, among others, NFE Inc. as issuer and U.S. Bank Trust Company, National Association, as trustee and collateral agent, on 12 April 2021 (as amended, supplemented or otherwise modified from time to time);

"**2029 Legacy Noteholders**" means the ultimate beneficial holders of the 2029 Legacy Notes Debt;

"**2029 Legacy Notes**" means the 8.750% senior secured notes due 2029 issued by NFE Inc. pursuant to the 2029 Legacy Notes Indenture;

"**2029 Legacy Notes Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the 2029 Legacy Noteholders under or in connection with the 2029 Legacy Notes (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise);

"**2029 Legacy Notes Indenture**" means the indenture entered into by, among others, NFE Inc. as issuer and U.S. Bank Trust Company, National Association, as trustee and collateral agent, on 8 March 2024 (as amended, supplemented or otherwise modified from time to time);

"**2029 New Noteholders**" means the ultimate beneficial holders of the 2029 New Notes Debt;

"**2029 New Notes**" means the 12.000% senior secured notes due 2029 issued by NFE Financing pursuant to the 2029 New Notes Indenture;

"**2029 New Notes Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the holders of the 2029 New Notes under or in connection with the 2029 New Notes (in each

case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise);

"**2029 New Notes Indenture**" means the indenture entered into by, among others, NFE Financing, as issuer and Wilmington Savings Fund Society, FSB, as trustee and collateral agent, on 22 November 2024 (as amended, supplemented or otherwise modified from time to time);

"**2029 New Notes Trustee**" means Wilmington Savings Fund Society, FSB in its capacity as trustee and the collateral agent in respect of the 2029 New Notes;

"**2029 New Notes Trustee Advisors**" means Winston & Strawn LLP, and Taylor Wessing LLP, in each case as counsel to the 2029 New Notes Trustee;

"**Act**" means the Companies Act 2006 (as amended from time to time);

"**Ad Hoc Groups**" means, collectively, the Akin/Evercore AHG, the PW/PWP AHG and the Legacy Notes AHG;

"**Administrative Party**" has the meaning given to it in the Transaction Implementation Deed;

"**Advisor Released Person**" means each of the current and former respective officers, directors, employees, executives, attorneys and agents (or equivalents) of each Released Advisor and each Affiliate of each Released Advisor;

"**Advisors**" means, collectively, the Akin/Evercore AHG Advisors, the PW/PWP AHG Advisors, the RCF Advisors, the TLA Advisors, the TLB Advisors, the Legacy Notes Advisors, the Legacy Notes Trustee Advisors, 2029 New Notes Trustee Advisors, the RCF Agent, the TLB Agent, the TLA Agent, the New CoreCo Term Loan Facility Agent, the FLNG 2 Term Loan Agent, the Legacy Notes Trustee, the 2029 New Notes Trustee, and any additional advisors or consultants engaged by any of the Ad Hoc Groups and (in each case) any successor professional advisors to each of the foregoing, in each case as advisors in connection with the Restructuring;

"**Affiliate**" means, with respect to a person, any other person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such person and, for the purposes of this definition, "control" shall mean the power, direct or indirect, to (a) vote on more than 50 per cent. of the securities having ordinary voting power for the election of directors of such person, or (b) direct or cause the direction of the management and policies of such person whether by contract or otherwise;

"**Agreed Form**" means:

(a)     in respect of documents appended to the Explanatory Statement, the form so appended to the Explanatory Statement or as otherwise amended pursuant to (and in accordance with) this Restructuring Plan or the Transaction Implementation Deed;

(b)     in respect of any other Implementation Document, in the form agreed between the Plan Company and the Majority Plan Creditors; or

(c)     in respect of any document which is not an Implementation Document or otherwise appended to the Explanatory Statement but which is required herein or in the Transaction Implementation Deed to be in the Agreed Form, in the form agreed between the Plan Companies and the Majority Plan Creditors,

provided that, notwithstanding any provision of this definition of Agreed Form, any documents that are to be agreed between a Company Party and one or more Ad Hoc Groups or other creditor groups pursuant to the Restructuring Support Agreement shall be deemed to be in "Agreed Form" if such documents are in form and substance acceptable to such specified parties only, and, to the extent any Administrative Party is party to a document as administrative agent, in form and substance satisfactory to such Administrative Party;

"**Akin/Evercore AHG**" means the ad hoc group of certain unaffiliated holders of Term Loan B Debt represented by the Akin/Evercore AHG Advisors;

"**Akin/Evercore AHG Advisors**" means, collectively, Akin Gump Strauss Hauer & Feld LLP and Evercore Group L.L.C., and their Affiliates as counsel and financial advisor, respectively, to the Akin/Evercore AHG, as well as other regulatory, local, foreign, barristers and special counsel (in each case as notified to the Plan Company), in their respective capacities as counsel to the Akin/Evercore AHG;

"**Brazil Parent**" means NFE Brazil Investments LLC;

"**BrazilCo Plan Claims**" means any (direct or indirect) claim of a BrazilCo Plan Creditor in respect of any Liability of the Plan Company or any other Group Company, whether as principal obligor, guarantor, indemnifier or security provider, in relation to, or arising out of or in connection with, the Debt Documents or the BrazilCo Plan Debt, arising on or before the Restructuring Effective Date, but excluding any claim of a BrazilCo Plan Creditor in respect of any Liability of the Plan Company or any other Group Company to any BrazilCo Plan Creditor arising directly or indirectly in relation to, or arising out of or in connection with, a failure to comply with the terms of this Restructuring Plan, the Transaction Implementation Deed or any other Implementation Document;

"**BrazilCo Plan Creditors**" means the 2029 New Noteholders;

"**BrazilCo Plan Debt**" means the 2029 New Notes Debt;

"**Business Day**" means a day other than a Saturday, Sunday, or other day on which commercial banks are authorised to close under the laws of, or are in fact closed in, the State of New York, United States of America or in London, United Kingdom;

"**Closing Steps**" has the meaning given to it in Clause 5.1.2;

"**Company Party**" has the meaning given to it in the Transaction Implementation Deed;

"**CoreCo Plan**" means the restructuring plan proposed by NFE Global in substantially the form attached to the Explanatory Statement (or appended to any supplemental explanatory statements made available to the BrazilCo Plan Creditors

4

prior to the Plan Meetings) or with, or subject to, any modification, addition or condition which the Court may think fit to approve or impose, as appropriate;

"**CoreCo Plan Creditors**" means each of the 2026 Legacy Noteholders; the 2029 Legacy Noteholders; the RCF Lenders; the TLB Lenders; the TLA Lenders; the Series I Lender; and the Series II Lender;

"**Court**" means the High Court of Justice of England and Wales and any appellate court in England and Wales having jurisdiction in connection with the Restructuring (including the Court of Appeal and the Supreme Court);

"**Debt Documents**" means the 2029 New Notes Indenture, the Finance Documents (as defined in or the equivalent of in the 2029 New Notes Indenture) and any related security and ancillary documents;

"**Deed of Undertaking**" means a deed of undertaking to the Plan Company in the form agreed by the parties thereto pursuant to which each of the parties thereto agrees to execute or procure to be executed all such documents, and to do or procure to be done all such acts and things as may be reasonably necessary or desirable to be done by it to implement the Restructuring as described in this Restructuring Plan and to be bound by and perform the terms of this Restructuring Plan and the Transaction Implementation Deed;

"**E-Mail Error Message**" means, with respect to an e-mail sent by one person to another under or in connection with this Restructuring Plan, an automatic error message received from an intended recipient (or the server by which such intended recipient is provided e-mail service) that:

(a)      such e-mail is undeliverable; or

(b)      there has been a failure to deliver such e-mail;

"**English Company Counsel**" means Daniel Bayfield KC, Ryan Perkins and Jon Colclough of South Square Chambers, instructed by the Group Legal Advisor to appear on behalf of the Plan Company before the Court in respect of the Restructuring Plan, or such other barrister as may be instructed by the Group Legal Advisor;

"**Excluded Liabilities**" means:

(a)      any Liability arising from criminal acts, fraud, gross negligence or wilful misconduct on the part of a Released Party, as determined by a judgment issued by a court of competent jurisdiction;

(b)      any Liability of any Released Advisor to its client arising under a duty of care which has been expressly assumed or acknowledged in writing by the relevant Advisor or which can only be excluded in accordance with applicable law and has not been so excluded, or which cannot be released, waived or excluded under applicable law;

(c)      any Liability of any accounting, restructuring or tax advisor of the Plan Company or any other member of the Group to the Released Parties or any other member of the Group and subject to the terms of any reliance letter,

in relation to any report, memorandum or opinion provided by such advisor on which a Released Party is expressly entitled to rely pursuant to an executed reliance letter;

(d)     any Liability of the Plan Company or any other member of the Group with respect to any outstanding fees, costs and/or expenses properly incurred by any party's professional advisors (including the Advisors) in accordance with the terms of any such advisors' fee letters, engagement letters or other form of written agreement entered into by any member of the Group in connection with the Restructuring;

(e)     any Liabilities created by the Implementation Documents, the Restructuring Plan or any ancillary document thereto, including as a result of a failure by any party to comply with such documents;

(f)     in the case of a Group Company: (i) any Liability of any director of such Group Company that would otherwise attach to that director in connection with any negligence, default, breach of duty or breach of trust, or that would be available upon the insolvency of such Group Company; and (ii) any Liability of a Group Advisor (solely in its capacity as advisor to such Group Company) that would otherwise attach to such Group Advisor in connection with any negligence, default, breach of duty or breach of trust, or that would be available upon the insolvency of such Group Company; and

(g)     any Liability of one Group Company to another Group Company that is expressly not released under the terms of the Separation Agreement or any other Implementation Document, which in each case, shall be solely governed by the terms and conditions thereunder;

"**Existing Obligor**" means each obligor under the Debt Documents from time to time;

"**Explanatory Statement**" means the explanatory statement dated 15 May 2026 relating to and issued by the Plan Company and NFE Global in connection with this Restructuring Plan and the CoreCo Plan pursuant to section 901D of the Act;

"**Group**" means NFE Inc. and its Subsidiaries (including the Plan Company) from time to time, with each being a "**Group Company**";

"**Group Advisor**" means:

(a)     the Group Legal Advisor;

(b)     English Company Counsel;

(c)     Houlihan Lokey Capital, Inc. and Alvarez & Marsal Europe LLP, as financial advisors to the Plan Company and the Group;

(d)     any local or specialist counsel engaged by any of the foregoing; and

(e)     any successors to the foregoing;

6

"**Group Legal Advisor**" means Skadden, Arps, Slate, Meagher & Flom LLP and its affiliates, as legal counsel to the Group, or any successor legal counsel to the Group, in respect of the Plans;

"**Holding Period Trust**" has the meaning given to it in the Holding Period Trust Deed;

"**Holding Period Trust Deed**" has the meaning given to it in the Transaction Implementation Deed;

"**Implementation Documents**" has the meaning given to it in the Transaction Implementation Deed;

"**Indebtedness**" has the meaning given to it in the Transaction Implementation Deed;

"**Information Agent**" means Kroll Issuer Services Limited in its capacity as information agent in connection with the Plans (and any successor information agent);

"**Legacy Notes**" means the 2026 Legacy Notes and the 2029 Legacy Notes.

"**Legacy Notes Advisors**" means Paul Hastings LLP, as counsel to the Legacy Notes AHG;

"**Legacy Notes AHG**" means the ad hoc group of certain unaffiliated holders of Legacy Notes represented by Paul Hastings LLP as counsel;

"**Legacy Notes Trustee**" means U.S. Bank Trust Company, National Association in its capacity as trustee and the collateral agent in respect of the 2026 Legacy Notes and the 2029 Legacy Notes;

"**Legacy Notes Trustee Advisors**" means Greenberg Traurig, LLP, and Thompson Hine LLP, in each case as counsel to the Legacy Notes Trustee;

"**Liability**" means any present or future payment and discharge obligation, liability, claim, debt, claims for specific performance, damages or restitution, counterclaims, suits, rights of action, or rights whatsoever or howsoever arising, including, without limitation, for the payment of money or the performance of an act or obligation (whether deliberate or otherwise) or any failure to perform any obligation or any omission, whether for negligence, breach of duty, breach of trust or misrepresentation or otherwise, whether in respect of principal, interest or otherwise, whether actual or contingent, whether fixed or undetermined, whether admitted or disputed, whether known or unknown, whether owed jointly or severally and whether owed as principal, surety or in any capacity whatsoever and whether it arises at common law, in equity or by statute, in England and Wales or in any other jurisdiction under whatever applicable law, under any legal theory, and in any manner whatsoever, and "**Liabilities**" shall be construed accordingly;

"**Majority Akin/Evercore AHG Members**" means, as of any relevant time, members of the Akin/Evercore AHG that are Supporting Creditors holding, in the aggregate, greater than 50.0% of the aggregate outstanding principal amount of

7

Term Loan B Debt then held by the members of the Akin/Evercore AHG that are Supporting Creditors;

"**Majority Legacy Notes Supporting Creditors**" means, as of any relevant time, members of the Legacy Notes AHG that are Supporting Creditors holding, in the aggregate, greater than 50.0% of the aggregate outstanding principal amount of the Legacy Notes then held by the members of the Legacy Notes AHG that are Supporting Creditors;

"**Majority Plan Creditors**" means, collectively, as of any relevant time, (i) the Majority Akin/Evercore AHG Members, (ii) the Majority PW/PWP AHG Members, (iii) the Majority RCF Supporting Creditors, (iv) solely with respect to any matter that (x) materially and adversely alters (1) the treatment of the 2026 Legacy Notes Debt or the 2029 Legacy Notes Debt, as applicable, under the Restructuring or (2) the rights or obligations of the Supporting Creditors who hold 2026 Legacy Notes Debt or 2029 Legacy Notes Debt, as applicable, under this Restructuring Plan, or (y) disproportionately alters the allocation of consideration to the holders of the 2026 Legacy Notes Debt or the 2029 Legacy Notes Debt as set forth on the Exchange Consideration Chart attached to the Restructuring Term Sheet, whether by decreasing the consideration allocated to holders of 2026 Legacy Notes Debt or the 2029 Legacy Notes Debt or increasing (including in the form of additional fees) the consideration allocated to holders of other Indebtedness, the Majority Legacy Notes Supporting Creditors and (v) solely with respect to any matter that (x) materially and adversely alters (1) the treatment of the Term Loan A Debt under the Restructuring or (2) the rights or obligations of the holders of Supporting Term Loan A Debt under this Restructuring Plan, or (y) disproportionately alters the allocation of consideration to the holders of the Term Loan A Debt as set forth on the Exchange Consideration Chart attached to the Restructuring Term Sheet, whether by decreasing the consideration allocated to holders of Term Loan A Debt or increasing (including in the form of additional fees) the consideration allocated to holders of other Indebtedness, the Majority TLA Supporting Creditors;

"**Majority Plan Creditors' Advisors**" means the Akin/Evercore AHG Advisors, the PW/PWP AHG Advisors and the RCF Advisors on behalf of, respectively, the Majority Akin/Evercore AHG Members, the Majority PW/PWP AHG Members and the Majority RCF Supporting Creditors and, to the extent required, the TLA Advisors on behalf of the Majority TLA Supporting Creditors and the Legacy Notes Advisors on behalf of the Majority Legacy Notes Supporting Creditors;

"**Majority PW/PWP AHG Members**" means, as of any relevant time, members of the PW/PWP AHG that are Supporting Creditors holding, in the aggregate, greater than 50.0% of the aggregate outstanding principal amount of 2029 New Notes Debt then held by the members of the PW/PWP AHG that are Supporting Creditors;

"**Majority RCF Supporting Creditors**" means, as of any relevant time, holders of Revolving Credit Facility Debt that are Supporting Creditors holding, in the aggregate, greater than 50.0% of the aggregate outstanding principal amount of Revolving Credit Facility Debt then held by holders of Revolving Credit Facility Debt that are Supporting Creditors;

8

"**Majority TLA Supporting Creditors**" means, as of any relevant time, holders of Term Loan A Debt that are Supporting Creditors holding, in the aggregate, greater than 50.0% of the aggregate outstanding principal amount of Term Loan A Debt then held by such holders of Term Loan A Debt that are Supporting Creditors;

"**NFE Financing**" means NFE Financing LLC, a Delaware limited liability company;

"**NFE Global**" means NFE Global Holdings Limited, an English private company limited by shares;

"**NFE Inc.**" means New Fortress Energy Inc., a Delaware corporation;

"**Notice**" means any notice or other written communication to be given under or in relation to the Restructuring Plan;

"**Notice Records**" means the names and addresses (including email addresses) contained in the Plan Company's records for a BrazilCo Plan Creditor at 5:00 p.m. (London time) two Business Days before the date of a relevant Notice;

"**Plan Company**" has the meaning given to it in the Parties section.

"**Plan Consideration**" means the consideration to be received by each BrazilCo Plan Creditor pursuant to this Restructuring Plan and in accordance with the Transaction Implementation Deed;

"**Plan Creditor Letter**" means a plan creditor letter, to be submitted online via the Plan Website to the Information Agent, in the form appended to the Explanatory Statement with such minor or technical amendments as the Court may approve;

"**Plan Creditors**" means, collectively, the BrazilCo Plan Creditors and the CoreCo Plan Creditors;

"**Plan Effective Date**" has the meaning given to that term in Clause 2.2;

"**Plan Meeting**" means a meeting of a class of BrazilCo Plan Creditors convened in accordance with the permission of the Court pursuant to section 901C of the Act to consider and, if thought fit, approve this Restructuring Plan, including any adjournment thereof;

"**Plan Party**" or "**Party**" means the Plan Company, each BrazilCo Plan Creditor and each Undertaking Party, and "**Plan Parties**" and "**Parties**" shall be construed accordingly;

"**Plan Sanction Order**" means the order or orders of the Court sanctioning the Restructuring Plan;

"**Plan Website**" means the website at https://deals.is.kroll.com/nfe;

"**Plans**" means, collectively, this Restructuring Plan and the CoreCo Plan;

"**Proceedings**" means any process, action or other legal proceedings (including, without limitation, any demand, arbitration, alternative dispute resolution, judicial review, adjudication, execution, seizure, distraint, forfeiture, re-entry lien,

9

enforcement of judgment or enforcement of any security), whether arising in connection with the Restructuring or otherwise;

"**PW/PWP AHG**" means the ad hoc group of certain unaffiliated 2029 New Noteholders represented by the PW/PWP AHG Advisors;

"**PW/PWP AHG Advisors**" means, collectively, Paul, Weiss, Rifkind, Wharton & Garrison LLP and Perella Weinberg Partners LP, as counsel and financial advisor, respectively, to the PW/PWP AHG, as well as other regulatory, tax, local, foreign, barristers (including Stephen Robins KC) and special counsel (in each case as notified to the Plan Company), in their respective capacities as counsel to the PW/PWP AHG;

"**R-1 Revolving Credit Facility**" means the facility drawn at approximately US$100 million as of the date of this Restructuring Plan under the Revolving Credit Facility Agreement;

"**R-1 Revolving Credit Facility Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to any agent, any issuing bank, any lender or any lender counterparty of the R-1 Revolving Credit Facility under or in connection with the R-1 Revolving Credit Facility (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise);

"**R-2 Revolving Credit Facility**" means the facility drawn at approximately US$560 million as of the date of this Restructuring Plan under the Revolving Credit Facility Agreement;

"**R-2 Revolving Credit Facility Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to any agent, any issuing bank, any lender or any lender counterparty of the R-2 Revolving Credit Facility under or in connection with the R-2 Revolving Credit Facility (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise);

"**RCF Advisors**" means Sidley Austin LLP, as counsel (together with any external counsel instructed by them in relation to the Restructuring Plan (including Felicity Toube KC and Matthew Abraham of South Square Chambers)) and FTI Consulting, Inc. and Moelis & Company as financial advisors, to the agent under the Revolving Credit Facility Agreement and each of their Affiliates and any other advisors retained by any of the foregoing in connection with the Restructuring in accordance with the Revolving Credit Facility Agreement;

"**RCF Agent**" means MUFG Bank, LTD, in its capacity as the administrative agent and as the collateral agent under the terms of the Revolving Credit Facility Agreement, or any successor thereof;

"**RCF Lenders**" means the lenders of record under the Revolving Credit Facility Agreement;

10

"**Record Date**" means the date on which the BrazilCo Plan Creditors' entitlement to vote on this Restructuring Plan and the value of their BrazilCo Plan Claims will be assessed, being 10 June 2026;

"**Released Advisors**" means:

(a)      the Group Legal Advisor;

(b)      English Company Counsel;

(c)      Houlihan Lokey Capital, Inc. and Alvarez & Marsal Europe LLP, as financial advisors to the Plan Company and the Group;

(d)      the Advisors;

(e)      any local or specialist counsel engaged by any of the foregoing; and

(f)      any successors to the foregoing;

"**Released Parties**" means, each in their various respective capacities as such in connection with the Restructuring and the Restructuring Plan:

(a)      the Plan Company;

(b)      each Group Company;

(c)      each Undertaking Party;

(d)      each Plan Creditor;

(e)      each: (i) Released Advisor; (ii) Advisor Released Person; and (iii) any person acting on the instructions of, or providing services to, any of the foregoing in connection with the Restructuring Plan or the Restructuring;

(f)      each Affiliate of the persons listed at (a) to (e) above; and

(g)      each of the respective officers, directors, employees, partners, executives and agents (or equivalents) of the persons listed in (a) to (f) above (each, a "**Representative**");

"**Restructuring**" has the meaning given to it in the Transaction Implementation Deed;

"**Restructuring Effective Date**" has the meaning given to it in the Transaction Implementation Deed;

"**Restructuring Long-Stop Time**" has the meaning given to it in the Transaction Implementation Deed;

"**Restructuring Plan**" means this restructuring plan proposed by the Plan Company under Part 26A of the Act (including the compromise and arrangement pursuant thereto) in the present form as set out herein or with, or subject to, any modification, addition or condition which the Court may think fit to approve or impose, as appropriate, provided any such modification, addition or condition is

11

approved by the Majority Plan Creditors to the extent required pursuant to Clause 6 (*Modifications of this Restructuring Plan*) herein;

"**Restructuring Support Agreement**" means the Restructuring Support Agreement dated 17 March 2026 originally entered into between, among others, NFE Inc., NFE Global and the Supporting Creditors (as defined therein) and acceded to by the Plan Company on 9 April 2026 and as amended, supplemented and/or restated from time to time;

"**Restructuring Term Sheet**" means the term sheet relating to the Restructuring appended to the Restructuring Support Agreement;

"**Revolving Credit Facility Agreement**" means the Credit Agreement, dated as of 15 April 2021, by and among NFE Inc., the guarantors from time to time party thereto, the lenders and issuing banks from time to time party thereto, and MUFG Bank Ltd., as administrative agent and collateral agent (as amended, supplemented or otherwise modified from time to time);

"**Revolving Credit Facility Debt**" means the R-1 Revolving Credit Facility Debt and the R-2 Revolving Credit Facility Debt;

"**Separation Agreement**" has the meaning given to it in the Transaction Implementation Deed;

"**Series I Lender**" means the lender under the Series I Loan Agreement;

"**Series I Loan**" means the loan made under the Series I Loan Agreement;

"**Series I Loan Agreement**" means the senior secured credit agreement entered into between, among others, the Brazil Parent as lender and NFE Inc. as borrower on 22 November 2024;

"**Series II Lender**" means the lender under the Series II Loan Agreement;

"**Series II Loan**" means the loan made under the Series II Loan Agreement;

"**Series II Loan Agreement**" means the senior secured credit agreement entered into between, among others, NFE Financing as lender and NFE Inc. as borrower on 6 December 2024;

"**Subsidiary**" means, in respect of an entity, any entity in respect of which it has direct or indirect control or owns directly or indirectly more than 50% of the voting rights, voting capital or similar rights of ownership, and "control" for this purpose means the power to direct the management and the policies of the entity whether through the ownership of voting capital, by contract or otherwise;

"**Supporting Creditor**" has the meaning given to it in the Transaction Implementation Deed;

"**Supporting Term Loan A Debt**" has the meaning given to it in the Restructuring Support Agreement;

12

"**Term Loan A**" means the loans and other extensions of credit made under the Term Loan A Agreement;

"**Term Loan A Agreement**" means the credit agreement entered into between, among others, NFE Inc., the TLA Agent and the lenders from time to time party thereto on 19 July 2024, as amended from time to time;

"**Term Loan A Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the lenders of the Term Loan A under or in connection with the Term Loan A Agreement (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise);

"**Term Loan B**" means the loans and other extensions of credit made under the Term Loan B Agreement;

"**Term Loan B Agreement**" means the credit agreement entered into between, among others, NFE Inc., the TLB Agent, and the lenders from time to time party thereto on 30 October 2023, as amended from time to time;

"**Term Loan B Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the lenders of the Term Loan B under or in connection with the Term Loan B Agreement (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise);

"**TLA Advisors**" means Seward & Kissel LLP, as counsel to the TLA Agent under the Term Loan A Agreement;

"**TLA Agent**" means Wilmington Trust, National Association, in its capacity as administrative agent and collateral agent under the Term Loan A Agreement, or any successor thereof;

"**TLA Lenders**" means the lenders of record under the Term Loan A Agreement;

"**TLB Advisors**" means Seward & Kissel LLP, as counsel to the TLB Agent under the Term Loan B Agreement;

"**TLB Agent**" means Wilmington Trust, National Association, in its capacity as administrative agent and collateral agent under the Term Loan B Agreement, or any successor thereof;

"**TLB Lenders**" means the lenders of record under the Term Loan B Agreement;

"**Transaction Implementation Deed**" means the transaction implementation deed to be entered into on (or around) the Plan Effective Date between, among others, the Plan Company, NFE Global, the BrazilCo Plan Creditors and the creditors of NFE Global subject to the CoreCo Plan, in Agreed Form; and

"**Undertaking Party**" means each of the entities listed in Schedule 1.

13

**1.2    Interpretation**

**1.2.1**    In this Restructuring Plan, unless the context otherwise requires or as otherwise expressly provided:

(a)    references to Clauses and Schedules are references to the Clauses of, and Schedules to, the Restructuring Plan and a reference to this "Restructuring Plan" includes a reference to each of the Schedules to this Restructuring Plan;

(b)    references to a statute or statutory provision include the same as subsequently modified, amended, supplemented or re-enacted from time to time;

(c)    references to the Information Agent, the Plan Company, a BrazilCo Plan Creditor, an Undertaking Party, or any other person shall be construed so as to include its and any subsequent successors in title, permitted assigns and permitted transferees;

(d)    where references to any actions, provisions or terms are stated as requiring the consent of the Majority Plan Creditors, such consent shall be deemed to be granted if it has been provided in writing (including by e-mail) by the Majority Plan Creditors' Advisors;

(e)    references to a person include references to an individual, firm, partnership, company, corporation, unincorporated body of persons or any state or state agency;

(f)    references to an agreement, deed or document will be deemed also to refer to such agreement, deed or document as amended, supplemented, restated, varied, verified, replaced and/or novated (in whole or in part) from time to time and to any agreement, deed or document executed pursuant thereto, provided that such amendment, supplement, restatement, variation, verification, replacement and/or novation has, to the extent it relates to an Implementation Document or this Restructuring Plan, been made in accordance with the terms of this Restructuring Plan, the Transaction Implementation Deed or otherwise the terms of such Implementation Document;

(g)    references to an agreement, deed or document shall include any schedules, annexes and appendices to such agreement, deed or document;

(h)    references to (or to any specified provision of) the Restructuring Plan shall be construed as references to the Restructuring Plan as in force for the time being;

(i)    references to a BrazilCo Plan Creditor shall be references to a BrazilCo Plan Creditor in its capacity as a BrazilCo Plan Creditor and an obligation or Liability of a BrazilCo Plan Creditor shall apply to its successors, transferees and assigns (as applicable);

(j)    the singular includes the plural and vice versa and words importing one gender shall include all genders;

(k)    headings to Clauses are for ease of reference only and shall not affect the interpretation of the Restructuring Plan;

(l)    unless otherwise stated, all references in the Restructuring Plan to dates and times are to the date and time prevailing in London, United Kingdom;

14

(m)"including" or "include" shall be deemed to mean including or include without limitation;

(n) "or" is not exclusive;

(o) general words introduced by the word "other" shall not be given a restrictive meaning by reason of the fact that they are preceded by words indicating a particular class of acts, matters or things and general words shall not be given a restrictive meaning by reason of the fact that they are followed by particular examples intended to be embraced by the general words; and

(p) "**US$**" denotes the lawful currency of the United States of America.

## 2    APPLICATION AND EFFECTIVENESS OF THE RESTRUCTURING PLAN

2.1    As soon as reasonably practicable following, and in any event within two Business Days of, the granting of the Plan Sanction Order (or such later date as agreed between the Plan Company and the Majority Plan Creditors' Advisors, each acting reasonably), the Plan Company shall deliver a certified copy of the Plan Sanction Order to the Registrar of Companies in England and Wales for registration in accordance with section 901F of the Act.

2.2    Unless otherwise stated and subject to Clause 8.1, the Restructuring Plan shall become effective and legally binding on the Plan Company and each of the BrazilCo Plan Creditors in accordance with its terms on and from the date certified copies of the Plan Sanction Order and the order or orders of the Court sanctioning the CoreCo Plan are delivered to the Registrar of Companies for registration (the "**Plan Effective Date**").

2.3    The compromises and arrangements effected by the Restructuring Plan will bind:

2.3.1    all BrazilCo Plan Creditors and all of their respective rights, title and interests to BrazilCo Plan Claims and, in each case, their respective permitted successors and assigns;

2.3.2    the Plan Company and its respective permitted successors and assigns;

2.3.3    subject to the terms of the applicable Deed of Undertaking, each Undertaking Party and its respective permitted successors and assigns; and

2.3.4    each other person that has undertaken to be bound by the terms of this Restructuring Plan and their respective permitted successors and assigns.

15

**2.4**    The Plan Company shall notify the Information Agent in accordance with Clause 10 (*Notice*) as soon as reasonably practicable following the occurrence of the Plan Effective Date, and the Information Agent shall make such notice available on the Plan Website.

