**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | **Chapter 15** |
| **NFE Global Holdings Limited,** *et al.***,** | **Case No. 26-11268 (___)** |
| **Debtors in a Foreign Proceeding.**[1] | **(Joint Administration Requested)** |

**DECLARATION OF CHRISTOPHER BOAS
IN SUPPORT OF THE VERIFIED PETITION FOR
(I) RECOGNITION OF FOREIGN MAIN PROCEEDING,
(II) RECOGNITION OF THE FOREIGN REPRESENTATIVE, AND
(III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

Pursuant to 28 U.S.C. § 1746, I, Christopher John Sotheby Boas, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.    I am over the age of 18 and, if called upon, could testify to all matters set forth in this declaration (this "**Declaration**").[2]  I am making this Declaration in accordance with section 1515 of title 11 of the United States Code (the "**Bankruptcy Code**") and rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

2.    On April 17, 2026 the boards of directors of the above-captioned foreign debtors (the "**Debtors**") adopted resolutions appointing me as the authorized representative of the Debtors in connection with the Chapter 15 Cases (the "**Foreign Representative**").  On May 14, 2026, the English Court entered the Convening Order, recognizing my appointment as the Foreign

---

[1]    The Debtors and the last four digits of their foreign identification numbers are NFE Global Holdings Limited (9588) and NFE Brazil Newco Limited (1053).  The address of NFE Global Holdings Limited's registered office is Suite 1, 7th Floor, 50 Broadway, London SW1H 0BL, United Kingdom, and the address of NFE Brazil Newco Limited's registered office is Suite 1, 7th Floor, 50 Broadway, London SW1H 0DB, United Kingdom.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Verified Petition.

Representative.  On May 18, 2026, the board of directors of each Debtor authorized me to file the Chapter 15 Petitions, Verified Petition, and attendant motions seeking recognition and enforcement of the English Proceedings for the Debtors.  Copies of these resolutions are attached to the Chapter 15 Petitions as Exhibit B.

3.      I currently serve as a director on the boards of directors of each of the Debtors, a position I have held since April 8, 2026.

4.      I submit this Declaration in support of (a) the Chapter 15 Petitions; (b) the *Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of the Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "**Verified Petition**"); (c) the *Motion for Entry of an Order (I) Scheduling Recognition Hearing and (II) Specifying Form and Manner of Service of Notice*, and (d) the *Motion for Entry of an Order (I) Directing Joint Administration of the Debtors' Chapter 15 Cases and (II) Authorizing the Foreign Representative to File Consolidated Lists of Information*, each filed contemporaneously herewith.

5.      Consistent with my roles as a director of the Debtors and Foreign Representative, I have gained knowledge of the Debtors' history, day-to-day operations, assets, financial condition, business affairs, and books and records.  Unless otherwise indicated, all facts set forth in this Declaration are based upon (a) my personal knowledge; (b) my review of relevant documents, including documents prepared or filed in connection with the English Proceedings and these Chapter 15 Cases; (c) information supplied to me by the Debtors, officers, directors, and/or employees, or professionals retained by the Debtors; or (d) my experience and knowledge of the Debtors' assets and financial condition.

2

**PROFESSIONAL BACKGROUND**

6.      I am a Partner and the Head of Europe at Uzzi & Lall ("**U&L**"), an independent boutique financial advisory firm.  I am currently the Liquidating Trustee for the Tupperware Brands Corporation bankruptcy estate.  I have over 30 years of experience advising clients in connection with derivatives trading, special situations, credit transactions, and commodity investing.  Prior to my tenure at U&L, I was a partner and Global Head of Credit at Citadel, where I managed and built out the firm's international credit investment strategies.  I also served as the CEO of Citadel Securities.  Prior to Citadel, I ran the global structured credit trading division of Morgan Stanley, focusing on creating new products and investment strategies in credit for both the bank's clients and the bank's own capital.  I was Morgan Stanley and Citadel's representative to the ISDA panels focused on designing the current market structure for credit derivative trading. I have a Bachelor's degree in Mathematics from Cambridge University.

**GENERAL BACKGROUND**

**I.      Corporate Structure**

7.      New Fortress Energy Inc. (the "**Parent**"), together with the Debtors and its other direct and indirect subsidiaries (collectively the "**Group**") is the ultimate parent of each of the other entities in the Group, including the Debtors.  As of December 31, 2025, affiliates of certain entities controlled by Wesley R. Edens (co-founder, CEO and board member of the Parent), Randal A. Nardone (co-founder and board member of the Parent), and affiliates of Fortress Investment Group LLC owned an aggregate of approximately 92,230,509 shares of Class A common stock, representing approximately 32.8 percent of total voting power in respect of the Parent.  Also as of December 31, 2025, affiliates of Energy Transition Holdings LLC owned an aggregate of approximately 25,559,846 shares of Class A common stock, representing approximately 9.0 percent of total voting power.  A copy of the Parent's Form 10-K annual report for the year ended

3

December 31, 2025, as filed with the United States Securities and Exchange Commission, is attached hereto as **Exhibit A**. NFE Global is a private company limited by shares, which was incorporated under the laws of England and Wales on October 14, 2021. NFE Global's registered office address is Suite 1, 7th Floor, 50 Broadway, London SW1H 0BL, United Kingdom. NFE Global is an existing guarantor of the 2026 Legacy Notes, 2029 Legacy Notes, Revolving Credit Facility, Term Loan A Facility, Term Loan B Facility, Series I Intercompany Loan Facility and Series II Intercompany Loan Facility. NFE Brazil is a private company limited by shares, which was incorporated under the laws of England and Wales on April 7, 2026. NFE Brazil's registered office address is Suite 1, 7th Floor, 50 Broadway, London SW1H 0DB, United Kingdom. NFE Brazil was formed specifically for the purpose of promoting the restructuring of BrazilCo. In furtherance of that purpose, NFE Brazil became a guarantor in respect of the obligations under the New 2029 Notes on April 9, 2026. The boards of both Debtors are comprised of four directors, one of whom is myself and I am a UK resident that does not sit on the board of any other Group entity. In addition, the Debtors' books and records are maintained in the UK, each Debtor maintains a bank account in the UK, and Vistra Cosec Limited, a UK company, serves as the corporate secretary for both Debtors.

