# EXHIBIT A

## Expert Opinion of Daniel M. Glosband

No. CR-2026-002385
No. CR-2026-002886

IN THE HIGH COURT OF JUSTICE

BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES

INSOLVENCY AND COMPANIES LIST (ChD)

IN THE MATTER OF NFE BRAZIL NEWCO LIMITED

IN THE MATTER OF NFE GLOBAL HOLDINGS LIMITED

AND IN THE MATTER OF THE COMPANIES ACT 2006

RESTRUCTURING PLANS

---

Expert Opinion of

Daniel M. Glosband

---

## Introduction

I have been requested by NFE Brazil Newco Limited ("**NFE Brazil Newco**") and NFE Global Holdings Limited ("**NFE Global**") (together the "**Plan Companies**" and each a "**Plan Company**"), in connection with inter-conditional restructuring plans under Part 26A of the Companies Act 2006 of the United Kingdom (the "**Companies Act**") (the "**Plans**" or the "**English Proceedings**") pending before the High Court of Justice, Business and Property Courts of England and Wales, Insolvency and Companies List (ChD) (the "**English Court**") to provide an expert opinion (the "**Opinion**") concerning the issues enumerated in paragraph 4 below, including (a) certain issues with respect to the Indenture Amendments (as defined below) (b) the principles of United States law that would be applicable to the recognition of the English Proceedings and enforcement of the Plans in the United States.[1]  I understand that the Opinion will be submitted to

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed in the Plans and the Practice Statement Letter regarding the Plans (the "**PSL**").

1

the English Court in connection with the joint hearing to convene meetings of creditors to consider and, if thought fit, approve the Plans, which is scheduled to be held on May 14, 2026 ("**Convening Hearing**").  NFE Brazil Newco is a wholly-owned subsidiary of NFE Financing LLC ("**NFE Financing**"), a Delaware limited liability company and the issuer of the 2029 New Notes (the "**Issuer**").  NFE Global is a wholly-owned subsidiary of NFE International Holdings Limited, a Bermudian company.  Both NFE Global and NFE Brazil Newco are indirect subsidiaries of New Fortress Energy Inc., a Delaware corporation and the parent of a group of direct and indirect subsidiaries (the "**Parent**,"  the "**Group**").

**Background And Qualifications**

1.      I am a retired partner and Of Counsel in the law firm of Goodwin Procter LLP ("**Goodwin**"), and I am located in Goodwin's Boston, Massachusetts office.  I am a member in good standing of the bars of two states, Massachusetts and New York, and admitted to practice before the following United States courts: the United States District Courts for the Districts of Massachusetts, Connecticut, and Vermont and the Southern District of New York; the United States Courts of Appeals for the First, Second and Eleventh Circuits; and the United States Supreme Court.  I hold a Bachelor of Arts degree from the University of Massachusetts, 1966, and a Juris Doctor degree from Cornell Law School, 1969.

2.      I now produce marked with the letters "DG--" a paginated bundle of true copies of documents to which I refer in this Opinion.  See Appendix A.  I also produce an indexed bundle of authorities to which I refer in this Opinion.  See Appendix B.  References to page numbers herein are references to the page numbers of Appendix A unless expressly stated to be otherwise.  Details of my background and qualifications to provide this Opinion are set forth in Appendix A.  [DG-001].

3.      Notable for purposes of this Opinion are (a) my participation in the "expert group" and "small drafting group" which were responsible for drafting the Model Law on Cross-Border Insolvency adopted by the United Nations Commission on International Trade Law (the "**Model Law**" and "**UNCITRAL**"), (b) my work as primary draftsman (with Professor Jay Westbrook of the University of Texas School of Law) of the United States adaptation of

ACTIVE/206784363.2

the Model Law, chapter 15 of the United States Bankruptcy Code[2], *Cross-Border and Other Ancillary Cases,* and as consultant to Congress in connection with its enactment and (c) my involvement in restructuring cases that involved debt issued under indentures governed by New York law.  In addition, I have provided expert opinions to the High Court of England and Wales and other courts in schemes of arrangement and restructuring plan proceedings on matters pertaining to recognition and enforcement in the United States of schemes of arrangement and restructuring plans.  Most of these expert opinions also required an analysis of matters pertaining to interpretation of indentures and other contracts governed by New York law and many required an opinion on New York law issues implicated by steps taken under the indentures to facilitate the scheme of arrangement or restructuring plan (the opinions that involved analysis of New York law documents are identified by one asterisk while those that included opinions on New York law issues are identified by two asterisks): (a) hibu Finance (UK) Ltd.; hibu Connect, SAU; hibu (USA) LLC; hibu Holdings (USA) Inc.; hibu of Pennsylvania, Inc.; hibuTel, Inc.; and ZNODE, Inc.; (b) New World Resources, N.V.*; (c) Afren plc*; (d) Codere S.A.; (e) EnQuest PLC*; (f) Bibby Offshore Services PLC*; (g) Stripes US Holding Inc.; (h) New Look Secured Issuer plc*; (i) Lecta Paper UK Ltd.**; (j) Swissport Fuelling Ltd. (June 2020)**; (k) New Look Financing Plc.*; (l) E D & F Man Treasury Management PLC*; (m) Matalan Finance plc*; (n) Codere Finance 2 (UK) Limited; (o) Swissport Fuelling Ltd. (November 2020)**; (p) Hertz UK Receivables Ltd. (December 2020)[3]**; (q) DTEK Finance PLC**; (r) Jain International Trading B.V.**; (s) Nostrum Oil & Gas PLC**; (t) Haya Holdco 2 Plc**; (u) SGB-SMIT Gmbh (restructuring plan proceeding under Part 26A); (v) Praesidiad Limited; (w) Lecta Paper UK Limited**; (x) Arvos Bidco S.àr.l.; (y) Light S.A.**; (z)  Mega Newco Limited; (aa) Petrofac Limited **; (bb) HSE Finance S.à.r.l. **; and (cc) Standard Profil Automotive Gmbh **.  I also provided an opinion for the proposed scheme of arrangement planned by Thomas Cook Group PLC, et al. (which did not ultimately proceed) and have provided opinions for schemes of arrangement in Hong Kong (Winsway Enterprises Holdings Limited, China Evergrande Group, Tianji Holding Limited), Bermuda (Markel CATCo Investment Ltd., et al), the British Virgin Islands

---

[2] United States bankruptcy law is embodied in Title 11 of the United States Code,  11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**.")
[3] A second Hertz scheme of arrangement was contemplated in early 2021 but was abandoned.

3

ACTIVE/206784363.2

(Scenery Journey Limited), the Cayman Islands (China Evergrande Group) and the Republic of Ireland (Nordic Aviation Capital Designated Activity Company).

**Issue To Be Addressed**

4.      I have been asked to address in my Opinion:

(a)     whether the amendments to the Indenture (as defined below) approved pursuant to the Consent Solicitation (as defined below) and implemented by the execution of the Supplemental Indentures (as defined below) were duly authorized and validly adopted in accordance with the terms of the 2029 New Notes Indenture and New York law, and whether such amendments validly effected: (i) the formation and accession of NFE Brazil Newco to the 2029 New Notes Indenture as a guarantor; (ii) the Proposed LLCA Amendment; and (iii) the ability of NFE Brazil Newco to maintain a collateral account with assets of up to $50,000 without the requirement to deliver a control agreement to the Notes Collateral Agent (the "**Indenture Amendments**")[4];

(b)     whether the United States Bankruptcy Court for the Southern District of New York (or such other appropriate forum determined by the Plan Companies) (the "**US Bankruptcy Court**") would recognize the English Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code[5]; and

(c)     whether, following such recognition, relief would be available and effective in the United States to give effect to, and ensure the enforceability of, the Plans, including in particular the effectiveness, under New York law, of any variation or discharge of the Plan Debt (the "**Additional Relief**").

---

[4] In addition to the Indenture Amendments, an amendment to the LLCA (as defined in the Consent Solicitation) was effected by the Member (as defined in the Consent Solicitation) to supplement the LLCA consistent with the intent of the Indenture, as amended (the "**Proposed LLCA Amendment**"). This amendment implicates Delaware law on which I am not qualified to testify. Nonetheless, I can and do opine that from the perspective of the Indenture and New York law, the Proposed LLCA Amendment has also been properly approved.

[5] US bankruptcy courts are units of the US District Courts to which cases under the Bankruptcy Code are referred. 28 U.S.C. §§ 151, 157.

4

ACTIVE/206784363.2

5.      In addition, I have been asked to explain (i) the basis upon which the Plan Companies intend to rely on the exemption in Section 3(a)(10) of the US Securities Act 1933 (the "**Securities Act**") on the sanction of the Plans as constituting approval of the Plans and the transactions contemplated thereby following a hearing on the procedural and substantive fairness of the Plans, at which all Plan Creditors will receive adequate notice and have the right to appear and be heard; and (ii) that, provided such requirements of Section 3(a)(10) are satisfied, the Plan Companies should be able to rely on that exemption for the issuance of securities pursuant to the Plans.

**Overall Conclusion**

6.      I have received a letter of instruction prepared by Counsel[6] (the "**Instruction**s") and the additional documents identified in paragraph 9 below providing, inter alia, background information on the Plans, the Parent, and the Group, including the Plan Companies.

7.      Based on the facts provided in the Instructions and the additional documents identified below, and the analysis set forth herein, and subject to the qualifications stated in this Opinion, in my opinion: (a) the Indenture Amendments were properly made pursuant to the terms of the Indenture and New York Law, including (i) the consent to the Indenture Amendments by holders of at least a majority in aggregate principal amount of the 2029 New Notes,[7] (ii) the formation and ownership of the equity of NFE Brazil Newco by NFE Financing, (iii) the accession of NFE Brazil Newco as a guarantor of the 2029 New Notes, and (iv) the provision for NFE Brazil Newco to maintain a collateral account of up to $50,000 without delivering a control agreement to the Notes Collateral Agent; (b) the English Proceedings will likely be recognized as foreign main proceedings under chapter 15 of the Bankruptcy Code; and (c) the Additional Relief manifesting as enforcement of the Plans (as defined and discussed in paragraphs 84-101 below) will be granted, and, as a result of that, the Plans are likely to be given full force and effect in the United States.  For these purposes, the Plans include provisions authorising the Plan Companies to execute the "Implementation Documents" (as defined under the Plans) on behalf of the creditors affected by the Plans and providing for

---

[6]Skadden, Arps, Slate, Meagher & Flom (UK) LLP ("**Counsel**").
[7] See discussion of authorization for the Consents at ¶¶ 46-49 below.

5

comprehensive releases pursuant to which, with effect from the Restructuring Effective Date, Plan Parties (as defined in the Plans) will waive, release and discharge all claims and liabilities in relation to or arising directly or indirectly out of or in connection with: (a) the negotiation, preparation, sanction or implementation of the Plans and/or the Restructuring; or (b) the Plan Debt (in each case, including, without limitation, the negotiation, preparation, sanction, execution or implementation of any Implementation Documents), against certain "Released Parties" (as defined in the Plans), including the Plan Companies and the Group, its current and former directors and officers, its advisors, and other persons involved in the English Proceedings, subject to customary carve-outs preserving rights under the Plans and the Implementation Documents (the "**Releases**").

**Duty Of Expert**

8. In forming my opinions as set forth in this Opinion, I understand that I owe a duty to the English Court to exercise reasonable skill and care in carrying out my instructions, that I must provide my unbiased opinion as an independent expert witness in relation to the matters contemplated in this Opinion and that I must be aware of and comply with the requirements of Part 35 of the Civil Procedure Rules, the Practice Direction to Part 35 and the Protocol for Instruction of Experts to give Evidence in Civil Claims. I confirm that: (a) I have reviewed and complied with the above-mentioned requirements in preparing this Opinion; (b) this Opinion includes all matters within my knowledge and area of expertise relevant to the issues on which this Opinion is given; (c) I have no prior relationship with the Plan Companies or other members of the Group; and (d) I have given details in this Opinion of any matters which, to my knowledge, might affect the validity of the Opinion.

**Documents Relied Upon In Submitting This Opinion**

9. In forming my opinions as set forth in this Opinion, I have reviewed papers relevant to, filed, and to be filed in the English Proceedings, including the documents referenced therein (together, the "**Supporting Documents**"), including:

(a) the Instructions (abbreviated in citations as "**Instrs**"); [DG-001]

6

(b)      the Practice Statement Letter dated April 20, 2026 (the "**PSL**"); [DG-016]

(c)      the indenture dated as of November 22, 2024 among the Issuer, the Guarantors from time to time party thereto and Wilmington Savings Fund Society, FSB as Trustee and Notes Collateral Agent (the "**Indenture**"), including the form of notes issued pursuant thereto (the "**2029 New Notes**," the "**2029 New Notes Debt**"), which will be affected by the BrazilCo Plan;[8] [DG-090]

(d)      a First Supplemental Indenture dated as of April 3, 2026 and a Second Supplemental Indenture dated as of April 9, 2026 pursuant to which the Indenture Amendments were implemented (the "**Supplemental Indentures**"); [**DG**-371]

(e)      a Consent Solicitation Statement dated as of March 17, 2026 (the "**Consent Solicitation**") with respect to the Indenture Amendments, together with an Officer's Certificate, Certificate of Information and Tabulation Agent dated April 1, 2026 ("**Information and Tabulation Agent Certificate**"), and legal opinion from counsel pursuant to Sections 9.06 and 13.04 of the Indenture; [DG-382]

(f)      the debt instruments to be affected by the CoreCo Plan (together, the "**CoreCo Plan Debt**" and together with the Letter of Credit Facility, the "**Corporate Debt**")[9]:
   o   the 2026 Legacy Notes Debt;
   o   the 2029 Legacy Notes Debt;
   o   the R-1 Revolving Credit Facility Debt;
   o   the R-2 Revolving Credit Facility Debt;
   o   the Term Loan B Debt;
   o   the Term Loan A Debt;
   o   the Series I Loan Debt; and
   o   the Series II Loan Debt.[10]

---

[8] The 2029 New Notes are described in ¶¶ 5.12 – 5.14 of the PSL.  [DG-029]

[9] The PSL also describes additional debt that is not Plan Debt.  PSL ¶¶ 5.17 -5.30.  [DG-030]

[10] The Corporate Debt documents are described in ¶¶ 5.2 – 5.30 of the PSL.  The 2029 New Notes Debt and the CoreCo Plan Debt being the "**Plan Debt**."  [DG-027] Because the Corporate Debt Documents are voluminous, they are not included in Appendix A.

7

(g)      a draft of the Restructuring Plan proposed by NFE Global; [DG-425]

(h)      a draft of the Restructuring Plan proposed by NFE Brazil Newco; [DG-466]

(i)      the resolutions of the directors of the Plan Companies in which execution of the Supplemental Indenture, commencement of the English Proceedings and appointment of the Foreign Representative were authorized (the "**Resolutions**"); [DG-504]

(j)      Part 26A of the Companies Act; and

(k)      the various statutory and case law and other authorities relevant to the issue of third-party releases attached hereto as Appendix B.

10.      For the purposes of this Opinion, I have been instructed to assume certain facts regarding the Company, including the business of the Group as described in the Instructions, and I have not independently verified those underlying factual matters unless otherwise stated.

**Brief Description Of The Plan Companies And The Group**

11.      NFE Global is a private company limited by shares incorporated in England and Wales under registered number 13679588 and with its registered office address at Suite 1, 7th Floor, 50 Broadway, London SW1H 0BL, United Kingdom.  NFE Global was incorporated on October 14, 2021.  NFE Global is a member of the Group, a direct wholly-owned subsidiary of NFE International Holdings Limited (a Bermudian company) and an indirect wholly-owned subsidiary of the Parent.  NFE Global has no material assets.  PSL ¶ 4.1 [DG-025]

12.      NFE Global is a guarantor in respect of the Corporate Debt and has entered into the NFE Global Deed of Contribution,[11] which gives the Parent contribution rights against NFE Global. Given these contribution rights (and those of the other guarantors), NFE Global cannot effectively obtain a release or variation of the Plan Creditors' rights against it in respect

---

[11] On April 9, 2026, NFE Global and the Parent executed a document titled the "Deed of Contribution" (the "**NFE Global Deed of Contribution**"), which established contribution rights in favour of Parent against NFE Global in respect of any amounts the Parent is required to pay under the Corporate Debt. PSL ¶ 4.2 [DG-025]

8

ACTIVE/206784363.2

of the CoreCo Plan Debt without also releasing or varying the CoreCo Plan Creditors' rights against the Parent and the other guarantors.  PSL ¶4.2.  [DG-025]

13.     NFE Brazil Newco is a private company limited by shares incorporated in England and Wales under registered number 17141053 and with its registered office address at Suite 1, 7th Floor, 50 Broadway, London SW1H 0DB, United Kingdom.  NFE Brazil Newco was incorporated on April 7, 2026.  NFE Brazil Newco is a member of the Group, a direct wholly-owned subsidiary of NFE Financing and an indirect wholly-owned subsidiary of the Parent. NFE Brazil Newco has no material assets.  PSL ¶ 4.3 [DG-025]

14.     NFE Brazil Newco was incorporated for the purpose of promoting the BrazilCo Plan to enable the restructuring of the 2029 New Notes on the terms outlined in the PSL. NFE Brazil Newco became a guarantor in respect of the obligations under the 2029 New Notes on April 9, 2026,[12] and has entered into the NFE Brazil Newco Deed of Contribution,[13] which established contribution rights in favor of NFE Financing against NFE Brazil Newco. Given these contribution rights (and those of the other guarantors), NFE Brazil Newco cannot effectively obtain a release or variation of the Plan Creditors' rights against it in respect of the 2029 New Notes without also releasing or varying the BrazilCo Plan Creditors' rights against NFE Financing and the other guarantors of the 2029 New Notes Debt.[14]   PSL ¶ 4.4  [DG-025]

15.     The PSL explains that the Group operates as a global energy infrastructure business, with an integrated model covering the entire value chain, from natural gas sourcing and liquefaction through to transportation, logistics, infrastructure, and the conversion or development of natural gas-fired power generation. It further explains that the Group delivers these services through an integrated liquefied natural gas supply and delivery model,

---

[12] See Supplemental Indentures.  [DG-371]
[13] On April 9, 2026, NFE Brazil Newco and NFE Financing executed a document titled the "Deed of Contribution" (the "**NFE Brazil Newco Deed of Contribution**" and together with the NFE Global Deed of Contribution, "**Deeds of Contribution**"), which established contribution rights in favour of NFE Financing against NFE Brazil Newco in respect of any amounts NFE Financing is required to pay under the Indenture.  PSL ¶ 4.4 [DG-025]

ACTIVE/206784363.2

including sourcing and producing LNG, supplemented by third-party purchases, and operating and chartering a fleet of LNG carriers and floating storage and regasification units.

