**EXHIBIT B**

**Appendix A**

# Appendix A

**Appendix A Index**
**NFE Brazil Newco Limited and NFE Global Holding Limited**

| Tab | Document Description |
|---|---|
| 1. | Instructions |
| 2. | Practice Statement Letter dated April 20, 2026 |
| 3. | Indenture dated as of November 22, 2024 |
| 4. | First Supplemental Indenture dated as of April 3, 2026; Second Supplemental Indenture dated as of April 9, 2026 |
| 5. | Consent Solicitation Statement, Officer's Certificate, Certificate of Information and Tabulation Agent, Legal Opinions |
| 6. | Corporate Debt Documents (not included in this Appendix A) |
| 7. | NFE Global Holdings Limited Draft Restructuring Plan |
| 8. | NFE Brazil Newco Limited Draft Restructuring Plan |
| 9. | Board Resolutions |

# Tab 01

SKADDEN, ARPS, SLATE, MEAGHER & FLOM (UK) LLP

22 BISHOPSGATE

LONDON EC2N 4BQ

———

TEL: (020) 7519-7000

FAX: (020) 7519-7070

www.skadden.com

AFFILIATE OFFICES
———
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
NEW YORK
PALO ALTO
WASHINGTON, D.C.
WILMINGTON
———
ABU DHABI
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
MUNICH
PARIS
SÃO PAULO
SEOUL
SINGAPORE
TOKYO
TORONTO

29 April 2026

Daniel M. Glosband
CBInsolvency LLC
34 Atlantic Avenue
Swampscott, MA 01907
United States of America

**BY EMAIL**: glosband@CBInsolvency.com

Dear Mr Glosband,

**In the Matter of NFE Global Holdings Limited ("NFE Global") and NFE Brazil Newco Limited ("NFE Brazil Newco") and in the Matter of the Companies Act 2006 (the "Application")**

**Independent Expert Witness – Letter of Instruction – Expert Opinion on Foreign Law Recognition of Proposed Restructuring Plans**

### I.    Introduction

1.    Thank you for agreeing to act as an independent expert witness in relation to the proposed restructuring of the liabilities of NFE Global and NFE Brazil Newco (the "**Plan Companies**"), to be implemented by two English law restructuring plans under Part 26A of the Companies Act 2006 (the "**Act**"):

(a)    NFE Global as the applicant in the "**CoreCo Plan**"; and

(b)    NFE Brazil Newco as the applicant in the "**BrazilCo Plan**"

(together, the "**Plans**").

SKADDEN, ARPS, SLATE, MEAGHER & FLOM (UK) LLP, A LIMITED LIABILITY PARTNERSHIP REGISTERED UNDER THE LAWS OF THE STATE OF DELAWARE, IS AUTHORISED AND REGULATED BY THE SOLICITORS REGULATION AUTHORITY UNDER REFERENCE NUMBER 80014.

A LIST OF THE FIRM'S PARTNERS IS OPEN TO INSPECTION AT THE ABOVE ADDRESS.

DG-001

Mr Daniel M. Glosband
29 April 2026

2.  We act for New Fortress Energy Inc., a Delaware corporation (the "**Parent**") and its direct and indirect subsidiaries (the "**Group**") in relation to the Plans.

3.  As detailed in **Section XIII** below, your role as an expert witness will primarily involve the production of an expert report (the "**Report**"), to be filed at the High Court of Justice England and Wales (the "**Court**") in connection with NFE Global and NFE Brazil Newco's applications to convene and hold meetings of certain of their creditors (referred to as the "**Plan Creditors**") for the purpose of considering and, if thought fit, approving the Plans, as well as other duties appropriate to the role of an expert witness, as directed by the Court or instructed by us (the "**Engagement**").

4.  The purpose of this letter ("**Letter of Instruction**") is to confirm your instructions as an independent expert witness in relation to the Plans and to ensure that the Report is prepared in accordance with Part 35 of the Civil Procedure Rules 1998 (the "**CPR**").

5.  In relation to the Engagement, you will only take instructions from Skadden, Arps, Slate, Meagher & Flom (UK) LLP ("**Skadden**" or "**we**" or "**us**", as the context requires).

6.  For the avoidance of doubt, to the extent that there is any inconsistency between the terms of this Letter of Instruction and the terms of the engagement letter agreed between you and the Parent dated 20 October 2025 or any subsequent supplemental engagement letter, the terms of this Letter of Instruction shall prevail.

7.  Capitalised terms in this letter shall have the meaning given to them in the Practice Statement Letter dated 20 April 2026 (the "**PSL**"), unless otherwise defined herein.

## II.   Background

NFE Global

8.  NFE Global is a private company limited by shares incorporated in England and Wales under registered number 13679588 and with its registered office address at Suite 1, 7th Floor, 50 Broadway, London SW1H 0BL, United Kingdom.  NFE Global was incorporated on 14 October 2021. NFE Global is a member of the Group, a direct wholly-owned subsidiary of NFE International Holdings Limited (a Bermudian company) and an indirect wholly-owned subsidiary of the Parent. NFE Global has no material assets.

NFE Brazil Newco

2

DG-002

Mr Daniel M. Glosband
29 April 2026

9.     NFE Brazil Newco is a private company limited by shares incorporated in England and Wales under registered number 17141053 and with its registered office address at Suite 1, 7th Floor, 50 Broadway, London SW1H 0DB, United Kingdom.  NFE Brazil Newco was incorporated on 7 April 2026.  NFE Brazil Newco is a member of the Group, a direct wholly-owned subsidiary of NFE Financing LLC (a Delaware limited liability company) and an indirect wholly-owned subsidiary of the Parent.

NFE Group

10.    The Group is a global energy infrastructure business.  The Group's business model spans the entire production and delivery chain from natural gas procurement and liquefaction to shipping, logistics, facilities and conversion or development of natural gas-fired power generation.

11.    The Group delivers targeted energy solutions by employing an integrated liquefied natural gas ("**LNG**") supply and delivery model summarised as follows:

(a)    ***LNG and Natural Gas Supply and Liquefaction***: the Group supplies LNG and natural gas regasified from LNG to its own power plants and to its customers. The Group's first floating liquefaction unit, FLNG 1, began producing LNG in July 2024, and the Group sources a significant portion of its LNG needs from this facility. Currently, demand for LNG above FLNG 1's capacity is acquired from third-party suppliers in open market purchases.

(b)    ***Shipping***: the Group leases, owns or operates a fleet of two floating storage and regasification units and five liquefied natural gas carriers, two of which operate as additional floating storage units. Six vessels are owned by Energos Infrastructure, and the Group also charters vessels to and from third parties.

(c)    ***Facilities***: through its network of current and planned downstream facilities and logistics assets, the Group is strategically positioned to deliver gas and power solutions to its customers seeking either to transition from environmentally dirtier distillate fuels such as automotive diesel oil and heavy fuel oil, or to purchase natural gas to meet their current fuel needs.

12.    Additionally, the Group builds modular LNG manufacturing production facilities that can be deployed in various locations globally to liquify natural gas cheaply and efficiently.

The Parent

13.    The Parent is a Delaware corporation and is the ultimate holding company of the Group.  As of 31 March 2026, the Parent had 285,634,650 shares of

3

DG-003

Mr Daniel M. Glosband
29 April 2026

Class A common stock outstanding. The Class A common stock is listed on the Nasdaq Global Select Market and carries voting rights.

**III.   The Plan Debt**

14.   The CoreCo Plan relates to rights, liabilities and obligations arising under the following debt instruments (as defined and explained in Section 5 of the PSL):

(a)   the 2026 Legacy Notes Debt;

(b)   the 2029 Legacy Notes Debt;

(c)   the R-1 Revolving Credit Facility Debt;

(d)   the R-2 Revolving Credit Facility Debt;

(e)   the Term Loan B Debt;

(f)   the Term Loan A Debt;

(g)   the Series I Loan Debt; and

(h)   the Series II Loan Debt,

(together, the "**CoreCo Plan Debt**" and together with the Letter of Credit Facility, the "**Corporate Debt**").

15.   The BrazilCo Plan relates to rights, liabilities and obligations arising under the 2029 New Notes Debt, (the 2029 New Notes Debt together with the CoreCo Plan Debt, being the "**Plan Debt**").

16.   NFE Brazil Newco was incorporated on 7 April 2026 and became a guarantor in respect of the 2029 New Notes on 9 April 2026 pursuant to a First Supplemental Indenture dated as of 3 April 2026 and a Second Supplemental Indenture dated as of 9 April 2026 (the "**Supplemental Indentures**").

17.   The Group's current collateral and priority arrangements are described in Section 5(H) of the PSL.

**IV.   The Plans and the Restructuring**

The Plans

18.   The purposes and objectives of the Plans are to:

(a)   restructure the Plan Companies' and the Group's balance sheets;

4

DG-004

Mr Daniel M. Glosband
29 April 2026

    (b)    address approaching maturities under the Plan Debt and replace existing debt with new debt and preferred equity finance arrangements that provide the Group and the Plan Companies with a sustainable capital structure;

    (c)    enable access to new money financing to address each of the CoreCo Group's and the BrazilCo Group's near-to medium-term liquidity needs, to the extent required; and

    (d)    facilitate the holistic restructuring of the Group, including the BrazilCo Separation (described in further detail in paragraph 22 below), pursuant to the Restructuring.

19. Further details of the Plans are set out in Section 9 of the PSL.

20. Pursuant to the Plans, the Plan Creditors will release their existing claims against the Group in return for a mix of debt, preferred equity and common equity (the "**Plan Consideration**"). The Plan Consideration is allocated in accordance with the Plan Creditors' existing rights against various Collateral Pools. The respective Plan Classes, Collateral Pool interests and Plan Consideration are summarised in paragraph 1.8 of the PSL.

The Restructuring

21. The Group is expected to carry out other processes in parallel with the Plans in order to implement a holistic restructuring of the Group's corporate and capital structure. These processes are collectively referred to as the "**Restructuring**". Details about the Restructuring are set out in the Restructuring Term Sheet and in Section 8 of the PSL.

22. The Restructuring will include, among other things, the separation of the Group into two standalone businesses:

    (a)    a business comprising New BrazilCo Parent and its direct and indirect subsidiaries, comprising the Group's Brazilian business and PA Land, ("**BrazilCo Group**"); and

    (b)    a business comprising the Parent and its direct and indirect subsidiaries other than the BrazilCo Group ("**CoreCo Group**").

23. Please refer to the PSL and the Restructuring Term Sheet, enclosed with this Letter of Instruction, for further background on the Plans and the Restructuring.

**V.    Restructuring plan process under Part 26A of the Companies Act**

24. The restructuring plan process and requirements pursuant to Part 26A of the Act are described in section 2 of the PSL as follows:

5

2122

DG-005

Mr Daniel M. Glosband
29 April 2026

(a) A restructuring plan is a formal, court-sanctioned legal procedure designed to help companies facing financial distress, generally, to avoid terminal insolvency proceedings or value destructive enforcement or other processes.

(b) A restructuring plan can be proposed by a company which has encountered, or is likely to encounter, financial difficulties that are affecting, or will or may affect, its ability to carry on its business as a going concern.

(c) A restructuring plan enables a company to agree a compromise or arrangement with its creditors or any class of its creditors and its members or any class of its members in respect of its debts or obligations owed to those creditors or members. The purpose of the proposed compromise or arrangement must be to eliminate, reduce or prevent, or mitigate the effect of, any of the financial difficulties currently faced by the plan company.

(d) A restructuring plan will become effective if:

(i) either:

(1) **approval of each class**: the restructuring plan is approved by at least 75 per cent. in value of each class of creditors and/or members of the plan company present in person or by proxy and voting at each meeting convened to approve the restructuring plan; or

(2) **cross-class cram down**: if the restructuring plan is not approved by the requisite majority of creditors in each class (any such class not approving being a "**Dissenting Class**"):

(a) the Court is satisfied that, if the restructuring plan is sanctioned, none of the members of any Dissenting Class would be any worse off than they would be in the event of the '*relevant alternative*'. The relevant alternative is whatever the Court considers to be the most likely alternative if the restructuring plan is not sanctioned; and

(b) the restructuring plan has been approved by at least 75 per cent. in value of one or more classes that would receive a payment, or have a genuine economic interest in the plan

6

2123

DG-006

Mr Daniel M. Glosband
29 April 2026

> company, in the event of the relevant alternative;

(ii)     the Court approves the restructuring plan by making an order sanctioning the restructuring plan; and

(iii)    (in the case of companies registered in England and Wales) a copy of the order sanctioning the restructuring plan is delivered to the Registrar of Companies.

(e)     Once effective, a restructuring plan will bind all the creditors and members subject to it, whether or not those creditors or members voted in favour of it or voted against it or did not vote at all and, in each case, their successors and assigns.

## VI.   Hearing dates

25.   The Plan Companies intend to apply to the High Court at a hearing (the "**Convening Hearing**") for an order convening certain meetings of the Plan Creditors for the purpose of considering, and, if thought fit, approving the their respective Plans.  The Convening Hearing has been listed for 14 May 2026.  It is not anticipated that you will be required to provide oral evidence at the Convening Hearing.

26.   The Plan Companies intend to apply to the High Court for an order sanctioning their respective Plans at a further hearing for that purpose (the "**Sanction Hearing**").  The Sanction Hearing has been listed for 18 June 2026. It is not currently anticipated that you will be required to provide oral evidence. However, we would ask that you please reserve this date in your diary, as your attendance may be required at the Sanction Hearing.

27.   In the event that your oral evidence is required we will provide you with further information in that regard.

## VII.   Relevant Alternative Report

28.   The Plan Companies have engaged Alvarez & Marsal to assess the likely outcome for Plan Creditors, lenders under the Letter of Credit Facility and the existing shareholders of NFE Inc. should the Relevant Alternative occur with respect to the Plan Companies and the Group.  If the Plans are not sanctioned, the Relevant Alternative is understood to be a proceeding under chapter 11 of the U.S. Bankruptcy Code to facilitate sales of the assets and separable business units within the Group to maximise recoveries to creditors pursuant to section 363 of the U.S. Bankruptcy Code.  The entities that comprise the Group's Brazilian business will most likely not commence voluntary proceedings under chapter 11 of the U.S. Bankruptcy Code (although the risk cannot be completely eliminated) and would be sold as a going concern independently from the section 363 sale process.

7

2124

DG-007

Mr Daniel M. Glosband
29 April 2026

29. According to Alvarez & Marsal's analysis (the "**Relevant Alternative Report**"), each Plan Creditor will be no worse off should the Plans be sanctioned and the Restructuring be implemented than it would in the Relevant Alternative.

## VIII.   Recognition

30. Because the United States is a material jurisdiction to the Group in terms of its assets, operations and management, each debt instrument subject to the Plans is governed by New York law and subject to New York jurisdiction, and certain of the Plan Creditors are expected to be U.S. persons, to ensure the effective and economical administration of the Plans and prevent adverse action in the United States, the Plan Companies will seek recognition of the Plans pursuant to Chapter 15 of Title 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") as provided in the Restructuring Support Agreement (the "**Chapter 15 Recognition Proceedings**").

31. To seek the Chapter 15 Recognition, the Company must appoint a foreign representative as such term is defined in section 101(24) of the Bankruptcy Code (the "**Foreign Representative**") to commence, or cause the commencement of the Chapter 15 Recognition Proceedings, on the Plan Companies' behalf, and to take certain other actions with respect to such proceedings. The Foreign Representative will file a petition (the "**Chapter 15 Petition**") in the United States Bankruptcy Court for the Southern District of New York (or such other appropriate forum determined by the Plan Companies) (the "**U.S. Bankruptcy Court**") seeking an order (i) recognising the Plans as a foreign main proceeding under chapter 15 of the U.S. Bankruptcy Code and (ii) providing that the Plans and the Sanction Order are entitled to full force and effect in the United States in accordance with their terms for recognition and enforcement of the Plans (and any order sanctioning the Plans) under chapter 15 of the U.S. Bankruptcy Code

32. The minutes of the resolutions of the board directors of each of the Plan Companies, passed on 17 April in London, at which the Foreign Representative was appointed (the "**Resolutions**") are enclosed with this Letter of Instruction.  The Resolutions reflect that the Plan Companies appointed Christopher Boas as the Foreign Representative in connection with the Chapter 15 Recognition Proceedings.

## IX.   Center of main interests

33. To assist you with preparing the Report, including the 'center of main interests analysis', we wish to draw your attention to the following facts in relation to the Plan Companies, and the restructuring process more broadly:

    (a)   ***Place of incorporation and registered office***: Per paragraphs 8 and 9 above, both the Plan Companies were incorporated in England

8

2125

Mr Daniel M. Glosband
29 April 2026

and Wales and share the same registered office, which is located in London, United Kingdom.

(b)      **Books and records**: The books and records of the Plan Companies are maintained in England.

(c)      **Bank account**: The Plan Companies both have UK bank accounts at J.P. Morgan's London branch. NFE Global has maintained its bank account since February 2026, and NFE Brazil Newco since April 2026.

(d)      **Governance**: Both the Plan Companies have a UK based director, Christopher Boas. A UK citizen and resident, Mr Boas was appointed as the director of NFE Global on 8 April 2026, and of NFE Brazil Newco on the date of its incorporation, 7 April 2026. Mr. Boas does not serve as a director of any other entity in the Group. NFE Global's and NFE Brazil Newco's corporate secretary is Vistra Cosec Limited, a UK company.

(e)      **Restructuring activities**: The Parent's and the Plan Creditors' principals, as well as their U.S. counsel, are primarily located in the United States. Skadden's UK team has been involved in the restructuring negotiations since at least August 2025 and has held meetings and calls with the creditors' UK counsel since at least October 2025. Restructuring-related discussions between Skadden, UK creditor advisors, and respective barristers have taken place in the UK.

(f)      **Board meetings**: The Plan Companies held two sets of board meetings in London on 9 and 17 April 2026. At those meetings, the Plan Companies approved the Restructuring and the PSL, and appointed Mr Boas as the Foreign Representative for purposes of the Plan Companies' Chapter 15 filing (see paragraph 32 above).

(g)      **Applicable law**: The Part 26A proceedings in connection with the Restructuring have been commenced under the Act, and the Court has exclusive jurisdiction over those proceedings. Key restructuring agreements, including the Restructuring Support Agreement (with respect to matters arising in connection with the Restructuring Plans), and the Deeds of Contribution, are governed by English law.

(h)      **Other UK based advisors**: The Parent has also engaged Kroll Issuer Services Limited as Information Agent and legal counsel from South Square to advise in connection with the Restructuring.

(i)      **Creditor support for UK proceedings**: The Restructuring Support Agreement, which was signed and publicly disclosed on 17 March 2026, notified creditors of the UK address of the Plan Companies,

9

DG-009

Mr Daniel M. Glosband
29 April 2026

and the notice that was sent to creditors upon its execution provided NFE Global's UK contact details for all restructuring-related communications. As of the date of the letter, the Restructuring Support Agreement has been signed or acceded to by creditors representing majorities across every class of the Group's funded debt, including 100% of the Series I and Series II Loan Debt. Each Supporting Creditor has affirmatively agreed to vote in favor of the Plans, to not take any action that would impede the Restructuring, and to forbear from exercising remedies against the Group.

(j) ***Notification of change of address to creditors***: On 25 March 2026, NFE Global notified a change of address to its creditors under all Corporate Debt, providing notice that all future communications should be directed to its UK address. On 10 April 2026, all holders of 2029 New Notes Debt were notified that all future communications to NFE Brazil Newco should be directed to its UK address.

## X.    Exemption under Section 3(a)(10) of the US Securities Act 1933

34.    The Plan Companies intend to rely on the exemption from registration provided by section 3(a)(10) of the U.S. Securities Act of 1933 in respect of the issuance of securities pursuant to the Plans. In this regard, the Plan Companies will rely on the sanction of the Plans by the English Court (e.g. the Sanction Order) as constituting approval of the fairness of the Plans and the transactions contemplated thereby, following a hearing on the procedural and substantive fairness of the Plans.

35.    It is anticipated that all Plan Creditors will receive adequate notice of the Plans and the Sanction Hearing, and will have the right to appear and be heard at such hearing. It is further anticipated that, at the Sanction Hearing, the English Court will consider whether the terms of the Plans, including the exchanges contemplated thereby, are procedurally and substantively fair and equitable, and that the Sanction Order will constitute approval of the fairness of the terms of the Plans for these purposes.

## XI.    Issues for you to address

36.    We request that you prepare your Report addressing the following matters:

(a) *whether the 2029 New Notes Indenture Amendments approved pursuant to the Consent Solicitation and implemented by the execution of the Supplemental Indentures were duly authorized and validly adopted in accordance with the terms of the 2029 New Notes Indenture and New York law, and whether such amendments validly effected: (i) the formation and accession of NFE Brazil Newco to the 2029 New Notes Indenture as a guarantor; (ii) the Proposed LLCA Amendment; and (iii) the ability of NFE Brazil Newco to*

10

2127

Mr Daniel M. Glosband
29 April 2026

*maintain a collateral account with assets of up to $50,000 without the requirement to deliver a control agreement to the Notes Collateral Agent;*

(b)   *whether the United States Bankruptcy Court for the Southern District of New York (or such other appropriate forum determined by the Plan Companies) would recognize the Plans as foreign main proceedings under chapter 15 of the U.S. Bankruptcy Code;*

(c)   *whether, following such recognition, relief would be available and effective in the United States to give effect to, and ensure the enforceability of, the Plans, including in particular the effectiveness, under New York law, of any variation or discharge of the Plan Debt; and*

(d)   *(i) the basis upon which the Plan Companies intend to rely on the exemption in section 3(a)(10) of the US Securities Act 1993 on the sanction of the Plans as constituting approval of the Plans and the transactions contemplated thereby following a hearing on the procedural and substantive fairness of the Plans, at which all Plan Creditors will receive adequate notice and have the right to appear and be heard; and (ii) that, provided such requirements of section 3(a)(10) are satisfied, the Plan Companies should be able to rely on that exemption for the issuance of securities pursuant to the Plans.*

### XII.   Expert's Duties

37.   Your duties as an expert witness are set out in the following documents, which are enclosed with this letter. By signing a copy of this Letter of Instruction, you agree to comply with the duties and requirements as set out therein:

(a)   CPR, Part 35 and its accompanying Practice Direction ("**PD35**");

(b)   The Civil Justice Council's Guidance for the Instruction of Experts in Civil Claims 2014 (the "**Guidance 2014**"); and

(c)   Chancery Guide 2022 (Chapter 9).

38.   In particular:

(a)   Your overriding duty as an expert witness is to the Court. Your primary function is to assist the Court and, in this capacity, you must provide objective, unbiased opinions on matters within your expertise, and should not assume the role of an advocate.

11

DG-011

Mr Daniel M. Glosband
29 April 2026

(b)   Your evidence will be an independent product uninfluenced by the pressures of litigation (meaning that you would express the same opinion if you were given the same instructions by another party).

(c)   You should consider all material facts, including those which might detract from your opinions.

(d)   You should make it clear (a) when a question or issue falls outside your expertise; and (b) when you are not able to reach a definite opinion, for example because you have insufficient information.

(e)   During the course of your engagement, we may give you instructions on legal points upon which you should conduct your analysis. Where those instructions are material to the opinions expressed in your Report, your Report should record these instructions.

(f)   If, after producing a Report, your view changes on any material matter, such change of view should be communicated to all the parties without delay, and when appropriate to the court.

(g)   You have a duty to exercise reasonable skill and care in carrying out your instructions and should comply with any relevant professional code of practice.

**XIII.   Structure of your Report**

39.   Your Report should:

(a)   be addressed to the Court and not the Plan Companies or the Parent;

(b)   give details of your qualifications, including a detailed curriculum vitae;

(c)   provide a list of the documents upon which you relied for the purposes of preparing it;

(d)   contain a list of those that you spoke to for the purposes of preparing it (whether employees of the Group or otherwise);

(e)   contain a statement setting out the substance of all facts and instructions which are material to the opinions expressed therein or upon which those opinions are based;

(f)   make clear which facts stated are within your own knowledge;

(g)   where there is a range of opinion on the matters dealt with: (i) summarise the range of opinions; and (ii) give reasons for your own opinion;

12

DG-012

Mr Daniel M. Glosband
29 April 2026

(h)  contain a summary of the conclusions reached;

(i)  contain any qualifications of your opinion (if any);

(j)  contain a statement that you: (i) understand your duty to the court, and have complied with that duty; and (ii) are aware of the requirements of CPR Part 35, PD 35 and the Guidance 2014; and

(k)  be verified by a statement of truth in the following form:

> *I confirm that I have made clear which facts and matters referred to in this report are within my own knowledge and which are not. Those that are within my own knowledge I confirm to be true. The opinions I have expressed represent my true and complete professional opinions on the matters to which they refer.*
>
> *I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.*

40.  Your Report should be provided as a searchable PDF file, preceded by a hyperlinked table of contents.

### XIV.  Confidentiality

41.  You have a duty of confidentiality that extends to the contents of your Report and any drafts, and any discussions in relation to your role as an expert witness.

42.  Please also note that during the course of your Engagement you may be shown and/or receive documents which are of a privileged nature, some of which may have been received by us from the Group, its financial and/or legal advisors. Please note that provision of such documents or information to you is not intended to, and does not waive privilege therein. Privileged information should not be referred to or relied upon in your Report unless otherwise agreed.

43.  For completeness, we note that your Report may be appended to the Explanatory Statement and/or supporting evidence submitted to the Court as part of the Plan Companies' application for an order that meetings be convened for the purpose of considering and, if thought fit, approving the Plans.

### XV.  Procedural Matters

44.  Please let us know immediately if, at any time after producing your expert Report, you change your views on the matters expressed or referred to

13

2130

Mr Daniel M. Glosband
29 April 2026

therein.  It is also important that you let us know promptly if you need to update your expert Report after it has been filed with the Court, so we can consider whether an amended version of your expert Report or a supplementary report should be filed with the Court and served on the relevant parties.

45.    Experts are entitled to ask the Court for directions to assist them in carrying out their functions if they feel that this is necessary.  Please let us know if you intend to make an application for directions as we may be able to assist with the matter, either by resolving any difficulties you may be experiencing (and thereby avoiding the need to seek directions) or by helping you to formulate the request.  If you wish to seek directions in any event, and unless the Court has directed otherwise, you are required under the CPR to:

(a)    provide us with a copy of your proposed request for directions at least seven days before filing it with the Court; and

(b)    provide all other parties to the proceedings with a copy of your request at least four days before the request is filed.

46.    If you would like to discuss any of the matters raised in this Letter of Instruction or require further information, please do not hesitate to contact us.  Otherwise we should be grateful if you would sign, date and return to us a copy of this Letter of Instruction in order to confirm your agreement to the terms and undertakings set out above.

## XVI.    Confirmation

47.    Please confirm your acceptance of the terms contained in this Letter of Instruction by returning a signed copy of it.

Yours sincerely,

*Skadden, Arps, Slate, Meagher & Flom (UK) LLP*

**Skadden, Arps, Slate, Meagher & Flom (UK) LLP**

14

2131

DG-014

Agreed by:   …………………….……………….. (Signature)

Name:   …………………………………………... (Print Name)

Date:   ……………………………………………

DG-015

# Tab 02

**THIS DOCUMENT AND ITS CONTENTS ARE NOT FOR RELEASE, PUBLICATION OR DISTRIBUTION, IN WHOLE OR IN PART, DIRECTLY OR INDIRECTLY, IN ANY JURISDICTION WHERE SUCH DISTRIBUTION WOULD BE UNLAWFUL OR TO ANY OTHER PERSON.**

**THIS PRACTICE STATEMENT LETTER REQUIRES YOUR IMMEDIATE AND URGENT ATTENTION AS IT RELATES TO RESTRUCTURING PLANS PROPOSED BY EACH OF (I) NFE GLOBAL HOLDINGS LIMITED, AND (II) NFE BRAZIL NEWCO LIMITED, WHICH WILL BE CONSIDERED BY THE HIGH COURT OF JUSTICE OF ENGLAND AND WALES.**

**THE SPECIFIC DETAILS OF THE CONVENING HEARING (INCLUDING THE DATE AND TIME) WILL BE CONFIRMED TO ALL PLAN CREDITORS IN THE NOTICE OF THE CONVENING HEARING. THIS NOTICE WILL BE SENT TO ALL PLAN CREDITORS BEFORE THE CONVENING HEARING AND WILL BE MADE AVAILABLE TO PLAN CREDITORS AT THE PLAN WEBSITE (AT HTTPS://DEALS.IS.KROLL.COM/NFE).**

**YOU ARE BEING CONTACTED AS NFE GLOBAL HOLDINGS LIMITED AND/ OR NFE BRAZIL NEWCO LIMITED BELIEVE THAT YOU ARE A CORECO PLAN CREDITOR AND/ OR A BRAZILCO PLAN CREDITOR AND WILL THEREFORE BE AFFECTED BY THE PROPOSED PLANS.**

**CORECO PLAN CREDITORS AND BRAZILCO PLAN CREDITORS MUST RELY ON THEIR OWN EXAMINATION OF THE TERMS OF THE PLANS, INCLUDING THE MERITS AND RISKS INVOLVED.**

**THIS PRACTICE STATEMENT LETTER CONCERNS MATTERS WHICH MAY AFFECT YOUR LEGAL RIGHTS AND ENTITLEMENTS AND YOU SHOULD TAKE APPROPRIATE LEGAL ADVICE ON ITS CONTENTS.**

**NOTHING IN THIS PRACTICE STATEMENT LETTER CONSTITUTES OR FORMS PART OF ANY OFFER OR INVITATION TO SELL, EXCHANGE OR ISSUE, OR ANY SOLICITATION OF ANY OFFER TO PURCHASE OR SUBSCRIBE FOR, ANY SECURITIES IN THE UNITED STATES OR ANY OTHER JURISDICTION OR TO OR FROM ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE ANY SUCH OFFER OR INVITATION OR SOLICITATION IN SUCH JURISDICTION. NONE OF THE SECURITIES REFERRED TO IN THIS DOCUMENT MAY BE SOLD, ISSUED OR TRANSFERRED IN THE UNITED STATES ABSENT REGISTRATION OR AN EXEMPTION FROM REGISTRATION OR IN ANY OTHER JURISDICTION IN CONTRAVENTION OF APPLICABLE LAW.**

**SECURITIES THAT MAY BE ISSUED PURSUANT TO THE PLANS WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED ("SECURITIES ACT") OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION OF THE UNITED STATES OR ANY OTHER APPLICABLE JURISDICTION, AND SUCH SECURITIES MAY NOT BE OFFERED OR SOLD WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, "U.S. PERSONS" (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT), EXCEPT PURSUANT TO EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH ALL APPLICABLE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION OF THE UNITED STATES AND ANY OTHER**

i

DG-016

JURISDICTION. HAVING TAKEN LEGAL ADVICE, NFE GLOBAL HOLDINGS LIMITED AND NFE BRAZIL NEWCO LIMITED CONSIDER THAT THE ISSUANCE OF CERTAIN SECURITIES PURSUANT TO THE PLANS IS LIKELY TO BE MADE IN RELIANCE UPON THE EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT PROVIDED BY SECTION 3(A)(10) THEREOF. NFE GLOBAL HOLDINGS LIMITED AND NFE BRAZIL NEWCO LIMITED HAVE BEEN ADVISED THAT THE SANCTION OF THE PLANS BY THE HIGH COURT OF JUSTICE OF ENGLAND AND WALES, FOLLOWING NOTICE TO AFFECTED STAKEHOLDERS AND AN OPPORTUNITY TO BE HEARD, WILL SATISFY THE FAIRNESS HEARING REQUIREMENTS OF SECTION 3(A)(10). ACCORDINGLY, NO REGISTRATION OF SUCH SECURITIES UNDER THE SECURITIES ACT IS EXPECTED TO BE REQUIRED.

THIS PRACTICE STATEMENT LETTER WILL NOT BE FILED WITH THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY STATE SECURITIES AUTHORITY AND THE PLAN DOCUMENTATION WILL NOT BE REVIEWED BY THE SEC OR ANY SECURITIES AUTHORITY OF ANY OTHER JURISDICTION AND NONE OF THEM HAS OR WILL APPROVE, DISAPPROVE, PASS UPON OR ENDORSE THE MERITS OF THE PLANS OR THE ACCURACY, ADEQUACY OR COMPLETENESS OF THIS PRACTICE STATEMENT LETTER OR THE PLAN DOCUMENTATION. IT IS UNLAWFUL TO MAKE ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

DG-017

**Table of Contents**

1    PURPOSE OF THIS LETTER.................................................................. 1

2    WHAT IS A RESTRUCTURING PLAN?.................................................5

3    WHO IS ENTITLED TO VOTE?.............................................................6

4    BACKGROUND TO THE PLAN COMPANIES AND THE GROUP .......7

5    DEBT CAPITAL STRUCTURE OF THE GROUP ................................. 9

6    BACKGROUND TO THE GROUP'S FINANCIAL DIFFICULTIES...... 15

7    OBJECTIVES OF THE PLANS ............................................................ 21

8    OVERVIEW OF THE RESTRUCTURING ........................................... 22

9    RIGHTS SUBJECT TO THE PLANS ................................................... 29

10   PROPOSED CLASS CONSTITUTION OF PLAN CREDITORS ........... 37

11   CONSEQUENCES IF THE PLANS ARE NOT SUCCESSFUL .............. 44

12   RECOMMENDATION OF THE BOARDS ............................................. 46

13   JURISDICTION AND RECOGNITION ................................................ 47

14   CREDITOR ISSUES ........................................................................... 48

15   CONVENING HEARING ..................................................................... 49

16   STEPS FOLLOWING THE CONVENING HEARING........................... 50

17   THE PLAN MEETINGS ...................................................................... 51

18   SANCTION HEARING ....................................................................... 51

19   EFFECTIVENESS OF THE PLANS ..................................................... 52

20   ENQUIRIES AND FURTHER INFORMATION ................................... 53

21   PLAN WEBSITE ................................................................................ 53

Schedule 1– Definitions and Interpretation ........................................... 56

1    Definitions...................................................................................... 56

2    Interpretation ................................................................................. 69

Schedule 2– Restructuring Effective Date Plan Consideration ............... 71

DG-018

## PRACTICE STATEMENT LETTER

**From**: NFE Global Holdings Limited ("**NFE Global**") and NFE Brazil Newco Limited ("**NFE Brazil Newco**") (together the "**Plan Companies**" and each a "**Plan Company**")

**To**:     The CoreCo Plan Creditors and the BrazilCo Plan Creditors

**Copy**: The Information Agent

**Date**:  20 April 2026

**THIS LETTER CONCERNS MATTERS WHICH MAY AFFECT YOUR LEGAL RIGHTS AND ENTITLEMENTS AND YOU MAY THEREFORE WISH TO TAKE APPROPRIATE LEGAL ADVICE ON ITS CONTENTS.**

Dear Sir or Madam,

**Proposed Restructuring Plans under Part 26A of the Companies Act 2006 (as amended) (the "Act") between (i) NFE Global and the CoreCo Plan Creditors, and (ii) NFE Brazil Newco and the BrazilCo Plan Creditors**

1      **PURPOSE OF THIS LETTER**

1.1    Each of the Plan Companies is proposing a restructuring plan under Part 26A of the Act.

1.2    The Plan Companies are sending you this letter in accordance with the Practice Statement (*Companies*: *Schemes of Arrangement and Restructuring Plans under Parts 26 and 26A of the Companies Act 2006*) issued on 18 September 2025 by the Chancellor of the Court (the "**Practice Statement**") in relation to two, inter-conditional restructuring plans proposed by (i) NFE Global in respect of the CoreCo Plan Creditors, and (ii) NFE Brazil Newco in respect of the BrazilCo Plan Creditors.

1.3    Capitalised terms in this letter shall have the meanings given to them under, and general terms shall be construed in accordance with, Schedule 1 (*Definitions and Interpretation*) to this letter, unless otherwise defined herein.

1.4    You are being contacted as the Plan Companies believe that you are a CoreCo Plan Creditor and/or a BrazilCo Plan Creditor, who is or may be entitled to vote on one or both of the Plans. The claims of each Plan Creditor against the relevant Plan Company, together with certain related rights in respect of such claims, will be affected by the relevant Plan.

1.5    In accordance with the Practice Statement, the purpose of this letter is to inform you:

1.5.1    that the Plan Companies intend to promote the CoreCo Plan and the BrazilCo Plan respectively, which will together enable the implementation of the Recapitalisation Transaction (see further Section 8 (*Overview of the Restructuring*));

DG-019

1.5.2   of the background to, and the purpose and effect of, the Plans (see further Section 7 (*Objectives of the Plans*));

1.5.3   of the proposed Plan Meetings and the proposed composition of the classes of Plan Creditors for voting on the Plans (see further Section 10 (*Proposed Class Constitution of Plan Creditors*));

1.5.4   of other matters that are proposed to be addressed at the Convening Hearing, including any Creditor Issues (see Section 14 (*Creditor Issues*));

1.5.5   that the Plan Companies each intend to apply to the Court at a joint Convening Hearing for an order granting each of the Plan Companies certain directions in relation to the Plans, including permission to convene the Plan Meetings for the purpose of the Plan Creditors considering and, if thought fit, approving the Plans. The date of the Convening Hearing is expected to be 14 May 2026 and the time of the Convening Hearing will be confirmed to Plan Creditors by the Information Agent (and details will also be available on the Plan Website) (see further Section 15 (*Convening Hearing*));

1.5.6   of the reasons why the Plan Companies consider the Court has jurisdiction to sanction the Plans (see further Section 0 (*Jurisdiction and Recognition*));

1.5.7   that you are entitled to attend the Convening Hearing and the Sanction Hearing (see further Sections 15 (*Convening Hearing*) and 18 (*Sanction Hearing*)); and

1.5.8   how you may make further enquiries about the Plans (see further Section 20 (*Enquiries and Further Information*)).

1.6   The CoreCo Plan relates to rights, liabilities and obligations arising under:

1.6.1   the 2026 Legacy Notes Debt;

1.6.2   the 2029 Legacy Notes Debt;

1.6.3   the R-1 Revolving Credit Facility Debt;

1.6.4   the R-2 Revolving Credit Facility Debt;

1.6.5   the Term Loan B Debt;

1.6.6   the Term Loan A Debt;

1.6.7   the Series I Loan Debt; and

1.6.8   the Series II Loan Debt,

(together, the "**CoreCo Plan Debt**" and together with the Letter of Credit Facility, the "**Corporate Debt**").

1.7   The BrazilCo Plan relates to rights, liabilities and obligations arising under the 2029 New Notes Debt (the 2029 New Notes Debt together with the CoreCo Plan Debt, being the "**Plan Debt**").

2

DG-020

1.8   Pursuant to the Plans, the Plan Creditors will release their existing claims against the Group in return for Plan Consideration comprising a mix of debt, preferred equity and common equity. The Plan Consideration is allocated in accordance with the Plan Creditors' existing rights against various Collateral Pools. The respective Plan Classes, Collateral Pool interests and Plan Consideration are summarised in the table below:

| Class | Plan Debt | Collateral Pool(s)[1] | Plan Consideration Instrument(s) |
|---|---|---|---|
| Legacy Notes Class | 2026 Legacy Notes Debt<br>2029 Legacy Notes Debt | Common Collateral | CoreCo Common Stock<br>CoreCo Preferred Stock |
| Series I and Series II Class | Series I Loan Debt<br>Series II Loan Debt | Common Collateral | CoreCo Common Stock<br>CoreCo Preferred Stock |
| R-1 Class | R-1 Revolving Credit Facility Debt | Common Collateral<br>F1 Collateral<br>F2 Collateral<br>Account Collateral | CoreCo Common Stock<br>CoreCo Preferred Stock<br>New CoreCo Term Loans<br>FLNG 2 Term Loans<br>FLNG 2 Preferred Equity |
| R-2 Class | R-2 Revolving Credit Facility Debt | Common Collateral<br>F1 Collateral<br>F2 Collateral<br>Account Collateral<br>Brazil Collateral | CoreCo Common Stock<br>CoreCo Preferred Stock<br>New CoreCo Term Loans<br>FLNG 2 Term Loans<br>FLNG 2 Preferred Equity<br>RCF-2 / TLA BrazilCo Equity Pool |
| TLA Class | Term Loan A Debt | Common Collateral<br>F2 Collateral<br>Account Collateral<br>Brazil Collateral | CoreCo Common Stock<br>CoreCo Preferred Stock<br>New CoreCo Term Loans<br>FLNG 2 Term Loans<br>FLNG 2 Preferred Equity<br>RCF-2 / TLA BrazilCo Equity Pool |
| TLB Class | Term Loan B Debt | Common Collateral | CoreCo Common Stock |

---

[1]   Note: Collateral Pools exclude security and other interests in respect of Plan Debt which are not expected to be shown to provide any recovery to Plan Creditors in the Relevant Alternative Report. Such excluded security and other interests include the Brazil 2L Lien and the Residual FLNG Proceeds Claims.

3

DG-021

| Class | Plan Debt | Collateral Pool(s)[1] | Plan Consideration Instrument(s) |
|---|---|---|---|
| | | F1 Collateral | CoreCo Preferred Stock |
| | | F2 Collateral | New CoreCo Term Loans |
| | | | FLNG 2 Term Loans |
| | | | FLNG 2 Preferred Equity |
| 2029 New Notes Class | 2029 New Notes Debt | Brazil Collateral | BrazilCo Common Equity |

1.9     The Plan Companies have received indications of support for the Plans and the Restructuring from Plan Creditors holding, in aggregate, more than 75 per cent. in value of each proposed class of Plan Debt and approximately 97 per cent. of the Plan Debt by value.

1.10    Neither Plan constitutes a compromise or arrangement between the relevant Plan Company and holders of the GLP Preferred Units. As such, claims under the GLP Preferred Units will not be Plan Debt for the purposes of the Plans, and holders of GLP Preferred Units will not be Plan Creditors. The Plans do not affect the rights of the holders of GLP Preferred Units.

1.11    For more detail on the debt instruments to which the Plans relate, please refer to Section 5 (*Debt Capital Structure of the Group*). The proposed compromise of the debt instruments is set out in detail at Section 9 (*Rights Subject to the Plans*) and the allocation of the Plan Consideration is described in further detail at Schedule 2 (*Restructuring Effective Date Plan Consideration*).

1.12    This letter is being sent to the Information Agent via email in its capacity as "Information Agent" under the Plans for the purposes of making it available to Plan Creditors by:

1.12.1  making it available on the Plan Website (https://deals.is.kroll.com/nfe) (see further Section 21 (*Plan Website*));

1.12.2  distributing it to the RCF Agent, the TLB Agent, the TLA Agent, the Series I Agent and the Series II Agent to send on to their respective Plan Creditors; and

1.12.3  with respect to each of the 2026 Legacy Notes, 2029 Legacy Notes and 2029 New Notes, publishing an announcement to the respective Plan Creditors via DTC.

1.13    The date of the Plan Meetings will be confirmed in the Explanatory Statement which, provided the Court gives its permission to convene the Plan Meetings, will be circulated to Plan Creditors shortly after the Court has granted permission for the Plan Meetings to be convened at the Convening Hearing. A notice will also be sent to Plan Creditors with the details of the Plan Meetings and how to join them.

DG-022

## 2   WHAT IS A RESTRUCTURING PLAN?

2.1   A restructuring plan is a formal, court-sanctioned legal procedure (under Part 26A of the Act) designed to help companies facing financial distress, generally, to avoid terminal insolvency proceedings or value destructive enforcement or other processes.

2.2   In accordance with Part 26A of the Act, a restructuring plan can be proposed by a company which has encountered, or is likely to encounter, financial difficulties that are affecting, or will or may affect, its ability to carry on its business as a going concern. A restructuring plan enables a company to agree a compromise or arrangement with its creditors or any class of its creditors and its members or any class of its members in respect of its debts or obligations owed to those creditors or members. The purpose of the proposed compromise or arrangement must be to eliminate, reduce or prevent, or mitigate the effect of, any of the financial difficulties currently faced by the plan company.

2.3   A restructuring plan will become effective if:

2.3.1   either:

(i)   **approval of each class**: the restructuring plan is approved by at least 75 per cent. in value of each class of creditors and/or members of the plan company present in person or by proxy and voting at each meeting convened to approve the restructuring plan; or

(ii)   **cross-class cram down**: if the restructuring plan is not approved by the requisite majority of creditors in each class (any such class not approving being a "**Dissenting Class**"):

(a)   the Court is satisfied that, if the restructuring plan is sanctioned, none of the members of any Dissenting Class would be any worse off than they would be in the event of the '*relevant alternative*'. The relevant alternative is whatever the Court considers to be the most likely alternative if the restructuring plan is not sanctioned; and

(b)   the restructuring plan has been approved by at least 75 per cent. in value of one or more classes that would receive a payment, or have a genuine economic interest in the plan company, in the event of the relevant alternative;

2.3.2   the Court approves the restructuring plan by making an order sanctioning the restructuring plan; and

2.3.3   (in the case of companies registered in England and Wales) a copy of the order sanctioning the restructuring plan is delivered to the Registrar of Companies.

2.4   Once effective, a restructuring plan will bind all the creditors and members subject to it, whether or not those creditors or members voted in favour of it or voted against it or did not vote at all and, in each case, their successors and assigns.

2.5   The arrangements and compromises in respect of:

5

DG-023

2.5.1   the CoreCo Plan Creditors are proposed to be implemented by way of a restructuring plan proposed by NFE Global (i.e., the CoreCo Plan) in respect of the CoreCo Plan Debt; and

2.5.2   the BrazilCo Plan Creditors are proposed to be implemented by way of a restructuring plan proposed by NFE Brazil Newco (i.e., the BrazilCo Plan) in respect of the 2029 New Notes.

3   **WHO IS ENTITLED TO VOTE?**

3.1   The creditors who are proposed to be bound by the terms of, and who will therefore be entitled to vote on, the CoreCo Plan are:

3.1.1   the ultimate beneficial holders of the 2026 Legacy Notes Debt (the "**2026 Legacy Noteholders**");

3.1.2   the ultimate beneficial holders of the 2029 Legacy Notes Debt (the "**2029 Legacy Noteholders**" and together with the 2026 Legacy Noteholders, the "**Legacy Noteholders**");

3.1.3   the lenders of record under the R-1 Revolving Credit Facility Debt (the "**R-1 Lenders**");

3.1.4   the lenders of record under the R-2 Revolving Credit Facility Debt (the "**R-2 Lenders**" and together with the R-1 Lenders, the "**RCF Lenders**");

3.1.5   the lenders of record under the Term Loan B Debt (the "**TLB Lenders**");

3.1.6   the lenders of record under the Term Loan A Debt (the "**TLA Lenders**");

3.1.7   the lender of record under the Series I Loan Debt (the "**Series I Lender**"); and

3.1.8   the lender of record under the Series II Loan Debt (the "**Series II Lender**"),

(each a "**CoreCo Plan Creditor**" and together, the "**CoreCo Plan Creditors**").

3.2   The creditors who are proposed to be bound by the terms of, and who will therefore be entitled to vote on, the BrazilCo Plan are the ultimate beneficial holders of the 2029 New Notes Debt (the "**2029 New Noteholders**") (each a "**BrazilCo Plan Creditor**" and together, the "**BrazilCo Plan Creditors**", and together with the CoreCo Plan Creditors, the "**Plan Creditors**").

3.3   To avoid double counting, and notwithstanding that they may be creditors under the Plan Debt, it is not intended that any of the Administrative Parties will exercise any voting rights at any Plan Meeting.

3.4   Under the terms of the Series I Loan and the Series II Loan, certain amendments and actions (including voting) require the consent of, or may be directed by, a majority of the 2029 New Noteholders. For the purposes of voting in the CoreCo Plan, the Series I Lender and Series II Lender will vote in respect of 100 per cent. of the Series I Loan Debt and Series II Loan Debt respectively, having been directed with, and

6

DG-024

subsequently ratifying, any such votes in accordance with the instruments relating to the 2029 New Notes Debt.

3.5   If you are, or were, a Plan Creditor and you have assigned, sold or otherwise transferred your interests as a Plan Creditor (in whole or in part) or intend to do so before the Plan Meetings, you should forward a copy of this letter to the person or persons to whom you have assigned, sold or otherwise transferred, or the person or persons to whom you intend to assign, sell or transfer, such interests.

## 4   BACKGROUND TO THE PLAN COMPANIES AND THE GROUP

### (A)   NFE GLOBAL HOLDINGS LIMITED

4.1   NFE Global is a private company limited by shares incorporated in England and Wales under registered number 13679588 and with its registered office address at Suite 1, 7th Floor, 50 Broadway, London SW1H 0BL, United Kingdom. NFE Global was incorporated on 14 October 2021. NFE Global is a member of the Group, a direct wholly-owned subsidiary of NFE International Holdings Limited (a Bermudian company) and an indirect wholly-owned subsidiary of the Parent. NFE Global has no material assets.

4.2   NFE Global is a guarantor in respect of the Corporate Debt. The other guarantors of the Corporate Debt have existing rights of contribution against NFE Global in accordance with the Corporate Debt documents and the general law of guarantees. Additionally, and to assist with the CoreCo Plan (in circumstances in which, absent it facing a contribution claim from the primary obligor, it may not be possible for a guarantor to bring about the release of a primary obligor through a restructuring plan promulgated by it), NFE Global entered into a deed of contribution prior to the date of this letter, pursuant to which the Parent has rights of contribution against NFE Global in connection with the CoreCo Plan Debt. By virtue of the Parent's and other guarantors' rights of contribution, for NFE Global effectively to obtain a release or variation of the Plan Creditors' rights against it in respect of the CoreCo Plan Debt, there must be a corresponding release or variation of the CoreCo Plan Creditors' rights against the Parent and the other guarantors of the CoreCo Plan Debt.

### (B)   NFE BRAZIL NEWCO LIMITED

4.3   NFE Brazil Newco is a private company limited by shares incorporated in England and Wales under registered number 17141053 and with its registered office address at Suite 1, 7th Floor, 50 Broadway, London SW1H 0BL, United Kingdom. NFE Brazil Newco was incorporated on 7 April 2026. NFE Brazil Newco is a member of the Group, a direct wholly-owned subsidiary of NFE Financing LLC (a Delaware limited liability company) and an indirect wholly-owned subsidiary of the Parent.

4.4   NFE Brazil Newco was incorporated with the consent of the majority of the holders of the 2029 New Notes for the express purpose of promoting the BrazilCo Plan to enable the restructuring of the 2029 New Notes. NFE Brazil Newco became a guarantor in respect of the obligations under the 2029 New Notes on 9 April 2026. The other guarantors of the 2029 New Notes have rights of contribution against NFE Brazil Newco in connection with the 2029 New Notes Debt in accordance with the Corporate Debt documents and the general law of guarantees. Additionally, and for the same reason as that identified in paragraph 4.2 above, NFE Brazil Newco has

2143

entered into a deed of contribution with NFE Financing prior to the date of this letter, pursuant to which NFE Financing has rights of contribution against NFE Brazil Newco. By virtue of NFE Financing's and the other guarantors' rights of contribution, for NFE Brazil Newco effectively to obtain a release or variation of the Plan Creditors' rights against it in respect of the 2029 New Notes Debt, there must be a corresponding release or variance of the BrazilCo Plan Creditors' rights against NFE Financing and the other guarantors of the 2029 New Notes Debt.

4.5     These matters will be brought to the attention of the Court at the Convening Hearing and it will be explained that the steps described in paragraphs 4.2 and 4.4 above which were taken to satisfy certain requirements of Part 26A of the Act were taken in the interests of the Plan Creditors generally to facilitate the Plans.

**(C)     BUSINESS OF THE NFE GROUP**

4.6     The Group is a global energy infrastructure business. The Group's business model spans the entire production and delivery chain from natural gas procurement and liquefaction to shipping, logistics, facilities and conversion or development of natural gas-fired power generation.

4.7     The Group delivers targeted energy solutions by employing an integrated LNG supply and delivery model summarised as follows:

4.7.1     ***LNG and Natural Gas Supply and Liquefaction***: the Group supplies liquefied natural gas ("**LNG**") and natural gas regasified from LNG to its own power plants and to its customers. The Group's first floating liquefaction unit, FLNG 1, began producing LNG in July 2024, and the Group sources a significant portion of its LNG needs from this facility. Currently, demand for LNG above FLNG 1's capacity is acquired from third-party suppliers in open market purchases.

4.7.2     ***Shipping***: the Group leases, owns or operates a fleet of two floating storage and regasification units and five liquefied natural gas carriers, two of which operate as additional floating storage units. Six vessels are owned by Energos Infrastructure ("**Energos**"), and the Group also charters vessels to and from third parties.

4.7.3     ***Facilities***: through its network of current and planned downstream facilities and logistics assets, the Group is strategically positioned to deliver gas and power solutions to its customers seeking either to transition from environmentally dirtier distillate fuels such as automotive diesel oil and heavy fuel oil, or to purchase natural gas to meet their current fuel needs.

4.8     Additionally, the Group builds modular LNG manufacturing production facilities that can be deployed in various locations globally to liquify natural gas cheaply and efficiently.

**(D)     SHAREHOLDING STRUCTURE**

4.9     The Parent is a Delaware corporation and is the ultimate holding company of the Group. As of 31 March 2026, the Parent had 285,634,650 shares of Class A common stock outstanding. The Class A common stock is listed on the Nasdaq Global Select Market and carries voting rights.

2144

4.10    As of 31 December 2025, affiliates of certain entities controlled by Wesley R. Edens (co-founder, CEO and board member of the Parent), Randal A. Nardone (co-founder and board member of the Parent), and affiliates of Fortress Investment Group LLC owned an aggregate of approximately 92,230,509 shares of Class A common stock, representing approximately 32.8 per cent. of total voting power in respect of the Parent. Also as of 31 December 2025, affiliates of Energy Transition Holdings LLC owned an aggregate of approximately 25,559,846 shares of Class A common stock, representing approximately 9.0 per cent. of total voting power.

4.11    Plan Creditors can obtain further information on the Group, including financial information, from the Group's investor relations website at *https://ir.newfortressenergy.com/investor-relations*.

## 5    DEBT CAPITAL STRUCTURE OF THE GROUP

5.1    The Group has a number of different sources of financial indebtedness which will be summarised in more detail in the Explanatory Statement. The Plans will not compromise secured or unsecured financial liabilities of the Group generally, other than the Plan Debt. This section provides a summary of the Plan Debt and the Letter of Credit Facility.

### (A)    LEGACY NOTES

5.2    On 12 April 2021, the Parent issued $1.5 billion of 6.500% senior secured notes due 2026, of which approximately $511 million of principal is outstanding as at the date of this letter, in a private offering pursuant to Rule 144A under the Securities Act (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**2026 Legacy Notes**").

5.3    On 8 March 2024, the Parent issued $750 million of 8.750% senior secured notes due 2029, of which approximately $237 million of principal is outstanding as at the date of this letter, in a private offering pursuant to Rule 144A under the Securities Act (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**2029 Legacy Notes**" and together with the 2026 Legacy Notes, the "**Legacy Notes**"). Each indenture (each a "**Legacy Notes Indenture**") pursuant to which the Legacy Notes were issued is governed by New York law.

5.4    The Legacy Notes are guaranteed by substantially all wholly-owned direct and indirect subsidiaries of the Parent other than: (i) the FLNG 1 Guarantors and the FLNG 2 Guarantors and the subsidiaries of each; (ii) certain immaterial subsidiaries; (iii) NFE Financing, the Brazil Parent and the subsidiaries of each; and (iv) certain other immaterial exceptions (each, a "**Common Guarantor**" and collectively, the "**Common Guarantors**"). Each of the Parent and the Common Guarantors has granted security interests over all of its assets and property (subject to certain excluded assets) (the "**Common Collateral**") to secure the obligations under each respective Legacy Notes series. The secured parties under each of the Legacy Notes have a first lien claim against the Common Collateral which ranks *pari passu* with the other Corporate Debt claims.

5.5    Pursuant to the 2024 Refinancing Transactions, recoveries (if any) to the Legacy Noteholders from any residual proceeds of assets of FLNG 1 or FLNG 2 after the discharge of the F1 Collateral or F2 Collateral (the "**Residual FLNG Proceeds**

DG-027

**Claims**") are contractually subordinated to the Series I Loan and Series II Loan. The Residual FLNG Proceeds Claims are "out-of-the-money" claims in terms of the value of the assets in both the Relevant Alternative (which is described more fully at paragraph 11.5 below) and in the CoreCo Plan.

**(B)   REVOLVING CREDIT FACILITY**

5.6    On 15 April 2021, the Parent and certain of its wholly-owned direct and indirect subsidiaries entered into a New York law-governed credit agreement (such credit agreement, as amended, restated, amended and restated, supplemented or otherwise modified from time to time, being the "**Revolving Credit Facility Agreement**") providing for syndicated senior secured revolving credit facilities. As at the date of this letter, the facilities advanced under the Revolving Credit Facility Agreement comprise: (i) a facility drawn at approximately $100 million at the date of this letter (the "**R-1 Revolving Credit Facility**") and (ii) a facility drawn at approximately $560 million at the date of this letter (the "**R-2 Revolving Credit Facility**" and together with the R-1 Revolving Credit Facility, the "**Revolving Credit Facility**").

5.7    The Revolving Credit Facility includes a letter of credit facility pursuant to which letters of credit in an aggregate amount of $70 million have been issued and are undrawn as at 26 February 2026. All letters of credit currently outstanding under the Revolving Credit Facility Agreement will be replaced under the New CoreCo LC Facility or the New BrazilCo LC Facility, as applicable.

5.8    The obligations under the Revolving Credit Facility are:

5.8.1    guaranteed by the Common Guarantors and secured by a first lien claim against the Common Collateral *pari passu* with the other Corporate Debt claims;

5.8.2    guaranteed by the subsidiaries of the Parent that own and operate the FLNG 1 rigs (the "**FLNG 1 Guarantors**") and secured by certain natural gas liquefaction assets and other assets of the FLNG 1 Guarantors (the "**F1 Collateral**") on terms such that claims under the Revolving Credit Facility rank *pari passu* with claims under the Term Loan B Facility and the Letter of Credit Facility;

5.8.3    guaranteed by the subsidiaries of the Parent that own FLNG 2 ("**FLNG 2 Guarantors**") and secured by certain natural gas liquefaction assets and other assets of the FLNG 2 Guarantors ("**F2 Collateral**") on terms such that claims under the Revolving Credit Facility rank *pari passu* with claims under the Term Loan B Facility, the Letter of Credit Facility and the Term Loan A Facility;

5.8.4    in addition to the security and guarantees above, secured by:

(i)    in respect of the R-2 Revolving Credit Facility only, the NFE Financing Collateral Assets pursuant to, and solely to the extent of, the Brazil $200m Pari Lien; and

(ii)    in respect of the R-1 Revolving Credit Facility and R-2 Revolving Credit Facility, the NFE Financing Collateral Assets pursuant to, and solely to the extent of, the Brazil 2L Lien,

DG-028

the collateral described in (i) and (ii) including the limitations thereon relating to the Brazil $200m Pari Lien and the Brazil 2L Lien, being the "**Brazil Bank Collateral**"; and

5.8.5 further secured by a security interest over certain of the Group's accounts *pari passu* with the holders of claims under the Letter of Credit Facility and the Term Loan A Facility (the "**Account Collateral**").

**(C)    TERM LOAN B FACILITY**

5.9    On 30 October 2023, the Parent and certain of its wholly-owned subsidiaries entered into a New York law-governed credit agreement (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, being the "**Term Loan B Agreement**") pursuant to which the lenders funded term loans in an initial aggregate principal amount of $856 million which was increased by $425 million following amendments to the Term Loan B Agreement dated 6 December 2024 and 3 March 2025, of which approximately $1,266 million of principal is outstanding as at the date of this letter (the "**Term Loan B Facility**") (the loans and other extensions of credit made under the Term Loan B Agreement being the "**Term Loan B**").

5.10    The obligations under the Term Loan B Facility are:

5.10.1 guaranteed by the Common Guarantors and secured by the Common Collateral;

5.10.2 guaranteed by the FLNG 1 Guarantors and secured by the F1 Collateral; and

5.10.3 guaranteed by the FLNG 2 Guarantors and secured by the F2 Collateral.

**(D)    TERM LOAN A FACILITY**

5.11    On 19 July 2024, the Parent and certain of its wholly-owned subsidiaries entered into a New York law-governed credit agreement (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, being the "**Term Loan A Agreement**") pursuant to which the lenders party thereto committed to advance term loans from time to time in an initial aggregate principal amount of up to $700 million of which approximately $295 million of principal is outstanding as at the date of this letter (the "**Term Loan A Facility**") (the loans and other extensions of credit made under the Term Loan A Agreement being the "**Term Loan A**").

5.12    The obligations under the Term Loan A Facility are:

5.12.1 guaranteed by the Common Guarantors and secured by the Common Collateral;

5.12.2 guaranteed by the FLNG 2 Guarantors and secured by the F2 Collateral;

5.12.3 secured by the Brazil Bank Collateral; and

5.12.4 secured by the Account Collateral.

11

DG-029

**(E)    2029 NEW NOTES**

5.13    On 6 November 2024, the Parent entered into an exchange and subscription agreement with certain holders of then outstanding Legacy Notes, which related to a series of transactions intended to extend the maturity profile of the Group's indebtedness and enhance liquidity. Pursuant to the transactions, NFE Financing was interposed as a holding company for approximately 45 per cent. of the Group's Brazilian business and, on 22 November 2024, issued approximately $2.73 billion 12.000% senior secured notes due 2029 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**2029 New Notes**"). The proceeds of the 2029 New Notes were used to repay in full certain 6.750% notes due 2025 issued by the Parent (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**2025 Notes**"), to exchange a portion of the Legacy Notes, and for general corporate purposes (such transactions being the "**2024 Refinancing Transactions**").

5.14    The indenture pursuant to which the 2029 New Notes were issued is governed by New York law.

5.15    The 2029 New Notes are guaranteed by PA Land and NFE Brazil Newco, and secured by first-ranking liens over the NFE Financing Collateral Assets (and such collateral that is subject to such first-ranking liens together with the Brazil $200m Pari Lien, the "**Brazil Collateral**").

5.16    The Brazil Collateral, the Common Collateral, the Account Collateral, the F1 Collateral and the F2 Collateral, together being the "**Collateral Pools**".

**(F)    INTERCOMPANY LOANS**

*Brazil Parent Intercompany Loan Facility*

5.17    In connection with the 2024 Refinancing Transactions, on 22 November 2024 NFE Financing, as lender, entered into a New York law-governed credit agreement (the "**Brazil Parent Credit Agreement**") with NFE Brazil Investments LLC ("**Brazil Parent**"), as borrower, which provides for a senior secured term loan facility initially drawn in an amount of approximately $970 million ("**Brazil Parent Intercompany Loan Facility**") (the loans and other extensions of credit made under the Brazil Parent Credit Agreement being the "**Brazil Parent Intercompany Loan**").

5.18    The Brazil Parent Credit Agreement is secured by substantially all assets of Brazil Parent (including the Series I Loan and the approximately 55 per cent. equity interest in the Group's Brazilian business held by Brazil Parent).

5.19    The obligations under the Brazil Parent Intercompany Loan Facility are not Plan Debt. In connection with the Restructuring, it is proposed that the Brazil Parent Intercompany Loan Facility will be released in full or otherwise discharged.

*Series I Loan*

5.20    On 22 November 2024, Brazil Parent, as lender, and the Parent, as borrower, and certain of the Parent's subsidiaries, as guarantors, entered into a New York law-governed senior secured, credit agreement ("**Series I Loan Agreement**") drawn in

12

DG-030

an amount of approximately $970 million (such loans made under the Series I Loan Agreement being the "**Series I Loan**").

5.21    The Series I Loan was funded using the proceeds of the Brazil Parent Intercompany Loan Facility.

5.22    The obligations under the Series I Loan Agreement are guaranteed by the Common Guarantors and are secured by the Common Collateral.

### *Series II Loan*

5.23    On 6 December 2024, NFE Financing, as lender, the Parent, as borrower, and certain of the Parent's subsidiaries, as guarantors, entered into a New York law-governed senior secured term loan credit agreement ("**Series II Loan Agreement**") drawn in an amount of approximately $1.43 billion (the loan made under the Series II Loan Agreement being the "**Series II Loan**" and together with the Series I Loan and the Brazil Parent Intercompany Loan, the "**2024 Intercompany Loans**") in connection with the 2024 Refinancing Transactions.

5.24    The obligations under the Series II Loan Agreement are guaranteed by the Common Guarantors and are secured by the Common Collateral.

5.25    Pursuant to the terms of the 2024 Intercompany Loans, NFE Financing is the ultimate recipient of the proceeds from the Series I Loan and the Series II Loan and such proceeds form part of the NFE Financing Collateral Assets. The R-2 Lenders, the TLA Lenders and the 2029 New Noteholders therefore have an indirect interest in the proceeds of the Series I Loan and the Series II Loan as part of the Brazil Collateral.

## (G)    LETTER OF CREDIT FACILITY

5.26    On 16 July 2021, the Parent and certain of its wholly-owned subsidiaries entered into a New York law-governed uncommitted letter of credit and reimbursement agreement (such credit and reimbursement agreement, as amended from time to time, being the "**Letter of Credit Agreement**") with a bank for the issuance of letters of credit (the "**Letter of Credit Facility**"). Claims under the Letter of Credit Facility will not be compromised under the Plans and do not form part of the Plan Debt. With effect from the Restructuring Effective Date and following the separation of the Group (as described at paragraph 8.2 below), the Letter of Credit Facility will be replaced with:

5.26.1  an amended letter of credit facility agreement for letters of credit required by the CoreCo Group; and

5.26.2  a new letter of credit facility agreement required by the BrazilCo Group.

5.27    The obligations under the Letter of Credit Facility are:

5.27.1  guaranteed by the Common Guarantors and secured by the Common Collateral;

5.27.2  guaranteed by the FLNG 1 Guarantors and secured by the F1 Collateral;

2149

DG-031

5.27.3  guaranteed by the FLNG 2 Guarantors and secured by the F2 Collateral;

5.27.4  secured by the Brazil Bank Collateral; and

5.27.5  secured by the Account Collateral.

**(H)   SECURITY, RANKING AND PRIORITY**

5.28   The ranking of claims and security of the Group in respect of the various Plan Debt instruments and the Letter of Credit Facility obligations described above is regulated by:

5.28.1  an intercreditor agreement dated 12 April 2021 (as amended from time to time) (the "**Equal Priority Intercreditor Agreement**") in respect of the Corporate Debt;

5.28.2  an intercreditor agreement dated 6 December 2024 (the "**Brazil Parent ICA**") that regulates recoveries under the first priority liens in respect of the Brazil Collateral; and

5.28.3  an intercreditor agreement dated 22 November 2024 (the "**Brazil Junior ICA**") that establishes the priority of the first priority liens and second priority liens in respect of the Brazil Collateral.

5.29   Under the terms of the Equal Priority Intercreditor Agreement, the RCF Agent has the exclusive right to direct enforcement of the Shared Collateral once it becomes enforceable, if so directed by the RCF Lenders.

5.30   The collateral and priority arrangements under the Equal Priority Intercreditor Agreement, the Brazil Parent ICA and the Brazil Junior ICA can be summarised as follows:

| Collateral | Priority |
|---|---|
| Common Collateral | *Pari passu* **first lien claims** in respect of the:<br>• Legacy Notes Debt;<br>• Revolving Credit Facility Debt;<br>• Letter of Credit Facility Debt;<br>• Term Loan B Debt;<br>• Term Loan A Debt;<br>• Series I Loan Debt; and<br>• Series II Loan Debt. |
| F1 Collateral | *Pari passu* **first lien claims** in respect of the:<br>• Revolving Credit Facility Debt;<br>• Letter of Credit Facility Debt; and<br>• Term Loan B Debt. |

14

DG-032

| Collateral | Priority |
|---|---|
| F2 Collateral | *Pari passu* **first lien claims** in respect of the:<br>• Revolving Credit Facility Debt;<br>• Letter of Credit Facility Debt;<br>• Term Loan B Debt; and<br>• Term Loan A Debt. |
| Brazil Collateral | *Pari passu* **first lien claims** in respect of the:<br>• R-2 Revolving Credit Facility Debt, Letter of Credit Facility Debt and Term Loan A Debt, subject to an aggregate $200 million cap; and<br>• 2029 New Notes Debt.<br>*Pari passu* **second lien claims** in respect of the:<br>• Revolving Credit Facility Debt<br>• Letter of Credit Facility Debt; and<br>• Term Loan A Debt. |
| Account Collateral | *Pari passu* **first lien claims** in respect of the:<br>• Revolving Credit Facility Debt;<br>• Letter of Credit Facility Debt; and<br>• Term Loan A Debt. |

## 6   BACKGROUND TO THE GROUP'S FINANCIAL DIFFICULTIES

### (A)   KEY PROJECTS

6.1   The key projects and other key assets in operation or development for the Group include:

6.1.1   *San Juan Terminal*: a landed micro-fuel handling terminal located in the Port of San Juan, Puerto Rico, which has been fully operational since the third quarter of 2020 and supports the Group's significant arrangements with the Puerto Rico Electric Power Authority ("**PREPA**") (the "**San Juan Terminal**");

6.1.2   *La Paz Facility*: an LNG receiving facility located in the Port of Pichilingue in Baja California Sur, Mexico, which also supplies the Group's gas-fired 135 MW power plant located adjacent to the facility (the "**La Paz Facility**"). The La Paz Facility has been in commercial operation since the fourth quarter of 2021 and supports the Group's arrangements with CFEnergia, a subsidiary of Federal Electricity Commission (Comisión Federal de Electricidad);

6.1.3   *Barcarena Terminal*: an LNG receiving facility comprising a floating storage and regasification unit and associated infrastructure, including

mooring and offshore and onshore pipelines, located in Pará, Brazil (the "**Barcarena Terminal**"), which supports a long-term gas supply agreement the Group has entered into with a subsidiary of Norsk Hydro ASA and will also supply gas to two natural gas-fired power plants that the Group is constructing adjacent to the Barcarena Terminal, the Barcarena Power Plant and the PortoCem Power Plant;

6.1.4 *Santa Catarina Terminal*: a facility, which was placed into service in the fourth quarter of 2024, located on the southern coast of Brazil (the "**Santa Catarina Terminal**"). It is in service and connected to Brazil's national gas grid;

6.1.5 *Barcarena Power Plant*: a natural gas-fired power plant that the Group is constructing adjacent to the Barcarena Terminal (the "**Barcarena Power Plant**"), which is fully contracted under multiple 25-year power purchase agreements to supply electricity to Brazil's national grid;

6.1.6 *PortoCem Power Plant*: the second natural gas-fired power plant that the Group is constructing adjacent to the Barcarena Terminal (the "**PortoCem Power Plant**");

6.1.7 *Puerto Sandino Facility*: the Group is developing an LNG receiving, transloading and regasification terminal in Puerto Sandino, Nicaragua (the "**Puerto Sandino Facility**"), which is in its final stages of construction, as well as a pipeline connecting the facility with the Group's nearby power plant, construction of which has already been completed. In connection with this project, the Group has entered into a 25-year power purchase agreement with Nicaragua's electricity distribution companies;

6.1.8 *FLNG*: the Group developed a first-in-kind modular liquefaction unit – referred to as 'Fast LNG' or "**FLNG**" – to provide a source of low-cost LNG to customers which the Group believes is faster and more economical to construct than many traditional liquefaction solutions. The Group's first FLNG unit ("**FLNG 1**"), comprised of three offshore fixed platforms and a floating storage unit, has been deployed 9 miles offshore of the coast of Altamira, Tamaulipas, Mexico, and was placed into service in the fourth quarter of 2024. The Group also owns an uncompleted, second FLNG project ("**FLNG 2**"); and

6.1.9 *Other assets*: the Group has contracted to lease certain gas turbines (the "**Turbines**").

## (B)   FINANCIAL DIFFICULTIES

6.2    The Group's business model historically required significant capital and operating expenditures to design, construct, procure and develop supply chain infrastructure and service its customer base. In some instances, the Group could not recoup capital outlay and generate income from customers until after the completion of construction of LNG terminal infrastructure, storage facilities and power plants. Moreover, most projects are completed in stages and are subject to risks of delay beyond the Group's control, including: (i) the need for specialised oil and gas regulatory permits and governmental authorisations, bespoke design and engineering solutions,

DG-034

environmental or geological problems related to location; (ii) shortages or delays in the delivery of equipment and supplies; (iii) failure to meet technical specifications or adjustments being required based on testing or commissioning; (iv) weather interference; and (v) potential labour shortages, work stoppages or labour union disputes. Further, where the Group successfully develops a project and/ or executes on a customer contract, it faces the risk that customers may not fulfil their payment obligations. These risks are particularly pronounced in many of the non-U.S. jurisdictions in which the Group operates. Due to these factors the Group has experienced time delays and cost overruns in a number of its development and construction projects.

6.3   The Group's liquidity position and ability to generate revenue from projects and customer contracts have been adversely impacted or delayed by the following:

6.3.1   unanticipated delays in the permitting, construction or commencement of operations of the San Juan Terminal, La Paz Facility, Santa Catarina Terminal and the Puerto Sandino Facility;

6.3.2   the development of a first-in-kind, offshore modular FLNG 1, which experienced permitting and construction delays, and equipment failures that ultimately delayed the commencement of commercial operations;

6.3.3   the Group has experienced a number of challenges in relation to its Puerto Rico business:

(i)   local authorities' decision to discontinue the allowance of ship-to-ship transfers of LNG within San Juan port necessitated the Group switching operational plans to less efficient and more costly means of delivery; and

(ii)   in 2023 it entered into a customer contract with the U.S. Army Corps of Engineers to provide services in Puerto Rico in connection with the territory's grid stabilisation project. This contract was terminated by the counterparty in March 2024, following which the Group has been pursuing a request to the Federal Emergency Management Agency ("**FEMA**") for equitable adjustment to recover its unreimbursed costs and liabilities of approximately $659 million related to the early termination of this contract. In April 2026, the Group received a final settlement in connection with work undertaken for FEMA in an amount of $142 million (before payment of certain taxes and costs). This process has taken considerable time and not all costs could be recouped, which has impacted liquidity significantly;

6.3.4   delays to certain scheduled power auctions in Brazil;

6.3.5   the Group's margins have been adversely impacted by fluctuations in natural gas feedstock, increases in the costs of construction materials, and swings in the shipping and freight markets; and

6.3.6   the Group's proposed LNG terminal in Shannon, Ireland has faced delays due to significant environmental activist opposition and governmental permitting denials.

17

DG-035

6.4     The challenges above delayed the commencement of revenue-generating operations for the affected projects and, collectively, had a material impact on the Group's liquidity. The 2024 Refinancing Transactions (see paragraph 5.13 of this letter) improved near-term liquidity and addressed the maturities of the 2025 Notes. However, many of the operational challenges described above have persisted since the 2024 Refinancing Transactions and continue to impact the Group's revenue-generation and its ability to service its indebtedness.

6.5     The liquidity challenges became critical in November 2025 by which point the Group had insufficient liquidity to make the following interest payments:

6.5.1   $163.8 million of interest due on the 2029 New Notes on 15 November 2025;

6.5.2   $13.1 million of interest due on the Revolving Credit Facility on 28 November 2025;

6.5.3   $30.6 million of interest due on Term Loan B on 10 December 2025; and

6.5.4   $1.6 million of interest due on Term Loan A on 10 December 2025.

6.6     The Group entered into short-term, rolling waivers and forbearances in respect of the interest payments with certain Plan Creditors to allow multilateral restructuring discussions to take place. On 17 March 2026, the Parent, NFE Global and certain Plan Creditors entered into the Restructuring Support Agreement, which among other things and subject to conditions and termination rights, extended forbearances on interest payments and other events of default to allow the Plan Companies to launch and implement the Plans. If the Plan Companies are unsuccessful or materially delayed in implementing the Plans, certain Plan Creditors will have the right to terminate the Restructuring Support Agreement, demand repayment and enforce rights in respect of the Plan Debt, including against the Plan Companies. Given the complexity of the capital structure and the number of different Plan Debt instruments and creditor groups, the Plan Companies consider that it would be extremely challenging to negotiate further extensions to forbearances if the Restructuring Support Agreement terminated. See Section 11 (*Consequences if the Plans are Not Successful*) for further detail on the consequences if the Plans are not successful.

6.7     The Group has very significant financial liabilities, including over $6 billion of Plan Debt owed to third parties. If the Plans are not sanctioned and the Restructuring is not implemented, there is substantial doubt as to the Group's ability to continue as a going concern. If Plan Creditors demanded the unpaid interest on Plan Debt from the Group, the Plan Companies would not have sufficient liquidity to meet the demands. In the Relevant Alternative, recoveries from the Group's assets would be insufficient to meet the financial liabilities under the Plan Debt in full. In order to resolve the very significant cash flow and balance sheet issues, there is an urgent need for a material balance sheet restructuring to convert a large proportion of Plan Debt into equity or preferred equity.

6.8     Following the Restructuring, the CoreCo Group and the BrazilCo Group will each have a portfolio of additional development projects and opportunities that are expected to generate revenue following the Restructuring. The realisation of these projects in the near- to medium-term is expected to significantly improve each of the CoreCo Group's and BrazilCo Group's revenues and liquidity. The purpose of the

DG-036

Restructuring is to provide the CoreCo Group and BrazilCo Group with the necessary liquidity and capital to complete and capitalise on their development projects and opportunities by reducing their debt service burden, allowing new money financing and aligning each of the CoreCo Group's and BrazilCo Group's capital structures with their respective revised expectations for revenue once their respective projects and customer agreements become cash generative.

**(C)   SUPPORT FOR THE PLANS: RESTRUCTURING SUPPORT AGREEMENT**

6.9     Each Plan Creditor who is a party to the Restructuring Support Agreement agrees, subject to certain qualifications and limitations, to support the implementation of the Plans and the Restructuring and, among other things, has agreed:

  6.9.1   to use commercially reasonable efforts to support, facilitate, implement, consummate or otherwise give effect to the Restructuring and the Plans including voting in favour of the Plans at each relevant Plan Meeting;

  6.9.2   not to take any action, a substantial purpose of which is to object to or interfere with, impede, obstruct, hinder or materially delay the implementation or consummation of the Restructuring or the Plans;

  6.9.3   not to sell their interests in the Plan Debt to any party who is not party to the Restructuring Support Agreement as a Supporting Creditor or who does not agree to become a party to the Restructuring Support Agreement as a Supporting Creditor; and

  6.9.4   to forbear from exercising certain rights or remedies it may have against any member of the Group in respect of any Plan Debt.

6.10    The Restructuring Support Agreement may be terminated by the Parent and/ or the Supporting Creditors, as applicable, upon the occurrence of specified events defined in the Restructuring Support Agreement.

6.11    Recognising the urgency of the situation, as of 20 April 2026, the Restructuring Support Agreement has been signed or supported by creditors certifying that they represent, on a reconciled basis:

  (i)      100.0 per cent. by value of the R-1 Revolving Credit Facility Debt;

  (ii)     99.9 per cent. by value of the R-2 Revolving Credit Facility Debt;

  (iii)    97.1 per cent. by value of the Term Loan B Debt;

  (iv)     100 per cent. by value of the Term Loan A Debt;

  (v)      84.6 per cent. by value of the 2026 Legacy Notes Debt;

  (vi)     87.2 per cent. by value of the 2029 Legacy Notes Debt;

  (vii)    100.0 per cent. by value of the Series I Loan Debt;

  (viii)   100.0 per cent. by value of the Series II Loan Debt; and

  (ix)     99.1 per cent. by value of the 2029 New Notes Debt.

19

2155

DG-037

6.12    The Restructuring Support Agreement has been notified and made available:

    6.12.1  to all Plan Creditors via the Information Agent posting it on the Plan Website and by distributing it to Plan Creditors directly or via their respective agents, trustees and legal representatives;

    6.12.2  to the 2026 Legacy Noteholders, 2029 Legacy Noteholders and 2029 New Noteholders, by publishing an announcement of its availability to Plan Creditors via DTC; and

    6.12.3  to all Plan Creditors generally by issuing an announcement of its availability through a press release and filing a Form 8-K with the SEC.

6.13    Plan Creditors who have not yet signed up to the Restructuring Support Agreement may still do so.

***Early Consent Fee***

6.14    Under the terms of the Restructuring Support Agreement, each eligible Supporting Creditor that was a party to the Restructuring Support Agreement as at 5.00 p.m. (New York time) on 8 April 2026 (the "**Early Consent Deadline**", as originally extended from 31 March 2026) (or, in accordance with the Restructuring Support Agreement, becomes a Supporting Creditor after the Early Consent Deadline by acquiring Plan Debt that is eligible for the Early Consent Fee) will be entitled to a fee (the "**Early Consent Fee**") equal to 0.75 per cent. of the principal amount of such Supporting Creditors' *pro rata* claim, as at the Record Time, in:

    6.14.1  the principal outstanding under the 2026 Legacy Notes for holders of the 2026 Legacy Notes;

    6.14.2  the principal outstanding under the 2029 Legacy Notes for holders of the 2029 Legacy Notes;

    6.14.3  the principal outstanding under Term Loan B for TLB Lenders;

    6.14.4  the principal outstanding under the R-1 Revolving Credit Facility for R-1 Lenders;

    6.14.5  for R-2 Lenders: (i) the principal outstanding under the R-2 Revolving Credit Facility, plus (ii) the portion of the principal outstanding under the Series I Loan and the Series II Loan that is equivalent to their *pro rata* share of the Brazil Collateral pursuant to the Brazil Parent ICA;

    6.14.6  for TLA Lenders: (i) the principal outstanding under the Term Loan A, plus (ii) the portion of the principal outstanding under the Series I Loan and the Series II Loan that is equivalent to their *pro rata* share of the Brazil Collateral pursuant to the Brazil Parent ICA; and

    6.14.7  for 2029 New Noteholders, the portion of the principal outstanding under the Series I Loan and the Series II Loan that is equivalent to their *pro rata* share of the Brazil Collateral pursuant to the Brazil Parent ICA.

6.15   The Early Consent Fee will be paid in the form of CoreCo Preferred Stock on the Restructuring Effective Date if the relevant conditions are satisfied. NFE Global believes that the Early Consent Fee is in line with market rates for such fees and is a reasonable fee for the benefit to the Group of having a significant number of Supporting Creditors in each class of Plan Debt committed to the Restructuring pursuant to the Restructuring Support Agreement before launching the Plans. Payment of the Early Consent Fee in the form of CoreCo Preferred Stock is appropriate because it preserves the liquidity of the Group and is a form of Plan Consideration payable to all Plan Creditors under the Recapitalisation Transaction (including to 2029 New Noteholders through their interests in the Series I Loan and the Series II Loan, as described at paragraph 5.25 above).

### Standstill Fee

6.16   The Parent has agreed to pay a fee (the "**Standstill Fee**") to each RCF Lender that agreed in writing to forbear in an amount equal to 2.0 per cent. of the Revolving Credit Facility Debt held by such RCF Lender in consideration for such forbearance until the Plans become effective (or the Plan Companies cease to pursue the Plans). Under the terms of the Equal Priority Intercreditor Agreement, the RCF Agent has the exclusive right to enforce the Common Collateral, F1 Collateral, F2 Collateral and Account Collateral for an initial period of time and may impose a standstill on other secured parties holding the Corporate Debt during this time. The Standstill Fee will be paid in the form of New CoreCo Term Loans on the Restructuring Effective Date or will become a payment obligation of the Parent on the termination of the Restructuring Support Agreement. The Plan Companies believe that the Standstill Fee is in line with market rates for such fees and is a reasonable fee to ensure that no secured creditor takes enforcement action with respect to the Collateral Pools while the Plan Companies promulgate the Plans.

## 7   OBJECTIVES OF THE PLANS

7.1   The purposes and objectives of the Plans are to:

7.1.1   restructure the Plan Companies' and the Group's balance sheets;

7.1.2   address approaching maturities under the Plan Debt and replace existing debt with new debt and preferred equity finance arrangements that provide the Group and the Plan Companies with a sustainable capital structure;

7.1.3   enable access to new money financing to address each of the CoreCo Group's and the BrazilCo Group's near- to medium-term liquidity needs, to the extent required; and

7.1.4   facilitate the holistic restructuring of the Group, including the BrazilCo Separation, pursuant to the Restructuring.

7.2   The Plans will:

7.2.1   with effect from the Restructuring Effective Date, authorise the Plan Companies to implement the Restructuring;

7.2.2   grant authority to the Plan Companies to execute the documents required to implement the transactions contemplated by the Plans to which the Plan

21

2157

DG-039

Creditors (or certain of them) are party in their capacity as Plan Creditors, on behalf of the relevant Plan Creditors, including (without limitation):

(i)      the Plans;

(ii)     the Transaction Implementation Deed;

(iii)    the New CoreCo Credit Agreement;

(iv)    the FLNG 2 Term Loan Credit Facility Agreement;

(v)     the CoreCo Intercreditor Agreement;

(vi)    the CoreCo Registration Rights Agreement;

(vii)   the BrazilCo Stockholders' / LLC Agreement;

(viii)  the FLNG 2 Parent LLCA;

(ix)    the Holding Period Trust Deed; and

(x)     all other documents, agreements and instruments to which the Plan Creditors are party in their capacity as Plan Creditors necessary or desirable to implement or consummate the Restructuring in accordance with the Restructuring Support Agreement, the Plans and the Transaction Implementation Deed,

(together, the "**Implementation Documents**");

7.2.3   implement certain of the transactions contemplated by the Plans, as described at Section 8 (*Overview of the Restructuring*); and

7.2.4   set out the order in which the steps required to implement the Restructuring will take place.

7.3   The material Implementation Documents will be attached to, or described in, the Explanatory Statement and made available to Plan Creditors via the Plan Website following the Convening Hearing.

7.4   Following the implementation of the Restructuring, the Plan Companies expect that any new financing, combined with cash generated from its operations, releases of claims under the Plans and the deleveraging effected by the Recapitalisation Transaction, will be sufficient to enable the Plan Companies and the wider Group to continue operating in the normal course and fulfil the Group's commitments to its stakeholders, including creditors, customers, suppliers, joint venture partners, business partners and employees.

8      **OVERVIEW OF THE RESTRUCTURING**

8.1   The terms of the Restructuring are described in the Restructuring Term Sheet (including appendices). The Restructuring comprises the following steps:

8.1.1   the Group will be separated into two separate, standalone businesses:

(i)      a business comprising New BrazilCo Parent and its direct and indirect subsidiaries, comprising the Group's Brazilian business and PA Land, ("**BrazilCo Group**"); and

DG-040

(ii)    a business comprising the Parent and its direct and indirect subsidiaries other than the BrazilCo Group ("**CoreCo Group**");

8.1.2   the Plan Creditors will release their existing claims against the Group in return for their allocation of the Plan Consideration as set out in Schedule 2 (*Restructuring Effective Date Plan Consideration*) (the "**Exchange Consideration Chart**");

8.1.3   the Parent, as borrower, and each other CoreCo Group entity, as a guarantor, will enter into a senior secured term loan credit facility for the CoreCo Group (described further below);

8.1.4   all letters of credit issued under the existing Letter of Credit Facility or Revolving Credit Facility will be replaced by letters of credit issued under separate new letter of credit facilities for each of the CoreCo Group and the BrazilCo Group (or, in the case of the CoreCo Group, remain outstanding under an amended, amended and restated, or otherwise modified Letter of Credit Agreement);

8.1.5   the Local Brazilian Debt Facilities will be refinanced in full or remain outstanding on their existing terms (subject to the release of the Parent corporate guarantee and any other obligations tied to the CoreCo Group);

8.1.6   the Brazil Parent Intercompany Loan Facility will be terminated and the Brazil Parent Intercompany Debt will be released in full or otherwise discharged;

8.1.7   the Existing NFE Stockholders will retain shares of the Parent's Class A common stock representing 35.0 per cent. of the CoreCo Common Stock issued and outstanding as of the Restructuring Effective Date, immediately before giving effect to the CoreCo MIP and before the conversion of CoreCo Preferred Stock into CoreCo Common Stock (which will automatically convert into 87 per cent. of *pro forma* CoreCo Common Stock on the third anniversary of their issue, and subject to a *pro rata* reduction in amount of converted CoreCo Common Stock issued relative to the amount of CoreCo Preferred Stock redeemed prior to that date) (as discussed further at paragraph 8.12 below);

8.1.8   certain management and employee incentive plans will be entered into as set out in more detail at paragraphs 8.14 to 8.16 below; and

8.1.9   to the extent required to satisfy the Minimum Liquidity Condition on the Restructuring Effective Date, the Parent will raise additional debt finance as described in more detail at paragraphs 8.20 to 8.23 below,

in each case on the terms and subject to the conditions set out in the Restructuring Support Agreement, including the Restructuring Term Sheet and the appendices and exhibits thereto (together, the "**Restructuring**").

### *Separation of the Group*

8.2   On the Restructuring Effective Date, the Group will separate the BrazilCo Group from the CoreCo Group and the BrazilCo Group will operate on a stand-alone basis

(the "**BrazilCo Separation**"). As part of the BrazilCo Separation, the BrazilCo Group will (a) secure a new long-term dedicated vessel, and (b) cause the BrazilCo GSA to become effective. The CoreCo Group and the BrazilCo Group will enter into the CoreCo–BrazilCo Transition Services Agreement.

8.3   Subject to the terms of a separation agreement, the CoreCo Group will retain ownership of all assets and liabilities (other than the BrazilCo Group and the assets and liabilities (including taxes) of the BrazilCo Group's business), including, without limitation, FLNG 1, FLNG 2, the assets and liabilities relating to the Group's businesses in Puerto Rico, Mexico and Nicaragua, the Turbines, the Group's claims against FEMA, and certain other non-core assets.

8.4   FLNG 2 Parent and its subsidiaries will remain wholly-owned subsidiaries of the Parent but will operate on an arm's length basis *vis-à-vis* the other CoreCo Group entities. On the Restructuring Effective Date, FLNG 2 Parent will incur $400 million of FLNG 2 Term Loans and issue $200 million of FLNG 2 Preferred Equity as set out in the Exchange Consideration Chart.

### *New CoreCo Credit Facilities*

8.5   The Parent, as borrower, and certain other CoreCo Group entities, as guarantors, will enter into the following credit facilities:

8.5.1   a term loan credit facility, secured by first-priority liens (except that such liens will rank junior to the liens securing the New CoreCo LC Facility and other permitted first-lien indebtedness) on substantially all assets of the CoreCo Group in accordance with the New CoreCo Credit Facility Term Sheet (the "**New CoreCo Credit Facility**" and the loans thereunder, the "**New CoreCo Term Loans**"), in an aggregate principal amount equal to the sum of (w) up to $475 million, (x) the aggregate principal amount of Incremental New CoreCo Term Loans, (y) the aggregate principal amount of Incremental Equity-for-Debt Exchange Election New CoreCo Term Loans, and (z) to the extent necessary to meet the Minimum Liquidity Condition, up to $35 million in aggregate principal amount of Capital Raise New CoreCo Term Loans (plus additional principal to reflect any original issue discount) and Capital Raise New CoreCo Junior Term Loans if necessary; and

8.5.2   a new letter of credit facility (or an amendment, amendment and restatement, or other modification to the Letter of Credit Agreement) (the "**New CoreCo LC Facility**"). The New CoreCo LC Facility will have the same guarantors as the New CoreCo Term Loans and rank senior in priority against collateral.

8.6   In addition, on the Restructuring Effective Date, FLNG 2 Parent, as borrower, will enter into a non-recourse term loan facility in the aggregate principal amount of $400 million (the "**FLNG 2 Term Loan Facility**", and the loans made thereunder, the "**FLNG 2 Term Loans**").

8.7   The intercreditor arrangements as between the New CoreCo Credit Facility and the New CoreCo LC Facility will be governed by the CoreCo Intercreditor Agreement, pursuant to which the obligations under the New CoreCo LC Facility will rank senior to the obligations under the New CoreCo Credit Facility.

24

DG-042

### BrazilCo Liquidity Arrangements

8.8    In April 2026, certain BrazilCo Plan Creditors provided $50 million of interim financing to the BrazilCo Group for liquidity purposes (the "**Interim Brazil Financing**"). The Interim Brazil Financing documentation provided that the other BrazilCo Plan Creditors would be offered the opportunity to participate in such financing on a *pro rata* basis. The Interim Brazil Financing will not be part of the Plan Debt, and is anticipated to be refinanced by the New BrazilCo Financing Arrangements in due course. Further information will be provided in the Explanatory Statement.

### New BrazilCo Financing Arrangements

8.9    On or before the Restructuring Effective Date, the BrazilCo Group will enter into:

8.9.1    arrangements to refinance certain existing financial indebtedness (which is not Plan Debt), fund the RCF-2 / TLA BrazilCo Cash Pool, and provide additional working capital for the BrazilCo Group (the "**New BrazilCo Financing Arrangements**"); and

8.9.2    a new letter of credit facility (the "**New BrazilCo LC Facility**"),

each, on terms satisfactory to the management and stakeholders of the separated BrazilCo Group. Further information on the New BrazilCo Financing Arrangements and New BrazilCo LC Facility will be provided in the Explanatory Statement.

### Brazil Parent Intercompany Loan

8.10    The Brazil Parent Intercompany Loan Facility will be terminated and the Brazil Parent Intercompany Debt will be released in full.

### Other BrazilCo–CoreCo Intercompany Claims

8.11    All valid net intercompany claims of the CoreCo Group against the BrazilCo Group (other than claims arising under the 2024 Intercompany Loans) (such claims, the "**Net BrazilCo–CoreCo Intercompany Claim**") will be replaced with a debt instrument in an aggregate principal amount equal to the Net BrazilCo–CoreCo Intercompany Claim, which will bear interest at a rate of 8.00% per annum, payable quarterly in cash with a three-year term.

### Existing NFE Stockholders

8.12    As discussed at paragraph 8.1.7 above, pursuant to the Plans, the Existing NFE Stockholders will retain shares of the Parent's Class A common stock. The Plan Companies consider that the retention of stock by the Existing NFE Stockholders is an appropriate compromise based on, among other things: the expected valuation in the Relative Alternative Report for the common stock on the Restructuring Effective Date, the need to incentivise the Existing NFE Stockholders to approve certain proposals (described at paragraph 8.25.1 below), and the benefit of maintaining the current Nasdaq listing of the Parent's Class A common stock. If the proposals to shareholders are not approved, then the Plans will not be approved and the likely outcome will be the Relevant Alternative, which will lead to a worse outcome for Plan Creditors.

25

DG-043

***BrazilCo Equity Interests***

8.13   100 per cent. of the BrazilCo Common Equity will be distributed to the holders of the 2029 New Notes in partial exchange for the 2029 New Notes Debt subject to dilution by (a) the issuance of BrazilCo Common Equity to holders of the R-2 Revolving Credit Facility Debt and Term Loan A Debt to the extent such holders elect to receive their *pro rata* share of the RCF-2 / TLA BrazilCo Equity Pool, and (b) the BrazilCo MIP.

***CoreCo MIP***

8.14   Promptly, and in any event no later than 120 days after the Restructuring Effective Date, the new board of directors of the Parent (the "**New CoreCo Board**") will adopt an equity incentive plan for directors, officers, and other employees of CoreCo (the "**CoreCo MIP**"). Ten per cent. of the CoreCo Common Stock and seven per cent. of the CoreCo Preferred Stock will be reserved for issuance in connection with the CoreCo MIP, on terms to be determined by the New CoreCo Board.

***FLNG 2 MIP***

8.15   The Parent will adopt a cash incentive plan for officers and other employees of the CoreCo Group that are involved in the development of FLNG 2 (the "**FLNG 2 MIP**") based on cash proceeds of any FLNG 2 Sale before deducting any such cash proceeds applied, or required to be applied, to pay amounts owing to the CoreCo Group under the CoreCo-FLNG 2 Management Agreement or otherwise (but net of other transactions expenses and customary deductions) ("**FLNG 2 Sale Proceeds**"), equal to the sum of: (i) 2.0 per cent. of every dollar of FLNG 2 Sale Proceeds up to and including $200,000,000, *plus* (ii) 3.0 per cent. of every dollar of FLNG 2 Sale Proceeds above $200,000,000 up to and including $400,000,000, *plus* (iii) 5 per cent. of every dollar of FLNG 2 Sale Proceeds above $400,000,000.

***BrazilCo MIP***

8.16   After the Restructuring Effective Date, the new board of directors of New BrazilCo Parent will adopt an equity incentive plan for directors, officers, and employees of the BrazilCo Group (the "**BrazilCo MIP**").

***CoreCo Governance***

8.17   The governance of the Parent after the Restructuring Effective Date is set out in the CoreCo Governance Term Sheet. In summary:

8.17.1   The Parent will remain a Delaware corporation, managed on a day-to-day basis by its chief executive officer and other senior executive officers with oversight from the New CoreCo Board.

8.17.2   The Parent will use its commercially reasonable efforts to continue as an SEC public reporting company. After the Restructuring Effective Date, if the CoreCo Common Stock and CoreCo Preferred Stock are not then listed on the Nasdaq Global Select Market or another National Securities Exchange, the holders of a majority of the issued and outstanding CoreCo Preferred Stock can require the Parent to use commercially reasonable efforts to cause the CoreCo Common Stock and, after the Parent satisfies applicable listing

26

DG-044

standards, the CoreCo Preferred Stock, to be listed on a National Securities Exchange as promptly as reasonably practicable.

8.17.3 Immediately following the Restructuring Effective Date, the New CoreCo Board will be comprised of seven directors: (i) Wesley R. Edens, (ii) to the extent RCF Lenders receive at least seven per cent. of the voting equity of the Parent, one director selected by the holders of a majority of the outstanding Revolving Credit Facility Debt (the "**Majority RCF Lenders**"), which director (if any) must have knowledge of or experience in the industry and satisfy Nasdaq independence rules (it being understood that such director will neither be an employee nor an affiliate of any holder of Revolving Credit Facility Debt), and (iii) the remaining five directors (or (x) six directors to the extent no director is selected pursuant to (ii) or (y) seven directors if the size of the Board is increased to nine directors pursuant to this paragraph) selected by holders of a majority of the outstanding Term Loan B Debt (the "**Majority TLB Lenders**") and holders of a majority of the outstanding 2029 New Notes Debt (the "**Majority 2029 New Noteholders**") in satisfaction of Nasdaq independence rules (including committee composition). The Majority TLB Lenders, the Majority 2029 New Noteholders and the Majority RCF Lenders, may consent to increase the size of the board to up to nine directors. The members of the New CoreCo Board will serve until the Parent's next annual meeting following the Restructuring Effective Date, following which the New CoreCo Board will be nominated/ elected in accordance with standard public company board procedures (i.e., no ongoing right to serve, elected by majority vote of stockholders).

8.17.4 The chairperson of the New CoreCo Board will be an independent director initially selected collectively by the Majority TLB Lenders and Majority 2029 New Noteholders and, thereafter, by a majority vote of the New CoreCo Board, provided that such chairperson (i) will not also serve as the chief executive officer and (ii) will at all times be an independent director in accordance with SEC and Nasdaq independence rules.

8.17.5 The CoreCo Common Stock and CoreCo Preferred Stock will be freely transferable following the Restructuring Effective Date, subject to compliance with applicable securities laws as determined by the Parent with the consent of the Majority Supporting Creditors.

8.17.6 Amendments and approvals will be in accordance with applicable law and any applicable listing rules and regulations.

### *BrazilCo Governance*

8.18 Further details on the governance of the New BrazilCo Parent will be disclosed to Plan Creditors in the Explanatory Statement.

### *FLNG 2 Sale*

8.19 In the event that FLNG 2 is sold following the Restructuring Effective Date (an "**FLNG 2 Sale**"), CoreCo Group will retain any proceeds from such sale, transfer, or disposal of FLNG 2 in excess of the sum of (a) the outstanding obligations under the

DG-045

FLNG 2 Term Loan Facility and (b) the FLNG 2 Preferred Equity amount, after giving effect to the FLNG 2 MIP.

### *Capital Raise*

8.20   If required to satisfy the Minimum Liquidity Condition on the Restructuring Effective Date (which may be determined after the Plan Meetings), the Parent will seek to raise (x) first, up to an initial $35 million in aggregate principal amount (after giving effect to any original issue discount) of additional New CoreCo Term Loans (the "**Capital Raise New CoreCo Term Loans**") and (y) to the extent the Minimum Liquidity Condition would not be satisfied after giving effect to funding commitments in respect of the Capital Raise New CoreCo Term Loans, additional New CoreCo Term Loans which are second ranking to the Capital Raise New CoreCo Term Loans described in (x) above, ("**Capital Raise New CoreCo Junior Term Loans**" collectively, as applicable, the "**Capital Raise**"), in each case on terms and conditions substantially similar to those under the New CoreCo Credit Facility Term Sheet, and, with respect to the Capital Raise New CoreCo Junior Term Loans, adjusted as appropriate for the Initial Terms (as described below) and similar second lien credit facilities of this size, type and purpose. The Plan Companies consider that the Capital Raise will enable the Group to raise additional funds (if required) to satisfy Minimum Liquidity Condition.

8.21   Following the Parent's final determination of the required amount (if any) of the Capital Raise, each Plan Creditor receiving New CoreCo Term Loans pursuant to the Plans will be offered the right to provide its *pro rata* share of the Capital Raise New CoreCo Term Loans. If required, each Plan Creditor will be offered the right to provide its *pro rata* share of Capital Raise New CoreCo Junior Term Loans relative to its share of initially allocated CoreCo Preferred Stock, at an interest rate and original issue discount based on market terms (the "**Initial Terms**"). Plan Creditors, and other third parties acceptable to the Plan Companies and the Parent, may offer to participate in unsubscribed allocations of the Capital Raise through a competitive pricing process.

8.22   The aggregate principal amount of Capital Raise New CoreCo Term Loan subscriptions accepted by the Parent will not exceed $35 million after giving effect to any original issue discount. The aggregate principal amount of the total Capital Raise will not exceed the minimum amount required to satisfy the Minimum Liquidity Condition on the Restructuring Effective Date, after giving effect to any original issue discount.

8.23   The issuance of the Capital Raise New CoreCo Junior Term Loans may be backstopped by prospective participants of such Capital Raise on market terms prior to the Capital Raise. It is not anticipated that the issuance of the Capital Raise New CoreCo Term Loans will be backstopped.

8.24   A more detailed summary of the procedure for the allocation of participation in the Capital Raise is set out in the Restructuring Support Agreement, including the Restructuring Term Sheet. Additional terms, conditions, and procedures for the Capital Raise, including the terms of any backstop, may be determined by the Parent in consultation with, and with the consent of, the Majority Supporting Creditors. Further information will be provided in the Explanatory Statement.

DG-046

*Other terms of the Restructuring*

8.25 There will also be a number of other conditions and steps to be completed prior to the implementation of the Restructuring, including:

8.25.1 the Existing NFE Stockholders approving the following proposals for the purposes of the Restructuring at a shareholder meeting to be held on or around the date of the Sanction Hearing:

(i) to amend the Parent's certificate of incorporation to increase the total number of authorised shares of the Parent's Class A common stock as required to issue the Plan Consideration pursuant to the Restructuring;

(ii) to issue shares of the Parent's Class A common stock in excess of 20 per cent. of the Parent's outstanding Class A common stock for the purposes of complying with the Nasdaq Listing Rule 5635(d);

(iii) to amend the 2019 Omnibus Incentive Plan to increase the total number of authorised shares of the Parent's Class A common stock available for grant thereunder, to implement the CoreCo MIP; and

(iv) to amend the Parent's certificate of incorporation to effect a reverse stock split of the Parent's Class A common stock, subject to the Parent's board of directors' authority to abandon the amendment;

8.25.2 Mexican antitrust approval in respect of the CoreCo Group;

8.25.3 other regulatory consents and approvals required for the continued operations of the CoreCo Group and BrazilCo Group;

8.25.4 consents for change of control and related amendments under certain agreements with third parties; and

8.25.5 other customary conditions precedent to the implementation of the Restructuring, including the inter-conditionality of the Plans.

8.26 The Plan Companies and the Group are seeking the necessary consents and approvals. As at the date of this letter, the Plan Companies are not aware of any likely impediments to fulfilling the relevant conditions or completing the relevant steps.

8.27 The Plans are an integral part of the wider Restructuring as, if approved by the requisite Plan Creditors and sanctioned by the Court, they will allow the Group to implement those aspects of the Recapitalisation Transaction which cannot be achieved on a fully consensual basis. The key terms of the Recapitalisation Transaction and the Plans are set out in detail at Section 9 (*Rights Subject to the Plans*) below.

8.28 Further detail as to the Restructuring, including conditions precedent, will be detailed in the Explanatory Statement.

## 9   RIGHTS SUBJECT TO THE PLANS

9.1 The key elements of the Plans are set out below.

29

DG-047

**(A)    RECAPITALISATION TRANSACTION**

9.2    Recapitalisation Transaction:

9.2.1    pursuant to the CoreCo Plan and as set out in the Exchange Consideration Chart, on the Restructuring Effective Date:

(i)    ***Series I Loan and Series II Loan***: all claims under or in connection with the Series I Loan Debt and Series II Loan Debt will be released in full in exchange, on a *pro rata* basis, for CoreCo Preferred Stock and CoreCo Common Stock. The Plan Creditors in respect of the Series I Loan Debt and Series II Loan Debt are the Brazil Parent and NFE Financing, respectively. By virtue of the Brazil Parent Intercompany Loan, the proceeds of the Series I Loan Debt would ultimately be payable to NFE Financing and, alongside proceeds of the Series II Loan Debt, would form part of the Brazil Collateral. The Series I Lender and the Series II Lender will vote at the Plan Meeting in respect of the Series I Loan Debt and the Series II Loan Debt in accordance with voting direction by the 2029 New Noteholders in accordance with the instruments under the 2029 New Notes Debt. For efficiency, Plan Consideration in respect of the Series I Loan Debt and Series II Loan Debt will be distributed directly to those Plan Creditors with recourse to the Brazil Collateral (in addition to any other Plan Consideration received by such Plan Creditors);

(ii)    ***Legacy Notes***: all claims under or in connection with the 2026 Legacy Notes Debt and the 2029 Legacy Notes Debt will be released in full in exchange, on a *pro rata* basis, for CoreCo Preferred Stock and CoreCo Common Stock;

(iii)    ***Revolving Credit Facility***: the Revolving Credit Facility Agreement and all RCF Commitments will be terminated and released in full in exchange, on a *pro rata* basis, as follows (and all letters of credit currently outstanding under the Revolving Credit Facility Agreement will be backstopped or replaced):

(a)    each R-1 Lender will exchange its R-1 Revolving Credit Facility Debt for its *pro rata* share of the $475 million New CoreCo Term Loans, CoreCo Preferred Stock, CoreCo Common Stock, FLNG 2 Term Loans and FLNG 2 Preferred Equity to be distributed to R-1 Lenders;

(b)    each R-2 Lender will exchange its R-2 Revolving Credit Facility Debt for its *pro rata* share of: (i) the $475 million New CoreCo Term Loans, CoreCo Preferred Stock, CoreCo Common Stock, FLNG 2 Term Loans and FLNG 2 Preferred Equity to be distributed to R-2 Lenders and (ii) its *pro rata* share of the RCF-2 / TLA BrazilCo Equity Pool; and

(c)    each RCF Lender will be entitled to receive its *pro rata* share of incremental New CoreCo Term Loans in an aggregate principal amount of $35 million (such incremental New

CoreCo Term Loans, together with any incremental New CoreCo Term Loans incurred pursuant to sub-paragraph (c) of paragraph (iv) below, the "**Incremental New CoreCo Term Loans**");

(iv)   *Term Loan A Facility*: all claims under or in connection with the Term Loan A Debt will be released in full in exchange for:

(a)   each TLA Lender's *pro rata* share of CoreCo Preferred Stock, CoreCo Common Stock, FLNG 2 Term Loans and FLNG 2 Preferred Equity to be distributed to TLA Lenders, in each case, as set out in the Exchange Consideration Chart;

(b)   each TLA Lender's *pro rata* share of the RCF-2 / TLA BrazilCo Equity Pool; and

(c)   each TLA Lender's *pro rata* share of Incremental New CoreCo Term Loans in an aggregate principal amount of $17.5 million; and

(v)   *Term Loan B Facility*: all claims under or in connection with the Term Loan B Debt will be released in full in exchange on a *pro rata* basis, for its share of the $475 million New CoreCo Term Loans, CoreCo Preferred Stock, CoreCo Common Stock, FLNG 2 Term Loans and FLNG 2 Preferred Equity;

9.2.2   pursuant to the BrazilCo Plan, on the Restructuring Effective Date:

(i)   *2029 New Notes*: all claims under or in connection with the 2029 New Notes Debt will be released in full in exchange, on a *pro rata* basis, for BrazilCo Common Equity to be distributed to holders of 2029 New Notes as set out in the Exchange Consideration Chart; and

9.2.3   eligible Plan Creditors will receive the Early Consent Fee, and/or the Standstill Fee, as described at paragraphs 6.14 to 6.16 above,

(together, the "**Recapitalisation Transaction**").

**(B)   ELECTIONS**

9.3   A number of the RCF Lenders and TLA Lenders are regulated banks and the effect of certain banking regulation and capital adequacy rules is that it may be more costly for such Plan Creditors to hold Equity Plan Consideration compared with Debt Plan Consideration. Such Plan Creditors are free to sell any equity (or other) instruments on the Restructuring Effective Date. To give these Plan Creditors comfort that they can dispose of Equity Plan Consideration on the Restructuring Effective Date regardless of market conditions, the Plan Companies and certain creditors offered the TLA Lenders and RCF Lenders a discounted exchange of certain instruments, to be exercised by the Election Deadline. The Election Deadline has passed, with all TLA Lenders and all RCF Lenders exercising their elections (other than one RCF Lender holding less than 1 per cent. of the Revolving Credit Facility Debt).

9.4   The terms of the elections are that:

31

2167

9.4.1   each RCF Lender can exchange all or, subject to the terms of the Restructuring Support Agreement, a portion of its shares of CoreCo Preferred Stock (and a proportionate number of shares of CoreCo Common Stock) for the right to receive incremental New CoreCo Term Loans at a rate of 50.0 per cent. of the liquidation preference of the CoreCo Preferred Stock, up to a cap (the "**Equity-for-Debt Exchange Election**") (any shares of CoreCo Preferred Stock in respect of which Equity-for-Debt Exchange Elections are exercised, the "**Equity-for-Debt Exchanged Preferred Shares**" and any incremental New CoreCo Term Loans incurred, the "**Incremental Equity-for-Debt Exchange Election New CoreCo Term Loans**");

9.4.2   each R-2 Lender can receive its *pro rata* share of the RCF-2 / TLA BrazilCo Cash Pool *in lieu* of its *pro rata* share of the RCF-2 / TLA BrazilCo Equity Pool;

9.4.3   each TLA Lender can receive its *pro rata* share of the RCF-2 / TLA BrazilCo Cash Pool *in lieu* of its *pro rata* share of the RCF-2 / TLA BrazilCo Equity Pool; and

9.4.4   certain Management Investors and such other investors as may be selected by the Management Investors, have offered to purchase from RCF Lenders and TLA Lenders the shares of CoreCo Preferred Stock allocated to such holders (and a proportional number of shares of CoreCo Common Stock) for a cash purchase price of 25.0 per cent. of the liquidation preference of the CoreCo Preferred Stock, up to a cap (the "**CoreCo Preferred Stock Cash Purchase Election**").

9.5   Each Plan Creditor that did not participate in either the Equity-for-Debt Exchange Election or the CoreCo Preferred Stock Cash Purchase Election and is entitled to receive CoreCo Preferred Stock pursuant to the Plans (an "**Eligible Non-Exchanging Creditor**") is entitled to receive its *pro rata* share of an incremental number of shares of CoreCo Preferred Stock equal to one-half the aggregate number of Equity-for-Debt Exchanged Preferred Shares.

9.6   The reallocation of the CoreCo Preferred Stock will be made based on each Eligible Non-Exchanging Creditor's CoreCo Preferred Stock holdings after taking into consideration *pro forma* adjustments for the Equity-for-Debt Exchange Election and the CoreCo Preferred Stock Cash Purchase Election.

9.7   CoreCo Common Stock held by Plan Creditors that make the Equity-for-Debt Exchange Election will be adjusted on a *pro rata* basis.

**(C)   NEW CORECO TERM LOANS**

9.8   The New CoreCo Term Loans will be made available as part of the New CoreCo Credit Facility. The proposed key terms of the New CoreCo Term Loans are set out in the New CoreCo Credit Facility Term Sheet and are summarised below:

| Item | Proposed term |
|---|---|
| Quantum and overview | Senior secured term loan facility, in an aggregate principal amount equal to the sum of (w) up to $475 |

32

DG-050

| Item | Proposed term |
|---|---|
| | million, (x) $52.5 million of Incremental New CoreCo Term Loans incurred, (y) approximately $43.8 million of Incremental Equity-for-Debt Exchange Election New CoreCo Term Loans and (z) solely to the extent necessary to meet the Minimum Liquidity Condition on the Restructuring Effective Date, up to $35 million of Capital Raise New CoreCo Term Loans.<br><br>New CoreCo Term Loans will be incurred by the borrower on the Restructuring Effective Date and (save for any Capital Raise New CoreCo Term Loans) applied to refinance, on a cashless basis, certain of the loans and other obligations outstanding under the Revolving Credit Facility and the Term Loan B Facility, as described in more detail in paragraph 9.2 above. |
| Maturity | 5 years after the Restructuring Effective Date.<br><br>Amortisation at a rate of 1 per cent. per annum, paid quarterly. |
| Borrower | Parent. |
| Guarantors | Each existing and subsequently acquired or organised, direct and indirect subsidiary of the borrower (subject to customary exclusions and other exclusions to be agreed). |
| Ranking and collateral | The borrower's obligations and each guarantor's guarantees will be secured by first-priority liens on substantially all of the assets of the borrower and the guarantors (subject to certain exceptions as listed below).<br><br>The collateral will not include (i) the "FLNG2 Collateral" (as defined in the Term Loan B Agreement) to the extent such FLNG 2 Collateral constitutes "Collateral" under the FLNG 2 Term Loan Facility, and (ii) other assets to be agreed.<br><br>The obligations under the facility will be secured by the collateral on a junior basis to the liens securing the obligations under the New CoreCo LC Facility and subject to an intercreditor agreement with respect to the liens securing the New CoreCo LC Facility (which liens will be super priority). |
| Interest | Fixed rate per annum equal to Term SOFR plus 6.125 per cent., payable in cash. |

33

2169

DG-051

| Item | Proposed term |
|---|---|
|  | Borrower's option to pay interest in kind during the period commencing on the Restructuring Effective Date and ending on the last day of the first full fiscal quarter after the 18-month anniversary thereof, at a rate equal to the cash interest rate plus 150 basis points, compounding at the end of the applicable interest period (but at least quarterly). |
| Governing law | New York. |

**(D)   FLNG 2 TERM LOANS**

9.9   The FLNG 2 Term Loans will be made available as part of the FLNG 2 Term Loan Facility. The proposed key terms of the FLNG 2 Term Loans are set out in the FLNG 2 Term Loan Term Sheet and are summarised below:

| Item | Proposed term |
|---|---|
| Quantum and overview | Non-recourse senior secured term loan facility in the aggregate principal amount of $400 million, the proceeds of which shall be used to refinance, on a cashless basis, certain loans and other obligations outstanding under the Revolving Credit Facility, Term Loan A Facility and Term Loan B Facility, as described in more detail in paragraph 9.2 above. |
| Maturity | 3 years after the Restructuring Effective Date. No amortisation. |
| Borrower | FLNG 2 Parent. |
| Guarantors | Each subsidiary of the borrower. |
| Ranking and collateral | Secured by first-priority liens on substantially all of the assets of the borrower and the guarantors (subject to customary exclusions and other exclusions to be agreed). |
| Interest | Paid-in-kind at fixed rate per annum equal to Term SOFR plus 3.00 per cent. |
| Governing law | New York. |

**(E)   CORECO PREFERRED STOCK**

9.10   The proposed key terms of the CoreCo Preferred Stock are set out in the CoreCo Preferred Stock Term Sheet and are summarised below:

DG-052

| Item | Proposed term |
|---|---|
| Issuer | Parent. |
| Securities | Mandatorily convertible preferred stock with a par value of $0.01. Automatically convert into Class A common stock upon the third anniversary of the issue date. |
| Ranking | Subordinated to all existing and future indebtedness of the Parent. Senior to all existing and future equity securities of the Parent with respect to rights to the payment of dividends and the distribution of assets upon liquidation, dissolution or winding up. |
| Liquidation Preference | Liquidation preference of a per share amount in cash equal to $1,000 per each share plus the amount of accrued but unpaid preferred dividends. |
| Dividends | Cumulative quarterly compounding dividend, which will accrue via an increase to the liquidation preference, with a cumulative per annum preferred return of 3.0 per cent. in Year 1, 5.0 per cent. in Year 2 and 7.0 per cent. in Year 3. CoreCo Preferred Stock will participate on an as-converted basis in any dividends and distributions on the CoreCo Common Stock. |
| Anti-Dilution Protections | Subject to: (a) mechanical adjustments to proportionally adjust the conversion rate and number of shares of CoreCo Common Stock issuable upon conversion in the event of any split, reverse split, combination or subdivision, stock dividend, recapitalisation or similar event, and (b) weighted average anti-dilution protection on future issuances of CoreCo Common Stock at a price less than the then current fair market value. |
| Consent Rights | Consent from holders of two thirds of the CoreCo Preferred Stock with respect to certain actions of the Parent and its subsidiaries. |
| Voting | On an "as converted" basis together with the CoreCo Common Stock as a single class. |
| Listing | Parent to use commercially reasonable efforts to list on the Nasdaq Global Select Market or another National Securities Exchange. |

2171

DG-053

| Item | Proposed term |
|---|---|
| Governing Law | Delaware. |
| Transfer Restrictions | Freely tradable, subject to applicable securities laws. |

## (F)    CORECO COMMON STOCK

9.11    The key terms of the CoreCo Common Stock are summarised below:

| Item | Term |
|---|---|
| Issuer | Parent. |
| Securities | The Parent's existing Class A common stock with a par value of $0.01. |
| Listing | Parent to use commercially reasonable efforts to list on the Nasdaq Global Select Market or another National Securities Exchange. |
| Governing Law | Delaware. |

## (G)    FLNG 2 PREFERRED EQUITY

9.12    The proposed key terms of the FLNG 2 Preferred Equity are set out in the FLNG 2 Preferred Equity Term Sheet and are summarised below:

| Item | Proposed term |
|---|---|
| Issuer | FLNG 2 Parent. |
| Securities | $200m nonconvertible non-voting perpetual preferred limited liability company membership interests. |
| Ranking | Subordinated to all existing and future indebtedness of the FLNG 2 Parent.<br><br>Senior to all existing and future equity securities of the FLNG 2 Parent with respect to rights upon any liquidation. |
| Liquidation Preference | Liquidation preference of a per share amount in cash equal to $1,000, unless a lower amount is agreed by the holders of a majority of FLNG 2 Preferred Equity. |
| Dividends | None. |

36

DG-054

| Item | Proposed term |
|---|---|
| Consent Rights | Consent from holders of a majority of units with respect to certain actions of FLNG 2 Parent and its subsidiaries. |
| Governing Law | Delaware. |
| Transfer Restrictions | Freely tradable, subject to applicable securities laws. |

**(H)    BRAZILCO COMMON EQUITY**

9.13    The key terms of the BrazilCo Common Equity will be disclosed to Plan Creditors in the Explanatory Statement.

**(I)     FURTHER DETAILS**

9.14    Further details of the Plans, and the documentation reflecting the matters provided for above, will be set out in the Explanatory Statement. For details on the circulation of the Explanatory Statement and other related material, please refer to Section 16 (*Steps Following the Convening Hearing*).

9.15    Provided the Court gives its permission to the Plan Companies to convene the Plan Meetings, the Plan Companies will notify the Plan Creditors in accordance with the directions of the Court of the time, date and venue of the Plan Meetings, set out how any Plan Creditors may vote at the Plan Meetings and provide further details of the terms of the Plans via the Information Agent and the Plan Website and will communicate any change in the same manner.

9.16    Any further details regarding the Plans and the Convening Hearing or Sanction Hearing dates will be made available on the Plan Website.

**10     PROPOSED CLASS CONSTITUTION OF PLAN CREDITORS**

10.1    Under the Practice Statement, it is the responsibility of each Plan Company to formulate the class or classes of Plan Creditors for the purpose of convening properly constituted meetings to consider and, if thought fit, approve the relevant Plans.

10.2    If the rights of creditors affected by the relevant Plan are so dissimilar or would be affected in such a different manner by the relevant Plan as to make it impossible for them to consult together with a view to their common interest, they must be divided into separate classes and a separate meeting must be held for each class of creditors. The final decision on the appropriate composition of any meetings convened to consider the Plans will be a matter for the Court.

10.3    Each Plan Company has considered: (i) the relevant rights of the Plan Creditors against it in the Relevant Alternative if the Plans and the Restructuring were not to be implemented, and (ii) how the Plan Creditors' current rights are proposed to be compromised under the Plans. Having taken legal advice (privilege in respect of which is not and has not been waived):

DG-055

10.3.1 NFE Global has concluded that the CoreCo Plan Creditors fall into six classes for the purposes of voting on the CoreCo Plan, as follows:

(i)     the R-1 Lenders (the "**R-1 Class**");

(ii)    the R-2 Lenders (the "**R-2 Class**");

(iii)   the TLB Lenders (the "**TLB Class**");

(iv)    the TLA Lenders (the "**TLA Class**");

(v)     the Legacy Noteholders (the "**Legacy Notes Class**"); and

(vi)    each of the Series I Lender and the Series II Lender (the "**Series I and Series II Class**"),

(each a "**CoreCo Plan Class**" and together, the "**CoreCo Plan Classes**").

10.3.2 NFE Brazil Newco has concluded that the BrazilCo Plan Creditors fall into one class for the purposes of voting on the BrazilCo Plan, as follows (and for the reasons outlined below):

(i)     the 2029 New Noteholders (the "**2029 New Notes Class**" and together with each CoreCo Plan Class, each a "**Plan Class**" and together, the "**Plan Classes**").

10.4    The Legacy Notes and the 2029 New Notes are currently held in global form, however the Legacy Notes Indentures and the indenture governing the 2029 New Notes each include provisions whereby holders of Legacy Notes and 2029 New Notes can be issued with definitive notes in certain circumstances, which would create a direct contractual right for the ultimate beneficial holders against the Parent and NFE Financing, respectively. Accordingly, the ultimate beneficial holders of the Legacy Notes and the 2029 New Notes will vote in the Plan Meetings for the Legacy Notes Class and the 2029 New Notes Class, respectively.

### *"Rights in" and "rights out" analysis*

10.5    As the value of recoveries in the Relevant Alternative and the Plan Consideration is determined by the collateral rights of the respective Plan Creditors, the Plan Companies have separated Plan Creditors who have recourse to a different combination of Collateral Pools into the different classes described above.

10.6    In relation to the current rights of each of the CoreCo Plan Creditors against NFE Global and the proposed rights of each of the CoreCo Plan Creditors as part of the CoreCo Plan:

10.6.1 *R-1 Class*: Each R-1 Lender has provided loans on identical terms under the Revolving Credit Facility Agreement and therefore has identical rights against NFE Global. If the CoreCo Plan becomes effective, the rights of each R-1 Lender will be compromised in the same way as those of each other R-1 Lender as described in Section 9 (*Rights Subject to the Plans*) above. In addition to the Common Collateral, Plan Creditors in the R-1 Class have recourse to:

DG-056

(i)     F1 Collateral, to which Plan Creditors in the Legacy Notes Class, the Series I and Series II Class and the TLA Class do not have recourse;

(ii)    F2 Collateral, to which Plan Creditors in the Legacy Notes Class and the Series I and Series II Class do not have recourse; and

(iii)   Brazil 2L Lien and Account Collateral, to which Plan Creditors in the Legacy Notes Class, the Series I and Series II Class and the TLB Class do not have recourse,

and, in each case, the difference in collateral rights leads to a different return in the Relevant Alternative and a difference in the value of the Plan Consideration allocated to creditors in the R-1 Class (compared with other Plan Classes).

10.6.2  *R-2 Class*: Each R-2 Lender has provided loans on identical terms under the Revolving Credit Facility Agreement and therefore has identical rights against NFE Global. If the CoreCo Plan becomes effective, the rights of each R-2 Lender will be compromised in the same way as those of each other R-2 Lender as described in Section 9 (*Rights Subject to the Plans*) above. In addition to the Common Collateral, Plan Creditors in the R-2 Class have recourse to:

(i)     Brazil Collateral, to which Plan Creditors in the Legacy Notes Class, the Series I and Series II Class, R-1 Class and the TLB Class do not have recourse;

(ii)    F1 Collateral, to which Plan Creditors in the Legacy Notes Class, the Series I and Series II Class and the TLA Class do not have recourse;

(iii)   F2 Collateral, to which Plan Creditors in the Legacy Notes Class and the Series I and Series II Class do not have recourse; and

(iv)    Account Collateral, to which Plan Creditors in the Legacy Notes Class, the Series I and Series II Class and the TLB Class do not have recourse,

and, in each case, the difference in collateral rights leads to a different return in the Relevant Alternative and a difference in the value of the Plan Consideration allocated to creditors in the R-2 Class (compared with other Plan Classes).

10.6.3  *TLB Class*: Each TLB Lender has made available loans on identical terms under the Term Loan B Agreement and therefore has the same rights against NFE Global. If the CoreCo Plan becomes effective, the rights of each TLB Lender will be compromised in the same way as those of each other TLB Lender as described in Section 9 (*Rights Subject to the Plans*) above. In addition to the Common Collateral, Plan Creditors in the TLB Class have recourse to:

(i)     F1 Collateral, to which Plan Creditors in the Legacy Notes Class, the Series I and Series II Class and the TLA Class do not have recourse; and

39

DG-057

(ii)    F2 Collateral, to which Plan Creditors in the Legacy Notes Class and the Series I and Series II Class do not have recourse;

and, in each case, the difference in collateral rights leads to a different return in the Relevant Alternative and a difference in the value of the Plan Consideration allocated to creditors in the TLB Class (compared with other Plan Classes).

10.6.4   ***TLA Class***: Each TLA Lender has made available loans on identical terms under the Term Loan A Agreement and therefore has identical rights against NFE Global. If the CoreCo Plan becomes effective, the rights of each TLA Lender will be compromised in the same way as those of each other TLA Lender as described in Section 9 (*Rights Subject to the Plans*) above. Wesley R. Edens holds approximately 37.0 per cent. of the Term Loan A Debt, but on identical terms to all other Term Loan A Debt, and consequently NFE Global does not consider it necessary to place him in a separate class. In addition to the Common Collateral, Plan Creditors in the TLA Class have recourse to:

(i)    Brazil Collateral, to which Plan Creditors in the Legacy Notes Class, the Series I and Series II Class, R-1 Class and the TLB Class do not have recourse;

(ii)    F2 Collateral, to which Plan Creditors in the Legacy Notes Class and the Series I and Series II Class do not have recourse; and

(iii)    Account Collateral, to which Plan Creditors in the Legacy Notes Class, the Series I and Series II Class and the TLB Class do not have recourse,

and, in each case, the difference in collateral rights leads to a different return in the Relevant Alternative and a difference in the value of the Plan Consideration allocated to creditors in the TLA Class (compared with other Plan Classes).

10.6.5   ***Legacy Notes Class***:

(i)    The claims under the Legacy Notes are guaranteed by the same group of obligors (i.e., the Parent and the Common Guarantors) and are secured by the same pool of common security (i.e., the Common Collateral) on a *pari passu* basis. NFE Global therefore expects that the creditors under the Legacy Notes would receive similar *pro rata* recoveries if the CoreCo Plan was not sanctioned and the Relevant Alternative scenario transpired.

(ii)    If the CoreCo Plan becomes effective, the rights of each of the creditors under the Legacy Notes will be compromised in the same way as each other such creditor's as described in Section 9 (*Rights Subject to the Plans*) above.

(iii)    The terms of the Legacy Notes are not identical and, in particular, the interest rates, maturities and events of default and covenant regimes

DG-058

differ across the instruments. However, NFE Global does not consider these differences to be material for the purposes of class composition.

(iv) The Residual FLNG Proceeds Claims are contractually subordinated to the Series I Loan and Series II Loan. NFE Global considers that, in the Relevant Alternative, realisations in respect of the Group's FLNG 1 and FLNG 2 gas liquefication facilities would be insufficient to pay the senior ranking debt in full meaning that the Legacy Noteholders would receive no return in respect of the Residual FLNG Proceeds Claims. Accordingly, no Plan Consideration is allocated in respect of the Residual FLNG Proceeds Claims.

(v) As described above, the Legacy Notes, the Series I Loan and the Series II Loan share the same guarantors and security. However, NFE Global believes that it is appropriate that the Plan Creditors in respect of (i) the Legacy Notes, and (ii) the Series I Loan and the Series II Loan, vote in separate classes, for the following reasons:

(a) the Series I Lender and the Series II Lender enjoy higher ranking security in respect of the proceeds from the Group's FLNG 1 and FLNG 2 gas liquification facilities – albeit in the Relevant Alternative, neither: (i) the Series I Lender and the Series II Lender, nor (ii) the Legacy Noteholders would receive any payment in respect of their security as realisations in respect of the assets would be insufficient to pay the senior ranking debt in full;

(b) security has been granted over the rights enjoyed by the Series I Lender and the Series II Lender under the Series I Loan and the Series II Loan pursuant to the Brazil Collateral. The 2029 New Noteholders enjoy the economic benefit of that security (by way of a lien) and have a contractual right to instruct the Series I Lender and the Series II Lender as to the exercise of their voting rights in respect of the CoreCo Plan;

(c) the Series I Loan and the Series II Loan contain certain "make-whole" provisions. Under these provisions, an additional sum of money becomes due to the Series I Lender and the Series II Lender upon prepayment or acceleration of the loans, in addition to the accrued interest and principal. This may motivate the Series I Lender and the Series II Lender to prefer acceleration and enforcement of their claims as compared to creditors that do not enjoy such a contractual right. The Legacy Noteholders do not enjoy such a clear contractual right;

(d) NFE Global recognises that there are arguments as to whether these differences between (i) the Legacy Noteholders, and (ii) the Series I Lender and the Series II Lender are sufficiently material (and, relatedly, whether they relate to the rights of the creditors as creditors or whether they relate to collateral

41

2177

"interests") so as to require the creditors to be divided into different classes; and

(e) however, the board of NFE Global wishes to avoid the risk of potential prejudice to any Plan Creditor of a dissenting creditor seeking to argue that the Legacy Noteholders and the Series I Lender and the Series II Lender should be in separate classes. NFE Global therefore proposes to take a pragmatic approach to class composition and invites the court to order separate meetings for: (i) the Legacy Notes Class; and (ii) the Series I and Series II Class.

(vi) Having considered this and taken legal advice (privilege in respect of which is not and has not been waived), NFE Global has concluded that, due to the high degree of similarity of "rights in" against NFE Global and "rights out" under the CoreCo Plan, the differences between the rights of the Legacy Noteholders are not so dissimilar as to make it impossible for them to consult together with a view to their common interest and, accordingly, it is appropriate for all such Legacy Noteholders to consider and, if thought fit, approve the CoreCo Plan at the same Plan Meeting.

10.6.6 *Series I and Series II Class*:

(i) The claims under each of the Series I Loan and Series II Loan are guaranteed by the same group of obligors (i.e., the Parent and the Common Guarantors) and are secured by the same pool of common security (i.e., the Common Collateral) on a *pari passu* basis. NFE Global therefore expects that the creditors under the Series I Loan and Series II Loan would receive similar *pro rata* recoveries if the CoreCo Plan was not sanctioned and the Relevant Alternative scenario transpired.

(ii) If the CoreCo Plan becomes effective, the rights of each of the creditors under the Series I Loan and Series II Loan will be compromised in the same way as each other such creditor's as described in Section 9 (*Rights Subject to the Plans*) above.

(iii) The terms of the Series I Loan and Series II Loan are not identical and, in particular, the interest rates and maturities differ across the instruments. However, NFE Global does not consider these differences to be material for the purposes of class composition.

(iv) As described above, the Legacy Notes, the Series I Loan and the Series II Loan share the same guarantors and security. However, for the reasons set out above, NFE Global believes that it is appropriate that the Plan Creditors in respect of (i) the Legacy Notes, and (ii) the Series I Loan and the Series II Loan, vote in separate classes.

(v) Having considered this and taken legal advice (privilege in respect of which is not and has not been waived), NFE Global has concluded that, due to the high degree of similarity of "rights in" against NFE

42

2178

Global and "rights out" under the CoreCo Plan, the differences between the rights of the Series I Lender and the Series II Lender are not so dissimilar as to make it impossible for them to consult together with a view to their common interest and, accordingly, it is appropriate for the Series I Lender and the Series II Lender to consider and, if thought fit, approve the CoreCo Plan at the same Plan Meeting.

10.7   In relation to the current rights of each of the BrazilCo Plan Creditors against NFE Brazil Newco and the proposed rights of each of the BrazilCo Plan Creditors as part of the BrazilCo Plan:

10.7.1   ***2029 New Notes Class***: Each 2029 New Noteholder holds its 2029 New Notes on identical terms pursuant to the 2029 New Notes' indenture and therefore has the same rights against NFE Brazil Newco. If the BrazilCo Plan becomes effective, the rights of each 2029 New Noteholder will be compromised in the same way as those of each other 2029 New Noteholder as described in Section 9 (*Rights Subject to the Plans*) above.

***Impact of Early Consent Fee, Standstill Fee and payment of certain professional fees***

10.8   The Plan Companies do not consider that Plan Creditors who are entitled to receive the Early Consent Fee need to be put in a separate class or classes for the purpose of voting on the CoreCo Plan or the BrazilCo Plan (as applicable) from Plan Creditors not so entitled, because all Plan Creditors have had adequate opportunity to sign or accede to the Restructuring Support Agreement ahead of the Early Consent Deadline, and thereby become entitled to the Early Consent Fee. Further, and in any event, the Early Consent Fee is a modest amount that is unlikely of itself to persuade any Plan Creditor to vote in favour of the Plans or to have any material influence on that decision.

10.9   NFE Global does not consider that R-1 Lenders and R-2 Lenders who are entitled to receive the Standstill Fee need to be put in separate classes for the purpose of voting on the CoreCo Plan, from respectively, R-1 Lenders and R-2 Lenders not so entitled. The Standstill Fee is available to all RCF Lenders who agree to forbear and as of the date of this letter, all bar one of the RCF Lenders (holding less than 1 per cent. of the Revolving Credit Facility Debt) have agreed to the forbearance. Each RCF Lender who agreed to forbear will be entitled to the Standstill Fee. The Standstill Fee is not a payment for consent or a success fee. The Standstill Fee is payable whether or not the Restructuring is completed and is non-refundable. Accordingly, the Standstill Fee is not considered to be material in terms of persuading any particular RCF Lender to vote in favour of the CoreCo Plan (and in any event it was not a condition to the Standstill Fee that the relevant RCF Lenders signed the Restructuring Support Agreement or supported the Restructuring).

10.10   A number of the Plan Creditors and Administrative Parties (including ad hoc groups of the Legacy Noteholders, the TLB Lenders, the 2029 New Notes, the TLA Lenders and the RCF Agent) will have certain professional fees of their advisors met by the Group in respect of the negotiation and documentation of the Restructuring. The payment of these professional fees will occur independently from the process of the Plans and will not be contingent upon the sanction of the Plans. As such, the Plan

43

DG-061

Companies have been advised and believe that these Plan Creditors are not required to be placed in a separate class from other Plan Creditors.

### *Impact of Capital Raise*

10.11 The Plan Companies do not consider that the Plan Creditors that may participate in the Capital Raise need to be put in separate classes for the purpose of voting on the Plans from those that do not so participate. If the relevant conditions for the Capital Raise are triggered, each Plan Creditor receiving New CoreCo Term Loans pursuant to the Plans (i.e., the RCF Lenders and the TLB Lenders) is entitled to participate in the Capital Raise New CoreCo Term Loans, and all Plan Creditors are entitled to participate in the Capital Raise New CoreCo Junior Term Loans on a *pro rata* basis according to their share of CoreCo Preferred Stock. The Capital Raise (and the terms of any backstop) if required, will be raised through a competitive pricing process aimed at achieving market terms within the parameters set by the Group and may not be agreed until after the Sanction Hearing has occurred. Accordingly, the right to participate in the Capital Raise (and any backstop) is not considered to be material in terms of persuading any particular Plan Creditor to vote in favour of the Plans and, in any case, there is no difference as to participation rights between creditors within each proposed Plan Class.

### *Impact of Elections*

10.12 NFE Global does not consider that the R-1 Lenders, R-2 Lenders and TLA Lenders that made the elections referred to at paragraphs 9.3 to 9.7 above need to be put in separate classes for the purpose of voting on the CoreCo Plan. The relevant elections were open to all RCF Lenders and TLA Lenders. Further, the CoreCo Preferred Stock Cash Purchase Election is a trading arrangement between third parties that Plan Creditors can elect into. Consequently, as the same rights were offered to each of the members of the R-1 Class, the R-2 Class and the TLA Class, NFE Global has been advised and believes that those Plan Creditors that participated in such elections are not required to be placed in a separate class from the other members of the R-1 Class, the R-2 Class and the TLA Class, respectively. Further, those Plan Creditors that will be reallocated CoreCo Preferred Stock need not be placed in a separate class from the other members of such class, as all reallocations are made on a *pro rata* basis.

### *Conclusions*

10.13 Both NFE Global and NFE Brazil Newco have placed particular reliance on the matters set out above when reaching the conclusion that it is appropriate for the Plan Classes to vote in the stipulated class meetings.

10.14 If any Plan Creditor has comments as to the proposed class constitution of Plan Creditors, or any other concerns which they consider should be raised with the Court, they should in the first instance contact the Information Agent and Skadden, legal advisers to the Plan Companies, using the contact details set out at the end of this letter as soon as practicable.

## 11   CONSEQUENCES IF THE PLANS ARE NOT SUCCESSFUL

11.1 In light of the conditions affecting the Group, it is the view of the Boards that if the Plans are not sanctioned and the Restructuring is not implemented, the Group will be

DG-062

unable to meet its outstanding and upcoming payment obligations to creditors and the Group will not have sufficient liquidity to continue as a going concern.

11.2     If the Plans are not sanctioned, the Restructuring Support Agreement will most likely terminate and the forbearances contained therein will fall away. In such circumstances, the Group will promptly face a number of events of default under the Plan Debt, including (without limitation) material payment defaults under each of the Plan Debt instruments. The Group will not have sufficient liquidity to meet the relevant payment obligations and would not have a realistic prospect of finding additional liquidity on a timely basis. Accordingly, it is likely that the termination of the Restructuring Support Agreement would result in the Group, including the Plan Companies, facing imminent action by creditors to accelerate debt, call guarantees and seek to enforce security rights under their respective instruments, including under certain Plan Debt instruments, which in turn will likely trigger cross-defaults under other instruments (including under other Plan Debt instruments).

11.3     Furthermore, if the Plans are not sanctioned, many of the Group's business and trade counterparties, some of which have agreed to defer or reduce certain accounts payable to support the Restructuring, may withdraw credit terms, terminate existing contracts and commence litigation, or take enforcement actions against Group assets located in jurisdictions all around the world.

11.4     In order to assist the Plan Companies in considering the Relevant Alternative, Richard Fleming and Richard Bibby, each of Alvarez & Marsal, were engaged to:

11.4.1   identify the scenario(s) that are likely in the event that the Plans and the Restructuring were unsuccessful; and

11.4.2   prepare a report estimating the financial return to the Plan Creditors in such scenario(s).

11.5     The relevant alternative if the Plans are not sanctioned will be whatever the Court considers to be most likely to occur (the "**Relevant Alternative**"). This will depend on the circumstances at the time and the options available to stakeholders. The Relevant Alternative is a hypothetical assessment of the most realistic counterfactual – it is not the theoretical worst case, nor does it favour certain stakeholders. Each of the Boards considers, with the support of the Group's advisors, that if the Plans are not sanctioned and the Restructuring is not implemented then the Relevant Alternative is that:

11.5.1   events of default will occur under the Plan Debt instruments and the respective Plan Creditors will become entitled to accelerate the relevant Plan Debt; the Plan Companies and the other obligors under the Plan Debt will be unable to meet demands for repayment following any such acceleration;

11.5.2   the Group (other than the Brazilian business), acting through their respective directors, will commence voluntary proceedings under chapter 11 of the U.S. Bankruptcy Code to facilitate sales of the assets and separable business units within the Group to maximise recoveries to creditors pursuant to section 363 of the U.S. Bankruptcy Code; and

DG-063

11.5.3 assuming temporary forbearance from local creditors and the 2029 New Noteholders, the subsidiaries of NFE Financing and the Brazil Parent that comprise the Group's Brazilian business will most likely not commence voluntary proceedings under chapter 11 of the U.S. Bankruptcy Code (although the risk cannot be completely eliminated) and the Brazilian business will be sold in an accelerated sales process. The proceeds of such sale will not be sufficient to discharge the 2029 New Notes Debt. The Brazilian business will likely be negatively impacted by a chapter 11 filing of the rest of the Group.

11.6 This analysis will be detailed in a report (the "**Relevant Alternative Report**") and described in more detail in the Explanatory Statement.

11.7 The Plan Companies expect that the final Relevant Alternative Report will indicate that each Plan Creditor will be better off should the Plans be sanctioned and the Restructuring be implemented than it would in the applicable Relevant Alternative.

11.8 The Plan Companies, together with Alvarez & Marsal, have also considered the allocation of the incremental value preserved by the Recapitalisation Transaction as compared with the Relevant Alternative (the "**Restructuring Surplus**"). The Boards consider that the allocation of the Plan Consideration represents a fair allocation of the Restructuring Surplus in light of each class of Plan Creditor's entitlement to proceeds from the respective Collateral Pools as outlined above. Further detail will be included in the Relevant Alternative Report.

## 12   RECOMMENDATION OF THE BOARDS

12.1 Each of the Boards considers the Restructuring and the Plans to be in the best interests of the Plan Companies and all Plan Creditors. Each Board has arrived at this conclusion on the basis of (without limitation):

12.1.1 the benefits to the Plan Companies and the Group of addressing certain near-term and longer-term maturities under certain of the Plan Debt instruments, achieving a deleveraged and sustainable capital structure and obtaining access to liquidity and new letter of credit facilities;

12.1.2 that all Plan Creditors are expected to be no worse off if the Plans are sanctioned and the Restructuring is implemented than would be the case in the Relevant Alternative; and

12.1.3 the high levels of support already received for the Restructuring and the Plans through the approvals provided in connection with the Restructuring Support Agreement entered into by various Plan Creditors, as described above.

12.2 Accordingly, the Boards unanimously recommend that the Plan Creditors vote in favour of the Plans at the Plan Meetings.

DG-064

## 13   JURISDICTION AND RECOGNITION

### (A)   JURISDICTION

13.1   The Plan Companies consider that the Court has jurisdiction under Part 26A of the Act in relation to the Plan Companies, and that the Court should exercise such jurisdiction, on the basis of:

13.1.1   **Plan Companies liable to be wound up**: the Plan Companies are incorporated under the laws of England and Wales and are liable to be wound up under the Insolvency Act 1986;

13.1.2   **Financial difficulties**: each of the Plan Companies has encountered or is likely to encounter significant financial difficulties for the reasons described above in Section 6 (*Background to the Group's Financial Difficulties*), which are affecting, or will affect its (and the Group's) ability to carry on business as a going concern and, absent the Plans, each Plan Company is expected to face the Relevant Alternative;

13.1.3   **Purpose**: as explained above in Section 7 (*Objectives of the Plans*), the purpose of the Plans is to eliminate, reduce or mitigate the effect of the Plan Companies' (and the Group's) financial difficulties; and

13.1.4   **Compromise or arrangement**: it is necessary for the proposals under the Plans to be a "compromise" or "arrangement" between the relevant Plan Company and the relevant Plan Creditors. The Plans contain the requisite elements of "give and take" in respect of each class of Plan Creditors in order to constitute a "compromise" or "arrangement" for these purposes.

13.2   Given the matters described above, the Plan Companies consider that the Court has jurisdiction to sanction the compromise and arrangement in respect of the claims and liabilities set out in the respective Plans (provided the requisite statutory requirements are satisfied).

### (B)   RECOGNITION

13.3   The United States (including Puerto Rico) is a material jurisdiction to the Group in terms of its assets, operations and management and certain of the Plan Creditors are expected to be U.S. persons. The Plan Companies will therefore seek recognition of the Plans in the United States (including Puerto Rico) under chapter 15 of the U.S. Bankruptcy Code ("**Chapter 15 Recognition**").

13.4   Each of the Plan Companies intends to appoint a foreign representative in respect of proceedings in relation to the Chapter 15 Recognition (and any other recognition proceedings). At the Convening Hearing, each of the Plan Companies will request a declaration from the Court that the foreign representative has been validly appointed for the purposes of such recognition proceedings.

13.5   To seek the Chapter 15 Recognition, the Plan Companies, through their duly appointed foreign representatives, will file a petition (the "**Chapter 15 Petition**") in the United States Bankruptcy Court for the Southern District of New York or other court of competent jurisdiction (the "**U.S. Bankruptcy Court**") seeking an order (i) recognising the Plans as a foreign main proceeding under chapter 15 of the U.S.

47

DG-065

Bankruptcy Code and (ii) providing that the Plans and the Sanction Order are entitled to full force and effect in the United States in accordance with their terms for recognition and enforcement of the Plans (and any order sanctioning the Plans) under chapter 15 of the U.S. Bankruptcy Code.

13.6    The Plan Companies will publish notice of the filing of the Chapter 15 Petition on the Plan Website.

13.7    If the Plans are approved by the Plan Creditors and sanctioned by the Court, the Plan Companies expect that the U.S. Bankruptcy Court will grant the relief sought in the Chapter 15 Petition. The Plan Companies will obtain and file with the Court in advance of the Sanction Hearing (at the latest):

13.7.1    an opinion from an independent expert on certain matters of U.S. Federal law and New York State law, including whether the Plans are likely to be recognised by the U.S. Bankruptcy Court as a foreign main proceeding under chapter 15 of the U.S. Bankruptcy Code and, if sanctioned, be given full force and effect in the United States; and

13.7.2    as the Group has significant assets and operations in Mexico, an opinion from an independent expert on Mexican law that the Plans are likely to be recognised and given effect to in Mexico.

13.8    Certain subsidiaries of the Group hold significant assets in Brazil. However, those subsidiaries are not issuers or guarantors of the 2029 New Notes Debt or CoreCo Plan Debt. Neither NFE Brazil Newco nor the issuers or guarantors of the 2029 New Notes Debt are incorporated in Brazil. The Plan Companies do not consider that a legal opinion on matters of Brazilian law would assist the Court.

14    **CREDITOR ISSUES**

14.1    This letter is intended to provide Plan Creditors with sufficient information regarding the Plans and the proposals for convening the Plan Meetings of the Plan Creditors, so that, should they wish to raise:

14.1.1    any issues which may arise as to the constitution of the Plan Meetings, or which otherwise affect the conduct of those Plan Meetings;

14.1.2    any issues as to the existence of the Court's statutory jurisdiction to sanction the Plans;

14.1.3    any issues relevant to the conditions to be satisfied pursuant to section 901A of the Act;

14.1.4    any issues as to the Court's international jurisdiction in respect of the Plans; or

14.1.5    any other issue not going to the merits or fairness of the Plans, but which might lead the Court to refuse to sanction the Plans,

(together, "**Creditor Issues**"), they may attend and be represented before the Court at the Convening Hearing. Details of the Convening Hearing are set out in Section 15 (*Convening Hearing*) of this letter.

48

DG-066

14.2    Plan Creditors should consider taking advice from their professional advisers if they have any concerns in relation to the matters set out in this letter.

14.3    Plan Creditors should be aware that, under the terms of the Practice Statement, the Court has indicated that Creditor Issues should be raised at the Convening Hearing. If Plan Creditors fail to raise these matters at the Convening Hearing, whilst they will still be able to appear and raise objections at the Sanction Hearing, the Court at the Sanction Hearing will expect those Plan Creditors to provide good reason why they did not raise any Creditor Issues at an earlier stage.

14.4    If any Plan Creditor has Creditor Issues which they consider should be raised with the Court, they should in the first instance contact the Information Agent and Skadden, legal advisers to the Plan Companies, using the contact details set out at Section 20 (*Enquiries and Further Information*) below as soon as practicable and in any event by no later than seven days in advance of the date of the Convening Hearing.

14.5    As more than 75 per cent. by value of Plan Creditors in each of the proposed Plan Classes have executed the Restructuring Support Agreement, thereby agreeing to vote in favour of the Plans, the Plan Companies do not envisage that there will be any Dissenting Class.

15    **CONVENING HEARING**

15.1    The Convening Hearing is expected to be held on 14 May 2026 in the Companies Court, Royal Courts of Justice, 7 Rolls Building, Fetter Lane, London EC4A 1NL and at which the Plan Companies will seek an order granting directions in relation to the Plans, including permission to convene the Plan Meetings of Plan Creditors for the purpose of considering and, if thought fit, approving the Plans.

15.2    Confirmation of the time and other details of the Convening Hearing will be sent to you via the Information Agent and the Plan Website in advance of the Convening Hearing.

15.3    Plan Creditors are entitled to attend the Convening Hearing in person or through counsel and to make representations at the Convening Hearing, although they are not obliged to do so. Plan Creditors who wish to attend the Convening Hearing in-person or through counsel should contact the Information Agent and Skadden, legal advisers to the Plan Companies, using the contact details set out at Section 20 (*Enquiries and Further Information*) below as soon as practicable to obtain instructions for attending the Convening Hearing.

15.4    At the Convening Hearing, the Court will consider whether or not to make an order convening the Plan Meetings of the Plan Creditors. In doing so, the Court will consider, among other things:

15.4.1    the purpose and effects of the Plans and the Restructuring (as to which see Section 7 (*Objectives of the Plans*), Section 8 (*Overview of the Restructuring*) and Section 9 (*Rights Subject to the Plans*));

15.4.2    the Relevant Alternative to the Plans (see Section 11 (*Consequences if the Plans are not Successful*));

DG-067

15.4.3   whether it has jurisdiction to convene the Plan Meetings (see Section 0 (*Jurisdiction and Recognition*));

15.4.4   class composition (see Section 10 (*Proposed Class Constitution of Plan Creditors*)); and

15.4.5   any considerations or "roadblocks" that might preclude the Court from exercising its discretion to sanction the Plans at the Sanction Hearing.

15.5   The Plan Companies will also draw to the Court's attention:

15.5.1   any Creditor Issues (see Section 14 (*Creditor Issues*)); and

15.5.2   any other issues raised by any Plan Creditor in response to this letter.

## 16   STEPS FOLLOWING THE CONVENING HEARING

16.1   If permission to convene the Plan Meetings is granted by the Court at the Convening Hearing, the Plan Companies will:

16.1.1   convene the Plan Meetings by notifying the respective Plan Creditors in accordance with the directions of the Court of the time and date of and means of attending the Plan Meetings; and

16.1.2   make available to Plan Creditors the following important documents relating to the Plans:

(i)   the Explanatory Statement;

(ii)   the Plans;

(iii)   the notices convening the Plan Meetings;

(iv)   a Plan Creditor Letter that the Plan Creditors will need to complete to vote at, or appoint a proxy to attend and vote on their behalf at, the Plan Meetings; and

(v)   the principal agreements and other related documents that will document the terms of the Restructuring,

(together the "**Plan Documentation**").

16.2   Plan Creditors will receive the Plan Documentation by email from the Information Agent and be able to view and download the Plan Documentation in electronic format via the Plan Website. A notice in this regard will be circulated to Plan Creditors via the Information Agent shortly after the Convening Hearing. In addition, a notice directing Plan Creditors to the copies of the Plan Documentation will be available on the Plan Website.

16.3   Any of the Plan Documentation provided to Plan Creditors on the Plan Website can also be provided in hard copy free of charge if so requested by a Plan Creditor. Any such request should be made to the Information Agent and Skadden, legal advisers to the Plan Companies, at the contact details set out at Section 20 (*Enquiries and Further Information*) below.

17      **THE PLAN MEETINGS**

17.1    The Plan Companies currently expect that the Plan Meetings of the Plan Creditors in respect of the Plans will be set out in the Explanatory Statement. The date and time at which the claims of Plan Creditors under the Plans are to be determined by the Plan Companies will be the Record Time, which will be set out in the Explanatory Statement.

17.2    Further details with respect to the Plan Meetings will be provided in the Plan Documentation, which will likely allow remote attendance via a video-conference platform.

18      **SANCTION HEARING**

18.1    Following the Plan Meetings, provided that the requisite majorities of Plan Creditors vote in favour of the Plans, the Plan Companies intend to apply at the Sanction Hearing for an order sanctioning the Plans.

18.2    The Sanction Hearing is expected to be held in the Companies Court, Royal Courts of Justice, 7 Rolls Building, Fetter Lane, London EC4A 1NL.

18.3    Confirmation of the date and time of the Sanction Hearing will be sent to you via the Information Agent and the Plan Website in advance of the Sanction Hearing.

18.4    Plan Creditors are entitled to attend the Sanction Hearing in person or through counsel and to make representations at the Sanction Hearing, although they are not obliged to do so. Plan Creditors who wish to attend the Sanction Hearing in person or through counsel should contact Skadden, legal advisers to the Plan Companies, using the contact details set out at Section 20 (*Enquiries and Further Information*) below as soon as practicable to obtain instructions for attending the Sanction Hearing.

18.5    At the Sanction Hearing, the Court will consider whether or not to make an order sanctioning the Plans. In doing so, the Court will consider, among other things, whether:

18.5.1  the provisions of the statute have been complied with. This will include questions of class composition, whether the statutory majorities were obtained, and whether an adequate explanatory statement was distributed to the creditors;

18.5.2  the classes of Plan Creditors were fairly represented by those who attended the Plan Meetings and the statutory majority in each assenting class were acting in a *bona fide* manner;

18.5.3  each of the Plans are, respectively, a fair restructuring plan which a creditor could reasonably approve;

18.5.4  if there is a Dissenting Class in the CoreCo Plan, it is fair in all the circumstances to impose the CoreCo Plan on such Dissenting Class, including whether the Restructuring Surplus has been fairly allocated among Plan Classes, taking account of their respective contributions to the Restructuring Surplus (as noted at paragraph 14.5 above, NFE Global does not anticipate that there will be any Dissenting Class); and

51

DG-069

18.5.5 there is any "blot" or defect in the Plans that would, for example, make it unlawful or in any other way inoperable.

18.6 The Plan Companies will also draw the Court's attention to:

18.6.1 objections raised as to Creditor Issues. However, as noted in Section 14 (*Creditor Issues*), if any such Creditor Issues were not raised prior to the Sanction Hearing then the Court is likely to expect relevant Plan Creditors to provide good reason why they did not raise such Creditor Issues at an earlier stage; and

18.6.2 other matters pertaining to the points set out above, including, for example, whether a Plan Creditor has indicated that it has not had adequate notice of the Plan Meetings.

18.7 Plan Creditors who have any comments or objections relating to the matters to be dealt with at the Sanction Hearing, as detailed above, should contact the Information Agent and Skadden, legal advisers to the Plan Companies, using the contact details set out at Section 20 (*Enquiries and Further Information*) below as soon as practicable setting out any concerns.

## 19   EFFECTIVENESS OF THE PLANS

19.1 Pursuant to the Plans, following:

19.1.1 in respect of the CoreCo Plan, either: (i) approval of the CoreCo Plan by a number representing at least 75 per cent. in value of each of the CoreCo Plan Classes present (in person or by proxy) and voting at each relevant Plan Meeting or (ii) approval of the CoreCo Plan by a number representing at least 75 per cent. in value of one or more (but not all) CoreCo Plan Classes present (in person or by proxy) and voting at the relevant Plan Meeting and reliance on the cross-class cram down feature in respect of the Dissenting Class(es);

19.1.2 in respect of the BrazilCo Plan: approval of the BrazilCo Plan by a number representing at least 75 per cent. in value of the 2029 New Notes Class present (in person or by proxy) and voting at the relevant Plan Meeting; and

19.1.3 in respect of both Plans:

(i)     the granting by the Court of the Sanction Order; and

(ii)    the delivery of a copy of the Sanction Order to the Registrar of Companies in England and Wales for registration,

the Plans will become effective in accordance with their terms and will be implemented once the conditions precedent to implementation are satisfied.

19.2 If the CoreCo Plan becomes effective and is implemented in accordance with its terms, all CoreCo Plan Creditors (including those who did not vote in favour of the CoreCo Plan or those who did not vote at all) will be bound by the terms of the CoreCo Plan as a matter of English law, irrespective of the jurisdiction in which the CoreCo Plan Creditor resides or has their seat, along with NFE Global.

DG-070

19.3    If the BrazilCo Plan becomes effective and is implemented in accordance with its terms, all BrazilCo Plan Creditors (including those who did not vote in favour of the BrazilCo Plan or those who did not vote at all) will be bound by the terms of the BrazilCo Plan as a matter of English law, irrespective of the jurisdiction in which the BrazilCo Plan Creditor resides or has their seat, along with NFE Brazil Newco.

19.4    The effectiveness of the CoreCo Plan will be conditional on the BrazilCo Plan being sanctioned by the Court and the effectiveness of the BrazilCo Plan will be conditional on the CoreCo Plan being sanctioned by the Court. Each Plan will, once sanctioned, also be subject to certain other conditions precedent to implementation, as described further at paragraph 8.25 above.

19.5    As at the date of this letter, the Restructuring Effective Date is expected to be in mid 2026.

## 20    ENQUIRIES AND FURTHER INFORMATION

20.1    If you have any questions in relation to this letter or the Plans, please contact Skadden using the following contact details:

**Legal advisers to the Plan Companies**

Skadden, Arps, Slate, Meagher & Flom (UK) LLP
22 Bishopsgate
London
EC2N 4BQ
United Kingdom

Attention:     Peter Newman and Nicole Stephansen
E-mail:         DLLADYUK@skadden.com
Phone:         +44 20 7519 7000

**Information Agent**

Kroll Issuer Services Limited
The News Building
3 London Bridge Street
London
SE1 9SG
United Kingdom

Attention:     Alessandro Zorza/ Sunjeeve Patel
E-mail:         nfe@is.kroll.com
Phone:         +44 20 7089 0909
Plan Website: https://deals.is.kroll.com/nfe

20.2    Skadden, as legal advisers to the Plan Companies rather than the Plan Creditors, will be unable to offer legal advice to Plan Creditors relating to the Plans.

## 21    PLAN WEBSITE

21.1    The Information Agent has set up the Plan Website to disseminate information and communications about the Plans and to facilitate the implementation of the Plans. Plan Creditors may download documents relating to the Plans from the Plan Website (at https://deals.is.kroll.com/nfe).

53

DG-071

21.2   For any questions regarding access to the Plan Website, or if a Plan Creditor encounters any technical difficulties accessing any Plan Documentation via the Plan Website, please contact the Information Agent using the contact details set out above.

DG-072

Yours faithfully,

Signed by:

4D5C907FC340418...

Christopher Boas

Director of NFE Global Holdings Limited

Signed by:

4D5C907FC340418...

Christopher Boas

Director of NFE Brazil Newco Limited

[*Signature Page to the Practice Statement Letter*]

2191

DG-073

**Schedule 1– Definitions and Interpretation**

1      **DEFINITIONS**

"**2019 Omnibus Incentive Plan**" means the Parent's existing employee incentive plan.

"**2024 Intercompany Loans**" has the meaning given to it in paragraph 5.23 of this letter.

"**2024 Refinancing Transactions**" has the meaning given to it in paragraph 5.13 of this letter.

"**2025 Notes**" has the meaning given to it in paragraph 5.13 of this letter.

"**2026 Legacy Noteholders**" has the meaning given to it in paragraph 3.1.1 of this letter.

"**2026 Legacy Notes**" has the meaning given to it in paragraph 5.2 of this letter.

"**2026 Legacy Notes Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the holders of the 2026 Legacy Notes under or in connection with the 2026 Legacy Notes (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise.

"**2026 Legacy Notes Trustee**" means U.S. Bank Trust Company, National Association, in its capacity as trustee under the 2026 Legacy Notes, or any successor thereof.

"**2029 Legacy Noteholders**" has the meaning given to it in paragraph 3.1.2 of this letter.

"**2029 Legacy Notes**" has the meaning given to it in paragraph 5.3 of this letter.

"**2029 Legacy Notes Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the holders of the 2029 Legacy Notes under or in connection with the 2029 Legacy Notes (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise).

"**2029 Legacy Notes Trustee**" means U.S. Bank Trust Company, National Association, in its capacity as trustee under the 2029 Legacy Notes, or any successor thereof.

"**2029 New Noteholders**" has the meaning given to it in paragraph 3.2 of this letter.

"**2029 New Notes**" has the meaning given to it in paragraph 5.13 of this letter.

"**2029 New Notes Class**" has the meaning given to it in paragraph 10.3.2(i) of this letter.

"**2029 New Notes Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the holders of the

2029 New Notes under or in connection with the 2029 New Notes (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise).

"**2029 New Notes Trustee**" means Wilmington Savings Fund Society, FSB, in its capacity as trustee under the 2029 New Notes, or any successor thereof.

"**Account Collateral**" has the meaning given to it in paragraph 5.8.5 of this letter.

"**Act**" has the meaning given to it in the Preamble of this letter.

"**Administrative Parties**" means the RCF Agent, the TLA Agent, the TLB Agent, the Series I Agent, the Series II Agent, the Common Representative, the 2026 Legacy Notes Trustee, the 2029 Legacy Notes Trustee, the 2029 New Notes Trustee, DTC and Cede & Co.

"**Alvarez & Marsal**" means Alvarez & Marsal Europe LLP.

"**Barcarena Power Plant**" has the meaning given to it in paragraph 6.1.5 of this letter.

"**Barcarena Terminal**" has the meaning given to it in paragraph 6.1.3 of this letter.

"**BNDES Term Loan**" means an up to $355.566 million loan facility made pursuant to a credit agreement dated October 2023 with BNDES, the Brazilian Development Bank.

"**Boards**" means the respective board of directors of each Plan Company.

"**Brazil**" means the Federative Republic of Brazil.

"**Brazil $200m Pari Lien**" means a first lien over the NFE Financing Collateral Assets, excluding certain real estate in Pennsylvania, U.S.A. owned by PA Land, on terms such that the secured first lien obligations in respect of the R-2 Revolving Credit Facility, the Letter of Credit Facility and the Term Loan A Facility are subject to an aggregate cap of $200 million and rank *pari passu* as between themselves, and, in turn, rank *pari passu* with the secured claims of the 2029 New Notes in respect of the NFE Financing Collateral Assets.

"**Brazil 2L Lien**" means, an uncapped, second lien over the NFE Financing Collateral Assets, excluding certain real estate in Pennsylvania, U.S.A. owned by PA Land (and after amounts owing under the 2029 New Notes have been repaid), shared *pari passu* between the Revolving Credit Facility, Term Loan A Facility and Letter of Credit Facility.

"**Brazil Bank Collateral**" has the meaning given to it in paragraph 5.8.4 of this letter.

"**Brazil Collateral**" has the meaning given to it in paragraph 5.15 of this letter.

"**Brazil Financing Notes**" means the up to $350 million aggregate principal amount of 15.00% Senior Secured Notes due 2029 issued in February 2025 by one of the Parent's consolidated subsidiaries.

"**Brazil Junior ICA**" has the meaning given to it in paragraph 5.28.3 of this letter.

57

DG-075

"**Brazil Parent**" has the meaning given to it in paragraph 5.17 of this letter.

"**Brazil Parent Credit Agreement**" has the meaning given to it in paragraph 5.17 of this letter.

"**Brazil Parent ICA**" has the meaning given to it in paragraph 5.28.2 of this letter.

"**Brazil Parent Intercompany Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the lenders of the Brazil Parent Intercompany Loan under or in connection with the Brazil Parent Intercompany Loan (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise).

"**Brazil Parent Intercompany Loan**" has the meaning given to it in paragraph 5.17 of this letter.

"**Brazil Parent Intercompany Loan Facility**" has the meaning given to it in paragraph 5.17 of this letter.

"**BrazilCo Common Equity**" means all common equity interests of New BrazilCo Parent from and after the Restructuring Effective Date.

"**BrazilCo Group**" has the meaning given to it in paragraph 8.1.1(i) of this letter.

"**BrazilCo GSA**" means a sale and purchase agreement for the purchase by CELBA-1 Centrais Electricas Barcarena S.A. from a third party of liquefied natural gas.

"**BrazilCo MIP**" has the meaning given to it in paragraph 8.16 of this letter.

"**BrazilCo Plan**" means the restructuring plan proposed by the NFE Brazil Newco under Part 26A of the Act.

"**BrazilCo Plan Creditors**" has the meaning given to it in paragraph 3.2 of this letter.

"**BrazilCo Separation**" has the meaning given to it in paragraph 8.2 of this letter.

"**BrazilCo Stockholders' / LLC Agreement**" means the document to be entered into pursuant to the Restructuring governing the terms of the BrazilCo Common Equity.

"**Capital Raise**" has the meaning given to it in paragraph 8.20 of this letter.

"**Capital Raise New CoreCo Junior Term Loans**" has the meaning given to it in paragraph 8.20 of this letter.

"**Capital Raise New CoreCo Term Loans**" has the meaning given to it in paragraph 8.20 of this letter.

"**Cash Plan Consideration**" means each relevant Plan Creditor's entitlement, pursuant to the Plans, to the RCF-2 / TLA BrazilCo Cash Pool.

DG-076

"**Cede & Co.**" means Cede & Co. as nominee for DTC and as registered holder of the 2026 Legacy Notes, the 2029 Legacy Notes and the 2029 New Notes, or any successor thereof.

"**Chapter 15 Petition**" has the meaning given to it in paragraph 13.5 of this letter.

"**Chapter 15 Recognition**" has the meaning given to it in paragraph 13.3 of this letter.

"**Collateral Pools**" has the meaning given to it in paragraph 5.16 of this letter.

"**Common Collateral**" has the meaning given to it in paragraph 5.4 of this letter.

"**Common Guarantors**" has the meaning given to it in paragraph 5.4 of this letter.

"**Common Representative**" means U.S. Bank, National Association, in its capacity as initial common representative under the terms of the Equal Priority Intercreditor Agreement, or any successor thereof.

"**Consolidated Liquidity**" means, as of any date of determination, an amount determined for CoreCo, on a consolidated basis, equal to the sum of: (x) unrestricted cash and cash equivalents, and (y) available committed capacity under the Exit LNG Facility.

"**Convening Hearing**" means the hearing expected to be held in the Companies Court, Royal Courts of Justice, 7 Rolls Building, Fetter Lane, London EC4A 1NL for an order granting the Plan Companies certain directions in relation to the Plans, including permission to convene the Plan Meetings for the purpose of Plan Creditors considering and, if thought fit, approving, the Plans.

"**CoreCo–BrazilCo Transition Services Agreement**" means a transition services agreement to be entered into on the Restructuring Effective Date, between, among others, the Parent and New BrazilCo Parent, pursuant to which the CoreCo Group will provide certain transition services to the BrazilCo Group.

"**CoreCo Common Stock**" means the common stock of the Parent from and after the Restructuring Effective Date.

"**CoreCo Governance Term Sheet**" means the term sheet appended to the Restructuring Term Sheet setting out the material terms and conditions regarding the governance of the Parent on and after the Restructuring Effective Date, including, but not limited to, the composition of the New CoreCo Board.

"**CoreCo Group**" has the meaning given to it in paragraph 8.1.1(ii) of this letter.

"**CoreCo Intercreditor Agreement**" means the intercreditor agreement to be entered into pursuant to the Restructuring in respect of the New CoreCo Credit Facility and New CoreCo LC Facility.

"**CoreCo MIP**" has the meaning given to it in paragraph 8.14 of this letter.

"**CoreCo Plan**" means the restructuring plan proposed by the NFE Global under Part 26A of the Act.

DG-077

"**CoreCo Plan Class**" has the meaning given to it in paragraph 10.3.1 of this letter.

"**CoreCo Plan Creditors**" has the meaning given to it in paragraph 3.1 of this letter.

"**CoreCo Plan Debt**" has the meaning given to it in paragraph 1.6 of this letter.

"**CoreCo Preferred Stock**" means a series of convertible preferred stock of the Parent from and after the Restructuring Effective Date, which shall have the terms set out in the CoreCo Preferred Stock Term Sheet.

"**CoreCo Preferred Stock Cash Purchase Election**" has the meaning given to it in paragraph 9.4 of this letter.

"**CoreCo Preferred Stock Term Sheet**" means the term sheet appended to the Restructuring Term Sheet setting out the material terms and conditions of the CoreCo Preferred Stock.

"**CoreCo Registration Rights Agreement**" means the document to be entered into pursuant to the Restructuring governing the registration rights in respect of the CoreCo Common Stock and CoreCo Preferred Stock.

"**Corporate Debt**" has the meaning given to it in paragraph 1.6 of this letter.

"**Court**" means the High Court of Justice of England and Wales and any appellate court in England and Wales having jurisdiction in connection with the Restructuring (including the Court of Appeal and the Supreme Court).

"**Creditor Issues**" has the meaning given to it in paragraph 14.1 of this letter.

"**Debt Plan Consideration**" means each relevant Plan Creditor's entitlement, pursuant to the Plans, to New CoreCo Term Loans and/or FLNG 2 Term Loans as applicable.

"**Dissenting Class**" has the meaning given to it in paragraph 2.3.1(ii) of this letter.

"**DTC**" means the Depository Trust Company, or any successor thereof.

"**Early Consent Deadline**" has the meaning given to it in paragraph 6.14 of this letter.

"**Early Consent Fee**" has the meaning given to it in paragraph 6.14 of this letter.

"**Election Deadline**" means 5.00pm (New York time) on 8 April 2026.

"**Eligible Non-Exchanging Creditor**" has the meaning given to it in paragraph 9.5 of this letter.

"**Energos**" has the meaning given to it in paragraph 4.7.2 of this letter.

"**Equal Priority Intercreditor Agreement**" has the meaning given to it in paragraph 5.28.1 of this letter.

"**Equity-for-Debt Exchange Election**" has the meaning given to it in paragraph 9.4.1 of this letter.

DG-078

"**Equity-for-Debt Exchanged Preferred Shares**" has the meaning given to it in paragraph 9.4.1 of this letter.

"**Equity Plan Consideration**" means each relevant Plan Creditor's entitlement, pursuant to the Plans, to CoreCo Preferred Stock, CoreCo Common Stock, FLNG 2 Preferred Equity and/or BrazilCo Common Equity as applicable.

"**Exchange Consideration Chart**" has the meaning given to it in paragraph 8.1.2 of this letter.

"**Existing NFE Stockholders**" means the holders of common stock of the Parent as of the Record Time.

"**Exit LNG Facility**" has the meaning given to it in the Restructuring Support Agreement.

"**Explanatory Statement**" means the explanatory statement to the Plans required to be provided to the Plan Creditors pursuant to section 901D of the Act (which will include a notice setting out the relevant details for Plan Meetings), including any appendices, schedules or other documents attached thereto and any supplemental, revised or replacement explanatory statement issued in connection with the Plans.

"**F1 Collateral**" has the meaning given to it in paragraph 5.8.2 of this letter.

"**F2 Collateral**" has the meaning given to it in paragraph 5.8.3 of this letter.

"**FEMA**" has the meaning given to it in paragraph 6.3.3(ii) of this letter.

"**FLNG**" has the meaning given to it in paragraph 6.1.8 of this letter.

"**FLNG 1**" has the meaning given to it in paragraph 6.1.8 of this letter.

"**FLNG 1 Guarantors**" has the meaning given to it in paragraph 5.8 of this letter.

"**FLNG 2**" has the meaning given to it in paragraph 6.1.8 of this letter.

"**FLNG 2 Guarantors**" has the meaning given to it in paragraph 5.8 of this letter.

"**FLNG 2 MIP**" has the meaning given to it in paragraph 8.15 of this letter.

"**FLNG 2 Parent**" means NFE FLNG 2 LLC, a Delaware limited liability company.

"**FLNG 2 Parent LLCA**" means the Amended and Restated Limited Liability Company Agreement of FLNG 2 Parent.

"**FLNG 2 Preferred Equity**" means all preferred equity interests of FLNG 2 Parent from and after the Restructuring Effective Date, which shall have the terms set out in the FLNG 2 Preferred Equity Term Sheet.

"**FLNG 2 Preferred Equity Term Sheet**" means the term sheet appended to the Restructuring Term Sheet setting forth the material terms and conditions of the FLNG 2 Preferred Equity.

DG-079

"**FLNG 2 Sale**" has the meaning given to it in paragraph 8.19 of this letter.

"**FLNG 2 Sale Proceeds**" has the meaning given to it in paragraph 8.15 of this letter.

"**FLNG 2 Term Loan Credit Facility Agreement**" means the credit agreement governing the FLNG 2 Term Loan Facility, to be entered into on the Restructuring Effective Date among the FLNG 2 Parent, the guarantors party thereto, the lenders party thereto, and the administrative agent for such lenders, on the terms set out in the FLNG 2 Term Loan Term Sheet.

"**FLNG 2 Term Loan Facility**" has the meaning given to it in paragraph 8.6 of this letter.

"**FLNG 2 Term Loan Term Sheet**" means the term sheet appended to the Restructuring Term Sheet setting forth the material terms and conditions of the FLNG 2 Term Loans.

"**FLNG 2 Term Loans**" has the meaning given to it in paragraph 8.6 of this letter.

"**GLP Preferred Units**" means the GLP 8.75% Series A cumulative redeemable preferred units issued by Golar LNG Partners LP.

"**Group**" means the Parent and its direct and indirect subsidiaries.

"**Holding Period Trust Deed**" means the trust deed to be entered into on or prior to the Restructuring Effective Date between, among others, the Plan Companies and the Holding Period Trustee (as defined therein) and attached to the Transaction Implementation Deed.

"**Implementation Documents**" has the meaning given to it in paragraph 7.2.2 of this letter.

"**Incremental Equity-for-Debt Exchange Election New CoreCo Term Loans**" has the meaning given to it in paragraph 9.4.1 of this letter.

"**Incremental New CoreCo Term Loans**" has the meaning given to it in paragraph 9.2.1(iii)(c) of this letter.

"**Information Agent**" means Kroll Issuer Services Limited, appointed by the Plan Companies in respect of the Plans (and any successor information agent).

"**Initial Terms**" has the meaning given to it in paragraph 8.21 of this letter.

"**Interim Brazil Financing**" has the meaning given to it in paragraph 8.8 of this letter.

"**La Paz Facility**" has the meaning given to it in paragraph 6.1.2 of this letter.

"**Legacy Noteholders**" has the meaning given to it in paragraph 3.1.2 of this letter.

"**Legacy Notes**" has the meaning given to it in paragraph 5.3 of this letter.

"**Legacy Notes Class**" has the meaning given to it in paragraph 10.3.1(v) of this letter.

2198

"**Legacy Notes Debt**" means the 2026 Legacy Notes Debt and the 2029 Legacy Notes Debt.

"**Legacy Notes Indenture**" has the meaning given to it in paragraph 5.3 of this letter.

"**Letter of Credit Agreement**" has the meaning given to it in paragraph 5.26 of this letter.

"**Letter of Credit Facility**" has the meaning given to it in paragraph 5.26 of this letter.

"**Letter of Credit Facility Debt**" means all present and future moneys, obligations, debts and liabilities, whether actual or contingent, direct or indirect, due, to become due, or that may become due, or otherwise incurred or outstanding from time to time by any member of the Group to any agent, any issuing bank, any lender or any lender counterparty of the Letter of Credit Facility under or in connection with the Letter of Credit Facility (in each case, whether alone or jointly, or jointly and severally, with any other person, and whether as principal, surety or otherwise).

"**LNG**" has the meaning given to it in paragraph 4.7.1 of this letter.

"**Local Brazilian Debt Facilities**" means the PortoCem Debentures, the Brazil Financing Notes and the BNDES Term Loan.

"**Majority 2029 New Noteholders**" has the meaning given to it in paragraph 8.17.3 of this letter.

"**Majority RCF Lenders**" has the meaning given to it in paragraph 8.17.3 of this letter.

"**Majority Supporting Creditors**" has the meaning given to that term in the Restructuring Support Agreement.

"**Majority TLB Lenders**" has the meaning given to it in paragraph 8.17.3 of this letter.

"**Management Investors**" has the meaning given to it in the Restructuring Support Agreement.

"**Mexico**" means the United Mexican States.

"**Minimum Liquidity Condition**" means a minimum liquidity condition, whereby the CoreCo Group shall have (i) Consolidated Liquidity of not less than $100 million on the Restructuring Effective Date (*pro forma* for the Restructuring) and (ii) projected Consolidated Liquidity of not less than $100 million as of the end of each monthly period projected by a business plan which is reasonably acceptable to the Majority Supporting Creditors.

"**Nasdaq**" means the National Association of Securities Dealers Automated Quotations.

"**National Securities Exchange**" means The New York Stock Exchange, The Nasdaq Global Select Market or the Nasdaq Global Market.

DG-081

"**Net BrazilCo–CoreCo Intercompany Claim**" has the meaning given to it in paragraph 8.11 of this letter.

"**New BrazilCo Financing Arrangements**" has the meaning given to it in paragraph 8.9.1 of this letter.

"**New BrazilCo LC Facility**" has the meaning given to it in paragraph 8.9.2 of this letter.

"**New BrazilCo Parent**" means NFE Brazil Holdings Limited, or a newly formed parent entity thereof, from and after the Restructuring Effective Date.

"**New CoreCo Board**" has the meaning given to it in paragraph 8.14 of this letter.

"**New CoreCo Credit Agreement**" means the credit agreement governing the New CoreCo Credit Facility, to be entered into on the Restructuring Effective Date among the Parent, the guarantors party thereto, the lenders party thereto, and the administrative agent for such lenders, on the terms set out in the New CoreCo Credit Facility Term Sheet.

"**New CoreCo Credit Facility**" has the meaning given to it in paragraph 8.5.1 of this letter.

"**New CoreCo Credit Facility Term Sheet**" means the term sheet setting forth the material terms and conditions of the New CoreCo Credit Facility, appended to the Restructuring Term Sheet.

"**New CoreCo LC Facility**" has the meaning given to it in paragraph 8.5.2 of this letter.

"**New CoreCo Term Loans**" has the meaning given to it in paragraph 8.5.1 of this letter.

"**NFE Brazil Newco**" means NFE Brazil Newco Limited, a private company limited by shares incorporated in England and Wales under registered number 17141053, whose registered address is Suite 1, 7th Floor, 50 Broadway, London SW1H 0BL, United Kingdom.

"**NFE Financing**" means NFE Financing LLC, a Delaware limited liability company.

"**NFE Financing Collateral Assets**" means certain assets of NFE Financing including: (A) approximately 45 per cent. of the equity in the Group's Brazil business, (B) proceeds of NFE Financing's interest in the Series II Loan, and (C) NFE Financing's interest in the Brazil Parent Intercompany Loan (which in turn is secured by the Brazil Parent's approximately 55 per cent. of the equity in the Group's Brazil business and its interest in the proceeds of the Series I Loan) and certain real estate in Pennsylvania, U.S.A. owned by PA Land.

"**NFE Global**" means NFE Global Holdings Limited, a private company limited by shares incorporated in England and Wales under registered number 13679588, whose registered address is Suite 1, 7th Floor 50 Broadway, London SW1H 0BL, United Kingdom.

"**PA Land**" means Bradford County Real Estate Partners LLC.

"**Parent**" means New Fortress Energy Inc., a Delaware corporation.

"**Plan Class**" has the meaning given to it in paragraph 10.3 of this letter.

"**Plan Companies**" means NFE Global and NFE Brazil Newco, each a "**Plan Company**".

"**Plan Consideration**" means the Debt Plan Consideration, the Equity Plan Consideration and/or the Cash Plan Consideration, as applicable.

"**Plan Creditor Letter**" means a plan creditor letter, the form of which will be appended to the Explanatory Statement.

"**Plan Creditors**" has the meaning given to it in paragraph 3.2 of this letter.

"**Plan Debt**" has the meaning given to it in paragraph 1.7 of this letter.

"**Plan Documentation**" has the meaning given to it in paragraph 16.1 in this letter.

"**Plan Meetings**" means each of the meetings of the Plan Creditors that the Court has granted the Plan Companies permission to convene (including any adjournment thereof).

"**Plan Website**" means https://deals.is.kroll.com/nfe.

"**Plans**" means the BrazilCo Plan and the CoreCo Plan and each a "**Plan**".

"**PortoCem Debentures**" means the R$4.5 billion debentures issued by Portocem Geração de Energia S.A. in November 2024.

"**PortoCem Power Plant**" has the meaning given to it in paragraph 6.1.6 of this letter.

"**Practice Statement**" has the meaning given to it in paragraph 1.2 of this letter.

"**PREPA**" has the meaning given to it in paragraph 6.1.1 of this letter.

"**Puerto Rico**" means the Commonwealth of Puerto Rico.

"**Puerto Sandino Facility**" has the meaning given to it in paragraph 6.1.7 of this letter.

"**R-1 Class**" has the meaning given to it in paragraph 10.3.1 of this letter.

"**R-1 Lenders**" means the lenders under the R-1 Revolving Credit Facility.

"**R-1 Loans**" means the loans made pursuant to the R-1 Revolving Credit Facility.

"**R-1 Revolving Credit Facility**" has the meaning given to it in paragraph 5.6 of this letter.

"**R-1 Revolving Credit Facility Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to any

DG-083

agent, any issuing bank, any lender or any lender counterparty of the R-1 Revolving Credit Facility under or in connection with the R-1 Revolving Credit Facility (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise).

"**R-2 Class**" has the meaning given to it in paragraph 10.3.1 of this letter.

"**R-2 Lenders**" means the lenders under the R-2 Revolving Credit Facility.

"**R-2 Loans**" means the loans made pursuant to the R-2 Revolving Credit Facility.

"**R-2 Revolving Credit Facility**" has the meaning given to it in paragraph 5.6 of this letter.

"**R-2 Revolving Credit Facility Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to any agent, any issuing bank, any lender or any lender counterparty of the R-2 Revolving Credit Facility under or in connection with the R-2 Revolving Credit Facility (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise).

"**RCF-2 / TLA BrazilCo Cash Pool**" means $45 million of cash, which cash pool shall be funded with proceeds of the New BrazilCo Financing Arrangements.

"**RCF-2 / TLA BrazilCo Equity Pool**" means a number of shares of BrazilCo Common Equity equal to 5.8 per cent. of the aggregate amount of BrazilCo Common Equity to be distributed to holders of 2029 New Notes, R-2 Revolving Credit Facility Debt, and holders of Term Loan A Debt pursuant to the Restructuring on the Restructuring Effective Date. For the avoidance of doubt, the BrazilCo Common Equity that comprises the RCF-2 / TLA BrazilCo Equity Pool is subject to dilution by the BrazilCo MIP.

"**RCF Agent**" means MUFG Bank. Ltd., in its capacity as administrative agent under the Revolving Credit Facility, or any successor thereof.

"**RCF Commitments**" means "Commitments" as that term is defined under the Revolving Credit Facility Agreement.

"**RCF Lenders**" has the meaning given to it in paragraph 3.1.4 of this letter.

"**Recapitalisation Transaction**" has the meaning given to it in paragraph 9.2 of this letter.

"**Record Time**" means the date and time at which the Plan Creditors' entitlement to vote in the Plans and the value of their Plan Debt claims shall be assessed.

"**Relevant Alternative**" has the meaning given to it in paragraph 11.5 of this letter.

"**Relevant Alternative Report**" has the meaning given to it in paragraph 11.6 of this letter.

DG-084

"**Residual FLNG Proceeds Claims**" has the meaning given to it in paragraph 5.5 of this letter.

"**Restructuring**" has the meaning given to it in paragraph 8.1 of this letter.

"**Restructuring Effective Date**" means the date on which each of the conditions precedent to the Restructuring (as described in the Restructuring Support Agreement) are satisfied or duly waived and the Restructuring has been fully implemented.

"**Restructuring Support Agreement**" means the Restructuring Support Agreement dated 17 March 2026 originally entered into between, *inter alios*, the Parent, NFE Global, and the Supporting Creditors, as amended, supplemented and/or restated from time to time.

"**Restructuring Surplus**" has the meaning given to it in paragraph 11.8 of this letter.

"**Restructuring Term Sheet**" means the term sheet appended to the Restructuring Support Agreement relating to the Restructuring.

"**Revolving Credit Facility**" has the meaning given to it in paragraph 5.6 of this letter.

"**Revolving Credit Facility Agreement**" has the meaning given to it in paragraph 5.6 of this letter.

"**Revolving Credit Facility Debt**" means the R-1 Revolving Credit Facility Debt and the R-2 Revolving Credit Facility Debt.

"**San Juan Terminal**" has the meaning given to it in paragraph 6.1.1 of this letter.

"**Sanction Hearing**" means the hearing of the Court for the purpose of sanctioning the Plans pursuant to the order of the Court under Section 901F of the Act expected to be held at the Companies Court, Royal Courts of Justice, 7 Rolls Building, Fetter Lane, London EC4A 1NL.

"**Sanction Order**" means an order of the Court sanctioning the Plans under section 901F of the Act.

"**Santa Catarina Terminal**" has the meaning given to it in paragraph 6.1.4 of this letter.

"**Securities Act**" has the meaning given to it in the Preamble of this letter.

"**Series I Agent**" means Wilmington Savings Fund Society, FSB, in its capacity as administrative agent under the Series I Loan, or any successor thereof.

"**Series I and Series II Class**" has the meaning given to it in paragraph 10.3.1(vi) of this letter.

"**Series I Lender**" has the meaning given to it in paragraph 3.1.7 of this letter.

"**Series I Loan**" has the meaning given to it in paragraph 5.20 of this letter.

DG-085

"**Series I Loan Agreement**" has the meaning given to it in paragraph 5.20 of this letter.

"**Series I Loan Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the lenders of the Series I Loan under or in connection with the Series I Loan (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise).

"**Series II Agent**" means Wilmington Savings Fund Society, FSB, in its capacity as administrative agent under the Series II Loans, or any successor thereof.

"**Series II Lender**" has the meaning given to it in paragraph 3.1.8 of this letter.

"**Series II Loan**" has the meaning given to it in paragraph 5.23 of this letter.

"**Series II Loan Agreement**" has the meaning given to it in paragraph 5.23 of this letter.

"**Series II Loan Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the lenders of the Series II Loan under or in connection with the Series II Loan (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise).

"**Shared Collateral**" has the meaning given to it in the Equal Priority Intercreditor Agreement.

"**Skadden**" means Skadden, Arps, Slate, Meagher & Flom (UK) LLP, legal advisers to the Plan Companies.

"**Standstill Fee**" has the meaning given to it in paragraph 6.16 of this letter.

"**Supporting Creditors**" means each Plan Creditor that has executed the Restructuring Support Agreement as a supporting creditor or has executed a joinder to the Restructuring Support Agreement as an additional supporting creditor.

"**Term Loan A**" has the meaning given to it in paragraph 5.11 of this letter.

"**Term Loan A Agreement**" has the meaning given to it in paragraph 5.11 of this letter.

"**Term Loan A Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the lenders of the Term Loan A under or in connection with the Term Loan A (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise).

"**Term Loan A Facility**" has the meaning given to it in paragraph 5.11 of this letter.

"**Term Loan B**" has the meaning given to it in paragraph 5.9 of this letter.

"**Term Loan B Agreement**" has the meaning given to it in paragraph 5.9 of this letter.

DG-086

"**Term Loan B Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the lenders of the Term Loan B under or in connection with the Term Loan B (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise).

"**Term Loan B Facility**" has the meaning given to it in paragraph 5.9 of this letter.

"**TLA Agent**" means the administrative agent under the Term Loan A Facility, or any successor thereof.

"**TLA Class**" has the meaning given to it in paragraph 10.3.1(iv) of this letter.

"**TLA Lenders**" has the meaning given to it in paragraph 3.1 of this letter.

"**TLB Agent**" means the administrative agent under the Term Loan B Facility, or any successor thereof.

"**TLB Class**" has the meaning given to it in paragraph 10.3.1(iii) of this letter.

"**TLB Lenders**" has the meaning given to it in paragraph 3.1.5 of this letter.

"**Transaction Implementation Deed**" means the deed to give effect to the terms of the Plans to be entered into by, *inter alios*, the Plan Companies and the Plan Creditors.

"**Turbines**" has the meaning given to it in paragraph 6.1.9 of this letter.

"**U.S.**" or "**U.S.A.**" means the United States of America.

"**U.S. Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. § 101, *et seq.*, as amended from time to time.

"**U.S. Bankruptcy Court**" has the meaning given to it in paragraph 13.5 of this letter.

2      **INTERPRETATION**

2.1    In this letter, unless the context otherwise requires or otherwise expressly provides for:

    2.1.1   references to a "person" include references to an individual, firm, partnership, company, corporation, unincorporated body of persons or any state or state agency;

    2.1.2   references to a statute or statutory provision include the same as subsequently modified, amended or re-enacted from time to time;

    2.1.3   references to a document include the same as subsequently supplemented, amended and/or restated from time to time;

    2.1.4   references to a time of the day are references to the time in London, United Kingdom;

DG-087

2.1.5   a reference to a Plan Company, a Plan Creditor or any other person includes its successors in title, permitted assigns and permitted transferees;

2.1.6   to the extent there is any conflict or inconsistency between the terms of this letter and the Plans, the terms of the Plans shall prevail;

2.1.7   the singular includes the plural and *vice versa* and words importing one gender shall include the other gender;

2.1.8   the term "including" means "including, without limitation"; and

2.1.9   "**$**" means the lawful currency for the time being of the U.S.A.

2206

DG-088

**Schedule 2– Restructuring Effective Date Plan Consideration**

1. The following table sets out allocations of base Plan Consideration (without giving effect to any elections), without any Early Consent Fee or Standstill Fee:

| ($ in actuals) | New 2029s | TLB | TLA | R-1 RCF | R-2 RCF | Legacy 2026s | Legacy 2029s | Total To Lenders | Existing Equity |
|---|---|---|---|---|---|---|---|---|---|
| Principal Claims | $ 2,730,126,770 | $ 1,266,077,800 | $ 294,999,563 | $ 100,000,000 | $ 560,400,000 | $ 510,879,463 | $ 236,728,231 | $ 5,699,211,827 | |
| **BrazilCo** | | | | | | | | | |
| BrazilCo Common Equity (%) | 94.2977% | - | - | - | - | - | - | 94.2977% | - |
| RCF-2 / TLA BrazilCo Equity Pool | - | - | 1.9719% | - | 3.7305% | - | - | 5.7023% | - |
| RCF-2 / TLA BrazilCo Cash Pool | - | - | - | - | - | - | - | - | - |
| **CoreCo** | | | | | | | | | |
| New CoreCo Term Loans | - | $313,094,462.12 | $17,500,000.00 | $27,662,978.52 | $156,034,559.36 | - | - | $514,292,000.00 | - |
| CoreCo Preferred Stock (Initial) | $973,824,550.04 | $698,372,912.27 | $125,104,942.51 | $54,393,677.87 | $345,226,895.54 | $178,438,630.25 | $83,907,200.66 | $2,459,268,809.15 | - |
| CoreCo Common Stock (%) | 25.7721% | 18.4046% | 3.3197% | 1.4337% | 9.1031% | 4.7390% | 2.2277% | 65.0000% | 35.0000% |
| FLNG 2 Term Loans | | $228,666,186.86 | $53,087,320.60 | $17,813,329.20 | $100,433,163.33 | - | - | $400,000,000.00 | - |
| FLNG 2 Preferred Equity | - | $114,333,093.43 | $26,543,660.30 | $8,906,664.60 | $50,216,581.67 | - | - | $200,000,000.00 | - |

2. The following table sets out allocations of Plan Consideration (without giving effect to any elections) assuming all Plan Creditors earn the Early Consent Fee and Standstill Fee:

| ($ in actuals) | New 2029s | TLB | TLA | R-1 RCF | R-2 RCF | Legacy 2026s | Legacy 2029s | Total To Lenders | Existing Equity |
|---|---|---|---|---|---|---|---|---|---|
| Principal Claims | $2,730,126,770 | $1,266,077,800 | $294,999,563 | $100,000,000 | $560,400,000 | $510,879,463 | $236,728,231 | $5,699,211,827 | |
| **BrazilCo** | | | | | | | | | |
| BrazilCo Common Equity (%) | 94.2977% | - | - | - | - | - | - | 94.2977% | - |
| RCF-2 / TLA BrazilCo Equity Pool | - | - | 1.9719% | - | 3.7305% | - | - | 5.7023% | - |
| RCF-2 / TLA BrazilCo Cash Pool | - | - | - | - | - | - | - | - | - |
| **CoreCo** | | | | | | | | | |
| New CoreCo Term Loans | - | $313,094,462.12 | $17,500,000.00 | $29,662,978.52 | $167,242,559.36 | - | - | $527,500,000.00 | - |
| CoreCo Preferred Stock (Initial) | $991,234,783.35 | $707,868,495.77 | $127,681,503.83 | $55,143,677.87 | $350,118,650.56 | $182,270,226.22 | $85,682,662.39 | $2,500,000,000.00 | - |
| CoreCo Common Stock (%) | 25.7721% | 18.4046% | 3.3197% | 1.4337% | 9.1031% | 4.7390% | 2.2277% | 65.0000% | 35.0000% |
| FLNG 2 Term Loans | - | $228,666,186.86 | $53,087,320.60 | $17,813,329.20 | $100,433,163.33 | - | - | $400,000,000.00 | - |
| FLNG 2 Preferred Equity | - | $114,333,093.43 | $26,543,660.30 | $8,906,664.60 | $50,216,581.67 | - | - | $200,000,000.00 | - |

71

DG-089

# Tab 03

INDENTURE

Dated as of November 22, 2024

Among

**NFE FINANCING LLC**,

as Issuer,

**THE GUARANTORS FROM TIME TO TIME PARTY HERETO,**

and

**WILMINGTON SAVINGS FUND SOCIETY, FSB**,

as Trustee and Notes Collateral Agent

**12.000% SENIOR SECURED NOTES DUE 2029**

2209

DG-090

# TABLE OF CONTENTS

## ARTICLE 1

## DEFINITIONS AND INCORPORATION BY REFERENCE

Section 1.01    Definitions. ..................................................................................................1
Section 1.02    Other Definitions. .......................................................................................40
Section 1.03    No Incorporation by Reference of Trust Indenture Act. ...............................42
Section 1.04    Rules of Construction. .................................................................................42
Section 1.05    [Reserved]. ..................................................................................................42
Section 1.06    Certain Compliance Determinations. ...........................................................42
Section 1.07    Acts of Holders. ..........................................................................................43

## ARTICLE 2

## THE NOTES

Section 2.01    Form and Dating; Terms. .............................................................................45
Section 2.02    Execution and Authentication. .....................................................................46
Section 2.03    Registrar and Paying Agent. ........................................................................47
Section 2.04    Paying Agent to Hold Money in Trust. ........................................................47
Section 2.05    Holder Lists. ................................................................................................47
Section 2.06    Transfer and Exchange. ................................................................................48
Section 2.07    Replacement Notes. ......................................................................................60
Section 2.08    Outstanding Notes. .......................................................................................60
Section 2.09    Treasury Notes. ............................................................................................60
Section 2.10    Temporary Notes. .........................................................................................61
Section 2.11    Cancellation. ................................................................................................61
Section 2.12    Defaulted Interest. .......................................................................................61
Section 2.13    CUSIP Numbers. .........................................................................................62

## ARTICLE 3

## REDEMPTION

Section 3.01    Notices to Trustee. .......................................................................................62
Section 3.02    Selection of Notes to be Redeemed or Purchased. .......................................62
Section 3.03    Notice of Redemption. .................................................................................63
Section 3.04    Effect of Notice of Redemption or Purchase. ..............................................64
Section 3.05    Deposit of Redemption or Purchase Price. ...................................................65
Section 3.06    Notes Redeemed or Purchased in Part. ........................................................65
Section 3.07    Optional Redemption. ..................................................................................65
Section 3.08    [Reserved]. ..................................................................................................67
Section 3.09    Offers to Repurchase. ...................................................................................67

i

2210

## ARTICLE 4

## COVENANTS

Section 4.01    Payment of Notes.....................................................................................70
Section 4.02    Maintenance of Office or Agency. ............................................................70
Section 4.03    Reports and Other Information...................................................................71
Section 4.04    Compliance Certificate. .............................................................................72
Section 4.05    Taxes. .........................................................................................................73
Section 4.06    Stay, Extension and Usury Laws...............................................................73
Section 4.07    Limitation on Restricted Payments.............................................................73
Section 4.08    Dividend and Other Payment Restrictions Affecting
Subsidiaries. ..............................................................................................76
Section 4.09    Limitation on Incurrence of Indebtedness and Issuance of
Disqualified Stock and Preferred Stock.....................................................77
Section 4.10    Asset Sales..................................................................................................82
Section 4.11    Transactions with Affiliates. ......................................................................82
Section 4.12    Limitation on Liens.....................................................................................84
Section 4.13    [Reserved]. .................................................................................................85
Section 4.14    Offer to Repurchase Upon Change of Control...........................................85
Section 4.15    Additional Note Guarantees; Equity Interests............................................88
Section 4.16    Effectiveness Of Covenants. ......................................................................89
Section 4.17    After-Acquired Collateral; Real Property Mortgage .................................90
Section 4.18    Certain Undertakings Relating to Separateness. ........................................91
Section 4.19    Refinancing Intercompany Credit Agreements...........................................94

## ARTICLE 5

## SUCCESSORS

Section 5.01    Merger, Consolidation, Amalgamation or Sale of All Or
Substantially All Assets. ............................................................................94

## ARTICLE 6

## DEFAULTS AND REMEDIES

Section 6.01    Events of Default. .......................................................................................95
Section 6.02    Acceleration................................................................................................99
Section 6.03    Other Remedies. .......................................................................................100
Section 6.04    Waiver of Past Defaults. ...........................................................................100
Section 6.05    Control by Majority. .................................................................................100
Section 6.06    Limitation on Suits. ..................................................................................100
Section 6.07    Rights of Holders to Receive Payment. ....................................................101
Section 6.08    Collection Suit by Trustee.........................................................................101
Section 6.09    Restoration of Rights and Remedies..........................................................101
Section 6.10    Rights and Remedies Cumulative...............................................................102

Section 6.11   Delay or Omission Not Waiver. ...................................................................102
Section 6.12   Trustee May File Proofs of Claim. ..............................................................102
Section 6.13   Priorities. .....................................................................................................102
Section 6.14   Undertaking for Costs. .................................................................................103

## ARTICLE 7

## TRUSTEE

Section 7.01   Duties of Trustee. ........................................................................................103
Section 7.02   Rights of Trustee. ........................................................................................105
Section 7.03   Individual Rights of Trustee..........................................................................106
Section 7.04   Trustee's Disclaimer. ...................................................................................106
Section 7.05   Notice of Defaults.........................................................................................107
Section 7.06   Compensation and Indemnity........................................................................107
Section 7.07   Replacement of Trustee. ..............................................................................108
Section 7.08   Successor Trustee by Merger, Etc. ..............................................................109
Section 7.09   Eligibility; Disqualification............................................................................109
Section 7.10   Certain Tax Matters. ....................................................................................109
Section 7.11   Security Documents; Intercreditor Agreements. ........................................110

## ARTICLE 8

## LEGAL DEFEASANCE AND COVENANT DEFEASANCE

Section 8.01   Option to Effect Legal Defeasance or Covenant Defeasance. ....................110
Section 8.02   Legal Defeasance and Discharge....................................................................110
Section 8.03   Covenant Defeasance....................................................................................111
Section 8.04   Conditions to Legal or Covenant Defeasance. ............................................111
Section 8.05   Deposited Money and U.S. Government Obligations to be Held
              in Trust; Other Miscellaneous Provisions. ................................................113
Section 8.06   Repayment to Issuer......................................................................................113
Section 8.07   Reinstatement. .............................................................................................114

## ARTICLE 9

## AMENDMENT, SUPPLEMENT AND WAIVER

Section 9.01   Without Consent of Holders...........................................................................114
Section 9.02   With Consent of Holders................................................................................116
Section 9.03   [Reserved]. ...................................................................................................118
Section 9.04   Revocation and Effect of Consents................................................................118
Section 9.05   Notation on or Exchange of Notes.................................................................118
Section 9.06   Trustee to Sign Amendments, Etc. ...............................................................118

iii

2212

DG-093

## ARTICLE 10

### GUARANTEES

Section 10.01    Guarantee. ..................................................................................................119
Section 10.02    Limitation on Guarantor Liability. ...........................................................120
Section 10.03    Execution and Delivery.............................................................................121
Section 10.04    Subrogation. .............................................................................................121
Section 10.05    Benefits Acknowledged. ...........................................................................121
Section 10.06    Release of Note Guarantees. .....................................................................121

## ARTICLE 11

### SATISFACTION AND DISCHARGE

Section 11.01    Satisfaction and Discharge.......................................................................122
Section 11.02    Application of Trust Money.......................................................................123

## ARTICLE 12

### COLLATERAL

Section 12.01    Security Documents...................................................................................124
Section 12.02    Release of Collateral.................................................................................125
Section 12.03    Suits to Protect the Collateral...................................................................126
Section 12.04    Authorization of Receipt of Funds by the Trustee Under the Security Documents..................................................................................127
Section 12.05    [Reserved]. ...............................................................................................127
Section 12.06    Powers Exercisable by Receiver or Trustee..............................................127
Section 12.07    Certain Limitations on Collateral. ............................................................127
Section 12.08    Notes Collateral Agent..............................................................................128

## ARTICLE 13

### MISCELLANEOUS

Section 13.01    Notices. ....................................................................................................136
Section 13.02    [Reserved]. ...............................................................................................138
Section 13.03    Communication by Holders with Other Holders.......................................138
Section 13.04    Certificate and Opinion as to Conditions Precedent..................................138
Section 13.05    Statements Required in Certificate or Opinion. ........................................139
Section 13.06    Rules by Trustee and Agents.....................................................................139
Section 13.07    No Personal Liability of Directors, Managers, Officers, Employees and Stockholders.............................................................................139
Section 13.08    Governing Law; Jurisdiction.....................................................................139
Section 13.09    Waiver of Jury Trial..................................................................................140
Section 13.10    Force Majeure...........................................................................................140

DG-094

Section 13.11    No Adverse Interpretation of Other Agreements. .....................................140
Section 13.12    Successors. ..........................................................................................141
Section 13.13    Severability..........................................................................................141
Section 13.14    Intercreditor Agreements. ...................................................................141
Section 13.15    Counterparts and Electronic Execution...............................................141
Section 13.16    Table Of Contents, Headings, Etc. ......................................................141
Section 13.17    USA Patriot Act...................................................................................142

**EXHIBITS**

Exhibit A    Form of Note

Exhibit B    Form of Certificate of Transfer

Exhibit C    Form of Certificate of Exchange

Exhibit D    Form of Equal Priority Intercreditor Agreement

Exhibit E    Form of Junior Priority Intercreditor Agreement

Exhibit F    Form of Supplemental Indenture to be Delivered by Subsequent Guarantor

2214

DG-095

INDENTURE, dated as of November 22, 2024, among NFE Financing LLC, a Delaware limited liability company (the "Issuer"), the Guarantors (as defined herein) from time to time party hereto, and Wilmington Savings Fund Society, FSB ("WSFS"), a federal savings bank, as Trustee (in such capacity, the "Trustee") and Collateral Agent (in such capacity, the "Notes Collateral Agent").

W I T N E S S E T H:

WHEREAS, on November 6, 2024, New Fortress Energy Inc., a Delaware corporation (the "Company"), as issuer under the Existing 2026 Notes Indenture and Existing 2029 Notes Indenture, and the Issuer entered into Exchange and Subscription Agreements with certain holders of Existing 2026 Notes and Existing 2029 Notes pursuant to which such holders agreed to either or both (a) tender such Existing 2026 Notes and Existing 2029 Notes to the Company in exchange for the Company causing the Issuer to issue an aggregate principal amount of Initial Notes (as defined below) on the Exchange Date equal to the sum of (i) the aggregate principal amount of Existing Notes exchanged plus (ii) all accrued and unpaid interest on such Existing Notes up to and including the Exchange Date plus (iii) an additional principal amount of Initial Notes to be issued as a commitment fee with respect to the aggregate principal amount of Initial Notes to be issued under clause (a)(i) above (collectively, the "Exchange Date Amount") and/or (b) purchase $1,207,600,000 aggregate principal amount of Initial Notes on the Issue Date (together with $2,796,256 aggregate principal amount of Initial Notes to be issued as a commitment fee with respect to such Initial Notes, the "Issue Date Amount" and, together with the Exchange Date Amount, the "Initial Notes Amount"), as applicable;

WHEREAS, the Issuer has duly authorized the creation of and issuance of 12.000% Senior Secured Notes due 2029 with an aggregate principal amount equal to the Initial Notes Amount (the "Initial Notes"); and

WHEREAS, the each Note Party has duly authorized the execution and delivery of this Indenture.

NOW, THEREFORE, the Note Parties, the Trustee and the Notes Collateral Agent agree as follows for the benefit of each other and for the equal and ratable benefit of the Holders.

**ARTICLE 1**

**DEFINITIONS AND INCORPORATION BY REFERENCE**

SECTION 1.01   DEFINITIONS.

"144A Global Note" means a Global Note substantially in the form of Exhibit A hereto bearing the Global Note Legend and the Private Placement Legend and deposited with or on behalf of, and registered in the name of, the Depositary or its nominee that shall be issued in a denomination equal to the outstanding principal amount of the Notes sold in reliance on Rule 144A.

2215

DG-096

"Additional Equal Priority Obligations" means the Obligations with respect to any Indebtedness having, or intended to have, Equal Lien Priority (but without regard to the control of remedies) relative to the Notes with respect to the Collateral; provided that an authorized representative of the holders of such Indebtedness shall have executed an Equal Priority Intercreditor Agreement.

"Additional Equal Priority Secured Parties" means the holders of any Additional Equal Priority Obligations and any trustee, authorized representative or agent of such Additional Equal Priority Obligations.

"Additional Notes" means additional Notes (other than the Initial Notes) issued under this Indenture in accordance with Sections 2.01, 4.09 and 4.12, as part of the same series as the Initial Notes, which may be represented by the same or different CUSIP, ISIN or other similar numbers as the Initial Notes.

"Affiliate" means, as applied to any Person, any other Person directly or indirectly Controlling, Controlled by, or under common Control with, that Person. For purposes of this definition, "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Agent" means any Registrar or Paying Agent.

"Applicable Premium" means, with respect to any Note on any Redemption Date, the greater of:

(1)    1.0% of the principal amount of such Note; and

(2)    the excess, if any, of (a) the present value at such Redemption Date of (i) the redemption price of such Note at November 15, 2026 (such redemption price being set forth in the table appearing in Section 3.07(b)), plus (ii) all required remaining scheduled interest payments due on such Note through November 15, 2026 (excluding accrued but unpaid interest to the Redemption Date), computed by the Issuer on a semi-annual basis (assuming a 360-day year consisting of twelve 30-day months) using a discount rate equal to the Treasury Rate as of such Redemption Date plus 50 basis points; over (b) the principal amount of such Note.

Calculation of the Applicable Premium will be made by the Issuer and shall not be a duty or obligation of the Trustee.

"Applicable Procedures" means, with respect to any transfer or exchange of or for beneficial interests in any Global Note, the rules and procedures of the Depositary, Euroclear and/or Clearstream that apply to such transfer or exchange.

"Asset Sale" means the sale, conveyance, transfer or other disposition, whether in a single transaction or a series of related transactions, of property or assets (including by way of a Sale and Lease-Back Transaction) of the Issuer or any of its Subsidiaries (a "Disposition"), other than:

2

2216

(a)     the Disposition of all or substantially all of the assets of the Issuer or any of its Subsidiaries in a manner permitted pursuant to Section 5.01 or any Disposition that constitutes a Change of Control pursuant to this Indenture;

(b)     Dispositions (including of Equity Interests issued by any Subsidiary) to the Issuer or among Guarantors (upon voluntary liquidation or otherwise);

(c)     any merger, consolidation, Disposition or conveyance the sole purpose of which is to reincorporate or reorganize any Subsidiary in the U.S., any state thereof or the District of Columbia;

(d)     Dispositions in connection with the Transactions;

(e)     [reserved];

(f)     Dispositions of cash, Cash Equivalents and/or other assets that were Cash Equivalents when the relevant original Investment was made;

(g)     Dispositions, mergers, amalgamations, consolidations or conveyances that constitute (i) Permitted Investments (other than pursuant to clause (j) of the definition thereof), (ii) Liens not prohibited under this Indenture or (iii) Restricted Payments permitted to be made, and that are made, under Section 4.07 (other than Section 4.07(b)(ix));

(h)     [reserved];

(i)     [reserved];

(j)     [reserved];

(k)     [reserved];

(l)     [reserved];

(m)     (i) any termination of any lease, assignment, sublease, license or sublicense in the ordinary course of business, consistent with past practice or consistent with industry norm, (ii) any expiration of any option agreement in respect of real or personal property and (iii) any surrender or waiver of contractual rights or the settlement, release or surrender of contractual rights or litigation claims (including in tort) in the ordinary course of business, consistent with past practice or consistent with industry norm or otherwise if the Issuer determines in good faith that such action is in the best interests of the Note Parties, taken as a whole, and is not materially disadvantageous to the Holders;

(n)     (i) Dispositions of property subject to foreclosure, casualty, eminent domain, expropriation, forced dispositions or condemnation proceedings (including in lieu thereof or any similar proceeding), (ii) any involuntary loss, damage or destruction of any property and (iii) transfers of any property that have been subject to a casualty event to the

3

DG-098

respective insurer of such property as part of an insurance settlement or upon receipt of the net proceeds of such casualty event;

(o)     Dispositions or consignments of equipment, inventory or other assets (including leasehold interests in real property) with respect to facilities that are temporarily not in use, held for sale or closed (or otherwise in connection with the closing or sale of any facility);

(p)     [reserved];

(q)     [reserved];

(r)     [reserved];

(s)     [reserved];

(t)     Dispositions made to comply with any order of any governmental authority or any applicable Requirements of Law;

(u)     terminations or unwinds of Banking Services; and

(v)     any lease or sublease of the Bradford County Property, to the extent the terms thereof comply with the first paragraph of Section 4.11 and such lease or sublease does not constitute a transfer of all or a material portion of the economic benefits of the future development of such real property unless such economic benefits are reflected in the terms of such lease (the "Bradford County Lease").

"Banking Services" means each and any of the following bank services: commercial credit cards, stored value cards, purchasing cards, treasury management services, netting services, overdraft protections, check drawing services, automated payment services (including depository, overdraft, controlled disbursement, ACH transactions, return items and interstate depository network services), employee credit card programs, cash pooling services and any arrangements or services similar to any of the foregoing and/or otherwise in connection with cash management and Deposit Accounts.

"Bankruptcy Code" means Title 11 of the United States Code, as amended.

"Bankruptcy Law" means the Bankruptcy Code and any similar federal, state or foreign law for the relief of debtors.

"Board of Directors" means, with respect to any Person, (a) in the case of any corporation, the board of directors of such Person or any committee thereof duly authorized to act on behalf of such board, (b) in the case of any limited liability company, the board of managers, board of directors, manager or managing member of such Person or the functional equivalent of the foregoing, (c) in the case of any partnership, the board of directors, board of managers, manager or managing member of a general partner of such Person or the functional equivalent of the foregoing and (d) in any other case, the functional equivalent of the foregoing. In addition, the

2218

DG-099

term "<u>director</u>" means a director or functional equivalent thereof with respect to the relevant Board of Directors.

"<u>Bradford County Property</u>" means the real property owned by Bradford County Real Estate Partners LLC located in Wyalusing, Pennsylvania.

"<u>Brazil Contributions</u>" means the fair market value of (i) any Equity Interests of NFE Brazil Holdings Limited, (ii) cash or Cash Equivalents (other than cash received by the Issuer pursuant to the Brazil Parent Credit Agreement and the Series II Intercompany Credit Agreement and used to service the Notes or redeem the Notes) or (iii) other assets, each as received by the Issuer following the Issue Date.

"<u>Brazil Parent</u>" means NFE Brazil Investments LLC, a Delaware limited liability company.

"<u>Brazil Parent Intercompany Credit Agreement</u>" means that certain Credit Agreement, dated as of the date hereof, by and among Brazil Parent, as borrower, the Issuer, as lender, and WSFS, as administrative agent and collateral agent, and any amendments, supplements, modifications, extensions, renewals, restatements, refundings, replacements, exchanges or refinancings thereof, in whole or in part, and any financing arrangements that amend, supplement, modify, extend, renew, restate, refund, replace, exchange or refinance any part thereof.

"<u>Brazil Proceeds Event</u>" means the receipt by the Issuer of any dividends, distributions or Subordinated Intercompany Loans from NFE Brazil Holdings Limited after the Issue Date.

"<u>Business Day</u>" means each day which is not a Legal Holiday.

"<u>Capital Stock</u>" means:

(1)     in the case of a corporation, corporate stock;

(2)     in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3)     in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and

(4)     any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"<u>Cash Equivalents</u>" means, as at any date of determination,

(a)     United States dollars, Brazilian real or such other currencies held by the Issuer and its Subsidiaries from time to time in the ordinary course of business, consistent with past practice or consistent with industry norm;

(b)     (i) readily marketable securities issued or directly and unconditionally guaranteed or insured by the U.S. government or any agency or instrumentality thereof, the obligations of which are backed by the full faith and credit of the U.S., in each case having average maturities of not more than 24 months from the date of acquisition thereof, (ii) readily marketable direct obligations issued or directly and fully and unconditionally

5

guaranteed by any foreign government or any political subdivision or public instrumentality thereof, in each case (other than in the case of such securities issued or guaranteed by any member nation of the European Union) having an Investment Grade Rating from either Moody's or S&P (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency) with average maturities of 24 months or less from the date of acquisition thereof and (iii) repurchase agreements and reverse repurchase agreements relating to any of the foregoing;

(c)    readily marketable direct obligations issued by any state, commonwealth or territory of the U.S., any political subdivision or taxing authority thereof or any public instrumentality of any of the foregoing, in each case having average maturities of not more than 24 months from the acquisition thereof and having, at the time of acquisition thereof, a rating of at least A-2 from S&P or at least P-2 from Moody's (or, if at any time either S&P or Moody's is not rating such obligations, an equivalent rating from another nationally recognized statistical rating agency) and, in each case, repurchase agreements and reverse repurchase agreements relating thereto;

(d)    commercial paper having average maturities of not more than 24 months from the date of creation thereof and having, at the time of the acquisition thereof, a rating of at least A-2 from S&P or at least P-2 from Moody's (or, if at any time either S&P or Moody's is not rating such obligations, an equivalent rating from another nationally recognized statistical rating agency) and variable or fixed rate notes issued by any financial institution meeting the qualifications specified in clause (e) below;

(e)    deposits, money market deposits, time deposit accounts, certificates of deposit or bankers' acceptances (or similar instruments) maturing within 24 months after such date and overnight bank deposits, in each case issued or accepted by any commercial bank or other financial institution having capital and surplus of not less than $100.0 million in the case of U.S. banks or other U.S. financial institutions and $100.0 million (or the dollar equivalent thereof as of the date of determination) in the case of non-U.S. banks and other non-U.S. financial institutions and, in each case, repurchase agreements and reverse repurchase agreements relating thereto;

(f)    securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any financial institution meeting the qualifications specified in clause (e) above;

(g)    marketable short-term money market and similar highly liquid funds having a rating of at least P-2 or A-2 from either Moody's or S&P, respectively (or, if at any time either S&P or Moody's is not rating such obligations, an equivalent rating from another nationally recognized statistical rating agency);

(h)    investments with average maturities of 24 months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's (or, if at any time either S&P or

6

Moody's is not rating such obligations, an equivalent rating from another nationally recognized statistical rating agency);

(i)      Indebtedness or Preferred Stock issued by Persons with a rating of at least A from S&P or at least A2 from Moody's (or, if at any time either S&P or Moody's is not rating such fund, an equivalent rating from another nationally recognized statistical rating agency) with average maturities of 24 months or less from the date of acquisition;

(j)      shares of any money market mutual fund that has (i) substantially all of its assets invested in the types of investments referred to in clauses (a) through (i) above, (ii) net assets of not less than $100.0 million and (iii) a rating of at least A-2 from S&P or at least P-2 from Moody's (or, if at any time either S&P or Moody's is not rating such fund, an equivalent rating from another nationally recognized statistical rating agency);

(k)      [reserved];

(l)      investments, classified in accordance with GAAP as current assets of the Issuer or any Subsidiary, in money market investment programs that are registered under the Investment Company Act of 1940 or that are administered by financial institutions meeting the qualifications specified in clause (e) above and, in either case, the portfolios of which are limited such that substantially all of such investments are of the character, quality and maturity described in clauses (a) through (k) of this definition;

(m)      investment funds investing at least 90.0% of their assets in the types of investments referred to in clauses (a) through (l) above;

(n)      [reserved]; and

(o)      investments of the type and maturity described in clauses (a) through (n) above of foreign obligors, which Investments or obligors (or the parent companies thereof) have the ratings described in such clauses or equivalent ratings from comparable foreign rating agencies.

Notwithstanding the foregoing, Cash Equivalents shall include amounts denominated in currencies other than those set forth in clause (a) above; provided that such amounts are converted into any currency listed in clause (a) as promptly as practicable and in any event within ten Business Days following the receipt of such amounts.

For the avoidance of doubt, any items identified as Cash Equivalents under this definition will be deemed to be Cash Equivalents under this Indenture regardless of the treatment of such items under GAAP.

"Change of Control" means the occurrence of one or more of the following events after the Issue Date:

(1)      the sale, lease or transfer, in one or a series of related transactions, of all or substantially all of the assets of the Issuer and its Subsidiaries, taken as a whole;

2221

(2)      the Company ceases to own and control, directly or indirectly, a majority on a fully diluted basis of the aggregate outstanding voting and economic power of the Equity Interests of the Issuer or Brazil Parent;

(3)      the Issuer or the Company becomes aware of (by way of a report or any other filing pursuant to Section 13(d) of the Exchange Act, proxy, vote, written notice or otherwise) the acquisition by any Person or group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act), including any group acting for the purpose of acquiring, holding or disposing of Equity Interests of the Company (within the meaning of Rule 13d-5(b)(1) under the Exchange Act), other than the Permitted Holders, in a single transaction or in a related series of transactions, by way of merger, consolidation or other business combination or purchase, of beneficial ownership (within the meaning of Rule 13d-3 under the Exchange Act) representing more than 50.0% of the total voting power of all of the outstanding Voting Stock of the Company, unless the Permitted Holders otherwise have the right (pursuant to contract, proxy or otherwise), directly or indirectly, to designate, nominate or appoint directors having a majority of the aggregate votes on the Board of Directors of the Company; or

(4)      a "change of control" (or similar event) shall occur under the Existing Credit Agreements or the Brazil Parent Intercompany Credit Agreement.

Notwithstanding anything to the contrary in this definition or any provision of Rule 13d-3 of the Exchange Act, (i) a Person or group shall not be deemed to beneficially own Voting Stock (x) to be acquired by such Person or group pursuant to a stock or asset purchase agreement, merger agreement, option agreement, warrant agreement or similar agreement (or voting or option or similar agreement related thereto) until the consummation of the acquisition of the Voting Stock in connection with the transactions contemplated by such agreement or (y) solely as a result of veto or approval rights in any joint venture agreement, shareholder agreement, investor rights agreement or other similar agreement, (ii) if any group (other than a Permitted Holder) includes one or more Permitted Holders, the issued and outstanding Voting Stock of the Company owned, directly or indirectly, by any Permitted Holders that are part of such group shall not be treated as being beneficially owned by such group or any other member of such group for purposes of determining whether a Change of Control has occurred, (iii) a Person or group (other than Permitted Holders) will not be deemed to beneficially own Voting Stock of another Person as a result of its ownership of Equity Interests or other securities of such other Person's parent (or related contractual rights) unless it owns more than 50.0% of the total voting power of the Voting Stock of such Person's parent and (iv) the right to acquire Voting Stock (so long as such Person does not have the right to direct the voting of the Voting Stock subject to such right) or any veto power in connection with the acquisition or disposition of Voting Stock will not cause a party to be a beneficial owner.

"Charge" means any fee, loss, charge, expense, cost, accrual or reserve of any kind (in each case, if applicable, as defined under GAAP).

"Clearstream" means Clearstream Banking, Société Anonyme.

"Code" means the Internal Revenue Code of 1986, as amended, or any successor thereto.

8

2222

DG-103

"Collateral" means all of the assets and property of any Note Party, whether real, personal or mixed, securing or purported to secure any Secured Notes Obligations, other than Excluded Assets.

"Collateral Agent" means (1) in the case of the Secured Notes Obligations, the Notes Collateral Agent and (2) in the case of any Additional Equal Priority Obligations, the collateral agent, administrative agent or the trustee with respect thereto.

"Confidential Information Memorandum" means the Confidential Information Memorandum dated November 6, 2024 relating to the Notes.

"Contingent Obligations" means, with respect to any Person, any obligation of such Person guaranteeing any leases, dividends or other obligations that do not constitute Indebtedness ("primary obligations") of any other Person (the "primary obligor") in respect of such primary obligations in any manner, whether directly or indirectly, including any obligation of such Person, whether or not contingent,

    (a)    to purchase any such primary obligation or any property constituting direct or indirect security therefor,

    (b)    to advance or supply funds:

        (i)    for the purchase or payment of any such primary obligation, or

        (ii)    to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, or

    (c)    to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation against loss in respect thereof.

"Control Agreement": an account control agreement (or similar agreement or local law equivalent), in form and substance reasonably acceptable to the Notes Collateral Agent, executed by the applicable Note Party, the Common Representative for the applicable Equal Priority Secured Parties, and the relevant bank, securities intermediary or commodity intermediary, as applicable, party thereto, in each case, the purpose of which is to perfect a first priority Lien by control.

"Controlling Collateral Agent" means, with respect to any Shared Collateral, the Collateral Agent designated as the Controlling Collateral Agent pursuant to the Equal Priority Intercreditor Agreement.

"Corporate Trust Office" means the principal corporate trust office of the Trustee, at which at any particular time its corporate trust business in relation to this Indenture shall be administered, which office at the date of execution of this Indenture is located at 500 Delaware Avenue, 11th Floor, Wilmington, DE 19801, except that with respect to presentation of the Notes for payment

or for registration of transfer or exchange, such term shall mean the office or agency of the Trustee at which, at any particular time, its corporate agency business in relation to this Indenture shall be conducted.

"date of determination" means the applicable date of determination for the specified amount or percentage.

"Declined Proceeds" means any Brazil Prepayment Proceeds, any Excess Interest Proceeds or any Permitted Asset Sale Proceeds that have been the subject of a Prepayment Offer and are not used to purchase any validly tendered Notes in accordance with Section 3.09.

"Default" means any event that is, or after notice or lapse of time or both would become, an Event of Default; provided that any Default that results solely from the taking of an action that would have been permitted but for the continuation of a previous Default will be deemed to be cured if such previous Default is cured prior to becoming an Event of Default.

"Definitive Note" means a certificated Note registered in the name of the Holder thereof and issued in accordance with Section 2.06(c), substantially in the form of Exhibit A, except that such Note shall not bear the Global Note Legend and shall not have the "Schedule of Exchanges of Interests in the Global Note" attached thereto.

"Deposit Account" means a demand, time, savings, passbook or like account with a bank, excluding, for the avoidance of doubt, any investment property (within the meaning of the UCC) or any account evidenced by an instrument (within the meaning of the UCC).

"Depositary" means, with respect to the Notes issuable or issued in whole or in part in global form, the Person specified in Section 2.03 as the Depositary with respect to the Notes, and any and all successors thereto appointed as Depositary under this Indenture and having become such pursuant to the applicable provision of this Indenture.

"Derivative Transaction" means (a) any interest-rate transaction, including any interest-rate swap, basis swap, forward rate agreement, interest rate option (including a cap, collar or floor), and any other instrument linked to interest rates that gives rise to similar credit risks (including when-issued securities and forward deposits accepted), (b) any exchange-rate transaction, including any cross-currency interest-rate swap, any forward foreign-exchange contract, any currency option, and any other instrument linked to exchange rates that gives rise to similar credit risks, (c) any equity derivative transaction, including any equity-linked swap, any equity-linked option, any forward equity-linked contract, and any other instrument linked to equities that gives rise to similar credit risk and (d) any commodity (including precious metal and natural gas) derivative transaction, including any commodity-linked swap, any commodity-linked option, any forward commodity-linked contract, and any other instrument linked to commodities that gives rise to similar credit risks; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees, members of management, managers, members, partners, independent contractors or consultants of the Issuer or its Subsidiaries shall constitute a Derivative Transaction.

"Designs" means any and all and any part of the following: (a) all design patents and intangibles of like nature (whether registered or unregistered), all registrations and recordings thereof, and all applications in connection therewith; (b) all reissues, extensions or renewals thereof; (c) all income, royalties, damages and payments now or hereafter due or payable with respect thereto, including damages, claims, and payments for past and future infringements thereof; (d) all rights to sue for past, present, and future infringements of the foregoing; and (e) all rights corresponding to any of the foregoing.

"Disqualified Stock" means any Capital Stock which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable) or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable (other than for Qualified Capital Stock and cash in lieu of fractional shares of such Capital Stock), pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof (other than for Qualified Capital Stock and cash in lieu of fractional shares of such Capital Stock), in whole or in part, on or prior to the date that is 91 days following the maturity date of the Notes at the time such Capital Stock is issued (it being understood that if any such redemption is in part, only such part coming into effect prior to the date that is 91 days following such maturity date shall constitute Disqualified Stock), (b) is or becomes convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) debt securities or (ii) any Capital Stock that would constitute Disqualified Stock, in each case at any time on or prior to the date that is 91 days following the maturity date of the Notes at the time such Capital Stock is issued, (c) contains any mandatory repurchase obligation or any other repurchase obligation at the option of the holder thereof (other than for Qualified Capital Stock), in whole or in part, which may come into effect prior to the date that is 91 days following the maturity date of the Notes at the time such Capital Stock is issued (it being understood that if any such repurchase obligation is in part, only such part coming into effect prior to the date that is 91 days following the maturity date of the Notes shall constitute Disqualified Stock) or (d) provides for the scheduled payments of dividends in cash on or prior to the date that is 91 days following the maturity date of the Notes at the time such Capital Stock is issued; provided that any Capital Stock that would not constitute Disqualified Stock but for provisions thereof requiring the issuer thereof to, or provisions thereof giving holders thereof (or the holders of any security into or for which such Capital Stock is convertible, exchangeable or exercisable) the right to require the issuer thereof to, redeem or purchase such Capital Stock upon the occurrence of any change of control, any disposition, asset sale (including pursuant to any casualty or condemnation event or eminent domain) or similar event shall not constitute Disqualified Stock.

Notwithstanding the preceding sentence, (A) if such Capital Stock is issued pursuant to any plan for the benefit of directors, officers, employees, members of management, managers, members, partners, independent contractors or consultants (or any Immediate Family Member of the foregoing) of the Issuer or any of its Subsidiaries, or by any such plan to such directors, officers, employees, members of management, managers, members, partners, independent contractors or consultants (or any Immediate Family Member of the foregoing), such Capital Stock shall not constitute Disqualified Stock solely because it may be required to be repurchased by the issuer thereof in order to satisfy applicable statutory or regulatory obligations and (B) no Capital Stock held by any future, present or former employee, director, officer, manager, member of management, member, partner, independent contractor or consultant (or by any Immediate Family

11

DG-106

Member of the foregoing) of the Issuer (or by and Subsidiary) shall be considered Disqualified Stock solely because such stock is redeemable or subject to repurchase pursuant to any management equity subscription agreement, stock option, stock appreciation right or other stock award agreement, stock ownership plan, put agreement, stockholder agreement or similar agreement that may be in effect from time to time.

"<u>Division</u>" means the division of the assets, liabilities and/or obligations of a Person (the "<u>Dividing Person</u>") among two or more Persons (whether pursuant to a "plan of division" or similar arrangement that is established by the laws of the jurisdiction of organization of any of the foregoing Persons), which may or may not include the Dividing Person and pursuant to which the Dividing Person may or may not survive.

"<u>DTC</u>" means The Depository Trust Company.

"<u>Equal Lien Priority</u>" means, with respect to specified Indebtedness, such Indebtedness is secured by a Lien that is equal in priority to the Liens on specified Collateral (but without regard to control of remedies) and is subject to the Equal Priority Intercreditor Agreement (or such other intercreditor agreement having substantially similar terms as the Equal Priority Intercreditor Agreement, taken as a whole).

"<u>Equal Priority Collateral Agent</u>" means the Equal Priority Representative for the holders of the Equal Priority Obligations.

"<u>Equal Priority Intercreditor Agreement</u>" means an intercreditor agreement with respect to the Collateral, entered into by and among the Notes Collateral Agent, MUFG Bank, Ltd., in its capacity as common representative for the Letter of Credit Facility collateral agent, the Revolving Credit Facility collateral agent and the Term Loan A Facility collateral agent, as acknowledged by each grantor party thereto, substantially in the form attached as <u>Exhibit D</u> to this Indenture (as the same may be amended, restated, renewed, replaced or otherwise modified from time to time).

"<u>Equal Priority Obligations</u>" means, collectively, (1) the Secured Notes Obligations and (2) each Series of Additional Equal Priority Obligations.

"<u>Equal Priority Representative</u>" means any duly authorized representative of any holders of Equal Priority Obligations, which representative is named as such in the Equal Priority Intercreditor Agreement or any joinder thereto.

"<u>Equal Priority Secured Parties</u>" means collectively, (1) the Secured Notes Secured Parties, and (2) any Additional Equal Priority Secured Parties.

"<u>Equity Interests</u>" means Capital Stock and all warrants, options or other rights to acquire Capital Stock, but excluding any debt security that is convertible into, or exchangeable for, Capital Stock.

"<u>Equity Offering</u>" means any public or private sale or issuance of common equity or Preferred Stock of the Issuer (excluding Disqualified Stock).

DG-107

"Excess Interest Event" means, as of any Interest Payment Date, (i) the aggregate amount of interest payments received by the Issuer pursuant to either the Brazil Parent Intercompany Credit Agreement or the Series II Intercompany Credit Agreement since the Issue Date and rent payments received by the Issuer pursuant to the Bradford County Lease since the Issue Date is in excess of (ii) the amount of interest payable under the Notes on such Interest Payment Date (any such excess amount as of such Interest Payment Date, the "Excess Interest Proceeds").

"Exchange Act" means the Securities Exchange Act of 1934, as amended (with respect to the definitions of "Change of Control" and "Permitted Holders" only, as in effect on the Issue Date).

"Exchange and Subscription Agreement" means each exchange and subscription agreement, dated as of November 6, 2024, by and among the Issuer, the Company, Bradford County Real Estates Partners LLC, as guarantor and certain of the holders of the Existing 2026 Notes and the Existing 2029 Notes, as amended on November 21, 2024, pursuant to which the Issuer agreed, subject to the terms of the Exchange and Subscription Agreement, to issue the Initial Notes.

"Exchange Date" means the date on which Initial Notes in an amount equal to the Exchange Date Amount are issued in accordance with the terms of the Exchange and Subscription Agreement.

"Excluded Assets" means the following:

(1)     any asset the grant of a security interest in which would (i) be prohibited by any enforceable anti-assignment provision set forth in any contract relating to such asset that is permitted or otherwise not prohibited by the terms of this Indenture, (ii) violate the terms of any contract relating to such asset that is permitted or otherwise not prohibited by the terms of this Indenture (in the case of clause (i) above, this clause (ii) and clause (iii) below, after giving effect to any applicable anti-assignment provision of the UCC or other applicable Requirements of Law) or (iii) trigger termination of, or a right of termination or any other modification of any rights under, any contract relating to such asset that is permitted or otherwise not prohibited by the terms of this Indenture pursuant to any "change of control" or similar provision; it being understood that (A) the term "Excluded Asset" shall not include proceeds or receivables arising out of any contract described in this clause (1) to the extent that the assignment of such proceeds or receivables is expressly deemed to be effective under the UCC or any other applicable Requirements of Law notwithstanding the relevant prohibition, violation or termination right, (B) the exclusions referenced in clauses (1)(i), (1)(ii) and (1)(iii) above shall not apply to the extent that the relevant contract expressly permits the grant of a security interest in all or substantially all of the assets of any Note Party and (C) the exclusion set forth in this clause (1) shall only apply if the contractual prohibitions or contractual provisions that would be so violated or that would trigger any such termination, right or modification under clause (1)(i), (1)(ii) or (1)(iii) above (x) existed on the Issue Date (or in the case of any contract of a Subsidiary that is acquired following the Issue Date, as of the date of such acquisition) and were not entered into in contemplation of the Issue Date (or such acquisition) and (y) cannot be waived unilaterally by the Issuer or any Subsidiary;

13

2227

(2)      [reserved];

(3)      any intent-to-use (or similar) trademark application prior to the filing and acceptance of a "Statement of Use" or "Amendment to Allege Use" notice and/or filing with respect thereto;

(4)      any asset, the grant of a security interest in which would (i) require any governmental consent, approval, license, permit or authorization (collectively, "Governmental Consents") that has not been obtained or (ii) be prohibited by applicable Requirements of Law, except, in each case of clause (i) above and this clause (ii), to the extent such requirement or prohibition would be rendered ineffective under the UCC or any other applicable Requirements of Law notwithstanding such requirement or prohibition; it being understood that the term "Excluded Asset" shall not include proceeds or receivables arising out of any asset described in clause (4)(i) or clause (4)(ii) to the extent that the assignment of such proceeds or receivables is expressly deemed to be effective under the UCC or any other applicable Requirements of Law notwithstanding the relevant requirement or prohibition;

(5)      any fee owned real property that is not a Material Real Estate Asset or that is located in a "special flood zone" (and no landlord lien waivers, estoppels or collateral access letters shall be required to be delivered);

(6)      [reserved];

(7)      (i) motor vehicles and other assets subject to certificates of title, (ii) letter-of-credit rights not constituting supporting obligations of other Collateral and (iii) commercial tort claims with a value (as reasonably estimated by the Issuer) of less than $5.0 million, except, in each case of clauses (7)(i)-(iii), to the extent a security interest therein can be perfected solely by the filing of a UCC financing statement;

(8)      any margin stock;

(9)      [reserved];

(10)      any lease, license or other agreement or contract or any asset subject thereto (including pursuant to a purchase money security interest, Financing Lease or similar arrangement) that is, in each case, not prohibited by the terms of this Indenture to the extent that the grant of a security interest therein would violate or invalidate such lease, license or agreement or contract or purchase money, Financing Lease or similar arrangement or trigger a right of termination in favor of any other party thereto (other than the Issuer or any of its Subsidiaries) after giving effect to the applicable anti-assignment provisions of the UCC or any other applicable Requirements of Law; it being understood that the term "Excluded Asset" shall not include any proceeds or receivables arising out of any asset described in this clause (10) to the extent that the assignment of such proceeds or receivables is expressly deemed to be effective under the UCC or any other applicable Requirements of Law notwithstanding the relevant requirement or prohibition;

(11)    [reserved];

(12)    [reserved]; and

(13)    any governmental licenses, permits or authorizations, or U.S. or foreign state or local franchises, charters or authorizations, to the extent a security interest in any such license, permit, franchise, charter or authorization would be prohibited or restricted thereby (including any legally effective prohibition or restriction) or where the effect thereof would be to limit or diminish any Note Party's ability to utilize such license, permit franchise, charter or authorization in the conduct of its business in the ordinary course.

"Existing Credit Agreements" means, collectively, the Revolving Credit Facility, the Letter of Credit Facility, the Term Loan A Facility and the Term Loan B Facility.

"Existing 2026 Notes" means the Company's $1,500,000,000 aggregate principal amount of 6.500% senior secured notes due 2026 issued pursuant to the Existing 2026 Notes Indenture.

"Existing 2029 Notes" means the Company's $750,000,000 aggregate principal amount of 8.750% senior secured notes due 2029 issued pursuant to the Existing 2029 Notes Indenture.

"Existing 2026 Notes Indenture" means the indenture dated April 12, 2021, among the Company, the Guarantors (as defined therein) and U.S. Bank National Association, as trustee and as collateral agent, as amended, restated or modified from time to time, relating to the Existing 2026 Notes.

"Existing 2029 Notes Indenture" means the indenture dated March 8, 2024, among the Company, the Guarantors (as defined therein) and U.S. Bank National Association, as trustee and as collateral agent, as amended, restated or modified from time to time, relating to the Existing 2029 Notes.

"Existing Notes" means, collectively, the Existing 2026 Notes and the Existing 2029 Notes.

"fair market value" means, with respect to any asset or group of assets on any date of determination, the value of the consideration obtainable in a sale of such asset at such date of determination assuming a sale by a willing seller to a willing purchaser dealing at arm's length and arranged in an orderly manner over a reasonable period of time having regard to the nature and characteristics of such asset, as reasonably determined in good faith by the Issuer.

"Financing Lease" means, as applied to any Person, any obligation that is required to be accounted for as a financing or capital lease (and, for the avoidance of doubt, not a straight-line or operating lease) on both the balance sheet and income statement for financial reporting purposes in accordance with GAAP. At the time any determination thereof is to be made, the amount of the liability in respect of a financing or capital lease would be the amount required to be reflected as a liability on such balance sheet (excluding the footnotes thereto) in accordance with GAAP.

"Fitch" means Fitch Inc. and any successor to its rating agency business.

"Fortress" means Fortress Investment Group LLC.

"GAAP" means, at the election of the Issuer, (i) the accounting standards and interpretations adopted by the International Accounting Standards Board, as in effect from time to

15

2229

DG-110

time ("IFRS") if the Issuer's financial statements are at such time prepared in accordance with IFRS or (ii) generally accepted accounting principles in the United States of America set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession, as in effect from time to time; provided that (a) all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts referred to herein shall be made without giving effect to (x) any election under Accounting Standards Codification 825-10-25 (previously referred to as Statement of Financial Accounting Standards 159) (or any other Accounting Standards Codification, International Accounting Standard or Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of the Issuer or any Subsidiary at "fair value", as defined therein and (y) any treatment of Indebtedness in respect of convertible debt instruments under Accounting Standards Codification 470-20 (or any other Accounting Standards Codification, International Accounting Standard or Financial Accounting Standard having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof and (b) any calculation or determination in this Indenture that requires the application of GAAP across multiple quarters need not be calculated or determined using the same accounting standard for each constituent quarter.

If there occurs or has occurred a change in generally accepted accounting principles and such change would cause a change in the method of calculation of any standard, term or measure used in this Indenture (an "Accounting Change"), then the Issuer may elect, as evidenced by a written notice of the Issuer to the Trustee, that such standard, term or measure shall be calculated as if such Accounting Change had not occurred. For the avoidance of doubt, solely making an election (without any other action) referred to in this definition will not (1) be treated as an incurrence of Indebtedness or (2) have the effect of rendering invalid any Restricted Payment, Investment or other action made prior to the date of such election pursuant to Section 4.07, any incurrence of Indebtedness incurred prior to the date of such election pursuant to Section 4.09 or any incurrence of Liens pursuant Section 4.12  if such Restricted Payment, Investment, incurrence or other action was valid under this Indenture on the date made, incurred or taken, as the case may be.

"Global Note Legend" means the legend set forth in Section 2.06(g)(ii), which is required to be placed on all Global Notes issued under this Indenture.

"Global Notes" means, individually and collectively, each of the Restricted Global Notes and the Unrestricted Global Notes, substantially in the form of Exhibit A, issued in accordance with Section 2.01, 2.06(b) or 2.06(d).

"guarantee" means a guarantee (other than by endorsement of negotiable instruments for collection in the ordinary course of business), direct or indirect, in any manner (including letters of credit and reimbursement agreements in respect thereof), of all or any part of any Indebtedness or other obligations.

16

2230

DG-111

"Guarantor" means each Subsidiary of the Issuer that executes this Indenture as a guarantor on the Issue Date and each other Subsidiary of the Issuer that thereafter guarantees the Notes in accordance with the terms of this Indenture, for such period that such Person guarantees the Notes in accordance with the terms of this Indenture (including the release provisions of Section 10.06).

"Hedge Agreement" means (a) any agreement with respect to any Derivative Transaction between the Issuer, any Guarantor or any Subsidiary and any other Person, whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, that are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Hedging Obligations" means the obligations of the Issuer, any Guarantor or any Subsidiary under any Hedge Agreement.

"holder" means, with reference to any Indebtedness or other Obligations, any holder or lender of, or trustee or collateral agent or other authorized representative with respect to, such Indebtedness or Obligations and, in the case of Hedging Obligations, any counter-party to such Hedging Obligations.

"Holder" means the Person in whose name a Note is registered on the registrar's books.

"IFRS" means the international accounting standards as promulgated by the International Accounting Standards Board.

"Immediate Family Member" means with respect to any individual, such individual's child, stepchild, grandchild or more remote descendant, parent, stepparent, grandparent, spouse, former spouse, domestic partner, former domestic partner, sibling, mother-in-law, father-in-law, son-in-law and daughter-in-law (including adoptive relationships), any trust, partnership or other bona fide estate- planning vehicle the only beneficiaries of which are any of the foregoing individuals, such individual's estate (or an executor or administrator acting on its behalf), heirs, legatees or any private foundation or fund that is controlled by any of the foregoing individuals or any donor-advised fund of which any such individual is the donor.

"Indebtedness" as applied to any Person means, without duplication:

(a)     all indebtedness for borrowed money;

(b)     all obligations with respect to Financing Leases;

(c)     all obligations of such Person evidenced by bonds, debentures, notes or similar instruments;

(d)     any obligation of such Person to pay the deferred purchase price of property or services (excluding (i) any earn-out obligation, purchase price adjustment or similar obligation, unless such obligation has not been paid within 60 days after becoming due and

17

2231

payable and becomes a liability on the balance sheet of such Person in accordance with GAAP and (ii) any such obligations incurred under the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder), which purchase price is (A) due more than 365 days from the date of incurrence of the obligation in respect thereof or (B) evidenced by a note or similar written instrument;

(e)     all Indebtedness of others that is secured by any Lien on any asset owned or held by such Person regardless of whether the Indebtedness secured thereby has been assumed by such Person or is non-recourse to the credit of such Person provided that the amount of Indebtedness of any Person for purposes of this clause (e) shall be deemed to be equal to the lesser of (A) the aggregate unpaid amount of such Indebtedness and (B) the fair market value of the property encumbered thereby;

(f)     letters of credit or bankers' acceptances issued for the account of such Person or as to which such Person is otherwise liable for reimbursement of drawings;

(g)     the guarantee by such Person of the Indebtedness of another, other than by endorsement of negotiable instruments for collection in the ordinary course of business; provided that the amount of Indebtedness of any Person for purposes of this clause (g) shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) in the case of Indebtedness that is non-recourse to the credit of the Issuer or any Subsidiary, the fair market value of the property encumbered thereby;

(h)     all obligations of such Person in respect of any Disqualified Stock; and

(i)     all net obligations of such Person in respect of any Derivative Transaction, whether or not entered into for hedging or speculative purposes, other than those providing for the delivery of a commodity pursuant to forward contracts;

in each case, to the extent the same would appear as a liability on a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any third person (including any partnership in which such Person is a general partner and any unincorporated joint venture in which such Person is a joint venture) to the extent such Person would be liable therefor under applicable Requirements of Law or any agreement or instrument by virtue of such Person's ownership interest in such Person, except to the extent the terms of such Indebtedness; provided that such Person is not liable therefor; provided that, notwithstanding anything herein to the contrary, the term "Indebtedness" shall not include, and shall be calculated without giving effect to, (x) the effects of Accounting Standards Codification Topic 815 or International Accounting Standard 39 and related interpretations to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose under this Indenture as a result of accounting for any embedded derivatives created by the terms of such Indebtedness (it being understood that any such amounts that would have constituted Indebtedness under this Indenture but for the application of this proviso shall not be deemed an incurrence of Indebtedness under this Indenture) and (y) the effects of Statement of Financial Accounting Standards No. 133

18

and related interpretations to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose under this Indenture as a result of accounting for any embedded derivative created by the terms of such Indebtedness (it being understood that any such amount that would have constituted Indebtedness under this Indenture but for the application of this sentence shall not be deemed to be an incurrence of Indebtedness under this Indenture).

For all purposes hereof, the Indebtedness of the Issuer and its Subsidiaries shall exclude (i) [reserved], (ii) any amounts payable or other liabilities to trade creditors (including undrawn letters of credit) arising in the ordinary course of business, consistent with past practice or consistent with industry norm, including any deferred or prepaid revenue, (iii) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the seller, (iv) any obligations attributable to the exercise of appraisal rights and the settlement of any claims or actions (whether actual, contingent or potential) with respect thereto (including any accrued interest), (v) Indebtedness appearing on the balance sheet of the Issuer solely by reason of pushdown accounting under GAAP, (vi) accrued expenses and royalties, (vii) asset retirement obligations and obligations in respect of performance bonds, reclamation and workers' compensation claims, retirement, post-employment or termination obligations (including pensions and retiree medical care), pension fund obligations or contributions or similar claims, or social security or wage taxes or contributions, (viii) accrued expenses or current trade or other ordinary course payables or liabilities incurred in the ordinary course of business, consistent with past practice or consistent with industry norm (including on an intercompany basis), and obligations resulting from take-or-pay contracts entered into in the ordinary course of business, consistent with past practice or consistent with industry norm, and other liabilities associated with customer prepayments and deposits, (ix) liabilities associated with customer prepayments and deposits and other accrued obligations (including transfer pricing), in each case incurred in the ordinary course of business, consistent with past practice or consistent with industry norm, (x) [reserved], (xi) customary obligations under employment agreements and deferred compensation arrangements, (xii) Contingent Obligations, (xiii) obligations under any license, permit or other approval (or guarantees given in respect of such obligations) incurred prior to the Issue Date or in the ordinary course of business, consistent with past practice or consistent with industry norm, (xiv) any liability for taxes and (xv) any land and port concessions.

"Indenture" means this Indenture, as amended or supplemented from time to time.

"Independent Financial Advisor" means an accounting, appraisal or investment banking firm or consultant of nationally recognized standing.

"Indirect Participant" means a Person who holds a beneficial interest in a Global Note through a Participant.

"Intercreditor Agreements" means the Equal Priority Intercreditor Agreement and any Junior Priority Intercreditor Agreement.

"Interest Payment Date" means May 15 and November 15 of each year to stated maturity, commencing on May 15, 2025.

2233

"Investment" means (a) any purchase or other acquisition by the Issuer or any of its Subsidiaries of any of the securities of any other Person (other than the Issuer or any Guarantor), (b) the acquisition by purchase or otherwise (other than any purchase or other acquisition of inventory, materials, supplies and/or equipment in the ordinary course of business) of all or substantially all the business, property or fixed assets of any other Person or any division or line of business or other business unit of any other Person and (c) any loan, advance or capital contribution (other than accounts receivable, trade credit, advances to customers, intercompany loans, advances or Indebtedness having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms) or any advance to any current or former employee, officer, director, member of management, manager, member, partner, consultant or independent contractor of the Issuer or any Subsidiary for moving, entertainment and travel expenses, drawing accounts and similar expenditures, in each case in the ordinary course of business, consistent with practice or consistent with industry norm of the Issuer and/or its Subsidiaries) by the Issuer or any of its Subsidiaries to any other Person.

The amount of any Investment outstanding at any time shall be the original cost of such Investment (determined, in the case of an Investment made with assets of the Issuer or any Subsidiary, based on the net book value of the assets invested), minus any payments actually received by such investor representing a Return in respect of such Investment (but without any other adjustment for increases or decreases in value of, or write-ups, write-downs or write-offs with respect to, such Investment after the date of such Investment.

"Investment Grade Rating" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P or Fitch or the equivalent investment grade credit rating from any other nationally recognized rating agency.

"IP Rights" means a license or right to use all rights in Designs, patents, trademarks, domain names, copyrights, software, Trade Secrets and all other intellectual property rights.

"Issue Date" means November 22, 2024.

"Issuer Order" means a written request or order signed on behalf of the Issuer by an Officer of the Issuer and delivered to the Trustee.

"Junior Lien Priority" means, with respect to specified Indebtedness, that such Indebtedness is secured by a Lien that is junior in priority to the Liens on all or a portion of the Collateral securing the Senior Priority Obligations and is subject to a Junior Priority Intercreditor Agreement (it being understood that junior Liens are not required to rank equally and ratably with other junior Liens, and that Indebtedness secured by junior Liens may be secured by Liens that are senior in priority to, or rank equally and ratably with, or junior in priority to, other Liens constituting junior Liens).

"Junior Priority Collateral Agent" means the Junior Priority Representative for the holders of any Junior Priority Obligations.

"Junior Priority Intercreditor Agreement" means the Intercreditor Agreement, dated as of the Issue Date, with respect to the Collateral specified therein entered into by, among others, the

20

2234

Notes Collateral Agent, MUFG Bank, Ltd., in its capacity as common representative for the Letter of Credit Facility collateral agent, the Revolving Credit Facility collateral agent and the Term Loan A Facility collateral agent, and each grantor party thereto, substantially in the form attached as Exhibit E to this Indenture (as the same may be amended, restated, renewed, replaced or otherwise modified from time to time).

"Junior Priority Obligations" means the Obligations with respect to any Indebtedness having Junior Lien Priority relative to the Secured Notes Obligations; provided that such Lien is permitted to be incurred under this Indenture, and provided further, that the holders of such indebtedness or their Junior Priority Representative shall become party to a Junior Priority Intercreditor Agreement.

"Junior Priority Representative" means any duly authorized representative of any holders of Junior Priority Obligations, which representative is named as such in a Junior Priority Intercreditor Agreement or any joinder thereto.

"Junior Priority Secured Parties" means the holders from time to time of any Junior Priority Obligations, the Junior Priority Collateral Agent and each other Junior Priority Representative.

"Junior Priority Security Agreement" means any security agreement covering any portion of the Collateral to be entered into by the Note Parties and a Junior Priority Representative.

"Junior Priority Security Documents" means, collectively, the Junior Priority Security Agreement, other security agreements relating to the Collateral securing a series of Junior Priority Obligations and the mortgages and instruments filed and recorded in appropriate jurisdictions to preserve and protect the Liens on the Collateral securing a series of Junior Priority Obligations (including financing statements under the Uniform Commercial Code of the relevant states) in each case, as amended, restated, renewed, replaced or otherwise modified from time to time.

"Legal Holiday" means a Saturday, a Sunday or a day on which commercial banking institutions are not required to be open in the State of New York or the place of payment.

"Letter of Credit Facility" means that certain Uncommitted Letter of Credit and Reimbursement Agreement, entered into on July 16, 2021, among the Company, the guarantors from time to time party thereto, the lenders from time to time party thereto, the issuing banks from time to time party thereto and Natixis, New York Branch, as administrative agent and as collateral agent, and any amendments, supplements, modifications, extensions, renewals, restatements, refundings, replacements, exchanges or refinancings thereof, in whole or in part, and any financing arrangements that amend, supplement, modify, extend, renew, restate, refund, replace, exchange or refinance any part thereof.

"Liability Management Transaction" means (a) any refinancing, retirement, exchange, repurchase or defeasance of any existing Indebtedness, Disqualified Stock or Preferred Stock of the Company with any other Indebtedness, Disqualified Stock or Preferred Stock (or the proceeds of any other Indebtedness, Disqualified Stock or Preferred Stock) that is contractually, structurally or temporally senior (including as to Lien priority or additional collateral) to any Refinancing Intercompany Credit Agreement or the Series I Intercompany Credit Agreement (including, for

21

the avoidance of doubt, through any incurrence or issuance of Indebtedness, Disqualified Stock or Preferred Stock by a Person that is not the Company, whether or not such Person owns any assets or property), (b) any refinancing, retirement, exchange, repurchase or defeasance of any existing Indebtedness, Disqualified Stock or Preferred Stock of Brazil Parent with any other Indebtedness, Disqualified Stock or Preferred Stock (or the proceeds of any other Indebtedness, Disqualified Stock or Preferred Stock) that is contractually, structurally or temporally senior (including as to Lien priority or additional collateral) to the Brazil Parent Intercompany Credit Agreement (including, for the avoidance of doubt, through any incurrence or issuance of Indebtedness, Disqualified Stock or Preferred Stock by a Person that is not Brazil Parent, whether or not such Person owns any assets or property) and (c) any refinancing, retirement, exchange, repurchase or defeasance of any existing Indebtedness, Disqualified Stock or Preferred Stock of the Issuer with any other Indebtedness, Disqualified Stock or Preferred Stock (or the proceeds of any other Indebtedness, Disqualified Stock or Preferred Stock) that is contractually, structurally or temporally senior (including as to Lien priority or additional collateral) to the Notes (including, for the avoidance of doubt, through any incurrence or issuance of Indebtedness, Disqualified Stock or Preferred Stock by a Person that is not the Issuer, whether or not such Person owns any assets or property). In no event shall any Transaction constitute a Liability Management Transaction for any purpose hereunder.

"Lien" means any mortgage, pledge, hypothecation, assignment, encumbrance, lien (statutory or other), charge, or other security interest or any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any Financing Lease having substantially the same economic effect as any of the foregoing), in each case, in the nature of security; provided that in no event shall a Non-Financing Lease Obligation be deemed to constitute a Lien.

"Macquarie Facility" means the Master LNG Sale and Purchase Agreement, dated May 4, 2022, between Macquarie Bank Limited and NFE North Trading LLC and each confirmation delivered thereunder for the purchase and sale of natural gas.

"Majority Holders" means Holders of a majority in aggregate principal amount of the then outstanding Notes.

"Management Investors" means the current, former or future officers, directors, managers and employees (and any Immediate Family Members of the foregoing) of the Company or any of its Subsidiaries who are or who become direct or indirect investors in the Company.

"Material Real Estate Asset" means any "fee-owned" real estate asset owned by any Note Party on the Issue Date or acquired by any Note Party after the Issue Date.

"Moody's" means Moody's Investors Service, Inc. and any successor to its rating agency business.

"Mortgage" means any mortgage, deed of trust or other similar agreement made by a Grantor in favor of the Notes Collateral Agent, for the benefit of the Notes Collateral Agent and the relevant Secured Notes Secured Parties, on any Material Real Estate Asset constituting Collateral, which shall be in form reasonably satisfactory to the Notes Collateral Agent and the Issuer.

22

2236

"Net Proceeds" means the cash proceeds (including Cash Equivalents and cash proceeds subsequently received (as and when received) in respect of non-cash consideration initially received) received by the Issuer in respect of any Prepayment Event or any Asset Sale, net of all fees and out-of-pocket expenses paid by (or on behalf of) the Issuer in connection with such event (including attorney's fees and the Issuer's good faith estimate of income or other taxes paid or payable (including any tax distributions permitted under Section 4.07(b)(i)) in connection with such Prepayment Event or such Asset Sale).

"Non-Financing Lease Obligation" means a lease obligation that is not required to be accounted for as a financing or capital lease on both the balance sheet and the income statement for financial reporting purposes in accordance with GAAP. For avoidance of doubt, a straight-line or operating lease shall be considered a Non-Financing Lease Obligation.

"Non-U.S. Person" means a Person who is not a U.S. Person.

"Note Guarantee" means the guarantee by any Guarantor of the Issuer's Obligations under this Indenture and the Notes.

"Note Party" means, the Issuer and the Guarantors.

"Notes" means the Initial Notes and more particularly means any Note authenticated and delivered under this Indenture. Unless the context requires otherwise, references to "Notes" for all purposes of this Indenture shall also include any Additional Notes that are actually issued.

"Notes Collateral Agent" means WSFS, as collateral agent for the holders of the Notes under the Security Documents and any successor pursuant to the provisions of this Indenture and the Security Documents.

"Obligations" means all unpaid principal of and accrued and unpaid interest (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) under the documentation governing any Indebtedness and all accrued and unpaid fees (including fees accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) and all expenses, reimbursements, indemnities and all other advances to, debts, liabilities and obligations to any lender, holder of Indebtedness or any beneficiary of any indemnification obligations arising under documentation governing any Indebtedness, whether direct or indirect (including those acquired by assumption), absolute, contingent, due or to become due, now existing or hereafter arising; provided that Obligations with respect to the Notes shall not include fees, reimbursements or indemnifications in favor of the Trustee (which obligations with respect to such fees, reimbursements or indemnifications shall survive the payment in full of the principal of and interest on the Notes) or other third parties other than the Holders.

"obligor" on the Notes and a Note Guarantee means the Issuer and the applicable Guarantor, respectively, and any successor obligor upon the Notes and such Note Guarantee, respectively.

2237

DG-118

"Officer" means the Chairman of the Board of Directors, any Manager or Director, the Chief Executive Officer, the Chief Financial Officer, the Chief Operating Officer, the President, any Executive Vice President, Senior Vice President, Vice President or Assistant Vice President, the Treasurer, any Assistant Treasurer, the Controller, the Secretary or any Assistant Secretary of a Person, or any equivalent position in such Person's jurisdiction of organization, or any other officer of such Person designated by any such individuals of the Issuer or any other Person, as the case may be. Unless otherwise specified, reference to an "Officer" means an Officer of the Issuer.

"Officer's Certificate" means a certificate signed on behalf of the Issuer by an Officer of the Issuer or on behalf of any other Person, as the case may be, that meets the requirements set forth in this Indenture and is delivered to the Trustee.

"Operating Agreement" means that certain Limited Liability Company Agreement of NFE Financing LLC, effective as of October 2, 2024 and entered into by Brazil Parent, as the sole equity member, and Orlando Figueroa, as the Independent Manager (as defined therein), as amended, restated, renewed, replaced or otherwise modified from time to time; provided that such amendments, restatements, renewals, replacements or other modifications are not prohibited under Section 6.01(a)(8).

"Opinion of Counsel" means a written opinion from legal counsel who is reasonably acceptable to the Trustee (which opinion may be subject to customary assumptions and exclusions) and is delivered to the Trustee. The counsel may be an employee of, or counsel to, the Issuer or any of its Subsidiaries or the Company.

"Participant" means, with respect to the Depositary, Euroclear or Clearstream, a Person who has an account with the Depositary, Euroclear or Clearstream, respectively (and, with respect to DTC, shall include Euroclear and Clearstream).

"Pass Through Prepayment Event" means any prepayment, including pursuant to any "Make-Whole Event" (as defined in the Brazil Parent Intercompany Credit Agreement or Series II Credit Agreement, as applicable), made under the Brazil Parent Intercompany Credit Agreement or the Series II Intercompany Credit Agreement.

"Permitted Bradford County Sale" means the sale by Bradford County Real Estates Partners LLC of a portion of the Bradford County Property not exceeding 50 acres in the aggregate for all such sales at fair market value and for consideration constituting at least 75% cash and Cash Equivalents; provided, that such sale shall not have a material adverse impact on the marketability or potential uses of the remaining portion of the Bradford County Property.

"Permitted Holders" means (a) any of Fortress, the Management Investors and their respective Affiliates, (b) any Person who is acting solely as an underwriter or initial purchaser in connection with a public or private offering of Equity Interests of the Company, acting in such capacity, (c) any group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act) of which any of the foregoing or any Permitted Holder specified in the last sentence of this definition are members and any member of such group; provided that, in the case of such group and any member of such group and without giving effect to the existence of such group or any other group, no Person or other group (other than the Permitted Holders specified in clauses

24

(a), (b) or (d) of this definition) owns, directly or indirectly, more than 50.0% of the total voting power of the Voting Stock of the Company held by such group, and (d) any Permitted Plan. Any Person or group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act) whose acquisition of beneficial ownership or assets or properties of the Company constitutes a Change of Control in respect of which a Change of Control Offer, including for the avoidance of doubt, any Alternate Offer, is made or waived in accordance with the requirements of this Indenture will thereafter, together with its Affiliates, constitute an additional Permitted Holder.

"Permitted Investments" means:

(a)     cash or Investments that were Cash Equivalents at the time made;

(b)     Investments existing on, or contractually committed to as set forth on Schedule A attached hereto as of, the Issue Date;

(c)     repurchases of the Notes;

(d)     Investments made after the Issue Date in the Issuer and/or one or more Subsidiaries (including, in each case, guarantees of obligations of Subsidiaries);

(e)     Investments consisting of (or resulting from) the Transactions;

(f)     Investments consisting of Capital Stock of NFE Brazil Holdings Limited received by the Issuer after the Issue Date;

(g)     Investments (including earn-outs) received in lieu of cash in connection with a Permitted Bradford County Sale;

(h)     [reserved];

(i)     [reserved];

(j)     Investments consisting of (or resulting from) (i) Indebtedness permitted under Section 4.09, (ii) Permitted Liens, (iii) Restricted Payments (or that would constitute a Restricted Payment but for the exclusions from the definition thereof) not prohibited under Section 4.07 and (iv) Asset Sales permitted under Section 4.10 or any other disposition not constituting an Asset Sale (other than pursuant to clause (a) and (g) of the definition thereof);

(k)     Investments consisting of (or resulting from) the Refinancing Intercompany Credit Agreements;

(l)     Investments (including debt obligations and Equity Interests) received (i) in connection with the bankruptcy or reorganization of any Person, (ii) in settlement of delinquent obligations of, or other disputes with, customers, suppliers and other account debtors arising in the ordinary course of business, consistent with past practice or consistent with industry norm, (iii) upon foreclosure with respect to any secured Investment or other

25

2239

transfer of title with respect to any secured Investment and/or (iv) as a result of the settlement, compromise, resolution of litigation, arbitration or other disputes;

(m)     loans and advances of payroll payments or other compensation (including deferred compensation) to present or former employees, directors, members of management, officers, managers, members, partners, independent contractors or consultants of the Issuer and/or any Subsidiary in the ordinary course of business, consistent with past practice or consistent with industry norm;

(n)     [reserved];

(o)     [reserved];

(p)     [reserved];

(q)     [reserved];

(r)     [reserved];

(s)     to the extent constituting Investments, guarantees of leases (other than Financing Leases) or of other obligations not constituting Indebtedness of the Issuer and/or its Subsidiaries;

(t)     [reserved];

(u)     [reserved];

(v)     [reserved];

(w)     [reserved];

(x)     [reserved];

(y)     [reserved];

(z)     [reserved];

(aa)     [reserved];

(bb)     [reserved];

(cc)     [reserved];

(dd)     [reserved];

(ee)     [reserved];

(ff)     [reserved];

26

2240

(gg)     [reserved];

(hh)     [reserved];

(ii)     Investments made from casualty insurance proceeds in connection with the replacement, substitution, restoration or repair of assets on account of a casualty event;

(jj)     Investments to the extent required by any governmental authority, including any Investment made in order to avoid early warning or notice requirements under such requirements;

(kk)     [reserved];

(ll)     any transaction to the extent it constitutes an Investment that is not prohibited by and is made in accordance with the provisions of Section 4.11 (except transactions permitted by clause (d)(i) of the second paragraph of Section 4.11 by reference to Section 4.07 or this definition and clause (o) of the second paragraph of Section 4.11); and

(mm)   loans made pursuant to the Series II Intercompany Credit Agreement and the Brazil Parent Intercompany Credit Agreement.

"Permitted Liens" means:

(a)     Liens securing Indebtedness permitted pursuant to clause (a) of the second paragraph of Section 4.09; provided that, the Liens securing the obligations of such Indebtedness shall be subject to the Junior Priority Intercreditor Agreement;

(b)     Liens for taxes, assessments or other governmental charges (i) which are not yet due or (ii) which are being contested in good faith by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the Issuer or any of its Subsidiaries in accordance with GAAP if such contest shall have the effect of suspending enforcement or collection of such taxes;

(c)     Liens (and rights of set-off) of landlords, banks, carriers, warehousemen, mechanics, repairmen, workmen and materialmen, and other Liens (including, without limitation, any maritime liens, whether or not statutory, that are recognized or given effect to as such by the law of any applicable jurisdiction) imposed by applicable Requirements of Law, in each case incurred in the ordinary course of business, consistent with past practice or consistent with industry norm (i) for amounts not yet overdue by more than 30 days, (ii) for amounts that are overdue by more than 30 days or that are unfiled and no other action has been taken to enforce such Liens or those that are being contested in good faith by appropriate proceedings, so long as any reserves or other appropriate provisions required by GAAP have been made for any such contested amounts or (iii) with respect to which the failure to make payment would not reasonably be expected to have a material adverse effect on the business, results of operations or financial condition of the Issuer and its Subsidiaries, taken as a whole;

27

DG-122

(d)     Liens incurred or deposits made in the ordinary course of business, consistent with past practice or consistent with industry norm (i) in connection with workers' compensation, pension, unemployment insurance, employers' health tax and other types of social security or similar laws and regulations or other insurance related obligations (including in respect of deductibles, self-insured retention amounts and premiums and adjustments thereto), (ii) [reserved], (iii) securing or in connection with (x) any liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees or similar instruments for the benefit of) insurance carriers providing property, casualty, liability or other insurance (including self-insurance) to the Issuer or its Subsidiaries or otherwise supporting the payment of items set forth in the foregoing clause (i) or (y) leases or licenses of property otherwise not prohibited by this Indenture and use and occupancy agreements, utility services and similar transactions entered into in the ordinary course of business, consistent with past practice or consistent with industry norm and (iv) to secure obligations in respect of letters of credit, bank guarantees, surety bonds, performance bonds, completion bonds or similar instruments posted with respect to the items described in clauses (i) through (iii) above;

(e)     Liens consisting of survey exceptions, easements, rights-of-way, restrictions, encroachments, and other similar encumbrances or minor defects or irregularities in title, in each case that would not reasonably be expected to result in a material adverse effect on the business, results of operations or financial condition of the Issuer and its Subsidiaries, taken as a whole;

(f)     Liens consisting of any (i) interest or title of a lessor or sub-lessor under any lease of real estate entered into by the Issuer or any of its Subsidiaries in the ordinary course of business, consistent with past practice or consistent with industry norm, (ii) landlord lien not prohibited by the terms of any lease, (iii) restriction or encumbrance to which the interest or title of such lessor or sub-lessor may be subject or (iv) subordination of the interest of the lessee or sub-lessee under such lease to any restriction or encumbrance referred to in the preceding clause (iii);

(g)     [reserved];

(h)     Liens or purported Liens evidenced by the filing of UCC financing statements, including precautionary UCC financing statements, or any similar filings made in respect of (i) Non-Financing Lease Obligations or consignment or bailee arrangements entered into by the Issuer or any of its Subsidiaries and/or (ii) the sale of accounts receivable in the ordinary course of business, consistent with past practice or consistent with industry norm (to the extent otherwise permitted herein) for which a UCC financing statement is required;

(i)     [reserved];

(j)     Liens in connection with any zoning, building, land use or similar Requirements of Law or right reserved to or vested in any governmental authority by any statutory provision or by the terms of any lease, license, franchise, grant or permit of the Issuer or any of its Subsidiaries to (i) control or regulate the use of any or dimensions of

28

2242

real property or the structure thereon that would not reasonably be expected to have a material adverse effect on the business, results of operations or financial condition of the Issuer and its Subsidiaries, taken as a whole, including Liens in connection with any condemnation or eminent domain proceeding or compulsory purchase order or (ii) terminate any such lease, license, franchise, grant or permit or to require annual or other payments as a condition to the continuation thereof;

(k)    Liens securing Refinancing Indebtedness permitted pursuant to clause (q) of the second paragraph of Section 4.09 (solely with respect to the permitted refinancing of Indebtedness permitted pursuant to the first paragraph of Section 4.09 or clauses (b), (j), or (q) of the second paragraph of Section 4.09; provided that (i) no such Lien extends to any property or asset of the Issuer or any of its Subsidiaries that did not secure the Indebtedness being refinanced, other than (A) after-acquired property that is affixed to or incorporated into the property covered by such Lien, (B) in the case of any property or assets financed by Indebtedness, Disqualified Stock or Preferred Stock or subject to a Lien securing Indebtedness, in each case, not prohibited by Section 4.09, the terms of which Indebtedness, Disqualified Stock or Preferred Stock require or include a pledge of after-acquired property to secure such Indebtedness and related obligations, any such after-acquired property and (C) the proceeds and products thereof, accessions thereto and improvements thereon (it being understood that individual financings of the type permitted under clause (n) of the second paragraph of Section 4.09 provided by any lender may be cross-collateralized to other financings of such type provided by such lender or its Affiliates) and (ii) such Liens shall be subject to an Equal Priority Intercreditor Agreement or a Junior Priority Intercreditor Agreement, as applicable, providing that the Liens on the Collateral securing such Indebtedness or other obligations shall rank (I) if the Liens on the Collateral that secured the Indebtedness that was refinanced by such Refinancing Indebtedness ranked equal in priority with the Liens on the Collateral securing the Secured Notes Obligations, at the option of the Issuer, either equal in priority (but without regard to the control of remedies) with the Liens on the Collateral securing the Secured Notes Obligations or junior in priority to the Liens on the Collateral securing the Secured Notes Obligations or (II) if the Liens on the Collateral that secured the Indebtedness that was refinanced by such Refinancing Indebtedness ranked junior in priority to the Liens on the Collateral securing the Secured Notes Obligations, junior in priority to the Liens on the Collateral securing the Secured Notes Obligations but, in any event, shall not be required to enter into any such intercreditor agreement with respect to any Collateral consisting of cash and Cash Equivalents;

(l)    Liens existing on the Issue Date or pursuant to agreements in existence on the Issue Date as set forth on Schedule B and any modification, replacement, refinancing, renewal or extension thereof; provided that (i) no such Lien extends to any property or asset of the Issuer or any of its Subsidiaries that was not subject to the original Lien, other than (A) after-acquired property that is affixed to or incorporated into the property covered by such Lien, (B) in the case of any property or assets financed by Indebtedness or subject to a Lien securing Indebtedness, in either case permitted under Section 4.09, the terms of which Indebtedness require or include a pledge of after-acquired property to secure such Indebtedness and related obligations, any such after-acquired property and (C) the proceeds

29

DG-124

and products thereof, accessions thereto and improvements thereon (it being understood that individual financings of the type permitted under clause (n) of the second paragraph of Section 4.09 provided by any lender may be cross-collateralized to other financings of such type provided by such lender or its Affiliates) and (ii) any such modification, replacement, refinancing, renewal or extension of the obligations secured or benefited by such Liens, if the same constitute Indebtedness, is not prohibited by Section 4.09;

(m)   [reserved];

(n)   [reserved];

(o)   [reserved];

(p)   (i) Liens that are contractual rights of setoff or netting relating to (A) the establishment of depositary relations with banks not granted in connection with the issuance of Indebtedness, (B) pooled deposit or sweep accounts of the Issuer or any Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business, consistent with past practice or consistent with industry norm of the Issuer or any Subsidiary, (C) purchase orders and other agreements entered into with customers of the Issuer or any Subsidiary in the ordinary course of business, consistent with past practice or consistent with industry norm and (D) commodity trading or other brokerage accounts incurred in the ordinary course of business, consistent with past practice or consistent with industry norm, (ii) Liens encumbering reasonable customary initial deposits and margin deposits, (iii) bankers Liens and rights and remedies as to Deposit Accounts, (iv) Liens on the proceeds of any Indebtedness in favor of the holders of such Indebtedness incurred in connection with any transaction permitted under this Indenture, which proceeds have been deposited into an escrow account on customary terms to secure such Indebtedness pending the application of such proceeds to finance such transaction and (v) Liens consisting of an agreement to dispose of the Bradford Property permitted under Section 4.10, in each case, solely to the extent such Investment or disposition, as the case may be, would have been permitted on the date of the creation of such Lien;

(q)   [reserved];

(r)   (i) Liens securing obligations (other than obligations representing indebtedness for borrowed money) under operating, reciprocal easement or similar agreements entered into in the ordinary course of business, consistent with past practice or consistent with industry norm of the Issuer and/or its Subsidiaries and (ii) Liens not securing indebtedness for borrowed money that are granted in the ordinary course of business, consistent with past practice or consistent with industry norm and customary in the operation of the business of the Issuer and its Subsidiaries;

(s)   [reserved];

(t)   [reserved];

30

2244

(u)      [reserved];

(v)      (i) Liens on assets securing, or otherwise arising from, judgments, awards, attachments and/or decrees and notices of *lis pendens* and associated rights relating to litigation not constituting an Event of Default under clause (5) under Section 6.01(a) and (ii) any pledge and/or deposit securing any settlement of litigation;

(w)      (i) leases, licenses, subleases or sublicenses granted to others in the ordinary course of business, consistent with past practice or consistent with industry norm (and other agreements pursuant to which the Issuer or any Subsidiary has granted rights to end users to access and use the Issuer's or any Subsidiary's products, technologies or services), or which would not reasonably be expected to result in a material adverse effect on the business, results of operations or financial condition of the Issuer and its Subsidiaries, taken as a whole (ii) ground leases, subleases, licenses or sublicenses in respect of real property on which facilities owned or leased by the Issuer or any of its Subsidiaries are located, and (iii) any Bradford County Lease;

(x)      Liens on securities that are the subject of repurchase agreements constituting Permitted Investments or any Investment permitted under Section 4.07 arising out of such repurchase transactions and reasonable customary initial deposits and margin deposits and similar Liens attaching to pooling, commodity trading accounts or other brokerage accounts maintained in the ordinary course of business, consistent with past practice or consistent with industry norm and not for speculative purposes;

(y)      Liens securing obligations in respect of letters of credit, bank guaranties, surety bonds, performance bonds, completion bonds or similar instruments permitted under clause (f), (h) or (aa) of the second paragraph of Section 4.09;

(z)      Liens arising (i) out of conditional sale, title retention, consignment or similar arrangements for the sale or purchase of any asset in the ordinary course of business, consistent with past practice or consistent with industry norm or (ii) by operation of law under Article 2 of the UCC (or any similar Requirements of Law under any jurisdiction);

(aa)      [reserved];

(bb)      Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(cc)      [reserved];

(dd)      Liens securing (i) obligations of the type described in clause (g) and/or (ii) obligations of the type described in clause (s), in each case of the second paragraph of Section 4.09;

(ee)      [reserved];

(ff)      Liens on cash or Cash Equivalents arising in connection with the defeasance, satisfaction, discharge or redemption of Indebtedness;

31

2245

(gg)    [reserved];

(hh)    Liens disclosed in any mortgage policy or survey with respect to any Material Real Estate Asset and any replacement, extension or renewal thereof;

(ii)    [reserved];

(jj)    Liens (i) of a collection bank arising under Section 4-208 or 4-210 of the UCC (or any comparable or successor provision) on the items in the course of collection and (ii) in favor of a banking or other financial institution or electronic payment service provider arising as a matter of law or under general terms and conditions encumbering deposits (including the right of setoff) and that are within the general parameters customary in the banking or finance industry;

(kk)    security given to a public utility or any municipality or governmental authority when required by such utility or authority in connection with the operations of such Person in the ordinary course of business, consistent with past practice or consistent with industry norm;

(ll)    [reserved];

(mm)   [reserved];

(nn)    [reserved];

(oo)    Liens relating to future escrow arrangements securing Indebtedness, including (i) Liens on escrowed proceeds from the issuance of Indebtedness for the benefit of the related holders of debt securities or other Indebtedness (or the underwriters, arrangers, trustee or collateral agent thereof) and (ii) Liens on cash or Cash Equivalents set aside at the time of the incurrence of any Indebtedness, in either case to the extent such cash or Cash Equivalents prefund the payment of interest or premium or discount on such Indebtedness (or any costs related to the issuance or incurrence of such Indebtedness) and are held in an escrow account or similar arrangement to be applied for such purpose;

(pp)    Liens securing the Notes (other than any Additional Notes) and the related Note Guarantees;

(qq)    [reserved];

(rr)    [reserved]; and

(ss)    [reserved].

For purposes of this definition, the term "Indebtedness" shall be deemed to include interest on such Indebtedness.

32

2246

"Permitted Plan" means any employee benefit plan of the Issuer or any of its Affiliates and any Person acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, governmental authority or any other entity.

"Preferred Stock" means any Capital Stock with preferential rights of payment of dividends or upon liquidation, dissolution, or winding up.

"Prepayment Event" means any Pass Through Prepayment Event, Specified Prepayment Event or Brazil Proceeds Event, as applicable.

"Prepayment Proceeds" means any Pass Through Prepayment Proceeds, Brazil Prepayment Proceeds, Excess Interest Proceeds or Permitted Asset Sale Proceeds, as applicable.

"Private Placement Legend" means the legend set forth in Section 2.06(g)(i) to be placed on all Notes issued under this Indenture, except where otherwise permitted by the provisions of this Indenture.

"QIB" means a "qualified institutional buyer" as defined in Rule 144A.

"Qualified Capital Stock" of any Person means any Equity Interests of such Person that is not Disqualified Stock.

"Rating Agency" means (1) S&P, Fitch and Moody's or (2) if S&P, Fitch or Moody's or each of them shall not make a corporate rating with respect to the Issuer or a rating on the Notes publicly available, a nationally recognized statistical rating agency or agencies, as the case may be, selected by the Issuer, which shall be substituted for any or all of S&P, Fitch or Moody's, as the case may be, with respect to such corporate rating or the rating of the Notes, as the case may be.

"Record Date" for the interest, if any, payable on any applicable Interest Payment Date means May 1 or November 1 (whether or not a Business Day) immediately preceding such Interest Payment Date.

"Refinancing Intercompany Credit Agreements" means the Brazil Parent Intercompany Credit Agreement and the Series II Intercompany Credit Agreement.

"Regulation S" means Regulation S promulgated under the Securities Act.

"Regulation S Global Note" means a Global Note substantially in the form of Exhibit A hereto bearing the Global Note Legend, the Private Placement Legend and the Regulation S Global Note Legend and deposited with or on behalf of, and registered in the name of, the Depositary or its nominee, issued in a denomination equal to the outstanding principal amount of the Notes initially sold in reliance on Rule 903.

"Regulation S Global Note Legend" means the legend set forth in Section 2.06(g)(iii).

33

2247

"<u>Requirements of Law</u>" means, with respect to any Person, collectively, the common law and all federal, state, provincial, territorial, municipal, local, foreign, multinational or international laws, statutes, codes, treaties, standards, rules and regulations, guidelines, ordinances, orders, judgments, writs, injunctions, decrees (including administrative or judicial precedents or authorities) and the interpretation or administration thereof by, and other determinations, directives, requirements or requests of any governmental authority, in each case whether or not having the force of law and that are applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"<u>Responsible Officer</u>" means, when used with respect to the Trustee, means, with respect to the Trustee, any officer assigned to the Global Corporate Trust Division (or any successor division or unit) of the Trustee located at the Corporate Trust Office of the Trustee, who shall have direct responsibility for the administration of this Indenture, and for the purposes of <u>Section 7.01(c)(ii)</u> shall also include any other officer of the Trustee to whom any corporate trust matter is referred because of such officer's knowledge of and familiarity with the particular subject.

"<u>Restricted Definitive Note</u>" means a Definitive Note bearing the Private Placement Legend.

"<u>Restricted Global Note</u>" means a Global Note bearing the Private Placement Legend.

"<u>Restricted Investment</u>" means an Investment other than a Permitted Investment.

"<u>Restricted Period</u>" means, in respect of any Note issued pursuant to Regulation S, the 40-day distribution compliance period as defined in Regulation S applicable to such Note.

"<u>Return</u>" means, with respect to any Investment, any dividend, distribution, interest, fee, premium, return of capital, repayment of principal, income, profit (from a disposition or otherwise) and any other similar amount received or realized in respect thereof.

"<u>Revolving Credit Facility</u>" means that certain Credit Agreement, entered into on April 15, 2021, among the Company, the guarantors from time to time party thereto, the lenders from time to time party thereto, the issuing banks from time to time party thereto, and MUFG Bank, Ltd., as administrative agent and as collateral agent, and any amendments, supplements, modifications, extensions, renewals, restatements, refundings, replacements, exchanges or refinancings thereof, in whole or in part, and any financing arrangements that amend, supplement, modify, extend, renew, restate, refund, replace, exchange or refinance any part thereof.

"<u>Rule 144A</u>" means Rule 144A promulgated under the Securities Act.

"<u>S&P</u>" means S&P Global Ratings and any successor to its rating agency business.

"<u>Sale and Lease-Back Transaction</u>" means any transaction or series of related transactions pursuant to which the Issuer or any of its Subsidiaries (a) sells, transfers or otherwise disposes of any property, real or personal, whether now owned or hereafter acquired, and (b) as part of such transaction, thereafter rents or leases such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold, transferred or disposed of.

"SEC" means the U.S. Securities and Exchange Commission.

"Secured Indebtedness" means any Indebtedness of the Issuer or any of its Subsidiaries secured by a Lien.

"Secured Notes Obligations" means Obligations in respect of the Notes, this Indenture, the Note Guarantees and the Security Documents relating to the Notes.

"Secured Notes Secured Parties" means the Trustee, the Notes Collateral Agent and the Holders.

"Securities Act" means the U.S. Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Security Agreement" means that certain Security Agreement, dated as of the Issue Date, among the Note Parties and the Notes Collateral Agent.

"Security Documents" means, collectively, the Security Agreement, other security agreements relating to the Collateral securing the Secured Notes Obligations and the mortgages and instruments filed and recorded in appropriate jurisdictions to preserve and protect the Liens on the Collateral securing the Secured Notes Obligations (including financing statements under the Uniform Commercial Code of the relevant states), each for the benefit of the Notes Collateral Agent, as amended, restated, renewed, replaced or otherwise modified from time to time.

"Senior Indebtedness" means:

(1)    all Indebtedness of the Issuer or any of its Subsidiaries outstanding under the Notes and related Note Guarantees (including interest accruing on or after the filing of any petition in bankruptcy or similar proceeding or for reorganization of any Note Party (at the rate provided for in the documentation with respect thereto, regardless of whether or not a claim for post-filing interest is allowed in such proceedings)), and any and all other fees, expense reimbursement obligations, indemnification amounts, penalties, and other amounts (whether existing on the Issue Date or thereafter created or incurred) and all obligations of any Note Party to reimburse any bank or other Person in respect of amounts paid under letters of credit, acceptances or other similar instruments;

(2)    [reserved];

(3)    any other Indebtedness of the Issuer or any Subsidiary permitted to be incurred under the terms of this Indenture, unless the instrument under which such Indebtedness is incurred expressly provides that it is subordinated in right of payment to the Notes or any related Note Guarantee; and

(4)    all Obligations with respect to the items listed in the preceding clauses (1), (2) and (3); provided, however, that Senior Indebtedness shall not include:

(a)    any obligation of such Person to the Issuer or any of its Subsidiaries;

35

2249

DG-130

(b)      any liability for U.S. or foreign federal, state, local or other taxes owed or owing by such Person;

(c)      any accounts payable or other liability to trade creditors arising in the ordinary course of business;

(d)      any Indebtedness or other Obligation of such Person which is subordinate or junior in right of payment to any other Indebtedness or other Obligation of such Person; or

(e)      that portion of any Indebtedness which at the time of incurrence is incurred in violation of this Indenture.

"Senior Lien Priority" means, with respect to specified indebtedness, that such indebtedness is secured by a Lien that is senior in priority to the Liens on the Collateral securing the Junior Priority Obligations, including the Liens securing the Equal Priority Obligations, and is subject to a Junior Priority Intercreditor Agreement.

"Senior Priority Obligations" means (x) the Equal Priority Obligations and (y) any Obligations with respect to any Indebtedness having a Junior Lien Priority relative to the Notes and the Note Guarantees with respect to the Collateral and having Senior Lien Priority relative to the Junior Priority Obligations; provided, that the holders of such Indebtedness or their Senior Priority Representative shall become party to a Junior Priority Intercreditor Agreement and any other applicable intercreditor agreements.

"Senior Priority Representative" means any duly authorized representative of any holders of Senior Priority Obligations, which representative is named as such in a Junior Priority Intercreditor Agreement or any joinder thereto.

"Series" means (1) with respect to the Equal Priority Secured Parties, each of (i) the Secured Notes Secured Parties (in their capacity as such) and (ii) the Additional Equal Priority Secured Parties that are represented by a common representative (in its capacity as such for such Additional Equal Priority Secured Parties) and (2) with respect to any Equal Priority Obligations, each of (i) the Secured Notes Obligations and (ii) the Additional Equal Priority Obligations incurred pursuant to any applicable agreement, which are to be represented under an Equal Priority Intercreditor Agreement by a common representative (in its capacity as such for such Additional Equal Priority Obligations).

"Series I Intercompany Credit Agreement" means that certain Credit Agreement, dated as of the date hereof, by and among the Company, as borrower, the guarantors party thereto from time to time, Brazil Parent, as lender, and WSFS, as administrative agent and collateral agent, and any amendments, supplements, modifications, extensions, renewals, restatements, refundings, replacements, exchanges or refinancings thereof, in whole or in part, and any financing arrangements that amend, supplement, modify, extend, renew, restate, refund, replace, exchange or refinance any part thereof.

"Series II Intercompany Credit Agreement" means that certain Credit Agreement, to be dated the Exchange Date, by and among the Company, as borrower, the guarantors party thereto

36

2250

from time to time, the Issuer, as lender, and WSFS, as administrative agent and collateral agent, and any amendments, supplements, modifications, extensions, renewals, restatements, refundings, replacements, exchanges or refinancings thereof, in whole or in part, and any financing arrangements that amend, supplement, modify, extend, renew, restate, refund, replace, exchange or refinance any part thereof.

"Shared Collateral" means, at any time, Collateral in which the holders of two or more Series of Equal Priority Obligations hold a valid and perfected security interest at such time. If more than two Series of Equal Priority Obligations are outstanding at any time and the holders of less than all Series of Equal Priority Obligations hold a valid and perfected security interest in any Collateral at such time, then such Collateral shall constitute Shared Collateral for those Series of Equal Priority Obligations that hold a valid security interest in such Collateral at such time and shall not constitute Shared Collateral for any Series that does not have a valid and perfected security interest in such Collateral at such time.

"Specified Prepayment Event" means any voluntary prepayment or any mandatory prepayment (other than a Pass Through Prepayment Event) of the Series II Intercompany Credit Agreement or the Brazil Parent Intercompany Credit Agreement.

"Subordinated Indebtedness" means, with respect to the Notes, any Indebtedness of the Issuer which is (i) by its terms subordinated in right of payment to the Notes or (ii) either unsecured or secured by Liens on that Collateral that are junior to the Liens securing the Obligations.

"Subordinated Intercompany Loan" means any intercompany loan from BrazilCo to the Issuer, which shall (i) not provide for any cash interest payments or other cash payments, and shall not mature, prior to the 180th day following the stated maturity date of the Notes, (ii) not provide for any restrictive or affirmative covenants with respect to the Issuer or any of its Subsidiaries, (iii) shall be unsecured and (iii) be subordinated in right of payment to the Notes and other Indebtedness of the Issuer pursuant to a subordination agreement in form and substance acceptable to Majority Holders.

"Subsidiary" means, with respect to any Person: (1) any corporation, association or other business entity (other than a partnership, joint venture, limited liability company or similar entity) of which more than 50.0% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time of determination owned, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof; and (2) any partnership, joint venture, limited liability company or similar entity of which (a) more than 50.0% of the capital accounts, distribution rights, total equity and voting interests or general or limited partnership interests, as applicable, are owned, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof whether in the form of membership, general, special or limited partnership or otherwise, and (b) such Person or any Subsidiary of such Person is a controlling general partner or otherwise controls such entity. Unless otherwise specified, references to a "Subsidiary" shall mean a Subsidiary of the Issuer.

"Term Loan A Facility" means that certain Credit Agreement, entered into on July 19, 2024, among the Company, the guarantors party thereto, the lenders from time to time party thereto

37

2251

and Morgan Stanley Senior Funding, Inc., as administrative agent and as collateral agent, and any amendments, supplements, modifications, extensions, renewals, restatements, refundings, replacements, exchanges or refinancings thereof, in whole or in part, and any financing arrangements that amend, supplement, modify, extend, renew, restate, refund, replace, exchange or refinance any part thereof.

"Term Loan B Facility" means that certain Credit Agreement, entered into on October 30, 2023, among the Company, the guarantors from time to time party thereto, the lenders from time to time party thereto and Morgan Stanley Senior Funding, Inc., as administrative agent and as collateral agent, and any amendments, supplements, modifications, extensions, renewals, restatements, refundings, replacements, exchanges or refinancings thereof, in whole or in part, and any financing arrangements that amend, supplement, modify, extend, renew, restate, refund, replace, exchange or refinance any part thereof.

"Trade Secrets" means any trade secrets or other proprietary and confidential information, including unpatented inventions, invention disclosures, engineering or other technical data, financial data, procedures, know-how, designs, personal information, supplier lists, customer lists, business, production or marketing plans, formulae, methods (whether or not patentable), processes, compositions, schematics, ideas, algorithms, techniques, analyses, proposals, software (to the extent not a copyright) and data collections.

"Transaction Costs" means fees, premiums, expenses, closing payments and other similar transaction costs (including original issue discount or upfront fees) payable or otherwise borne by the Issuer and/or its Subsidiaries in connection with the Transactions.

"Transactions" means all the transactions (and any transactions related thereto) described in either (x) the Transaction Support Agreement, dated as of September 30, 2024, among the Company and the Supporting Holders party thereto, as amended, restated, supplemented or otherwise modified from time to time, or (y) the definition of "Notes Transactions" in the Confidential Information Memorandum, which, for the avoidance of doubt, need not occur on the Issue Date.

"Treasury Rate" means, as obtained by the Issuer, as of any Redemption Date, the yield to maturity as of such Redemption Date of United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15 that has become publicly available at least two Business Days prior to the Redemption Date (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from such Redemption Date to November 15, 2026; provided, however, that if the period from such Redemption Date to November 15, 2026 is less than one year, the weekly average yield on actively traded United States Treasury securities adjusted to a constant maturity of one year will be used.

"Trust Indenture Act" means the Trust Indenture Act of 1939, as amended.

"Trustee" means WSFS, and its successors and assigns, until a successor replaces it under the Indenture and, thereafter, means the successor thereto.

38

2252

"Turbine Loan Agreement" means that certain Loan Agreement, dated as of May 31, 2024, by and between the Company and Stonebriar Commercial Finance LLC, a Delaware limited liability company.

"Uniform Commercial Code" or "UCC" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

"Unrestricted Definitive Note" means one or more Definitive Notes that do not bear and are not required to bear the Private Placement Legend.

"Unrestricted Global Note" means a permanent Global Note, substantially in the form of Exhibit A that bears the Global Note Legend and that has the "Schedule of Exchanges of Interests in the Global Note" attached thereto, and that is deposited with or on behalf of and registered in the name of the Depositary, representing Notes that do not bear the Private Placement Legend.

"U.S. Government Obligations" means securities that are:

(1)    direct obligations of, or obligations guaranteed by, the United States of America for the timely payment of which its full faith and credit is pledged; or

(2)    obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the United States of America the timely payment of which is unconditionally guaranteed as a full faith and credit obligation by the United States of America, which, in either case, are not callable or redeemable at the option of the issuers thereof, and shall also include a depository receipt issued by a bank (as defined in Section 3(a)(2) of the Securities Act), as custodian with respect to any such U.S. Government Obligations or a specific payment of principal of or interest on any such U.S. Government Obligations held by such custodian for the account of the holder of such depository receipt; provided that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depository receipt from any amount received by the custodian in respect of the U.S. Government Obligations or the specific payment of principal of or interest on the U.S. Government Obligations evidenced by such depository receipt.

"U.S. Person" means a U.S. person as defined in Rule 902(k) under the Securities Act.

"Voting Stock" means, with respect to any Person, shares of such Person's Capital Stock that are at the time generally entitled, without regard to contingencies, to vote in the election of the Board of Directors of such Person.

"Weighted Average Life to Maturity" means, when applied to any Indebtedness, Disqualified Stock or Preferred Stock, as the case may be, at any date, the number of years obtained by dividing: (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment (it being understood that the Weighted Average Life to Maturity shall be determined without giving effect to any change in installment or other required payments of principal resulting from

39

2253

DG-134

prepayments following the incurrence of such Indebtedness); by (b) the then outstanding principal amount of such Indebtedness.

"Wholly-Owned Subsidiary" of any Person means a Subsidiary of such Person, 100.0% of the outstanding Capital Stock of which (other than directors' qualifying shares and/or shares required by Requirements of Law to be owned by a resident of the relevant jurisdiction) shall at the time be owned by such Person or by one or more Wholly-Owned Subsidiaries of such Person.

SECTION 1.02   OTHER DEFINITIONS.

| Term | Defined in Section |
|---|---|
| Accounting Change | 1.01 |
| Action | 7.01(e) |
| Advance Portion | 4.10(b) |
| Affiliate Transaction | 4.11 |
| Alternate Offer | 4.14(a) |
| Amendment to Allege Use | 1.01 |
| Applicable Law | 7.10 |
| Applicable Premium Deficit | 8.04(1) |
| Authentication Order | 2.02 |
| Brazil Prepayment Proceeds | 3.09(a) |
| CERCLA | 12.08(q) |
| Change of Control Offer | 4.14(a) |
| Change of Control Payment | 4.14(a) |
| Change of Control Payment Date | 4.14(a)(2) |
| Company | Preamble |
| Control | 1.01 |
| Controlled | 1.01 |
| Controlling | 1.01 |
| Covenant Defeasance | 8.03 |
| Covenant Suspension Event | 4.16(a) |
| director | 1.01 |
| Disposition | 1.01 |
| Dividing Person | 1.01 |
| Event of Default | 6.01(a) |
| Exchange Date Amount | Preamble |
| Exchange Rate | 1.06(g) |
| Governmental Consents | 1.01 |
| Increased Amount | 4.12(c) |
| incur | 4.09 |
| incurrence | 4.09 |
| Initial Default | 6.02(f) |
| Initial Notes | Preamble |
| Initial Notes Amount | Preamble |
| Issue Date Amount | Preamble |
| Issuer | Preamble |
| Legal Defeasance | 8.02 |

40

DG-135

| Term | Defined in Section |
|---|---|
| Make-Whole Amount | 6.01(c) |
| Make-Whole Event | 6.01(c) |
| Note Register | 2.03 |
| obligor | 1.01 |
| Offer Amount | 3.09(b) |
| Offer Period | 3.09(b) |
| Pass Through Prepayment Proceeds | 3.09(a) |
| Paying Agent | 2.03 |
| Performance References | 1.01 |
| Permitted Asset Sale Effective Date | 4.10 |
| Permitted Asset Sale Event | 4.10 |
| Permitted Asset Sale Proceeds | 4.10 |
| Prepayment Offer | 3.09(a) |
| Prepayment Proceeds | 3.09(a) |
| primary obligations | 1.01 |
| primary obligor | 1.01 |
| Purchase Date | 3.09(b) |
| Redemption Date | 3.07(a) |
| refinance | 4.09(q) |
| refinanced | 4.09(q) |
| Refinanced Indebtedness | 4.09(q) |
| refinances | 4.09(q) |
| refinancing | 4.09(q) |
| Refinancing Indebtedness | 4.09(q) |
| Registrar | 2.03 |
| Reinvestment Period | 4.10 |
| Related Person | 12.08(b) |
| Restricted Debt Payments | 4.07(a)(III) |
| Restricted Payments | 4.07(a) |
| Reversion Date | 4.16(b) |
| Second Change of Control Payment Date | 4.14(d) |
| Security Document Order | 12.08(r) |
| Specified Prepayment Proceeds | 3.08(a) |
| specified transaction | 1.06(g) |
| Statement of Use | 1.01 |
| Subject Person | 1.01 |
| Successor Company | 5.01(a)(i) |
| Suspended Covenants | 4.16(a) |
| Suspension Period | 4.16(c) |
| Tax Group | 4.07(b)(i) |
| Testing Party | 1.05(a) |
| Treasury Capital Stock | 4.07(b)(viii) |
| withdrawal deadline | 4.14(a)(6) |

41

DG-136

SECTION 1.03   NO INCORPORATION BY REFERENCE OF TRUST INDENTURE ACT.

Notwithstanding any other provision in this Indenture, no obligation or requirement under the Trust Indenture Act shall be applicable to any Note Party.

SECTION 1.04   RULES OF CONSTRUCTION.

Unless the context otherwise requires:

(a)      a term has the meaning assigned to it;

(b)      an accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP;

(c)      "or" is not exclusive;

(d)      words in the singular include the plural, and in the plural include the singular;

(e)      the words "shall" and "will" are intended to have the same meaning;

(f)      the words "include", "includes" and "including" shall be deemed to be followed by the words "without limitation";

(g)      provisions apply to successive events and transactions;

(h)      references to sections of, or rules under, the Securities Act or the Exchange Act shall be deemed to include substitute, replacement or successor sections or rules adopted by the SEC from time to time;

(i)      unless the context otherwise requires, any reference to an "Article", "Section", "clause" or "Exhibit" refers to an Article, Section, clause or Exhibit, as the case may be, of this Indenture; and

(j)      the words "herein", "hereof" and "hereunder" and other words of similar import refer to this Indenture as a whole and not any particular Article, Section, clause, other subdivision or Exhibit.

SECTION 1.05   [RESERVED].

SECTION 1.06   CERTAIN COMPLIANCE DETERMINATIONS.

(a)      [reserved].

(b)      [reserved].

(c)      [reserved].

(d)      [reserved].

42

2256

DG-137

(e)     [reserved].

(f)     Notwithstanding anything in this Indenture to the contrary, so long as an action was taken (or not taken) in reliance upon a basket or test under this Indenture that was calculated or determined in good faith by a responsible financial or accounting officer of the Issuer based upon financial information available to such officer at such time and such action (or inaction) was permitted under this Indenture at the time of such calculation or determination, any subsequent restatement, modification or adjustments made to such financial information (including any restatement, modification or adjustment that would have caused such basket or test to be exceeded as a result of such action or inaction) shall not result in any Default or Event of Default under this Indenture.

(g)     For purposes of any determination under this Indenture with respect to the amount of any Indebtedness, Lien, Restricted Payment, Investment, Asset Sale, Sale and Lease-Back Transaction, Affiliate Transaction or other transaction, event or circumstance, or any determination under any other provision of this Indenture (any of the foregoing, a "specified transaction") requiring the use of a current exchange rate, (i) the equivalent amount in U.S. dollars of a specified transaction in a currency other than U.S. dollars shall be calculated based on the relevant exchange rate, as may be determined by the Issuer in good faith, for such foreign currency (the "Exchange Rate") on the date of such determination (which, in the case of any Restricted Payment, shall be deemed to be the date of the declaration thereof and, in the case of the incurrence of Indebtedness, shall be deemed to be on the date first committed); provided, that if any Indebtedness is incurred (and, if applicable, associated Lien granted) to refinance or replace other Indebtedness denominated in a currency other than U.S. dollars, and the relevant refinancing or replacement would cause the applicable U.S. dollar-denominated restriction to be exceeded if calculated at the relevant currency Exchange Rate in effect on the date of such refinancing or replacement, such U.S. dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing or replacement Indebtedness (and, if applicable, associated Lien granted) does not exceed an amount sufficient to repay the principal amount of the Refinanced Indebtedness, except by an amount equal to (x) unpaid accrued interest and premiums (including premiums) thereon plus other reasonable and customary fees and expenses (including upfront fees and original issue discount) incurred in connection with such refinancing or replacement, (y) any existing unutilized commitments and letters of credit undrawn thereunder and (z) additional amounts permitted to be incurred under Section 4.09 and (ii) for the avoidance of doubt, no Default or Event of Default shall be deemed to have occurred solely as a result of a change in the Exchange Rate occurring after the time of any specified transaction so long as such specified transaction was permitted at the time incurred, made, acquired, committed, entered or declared as set forth in clause (i).

SECTION 1.07   ACTS OF HOLDERS.

(a)     Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Holders in person or by an agent duly appointed in writing. Except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments or record or both are delivered to the Trustee and, where it is hereby expressly required, to the Issuer. Proof of execution

43

2257

of any such instrument or of a writing appointing any such agent, or the holding by any Person of a Note, shall be sufficient for any purpose of this Indenture and (subject to Section 7.01) conclusive in favor of the Trustee and the Issuer, if made in the manner provided in this Section 1.07.

(b)     The fact and date of the execution by any Person of any such instrument or writing may be proved by the affidavit of a witness of such execution or by the certificate of any notary public or other officer authorized by law to take acknowledgments of deeds, certifying that the individual signing such instrument or writing acknowledged to him the execution thereof. Where such execution is by or on behalf of any legal entity other than an individual, such certificate or affidavit shall also constitute proof of the authority of the Person executing the same. The fact and date of the execution of any such instrument or writing, or the authority of the Person executing the same, may also be proved in any other manner that the Trustee deems sufficient.

(c)     The ownership of Notes shall be proved by the Note Register, and a Person registered as the Holder of a Note in the Note Register shall be treated as the owner of such Note for all purposes, absent manifest error.

(d)     Any request, demand, authorization, direction, notice, consent, waiver or other action by the Holder of any Note shall bind every future Holder of the same Note and the Holder of every Note issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof, in respect of any action taken, suffered or omitted by the Trustee or the Issuer in reliance thereon, whether or not notation of such action is made upon such Note.

(e)     The Issuer may set a record date for purposes of determining the identity of Holders entitled to give any request, demand, authorization, direction, notice, consent, waiver or take any other act, or to vote or consent to any action by vote or consent authorized or permitted to be given or taken by Holders. Unless otherwise specified, if not set by the Issuer prior to the first solicitation of a Holder made by any Person in respect of any such action, or in the case of any such vote, prior to such vote, any such record date shall be the later of 30 days prior to the first solicitation of such consent or the date of the most recent list of Holders furnished to the Trustee prior to such solicitation.

(f)     Without limiting the foregoing, a Holder entitled to take any action hereunder with regard to any particular Note may do so with regard to all or any part of the principal amount of such Note or by one or more duly appointed agents, each of which may do so pursuant to such appointment with regard to all or any part of such principal amount. Any notice given or action taken by a Holder or its agents with regard to different parts of such principal amount pursuant to this Section 1.07(f) shall have the same effect as if given or taken by separate Holders of each such different part.

(g)     Without limiting the generality of the foregoing, a Holder, including DTC that is the Holder of a Global Note, may make, give or take, by a proxy or proxies duly appointed in writing, any request, demand, authorization, direction, notice, consent, waiver or other action provided in this Indenture to be made, given or taken by Holders, and DTC that is the Holder of a Global Note may provide its proxy or proxies to the beneficial owners of interests in any such Global Note through such depositary's standing instructions and customary practices.

44

2258

(h)      The Issuer may fix a record date for the purpose of determining the Persons who are beneficial owners of interests in any Global Note held by DTC entitled under the procedures of such depositary to make, give or take, by a proxy or proxies duly appointed in writing, any request, demand, authorization, direction, notice, consent, waiver or other action provided in this Indenture to be made, given or taken by Holders. If such a record date is fixed, the Holders on such record date or their duly appointed proxy or proxies, and only such Persons, shall be entitled to make, give or take such request, demand, authorization, direction, notice, consent, waiver or other action, whether or not such Holders remain Holders after such record date. No such request, demand, authorization, direction, notice, consent, waiver or other action shall be valid or effective if made, given or taken more than 90 days after such record date.

## ARTICLE 2

## THE NOTES

SECTION 2.01   FORM AND DATING; TERMS.

(a)      General. The Notes and the Trustee's certificate of authentication shall be substantially in the form of Exhibit A. The Notes may have notations, legends or endorsements required by law, stock exchange rules or usage. Each Note shall be dated the date of its authentication. The Notes shall be in minimum denominations of $1.00 and integral multiples of $1.00 in excess thereof.

(b)      Global Notes. Notes issued in global form shall be substantially in the form of Exhibit A (including the Global Note Legend thereon and the "Schedule of Exchanges of Interests in the Global Note" attached thereto). Notes issued in definitive form shall be substantially in the form of Exhibit A (but without the Global Note Legend thereon and without the "Schedule of Exchanges of Interests in the Global Note" attached thereto). Each Global Note shall represent such of the outstanding Notes as shall be specified in the "Schedule of Exchanges of Interests in the Global Note" attached thereto and each shall provide that it shall represent the aggregate principal amount of Notes from time to time endorsed thereon and that the aggregate principal amount of outstanding Notes represented thereby may from time to time be reduced or increased, as applicable, to reflect exchanges, repurchases and redemptions. Any endorsement of a Global Note to reflect the amount of any increase or decrease in the aggregate principal amount of outstanding Notes represented thereby shall be made by the Trustee or the Custodian, at the direction of the Trustee, in accordance with instructions given by the Holder thereof as required by Section 2.06.

(c)      Regulation S Global Notes and 144A Global Notes. Notes offered and sold in reliance on (i) Regulation S shall be issued initially in the form of a Regulation S Global Note and (ii) Rule 144A shall be issued initially in the form of a 144A Global Note; each such Global note shall be deposited on behalf of the holders of the Notes represented thereby with the Trustee, as custodian for the Depositary, and registered in the name of the Depositary or the nominee of the Depositary, duly executed by the Issuer and authenticated by the Trustee as hereinafter provided.

The aggregate principal amount of a Regulation S Global Note or a 144A Global Note may from time to time be increased or decreased by adjustments made on the records of the Trustee

45

2259

and the Depositary or its nominee, as the case may be, in connection with transfers of interest as hereinafter provided.

(d)      Terms. The aggregate principal amount of Notes that may be authenticated and delivered under this Indenture is unlimited.

The terms and provisions contained in the Notes shall constitute, and are hereby expressly made, a part of this Indenture and the Note Parties and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby. However, to the extent any provision of any Note conflicts with the express provisions of this Indenture, the provisions of this Indenture shall govern and be controlling.

The Notes shall be subject to repurchase by the Issuer pursuant to a Prepayment Offer as provided in Section 3.09 or a Change of Control Offer as provided in Section 4.14. The Notes shall not be redeemable, other than as provided in Article 3 or Section 4.14(d).

Subject to compliance with Section 4.09 and Section 4.12, the Issuer may issue Additional Notes from time to time after the Issue Date under this Indenture without notice to or consent of the Holders. The Initial Notes and any Additional Notes shall be treated as a single class for all purposes under this Indenture, including waivers, amendments, redemptions and offers to purchase, and shall have the same terms as to status, redemption and otherwise as the Initial Notes (other than the issue date, issue price, the amount of interest payable on the first interest payment date and first interest payment date, as the case may be). Any Additional Notes shall be issued with the benefit of an indenture supplemental to this Indenture.

SECTION 2.02   EXECUTION AND AUTHENTICATION.

At least one Officer shall execute the Notes on behalf of the Issuer by manual, facsimile or electronic transmission signature.

If an Officer whose signature is on a Note no longer holds that office at the time a Note is authenticated, the Note shall nevertheless be valid.

A Note shall not be entitled to any benefit under this Indenture or be valid or obligatory for any purpose until authenticated substantially in the form of Exhibit A by the manual signature of the Trustee. The signature shall be conclusive evidence that the Note has been duly authenticated and delivered under this Indenture.

On the Issue Date, the Trustee shall, upon receipt of an Issuer Order (an "Authentication Order"), authenticate and deliver the Initial Notes in an amount equal to the Issue Date Amount. On the Exchange Date, the Trustee shall, upon receipt of an Authentication Order, authenticate and deliver the Initial Notes in an amount equal to the Exchange Date Amount. The Initial Notes issued on the Exchange Date may be represented by the same or different CUSIP, ISIN or other similar numbers as the Initial Notes issued on the Issue Date. In addition, at any time, from time to time, the Trustee shall upon receipt of an Authentication Order authenticate and deliver any Additional Notes for an aggregate principal amount specified in such Authentication Order for such Additional Notes issued hereunder.   Notwithstanding anything in this Indenture to the

46

contrary, the Issuer shall not be required to deliver an Officer's Certificate or Opinion of Counsel in connection with the  authentication of the Initial Notes.

The Trustee may appoint an authenticating agent acceptable to the Issuer to authenticate Notes. An authenticating agent may authenticate Notes whenever the Trustee may do so. Each reference in this Indenture to authentication by the Trustee includes authentication by such agent. An authenticating agent has the same rights as an Agent to deal with Holders or an Affiliate of the Issuer.

SECTION 2.03   REGISTRAR AND PAYING AGENT.

The Issuer shall maintain an office or agency where Notes may be presented for registration of transfer or for exchange ("Registrar") and an office or agency where Notes may be presented for payment ("Paying Agent"). The Registrar shall keep a register of the Notes ("Note Register") and of their transfer and exchange. The Issuer may appoint one or more co-registrars and one or more additional paying agents. The term "Registrar" includes any co-registrar and the term "Paying Agent" includes any additional paying agent. The Issuer may change any Paying Agent or Registrar without notice to any Holder. The Issuer shall notify the Trustee in writing of the name and address of any Agent not a party to this Indenture. If the Issuer fails to appoint or maintain another entity as Registrar or Paying Agent, the Trustee shall act as such. The Issuer or any of its Affiliates may act as Paying Agent or Registrar.

The Issuer initially appoints DTC to act as Depositary with respect to the Global Notes.

The Issuer initially appoints the Trustee to act as the Paying Agent and Registrar for the Notes and to act as Custodian with respect to the Global Notes.

SECTION 2.04   PAYING AGENT TO HOLD MONEY IN TRUST.

The Issuer shall require each Paying Agent other than the Trustee to agree in writing that the Paying Agent shall hold in trust for the benefit of Holders or the Trustee all money held by the Paying Agent for the payment of principal, premium, if any, or interest on the Notes, and will notify the Trustee of any default by the Issuer in making any such payment. While any such default continues, the Trustee may require a Paying Agent to pay all money held by it to the Trustee. The Issuer at any time may require a Paying Agent to pay all money held by it to the Trustee. Upon payment over to the Trustee, the Paying Agent (if other than the Issuer or a Subsidiary) shall have no further liability for the money. If the Issuer or a Subsidiary acts as Paying Agent, it shall segregate and hold in a separate trust fund for the benefit of the Holders all money held by it as Paying Agent. Upon any bankruptcy or reorganization proceedings relating to the Issuer, the Trustee shall serve as Paying Agent for the Notes.

SECTION 2.05   HOLDER LISTS.

The Trustee shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of all Holders. If the Trustee is not the Registrar, the Issuer shall furnish to the Trustee at least two Business Days before each Interest Payment Date

47

DG-142

and at such other times as the Trustee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of the Holders.

SECTION 2.06    TRANSFER AND EXCHANGE.

(a)    Transfer and Exchange of Global Notes. Except as otherwise set forth in this Section 2.06, a Global Note may be transferred, in whole and not in part, only to another nominee of the Depositary or to a successor Depositary or a nominee of such successor Depositary. A beneficial interest in a Global Note may not be exchanged for a Definitive Note unless (i) the Depositary (x) notifies the Issuer that it is unwilling or unable to continue as Depositary for such Global Note or (y) has ceased to be a clearing agency registered under the Exchange Act and, in either case, a successor Depositary is not appointed by the Issuer within 120 days or (ii) there shall have occurred and be continuing an Event of Default with respect to the Notes. Upon the occurrence of any of the preceding events in (i) or (ii) above, Definitive Notes delivered in exchange for any Global Note or beneficial interests therein will be registered in the names, and issued in any approved denominations, requested by or on behalf of the Depositary (in accordance with its customary procedures). Global Notes also may be exchanged or replaced, in whole or in part, as provided in Sections 2.07 and 2.10. Every Note authenticated and delivered in exchange for, or in lieu of, a Global Note or any portion thereof, pursuant to this Section 2.06 or Section 2.07 or 2.10, shall be authenticated and delivered in the form of, and shall be, a Global Note, except for Definitive Notes issued subsequent to any of the preceding events in (i) or (ii) above and pursuant to Section 2.06(b)(ii)(B) and Section 2.06(c). A Global Note may not be exchanged for another Note other than as provided in this Section 2.06(a); provided, however, beneficial interests in a Global Note may be transferred and exchanged as provided in Section 2.06 (b), (c) or (f).

(b)    Transfer and Exchange of Beneficial Interests in the Global Notes. The transfer and exchange of beneficial interests in the Global Notes shall be effected through the Depositary, in accordance with the provisions of this Indenture and the Applicable Procedures. Beneficial interests in the Restricted Global Notes shall be subject to restrictions on transfer comparable to those set forth herein to the extent required by the Securities Act. Transfers of beneficial interests in the Global Notes also shall require compliance with either subparagraph (i) or (ii) below, as applicable, as well as one or more of the other following subparagraphs, as applicable:

(i)    Transfer of Beneficial Interests in the Same Global Note. Beneficial interests in any Restricted Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in the same Restricted Global Note in accordance with the transfer restrictions set forth in the Private Placement Legend; provided, however, that prior to the expiration of the applicable Restricted Period, transfers of beneficial interests in a Regulation S Global Note may not be made to a U.S. Person or for the account or benefit of a U.S. Person (other than an initial purchaser). Beneficial interests in any Unrestricted Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note. No written orders or instructions shall be required to be delivered to the Registrar to effect the transfers described in this Section 2.06(b)(i).

48

DG-143

(ii)    <u>All Other Transfers and Exchanges of Beneficial Interests in Global Notes</u>. In connection with all transfers and exchanges of beneficial interests that are not subject to <u>Section 2.06(b)(i)</u>, the transferor of such beneficial interest must deliver to the Registrar either (A) (1) a written order from a Participant or an Indirect Participant given to the Depositary in accordance with the Applicable Procedures directing the Depositary to credit or cause to be credited a beneficial interest in another Global Note in an amount equal to the beneficial interest to be transferred or exchanged and (2) instructions given in accordance with the Applicable Procedures containing information regarding the Participant account to be credited with such increase or (B) (1) a written order from a Participant or an Indirect Participant given to the Depositary in accordance with the Applicable Procedures directing the Depositary to cause to be issued a Definitive Note in an amount equal to the beneficial interest to be transferred or exchanged and (2) instructions given by the Depositary to the Registrar containing information regarding the Person in whose name such Definitive Note shall be registered to effect the transfer or exchange referred to in (1) above; <u>provided</u> that in no event shall Definitive Notes be issued upon the transfer or exchange of beneficial interests in a Regulation S Global Note prior to the expiration of the applicable Restricted Period. Upon satisfaction of all of the requirements for transfer or exchange of beneficial interests in Global Notes contained in this Indenture and the Notes or otherwise applicable under the Securities Act, the Trustee shall adjust the principal amount of the relevant Global Note(s) pursuant to <u>Section 2.06(h)</u>.

(iii)    <u>Transfer of Beneficial Interests to Another Restricted Global Note</u>. A beneficial interest in any Restricted Global Note may be transferred to a Person who takes delivery thereof in the form of a beneficial interest in another Restricted Global Note if the transfer complies with the requirements of <u>Section 2.06(b)(ii)</u> and the Registrar receives the following:

(A)    if the transferee will take delivery in the form of a beneficial interest in a 144A Global Note, then the transferor must deliver a certificate in the form of <u>Exhibit B</u>, including the certifications in item (1) thereof; or

(B)    if the transferee will take delivery in the form of a beneficial interest in a Regulation S Global Note, then the transferor must deliver a certificate in the form of <u>Exhibit B</u>, including the certifications in item (2) thereof.

(iv)    <u>Transfer and Exchange of Beneficial Interests in a Restricted Global Note for Beneficial Interests in an Unrestricted Global Note</u>. A beneficial interest in any Restricted Global Note may be exchanged by any holder thereof for a beneficial interest in an Unrestricted Global Note or transferred to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note if the exchange or transfer complies with the requirements of <u>Section 2.06(b)(ii)</u> and:

(A)    such transfer is effected pursuant to an effective registration statement; or

(B)    the Registrar receives the following:

49

2263

DG-144

(1) if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a beneficial interest in an Unrestricted Global Note, a certificate from such Holder substantially in the form of Exhibit C, including the certifications in item (1)(a) thereof; or

(2) if the holder of such beneficial interest in a Restricted Global Note proposes to transfer such beneficial interest to a Person who shall take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note, a certificate from such holder in the form of Exhibit B, including the certifications in item (4) thereof;

and, in each such case set forth in this subparagraph (B), if the Registrar so requests or if the Applicable Procedures so require, an Opinion of Counsel in form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

If any such transfer is effected pursuant to this clause (iv) at a time when an Unrestricted Global Note has not yet been issued, the Issuer shall issue and, upon receipt of an Authentication Order in accordance with Section 2.02, the Trustee shall authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the aggregate principal amount of beneficial interests transferred pursuant to this clause (iv).

Beneficial interests in an Unrestricted Global Note cannot be exchanged for, or transferred to Persons who take delivery thereof in the form of, a beneficial interest in a Restricted Global Note.

(c) Transfer or Exchange of Beneficial Interests for Definitive Notes.

(i) Beneficial Interests in Restricted Global Notes to Restricted Definitive Notes. If any holder of a beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a Restricted Definitive Note or to transfer such beneficial interest to a Person who takes delivery thereof in the form of a Restricted Definitive Note, then, upon the occurrence of any of the events in paragraph (i) or (ii) of Section 2.06(a) and receipt by the Registrar of the following documentation:

(A) if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a Restricted Definitive Note, a certificate from such holder substantially in the form of Exhibit C, including the certifications in item (2)(a) thereof;

(B) if such beneficial interest is being transferred to a person the transferor reasonably believes to be a QIB in accordance with Rule 144A, a certificate substantially in the form of Exhibit B, including the certifications in item (1) thereof;

(C) if such beneficial interest is being transferred to a Non-U.S. Person in an offshore transaction in accordance with Rule 903 or Rule

50

2264

904, a certificate substantially in the form of <u>Exhibit B</u>, including the certifications in item (2) thereof;

    (D) if such beneficial interest is being transferred to the Issuer or any Subsidiary, a certificate substantially in the form of <u>Exhibit B</u>, including the certifications in item (3)(a) thereof; or

    (E) if such beneficial interest is being transferred pursuant to an effective registration statement under the Securities Act, a certificate substantially in the form of <u>Exhibit B</u>, including the certifications in item (3)(b) thereof,

the Trustee shall cause the aggregate principal amount of the applicable Global Note to be reduced accordingly pursuant to <u>Section 2.06(h)</u>, and the Issuer shall execute and the Trustee shall authenticate and mail to the Person designated in the instructions a Definitive Note in the applicable principal amount. Any Definitive Note issued in exchange for a beneficial interest in a Restricted Global Note pursuant to this <u>Section 2.06(c)</u> shall be registered in such name or names and in such authorized denomination or denominations as the holder of such beneficial interest shall instruct the Registrar through instructions from the Depositary and the Participant or Indirect Participant. The Trustee shall mail such Definitive Notes to the Persons in whose names such Notes are so registered. Any Definitive Note issued in exchange for a beneficial interest in a Restricted Global Note pursuant to this <u>Section 2.06(c)(i)</u> shall bear the Private Placement Legend and shall be subject to all restrictions on transfer contained therein.

    (ii) <u>Beneficial Interests in Regulation S Global Note to Definitive Notes</u>. Notwithstanding <u>Sections 2.06(c)(i)(A)</u> and <u>(C)</u>, a beneficial interest in a Regulation S Global Note may not be exchanged for a Definitive Note or transferred to a Person who takes delivery thereof in the form of a Definitive Note prior to the expiration of the applicable Restricted Period, except in the case of a transfer pursuant to an exemption from the registration requirements of the Securities Act other than Rule 903 or Rule 904.

    (iii) <u>Beneficial Interests in Restricted Global Notes to Unrestricted Definitive Notes</u>. A holder of a beneficial interest in a Restricted Global Note may exchange such beneficial interest for an Unrestricted Definitive Note or may transfer such beneficial interest to a Person who takes delivery thereof in the form of an Unrestricted Definitive Note only upon the occurrence of any of the events in <u>subsection (i)</u> or <u>(ii)</u> of <u>Section 2.06(a)</u> and if:

    (A) such transfer is effected pursuant to an effective registration statement; or

    (B) the Registrar receives the following:

    (1) if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for an Unrestricted Definitive Note, a certificate from such holder substantially in the form of <u>Exhibit C</u>, including the certifications in item (1)(b) thereof; or

51

2265

(2)      if the holder of such beneficial interest in a Restricted Global Note proposes to transfer such beneficial interest to a Person who shall take delivery thereof in the form of an Unrestricted Definitive Note, a certificate from such holder substantially in the form of Exhibit B, including the certifications in item (4) thereof;

and, in each such case set forth in this subparagraph (B), if the Registrar so requests or if the Applicable Procedures so require, an Opinion of Counsel in form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

(i)      Beneficial Interests in Unrestricted Global Notes to Unrestricted Definitive Notes. If any holder of a beneficial interest in an Unrestricted Global Note proposes to exchange such beneficial interest for a Definitive Note or to transfer such beneficial interest to a Person who takes delivery thereof in the form of a Definitive Note, then, upon the occurrence of any of the events in subsection (i) or (ii) of Section 2.06(a) and satisfaction of the conditions set forth in Section 2.06(b)(ii), the Trustee shall cause the aggregate principal amount of the applicable Global Note to be reduced accordingly pursuant to Section 2.06(h), and the Issuer shall execute and the Trustee shall, upon receipt of an Authentication Order, authenticate and mail to the Person designated in the instructions a Definitive Note in the applicable principal amount. Any Definitive Note issued in exchange for a beneficial interest pursuant to this Section 2.06(c)(iv) shall be registered in such name or names and in such authorized denomination or denominations as the holder of such beneficial interest shall instruct the Registrar through instructions from or through the Depositary and the Participant or Indirect Participant. The Trustee shall mail such Definitive Notes to the Persons in whose names such Notes are so registered. Any Definitive Note issued in exchange for a beneficial interest pursuant to this Section 2.06(c)(iv) shall not bear the Private Placement Legend.

(d)      Transfer and Exchange of Definitive Notes for Beneficial Interests.

(i)      Restricted Definitive Notes to Beneficial Interests in Restricted Global Notes. If any Holder of a Restricted Definitive Note proposes to exchange such Note for a beneficial interest in a Restricted Global Note or to transfer such Restricted Definitive Note to a Person who takes delivery thereof in the form of a beneficial interest in a Restricted Global Note, then, upon receipt by the Registrar of the following documentation:

(A)      if the Holder of such Restricted Definitive Note proposes to exchange such Note for a beneficial interest in a Restricted Global Note, a certificate from such Holder substantially in the form of Exhibit C, including the certifications in item (2)(b) thereof;

(B)      if such Restricted Definitive Note is being transferred to a person the transferor reasonably believes to be a QIB in accordance with Rule 144A, a certificate substantially in the form of Exhibit B, including the certifications in item (1) thereof;

52

2266

(C)    if such Restricted Definitive Note is being transferred to a Non-U.S. Person in an offshore transaction in accordance with Rule 903 or Rule 904, a certificate substantially in the form of <u>Exhibit B</u>, including the certifications in item (2) thereof;

(D)    if such Restricted Definitive Note is being transferred to the Issuer or any Subsidiary, a certificate substantially in the form of <u>Exhibit B</u>, including the certifications in item (3)(a) thereof; or

(E)    if such Restricted Definitive Note is being transferred pursuant to an effective registration statement under the Securities Act, a certificate substantially in the form of <u>Exhibit B</u>, including the certifications in item (3)(b) thereof,

the Trustee shall cancel the Restricted Definitive Note, increase or cause to be increased the aggregate principal amount of, in the case of clause (A) above, the applicable Restricted Global Note, in the case of clause (B) above, the applicable 144A Global Note, and in the case of clause (C) above, the applicable Regulation S Global Note.

(ii)    <u>Restricted Definitive Notes to Beneficial Interests in Unrestricted Global Notes</u>. A Holder of a Restricted Definitive Note may exchange such Note for a beneficial interest in an Unrestricted Global Note or transfer such Restricted Definitive Note to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note only if:

(A)    such transfer is effected pursuant to an effective registration statement; or

(B)    the Registrar receives the following:

(1)    if the Holder of such Definitive Notes proposes to exchange such Notes for a beneficial interest in the Unrestricted Global Note, a certificate from such Holder substantially in the form of <u>Exhibit C</u>, including the certifications in item (1)(c) thereof; or

(2)    if the Holder of such Definitive Notes proposes to transfer such Notes to a Person who shall take delivery thereof in the form of a beneficial interest in the Unrestricted Global Note, a certificate from such Holder substantially in the form of <u>Exhibit B</u>, including the certifications in item (4) thereof;

and, in each such case set forth in this subparagraph (B), if the Registrar so requests or if the Applicable Procedures so require, an Opinion of Counsel in form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

Upon satisfaction of the conditions of any of the subparagraphs in this <u>Section 2.06(d)(ii)</u>, the Trustee shall cancel the Definitive Notes and increase or cause to be increased the aggregate principal amount of the Unrestricted Global Note.

53

2267

DG-148

(iii)    Unrestricted Definitive Notes to Beneficial Interests in Unrestricted Global Notes. A Holder of an Unrestricted Definitive Note may exchange such Note for a beneficial interest in an Unrestricted Global Note or transfer such Definitive Notes to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note at any time. Upon receipt of a request for such an exchange or transfer, the Trustee shall cancel the applicable Unrestricted Definitive Note and increase or cause to be increased the aggregate principal amount of one of the Unrestricted Global Notes.

If any such exchange or transfer from a Definitive Note to a beneficial interest is effected pursuant to clause (ii) or (iii) above at a time when an Unrestricted Global Note has not yet been issued, the Issuer shall issue and, upon receipt of an Authentication Order in accordance with Section 2.02, the Trustee shall authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the principal amount of Definitive Notes so transferred.

(e)    Transfer and Exchange of Definitive Notes for Definitive Notes. Upon request by a Holder of Definitive Notes and such Holder's compliance with the provisions of this Section 2.06(e), the Registrar shall register the transfer or exchange of Definitive Notes. Prior to such registration of transfer or exchange, the requesting Holder shall present or surrender to the Registrar the Definitive Notes duly endorsed or accompanied by a written instruction of transfer in form satisfactory to the Registrar duly executed by such Holder or by its attorney, duly authorized in writing. In addition, the requesting Holder shall provide any additional certifications, documents and information, as applicable, required pursuant to the following provisions of this Section 2.06(e):

(i)    Restricted Definitive Notes to Restricted Definitive Notes. Any Restricted Definitive Note may be transferred to and registered in the name of Persons who take delivery thereof in the form of a Restricted Definitive Note if the Registrar receives the following:

(A)    if the transfer will be made to a person that the transferor reasonably believes to be a QIB in accordance with Rule 144A, then the transferor must deliver a certificate substantially in the form of Exhibit B, including the certifications in item (1) thereof;

(B)    if the transfer will be made pursuant to Rule 903 or Rule 904 then the transferor must deliver a certificate in the form of Exhibit B, including the certifications in item (2) thereof; or

(C)    if the transfer will be made pursuant to any other exemption from the registration requirements of the Securities Act (other than Rule 144), then the transferor must deliver a certificate in the form of Exhibit B, including the certifications required by item (3) thereof, if applicable.

(ii)    Restricted Definitive Notes to Unrestricted Definitive Notes. Any Restricted Definitive Note may be exchanged by the Holder thereof for an Unrestricted Definitive Note or transferred to a Person or Persons who take delivery thereof in the form of an Unrestricted Definitive Note if:

54

2268

DG-149

26-11268-mg   Doc 23-2   Filed 06/24/26   Entered 06/24/26 13:13:49   Exhibit B   Pg
156 of 551

(A)     such transfer is effected pursuant to an effective registration statement; or

(B)     the Registrar receives the following:

(1)     if the Holder of such Restricted Definitive Notes proposes to exchange such Notes for an Unrestricted Definitive Note, a certificate from such Holder substantially in the form of <u>Exhibit C</u>, including the certifications in item (1)(d) thereof; or

(2)     if the Holder of such Restricted Definitive Notes proposes to transfer such Notes to a Person who shall take delivery thereof in the form of an Unrestricted Definitive Note, a certificate from such Holder substantially in the form of <u>Exhibit B</u>, including the certifications in item (4) thereof;

and, in each such case set forth in this subparagraph (B), if the Registrar so requests, an Opinion of Counsel in form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

(iii)     <u>Unrestricted Definitive Notes to Unrestricted Definitive Notes</u>. A Holder of Unrestricted Definitive Notes may transfer such Notes to a Person who takes delivery thereof in the form of an Unrestricted Definitive Note. Upon receipt of a request to register such a transfer, the Registrar shall register the Unrestricted Definitive Notes pursuant to the instructions from the Holder thereof.

(f)     Notwithstanding anything to the contrary contained in this Indenture, a Holder may not transfer a Restricted Definitive Note or Restricted Global Note in reliance on Rule 144 (or any successor provision) under the Securities Act.

(g)     <u>Legends</u>. The following legends shall appear on the face of all Global Notes and Definitive Notes issued under this Indenture unless specifically stated otherwise in the applicable provisions of this Indenture:

(i)     <u>Private Placement Legend</u>.

(A)     Except as permitted by subparagraph (B) below, each Global Note and each Definitive Note (and all Notes issued in exchange therefor or substitution thereof) shall bear the legend in substantially the following form:

"THIS NOTE (OR ITS PREDECESSOR) HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, THIS NOTE MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS, EXCEPT AS SET FORTH IN THE NEXT SENTENCE. BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE HOLDER: (1) REPRESENTS THAT IT IS NOT AN "AFFILIATE" (AS DEFINED IN RULE 144 UNDER THE SECURITIES ACT) OF NFE FINANCING LLC ("NFE

55

2269

DG-150

FINANCING") AND (A) IT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) (A "QIB"), OR (B) IT IS NOT A U.S. PERSON AND HAS ACQUIRED THIS NOTE IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH REGULATION S UNDER THE SECURITIES ACT; (2) AGREES THAT IT WILL NOT RESELL OR OTHERWISE TRANSFER THIS NOTE OR ANY BENEFICIAL INTEREST HEREIN EXCEPT (A) TO NFE FINANCING OR ANY OF ITS SUBSIDIARIES, (B) TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QIB PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QIB IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, (C) TO NON-U.S. PERSONS IN AN OFFSHORE TRANSACTION MEETING THE REQUIREMENTS OF RULE 903 OR 904 OF REGULATION S OF THE SECURITIES ACT, (D) IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144 UNDER THE SECURITIES ACT, (E) IN ACCORDANCE WITH ANOTHER EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT (AND BASED UPON AN OPINION OF COUNSEL REASONABLY ACCEPTABLE TO NFE FINANCING AND THE TRUSTEE) OR (F) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT AND, IN EACH CASE, IN ACCORDANCE WITH THE APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER APPLICABLE JURISDICTION; (3) AGREES THAT IT WILL DELIVER TO EACH PERSON TO WHOM THIS NOTE OR AN INTEREST HEREIN IS TRANSFERRED A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND; AND (4) AGREES THAT ANY SECURITY THAT IS OWNED BY AN AFFILIATE (AS DEFINED IN RULE 144 UNDER THE SECURITIES ACT) OF NFE FINANCING MAY NOT BE RESOLD OR TRANSFERRED BY SUCH AFFILIATE OTHER THAN TO NFE FINANCING OR A SUBSIDIARY THEREOF OR PURSUANT TO (A) A REGISTRATION STATEMENT UNDER THE SECURITIES ACT, (B) IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144 UNDER THE SECURITIES ACT OR (C) ANOTHER EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT (IF AVAILABLE) IN A TRANSACTION THAT RESULTS IN SUCH SECURITY NO LONGER BEING A RESTRICTED SECURITY (AS DEFINED UNDER RULE 144). IN THE EVENT ANY SUCH PERSONS BENEFICIALLY OWN AN INTEREST IN THE SECURITY PRIOR TO THE TIME NFE FINANCING REMOVES THE RESTRICTIVE LEGEND ON THE SECURITY, NFE FINANCING MAY REQUIRE THAT SUCH PERSONS HOLD THEIR INTERESTS IN THE SECURITY IN CERTIFICATED FORM BEARING AN APPROPRIATE RESTRICTIVE LEGEND AND A RESTRICTED CUSIP NUMBER. AS USED HEREIN, THE TERMS "OFFSHORE TRANSACTIONS" AND "UNITED STATES" HAVE THE MEANINGS GIVEN TO THEM BY RULE 902 OF REGULATION S UNDER THE SECURITIES ACT. THE INDENTURE CONTAINS A PROVISION REQUIRING THE TRUSTEE TO REFUSE TO REGISTER ANY TRANSFER OF THIS NOTE IN VIOLATION OF THE FOREGOING".

> (B)    Notwithstanding the foregoing, any Global Note or Definitive Note issued pursuant to subparagraph (b)(iv), (c)(iii), (c)(iv), (d)(ii), (d)(iii), (e)(ii), or (e)(iii) of this Section 2.06 (and all Notes issued in exchange therefor or substitution thereof) shall not bear the Private Placement Legend.

> (ii)    Global Note Legend. Each Global Note shall bear a legend in substantially the following form:

<div align="center">56</div>

<div align="center">2270</div>

<div align="right">DG-151</div>

"THIS GLOBAL NOTE IS HELD BY THE DEPOSITARY (AS DEFINED IN THE INDENTURE GOVERNING THIS NOTE) OR ITS NOMINEE IN CUSTODY FOR THE BENEFIT OF THE BENEFICIAL OWNERS HEREOF, AND IS NOT TRANSFERABLE TO ANY PERSON UNDER ANY CIRCUMSTANCES EXCEPT THAT (I) THE TRUSTEE MAY MAKE SUCH NOTATIONS HEREON AS MAY BE REQUIRED PURSUANT TO SECTION 2.06(h) OF THE INDENTURE, (II) THIS GLOBAL NOTE MAY BE EXCHANGED IN WHOLE BUT NOT IN PART PURSUANT TO SECTION 2.06(a) OF THE INDENTURE, (III) THIS GLOBAL NOTE MAY BE DELIVERED TO THE TRUSTEE FOR CANCELLATION PURSUANT TO SECTION 2.11 OF THE INDENTURE AND (IV) THIS GLOBAL NOTE MAY BE TRANSFERRED TO A SUCCESSOR DEPOSITARY WITH THE PRIOR WRITTEN CONSENT OF THE ISSUER. UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR NOTES IN DEFINITIVE FORM, THIS NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY. UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY (55 WATER STREET, NEW YORK, NEW YORK) ("DTC") TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN".

(iii)    Regulation S Global Note Legend. The Regulation S Global Note shall bear a legend in substantially the following form:

"BY ITS ACQUISITION HEREOF, THE HOLDER HEREOF REPRESENTS THAT IT IS NOT A U.S. PERSON, NOR IS IT PURCHASING FOR THE ACCOUNT OF A U.S. PERSON, AND IS ACQUIRING THIS SECURITY IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH REGULATION S UNDER THE SECURITIES ACT".

(h)    Cancellation and/or Adjustment of Global Notes. At such time as all beneficial interests in a particular Global Note have been exchanged for Definitive Notes or a particular Global Note has been redeemed, repurchased or canceled in whole and not in part, each such Global Note shall be returned to or retained and canceled by the Trustee in accordance with Section 2.11. At any time prior to such cancellation, if any beneficial interest in a Global Note is exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note or for Definitive Notes, the principal amount of Notes represented by such Global Note shall be reduced accordingly and an endorsement shall be made on such Global Note by the Trustee or by the Depositary at the direction of the Trustee to reflect such reduction; and if the beneficial interest is being exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note, such other Global

57

2271

Note shall be increased accordingly and an endorsement shall be made on such Global Note by the Trustee or by the Depositary at the direction of the Trustee to reflect such increase.

(i) <u>General Provisions Relating to Transfers and Exchanges</u>.

(i) To permit registrations of transfers and exchanges, the Issuer shall execute and the Trustee shall authenticate Global Notes and Definitive Notes upon receipt of an Authentication Order in accordance with <u>Section 2.02</u> or at the Registrar's request.

(ii) No service charge shall be made to a holder of a beneficial interest in a Global Note or to a Holder of a Definitive Note for any registration of transfer or exchange, but the Issuer may require payment of a sum sufficient to cover any transfer tax, fees required by law or similar governmental charge payable in connection therewith (other than any such transfer taxes, fees required by law or similar governmental charge payable upon exchange or transfer pursuant to <u>Sections 2.07</u>, <u>2.10</u>, <u>3.06</u>, <u>3.09</u>, <u>4.10</u>, <u>4.14</u> and <u>9.05</u>).

(iii) Neither the Registrar nor the Issuer shall be required to register the transfer of or exchange any Note selected for redemption in whole or in part, except the unredeemed portion of any Note being redeemed in part.

(iv) All Global Notes and Definitive Notes issued upon any registration of transfer or exchange of Global Notes or Definitive Notes shall be the valid obligations of the Issuer, evidencing the same debt, and entitled to the same benefits under this Indenture, as the Global Notes or Definitive Notes surrendered upon such registration of transfer or exchange.

(v) The Issuer and Registrar shall not be required (A) to issue, to register the transfer of or to exchange any Notes during a period beginning at the opening of business 15 days before the delivery of a notice of redemption of Notes to be redeemed and ending at the close of business on the day of selection of Notes to be redeemed, (B) to register the transfer of or to exchange any Note so selected for redemption or tendered (and not withdrawn) for repurchase in connection with a Change of Control Offer, an Alternate Offer, a Prepayment Offer or other tender offer, in whole or in part, except the unredeemed portion of any Note being redeemed in part or (C) to register the transfer of or to exchange a Note between a Record Date and the next succeeding Interest Payment Date.

(vi) Prior to due presentment for the registration of a transfer of any Note, the Trustee, any Agent and the Issuer shall deem and treat the Person in whose name any Note is registered as the absolute owner of such Note for the purpose of receiving payment of principal of (and premium, if any) and interest on such Notes and for all other purposes, and none of the Trustee, any Agent or the Issuer shall be affected by notice to the contrary.

(vii) Upon surrender for registration of transfer of any Note at the office or agency of the Issuer designated pursuant to <u>Section 4.02</u>, the Issuer shall execute, and the Trustee shall authenticate and mail, in the name of the designated transferee or

58

2272

transferees, one or more replacement Notes of any authorized denomination or denominations of a like aggregate principal amount.

(viii)   At the option of the Holder, Notes may be exchanged for other Notes of any authorized denomination or denominations of a like aggregate principal amount upon surrender of the Notes to be exchanged at such office or agency. Whenever any Global Notes or Definitive Notes are so surrendered for exchange, the Issuer shall execute, and the Trustee shall authenticate and mail, the replacement Global Notes and Definitive Notes which the Holder making the exchange is entitled to in accordance with the provisions of Section 2.02.

(ix)   All certifications, certificates and Opinions of Counsel required to be submitted to the Registrar pursuant to this Section 2.06 to effect a registration of transfer or exchange may be submitted by facsimile.

(x)   None of the Issuer, the Guarantor, the Trustee or the Agents shall have any responsibility or obligation to any beneficial owner in a Global Note, a Participant, an Indirect Participant or other Person with respect to the accuracy of the records of the Depositary or its nominee or of any Participant, with respect to any ownership interest in the Notes or with respect to the delivery to any Participant, Indirect Participant, beneficial owner or other Person (other than the Depositary) of any notice (including any notice of redemption) or the payment of any amount, under or with respect to such Notes. All notices and communications to be given to the Holders and all payments to be made to Holders under the Notes and this Indenture shall be given or made only to or upon the order of the registered holders (which shall be the Depositary or its nominee in the case of the Global Note). The rights of beneficial owners in the Global Note shall be exercised only through the Depositary subject to the applicable rules and procedures of the Depositary. The Note Parties, the Trustee and the Agents shall be entitled to rely and shall be fully protected in relying upon information furnished by the Depositary with respect to its members, participants and any beneficial owners. The Note Parties, the Trustee and the Agents shall be entitled to deal with the Depositary, and any nominee thereof, that is the registered holder of any Global Note for all purposes of this Indenture relating to such Global Note (including the payment of principal, premium, if any, and interest and additional amounts, if any, and the giving of instructions or directions by or to the owner or holder of a beneficial ownership interest in such Global Note) as the sole holder of such Global Note and shall have no obligations to the beneficial owners thereof. None of the Issuer, the Guarantor, the Trustee or the Agents shall have any responsibility or liability for any acts or omissions of the Depositary with respect to such Global Note, for the records of any such depositary, including records in respect of beneficial ownership interests in respect of any such Global Note, for any transactions between the Depositary and any Participant or between or among the Depositary, any such Participant and/or any holder or owner of a beneficial interest in such Global Note, or for any transfers of beneficial interests in any such Global Note.

(xi)   Notwithstanding the foregoing, with respect to any Global Note, nothing herein shall prevent any Note Party, the Trustee, or any agent of any Note Party or the Trustee from giving effect to any written certification, proxy or other authorization

59

2273

DG-154

furnished by any Depositary (or its nominee), as a Holder, with respect to such Global Note or shall impair, as between such Depositary and owners of beneficial interests in such Global Note, the operation of customary practices governing the exercise of the rights of such Depositary (or its nominee) as Holder of such Global Note.

SECTION 2.07   REPLACEMENT NOTES.

If any mutilated Note is surrendered to the Trustee, the Registrar or the Issuer and the Trustee receives evidence to its satisfaction of the ownership and destruction, loss or theft of any Note, the Issuer shall issue and the Trustee, upon receipt of an Authentication Order, shall authenticate a replacement Note if the Trustee's requirements are met. If required by the Trustee or the Issuer, an indemnity bond must be supplied by the Holder that is sufficient in the judgment of the Trustee and the Issuer to protect the Note Parties, the Trustee, any Agent and any authenticating agent from any loss that any of them may suffer if a Note is replaced. The Issuer may charge for its expenses in replacing a Note.

Every replacement Note is a contractual obligation of the Issuer and shall be entitled to all of the benefits of this Indenture equally and proportionately with all other Notes duly issued hereunder.

SECTION 2.08   OUTSTANDING NOTES.

The Notes outstanding at any time are all the Notes authenticated by the Trustee except for those canceled by it, those delivered to it for cancellation, those reductions in the interest in a Global Note effected by the Trustee in accordance with the provisions hereof, and those described in this Section 2.08 as not outstanding. Except as set forth in Section 2.09, a Note does not cease to be outstanding because the Issuer or an Affiliate of the Issuer holds the Note.

If a Note is replaced pursuant to Section 2.07, it ceases to be outstanding unless the Trustee receives proof satisfactory to it that the replaced Note is held by a bona fide purchaser.

If the principal amount of any Note is considered paid under Section 4.01, it ceases to be outstanding and interest on it ceases to accrue.

If the Paying Agent (other than the Issuer, a Subsidiary or an Affiliate of any thereof) holds, on a Redemption Date or maturity date, money sufficient to pay Notes payable on that date, then on and after that date such Notes shall be deemed to be no longer outstanding and shall cease to accrue interest.

SECTION 2.09   TREASURY NOTES.

In determining whether the Holders of the required principal amount of Notes have concurred in any direction, waiver or consent, Notes owned by the Issuer, or by any Affiliate of the Issuer, shall be considered as though not outstanding, except that for the purposes of determining whether the Trustee shall be protected in relying on any such direction, waiver or consent, only Notes that a Responsible Officer of the Trustee knows are so owned shall be so disregarded. Notes so owned which have been pledged in good faith shall not be disregarded if the pledgee establishes to the satisfaction of the Trustee the pledgee's right to deliver any such

60

direction, waiver or consent with respect to the Notes and that the pledgee is not the Issuer or any obligor upon the Notes or any Affiliate of the Issuer or of such other obligor.

SECTION 2.10   <u>TEMPORARY NOTES</u>.

Until certificates representing Notes are ready for delivery, the Issuer may prepare and the Trustee, upon receipt of an Authentication Order, shall authenticate temporary Notes. Temporary Notes shall be substantially in the form of certificated Notes but may have variations that the Issuer considers appropriate for temporary Notes and as shall be reasonably acceptable to the Trustee. Without unreasonable delay, the Issuer shall prepare and the Trustee shall authenticate Definitive Notes in exchange for temporary Notes.

Holders and beneficial holders, as the case may be, of temporary Notes shall be entitled to all of the benefits accorded to Holders, or beneficial holders, respectively, of Notes under this Indenture.

SECTION 2.11   <u>CANCELLATION</u>.

The Issuer at any time may deliver Notes to the Trustee for cancellation. The Registrar and Paying Agent shall forward to the Trustee any Notes surrendered to them for registration of transfer, exchange or payment. The Trustee or, at the direction of the Trustee, the Registrar or the Paying Agent and no one else shall cancel all Notes surrendered for registration of transfer, exchange, payment, replacement or cancellation and shall dispose of cancelled Notes (subject to the record retention requirement of the Exchange Act). Certification of the disposal of all cancelled Notes shall be delivered to the Issuer upon their written request. The Issuer may not issue new Notes to replace Notes that have been paid or that have been delivered to the Trustee for cancellation.  If the Issuer or any Guarantor acquires any of the Notes, such Notes shall be surrendered to the Trustee for cancellation pursuant to this <u>Section 2.11</u>.

SECTION 2.12   <u>DEFAULTED INTEREST</u>.

If the Issuer defaults in a payment of interest on the Notes, it shall pay the defaulted interest in any lawful manner plus, to the extent lawful, interest payable on the defaulted interest to the Persons who are Holders on a subsequent special record date, in each case at the rate provided in the Notes and in <u>Section 4.01</u>. The Issuer shall notify the Trustee in writing of the amount of defaulted interest proposed to be paid on each Note and the date of the proposed payment, and at the same time the Issuer shall deposit with the Trustee an amount of money equal to the aggregate amount proposed to be paid in respect of such defaulted interest or shall make arrangements satisfactory to the Trustee for such deposit prior to the date of the proposed payment, such money when deposited to be held in trust for the benefit of the Persons entitled to such defaulted interest as provided in this <u>Section 2.12</u>. The Trustee shall fix or cause to be fixed each such special record date and payment date; <u>provided</u> that no such special record date shall be less than 10 days prior to the related payment date for such defaulted interest. The Trustee shall promptly notify the Issuer of such special record date. At least 10 days before the special record date, the Issuer (or, upon the written request of the Issuer, the Trustee in the name and at the expense of the Issuer) shall send or cause to be sent to each Holder a notice at his or her address as it appears in the Note Register

61

2275

that states the special record date, the related payment date and the amount of such interest to be paid.

Subject to the foregoing provisions of this Section 2.12 and for greater certainty, each Note delivered under this Indenture upon registration of transfer of or in exchange for or in lieu of any other Note shall carry the rights to interest accrued and unpaid, and to accrue, which were carried by such other Note.

SECTION 2.13   CUSIP NUMBERS.

The Issuer in issuing the Notes may use CUSIP, ISIN or other similar numbers (if then generally in use) and, if so, the Trustee shall use CUSIP, ISIN or other similar numbers in notices of redemption as a convenience to Holders; provided that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Notes or as contained in any notice of redemption and that reliance may be placed only on the other identification numbers printed on the Notes, and any such notice shall not be affected by any defect in or omission of such numbers. The Issuer will as promptly as practicable notify the Trustee of any change in the CUSIP, ISIN or other similar numbers.

## ARTICLE 3

## REDEMPTION

SECTION 3.01   NOTICES TO TRUSTEE.

If the Issuer elects to redeem Notes pursuant to Section 3.07, it shall furnish to the Trustee, at least two Business Days (or such shorter time period as the Trustee may agree) before notice of redemption is required to be sent or caused to be sent to Holders pursuant to Section 3.03, an Officer's Certificate setting forth (i) the paragraph or subparagraph of such Note and/or Section of this Indenture pursuant to which the redemption shall occur, (ii) the Redemption Date, (iii) the principal amount of the Notes to be redeemed (or, if the Notes are to be redeemed in whole, that the Notes are to be redeemed in whole) and (iv) the redemption price or, if not then ascertainable, the manner of calculation thereof; provided that notwithstanding anything herein to the contrary, no Opinion of Counsel shall be required in connection with such redemption or the delivery of such notice of redemption in accordance with Section 3.03.

SECTION 3.02   SELECTION OF NOTES TO BE REDEEMED OR PURCHASED.

With respect to any partial redemption or purchase of Notes made pursuant to this Indenture, selection of the Notes for redemption or purchase will be made by the Trustee on a pro rata basis to the extent applicable or by lot or by such method as the Trustee shall deem fair and appropriate; provided that if the Notes are represented by Global Notes, interests in the Notes shall be selected for redemption or purchase by DTC in accordance with its standard procedures therefor; provided, further, that no Notes of less than $1.00 can be redeemed or repurchased in part. Such Notes to be redeemed or purchased shall be selected, unless otherwise provided herein, at least 10 days but, except in connection with Section 3.03(c), Article 8 and Article 11, not more

62

2276

DG-157

than 60 days prior to the Redemption Date from the outstanding Notes not previously called for redemption or purchase.

The Trustee shall promptly notify the Issuer in writing of the Notes selected for redemption or purchase and, in the case of any Note selected for partial redemption or purchase, the principal amount thereof to be redeemed or purchased. Notes and portions of Notes selected shall be in amounts of $1.00 or whole multiples of $1.00 in excess thereof; no Notes of $1.00 or less can be redeemed or repurchased in part, except that if all of the Notes of a Holder are to be redeemed or purchased, the entire outstanding amount of Notes held by such Holder, even if not a multiple of $1.00, shall be redeemed or purchased. Except as provided in the preceding sentence, provisions of this Indenture that apply to Notes called for redemption or purchase also apply to portions of Notes called for redemption or purchase.

SECTION 3.03   NOTICE OF REDEMPTION.

(a)      Subject to Section 3.09, the Issuer shall deliver or cause to be delivered electronically, in accordance with DTC procedures in the case of Global Notes, mail or cause to be mailed by first-class mail, postage prepaid, notices of redemption at least 10 days but except as set forth in Section 3.03(c), Article 8 and Article 11, not more than 60 days before the purchase date or Redemption Date to each Holder at such Holder's registered address or otherwise in accordance with the procedures of DTC, except that redemption notices may be delivered or mailed more than 60 days prior to a Redemption Date if the notice is issued in connection with Article 8, Article 11 or as specified in Section 3.03(c). Notices of redemption may be conditional.

(b)      The notice shall identify the Notes to be redeemed and shall state:

(i)       the Redemption Date;

(ii)      the redemption price or, if not then ascertainable, the manner of calculation thereof;

(iii)     if any Note is to be redeemed or purchased in part only, the portion of the principal amount of that Note that is to be redeemed or purchased and that, after the Redemption Date upon cancellation of the Note surrendered, a new Note or Notes in principal amount equal to the unredeemed or unpurchased portion of the surrendered Note will be issued in the name of the Holder thereof;

(iv)     the name and address of the Paying Agent;

(v)      that Notes called for redemption must be surrendered to the Paying Agent to collect the redemption price;

(vi)     that, unless the Issuer defaults in making such redemption payment, interest on Notes called for redemption ceases to accrue on and after the Redemption Date;

(vii)    the paragraph or subparagraph of the Notes and/or Section of this Indenture pursuant to which the Notes called for redemption are being redeemed;

63

2277

(viii)   that no representation is made as to the correctness or accuracy of the CUSIP number, if any, listed in such notice or printed on the Notes; and

(ix)   any conditions to such redemption.

At the Issuer's request, the Trustee shall give the notice of redemption in the Issuer's name and at its expense; provided that the Issuer shall have delivered to the Trustee, at least two Business Days before notice of redemption is required to be sent or caused to be sent to Holders pursuant to this Section 3.03 (or such shorter time period as the Trustee may agree), an Officer's Certificate requesting that the Trustee give such notice and setting forth the information to be stated in such notice as provided in the preceding paragraph.

(c)   Any redemption of, or offer to purchase, the Notes may, at the Issuer's discretion, be subject to the satisfaction of one or more conditions precedent, including, the completion or occurrence of an Equity Offering, other transaction (or series of related transactions) or an event that constitutes a Change of Control. If a redemption or purchase is subject to the satisfaction of one or more conditions precedent, notice of such redemption or purchase may be given in connection with the related Equity Offering, transaction or event, as the case may be, and prior to the completion or the occurrence thereof. Such notice shall describe each such condition and, if applicable, shall state that, in the Issuer's discretion, the Redemption Date or purchase date may be delayed until such time (including more than 60 days after the date the notice of redemption or offer to purchase was mailed or delivered, including by electronic transmission) as any or all such conditions shall be satisfied or waived, or such redemption or purchase may not occur and such notice may be rescinded in the event that any or all such conditions shall not have been satisfied or waived, or at any time in the Issuer's discretion if the Issuer reasonably believes that any or all of such conditions will not be satisfied or waived, in each case by the Redemption Date or purchase date or by the Redemption Date or purchase date as so delayed. In addition, the Issuer may provide in any notice of redemption or offer to purchase that payment of the redemption or purchase price and performance of the Issuer's obligations with respect to such redemption or offer to purchase may be performed by another Person. In no event shall the Trustee be responsible for monitoring, or charged with knowledge of, the maximum aggregate amount of the Notes eligible under this Indenture to be redeemed.

(d)   The Issuer may redeem Notes pursuant to one or more of the relevant provisions in this Indenture, and a single notice of redemption may be delivered with respect to redemptions made pursuant to different provisions. Any such notice may provide that redemptions made pursuant to different provisions will have different redemption dates and, with respect to redemptions that occur on the same date, may specify the order in which such redemptions are deemed to occur.

SECTION 3.04   EFFECT OF NOTICE OF REDEMPTION OR PURCHASE.

Once notice of redemption is sent in accordance with Section 3.03, Notes called for redemption or purchase become irrevocably due and payable on the Redemption Date or purchase date, as applicable, at the redemption price or purchase price, as applicable, unless such redemption or purchase remains conditioned on the happening of a future event that has not occurred. The notice, if sent in a manner herein provided, shall be conclusively presumed to have been given,

2278

whether or not the Holder receives such notice. In any case, failure to give such notice or any defect in the notice to the Holder of any Note designated for redemption or purchase in whole or in part shall not affect the validity of the proceedings for the redemption or purchase of any other Note. Subject to Section 3.05, on and after the Redemption Date or purchase date, as applicable, unless the Issuer defaults in payment of the redemption or purchase price, interest shall cease to accrue on Notes or portions of Notes called for redemption or purchase, unless such redemption or purchase remains conditioned on the occurrence of a future event that has not occurred.

SECTION 3.05    DEPOSIT OF REDEMPTION OR PURCHASE PRICE.

Prior to noon (New York City time) on the Redemption Date or purchase date, the Issuer shall deposit with the Trustee or with the Paying Agent money sufficient to pay the redemption or purchase price of and accrued and unpaid interest, if any, on all Notes to be redeemed or purchased on that date. The Trustee or the Paying Agent shall promptly return to the Issuer any money deposited with the Trustee or the Paying Agent by the Issuer in excess of the amounts necessary to pay the redemption or purchase price of, and accrued and unpaid interest, if any, on, all Notes to be redeemed or purchased.

If the Issuer complies with the provisions of the preceding paragraph, on and after the Redemption Date or purchase date, interest shall cease to accrue on the Notes or the portions of Notes called for redemption or purchase. If a Note is redeemed or purchased on or after a Record Date but on or prior to the related Interest Payment Date, then any accrued and unpaid interest to the Redemption Date or purchase date shall be paid on the Redemption Date or purchase date to the Person in whose name such Note was registered at the close of business on such Record Date. If any Note called for redemption or purchase shall not be so paid upon surrender for redemption or purchase because of the failure of the Issuer to comply with the preceding paragraph, interest shall be paid on the unpaid principal, from the Redemption Date or purchase date until such principal is paid, and to the extent lawful on any interest accrued to the redemption or purchase date not paid on such unpaid principal, in each case at the rate provided in the Notes and in Section 4.01.

SECTION 3.06    NOTES REDEEMED OR PURCHASED IN PART.

Upon cancellation of a Note that is redeemed or purchased in part only, the Issuer shall issue and the Trustee shall authenticate for the Holder at the expense of the Issuer a new Note in a principal amount equal to the unredeemed or unpurchased portion of the Note surrendered; provided that each new Note will be issued only in denominations of $1.00 or any integral multiple of $1.00 in excess thereof. It is understood that, notwithstanding anything in this Indenture to the contrary, only an Authentication Order and not an Opinion of Counsel or Officer's Certificate is required for the Trustee to authenticate such new Note.

SECTION 3.07    Optional Redemption.

(a)    At any time prior to November 15, 2026, the Issuer may, at its option and on one or more occasions, redeem all or a part of the Notes, upon notice as described in Section 3.03, at a redemption price equal to 100.0% of the principal amount of the Notes redeemed plus the Applicable Premium  as of, and accrued and unpaid interest, if any, to, but excluding, the

65

2279

DG-160

date of redemption (any applicable date of redemption hereunder, the "Redemption Date"), subject to the right of Holders of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date falling on or prior to the Redemption Date.

(b)    On and after November 15, 2026, the Issuer may, at its option and on one or more occasions, redeem the Notes, in whole or in part, upon notice as described in Section 3.03, at the redemption prices (expressed as percentages of principal amount of the Notes to be redeemed) set forth below (the "Prepayment Premium"), plus accrued and unpaid interest thereon, if any, to, but excluding, the applicable Redemption Date, subject to the right of Holders of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date falling on or prior to the Redemption Date, if redeemed during the twelve-month period beginning on November 15 of each of the years indicated below:

| Year | Percentage |
|------|------------|
| 2026 | 106.000% |
| 2027 | 103.000% |
| 2028 and thereafter | 100.000% |

(c)    [Reserved]

(d)    Notwithstanding the foregoing, in connection with any tender offer for the Notes, if Holders of not less than 90.0% in aggregate principal amount of the outstanding Notes validly tender and do not withdraw such Notes in such tender offer and the Issuer, or any third party approved in writing by the Issuer making such tender offer in lieu of the Issuer, purchases all of the Notes validly tendered and not withdrawn by such Holders, the Issuer or such third party will have the right upon not less than 20 nor more than 60 days' prior notice (except that such notice may be delivered or mailed more than 60 days prior to the Redemption Date or purchase date if the notice is issued in connection with Article 8, Article 11 or as specified in Section 3.03(c)), given not more than 60 days following such purchase date, to redeem (with respect to the Issuer) or purchase (with respect to a third party) all of the Notes that remain outstanding following such purchase at a price equal to the price paid to each other Holder in such tender offer (which may be less than par and shall exclude any early tender premium or similar premium and any accrued and unpaid interest paid to any Holder in such tender offer) plus accrued and unpaid interest, if any, thereon, to, but excluding, the Redemption Date or purchase date, subject to the right of Holders of record on the relevant record date to receive interest due on the relevant interest payment date falling on or prior to the Redemption Date or purchase date.

(e)    The Notes may also be redeemed under the circumstances and in accordance with Section 4.14(d).

(f)    [reserved].

(g)    [reserved].

(h)    Any redemption pursuant to this Section 3.07 shall be made pursuant to the provisions of Sections 3.01 through 3.06.

66

2280

(i) The Issuer, its equityholders (including members of its management) and their respective Affiliates may, at their discretion, at any time and from time to time, acquire Notes by means other than a redemption, whether by a tender offer, open market purchases, negotiated transactions or otherwise.

SECTION 3.08   RESERVED.

SECTION 3.09   OFFERS TO REPURCHASE.

(a) (i) If any Pass Through Prepayment Event occurs, the Issuer shall, within 5 Business Days following the Issuer's receipt of Net Proceeds, directly or indirectly, from such Pass Through Prepayment Event (the "Pass Through Prepayment Proceeds"), use such Pass Through Prepayment Proceeds to commence an offer (a "Prepayment Offer") to purchase any outstanding Notes and, at the Issuer's discretion, solely to the extent such redemption results in a dollar for dollar permanent reduction in that portion of the Equal Priority Obligations that are secured by the Collateral, any outstanding Equal Priority Obligations (ratably based on the aggregate outstanding principal amount of each), in the maximum aggregate principal amount (or accreted value, as applicable) of the Notes and such Equal Priority Obligations, as applicable, and for no less than 100.0% of the principal amount thereof, plus the amount of accrued and unpaid interest, if any, thereon available, (ii) if any Brazil Proceeds Event occurs, the Issuer shall, within 5 Business Days following the Issuer's receipt of Net Proceeds, directly or indirectly, from such Brazil Proceeds Event (the "Brazil Prepayment Proceeds"), use such Brazil Prepayment Proceeds to commence a Prepayment Offer to purchase any outstanding Notes and, at the Issuer's discretion, solely to the extent such redemption results in a dollar for dollar permanent reduction in that portion of the Equal Priority Obligations that are secured by the Collateral, any outstanding Equal Priority Obligations (ratably based on the aggregate outstanding principal amount of each), at a repurchase price equal to (w) if such Brazil Proceeds Event occurs prior to November 15, 2025, 103.000% of the principal amount thereof plus the amount of accrued and unpaid interest thereon, if any, (x) if such Brazil Proceeds Event occurs on or after November 15, 2025 and prior to November 15, 2026, 102.000% of the principal amount thereof plus the amount of accrued and unpaid interest thereon, if any, (y) if such Brazil Proceeds Event occurs on or after November 15, 2026 and prior to November 15, 2027, 101.000% of the principal amount thereof plus the amount of accrued and unpaid interest thereon, if any, and (z) if such Brazil Proceeds Event occurs on or after November 15, 2027, 100.000% of the principal amount thereof plus the amount of accrued and unpaid interest thereon, if any, and (iii) if any Excess Interest Event or any Permitted Asset Sale Event occurs, the Issuer may, in the case of an Excess Interest Event, on any Interest Payment Date, or in the case of a Permitted Asset Sale Event, on the Permitted Asset Sale Effective Date, use such Excess Interest Proceeds or such Permitted Asset Sale Proceeds, if any, to commence a Prepayment Offer to purchase any outstanding Notes and, at the Issuer's discretion, solely to the extent such redemption results in a dollar for dollar permanent reduction in that portion of the Equal Priority Obligations that are secured by the Collateral, any outstanding Equal Priority Obligations (ratably based on the aggregate outstanding principal amount of each), at a repurchase price equal to (w) if such Excess Interest Event or such Permitted Asset Sale Event occurs prior to November 15, 2025, 103.000% of the principal amount thereof plus the amount of accrued and unpaid interest thereon, if any, (x) if such Excess Interest Event or such Permitted Asset Sale Event occurs on or after November 15, 2025 and prior to November 15, 2026, 102.000% of the principal amount thereof plus the amount of accrued and unpaid interest thereon, if any, (y) if such Excess

67

2281

Interest Event or such Permitted Asset Sale Event occurs on or after November 15, 2026 and prior to November 15, 2027, 101.000% of the principal amount thereof plus the amount of accrued and unpaid interest thereon, if any, and (z) if such Excess Interest Event or such Permitted Asset Sale Event occurs on or after November 15, 2027, 100.000% of the principal amount thereof plus the amount of accrued and unpaid interest thereon, if any, in each case, pursuant to the procedures specified below; *provided* that, in no event shall the Company be required to make any Prepayment Offer until the amount of Prepayment Proceeds accumulated since the most recent Prepayment Offer exceeds $25,000,000.

(b)     The Prepayment Offer shall remain open for a period of 20 Business Days following its commencement and no longer, except to the extent that a longer period is required by applicable law (the "Offer Period"). No later than five Business Days after the termination of the Offer Period (the "Purchase Date"), the Issuer shall apply all Prepayment Proceeds (the "Offer Amount"), to the purchase of any validly tendered Notes and the Equal Priority Obligations, as applicable. Payment for any Notes so purchased shall be made in the same manner as interest payments are made.

(c)     If the Purchase Date is on or after a Record Date and on or before the related Interest Payment Date, accrued and unpaid interest, if any, to, but excluding, the Purchase Date, shall be paid on the Purchase Date to the Person in whose name a Note is registered at the close of business on such Record Date, and no additional interest shall be payable to Holders who tender Notes pursuant to the Prepayment Offer.

(d)     Upon the commencement of an Prepayment Offer, the Issuer shall send, electronically or by first-class mail (or otherwise in accordance with the applicable rules and procedures of the Depositary), a notice to each of the Holders, with a copy to the Trustee. The notice shall contain all instructions and materials necessary to enable such Holders to tender Notes pursuant to the Prepayment Offer. The Prepayment Offer shall be made to all Holders. The notice, which shall govern the terms of the Prepayment Offer shall state:

(i)     that the Prepayment Offer is being made pursuant to this Section 3.09 and the length of time the Prepayment Offer shall remain open;

(ii)     the Offer Amount, the purchase price and the Purchase Date;

(iii)     that any Note not tendered or accepted for payment shall continue to accrue interest;

(iv)     that, unless the Issuer defaults in making such payment, any Note accepted for payment pursuant to the Prepayment Offer shall cease to accrue interest after the Purchase Date;

(v)     that Holders electing to have a Note purchased pursuant to an Prepayment Offer may elect to have Notes purchased in denominations of $1.00 or whole multiples of $1.00 in excess thereof only;

2282

(vi)    that Holders electing to have a Note purchased pursuant to any Prepayment Offer shall be required to surrender the Note, with the form entitled "Option of Holder to Elect Purchase" attached to the Note completed, or transfer by book-entry transfer, to the Issuer, the Depositary, if appointed by the Issuer, or a Paying Agent at the address specified in the notice at least three days before the Purchase Date;

(vii)    that Holders shall be entitled to withdraw their election if the Issuer, the Depositary or the Paying Agent, as the case may be, receives, not later than the expiration of the Offer Period, a facsimile transmission or letter setting forth the name of the Holder, the principal amount of the Note the Holder delivered for purchase and a statement that such Holder is withdrawing his election to have such Note purchased;

(viii)    that, if the aggregate principal amount (or accreted value, as applicable) of Notes and, if applicable, other Equal Priority Obligations surrendered by the holders thereof exceeds the Offer Amount, the Trustee shall select the Notes (subject to applicable rules and procedures of the Depositary as to Global Notes) and the Issuer or the representative of such other Equal Priority Obligations shall select such other Equal Priority Obligations to be purchased or repaid on a pro rata basis based on the accreted value or principal amount of the Notes or such other Equal Priority Obligations tendered (with such adjustments as may be deemed appropriate by the Trustee so that only Notes in denominations of $1.00 or whole multiples of $1.00 in excess thereof shall be purchased; and

(ix)    that Holders whose Notes were purchased only in part shall, after the Repurchase Date upon cancellation of the Notes surrendered, be issued new Notes equal in principal amount to the unpurchased portion of the Notes surrendered.

(e)    On or before the Purchase Date, the Issuer shall, to the extent lawful, (1) accept for payment, on a pro rata basis to the extent necessary, the Offer Amount of Notes or portions thereof validly tendered pursuant to the Prepayment Offer, as the case may be, or if less than the Offer Amount has been tendered, all Notes tendered and (2) deliver or cause to be delivered to the Trustee the Notes properly accepted together with an Officer's Certificate stating the aggregate principal amount of Notes or portions thereof so tendered.

(f)    The Issuer, the Depositary or the Paying Agent, as the case may be, shall promptly mail or deliver to each tendering Holder an amount equal to the purchase price of the Notes properly tendered by such Holder and accepted by the Issuer for purchase, and, if any Notes are purchased in part only, after the Purchase Date upon cancellation of the Note surrendered, the Issuer shall promptly issue a new Note, and the Trustee, upon receipt of an Authentication Order, shall authenticate and mail or deliver (or cause to be transferred by book-entry) such new Note to such Holder (it being understood that, notwithstanding anything in this Indenture to the contrary, no Opinion of Counsel or Officer's Certificate is required for the Trustee to authenticate and mail or deliver such new Note) in a principal amount equal to the unpurchased portion of the Note surrendered; provided, that each such new Note shall be in a principal amount of $1.00 or an integral multiple of $1.00 in excess thereof. Any Note not so accepted shall be promptly mailed or delivered by the Issuer to the Holder thereof. The Issuer shall publicly announce the results of the Prepayment Offer on or as soon as practicable after the Purchase Date.

69

2283

Other than as specifically provided in this Section 3.09, any purchase pursuant to this Section 3.09 shall be made pursuant to the applicable provisions of Sections 3.01 through 3.06.

## ARTICLE 4

## COVENANTS

SECTION 4.01   PAYMENT OF NOTES.

The Issuer shall pay or cause to be paid the principal of, premium, if any, and interest on the Notes on the dates and in the manner provided in the Notes. Principal, premium, if any, and interest shall be considered paid on the date due if the Paying Agent, if other than the Issuer or a Subsidiary, holds as of noon (New York City time) on the due date money deposited by the Issuer in immediately available funds and designated for and sufficient to pay all principal, premium, if any, and interest then due. If any Interest Payment Date, the maturity date of the Notes or any earlier required repurchase date or Redemption Date falls on a day that is a Legal Holiday, the required payment will be made on the next succeeding Business Day and no interest on such payment will accrue in respect of the delay.

The Issuer shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principal at the rate equal to the then applicable interest rate on the Notes to the extent lawful; it shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest (without regard to any applicable grace period) at the same rate to the extent lawful.

SECTION 4.02   MAINTENANCE OF OFFICE OR AGENCY.

The Issuer shall maintain an office or agency (which may be an office of the Trustee or an affiliate of the Trustee, Registrar or co-registrar) where Notes may be surrendered for registration of transfer or for exchange and where notices and demands to or upon the Issuer in respect of the Notes and this Indenture may be served. The Issuer shall give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency. If at any time the Issuer shall fail to maintain any such required office or agency or shall fail to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the Corporate Trust Office of the Trustee.

The Issuer may also from time to time designate one or more other offices or agencies where the Notes may be presented or surrendered for any or all such purposes and may from time to time rescind such designations; provided that no such designation or rescission shall in any manner relieve the Issuer of its obligation to maintain an office or agency for such purposes. The Issuer shall give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.

The Issuer hereby designates the Corporate Trust Office of the Trustee as one such office or agency of the Issuer in accordance with Section 2.03; provided, however, no service of legal process may be made on the Issuer at any office of the Trustee.

70

SECTION 4.03    <u>REPORTS AND OTHER INFORMATION</u>.

(a)    So long as any Notes are outstanding, the Issuer will furnish to the Trustee within 15 Business Days after the applicable date such information would be required to be filed with the SEC if the Issuer were a reporting company under the Exchange Act as a non-accelerated filer (without giving effect to any extensions permitted by Rule 12b-25 of the Exchange Act):

(i)    annual reports, beginning with the fiscal year ended December 31, 2024, containing substantially all of the financial information that would have been required to be contained in an Annual Report on Form 10-K under the Exchange Act, or any successor or comparable form, containing the financial and other information required to be contained therein, or required in such successor or comparable form as if the Issuer had been a reporting company under the Exchange Act for such period, including a "Management's Discussion and Analysis of Financial Condition and Results of Operations" with respect to the periods presented and an audit report on the annual financial statements by the Issuer's independent registered public accounting firm; <u>provided</u> that no such report will be required to contain audited financial and other information for more than the two most recently completed fiscal years;

(ii)    quarterly reports, beginning with the fiscal quarter ended March 31, 2025, containing substantially all of the financial and other information that would have been required to be contained in a Quarterly Report on Form 10-Q containing all quarterly financial information that would be required to be contained in Form 10-Q, or any successor or comparable form as if the Issuer had been a reporting company under the Exchange Act for such period, including a "Management's Discussion and Analysis of Financial Condition and Results of Operations", subject to normal year-end adjustments; and

(iii)    such other reports on Form 8-K, or any successor or comparable form as if the Issuer had been a reporting company under the Exchange Act for such period;

in each case, in a manner that complies in all material respects with the requirements specified in such form; <u>provided</u> that the Issuer shall make available such information to securities analysts and prospective purchasers of the Notes, in addition to providing such information to the Trustee, the Holders and the beneficial owners of the Global Notes, including by posting such information on an online data system or the website of any direct or indirect parent company of the Issuer; <u>provided further</u> that such reports required pursuant to clauses (i), (ii) and (iii) above (x) shall not be required to comply with Items 402, 403, 405, 406, 407, 408 and 601 (other than 601(b)(2), (3), (4) and (10)) of Regulation S-K promulgated by the SEC and(y) shall not be required to comply with Rules 3-09, 3-10 or 3-16 of Regulation S-X promulgated by the SEC; <u>provided further</u> that, notwithstanding the foregoing, (i) such financial and other information may be prepared on a GAAP or International Financial Reporting Standards ("IFRS") basis, (ii) no such report shall be required to provide any information that is not otherwise similar in scope to information currently included in the Confidential Information Memorandum, (iii) in no event shall such reports be required to include management compensatory plans or arrangements and (iv) such information will not be required to contain any "segment information" but shall provide relevant information

71

in a level of detail consistent with that disclosed in the Confidential Information Memorandum (including with respect to financial performance) to the extent applicable.

(b)     In addition, for so long as the Notes remain outstanding, to the extent not satisfied by the reports referred to in Section 4.03(a), the Issuer shall furnish to the Holders, beneficial owners of the Global Notes, prospective purchasers, broker-dealers and securities analysts, upon their request, any information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act.

(c)     Delivery of such reports, information and documents to the Trustee is for informational purposes only and the Trustee's receipt of such shall not constitute constructive notice of any information contained therein or determinable from information contained there, including the Issuer's compliance with any of its covenants hereunder (as to which the Trustee is entitled to rely exclusively on Officer's Certificates with respect thereto). The Trustee shall have no responsibility for the filing, timeliness or content of such reports. Additionally, the Trustee shall not be obligated to monitor or confirm, on a continuing basis or otherwise, the Issuer's compliance with the covenants or with respect to any reports or other documents filed with the SEC or any website or datasite under this Indenture.

(d)     Notwithstanding anything to the contrary set forth above, if the Issuer (or any direct or indirect parent of the Issuer) has made available through EDGAR or SEC filings the reports and information with respect to the Issuer described in the preceding paragraphs, the Issuer shall be deemed to be in compliance with the provisions of this Section 4.03.

(e)     Following each fiscal quarter, the Issuer will participate in conference calls to discuss its results of operations for the period since the previous conference call. The conference call will be held following the distribution of the information called for by Section 4.03(a) and not later than five Business Days following the time that the Issuer distributes the information as set forth in Section 4.03(a) with respect to such quarter. No fewer than two days prior to the conference call, the Issuer will issue a press release or otherwise announce the time and date of such conference call and provide instructions for Holders, beneficial owners of Global Notes, prospective purchasers, broker-dealers and securities analysts to obtain access to such call.

(f)     In addition, to the extent not satisfied by the reports referred to in Section 4.03(a), the Issuer shall furnish to the Holders, prospective investors, broker-dealers and securities analysts, upon their request, any information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act so long as the Notes are not freely transferable under the Securities Act.

SECTION 4.04   COMPLIANCE CERTIFICATE.

(a)     The Issuer shall deliver to the Trustee, within 120 days after the end of each fiscal year (beginning with the first fiscal year ending after the Issue Date and after giving effect to any fiscal year change effected on or after the Issue Date), an Officer's Certificate stating that a review of the activities of the Issuer and its Subsidiaries during the preceding fiscal year has been made under the supervision of the signing Officer with a view to determining whether the Issuer has kept, observed, performed and fulfilled its obligations under this Indenture, and further stating, as to such Officer signing such certificate, that to the best of his or her knowledge the Issuer has

kept, observed, performed and fulfilled each and every condition and covenant contained in this Indenture and are not in default in the performance or observance of any of the terms, provisions, covenants and conditions of this Indenture (or, if a Default shall have occurred, describing all such Defaults of which he or she may have knowledge and what action the Issuer is taking or propose to take with respect thereto). Such certificate shall also notify the Trustee should the Issuer elect to change the manner in which it fixes its fiscal year-end.

(b)    If any Default has occurred and is continuing under this Indenture, or if the Trustee or the holder of any other evidence of Indebtedness of the Issuer or any Subsidiary gives any notice or takes any other action with respect to a claimed Default, the Issuer shall, within 30 days of becoming aware of such Default, deliver to the Trustee an Officer's Certificate specifying such Default and what action the Issuer proposes to take with respect thereto (unless such Default has been cured or waived within such 30-day time period).

SECTION 4.05   TAXES.

The Issuer shall pay, and cause each Subsidiary to pay,  prior to delinquency, all material taxes, assessments, and governmental levies required to be paid except such as are contested in good faith and by appropriate negotiations or proceedings, so long as adequate reserves with respect thereto are maintained on the books of the Issuer or any of its Subsidiaries in accordance with GAAP if such contest shall have the effect of suspending enforcement or collection of such taxes, assessments, and governmental levies, or where the failure to effect such payment, individually or in the aggregate, would not reasonably be expected to result in a material adverse effect on (i) the business, results of operations or financial condition of the Issuer and its Subsidiaries, taken as a whole, or (ii) the ability of the Note Parties (taken as a whole) to perform their payment obligations under this Indenture.

SECTION 4.06   STAY, EXTENSION AND USURY LAWS.

Each Note Party covenants (to the extent that they may lawfully do so) that such Note Party shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of this Indenture; and each Note Party (to the extent that they may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that such Note Party shall not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Trustee, but shall suffer and permit the execution of every such power as though no such law has been enacted.

SECTION 4.07   LIMITATION ON RESTRICTED PAYMENTS.

(a)    The Issuer shall not, and shall not permit any of its Subsidiaries to:

(I)    declare or pay any dividend or make any payment or distribution on account of the Issuer's or any Subsidiary's Equity Interests (in each case, solely to a holder of Equity Interests in such Person's capacity as a holder of such Equity Interests), including any dividend or distribution payable in connection with any merger, amalgamation or consolidation other than:

73

2287

DG-168

(a) dividends, payments or distributions by the Issuer payable solely in Qualified Capital Stock of the Issuer or in options, warrants or other rights to purchase Qualified Capital Stock; or

(b) dividends, payments or distributions by a Subsidiary so long as, in the case of any dividend, payment or distribution payable on or in respect of any class or series of securities issued by a Subsidiary other than a Wholly-Owned Subsidiary, the Issuer or a Subsidiary receives at least its pro rata share of such dividend, payment or distribution in accordance with its Equity Interests in such class or series of securities;

(II) redeem, purchase, repurchase, defease or otherwise acquire or retire for value any Equity Interests of the Issuer, including in connection with any merger, amalgamation or consolidation, in each case, held by a Person other than the Issuer or a Subsidiary;

(III) make any principal payment on, or redeem, purchase, repurchase, defease, discharge or otherwise acquire or retire for value, in each case, prior to any scheduled repayment, sinking fund payment or maturity, any Subordinated Indebtedness (such payment and other actions described in the foregoing (subject to the exceptions in clauses (a) and (b) below), "Restricted Debt Payments"), other than:

(a) Indebtedness permitted to be incurred or issued under clauses (a) or (c) of the second paragraph of Section 4.09; or

(b) the prepayment, redemption, purchase, repurchase, defeasance, discharge or other acquisition or retirement of Subordinated Indebtedness in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case due within one year of the date of prepayment, redemption, purchase, repurchase, defeasance, discharge or acquisition or retirement; or

(IV) make any Restricted Investment

(all such payments and other actions set forth in these clauses (I) through (IV) (other than any exceptions thereto) being collectively referred to as "Restricted Payments").

(b) The provisions of Section 4.07(a) shall not prohibit:

(i) for any taxable period in which Issuer and/or any of its Subsidiaries is a disregarded entity, partnership or other flow-through entity for tax purposes, or a member of an income or similar tax group of which a direct or indirect parent of Issuer is the common parent (a "Tax Group"), Restricted Payments used to pay federal, foreign, state and local income or similar taxes, as applicable, of such direct or indirect owner of Issuer or such Tax Group that are attributable to the taxable income of Issuer and/or such Subsidiaries, as applicable, determined taking into account the character of the income and loss of the Issuer and/or such Subsidiaries as it affects the applicable tax rate and taking into account losses of the Issuer and/or such Subsidiaries arising after the Issue Date, to the extent not taken into account in prior periods; provided that any Restricted Payments that are attributable to the taxable income of any such Subsidiary will be permitted only to the

74

2288

extent of the amount of cash distributions made by such Subsidiary to Issuer for the purpose of paying such tax liability; provided, further, that (x) such Restricted Payment will be promptly used to pay such taxes and (y) the amount of such Restricted Payment for any taxable period shall not exceed the amount of such taxes that Issuer would have paid had Issuer been a stand-alone corporate taxpayer (or the parent of a stand-alone corporate Tax Group);

(ii)     Restricted Payments (or any transaction that would constitute a Restricted Payment but for the exclusions from the definition thereof) in connection with the Transactions, including, without limitation, a dividend or other distribution of $325 million to Brazil Parent;

(iii)     transactions pursuant to any employee compensation, benefit plan, stock option plan or arrangement, any supplemental executive retirement benefit plan, any health, disability or similar insurance plan that covers current or former officers, directors, members of management, managers, employees, members, partners, consultants or independent contractors of the Issuer, or any employment contract or arrangement of the Issuer;

(iv)     Restricted Payments in an aggregate amount not to exceed the lesser of (x) the aggregate amount of Declined Proceeds and (y) the aggregate amount of Brazil Contributions received since the Issue Date to the extent the assets or property received in such Brazil Contributions are subject to a perfected first priority security interest (subject to Permitted Liens) as security for the Secured Notes Obligations;

(v)      [reserved];

(vi)     [reserved];

(vii)    [reserved];

(viii)   [reserved];

(ix)     [reserved];

(x)      [reserved];

(xi)     [reserved];

(xii)    [reserved];

(xiii)   [reserved];

(xiv)    [reserved];

(xv)     [reserved];

(xvi)    [reserved];

75

2289

(xvii)   [reserved];

(xviii)   [reserved];

(xix)   [reserved];

(xx)   [reserved];

(xxi)   [reserved];

(xxii)   [reserved];

(xxiii)   [reserved]; and

(xxiv)   Restricted Debt Payments made by exchange for, or out of the proceeds of, Refinancing Indebtedness permitted under Section 4.09.

The amount of all Restricted Payments (other than cash) will be the fair market value on the date of the Restricted Payment of the assets or securities proposed to be transferred or issued by the Issuer or any Subsidiary, as the case may be, pursuant to the Restricted Payment.

Notwithstanding anything else in this Section 4.07 to the contrary, the Issuer shall not, and shall not permit any Subsidiary to, make a Restricted Payment in connection with any Liability Management Transaction.

SECTION 4.08   DIVIDEND AND OTHER PAYMENT RESTRICTIONS AFFECTING SUBSIDIARIES.

The Issuer shall not, and shall not permit any of its Subsidiaries to, directly or indirectly, create or otherwise cause to become effective any consensual encumbrance or consensual restriction on the ability of any Subsidiary that is not a Guarantor to:

(1)   (a) pay dividends or make any other distributions to the Issuer or any of its Subsidiaries that is a Guarantor on its Equity Interests or with respect to any other interest or participation in, or measured by, its profits, or (b) pay any Indebtedness owed to the Issuer or any of its Subsidiaries that is a Guarantor;

(2)   make loans or advances to the Issuer or any of its Subsidiaries that is a Guarantor; or

(3)   sell, lease or transfer any of its properties or assets to the Issuer or any of its Subsidiaries that is a Guarantor.

The provisions of the first paragraph of this Section 4.08 shall not apply to encumbrances or restrictions:

(a)   set forth in any agreement evidencing or governing (i) Indebtedness of a Subsidiary permitted to be incurred pursuant to Section 4.09 and (ii) Secured Indebtedness

76

permitted to be incurred pursuant to Sections 4.09 and 4.12 if the relevant restriction applies only to the Person obligated under such Indebtedness and its Subsidiaries or the assets intended to secure such Indebtedness;

(b)      that are or were created by virtue of any Lien granted upon, transfer of, agreement to transfer or grant of, any option or right with respect to any assets or Equity Interests not otherwise prohibited under this Indenture;

(c)      set forth in documents that exist on the Issue Date (or in the case of the Refinancing Intercompany Credit Agreements contemplated on the Issue Date), including pursuant to the Notes, the Note Guarantees, this Indenture and the Existing Credit Agreements or (ii) the Refinancing Intercompany Credit Agreements, and, in each case, related documentation and related Derivative Transactions;

(d)      arising under or as a result of applicable Requirements of Law;

(e)      arising under any agreement relating to Banking Services;

(f)      set forth in any agreement relating to any Permitted Lien that limits the right of the Issuer or any Restricted Subsidiary to dispose of or encumber the assets subject thereto; and//or

(g)      imposed by any amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing of any contract, instrument or obligation referred to in clauses (a) through (f) above; provided that no such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing is, in the good faith judgment of the Issuer, more restrictive with respect to such restrictions, taken as a whole, than those in existence prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing.

For purposes of determining compliance with this Section 4.08, the subordination of (including the application of any standstill requirements to) loans and advances made to the Issuer or a Subsidiary to other Indebtedness incurred by the Issuer or such Subsidiary shall not be deemed a restriction on the ability to make loans or advances.

SECTION 4.09   LIMITATION ON INCURRENCE OF INDEBTEDNESS AND ISSUANCE OF DISQUALIFIED STOCK AND PREFERRED STOCK.

The Issuer shall not, and shall not permit any of its Subsidiaries to, directly or indirectly, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise (collectively, "incur" and collectively, an "incurrence") with respect to any Indebtedness and the Issuer shall not shall issue any shares of Disqualified Stock and shall not permit any Subsidiary to issue any shares of Disqualified Stock.

The provisions of the first paragraph of this Section 4.09 shall not apply to:

(a)      Indebtedness consisting of guarantees of, or existing by virtue of Liens on the assets of the Issuer securing, the Revolving Credit Facility, the Letter of Credit Facility and the

77

2291

DG-172

Term Loan A Facility; provided that (i) the amount of any such Indebtedness secured on a pari passu basis with the Notes shall not exceed $200.0 million and shall be subject to the Equal Priority Intercreditor Agreement and (ii) such Indebtedness shall be subject to an Intercreditor Agreement;

(b)     the incurrence by the Note Parties of Indebtedness represented by the Notes (including any Note Guarantees thereof, but excluding any Additional Notes and any Note Guarantees thereof) issued on the Issue Date or the Exchange Date;

(c)     Indebtedness and Disqualified Stock of the Issuer issued or owing to any Subsidiary and/or of any Subsidiary issued or owing to the Issuer and/or any other Subsidiary; provided that any such Indebtedness or Disqualified Stock of the Issuer or a Guarantor owing to any Subsidiary that is not a Guarantor is expressly subordinated in right of payment to the Notes;

(d)     Indebtedness of the Issuer pursuant to any Subordinated Intercompany Loan;

(e)     [reserved];

(f)     [reserved];

(g)     Indebtedness of the Issuer and/or any Subsidiary in respect of Banking Services (including Indebtedness owed on a short term basis to banks and other financial institutions incurred in the ordinary course of business, consistent with past practice or consistent with industry norm that arises in connection with ordinary banking arrangements to manage cash balances of the Issuer and its Subsidiaries) and incentive, supplier finance or similar programs;

(h)     [reserved];

(i)     guarantees of Indebtedness by the Issuer and/or any Subsidiary of Indebtedness or other obligations of the Issuer or any Subsidiary with respect to Indebtedness otherwise permitted to be incurred pursuant to the terms of this Indenture or other obligations not prohibited by this Indenture;

(j)     Indebtedness of the Issuer and/or any Subsidiary existing, or pursuant to commitments existing on the Issue Date as set forth on Schedule C hereto;

(k)     [reserved];

(l)     [reserved];

(m)     [reserved];

(n)     [reserved];

(o)     [reserved];

(p)     [reserved];

2292

(q)      the incurrence or issuance by the Issuer or any Subsidiary of Indebtedness, Disqualified Stock or Preferred Stock incurred or issued in exchange for or as a replacement of (including by entering into alternative financing arrangements in respect of such exchange or replacement (in whole or in part), by adding or replacing lenders, creditors, agents, borrowers and/or guarantors, or, after the original instrument giving rise to such Indebtedness, Disqualified Stock or Preferred Stock has been terminated, by entering into any credit agreement, loan agreement, note purchase agreement, indenture or other agreement), or the net proceeds of which are to be used for the purpose of modifying, extending, refinancing, renewing, replacing, redeeming, repurchasing, defeasing, acquiring, amending, supplementing, restructuring, repaying, prepaying, retiring, extinguishing or refunding (collectively, "refinance" with "refinances", "refinanced" and "refinancing" having a correlative meaning) any Indebtedness (or unutilized commitment in respect of Indebtedness), Disqualified Stock or Preferred Stock incurred or issued as permitted under the first paragraph of this Section 4.09 or any of clauses (b), (j) and (q) of this second paragraph of Section 4.09 (in any case, including any refinancing Indebtedness incurred in respect thereof, "Refinancing Indebtedness" and such Indebtedness, Disqualified Stock or Preferred Stock being refinanced, the "Refinanced Indebtedness") and any subsequent Refinancing Indebtedness in respect thereof; provided that:

(i)      the principal amount (or accreted value, if applicable) of such Refinancing Indebtedness does not exceed the principal amount (or accreted value, if applicable) of the Refinanced Indebtedness outstanding immediately prior to the consummation of such refinancing, except by (A) an amount equal to unpaid accrued interest, dividends and premiums (including tender premiums) thereon plus defeasance costs, underwriting discounts and other fees, commissions and expenses (including upfront fees, closing payments, original issue discount, initial yield payments and similar fees) incurred in connection with the relevant refinancing, (B) an amount equal to any existing commitments unutilized and letters of credit undrawn thereunder and (C) additional amounts permitted to be incurred pursuant to this Section 4.09 (provided that (1) any additional Indebtedness, Disqualified Stock or Preferred Stock referenced in this clause (C) satisfies the other applicable requirements of this clause (q) (with additional amounts incurred in reliance on this clause (C) constituting a utilization of the relevant basket or exception pursuant to which such additional amount is permitted) and (2) if such additional Indebtedness is secured, the Lien securing such Refinancing Indebtedness is permitted pursuant to Section 4.12);

(ii)      (A) such Refinancing Indebtedness either (1) has a final maturity the same as or later than (and, in the case of revolving Indebtedness, does not require mandatory commitment reductions, if any, prior to) or (2) requires no or nominal payments in cash (other than interest payments) prior to, in each case, the earlier of (x) the final maturity of the Refinanced Indebtedness and (y) the maturity date of the Notes and (B) other than with respect to revolving Indebtedness, such Refinancing Indebtedness has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of the Refinanced Indebtedness (without giving effect to any amortization or prepayments in respect of such Refinanced Indebtedness); and

(iii)      if the Indebtedness being Refinanced is subordinated in right of payment and/or in lien priority to the Obligations under this Indenture, such Refinancing

79

Indebtedness shall be subordinated in right of payment and/or in lien priority, as applicable, to such Obligations on terms not materially less favorable to the Noteholder Parties as those contained in the documentation governing the Indebtedness being Refinanced (it being understood that secured Indebtedness may be Refinanced with unsecured Indebtedness);

(iv)   (A) no Refinancing Indebtedness shall have obligors that are not (or would not have been) obligated with respect to the Refinanced Indebtedness as of the Issue Date, (B)(i) no Refinancing Indebtedness may be secured Indebtedness if the Indebtedness being Refinanced is unsecured Indebtedness as of the Issue Date and (ii) no Refinancing Indebtedness may be secured by more or different collateral than the Indebtedness being Refinanced was secured as of the Issue Date and (C) no Refinancing Indebtedness may be provided by the Company or any Affiliate of the Company;

(r)   [reserved];

(s)   [reserved];

(t)   Indebtedness of the Issuer and/or any Subsidiary representing (i) deferred compensation to current or former directors, officers, employees, members of management, managers, members, partners, independent contractors and consultants of the Issuer and/or any Subsidiary in the ordinary course of business, consistent with past practice or consistent with industry norm of the Issuer and/or its Subsidiaries and (ii) deferred compensation or other similar arrangements in connection with any Investment or any acquisition permitted under this Indenture;

(u)   [reserved];

(v)   [reserved];

(w)   [reserved];

(x)   [reserved];

(y)   [reserved];

(z)   [reserved];

(aa)   [reserved];

(bb)   [reserved];

(cc)   [reserved];

(dd)   [reserved];

(ee)   unfunded pension fund and other employee benefit plan obligations and liabilities incurred by the Issuer and/or any Subsidiary in the ordinary course of business, consistent with past practice or consistent with industry norm;

(ff) (i) customer deposits and advance payments (including progress premiums) received in the ordinary course of business, consistent with past practice or consistent with industry norm from customers or (ii) obligations to pay, in each case, for goods and services purchased or sold in the ordinary course of business, consistent with past practice or consistent with industry norm;

(gg) without duplication of any other Indebtedness, all premiums (if any), interest (including post-petition interest and payment in kind interest), accretion or amortization of original issue discount, fees, expenses, charges and additional or contingent interest with respect to Indebtedness of any Note Party otherwise permitted under this Indenture;

(hh) [reserved];

(ii) [reserved];

(jj) [reserved];

(kk) [reserved];

(ll) [reserved];

(mm) Indebtedness, Disqualified Stock or Preferred Stock incurred or issued by the Issuer or any Subsidiary to the extent that the net proceeds thereof are promptly deposited with the Trustee in connection with a Legal Defeasance, Covenant Defeasance or satisfaction and discharge of this Indenture; and

(nn) Indebtedness of the Issuer or any Subsidiary incurred through the provision of bonds, guarantees, letters of credit or similar instruments required by any maritime commission or authority or other governmental or regulatory agencies, including, without limitation, customs authorities in connection with ships owned or chartered or ordinary course business conducted by any Note Party, not to exceed the amount required by such governmental or regulatory authority.

For the avoidance of doubt and notwithstanding anything herein to the contrary, (a) the accrual of interest or dividends, the accretion of accreted value, the accretion or amortization of original issue discount and the payment of interest or dividends in the form of additional Indebtedness or additional Equity Interests and (b) the obligation to pay a premium in respect of Indebtedness arising in connection with the issuance of a notice of prepayment, redemption, repurchase, defeasance, acquisition or similar payment or making of a mandatory offer to prepay, redeem, repurchase, defease, acquire, or similarly pay such Indebtedness will not be deemed to be an incurrence of Indebtedness or issuance of Disqualified Stock or Preferred Stock for purposes of this Section 4.09.

For purposes of determining compliance with this Section 4.09, the principal amount of Indebtedness or the liquidation preference of Disqualified Stock or Preferred Stock outstanding under any clause of this Section 4.09 shall be determined after giving effect to the application of proceeds of any such Indebtedness, Disqualified Stock or Preferred Stock to refinance any such other Indebtedness, Disqualified Stock or Preferred Stock.

81

2295

Notwithstanding anything else in this Section 4.09 to the contrary, the Issuer shall not, and shall not permit any Subsidiary to, directly or indirectly, create, incur or assume any Indebtedness, Disqualified Stock or Preferred Stock in connection with a Liability Management Transaction.

SECTION 4.10    ASSET SALES.

The Issuer shall not, and shall not permit any Subsidiary to, consummate, directly or indirectly, any Asset Sale, other than a Permitted Bradford County Sale (a "Permitted Asset Sale Event"); provided, that, within 365 days after the receipt of any Net Proceeds from a Permitted Bradford County Sale (or, within 545 days, to the extent Bradford County Real Estate Partners LLC has entered into a binding agreement to reinvest such Net Proceeds within such initial 365 day period) (the "Reinvestment Period"), Bradford County Real Estate Partners LLC shall use such Net Proceeds to reinvest in the Bradford County Property.  To the extent any Net Proceeds from a Permitted Bradford County Sale have not been reinvested at the end of the applicable Reinvestment Period (the "Permitted Asset Sale Effective Date"), such Net Proceeds shall constitute "Permitted Asset Sale Proceeds". Notwithstanding the foregoing, the Issuer shall have the right to make a Prepayment Offer prior to the end of the Reinvestment Period, in which case (i) the date of such Prepayment Offer shall be deemed to be the Permitted Asset Sale Effective Date and (ii) any Net Proceeds not previously reinvested shall be deemed to constitute Permitted Asset Sale Proceeds as of such date.

SECTION 4.11    TRANSACTIONS WITH AFFILIATES.

The Issuer shall not, and shall not permit any Subsidiary to, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract, agreement, understanding, loan, advance or guarantee with any Affiliate of the Issuer (each of the foregoing, an "Affiliate Transaction"), unless:

(1)    such Affiliate Transaction is on terms, taken as a whole, that are not materially less favorable to the Issuer or the relevant Subsidiary than those that would have been obtained in a comparable transaction by the Issuer or such Subsidiary with an unrelated Person on an arm's-length basis or, if in the good faith judgment of the Issuer, no comparable transaction is available with which to compare such Affiliate Transaction, such Affiliate Transaction is otherwise fair to the Issuer or such Subsidiary from a financial point of view and when such transaction is taken in its entirety; and

(2)    the Issuer delivers to the Trustee with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate payments or consideration in excess of the greater of $50.0 million, a resolution adopted by the Board of Directors of the Issuer approving such Affiliate Transaction.

The provisions of the first paragraph of this Section 4.11 shall not apply to the following:

(a)    any transaction between or among the Issuer and its Subsidiaries;

(b)    any transactions pursuant to one or more management services agreements (or similar arrangements) between the Issuer and the Company and/or one or more of the

82

2296

DG-177

Company's Subsidiaries involving aggregate payments no greater than $5.0 million per calendar year;

(c) (i) any collective bargaining, employment or severance agreement or compensatory (including profit sharing) arrangement entered into by the Issuer or any of its Subsidiaries with their respective current or former officers, directors, members of management, managers, employees, members, partners, consultants or independent contractors, (ii) any subscription agreement or similar agreement pertaining to the repurchase of Equity Interests pursuant to put/call rights or similar rights with current or former officers, directors, members of management, managers, employees, members, partners, consultants or independent contractors, (iii) transactions pursuant to any employee compensation, benefit plan, stock option plan or arrangement, any supplemental executive retirement benefit plan, any health, disability or similar insurance plan that covers current or former officers, directors, members of management, managers, employees, members, partners, consultants or independent contractors or any employment contract or arrangement and (iv) any transaction with an Immediate Family Member of a current or former officer, director, member of management, manager, employee, member, partner, consultant or independent contractor of the Issuer or any of its Subsidiaries, in connection with any agreement, arrangement or transaction described in the foregoing clauses (i) through (iii);

(d) (i) Restricted Payments (or any transaction that would constitute a Restricted Payment but for the exclusions from the definition thereof) not prohibited by Section 4.07 and (ii) issuances of Equity Interests and issuances and incurrences of Indebtedness, Disqualified Stock and Preferred Stock not restricted by this Indenture;

(e) transactions in existence on the Issue Date and any amendment, modification or extension thereof to the extent such amendment, modification or extension, taken as a whole, is not (i) materially adverse to the Holders or (ii) more disadvantageous, in any material respect, to the Holders than the relevant transaction in existence on the Issue Date;

(f) the payment of all indemnification obligations and expenses owed to any of their respective directors, officers, members of management, managers, employees, members, partners, independent contractors and consultants (or any Immediate Family Member of the foregoing) in connection with such management, monitoring, consulting, advisory or similar services provided by them, whether currently due or paid in respect of accruals from prior periods;

(g) the Transactions;

(h) transactions permitted under Section 4.07, 4.09 and 4.10;

(i) guarantees not prohibited by Section 4.07, Section 4.09 or the definition of "Permitted Investments";

(j) [reserved];

(k) the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of, members of the Board of Directors, officers, employees,

2297

members of management, managers, members, partners, consultants and independent contractors (or any Immediate Family Members of the foregoing) of the Issuer and/or any of its Subsidiaries;

(l)     [reserved];

(m)     the issuance or transferee of directors' qualifying shares and shares issued to foreign nationals as required by applicable law;

(n)     for any taxable period in which Issuer and/or any of its Subsidiaries is a disregarded entity, partnership or other flow-through entity for tax purposes, or a member of a Tax Group, Affiliate Transactions to pay federal, foreign, state and local income or similar taxes, as applicable, of such direct or indirect owner of Issuer or such Tax Group that are attributable to the taxable income of Issuer and/or such Subsidiaries, as applicable, determined taking into account the character of the income and loss of the Issuer and/or such Subsidiaries as it affects the applicable tax rate and taking into account losses of the Issuer and/or such Subsidiaries arising after the Issue Date, to the extent not taken into account in prior periods; provided that any Restricted Payments that are attributable to the taxable income of any such Subsidiary will be permitted only to the extent of the amount of cash distributions made by such Subsidiary to Issuer for the purpose of paying such tax liability; provided, further, that (x) such Restricted Payment will be promptly used to pay such taxes and (y) the amount of such Restricted Payment for any taxable period shall not exceed the amount of such taxes that Issuer would have paid had Issuer been a stand-alone corporate taxpayer (or the parent of a stand-alone corporate Tax Group));

(o)     in connection with the incurrence of, and performance of any obligations under, any Indebtedness permitted by Section 4.09; and

(p)     any transaction in which the Issuer or any of its Subsidiaries, as the case may be, delivers to the Trustee a letter from an Independent Financial Advisor stating that such transaction is fair to the Issuer or such Subsidiary from a financial point of view or stating that the terms are not materially less favorable, when taken as a whole, to the Issuer or the relevant Subsidiary than those that would have been obtained in a comparable transaction by the Issuer or such Subsidiary with an unrelated Person on an arm's length basis.

Notwithstanding anything else in this Section 4.11 to the contrary, the Issuer shall not, and shall not permit any Subsidiary to, consummate any Affiliate Transaction in connection with any Liability Management Transaction.

SECTION 4.12   LIMITATION ON LIENS.

(a)     The Issuer shall not, and shall not permit any Subsidiary to, directly or indirectly, create, incur or assume any Lien that secures Obligations under any Indebtedness on any asset or property of the Issuer or any Subsidiary, unless such Lien is a Permitted Lien.

(b)     [reserved]

(c)     With respect to any Lien securing Indebtedness that was permitted to secure such Indebtedness at the time of the incurrence of such Indebtedness, such Lien shall also be permitted to secure any Increased Amount of such Indebtedness. The "Increased Amount" of any

DG-179

Indebtedness shall mean any increase in the amount of such Indebtedness in connection with any accrual of interest, the accretion of accreted value, the amortization of original issue discount, the payment of interest in the form of additional Indebtedness with the same terms, accretion of original issue discount or liquidation preference and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies or increases in the value of property securing Indebtedness.

Notwithstanding anything else in this Section 4.12 to the contrary, the Issuer shall not, and shall not permit any Subsidiary to, incur any Liens in connection with any Liability Management Transaction.

SECTION 4.13   [RESERVED].

SECTION 4.14   OFFER TO REPURCHASE UPON CHANGE OF CONTROL.

(a)      If a Change of Control occurs after the Issue Date, unless, prior to or concurrently with the time the Issuer is required to make a Change of Control Offer, (x) the Issuer or a third-party has mailed or delivered, or otherwise sent through electronic transmission, a redemption notice with respect to all the outstanding Notes as described under Article 3 or (y) the Issuer has made a Prepayment Offer in connection with a Pass Through Prepayment Event that results from a Change of Control (as defined in the Series I Credit Agreement or Series II Credit Agreement, as applicable) under the Series I Credit Agreement and Series II Credit Agreement, the Issuer shall make an offer to purchase all of the Notes pursuant to the offer described below (the "Change of Control Offer") at a price in cash equal to 101.0% of the aggregate principal amount thereof (or such higher amount as the Issuer may determine (any Change of Control Offer at a higher amount, an "Alternate Offer")) (such price, the "Change of Control Payment") plus accrued and unpaid interest, if any, to, but excluding the date of purchase, subject to the right of Holders of record of the Notes on the relevant record date to receive interest due on the relevant interest payment date falling on or prior to the Change of Control Payment Date (as defined below). Within 60 days following any Change of Control, the Issuer shall send notice of such Change of Control Offer by first-class mail, with a copy to the Trustee, to each Holder of Notes to the address of such Holder appearing in the security register or otherwise deliver in accordance with the procedures of DTC, with the following information:

(1)      that a Change of Control Offer is being made pursuant to this Section 4.14 and that all Notes properly tendered pursuant to such Change of Control Offer will be accepted for payment by the Issuer;

(2)      the purchase price and the purchase date, which will be no earlier than 20 Business Days nor later than 60 days from the date such notice is sent (the "Change of Control Payment Date"); provided, that the Change of Control Payment Date shall be delayed until such time (including more than 60 days after the date such notice is sent) as any or all such conditions referred to in clause (8) below shall be satisfied or waived;

(3)      that any Note not properly tendered will remain outstanding and continue to accrue interest;

85

2299

(4)      that unless the Issuer defaults in the payment of the Change of Control Payment plus accrued and unpaid interest, if any, on all properly tendered Notes, all Notes accepted for payment pursuant to the Change of Control Offer will cease to accrue interest on the Change of Control Payment Date;

(5)      that Holders electing to have any Notes purchased pursuant to a Change of Control Offer will be required to surrender such Notes, with the form entitled "Option of Holder to Elect Purchase" on the reverse of such Notes completed or otherwise in accordance with the procedures of DTC, to the paying agent specified in the notice at the address specified in the notice prior to the close of business on the third Business Day preceding the Change of Control Payment Date;

(6)      until the close of business on the earlier of the last day of the offer period and the tenth Business Day after the date such notice is sent (or such later time and date as the Issuer may decide in its sole discretion) (such time and date, the "withdrawal deadline"), that Holders shall be entitled to withdraw their tendered Notes and their election to require the Issuer to purchase such Notes; provided that the paying agent receives, not later than the withdrawal deadline, as electronic transmission (in PDF), a facsimile transmission or letter or other communication in accordance with the procedures of DTC setting forth the name of the Holder of the Notes, the principal amount of Notes tendered for purchase, and a statement that such Holder is withdrawing its tendered Notes and its election to have such Notes purchased;

(7)      that if less than all of such Holder's Notes are tendered for purchase, such Holder will be issued new Notes (or, in the case of Global Notes, such Notes shall be reduced by such amount of Notes that the Holder has tendered) and such new Notes will be equal in principal amount to the unpurchased portion of the Notes surrendered (the unpurchased portion of the Notes must be equal to $1.00 or an integral multiple of $1.00 in excess thereof);

(8)      if such notice is sent prior to the occurrence of a Change of Control, stating that the Change of Control Offer is conditional on the occurrence of such Change of Control or such other conditions specified therein and describing each such condition, and, if applicable, stating that, in the Issuer's discretion, the Change of Control Payment Date may be delayed until such time (including more than 60 days after the notice is mailed or delivered) as any or all such conditions shall be satisfied or waived, or that such purchase may not occur and such notice may be rescinded in the event that the Issuer reasonably believes that any or all such conditions (including the occurrence of such Change of Control) will not be satisfied or waived by the Change of Control Payment Date, or by the Change of Control Payment Date as so delayed; and

(9)      such other instructions, as determined by the Issuer, consistent with this Section 4.14, that a Holder must follow.

If a notice relating to a Change of Control Offer that is subject to one or more conditions precedent (other than the occurrence of a Change of Control) is later rescinded as described in clause (8) above as a result of the failure of such condition(s) to be satisfied or waived (or as a result of the Issuer reasonably believing that such will be the case), the offer described in such notice will not be deemed a valid "Change of Control Offer" for purposes of this Section 4.14.

86

2300

While the Notes are in global form and the Issuer makes an offer to purchase all of the Notes pursuant to the Change of Control Offer, a Holder may exercise its option to elect for the purchase of the Notes through the facilities of DTC, subject to its rules and regulations.

The notice, if sent in a manner herein provided, shall be conclusively presumed to have been given, whether or not the Holder receives such notice. If (a) the notice is sent in a manner herein provided and (b) any Holder fails to receive such notice or a Holder receives such notice but it is defective, such Holder's failure to receive such notice or such defect shall not affect the validity of the proceedings for the purchase of the Notes as to all other Holders that properly received such notice without defect.

The Issuer shall comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent such laws or regulations are applicable in connection with the repurchase of Notes pursuant to a Change of Control Offer. To the extent that the provisions of any securities laws or regulations conflict with the provisions of this Indenture, the Issuer shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations described in this Indenture by virtue thereof.

(b)     On the Change of Control Payment Date, the Issuer shall, to the extent permitted by law,

(1)     accept for payment all Notes issued by it or portions thereof properly tendered pursuant to the Change of Control Offer,

(2)     deposit with the Paying Agent an amount equal to the aggregate Change of Control Payment in respect of all Notes or portions thereof so tendered, plus accrued and unpaid interest thereon, and

(3)     deliver, or cause to be delivered, to the Trustee for cancellation the Notes so accepted together with an Officer's Certificate to the Trustee stating that such Notes or portions thereof have been tendered to and purchased by the Issuer.

(c)     The Issuer shall not be required to make a Change of Control Offer if a third party approved in writing by the Issuer makes the Change of Control Offer (including, for the avoidance of doubt, an Alternate Offer) in the manner, at the times and otherwise in compliance with the requirements set forth in this Indenture applicable to a Change of Control Offer made by the Issuer and purchases all Notes validly tendered and not withdrawn under such Change of Control Offer. Notwithstanding anything to the contrary herein, a Change of Control Offer (including, for the avoidance of doubt, an Alternate Offer) may be made in advance of a Change of Control, conditional upon such Change of Control and such other conditions specified therein, if a definitive agreement is in place for the Change of Control at the time of making of the Change of Control Offer.

(d)     If Holders of not less than 90.0% in aggregate principal amount of the outstanding Notes validly tender and do not withdraw such Notes in a Change of Control Offer and the Issuer, or any third party approved in writing by the Issuer making a Change of Control Offer in lieu of the Issuer as described above, purchases all of the Notes validly tendered and not

87

2301

withdrawn by such Holders, the Issuer or such third party will have the right, upon not less than 20 nor more than 60 days' prior notice (except that such notice may be delivered or mailed more than 60 days prior to the Redemption Date or purchase date if the notice is issued in connection with Article 8, Article 11 or as specified in Section 3.03(c)), given not more than 60 days following such purchase pursuant to the Change of Control Offer described above, to redeem (with respect to the Issuer) or purchase (with respect to a third party) all of the Notes that remain outstanding following such purchase on a date (the "Second Change of Control Payment Date") at a price in cash equal to the Change of Control Payment in respect of the Second Change of Control Payment Date, including, to the extent not included in the Change of Control Payment, accrued and unpaid interest, if any, thereon, to, but excluding, the Second Change of Control Payment Date, subject to the right of Holders of record of Notes on the relevant record date to receive interest due on the relevant interest payment date falling on or prior to the Second Change of Control Payment Date.

(e)      The provisions of this Indenture and the Notes relating to the Issuer's obligation to make a Change of Control Offer upon a Change of Control, including the provisions of this Section 4.14 and the definition of "Change of Control", may be waived or modified at any time with the written consent of Majority Holders.

(f)      A Change of Control Offer (including, for the avoidance of doubt, an Alternate Offer) may be made at the same time as consents are solicited with respect to an amendment, supplement or waiver of this Indenture, the Notes and/or the Note Guarantees so long as the tender of Notes by a Holder is not conditioned upon the delivery of consents by such Holder. In addition, the Issuer or any third party approved in writing by the Issuer that is making the Change of Control Offer (including, for the avoidance of doubt, an Alternate Offer) may, subject to applicable law, increase or decrease the Change of Control Payment (or decline to pay any early tender or similar premium) being offered to Holders at any time in its sole discretion, so long as the Change of Control Payment is at least equal to 101.0% of the aggregate principal amount of the Notes being repurchased, plus accrued and unpaid interest thereon.

SECTION 4.15    ADDITIONAL NOTE GUARANTEES; EQUITY INTERESTS.

The Issuer shall cause each of its Subsidiaries (other than the Guarantors) to, within five Business Days such Subsidiary becoming a Wholly-Owned Subsidiary and (ii) the Issuer determining such Subsidiary ceased to meet any of the exceptions set forth in the preceding parenthetical, execute and deliver a supplemental indenture to this Indenture, substantially in the form attached as Exhibit F hereto, providing for a Note Guarantee by such Subsidiary and, thereafter (and within the time periods or efforts requirements as set forth in such documents), joinders to any applicable Equal Priority Intercreditor Agreement, Junior Priority Intercreditor Agreement and Security Documents or new intercreditor agreements and Security Documents, an updated perfection certificate, together with any filings and agreements to the extent required by the Security Documents to create or perfect the security interests for the benefit of the Holders in the Collateral of such Subsidiary.

Notwithstanding anything to the contrary set forth in this Indenture, no Note Party shall (other than any Subsidiary formed or acquired during a Suspension Period), (a) directly acquire or own any Equity Interests (other than, solely with respect to the Issuer, the Equity Interests of NFE Brazil Holdings Limited and Bradford County Real Estate Partners LLC) or (b)

2302

have any Subsidiaries (other than, solely with respect to the Issuer, Bradford County Real Estate Partners LLC).

SECTION 4.16   EFFECTIVENESS OF COVENANTS.

(a)     If on any date following the Issue Date, (i) the Notes have Investment Grade Ratings from two of three Rating Agencies and (ii) no Default has occurred and is continuing under this Indenture (the occurrence of the events described in the foregoing clauses (i) and (ii) being collectively referred to as a "Covenant Suspension Event"), then, beginning on such date and continuing until the Reversion Date, the Issuer and its Subsidiaries shall not be subject to the following provisions of this Indenture (collectively, the "Suspended Covenants"): Section 4.07, Section 4.08, Section 4.09, Section 4.10, Section 4.11, Section 4.15, clause (iv) of Section 5.01(a) and Section 5.01(c).

(b)     In the event that the Issuer and its Subsidiaries are not subject to the Suspended Covenants for any period of time as a result of the foregoing, and on any subsequent date (the "Reversion Date") the rating assigned to the Notes by two of three of the Rating Agencies is below an Investment Grade Rating, then Issuer and its Subsidiaries will thereafter again be subject to the Suspended Covenants with respect to future events.

(c)     The period of time between (and including) the date of the Covenant Suspension Event and the Reversion Date (but excluding the Reversion Date) is referred to in this description as the "Suspension Period". In the event of any reinstatement, no action taken or omitted to be taken by the Issuer or any Subsidiary prior to such reinstatement will give rise to a Default or Event of Default with respect to the Suspended Covenants under this Indenture; provided that, (1) with respect to Restricted Payments made on or after the Reversion Date and the capacity to make Restricted Payments, the amount of Restricted Payments made and the capacity to make Restricted Payments will be calculated as though Section 4.07 had been in effect prior to, but not during, the Suspension Period and accordingly, Restricted Payments made or deemed to be made during the Suspension Period will not reduce the amount available to be made as Restricted Payments under Section 4.07, including clause (2) of Section 4.07(a), (2) all Indebtedness incurred, or Disqualified Stock or Preferred Stock issued, during the Suspension Period will be deemed to have been incurred or issued pursuant to clause (j) of the second paragraph of Section 4.09, (3) [reserved], (4) any Affiliate Transaction entered into on or after the Reversion Date pursuant to an agreement entered into during any Suspension Period shall be deemed to be permitted pursuant to clause (e) of the second paragraph of Section 4.11, (5) any equity owned or acquired, and any Subsidiary obtained, shall be permitted under Section 4.15, and (6) all Investments made during the Suspension Period will be classified as having been made pursuant to clause (f) of the definition of "Permitted Investments".

(d)     During the Suspension Period, the Issuer and its Subsidiaries will be entitled to incur Liens permitted under Section 4.12 (including Permitted Liens). To the extent such covenant and any Permitted Liens refer to one or more Suspended Covenants, such covenant or definition shall be interpreted as though such applicable Suspended Covenant(s) continued to be applicable during the Suspension Period (but solely for purposes of Section 4.12 and the "Permitted Liens" definition and for no other covenant).

DG-184

(e)      Notwithstanding that the Suspended Covenants may be reinstated after the Reversion Date, (1) no Default, Event of Default or breach of any kind will be deemed to exist or have occurred under the Notes, the Note Guarantees or this Indenture with respect to the Suspended Covenants, and none of the Issuer or any its Subsidiaries shall bear any liability for any actions taken or events occurring during the Suspension Period, or any actions taken at any time pursuant to any contractual obligation entered into or arising during any Suspension Period, in each case as a result of a failure to comply with the Suspended Covenants during the Suspension Period (or, upon termination of the Suspension Period or after that time, as a result of any action taken or event that occurred during the Suspension Period), and (2) following a Reversion Date, the Issuer and each Subsidiary will be permitted, without causing a Default or Event of Default, to honor, comply with or otherwise perform any contractual commitments or obligations arising during any Suspension Period and to consummate the transactions contemplated thereby.

(f)      The Issuer shall deliver promptly to the Trustee an Officer's Certificate notifying it of any such occurrence under this Section 4.16.

SECTION 4.17   AFTER-ACQUIRED COLLATERAL; REAL PROPERTY MORTGAGE;

(a)      From and after the Issue Date, and subject to the applicable limitations and exceptions set forth in the Security Documents and this Indenture (including as described under Section 12.07(c)(x)), if any Note Party creates, or acquires any security interest upon any property or asset that would constitute Collateral (which, for the avoidance of doubt, does not include any Excluded Assets), such Note Party must grant a first-priority perfected security interest (subject to Permitted Liens) upon any such Collateral, as security for the Secured Notes Obligations.

(b)      Subject to the applicable terms of the Security Documents and any Intercreditor Agreements, within 90 days after the acquisition by any Grantor of any Material Real Estate Asset (or within 90 days after the acquisition of a Person that becomes a Grantor and that owns any Material Real Estate Asset) (in each case, other than any Excluded Asset) (or as soon as practicable thereafter using commercially reasonable efforts), the Issuer shall cause such Grantor to (i) execute, deliver and record a Mortgage with respect thereto, (ii) deliver a fully paid extended coverage policy or policies of title insurance (or executed proforma therefor) from a national title insurance company with respect to such Material Real Estate Asset in an amount not to exceed 100.0% of the fair market value of the such Material Real Estate Asset, as reasonably determined by the Issuer, naming the Notes Collateral Agent for the benefit of the Secured Notes Secured Parties as the insured, insuring such Mortgage to be a valid first priority Lien on the real property described therein, free and clear of all Liens other than Permitted Liens and containing reasonable and customary endorsements (each, a "Title Policy"), (iii) deliver legal opinions of local counsel or Borrower's counsel with respect to enforceability of such Mortgage and other customary matters; (iv) deliver an existing or new ALTA survey of such Material Real Estate Asset or with such affidavits as shall be sufficient for the title insurance company to delete the standard survey exception in the applicable Title Policy; and (v) deliver an updated perfection certificate.

2304

SECTION 4.18   <u>CERTAIN UNDERTAKINGS RELATING TO SEPARATENESS</u>.

The Issuer shall conduct its business and operations separate and apart from that of any other Person (including the holders of its Equity Interests and their respective Affiliates) and in furtherance of the foregoing,

(a)      the Issuer shall:

(1)      maintain its own separate books and records and bank accounts;

(2)      at all times hold itself out to the public and all other Persons as a legal entity separate from the Brazil Parent and any other Person;

(3)      have a Board of Directors separate from that of the Brazil Parent and any other Person;

(4)      file its own tax returns, if any, as may be required under applicable law, to the extent (1) not part of a consolidated group filing a consolidated return or returns or (2) not treated as a division for tax purposes of another taxpayer, and pay any taxes so required to be paid under applicable law;

(5)      not commingle its funds or assets with funds or assets of any other Person;

(6)      conduct its business in its own name, except for business conducted on behalf of itself by another Person under a business management or investment advisory agreement that is on commercially reasonable terms, so long as the manager, servicer, investment advisor or equivalent thereof, under such agreement holds itself out as agent of the Issuer, and strictly comply with all organizational formalities to maintain its separate existence;

(7)      maintain separate financial statements and accounting records and show, in its financial statements, its assets and liabilities separate and apart from those of any other Person and not permit its assets to be listed as assets on the financial; statements of any of its Affiliates; provided that the Issuer may be consolidated with another Person for accounting purposes in accordance with U.S. generally accepted accounting principles;

(8)      pay its own debts, liabilities and expenses only out of its own funds as the same shall become due, provided, however, the foregoing shall not require the Brazil Parent to make any additional capital contributions to the Issuer;

(9)      maintain an arm's length relationship with its Affiliates and the Brazil Parent, except as not prohibited under the Operating Agreement and hereunder;

(10)      pay the salaries of its own employees, if any, provided, however, the foregoing shall not require the Brazil Parent to make any additional capital contributions to the Issuer;

2305

(11)    not hold out its credit or assets as being available to satisfy the obligations of others;

(12)    allocate fairly and reasonably any overhead expenses (including any overhead for shared office space and for services performed by any employee of any Affiliates) from only its own assets;

(13)    maintain and use separate stationery, invoices and checks bearing its name and not bearing the name of any other entity unless such entity is clearly designated as being the Issuer's agent;

(14)    except pursuant to or as not prohibited under the Operating Agreement and hereunder, not pledge its assets for the benefit of any other Person or guaranty or become obligated for the debts of any other Person;

(15)    correct any known misunderstanding regarding its separate identity and refrain from engaging in any activity that compromises the separate legal identity of the Issuer or the separateness of its assets;

(16)    maintain adequate capital in light of its contemplated business purpose, transactions and liabilities;

(17)    cause its Board of Directors to keep minutes of any meetings and actions and observe all other Delaware limited liability company formalities;

(18)    cause the Issuer to continue to be duly formed, validly existing and in good standing in the State of Delaware and in all other jurisdictions where it is qualified to do business;

(19)    at all times be organized as a special-purpose entity with constituent documents substantially similar to those in effect on the Issue Date;

(20)    except as contemplated by the Operating Agreement or hereunder, not acquire any securities of the Brazil Parent or any other owner or Affiliate;

(21)    hold its assets in its own name and maintain its assets in such a manner that it is possible, with reasonable ease to ascertain, or identify its individual assets from those of any other Person; and

(22)    cause the directors, Officers, agents and other representatives of the Issuer to act at all times with respect to the Issuer consistently and in furtherance of the foregoing; and

(b)    the Issuer shall not:

(1)    except pursuant to or as not prohibited under the Operating Agreement or hereunder, guarantee any obligation of any Person, including any Affiliate;

92

2306

DG-187

(2)     engage, directly or indirectly, in any business other than the actions required or permitted to be performed under Section 7 or Section 9(J) of the Operating Agreement or herunder;

(3)     incur, create or assume any indebtedness other than as not prohibited under the Operating Agreement or hereunder;

(4)     make or permit to remain outstanding any loan or advance to, or own or acquire any stock or securities of, any Person, except that the Issuer may invest in those investments not prohibited under the Operating Agreement or hereunder, including investments in NFE Brazil Holdings Limited and Bradford County Real Estate Partners LLC, and may make any advance required or not prohibited to be made pursuant to any provisions of the Operating Agreement or hereunder and permit the same to remain outstanding in accordance with such provisions;

(5)     to the fullest extent permitted by law, engage in any dissolution, winding up, liquidation, consolidation, division, merger, consolidation, asset sale or transfer of ownership interests other than such activities as are expressly permitted pursuant to any provision of the Operating Agreement or hereunder and subject to obtaining any approvals required under the Operating Agreement;

(6)     permit any Affiliate or constituent party independent access to any of its bank accounts, except for any employee of an Affiliate who has been authorized by the Issuer to access such account on behalf of the Issuer as its authorized representative;

(7)     perform any act that would subject the Brazil Parent to liability for the liabilities or obligations of the Issuer except as not prohibited under the Operating Agreement or hereunder;

(8)     create or permit to be created or exist, any security interest, encumbrance, or other lien on its assets, except the security interests created under or permitted by the Operating Agreement or hereunder;

(9)     enter into or be a party to any non-arm's length transaction with the Brazil Parent or any of its Affiliates, except as not prohibited by the Operating Agreement or hereunder;

(10)     permit any Affiliate independent access to any of its bank accounts, except for any employee of an Affiliate who has been authorized by the Issuer to access such account on behalf of the Issuer as its authorized representative;

(11)     transfer any of its assets, except as not prohibited by the Operating Agreement or hereunder; or

(12)     form, acquire, hold or own directly any equity interests (whether corporate, partnership, limited liability company or other) other than equity interests of NFE Brazil Holdings Limited and Bradford County Real Estate Partners LLC.

93

2307

Notwithstanding anything to the contrary set forth in this Indenture, (i) capitalized term used in this Section 4.18 and not otherwise defined in this Indenture shall have their respective meanings as set forth in the Operating Agreement as in effect on the Issue Date and (ii) none of the Transactions or any transaction otherwise expressly permitted by this Indenture or any action otherwise required to be taken to comply with this Indenture shall be prohibited.

SECTION 4.19   REFINANCING INTERCOMPANY CREDIT AGREEMENTS.

The Issuer shall not consent to any amendment to the Refinancing Intercompany Credit Agreements that would adversely affect the interests of the Holders in any material respect. The Issuer shall use its reasonable best efforts to enforce any of its rights under any Refinancing Intercompany Credit Agreement (at the written direction of the Majority Holders).

## ARTICLE 5

## SUCCESSORS

SECTION 5.01   MERGER, CONSOLIDATION, AMALGAMATION OR SALE OF ALL OR SUBSTANTIALLY ALL ASSETS.

(a)      The Issuer shall not merge, consolidate or amalgamate with or into or wind up into (whether or not the Issuer is the surviving Person), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of the properties or assets of the Issuer and its Subsidiaries, taken as a whole, in one or more related transactions, to any Person unless:

(i)      the Issuer is the surviving Person or the Person formed by or surviving any such merger, consolidation, amalgamation or winding up (if other than the Issuer) or to which such sale, assignment, transfer, lease, conveyance or other disposition will have been made is a corporation, partnership, limited partnership, limited liability company, trust or other entity organized or existing under the laws of the United States, any state or territory thereof or the District of Columbia (the Issuer or such Person, as the case may be, being herein called the "Successor Company"); provided that in the case where the Successor Company of the Issuer is not a corporation, a co-issuer of the Notes is a corporation;

(ii)      the Successor Company (if other than the Issuer) expressly assumes all of the obligations of the Issuer under this Indenture, the Notes, the Equal Priority Intercreditor Agreement, any Junior Priority Intercreditor Agreement and the applicable Security Documents pursuant to supplemental indentures, joinders to the applicable Security Documents, the Equal Priority Intercreditor Agreement, any Junior Priority Intercreditor Agreement, or other documents or instruments in form reasonably satisfactory to the Trustee and the Notes Collateral Agent;

(iii)      immediately after such transaction, no Event of Default shall have occurred and be continuing;

(iv)      [reserved];

94

2308

DG-189

(v)      the Successor Company shall have delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that such merger, consolidation, amalgamation, winding up, sale, assignment, transfer, lease, conveyance or disposition and such supplemental indentures or other documents or instruments, if any, comply with this Indenture; and

(vi)      to the extent any assets of the Person who is merged, consolidated or amalgamated with or into the Successor Company are assets of the type that would constitute Collateral under the Security Documents, the Successor Company will take such action as may be reasonably necessary to cause such property and assets to be made subject to the Lien of the applicable Security Documents in the manner and to the extent required in this Indenture or the applicable Security Documents and shall take all reasonably necessary action so that such Lien is perfected to the extent required by the applicable Security Documents.

(b)      The Successor Company will succeed to and be substituted for the Issuer under this Indenture, the Notes, the Equal Priority Intercreditor Agreement, any Junior Priority Intercreditor Agreement and the applicable Security Documents and the Issuer will automatically be released and discharged from its obligations under this Indenture, the Notes, the Equal Priority Intercreditor Agreement, any Junior Priority Intercreditor Agreement and the applicable Security Documents, as applicable. Notwithstanding clauses (iii) and (iv) of Section 5.01(a),

(1)      [reserved],

(2)      the Issuer may merge, consolidate or amalgamate with or into or wind up into an Affiliate of the Issuer solely for the purpose of reincorporating the Issuer in the United States, any state or territory thereof or the District of Columbia, and

(3)      [reserved].

Notwithstanding anything else in this Section 5.01 to the contrary, no Note Party shall merge, consolidate or amalgamate with or into or wind up into (whether or not the Issuer is the surviving Person), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of the properties or assets of the Issuer and its Subsidiaries, taken as a whole, in one or more related transactions, to any Person in connection with any Liability Management Transaction.

## ARTICLE 6

## DEFAULTS AND REMEDIES

SECTION 6.01   EVENTS OF DEFAULT.

(a)      An "Event of Default" wherever used herein, means any one of the following events:

(1)      (x) default in payment when due and payable, upon redemption, acceleration or otherwise, of principal of, or premium, if any, on the Notes and (y) default in

95

DG-190

payment when due and payable at the stated maturity of any Indebtedness of the Company or any of its Subsidiaries in excess of $100.0 million in aggregate outstanding principal amount;

(2)     default for 3 Business Days or more in the payment when due of interest on or with respect to the Notes;

(3)     failure by the Issuer or any Subsidiary for 30 days after the earlier of (x) the date on which an Officer of such Note Party obtains knowledge of the failure to comply with any of its obligations, covenants or agreements (other than a default referred to in clauses (1) or (2) above) contained in this Indenture or the Notes and (y) receipt of written notice given by the Trustee or the Holders of not less than 30.0% in principal amount of the Notes then outstanding (with a copy to the Trustee) to comply with any of its obligations, covenants or agreements (other than a default referred to in clauses (1) or (2) above) contained in this Indenture or the Notes;

(4)     default under any mortgage, indenture or instrument under which there is issued or by which there is secured or evidenced any Indebtedness (including, without limitation, the Refinancing Intercompany Credit Agreements, the Series I Intercompany Credit Agreement, the Existing Credit Agreements, the 2026 Notes Indenture and the 2029 Notes Indenture) for money borrowed by the Issuer, the Company or any of its Subsidiaries or the payment of which is guaranteed by the Issuer, the Company or any of its Subsidiaries, whether such Indebtedness or guarantee now exists or is created after the issuance of the Notes, if the principal amount of such Indebtedness, together with the principal amount of any other such Indebtedness in default (after giving effect to any applicable grace periods) is in the aggregate equal to $10.0 million (or its foreign currency equivalent) in the case of Indebtedness of the Issuer and $100.0 million (or its foreign currency equivalent) in the case of Indebtedness of the Company or any of its Subsidiaries (other than the Issuer);

(5)     failure by the Issuer or any Subsidiary to pay final non-appealable judgments aggregating in excess of $10.0 million (to the extent not covered by insurance as to which the insurer has been notified of such judgment or order and has not denied its obligation), which final non-appealable judgments remain unpaid, undischarged and unstayed for a period of more than 90 days after such judgment becomes final and non-appealable, and, in the event such judgment is covered by insurance, an enforcement proceeding has been commenced by any creditor upon such judgment or decree which is not promptly stayed;

(6)     (A) the Issuer or any Subsidiary, pursuant to or within the meaning of any Bankruptcy Law:

(i)     commences proceedings to be adjudicated bankrupt or insolvent;

(ii)     consents to the institution of bankruptcy or insolvency proceedings against it, or the filing by it of a petition or answer or consent seeking reorganization or relief under applicable Bankruptcy Law;

(iii)     consents to the appointment of a receiver, liquidator, assignee, trustee, sequestrator or other similar official of it or for all or substantially all of its property; or

96

2310

DG-191

(iv)    makes a general assignment for the benefit of its creditors;

(B)    a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

(i)    is for relief against the Issuer or any Subsidiary is to be adjudicated bankrupt or insolvent;

(ii)    appoints a receiver, liquidator, assignee, trustee, sequestrator or other similar official of the Issuer or any Subsidiary; or

(iii)    orders the liquidation of the Issuer or any Subsidiary;

and the order or decree remains unstayed and in effect for 60 consecutive days;

(7)    any amendment or modification to (i) any transfer pricing agreement or other intercompany arrangement between the Company or any of its Subsidiaries on the one hand and NFE Brazil Holdings Limited or any of its Subsidiaries on the other hand or (ii) the organizational documents of the Issuer or Brazil Parent that is reasonably expected to be adverse to the Holders in any material respect; provided that, in the case of the foregoing clause (i), any amendment or modification of such agreements or arrangements that are required by applicable law or expressly permitted by the Brazil Parent Intercompany Credit Agreement shall be deemed not to be adverse to the Holders;

(8)    the Note Guarantee of any Guarantor ceases to be in full force and effect (other than in accordance with the terms of such Note Guarantee) or such Guarantor or such group of Guarantors denies or disaffirms its obligations under its Note Guarantee (other than by reason of the satisfaction in full of all obligations under this Indenture and discharge of this Indenture or the release of such Note Guarantee in accordance with the terms of this Indenture);

(9)    the Liens created by the Security Documents shall at any time not constitute a valid and perfected Lien on any material portion of the Collateral intended to be covered thereby (unless perfection is not required by this Indenture or the Security Documents) other than (A) in accordance with the terms of the relevant Security Document and this Indenture, (B) the satisfaction in full of all Obligations under this Indenture or (C) any loss of perfection that results from the failure of the Controlling Collateral Agent or Notes Collateral Agent to maintain possession of certificates delivered to it representing securities pledged under the Security Documents or to file Uniform Commercial Code continuation statements; or

(10)    any Note Party shall assert, in any pleading in any court of competent jurisdiction, that any security interest in any material Security Document is invalid or unenforceable (other than by reason of the satisfaction in full of all obligations under this Indenture and discharge of this Indenture, the release of the Note Guarantee of such Guarantor in accordance with the terms of this Indenture or the release of such security interest in accordance with the terms of this Indenture and the Security Documents).

(b)    In the event of any Event of Default specified in clause (4) of Section 6.01(a), such Event of Default and all consequences thereof (excluding any resulting payment

97

2311

default, other than as a result of acceleration of the Notes) shall be annulled, waived and rescinded, automatically and without any action by the Trustee or the Holders, if within 30 days after such Event of Default arose:

(1)    the Indebtedness or guarantee that is the basis for such Event of Default has been discharged; or

(2)    the requisite holders thereof have rescinded or waived the acceleration, notice or action (as the case may be) giving rise to such Event of Default; or

(3)    the default that is the basis for such Event of Default has been cured.

(c)    Notwithstanding anything to the contrary set forth in this Indenture, in the event the Notes are accelerated or otherwise become due prior to their stated maturity for any reason following the occurrence of any Event of Default (including, without limitation, pursuant to Section 6.01(a)(6) or the acceleration of claims by operation of law (a "Make-Whole Event")), all fees, expenses and premiums (including any Applicable Premium or Prepayment Premium) as of the date such Notes are accelerated or become due will also be due and payable as if the Issuer had voluntarily redeemed such Notes (the "Make-Whole Amount"), and such Make-Whole Amount shall also be due and payable as of such date and shall constitute part of the Secured Notes Obligations.

In any such case, the Make-Whole Amount shall constitute part of the Secured Notes Obligations payable by the Issuer in respect of the Notes, which Secured Notes Obligations are secured by the Collateral, and constitutes liquidated damages, not unmatured interest or a penalty, as the actual amount of damages to the Holders as a result of the relevant Make-Whole Event, as applicable, would be impracticable and extremely difficult to ascertain. The Make-Whole Amount is provided by mutual agreement of the Issuer and the Holders as a reasonable estimation and calculation of such actual lost profits and other actual damages of such Holders. Without limiting the generality of the foregoing, it is understood and agreed that upon the occurrence of any Make-Whole Event, the Make-Whole Amount shall be automatically and immediately due and payable as though any Notes subject to such Make-Whole Event were voluntarily prepaid as of the earliest such date and shall constitute part of the Secured Notes Obligations payable by the Issuer in respect of the Notes, which Secured Notes Obligations are secured by the Collateral. The Make-Whole Amount shall also be automatically and immediately due and payable if the Notes are satisfied, released or discharged by foreclosure (whether by power of judicial proceeding or otherwise), deed in lieu of foreclosure or by any other means. THE ISSUER HEREBY EXPRESSLY WAIVE (TO THE FULLEST EXTENT THEY MAY LAWFULLY DO SO) THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR OTHER LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE FOREGOING MAKE-WHOLE AMOUNT IN CONNECTION WITH ANY MAKE-WHOLE EVENT, ANY RESCISSION OF SUCH ACCELERATION OR THE COMMENCEMENT OF ANY BANKRUPTCY OR INSOLVENCY EVENT. The Issuer expressly agrees (to the fullest extent it and they may lawfully do so) that with respect to the Make-Whole Amount payable under the terms of this Indenture: (i) the Make-Whole Amount is reasonable and is the product of an arm's length transaction between sophisticated business parties, ably represented by counsel; (ii) the Make-Whole Amount shall be payable notwithstanding the then-prevailing market rates at the time payment is made; (iii) there

has been a course of conduct between the Holders and the Issuer giving specific consideration in this transaction for such agreement to pay the Make-Whole Amount; and (iv) the Issuer shall be estopped hereafter from claiming differently than as agreed to in this paragraph. The Issuer expressly acknowledges that its agreement to pay the Make-Whole Amount as herein described is a material inducement to the Holders to purchase the Notes.

SECTION 6.02   ACCELERATION.

(a)   If any Event of Default (other than an Event of Default specified in clause (6) of Section 6.01(a) with respect to the Issuer) occurs and is continuing under this Indenture, the Trustee or the Holders of at least 30.0% in aggregate principal amount of the then total outstanding Notes may declare the principal, premium, if any, interest and any other monetary obligations on all the then outstanding Notes to be due and payable immediately.

(b)   [Reserved].

(c)   [Reserved].

(d)   Upon the effectiveness of a declaration described in clause (a) of this Section 6.02, such principal and interest shall be due and payable immediately. Notwithstanding the foregoing, in the case of an Event of Default arising under clause (6) of Section 6.01(a) with respect to the Issuer, the principal of and interest on all outstanding Notes shall become due and payable without further action or notice.

(e)   (i)   [Reserved].

(ii)   The Trustee will treat all Noteholders equally with respect to their rights under this Section 6.02. The Issuer hereby confirms that any and all other actions that the Trustee takes or omits to take under this Section and all fees, costs and expenses of the Trustee and its agents and counsel arising hereunder and in connection herewith shall be covered by the Issuer's indemnifications under Section 7.06 of this Indenture.

(f)   (i) If a Default for a failure to report or failure to deliver a required certificate in connection with another default (such other default, the "Initial Default") occurs, then at the time such Initial Default is cured, the Default for a failure to report or failure to deliver a required certificate in connection with the Initial Default will also be cured without any further action and (ii) any Default or Event of Default for the failure to comply with the time periods prescribed under Section 4.03 or otherwise to deliver any notice or certificate pursuant to any other provision of this Indenture shall be deemed to be cured upon the delivery of any such report required by Section 4.03 or such notice or certificate, as applicable, even though such delivery is not within the prescribed period specified in this Indenture. Any time period specified in this Indenture to cure any actual or alleged Default or Event of Default may be extended or stayed by a court of competent jurisdiction.

(g)   The Trustee shall have no obligation to accelerate the Notes if in the reasonable judgment of the Trustee acceleration is not in the interest of the Holders.

SECTION 6.03    OTHER REMEDIES.

If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy to collect the payment of principal, premium, if any, and interest on the Notes or to enforce the performance of any provision of the Notes or this Indenture.

The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding. A delay or omission by the Trustee or any Holder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default. All remedies are cumulative to the extent permitted by law.

SECTION 6.04    WAIVER OF PAST DEFAULTS.

Majority Holders by notice to the Trustee may on behalf of the Holders of all of the Notes waive any existing Default or Event of Default and its consequences under this Indenture and the Security Documents, except a continuing Default or Event of Default in the payment of the principal of, premium, if any, or interest on, any Note held by a non-consenting Holder, and may rescind any acceleration and its consequences with respect to the Notes; provided such rescission would not conflict with any judgment of a court of competent jurisdiction. Upon any such waiver, such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured for every purpose of this Indenture; but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereon.

SECTION 6.05    CONTROL BY MAJORITY.

Subject to the Equal Priority Intercreditor Agreement, Majority Holders shall have the right to direct the time, method and place of conducting any proceeding for exercising any remedy available to the Trustee or the Notes Collateral Agent or of exercising any trust or power conferred on the Trustee or the Notes Collateral Agent, and the Trustee or the Notes Collateral Agent, as applicable, may act at the direction of the Holders without liability. The Trustee or the Notes Collateral Agent, as applicable, however, may refuse to follow any direction that conflicts with law or this Indenture or that the Trustee or the Notes Collateral Agent, as applicable, determines is unduly prejudicial to the rights of any other Holder or that would involve the Trustee or the Notes Collateral Agent, as applicable, in personal liability. Notwithstanding anything to the contrary herein, the Controlling Collateral Agent will determine the time and method by which the security interests in the Shared Collateral will be enforced, as will be set forth in the Equal Priority Intercreditor Agreement.

SECTION 6.06    LIMITATION ON SUITS.

Subject to Sections 6.07 and 7.01, in case an Event of Default occurs and is continuing, the Trustee will be under no obligation to exercise any of the rights or powers under this Indenture at the request or direction of any of the Holders unless the Holders have offered to the Trustee indemnity or security reasonably satisfactory to the Trustee against any loss, liability or expense. Subject to the Equal Priority Intercreditor Agreement, and except to enforce the right to receive

100

2314

DG-195

payment of principal, premium (if any) or interest when due, no Holder may pursue any remedy with respect to the Notes or this Indenture unless:

      (1)      such Holder has previously given the Trustee written notice that an Event of Default is continuing;

      (2)      Holders of at least 30.0% in aggregate principal amount of the total outstanding Notes have requested the Trustee in writing to pursue the remedy;

      (3)      Holders have offered and, if requested, provided to the Trustee indemnity or security reasonably satisfactory to the Trustee against any loss, liability or expense;

      (4)      the Trustee has not complied with such request within 60 days after the receipt thereof and the offer of security or indemnity; and

      (5)      Majority Holders have not given the Trustee a direction inconsistent with such request within such 60-day period.

SECTION 6.07   RIGHTS OF HOLDERS TO RECEIVE PAYMENT.

Notwithstanding any other provision of this Indenture (including Section 6.06), the contractual right expressly set forth in this Indenture or the Notes of any Holder to receive payment of principal of, premium, if any, or interest on the Notes held by such Holder, on or after the respective due dates, Redemption Dates or purchase date expressed in this Indenture or the Notes, or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be amended without the consent of such Holder.

SECTION 6.08   COLLECTION SUIT BY TRUSTEE.

If an Event of Default specified in Section 6.01(a)(1) or (2) occurs and is continuing, the Trustee is authorized to recover judgment in its own name and as trustee of an express trust against the Issuer for the whole amount of principal of, premium, if any, and interest remaining unpaid on the Notes and interest on overdue principal and, to the extent lawful, interest and such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel.

SECTION 6.09   RESTORATION OF RIGHTS AND REMEDIES.

If the Trustee or any Holder has instituted any proceeding to enforce any right or remedy under this Indenture and such proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or to such Holder, then and in every such case, subject to any determination in such proceedings, the Issuer, the Trustee and the Holders shall be restored severally and respectively to their former positions hereunder and thereafter all rights and remedies of the Trustee and the Holders shall continue as though no such proceeding has been instituted.

101

2315

SECTION 6.10   RIGHTS AND REMEDIES CUMULATIVE.

Except as otherwise provided with respect to the replacement or payment of mutilated, destroyed, lost or stolen Notes in Section 2.07, no right or remedy herein conferred upon or reserved to the Trustee or to the Holders is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

SECTION 6.11   DELAY OR OMISSION NOT WAIVER.

No delay or omission of the Trustee or of any Holder to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein. Every right and remedy given by this Article or by law to the Trustee or to the Holders may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Holders, as the case may be.

SECTION 6.12   TRUSTEE MAY FILE PROOFS OF CLAIM.

The Trustee is authorized to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel) and the Holders allowed in any judicial proceedings relative to any Note Party (or any other obligor upon the Notes), its creditors or its property and shall be entitled and empowered to participate as a member in any official committee of creditors appointed in such matter and to collect, receive and distribute any money or other property payable or deliverable on any such claims and any custodian in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee, and in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due to it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 7.06. To the extent that the payment of any such compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 7.06 out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Holders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise. Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

SECTION 6.13   PRIORITIES.

Subject to the provisions of any Intercreditor Agreements and the Security Documents, if the Trustee collects any money pursuant to this Article 6 or, after an Event of Default, any money

102

2316

or other property distributable in respect of the Issuer's obligations under this Indenture, it shall pay out the money in the following order:

(i) first to the Trustee (including any predecessor trustee) and second to the Notes Collateral Agent, in each case, and their respective agents and attorneys for amounts due under Section 7.06, including payment of all compensation, expenses and liabilities incurred, and all advances made, by the Trustee and the Notes Collateral Agent and the costs and expenses of collection;

(ii) to Holders for amounts due and unpaid on the Notes for principal, premium, if any, and interest, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal, premium, if any, and interest, respectively; and

(iii) to the Issuer or to such party as a court of competent jurisdiction shall direct, including any Note Party, if applicable.

The Trustee may fix a record date and payment date for any payment to Holders pursuant to this Section 6.13.

SECTION 6.14   UNDERTAKING FOR COSTS.

In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as a Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant. This Section 6.14 does not apply to a suit by the Trustee, a suit by a Holder pursuant to Section 6.07, or a suit by Holders of more than 10.0% in principal amount of the then outstanding Notes.

**ARTICLE 7**

**TRUSTEE**

SECTION 7.01   DUTIES OF TRUSTEE.

(a) If an Event of Default has occurred and is continuing, the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of his or her own affairs.

(b) Except during the continuance of an Event of Default:

(i) the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

103

2317

(ii)      in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture. However, in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture (but need not confirm or investigate the accuracy of mathematical calculations or other facts, statements, opinions or conclusions stated therein).

(c)      The Trustee may not be relieved from liabilities for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(i)      this Section 7.01(c) does not limit the effect of Sections 7.01(b) or 7.01(g);

(ii)      the Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer, unless it is proved in a court of competent jurisdiction that the Trustee was negligent in ascertaining the pertinent facts; and

(iii)      the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.05.

(d)      Whether or not therein expressly so provided, every provision of this Indenture that in any way relates to the Trustee is subject to this Section 7.01.

(e)      The Trustee shall be under no obligation to exercise any of its rights or powers under this Indenture at the request or direction of any of the Holders unless the Holders have offered to the Trustee indemnity or security reasonably satisfactory to the Trustee against any loss, liability or expense, with respect to such exercise.   In each case that the Trustee may or is required hereunder or under the Indenture, any Security Document or any Intercreditor Agreement to take any action (an "Action"), including to make any determination, to give consents, to exercise rights, powers or remedies, to release or sell Collateral or otherwise to act hereunder or under any Security Document or any Intercreditor Agreement, the Trustee may seek direction from Majority Holders. The Trustee shall not be liable with respect to any Action taken or omitted to be taken by it in accordance with the direction from Majority Holders, and shall take any Action if directed to do so by the Majority Holders if it shall have received indemnity reasonably satisfactory to the Trustee against potential costs and liabilities incurred by the Trustee relating thereto. If the Trustee shall request direction from Majority Holders with respect to any Action, the Trustee shall be entitled to refrain from such Action unless and until the Trustee shall have received direction from Majority Holders, and the Trustee shall not incur liability to any Person by reason of so refraining.

(f)      The Trustee shall not be liable for interest on any money received by it except as the Trustee may agree in writing with the Issuer. Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

104

2318

DG-199

(g)     None of the provisions of this Indenture shall require the Trustee to expend or risk its own funds or otherwise to incur any liability, financial or otherwise, in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to it against such risk or liability is not assured to it.

(h)     The parties hereto and the Holders hereby agree and acknowledge that the Holders representing the "Required Holders" (as defined in the applicable Refinancing Intercompany Credit Agreement or the Series I Intercompany Credit Agreement, as applicable) may, through the Trustee and/or Notes Collateral Agent, instruct the Lenders party to such Refinancing Intercompany Credit Agreement or the Series I Intercompany Credit Agreement, as applicable, in accordance with the terms set forth therein.  The Trustee shall be under no obligation to deliver any such instruction to the Lenders at the request or direction of such Holders unless such Holders have offered to the Trustee indemnity or security reasonably satisfactory to the Trustee against any loss, liability or expense, with respect to such exercise. Additionally, in delivering any such instruction to the Lenders, the Trustee shall have all of the rights, privileges, benefits, immunities, indemnities and other protections granted to it under this Indenture.

SECTION 7.02   RIGHTS OF TRUSTEE.

Subject to the provisions of Section 7.01:

(a)     The Trustee may conclusively rely and shall be fully protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document believed by it to be genuine and to have been signed or presented by the proper Person. The Trustee shall not be bound to make any investigation into any fact or matter stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Issuer, personally or by agent or attorney at the sole cost of the Issuer and shall incur no liability or additional liability of any kind by reason of such inquiry or investigation.

(b)     Before the Trustee acts or refrains from acting, it may require an Officer's Certificate or an Opinion of Counsel or both. The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on such Officer's Certificate or Opinion of Counsel. The Trustee may consult with counsel of its selection and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection from liability in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.

(c)     The Trustee may act through its attorneys and agents and shall not be responsible for the misconduct or negligence of any agent or attorney appointed with due care.

2319

DG-200

(d)     The Trustee shall not be liable for any action it takes or omits to take in good faith that it believes to be authorized or within the rights or powers conferred upon it by this Indenture.

(e)     Unless otherwise specifically provided in this Indenture, any demand, request, direction or notice from the Issuer shall be sufficient if signed by an Officer of the Issuer. Any request or direction of the Issuer mentioned herein shall be sufficiently evidenced by an Issuer Order.

(f)     The Trustee shall not be deemed to have notice of any Default or Event of Default unless written notice of any event which is in fact such a Default is received by a Responsible Officer of the Trustee at the Corporate Trust Office of the Trustee, and such notice references the Notes and this Indenture.

(g)     In no event shall the Trustee be responsible or liable for special, punitive, indirect, or consequential loss or damage of any kind whatsoever (including loss of profit) irrespective of whether the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(h)     The rights, privileges, benefits, immunities, indemnities and other protections given to the Trustee are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each agent, custodian and other Person employed to act hereunder, including the Notes Collateral Agent.

(i)     The Trustee may request that the Note Parties deliver a certificate setting forth the names of the individuals and/or titles of Officers (with specimen signatures) authorized at such times to take specific actions pursuant to this Indenture, which certificate may be signed by any person specified as so authorized in any certificate previously delivered and not superseded.

SECTION 7.03   <u>INDIVIDUAL RIGHTS OF TRUSTEE.</u>

The Trustee in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Issuer or any Affiliate of the Issuer with the same rights it would have if it were not Trustee. However, in the event that the Trustee acquires any conflicting interest, it must eliminate such conflict within 90 days or resign as Trustee. Any Agent may do the same with like rights and duties. The Trustee is also subject to <u>Section 7.09</u>.

SECTION 7.04   <u>TRUSTEE'S DISCLAIMER.</u>

The Trustee shall not be responsible for and makes no representation as to the validity, sufficiency or adequacy of this Indenture or the Notes, it shall not be accountable for the Issuer's use of the proceeds from the Notes or any money paid to the Issuer or upon the Issuer's direction under any provision of this Indenture, it shall not be responsible for the use or application of any money received by any Paying Agent other than the Trustee, and it shall not be responsible for any statement or recital herein or any statement in the Notes or any other document in connection with the sale of the Notes or pursuant to this Indenture other than its certificate of authentication. The Trustee shall not be responsible to make any calculation with respect to any matter under this

106

Indenture. The Trustee shall have no duty to monitor or investigate the Issuer's compliance with or the breach of, or cause to be performed or observed, any representation, warranty, or covenant, or agreement of any Person, other than the Trustee, made in this Indenture.

The Trustee does not assume any responsibility for any failure or delay in performance or any breach by the Issuer or any other Grantor under this Indenture, any Intercreditor Agreements and the Security Documents. The Trustee shall not be responsible to the Holders or any other Person for any recitals, statements, information, representations or warranties contained in this Indenture, the Security Documents, any Intercreditor Agreements or any certificate, report, statement, or other document referred to or provided for in, or received by the Trustee under or in connection with, this Indenture, any Intercreditor Agreements or any Security Document; the execution, validity, genuineness, effectiveness or enforceability of any Intercreditor Agreements and any Security Documents of any other party thereto; the genuineness, enforceability, collectability, value, sufficiency, location or existence of any Collateral, or the validity, effectiveness, enforceability, sufficiency, extent, perfection or priority of any Lien therein; the validity, enforceability or collectability of any Obligations; the assets, liabilities, financial condition, results of operations, business, creditworthiness or legal status of any obligor; or for any failure of any obligor to perform its Obligations under this Indenture, any Intercreditor Agreements and the Security Documents.

SECTION 7.05    NOTICE OF DEFAULTS.

If a Default occurs and is continuing and if it is actually known to a responsible officer of the Trustee pursuant to Section 7.02(f), the Trustee shall send to Holders a notice of the Default within 90 days after it is known to the Trustee. Except in the case of a Default relating to the payment of principal, premium, if any, or interest on any Note, the Trustee may withhold from the Holders notice of any continuing Default if it in good faith determines that withholding the notice is in the interests of the Holders.

SECTION 7.06    COMPENSATION AND INDEMNITY.

The Issuer shall pay to the Trustee from time to time such compensation for its acceptance of this Indenture and services hereunder as the parties shall agree in writing from time to time. The Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust. The Issuer shall reimburse the Trustee promptly upon request for all reasonable disbursements, advances and expenses incurred or made by it in addition to the compensation for its services. Such expenses shall include the reasonable compensation, disbursements and expenses of the Trustee's agents and counsel.

The Note Parties, jointly and severally, shall indemnify each of the Trustee or any predecessor Trustee and their officers, agents, directors and employees for, and hold them harmless against, any and all loss, damage, claim, liability or expense (including attorneys' fees and expenses), including taxes (other than taxes based upon, measured by or determined by the income of the Trustee), incurred by it in connection with the acceptance or administration of this trust and the performance of its duties hereunder (including the costs and expenses of enforcing this Indenture against any Note Party (including this Section 7.06) or defending itself against any claim whether asserted by any Holder, any Note Party or any other Person, or liability in connection with

107

DG-202

the acceptance, exercise or performance of any of its powers or duties hereunder). The Trustee shall notify the Issuer promptly of any claim for which it may seek indemnity. Failure by the Trustee to so notify the Issuer shall not relieve the Issuer of its obligations hereunder and the Trustee shall not incur any liability it if fails to so notify. The Issuer shall defend the claim and the Trustee may have separate counsel and the Issuer shall pay the fees and expenses of such counsel. The Issuer need not reimburse any expense or indemnify against any loss, liability or expense determined to have been caused by the Trustee's own willful misconduct or gross negligence.

To secure the payment obligations of the Note Parties in this Section 7.06, the Trustee shall have a Lien prior to the Notes on all money or property held or collected by the Trustee, except that held in trust to pay principal and interest on particular Notes.

When the Trustee incurs expenses or renders services after an Event of Default specified in Section 6.01(a)(6) occurs, the expenses and the compensation for the services (including the fees and expenses of its agents and counsel) are intended to constitute expenses of administration under any Bankruptcy Law.

"Trustee" for purposes of this Section shall include any predecessor Trustee; provided, however, that the negligence, willful misconduct or bad faith of any Trustee hereunder shall not affect the rights of any other Trustee hereunder.

The provisions of this Section 7.06 shall survive the satisfaction and discharge of this Indenture, the earlier resignation or removal of the Trustee or the termination for any reason of this Indenture.

SECTION 7.07    REPLACEMENT OF TRUSTEE.

A resignation or removal of the Trustee and appointment of a successor Trustee shall become effective only upon the successor Trustee's acceptance of appointment as provided in this Section 7.07. The Trustee may resign in writing at any time and be discharged from the trust hereby created by so notifying the Issuer. Majority Holders may remove the Trustee by so notifying the Trustee and the Issuer in writing. The Issuer may remove the Trustee if:

> (a)    the Trustee fails to comply with Section 7.09;

> (b)    the Trustee is adjudged a bankrupt or an insolvent or an order for relief is entered with respect to the Trustee under any Bankruptcy Law;

> (c)    a custodian or public officer takes charge of the Trustee or its property; or

> (d)    the Trustee becomes incapable of acting.

If the Trustee resigns or is removed or if a vacancy exists in the office of Trustee for any reason, the Issuer shall promptly appoint a successor Trustee. Within one year after the successor Trustee takes office, Majority Holders may appoint a successor Trustee to replace the successor Trustee appointed by the Issuer.

108

DG-203

If a successor Trustee does not take office within 60 days after the retiring Trustee resigns or is removed, the retiring Trustee (at the Issuer's expense), the Issuer or the Holders of at least 10.0% in principal amount of the then outstanding Notes may petition any court of competent jurisdiction for the appointment of a successor Trustee.

If the Trustee, after written request by any Holder who has been a Holder for at least six months, fails to comply with Section 7.09, such Holder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Issuer. Thereupon, the resignation or removal of the retiring Trustee shall become effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under this Indenture. The successor Trustee shall send a notice of its succession to Holders. The retiring Trustee shall promptly transfer all property held by it as Trustee to the successor Trustee; provided all sums owing to the Trustee hereunder have been paid and subject to the Lien provided for in Section 7.06. Notwithstanding replacement of the Trustee pursuant to this Section 7.07, the Issuer's obligations under Section 7.06 shall continue for the benefit of the retiring Trustee.

SECTION 7.08    SUCCESSOR TRUSTEE BY MERGER, ETC.

If the Trustee consolidates, merges or converts into, or transfers all or substantially all of its corporate trust business to, another Person, the successor Person without any further act shall be the successor Trustee.

SECTION 7.09    ELIGIBILITY; DISQUALIFICATION.

There shall at all times be a Trustee hereunder that is a Person organized and doing business under the laws of the United States of America or of any state thereof that is authorized under such laws to exercise corporate trustee power, that is subject to supervision or examination by federal or state authorities and that has a combined capital and surplus of at least $50.0 million as set forth in its most recent published annual report of condition.

SECTION 7.10    CERTAIN TAX MATTERS.

In order to comply with applicable tax laws (inclusive of rules, regulations and interpretations promulgated by competent authorities) related to this Indenture in effect from time to time ("Applicable Law") that a foreign financial institution, issuer, trustee, paying agent or other party is or has agreed to be subject to, the Issuer agrees (i) to use commercially reasonable efforts to provide to the Trustee sufficient information about the parties and/or transactions related to this Indenture and the Notes (including any modification to the terms of such transactions) so the Trustee can determine whether it has tax related obligations under Applicable Law, and (ii) that the Trustee shall be entitled to make any withholding or deduction from payments to the extent necessary to comply with Applicable Law for which the Trustee shall not have any liability. The terms of this section shall survive the termination of this Indenture.

109

SECTION 7.11   SECURITY DOCUMENTS; INTERCREDITOR AGREEMENTS.

By their acceptance of the Notes, the Holders hereby authorize and direct the Trustee and Notes Collateral Agent, as the case may be, to execute and deliver each of the Security Documents, the Equal Priority Intercreditor Agreement and, if applicable, any Junior Priority Intercreditor Agreement to which the Trustee or the Notes Collateral Agent, as applicable, is to be a party, including any Intercreditor Agreement or Security Documents executed on or after the Issue Date and any amendments, joinders or supplements to any Intercreditor Agreement or Security Document not prohibited by this Indenture. It is hereby expressly acknowledged and agreed that, in doing so, the Trustee and the Notes Collateral Agent are not responsible for the terms or contents of such agreements, or for the validity or enforceability thereof, or the sufficiency thereof for any purpose. Whether or not so expressly stated therein, in entering into, or taking (or forbearing from) any action under, any Intercreditor Agreement or any other Security Document, the Trustee and the Notes Collateral Agent each shall have all of the rights, privileges, benefits, immunities, indemnities and other protections granted to it under this Indenture (in addition to those that may be granted to it under the terms of such other agreement or agreements).

## ARTICLE 8

## LEGAL DEFEASANCE AND COVENANT DEFEASANCE

SECTION 8.01   OPTION   TO   EFFECT   LEGAL   DEFEASANCE   OR   COVENANT DEFEASANCE.

The Issuer may, at its option and at any time, elect to have either Section 8.02 or 8.03 applied to all outstanding Notes upon compliance with the conditions set forth below in this Article 8.

SECTION 8.02   LEGAL DEFEASANCE AND DISCHARGE.

Upon the Issuer's exercise under Section 8.01 of the option applicable to this Section 8.02, the Note Parties shall, subject to the satisfaction of the conditions set forth in Section 8.04, be deemed to have been discharged from their Obligations with respect to all outstanding Notes, this Indenture, the applicable Security Documents and Note Guarantees on the date the conditions set forth below are satisfied ("Legal Defeasance"). For this purpose, Legal Defeasance means that the Issuer shall be deemed to have paid and discharged the entire Indebtedness represented by the outstanding Notes, which shall thereafter be deemed to be "outstanding" only for the purposes of Section 8.05 and the other Sections of this Indenture referred to in clauses (a) and (b) below, and to have satisfied all its other Obligations under such Notes and this Indenture, the applicable Security Documents and the applicable Intercreditor Agreements, and to have the Obligations of each of the Guarantors discharged with respect to its Note Guarantee, and to have Liens on the Collateral securing the Notes released (and the Trustee, on demand of and at the expense of the Issuer, shall execute proper instruments acknowledging the same) and to have cured all then existing Events of Default, except for the following provisions which shall survive until otherwise terminated or discharged under this Indenture:

110

DG-205

(a)    the rights of Holders to receive payments in respect of the principal of, premium, if any, and interest on the Notes when such payments are due solely out of the trust created pursuant to this Indenture referred to in <u>Section 8.04</u>;

(b)    the Issuer's obligations with respect to Notes concerning issuing temporary Notes, registration of such Notes, mutilated, destroyed, lost or stolen Notes and the maintenance of an office or agency for payment and money for security payments held in trust;

(c)    the rights, powers, trusts, duties and immunities of the Trustee and the Notes Collateral Agent, and the Issuer's obligations in connection therewith; and

(d)    this <u>Section 8.02</u>.

Subject to compliance with this <u>Article 8</u>, the Issuer may exercise its option under this <u>Section 8.02</u> notwithstanding the prior exercise of their option under <u>Section 8.03</u>.

SECTION 8.03   <u>COVENANT DEFEASANCE.</u>

Upon the Issuer's exercise under <u>Section 8.01</u> of the option applicable to this <u>Section 8.03</u>, the Note Parties shall, subject to the satisfaction of the conditions set forth in <u>Section 8.04</u>, be released from their obligations under the covenants contained in <u>Sections 4.03</u>, <u>4.04</u>, <u>4.05</u>, <u>4.07</u>, <u>4.08</u>, <u>4.09</u>, <u>4.10</u>, <u>4.11</u>, <u>4.12</u>, <u>4.14</u>, <u>4.15</u> and 4.17 and <u>clauses (iii)</u>, <u>(iv)</u>, <u>(v)</u> and <u>(vi)</u> of <u>Section 5.01(a)</u>, <u>Section 5.01(c)</u> and <u>Section 5.01(d)</u> with respect to the outstanding Notes on and after the date the conditions set forth in <u>Section 8.04</u> are satisfied ("<u>Covenant Defeasance</u>"), and the Notes shall thereafter be deemed not "outstanding" for the purposes of any direction, waiver, consent or declaration or act of Holders (and the consequences of any thereof) in connection with such covenants, but shall continue to be deemed "<u>outstanding</u>" for all other purposes under this Indenture (it being understood that such Notes shall not be deemed outstanding for accounting purposes). For this purpose, Covenant Defeasance means that, with respect to the outstanding Notes, the Issuer and its Subsidiaries may omit to comply with and shall have no liability in respect of any term, condition or limitation set forth in any such covenant, whether directly or indirectly, by reason of any reference elsewhere herein to any such covenant or by reason of any reference in any such covenant to any other provision herein or in any other document and such omission to comply shall not constitute a Default or an Event of Default under <u>Section 6.01</u>, but, except as specified above, the remainder of this Indenture and such Notes shall be unaffected thereby. In addition, upon the Issuer's exercise under <u>Section 8.01</u> of the option applicable to this <u>Section 8.03</u>, subject to the satisfaction of the conditions set forth in <u>Section 8.04</u>, <u>Sections 6.01(a)(3)</u>, <u>6.01(a)(4)</u>, <u>6.01(a)(5)</u>, <u>6.01(a)(6)</u>, 6.01(a)(7), 6.01(a)(9) and 6.01(a)(10) shall not constitute Events of Default.

SECTION 8.04   <u>CONDITIONS TO LEGAL OR COVENANT DEFEASANCE.</u>

The following shall be the conditions to the application of either <u>Section 8.02</u> or <u>8.03</u> to the outstanding Notes:

(1)    the Issuer must irrevocably deposit with the Trustee, in trust, for the benefit of the Holders, cash in U.S. dollars, U.S. Government Obligations, or a combination

111

2325

thereof, in such amounts (including scheduled payments thereon) as will be sufficient, in the opinion of an Independent Financial Advisor, to pay the principal of, premium, if any, and interest due on the Notes on the stated maturity date or on the Redemption Date, as the case may be, of such principal, premium, if any, or interest on such Notes and the Issuer must specify whether such Notes are being defeased to maturity or to a particular Redemption Date; provided, that upon any redemption that requires the payment of the Applicable Premium, the amount deposited shall be sufficient for purposes of this Indenture to the extent that an amount is deposited with the Trustee equal to the Applicable Premium calculated as of the date of the notice of redemption, with any deficit as of the date of redemption (any such amount, the "Applicable Premium Deficit") only required to be deposited with the Trustee on or prior to the date of redemption. Any Applicable Premium Deficit shall be set forth in an Officer's Certificate delivered to the Trustee simultaneously with the deposit of such Applicable Premium Deficit that confirms that such Applicable Premium Deficit shall be applied toward such redemption;

(2)     in the case of Legal Defeasance, the Issuer shall have delivered to the Trustee an Opinion of Counsel reasonably acceptable to the Trustee confirming that, subject to customary assumptions and exclusions,

(a)     the Issuer has received from, or there has been published by, the U.S. Internal Revenue Service a ruling, or

(b)     since the issuance of the Notes, there has been a change in the applicable U.S. federal income tax law,

in either case to the effect that, and based thereon such Opinion of Counsel shall confirm that, subject to customary assumptions and exclusions, the Holders will not recognize income, gain or loss for U.S. federal income tax purposes, as applicable, as a result of such Legal Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred;

(3)     in the case of Covenant Defeasance, the Issuer shall have delivered to the Trustee an Opinion of Counsel reasonably acceptable to the Trustee confirming that, subject to customary assumptions and exclusions, the Holders will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such Covenant Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Covenant Defeasance had not occurred;

(4)     no Default or Event of Default (other than that resulting from borrowing funds to be applied to make such deposit and any similar and simultaneous deposit relating to other Indebtedness, and, in each case the granting of Liens in connection therewith) shall have occurred and be continuing on the date of such deposit;

(5)     such Legal Defeasance or Covenant Defeasance shall not result in a breach or violation of, or constitute a default under, any material agreement or material instrument (other than this Indenture) to which any Note Party is a party or by which any Note Party is bound (other than that resulting from borrowing funds to be applied to make such deposit and any similar

112

2326

and simultaneous deposit relating to other Indebtedness and, in each case, the granting of Liens in connection therewith);

(6)    the Issuer shall have delivered to the Trustee an Officer's Certificate stating that the deposit was not made by the Issuer with the intent of defeating, hindering, delaying or defrauding any creditors of any Note Party or others; and

(7)    the Issuer shall have delivered to the Trustee an Officer's Certificate and an Opinion of Counsel (which Opinion of Counsel may be subject to customary assumptions and exclusions) each stating that all conditions precedent provided for or relating to the Legal Defeasance or the Covenant Defeasance, as the case may be, have been complied with.

SECTION 8.05    DEPOSITED MONEY AND U.S. GOVERNMENT OBLIGATIONS TO BE HELD IN TRUST; OTHER MISCELLANEOUS PROVISIONS.

Subject to Section 8.06, all money and U.S. Government Obligations (including the proceeds thereof) deposited with the Trustee (or other qualifying trustee, collectively for purposes of this Section 8.05, the "Trustee") pursuant to Section 8.04 in respect of the outstanding Notes shall be held in trust and applied by the Trustee, in accordance with the provisions of such Notes and this Indenture, to the payment, either directly or through any Paying Agent (including any Note Party acting as Paying Agent) as the Trustee may determine, to the Holders of such Notes of all sums due and to become due thereon in respect of principal, premium and interest, but such money need not be segregated from other funds except to the extent required by law.

The Issuer shall pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the cash or U.S. Government Obligations deposited pursuant to Section 8.04 or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Holders of the outstanding Notes.

Anything in this Article 8 to the contrary notwithstanding, the Trustee shall deliver or pay to the Issuer from time to time upon the request of the Issuer any money or U.S. Government Obligations held by it as provided in Section 8.04 which, in the opinion of an Independent Financial Advisor expressed in a written certification thereof delivered to the Trustee (which may be the opinion delivered under Section 8.04(1)), are in excess of the amount thereof that would then be required to be deposited to effect an equivalent Legal Defeasance or Covenant Defeasance.

SECTION 8.06    REPAYMENT TO ISSUER.

The Trustee and each Paying Agent shall promptly turn over to the Issuer upon receipt of an Issuer Order any excess money or securities held by them upon payment of all the obligations under this Indenture. Any money deposited with the Trustee or any Paying Agent, or then held by the Issuer, in trust for the payment of the principal of, premium or interest on any Note and remaining unclaimed for two years after such principal, premium or interest has become due and payable shall be paid to the Issuer on its request or (if then held by the Issuer) shall be discharged from such trust; and the Holder of such Note shall thereafter look only to the Issuer for payment thereof, and all liability of the Trustee or such Paying Agent with respect to such trust money, and all liability of the Issuer as trustee thereof, shall thereupon cease.

113

2327

DG-208

SECTION 8.07    <u>REINSTATEMENT.</u>

If the Trustee or Paying Agent is unable to apply any United States dollars or U.S. Government Obligations in accordance with <u>Section 8.02</u> or <u>8.03</u>, as the case may be, by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, then the Issuer's obligations under this Indenture and the Notes shall be revived and reinstated as though no deposit had occurred pursuant to <u>Section 8.02</u> or <u>8.03</u> until such time as the Trustee or Paying Agent is permitted to apply all such money in accordance with <u>Section 8.02</u> or <u>8.03</u>, as the case may be; <u>provided</u> that, if the Issuer makes any payment of principal of, premium or interest on any Note following the reinstatement of their obligations, the Issuer shall be subrogated to the rights of the Holders of such Notes to receive such payment from the money held by the Trustee or Paying Agent.

## ARTICLE 9

## <u>AMENDMENT, SUPPLEMENT AND WAIVER</u>

SECTION 9.01    <u>WITHOUT CONSENT OF HOLDERS.</u>

Notwithstanding <u>Section 9.02</u>, the Issuer, any Guarantor (with respect to its Note Guarantee), this Indenture, the Equal Priority Intercreditor Agreement, any Junior Priority Intercreditor Agreement or the Security Documents to which it is a party and excluding any amendment or supplement the sole purpose of which is to add an additional Guarantor), the Trustee and the Notes Collateral Agent, without the consent of any Holders, may amend the Notes, the Note Guarantee this Indenture, the Equal Priority Intercreditor Agreement, any Junior Priority Intercreditor Agreement or the Security Documents, for any of the following purposes:

(1)    to cure any ambiguity, omission, mistake, defect or inconsistency;

(2)    to provide for uncertificated Notes in addition to or in place of certificated Notes or to alter the provisions of this Indenture relating to the form of Notes (including the related definitions) in a manner that does not materially adversely affect any Holder;

(3)    to comply with <u>Article 5</u>;

(4)    to provide for the assumption of any Note Party's obligations to the Holders pursuant to the terms of this Indenture, the Equal Priority Intercreditor Agreement, any Junior Priority Intercreditor Agreement or any Security Document;

(5)    to make any change that would provide any additional rights or benefits to the Holders or that does not adversely affect the legal rights under this Indenture of any such Holder in any material respect;

(6)    to add covenants for the benefit of the Holders or to surrender any right or power conferred upon any Note Party;

(7)    to provide for the issuance of Additional Notes in accordance with the terms of this Indenture;

114

2328

(8)      to comply with requirements of the SEC in order to effect or maintain the qualification of this Indenture under the Trust Indenture Act, if applicable;

(9)      to evidence and provide for the acceptance and appointment under this Indenture of a successor Trustee, a successor Notes Collateral Agent or a successor paying agent hereunder pursuant to the requirements hereof;

(10)     [reserved];

(11)     [reserved];

(12)     to make any amendment to the provisions of this Indenture relating to the transfer and legending of Notes as permitted by this Indenture, including to facilitate the issuance and administration of the Notes; provided, however, that such amendment does not materially and adversely affect the rights of Holders to transfer Notes;

(13)     to add Collateral with respect to any or all of the Notes and/or the Note Guarantees;

(14)     [reserved];

(15)     to comply with the rules of any applicable securities depositary;

(16)     to add any Additional Equal Priority Secured Parties to any Security Documents or the Equal Priority Intercreditor Agreement or add any Junior Priority Secured Parties to any Junior Priority Intercreditor Agreement;

(17)     to enter into the Equal Priority Intercreditor Agreement, any Junior Priority Intercreditor Agreement or any joinder thereto

(18)     to release any Collateral from the Lien securing the Notes when permitted or required by the Security Documents, this Indenture (including pursuant to Section 4.12(b) and including any release of any Lien that is not then otherwise required by this Indenture to be pledged as security for the Notes) or the Equal Priority Intercreditor Agreement;

(19)     in the case of any Security Document, to include therein any legend required to be set forth therein pursuant to the Equal Priority Intercreditor Agreement or any Junior Priority Intercreditor Agreement, or to modify any such legend as required by the Equal Priority Intercreditor Agreement or any Junior Priority Intercreditor Agreement;

(20)     with respect to the Security Documents, the Equal Priority Intercreditor Agreement and any Junior Priority Intercreditor Agreement, as provided in the relevant Security Document, Equal Priority Intercreditor Agreement or Junior Priority Intercreditor Agreement, as applicable; or

(21)     to provide for the succession of any parties to the Security Documents, the Equal Priority Intercreditor Agreement or any Junior Priority Intercreditor Agreement (and any amendments that are administrative or ministerial in nature) in connection

115

2329

with an amendment, renewal, extension, substitution, refinancing, restructuring, replacement, supplementing or other modification from time to time of any agreement that is not prohibited by this Indenture.

Upon the request of the Issuer, and upon receipt by the Trustee of the documents described in Section 9.06, the Trustee and/or the Notes Collateral Agent shall join with the Note Parties in the execution of any amended or supplemental indenture or security documents or intercreditor agreements authorized or not prohibited by the terms of this Indenture and to make any further appropriate agreements and stipulations that may be therein contained, but the Trustee and/or the Notes Collateral Agent shall not be obligated to enter into such amended or supplemental indenture or security documents or intercreditor agreements that directly affect its own rights, duties or immunities under this Indenture or otherwise.

SECTION 9.02   WITH CONSENT OF HOLDERS.

Except as provided in Section 9.01 or below in this Section 9.02, the Note Parties and the Trustee and the Notes Collateral Agent may amend or supplement this Indenture, the Notes, any Note Guarantee, the Equal Priority Intercreditor Agreement, any Junior Priority Intercreditor Agreement and the Security Documents with the consent of the Holders of at least a majority in aggregate principal amount of the then outstanding Notes (for the avoidance of doubt, including Additional Notes, if any) voting as a single class (including consents or waivers obtained in connection with a purchase or tender offer (including a Change of Control Offer) or exchange offer for, or purchase of, the Notes), and, subject to Section 6.04 and 6.07, any existing Default or Event of Default (other than a Default or Event of Default in the payment of the principal of, premium or interest on the Notes, except a payment default resulting from an acceleration that has been rescinded) or compliance with any provision of this Indenture, the Notes, any Note Guarantee, the Equal Priority Intercreditor Agreement, any Junior Priority Intercreditor Agreement or any Security Document may be waived with the consent of the Holders of at least a majority in aggregate principal amount of the then outstanding Notes (for the avoidance of doubt, including Additional Notes, if any) voting as a single class (including consents or waivers obtained in connection with a purchase or tender offer (including a Change of Control Offer) or exchange offer for, or purchase of, the Notes). Section 2.08 and Section 2.09 shall determine which Notes are considered to be "outstanding" for the purposes of this Section 9.02.

Upon the request of the Issuer and upon the filing with the Trustee of evidence satisfactory to the Trustee of the consent of the Holders as aforesaid, and upon receipt by the Trustee of the documents described in Section 9.06, the Trustee and/or the Notes Collateral Agent shall join with Note Parties in the execution of any amended or supplemental indenture or security documents or intercreditor agreements authorized or not prohibited by the terms of this Indenture and to make any further appropriate agreements and stipulations that may be therein contained, but the Trustee and/or the Notes Collateral Agent shall not be obligated to enter into such amended or supplemental indenture or security documents or intercreditor agreements that directly affect its own rights, duties or immunities under this Indenture or otherwise.

It shall not be necessary for the consent of the Holders under this Section 9.02 to approve the particular form of any proposed amendment or waiver; it shall be sufficient if such consent approves the substance thereof.

116

2330

DG-211

After an amendment, supplement or waiver under this Section 9.02 becomes effective, the Issuer shall deliver to the Holders of Notes affected thereby a notice briefly describing the amendment, supplement or waiver. Any failure of the Issuer to deliver such notice, or any defect therein, shall not, however, in any way impair or affect the validity of any such amended or supplemental indenture or waiver.

Without the consent of each affected Holder, an amendment or waiver under this Section 9.02 may not, with respect to any Notes held by a non-consenting Holder:

(1)    reduce the principal amount of such Notes whose Holders must consent to an amendment, supplement or waiver;

(2)    reduce the principal of or change the fixed final maturity of any such Note or reduce the premium payable upon the redemption of such Notes or change the time at which such Notes may be redeemed under Section 3.07; provided that any amendment to notice periods may be made with the consent of Majority Holders;

(3)    reduce the rate of or change the time for payment of interest on any Note;

(4)    waive a Default or Event of Default in (a) the payment of principal of or premium, if any, or interest on the Notes, except a rescission of acceleration of the Notes by the Holders of at least a majority in aggregate principal amount of the outstanding Notes and a waiver of the payment default that resulted from such acceleration, or (b) in respect of a covenant or provision contained in this Indenture or any Note Guarantee which cannot be amended or modified without the consent of all affected Holders;

(5)    make any Note payable in money other than that stated therein;

(6)    make any change in the provisions of this Indenture relating to waivers of past Defaults or the rights of Holders to receive payments of principal of or premium, if any, or interest on the Notes;

(7)    make any change in these amendment and waiver provisions;

(8)    amend the contractual right expressly set forth in this Indenture or any Note of any Holder to institute suit for the enforcement of any payment of principal, premium, if any, and interest on such Holder's Notes on or after the due dates therefor; or

(9)    make any change to or modify the ranking of the Notes that would adversely affect the Holders.

Notwithstanding the foregoing, without the consent of the Holders of at least 66-2⁄3% in aggregate principal amount of the Notes then outstanding, no amendment or waiver may (A) make any change in any Security Document, the Equal Priority Intercreditor Agreement, any Junior Priority Intercreditor Agreement or the provisions in this Indenture dealing with Collateral or application of trust proceeds of the Collateral, which change has the effect of releasing the Liens on all or substantially all of the Collateral which secure the Secured Notes Obligations or (B)

117

DG-212

change or alter the priority of the Liens securing the Secured Notes Obligations in any material portion of the Collateral in any way materially adverse, taken as a whole, to the Holders, other than, in each case, as provided under the terms of this Indenture, the Security Documents or the Equal Priority Intercreditor Agreement.

SECTION 9.03   [RESERVED].

SECTION 9.04   REVOCATION AND EFFECT OF CONSENTS.

Until an amendment, supplement or waiver becomes effective, a consent to it by a Holder is a continuing consent by the Holder and every subsequent Holder of a Note or portion thereof that evidences the same debt as the consenting Holder's Note, even if notation of the consent is not made on any Note. However, any such Holder or subsequent Holder may revoke the consent as to its Note if the Trustee receives written notice of revocation before the date the waiver, supplement or amendment becomes effective. An amendment, supplement or waiver becomes effective in accordance with its terms and thereafter binds every Holder.

The Issuer may, but shall not be obligated to, fix a record date for the purpose of determining the Holders entitled to consent to any amendment, supplement or waiver. If a record date is fixed, then, notwithstanding the preceding paragraph, those Persons who were Holders at such record date (or their duly designated proxies), and only such Persons, shall be entitled to consent to such amendment, supplement, or waiver or to revoke any consent previously given, whether or not such Persons continue to be Holders after such record date. No such consent shall be valid or effective for more than 120 days after such record date unless the consent of the requisite number of Holders has been obtained.

SECTION 9.05   NOTATION ON OR EXCHANGE OF NOTES.

The Trustee may place an appropriate notation about an amendment, supplement or waiver on any Note thereafter authenticated. The Issuer in exchange for all Notes may issue and the Trustee shall, upon receipt of an Authentication Order, authenticate new Notes that reflect the amendment, supplement or waiver.

Failure to make the appropriate notation or issue a new Note shall not affect the validity and effect of such amendment, supplement or waiver.

SECTION 9.06   TRUSTEE TO SIGN AMENDMENTS, ETC.

The Trustee and the Notes Collateral Agent shall sign any amendment, supplement or waiver authorized pursuant to this Article 9 if the amendment or supplement does not adversely affect the rights, duties, liabilities or immunities of the Trustee and the Notes Collateral Agent. The Issuer may not sign an amendment, supplement or waiver until its Board approves it. In executing any amendment, supplement or waiver, the Trustee shall receive and (subject to Section 7.01) shall be fully protected in relying upon, in addition to the documents required by Section 13.04, an Officer's Certificate and an Opinion of Counsel stating that the execution of such amended or supplemental indenture or security documents or intercreditor agreements is authorized or not prohibited by this Indenture and that such amendment, supplement or waiver is

118

2332

the legal, valid and binding obligation of each Note Party, enforceable against them in accordance with its terms, subject to customary exceptions, and complies with the provisions hereof.

## ARTICLE 10

## <u>GUARANTEES</u>

SECTION 10.01 <u>GUARANTEE.</u>

Subject to this <u>Article 10</u>, each of the Guarantors hereby, jointly and severally, fully and unconditionally guarantees, as primary obligor and not merely as surety, to each Holder of a Note authenticated and delivered by the Trustee and to the Trustee and its successors and assigns, irrespective of the validity and enforceability of this Indenture, the Notes or the Obligations of the Issuer hereunder or thereunder, that: (a) the principal of, interest and premium on the Notes shall be promptly paid in full when due, whether at maturity, by acceleration, redemption or otherwise, and interest on the overdue principal of and interest on the Notes, if any, if lawful, and all other Obligations of the Issuer to the Holders or the Trustee hereunder or thereunder shall be promptly paid in full or performed, all in accordance with the terms hereof and thereof; and (b) in case of any extension of time of payment or renewal of any Notes or any of such other Obligations, that same shall be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration or otherwise. Failing payment when due of any amount so guaranteed or any performance so guaranteed for whatever reason, the Guarantors shall be jointly and severally obligated to pay the same immediately. Each Guarantor agrees that this is a guarantee of payment and not a guarantee of collection.

The Guarantors hereby agree that their obligations hereunder shall be unconditional, irrespective of the validity, regularity or enforceability of the Notes or this Indenture, the absence of any action to enforce the same, any waiver or consent by any Holder with respect to any provisions hereof or thereof, the recovery of any judgment against the Issuer, any action to enforce the same or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor. Each Guarantor hereby waives (to the extent permitted by law) diligence, presentment, demand of payment, filing of claims with a court in the event of insolvency or bankruptcy of the Issuer, any right to require a proceeding first against the Issuer, protest, notice and all demands whatsoever and covenants that this Note Guarantee shall not be discharged except by complete performance of the obligations contained in the Notes and this Indenture.

Each Guarantor also agrees to pay any and all costs and expenses (including reasonable attorneys' fees) incurred by the Trustee or any Holder in enforcing any rights under this <u>Section 10.01</u>.

If any Holder or the Trustee is required by any court or otherwise to return to the Issuer, the Guarantors or any custodian, trustee, liquidator or other similar official acting in relation to either the Issuer or the Guarantors, any amount paid either to the Trustee or such Holder, this Note Guarantee, to the extent theretofore discharged, shall be reinstated in full force and effect.

Each Guarantor agrees that it shall not be entitled to any right of subrogation in relation to the Holders in respect of any obligations guaranteed hereby until payment in full of all obligations

119

2333

guaranteed hereby. Each Guarantor further agrees that, as between the Guarantors, on the one hand, and the Holders and the Trustee, on the other hand, (x) the maturity of the obligations guaranteed hereby may be accelerated as provided in Article 6 for the purposes of this Note Guarantee, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the obligations guaranteed hereby, and (y) in the event of any declaration of acceleration of such obligations as provided in Article 6, such obligations (whether or not due and payable) shall forthwith become due and payable by the Guarantors for the purpose of this Note Guarantee. The Guarantors shall have the right to seek contribution from any non-paying Guarantor so long as the exercise of such right does not impair the rights of the Holders under the Note Guarantees.

Each Note Guarantee shall remain in full force and effect and continue to be effective should any petition be filed by or against the Issuer for liquidation or reorganization, should the Issuer become insolvent or make an assignment for the benefit of creditors or should a receiver or trustee be appointed for all or any significant part of the Issuer's assets, and shall, to the fullest extent permitted by law, continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Notes are, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee on the Notes or Note Guarantees, whether as a "voidable preference", "fraudulent transfer" or otherwise, all as though such payment or performance had not been made. In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Notes shall, to the fullest extent permitted by law, be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

In case any provision of any Note Guarantee shall be invalid, illegal or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

The Note Guarantee issued by any Guarantor shall be a general senior obligation of such Guarantor and shall be equal in right of payment with all existing and future Senior Indebtedness of such Guarantor.

Each payment to be made by a Guarantor in respect of its Note Guarantee shall be made without set-off, counterclaim, reduction or diminution of any kind or nature.

SECTION 10.02 LIMITATION ON GUARANTOR LIABILITY.

Each Guarantor, and by its acceptance of Notes, each Holder, hereby confirms that it is the intention of all such parties that the Note Guarantee of such Guarantor not constitute a fraudulent transfer or conveyance for purposes of Bankruptcy Law, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar federal or state law to the extent applicable to any Note Guarantee. To effectuate the foregoing intention, the Trustee, the Holders and the Guarantors hereby irrevocably agree that the obligations of each Guarantor shall be limited to the maximum amount as will, after giving effect to such maximum amount and all other contingent and fixed liabilities of such Guarantor that are relevant under such laws and after giving effect to any collections from, rights to receive contribution from or payments made by or on behalf of any other Guarantor in respect of the obligations of such other Guarantor under this Article 10, result in the obligations of such Guarantor under its Note Guarantee not constituting a fraudulent

120

2334

DG-215

conveyance or fraudulent transfer under applicable law. Each Guarantor that makes a payment under its Note Guarantee shall be entitled upon payment in full of all guaranteed Obligations under this Indenture to a contribution from each other Guarantor in an amount equal to such other Guarantor's pro rata portion of such payment based on the respective net assets of all the Guarantors at the time of such payment determined in accordance with GAAP.

SECTION 10.03  EXECUTION AND DELIVERY.

To evidence its Note Guarantee set forth in Section 10.01, (i) each Subsidiary that executes this Indenture as a Guarantor on the Issue Date hereby agrees that this Indenture shall be executed on behalf of such Guarantor by any Officer of such Guarantor and (ii) each Subsidiary that thereafter becomes a Guarantor in accordance with the terms of this Indenture agrees that a supplemental indenture, substantially in the form of Exhibit D hereto, shall be executed on behalf of such Guarantor by any Officer of such Guarantor.

Each Guarantor hereby agrees that its Note Guarantee set forth in Section 10.01 shall remain in full force and effect notwithstanding the absence of the endorsement of any notation of such Note Guarantee on the Notes.

If an Officer of the Issuer or any Guarantor whose signature is on this Indenture or any supplemental indenture hereto no longer holds that office at the time the Trustee authenticates any Note, the Note Guarantee shall be valid nevertheless.

The delivery of any Note by the Trustee, after the authentication thereof hereunder, shall constitute due delivery of the Note Guarantee set forth in this Indenture on behalf of the Guarantors.

If required by Section 4.15, the Issuer shall cause any of its Subsidiaries to comply with the provisions of Section 4.15 and this Article 10, to the extent applicable.

SECTION 10.04  SUBROGATION.

Each Guarantor shall be subrogated to all rights of Holders against the Issuer in respect of any amounts paid by any Guarantor pursuant to the provisions of Section 10.01; provided that, if an Event of Default has occurred and is continuing, no Guarantor shall be entitled to enforce or receive any payments arising out of, or based upon, such right of subrogation until all amounts then due and payable by the Issuer under this Indenture and the Notes shall have been paid in full.

SECTION 10.05  BENEFITS ACKNOWLEDGED.

Each Guarantor acknowledges that it will receive direct and indirect benefits from the financing arrangements contemplated by this Indenture and that the guarantee and waivers made by it pursuant to its Note Guarantee are knowingly made in contemplation of such benefits.

SECTION 10.06  RELEASE OF NOTE GUARANTEES.

Notwithstanding anything to the contrary, a Note Guarantee by a Guarantor shall be automatically and unconditionally released and discharged, and no further action by such

121

DG-216

Guarantor, the Issuer or the Trustee is required for the release of such Guarantor's Note Guarantee upon (i) a Legal Defeasance or Covenant Defeasance with respect to the Notes in accordance with Article 8 or a satisfaction and discharge of this Indenture with respect to the Notes in accordance with Article 11, (ii) upon the merger, amalgamation, consolidation or winding up of such Guarantor with and into the Issuer or another Guarantor that is the surviving Person in such merger, amalgamation, consolidation or winding up, or upon the liquidation of such Guarantor or (iii) as described under Article 9 hereof or in accordance with the provisions of the Equal Priority Intercreditor Agreement.

## ARTICLE 11

## SATISFACTION AND DISCHARGE

SECTION 11.01 SATISFACTION AND DISCHARGE.

This Indenture shall be discharged and shall cease to be of further effect as to all Notes, and the Liens on the Collateral securing the Notes will be released, when:

(1)     either:

(i)     all Notes theretofore authenticated and delivered (except mutilated, lost, stolen or destroyed Notes which have been replaced or paid and Notes for whose payment money has theretofore been deposited in trust) have been delivered to the Trustee for cancellation; or

(ii)     (A) all Notes not theretofore delivered to the Trustee for cancellation (i) have become due and payable by reason of the making of a notice of redemption or otherwise, (ii) will become due and payable within one year or (iii) are to be called for redemption within one year under arrangements reasonably satisfactory to the Trustee for the giving of notice of redemption by the Trustee in the name, and at the expense, of the Issuer;

(B)     any Note Party has irrevocably deposited or caused to be deposited with the Trustee as trust funds in trust solely for the benefit of the Holders, cash in U.S. dollars, U.S. Government Obligations or a combination thereof in an amount (including scheduled payments thereon) sufficient to pay and discharge the entire Indebtedness on the Notes not theretofore delivered to the Trustee for cancellation, for principal, premium, if any, and accrued interest to the date of such deposit (in the case of Notes which have become due and payable) or to the date of maturity or redemption, as the case may be; provided, that upon any redemption that requires the payment of the Applicable Premium, the amount deposited shall be sufficient for purposes of this Indenture to the extent that an amount is deposited with the Trustee equal to the Applicable Premium, calculated as of the date of the notice of redemption, with any Applicable Premium Deficit only required to be deposited with the Trustee on or prior to the date of redemption. Any Applicable Premium Deficit shall be set forth in an Officer's Certificate delivered to the Trustee simultaneously with the deposit of such Applicable

122

DG-217

Premium Deficit that confirms that such Applicable Premium Deficit shall be applied toward such redemption;

(C)      no Default or Event of Default (other than that resulting from borrowing funds to be applied to make such deposit or any similar and simultaneous deposit relating to other Indebtedness and, in each case, the granting of Liens in connection therewith) shall have occurred and be continuing on the date of such deposit or shall occur as a result of such deposit and such deposit will not result in a breach or violation of, or constitute a default under any, material agreement or material instrument (other than this Indenture) to which any Note Party is a party or by which any Note Party is bound (other than that resulting from borrowing funds to be applied to make such deposit and any similar and simultaneous deposit relating to other Indebtedness and, in each case, the granting of Liens in connection therewith); and

(D)      the Issuer has delivered irrevocable instructions to the Trustee to apply the deposited money toward the payment of the Notes at maturity or the Redemption Date, as the case may be.

(2)      the Issuer has paid or caused to be paid all other sums payable by it under this Indenture; and

(3)      the Issuer has delivered an Officer's Certificate and an Opinion of Counsel (which Opinion of Counsel may be subject to customary assumptions and exclusions) to the Trustee stating that all conditions precedent to satisfaction and discharge have been complied with. Such Opinion of Counsel may rely on such Officer's Certificate as to matters of fact, including clauses (ii)(A), (B), (C) and (D) above.

Notwithstanding the satisfaction and discharge of this Indenture, if money shall have been deposited with the Trustee pursuant to subclause (ii)(B) of clause (1) of this Section 11.01, the provisions of Section 11.02 and Section 8.06 shall survive.

SECTION 11.02  APPLICATION OF TRUST MONEY.

Subject to the provisions of Section 8.06, all money deposited with the Trustee pursuant to Section 11.01 shall be held in trust and applied by it, in accordance with the provisions of the Notes and this Indenture, to the payment, either directly or through any Paying Agent (including any Note Party acting as Paying Agent) as the Trustee may determine, to the Persons entitled thereto, of the principal, premium and interest for whose payment such money has been deposited with the Trustee; but such money need not be segregated from other funds except to the extent required by law.

If the Trustee or Paying Agent is unable to apply any money in accordance with Section 11.01 by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the each Note Party's obligations under this Indenture and the Notes shall be revived and reinstated as though no deposit had occurred pursuant to Section 11.01; provided that if the Issuer has made any

123

2337

payment of principal of, premium or interest on any Notes because of the reinstatement of its obligations, the Issuer shall be subrogated to the rights of the Holders of such Notes to receive such payment from the money held by the Trustee or Paying Agent.

## ARTICLE 12

## COLLATERAL

SECTION 12.01 SECURITY DOCUMENTS.

(a)    The due and punctual payment of the principal of, premium and interest on the Notes when and as the same shall be due and payable, whether on an interest payment date, at maturity, by acceleration, repurchase, redemption or otherwise, and interest on the overdue principal of, premium and interest on the Notes and performance of all other Obligations of the Note Parties to the Holders or the Trustee under this Indenture, the Notes, the Note Guarantees, any Intercreditor Agreements and the Security Documents, according to the terms hereunder or thereunder, shall be secured as provided in the Security Documents, which define the terms of the Liens that secure Secured Notes Obligations, subject to the terms of any Intercreditor Agreements. The Trustee and the Note Parties hereby acknowledge and agree that the Notes Collateral Agent holds the Collateral in trust for the benefit of the Holders, the Trustee and the Notes Collateral Agent and pursuant to the terms of the Security Documents and any Intercreditor Agreements. Each Holder, by accepting a Note, consents and agrees to the terms of the Security Documents (including the provisions providing for the possession, use, release and foreclosure of Collateral) and any Intercreditor Agreements as the same may be in effect or may be amended from time to time in accordance with their terms and this Indenture and any Intercreditor Agreements, and authorizes and directs the Notes Collateral Agent to enter into the Security Documents on the Issue Date and to perform its obligations and exercise its rights thereunder in accordance therewith. In the event of conflict between an Intercreditor Agreement, any of the other Security Documents and this Indenture, the applicable Intercreditor Agreement shall control. The Issuer shall deliver to the Notes Collateral Agent copies of all documents required to be filed pursuant to the Security Documents, and will do or cause to be done all such acts and things as may be reasonably required by the next sentence of this Section 12.01, to assure and confirm to the Notes Collateral Agent the security interest in the Collateral contemplated hereby, by the Security Documents or any part thereof, as from time to time constituted, so as to render the same available for the security and benefit of this Indenture and of the Notes secured hereby, according to the intent and purposes herein expressed. The Note Parties shall, at their sole expense and subject to the other limitations set forth in Section 12.07, take all actions (including filing Uniform Commercial Code and other financing statements, mortgages and deeds of trust) that may be required under applicable law, or that the Trustee or the Notes Collateral Agent may reasonably request, in order to ensure the creation, perfection and priority (or continuance thereof) of the security interests created or intended to be created by the Security Documents in the Collateral. Such security interests will be created under the Security Documents and other security agreements, mortgages, deeds of trust and other instruments and documents in form reasonably satisfactory to the Trustee.

SECTION 12.02 <u>RELEASE OF COLLATERAL.</u>

(a)      Collateral may be released from the Liens and security interests created by the Security Documents at any time and from time to time in accordance with the provisions of the Security Documents, any Intercreditor Agreements and this Indenture. Notwithstanding anything to the contrary in the Security Documents, any Intercreditor Agreements and this Indenture, the Note Parties will be entitled to the release of property and other assets constituting Collateral from the Liens securing the Notes and the Note Guarantees under any one or more of the following circumstances:

(i)      to enable any Note Party to consummate the sale, transfer or other disposition (including by the termination of Financing Leases or the repossession of the leased property in a Financing Lease by the lessor and by means of a Restricted Payment) of such Collateral to any Person other than any Note Party , to the extent such sale, transfer or other disposition is not prohibited under <u>Section 4.10</u>;

(ii)      in the case of a Guarantor that is released from its Note Guarantee, with respect to the Capital Stock, and property and other assets, of such Guarantor, upon the release of such Guarantor from its Note Guarantee;

(iii)      [reserved];

(iv)      with respect to any Collateral that becomes an Excluded Asset, upon it becoming an Excluded Asset;

(v)      [reserved];

(vi)      [reserved];

(vii)      in connection with any enforcement action taken by the Controlling Collateral Agent in accordance with the terms of the Equal Priority Intercreditor Agreement; or

(viii)      as described under <u>Article 9</u>.

(b)      The Liens on the Collateral securing the Notes and the Note Guarantees also shall automatically and without the need for any further action by any Person be terminated and released:

(i)      upon payment in full of the principal of, together with accrued and unpaid interest on, the Notes and all other Obligations in respect of the Notes under this Indenture, the Note Guarantees and the Security Documents that are due and payable at or prior to the time such principal, together with accrued and unpaid interest, are paid;

(ii)      upon a Legal Defeasance or Covenant Defeasance with respect to the Notes under this Indenture as described under <u>Section 8.02</u> and <u>Section 8.03</u>, or a satisfaction and discharge of this Indenture with respect to the Notes as described under <u>Section 11.01</u>; or

<div align="center">125</div>

<div align="center">2339</div>

(iii)    pursuant to the Equal Priority Intercreditor Agreement and the Security Documents with respect to the Notes,

in each case, other than any contingent obligations (including contingent indemnity obligations not yet due or payable).

(c)    [reserved].

(d)    With respect to any release of Collateral, upon receipt of an Officer's Certificate and an Opinion of Counsel stating that all conditions precedent under this Indenture and the Security Documents and any Intercreditor Agreements, as applicable, to such release have been met and that it is permitted for the Trustee or Notes Collateral Agent to execute and deliver the documents requested by the Issuer in connection with such release and any necessary or proper instruments of termination, satisfaction or release prepared by the Issuer, the Trustee and the Notes Collateral Agent shall execute, deliver or acknowledge (at the Issuer's expense) such instruments or releases to evidence the release of any Collateral permitted to be released pursuant to this Indenture or the Security Documents or any Intercreditor Agreements and shall do or cause to be done (at the Issuer's expense) all acts reasonably requested of them to release such Lien as soon as is reasonably practicable. Neither the Trustee nor the Notes Collateral Agent shall be liable for any such release undertaken in reliance upon any such Officer's Certificate and such Opinion of Counsel, and notwithstanding any term hereof or in any Security Document or in any Intercreditor Agreements to the contrary, the Trustee and the Notes Collateral Agent shall not be under any obligation to release any such Lien and security interest, or execute and deliver any such instrument of release, satisfaction or termination, unless and until it receives such Officer's Certificate.

SECTION 12.03 <u>SUITS TO PROTECT THE COLLATERAL.</u>

Subject to the provisions of <u>Article 7</u> and the Security Documents and any Intercreditor Agreements, the Trustee may or may direct the Notes Collateral Agent to take all actions it determines in order to:

(a)    enforce any of the terms of the Security Documents; and

(b)    collect and receive any and all amounts payable in respect of the Obligations hereunder.

Subject to the provisions of the Security Documents and any Intercreditor Agreements, the Trustee and the Notes Collateral Agent shall have power to institute and to maintain such suits and proceedings as the Trustee may determine to prevent any impairment of the Collateral by any acts which may be unlawful or in violation of any of the Security Documents or this Indenture, and such suits and proceedings as the Trustee may determine to preserve or protect its interests and the interests of the Holders in the Collateral. Nothing in this <u>Section 12.03</u> shall be considered to impose any such duty or obligation to act on the part of the Trustee or the Notes Collateral Agent.

126

DG-221

SECTION 12.04 <u>AUTHORIZATION OF RECEIPT OF FUNDS BY THE TRUSTEE UNDER THE SECURITY DOCUMENTS.</u>

Subject to the provisions of any Intercreditor Agreements, the Trustee is authorized to receive any funds for the benefit of the Holders distributed under the Security Documents, and to make further distributions of such funds to the Holders according to the provisions of this Indenture.

SECTION 12.05 <u>[RESERVED]</u>.

SECTION 12.06 <u>POWERS EXERCISABLE BY RECEIVER OR TRUSTEE.</u>

In case the Collateral shall be in the possession of a receiver or trustee, lawfully appointed, the powers conferred in this <u>Article 12</u> upon any Note Party with respect to the release, sale or other disposition of such property may be exercised by such receiver or trustee, and an instrument signed by such receiver or trustee shall be deemed the equivalent of any similar instrument of any Note Party or of any Officer or Officers thereof required by the provisions of this <u>Article 12</u>; and if the Trustee shall be in the possession of the Collateral under any provision of this Indenture, then such powers may be exercised by the Trustee.

SECTION 12.07 <u>CERTAIN LIMITATIONS ON COLLATERAL.</u>

Notwithstanding anything to the contrary, to the extent that the Lien on any Collateral is not or cannot be created and/or perfected on the Issue Date (other than (a) by the execution and delivery of the Security Agreement by the Note Parties and (b) a Lien on Collateral that is of the type that may be perfected by the filing of a financing statement in the United States under the UCC), in each case after the Issuer's use of commercially reasonably efforts to do so or without undue burden or expense, the Issuer shall take all necessary actions to create and/or perfect such Lien pursuant to arrangements to be mutually agreed between the Issuer and the Notes Collateral Agent acting reasonably. In addition, notwithstanding anything to the contrary, it is further understood and agreed that:

(a)     the Notes Collateral Agent may waive or grant extensions of time for the creation and perfection of security interests in, or obtaining Mortgages, policies of title insurance, legal opinions, surveys, appraisals or other deliverables with respect to, particular assets or the provision of any Note Guarantee by any Subsidiary;

(b)     no later than 90 days after the Issue Date, each Note Party shall deliver a Collateral Agreement to the Notes Collateral Agent for each Deposit Account, securities account, and commodities account of each Note Party, in each case, in form and substance reasonably satisfactory to the Notes Collateral Agent. Notwithstanding anything to the contrary in this Agreement or any Security Document, at all times, each Deposit Account, securities account, and commodities account established and/or maintained by each Note Party must be subject to a Control Agreement except as otherwise agreed by the Notes Collateral Agent in its reasonable discretion;

2341

(c)      no later than 90 days after the Issue Date (or as soon as practicable following such 90-day period, provided that Bradford County Real Estate Partners LLC is using commercially reasonable efforts to obtain the same), Bradford County Real Estate Partners LLC shall satisfy the requirements set forth in Section 4.17(b) of this Indenture with respect to the Bradford County Property; and

(d)      no actions shall be required to perfect a security interest in (1) any vehicle, or other asset subject to a certificate of title, (2) letter-of-credit rights not constituting supporting obligations of other Collateral, (3) [reserved], (4) [reserved] or (5) commercial tort claims with a value of less than $1 million, except in the case of each of clauses (1) through (5), perfection actions limited solely to the filing of a UCC financing statement.

SECTION 12.08  NOTES COLLATERAL AGENT.

(a)      The Issuer and each of the Holders by acceptance of the Notes hereby designates and appoints the Notes Collateral Agent as its agent under this Indenture, the Security Documents and any Intercreditor Agreements, and the Issuer and each of the Holders by acceptance of the Notes hereby irrevocably authorizes the Notes Collateral Agent to take such action on its behalf under the provisions of this Indenture, the Security Documents and any Intercreditor Agreements and to exercise such powers and perform such duties as are expressly delegated to the Notes Collateral Agent by the terms of this Indenture, the Security Documents and any Intercreditor Agreements, and consents and agrees to the terms of any Intercreditor Agreements and each Security Document, as the same may be in effect or may be amended, restated, supplemented or otherwise modified from time to time in accordance with their respective terms. The Notes Collateral Agent agrees to act as such on the express conditions contained in this Section 12.08. Each Holder agrees that any action taken by the Notes Collateral Agent in accordance with the provision of this Indenture, any Intercreditor Agreements and the Security Documents, and the exercise by the Notes Collateral Agent of any rights or remedies set forth herein and therein shall be authorized and binding upon all Holders. Notwithstanding any provision to the contrary contained elsewhere in this Indenture, the Security Documents and any Intercreditor Agreements, the duties of the Notes Collateral Agent shall be ministerial and administrative in nature, and the Notes Collateral Agent shall not have any duties or responsibilities, except those expressly set forth herein and in the Security Documents and any Intercreditor Agreements to which the Notes Collateral Agent is a party, nor shall the Notes Collateral Agent have or be deemed to have any trust or other fiduciary relationship with the Trustee, any Holder or any Grantor, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Indenture, the Security Documents and any Intercreditor Agreements or otherwise exist against the Notes Collateral Agent. Without limiting the generality of the foregoing sentence, the use of the term "agent" in this Indenture with reference to the Notes Collateral Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.

(b)      The Notes Collateral Agent may perform any of its duties under this Indenture, the Security Documents or any Intercreditor Agreements by or through receivers, agents, employees, attorneys-in-fact or with respect to any specified Person, such Person's

128

2342

Affiliates, and the respective officers, directors, employees, agents, advisors and attorneys-in-fact of such Person and its Affiliates (a "Related Person"), and shall be entitled to advice of counsel concerning all matters pertaining to such duties, and shall be entitled to act upon, and shall be fully protected in taking action in reliance upon any advice or opinion given by legal counsel. The Notes Collateral Agent shall not be responsible for the negligence or misconduct of any receiver, agent, employee, attorney-in-fact or Related Person that it selects as long as such selection was made in good faith and with due care.

(c)      None of the Notes Collateral Agent or any of its respective Related Persons shall (i) be liable for any action taken or omitted to be taken by any of them under or in connection with this Indenture or the transactions contemplated hereby (except for its own gross negligence or willful misconduct) or under or in connection with any Security Document or any Intercreditor Agreements or the transactions contemplated thereby (except for its own gross negligence or willful misconduct), or (ii) be responsible in any manner to any of the Trustee or any Holder for any recital, statement, representation, warranty, covenant or agreement made by the Issuer or any other Grantor or Affiliate of any Grantor, or any Officer or Related Person thereof, contained in this Indenture, the Security Documents, any Intercreditor Agreements or any certificate, report, statement or other document referred to or provided for in, or received by the Notes Collateral Agent under or in connection with, this Indenture, the Security Documents or any Intercreditor Agreements, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Indenture, the Security Documents or any Intercreditor Agreements, or for any failure of any Grantor or any other party to this Indenture, the Security Documents or any Intercreditor Agreements to perform its obligations hereunder or thereunder. None of the Notes Collateral Agent or any of its respective Related Persons shall be under any obligation to the Trustee or any Holder to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Indenture, the Security Documents or any Intercreditor Agreements or to inspect the properties, books, or records of any Grantor or any Grantor's Affiliates.

(d)      The Notes Collateral Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telegram, facsimile, certification, telephone message, statement, or other communication, document or conversation (including those by telephone or e-mail) believed by it to be genuine and correct and to have been signed, sent, or made by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to the Issuer or any other Grantor), independent accountants and other experts and advisors selected by the Notes Collateral Agent. The Notes Collateral Agent shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, or other paper or document. The Notes Collateral Agent shall be fully justified in failing or refusing to take any action under this Indenture, the Security Documents or any Intercreditor Agreements unless it shall first receive such advice or concurrence of the Trustee or Majority Holders as it determines and, if it so requests, it shall first be indemnified to its reasonable satisfaction by the Holders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. The Notes Collateral Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Indenture, the Security Documents or any Intercreditor Agreements in accordance with a request,

129

2343

DG-224

direction, instruction or consent of the Trustee or Majority Holders and such request and any action taken or failure to act pursuant thereto shall be binding upon all of the Holders.

(e)    The Notes Collateral Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, unless a Responsible Officer of the Notes Collateral Agent shall have received written notice from the Trustee or the Issuer referring to this Indenture, describing such Default or Event of Default and stating that such notice is a "notice of default". The Notes Collateral Agent shall take such action with respect to such Default or Event of Default as may be requested by the Trustee in accordance with Article 6 or Majority Holders (subject to this Section 12.08).

(f)    The Notes Collateral Agent may resign at any time by notice to the Trustee and the Issuer, such resignation to be effective upon the acceptance of a successor agent to its appointment as Notes Collateral Agent. If the Notes Collateral Agent resigns under this Indenture, the Issuer shall appoint a successor collateral agent. If no successor collateral agent is appointed prior to the intended effective date of the resignation of the Notes Collateral Agent (as stated in the notice of resignation), the Trustee, at the direction of Majority Holders, may appoint a successor collateral agent, subject to the consent of the Issuer (which consent shall not be unreasonably withheld and which shall not be required during a continuing Event of Default). If no successor collateral agent is appointed and consented to by the Issuer pursuant to the preceding sentence within thirty (30) days after the intended effective date of resignation (as stated in the notice of resignation) the Notes Collateral Agent shall be entitled to petition a court of competent jurisdiction to appoint a successor. Upon the acceptance of its appointment as successor collateral agent hereunder, such successor collateral agent shall succeed to all the rights, powers and duties of the retiring Notes Collateral Agent, and the term "Notes Collateral Agent" shall mean such successor collateral agent, and the retiring Notes Collateral Agent's appointment, powers and duties as the Notes Collateral Agent shall be terminated. After the retiring Notes Collateral Agent's resignation hereunder, the provisions of this Section 12.08 shall continue to inure to its benefit and the retiring Notes Collateral Agent shall not by reason of such resignation be deemed to be released from liability as to any actions taken or omitted to be taken by it while it was the Notes Collateral Agent under this Indenture.

(g)    The Trustee shall initially act as Notes Collateral Agent and shall be authorized to appoint co-Notes Collateral Agents as necessary in its sole discretion. Except as otherwise explicitly provided herein or in the Security Documents or any Intercreditor Agreements, neither the Notes Collateral Agent nor any of its respective officers, directors, employees or agents or other Related Persons shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of any other Person or to take any other action whatsoever with regard to the Collateral or any part thereof. The Notes Collateral Agent shall be accountable only for amounts that it actually receives as a result of the exercise of such powers, and neither the Notes Collateral Agent nor any of its officers, directors, employees or agents shall be responsible for any act or failure to act hereunder, except for its own gross negligence or willful misconduct.

(h)    The Notes Collateral Agent is authorized and directed to (i) enter into the Security Documents to which it is party, whether executed on or after the Issue Date, (ii) enter into

130

2344

any Intercreditor Agreements, whether executed on or after the Issue Date, (iii) make the representations of the Holders set forth in the Security Documents and Intercreditor Agreements, (iv) bind the Holders on the terms as set forth in the Security Documents and any Intercreditor Agreements and (v) perform and observe its obligations under the Security Documents and any Intercreditor Agreements.

(i)     If at any time or times the Trustee shall receive (i) by payment, foreclosure, set-off or otherwise, any proceeds of Collateral or any payments with respect to the Obligations arising under, or relating to, this Indenture, except for any such proceeds or payments received by the Trustee from the Notes Collateral Agent pursuant to the terms of this Indenture, or (ii) payments from the Notes Collateral Agent in excess of the amount required to be paid to the Trustee pursuant to Article 6, the Trustee shall promptly turn the same over to the Notes Collateral Agent, in kind, and with such endorsements as may be required to negotiate the same to the Notes Collateral Agent such proceeds to be applied by the Notes Collateral Agent pursuant to the terms of this Indenture, the Security Documents and any Intercreditor Agreements.

(j)     The Notes Collateral Agent is each Holder's agent for the purpose of perfecting the Holders' security interest in assets which, in accordance with Article 9 of the Uniform Commercial Code can be perfected only by possession. Should the Trustee obtain possession of any such Collateral, upon request from the Issuer, the Trustee shall notify the Notes Collateral Agent thereof and promptly shall deliver such Collateral to the Notes Collateral Agent or otherwise deal with such Collateral in accordance with the Notes Collateral Agent's instructions.

(k)     The Notes Collateral Agent shall have no obligation whatsoever to the Trustee or any of the Holders to assure that the Collateral exists or is owned by any Grantor or is cared for, protected, or insured or has been encumbered, or that the Notes Collateral Agent's Liens have been properly or sufficiently or lawfully created, perfected, protected, maintained or enforced or are entitled to any particular priority, or to determine whether all of the Grantor's property constituting Collateral intended to be subject to the Lien and security interest of the Security Documents has been properly and completely listed or delivered, as the case may be, or the genuineness, validity, marketability or sufficiency thereof or title thereto, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities, and powers granted or available to the Notes Collateral Agent pursuant to this Indenture, any Security Document or any Intercreditor Agreements other than pursuant to the instructions of the Trustee or Majority Holders or as otherwise provided in the Security Documents.

(l)     If any Note Party (i) incurs any Junior Priority Obligations at any time when no Junior Priority Intercreditor Agreement is in effect and (ii) delivers to the Notes Collateral Agent an Officer's Certificate so stating and requesting the Notes Collateral Agent to enter into a Junior Priority Intercreditor Agreement in favor of a designated agent or representative for the holders of the Junior Priority Obligations so incurred, the Notes Collateral Agent shall (and is hereby authorized and directed to) enter into such intercreditor agreement (at the sole expense and cost of the Issuer, including legal fees and expenses of the Notes Collateral Agent), bind the Holders on the terms set forth therein and perform and observe its obligations thereunder.

131

2345

(m)     No provision of this Indenture, any Intercreditor Agreements or any Security Document shall require the Notes Collateral Agent (or the Trustee) to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder or thereunder or to take or omit to take any action hereunder or thereunder or take any action at the request or direction of Holders (or the Trustee in the case of the Notes Collateral Agent) unless it shall have received indemnity reasonably satisfactory to the Notes Collateral Agent and the Trustee against potential costs and liabilities incurred by the Notes Collateral Agent relating thereto. Notwithstanding anything to the contrary contained in this Indenture, any Intercreditor Agreements or the Security Documents, in the event the Notes Collateral Agent is entitled or required to commence an action to foreclose or otherwise exercise its remedies to acquire control or possession of the Collateral, the Notes Collateral Agent shall not be required to commence any such action or exercise any remedy or to inspect or conduct any studies of any property under the mortgages or take any such other action if the Notes Collateral Agent has determined that the Notes Collateral Agent may incur personal liability as a result of the presence at, or release on or from, the Collateral or such property, of any hazardous substances. The Notes Collateral Agent shall at any time be entitled to cease taking any action described in this clause if it no longer reasonably deems any indemnity, security or undertaking from the Issuer or the Holders to be sufficient.

(n)     The Notes Collateral Agent (i) shall not be liable for any action taken or omitted to be taken by it in connection with this Indenture, any Intercreditor Agreements and the Security Documents or instrument referred to herein or therein, except to the extent that any of the foregoing are found by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from its own gross negligence or willful misconduct, (ii) shall not be liable for interest on any money received by it except as the Notes Collateral Agent may agree in writing with the Issuer (and money held in trust by the Notes Collateral Agent need not be segregated from other funds except to the extent required by law) and (iii) may consult with counsel of its selection and the advice or opinion of such counsel as to matters of law shall be full and complete authorization and protection from liability in respect of any action taken, omitted or suffered by it in good faith and in accordance with the advice or opinion of such counsel. The grant of permissive rights or powers to the Notes Collateral Agent shall not be construed to impose duties to act.

(o)     Neither the Notes Collateral Agent nor the Trustee shall be liable for delays or failures in performance resulting from acts beyond its control. Such acts shall include but not be limited to acts of God, strikes, lockouts, riots, acts of war, epidemics, governmental regulations superimposed after the fact, fire, communication line failures, computer viruses, power failures, earthquakes or other disasters. Neither the Notes Collateral Agent nor the Trustee shall be liable for any indirect, special, punitive, incidental or consequential damages (included but not limited to lost profits) whatsoever, even if it has been informed of the likelihood thereof and regardless of the form of action.

(p)     The Notes Collateral Agent does not assume any responsibility for any failure or delay in performance or any breach by the Issuer or any other Grantor under this Indenture, any Intercreditor Agreements and the Security Documents. The Notes Collateral Agent shall not be responsible to the Holders or any other Person for any recitals, statements, information, representations or warranties contained in this Indenture, the Security Documents, any Intercreditor Agreements or any certificate, report, statement, or other document referred to or

132

2346

provided for in, or received by the Notes Collateral Agent under or in connection with, this Indenture, any Intercreditor Agreements or any Security Document; the execution, validity, genuineness, effectiveness or enforceability of any Intercreditor Agreements and any Security Documents of any other party thereto; the genuineness, enforceability, collectability, value, sufficiency, location or existence of any Collateral, or the validity, effectiveness, enforceability, sufficiency, extent, perfection or priority of any Lien therein; the validity, enforceability or collectability of any Obligations; the assets, liabilities, financial condition, results of operations, business, creditworthiness or legal status of any obligor; or for any failure of any obligor to perform its Obligations under this Indenture, any Intercreditor Agreements and the Security Documents. The Notes Collateral Agent shall have no obligation to any Holder or any other Person to ascertain or inquire into the existence of any Default or Event of Default, the observance or performance by any obligor of any terms of this Indenture, any Intercreditor Agreements and the Security Documents, or the satisfaction of any conditions precedent contained in this Indenture, any Intercreditor Agreements and any Security Documents. The Notes Collateral Agent shall not be required to initiate or conduct any litigation or collection or other proceeding under this Indenture, any Intercreditor Agreements and the Security Documents unless expressly set forth hereunder or thereunder. The Notes Collateral Agent shall have the right at any time to seek instructions from the Holders with respect to the administration of this Indenture, the Security Documents and any Intercreditor Agreements.

(q)     The parties hereto and the Holders hereby agree and acknowledge that neither the Notes Collateral Agent nor the Trustee shall assume, be responsible for or otherwise be obligated for any liabilities, claims, causes of action, suits, losses, allegations, requests, demands, penalties, fines, settlements, damages (including foreseeable and unforeseeable), judgments, expenses and costs (including any remediation, corrective action, response, removal or remedial action, or investigation, operations and maintenance or monitoring costs, for personal injury or property damages, real or personal) of any kind whatsoever, pursuant to any environmental law as a result of this Indenture, any Intercreditor Agreements, the Security Documents or any actions taken pursuant hereto or thereto. Further, the parties hereto and the Holders hereby agree and acknowledge that in the exercise of its rights under this Indenture, any Intercreditor Agreements and the Security Documents, the Notes Collateral Agent may hold or obtain indicia of ownership primarily to protect the security interest of the Notes Collateral Agent in the Collateral and that any such actions taken by the Notes Collateral Agent shall not be construed as or otherwise constitute any participation in the management of such Collateral. In the event that the Notes Collateral Agent or the Trustee is required to acquire title to an asset for any reason, or take any managerial action of any kind in regard thereto, in order to carry out any fiduciary or trust obligation for the benefit of another, which in the Notes Collateral Agent or the Trustee's sole discretion may cause the Notes Collateral Agent or the Trustee to be considered an "owner or operator" under the provisions of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §9601, et seq., or otherwise cause the Notes Collateral Agent or the Trustee to incur liability under CERCLA or any other federal, state or local law, the Notes Collateral Agent and the Trustee reserves the right, instead of taking such action, to either resign as the Notes Collateral Agent or the Trustee or arrange for the transfer of the title or control of the asset to a court-appointed receiver. Neither the Notes Collateral Agent nor the Trustee shall be liable to any Note Party or any other Person for any environmental claims or contribution actions under any federal, state or local law, rule or regulation by reason of the

133

DG-228

Notes Collateral Agent or the Trustee's actions and conduct as authorized, empowered and directed hereunder or relating to the discharge, release or threatened release of hazardous materials into the environment. If at any time it is necessary or advisable for property to be possessed, owned, operated or managed by any Person (including the Notes Collateral Agent or the Trustee) other than any Note Party, Majority Holders shall direct the Notes Collateral Agent or the Trustee to appoint an appropriately qualified Person (excluding the Notes Collateral Agent or the Trustee) who they shall designate to possess, own, operate or manage, as the case may be, the property.

(r)      Upon the receipt by the Notes Collateral Agent of a written request of the Issuer signed by an Officer (a "Security Document Order"), the Notes Collateral Agent is hereby authorized to execute and enter into, and shall execute and enter into, without the further consent of any Holder or the Trustee, any Security Document to be executed after the Issue Date. Such Security Document Order shall (i) state that it is being delivered to the Notes Collateral Agent pursuant to, and is a Security Document Order referred to in, this Section 12.08(r), and (ii) instruct the Notes Collateral Agent to execute and enter into such Security Document. Any such execution of a Security Document shall be at the direction and expense of the Issuer, upon delivery to the Notes Collateral Agent of an Officer's Certificate stating that all conditions precedent to the execution and delivery of the Security Document have been satisfied. The Holders, by their acceptance of the Notes, hereby authorize and direct the Notes Collateral Agent to execute such Security Documents.

(s)      Subject to the provisions of the applicable Security Documents and any Intercreditor Agreements, each Holder, by acceptance of the Notes, agrees that the Notes Collateral Agent shall execute and deliver any Intercreditor Agreements and the Security Documents to which it is a party and all agreements, documents and instruments incidental thereto, and act in accordance with the terms thereof. For the avoidance of doubt, except as otherwise provided in this Indenture, the Notes Collateral Agent shall have no discretion under this Indenture and shall not be required to make or give any determination, consent, approval, request or direction without the written direction of Majority Holders or the Trustee, as applicable.

(t)      After the occurrence and continuance of an Event of Default, the Trustee, acting at the direction of Majority Holders, may direct the Notes Collateral Agent in connection with any action required or permitted by this Indenture, the Security Documents or any Intercreditor Agreements.

(u)      The Notes Collateral Agent is authorized to receive any funds for the benefit of itself, the Trustee and the Holders distributed under the Security Documents or any Intercreditor Agreements and to the extent not prohibited under any Intercreditor Agreements, for turnover to the Trustee to make further distributions of such funds to itself, the Trustee and the Holders in accordance with the provisions of Section 6.13 and the other provisions of this Indenture.

(v)      In each case that the Notes Collateral Agent may or is required to take any Action, including to make any determination, to give consents, to exercise rights, powers or remedies, to release or sell Collateral or otherwise to act hereunder or under any Security Document or any Intercreditor Agreement, the Notes Collateral Agent may seek direction from Majority Holders. The Notes Collateral Agent shall not be liable with respect to any Action taken or omitted to be taken by it in accordance with the direction from Majority Holders, and shall take

134

2348

any Action if directed to do so by the Majority Holders if it shall have received indemnity reasonably satisfactory to the Notes Collateral Agent and the Trustee against potential costs and liabilities incurred by the Notes Collateral Agent relating thereto. If the Notes Collateral Agent shall request direction from Majority Holders with respect to any Action, the Notes Collateral Agent shall be entitled to refrain from such Action unless and until the Notes Collateral Agent shall have received direction from Majority Holders, and the Notes Collateral Agent shall not incur liability to any Person by reason of so refraining.

(w)     Notwithstanding anything to the contrary in this Indenture or in any Security Document or any Intercreditor Agreement, in no event shall the Notes Collateral Agent or the Trustee be responsible for, or have any duty or obligation with respect to, the recording, filing, registering, perfection, protection or maintenance of the security interests or Liens intended to be created by this Indenture, the Security Documents or any Intercreditor Agreements (including the filing or continuation of any UCC financing or continuation statements or similar documents or instruments), nor shall the Notes Collateral Agent or the Trustee be responsible for, and neither the Notes Collateral Agent nor the Trustee makes any representation regarding, the validity, effectiveness or priority of any of the Security Documents or the security interests or Liens intended to be created thereby.

(x)     Before the Notes Collateral Agent acts or refrains from acting in each case at the request or direction of any Note Party, it may require an Officer's Certificate, which shall conform to the provisions of this Section 12.08 and Sections 13.03 and 13.04; provided that no Officer's Certificate shall be required in connection with the Security Documents to be entered by the Notes Collateral Agent on the Issue Date or Exchange Date. The Notes Collateral Agent shall not be liable for any action it takes or omits to take in good faith in reliance on such certificate.

(y)     Notwithstanding anything to the contrary contained herein, the Notes Collateral Agent shall act pursuant to the instructions of the Holders and the Trustee solely with respect to the Security Documents and the Collateral.

(z)     The rights, privileges, benefits, immunities, indemnities and other protections given to the Trustee are extended to, and shall be enforceable by, the Notes Collateral Agent as if the Notes Collateral Agent were named as the Trustee herein and the Security Documents were named as this Indenture herein.

(aa)     The Note Parties shall furnish to the Trustee and the Notes Collateral Agent, within 120 days after the end of each fiscal year (beginning with the first fiscal year ending after the Issue Date and after giving effect to any fiscal year end change effected on or after the Issue Date), an Officer's Certificate (which may be the same certificate required to be delivered by the Issuer pursuant to Section 4.04) either (i) (x) stating that such action has been taken with respect to the recording, filing, re-recording, and refiling of this Indenture or the Security Documents, as applicable, as are necessary to maintain the perfected Liens of the applicable Security Documents securing the Obligations under applicable law to the extent required by the Security Documents other than any action as described therein to be taken, and (y) stating that on the date of such Officer's Certificate, all financing statements, financing statement amendments and continuation statements have been or will be executed and filed that are necessary, as of such date or promptly thereafter and during the succeeding 12 months, fully to maintain the perfection (to the extent

135

2349

required by the Security Documents) of the security interests of the Notes Collateral Agent securing the Obligations thereunder and under the Security Documents with respect to the Collateral; provided that if there is a required filing of a continuation statement or other instrument within such 12-month period and such continuation statement or amendment is not effective if filed at the time of the Officer's Certificate, such Officer's Certificate may so state and in that case the Note Parties shall cause a continuation statement or amendment to be timely filed and become effective so as to maintain such Liens and security interests securing Obligations or (ii) stating that no such action is necessary to maintain such Liens or security interests.

(bb)    Section 7.06 of this Indenture shall apply mutatis mutandis to the Notes Collateral Agent in its capacity as such.

(cc)    The parties hereto and the Holders hereby agree and acknowledge that the Holders representing the "Required Holders" (as defined in the applicable Refinancing Intercompany Credit Agreement or the Series I Intercompany Credit Agreement, as applicable) may, through the Trustee and/or Notes Collateral Agent, instruct the Lenders party to such Refinancing Intercompany Credit Agreement or the Series I Intercompany Credit Agreement, as applicable, in accordance with the terms set forth therein.   The Notes Collateral Agent shall be under no obligation to deliver any such instruction to the Lenders at the request or direction of such Holders unless such Holders have offered to the Notes Collateral Agent indemnity or security reasonably satisfactory to the Notes Collateral Agent against any loss, liability or expense, with respect to such exercise. Additionally, in delivering any such instruction to the Lenders, the Notes Collateral Agent shall have all of the rights, privileges, benefits, immunities, indemnities and other protections granted to it under this Indenture.

## ARTICLE 13

## MISCELLANEOUS

SECTION 13.01  NOTICES.

Any notice or communication by any Note Party, the Trustee or the Notes Collateral Agent to the others is duly given if in writing and delivered in person or mailed by first-class mail (registered or certified, return receipt requested), fax or overnight air courier guaranteeing next day delivery, to the others' address, or given electronically:

If to the any Note Party:

> NFE Financing LLC
> 111 W. 19th Street, 8th Floor
> New York, New York 10011
> Attention: Cameron D. MacDougall, Esq.
> Email: cmacdougall@fortress.com

With a copy to (which copy shall be delivered as an accommodation and shall not be required to be delivered in satisfaction of any requirement hereof):

136

2350

DG-231

Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, New York 10001-8602
Attention: Michael J. Schwartz, Esq.
Email: michael.schwartz@skadden.com

If to the Trustee:

Wilmington Savings Fund Society, FSB
500 Delaware Avenue, 11th Floor
Wilmington, DE 19801
Attention: Raye Goldsborough & Pat Healy
Email: rgoldsborough@wsfsbank.com; phealy@wsfsbank.com

If to the Notes Collateral Agent:

Wilmington Savings Fund Society, FSB
500 Delaware Avenue, 11th Floor
Wilmington, DE 19801
Attention: Raye Goldsborough & Pat Healy
Email: rgoldsborough@wsfsbank.com; phealy@wsfsbank.com

Any Note Party, the Trustee or the Notes Collateral Agent, by notice to the others, may designate additional or different addresses for subsequent notices or communications.

Notices given by publication (including posting of information as contemplated by the provisions described under Section 4.03) will be deemed given on the first date on which publication is made, notices given by first-class mail, postage prepaid, will be deemed given five calendar days after mailing or transmitting, notices sent by overnight delivery service will be deemed given on the next Business Day after timely delivery to the courier and notices given electronically will be deemed given when sent. Notice given in accordance with the procedures of DTC will be deemed given on the date sent to DTC. Failure to send a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders.

Notwithstanding any other provision of this Indenture or any Note, where this Indenture or any Note provides for notice of any event or any other communication (including any notice of redemption or repurchase) to a Holder of a Global Note (whether by mail or otherwise), such notice shall be sufficiently given if given to the Depositary (or its designee) pursuant to the standing instructions from the Depositary or its designee, including by electronic mail in accordance with accepted practices at the Depositary.

If a notice or communication is mailed in the manner provided above within the time prescribed, it is duly given, whether or not the addressee receives it.

If the Issuer mails a notice or communication to Holders, it shall mail a copy to the Trustee at the same time.

137

2351

Each of the Trustee and the Notes Collateral Agent agrees to accept and act upon instructions or directions pursuant to this Indenture sent by unsecured e-mail, facsimile transmission or other similar unsecured electronic methods. If any Note Party or any Holder elects to give the Trustee or the Notes Collateral Agent e-mail or facsimile instructions (or instructions by a similar electronic method) and the Trustee or the Notes Collateral Agent, as applicable, in its discretion elects to act upon such instructions, the Trustee's or Notes Collateral Agent's, as applicable, understanding of such instructions shall be deemed controlling. The Trustee or the Notes Collateral Agent, as applicable, shall not be liable for any losses, costs or expenses arising directly or indirectly from the Trustee's or the Notes Collateral Agent's, as applicable, reliance upon and compliance with such instructions notwithstanding if such instructions conflict or are inconsistent with a subsequent written instruction. The party providing electronic instructions agrees to assume all risks arising out of the use of such electronic methods to submit instructions and directions to the Trustee, including the risk of the Trustee or the Notes Collateral Agent, as applicable, acting on unauthorized instructions, and the risk of interception and misuse by third parties.

SECTION 13.02 [RESERVED].

SECTION 13.03 COMMUNICATION BY HOLDERS WITH OTHER HOLDERS.

Holders may communicate with other Holders with respect to their rights under this Indenture or the Notes.

SECTION 13.04 CERTIFICATE AND OPINION AS TO CONDITIONS PRECEDENT.

Upon any request or application by any Note Party to the Trustee or the Notes Collateral Agent to take any action under this Indenture, such Note Party shall furnish to the Trustee or, if such action relates to a Security Document or an Intercreditor Agreement, the Notes Collateral Agent:

(a)    An Officer's Certificate (which shall include the statements set forth in Section 13.05) stating that, in the opinion of the signatory thereto, all conditions precedent and covenants, if any, provided for in this Indenture relating to the proposed action have been complied with; provided that an Officer's Certificate shall not be required in connection with the entering into the Security Documents and the Equal Priority Intercreditor Agreement; and

(b)    An Opinion of Counsel (which shall include the statements set forth in Section 13.05) stating that, in the opinion of such counsel, all such conditions precedent and covenants have been complied with; provided that an Opinion of Counsel shall not be required in connection with (i) the issuance of the Notes that are issued on the Issue Date or Exchange Date and (ii) the entering into of the Security Documents and any Intercreditor Agreements.

(c)    Notwithstanding anything in this Indenture to the contrary, the Issuer shall not be required to deliver any Officer's Certificate or Opinion of Counsel with respect to (i) the Trustee's and Collateral Agent's execution and delivery of the Indenture or any Security Agreement or Intercreditor Agreement in connection therewith or (ii) the Trustee's authentication of the Initial Notes.

138

2352

SECTION 13.05 <u>STATEMENTS REQUIRED IN CERTIFICATE OR OPINION.</u>

Each certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture (other than a certificate provided pursuant to <u>Section 4.04</u>) shall include:

(a)     a statement that the Person making such certificate or opinion has read such covenant or condition;

(b)     a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(c)     a statement that, in the opinion of such Person, he or she has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been complied with (and, in the case of an Opinion of Counsel, may be limited to reliance on an Officer's Certificate as to matters of fact); and

(d)     a statement as to whether or not, in the opinion of such Person, such condition or covenant has been complied with; <u>provided</u>, <u>however</u>, that with respect to matters of fact an Opinion of Counsel may rely on an Officer's Certificate or certificates of public officials.

SECTION 13.06 <u>RULES BY TRUSTEE AND AGENTS.</u>

The Trustee may make reasonable rules for action by or at a meeting of Holders. The Registrar or Paying Agent may make reasonable rules and set reasonable requirements for its functions.

SECTION 13.07 <u>NO PERSONAL LIABILITY OF DIRECTORS, MANAGERS, OFFICERS, EMPLOYEES AND STOCKHOLDERS.</u>

No past, present or future director, manager, officer, employee, incorporator, member, partner or stockholder of any Note Party or any of their parent companies or entities, as such, shall have any liability for any obligations of any Note Party under the Notes, the Note Guarantees, the Security Documents, any Intercreditor Agreements or this Indenture or for any claim based on, in respect of, or by reason of such obligations or their creation. Each Holder by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes.

SECTION 13.08 <u>GOVERNING LAW; JURISDICTION.</u>

THIS INDENTURE, THE NOTES AND ANY NOTE GUARANTEE WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS INDENTURE AND ANY ACTION FOR ENFORCEMENT OF ANY JUDGMENT IN RESPECT THEREOF MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR OF THE

2353

DG-234

UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK, IN EACH CASE RESIDING IN THE COUNTY OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS INDENTURE, EACH OF THE PARTIES HERETO HEREBY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE NON-EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS AND APPELLATE COURTS FROM ANY THEREOF. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT IT MAY DO SO UNDER APPLICABLE LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS INDENTURE BROUGHT IN THE COURTS REFERRED TO ABOVE AND TO THE FULLEST EXTENT IT MAY DO SO UNDER APPLICABLE LAW HEREBY FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. NOTHING HEREIN SHALL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED IN ANY OTHER JURISDICTION

SECTION 13.09 <u>WAIVER OF JURY TRIAL.</u>

EACH OF THE ISSUER, THE GUARANTORS, THE TRUSTEE AND THE NOTES COLLATERAL AGENT, AND EACH HOLDER BY ITS ACCEPTANCE THEREOF, HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE, THE NOTES OR THE TRANSACTIONS CONTEMPLATED HEREBY.

SECTION 13.10 <u>FORCE MAJEURE.</u>

In no event shall the Trustee or the Notes Collateral Agent be responsible or liable for any failure or delay in the performance of its obligations under this Indenture arising out of or caused by, directly or indirectly, forces beyond its reasonable control, including strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software or hardware) services.

SECTION 13.11 <u>NO ADVERSE INTERPRETATION OF OTHER AGREEMENTS.</u>

This Indenture may not be used to interpret any other indenture, loan or debt agreement of the Issuer or any Subsidiary or of any other Person. Any such indenture, loan or debt agreement may not be used to interpret this Indenture.

2354

SECTION 13.12 <u>SUCCESSORS.</u>

All agreements of the Issuer in this Indenture and the Notes shall bind its respective successors. All agreements of the Trustee in this Indenture shall bind its successors. All agreements of each Guarantor in this Indenture shall bind its successors.

SECTION 13.13 <u>SEVERABILITY.</u>

In case any provision in this Indenture or in the Notes shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

SECTION 13.14 <u>INTERCREDITOR AGREEMENTS.</u>

Each Holder, by its acceptance of a Note, agrees that it will be bound by and will take no actions contrary to the provisions of any Intercreditor Agreement, and authorizes and instructs the Trustee and the Notes Collateral Agent to enter into the Equal Priority Intercreditor Agreement and/or Junior Priority Intercreditor Agreement after the Issue Date in accordance with <u>Section 12.08(l)</u> and <u>Section 9.01(18)</u>, in each case as Trustee and as Notes Collateral Agent, as the case may be, and on behalf of such Holder, including making the representations of the Holders contained therein.

SECTION 13.15 <u>COUNTERPARTS AND ELECTRONIC EXECUTION.</u>

This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Agreement by facsimile or other electronic transmission shall be as effective as delivery of a manually executed counterpart hereof. The exchange of copies of this Agreement and of signature pages by facsimile or PDF transmission shall constitute effective execution and delivery of this Agreement as to the parties hereto and may be used in lieu of the original Agreement and signature pages for all purposes. All notices, approvals, consents, requests and any communications hereunder must be in writing (provided that any communication sent to the Trustee hereunder must be in the form of a document that is signed manually or by way of a digital signature provided by DocuSign or such other digital signature provider as specified inwriting to the Trustee by the Issuer, in English. The Issuer agrees to assume all risks arising out of the use of using digital signatures and electronic methods to submit communications to the Trustee, including without limitation the risk of the Trustee acting on unauthorized instructions, and the risk of interception and misuse by third parties.

SECTION 13.16 <u>TABLE OF CONTENTS, HEADINGS, ETC.</u>

The Table of Contents and headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part of this Indenture and shall in no way modify or restrict any of the terms or provisions hereof.

2355

DG-236

SECTION 13.17 <u>USA PATRIOT ACT.</u>

The parties hereto acknowledge that in accordance with Section 326 of the USA PATRIOT Act, the Trustee, like all financial institutions and in order to help fight the funding of terrorism and money laundering, is required to obtain, verify, and record information that identifies each person or legal entity that establishes a relationship or opens an account. The Issuer agrees that it will provide the Trustee with information about the Issuer as the Trustee may reasonably request in order for the Trustee to satisfy the requirements of the USA PATRIOT Act.

*[Signatures on following page]*

2356

DG-237

IN WITNESS WHEREOF, the parties have caused this Indenture to be duly executed as of the date first written above.

NFE FINANCING LLC

By:   *Christopher Guinta*

Name:  Christopher S. Guinta
Title:   Manager

[*Signature Page to Indenture*]

2357

DG-238

BRADFORD COUNTY REAL ESTATE
PARTNERS LLC, as Guarantor


By:    *Christopher Guinta*
Name:  Christopher S. Guinta
Title:  Manager

[*Signature Page to Indenture*]

DG-239

WILMINGTON SAVINGS FUND SOCIETY, FSB
as Trustee and Notes Collateral Agent

By: _____

Name: Raye Goldsborough
Title: Vice President

*[Signature Page to Indenture]*

2359

DG-240

## SCHEDULE A

None.

DG-241

## SCHEDULE B

None.

## SCHEDULE C

None.

## EXHIBIT A-1

THIS GLOBAL NOTE IS HELD BY THE DEPOSITARY (AS DEFINED IN THE INDENTURE GOVERNING THIS NOTE) OR ITS NOMINEE IN CUSTODY FOR THE BENEFIT OF THE BENEFICIAL OWNERS HEREOF, AND IS NOT TRANSFERABLE TO ANY PERSON UNDER ANY CIRCUMSTANCES EXCEPT THAT (I) THE TRUSTEE MAY MAKE SUCH NOTATIONS HEREON AS MAY BE REQUIRED PURSUANT TO SECTION 2.06(H) OF THE INDENTURE, (II) THIS GLOBAL NOTE MAY BE EXCHANGED IN WHOLE BUT NOT IN PART PURSUANT TO SECTION 2.06(A) OF THE INDENTURE, (III) THIS GLOBAL NOTE MAY BE DELIVERED TO THE TRUSTEE FOR CANCELLATION PURSUANT TO SECTION 2.11 OF THE INDENTURE AND (IV) THIS GLOBAL NOTE MAY BE TRANSFERRED TO A SUCCESSOR DEPOSITARY WITH THE PRIOR WRITTEN CONSENT OF THE ISSUER. UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR NOTES IN DEFINITIVE FORM, THIS NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY. UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY (55 WATER STREET, NEW YORK, NEW YORK) ("DTC") TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THIS NOTE (OR ITS PREDECESSOR) HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, THIS NOTE MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS, EXCEPT AS SET FORTH IN THE NEXT SENTENCE. BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE HOLDER: (1) REPRESENTS THAT IT IS NOT AN "AFFILIATE" (AS DEFINED IN RULE 144 UNDER THE SECURITIES ACT) OF NFE FINANCING LLC ("NFE FINANCING") AND (A) IT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) (A "QIB"), OR (B) IT IS NOT A U.S. PERSON AND HAS ACQUIRED THIS NOTE IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH REGULATION S UNDER THE SECURITIES ACT; (2) AGREES THAT IT WILL NOT RESELL OR OTHERWISE TRANSFER THIS NOTE OR ANY BENEFICIAL INTEREST HEREIN EXCEPT (A) TO NFE FINANCING OR ANY OF ITS SUBSIDIARIES, (B) TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QIB PURCHASING FOR

DG-244

ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QIB IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, (C) TO NON-U.S. PERSONS IN AN OFFSHORE TRANSACTION MEETING THE REQUIREMENTS OF RULE 903 OR 904 OF REGULATION S OF THE SECURITIES ACT, (D) IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144 UNDER THE SECURITIES ACT, (E) IN ACCORDANCE WITH ANOTHER EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT (AND BASED UPON AN OPINION OF COUNSEL REASONABLY ACCEPTABLE TO NFE FINANCING AND THE TRUSTEE) OR (F) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT AND, IN EACH CASE, IN ACCORDANCE WITH THE APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER APPLICABLE JURISDICTION; (3) AGREES THAT IT WILL DELIVER TO EACH PERSON TO WHOM THIS NOTE OR AN INTEREST HEREIN IS TRANSFERRED A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND; AND (4) AGREES THAT ANY SECURITY THAT IS OWNED BY AN AFFILIATE (AS DEFINED IN RULE 144 UNDER THE SECURITIES ACT) OF NFE FINANCING MAY NOT BE RESOLD OR TRANSFERRED BY SUCH AFFILIATE OTHER THAN TO NFE FINANCING OR A SUBSIDIARY THEREOF OR PURSUANT TO (A) A REGISTRATION STATEMENT UNDER THE SECURITIES ACT, (B) IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144 UNDER THE SECURITIES ACT OR (C) ANOTHER EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT (IF AVAILABLE) IN A TRANSACTION THAT RESULTS IN SUCH SECURITY NO LONGER BEING A RESTRICTED SECURITY (AS DEFINED UNDER RULE 144). IN THE EVENT ANY SUCH PERSONS BENEFICIALLY OWN AN INTEREST IN THE SECURITY PRIOR TO THE TIME NFE FINANCING REMOVES THE RESTRICTIVE LEGEND ON THE SECURITY, NFE FINANCING MAY REQUIRE THAT SUCH PERSONS HOLD THEIR INTERESTS IN THE SECURITY IN CERTIFICATED FORM BEARING AN APPROPRIATE RESTRICTIVE LEGEND AND A RESTRICTED CUSIP NUMBER. AS USED HEREIN, THE TERMS "OFFSHORE TRANSACTIONS" AND "UNITED STATES" HAVE THE MEANINGS GIVEN TO THEM BY RULE 902 OF REGULATION S UNDER THE SECURITIES ACT. THE INDENTURE CONTAINS A PROVISION REQUIRING THE TRUSTEE TO REFUSE TO REGISTER ANY TRANSFER OF THIS NOTE IN VIOLATION OF THE FOREGOING.

DG-245

<div align="right">CUSIP 62909B AA5

ISIN US62909BAA52</div>

<div align="center">RULE 144A GLOBAL NOTE

12.000% Senior Secured Notes due 2029</div>

No. A-1                                                                    $500,000,000.00

<div align="center">NFE Financing LLC</div>

NFE Financing LLC promises to pay to CEDE & CO. or registered assigns, the principal sum set forth on the Schedule of Exchanges of Interests in the Global Note attached hereto, on November 15, 2029 (the "Stated Maturity Date"); provided, that the Stated Maturity Date shall be accelerated to the date that is ninety-one (91) days prior to the stated maturity date of any Indebtedness of New Fortress Energy Inc. or any of its Subsidiaries, for borrowed money (including Indebtedness for borrowed money deemed to be issued in a debt exchange), other than the Letter of Credit Facility, the Macquarie Facility and the Turbine Loan Agreement, if more than $100,000,000 of aggregate principal amount of such Indebtedness is outstanding as of such date.

Interest Payment Dates: May 15 and November 15, commencing on May 15,

2025[1] Record Dates: May 1 and November 1

---

[1] With respect to the Initial Notes.

<div align="center">A-1-3

2365</div>

<div align="right">DG-246</div>

[Back of Note]

12.000% Senior Secured Notes due 2029

Capitalized terms used herein shall have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

1.      INTEREST. NFE Financing LLC, a Delaware limited liability company (the "Issuer"), promises to pay interest on the unpaid principal amount of this Note at 12.000% per annum until maturity. The Issuer will pay interest semi-annually in arrears on May 15 and November 15 of each year, commencing May 15, 2025, or if any such day is not a Business Day, on the next succeeding Business Day (each, an "Interest Payment Date"). Interest on the Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from November 22, 2024[4].  The Issuer will pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principal and premium, if any, from time to time on demand at a rate that is 2.00% higher than the interest rate on the Notes; it shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest (without regard to any applicable grace period) from time to time on demand at a rate that is 2.00% higher than the interest rate on the Notes. Interest will be computed on the basis of a 360-day year comprised of twelve 30-day months.

2.      METHOD OF PAYMENT. The Issuer will pay interest on the Notes to the Persons who are registered Holders of Notes at the close of business on the May 1 or November 1 (whether or not a Business Day), as the case may be, immediately preceding the Interest Payment Date, even if such Notes are canceled after such record date and on or before such Interest Payment Date, except as provided in Section 2.12 of the Indenture with respect to defaulted interest. Payment of interest may be made by check mailed to the Holders at their addresses set forth in the register of Holders or by wire transfer; provided that all payments of principal of and interest and premium, if any, on all Global Notes shall be made in accordance with the Depositary's applicable procedures. Such payment shall be in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. If a payment date is not a Business Day at the place of payment, payment shall be made on the next succeeding day that is a Business Day, and no interest shall accrue for the intervening period. If a regular record date is not a Business Day, the record date shall not be affected.

3.      PAYING AGENT AND REGISTRAR. Initially, Wilmington Savings Fund Society, FSB, the Trustee under the Indenture, will act as Paying Agent and Registrar. The Issuer may change any Paying Agent or Registrar without notice to the Holders. The Issuer or any of its Subsidiaries may act in such capacity.

4.      INDENTURE. The Issuer issued the Notes under an Indenture, dated as of November 22, 2024 (the "Indenture"), among the Issuer, the Guarantors from time to time party thereto, the Trustee and the Notes Collateral Agent. This Note is one of a duly authorized issue of notes of the Issuer designated as its 12.000% Senior Secured Notes due 2029. The Issuer shall be entitled to issue Additional Notes pursuant to Sections 2.01, 4.09 and 4.12 of the Indenture. The

---

[4] With respect to the Initial Notes issued on the Issue Date.

A-1-4

terms of the Notes include those stated in the Indenture. The Notes are subject to all such terms, and Holders are referred to the Indenture for a statement of such terms. To the extent any provision of this Note conflicts with the express provisions of the Indenture, the provisions of the Indenture shall govern and be controlling.

5.    REDEMPTION AND REPURCHASE. The Notes are subject to optional redemption, and may be the subject of a Change of Control Offer (or an Alternate Offer) and a Prepayment Offer, as further described in the Indenture. The Issuer shall not be required to make any mandatory or sinking fund payments with respect to the Notes.

6.    DENOMINATIONS, TRANSFER, EXCHANGE. The Notes are in registered form without coupons in denominations of $1.00 and integral multiples of $1.00 in excess thereof. The transfer of Notes shall be registered and Notes may be exchanged as provided in the Indenture. The Registrar and the Trustee may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and the Issuer may require a Holder to pay any taxes and fees required by law or permitted by the Indenture. The Issuer need not exchange or register the transfer of any Note or portion of a Note selected for redemption or tendered (and not withdrawn) for repurchase in connection with a Change of Control Offer, an Alternate Offer, a Prepayment Offer or other tender offer, in whole or in part, except for the unredeemed portion of any Note being redeemed in part. Also, the Issuer need not exchange or register the transfer of any Notes during a period beginning at the opening of business 15 days before the delivery of a notice of redemption of Notes to be redeemed and ending at the close of business on the day of selection of Notes to be redeemed.

7.    PERSONS DEEMED OWNERS. The registered Holder shall be treated as its owner for all purposes.

8.    AMENDMENT, SUPPLEMENT AND WAIVER. The Indenture, the Note Guarantees or the Notes may be amended or supplemented as provided in the Indenture.

9.    DEFAULTS AND REMEDIES. The Events of Default relating to the Notes are defined in Section 6.01 of the Indenture. Upon the occurrence of an Event of Default, the rights and obligations of the Note Parties, the Trustee and the Holders shall be as set forth in the applicable provisions of the Indenture.

10.    AUTHENTICATION. This Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose until authenticated by the manual signature of the Trustee.

11.    GOVERNING LAW. THE INDENTURE, THE NOTES AND THE NOTE GUARANTEES SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

12.    CUSIP NUMBERS. Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Issuer has caused CUSIP numbers to be printed on the Notes and the Trustee may use CUSIP numbers in notices of redemption as a convenience to Holders. No representation is made as to the accuracy of such numbers either as printed on the

Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

The Issuer will furnish to any Holder upon written request and without charge a copy of the Indenture. Requests may be made to the Issuer at the following address:

> NFE Financing LLC
> Investor Relations
> 111 W. 19th Street, 8th Floor
> New York, New York 10011

13.     SECURITY. The Notes and the Note Guarantees will be secured by the Collateral on the terms and subject to the conditions set forth in the Indenture and the Security Documents. The Trustee and the Notes Collateral Agent, as the case may be, will hold the Collateral in trust for the benefit of the Holders of the Notes, in each case pursuant to the Security Documents and any Intercreditor Agreements. Each Holder, by accepting this Note, consents and agrees to the terms of the Security Documents (including the provisions providing for the foreclosure and release of Collateral) and any Intercreditor Agreements as the same may be in effect or may be amended from time to time in accordance with their terms and the Indenture and authorizes and directs the Notes Collateral Agent to enter into the Security Documents and any Intercreditor Agreements on the Issue Date and at any time after Issue Date, as applicable, and to perform its obligations and exercise its rights thereunder in accordance therewith.

14.     ORIGINAL ISSUE DISCOUNT. THE FOLLOWING INFORMATION IS SUPPLIED SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES. THIS NOTE WAS ISSUED WITH "ORIGINAL ISSUE DISCOUNT" ("OID") WITHIN THE MEANING OF SECTION 1273 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), AND THIS LEGEND IS REQUIRED BY SECTION 1275(c) OF THE CODE. HOLDERS MAY OBTAIN INFORMATION REGARDING THE AMOUNT OF ANY OID, THE ISSUE PRICE, THE ISSUE DATE, AND THE YIELD TO MATURITY RELATING TO THIS NOTE BY CONTACTING CHRISTOPHER GUINTA, CHIEF FINANCIAL OFFICER, AT 111 W. 19TH STREET, 8TH FLOOR, NEW YORK, NEW YORK 10011.

DG-249

## ASSIGNMENT FORM

To assign this Note, fill in the form below:

(I) or (we) assign and transfer this Note to: _____

<div align="center">(Insert assignee's legal name)</div>

_____

<div align="center">(Insert assignee's soc. Sec. or tax I.D. No.)</div>

_____

_____

_____

_____

<div align="center">(Print or type assignee's name, address and zip code)</div>

and irrevocably appoint_____ to transfer this Note on the books of the Issuer. The agent may substitute another to act for him.

Date:

<div align="right">Your Signature _____

(Sign exactly as your name appears on the face of this Note)</div>

Signature Guarantee:*

* Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

A-1-7

2369

DG-250

## OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have this Note purchased by the Issuer pursuant to Section 3.09 or 4.14 of the Indenture, check the appropriate box below:

[ ] Section 3.09            [ ] Section 4.14

If you want to elect to have only part of this Note purchased by the Issuer pursuant to Section 3.09 or Section 4.14 of the Indenture, state the amount you elect to have purchased:

$

Date:

Your Signature _____
(Sign exactly as your name appears on the face of this Note)

Tax Identification No.:

_____

Signature Guarantee:*

* Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

A-1-8

2370

DG-251

SCHEDULE OF EXCHANGES OF INTERESTS IN THE GLOBAL NOTE

The initial outstanding principal amount of this Global Note is $500,000,000.00. The following exchanges of a part of this Global Note for an interest in another Global Note or for a Definitive Note, or exchanges of a part of another Global or Definitive Note for an interest in this Global Note, have been made:

| Date of Exchange | Amount of decrease in Principal Amount | Amount of increase in Principal Amount of this Global Note | Principal Amount of this Global Note following such decrease or increase | Signature of authorized signatory of Trustee or Note Custodian |
|---|---|---|---|---|

A-1-9

2371

DG-252

## EXHIBIT A-2

THIS GLOBAL NOTE IS HELD BY THE DEPOSITARY (AS DEFINED IN THE INDENTURE GOVERNING THIS NOTE) OR ITS NOMINEE IN CUSTODY FOR THE BENEFIT OF THE BENEFICIAL OWNERS HEREOF, AND IS NOT TRANSFERABLE TO ANY PERSON UNDER ANY CIRCUMSTANCES EXCEPT THAT (I) THE TRUSTEE MAY MAKE SUCH NOTATIONS HEREON AS MAY BE REQUIRED PURSUANT TO SECTION 2.06(H) OF THE INDENTURE, (II) THIS GLOBAL NOTE MAY BE EXCHANGED IN WHOLE BUT NOT IN PART PURSUANT TO SECTION 2.06(A) OF THE INDENTURE, (III) THIS GLOBAL NOTE MAY BE DELIVERED TO THE TRUSTEE FOR CANCELLATION PURSUANT TO SECTION 2.11 OF THE INDENTURE AND (IV) THIS GLOBAL NOTE MAY BE TRANSFERRED TO A SUCCESSOR DEPOSITARY WITH THE PRIOR WRITTEN CONSENT OF THE ISSUER. UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR NOTES IN DEFINITIVE FORM, THIS NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY. UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY (55 WATER STREET, NEW YORK, NEW YORK) ("DTC") TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THIS NOTE (OR ITS PREDECESSOR) HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, THIS NOTE MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS, EXCEPT AS SET FORTH IN THE NEXT SENTENCE. BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE HOLDER: (1) REPRESENTS THAT IT IS NOT AN "AFFILIATE" (AS DEFINED IN RULE 144 UNDER THE SECURITIES ACT) OF NFE FINANCING LLC ("NFE FINANCING") AND (A) IT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) (A "QIB"), OR (B) IT IS NOT A U.S. PERSON AND HAS ACQUIRED THIS NOTE IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH REGULATION S UNDER THE SECURITIES ACT; (2) AGREES THAT IT WILL NOT RESELL OR OTHERWISE TRANSFER THIS NOTE OR ANY BENEFICIAL INTEREST HEREIN EXCEPT (A) TO NFE FINANCING OR ANY OF ITS SUBSIDIARIES, (B) TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QIB PURCHASING FOR

ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QIB IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, (C) TO NON-U.S. PERSONS IN AN OFFSHORE TRANSACTION MEETING THE REQUIREMENTS OF RULE 903 OR 904 OF REGULATION S OF THE SECURITIES ACT, (D) IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144 UNDER THE SECURITIES ACT, (E) IN ACCORDANCE WITH ANOTHER EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT (AND BASED UPON AN OPINION OF COUNSEL REASONABLY ACCEPTABLE TO NFE FINANCING AND THE TRUSTEE) OR (F) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT AND, IN EACH CASE, IN ACCORDANCE WITH THE APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER APPLICABLE JURISDICTION; (3) AGREES THAT IT WILL DELIVER TO EACH PERSON TO WHOM THIS NOTE OR AN INTEREST HEREIN IS TRANSFERRED A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND; AND (4) AGREES THAT ANY SECURITY THAT IS OWNED BY AN AFFILIATE (AS DEFINED IN RULE 144 UNDER THE SECURITIES ACT) OF NFE FINANCING MAY NOT BE RESOLD OR TRANSFERRED BY SUCH AFFILIATE OTHER THAN TO NFE FINANCING OR A SUBSIDIARY THEREOF OR PURSUANT TO (A) A REGISTRATION STATEMENT UNDER THE SECURITIES ACT, (B) IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144 UNDER THE SECURITIES ACT OR (C) ANOTHER EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT (IF AVAILABLE) IN A TRANSACTION THAT RESULTS IN SUCH SECURITY NO LONGER BEING A RESTRICTED SECURITY (AS DEFINED UNDER RULE 144). IN THE EVENT ANY SUCH PERSONS BENEFICIALLY OWN AN INTEREST IN THE SECURITY PRIOR TO THE TIME NFE FINANCING REMOVES THE RESTRICTIVE LEGEND ON THE SECURITY, NFE FINANCING MAY REQUIRE THAT SUCH PERSONS HOLD THEIR INTERESTS IN THE SECURITY IN CERTIFICATED FORM BEARING AN APPROPRIATE RESTRICTIVE LEGEND AND A RESTRICTED CUSIP NUMBER. AS USED HEREIN, THE TERMS "<u>OFFSHORE TRANSACTIONS</u>" AND "<u>UNITED STATES</u>" HAVE THE MEANINGS GIVEN TO THEM BY RULE 902 OF REGULATION S UNDER THE SECURITIES ACT. THE INDENTURE CONTAINS A PROVISION REQUIRING THE TRUSTEE TO REFUSE TO REGISTER ANY TRANSFER OF THIS NOTE IN VIOLATION OF THE FOREGOING.

DG-254

CUSIP 62909B AA5

ISIN US62909BAA52

RULE 144A GLOBAL NOTE

12.000% Senior Secured Notes due 2029

No. A-2                                                                 $500,000,000

NFE Financing LLC

NFE Financing LLC promises to pay to CEDE & CO. or registered assigns, the principal sum set forth on the Schedule of Exchanges of Interests in the Global Note attached hereto, on November 15, 2029 (the "Stated Maturity Date"); provided, that the Stated Maturity Date shall be accelerated to the date that is ninety-one (91) days prior to the stated maturity date of any Indebtedness of New Fortress Energy Inc. or any of its Subsidiaries, for borrowed money (including Indebtedness for borrowed money deemed to be issued in a debt exchange), other than the Letter of Credit Facility, the Macquarie Facility and the Turbine Loan Agreement, if more than $100,000,000 of aggregate principal amount of such Indebtedness is outstanding as of such date.

Interest Payment Dates: May 15 and November 15, commencing on May 15, 2025[1]

Record Dates: May 1 and November 1

---

[1] With respect to the Initial Notes.

A-2-3

2374

DG-255

[Back of Note]

12.000% Senior Secured Notes due 2029

Capitalized terms used herein shall have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

1.      INTEREST. NFE Financing LLC, a Delaware limited liability company (the "Issuer"), promises to pay interest on the unpaid principal amount of this Note at 12.000% per annum until maturity. The Issuer will pay interest semi-annually in arrears on May 15 and November 15 of each year, commencing May 15, 2025, or if any such day is not a Business Day, on the next succeeding Business Day (each, an "Interest Payment Date"). Interest on the Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from November 22, 2024[4]. The Issuer will pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principal and premium, if any, from time to time on demand at a rate that is 2.00% higher than the interest rate on the Notes; it shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest (without regard to any applicable grace period) from time to time on demand at a rate that is 2.00% higher than the interest rate on the Notes. Interest will be computed on the basis of a 360-day year comprised of twelve 30-day months.

2.      METHOD OF PAYMENT. The Issuer will pay interest on the Notes to the Persons who are registered Holders of Notes at the close of business on the May 1 or November 1 (whether or not a Business Day), as the case may be, immediately preceding the Interest Payment Date, even if such Notes are canceled after such record date and on or before such Interest Payment Date, except as provided in Section 2.12 of the Indenture with respect to defaulted interest. Payment of interest may be made by check mailed to the Holders at their addresses set forth in the register of Holders or by wire transfer; provided that all payments of principal of and interest and premium, if any, on all Global Notes shall be made in accordance with the Depositary's applicable procedures. Such payment shall be in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. If a payment date is not a Business Day at the place of payment, payment shall be made on the next succeeding day that is a Business Day, and no interest shall accrue for the intervening period. If a regular record date is not a Business Day, the record date shall not be affected.

3.      PAYING AGENT AND REGISTRAR. Initially, Wilmington Savings Fund Society, FSB, the Trustee under the Indenture, will act as Paying Agent and Registrar. The Issuer may change any Paying Agent or Registrar without notice to the Holders. The Issuer or any of its Subsidiaries may act in such capacity.

4.      INDENTURE. The Issuer issued the Notes under an Indenture, dated as of November 22, 2024 (the "Indenture"), among the Issuer, the Guarantors from time to time party thereto, the Trustee and the Notes Collateral Agent. This Note is one of a duly authorized issue of notes of the Issuer designated as its 12.000% Senior Secured Notes due 2029. The Issuer shall be entitled to issue Additional Notes pursuant to Sections 2.01, 4.09 and 4.12 of the Indenture. The

---

[4] With respect to the Initial Notes issued on the Issue Date.

A-2-4

DG-256

terms of the Notes include those stated in the Indenture. The Notes are subject to all such terms, and Holders are referred to the Indenture for a statement of such terms. To the extent any provision of this Note conflicts with the express provisions of the Indenture, the provisions of the Indenture shall govern and be controlling.

5.      REDEMPTION AND REPURCHASE. The Notes are subject to optional redemption, and may be the subject of a Change of Control Offer (or an Alternate Offer) and a Prepayment Offer, as further described in the Indenture. The Issuer shall not be required to make any mandatory or sinking fund payments with respect to the Notes.

6.      DENOMINATIONS, TRANSFER, EXCHANGE. The Notes are in registered form without coupons in denominations of $1.00 and integral multiples of $1.00 in excess thereof. The transfer of Notes shall be registered and Notes may be exchanged as provided in the Indenture. The Registrar and the Trustee may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and the Issuer may require a Holder to pay any taxes and fees required by law or permitted by the Indenture. The Issuer need not exchange or register the transfer of any Note or portion of a Note selected for redemption or tendered (and not withdrawn) for repurchase in connection with a Change of Control Offer, an Alternate Offer, a Prepayment Offer or other tender offer, in whole or in part, except for the unredeemed portion of any Note being redeemed in part. Also, the Issuer need not exchange or register the transfer of any Notes during a period beginning at the opening of business 15 days before the delivery of a notice of redemption of Notes to be redeemed and ending at the close of business on the day of selection of Notes to be redeemed.

7.      PERSONS DEEMED OWNERS. The registered Holder shall be treated as its owner for all purposes.

8.      AMENDMENT, SUPPLEMENT AND WAIVER. The Indenture, the Note Guarantees or the Notes may be amended or supplemented as provided in the Indenture.

9.      DEFAULTS AND REMEDIES. The Events of Default relating to the Notes are defined in Section 6.01 of the Indenture. Upon the occurrence of an Event of Default, the rights and obligations of the Note Parties, the Trustee and the Holders shall be as set forth in the applicable provisions of the Indenture.

10.     AUTHENTICATION. This Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose until authenticated by the manual signature of the Trustee.

11.     GOVERNING LAW. THE INDENTURE, THE NOTES AND THE NOTE GUARANTEES SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

12.     CUSIP NUMBERS. Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Issuer has caused CUSIP numbers to be printed on the Notes and the Trustee may use CUSIP numbers in notices of redemption as a convenience to Holders. No representation is made as to the accuracy of such numbers either as printed on the

A-2-5

Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

The Issuer will furnish to any Holder upon written request and without charge a copy of the Indenture. Requests may be made to the Issuer at the following address:

> NFE Financing LLC
> Investor Relations
> 111 W. 19th Street, 8th Floor
> New York, New York 10011

13.    SECURITY. The Notes and the Note Guarantees will be secured by the Collateral on the terms and subject to the conditions set forth in the Indenture and the Security Documents. The Trustee and the Notes Collateral Agent, as the case may be, will hold the Collateral in trust for the benefit of the Holders of the Notes, in each case pursuant to the Security Documents and any Intercreditor Agreements. Each Holder, by accepting this Note, consents and agrees to the terms of the Security Documents (including the provisions providing for the foreclosure and release of Collateral) and any Intercreditor Agreements as the same may be in effect or may be amended from time to time in accordance with their terms and the Indenture and authorizes and directs the Notes Collateral Agent to enter into the Security Documents and any Intercreditor Agreements on the Issue Date and at any time after Issue Date, as applicable, and to perform its obligations and exercise its rights thereunder in accordance therewith.

14.    ORIGINAL ISSUE DISCOUNT. THE FOLLOWING INFORMATION IS SUPPLIED SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES. THIS NOTE WAS ISSUED WITH "ORIGINAL ISSUE DISCOUNT" ("OID") WITHIN THE MEANING OF SECTION 1273 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), AND THIS LEGEND IS REQUIRED BY SECTION 1275(c) OF THE CODE. HOLDERS MAY OBTAIN INFORMATION REGARDING THE AMOUNT OF ANY OID, THE ISSUE PRICE, THE ISSUE DATE, AND THE YIELD TO MATURITY RELATING TO THIS NOTE BY CONTACTING CHRISTOPHER GUINTA, CHIEF FINANCIAL OFFICER, AT 111 W. 19TH STREET, 8TH FLOOR, NEW YORK, NEW YORK 10011.

A-2-6

DG-258

## ASSIGNMENT FORM

To assign this Note, fill in the form below:

(I) or (we) assign and transfer this Note to:_____
<div align="center">(Insert assignee's legal name)</div>

_____
<div align="center">(Insert assignee's soc. Sec. or tax I.D. No.)</div>

_____

_____

_____

_____
<div align="center">(Print or type assignee's name, address and zip code)</div>

and irrevocably appoint_____ to transfer this Note on the books of the Issuer. The agent may substitute another to act for him.

Date:

<div align="right">Your Signature _____<br>(Sign exactly as your name appears on the face of this Note)</div>

Signature Guarantee:*

* Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

<div align="center">A-2-7</div>

<div align="center">2378</div>

<div align="right">DG-259</div>

## OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have this Note purchased by the Issuer pursuant to Section 3.09 or 4.14 of the Indenture, check the appropriate box below:

[ ] Section 3.09          [ ] Section 4.14

If you want to elect to have only part of this Note purchased by the Issuer pursuant to Section 3.09 or Section 4.14 of the Indenture, state the amount you elect to have purchased:

$

Date:

Your Signature _____
(Sign exactly as your name appears on the face of this Note)

Tax Identification No.:

_____

Signature Guarantee:*

* Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

A-2-8

2379

DG-260

SCHEDULE OF EXCHANGES OF INTERESTS IN THE GLOBAL NOTE

The initial outstanding principal amount of this Global Note is $500,000,000.00. The following exchanges of a part of this Global Note for an interest in another Global Note or for a Definitive Note, or exchanges of a part of another Global or Definitive Note for an interest in this Global Note, have been made:

| Date of Exchange | Amount of decrease in Principal Amount | Amount of increase in Principal Amount of this Global Note | Principal Amount of this Global Note following such decrease or increase | Signature of authorized signatory of Trustee or Note Custodian |
|---|---|---|---|---|

A-2-9

2380

DG-261

**EXHIBIT A-3**

THIS GLOBAL NOTE IS HELD BY THE DEPOSITARY (AS DEFINED IN THE INDENTURE GOVERNING THIS NOTE) OR ITS NOMINEE IN CUSTODY FOR THE BENEFIT OF THE BENEFICIAL OWNERS HEREOF, AND IS NOT TRANSFERABLE TO ANY PERSON UNDER ANY CIRCUMSTANCES EXCEPT THAT (I) THE TRUSTEE MAY MAKE SUCH NOTATIONS HEREON AS MAY BE REQUIRED PURSUANT TO SECTION 2.06(H) OF THE INDENTURE, (II) THIS GLOBAL NOTE MAY BE EXCHANGED IN WHOLE BUT NOT IN PART PURSUANT TO SECTION 2.06(A) OF THE INDENTURE, (III) THIS GLOBAL NOTE MAY BE DELIVERED TO THE TRUSTEE FOR CANCELLATION PURSUANT TO SECTION 2.11 OF THE INDENTURE AND (IV) THIS GLOBAL NOTE MAY BE TRANSFERRED TO A SUCCESSOR DEPOSITARY WITH THE PRIOR WRITTEN CONSENT OF THE ISSUER. UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR NOTES IN DEFINITIVE FORM, THIS NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY. UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY (55 WATER STREET, NEW YORK, NEW YORK) ("DTC") TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THIS NOTE (OR ITS PREDECESSOR) HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, THIS NOTE MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS, EXCEPT AS SET FORTH IN THE NEXT SENTENCE. BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE HOLDER: (1) REPRESENTS THAT IT IS NOT AN "AFFILIATE" (AS DEFINED IN RULE 144 UNDER THE SECURITIES ACT) OF NFE FINANCING LLC ("NFE FINANCING") AND (A) IT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) (A "QIB"), OR (B) IT IS NOT A U.S. PERSON AND HAS ACQUIRED THIS NOTE IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH REGULATION S UNDER THE SECURITIES ACT; (2) AGREES THAT IT WILL NOT RESELL OR OTHERWISE TRANSFER THIS NOTE OR ANY BENEFICIAL INTEREST HEREIN EXCEPT (A) TO NFE FINANCING OR ANY OF ITS SUBSIDIARIES, (B) TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QIB PURCHASING FOR

2381

ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QIB IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, (C) TO NON-U.S. PERSONS IN AN OFFSHORE TRANSACTION MEETING THE REQUIREMENTS OF RULE 903 OR 904 OF REGULATION S OF THE SECURITIES ACT, (D) IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144 UNDER THE SECURITIES ACT, (E) IN ACCORDANCE WITH ANOTHER EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT (AND BASED UPON AN OPINION OF COUNSEL REASONABLY ACCEPTABLE TO NFE FINANCING AND THE TRUSTEE) OR (F) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT AND, IN EACH CASE, IN ACCORDANCE WITH THE APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER APPLICABLE JURISDICTION; (3) AGREES THAT IT WILL DELIVER TO EACH PERSON TO WHOM THIS NOTE OR AN INTEREST HEREIN IS TRANSFERRED A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND; AND (4) AGREES THAT ANY SECURITY THAT IS OWNED BY AN AFFILIATE (AS DEFINED IN RULE 144 UNDER THE SECURITIES ACT) OF NFE FINANCING MAY NOT BE RESOLD OR TRANSFERRED BY SUCH AFFILIATE OTHER THAN TO NFE FINANCING OR A SUBSIDIARY THEREOF OR PURSUANT TO (A) A REGISTRATION STATEMENT UNDER THE SECURITIES ACT, (B) IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144 UNDER THE SECURITIES ACT OR (C) ANOTHER EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT (IF AVAILABLE) IN A TRANSACTION THAT RESULTS IN SUCH SECURITY NO LONGER BEING A RESTRICTED SECURITY (AS DEFINED UNDER RULE 144). IN THE EVENT ANY SUCH PERSONS BENEFICIALLY OWN AN INTEREST IN THE SECURITY PRIOR TO THE TIME NFE FINANCING REMOVES THE RESTRICTIVE LEGEND ON THE SECURITY, NFE FINANCING MAY REQUIRE THAT SUCH PERSONS HOLD THEIR INTERESTS IN THE SECURITY IN CERTIFICATED FORM BEARING AN APPROPRIATE RESTRICTIVE LEGEND AND A RESTRICTED CUSIP NUMBER. AS USED HEREIN, THE TERMS "OFFSHORE TRANSACTIONS" AND "UNITED STATES" HAVE THE MEANINGS GIVEN TO THEM BY RULE 902 OF REGULATION S UNDER THE SECURITIES ACT. THE INDENTURE CONTAINS A PROVISION REQUIRING THE TRUSTEE TO REFUSE TO REGISTER ANY TRANSFER OF THIS NOTE IN VIOLATION OF THE FOREGOING.

A-3-2

DG-263

CUSIP 62909B AA5

ISIN US62909BAA52

RULE 144A GLOBAL NOTE

12.000% Senior Secured Notes due 2029

No. A-3                                                                                     $177,881,950.00

NFE Financing LLC

NFE Financing LLC promises to pay to CEDE & CO. or registered assigns, the principal sum set forth on the Schedule of Exchanges of Interests in the Global Note attached hereto, on November 15, 2029 (the "Stated Maturity Date"); provided, that the Stated Maturity Date shall be accelerated to the date that is ninety-one (91) days prior to the stated maturity date of any Indebtedness of New Fortress Energy Inc. or any of its Subsidiaries, for borrowed money (including Indebtedness for borrowed money deemed to be issued in a debt exchange), other than the Letter of Credit Facility, the Macquarie Facility and the Turbine Loan Agreement, if more than $100,000,000 of aggregate principal amount of such Indebtedness is outstanding as of such date.

Interest Payment Dates: May 15 and November 15, commencing on May 15, 2025[1]

Record Dates: May 1 and November 1

---

[1] With respect to the Initial Notes.

A-3-3

2383

DG-264

[Back of Note]

12.000% Senior Secured Notes due 2029

Capitalized terms used herein shall have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

1.        INTEREST. NFE Financing LLC, a Delaware limited liability company (the "Issuer"), promises to pay interest on the unpaid principal amount of this Note at 12.000% per annum until maturity. The Issuer will pay interest semi-annually in arrears on May 15 and November 15 of each year, commencing May 15, 2025, or if any such day is not a Business Day, on the next succeeding Business Day (each, an "Interest Payment Date"). Interest on the Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from November 22, 2024[4].  The Issuer will pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principal and premium, if any, from time to time on demand at a rate that is 2.00% higher than the interest rate on the Notes; it shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest (without regard to any applicable grace period) from time to time on demand at a rate that is 2.00% higher than the interest rate on the Notes. Interest will be computed on the basis of a 360-day year comprised of twelve 30-day months.

2.        METHOD OF PAYMENT. The Issuer will pay interest on the Notes to the Persons who are registered Holders of Notes at the close of business on the May 1 or November 1 (whether or not a Business Day), as the case may be, immediately preceding the Interest Payment Date, even if such Notes are canceled after such record date and on or before such Interest Payment Date, except as provided in Section 2.12 of the Indenture with respect to defaulted interest. Payment of interest may be made by check mailed to the Holders at their addresses set forth in the register of Holders or by wire transfer; provided that all payments of principal of and interest and premium, if any, on all Global Notes shall be made in accordance with the Depositary's applicable procedures. Such payment shall be in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. If a payment date is not a Business Day at the place of payment, payment shall be made on the next succeeding day that is a Business Day, and no interest shall accrue for the intervening period. If a regular record date is not a Business Day, the record date shall not be affected.

3.        PAYING AGENT AND REGISTRAR. Initially, Wilmington Savings Fund Society, FSB, the Trustee under the Indenture, will act as Paying Agent and Registrar. The Issuer may change any Paying Agent or Registrar without notice to the Holders. The Issuer or any of its Subsidiaries may act in such capacity.

4.        INDENTURE. The Issuer issued the Notes under an Indenture, dated as of November 22, 2024 (the "Indenture"), among the Issuer, the Guarantors from time to time party thereto, the Trustee and the Notes Collateral Agent. This Note is one of a duly authorized issue of notes of the Issuer designated as its 12.000% Senior Secured Notes due 2029. The Issuer shall be entitled to issue Additional Notes pursuant to Sections 2.01, 4.09 and 4.12 of the Indenture. The

---

[4] With respect to the Initial Notes issued on the Issue Date.

A-3-4

2384

DG-265

terms of the Notes include those stated in the Indenture. The Notes are subject to all such terms, and Holders are referred to the Indenture for a statement of such terms. To the extent any provision of this Note conflicts with the express provisions of the Indenture, the provisions of the Indenture shall govern and be controlling.

5.      REDEMPTION AND REPURCHASE. The Notes are subject to optional redemption, and may be the subject of a Change of Control Offer (or an Alternate Offer) and a Prepayment Offer, as further described in the Indenture. The Issuer shall not be required to make any mandatory or sinking fund payments with respect to the Notes.

6.      DENOMINATIONS, TRANSFER, EXCHANGE. The Notes are in registered form without coupons in denominations of $1.00 and integral multiples of $1.00 in excess thereof. The transfer of Notes shall be registered and Notes may be exchanged as provided in the Indenture. The Registrar and the Trustee may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and the Issuer may require a Holder to pay any taxes and fees required by law or permitted by the Indenture. The Issuer need not exchange or register the transfer of any Note or portion of a Note selected for redemption or tendered (and not withdrawn) for repurchase in connection with a Change of Control Offer, an Alternate Offer, a Prepayment Offer or other tender offer, in whole or in part, except for the unredeemed portion of any Note being redeemed in part. Also, the Issuer need not exchange or register the transfer of any Notes during a period beginning at the opening of business 15 days before the delivery of a notice of redemption of Notes to be redeemed and ending at the close of business on the day of selection of Notes to be redeemed.

7.      PERSONS DEEMED OWNERS. The registered Holder shall be treated as its owner for all purposes.

8.      AMENDMENT, SUPPLEMENT AND WAIVER. The Indenture, the Note Guarantees or the Notes may be amended or supplemented as provided in the Indenture.

9.      DEFAULTS AND REMEDIES. The Events of Default relating to the Notes are defined in Section 6.01 of the Indenture. Upon the occurrence of an Event of Default, the rights and obligations of the Note Parties, the Trustee and the Holders shall be as set forth in the applicable provisions of the Indenture.

10.     AUTHENTICATION. This Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose until authenticated by the manual signature of the Trustee.

11.     GOVERNING LAW. THE INDENTURE, THE NOTES AND THE NOTE GUARANTEES SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

12.     CUSIP NUMBERS. Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Issuer has caused CUSIP numbers to be printed on the Notes and the Trustee may use CUSIP numbers in notices of redemption as a convenience to Holders. No representation is made as to the accuracy of such numbers either as printed on the

A-3-5

DG-266

Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

The Issuer will furnish to any Holder upon written request and without charge a copy of the Indenture. Requests may be made to the Issuer at the following address:

> NFE Financing LLC
> Investor Relations
> 111 W. 19th Street, 8th Floor
> New York, New York 10011

13. SECURITY. The Notes and the Note Guarantees will be secured by the Collateral on the terms and subject to the conditions set forth in the Indenture and the Security Documents. The Trustee and the Notes Collateral Agent, as the case may be, will hold the Collateral in trust for the benefit of the Holders of the Notes, in each case pursuant to the Security Documents and any Intercreditor Agreements. Each Holder, by accepting this Note, consents and agrees to the terms of the Security Documents (including the provisions providing for the foreclosure and release of Collateral) and any Intercreditor Agreements as the same may be in effect or may be amended from time to time in accordance with their terms and the Indenture and authorizes and directs the Notes Collateral Agent to enter into the Security Documents and any Intercreditor Agreements on the Issue Date and at any time after Issue Date, as applicable, and to perform its obligations and exercise its rights thereunder in accordance therewith.

14. ORIGINAL ISSUE DISCOUNT. THE FOLLOWING INFORMATION IS SUPPLIED SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES. THIS NOTE WAS ISSUED WITH "ORIGINAL ISSUE DISCOUNT" ("OID") WITHIN THE MEANING OF SECTION 1273 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), AND THIS LEGEND IS REQUIRED BY SECTION 1275(c) OF THE CODE. HOLDERS MAY OBTAIN INFORMATION REGARDING THE AMOUNT OF ANY OID, THE ISSUE PRICE, THE ISSUE DATE, AND THE YIELD TO MATURITY RELATING TO THIS NOTE BY CONTACTING CHRISTOPHER GUINTA, CHIEF FINANCIAL OFFICER, AT 111 W. 19TH STREET, 8TH FLOOR, NEW YORK, NEW YORK 10011.

DG-267

## ASSIGNMENT FORM

To assign this Note, fill in the form below:

(I) or (we) assign and transfer this Note to:_____

<div align="center">(Insert assignee's legal name)</div>

_____

<div align="center">(Insert assignee's soc. Sec. or tax I.D. No.)</div>

_____

_____

_____

_____

<div align="center">(Print or type assignee's name, address and zip code)</div>

and irrevocably appoint_____ to transfer this Note on the books of the Issuer. The agent may substitute another to act for him.

Date:

Your Signature _____

<div align="center">(Sign exactly as your name appears on the face of this Note)</div>

Signature Guarantee:*

* Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

A-3-7

2387

DG-268

## OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have this Note purchased by the Issuer pursuant to Section 3.09 or 4.14 of the Indenture, check the appropriate box below:

[ ] Section 3.09          [ ] Section 4.14

If you want to elect to have only part of this Note purchased by the Issuer pursuant to Section 3.09 or Section 4.14 of the Indenture, state the amount you elect to have purchased:

$

Date:

Your Signature _____
(Sign exactly as your name appears on the face of this Note)

Tax Identification No.:

_____

Signature Guarantee:*

* Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

A-3-8

2388

DG-269

SCHEDULE OF EXCHANGES OF INTERESTS IN THE GLOBAL NOTE

   The initial outstanding principal amount of this Global Note is $177,881,950.00. The following exchanges of a part of this Global Note for an interest in another Global Note or for a Definitive Note, or exchanges of a part of another Global or Definitive Note for an interest in this Global Note, have been made:

| Date of Exchange | Amount of decrease in Principal Amount | Amount of increase in Principal Amount of this Global Note | Principal Amount of this Global Note following such decrease or increase | Signature of authorized signatory of Trustee or Note Custodian |
| --- | --- | --- | --- | --- |

A-3-9

2389

**EXHIBIT A-4**

THIS GLOBAL NOTE IS HELD BY THE DEPOSITARY (AS DEFINED IN THE INDENTURE GOVERNING THIS NOTE) OR ITS NOMINEE IN CUSTODY FOR THE BENEFIT OF THE BENEFICIAL OWNERS HEREOF, AND IS NOT TRANSFERABLE TO ANY PERSON UNDER ANY CIRCUMSTANCES EXCEPT THAT (I) THE TRUSTEE MAY MAKE SUCH NOTATIONS HEREON AS MAY BE REQUIRED PURSUANT TO SECTION 2.06(H) OF THE INDENTURE, (II) THIS GLOBAL NOTE MAY BE EXCHANGED IN WHOLE BUT NOT IN PART PURSUANT TO SECTION 2.06(A) OF THE INDENTURE, (III) THIS GLOBAL NOTE MAY BE DELIVERED TO THE TRUSTEE FOR CANCELLATION PURSUANT TO SECTION 2.11 OF THE INDENTURE AND (IV) THIS GLOBAL NOTE MAY BE TRANSFERRED TO A SUCCESSOR DEPOSITARY WITH THE PRIOR WRITTEN CONSENT OF THE ISSUER. UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR NOTES IN DEFINITIVE FORM, THIS NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY. UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY (55 WATER STREET, NEW YORK, NEW YORK) ("DTC") TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

BY ITS ACQUISITION HEREOF, THE HOLDER HEREOF REPRESENTS THAT IT IS NOT A U.S. PERSON, NOR IS IT PURCHASING FOR THE ACCOUNT OF A U.S. PERSON, AND IS ACQUIRING THIS SECURITY IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH REGULATION S UNDER THE SECURITIES ACT.

A-4-1

DG-271

CUSIP U6510B AA0

ISIN USU6510BAA09

REGULATION S GLOBAL NOTE

12.000% Senior Secured Notes due 2029

No. S-1                                      $32,514,306.00

NFE Financing LLC

NFE Financing LLC promises to pay to CEDE & CO. or registered assigns, the principal sum set forth on the Schedule of Exchanges of Interests in the Global Note attached hereto, on November 15, 2029 (the "Stated Maturity Date"); provided, that the Stated Maturity Date shall be accelerated to the date that is ninety-one (91) days prior to the stated maturity date of any Indebtedness of New Fortress Energy Inc. or any of its Subsidiaries, for borrowed money (including Indebtedness for borrowed money deemed to be issued in a debt exchange), other than the Letter of Credit Facility, the Macquarie Facility and the Turbine Loan Agreement, if more than $100,000,000 of aggregate principal amount of such Indebtedness is outstanding as of such date.

Interest Payment Dates: May 15 and November 15, commencing on May 15, 2025[1]

Record Dates: May 1 and November 1

---

[1] With respect to the Initial Notes.

A-4-2

2391

[Back of Note]

12.000% Senior Secured Notes due 2029

Capitalized terms used herein shall have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

1.      INTEREST. NFE Financing LLC, a Delaware limited liability company (the "Issuer"), promises to pay interest on the unpaid principal amount of this Note at 12.000% per annum until maturity. The Issuer will pay interest semi-annually in arrears on May 15 and November 15 of each year, commencing May 15, 2025, or if any such day is not a Business Day, on the next succeeding Business Day (each, an "Interest Payment Date"). Interest on the Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from November 22, 2024[4]. The Issuer will pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principal and premium, if any, from time to time on demand at a rate that is 2.00% higher than the interest rate on the Notes; it shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest (without regard to any applicable grace period) from time to time on demand at a rate that is 2.00% higher than the interest rate on the Notes. Interest will be computed on the basis of a 360-day year comprised of twelve 30-day months.

2.      METHOD OF PAYMENT. The Issuer will pay interest on the Notes to the Persons who are registered Holders of Notes at the close of business on the May 1 or November 1 (whether or not a Business Day), as the case may be, immediately preceding the Interest Payment Date, even if such Notes are canceled after such record date and on or before such Interest Payment Date, except as provided in Section 2.12 of the Indenture with respect to defaulted interest. Payment of interest may be made by check mailed to the Holders at their addresses set forth in the register of Holders or by wire transfer; provided that all payments of principal of and interest and premium, if any, on all Global Notes shall be made in accordance with the Depositary's applicable procedures. Such payment shall be in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. If a payment date is not a Business Day at the place of payment, payment shall be made on the next succeeding day that is a Business Day, and no interest shall accrue for the intervening period. If a regular record date is not a Business Day, the record date shall not be affected.

3.      PAYING AGENT AND REGISTRAR. Initially, Wilmington Savings Fund Society, FSB, the Trustee under the Indenture, will act as Paying Agent and Registrar. The Issuer may change any Paying Agent or Registrar without notice to the Holders. The Issuer or any of its Subsidiaries may act in such capacity.

4.      INDENTURE. The Issuer issued the Notes under an Indenture, dated as of November 22, 2024 (the "Indenture"), among the Issuer, the Guarantors from time to time party thereto, the Trustee and the Notes Collateral Agent. This Note is one of a duly authorized issue of notes of the Issuer designated as its 12.000% Senior Secured Notes due 2029. The Issuer shall be entitled to issue Additional Notes pursuant to Sections 2.01, 4.09 and 4.12 of the Indenture. The

---

[4] With respect to the Initial Notes issued on the Issue Date.

A-4-3

terms of the Notes include those stated in the Indenture. The Notes are subject to all such terms, and Holders are referred to the Indenture for a statement of such terms. To the extent any provision of this Note conflicts with the express provisions of the Indenture, the provisions of the Indenture shall govern and be controlling.

5.      REDEMPTION AND REPURCHASE. The Notes are subject to optional redemption, and may be the subject of a Change of Control Offer (or an Alternate Offer) and a Prepayment Offer, as further described in the Indenture. The Issuer shall not be required to make any mandatory or sinking fund payments with respect to the Notes.

6.      DENOMINATIONS, TRANSFER, EXCHANGE. The Notes are in registered form without coupons in denominations of \$1.00 and integral multiples of \$1.00 in excess thereof. The transfer of Notes shall be registered and Notes may be exchanged as provided in the Indenture. The Registrar and the Trustee may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and the Issuer may require a Holder to pay any taxes and fees required by law or permitted by the Indenture. The Issuer need not exchange or register the transfer of any Note or portion of a Note selected for redemption or tendered (and not withdrawn) for repurchase in connection with a Change of Control Offer, an Alternate Offer, a Prepayment Offer or other tender offer, in whole or in part, except for the unredeemed portion of any Note being redeemed in part. Also, the Issuer need not exchange or register the transfer of any Notes during a period beginning at the opening of business 15 days before the delivery of a notice of redemption of Notes to be redeemed and ending at the close of business on the day of selection of Notes to be redeemed.

7.      PERSONS DEEMED OWNERS. The registered Holder shall be treated as its owner for all purposes.

8.      AMENDMENT, SUPPLEMENT AND WAIVER. The Indenture, the Note Guarantees or the Notes may be amended or supplemented as provided in the Indenture.

9.      DEFAULTS AND REMEDIES. The Events of Default relating to the Notes are defined in Section 6.01 of the Indenture. Upon the occurrence of an Event of Default, the rights and obligations of the Note Parties, the Trustee and the Holders shall be as set forth in the applicable provisions of the Indenture.

10.     AUTHENTICATION. This Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose until authenticated by the manual signature of the Trustee.

11.     GOVERNING LAW. THE INDENTURE, THE NOTES AND THE NOTE GUARANTEES SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

12.     CUSIP NUMBERS. Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Issuer has caused CUSIP numbers to be printed on the Notes and the Trustee may use CUSIP numbers in notices of redemption as a convenience to Holders. No representation is made as to the accuracy of such numbers either as printed on the

A-4-4

2393

DG-274

Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

The Issuer will furnish to any Holder upon written request and without charge a copy of the Indenture. Requests may be made to the Issuer at the following address:

> NFE Financing LLC
> Investor Relations
> 111 W. 19th Street, 8th Floor
> New York, New York 10011

13.     SECURITY. The Notes and the Note Guarantees will be secured by the Collateral on the terms and subject to the conditions set forth in the Indenture and the Security Documents. The Trustee and the Notes Collateral Agent, as the case may be, will hold the Collateral in trust for the benefit of the Holders of the Notes, in each case pursuant to the Security Documents and any Intercreditor Agreements. Each Holder, by accepting this Note, consents and agrees to the terms of the Security Documents (including the provisions providing for the foreclosure and release of Collateral) and any Intercreditor Agreements as the same may be in effect or may be amended from time to time in accordance with their terms and the Indenture and authorizes and directs the Notes Collateral Agent to enter into the Security Documents and any Intercreditor Agreements on the Issue Date and at any time after Issue Date, as applicable, and to perform its obligations and exercise its rights thereunder in accordance therewith.

14.     ORIGINAL ISSUE DISCOUNT. THE FOLLOWING INFORMATION IS SUPPLIED SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES. THIS NOTE WAS ISSUED WITH "ORIGINAL ISSUE DISCOUNT" ("OID") WITHIN THE MEANING OF SECTION 1273 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), AND THIS LEGEND IS REQUIRED BY SECTION 1275(c) OF THE CODE. HOLDERS MAY OBTAIN INFORMATION REGARDING THE AMOUNT OF ANY OID, THE ISSUE PRICE, THE ISSUE DATE, AND THE YIELD TO MATURITY RELATING TO THIS NOTE BY CONTACTING CHRISTOPHER GUINTA, CHIEF FINANCIAL OFFICER, AT 111 W. 19TH STREET, 8TH FLOOR, NEW YORK, NEW YORK 10011.

A-4-5

DG-275

## ASSIGNMENT FORM

To assign this Note, fill in the form below:

(I) or (we) assign and transfer this Note to:_____
<div align="center">(Insert assignee's legal name)</div>

_____
<div align="center">(Insert assignee's soc. Sec. or tax I.D. No.)</div>

_____

_____

_____

_____
<div align="center">(Print or type assignee's name, address and zip code)</div>

and irrevocably appoint_____ to transfer this Note on the books of the Issuer. The agent may substitute another to act for him.

Date:

<div align="right">Your Signature _____<br>(Sign exactly as your name appears on the face of this Note)</div>

Signature Guarantee:*

\* Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

<div align="center">A-4-6</div>

<div align="center">2395</div>

DG-276

## OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have this Note purchased by the Issuer pursuant to Section 3.09 or 4.14 of the Indenture, check the appropriate box below:

[ ] Section 3.09          [ ] Section 4.14

If you want to elect to have only part of this Note purchased by the Issuer pursuant to Section 3.09 or Section 4.14 of the Indenture, state the amount you elect to have purchased:

$

Date:

Your Signature _____
(Sign exactly as your name appears on the face of this Note)

Tax Identification No.:

_____

Signature Guarantee:*

* Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

A-4-7

DG-277

SCHEDULE OF EXCHANGES OF INTERESTS IN THE GLOBAL NOTE

    The initial outstanding principal amount of this Global Note is $32,514,306.00. The following exchanges of a part of this Global Note for an interest in another Global Note or for a Definitive Note, or exchanges of a part of another Global or Definitive Note for an interest in this Global Note, have been made:

| Date of Exchange | Amount of decrease in Principal Amount | Amount of increase in Principal Amount of this Global Note | Principal Amount of this Global Note following such decrease or increase | Signature of authorized signatory of Trustee or Note Custodian |
|---|---|---|---|---|

A-4-8

2397

DG-278

**EXHIBIT B**

FORM OF CERTIFICATE OF TRANSFER

NFE Financing LLC]
111 W. 19th Street, 8th Floor
New York, New York 10011
Attention: Cameron D. MacDougall, Esq.

[__]

Re: 12.000% Senior Secured Notes due 2029

Reference is hereby made to the Indenture, dated as of November 22, 2024 (the "Indenture"), among the Issuer, the Guarantors from time to time party thereto, the Trustee and the Notes Collateral Agent. Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

_____ (the "Transferor") owns and proposes to transfer the Note[s] or interest in such Note[s] specified in Annex A hereto, in the principal amount of $_____ in such Note[s] or interests (the "Transfer"), to _____ (the "Transferee"), as further specified in Annex A hereto. In connection with the Transfer, the Transferor hereby certifies that:

[CHECK ALL THAT APPLY]

1.     [  ] CHECK IF TRANSFEREE WILL TAKE DELIVERY OF A BENEFICIAL INTEREST IN A 144A GLOBAL NOTE OR A DEFINITIVE NOTE PURSUANT TO RULE 144A. The Transfer is being effected pursuant to and in accordance with Rule 144A under the United States Securities Act of 1933, as amended (the "Securities Act"), and, accordingly, the Transferor hereby further certifies that the beneficial interest or Definitive Note is being transferred to a Person that the Transferor reasonably believes is purchasing the beneficial interest or Definitive Note for its own account, or for one or more accounts with respect to which such Person exercises sole investment discretion, and such Person and each such account is a "qualified institutional buyer" within the meaning of Rule 144A in a transaction meeting the requirements of Rule 144A and such Transfer is in compliance with any applicable blue sky securities laws of any state of the United States.

2.     [  ] CHECK IF TRANSFEREE WILL TAKE DELIVERY OF A BENEFICIAL INTEREST IN A REGULATION S GLOBAL NOTE OR A DEFINITIVE NOTE PURSUANT TO REGULATION S. The Transfer is being effected pursuant to and in accordance with Rule 903 or Rule 904 of Regulation S and, accordingly, the Transferor hereby further certifies that (i) the Transfer is not being made to a person in the United States and (x) at the time the buy order was originated, the Transferee was outside the United States or such Transferor and any Person acting on its behalf reasonably believed and believes that the Transferee was outside the United States or (y) the transaction was executed in, on or through the facilities of a designated offshore securities market and neither such Transferor nor any Person acting on its behalf knows that the transaction was prearranged with a buyer in the United States, (ii) no directed selling efforts have been made

in contravention of the requirements of Rule 903(b) or Rule 904(b) of Regulation S, (iii) the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act and (iv) if the proposed transfer is being made prior to the expiration of the applicable Restricted Period, the transfer is not being made to a U.S. Person or for the account or benefit of a U.S. Person (other than an initial purchaser). Upon consummation of the proposed transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will be subject to the restrictions on Transfer enumerated in the Indenture and the Securities Act.

3.      [ ] CHECK AND COMPLETE IF TRANSFEREE WILL TAKE DELIVERY OF A BENEFICIAL INTEREST IN A DEFINITIVE NOTE PURSUANT TO ANY PROVISION OF THE SECURITIES ACT OTHER THAN RULE 144A OR REGULATION S WHICH PROVISION MAY NOT BE RULE 144. The Transfer is being effected in compliance with the transfer restrictions applicable to beneficial interests in Restricted Global Notes and Restricted Definitive Notes and pursuant to and in accordance with the Securities Act and any applicable blue sky securities laws of any state of the United States, and accordingly the Transferor hereby further certifies that (check one):

(a)      [ ] such Transfer is being effected to the Issuer or a subsidiary thereof;

or

(b)      [ ] such Transfer is being effected pursuant to an effective registration statement under the Securities Act and, if applicable, in compliance with the prospectus delivery requirements of the Securities Act.

4.      [ ] CHECK IF TRANSFEREE WILL TAKE DELIVERY OF A BENEFICIAL INTEREST IN AN UNRESTRICTED GLOBAL NOTE OR OF AN UNRESTRICTED DEFINITIVE NOTE.

(a)      [ ] CHECK IF TRANSFER IS PURSUANT TO REGULATION S. (i) The Transfer is being effected pursuant to and in accordance with Rule 903 or Rule 904 of Regulation S and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any state of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will no longer be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Global Notes, on Restricted Definitive Notes and in the Indenture.

(b)      [ ] CHECK IF TRANSFER IS PURSUANT TO OTHER EXEMPTION. (i) The Transfer is being effected pursuant to and in compliance with an exemption from the registration requirements of the Securities Act other than Rule 144, Rule 903 or Rule 904 and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any State of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement

B-2

2399

Legend are not required in order to maintain compliance with the Securities Act. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will not be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Global Notes or Restricted Definitive Notes and in the Indenture.

2400

DG-281

This certificate and the statements contained herein are made for your benefit and the benefit of the Issuer.

[Insert Name of Transferor]


By:    _____
               Name:
               Title:


Dated: _____

B-4

2401

DG-282

ANNEX A TO CERTIFICATE OF TRANSFER

1.      The Transferor owns and proposes to transfer the following:

[CHECK ONE OF (a) OR (b)]

(a)      [  ] a beneficial interest in the:

(i)      [  ] 144A Global Note (CUSIP 62909B AA5), or

(ii)      [  ] Regulation S Global Note (CUSIP U6510B AA0), or

(b)      [  ] a Restricted Definitive Note.

2.      After the Transfer the Transferee will hold:

[CHECK ONE]

(a)      [  ] a beneficial interest in the:

(i)      [  ] 144A Global Note (CUSIP 62909B AA5), or

(ii)      [  ] Regulation S Global Note (CUSIP U6510B AA0), or

(b)      [  ] a Restricted Definitive Note; or

(c)      [  ] an Unrestricted Definitive Note,
in accordance with the terms of the Indenture.

B-5

2402

DG-283

**EXHIBIT C**

FORM OF CERTIFICATE OF EXCHANGE

NFE Financing LLC]
111 W. 19th Street, 8th Floor
New York, New York 10011
Attention: Cameron D. MacDougall, Esq.

[__]

Re: 12.000% Senior Secured Notes due 2029

Reference is hereby made to the Indenture, dated as of November 22, 2024 (the "Indenture"), among the Issuer, the Guarantors from time to time party thereto, the Trustee and the Notes Collateral Agent. Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

_____ (the "Owner") owns and proposes to exchange the Note[s] or interest in such Note[s] specified herein, in the principal amount of $_____ in such Note[s] or interests (the "Exchange"). In connection with the Exchange, the Owner hereby certifies that:

1)      EXCHANGE OF RESTRICTED DEFINITIVE NOTES OR BENEFICIAL INTERESTS IN A RESTRICTED GLOBAL NOTE FOR UNRESTRICTED DEFINITIVE NOTES OR BENEFICIAL INTERESTS IN AN UNRESTRICTED GLOBAL NOTE

a)      [ ] CHECK IF EXCHANGE IS FROM BENEFICIAL INTEREST IN A RESTRICTED GLOBAL NOTE TO BENEFICIAL INTEREST IN AN UNRESTRICTED GLOBAL NOTE. In connection with the Exchange of the Owner's beneficial interest in a Restricted Global Note for a beneficial interest in an Unrestricted Global Note in an equal principal amount, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Global Notes and pursuant to and in accordance with the United States Securities Act of 1933, as amended (the "Securities Act"), (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the beneficial interest in an Unrestricted Global Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

b)      [ ] CHECK IF EXCHANGE IS FROM BENEFICIAL INTEREST IN A RESTRICTED GLOBAL NOTE TO UNRESTRICTED DEFINITIVE NOTE. In connection with the Exchange of the Owner's beneficial interest in a Restricted Global Note for an Unrestricted Definitive Note, the Owner hereby certifies (i) the Definitive Note is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Restricted Global Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions

C-1

2403

on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the Definitive Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

c)      [  ] CHECK IF EXCHANGE IS FROM RESTRICTED DEFINITIVE NOTE TO BENEFICIAL INTEREST IN AN UNRESTRICTED GLOBAL NOTE. In connection with the Owner's Exchange of a Restricted Definitive Note for a beneficial interest in an Unrestricted Global Note, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to Restricted Definitive Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the beneficial interest is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

d)      [  ] CHECK IF EXCHANGE IS FROM RESTRICTED DEFINITIVE NOTE TO UNRESTRICTED DEFINITIVE NOTE. In connection with the Owner's Exchange of a Restricted Definitive Note for an Unrestricted Definitive Note, the Owner hereby certifies (i) the Unrestricted Definitive Note is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to Restricted Definitive Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the Unrestricted Definitive Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

2)      EXCHANGE OF RESTRICTED DEFINITIVE NOTES OR BENEFICIAL INTERESTS IN RESTRICTED GLOBAL NOTES FOR RESTRICTED DEFINITIVE NOTES OR BENEFICIAL INTERESTS IN RESTRICTED GLOBAL NOTES

a)      [  ] CHECK IF EXCHANGE IS FROM BENEFICIAL INTEREST IN A RESTRICTED GLOBAL NOTE TO RESTRICTED DEFINITIVE NOTE. In connection with the Exchange of the Owner's beneficial interest in a Restricted Global Note for a Restricted Definitive Note with an equal principal amount, the Owner hereby certifies that the Restricted Definitive Note is being acquired for the Owner's own account without transfer. Upon consummation of the proposed Exchange in accordance with the terms of the Indenture, the Restricted Definitive Note issued will continue to be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Definitive Note and in the Indenture and the Securities Act.

b)      [  ] CHECK IF EXCHANGE IS FROM RESTRICTED DEFINITIVE NOTE TO BENEFICIAL INTEREST IN A RESTRICTED GLOBAL NOTE. In connection with the Exchange of the Owner's Restricted Definitive Note for a beneficial interest in the [CHECK ONE] [ ] 144A Global Note [ ] Regulation S Global Note, with an

C-2

2404

equal principal amount, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer and (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Restricted Global Notes and pursuant to and in accordance with the Securities Act, and in compliance with any applicable blue sky securities laws of any state of the United States. Upon consummation of the proposed Exchange in accordance with the terms of the Indenture, the beneficial interest issued will be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the relevant Restricted Global Note and in the Indenture and the Securities Act.

This certificate and the statements contained herein are made for your benefit and the benefit of the Issuer.

[Insert Name of Transferor]

By: _____
Name:
Title:

Dated: _____

C-3

2405

DG-286

# EXHIBIT D

FORM OF EQUAL PRIORITY INTERCREDITOR AGREEMENT

[attached]

**EQUAL PRIORITY INTERCREDITOR AGREEMENT**

dated as of

[●], 2024

among

MUFG Bank, Ltd.,
as Credit Facility Agent and

the NFE Financing Notes Collateral Agent from time to time party hereto, and

and acknowledged by each Grantor

2407

DG-288

TABLE OF CONTENTS

Page

ARTICLE I

Definitions                                                                                             1

SECTION 1.01.        Construction; Certain Defined Terms..........................................1

ARTICLE II

Priorities and Agreements with Respect to Shared Collateral                              11

SECTION 2.01.        Priority of Claims. .........................................................................11
SECTION 2.02.        Actions with Respect to Shared Collateral; Prohibition on
                     Contesting Liens. ...................................................................13
SECTION 2.03.        No Interference; Payment Over....................................................15
SECTION 2.04.        Automatic Release of Liens; Amendments to Equal Priority
                     Collateral Documents. ...........................................................16
SECTION 2.05.        Certain Agreements with Respect to Bankruptcy or
                     Insolvency Proceedings. .........................................................17
SECTION 2.06.        Reinstatement ........................................................................18
SECTION 2.07.        Insurance ...............................................................................18
SECTION 2.08.        Refinancings...........................................................................18
SECTION 2.09.        Possessory Collateral, Control Collateral and Controlling
                     Authorized Representative as Gratuitous Bailee/Agent for
                     Perfection. ...............................................................................18

ARTICLE III

Existence and Amounts of Liens and Obligations                                          19

ARTICLE IV

The Controlling Authorized Representative                                                20

SECTION 4.01.        Appointment and Authority. .....................................................20
SECTION 4.02.        Rights as an Equal Priority Secured Party ...............................21
SECTION 4.03.        Exculpatory Provisions. ...........................................................21
SECTION 4.04.        Reliance by Controlling Authorized Representative ...................23
SECTION 4.05.        Delegation of Duties .................................................................23
SECTION 4.06.        Non-Reliance on Controlling Authorized Representative ............23

ARTICLE V

Miscellaneous                                                                                          24

i

DG-289

SECTION 5.01.     Notices ..................................................................................24
SECTION 5.02.     Waivers; Amendment. ...........................................................24
SECTION 5.03.     Parties in Interest ..................................................................25
SECTION 5.04.     Survival of Agreement............................................................25
SECTION 5.05.     Counterparts ...........................................................................25
SECTION 5.06.     Severability ............................................................................25
SECTION 5.07.     Governing Law.......................................................................26
SECTION 5.08.     Submission to Jurisdiction; Waivers .......................................26
SECTION 5.09.     **WAIVER OF JURY TRIAL** ..............................................26
SECTION 5.10.     Headings..................................................................................27
SECTION 5.11.     Conflicts..................................................................................27
SECTION 5.12.     Provisions Solely to Define Relative Rights............................27
SECTION 5.13.     Authorized Representatives......................................................27
SECTION 5.14.     [Reserved] ...............................................................................28
SECTION 5.15.     Junior Lien Intercreditor Agreements......................................28
SECTION 5.16.     Purchase Right.........................................................................29

Annexes

*Forms of*

Annex A     Acknowledgement of Grantors
Annex B     NFE Financing Notes Obligations Joinder Agreement

ii

2409

DG-290

This EQUAL PRIORITY INTERCREDITOR AGREEMENT (as amended, restated, modified or supplemented from time to time, this "*Agreement*"), dated as of [●], 2024, is among MUFG Bank, Ltd., in its capacity as common representative for the LC Collateral Agent, the RCF Collateral Agent, the TLA Collateral Agent and the Credit Agreement Secured Parties (in such capacity and together with its successors in such capacity, the "*Credit Facility Agent*") and the NFE Financing Notes Collateral Agent from time to time party hereto for the NFE Financing Notes Secured Parties, as acknowledged by the Grantors in the Acknowledgement of Grantors.

NFE Financing is party to that certain First Lien Pledge and Security Agreement, dated as of the date hereof (the "*Common Representative First Lien Pledge and Security Agreement*"), by and among the grantors party thereto and the Credit Facility Agent in its capacity as common representative for the LC Collateral Agent, the RCF Collateral Agent and the TLA Collateral Agent.

In consideration of the mutual agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the NFE Financing Notes Collateral Agent (for itself and on behalf of the NFE Financing Notes Secured Parties) and the Credit Facility Agent (for itself and on behalf of the Credit Agreement Secured Parties) agree as follows:

## ARTICLE I

### Definitions

SECTION 1.01.        *Construction; Certain Defined Terms.*

(a)        The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument, other document as from time to time amended, restated, amended and restated, supplemented or otherwise modified (subject to any restrictions on such amendments, amendments and restatements, supplements or modifications set forth herein), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, but shall not be deemed to include the subsidiaries of such Person unless express reference is made to such subsidiaries, (iii) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) unless otherwise expressly stated herein, all references herein to Articles, Sections and Annexes shall be construed to refer to Articles, Sections and Annexes of this Agreement, (v) unless otherwise expressly qualified herein, the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights and

1

DG-291

(vi) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time.

(b)     It is the intention of the Equal Priority Secured Parties of each Series that the holders of Equal Priority Obligations of such Series (and not the Equal Priority Secured Parties of any other Series) bear the risk of (i) any determination by a court of competent jurisdiction that (x) any of the Equal Priority Obligations of such Series are unenforceable under applicable law or are subordinated to any other obligations (other than another Series of Equal Priority Obligations), (y) any of the Equal Priority Obligations of such Series do not have an enforceable security interest in any of the Collateral securing any other Series of Equal Priority Obligations and/or (z) any intervening security interest exists securing any other obligations (other than another Series of Equal Priority Obligations) on a basis ranking prior to the security interest of such Series of Equal Priority Obligations but junior to the security interest of any other Series of Equal Priority Obligations or (ii) the existence of any Collateral for any other Series of Equal Priority Obligations that is not Shared Collateral (any such condition referred to in the foregoing clauses (i) or (ii) with respect to any Series of Equal Priority Obligations, an "*Impairment*" of such Series). In the event of any Impairment with respect to any Series of Equal Priority Obligations, the results of such Impairment shall be borne solely by the holders of such Series of Equal Priority Obligations, and the rights of the holders of such Series of Equal Priority Obligations (including the right to receive distributions in respect of such Series of Equal Priority Obligations not prohibited by this Agreement) set forth herein shall be modified to the extent necessary so that the effects of such Impairment are borne solely by the holders of the Series of such Equal Priority Obligations subject to such Impairment. Additionally, in the event the Equal Priority Obligations of any Series are modified pursuant to applicable law (including pursuant to Section 1129 of the Bankruptcy Code), any reference to such Equal Priority Obligations or the Secured Credit Documents governing such Equal Priority Obligations shall refer to such obligations or such documents as so modified.

(c)     As used in this Agreement, the following terms have the meanings specified below:

"*Acknowledgement of Grantors*" means the Acknowledgement of Grantors in the form of Annex A attached hereto.

"*Affiliate*" means, as applied to any Person, any other Person directly or indirectly Controlling, Controlled by, or under common Control with, that Person. For purposes of this definition, "*Control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "*Controlling*" and "*Controlled*" have meanings correlative thereto.

"*Agreement*" has the meaning assigned to such term in the introductory paragraph of this Agreement.

2411

DG-292

"*Authorized Representative*" means (i) in the case of any Credit Agreement Obligations or the Credit Agreement Secured Parties, if any, the Credit Facility Agent and (ii) in the case of the NFE Financing Notes Obligations or the NFE Financing Notes Secured Parties, the NFE Financing Notes Collateral Agent.

"*Bankruptcy Code*" means Title 11 of the United States Code, as amended.

"*Bankruptcy Law*" means the Bankruptcy Code and any similar federal, state or foreign law for the relief of debtors.

"*Collateral*" means all assets and properties of any Grantor subject to Liens created pursuant to any Equal Priority Collateral Document to secure one or more Series of Equal Priority Obligations.

"*Company*" means New Fortress Energy Inc., a Delaware corporation.

"*Control Collateral*" means any Shared Collateral in the control of the Controlling Authorized Representative (or to the extent provided in Section 2.09(a), each other Authorized Representative) (in each case, or its agents or bailees), to the extent that control thereof perfects a Lien thereon under the Uniform Commercial Code of any jurisdiction or otherwise. Control Collateral includes, without limitation, Deposit Accounts, Electronic Chattel Paper, Investment Property or Letter-of-Credit Rights. All capitalized terms used in this definition and not defined elsewhere in this Agreement have the meanings assigned to them in the New York UCC.

"*Controlling Authorized Representative*" means, with respect to any Shared Collateral, (a) at any time that a NFE Financing Notes Indenture is in effect, (i) until the earlier of (x) the Discharge of NFE Financing Notes Obligations in respect of such NFE Financing Notes Indenture and (y) the Non-Controlling Authorized Representative Enforcement Date, the NFE Financing Notes Collateral Agent and (ii) from and after the earlier of (x) the Discharge of NFE Financing  Notes Obligations in respect of such NFE Notes Financing Indenture and (y) the Non-Controlling Authorized Representative Enforcement Date, the Credit Facility Agent, and (b) at any time that a NFE Notes Financing Indenture is not in effect, the Credit Facility Agent.

"*Controlling Secured Parties*" means, with respect to any Shared Collateral, the Series of Equal Priority Secured Parties whose Authorized Representative is the Controlling Authorized Representative for such Shared Collateral.

"*Credit Agreements*" means the Initial Credit Agreements, as amended, restated, amended and restated, supplemented, otherwise modified, Refinanced or replaced from time to time, including, in the event any such Initial Credit Agreement is terminated or replaced and NFE Financing and any of its subsidiaries subsequently enter into any debt agreement (or the Equivalent Provision thereof)), the debt agreement designated by NFE Financing to be a "Credit Agreement" hereunder.

3

DG-293

"*Credit Agreement Documents*" means the (i) LC Loan Documents, (ii) RCF Loan Documents, (iii) TLA Loan Documents and (iv) Common Representative First Lien Pledge and Security Agreement.

"*Credit Agreement Obligations*" means all (i) LC Obligations, (ii) RCF Obligations and (iii) TLA Obligations; provided that for the purposes of this Agreement the amount of Credit Agreement Obligations shall not exceed $200,000,000 in aggregate outstanding principal amount plus accrued and unpaid interest thereon (the "*Credit Agreement Obligations Cap*") and any excess over the Credit Agreement Obligations Cap purporting to be secured by the Collateral on a pari passu basis with the NFE Financing Obligations shall be deemed to not be so secured by the Collateral for all purposes of this Agreement.

"*Credit Agreement Secured Parties*" means the (i) LC Secured Parties, (ii) RCF Secured Parties and (iii) TLA Secured Parties .

"*Credit Facility Agent*" means (a) MUFG Bank, Ltd., as common representative for the Credit Agreement Secured Parties in connection with the Initial Credit Agreements, or (b) if a Refinancing of any of the Initial Credit Agreements has occurred, any other Person acting as collateral agent for the Credit Agreement Secured Parties in connection with any other Credit Agreement.

"*DIP Financing*" has the meaning assigned to such term in Section 2.05(b).

"*DIP Financing Liens*" has the meaning assigned to such term in Section 2.05(b).

"*DIP Lenders*" has the meaning assigned to such term in Section 2.05(b).

"*Discharge*" means, with respect to any Shared Collateral and any Series of Equal Priority Obligations, the date on which such Series of Equal Priority Obligations is no longer secured by, and no longer required to be secured by, such Shared Collateral. The term "*Discharged*" has a corresponding meaning.

"*Discharge of NFE Financing Notes Obligations*" means, the payment in full and Discharge of the NFE Financing Notes Obligations; provided that the Discharge of NFE Financing Notes Obligations shall not be deemed to have occurred in connection with a Refinancing of such NFE Financing Notes Obligations.

"*Equal Priority Agreement*" means (i) the NFE Financing Notes Indenture and (ii) the Credit Agreements.

"*Equal Priority Collateral Documents*" means any agreement, instrument or document entered into in favor of the applicable Authorized Representative for the holders of any Series of Equal Priority Obligations for purposes of securing such Series of Equal Priority Obligations by Collateral.

4

2413

"*Equal Priority Obligations*" means, collectively, (i) the NFE Financing Notes Obligations and (ii) the Credit Agreement Obligations.

"*Equal Priority Secured Parties*" means (i) the NFE Financing Notes Secured Parties and (ii) the Credit Agreement Secured Parties.

"*Equivalent Provision*" means, with respect to any reference to a specific provision of or definition in an agreement in effect on the date hereof (the "*original agreement*"), if such agreement is amended, restated, supplemented, modified or replaced after the date hereof in a manner permitted hereby, the provision or definition in such amended, restated, supplemented, modified or replacement agreement that is the equivalent to such specific provision in such original agreement.

"*Event of Default*" means an "Event of Default" under and as defined in any Secured Credit Document (or, in each case, the Equivalent Provision thereof).

"*Grantors*" means NFE Financing, and each of the Subsidiaries of NFE Financing that has executed and delivered an Equal Priority Collateral Document as a grantor thereunder unless and until such Subsidiary is released from its obligations under such Equal Priority Collateral Documents.

"*Impairment*" has the meaning assigned to such term in Section 1.01(b).

"*Initial Credit Agreements*" means the (i) LC Credit Agreement, (ii) RCF Credit Agreement and (iii) TLA Credit Agreement.

"*Initial NFE Financing Notes Indenture*" means that certain Indenture, dated as of [●], 2024, with respect to NFE Financing's 12.000% Senior Secured Notes due 2029, among NFE Financing, as issuer, the guarantors named therein and Wilmington Savings Fund Society, FSB, as trustee and as NFE Financing Notes Collateral Agent, as further amended, restated, amended and restated, supplemented, otherwise modified, Refinanced or replaced from time to time.

"*Insolvency or Liquidation Proceeding*" means:

(1)     any case commenced by or against NFE Financing or any other Grantor under any Bankruptcy Law, any other proceeding for the reorganization, recapitalization or adjustment or marshalling of the assets or liabilities of NFE Financing or any other Grantor, any receivership or assignment for the benefit of creditors relating to NFE Financing or any other Grantor or any similar case or proceeding relative to NFE Financing or any other Grantor or its creditors, as such, in each case whether or not voluntary;

(2)     any liquidation, dissolution, marshalling of assets or liabilities or other winding up of or relating to NFE Financing or any other Grantor, in each case whether or not voluntary and whether or not involving bankruptcy or insolvency (except for any voluntary liquidation, dissolution or other winding up to the extent permitted by the applicable Secured Credit Documents); or

5

2414

(3)      any other proceeding of any type or nature in which substantially all claims of creditors of NFE Financing or any other Grantor are determined and any payment or distribution is or may be made on account of such claims.

"*Intervening Creditor*" has the meaning assigned to such term in Section 2.01(a).

"*LC Credit Agreement*" means that certain Uncommitted Letter of Credit and Reimbursements Agreement, dated as of July 16, 2021, among the New Fortress Energy Inc., as borrower, the guarantors from time to time party thereto, the lenders from time to time party thereto, the issuing banks from time to time party thereto, and Natixis, New York Branch as administrative agent ("*LC Administrative Agent*") and collateral agent ("*LC Collateral Agent*") (as amended, restated, amended and restated, supplemented or otherwise modified and in effect from time to time).

"*LC Loan Documents*" means the LC Credit Agreement and the other Loan Documents (as defined in the LC Credit Agreement) and each of the other agreements, documents and instruments providing for or evidencing any other LC Obligations, and any other document or instrument executed or delivered at any time in connection with any LC Obligations, to the extent such documents are effective at the relevant time, as each may be amended, restated, supplemented, modified, renewed or extended from time to time in accordance with the provisions of this Agreement.

"*LC Obligations*" means the "Obligations" as defined in the LC Loan Documents, and includes, without limitation, all other obligations of every nature of the Grantor from time to time owed to any LC Secured Party or any of their respective Affiliates under the LC Loan Documents, whether for principal, interest, fees, expenses, indemnification or otherwise and all guarantees of any of the foregoing, including all post-petition interest, fees and expenses accrued or accruing (or which would, absent commencement of an Insolvency or Liquidation Proceeding, accrue) after commencement of an Insolvency or Liquidation Proceeding in accordance with the rate specified in the relevant LC Loan Documents whether or not a claim for such post-petition interest, fees and expenses is allowed as a claim in such Insolvency or Liquidation Proceeding.

"*LC Secured Parties*" means the "Secured Parties" under (and as such term is defined in) the LC Loan Documents.

"*Lien*" means any mortgage, pledge, hypothecation, assignment, encumbrance, lien (statutory or other), charge, or other security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any Financing Lease (as defined in the NFE Financing Notes Indenture (or the Equivalent Provision thereof)) having substantially the same economic effect as any of the foregoing), in each case, in the nature of security; provided that in no event shall a Non-Financing Lease Obligation (as defined in the NFE Financing Notes Indenture (or the Equivalent Provision thereof)) be deemed to constitute a Lien.

6

2415

DG-296

"***Major Non-Controlling Authorized Representative***" means, with respect to any Shared Collateral, the Credit Facility Agent.

"***New York UCC***" means the Uniform Commercial Code as from time to time in effect in the State of New York.

"***NFE Financing***" means NFE Financing, LLC, a Delaware limited liability company.

"***NFE Financing Notes Collateral Agent***" means (a) Wilmington Savings Fund Society, FSB, as notes collateral agent for the NFE Financing Notes Secured Parties in connection with the Initial NFE Financing Notes Indenture, or (b) if the Discharge of NFE Notes Financing Obligations has occurred in respect of the Initial NFE Financing Notes Indenture, any other Person acting as collateral agent for the NFE Financing Notes Secured Parties in connection with any other NFE Financing Notes Indenture.

"***NFE Financing Notes Documents***" means the NFE Financing Notes Indenture and the "Security Documents" (as such term is defined in the NFE Financing Notes Indenture (or the Equivalent Provision thereof)).

"***NFE Financing Notes Indenture***" means the Initial NFE Financing Notes Indenture, as amended, restated, amended and restated, supplemented, otherwise modified, Refinanced or replaced from time to time, including, in the event such Initial NFE Financing Notes Indenture is terminated or replaced and NFE Financing and any of its subsidiaries subsequently enter into any debt agreement (or the Equivalent Provision thereof)), the debt agreement designated by NFE Financing to be the "NFE Financing Notes Indenture" hereunder.

"***NFE Financing Notes Obligations***" means the "Secured Notes Obligations" as defined in the NFE Financing Notes Indenture (or the Equivalent Provision thereof).

"***NFE Financing Notes Obligations Joinder Agreement***" means a supplement to this agreement substantially in the form of Annex B, appropriately completed.

"***NFE Financing Notes Secured Parties***" means the holders of any NFE Financing Notes Obligations and the NFE Financing Notes Collateral Agent.

"***Non-Controlling Authorized Representative***" means, at any time with respect to any Shared Collateral, any Authorized Representative that is not the Controlling Authorized Representative at such time with respect to such Shared Collateral.

"***Non-Controlling Authorized Representative Enforcement Date***" means, with respect to the Non-Controlling Authorized Representative, the date which is 120 days after the occurrence of both (i) an Event of Default (under and as defined in each Credit Agreement), but only for so long as such Event of Default is continuing, and (ii) the Controlling Authorized Representative's receipt of written notice from such Non-

7

2416

Controlling Authorized Representative certifying that (x) an Event of Default (under and as defined in each Credit Agreement) has occurred and is continuing and (y) the Credit Agreement Obligations are currently due and payable in full (whether as a result of acceleration thereof or otherwise) in accordance with the terms of the Credit Agreements; provided that the Non-Controlling Authorized Representative Enforcement Date shall be stayed and shall not occur and shall be deemed not to have occurred with respect to any Shared Collateral (1) at any time the Controlling Authorized Representative has commenced and is diligently pursuing any enforcement action with respect to such Shared Collateral or (2) at any time the Grantor that has granted a security interest in such Shared Collateral is then a debtor under or with respect to (or otherwise subject to) any Insolvency or Liquidation Proceeding.

"*Non-Controlling Secured Parties*" means, with respect to any Shared Collateral, the Equal Priority Secured Parties which are not Controlling Secured Parties with respect to such Shared Collateral.

"*Officer*" means the Chairman of the Board of Directors, any Manager or Director, the Chief Executive Officer, the Chief Financial Officer, the Chief Operating Officer, the President, any Executive Vice President, Senior Vice President, Vice President or Assistant Vice President, the Treasurer, any Assistant Treasurer, the Controller, the Secretary or any Assistant Secretary of a Person, or any equivalent position in such Person's jurisdiction of organization, or any other officer of such Person designated by any such individuals of NFE Financing or any other Person, as the case may be. Unless otherwise specified, reference to an "Officer" means an Officer of NFE Financing.

"*Person*" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, governmental authority or any other entity.

"*Possessory Collateral*" means any Shared Collateral in the possession of the Controlling Authorized Representative (or to the extent provided in Section 2.09(a), each other Authorized Representative) (or its agents or bailees), to the extent that possession thereof perfects a Lien thereon under the Uniform Commercial Code of any jurisdiction or otherwise. Possessory Collateral includes any Certificated Securities, Promissory Notes, Instruments, and Chattel Paper, in each case, delivered to or in the possession of the Controlling Authorized Representative under the terms of the Equal Priority Collateral Documents. All capitalized terms used in this definition and not defined elsewhere in this Agreement have the meanings assigned to them in the New York UCC.

"*Proceeds*" has the meaning assigned to such term in Section 2.01(a).

"*Purchase*" has the meaning assigned to such term in Section 5.16(b).

"*Purchase Event*" has the meaning assigned to such term in Section 5.16(a).

"*RCF Credit Agreement*" means that certain Credit Agreement, dated as of April 15, 2021, among the New Fortress Energy Inc., as borrower, guarantors party thereto,

8

2417

DG-298

the lenders party thereto from time to time, MUFG Bank, Ltd., as trustee (the "***RCF Administrative Agent***") and MUFG Bank Ltd., as collateral agent (the "***RCF Collateral Agent***") (as amended, restated, amended and restated, supplemented or otherwise modified and in effect from time to time).

"***RCF Loan Documents***" means the RCF Credit Agreement and the other Loan Documents (as defined in the RCF Credit Agreement) and each of the other agreements, documents and instruments providing for or evidencing any other RCF Obligations, and any other document or instrument executed or delivered at any time in connection with any RCF Obligations, to the extent such documents are effective at the relevant time, as each may be amended, restated, supplemented, modified, renewed or extended from time to time in accordance with the provisions of this Agreement.

"***RCF Obligations***" means the "Obligations" as defined in the RCF Loan Documents (other than any such "Obligations" owed to any R-1 Lender (as defined in the RCF Loan Documents)), and includes, without limitation, all other obligations of every nature of the Grantor from time to time owed to any RCF Secured Party or any of their respective Affiliates with respect to the R-2 Loans (as defined in the RCF Loan Documents) under the RCF Loan Documents, whether for principal, interest, fees, expenses, indemnification or otherwise (but excluding, for the avoidance of doubt, all Obligations (as defined in the RCF Credit Agreement) arising under, out of, or in connection with, any Secured Hedge Agreement or any Secured Cash Management Agreement under the RCF Loan Documents) and all guarantees of any of the foregoing, including all post-petition interest, fees and expenses accrued or accruing (or which would, absent commencement of an Insolvency or Liquidation Proceeding, accrue) after commencement of an Insolvency or Liquidation Proceeding in accordance with the rate specified in the relevant RCF Loan Documents whether or not a claim for such post-petition interest, fees and expenses is allowed as a claim in such Insolvency or Liquidation Proceeding.

"***RCF Secured Parties***" means the "Secured Parties" under (and as such term is defined in) the RCF Loan Documents.

"***Refinance***" means, in respect of any indebtedness, to refinance, extend, renew, defease, amend, increase, modify, supplement, restructure, refund, replace or repay, or to issue other indebtedness or enter alternative financing arrangements, in exchange or replacement for such indebtedness (in whole or in part), whether of the same principal amount or greater or lesser principal amount, including by adding or replacing lenders, creditors, agents, borrowers and/or guarantors, and including in each case, but not limited to, after the original instrument giving rise to such indebtedness has been terminated and including, in each case, through any credit agreement, indenture or other agreement. "***Refinanced***" and "***Refinancing***" have correlative meanings.

"***Related Person***" has the meaning assigned to such term in Section 6.02(b).

"***Required Holders***" means, with respect to any Secured Credit Document, those Equal Priority Secured Parties the approval of which is required to approve an

9

2418

amendment or modification, termination or waiver of any provision of or consent to any departure from such Secured Credit Document (or which would be required to effect such consent under this Agreement if such consent were treated as an amendment of such Secured Credit Document).

"*Secured Credit Document*" means (i) the Credit Agreement Documents and (ii) the NFE Financing Notes Documents.

"*Series*" means (a) with respect to the Equal Priority Secured Parties, each of (i) the Credit Agreement Secured Parties (in their capacities as such) and (ii) the NFE Financing Notes Secured Parties (in their capacities as such) and (b) with respect to any Equal Priority Obligations, each of (i) the Credit Agreement Obligations and (ii) the NFE Financing Notes Obligations.

"*Shared Collateral*" means, at any time, Collateral in which the holders of two or more Series of Equal Priority Obligations (or their respective Authorized Representatives) hold a valid and perfected security interest at such time. If more than two Series of Equal Priority Obligations are outstanding at any time and the holders of less than all Series of Equal Priority Obligations hold a valid and perfected security interest in any Collateral at such time, then such Collateral shall constitute Shared Collateral for those Series of Equal Priority Obligations that hold a valid and perfected security interest in such Collateral at such time and shall not constitute Shared Collateral for any Series which does not have a valid and perfected security interest in such Collateral at such time.

"*Subsidiary*" means "Subsidiary" as defined in the NFE Financing Notes Indenture (or the Equivalent Provision thereof).

"*TLA Credit Agreement*" means that certain Credit Agreement, dated as of July 19, 2024, among the New Fortress Energy Inc., as borrower, guarantors party thereto, the lenders party thereto from time to time, Morgan Stanley Senior Funding, Inc., as administrative agent (the "*TLA Administrative Agent*") and Morgan Stanley Senior Funding, Inc., as collateral agent (the "*TLA Collateral Agent*") (as amended, restated, amended and restated, supplemented or otherwise modified and in effect from time to time).

"*TLA Loan Documents*" means the TLA Credit Agreement and the other Loan Documents (as defined in the TLA Credit Agreement) and each of the other agreements, documents and instruments providing for or evidencing any other TLA Obligations, and any other document or instrument executed or delivered at any time in connection with any TLA Obligations, to the extent such documents are effective at the relevant time, as each may be amended, restated, supplemented, modified, renewed or extended from time to time in accordance with the provisions of this Agreement.

"*TLA Obligations*" means the "Obligations" as defined in the TLA Loan Documents, and includes, without limitation, all other obligations of every nature of the Grantor from time to time owed to any TLA Secured Party or any of their respective Affiliates under the TLA Loan Documents, whether for principal, interest, fees, expenses,

DG-300

indemnification or otherwise and all guarantees of any of the foregoing, including all post-petition interest, fees and expenses accrued or accruing (or which would, absent commencement of an Insolvency or Liquidation Proceeding, accrue) after commencement of an Insolvency or Liquidation Proceeding in accordance with the rate specified in the relevant TLA Loan Documents whether or not a claim for such post-petition interest, fees and expenses is allowed as a claim in such Insolvency or Liquidation Proceeding.

"*TLA Secured Parties*" means the "Secured Parties" under (and as such term is defined in) the TLA Loan Documents.

"*Uniform Commercial Code*" or "*UCC*" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

"*WSFS*" means Wilmington Savings Fund Society, FSB.

## ARTICLE II

### Priorities and Agreements with Respect to Shared Collateral

SECTION 2.01.       *Priority of Claims.*

(a)       Anything contained herein or in any of the Secured Credit Documents (including any existing pari passu intercreditor agreement) to the contrary notwithstanding (but subject to Section 1.01(b)), if an Event of Default has occurred and is continuing, and (i) the Controlling Authorized Representative or any Equal Priority Secured Party is taking action to enforce rights in respect of any Shared Collateral, and/or (ii) any distribution is made in respect of any Shared Collateral in any Insolvency or Liquidation Proceeding of any Grantor (including any adequate protection payments), and/or (iii) any Equal Priority Secured Party receives any payment pursuant to any intercreditor agreement (other than this Agreement) with respect to any Shared Collateral, then, (x) the proceeds of any sale, collection, liquidation or other disposition of any such Shared Collateral by any Authorized Representative or any Equal Priority Secured Party, (y) the proceeds of any such distribution, and (z) the proceeds of any payment with respect to any Shared Collateral to which the Equal Priority Obligations are entitled under any intercreditor agreement (other than this Agreement) (all proceeds of any sale, collection, liquidation or other disposition of any Collateral and all proceeds of any such distribution being collectively referred to as "*Proceeds*"), shall (subject to the sentence immediately following) be applied by the Controlling Authorized Representative as follows:

FIRST, to the payment of all reasonable fees, costs and expenses incurred by the Controlling Authorized Representative in connection with such collection or sale or otherwise in connection with this Agreement, or any other Equal Priority Collateral Document or any of the Equal Priority Obligations, including all court costs and the reasonable fees and expenses of its agents, professional advisors and legal counsel, the repayment of all advances made by the Controlling Authorized Representative hereunder or under any other Equal Priority Collateral Document on behalf of the

11

2420

Grantors, if any, and any other reasonable costs or expenses incurred in connection with the exercise of any right or remedy hereunder or under any other Equal Priority Collateral Document;

SECOND, to the payment of all reasonable fees, costs and expenses incurred by the Authorized Representatives (other than the Authorized Representative that is the Controlling Authorized Representative) in connection with such collection or sale or otherwise in connection with this Agreement, or any other Equal Priority Collateral Document or any of the Equal Priority Obligations, including all court costs and the reasonable fees and expenses of its agents, professional advisors and legal counsel, the repayment of all advances made by such Authorized Representatives hereunder or under any other Equal Priority Collateral Document on behalf of the Grantors, if any, and any other reasonable costs or expenses incurred in connection with the exercise of any right or remedy hereunder or under any other Equal Priority Collateral Document;

THIRD, subject to Section 1.01(b), to the payment in full of the Equal Priority Obligations of each Series on a ratable basis, with such Proceeds to be applied to the Equal Priority Obligations of a given Series in accordance with the terms of the applicable Secured Credit Documents; and

FOURTH, subject to intercreditor agreements governing any Liens on Shared Collateral junior to Liens securing the Equal Priority Obligations entered into in accordance with Section 5.15, to the Grantors or their successors or assigns, as their interests may appear, or to whomever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

Notwithstanding the foregoing, with respect to any Shared Collateral for which a third party (other than an Equal Priority Secured Party and, without limiting the foregoing, after taking into account the effect of any applicable intercreditor agreements) has a lien or security interest that is junior in priority to the security interest of any Series of Equal Priority Obligations but senior (as determined by appropriate legal proceedings in the case of any dispute) to the security interest of any other Series of Equal Priority Obligations (such third party an "*Intervening Creditor*"), the value of any Shared Collateral or Proceeds which are allocated to such Intervening Creditor shall be deducted on a ratable basis solely from the Shared Collateral or Proceeds to be distributed in respect of the Series of Equal Priority Obligations with respect to which such Impairment exists.

(b)     It is acknowledged that the Equal Priority Obligations of any Series may, subject to the limitations set forth in the then extant Secured Credit Documents, be increased, extended, renewed, replaced, restated, supplemented, restructured, repaid, refunded, Refinanced or otherwise amended, supplemented or modified from time to time, all without affecting the priority of claims and application of proceeds set forth in this Agreement or the other provisions of this Agreement defining the relative rights of the Equal Priority Secured Parties of any Series.

12

2421

DG-302

(c)      Notwithstanding the date, time, method, manner or order of grant, attachment or perfection of any Liens securing any Series of Equal Priority Obligations granted on the Shared Collateral and notwithstanding any provision of the Uniform Commercial Code of any jurisdiction, or any other applicable law or the Secured Credit Documents or any defect or deficiencies in the Liens securing the Equal Priority Obligations of any Series or any other circumstance whatsoever (but, in each case, subject to Section 1.01(b) hereof), each Equal Priority Secured Party hereby agrees that the Liens securing each Series of Equal Priority Obligations on any Shared Collateral shall be of equal priority.

(d)      Notwithstanding anything to the contrary in this Agreement or any other Secured Credit Documents to the contrary, each Authorized Representative or Equal Priority Secured Party (in each case, with respect to a Series of Equal Priority Obligations) may:

(i)      take any action (not adverse to the pari-passu status of the Liens on the Shared Collateral securing each other Series of Equal Priority Obligations, or the rights of any other Authorized Representative to exercise remedies in respect thereof) in order to create, perfect, preserve or protect its Lien on the Shared Collateral;

(ii)      file a claim, proof of claim or statement of interest with respect to such Series of Equal Priority Obligations; provided that an Insolvency or Liquidation Proceeding has been commenced by or against any of the Grantors;

(iii)      file any necessary or appropriate responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any person objecting to or otherwise seeking the disallowance of the claims or Liens of the applicable Series of Equal Priority Secured Parties, including any claims secured by the Shared Collateral, if any, in each case not in violation of the terms of this Agreement;

(iv)      file any pleadings, objections, motions or agreements which assert rights or interests available to unsecured creditors of the Grantors arising under either any Insolvency or Liquidation Proceeding or applicable non-Bankruptcy Law, in each case not in violation of the terms of this Agreement; and

(v)      vote on any plan of reorganization or similar dispositive restructuring plan, file any proof of claim, make other filings and make any arguments and motions that are, in each case, in accordance with the terms of this Agreement, with respect to such Series of Equal Priority Obligations and the Shared Collateral.

SECTION 2.02.      *Actions with Respect to Shared Collateral; Prohibition on Contesting Liens.*

13

2422

(a)      With respect to any Shared Collateral, (i) notwithstanding Section 2.01, only the Controlling Authorized Representative shall have the right to act or refrain from acting with respect to the Shared Collateral (including with respect to any intercreditor agreement with respect to any Shared Collateral) and (ii) no other Authorized Representative or Non-Controlling Authorized Representative or other Equal Priority Secured Party (other than the Controlling Secured Parties) shall, or shall have the right to, instruct the Controlling Authorized Representative to, commence any judicial or nonjudicial foreclosure proceedings with respect to, seek to have a trustee, receiver, liquidator or similar official appointed for or over, attempt any action to take possession of, exercise any right, remedy or power with respect to, or otherwise take any action to enforce its security interest in or realize upon, or take any other action available to it in respect of, any Shared Collateral (including with respect to any intercreditor agreement with respect to any Shared Collateral), whether under any Equal Priority Collateral Document, applicable law or otherwise, it being agreed that only the Controlling Authorized Representative, acting in accordance with the applicable Secured Credit Document and in accordance with the applicable Equal Priority Collateral Documents, shall be entitled to take any such actions or exercise any such remedies with respect to Shared Collateral. Notwithstanding the equal priority of the Liens, the Controlling Authorized Representative may deal with the Shared Collateral as if such Controlling Authorized Representative had a senior Lien on such Collateral. No Non-Controlling Authorized Representative or Non-Controlling Secured Party will, or will have the right to, contest, protest or object to any foreclosure proceeding or action brought by the Controlling Authorized Representative or any Controlling Secured Parties or any other exercise by the Controlling Authorized Representative or any Controlling Secured Parties of any rights and remedies relating to the Shared Collateral or to cause the Controlling Authorized Representative to do so. The foregoing shall not be construed to limit the rights and priorities of any Equal Priority Secured Party, Controlling Authorized Representative or any Authorized Representative with respect to any Collateral not constituting Shared Collateral.

(b)      Each of the Authorized Representatives agrees that it will not accept any Lien on any Shared Collateral for the benefit of any Series of Equal Priority Obligations (other than funds deposited for the discharge or defeasance of any Equal Priority Agreement) other than pursuant to the Equal Priority Collateral Documents and, by executing this Agreement, each Authorized Representative and the Series of Equal Priority Secured Parties for which it is acting hereunder agree to be bound by the provisions of this Agreement and the other Equal Priority Collateral Documents applicable to it.

(c)      Each of the Authorized Representatives, on behalf of itself and the other Equal Priority Secured Parties of the applicable Series, agrees that it will not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the perfection, priority, validity, attachment or enforceability of a Lien held by or on behalf of any of the Equal Priority Secured Parties in all or any part of the Shared Collateral, or the provisions of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair (i) the rights of any Authorized Representative or any Equal Priority Secured Party to enforce this Agreement or (ii) the rights of any Equal Priority Secured Party from

14

2423

contesting or supporting any other Person in contesting the enforceability of any Lien purporting to secure Equal Priority Obligations constituting unmatured interest pursuant to Section 502(b)(2) of the Bankruptcy Code.

SECTION 2.03.        *No Interference; Payment Over.*

(a)        Each Authorized Representative, on behalf of itself and the other Equal Priority Secured Parties of the applicable Series, agrees that (i) it will not challenge or question in any proceeding (including any Insolvency or Liquidation Proceeding) the validity or enforceability of any Equal Priority Obligations of any Series or any Equal Priority Collateral Document or the validity, attachment, perfection or priority of any Lien under any Equal Priority Collateral Document or the validity or enforceability of the priorities, rights or duties established by or other provisions of this Agreement, (ii) it will not take or cause to be taken any action the purpose or intent of which is, or could be, to interfere, hinder or delay, in any manner, whether by judicial proceedings or otherwise, any sale, transfer or other disposition of the Shared Collateral by the Controlling Authorized Representative, (iii) except as provided in Section 2.02, it shall have no right to (A) direct the Controlling Authorized Representative or any other Equal Priority Secured Party to exercise any right, remedy or power with respect to any Shared Collateral (including pursuant to any intercreditor agreement) or (B) consent to the exercise by the Controlling Authorized Representative or any other Equal Priority Secured Party of any right, remedy or power with respect to any Shared Collateral, (iv) it will not institute any suit or assert in any suit, Insolvency or Liquidation Proceeding or other proceeding any claim against the Controlling Authorized Representative or any other Equal Priority Secured Party seeking damages from or other relief by way of specific performance, instructions or otherwise with respect to any Shared Collateral, and none of the Controlling Authorized Representative, any other Authorized Representatives or any other Equal Priority Secured Party shall be liable for any action taken or omitted to be taken by the Controlling Authorized Representative or other Equal Priority Secured Party with respect to any Shared Collateral in accordance with the provisions of this Agreement, (v) it will not seek, and hereby waives any right, to have any Shared Collateral or any part thereof marshaled upon any foreclosure or other disposition of such Collateral and (vi) it will not attempt, directly or indirectly, whether by judicial proceedings or otherwise, to challenge the enforceability of any provision of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair the rights of any of the Authorized Representatives or any other Equal Priority Secured Party to enforce this Agreement.

(b)        Each Equal Priority Secured Party hereby agrees that, if it shall obtain possession of any Shared Collateral or shall realize any proceeds or payment in respect of any such Shared Collateral, pursuant to any Equal Priority Collateral Document or by the exercise of any rights available to it under applicable law or in any Insolvency or Liquidation Proceeding or through any other exercise of remedies (including pursuant to any intercreditor agreement), at any time prior to the Discharge of each Series of Equal Priority Obligations, then it shall hold such Shared Collateral, proceeds or payment in trust for the other Equal Priority Secured Parties and promptly transfer such Shared Collateral, proceeds or payment, as the case may be, to the Controlling Authorized Representative, to

15

2424

be distributed by the Controlling Authorized Representative in accordance with the provisions of Section 2.01(a) hereof.

SECTION 2.04.      *Automatic Release of Liens; Amendments to Equal Priority Collateral Documents.*

(a)      If at any time the Controlling Authorized Representative forecloses upon or otherwise exercises remedies with respect to any Shared Collateral, then (whether or not any Insolvency or Liquidation Proceeding is pending at the time) the Liens in favor of each Authorized Representative for the benefit of each Series of Equal Priority Secured Parties upon such Shared Collateral will automatically be released and discharged; provided that any proceeds of any Shared Collateral realized therefrom shall be applied pursuant to Section 2.01 hereof.

(b)      If, in connection with any sale, lease, exchange, transfer or other disposition of any Shared Collateral permitted under the terms of the NFE Financing Notes Documents (whether or not an Event of Default thereunder, and as defined therein, has occurred and is continuing), the Controlling Authorized Representative, for itself or on behalf of the Controlling Secured Parties, releases any of its Liens on any part of the Shared Collateral, then the Liens, if any, of each Non-Controlling Authorized Representative on such Shared Collateral (but not the proceeds thereof, which shall be subject to the priorities set forth in this Agreement) shall be automatically, unconditionally and simultaneously released, and each Non-Controlling Authorized Representative promptly shall execute, if applicable, and deliver to the Controlling Authorized Representative or such Grantor (at the sole cost and expense of the Grantors) such termination statements, releases, authorizations and other documents and instruments, and shall take or authorize the Controlling Authorized Representative or such Grantor to take such action (including any recordation, filing or giving of notice), as the Controlling Authorized Representative or such Grantor may reasonably request to effectively confirm such release.

(c)      Each Authorized Representative, on behalf of itself and the other Equal Priority Secured Parties of the applicable Series, agrees that any Authorized Representative may, with the prior written consent of the Grantors, enter into any amendment to any Equal Priority Collateral Document (including to release any Liens securing any Series of Equal Priority Obligations), so long as such amendment does not adversely affect the Equal Priority Secured Parties of any other Series.

(d)      Each Authorized Representative agrees to execute, if applicable, and deliver (at the sole cost and expense of the Grantors) all such termination statements, releases, authorizations and other documents and instruments, and shall take or authorize the applicable Authorized Representative or Grantor to take such action (including any recordation, filing or giving of notice) reasonably required in connection therewith as shall reasonably be requested by the applicable Authorized Representative to evidence and confirm any release of Shared Collateral, whether in connection with a sale of such assets by the relevant owner pursuant to the preceding clauses or otherwise.

<div align="center">16</div>

<div align="center">2425</div>

SECTION 2.05.    *Certain Agreements with Respect to Bankruptcy or Insolvency Proceedings.*

(a)    This Agreement shall continue in full force and effect notwithstanding the commencement of any Insolvency or Liquidation Proceeding by or against any Grantor and constitutes a "subordination agreement" within the meaning of Section 510(a) of the Bankruptcy Code (and the comparable provisions of any other applicable Bankruptcy Law).

(b)    If any Grantor shall become subject to an Insolvency or Liquidation Proceeding and shall, as debtor(s)-in-possession, move for approval of financing ("***DIP Financing***") to be provided by one or more lenders (the "***DIP Lenders***") under Section 364 of the Bankruptcy Code or the use of cash collateral under Section 363 of the Bankruptcy Code (or, in each case, under any equivalent provision of any other applicable Bankruptcy Law), each Authorized Representative, on behalf of itself and the other Equal Priority Secured Parties of the applicable Series, agrees not to object to any such financing or to the Liens on the Shared Collateral securing the same ("***DIP Financing Liens***") or to any use of cash collateral that constitutes Shared Collateral, unless the Controlling Authorized Representative or any Controlling Secured Party with respect to such Shared Collateral opposes or objects to such DIP Financing or such DIP Financing Liens and/or use of cash collateral (and (i) to the extent that such DIP Financing Liens are senior to the Liens on any such Shared Collateral for the benefit of the Controlling Secured Parties, each Non-Controlling Secured Party will subordinate its Liens with respect to such Shared Collateral on the same terms as the Liens of the Controlling Secured Parties (other than any Liens of any Equal Priority Secured Parties constituting DIP Financing Liens) are subordinated thereto, and (ii) to the extent that such DIP Financing Liens rank pari passu with the Liens on any such Shared Collateral granted to secure the Equal Priority Obligations of the Controlling Secured Parties, each Non-Controlling Secured Party will confirm the priorities with respect to such Shared Collateral as set forth herein), in each case so long as (A) the Equal Priority Secured Parties of each Series retain the benefit of their security interests on all such Shared Collateral pledged to the DIP Lenders, including proceeds thereof arising after the commencement of such proceeding, with the same priority relative to all the other Equal Priority Secured Parties (other than any Liens of the Equal Priority Secured Parties constituting DIP Financing Liens) as existed prior to the commencement of the Insolvency or Liquidation Proceeding, (B) the Equal Priority Secured Parties of each Series are granted security interests on any additional or replacement collateral pledged to any Equal Priority Secured Parties as adequate protection or otherwise in connection with such DIP Financing or use of cash collateral, with the same priority relative to the other Equal Priority Secured Parties as set forth in this Agreement, (C) if any amount of such DIP Financing and/or cash collateral is applied to repay any of the Equal Priority Obligations, such amount is applied pursuant to Section 2.01(a) of this Agreement and (D) if any Equal Priority Secured Parties are granted adequate protection, including in the form of periodic payments, in connection with such DIP Financing and/or use of cash collateral, the proceeds of such adequate protection are applied pursuant to Section 2.01(a) of this Agreement; provided that the Equal Priority Secured Parties of each Series shall have a right to object to the grant of a security interest to secure the DIP Financing over any Collateral subject to security interests in favor of the Equal Priority

17

2426

Secured Parties of such Series or its Authorized Representative that do not constitute Shared Collateral; and provided further that the Equal Priority Secured Parties receiving adequate protection shall not object to any other Equal Priority Secured Party receiving adequate protection comparable to any adequate protection granted to such Equal Priority Secured Parties in connection with a DIP Financing and/or use of cash collateral.  Neither the Non-Controlling Authorized Representative nor any Non-Controlling Secured Party shall propose or provide any post-petition financing to the Grantors without the prior written consent of the Controlling Authorized Representative.

SECTION 2.06.     *Reinstatement*.  In the event that any of the Equal Priority Obligations shall be paid in full and such payment or any part thereof shall subsequently, for whatever reason (including an order or judgment for disgorgement or avoidance of a preference or fraudulent transfer under the Bankruptcy Code, any other applicable Bankruptcy Law or any similar law, or the settlement of any claim in respect thereof), be required to be returned or repaid, the terms and conditions of this Article II shall be fully applicable thereto until all such Equal Priority Obligations shall again have been paid in full in cash.

SECTION 2.07.     *Insurance*.  As between the Equal Priority Secured Parties, the Controlling Authorized Representative shall have the right (to the extent permitted in the Secured Credit Documents to which it is a party) to adjust or settle any insurance policy or claim covering or constituting Shared Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding affecting the Shared Collateral.

SECTION 2.08.     *Refinancings*.  The Equal Priority Obligations of any Series may be Refinanced, in whole or in part, in each case without notice to, or the consent (except to the extent a consent is otherwise required to permit the refinancing transaction under any Secured Credit Document) of, any Equal Priority Secured Party of any other Series, all without affecting the priorities provided for herein or the other provisions hereof.

SECTION 2.09.     *Possessory Collateral, Control Collateral and Controlling Authorized Representative as Gratuitous Bailee/Agent for Perfection.*

(a)     The Controlling Authorized Representative agrees to hold any Shared Collateral constituting Possessory Collateral or Control Collateral that is part of the Collateral in its possession or control (or in the possession or control of its agents or bailees) as gratuitous bailee and/or gratuitous agent for the benefit of each other Equal Priority Secured Party and any assignee solely for the purpose of perfecting the security interest granted in such Possessory Collateral or Control Collateral, if any, pursuant to the applicable Equal Priority Collateral Documents, in each case, subject to the terms and conditions of this Section 2.09. Pending delivery to the Controlling Authorized Representative, each other Authorized Representative agrees to hold any Shared Collateral constituting Possessory Collateral or Control Collateral, from time to time in its possession, as gratuitous bailee and/or gratuitous agent for the benefit of each other Equal Priority Secured Party and any assignee, solely for the purpose of perfecting the security interest granted in such Possessory Collateral or Control Collateral, if any, pursuant to the

18

2427

applicable Equal Priority Collateral Documents, in each case, subject to the terms and conditions of this Section 2.09.

(b)    The duties or responsibilities of the Controlling Authorized Representative and each other Authorized Representative under this Section 2.09 shall be limited solely to holding any Shared Collateral constituting Possessory Collateral or Control Collateral as gratuitous bailee and/or gratuitous agent for the benefit of each other Equal Priority Secured Party for purposes of perfecting the Lien held by such Equal Priority Secured Parties therein.

(c)    The agreement of the Controlling Authorized Representative to act as gratuitous bailee and/or gratuitous agent pursuant to this Section 2.09 is intended, among other things, to satisfy the requirements of Sections 8-106(d)(3), 8-301(a)(2), 9-104(a)(2) and 9-313(c) of the Uniform Commercial Code.

(d)    [Reserved].

(e)    Upon the occurrence of any change in the identity of the Person serving as the Controlling Authorized Representative, the retiring Controlling Authorized Representative shall (1) deliver to the successor Controlling Authorized Representative (and each Grantor hereby directs the Controlling Authorized Representative to so deliver) at the Grantors' sole cost and expense to the extent required under the Secured Credit Documents, any Possessory Collateral or Control Collateral evidencing or constituting Shared Collateral in its possession or control together with any necessary endorsements to the extent required by the Secured Credit Documents and (2) in the case of any Shared Collateral as to which the Controlling Authorized Representative has control (whether pursuant to an account control agreement or otherwise), the retiring Controlling Authorized Representative, at the sole cost and expense of the Grantors, (to the extent required under the Secured Credit Documents) shall cooperate with the Grantors and the successor Controlling Authorized Representative to cause control over such Shared Collateral to become vested in the successor Controlling Authorized Representative.

## ARTICLE III

### Existence and Amounts of Liens and Obligations

Whenever the Controlling Authorized Representative or any Authorized Representative shall be required, in connection with the exercise of its rights or the performance of its obligations hereunder, to determine the existence or amount of any Equal Priority Obligations of any Series, or the Shared Collateral subject to any Lien securing the Equal Priority Obligations of any Series, it may request that such information be furnished to it in writing by each other Authorized Representative and shall be entitled to make such determination on the basis of the information so furnished; provided, however, that, if an Authorized Representative shall fail or refuse reasonably promptly to provide the requested information, the requesting Controlling Authorized Representative or Authorized Representative shall be entitled to make any such determination or not make any determination by such method as it may, in the exercise of its good faith judgment,

19

2428

determine, including by reliance upon a certificate of an Officer of NFE Financing. The Controlling Authorized Representative and each Authorized Representative may rely conclusively, and shall be fully protected in so relying, on any determination made by it in accordance with the provisions of the preceding sentence (or as otherwise directed by a court of competent jurisdiction) and shall have no liability to any Grantor, any Equal Priority Secured Party or any other person as a result of such determination, except to the extent a court of competent jurisdiction in a final, nonappealable judgment to have resulted from gross negligence or willful misconduct of such Authorized Representative.

## ARTICLE IV

### The Controlling Authorized Representative

SECTION 4.01.     *Authority.*

(a)     Notwithstanding any other provision of this Agreement, nothing herein shall be construed to impose any fiduciary or other duty on the Controlling Authorized Representative to any Non-Controlling Secured Party or give any Non-Controlling Secured Party the right to direct the Controlling Authorized Representative, except that the Controlling Authorized Representative shall be obligated to distribute proceeds of any Shared Collateral in accordance with Section 2.01 hereof.

(b)     Each Non-Controlling Secured Party acknowledges and agrees that the Controlling Authorized Representative shall be entitled, for the benefit of the Equal Priority Secured Parties, to sell, transfer or otherwise dispose of or deal with any Shared Collateral as provided herein and in the Equal Priority Collateral Documents for which the Controlling Authorized Representative is the collateral agent of such Shared Collateral, without regard to any rights to which Non-Controlling Secured Parties would otherwise be entitled as a result of holding any Equal Priority Obligations. Without limiting the foregoing, each Non-Controlling Secured Party agrees that none of the Controlling Authorized Representative or any other Equal Priority Secured Party shall have any duty or obligation first to marshal or realize upon any type of Shared Collateral (or any other Collateral securing any of the Equal Priority Obligations), or to sell, dispose of or otherwise liquidate all or any portion of such Shared Collateral (or any other Collateral securing any Equal Priority Obligations), in any manner that would maximize the return to the Non-Controlling Secured Parties, notwithstanding that the order and timing of any such realization, sale, disposition or liquidation may affect the amount of proceeds actually received by the Non-Controlling Secured Parties from such realization, sale, disposition or liquidation. Each of the Equal Priority Secured Parties waives any claim it may now or hereafter have against the Controlling Authorized Representative or the Authorized Representative of any other Series of Equal Priority Obligations or any other Equal Priority Secured Party of any other Series arising out of (i) any actions which the Controlling Authorized Representative, any Authorized Representative or any Equal Priority Secured Party takes or omits to take (including, actions with respect to the creation, perfection or continuation of Liens on any Collateral, actions with respect to the foreclosure upon, sale, release or depreciation of, or failure to realize upon, any of the Collateral and actions with respect to the collection of any claim for all or any part of the Equal Priority Obligations

20

from any account debtor, guarantor or any other party) in accordance with the Equal Priority Collateral Documents or any other agreement related thereto or to the collection of the Equal Priority Obligations or the valuation, use, protection or release of any security for the Equal Priority Obligations, (ii) any election by any Authorized Representative or any holders of Equal Priority Obligations, in any proceeding instituted under the Bankruptcy Code, of the application of Section 1111(b) of the Bankruptcy Code or (iii) subject to Section 2.05 of this Agreement, any borrowing or grant of a security interest or administrative expense priority under Section 364 of the Bankruptcy Code by NFE Financing or any other Grantor, as debtor-in-possession.

SECTION 4.02. *Rights as an Equal Priority Secured Party*. The Person serving as the Controlling Authorized Representative hereunder shall have the same rights and powers in its capacity as an Equal Priority Secured Party under any Series of Equal Priority Obligations that it holds as any other Equal Priority Secured Party of such Series and may exercise the same as though it were not the Controlling Authorized Representative and the term "Equal Priority Secured Party" or "Equal Priority Secured Parties" or (as applicable) "NFE Financing Notes Secured Party", "NFE Financing Notes Secured Parties", shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Controlling Authorized Representative hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with NFE Financing or any Subsidiary of NFE Financing or other Affiliate thereof as if such Person were not the Controlling Authorized Representative hereunder and without any duty to account therefor to any other Equal Priority Secured Party.

SECTION 4.03. *Exculpatory Provisions.*

(a) The Controlling Authorized Representative shall not have any duties or obligations except those expressly set forth herein and in the other Equal Priority Collateral Documents. Without limiting the generality of the foregoing, the Controlling Authorized Representative:

(i) shall not be subject to any fiduciary or other implied duties of any kind or nature to any Person, regardless of whether an Event of Default has occurred and is continuing;

(ii) shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Equal Priority Collateral Documents; provided that the Controlling Authorized Representative shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Controlling Authorized Representative to liability or that is contrary to any Equal Priority Collateral Document or applicable law;

(iii) shall not, except as expressly set forth herein and in the other Equal Priority Collateral Documents, have any duty to disclose, and shall not be

21

2430

liable for the failure to disclose, any information relating to NFE Financing or any of its Affiliates that is communicated to or obtained by the Person serving as the Controlling Authorized Representative or any of its Affiliates in any capacity;

(iv)    shall not be liable for any action taken or not taken by it (i) in the absence of its own gross negligence or willful misconduct, as determined by a court of competent jurisdiction in a final and non-appealable decision or (ii) in reliance on a certificate of an authorized officer of NFE Financing stating that such action is not prohibited by the terms of this Agreement. The Controlling Authorized Representative shall be deemed not to have knowledge of any Event of Default under any Series of Equal Priority Obligations unless and until notice describing such Event of Default is given to the Controlling Authorized Representative by the Authorized Representative of such Equal Priority Obligations or NFE Financing;

(v)    shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Equal Priority Collateral Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Equal Priority Collateral Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Equal Priority Collateral Documents, (v) the value or the sufficiency of any Collateral for any Series of Equal Priority Obligations, or (vi) the satisfaction of any condition set forth in any Secured Credit Document, other than to confirm receipt of items expressly required to be delivered to the Controlling Authorized Representative;

(vi)    shall not have any fiduciary duties or contractual obligations of any kind or nature under any Equal Priority Agreement (but shall be entitled to all protections provided to the Authorized Representative therein); and

(vii)    with respect to any Equal Priority Agreement or any Equal Priority Collateral Document, may conclusively assume that the Grantors have complied with all of their obligations thereunder unless it has knowledge of any such non-compliance or is advised in writing by the Authorized Representative thereunder to the contrary specifically setting forth the alleged violation.

(b)    Each Equal Priority Secured Party acknowledges that, in addition to acting as the Controlling Authorized Representative, WSFS will also serve as NFE Financing Notes Collateral Agent under the NFE Financing Notes Indenture and each Equal Priority Secured Party hereby agrees not to assert any claim (including as a result of any conflict of interest) against WSFS, or any successor, arising from the role of NFE Financing Notes Collateral Agent under the NFE Financing Notes Indenture so long as WSFS, or any such successor is either acting in accordance with the express terms of such documents or otherwise has not engaged in gross negligence or willful misconduct.

22

2431

(c)     Each Authorized Representative and each Equal Priority Secured Party hereby waives any claim it may now or hereafter have against the Controlling Authorized Representative or any Equal Priority Secured Parties arising out of (i) any actions which the Controlling Authorized Representative (or any of its representatives) takes or omits to take (including actions with respect to the creation, perfection or continuation of Liens on any Collateral, actions with respect to the foreclosure upon, disposition, release or depreciation of, or failure to realize upon, any of the Collateral and actions with respect to the collection of any claim for all or any part of the Equal Priority Obligations from any account debtor, guarantor or any other party) in accordance with any relevant Equal Priority Collateral Documents, or any other agreement related thereto, or to the collection of the Equal Priority Obligations or the valuation, use, protection or release of any security for the Equal Priority Obligations, (ii) any election by the Controlling Authorized Representative (or any of its agents), in any proceeding instituted under the Bankruptcy Code, of the application of Section 1111(b) of the Bankruptcy Code, or (iii) subject to Section 2.05, any borrowing by, or grant of a security interest or administrative expense priority under Section 364 of the Bankruptcy Code by, NFE Financing or any of its Subsidiaries, as debtor-in-possession.

SECTION 4.04.     *Reliance by Controlling Authorized Representative*. The Controlling Authorized Representative shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Controlling Authorized Representative also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. The Controlling Authorized Representative may consult with legal counsel (who may include, but shall not be limited to counsel for NFE Financing and its Subsidiaries or counsel to the NFE Financing Notes Collateral Agent or any Authorized Representative), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

SECTION 4.05.     *Delegation of Duties*.  The Controlling Authorized Representative may perform any and all of its duties and exercise its rights and powers hereunder or under any other Equal Priority Collateral Document by or through any one or more sub-agents appointed by the Controlling Authorized Representative. The Controlling Authorized Representative and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Affiliates of the Controlling Authorized Representative and any such sub-agent.

SECTION 4.06.     *Non-Reliance on Controlling Authorized Representative*.  Each Equal Priority Secured Party acknowledges that it has, independently and without reliance upon the Controlling Authorized Representative, any Authorized Representative or any other Equal Priority Secured Party or any of their Affiliates and based on such documents and information as it has deemed appropriate, made its own credit

23

analysis and decision to enter into this Agreement and the other Secured Credit Documents. Each Equal Priority Secured Party also acknowledges that it will, independently and without reliance upon the Controlling Authorized Representative, any Authorized Representative or any other Equal Priority Secured Party or any of their Affiliates and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Secured Credit Document or any related agreement or any document furnished hereunder or thereunder.

## ARTICLE V

### Miscellaneous

SECTION 5.01.    *Notices*.    All notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

(a)    if to the NFE Financing Notes Collateral Agent, to it at Wilmington Savings Fund Society, FSB, 500 Delaware Avenue, 11th Floor, Wilmington, DE 19801, Telecopy No.: 302-421-9137, Email: rgoldsborough@wsfsbank.com and PHealy@wsfsbank.com, Attention [●];

(b)    if to the Credit Facility Agent, to it at [●], [Address], Telecopy No.: [●], Attention: [●]; and

(c)    if to the Controlling Authorized Representative, to it at the address otherwise provided in accordance with the terms hereof for the Authorized Representative acting in such capacity.

Any party hereto may change its address or telecopy or electronic mail address number for notices and other communications hereunder by notice to the other parties hereto. Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by telecopier or electronic communications shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient). As agreed to in writing among the Controlling Authorized Representative and each Authorized Representative from time to time, notices and other communications may also be delivered by e-mail to the e-mail address of a representative of the applicable person provided from time to time by such person.

SECTION 5.02.    *Waivers; Amendment.*

(a)    No failure or delay on the part of any party hereto in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise

24

2433

DG-314

of any other right or power. The rights and remedies of the parties hereto are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or consent to any departure by any party therefrom shall in any event be effective unless the same shall not be prohibited by paragraph (b) of this Section 5.02, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice or demand on any party hereto in any case shall entitle such party to any other or further notice or demand in similar or other circumstances.

(b)    Neither this Agreement nor any provision hereof may be terminated, waived, amended or modified except pursuant to an agreement or agreements in writing entered into by each Authorized Representative (or its authorized agent), and acknowledged by, NFE Financing and each other affected Grantor.

(c)    Notwithstanding the foregoing, without the consent of any Equal Priority Secured Party, (i) at any time that a NFE Financing Notes Collateral Agent is not a party to this Agreement, any NFE Financing Notes Collateral Agent may become a party to hereto by execution and delivery of a NFE Financing Notes Obligations Joinder Agreement in accordance with Section 5.14 and, upon such execution and delivery, such NFE Financing Notes Collateral Agent and the NFE Financing Notes Secured Parties and NFE Financing Notes Obligations in respect thereof shall be subject to the terms hereof and the terms of the other Equal Priority Collateral Documents applicable thereto.

SECTION 5.03.    *Parties in Interest*.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, as well as the other Equal Priority Secured Parties, all of whom are intended to be bound by, and to be third party beneficiaries of, this Agreement. NFE Financing and the other Grantors shall be third party beneficiaries of Section 5.02 only.

SECTION 5.04.    *Survival of Agreement*.  All covenants, agreements, representations and warranties made by any party in this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement.

SECTION 5.05.    *Counterparts*.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement constitutes the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic imaging means (including in .pdf format) shall be effective as delivery of a manually executed counterpart of this Agreement.

SECTION 5.06.    *Severability*.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting

2434

the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction. The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 5.07.      *Governing Law*.  THIS AGREEMENT AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSES OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY PRINCIPLE OF CONFLICTS OF LAW THAT COULD REQUIRE THE APPLICATION OF ANY OTHER LAW.

SECTION 5.08.      *Submission to Jurisdiction; Waivers*.      The Controlling Authorized Representative and each Authorized Representative, on behalf of itself and the Equal Priority Secured Parties of the Series for whom it is acting, irrevocably and unconditionally:

(a)      submits for itself and its property in any legal action or proceeding relating to this Agreement and the Equal Priority Collateral Documents, or for recognition and enforcement of any judgment in respect thereof, to the exclusive general jurisdiction of the state and federal courts located in New York County and appellate courts from any thereof and waives any objection to any action instituted hereunder in any such court based on forum non conveniens, and any objection to the venue of any action instituted hereunder in any such court;

(b)      consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)      agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Person (or its Authorized Representative) at the address referred to in Section 5.01 hereof;

(d)      agrees that nothing herein shall affect the right of any other party hereto (or any Equal Priority Secured Party) to effect service of process in any other manner permitted by law; and

(e)      waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section 5.08 any special, exemplary, punitive or consequential damages.

SECTION 5.09.      ***WAIVER OF JURY TRIAL***.  **EACH OF THE PARTIES HERETO WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY**

26

DG-316

**IN RESPECT OF ANY LITIGATION BASED ON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, VERBAL OR WRITTEN STATEMENT OR ACTION OF ANY PARTY HERETO IN CONNECTION WITH THE SUBJECT MATTER HEREOF.**

SECTION 5.10.    *Headings.*  Article, Section and Annex headings used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 5.11.    *Conflicts.*  In the event of any conflict between the terms of this Agreement and the terms of any of the other Secured Credit Documents or Equal Priority Collateral Documents related to the Collateral, the terms of this Agreement shall govern.

SECTION 5.12.    *Provisions Solely to Define Relative Rights.*  The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the Equal Priority Secured Parties in relation to one another. None of the NFE Financing, any other Grantor or any other creditor thereof shall have any rights or obligations hereunder, except as expressly provided in this Agreement (provided that nothing in this Agreement (other than Section 2.04, 2.05, 2.08, 2.09 or Article V) is intended to or will amend, waive or otherwise modify the provisions of the Equal Priority Agreements), and neither NFE Financing nor any other Grantor may rely on the terms hereof (other than Sections 2.04, 2.05, 2.08, 2.09 and Article V); provided, however, that in no event shall any amendment or other modification of this Agreement be effective to the extent the rights or obligations of any Grantor would be adversely affected thereby without the written consent of NFE Financing. Nothing in this Agreement is intended to or shall impair the obligations of any Grantor, which are absolute and unconditional, to pay the Equal Priority Obligations as and when the same shall become due and payable in accordance with their terms.

SECTION 5.13.    *Authorized Representatives.* Each of the Authorized Representative under the NFE Financing Notes Indenture and the Credit Facility Agent is executing and delivering this Agreement or a joinder hereto solely in its capacity as such and pursuant to directions set forth in the NFE Financing Notes Indenture or the Credit Agreement Documents, as applicable; and in so doing, neither the NFE Financing Notes Collateral Agent nor the Credit Facility Agent shall be responsible for the terms or sufficiency of this Agreement for any purpose. Neither the NFE Financing Notes Collateral Agent nor the Credit Facility Agent shall have duties or obligations under or pursuant to this Agreement other than such duties expressly set forth in this Agreement as duties on its part to be performed or observed. In entering into or joining this Agreement, or in taking (or forbearing from) any action under or pursuant to this Agreement, each of the NFE Financing Notes Collateral Agent and the Credit Facility Agent shall have and be protected by all of the rights, immunities, indemnities and other protections granted to it under the NFE Financing Notes Indenture and the Credit Agreement Documents, as applicable.

2436

DG-317

SECTION 5.14.        *NFE Financing Notes Obligations*. Each Authorized Representative agrees that NFE Financing may from time to time when a NFE Financing Notes Collateral Agent is not a party to this Agreement, subject to any limitations contained in any Secured Credit Documents in effect at such time, designate additional indebtedness and related obligations that are, or are to be, secured by Liens on any assets of the Grantors that would, if such Liens were granted, constitute Shared Collateral as "NFE Financing Notes Obligations" hereunder, by delivering to each Authorized Representative party hereto at such time a certificate of an Officer of NFE Financing:

(i)        describing the indebtedness and other obligations being designated as NFE Financing Notes Obligations, and including a statement of the maximum aggregate outstanding principal amount of such indebtedness as of the date of such certificate;

(ii)        setting forth the NFE Financing Notes Indenture and the related NFE Financing Notes Documents under which such NFE Financing Notes Obligations are, or are to be, issued or incurred, and under which the Liens securing such NFE Financing Notes Obligations are, or are to be, granted or created, and attaching copies of such NFE Financing Notes Indenture and the related NFE Financing Notes Documents as each Grantor has executed and delivered to the Person that serves as the NFE Financing Notes Collateral Agent, certified as being true and complete;

(iii)        identifying the Person that serves as the NFE Financing Notes Collateral Agent;

(iv)        certifying that the incurrence of such NFE Financing Notes Obligations, the creation of the Liens securing such NFE Financing Notes Obligations and the designation of such NFE Financing Notes Obligations as "NFE Financing Notes Obligations hereunder do not violate or result in a default under any provision of any Secured Credit Document of any Series in effect at such time; and

(v)        attaching a fully completed NFE Financing Notes Obligations Joinder Agreement executed and delivered by the NFE Financing Notes Collateral Agent.

Upon the delivery of such certificate and the related attachments as provided above, the obligations designated in such notice shall become NFE Financing Notes Obligations for all purposes of this Agreement.

SECTION 5.15.        *Junior Lien Intercreditor Agreements.* Each Authorized Representative hereby appoint the Controlling Authorized Representative to act as agent on their behalf pursuant to and in connection with the execution of any intercreditor agreements governing any Liens on Shared Collateral junior to Liens securing the Equal Priority Obligations that are incurred after the date hereof in compliance with the Secured Credit Documents.

2437

SECTION 5.16.        *Purchase Right*.

(a)        Without prejudice to the enforcement of the Credit Agreement Secured Parties' remedies, the Credit Agreement Secured Parties agree that following (a) the acceleration of the Credit Agreement Obligations in accordance with the terms of the Credit Agreement Documents, (b) the commencement of an Insolvency or Liquidation Proceeding with respect to any Grantor or (c) the occurrence of any Event of Default (as such term is defined in the Credit Agreement) pursuant to Sections [●][1] (each, a "***Purchase Event***"), within sixty (60) days of the Purchase Event, one or more of the NFE Financing Notes Secured Parties may request, and the Credit Agreement Secured Parties hereby offer the NFE Financing Notes Parties the option, to purchase $200,000,000 of the aggregate principal amount of Credit Agreement Obligations outstanding at the time of purchase at par, plus any premium that would be applicable upon prepayment of the Credit Agreement Obligations and all accrued and unpaid interest, fees, and expenses, without warranty or representation or recourse (except for representations and warranties required to be made by assigning lenders pursuant to the [[Assignment and Assumption]] (as such term is defined in the Credit Agreement)) (a "***Purchase***").  If such right is exercised, the parties shall endeavor to close promptly thereafter but in any event within ten (10) business days of the request.  If one or more of the NFE Financing Notes Secured Parties exercises such purchase right, it shall be exercised pursuant to documentation mutually acceptable to each of the Authorized Representative for each of the NFE Financing Notes Secured Parties and the Credit Agreement Secured Parties.  If more than one NFE Financing Notes Secured Party has exercised such purchase right and the aggregate amount of all purchase rights exercised exceeds the amount of the Credit Agreement Obligations, the amount with respect to which each exercising NFE Financing Notes Secured Party shall be deemed to have exercised its purchase right shall be reduced on a ratable basis according to the amounts of the original exercises of such purchase right by each such NFE Financing Notes Secured Party.  If none of the NFE Financing Notes Secured Party timely exercise such right, the Credit Agreement Secured Parties shall have no further obligations pursuant to this Section 5.16 for such Purchase Event and may take any further actions in their sole discretion in accordance with the Credit Agreement Documents and this Agreement.

(b)        Upon the consummation of a Purchase, the Liens in favor of the Credit Facility Agent Authorized Representative for the benefit of the Credit Agreement Secured Parties upon such Shared Collateral will automatically be released and discharged without any further action by any party.

*[Remainder of this page intentionally left blank]*

---

[1] NTD: Payment EoDs.

2438

DG-319

IN WITNESS WHEREOF, the parties hereto have caused this Equal Priority Intercreditor Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**WILMINGTON SAVINGS FUND SOCIETY**, **FSB**,
as NFE Financing Notes Collateral Agent

By: _____

    Name:
    Title:

**MUFG BANK, LTD.**,
as Credit Facility Agent

By: _____

    Name:
    Title:

DG-320

**ANNEX A**

**[FORM OF]**
**ACKNOWLEDGEMENT OF GRANTORS**


Dated as of: [___]


Reference is made to the Equal Priority Intercreditor Agreement, dated as of [●], 2024, among MUFG Bank, Ltd., as Credit Facility Agent, the NFE Financing Notes Collateral Agent from time to time party thereto, and each other Authorized Representative from time to time party thereto (as the same may be amended, restated, supplemented, waived, or otherwise modified from time to time, the "***Intercreditor Agreement***"). Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Intercreditor Agreement.

Each of the Grantors party hereto has received a copy of the foregoing Intercreditor Agreement, agrees to recognize all rights of the Equal Priority Secured Parties granted therein and agrees that it will not take any action that would be contrary to the express provisions thereof. Each of the Grantors party hereto further acknowledges and agrees that the foregoing Intercreditor Agreement is for the sole benefit of the Equal Priority Secured Parties and their respective successors and assigns, and that no Grantor is an intended beneficiary or third party beneficiary thereof except to the extent otherwise expressly provided therein.

This Acknowledgement of Grantors shall be governed and construed in accordance with the laws of the State of New York. Notices delivered to the Grantors pursuant to this Acknowledgement of Grantors shall be delivered in accordance with the notice provisions set forth in the Intercreditor Agreement.

[*Signatures follow.*]

2440

DG-321

Acknowledged by:


NFE FINANCING LLC.


By: _____
    Name:
    Title:


BRADFORD COUNTY REAL ESTATE
PARTNERS LLC


By: _____
    Name:
    Title:

DG-322

<div align="right">**ANNEX B**</div>

<div align="center">

**[FORM OF]**
**NFE FINANCING NOTES OBLIGATIONS JOINDER AGREEMENT**

</div>

NFE FINANCING NOTES OBLIGATIONS JOINDER AGREEMENT NO. [ ] dated as of [   ], 20[ ] (the "*Joinder Agreement*") to the EQUAL PRIORITY INTERCREDITOR AGREEMENT dated as of [●], 2024 (as the same may be amended, restated, supplemented, waived, or otherwise modified from time to time, the "*Intercreditor Agreement*"), among MUFG Bank, Ltd., as Credit Facility Agent, and each other Authorized Representative from time to time party thereto.

A.      Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the Intercreditor Agreement.

B.      Immediately prior to giving effect to this Joinder Agreement, an NFE Financing Notes Indenture (as defined in the Intercreditor Agreement) is not in effect. NFE Financing proposes to issue or incur NFE Financing Notes Obligations and the Person identified in the signature pages hereto as the "NFE Financing Notes Collateral Agent" (the "*NFE Financing Notes Collateral Agent*") will serve as the collateral agent, collateral trustee or a similar representative for the NFE Financing Notes Secured Parties.  The NFE Financing Notes Obligations are being designated as such by NFE Financing in accordance with Section 5.14 of the Intercreditor Agreement.

C.      The NFE Financing Notes Collateral Agent wishes to become a party to the Intercreditor Agreement and to acquire and undertake, for itself and on behalf of the NFE Financing Notes Secured Parties, the rights and obligations of the "NFE Financing Notes Collateral Agent", "Controlling Authorized Representative" and "Authorized Representative" thereunder.  The NFE Financing Notes Collateral Agent is entering into this Joinder Agreement in accordance with the provisions of the Intercreditor Agreement in order to become a NFE Financing Notes Collateral Agent, Controlling Authorized Representative and Authorized Representative thereunder.

Accordingly, the NFE Financing Notes Collateral Agent agrees as follows:

Section 1.  *Accession to the Intercreditor Agreement*.  The NFE Financing Notes Collateral Agent (a) hereby accedes and becomes a party to the Intercreditor Agreement as a NFE Financing Notes Collateral Agent, Controlling Authorized Representative and Authorized Representative for the NFE Financing Notes Secured Parties from time to time in respect of the NFE Financing Notes Obligations, (b) agrees, for itself and on behalf of the NFE Financing Notes Secured Parties from time to time in respect of the NFE Financing Notes Obligations, to all the terms and provisions of the Intercreditor Agreement and (c) shall have all the rights and obligations of the NFE Financing Notes Collateral Agent, Controlling Authorized Representative and an Authorized Representative under the Intercreditor Agreement.

Section 2.   *Representations, Warranties and Acknowledgement of the NFE Financing Notes Collateral Agent*.  The NFE Financing Notes Collateral Agent represents

<div align="center">2442</div>

<div align="right">DG-323</div>

and warrants to the other Authorized Representatives and the other Equal Priority Secured Parties that (a) it has full power and authority to enter into this Joinder Agreement, in its capacity as the NFE Financing Notes Collateral Agent, (b) this Joinder Agreement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with the terms of this Joinder Agreement, except as enforceability may be limited by applicable bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability, and (c) the NFE Financing Notes Documents provide that, upon the NFE Financing Notes Collateral Agent's entry into this Joinder Agreement, the secured parties in respect of the NFE Financing Notes Obligations will be subject to and bound by the provisions of the Intercreditor Agreement as NFE Financing Notes Secured Parties.

Section 4.  *Counterparts*.  This Joinder Agreement may be executed in multiple counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Joinder Agreement shall become effective when each Authorized Representative shall have received a counterpart of this Joinder Agreement that bears the signature of the NFE Financing Notes Collateral Agent.  Delivery of an executed signature page to this Joinder Agreement by facsimile or other electronic transmission (including PDF copies) shall be effective as delivery of a manually signed counterpart of this Joinder Agreement.

Section 5.  *Benefit of Agreement*.  The agreements set forth herein or undertaken pursuant hereto are for the benefit of, and may be enforced by, any party to the Intercreditor Agreement.

Section 6.  *Governing Law*.  **THIS JOINDER AGREEMENT AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSES OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS JOINDER AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY PRINCIPLE OF CONFLICTS OF LAW THAT COULD REQUIRE THE APPLICATION OF ANY OTHER LAW.**

Section 7. *Severability*.  In case any one or more of the provisions contained in this Joinder Agreement should be held invalid, illegal or unenforceable in any respect, none of the parties hereto shall be required to comply with such provision for so long as such provision is held to be invalid, illegal or unenforceable, but the validity, legality and enforceability of the remaining provisions contained herein and in the Intercreditor Agreement shall not in any way be affected or impaired.  The parties hereto shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

Section 8. *Notices*.  All communications and notices hereunder shall be in writing and given as provided in Section 5.01 of the Intercreditor Agreement.  All communications and notices hereunder to the NFE Financing Notes Collateral Agent shall be given to it at

2443

DG-324

the address set forth under its signature hereto, which information supplements Section 5.01 of the Intercreditor Agreement.

[Signature Pages Follow]

IN WITNESS WHEREOF, the NFE Financing Notes Collateral Agent has duly executed this Joinder Agreement to the Intercreditor Agreement as of the day and year first above written.

<div style="margin-left: 50%;">

[NAME OF NFE FINANCING NOTES COLLATERAL AGENT], as NFE FINANCING NOTES COLLATERAL AGENT, CONTROLLING AUTHORIZED REPRESENTATIVE and AUTHORIZED REPRESENTATIVE for the NFE FINANCING NOTES SECURED PARTIES

By: _____
    Name:
    Title:

Address for notices:

_____

_____

_____

attention of: _____

Telecopy: _____

</div>

2445

DG-326

Acknowledged by:

[NAME OF EACH AUTHORIZED
    REPRESENTATIVE PARTY TO
    THE INTERCREDITOR
    AGREEMENT AT SUCH TIME], as
    [DESCRIBE ROLE]


By: _____
    Name:
    Title:

2446

NFE FINANCING LLC


By: _____
    Name:
    Title:

[EACH OTHER LOAN PARTY AT SUCH
TIME]

# EXHIBIT E

FORM OF JUNIOR PRIORITY INTERCREDITOR AGREEMENT

[attached]

2448

INTERCREDITOR AGREEMENT

among

Wilmington Savings Fund Society, FSB
as Senior Notes Collateral Trustee,

MUFG Bank Ltd,
as Senior Common Collateral Agent and Junior Common Collateral Agent

and

acknowledged and consented to by the Grantor

Dated as of November 22, 2024

DG-330

**TABLE OF CONTENTS**

Page

ARTICLE I        Definitions ...................................................................................................2

SECTION 1.01    Certain Defined Terms ...................................................................2
SECTION 1.02    Terms Generally ............................................................................9

ARTICLE II       Priorities and Agreements with Respect to Collateral.......................................9

SECTION 2.01    Subordination .................................................................................9
SECTION 2.02    Nature of Claims ..........................................................................10
SECTION 2.03    Prohibition on Contesting Liens....................................................10

ARTICLE III      Enforcement...................................................................................................11

SECTION 3.01    Exercise of Remedies ...................................................................11
SECTION 3.02    Cooperation ..................................................................................13
SECTION 3.03    Actions upon Breach ....................................................................13

ARTICLE IV       Payments........................................................................................................14

SECTION 4.01    Application of Proceeds.................................................................14
SECTION 4.02    Payments Over ..............................................................................14

ARTICLE V        Other Agreements ..........................................................................................14

SECTION 5.01    Releases ........................................................................................14
SECTION 5.02    Insurance and Condemnation Awards............................................16
SECTION 5.03    Amendments to Debt Documents...................................................16
SECTION 5.04    Rights as Unsecured Creditors ......................................................17
SECTION 5.05    Gratuitous Bailee for Perfection....................................................17
SECTION 5.06    When Discharge of Senior Lien Obligations Deemed To Not
                 Have Occurred...............................................................................19

ARTICLE VI       Insolvency or Liquidation Proceedings. .........................................................20

SECTION 6.01    Financing and Sale Issues .............................................................20
SECTION 6.02    Relief from the Automatic Stay .....................................................22
SECTION 6.03    Adequate Protection .....................................................................22
SECTION 6.04    Preference Issues ..........................................................................23
SECTION 6.05    Separate Grants of Security and Separate Classifications ....................23
SECTION 6.06    No Waivers of Rights of Senior Lien Secured Parties ....................24
SECTION 6.07    Application.....................................................................................24
SECTION 6.08    Other Matters ................................................................................24

i

DG-331

SECTION 6.09    506(c) Claims ...................................................................................24

SECTION 6.10    Reorganization Securities; Voting..................................................24

ARTICLE VII    Reliance; Etc. ...............................................................................25

SECTION 7.01    Reliance .........................................................................................25

SECTION 7.02    No Warranties or Liability .............................................................25

SECTION 7.03    Obligations Unconditional .............................................................26

ARTICLE VIII    Miscellaneous................................................................................26

SECTION 8.01    Conflicts........................................................................................26

SECTION 8.02    Continuing Nature of this Agreement; Severability..............................27

SECTION 8.03    Amendments; Waivers....................................................................27

SECTION 8.04    Information Concerning Financial Condition of the Grantor and Its Subsidiaries ...............................................................................28

SECTION 8.05    Subrogation ...................................................................................28

SECTION 8.06    Application of Payments.................................................................28

SECTION 8.07    [Reserved] .....................................................................................28

SECTION 8.08    Dealings with Grantor....................................................................28

SECTION 8.09    Consent to Jurisdiction; Waivers....................................................29

SECTION 8.10    Notices ..........................................................................................29

SECTION 8.11    Further Assurances ........................................................................32

SECTION 8.12    GOVERNING LAW; WAIVER OF JURY TRIAL ...........................32

SECTION 8.13    Binding on Successors and Assigns ...............................................32

SECTION 8.14    Section Titles.................................................................................32

SECTION 8.15    Counterparts ..................................................................................32

SECTION 8.16    Authorization.................................................................................32

SECTION 8.17    No Third Party Beneficiaries; Successors and Assigns.......................32

SECTION 8.18    Effectiveness .................................................................................33

SECTION 8.19    Collateral Agent and Representative ...............................................33

SECTION 8.21    Survival of Agreement    33

DG-332

# INTERCREDITOR AGREEMENT

This **INTERCREDITOR AGREEMENT**, is dated as of November 22, 2024 (as amended, supplemented, restated or otherwise modified from time to time pursuant to the terms hereof, this "Agreement"), is entered into by and among the Senior Notes Collateral Trustee, MUFG Bank, Ltd., in its capacity as common representative for the LC Collateral Agent, the RCF Collateral Agent, the TLA Collateral Agent and the Senior Common Secured Parties (in such capacity, the "Senior Common Collateral Agent"), MUFG Bank, Ltd., in its capacity as common representative for the LC Collateral Agent, the RCF Collateral Agent, the TLA Collateral Agent and the Junior Lien Secured Parties (in such capacity, the "Junior Common Collateral Agent") and acknowledged and consented to by the Grantor (each as defined below).

## RECITALS

WHEREAS, NFE Financing LLC, a Delaware limited liability company (the "Issuer" or "NFE Financing"), is party to that certain Indenture, dated as of the date hereof, among Issuer, guarantors party thereto, Wilmington Savings Fund Society, FSB, as trustee (the "Senior Notes Trustee"), and Wilmington Savings Fund Society, FSB, as notes collateral agent (the "Senior Notes Collateral Trustee") (as amended, restated, amended and restated, supplemented or otherwise modified and in effect from time to time, the "Senior Notes Indenture"), pursuant to which the Issuer issued 12.00% Senior Secured Notes due 2029;

WHEREAS, New Fortress Energy Inc., a Delaware corporation (the "Company"), is party to that certain Credit Agreement, dated as of April 15, 2021, among the Company, as borrower, guarantors party thereto, the lenders party thereto from time to time, MUFG Bank Ltd., as trustee (the "RCF Administrative Agent") and MUFG Bank Ltd., as collateral agent (the "RCF Collateral Agent") (as amended, restated, amended and restated, supplemented or otherwise modified and in effect from time to time, the "RCF Credit Agreement"), pursuant to which the RCF Lenders (as defined therein) have agreed to make revolving loans available to the Company from time to time;

WHEREAS, the Company is party to that certain Credit Agreement, dated as of July 19, 2024, among the Company, as borrower, guarantors party thereto, the lenders party thereto from time to time, Morgan Stanley Senior Funding, Inc., as administrative agent (the "TLA Administrative Agent") and Morgan Stanley Senior Funding, Inc., as collateral agent (the "TLA Collateral Agent") (as amended, restated, amended and restated, supplemented or otherwise modified and in effect from time to time, the "TLA Credit Agreement"), pursuant to which the Company borrowed $700,000,000 of term loans;

WHEREAS, the Company is party to that certain Uncommitted Letter of Credit and Reimbursements Agreement, dated as of July 16, 2021, among the Company, as borrower, the guarantors from time to time party thereto, the lenders from time to time party thereto, the issuing banks from time to time party thereto, and Natixis, New York Branch as administrative agent ("LC Administrative Agent") and collateral agent ("LC Collateral Agent") (as amended, restated, amended and restated, supplemented or otherwise modified and in effect from time to time, the "LC Credit Agreement"), pursuant to which the Lenders (as defined therein) have agreed to consider issuing letter of credits for the Company's account from time to time;

LEGAL_US_E # 178768756.6

WHEREAS, the Company will enter into to that certain First Lien Pledge and Security Agreement, on or about the Exchange Date (as defined herein) (the "Common Representative First Lien Pledge and Security Agreement"), by and among the grantors party thereto and the Senior Common Collateral Agent;

WHEREAS, the Company is party to that certain Second Lien Pledge Agreement, dated as of the date hereof (the "Common Representative Second Lien Pledge Agreement"), by and among the grantors party thereto and the Junior Common Collateral Agent;

WHEREAS, each of the LC Collateral Agent, the RCF Collateral Agent, and the TLA Collateral Agent has appointed MUFG Bank, Ltd. as its common representative, to act as a common representative on its behalf with regard to the Collateral;

WHEREAS, this Agreement governs the relationship between the Senior Lien Secured Parties (as defined herein), on the one hand, and the Junior Lien Secured Parties (as defined herein) as a group, on the other hand, with respect to the Collateral; and

WHEREAS, the Grantor hereby acknowledges the entry into this Agreement by the Senior Lien Representative (on behalf of the Senior Lien Secured Parties) and the Junior Lien Representative (on behalf of the Junior Lien Secured Parties), and the intentions and agreements of the Secured Parties described herein.

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

ARTICLE I

Definitions

SECTION 1.01   Certain Defined Terms.   Capitalized terms used but not otherwise defined herein have the meanings set forth in the Senior Lien Debt Documents (as in effect on the date hereof) or, if defined in the Uniform Commercial Code, the meanings specified therein. As used in this Agreement, the following terms have the meanings specified below.

"Agreement" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"Authorized Officer" means, with respect to any Person, the chief executive officer, the chief financial officer, principal accounting officer, the president, any vice president, treasurer, general counsel, secretary or another executive officer of such Person.

"Bankruptcy Code" means Title 11 of the United States Code, as amended.

"Bankruptcy Law" means the Bankruptcy Code and any other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, administration, rearrangement, judicial management, receivership, insolvency, reorganization (by way of voluntary arrangement, scheme of arrangement or otherwise), or similar federal, state, or foreign debtor relief law

DG-334

(including under any applicable corporate statute) of the United States or other applicable jurisdictions from time to time in effect.

"Brazil Parent Intercompany Credit Agreement" means that certain Credit Agreement, dated as of the date hereof, by and among NFE Brazil Investments LLC, as borrower, NFE Financing, as lender, and Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent, as amended, restated, amended and restated, supplemented, or modified from time to time.

"Collateral" means (without duplication): (a) Senior Lien Collateral and (b) Junior Lien Collateral.

"Collateral Documents" means the Senior Lien Collateral Documents and the Junior Lien Collateral Documents.

"Common Representative Second Lien Pledge Agreement" has the meaning assigned to such term in the Recitals.

"Debt Facility" means each Senior Lien Debt Agreement and each Junior Lien Debt Agreement.

"Designated Senior Lien Representative" means (i) the Senior Notes Trustee, so long as the Senior Notes Indenture is in effect (or, if the Senior Notes Indenture has been Refinanced in full and the Refinancing Senior Lien Debt Agreement is the only Senior Lien Debt Agreement then in effect, the Senior Lien Representative with respect to such Senior Lien Debt Agreement) and (ii) at any time when clause (i) does not apply, the "Designated Representative" (or like term) under the Senior Lien Intercreditor Agreement. As of the date hereof, the Senior Notes Trustee is the Designated Senior Lien Representative and the Junior Lien Representative may treat the Senior Notes Trustee as the Designated Senior Lien Representative until such time as it receives a written notice from the Senior Notes Trustee and the Senior Lien Representative that will thereafter be the Designated Senior Lien Representative with respect to such change.

"DIP Financing" has the meaning assigned to such term in Section 6.01.

"Discharge of Senior Lien Obligations" means the date on which each Senior Lien Debt Agreement and the Senior Lien Obligations thereunder or secured pursuant thereto, as the case may be, are no longer secured by any Collateral pursuant to the terms of the Senior Lien Debt Documents, subject to Sections 5.06 and 6.04; provided that the Discharge of Senior Lien Obligations shall be deemed not to have occurred in connection with a Refinancing of such Senior Lien Obligations secured by Collateral.

"Distribution" means, with respect to any indebtedness, obligation or security (including any Secured Obligations), (a) any payment or distribution by any Person of cash, securities or other property, by set-off or otherwise, on account of such indebtedness, obligation or security or (b) any redemption, purchase or other acquisition of such indebtedness, obligation or security by any Person.

"Exchange Date" has the meaning assigned to such term in the Senior Notes Indenture.

3

DG-335

"Grantor" means NFE Financing.

"Insolvency or Liquidation Proceeding" means:

(1)      any case commenced by or against the Grantor under any Bankruptcy Law, any other proceeding for the reorganization, recapitalization, administration or adjustment or marshalling of the assets or liabilities of the Grantor, any receivership, administration or assignment for the benefit of creditors relating to the Grantor or any similar case or proceeding relative to the Grantor or its creditors, as such, in each case whether or not voluntary;

(2)      any liquidation, dissolution, administration, marshalling of assets or liabilities or other winding up of or relating to the Grantor, in each case whether or not voluntary and whether or not involving bankruptcy or insolvency; or

(3)      any other proceeding of any type or nature in which substantially all claims of creditors of the Grantor are determined and any payment or Distribution is or may be made on account of such claims.

"Issuer" has the meaning set forth in the recitals.

"Junior Lien Collateral" means (i) the Pledged Debt, (ii) the Pledged Shares, and (iii) all other "Collateral" as defined in the Common Representative Second Lien Pledge Agreement as in effect on the date hereof.

"Junior Lien Collateral Documents" means the Common Representative Second Lien Pledge Agreement and the other pledge agreements or other collateral or security agreements pursuant to which a Lien is granted on the Junior Lien Collateral to secure any Junior Lien Obligations.

 "Junior Lien Debt Agreements" means, collectively, the RCF Credit Agreement, the LC Credit Agreement and the TLA Credit Agreement.

"Junior Lien Debt Documents" means, collectively, the RCF Loan Documents, LC Loan Documents and the TLA Loan Documents.

"Junior Lien Enforcement Date" means, with respect to the Junior Lien Representative, the date which is 180 consecutive days after the occurrence of both (i) an Event of Default (under and as defined in the Junior Lien Debt Document for which the Junior Lien Representative has been named as Representative) and (ii) the Designated Senior Lien Representative's and each other Representative's receipt of written notice from the Junior Lien Representative that (x) it is the Junior Lien Representative and that an Event of Default (under and as defined in the Junior Lien Debt Document for which the Junior Lien Representative has been named as Representative) has occurred and is continuing and (y) such Junior Lien Debt Obligations are currently due and payable in full (whether as a result of acceleration thereof or otherwise) in accordance with the terms of the applicable Junior Lien Debt Document; provided that the Junior Lien Enforcement Date shall be stayed and shall not occur and shall be deemed not to have occurred with respect to any Collateral (1) at any time the Designated Senior Lien Representative has commenced and is

4

DG-336

diligently pursuing any enforcement action with respect to all or any material portion of the Collateral or (2) at any time the Grantor which has granted a security interest in the Collateral is then a debtor under or with respect to (or otherwise subject to) any Insolvency or Liquidation Proceeding.

"Junior Lien Obligations" means, collectively, the RCF Obligations, LC Obligations and the TLA Obligations.

"Junior Lien Representative" means the Junior Common Collateral Agent.

"Junior Lien Secured Parties" means (i) the "Secured Parties" under (and as such term is defined in) the Junior Lien Debt Agreements, and (ii) each Representative for holders of any Junior Lien Obligations (including the Junior Common Collateral Agent, the RCF Collateral Agent, the LC Collateral Agent and the TLA Collateral Agent).

"Junior Priority Lien" means the Liens on the Junior Lien Collateral in favor of Junior Lien Secured Parties under the Junior Lien Collateral Documents.

"LC Loan Documents" means the LC Credit Agreement and the other Loan Documents (as defined in the LC Credit Agreement) and each of the other agreements, documents and instruments providing for or evidencing any other LC Obligations, and any other document or instrument executed or delivered at any time in connection with any LC Obligations, to the extent such documents are effective at the relevant time, as each may be amended, restated, supplemented, modified, renewed or extended from time to time in accordance with the provisions of this Agreement.

"LC Obligations" means the "Obligations" as defined in the LC Loan Documents, and includes, without limitation, all other obligations of every nature of the Grantor from time to time owed to any LC Secured Party or any of their respective Affiliates under the LC Loan Documents, whether for principal, interest, fees, expenses, indemnification or otherwise and all guarantees of any of the foregoing, including all post-petition interest, fees and expenses accrued or accruing (or which would, absent commencement of an Insolvency or Liquidation Proceeding, accrue) after commencement of an Insolvency or Liquidation Proceeding in accordance with the rate specified in the relevant LC Loan Documents whether or not a claim for such post-petition interest, fees and expenses is allowed as a claim in such Insolvency or Liquidation Proceeding.

"LC Secured Parties" means the "Secured Parties" under (and as such term is defined in) the LC Loan Documents.

"Lien" means any mortgage, pledge, hypothecation, assignment, encumbrance, lien (statutory or other), charge, or other security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing), in each case, in the nature of security; provided that in no event shall a non-financing lease obligation be deemed to constitute a Lien.

"NFE Brazil" means NFE Brazil Holdings Limited, an exempted company organized under the laws of Bermuda.

DG-337

"Officer's Certificate" has the meaning provided to such term in Section 8.08.

"Pledged or Controlled Collateral" has the meaning assigned to such term in Section 5.05(a).

"Pledged Debt" means all rights under the Brazil Parent Intercompany Credit Agreement.

"Pledged Shares" means all shares of capital stock issued by NFE Brazil.

"Proceeds" means the proceeds of any sale, collection or other liquidation of Collateral and any payment or distribution made in respect of Collateral in an Insolvency or Liquidation Proceeding and/or any distributions received by any Senior Lien Secured Party or any Junior Lien Secured Party on account of its secured claims pursuant to a plan of reorganization or a plan of liquidation and any amounts received by the Senior Lien Representative or any other Senior Lien Secured Party from a Junior Lien Secured Party in respect of Collateral pursuant to this Agreement, and shall include all "proceeds," as such term is defined in the UCC.

"Purchase Event" has the meaning provided to such term in Section 5.07.

"RCF Loan Documents" means the RCF Credit Agreement and the other Loan Documents (as defined in the RCF Credit Agreement) and each of the other agreements, documents and instruments providing for or evidencing any other RCF Obligations, and any other document or instrument executed or delivered at any time in connection with any RCF Obligations, to the extent such documents are effective at the relevant time, as each may be amended, restated, supplemented, modified, renewed or extended from time to time in accordance with the provisions of this Agreement.

"RCF Obligations" means the "Obligations" as defined in the RCF Loan Documents, and includes, without limitation, all other obligations of every nature of the Grantor from time to time owed to any RCF Secured Party or any of their respective Affiliates under the RCF Loan Documents, whether for principal, interest, fees, expenses, indemnification or otherwise and all guarantees of any of the foregoing, including all post-petition interest, fees and expenses accrued or accruing (or which would, absent commencement of an Insolvency or Liquidation Proceeding, accrue) after commencement of an Insolvency or Liquidation Proceeding in accordance with the rate specified in the relevant RCF Loan Documents whether or not a claim for such post-petition interest, fees and expenses is allowed as a claim in such Insolvency or Liquidation Proceeding.

"RCF Secured Parties" means the "Secured Parties" under (and as such term is defined in) the RCF Loan Documents.

"Recovery" has the meaning assigned to such term in Section 6.04.

"Refinance" means, in respect of any Indebtedness, to refinance, extend, exchange, renew, refund, repay, prepay, redeem, purchase, defease, retire, restructure, amend, increase, modify, supplement or replace, or to issue other Indebtedness or enter alternative financing arrangements in exchange or replacement for such Indebtedness, in whole or in part, including by adding or replacing lenders, creditors, agents, borrowers and/or guarantors, and including, in each case, but not limited to, after the original instrument giving rise to such Indebtedness has been terminated

and including, in each case, through any credit agreement, indenture or other agreement. "Refinanced" and "Refinancing" have correlative meanings.

"Representatives" means the Senior Lien Representatives and the Junior Lien Representative.

"Secured Obligations" means the Senior Lien Obligations and the Junior Lien Obligations.

"Secured Parties" means the Senior Lien Secured Parties and the Junior Lien Secured Parties.

"Senior Common Obligations" means the "Secured Obligations" as defined in the Common Representative First Lien Pledge and Security Agreement as in effect of the date hereof; provided that for the purposes of this Agreement the amount of Senior Common Obligations shall not exceed $200,000,000 in aggregate outstanding principal amount plus accrued and unpaid interest thereon.

"Senior Common Secured Parties" means the "Secured Parties" under (and as such term is defined in) the Common Representative First Lien Pledge and Security Agreement.

"Senior Lien Collateral" means (i) the Pledged Debt, (ii) the Pledged Shares, and (iii) all other "Collateral" as defined in the Common Representative Second Lien Pledge Agreement as in effect on the date hereof.

"Senior Lien Collateral Documents" means pledge agreements or other collateral or security agreements pursuant to which a Lien is granted on the Senior Lien Collateral to secure any Senior Lien Obligations.

"Senior Lien Debt Agreements" means (i) the Senior Notes Indenture and (ii) as related solely to the Senior Common Obligations and subject to the Senior Lien Intercreditor Agreement and without limitation in any way of the rights of the controlling representative thereunder, the RCF Credit Agreement, the TLA Credit Agreement and the LC Credit Agreement.

"Senior Lien Debt Documents" means (i) the Senior Notes Documents and (ii) as related solely to the Senior Common Obligations and subject to the Senior Lien Intercreditor Agreement and without limitation in any way of the rights of the controlling representative thereunder, the RCF Loan Documents, the TLA Loan Documents and the LC Loan Documents.

"Senior Lien Event of Default" means an "Event of Default" (as defined in the Senior Notes Indenture), or any other "event of default" or similar term referred to in any other Senior Lien Debt Document.

"Senior Lien Intercreditor Agreement" means that certain Equal Priority Intercreditor Agreement, to be dated on or about the Exchange Date, among the Senior Notes Collateral Trustee, the Senior Common Collateral Agent, and acknowledged and agreed by the Grantor, and which sets forth the terms governing the Liens (including the relative priority thereof) on the collateral securing each such series of Senior Lien Obligations as amongst the applicable Senior Lien

7

Secured Parties, as such agreement may be amended, restated, supplemented, modified, renewed or extended.

"Senior Lien Obligations" means, collectively, the Senior Notes Obligations and the Senior Common Obligations.

"Senior Lien Representative" means (i) with respect to the Senior Lien Obligations under the Senior Notes Documents and the Senior Notes Secured Parties with respect thereto, the Senior Notes Trustee and shall include any successor administrative agent and collateral agent as provided in the Senior Notes Indenture and (ii) with respect to the Senior Lien Obligations under the Common Representative First Lien Pledge and Security Agreement and the Senior Common Secured Parties with respect thereto, the Common Representative First Lien Pledge and Security Agreement.

"Senior Lien Secured Parties" means (i) the "Secured Parties" or the "Secured Notes Secured Parties", as applicable, under and as such term is defined in the applicable Senior Lien Debt Agreements, and (ii) each Representative for the holders of any Senior Lien Obligations (including the Senior Notes Collateral Trustee and the Common Representative First Lien Pledge and Security Agreement).

"Senior Notes Documents" means the Senior Notes Indenture and the other Security Documents (as defined in the Senior Notes Indenture) and each of the other agreements, documents and instruments providing for or evidencing any other Senior Notes Obligations, and any other document or instrument executed or delivered at any time in connection with any Senior Notes Obligations, to the extent such documents are effective at the relevant time, as each may be amended, restated, supplemented, modified, renewed or extended from time to time in accordance with the provisions of this Agreement.

"Senior Notes Obligations" means the "Secured Notes Obligations" as defined in the Senior Notes Documents, and includes, without limitation, all other obligations of every nature of the Grantor from time to time owed to any Senior Notes Secured Party or any of their respective Affiliates under the Senior Notes Documents, whether for principal, interest, fees, expenses, indemnification or otherwise and all guarantees of any of the foregoing, including all post-petition interest accrued or accruing (or which would, absent commencement of an Insolvency or Liquidation Proceeding, accrue) after commencement of an Insolvency or Liquidation Proceeding in accordance with the rate specified in the relevant Senior Notes Documents whether or not a claim for such post-petition interest is allowed as a claim in such Insolvency or Liquidation Proceeding.

"Senior Notes Secured Parties" means the "Secured Parties" under (and as such term is defined in) the Senior Notes Documents.

"Senior Priority Lien" means the Liens on the Senior Lien Collateral in favor of Senior Lien Secured Parties under the Senior Lien Collateral Documents.

"TLA Loan Documents" means the TLA Credit Agreement and the other Loan Documents (as defined in the TLA Credit Agreement) and each of the other agreements, documents and instruments providing for or evidencing any other TLA Obligations, and any other document or

8

instrument executed or delivered at any time in connection with any TLA Obligations, to the extent such documents are effective at the relevant time, as each may be amended, restated, supplemented, modified, renewed or extended from time to time in accordance with the provisions of this Agreement.

"TLA Obligations" means the "Obligations" as defined in the TLA Loan Documents, and includes, without limitation, all other obligations of every nature of the Grantor from time to time owed to any TLA Secured Party or any of their respective Affiliates under the TLA Loan Documents, whether for principal, interest, fees, expenses, indemnification or otherwise and all guarantees of any of the foregoing, including all post-petition interest, fees and expenses accrued or accruing (or which would, absent commencement of an Insolvency or Liquidation Proceeding, accrue) after commencement of an Insolvency or Liquidation Proceeding in accordance with the rate specified in the relevant TLA Loan Documents whether or not a claim for such post-petition interest, fees and expenses is allowed as a claim in such Insolvency or Liquidation Proceeding.

"TLA Secured Parties" means the "Secured Parties" under (and as such term is defined in) the TLA Loan Documents.

"Uniform Commercial Code" or "UCC" means, unless otherwise specified, the Uniform Commercial Code as from time to time in effect in the State of New York.

SECTION 1.02    Terms Generally.   The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented, waived or otherwise modified, in each case in accordance with the terms of this Agreement, (ii) any definition of or reference to any statute or regulation herein shall be construed as referring to such statute or regulation as from time to time amended, supplemented or otherwise modified, (iii) any reference herein to any Person shall be construed to include such Person's permitted successors and permitted assigns, (iv) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (v) all references herein to Articles, Sections and Annexes shall be construed to refer to Articles, Sections and Annexes of this Agreement, (vi) unless otherwise expressly qualified herein, the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights and (vii) the term "or" is not exclusive.

<center>ARTICLE II</center>

<center>Priorities and Agreements with Respect to Collateral</center>

SECTION 2.01    Subordination of Liens.   Notwithstanding the date, time, manner or order of filing or recordation of any document or instrument or grant, attachment or perfection

<center>9</center>

<center>2460</center>

of any Liens granted to the Junior Lien Representative or any of the other Junior Lien Secured Parties on the Collateral or of any Liens granted to any Senior Lien Representative or any of the other Senior Lien Secured Parties on the Collateral (or any actual or alleged defect in any of the foregoing as a result of an avoidance action or otherwise) and notwithstanding any provision of the UCC, any applicable law, the Common Representative First Lien Pledge and Security Agreement, the Common Representative Second Lien Pledge and Security Agreement, any Junior Lien Debt Document or any Senior Lien Debt Document or any other circumstance whatsoever, the Junior Lien Representative, on behalf of itself and each of the other applicable Junior Lien Secured Parties, hereby agrees that (a) any and all Liens on the Collateral securing any and all Senior Lien Obligations now or hereafter held by or on behalf of any Senior Lien Representative or any of the other Senior Lien Secured Parties or other agent or trustee therefor, regardless of how acquired, whether by grant, statute, operation of law, subrogation or otherwise, shall have priority over and be senior in all respects and prior to any and all Liens on the Collateral securing any and all Junior Lien Obligations and (b) any and all Liens on the Collateral securing any and all Junior Lien Obligations now or hereafter held by or on behalf of the Junior Lien Representative or any of the other Junior Lien Secured Parties or other agent or trustee therefor, regardless of how acquired, whether by grant, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to any and all Liens on the Collateral securing any and all Senior Lien Obligations. Any and all Liens on the Collateral securing any and all Senior Lien Obligations shall be and remain senior in all respects and prior to any and all Liens on the Collateral securing any and all Junior Lien Obligations, and any and all Junior Lien Obligations shall be and remain junior and subordinate in all respects to any and all Liens on the Collateral securing any and all Senior Lien Obligations, in each case, for all purposes, whether or not such Liens securing any and all Senior Lien Obligations are subordinated to any Lien securing any other obligation of the Grantor or any other Person or are otherwise subordinated, voided, avoided or invalidated or have lapsed.

SECTION 2.02    Nature of Claims.  The Junior Lien Representative, on behalf of itself and each other applicable Junior Lien Secured Party, acknowledges that (a) the terms of the Senior Lien Debt Documents and the Senior Lien Obligations may be amended, restated, supplemented, waived or otherwise modified from time to time, and the Senior Lien Obligations, or a portion thereof, may be Refinanced from time to time, in each case subject to any limitations in Section 5.03(a), and (b) the aggregate amount of the Senior Lien Obligations may be increased, in each case without notice to or consent by the Junior Lien Representative or any other Junior Lien Secured Party and without affecting the provisions hereof, but also in each case without affecting the validity of any limitations in the Junior Lien Debt Documents as between the parties thereto.  The Lien priorities provided for in Section 2.01 shall not be altered or otherwise affected by any amendment, restatement, amendment and restatement, supplement or other modification, or any Refinancing, of either the Senior Lien Obligations or the Junior Lien Obligations, or any portion thereof.  As between the Grantor and the Junior Lien Secured Parties, the foregoing provisions will not limit or otherwise affect the obligations of the Grantor contained in any Junior Lien Debt Document with respect to the incurrence of additional Senior Lien Obligations.

SECTION 2.03    Prohibition on Contesting Liens.    (a) The Junior Lien Representative, for itself and on behalf of each of the other applicable Junior Lien Secured Parties, agrees that it shall not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the validity, extent, perfection, priority or enforceability of any Lien on any Senior Lien Collateral securing

10

2461

DG-342

any Senior Lien Obligations held (or purported to be held) by or on behalf of any Senior Lien Representative or any of the other Senior Lien Secured Parties or any other agent or trustee therefor in any Senior Lien Collateral or the allowability of any claims asserted with respect to any Senior Lien Obligations in any proceeding (including any Insolvency or Liquidation Proceeding) and (b) each Senior Lien Representative, for itself and on behalf of each of the other applicable Senior Lien Secured Parties, agrees that it shall not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the validity, extent, perfection, priority or enforceability of any Lien on any Junior Lien Collateral securing any Junior Lien Obligations held (or purported to be held) by or on behalf of any Junior Lien Representative or any of the other Junior Lien Secured Parties or any other agent or trustee therefor in the Junior Lien Collateral or the allowability of any claims (other than as expressly set forth in clause (iii) of the last sentence of Section 6.03) asserted with respect to any Junior Lien Obligations in any proceeding with respect to the Grantor (including any Insolvency or Liquidation Proceeding).  Notwithstanding the foregoing, no provision in this Agreement shall be construed to prevent or impair the rights of any Senior Lien Representative to enforce this Agreement (including the priority of the Liens securing the Senior Lien Obligations as provided in Section 2.01) or any of the Senior Lien Debt Documents.

## ARTICLE III

### Enforcement

SECTION 3.01    Exercise of Remedies.

(a)    So long as the Discharge of Senior Lien Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against the Grantor, (i) neither any Junior Lien Representative nor any other Junior Lien Secured Party will, directly or indirectly, or will support any Person in connection therewith, (x) exercise or seek to exercise any rights or remedies (including setoff) with respect to any Collateral in respect of any Junior Lien Obligations, or institute any action or proceeding with respect to such rights or remedies (including any action of foreclosure), (y) contest, protest or object to any foreclosure proceeding or other action brought with respect to the Collateral, the exercise of any right by the Designated Senior Lien Representative or any Senior Lien Secured Party (or any agent or sub-agent on their behalf) in respect of the Senior Lien Obligations under any lockbox agreement, control agreement, landlord waiver or bailee's letter or similar agreement or arrangement to which the Designated Senior Lien Representative or any Senior Lien Secured Party either is a party or may have rights as a third party beneficiary, or any other exercise by any such party of any rights and remedies relating to the Collateral under the Senior Lien Debt Documents, or (z) object to the forbearance by the Senior Lien Secured Parties from bringing or pursuing any foreclosure proceeding or action or any other exercise of any rights or remedies relating to the Collateral in respect of Senior Lien Obligations and (ii) the Designated Senior Lien Representative and the Senior Lien Secured Parties shall (except as otherwise set forth in Section 6.01) have the exclusive right to enforce rights, exercise remedies (including setoff and the right to credit bid their debt) and make determinations regarding the release, disposition or restrictions with respect to the Collateral without any consultation with or the consent of any Junior Lien Representative or any other Junior Lien Secured Party; provided, however, that (A) in any Insolvency or Liquidation Proceeding commenced by or against the Grantor, any Junior Lien Representative may file a claim,

11

2462

proof of claim or statement of interest with respect to the Junior Lien Collateral and the Junior Lien Obligations (B) any Junior Lien Representative may take any action (not adverse to the prior Liens (or to the priority status of the Liens) on the Collateral securing the Senior Lien Obligations, or the rights of the Senior Lien Representatives or the other Senior Lien Secured Parties to exercise remedies in respect thereof, and not inconsistent with the terms of this Agreement) in order to create, perfect, preserve or protect (but not enforce) its Lien on the Collateral; (C) to the extent not otherwise inconsistent with the terms of this Agreement and to the extent the Junior Lien Obligations constitute claims against the Grantor apart from the Lien on the Junior Lien Representative on the Collateral, any Junior Lien Representative and the Junior Lien Secured Parties may exercise their rights and remedies as unsecured creditors, (D) any Junior Lien Representative may exercise the rights and remedies provided for in Section 6.03 and the Junior Lien Secured Parties may file any necessary or appropriate responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any person objecting to or otherwise seeking the disallowance of the Liens of the Junior Lien Secured Parties or the avoidance of any Junior Priority Lien to the extent not inconsistent with the terms of this Agreement, (E) any Junior Lien Secured Party may vote on any plan of reorganization, plan of liquidation, agreement for composition, or other type of plan of arrangement proposed in or in connection with any Insolvency or Liquidation Proceeding in a manner that is not inconsistent with the terms of this Agreement and (F) from and after the Junior Lien Enforcement Date, the applicable Junior Lien Representative (or a person authorized by it) may exercise or seek to exercise any rights or remedies (including setoff) with respect to any Collateral in respect of any Junior Lien Obligations, or institute any action or proceeding with respect to such rights or remedies (including any action of foreclosure), but only so long as (1) the Designated Senior Lien Representative has not commenced and is not diligently pursuing any enforcement action with respect to all or any material portion of the Collateral or (2) the Grantor which has granted a security interest in any Collateral is not then a debtor under or with respect to (or otherwise subject to) any Insolvency or Liquidation Proceeding.  In exercising rights and remedies with respect to the Senior Lien Collateral, the Designated Senior Lien Representative and the other Senior Lien Secured Parties may enforce the provisions of the Senior Lien Debt Documents and exercise remedies in accordance with the terms thereof, all in such order and in such manner as they may determine in the exercise of their sole discretion. Such exercise and enforcement shall include the rights of an agent appointed by them to sell or otherwise dispose of Collateral upon foreclosure, to incur expenses in connection with such sale or disposition and to exercise all the rights and remedies of a secured lender under the Uniform Commercial Code or any other applicable law of any applicable jurisdiction and of a secured creditor under the Bankruptcy Laws of any applicable jurisdiction.

(b)     So long as the Discharge of Senior Lien Obligations has not occurred, except as expressly provided in the proviso to clause (ii) of Section 3.01(a) but subject to Article IV and Article VI, the Junior Lien Representative, on behalf of itself and each other applicable Junior Lien Secured Party, agrees that it will not take or receive any Collateral or any Proceeds of Collateral in connection with any Insolvency or Liquidation Proceeding. Without limiting the generality of the foregoing, unless and until the Discharge of Senior Lien Obligations has occurred, the sole right of the Junior Lien Representative and the other Junior Lien Secured Parties with respect to the Collateral is to hold a Lien on the Collateral in respect of Junior Lien Obligations pursuant to the Junior Lien Debt Documents for the period and to the extent granted therein and to

12

2463

DG-344

receive a share of the Proceeds thereof, if any, after the Discharge of Senior Lien Obligations has occurred.

(c)     The Junior Lien Representative, for itself and on behalf of each applicable Junior Lien Secured Party, (i) agrees that neither such Junior Lien Representative nor any such Junior Lien Secured Party will take any action that would hinder any exercise of remedies undertaken by any Senior Lien Representative or any Senior Lien Secured Party with respect to the Collateral, including any sale, lease, exchange, transfer or other disposition of the Collateral, whether by foreclosure or otherwise, and (ii) hereby waives any and all rights it or any such Junior Lien Secured Party may have as a junior Lien creditor or otherwise to object to the manner in which any Senior Lien Representative or any of the Senior Lien Secured Parties seek to enforce or collect the Senior Lien Obligations or the Liens granted on any of the Collateral, regardless of whether any action or failure to act by or on behalf of any Senior Lien Representative or any other Senior Lien Secured Party is adverse to the interests of the Junior Lien Secured Parties.

(d)     The Junior Lien Representative hereby acknowledges and agrees that no covenant, agreement or restriction contained in any Junior Lien Debt Document shall be deemed to restrict in any way the rights and remedies of any Senior Lien Representative or the Senior Lien Secured Parties with respect to the Senior Lien Collateral as set forth in this Agreement and the Senior Lien Debt Documents.

(e)     Until the Discharge of Senior Lien Obligations, the Designated Senior Lien Representative shall (subject to the proviso to clause (ii) of Section 3.01(a)) have the exclusive right to exercise any right or remedy with respect to the Collateral and shall have the exclusive right to determine and direct the time, method and place for exercising such right or remedy or conducting any proceeding with respect thereto, in each case in accordance with the terms of the Senior Lien Debt Documents.

SECTION 3.02   Cooperation.  The Junior Lien Representative, on behalf of itself and each other applicable Junior Lien Secured Party, agrees that, unless and until the Discharge of Senior Lien Obligations has occurred, it will not commence, or join with any Person (other than the Senior Lien Secured Parties and the Senior Lien Representatives upon the request of the Designated Senior Lien Representative) in commencing, any enforcement, collection, execution, levy or foreclosure action or proceeding with respect to any Lien held by it in the Collateral under any of the Junior Lien Debt Documents.

SECTION 3.03   Actions upon Breach.  Should any Junior Lien Representative or any other Junior Lien Secured Party, contrary to this Agreement, in any way take, attempt to take or threaten to take any action with respect to the Collateral (including any attempt to realize upon or enforce any remedy with respect to this Agreement) or fail to take any action required by this Agreement, any Senior Lien Representative or any other Senior Lien Secured Party (in its or their own name or in the name of the Grantor) may obtain relief against such Junior Lien Representative or such other Junior Lien Secured Party by injunction, specific performance or other appropriate equitable relief. The Junior Lien Representative, on behalf of itself and each other applicable Junior Lien Secured Party, hereby (i) agrees that the Senior Lien Secured Parties' damages from the actions of the Junior Lien Representative or any other Junior Lien Secured Party may at that time be difficult to ascertain and may be irreparable and waives any defense that the Grantor or the

13

2464

DG-345

Senior Lien Secured Parties cannot demonstrate damage or be made whole by the awarding of damages and (ii) irrevocably waives any defense based on the adequacy of a remedy at law and any other defense that might be asserted to bar the remedy of specific performance in any action that may be brought by any Senior Lien Representative or any other Senior Lien Secured Party.

ARTICLE IV

Payments

SECTION 4.01    Application of Proceeds.    So long as the Discharge of Senior Lien Obligations has not occurred and regardless of whether an Insolvency or Liquidation Proceeding has been commenced, the Collateral or Proceeds thereof received in connection with the sale or other disposition of, or collection on, such Collateral upon the exercise of remedies or in connection with any Insolvency or Liquidation Proceeding shall be applied by the Designated Senior Lien Representative to the Senior Lien Obligations in such order as specified in the Senior Lien Debt Documents (including, if in effect, the Senior Lien Intercreditor Agreement) until the Discharge of Senior Lien Obligations has occurred. Upon the Discharge of Senior Lien Obligations, the Designated Senior Lien Representative shall deliver promptly to the Junior Lien Representative any Collateral or Proceeds thereof held by it in the same form as received, with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct, to be applied by the Junior Lien Representative to the Junior Lien Obligations in such order as specified in the Junior Lien Debt Documents.

SECTION 4.02    Payments Over.    So long as the Discharge of Senior Lien Obligations has not occurred, any Collateral or Proceeds thereof received by any Junior Lien Representative or any other Junior Lien Secured Party in connection with the exercise of any right or remedy (including setoff) relating to the Collateral or in connection with any Insolvency or Liquidation Proceeding (including any Collateral or Proceeds thereof received by any Junior Lien Representative or any other Junior Lien Secured Party pursuant to any plan of reorganization or plan of liquidation) shall, except as otherwise provided in Article VI, be segregated and held in trust for the benefit of and forthwith paid over to the Designated Senior Lien Representative for the benefit of the Senior Lien Secured Parties in the same form as received, with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct. The Designated Senior Lien Representative is hereby authorized to make any such endorsements as agent for the Junior Lien Representative or any such other Junior Lien Secured Party.  This authorization is coupled with an interest and is irrevocable.

ARTICLE V

Other Agreements

SECTION 5.01    Releases.

(a)    The Junior Lien Representative, for itself and on behalf of each Junior Lien Secured Party, agrees that, in the event of a sale, transfer or other disposition of any specified item of Collateral (i) in connection with the exercise by the Designated Senior Lien Representative or the applicable Senior Lien Secured Parties of any rights or remedies pursuant to the Senior Lien

14

2465

DG-346

Debt Documents or otherwise in respect of Collateral, or otherwise in connection with the disposition of the Collateral in connection with the exercise of remedies during the existence of any Senior Lien Event of Default (including in connection with any sale, transfer or other disposition conducted in such circumstances by the Grantor with the consent or at the direction of the Designated Senior Lien Representative or the applicable Senior Lien Secured Parties), (ii) after the occurrence and during the continuance of an Insolvency or Liquidation Proceeding by or against the Grantor, any sale, transfer or other disposition of all or any portion of the Collateral conducted pursuant to an order of the Bankruptcy Court authorizing such sale pursuant to Section 363, 1123 or 1129(b) of the Bankruptcy Code (including any such sale of the Collateral to the Senior Lien Representative or applicable Senior Lien Secured Parties (or their respective designees or assignees) pursuant to a credit bid of all or part of the Senior Lien Obligations), or (iii) if not in connection with the foregoing, so long as such sale, transfer or other disposition is permitted by the terms of the Senior Notes Documents (including any waiver or consent thereunder) then, in the case of each of the foregoing clauses (i), (ii) and (iii), the Liens granted to the Junior Lien Representative and the Junior Lien Secured Parties upon such Collateral to secure Junior Lien Obligations shall, whether or not any Insolvency or Liquidation Proceeding is pending at the time, terminate and be released, automatically and without any further action, concurrently with the termination and release of all Liens granted upon such Collateral to secure Senior Lien Obligations (but shall instead attach to the Proceeds of any such sale or other disposition that are not otherwise applied to the Senior Obligations, subject to the Lien priorities set forth herein).  Upon the effectiveness of the termination and release of Liens securing the Senior Lien Obligations such Junior Lien Representative shall use commercially reasonable efforts to execute, deliver or acknowledge, at the Grantor's sole cost and expense and without any representation or warranty, such instruments to evidence such termination and release of the Liens.  In connection with the foregoing, if the Junior Lien Representative does not timely deliver such instruments, the Designated Senior Lien Representative shall be authorized to execute such instruments pursuant to the authorizations granted under Section 5.01(b).

(b)     The Junior Lien Representative, for itself and on behalf of each Junior Lien Secured Party, hereby irrevocably constitutes and appoints the Designated Senior Lien Representative and any officer or agent of the Designated Senior Lien Representative, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Junior Lien Representative or such Junior Lien Secured Party or in the Designated Senior Lien Representative's own name, from time to time in the Designated Senior Lien Representative's discretion, for the purpose of carrying out the terms of Section 5.01(a), to take any and all appropriate action consistent with Section 5.01(a) and to execute any and all documents and instruments that may be necessary or desirable to accomplish the purposes of Section 5.01(a), including any termination statements, endorsements or other instruments of transfer or release.

(c)     Notwithstanding anything to the contrary in any Junior Lien Collateral Document, but subject to Section 5.05 hereof, in the event the terms of a Senior Lien Collateral Document and a Junior Lien Collateral Document each require the Grantor (i) to make payment in respect of any item of Collateral, (ii) to deliver or afford control over any item of Collateral to, or deposit any item of Collateral with, (iii) to register ownership of any item of Collateral in the name of or make an assignment of ownership of any Collateral or the rights thereunder to, (iv) cause any securities intermediary, commodity intermediary or other Person acting in a similar capacity to

15

DG-347

agree to comply, in respect of any item of Collateral, with instructions or orders from, or to treat, in respect of any item of Collateral, as the entitlement holder, (v) hold any item of Collateral in trust for (to the extent such item of Collateral cannot be held in trust for multiple parties under applicable law), (vi) obtain the agreement of a bailee or other third party to hold any item of Collateral for the benefit of or subject to the control of or, in respect of any item of Collateral, to follow the instructions of or (vii) obtain the agreement of a landlord with respect to access to leased premises where any item of Collateral is located or waivers or subordination of rights with respect to any item of Collateral in favor of, in any case, both a Senior Lien Representative and a Junior Lien Representative or Junior Lien Secured Party, the Grantor may, until the applicable Discharge of Senior Lien Obligations has occurred, comply with such requirement under the applicable Junior Lien Collateral Document as it relates to such Collateral by taking any of the actions set forth above only with respect to, or in favor of, the Designated Senior Lien Representative.

SECTION 5.02    Insurance and Condemnation Awards.    Unless and until the Discharge of Senior Lien Obligations has occurred, the Designated Senior Lien Representative and the other Senior Lien Secured Parties shall have the sole and exclusive right, subject to the rights of the Grantor under the Senior Lien Debt Documents, (a) to be named as additional insured, loss payee and lender loss payee under any insurance policies maintained from time to time, (b) to adjust settlement for any insurance policy covering the Collateral in the event of any loss thereunder and (c) to approve any award granted in any condemnation or similar proceeding affecting the Collateral. Unless and until the Discharge of Senior Lien Obligations has occurred, all proceeds of any such policy and any such award, if in respect of the Collateral, shall be paid (i) first, prior to the occurrence of the Discharge of Senior Lien Obligations, to the Designated Senior Lien Representative for the benefit of the Senior Lien Secured Parties pursuant to the terms of the Senior Lien Debt Documents, (ii) second, after the occurrence of the Discharge of Senior Lien Obligations, to the Junior Lien Representative for the benefit of the Junior Lien Secured Parties pursuant to the terms of the applicable Junior Lien Debt Documents and (iii) third, if no Junior Lien Obligations are outstanding, to the owner of the subject property, such other Person as may be entitled thereto or as a court of competent jurisdiction may otherwise direct. If any Junior Lien Representative or any Junior Lien Secured Party shall, at any time, receive any proceeds of any such insurance policy or any such award in contravention of this Agreement, it shall pay such proceeds over to the Designated Senior Lien Representative in accordance with the terms of Section 4.02.

SECTION 5.03    Amendments to Debt Documents.

(a)    The Senior Lien Debt Documents may be amended, restated, supplemented, waived or otherwise modified in accordance with their terms, and the Indebtedness and Senior Lien Obligations under the Senior Lien Debt Documents may be increased and Refinanced, in each case, without the consent of any Junior Lien Secured Party.

(b)    The Junior Lien Debt Documents may be amended, restated, supplemented, waived or otherwise modified in accordance with their terms, and the Indebtedness and Junior Lien Obligations under the Junior Lien Debt Documents may be increased and Refinanced, in each case, without the consent of any Senior Lien Secured Party.

DG-348

(c)     In the event that the Senior Lien Representatives or the other Senior Lien Secured Parties enter into any amendment, restatement, supplement, modification, waiver or consent in respect of any of the Senior Lien Collateral Documents for the purpose of adding to or deleting from, or waiving or consenting to any departures from any provisions of, any Senior Lien Collateral Document or changing in any manner the rights of the Senior Lien Representatives, the Senior Lien Secured Parties or the Grantor thereunder (including the release of any Liens in Senior Lien Collateral) in a manner that is applicable to all Senior Lien Obligations, then, except as determined otherwise by the Senior Lien Representatives, such amendment, restatement, supplement, modification, waiver or consent shall apply automatically to any comparable provision of each comparable Junior Lien Collateral Document without the consent of any Junior Lien Representative or any other Junior Lien Secured Party and without any action by any Junior Lien Representative or any other Junior Lien Secured Party or the Grantor; provided, however, that (A) no such amendment, waiver or consent shall have the effect of (i) releasing any Liens of any Junior Lien Representative or any Junior Lien Secured Party or removing assets subject to the Lien of the Junior Lien Collateral Documents, except to the extent that such release is permitted by Section 5.01 and there is corresponding release of the lien securing the Senior Lien Obligations, (ii) imposing duties or obligations that are adverse on any Junior Lien Representative without its consent or (iii) altering the terms of the Junior Lien Collateral Documents to permit other Liens on the Collateral not permitted under the terms of the Junior Lien Collateral Documents as in effect on the date hereof or under Article VI hereof and (B) written notice of such amendment, waiver or consent shall have been given to the Junior Lien Representative by the Senior Lien Representatives within 10 Business Days after the effectiveness of such amendment, waiver or consent, provided that the failure to give such notice shall not affect the effectiveness and validity thereof.

SECTION 5.04     Judgment Liens.     In the event that any Junior Lien Representative or any other Junior Lien Secured Party becomes a judgment Lien creditor in respect of Collateral as a result of its enforcement of its rights as an unsecured creditor in respect of Junior Lien Obligations, such judgment lien shall be subordinated to the Liens securing Senior Lien Obligations on the same basis as the other Liens securing the Junior Lien Obligations are so subordinated to such Liens securing Senior Lien Obligations under this Agreement.

SECTION 5.05     Gratuitous Bailee for Perfection.

(a)     Each of the Senior Lien Representatives (for and on behalf of itself and the other applicable Senior Lien Secured Parties) and the Junior Lien Representative (for and on behalf of itself and the other applicable Junior Lien Secured Parties) acknowledges and agrees that if it shall at any time hold a Lien securing, in the case of any Senior Lien Representative, any Senior Lien Obligations, and, in the case of any Junior Lien Representative, any Junior Lien Obligations, in each case, on any Collateral that can be perfected by the possession or control of such Collateral or of any account in which such Collateral is held, and if such Collateral or any such account is in fact in the possession or under the control of such Senior Lien Representative or such Junior Lien Representative, as applicable, or of agents or bailees of such Person (such Collateral being referred to herein as the "Pledged or Controlled Collateral"), or if it shall at any time obtain any landlord waiver or bailee's letter or any similar agreement or arrangement granting it rights or access to Collateral, or with respect to any Collateral subject to any other arrangement set forth in Section 5.01(d), each such Senior Lien Representative and such Junior Lien Representative, as applicable, shall also hold such Pledged or Controlled Collateral, or take such actions with respect to such

17

2468

landlord waiver, bailee's letter or similar agreement or arrangement, for the benefit of and on behalf of, and as sub-agent and gratuitous bailee for, in the case of any Senior Lien Representative holding Pledged or Controlled Collateral, the Junior Lien Representative, and, in the case of any Junior Lien Representative holding Pledged or Controlled Collateral, the Senior Lien Representatives (the foregoing being intended, among other things, to satisfy the requirements of Sections 8-106(d)(3), 8-301(a)(2), 9- 104(a)(5) and 9-313(h) of the UCC), in each case solely for the purpose of perfecting the Liens granted under the Junior Lien Collateral Documents or the Senior Lien Collateral Documents, as applicable, and, in each case, subject to the terms and conditions of this Section 5.05.

(b)    Until the Discharge of Senior Lien Obligations has occurred, the Senior Lien Representatives and the other Senior Lien Secured Parties shall be entitled to deal with the Pledged or Controlled Collateral in accordance with the terms of the Senior Lien Debt Documents as if the Liens under the Junior Lien Collateral Documents did not exist. The rights of the Junior Lien Representative and the other Junior Lien Secured Parties with respect to the Pledged or Controlled Collateral shall at all times be subject to the terms of this Agreement.

(c)    None of the Senior Lien Representatives, the other Senior Lien Secured Parties, the Junior Lien Representative or the other Junior Lien Secured Parties, as applicable, shall have any obligation whatsoever to the others to assure that any of the Pledged or Controlled Collateral is genuine or owned by the Grantor or to protect or preserve rights or benefits of any Person or any rights pertaining to the Collateral, except as expressly set forth in this Section 5.05. The duties or responsibilities of the Senior Lien Representatives and the Junior Lien Representative under this Section 5.05 shall be limited solely to holding or controlling the Collateral and the related Liens referred to in paragraphs (a) and (b) of this Section 5.05 as sub-agent and gratuitous bailee for the Junior Lien Representative or the Senior Lien Representatives, as applicable, for purposes of perfecting the Lien held by the Junior Lien Representative or the Senior Lien Representatives, as applicable.

(d)    The Senior Lien Representatives shall not have by reason of the Junior Lien Collateral Documents or this Agreement, or any other document, a fiduciary relationship in respect of any Junior Lien Representative or any other Junior Lien Secured Party, and the Junior Lien Representative, for itself and on behalf of each other applicable Junior Lien Secured Party, hereby waives and releases the Senior Lien Representatives from all claims and liabilities arising pursuant to the Senior Lien Representatives' roles under this Section 5.05 as sub-agent and gratuitous bailee with respect to the Collateral. The Junior Lien Representative shall not have by reason of the Senior Lien Collateral Documents or this Agreement, or any other document, a fiduciary relationship in respect of any Senior Lien Representative or any other Senior Lien Secured Party, and each Senior Lien Representative, for itself and on behalf of each other Senior Lien Secured Party, hereby waives and releases the Junior Lien Representative from all claims and liabilities arising pursuant to the Junior Lien Representative's role under this Section 5.05 as sub-agent and gratuitous bailee with respect to the Collateral.

(e)    Upon the Discharge of Senior Obligations, each applicable Senior Lien Representative shall, at the Grantor's sole cost and expense, (i) (A) deliver to the Junior Lien Representative, to the extent that it is legally permitted to do so and as Junior Lien Representative may direct, all Collateral, including all Proceeds thereof, held or controlled by such Senior Lien

Representative or any of its agents or bailees, including the transfer of possession and control, as applicable, of the Pledged or Controlled Collateral, together with any necessary endorsements and notices to depositary banks, securities intermediaries and commodities intermediaries, and assign to the Junior Lien Representative, to the extent that it is legally permitted to do so and as the Junior Lien Representative may direct, its rights under any landlord waiver or bailee's letter or any similar agreement or arrangement granting it rights or access to Collateral, (B) if not legally permitted or no direction is given and if prior to discharge of the Junior Lien Obligations, deliver such Collateral and assign its rights in respect thereof as a court of competent jurisdiction may otherwise direct or (C) if the Junior Lien Obligations have been discharged, deliver such Collateral to the Grantor and terminate its rights therein as directed by the Grantor; (ii) notify any applicable insurance carrier that it is no longer entitled to be an additional loss payee or additional insured under the insurance policies of the Grantor issued by such insurance carrier; and (iii) notify any governmental authority involved in any condemnation or similar proceeding involving the Grantor that the Junior Lien Representative is entitled to approve any awards granted in such proceeding.

(f)     None of the Senior Lien Representatives nor any of the other Senior Lien Secured Parties shall be required to marshal any present or future collateral security for any obligations of the Grantor to any Senior Lien Representative or any other Senior Lien Secured Party or any assurance of payment in respect thereof, or to resort to such collateral security or other assurances of payment in any particular order, and all of their rights in respect of such collateral security or any assurance of payment in respect thereof shall be cumulative and in addition to all other rights, however existing or arising.

(g)     Except as expressly set forth herein, the Senior Lien Representatives shall not be responsible for perfecting and maintaining the perfection of Liens with respect to the Collateral for the benefit of any Junior Lien Representative or any of the other Junior Lien Secured Parties.

SECTION 5.06     <u>When Discharge of Senior Lien Obligations Deemed To Not Have Occurred</u>. If, at any time substantially concurrently with or after the Discharge of Senior Lien Obligations has occurred, the Grantor consummates any Refinancing or incurs any Senior Lien Obligations permitted under the Junior Lien Debt Documents (other than in respect of the payment of indemnities surviving the Discharge of Senior Lien Obligations), then such Discharge of Senior Lien Obligations shall automatically be deemed not to have occurred for all purposes of this Agreement (other than with respect to any actions taken prior to the date of such designation as a result of the occurrence of such first Discharge of Senior Lien Obligations) and the applicable agreement governing such Senior Lien Obligations shall automatically be treated as a Senior Lien Debt Document for all purposes of this Agreement, including for purposes of the Lien priorities and rights in respect of Collateral set forth herein and the agent, representative or trustee for the holders of such Senior Lien Obligations shall be the Senior Lien Representatives for all purposes of this Agreement; <u>provided</u> that the new Senior Lien Representative shall have become a party to this Agreement pursuant to Section 8.09. Upon receipt of notice of such incurrence (including the identity of the new Senior Lien Representative), the Junior Lien Representative shall promptly (a) enter into such documents and agreements (at the expense of the Grantor), including amendments, restatements, supplements or other modifications to this Agreement, as the Grantor or such new Senior Lien Representative shall reasonably request in writing in order to provide the new Senior Lien Representative the rights of the Senior Lien Representative contemplated hereby and (b)

19

DG-351

deliver to such new Senior Lien Representative, to the extent that it is legally permitted to do so, all Collateral, including all Proceeds thereof, held or controlled by such Junior Lien Representative or any of its agents or bailees, including the transfer of possession and control, as applicable, of the Pledged or Controlled Collateral, together with any necessary endorsements and notices to depositary banks, securities intermediaries and commodities intermediaries, and assign to such new Senior Lien Representative, to the extent that it is legally permitted to do so, its rights under any landlord waiver or bailee's letter or any similar agreement or arrangement granting it rights or access to Collateral.

SECTION 5.07     Purchase Right.  Without prejudice to the enforcement of the Senior Lien Secured Parties' remedies, the Senior Lien Secured Parties agree that at any time following (a) the acceleration of the Senior Obligations in accordance with the terms of the applicable Senior Lien Debt Documents or (b) the commencement of an Insolvency or Liquidation Proceeding (each, a "Purchase Event"), within thirty (30) days after the date on which a Purchase Event occurs, one or more of the Junior Lien Secured Parties may request, and the Senior Lien Secured Parties hereby offer the Junior Lien Secured Parties the option, to purchase all, but not less than all, of the aggregate amount of Senior Obligations outstanding at the time of purchase at par, plus any then accrued and unpaid interest, fees, and expenses plus any applicable call or redemption premium payable upon any voluntary redemption thereof, without warranty or representation or recourse (except for representations and warranties required to be made by assigning lenders pursuant to a customary Assignment and Assumption).  If such right is exercised, the parties shall endeavor to close promptly thereafter but in any event within ten (10) Business Days of the request.  If one or more of the Junior Lien Secured Parties exercises such purchase right, it shall be exercised pursuant to documentation mutually acceptable to each of the Senior Lien Representatives and the Junior Lien Representative.  If none of the Junior Lien Secured Parties timely exercises such right, the Senior Lien Secured Parties shall have no further obligations pursuant to this Section 5.07 for such Purchase Event and may take any further actions in their sole discretion in accordance with the Senior Lien Debt Documents and this Agreement.

ARTICLE VI

Insolvency or Liquidation Proceedings.

SECTION 6.01     Financing and Sale Issues.  Until the Discharge of Senior Lien Obligations has occurred, if the Grantor shall be subject to any Insolvency or Liquidation Proceeding and the Designated Senior Lien Representative shall desire to consent (or not object) to the sale, use or lease of cash or other collateral under Section 363 of the Bankruptcy Code or any other similar provision of any other Bankruptcy Law, or to consent (or not object) to the Grantor's obtaining financing under Section 364 of the Bankruptcy Code or any other similar provision of any other Bankruptcy Law ("DIP Financing"), then the Junior Lien Representative, for itself and on behalf of each other applicable Junior Lien Secured Party, agrees that (a) it will raise no objection to and will not otherwise contest directly or indirectly any such sale, use or lease of such cash or other collateral or DIP Financing (or support, directly or indirectly, any such objection or contest), including any proposed orders for such collateral use and/or DIP Financing which are acceptable to the Designated Senior Lien Representative, unless any of the Senior Lien Representatives or any of the other Senior Lien Secured Parties shall oppose or object to such sale, use or lease of cash or other collateral and/or such DIP Financing (in which case neither any Junior

20

2471

DG-352

Lien Representative nor any other Junior Lien Secured Party shall seek any relief in connection with any of the foregoing that is inconsistent with the relief being sought by such Senior Lien Secured Parties); and (1) except to the extent permitted by Section 6.03, it will not request adequate protection or any other relief in connection therewith or otherwise in such Insolvency or Liquidation Proceeding and (2) to the extent the Liens securing any Senior Lien Obligations are subordinated to or pari passu with the Liens securing such DIP Financing or the Senior Lien Obligations are "rolled-up" (or are deemed to have been "rolled up") into such DIP Financing, it will subordinate (and will be deemed hereunder to have subordinated) its Liens in the Collateral to (x) the Liens securing such DIP Financing (and all obligations relating thereto) on the same basis as the Liens on the Junior Lien Collateral securing the Junior Lien Obligations are so subordinated to the Liens on the Senior Lien Collateral securing the Senior Lien Obligations under this Agreement, (y) any adequate protection Liens granted to the Senior Lien Secured Parties, and (z) to any reasonable "carve-out" for professional fees and costs, United States Trustee fees and costs and other customary fees and costs agreed to by the Designated Senior Lien Representative. The Junior Lien Representative, for itself and on behalf of each Junior Lien Secured Party, further agrees that, until the Discharge of Senior Obligations has occurred: (a) it will raise no objection to and will not otherwise contest directly or indirectly any motion for relief from the automatic stay or from any injunction against foreclosure or enforcement in respect of Senior Lien Obligations made by any Senior Lien Representative or any other Senior Lien Secured Party; (b) it will raise no objection to and will not otherwise contest directly or indirectly any lawful exercise by any Senior Lien Secured Party of the right to credit bid Senior Lien Obligations at any sale or other disposition of Senior Lien Collateral under Section 363(k), Section 1129 or any other applicable provision of the Bankruptcy Code (or any other Bankruptcy Law or other applicable law); (c) it will raise no objection to and will not otherwise contest directly or indirectly any other request for judicial relief made in any court by any Senior Lien Secured Party relating to the lawful enforcement of any Lien on Senior Lien Collateral; (d) it will raise no objection to and will not otherwise contest directly or indirectly, or seek consultation or consent rights in connection with any sale or other disposition of Collateral to which the Designated Senior Lien Representative has consented or not objected pursuant to Section 363(f) of the Bankruptcy Code (or any similar provision under any other Bankruptcy Law), and will be deemed to have consented to any such sale or disposition of Collateral to which such Senior Lien Representative has consented or not objected and any order approving or relating to such sale or other disposition (including, without limitation, orders to retain professionals or establish bid and other sale procedures in connection with such sale or other disposition), that provides, to the extent such sale or other disposition is to be free and clear of Liens, that the Liens securing the Senior Lien Obligations and the Junior Lien Obligations will attach to the proceeds of the sale on the same basis of priority as the Liens on the Collateral securing the Senior Lien Obligations rank to the Liens on the Collateral securing the Junior Lien Obligations pursuant to this Agreement; provided that the net cash proceeds of any such sale or other disposition are applied to the permanent reduction of the Senior Lien Obligations in accordance with Section 4.01; and (e) it will not propose or provide any post-petition financing to the Grantor without the prior written consent of the Designated Senior Lien Representative. The Junior Lien Representative, for itself and on behalf of each other applicable Junior Lien Secured Party, agrees that notice received two (2) Business Days prior to the entry of an order approving any such sale or disposition, or any such use or lease of cash or other collateral, in each case as described above, or any DIP financing, shall, in each case, be adequate notice thereof.

21

2472

DG-353

SECTION 6.02   <u>Relief from the Automatic Stay</u>.  Until the Discharge of Senior Lien Obligations has occurred, the Junior Lien Representative, for itself and on behalf of each applicable Junior Lien Secured Party, agrees that none of them shall seek relief from the automatic stay or any other stay in any Insolvency or Liquidation Proceeding or take any action in derogation thereof, in each case in respect of any Collateral, without the prior written consent of the Designated Senior Lien Representative.

SECTION 6.03   <u>Adequate Protection</u>.  The Junior Lien Representative, for itself and on behalf of each applicable Junior Lien Secured Party, agrees that none of them shall (A) object, contest or support any other Person objecting to or contesting (a) any request by any Senior Lien Representative or any Senior Lien Secured Parties for any adequate protection, (b) any objection by any Senior Lien Representative or any Senior Lien Secured Parties to any motion, relief, action or proceeding based on such Senior Lien Representative's or Senior Lien Secured Party's claiming a lack of adequate protection or (c) the payment of interest (including post-petition interest), fees, expenses or other amounts of or to any Senior Lien Representative or any other Senior Lien Secured Party (or any of their advisors, as applicable) under Section 506(b) of the Bankruptcy Code or any similar provision of any other Bankruptcy Law or (B) assert or support any claim for costs or expenses of preserving or disposing of any Collateral under Section 506(c) of the Bankruptcy Code or any similar provision of any other Bankruptcy Law. Without limiting the generality of the foregoing, in any Insolvency or Liquidation Proceeding, (i) if the Senior Lien Secured Parties (or any subset thereof) are granted adequate protection in the form of a Lien on additional or replacement collateral in connection with any DIP Financing or use of cash collateral under Section 363 or 364 of the Bankruptcy Code or any similar provision of any other Bankruptcy Law, then the Junior Lien Representative, for itself and on behalf of each applicable Junior Lien Secured Party, may seek or request adequate protection in the form of a Lien on such additional or replacement collateral, which Lien is subordinated to the Liens securing all Senior Lien Obligations and such DIP Financing (and all obligations relating thereto) on the same basis as the other Liens securing the Junior Lien Obligations are so subordinated to the Liens securing the Senior Lien Obligations under this Agreement, (ii) in the event any Junior Lien Representative, for itself and on behalf of the applicable Junior Lien Secured Parties, seeks or requests adequate protection in the form of a Lien on additional or replacement collateral and such adequate protection is granted (in each instance, to the extent such grant is otherwise permissible under the terms and conditions of this Agreement), then the Junior Lien Representative, for itself and on behalf of each applicable Junior Lien Secured Party, agrees that each Senior Lien Representative shall also be granted a Senior Priority Lien on such additional or replacement collateral as security for the Senior Lien Obligations and any such DIP Financing and that any Lien on such additional or replacement collateral securing the Junior Lien Obligations shall be subordinated to the Liens on such collateral securing the Senior Lien Obligations and any such DIP Financing (and all obligations relating thereto) and any other Liens granted to the Senior Lien Secured Parties as adequate protection on the same basis as the other Liens securing the Junior Lien Obligations are so subordinated to such Liens securing the Senior Lien Obligations under this Agreement (and, to the extent the Senior Lien Secured Parties are not granted such adequate protection in such form, any amounts recovered by or distributed to any Junior Lien Secured Party pursuant to or as a result of any Lien on such additional or replacement collateral so granted to the Junior Lien Secured Parties shall be subject to Article IV), and (iii) in the event any Senior Lien Representative, for itself and on behalf of the applicable Senior Lien Secured Parties, seeks or requests adequate protection in the form of a superpriority claim, and such adequate protection is granted, then the

22

DG-354

Junior Lien Representative, for itself and on behalf of each applicable Junior Lien Secured Party, may, with such Senior Lien Representative's consent, request adequate protection in the form of a superpriority claim, which superpriority claim shall be junior to the superpriority claim of the Senior Lien Secured Parties.  Except to the extent expressly set forth in this Section 6.03, no Junior Lien Representative or other Junior Lien Secured Parties may seek or shall be entitled to request or receive adequate protection (including adequate protection in the form of a cash payment, periodic cash payments, cash payments of interest, additional collateral or otherwise) without the prior written consent of the Designated Senior Lien Representative.

SECTION 6.04   Preference Issues.  If any Senior Lien Secured Party is required in any Insolvency or Liquidation Proceeding or otherwise to disgorge, turn over or otherwise pay any amount to the estate of the Grantor (or any trustee, receiver or similar Person therefor), because the payment of such amount, whether received as proceeds of security, enforcement of any right of setoff or otherwise, was declared to be fraudulent or preferential in any respect or for any other reason (any such amount, a "Recovery"),  then the Senior Lien Obligations shall be reinstated to the extent of such Recovery and deemed to be outstanding as if such payment had not occurred and the Senior Lien Secured Parties shall be entitled to the benefits of this Agreement until a Discharge of Senior Lien Obligations with respect to all such recovered amounts. If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto. The Junior Lien Representative, for itself and on behalf of each applicable Junior Lien Secured Party, hereby agrees that none of them shall be entitled to benefit from any avoidance action affecting or otherwise relating to any distribution or allocation made in accordance with this Agreement, whether by preference or otherwise, it being understood and agreed that the benefit of such avoidance action otherwise allocable to them shall instead be allocated and turned over for application in accordance with the priorities set forth in this Agreement.

SECTION 6.05   Separate Grants of Security and Separate Classifications.  The Junior Lien Representative, for itself and on behalf of each applicable Junior Lien Secured Party, acknowledges and agrees that (a) the grants of Liens pursuant to the Senior Lien Collateral Documents and the Junior Lien Collateral Documents constitute separate and distinct grants of Liens and (b) because of, among other things, their differing rights in the Collateral, the Junior Lien Obligations are fundamentally different from the Senior Lien Obligations and must be separately classified in any plan of reorganization or plan of liquidation proposed, confirmed or adopted in an Insolvency or Liquidation Proceeding. To further effectuate the intent of the parties as provided in the immediately preceding sentence, if it is held that any claims of the Senior Lien Secured Parties and the Junior Lien Secured Parties in respect of the Collateral constitute a single class of claims (rather than separate classes of senior and junior secured claims), then the Junior Lien Representative, for itself and on behalf of each applicable Junior Lien Secured Party, hereby acknowledges and agrees that all distributions from the Collateral shall be made as if there were separate classes of senior and junior secured claims against the Grantor in respect of the Collateral (with the effect being that, to the extent that the aggregate value of the Collateral is sufficient (for this purpose ignoring all claims held by the Junior Lien Secured Parties), the Senior Lien Secured Parties shall be entitled to receive, in addition to amounts distributed to them in respect of principal, pre-petition interest, fees, expenses and other claims, all amounts owing in respect of post-petition interest, fees and expenses (whether or not allowed or allowable under Section 506(b) of the

23

2474

Bankruptcy Code (or any similar provision of any other Bankruptcy Law) or otherwise in such Insolvency or Liquidation Proceeding) before any distribution from the Collateral is made in respect of the Junior Lien Obligations, and the Junior Lien Representative, for itself and on behalf of each applicable Junior Lien Secured Party, hereby acknowledges and agrees to turn over to the Designated Senior Lien Representative amounts otherwise received or receivable by them from the Collateral to the extent necessary to effectuate the intent of this sentence, even if such turnover has the effect of reducing the claim or recovery of the Junior Lien Secured Parties).

SECTION 6.06   No Waivers of Rights of Senior Lien Secured Parties.  Nothing contained herein shall, except as expressly provided herein, prohibit or in any way limit any Senior Lien Representative or any other Senior Lien Secured Party from objecting in any Insolvency or Liquidation Proceeding or otherwise to any action taken by any Junior Lien Secured Party, including the seeking by any Junior Lien Secured Party of adequate protection or the assertion by any Junior Lien Secured Party of any of its rights and remedies under the Junior Lien Debt Documents or otherwise.

SECTION 6.07   Application.   This Agreement, which the parties hereto expressly acknowledge is a "subordination agreement" under Section 510(a) of the Bankruptcy Code or any similar provision of any other Bankruptcy Law, shall be effective before, during and after the commencement of any Insolvency or Liquidation Proceeding. The relative rights as to the Collateral and Proceeds thereof shall continue after the commencement of any Insolvency or Liquidation Proceeding on the same basis as prior to the date of the petition therefor. All references herein to the Grantor shall include the Grantor as a debtor-in-possession and any receiver or trustee for the Grantor.

SECTION 6.08   Other Matters.  To the extent that any Junior Lien Representative or any Junior Lien Secured Party has or acquires rights under Section 363 or Section 364 of the Bankruptcy Code or any similar provision of any other Bankruptcy Law with respect to any of the Collateral, then, except as otherwise permitted herein, the Junior Lien Representative, on behalf of itself and each applicable Junior Lien Secured Party agrees not to assert any such rights without the prior written consent of each Senior Lien Representative; provided that if requested by any Senior Lien Representative, such Junior Lien Representative shall timely exercise such rights in the manner requested by the Senior Lien Representatives, including any rights to payments in respect of such rights.

SECTION 6.09   506(c) Claims.  Until the Discharge of Senior Lien Obligations has occurred, the Junior Lien Representative, on behalf of itself and each applicable Junior Lien Secured Party, agrees that it will not assert or enforce any claim under Section 506(c) of the Bankruptcy Code or any similar provision of any other Bankruptcy Law senior to or on a parity with the Liens securing the Senior Lien Obligations for costs or expenses of preserving or disposing of any Collateral.

SECTION 6.10   Reorganization Securities; Voting.

(a)   If, in any Insolvency or Liquidation Proceeding, debt obligations of the reorganized debtor secured by Liens upon any property of the reorganized debtor are distributed, pursuant to a plan of reorganization or plan of liquidation proposed, confirmed or adopted in an

Insolvency or Liquidation Proceeding, on account of both the Senior Lien Obligations and the Junior Lien Obligations, then, to the extent the debt obligations distributed on account of the Senior Lien Obligations and on account of the Junior Lien Obligations are secured by Liens upon the same assets or property, the provisions of this Agreement will survive the distribution of such debt obligations pursuant to such plan and will apply with like effect to the Liens securing such debt obligations.

(b)      No Junior Lien Secured Party (whether in the capacity of a secured creditor or an unsecured creditor) shall propose, vote in favor of, or otherwise directly or indirectly support any plan of reorganization or plan of liquidation that does not provide for the payment in full in cash of the Senior Lien Obligations on the effective date thereof, or that treats the Senior Lien Secured Parties or the Senior Lien Obligations in a manner that is inconsistent with the terms of this Agreement, in each case, other than to the extent any such plan is supported by each Senior Lien Representative.

ARTICLE VII

Reliance; Etc.

SECTION 7.01      Reliance.   All loans and other extensions of credit made or deemed made prior to, on and after the date hereof by the Senior Lien Secured Parties to the Grantor shall be deemed to have been given and made in reliance upon this Agreement. The Junior Lien Representative, on behalf of itself and each applicable Junior Lien Secured Party, acknowledges that it and such Junior Lien Secured Parties have, independently and without reliance on any Senior Lien Representative or other Senior Lien Secured Party, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into the Junior Lien Debt Documents to which they are party or by which they are bound, this Agreement and the transactions contemplated hereby and thereby, and they will continue to make their own credit decisions in taking or not taking any action under the Junior Lien Debt Documents or this Agreement.

SECTION 7.02      No Warranties or Liability.   The Junior Lien Representative, on behalf of itself and each applicable Junior Lien Secured Party, acknowledges and agrees that neither any Senior Lien Representative nor any other Senior Lien Secured Party has made any express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectability or enforceability of any of the Senior Lien Debt Documents, the ownership of any Collateral or the perfection or priority of any Liens thereon. The Senior Lien Secured Parties will be entitled to manage and supervise their respective loans and extensions of credit under the Senior Lien Debt Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate, and the Senior Lien Secured Parties may manage their loans and extensions of credit without regard to any rights or interests that the Junior Lien Representative and the Junior Lien Secured Parties have in the Collateral or otherwise, except as otherwise provided in this Agreement. Neither any Senior Lien Representative nor any other Senior Lien Secured Party shall have any duty to any Junior Lien Representative or any Junior Lien Secured Party to act or refrain from acting in a manner that allows, or results in, the occurrence or continuance of an event of default or default under any agreement with the Grantor (including the Junior Lien Debt Documents), regardless of any knowledge thereof that they may

25

DG-357

have or be charged with. Except as expressly set forth in this Agreement, the Senior Lien Representatives, the Senior Lien Secured Parties, the Junior Lien Representative and the Junior Lien Secured Parties have not otherwise made to each other, nor do they hereby make to each other, any warranties, express or implied, nor do they assume any liability to each other with respect to (a) the enforceability, validity, value or collectability of any of the Senior Lien Obligations, the Junior Lien Obligations or any guarantee or security which may have been granted to any of them in connection therewith, (b) the Grantor's title to or right to transfer any of the Collateral or (c) any other matter except as expressly set forth in this Agreement.

SECTION 7.03    Obligations Unconditional.  All rights, interests, agreements and obligations of the Senior Lien Representatives, the Senior Lien Secured Parties, the Junior Lien Representative and the Junior Lien Secured Parties hereunder shall remain in full force and effect irrespective of:

(a)    any lack of validity or enforceability of any Senior Lien Debt Document or any Junior Lien Debt Document, and notwithstanding the date, time, manner or order of filing or recordation of any document or instrument relating to the Senior Priority Liens or the Junior Priority Liens, or grant, attachment or perfection of any Senior Priority Liens or any Junior Priority Liens, and whether or not such Senior Priority Liens or Junior Priority Liens are subordinated to any other Liens or are otherwise subordinated, voided or invalidated or have lapsed;

(b)    any change in the time, manner or place of payment of, or in any other terms of, all or any of the Senior Lien Obligations or Junior Lien Obligations, or any amendment or waiver or other modification, including any increase in the amount thereof, whether by course of conduct or otherwise, of the terms of the Senior Lien Debt Agreement or any other Senior Lien Debt Document or of the terms of the Junior Lien Debt Agreement or any other Junior Lien Debt Document;

(c)    any exchange of any security interest in any Collateral or any other collateral or any amendment, waiver or other modification, whether in writing or by course of conduct or otherwise, of all or any of the Senior Lien Obligations or Junior Lien Obligations or any guarantee thereof;

(d)    the commencement of any Insolvency or Liquidation Proceeding in respect of the Grantor; or

(e)    any other circumstances that otherwise might constitute a defense available to, or a discharge of, (i) the Grantor in respect of the Senior Lien Obligations (other than the Discharge of Senior Lien Obligations subject to Section 5.06 and 6.04 hereof) or (ii) any Junior Lien Representative or Junior Lien Secured Party in respect of this Agreement.

ARTICLE VIII

Miscellaneous

SECTION 8.01    Conflicts.  In the event of any conflict or inconsistency between any of the provisions of this Agreement, on the one hand, and any provision of (a) the Common Representative First Lien Pledge Agreement, the Common Representative Second Lien Pledge

26

DG-358

Agreement, any Senior Lien Debt Document or any Junior Lien Debt Document (as the case may be), on the other hand, the provisions of this Agreement shall govern and control.  Notwithstanding anything herein to the contrary, the relative rights and obligations of the Senior Lien Secured Parties (solely as amongst themselves) with respect to any Collateral securing the Senior Lien Obligations shall be governed by the terms of the Senior Lien Intercreditor Agreement and in the event of any conflict between the Senior Lien Intercreditor Agreement and this Agreement with respect to such rights and obligations, the provisions of the Senior Lien Intercreditor Agreement shall control. Notwithstanding anything herein to the contrary, the relative rights and obligations of the Junior Lien Secured Parties (solely as amongst themselves) with respect to any Collateral securing the Junior Lien Obligations shall be governed by the terms of this Agreement and in the event of any conflict between the Senior Lien Intercreditor Agreement and this Agreement with respect to such rights and obligations, the provisions of this Agreement shall control.

SECTION 8.02    Continuing Nature of this Agreement; Severability.  Subject to Section 6.04, this Agreement shall continue to be effective until the Discharge of Senior Lien Obligations shall have occurred. This is a continuing agreement of Lien subordination, and the Senior Lien Secured Parties may continue, at any time and without notice to any Junior Lien Representative or any Junior Lien Secured Party, to extend credit and other financial accommodations and lend monies to or for the benefit of the Grantor constituting Senior Lien Obligations in reliance hereon. The terms of this Agreement shall survive and continue in full force and effect in any Insolvency or Liquidation Proceeding. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 8.03    Amendments; Waivers.

(a)    No failure or delay on the part of any party hereto in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the parties hereto are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or consent to any departure by any party therefrom shall in any event be effective unless the same shall be in writing and permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice or demand on any party hereto in any case shall entitle such party to any other or further notice or demand in similar or other circumstances.

(b)    This Agreement may be amended in writing signed by each Representative (in each case, acting in accordance with the documents governing the applicable Debt Facility); provided that any such amendment, restatement, supplement, modification or waiver which by the terms of this Agreement requires the Grantor's consent or which increases the obligations or reduces the rights of, or otherwise affects the rights or duties of the Grantor or any amendment,

27

2478

DG-359

restatement, supplement, modification or waiver to the terms of <u>Section 8.17</u> of this Agreement shall require the consent of the Grantor. Any such amendment, restatement, supplement, modification or waiver shall be in writing and shall be binding upon the Senior Lien Secured Parties, the Junior Lien Secured Parties, their respective permitted successors and permitted assigns and the Grantor.

SECTION 8.04   <u>Information Concerning Financial Condition of the Grantor and Its Subsidiaries</u>.  The Senior Lien Representatives, the Senior Lien Secured Parties, the Junior Lien Representative and the Junior Lien Secured Parties shall each be responsible for keeping themselves informed of (a) the financial condition of the Grantor and its Subsidiaries and all endorsers or guarantors of the Senior Lien Obligations or the Junior Lien Obligations and (b) all other circumstances bearing upon the risk of nonpayment of the Senior Lien Obligations or the Junior Lien Obligations. The Senior Lien Representatives, the Senior Lien Secured Parties, the Junior Lien Representative and the Junior Lien Secured Parties shall have no duty to advise any other party hereunder of information known to it or them regarding such condition or any such circumstances or otherwise. In the event that any Senior Lien Representative, any Senior Lien Secured Party, any Junior Lien Representative or any Junior Lien Secured Party, in its sole discretion, undertakes at any time or from time to time to provide any such information to any other party, it shall be under no obligation to (i) make, and the Senior Lien Representatives, the Senior Lien Secured Parties, the Junior Lien Representative and the Junior Lien Secured Parties shall not make or be deemed to have made, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of any such information so provided, (ii) provide any additional information or to provide any such information on any subsequent occasion, (iii) undertake any investigation or (iv) disclose any information that, pursuant to accepted or reasonable commercial finance practices, such party wishes to maintain confidential or is otherwise required to maintain confidential.

SECTION 8.05   <u>Subrogation</u>.  The Junior Lien Representative, on behalf of itself and each applicable Junior Lien Secured Party, hereby waives any rights of subrogation it may acquire as a result of any payment hereunder until the Discharge of Senior Lien Obligations has occurred.

SECTION 8.06   <u>Application of Payments</u>.  Except as otherwise provided herein, all payments received by the Senior Lien Secured Parties may be applied, reversed and reapplied, in whole or in part, to such part of the Senior Lien Obligations as the Senior Lien Secured Parties, in their sole discretion, deem appropriate, consistent with the terms of the Senior Lien Debt Documents. Except as otherwise provided herein, the Junior Lien Representative, on behalf of itself and each applicable Junior Lien Secured Party, assents to any such extension or postponement of the time of payment of the Senior Lien Obligations or any part thereof and to any other indulgence with respect thereto, to any substitution, exchange or release of any security that may at any time secure any part of the Senior Lien Obligations and to the addition or release of any other Person primarily or secondarily liable therefor.

SECTION 8.07   [<u>Reserved</u>].

SECTION 8.08   <u>Dealings with Grantor</u>.  Upon any application or demand by the Grantor to any Representative to take or permit any action under any of the provisions of this

<div align="center">28</div>

<div align="center">2479</div>

<div align="right">DG-360</div>

Agreement or under any Collateral Document (if such action is subject to the provisions hereof), at the reasonable request of such Representative, the Grantor, as appropriate, shall furnish to such Representative a certificate of an Authorized Officer (an "Officer's Certificate") stating that all conditions precedent, if any, provided for in this Agreement or such Collateral Document, as the case may be, relating to the proposed action have been complied with, except that in the case of any such application or demand as to which the furnishing of such documents is specifically required by any provision of this Agreement or any Collateral Document relating to such particular application or demand, no additional certificate or opinion need be furnished.

SECTION 8.09   Consent to Jurisdiction; Waivers.   Each Representative, on behalf of itself and the Secured Parties of the Debt Facility for which it is acting, irrevocably and unconditionally:

(a)   submits for itself and its property in any legal action or proceeding relating to this Agreement and the Collateral Documents, or for recognition and enforcement of any judgment in respect thereof, to the exclusive jurisdiction of the courts of the State of New York sitting in New York City in the borough of Manhattan, the courts of the United States District Court of the Southern District of New York, and appellate courts from any thereof;

(b)   consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same and agrees not to commence or support any such action or proceeding in any other jurisdiction;

(c)   agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Person (or its Representative) at the address referred to in Section 8.10;

(d)   agrees that nothing herein shall affect the right of any other party hereto (or any Secured Party) to effect service of process in any other manner permitted by law; and

(e)   waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section 8.09 any special, exemplary, punitive or consequential damages.

SECTION 8.10   Notices.   All notices, requests, demands and other communications provided for or permitted hereunder shall be in writing and shall be sent:

if to the Grantor, to the Grantor, at its address at:

C/o New Fortress Energy Inc.
111 W. 19th Street, 8th Floor
New York, NY 10011
Attention:  Christopher S. Guinta – Chief Financial Offer
Telephone:  516-268-7406

DG-361

Email:  cguinta@newfortressenergy.com

with a copy to (which shall not constitute notice):

Skadden, Arps, Slate, Meagher & Flom LLP
Attention: Seth E. Jacobson
320 S. Canal St.
Chicago, IL 60606
Telephone: (312) 409-0889
Email:  seth.jacobson@skadden.com

if to the Senior Notes Collateral Trustee, to it at:

Wilmington Savings Fund Society, FSB
500 Delaware Avenue, 11th Floor
Wilmington, DE 19801
Telephone: (302) 888-7580; (302) 888-7420
Telecopy: 302-421-9137
Email: rgoldsborough@wsfsbank.com; PHealy@wsfsbank.com

with a copy to:

McDermott Will & Emery LLP
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: 212.547.5691
Email: jlevine@mwe.com

if to the Common Representative First Lien Pledge and Security Agreement, to it at:

HQA – Post Boarding Regional Support
Corporate Banking Middle Office
MUFG Bank, Ltd.
1251 Avenue of the Americas, 12th Fl.
New York, NY 10020
T: (212) 782-5753
Email: ttsodikovich@us.mufg.jp

with a copy to:

Sidley Austin LLP
1000 Louisiana Street
Suite 5900
Houston, TX 77002
T: (713) 495-4517
Attention: Brian Minyard and Matthew Walker
Email: bminyard@sidley.com and matthew.walker@sidley.com

30

DG-362

if to the RCF Collateral Agent, to it at:

    HQA – Post Boarding Regional Support
    Corporate Banking Middle Office
    MUFG Bank, Ltd.
    1251 Avenue of the Americas, 12th Fl.
    New York, NY 10020
    T: (212) 782-5753
    Email: ttsodikovich@us.mufg.jp

if to the LC Collateral Agent, to it at:

    Natixis, New York Branch
    1251 Avenue of the Americas, 5th Floor
    New York, NY 10020
    Tel: (212) 872-5051
    Attention: Admin. Agency
    Email: adminagency@natixis.com

with a copy to (which shall not constitute notice):

    Steptoe LLP
    Attention: Philip Corsello
    1114 Avenue of the Americas
    New York, NY 10036
    Telephone: (212) 378-7693
    Email: pcorsello@steptoe.com

if to the TLA Collateral Agent, to it at:

    Morgan Stanley Senior Funding, Inc.
    1300 Thames Street, 4th Floor
    Thames Street Wharf
    Baltimore, MD 21231
    Email: docs4loans@morganstanley.com

with a copy to:

    Cahill Gordon & Reindel LLP
    Attention: Ariel Goldman and Matthew Rosenthal
    32 Old Slip
    New York, NY 10005
    Telephone: (212) 701-3398; (212) 701-3832;
    Email: agoldman@cahill.com; mrosenthal@cahill.com

Unless otherwise specifically provided herein, all notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been

31

2482

DG-363

given on the date of receipt if delivered by hand or overnight courier service or sent by fax or on the date five Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section 8.10 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 8.10. Notices and other communications may also be delivered by email to the email address of a representative of the applicable Person provided from time to time by such Person.

SECTION 8.11    Further Assurances.  Each Senior Lien Representative, on behalf of itself and each applicable Senior Lien Secured Party, agrees that it will take such further action and shall execute and deliver such additional documents and instruments (in recordable form, if requested) as the Junior Lien Representative may reasonably request to effectuate the terms of, and the Lien priorities contemplated by, this Agreement. The Junior Lien Representative, on behalf of itself and each applicable Junior Lien Secured Party, agrees that it will take such further action and shall execute and deliver such additional documents and instruments (in recordable form, if requested) as the Senior Lien Representatives may reasonably request to effectuate the terms of, and the Lien priorities contemplated by, this Agreement.

SECTION 8.12    **GOVERNING LAW; WAIVER OF JURY TRIAL**.

**(A)    THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.**

**(B)    EACH    PARTY    HERETO    HEREBY    IRREVOCABLY    AND UNCONDITIONALLY   WAIVES   TRIAL   BY   JURY   IN   ANY   LEGAL   ACTION   OR PROCEEDING RELATING TO THIS AGREEMENT AND FOR ANY COUNTERCLAIM THEREIN.**

SECTION 8.13    Binding on Successors and Assigns.  This Agreement shall be binding upon the Senior Lien Representatives, the Senior Lien Secured Parties, the Junior Lien Representative, the Junior Lien Secured Parties, the Grantor and each of their respective permitted successors and permitted assigns.

SECTION 8.14    Section Titles.  The section titles contained in this Agreement are and shall be without substantive meaning or content of any kind whatsoever and are not a part of this Agreement.

SECTION 8.15    Counterparts.  This Agreement may be executed in one or more counterparts, including by means of facsimile or other electronic method, each of which shall be an original and all of which shall together constitute one and the same document. Delivery of an executed signature page to this Agreement by facsimile or other electronic transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.

SECTION 8.16    Authorization.  By its signature, each Person executing this Agreement on behalf of a party hereto represents and warrants to the other parties hereto that it is duly authorized to execute this Agreement.

SECTION 8.17    No Third Party Beneficiaries; Successors and Assigns.  The Lien priorities set forth in this Agreement and the rights and benefits hereunder in respect of such Lien

DG-364

priorities shall inure solely to the benefit of the Senior Lien Representatives, the Senior Lien Secured Parties, the Junior Lien Representative and the Junior Lien Secured Parties, and their respective permitted successors and permitted assigns, and no other Person (including the Grantor, or any trustee, receiver, debtor in possession or bankruptcy estate in a bankruptcy or like proceeding) shall have or be entitled to assert such rights; provided, however, that the Grantor will be entitled to assert such rights with respect to Sections 2.02, 5.01(a), 5.01(c), 5.05(f), 6.07, 8.03(b), 8.08, 8.09, 8.10, 8.12, 8.13 and 8.17. The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the Senior Lien Secured Parties, on the one hand, and the Junior Lien Secured Parties, on the other hand. Nothing in this Agreement is intended to or shall impair the obligations of the Grantor, to pay the Senior Lien Obligations and the Junior Lien Obligations as and when the same shall become due and payable in accordance with their terms.  Nothing in this Agreement shall require the Grantor to provide any security interest in the assets or properties of the Grantor that constitute "Excluded Property" or a similar term or concept under any applicable Collateral Document.

SECTION 8.18   Effectiveness.  This Agreement shall become effective when executed and delivered by the parties hereto; provided, that notwithstanding anything to the contrary set forth in this Agreement, solely with respect to the Senior Common Collateral Agent, this Agreement shall not become effective until the execution of the Common Representative First Lien Pledge and Security Agreement.

SECTION 8.19   Collateral Trustee and Representative.  It is understood and agreed that (a) the Senior Notes Collateral Trustee is entering into this Agreement in its capacity as notes collateral agent under the Senior Notes Indenture, and any other indemnifications, waivers, or disclaimers for the benefit of the Senior Notes Collateral Trustee and the other agents contained therein, shall also apply to the Senior Notes Collateral Trustee hereunder, (b) the Senior Common Collateral Agent is entering into this Agreement in its capacity as common representative under the Common Representative First Lien Pledge and Security Agreement, and any other indemnifications, waivers, or disclaimers for the benefit of the Senior Common Collateral Agent and the other agents contained therein, shall also apply to the Senior Common Collateral Agent hereunder and (c) the Junior Common Collateral Agent is entering into this Agreement in its capacity as common representative under the Common Representative Second Lien Pledge Agreement, and any other indemnifications, waivers, or disclaimers for the benefit of the Junior Common Collateral Agent and the other agents contained therein, shall also apply to the Junior Common Agent hereunder.

SECTION 8.20   Survival of Agreement.   All covenants, agreements, representations and warranties made by any party in this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement.

[Remainder of page intentionally left blank]

2484

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

Wilmington Savings Fund Society, FSB, as
Senior Notes Collateral Trustee

By: _____
     Name:
     Title:

MUFG Bank, Ltd., as Senior Common Collateral
Agent and Junior Common Collateral Agent

By: _____
     Name:
     Title:

2485

## <u>CONSENT</u>

The undersigned hereby (a) acknowledge and consent to the terms of the Intercreditor Agreement, dated as of November 22, 2024 (the "<u>Intercreditor Agreement</u>") among Wilmington Savings Fund Society, FSB, as Senior Notes Collateral Trustee and MUFG Bank Ltd, as Senior Common Collateral Agent and Junior Common Collateral Agent, as amended, supplemented, amended and restated or otherwise modified and in effect from time to time, for all purposes on the terms set forth therein, (b) agree to the terms of the Intercreditor Agreement applicable to the Grantor under the Intercreditor Agreement and (c) have caused this Consent to be executed by their respective officers or representatives as of the 22nd day of November, 2024.

GRANTOR:

NFE FINANCING LLC

By: _____

Name:

Title:

DG-367

**EXHIBIT F**

[FORM OF SUPPLEMENTAL INDENTURE
TO BE DELIVERED BY SUBSEQUENT GUARANTORS]

Supplemental Indenture (this "Supplemental Indenture"), dated as of [_____], by [_____] (the "Guaranteeing Subsidiary"), a subsidiary of the Issuer, and [__], as trustee (the "Trustee").

W I T N E S S E T H

WHEREAS, the Issuer, the Guarantors party thereto, the Trustee and the Notes Collateral Agent have heretofore executed and delivered an indenture, dated as of November 22, 2024 (as amended, supplemented, waived or otherwise modified, the "Indenture"), providing for the issuance of 12.000% Senior Secured Notes due 2029 (the "Notes");

WHEREAS, the Indenture provides that under certain circumstances the Guaranteeing Subsidiary shall execute and deliver to the Trustee a supplemental indenture pursuant to which the Guaranteeing Subsidiary shall unconditionally guarantee all of the Issuer's Obligations under the Notes and the Indenture on the terms and conditions set forth herein and under the Indenture (the "Note Guarantee");

WHEREAS, pursuant to Section 9.01 of the Indenture, the Trustee is authorized to execute and deliver this Supplemental Indenture to amend or supplement the Indenture without the consent of any Holder; and

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties mutually covenant and agree for the equal and ratable benefit of the Holders as follows:

(1)     Capitalized Terms. Capitalized terms used herein without definition shall have the meanings assigned such terms in the Indenture.

(2)     Guarantee. The Guaranteeing Subsidiary hereby agrees to provide an unconditional Note Guarantee on the terms and subject to the conditions set forth in the Indenture, including Article 10 thereof.

(3)     Execution and Delivery. The Guaranteeing Subsidiary agrees that the Note Guarantee shall remain in full force and effect notwithstanding the absence of the endorsement of any notation of such Note Guarantee on the Notes.

(4)     Governing Law. THIS SUPPLEMENTAL INDENTURE WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

(5)     Counterparts. The parties may sign any number of copies of this Supplemental Indenture. Each signed copy shall be an original, but all of them together represent the same agreement. The exchange of copies of this Supplemental Indenture and of signature pages by

2487

facsimile, PDF or other electronic transmission shall constitute effective execution and delivery of this Supplemental Indenture as to the parties hereto and may be used in lieu of the original Supplemental Indenture for all purposes. Signatures of the parties hereto transmitted by facsimile, PDF or other electronic transmission shall be deemed to be their original signatures for all purposes.

(6)      Effect of Headings. The Section headings herein are for convenience only and shall not affect the construction hereof.

(7)      Ratification Of Indenture; Supplemental Indentures Part of Indenture. Except as expressly amended hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect. This Supplemental Indenture shall form a part of the Indenture for all purposes, and every Holder heretofore or hereafter authenticated and delivered shall be bound hereby.

(8)      The Trustee. The Trustee shall not be responsible in any manner whatsoever for or in respect of the validity, sufficiency or adequacy of this Supplemental Indenture or for or in respect of the statements or recitals contained herein, all of which recitals are made solely by the Guaranteeing Subsidiary.

2488

DG-369

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed, all as of the date first above written.

[GUARANTEEING SUBSIDIARY]

By: _____
       Name:
       Title:

[__],
as Trustee

By: _____
       Name:
       Title:

2489

DG-370

# Tab 04

*Execution Version*

## FIRST SUPPLEMENTAL INDENTURE

First Supplemental Indenture (this "Supplemental Indenture"), dated as of April 3, 2026, among NFE Financing LLC, a Delaware limited liability company (the "Issuer"), Bradford County Real Estate Partners LLC, as guarantor (the "Guarantor") and Wilmington Savings Fund Society, FSB, as trustee (in such capacity, the "Trustee") and as notes collateral agent (in such capacity, the "Notes Collateral Agent") under the Indenture referred to below. Capitalized terms used but not defined herein shall have the meanings set forth in the Indenture (as defined below).

WITNESSETH

WHEREAS, each of the Issuer, the Guarantor, the Trustee and the Notes Collateral Agent have executed and delivered an indenture, dated as of November 22, 2024 (as amended, supplemented, waived or otherwise modified, the "Indenture"), providing for the issuance of 12.000% Senior Secured Notes due 2029 of the Issuer (the "Notes") and the guarantee of such Notes issued under the Indenture by the Guarantor (the "Note Guarantees");

WHEREAS, Section 9.02 of the Indenture provides that, subject to certain conditions, the Issuer, the Guarantor, the Trustee and the Notes Collateral Agent may amend or supplement the Indenture, the Notes, any Note Guarantee, the Equal Priority Intercreditor Agreement, any Junior Priority Intercreditor Agreement and the Security Documents with the consent of the holders of the Notes ("Holders") of at least a majority in aggregate principal amount of the then outstanding Notes (such consents, the "Required Consents");

WHEREAS, certain holders of the existing Notes have provided the Required Consents to enact certain proposed amendments to the Indenture set forth in Article I of this Supplemental Indenture (the "Amendments");

WHEREAS, the Issuer has satisfied all conditions precedent provided under the Indenture to enable the Issuer, the Guarantor, the Trustee and the Notes Collateral Agent to enter into this Supplemental Indenture; the execution and delivery of this Supplemental Indenture is authorized or permitted by the Indenture; and all other conditions and requirements necessary to make this Supplemental Indenture, when duly executed and delivered, a valid, binding and enforceable agreement against the Issuer and the Guarantor in accordance with its terms have been performed and fulfilled, and the Issuer has delivered to the Trustee simultaneously with the execution and delivery of this Supplemental Indenture an Officer's Certificate and an Opinion of Counsel relating to this Supplemental Indenture as contemplated by Sections 9.06 and 13.04 of the Indenture;

WHEREAS, the Indenture provides pursuant to Section 9.02 that the Trustee and the Notes Collateral Agent will join the Issuer and the Guarantor in the execution of any amended or supplemental indenture authorized pursuant to Section 9.02 of the Indenture if the amendment or supplement does not adversely affect the rights, duties, liabilities or immunities of the Trustee and the Notes Collateral Agent under the Indenture or otherwise; and

WHEREAS, the Issuer and the Guarantor have authorized and approved the execution and delivery of this Supplemental Indenture.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Issuer, the Guarantor, the Trustee and the Notes Collateral Agent mutually covenant and agree for the equal and ratable benefit of the Holders as follows:

## ARTICLE I

## CONSENTED AMENDMENTS

Section 1.1    Amendments to Certain Provisions of the Indenture.

(a)    Section 4.15(a) of the Indenture (*Additional Note Guarantees; Equity Interests*) is hereby amended and restated in its entirety to read as follows:

"Notwithstanding anything to the contrary set forth in this Indenture, no Note Party shall (other than any Subsidiary formed or acquired during a Suspension Period), (a) directly acquire or own any Equity Interests (other than, solely with respect to the Issuer, the Equity Interests of NFE Brazil Holdings Limited, Bradford County Real Estate Partners LLC and NFE Brazil Newco Limited) or (b) have any Subsidiaries (other than, solely with respect to the Issuer, Bradford County Real Estate Partners LLC and NFE Brazil Newco Limited)."

(b)    Section 4.18(a)(b)(4) of the Indenture (*Certain Undertakings Relating to Separateness*) is hereby amended and restated in its entirety to read as follows:

"make or permit to remain outstanding any loan or advance to, or own or acquire any stock or securities of, any Person, except that the Issuer may invest in those investments not prohibited under the Operating Agreement or hereunder, including investments in NFE Brazil Holdings Limited, Bradford County Real Estate Partners LLC and NFE Brazil Newco Limited, and may make any advance required or not prohibited to be made pursuant to any provisions of the Operating Agreement or hereunder and permit the same to remain outstanding in accordance with such provisions;"

(c)    Section 4.18(a)(b)(12) of the Indenture (*Certain Undertakings Relating to Separateness*) is hereby amended and restated in its entirety to read as follows:

"form, acquire, hold or own directly any equity interests (whether corporate, partnership, limited liability company or other) other than equity interests of NFE Brazil Holdings Limited, Bradford County Real Estate Partners LLC and NFE Brazil Newco Limited."

(d)    Section 12.07(b) (*Certain Limitations on Collateral*) is hereby amended and restated in its entirety to read as follows:

no later than 90 days after the Issue Date, each Note Party shall deliver a Collateral Agreement to the Notes Collateral Agent for each Deposit

2492

Account, securities account, and commodities account of each Note Party, in each case, in form and substance reasonably satisfactory to the Notes Collateral Agent. Notwithstanding anything to the contrary in this Agreement or any Security Document, at all times, each Deposit Account, securities account, and commodities account established and/or maintained by each Note Party must be subject to a Control Agreement except as otherwise agreed by the Notes Collateral Agent in its reasonable discretion; provided, that notwithstanding anything to the contrary in this subsection (b) or in any other section of this Indenture, in no event shall the NFE Brazil Newco Limited be obligated to deliver a Collateral Agreement, nor shall any Deposit Account, securities account or commodities account established and/or maintained by NFE Brazil Newco Limited be subject to a Control Agreement, where the balance of such account does not exceed $50,000;"

(e)    All references to Sections of the Indenture amended by this Supplemental Indenture shall be to such Sections as amended by this Supplemental Indenture.

## ARTICLE II

## **<u>MISCELLANEOUS</u>**

Section 2.1    <u>Effectiveness</u>.  This Supplemental Indenture shall become effective immediately upon its execution and delivery by the Issuer, the Trustee and the Notes Collateral Agent.

Section 2.2    <u>Ratification of Indenture; Supplemental Indenture Part of Indenture</u>. Except as expressly amended and supplemented hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect. This Supplemental Indenture shall form a part of the Indenture for all purposes, and every Holder heretofore or hereafter authenticated and delivered shall be bound hereby.

Section 2.3    <u>Governing Law</u>.  THIS SUPPLEMENTAL INDENTURE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW. EACH OF THE ISSUER, THE GUARANTOR AND THE TRUSTEE HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS SUPPLEMENTAL INDENTURE, THE INDENTURE, THE NOTES OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 2.4    <u>Severability</u>.  In case any provision in this Supplemental Indenture shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby and such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability.

DG-373

Section 2.5    <u>Trustee Makes No Representation</u>.    The Trustee makes no representation as to the validity or sufficiency of this Supplemental Indenture or for the recitals contained herein.

Section 2.6    <u>The Trustee</u>.    The Trustee shall not be responsible in any manner whatsoever for or in respect of the validity or sufficiency of this Supplemental Indenture or for or in respect of the recitals contained herein, all of which recitals are made solely by the Issuer and the Guarantor and the rights, protections and indemnities afforded the Trustee under the Indenture shall apply to any action (or inaction) of the Trustee hereunder or in connection herewith.    The Trustee is executing this Supplemental Indenture and performing hereunder solely in conclusive reliance on (i) the consents and direction of the consenting Holders who together constitute the Required Consents, (ii) the statements and representations of the Issuer hereunder and in the Officer's Certificate and (iii) the Opinion of Counsel being delivered in connection herewith.

Section 2.7    <u>Parties</u>.    Nothing expressed or mentioned herein is intended or shall be construed to give any Person, firm or corporation, other than the Holders and the Trustee, any legal or equitable right, remedy or claim under or in respect of this Supplemental Indenture or the Indenture or any provision herein or therein contained.

Section 2.8    <u>Further Assurances</u>.    The parties hereto will execute and deliver such further instruments and do such further acts and things as may be reasonably required to carry out the intent and purpose of this Supplemental Indenture and the Indenture.

Section 2.9    <u>Counterparts</u>.    The parties may sign any number of copies of this Supplemental Indenture. Each signed copy shall be an original, but all of them together represent the same agreement. The exchange of copies of this Supplemental Indenture and of signature pages by facsimile, PDF or other electronic transmission shall constitute effective execution and delivery of this Supplemental Indenture as to the parties hereto and may be used in lieu of the original Supplemental Indenture for all purposes. Signatures of the parties hereto transmitted by facsimile, PDF or other electronic transmission shall be deemed to be their original signatures for all purposes.

Section 2.10    <u>Effect of Headings</u>.    The headings of the Articles and the Sections in this Supplemental Indenture are for convenience of reference only and shall not be deemed to alter or affect the meaning or interpretation of any provisions hereof, and every Holder heretofore or hereafter authenticated and delivered shall be bound hereby.

Section 2.11    <u>Successors</u>.    All agreements of the Issuer and the Guarantor, as applicable, in this Supplemental Indenture shall bind its successors.    All agreements of the Trustee in the Indenture shall bind its successors.

[*Signature Pages Follow*]

2494

DG-374

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed, all as of the date first above written.

**NFE FINANCING LLC**

By: _Chris Guinta_____
Name: Christopher S. Guinta
Title: Chief Financial Officer

**BRADFORD COUNTY REAL ESTATE PARTNERS LLC,** as Guarantor

By: _Chris Guinta_____
Name: Christopher S. Guinta
Title: Chief Financial Officer

*[Signature Page to First Supplemental Indenture – NFE Financing LLC 2029 Notes]*

2495

DG-375

**WILMINGTON SAVINGS FUND SOCIETY, FSB,** as Trustee

By:   _____

Name: Raye Goldsborough

Title:   Vice President

*[Signature Page to First Supplemental Indenture – NFE Financing LLC 2029 Notes]*

2496

DG-376

*Execution Version*

## SECOND SUPPLEMENTAL INDENTURE

Second Supplemental Indenture (this "<u>Supplemental Indenture</u>"), dated as of April 9, 2026, by NFE Brazil Newco Limited, a private company limited by shares incorporated in England and Wales (the "<u>Guaranteeing Subsidiary</u>"), a subsidiary of NFE Financing LLC, a Delaware limited liability company (the "<u>Issuer</u>"), and Wilmington Savings Fund Society, FSB, as trustee (in such capacity, the "<u>Trustee</u>") and as notes collateral agent under the Indenture referred to below.

### W I T N E S S E T H

WHEREAS, the Issuer, the Guarantor party thereto, the Trustee and the Notes Collateral Agent have heretofore executed and delivered an indenture, dated as of November 22, 2024 (as amended, supplemented, waived or otherwise modified, the "<u>Indenture</u>"), providing for the issuance of 12.000% Senior Secured Notes due 2029 (the "<u>Notes</u>");

WHEREAS, the Indenture provides that under certain circumstances the Guaranteeing Subsidiary shall execute and deliver to the Trustee a supplemental indenture pursuant to which the Guaranteeing Subsidiary shall unconditionally guarantee all of the Issuer's Obligations under the Notes and the Indenture on the terms and conditions set forth herein and under the Indenture (the "<u>Note Guarantee</u>");

WHEREAS, pursuant to Section 9.01 of the Indenture, the Trustee is authorized to execute and deliver this Supplemental Indenture to amend or supplement the Indenture without the consent of any Holder; and

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties mutually covenant and agree for the equal and ratable benefit of the Holders as follows:

1.  <u>Capitalized Terms</u>. Capitalized terms used herein without definition shall have the meanings assigned such terms in the Indenture.

2.  <u>Guarantee</u>. The Guaranteeing Subsidiary hereby agrees to provide an unconditional Note Guarantee on the terms and subject to the conditions set forth in the Indenture, including Article 10 thereof.

3.  <u>Execution and Delivery</u>. The Guaranteeing Subsidiary agrees that the Note Guarantee shall remain in full force and effect notwithstanding the absence of the endorsement of any notation of such Note Guarantee on the Notes.

4.  <u>Governing Law</u>. THIS SUPPLEMENTAL INDENTURE WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

5.  <u>Counterparts</u>. The parties may sign any number of copies of this Supplemental Indenture. Each signed copy shall be an original, but all of them together represent the same

agreement. The exchange of copies of this Supplemental Indenture and of signature pages by facsimile, PDF or other electronic transmission shall constitute effective execution and delivery of this Supplemental Indenture as to the parties hereto and may be used in lieu of the original Supplemental Indenture for all purposes. Signatures of the parties hereto transmitted by facsimile, PDF or other electronic transmission shall be deemed to be their original signatures for all purposes.

6.   <u>Effect of Headings</u>. The Section headings herein are for convenience only and shall not affect the construction hereof.

7.   <u>Ratification Of Indenture; Supplemental Indentures Part of Indenture</u>. Except as expressly amended hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect. This Supplemental Indenture shall form a part of the Indenture for all purposes, and every Holder heretofore or hereafter authenticated and delivered shall be bound hereby.

8.   <u>The Trustee</u>. The Trustee shall not be responsible in any manner whatsoever for or in respect of the validity, sufficiency or adequacy of this Supplemental Indenture or for or in respect of the statements or recitals contained herein, all of which recitals are made solely by the Guaranteeing Subsidiary.

<p align="center">[<em>Signature Pages Follow</em>]</p>

DG-378

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed, all as of the date first above written.

**EXECUTED** and **DELIVERED** by **NFE BRAZIL NEWCO LIMITED**
acting by its directors

By: _Kevin Sullivan_ _____
　　　Name:  Kevin Sullivan
　　　Title:  Director

By: _____
　　　Name:  Matthew Reinhard
　　　Title:  Director

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed, all as of the date first above written.

**EXECUTED** and **DELIVERED** by **NFE BRAZIL NEWCO LIMITED**
acting by its directors

By: _____
    Name: Kevin Sullivan
    Title:  Director

By:    *Matthew Reinhard*_____
    Name: Matthew Reinhard
    Title:  Director

*[Signature Page to Second Supplemental Indenture – NFE Financing LLC 2029 Notes ]*

DG-380

**WILMINGTON SAVINGS FUND SOCIETY,
FSB,** as Trustee

By: _____
Name:  Raye Goldsborough
Title:   Vice President

*[Signature Page to Second Supplemental Indenture – NFE Financing LLC 2029 Notes]*

2501

DG-381

# Tab 05

**CONSENT SOLICITATION STATEMENT**
**NFE Financing LLC**
**Solicitation of Consents (the "Consent Solicitation")**
**Relating to the 12.000% Senior Secured Notes due 2029**
**$2,730,540,406 Aggregate Principal Amount Outstanding**
**CUSIP No./ISIN: 62909B AA5/U6510B AA0**

> THE CONSENT SOLICITATION EXPIRES AT 5:00 P.M., NEW YORK CITY TIME, ON MARCH 31, 2026 (SUCH DATE AND TIME, AS IT MAY BE EXTENDED, THE "EXPIRATION DATE"), UNLESS EARLIER TERMINATED. DELIVERED CONSENTS MAY BE VALIDLY REVOKED FROM THE CONSENT SOLICITATION, AT OR PRIOR TO, BUT NOT AFTER THE EARLIER OF (I) 5:00 P.M., NEW YORK CITY TIME, ON MARCH 31, 2026 OR (II) THE TIME AND DATE ON WHICH THE REQUISITE CONSENTS (AS DEFINED BELOW) HAVE BEEN RECEIVED AND ACCEPTED BY THE COMPANY (SUCH EARLIER DATE AND TIME, UNLESS EXTENDED OR EARLIER TERMINATED BY THE COMPANY IN ITS SOLE DISCRETION, THE "REVOCATION DEADLINE").
>
> THE CONSENT SOLICITATION IS SUBJECT TO THE SATISFACTION OR WAIVER OF CERTAIN CONDITIONS, INCLUDING OBTAINING THE REQUISITE CONSENTS, AS SET FORTH UNDER THE HEADING "THE CONSENT SOLICITATION—CONDITIONS TO THE CONSENT SOLICITATION." NFE FINANCING LLC, A DELAWARE LIMITED LIABILITY COMPANY (THE "COMPANY," "WE," "US" OR "OUR"), AN INDIRECT SUBSIDIARY OF NEW FORTRESS ENERGY INC. ("NFE"), IN ITS SOLE DISCRETION, MAY TERMINATE OR EXTEND THE CONSENT SOLICITATION OR OTHERWISE AMEND THE CONSENT SOLICITATION FOR ANY PURPOSE.

Subject to the terms and conditions set forth in this Consent Solicitation Statement (as it may be amended or supplemented from time to time, this "Statement"), the Company hereby solicits the consent (each, a "Consent" and collectively, the "Consents") of holders (the "Holders") of its 12.000% Senior Secured Notes due 2029 (the "Notes"), to the Proposed Amendments (as defined and described under "—Proposed Amendments"). The Indenture, dated as of November 22, 2024 (as amended and supplemented through the date hereof, the "Indenture"), by and among the Company, Bradford County Real Estate Partners LLC (the "Guarantor") and Wilmington Savings Fund Society, FSB, as trustee (in such capacity, the "Trustee") and as notes collateral agent (in such capacity, the "Notes Collateral Agent") provides that the Company, the Guarantors and the Trustee may generally amend or supplement the Indenture by entering into a supplemental indenture with the consent of holders of at least a majority in aggregate principal amount of the then outstanding Notes. Accordingly, approval of the Proposed Indenture Amendment (as defined and described under "—Proposed Amendments") requires receipt of valid, unrevoked Consents from Holders of at least a majority in aggregate principal amount of the outstanding Notes (the "Requisite Consents"). Additionally, the Company's Limited Liability Company Agreement, dated as of October 2, 2024 (the "LLCA"), provides that NFE Brazil Investments LLC, a Bermuda limited liability company (the "Member"), may amend the LLCA to supplement relevant provisions thereof consistent with the intent of the Indenture. The Proposed Amendments are expected to be entered into once the Requisite Consents are obtained. Capitalized terms used in this Statement that are not otherwise defined herein have the meanings set forth in the Indenture.

**No consideration or fee will be paid by the Company to the Holders for the delivery of their Consent.**

This Statement contains important information that should be read before any decision is made with respect to the Consent Solicitation. In particular, see "Risk Factors" beginning on page 6 of this Statement for a discussion of certain risk factors you should consider in connection with the Consent Solicitation. Questions or requests for additional copies of this Statement or any other documents may be directed to the Information and Tabulation Agent (as defined below) at the address and telephone numbers set forth on the back cover of this Statement.

*None of the U.S. Securities and Exchange Commission (the "SEC"), any U.S. state securities commission or any regulatory authority of any other jurisdiction has approved or disapproved of the Consent Solicitation, passed upon the merits or fairness of the Consent Solicitation or passed upon the adequacy or accuracy of the disclosure in this Statement. Any representation to the contrary is a criminal offense.*

March 17, 2026

DG-382

The Company's obligation to accept validly delivered Consents with respect to the Notes is conditioned upon, among other things, the receipt of the Requisite Consents on or prior to the Expiration Date, though the Company reserves the right to waive any and all conditions to the Consent Solicitation (as described below), except for the receipt of the Requisite Consents. The Consent Solicitation may, subject to applicable law, be amended, extended, terminated or withdrawn by the Company in its sole discretion.

In this Statement, the Company has used the convention of referring to all Consents that have been validly delivered and not validly revoked as having been "validly delivered."

If the Company receives the Requisite Consents from the Holders on or prior to the Expiration Date, and the other conditions discussed under "The Consent Solicitation—Conditions to the Consent Solicitation" have been satisfied or waived, the Indenture will be amended pursuant to a supplemental indenture (the "Supplemental Indenture") to effect the Proposed Indenture Amendment, and the Member will amend the LLCA to effect the Proposed LLCA Amendment (as defined and described under "—Proposed Amendments").

If the Requisite Consents are obtained and accepted by the Company, the terms of the Requisite Consents will apply to all of the Notes (meaning the Proposed Indenture Amendment will be entered into and be binding on all of the Notes), whether or not a particular Holder of such Notes provides a Consent.

Consents, in order to be valid, must be delivered in accordance with the procedures established by and in the minimum denominations required by The Depository Trust Company ("DTC"). The Consent Solicitation is being conducted so as to be eligible for use of the Automated Tender Offer Program ("ATOP") of DTC following the procedures set forth below under "The Consent Solicitation—Procedures for Consenting." After receipt of the Requisite Consents, the Company will give notice and provide a certification from the Information and Tabulation Agent to the Trustee, upon which the Trustee may conclusively rely, that the Requisite Consents have been received and not validly revoked. The Company reserves the right to accept any Consent received by the Company, the Information and Tabulation Agent or the Trustee, by any other reasonable means or in any form that reasonably evidences the giving of a Consent.

The Company's obligation to accept validly delivered Consents is subject to the satisfaction or waiver of the conditions described in "The Consent Solicitation—Conditions to the Consent Solicitation." Unless all other conditions have been satisfied (or waived), receipt of the Requisite Consents will not obligate the Company to accept the Consents. The Company reserves the right to waive any of the conditions to the Consent Solicitation, except the condition that it receives the Requisite Consents. If the Requisite Consents have not been obtained before the Expiration Date and accepted by the Company, then the Consents will expire.

Holders may revoke Consents for the Consent Solicitation at or prior to the Revocation Deadline. Any notice of revocation not received before the Revocation Deadline will not be effective. See "The Consent Solicitation—Revocation of Consents."

Notwithstanding anything to the contrary set forth in this Statement, subject to applicable law, the Company reserves the right at any time before 9:00 a.m., New York City time, on the first business day following the Expiration Date, to: (1) terminate the Consent Solicitation for any reason; (2) extend the Expiration Date; (3) amend the terms of the Consent Solicitation; or (4) waive any and all of the conditions to the Consent Solicitation, except for the receipt of the Requisite Consents. See "The Consent Solicitation—Expiration Date; Extensions; Amendment."

THE CONSENT SOLICITATION IS NOT BEING MADE TO, AND NO CONSENTS ARE BEING SOLICITED FROM, HOLDERS IN ANY JURISDICTION IN WHICH IT IS UNLAWFUL TO CONDUCT THE CONSENT SOLICITATION OR GRANT SUCH CONSENTS.

The Company has appointed Kroll Issuer Services Limited as information agent and tabulation agent with respect to the Consent Solicitation (the "Information and Tabulation Agent").

None of the Company, the Guarantors, NFE, the Information and Tabulation Agent, the Trustee or any of their respective directors, officers, employees, agents, subsidiaries or affiliates makes any recommendation as to whether or not Holders should deliver Consents.

Neither the Information and Tabulation Agent nor the Trustee assumes any responsibility for the accuracy or completeness of the information contained in this Statement or any related documents or for any failure by the Company and its affiliates or any other party to disclose events that may have occurred and may affect the significance or accuracy of such information.

No representation is made as to the correctness or accuracy of the CUSIP or ISIN numbers listed in this Statement or printed on the Notes. They are provided solely for the convenience of the Holders.

If the Company makes a material change in the terms of the Consent Solicitation or waives a material condition of the Consent Solicitation, the Company will disseminate additional materials related to the Consent Solicitation, as applicable, and extend the Consent Solicitation to the extent required by law (and extend the Revocation Deadline by the same number of days) (the "Material Amendment Revocation Deadline Extension Requirement"). In addition, the Company may, if it deems appropriate, extend the Consent Solicitation for any other reason. Any extension, amendment or termination will be followed promptly by public announcement thereof following the Expiration Date. Without limiting the manner in which the Company may choose to make a public announcement of any extension, amendment or termination of the Consent Solicitation, the Company will not be obligated to publish, advertise or otherwise communicate any such public announcement, other than by making a timely press release or transmitting such notification to Holders through DTC.

DG-384

**TABLE OF CONTENTS**

<u>Page</u>

IMPORTANT INFORMATION ..................................................................................................................1

CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS ........................................1

SUMMARY ..........................................................................................................................................3

RISK FACTORS ....................................................................................................................................6

THE CONSENT SOLICITATION ..............................................................................................................8

PROPOSED AMENDMENTS ...................................................................................................................14

DG-385

## IMPORTANT INFORMATION

**You should read this Statement carefully before making a decision to participate in the Consent Solicitation.**

The Company has not filed this document with, and it has not been reviewed by, any federal or state securities commission or any regulatory authority of any other jurisdiction. No authority has passed upon the accuracy or adequacy of this document, and it is unlawful and is a criminal offense to make any representation to the contrary.

All of the Notes are registered in the name of Cede & Co., the nominee of DTC. To cause a Consent to be delivered with respect to the Notes held through DTC, a Holder must electronically deliver such Consent to the Information and Tabulation Agent in accordance with DTC's ATOP procedures. A Holder of Notes that are held through a custodian bank, broker, dealer, commercial bank, trust company or other nominee must contact the nominee and request that such nominee arrange for the delivery of a Consent related to the Notes prior to the Expiration Date in order to participate in the Consent Solicitation. Holders should be aware that their custodian bank, broker, dealer, commercial bank, trust company or other nominee may establish its own earlier deadline for participation in the Consent Solicitation. Accordingly, Holders wishing to participate in the Consent Solicitation should contact their custodian bank, broker, dealer, commercial bank, trust company or other nominee as soon as possible in order to determine the time by which such owner must take action in order to so participate. The Company reserves the right to accept any Consent received by the Company, the Information and Tabulation Agent or the Trustee by any other reasonable means or in any form that reasonably evidences the giving of a Consent. Under no circumstances should any person tender or deliver Notes to the Company, the Information and Tabulation Agent or the Trustee.

**Recipients of this Statement and any related materials should not construe the contents hereof or thereof as legal, business or tax advice. Each recipient should consult its attorney, business advisor and tax advisor as to legal, business, tax and related matters concerning the Consent Solicitation.**

**Please handle this matter through the custodian bank, broker, dealer, commercial bank, trust company or other nominee through which you hold your Notes. Questions or requests for assistance or for additional copies of this Statement or related documents should be directed to the Information and Tabulation Agent at its address or telephone number set forth on the back cover page of this Statement.**

**Consents should not be delivered to the Company or the Trustee, or any of their respective agents. However, the Company reserves the right to accept any Consent received by the Company, the Trustee or any of their respective agents.**

This Statement contains important information that should be read before any decision is made with respect to the Consent Solicitation, including under the heading "Risk Factors" in this Statement.

**CONSENTS MUST BE ELECTRONICALLY DELIVERED IN ACCORDANCE WITH DTC'S ATOP PROCEDURES.**

This Statement does not constitute an offer to buy or the solicitation of an offer to sell any securities, including the Notes. No person has been authorized to give any information or make any representations other than those contained in this Statement, and, if given or made, such information or representations must not be relied upon as having been authorized by the Company or any of its subsidiaries, the Information and Tabulation Agent or any other person.

The statements made in this Statement are made as of the date of this Statement, and delivery of this Statement or any related materials at any time does not imply that the information herein or therein is correct as of any subsequent date. The information provided in this Statement is based upon information provided solely by the Company. The Information and Tabulation Agent has not independently verified or makes any representation or warranty, express or implied, or assumes any responsibility, as to the accuracy or adequacy of the information contained herein.

No Consent Solicitation is being made to any Holder in any jurisdiction in which the conduct of the Consent Solicitation or the acceptance thereof would not be in compliance with the laws of such jurisdiction.

DG-386

**WHERE YOU CAN FIND MORE INFORMATION**

The Company is an indirect subsidiary of NFE, which currently files annual, quarterly and current reports, proxy statements and other information, including the Indenture, with the SEC pursuant to the Securities Exchange Act of 1934, as amended. These SEC filings are available to the public over the internet at the SEC's website at www.sec.gov. You can also access NFE's SEC filings through the Investor Relations section of its website at www.newfortressenergy.com. The information on NFE's website, however, is not incorporated by reference in, and does not form a part of, this Statement. Statements made in this Statement concerning the provisions of any contract, agreement, indenture or other document referred to herein are not necessarily complete. With respect to each such statement concerning a contract, agreement, indenture or other document filed with the SEC, reference is made to such filing for a more complete description of the matter involved, and each such statement is qualified in its entirety by such reference.

2

DG-387

## CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS

For purposes of this section only, references to "we," "us" and "our" refer to NFE and its subsidiaries. This Statement includes "forward-looking statements," within the meaning of Section 27A of the Securities Act and Section 21E of the Exchange Act, including, in particular, any statements about our plans, strategies, objectives, initiatives, roadmap and prospects. We generally use the words "may," "will," "could," "expect," "anticipate," "believe," "estimate," "plan," "intend," "aim" and similar expressions in this Statement to identify forward-looking statements. We have based these forward-looking statements on our current views with respect to future events and financial performance. Actual results could differ materially from those projected in the forward-looking statements. These forward-looking statements, include, but are not limited to, statements related to the Restructuring Transaction (as defined herein), including our ability to complete the Restructuring Transaction on the terms contemplated by the RSA (as defined herein), on the timeline contemplated or at all, and our ability to realize the intended benefits of the Restructuring Transaction. Our actual results may differ materially from those anticipated in these forward-looking statements as a result of certain risks and other factors. Additional risks that could cause future results to differ from those expressed by any forward-looking statement are described in NFE's reports filed with the U.S. Securities and Exchange Commission, including in the section entitled "Risk Factors" in Part I, Item 1A of the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2024 and the section entitled "Risk Factors" in Part II, Item 1A of the Company's Quarterly Report on Form 10-Q for the quarter ended September 30, 2025. You should not put undue reliance on any forward-looking statements. You should understand that many important factors, including those identified herein, could cause our results to differ materially from those expressed or suggested in any forward-looking statement. Except as required by law, we do not undertake any obligation to update or revise these forward-looking statements to reflect new information or events or circumstances that occur after the date of this Statement or to reflect the occurrence of unanticipated events or otherwise.

1

DG-388

## SUMMARY

*The following summary is provided solely for the convenience of Holders. This summary is not intended to be complete and is qualified in its entirety by reference to, and should be read in conjunction with, the information appearing elsewhere in this Statement or any amendments or supplements hereto. Each undefined capitalized term used in this Summary has the meaning set forth elsewhere in this Statement. Before participating in the Consent Solicitation, you should read carefully this Statement. In particular, see "Risk Factors" beginning on page 6.*

| | |
|---|---|
| The Company ................................................. | NFE Financing LLC, a Delaware limited liability company |
| The Notes ...................................................... | 12.000% Senior Secured Notes due 2029 |
| Expiration Date............................................... | 5:00 p.m., New York City time, on March 31, 2026, or such later date and time to which the Consent Solicitation may be extended from time to time. The Company may, in its sole discretion, terminate or amend the Consent Solicitation for any reason at any time, regardless of whether the Requisite Consents have been obtained. |
| Purpose of the Consent Solicitation................ | The Company is seeking Consents in order to adopt the Proposed Amendments. |
| Proposed Amendments.................................... | If the Company receives the Requisite Consents from the Holders on or prior to the Expiration Date, and the other conditions discussed under "The Consent Solicitation—Conditions to the Consent Solicitation" have been satisfied or waived, then the Indenture will be amended pursuant to the Supplemental Indenture to effect the Proposed Indenture Amendment, and the Member will amend the LLCA to effect the Proposed LLCA Amendment. |
| | If the Requisite Consents are obtained and accepted by the Company, the terms of the Requisite Consents will apply to all of the Notes (meaning the Proposed Indenture Amendment will be entered into and be binding on all of the Notes), whether or not a particular Holder of such Notes provides a Consent. |
| Requisite Consents ......................................... | The adoption of the Proposed Indenture Amendment requires receipt of valid Consents from Holders of at least a majority in aggregate principal amount of the outstanding Notes. Consents may not be delivered on an alternative, conditional or selective basis. |
| Conditions to the Consent Solicitation ........... | The Consent Solicitation is conditioned upon, among other things, the Requisite Consents being obtained. See "The Consent Solicitation—Conditions to the Consent Solicitation." |
| Extensions; Amendment................................. | The Company may extend the Consent Solicitation if any condition to the Consent Solicitation has not been satisfied or waived at the Company's sole discretion. To extend the Consent Solicitation, the Company will notify the Information and Tabulation Agent of such extension by oral or written notice and will notify Holders by making a public announcement thereof or by transmitting to such Holders notice thereof through DTC at or before 9:00 a.m., New York City time, on the next business day after the previously scheduled Expiration Date. Failure of any |

3

DG-389

Holder or beneficial owner of Notes to be so notified will not affect the extension of the Consent Solicitation.

If the Consent Solicitation is amended in any material manner, or the Company waives or modifies any material conditions to the Consent Solicitation, the Company will promptly notify Holders of such amendment, waiver or modification by making a public announcement thereof or by transmitting to such Holders notice thereof through DTC, and the Company may, if determined by the Company to be appropriate, extend the Consent Solicitation for no less than one day, such period to be set at the Company's sole discretion subject to applicable law.

Effective Time ................................................. As soon as practical following receipt of the Requisite Consents and in compliance with the conditions contained in the Indenture, the Company, the New Guarantor (as defined herein), the Trustee and the Notes Collateral Agent will execute the Supplemental Indenture, the Member will amend the LLCA, and the Proposed Amendments will become effective, whether such execution is before, on or after the Expiration Date.

Revocation Deadline ..................................... The Revocation Deadline for the Consent Solicitation is the earlier of (i) 5:00 p.m., New York City time, on March 31, 2026, or (ii) the time and date at which the Requisite Consents have been received and accepted by the Company, unless extended or earlier terminated by the Company in its sole discretion. Any notice of revocation not received before the Revocation Deadline will not be effective.

Procedures for Consenting ............................ Consents must be electronically delivered in accordance with DTC's ATOP procedures. DTC is expected to grant the assignment of consents authorizing the DTC participants to deliver an Agent's Message (as defined below). Only registered owners of Notes or their duly designated proxies, including, for the purposes of the Consent Solicitation, DTC participants, are eligible to consent to the Proposed Amendments. Therefore, a beneficial owner of an interest in Notes held in the account of a DTC participant who wishes to deliver a Consent must properly instruct such DTC participant to cause a Consent to be given timely in respect of such Notes. See "The Consent Solicitation— Procedures for Consenting."

Revocation of Consents ................................. Delivery of the Consents made prior to the Revocation Deadline may be validly revoked at any time prior to or at the Revocation Deadline unless the Company amends or extends the Consent Solicitation in which case revocation rights may be extended to the extent required by law or as the Company determines, in its sole discretion (but subject to the Material Amendment Revocation Deadline Extension Requirement), appropriate to allow consenting Holders a reasonable opportunity to respond to such amendment (if applicable). The Company, in its sole discretion, may extend the Revocation Deadline for any purpose.

Consents revoked prior to the Revocation Deadline may be delivered again prior to the Expiration Date in accordance with the procedures set forth in this Statement.

DG-390

|  | To validly revoke a Consent from the Consent Solicitation, Holders must arrange for a properly transmitted "Request Message" through ATOP, with the required information prior to the Revocation Deadline. The Company may extend the Expiration Date without extending or reinstating revocation rights (but subject to the Material Amendment Revocation Deadline Extension Requirement). See "The Consent Solicitation—Revocation of Consents." |
|---|---|
| Consequences to Non-Consenting Holders .... | If the Requisite Consents are obtained and accepted by the Company, the terms of the Requisite Consents will apply to all of the Notes (meaning the Proposed Indenture Amendment will be entered into and be binding on all of the Notes), whether or not such Holder delivered a Consent. |
| Information and Tabulation Agent ................. | Kroll Issuer Services Limited is serving as Information and Tabulation Agent in connection with the Consent Solicitation. Requests for additional copies of this Statement should be directed to the Information and Tabulation Agent using the contact information appearing on the back cover page of this Statement. |
| Brokerage Commissions................................ | No brokerage commissions are payable by Holders to the Company, the Guarantors, NFE, the Information and Tabulation Agent or the Trustee. |
| Governing Law.............................................. | This Statement, the Consent Solicitation, each Agent's Message and any acceptance of Consents pursuant to the Consent Solicitation shall be governed by and construed in accordance with the laws of the state of New York. |

2512

DG-391

**RISK FACTORS**

*In deciding whether to participate in the Consent Solicitation, each Holder should consider carefully, in addition to the other information contained in this Statement, the following risk factors:*

**There are limits on your ability to revoke a Consent.**

Delivered Consents may be revoked at any time at or prior to the Revocation Deadline, but not thereafter. Holders of Notes who deliver their Consent after the Revocation Deadline may not revoke their delivered Consent, unless the Company amends or extends the Consent Solicitation, in which case revocation rights may be extended to the extent required by law, or as the Company determines, in its sole discretion, appropriate to allow Holders a reasonable opportunity to respond to such amendment (if applicable).

**No recommendation is being made with respect to the Consent Solicitation.**

None of the Company, the Guarantors, NFE, the Information and Tabulation Agent, the Trustee or any of their respective directors, officers, employees, agents, subsidiaries or affiliates makes any recommendation to any Holder whether to participate or refrain from participating in the Consent Solicitation or how much they should participate, and none of them has authorized any person to make any such recommendation. Holders are urged to evaluate carefully all information in this Statement, consult their own investment and tax advisors and make their own decisions with respect to the Consent Solicitation.

**If the Requisite Consents are obtained and accepted by the Company, the terms of the Requisite Consents will apply to all of the Notes.**

If the Requisite Consents are obtained and accepted by the Company, the terms of the Requisite Consents will apply to all of the Notes (meaning the Proposed Indenture Amendment will be entered into and be binding on all of the Notes), whether or not a particular Holder delivered a Consent or affirmatively objected to the terms of the Requisite Consents. Non-consenting Holders will not be entitled to any rights of appraisal or similar rights of dissenters with respect to the effectiveness of the Proposed Amendments.

**The effectiveness of the Proposed Amendments is not conditioned upon the consummation of the Restructuring Transactions.**

Consents may not be delivered on an alternative, conditional or selective basis. If the Requisite Consents are obtained and accepted by the Company, all conditions to the adoption of the Proposed Amendments that are not otherwise waivable by the Company will have been satisfied. As a result, the Proposed Amendments will become and remain effective regardless of whether the Restructuring Transactions are consummated as currently contemplated by the RSA or at all.

**The Company has the right to terminate or withdraw the Consent Solicitation at any time, subject to applicable law.**

The Company's obligation to accept Consents validly delivered by Holders pursuant to the Consent Solicitation is conditioned upon the satisfaction or waiver by the Company of certain conditions. See "The Consent Solicitation—Conditions to the Consent Solicitation." In addition, the Company expressly reserves the right, subject to applicable law, to terminate or withdraw the Consent Solicitation at any time. There can be no assurance that the conditions to the Consent Solicitation will be satisfied or waived, and even if such conditions are satisfied, that the Company will not terminate the Consent Solicitation.

**Notes for which a Consent is delivered will be blocked from being transferred until the earliest of the Expiration Date, the date on which such Consent is revoked and the date on which the Consent Solicitation is terminated.**

The delivery of a Consent will affect a Holder's right to sell or transfer the Notes. The Notes for which a Consent has been delivered through ATOP as part of the Consent Solicitation prior to the Expiration Date will be held under one or more temporary CUSIP numbers (i.e., Contra CUSIP) during the period beginning at the time the DTC participant electronically delivers a Consent and ending on the earlier of (i) the Expiration Date, (ii) the date on which the DTC participant revokes its Consent and (iii) the date on which the Consent Solicitation is terminated. Subsequent to the date on which the Notes are no longer blocked from trading, the Information and Tabulation Agent will instruct

6

2513

DTC to release the positions as soon as practicable but no later than three business days after such date and not exceeding forty-five calendar days from the date hereof. Thereafter, Holders may transfer the Notes in accordance with the terms thereof and in accordance with the procedures of DTC. During the period in which a Holder's Notes are blocked pursuant to the procedures for delivering Consents and cannot be transferred, such Holder may be unable to promptly liquidate such Notes or timely react to adverse trading conditions and could suffer losses as a result of these restrictions on transferability.

DG-393

## THE CONSENT SOLICITATION

**General**

The Consent Solicitation commenced on March 17, 2026, and will expire on the Expiration Date. As of the date of this Statement, there are $2,730,540,406 aggregate principal amount of Notes outstanding.

Following receipt of the Requisite Consents and subject to the satisfaction or waiver of the conditions to the Consent Solicitation described below, the Company, the New Guarantor, the Trustee and the Notes Collateral Agent will execute the Supplemental Indenture, the Member will amend the LLCA, and the Proposed Amendments will become effective, whether such execution is before, on or after the Expiration Date.

**Conditions to the Consent Solicitation**

Notwithstanding any other provision of the Consent Solicitation and in addition to (and not in limitation of) the Company's right to extend or amend the Consent Solicitation, the Company shall not be required to accept any Consents, subject to applicable law, and may terminate the Consent Solicitation, if, before such time any Consent has been delivered and accepted pursuant to the Consent Solicitation, any of the following events or conditions exist or shall have occurred and remain in effect or shall be determined by the Company in its sole judgment to exist or to have occurred and remain in effect:

- the Requisite Consents have not been obtained;

- (i) any general suspension of trading in, or limitation on prices for, trading in securities in the United States securities or financial markets or any other significant adverse change in the United States securities or financial markets, (ii) a material impairment in the trading market for debt securities generally, (iii) a declaration of a banking moratorium or any suspension of payments in respect of banks in the United States (whether or not mandatory), (iv) any limitation (whether or not mandatory) by any governmental authority on, or other event that, in the sole judgment of the Company, might affect the nature or extension of credit by banks or other lending institutions in the United States, (v) any attack on, outbreak or escalation of hostilities, acts of terrorism, pandemic, epidemic or any declaration of a national emergency, commencement of war, armed hostilities or other national or international crisis directly or indirectly involving the United States or (vi) any significant adverse change in the United States currency exchange rates or securities or financial markets generally or, in the case of any of the foregoing existing on the date hereof, a material acceleration, escalation or worsening thereof;

- the existence of an order, statute, rule, regulation, executive order, stay, decree, judgment or injunction that shall have been enacted, entered, issued, promulgated, enforced or deemed applicable by any court or governmental, regulatory or administrative agency or instrumentality that, in the sole judgment of the Company, would or would be reasonably likely to prohibit, prevent or materially restrict or delay the consummation of the Consent Solicitation or that is, or is reasonably likely to be, materially adverse to the business, operations, properties, condition (financial or otherwise), assets, liabilities or prospects of the Company or its affiliates or would materially impair the contemplated benefits of the Consent Solicitation or be material to Holders of Notes in deciding whether to participate in the Consent Solicitation;

- any instituted or pending action or proceeding before or by any court or governmental, regulatory or administrative agency or instrumentality, or by any other person, that challenges the making of the Consent Solicitation or is reasonably likely to directly or indirectly prohibit, prevent, restrict or delay the consummation of the Consent Solicitation or otherwise adversely affect the Consent Solicitation in any material manner;

- the existence of any other actual or threatened legal impediment (including a default under an agreement, indenture or other instrument or obligation to which the Company or any of its affiliates is a party or by which the Company or any of its affiliates is bound) to the Consent Solicitation or any other circumstances that would materially adversely affect the transactions contemplated by the Consent Solicitation, or the contemplated benefits to the Company or its affiliates of the Consent Solicitation;

2515

DG-394

- the actual or prospective occurrence of any event or events that, in the sole judgment of the Company, could prevent, restrict or delay consummation of the Consent Solicitation or materially impair the contemplated benefits of the Consent Solicitation to the Company or its affiliates; or

- any change or development, including any prospective change or development, that in the sole judgment of the Company, has or may have a material adverse effect on the Company or its affiliates.

The conditions described above are solely for the Company's benefit and may be asserted by the Company regardless of the circumstances giving rise to any such condition, including any action or inaction by the Company, and, other than the receipt of the Requisite Consents, may be waived by the Company, in whole or in part, at any time and from time to time. The Company's failure at any time to exercise any of its rights will not be deemed a waiver of any other right, and each right will be deemed an ongoing right which may be asserted at any time and from time to time.

**No Consent Consideration or Fee**

**There will be no consent consideration or fee provided to Holders that validly deliver their Consents before the Expiration Date. Consents validly delivered before the Revocation Deadline shall constitute Consents for the determination of all Requisite Consents.**

**No Alternative, Conditional or Selective Consents**

Consents may not be delivered on an alternative, conditional or selective basis. Furthermore, the adoption of the Proposed Amendments is not conditioned upon the consummation of the Restructuring Transactions.

**Expiration Date; Extensions; Amendments**

The Expiration Date for the Consent Solicitation is 5:00 p.m., New York City time, on March 31, 2026, unless extended, in which case the Expiration Date will be such date to which the Expiration Date is extended. If a custodian bank, broker, dealer, commercial bank, trust company or other nominee holds your Notes, such nominee may have an earlier deadline for accepting a Consent. You should promptly contact the custodian bank, broker, dealer, commercial bank, trust company or other nominee that holds your Notes to determine its deadline.

The Company, in its sole discretion, may extend the Revocation Deadline or the Expiration Date or otherwise amend the Consent Solicitation for any purpose, including to permit the satisfaction or waiver of any or all conditions to the Consent Solicitation. To extend the Expiration Date or otherwise amend the Consent Solicitation, the Company will notify the Information and Tabulation Agent and will promptly make a public announcement thereof. In the case of an extension of the Expiration Date, an announcement will be issued no later than 9:00 a.m., New York City time, on the next business day after the previously scheduled deadline or expiration date. Such announcement will specify whether the Company is extending for a specified period or on a daily basis.

Without limiting the manner in which the Company may choose to make a public announcement of any extension, amendment or termination of the Consent Solicitation, the Company will not be obligated to publish, advertise or otherwise communicate any such public announcement, other than by making a timely press release or transmitting such notification to Holders through DTC.

**Procedures for Consenting**

All of the Notes are held in book-entry form. Any Holder who wishes to deliver Consents should contact their custodian bank, broker, dealer, commercial bank, trust company or other nominee promptly and instruct such nominee to electronically transmit their acceptance through ATOP (and thereby deliver a Consent). In some cases, the custodian bank, broker, dealer, commercial bank, trust company or other nominee may request submission of such instructions on a Holder's instruction form. Please check with your nominee to determine the procedures for such firm.

Any acceptance of an Agent's Message transmitted through ATOP is at the election and risk of the person transmitting such Agent's Message and delivery will be deemed made only when actually received by the Information and Tabulation Agent.

9

**CONSENT INSTRUCTIONS MUST BE ELECTRONICALLY DELIVERED IN ACCORDANCE WITH DTC'S ATOP PROCEDURES. EACH BENEFICIAL OWNER MUST INSTRUCT THE BROKER, DEALER, COMMERCIAL BANK, CUSTODIAN OR DTC PARTICIPANT WHO HOLDS NOTES FOR THEM TO ELECTRONICALLY DELIVER A CONSENT INSTRUCTION IN ORDER TO RECORD THEIR CONSENT INSTRUCTION FOR THE CONSENT SOLICITATION.**

**Delivery of documents to DTC does not constitute delivery to the Information and Tabulation Agent. All questions as to the validity (including time of receipt) and acceptance, revocation and delivery of Consents will be determined by the Company, in its sole discretion, which determination shall be final and binding.**

**UNDER NO CIRCUMSTANCES SHOULD ANY PERSON TENDER OR DELIVER NOTES TO THE COMPANY, THE GUARANTORS, NFE, THE INFORMATION AND TABULATION AGENT OR THE TRUSTEE.**

**Revocation of Consents**

Delivery of a Consent made prior to the Revocation Deadline may be validly revoked at any time prior to or at the Revocation Deadline, but not thereafter. Consent delivered at or after the Revocation Deadline may not be revoked, unless the Company amends or extends the Consent Solicitation, in which case revocation rights may be extended to the extent required by law or as the Company determines, in its sole discretion, appropriate to allow consenting Holders a reasonable opportunity to respond to such amendment (if applicable). The Company, in its sole discretion, may extend the Revocation Deadline for any purpose.

Consent revoked prior to the Revocation Deadline may be delivered again prior to the Expiration Date by following one of the procedures described above under "—Procedures for Consenting."

For a revocation of a delivered Consent to be effective, the Information and Tabulation Agent must receive a properly transmitted "Request Message" through ATOP prior to or at the Revocation Deadline. Any such notice of revocation must contain the description of the Consent to be revoked, including DTC nominee, VOI number and quantity.

A revocation of Consent may only be accomplished if done so prior to or at the Revocation Deadline and in accordance with the foregoing procedures.

**A revocation of the Consent will be effective only as to the Notes listed on the revocation and only if such revocation complies with the provisions of this Statement. Only a Holder is entitled to revoke a Consent previously given. A beneficial owner of Notes with respect to which a Consent has been given must arrange with its custodian bank, broker, dealer, commercial bank, trust company or other nominee to execute and deliver on its behalf a revocation of such Consent.**

The Company will resolve all questions as to the validity, form, eligibility (including time of receipt) and acceptance and revocation of Consents, and those determinations will be conclusive and binding. The Company reserves the absolute right in its sole discretion to reject any or all Consents and revocations that are not in proper form or are otherwise not validly given or any Consents, the Company's acceptance of which could, in the opinion of the Company or its counsel, be unlawful. The Company also reserves the absolute right in its sole discretion to waive any defects or irregularities in connection with deliveries of particular Consents, whether or not similar defects or irregularities are waived in the case of other Holders, or to require a cure of such defects or irregularities within such time as the Company determines. None of the Company, the Guarantors, NFE, the Information and Tabulation Agent, the Trustee, any of their respective affiliates or any other person will have any duty to give notification of any such waiver, defects or irregularities, and none of them will incur any liability for failure to give such notification. Deliveries of Consents or notices of revocation will be deemed not to have been made until such defects or irregularities have been cured or waived. The Company's interpretations of the terms and conditions of the Consent Solicitation shall be conclusive and binding.

The Company expects that DTC will authorize participants that hold Notes on behalf of beneficial owners of Notes through DTC to deliver Consents as if they were Holders.

10

2517

DG-396

The Consent Solicitation is being conducted in a manner eligible for use of the ATOP of DTC. At the date of this Statement, all of the Notes are registered in the name of the nominee of DTC. In turn, the Notes are recorded on DTC's books in the names of DTC participants that hold Notes either for themselves or for the ultimate beneficial owners. A beneficial owner of an interest in the Notes held in the account of a DTC participant must properly instruct such DTC participant sufficiently in advance of the Expiration Date to cause a Consent to be validly delivered by such DTC participant. To cause Consents to be delivered with respect to Notes held through DTC, DTC participants must electronically deliver a Consent to the Information and Tabulation Agent in accordance with DTC's ATOP procedures. Consents may be delivered only in principal amounts equal to integral multiples of $1. DTC will confirm the electronic delivery of a Consent by sending an Agent's Message (as defined below) to the Information and Tabulation Agent.

The term "Agent's Message" means a message transmitted by DTC to, and received by, the Information and Tabulation Agent and forming a part of the Book-Entry Confirmation (as defined below), which states that DTC has received an express and unconditional acknowledgment from the DTC participant described in such Agent's Message, stating (i) that such participant has received the Statement and agrees to be bound by the terms of the Consent Solicitation as described in this Statement and (ii) that the Company may enforce such agreement against such Holder.

A beneficial owner of Notes held through a custodian bank, broker, dealer, commercial bank, trust company or other nominee must provide appropriate instructions to such person to cause a delivery of Consent through ATOP with respect to such Notes. Beneficial owners of Notes should be aware that their custodian bank, broker, dealer, commercial bank, trust company or other nominee may establish its own deadline, earlier than the Expiration Date, for participation in the Consent Solicitation.

**Holders desiring to deliver their Consents before the Expiration Date should note that they must allow sufficient time for completion of the ATOP procedures during the normal business hours of DTC before the Expiration Date. Consents not received by the Information and Tabulation Agent before the Expiration Date will be disregarded and of no effect.**

### No Letter of Transmittal or Consent Form

No consent form or letter of transmittal needs to be executed in relation to the Consent Solicitation or the Consents delivered through DTC. The valid electronic delivery of Consents in accordance with DTC's ATOP procedures shall constitute a written Consent for purposes of the Consent Solicitation.

### Book-Entry Transfer

The Information and Tabulation Agent will establish and maintain one or more accounts with respect to the Notes at DTC (the "Book-Entry Transfer Facility") promptly after the date of this Statement (to the extent such arrangements have not been made previously by the Information and Tabulation Agent), and any financial institution that is a DTC participant and the name of which appears on a security position listing as the owner of Notes may make book-entry delivery and surrender of such Notes into one of the Information and Tabulation Agent's accounts in accordance with the Book-Entry Transfer Facility's procedures for such transfer. The confirmation of a book-entry transfer of Notes into one of the Information and Tabulation Agent's accounts at DTC as described above is referred to herein as a "Book-Entry Confirmation." The delivery of a Consent will affect a Holder's right to sell or transfer the Notes. The Notes for which a Consent has been delivered through ATOP as part of the Consent Solicitation prior to the Expiration Date will be held under one or more temporary CUSIP numbers (i.e., Contra CUSIP) during the period beginning at the time the DTC participant electronically delivers a Consent and ending on the earlier of (i) the Expiration Date, (ii) the date on which the DTC participant revokes its Consent and (iii) the date on which the Consent Solicitation is terminated. Subsequent to the date on which the Notes are no longer blocked from trading, the Information and Tabulation Agent will instruct DTC to release the positions as soon as practicable but no later than three business days after such date and not exceeding forty-five calendar days from the date hereof. Thereafter, Holders may transfer the Notes in accordance with the terms thereof and in accordance with the procedures of DTC.

### Representations, Warranties and Undertaking

By delivering a Consent to the Information and Tabulation Agent in accordance with DTC's ATOP procedures, the consenting Holder (a "Consenting Holder") is deemed to represent, warrant and undertake to the Company, the Information and Tabulation Agent and the Trustee as follows:

11

2518

DG-397

- such Consenting Holder is a Holder of such Notes.

- such Consenting Holder has received, reviewed and accepted the terms of this Statement.

- such Consenting Holder consents to the adoption of the Proposed Amendments as described in this Statement upon the terms and subject to the conditions set forth in this Statement. The delivery of such Consent to the Information and Tabulation Agent in accordance with DTC's ATOP procedures constitutes such Consenting Holder's written consent to the adoption of the Proposed Amendments.

- All authority conferred or agreed to be conferred pursuant to these representations, warranties and undertakings and every obligation of the Consenting Holder and the Consents given by such Consenting Holder shall be binding (to the extent applicable in law) upon the successors, assigns, heirs, executors, administrators, trustees in bankruptcy and legal representatives of such Consenting Holder and shall not be affected by, and shall survive, the death or incapacity of such Consenting Holder.

- Such Consenting Holder's participation in the Consent Solicitation does not conflict with the laws of any jurisdiction.

- Such Consenting Holder empowers, authorizes and requests the relevant parties to do all such other things as may be necessary or expedient to carry out and give effect to the Consent Solicitation, including to enter into the Supplemental Indenture.

- No information has been provided to such Consenting Holder by the Company, the Guarantors, NFE, the Information and Tabulation Agent, the Trustee or any of their respective directors, officers, employees, agents, subsidiaries or affiliates with regard to the tax consequences to Holders or beneficial owners of Notes arising from participation in the Consent Solicitation. Such Consenting Holder is solely liable for any taxes and similar or related payments imposed on it under the laws of any applicable jurisdiction as a result of its participation in the Consent Solicitation, and such Consenting Holder will not and does not have any right of recourse (whether by way of reimbursements, indemnity or otherwise) against the Company, the Information and Tabulation Agent, the Trustee, any affiliates, officers, directors, employees or agents of any of the foregoing or any other person in respect of such taxes and payments.

- This Statement and the transactions contemplated hereby shall not be deemed to be investment advice or a recommendation as to a course of conduct by the Company, the Guarantors, NFE, the Information and Tabulation Agent, the Trustee or any of their respective directors, officers, employees, agents, subsidiaries or affiliates. In delivering a Consent to the Information and Tabulation Agent in accordance with DTC's ATOP procedures, such Consenting Holder has made an independent decision in consultation with its own agents and professionals to the extent that it considers it necessary.

**Information and Tabulation Agent**

The Company has retained Kroll Issuer Services Limited as the Information and Tabulation Agent in connection with the Consent Solicitation. The Company has agreed to pay the Information and Tabulation Agent customary fees for their services in connection with the Consent Solicitation. The Company has also agreed to reimburse the Information and Tabulation Agent for certain of their out-of-pocket expenses.

None of the Information and Tabulation Agent or the Trustee assumes any responsibility for the accuracy or completeness of the information concerning the Company, the Guarantors, NFE or the Notes contained or referred to in this Statement or for any failure by the Company to disclose events that may have occurred and may affect the significance or accuracy of such information.

12

2519

**NONE OF THE COMPANY, THE GUARANTORS, NFE, THE INFORMATION AND TABULATION AGENT, THE TRUSTEE OR ANY OF THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, SUBSIDIARIES OR AFFILIATES IS MAKING ANY RECOMMENDATION AS TO WHETHER HOLDERS SHOULD PARTICIPATE IN THE CONSENT SOLICITATION, AND NEITHER THE COMPANY NOR ANY SUCH OTHER PERSON HAS AUTHORIZED ANY PERSON TO MAKE ANY SUCH RECOMMENDATION. HOLDERS MUST MAKE THEIR OWN DECISION AS TO WHETHER TO PARTICIPATE IN THE CONSENT SOLICITATION AND, IF SO, THE PRINCIPAL AMOUNT OF NOTES FOR WHICH TO PROVIDE CONSENT.**

The Company will also pay brokerage houses and other custodians, nominees and fiduciaries the reasonable out-of-pocket expenses incurred by them in forwarding copies of this Statement and related documents to the Holders and in handling or forwarding or consents in connection with Notes by their customers.

**Governing Law**

This Statement, the Consent Solicitation, each Agent's Message, and any Consent delivered pursuant to the Consent Solicitation shall be governed by and construed in accordance with the laws of the state of New York.

DG-399

## PROPOSED AMENDMENTS

**Background of the Proposed Amendments**

On March 17, 2026, NFE and certain of its subsidiaries entered into a restructuring support agreement (together with all exhibits, annexes, schedules, and appendices thereto, the "RSA") with certain of its lenders and noteholders, including (i) certain members of an ad hoc group of holders of the Notes (the "Supporting Noteholders"); (ii) certain members of an ad hoc group of term lenders under that certain Credit Agreement, dated as of October 30, 2023, by and among NFE, as the borrower, the guarantors from time to time party thereto, the lenders from time to time party thereto, and Morgan Stanley Senior Funding, Inc., as administrative agent and collateral agent (the "Supporting Term Loan B Lenders"); (iii) certain members of an ad hoc group of revolving lenders under that certain Credit Agreement, dated as of April 15, 2021, by and among NFE, as the borrower, the guarantors from time to time party thereto, the lenders from time to time party thereto, and MUFG Bank Ltd., as administrative agent and collateral agent (the "Supporting Revolving Loan Lenders"); (iv) certain members of an ad hoc group of term lenders under that certain Credit Agreement, dated as of July 19, 2024, by and among NFE, as the borrower, the guarantors from time to time party thereto, the lenders from time to time party thereto, and Morgan Stanley Senior Funding, Inc., as administrative agent and collateral agent (the "Supporting Term Loan A Lenders"); and (v) a majority of the members of a group of creditors with recourse to the collateral assets in NFE's core business, but not to the NFE's Fast LNG assets or Brazil business, including (1) holders of the 6.500% Senior Secured Notes due 2026 issued pursuant to that certain Indenture, dated as of April 12, 2021, by and among NFE, as the issuer, the guarantors from time to time party thereto and U.S. Bank Trust Company, National Association (as successor in interest to U.S. Bank National Association), as trustee and collateral agent (the "Supporting 2026 Legacy Notes Holders"), (2) holders of the 8.750% Senior Secured Notes issued pursuant to that certain Indenture, dated as of March 8, 2024, by and among NFE, as the issuer, the guarantors from time to time party thereto and U.S. Bank Trust Company, National Association, as trustee and collateral agent (the "Supporting 2029 Legacy Notes Holders," and together with the Supporting 2026 Legacy Notes Holders, the Supporting Noteholders, the Supporting Term Loan B Lenders, the Supporting Term Loan A Lenders, the Supporting Revolving Loan Lenders and creditors of the Series I Loan Debt and Series II Loan Debt (each, as defined below), the "Supporting Creditors") and (3) creditors of the debt under that certain Credit Agreement, dated as of November 22, 2024, by and among NFE, as the borrower, the guarantors from time to time party thereto, NFE Brazil Investments LLC, as the lender, and Wilmington Savings Funds Society, FSB, as the administrative agent and as collateral agent (the "Series I Loan Debt"), and under that certain Credit Agreement, dated as of December 6, 2024, by and among NFE, as the borrower, the guarantors from time to time party thereto, the Company, as the lender, and Wilmington Savings Funds Society, FSB, as the administrative agent and as collateral agent (the "Series II Loan Debt"). The RSA outlines the principal terms for a comprehensive restructuring of NFE's principal funded debt obligations (the "Restructuring Transaction"), including the separation of NFE into two independent companies—"BrazilCo" and "CoreCo"—and the exchange of existing obligations for new debt and equity securities. These new debt and equity securities include, but are not limited to, (a) 100% of BrazilCo's equity, (b) up to $643 million in new senior secured term loans, (c) shares representing 65% of NFE's fully-diluted common stock as of the closing of the Restructuring Transaction (the "Closing Date"), (d) NFE's convertible preferred stock, with an aggregate liquidation preference of up to $2.5 billion and which is mandatorily convertible by NFE upon the third anniversary of the Closing Date into 87% of NFE's fully-diluted common stock (determined as of the Closing Date) and (e) $400 million non-recourse term loans and preferred equity with a liquidation preference of $200 million incurred or issued by the NFE subsidiary that owns NFE's Fast LNG 2 assets. Letters of credit under NFE's existing Letter of Credit Facility and/or Revolving Credit Facility will be replaced or backstopped, and certain other liabilities will be refinanced or compromised. All existing NFE common stock will remain outstanding and will represent 35% of NFE common stock issued and outstanding following the consummation of the Restructuring Transaction but before giving effect to an incentive plan for directors, officers and other employees of NFE or any conversion of NFE convertible preferred stock into NFE common stock.

The Restructuring Transaction is expected to be implemented through restructuring plans promoted by each of two of NFE's indirect subsidiaries incorporated in England (the "PlanCos") under Part 26A of the UK Companies Act 2006 (for each PlanCo, the "Restructuring Plan"), which will be binding on all relevant creditors and recognized in the United States under chapter 15 of the Bankruptcy Code. The RSA requires the parties to cooperate in good faith, negotiate definitive documents, and refrain from actions inconsistent with the transaction, with obligations subject to various conditions including court approval, regulatory consents, and satisfaction of process milestones. The RSA may be terminated under specified circumstances, including breaches, failure to meet conditions, or if NFE's board

14

of directors determines continued performance would conflict with fiduciary duties. There is no assurance the Restructuring Transaction will be completed as contemplated, and failure to do so may require or compel NFE to pursue additional restructuring initiatives to preserve value and optionality, including possible out of court restructurings, or in-court relief, in the United Kingdom or the United States, which could have a material and adverse impact on stockholders.

The preceding summary of the Restructuring Plans and the RSA does not purport to be complete and is qualified in its entirety by reference to the description of the Restructuring Plans included in, and the RSA filed as an exhibit to, NFE's Current Report on Form 8-K, filed with the SEC on March 17, 2026 and incorporated herein by reference.

**Purpose of the Amendments**

The newly-formed, wholly-owned subsidiary of the Company (the "New Guarantor") is intended to serve as one of the two PlanCos that promote the Restructuring Plans. To facilitate the Restructuring Plans, the Company is seeking consent from Holders to adopt the Proposed Amendments. The Proposed Amendments, when effectuated by the Company, would result in:

- the formation of the New Guarantor and its subsequent accession to the Indenture as a guarantor;

- the amendment of the LLCA by the Member to supplement the LLCA consistent with the intent of the Indenture, as amended (the "Proposed LLCA Amendment"); and

- provision for the New Guarantor to maintain a collateral account with assets of up to $50,000 without delivering a control agreement to the Notes Collateral Agent, so as to facilitate the New Guarantor's promotion of the Restructuring Plans and related matters.

**Terms of the Proposed Amendments**

*Proposed Indenture Amendment*

The proposed amendment of the Indenture (the "Proposed Indenture Amendment") would amend the Indenture as follows:

Section 4.15    ADDITIONAL NOTE GUARANTEES; EQUITY INTERESTS.

(a)    Notwithstanding anything to the contrary set forth in this Indenture, no Note Party shall (other than any Subsidiary formed or acquired during a Suspension Period), (a) directly acquire or own any Equity Interests (other than, solely with respect to the Issuer, the Equity Interests of NFE Brazil Holdings Limited, ~~and~~ Bradford County Real Estate Partners LLC **and the New Guarantor**) or (b) have any Subsidiaries (other than, solely with respect to the Issuer, Bradford County Real Estate Partners LLC **and the New Guarantor**). [. . .]

Section 4.18    CERTAIN UNDERTAKINGS RELATING TO SEPARATENESS.

(a)    The Issuer shall conduct its business and operations separate and apart from that of any other Person (including the holders of its Equity Interests and their respective Affiliates) and in furtherance of the foregoing, [. . .]

(b) the Issuer shall not:

[. . .]

(4) make or permit to remain outstanding any loan or advance to, or own or acquire any stock or securities of, any Person, except that the Issuer may invest in those investments not prohibited under the Operating Agreement or hereunder, including investments in NFE Brazil Holdings Limited, ~~and~~ Bradford County Real Estate Partners LLC **and the New Guarantor**, and may make any advance required or not prohibited to be made pursuant to

15

DG-401

any provisions of the Operating Agreement or hereunder and permit the same to remain outstanding in accordance with such provisions;

[. . .]

(12) form, acquire, hold or own directly any equity interests (whether corporate, partnership, limited liability company or other) other than equity interests of NFE Brazil Holdings Limited, ~~and~~ Bradford County Real Estate Partners LLC **and the New Guarantor**.

[. . .]

<u>Section 12.07</u>    CERTAIN LIMITATIONS ON COLLATERAL.

Notwithstanding anything to the contrary, to the extent that the Lien on any Collateral is not or cannot be created and/or perfected on the Issue Date (other than (a) by the execution and delivery of the Security Agreement by the Note Parties and (b) a Lien on Collateral that is of the type that may be perfected by the filing of a financing statement in the United States under the UCC), in each case after the Issuer's use of commercially reasonably efforts to do so or without undue burden or expense, the Issuer shall take all necessary actions to create and/or perfect such Lien pursuant to arrangements to be mutually agreed between the Issuer and the Notes Collateral Agent acting reasonably. In addition, notwithstanding anything to the contrary, it is further understood and agreed that:

(b)    no later than 90 days after the Issue Date, each Note Party shall deliver a Collateral Agreement to the Notes Collateral Agent for each Deposit Account, securities account, and commodities account of each Note Party, in each case, in form and substance reasonably satisfactory to the Notes Collateral Agent. Notwithstanding anything to the contrary in this Agreement or any Security Document, at all times, each Deposit Account, securities account, and commodities account established and/or maintained by each Note Party must be subject to a Control Agreement except as otherwise agreed by the Notes Collateral Agent in its reasonable discretion; ***provided*, that notwithstanding anything to the contrary in this subsection (b) or in any other section of this Indenture, in no event shall the New Guarantor be obligated to deliver a Collateral Agreement, nor shall] any Deposit Account, securities account or commodities account established and/or maintained by the New Guarantor be subject to a Control Agreement, where the balance of such account does not exceed $50,000**; [. . .]

*Proposed LLCA Amendment*

The proposed amendment of the LLCA (the "<u>Proposed LLCA Amendment</u>") would amend the LLCA as follows:

<u>Section 9(J)</u>    LIMITATIONS ON THE COMPANY'S ACTIVITIES.

[. . .]

(v) So long as any Obligation is outstanding, the Board shall not cause or permit the Company to:

[. . .]

(D) make or permit to remain outstanding any loan or advance to, or own or acquire any stock or securities of, any Person, except that the Company may invest in those investments not prohibited under the Basic Documents, including investments in NFE Brazil Holdings Limited, ~~and~~ Bradford County Real Estate Partners LLC **and the New Guarantor**, and may make any advance required or not prohibited to be made pursuant to any provisions of the Basic Documents and permit the same to remain outstanding in accordance with such provisions;

[. . .]

(L) form, acquire, hold or own directly any equity interests (whether corporate, partnership, limited liability company or other) other than equity interests of NFE Brazil Holdings Limited, ~~and~~ Bradford County Real Estate Partners LLC **and the New Guarantor**. [. . .]

16

**2523**

To cause Consents to be delivered with respect to Notes held through DTC, Holders must electronically deliver a Consent to the Information and Tabulation Agent in accordance with DTC's ATOP procedures. Requests for assistance or for additional copies of this Statement or related documents should be directed to the Information and Tabulation Agent by email or at the telephone numbers set forth below. A Holder (or a beneficial owner that is not a Holder) may also contact the Information and Tabulation Agent by email or at the telephone numbers set forth below or its custodian bank, broker, dealer, commercial bank, trust company or other nominee for assistance concerning the Consent Solicitation.

*The Information and Tabulation Agent for the Consent Solicitation is:*

# Kroll Issuer Services Limited

The News Building
3 London Bridge Street
London SE1 9SG
United Kingdom

E-mail: nfe@is.kroll.com
Website: https://deals.is.kroll.com/nfe
Tel: +44 20 7089 0909
Attention: Alessandro Zorza

17

2524

DG-403

*Execution Version*

**OFFICER'S CERTIFICATE PURSUANT TO THE INDENTURE**

**NFE FINANCING LLC**

**April 9, 2026**

**12.000% Senior Secured Notes due 2029**

Reference is made to the Indenture, dated as of November 22, 2024 (the "Original Indenture"), among NFE Financing LLC, a Delaware limited liability company (the "Company"), the subsidiary guarantor party thereto and Wilmington Savings Fund Society, FSB, as trustee and as notes collateral agent, relating to the Company's 12.000% Senior Secured Notes due 2029 (the "Notes"), as supplemented by (i) the first supplemental indenture thereto, dated as of April 3, 2026 (the "First Supplemental Indenture") and (ii) the second supplemental indenture thereto, dated as of the date hereof (the "Second Supplemental Indenture" and the Original Indenture, as amended and supplemented by the First Supplemental Indenture and the Second Supplemental Indenture, the "Indenture"). Capitalized terms used and not otherwise defined in this certificate have the respective meanings assigned to them in the Indenture.

The undersigned, being a duly elected, qualified and acting Officer of NFE Brazil Newco Limited, a private company limited by shares incorporated in England and Wales (the "New Guarantor") and not in his individual capacity, does hereby certify pursuant to Section 9.01, Section 9.06, Section 13.04 and Section 13.05 of the Indenture that:

1. The execution of the Second Supplemental Indenture is authorized or permitted by the Indenture;

2. The undersigned has read all of the covenants and conditions contained in the Indenture, and the definitions in the Indenture relating thereto, relating to the execution and delivery of the Second Supplemental Indenture;

3. The statements contained in this certificate are based upon the undersigned's familiarity with the Indenture, and upon discussions by the undersigned with officers and employees of the Company familiar with the matters set forth herein;

4. In the opinion of the undersigned, he or she has made such examination or investigation as is necessary to enable him or her to express an informed opinion as to whether or not such covenants and conditions have been complied with; and

5. In the opinion of the undersigned, such conditions and covenants provided for in the Indenture relating to the execution and delivery of the Second Supplemental Indenture have been complied with.

*[Signature Page Follows]*

DG-404

**NFE BRAZIL NEWCO LIMITED**


By: _Kevin Sullivan_____
        Name:  Kevin Sullivan
        Title:    Director

[*Signature Page to Officer's Certificate re: 2029 UnSub Notes Second Supplemental Indenture*]

DG-405



### CERTIFICATE OF INFORMATION AND TABULATION AGENT

NFE Financing LLC
111 W. 19th Street, 8th Floor
New York, New York 10011

Wilmington Savings Fund
Society, FSB
500 Delaware Avenue, 11th Floor
Wilmington, Delaware 19801
Attention: Raye Goldsborough,
GCM

**12.000% Senior Secured Notes due 2029**
**$2,730,540,406 Aggregate Principal Amount Outstanding CUSIP No./ISIN: 62909B AA5/U6510B AA0**
**US62909BAA52 / USU6510BAA09 (the "2029 New Notes")**

**of**
**NFE Financing LLC**

___

Dear Sirs,

Capitalised terms used in this certificate but not otherwise defined herein shall have the meanings set out in the consent solicitation statement dated 17 March 2026 (the "Consent Solicitation Statement").

We confirm and certify that as at 5 p.m. New York City Time on 31 March 2026, Kroll Issuer Services Limited, in its capacity as Information and Tabulation Agent, received Consent Instructions from $2,712,456,455 in principal amount of the 2029 New Notes, representing 99.35% of the 2029 New Notes outstanding.

This certificate is made at 8.25 p.m. London Time on 1 April 2026.

For and on behalf of
Kroll Issuer Services Limited

Sunjeeve D. Patel
Managing Director

kroll.com

E info@is.kroll.com
T +44 20 7704 0880

Kroll Issuer Services Limited
The News Building
3 London Bridge Street
London SE1 9SG

registered as a private limited company in England
and Wales with Company Number 5098454
authorised and regulated by the
Financial Conduct Authority (FRN 548041)

DG-406

2527

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

ONE MANHATTAN WEST
NEW YORK, NY 10001
————
TEL: (212) 735-3000
FAX: (212) 735-2000
www.skadden.com

FIRM/AFFILIATE OFFICES
————
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
PALO ALTO
WASHINGTON, D.C.
WILMINGTON
————
ABU DHABI
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MUNICH
PARIS
SÃO PAULO
SEOUL
SINGAPORE
TOKYO
TORONTO

April 3, 2026

Wilmington Savings Fund Society, FSB
500 Delaware Avenue, 11th Floor
Wilmington, DE 19801
Attention: Raye Goldsborough, GCM

Re:    NFE Financing LLC – Execution of First Supplemental Indenture

Ladies and Gentlemen:

We have acted as special United States counsel to New Fortress Energy Inc., a Delaware corporation ("NFE"), in connection with the execution of the First Supplemental Indenture, dated as of the date hereof (the "First Supplemental Indenture"), by and among NFE Financing LLC, a Delaware limited liability company and a subsidiary of NFE (the "Company"), the guarantor party thereto (the "Guarantor," and together with the Company, the "Opinion Parties," and each, an "Opinion Party") and you, as trustee (in such capacity, the "Trustee"), to the indenture, dated as of November 22, 2024 (the "Original Indenture"), relating to the Company's 12.000% Senior Secured Notes due 2029 (the "Notes"), by and among the Company, the guarantor party thereto and the Trustee, as trustee and notes collateral agent (in such capacity, the "Notes Collateral Agent") (the Original Indenture, as supplemented by the First Supplemental Indenture, the "Indenture").

This opinion letter is being furnished to you pursuant to Sections 9.02, 9.06, 13.04 and 13.05 of the Indenture. Capitalized terms used herein and not otherwise defined have the meanings assigned to such terms in the Indenture. Neither the delivery of this opinion letter nor anything in connection with the preparation, execution or delivery of the First Supplemental Indenture or the transactions contemplated thereby is intended to create or shall create an attorney-client relationship with you or any other recipient of this opinion letter.

2528

DG-407

Wilmington Savings Fund Society, FSB
April 3, 2026
Page 2

In rendering the opinion stated herein, we have examined and relied upon the following:

1. an executed copy of the Original Indenture;

2. an executed copy of a certificate of Christopher S. Guinta, Chief Financial Officer of the Company, dated the date hereof, required to be delivered to you pursuant to Sections 9.02, 9.06, 13.04 and 13.05 of the Original Indenture (the "Officer's Certificate"), attached hereto as Exhibit A;

3. the First Supplemental Indenture, dated as of the date hereof, executed by the Company, and delivered to you for execution; and

4. an executed copy of a certificate of the Tabulation Agent, dated April 1, 2026, certifying the aggregate principal amount of Notes consenting to the proposed amendments set forth in the First Supplemental Indenture as of 5:00 P.M., New York City time, on the date set forth in such certificate (the "Tabulation Agent Certificate").

In addition, in rendering the opinion stated herein, we have (i) read the applicable covenants and conditions precedent provided for in the Original Indenture relating to the execution of the First Supplemental Indenture and (ii) in our opinion, made such examination or investigation as is necessary to enable us to express an informed opinion as to whether or not all such covenants and conditions precedent provided for in the Original Indenture relating to the execution of the First Supplemental Indenture have been complied with.

We have also examined originals or copies, certified or otherwise identified to our satisfaction, of such records of each Opinion Party and such agreements, certificates and receipts of public officials, certificates of officers or other representatives of each Opinion Party and others, and such other documents as we have deemed necessary or appropriate as a basis for the opinions stated below.

In our examination, we have assumed the genuineness of all signatures, including electronic signatures, the legal capacity and competency of all natural persons, the authenticity of all documents submitted to us as originals, the conformity to original documents of all documents submitted to us as facsimile, electronic, certified or photocopied copies, and the authenticity of the originals of such copies. As to any facts relevant to the opinions stated herein that we did not independently establish or verify, we have relied upon statements and representations of officers and other representatives of each Opinion Party and others and of public officials, including the facts and conclusions set forth in the Officer's Certificate and the Tabulation Agent Certificate.

In addition, we have assumed that (i) you have received the Officer's Certificate, the Tabulation Agent Certificate and this Opinion of Counsel, (ii) the Tabulation Agent Certificate constitutes evidence reasonably satisfactory to you of the consent of Holders of Notes to the proposed amendments set forth in the First Supplemental Indenture and that (iii) we, as counsel, are reasonably acceptable to you.

DG-408

Wilmington Savings Fund Society, FSB
April 3, 2026
Page 3

We do not express any opinion with respect to the laws of any jurisdiction other than the laws of the State of New York.

Based upon the foregoing and subject to the qualifications and assumptions stated herein, we are of the opinion that:

1.      The execution of the First Supplemental Indenture by the Opinion Parties is authorized or permitted under the Original Indenture and all covenants and conditions precedent provided for in the Original Indenture relating to the execution of the First Supplemental Indenture have been complied with.

2.      The First Supplemental Indenture constitutes the valid and binding obligation of each Opinion Party, enforceable against each Opinion Party in accordance with its terms under the laws of the State of New York.

The opinions stated herein are subject to the following assumptions and qualifications:

(a)      we do not express any opinion with respect to the effect on the opinions stated herein of any bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer, preference and other similar laws or governmental orders affecting creditors' rights generally, and the opinions stated herein are limited by such laws and governmental orders and by general principles of equity (regardless of whether enforcement is sought in equity or at law);

(b)      we do not express any opinion with respect to the effect on the opinions stated herein of (i) the compliance or non-compliance of any party to the First Supplemental Indenture with any laws, rules, regulations or orders applicable to such party or (ii) the legal status or legal capacity of any party to the First Supplemental Indenture;(c)      we do not express any opinion with respect to any law, rule, regulation or order that is applicable to any party to the First Supplemental Indenture or the transactions contemplated thereby solely because such law, rule, regulation or order is part of a regulatory regime applicable to any such party or any of its affiliates as a result of the specific assets or business operations of such party or such affiliates;(d)   we do not express any opinion with respect to any securities, antifraud, consumer credit, debt collection, privacy, derivatives or commodities laws, rules, regulations or orders, Regulations T, U or X of the Board of Governors of the Federal Reserve System or laws, rules, regulations or orders relating to national security;

(e)      we do not express any opinion with respect to any laws, rules, regulations or orders concerning financial or economic sanctions, export controls, trade embargoes, anti-money laundering or anti-corruption imposed by any governmental authority (including any licenses or authorizations issued or required thereunder) or declared emergencies or the effect of any thereof on the opinions stated herein;

(f)      we have assumed that the First Supplemental Indenture constitutes the valid and binding obligation of the Trustee, enforceable against the Trustee in accordance with its terms;

DG-409

Wilmington Savings Fund Society, FSB
April 3, 2026
Page 4

(g)     the opinions stated herein are limited to the agreements and documents specifically identified in the opinions contained herein (the "Specified Documents") without regard to any agreement or other document referenced in any Specified Document (including agreements or other documents incorporated by reference or attached or annexed thereto) and without regard to any other agreement or document relating to any Specified Document;

(h)     we have assumed that all conditions precedent contained in Section 9.06, Section 13.04 and Section 13.05 of the Indenture, which conditions require the delivery of documents, evidence of other items satisfactory in form, scope and/or substance to the Trustee and the Collateral Agent or the satisfaction of which is otherwise in the discretion or control of the Trustee and the Collateral Agent, have been, or contemporaneously with the delivery hereof will be, fully satisfied or waived;

(i)     we have assumed that (i) the Original Indenture constitutes the valid and binding obligation of each party thereto, enforceable against each such party in accordance with its terms immediately prior to the effectiveness of the First Supplemental Indenture and (ii) subsequent to the effectiveness of the Original Indenture and immediately prior to the effectiveness of the First Supplemental Indenture, the Original Indenture has not been amended, restated, supplemented or otherwise modified;

(j)     we do not express any opinion with respect to the enforceability of Section 10.01 of the Indenture or Section 2 of the First Supplemental Indenture to the extent that such section provides that the obligations of the Guarantor are absolute and unconditional irrespective of the enforceability or genuineness of the Indenture or the effect thereof on the opinions herein stated;

(k)     we do not express any opinion with respect to the enforceability of the provisions contained in Section 10.01 and 10.02 of the Indenture to the extent that such provisions limit the obligations of the Guarantor under the Indenture or any right of contribution of any party with respect to the obligations under the Indenture;

(l)     we do not express any opinion with respect to the enforceability of any provision contained in the First Supplemental Indenture purporting to prohibit, restrict or condition the assignment of rights under the First Supplemental Indenture to the extent that such prohibition, restriction or condition on assignability is ineffective pursuant to the Uniform Commercial Code;

(m)     to the extent that any opinion relates to the enforceability of the choice of New York law and choice of New York forum provisions contained in the First Supplemental Indenture, the opinions stated herein are subject to the qualification that such enforceability may be subject to, in each case, (i) the exceptions and limitations in New York General Obligations Law Sections 5-1401 and 5-1402 and (ii) principles of comity and constitutionality;

(n)     we do not express any opinion as to the creation, perfection or priority of any security interest;

DG-410

Wilmington Savings Fund Society, FSB
April 3, 2026
Page 5

(o)     we do not express any opinion with respect to the enforceability of any provision contained in the First Supplemental Indenture providing any waiver, release, disclaimer or any other variation of any right or duty of any party to the extent that any such waiver, release, disclaimer or other variation is not enforceable pursuant to Sections 1-302 or 9-602 of the Uniform Commercial Code;

(p)     we call to your attention that irrespective of the agreement of the parties to the First Supplemental Indenture, a court may decline to hear a case on grounds of forum non conveniens or other doctrine limiting the availability of such court as a forum for resolution of disputes; in addition, we call to your attention that we do not express any opinion with respect to the subject matter jurisdiction of the federal courts of the United States of America in any action arising out of or relating to the First Supplemental Indenture;

(q)     we do not express any opinion with respect to the enforceability of any provision contained in the First Supplemental Indenture relating to any indemnification, contribution, non-reliance, exculpation, release, limitation or exclusion of remedies, waiver or other provisions having similar effect that may be contrary to public policy or violative of federal or state securities laws, rules, regulations or orders, or to the extent any such provision purports to waive or alter, or has the effect of waiving or altering, any statute of limitations;

(r)     we call to your attention that the opinions stated herein are subject to possible judicial action giving effect to governmental actions or laws of jurisdictions other than those with respect to which we express our opinion; and

(s)     this opinion letter shall be interpreted in accordance with customary practice of United States lawyers who regularly give, and United States lawyers who regularly advise opinion recipients regarding, opinions in transactions of this type.

In addition, in rendering the foregoing opinions we have further assumed that:

(a)     each Opinion Party (i) is duly formed and is validly existing and in good standing, (ii) has requisite legal status and legal capacity under the laws of the jurisdiction of its formation, and (iii) has complied and will comply with all aspects of the laws of the jurisdiction of its organization or formation, as applicable, in connection with the transactions contemplated by, and the performance of its obligations under, the First Supplemental Indenture;

(b)     each Opinion Party has the limited liability company power and authority to execute, deliver and perform all its obligations under the First Supplemental Indenture;

(c)     the First Supplemental Indenture has been duly authorized, executed and delivered by all requisite limited liability company action on the part of such Opinion Party;

(d)     neither the execution and delivery by each Opinion Party of the First Supplemental Indenture nor the performance by such Opinion Party of its obligations under the First Supplemental Indenture (i) conflicts or will conflict with the certificate of formation or limited liability company agreement, or any other comparable organizational documents, of any

2532

Wilmington Savings Fund Society, FSB
April 3, 2026
Page 6

Opinion Party, (ii) constitutes or will constitute a violation of, or a default under, any lease, indenture, agreement or other instrument to which any Opinion Party or its property is subject, (iii) contravenes or will contravene any order or decree of any governmental authority to which any Opinion Party or its property is subject, or (iv) violates or will violate any law, rule or regulation to which any Opinion Party or its property is subject; and

(e)      neither the execution and delivery by each Opinion Party of the First Supplemental Indenture nor the enforceability of the First Supplemental Indenture against such Opinion Party requires or will require the consent, approval, licensing or authorization of, or any filing, recording or registration with, any governmental authority under any law, rule or regulation of any jurisdiction.

This opinion letter is being furnished only to you in your capacity as Trustee and is solely for your benefit as Trustee in connection with the execution of the First Supplemental Indenture.  Without our prior written consent, this opinion letter may not be used, circulated, quoted or otherwise referred to for any other purpose or relied upon by, or assigned to, any other person or entity for any purpose, including any holder of any Notes or any other person or entity that seeks to assert your rights in respect of this opinion letter (other than your successor in interest by means of merger, consolidation, transfer of a business or other similar transaction).

Very truly yours,

Skadden Arps Slate Meagher & Flom LLP

MJS

2533

DG-412

<u>EXHIBIT A</u>

[OFFICER'S CERTIFICATE]

DG-413

*Execution Version*

# OFFICER'S CERTIFICATE PURSUANT TO THE INDENTURE

## NFE FINANCING LLC

### April 3, 2026

### 12.000% Senior Secured Notes due 2029

Reference is made to the Indenture, dated as of November 22, 2024 (the "Original Indenture"), among NFE Financing LLC, a Delaware limited liability company (the "Company"), the subsidiary guarantor party thereto and Wilmington Savings Fund Society, FSB, as trustee and as notes collateral agent, relating to the Company's 12.000% Senior Secured Notes due 2029 (the "Notes"), as supplemented by the first supplemental indenture thereto, dated as of the date hereof (the "First Supplemental Indenture" and the Original Indenture, as amended and supplemented by the First Supplemental Indenture, the "Indenture"). Capitalized terms used and not otherwise defined in this certificate have the respective meanings assigned to them in the Indenture.

The undersigned, being a duly elected, qualified and acting Chief Financial Officer of the Company and not in his individual capacity, does hereby certify pursuant to Section 9.02, Section 9.06, Section 13.04 and Section 13.05 of the Indenture that:

1.  The execution of the First Supplemental Indenture is authorized or permitted by the Indenture;

2.  The undersigned has read all of the covenants and conditions contained in the Indenture, and the definitions in the Indenture relating thereto, relating to the execution and delivery of the First Supplemental Indenture;

3.  The statements contained in this certificate are based upon the undersigned's familiarity with the Indenture, and upon discussions by the undersigned with officers and employees of the Company familiar with the matters set forth herein;

4.  In the opinion of the undersigned, he or she has made such examination or investigation as is necessary to enable him or her to express an informed opinion as to whether or not such covenants and conditions have been complied with; and

5.  In the opinion of the undersigned, such conditions and covenants provided for in the Indenture relating to the execution and delivery of the First Supplemental Indenture have been complied with.

*[Signature Page Follows]*

DG-414

**NFE FINANCING LLC**

By: _____
      Name:  Christopher S. Guinta
      Title:    Chief Financial Officer

[*Signature Page to Officer's Certificate re: 2029 UnSub Notes First Supplemental Indenture*]

DG-415

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

ONE MANHATTAN WEST

NEW YORK, NY 10001

———

TEL: (212) 735-3000

FAX: (212) 735-2000

www.skadden.com

FIRM/AFFILIATE OFFICES
———
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
PALO ALTO
WASHINGTON, D.C.
WILMINGTON
———
ABU DHABI
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MUNICH
PARIS
SÃO PAULO
SEOUL
SINGAPORE
TOKYO
TORONTO

April 9, 2026

Wilmington Savings Fund Society, FSB
500 Delaware Avenue, 11th Floor
Wilmington, DE 19801
Attention: Raye Goldsborough, GCM

Re:      NFE Financing LLC – Second Supplemental Indenture

Ladies and Gentlemen:

We have acted as special United States counsel to New Fortress Energy Inc., a Delaware corporation ("NFE"), in connection with the preparation, execution and delivery by NFE Brazil NewCo Limited, a private company limited by shares incorporated in England and Wales and a subsidiary of the Company (as defined below) (the "New Guarantor"), of the Second Supplemental Indenture, dated as of the date hereof (the "Second Supplemental Indenture"), between the New Guarantor and you, as trustee (in such capacity, the "Trustee"), to the indenture, dated as of November 22, 2024 (the "Original Indenture"), relating to the Company's 12.000% Senior Secured Notes due 2029 (the "Notes"), by and among NFE Financing LLC, a Delaware limited liability company and a subsidiary of NFE (the "Company") and the Trustee, as trustee and collateral agent (in such capacity, the "Collateral Agent"), as supplemented by the First Supplemental Indenture, dated as of April 3, 2026 (the "First Supplemental Indenture"), by and among the Company, the guarantor party thereto, the Trustee and the Collateral Agent (the Original Indenture, as so supplemented, the "Existing Indenture," and the Existing Indenture, as supplemented by the Second Supplemental Indenture, the "Indenture"). This opinion letter is being furnished to you pursuant to Sections 9.01, 9.06, 13.04 and 13.05 of the Indenture. Neither the delivery of this opinion letter nor anything in connection with the preparation, execution or delivery of the Second Supplemental Indenture or the transactions contemplated thereby is intended to create or shall create an attorney-client relationship with you or any other recipient of this opinion letter.

2537

DG-416

Wilmington Savings Fund Society, FSB
April 9, 2026
Page 2

In rendering the opinion stated herein, we have examined and relied upon the following:

(a)      an executed copy of the Existing Indenture;

(b)      the Second Supplemental Indenture, dated as of the date hereof, executed by the New Guarantor, and delivered to you for execution; and

(c)      an executed copy of a certificate of Kevin Sullivan, Director of the New Guarantor, dated the date hereof, required to be delivered to you pursuant to Sections 9.01, 9.06, 13.04 and 13.05 of the Existing Indenture (the "Officer's Certificate"), attached hereto as Exhibit A.

In addition, in rendering the opinion stated herein, we have (i) read the applicable covenants and conditions precedent provided for in the Existing Indenture relating to the execution of the Second Supplemental Indenture and (ii) in our opinion, made such examination or investigation as is necessary to enable us to express an informed opinion as to whether or not all such covenants and conditions precedent provided for in the Existing Indenture relating to the execution of the Second Supplemental Indenture have been complied with.

We have also examined originals or copies, certified or otherwise identified to our satisfaction, of such records of the New Guarantor and such agreements, certificates and receipts of public officials, certificates of officers or other representatives of the New Guarantor and others, and such other documents as we have deemed necessary or appropriate as a basis for the opinions stated below.

In our examination, we have assumed the genuineness of all signatures, including electronic signatures, the legal capacity and competency of all natural persons, the authenticity of all documents submitted to us as originals, the conformity to original documents of all documents submitted to us as facsimile, electronic, certified or photocopied copies, and the authenticity of the originals of such copies. As to any facts relevant to the opinions stated herein that we did not independently establish or verify, we have relied upon statements and representations of officers and other representatives of the New Guarantor and others and of public officials, including the facts and conclusions set forth in the Officer's Certificate and the factual representations and warranties contained in the Second Supplemental Indenture.

In addition, we have assumed that (i) you have received the Officer's Certificate and this Opinion of Counsel and that (ii) we, as counsel, are reasonably acceptable to you.

We do not express any opinion with respect to the laws of any jurisdiction other than the laws of the State of New York.

Based upon the foregoing and subject to the qualifications and assumptions stated herein, we are of the opinion that:

DG-417

Wilmington Savings Fund Society, FSB
April 9, 2026
Page 3

1.      All conditions precedent and covenants provided for in the Existing Indenture relating to the execution and delivery of the Second Supplemental Indenture have been complied with and the execution by the Trustee of the Second Supplemental Indenture is authorized by the Existing Indenture.

2.      The Second Supplemental Indenture constitutes the valid and binding obligation of the New Guarantor, enforceable against the New Guarantor in accordance with its terms under the laws of the State of New York.

The opinions stated herein are subject to the following assumptions and qualifications:

(a)      we do not express any opinion with respect to the effect on the opinions stated herein of any bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer, preference and other similar laws or governmental orders affecting creditors' rights generally, and the opinions stated herein are limited by such laws and governmental orders and by general principles of equity (regardless of whether enforcement is sought in equity or at law);

(b)      we do not express any opinion with respect to the effect on the opinions stated herein of (i) the compliance or non-compliance of any party to the Second Supplemental Indenture with any laws, rules, regulations or orders applicable to such party or (ii) the legal status or legal capacity of any party to the Second Supplemental Indenture;

(c)      we do not express any opinion with respect to any law, rule, regulation or order that is applicable to any party to the Second Supplemental Indenture or the transactions contemplated thereby solely because such law, rule, regulation or order is part of a regulatory regime applicable to any such party or any of its affiliates as a result of the specific assets or business operations of such party or such affiliates;

(d)      we do not express any opinion with respect to any securities, antifraud, consumer credit, debt collection, privacy, derivatives or commodities laws, rules, regulations or orders, Regulations T, U or X of the Board of Governors of the Federal Reserve System or laws, rules, regulations or orders relating to national security;

(e)      we do not express any opinion with respect to any laws, rules, regulations or orders concerning financial or economic sanctions, export controls, trade embargoes, anti-money laundering or anti-corruption imposed by any governmental authority (including any licenses or authorizations issued or required thereunder) or declared emergencies or the effect of any thereof on the opinions stated herein;

(f)      we have assumed that the Second Supplemental Indenture constitutes the valid and binding obligation of the Trustee, enforceable against the Trustee in accordance with its terms;

(g)      the opinions stated herein are limited to the agreements and documents specifically identified in the opinions contained herein (the "Specified Documents") without

2539

DG-418

Wilmington Savings Fund Society, FSB
April 9, 2026
Page 4

regard to any agreement or other document referenced in any Specified Document (including agreements or other documents incorporated by reference or attached or annexed thereto) and without regard to any other agreement or document relating to any Specified Document;

(h)     we have assumed that all conditions precedent contained in Section 9.06, Section 13.04 and Section 13.05 of the Indenture, which conditions require the delivery of documents, evidence of other items satisfactory in form, scope and/or substance to the Trustee and the Collateral Agent or the satisfaction of which is otherwise in the discretion or control of the Trustee and the Collateral Agent, have been, or contemporaneously with the delivery hereof will be, fully satisfied or waived;

(i)     we have assumed that (i) the Existing Indenture constitutes the valid and binding obligation of each party thereto, enforceable against each such party in accordance with its terms immediately prior to the effectiveness of the Second Supplemental Indenture and (ii) subsequent to the effectiveness of the Original Indenture and immediately prior to the effectiveness of the Second Supplemental Indenture, the Original Indenture has not been amended, restated, supplemented or otherwise modified, other than by the First Supplemental Indenture;

(j)     we do not express any opinion with respect to the enforceability of Section 10.01 of the Indenture or Section 2 of the Second Supplemental Indenture to the extent that such section provides that the obligations of the New Guarantor are absolute and unconditional irrespective of the enforceability or genuineness of the Indenture or the effect thereof on the opinions herein stated;

(k)     we do not express any opinion with respect to the enforceability of the provisions contained in Section 10.01 and 10.02 of the Indenture to the extent that such provisions limit the obligations of the New Guarantor under the Indenture or any right of contribution of any party with respect to the obligations under the Indenture;

(l)     we do not express any opinion as to the creation, perfection or priority of any security interest;

(m)     we do not express any opinion with respect to the enforceability of any provision contained in the Second Supplemental Indenture purporting to prohibit, restrict or condition the assignment of rights under the Second Supplemental Indenture to the extent that such prohibition, restriction or condition on assignability is ineffective pursuant to the Uniform Commercial Code;

(n)     to the extent that any opinion relates to the enforceability of the choice of New York law and choice of New York forum provisions contained in the Second Supplemental Indenture, the opinions stated herein are subject to the qualification that such enforceability may be subject to, in each case, (i) the exceptions and limitations in New York General Obligations Law Sections 5-1401 and 5-1402 and (ii) principles of comity and constitutionality;

DG-419

Wilmington Savings Fund Society, FSB
April 9, 2026
Page 5

(o)    we do not express any opinion with respect to the enforceability of any provision contained in the Second Supplemental Indenture providing any waiver, release, disclaimer or any other variation of any right or duty of any party to the extent that any such waiver, release, disclaimer or other variation is not enforceable pursuant to Sections 1-302 or 9-602 of the Uniform Commercial Code;

(p)    we call to your attention that irrespective of the agreement of the parties to the Second Supplemental Indenture, a court may decline to hear a case on grounds of forum non conveniens or other doctrine limiting the availability of such court as a forum for resolution of disputes; in addition, we call to your attention that we do not express any opinion with respect to the subject matter jurisdiction of the federal courts of the United States of America in any action arising out of or relating to the Second Supplemental Indenture;

(q)    we do not express any opinion with respect to the enforceability of any provision contained in the Second Supplemental Indenture relating to any indemnification, contribution, non-reliance, exculpation, release, limitation or exclusion of remedies, waiver or other provisions having similar effect that may be contrary to public policy or violative of federal or state securities laws, rules, regulations or orders, or to the extent any such provision purports to waive or alter, or has the effect of waiving or altering, any statute of limitations;

(r)    we call to your attention that the opinions stated herein are subject to possible judicial action giving effect to governmental actions or laws of jurisdictions other than those with respect to which we express our opinion; and

(s)    this opinion letter shall be interpreted in accordance with customary practice of United States lawyers who regularly give, and United States lawyers who regularly advise opinion recipients regarding, opinions in transactions of this type.

In addition, in rendering the foregoing opinions we have further assumed that:

(a)    the New Guarantor (i) is duly formed and is validly existing and in good standing, (ii) has requisite legal status and legal capacity under the laws of the jurisdiction of its organization and (iii) has complied and will comply with all aspects of the laws of the jurisdiction of its organization in connection with the transactions contemplated by, and the performance of its obligations under, the Second Supplemental Indenture;

(b)    the New Guarantor has the private company limited power and authority to execute, deliver and perform all its obligations under the Second Supplemental Indenture;

(c)    the Second Supplemental Indenture has been duly authorized, executed and delivered by all requisite private company limited action on the part of the New Guarantor;

(d)    neither the execution and delivery by the New Guarantor of the Second Supplemental Indenture nor the performance by the New Guarantor of its obligations under the Second Supplemental Indenture (i) conflicts or will conflict with the Certificate of Incorporation of the New Guarantor, (ii) constitutes or will constitute a violation of, or a default under, any

Wilmington Savings Fund Society, FSB
April 9, 2026
Page 6

lease, indenture, agreement or other instrument to which the New Guarantor or its property is subject, (iii) contravenes or will contravene any order or decree of any governmental authority to which the New Guarantor or its property is subject, or (iv) violates or will violate any law, rule or regulation to which the New Guarantor or its property is subject; and

(e)      neither the execution and delivery by the New Guarantor of the Second Supplemental Indenture nor the enforceability of the Second Supplemental Indenture against the New Guarantor requires or will require the consent, approval, licensing or authorization of, or any filing, recording or registration with, any governmental authority under any law, rule or regulation of any jurisdiction.

This opinion letter is being furnished only to you in your capacity as Trustee and is solely for your benefit as Trustee in connection with the execution of the Second Supplemental Indenture.  Without our prior written consent, this opinion letter may not be used, circulated, quoted or otherwise referred to for any other purpose or relied upon by, or assigned to, any other person or entity for any purpose, including any holder of any Notes or any other person or entity that seeks to assert your rights in respect of this opinion letter (other than your successor in interest by means of merger, consolidation, transfer of a business or other similar transaction).

Very truly yours,

Skadden Arps Slate Meagher & Flom LLP

MJS

2542

DG-421

EXHIBIT A

[OFFICER'S CERTIFICATE]

2543

DG-422

*Execution Version*

**OFFICER'S CERTIFICATE PURSUANT TO THE INDENTURE**

**NFE FINANCING LLC**

**April 9, 2026**

**12.000% Senior Secured Notes due 2029**

Reference is made to the Indenture, dated as of November 22, 2024 (the "Original Indenture"), among NFE Financing LLC, a Delaware limited liability company (the "Company"), the subsidiary guarantor party thereto and Wilmington Savings Fund Society, FSB, as trustee and as notes collateral agent, relating to the Company's 12.000% Senior Secured Notes due 2029 (the "Notes"), as supplemented by (i) the first supplemental indenture thereto, dated as of April 3, 2026 (the "First Supplemental Indenture") and (ii) the second supplemental indenture thereto, dated as of the date hereof (the "Second Supplemental Indenture" and the Original Indenture, as amended and supplemented by the First Supplemental Indenture and the Second Supplemental Indenture, the "Indenture"). Capitalized terms used and not otherwise defined in this certificate have the respective meanings assigned to them in the Indenture.

The undersigned, being a duly elected, qualified and acting Officer of NFE Brazil Newco Limited, a private company limited by shares incorporated in England and Wales (the "New Guarantor") and not in his individual capacity, does hereby certify pursuant to Section 9.01, Section 9.06, Section 13.04 and Section 13.05 of the Indenture that:

1.    The execution of the Second Supplemental Indenture is authorized or permitted by the Indenture;

2.    The undersigned has read all of the covenants and conditions contained in the Indenture, and the definitions in the Indenture relating thereto, relating to the execution and delivery of the Second Supplemental Indenture;

3.    The statements contained in this certificate are based upon the undersigned's familiarity with the Indenture, and upon discussions by the undersigned with officers and employees of the Company familiar with the matters set forth herein;

4.    In the opinion of the undersigned, he or she has made such examination or investigation as is necessary to enable him or her to express an informed opinion as to whether or not such covenants and conditions have been complied with; and

5.    In the opinion of the undersigned, such conditions and covenants provided for in the Indenture relating to the execution and delivery of the Second Supplemental Indenture have been complied with.

*[Signature Page Follows]*

DG-423

**NFE BRAZIL NEWCO LIMITED**

By: _Kevin Sullivan_
      Name:  Kevin Sullivan
      Title:    Director

[*Signature Page to Officer's Certificate re: 2029 UnSub Notes Second Supplemental Indenture*]

DG-424

# Tab 06

# Tab 07

**PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
SKADDEN DRAFT 24 APRIL 2026**

**IN THE HIGH COURT OF JUSTICE
BUSINESS AND PROPERTY COURTS OF
ENGLAND AND WALES
INSOLVENCY AND COMPANIES LIST (ChD)**

**IN THE MATTER OF NFE GLOBAL HOLDINGS LIMITED**

**-and-**

**IN THE MATTER OF THE COMPANIES ACT 2006**

---

**RESTRUCTURING PLAN**
(under Part 26A of the Companies Act 2006)

- between –

NFE GLOBAL HOLDINGS LIMITED

- and –

THE CORECO PLAN CREDITORS
(as defined herein)

---

i

DG-425

**PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
SKADDEN DRAFT 24 APRIL 2026**

## Table of Contents

1    Definitions and Interpretation ............................................................... 1

2    Application and effectiveness of the restructuring plan .................................. 14

3    Grant of authority to execute the implementation documents .......................... 15

4    Deeds of undertaking ............................................................................ 19

5    Closing Steps and Plan Consideration ..................................................... 19

6    Transaction Implementation DeedModifications of this restructuring plan ...... 22

7    Releases  ........................................................................................... 23

8    Termination ....................................................................................... 24

9    General restructuring plan provisions ...................................................... 25

10   Notice ............................................................................................... 27

11   Future Liquidation or Administration ...................................................... 30

12   Plan Parties ....................................................................................... 30

13   Governing Law and Jurisdiction ............................................................. 30

Schedule [●] – [●] ................................................................................... 31

Schedule [●] – Implementation Documents ................................................. 32

Schedule [●] – Undertaking Parties ............................................................ 35

DG-426

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
SKADDEN DRAFT 24 APRIL 2026

## RESTRUCTURING PLAN

**Between**:

(1) **NFE GLOBAL HOLDINGS LIMITED**, a company incorporated under the laws of England and Wales (company number 13679588) (the "**Plan Company**"); and

(2) **THE CORECO PLAN CREDITORS** (as hereinafter defined).

**Recitals**

(A) The Plan Company was incorporated and registered in England and Wales on 14 October 2021, with registered number 13679588, as a private company limited by shares under the Act (as defined below). The Plan Company's registered office is at Suite 1, 7th Floor, 50 Broadway, London, United Kingdom, SW1H 0BL. The Plan Company is an indirect subsidiary of New Fortress Energy Inc., a Delaware corporation.

(B) The purpose of this Restructuring Plan (as defined below) is to effect a compromise and arrangement between the Plan Company and the CoreCo Plan Creditors (as defined below) to facilitate the implementation of the Restructuring (as defined below). The CoreCo Plan Creditors are the Legacy Noteholders, the RCF Lenders, the TLA Lenders, the TLB Lenders, the Series I Lender and the Series II Lender (each as defined below).

(C) To effect such compromise and arrangement, each Plan Creditor will pursuant to the terms of this Restructuring Plan, grant a power of attorney to the Plan Company to execute the Transaction Implementation Deed and the applicable Implementation Documents to which such Plan Creditor is a party on its behalf (each as defined below).

(D) In order to successfully implement the Restructuring, participation is required from, among others, the Undertaking Parties. Each of the Undertaking Parties has severally agreed, upon the sanctioning of this Restructuring Plan by the Court (as defined below), to be bound by and comply with the obligations expressed to apply to it under this Restructuring Plan and, on and from their release in accordance with the Restructuring Plan, the Implementation Documents to which it is a party pursuant to the provisions of such person's Deed of Undertaking (as defined below).

(E) This Restructuring Plan and the BrazilCo Plan (as defined below) are inter-conditional such that this Restructuring Plan and the BrazilCo Plan shall become effective and legally binding at the same time (or not at all).[1]

## 1    DEFINITIONS AND INTERPRETATION

## 1.1    Definitions

**1.1.1**    In this Restructuring Plan, the following terms shall, unless the context otherwise requires, have the following meanings:

---

[1]    Note to Skadden: can you please confirm that the intention is that the effectiveness of each Plan will be conditional on the other also being sanctioned and that the effectiveness of the Restructuring will be conditional on both Plans remaining in full force and effect and not having been appealed? **Skadden**: Yes.

1

DG-427

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**
**SKADDEN DRAFT 24 APRIL 2026**

"**2026 Legacy Noteholders**" means the ultimate beneficial holders of the 2026 Legacy Notes Debt;

"**2026 Legacy Notes**" means the 6.500% senior secured notes due 2026 issued by NFE Inc. pursuant to the 2026 Legacy Notes Indenture;

"**2026 Legacy Notes Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the 2026 Legacy Noteholders under or in connection with the 2026 Legacy Notes (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise);

"**2026 Legacy Notes Indenture**" means the indenture entered into by, among others, NFE Inc. as issuer and U.S. Bank Trust Company, National Association (as successor in interest to U.S. Bank National Association), as trustee and collateral agent, on 12 April 2021 (as amended, supplemented or otherwise modified from time to time);

"**2029 Legacy Noteholders**" means the ultimate beneficial holders of the 2029 Legacy Notes Debt;

"**2029 Legacy Notes**" means the 8.750% senior secured notes due 2029 issued by NFE Inc. pursuant to the 2029 Legacy Notes Indenture;

"**2029 Legacy Notes Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the 2029 Legacy Noteholders under or in connection with the 2029 Legacy Notes (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise);

"**2029 Legacy Notes Indenture**" means the indenture entered into by, among others, NFE Inc. as issuer and U.S. Bank Trust Company, National Association (as successor in interest to U.S. Bank National Association), as trustee and collateral agent, on 8 March 2024 (as amended, supplemented or otherwise modified from time to time);

"**2029 New Noteholders**" means the ultimate beneficial holders of the 2029 New Notes;

"**2029 New Notes**" means the 12.000% senior secured notes due 2029 issued by NFE Financing pursuant to the 2029 New Notes Indenture;

"**2029 New Notes Indenture**" means the indenture entered into by, among others, NFE Financing, as issuer and Wilmington Savings Fund Society, FSB, as trustee and collateral agent, on 22 November 2024 (as amended, supplemented or otherwise modified from time to time);

"**Act**" means the Companies Act 2006 (as amended from time to time);

"**Ad Hoc Groups**" means, collectively, the Akin/Evercore AHG, the PW/PWP AHG and the Legacy Notes AHG.

DG-428

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
SKADDEN DRAFT 24 APRIL 2026

"**Administrative Party**" means the RCF Agent, the TLA Agent, the TLB Agent, the Series I Agent, the Series II Agent, the Common Representative, the 2026 Legacy Notes Trustee, the 2029 Legacy Notes Trustee, the 2029 New Notes Trustee, the New CoreCo Term Loan Facility Agent, the FLNG 2 Term Loan Facility Agent, the New Common Representative, DTC and Cede & Co, the Holding Period Trustee and the Information Agent (each as defined in the Transaction Implementation Deed);

"**Advisor Released Person**" means each of the current and former respective officers, directors, employees, executives and agents (or equivalents) of each Released Advisor and each Affiliate of each Released Advisor;

"**Advisors**" means, collectively, the Akin/Evercore AHG Advisors, the PW/PWP AHG Advisors, the RCF Advisors, the TLA Advisors, the Legacy Notes Advisors, and any additional advisors or consultants engaged by any of the Ad Hoc Groups, the agent under the Revolving Credit Facility Agreement or the agent under the Term Loan A Agreement, and any successor professional advisors to the foregoing, in each case as advisors in connection with the Restructuring;

"**Affiliate**" means, with respect to a person, any other person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such person and, for the purposes of this definition, "**control**" shall mean the power, direct or indirect, to (a) vote on more than 50 per cent, of the securities having ordinary voting power for the election of directors of such person, or (b) direct or cause the direction of the management and policies of such person whether by contract or otherwise;

"**Akin/Evercore AHG**" means the ad hoc group of certain unaffiliated holders of Term Loan B Loans represented by the Akin /Evercore AHG Advisors;

"**Akin/Evercore AHG Advisors**" means, collectively, Akin Gump Strauss Hauer & Feld LLP and Evercore Group L.L.C., and their Affiliates as counsel and financial advisor, respectively, to the Akin/Evercore AHG, as well as other regulatory, local, foreign, barristers and special counsel (in each case as notified to the Plan Company), in their respective capacities as counsel to the Akin/Evercore AHG;

"**Brazil Parent**" means NFE Brazil Investments LLC;

"**BrazilCo Plan**" means the restructuring plan proposed by NFE Brazil Newco in substantially the form attached at [●] to the Explanatory Statement (or appended to any supplemental explanatory statements made available to the CoreCo Plan Creditors prior to the Plan Meetings) or with, or subject to, any modification, addition or condition which the Court may think fit to approve or impose, as appropriate;

"**BrazilCo Plan Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the 2029 New Noteholders under or in connection with the 2029 New Notes (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise);

DG-429

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
SKADDEN DRAFT 24 APRIL 2026

"**Business Day**" means a day other than a Saturday, Sunday, or other day on which commercial banks are authorised to close under the laws of, or are in fact closed in, the State of New York, United States of America or in London, United Kingdom;

"**Closing Conditions Precedent**" has the meaning has the meaning given to it in the Transaction Implementation Deed;

"**Closing Steps**" has the meaning given to it in Clause 5.1.2;

"**CoreCo Plan Claims**" means any (direct or indirect) claim of a Plan Creditor in respect of any Liability of the Plan Company, whether as principal obligor, guarantor, indemnifier or security provider, in relation to, or arising out of or in connection with, the Debt Documents or the CoreCo Plan Debt, arising on or before the Record Date or which may arise after the Record Date as a result of an obligation or Liability of the Plan Company to a Plan Creditor incurred or as a result of an event occurring or an act done on or before the Record Date (including, for the avoidance of doubt, any interest accruing on, or accretions arising with respect to, such claims before or until the Record Date), but excluding any claim of a Plan Creditor in respect of any Liability of the Plan Company to any Plan Creditor arising directly or indirectly in relation to, or arising out of or in connection with, a failure to comply with the terms of this Restructuring Plan, the Transaction Implementation Deed or any other Implementation Document;

"**CoreCo Plan Creditors**" means each of: the Legacy Noteholders; the RCF Lenders; the TLB Lenders; the TLA Lenders; the Series I Lender; and the Series II Lender.

"**CoreCo Plan Debt**" means any obligation or Liability of the Plan Company to any of the CoreCo Plan Creditors in relation to, or arising out of or in connection with, the 2026 Legacy Notes Debt, the 2029 Legacy Notes Debt, the R-1 Revolving Credit Facility Debt, the R-2 Revolving Credit Facility Debt, the Term Loan A Debt, the Term Loan B Debt, the Series I Loan Debt, and the Series II Loan Debt;

"**Court**" means the High Court of Justice of England and Wales and any appellate court in England and Wales (including the Court of Appeal and the Supreme Court);

"**Debt Documents**" means the Term Loan A Agreement, Term Loan B Agreement, Revolving Credit Facility Agreement, Series I Loan Agreement, Series II Loan Agreement, the 2026 Legacy Notes Indenture, the 2029 Legacy Notes Indenture, and any related security and ancillary documents;

"**Deed of Undertaking**" means a deed of undertaking to the Plan Company in the form agreed by the parties thereto pursuant to which each of the parties thereto agrees to execute or procure to be executed all such documents, and to do or procure to be done all such acts and things as may be reasonably necessary or desirable to be done by it as described in this Restructuring Plan and to be bound by and perform the terms of this Restructuring Plan;

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
SKADDEN DRAFT 24 APRIL 2026

"**E-Mail Error Message**" means, with respect to an e-mail sent by one person to another under or in connection with this Restructuring Plan, an automatic error message received from an intended recipient (or the server by which such intended recipient is provided e-mail service) that:

(a)     such e-mail is undeliverable; or

(b)     there has been a failure to deliver such e-mail;

"**English Counsel**" means Daniel Bayfield KC, Ryan Perkins and Jon Colclough of South Square Chambers, instructed by the Group Legal Advisor to appear on behalf of the Plan Companies before the Court in respect of the Restructuring Plan, or such other barrister as may be instructed by the Group Legal Advisor;

"**Excluded Liabilities**" means:

(a)     any Liability arising from criminal acts, fraud, gross negligence or wilful misconduct on the part of a Released Party;

(b)     any Liability arising from omissions occurring or actions taken on or following the Restructuring Completion Time that do not relate to, or arise out of, the negotiation, preparation or implementation of the Restructuring;

(c)     any Liability of any Released Advisor to its client arising under a duty of care which has been expressly assumed or acknowledged in writing by the relevant Advisor or which can only be excluded in accordance with applicable law and has not been so excluded, or which cannot be released, waived or excluded under applicable law;

(d)     any Liability of a Representative to a Plan Creditor in respect of which it is a Representative;

(e)     any Liability of any accounting, restructuring or tax advisor of the Plan Company or any other member of the Group to the Released Parties or any other member of the Group and subject to the terms of any reliance letter, in relation to any report, memorandum or opinion provided by such advisor on which a Released Party is expressly entitled to rely;

(f)     any Liability of the Plan Company or any other member of the Group with respect to any outstanding fees, costs and/or expenses properly incurred by its professional advisors (including the Advisors) in accordance with the terms of any such advisors' fee letters, engagement letters or other form of written agreement entered into by any member of the Group in connection with the Restructuring;

(g)     any Liabilities created by the Implementation Documents or the Restructuring Plan or any document entered into pursuant to, or in connection with, the Restructuring, the Restructuring Plan or any other Implementation Document, including as a result of a failure by any party to comply with the Restructuring Support Agreement, the Restructuring Plan or any Implementation Document; and

(h)     in the case of a Group Member, any intercompany indebtedness or any intra-Group transaction entered into which is not expressly released, amended or otherwise reorganized pursuant to the Restructuring Plan.

"**Existing Obligor**" means each obligor under the Debt Documents from time to time;

"**Explanatory Statement**" means the explanatory statement dated [●] relating to and issued by the Plan Company and NFE Brazil Newco in connection with this Restructuring Plan and the BrazilCo Plan pursuant to section 901D of the Act;

"**Group**" means NFE Inc. and each of its directly and indirectly owned subsidiaries (including the Plan Company) from time to time, with each being a "**Group Company**";

"**Group Legal Advisor**" means  Skadden, Arps, Slate, Meagher & Flom LLP and its affiliates;

"**Implementation Documents**" means each of the documents listed in Schedule [●] (*Implementation Documents*) in the form made available with the Explanatory Statement (subject to any amendments made in accordance with this Restructuring Plan or the Transaction Implementation Deed), and "**Implementation Document**" shall be construed accordingly;

"**Information Agent**" means Kroll Issuer Services Limited;

"**Legacy Noteholders**" means the 2026 Legacy Noteholders and the 2029 Legacy Noteholders;

"**Legacy Notes**" means the 2026 Legacy Notes and the 2029 Legacy Notes.

"**Legacy Notes Advisors**" means Paul Hastings LLP, as counsel to the Legacy Notes AHG;

"**Legacy Notes AHG**" means the ad hoc group of certain unaffiliated holders of Legacy Notes represented by Paul Hastings LLP as counsel;

"**Liability**" means any present or future payment and discharge obligation, liability, claim, debt, claims for specific performance, damages or restitution, counterclaims, suits, rights of action, or rights whatsoever or howsoever arising, including, without limitation, for the payment of money or the performance of an act or obligation (whether deliberate or otherwise) or any failure to perform any obligation or any omission, whether for negligence, breach of duty, breach of trust or misrepresentation or otherwise, whether in respect of principal, interest or otherwise, whether actual or contingent, whether fixed or undetermined, whether admitted or disputed, whether known or unknown, whether owed jointly or severally and whether owed as principal, surety or in any capacity whatsoever and whether it arises at common law, in equity or by statute, in England and Wales or in any other jurisdiction under whatever applicable law, under any legal theory, and in any manner whatsoever, and "**Liabilities**" shall be construed accordingly;

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
SKADDEN DRAFT 24 APRIL 2026

"**Majority Akin/Evercore AHG Members**" means, as of any relevant time, members of the Akin/Evercore AHG that are Supporting Creditors holding, in the aggregate, greater than 50.0% of the aggregate outstanding principal amount of Term Loan B Debt then held by the members of the Akin/Evercore AHG that are Supporting Creditors;

"**Majority Legacy Notes AHG Members**" means, as of any relevant time, members of the Legacy Notes AHG that are Supporting Creditors holding, in the aggregate, greater than 50.0% of the aggregate outstanding principal amount of the Legacy Notes then held by the members of the Legacy Notes AHG that are Supporting Creditors;

"**Majority PW/PWP AHG Members**" means, as of any relevant time, members of the PW/PWP AHG that are Supporting Creditors holding, in the aggregate, greater than 50.0% of the aggregate outstanding principal amount of 2029 New Notes Debt then held by the members of the PW/PWP AHG that are Supporting Creditors;

"**Majority RCF Supporting Creditors**" means, as of any relevant time, holders of Revolving Credit Facility Debt that are Supporting Creditors holding, in the aggregate, greater than 50.0% of the aggregate outstanding principal amount of Revolving Credit Facility Debt then held by holders of Revolving Credit Facility Debt that are Supporting Creditors;

"**Majority Supporting Creditors**" means, collectively, as of any relevant time, the (i) Majority Akin/Evercore AHG Members, (ii) the Majority PW/PWP AHG Members, (iii) the Majority RCF Supporting Creditors, (iv) the Majority Legacy Notes AHG Members, and (v) the Majority TLA Supporting Creditors;

"**Majority TLA Supporting Creditors**" means, as of any relevant time, holders of Term Loan A Debt that are Supporting Creditors holding, in the aggregate, greater than 50.0% of the aggregate outstanding principal amount of Term Loan A Debt then held by such holders of Term Loan A Debt that are Supporting Creditors;

"**Majority Supporting Creditors' Advisors**" means the Akin /Evercore AHG Advisors, the PW/PWP AHG Advisors and the RCF Advisors on behalf of the majorities of their respective Ah Hoc Groups;

"**NFE Brazil Newco**" means NFE Brazil Newco Limited;

"**NFE Financing**" means NFE Financing LLC, a Delaware limited liability company;

"**NFE Inc.**" means New Fortress Energy Inc., a Delaware corporation;

"**Notice**" means any notice or other written communication to be given under or in relation to the Restructuring Plan;

"**Notice Records**" means the names and addresses (including email addresses) contained in the Plan Company's records for a Plan Creditor at 5:00 p.m. (London time) two Business Days before the date of a relevant Notice;

DG-433

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
SKADDEN DRAFT 24 APRIL 2026

"**Plan Consideration**" means the consideration to be received by each Plan Creditor pursuant to the Restructuring Plan and in accordance with the Transaction Implementation Deed;

"**Plan Creditor Letter**" means a plan creditor letter, in the form appended to the Explanatory Statement;

"**Plan Effective Date**" has the meaning given to that term in Clause 2.2;

"**Plan Meeting**" means a meeting of a class of CoreCo Plan Creditors convened in accordance with the permission of the Court pursuant to section 901C of the Act to consider and, if thought fit, approve this Restructuring Plan, including any adjournment thereof;

"**Plan Party**" or "**Party**" means the Plan Company, each Plan Creditor and each Undertaking Party,[2] and "**Plan Parties**" and "**Parties**" shall be construed accordingly;

"**Plan Sanction Order**" means the order or orders of the Court sanctioning the Restructuring Plan;

"**Plan Website**" means the website at https://deals.is.kroll.com/nfe;

"**Plans**" means, collectively, this Restructuring Plan and the BrazilCo Plan;

"**Proceedings**" means any process, action or other legal proceedings (including, without limitation, any demand, arbitration, alternative dispute resolution, judicial review, adjudication, execution, seizure, distraint, forfeiture, re-entry lien, enforcement of judgment or enforcement of any security), whether arising in connection with the Restructuring or otherwise;

"**PW/PWP AHG**" means the ad hoc group of certain unaffiliated 2029 New Noteholders represented by the PW/PWP AHG Advisors;

"**PW/PWP AHG Advisors**" means, collectively, Paul, Weiss, Rifkind, Wharton & Garrison LLP and Perella Weinberg Partners LP, as counsel and financial advisor, respectively, to the PW/PWP AHG, as well as other regulatory, local, foreign, barristers and special counsel (in each case as notified to the Plan Company), in their respective capacities as counsel to the PW/PWP AHG;

"**R-1 Revolving Credit Facility**" means the facility drawn at US$[●] million as of the date of this Restructuring Plan under the Revolving Credit Facility Agreement;

"**R-1 Revolving Credit Facility Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to any agent, any issuing bank, any lender or any lender counterparty

---

[2] Note to Skadden: we assume Undertaking Parties are Plan Parties even though they are not actually parties to the Restructuring Plan document as there will be a provision in the Deeds of Undertaking whereby they undertake to comply with the provisions of the Plan stated to be applicable to them (and thereby binding them to the RP). We will be reviewing and commenting on the Deeds of Undertaking on this basis. Please let us know if this is not the intention. **Note from Skadden: Correct.**

8

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
SKADDEN DRAFT 24 APRIL 2026

of the R-1 Revolving Credit Facility under or in connection with the R-1 Revolving Credit Facility (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise);

"**R-2 Revolving Credit Facility**" means the facility drawn at US$[●] million as of the date of this Restructuring Plan under the Revolving Credit Facility Agreement;

"**R-2 Revolving Credit Facility Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to any agent, any issuing bank, any lender or any lender counterparty of the R-2 Revolving Credit Facility under or in connection with the R-2 Revolving Credit Facility (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise);

"**Revolving Credit Facility Agreement**" means the Credit Agreement, dated as of April 15, 2021, by and among NFE Inc., the guarantors from time to time party thereto, the lenders and issuing banks from time to time party thereto, and MUFG Bank Ltd., as administrative agent and collateral agent (as amended, supplemented or otherwise modified from time to time).

"**Revolving Credit Facility Debt**" means the R-1 Revolving Credit Facility Debt and the R-2 Revolving Credit Facility Debt;

"**RCF Advisors**" means Sidley Austin LLP, as counsel (together with any external counsel instructed by them in relation to the Restructuring Plan (including Felicity Toube KC and Matthew Abraham of South Square Chambers)) and FTI Consulting, Inc. and Moelis & Company as financial advisors, to the agent under the Revolving Credit Facility Agreement and each of their Affiliates and any other advisors retained by any of the foregoing in connection with the Restructuring in accordance with the Revolving Credit Facility Agreement;

"**RCF Lenders**" means the lenders of record under the Revolving Credit Facility Agreement;

"**Record Date**" means the date on which the CoreCo Plan Creditors' entitlement to vote on this Restructuring Plan and the value of their CoreCo Plan Claims will be assessed, being [●] 2026;

"**Released Advisors**"  means:

(a)     the Group Legal Advisor;

(b)     English Counsel;

(c)     Houlihan Lokey Capital, Inc. and Alvarez & Marsal Europe LLP, as financial advisors to the Plan Companies and the Group;

(d)     the Advisors;

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**
**SKADDEN DRAFT 24 APRIL 2026**

(e)     any local or specialist counsel engaged by any of the foregoing; and

(f)     any successors to the foregoing;

"**Released Parties**" means, each in their various respective capacities as such in connection with the Restructuring and the Restructuring Plan:

(a)     the Plan Company;

(b)     each Group Company;

(c)     each Undertaking Party;

(d)     each Plan Creditor;

(e)     each: (i) Released Advisor; (ii) Advisor Released Person; and (iii) any person acting on the instructions of, or providing services to, any of the foregoing in connection with the Restructuring Plan or the Restructuring;

(f)     each Affiliate of the persons listed at (a) to (e) above; and

(g)     each of the respective officers, directors, employees, partners, executives and agents (or equivalents) of the persons listed in (a) to (f) above (each, a "**Representative**");[3]

"**Restructuring**" has the meaning given to it in the Transaction Implementation Deed;

"**Restructuring Completion Time**" has the meaning set out in the Transaction Implementation Deed;

"**Restructuring Effective Date**" has the meaning set out in the Transaction Implementation Deed;

"**Transaction Implementation Deed**" means the transaction implementation deed to be entered into on (or around) the Plan Effective Date between, among others, the Plan Company, NFE Brazil Newco, the CoreCo Plan Creditors and the creditors of NFE Brazil Newco subject to the BrazilCo Plan, substantially in the form attached to the Explanatory Statement (or appended to any supplemental explanatory statements made available to the CoreCo Plan Creditors prior to the Plan Meetings);

"**Restructuring Longstop Time**" has the meaning given to the term "Long-Stop Date" in the Restructuring Support Agreement;

"**Restructuring Plan**" means this restructuring plan proposed by the Plan Company under Part 26A of the Act (including the compromise and arrangement pursuant thereto) in the present form as set out herein or with, or subject to, any modification, addition or condition which the Court may think fit to approve or impose, as appropriate, provided any such modification, addition or condition is

---

[3]     Note to Skadden: have you considered the inclusion of Company releases against directors following Thames Water? **Note from Skadden: yes.**

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
SKADDEN DRAFT 24 APRIL 2026

approved by the Majority Supporting Creditors to the extent required pursuant to Clause 6 herein;

"**Restructuring Support Agreement**" means the Restructuring Support Agreement dated 17 March 2026 originally entered into between, among others, NFE Inc., the Plan Company and the Supporting Creditors (as defined therein) and acceded to by NFE Brazil Newco on 9 April 2026 and as amended, supplemented and/or restated from time to time;

"**Revolving Credit Facility Agreement**" means the credit agreement entered into between, among others, NFE Inc. and the lenders from time to time party thereto on 15 April 2021, as amended from time to time;

"**Revolving Credit Facility Debt**" means the R-1 Revolving Credit Facility Debt and the R-2 Revolving Credit Facility Debt;

"**Series I Lender**" means the lender under the Series I Loan Agreement;

"**Series I Loan**" means the loan made under the Series I Loan Agreement;

"**Series I Loan Agreement**" means the senior secured credit agreement entered into between, among others, the Brazil Parent as lender and NFE Inc. as borrower on 22 November 2024;

"**Series I Loan Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the lenders of the Series I Loan under or in connection with the Series I Loan Agreement (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise);

"**Series II Lender**" means the lender under the Series II Loan Agreement;

"**Series II Loan**" means the loan made under the Series II Loan Agreement;

"**Series II Loan Agreement**" means the senior secured credit agreement entered into between, among others, NFE Financing as lender and NFE Inc. as borrower on 6 December 2024;

"**Series II Loan Debt**" means present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the lenders of the Series II Loan under or in connection with the Series II Loan Agreement (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise);

"**Subsidiary**" means, in respect of an entity, any entity in respect of which it has direct or indirect control or owns directly or indirectly more than 50% of the voting rights, voting capital or similar rights of ownership, and "control" for this purpose means the power to direct the management and the policies of the entity whether through the ownership of voting capital, by contract or otherwise;

DG-437

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
SKADDEN DRAFT 24 APRIL 2026

"**Supporting Creditor**" means each of the undersigned holders or lenders of, or the investment advisors, sub-advisors or managers for the accounts of beneficial holders or beneficial holder(s), which such accounts of beneficial holders and such investment advisors, sub-advisors or managers have authority to bind or direct the beneficial holder(s) or lender(s) of, the CoreCo Plan Debt and BrazilCo Plan Debt (and in such capacity having the power to direct the voting and disposition of the CoreCo Plan Debt and BrazilCo Plan Debt held by such holder(s) or lender(s)) (each such holder, lender, investment advisor, sub-advisor or manager for the account of a beneficial holder, and, collectively, the "**Supporting Creditors**," in each case, including those who execute and deliver to the Information Agent an additional supporting creditor joinder substantially in the form of Schedule 8 of the Restructuring Support Agreement, pursuant to Section 7 of the Restructuring Support Agreement;

"**Term Loan A**" means the loans and other extensions of credit made under the Term Loan A Agreement;

"**Term Loan A Agreement**" means the credit agreement entered into between, among others, NFE Inc. and the lenders from time to time party thereto on 19 July 2024, as amended from time to time;

"**Term Loan A Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the lenders of the Term Loan A under or in connection with the Term Loan A Agreement (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise);

"**Term Loan B**" means the loans and other extensions of credit made under the Term Loan B Agreement;

"**Term Loan B Agreement**" means the credit agreement entered into between, among others, NFE Inc. and the lenders from time to time party thereto on 30 October 2023, as amended from time to time;

"**Term Loan B Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the lenders of the Term Loan B under or in connection with the Term Loan B Agreement (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise);

"**TLA Advisors**" means Cahill Gordon & Reindel LLP, as counsel to the agent under the Term Loan A Agreement;

"**TLA Lenders**" means the lenders of record under the Term Loan A Agreement;

"**TLB Lenders**" means the lenders of record under the Term Loan B Agreement; and

"**Undertaking Party**" means each of the entities listed in Schedule [●].

## 1.2    Interpretation

DG-438

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**
**SKADDEN DRAFT 24 APRIL 2026**

**1.2.1**    In this Restructuring Plan, unless the context otherwise requires or as otherwise expressly provided:

(a)    references to Clauses and Schedules are references to the Clauses of, and Schedules to, the Restructuring Plan and a reference to this "Restructuring Plan" includes a reference to each of the Schedules to this Restructuring Plan;

(b)    references to a statute or statutory provision include the same as subsequently modified, amended, supplemented or re-enacted from time to time;

(c)    references to the Information Agent, the Plan Company, a Plan Creditor, an Undertaking Party, or any other person shall be construed so as to include its and any subsequent successors in title, permitted assigns and permitted transferees;

(d)    where references to any actions, provisions or terms are stated as requiring the consent of the Majority Supporting Creditors, such consent shall be deemed to be granted if it has been provided in writing (including by e-mail) by the Majority Supporting Creditors' Advisors;

(e)    references to a person include references to an individual, firm, partnership, company, corporation, unincorporated body of persons or any state or state agency;

(f)    references to a statute or statutory provision include the same as subsequently modified, amended, supplemented or re-enacted from time to time;

(g)    references to an agreement, deed or document will be deemed also to refer to such agreement, deed or document as amended, supplemented, restated, varied, verified, replaced and/or novated (in whole or in part) from time to time and to any agreement, deed or document executed pursuant thereto, provided that such amendment, supplement, restatement, variation, verification, replacement and/or novation has, to the extent it relates to an Implementation Document or this Restructuring Plan, been made in accordance with the terms of this Restructuring Plan, the Transaction Implementation Deed or otherwise the terms of such Implementation Document;

(h)    references to an agreement, deed or document shall include any schedules, annexes and appendices to such agreement, deed or document;

(i)    references to (or to any specified provision of) the Restructuring Plan shall be construed as references to the Restructuring Plan as in force for the time being;

(j)    references to a Plan Creditor shall be references to a Plan Creditor in its capacity as a Plan Creditor and an obligation or Liability of a Plan Creditor shall apply to its successors, transferees and assigns (as applicable);

(k)    the singular includes the plural and vice versa and words importing one gender shall include all genders;

(l)    headings to Clauses are for ease of reference only and shall not affect the interpretation of the Restructuring Plan;

13

DG-439

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
SKADDEN DRAFT 24 APRIL 2026

(m) unless otherwise stated, all references in the Restructuring Plan to dates and times are to the date and time prevailing in London, United Kingdom;

(n) "including" or "include" shall be deemed to mean including or include without limitation;

(o) "or" is not exclusive;

(p) general words introduced by the word "other" shall not be given a restrictive meaning by reason of the fact that they are preceded by words indicating a particular class of acts, matters or things and general words shall not be given a restrictive meaning by reason of the fact that they are followed by particular examples intended to be embraced by the general words; and

(q) where a Closing Step refers to a document, notice or confirmation being delivered to a Plan Party or the Plan Parties, each Plan Party agrees that it will be sufficient for the relevant document, notice or confirmation to be uploaded on the Plan Website or delivered to CoreCo Plan Creditors via DTC[4];

(r) "US$" denotes the lawful currency of the United States of America.

## 2   APPLICATION AND EFFECTIVENESS OF THE RESTRUCTURING PLAN

2.1    As soon as reasonably practicable following, and in any event within two Business Days of, the granting of the Plan Sanction Order (or such later date as agreed between the Plan Company and the Majority Supporting Creditors' Advisors, each acting reasonably), the Plan Company shall deliver a certified copy of the Plan Sanction Order to the Registrar of Companies in England and Wales for registration in accordance with section 901F of the Act.

2.2    Unless otherwise stated and subject to Clause 8.1, the Restructuring Plan shall become effective and legally binding on the Plan Parties in accordance with its terms on and from the date certified copies of the Plan Sanction Order and the order or orders of the Court sanctioning the BrazilCo Plan are delivered to the Registrar of Companies for registration (the "**Plan Effective Date**").

2.3    [Unless otherwise stated and subject to Clause 8.1, on and from the Plan Effective Date, all of the rights, title and interests of CoreCo Plan Creditors to CoreCo Plan Claims shall be subject to the compromises and arrangements effected by this Restructuring Plan and implemented through the Transaction Implementation Deed (including, without limitation, any person to whom a Plan Creditor has transferred its rights in respect of its CoreCo Plan Claim after the Record Date).][5]

2.4    The compromises and arrangements effected by the Restructuring Plan will bind:

---

[4] **Note from Skadden: could you please indicate what you would suggest including here?**

[5]    Note to Skadden: 1) The compromises and arrangements are not occurring on and from PED, they are occurring in the sequence and the time set out in the RID; 2) should this refer to the various compromises, steps, arrangements etc. in the RID and CPs rather than / in addition to this RP document?

DG-440

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**
**SKADDEN DRAFT 24 APRIL 2026**

**2.4.1**   all CoreCo Plan Creditors and the Plan Company and, in each case, their respective permitted successors and assigns;

**2.4.2**   subject to the terms of the applicable Deed of Undertaking, each Undertaking Party and its respective permitted successors and assigns; and

**2.4.3**   [each other person that has undertaken to be bound by the terms of this Restructuring Plan and their respective permitted successors and assigns.][6]

**2.5**   The Plan Company shall notify the Information Agent in accordance with Clause 10 (*Notice*) as soon as reasonably practicable following the occurrence of the Plan Effective Date, and the Information Agent shall make such notice available on the Plan Website.

**3   GRANT OF AUTHORITY TO EXECUTE THE IMPLEMENTATION DOCUMENTS**

**3.1   Plan Company's Authority to Execute the Implementation Documents**

**3.1.1**   Subject to the terms of this Clause 3 and Clause 8 below, with effect on and from the Plan Effective Date, in consideration of the rights and benefits conferred on the CoreCo Plan Creditors under this Restructuring Plan and solely for the purpose of giving effect to the terms of this Restructuring Plan (and the transactions contemplated by it), notwithstanding any term of any other agreement, instrument or arrangement whatsoever (other than the Implementation Documents), each Plan Creditor hereby irrevocably appoints the Plan Company as its attorney and agent, acting by any duly authorised representative, for and on its behalf and in its name, and irrevocably authorises, directs, empowers and instructs the Plan Company, to:

(a)   enter into, execute and deliver as a deed, on behalf of each Plan Creditor in its capacity as a Plan Creditor, the Transaction Implementation Deed, such that each Plan Creditor will become a party to and be bound by the Transaction Implementation Deed;

(b)   enter into, sign, execute, notarise, acknowledge, release, deliver (whether as a deed or otherwise) and, where applicable, file[7] each Implementation Document to which such Plan Creditor is expressed to be, or is intended to become, a party, such that such Plan Creditor shall be a party to and bound by each such document as if it had executed it personally, in each case in its capacity as Plan Creditor;

(c)   enter into, sign, execute and deliver all deeds, agreements, instruments, certificates, confirmations, notices, elections, transfers, assignments, releases, directions, instructions and filings (including security, guarantee, escrow, perfection and regulatory filings) which are scheduled to, contemplated by, or expressly referred to in, or reasonably required to implement or give effect to

---

[6]   Note to Skadden: Please confirm which parties this limb is intended to capture, as the compromise/arrangement is really only between the plan parties being the Plan Company, CoreCo Plan Creditors and Undertaking Parties. **Note from Skadden**: **this is intended as a catch all.**

[7]   Note to Skadden: in addition to the RP being filed with CH, what do you envisage being filed, notarised etc? **Note from Skadden: Security documents and other TBD.**

DG-441

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**
**SKADDEN DRAFT 24 APRIL 2026**

this Restructuring Plan or any Implementation Document to which such Plan Creditor is expressed to be a party;

(d) complete, insert, amend or correct any blanks, schedules, annexes, signature blocks, party lists, dates, amounts, legal entity details, account details or similar particulars in any Implementation Document or related document; agree, consent to and effect, on behalf of such Plan Creditor, any amendment, waiver, modification or supplement to any Implementation Document or ancillary document(to which such Plan Creditor is expressed to be a party) which the Plan Company considers necessary or reasonably desirable in connection with the Restructuring provided that any such amendment, modification or supplement is made in accordance with Clause 6;

(e) give all notices, confirmations, directions and instructions to any trustee, agent, paying agent, information agent, clearing system, registrar, custodian or administrative party as may be required or desirable to give effect to this Restructuring Plan and the Implementation Documents;

(f) execute and deliver any release, discharge or waiver required to implement the releases and compromises and extinguishment of claims contemplated by this Restructuring Plan and grant the releases under and in accordance with the Transaction Implementation Deed;

(g) take any step, make any determination and do any act which the Plan Company considers necessary to carry out, enforce or consummate this Restructuring Plan and the transactions contemplated by it, including actions required under the laws of any jurisdiction (acting reasonably and, with respect to any step, determination or action not contemplated by the Transaction Implementation Deed, with the consent of the Majority Supporting Creditors (unless such step, determination or action is required by applicable law, in which case no such consent shall be required)), provided that such related or ancillary actions do not change any right or obligation of, or impose an additional obligation (by reference to such rights or obligations as are contemplated as at the date of this Restructuring Plan) on, a Plan Creditor and do not adversely affect any Plan Creditor;

(h) grant powers of attorney or authorities (under English law or any other applicable law) with equivalent or lesser scope to the power of attorney granted by this Clause 3 to any person selected by the Plan Company for the purposes of implementing the documents and steps set out in this Clause 3.1.1; and

(i) do all such other related or ancillary acts and things as the Plan Company considers (acting reasonably and, with respect to any action not contemplated by the Transaction Implementation Deed, with the consent of the Majority Supporting Creditors) to be reasonably necessary or desirable to the full and timely implementation of this Restructuring Plan and the transactions contemplated by it, provided that such other acts or things do not change any right or obligation of, or impose an additional obligation (by reference to such rights or obligations as are contemplated as at the date of the Explanatory Statement) on, a Plan Creditor and do not adversely affect any Plan Creditor.

3.2   Subject to the terms of this Clause 3 and Clause 8 below, the authority and power of attorney granted pursuant to this Clause 3 is irrevocable, being granted for valuable consideration and to secure the performance of obligations under this Restructuring Plan.

DG-442

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**
**SKADDEN DRAFT 24 APRIL 2026**

**3.3**   Each Plan Creditor waives any right to revoke or terminate such authority except as expressly provided in this Restructuring Plan.

**3.4**   Each Plan Creditor irrevocably agrees that it shall be bound by, and shall comply with, each Implementation Document and any ancillary document to which such Plan Creditor is a party (as if it were an original executing party) after such document has been executed and dated by the Plan Company on its behalf pursuant to, and in accordance with, this Clause 3.

**3.5**   The authority granted pursuant to this Clause 3 shall:

**3.5.1**   continue until the earlier of (i) Restructuring Completion Time or (ii) such other termination date as expressly provided in this Restructuring Plan, at which time it shall automatically expire; and

**3.5.2**   automatically lapse in respect of any Implementation Document or ancillary document once that document has been fully executed, released and delivered, whereupon it may thereafter be amended only in accordance with its terms.

**3.6**   Nothing in this Clause 3 authorises or permits the Plan Company to commence any Proceedings in the name of, or on behalf of, any Plan Creditor.

**3.7**   Promptly following any amendments, modification or variations being made to any Implementation Document pursuant to this Clause 3, the Plan Company shall procure that such Implementation Document (as amended, modified or varied) is promptly made available to the CoreCo Plan Creditors and each relevant Undertaking Party via the Plan Website and in accordance with the notice provisions of the applicable Deed of Undertaking (if any).

**3.8**   **Administrative Parties' Authority[8]**

**3.8.1**   Pursuant and subject to the terms of any Deed of Undertaking or applicable Implementation Document, with effect on and from the Plan Effective Date, each of the CoreCo Plan Creditors hereby irrevocably authorises and instructs each applicable Administrative Party to:

(a)   enter into, execute, deliver and perform (whether as a deed or otherwise) each Implementation Document to which it is expressed to be a party, provided that such Implementation Documents (other than the Transaction Implementation Deed) shall only become effective in accordance with their respective terms and as provided in the Transaction Implementation Deed and this Restructuring Plan, whereupon they shall become binding on all parties there;

(b)   take all steps and do all other things as it considers necessary or reasonably desirable for it to take to give effect to or implement the Restructuring, this Restructuring Plan and the transactions contemplated by it, including entering into, executing and delivering all such documents as the Plan Company and the relevant Administrative Party reasonably considers necessary for such purpose,

---

[8]   NTD: Subject to review by RCF Agent.

DG-443

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**
**SKADDEN DRAFT 24 APRIL 2026**

and taking any step expressed in this Restructuring Plan or any Implementation Document to be taken by or on behalf of it;

(c) act and rely, without further verification, on any written instruction from the Plan Company (acting on behalf of the CoreCo Plan Creditors pursuant to Clause 3.1) to take any action referred to in this Clause 3.8 or otherwise under this Restructuring Plan, and be entitled to assume that any such instruction complies with the terms of this Restructuring Plan and the Implementation Documents;

(d) give all such instructions, consents or confirmations to any trustee, agent, security agent, paying agent, registrar, clearing system or other administrative party as are necessary, and any other directions that may reasonably be requested, for the purposes of implementing any step contemplated by the Restructuring or this Restructuring Plan; and

(e) acknowledges and irrevocably confirms, authorizes and ratifies any such action taken by any Administrative Party on or prior to the Plan Effective Date,

in each case provided that each Administrative Party shall have all of the protections, immunities, rights, powers, authorities, indemnities, exculpations, exclusions or limitations of liability and/or benefits conferred on it under and by the applicable Finance Documents governing its appointment and, upon such document's effectiveness and in respect of actions taken after the effectiveness thereof, the Implementation Documents.

3.8.2 No Administrative Party shall have any Liability to the Plan Company, any Plan Creditor or any of their respective Affiliates for any action taken, document executed or reliance placed on any instruction given to it in accordance with Clause 3.7.1 above, except to the extent arising from its fraud, willful misconduct, willful default or gross negligence.

3.8.3 In complying with any authorisations, instructions or requests pursuant to this Clause 3.8, each Administrative Party:

(a) shall be entitled to assume that any instructions received by it pursuant to this Restructuring Plan have been duly given in accordance with its terms and the relevant Finance Documents or Implementation Documents;

(b) shall be entitled to assume that, unless it has received notice to the contrary, such instructions have not been revoked;

(c) shall not be obliged to do or omit to do anything if it would, or might in its reasonable opinion, constitute a breach of any applicable law, regulation or contractual obligation or any duty binding upon it;

(d) shall have only those duties, obligations and responsibilities as are expressly specified in this Restructuring Plan and the Implementation Documents to which it is a party (and no others shall be implied), and such duties shall be of a mechanical and administrative nature;

(e) shall not be responsible for the legality, validity, effectiveness, adequacy or enforceability of any Implementation Document or any transaction contemplated by this Restructuring Plan; and

18

DG-444

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**
**SKADDEN DRAFT 24 APRIL 2026**

(f) shall not be liable (other than in the case of fraud, willful misconduct, willful default or gross negligence on the part of such Administrative Party) for any loss, Liability or damage, or any failure or delay in the performance of its obligations, arising out of or in connection with:

(i) any action taken or omitted to be taken in accordance with instructions received pursuant to this Restructuring Plan;

(ii) the exercise or non-exercise of any right, power, authority or discretion conferred on it; or

(iii) any event or circumstance beyond its reasonable control, including (without limitation) governmental action, market disruption, failure of systems or communications, natural events or industrial action.

**3.8.4** The authorities, appointments and instructions granted in Clauses 3.1 and 3.8 and shall be treated, for all purposes whatsoever and without limitation, as having been granted by deed.

## 4 DEEDS OF UNDERTAKING

**4.1** Subject to Clause 8, and the terms of the Deeds of Undertaking executed by them, each of the Undertaking Parties severally undertakes, as applicable: (i) to take all steps and execute all such documents as may be necessary or reasonably desirable for the purpose of giving effect to this Restructuring Plan, including the Implementation Documents to which they will be a party and the documentary conditions precedent (if any) applicable to them, and/or (ii) to authorise the Plan Company to act as its attorney to execute and deliver such Implementation Documents in accordance with this Restructuring Plan, the Transaction Implementation Deed, and the Implementation Documents, and in each case and to be bound by, and to comply with, and to perform, the obligations expressed to apply to it in this Restructuring Plan.

**4.2** The Plan Company undertakes to comply with the terms of the BrazilCo Plan to the extent applicable to it.[9]

## 5 CLOSING STEPS AND PLAN CONSIDERATION

### 5.1 Closing Steps

**5.1.1** As soon as reasonably practicable following the Plan Effective Date, the Plan Company shall execute the Transaction Implementation Deed for and on behalf of itself, the applicable Undertaking Parties as attorney for such Undertaking Parties in accordance with their Deeds of Undertaking, and, in accordance with Clause 3 (*Grant of Authority to Execute the Implementation Documents*), on behalf of the CoreCo Plan Creditors.

---

[9] Note to Skadden: is this required—will CoreCo have to comply with any terms of the BrazilCo Plan (and vice versa in the BrazilCo RP)? If you would like to retain this wording then perhaps it should be somewhere else in the document. BrazilCo should also give an undertaking to be bound by this Plan in a document to which the CoreCo CoreCo Plan Creditors are party or which they have the benefit of. **Note from Skadden: NFE Brazil Newco will sign a Deed of Undertaking**.

2568

DG-445

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
SKADDEN DRAFT 24 APRIL 2026

**5.1.2** The steps to be taken to implement the Restructuring and the transactions contemplated in the Plans (the "**Closing Steps**") shall take place in accordance with, and in the order and at the times specified in, the terms of the Transaction Implementation Deed.

**5.1.3** The applicable Implementation Documents shall be signed, dated and released in accordance with the Transaction Implementation Deed.

**5.2** **Plan Consideration**

**5.2.1** The CoreCo Plan Creditors acknowledge and agree that the CoreCo Plan Creditors shall:

(a) receive their Plan Consideration in accordance with the terms set out in the Transaction Implementation Deed; and

(b)  give the authorities, instructions, undertakings, releases, ratifications, and waivers in favour of the Plan Company and the Released Parties, where applicable, in consideration of the rights provided to each Plan Creditor under this Restructuring Plan and the Transaction Implementation Deed.

**5.2.2** The Plan Consideration of the CoreCo Plan Creditors shall be calculated and paid (or issued, as applicable) in accordance with the Transaction Implementation Deed and shall include the following Plan Consideration Instruments (each as defined in the Transaction Implementation Deed):

| CoreCo Plan Debt | Plan Consideration Instruments |
|---|---|
| 2026 Legacy Notes Debt<br>2029 Legacy Notes Debt | CoreCo Common Stock<br>CoreCo Preferred Stock |
| Series I Loan Debt<br>Series II Loan Debt | CoreCo Common Stock<br>CoreCo Preferred Stock |
| R-1 Revolving Credit Facility Debt | CoreCo Common Stock<br>CoreCo Preferred Stock<br>New CoreCo Term Loans<br>FLNG 2 Term Loans<br>FLNG 2 Preferred Equity |
| R-2 Revolving Credit Facility Debt | CoreCo Common Stock<br>CoreCo Preferred Stock<br>New CoreCo Term Loans<br>FLNG 2 Term Loans<br>FLNG 2 Preferred Equity<br>RCF-2 / TLA BrazilCo Equity Pool |

DG-446

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**
**SKADDEN DRAFT 24 APRIL 2026**

| CoreCo Plan Debt | Plan Consideration Instruments |
|---|---|
| Term Loan A Debt | CoreCo Common Stock<br>CoreCo Preferred Stock<br>New CoreCo Term Loans<br>FLNG 2 Term Loans<br>FLNG 2 Preferred Equity<br>RCF-2 / TLA BrazilCo Equity Pool |
| Term Loan B Debt | CoreCo Common Stock<br>CoreCo Preferred Stock<br>New CoreCo Term Loans<br>FLNG 2 Term Loans<br>FLNG 2 Preferred Equity |

**5.3    Standstill[10]**

5.3.1    On and from the Plan Effective Date until the Restructuring Effective Date, or if earlier, until the termination of this Restructuring Plan in accordance with Clause 8 (*Termination*), each Plan Creditor shall not (and no person or entity shall be entitled to, on behalf of such Plan Creditor), in any jurisdiction:

(a) exercise or seek to exercise any rights, remedies, powers or discretions (including any right to accelerate, enforce any guarantee or make any demand in respect of any Liability) under or in connection with the Debt Documents, or instruct or direct any other person to do so;

(b) commence, continue or take any step in relation to any legal, judicial, administrative, arbitral or other proceedings against the Plan Company or any other Existing Obligor or their respective assets or proceeds thereof (including the enforcement of any judgment, order, award, lien or security), or instruct or direct any other person to do so, in each case in connection with the Debt Documents (other than any action taken in response to, or in connection with, any proceedings commenced by or on behalf of any member of the Group);

(c) take any step to enforce, attach, sequester or levy execution against any asset of the Plan Company or any other Existing Obligor, or to enforce or realise any security or other encumbrance, or instruct or direct any other person to do so, in each case in connection with the Debt Documents; or

(d) take any action which would, or would reasonably be expected to, impede, delay or frustrate the implementation of the transactions contemplated by this Restructuring Plan,

---

[10]   Note to Skadden: subject to further review.

DG-447

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
SKADDEN DRAFT 24 APRIL 2026

in each case, other than as expressly contemplated by, and in accordance with, this Restructuring Plan, the Transaction Implementation Deed or any other Implementation Document, or where such action is taken for the purpose of giving effect to the Restructuring.

## 6  MODIFICATIONS OF THIS RESTRUCTURING PLAN

6.1    Subject to Clauses 6.2 and 6.3 below, the Plan Company may, at any hearing to sanction the Restructuring Plan, acting reasonably and in good faith, consent on behalf of the CoreCo Plan Creditors to any modification, amendment, variation or supplement to or of this Restructuring Plan, the Transaction Implementation Deed or any other Implementation Document on terms or conditions that the Court may think fit to approve or impose for the purpose of consummating or implementing this Restructuring Plan.

6.2    Subject to 6.3 below, no modification, amendment, variation or supplement shall be made to this Restructuring Plan, the Transaction Implementation Deed or any other Implementation Document, unless:

6.2.1    it is made with the prior written consent of the Majority Supporting Creditors provided that, to the extent any modification, amendment or variation could reasonably be expected to, directly or indirectly:

(i) have an adverse or, relative to the other CoreCo Plan Creditors, disproportionate, effect on the rights or interests of any Plan Creditor;

(ii) alter any right or obligation, or impose any additional or new obligation, on any Plan Creditor (by reference to such rights or obligations as contemplated as at the date of the Explanatory Statement); or

(iii) be inconsistent in any material respect with the Restructuring as described in or contemplated by the Explanatory Statement,

the prior written consent of each such affected Plan Creditor(s) is also obtained; or

6.2.2    such modification, amendment or variation is necessary for the implementation of this Restructuring Plan and is of a minor, technical or administrative nature, or to correct a manifest error.

6.3    No modification, amendment, variation or supplement shall be made to this Clause 6 without the consent of each Plan Creditor.

6.4    The Plan Company shall promptly notify the CoreCo Plan Creditors (by notice to the Majority Supporting Creditors' Advisors and by the Information Agent making such notice available on the Plan Website) and each Administrative Party (in accordance with the notice provisions of the applicable Deed of Undertaking) of the occurrence of any modification, amendment or variation made to the Plans.

6.5    Nothing in this Restructuring Plan shall govern the modification amendment or waiver of any Implementation Document once such document becomes effective in accordance with its terms.

22

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**
**SKADDEN DRAFT 24 APRIL 2026**

**7      RELEASES** [11]

**7.1**    Subject to Clause 7.2, with effect from the Restructuring Completion Time, each Plan Party (on behalf of itself and each of its permitted successors and assigns) irrevocably, unconditionally, fully and absolutely:

**7.1.1**    pursuant to the Restructuring Plan, waives, releases and forever discharges any and all actions, proceedings, claims, damages, counterclaims, complaints, liabilities, liens, rights, demands and set-offs, whether present or future, prospective or contingent, whether in this jurisdiction or any other or under any law, of whatsoever nature and howsoever arising, whether in law or in equity, in contract (including, but not limited to, breaches or non-performances of contract), in statute or in tort (including, but not limited to, negligence and misrepresentation) or in any other manner whatsoever, breaches of statutory duty, for contribution, or for interest and/or costs and/or disbursements, whether or not for a fixed or unliquidated amount, whether filed or unfiled, whether asserted or unasserted, whether or not presently known to the parties or to the law, in each case that it ever had, may have or hereafter can, shall or may have arising out of actions, omissions or circumstances on or prior to the Restructuring Completion Time against each and any Released Party whatsoever or howsoever arising (and notwithstanding any subsequent facts or information becoming known following the Restructuring Effective Date), in each case in relation to or arising directly or indirectly out of or in connection with, such Released Party's participation in the negotiation, preparation, sanction or implementation of the Restructuring Plan (in each case, including, without limitation, the negotiation, preparation, sanction, execution or implementation of any Implementation Documents); and

**7.1.2**    undertakes to the Released Parties that it will not commence or continue, or instruct, direct or authorise any other person to commence or continue, any process, action, other legal proceedings (including, without limitation, any demand, arbitration, alternative dispute resolution, judicial review, adjudication, execution, seizure, distraint, forfeiture, re-entry, lien, enforcement of judgment or enforcement of any security), in any jurisdiction whatsoever against any Released Party in respect of the actions ratified or the waivers, releases, and discharges referred to in Clause 7.1.1 above.

**7.2**    Clause 7.1 shall not discharge, limit, vary, impact, compromise or otherwise affect in any way: (i) the Excluded Liabilities, (ii) any rights of any Plan Party in respect of any CoreCo Plan Claim or right arising pursuant to any Implementation Document (including guarantees or security interests or other obligations and any rights to submit claims and, if eligible, receive distributions in accordance the Restructuring Plan or any Implementation Document) or (iii) which may arise or accrue in relation to acts, omissions or circumstances occurring after the Restructuring Completion Time.

**7.3**    Nothing in this Restructuring Plan shall prevent a Plan Creditor from responding to or taking any action to defend itself in any claims or Proceedings which are asserted against it or any of its Representatives.

---

[11] Note to Skadden: have you considered whether the scope of the releases will be permissible from a Ch 15 perspective? **Note from Skadden**: Yes, we did.

DG-449

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
SKADDEN DRAFT 24 APRIL 2026

## 8   TERMINATION

8.1   This Restructuring Plan shall terminate with immediate and automatic effect upon the occurrence of any of the following events:

8.1.1   the Restructuring Effective Date does not occur on or before the Restructuring Longstop Time; or[12]

8.1.2   the Transaction Implementation Deed terminates in accordance with its terms prior to the Restructuring Effective Date (other than as a result of the Restructuring Effective Date having occurred)[13].

8.2   Upon termination of this Restructuring Plan pursuant to Clause 8.1:

8.2.1   the terms of and the obligations on, and rights granted to, the Plan Parties under or pursuant to this Restructuring Plan and any Implementation Document shall lapse and be of no further force or effect;

8.2.2   all compromises, arrangements and releases provided for under or pursuant to this Restructuring Plan and each other Implementation Document shall be of no effect and shall be construed as if this Restructuring Plan and each other Implementation Document had never become effective;

8.2.3   the rights and obligations of the CoreCo Plan Creditors shall remain unaffected by this Restructuring Plan and shall be reinstated and remain in full force and effect as they applied immediately prior to the Plan Effective Date; and

8.2.4   any defaults under any agreement governing the terms of any CoreCo Plan Claim, including the Debt Documents, and any consequences thereof (including any alleged deemed or actual acceleration) shall be reinstated as if such default had been continuing since the date on which it originally occurred or was deemed to occur.

8.3   Promptly following termination of this Restructuring Plan, the Plan Parties shall execute such documents and perform such acts and things as are reasonably necessary and/or desirable to give effect to Clause 8.2 and 8.4 (including, where applicable, reversing any steps taken in contemplation of the implementation of the Restructuring).

8.4   In the event of automatic termination of this Restructuring Plan pursuant to this Clause 8 (*Termination*), the Plan Company shall promptly notify all CoreCo Plan Creditors (by notice to the Majority Supporting Creditors' Advisors and by the Information Agent making such notice available on the Plan Website) and the Administrative Parties, and any standstill, power of attorney, instruction or authority granted pursuant to this Restructuring Plan or any Implementation Document shall be automatically revoked and

---

[12]   Note to Skadden: the Restructuring Longstop Time needs to be the same time as the Restructuring Longstop Date in the RSA.

[13]   Note to Skadden: please could you clarify the intention here—presumably the mechanic in the RID will be that the RID terminates upon RED, but if RED has occurred then the RID can't then terminate for some other reason? Subject to reviewing RID termination rights which need, as a minimum, to replicate the RSA termination events. **Note from Skadden**: Yes, it does.

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**
**SKADDEN DRAFT 24 APRIL 2026**

terminated. Any action taken under any power of attorney granted pursuant to this Restructuring Plan shall be automatically void and of no further force or effect.

**8.5** This Clause 8 (*Termination*), Clause 1 (*Definitions and Interpretation*) and Clause 13 (*Governing Law and Jurisdiction*) shall survive any termination of this Restructuring Plan.

## 9 GENERAL RESTRUCTURING PLAN PROVISIONS

### 9.1 Ratification

**9.1.1** In consideration for its rights and entitlements under this Restructuring Plan, on and from, and subject to the occurrence of, the Restructuring Completion Time:

(a) each Plan Party hereby irrevocably ratifies and confirms everything which:

(i) the Plan Company and its respective directors, officers or other duly appointed representatives may lawfully do or cause to be done or purport to be done, to the extent compliant with the terms of this Restructuring Plan and the Implementation Documents;

(ii) is lawfully done or caused to be done by any Undertaking Party or its representatives pursuant to any authority conferred by this Restructuring Plan or the Implementation Documents; and

(iii) the Information Agent and its respective directors, managers, officers or other duly appointed representatives has each lawfully done or caused to be done or purported to be done or may lawfully do or cause to be done or purport to be done, in each case to the extent in compliance with this Restructuring Plan or the Implementation Documents;

(b) each Plan Creditor hereby irrevocably undertakes to the Plan Company to treat all CoreCo Plan Claims and the (direct and indirect) rights and obligations of each Plan Creditor under the Debt Documents as having been effectively varied and/or released in the manner envisaged by this Restructuring Plan, the Transaction Implementation Deed and the Implementation Documents.[14]

### 9.2 Costs

The Plan Company or another Group Member will pay in full all costs, charges, expenses, and disbursements incurred by it in connection with the negotiation, preparation, and implementation of this Restructuring Plan as and when they arise, including, but not limited to, the costs of holding the Plan Meetings, the costs of obtaining the sanction of the Court and the costs of placing notices (if any) required by this Restructuring Plan.

### 9.3 Record Date

---

[14] Note to Skadden: is there a reason why these ratifications are in here rather than the RID?

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
SKADDEN DRAFT 24 APRIL 2026

**9.3.1**  For the purposes of calculating entitlements to vote on the Restructuring Plan and to receive Plan Consideration, all CoreCo Plan Claims will be determined by the Information Agent (on behalf of the Plan Company) as at the Record Date.

**9.3.2**  Any successors, assignees or transferees of a Plan Creditor after the Record Date shall be bound by the terms of this Restructuring Plan as CoreCo Plan Creditors.

**9.4  Assignments or transfers**

**9.4.1**  The Plan Company shall be under no obligation to recognise any assignment or transfer of rights, benefits or interests in the Debt Documents after the Record Date for the purposes of calculating entitlements to receive Plan Consideration under the Restructuring Plan and has no obligations hereunder to any person other than the CoreCo Plan Creditors on the Record Date, provided that, where the Plan Company has received from the relevant parties notice in writing of such assignment or transfer prior to the Restructuring Effective Date, the Plan Company may, in its sole discretion and subject to the production of such other evidence in relation to such assignment or transfer as it may reasonably require and to any other terms and conditions which the Plan Company may consider necessary or desirable, acting reasonably, agree to recognise such assignment or transfer for the purposes of calculating entitlements to receive Plan Consideration under the Restructuring Plan.

**9.4.2**  Any assignee or transferee of the interests in the Debt Documents recognised by the Plan Company pursuant to this Clause 9.4 shall be bound by the terms of the Restructuring Plan as a Plan Creditor and shall produce such evidence as the Plan Company may reasonably require to confirm that it has agreed to be bound by the terms of the Restructuring Plan.

**9.5  Obligations on days other than a Business Day**

**9.5.1**  If any obligation is to be performed under the terms of the Restructuring Plan on a date other than a Business Day, the relevant obligation shall be performed on the next Business Day.

**9.6  Exercise of discretion**

**9.6.1**  Where, under or pursuant to any provision of this Restructuring Plan, a matter is to be determined by the Plan Company, it will be determined by the directors of the Plan Company in their discretion in such manner as they may consider fair and reasonable.

**9.7  Severability**

**9.7.1**  If at any time any provision of this Restructuring Plan is or becomes illegal, invalid or unenforceable in any respect under the law of any jurisdiction, such provision shall be severed from the Restructuring Plan for the purposes of that jurisdiction, and neither the legality, validity or enforceability of that provision under the law of any other jurisdiction nor the legality, validity or enforceability of any other provision of this Restructuring Plan under the law of that or any other jurisdiction will in any way be affected or impaired thereby, and the rest of the Restructuring Plan shall continue in full force and effect in that jurisdiction as if the severed provision had not been included.

DG-452

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**
**SKADDEN DRAFT 24 APRIL 2026**

**9.8**    **CoreCo Plan Creditors' obligations**

The obligations of each Plan Creditor under this Restructuring Plan are several.

**9.9**    **Conflict**

**9.10**    In the case of any conflict or inconsistency between the terms of this Restructuring Plan and the terms of the Explanatory Statement, the terms of this Restructuring Plan will prevail.

**10**    **NOTICE**

**10.1**    Any notices (including any service of process in connection with a breach of the Restructuring Plan) shall be given in writing and shall be deemed to have been duly given if it is uploaded to the Plan Website *and* delivered by hand, pre-paid first class post, airmail or electronically to the following parties:

(a)   if to the Plan Company, to:

NFE Global Holdings Limited
Suite 1, 7th Floor
50 Broadway
London SW1H 0BL
United Kingdom
Email: NFEGlobalUK@newfortressenergy.com
Attention: Office of the General Counsel

with copies (which shall not constitute notice) to:

Skadden, Arps, Slate, Meagher & Flom (UK) LLP
22 Bishopsgate
London EC2N 4BQ
United Kingdom
Email: Peter.Newman@Skadden.com; Christopher.Dressel@skadden.com; and DLPLady@Skadden.com
Attention: Peter Newman; Christopher Dressel

(b)   if to a Plan Creditor, to its last known address, fax number or email address stated in the Plan Creditor Letter or failing that according to the Notice Records, and:

(i)   if to any member of the Akin/Evercore AHG, with copies (which shall not constitute notice) to:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
Attention: Michael Stamer
Email: mstamer@akingump.com

DG-453

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**
**SKADDEN DRAFT 24 APRIL 2026**

and

Akin Gump Strauss Hauer & Feld LLP
2001 K Street, NW
Washington, DC 20006
Attention: James Savin; Iain Wood
Email: jsavin@akingump.com; iwood@akingump.com

(ii) if to any member of the Legacy Notes AHG, with copies (which shall not constitute notice) to:

Paul Hastings LLP
200 Park Avenue
New York, NY 10166
Attention: Sayan Bhattacharyya and Matthew Friedrick
Email: sayanbhattacharyya@paulhastings.com; matthewfriedrick@paulhastings.com

(iii) if to any Supporting Creditor that is a holder of Revolving Credit Facility Debt, with copies (which shall not constitute notice) to:

Sidley Austin LLP
1000 Louisiana Street
Suite 5900
Houston, TX 77002
Attention: Duston K. McFaul; Brian E. Minyard; Maegan Quejada
Email: dmcfaul@sidley.com; bminyard@sidley.com; mquejada@sidley.com

and

Sidley Austin LLP
One South Dearborn
Chicago, IL 60603
Attention: Matthew A. Clemente
Email: mclemente@sidley.com

(iv) if to the Series I Lender or Series II Lender, with copies (which shall not constitute notice) to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Attention: Andrew Rosenberg; Sung Pak; Kyle R. Satterfield
Email:arosenberg@paulweiss.com;spak@paulweiss.com; ksatterfield@paulweiss.com

(c) if to the Information Agent, to:

Kroll Issuer Services Limited
The News Building

DG-454

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**
**SKADDEN DRAFT 24 APRIL 2026**

3 London Bridge Street
London SE1 9SG
United Kingdom
Attention: Ivan Santek/ Alessandro Zorza
E-mail: nfe@is.kroll.com
Phone: +44 20 7089 0909
Plan Website: https://deals.is.kroll.com/nfe

10.2   CoreCo Plan Creditors shall have the right to request a paper copy of any Notice by contacting the Information Agent. The Information Agent shall send such requested documents by first class post in respect of CoreCo Plan Creditors whose address is in the UK and by "international standard post" in respect of CoreCo Plan Creditors whose address is outside the UK.

10.3   Any Notice shall be deemed to have been delivered and served:

(a)  if by way of e-mail:

(i)   subject to Clause 10.3(a)(ii), when sent; and

(ii)  if one or more E-Mail Error Messages are sent from and with respect to a person's e-mail address for the purposes of Notices within one hour of such e-mail being sent, the e-mail shall not be deemed to be delivered and effective unless the intended recipient confirms receipt (but failure of an e-mail to be deemed delivered and effective shall not affect other or subsequent e-mails, or delivery of a communication or document pursuant to another method permitted under this Clause 10);

(b)  if by way of letter, five Business Days after being deposited in the post postage prepaid in an envelope and addressed correctly;

(c)  if delivered by hand or courier, on the first Business Day following delivery; and

(d)  if by way of upload to the Plan Website, when viewable on the Plan Website; and, if a particular department or officer is specified as part of the address details provided under this Clause 10, if addressed to that department or officer (other than with respect to Clause 10.3(d)).

10.4   In proving service, it shall be sufficient proof, in the case of a Notice sent by post, that the envelope was properly stamped, addressed and placed in the post.

10.5   The accidental omission to send any Notice, written communication or other document in accordance with this Clause 10, or the non-receipt of any such Notice by any Plan Creditor, shall not affect the provisions of the Restructuring Plan or their effectiveness.

DG-455

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**
**SKADDEN DRAFT 24 APRIL 2026**

**11      FUTURE LIQUIDATION OR ADMINISTRATION[15]**

The Restructuring Plan shall be unaffected by any liquidation or administration or any analogous proceeding (in any jurisdiction) of the Plan Company after the Restructuring Effective Date and shall, in these circumstances, continue according to it terms.

**12      PLAN PARTIES**

**12.1**    Each Plan Party shall enjoy the benefit and be entitled to enforce the terms of this Restructuring Plan.

**12.2**    Except as provided in this Restructuring Plan, no rights are conferred on any person under the Contracts (Rights of Third Parties) Act 1999 to enforce the terms of this Restructuring Plan.

**13      GOVERNING LAW AND JURISDICTION**

**13.1**    Subject to Clause 13.2:

**13.1.1**  the Restructuring Plan and any non-contractual obligations arising out of or in connection with the Restructuring Plan shall be governed by, and construed in accordance with, the laws of England and Wales; and

**13.1.2**  the CoreCo Plan Creditors hereby agree that the Court shall have exclusive jurisdiction to hear and determine any suit, action or proceeding and to settle any dispute which may arise out of or in connection with the Restructuring Plan, or out of any action taken or omitted to be taken under the Restructuring Plan or any non-contractual obligations arising out of or in  connection with the Restructuring Plan. For such purposes the CoreCo Plan Creditors irrevocably submit to the jurisdiction of the Court,

**13.2**    Nothing in this Clause 13 shall affect the validity of other provisions of the Implementation Documents (from and after the date such documents become effective) determining governing law and jurisdiction as between the Plan Company and the CoreCo Plan Creditors, whether contained in any contract or otherwise.

**13.3**    The Restructuring Plan shall take effect subject to any prohibition or condition imposed by applicable law.

[*The remainder of this page is intentionally left blank*]

---

[15]  Note to Skadden: please could you clarify why the future administration/liquidation provision is included in this case, given no contemplation of either (which may or may not have been the case in precedents where it had been included) and may just draw some unnecessary attention to the matter.

DG-456

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**
**SKADDEN DRAFT 24 APRIL 2026**

**Schedule [●] – [●]**



31

DG-457

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**
**SKADDEN DRAFT 24 APRIL 2026**

**Schedule [●] – Implementation Documents[16]**

1.      this Restructuring Plan;

2.      the BrazilCo Plan;

3.      the Transaction Implementation Deed;

4.      each Deed of Accession;

5.      each Deed of Undertaking;

6.      the Holding Period Trust Deed;[17]

7.      the Intercompany Netting Documents;

8.      the [BrazilCo-CoreCo Intercompany Loan];

9.      the Corporate Reorganisation Documents;

10.     the [Separation Agreement];

11.     the [CoreCo-BrazilCo Transition Services Agreement];

12.     the [CoreCo-BrazilCo Management Agreement];

13.     the [CoreCo-FLNG 2 Management Agreement];

14.     the [BNDES Brazil Separation Conditional Release];

15.     the [Lumina Brazil Separation Conditional Release];

16.     the [Energos Brazil Separation Conditional Release];

17.     the [Intragroup BrazilCo Share Transfer Agreement];

18.     the [Intragroup Series I Credit Assignment Agreement];

19.     the Brazil Parent Intercompany Loan Discharge Notice;

20.     the [BrazilCo Stock Transfer Agreement];

21.     the [Bradford Stock Transfer Agreement];

22.     the [Series I and II Credit Assignment Agreement];

---

[16]    [NTD: Final list and defined terms TBC.]

[17]    Note to Skadden: We assume the RID will set out the mechanics regarding the Holding Period Trust and the expiry of the Holding Period (and CoreCo Plan Creditors will therefore agree to receive consideration via the Holding Period Trust if necessary under clause 5.2 of the Restructuring Plan). Otherwise, we would suggest including an operative clause regarding the Holding Period Trust in the Restructuring Plan itself.

DG-458

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**
**SKADDEN DRAFT 24 APRIL 2026**

23. the BrazilCo Stockholders' / LLC Agreement;

24. the [*New BrazilCo MIP documentation*];

25. the [BrazilCo Upstreaming Stock Transfer Agreements];

26. the [FLNG 2 Upstreaming Stock Transfer Agreements];

27. the FLNG 2 Term Loan Finance Documents;

28. the CoreCo Stockholders' Agreement;

29. the [FLNG 2 Parent Preferred Equity Subscription Agreement];

30. the FLNG 2 Parent LLCA;

31. the [*FLNG 2 MIP documentation*];

32. the [FLNG 2 Term Loan Assignment Agreement];

33. the [FLNG 2 Preferred Equity Transfer Agreements];

34. the [New CoreCo Term Loan Finance Documents];

35. the [Initial CoreCo Common Stock Transfer Agreements];

36. the [Initial CoreCo Preferred Stock Subscription Agreement];

37. the [RCF-2 / TLA BrazilCo Stock Transfer Agreement];

38. the Revolving Facility Discharge Notice;

39. the Term Loan A Discharge Notice;

40. the Term Loan B Discharge Notice;

41. the 2026 Notes Cancellation Documents;

42. the 2029 Notes Cancellation Documents;

43. the Intercreditor Agreement;

44. the [*Capital Raise documentation*];

45. the [Second CoreCo Common Stock Transfer Agreement];

46. the [Second CoreCo Preferred Stock Subscription Agreement];

47. the 2029 New Notes Cancellation Documents;

48. the Series I Loan Discharge Notice;

49. the Series II Loan Discharge Notice;

2582

DG-459

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**
**SKADDEN DRAFT 24 APRIL 2026**

50.   the [CoreCo Stockholders' Agreement];

51.   the [*CoreCo MIP documentation*];

52.   the [New Money Documents];

53.   the [CoreCo Letter of Credit Finance Documents];

54.   the [BrazilCo Letter of Credit Finance Documents];

55.   each Fee Letter;

56.   [*shareholders' meeting minutes TBC*];

57.   [*other*];[18] and

58.   all other documents, agreements and instruments as agreed between the Plan Company and the Majority Supporting Creditors to be necessary to implement or consummate the Restructuring, in each case, in the form agreed between the Plan Company and the Majority Supporting Creditors and as amended, supplemented, extended, restated or novated from time to time.[19]

---

[18]   Note to Skadden: Should the Chapter 15 Documents be included?

[19]   Note to Skadden: "Implementation Documents" definition refers to the documents "in the form made available with the Explanatory Statement". This means that this catch-all will not add anything, unless it is meant to capture other documents made available with the Explan but not listed in this schedule.

DG-460

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**
**SKADDEN DRAFT 24 APRIL 2026**

**Schedule [●] – Undertaking Parties**[20]

1.    NFE FLNG 2 LLC

2.    NFE Brazil Investments LLC

3.    NFE Brazil Holdings Limited

4.    The Obligors set out in Part 1 of Schedule 1 to the Transaction Implementation Deed

5.    U.S. Bank Trust Company, National Association as 2026 Legacy Notes Trustee and 2029 Legacy Notes Trustee

6.    Wilmington Savings Fund Society, FSB as 2029 New Notes Trustee, Series I and II Agent, and Brazil Parent Intercompany Agent

7.    MUFG Bank as [RCF Agent]

8.    [*New TLA / TLB Agent once confirmed*]

9.    U.S. Bank, National Association as Common Representative

10.   Wilmington Trust, National Association as New CoreCo Term Loan Facility Agent and FLNG 2 Term Loan Facility Agent

11.   [*New ICA Common Representative once confirmed*]

12.   Kroll Issuer Services Limited as Holding Period Trustee and Information Agent

13.   NFE Brazil Funding LP

14.   NFE Brazil Funding LLC

15.   Hygo Energy Transition Ltd.

16.   NFE Brazil Financing Limited

17.   LNG Power Limited (UK)

18.   NFE Power Brasil Participações S.A.

19.   NFE Power Latam Participações e Comércio Ltda.

20.   CELBA – Centrais Elétricas Barcarena S.A.

21.   Barcarena Offshore Capital LLC

22.   NFE Power SSLNG Participações Ltda.

---

[20]   Note to Skadden: to include Administrative Parties.

DG-461

**PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
SKADDEN DRAFT 24 APRIL 2026**

23.    NFE Power Distribuidora de Gás Natural Ltda.



DG-462

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**
**SKADDEN DRAFT 24 APRIL 2026**

**Part II**
**[NFE Non-Obligor Security Providers**

1.      NFE Brazil Holdings Limited

2.      NFE Brazil Holdings LLC

3.      NFE Brazil Investments LLC

4.      NFE South Power Buyback Holdings Limited

5.      PATH Ltd

6.      Shannon LNG Energy Limited

7.      Shannon LNG Limited

2586

DG-463

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**
**SKADDEN DRAFT 24 APRIL 2026**

**Part III**
**[The New Money Providers[21]**

1.      [*TBC*]]



---

[21]   Note to Skadden: Firstly, any new money providers would presumably be party to any new money documents but not party to the RP, so why do they need to be Undertaking Parties? Secondly, are there actually any new money providers confirmed that you would include at this stage?

38

DG-464

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**
**SKADDEN DRAFT 24 APRIL 2026**

**Part IV**
**[The Nominees**

1.      [*TBC*]][22]



---

[22]   Note to Skadden: is this reflecting the concept of Nominees in the Plan Creditor Letters? If so, why are they included here when they are appointed by the CoreCo Plan Creditors under the Plan Creditor Letters and any required undertakings can be included in the document they sign at that stage?

DG-465

# Tab 08

**PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
SKADDEN DRAFT 29 APRIL 2026**

**IN THE HIGH COURT OF JUSTICE
BUSINESS AND PROPERTY COURTS OF
ENGLAND AND WALES
INSOLVENCY AND COMPANIES LIST (ChD)**

**IN THE MATTER OF NFE GLOBAL HOLDINGS LIMITED**

**-and-**

**IN THE MATTER OF THE COMPANIES ACT 2006**

---

**RESTRUCTURING PLAN**
(under Part 26A of the Companies Act 2006)

- between –

NFE BRAZIL NEWCO LIMITED

- and –

THE BRAZILCO PLAN CREDITORS
(as defined herein)

---

DG-466

**PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
SKADDEN DRAFT 29 APRIL 2026**

**Table of Contents**

1    Definitions and Interpretation .................................................................. 1

2    Application and effectiveness of the restructuring plan ............................ 14

3    Grant of authority to execute the implementation documents ................... 15

4    Deeds of undertaking ............................................................................ 19

5    Closing Steps and Plan Consideration .................................................... 19

6    Modifications of this restructuring plan .................................................. 21

7    [Releases ............................................................................................. 22

8    Termination .......................................................................................... 22

9    General restructuring plan provisions .................................................... 23

10    Notice ................................................................................................ 25

11    Plan Parties ....................................................................................... 27

12    Governing Law and Jurisdiction ........................................................... 27

Schedule 1 – Implementation Documents .................................................... 29

Schedule 2 – Undertaking Parties ............................................................... 31

DG-467

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**
**SKADDEN DRAFT 29 APRIL 2026**

## RESTRUCTURING PLAN

**Between**:

(1) **NFE GLOBAL HOLDINGS LIMITED**, a company incorporated under the laws of England and Wales (company number 13679588) (the "**Plan Company**"); and

(2) **THE BRAZILCO PLAN CREDITORS** (as hereinafter defined).

**Recitals**

(A) The Plan Company was incorporated and registered in England and Wales on 7 April 2026, with registered number 17141053, as a private company limited by shares under the Act (as defined below). The Plan Company's registered office is at Suite 1, 7th Floor, 50 Broadway, London, United Kingdom, SW1H 0DB. The Plan Company is an indirect subsidiary of NFE Inc. (as defined below).

(B) The purpose of this Restructuring Plan (as defined below) is to effect a compromise and arrangement between the Plan Company and the BrazilCo Plan Creditors (as defined below) to facilitate the implementation of the Restructuring (as defined below). The BrazilCo Plan Creditors are the 2029 New Noteholders (as defined below).

(C) To effect such compromise and arrangement, each BrazilCo Plan Creditor will pursuant to the terms of this Restructuring Plan, grant a power of attorney to the Plan Company to execute the Transaction Implementation Deed and the applicable Implementation Documents to which such BrazilCo Plan Creditor is a party on its behalf (each as defined below).

(D) In order to successfully implement the Restructuring, participation is required from, among others, the Undertaking Parties. Each of the Undertaking Parties has severally agreed, upon the sanctioning of this Restructuring Plan by the Court (as defined below), to be bound by and comply with the obligations expressed to apply to it under this Restructuring Plan and, on and from their release in accordance with the Restructuring Plan, the Implementation Documents to which it is a party pursuant to the provisions of such person's Deed of Undertaking (as defined below).

(E) This Restructuring Plan and the CoreCo Plan (as defined below) are inter-conditional such that this Restructuring Plan and the CoreCo Plan shall become effective and legally binding at the same time (or not at all).

## 1       DEFINITIONS AND INTERPRETATION

### 1.1     Definitions

**1.1.1**    In this Restructuring Plan, the following terms shall, unless the context otherwise requires, have the following meanings:

"**2026 Legacy Noteholders**" means the ultimate beneficial holders of the 2026 Legacy Notes Debt;

"**2026 Legacy Notes**" means the 6.500% senior secured notes due 2026 issued by NFE Inc. pursuant to the 2026 Legacy Notes Indenture;

DG-468

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
SKADDEN DRAFT 29 APRIL 2026

"**2026 Legacy Notes Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the 2026 Legacy Noteholders under or in connection with the 2026 Legacy Notes (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise);

"**2026 Legacy Notes Indenture**" means the indenture entered into by, among others, NFE Inc. as issuer and U.S. Bank Trust Company, National Association (as successor in interest to U.S. Bank National Association), as trustee and collateral agent, on 12 April 2021 (as amended, supplemented or otherwise modified from time to time);

"**2029 Legacy Noteholders**" means the ultimate beneficial holders of the 2029 Legacy Notes Debt;

"**2029 Legacy Notes**" means the 8.750% senior secured notes due 2029 issued by NFE Inc. pursuant to the 2029 Legacy Notes Indenture;

"**2029 Legacy Notes Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the 2029 Legacy Noteholders under or in connection with the 2029 Legacy Notes (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise);

"**2029 Legacy Notes Indenture**" means the indenture entered into by, among others, NFE Inc. as issuer and U.S. Bank Trust Company, National Association (as successor in interest to U.S. Bank National Association), as trustee and collateral agent, on 8 March 2024 (as amended, supplemented or otherwise modified from time to time);

"**2029 New Noteholders**" means the ultimate beneficial holders of the 2029 New Notes;

"**2029 New Notes**" means the 12.000% senior secured notes due 2029 issued by NFE Financing pursuant to the 2029 New Notes Indenture;

"**2029 New Notes Indenture**" means the indenture entered into by, among others, NFE Financing, as issuer and Wilmington Savings Fund Society, FSB, as trustee and collateral agent, on 22 November 2024 (as amended, supplemented or otherwise modified from time to time);

"**Act**" means the Companies Act 2006 (as amended from time to time);

"**Ad Hoc Groups**" means, collectively, the Akin/Evercore AHG, the PW/PWP AHG and the Legacy Notes AHG;

"**Administrative Party**" means the RCF Agent, the TLA Agent, the TLB Agent, the Series I Agent, the Series II Agent, the Common Representative, the 2026 Legacy Notes Trustee, the 2029 Legacy Notes Trustee, the 2029 New Notes Trustee, the New CoreCo Term Loan Facility Agent, the FLNG 2 Term Loan Facility Agent, the New Common Representative, DTC and Cede & Co, the

2

DG-469

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
SKADDEN DRAFT 29 APRIL 2026

Holding Period Trustee and the Information Agent (each as defined in the Transaction Implementation Deed);

"**Advisor Released Person**" means each of the current and former respective officers, directors, employees, executives, attorneys and agents (or equivalents) of each Released Advisor and each Affiliate of each Released Advisor;

"**Advisors**" means, collectively, the Akin/Evercore AHG Advisors, the PW/PWP AHG Advisors, the RCF Advisors, the TLA Advisors, the TLB Advisors, the Legacy Notes Advisors, and any additional advisors or consultants engaged by any of the Ad Hoc Groups, the agent under the Revolving Credit Facility Agreement, the TLA Agent, the TLB Agent, and any successor professional advisors to the foregoing, in each case as advisors in connection with the Restructuring;

"**Affiliate**" means, with respect to a person, any other person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such person and, for the purposes of this definition, "**control**" shall mean the power, direct or indirect, to (a) vote on more than 50 per cent, of the securities having ordinary voting power for the election of directors of such person, or (b) direct or cause the direction of the management and policies of such person whether by contract or otherwise;

"**Agreed Form**" means:

(a) in respect of documents appended to the Explanatory Statement, the form so appended to the Explanatory Statement or as otherwise amended pursuant to (and in accordance with) this Restructuring Plan or the Transaction Implementation Deed; or

(b) in respect of any other Implementation Document, in the form agreed between the Plan Company and the Majority Plan Creditors;

"**Akin/Evercore AHG**" means the ad hoc group of certain unaffiliated holders of Term Loan B Loans represented by the Akin /Evercore AHG Advisors;

"**Akin/Evercore AHG Advisors**" means, collectively, Akin Gump Strauss Hauer & Feld LLP and Evercore Group L.L.C., and their Affiliates as counsel and financial advisor, respectively, to the Akin/Evercore AHG, as well as other regulatory, local, foreign, barristers and special counsel (in each case as notified to the Plan Company), in their respective capacities as counsel to the Akin/Evercore AHG;

"**Brazil Parent**" means NFE Brazil Investments LLC;

"**BrazilCo Plan Claims**" means any (direct or indirect) claim of a BrazilCo Plan Creditor in respect of any Liability of the Plan Company, whether as principal obligor, guarantor, indemnifier or security provider, in relation to, or arising out of or in connection with, the 2029 New Notes or the BrazilCo Plan Debt, arising on or before the Record Date or which may arise after the Record Date as a result of an obligation or Liability of the Plan Company to a BrazilCo Plan Creditor incurred or as a result of an event occurring or an act done on or before the Record Date (including, for the avoidance of doubt, any interest accruing on, or

3

DG-470

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
SKADDEN DRAFT 29 APRIL 2026

accretions arising with respect to, such claims before or until the Record Date), but excluding any claim of a BrazilCo Plan Creditor in respect of any Liability of the Plan Company to any BrazilCo Plan Creditor arising directly or indirectly in relation to, or arising out of or in connection with, a failure to comply with the terms of this Restructuring Plan, the Transaction Implementation Deed or any other Implementation Document;

"**BrazilCo Plan Creditors**" means the 2029 New Noteholders who are proposed to be bound by the terms of, and who will therefore be entitled to vote on this Restructuring Plan;

"**BrazilCo Plan Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the 2029 New Noteholders under or in connection with the 2029 New Notes (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise);

"**Business Day**" means a day other than a Saturday, Sunday, or other day on which commercial banks are authorised to close under the laws of, or are in fact closed in, the State of New York, United States of America or in London, United Kingdom;

"**Closing Conditions Precedent**" has the meaning has the meaning given to it in the Transaction Implementation Deed;

"**Closing Steps**" has the meaning given to it in Clause 5.1.2;

"**CoreCo Plan**" means the restructuring plan proposed by NFE Global in substantially the form attached at [●] to the Explanatory Statement (or appended to any supplemental explanatory statements made available to the BrazilCo Plan Creditors prior to the Plan Meetings) or with, or subject to, any modification, addition or condition which the Court may think fit to approve or impose, as appropriate;

"**Court**" means the High Court of Justice of England and Wales and any appellate court in England and Wales (including the Court of Appeal and the Supreme Court);

"**Debt Documents**" means the 2029 New Notes Indenture, the Finance Documents (as defined in or the equivalent of in the 2029 New Notes Indenture) and any related security and ancillary documents;

"**Deed of Undertaking**" means a deed of undertaking to the Plan Company in the form agreed by the parties thereto pursuant to which each of the parties thereto agrees to execute or procure to be executed all such documents, and to do or procure to be done all such acts and things as may be reasonably necessary or desirable to be done by it as described in this Restructuring Plan and to be bound by and perform the terms of this Restructuring Plan;

"**E-Mail Error Message**" means, with respect to an e-mail sent by one person to another under or in connection with this Restructuring Plan, an automatic error message received from an intended recipient (or the server by which such intended recipient is provided e-mail service) that:

DG-471

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**
**SKADDEN DRAFT 29 APRIL 2026**

(a)     such e-mail is undeliverable; or

(b)     there has been a failure to deliver such e-mail;

"**English Counsel**" means Daniel Bayfield KC, Ryan Perkins and Jon Colclough of South Square Chambers, instructed by the Group Legal Advisor to appear on behalf of the Plan Company before the Court in respect of the Restructuring Plan, or such other barrister as may be instructed by the Group Legal Advisor;

"**Excluded Liabilities**" means:

(a)     any Liability arising from criminal acts, fraud, gross negligence or wilful misconduct on the part of a Released Party, as determined by a final non-appealable judgment issued by a court of competent jurisdiction;

(b)     any Liability of any Released Advisor to its client arising under a duty of care which has been expressly assumed or acknowledged in writing by the relevant Advisor or which can only be excluded in accordance with applicable law and has not been so excluded, or which cannot be released, waived or excluded under applicable law;

(c)     any Liability of any accounting, restructuring or tax advisor of the Plan Company to the Released Parties or any other member of the Group and subject to the terms of any reliance letter, in relation to any report, memorandum or opinion provided by such advisor on which a Released Party is expressly entitled to rely pursuant to an executed reliance letter;

(d)     any Liability of the Plan Company or any other member of the Group with respect to any outstanding fees, costs and/or expenses properly incurred by its professional advisors (including the Advisors) in accordance with the terms of any such advisors' fee letters, engagement letters or other form of written agreement entered into by any member of the Group in connection with the Restructuring;

(e)     any Liabilities created by the Implementation Documents or the Restructuring Plan, including as a result of a failure by any party to comply with any Implementation Document or the Restructuring Plan; and

(f)     in the case of a Group Member, any intercompany indebtedness or any intra-Group transaction entered into which is not expressly released, amended or otherwise reorganized pursuant to the Restructuring Plan;

"**Existing Obligor**" means each obligor under the Debt Documents from time to time;

"**Explanatory Statement**" means the explanatory statement dated [●] 2026 relating to and issued by the Plan Company and NFE Brazil Newco in connection with this Restructuring Plan and the BrazilCo Plan pursuant to section 901D of the Act;

DG-472

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
SKADDEN DRAFT 29 APRIL 2026

"**Group**" means NFE Inc. and each of its directly and indirectly owned subsidiaries (including the Plan Company) from time to time, with each being a "**Group Company**";

"**Group Legal Advisor**" means Skadden, Arps, Slate, Meagher & Flom LLP and its affiliates;

"**Implementation Documents**" means each of the documents listed in Schedule 1 (*Implementation Documents*) in each case in the Agreed Form;

"**Information Agent**" means Kroll Issuer Services Limited;

"**Legacy Noteholders**" means the 2026 Legacy Noteholders and the 2029 Legacy Noteholders;

"**Legacy Notes**" means the 2026 Legacy Notes and the 2029 Legacy Notes.

"**Legacy Notes Advisors**" means Paul Hastings LLP, as counsel to the Legacy Notes AHG;

"**Legacy Notes AHG**" means the ad hoc group of certain unaffiliated holders of Legacy Notes represented by Paul Hastings LLP as counsel;

"**Liability**" means any present or future payment and discharge obligation, liability, claim, debt, claims for specific performance, damages or restitution, counterclaims, suits, rights of action, or rights whatsoever or howsoever arising, including, without limitation, for the payment of money or the performance of an act or obligation (whether deliberate or otherwise) or any failure to perform any obligation or any omission, whether for negligence, breach of duty, breach of trust or misrepresentation or otherwise, whether in respect of principal, interest or otherwise, whether actual or contingent, whether fixed or undetermined, whether admitted or disputed, whether known or unknown, whether owed jointly or severally and whether owed as principal, surety or in any capacity whatsoever and whether it arises at common law, in equity or by statute, in England and Wales or in any other jurisdiction under whatever applicable law, under any legal theory, and in any manner whatsoever, and "**Liabilities**" shall be construed accordingly;

"**Majority Akin/Evercore AHG Members**" means, as of any relevant time, members of the Akin/Evercore AHG that are Supporting Creditors holding, in the aggregate, greater than 50.0% of the aggregate outstanding principal amount of Term Loan B Debt then held by the members of the Akin/Evercore AHG that are Supporting Creditors;

"**Majority Legacy Notes AHG Members**" means, as of any relevant time, members of the Legacy Notes AHG that are Supporting Creditors holding, in the aggregate, greater than 50.0% of the aggregate outstanding principal amount of the Legacy Notes then held by the members of the Legacy Notes AHG that are Supporting Creditors;

"**Majority PW/PWP AHG Members**" means, as of any relevant time, members of the PW/PWP AHG that are Supporting Creditors holding, in the aggregate, greater than 50.0% of the aggregate outstanding principal amount of 2029 New

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
SKADDEN DRAFT 29 APRIL 2026

Notes Debt then held by the members of the PW/PWP AHG that are Supporting Creditors;

"**Majority RCF Supporting Creditors**" means, as of any relevant time, holders of Revolving Credit Facility Debt that are Supporting Creditors holding, in the aggregate, greater than 50.0% of the aggregate outstanding principal amount of Revolving Credit Facility Debt then held by holders of Revolving Credit Facility Debt that are Supporting Creditors;

"**Majority Supporting Creditors**" means, collectively, as of any relevant time, (i) the Majority Akin/Evercore AHG Members, (ii) the Majority PW/PWP AHG Members, (iii) the Majority RCF Supporting Creditors, (iv) solely with respect to any matter that (x) materially and adversely alters (1) the treatment of the 2026 Legacy Notes Debt or the 2029 Legacy Notes Debt, as applicable, under the Restructuring or (2) the rights or obligations of the Supporting Creditors who hold 2026 Legacy Notes Debt or 2029 Legacy Notes Debt, as applicable, under this Agreement, or (y) disproportionately alters the allocation of consideration to the holders of the 2026 Legacy Notes Debt or the 2029 Legacy Notes Debt as set forth on the Exchange Consideration Chart attached to the Restructuring Term Sheet, whether by decreasing the consideration allocated to holders of 2026 Legacy Notes Debt or the 2029 Legacy Notes Debt or increasing (including in the form of additional fees) the consideration allocated to holders of other Indebtedness, the Majority Legacy Notes Supporting Creditors and (v) solely with respect to any matter that (x) materially and adversely alters (1) the treatment of the Term Loan A Debt under the Restructuring or (2) the rights or obligations of the holders of Supporting Term Loan A Debt under this Agreement, or (y) disproportionately alters the allocation of consideration to the holders of the Term Loan A Debt as set forth on the Exchange Consideration Chart attached to the Restructuring Term Sheet, whether by decreasing the consideration allocated to holders of Term Loan A Debt or increasing (including in the form of additional fees) the consideration allocated to holders of other Indebtedness, the Majority TLA Supporting Creditors;

"**Majority TLA Supporting Creditors**" means, as of any relevant time, holders of Term Loan A Debt that are Supporting Creditors holding, in the aggregate, greater than 50.0% of the aggregate outstanding principal amount of Term Loan A Debt then held by such holders of Term Loan A Debt that are Supporting Creditors;

"**Majority Supporting Creditors' Advisors**" means the Akin /Evercore AHG Advisors, the PW/PWP AHG Advisors and the RCF Advisors on behalf of the majorities of each of their respective Ad Hoc Groups;

"**NFE Financing**" means NFE Financing LLC, a Delaware limited liability company;

"**NFE Global**" means NFE Global Holdings Limited, an English private company limited by shares;

"**NFE Inc.**" means New Fortress Energy Inc., a Delaware corporation;

"**Notice**" means any notice or other written communication to be given under or in relation to the Restructuring Plan;

DG-474

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
SKADDEN DRAFT 29 APRIL 2026

"**Notice Records**" means the names and addresses (including email addresses) contained in the Plan Company's records for a BrazilCo Plan Creditor at 5:00 p.m. (London time) two Business Days before the date of a relevant Notice;

"**Plan Consideration**" means the consideration to be received by each BrazilCo Plan Creditor pursuant to the Restructuring Plan and in accordance with the Transaction Implementation Deed;

"**Plan Creditor Letter**" means a plan creditor letter, in the form appended to the Explanatory Statement;

"**Plan Effective Date**" has the meaning given to that term in Clause 2.2;

"**Plan Meeting**" means a meeting of a class of BrazilCo Plan Creditors convened in accordance with the permission of the Court pursuant to section 901C of the Act to consider and, if thought fit, approve this Restructuring Plan, including any adjournment thereof;

"**Plan Party**" or "**Party**" means the Plan Company, each BrazilCo Plan Creditor and each Undertaking Party, and "**Plan Parties**" and "**Parties**" shall be construed accordingly;

"**Plan Sanction Order**" means the order or orders of the Court sanctioning the Restructuring Plan;

"**Plan Website**" means the website at https://deals.is.kroll.com/nfe;

"**Plans**" means, collectively, this Restructuring Plan and the BrazilCo Plan;

"**Proceedings**" means any process, action or other legal proceedings (including, without limitation, any demand, arbitration, alternative dispute resolution, judicial review, adjudication, execution, seizure, distraint, forfeiture, re-entry lien, enforcement of judgment or enforcement of any security), whether arising in connection with the Restructuring or otherwise;

"**PW/PWP AHG**" means the ad hoc group of certain unaffiliated 2029 New Noteholders represented by the PW/PWP AHG Advisors;

"**PW/PWP AHG Advisors**" means, collectively, Paul, Weiss, Rifkind, Wharton & Garrison LLP and Perella Weinberg Partners LP, as counsel and financial advisor, respectively, to the PW/PWP AHG, as well as other regulatory, local, foreign, barristers and special counsel (in each case as notified to the Plan Company), in their respective capacities as counsel to the PW/PWP AHG;

"**R-1 Revolving Credit Facility**" means the facility drawn at approximately $100 million as of the date of this Restructuring Plan under the Revolving Credit Facility Agreement;

"**R-1 Revolving Credit Facility Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to any agent, any issuing bank, any lender or any lender counterparty of the R-1 Revolving Credit Facility under or in connection with the R-1 Revolving Credit Facility (in each case, whether alone or jointly, or jointly and

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
SKADDEN DRAFT 29 APRIL 2026

severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise);

"**R-2 Revolving Credit Facility**" means the facility drawn at approximately $560 million as of the date of this Restructuring Plan under the Revolving Credit Facility Agreement;

"**R-2 Revolving Credit Facility Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to any agent, any issuing bank, any lender or any lender counterparty of the R-2 Revolving Credit Facility under or in connection with the R-2 Revolving Credit Facility (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise);

"**Revolving Credit Facility Agreement**" means the Credit Agreement, dated as of April 15, 2021, by and among NFE Inc., the guarantors from time to time party thereto, the lenders and issuing banks from time to time party thereto, and MUFG Bank Ltd., as administrative agent and collateral agent (as amended, supplemented or otherwise modified from time to time).

"**Revolving Credit Facility Debt**" means the R-1 Revolving Credit Facility Debt and the R-2 Revolving Credit Facility Debt;

"**RCF Advisors**" means Sidley Austin LLP, as counsel (together with any external counsel instructed by them in relation to the Restructuring Plan (including Felicity Toube KC and Matthew Abraham of South Square Chambers)) and FTI Consulting, Inc. and Moelis & Company as financial advisors, to the agent under the Revolving Credit Facility Agreement and each of their Affiliates and any other advisors retained by any of the foregoing in connection with the Restructuring in accordance with the Revolving Credit Facility Agreement;

"**RCF Lenders**" means the lenders of record under the Revolving Credit Facility Agreement;

"**Record Date**" means the date on which the BrazilCo Plan Creditors' entitlement to vote on this Restructuring Plan and the value of their BrazilCo Plan Claims will be assessed, being [●] 2026;

"**Released Advisors**" means:

(a)     the Group Legal Advisor;

(b)     English Counsel;

(c)     Houlihan Lokey Capital, Inc. and Alvarez & Marsal Europe LLP, as financial advisors to the Plan Company and the Group;

(d)     the Advisors;

(e)     any local or specialist counsel engaged by any of the foregoing; and

DG-476

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
SKADDEN DRAFT 29 APRIL 2026

(f)     any successors to the foregoing;

"**Released Parties**" means, each in their various respective capacities as such in connection with the Restructuring and the Restructuring Plan:

(a)     the Plan Company;

(b)     each Group Company;

(c)     each Undertaking Party;

(d)     each BrazilCo Plan Creditor;

(e)     each: (i) Released Advisor; (ii) Advisor Released Person; and (iii) any person acting on the instructions of, or providing services to, any of the foregoing in connection with the Restructuring Plan or the Restructuring;

(f)     each Affiliate of the persons listed at (a) to (e) above; and

(g)     each of the respective officers, directors, employees, partners, executives and agents (or equivalents) of the persons listed in (a) to (f) above (each, a "**Representative**");

"**Restructuring**" has the meaning given to it in the Transaction Implementation Deed;

"**Restructuring Effective Date**" has the meaning set out in the Transaction Implementation Deed;

"**Transaction Implementation Deed**" means the transaction implementation deed to be entered into on (or around) the Plan Effective Date between, among others, the Plan Company, NFE Global, the BrazilCo Plan Creditors and the creditors of NFE Global subject to the CoreCo Plan, substantially in the form attached to the Explanatory Statement (or appended to any supplemental explanatory statements made available to the BrazilCo Plan Creditors prior to the Plan Meetings);

"**Restructuring Longstop Time**" has the meaning given to the term "Long-Stop Date" in the Transaction Implementation Deed;

"**Restructuring Plan**" means this restructuring plan proposed by the Plan Company under Part 26A of the Act (including the compromise and arrangement pursuant thereto) in the present form as set out herein or with, or subject to, any modification, addition or condition which the Court may think fit to approve or impose, as appropriate, provided any such modification, addition or condition is approved by the Majority Supporting Creditors to the extent required pursuant to Clause 6 herein;

"**Restructuring Support Agreement**" means the Restructuring Support Agreement dated 17 March 2026 originally entered into between, among others, NFE Inc., NFE Global and the Supporting Creditors (as defined therein) and acceded to by the Plan Company on 9 April 2026 and as amended, supplemented and/or restated from time to time;

DG-477

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**
**SKADDEN DRAFT 29 APRIL 2026**

"**Revolving Credit Facility Agreement**" means the credit agreement entered into between, among others, NFE Inc. and the lenders from time to time party thereto on 15 April 2021, as amended from time to time;

"**Revolving Credit Facility Debt**" means the R-1 Revolving Credit Facility Debt and the R-2 Revolving Credit Facility Debt;

"**Series I Lender**" means the lender under the Series I Loan Agreement;

"**Series I Loan**" means the loan made under the Series I Loan Agreement;

"**Series I Loan Agreement**" means the senior secured credit agreement entered into between, among others, the Brazil Parent as lender and NFE Inc. as borrower on 22 November 2024;

"**Series I Loan Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the lenders of the Series I Loan under or in connection with the Series I Loan Agreement (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise);

"**Series II Lender**" means the lender under the Series II Loan Agreement;

"**Series II Loan**" means the loan made under the Series II Loan Agreement;

"**Series II Loan Agreement**" means the senior secured credit agreement entered into between, among others, NFE Financing as lender and NFE Inc. as borrower on 6 December 2024;

"**Series II Loan Debt**" means present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the lenders of the Series II Loan under or in connection with the Series II Loan Agreement (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise);

"**Subsidiary**" means, in respect of an entity, any entity in respect of which it has direct or indirect control or owns directly or indirectly more than 50% of the voting rights, voting capital or similar rights of ownership, and "control" for this purpose means the power to direct the management and the policies of the entity whether through the ownership of voting capital, by contract or otherwise;

"**Supporting Creditor**" means a CorCo Plan Creditor who is party to the Restructuring Support Agreement or a similar support agreement including substantially similar lender undertakings as the Restructuring Support Agreement;

"**Term Loan A**" means the loans and other extensions of credit made under the Term Loan A Agreement;

DG-478

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
SKADDEN DRAFT 29 APRIL 2026

"**Term Loan A Agreement**" means the credit agreement entered into between, among others, NFE Inc., the TLA Agent and the lenders from time to time party thereto on 19 July 2024, as amended from time to time;

"**Term Loan A Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the lenders of the Term Loan A under or in connection with the Term Loan A Agreement (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise);

"**Term Loan B**" means the loans and other extensions of credit made under the Term Loan B Agreement;

"**Term Loan B Agreement**" means the credit agreement entered into between, among others, NFE Inc., the TLB Agent, and the lenders from time to time party thereto on 30 October 2023, as amended from time to time;

"**Term Loan B Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by any member of the Group to the lenders of the Term Loan B under or in connection with the Term Loan B Agreement (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise);

"**TLA Advisors**" means Seward & Kissel LLP, as counsel to the TLA Agent under the Term Loan A Agreement;

"**TLA Agent**" means Wilmington Trust, National Association, as administrative agent and collateral agent under the Term Loan A Agreement.

"**TLA Lenders**" means the lenders of record under the Term Loan A Agreement;

"**TLB Advisors**" means Seward & Kissel LLP, as counsel to the TLB Agent under the Term Loan B Agreement;

"**TLB Agent**" means Wilmington Trust, National Association, as administrative agent and collateral agent under the Term Loan B Agreement.

"**TLB Lenders**" means the lenders of record under the Term Loan B Agreement; and

"**Undertaking Party**" means each of the entities listed in Schedule 2.

## 1.2 Interpretation

1.2.1 In this Restructuring Plan, unless the context otherwise requires or as otherwise expressly provided:

(a) references to Clauses and Schedules are references to the Clauses of, and Schedules to, the Restructuring Plan and a reference to this "Restructuring Plan" includes a reference to each of the Schedules to this Restructuring Plan;

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**
**SKADDEN DRAFT 29 APRIL 2026**

(b) references to a statute or statutory provision include the same as subsequently modified, amended, supplemented or re-enacted from time to time;

(c) references to the Information Agent, the Plan Company, a BrazilCo Plan Creditor, an Undertaking Party, or any other person shall be construed so as to include its and any subsequent successors in title, permitted assigns and permitted transferees;

(d) where references to any actions, provisions or terms are stated as requiring the consent of the Majority Supporting Creditors, such consent shall be deemed to be granted if it has been provided in writing (including by e-mail) by the Majority Supporting Creditors' Advisors;

(e) references to a person include references to an individual, firm, partnership, company, corporation, unincorporated body of persons or any state or state agency;

(f) references to a statute or statutory provision include the same as subsequently modified, amended, supplemented or re-enacted from time to time;

(g) references to an agreement, deed or document will be deemed also to refer to such agreement, deed or document as amended, supplemented, restated, varied, verified, replaced and/or novated (in whole or in part) from time to time and to any agreement, deed or document executed pursuant thereto, provided that such amendment, supplement, restatement, variation, verification, replacement and/or novation has, to the extent it relates to an Implementation Document or this Restructuring Plan, been made in accordance with the terms of this Restructuring Plan, the Transaction Implementation Deed or otherwise the terms of such Implementation Document;

(h) references to an agreement, deed or document shall include any schedules, annexes and appendices to such agreement, deed or document;

(i) references to (or to any specified provision of) the Restructuring Plan shall be construed as references to the Restructuring Plan as in force for the time being;

(j) references to a BrazilCo Plan Creditor shall be references to a BrazilCo Plan Creditor in its capacity as a BrazilCo Plan Creditor and an obligation or Liability of a BrazilCo Plan Creditor shall apply to its successors, transferees and assigns (as applicable);

(k) the singular includes the plural and vice versa and words importing one gender shall include all genders;

(l) headings to Clauses are for ease of reference only and shall not affect the interpretation of the Restructuring Plan;

(m) unless otherwise stated, all references in the Restructuring Plan to dates and times are to the date and time prevailing in London, United Kingdom;

(n) "including" or "include" shall be deemed to mean including or include without limitation;

2604

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**
**SKADDEN DRAFT 29 APRIL 2026**

(o)   "or" is not exclusive;

(p)   general words introduced by the word "other" shall not be given a restrictive meaning by reason of the fact that they are preceded by words indicating a particular class of acts, matters or things and general words shall not be given a restrictive meaning by reason of the fact that they are followed by particular examples intended to be embraced by the general words; and

(q)   where a Closing Step refers to a document, notice or confirmation being delivered to a Plan Party or the Plan Parties, each Plan Party agrees that it will be sufficient for the relevant document, notice or confirmation to be uploaded on the Plan Website (with notice from the Information Agent or the Plan Company that a document, notice or confirmation is available) or delivered to BrazilCo Plan Creditors via DTC;

(r)   "US$" denotes the lawful currency of the United States of America.

## 2       APPLICATION AND EFFECTIVENESS OF THE RESTRUCTURING PLAN

2.1   As soon as reasonably practicable following, and in any event within two Business Days of, the granting of the Plan Sanction Order (or such later date as agreed between the Plan Company and the Majority Supporting Creditors' Advisors, each acting reasonably), the Plan Company shall deliver a certified copy of the Plan Sanction Order to the Registrar of Companies in England and Wales for registration in accordance with section 901F of the Act.

2.2   Unless otherwise stated and subject to Clause 8.1, the Restructuring Plan shall become effective and legally binding on the Plan Parties in accordance with its terms on and from the date certified copies of the Plan Sanction Order and the order or orders of the Court sanctioning the BrazilCo Plan are delivered to the Registrar of Companies for registration (the "**Plan Effective Date**").

2.3   The compromises and arrangements effected by the Restructuring Plan will bind:

2.3.1   all BrazilCo Plan Creditors and all of their respective rights, title and interests to BrazilCo Plain Claims and, in each case, their respective permitted successors and assigns;

2.3.2   the Plan Company and its respective permitted successors and assigns;

2.3.3   subject to the terms of the applicable Deed of Undertaking, each Undertaking Party and its respective permitted successors and assigns; and

2.3.4   each other person that has undertaken to be bound by the terms of this Restructuring Plan and their respective permitted successors and assigns.

2.4   The Plan Company shall notify the Information Agent in accordance with Clause 10 (*Notice*) as soon as reasonably practicable following the occurrence of the Plan Effective Date, and the Information Agent shall make such notice available on the Plan Website.

DG-481

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**
**SKADDEN DRAFT 29 APRIL 2026**

**3   GRANT OF AUTHORITY TO EXECUTE THE IMPLEMENTATION DOCUMENTS**

**3.1   Plan Company's Authority to Execute the Implementation Documents**

3.1.1   Subject to the terms of this Clause 3 and Clause 8 below, with effect on and from the Plan Effective Date, in consideration of the rights and benefits conferred on the BrazilCo Plan Creditors under this Restructuring Plan and solely for the purpose of giving effect to the terms of this Restructuring Plan (and the transactions contemplated by it), notwithstanding any term of any other agreement, instrument or arrangement whatsoever (other than the Implementation Documents), each BrazilCo Plan Creditor hereby irrevocably appoints the Plan Company as its true and lawful attorney and agent (and as attorney and agent of such person to whom such BrazilCo Plan Creditor has assigned or transferred any of its BrazilCo Plan Claims), acting by any director, officer, employee or other duly authorised representative, for and on its behalf and in its name, and irrevocably authorises, directs, empowers and instructs the Plan Company, to:

(a)   enter into, execute and deliver as a deed, on behalf of each BrazilCo Plan Creditor in its capacity as a BrazilCo Plan Creditor, the Transaction Implementation Deed, such that each BrazilCo Plan Creditor will become a party to and be bound by the Transaction Implementation Deed;

(b)   enter into, sign, execute, notarise, acknowledge, release, deliver (whether as a deed or otherwise) and, where applicable, file each Implementation Document to which such BrazilCo Plan Creditor is expressed to be, or is intended to become, a party, such that such BrazilCo Plan Creditor shall be a party to and bound by each such document as if it had executed it personally, in each case in its capacity as BrazilCo Plan Creditor;

(c)   enter into, sign, execute and deliver all deeds, agreements, instruments, certificates, confirmations, notices, elections, transfers, assignments, releases, directions, instructions and filings (including security, guarantee, escrow, perfection and regulatory filings) which are scheduled to, contemplated by, or expressly referred to in, or reasonably required to implement or give effect to this Restructuring Plan or any Implementation Document to which such BrazilCo Plan Creditor is expressed to be a party;

(d)   complete, insert, amend or correct any blanks, schedules, annexes, signature blocks, party lists, dates, amounts, legal entity details, account details or similar particulars in any Implementation Document or related document; agree, consent to and effect, on behalf of such BrazilCo Plan Creditor, any amendment, waiver, modification or supplement to any Implementation Document or ancillary document (to which such BrazilCo Plan Creditor is expressed to be a party) which the Plan Company considers necessary or reasonably desirable in connection with the Restructuring provided that any such amendment, modification or supplement is made in accordance with Clause 6;

(e)   give all notices, confirmations, directions and instructions to any trustee, agent, paying agent, information agent, clearing system, registrar, custodian or Administrative Party as may be required or desirable to give effect to this Restructuring Plan and the Implementation Documents;

DG-482

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**
**SKADDEN DRAFT 29 APRIL 2026**

(f)    execute and deliver any release, discharge or waiver required to implement the releases and compromises and extinguishment of claims contemplated by this Restructuring Plan and grant the releases under and in accordance with the Transaction Implementation Deed;

(g)    take any step, make any determination and do any act which the Plan Company considers necessary to carry out, enforce or consummate this Restructuring Plan and the transactions contemplated by it, including actions required under the laws of any jurisdiction (acting reasonably and, with respect to any step, determination or action not contemplated by the Transaction Implementation Deed, with the consent of the Majority Supporting Creditors (unless such step, determination or action is required by applicable law, in which case no such consent shall be required)), provided that such related or ancillary actions do not change any right or obligation of, or impose an additional obligation (by reference to such rights or obligations as are contemplated as at the date of this Restructuring Plan) on, a BrazilCo Plan Creditor and do not adversely affect any BrazilCo Plan Creditor;

(h)    grant powers of attorney or authorities (under English law or any other applicable law) with equivalent or lesser scope to the power of attorney granted by this Clause 3 to any person selected by the Plan Company for the purposes of implementing the documents and steps set out in this Clause 3.1.1; and

(i)    do all such other related or ancillary acts and things as the Plan Company considers (acting reasonably and, with respect to any action not contemplated by the Transaction Implementation Deed, with the consent of the Majority Supporting Creditors) to be reasonably necessary or desirable to the full and timely implementation of this Restructuring Plan and the transactions contemplated by it, provided that such other acts or things do not change any right or obligation of, or impose an additional obligation (by reference to such rights or obligations as are contemplated as at the date of the Explanatory Statement) on, a BrazilCo Plan Creditor and do not adversely affect any BrazilCo Plan Creditor.

**3.2**    Subject to the terms of this Clause 3 and Clause 8 below, the authority and power of attorney granted pursuant to this Clause 3 is irrevocable, being granted for valuable consideration and to secure the performance of obligations under this Restructuring Plan.

**3.3**    Each BrazilCo Plan Creditor waives any right to revoke or terminate such authority except as expressly provided in this Restructuring Plan.

**3.4**    Each BrazilCo Plan Creditor irrevocably agrees that it shall be bound by, and shall comply with, each Implementation Document and any ancillary document to which such BrazilCo Plan Creditor is a party (as if it were an original executing party) after such document has been executed and dated by the Plan Company on its behalf pursuant to, and in accordance with, this Clause 3.

**3.5**    The authority granted pursuant to this Clause 3 shall:

**3.5.1**    continue until the earlier of (i) Restructuring Effective Date or (ii) such other termination date as expressly provided in this Restructuring Plan, at which time it shall automatically expire; and

DG-483

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**
**SKADDEN DRAFT 29 APRIL 2026**

3.5.2   automatically lapse in respect of any Implementation Document or ancillary document once that document has been fully executed, released and delivered, whereupon it may thereafter be amended only in accordance with its terms.

3.6   Nothing in this Clause 3 authorises or permits the Plan Company to commence any Proceedings in the name of, or on behalf of, any BrazilCo Plan Creditor.

3.7   Promptly following any amendments, modification or variations being made to any Implementation Document pursuant to this Clause 3, the Plan Company shall procure that such Implementation Document (as amended, modified or varied) is promptly made available to the BrazilCo Plan Creditors and each relevant Undertaking Party via the Plan Website and in accordance with the notice provisions of the applicable Deed of Undertaking (if any).

3.8   **Administrative Parties' Authority**

3.8.1   Pursuant and subject to the terms of any Deed of Undertaking or applicable Implementation Document, with effect on and from the Plan Effective Date, each of the BrazilCo Plan Creditors hereby irrevocably authorises and instructs each applicable Administrative Party to:

(a)   enter into, execute, deliver and perform (whether as a deed or otherwise) each Implementation Document to which it is expressed to be a party, provided that such Implementation Documents (other than the Transaction Implementation Deed) shall only become effective in accordance with their respective terms and as provided in the Transaction Implementation Deed and this Restructuring Plan, whereupon they shall become binding on all parties there;

(b)   take all steps and do all other things as may be necessary or reasonably desirable to give effect to or implement the Restructuring, this Restructuring Plan and the transactions contemplated by it, including entering into, executing and delivering all such documents as the Plan Company and the relevant Administrative Party reasonably requests for such purpose, and taking any step expressed in this Restructuring Plan or any Implementation Document to be taken by or on behalf of it;

(c)   act and rely, without further verification, on any written instruction from the Plan Company (acting on behalf of the BrazilCo Plan Creditors pursuant to Clause 3.1) to take any action referred to in this Clause 3.8 or otherwise under this Restructuring Plan, and be entitled to assume that any such instruction complies with the terms of this Restructuring Plan and the Implementation Documents;

(d)   give all such instructions, consents or confirmations to any trustee, agent, security agent, paying agent, registrar, clearing system or other Administrative Party as are requested by the Plan Company, and any other directions that may reasonably be requested by the Plan Company, for the purposes of implementing any step contemplated by the Restructuring or this Restructuring Plan;

(e)   take each step under this Restructuring Plan or any Implementation Document expressed to be taken by or on behalf of the relevant Undertaking Party (in any capacity), including the giving, execution, delivery and performance of any obligations, consents, confirmations, acknowledgements, agreements, waivers or authorizations, in each case as requested by the Plan Company for the purposes

**PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
SKADDEN DRAFT 29 APRIL 2026**

of implementing this Restructuring Plan and subject to applicable law and the terms of the relevant Implementation Documents; and

(f) acknowledges and irrevocably confirms, authorizes directs, and ratifies any such action taken by any Administrative Party on or prior to the Plan Effective Date,

in each case provided that each Administrative Party shall have all of the protections, immunities, rights, powers, authorities, indemnities, exculpations, exclusions or limitations of liability and/or benefits conferred on it under and by the applicable Debt Documents governing its appointment and, upon such document's effectiveness and in respect of actions taken after the effectiveness thereof, the Implementation Documents.

**3.8.2** No Administrative Party shall have any Liability to the Plan Company, any BrazilCo Plan Creditor or any of their respective Affiliates for any action taken, document executed or reliance placed on any instruction given to it in accordance with Clause 3.7.1 above, except to the extent arising from its fraud, gross negligence or willful misconduct as determined by a final non-appealable judgment issued by a court of competent jurisdiction.

**3.8.3** In complying with any authorisations, instructions or requests pursuant to this Clause 3.8, each Administrative Party:

(a) shall be entitled to assume that any instructions received by it pursuant to this Restructuring Plan have been duly given in accordance with its terms and the relevant Debt Documents or Implementation Documents;

(b) shall be entitled to assume that, unless it has received notice to the contrary, such instructions have not been revoked;

(c) shall not be obliged to do or omit to do anything if it would, or might in its reasonable opinion, constitute a breach of any applicable law, regulation or contractual obligation or any duty binding upon it;

(d) shall have only those duties, obligations and responsibilities as are expressly specified in this Restructuring Plan and the Implementation Documents to which it is a party (and no others shall be implied), and such duties shall be of a mechanical and administrative nature;

(e) shall not be responsible for the legality, validity, effectiveness, adequacy or enforceability of any Implementation Document or any transaction contemplated by this Restructuring Plan; and

(f) shall not be liable (other than in the case of fraud, gross negligence or willful misconduct on the part of such Administrative Party as determined by a final non-appealable judgment issued by a court of competent jurisdiction) for any loss, Liability or damage, or any failure or delay in the performance of its obligations, arising out of or in connection with:

(i) any action taken or omitted to be taken in accordance with instructions received pursuant to this Restructuring Plan;

18

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
SKADDEN DRAFT 29 APRIL 2026

(ii) the exercise or non-exercise of any right, power, authority or discretion conferred on it; or

(iii) any event or circumstance beyond its reasonable control, including (without limitation) governmental action, market disruption, failure of systems or communications, natural events or industrial action.

**3.8.4**   The authorities, appointments and instructions granted in Clauses 3.1 and 3.8 and shall be treated, for all purposes whatsoever and without limitation, as having been granted by deed.

## 4   DEEDS OF UNDERTAKING

**4.1**   Each Undertaking Party is hereby authorised and instructed to (i) enter into its Deed of Undertaking, and (ii) comply with the Undertakings (as defined therein). Each BrazilCo Plan Creditor and the Plan Company ratifies the execution by each Undertaking Party of its Deed of Undertaking.

**4.2**   Subject to Clause 8, and the terms of the Deeds of Undertaking executed by them, each of the Undertaking Parties severally undertakes, as applicable: (i) to take all steps and execute all such documents as may be necessary or reasonably desirable for the purpose of giving effect to this Restructuring Plan, including the Implementation Documents to which they will be a party and the documentary conditions precedent (if any) applicable to them, or (ii) in their sole discretion, to authorise the Plan Company to act as its attorney to execute and deliver such Implementation Documents in accordance with this Restructuring Plan, the Transaction Implementation Deed, and the Implementation Documents, and in each case and to be bound by, and to comply with, and to perform, the obligations expressed to apply to it in this Restructuring Plan.

## 5   CLOSING STEPS AND PLAN CONSIDERATION

**5.1**   **Closing Steps**

**5.1.1**   As soon as reasonably practicable following the Plan Effective Date, the Plan Company shall execute the Transaction Implementation Deed for and on behalf of itself, the applicable Undertaking Parties as attorney for such Undertaking Parties in accordance with their Deeds of Undertaking, and, in accordance with Clause 3 (*Grant of Authority to Execute the Implementation Documents*), on behalf of the BrazilCo Plan Creditors.

**5.1.2**   The steps to be taken to implement the Restructuring and the transactions contemplated in the Plans (the "**Closing Steps**") shall take place in accordance with, and in the order and at the times specified in, the terms of the Transaction Implementation Deed.

**5.1.3**   The applicable Implementation Documents shall be signed, dated and released in accordance with the Transaction Implementation Deed.

**5.2**   **Plan Consideration**

**5.2.1**   The BrazilCo Plan Creditors acknowledge and agree that the BrazilCo Plan Creditors shall:

DG-486

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**
**SKADDEN DRAFT 29 APRIL 2026**

(a) receive their Plan Consideration in accordance with the terms set out in the Transaction Implementation Deed; and

(b) give the authorities, instructions, undertakings, releases, ratifications, and waivers in favour of the Plan Company and the Released Parties, where applicable, in consideration of the rights provided to each BrazilCo Plan Creditor under this Restructuring Plan and the Transaction Implementation Deed.

5.2.2 The Plan Consideration of the BrazilCo Plan Creditors shall be calculated and paid (or issued, as applicable) in accordance with the Transaction Implementation Deed, including that a BrazilCo Plan Creditor may receive Plan Consideration via the Holding Period Trust if necessary and in accordance with the terms of the Holding Period Trust Deed, and shall include the following Plan Consideration Instruments (each as defined in the Transaction Implementation Deed):

| BrazilCo Plan Debt | Plan Consideration Instruments |
|---|---|
| 2029 New Notes Debt | BrazilCo Common Equity |

## 5.3 Standstill

5.3.1 On and from the Plan Effective Date until the Restructuring Effective Date, or if earlier, until the termination of this Restructuring Plan in accordance with Clause 8 (*Termination*), each BrazilCo Plan Creditor shall not (and no person or entity shall be entitled to, on behalf of such BrazilCo Plan Creditor), in any jurisdiction:

(a) exercise or seek to exercise any rights, remedies, powers or discretions (including any right to accelerate, enforce any guarantee or make any demand in respect of any Liability) under or in connection with the Debt Documents, or instruct or direct any other person to do so;

(b) commence, continue or take any step in relation to any legal, judicial, administrative, arbitral or other proceedings against the Plan Company or any other Existing Obligor or their respective assets or proceeds thereof (including the enforcement of any judgment, order, award, lien or security), or instruct or direct any other person to do so, in each case in connection with the Debt Documents (other than any action taken in response to, or in connection with, any proceedings commenced by or on behalf of any member of the Group);

(c) take any step to enforce, attach, sequester or levy execution against any asset of the Plan Company or any other Existing Obligor, or to enforce or realise any security or other encumbrance, or instruct or direct any other person to do so, in each case in connection with the Debt Documents; or

(d) take any action which would, or would reasonably be expected to, impede, delay or frustrate the implementation of the transactions contemplated by this Restructuring Plan,

in each case, other than as expressly contemplated by, and in accordance with, this Restructuring Plan, the Transaction Implementation Deed or any other

DG-487

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
SKADDEN DRAFT 29 APRIL 2026

Implementation Document, or where such action is taken for the purpose of giving effect to the Restructuring.

## 6    MODIFICATIONS OF THIS RESTRUCTURING PLAN

6.1    Subject to Clauses 6.2 and 6.3 below, the Plan Company may, at any hearing to sanction the Restructuring Plan, acting reasonably and in good faith, consent on behalf of the BrazilCo Plan Creditors to any modification, amendment, variation or supplement to or of this Restructuring Plan, the Transaction Implementation Deed or any other Implementation Document on terms or conditions that the Court may think fit to approve or impose for the purpose of consummating or implementing this Restructuring Plan.

6.2    Subject to 6.3 below, no modification, amendment, variation or supplement shall be made to this Restructuring Plan, the Transaction Implementation Deed or any other Implementation Document, unless:

6.2.1    it is made with the prior written consent of the Majority Supporting Creditors provided that, to the extent any modification, amendment or variation could reasonably be expected to, directly or indirectly:

(i)    have an adverse or, relative to the other BrazilCo Plan Creditors, disproportionate, effect on the rights or interests of any BrazilCo Plan Creditor;

(ii)    alter any right or obligation, or impose any additional or new obligation, on any BrazilCo Plan Creditor (by reference to such rights or obligations as contemplated as at the date of the Explanatory Statement),

the prior written consent of each such affected BrazilCo Plan Creditor(s) is also obtained; or

6.2.2    such modification, amendment or variation is necessary for the implementation of this Restructuring Plan and is of a minor, technical or administrative nature, or to correct a manifest error.

6.3    No modification, amendment, variation or supplement shall be made to this Clause 6 without the consent of each BrazilCo Plan Creditor.

6.4    The Plan Company shall promptly notify the BrazilCo Plan Creditors (by notice to the Majority Supporting Creditors' Advisors and by the Information Agent making such notice available on the Plan Website) and each Administrative Party (in accordance with the notice provisions of the applicable Deed of Undertaking) of the occurrence of any modification, amendment or variation made to the Plans.

6.5    Nothing in this Restructuring Plan shall govern the modification amendment or waiver of any Implementation Document once such document becomes effective in accordance with its terms.

6.6    No modification, amendment, variation or supplement that affects the rights or duties of any Administrative Party shall be made to this Restructuring Plan, the Transaction Implementation Deed or any other Implementation Document without the consent of such Administrative Party.

21

DG-488

**PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
SKADDEN DRAFT 29 APRIL 2026**

**7      [RELEASES**

7.1    Subject to Clause 7.2, with effect from the Restructuring Effective Date, each Plan Party (on behalf of itself and each of its permitted successors and assigns) irrevocably, unconditionally, fully and absolutely:

7.1.1    pursuant to the Restructuring Plan, waives, releases and forever discharges any and all actions, proceedings, claims, damages, counterclaims, complaints, liabilities, liens, rights, demands and set-offs, whether present or future, prospective or contingent, whether in this jurisdiction or any other or under any law, of whatsoever nature and howsoever arising, whether in law or in equity, in contract (including, but not limited to, breaches or non-performances of contract), in statute or in tort (including, but not limited to, negligence and misrepresentation) or in any other manner whatsoever, breaches of statutory duty, for contribution, or for interest and/or costs and/or disbursements, whether or not for a fixed or unliquidated amount, whether filed or unfiled, whether asserted or unasserted, whether or not presently known to the parties or to the law, in each case that it ever had, may have or hereafter can, shall or may have arising out of actions, omissions or circumstances on or prior to the Restructuring Effective Date against each and any Released Party whatsoever or howsoever arising (and notwithstanding any subsequent facts or information becoming known following the Restructuring Effective Date), in relation to or arising directly or indirectly out of or in connection with: (a) the negotiation, preparation, sanction or implementation of the Plans or the Restructuring; or (b) the BrazilCo Plan Claims (in each case, including, without limitation, the negotiation, preparation, sanction, execution or implementation of any Implementation Documents); and

7.1.2    undertakes to the Released Parties that it will not commence or continue, or instruct, direct or authorise any other person to commence or continue, any process, action, other legal proceedings (including, without limitation, any demand, arbitration, alternative dispute resolution, judicial review, adjudication, execution, seizure, distraint, forfeiture, re-entry, lien, enforcement of judgment or enforcement of any security), in any jurisdiction whatsoever against any Released Party in respect of the actions ratified or the waivers, releases, and discharges referred to in Clause 7.1.1 above.

7.2    Clause 7.1 shall not discharge, limit, vary, impact, compromise or otherwise affect in any way: (i) the Excluded Liabilities, (ii) any rights of any Plan Party arising under or in connection with the Implementation Documents (including guarantees or security interests or other obligations and any rights to submit claims and, if eligible, receive distributions in accordance the Restructuring Plan or any Implementation Document), or (iii) which may arise or accrue in relation to acts, omissions or circumstances occurring after the Restructuring Effective Date.

7.3    Nothing in this Restructuring Plan shall prevent a BrazilCo Plan Creditor from responding to or taking any action to defend itself in any claims or Proceedings which are asserted against it or any of its Representatives.]

**8      TERMINATION**

8.1    This Restructuring Plan shall terminate with immediate effect upon the occurrence of any of the following events:

DG-489

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**
**SKADDEN DRAFT 29 APRIL 2026**

**8.1.1** the Restructuring Effective Date does not occur on or before the Restructuring Longstop Time; or

**8.1.2** the Transaction Implementation Deed terminates in accordance with its terms prior to the Restructuring Effective Date (other than as a result of the Restructuring Effective Date having occurred).

**8.2** Upon termination of this Restructuring Plan pursuant to Clause 8.1:

**8.2.1** the terms of and the obligations on, and rights granted to, the Plan Parties under or pursuant to this Restructuring Plan and any Implementation Document shall lapse and be of no further force or effect;

**8.2.2** all compromises, arrangements and releases provided for under or pursuant to this Restructuring Plan and each other Implementation Document shall be of no effect and shall be construed as if this Restructuring Plan and each other Implementation Document had never become effective;

**8.2.3** the rights and obligations of the BrazilCo Plan Creditors shall remain unaffected by this Restructuring Plan and shall be reinstated and remain in full force and effect as they applied immediately prior to the Plan Effective Date; and

**8.2.4** any defaults under any agreement governing the terms of any BrazilCo Plan Claim, including the Debt Documents, and any consequences thereof (including any alleged deemed or actual acceleration) shall be reinstated as if such default had been continuing since the date on which it originally occurred or was deemed to occur.

**8.3** Promptly following termination of this Restructuring Plan, the Plan Parties shall execute such documents and perform such acts and things as are reasonably necessary and/or desirable to give effect to Clause 8.2 and 8.4 (including, where applicable, reversing any steps taken in contemplation of the implementation of the Restructuring).

**8.4** In the event of termination of this Restructuring Plan pursuant to this Clause 8 (*Termination*), the Plan Company shall promptly notify all BrazilCo Plan Creditors (by notice to the Majority Supporting Creditors' Advisors and by the Information Agent making such notice available on the Plan Website) and the Administrative Parties, and any standstill, power of attorney, instruction or authority granted pursuant to this Restructuring Plan or any Implementation Document shall be automatically revoked and terminated. Any action taken under any power of attorney granted pursuant to this Restructuring Plan shall be automatically void and of no further force or effect.

**8.5** This Clause 8 (*Termination*), Clause 1 (*Definitions and Interpretation*) and Clause 12 (*Governing Law and Jurisdiction*) shall survive any termination of this Restructuring Plan.

**9 GENERAL RESTRUCTURING PLAN PROVISIONS**

**9.1 Ratification**

**9.1.1** In consideration for its rights and entitlements under this Restructuring Plan, on and from, and subject to the occurrence of, the Restructuring Effective Date:

**PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
SKADDEN DRAFT 29 APRIL 2026**

(a) each Plan Party hereby irrevocably ratifies and confirms everything which:

    (i) the Plan Company and its respective directors, officers or other duly appointed representatives may lawfully do or cause to be done or purport to be done, to the extent compliant with the terms of this Restructuring Plan and the Implementation Documents;

    (ii) is lawfully done or caused to be done by any Undertaking Party or its representatives pursuant to any authority conferred by this Restructuring Plan or the Implementation Documents; and

    (iii) the Information Agent and its respective directors, managers, officers or other duly appointed representatives has each lawfully done or caused to be done or purported to be done or may lawfully do or cause to be done or purport to be done, in each case to the extent in compliance with this Restructuring Plan or the Implementation Documents;

(b) each BrazilCo Plan Creditor hereby irrevocably undertakes to the Released Parties to treat all BrazilCo Plan Claims and the (direct and indirect) rights and obligations of each BrazilCo Plan Creditor under the Debt Documents as having been effectively varied and/or released in the manner envisaged by this Restructuring Plan, the Transaction Implementation Deed and the Implementation Documents.

## 9.2   Costs

The Plan Company or another Group Member will pay in full all costs, charges, expenses, and disbursements incurred by it in connection with the negotiation, preparation, and implementation of this Restructuring Plan as and when they arise, including, but not limited to, the costs of holding the Plan Meetings, the costs of obtaining the sanction of the Court and the costs of placing notices (if any) required by this Restructuring Plan.

## 9.3   Record Date

**9.3.1**   For the purposes of calculating entitlements to vote on the Restructuring Plan and to receive Plan Consideration, all BrazilCo Plan Claims will be determined by the Information Agent (on behalf of the Plan Company) as at the Record Date.

**9.3.2**   Any successors, assignees or transferees of a BrazilCo Plan Creditor after the Record Date shall be bound by the terms of this Restructuring Plan as BrazilCo Plan Creditors.

## 9.4   Assignments or transfers

**9.4.1**   The Plan Company shall be under no obligation to recognise any assignment or transfer of rights, benefits or interests in the Debt Documents after the Record Date for the purposes of calculating entitlements to receive Plan Consideration under the Restructuring Plan and has no obligations hereunder to any person other than the BrazilCo Plan Creditors on the Record Date, provided that, where the Plan Company has received from the relevant parties notice in writing of such assignment or transfer prior to the Restructuring Effective Date, the Plan Company may, in its sole discretion and subject to the production of such other

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**
**SKADDEN DRAFT 29 APRIL 2026**

evidence in relation to such assignment or transfer as it may reasonably require and to any other terms and conditions which the Plan Company may consider necessary or desirable, acting reasonably, agree to recognise such assignment or transfer for the purposes of calculating entitlements to receive Plan Consideration under the Restructuring Plan.

**9.4.2** Any assignee or transferee of the interests in the Debt Documents recognised by the Plan Company pursuant to this Clause 9.4 shall be bound by the terms of the Restructuring Plan as a BrazilCo Plan Creditor and shall produce such evidence as the Plan Company may reasonably require to confirm that it has agreed to be bound by the terms of the Restructuring Plan.

**9.5   Obligations on days other than a Business Day**

**9.5.1** If any obligation is to be performed under the terms of the Restructuring Plan on a date other than a Business Day, the relevant obligation shall be performed on the next Business Day.

**9.6   Exercise of discretion**

**9.6.1** Where, under or pursuant to any provision of this Restructuring Plan, a matter is to be determined by the Plan Company, it will be determined by the directors of the Plan Company in their discretion in such manner as they may consider fair and reasonable.

**9.7   Severability**

**9.7.1** If at any time any provision of this Restructuring Plan is or becomes illegal, invalid or unenforceable in any respect under the law of any jurisdiction, such provision shall be severed from the Restructuring Plan for the purposes of that jurisdiction, and neither the legality, validity or enforceability of that provision under the law of any other jurisdiction nor the legality, validity or enforceability of any other provision of this Restructuring Plan under the law of that or any other jurisdiction will in any way be affected or impaired thereby, and the rest of the Restructuring Plan shall continue in full force and effect in that jurisdiction as if the severed provision had not been included.

**9.8   BrazilCo Plan Creditors' obligations**

The obligations of each BrazilCo Plan Creditor under this Restructuring Plan are several.

**9.9   Conflict**

**9.10** In the case of any conflict or inconsistency between the terms of this Restructuring Plan and the terms of the Explanatory Statement, the terms of this Restructuring Plan will prevail.

**10   NOTICE**

**10.1** Any notices (including any service of process in connection with a breach of the Restructuring Plan) shall be given in writing and shall be deemed to have been duly given if it is uploaded to the Plan Website *and* delivered by hand, pre-paid first class post, airmail or electronically to the following parties:

DG-492

**PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
SKADDEN DRAFT 29 APRIL 2026**

(a)  if to the Plan Company, to:

NFE Global Holdings Limited
Suite 1, 7th Floor
50 Broadway
London SW1H 0BL
United Kingdom
Email: NFEGlobalUK@newfortressenergy.com
Attention: Office of the General Counsel

with copies (which shall not constitute notice) to:

Skadden, Arps, Slate, Meagher & Flom (UK) LLP
22 Bishopsgate
London EC2N 4BQ
United Kingdom
Email: Peter.Newman@Skadden.com; Christopher.Dressel@skadden.com; and
DLPLady@Skadden.com
Attention: Peter Newman; Christopher Dressel

(b)  if to a BrazilCo Plan Creditor, to its last known address, fax number or email
address stated in the Plan Creditor Letter or failing that according to the Notice
Records, and:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Attention: Andrew Rosenberg; Sung Pak; Kyle R. Satterfield

Email:arosenberg@paulweiss.com;spak@paulweiss.com;
ksatterfield@paulweiss.com

(c)  if to the Information Agent, to:

Kroll Issuer Services Limited
The News Building
3 London Bridge Street
London SE1 9SG
United Kingdom
Attention: Ivan Santek/ Alessandro Zorza
E-mail: nfe@is.kroll.com
Phone: +44 20 7089 0909
Plan Website: https://deals.is.kroll.com/nfe

10.2   BrazilCo Plan Creditors and any Administrative Party shall have the right to request a
paper copy of any Notice by contacting the Information Agent. The Information Agent
shall send such requested documents by first class post in respect of BrazilCo Plan
Creditors whose address is in the UK and by "international standard post" in respect of
BrazilCo Plan Creditors whose address is outside the UK.

10.3   Any Notice shall be deemed to have been delivered and served:

DG-493

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
SKADDEN DRAFT 29 APRIL 2026

(a) if by way of e-mail:

    (i) subject to Clause 10.3(a)(ii), when sent; and

    (ii) if one or more E-Mail Error Messages are sent from and with respect to a person's e-mail address for the purposes of Notices within one hour of such e-mail being sent, the e-mail shall not be deemed to be delivered and effective unless the intended recipient confirms receipt (but failure of an e-mail to be deemed delivered and effective shall not affect other or subsequent e-mails, or delivery of a communication or document pursuant to another method permitted under this Clause 10);

(b) if by way of letter, five Business Days after being deposited in the post postage prepaid in an envelope and addressed correctly;

(c) if delivered by hand or courier, on the first Business Day following delivery; and

(d) if by way of upload to the Plan Website, when viewable on the Plan Website (written notice of which shall be distributed by the Plan Company to each Plan Party); and, if a particular department or officer is specified as part of the address details provided under this Clause 10, if addressed to that department or officer (other than with respect to Clause 10.3(d)).

10.4   In proving service, it shall be sufficient proof, in the case of a Notice sent by post, that the envelope was properly stamped, addressed and placed in the post.

10.5   The accidental omission to send any Notice, written communication or other document in accordance with this Clause 10, or the non-receipt of any such Notice by any BrazilCo Plan Creditor, shall not affect the provisions of the Restructuring Plan or their effectiveness.

## 11   PLAN PARTIES

11.1   Each Plan Party shall enjoy the benefit and be entitled to enforce the terms of this Restructuring Plan.

11.2   Except as provided in this Restructuring Plan, no rights are conferred on any person under the Contracts (Rights of Third Parties) Act 1999 to enforce the terms of this Restructuring Plan.

## 12   GOVERNING LAW AND JURISDICTION

12.1   Subject to Clause 12.2:

12.1.1   the Restructuring Plan and any non-contractual obligations arising out of or in connection with the Restructuring Plan shall be governed by, and construed in accordance with, the laws of England and Wales; and

12.1.2   the BrazilCo Plan Creditors hereby agree that the Court shall have exclusive jurisdiction to hear and determine any suit, action or proceeding and to settle any dispute which may arise out of or in connection with the Restructuring Plan, or out of any action taken or omitted to be taken under the Restructuring Plan or any non-contractual obligations arising out of or in connection with the

DG-494

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**
**SKADDEN DRAFT 29 APRIL 2026**

Restructuring Plan. For such purposes the BrazilCo Plan Creditors irrevocably submit to the jurisdiction of the Court,

12.2   Nothing in this Clause 12 shall affect the validity of other provisions of the Implementation Documents (from and after the date such documents become effective) determining governing law and jurisdiction as between the Plan Company and the BrazilCo Plan Creditors, whether contained in any contract or otherwise.

12.3   The Restructuring Plan shall take effect subject to any prohibition or condition imposed by applicable law.

[*The remainder of this page is intentionally left blank*]

DG-495

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**
**SKADDEN DRAFT 29 APRIL 2026**

### Schedule 1 – Implementation Documents

1. this Restructuring Plan;

2. the CoreCo Plan;

3. the Transaction Implementation Deed;

4. each Deed of Accession;

5. each Deed of Undertaking;

6. the Holding Period Trust Deed;

7. the First Omnibus Agreement;

8. the BrazilCo-CoreCo Intercompany Loans;

9. the Second Omnibus Agreement;

10. the Intragroup BrazilCo Share Transfer Instruments;

11. the Brazil Parent Intercompany Loan Discharge Notice;

12. the BrazilCo Stock Transfer Instruments;

13. the Bradford Stock Transfer Instrument;

14. the Separation Documents;

15. the Separation Agreement;

16. the CoreCo-BrazilCo Transition Services Agreement;

17. the Master Assignment Agreement;

18. the Master Distribution Agreement;

19. the FLNG 2 Term Loan Finance Documents;

20. the FLNG 2 Parent LLCA;

21. the New CoreCo Term Loan Finance Documents;

22. the New CoreCo Intercreditor Agreement;

23. the Revolving Facility Discharge Notice;

24. the Term Loan A Discharge Notice;

25. the Term Loan B Discharge Notice;

26. the 2026 Legacy Notes Cancellation Documents;

DG-496

**PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
SKADDEN DRAFT 29 APRIL 2026**

27.  the 2029 Legacy Notes Cancellation Documents;

28.  the 2029 New Notes Cancellation Documents;

29.  the Series I Loan Discharge Notice;

30.  the Series II Loan Discharge Notice; and

31.  all other agreed form documents, agreements and instruments necessary to implement or consummate the Restructuring in accordance with the Restructuring Support Agreement, the Plans and this Deed, in each case, as amended, supplemented, extended, restated or novated from time to time.

30

DG-497

**PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
SKADDEN DRAFT 29 APRIL 2026**

**Schedule 2 – Undertaking Parties**

1. NFE FLNG 2 LLC

2. NFE Brazil Investments LLC

3. NFE Brazil Holdings Limited

4. Amaunet, S. de R.L. de C.V.

5. American Energy Logistics Solutions LLC

6. Atlantic Energy Holdings LLC

7. Bradford County Development Holdings LLC

8. Bradford County GPF Holdings LLC

9. Bradford County GPF Partners LLC

10. Bradford County Power Holdings LLC

11. Bradford County Power Partners LLC

12. Bradford County Real Estate Partners LLC

13. Bradford County Transport Holdings LLC

14. Bradford County Transport Partners LLC

15. Encanto East LLC

16. Encanto Power West LLC

17. Encanto West LLC

18. Island LNG LLC

19. LA Development Holdings LLC

20. LA Real Estate Holdings LLC

21. LA Real Estate Partners LLC

22. LNG Holdings LLC

23. Mexico FLNG Onshore S. de R.L. de C.V.

24. New Fortress Energy Holdings LLC

25. New Fortress Energy Inc.

31

**PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
SKADDEN DRAFT 29 APRIL 2026**

26. New Fortress Energy Marketing LLC

27. New Fortress Intermediate LLC

28. NFE Altamira Onshore S. de R.L. de C.V.

29. NFE Andromeda Chartering LLC

30. NFE Angola Holdings LLC

31. NFE Atlantic Holdings LLC

32. NFE BCS Holdings (A) LLC

33. NFE BCS Holdings (B) LLC

34. NFE BCS Mexico Holdings, S. de R.L. de C.V.

35. NFE Bermuda Holdings Limited

36. NFE Brazil Newco Limited

37. Equipment Holdings LLC

38. NFE Equipment Partners LLC

39. NFE Financing LLC

40. NFE FLNG 1 Issuer LLC

41. NFE FLNG 2 LLC

42. NFE Ghana Holdings LLC

43. NFE Ghana Partners LLC

44. NFE Global Holdings Limited

45. NFE Global Shipping LLC

46. NFE GP LLC

47. NFE Grand Shipping LLC

48. NFE Honduras Holdings LLC

49. NFE International Holdings

50. NFE International Holdings 1 Limited

51. NFE International Holdings 2 Limited

52. NFE International Holdings Limited

DG-499

**PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
SKADDEN DRAFT 29 APRIL 2026**

53. NFE International LLC

54. NFE International Shipping LLC

55. NFE ISO Holdings LLC

56. NFE ISO Partners LLC

57. NFE Jamaica GP LLC

58. NFE Logistics Holdings LLC

59. NFE Management LLC

60. NFE Mexico Holdings Parent S. à R.L.

61. NFE Mexico Holdings S. à R.L.

62. NFE Mexico Power Holdings Limited

63. NFE Mexico Terminal Holdings Limited

64. NFE Nicaragua Development Partners LLC

65. NFE Nicaragua Development Partners LLC, Sucursal Nicaragua

66. NFE Nicaragua Holdings LLC

67. NFE North Trading LLC

68. NFE Pacifico LAP, S. de R.L. de C.V.

69. NFE Pioneer 1 LLC

70. NFE Pioneer 2 LLC

71. NFE Pioneer 3 LLC

72. NFE Plant Development Holdings LLC

73. NFE Power PR LLC

74. NFE Shannon Holdings Limited

75. NFE South Power Holdings LLC

76. NFE South Power Trading Limited

77. NFE Sub LLC

78. NFE Transport Holdings LLC

79. NFE Transport Partners LLC

DG-500

**PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
SKADDEN DRAFT 29 APRIL 2026**

80.   NFE UK Holdings Limited

81.   NFE US Holdings LLC

82.   Nfenergia GN de BCS, S. de R.L. de C.V.

83.   NFENERGÍA LLC

84.   Nfenergia Mexico, S. de R.L. de C.V.

85.   PA Development Holdings LLC

86.   PA Real Estate Holdings LLC

87.   PA Real Estate Partners LLC

88.   Soluciones de Energia Limpia PR LLC

89.   Tico Development Partners Holdings LLC

90.   Tico Development Partners LLC

91.   U.S. Bank Trust Company, National Association as 2026 Legacy Notes Trustee and 2029 Legacy Notes Trustee

92.   Wilmington Savings Fund Society, FSB as 2029 New Notes Trustee, Series I and II Agent, and Brazil Parent Intercompany Agent

93.   MUFG Bank as [RCF Agent]

94.   [*New TLA / TLB Agent once confirmed*]

95.   U.S. Bank, National Association as Common Representative

96.   Wilmington Trust, National Association as New CoreCo Term Loan Facility Agent and FLNG 2 Term Loan Facility Agent

97.   [*New ICA Common Representative once confirmed*]

98.   Kroll Issuer Services Limited as Holding Period Trustee and Information Agent

99.   NFE Brazil Funding LP

100.   NFE Brazil Funding LLC

101.   Hygo Energy Transition Ltd.

102.   NFE Brazil Financing Limited

103.   LNG Power Limited (UK)

104.   NFE Power Brasil Participações S.A.

DG-501

105.  NFE Power Latam Participações e Comércio Ltda.

106.  CELBA – Centrais Elétricas Barcarena S.A.

107.  Barcarena Offshore Capital LLC

108.  NFE Power SSLNG Participações Ltda.

109.  NFE Power Distribuidora de Gás Natural Ltda.



35

DG-502

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**
**SKADDEN DRAFT 29 APRIL 2026**

## Part II
### NFE Non-Obligor Security Providers

1.    NFE Brazil Holdings Limited

2.    NFE Brazil Holdings LLC

3.    NFE Brazil Investments LLC

4.    NFE South Power Buyback Holdings Limited

5.    PATH Ltd

6.    Shannon LNG Energy Limited

7.    Shannon LNG Limited

DG-503

# Tab 09

*Execution Version*

**COMPANY NUMBER**: 17141053

**NFE BRAZIL NEWCO LIMITED**
**(the "Company")**

**WRITTEN RESOLUTIONS OF THE BOARD OF DIRECTORS OF THE COMPANY**

**Date**: **8 April 2026**

The undersigned, being all of the directors of the Company entitled to receive notice of and to attend and vote at board meetings of the Company, acting pursuant to Model Article 8(2) of Schedule 1 of the Companies (Model Articles) Regulations 2008, SI 2008/3229 which applies (as amended) to the articles of association of the Company, hereby consent to the adoption of the following resolutions (the "**Resolutions**") and approve and adopt such Resolutions with the same force and effect as if they had been approved and adopted at a duly convened meeting of the board of directors of the Company, and direct that these written Resolutions be filed in the minute book of the Company.

**1. INCORPORATION OF THE COMPANY**

1.1 NOTED THAT the Company was incorporated on 7 April 2026 and had been allocated company number 17141053 by the Registrar of Companies for England and Wales.

**2. REGISTERED OFFICE**

2.1 NOTED THAT the registered office address of the Company is Suite 1, 7th Floor, 50 Broadway, London, SW1H 0DB.

**3. DIRECTORS**

3.1 NOTED THAT Christopher John Sotheby Boas, Matthew Reinhard and Kevin Sullivan, each having indicated a willingness to act as director, being the persons named in the statement of proposed officers on Form IN01 and whose identities are verified within the meaning of section 1110A(1) of the Companies Act 2006 (the "**CA 2006**"), are each deemed by virtue of section 16(6) of the CA 2006 to have been appointed, respectively, to the office of director of the Company.

**4. SUBSCRIBER SHARES**

4.1 NOTED THAT by virtue of section 16(5) of the CA 2006, NFE Financing LLC ("**NFE Financing**"), being the subscriber to the memorandum of association of the Company, is the holder of the shares specified in the statement of capital on Form IN01, being 500 ordinary shares of £1.00 each fully paid in the capital of the Company (the "**Subscriber Shares**").

4.2 **IT IS RESOLVED THAT:**

(a) the entry in the register of members of the Company of NFE Financing as the holder of the Subscriber Shares be and is hereby confirmed and approved; and

(b) a share certificate in appropriate form in respect of the Subscriber Shares be executed by the Company and issued to NFE Financing.

**5. PEOPLE WITH SIGNIFICANT CONTROL**

5.1 NOTED THAT NFE International Holdings 1 Limited, being the entity named in the statement of initial significant control on Form IN01 and whose required particulars as defined in 790(K)(3) of the CA 2006 were stated thereon, is a registrable relevant legal entity (within the meaning of section 790(C) of the CA 2006) in relation to the Company for the purposes of section 12A(1) of the CA 2006.

DG-504

**6. DISTINGUISHING NUMBERS**

6.1 **IT IS RESOLVED THAT** none of the issued shares in the capital of the Company shall bear a distinguishing number so long as it remains fully paid and ranks *pari passu* with all the other shares of the same class.

**7. ACCOUNTING REFERENCE DATE**

7.1 NOTED THAT the accounting reference date of the Company is 30 April in each year, being the last day of the month of the anniversary of incorporation of the Company.

7.2 **IT IS RESOLVED THAT** the Company's first accounting reference period be shortened to end on 31 December 2026 and that the accounting reference date of the Company be 31 December in each subsequent year.

**8. FILINGS AND ADDITIONAL MATTERS**

8.1 After due and careful consideration, including taking into account the obligation of each director to act in the way which that director considers, in good faith, would be most likely to promote the success of the Company for the benefit of its members as a whole, and having regard (amongst other matters) to the matters referred to in section 172(1) of the CA 2006, **IT IS RESOLVED**:

(a) **THAT** each director of the Company (or in the case of any document requiring execution as a deed, two directors or one director in the presence of a witness who attests that director's signature) be and is hereby authorised to take or do, or cause to be taken or done, all such acts and things, and agree and execute on behalf of the Company any ancillary documents that the director may consider necessary or desirable in connection with the incorporation of the Company, and further to approve amendments or revisions to the same, execution of any such documents on behalf of the Company as aforesaid to constitute conclusive evidence of such approval; and

(b) **THAT** the directors of the Company and its agents or advisers, as applicable, each be and are hereby severally authorised and instructed to make any and all further necessary entries to update the statutory books and records of the Company in respect of these Resolutions and to arrange for any and all further forms and documents, as necessary, to be filed with the Registrar (including, without limitation, Form AA01 (*Change of accounting reference date*)).

*[Signature page follows]*

2630

DG-505

*Execution Version*

These Resolutions may be executed in counterparts, but shall not be effective until each director has executed at least one counterpart. Each counterpart shall constitute an original of these Resolutions, but the counterparts shall together constitute one and the same instrument.

Signed by:

Christopher John Sotheby Boas

4D5C907FC340418... · · · · · · · · · · · · · · · · · · · · · ·   · · · · · · · · · · · · · · · · · · · · · · · · · · · ·
**Christopher John Sotheby Boas**   **Matthew Reinhard**
**Director**   **Director**

· · · · · · · · · · · · · · · · · · · · · · · · · · ·
**Kevin Sullivan**
**Director**

[*Signature Page to NFE Brazil Newco Limited – Incorporation Resolutions*]

2631

DG-506

*Execution Version*

These Resolutions may be executed in counterparts, but shall not be effective until each director has executed at least one counterpart.  Each counterpart shall constitute an original of these Resolutions, but the counterparts shall together constitute one and the same instrument.

............................................
**Christopher John Sotheby Boas**
**Director**

............................................
**Matthew Reinhard**
**Director**

............................................
**Kevin Sullivan**
**Director**

*[Signature Page to NFE Brazil Newco Limited – Incorporation Resolutions]*

2632

DG-507

Docusign Envelope ID: 1B49D4FC-E49D-406B-AF2E-4613BA8D97ED

*Execution Version*

**REGISTERED NUMBER 13679588**

**NFE GLOBAL HOLDINGS LIMITED**

(the "Company")

MINUTES of a meeting of the directors

of the Company held at

Skadden, Arps, Slate, Meagher & Flom (UK) LLP

22 Bishopsgate, London EC2N 4BQ

United Kingdom

on    9 April 2026 at 12:10 p.m.

---

**Present:**        Christopher Boas

Matthew Reinhard (Chairperson)

Kevin Sullivan (via video link)

Christopher Guinta (via video link)

**In attendance:**  Christopher Boas

Matthew Reinhard

Kevin Sullivan (via video link)

Christopher Guinta (via video link)

Nicole Stephansen (Skadden)

Peter Newman (Skadden) (via video link)

Edward Taylor (Skadden)

Robert Young (Skadden) (via video link)

---

2633

Docusign Envelope ID: 1B49D4FC-E49D-406B-AF2E-4613BA8D97ED

## APPOINTMENT OF CHAIRPERSON

1.      Matthew Reinhard was appointed Chairperson of the meeting. The Chairperson reported that notice of the meeting had been given to the directors in accordance with the Company's articles of association.

## DISCLOSURE OF INTEREST

2.      Each of the directors present either: a) confirmed that they had no direct or indirect interest; b) confirmed that they had previously duly declared a direct or indirect interest; or c) duly declared a direct or indirect interest (whether by virtue of any director being a director of any affiliate of the Company or otherwise), in each case, in any of the various matters to be considered at the meeting which they were required to declare in accordance with sections 177 and 182 of the Companies Act 2006 (the "**Act**") and the Company's articles of association.

3.      In particular, each director noted that they are directors of other companies in the Group (as defined below) which may potentially benefit from transactions being considered for approval at the meeting.

## DISCLOSURE OF CONFLICT OF INTEREST

4.      Each of the directors present declared that no disclosures of direct or indirect interests which conflict, or possibly may conflict, with the interests of the Company need to be made with respect to the various matters to be considered at the meeting. The directors noted that the interests referred to in paragraph 3 above could not reasonably be regarded as likely to give rise to a conflict of interest and that the interests of the Company and the other relevant Group companies were aligned in respect of the matters to be considered at the meeting.

5.      It was noted that having confirmed that there were no conflict of interests pursuant to paragraph 4 above and having duly declared any interest in the various matters to be discussed pursuant to paragraphs 2 and 3 above, it was established that none of the directors was prohibited from voting or being taken into account in ascertaining whether a quorum was present.

## QUORUM

6.      It was further noted that a quorum of directors was present and that the meeting had been duly convened.

## BUSINESS OF THE MEETING

7.      Skadden, Arps, Slate, Meagher & Flom (UK) LLP ("**Skadden**") gave a presentation to the directors that was outlined in slides provided at the meeting (the "**Presentation**") and addressed:

(a)      the Restructuring Plan process to date, including the consent levels obtained under the RSA;

(b)      the anticipated timeline for the Restructuring Plan;

2

2634

DG-509

Docusign Envelope ID: 1B49D4FC-E49D-406B-AF2E-4613BA8D97ED

(c)    the directors' duties under the Act and at common law in relation to the Restructuring Plan;

(d)    the entry by the Company into the Deed of Contribution; and

(e)    the entry by the Company into the other Documents to be considered at the meeting.

8.    Matthew Reinhard asked whether the directors' duty to consider the interests of creditor stopped short of being a fiduciary duty. Skadden explained that directors owe duties to the company, rather than directly to creditors, but that the discharge of the duty requires the consideration of creditors' interests.

9.    It was noted that:

(a)    the Company is a member of the New Fortress Energy Inc. group (the "**Group**") and an indirect wholly-owned subsidiary of New Fortress Energy Inc., a Delaware Corporation (the "**Parent**");

(b)    the Company expects to propose a restructuring plan in accordance with the terms of the restructuring support agreement (the "**RSA**") dated 17 March 2026 and made between, among others, the Parent, the Company and various creditors of the Parent (the "**Plan Creditors**"), pursuant to which the Company (amongst other parties) has agreed to use commercially reasonable efforts to promptly take all actions reasonably necessary to support, facilitate, implement, consummate, or otherwise give effect to the RSA;

(c)    the restructuring is to be implemented through two inter-conditional restructuring plans under Part 26A of the Act, to be proposed by (i) the Company, as the "**CoreCo Plan**", in respect of the holders of the CoreCo Plan Debt (as such term is defined in the PSL) (the "**CoreCo Plan**"), and (ii) NFE Brazil Newco Limited ("**Brazil Newco**"), in respect of the holders of the 2029 New Notes Debt (as such term is defined in the PSL) (the "**BrazilCo Plan**" and, together with the CoreCo Plan, the "**Restructuring Plan**");

(d)    in connection with the Restructuring Plan, on 24 March 2026 the Company filed a claim form (the "**Claim Form**") and listing note (the "**Listing Note**") with the High Court of Justice in London seeking a hearing to approve the convening of the Plan Meetings (as defined below);

(e)    in connection with the Restructuring Plan, the Company proposes to enter into a deed of contribution with the Parent on or around the date of these Resolutions, pursuant to which the Company will grant a right of contribution to the Parent to cover certain liabilities of the Parent, as described in the deed of contribution (the "**Deed of Contribution**");

(f)    the purpose and objectives of the Restructuring Plan are to:

    (i)    restructure the Company's, Brazil Newco's (together, the "**Plan Companies**") and the Group's balance sheet;

3

Docusign Envelope ID: 1B49D4FC-E49D-406B-AF2E-4613BA8D97ED

(ii)    address approaching maturities under the CoreCo Plan Debt (as such term is defined in the PSL) and the 2029 New Notes Debt (as such term is defined in the PSL) and enter into new debt and preferred equity finance arrangements that provide the Group and the Plan Companies with a sustainable capital structure;

(iii)   enable access to new money financing to address the Group's near- to medium-term liquidity needs, to the extent required; and

(iv)    facilitate the holistic restructuring of the Group pursuant to the Restructuring Plan;

(g)    pursuant to the Restructuring Plan, the Plan Creditors shall release their existing claims against the Group in return for plan consideration comprising a mix of debt, preferred equity and common equity (the "**Plan Consideration**"). The Plan Consideration is allocated in accordance with the Plan Creditors' existing rights against various groups of collateral assets (the "**Collateral Pools**"). The respective Plan Classes, Collateral Pool interests and Plan Consideration is summarised in the table below (capitalised terms have the meaning given to them in the draft PSL):

| Class | Plan Debt | Collateral Pool(s) | Plan Consideration |
|---|---|---|---|
| Legacy Notes Class | 2026 Legacy Notes Debt<br><br>2029 Legacy Notes Debt | Common Collateral | CoreCo Common Stock<br><br>CoreCo Preferred Stock |
| Series I and Series II Class | Series I Loan Debt<br><br>Series II Loan Debt | Common Collateral | CoreCo Common Stock<br><br>CoreCo Preferred Stock |
| R1-Class | R-1 Revolving Credit Facility Debt | Common Collateral<br><br>F1 Collateral<br><br>F2 Collateral<br><br>Account Collateral | CoreCo Common Stock<br><br>CoreCo Preferred Stock<br><br>New CoreCo Term Loans<br><br>FLNG 2 Term Loans<br><br>FLNG 2 Preferred Equity |
| R2-Class | R-2 Revolving Credit Facility Debt | Common Collateral<br><br>F1 Collateral<br><br>F2 Collateral<br><br>Account Collateral<br><br>Brazil Collateral | CoreCo Common Stock<br><br>CoreCo Preferred Stock<br><br>New CoreCo Term Loans<br><br>FLNG 2 Term Loans<br><br>FLNG 2 Preferred Equity |

4

DG-511

Docusign Envelope ID: 1B49D4FC-E49D-406B-AF2E-4613BA8D97ED

| Class | Plan Debt | Collateral Pool(s) | Plan Consideration |
|---|---|---|---|
| | | | RCF-2 / TLA BrazilCo Equity Pool |
| TLA Class | Term Loan A Debt | Common Collateral<br><br>F2 Collateral<br><br>Account Collateral<br><br>Brazil Collateral | CoreCo Common Stock<br><br>CoreCo Preferred Stock<br><br>New CoreCo Term Loans<br><br>FLNG 2 Term Loans<br><br>FLNG 2 Preferred Equity<br><br>RCF-2 / TLA BrazilCo Equity Pool |
| TLB Class | Term Loan B Debt | Common Collateral<br><br>F1 Collateral<br><br>F2 Collateral | CoreCo Common Stock<br><br>CoreCo Preferred Stock<br><br>New CoreCo Term Loans<br><br>FLNG 2 Term Loans<br><br>FLNG 2 Preferred Equity |
| 2029 New Notes Class | 2029 New Notes Debt | Brazil Collateral | BrazilCo Common Equity |

(h)     implementation of the Restructuring Plan would require, among other things, the following steps:

(i)     issuing a practice statement letter (the "**PSL**") to be sent from the Company and Brazil Newco to the Plan Creditors, advising them of the intention to propose the Restructuring Plan under Part 26A of the Act;

(ii)    applying to English court (the "**Court**") to request permission to convene the Plan Meetings (as defined below) and obtain other relevant directions (the "**First Court Application**");

(iii)   sending the relevant documentation to the Plan Creditors, including an explanatory statement setting out the details of the proposed Restructuring Plan and certain commercial and financial information in relation to the Company and its business;

5

2637

Docusign Envelope ID: 1B49D4FC-E49D-406B-AF2E-4613BA8D97ED

(iv) holding meetings of the Plan Creditors for the purposes of voting on the proposed Restructuring Plan (the "**Plan Meetings**");

(v) applying to Court for the purpose of obtaining the Court's sanction of the Restructuring Plan (assuming that the Restructuring Plan is approved by at least one class of creditors at the Plan Meetings for each of the CoreCo Plan and the BrazilCo Plan) (the "**Second Court Application**"); and

(vi) assuming that the Court sanctions the Restructuring Plan, and an office copy of the order sanctioning the Restructuring Plan is delivered to Companies House,

(7(h)(i) to 7(h)(vi) above collectively, the "**Plan Steps**");

(i) the timing and sequencing of the Plan Steps is currently anticipated as follows (subject to further change):

(i) the PSL would be issued on or around 17 April 2026;

(ii) the first Court hearing in respect of the First Court Application would take place on or around 11 May 2026;

(iii) the Plan Meetings would take place on or around 1 June 2026;

(iv) the second Court hearing in respect of the Second Court Application would take place on or around 18 June 2026 (the "**Sanction Hearing**"); and

(v) the implementation of the restructuring steps set out in the Restructuring Plan would be completed in the days following the Sanction Hearing; and

(j) the Plan Companies would seek recognition of the Restructuring Plan in the United States pursuant to chapter 15 of the U.S. Bankruptcy Code (the "**Code**") by filing a petition in the United States Bankruptcy Court for the Southern District of New York (or such other appropriate forum determined by the Plan Companies).

**PRODUCTION OF DOCUMENTS**

10.    The following documents were produced to the meeting and reviewed by the directors:

(a) a draft of the PSL;

(b) the executed RSA;

(c) the Presentation;

(d) the filed Claim Form;

(e) the filed Listing Note; and

(f) a draft of the Deed of Contribution,

6

2638

(together with any other document, letter, certificate, deed, instrument, agreement, power of attorney, request, memorandum, statement or notice as may be ancillary, necessary, desirable, required or requested to be entered into by the Company in connection with the Restructuring Plan, the "**Documents**").

11.     The Documents were reviewed by the directors. The Chairperson explained that although the parties had substantially negotiated the terms of these Documents, the parties may still be required to make some amendments to the Documents and approve final versions prior to their execution.

12.     Matthew Reinhard requested that Skadden make certain non-substantive amendments to the Deed of Contribution, which was agreed.

**DIRECTORS' DUTIES**

13.     The directors considered their duties under the Act and at common law, having been advised on such matters by Skadden, including the duty under Section 172 of the Act to promote the success of the Company for the benefit of its members and the duty at common law to, under certain circumstances, consider the interests of a company's creditors.

14.     The directors noted that by a resolution of 11 March 2026, the Parent had determined to enter into the RSA, having concluded that to do so would be in the best interest of the Parent and its stockholders, creditors and other stakeholders.

15.     The directors noted that as of the Early Consent Deadline (as such term is defined in the PSL), 95% of Plan Creditors by value, as well as each of the direct and indirect owners of the Company up to and including the Parent, had signed on to the RSA and committed to support the Restructuring Plan.

16.     The directors noted that the steps and transactions contemplated at the meeting were necessary to fulfil the obligations of the Company and the Group under the RSA and to progress to the completion of the Restructuring Plan.

17.     On the basis of the foregoing and after having carefully considered the information presented regarding the Restructuring Plans including the advice, presentations and recommendation of the Company's legal and financial advisors, the directors concluded that they were satisfied that the adoption of the resolutions considered at this meeting would be consistent with their duties under the Act and at common law and would promote the success of the Company for the benefit of all relevant stakeholders.

**RESOLUTIONS**

18.     After full and careful consideration of the terms and the conditions of the Documents, in the light of the directors' duties under the Act, **IT WAS UNANIMOUSLY RESOLVED THAT:**

(a)     the pursuit and implementation of the Restructuring Plan and the transactions contemplated by the Documents would, in each case, be most likely to promote the success of the Company and be in the best interests of the Company and all its stakeholders, and are hereby authorised and approved in all respects;

7

2639

DG-514

Docusign Envelope ID: 1B49D4FC-E49D-406B-AF2E-4613BA8D97ED

(b)    the directors be and are hereby authorised to take such steps as shall be necessary to implement the Restructuring Plan and the transactions contemplated by the Documents including, without limitation, taking each of the Plan Steps:

(c)    the entry by the Company into the RSA be and is hereby ratified;

(d)    the filing by the Company of the Claim Form and the Listing Note be and is hereby ratified;

(e)    the entry by the Company into the Documents and any ancillary or related documents in accordance with the RSA be and is hereby approved and the execution, delivery and performance by the Company of the Documents to which it is a party be and are hereby approved;

(f)    any director of the Company (or, in the case of any document to be executed by the Company under seal or as a deed, any director and the secretary of the Company or any two directors or a director whose signature is witnessed), be and is hereby authorised to execute, on behalf of the Company (whether under hand, under seal or otherwise):

   (i)    the Documents in the form produced to the meeting with such amendments to them, if any, as may be approved by the person or persons so authorised and executing such documents, which approval may be communicated by email; and

   (ii)    any other agreement or document whatsoever the Company may require, or deem necessary, in connection with the Documents, which is approved by the person or persons so authorised and executing each such other agreement or document and to send and dispatch all documents and notices to be entered into by the Company in connection with the Documents;

(g)    the approval of each such person in any such case be conclusively evidenced by his or her signing such document or witnessing the affixation of the Company's seal to them (as the case may be);

(h)    any director be and is hereby authorised to do all such acts and things and agree, execute and deliver all such documents as may be required in order to implement the transactions contemplated by the Documents or the RSA, in each case in such manner or form as the director may in his absolute discretion think fit; and

(i)    any director of the Company (or, in the case of any document to be executed by the Company under seal or as a deed, any director and the secretary of the Company or any two directors or a director whose signature is witnessed), be and is hereby authorised on behalf of the Company, to execute and do all such deeds, documents (in addition to the Documents) and things as he or she may consider expedient in connection with the execution or performance by the Company of the Documents and any other agreement or document as is referred to in paragraph (f)(ii) above.

8

2640

**CLOSING**

19.     There being no further business, the meeting then ended.

*Matthew Reinhard*
...........................................

**Chairperson**

*[NFE Global Holdings Limited Board Minutes – Signature Page]*

2641

Docusign Envelope ID: 1B49D4FC-E49D-406B-AF2E-4613BA8D97ED

*Execution version*

**REGISTERED NUMBER 17141053**

**NFE BRAZIL NEWCO LIMITED**

**(the "Company")**

MINUTES of a meeting of the directors

of the Company held at

Skadden, Arps, Slate, Meagher & Flom (UK) LLP

22 Bishopsgate, London EC2N 4BQ

United Kingdom

on    9 April 2026 at 12:31 p.m.

―――――――――――――――――――――――――

| | |
|---|---|
| **Present:** | Christopher Boas |
| | Matthew Reinhard (Chairperson) |
| | Kevin Sullivan (via video link) |
| **In attendance:** | Christopher Boas |
| | Matthew Reinhard |
| | Kevin Sullivan (via video link) |
| | Nicole Stephansen (Skadden) |
| | Peter Newman (Skadden) (via video link) |
| | Edward Taylor (Skadden) |
| | Robert Young (Skadden) (via video link) |

―――――――――――――――――――――――――

2642

DG-517

Docusign Envelope ID: 1B49D4FC-E49D-406B-AF2E-4613BA8D97ED

**APPOINTMENT OF CHAIRPERSON**

1.  Matthew Reinhard was appointed Chairperson of the meeting. The Chairperson reported that notice of the meeting had been given to the directors in accordance with the Company's articles of association.

**DISCLOSURE OF INTEREST**

2.  Each of the directors present either: a) confirmed that they had no direct or indirect interest; b) confirmed that they had previously duly declared a direct or indirect interest; or c) duly declared a direct or indirect interest (whether by virtue of any director being a director of any affiliate of the Company or otherwise), in each case, in any of the various matters to be considered at the meeting which they were required to declare in accordance with sections 177 and 182 of the Companies Act 2006 (the "**Act**") and the Company's articles of association.

3.  In particular, each director noted that they are directors of other companies in the Group (as defined below) which may potentially benefit from transactions being considered for approval at the meeting.

**DISCLOSURE OF CONFLICT OF INTEREST**

4.  Each of the directors present declared that no disclosures of direct or indirect interests which conflict, or possibly may conflict, with the interests of the Company need to be made with respect to the various matters to be considered at the meeting. The directors noted that the interests referred to in paragraph 3 above could not reasonably be regarded as likely to give rise to a conflict of interest and that the interests of the Company and the other relevant Group companies were aligned in respect of the matters to be considered at the meeting.

5.  It was noted that having confirmed that there were no conflict of interests pursuant to paragraph 4 above and having duly declared any interest in the various matters to be discussed pursuant to paragraphs 2 and 3 above, it was established that none of the directors was prohibited from voting or being taken into account in ascertaining whether a quorum was present.

**QUORUM**

6.  It was further noted that a quorum of directors was present and that the meeting had been duly convened.

**BUSINESS OF THE MEETING**

7.  Skadden, Arps, Slate, Meagher & Flom (UK) LLP ("**Skadden**") gave a presentation to the directors that was outlined in slides  provided at the meeting (the "**Presentation**") and addressed:

    (a)    the Restructuring Plan process to date, including the consent levels obtained under the RSA;

    (b)    the anticipated timeline for the Restructuring Plan;

2

2643

DG-518

Docusign Envelope ID: 1B49D4FC-E49D-406B-AF2E-4613BA8D97ED

(c)    the directors' duties under the Act and at common law in relation to the Restructuring Plan;

(d)    the accession by the Company as a Subsidiary Guarantor under the 2024 Indenture;

(e)    the entry by the Company into the Deed of Contribution; and

(f)    the entry by the Company into the other Documents to be considered at the meeting.

8.    It was noted that:

(a)    the Company is a member of the New Fortress Energy Inc. group (the "**Group**") and an indirect wholly-owned subsidiary of New Fortress Energy Inc., a Delaware Corporation (the "**Parent**") and a direct wholly-owned subsidiary of NFE Financing LLC, a Delaware Limited Liability Company ("**NFE Financing**");

(b)    the Company expects to propose a restructuring plan in accordance with the terms of the restructuring support agreement (the "**RSA**") dated 17 March 2026 between, among others, the Parent, NFE Financing and various creditors of the Parent and NFE Financing (the "**Plan Creditors**"), to which it is proposed that the Company accedes by execution of a joinder (the "**RSA Joinder**"), and thereby agree to use commercially reasonable efforts to promptly take all actions reasonably necessary to support, facilitate, implement, consummate, or otherwise give effect to the RSA;

(c)    the restructuring is to be implemented through two inter-conditional restructuring plans under Part 26A of the Act, to be proposed by (i) the Company, as the "**BrazilCo Plan**", in respect of the holders of the 2029 New Notes Debt (as such term is defined in the PSL) (the "**BrazilCo Plan**"), and (ii) NFE Global Holdings Limited ("**NFE Global**"), in respect of the holders of the CoreCo Plan Debt (as such term is defined in the PSL) (the "**CoreCo Plan**" and, together with the BrazilCo Plan, the "**Restructuring Plan**");

(d)    in connection with the Restructuring Plan, the Company proposes to accede as a guarantor to the indenture governed by the laws of the State of New York (the "**2029 New Notes Indenture**") dated as of 22 November 2024 between NFE Financing as issuer and Bradford County Real Estate Partners LLC as guarantor (the "**Original Guarantor**"), and Wilmington Savings Fund Society, FSB, as trustee (in such capacity, the "**Trustee**") and as notes collateral agent under which the 12.000% Senior Secured Notes due 2029 (the "**2029 New Notes**");

(e)    in connection with the Restructuring Plan, NFE Financing launched a consent solicitation on 17 March 2026 (the "**Consent Solicitation Statement**") seeking the consent of the holders of the 2029 New Notes to make certain amendments to the 2029 New Notes Indenture including, without limitation, amendments to permit the Company to be incorporated by NFE Financing and thereafter accede to the 2029 New Notes Indenture as guarantor, with such Consent Solicitation Statement being approved by well over a majority of the holders of the 2029 New Notes;

3

DG-519

Docusign Envelope ID: 1B49D4FC-E49D-406B-AF2E-4613BA8D97ED

(f)    in connection with the Consent Solicitation Statement, NFE Financing and the Trustee signed the first supplement to the 2029 New Notes Indenture (the "**First Supplemental Indenture**") pursuant to which the 2029 New Notes Indenture was amended to permit the formation of the Company as a subsidiary of the Parent and permit the Company to accede to the 2029 New Notes Indenture as a guarantor (the "**Subsidiary Guarantor**"), and it is proposed that the Company and the Trustee execute a second supplement to the 2029 New Notes Indenture (the "**Second Supplemental Indenture**") pursuant to which the Company shall accede as a Subsidiary Guarantor;

(g)    in connection with the Second Supplemental Indenture, the Company proposes to provide a certificate of a director of the Company (the "**Officer's Certificate**");

(h)    in connection with the Restructuring Plan, the Company proposes to file a Part 8 claim form (the "**Claim Form**") and listing note (the "**Listing Note**") with the High Court of Justice in London seeking a hearing to approve the convening of the Plan Meetings (as defined below);

(i)    in connection with the Restructuring Plan, the Company proposes to enter into a deed of contribution with NFE Financing on or around the date of these Resolutions, pursuant to which the Company will grant a right of contribution to NFE Financing to cover certain liabilities of NFE Financing, as described in the deed of contribution (the "**Deed of Contribution**");

(j)    the purpose and objectives of the Restructuring Plan are to:

    (i)    restructure the Company's, NFE Global's (together, the "**Plan Companies**") and the Group's balance sheet;

    (ii)    address approaching maturities under the CoreCo Plan Debt (as such term is defined in the PSL) and the 2029 New Notes Debt (as such term is defined in the PSL) and enter into new debt and preferred equity finance arrangements that provide the Group and the Plan Companies with a sustainable capital structure;

    (iii)    enable access to new money financing to address the Group's near- to medium-term liquidity needs, to the extent required; and

    (iv)    facilitate the holistic restructuring of the Group pursuant to the Restructuring Plan;

(k)    pursuant to the Restructuring Plan, the Plan Creditors shall release their existing claims against the Group in return for plan consideration comprising a mix of debt, preferred equity and common equity (the "**Plan Consideration**"). The Plan Consideration is allocated in accordance with the Plan Creditors' existing rights against various groups of collateral assets (the "**Collateral Pools**"). The respective Plan Classes, Collateral Pool interests and Plan Consideration is summarised in the table below (capitalised terms have the meaning given to them in the draft PSL):

4

2645

DG-520

Docusign Envelope ID: 1B49D4FC-E49D-406B-AF2E-4613BA8D97ED

| Class | Plan Debt | Collateral Pool(s) | Plan Consideration |
|---|---|---|---|
| Legacy Notes Class | 2026 Legacy Notes Debt<br><br>2029 Legacy Notes Debt | Common Collateral | CoreCo Common Stock<br><br>CoreCo Preferred Stock |
| Series I and Series II Class | Series I Loan Debt<br><br>Series II Loan Debt | Common Collateral | CoreCo Common Stock<br><br>CoreCo Preferred Stock |
| R1-Class | R-1 Revolving Credit Facility Debt | Common Collateral<br><br>F1 Collateral<br><br>F2 Collateral<br><br>Account Collateral | CoreCo Common Stock<br><br>CoreCo Preferred Stock<br><br>New CoreCo Term Loans<br><br>FLNG 2 Term Loans<br><br>FLNG 2 Preferred Equity |
| R2-Class | R-2 Revolving Credit Facility Debt | Common Collateral<br><br>F1 Collateral<br><br>F2 Collateral<br><br>Account Collateral<br><br>Brazil Collateral | CoreCo Common Stock<br><br>CoreCo Preferred Stock<br><br>New CoreCo Term Loans<br><br>FLNG 2 Term Loans<br><br>FLNG 2 Preferred Equity<br><br>RCF-2 / TLA BrazilCo Equity Pool |
| TLA Class | Term Loan A Debt | Common Collateral<br><br>F2 Collateral<br><br>Account Collateral<br><br>Brazil Collateral | CoreCo Common Stock<br><br>CoreCo Preferred Stock<br><br>New CoreCo Term Loans<br><br>FLNG 2 Term Loans<br><br>FLNG 2 Preferred Equity<br><br>RCF-2 / TLA BrazilCo Equity Pool |
| TLB Class | Term Loan B Debt | Common Collateral<br><br>F1 Collateral | CoreCo Common Stock<br><br>CoreCo Preferred Stock |

5

2646

DG-521

Docusign Envelope ID: 1B49D4FC-E49D-406B-AF2E-4613BA8D97ED

| Class | Plan Debt | Collateral Pool(s) | Plan Consideration |
|---|---|---|---|
| | | F2 Collateral | New CoreCo Term Loans<br>FLNG 2 Term Loans<br>FLNG 2 Preferred Equity |
| 2029 New Notes Class | 2029 New Notes Debt | Brazil Collateral | BrazilCo Common Equity |

(l) implementation of the Restructuring Plan would require, among other things, the following steps:

(i) issuing a practice statement letter (the "**PSL**") to be sent from the Company and NFE Global to the Plan Creditors, advising them of the intention to propose the Restructuring Plan under Part 26A of the Act;

(ii) applying to English court (the "**Court**") to request permission to convene the Plan Meetings (as defined below) and obtain other relevant directions (the "**First Court Application**");

(iii) sending the relevant documentation to the Plan Creditors, including an explanatory statement setting out the details of the proposed Restructuring Plan and certain commercial and financial information in relation to the Company and its business;

(iv) holding meetings of the Plan Creditors for the purposes of voting on the proposed Restructuring Plan (the "**Plan Meetings**");

(v) applying to Court for the purpose of obtaining the Court's sanction of the Restructuring Plan (assuming that the Restructuring Plan is approved by at least one class of creditors at the Plan Meetings for each of the CoreCo Plan and the BrazilCo Plan) (the "**Second Court Application**"); and

(vi) assuming that the Court sanctions the Restructuring Plan, and an office copy of the order sanctioning the Restructuring Plan is delivered to Companies House,

(7(k)(i) to 7(k)(vi) above collectively, the "**Plan Steps**");

(m) the timing and sequencing of the Plan Steps is currently anticipated as follows (subject to further change):

(i) the PSL would be issued on or around 17 April 2026;

(ii) the first Court hearing in respect of the First Court Application would take place on or around 11 May 2026;

6

2647

Docusign Envelope ID: 1B49D4FC-E49D-406B-AF2E-4613BA8D97ED

(iii)   the Plan Meetings would take place on or around 1 June 2026;

(iv)   the second Court hearing in respect of the Second Court Application would take place on or around 18 June 2026 (the "**Sanction Hearing**"); and

(v)   the implementation of the restructuring steps set out in the Restructuring Plan would be completed in the days following the Sanction Hearing; and

(n)   the Plan Companies would seek recognition of the Restructuring Plan in the United States pursuant to chapter 15 of the U.S. Bankruptcy Code (the "**Code**") by filing a petition in the United States Bankruptcy Court for the Southern District of New York (or such other appropriate forum determined by the Plan Companies).

**PRODUCTION OF DOCUMENTS**

9.   The following documents were produced to the meeting and reviewed by the directors:

(a)   a draft of the PSL;

(b)   the executed RSA;

(c)   the Presentation;

(d)   an executed forbearance agreement dated 27 March 2026 with the providers of certain letter of credit facilities to the Group;

(e)   the executed Consent Solicitation Statement;

(f)   the executed 2029 New Notes Indenture;

(g)   the executed First Supplemental Indenture;

(h)   a draft of the Second Supplemental Indenture;

(i)   a draft of the Officer's Certificate;

(j)   a draft of the RSA Joinder;

(k)   a draft of the Claim Form;

(l)   a draft of the Listing Note; and

(m)   a draft of the Deed of Contribution,

(together with any other document, letter, certificate, deed, instrument, agreement, power of attorney, request, memorandum, statement or notice as may be ancillary, necessary, desirable, required or requested to be entered into by the Company in connection with the Restructuring Plan, the "**Documents**").

10.   The Documents were reviewed by the directors, who noted in particular:

DG-523

Docusign Envelope ID: 1B49D4FC-E49D-406B-AF2E-4613BA8D97ED

(a)   the representations set out in the 2029 New Notes Indenture and the effect of making these representations;

(b)   the covenants set out in the 2029 New Notes Indenture;

(c)   the guarantees to be granted by the Company under the Second Supplemental Indenture and the effect of granting such guarantees; and

(d)   the events of default set out in the 2029 New Notes Indenture,

and that:

(i)   in respect of the provisions referred to in paragraphs (a) to (c) above, failure to comply with these provisions may give rise to an event of default under the 2029 New Notes Indenture;

(ii)   an event of default under the 2029 New Notes Indenture may lead to the facilities and notes (as applicable) thereunder being accelerated in accordance with the terms of the relevant Document;

(iii)   there are material benefits to the Group (including NFE Financing and the Company) as a whole, as well as the financial strength of the Group as a whole, in entering into the Documents; and

(iv)   the Company's and the rest of the Group's need to be properly funded,

and

(e)   that the Company performing its obligations under and/or entering into the Documents (as applicable) would not result in the Company exceeding any borrowing limits or similar limits.

11.   The Chairperson explained that although the parties had substantially negotiated the terms of these Documents, the parties may still be required to make some amendments to the Documents and approve final versions prior to their execution.

**DIRECTORS' DUTIES**

12.   The directors considered their duties under the Act and at common law, having been advised on such matters by Skadden, including the duty under Section 172 of the Act to promote the success of the Company for the benefit of its members and the duty at common law to, under certain circumstances, consider the interests of a company's creditors.

13.   The directors noted that by a resolution of 11 March 2026, the Parent had determined to enter into the RSA, having concluded that to do so would be in the best interest of the Parent and its stockholders, creditors and other stakeholders.

14.   The directors noted that as of the Early Consent Deadline (as such term is defined in the PSL), 95% of Plan Creditors by value, as well as certain of the direct and indirect owners

2649

Docusign Envelope ID: 1B49D4FC-E49D-406B-AF2E-4613BA8D97ED

of the Company including both NFE Financing and the Parent, had signed on to the RSA and committed to support the Restructuring Plan.

15.   The directors noted that the steps and transactions contemplated at the meeting were necessary to fulfil the obligations of the Company (upon execution of the RSA Joinder) and the Group under the RSA and to progress to the completion of the Restructuring Plan.

16.   On the basis of the foregoing and after having carefully considered the information presented regarding the Restructuring Plans including the advice, presentations and recommendation of the Company's legal and financial advisors, the directors concluded that they were satisfied that the adoption of the resolutions considered at this meeting would be consistent with their duties under the Act and at common law and would promote the success of the Company for the benefit of all relevant stakeholders.

**RESOLUTIONS**

17.   After full and careful consideration of the terms and the conditions of the Documents, in the light of the directors' duties under the Act, **IT WAS UNANIMOUSLY RESOLVED THAT:**

(a)   the pursuit and implementation of the Restructuring Plan and the transactions contemplated by the Documents would, in each case, be most likely to promote the success of the Company and be in the best interests of the Company and all its stakeholders, and are hereby authorised and approved in all respects;

(b)   the directors be and are hereby authorised to take such steps as shall be necessary to implement the Restructuring Plan and the transactions contemplated by the Documents including, without limitation, taking each of the Plan Steps;

(c)   the directors be and are hereby authorised to file the Claim Form and the Listing Note;

(d)   the entry by the Company into the Documents and any ancillary or related documents in accordance with the RSA be and is hereby approved and the execution, delivery and performance by the Company of the Documents to which it is a party be and are hereby approved;

(e)   any director of the Company (or, in the case of any document to be executed by the Company under seal or as a deed, any director and the secretary of the Company or any two directors or a director whose signature is witnessed), be and is hereby authorised to execute, on behalf of the Company (whether under hand, under seal or otherwise):

(i)   the Documents in the form produced to the meeting with such amendments to them, if any, as may be approved by the person or persons so authorised and executing such documents, which approval may be communicated by email; and

(ii)   any other agreement or document whatsoever the Company may require, or deem necessary, in connection with the Documents, which is approved

9

DG-525

Docusign Envelope ID: 1B49D4FC-E49D-406B-AF2E-4613BA8D97ED

by the person or persons so authorised and executing each such other agreement or document and to send and dispatch all documents and notices to be entered into by the Company in connection with the Documents;

(f) the approval of each such person in any such case be conclusively evidenced by his or her signing such document or witnessing the affixation of the Company's seal to them (as the case may be);

(g) any director be and is hereby authorised to do all such acts and things and agree, execute and deliver all such documents as may be required in order to implement the transactions contemplated by the Documents or the RSA, in each case in such manner or form as the director may in his absolute discretion think fit; and

(h) any director of the Company (or, in the case of any document to be executed by the Company under seal or as a deed, any director and the secretary of the Company or any two directors or a director whose signature is witnessed), be and is hereby authorised on behalf of the Company, to execute and do all such deeds, documents (in addition to the Documents) and things as he or she may consider expedient in connection with the execution or performance by the Company of the Documents and any other agreement or document as is referred to in paragraph (e)(ii) above.

10

2651

DG-526

**CLOSING**

18.     There being no further business, the meeting then ended.

*Matthew Reinhard*

................................................

**Chairperson**

COMPANY NUMBER 13679588

## NFE GLOBAL HOLDINGS LIMITED

### (the "Company")

MINUTES of a meeting of the directors

of the Company held at

Skadden, Arps, Slate, Meagher & Flom (UK) LLP

22 Bishopsgate, London EC2N 4BQ

United Kingdom

on 17 April 2026 at 2:00 p.m.

---

| | |
|---|---|
| **Present:** | Christopher Boas (Chairperson) |
| | Matthew Reinhard (via video link) |
| | Kevin Sullivan (via video link) |
| | Christopher Guinta (via video link) |
| **In attendance:** | Christopher Boas |
| | Matthew Reinhard (via video link) |
| | Kevin Sullivan (via video link) |
| | Christopher Guinta (via video link) |
| | Nicole Stephansen (Skadden) |
| | Peter Newman (Skadden) (via video link) |
| | Teresa Lotufo (Skadden) (via video link) |
| | Robert Young (Skadden) (via video link) |

---

**APPOINTMENT OF CHAIRPERSON**

2653

DG-528

1.      Christopher Boas was appointed Chairperson of the meeting. The Chairperson reported that notice of the meeting had been given to the directors in accordance with the Company's articles of association.

**DISCLOSURE OF INTEREST**

2.      Each of the directors present either: a) confirmed that they had no direct or indirect interest; b) confirmed that they had previously duly declared a direct or indirect interest; or c) duly declared a direct or indirect interest (whether by virtue of any director being a director of any affiliate of the Company or otherwise), in each case, in any of the various matters to be considered at the meeting which they were required to declare in accordance with sections 177 and 182 of the Companies Act 2006 (the "**Act**") and the Company's articles of association.

3.      In particular, each director noted that they are directors of other companies in the Group (as defined below) which may potentially benefit from transactions being considered for approval at the meeting.

**DISCLOSURE OF CONFLICT OF INTEREST**

4.      Each of the directors present declared that no disclosures of direct or indirect interests which conflict, or possibly may conflict, with the interests of the Company need to be made with respect to the various matters to be considered at the meeting. The directors noted that the interests referred to in paragraph 3 above could not reasonably be regarded as likely to give rise to a conflict of interest and that the interests of the Company and the other relevant Group companies were aligned in respect of the matters to be considered at the meeting.

5.      It was noted that having confirmed that there were no conflict of interests pursuant to paragraph 4 above and having duly declared any interest in the various matters to be discussed pursuant to paragraphs 2 and 3 above, it was established that none of the directors was prohibited from voting or being taken into account in ascertaining whether a quorum was present.

**QUORUM**

6.      It was further noted that a quorum of directors was present and that the meeting had been duly convened.

**BUSINESS OF THE MEETING**

7.      It was noted that:

(a)      the Company is a member of the New Fortress Energy Inc. group (the "**Group**") and an indirect wholly-owned subsidiary of New Fortress Energy Inc., a Delaware Corporation (the "**Parent**");

(b)      on 9 April 2026, the directors unanimously approved certain resolutions in connection with a proposed restructuring of certain of the Group's financial liabilities (the "**Restructuring**") through two inter-conditional restructuring plans under Part 26A of the Companies Act 2006 (as amended) to be proposed by each

2

2654

DG-529

of the Company and NFE Brazil Newco Limited (**"Brazil Newco"**) (collectively, the **"Restructuring Plans"**), pursuant to the terms of the restructuring support agreement (the **"RSA"**) dated 17 March 2026 entered into by, among others, the Parent, the Company, and a substantial majority of those creditors of the Group whose rights will be affected by the Restructuring (the **"Plan Creditors"**);

(c) in furtherance of the Restructuring, the Company will, jointly with Brazil Newco, issue a practice statement letter (the **"PSL"**) to the Plan Creditors advising them of the intention to propose the Restructuring Plans; and

(d) to ensure the effective and economical administration of the Restructuring Plans and prevent adverse action in the United States, the Company is proposing to seek recognition of the Restructuring Plans pursuant to Chapter 15 of Title 11 of the United States Bankruptcy Code (the **"Bankruptcy Code"**) as provided in the RSA;

(e) the Company must appoint a foreign representative as such term is defined in section 101(24) of the Bankruptcy Code (the **"Foreign Representative"**) to commence, or cause the commencement of, recognition proceedings pursuant to Chapter 15 of the Bankruptcy Code (the **"Chapter 15 Recognition Proceedings"**), on the Company's behalf, and to take certain other actions with respect to such proceedings.

## PRODUCTION OF DOCUMENTS

8. An advanced draft of the PSL was produced to the meeting and reviewed by the directors.

9. The Chairperson explained that although the parties had substantially negotiated the terms of the PSL, the parties may still be required to make some amendments to the PSL and approve a final version prior to their execution.

## DIRECTORS' DUTIES

10. The directors considered their duties under the Act and at common law, having been advised on such matters by Skadden, Arps, Slate, Meagher & Flom (UK) LLP (**"Skadden"**), including the duty under Section 172 of the Act to promote the success of the Company for the benefit of its members and the duty at common law to, under certain circumstances, consider the interests of a company's creditors.

11. The directors noted that by a resolution of 11 March 2026, the Parent had determined to enter into the RSA, having concluded that to do so would be in the best interest of the Parent and its stockholders, creditors and other stakeholders.

12. The directors noted that as of today, over 95% of Plan Creditors by value had signed on to the RSA and committed to support the Restructuring Plans.

13. The directors noted that the steps contemplated at the meeting were necessary to fulfil the obligations of the Company and the Group under the RSA and to progress to the completion of the Restructuring Plans.

2655

DG-530

14.  On the basis of the foregoing and after having carefully considered the information presented regarding the Restructuring Plans including the advice, presentations and recommendation of the Company's legal and financial advisors, the directors concluded that they were satisfied that the adoption of the resolutions considered at this meeting would be consistent with their duties under the Act and at common law and would promote the success of the Company for the benefit of all relevant stakeholders.

**RESOLUTIONS**

15.  After full and careful consideration of the terms of the PSL, in the light of the directors' duties under the Act, **IT WAS UNANIMOUSLY RESOLVED THAT:**

(a)  Christopher Boas, having consented to act, be and is hereby appointed as the Foreign Representative of the Company for the purposes of the Chapter 15 Recognition Proceedings, with effect from the date of this meeting;

(b)  the issuance by the Company of the PSL and the entry into any ancillary or related documents in accordance with the RSA be and are hereby approved;

(c)  Christopher Boas (or, in the case of any document to be executed by the Company under seal or as a deed, Christopher Boas and the secretary of the Company or any other director of the Company, or Christopher Boas with a witness to his signature), be and is hereby authorised to execute, on behalf of the Company (whether under hand, under seal or otherwise):

(i)  the PSL in the form produced to the meeting, with such amendments (if any) as may be approved by the person or persons so authorised, which approval may be communicated by email and shall be conclusively evidenced by such person's execution of the PSL; and

(ii)  any other agreement or document which the Company may require or deem necessary in connection with the PSL, with such agreement or document to be approved by the person or persons so authorised, which approval may be communicated by email and shall be conclusively evidenced by such person's execution of such agreement or document, and to send and dispatch all documents and notices to be entered into by the Company in connection with the PSL;

(d)  the approval of each such person in any such case be conclusively evidenced by such person's signature on the relevant document or, where applicable, by witnessing the affixation of the Company's seal (as the case may be);

(e)  any director be and is hereby authorised to do all such acts and things and agree, execute and deliver all such documents as may be required to implement the transactions contemplated by the PSL or the RSA, in each case in such manner and form as the director may, in their absolute discretion, determine;

(f)  any director of the Company (or, in the case of any document to be executed by the Company under seal or as a deed, any director and the secretary of the Company or any two directors or a director whose signature is witnessed), be and

4

2656

DG-531

is hereby authorised on behalf of the Company, to execute and do all such deeds, documents (in addition to the PSL) and things as such person may consider expedient in connection with the execution or performance by the Company of the PSL and any other agreement or document as is referred to in paragraph (c)(ii) above; and

(g)     any and all actions previously or hereafter taken in the name and on behalf of the Company by the directors in connection with or related to any of the matters referred to in these resolutions be, and hereby are affirmed, approved and ratified in all respects as the acts and deeds of the Company.

5

DG-532

**CLOSING**

16.      There being no further business, the meeting then ended.

─Signed by:

─4D5C907FC340418...

..............................................

**Chairperson**

**COMPANY NUMBER 17141053**

**NFE BRAZIL NEWCO LIMITED**

**(the "Company")**

MINUTES of a meeting of the directors

of the Company held at

Skadden, Arps, Slate, Meagher & Flom (UK) LLP

22 Bishopsgate, London EC2N 4BQ

United Kingdom

on 17 April 2026 at 2:13 p.m.

| | |
|---|---|
| **Present:** | Christopher Boas (Chairperson) |
| | Matthew Reinhard (via video link) |
| | Kevin Sullivan (via video link) |
| | Christopher Guinta (via vídeo link) |
| **In attendance:** | Christopher Boas |
| | Matthew Reinhard (via video link) |
| | Kevin Sullivan (via video link) |
| | Christopher Guinta (via vídeo link) |
| | Nicole Stephansen (Skadden) |
| | Peter Newman (Skadden) (via video link) |
| | Teresa Lotufo (Skadden) (via video link) |
| | Robert Young (Skadden) (via video link) |

2659

DG-534

## APPOINTMENT OF CHAIRPERSON

1.  Christopher Boas was appointed Chairperson of the meeting. The Chairperson reported that notice of the meeting had been given to the directors in accordance with the Company's articles of association.

## DISCLOSURE OF INTEREST

2.  Each of the directors present either: a) confirmed that they had no direct or indirect interest; b) confirmed that they had previously duly declared a direct or indirect interest; or c) duly declared a direct or indirect interest (whether by virtue of any director being a director of any affiliate of the Company or otherwise), in each case, in any of the various matters to be considered at the meeting which they were required to declare in accordance with sections 177 and 182 of the Companies Act 2006 (the "**Act**") and the Company's articles of association.

3.  In particular, each director noted that they are directors of other companies in the Group (as defined below) which may potentially benefit from transactions being considered for approval at the meeting.

## DISCLOSURE OF CONFLICT OF INTEREST

4.  Each of the directors present declared that no disclosures of direct or indirect interests which conflict, or possibly may conflict, with the interests of the Company need to be made with respect to the various matters to be considered at the meeting. The directors noted that the interests referred to in paragraph 3 above could not reasonably be regarded as likely to give rise to a conflict of interest and that the interests of the Company and the other relevant Group companies were aligned in respect of the matters to be considered at the meeting.

5.  It was noted that having confirmed that there were no conflict of interests pursuant to paragraph 4 above and having duly declared any interest in the various matters to be discussed pursuant to paragraphs 2 and 3 above, it was established that none of the directors was prohibited from voting or being taken into account in ascertaining whether a quorum was present.

## QUORUM

6.  It was further noted that a quorum of directors was present and that the meeting had been duly convened.

## BUSINESS OF THE MEETING

7.  It was noted that:

    (a)   the Company is a member of the New Fortress Energy Inc. group (the "**Group**") and an indirect wholly-owned subsidiary of New Fortress Energy Inc., a Delaware Corporation (the "**Parent**");

    (b)   on 9 April 2026, the directors unanimously approved certain resolutions in connection with a proposed restructuring of certain of the Group's financial liabilities (the "**Restructuring**") through two inter-conditional restructuring plans

2

DG-535

under Part 26A of the Companies Act 2006 (as amended) to be proposed by each of the Company and NFE Global Holdings Limited ("**NFE Global**") (collectively, the "**Restructuring Plans**"), pursuant to the terms of the restructuring support agreement (the "**RSA**") dated 17 March 2026 entered into by, among others, the Parent, the Company, and a substantial majority of those creditors of the Group whose rights will be affected by the Restructuring (the "**Plan Creditors**");

(c)    in furtherance of the Restructuring, the Company will, jointly with NFE Global, issue a practice statement letter (the "**PSL**") to the Plan Creditors advising them of the intention to propose the Restructuring Plans; and

(d)    to ensure the effective and economical administration of the Restructuring Plans and prevent adverse action in the United States, the Company is proposing to seek recognition of the Restructuring Plans pursuant to Chapter 15 of Title 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") as provided in the RSA;

(e)    the Company must appoint a foreign representative as such term is defined in section 101(24) of the Bankruptcy Code (the "**Foreign Representative**") to commence, or cause the commencement of, recognition proceedings pursuant to Chapter 15 of the Bankruptcy Code (the "**Chapter 15 Recognition Proceedings**"), on the Company's behalf, and to take certain other actions with respect to such proceedings.

## PRODUCTION OF DOCUMENTS

8.    An advanced draft of the PSL was produced to the meeting and reviewed by the directors.

9.    The Chairperson explained that although the parties had substantially negotiated the terms of the PSL, the parties may still be required to make some amendments to the PSL and approve a final version prior to their execution.

## DIRECTORS' DUTIES

10.    The directors considered their duties under the Act and at common law, having been advised on such matters by Skadden, Arps, Slate, Meagher & Flom (UK) LLP ("**Skadden**"), including the duty under Section 172 of the Act to promote the success of the Company for the benefit of its members and the duty at common law to, under certain circumstances, consider the interests of a company's creditors.

11.    The directors noted that by a resolution of 11 March 2026, the Parent had determined to enter into the RSA, having concluded that to do so would be in the best interest of the Parent and its stockholders, creditors and other stakeholders.

12.    The directors noted that as of today, over 95% of Plan Creditors by value had signed on to the RSA and committed to support the Restructuring Plans.

13.    The directors noted that the steps contemplated at the meeting were necessary to fulfil the obligations of the Company and the Group under the RSA and to progress to the completion of the Restructuring Plans.

2661

DG-536

14. On the basis of the foregoing and after having carefully considered the information presented regarding the Restructuring Plans including the advice, presentations and recommendation of the Company's legal and financial advisors, the directors concluded that they were satisfied that the adoption of the resolutions considered at this meeting would be consistent with their duties under the Act and at common law and would promote the success of the Company for the benefit of all relevant stakeholders.

**RESOLUTIONS**

15. After full and careful consideration of the terms of the PSL, in the light of the directors' duties under the Act, **IT WAS UNANIMOUSLY RESOLVED THAT:**

   (a) Christopher Boas, having consented to act, be and is hereby appointed as the Foreign Representative of the Company for the purposes of the Chapter 15 Recognition Proceedings, with effect from the date of this meeting;

   (b) the issuance by the Company of the PSL and the entry into any ancillary or related documents in accordance with the RSA be and are hereby approved;

   (c) Christopher Boas (or, in the case of any document to be executed by the Company under seal or as a deed, Christopher Boas and the secretary of the Company or any other director of the Company, or Christopher Boas with a witness to his signature), be and is hereby authorised to execute, on behalf of the Company (whether under hand, under seal or otherwise):

      (i) the PSL in the form produced to the meeting, with such amendments (if any) as may be approved by the person or persons so authorised, which approval may be communicated by email and shall be conclusively evidenced by such person's execution of the PSL; and

      (ii) any other agreement or document which the Company may require or deem necessary in connection with the PSL, with such agreement or document to be approved by the person or persons so authorised, which approval may be communicated by email and shall be conclusively evidenced by such person's execution of such agreement or document, and to send and dispatch all documents and notices to be entered into by the Company in connection with the PSL;

   (d) the approval of each such person in any such case be conclusively evidenced by such person's signature on the relevant document or, where applicable, by witnessing the affixation of the Company's seal (as the case may be);

   (e) any director be and is hereby authorised to do all such acts and things and agree, execute and deliver all such documents as may be required to implement the transactions contemplated by the PSL or the RSA, in each case in such manner and form as the director may, in their absolute discretion, determine;

   (f) any director of the Company (or, in the case of any document to be executed by the Company under seal or as a deed, any director and the secretary of the Company or any two directors or a director whose signature is witnessed), be and

4

2662

is hereby authorised on behalf of the Company, to execute and do all such deeds, documents (in addition to the PSL) and things as such person may consider expedient in connection with the execution or performance by the Company of the PSL and any other agreement or document as is referred to in paragraph (c)(ii) above; and

(g)     any and all actions previously or hereafter taken in the name and on behalf of the Company by the directors in connection with or related to any of the matters referred to in these resolutions be, and hereby are affirmed, approved and ratified in all respects as the acts and deeds of the Company.

2663

DG-538

**CLOSING**

16.     There being no further business, the meeting then ended.

Signed by:

4D5C907FC340418...

.............................................

**Chairperson**

*[NFE Brazil Newco Limited Board Minutes – Signature Page]*

2664

DG-539