**3**    **GRANT OF AUTHORITY TO EXECUTE THE IMPLEMENTATION DOCUMENTS**

**3.1**    **Plan Company's Authority to Execute and Give Effect to the Implementation Documents**

**3.1.1**    Subject to the terms of this Clause 3 and Clause 8 (*Termination*) below, with effect on and from the Plan Effective Date, in consideration of the rights and benefits conferred on the BrazilCo Plan Creditors under this Restructuring Plan and solely for the purpose of giving effect to the terms of this Restructuring Plan (and the transactions contemplated by it), notwithstanding any term of any other agreement, instrument or arrangement whatsoever (other than the Implementation Documents), each BrazilCo Plan Creditor hereby irrevocably appoints the Plan Company as its true and lawful attorney and agent, acting by any director, officer, employee or other duly authorised representative, for and on its behalf and in its name, and irrevocably authorises, directs, empowers and instructs the Plan Company, to:

(a)    enter into, execute and deliver as a deed, on behalf of each BrazilCo Plan Creditor in its capacity as a BrazilCo Plan Creditor, the Transaction Implementation Deed, such that each BrazilCo Plan Creditor will become a party to and be bound by the Transaction Implementation Deed;

(b)    enter into, sign, execute, notarise, acknowledge, release, deliver (whether as a deed or otherwise) and, where applicable, file each Implementation Document to which such BrazilCo Plan Creditor is expressed to be a party, such that such BrazilCo Plan Creditor shall be a party to and bound by each such document as if it had executed it personally, in each case in its capacity as BrazilCo Plan Creditor;

(c)    enter into, sign, execute and deliver all deeds, agreements, instruments, certificates, confirmations, notices, elections, transfers, assignments, releases, directions, instructions and filings (including security, guarantee, escrow, perfection and regulatory filings) which are scheduled to, contemplated by, or expressly referred to in, or reasonably required to implement or give effect to this Restructuring Plan or any Implementation Document to which such BrazilCo Plan Creditor is expressed to be a party;

(d)    agree, consent to and effect, on behalf of such BrazilCo Plan Creditor, any amendment, waiver, modification or supplement to any Implementation Document or ancillary document (to which such BrazilCo Plan Creditor is expressed to be a party) which the Plan Company considers necessary or reasonably desirable in connection with the Restructuring provided that any such amendment, modification or supplement is made in accordance with Clause 6 (*Modifications of this Restructuring Plan*);

(e)    give all notices, confirmations, directions and instructions to any trustee, agent, paying agent, information agent, clearing system, registrar, custodian or Administrative Party as may be required or desirable to give effect to this Restructuring Plan and the Implementation Documents;

16

(f) execute and deliver any release, discharge or waiver required to implement the releases and compromises and extinguishment of claims contemplated by this Restructuring Plan and grant the releases under and in accordance with the Transaction Implementation Deed;

(g) take any step, make any determination and do any act which the Plan Company considers necessary to carry out, enforce or consummate this Restructuring Plan and the transactions contemplated by it, including actions required under the laws of any jurisdiction (acting reasonably and, with respect to any step, determination or action not contemplated by the Transaction Implementation Deed, with the consent of the Majority Plan Creditors (unless such step, determination or action is required by applicable law, in which case no such consent shall be required but if permitted, the Plan Company shall provide written notice of any such step, determination or action being undertaken to the BrazilCo Plan Creditors)), provided that such related or ancillary actions do not change any right or obligation of, or impose an additional obligation (by reference to such rights or obligations as are contemplated as at the Plan Effective Date) on, a BrazilCo Plan Creditor and do not adversely affect any BrazilCo Plan Creditor;

(h) grant powers of attorney or authorities (under English law or any other applicable law) with equivalent or lesser scope to the power of attorney granted by this Clause 3 to any person selected by the Plan Company for the purposes of implementing the documents and steps set out in this Clause 3.1.1; and

(i) do all such other related or ancillary acts and things as the Plan Company considers (acting reasonably and, with respect to any action not contemplated by the Transaction Implementation Deed, with the consent of the Majority Plan Creditors) to be reasonably necessary or desirable to the full and timely implementation of this Restructuring Plan and the transactions contemplated by it, provided that such other acts or things do not change any right or obligation of, or impose an additional obligation (by reference to such rights or obligations as are contemplated as at the Plan Effective Date) on, a BrazilCo Plan Creditor and do not adversely affect any BrazilCo Plan Creditor.

**3.2** Subject to the terms of this Clause 3 and Clause 8 (*Termination*) below, the authority and power of attorney granted pursuant to this Clause 3 is irrevocable, being granted for valuable consideration and to secure the performance of obligations under this Restructuring Plan.

**3.3** Each BrazilCo Plan Creditor waives any right to revoke or terminate such authority except as expressly provided in this Restructuring Plan.

**3.4** Each BrazilCo Plan Creditor irrevocably agrees that it shall be bound by, and shall comply with, each Implementation Document and any ancillary document to which such BrazilCo Plan Creditor is a party (as if it were an original executing party) after such document has been fully executed, dated, released and delivered by the Plan Company on its behalf

17

pursuant to, and in accordance with, this Clause 3 and the Transaction Implementation Deed.

**3.5** The authority granted pursuant to this Clause 3 shall:

**3.5.1** continue until the earlier of (i) Restructuring Effective Date or (ii) such other termination date as expressly provided in this Restructuring Plan, at which time it shall automatically expire; and

**3.5.2** automatically lapse in respect of any Implementation Document or ancillary document once that document has been fully executed, released and delivered, whereupon it may thereafter be amended only in accordance with its terms.

**3.6** Nothing in this Clause 3 authorises or permits the Plan Company to commence any Proceedings in the name of, or on behalf of, any BrazilCo Plan Creditor.

**3.7** Promptly following any amendments, modification or variations being made to any Implementation Document pursuant to this Clause 3, the Plan Company shall procure that such Implementation Document (as amended, modified or varied) is promptly made available to the BrazilCo Plan Creditors and each relevant Undertaking Party via the Plan Website and in accordance with the notice provisions of the applicable Deed of Undertaking (if any).

**3.8** **Administrative Parties' Authority**

**3.8.1** Subject to the terms of any Deed of Undertaking or applicable Implementation Document, with effect on and from the Plan Effective Date, each of the BrazilCo Plan Creditors hereby irrevocably authorises and instructs each applicable Administrative Party, as their agent and attorney (acting by any one of their duly appointed representatives) to:

(a) enter into, execute, deliver and perform (whether as a deed or otherwise) each Implementation Document to which such Administrative Party is expressed to be a party, provided that such Implementation Documents (other than the Transaction Implementation Deed) shall only become effective in accordance with their respective terms and as provided in the Transaction Implementation Deed and this Restructuring Plan, whereupon they shall become binding on all parties thereto;

(b) take all steps and do all other things as may be necessary or reasonably desirable to give effect to or implement the Restructuring, this Restructuring Plan and the transactions contemplated by it, including entering into, executing and delivering all such documents as the Plan Company reasonably requests or the relevant Administrative Party considers reasonably necessary or desirable for such purpose, and taking any step expressed in this Restructuring Plan or any Implementation Document to be taken by such Administrative Party;

(c) act and rely, without further verification, on any written instruction from the Plan Company (acting on behalf of the BrazilCo Plan Creditors pursuant to Clause 3.1) to take any action referred to in this Clause 3.8 or otherwise under this Restructuring Plan, and be entitled to assume that any such instruction complies with the terms of this Restructuring Plan and the Implementation Documents;

18

(d) give all such instructions, consents or confirmations to any trustee, agent, security agent, paying agent, registrar, clearing system or other Administrative Party as are reasonably requested by the Plan Company (in accordance with the authority granted to it under this Restructuring Plan, where applicable), and any other directions that may reasonably be requested by the Plan Company (in accordance with the authority granted to it under this Restructuring Plan, where applicable), for the purposes of implementing any step contemplated by the Restructuring or this Restructuring Plan; and

(e) take each step under this Restructuring Plan or any Implementation Document expressed to be taken by the relevant Administrative Party, including the giving, execution, delivery and performance of any obligations, consents, confirmations, acknowledgements, agreements, waivers or authorizations, in each case as reasonably requested by the Plan Company (in accordance with the authority granted to it under this Restructuring Plan, where applicable) for the purposes of implementing this Restructuring Plan and subject to applicable law and the terms of the relevant Implementation Documents, and

each BrazilCo Plan Creditor acknowledges and irrevocably confirms, authorizes, directs, and ratifies any such action taken by any Administrative Party on or prior to the Plan Effective Date, and in each case provided that each Administrative Party shall have all of the protections, immunities, rights, powers, authorities, indemnities, exculpations, exclusions or limitations of liability and/or benefits conferred on it under and by the applicable Debt Documents governing its appointment and, upon such document's effectiveness and in respect of actions taken after the effectiveness thereof, the Implementation Documents.

**3.8.2** No Administrative Party shall have any Liability to the Plan Company, any BrazilCo Plan Creditor or any of their respective Affiliates for any action taken, document executed or reliance placed on any instruction given to it in accordance with Clause 3.8.1 above, except to the extent arising from its fraud, gross negligence or willful misconduct as determined by a final non-appealable judgment issued by a court of competent jurisdiction.

**3.8.3** In complying with any authorisations, instructions or requests pursuant to this Clause 3.8, each Administrative Party:

(a) shall be entitled to assume that any instructions received by it pursuant to this Restructuring Plan have been duly given in accordance with its terms and the relevant Debt Documents or Implementation Documents;

(b) shall be entitled to assume that, unless it has received notice to the contrary, such instructions have not been revoked;

(c) shall not be obliged to do or omit to do anything if it would, or might in its reasonable opinion, constitute a breach of any applicable law, regulation or contractual obligation or any duty binding upon it;

(d) shall have only those duties, obligations and responsibilities as are expressly specified in this Restructuring Plan and the Implementation Documents to which it is a party (and no others shall be implied), and such duties shall be of a mechanical and administrative nature;

19

(e) shall not be responsible for the legality, validity, effectiveness, adequacy or enforceability of any Implementation Document or any transaction contemplated by this Restructuring Plan; and

(f) shall not be liable (other than in the case of fraud, gross negligence or willful misconduct on the part of such Administrative Party as determined by a final non-appealable judgment issued by a court of competent jurisdiction) for any loss, Liability or damage, or any failure or delay in the performance of its obligations, arising out of or in connection with:

(i) any action taken or omitted to be taken in accordance with instructions received pursuant to this Restructuring Plan;

(ii) the exercise or non-exercise of any right, power, authority or discretion conferred on it; or

(iii) any event or circumstance beyond its reasonable control, including (without limitation) governmental action, market disruption, failure of systems or communications, natural events or industrial action.

**3.9** The authorities, appointments and instructions granted in Clauses 3.1 and 3.8 shall be treated, for all purposes whatsoever and without limitation, as having been granted by deed.

**4      DEEDS OF UNDERTAKING**

**4.1** Subject to Clause 8 (*Termination*) and the terms of the Deeds of Undertaking executed by them, each of the Undertaking Parties severally undertakes, with effect on and from the Plan Effective Date: (i) to be bound by, and to comply with, and to perform, the obligations expressed to apply to it in this Restructuring Plan and the Undertakings (as defined therein) set out in its Deed of Undertaking, and (ii) to take all steps and execute all such documents as may be necessary or reasonably desirable for the purpose of giving effect to this Restructuring Plan, including executing and delivering (through power of attorney appointed under the Deed of Undertaking or otherwise) the Implementation Documents to which they will be a party and the documentary conditions precedent (if any) applicable to them. Each BrazilCo Plan Creditor (in respect of the applicable Administrative Parties who are Undertaking Parties only) and the Plan Company ratifies the execution by each Undertaking Party of its Deed of Undertaking and the taking of any actions by such Undertaking Party pursuant to this Clause 4.1.

**5      CLOSING STEPS AND PLAN CONSIDERATION**

**5.1    Closing Steps**

**5.1.1** As soon as reasonably practicable following the Plan Effective Date, the Plan Company shall execute the Transaction Implementation Deed for and on behalf of itself, the applicable Undertaking Parties as attorney for such Undertaking Parties in accordance with their Deeds of Undertaking, and, in accordance with Clause 3 (*Grant of Authority to Execute the Implementation Documents*), on behalf of the BrazilCo Plan Creditors.

**5.1.2** The steps to be taken to implement the Restructuring and the transactions contemplated in the Plans (the "**Closing Steps**") shall take place in accordance

with, and in the order and at the times specified in, the terms of the Transaction Implementation Deed.

**5.1.3** The applicable Implementation Documents shall be signed, dated and released in accordance with the Transaction Implementation Deed.

**5.2   Plan Consideration**

**5.2.1** The BrazilCo Plan Creditors acknowledge and agree that the BrazilCo Plan Creditors shall:

(a) receive their Plan Consideration in accordance with the terms set out in the Transaction Implementation Deed; and

(b) give the authorities, instructions, undertakings, releases, ratifications, and waivers in favour of the Plan Company and the Released Parties, where applicable, in consideration of the rights provided to each BrazilCo Plan Creditor under this Restructuring Plan and the Transaction Implementation Deed.

**5.2.2** The Plan Consideration of the BrazilCo Plan Creditors shall be calculated and paid (or issued, as applicable) in accordance with the Transaction Implementation Deed, including that a BrazilCo Plan Creditor may receive Plan Consideration via the Holding Period Trust if necessary and in accordance with the terms of the Holding Period Trust Deed, and shall include the following Plan Consideration Instruments (each as defined in the Transaction Implementation Deed):

| BrazilCo Plan Debt | Plan Consideration Instruments |
| --- | --- |
| 2029 New Notes Debt | BrazilCo Common Equity |

**5.3   Standstill**

**5.3.1** On and from the Plan Effective Date until the Restructuring Effective Date, or if earlier, until the termination of this Restructuring Plan in accordance with Clause 8 (*Termination*), each BrazilCo Plan Creditor shall not (and no person or entity shall be entitled to, on behalf of such BrazilCo Plan Creditor), in any jurisdiction:

(a) exercise or seek to exercise any rights, remedies, powers or discretions (including any right to accelerate, enforce any guarantee or make any demand in respect of any Liability) under or in connection with the Debt Documents, or instruct or direct any other person to do so;

(b) commence, continue or take any step in relation to any legal, judicial, administrative, arbitral or other proceedings against the Plan Company or any other Existing Obligor or their respective assets or proceeds thereof (including the enforcement of any judgment, order, award, lien or security), or instruct or direct any other person to do so, in each case in connection with the Debt Documents (other than any action taken in response to, or in connection with, any proceedings commenced by or on behalf of any member of the Group);

(c) take any step to enforce, attach, sequester or levy execution against any asset of the Plan Company or any other Existing Obligor, or to enforce or realise any security

21

or other encumbrance, or instruct or direct any other person to do so, in each case in connection with the Debt Documents; or

(d) take any action which would, or would reasonably be expected to, impede, delay or frustrate the implementation of the transactions contemplated by this Restructuring Plan,

in each case, other than as expressly contemplated by, and in accordance with, this Restructuring Plan, the Transaction Implementation Deed or any other Implementation Document, or where such action is taken for the purpose of giving effect to the Restructuring.

## 6    MODIFICATIONS OF THIS RESTRUCTURING PLAN

6.1    The Plan Company may, subject to the terms of the Restructuring Support Agreement (including the consent rights contained therein), at any hearing to sanction this Restructuring Plan, acting reasonably and in good faith, consent on behalf of the BrazilCo Plan Creditors to any modification, amendment, variation or supplement to or of this Restructuring Plan, the Transaction Implementation Deed or any other Implementation Document on terms or conditions that the Court may think fit to approve or impose for the purpose of consummating or implementing this Restructuring Plan, provided that such modification, amendment, variation or supplement cannot reasonably be expected to, directly or indirectly: (i) have a material and adverse or, relative to the other BrazilCo Plan Creditors, disproportionate effect on the rights or interests of a BrazilCo Plan Creditor under this Restructuring Plan or any Implementation Document; or (ii) alter any right or obligation, or impose any additional or new material obligation on any BrazilCo Plan Creditor (by reference to such rights or obligations as contemplated as at the Record Date), in each case unless such BrazilCo Plan Creditor consents in writing.

6.2    After the Plan Sanction Order has been granted, the terms of this Restructuring Plan may be amended, waived or supplemented with the consent of the Plan Company and the Majority Plan Creditors, provided that such amendment, waiver or supplement is only of a technical or non-material nature or to correct a manifest error, and provided further that any such proposed amendment, waiver or supplement cannot reasonably be expected to, directly or indirectly: (i) have a material and adverse or, relative to the other BrazilCo Plan Creditors, disproportionate effect on the rights or interests of a BrazilCo Plan Creditor under this Restructuring Plan or any Implementation Document; or (ii) alter any right or obligation, or impose any additional or new material obligation on any BrazilCo Plan Creditor (by reference to such rights or obligations as contemplated as at the Record Date), in each case unless such BrazilCo Plan Creditor consents in writing.

6.3    No modification, amendment, variation or supplement shall be made to this Clause 6 without the consent of each BrazilCo Plan Creditor, and no modification, amendment or variation to the designation of documents as Implementation Documents hereunder shall be made without the consent of the Majority Plan Creditors. No modification, amendment, variation or supplement that affects the rights or duties of any Administrative Party shall be made without the consent of such Administrative Party.

6.4    The Plan Company shall promptly notify the BrazilCo Plan Creditors (by notice to the Majority Plan Creditors' Advisors and by the Information Agent making such notice available on the Plan Website) and each Administrative Party (in accordance with the notice provisions of the applicable Deed of Undertaking) of the occurrence of any modification,

22

amendment or variation made to this Restructuring Plan or any Implementation Document in accordance with this Clause 6.

6.5 Nothing in this Restructuring Plan or the Transaction Implementation Deed shall govern the modification, amendment or waiver of any Implementation Document once such document becomes effective in accordance with its terms.

## 7 RELEASES

7.1 Subject to Clause 7.2, with effect from the Restructuring Effective Date, each Plan Party (on behalf of itself and each of its permitted successors and assigns) irrevocably, unconditionally, fully and absolutely:

7.1.1 pursuant to this Restructuring Plan, waives, releases and forever discharges any and all actions, proceedings, claims, damages, counterclaims, complaints, liabilities, liens, rights, demands, causes of action, set-offs or other obligations, whether present or future, prospective or contingent, whether in this jurisdiction or any other or under any law, of whatsoever nature and howsoever arising, whether in law or in equity, in contract (including, but not limited to, breaches or non-performances of contract), in statute or in tort (including, but not limited to, negligence and misrepresentation) or in any other manner whatsoever, breaches of statutory duty, for contribution, or for interest and/or costs and/or disbursements, whether or not for a fixed or unliquidated amount, whether filed or unfiled, whether asserted or unasserted, whether or not presently known to the parties or to the law, in each case that it ever had, may have or hereafter can, shall or may have arising out of actions, omissions or circumstances occurring on or prior to the Restructuring Effective Date against each and any Released Party whatsoever or howsoever arising (and notwithstanding any subsequent facts or information becoming known following the Restructuring Effective Date), in relation to or arising directly or indirectly out of or in connection with: (a) the negotiation, preparation, sanction or implementation of the Plans and/or the Restructuring; or (b) the BrazilCo Plan Claims (in each case, including, without limitation, the negotiation, preparation, sanction, execution or implementation of any Implementation Documents);

7.1.2 pursuant to this Restructuring Plan, waives, releases and forever discharges all rights, title and interest it has in the BrazilCo Plan Claims, and all Liabilities owed by a Group Company to any Plan Party in relation to such BrazilCo Plan Claims; and

7.1.3 undertakes to the Released Parties that it will not commence or continue, or instruct, direct or authorise any other person to commence or continue, any process, action, other legal proceedings (including, without limitation, any demand, arbitration, alternative dispute resolution, judicial review, adjudication, execution, seizure, distraint, forfeiture, re-entry, lien, enforcement of judgment or enforcement of any security), in any jurisdiction whatsoever against any Released Party in respect of the actions ratified or the waivers, releases, and discharges referred to in Clauses 7.1.1 and 7.1.2 above.

7.2 Clause 7.1 shall not discharge, limit, vary, impact, compromise or otherwise affect in any way: (i) the Excluded Liabilities, (ii) any rights of any Plan Party arising under or in connection with the Implementation Documents (including guarantees or security interests or other obligations and any rights to submit claims and, if eligible, receive distributions in accordance with the Restructuring Plan or any Implementation Document), or (iii) any

claims of any Plan Party which may arise or accrue in relation to acts, omissions or circumstances occurring after the Restructuring Effective Date.

**7.3**     Nothing in this Restructuring Plan shall prevent a BrazilCo Plan Creditor from responding to or taking any action to defend itself in any claims or Proceedings which are asserted against it or any of its Representatives.

**8**     **TERMINATION**

**8.1**     This Restructuring Plan shall terminate with immediate effect upon the occurrence of any of the following events:

**8.1.1**     the Restructuring Effective Date does not occur on or before the Restructuring Long-Stop Time; or

**8.1.2**     the Transaction Implementation Deed terminates in accordance with its terms prior to the Restructuring Effective Date (other than as a result of the Restructuring Effective Date having occurred).

**8.2**     Upon termination of this Restructuring Plan pursuant to Clause 8.1:

**8.2.1**     the terms of and the obligations on, and rights granted to, the Plan Parties under or pursuant to this Restructuring Plan and any Implementation Document shall lapse and be of no further force or effect;

**8.2.2**     all compromises, arrangements and releases provided for under or pursuant to this Restructuring Plan and each other Implementation Document shall be of no effect and shall be construed as if this Restructuring Plan and each other Implementation Document had never become effective;

**8.2.3**     the rights and obligations of the BrazilCo Plan Creditors shall remain unaffected by this Restructuring Plan and shall be reinstated and remain in full force and effect as they applied immediately prior to the Plan Effective Date; and

**8.2.4**     any defaults under any agreement governing the terms of any BrazilCo Plan Claim, including the Debt Documents, and any consequences thereof (including any alleged deemed or actual acceleration) shall be reinstated as if such default had been continuing since the date on which it originally occurred or was deemed to occur.

**8.3**     Promptly following termination of this Restructuring Plan, the Plan Parties shall execute such documents and perform such acts and things as are reasonably necessary and/or desirable to give effect to Clause 8.2 and 8.4 (including, where applicable, reversing any steps taken in contemplation of the implementation of the Restructuring).

**8.4**     In the event of termination of this Restructuring Plan pursuant to this Clause 8, the Plan Company shall promptly notify all BrazilCo Plan Creditors (by notice to the Majority Plan Creditors' Advisors and by the Information Agent making such notice available on the Plan Website) and the Administrative Parties, and any release, standstill, power of attorney, instruction or authority granted pursuant to this Restructuring Plan or any Implementation Document shall be automatically revoked and terminated. Any action taken under any

24

power of attorney granted pursuant to this Restructuring Plan shall be automatically void and of no further force or effect.

8.5     This Clause 8, Clause 1 (*Definitions and Interpretation*) and Clause 12 (*Governing Law and Jurisdiction*) shall survive any termination of this Restructuring Plan.

## 9     GENERAL RESTRUCTURING PLAN PROVISIONS

### 9.1     Ratification

9.1.1   In consideration for its rights and entitlements under this Restructuring Plan, and subject to the occurrence of, the Restructuring Effective Date:

(a) each Plan Party hereby irrevocably ratifies and confirms everything which:

(i) the Plan Company and its respective directors, officers or other duly appointed representatives have lawfully done or caused to be done, to the extent compliant with the terms of this Restructuring Plan and the Implementation Documents;

(ii) was lawfully done or caused to be done by any Undertaking Party or its representatives pursuant to any authority conferred by this Restructuring Plan or the Implementation Documents; and

(iii) the Information Agent and its respective directors, managers, officers or other duly appointed representatives has each lawfully done or caused to be done or purported to be done, in each case to the extent in compliance with this Restructuring Plan or the Implementation Documents,

in each case on or prior to the Restructuring Effective Date; and

(b) each BrazilCo Plan Creditor hereby irrevocably undertakes to the Plan Parties to treat all BrazilCo Plan Claims and the (direct and indirect) rights and obligations of each BrazilCo Plan Creditor under the Debt Documents as having been effectively varied and/or released in the manner envisaged by this Restructuring Plan, the Transaction Implementation Deed and the Implementation Documents.

### 9.2     Costs

9.2.1   The Plan Company or another Group Company will pay in full all costs, charges, expenses, and disbursements incurred by it in connection with the negotiation, preparation, and implementation of this Restructuring Plan as and when they arise, including, but not limited to, the costs of holding the Plan Meetings, the costs of obtaining the sanction of the Court and the costs of placing notices (if any) required by this Restructuring Plan.

### 9.3     Record Date

9.3.1   For the purposes of calculating entitlements to receive Plan Consideration, all BrazilCo Plan Claims shall be determined by the Plan Company, acting on information provided by the Information Agent, in accordance with the methodology set out in the Transaction Implementation Deed, as at the Record Date.

25

**9.4** **Assignments or transfers**

**9.4.1** The Plan Company shall be under no obligation to recognise any assignment or transfer of rights, benefits or interests in the Debt Documents after the Record Date for the purposes of calculating entitlements to receive Plan Consideration under this Restructuring Plan and has no obligations hereunder to any person other than the BrazilCo Plan Creditors on the Record Date, provided that, where the Plan Company has received from the relevant parties notice in writing of such assignment or transfer prior to the Restructuring Effective Date, the Plan Company may, in its sole discretion and subject to the production of such other evidence in relation to such assignment or transfer as it may reasonably require and to any other terms and conditions which the Plan Company may consider necessary or desirable, acting reasonably, agree to recognise such assignment or transfer for the purposes of calculating entitlements to receive Plan Consideration under this Restructuring Plan.

**9.4.2** Any assignee or transferee of the interests in the Debt Documents recognised by the Plan Company pursuant to this Clause 9.4 shall be bound by the terms of the Restructuring Plan as a BrazilCo Plan Creditor and shall produce such evidence as the Plan Company may reasonably require to confirm that it has agreed to be bound by the terms of this Restructuring Plan.

**9.5** **Obligations on days other than a Business Day**

**9.5.1** If any obligation is to be performed under the terms of the Restructuring Plan on a date other than a Business Day, the relevant obligation shall be performed on the next Business Day.

**9.6** **Exercise of discretion**

**9.6.1** Where, under or pursuant to any provision of this Restructuring Plan, a matter is to be determined by the Plan Company, it will be determined by the directors of the Plan Company in their discretion in such manner as they may consider fair and reasonable.

**9.7** **Severability**

**9.7.1** If at any time any provision of this Restructuring Plan is or becomes illegal, invalid or unenforceable in any respect under the law of any jurisdiction, such provision shall be severed from the Restructuring Plan for the purposes of that jurisdiction, and neither the legality, validity or enforceability of that provision under the law of any other jurisdiction nor the legality, validity or enforceability of any other provision of this Restructuring Plan under the law of that or any other jurisdiction will in any way be affected or impaired thereby, and the rest of the Restructuring Plan shall continue in full force and effect in that jurisdiction as if the severed provision had not been included.

**9.8** **BrazilCo Plan Creditors' obligations**

**9.8.1** The obligations of each BrazilCo Plan Creditor under this Restructuring Plan are several.

**9.9**     **Conflict**

**9.9.1**   In the case of any conflict or inconsistency between the terms of this Restructuring Plan and the terms of the Explanatory Statement, the terms of this Restructuring Plan will prevail.

**10**     **NOTICE**

**10.1**   Any notices (including any service of process in connection with a breach of the Restructuring Plan) shall be given in writing and shall be deemed to have been duly given if it is uploaded to the Plan Website *and* delivered by hand, pre-paid first class post, airmail or electronically to the following parties:

(a)  if to the Plan Company, to:

> NFE Brazil Newco Limited
> Suite 1, 7th Floor 50 Broadway
> London SW1H 0DB
> United Kingdom
> Email: NFEBrazilUK@newfortressenergy.com
> Attention: Office of the General Counsel

with copies (which shall not constitute notice) to:

> Skadden, Arps, Slate, Meagher & Flom (UK) LLP
> 22 Bishopsgate
> London EC2N 4BQ
> United Kingdom
> Email: Peter.Newman@Skadden.com;
> Christopher.Dressel@skadden.com; and DLPLady@Skadden.com
> Attention: Peter Newman; Christopher Dressel

(b)  if to a BrazilCo Plan Creditor, to its last known address, fax number or email address stated in the Plan Creditor Letter or failing that according to the Notice Records, and if to any member of the PW/PWP AHG, with copies (which shall not constitute notice) to:

> Paul, Weiss, Rifkind, Wharton & Garrison LLP
> 1285 Avenue of the Americas
> New York, New York 10019
> Attention: Andrew Rosenberg; Sung Pak; Kyle R. Satterfield
> Email: arosenberg@paulweiss.com; spak@paulweiss.com;
> ksatterfield@paulweiss.com

(c)  if to the Information Agent, to:

Kroll Issuer Services Limited
The News Building 3 London Bridge Street
London SE1 9SG
United Kingdom
Attention: Ivan Santek/ Alessandro Zorza
E-mail: nfe@is.kroll.com
Phone: +44 20 7089 0909
Plan Website: https://deals.is.kroll.com/nfe

10.2    BrazilCo Plan Creditors and any Administrative Party shall have the right to request a paper copy of any Notice by contacting the Information Agent. The Information Agent shall send such requested documents by first class post in respect of BrazilCo Plan Creditors whose address is in the UK and by "international standard post" in respect of BrazilCo Plan Creditors whose address is outside the UK.

10.3    Any Notice shall be deemed to have been delivered and served:

(a)    if by way of e-mail:

(i)    subject to Clause 10.3(a)(ii), when sent; and

(ii)    if one or more E-Mail Error Messages are sent from and with respect to a person's e-mail address for the purposes of Notices within one hour of such e-mail being sent, the e-mail shall not be deemed to be delivered and effective unless the intended recipient confirms receipt (but failure of an e-mail to be deemed delivered and effective shall not affect other or subsequent e-mails, or delivery of a communication or document pursuant to another method permitted under this Clause 10);

(b)    if by way of letter, five Business Days after being deposited in the post postage prepaid in an envelope and addressed correctly;

(c)    if delivered by hand or courier, on the first Business Day following delivery; and

(d)    if by way of upload to the Plan Website, when viewable on the Plan Website (written notice of which shall be distributed by the Plan Company to each Plan Party); and, if a particular department or officer is specified as part of the address details provided under this Clause 10, if addressed to that department or officer (other than with respect to Clause 10.3(d)).