8. A structure chart depicting the Group's organizational structure is attached to the Verified Petition as Exhibit B.

## II. Capital Structure

9. As of the date hereof, the Debtors have guaranteed external funded debt (i.e., funded debt owed to creditors outside the Group) in a total outstanding principal amount of approximately $5.7 billion and NFE Global is also an obligor on intercompany obligations with a total outstanding principal amount of approximately $2.4 billion. All of the aforementioned external funded debt and intercompany obligations (collectively, the "**Plan Debt**," and the holders

4

of such debt, the "**Plan Creditors**") is denominated in U.S. dollars and addressed by the Restructuring Plans.     NFE Brazil is a guarantor on the New 2029 Notes (the "**BrazilCo Plan Debt**") and NFE Global is a guarantor on all other Plan Debt (the "**CoreCo Plan Debt**").   The following table summarizes the Debtors' external funded debt, which, along with the Debtors' intercompany obligations, are described in further detail below:

| Obligation | Principal Amount Outstanding | Collateral and Priority | Maturity Date |
|---|---|---|---|
| **CoreCo Plan Debt[3]** | | | |
| 2026 Legacy Notes | $510,879,463 | Common Collateral (*Pari passu* first lien claim) | September 30, 2026 |
| 2029 Legacy Notes | $236,728,231 | Common Collateral (*Pari passu* first lien claim) | March 15, 2029 |
| R-1 Revolving Credit Facility | $100,000,000 | Common Collateral FLNG 1 Collateral FLNG 2 Collateral Account Collateral (*Pari passu* first lien claims) Brazil Collateral (*Pari passu* second lien claim) | April 15, 2026 |
| R-2 Revolving Credit Facility | $560,400,000 | Common Collateral FLNG 1 Collateral FLNG 2 Collateral Account Collateral Brazil Collateral (*Pari passu* first lien claim) Brazil Collateral (*Pari passu* second lien claim) | October 15, 2027 |

---

[3]   Excludes NFE Global's intercompany obligations.

| Obligation | Principal Amount Outstanding | Collateral and Priority | Maturity Date |
|---|---|---|---|
| **CoreCo Plan Debt[3]** | | | |
| Term Loan A | $294,999,563 | Common Collateral<br>FLNG 2 Collateral<br>Account Collateral<br>Brazil Collateral<br>(*Pari passu* first lien claim)<br>Brazil Collateral<br>(*Pari passu* second lien claim) | July 19, 2027 |
| Term Loan B | $1,266,077,800 | Common Collateral<br>FLNG 1 Collateral<br>FLNG 2 Collateral<br>Account Collateral<br>(*Pari passu* first lien claim) | October 30, 2028 |
| **BrazilCo Plan Debt** | | | |
| New 2029 Notes | $2,730,126,770 | Brazil Collateral<br>(*Pari passu* first lien claim) | November 15, 2029 |
| **Total:** | **$5,699,211,827** | | |

1. **2026 Legacy Notes**

10. Pursuant to that certain Indenture, dated April 12, 2021 (as amended, restated, supplemented or otherwise modified from time to time), by and among the Parent, as issuer, certain of the Parent's wholly-owned, direct and indirect subsidiaries as guarantors from time to time party thereto (collectively, including NFE Global, the "**Common Guarantors**"), and U.S. Bank Trust Company, National Association (as successor in interest to U.S. Bank, National Association), as trustee and notes collateral agent, the Parent issued approximately $1.5 billion of 6.500% senior secured notes due September 30, 2026 (the "**2026 Legacy Notes**" and the holders of 2026 Legacy Notes the "**2026 Legacy Noteholders**"). The obligations under the 2026 Legacy Notes are guaranteed, jointly and severally, by the Common Guarantors and secured by a first priority lien

on substantially all of the assets of the Parent and the Common Guarantors (the "**Common Collateral**"), which is *pari passu* with the first priority liens on the Common Collateral securing the other Plan Debt, as applicable.

2. **2029 Legacy Notes**

11. Pursuant to that certain Indenture, dated March 8, 2024 (as amended, restated, supplemented or otherwise modified from time to time), by and among the Parent, as issuer, the Common Guarantors, and U.S. Bank Trust Company, National Association, as trustee and collateral agent, the Parent issued approximately $750 million of 8.750% senior notes due March 15, 2029 (the "**2029 Legacy Notes**" and the holders of 2029 Legacy Notes the "**2029 Legacy Noteholders,** and the 2029 Legacy Notes, together with the 2026 Legacy Notes, the "**Legacy Notes**"). The obligations under the 2029 Legacy Notes are guaranteed, jointly and severally, by the Common Guarantors and secured by a first priority lien on the Common Collateral, which is *pari passu* with the first priority liens on the Common Collateral securing the other Plan Debt, as applicable.

3. **New 2029 Notes**

12. On November 6, 2024, NFE Financing LLC, an indirect subsidiary of the Parent ("**NFE Financing**"), and Bradford County Real Estate Partners LLC, a wholly owned subsidiary of NFE Financing ("**Bradford Partners**"), entered into an exchange and subscription agreement with certain holders of the then outstanding Legacy Notes, which related to a series of transactions intended to extend the maturity profile of the Group's indebtedness and enhance liquidity (the "**2024 Refinancing**"). In accordance with the 2024 Refinancing transactions, NFE Financing also issued approximately $2.73 billion of 12.000% secured notes due November 15, 2029 (the "**New 2029 Notes**"), which is governed by that certain Indenture, dated November 22, 2024 (as amended, restated, supplemented or otherwise modified from time to time), between NFE

7

Financing, as issuer, Bradford Partners and NFE Brazil, as guarantors, and Wilmington Savings Fund Society, FSB, as trustee and notes collateral agent. The obligations under the New 2029 Notes are jointly and severally guaranteed by Bradford Partners, which owns land in Wyalusing, Pennsylvania ("**PA Land**"), and NFE Brazil. The collateral provided in connection with securing the New 2029 Notes consisted of NFE Financing's interest in (i) approximately 45% of the Group's Brazilian business, (ii) proceeds of NFE Financing's interest in the Series II Intercompany Loan Facility, (iii) the Brazilian Intercompany Loan Facility (which in turn is secured by the Brazilian Parent's approximately 55% equity interest in the Group's Brazil business and its interest in the proceeds of the Series I Intercompany Loan Facility), and (iv) the PA Land (collectively, the "**NFE Financing Collateral**").