16.     According to the PSL, the Group utilizes a network of downstream facilities and logistics assets to deliver gas and power solutions to customers, including those transitioning from more carbon-intensive fuels or seeking natural gas supply. In addition, the Group develops modular liquefied natural gas production facilities that can be deployed globally to enable efficient and cost-effective liquefaction of natural gas.  PSL ¶¶ 4.6–4.8 [DG-026]

**Background To The Restructuring**

17.     The PSL describes significant challenges affecting the Group's operations and financial position, including a material reduction in available liquidity, an inability to service interest on approximately $6.6 billion of Plan Debt, and consequent constraints on its ability to refinance existing indebtedness as it falls due, such that the Group is both cash flow insolvent and balance sheet insolvent and, absent a restructuring, the Plan Creditors would be entitled to place relevant entities into insolvency proceedings. PSL ¶¶ 6.1–6.8 [DG-033]. While the Group has a portfolio of development projects and opportunities which are expected, in the near- to medium-term, to generate revenues and materially improve liquidity, its capital structure is unsustainable and requires a comprehensive balance sheet restructuring.

18.     The restructuring being pursued, the terms of which are embodied in a Restructuring Support Agreement dated March 17, 2026, and entered into, among others, the Parent, NFE Global, and certain of its lenders and noteholders discussed in ¶¶ 6.13–6.19 of the PSL and detailed in ¶ 8.1 of the PSL (the "**RSA**"), is intended to address these issues by effecting a substantial deleveraging of the balance sheet, including through the conversion of a significant proportion of existing debt into equity, extending or addressing maturities under the Plan Debt, separating the Group's Brazilian business into an independent entity, and providing access to new money financing and other sources of liquidity, thereby aligning the capital structure with expected future revenue generation (the "**Restructuring**").  [DG-037, 040]

**The Plans**

10

ACTIVE/206784363.2

19.     The Plan Companies intend to promote, respectively, the CoreCo Plan and the BrazilCo Plan as restructuring plans pursuant to Part 26A of the Companies Act 2006, PSL ¶ 1.5 [DG-019].  The CoreCo Plan will become effective if (a) CoreCo Plan Creditors approve the CoreCo Plan by 75% in value of each class of creditors present in person or by proxy and voting at each meeting convened to approve the CoreCo Plan, or (b) if the restructuring plan is not approved by the requisite majority of creditors in each class (any such class not approving being the "**Dissenting Class**"), the Court sanctions the CoreCo Plan notwithstanding such dissent, being satisfied that, (i) none of the members of the Dissenting Class would be any worse off than they would be in the event of the '*relevant alternative*',[15] and (ii) that the CoreCo Plan has been approved by at least one class of creditors who would receive a payment, or have a genuine economic interest in the company, in the event of the Relevant alternative, (c) the English Court makes an order sanctioning the CoreCo Plan, and (d) a copy of the order sanctioning the CoreCo Plan and the BrazilCo Plan is delivered to the Registrar of Companies.  PSL ¶ 2.3.1 [DG-023].

20.     The BrazilCo Plan will become effective if (a) the single class of BrazilCo Creditors approves the BrazilCo plan by 75% in value of the class of creditors present in person or by proxy and voting at the meeting convened to approve the BrazilCo Plan, (b) the English Court makes an order sanctioning (approving) the BrazilCo Plan, and (c) a copy of the order sanctioning the BrazilCo Plan and the CoreCo Plan is delivered to the Registrar of Companies. PSL ¶ 2.3.1 [DG-023].

21.     The Plans are inter-conditional and form an integral part of the wider Restructuring and, if approved by the requisite majorities of Plan Creditors and sanctioned by the Court, will facilitate the implementation of the Group's recapitalisation (the "**Recapitalisation Transaction**"). In particular, the Plans provide for a compromise of the Plan Debt in exchange for Plan Consideration allocated by reference to existing rights and recourse to the relevant collateral pools, as set out in PSL Section 9 (Rights Subject to the Plans). PSL ¶¶ 9.2–9.3 [DG-048].

---

[15] The relevant alternative is in relation to a proposed restructuring plan, whatever the English Court considers would be most likely to occur in relation to the company if the plan were not sanctioned (the "**Relevant Alternative**").  PSL ¶2.3.1 [DG-023]

ACTIVE/206784363.2

22.      The purposes and objectives of the Plans are to: restructure the Plan Companies' and the Group's balance sheet; address approaching maturities under the Plan Debt and enter into new debt and preferred equity finance arrangements that provide the Group and the Plan Companies with a sustainable capital structure; enable access to new money financing to meet near-to medium-term liquidity needs; separate the Group's Brazilian business into an independent entity; and facilitate the restructuring of the Group pursuant to the Restructuring. PSL ¶ 7.1.  [DG-031]

23.      The Plan Companies advise that in issuing equity securities in exchange for existing debt, they intend (i) to rely on the exemption to the registration requirements of the Securities Act set forth in Section 3(a)(10) of the Securities Act  and (ii) to rely on the sanction of the Plans as constituting approval of the Plans and the transactions contemplated thereby following a hearing on the procedural and substantive fairness of the Plans, at which all Plan Creditors will receive adequate notice and have the right to appear and be heard. PSL ¶18. [DG-069]

24.      The Plan Companies have asked that, in addition to providing my opinion on the issues denominated in paragraph 4 above, I explain Section 3(a)(10) of the Securities Act to the English Court.  Section 3(a)(10) provides a registration exemption for securities issued in exchange for other securities, claims, or property interests (but not cash, other than in certain limited circumstances) where a court or a governmental entity which is authorized by law to do so approves the fairness of the exchange terms after a hearing at which affected parties have the right to appear, and of which all affected parties have adequate notice. The Securities and Exchange Commission (the "**SEC**") has confirmed, in Staff Legal Bulletin No. 3A (the "**Bulletin 3A**"), that such authority may include foreign courts.[16] Specifically, Section 3(a)(10) provides that the provisions of the Securities Act shall not apply to:

---

[16] Bulletin 3A states that "[i]t is the Division's view the term 'any court' in Section 3(a)(10) may include a foreign court." *Id.* § B.4 (citing *SanDisk Corp.* (Sept. 21, 2026); *AngloGold Ltd.* (Jan. 15, 2024); *Constellation Brands, Inc.* (Jan. 29, 2023); *Galen Holdings PLC* (Aug. 7, 2000); *Lucas Industries plc* (Aug. 20, 1996); *Symantec Corp.* (Nov. 22, 1995); *Orbital Sciences Corp.* (Oct. 13, 1995)).  One of the cases named in a footnote to this quotation, AngloGold Ltd. was a Ghanian scheme of arrangement.  A case named in a footnote to identical language in a 1999 version of the bulletin, the Hongkong and Shanghai Banking Corporation Ltd. (January 21, 1991), was a Hong Kong scheme of arrangement.

12

342

Except with respect to a security exchanged in a case under title 11 [(i.e., the US Bankruptcy Code])[17], any security which is issued in exchange for one or more bona fide outstanding securities, claims or property interests, or partly in such exchange and partly for cash, where the terms and conditions of such issuance and exchange are approved, after a hearing upon the fairness of such terms and conditions at which all persons to whom it is proposed to issue securities in such exchange shall have the right to appear, by any court, or by any official or agency of the United States, or by any State or Territorial banking or insurance commission or other governmental authority expressly authorized by law to grant such approval

25.     Bulletin 3A states that, in order for the issuer to rely on the exemption (i) the securities must be issued in exchange for securities, claims, or property interests (other than cash), (ii) the court must be advised in advance that the issuer intends to rely on the exemption based on the court's approval, (iii) the court must hold a hearing on the procedural and substantive fairness of the exchange, (iv) such hearing to be open to and notified in an adequately timely manner to those receiving the new securities, (v) the court must approve the fairness of the terms and conditions of the exchange before the issuance of the new securities, and (vi) a governmental entity must be expressly authorized by law to hold the hearing, although it is not necessary that the law require the hearing.

26.     As set forth in parts 16 and 19 of the PSL and as I have been advised by Counsel to the Plan Companies, all Plan Creditors will receive notice of the Plans and will have an opportunity to vote whether to accept or reject the Plans, that at the sanction hearing the English Court will scrutinize whether the terms of the Plans, including the exchanges contemplated by the Plans, are procedurally and substantively fair and equitable to the classes of stakeholder receiving consideration under the Plans ("**Sanction Hearing**"), that if the English Court sees fit to issue a sanction order in relation to each Plan, those sanction orders shall approve the fairness of the terms of the Plans ("**Sanction Order**"), and that the Sanction Hearing to be held by the English Court should thereby satisfy the fairness hearing requirement in Section 3(a)(10).

27.     Provided that the foregoing is correct, and subject to the English Court being satisfied at the Sanction Hearing that the requirements of procedural and substantive fairness are met,

---

[17] As stated in note 2, Title 11 is the Bankruptcy Code.  The Bankruptcy Code is excepted from Section 3(a)(10) because it contains a parallel exemption for securities issued pursuant to a chapter 11 plan of reorganization.  11 U.S.C. §1145(a)(1).]

13

the Plan Companies should be able to rely on the exemption under Section 3(a)(10) of the Securities Act, which should permit the Plan Companies to issue securities pursuant to the Plans without registration.

28.      In the context of the most likely alternative to the Plans, each Plan Company has considered: (i) the relevant rights of the Plan Creditors against it in the Relevant Alternative if the Plans and the Restructuring were not to be implemented; and (ii) how the Plan Creditors' current rights are proposed to be compromised under the Plans. NFE Global has concluded that the CoreCo Plan Creditors fall into six classes for the purposes of voting on the CoreCo Plan while NFE Brazil Newco has concluded that the BrazilCo Plan Creditors fall into one class for the purposes of voting on the BrazilCo Plan.  PSL ¶¶ 10.3.1, 10.3.2  [DG-056]  As noted in ¶ 35 below, the BrazilCo Plan is necessary to enable approval of the modifications of the 2029 New Notes embodied in the restructuring of the 2029 New Notes without requiring the unanimous consent of the noteholders.

29.      Each Plan Company intends to promote the relevant Plan, which together implement the Recapitalisation Transaction and each intends to apply to the Court at a joint Convening Hearing for an order (the "**Convening Order**") granting each of the Plan Companies certain directions in relation to the Plans, including permission to convene the Plan Meetings for the purpose of the Plan Creditors considering and, if thought fit, approving the Plans.  PSL ¶ 1.5. [DG-019] The Convening Hearing is scheduled for  May 14, 2026.  Plan Creditors are entitled to attend the Convening Hearing in person or through counsel and to make representations at the Convening Hearing, although they are not obliged to do so.  PSL ¶16. [DG-068]

30.      At the Convening Hearing, the Court will consider whether or not to make an order convening the Plan Meetings of the Plan Creditors.  In doing so, the Court will consider: the purpose and effects of the Plans and the Restructuring as discussed in the PSL, including the objectives of the plans, the overview of the restructuring; the Relevant Alternative to the Plans and the consequences if the Plans are not successful; whether it has jurisdiction to convene the Plan Meetings; the class composition; and any considerations or "roadblocks" that might preclude the Court from exercising its sanction discretion at the sanction hearing.  The Plan

14

Companies will also draw to the Court's attention: any Creditor Issues; and any (other) issues raised by any Plan Creditor in response to the PSL.  PSL ¶¶ 15.4–15.5 [DG-067]

31.     If permission to convene the Plan Meetings is granted by the Court at the Convening Hearing, the Plan Companies will convene the Plan Meetings by notifying the respective Plan Creditors in accordance with the directions of the Court of the time and date of and means of attending the Plan Meetings and will make the Plan Documents available to the Plan Creditors.  PSL ¶17.1 [DG-069]

32.     Following the Plan Meetings, provided that the requisite majorities of Plan Creditors vote in favor of the Plans, the Plan Companies intend to apply at the Sanction Hearing for an order sanctioning the Plans.  The Sanction Hearing is currently scheduled for June 18, 2026. PSL ¶ 19.1–19.2. [DG----] Plan Creditors are entitled to attend the Sanction Hearing in person or through counsel and to make representations at the sanction hearing, although they are not obliged to do so.  At the Sanction Hearing, the Court will consider whether or not to make an order sanctioning the Plans.  In doing so, the Court will consider whether:  the provisions of the statute have been complied with, including questions of class composition, whether the statutory majorities were obtained, and whether an adequate explanatory statement was distributed to the creditors. PSL ¶ 19.5 [DG-070]

33.     To invoke the Court's jurisdiction, it must be shown, inter alia, that (a) the applicant company has encountered or is likely to encounter financial difficulties that are affecting or will or may affect its ability to carry on business as a going concern.  The Plan Companies have encountered significant financial difficulties, described in PSL Section 6, which are affecting its (and the Group's) ability to carry on business as a going concern and, absent the Plans, are expected to face the Relevant Alternative.  PSL Section 6.2 [DG-034] It must also be shown that the proposals under the Plans are a "compromise" or "arrangement" between the relevant Plan Company and the relevant Plan Creditors.  The Plans contain the requisite elements of "give and take" in respect of each class of Plan Creditors in order to constitute a "compromise" or "arrangement" for these purposes.  PSL ¶¶ 13.1 [DG-065]

34.     A restructuring plan will become effective if:

15

i.      either:

(A)     **approval of each class**: the restructuring plan is approved by a number representing at least 75 per cent. in value of each class of creditors and/or members of the Plan Company present in person or by proxy and voting at each meeting convened to approve the restructuring plan; or

(B)     **cross-class cram down**: if the restructuring plan is not approved by the requisite majority of creditors in each class:

(i)     the Court is satisfied that, if the restructuring plan is sanctioned, none of the members of the Dissenting Class would be any worse off than they would be in the event of the '*relevant alternative*'.  The relevant alternative is whatever the Court considers to be the most likely alternative if the restructuring plan is not sanctioned; and

(ii)    the restructuring plan has been approved by 75 per cent. in value of any class that would receive a payment, or have a genuine economic interest in the Plan Company, in the event of the relevant alternative; and

ii.     the Plan is approved by the English Court by the making of an order sanctioning the restructuring plan; and

iii.    a copy of the order sanctioning the restructuring plan is delivered to the Registrar of Companies.

Once effective, a restructuring plan will bind all the creditors and members subject to it, whether or not those creditors or members voted in favor of it or voted against it or did not vote at all and, in each case, their successors and assigns.  PSL Part 2. [DG-023]

16

35.     The Plans will: (i) authorize the Plan Companies to implement the Restructuring in accordance with the Plans and the Transaction Implementation Deed, with effect from the Restructuring Effective Date, (ii) grant authority to the Plan Companies to execute the documents required to implement the transactions contemplated by the Plans to which the Plan Creditors are party in their capacity as Plan Creditors, on behalf of the Plan Creditors, including the Transaction Implementation Deed, and the additional documents identified in PSL; (iii) implement certain of the transactions contemplated by the Plans; and (iv) set out the order in which the steps required to implement the Restructuring will take place . PSL ¶ 7.2.2. [DG-039]

36.     On March 17, 2026, prior to the commencement of the English Proceedings, NFE Financing, the Issuer under the Indenture, issued the Consent Solicitation Statement seeking consents from the Holders of the 2029 New Notes to the Indenture Amendments, including (a) authorization to form NFE Brazil Newco and for NFE Brazil Newco to accede to the Indenture as a guarantor and (b) the provision for NFE Brazil Newco as new guarantor to maintain a collateral account with assets of up to $50,000 without delivering a control agreement to the Notes Collateral Agent, so as to facilitate the NFE Brazil Newco's promotion of the BrazilCo Plan and related matters, Consent Solicitation p. 15.  [DG-401]  Absent an authorizing amendment, NFE Financing would be prevented by provisions in the Indenture from owning or acquiring equity interests or having any subsidiaries, other than specified exceptions, and from maintaining a collateral account not subject to a control agreement:

> Section 4.15 Notwithstanding anything to the contrary set forth in this Indenture, no Note Party shall (other than any Subsidiary formed or acquired during a Suspension Period), (a) directly acquire or own any Equity Interests (other than, solely with respect to the Issuer, the Equity Interests of NFE Brazil Holdings Limited and Bradford County Real Estate Partners LLC) or (b) have any Subsidiaries (other than, solely with respect to the Issuer, Bradford County Real Estate Partners LLC).

> Section 4.18  (b) the Issuer shall not: … (12) form, acquire, hold or own directly any equity interests (whether corporate, partnership, limited liability company or other) other than equity interests of NFE Brazil Holdings Limited and Bradford County Real Estate Partners LLC.