28

**10.4**    In proving service, it shall be sufficient proof, in the case of a Notice sent by post, that the envelope was properly stamped, addressed and placed in the post.

**10.5**    The accidental omission to send any Notice, written communication or other document in accordance with this Clause 10, or the non-receipt of any such Notice by any BrazilCo Plan Creditor, shall not affect the provisions of the Restructuring Plan or their effectiveness.

## 11    PLAN PARTIES

**11.1**    Each Plan Party shall enjoy the benefit and be entitled to enforce the terms of this Restructuring Plan.

**11.2**    Except as provided in this Restructuring Plan, no rights are conferred on any person under the Contracts (Rights of Third Parties) Act 1999 to enforce the terms of this Restructuring Plan.

## 12    GOVERNING LAW AND JURISDICTION

**12.1**    **Subject to Clause 12.2**:

   **12.1.1**    the Restructuring Plan and any non-contractual obligations arising out of or in connection with the Restructuring Plan shall be governed by, and construed in accordance with, the laws of England and Wales; and

   **12.1.2**    the BrazilCo Plan Creditors hereby agree that the Court shall have exclusive jurisdiction to hear and determine any suit, action or proceeding and to settle any dispute which may arise out of or in connection with the Restructuring Plan, or out of any action taken or omitted to be taken under the Restructuring Plan or any non-contractual obligations arising out of or in connection with the Restructuring Plan. For such purposes the BrazilCo Plan Creditors irrevocably submit to the jurisdiction of the Court.

**12.2**    Nothing in this Clause 12 shall:

   **12.2.1**    affect the validity of other provisions of the Implementation Documents (from and after the date such documents become effective) determining governing law and jurisdiction as between the Plan Company and the BrazilCo Plan Creditors, whether contained in any contract or otherwise; or

   **12.2.2**    prevent the Plan Company from relying upon the provisions of this Restructuring Plan in any foreign court or in any foreign proceedings.

**12.3**    The Restructuring Plan shall take effect subject to any prohibition or condition imposed by applicable law.

*[The remainder of this page is intentionally left blank]*

## Schedule 1 – Undertaking Parties

Entities accompanied by an asterisk are planned to be dissolved within 30 or 60 days following the Restructuring Effective Date. In order to comply with that timeframe, the dissolution of certain of these entities may be commenced or completed prior to the sanction hearing in relation to the Plans. To the extent this occurs, an updated list will be filed with the court in advance of the sanction hearing with any such entities flagged.

1. Amaunet, S. de R.L. de C.V.

2. American Energy Logistics Solutions LLC *

3. Atlantic Energy Holdings LLC

4. Atlantic Pipeline Holdings SRL *

5. Bradford County Development Holdings LLC *

6. Bradford County GPF Holdings LLC *

7. Bradford County GPF Partners LLC *

8. Bradford County Power Holdings LLC *

9. Bradford County Power Partners LLC *

10. Bradford County Real Estate Partners LLC

11. Bradford County Transport Holdings LLC *

12. Bradford County Transport Partners LLC *

13. Encanto East LLC *

14. Encanto Power West LLC *

15. Encanto West LLC *

16. Island LNG LLC *

17. LA Development Holdings LLC *

18. LA Real Estate Holdings LLC *

19. LA Real Estate Partners LLC

20. LNG Holdings LLC *

21. Mexico FLNG Onshore S. de R.L. de C.V.

22. New Fortress Energy Holdings LLC

23. New Fortress Energy Inc.

30

24.     New Fortress Energy Marketing LLC

25.     New Fortress Intermediate LLC

26.     NFE Altamira Onshore S. de R.L. de C.V.

27.     NFE Andromeda Chartering LLC

28.     NFE Angola Holdings LLC *

29.     NFE Atlantic Holdings LLC

30.     NFE BCS Holdings (A) LLC

31.     NFE BCS Holdings (B) LLC

32.     NFE BCS Mexico Holdings, S. de R.L. de C.V.

33.     NFE Bermuda Holdings Limited

34.     NFE Brazil Newco Limited

35.     NFE Equipment Holdings LLC *

36.     NFE Equipment Partners LLC

37.     NFE Financing LLC

38.     NFE FLNG 1 Issuer LLC

39.     NFE FLNG 2 LLC

40.     NFE Ghana Holdings LLC *

41.     NFE Ghana Partners LLC *

42.     NFE Global Holdings Limited

43.     NFE Global Shipping LLC *

44.     NFE GP LLC

45.     NFE Grand Shipping LLC

46.     NFE Honduras Holdings LLC *

47.     NFE International Holdings

48.     NFE International Holdings 1 Limited

49.     NFE International Holdings 2 Limited

50.     NFE International Holdings Limited

51.     NFE International LLC

31

52.   NFE International Shipping LLC

53.   NFE ISO Holdings LLC *

54.   NFE ISO Partners LLC

55.   NFE Jamaica GP LLC *

56.   NFE Logistics Holdings LLC *

57.   NFE Management LLC

58.   NFE Mexico Holdings Parent S. à R.L.

59.   NFE Mexico Holdings S. à R.L.

60.   NFE Mexico Power Holdings Limited

61.   NFE Mexico Terminal Holdings Limited

62.   NFE Nicaragua Development Partners LLC

63.   NFE Nicaragua Development Partners LLC, Sucursal Nicaragua

64.   NFE Nicaragua Holdings LLC

65.   NFE North Trading LLC

66.   NFE Pacifico LAP, S. de R.L. de C.V.

67.   NFE Pioneer 1 LLC

68.   NFE Pioneer 2 LLC

69.   NFE Pioneer 3 LLC

70.   NFE Plant Development Holdings LLC *

71.   NFE Power PR LLC

72.   NFE Shannon Holdings Limited

73.   NFE South Power Holdings LLC

74.   NFE South Power Trading Limited

75.   NFE Sub LLC

76.   NFE Transport Holdings LLC *

77.   NFE Transport Partners LLC

78.   NFE UK Holdings Limited

79.   NFE US Holdings LLC

32

80.  Nfenergia GN de BCS, S. de R.L. de C.V.

81.  NFENERGÍA LLC

82.  Nfenergia Mexico, S. de R.L. de C.V.

83.  PA Development Holdings LLC *

84.  PA Real Estate Holdings LLC *

85.  PA Real Estate Partners LLC *

86.  Soluciones de Energia Limpia PR LLC

87.  Tico Development Partners Holdings LLC *

88.  Tico Development Partners LLC *

89.  NFE Brazil Funding LP *

90.  NFE Brazil Funding LLC *

91.  Hygo Energy Transition Ltd.

92.  NFE Brazil Financing Limited

93.  LNG Power Limited (UK)

94.  NFE Power Brasil Participações S.A.

95.  NFE Power Latam Participações e Comércio Ltda.

96.  CELBA – Centrais Elétricas Barcarena S.A.

97.  Barcarena Offshore Capital LLC

98.  NFE Power SSLNG Participações Ltda.

99.  NFE Power Distribuidora de Gás Natural Ltda.

100.  NFE Brazil Holdings Limited

101.  NFE Brazil Holdings LLC

102.  Shannon LNG Energy Limited

103.  Shannon LNG Limited

104.  NFE Brazil Investments LLC

105.  U.S. Bank Trust Company, National Association as 2026 Legacy Notes Trustee, 2029 Legacy Notes Trustee and Initial Common Representative

106. Wilmington Savings Fund Society, FSB as 2029 New Notes Trustee, Series I Agent, Series II Agent, and Brazil Parent Intercompany Agent

107. MUFG Bank, Ltd as RCF Agent and Second Additional Common Representative

108. Wilmington Trust, National Association, as TLA Agent, TLB Agent, First Equal Priority Agent, Second Equal Priority Agent, New CoreCo Term Loan Facility Agent and FLNG 2 Term Loan Agent

109. Natixis, New York Branch as New Common Representative

110. Kroll Issuer Services Limited as Holding Period Trustee and Information Agent.

**APPENDIX 2**

**INSTRUCTIONS AND GUIDANCE FOR PLAN CREDITORS**

**INSTRUCTIONS AND GUIDANCE FOR PLAN CREDITORS**

**THIS APPENDIX SETS OUT INSTRUCTIONS AND GUIDANCE FOR VOTING AT THE PLAN MEETINGS AND CERTAIN ADDITIONAL MATTERS.**

**PRIOR TO SUBMITTING THE PLAN CREDITOR LETTER, ALL PLAN CREDITORS ARE ADVISED TO READ:**

**(A)     THE GENERAL GUIDANCE IN SECTION 1 (GENERAL GUIDANCE);**

**(B)     THE VOTING GUIDANCE FOR PLAN CREDITORS IN SECTION 2 (VOTING GUIDANCE FOR PLAN CREDITORS);**

**(C)     IN RESPECT OF EARLY CONSENT FEE CREDITORS, THE GUIDANCE FOR RECEIVING THE EARLY CONSENT FEE IN SECTION 3 (GUIDANCE FOR RECEIVING THE EARLY CONSENT FEE); AND**

**(D)     IN RESPECT OF LEGACY NOTEHOLDERS AND 2029 NEW NOTEHOLDERS, THE GUIDANCE IN SECTION 4 (GUIDANCE FOR LEGACY NOTEHOLDERS AND 2029 NEW NOTEHOLDERS).**

**SECTION 1 - GENERAL GUIDANCE**

**1      Plan Meetings**

1.1     The CoreCo Plan is proposed between NFE Global and the CoreCo Plan Creditors.

1.2     The BrazilCo Plan is proposed between NFE Brazil Newco and the BrazilCo Plan Creditors.

1.3     NFE Global shall hold a separate meeting for each of the:

　　　　1.3.1     R-1 Class;

　　　　1.3.2     R-2 Class;

　　　　1.3.3     TLA Class;

　　　　1.3.4     TLB Class;

　　　　1.3.5     Legacy Notes Class; and

　　　　1.3.6     Series I and Series II Class.

1.4     NFE Brazil Newco shall hold a meeting for the 2029 New Notes Class.

1.5     The CoreCo Plan Creditors for the purposes of voting on the CoreCo Plan at the CoreCo Plan Meetings are the R-1 Lenders, the R-2 Lenders, the TLA Lenders, the TLB Lenders, the 2026 Legacy Noteholders, the 2029 Legacy Noteholders, the Series I Lender and the Series II Lender.

1.6     The BrazilCo Plan Creditors for the purposes of voting on the BrazilCo Plan at the BrazilCo Plan Meeting are the 2029 New Noteholders.

1.7     Further information on whether you are a Plan Creditor can be found in the section "*Are you a Plan Creditor?*" of this Explanatory Statement.

1.8     If a resolution to approve (i) the CoreCo Plan is passed by the requisite majorities of the CoreCo Plan Creditors, the Court may sanction the CoreCo Plan, and (ii) the BrazilCo Plan is passed

by the requisite majorities of the BrazilCo Plan Creditors, the Court may sanction the BrazilCo Plan (section 901F of the Companies Act 2006).

1.9   The requisite majorities are the approval of at least 75 per cent. in value of each class of the Plan Creditors **present** (either in person or by proxy), and **voting** at the relevant Plan Meeting.

1.10   If the CoreCo Plan is not approved by at least 75 per cent. in value of a class of CoreCo Plan Creditors present (either in person or by proxy) and voting at the relevant CoreCo Plan Meeting (any such class being the Dissenting Class) the Court can still sanction the CoreCo Plan if it is satisfied that:

1.10.1   if the CoreCo Plan is sanctioned, none of the members of such Dissenting Class would be any worse off than they would be in the event of the relevant alternative to the CoreCo Plan; and

1.10.2   the CoreCo Plan has been approved by 75 per cent. in value present and voting of any class that would receive a payment or have a genuine economic interest in NFE Global, in the event of the relevant alternative to the CoreCo Plan (section 901G of the Companies Act 2006).

1.11   As noted at paragraph 5.13 of Part 4 (*Certain Legal Aspects of the Plans*) of this Explanatory Statement, NFE Global does not anticipate that there will be any Dissenting Class.

1.12   The Court has granted (i) NFE Global permission to convene six Plan Meetings, and (ii) NFE Brazil Newco permission to convene one Plan Meeting, to be held at the offices of Skadden, Arps, Slate, Meagher & Flom (UK) LLP and by way of video conference, as described further in the table below.  Formal notices of the Plan Meetings are set out in Appendix 4 (*Notice of Plan Meetings*) to this Explanatory Statement.

| Plan Meeting | CoreCo Plan or BrazilCo Plan | Plan Creditors entitled to attend and vote | Date & Time of Plan Meeting |
| --- | --- | --- | --- |
| R-1 Class Plan Meeting | CoreCo Plan | R-1 Lenders | 3:00 p.m. (London) / 10:00 a.m. (New York) on 15 June 2026 |
| R-2 Class Plan Meeting | CoreCo Plan | R-2 Lenders | 3:15 p.m. (London) / 10:15 a.m. (New York) on 15 June 2026, or as soon as possible thereafter |
| TLB Class Plan Meeting | CoreCo Plan | TLB Lenders | 3:30 p.m. (London) / 10:30 a.m. (New York) on 15 June 2026, or as soon as possible thereafter |
| TLA Class Plan Meeting | CoreCo Plan | TLA Lenders | 3:45 p.m. (London) / 10:45 a.m. (New York) on 15 June 2026, or as soon as possible thereafter |
| Legacy Notes Class Plan Meeting | CoreCo Plan | 2026 Legacy Noteholders | 4:00 p.m. (London) / 11:00 a.m. (New York) on 15 June |

| Plan Meeting | CoreCo Plan or BrazilCo Plan | Plan Creditors entitled to attend and vote | Date & Time of Plan Meeting |
|---|---|---|---|
| | | 2029 Legacy Noteholders | 2026, or as soon as possible thereafter |
| Series I and Series II Class Plan Meeting | CoreCo Plan | Series I Lender Series II Lender | 4:15 p.m. (London) / 11:15 a.m. (New York) on 15 June 2026, or as soon as possible thereafter |
| 2029 New Notes Class Plan Meeting | BrazilCo Plan | 2029 New Noteholders | 4:30 p.m. (London) / 11:30 a.m. (New York) on 15 June 2026, or as soon as possible thereafter |

1.13    Formal notice of the Plan Meetings is set out in Appendix 4 (*Notice of Plan Meetings*) to this Explanatory Statement.

1.14    By the Convening Order, the Court has appointed Christopher Boas, a director of each Plan Company, or failing him, Peter Newman of Skadden, Arps, Slate, Meagher & Flom (UK) LLP, or such other person as each Plan Company elects, to act as chairperson of the meetings referred to above and has directed the chairperson to report the result of such meetings to the Court.

1.15    Plan Creditors must validly complete a Plan Creditor Letter by the prescribed deadlines, as described below.  Any Plan Creditor who fails to submit a validly completed Plan Creditor Letter to the Information Agent before the Voting Instructions Deadline:

1.15.1    may not be able to vote at the relevant Plan Meeting(s); and/ or

1.15.2    their Plan Consideration may be issued and delivered to the Holding Period Trustee on the Restructuring Effective Date.

1.16    Any Plan Creditor who fails to provide satisfactory evidence that it is an Eligible Person before the Voting Instructions Deadline may have their Plan Consideration issued and delivered to the Holding Period Trustee on the Restructuring Effective Date. Plan Creditors who are not Eligible Persons or who are Unadmitted Plan Creditors are, in each case, entitled to elect for their entitlement to the Plan Consideration, to be issued or allocated (as applicable) to their Nominee(s) (if such Nominee is an Eligible Person and has delivered a confirmation deed (as set out at Part 6 (*Confirmation Deed*) of the Plan Creditor Letter)) to the Information Agent on or prior to the Voting Instructions Deadline in accordance with the provisions of the Plan Creditor Letter).

1.17    Plan Creditors who are Early Consent Fee Creditors who fail to validly complete a Plan Creditor Letter by the prescribed deadlines, as a result of which they are unable, and therefore fail, to vote at the relevant Plan Meeting(s), shall lose their entitlement to the Early Consent Fee in accordance with the Restructuring Support Agreement.

1.18    Plan Creditors are advised to act well in advance of the prescribed deadlines in order to make sure all the necessary procedures are completed in advance of the relevant deadlines.

1.19    The Information Agent has been appointed to facilitate communications with Plan Creditors. The Information Agent's remuneration and expenses, and all costs incurred by it on behalf of

the Plan Companies, shall be met by the Plan Companies.  The Information Agent is the agent of the Plan Companies and owes no duty to any Plan Creditor.

1.20    For further assistance, or if a person is in any doubt as to whether or not it is a Plan Creditor, contact the Information Agent using the using the details below:

**Kroll Issuer Services Limited**
The News Building
3 London Bridge Street
London
SE1 9SG
United Kingdom

**Attention**:  Alessandro Zorza/ Sunjeeve Patel
**E-mail**:  nfe@is.kroll.com
**Phone**:  +44 20 7089 0909

**2        Voting**

Voting will take place at the Plan Meetings by Plan Creditors appearing either in person (physically or via video conference) or by a duly authorised representative or proxy as explained in more detail in Section 2 of this Appendix.

**3        Assessment of Plan Claims for Voting Purposes**

3.1    The amount of the Plan Claim for voting purposes of each Plan Creditor will be calculated as at the Record Time, in each case, based on:

3.1.1    information provided to the Plan Companies, or the Information Agent (including information received through DTC) on its behalf;

3.1.2    based on the Plan Companies' own books and records and other information available to its auditors and financial and legal advisers; and/ or

3.1.3    information provided to the Plan Companies, or the Information Agent on its behalf, by a Plan Creditor.

3.2    This information will be used by the Chairperson to determine whether the Plans are approved at the relevant Plan Meeting(s).

3.3    The Plan Creditors may be requested by the Plan Companies to assist with confirming the amount of their Plan Claims.  Plan Creditors do not need to take any action in respect of confirming the amount of their Plan Claims other than providing the details requested in the Plan Creditor Letter.

3.4    Only Plan Creditors as at the Record Time (being 10:00 p.m. (London time)/ 5:00 p.m. (New York time) on 10 June 2026) will be entitled to attend and vote on the relevant Plan.

3.5    The assessment of Plan Claims for voting purposes shall be carried out by the Chairperson.  The Chairperson may, for voting purposes only, reject or disregard a Plan Claim in whole or in part if they consider that it does not constitute a fair and reasonable assessment of the relevant sums owed to the relevant Plan Creditor by the Plan Companies or if the relevant Plan Creditor has not complied with the procedures (including if applicable, as to blocking) described in this Explanatory Statement (including the Plan Creditor Letter).  The Chairperson will have the discretion to admit votes received after the Voting Instructions Deadline.

3.6     The Chairperson will report to the Court, at the Sanction Hearing (which is anticipated will take place on or around 18 June 2026), their decision to reject Plan Claims (if any), with details of those Plan Claims and the reasons for rejection.

3.7     Plan Claims for the purposes of voting at the Plan Meetings, will be calculated as set out under "Plan Claims" of the "*Are you a Plan Creditor?*" section of the Explanatory Statement.

3.8     The admission and valuation of any Plan Claim for voting purposes does not (in itself) constitute an admission of the existence or value of the Plan Claim and will not bind the Plan Companies or the Plan Creditors concerned.

**4       Transfers and Assignments after the Record Time**

4.1     The Plan Companies shall be under no obligation to recognise any assignment or transfer of rights, benefits or interests in Plan Debt after the Record Time for the purposes of calculating entitlements to receive Plan Consideration under the relevant Plan and have no obligations to any person other than their Plan Creditors on the Record Time, provided that, where the relevant Plan Company has received from the relevant parties notice in writing of such assignment or transfer prior to the Restructuring Effective Date, the relevant Plan Company may, in its sole discretion and subject to the production of such other evidence in relation to such assignment or transfer as it may reasonably require and to any other terms and conditions which the relevant Plan Company may consider necessary or desirable, acting reasonably, agree to recognise such assignment or transfer for the purposes of calculating entitlements to receive Plan Consideration under the relevant Plan.

4.2     Any assignee or transferee of the interests in Plan Debt recognised by the relevant Plan Company shall be bound by the terms of the relevant Plan as a Plan Creditor and shall produce such evidence as the relevant Plan Company may reasonably require to confirm that it has agreed to be bound by the terms of the relevant Plan.

**SECTION 2 - VOTING GUIDANCE FOR PLAN CREDITORS**

**5       Voting at the Plan Meetings**

5.1     In order to vote at the relevant Plan Meeting(s) (whether in person or by proxy), each Plan Creditor is required to complete and submit the applicable parts of the Plan Creditor Letter to the Information Agent via the Plan Website (https://deals.is.kroll.com/nfe) by no later than the **Voting Instructions Deadline being 10:00 p.m. (London time)/ 5:00 p.m. (New York time) on 9 June 2026**.

5.2     Unless a validly completed Plan Creditor Letter is delivered to the Information Agent before the Voting Instructions Deadline, together with the relevant corporate authorisations for the representative of the Plan Creditor or the proxy (other than the Chairperson) named in Part 3 (*Voting Instructions*) of the Plan Creditor Letter, the **voting instructions contained therein will be disregarded** for the purposes of voting at the relevant Plan Meeting(s) and **such Plan Creditor's admission to and entitlement to vote** at the relevant Plan Meeting(s) will be at the discretion of the Chairperson (following the submission of the validly completed Plan Creditor Letter and evidence of corporate authority and/ or Identification Documents (as applicable)). Plan Creditors are strongly encouraged to submit the Plan Creditor Letter as soon as possible and prior to the Voting Instructions Deadline.

5.3     Plan Creditors that have missed the Voting Instructions Deadline should still submit the validly completed Plan Creditor Letter, and evidence of corporate authority and/ or Identification Documents (as applicable) to the Information Agent via the Plan Website **as soon as possible** thereafter.

**6        Completing the Plan Creditor Letter**

6.1        The Plan Creditor Letter contains detailed instructions to ensure it is validly completed, which each Plan Creditor should read in full.

6.2        Parts 1 (*Plan Creditor Administrative and Entitlement Information*), 2 (*Blocking Legacy Notes and 2029 New Notes*), 3 (*Voting Instructions*) and 4 (*Appointment of Nominee(s)*) (as applicable) of the Plan Creditor Letter must be submitted via the online form on the Plan Website at https://deals.is.kroll.com/nfe.

6.3        Plan Creditors who will receive New CoreCo Term Loans and/ or FLNG 2 Term Loans are asked to also submit the documents referenced in Part 5 (*Lender Forms*) of the Plan Creditor Letter to Seward & Kissel LLP, counsel to the FLNG 2 Term Loan Agent and New CoreCo Term Loan Agent, via email at nferx@sewkis.com.

6.4        In summary, under Part 3 (*Voting Instructions*) of the Plan Creditor Letter each Plan Creditor may elect to:

6.4.1        attend and vote (or abstain from voting) at the Plan Meeting in person (physically or via video conference);

6.4.2        instruct the Chairperson as its proxy to cast its vote (or abstain from voting) in accordance with the wishes of that Plan Creditor; or

6.4.3        appoint someone else as its proxy to attend and vote at the Plan Meeting in person (physically or via video conference) on its behalf,

in each case, by ensuring that such election is recorded in the Plan Creditor Letter and that the voting intention/ instruction section of the Plan Creditor Letter is completed.

6.5        Plan Creditors are strongly encouraged to **appoint a proxy** (either the Chairperson or another person of their choice who is willing to attend the relevant Plan Meeting(s)) even if they intend to attend and vote in person (physically or via video conference) in case they are unable to do so for any reason.

6.6        Plan Creditors that are corporate persons are required to provide to the Information Agent evidence of the authority granted to the individual named as representative of the Plan Creditor or as proxy (other than the Chairperson) when submitting the Plan Creditor Letter on the Plan Website.  Plan Creditors should refer to paragraph 7.4 below to note what the natural person named in Part 3 (*Voting Instructions*) of the Plan Creditor Letter will be asked to provide at the registration of the Plan Meeting(s).

6.7        Plan Creditors who wish to appoint any Nominee(s) in respect of Plan Consideration to be received on the Restructuring Effective Date must complete Part 4 (*Appointment of Nominee(s)*) of the Plan Creditor Letter. Given constraints arising from DTC systems, holders of Legacy Notes and 2029 New Notes are not permitted to appoint a Nominee to receive any Plan Consideration due to them in their capacity, as such on their behalf. Nominees are also required to complete Part 6 (*Confirmation Deed*) of the Plan Creditor Letter by the Voting Instructions Deadline.

6.8        Plan Creditors that are business units should indicate the full name of their specific business units in the Plan Creditor Letter.  For the avoidance of doubt, any vote by a specific business unit of a legal entity does not bind other departments, divisions or business units within that legal entity.

6.9     A separate Plan Creditor Letter must be validly completed in respect of each Plan Creditor, provided that where a Plan Creditor has Affiliates or Related Funds that are also Plan Creditors, a single Plan Creditor Letter may be submitted on behalf of such Plan Creditor and all of its Affiliates or Related Funds, together with a file listing all such Affiliates or Related Funds, and the interests of all such Affiliates or Related Funds will vote in accordance with that Plan Creditor Letter.  When completing the Plan Creditor Letter, a Plan Creditor should consider and complete the relevant sections of the Plan Creditor Letter in each of the capacities in which it may be eligible to receive Plan Consideration (including, but not limited to, in its capacity as an Early Consent Fee Creditor (as applicable and where relevant)) and it shall be deemed to have completed the Plan Creditor Letter in each capacity in respect of which the relevant Plan Consideration accrues.

6.10    The relevant parts of the Plan Creditor Letter must be validly completed together with any accompanying documents and evidence and must be submitted to the Information Agent as soon as possible and in any event within the deadlines set out in the Plan Creditor Letter.

## 7       Attending the Relevant Plan Meeting(s)

7.1     The Plan Meeting(s) will take place as described in paragraph 1 to 1.12 of Section 1 (*General Guidance*).

### *Attending in person*

7.2     If a Plan Creditor wishes to attend the Plan Meeting(s) in person, it should make the relevant selections when completing its Plan Creditor Letter as set out in paragraph 5.1 above.

7.3     The Plan Creditor will be required to produce its Identification Document and evidence of corporate authority (in the case of a corporation) at registration of the Plan Meetings, which will commence at **2:30 p.m. (London time)/ 9:30 a.m. (New York time) on 15 June 2026**.

7.4     Any natural person acting as representative of a Plan Creditor or proxy (other than the Chairperson) attending the Plan Meeting(s) on behalf of a Plan Creditor in person should produce:

    7.4.1    a duplicate copy of Part 3 (*Voting Instructions*) of the Plan Creditor Letter in which he/ she is named as proxy, which will be compared against the copy provided to the Information Agent on behalf of the Plan Creditor;

    7.4.2    an Identification Document as proof of personal identity (which must match the details in Part 3 (*Voting Instructions*) of the Plan Creditor Letter under which the Plan Creditor appoints such person as its proxy); and

    7.4.3    in case of a corporation, evidence of corporate authority (for example, a valid power of attorney and/ or board minutes),

at registration of the Plan Meetings.

7.5     If:

    7.5.1    the applicable sections of the Plan Creditor Letter are not validly completed and submitted via the Plan Website (or otherwise specified) by the prescribed deadline;

    7.5.2    appropriate evidence of corporate authority is not produced for proxies (other than the Chairperson) or representatives attending on behalf of a Plan Creditor; and

    7.5.3    such proxies or representatives do not provide Identification Documents at registration of the Plan Meeting(s),

that proxy shall only be permitted to attend and vote at the relevant Plan Meeting(s) at the discretion of the Chairperson of the relevant Plan Meeting(s).

### *Attending via video conference*

7.6 The Plan Meetings can also be attended remotely on Zoom or similar video-conference platform.  A Plan Creditor or proxy will receive video-conference access details for the applicable Plan Meeting(s), subject to providing the Information Agent with the following by the Voting Instructions Deadline:

7.6.1 in the case of a corporation, evidence of corporate authority (for example, a valid power of attorney and/ or board minutes) of the individual attending the Plan Meeting on behalf of the Plan Creditor or as its proxy (other than the Chairperson);

7.6.2 in respect of Plan Creditors other than the Legacy Noteholders and 2029 New Noteholders, a validly completed Part 1 (*Plan Creditor Administrative and Entitlement Information*) **and** Part 3 (*Voting Instructions*) of the Plan Creditor Letter; and

7.6.3 in respect of Legacy Noteholders and 2029 New Noteholders, a validly completed Part 1 (*Plan Creditor Administrative and Entitlement Information*), Part 2 (*Blocking Legacy Notes and 2029 New Notes*) **and** Part 3 (*Voting Instructions*) of the Plan Creditor Letter.

7.7 In addition, in order to attend the Plan Meeting(s) via video conference, Plan Creditors that are natural persons or proxies must provide an Identification Document as proof of personal identity, and the passport or identification details contained therein must match Part 3 (*Voting Instructions*) of the Plan Creditor Letter, at registration of the Plan Meetings commencing from **2:30 p.m. (London time)/ 9:30 a.m. (New York time) on 15 June 2026**. Such Plan Creditors or proxies will be asked to show their Identification Documents (by holding these up to the camera) to the Information Agent prior to being admitted to the Plan Meeting(s).

7.8 If an appropriate Identification Document, evidence of corporate authority (in the case of a corporation) and/ or duplicate copy of Part 3 (*Voting Instructions*) (in the case of a proxy other than a Chairperson attending the Plan Meeting via video conference) is not produced, that person shall only be permitted to attend and vote at the relevant Plan Meeting(s) at the discretion of the Chairperson.

7.9 If a Plan Creditor appoints the Chairperson as its proxy, there is no need for the Chairperson to take the Plan Creditor Letter to the Plan Meeting and Plan Creditors that are corporate persons are not required to submit evidence of corporate authority in respect of the Chairperson.