4.    **Revolving Facility**

13.    On April 15, 2021, the Parent entered into that certain Credit Agreement (as amended, restated, supplemented or otherwise modified from time to time prior to, the date hereof, the "**Revolving Credit Facility**" and the lenders under the Revolving Credit Facility the "**RCF Lenders**"), by and among the Parent, the Common Guarantors, FLNG 1 LLC and its direct subsidiaries (collectively, "**FLNG 1**"), FLNG 2 LLC and its direct subsidiaries (collectively, "**FLNG 2**"), as guarantors, the lenders and issuing banks from time to time party thereto and MUFG Bank, Ltd., as administrative agent and collateral agent, which provided for a senior secured revolving credit facility. Pursuant to amendments made in connection with the 2024 Refinancing, the Revolving Credit Facility is currently comprised of two tranches: (i) a tranche in an aggregate principal amount of $100 million, with a scheduled maturity on April 15, 2026 (the "**R-1 Revolving Facility**") and (ii) a tranche in an aggregate principal amount of $560.4 million, maturing on October 15, 2027 (the "**R-2 Revolving Facility**").

8

14. The obligations under the R-1 Revolving Facility and the R-2 Revolving Facility are guaranteed, jointly and severally, by the Common Guarantors, FLNG 1 and FLNG 2. The obligations under the R-1 Revolving Facility and R-2 Revolving Facility are secured by (i) a first priority lien against (w) the Common Collateral *pari passu* with the other corporate debt claims, (x) substantially all of the assets held by FLNG 1 (the "**FLNG 1 Collateral**") *pari passu* with claims under the Term Loan B Facility and letter of credit and reimbursement agreement, dated July 16, 2021, for the issuance of letters of credit for an aggregate amount of up to $195 million (as amended, restated, supplemented or otherwise modified from time to time, the "**Letter of Credit Facility**"), (y) certain natural gas liquefaction assets and other assets of FLNG 2 (the "**FLNG 2 Collateral**"), which is *pari passu* with the first priority liens on the FLNG 2 Collateral securing the Letter of Credit Facility, Term Loan A Facility (as defined below) and Term Loan B Facility (as defined below) and (z) certain deposit and securities accounts that are *pari passu* with the holders of claims under the Letter of Credit Facility and the Term Loan A Facility (as defined below) (the "**Account Collateral**"), and (ii) a second lien on the NFE Financing Collateral excluding the PA Land for claims in excess of $200 million (the "**Second Lien NFE Financing Collateral Rights**"). In addition, solely with respect to the R-2 Revolving Facility, the obligations thereunder are secured by a first priority lien on the NFE Financing Collateral excluding the PA Land up to $200 million that is *pari passu* with the first priority liens on the NFE Financing Collateral securing the Term Loan A Facility, the Letter of Credit Facility and the New 2029 Notes (the "**First Priority Lien NFE Financing Collateral Rights**" and such collateral together with the NFE Financing Collateral, the "**Brazil Collateral**").

### 5. Term Loan A Facility

15. On July 19, 2024, the Parent entered into that certain Credit Agreement (as amended, restated, supplemented or otherwise modified from time to time), by and among the

9

Parent, the Common Guarantors and FLNG 2, as guarantors, the lenders from time to time party thereto and Wilmington Trust, National Association (as successor in interest to Morgan Stanley Senior Funding, Inc.), as administrative agent and collateral agent, which provided for a senior secured, multi-draw term loan facility in an initial aggregate principal amount of up to $700 million, which was subsequently reduced on March 3, 2025 to $350 million when the unused commitments were terminated (the "**Term Loan A Facility**" and the lenders under the Term Loan A Facility the "**TLA Lenders**").  The obligations under the Term Loan A Facility are guaranteed, jointly and severally, by the Common Guarantors and FLNG 2 and are secured by a first priority lien on the Common Collateral, the FLNG 2 Collateral, the First Priority Lien NFE Financing Collateral Rights, and the Second Lien NFE Financing Collateral Rights.

6. **Term Loan B Facility**

16. On October 30, 2023, the Parent entered into that certain Credit Agreement (as amended, restated, supplemented or otherwise modified from time to time), by and among the Parent, the Common Guarantors, FLNG 1 and FLNG 2, as guarantors, the lenders from time to time party thereto and Wilmington Trust, National Association (as successor in interest to Morgan Stanley Senior Funding, Inc.), as administrative agent and collateral agent, pursuant to which the lenders funded term loans in an aggregate principal amount of $1.266 billion (the "**Term Loan B Facility**").  The obligations under the Term Loan B Facility are guaranteed, jointly and severally, by the Common Guarantors, FLNG 1 and FLNG 2.  Term Loan B is secured by a first priority lien on (i) the Common Collateral, which lien is *pari passu* with the first priority liens on the Common Collateral securing the other Plan Debt, (ii) the FLNG 1 Collateral, which is *pari passu* with the first priority liens on the FLNG 1 Collateral securing the Revolving Credit Facility and Letter of Credit Facility, and (iii) the FLNG 2 Collateral, which is *pari passu* with the first

10

priority liens on the FLNG 2 Collateral securing the Revolving Credit Facility, Letter of Credit Facility, and Term Loan A Facility.

### 7. **Brazilian Intercompany Loan Facility**

17.     On November 22, 2024, in connection with the 2024 Refinancing, NFE Brazil Investments LLC (the "**Brazilian Parent**") entered into that certain Credit Agreement (as amended, restated, supplemented or otherwise modified from time to time), between the Brazilian Parent, as borrower, NFE Financing as lender, the other lenders from time to time party thereto and Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent, which provided for a senior secured term loan facility of approximately $970 million (the "**Brazilian Intercompany Loan Facility**").  The obligations under the Brazilian Intercompany Loan Facility are secured by substantially all of Brazilian Parent's assets.

### 8. **Series I Intercompany Loan Facility**

18.     On November 22, 2024, the Parent entered into that certain Credit Agreement (as amended, restated, supplemented or otherwise modified from time to time), by and among the Parent, as borrower, the Common Guarantors, the Brazilian Parent, as lender, and Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent, which provided for a senior secured, multiple-draw term loan facility of $970 million (the "**Series I Intercompany Loan Facility**").  The obligations under the Series I Intercompany Loan Facility are guaranteed, jointly and severally, by the Common Guarantors and secured by a first priority lien on the Common Collateral, which is *pari passu* with the first priority liens on the Common Collateral securing the other Plan Debt, as applicable.