> Section 12.07(b) [N]o later than 90 days after the Issue Date, each Note Party shall deliver a Collateral Agreement to the Notes Collateral Agent for each Deposit Account, securities account, and commodities account of each Note Party, in each

17

case, in form and substance reasonably satisfactory to the Notes Collateral Agent. Notwithstanding anything to the contrary in this Agreement or any Security Document, at all times, each Deposit Account, securities account, and commodities account established and/or maintained by each Note Party must be subject to a Control Agreement except as otherwise agreed by the Notes Collateral Agent in its reasonable discretion…

37.     Section 9.02 of the Indenture permits the Indenture to be amended with the consent of the holders of at least a majority in aggregate principal amount of the outstanding 2029 New Notes[18] and obligates the Trustee to sign an amended Indenture and certain related documents upon satisfaction of specified conditions:

> Upon the request of the Issuer and upon the filing with the Trustee of evidence satisfactory to the Trustee of the consent of the Holders as aforesaid, and upon receipt by the Trustee of the documents described in Section 9.06, the Trustee and/or the Notes Collateral Agent shall join with Note Parties in the execution of any amended or supplemental indenture or security documents or intercreditor agreements authorized or not prohibited by the terms of this Indenture and to make any further appropriate agreements and stipulations that may be therein contained, but the Trustee and/or the Notes Collateral Agent shall not be obligated to enter into such amended or supplemental indenture or security documents or intercreditor agreements that directly affect its own rights, duties or immunities under this Indenture or otherwise.[19]

38.     The Indenture Amendments, as approved pursuant to the Consent Solicitation, permit the formation and ownership of the equity of NFE Brazil Newco as a new subsidiary and the creation of an unencumbered collateral account.

---

[18] Certain amendments, enumerated in Section 9.02 but not here relevant, require the consent of all holders.  [**DG‑‑211**] See discussion beginning at ¶ 43 explaining that the Holder authorized holders of beneficial interests to provide consents pursuant to the Consent Solicitation.

[19] Section 9.06 of the Indenture states:  "The Trustee and the Notes Collateral Agent shall sign any amendment, supplement or waiver authorized pursuant to this Article 9 if the amendment or supplement does not adversely affect the rights, duties, liabilities or immunities of the Trustee and the Notes Collateral Agent. The Issuer may not sign an amendment, supplement or waiver until its Board approves it. In executing any amendment, supplement or waiver, the Trustee shall receive and (subject to Section 7.01) shall be fully protected in relying upon, in addition to the documents required by Section 13.04, an Officer's Certificate and an Opinion of Counsel stating that the execution of such amended or supplemental indenture or security documents or intercreditor agreements is authorized or not prohibited by this Indenture and that such amendment, supplement or waiver is the legal, valid and binding obligation of each Note Party, enforceable against them in accordance with its terms, subject to customary exceptions, and complies with the provisions hereof."  The Resolutions evidence the approval by Issuer's Board of the Indenture Amendments.  [DG‑213]

18

ACTIVE/206784363.2

39.     Section 4.15 of the Indenture requires that any of the Issuer's new subsidiaries, such as NFE Brazil Newco, provide a Note Guarantee:

… within five Business Days [of] such Subsidiary becoming a Wholly-Owned Subsidiary and (ii) the Issuer determining such Subsidiary ceased to meet any of the exceptions set forth in the preceding parenthetical, execute and deliver a supplemental indenture to this Indenture, substantially in the form attached as Exhibit F hereto, providing for a Note Guarantee by such Subsidiary …

40.     Also prior to the commencement of the English Proceedings, NFE Brazil Newco became a guarantor to the Indenture pursuant to Indenture Section 4.15 by entering into the Second Supplemental Indenture substantially on the form of Exhibit F to the Indenture.  PSL ¶ 4.4 [DG-025]

41.     Similarly, the maintenance of a collateral account by NFE Brazil Newco which is not subject to a control agreement would be prohibited by Section 12.07 of the Indenture and approval of the Indenture Amendments permits NFE Brazil Newco to maintain such an account where the balance does not exceed $50,000.[20]

42.     Counsel advises that the Trustee has received the directors' certificates and legal opinions required by Section 13.04 of the Indenture and it and the Issuer have signed the First Supplemental Indenture and the Second Supplemental Indenture embodying the Indenture Amendments.  [DG-371]

## Construction Of Contracts Under New York Law

43.     New York law confirms that the express language of contracts governs determination of the parties' rights: "The proper interpretation of an unambiguous contract is a question of law for the court," and "courts are to enforce them as written."  Reyes v. Metromedia Software, Inc., 840 F.Supp.2d 752, 755 (S.D.N.Y. 2012) (quoting Omni Quartz, Ltd. v. CVS Corp., 287 F.3d 61, 64 (2d Cir. 2002); and then quoting Vill. of Sylvan Beach v. Travelers Indem. Co., 55 F.3d 114, 115 (2d Cir. 1995)).  The fact that the relevant contract is an "Indenture" does not result in the application of different principles.  New York law confirms

---

[20] Section 12.07 provides, inter alia, "no later than 90 days after the Issue Date, each Note Party shall deliver a Collateral Agreement to the Notes Collateral Agent for each Deposit Account…".  [DG-222]

19

that the language of the Indenture governs determination of whether the Indenture

Amendments have been properly authorized.  Courts applying New York law consistently

treat indentures as contracts to be interpreted under basic contract law.  For example, in

answering questions posed by the Supreme Court of the State of Delaware relative to a "no-

action clause" in an indenture, the Court of Appeals of New York (New York's highest court)

stated:

> A trust indenture is a contract, and under New York law "[i]nterpretation of
> indenture provisions is a matter of basic contract law" (*Sharon Steel Corp. v Chase
> Manhattan Bank, N.A.*, 691 F2d 1039, 1049 [2d Cir 1982]; *see also* Thomas Lee
> Hazen, The Law of Securities Regulation § 19.1 at 467 [6th ed] [referring to
> indenture as a contract]; *Racepoint Partners, LLC v JPMorgan Chase Bank, N.A.*,
> 14 NY3d 419 [2010] [same]; *AG Capital Funding Partners, L.P. v State St. Bank &
> Trust Co.*, 11 NY3d 146 [2008] [same]).
>
> In construing a contract, we look to its language, for 'a written agreement that is
> complete, clear and unambiguous on its face must be enforced according to the plain
> meaning of its terms'….
>
> Quadrant Structured Prods. Co. v. Vertin, 23 N.Y.3d 549, 559 (2014) (internal
> citations omitted).

44.    The United States Bankruptcy Court for the Southern District of New York adopted

the same analysis in In re K-V Discovery Sols., Inc., 496 B.R. 330, 337-38 (Bankr. S.D.N.Y.

2013), a case concerning subordination provisions of an indenture:

> Indentures are contracts, to be construed in accordance with ordinary contractual
> principles. In a very recent decision, the Second Circuit quoted prior authority and
> held that "It is a well-established rule in this Circuit that the 'interpretation of
> Indenture provisions is a matter of basic contract law.'" *Bank of New York Trust Co.
> N.A. v. Franklin Advisers, Inc.,* 726 F.3d 269, 277–78, 2013 WL3942430 at *5 (2d
> Cir. Aug. 1, 2013), quoting *Jamie Sec. Co. v. The Ltd., Inc.,* 880 F.2d 1572, 1576
> (2d Cir.1989), which in turn quoted *Sharon Steel Corp. v. Chase Manhattan Bank
> ,*691 F.2d 1039, 1049 (2d Cir.1982). Under basic principles of contract law in New
> York, whose law governs the Indenture, words are to be given their plain reading.
> *LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.,* 424 F.3d 195, 206 (2d
> Cir.2005) ("under New York law, 'words and phrases ... should be given their plain
> meaning'") ….

45.    The objective of these principles of contract interpretation is to "give effect to the

intent of the parties as revealed by the language of their agreement." In re Motors Liquidation

ACTIVE/206784363.2

Co., 943 F.3d 125, 131 (2d Cir. 2019) (first quoting <u>Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co.</u>, 773 F.3d 110, 113-14 (2d Cir. 2014), which was, in turn, quoting <u>Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 232 F.3d 153, 157 (2d Cir. 2000)). Similarly, the inquiry should be limited to the language of the indenture. <u>See</u> <u>In re Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.</u>, 716 F. Supp. 1504, 1515 (S.D.N.Y. 1989) (citing to New York decisions).[21] While New York decisions also establish principles applicable to determining if a contract is ambiguous and, in case of ambiguity, for accepting extrinsic evidence to determine the parties' intent,[22] the amendment provisions of the Indenture are, in my opinion, clear and unambiguous and their interpretation does not require extrinsic evidence.

46.     From the language contained in Section 9.02 of the Indenture, consent by holders of a majority in principal amount of the 2029 New Notes then outstanding would be sufficient to approve the Indenture Amendments. The Information and Tabulation Agent Certificate reports that Required Consents to the Indenture Amendments were submitted by Holders of over 50% of the aggregate principal amount outstanding of the 2029 New Notes. Information and Tabulation Agent Certificate.[23] [DG-406] In addition, the Resolutions reflect the approval required by Section 9.06 of the Indenture for the Issuer to sign the Supplemental Indentures and I am advised that the First Supplemental Indenture was executed on April 3, 2026, and the Second Supplemental Indenture was executed on April 9, 2026. Upon execution of the Supplemental Indentures, the Indenture Amendments became valid and enforceable under the terms of the Indenture and the governing New York law. In my opinion the Consents properly authorized the Indenture Amendments under the Indenture and New York law. The Supplemental Indentures, which are in the form required by Exhibit F to the Indenture,

---

[21] These principles of contract interpretation were confirmed in a decision by the U.S. Bankruptcy Court for the District of Delaware, applying New York law:  "All of the various agreements are governed by New York Law.  Under New York Law, a contract's 'words should be given the meanings ordinarily ascribed to them.'  Contractual language 'should be examined in light of the business purposes sought to be achieved by the parties and the plain meaning of the words chosen by them to effect those purposes."  Moreover, New York Law is clear that 'especially in the context of a commercial contract negotiated at arm's length by [ ] sophisticated [parties],' the role of the court, when confronted with a written contract that is 'clear' and 'complete,' is simply to 'enforce[ ] [the writing] according to its terms.'  <u>In re TPC Group Inc.</u>, 2022 WL 2498751 (Bankr. D. Del, Jul. 6, 2022).

[22] <u>See, e.g.</u>, <u>Olin Corp. v. Am. Home Ins. Co.</u>, 704 F. 3d 89, 99 (2d Cir. 2012).

[23] The Information and Tabulation Agent Certificate shows that consents were received from 99.35% of the holders of 2029 New Notes.  [DG-406]

21

ACTIVE/206784363.2

incorporate the Indenture Amendments and properly document the Indenture Amendments pursuant to the Indenture and New York law. The Supplemental Indentures conform to the requirements of the Indenture and are binding and effective under New York law to enable NFE Financing to form and own NFE Brazil Newco as a subsidiary, to enable NFE Brazil Newco to become a Guarantor of the 2029 New Notes, and to enable NFE Brazil Newco to maintain a collateral account of up to $50,000 without signing a control agreement to the Notes Collateral Agent.[24]

## Authorization For The Consents

47.     The Consent Solicitation seeks consents to the Indenture Amendments from "Holders" of the 2029 New Notes (the "**Consents**"). For purposes of the Solicitation, "Holders" comprise the ultimate beneficial owners of the Notes (the "**Beneficial Owners**") and the DTC participants that hold the Beneficial Owners' interests in the 2029 New Notes (the "**Participants**"), and not Holders as defined in the Indenture.[25] However, the Indenture permits DTC as Holder to grant proxies to Participants or Beneficial Owners to take actions under the Indenture such as providing consents to the Indenture Amendments.[26] The Consent Solicitation was conducted so as to be eligible for use of the Automated Tender Offer Program ("ATOP") of DTC, pursuant to which Participants could deliver Consents on behalf of Holders. Consent Solicitation p. 10. [DG-396]. It contemplates that the Beneficial Owners will direct their Participants to cause a consent to be delivered to the Information and Tabulation Agent. In this context, the Beneficial Owners probably do need to act as Holders but the language of the Consent Solicitation refers to the Requisite Consents as valid consents

---

[24] From the perspective of the Indenture and New York law, the amendment of the LLCA has also been properly approved but I cannot opine on the Delaware law implications of this approval.

[25] The Indenture contains the following definition: "Holder" means the Person in whose name a Note is registered on the registrar's books. [DG-112] The Consent Solicitation states that the 2029 New Notes are registered in the name of Cede & Co., the nominee of DTC. Consent Solicitation, p. 1. [DG-382] Consequently, DTC, through its nominee, is the Holder. The Indenture states in ¶1.07(c) " The ownership of Notes shall be proved by the Note Register, and a Person registered as the Holder of a Note in the Note Register shall be treated as the owner of such Note for all purposes, absent manifest error.  [DG-139]

[26] Paragraph 1.07(g) of the Indenture states: "(g) Without limiting the generality of the foregoing, a Holder, including DTC that is the Holder of a Global Note, may make, give or take, by a proxy or proxies duly appointed in writing, any request, demand, authorization, direction, notice, consent, waiver or other action provided in this Indenture to be made, given or taken by Holders, and DTC that is the Holder of a Global Note may provide its proxy or proxies to the beneficial owners of interests in any such Global Note through such depositary's standing instructions and customary practices." [DG-139]

22

ACTIVE/206784363.2

from Holders of at least a majority in amount of the outstanding 2029 New Notes and might be read to refer to the Beneficial Owners.  Consent Solicitation p. 3.  [DG-389]  As discussed below, the Beneficial Owners can direct their Participants to provide Consents but, alternatively, if treating them as Holders were necessary, they have implied authority to act as Holders.

48.     DTC and its participants are subject to governing New York law, including Article 8 of the Uniform Commercial Code.  Under Article 8, a Beneficial Owner has an account with a Participant as a securities intermediary, which in turn has an account with DTC (both being securities intermediaries), showing an indirect beneficial ownership in a fungible portion of the a 2029 New Note. Under governing Article 8, the Beneficial Owner is an "entitlement holder" holding only a "securities entitlement" to a pro rata share of the "financial asset" held by the Participant, a "securities intermediary." The financial asset comprises the Beneficial Owner's rights against the Participant, which in turn has rights against DTC with respect to the 2029 New Notes.[27]   The Beneficial Owner can direct the Participant to act and the Participant has a duty to follow the directions.[28]

---

[27] New York Uniform Commercial Code, Article 8, Investment Securities. Article 8 essentially creates a chain where a beneficial owner can direct its intermediary, Participant, to consent to an act under the Indenture. The Participant can then act to consent as a Holder, either based on a specific or implied grant of authority from DTC.
Article 8 §8-501(c).
§ 8-501 Section 8--501. Securities Account; Acquisition of Security Entitlement from Securities Intermediary.
(a) 'Securities account" means an account to which a financial asset is or may be credited in accordance with an agreement under which the person maintaining the account undertakes to treat the person for whom the account is maintained as entitled to exercise the rights that comprise the financial asset.
(b) Except as otherwise provided in subsections (d) and (e), a person acquires a security entitlement if a securities intermediary:  (1) indicates by book entry that a financial asset has been credited to the person's securities account…'

The leading treatise on Article 8 confirms that a Beneficial Owner can act only against its intermediary, and not against any other person:
§ 8-503:5 Enforcement of entitlement holders' property interest—In general … a security entitlement is not a discrete claim to a specific identifiable item. Rather, it is a package of rights against the intermediary and interest in the property held by the intermediary…. The core content of a security entitlement is the right of the entitlement holder to be treated as entitled to all of the economic and corporate rights that comprise the underlying financial asset. That is a right which runs against the entitlement holder's own intermediary. As the Official Comment notes: [*one of the] fundamental principles of the indirect holding system rules [is] that the entitlement holder can look only to that intermediary for performance of the obligations. The entitlement holder cannot assert rights directly against other persons*, such as other intermediaries through whom the intermediary holds the positions …" (emphasis added).  Hawkland, et al, Hawkland's Uniform Commercial Code Series, §§8-503, 8-506.
[28] §8-506 Duty of Securities Intermediary to Exercise Rights as Directed by an Entitlement Holder. A securities intermediary shall exercise rights with respect to a financial asset if directed to do so by an entitlement holder.

23

49.     In addition, New York law recognizes that authority to act can be granted either explicitly or implicitly[29] and that:

> [a]ctual authority is created by direct manifestations from the principal to the agent, and the extent of the agent's actual authority is interpreted in the light of all circumstances attending those manifestations, including the customs of business, the subject matter, any formal agreement between the parties, and the facts of which both parties are aware.  Highland Capital Management LP v. Schneider, 607 F.3d 322, 327 (2d Cir. 2010).[30]

50.     The participation of DTC in the Consent Solicitation and the use of its ATOP Procedures to gather consents are direct manifestations that provide implicit, actual authority to the Beneficial Owners and to the DTC Participants that hold 2029 New Notes for themselves or for the ultimate Beneficial Owners to act as or on behalf of the holders of 2029 New Notes to provide consents to the Indenture Amendments.