7.10 If a Plan Creditor appoints a proxy and then decides to attend and vote at the Plan Meeting, in person or by a duly authorised representative (if a corporation) whether at the physical Plan Meeting or via video conference, that Plan Creditor will be entitled to do so.  In any case, only one individual person may speak and vote at the relevant Plan Meeting(s) on behalf of a Plan Creditor.

### *Attendance if Plan Creditor Letter not submitted on time*

7.11 If the Plan Creditor fails to submit a validly completed Plan Creditor Letter prior to the Voting Instructions Deadline, the Plan Creditor's admission to vote at the relevant Plan Meeting(s) will be at the discretion of the Chairperson (following submission of a Plan Creditor Letter with Part 1 (*Plan Creditor Administrative and Entitlement Information*), Part 2 (*Blocking Legacy Notes and 2029 New Notes*) (if applicable) and Part 3 (*Voting Instructions*) completed, and if the Plan Creditor appoints a representative to attend the relevant Plan Meeting(s), evidence of corporate authority of the representative, in each case prior to the conclusion of the relevant

Plan Meeting(s)). Where practical, the Information Agent will endeavour to process and verify any Plan Creditor Letters, evidence of corporate authority and/ or Identification Documents received after the Voting Instruction Deadline but prior to the opening of the relevant Plan Meeting).

*Further information*

7.12    If any Plan Creditor wishes to obtain the link to access their Plan Meeting, has any issue accessing the Plan Meeting or has any other query in relation to attending their Plan Meeting or voting they should contact the Information Agent.

**SECTION 3 - GUIDANCE FOR RECEIVING THE EARLY CONSENT FEE**

8    The Early Consent Fee will be paid to eligible Plan Creditors on the Restructuring Effective Date subject to such Plan Creditors complying with the terms of the Restructuring Support Agreement and voting in accordance with the requirements set out in the Plan Creditor Letter. No additional action is necessary to receive the Early Consent Fee, provided the eligible Plan Creditor submits its vote in accordance with the Plan Creditor Letter and the Plan Creditor otherwise remains in compliance with the Restructuring Support Agreement..

**SECTION 4 - GUIDANCE FOR LEGACY NOTEHOLDERS AND 2029 NEW NOTEHOLDERS**

**9    Guidance on blocking the Legacy Notes and 2029 New Notes**

9.1    Before the Custody Instructions Deadline, being **10:00 p.m. (London time)/ 5:00 p.m. (New York time) on 10 June 2026**, each Legacy Noteholder and 2029 New Noteholder that wishes to vote at the Plan Meeting is required to submit (or cause to be submitted via its Intermediaries) their Custody Instruction(s) in DTC (in which the Legacy Notes and 2029 New Notes which are the subject of the Plan Creditor Letter are held).  Following submission of the Plan Creditor Letter, a UIR will be generated and sent to the Plan Creditor's email address, and such UIR will need to be specified in the Custody Instruction(s) submitted to DTC by the relevant deadline. Without such UIR in the Custody Instruction(s), such Custody Instruction(s) will be invalid. The submission of the Custody Instruction will cause the relevant Legacy Notes and 2029 New Notes to be blocked as from time of submission until the Restructuring Effective Date.

9.2    Each Plan Creditor should contact its Account Holder to ensure that DTC has received irrevocable instructions, as per the standard procedures of DTC (with which it has complied) to block the relevant Legacy Notes and 2029 New Notes which are the subject of the Plan Creditor Letter.

9.3    Legacy Notes and 2029 New Notes held in DTC should be blocked in accordance with the procedures of DTC and the deadlines required by DTC.  It is the responsibility of the Plan Creditors to ensure that they comply with any particular deadlines imposed by their Intermediaries and DTC for submitting instructions.  Custodians, brokers and Intermediaries may impose earlier deadlines for the delivery of instructions by Legacy Notes and 2029 New Notes, and you should check the timing requirements for delivery of instructions with your Intermediaries.

9.4    Plan Creditors that hold the Legacy Notes and/ or 2029 New Notes via Euroclear or Clearstream must allow sufficient time for completion of the ATOP procedures during the normal business hours of DTC on such date.  DTC's deadlines may be earlier than the ones stated in this Explanatory Statement.  Such Plan Creditors should ensure that their relevant clearing participants in Euroclear or Clearstream include in their Custody Instruction(s), submitted to the Information Agent via DTC, the UIR, by no later than the Custody Instructions Deadline (**10:00 p.m. (London time)/ 5:00 p.m. (New York time) on 10 June 2026**).

9.5   DTC will assign a Custody Instruction Reference Number in respect of each Custody Instruction and, as noted above, the Custody Instruction Reference Number must be cross-referenced in the Plan Creditor Letter relating to the Legacy Notes and 2029 New Notes in respect of which the Custody Instruction Reference Number has been obtained.  This will enable the Information Agent to verify the blocking of the Legacy Notes and 2029 New Notes in accordance with the procedure described below.

9.6   Each Custody Instruction should clearly state:

9.6.1   the aggregate principal amount of the Legacy Notes and 2029 New Notes;

9.6.2   the UIR;

9.6.3   the securities account number at DTC in which the relevant Legacy Notes and 2029 New Notes are held; and

9.6.4   the name of the Account Holder.

9.7   The Information Agent will request DTC to confirm to its satisfaction that the relevant Legacy Notes and 2029 New Notes have been blocked with effect from or before the date of receipt by the Information Agent of Part 2 (*Blocking Legacy Notes and 2029 New Notes*) of the Plan Creditor Letter.  In the event that DTC fails to do so, the Information Agent will notify the Plan Creditor and may reject that Plan Creditor Letter.

9.8   The Information Agent will use all reasonable endeavours to assist Legacy Noteholders and 2029 New Noteholders to complete the Plan Creditor Letter validly, should it receive any versions which are not valid.

9.9   Failure to block Legacy Notes and/ or 2029 New Notes and validly complete and submit Part 2 (*Blocking Legacy Notes and 2029 New Notes*) of the Plan Creditor Letter by the relevant deadlines will invalidate the Plan Creditor Letter and the relevant Legacy Noteholders and/ or 2029 New Noteholders may not be entitled to:

9.9.1   vote at the relevant Plan Meeting(s); and/or

9.9.2   receive (and/ or elect any Nominee(s)) to receive) any Plan Consideration on the Restructuring Effective Date, with any such Plan Consideration to be issued and delivered to the Holding Period Trustee.

9.10   Legacy Noteholders and/ or 2029 New Noteholders who are Early Consent Fee Creditors and who fail to block their Legacy Notes and/ or 2029 New Notes and validly complete Part 2 (*Blocking Legacy Notes and 2029 New Notes*) of the Plan Creditor Letter by the prescribed deadlines, as a result of which they are unable, and therefore fail, to vote at the relevant Plan Meeting(s), shall lose their entitlement to the Early Consent Fee in accordance with the Restructuring Support Agreement.

9.11   None of the Plan Companies, the Information Agent or any other person will be responsible for any loss or Liability incurred by a Legacy Noteholder or 2029 New Noteholder as a result of any determination by the Information Agent that a Plan Creditor Letter contains an error or is incomplete, even if this is subsequently shown not to have been the case.

**APPENDIX 3**

**FORM OF PLAN CREDITOR LETTER**

## PLAN CREDITOR LETTER

| | |
|---|---|
| **IN THE HIGH COURT OF JUSTICE** | **Claim No. CR-2026-002385** |
| **BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES** | **Claim No. CR-2026-002886** |
| **INSOLVENCY AND COMPANIES LIST (ChD)** | |

**IN THE MATTER OF (1) NFE GLOBAL HOLDINGS LIMITED, AND (2) NFE BRAZIL NEWCO LIMITED**

**- and -**

**IN THE MATTER OF THE COMPANIES ACT 2006**

**RESTRUCTURING PLANS**

(*under Part 26A of the Companies Act 2006*)

**between**

**NFE GLOBAL HOLDINGS LIMITED ("NFE Global")**

**and**

**NFE BRAZIL NEWCO LIMITED ("NFE Brazil Newco")**

**(together, the "Plan Companies" and each a "Plan Company")**

**and**

**THE PLAN CREDITORS**

**THIS LETTER IS THE PLAN CREDITOR LETTER (THE "LETTER") AS REFERRED TO AND DEFINED IN THE EXPLANATORY STATEMENT, THE PLANS AND THE TRANSACTION IMPLEMENTATION DEED.**

**THIS LETTER IS NOT TO BE DISTRIBUTED TO OR ACCESSED BY ANY PERSON TO WHOM IT IS UNLAWFUL TO SEND THIS LETTER.**

**THE ISSUANCE OF THE SECURITIES PURSUANT TO THE PLANS HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR ANY SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION OF THE UNITED STATES OR ANY OTHER APPLICABLE JURISDICTION AND SUCH SECURITIES MAY NOT BE OFFERED OR SOLD WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, "U.S. PERSONS" (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT), EXCEPT PURSUANT TO EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH ALL APPLICABLE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION OF THE UNITED STATES AND ANY OTHER JURISDICTION ABSENT REGISTRATION OR AN APPLICABLE EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT. HAVING TAKEN LEGAL ADVICE, THE PLAN COMPANIES INTEND THAT THE ISSUANCE OF THE SECURITIES PURSUANT TO THE PLANS WILL BE MADE IN RELIANCE UPON THE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT PROVIDED BY SECTION**

**3(A)(10) THEREOF. THE PLAN COMPANIES HAVE BEEN ADVISED THAT THE SANCTION OF THE PLANS BY THE COURT AS TO THE FAIRNESS OF THE TERMS AND CONDITIONS OF THE ISSUANCE, FOLLOWING ADEQUATE NOTICE TO AFFECTED STAKEHOLDERS AND AN OPPORTUNITY TO BE HEARD, WILL SATISFY THE FAIRNESS HEARING REQUIREMENTS OF SECTION 3(A)(10). THE PLAN COMPANIES WILL, AT OR PRIOR TO THE SANCTION HEARING, EXPRESSLY ADVISE THE COURT THAT ITS SANCTION OF THE PLANS WILL BE RELIED UPON FOR PURPOSES OF SATISFYING THE FAIRNESS HEARING REQUIREMENTS OF SECTION 3(A)(10). PLAN CREDITORS, AS THE PERSONS TO WHOM THE SECURITIES WILL BE ISSUED, WILL BE GIVEN NOTICE OF THE SANCTION HEARING AND THE OPPORTUNITY TO ATTEND AND BE HEARD AS TO THE FAIRNESS OF THE TERMS AND CONDITIONS OF THE ISSUANCE. SECURITIES ISSUED TO PLAN CREDITORS THAT ARE NOT "AFFILIATES" OF THE RELEVANT ISSUER (WITHIN THE MEANING OF RULE 144 UNDER THE SECURITIES ACT) WILL BE ISSUED WITHOUT RESTRICTIVE LEGEND AND WILL BE FREELY TRANSFERABLE.**

**YOU ACKNOWLEDGE THAT THIS LETTER (INCLUDING ITS ONLINE FORM) IS CONFIDENTIAL AND INTENDED ONLY FOR YOU AND YOU AGREE THAT YOU WILL NOT FORWARD, REPRODUCE OR PUBLISH THIS LETTER AND/OR ITS ONLINE FORM, OTHER THAN TO YOUR NOMINEE(S).**

2

**Table of Contents**

**Contents**                                                                                                  **Page**


KEY DATES AND EXPECTED TIMETABLE ........................................................................................ 1
INTRODUCTION AND INSTRUCTIONS FOR THE COMPLETION AND SUBMISSION OF
    THIS LETTER ......................................................................................................................... 2
SUMMARY OF THE CONTENTS OF THIS LETTER ...................................................................... 4
    Part 1: PLAN CREDITOR ADMINISTRATIVE AND ENTITLEMENT
        INFORMATION ....................................................................................................... 9
    Part 2: BLOCKING LEGACY NOTES AND 2029 NEW NOTES ............................................ 14
    Part 3: VOTING INSTRUCTIONS ............................................................................................. 16
    Part 4: APPOINTMENT OF NOMINEE(S) ................................................................................ 22
    Part 5: LENDER FORMS ............................................................................................................ 26
    Part 6: CONFIRMATION DEED................................................................................................. 27

**KEY DATES AND EXPECTED TIMETABLE**

| EVENT | DATE AND TIME |
|---|---|
| **Voting Instructions Deadline** – the latest date and time by which Plan Creditors must make their elections in respect of voting at the relevant Plan Meeting(s) and appoint Nominees to receive their Plan Consideration, if applicable. | **10:00 p.m. (London)/ 5:00 p.m. (New York) on 9 June 2026** |
| **Custody Instructions Deadline** – the latest date and time by which the relevant Plan Creditors must submit Custody Instructions to block trading on the Legacy Notes and/ or 2029 New Notes.<br><br>Only applicable to Plan Creditors who are Legacy Noteholders and/ or 2029 New Noteholders. | **10:00 p.m. (London)/ 5:00 p.m. (New York) on 10 June 2026** |
| **Record Time** – the date and time at which Plan Creditors' entitlement to vote (either in person or by proxy) on the Plans and the value of their Plan Claims will be assessed. | **10:00 p.m. (London)/ 5:00 p.m. (New York) on 10 June 2026** |
| **Plan Meetings** – the date of the meetings of Plan Creditors to vote (either in person or by proxy) on the Plans. | **Starting from 3:00 p.m. (London)/ 10:00 a.m. (New York) on 15 June 2026** |
| **Sanction Hearing** – Court hearing to sanction the Plans. | **On or around 18 June 2026** |
| **Plan Effective Date** – the date on which the Plans are anticipated to become effective (if sanctioned by the Court). | **On or around 19 June 2026** |
| **Restructuring Effective Date** – the date on which the Restructuring is anticipated to be implemented. | **Expected to be by the third quarter of 2026** |

**The dates given are based on current expectations and may be subject to change. If any of the expected dates change, adequate notice of the change will be given to the Plan Creditors by such notice being made available on the Plan Website. Plan Creditors are encouraged to monitor the Plan Website regularly for any updates.**

You are advised to act well in advance of the above deadlines in order to make sure all the necessary procedures are completed in advance of the relevant deadlines.

If the Plan Effective Date occurs, the Plans will become effective and binding on all relevant Plan Creditors in accordance with their terms, regardless of whether you voted in favour of or against the relevant Plan.

If you do not validly complete and submit all relevant sections of this Letter by the prescribed deadlines: (i) your Plan Consideration may be issued and delivered to the Holding Period Trustee on the Restructuring Effective Date; and/or (ii) if you are therefore unable to vote in the relevant Plan Meeting(s), you may lose any right to receive any Early Consent Fee.

**INTRODUCTION AND INSTRUCTIONS FOR THE COMPLETION AND SUBMISSION OF THIS LETTER**

**Introduction**

This Letter should be validly completed by Plan Creditors in order to: (i) attend the relevant Plan Meeting(s) and vote (either in person or by proxy) on the relevant Plan, and (ii) where applicable, provide relevant details to receive (or have their Nominee(s) receive) their Plan Consideration.

This Letter is divided into six parts as summarised in "*Summary of the contents of this Letter*" below. Plan Creditors should read the "*Summary of the contents of this Letter*" section carefully to ensure that they complete all relevant parts of this Letter by the relevant deadline(s).

In particular, Plan Creditors must use this Letter to make their elections in respect of voting at the relevant Plan Meeting(s). Failure to comply with the relevant deadlines may result in such Plan Creditor's vote not counting for the purposes of the relevant Plan Meeting(s).

Before any part of this Letter is completed, Plan Creditors should read the Plans, the Transaction Implementation Deed and the Explanatory Statement and, in particular, appendix 2 (*Instructions and Guidance for Plan Creditors*) to the Explanatory Statement. The Plans and the Explanatory Statement and all relevant associated documentation can be found at the Plan Website maintained by the Information Agent, Kroll Issuer Services Limited, at https://deals.is.kroll.com/nfe.

If any Plan Creditor wishes to obtain the link to access their Plan Meeting(s), has any issue accessing the Plan Meeting(s) or has any other query in relation to attending their Plan Meeting(s) or voting they should contact the Information Agent.

**Completion of this Letter**

A separate Letter must be validly completed in respect of each Plan Creditor, provided that where a Plan Creditor has Affiliates or Related Funds that are also Plan Creditors, a single Plan Creditor Letter may be submitted on behalf of such Plan Creditor and all of its Affiliates or Related Funds, together with a file listing all such Affiliates or Related Funds, and the interests of all such Affiliates or Related Funds will vote in accordance with that Plan Creditor Letter. When completing this Letter, a Plan Creditor should consider and complete the relevant sections of this Letter in each of the capacities in which it may be eligible to receive Plan Consideration (including, but not limited to, in its capacity as an Early Consent Fee Creditor (as applicable and where relevant)) and it shall be deemed to have completed this Letter in each capacity in respect of which the relevant Plan Consideration accrues.

The relevant parts of this Letter must be validly completed together with any accompanying documents and evidence and must be submitted to the Information Agent as soon as possible and in any event within the deadlines set out in this Letter.

Parts 1 (*Plan Creditor Administrative and Entitlement Information*), 2 (*Blocking Legacy Notes and 2029 New Notes* ), 3 (*Voting Instructions*) and 4 (*Appointment of Nominee(s)*) (as applicable) of this Letter can be completed via the online form on the Plan Website at https://deals.is.kroll.com/nfe.

Each person completing this Letter on behalf of a Plan Creditor (and/or any Nominee(s)) confirms and warrants that it is a person who, in accordance with the laws of the relevant jurisdiction, is acting under the authority of the Plan Creditor (and/or its Nominee(s)), is duly authorised to complete and deliver this Letter and to give the voting instructions set out in this Letter and, if applicable, appoints the person(s) named in this Letter to attend, speak and vote (as applicable) at the relevant Plan Meeting(s).

All proxy appointments and elections made in this Letter shall, subject to verification by the Plan Companies and/or the Information Agent, be final and binding on and from the date of submission of this Letter to the Information Agent, with the exception of the "*Indication of Voting Intention / Voting Instruction*" set out in Part 3 (*Voting Instructions*) of this Letter.

Notwithstanding any other provisions of this Letter, (i) any representation, undertaking, or confirmation required to be delivered, (ii) any deadline for the making of any elections, the delivery of any documents, or the taking of any actions, and/or (iii) the form of any elections or documents required to be delivered, in each case under or in connection with this Letter, may be accepted in such other form, or at such other time, as agreed by the Plan Companies in their sole discretion.

**What do you need to complete?**

Any Plan Creditor who wishes to attend the relevant Plan Meeting(s) and vote (either in person or by proxy) on the relevant Plan must validly complete and submit the relevant sections of:

- Part 1 (*Plan Creditor Administrative and Entitlement Information*); and
- Part 3 (*Voting Instructions*),

on or prior to the **Voting Instructions Deadline (10:00 p.m. (London)/ 5:00 p.m. (New York) on 9 June 2026)**. Plan Creditors that are Legacy Noteholders and/or 2029 New Noteholders must also complete the relevant sections of Part 2 (*Blocking Legacy Notes and 2029 New Notes* ) by such time (noting also the **Custody Instructions Deadline (10:00 p.m. (London)/ 5:00 p.m. (New York) on 10 June 2026)** to block Legacy Notes and/or 2029 New Notes held in DTC).

**General**

Capitalised terms used in this Letter but not defined in it have the same meaning as given to them in the explanatory statement relating to the Plans dated 15 May 2026 (as amended, modified or supplemented) (the "**Explanatory Statement**").

In this Letter, reference to "**validly completed**" means, in relation to a Letter, a Letter which, to the satisfaction of the Information Agent (acting reasonably):

(a)    has had each relevant part and section thereof completed in full;

(b)    gives all required authorisations, confirmations and undertakings in the form requested therein; and

(c)    to the extent a Plan Creditor has nominated Nominee(s), in respect of Part 6 (*Confirmation Deed*) of this Letter only, it has been executed as a deed by a Plan Creditor's Nominee(s).

In this Letter, references to a Plan Creditor being entitled to or eligible for, receiving, and/or making any election in respect of, any Plan Consideration, shall mean in its capacity as a Plan Creditor or in any other applicable capacity in respect of the relevant Plan Consideration (including, but not limited to, in its capacity as an Early Consent Fee Creditor).

In the event of any inconsistency between the summaries and explanations given in this Letter (including as regards a Plan Creditor's Plan Consideration (whether before or after the Restructuring Effective Date)) and the Plans, the Transaction Implementation Deed and the Holding Period Trust Deed, the terms of the Plans, the Transaction Implementation Deed and the Holding Period Trust Deed (as applicable) shall prevail.

The Information Agent acts in its capacity as agent of each Plan Company only and owes no duty, whether express or implied, to any Plan Creditor.

This Letter and any non-contractual obligations arising out of or in relation to it shall be governed by, and interpreted in accordance with, English law and the courts of England and Wales shall have exclusive jurisdiction to settle any dispute arising out of or in connection with this Letter.

## SUMMARY OF THE CONTENTS OF THIS LETTER

### PART 1: Plan Creditor Administrative and Entitlement Information

Part 1 (*Plan Creditor Administrative and Entitlement Information*) must be validly completed by all Plan Creditors in order to attend and vote (either in person or by proxy) at the relevant Plan Meeting(s).

Part 1 (*Plan Creditor Administrative and Entitlement Information*) must also be validly completed by Plan Creditors who wish to receive their Plan Consideration on the Restructuring Effective Date.

Part 1 (*Plan Creditor Administrative and Entitlement Information*) is divided into the following sections and should be completed as follows:

| Sections | To be completed by | Deadline |
|---|---|---|
| Part A | All Plan Creditors who wish to vote (either in person or by proxy) on the relevant Plan | **Voting Instructions Deadline (10:00 p.m. (London)/ 5:00 p.m. (New York) on 9 June 2026)** |
| | Plan Creditors who wish to receive their Plan Consideration on the Restructuring Effective Date | |
| Part B | Any Plan Creditor whose Plan Consideration includes Equity Plan Consideration (including any Early Consent Fee) payable on the Restructuring Effective Date | |
| Part C | Any Plan Creditor who elected to receive a share of the RCF-2 / TLA BrazilCo Cash Pool *in lieu* of its *pro rata* share of the RCF-2 / TLA BrazilCo Equity Pool | |

If Part 1 (*Plan Creditor Administrative and Entitlement Information*) is not validly completed by Plan Creditors by the prescribed deadlines:

(a)     they may not be able to attend or vote (either in person or by proxy) at the relevant Plan Meeting(s); and

(b)     their Plan Consideration may be issued and delivered to the Holding Period Trustee on the Restructuring Effective Date.

Plan Creditors are advised that their Plan Consideration which is Equity Plan Consideration may only be transferred to an account held with DTC. Relevant Plan Creditors must therefore provide DTC details to enable such settlement.

### PART 2: Blocking Legacy Notes and 2029 New Notes

Part 2 (*Blocking Legacy Notes and 2029 New Notes*) of this Letter must be validly completed by Plan Creditors who are Legacy Noteholders and/or 2029 New Noteholders.

Legacy Noteholders and/or 2029 New Noteholders who hold their Legacy Notes and/or 2029 New Notes in DTC must submit (or cause to be submitted via their intermediaries) their Custody Instruction(s) to the Information Agent via DTC, by the relevant deadline.

Following submission of this Letter, a Unique Instruction Reference ("**UIR**") will be generated and sent to the Plan Creditor's email address by the Information Agent. Such UIR will need to be specified in the Custody Instruction(s) submitted to DTC by the relevant deadline.

Part 2 (*Blocking Legacy Notes and 2029 New Notes*) comprises one section and should be completed as follows:

4

| Sections | To be completed by | Deadline |
|---|---|---|
| Part A | Plan Creditors who are Legacy Noteholders and/ or 2029 New Noteholders and whose Legacy Notes and/ or 2029 New Notes are held in DTC | **Custody Instructions Deadline (10:00 p.m. (London)/ 5:00 p.m. (New York) on 10 June 2026) to submit Custody Instruction(s) to block Legacy Notes and 2029 New Notes** |

The submission of a Custody Instruction will cause the relevant Legacy Notes and/or 2029 New Notes to be blocked as from the time of submission of a Custody Instruction until the Restructuring Effective Date.

In respect of the Legacy Notes and 2029 New Notes, custodians, brokers and intermediaries may impose earlier deadlines than those set out above, and Legacy Noteholders and 2029 New Noteholders are encouraged to reach out to their custodians, brokers and intermediaries as soon as possible.

Failure to deliver Custody Instruction(s) which include a valid UIR or deliver a valid Medallion Guarantee Confirmation executed by a DTC Participant by the applicable deadlines will invalidate this Letter and the relevant Legacy Noteholder and/or 2029 New Noteholder may not be entitled to:

(a)     attend or vote (either in person or by proxy) at the relevant Plan Meeting(s); and/or

(b)     receive any Plan Consideration on the Restructuring Effective Date, with any such Plan Consideration to be issued and delivered to the Holding Period Trustee.

Plan Creditors who are Early Consent Fee Creditors and who fail to block their Legacy Notes and/or 2029 New Notes and fail to validly complete Part 2 (*Blocking Legacy Notes and 2029 New Notes*) of this Letter by the prescribed deadlines, as a result of which they are unable, and therefore fail, to vote at the relevant Plan Meeting(s), shall lose their entitlement to the Early Consent Fee in accordance with the Restructuring Support Agreement.

**INSTRUCTIONS PROVIDED TO DTC AFTER THE CUSTODY INSTRUCTIONS DEADLINE WILL NOT BE DEEMED RECEIVED AND YOU WILL NOT BE ABLE TO VOTE IN THE PLAN MEETING(S) AND WILL THEREFORE FORFEIT ANY ENTITLEMENT TO THE EARLY CONSENT FEE.**

### PART 3: Voting Instructions

Part 3 (*Voting Instructions*) of this Letter must be validly completed by a Plan Creditor if it wishes to attend and vote (either in person or by proxy) at the relevant Plan Meeting(s) on the relevant Plan.

Part 3 (*Voting Instructions*) is divided into the following sections and should be completed as follows:

| Sections | To be completed by | Deadline |
|---|---|---|
| Part A | CoreCo Plan Creditors | **Voting Instructions Deadline (10:00 p.m. (London)/ 5:00 p.m. (New York) on 9 June 2026)** |
| Part B | BrazilCo Plan Creditors | |
| Part C | 2029 New Noteholders | |

Failure to comply with the relevant deadline may result in such Plan Creditor's vote not counting for the purposes of the relevant Plan Meeting(s). If a Plan Creditor who is an Early Consent Fee Creditor fails to validly complete Part 3 (*Voting Instructions*) and, as a result, does not vote at the relevant Plan Meeting(s),

5

it shall lose its entitlement to the Early Consent Fee in accordance with the Restructuring Support Agreement.

Where a Plan Creditor or its proxy (apart from the Chairperson) intends to attend the relevant Plan Meeting(s) in person, they are required to provide (by no later than the Voting Instructions Deadline):

(a) **natural persons:** an Identification Document as proof of personal identity. The passport or identification details contained in the Identification Document must match the details provided by the Plan Creditor in Part 3 (*Voting Instructions*) of this Letter;

(b) **corporate persons:** evidence of the relevant representative's or individual proxy's authority (as applicable) to attend the relevant Plan Meeting(s) on behalf of the Plan Creditor (for example, a valid power of attorney and/or board resolutions) (unless the Chairperson of the relevant Plan Meeting(s) has been selected as the proxy); and

**(c) a validly completed Letter.**

Registration for the Plan Meetings will commence at 2:30 p.m. (London)/ 9:30 a.m. (New York) on 15 June 2026 (being 30 minutes before the anticipated time of the first Plan Meeting). The anticipated time of each Plan Meeting is set out in the Notice of Plan Meetings, which is appendix 4 (*Notice of Plan Meetings*) to the Explanatory Statement and is available on the Plan Website at https://deals.is.kroll.com/nfe.

If:

(a) the applicable sections of the Letter are not validly completed and submitted via the Plan Website by the prescribed deadline;

(b) appropriate evidence of corporate authority is not produced for proxies (other than the Chairperson) or representatives attending on behalf of a Plan Creditor; or

(c) such proxies or representatives do not provide Identification Documents at registration of the Plan Meeting(s),

that proxy shall only be permitted to attend and vote at the relevant Plan Meeting(s) at the discretion of the Chairperson of the relevant Plan Meeting(s) (although, with respect to proxies and where practical, the Information Agent will endeavour to process and verify any Plan Creditor Letters, evidence of corporate authority and/or Identification Documents received after the Voting Instructions Deadline but prior to the opening of the relevant Plan Meeting).

The Chairperson shall retain sole and absolute discretion to accept and tabulate any vote received after the Voting Instructions Deadline.

**PART 4: Appointment of Nominee(s)**

Part 4 (*Appointment of Nominee(s)*) of this Letter (or such other form(s) as the Information Agent may direct in accordance with Part 4 (*Appointment of Nominee(s)*) of this Letter) must be validly completed by Plan Creditors who wish to appoint any Nominee(s) in respect of Plan Consideration to be received on the Restructuring Effective Date. Given constraints arising from DTC systems, holders of Legacy Notes and 2029 New Notes are not permitted to appoint a Nominee to receive any Plan Consideration due to them in their capacity as such on their behalf.

Failure to validly complete and submit Part 4 (*Appointment of Nominee(s)*) of this Letter (or such other form(s) as described above) or to appoint any Nominee(s) by the **Voting Instructions Deadline (10:00 p.m. (London)/ 5:00 p.m. (New York) on 9 June 2026)** may result in the Plan Creditor receiving all of its applicable Plan Consideration or, if there are other deficiencies with the Plan Creditor Letter, the Plan Creditor having certain of its Plan Consideration issued and delivered to the Holding Period Trustee.

6

Plan Creditors are also advised that, if any Nominee is appointed in respect of any Equity Plan Consideration, the Plan Creditor's Equity Plan Consideration must be settled manually and any cost of such manual settlement will be borne by the Plan Companies.

Part 6 (*Confirmation Deed*) of this Letter must be validly completed in all cases by all Nominees of CoreCo Plan Creditors that have been nominated by a CoreCo Plan Creditor to receive their Plan Consideration.