### 9. **Series II Intercompany Loan Facility**

19.     On December 6, 2024, the Parent entered into that certain Credit Agreement (as amended, restated, supplemented or otherwise modified from time to time), by and among the

11

Parent, as borrower, the Common Guarantors, NFE Financing, as lender, and Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent, providing for a senior secured term loan facility of approximately $1.43 billion (the "**Series II Intercompany Loan Facility**"). The obligations under the Series II Intercompany Loan Facility are guaranteed by the Common Guarantors and secured by a first priority lien on the Common Collateral, which is *pari passu* with the first priority liens on the Common Collateral securing the other Plan Debt, as applicable.

### III.    The Debtors' U.S. Assets

20.    The Debtors have property in the United States in the form of a retainer held in an account maintained in New York, New York by Skadden, Arps, Slate, Meagher & Flom LLP ("**Skadden**").    In addition, the Debtors are obligors on U.S. dollar-denominated debt that is governed by New York law, including under the instruments related to the Legacy Notes, the Term Loan A Facility, the Term Loan B Facility, the Revolving Credit Facility, the Series I Intercompany Loan Facility, the Series II Intercompany Loan Facility, and the New 2029 Notes.

### EVENTS LEADING TO THE ENGLISH PROCEEDINGS

### I.    The Restructuring Support Agreement

21.    In June and July 2025, the Group engaged restructuring professionals, including Skadden and Houlihan Lokey Capital, Inc., to explore possible restructuring transactions.  In late September and early October 2025, the Group's advisors presented the Group's key creditor constituencies with the terms of a proposed restructuring that involved spinning off the Group's Brazilian business.  While restructuring negotiations were underway with creditors, the Group entered into temporary waivers and forbearances with certain of its creditors beginning in November 2025 with respect to ongoing events of default under the relevant debt documents. These temporary waivers and forbearances provided the Group with a stable platform on which to

12

negotiate with creditors on the terms of a restructuring that would provide a comprehensive solution to the Group's capital structure.

22.      On March 17, 2026, following lengthy and thorough consideration, consultation, and negotiation, the Parent, NFE Global, certain other members of the Group, and members of an ad hoc group of New 2029 Noteholders, certain TLA Lenders, members of an ad hoc group of TLB Lenders, members of an ad hoc group of RCF Lenders, and members of an ad hoc group of 2026 Legacy Noteholders and 2029 Legacy Noteholders (collectively, the "**RSA Parties**") entered into the RSA that sets forth the principal terms of a comprehensive restructuring of the Group's principal funded debt obligations.  The RSA has been acceded to by 100% of the RCF Lenders, 100% of the TLA Lenders, approximately 97% of the TLB Lenders, approximately 85% of the 2026 Legacy Noteholders, approximately 87% of the 2029 Legacy Noteholders, and approximately 99% of the New 2029 Noteholders.  NFE Brazil acceded to the RSA on April 9, 2026.  Pursuant to the RSA, the RSA Parties have agreed to support the Restructuring Plans and forbear from exercising remedies while the RSA is in effect.

## THE RESTRUCTURING PLANS

23.      The key terms of the Restructuring Plans are set forth in the table below:[4]

| Key Terms of the Restructuring Plans |
|---|
| Overview | The Restructuring Plans will provide for the following:<br><br>• The Group will separate into two independent companies: (i) New BrazilCo Parent and its direct and indirect subsidiaries ( "**BrazilCo** |

---

[4]    The summary contained herein is provided for illustrative purposes only and is qualified in its entirety by reference to the full text of the Restructuring Plans.  In the event of any inconsistency between this summary table and the Restructuring Plans, the Restructuring Plans or the relevant underlying implementation documentation will control in all respects.  Capitalized terms used in this table that are not otherwise defined shall have the meanings ascribed to such terms in the Explanatory Statement.

| Key Terms of the Restructuring Plans |
|---|

**Group**"), and (ii) NFE and its direct and indirect subsidiaries other than BrazilCo Group (collectively, "**CoreCo Group**").

- Obligations under the 2026 Legacy Notes, 2029 Legacy Notes, Term Loan A Agreement, Term Loan B Agreement, Revolving Credit Facility Agreement, New 2029 Notes, and Intercompany Credit Agreements will be exchanged (in each case on a ratable basis), as applicable, for BrazilCo Common Equity, New CoreCo Term Loans, CoreCo Preferred Stock, CoreCo Common Stock, the FLNG 2 Term Loans, and/or the FLNG 2 Preferred Equity.

- NFE, as borrower, and each other CoreCo Group entity, as a guarantor shall enter into a senior secured, first-priority term loan credit facility for CoreCo Group in accordance with the New CoreCo Credit Facility Term Sheet. All letters of credit issued under the existing Letter of Credit Facility or Revolving Credit Facility will be backstopped, rolled into, or replaced by letters of credit issued under separate new fully committed letter of credit facilities for each of CoreCo Group and BrazilCo Group (or, in the case of CoreCo Group, remain outstanding under an amended, amended and restated, or otherwise modified Letter of Credit Facility Agreement).

- BrazilCo Group shall enter into one or more financing arrangements to provide liquidity for New BrazilCo on or prior to the date on which the conditions precedent to the Restructuring are satisfied or duly waived and the Restructuring has been fully implemented (the "**Restructuring Effective Date**"). Local Brazilian Debt Facilities shall, at the election of the Company Parties and with the consent of the majority of the ad hoc group of certain unaffiliated holders of New 2029 Notes represented by Paul Weiss, Rifkind, Wharton & Garrison LLP and Perella Weinberg Partners LP, be refinanced in full or remain outstanding on their existing terms (subject to the elimination of the NFE corporate guarantee and any other obligations tied to CoreCo).

- Existing NFE Stockholders shall retain shares of NFE's common stock representing 35 percent of the CoreCo Common Stock issued and outstanding as of the Restructuring Effective Date, immediately before giving effect to the CoreCo MIP or any conversion of the CoreCo Preferred Stock into CoreCo Common Stock.