**Recognition Of The English Proceedings In The United States And Grant Of Additional Relief**

51.     Section 1517 of the Bankruptcy Code sets forth the requirements for recognition of a foreign proceeding.  If these requirements are met and if recognition would not be "manifestly contrary" to the public policy of the United States, a bankruptcy court can issue an order granting recognition of a foreign proceeding as either a "foreign main" proceeding or a "foreign nonmain" proceeding.  11 U.S.C. §§ 1517(a), (b)(1)-(2), 1506.  Section 1520 of the Bankruptcy Code sets forth the terms of certain automatic relief granted upon recognition of a foreign main proceeding.  Sections 1521 and 1522 of the Bankruptcy Code set forth the provisions for additional relief that may be granted upon recognition and the conditions to granting such additional relief.  Section 1507 of the Bankruptcy Code sets forth provisions

---

[29] Restatement (Third) Of Agency § 2.01 (2006) (cmt. B. "As commonly used, the term "express authority" often means actual authority that a principal has stated in very specific or detailed language…. "Implied authority" is often used to mean actual authority either (1) to do what is necessary, usual, and proper to accomplish or perform an agent's express responsibilities or (2) to act in a manner in which an agent believes the principal wishes the agent to act based on the agent's reasonable interpretation of the principal's manifestation in light of the principal's objectives and other facts known to the agent. These meanings are not mutually exclusive. Both fall within the definition of actual authority."
[30] Citing Peltz v. SHB Commodities, Inc., 115 F.3d 1082, 1088 (2d Cir.1997).

24

ACTIVE/206784363.2

pursuant to which additional assistance may be granted to the foreign representative, as defined by section 101(24) of the Bankruptcy Code ("**Foreign Representative**").[31]

52.     Since case law on recognition and relief under chapter 15 of the Bankruptcy Code continues to evolve and courts may vary in their interpretation of relevant facts and legal principles, my analysis reflects only my opinion of how the US Bankruptcy Court will most likely rule with respect to the Plans.  My opinion is informed by the fact that United States bankruptcy courts have frequently granted recognition under chapter 15 to restructuring plans and schemes of arrangement sanctioned in England & Wales and other countries with a British legal heritage and, in most instances, have also granted, as additional relief, full force and effect to the terms of those restructuring plans and schemes.

**Recognition – Eligibility To Be A Debtor Under The Bankruptcy Code**

53.     The US Bankruptcy Court is within the Second Circuit of the United States federal court system and is bound to follow the precedent of the United States Court of Appeals for the Second Circuit (the "**Second Circuit Court of Appeals**").  As a threshold matter, the Second Circuit Court of Appeals has held that a debtor that is the subject of a foreign proceeding must meet the requirements of section 109(a) of the Bankruptcy Code before a bankruptcy court may grant recognition of the foreign proceeding in chapter 15.  Drawbridge Special Opportunities Fund LP v. Barnet (*In re* Barnet), 737 F.3d 238, 247 (2d Cir. 2013). Section 109(a) provides the general criteria for eligibility to be a debtor in a case under the Bankruptcy Code, and requires specifically that a debtor either reside in or have a domicile, a place of business, or property in the United States.[32]

54.     Assuming that each of the Plan Companies has property in the United States (whether in the form of a retainer deposited with its Counsel in New York or otherwise), the Plan

---

[31]See discussion of Foreign Representative at ¶¶ 70-72 below.

[32]While the decision in the Barnet case has been criticized, it is binding on bankruptcy courts within the Second Circuit, including the Southern District of New York.  *See* In re Berau Capital Resources Pte Ltd, 540 B.R. 80, 81-82 (Bankr. S.D.N.Y. 2015), citing Daniel M. Glosband and Jay Lawrence Westbrook, Chapter 15 Recognition in the United States: Is a Debtor "Presence" Required?, 24 Int. Insolv. Rev. 28 (2015).  The only other Circuit Court to address this issue ruled that §109(a) did not apply to chapter 15 eligibility.  In re Al Zawawi, 97 F.4th 1244 (11th Cir., 2024).

25

Companies would meet the threshold eligibility requirement imposed in the Second Circuit.[33] The Plan Companies advise that they each have deposited such a retainer with their Counsel in a bank account in New York. In addition, the Plan Companies are each guarantors of indebtedness under, respectively, the Indenture (NFE Brazil Newco) and the Corporate Debt (NFE Global) which include New York governing law and forum clauses. Consequently, they have contract rights in respect of those documents which comprise intangible property in New York that also satisfy the section 109(a) requirement.[34]

## Recognition – Satisfaction Of Elements Of Section 1517

55.     Section 1517(a) of the Bankruptcy Code provides that, subject to section 1506 of the Bankruptcy Code (the public policy exception),[35] an order recognizing a foreign proceeding shall be entered, after notice and a hearing, "if – (1) such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502; (2) the foreign representative applying for recognition is a person or a body; and (3) the petition meets the requirements of section 1515." 11 U.S.C. § 1517(a)(1)-(3). Section 1517 employs terms defined elsewhere in the Bankruptcy Code and interpolates those definitional provisions among the requirements for recognition. Specifically, section 101(23) defines "foreign proceeding," section 101(24) defines "foreign representative," section 1502(4) defines "foreign main proceeding" and section 1502(5) defines "foreign nonmain proceeding."

---

[33]Bankruptcy courts within the Second Circuit have regularly confirmed that minimal property is required to satisfy §109(a) and that an attorney retainer satisfies the requirement. See, e.g., In re B.C.I. Finances Pty Limited, 671 B.R. 669, 672 (Bankr. S.D.N.Y. 2025) ("As all courts that have addressed this issue have held, the text of section 109(a)'s property requirement is unambiguous: It requires only that the debtor have *some* property in the United States, no matter how small and no matter when or why acquired.").

[34] Contract rights are intangible property of a debtor which also satisfy the "property" requirement of § 109(a). In re Berau Capital Resources Pte, 540 B.R. 80, 83-84 (Bankr. S.D.N.Y. 2015).

[35]Section 1506 of the Bankruptcy Code provides: "Nothing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506. In my opinion, the Restructuring Plan does not present any public policy issues as contemplated by section 1506. U.S. bankruptcy courts routinely grant recognition to foreign proceedings pending in the United Kingdom and other former British Commonwealth countries. *See* ¶ 67 infra. In addition, the Restructuring (which the Restructuring Plans are intended to facilitate) is roughly analogous to a restructuring under chapter 11 of the Bankruptcy Code in which either (a) a sufficient majority of impacted creditors have, after notice of the proposed terms, voted to accept their treatment under the plan, or (b) the plan satisfies the requirements for imposition on a non-accepting class, and the plan is ultimately approved by the English Court. Therefore, recognition of the Restructuring Plan is consistent with U.S. public policy.

26

ACTIVE/206784363.2

**The English Proceedings Are Foreign Proceedings**

56.     In my opinion, the English Proceedings each satisfy the definitional requirements of a "foreign proceeding" under section 101(23).  The concept of a "foreign proceeding" under chapter 15 finds its origins in the definition of "foreign proceeding" contained in Article 2(a) of the Model Law.  As set forth in the Guide to Enactment and Interpretation of the Model Law (the "**Guide**"), to fall within the scope of the Model Law, a proceeding must include the following attributes: a basis in insolvency or debt adjustment-related law of the originating State; involvement of creditors collectively; control or supervision of the assets and affairs of the debtor by a court or another official body; and reorganization or liquidation of the debtor as the purpose of the proceeding.  *See* Guide ¶ 66.[36]  This concept is codified in the Bankruptcy Code at Section 101(23), which states:

> The term "foreign proceeding" means a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.[37]

57.     U.S. bankruptcy courts interpret section 101(23) as imposing a seven-part test, each element of which must be satisfied before a proceeding may qualify as a "foreign proceeding" within the scope of chapter 15.  In re ABC Learning Centres Ltd., 728 F.3d 301, 307-08 (3d Cir. 2013), cert. denied, 134 S. Ct. 1283 (2014); In re Betcorp Ltd., 400 B.R. 266, 276-77 (Bankr. D. Nev. 2009); In re Ashapura Minechem Ltd., 480 B.R. 129, 136 (Bankr. S.D.N.Y. 2012); In re Manley Toys Ltd., 580 B.R. 632 (Bankr. D.N.J. 2018), aff'd, 597 B.R. 578 (D.N.J. 2019).[38]  These elements are (i) the existence of a proceeding; (ii) that is either judicial

---

[36]*See* UNCITRAL Model Law on Cross–Border Insolvency with Guide to Enactment and Interpretation (2014), available at https://uncitral.un.org/sites/uncitral.un.org/files/media-documents/uncitral/en/1997-model-law-insol-2013-guide-enactment-e.pdf.  UNCITRAL issued a revised Guide in 2013 that resulted in relocation of paragraphs from the original 1997 Guide.  Citations are to the revised Guide.

[37]In enacting chapter 15, Congress prescribed a rule of interpretation that expressly requires United States courts to take into account the statute's international origin and to promote applications of chapter 15 that are consistent with versions of the Model Law adopted in other jurisdictions. In re Fairfield Sentry Ltd., 714 F.3d 127, 136 (2d Cir. 2013); In re Pro-Fit Int'l, Ltd., 391 B.R. 850, 857 (Bankr. C.D. Cal. 2008); *see also* In re ABC Learning Centres Ltd., 728 F.3d at 304-06. Thus, when interpreting chapter 15, a United States court is instructed to "consider its international origin, and the need to promote an application of [chapter 15] that is consistent with the application of similar statutes adopted by foreign jurisdictions." 11 U.S.C. § 1508.

[38]*See also* In re Serviços de Petróleo Constellation S.A., 600 B.R. 237 (Bankr. S.D.N.Y. 2019) (reviewing the component recognition requirements for each of several entities in a Brazilian reorganization proceeding); In re Olinda

27

or administrative in nature; (iii) that is collective in nature; (iv) in a foreign country; (v) authorized or conducted under a law related to insolvency or the adjustment of debts; (vi) in which the debtor's assets and affairs are subject to the control or supervision of a foreign court; and (vii) which proceeding is for the purpose of reorganization or liquidation. Id. I address each of these elements below in light of U.S. case law interpreting and applying section 101(23).

**Each Plan Proceeding Is A "Proceeding"**

58.     For purposes of section 101(23), the Betcorp opinion endorses the broad definition of proceeding suggested by Council Regulation 1346/2000, O.J. (L 160) (EC), and characterizes the essence of a proceeding as "acts and formalities set down in law so that courts, merchants and creditors can know them in advance, and apply them evenly in practice." 400 B.R. at 278. In re ABC Learning Centres Ltd., 445 B.R. 318 (Bankr. D. Del. 2010), aff'd, 728 F.3d 301 (3d Cir. 2013), cert. denied, 134 S. Ct. 1283 (2014) (quoting and following In re Betcorp Ltd.). Each of the English Proceedings meets the definition of a "proceeding."[39] In this case, the statutory framework is Part 26A of the Companies Act, which sets forth the requirements for the Plan Companies to petition the English Court to initiate and implement processes by which the rights of the BrazilCo Plan Creditors and CoreCo Plan Creditors may be adjusted by way of compromise or arrangement. PSL, *passim.* [DG-016] The Plans will take place in England and are subject to the provisions of the Companies Act. The Plan Companies will be under the supervision and direction of the English Court up to and including final approval of the Plans by entry of an order sanctioning the Plans. Id. In light of the fact that the US Bankruptcy Court has granted chapter 15 recognition to restructuring plan and scheme of arrangement proceedings under laws similar to and including the Companies Act, including

---

Star Ltd*.,* 614 B.R. 28 (Bankr. S.D.N.Y. 2020) (reviewing the requirements for recognition of a BVI proceeding of a debtor member of the Constellation group involved in the Serviços de Petróleo Constellation case).

[39]The fact that the Group is not in default in respect of its several financial arrangements and that the Restructuring Plan may be deemed to involve a solvent debtor is no obstacle to recognition under chapter 15. As the US Bankruptcy Court has held, it is the nature of the proceeding and not the status of the debtor which determines chapter 15 eligibility, and there is no requirement that a foreign debtor in a foreign insolvency proceeding actually be insolvent in order to gain recognition under chapter 15. *See* In re Millard, 501 B.R. 644, 649-50 (Bankr. S.D.N.Y. 2013). I am advised that if the Plans are not sanctioned, the RSA will most likely terminate and the forbearances contained therein will fall away. In such circumstances, the Group will promptly face a number of events of default under the Plan Debt, including material payment defaults under each of the Plan Debt instruments.

28

ACTIVE/206784363.2

to restructuring plan and scheme of arrangement proceedings in England and other countries that follow the English law tradition, it is virtually certain that the Plans will qualify as a "proceeding" under section 101(23).[40]

**The English Proceeding Is Judicial In Nature**

59.    A proceeding is deemed "judicial in nature" under section 101(23) where the proceeding is subject to review by a court.  In re Betcorp Ltd., 400 B.R. at 280-81; accord In re ABC Learning Centres Ltd., 445 B.R. at 328.  As discussed in more detail in ¶¶ 49 -54 below concerning the "collective" nature of the English Proceedings, an order of the English Court is required in order to convene the Plan Meetings of affected creditors and the English Court must sanction the Plans before the Plans can become effective.  PSL ¶2.3.  [DG-023] Because involvement and oversight of the English Court is required to implement a restructuring plan procedure, the Plans clearly qualifies as "judicial in nature" under section 101(23). Id.

**The English Proceedings Are Collective In Nature**

60.    Section 101(23) also requires that the foreign proceedings be "collective."   The legislative history of chapter 15 notes that it adopts the definition of foreign proceeding nearly verbatim from the Model Law.  H.R. Rep. No. 109-31, pt. 1, at 118 (2005) ("**House Report**"). It also directs reference to the Model Law and the Guide as aids to interpreting chapter 15. Id. at 109.  The Guide, in turn, takes a broad view of collective proceedings which may include "a variety of collective proceedings… be they compulsory or voluntary, corporate or individual, winding-up or reorganization."  Guide ¶ 71.  Case law takes a similar approach. See, e.g., In re Betcorp Ltd., 400 B.R. at 281; In re Gold & Honey, Ltd., 410 B.R. 357, 370 (Bankr. E.D.N.Y. 2009); In re ABC Learning Centres Ltd., 728 F.3d at 318 ("A proceeding is collective if it considers the rights and obligations of all creditors.") (citing In re Betcorp Ltd., supra); In re Avanti Commc'ns Grp. plc, 582 B.R. 603, 614 ("The UK Proceeding [a scheme of arrangement] fits the definition of a "foreign proceeding" in section 101(23) of the Bankruptcy Code as a collective proceeding for the adjustment of debt supervised by a judicial

---

[40]See ¶ 67, below, for examples of restructuring plans and schemes of arrangement that have been granted recognition under chapter 15.

29

authority."). The English Proceedings are collective because they are conducted for the benefit of the Plan Creditors as a whole (PSL Part 2) and provide due process to all parties whose rights and interests will be affected. PSL Parts 15-19. [DG-023, 067]

61.     U.S. courts have held restructuring plans and schemes of arrangement to be collective in nature where all impacted creditors or members had a right to object to the proposed restructuring plan or scheme and where the court was involved in approving them. In re Board of Directors of Hopewell Int'l Ins. Ltd., 275 B.R. 699, 707 (S.D.N.Y. 2002) (dealing with a Bermuda scheme). "Collective" proceedings are often contrasted with a single creditor-initiated receivership, which is presumed to operate for the benefit of that creditor rather than all creditors collectively. See, e.g., In re Betcorp Ltd., 400 B.R. at 281; In re Gold & Honey, Ltd., 410 B.R. at 370. In Gold & Honey, the court distinguished a non-collective single creditor receivership from schemes of arrangement, noting that scheme proceedings are initiated by the debtor for purposes of paying creditors "with court supervision to ensure evenhandedness." 410 B.R. at 370.[41] A proceeding need not deal with all creditors or members to be collective. Guide ¶ 70 ("A proceeding should not be considered to fail the test of collectivity purely because a class of creditors' rights is unaffected by it."). Many of the restructuring plans and schemes of arrangement that have been granted recognition under chapter 15 involved modification of one or more classes of debt or interests but did not affect all creditors or interest holders.[42]

62.     Here, the proposed Plans contain provisions affording due regard to the rights and obligations of all Plan Creditors impacted by the Plans. The Plan Companies will submit an application to the English Court requesting a court to hold a joint Convening Hearing at which they will seek directions concerning the Plans and the entry of the Convening Order granting permission to convene the Plan Meetings of their Plan Creditors. PSL Part 15. [DG-067] The Convening Hearing will be held on May 14, 2026. PSL ¶15.1 [DG-067]

---

[41] See also In re ABC Learning Centres Ltd., 728 F.3d at 310, focusing on the requirement for identical treatment of creditors of the same priority as indicative of the collective nature of a proceeding. ("It is undisputed that the Australian liquidation proceeding is a collective proceeding. The liquidator must distribute assets on a pro-rata basis to creditors of the same priority.")

[42] All of the restructuring plans and schemes cited elsewhere in this Opinion affected only specified classes of debt or interests.