## PART 5: Lender Forms

Part 5 (*Lender Forms*) of this Letter must be validly completed by all Plan Creditors who will receive New CoreCo Term Loans and/or FLNG 2 Term Loans. The documents to be submitted to Wilmington Trust, National Association, as administrative agent for the CoreCo Term Loans and FLNG 2 Term Loans (the "**Administrative Agent**") must be received by Seward & Kissel LLP, counsel to the Administrative Agent, via email at nferx@sewkis.com by the **Voting Instructions Deadline (10:00 p.m. (London)/ 5:00 p.m. (New York) on 9 June 2026)**.

## PART 6: Confirmation Deed

Part 6 (*Confirmation Deed*) of this Letter must be validly completed in all cases by all Nominees of CoreCo Plan Creditors that have been nominated by a CoreCo Plan Creditor to receive their Plan Consideration. Given constraints arising from DTC systems, holders of Legacy Notes and 2029 New Notes are not permitted to appoint a Nominee to receive any Plan Consideration due to them in their capacity as such on their behalf.

Part 6 (*Confirmation Deed*) comprises one section and should be completed as follows:

| Sections | To be completed by | Deadline |
|---|---|---|
| Part A | Any Nominee(s) that have been nominated by a CoreCo Plan Creditor to receive their Plan Consideration (holders of Legacy Notes are not permitted to appoint a Nominee to receive any Plan Consideration on their behalf). | **Voting Instructions Deadline (10:00 p.m. (London)/ 5:00 p.m. (New York) on 9 June 2026)** |

Part A requires all Nominee(s) of a CoreCo Plan Creditor, to complete and deliver the Confirmation Deed.

The Confirmation Deed must be printed in full, executed as a deed where indicated and the scanned pdf of all of the pages of the Confirmation Deed (not only the signature pages) uploaded by the Plan Creditor or Nominee(s) at https://deals.is.kroll.com/nfe.

Part A must be validly completed by all Nominee(s) elected by a Plan Creditor to receive their Plan Consideration.

Failure to validly complete and submit Part 6 (*Confirmation Deed*) of this Letter by the Voting Instructions Deadline (10:00 p.m. (London)/ 5:00 p.m. (New York) on 9 June 2026) may result in the Plan Creditor receiving all of its applicable Plan Consideration or, if there are other deficiencies with the Plan Creditor Letter, the Plan Creditor having certain of its Plan Consideration issued and delivered to the Holding Period Trustee.

7

**FOR ANY ASSISTANCE WITH COMPLETING THIS LETTER, CONTACT:**

**Kroll Issuer Services Limited**

**Phone: +44 20 7089 0909**

**E-mail: nfe@is.kroll.com**

**Plan Website: https://deals.is.kroll.com/nfe**

**Part 1:**
**PLAN CREDITOR ADMINISTRATIVE AND ENTITLEMENT INFORMATION**

**MUST BE VALIDLY COMPLETED BY <u>ALL PLAN CREDITORS</u>**

**PART A** must be validly completed by:

- all Plan Creditors in order to attend and vote (either in person or by proxy) at the relevant Plan Meeting(s); and

- Plan Creditors who wish to receive their Plan Consideration on the Restructuring Effective Date.

**PART B** must be validly completed by Plan Creditors whose Plan Consideration includes Equity Plan Consideration (including any Early Consent Fee) payable on the Restructuring Effective Date.

**PART C** must be validly completed by any Plan Creditor who elected to receive a share of the RCF-2 / TLA BrazilCo Cash Pool *in lieu* of its *pro rata* share of the RCF-2 / TLA BrazilCo Equity Pool.

If the relevant sections of this Part 1 are not validly completed by Plan Creditors by the **Voting Instructions Deadline (10:00 p.m. (London)/ 5:00 p.m. (New York) on 9 June 2026)**:

(a)     their Plan Consideration may be issued and delivered to the Holding Period Trustee on the Restructuring Effective Date; and

(b)     they may not be able to attend or vote at the relevant Plan Meeting(s).

9

**Part A: Administrative Details**

Full name of Plan Creditor:

---

*Plan Creditors that are voting in respect of specific business units should indicate the full name of their specific business unit here. For the avoidance of doubt, any vote by a specific business unit of a legal entity does not bind other departments, divisions or business units within that legal entity and is not being made on behalf of any other desk, business group or affiliate.*

Plan Creditor *(tick all applicable)*:

| | |
|---|---|
| 2026 Legacy Noteholder | ☐ |
| 2029 Legacy Noteholder | ☐ |
| 2029 New Noteholder | ☐ |
| R-1 Lender | ☐ |
| R-2 Lender | ☐ |
| TLA Lender | ☐ |
| TLB Lender | ☐ |
| Series I Lender | ☐ |
| Series II Lender | ☐ |

Telephone number (with country code):

---

E-mail address:

---

Principal contact person:

---

Jurisdiction of incorporation of the Plan Creditor:

---

| | **By ticking, the Plan Creditor hereby confirms, acknowledges, represents, warrants and undertakes that it is not a Sanctioned Person.** |
|---|---|
| **TO BE COMPLETED BY ALL PLAN CREDITORS** | ☐ |

**Part B: Equity Settlement Details**

This Part B must be validly completed by Plan Creditors whose Plan Consideration includes Equity Plan Consideration (including any Early Consent Fee), namely:

(a)    R-1 Lenders, R-2 Lenders, TLA Lenders and TLB Lenders in respect to CoreCo Preferred Stock, CoreCo Common Stock and FLNG 2 Preferred Equity; and

(b)    R-2 Lenders and TLA Lenders in respect to BrazilCo Common Equity.

Equity Plan Consideration due to 2029 New Noteholders through their interest in the Plan Consideration payable to the Series I Lender and Series II Lender will be settled in the DTC account of the relevant 2029 New Noteholder.

<u>Any</u> Plan Creditor intending that their share of the Equity Plan Consideration be delivered to a single Nominee must i) provide the settlement details for such Nominee below and ii) complete Part 4 (*Appointment of Nominee(s)*) of this Letter. If a Plan Creditor wishes to appoint more than one Nominee and/or allocate its Plan Consideration between its Nominees in a way which is not facilitated below, it should contact the Information Agent at nfe@is.kroll.com and follow the appropriate process instructed by the Information Agent.

I.    Name of DTC participant:

II.    DTC account number:

III.    Contact person for settlement purposes:

IV.    Contact person for settlement purposes e-mail address:

**Part C: Cash Settlement**

This Part C must be validly completed by Plan Creditors who elected to receive a share of the RCF-2 / TLA BrazilCo Cash Pool *in lieu* of their *pro rata* share of the RCF-2 / TLA BrazilCo Equity Pool.

Plan Creditors intending that their share of the RCF-2 / TLA Brazil Cash Pool be paid to a single Nominee must i) provide the payment details for such Nominee below and ii) complete Part 4 (*Appointment of Nominees*) of this Letter. If a Plan Creditor wishes to appoint more than one Nominee and/or allocate its Plan Consideration between its Nominees in a way which is not facilitated below, it should contact the Information Agent at nfe@is.kroll.com and follow the appropriate process instructed by the Information Agent.

I.       Name of Bank:

II.      Jurisdiction of Bank:

III.     Name of account bank:

IV.      Bank account number:

V.       Bank account IBAN:

VI.      Bank account SWIFT code / BIC:

VII.     ABA number / U.S. Correspondent Bank:

13

**PART 2:**
**BLOCKING LEGACY NOTES AND 2029 NEW NOTES**

**LEGACY NOTES AND 2029 NEW NOTES  MUST BE BLOCKED AND THEIR BLOCKING EVIDENCED BY THE RELEVANT DEADLINES BY SUBMITTING CUSTODY INSTRUCTIONS IN DTC INCLUDING A UNIQUE INSTRUCTION REFERENCE**

**THE BLOCK ON TRADING WILL REMAIN IN PLACE UNTIL THE RESTRUCTURING EFFECTIVE DATE.**

**THIS PART MUST BE VALIDLY COMPLETED BY LEGACY NOTEHOLDERS AND/OR 2029 NEW NOTEHOLDERS WHOSE LEGACY NOTES AND/OR 2029 NEW NOTES ARE HELD IN DTC.**

Failure to block Legacy Notes and/or 2029 New Notes and validly complete and submit this Part 2 by the relevant deadlines will invalidate this Letter and the relevant Legacy Noteholders and/or 2029 New Noteholders may not be entitled to:

(a)    attend or vote (either in person or by proxy) at the relevant Plan Meeting(s); and/or

(b)    receive any Plan Consideration on the Restructuring Effective Date, with any such Plan Consideration to be issued and delivered to the Holding Period Trustee.

Legacy Noteholders and/or 2029 New Noteholders who are Early Consent Fee Creditors and who fail to block their Legacy Notes and/or 2029 New Notes and validly complete this Part 2 by the prescribed deadlines, as a result of which they are unable, and therefore fail, to vote at the relevant Plan Meeting(s), shall lose their entitlement to the Early Consent Fee in accordance with the Restructuring Support Agreement.

**INSTRUCTIONS PROVIDED TO DTC AFTER THE CUSTODY INSTRUCTIONS DEADLINE WILL NOT BE DEEMED RECEIVED AND YOU WILL NOT BE ABLE TO VOTE IN THE PLAN MEETING(S) AND WILL THEREFORE FORFEIT ANY ENTITLEMENT TO THE EARLY CONSENT FEE.**

**DTC**

The Plan Creditor named in Part A of Part 1 (*Plan Creditor Administrative and Entitlement Information*) of this Letter must, to vote (either in person or by proxy) on the relevant Plan Meeting(s), and receive Plan Consideration on the Restructuring Effective Date, submit (or cause to be submitted via their intermediaries) their Custody Instruction(s), including the UIR, to the Information Agent via DTC, by no later than the **Custody Instructions Deadline (10:00 p.m. (London)/ 5:00 p.m. (New York) on 10 June 2026)**.

If you own Legacy Notes and/or 2029 New Notes under more than one ISIN, you must complete a separate line below for each respective ISIN.

Plan Creditors that hold the Legacy Notes and/or 2029 New Notes via Euroclear or Clearstream must allow sufficient time for completion of the ATOP procedures during the normal business hours of DTC on such date. DTC's deadlines may be earlier than the ones stated in this announcement. Such Plan Creditors should ensure that their relevant clearing participants in Euroclear or Clearstream include in their Custody Instruction(s), submitted to the Information Agent via DTC, the UIR, by no later than the **Custody Instructions Deadline (10:00 p.m. (London)/ 5:00 p.m. (New York) on 10 June 2026)**.

Without such UIR in the Custody Instruction(s), such Custody Instruction(s) will be invalid.

14

| Existing Notes and ISIN | Current face amount of USD to be blocked |
|---|---|
| 6.500% Senior Secured Notes due 2026 US644393AB64 | |
| 6.500% Senior Secured Notes due 2026 USU6422PAC24 | |
| 8.750% Senior Secured Notes due 2029 US644393AC48 | |
| 8.750% Senior Secured Notes due 2029 USU6422PAD07 | |
| 12.000% Senior Secured Notes due 2029 US62909BAA52 | |
| 12.000% Senior Secured Notes due 2029 USU6510BAA09 | |

15

**PART 3:**
**VOTING INSTRUCTIONS**

**APPLICABLE SECTIONS MUST BE VALIDLY COMPLETED BY ALL PLAN CREDITORS WHO WISH TO VOTE (EITHER IN PERSON OR BY PROXY) AT THE RELEVANT PLAN MEETING(S).**

**PART A** must be validly completed by or on behalf of a Plan Creditor for the purposes of attending and voting at the relevant CoreCo Plan Meeting(s).

**PART B AND C** must be validly completed by or on behalf of a Plan Creditor for the purposes of attending and voting at the relevant BrazilCo Plan Meeting(s).

Failure to validly complete and submit this Part 3 by the **Voting Instructions Deadline (10:00 p.m. (London)/ 5:00 p.m. (New York) on 9 June 2026)** (along with the relevant sections of Part 1 (*Plan Creditor Administrative and Entitlement Information*) and, for Legacy Noteholders and/or 2029 New Noteholders, Part 2 (*Blocking Legacy Notes and 2029 New Notes*) of this Letter by the relevant deadlines set out therein) and/or a failure to provide all relevant supporting information may result in such Plan Creditor's vote not counting for the purposes of the relevant Plan Meeting(s).

If a Plan Creditor who is an Early Consent Fee Creditor fails to validly complete this Part 3 and, as a result, does not vote at the relevant Plan Meeting(s), it shall lose its entitlement to the Early Consent Fee in accordance with the Restructuring Support Agreement.

**PLEASE CONTACT THE INFORMATION AGENT (NFE@IS.KROLL.COM) AS SOON AS POSSIBLE IF YOU WISH TO VOTE (EITHER IN PERSON OR BY PROXY) ON THE RELEVANT PLAN BUT MISS THE VOTING INSTRUCTIONS DEADLINE.**

**Part A: CoreCo Plan Meetings**

You must make only <u>one</u> election in Section 1 below.

**1.      Attendance at the relevant Plan Meeting(s)**

The Plan Creditor identified in Part A of Part 1 (*Plan Creditor administrative and Entitlement information*) of this Letter wishes to:

☐      Appoint the Chairperson of the relevant Plan Meeting(s) as its proxy to attend and vote on its behalf; or

☐      Appoint the following individual (being a person other than the Chairperson of the relevant Plan Meeting(s)) to attend as its proxy and vote on its behalf; or

Name:   _____

Email:   _____

Passport (or government issued photographic identification) country and number / identification number:

_____

☐      Attend and vote in person at the relevant Plan Meeting(s) (if a corporate person, by the below-named individual as its representative):

Name:   _____

Email:   _____

Passport (or government issued photographic identification) country and number:

_____

*Notes:*

*If the Plan Creditor is a corporate person, please enclose evidence of the authority granted to the above-named individual as proxy or representative (for example, a valid power of attorney or board resolutions) when submitting this Letter.*

*In order to attend the relevant Plan Meeting(s), an attendee may be asked to produce at the registration of the relevant Plan Meeting(s):*

*(a)      a duplicate copy of the completed Letter for each Plan Creditor they represent;*

*(b)      a passport (or government issued photographic identification), matching the details above, as proof of identity; and*

*(c)      where they are representing a corporate person, evidence of the relevant representative's or individual proxy's authority (as applicable) to attend the relevant Plan Meeting(s) on behalf of the Plan Creditor (for example, a valid power of attorney and/or board resolutions).*

*In order to attend the relevant Plan Meeting(s) via video conference, an attendee will need to have been granted access details to the video conference platform, following submission of the required evidence by the Voting Instructions Deadline (10:00 p.m. (London)/ 5:00 p.m. (New York) on 9 June 2026). Such attendee may be required to prove their identity on the video conference platform.*

*In order to attend the relevant Plan Meeting(s) physically, an attendee should identify themselves at the registration desk no later than 30 minutes before the scheduled time of the relevant Plan Meeting(s).*

**2.        Indication of Voting Intention/ Voting Instruction**

The Plan Creditor identified in Part A of Part 1 (*Plan Creditor Administrative and Entitlement Information*) of this Letter intends to vote, or hereby instructs its proxy to vote, in accordance with the below election at the relevant Plan Meeting(s) by ticking in the relevant box FOR or AGAINST.

You must make only ONE election on whether you vote FOR or AGAINST in respect of each applicable Plan Meeting and your voting selection will be deemed to have been made in respect of all of your Plan Claim(s) for that Plan Meeting. You are not able to split your vote.

| CoreCo Plan Meeting | CoreCo Plan Creditors entitled to attend & vote | To vote FOR the CoreCo Plan* | To vote AGAINST the CoreCo Plan |
|---|---|---|---|
| R-1 Class Plan Meeting | R-1 Lenders | | |
| R-2 Class Plan Meeting | R-2 Lenders | | |
| TLB Class Plan Meeting | TLB Lenders | | |
| TLA Class Plan Meeting | TLA Lenders | | |
| Legacy Notes Class Plan Meeting | 2026 Legacy Noteholders 2029 Legacy Noteholders | | |
| Series I and Series II Class Plan Meeting | Series I Lender Series II Lender | | |

**\* By voting FOR the CoreCo Plan, the CoreCo Plan Creditor agrees that NFE Global may, subject to the terms of the Restructuring Support Agreement (including the consent rights contained therein), at any hearing to sanction the CoreCo Plan, acting reasonably and in good faith, consent on behalf of the CoreCo Plan Creditors to any modification, amendment, variation or supplement to or of the CoreCo Plan, the Transaction Implementation Deed or any other Implementation Document on terms or conditions that the Court may think fit to approve or impose for the purpose of consummating or implementing the CoreCo Plan, provided that any such modification, amendment, variation or supplement complies with the terms of the CoreCo Plan, Transaction Implementation Deed or other Implementation Document, as applicable.**

18

**Part B: BrazilCo Plan Meeting**

You must make only <u>one</u> election in Section 1 below.

**1.      Attendance at the Plan Meeting**

The Plan Creditor identified in Part A of Part 1 (*Plan Creditor Administrative and Entitlement Information*) of this Letter wishes to:

☐      Appoint the Chairperson of the Plan Meeting as its proxy to attend and vote on its behalf; or

☐      Appoint the following individual (being a person other than the Chairperson of the relevant Plan Meeting(s)) to attend as its proxy and vote on its behalf; or

Name: _____

Email: _____

Passport (or government issued photographic identification) country and number / identification number:

_____

☐      Attend and vote in person at the Plan Meeting (if a corporate person, by the below-named individual as its representative):

Name: _____

Email: _____

Passport (or government issued photographic identification) country and number:

_____

*Notes:*

*If the Plan Creditor is a corporate person, please enclose evidence of the authority granted to the above-named individual as proxy or representative (for example, a valid power of attorney or board resolutions) when submitting this Letter.*

*In order to attend the Plan Meeting, an attendee may be asked to produce at the registration of the Plan Meeting:*

*(a)      a duplicate copy of the completed Letter for each Plan Creditor they represent;*

*(b)      a passport (or government issued photographic identification), matching the details above, as proof of identity; and*

*(c)      where they are representing a corporate person, evidence of the relevant representative's or individual proxy's authority (as applicable) to attend the Plan Meeting on behalf of the Plan Creditor (for example, a valid power of attorney and/or board resolutions).*

*In order to attend the Plan Meeting via video conference, an attendee will need to have been granted access details to the video conference platform, following submission of the required evidence by the Voting Instructions Deadline (10:00 p.m. (London)/ 5:00 p.m. (New York) on 9 June 2026). Such attendee may be required to prove their identity on the video conference platform.*

*In order to attend the Plan Meeting physically, an attendee should identify themselves at the registration desk no later than 30 minutes before the scheduled time of the Plan Meeting.*

19

**2.        Indication of Voting Intention/ Voting Instruction**

The Plan Creditor identified in Part A of Part 1 (*Plan Creditor Administrative and Entitlement Information*) of this Letter intends to vote, or hereby instructs its proxy to vote, in accordance with the below election at the Plan Meeting by ticking in the relevant box FOR or AGAINST.

You must make only ONE election on whether you vote FOR or AGAINST in respect of the Plan Meeting and your voting selection will be deemed to have been made in respect of all of your Plan Claim(s) for the Plan Meeting. You are not able to split your vote.

| BrazilCo Plan Meeting | BrazilCo Plan Creditors entitled to attend & vote | To vote FOR the BrazilCo Plan* | To vote AGAINST the BrazilCo Plan |
|---|---|---|---|
| 2029 New Notes Class Plan Meeting | 2029 New Noteholders | | |

**\* By voting FOR the BrazilCo Plan, the BrazilCo Plan Creditor agrees that NFE Brazil Newco may, subject to the terms of the Restructuring Support Agreement (including the consent rights contained therein), at any hearing to sanction the BrazilCo Plan, acting reasonably and in good faith, consent on behalf of the BrazilCo Plan Creditors to any modification, amendment, variation or supplement to or of the BrazilCo Plan, the Transaction Implementation Deed or any other Implementation Document on terms or conditions that the Court may think fit to approve or impose for the purpose of consummating or implementing the BrazilCo Plan, provided that any such modification, amendment, variation or supplement complies with the terms of the BrazilCo Plan, Transaction Implementation Deed or other Implementation Document, as applicable.**

20

**Part C: 2029 New Noteholder Consent to Series I Lender and Series II Lender voting**

The Plan Creditor identified in Part A of Part 1 (*Plan Creditor Administrative and Entitlement Information*) of this Letter INSTRUCTS AND RATIFIES or DOES NOT INSTRUCT AND RATIFY the Series I Lender and the Series II Lender to vote FOR the CoreCo Plan at the Series I and Series II Class Plan Meeting.

If Required Holders (as defined in the Series I Loan Agreement and the Series II Loan Agreement) instruct and ratify the Series I Lender and the Series II Lender to vote FOR the CoreCo Plan, such instruction and ratification shall constitute an instruction to each of the Series I Lender and the Series II Lender under the Series I Loan Agreement and Series II Loan Agreement to vote FOR the CoreCo Plan and a ratification of such affirmative votes.

You must make only ONE election on whether you INSTRUCT AND RATIFY or DO NOT INSTRUCT AND RATIFY in respect of the Series I Lender and Series II Lender to vote FOR the CoreCo Plan at the Series I and Series II Class Plan Meeting and your selection will be deemed to have been made in respect of all of your 2029 New Notes. You are not able to split your consent.

| CoreCo Plan Meeting | Plan Creditors entitled to consent | CONSENTS | DOES NOT CONSENT |
|---|---|---|---|
| Series I and Series II Class Plan Meeting | 2029 New Noteholders | | |

21

**PART 4:**
**APPOINTMENT OF NOMINEE(S)**

**PLAN CREDITORS WHO WISH TO APPOINT ANY NOMINEE(S) IN RESPECT OF PLAN CONSIDERATION TO BE RECEIVED ON THE RESTRUCTURING EFFECTIVE DATE MUST VALIDLY COMPLETE AND SUBMIT THIS PART 4 (OR FOLLOW SUCH OTHER DIRECTIONS AS MAY BE GIVEN BY THE INFORMATION AGENT). GIVEN CONSTRAINTS ARISING FROM DTC SYSTEMS, HOLDERS OF LEGACY NOTES AND 2029 NEW NOTES ARE NOT PERMITTED TO APPOINT A NOMINEE TO RECEIVE ANY PLAN CONSIDERATION DUE TO THEM IN THEIR CAPACITY AS SUCH ON THEIR BEHALF.**

If a Plan Creditor wishes to appoint more than one Nominee and/or allocate its Plan Consideration between its Nominees in a way which is not facilitated by this Part 4, it should contact the Information Agent at nfe@is.kroll.com in lieu of filling out this Part 4. Submission of the forms requested by the applicable agent in the manner requested by such agent will be deemed sufficient to appoint any applicable Nominees hereunder.

Failure to validly complete and submit this Part 4 (or the forms requested by the Information Agent) or to appoint any Nominee(s) by the **Voting Instructions Deadline (10:00 p.m. (London)/ 5:00 p.m. (New York) on 9 June 2026)** may result in the Plan Creditor receiving all of its applicable Plan Consideration or, if there are other deficiencies with the Plan Creditor Letter, the Plan Creditor having certain of its Plan Consideration issued and delivered to the Holding Period Trustee.

If any Nominee is appointed in respect of any Equity Plan Consideration, the Plan Creditor's Equity Plan Consideration must be settled manually and any cost of such manual settlement will be borne by the Plan Companies.

Part 6 (*Confirmation Deed*) of this Letter must also be validly completed in all cases by all Nominees of CoreCo Plan Creditors that have been nominated by a CoreCo Plan Creditor to receive their Plan Consideration.

A Plan Creditor must not itself be a Sanctioned Person to be able to appoint any Nominee(s) to receive any of its Plan Consideration.

**PLAN CREDITORS ARE ADVISED THAT (I) ANY PLAN CONSIDERATION WHICH COMPRISES EQUITY PLAN CONSIDERATION WILL NOT BE TRANSFERRED TO ANY NOMINEE WHO IS NOT AN ELIGIBLE PERSON; AND (II) NO PLAN CONSIDERATION WILL BE TRANSFERRED TO ANY NOMINEE WHO IS A SANCTIONED PERSON.**

**Debt Plan Consideration**

Plan Creditors who are entitled to receive Debt Plan Consideration must validly complete (or ask their Nominee to complete) this section in order for their Nominee to receive such Plan Creditor's entitlement to Debt Plan Consideration. If a Plan Creditor wishes to appoint more than one Nominee and/or allocate its Debt Plan Consideration between its Nominees in a way which is not facilitated by this Part 4, it should contact the Information Agent at nfe@is.kroll.com.

I.      Name of Nominee:

        --------------------------------------------------------------------------------

II.     Address of Nominee:

        --------------------------------------------------------------------------------

III.    Contact name at Nominee:

        --------------------------------------------------------------------------------

IV.     Contact e-mail of Nominee:

        --------------------------------------------------------------------------------

V.      Contact telephone number (with country code) of Nominee:

        --------------------------------------------------------------------------------

VI.     Jurisdiction of Nominee:

        --------------------------------------------------------------------------------

23

**Equity Plan Consideration**

Plan Creditors who are entitled to receive Equity Plan Consideration must validly complete (or ask their Nominee to complete) this section in order for their Nominee to receive such Plan Creditor's entitlement to Equity Plan Consideration. If a Plan Creditor wishes to appoint more than one Nominee and/or allocate its Equity Plan Consideration between its Nominees in a way which is not facilitated by this Part 4, it should contact the Information Agent at nfe@is.kroll.com.

I.      Name of Nominee:

        -----------------------------------------------------------------------------

II.     Address of Nominee:

        -----------------------------------------------------------------------------

III.    Contact name at Nominee:

        -----------------------------------------------------------------------------

IV.     Contact e-mail of Nominee:

        -----------------------------------------------------------------------------

V.      Contact telephone number (with country code) of Nominee:

        -----------------------------------------------------------------------------

VI.     Jurisdiction of Nominee:

        -----------------------------------------------------------------------------

VII.    Name of DTC participant:

        -----------------------------------------------------------------------------

VIII.   DTC account number:

24

---

IX.    Contact person for settlement purposes:

---

X.    Contact person for settlement purposes e-mail address:

---

**Part 5: LENDER FORMS**

**THIS PART MUST BE VALIDLY COMPLETED BY ALL PLAN CREDITORS WHOSE PLAN CONSIDERATION INCLUDES NEW CORECO TERM LOANS AND/OR FLNG 2 TERM LOANS.**

Plan Creditors whose Plan Consideration will include New CoreCo Term Loans and/or FLNG 2 Term Loans shall be required to provide the Administrative Agent with:

- a completed Administrative Details Form, which may be in the form of the LMA/LSTA Standard Administrative Details Form (attached as Annex A, hereto) or such Plan Creditor's (or their Nominee's) standard form; and

- its applicable tax form (e.g. W-9, W8-BEN, etc.).

In the event that a Plan Creditor appoints one or more Nominees to receive its New CoreCo Term Loans and/or FLNG 2 Term Loans, the foregoing forms should be completed by each such Nominee and not by the Plan Creditor.

The Administrative Detail Forms and the Tax Forms, which are received from Plan Creditors or its Nominee(s), as applicable, will be sent to the Administrative Agent for review and onboarding of each Plan Creditor (or their Nominee(s)).

This Part 5 must be validly completed and submitted to Seward & Kissel LLP, counsel to the Administrative Agent, via email at nferx@sewkis.com by the **Voting Instructions Deadline (10:00 p.m. (London)/ 5:00 p.m. (New York) on 9 June 2026)**.

**Part 6: CONFIRMATION DEED**

**PART A**

**To be completed by Nominee(s) of CoreCo Plan Creditors. Given constraints arising from DTC systems, holders of Legacy Notes and 2029 New Notes are not permitted to appoint Nominee(s) to receive any Plan Consideration due to them in their capacity as such on their behalf.**

**For a CoreCo Plan Creditor's Nominee(s) to receive Plan Consideration, a validly completed Plan Creditor Letter, including a validly completed Confirmation Deed, must be submitted to and received by the Information Agent by the Voting Instruction Deadline. For the avoidance of doubt, a CoreCo Plan Creditor's Nominee(s) do not have to complete a Confirmation Deed in order for that CoreCo Plan Creditor to vote on the CoreCo Plan. However, if no Confirmation Deed is validly completed and submitted by the Voting Instructions Deadline (10:00 p.m. (London)/ 5:00 p.m. (New York) on 9 June 2026), the relevant CoreCo Plan Creditor may receive all of its applicable Plan Consideration or, if there are other deficiencies with the Plan Creditor Letter, the CoreCo Plan Creditor may have certain of its Plan Consideration issued and delivered to the Holding Period Trustee.**

**1      DEFINITIONS AND INTERPRETATION**

1.1     Capitalised terms used but not defined in this Deed shall have the meaning given to such terms in the CoreCo Plan, otherwise, the terms as defined in the Explanatory Statement.

1.2     In this Deed unless the context otherwise requires:

(a)      words in the singular include the plural and words in the plural include the singular;

(b)      the words "including" and "include" shall not be construed as or take effect as limiting the generality of the foregoing;

(c)      the headings shall not be construed as part of this Deed nor affect its interpretation;

(d)      references to any clause, without further designation, shall be construed as a reference to the clause of this Deed so numbered;

(e)      reference to any act, statute or statutory provision shall include a reference to that provision as amended, re-enacted or replaced from time to time whether before or after the date of this Deed and any former statutory provision replaced (with or without modification) by the provision referred to;

(f)      a reference to this Deed includes all schedules and appendices, exhibits and other attachments hereto, including, but not limited to, the Annex;

(g)      reference to a person includes a reference to any body corporate, unincorporated association or partnership and to that person's legal personal representatives or successors; and

27

(h)     subject to Clause 1.1 above, the principles of construction set out in the CoreCo Plan apply to this Deed except that references to the CoreCo Plan shall instead be construed as references to this Deed.

## 2      DEED POLL

This Deed is made by way of deed poll by the CoreCo Plan Creditor's Nominee party hereto whose details are set out in Part 4 of the Plan Creditor Letter of the Plan Creditor that nominated the Nominee party hereto, for the benefit of NFE Global and the Administrative Parties, and with the intention and effect that it may be directly relied upon and enforced separately by NFE Global and the Administrative Parties, even though they are not party to this Deed.