14

| Key Terms of the Restructuring Plans | |
|---|---|
| Plan Consideration | Pursuant to the Restructuring Plans, the Plan Creditors will release their existing Plan Debt claims against the Group in return for Plan Consideration as set forth below. |

| Plan Debt | Plan Consideration |
|---|---|
| Legacy Notes | CoreCo Common Stock<br>CoreCo Preferred Stock |
| New 2029 Notes | BrazilCo Common Equity |
| Series I Intercompany Loan Facility[5] | CoreCo Common Stock<br>CoreCo Preferred Stock |
| Series II Intercompany Loan Facility | CoreCo Common Stock<br>CoreCo Preferred Stock |
| R-1 Revolving Credit Facility | CoreCo Common Stock<br>CoreCo Preferred Stock<br>New CoreCo Term Loans<br>FLNG 2 Term Loans<br>FLNG 2 Preferred Equity |
| R-2 Revolving Credit Facility | CoreCo Common Stock<br>CoreCo Preferred Stock<br>New CoreCo Term Loans<br>FLNG 2 Term Loans<br>FLNG 2 Preferred Equity<br>RCF-2 / TLA BrazilCo Equity Pool |
| Term Loan A | CoreCo Common Stock<br>CoreCo Preferred Stock<br>New CoreCo Term Loans<br>FLNG 2 Term Loans<br>FLNG 2 Preferred Equity<br>RCF-2 / TLA BrazilCo Equity Pool |

---

[5] By virtue of the Brazilian Intercompany Loan Facility, the proceeds of the Series I Intercompany Loan Facility would ultimately be payable to NFE Financing and, alongside proceeds of the Series II Intercompany Loan Facility, would form part of the Brazil Collateral. For efficiency, Plan Consideration in respect of the Series I Intercompany Loan Facility and Series II Intercompany Loan Facility will be distributed directly to those Plan Creditors with recourse to the Brazil Collateral (in addition to any other Plan Consideration received by such Plan Creditors).

| Key Terms of the Restructuring Plans | |
| --- | --- |
| | Term Loan B | CoreCo Common Stock<br>CoreCo Preferred Stock<br>New CoreCo Term Loans<br>FLNG 2 Term Loans<br>FLNG 2 Preferred Equity |
| Certain Shareholder Approvals | The Company shall, in accordance with the Restructuring Milestones and the other provisions of the RSA, obtain the approval of holders of a majority of its existing common stock to, among such other matters as the Company and the Majority Supporting Creditors may determine advisable, (a) issue greater than 20% of its existing common stock, (b) amend its organizational documents to, among other things, authorize additional shares of common stock, (c) grant NFE's board of directors authority to effect a reverse stock split, and (d) approve the issuance of shares in respect of the CoreCo MIP, in each case, as required by applicable securities laws and exchange rules. | |
| Releases | The Restructuring Plans and the Transaction Implementation Deed provide for the Plan Releases.  With effect on and from the Restructuring Effective Date, each "Plan Party" (defined as each of the Plan Companies, each Undertaking Party[6] and each Plan Creditor) irrevocably, unconditionally, fully and absolutely waives, releases and forever discharges (i) any and all actions, proceedings, claims, damages, counterclaims, complaints, liabilities, liens, rights, demands and set-offs against each Released Party, whether present or future, prospective or contingent, of whatsoever nature and howsoever arising, whether in law or in equity, in contract (including, but not limited to, breaches or non-performance of contract), in statute or in tort (including, but not limited to, negligence and misrepresentation) or in any other manner whatsoever, breaches of statutory duty, for contribution, or for interest and/or costs and/or disbursements, whether or not for a fixed or unliquidated amount, whether filed or unfiled, whether asserted or unasserted, whether or not presently known to the parties or to the law, in each case, that it ever had, may have or hereafter can, shall or may have, arising out of actions, omissions or circumstances on or prior to the Restructuring Effective Date against each and any Released Party (as defined below) whatsoever or howsoever arising (and notwithstanding any subsequent facts or information becoming known following the Restructuring Effective Date), in relation to or arising directly or indirectly out of or in connection with (a) the negotiation, preparation, sanction or implementation of the Plans and/or the Restructuring or (b) the Plan Claims (including the negotiation, preparation, sanction, execution or implementation of any Implementation Documents); and (ii) all rights, title and interest it has | |

---

[6]   "Undertaking Parties" include: the Parent, NFE Financing, FLNG 2 LLC, the Debtors, certain direct and indirect subsidiaries of the Parent, and certain trustees and agents of Plan Debt instruments.

16

| Key Terms of the Restructuring Plans |
|---|
| in the Plan Claims, and all Liabilities owed by a Group Company to any Plan Party in relation to such Plan Claims.[7] <br><br> • Released parties (the "**Released Parties**" each individually a "**Released Party**") include: (a) each of the Plan Companies and each member of the Group, and their respective direct and indirect subsidiaries from time to time; (b) the Plan Creditors party to or bound by the Plans and each Nominee (as applicable); (c) each Undertaking Party; (d) the Released Advisors,[8] each Advisor Released Person,[9] and any person acting on the instructions of the foregoing in connection with the Plans or the Restructuring; (e) each Affiliate of the persons listed in (a)-(d) above; and (f) each of the respective officers, directors, employees, partners, executives and agents of the persons listed in (a)-(e) above. <br><br> • The Plan Releases are subject to customary carve-outs, including for: (i) the Excluded Liabilities (as defined below); (ii) rights arising under or in connection with the Implementation Documents; and (iii) claims which may arise or accrue in relation to acts, omissions or circumstances occurring after the Restructuring Effective Date. <br><br> • Excluded liabilities ("**Excluded Liabilities**") include liabilities: (i) arising from criminal acts, fraud, gross negligence or willful misconduct, as determined by a judgment issued by a court of competent jurisdiction; (ii) arising from a Released Advisor's duty of care to its client; (iii) of accounting, restructuring, or tax advisors subject to reliance letters; (iv) of outstanding professional advisor fees and costs properly incurred in connection with the Restructuring; (v) created by the Implementation Documents, the Restructuring Plans, or ancillary documents; (vi) indemnity or reimbursement obligations owed by lenders to their respective agents under the relevant facility |

---

[7]   "Implementation Documents" include: the Plan document(s); the Transaction Implementation Deed; the New CoreCo Credit Agreement; the FLNG 2 Term Loan Credit Facility Agreement; the CoreCo Intercreditor Agreement; the CoreCo Stockholders' Agreement; the BrazilCo Stockholders' / LLC Agreement; the FLNG 2 Parent LLCA; the Holding Period Trust Deed; and all other documents, agreements and instruments necessary or desirable to implement or consummate the Restructuring in accordance with the RSA, the Restructuring Plans and the Transaction Implementation Deed (each as defined in the Explanatory Statement).