30

ACTIVE/206784363.2

63.     If the Convening Order is entered as requested, they will be followed by dissemination to Plan Creditors of the Plan Documentation, comprised of a copy of the Explanatory Statement, the Plan documents, the notices convening the Plan Meetings, a Plan Creditor Letter that the Plan Creditors will need to complete to vote at or appoint a proxy to attend and vote on their behalf at the Plan Meetings, and the principal agreements and other related documents that will document the terms of the Restructuring.  PSL Part 16.  [DG-068]

64.     The Plan Meetings will be convened for the purpose of considering and, if thought fit, approving the Plans pursuant to Part 26A of the Companies Act.  PSL ¶ 1.5.5.  [DG-020] Plan Creditors are entitled to attend the Plan Meetings in person or through counsel. PSL Part 15 [DG-067]  For the Plans to be approved by the English Court, the classes of creditors voting at the Plan Meetings must approve the respective Plans by 75% in value or, with respect to the CoreCo Plan, CoreCo will rely on the cross-class cramdown feature as to any classes of Plan Creditors that do not approve the plan by the requisite majority.  PSL ¶ 19.1.  [DG-070]

65.     If the requisite votes are obtained or the cross-class cram down feature is invoked, the Plan Companies each will seek an order from the English Court at the Sanction Hearing, expected to be held on June 18, 2026 sanctioning the  Plans.  Instrs. ¶26 [DG-007] At the Sanction Hearing, the English Court will decide whether to exercise its discretion to sanction the Plans.  The English Court will consider, among other things, whether:  the relevant provisions of Part 26A of the Companies Act have been complied with; the classes of Plan Creditors were fairly represented by those who attended the Plan Meetings and the statutory majority were acting in a *bona fide* manner; the Plans are fair restructuring plans which a creditor could reasonably approve; and there is any "blot" or defect in the Plans that would, for example, make it unlawful or in any other way inoperable.  PSL ¶ 18.5.5  [DG-070]

66.     Upon approval, the English Court will enter the Sanction Order.  PSL ¶ 2.3.2  [DG-023]  The Plans will take effect when a sealed copy of the Sanction Order has been delivered to the Registrar of Companies for registration.  PSL ¶ 2.3.3.  [DG-023] Upon such delivery, the Plans will be binding on all affected creditors.  PSL¶ 2.4.  [DG-023]  Because the involvement of the English Court assures consideration of the "rights and obligations" of all affected Plan Creditors and because the English Court retains independent and final authority

ACTIVE/206784363.2

to review and approve the Plans before implementation, the Plan are "collective" as defined by the authorities discussed in paragraphs 59-61 above.

**The English Proceedings Are In A Foreign Country**

67.      There is no dispute that the English Proceedings are taking place or will take place in England, all before the English Court.  PSL *passim*.  Likewise, there can be no dispute that this element of the section 101(23) analysis is satisfied.

**The Plans Are Under A Law "Relating To Insolvency Or Adjustment Of Debt"**

68.      The Companies Act is the law that governs an arrangement or compromise proposed to be entered into by a company with its creditors or any class of creditors or members.  In this context, the Companies Act functions as a law relating to adjustment of debt.  The recognition of numerous foreign proceedings involving restructuring plans and schemes of arrangement emanating from England and other countries confirms that the Companies Act satisfies this definitional element of a foreign proceeding.  For example, numerous U.S. courts have held that this manner of reorganization under the provisions of Parts 26 or 26A of the Companies Act, qualifies for purposes of section 101(23).  *See, e.g.*, In re Fossil (UK) Global Services Ltd (Bankr. S.D. Tex, Nov. 12, 2025); In re Mega Newco Limited, No. 24-12031 (Bankr. S.D.N.Y. Nov. 25, 2024); In re Light, S.A. – Em Recuperação Judicial, No. 24-90531 (Bankr. S.D. Tex. Nov. 12, 2024); In re CB&I UK Limited, No. 23-90795 (Bankr. S.D. Tex. Mar. 22, 2024); In re DTEK Finance PLC, No. 21-10735 (Bankr. S.D.N.Y. May 20, 2021); In re Petra Diamonds US$ Treasury plc, No. 20-12874-MG (Bankr. S.D.N.Y. Jan. 14, 2021); In re Swissport Fuelling Ltd., Case No. 20-12990 (Bankr. D. Del. Dec. 11, 2020); In re KCA Deutag UK Finance plc, Case No. 20-12433 (Bankr. S.D.N.Y. Nov. 6, 2020); In re Selecta Finance UK Limited and Selecta Group B.V., Case No. 20-34947 (Bankr. S.D. Tex. Oct. 30, 2020); In re New Look Financing plc, Case No. 20-12297 (Bankr. S.D.N.Y. Oct. 29, 2020); In re Codere Finance 2 (UK) Limited, Case No. 20-12151 (Bankr. S.D.N.Y., Oct. 9, 2020); ); In re PizzaExpress Financing 2 PLC, Case No. 20-34868 (Bankr. S.D. Tex. Oct. 4, 2020); In re Virgin Atlantic Airways Limited, Case No. 20-11804 (Bankr. S.D.N.Y. Sept. 3, 2020). In re Matalan Finance Plc, (Bankr. S.D.N.Y., Doc. No. 16, Sep. 2, 2020); In re HEMA UK I Ltd., (Bankr. S.D.N.Y., Doc. No. 11, Sep. 14, 2020); In re Swissport Fuelling Ltd., No. 20-

32

11524-MFW (Bankr. D. Del., Doc No. 37, July 6, 2020); In re Lecta Paper UK Limited, No. 1913990 (Bankr. S.D.N.Y., Feb. 4, 2020); In re Syncreon Auto. (U.K.) Ltd., No. 19-11702-BLS (Bankr. D. Del., Sep. 11, 2019); In re New Look Secured Issuer plc, No. 19-11005-SMB (Bankr. S.D.N.Y., April 2, 2019); In re Stripes US Holding, Inc., No. 18-12388-CSS (Bankr. D. Del., Nov. 13, 2018); In re New World Res. N.V., No. 14-12226-SMB (Bankr. S.D.N.Y. Sept. 9, 2014); In re hibu, Inc., No. 8-14-70323-REG (Bankr. E.D.N.Y. Feb. 27, 2014); In re Magyar Telecom B.V., No. 13-13508-SHL, 2013 WL 10399944 (Bankr. S.D.N.Y. Dec. 11, 2013); In re Hellas Telecomms. (Lux.) V, 524 B.R. 488 (Bankr. D. Del. 2010); In re Highlands Ins. Co. (U.K.), No. 07-13970-MG (Bankr. S.D.N.Y. Aug. 18, 2009). A Hong Kong scheme was recognized in the cases In Re Winsway Enterprises Holdings Limited f/k/a Winsway Coking Coal Holdings Limited, Case No. 16-10833(Bankr. S.D.N.Y. 2016) and In re Youzhou Group Holdings Company Limited, Case No. 24-11441 (Bankr. S.D.N.Y. May 2, 2025). Several Bermuda schemes of arrangement under a law similar to Part 26 of the Companies Act 2006 have been recognized and enforced under chapter 15. *See, e.g.*, Arion Ins. Co., No. 07-12108-RDD (Bankr. S.D.N.Y. Aug. 9, 2007); In re Digicel Group One Limited, No. 20-11207 (Bankr. S.D.N.Y. Jun. 17, 2020); and Markel Catco Reinsurance Fund Ltd., et al (four related schemes), Case No. 211733 (Bankr. S.D.N.Y., Nov. 4, 2021). As noted in paragraph 52 above, the court in Avanti saw a scheme of arrangement "…as a collective proceeding for the adjustment of debt…." 582 B.R. at 614. While the Plans will not, by themselves completely effect the restructuring of the Group, they will comprise a compromise or arrangement between the Plan Companies and the Plan Creditors. Further, the focus of this part of the definition of foreign proceeding is on the law, not on the terms of the plan, and Part 26A of the Companies Act, has been regularly held by U.S. courts to be a law relating to insolvency or the adjustment of debt for the purposes of reorganization or liquidation.

**The Assets And Affairs Of The Plan Companies Are Subject To The Control Or Supervision Of A Foreign Court**

69.     Section 1502(3) of the Bankruptcy Code defines "foreign court" as a "judicial or other authority competent to control or supervise a foreign proceeding." By virtue of the applicable provisions of the Companies Act, the English Court has direct supervisory authority over the Plans. PSL Part 2. [DG-023] In light of the direct involvement of the English Court in

33

ACTIVE/206784363.2

considering the applications to convene the Plan Meetings and entering the Convening Order and the requirement that the English Court ultimately sanction the Plans, the Plans certainly meet this element of the Section 101(23) analysis.  In re Betcorp Ltd., 400 B.R. at 284; In re Avanti Commc'ns Grp. plc, 582 B.R. at 614.

**The Plans Are For The Purpose Of Reorganization**

70.    The final element of the section 101(23) analysis requires that each proceeding be for a reorganization or liquidation purpose.  United States courts will often look to the debtor's own description of the proceeding to determine whether it is for the purpose of reorganization or liquidation.  In re Betcorp Ltd., 400 B.R. at 284-85 (noting that directors' minutes stated that winding-up was for the purpose of liquidation).  Here, the PSL confirms that the Plans are for the purposes of reorganization, i.e. "The purposes and objectives of the Plans are to: restructure the Plan Companies' and the Group's balance sheet; address approaching maturities under the Plan Debt and enter into new debt and preferred equity finance arrangements that provide the Group and the Plan Companies with a sustainable capital structure; enable access to new money financing to address the Group's near- to medium-term liquidity needs; and facilitate the holistic restructuring of the Group pursuant to the Restructuring."  Should the Plans not be approved, the Companies believe that the most likely alternatives will be that the Group (other than the Brazilian business) will be forced to consider and will likely support, commencing voluntary proceedings under chapter 11 of the Bankruptcy Code to either: (i) propose a plan of reorganization (which is considered highly challenging), or (ii) (more likely) facilitate sales of the assets and separable business units within the Group to maximize recoveries to creditors pursuant to section 363 of the Bankruptcy Code; and the entities that comprise the Group's Brazilian business will most likely not commence voluntary proceedings under chapter 11 of the Bankruptcy Code (although the risk cannot be completely eliminated) and the Brazilian business will be sold in an accelerated sales process.  PSL Part 11.  [DG-062]

71.    While the Plans meet the definitional elements of a "foreign proceeding," before an order granting recognition can be entered, the court must find that the Foreign Representative is a person or body as defined in Bankruptcy Code §101(24) and that the foreign proceeding

34

is either a "foreign main proceeding" or a "foreign nonmain proceeding" as defined by sections 1502(4) and (5). *See* 11 U.S.C. § 1517(a)(1). In light of applicable case law, and based upon the Supporting Documents, in my opinion the Plans each would qualify as a "foreign main proceeding" as defined by section 1502(4) and the Foreign Representative meet the statutory requirements. I address each element of my analysis below.

**The Plans Each Qualify For Recognition As A "Foreign Main Proceeding" Under Sections 1517 and 1502(4) of the Bankruptcy Code**

72.    In order to be recognized under chapter 15, a foreign proceeding must be either main or nonmain.[43] *See* In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd., 374 B.R. 122, 126-27 (Bankr. S.D.N.Y. 2007), aff'd, 389 B.R. 325 (S.D.N.Y. 2008). The essence of the requirement that the Plan Companies have either their center of main interests (frequently abbreviated as "**COMI**") or an establishment as a condition to recognition is the determination of the legislators that a debtor must have an economic presence in the country that is conducting the foreign proceeding to be eligible for assistance from courts in the United States.[44] However, as discussed below, U.S. bankruptcy courts have recognized foreign proceedings that were pending in countries where the debtor had little or no economic presence when there was a laudable purpose to the proceeding, no thwarting of creditor expectations, and other factors supporting the COMI determination.

73.    COMI is not defined in either the Bankruptcy Code or in the UNCITRAL Model Law on Cross-Border Insolvency on which chapter 15 is based. In determining COMI, the Second Circuit has considered several factors denominated in the case of In re SphinX, Ltd.[45], decided

---

[43]Section 1502 of the Bankruptcy Code contains the pertinent definitions: "(4) 'foreign main proceeding' means a foreign proceeding pending in the country where the debtor has the center of its main interests;
(5) 'foreign nonmain proceeding' means a foreign proceeding, other than a foreign main proceeding, pending in a country where the debtor has an establishment."
[44] In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd., 389 B.R. at 333-334 ("The objective criteria for recognition reflect the legislative decision by UNCITRAL and Congress that a foreign proceeding should not be entitled direct access to or assistance from the host country courts unless the debtor had a sufficient pre-petition economic presence in the country of the foreign proceeding. *See* House Report at 110; § 1509(b)(3).").
[45] In re SphinX, Ltd., 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006) ("Various factors, singly or combined, could be relevant to such a determination: the location of the debtor's headquarters; the location of those who actually manage the debtor (which, conceivably could be the headquarters of a holding company); the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes.")

35

in the year after the 2005 effective date of chapter 15, but cautioned that "[t]his nonexclusive list [in SphinX] is a helpful guide, but consideration of these specific factors is neither required nor dispositive." Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd., 714 F.3d 127, 138 (2d Cir. 2013) (hereinafter "**Fairfield Sentry**"). The Fairfield Sentry decision also held that (a) the proper date to measure a debtor's COMI is the date of the filing of the chapter 15 petition and (b) consideration of chapter 15's international origin, as mandated by section 1508, warrants reference to "the EU Regulation enacting the European Union Convention on Insolvency [which] explains that COMI 'should correspond to the place where the debtor conducts the administration of his interests on a regular basis and is therefore ascertainable by third parties.'" Id. at 138. See also In re Tri-Continental Exchange Ltd., 349 B.R. 627, 633 (Bankr. E.D. Cal. 2006); In re JSC BTA Bank, 434 B.R. 334, 340 (Bankr. S.D.N.Y. 2010) ("Section 1508 represents an instruction to take into account more than the words used within a particular section of chapter 15 … This is the one chapter of the Bankruptcy Code predicated on the concept of international cooperation and that encourages bankruptcy courts to look beyond the shores of the United States for interpretative guidance.") That international perspective led courts in the U.S. to hold that a debtor's COMI should be the location that third parties would objectively consider to be the location where the debtor is conducting the administration of its affairs. See, e.g., In re Serviços de Petróleo S.A., 600 B.R. 237, 274 (Bankr. S.D.N.Y. 2019) (considering, inter alia, third-party expectations and expectations of creditors); In re British-Am. Ins. Co., 425 B.R. 884, 912 (Bankr. S.D. Fla. 2010) ("The location of a debtor's COMI should be readily ascertainable by third parties"). As discussed below, this approach caused U.S. courts to focus on the locus of restructuring related activities as determinative of the COMI of debtors that had no or limited economic presence in the country of the foreign proceeding.

74.    Section 1502(4) of the Bankruptcy Code defines a foreign main proceeding as a "foreign proceeding pending in the country where the debtor has the center of its main interests." Section 1516(c) creates a presumption that a debtor's registered office (place of incorporation) is its COMI and consequently each Plan Company's COMI is presumed to be in England and Wales. PSL ¶¶ 4.1, 4.3. [DG-025] However, if the facts do not support the presumption, the presumption may be rebutted by contrary evidence. As noted by the court in In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd., 389 B.R. at

36

335, "… section 1516(c) creates no more than a rebuttable evidentiary presumption, which may be rebutted notwithstanding a lack of party opposition.  See also In re Basis-Yield Alpha Fund (Master), 381 B.R. 37, 51 (Bankr. S.D.N.Y. 2008) (court must make an independent determination of COMI).  The [UNCITRAL] Guide explains that:  'Article 16 establishes presumptions that allow the court to expedite the evidentiary process; at the same time they do not prevent, in accordance with the applicable procedural law, calling for or assessing other evidence if the conclusion suggested by the presumption is called into question by the court or an interested party.'"[46]

75.     Section 1516(c) would permit the US Bankruptcy Court to presume that each Plan Company's COMI is in its country of registration, England and Wales.  There is no evidence in this case that contravenes the efficacy of the presumption with respect to the Plan Companies.  As detailed in the following paragraphs, each Plan Company is incorporated and registered in England and has no material assets or substantial operations.  PSL ¶¶ 4.1–4.4. [DG-025]  The Parent and part of the Group, excluding the Plan Companies, is incorporated in Delaware in the United States.  PSL Par 4.9).   [DG-026]  However, recognition under chapter 15 does not consider the COMI of the Group, but is limited to consideration of the specific entity that is the debtor in a foreign proceeding.   In re Servicos de Petróleo Constellation S.A., 600 B.R. 237, 279 ("…each debtor entity must be considered, rather than making a top-down decision on the basis of the COMI of the parent company of the group." (internal citations omitted)).

76.     As described in the Instructions, NFE Global is incorporated in, and tax resident in, England and Wales. Its registered office is in London; it has a director who is a UK national and resident in London; and its books, records and bank account are maintained there. Its restructuring counsel and the Information Agent are also based in England and Wales, and their engagement letters were executed there. Prior to the issuance of the PSL, NFE Global notified its creditors of its address in England and Wales and conducted restructuring-related communications from there. Its address for notices under the RSA is in England and Wales, and it held board meetings in London on April 9, 2026 to consider and approve the PSL and

---

[46] Guide ¶ 137.

ACTIVE/206784363.2

on April 17, 2026 to appoint the Foreign Representative for purposes of the Plan Company's chapter 15 filing.  Instrs. ¶33 [DG-008]

77.     NFE Brazil Newco is incorporated in, and is tax resident in, England and Wales. Its registered office is in London; it has a director who is a UK national and resident in London; and its accounting, books and records and a bank account are maintained there. NFE Brazil Newco' restructuring counsel and the Information Agent are based in England and Wales, and their engagement letters were executed there. Prior to the PSL, creditors were notified that NFE Brazil Newco's address and restructuring-related activities were located in England and Wales. It held board meetings in London on April 9, 2026 to approve the PSL and on April 17, 2026 to appoint the Foreign Representative for the purposes of the Plan Company's chapter 15 filing.  Instrs. ¶33 [DG-008]

78.     As further described in the Instructions, to address the Group's financial difficulties mentioned above and discussed in the PSL, the Parent, NFE Global, NFE Financing, NFE Brazil Investments LLC, each Obligor (as defined in the RSA) and certain of its lenders and noteholders entered into the RSA.[47]  The RSA has been signed or acceded to by holders representing majorities across all of the Group's principal funded debt instruments, including the 2029 New Notes, Term Loan B, Revolving Credit Facility, Term Loan A, 2026 Legacy Notes, 2029 Legacy Notes, and 100% of the Series I and Series II Loan.  Each plan creditor that is a party to the RSA has agreed to, among other things, support the implementation of the plans and the restructuring, vote in favor of the plans at each relevant plan meeting, refrain from taking any action that would impede the restructuring, and forbear from exercising certain remedies against any member of the Group. PSL Part 8 [DG-040]  Clearly, the expectations of the Plan Creditors as manifested in the RSA is the Restructuring would be accomplished in England through the Plans and the English Proceedings.