## 3      CONFIRMATIONS, WARRANTIES AND UNDERTAKINGS

The Nominee hereto confirms, acknowledges, represents, warrants and undertakes that it is not a Sanctioned Person.

## 4      NFE GLOBAL'S AND THE ADMINISTRATIVE PARTIES' AUTHORITY TO EXECUTE AND GIVE EFFECT TO THE IMPLEMENTATION DOCUMENTS

4.1     Subject to the terms of clauses 3 (*Grant of Authority to Execute the Implementation Documents*) and 8 (*Termination*) of the CoreCo Plan, with effect on and from the Plan Effective Date, in consideration of the rights and benefits conferred on the CoreCo Plan Creditors under the CoreCo Plan and solely for the purpose of giving effect to the terms of the CoreCo Plan (and the transactions contemplated by it), notwithstanding any term of any other agreement, instrument or arrangement whatsoever (other than the Implementation Documents), the Nominee party hereto hereby irrevocably appoints NFE Global as its true and lawful attorney and agent, acting by any director, officer, employee or other duly authorised representative, for and on its behalf and in its name, and irrevocably authorises, directs, empowers and instructs NFE Global in accordance with and pursuant to the terms of clause 3.1 of the CoreCo Plan as if it were a CoreCo Plan Creditor for purposes of that clause of the CoreCo Plan, but solely to the extent that such CoreCo Plan Creditor is acting in its capacity as a recipient of the applicable Plan Consideration for which the signatory hereto is a Nominee.

4.2     Subject to the terms of clauses 3 and 8 of the CoreCo Plan, the authority and power of attorney granted pursuant to this Deed is irrevocable, being granted for valuable consideration and to secure the performance of obligations under the CoreCo Plan.

4.3     The Nominee party hereto waives any right to revoke or terminate such authority except as expressly provided in the CoreCo Plan.

4.4     The Nominee party hereto irrevocably agrees that it shall be bound by, and shall comply with, each Implementation Document and any ancillary document to which such Nominee is a party (as if it were an original executing party) after such document has been fully executed, dated, released and delivered by NFE Global on its behalf pursuant to, and in accordance with, this Deed, clause 3 of the CoreCo Plan and the Transaction Implementation Deed.

4.5     The authority granted pursuant to this Deed shall:

28

(a)       continue until the earlier of (i) Restructuring Effective Date or (ii) such other termination date as expressly provided in the CoreCo Plan, at which time it shall automatically expire; and

(b)       automatically lapse in respect of any Implementation Document or ancillary document once that document has been fully executed, released and delivered, whereupon it may thereafter be amended only in accordance with its terms.

4.6       Nothing in this Deed nor clause 3 of the CoreCo Plan authorises or permits NFE Global to commence any Proceedings in the name of, or on behalf of, the Nominee party hereto.

4.7       Promptly following any amendments, modification or variations being made to any Implementation Document pursuant to clause 3 of the CoreCo Plan, NFE Global shall procure that such Implementation Document (as amended, modified or varied) is promptly made available to the Nominee party hereto, via the Plan Website.

4.8       Subject to the terms of any Deed of Undertaking or applicable Implementation Document, with effect on and from the Plan Effective Date, the Nominee party hereto hereby irrevocably authorises and instructs each applicable Administrative Party, as their agent and attorney (acting by any one of their duly appointed representatives) in accordance with and pursuant to the terms of clause 3.8 of the CoreCo Plan as if it were a CoreCo Plan Creditor for purposes of that clause of the CoreCo Plan.

## 5      GOVERNING LAW

This Deed and any dispute or claim (including any non-contractual disputes or claims) arising out of or in connection with it or its subject matter or formation shall be governed by and construed in accordance with, the law of England and Wales.

## 6      JURISDICTION

The courts of England & Wales shall have exclusive jurisdiction to settle any dispute or claim (including any non-contractual disputes or claims) arising out of or in connection with this Deed or its subject matter.

**NONE OF THE SECURITIES REFERRED TO IN THIS DEED SHALL BE SOLD, ISSUED OR TRANSFERRED IN ANY JURISDICTION IN CONTRAVENTION OF APPLICABLE LAW.**

**IN WITNESS** whereof this Deed has been executed as a deed and delivered on

_____by the party hereto.

**Nominee for Plan Consideration who is an individual**

EXECUTED and DELIVERED as a DEED by

*Nominee*,          _____          _____

                          (print name)                          (sign)

in the presence of:

Witness signature[1]:          _____

Witness name:          _____

Witness address:          _____

**Nominee for Plan Consideration who is a corporate entity**

**EXECUTED** and **DELIVERED** as a **DEED**
for and on behalf of

**Nominee**,          _____
                          (print name)

acting by:

_____          _____
        (sign)                          (sign)
Name:                          Name:
Title:                          Title:

in the presence of:

---

[1] Note: witness may be any person over the age of 18 years

1

2

*Witness signature*[2] *:*    _____

*Witness name:*    _____

*Witness address:*    _____

---

[2] Note: witness may be any person over the age of 18 years

**ANNEX A**

  

# LMA/LSTA Standard Administrative Details Form

**The Loan Market Association ("LMA") and Loan Syndications & Trading Association ("LSTA")
consent to the use and reproduction of this document for the preparation and documentation of
agreements relating to transactions or potential transactions in the loan markets.**

**© Loan Market Association, Loan Syndications & Trading Association.  All rights reserved.**

1

# LMA / LSTA Standard Administrative Details Form

| ENTITY DETAILS | | | | | | |
|---|---|---|---|---|---|---|
| **Name** | Lender's name as it appears on tax/registration documentation. | | | | **MEI** | Markit Entity ID |
| **Financial or non-financial institution** | Institution type. | | | | | |
| **GIIN** | FATCA Global Intermediary Identification Number (Optional) | **CRN** | UK Company Registration Number (Optional) | **LEI** | | Legal Entity ID (Optional) |
| **Entity Type** | Type of lender. If lender/entity type does not appear in list, you may provide your own value. | | | | | |
| **Address (of Lending Office):** Registered address of lending office, including country of domicile. | | | **Signature Block:** Signature Block as it would appear on settlement documentation. E.g. (for separately managed account): ABC Fund by 123 Asset Management as Advisor | | | |
| **Fund Manager** | | | | | **MEI** | Markit Entity ID |
| **Lender Parent** | Name of legal parent if different from lender entity. (Optional) | | | | **MEI** | Markit Entity ID |

| NOTICE/SERVICING MESSAGE DELIVERY INSTRUCTIONS | | | | | |
|---|---|---|---|---|---|
| **Firm** | Name of Company | **Fax** Fax Number | **Email** | Email Address | Email Pfd. |
| **Firm** | Name of Company | **Fax** Fax Number | **Email** | Email Address | Email Pfd. |

| STANDARD SETTLEMENT INSTRUCTIONS / WIRING INSTRUCTIONS | | | |
|---|---|---|---|
| **Payment Method** | MT103 or MT202 | | |
| **Currency** | Applicable Currency. | | |
| Account With Institution | Name of Beneficiary's Bank (usually custodian/trustee) | | |
| SWIFT BIC | 8/11-Character BIC of Beneficiary's Bank | ABA # | Routing # or UK Sort Code of Beneficiary's Bank (optional) |
| Beneficiary Customer | Name of Ultimate Beneficiary (Lender) | | |
| Beneficiary Account # | Account # of Ultimate Beneficiary | IBAN | IBAN of Ultimate Beneficiary (optional) |
| Payment Reference (Remittance Info) | **Use Standard Wire Reference Format\*:** [Borrower Name] [Facility Name/Abbr.] [Facility/Deal CUSIP/ISIN] [Payment Purpose(s)] [Transaction Reference ID] | | |
| Special Instructions | | | |

**Template above can be used for wire instructions where receiving bank is custodian/trustee, and lender has dedicated account. Additional templates provided at Appendix A.**

**OR**

## STANDARD SETTLEMENT INSTRUCTIONS / WIRING INSTRUCTIONS FOLLOWING ISO20022 UPDATES

*This alternate should be used for wire instructions where receiving bank is custodian/trustee, and lender has dedicated account following updates to ISO20022.  It will not be appropriate for those lenders for e.g. USD debt in US.*

*Additional templates provided at Appendix A.*

| | |
|---|---|
| **Payment Method** | *PACS.008 or PACS.009* |
| **Currency** | *Applicable Currency.* |
| Receiver BIC | *Name of Correspondent Bank* |
| Creditor Agent | *Name of Beneficiary's Bank (usually custodian/trustee)* |
| Creditor Agent BIC | *8/11-Character BIC of Beneficiary's Bank* |
| Creditor | *Name of Ultimate Beneficiary (Lender)* |
| Creditor Account # | *Account # of Ultimate Beneficiary*  **IBAN¹** *IBAN of Ultimate Beneficiary (optional)* |
| Payment Reference (Remittance Info) | **Use Standard Wire Reference Format\*:** [Borrower Name] [Facility Name/Abbr.] [Facility/Deal CUSIP/ISIN] [Payment Purpose(s)] [Transaction Reference ID] |
| Special Instructions | |

¹*In some instances it may be appropriate to add an additional account number where required.  Consider on a case-by-case basis depending on currencies used in the underlying transaction.*

## SERVICE PROVIDERS & THIRD-PARTY DATA ACCESS

| | | | | | | | Doc. Delivery | Recon & Inventory |
|---|---|---|---|---|---|---|---|---|
| Role | Custodian/Trustee | **Name** | *Name of Company* | | **MEI** | *Markit Entity ID* | ☐ | ☐ |
| Role | *Relationship to lender.* | **Name** | *Name of Company* | | **MEI** | *Markit Entity ID* | ☐ | ☐ |

## CREDIT CONTACTS (LEGAL DOCUMENTATION, AMENDMENTS & WAIVERS)

| **Name** | *Name of group or individual.* | *Select group or Individual* | **Firm** | *Firm with which contact is affiliated.* |
|---|---|---|---|---|

**Address:** ***Registered address of contact's office (if different than the lender's office), including country of domicile.***

| **Phone** | | **Fax** | | **Email** | |
|---|---|---|---|---|---|

☐ **Data Room Access**   |  **Pfd. Contact Method**  *Preferred contact method for inquiries.*

*Copy and paste section above to add any additional contacts.*  **It is recommended that at least one of the contacts be a group.**

3

## OPERATIONS CONTACTS (INQUIRIES ONLY)

| **Name** | *Name of group or individual.* | *Select group or Individual* | **Firm** | *Firm with which contact is affiliated.* |
|---|---|---|---|---|

**Address:** *Registered address of contact's office (if different than the lender's office), including country of domicile.*

| **Phone** | | **Fax** | | **Email** | |
|---|---|---|---|---|---|

☐ **Settlements** ☐ **Servicing** ☐ **SSI Verification** ☐ **KYC** | **Pfd. Contact Method** | *Preferred contact method for inquiries.*

*Copy and paste section above to add any additional contacts.* **It is recommended that at least one of the contacts be a group.**

## LETTER OF CREDIT CONTACTS

| **Name** | *Name of group or individual.* | *Select group or Individual* | **Firm** | *Firm with which contact is affliated.* |
|---|---|---|---|---|

**Address:** *Registered address of contact's office (if different than the lender's office), including country of domicile.*

| **Phone** | *Phone number (optional for groups)* | **Fax** | *Fax Number* | **Email** | *Email Address* |
|---|---|---|---|---|---|

| | **Pfd. Contact Method** | *Preferred contact method for inquiries.* |
|---|---|---|

*Copy and paste section above to add any additional contacts.* **It is recommended that at least one of the contacts be a group.**

## ADDITIONAL ENTITY DETAILS & KYC/FATCA INFORMATION

| **Country of Incorporation** | *Country of Incorporation of lender* | **Country of Tax Residence** | *Country of Residence of lender for tax purposes* |
|---|---|---|---|
| **EIN** | *US Employee ID Number* | **UK Treaty Passport #** | *UK Treaty Passport #* |
| **US Tax Form** | *Type of tax form used/attached* | **UK Treaty Passport Expiry Date** | *UK Treaty Passport Expiry Date* |
| **Entity Referenced As** | Primary Entity | | |

4

**Appendix A: Additional Wire Instruction Templates:**

*Template below can be used for wire instructions where recipient is intermediary bank with nostro account for custodian and the Lender does not have a dedicated account.*

| | | | |
|---|---|---|---|
| **Currency** | *Applicable Currency.* | | |
| Correspondent Bank | *Name of **Receiver's** Correspondent Bank (SWIFT 54a)* | | |
| SWIFT BIC | *8/11-Character SWIFT BIC of Correspondent Bank* | | |
| Intermediary Bank | *Name of Intermediary Bank (SWIFT 56a)* | | |
| SWIFT BIC | *8/11-Character SWIFT BIC of Intermediary Bank* | ABA # | *ABA/Routing # or UK Sort Code of Intermediary Bank (optional)* |
| Account With Institution | *Name of Beneficiary's Bank – usually custodian (SWIFT 57a)* | | |
| SWIFT BIC | *8/11-Character SWIFT BIC of Beneficiary's Bank* | IBAN | *IBAN of Beneficiary's Bank at Intermediary* |
| Beneficiary Customer | *Name of Ultimate Beneficiary (Lender) (SWIFT 59a)* | | |
| Beneficiary Account # | *Account # / Code of Ultimate Beneficiary* | | |
| Payment Reference (Remittance Info) | ***Use Standard Wire Reference Format*:**<br>[Borrower Name]<br>[Facility Name/Abbr.] [Facility/Deal CUSIP/ISIN]<br>[Payment Purpose(s)] [Transaction Reference ID] | | |
| Special Instructions | | | |

**APPENDIX 4**

**NOTICE OF PLAN MEETINGS**

NOTICE OF PLAN MEETINGS

Claim No: CR-2026-002385

Claim No. CR-2026-002886

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS
OF ENGLAND AND WALES**

**INSOLVENCY AND COMPANIES LIST
(ChD)**

**IN THE MATTER OF (1) NFE GLOBAL HOLDINGS LIMITED,
AND (2) NFE BRAZIL NEWCO LIMITED**

**- and -**

**IN THE MATTER OF THE COMPANIES ACT 2006**

**RESTRUCTURING PLANS**

*(under Part 26A of the Companies Act 2006)*

**between**

**NFE GLOBAL HOLDINGS LIMITED ("NFE Global")**

**and**

**NFE BRAZIL NEWCO LIMITED ("NFE BRAZIL NEWCO")**

**(together, the "Plan Companies" and each a "Plan Company")**

**and**

**THEIR PLAN CREDITORS**

Capitalised terms used in this notice which are not otherwise defined herein shall have the meanings given to the in the Explanatory Statement (as that term is defined below).

**NOTICE IS HEREBY GIVEN** that, by an order dated 14 May 2026 made in the above matters (the "**Convening Order**"), the High Court of Justice of England and Wales (the "**Court**") has granted the Plan Companies permission to convene meetings (each, a "**Plan Meeting**") of certain of their creditors (the "**Plan Creditors**") for the purposes of considering and, if thought fit, approving the restructuring plans proposed by the Plan Companies.

The Convening Order permits: (i) six Plan Meetings to be convened by NFE Global (the "**CoreCo Plan Meetings**") for the purpose of considering and, if thought fit, approving (with or without modification, addition or condition approved or imposed by the Court) the restructuring plan proposed in respect of NFE Global pursuant to Part 26A of the Companies Act 2006 (the "**CoreCo Plan**"); and (ii) a single Plan Meeting to be convened by NFE Brazil Newco (the "**BrazilCo Plan Meeting**") for the purpose of considering and, if thought fit, approving (with or without modification, addition or condition approved or imposed by the Court) the restructuring plan proposed in respect of NFE Brazil Newco pursuant to Part 26A of the Companies Act 2006 (the "**BrazilCo Plan**", and together with the CoreCo Plan, the "**Plans**"), as set out in Appendix 1 (*The Plans*) to the statement required to be furnished to Plan Creditors pursuant to section 901D of the Companies Act 2006 (the "**Explanatory Statement**").

1

**NOTICE IS HEREBY GIVEN** that the Plan Meetings will be held at the offices of Skadden, Arps, Slate, Meagher & Flom (UK) LLP ("**Skadden**") at 22 Bishopsgate, London, EC2N 4BQ, and via video conference, on 15 June 2026 as follows:

| Plan Meeting | CoreCo Plan or BrazilCo Plan | Plan Creditors entitled to attend and vote | Date & Time of Plan Meeting |
|---|---|---|---|
| R-1 Class Plan Meeting | CoreCo Plan | R-1 Lenders | 3:00 p.m. (London) / 10:00 a.m. (New York) on 15 June 2026 |
| R-2 Class Plan Meeting | CoreCo Plan | R-2 Lenders | 3:15 p.m. (London) / 10:15 a.m. (New York) on 15 June 2026, or as soon as possible thereafter |
| TLB Class Plan Meeting | CoreCo Plan | TLB Lenders | 3:30 p.m. (London) / 10:30 a.m. (New York) on 15 June 2026, or as soon as possible thereafter |
| TLA Class Plan Meeting | CoreCo Plan | TLA Lenders | 3:45 p.m. (London) / 10:45 a.m. (New York) on 15 June 2026, or as soon as possible thereafter |
| Legacy Notes Class Plan Meeting | CoreCo Plan | 2026 Legacy Noteholders 2029 Legacy Noteholders | 4:00 p.m. (London) / 11:00 a.m. (New York) on 15 June 2026, or as soon as possible thereafter |
| Series I and Series II Class Plan Meeting | CoreCo Plan | Series I Lender Series II Lender | 4:15 p.m. (London) / 11:15 a.m. (New York) on 15 June 2026, or as soon as possible thereafter |
| 2029 New Notes Class Plan Meeting | BrazilCo Plan | 2029 New Noteholders | 4:30 p.m. (London) / 11:30 a.m. (New York) on 15 June 2026, or as soon as possible thereafter |

1      The purpose of the Plan Meetings will be to consider and vote upon the following resolutions:

(a)      In respect of the CoreCo Plan Meetings:

"*THAT the CoreCo Plan (in its present form or with, or subject to, any modification, addition or condition approved or imposed by the Court), a print of which has been produced to the CoreCo Plan Meetings and, for the purpose of identification only, signed by the Chairperson thereof, be and is hereby approved.*"; and

(b)      In respect of the BrazilCo Plan Meeting:

"*THAT the BrazilCo Plan (in its present form or with, or subject to, any modification, addition or condition approved or imposed by the Court), a print of which has been*

2

*produced to the BrazilCo Plan Meeting and, for the purpose of identification only, signed by the Chairperson thereof, be and is hereby approved.*"

2    All Plan Creditors as at the Record Time, being 10:00 p.m. (London time)/ 5:00 p.m. (New York time) on 10 June 2026, are requested to attend the relevant Plan Meeting(s) at the time and place above indicated either in person (physically or by video conference) or by proxy. Plan Creditors will be notified of any changes to the time of any Plan Meeting(s).

3    In order for a Plan Creditor to vote at the relevant Plan Meeting(s), it is required that:

(a)    in respect of all Plan Creditors, Part 1 (*Plan Creditor Administrative and Entitlement Information*) and Part 3 (*Voting Instructions*) of the Plan Creditor Letter; and

(b)    in respect of Legacy Noteholders and 2029 New Noteholders only, Part 2 (*Blocking Legacy Notes and New 2029 Notes*),

are completed and submitted, in accordance with the procedures described in the Plan Creditor Letter, to Kroll Issuer Services Limited (as Information Agent) by online form via the Plan Website (https://deals.is.kroll.com/nfe) as soon as possible, and, in any event, no later than 10:00 p.m. (London time)/ 5:00 p.m. (New York time) on 9 June 2026 (the "**Voting Instructions Deadline**"). If a Plan Creditor does not submit a validly completed Plan Creditor Letter before the Voting Instructions Deadline, its admission to, and thus, entitlement to vote at the relevant Plan Meeting will be at the discretion of the Chairperson (although where practical, the Information Agent will endeavour to process and verify any Plan Creditor Letters, evidence of corporate authority and/ or Identification Documents received after the Voting Instruction Deadline but prior to the opening of the relevant Plan Meeting).

4    Plan Creditors may vote in person (physically at the offices of Skadden referred to above, or by video conference) at the relevant Plan Meeting(s) or they may appoint another person, whether a Plan Creditor or not, as their proxy to attend and vote in their place. Each Plan Creditor or its proxy attending the Plan Meeting(s) physically will be required to register his/ her attendance at the Plan Meeting(s) prior to its commencement. Registration will commence from 2:30 p.m. (London time)/ 9:30 a.m. (New York time) on 15 June 2026.

5    The Plan Meetings can also be attended remotely on the Zoom or similar video-conference platform at the times set out above. Subject to the Plan Creditor or its proxy providing the Information Agent with a validly completed Plan Creditor Letter and, in the case of a corporation, evidence of corporate authority (for example, a valid power of attorney and/ or board minutes) by no later than the Voting Instructions Deadline, the Information Agent will provide such Plan Creditor with video-conference access details for the relevant Plan Meeting(s).

6    Plan Creditors and proxies that are natural persons must provide an Identification Document as proof of personal identity by no later than the Voting Instructions Deadline, and the identification details contained therein must match those provided in Part 3 (*Voting Instructions*) of the Plan Creditor Letter at the registration of the Plan Meetings.

7    The Plan Companies have made available to the Plan Creditors copies of the Plan Documentation, including the Plans, the Plan Creditor Letter and the Explanatory Statement by making them available online via the Plan Website at https://deals.is.kroll.com/nfe. Further information regarding the Plans can be found in the Explanatory Statement.

8    The Plans are inter-conditional and will be binding on all Plan Creditors to the respective Plan Companies if:

(a)    in respect of the CoreCo Plan: (i) a majority representing at least 75% in value present and voting of either (i) each class of CoreCo Plan Creditors; or (ii) at least one "in the money" class of CoreCo Plan Creditors, has voted in favour of the CoreCo Plan; and

3

(b)    in respect of the BrazilCo Plan: a majority representing at least 75% in value of BrazilCo Plan Creditors present and voting has voted in favour of the BrazilCo Plan; and

(c)    in respect of both Plans:

(i)    the Court sanctions the Plans (which, if a class of CoreCo Plan Creditors has voted against the CoreCo Plan, will require the Court to be satisfied that no member of the dissenting class(es) is worse off than they would be in the relevant alternative to the CoreCo Plan); and

(ii)    a copy of the Sanction Order sanctioning the Plans is filed with the Registrar of Companies.

9    By the Convening Order, the Court has appointed Christopher Boas, a director of each Plan Company, or failing him, Peter Newman of Skadden, or such other person as each Plan Company elects, to act as chairperson of the meetings referred to above and has directed the chairperson to report the result of such meetings to the Court.

10    The Plans will be subject to the subsequent approval of the Court. The Sanction Hearing is expected to be held on 18 June 2026.

11    For further information of a general nature regarding the Plans, please contact Skadden, the Plan Companies' legal advisers, and for further information on the voting procedure or access to the relevant Plan Meeting, please contact the Information Agent:

(a)    Skadden, Arps, Slate, Meagher & Flom (UK) LLP

Attention: Peter Newman and Nicole Stephansen

Email: DLLadyUK@Skadden.com

Phone: +44 20 7519 7000

(b)    Kroll Issuer Services Limited as Information Agent

Attention: Alessandro Zorza/ Sunjeeve Patel

Email: nfe@is.kroll.com

Phone: +44 20 7089 0909

12    If any Plan Creditor wishes to obtain the link to access their Plan Meeting, has any issue accessing the Plan Meeting or has any other query in relation to attending their Plan Meeting or voting they should contact the Information Agent at the email address above.

This notice is for informational purposes only and is not an offer to buy or sell or the solicitation of an offer to buy or sell any security.

Skadden, Arps, Slate, Meagher & Flom (UK) LLP
22 Bishopsgate
London
EC2N 4BQ
United Kingdom

Solicitors for the Plan Companies

Dated  15 May 2026

**APPENDIX 5**

**PART A:  SIMPLIFIED GROUP STRUCTURE CHART**

## Existing Structure



**APPENDIX 5**

**PART B:  UPDATED GROUP STRUCTURE CHART**



## APPENDIX 6

## DEFINITIONS AND INTERPRETATION

**1      Definitions and Interpretation**

In this Explanatory Statement, unless the context otherwise requires, the provisions in this Clause 1 apply:

**1.1     Definitions**

"**$**" means the lawful currency of the U.S.

"**2019 Omnibus Incentive Plan**" means the Parent's existing employee incentive plan (as amended and restated as of 7 August 2020).

"**2024 Intercompany Loans**" has the meaning given to it in paragraph 3.38 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**2024 Refinancing Transactions**" has the meaning given to it in paragraph 3.26 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**2025 Notes**" has the meaning given to it in paragraph 3.2 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**2026 Legacy Noteholders**" has the meaning given to it in paragraph 1.1.1 of the section "*Are You a Plan Creditor?*" of this Explanatory Statement.

"**2026 Legacy Notes**" has the meaning given to it in paragraph 3.3 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**2026 Legacy Notes Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the holders of the 2026 Legacy Notes under or in connection with the 2026 Legacy Notes (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise).

"**2026 Legacy Notes Trustee**" means U.S. Bank Trust Company, National Association, in its capacity as trustee under the 2026 Legacy Notes, or any successor thereof.

"**2029 Legacy Noteholders**" has the meaning given to it in paragraph 1.1.2 of the section "*Are You a Plan Creditor?*" of this Explanatory Statement.

"**2029 Legacy Notes**" has the meaning given to it in paragraph 3.4 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**2029 Legacy Notes Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the holders of the 2029 Legacy Notes under or in connection with the 2029 Legacy Notes (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise).

"**2029 Legacy Notes Trustee**" means U.S. Bank Trust Company, National Association, in its capacity as trustee under the 2029 Legacy Notes, or any successor thereof.

"**2029 New Noteholders**" has the meaning given to it in paragraph 1.2 of the section "*Are You a Plan Creditor?*" of this Explanatory Statement.

"**2029 New Notes**" has the meaning given to it in paragraph 3.26 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**2029 New Notes Class**" has the meaning given to it in paragraph 3.5(a) of Part 4 (*Certain Legal Aspects of the Plans*) of this Explanatory Statement.

"**2029 New Notes Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the holders of the 2029 New Notes under or in connection with the 2029 New Notes (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise).

"**2029 New Notes Trustee**" means Wilmington Savings Fund Society, FSB, in its capacity as trustee under the 2029 New Notes, or any successor thereof.

"**2029 New Notes Trustee Advisors**" means:

(a)     Winston & Strawn LLP; and

(b)     Taylor Wessing LLP,

in each case as counsel to the 2029 New Notes Trustee.

"**2029 Notes Cancellation Documents**" has the meaning given to it in the Transaction Implementation Deed.

"**Account Collateral**" has the meaning given to it in paragraph 3.12.5 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Account Holder**" means a holder of an interest in the Legacy Notes or 2029 New Notes, as recorded directly in the records of DTC.

"**Act**" means the Companies Act 2006 (as amended).

"**Ad Hoc Groups**" means, collectively, the Akin/Evercore AHG, the PW/PWP AHG and the Legacy Notes AHG.

"**Administrative Parties**" means the RCF Agent, the TLA Agent, the TLB Agent, the Series I Agent, the Series II Agent, the Common Representative, the 2026 Legacy Notes Trustee, the 2029 Legacy Notes Trustee, the 2029 New Notes Trustee, DTC and Cede & Co.

"**Advisor Released Person**" means each of the current and former respective officers, directors, employees, executives, attorneys and agents (or equivalents) of each Released Advisor and each Affiliate of each Released Advisor.

"**Advisors**" means, collectively, the Akin/Evercore AHG Advisors, the PW/PWP AHG Advisors, the RCF Advisors, the TLA Advisors, the TLB Advisors, the Legacy Notes Advisors, the 2029 New Notes Trustee Advisors, the Legacy Notes Trustee Advisors, the RCF Agent, the TLB Agent, the TLA Agent, the New CoreCo Term Loan Facility Agent, the FLNG 2 Term Loan Agent, the 2026 Legacy Notes Trustee, the 2029 Legacy Notes Trustee, the 2029 New Notes Trustee, and any additional advisors or consultants engaged by any of the Ad Hoc Groups and (in each case) any successor professional advisors to each of the foregoing, in each case as advisors in connection with the Restructuring.

"**Affiliate**" means, with respect to a specified person or entity, any other person or entity directly or indirectly controlling, controlled by, or under direct or indirect common control with, such specified

person or entity, including any Related Fund, and, for the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by," and "under common control with") as used with respect to any person or entity shall mean the possession, directly or indirectly, of the right or power to direct or cause the direction of the management or policies of such person or entity, whether through the ownership of voting securities, by agreement, or otherwise; provided that parties with investments managed by separate persons, entities, trading desks, fund(s), account(s), business groups or units therein shall not be deemed to be Affiliates of one another solely as a result of such persons, entities, trading desks, fund(s), account(s), business groups, or units therein being under common control, nor shall entities specified on the party's signature page to the Restructuring Support Agreement as excluded be deemed to be Affiliates of a party and, in each case, shall be excluded hereunder.

"**Agreed Form**" has the meaning given to it in the Transaction Implementation Deed.

"**Akin/Evercore AHG**" means the ad hoc group of certain unaffiliated holders of Term Loan B Debt represented by the Akin /Evercore AHG Advisors.

"**Akin/Evercore AHG Advisors**" means, collectively, Akin Gump Strauss Hauer & Feld LLP and Evercore Group L.L.C., and their respective Affiliates, as counsel and financial advisor, respectively, to the Akin/Evercore AHG, as well as other regulatory, local, foreign, barristers and special counsel (in each case as notified to NFE Global), in their respective capacities as counsel to the Akin/Evercore AHG.

"**Allocations and Entitlements Table**" has the meaning given to it in the Transaction Implementation Deed.

"**Alvarez & Marsal**" means Alvarez & Marsal Europe LLP.

"**Amended and Restated By-Laws**" means the amended and restated by-laws of the Parent in the Agreed Form.

"**Amended and Restated Certificate of Incorporation**" means the amended and restated certificate of incorporation of the Parent in the Agreed Form.