[8]   "Released Advisors" include: Skadden; Daniel Bayfield KC, Ryan Perkins and Jon Colclough of South Square Chambers (as English counsel); Houlihan Lokey Capital, Inc. and Alvarez & Marsal Europe LLP, as financial Advisors to the Debtors and the Group; advisors to the various ad hoc groups of lenders and the various agents and trustees; and any local counsel of any of the foregoing.

[9]   "Advisor Released Person" means each of the current and former respective officers, directors, employees, executives, attorneys and agents (or equivalents) of each Released Advisor and each Affiliate of each Released Advisor.

17

| Key Terms of the Restructuring Plans |
|---|
| | agreements; (vii) in the case of a Group Company, liabilities of directors or Group Advisors arising from negligence, default, or breach of duty, or that would be available upon the insolvency of such Group Company; and (viii) of one Group Company to another Group Company that is expressly not released under the terms of the Separation Agreement or any other Implementation Document.<br><br>• Each Plan Party also undertakes not to commence or continue any proceedings against any Released Party in respect of the released claims.  Pursuant to the Restructuring Plans, NFE Global Holdings Limited shall, on behalf of itself and the CoreCo Plan Creditors, and NFE Brazil Newco Limited shall, on behalf of itself and the BrazilCo Plan Creditors, enter into the releases on the terms set out in the Transaction Implementation Deed. |

24.     The Debtors are seeking to effectuate the Restructuring pursuant to Part 26A of the Companies Act, by way of a "restructuring plan."  To that end, on March 24, 2026 and April 10, 2026, respectively, each of Debtor NFE Global and Debtor NFE Brazil filed a Part 8 claim form and listing note with the English Court to commence the English Proceedings for the Restructuring Plans proposed pursuant to Part 26A of the Companies Act.  On May 14, 2026, the English Court entered an order, among other things, confirming my appointment as foreign representative, convening seven meetings of Plan Creditors to consider approval of the Restructuring Plans and scheduling a hearing to consider sanctioning of the Restructuring Plans for June 18, 2026.  Once sanctioned by the English Court, the Restructuring Plans will be implemented in accordance with the Transaction Implementation Deed.

## THE CHAPTER 15 CASES

25.     As detailed in the Verified Petition, I have commenced ancillary proceedings for the Debtors under chapter 15 of the Bankruptcy Code to obtain recognition of the English Proceedings and seek related relief.  I believe that these Chapter 15 Cases will complement the Debtors' primary proceeding in England to ensure the effective and economic administration of

18

the English Proceedings and prevent adverse action in the United States and submit that the recognition of the English Proceedings is necessary and appropriate for the benefit of the Debtors, their creditors, and other parties in interest.

**I.      The Debtors Meet the General Eligibility Requirements of Section 109(a) of the Bankruptcy Code**

26.      I understand from U.S. lawyers at Skadden ("**U.S. Counsel**") that only a person that resides or has a domicile, a place of business, *or property* in the United States, or a municipality, may be a debtor, and that a foreign debtor satisfies the applicable requirement even when it has only a nominal amount of property in the United States.  I also understand from U.S. Counsel that, among other things, attorney retainers deposited in New York and a debtor's contract rights, including rights pursuant to debt that is governed by New York law and contains a New York forum selection clause, constitute property of the debtor in New York for purposes of the Bankruptcy Code.

27.      Here, the Debtors satisfy this requirement because they have an interest in certain funds deposited with Skadden as a retainer for its services, which funds are held in a client trust account in New York.  Furthermore, the Debtors are obligors on U.S. dollar denominated debt, which is governed by New York law and contains New York law forum selection clauses.

**II.     The Requirements of Section 1517(a) of the Bankruptcy Code Are Satisfied**

**A.      The English Proceedings are Foreign Proceedings**

28.      I have been informed by U.S. Counsel that the Bankruptcy Code defines a "foreign proceeding" as:

> a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

19

29.    I have been informed that the English Proceedings fall within the foregoing definition because (i) the Debtors commenced the English Proceedings pursuant to Part 26A of the Companies Act, (ii) the English Proceedings are being overseen by the English Court in England and are being conducted pursuant to laws relating to insolvency or the adjustment of debts, (iii) the English Proceedings are collective in nature as they take into account the rights of all Plan Creditors, and (iv) the English Proceedings will facilitate the Restructuring of the Debtors as the implementation of the Restructuring Plans will address the Group's liquidity and operational challenges, while providing runway for the Group's portfolio of development projects and opportunities that are expected to generate significant revenue and liquidity in the future.

**B.    The English Proceedings are Foreign Main Proceedings**

### 1.    The Debtors' COMI is in England

30.    I am also informed by U.S. Counsel that the Bankruptcy Code provides that a foreign proceeding shall be recognized as a "foreign main proceeding" if the foreign proceeding is pending in the country where the debtor has "the center of its main interests" ("**COMI**").

31.    The Debtors' registered office is located in England, which, I am informed by U.S. Counsel, creates a presumption under the Bankruptcy Code that England is the COMI for the Debtors.  I understand that other factors that support the COMI analysis include: the Debtors are private companies limited by shares incorporated under the laws of England and Wales; the Debtors' books and records are maintained in England; each Debtor maintains bank accounts in England; a UK company (Vistra Cosec Limited) serves as the corporate secretary for both Debtors; I am an English citizen and resident and serve as a director of both Debtors.  I do not serve as a director of any other Group entity.