79.     The RSA sets forth principal terms for a comprehensive restructuring of the Group's principal funded debt obligations, under which, among other things, the Group will separate into two standalone businesses: (i) BrazilCo, comprising the Group's Brazilian business, and (ii) CoreCo, comprising the Group's other businesses and assets.  Existing funded debt

---

[47]     NFE Brazil Newco Limited acceded to the RSA upon its formation.

ACTIVE/206784363.2

obligations will be exchanged for a combination of new debt instruments and equity securities in the reorganized entities.   Pursuant to the RSA, the Group expects to complete the Restructuring through the Plans in the English Proceedings.  PSL *passim* [DG-016]

80.     The Debtors' restructuring activities have been centralized in the UK. Although the Parent's and creditors' principals, as well as their U.S. counsel, are primarily located in the United States, the Parent's UK counsel has been involved in the restructuring negotiations since at least August 2025 and has held meetings and calls with the creditors' UK counsel since at least October 2025. Restructuring-related discussions between Counsel, UK creditor advisors, and respective barristers have taken place in the UK. Moreover, the Plan Companies held two sets of board meetings in London, approving the PSL and the Restructuring, and approving Christopher Boas as the Foreign Representative for purposes of the Plan Companies' chapter 15 filing. Additionally, the English Proceedings have been commenced under the Companies Act, and the English Court has exclusive jurisdiction over the Plans. Key restructuring agreements, including the RSA (with respect to matters arising in connection with the Restructuring Plans) and the Deeds of Contribution, are governed by English law. The engagement of UK-based information agent Kroll Issuer Services Limited and the retention of English barristers further confirm the centralization of restructuring activities in the UK.  Instrs. ¶33 [DG-008]

81.     The Modern Land case confirms the importance of restructuring related activities in establishing the COMI of a non-operating debtor:

> The Debtor asserts, importantly, that as of the time of the filing of the Chapter 15 petition, the restructuring efforts were the Debtor's "primary business activity ... to ensure the Debtor's survival…. The 'vast majority of Restructuring-related activities took place in the Caymans…' The Scheme received the support of Scheme Creditors representing approximately 95% of the value of the Existing Notes. ... Given the strong support for the Scheme, the fact that the restructuring was the primary business activity of the Debtor at the time of the filing of the Chapter 15, the ongoing activities pertaining to the restructuring itself support recognition of the Cayman Islands as the Debtor's COMI in the present case.[48]

---

[48] In re Modern Land Co., Ltd, 641 B.R. 768, 790 (Bankr. S.D.N.Y. 2022).  See also In re InterCement Brasil S.A., 668 B.R. at 823 (Court expressed that it "need not answer [the question]" of whether the notes indentures explicitly warned of a potential bankruptcy in Brazil, and instead that is "must only identify ICBV's COMI as of the New Petition Date," for which the "applicable restructuring activities… establish[ed] conclusively that… ICBV's COMI was Brazil.").

ACTIVE/206784363.2

82. As described in the Instructions, neither NFE Global nor NFE Brazil Newco has material assets or operations. NFE Brazil Newco was established, in part, to ensure a sufficient connection with England for jurisdictional purposes. Both NFE Global nor NFE Brazil Newco entered into the Deeds of Contribution that give the Parent and NFE Financing, respectively, rights of contribution against them such that neither Plan Company would be able to effectively obtain a release or variation of the Plan Creditors' rights against it without also releasing or varying the Plan Creditors' rights against the Parent and NFE Financing. In similar situations, courts have recognized that the COMI of a debtor may be different than the location of the primary business activities of the debtor and its affiliated group.[49]

83. The Mega Newco case involved a new English-incorporated subsidiary of a Mexican parent. The business of the parent and its affiliates was conducted primarily in Mexico and its COMI was in Mexico. The court expressed concern that the laws of the jurisdiction in which the new subsidiary was incorporated would render traditional notions of COMI irrelevant and might affect the legitimate expectations of creditors.[50] However, overwhelming creditor support and the absence of objections to chapter 15 recognition and enforcement obviated concerns about improper COMI manipulation and led the court to conclude that "COMI should be assessed 'in light of chapter 15's emphasis on protecting the reasonable interests of parties in interest pursuant to fair procedures and the maximization of the debtor's value.'"[51] In this regard, Mega NewCo follows precedent set in the US Bankruptcy Court in the Modern Land case discussed above.[52] Modern Land was incorporated in the Cayman Islands and was part of a group of companies incorporated in the Cayman Islands or the British

---

[49] See, e.g., In re Ocean Rig UDW Inc., 570 B.R. 687, 706-707 (Bankr. S.D.N.Y. 2017) (finding that relocation of the debtor's COMI from the Republic of the Marshall Islands, which had no restructuring law, to the Cayman Islands, which did, was acceptable: "The Court finds that the Foreign Debtors purposefully established the Cayman Islands as their COMI before the Petition Date. The Foreign Debtors' actions in doing so were not taken in bad faith. There is no evidence in the record pointing to any 'insider exploitation, untoward manipulation, [and] overt thwarting of third-party expectations,' that would support denying recognition here. See id. The evidence establishes that the Foreign Debtors had a legitimate, good faith purpose for shifting their COMI from the RMI to the Cayman Islands.");

[50] In re Mega Newco Limited, 2025 WL 601463, at *3, *4 (Bankr. S.D.N.Y. 2025) ("Clearly, the structure before me could be used in another case as a way of frustrating and thwarting the legitimate expectations of creditors. This case, however, involves no such frustration or thwarting of creditor rights. Mega Newco was formed, and the English Scheme Proceeding was pursued, for laudable objectives. The Scheme of Arrangement will enable a broader restructuring to be accomplished efficiently and thereby will enhance all parties' recoveries. It will also maximize the value of the underlying businesses. In these respects, the enforcement of the Scheme of Arrangement is fully consistent with the stated purposes of Chapter 15"). See 11 U.S.C. § 1501(a)."

[51] Quoting from In re SPhinX, Ltd., 351 B.R. 103, 117 (Bankr. S.D.N.Y.2006).

[52] In re Modern Land Co., Ltd, 641 B.R. 768, 769 (Bankr. S.D.N.Y. 2022).

40

Virgin Islands that conducted most of their business in the People's Republic of China. Modern Land proposed a scheme of arrangement in the Cayman Islands that was sanctioned by the Cayman Islands court and then was the subject of a petition for recognition and enforcement under chapter 15. The Modern Land court noted that prior cases had recognized as a debtors' COMI as the country of its incorporation and reorganization proceeding, as opposed to the country where business operations had been centered, in situations where court-appointed fiduciaries had assumed substantial control over the debtor's proceeding.[53] The Modern Land court went further, ruling that the absence of fiduciaries did not alter the result, i.e. COMI could be in the country of the debtor's registered office if supported by the totality of the circumstances:

> The Court recognizes the Debtor's COMI in the Cayman Islands. Section 1516(c) provides that "[i]n the absence of evidence to the contrary, the debtor's registered office ... is presumed to be the center of the debtor's main interest." 11 U.S.C. § 1516(c). Given the evidence in this case, the Court considers the totality of the circumstances before it, including the goals of chapter 15, the Scheme Creditors' expectations and intentions, the judicial role in the Cayman Scheme, the function of the Cayman Scheme Chairperson, the insolvency activities in the Caymans, Cayman choice of law principles and the Debtor's good-faith petition for recognition of the Cayman Proceeding. Each of these factors function together to support a finding of COMI in the Cayman Islands.[54]

84.     Here, the Plan Companies, NFE Global Holdings and NFE Brazil Newco, have entered into the Deeds of Contribution that link their obligations with those of the primary

---

[53] Citing In re Fairfield Sentry Ltd., 714 B.R. 127 (2d Cir. 2013) and In re Suntech Power Holdings Co., 529 B.R. 399 (Bankr. S.D.N.Y. 2017).

[54] Modern Land, 641 B.R. 783, 786. ("It would be ironic if a scheme proceeding, following the appointment of JPLs in a contentious case where JPLs were needed to facilitate agreement between the debtor and its creditors, was recognized as a foreign main proceeding, but in a case such as this one where the Debtor and its professionals successfully negotiated the RSA with overwhelming creditor support without the need to file a winding up petition and the appointment of JPLs before obtaining sanction of the Scheme could not be recognized as a foreign main proceeding.") See also In re Xinyuan Real Estate Company Ltd., 2026 WL 592250 (Bankr. S.D.N.Y. Mar. 3, 2026) (A debtor moved to dismiss an involuntary chapter 11 petition, arguing that a proceeding in the Cayman Islands where the debtor was incorporated warranted abstention by the US Bankruptcy Court. The court denied the motion because recognition of the Cayman Islands proceeding was unlikely since the debtor had neither its COMI nor an establishment in the Cayman Islands. The court noted however that "Nevertheless, precedent in this District would support a Cayman Islands COMI finding if two conditions were met—specifically, if (i) the Debtor obtained the overwhelming support of its Scheme creditors, and (ii) no party objected to recognition. Thus, if the Debtor were eventually to obtain the overwhelming support of its Scheme creditors and if no party objected to recognition, Modern Land would provide strong precedential support for recognition of the Cayman Restructuring as a foreign main proceeding. But those are big "ifs." At present, the Debtor is very far from obtaining overwhelming creditor support or from coming to terms with the petitioning creditors."

ACTIVE/206784363.2

obligors, the Parent and NFE Financing. The RSA has received overwhelming creditor support, and has been signed or acceded to by creditors representing majorities across every of the Group's funded debt, with Plan Creditors agreeing to support the Restructuring and refrain from taking adverse action. PSL ¶6.6 [DG-036] As described in the PSL, the interrelated guarantee and contribution arrangements across the Group mean that the liabilities of the Plan Companies cannot be addressed in isolation. In particular, NFE Global cannot obtain an effective release or variation of creditor claims in respect of the CoreCo Plan Debt without corresponding adjustments to claims against the Parent and other guarantors. Similarly, NFE Brazil Newco cannot effect a meaningful compromise of claims under the 2029 New Notes without impacting the rights of creditors against NFE Financing and other guarantors. These interdependencies further support the appropriateness of addressing the relevant indebtedness through the Plans in England.  PSL ¶¶ 4.2, 4.4. [DG-025]

85.    Mega Newco and two additional recent cases have recognized and granted full force and effect to English restructuring plan proceedings that employed a structure similar to that adopted in this case, i.e. restructuring indebtedness of an enterprise group whose business operations were predominantly in a country other than England through an English subsidiary that was an obligor or guarantor of the debt to be restructured and that had indemnified other group members for any payments made in respect of such debt.[55]  The Court in the Mega Newco case supported this view:

> A foreign proceeding is a "foreign main proceeding" if it is taking place in the jurisdiction where the debtor has its center of main interests, or COMI. 11 U.S.C. § 1502(4).  Section 1516(c) of the Bankruptcy Code provides that "[i]n the absence of evidence to the contrary, the debtor's registered office ... is presumed to be the center of the debtor's main interests." 11 U.S.C. § 1516(c). Mega Newco's registered office is in London. Unlike some other cases, there is no "contrary evidence" in the record before me that indicates that Mega Newco's own COMI is located outside the United Kingdom. *See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 129-30 (Bankr. S.D.N.Y. 2007) (holding that other evidence before the court showed that the debtor's COMI was not situated where the debtor had contended). Mega Newco has engaged in restructuring activities in the U.K., and those may be considered in determining whether

---

[55] In re CB&I UK Limited, et al, Case No. 23-90795 (Bankr. S.D. Tex. 2024) (predominantly U.S. group); In re Mega Newco Limited, *supra* (predominantly Mexican group); In re Fossil (UK) Global Services Ltd, Case No. 25-90525 (Bankr. S.D.N.Y. 2025) (predominantly U.S. business operations).

42

its COMI is in the U.K. *See Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 138 (2d Cir. 2013). These restructuring activities apparently are the only activities in which Mega Newco has ever engaged.[56]

86.    In light of the above authorities, in my opinion the COMI of each of the Plan Companies is England.

**The Foreign Representative Is A "Person" Authorized To Act On Behalf Of The English Proceeding And Within The Meaning Of Section 1517(a)(2)**

87.    The second requirement under section 1517 is that the Foreign Representative applying for recognition be a person or a body authorized to act on behalf of the foreign proceeding.    11 U.S.C. §1517(a)(2).    Section 101(24) defines the term "foreign representative" as being "a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding."    Under section 101(41), the term "person" includes an "individual."    The definition of Foreign Representative in section 101(24) closely follows the language of the Model Law, Article 2(d), which provides that a Foreign Representative be a "person…authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs …or to act as a representative of such foreign proceeding."    In re Vitro S.A.B. de C.V., 701 F.3d 1031, 1045 (5th Cir. 2012), cert. dismissed, 569 U.S. 944 (2013); *see also* UNCITRAL Report of the Working Group on Insolvency Law on the Work of the Eighteenth Session, ¶ 110, U.N. Doc. A/CN.9/419 (Dec. 1, 1995).    This definition of Foreign Representative does

---

[56] In re Mega Newco Limited, 2025 WL 601463, at *3 (Bankr. S.D.N.Y. 2025). *See also* In re InterCement Brasil S.A. et al, 668 B.R. 802 (Bankr. S.D.N.Y. 2025) (finding, despite opposition, that the COMI of a Netherlands-incorporated finance subsidiary of a Brazilian parent was Brazil: "the Court finds that applicable restructuring activities occurring as part of the Brazilian Mediation and Brazilian EJ Proceeding establish conclusively that, as of December 9, 2024, ICBV's [the Netherlands subsidiary's] COMI was Brazil"); In re Modern Land (China) Co., Ltd., 641 B.R. 768, 786–787 (Bankr. S.D.N.Y. 2022) (recognizing Cayman Islands scheme of arrangement, a debtor in possession restructuring under corporate law, as a foreign main proceeding based on "the totality of the circumstances before it, including the goals of Chapter 15, the Scheme Creditors' expectations and intentions, the judicial role in the Cayman Scheme, the function of the Cayman Scheme Chairperson, the insolvency activities in the Caymans, Cayman choice of law principles and the Debtor's good-faith petition for recognition of the Cayman Proceeding"); In re Suntech Power Holdings Co., Ltd., 520 B.R. 399, 418 (Bankr. S.D.N.Y. 2014) (COMI was transferred, by virtue of the conduct and attributes of the joint provisional liquidation, from China to the Cayman Islands).

43

not require that the individual be appointed by a foreign court or other judicial body.  In re Vitro S.A.B. de C.V., 701 F.3d at 1047.[57]   Instead, it is sufficient that the Foreign Representative be authorized to act "in the context" of a foreign bankruptcy proceeding, such as by resolution of the debtor's board of directors or a provision in the Plans authorizing the representative to commence and pursue a foreign bankruptcy proceeding on the debtor's behalf.  Id. at 1047, 1049 (affirming recognition of Foreign Representatives nominated by boards of directors).  This flexible approach is in keeping with the definition of "foreign representative" under Article 2(d) of the Model Law, wherein the UNCITRAL Working Group "expressly rejected" the requirement that a Foreign Representative be specifically appointed by statute or court order.[58]

88.     The Resolutions reflect the appointment of Mr. Christopher Boas as the Foreign Representative of the English Proceedings for purposes of commencing ancillary proceedings to the English Proceedings in the United States of America under chapter 15 of the Bankruptcy Code before the US Bankruptcy Court.  Resolutions [DG-504]

89.     Based on the precedent discussed above Mr. Christopher Boas satisfies the requirement of Section 1517(a)(2) and can act as the Foreign Representative of the English Proceeding.

**The Chapter 15 Petition Will Meet The Requirements Of Section 1515, As Required By Section 1517(a)(3)**

90.     Recognition also requires that the requirements of section 1515 be met.  11 U.S.C. §1517(a), (b)(1)-(2), (c).  These requirements are procedural, and the Foreign Representative will satisfy them in connection with filing the chapter 15 petition.

91.     Section 1515 essentially implicates three separate requirements that are relevant:

---

[57]See also In re OAS S.A., 533 B.R. 83, 95 (Bankr. S.D.N.Y. 2015) (denying objections to the qualification of a foreign representative appointed by the Brazilian debtors' boards of directors, "the Court concludes that the Bankruptcy Code does not require the judicial authorization or appointment of the foreign representative."; accord In re Cell C Proprietary, 571 B.R. 542, 553 (Bankr. S.D.N.Y. 2017); In re Avanti Commc'ns Grp. plc, 582 B.R. at 614.
[58]See UNCITRAL Report of the Working Group on Insolvency Law on the Work of the Eighteenth Session, ¶ 111, U.N. Doc. A/CN.9/419 (Dec. 1, 1995), available at https://undocs.org/en/A/CN.9/419.

ACTIVE/206784363.2

(a)     Section 1515(a) requires that the Foreign Representative file a petition for recognition.  The chapter 15 petitions will satisfy that requirement.

(b)     Section 1515(b) requires that the petitions be accompanied by certified copies of the decision commencing the foreign proceedings and appointing the Foreign Representatives or alternative evidence of these facts.   Here, if the Foreign Representative submits the Resolutions approving his appointment as foreign representative, the Part 8 claim forms and accompanying listing notes filed with the English Court on March 24, 2026 and April 10, 2026, formally commencing the restructuring plan process, the PSL and a copy of the Convening Order, which will establish conclusively that the English Proceedings have commenced in the English Court and that Mr. Christopher Boas has been appointed as the Foreign Representative, this requirement of Section 1515(b) will be satisfied.