"**Amended and Restated CoreCo Equity Plan**" has the meaning given to it in paragraph 2.46 of Part 2 (*Summary of the Restructuring and the Recapitalisation Transaction (Including the Plans)*) of this Explanatory Statement.

"**Appendices**" means the appendices to the Explanatory Statement.

"**ATOP**" means DTC's Automated Tender Offer Program.

"**Barcarena Power Plant**" has the meaning given to it in paragraph 4.1.5 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Barcarena Terminal**" has the meaning given to it in paragraph 4.1.3 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Base Exchange Consideration Chart**" has the meaning given to it in paragraph 1.12 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**BNDES Credit Agreement**" has the meaning given to it in paragraph 3.69 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**BNDES Term Loan**" has the meaning given to it in paragraph 3.69 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Boards**" means the respective boards of directors of each Plan Company.

"**Bradford County**" means Bradford County Real Estate Partners LLC.

"**Brazil**" means the Federative Republic of Brazil.

"**Brazil $200m Pari Lien**" means a first lien over the NFE Financing Collateral Assets, excluding certain real estate in Pennsylvania, U.S.A. owned by Bradford County, on terms such that the secured first lien obligations in respect of the R-2 Revolving Credit Facility, the Letter of Credit Facility and the Term Loan A Facility are subject to an aggregate cap of $200 million and rank *pari passu* as between themselves, and, in turn, rank *pari passu* with the secured claims of the 2029 New Notes in respect of the NFE Financing Collateral Assets.

"**Brazil 2L Lien**" means, an uncapped, second lien over the NFE Financing Collateral Assets, excluding certain real estate in Pennsylvania, U.S.A. owned by Bradford County (and after amounts owing under the 2029 New Notes have been repaid), shared *pari passu* between the Revolving Credit Facility, Term Loan A Facility and Letter of Credit Facility.

"**Brazil Bank Collateral**" has the meaning given to it in paragraph 3.12.4 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Brazil Bridge Credit Agreement**" has the meaning given to it in paragraph 3.53 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Brazil Bridge Term Loan Facility**" has the meaning given to it in paragraph 3.53 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Brazil Collateral**" has the meaning given to it in paragraph 3.30 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Brazil Financing Notes**" has the meaning given to it in paragraph 3.72 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Brazil Junior ICA**" has the meaning given to it in paragraph 3.42.3 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Brazil Parent**" has the meaning given to it in paragraph 3.60 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Brazil Parent ICA**" has the meaning given to it in paragraph 3.42.2 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Brazil Parent Intercompany Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the lenders of the Brazil Parent Intercompany Loan under or in connection with the Brazil Parent Intercompany Loan (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise).

"**Brazil Parent Intercompany Loan**" has the meaning given to it in paragraph 3.60 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Brazil Parent Intercompany Loan Agreement**" has the meaning given to it in paragraph 3.60 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Brazil Parent Intercompany Loan Facility**" has the meaning given to it in paragraph 3.60 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**BrazilCo**" has the meaning given in paragraph 2.1 of Part 2 (*Summary of the Restructuring and the Recapitalisation Transaction (Including the Plans)*) of this Explanatory Statement.

"**BrazilCo Board**" has the meaning given in paragraph 2.53 of Part 2 (*Summary of the Restructuring and the Recapitalisation Transaction (Including the Plans)*) of this Explanatory Statement.

"**BrazilCo Board Initial Term**" has the meaning given in paragraph 2.54 of Part 2 (*Summary of the Restructuring and the Recapitalisation Transaction (Including the Plans)*) of this Explanatory Statement.

"**BrazilCo Cash Pool Election**" has the meaning given to it in paragraph 1.8.2 of Part 2 *(Summary of the Restructuring and the Recapitalisation Transaction (Including the Plans))*.

"**BrazilCo Common Equity**" means all common equity interests of New BrazilCo Parent and Bradford County from and after the Restructuring Effective Date.

"**BrazilCo Group**" has the meaning given to it in paragraph 1.5.1(i) of Part 2 *(Summary of the Restructuring and the Recapitalisation Transaction (Including the Plans))* of this Explanatory Statement.

"**BrazilCo MIP**" has the meaning given to it in paragraph 2.49 of Part 2 *(Summary of the Restructuring and the Recapitalisation Transaction (Including the Plans))* of this Explanatory Statement.

"**BrazilCo Plan**" means the restructuring plan proposed by the NFE Brazil Newco under Part 26A of the Act.

"**BrazilCo Plan Creditors**" has the meaning given to it in paragraph 1.2 of the section "*Are You a Plan Creditor?*" of this Explanatory Statement.

"**BrazilCo Plan Meeting**" means the Plan Meeting for the 2029 New Notes Class.

"**BrazilCo Preferred Equity**" has the meaning given to it in paragraph 15.4 of Part 3 (*Summary of the Terms of Certain Key Implementation Documents and Equity Instruments*) of this Explanatory Statement.

"**BrazilCo Separation**" has the meaning given to it in paragraph 2.1 of Part 2 (*Summary of the Restructuring and the Recapitalisation Transaction (Including the Plans)*) of this Explanatory Statement.

"**Business Day**" means a day other than a Saturday, Sunday, or other day on which commercial banks are authorised to close under the laws of, or are in fact closed in, the State of New York, United States of America or in London, United Kingdom.

"**Capital Raise**" has the meaning given to it in paragraph 2.38 of Part 2 *(Summary of the Restructuring and the Recapitalisation Transaction (Including the Plans))* of this Explanatory Statement.

"**Capital Raise New CoreCo Junior Term Loans**" has the meaning given to it in paragraph 2.38 of Part 2 *(Summary of the Restructuring and the Recapitalisation Transaction (Including the Plans))* of this Explanatory Statement.

"**Capital Raise New CoreCo Term Loans**" has the meaning given to it in paragraph 2.38 of Part 2 *(Summary of the Restructuring and the Recapitalisation Transaction (Including the Plans))* of this Explanatory Statement.

"**Cash Plan Consideration**" means each relevant Plan Creditor's entitlement, pursuant to the Plans, to the RCF-2 / TLA BrazilCo Cash Pool.

"**Cede & Co**." means Cede & Co. as nominee for DTC and as registered holder of the 2026 Legacy Notes, the 2029 Legacy Notes and the 2029 New Notes.

"**CEO**" means chief executive officer.

"**Certificate of Designations**" means the certificate of designation to be filed with the Secretary of State of the State of Delaware pursuant to the step described in the Transaction Implementation Deed, in the Agreed Form.

"**CFE**" has the meaning given to it in paragraph 4.1.2 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Chairperson**" means the person specified as such in Appendix 4 (*Notice of Plan Meetings*) as chairperson of the relevant Plan Meeting.

"**Chapter 15 Petition**" has the meaning given to it in paragraph 6.7 of Part 4 (*Certain Legal Aspects of the Plans*) of this Explanatory Statement.

"**Chapter 15 Recognition**" has the meaning given to it in paragraph 6.4 of Part 4 (*Certain Legal Aspects of the Plans*) of this Explanatory Statement.

"**Closing Conditions Precedent**" has the meaning given to it in the Transaction Implementation Deed.

"**Closing Date**" has the meaning given to it in the Transaction Implementation Deed.

"**Closing Steps**" has the meaning given to it in the Transaction Implementation Deed.

"**Collateral Pools**" has the meaning given to it in paragraph 3.31 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Commitment Fee Notes**" has the meaning given to it in paragraph 3.28 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Commitment Fee Shares**" has the meaning given to it in paragraph 3.28 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Common Collateral**" has the meaning given to it in paragraph 3.6 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Common Guarantors**" has the meaning given to it in paragraph 3.6 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Common Interests**" has the meaning given paragraph 14.3 of Part 3 (*Summary of the Terms of Certain Key Implementation Documents and Equity Instruments*) of this Explanatory Statement.

"**Common Representative**" has the meaning given to it in the Transaction Implementation Deed.

"**Consolidated Liquidity**" means, as of any date of determination, an amount determined for CoreCo, on a consolidated basis, equal to the sum of:  (x) unrestricted cash and cash equivalents, and (y) available committed capacity under the Exit LNG Facility.

"**Convening Hearing**" means the hearing held on 14 May 2026 in the Companies Court, Royal Courts of Justice, 7 Rolls Building, Fetter Lane, London EC4A 1NL to hear the Plan Companies' application for an order granting the Plan Companies certain directions in relation to the Plans, including permission to convene the Plan Meetings for the purpose of Plan Creditors considering and, if thought fit, approving, the Plans.

"**Convening Order**" has the meaning given to it in Appendix 4 (*Notice of Plan Meetings*) of the Explanatory Statement.

"**CoreCo Common Stock**" means the common stock of the Parent from and after the Restructuring Effective Date.

"**CoreCo Common Stock Agent**" has the meaning given in paragraph 12.4 of Part 3 (*Summary of the Terms of Certain Key Implementation Documents and Equity Instruments*) of this Explanatory Statement.

"**CoreCo–FLNG 2 Management Agreement**" has the meaning given to it in the Restructuring Term Sheet.

"**CoreCo Group**" has the meaning given to it in paragraph 1.5.1(ii) of Part 2 *(Summary of the Restructuring and the Recapitalisation Transaction (Including the Plans))* of this Explanatory Statement.

"**CoreCo Intercreditor Agreement**" means the intercreditor agreement to be entered into pursuant to the Restructuring in respect of the New CoreCo Credit Facility and New CoreCo LC Facility.

"**CoreCo MIP**" has the meaning given to it in paragraph 2.46 of Part 2 *(Summary of the Restructuring and the Recapitalisation Transaction (Including the Plans))* of this Explanatory Statement.

"**CoreCo Plan**" means the restructuring plan proposed by the NFE Global under Part 26A of the Act.

"**CoreCo Plan Class**" has the meaning given to it in paragraph 3.4 of Part 4 (*Certain Legal Aspects of the Plans*) of the Explanatory Statement.

"**CoreCo Plan Creditors**" has the meaning given to it in paragraph 1.1 of the section "*Are You a Plan Creditor?*" of this Explanatory Statement.

"**CoreCo Plan Debt**" has the meaning given to it in paragraph 1.6 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**CoreCo Plan Meetings**" means, collectively, the Plan Meetings for the R-1 Class, the R-2 Class, the TLB Class, the TLA Class, the Legacy Notes Class and the Series I and Series II Class (and each a "**CoreCo Plan Meeting**").

"**CoreCo Preferred Stock**" means a series of convertible preferred stock of the Parent from and after the Restructuring Effective Date, which shall have the terms set out in the CoreCo Preferred Stock Term Sheet.

"**CoreCo Preferred Stock Agent**" has the meaning given in paragraph 13.17 of Part 3 (*Summary of the Terms of Certain Key Implementation Documents and Equity Instruments*) of this Explanatory Statement.

"**CoreCo Preferred Stock Cash Purchase Election**" has the meaning given to it in paragraph 1.8.4 of Part 2 *(Summary of the Restructuring and the Recapitalisation Transaction (Including the Plans))* of this Explanatory Statement.

"**CoreCo Preferred Stock Term Sheet**" means the term sheet setting forth the material terms and conditions of the CoreCo Preferred Stock appended to the Restructuring Term Sheet.

"**CoreCo Registration Rights Agreement**" means the document to be entered into pursuant to the Restructuring governing the registration rights in respect of the CoreCo Common Stock and CoreCo Preferred Stock.

"**Corporate Debt**" has the meaning given to it in paragraph 1.6 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Court**" means the High Court of Justice of England and Wales and any appellate court in England and Wales having jurisdiction in connection with the Restructuring (including the Court of Appeal and the Supreme Court).

"**Creditor Issues**" has the meaning given to it in the Practice Statement Letter.

"**Custody Instruction Reference Number**" means a reference number provided DTC to an Account Holder which has delivered Custody Instructions to DTC, confirming that the blocking instructions contained in those Custody Instructions have been complied with by DTC.

"**Custody Instructions**" means instructions given by any relevant Account Holder to the DTC in which any relevant Legacy Notes or 2029 New Notes (as applicable) are held instructing DTC to block those Legacy Notes or 2029 New Notes (as applicable) in accordance with the instructions contained in this Explanatory Statement.

"**Custody Instructions Deadline**" means 10:00 p.m. (London time)/ 5:00 p.m. (New York time) on 10 June 2026.

"**Debt Documents**" means the Term Loan A Agreement, Term Loan B Agreement, Revolving Credit Facility Agreement, Series I Loan Agreement, Series II Loan Agreement, the Legacy Notes Indentures, the Finance Documents (as defined in or the equivalent of in each of these Debt Documents) and any related security and ancillary documents.

"**Debt Plan Consideration**" means each relevant Plan Creditor's entitlement, pursuant to the Plans, to New CoreCo Term Loans and/ or FLNG 2 Term Loans as applicable.

"**Deed of Undertaking**" means a deed of undertaking to the Plan Companies or a Plan Company in the Agreed Form pursuant to which each of the parties thereto agrees to execute or procure to be executed all such documents, and to do or procure to be done all such acts and things as may be reasonably necessary or desirable to be done by it, to implement the Restructuring in accordance with the Plans and the Transaction Implementation Deed.

"**Demand Registration**" has the meaning given paragraph 6.10 of Part 3 (*Summary of the Terms of Certain Key Implementation Documents and Equity Instruments*) of this Explanatory Statement.

"**Demand Registration Period**" has the meaning given paragraph 6.10 of Part 3 (*Summary of the Terms of Certain Key Implementation Documents and Equity Instruments*) of this Explanatory Statement.

"**Demanding Holders**" has the meaning given paragraph 6.10 of Part 3 (*Summary of the Terms of Certain Key Implementation Documents and Equity Instruments*) of this Explanatory Statement.

"**Disqualified Person**" means a person who is a citizen of, or domiciled or resident in, or subject to the laws of, any jurisdiction where the offer to issue to, subscribe by or transfer to, such person of any rights under the Plan Consideration is prohibited by law or would, or would be likely to, result in the Parent, FLNG 2 Parent, New BrazilCo Parent, either Plan Company or any Obligor being required to comply with any filing, registration, disclosure or other onerous (as may be decided by the Plan Companies in their sole discretion acting reasonably) requirement in such jurisdiction.

"**Dissenting Class**" has the meaning given to it in paragraph 1.3.1(i) of Part 4 (*Certain Legal Aspects of the Plans*) of the Explanatory Statement.

"**DTC**" means the Depository Trust Company, or any successor thereof.

"**DTC Participant**" means an Account Holder.

"**Early Consent Deadline**" has the meaning given to it in paragraph 4.15 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Early Consent Fee**" has the meaning given to it in paragraph 4.15 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Early Consent Fee Creditor**" means a Plan Creditor that became a Supporting Creditor:

(a)    by no later than 5 p.m. Eastern Time on 8 April 2026; or

(b)    after 5 p.m. Eastern Time on 8 April 2026 by acquiring Indebtedness that is eligible for the Early Consent Fee.

"**EB-5 Loan**" has the meaning given to it in paragraph 3.76 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**EB-5 Loan Agreement**" has the meaning given to it in paragraph 3.75 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**EB-5 Term Sheet**" has the meaning given to it in paragraph 3.77 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**EEA**" means the European Economic Area.

"**Election Deadline**" means 5.00 pm (New York time) on 8 April 2026.

"**Eligible Non-Exchanging Creditor**" has the meaning given to it in paragraph 1.9 of Part 2 (*Summary of the Restructuring and the Recapitalisation Transaction (including the Plans)*) of this Explanatory Statement.

"**Eligible Person**" means a person who is:

(a)    not a Sanctioned Person; and

(b)    not a Disqualified Person.

"**Energos**" means Energos Infrastructure, an affiliate of Apollo Global Management, Inc.

"**English Company Counsel**" means Daniel Bayfield KC, Ryan Perkins and Jon Colclough of South Square Chambers, instructed by the Group Legal Advisor to appear on behalf of the Plan Companies before the Court in respect of the Plans, or such other barrister as may be instructed by the Group Legal Advisor.

"**Equal Priority Intercreditor Agreement**" has the meaning given to it in paragraph 3.42.1 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Equity-for-Debt Exchange Election**" has the meaning given to it in paragraph 1.8.1 of Part 2 (*Summary of the Restructuring and the Recapitalisation Transaction (including the Plans)*) of this Explanatory Statement.

"**Equity-for-Debt Exchanged Preferred Shares**" has the meaning given to it in paragraph 1.8.1 of Part 2 (*Summary of the Restructuring and the Recapitalisation Transaction (including the Plans)*) of this Explanatory Statement.

"**Equity Plan Consideration**" means each relevant Plan Creditor's entitlement, pursuant to the Plans, to CoreCo Preferred Stock, CoreCo Common Stock, FLNG 2 Preferred Equity and/or BrazilCo Common Equity as applicable.

"**EU**" means the European Union.

"**EV Report**" has the meaning given to it in paragraph 3.4 of Part 2 (*Summary of the Restructuring and the Recapitalisation Transaction (Including the Plans)*) of the Explanatory Statement.

"**Exchange and Subscription Agreement**" has the meaning given to it in paragraph 3.26 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Exchange Consideration Charts**" has the meaning given to it in paragraph 1.13 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Existing Intermediation Facility**" has the meaning given to it in paragraph 3.81 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Existing NFE Stockholders**" means the holders of Class A common stock of the Parent as of the Record Time.

"**Exit LNG Facility**" has the meaning given to it in the Restructuring Support Agreement.

"**Explanatory Statement**" has the meaning given to it on page i of this Explanatory Statement.

"**F1 Collateral**" has the meaning given to it in paragraph 3.12.2 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**F2 Collateral**" has the meaning given to it in paragraph 3.12.3 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**FEMA**" has the meaning given to it in paragraph 4.3.3(ii) of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**FLNG**" has the meaning given to it in paragraph 4.1.8 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**FLNG 1**" has the meaning given to it in paragraph 4.1.8 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**FLNG 1 Guarantors**" has the meaning given to it in paragraph 3.12.2 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**FLNG 2**" has the meaning given to it in paragraph 4.1.8 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**FLNG 2 Guarantors**" has the meaning given to it in paragraph 3.12.3 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**FLNG 2 Loan Parties**" means the "Loan Parties" as defined in the FLNG 2 Term Loan Credit Facility Agreement.

"**FLNG 2 MIP**" has the meaning given to it in paragraph 2.48 of Part 2 (*Summary of the Restructuring and the Recapitalisation Transaction (including the Plans)*) of this Explanatory Statement.

"**FLNG 2 Parent**" means NFE FLNG 2 LLC, a Delaware limited liability company, or an immediate holding company of that company.

"**FLNG 2 Parent LLCA**" means the limited liability company agreement of FLNG 2 Parent, as amended and restated as necessary.

"**FLNG 2 Preferred Equity**" means all preferred equity interests of FLNG 2 Parent from and after the Restructuring Effective Date, which shall have the terms set out in the FLNG 2 Preferred Equity Term Sheet.

"**FLNG 2 Preferred Equity Agent**" has the meaning given in paragraph 14.17 of Part 3 (*Summary of the Terms of Certain Key Implementation Documents and Equity Instruments*) of this Explanatory Statement.

"**FLNG 2 Preferred Equity Term Sheet**" means the term sheet setting forth the material terms and conditions of the FLNG 2 Preferred Equity appended to the Restructuring Term Sheet.

"**FLNG 2 Sale**" has the meaning given to it in paragraph 2.59 of Part 2 (*Summary of the Restructuring and the Recapitalisation Transaction (including the Plans)*) of this Explanatory Statement.

"**FLNG 2 Sale Proceeds**" has the meaning given to it in paragraph 2.48 of Part 2 (*Summary of the Restructuring and the Recapitalisation Transaction (including the Plans)*) of this Explanatory Statement.

"**FLNG 2 Term Loan Agent**" means Wilmington Trust, National Association, in its capacity as the administrative agent and collateral agent under the terms of the FLNG 2 Term Loan Credit Facility Agreement, or any successor thereof.

"**FLNG 2 Term Loan Credit Facility Agreement**" means the credit agreement governing the FLNG 2 Term Loan Facility, to be entered into on the Restructuring Effective Date among the FLNG 2 Parent, the guarantors party thereto, the lenders party thereto, and the FLNG 2 Term Loan Agent, on the terms set out in the FLNG 2 Term Loan Term Sheet.

"**FLNG 2 Term Loan Facility**" has the meaning given to it in paragraph 2.23 of Part 2 (*Summary of the Restructuring and the Recapitalisation Transaction (including the Plans)*) of this Explanatory Statement.

"**FLNG 2 Term Loan Term Sheet**" means the term sheet setting forth the material terms and conditions of the FLNG 2 Term Loans.

"**FLNG 2 Term Loans**" has the meaning given to it in paragraph 2.23 of Part 2 (*Summary of the Restructuring and the Recapitalisation Transaction (including the Plans)*) of this Explanatory Statement.

"**Gazette**" means The Gazette, a UK publication which serves as an official journal of record.

"**Genuine Economic Interest Condition**" has the meaning given to it in paragraph 1.3.1 of Part 4 (*Certain Legal Aspects of the Plans*) of this Explanatory Statement.

"**GLP Preferred Units**" means the GLP 8.75% Series A cumulative redeemable preferred units issued by Golar LNG Partners LP.

"**Group**" means the Parent and its subsidiaries, including the Plan Companies and "**Group Company**" means any one of them.

"**Group Legal Advisor**" means Skadden, Arps, Slate, Meagher & Flom LLP and its affiliates, legal advisors to the Plan Companies.

"**Holding Period**" has the meaning given to it in paragraph 9.8 of Part 3 (*Summary of the Terms of Certain Key Implementation Documents and Equity Instruments*) of this Explanatory Statement.

"**Holding Period Expiry Date**" has the meaning given to it in the Holding Period Trust Deed.

"**Holding Period Trust**" has the meaning given to it in the Holding Period Trust Deed.

"**Holding Period Trust Deed**" means the trust deed to be entered into on or prior to the Restructuring Effective Date between, among others, the Plan Companies and the Holding Period Trustee and attached to the Transaction Implementation Deed.

"**Holding Period Trustee**" means Kroll Issuer Servies Limited, as Holding Period Trustee pursuant to the Holding Period Trust Deed.

"**Identification Document**" means proof of personal identity (for example, a copy of a passport or driving licence with photocard or other proof of personal identity).

"**Implementation Documents**" has the meaning given to it in the Transaction Implementation Deed.

"**Incremental Equity-for-Debt Exchange Election New CoreCo Term Loans**" has the meaning given to it in paragraph 1.8 of Part 2 (*Summary of the Restructuring and the Recapitalisation Transaction (including the Plans)*) of this Explanatory Statement.

"**Incremental New CoreCo Term Loans**" has the meaning given to it in paragraph 1.6.1(iii) of Part 2 (*Summary of the Restructuring and the Recapitalisation Transaction (including the Plans)*) of this Explanatory Statement.

"**Indebtedness**" has the meaning given to it in the Transaction Implementation Deed.

"**Information Agent**" means Kroll Issuer Services Limited in its capacity as information agent in connection with the Plans (and any successor information agent).

"**Initial Registration Statement**" has the meaning given paragraph 6.6 of Part 3 (*Summary of the Terms of Certain Key Implementation Documents and Equity Instruments*) of this Explanatory Statement.

"**Initial Terms**" has the meaning given to it in paragraph 2.39 of Part 2 (*Summary of the Restructuring and the Recapitalisation Transaction (including the Plans)*) of this Explanatory Statement.

"**Intermediary**" means the holder of an interest in the 2029 New Notes or Legacy Notes on behalf of another person or other persons, that does not hold that interest as an Account Holder.

"**Intermediation Facility Counterparty**" has the meaning given to it in paragraph 3.81 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Key Implementation Documents**" has the meaning given to it in paragraph 1.2.2 of Part 2 (*Summary of the Restructuring and the Recapitalisation Transaction (including the Plans)*) of this Explanatory Statement.

"**La Paz Facility**" has the meaning given to it in paragraph 4.1.2 Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Legacy Indenture Amendments**" has the meaning given to it in paragraph 3.33 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Legacy Noteholders**" has the meaning given to it in paragraph 1.1.2 of the section "*Are You a Plan Creditor?*" of this Explanatory Statement.

"**Legacy Notes**" means the 2026 Legacy Notes and the 2029 Legacy Notes.

"**Legacy Notes Advisors**" means Paul Hastings LLP, as counsel to the Legacy Notes AHG.

"**Legacy Notes AHG**" means the means the ad hoc group of certain unaffiliated holders of the Legacy Notes represented by Paul Hastings LLP as counsel.

"**Legacy Notes Class**" has the meaning given to it in paragraph 3.4(v) of Part 4 (*Certain Legal Aspects of the Plans*) of this Explanatory Statement.

"**Legacy Notes Debt**" means the 2026 Legacy Notes Debt and the 2029 Legacy Notes Debt.

"**Legacy Notes Indenture**" has the meaning given to it in paragraph 3.4 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Legacy Notes Trustee Advisors**" means:

      (a)      Greenberg Traurig, LLP; and

      (b)      Thompson Hine LLP,

in each case as counsel to the 2026 Legacy Notes Trustee and the 2029 Legacy Notes Trustee.

"**Letter of Credit Agreement**" has the meaning given to it in paragraph 3.47 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Letter of Credit Facility**" has the meaning given to it in paragraph 3.47 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Letter of Credit Facility Debt**" means all present and future moneys, obligations, debts and liabilities, whether actual or contingent, direct or indirect, due, to become due, or that may become due, or otherwise incurred or outstanding from time to time by any member of the Group to any agent, any issuing bank, any lender or any lender counterparty of the Letter of Credit Facility under or in connection with the Letter of Credit Facility (in each case, whether alone or jointly, or jointly and severally, with any other person, and whether as principal, surety or otherwise).

"**Liability**" means any present or future payment and discharge obligation, liability, claim, debt, claims for specific performance, damages or restitution, counterclaims, suits, rights of action, or rights whatsoever or howsoever arising, including, without limitation, for the payment of money or the performance of an act or obligation (whether deliberate or otherwise) or any failure to perform any obligation or any omission, whether for negligence, breach of duty, breach of trust or misrepresentation or otherwise, whether in respect of principal, interest or otherwise, whether actual or contingent, whether fixed or undetermined, whether admitted or disputed, whether known or unknown, whether owed jointly or severally and whether owed as principal, surety or in any capacity whatsoever and whether it arises at common law, in equity or by statute, in England and Wales or in any other jurisdiction under whatever applicable law, under any legal theory, and in any manner whatsoever, and "**Liabilities**" shall be construed accordingly.

"**Liquidation Preference**" has the meaning given paragraph 13.3 of Part 3 (*Summary of the Terms of Certain Key Implementation Documents and Equity Instruments*) of this Explanatory Statement.

"**LNG**" has the meaning given to it in paragraph APPENDIX 1PART 12.6 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Local Brazilian Debt Facilities**" means the PortoCem Debentures, the Brazil Financing Notes and the BNDES Term Loan.

"**Majority 2029 New Noteholders**" has the meaning given to it in paragraph 2.50.3 of Part 2 (*Summary of the Restructuring and the Recapitalisation Transaction (including the Plans)*) of this Explanatory Statement.

"**Majority Akin/Evercore AHG Members**" means, as of any relevant time, members of the Akin/Evercore AHG that are Supporting Creditors holding, in the aggregate, greater than 50.0 per cent. of the aggregate outstanding principal amount of Term Loan B Debt then held by the members of the Akin/Evercore AHG that are Supporting Creditors.

"**Majority Legacy Notes Supporting Creditors**" means, as of any relevant time, holders of Legacy Notes Debt that are Supporting Creditors holding, in the aggregate, greater than 50.0% of the aggregate outstanding principal amount of Legacy Notes Debt then held by holders of Legacy Notes Debt that are Supporting Creditors.

"**Majority Plan Creditors**" means, collectively, as of any relevant time, (i) the Majority Akin/Evercore AHG Members, (ii) the Majority PW/PWP AHG Members, (iii) the Majority RCF Supporting Creditors, (iv) solely with respect to any matter that (x) materially and adversely alters (1) the treatment of the 2026 Legacy Notes Debt or the 2029 Legacy Notes Debt, as applicable, under the Restructuring or (2) the rights or obligations of the Supporting Creditors who hold 2026 Legacy Notes Debt or 2029 Legacy Notes Debt, as applicable, under the Plans, or (y) disproportionately alters the allocation of consideration to the holders of the 2026 Legacy Notes Debt or the 2029 Legacy Notes Debt as set forth on the Exchange Consideration Chart attached to the Restructuring Term Sheet, whether by decreasing the consideration allocated to holders of 2026 Legacy Notes Debt or the 2029 Legacy Notes Debt or increasing (including in the form of additional fees) the consideration allocated to holders of other Indebtedness, the Majority Legacy Notes Supporting Creditors and (v) solely with respect to any matter that (x) materially and adversely alters (1) the treatment of the Term Loan A Debt under the Restructuring or (2) the rights or obligations of the holders of Supporting Term Loan A Debt under the Plans, or (y) disproportionately alters the allocation of consideration to the holders of the Term Loan A Debt as set forth on the Exchange Consideration Chart attached to the Restructuring Term Sheet, whether by decreasing the consideration allocated to holders of Term Loan A Debt or increasing (including in the form of additional fees) the consideration allocated to holders of other Indebtedness, the Majority TLA Supporting Creditors.

"**Majority PW/PWP AHG Members**" means, as of any relevant time, members of the PW/PWP AHG that are Supporting Creditors holding, in the aggregate, greater than 50 per cent. of the aggregate outstanding principal amount of 2029 New Notes Debt then held by the members of the PW/PWP AHG that are Supporting Creditors.

"**Majority RCF Lenders**" has the meaning given to it in paragraph 2.50.3 of Part 2 (*Summary of the Restructuring and the Recapitalisation Transaction (including the Plans)*) of this Explanatory Statement.

"**Majority RCF Supporting Creditors**" means, as of any relevant time, holders of Revolving Credit Facility Debt that are Supporting Creditors holding, in the aggregate, greater than 50.0% of the aggregate outstanding principal amount of Revolving Credit Facility Debt then held by holders of Revolving Credit Facility Debt that are Supporting Creditors.