32.    I understand from U.S. Counsel that U.S. courts also consider creditor expectations when making a COMI determination.  I understand that the Debtors' COMI in England has been

consistently ascertainable to third parties.  Here, Plan Creditors have overwhelmingly supported the Restructuring Plans as reflected by the fact that as of the date hereof, approximately ninety-seven (97) percent of the holders of the Group's funded debt obligations by value have signed the RSA.[10]

33.   The Plan Creditors who signed the RSA knew they were entering into a restructuring with UK-incorporated Debtors that would propose Restructuring Plans in England. In particular, the formation of NFE Brazil, and its role as a Debtor in the English Proceedings was expressly contemplated by the RSA.  The RSA indicates a UK address for the Debtors, and upon execution of the RSA on March 17, 2026, creditors were provided with NFE Global's English contact details for all restructuring-related communications.  Creditors under all major debt instruments were also sent notice of NFE Global's address on March 25, 2026, directing all future communications to NFE Global's UK address, and, on April 9, 2026, the NFE Brazil Plan Creditors were sent notices directing all future communications to NFE Brazil's UK address. Additionally, the Parent filed an 8-K and press release on March 17, 2026, announcing the RSA and its intention to implement the restructuring through Restructuring Plans and to seek recognition under chapter 15 of the Bankruptcy Code, and issued a further press release on April 1, 2026, announcing the results of a consent solicitation with respect to amendments to the indenture governing the New 2029 Notes which allowed for the formation of NFE Brazil.  On May 18, 2026 the Parent also filed a press release announcing the date of the plan creditor meetings and that the meetings would be held in London, England at the offices of Skadden, and that creditors could attend in person or virtually through an online meeting room.

---

[10]   In addition to the Supporting Creditors (as defined in the RSA) who have signed onto the RSA as of the date of this Verified Petition, Additional Supporting Creditors (as defined in the RSA) may join the RSA in accordance with the terms thereof, and Kroll Issuer Services Limited, as information agent, signed onto the RSA in a limited capacity.

34. In addition, several key agreements entered into in connection with the Group's reorganization are governed by English law, including the RSA (with respect to matters arising in connection with the Restructuring Plans) and other documents necessary to effectuate the transactions contemplated by the RSA and the Restructuring Plans. Under English law, a suit against a member of the Debtors' board of directors would require the application of English law, even if such director did not live in England.

35. Thus, the RSA and related documents made clear the requirements and application of English law to the Debtors and that their address is in England, and the Plan Creditors who signed the RSA knew they were entering into a restructuring with UK-incorporated debtors and that the restructuring would be implemented through the Restructuring Plans in England. I believe that this pattern of public notices and communications that consistently directed all queries to the Debtors and their advisers at their England-based addresses makes it clear to third parties that the Debtors' COMI is in England.

36. Further, as of the date hereof, I believe that the Debtors' restructuring efforts are the Debtors' primary business activity and that such activities are centralized in England.

37. The Debtors' restructuring activities are centralized in England given the prevalence of the English Court in such activities and the fact that UK actors have been heavily involved in the Debtors' restructuring efforts.

38. The English Court's role in the English Proceedings is prevalent as the English Court entered the Convening Order on May 14, 2026 and a Sanction Hearing will be held in the UK before the English Court.[11] I also understand based on discussions with Skadden U.K. that

---

[11] The Foreign Representative will update the Court following the Sanction Hearing to inform the Court of the outcome of that hearing, and the Sanction Order will be filed on the docket.

the English Court has exclusive jurisdiction to hear and determine any proceeding and to settle any dispute in connection with the Restructuring Plans.

39. Further, the Debtors' restructuring activities have been undertaken primarily by UK actors. Since my appointment as a director on the boards of each Debtor, I have been involved in the aspects of the English Proceedings that are governed under and in accordance with the laws of England and Wales. Meanwhile, Skadden U.K. and their barrister team, on behalf of the Debtors, circulated the Practice Statement Letter and filed the Explanatory Statement with the English Court, prepared for and appeared at the Convening Hearing, and will appear at the Sanction Hearing, in front of the English Court. Similarly, the Debtors, pursuant to the Convening Order, will convene the hybrid Plan Meetings at the Skadden offices in London and virtually on June 15, 2026, at which I will serve as chairman.

40. Moreover, the Debtors engaged Kroll Issuer Services Limited, a UK-based information agent located in London, to serve as the Information Agent for the English Proceedings.[12] The Information Agent is responsible for facilitating communications with Plan Creditors, distributing restructuring-related documentation, and fielding queries from Plan Creditors.

41. The Debtors maintain their administrative documents, consisting of their accounting books and records, in the UK. In addition, each of the Debtors maintains a bank account in the UK, further evidencing the Debtors' operational and administrative ties to the UK. I understand from U.S. Counsel that a stated goal of chapter 15 is to maximize the value of the debtor's assets. I also understand that recognition of the English Proceedings is a condition

---

[12] Kroll Restructuring Administration LLC has been engaged as noticing agent for service of documents in the Chapter 15 Cases.

precedent to the effectiveness of the RSA. Failure to grant recognition of the English Proceedings would (i) jeopardize the overall transaction contemplated by the RSA, (ii) lead to a value destructive alternative, (iii) upset creditor expectations, and (iv) undermine these highly consensual restructuring transactions designed to de-lever the Group and facilitate their corporate renewal. Thus, I believe that recognition of the English Proceedings would comport with the goals of chapter 15.

### C.   In the Alternative, the English Proceedings Are Foreign Nonmain Proceedings

#### 1.   Each of the Debtors Has an Establishment in the UK and Therefore Qualifies for Foreign Nonmain Recognition

42. I am informed by U.S. Counsel that a foreign nonmain proceeding takes place in a jurisdiction that is not the entity's center of main interests, but where it has an "establishment," which is any place of operations where the debtor carries out a nontransitory economic activity.

43. As set forth above, the Restructuring Plans have centralized the Debtors' restructuring activities in the UK. These activities are primarily being conducted by English actors, including Skadden U.K. and me (a resident of England), in my capacity as Foreign Representative. For example, I have signed the Practice Statement Letter on behalf of the Debtors and I will, among other things, oversee the Plan Meetings. Additionally, the Debtors maintain a registered office in England to which all communications may be addressed or served. The Debtors' registered office is also where annual filings are administered, the payment of annual fees are registered, and where the Debtors' accounting, books, and records are maintained.

### D.   These Chapter 15 Cases Have Been Commenced by a Duly Authorized Foreign Representative

44. I further understand from U.S. Counsel that another requirement for recognition of a foreign proceeding under the Bankruptcy Code is that the foreign representative applying for

24

recognition be a "person or body." Here, I am informed by U.S. Counsel that I am an individual satisfying the Bankruptcy Code definition of "person." Moreover, under the resolutions passed by the boards of directors of each of the Debtors, I am authorized to act as the Debtor's foreign representative and to seek relief under chapter 15 of the Bankruptcy Code.