(c)     Section 1515(c) requires that the petition include a statement identifying all foreign proceedings with respect to the debtors that are known to the Foreign Representatives.  That requirement would be satisfied if the recognition pleadings state that there are no foreign proceedings other than the English Proceedings.

**Additional Relief**

92.     In addition to recognition as a foreign main proceeding, the Foreign Representative may seek Additional Relief in the form of an order giving full force and effect to the Plans including recognition and enforcement in the United States of the Plans, the Convening Order, the Sanction Order, and prohibition of the exercise of rights, remedies, powers or discretions in contradiction of the provisions of the Plans and the Restructuring (the "**Non-Debtor Effects**").  PSL ¶ 13.3 – 13.7 [DG-085]  As part of the Recapitalisation Transaction, the Plans provide that the Plan Creditors will grant the Releases of their existing claims against the Group in exchange for the Plan Consideration. The Plans also include the Releases, a comprehensive release provision in favor of the "Released Parties," which comprise, among others, the Plan Companies, other Group members and their respective current and former affiliates, officers, directors and related persons, the Plan Creditors, and certain advisors and

ACTIVE/206784363.2

other restructuring participants, in each case in their respective capacities in connection with the Restructuring.[59]

93.     The Additional Relief and Non-Debtor Effects therefore include giving effect in the United States to these release provisions. In particular, with effect from the Restructuring Effective Date, each Plan Party irrevocably waives, releases and discharges all claims of any nature arising on or prior to that date, whether known or unknown, against the Released Parties to the extent arising directly or indirectly out of or in connection with: (a) the negotiation, preparation, sanction or implementation of the Plans and/or the Restructuring; or (b) the relevant Plan Debt, and undertakes not to pursue such claims. Recognition and enforcement of the Plans, the Sanction Order and the related Implementation Documents by US Bankruptcy Court will give effect to those Releases in the United States and preclude the assertion or continuation of such claims in this jurisdiction, while preserving rights expressly carved out under the Plans.

94.     An order granting recognition of the English Proceedings as foreign main proceedings will trigger the automatic application of section 362 (automatic stay) of the Bankruptcy Code pursuant to Section 1520.  An order granting enforcement of the Plans and giving them and the Sanction Order full force and effect will effectively grant the Additional Relief pursuant to sections 1507 and 1521 of the Bankruptcy Code, as discussed below.  The Plans will have the effect, as a consequence of the enforcement of the terms of the Plans, including the "Non-Debtor Effects", of prohibiting proceedings or actions by Plan Creditors and other persons against Released Parties contrary to the Plans.  While the Non-Debtor Effects are broad and affect parties beyond the Plan Companies, the English Court will consider whether such Non-Debtor Effects are proper in the context of the English Proceedings.  If the English Court sanctions the Plans, the Additional Relief, including the Non-Debtor Effects, will be effective in the U.S. when the US Bankruptcy Court grants recognition of the Plans and enters orders enforcing them.  As explained below, in my opinion, the US bankruptcy court would grant such relief if the English Court enters the Sanction Order and the Plan Companies seek recognition and enforcement of the Plans under chapter 15.

---

[59]The "Released Parties" is a term defined in the Plans.

46

ACTIVE/206784363.2

95.   Several provisions of chapter 15 empower a bankruptcy court to grant the sort of relief that may be requested in the chapter 15 proceeding by the Foreign Representative on behalf of the Plan Companies.  On the most basic level, in keeping with the purpose of chapter 15, which is to incorporate the Model Law into the Bankruptcy Code so as to provide "effective mechanisms for dealing with cases of cross-border insolvency with the objectives of cooperation between courts of the United States…and the courts…of foreign countries involved in cross border insolvency cases" 11 U.S.C. § 1501(a)(1), chapter 15 explicitly instructs U.S. courts to "cooperate to the maximum extent possible with a foreign court or a foreign representative."  11 U.S.C. §  1525(a).  Likewise, section 1509(b)(3) provides that, upon recognition, a U.S. court "shall grant comity or cooperation to the foreign representative."

96.   As noted above, recognition of the Plans as foreign main proceedings will have certain automatic effects, including the application pursuant to section 1520 of the automatic stay of section 362 with respect to the Plan Companies and the property of the Plan Companies that is within the territorial jurisdiction of the United States.  In addition, upon recognition, section 1521(a) authorizes the US Bankruptcy Court to grant "any appropriate relief" at the request of the foreign representative "where necessary to effectuate the purpose of [chapter 15] and to protect the assets of the debtor or the interests of the creditors."  Section 1521(a) confers broad discretion to make orders necessary to effectuate a comprehensive restructuring of a debtor or group of debtors.

97.   While the court may grant a broad array of relief under section 1521(a) (including relief pursuant to section 105(a))[60], section 1522(a) dictates that the court may grant such relief only if the interests of creditors and other interested entities (including the debtor) are "sufficiently protected."  The concept of "sufficient protection" is often highly fact-specific, but it is well established that the purpose of section 1522 is to ensure that any relief so granted under section 1521 reflects a balance of interests between the foreign representative and those of other persons potentially affected by the entry of such relief.  In re Cozumel Caribe, S.A.

---

[60]Section 105(a) provides:  "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process."

47

ACTIVE/206784363.2

de C.V., 482 B.R. 96, 108 (Bankr. S.D.N.Y. 2012).  In this case, the Plans appear to offer such a balance.  All Plan Creditors have received notice of the Plans and will have an opportunity to vote whether to accept or reject the Plans.  PSL Part 2.  [DG-023]  The Plans are ultimately subject to the control and supervision of the English Court and the Plan Creditors have an opportunity to raise objections to the Plans prior to the English Court's decision whether or not to exercise its discretion to sanction (approve) the Plans.  PSL Parts 15 – 19.  [DG-067]

98.      In granting Additional Relief of the type that would be sought by the Plan Companies, including the Non-Debtor Effects, a court may also act pursuant to section 1507 to provide "additional assistance" to the foreign representative.  11 U.S.C. § 1507(a).  The legislative history to section 1507 states that the section was intended to provide authority for "additional relief" beyond that permitted in sections 1519-1521.[61]  Most fundamentally, a bankruptcy court may also act pursuant to its general equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [Title 11]," which includes the mandates of chapter 15. 11 U.S.C. § 105(a).

99.      U.S. bankruptcy courts have recognized and given full force and effect to restructuring plans[62] and schemes of arrangement (discussed below) that included non-debtor third-party releases (i.e., of claims by and against third parties other than the debtor) and orders binding third parties such as those contemplated by the Plans.  The Non-Debtor Effects are analogous to third-party releases in terms of their necessity to enable the Plans to achieve their purpose.

100.    In December 2013, the United States Bankruptcy Court for the Southern District of New York entered an order granting recognition to a scheme of arrangement and granting ancillary relief under sections 1520, 1521, 1507(a), 1509(b)(2)-(3), 1525(a) and 105(a) of the Bankruptcy Code[63] giving "full force and effect" to an English scheme of arrangement and making broad injunctive relief that effected third-party releases.  In re Magyar Telecom B.V.,

---

[61]House Report at 109.
[62]See, e.g., In re CB&I UK Limited, No. 23-90795 (Bankr. S.D. Tex. Mar. 22, 2024); In re Fossil (UK) Global Services Ltd (Bankr. S.D. Tex, 2025); In re PizzaExpress Financing 2 PLC,Case No. 20-34868 (Bankr. S.D. Tex. 2020); In re Virgin Atlantic Airways Limited, Case No. 20-11804 (Bankr. S.D.N.Y. 2020).
[63]Section 105(a) is discussed in ¶ 93 above. Section 1509(b)(2)-(3) permit a foreign representative to apply directly to a court in the U.S. for relief and requires the court to grant comity or cooperation to the foreign representative.  Section 1525 repeats the mandate to cooperate with a foreign representative.

48

No. 13-13508-SHL, 2013 WL 10399944 (Bankr. S.D.N.Y. Dec. 11, 2013).  Likewise, in In re Hellas Telecomms. (Lux.) V, the United States Bankruptcy Court for the District of Delaware issued a similar order giving "full force and effect" to such an English scheme of arrangement and ordering broad injunctive orders that effected third-party releases.  No. 10-13651-KJC (Bankr. D. Del. Dec. 13, 2010).  On February 27, 2014, the United States Bankruptcy Court for the Eastern District of New York in In re hibu Inc., granted recognition to an English scheme of arrangement as a "foreign nonmain proceeding" and entered an order giving effect to a series of releases required for implementation of the scheme.  No. 8-14-70323-REG (Bankr. E.D.N.Y. Feb. 27, 2014).  On September 9, 2014, the United States Bankruptcy Court for the Southern District of New York in In re New World Resources, N.V. granted recognition to an English scheme of arrangement as a "foreign main proceeding" and ruled that the scheme was entitled to full force and effect.  No. 14-12226-SMB (Bankr. S.D.N.Y. Sept. 9, 2014).  The New World scheme of arrangement contemplated that existing scheme creditors would provide releases of the debtor and of affiliated persons and entities, including affiliates who had guaranteed the debtor's obligations to the scheme creditors.[64]

---

[64]U.S. Courts have regularly granted recognition to schemes of arrangement and restructuring plans emanating from England and from former British Commonwealth countries other than England and have enforced third-party releases granted pursuant to such schemes of arrangement.  *See* In re Fossil (UK) Global Services Ltd, Case No. 25-90525 (Bankr. S.D. Tex. Nov. 12, 2025); In re Mega Newco Limited, No. 24-12031 (Bankr. S.D.N.Y. Nov. 25, 2024); In re CB&I UK Limited, Case No. 23-90795 (Bankr. S.D. Tex. Mar. 22, 2024); In re Light, S.A. – Em Recuperação Judicial, No. 24-90531 (Bankr. S.D. Tex. Nov. 12, 2024); In re DTEK Finance PLC, No. 21-10735 (Bankr. S.D.N.Y. May 20, 2021); In re Swissport Fuelling Ltd., No. 20-12990 (Bankr. D. Del. Dec. 11, 2020); In re New Look Financing plc,  No. 20-12297 (Bankr. S.D.N.Y. Oct. 29, 2020);  In re PizzaExpress Financing 2 PLC, Case No. 20-34868 (Bankr. S.D. Tex. Oct. 4, 2020); In re Codere Finance 2 (UK) Limited,  No. 20-12151 (Bankr. S.D.N.Y., Oct. 9, 2020); In re Virgin Atlantic Airways Limited, Case No.20-11804 (Bankr. S.D.N.Y. Sept. 30, 2020); In re Matalan Finance PLC, No. 20-11749 (Bankr. S.D.N.Y, Sept. 2, 2020); In re  Swissport Fuelling Ltd., No. 20-11524-MFW (Bankr. D. Del., Doc No. 37, July 6, 2020); In re Lecta Paper UK Ltd., No. 19-13990 (MEW), (Bankr. S.D.N.Y. Feb. 4, 2020);  In re New Look Secured Issuer plc, No. 19-11005-SMB (Bankr. S.D.N.Y. May 3, 2019); In re Stripes US Holding, Inc., No. 18-12388-CSS (Bankr. D. Del. Nov. 13, 2018); In re Schahin II Fin. Co. (SPV), No. 18-12964-MEW (Bankr. S.D.N.Y. Nov. 1, 2018) (Cayman Islands); In re Lehman Bros. Int'l (Eur.) (in administration), No. 18-11470-SCC (Bankr. S.D.N.Y. Jun. 19, 2018); In re Bibby Offshore Servs. PLC, No. 17-13588-MG (Bankr. S.D.N.Y. Jan.8, 2018); In re Ocean Rig UDW Inc., 570 B.R. 687 (Bankr. S.D.N.Y. 2017); In re YH Ltd., No. 16-12262-SCC (Bankr. S.D.N.Y. Sep. 8, 2016); In re Winsway Enters. Holdings Ltd., No. 16-10833-MG (Bankr. S.D.N.Y. Jun. 16. 2016) (Hong Kong); In re Kaisa Group Holdings Ltd., No. 16-11303-SHL (Bankr. S.D.N.Y. Jul. 14, 2016) (Cayman Islands); In re Codere Fin. (U.K.) Ltd., No. 15-13017-JLG (Bankr. S.D.N.Y. Dec. 22, 2015; In re Murray Holdings Ltd., No. 15-11231-MG (Bankr. S.D.N.Y. Jun. 25, 2015) (Isle of Man); In re Towergate Finance plc., No. 15-10509 (Bankr. S.D.N.Y. Mar. 27, 2015); In re LDK Solar Co. (in Provisional Liquidation), No. 14-12387-PJW (Bankr. D. Del. Nov. 21, 2014) (Cayman Islands and Hong Kong); In re Zlomrex Int'l Fin. S.A., No. 13-14138-SHL (Bankr. S.D.N.Y. Jan. 31, 2014); In re Allianz Glob. Corp. & Specialty (Fr.), No. 10-4990-SMB (Bankr. S.D.N.Y. Nov. 4, 2011); In re Tokio Marine Eur. Ins. Ltd., No. 11-13420-MG (Bankr. S.D.N.Y. Sep. 8, 2011).

ACTIVE/206784363.2

101.     Nearly all requests for additional relief for purposes of enforcing or giving effect to schemes of arrangement or other orders resulting from foreign insolvency proceedings and involving certain releases of third parties have been granted by U.S. courts.[65] Here, based on the terms of the Plans, the Sanction Order giving full force and effect to the Plans will include enforcement of the Non-Debtor Effects against Plan Creditors.

102.     The courts that recognized and enforced schemes of arrangement that included third-party releases and complementary provisions for binding third parties initially relied on precedent in U.S. case law under chapter 15 for the enforcement of third-party releases and related injunctions as additional relief upon recognition under chapter 15, where the releases were permissible under the law of the foreign proceeding, the affected parties had notice and an opportunity to be heard, and the releases were approved by the foreign court.[66] *See, e.g.*, In re Metcalfe & Mansfield Alt. Invs., 421 B.R. 685, 700 (S.D.N.Y. 2010); In re Sino-Forest Corp., 501 B.R. 655, 666 (Bankr. S.D.N.Y. 2013); In re Magyar Telecom B.V., No. 13-13508-SHL, 2013 WL 1039994 (Bankr. S.D.N.Y. Dec. 11, 2013); In re Avanti Commc'ns Grp. plc, 582 B.R. at 618. These decisions each recognize that section 1507 provides authority to approve the release provisions under the doctrine of international comity. In re Sino-Forest Corp., 501 B.R. at 663; In re Metcalfe & Mansfield Alt. Invs., 421 B.R. at 699-700.[67]

---

[65]*Cf.* In re Vitro S.A.B. de C.V., *infra* note 57.

[66]A notable exception occurred in the case of In re Vitro, S.A.B. de C.V., 473 B.R. 117 (Bankr. N.D. Tex. 2012), aff'd, 701 F.3d 1031 (5th Cir. 2012), cert. dismissed, 569 U.S. 944 (2013), where the bankruptcy court declined to enforce a Mexican *concurso* (similar to a scheme of arrangement) where the plan granted relief not available under U.S. law and did not give "sufficient protection" to creditors. In my opinion, however, Vitro is distinguishable from the Restructuring Plans for at least two significant reasons: first, the Vitro opinion is peculiar to the United States Court of Appeals for the Fifth Circuit, which appears to take a different and altogether more stringent approach to the question of third-party releases than most other Circuit Courts of Appeal, and second, the Restructuring Plans and surrounding facts are much more analogous to the circumstances of the Metcalfe & Mansfield and Sino-Forest proceedings, where the schemes in question required the support of the requisite majority of independent investors in order to secure approval by the respective foreign courts.

[67]The Metcalfe & Mansfield court noted that Second Circuit case law, which governs the US Bankruptcy Court, "places narrow constraints on bankruptcy court approval of third-party non-debtor release and injunction provisions" but that "the use of such provisions is not entirely precluded." In re Metcalfe & Mansfield Alt. Invs., 421 B.R. at 697 (citing In re Metromedia Fiber Network, Inc., 416 F.3d 136, 142 (2d Cir. 2005)). The Third Circuit also took a narrow view of the circumstances that permit thir- party releases in chapter 11 cases but bankruptcy courts within the Third Circuit have recognized and enforced schemes of arrangement that include third-party releases. *See* In re Millennium Lab Holdings II, LLC, 945 F.3d 126 (3d Cir. 2019); In re Swissport Fuelling Ltd., Case No. 20-12990 (Bankr. D. Del. Dec. 11, 2020).

50

ACTIVE/206784363.2

103.    In April 2018, Chief Judge Martin Glenn, the author of the <u>Metcalfe & Mansfield</u> decision, elaborated on the reasoning that supports enforcement of third-party releases and related injunctions in the <u>Avanti</u> decision.  Significantly, he relied on the following discussion of English authority presented to him in a declaration of English counsel:

> …third-party nondebtor releases are common in schemes sanctioned under UK law, particularly for releases of affiliate guarantees of the debt that is being adjusted by the scheme. *See In re T & N Ltd and others (No 4) [2006] EWHC 1447 (Ch)* (David Richards , J.) (holding that a scheme did not necessarily prohibit the alteration of third-party claims against insurers); *Re Lehman Brothers International (Europe) (In administration) (No 2) [2009] EWCA Civ 1161* (following *T & N*, Patten LJ held (at paragraph 63) that it was "entirely logical to regard the court's jurisdiction as extending to approving a scheme which varies or releases creditors' claims against the company on terms which require them to bring into account and release rights of action against third-parties designed to recover the same loss. The release of such third-party claims is merely ancillary to the arrangement between the company and its own creditors."); *In Re La Seda de Barcelona SA [2010] EWHC 1364 (Ch)* (Proudman J applied *T & N* and *Lehman*, and concluded that a third-party subsidiary guarantor could be released pursuant to a deed of release executed on behalf of scheme creditors).