"**Majority TLA Supporting Creditors**" means, as of any relevant time, holders of Term Loan A Debt that are Supporting Creditors holding, in the aggregate, greater than 50.0% of the aggregate outstanding principal amount of Term Loan A Debt then held by such holders of Term Loan A Debt that are Supporting Creditors.

"**Majority TLB Lenders**" has the meaning given to it in paragraph 2.50.3 of Part 2 (*Summary of the Restructuring and the Recapitalisation Transaction (including the Plans)*) of this Explanatory Statement.

"**Management Investors**" has the meaning given to it in the Restructuring Support Agreement.

"**Managing Member**" has the meaning given paragraph 8.5 of Part 3 (*Summary of the Terms of Certain Key Implementation Documents and Equity Instruments*) of this Explanatory Statement.

"**Master Distribution Agreement**" has the meaning given to it in the Transaction Implementation Deed.

"**Member State**" means a member state of the EU.

"**Mexico**" means the United Mexican States.

"**Minimum Liquidity Condition**" means a minimum liquidity condition, whereby the CoreCo Group shall have (i) Consolidated Liquidity of not less than $100 million on the Restructuring Effective Date (*pro forma* for the Restructuring) and (ii) projected Consolidated Liquidity of not less than $100 million as of the end of each monthly period projected by a business plan which is reasonably acceptable to the Majority Plan Creditors.

"**Nasdaq**" means the National Association of Securities Dealers Automated Quotations.

"**National Securities Exchange**" means The New York Stock Exchange, The Nasdaq Global Select Market or the Nasdaq Global Market.

"**Net BrazilCo–CoreCo Intercompany Claims**" has the meaning given to it in paragraph 2.17 of Part 2 (*Summary of the Restructuring and the Recapitalisation Transaction (including the Plans)*) of this Explanatory Statement.

"**New BrazilCo–CoreCo Notes**" has the meaning given to it in paragraph 2.17 of Part 2 (*Summary of the Restructuring and the Recapitalisation Transaction (including the Plans)*) of this Explanatory Statement.

"**New BrazilCo Governance Documents**" means the governance documents for the BrazilCo Group to be entered into pursuant to the Restructuring.

"**New BrazilCo LC Facility**" has the meaning given to it in paragraph 2.35 of Part 2 *(Summary of the Restructuring and the Recapitalisation Transaction (Including the Plans))* of this Explanatory Statement.

"**New BrazilCo Notes**" has the meaning given to it in paragraph 2.35 of Part 2 *(Summary of the Restructuring and the Recapitalisation Transaction (Including the Plans))* of this Explanatory Statement.

"**New BrazilCo Notes Issuer**" has the meaning given to it in paragraph APPENDIX 1PART 22.35 of Part 2 *(Summary of the Restructuring and the Recapitalisation Transaction (Including the Plans))* of this Explanatory Statement.

"**New BrazilCo Parent**" means NFE Brazil, or a newly formed parent entity thereof, from and after the Restructuring Effective Date.

"**New CoreCo Board**" has the meaning given to it in paragraph 2.50.3 of Part 2 (*Summary of the Restructuring and the Recapitalisation Transaction (Including the Plans)*) of this Explanatory Statement.

"**New CoreCo Common Stock Share Reserve**" has the meaning given to it in paragraph 2.46 of Part 2 (*Summary of the Restructuring and the Recapitalisation Transaction (Including the Plans)*) of this Explanatory Statement.

"**New CoreCo Credit Agreement**" means the credit agreement governing the New CoreCo Credit Facility, to be entered into on or prior to the Restructuring Effective Date among the Parent, the guarantors party thereto, the lenders party thereto, and the New CoreCo Term Loan Agent, on the terms set out in the New CoreCo Credit Facility Term Sheet.

"**New CoreCo Credit Facility**" has the meaning given to it in paragraph 2.22.1 of Part 2 *(Summary of the Restructuring and the Recapitalisation Transaction (Including the Plans))* of this Explanatory Statement.

"**New CoreCo Credit Facility Term Sheet**" means the term sheet setting forth the material terms and conditions of the New CoreCo Credit Facility.

"**New CoreCo LC Facility**" has the meaning given to it in paragraph 2.22.2 of Part 2 (*Summary of the Restructuring and the Recapitalisation Transaction (Including the Plans)*) of this Explanatory Statement.

"**New CoreCo LC Facility Agreement**" has the meaning given to it in paragraph 2.25 of Part 2 (*Summary of the Restructuring and the Recapitalisation Transaction (Including the Plans)*) of this Explanatory Statement.

"**New CoreCo Term Loan Agent**" has the meaning given in paragraph 3.18 of Part 3 (*Summary of the Terms of Certain Key Implementation Documents and Equity Instruments*) of this Explanatory Statement.

"**New CoreCo Term Loan Finance Documents**" has the meaning given to it in the Transaction Implementation Deed.

"**New CoreCo Term Loans**" has the meaning given to it in paragraph 2.22.1 of Part 2 (*Summary of the Restructuring and the Recapitalisation Transaction (Including the Plans)*) of this Explanatory Statement.

"**New Share Reserve**" has the meaning given to it in paragraph 2.46 of Part 2 (*Summary of the Restructuring and the Recapitalisation Transaction (Including the Plans)*) of this Explanatory Statement.

"**NFE Brazil**" means NFE Brazil Holdings Limited, an exempted company limited by shares incorporated under the laws of Bermuda.

"**NFE Brazil Financing**" has the meaning given to it in paragraph 3.72 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**NFE Brazil Financing Guarantors**" has the meaning given to it in paragraph 3.73 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**NFE Brazil Newco**" means NFE Brazil Newco Limited, a private company limited by shares incorporated in England and Wales under registered number 17141053, whose registered address is Suite 1, 7th Floor, 50 Broadway, London, SW1H 0DB, United Kingdom.

"**NFE Financing**" means NFE Financing LLC, a Delaware limited liability company.

"**NFE Financing Collateral Assets**" means certain assets of NFE Financing including:  (A) approximately 45 per cent. of the equity in the Group's Brazil business, (B) proceeds of NFE Financing's interest in the Series II Loan, and (C) NFE Financing's interest in the Brazil Parent Intercompany Loan (which in turn is secured by the Brazil Parent's approximately 55 per cent. of the equity in the Group's Brazil business and its interest in the proceeds of the Series I Loan) and certain real estate in Pennsylvania, U.S.A. owned by Bradford County.

"**NFE Global**" means NFE Global Holdings Limited, a private company limited by shares incorporated in England and Wales under registered number 13679588, whose registered address is Suite 1, 7th Floor 50 Broadway, London SW1H 0BL, United Kingdom.

"**NFE North**" has the meaning given to it in paragraph 3.81 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**No Worse Off Condition**" has the meaning given to it in paragraph 1.3.1 of Part 4 (*Certain Legal Aspects of the Plans*) of this Explanatory Statement.

"**Nominee**" means in respect of a Plan Creditor, one or more persons or entities nominated by that Plan Creditor pursuant to the Plan Creditor Letter to receive all or any part of the Plan Consideration on its behalf.

"**Non-Refinancing BrazilCo Notes Ratable Portion**" has the meaning given to it in paragraph 2.36.3 of Part 2 (*Summary of the Restructuring and the Recapitalisation Transaction (Including the Plans)*) of this Explanatory Statement.

"**Non-Refinancing BrazilCo Notes Ratable Proceeds**" has the meaning given to it in paragraph 2.36.3 of Part 2 (*Summary of the Restructuring and the Recapitalisation Transaction (Including the Plans)*) of this Explanatory Statement.

"**Obligors**" has the meaning given to it in the Transaction Implementation Deed.

"**Parent**" means New Fortress Energy Inc., a Delaware corporation.

"**Plan Claims**" means any (direct or indirect) claim of a Plan Creditor in respect of any Liability of the Plan Companies or any other Group Company, whether as principal obligor, guarantor, indemnifier or security provider, in relation to, or arising out of or in connection with, the Debt Documents or the Plan Debt, arising on or before the Restructuring Effective Date, but excluding any claim of a Plan Creditor in respect of any Liability of the Plan Companies or any other Group Company to any Plan Creditor arising directly or indirectly in relation to, or arising out of or in connection with, a failure to comply with the terms of the Plans, the Transaction Implementation Deed or any other Implementation Document.

"**Plan Class**" and "**Plan Classes**" have the meaning given to them in paragraph 3.5(a) of Part 4 (*Certain Legal Aspects of the Plans*) of this Explanatory Statement.

"**Plan Companies**" means NFE Global and NFE Brazil Newco, each a "**Plan Company**".

"**Plan Consideration**" means the Debt Plan Consideration, the Equity Plan Consideration and/or the Cash Plan Consideration, as applicable.

"**Plan Creditor Letter**" means the Plan Creditor Letter to be submitted online via the Plan Website to the Information Agent, substantially in the form as set out in Appendix 3 (*Form of Plan Creditor Letter*) of this Explanatory Statement with such minor or technical amendments as the Court may approve.

"**Plan Creditors**" has the meaning given to it in paragraph 1.2 of the section "*Are You a Plan Creditor?*" of this Explanatory Statement.

"**Plan Debt**" has the meaning given to it in paragraph 1.7 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Plan Documentation**" means each of the Explanatory Statement (including the notice setting out the relevant details for the Plan Meetings), the Plans and the Plan Creditor Letter.

"**Plan Effective Date**" means the date on which both:  (a) the Plan Effective Date under, and as defined in, the BrazilCo Plan occurs and (b) the Plan Effective Date under, and as defined in, the CoreCo Plan occurs.

"**Plan Meeting(s)**" means each of the meetings of the Plan Creditors that the Court has granted the Plan Companies permission to convene (including any adjournment thereof).

"**Plan Party**" or "**Party**" means the Plan Company, each Plan Creditor and each Undertaking Party, and "**Plan Parties**" and "**Parties**" shall be construed accordingly.

"**Plan Website**" means https://deals.is.kroll.com/nfe.

"**Plans**" means the BrazilCo Plan and the CoreCo Plan, each a "**Plan**".

"**PortoCem**" has the meaning given to it in paragraph APPENDIX 1PART 13.65 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**PortoCem Debentures**" has the meaning given to it in paragraph 3.65 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**PortoCem Power Plant**" has the meaning given to it in paragraph 4.1.6 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Post-Elections Exchange Consideration Chart**" has the meaning given to it in paragraph 1.13 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Practice Statement**" means the Practice Statement (*Companies*: *Schemes of Arrangement and Restructuring Plans under Parts 26 and 26A of the Companies Act 2006*) issued on 18 September 2025 by the Chancellor of the Court.

"**Practice Statement Letter**" means the practice statement letter published by the Plan Companies on 20 April 2026.

"**Preferred Interests**" has the meaning given paragraph APPENDIX 1PART 314.2 of Part 3 (*Summary of the Terms of Certain Key Implementation Documents and Equity Instruments*) of this Explanatory Statement.

"**Preferred Members**" has the meaning given paragraph 14.7 of Part 3 (*Summary of the Terms of Certain Key Implementation Documents and Equity Instruments*) of this Explanatory Statement.

"**PREPA**" has the meaning given to it in paragraph 4.1.1 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Proceedings**" means any process, action, other legal proceedings (including, without limitation, any demand, arbitration, alternative dispute resolution, judicial review, adjudication, execution, seizure, distraint, forfeiture, re-entry, lien, enforcement of judgment or enforcement of any security), in any jurisdiction whatsoever.

"**Prospectus Regulation**" means EU Regulation 2017/1129/EU, as amended from time to time.

"**Proxy Statement**" means the proxy statement issued pursuant to Section 14(a) of the Securities Exchange Act of 1934 to Existing NFE Stockholders in respect of, among other things, certain proposals to Existing NFE Stockholders necessary to implement the Recapitalisation Transaction, dated on or about the date of this Explanatory Statement, together with any amendments thereto.

"**Puerto Rico**" means the Commonwealth of Puerto Rico.

"**Puerto Sandino Facility**" has the meaning given to it in paragraph 4.1.7 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**PW/PWP AHG**" means the ad hoc group of certain unaffiliated 2029 New Noteholders represented by the PW/PWP AHG Advisors.

"**PW/PWP AHG Advisors**" means, collectively, Paul, Weiss, Rifkind, Wharton & Garrison LLP and Perella Weinberg Partners LP, as counsel and financial advisor, respectively, to the PW/PWP AHG, as well as other regulatory, tax, local, foreign, barristers (including Stephen Robins KC) and special counsel (in each case as notified to NFE Brazil Newco), in their respective capacities as counsel to the PW/PWP AHG.

"**R-1 Class**" has the meaning given to it in paragraph 3.4(i) of Part 4 (*Certain Legal Aspects of the Plans*) of this Explanatory Statement.

"**R-1 Lenders**" has the meaning given to it in paragraph 1.1.3 of the "*Are you a Plan Creditor?*" section of this Explanatory Statement.

"**R-1 Loans**" has the meaning given to it in paragraph 3.10 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**R-1 Revolving Credit Facility**" has the meaning given to it in paragraph 3.8 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**R-1 Revolving Credit Facility Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to any agent, any issuing bank, any lender or any lender counterparty of the R-1 Revolving Credit Facility under or in connection with the R-1 Revolving Credit Facility (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise).

"**R-2 Class**" has the meaning given to it in paragraph 3.4(ii) of Part 4 (*Certain Legal Aspects of the Plans*) of this Explanatory Statement.

"**R-2 Lenders**" has the meaning given to it in paragraph 1.1.4 of the "*Are you a Plan Creditor?*" section of this Explanatory Statement.

"**R-2 Loans**" has the meaning given to it in paragraph 3.10 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**R-2 Revolving Credit Facility**" has the meaning given to it in paragraph 3.8 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**R-2 Revolving Credit Facility Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to any agent, any issuing bank, any lender or any lender counterparty of the R-2 Revolving Credit Facility under or in connection with the R-2 Revolving Credit Facility (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise).

"**RCF-2 / TLA BrazilCo Cash Pool**" means $45 million of cash, which cash pool shall be funded with proceeds of the New BrazilCo Notes.

"**RCF-2 / TLA BrazilCo Equity Pool**" means a number of shares of BrazilCo Common Equity equal to 5.8 per cent. of the aggregate amount of BrazilCo Common Equity to be distributed to holders of 2029 New Notes, R-2 Revolving Credit Facility Debt, and holders of Term Loan A Debt pursuant to the Restructuring on the Restructuring Effective Date.  For the avoidance of doubt, the BrazilCo Common Equity that comprises the RCF-2 / TLA BrazilCo Equity Pool is subject to dilution by the BrazilCo MIP.

"**RCF Advisors**" means Sidley Austin LLP, as counsel (together with any external counsel instructed by them in relation to the Plans (including Felicity Toube KC and Matthew Abraham of South Square Chambers)) and FTI Consulting, Inc. and Moelis & Company as financial advisors, to the agent under the Revolving Credit Facility Agreement and each of their Affiliates and any other advisors retained by any of the foregoing in connection with the Restructuring in accordance with the Revolving Credit Facility Agreement.

"**RCF Agent**" means MUFG Bank. Ltd., in its capacity as administrative agent under the Revolving Credit Facility Agreement, or any successor thereof.

"**RCF Commitments**" means "Commitments" as that term is defined under the Revolving Credit Facility Agreement.

"**RCF Lenders**" has the meaning given to it in paragraph 1.1.4 of the "*Are you a Plan Creditor?*" section of this Explanatory Statement.

"**Recapitalisation Transaction**" has the meaning given to it in paragraph 1.6.2 of Part 2 (*Summary of the Restructuring and the Recapitalisation Transaction (including the Plans)*) of this Explanatory Statement.

"**Record Time**" means 10:00 p.m. (London time)/ 5:00 p.m. (New York time) on 10 June 2026, being the date and time at which the Plan Creditors' entitlement to vote in the Plans and the value of their Plan Claims shall be assessed.

"**Registrable Securities**" has the meaning given paragraph 6.4 of Part 3 (*Summary of the Terms of Certain Key Implementation Documents and Equity Instruments*) of this Explanatory Statement.

"**Registrar of Companies**" means the registrar of companies within the meaning of the Act.

"**Related Fund**" means with respect to any person or entity, a fund, account or investment vehicle which is (i) controlled, managed or advised by such person or entity or (ii) if such fund, account or investment vehicle is managed by a different investment manager or investment adviser, a fund, account or investment vehicle whose investment manager or investment adviser is an Affiliate of the investment manager or investment adviser of the specified fund, account or investment vehicle.

"**Related Rights**" has the meaning given to it in the Holding Period Trust Deed.

"**Released Advisors**" means:

      (a)     the Group Legal Advisor;

      (b)     English Company Counsel;

      (c)     Houlihan Lokey Capital, Inc. and Alvarez & Marsal Europe LLP, as financial Advisors to the Plan Companies and the Group;

      (d)     the Advisors;

      (e)     any local or specialist counsel engaged by any of the foregoing; and

      (f)     any successors to the foregoing;

"**Released Parties**" means, each in their various respective capacities as such in connection with the Restructuring and the Plans:

      (a)     each Plan Company;

(b)      each Group Company;

(c)      each Undertaking Party;

(d)      each Plan Creditor;

(e)      each:  (i) Released Advisor; (ii) Advisor Released Person; and (iii) any person acting on the instructions of, or providing services to, any of the foregoing in connection with the Plans or the Restructuring;

(f)      each Affiliate of the persons listed at (a) to (e) above; and

(g)      each of the respective officers, directors, employees, partners, executives and agents (or equivalents) of the persons listed in (a) to (f) above (each, a "**Representative**").

"**Relevant Alternative**" has the meaning given to it in paragraph APPENDIX 1PART 23.4 of Part 2 *(Summary of the Restructuring and the Recapitalisation Transaction (Including the Plans)*) of the Explanatory Statement.

"**Relevant Alternative Report**" has the meaning given to it in paragraph APPENDIX 1PART 23.4 of Part 2 *(Summary of the Restructuring and the Recapitalisation Transaction (Including the Plans)*) of the Explanatory Statement.

"**Relevant Plan Debt**" means, for any Plan Creditor in respect of the Legacy Notes, Revolving Credit Facility, Term Loan A Facility or Term Loan B Facility, the principal face value of Plan Debt held by that Plan Creditor at the Record Time and, in the case of any 2029 New Noteholder, a proportion of the principal face value of the 2024 Intercompany Loans equal to the proportion of the total issued 2029 New Notes held by that 2029 New Noteholder at the Record Time.

"**Required Preferred Members**" has the meaning given paragraph 14.13 of Part 3 *(Summary of the Terms of Certain Key Implementation Documents and Equity Instruments*) of this Explanatory Statement.

"**Residual FLNG Proceeds Claims**" has the meaning given to it in paragraph 3.7 of Part 1 *(Background to and Reasons for the Plans*) of this Explanatory Statement

"**Restructuring**" has the meaning given to it in paragraph 1.5 of Part 2 *(Summary of the Restructuring and the Recapitalisation Transaction (Including the Plans)*) of this Explanatory Statement.

"**Restructuring Effective Date**" has the meaning given to it in the Transaction Implementation Deed.

"**Restructuring Long-Stop Time**" has the meaning given to it in the Transaction Implementation Deed.

"**Restructuring Support Agreement**" means the Restructuring Support Agreement dated 17 March 2026 originally entered into between, among others, New Fortress Energy Inc., the Plan Company and the Supporting Creditors (as defined therein) and acceded to by NFE Brazil Newco on 9 April 2026 and as amended, supplemented and/or restated from time to time.

"**Restructuring Surplus**" has the meaning given to it in paragraph APPENDIX 1PART 23.12 of Part 2 *(Summary of the Restructuring and the Recapitalisation Transaction (Including the Plans)*) of the Explanatory Statement.

"**Restructuring Term Sheet**" has the meaning given to it in the Restructuring Support Agreement.

"**Revolving Credit Facility**" has the meaning given to it in paragraph 3.8 of Part 1 *(Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Revolving Credit Facility Agreement**" has the meaning given to it in paragraph 3.8 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Revolving Credit Facility Debt**" means the R-1 Revolving Credit Facility Debt and the R-2 Revolving Credit Facility Debt.

"**Rule 144**" has the meaning given paragraph 6.5 of Part 3 (*Summary of the Terms of Certain Key Implementation Documents and Equity Instruments*) of this Explanatory Statement.

"**Rule 144A**" means rule 144A under the Securities Act.

"**S-3 Resale Shelf**" has the meaning given paragraph 6.9 of Part 3 (*Summary of the Terms of Certain Key Implementation Documents and Equity Instruments*) of this Explanatory Statement.

"**San Juan Terminal**" has the meaning given to it in paragraph 4.1.1 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Sanction Hearing**" means the hearing of the Court to hear the Plan Companies' application for an order of the Court sanctioning the Plans under Section 901F of the Act, anticipated to be held on 18 June 2026 in the Companies Court, Royal Courts of Justice, 7 Rolls Building, Fetter Lane, London EC4A 1NL.

"**Sanction Order**" means an order of the Court sanctioning the Plans under section 901F of the Act.

"**Sanctioned Jurisdiction**" means a country or territory subject to comprehensive or sectoral Sanctions (currently being Cuba, Iran, North Korea, and Crimea, and those portions of the so-called Donetsk People's Republic and the Luhansk People's Republic, and the non-Ukrainian government controlled areas of Kherson and Zaporizhzhia regions of Ukraine, Russia, Belarus or Venezuela).

"**Sanctioned Person**" means any person:

(a)      that is listed on any Sanctions List, or is otherwise the target of any Sanctions Legislation (including, without limitation, by reason of ownership, control or agency (as such terms are defined by the relevant Sanctions Legislation or Sanctions Authority) of or over any person listed on a Sanctions List);

(b)      located or ordinarily resident in or organised under the laws of any Sanctioned Jurisdiction; or

(c)      with which any Party is prohibited from dealing or otherwise engaging pursuant to any Sanctions Legislation in any transaction contemplated by the terms of the Restructuring.

"**Sanctions**" means any economic, financial or trade sanctions administered or enforced by any Sanctions Authority.

"**Sanctions Authority**" means the United States (including the Office of Foreign Assets Control of the United States Treasury Department, the U.S. Department of State and the U.S. Department of Commerce), United Nations Security Council, United Kingdom (including His Majesty's Treasury) or the EU or its Member States.

"**Sanctions Legislation**" means economic or financial sanctions, laws, regulations or trade embargoes or similar measures implemented, administered or enforced by any Sanctions Authority.

"**Sanctions List**" means any of the lists of specifically designated persons or entities (or equivalent) maintained by a Sanctions Authority, each as amended, supplemented or substituted from time to time.

"**Santa Catarina Terminal**" has the meaning given to it in paragraph 4.1.4 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**SEC**" means the U.S. Securities and Exchange Commission.

"**Securities Act**" means the US Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder, as amended.

"**Senior Obligations**" has the meaning given to it in paragraph 2.25 of Part 2 (*Summary of the Restructuring and the Recapitalisation Transaction (Including the Plans)*) of this Explanatory Statement.

"**Separation Agreement**" has the meaning given to it in paragraph 2.1 of PartPART 2 *(Summary of the Restructuring and the Recapitalisation Transaction (Including the Plans)*) of this Explanatory Statement.

"**Series I Agent**" means Wilmington Savings Fund Society, FSB, in its capacity as administrative agent under the Series I Loan, or any successor thereof.

"**Series I and Series II Class**" has the meaning given to it in paragraph 3.4(vi) of Part 4 (*Certain Legal Aspects of the Plans*) of this Explanatory Statement.

"**Series I Lender**" has the meaning given to it in paragraph 1.1.7 of the "*Are you a Plan Creditor?*" section of this Explanatory Statement.

"**Series I Loan**" has the meaning given to it in paragraph 3.34 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Series I Loan Agreement**" has the meaning given to it in paragraph 3.34 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Series I Loan Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the lenders of the Series I Loan under or in connection with the Series I Loan (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise).

"**Series II Agent**" means Wilmington Savings Fund Society, FSB, in its capacity as administrative agent under the Series II Loans, or any successor thereof.

"**Series II Lender**" has the meaning given to it in paragraph 1.1.8 of the "*Are you a Plan Creditor?*" section of this Explanatory Statement.

"**Series II Loan**" has the meaning given to it in paragraph 3.38 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Series II Loan Agreement**" has the meaning given to it in paragraph 3.38 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Series II Loan Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the lenders of the Series II Loan under or in connection with the Series II Loan (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise).

"**Shelf Underwriting**" has the meaning given paragraph 6.11 of Part 3 (*Summary of the Terms of Certain Key Implementation Documents and Equity Instruments*) of this Explanatory Statement.

"**Standstill Fee**" has the meaning given to it in paragraph 4.17 of Part 1 (*Background to and Reasons for the Plans*) of the Explanatory Statement.

"**Standstill Fee Creditor**" means an RCF Lender who is entitled to the Standstill Fee.

"**Stated Maturity Date**" has the meaning given to it in paragraph 3.53 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Super Priority Obligations**" has the meaning given to it in paragraph 2.25 of Part 2 (*Summary of the Restructuring and the Recapitalisation Transaction (Including the Plans)*) of this Explanatory Statement.

"**Supporting Creditor**" means a Plan Creditor who is party to the Restructuring Support Agreement or a similar support agreement including the same lender undertakings as the Restructuring Support Agreement.

"**Supporting Holders**" has the meaning given to it in paragraph 3.26 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Supporting Term Loan A Debt**" has the meaning given to it in the Restructuring Support Agreement.

"**Term Loan A**" has the meaning given to it in paragraph 3.21 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Term Loan A Agreement**" has the meaning given to it in paragraph 3.21 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Term Loan A Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the lenders of the Term Loan A under or in connection with the Term Loan A (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise).

"**Term Loan A Facility**" has the meaning given to it in paragraph 3.21 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Term Loan B**" has the meaning given to it in paragraph 3.15 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Term Loan B Agreement**" has the meaning given to it in paragraph 3.15 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Term Loan B Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the lenders of the Term Loan B under or in connection with the Term Loan B (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise).

"**Term Loan B Facility**" has the meaning given to it in paragraph 3.15 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**TLA Advisors**" means Seward & Kissel LLP, as counsel to the TLA Agent under the Term Loan A Agreement.

"**TLA Agent**" means Wilmington Trust, National Association, in its capacity as administrative agent under the Term Loan A Facility, or any successor thereof.

"**TLA Class**" has the meaning given to it in paragraph 3.4(iv) of Part 4 (*Certain Legal Aspects of the Plans*) of this Explanatory Statement.

"**TLA Lenders**" has the meaning given to it in paragraph 1.1.6 of the "*Are you a Plan Creditor?*" section of this Explanatory Statement.

"**TLB Advisors**" means Seward & Kissel LLP, as counsel to the TLB Agent under the Term Loan B Agreement.

"**TLB Agent**" means Wilmington Trust, National Association, in its capacity as administrative agent under the Term Loan B Facility, or any successor thereof.

"**TLB Class**" has the meaning given to it in paragraph 3.4(iii) of Part 4 (*Certain Legal Aspects of the Plans*) of this Explanatory Statement.

"**TLB Lenders**" has the meaning given to it in paragraph 1.1.5 of the "*Are you a Plan Creditor?*" section of this Explanatory Statement.

"**Transaction Implementation Deed**" means the transaction implementation deed to be entered into on (or around) the Plan Effective Date between, among others, the Plan Companies and the Plan Creditors, in Agreed Form.

"**Trustees**" means the 2026 Legacy Notes Trustee, the 2029 Legacy Notes Trustee and the 2029 New Notes Trustee.

"**Turbine Lease**" has the meaning given to it in paragraph 3.80 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Turbine Lease Guarantee**" has the meaning given to it in paragraph 3.80 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Turbine Purchase Agreement**" has the meaning given to it in paragraph 3.80 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**Turbines**" has the meaning given to it in paragraph 4.1.9 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

"**UIR**" has the meaning given to it in paragraph 2.1.2 of "*Summary of Action to be Taken by Plan Creditors*" of this Explanatory Statement.

"**UK**" means the United Kingdom of Great Britain and Northern Ireland.

"**UK POATRs**" means the Public Offers and Admissions to Trading Regulations 2024.

"**Unadmitted Plan Creditor**" means a Plan Creditor on whose behalf a validly completed Plan Creditor Letter has not been delivered to, and received by, the Information Agent by the Voting Instructions Deadline.

"**Undertaking Parties**" means "Plan Undertaking Parties" as defined in the Transaction Implementation Deed.

"**U.S.**" means the United States of America.

"**U.S. Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. § 101, et seq., as amended from time to time.

"**U.S. Bankruptcy Court**" has the meaning given to it in paragraph 6.7 of Part 4 (*Certain Legal Aspects of the Plans*) of this Explanatory Statement.

"**Voting Instructions Deadline**" means 10:00 p.m. (London time)/ 5:00 p.m. (New York time) on 9 June 2026.

"**ZeroPark**" has the meaning given to it in paragraph 3.75 of Part 1 (*Background to and Reasons for the Plans*) of this Explanatory Statement.

1.2    **Interpretation**

1.2.1    references to a "person" include references to an individual, firm, partnership, company, corporation, unincorporated body of persons or any state or state agency;

1.2.2    references to a statute or statutory provision include the same as subsequently modified, amended or re-enacted from time to time;

1.2.3    references to a document include the same as subsequently supplemented, amended and/or restated from time to time;

1.2.4    references to a time of the day are references to the time in London, United Kingdom;

1.2.5    a reference to a Plan Company, a Plan Creditor or any other person includes its successors in title, permitted assigns and permitted transferees;

1.2.6    to the extent there is any conflict or inconsistency between the terms of this Explanatory Statement and the Plans, the terms of the Plans shall prevail;

1.2.7    the singular includes the plural and vice versa and words importing one gender shall include the other gender;

1.2.8    the term "including" means "including, without limitation"; and

1.2.9    "$" means the lawful currency for the time being of the U.S.

## APPENDIX 7

### PART A – RELEVANT ALTERNATIVE REPORT

Part A of Appendix 7 is available on the Plan Website.

**APPENDIX 7**

**PART B – EV REPORT**

Part B of Appendix 7 is available on the Plan Website.

**APPENDIX 8**

**KEY IMPLEMENTATION DOCUMENTS**

Appendix 8 is available on the Plan Website.