### E.    The Verified Petition Meets the Requirements of Section 1515 of the Bankruptcy Code and Bankruptcy Rule 1007(a)(4)

45.    I am informed by U.S. Counsel that the Bankruptcy Code requires that the petition for recognition must be accompanied by (1) a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative; (2) a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or (3) in the absence of evidence referred to in (1) and (2) above, any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative. I also understand from U.S. Counsel that a petition for recognition must also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative.

46.    Here, I commenced these Chapter 15 Cases by filing the Chapter 15 Petitions accompanied by all fees, documents, and information required by the Bankruptcy Code and the Bankruptcy Rules, including: (i) a corporate ownership statement containing the information described in Bankruptcy Rule 7007.1; (ii) a list containing (a) the names and addresses of all persons or bodies authorized to administer the English Proceedings (aside from the Foreign Representative, none), (b) all parties to litigation pending in the United States in which a Debtor is a party at the time of the filing of the Chapter 15 Petitions (here, none), and (c) all entities against whom provisional relief is being sought under section 1519 of the Bankruptcy Code (here, none); (iii) a certified copy of the Convening Order, which serves as the decision commencing the foreign

proceeding and recognizing me as the Foreign Representative; and (iv) copies of the written resolutions of the boards of directors of the Debtors appointing me as the Foreign Representative and authorizing me to file the Chapter 15 Petitions, the Verified Petition, and attendant motions seeking recognition and enforcement of the English Proceedings for the Debtors.[13]

### III.    The Restructuring Plans, Including the Plan Releases, and the Sanction Order Should be Enforced

47.    I believe that recognition of the English Proceedings, enforcement of the Restructuring Plans (including the Plan Releases) and Sanction Order, and the issuance of an injunction enforcing the terms thereof in the United States is necessary to ensure that the Restructuring Plans, which have the support of the vast majority of the Plan Creditors, can be implemented without disruption or adverse actions being brought within this Court's jurisdiction.

48.    Specifically, enforcement of the Restructuring Plans is appropriate because if certain Plan Creditors could effectively evade the terms of the Restructuring Plans by commencing actions in the United States, the purpose of the Restructuring Plans could be thwarted.  Allowing creditors to re-litigate issues resolved under the Restructuring Plans and Sanction Order would threaten the success of the English Proceedings and cause irreparable harm to the Debtors.

49.    Furthermore, the implementation of the Restructuring Plans will result in the Plan Creditors receiving the Plan Consideration, which is preferable to liquidation because liquidation would likely result in a substantially lower return to Plan Creditors as compared to the Plan Consideration.  The Restructuring Plans will result in the same compromise or arrangement between the Debtors and each Plan Creditor as other similarly situated Plan Creditors.

---

[13]    Because the Debtors are subject only to the English Proceedings before the English Court, a statement identifying additional countries in which a foreign proceeding by, regarding, or against the Debtors is pending was not applicable.

50. The Restructuring Plans address and restructure only the claims of the Plan Creditors (who are the only affected creditors) and do not contemplate any other class of creditors other than the Plan Creditors being affected. All of the Plan Creditors have been and will be given adequate notice of the Restructuring Plans, and the process for participating in or objecting to the Restructuring Plans is the same for United States creditors as all other creditors.

### A. The Court Should Enforce the Plan Releases

51. The Restructuring Plans provide for the resolution of claims under the Plan Debt and facilitate the financial restructuring of the Debtors. As part of this restructuring, the Restructuring Plans contemplate providing releases to Released Parties essential to the Restructuring. The Plan Releases are more narrowly tailored than releases approved in other chapter 15 cases. The Plan Releases comprise only (i) an exculpation of acts taken in connection with the negotiation, preparation, sanction or implementation of the Restructuring Plans and/or the Restructuring and (ii) releases of Group entities and related parties from claims arising from or related to the Plan Debt. Such releases are also subject to customary carve-outs, including for: (i) the Excluded Liabilities[14]; (ii) rights arising under the Implementation Documents; and (iii) claims which may arise or accrue in relation to acts, omissions or circumstances occurring after the Restructuring Effective Date.

---

[14] "Excluded Liabilities" is a term defined in the Restructuring Plans and include liabilities: (i) arising from criminal acts, fraud, gross negligence or willful misconduct, as determined by a judgment issued by a court of competent jurisdiction; (ii) arising from a Released Advisor's duty of care to its client; (iii) of accounting, restructuring, or tax advisors subject to reliance letters; (iv) of outstanding professional advisor fees and costs properly incurred in connection with the Restructuring; (v) created by the Implementation Documents, the Restructuring Plans, or ancillary documents; (vi) indemnity or reimbursement obligations owed by lenders to their respective agents under the relevant facility agreements; (vii) in the case of a Group Company, liabilities of directors or Group Advisors arising from negligence, default, or breach of duty, or that would be available upon the insolvency of such Group Company; and (viii) of one Group Company to another Group Company that is expressly not released under the terms of the Separation Agreement or any other Implementation Document.

52.     The Plan Releases are necessary and fundamental to the Restructuring Plans, and are an integral part thereof because they provide a mechanism for the Plan Creditors to release their claims against the Parent, the Debtors, and the other Released Parties in exchange for the Plan Creditors receiving their Plan Consideration.  The Plan Releases are intended to ensure the Group and other Released Parties are afforded the full benefits of the reorganization and restructuring effectuated under the Restructuring Plans and accordingly. the Plan Releases shall, with effect from, and subject to the occurrence of, the Restructuring Effective Date, provide for the satisfaction, waiver and release, fully and absolutely, of all claims of the Plan Creditors under the Plan Debt.

53.     If the Plan Releases were not implemented, this would undermine the Restructuring because the claims of the Plan Creditors under the Plan Debt would not be extinguished.  The releases are therefore necessary to give commercial effect to the restructuring transactions contemplated by the RSA and Restructuring Plans.

*[Remainder of Page Intentionally Left Blank]*

28

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge,

information, and belief.


Dated:   May 28, 2026
         London, United Kingdom


                                        */s/ Christopher Boas*
                                        Christopher Boas
                                        Foreign Representative of the Debtors