104.    Based on that discussion of English law, Chief Judge Glenn concluded as follows:

> The Court concludes that schemes of arrangements sanctioned under UK law that provide third-party nondebtor guarantor releases should be recognized and enforced under chapter 15 of the Bankruptcy Code. Avanti's Scheme Creditors had a full and fair opportunity to vote on, and be heard in connection with, the Scheme. *See* Angel Declaration, ¶¶ 12, 17–18. The proceedings under UK law in the UK courts afford creditors a full and fair opportunity to be heard in a manner consistent with US due process standards.

> The failure of a US bankruptcy court to enforce the Guarantor Releases could result in prejudicial treatment of creditors to the detriment of the Debtor's reorganization efforts and prevent the fair and efficient administration of the Restructuring. Principles of comity permit a US bankruptcy court to recognize and enforce the Scheme.

> 582 B.R. at 618 (internal citations omitted).[68]

---

[68]Judge Glenn subsequently renewed and reiterated his view that foreign restructuring plans that include third-party releases are entitled to comity if creditors had a full and fair opportunity to vote and be heard.  <u>In re Agrokor D.D.</u>, 591 B.R. 163, 189-190 (Bankr. S.D.N.Y. 2018).

51

105.    A decision of the U.S. Supreme Court effectively reversed the precedents in the Second and Third Circuits, discussed in note 58 *supra*, that permitted chapter 11 plans of reorganization to include non-consensual third-party releases in narrow circumstances. Harrington v. Purdue Pharma, L.P., 603 U.S. ___, 144 S. Ct. 2071 (June 27, 2024) ("**Purdue**"). A decision by the U.S. District Court for the Southern District of New York reversed an order confirming the Purdue chapter 11 reorganization plan on the grounds that there was no statutory authority for the broad third-party releases contained in the plan.[69] The District Court Order was appealed to the Second Circuit and the Second Circuit reversed it.[70] The Supreme Court, in reversing the Second Circuit, was careful to limit its ruling to the chapter 11 reorganization plan context:

> Confining ourselves to the question presented, we hold only that the bankruptcy code does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of affected claimants.[71]

106.    Subsequent to the District Court decision rejecting third-party releases in the Purdue Pharma chapter 11 case, Southern District of New York Bankruptcy Judge Lisa G. Beckerman noted that in a chapter 15 case principles of comity determine whether third-party releases should be enforced: "Principles of enforcement of foreign judgments in comity in Chapter 15 cases strongly counsel approval of enforcement in the United States of third-party, non-debtor release and injunction provisions even if those provisions could not be entered in a plenary Chapter 11 case. (citing the Metcalfe & Mansfield decision)." In re Huachen Energy, Ltd., Case No. 22-10005, Dkt. No. 22 (Transcript) at p. 19; Dkt. No. 19 (Order Recognizing Foreign Proceeding and Granting Additional Relief) (Bankr. S.D.N.Y. Feb 1 and Feb.2, 2022).[72]

---

[69]In re Purdue Pharma L.P., 635 B.R. 26 (S.D.N.Y. 2021). *See also* Patterson, et al v. Mahwah Bergen Retail Group, Inc., 2022 WL 33425 (E.D. Vir. 2022) (same).

[70]In re Purdue Pharma, L.P., 69 F4th 45 (2d Cir. 2023). Prior to the Supreme Court's Purdue decision, a Third Circuit bankruptcy court confirmed a reorganization plan that included broad release and exculpation provisions, noting the Purdue Pharma and Patterson/Mahwah lower court decisions but concluding that they did not represent the law in the Third Circuit. In re Mallinckrodt PLC, et al, note 69, Case No. 20-12522 (Bankr. D. Del. Feb. 3, 2022).

[71]Purdue at p. 19.

[72]Three additional post-Purdue decisions in chapter 15 cases enforced foreign court orders granting third-party releases. None mentioned or discussed the Purdue decision. In re Light S.A., Order Granting (I) Recognition of Brazilian Proceeding, (II) Full Force And Effect To Brazilian Plan, And (III) Certain Related Relief, Case No. 24-90531) (enjoining claims against related entities, having the effect of third-party releases) (Bankr. S.D. Tex. Nov. 11, 2024); In re Americanas, S.A, et al., Decision And Order Giving Force And Effect To The Brazilian RJ Plan And Granting Related Relief, 2024 WL 3506637 (Bankr. S.D.N.Y. July 22, 2024); In re Nexii Building Solutions Inc., et al, Case No.

52

107.    Two post-Purdue decisions directly consider whether Purdue's rejection of non-consensual third-party releases in chapter 11 cases affects the enforcement of third-party releases in chapter 15 cases.  Both cases hold that third-party releases granted in foreign proceedings can be enforced in a chapter 15 case in the United States.  The Bankruptcy Court for the District of Delaware relied on Sections 1521 and 1507 to enforce a Mexican reorganization plan that included third-party releases, notwithstanding an objection interposed on Purdue grounds:

> Accordingly, the plain language of both section 1521(a)(7) and section 1507(a) permit a U.S. court to enforce a foreign order for nonconsensual third-party releases. Nevertheless, even if the Chapter 15 Catchalls are ambiguous, the legislative history and canons of statutory construction confirm this interpretation and corresponding Congressional intent.[73]

108.    The Bankruptcy Court for the Southern District of New York reached a similar conclusion:

> … the plain text of Chapter 15, (2) caselaw under its predecessor (section 304), and (3) pre-Purdue caselaw in this district all support a finding that courts can, pursuant to section 1521 of the Code, issue orders pursuant to their discretionary powers under section 1521 which contain nonconsensual third-party releases, whether or not those releases originate from a foreign court. Having found that this power exists under section 1521, this Court need not conduct a full analysis of section 1507 to determine whether it, too, so permits.[74]

109.    In my opinion, the authority discussed above that third-party releases – Non-Debtor Effects – can be enforced in chapter 15 cases is well reasoned and any such releases under the Plans and Sanction Order are most likely to be enforced in the United States.

**The English Plans Are Not Manifestly Contrary To U.S. Public Policy**

110.    The conclusion by the English courts discussed in the Avanti decision and quoted in ¶83 above, that their jurisdiction extends to approving a scheme that "…varies or releases creditors' claims against the company …and rights of action against third parties designed to

---

24-10026, Order (I) Recognizing and Enforcing The Ancillary Order, (II) Approving the Procedure Governing Closing of Chapter 15 Cases and (III) Granting Ancillary Relief (Bankr. D. Del. July 22, 2024).

[73] In re Credito Real, S.A.B. de C.V., SOFOM, E.N.R., 670 B.R. 150, 169 (Bankr. D. Del. 2025), affd. Case No. 25-371 (D. Del. Mar. 31, 2026).

[74] In re Odebrecht Engenharia e Construção S.A. Em Recuperação Judicial, 669 B.R. 457 (Bankr. S.D.N.Y. 2025).

53

recover the same loss..." is consistent with the exercise of "related to jurisdiction" in bankruptcy cases by U.S. courts.[75] The Plan Companies would likely face indemnity claims by any Released Person who was sued relative to the Plan Debt, the Plans or the Restructuring. Each such Released Person would have a claim against the relevant Plan Company were it alleged to be or held responsible for such claims. "Related to" jurisdiction has been exercised in cases under chapter 11 of the Bankruptcy Code to enforce third-party releases and complementary injunctive orders, and such exercise has been approved by the U.S. Supreme Court in the context of an asbestos-related case. *See* Celotex Corp. v. Edwards, 514 U.S. 300, 307-309 (1995).[76] If a creditor has a claim against a Released Person and the Released Person then has a "ricochet" claim against a Plan Company, then modifying the rights of such creditor by releasing its claim should not be objectionable as manifestly contrary to U.S. public policy.

111. In my opinion, the Plans should not raise any concerns based on the public policy exception under section 1506.[77] As noted above, U.S. courts have previously recognized and given full force and effect to numerous schemes of arrangement and restructuring plans that included Non-Debtor Effects including third-party releases.

112. Should the CoreCo Plan rely on the cross-class cram down feature, the CoreCo Plan should still be given full force and effect. The requirements and effects of a cross-class cramdown under Section 901G of Part 26A are different than those for such a cram down under Section 1129(b) of the Bankruptcy Code (which invokes the "absolute priority rule" in a cram down of a class of unsecured creditors), but both laws permit the imposition of a restructuring plan on a dissenting class of creditors in specified circumstances.[78] U.S. courts

---

[75] 28 U.S. Code § 1334, Bankruptcy cases and proceedings, provides in pertinent part: "(a) Except as provided in subsection (b) of this section, the district courts shall have original and exclusive jurisdiction of all cases under title 11(b). Except as provided in subsection (e)(2) [not relevant], and notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, **the district courts shall have original but not exclusive jurisdiction of all civil proceedings** arising under title 11, or arising in or **related to cases under title 11**. (emphasis added)

[76] The Bankruptcy Code specifically permits third-party releases in reorganization plans of companies with asbestos-related liabilities. 11 U.S.C. §524(g). In addition, even the Fifth Circuit Vitro decision that denied enforcement of a Mexican reorganization plan containing third-party releases recognized that the §1506 "manifestly contrary to public policy exception" must be applied narrowly and based its ruling on other grounds. Vitro, *supra,* 701 F.3d at 1069.

[77] See *supra* note 35.

[78] §1129(b) provides: "…if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." For a class of unsecured

54

regularly hold that relief granted in a foreign proceeding need not be identical to relief available in a U.S. proceeding.  For example, the Court in the <u>Metcalfe & Mansfield</u> decision discussed above stated:

> The relief granted in the foreign proceeding and the relief available in a U.S. proceeding need not be identical. A U.S. bankruptcy court is not required to make an independent determination about the propriety of individual acts of a foreign court. *See In re Bd. of Dirs. of Multicanal S.A.,* 307 B.R. 384, 391 (Bankr.S.D.N.Y.2004) (noting that neither case law nor section 304 (the statutory predecessor to chapter 15) require a determination that the foreign proceeding is identical to the U.S. proceeding). The key determination required by this Court is whether the procedures used in Canada meet our fundamental standards of fairness. *See Cunard S.S. Co. Ltd. v. Salen Reefer Servs. AB,* 773 F.2d 452, 457 (2d Cir.1985).[79]

113.    The English Proceedings indisputably satisfy the "fundamental standards of fairness" requirement.

114.    A foreign country's distribution rules need not be identical to U.S. distribution rules and need not follow the absolute priority rule.  <u>In re Rede Energia S.A</u>., 515 B.R. 69 at 103 - 104 (Bankr. S.D.N.Y. 2014).  In addition, U.S. courts have enforced English restructuring plans that involved cross-class cram downs in several cases that did not result in reported decisions.[80]

115.    The Plan process contemplates that the requisite majorities of affected Plan Creditors will approve the Plans or, where applicable, that the English Court will sanction the Plans (including through cross-class cram down) in accordance with the requirements of the Companies Act 2006. That process is broadly analogous to the disclosure, voting and

---

creditors, "fair and equitable" means that no class junior to the dissenting class can participate in plan distributions, the so-called "absolute priority rule." §1129(b)2(B) provides:  "**(B)**With respect to a class of unsecured claims— **(i)** the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
**(ii)** the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property…".
[79] <u>In re Metcalfe & Mansfield Alt. Invs.</u>, 421 B.R. 685, 697 (S.D.N.Y. 2010).  See also <u>In re Canterbury Securities, Ltd.</u>, 675 B.R. 109,120 (Bankr. S.D.N.Y. 2025).
[80] See, e.g., <u>In re PizzaExpress Fin. 2 PLC</u>, No. 20-34868 (Bankr. S.D. Tex Nov. 3, 2020) (ultimately, all classes accepted the restructuring plan so that the cross-class cramdown feature was not invoked); <u>In re CB&I UK Limited, et al</u>, No. 23-90795 (Bankr. S.D. Tex. Mar. 22, 2024).

55

confirmation framework applicable to chapter 11 plans under the US Bankruptcy Code. See 11 U.S.C. §§ 1125–1126, 1128–1129. Accordingly, the procedures governing the Plans are consistent with U.S. public policy. In addition, U.S. courts have long exercised "related to" jurisdiction to grant relief comparable to that contemplated by the Plans and the anticipated Sanction Order, including varying or releasing creditor rights. Given that similar relief could be granted in a domestic proceeding, recognition and enforcement of the Plans by the US Bankruptcy Court would not be manifestly contrary to the public policy of the United States.

**Comity In The Absence of Chapter 15 Recognition**

116.    The PSL discloses that the Plan Companies will seek recognition and enforcement of the Plans under chapter 15.  PSL ¶¶ 13.3 – 13.7.  [DG-065]  If the English Court enters the Sanction Order and the Plan Companies register copies of the Sanction Order with the Companies Registrar, the Plans will become effective and binding on all Plan Creditors.  PSL ¶¶19.2, 19.3.  [DG-070]  Even if the Plans were not recognized under chapter 15, an affected party other than the Foreign Representative could request comity to the Plans and the Sanction Order. Whether or not the Foreign Representative obtained chapter 15 recognition and enforcement of the Plans, the Plan Companies or any affected party could ask a U.S. court in litigation in the U.S. against a Plan Company or any affected party to grant comity to the Sanction Order and the Plans and to enforce the Plans.

117.    When the party seeking recognition and enforcement of the foreign court's order is not a foreign representative, chapter 15 is not applicable.  In a case where recognition of an English bankruptcy proceeding of a natural person had been denied because the debtor no longer had its COMI or an establishment in England, a New York state court granted comity to the discharge granted to the debtor in the UK bankruptcy, noting:  "In that regard, [Bankruptcy] Judge Peck stated that 'all of the provisions of Section 1509 deal with rights of the foreign representative' and that:  '[l]ooking literally at the language of Section 1509(d), which deals, literally, with the situation of nonrecognition, it is apparent from the plain language that the consequence of nonrecognition applies only to prevent the *foreign representative* from obtaining comity or cooperation from courts in the United States, and does not, by its literal terms, preclude the *foreign debtor* from asserting an entitlement to

56

comity. (emphasis added.)'"   Barclays Bank PLC v. Kemsley, 44 Misc. 3d 773 (N.Y. Sup. Ct. 2014).  Here, the Sanction Order would be analogous to the discharge in the Kemsley bankruptcy.  Comity is the recognition that one nation affords to, *inter alia*, the judicial acts of another nation and requires a determination that the foreign court satisfied fundamental standards of procedural fairness and that the foreign order was not contrary to U.S. public policy.  Id. at 779-780.  For the reasons discussed above in the context of analyzing recognition and enforcement under chapter 15, the English Proceeding is procedurally fair and does not violate U.S. public policy.  *See also* Oui Financing v. Dellar and Oui Management, 2013 WL 5568732 (S.D.N.Y. 2013) (granting comity to a stay order emanating from a French safeguard plan to dismiss litigation against the president of the debtor); Trikona Advisors v. Chugh, 846 F. 3d 22 (2d Cir. 2017) (dismissing litigation based on granting comity to facts found in a Cayman Islands winding up proceeding); EMA Garp Fund v. Banro Corporation, et al, 2019 WL 773988 (S.D.N.Y. 2019) (dismissing litigation of securities law claims by granting comity to releases of those claims granted in a Canadian restructuring proceeding).  In my opinion, if recognition of the Plans is not obtained, or if the Plan Companies or an affected party (other than a foreign representative) requested comity, the Plans would most likely be enforced in the U.S. based on comity being granted to the English Proceedings under the principles discussed above.

**Conclusion**

118.   I understand that as part of considering whether to exercise its discretion to sanction the Plans, the English Court will consider whether the Plans, if approved, will have substantial effect in the United States if necessary.  As set out above, it is my opinion that if the Plan Companies seek recognition and enforcement of the Plans:  (a) the US Bankruptcy Court will most likely recognize the English Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code; (b) relief can most likely be obtained to insure that the effects of the Plans would be enforceable in the United States; (c) the waivers and Releases provided for by the Plans would likely be enforceable in the United States, within the territorial jurisdiction of the United States; (d) the Plans would likely be recognized in the United States under principles of international comity (i.e., that, in accordance with such principles, whether a creditor would or could be prevented from bringing legal proceedings in the United States

57

against the Plan Companies or other persons affected by the Plans in contravention of the terms of the Plans; (e) the parties to the Indenture would be found to have properly amended it by obtaining the consents necessary to approve the Indenture Amendments and by entering into Supplemental Indentures to implement the Indenture Amendments; and (f) NFE Brazil Newco would be determined to have properly acceded to the Indenture as a Guarantor of the 2029 New Notes.

119.    In addition, subject to the English Court being satisfied that the requirements of procedural and substantive fairness are met at the Sanction Hearing, the Plan Companies should be able to rely on the exemption under Section 3(a)(10) of the Securities Act, such that the issuance of securities pursuant to the Plans may be effected without registration.

58

ACTIVE/206784363.2

**Statement of Truth**

I confirm that I have made clear which facts and matters referred to in this report are within my own knowledge and which are not. Those that are within my own knowledge I confirm to be true. The opinions I have expressed represent my true and complete professional opinions on the matters to which they refer.

I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

_Daniel M. Glosband_

Daniel M. Glosband

April 30, 2026

ACTIVE/206784363.2