# EXHIBIT C

## Appendix B (Tab 1 through Tab 45)

# Appendix B

**Appendix B Index**

**NFE Brazil Newco Limited and NFE Global Holding Limited**

| Tab | Document Description |
|---|---|
| 1. | Background and Qualifications of Daniel M. Glosband |
| 2. | Publications List - Post 2007 |
| 3. | 11 U.S.C. § 101 (23), (24),  § 105(a),  § 109(a),  § 362, §1145(a), §§ 1501-1532 (chapter 15) |
| 4. | 28 U.S.C. § 1334 |
| 5. | Hawkland, et al., Hawkland's Uniform Commercial Code Series §8-503:5, §8-503:6 |
| 6. | House Report H.R. Rep. 109-31 (chapter 15 discussion only) |
| 7. | New York Uniform Commercial Code Article 8, Part 5 and Sections 8-503 and 8-506 with Official Comments |
| 8. | Reinstatement (Third) of Agency, §2.01 |
| 9. | Securities Act Section 3(a)(10) (15 U.S. Code attached); Staff Legal Bulletin No. 3; Staff Legal Bulletin No. 3A |
| 10. | In re ABC Learning Centres Ltd., 445 B.R. 218 (Bankr. D. Del. 2010) |
| 11. | In re ABC Learning Centres Ltd., 728 F.3d 301 (3d Cir. 2013) |
| 12. | In re Agrokor D.D., 591 B.R. 163 (Bankr. S.D.N.Y. 2018) |
| 13. | In re Al Zawawi, 97 F.4th 1244 (11th Cir. 2024) |
| 14. | In re Americanas, S.A, et al., 2024 WL 3506637 (Bankr. S.D.N.Y., Doc. No. 75, Jul. 22, 2024) |
| 15. | Anglogold No Action Letter |
| 16. | In re Ashapura Minechem Ltd. v. Shah, 480 B.R. 129 (S.D.N.Y. 2012) |
| 17. | In re Avanti Comm. Grp. Plc, 582 B.R. 603 (Bankr. S.D.N.Y. 2018) |
| 18. | Barclays Bk. PLC v. Kemsley, 44 Misc. 3d 773 (N.Y.S.2d 2014) |
| 19. | In re Basis-Yield Alpha Fund (Master), 381 B.R. 37, 51 (Bankr. S.D.N.Y. 2008) |
| 20. | In re B.C.I. Finances Pty Ltd., 671 B.R. 669, 672 (Bankr. S.D.N.Y. 2025) |
| 21. | In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd., 374 B.R. 122 (Bankr. S.D.N.Y. 2007) |

**Appendix B Index**
**NFE Brazil Newco Limited and NFE Global Holding Limited**

| Tab | Document Description |
|-----|---------------------|
| 22. | In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd., 389 B.R. 325 (S.D.N.Y. 2008) |
| 23. | In re Berau Capital Resources Pte Ltd., 540 B.R. 80 (Bankr. S.D.N.Y. 2015) |
| 24. | In re Betcorp Ltd., 400 B.R. 266 (Bankr. D. Nev. 2009) |
| 25. | In re Bd. of Dir. of Hopewell Int'l. Ins. Ltd., 275 B.R. 699 (S.D.N.Y. 2002) |
| 26. | In re British-American Ins. Co. Ltd., 425 B.R. 884 (Bankr. S.D. Fla. 2010) |
| 27. | In re Canterbury Securities, Ltd., 675 B.R. 109 (Bankr. S.D.N.Y. 2025) |
| 28. | In re Cell C Proprietary Ltd., 571 B.R. 542 (Bankr. S.D.N.Y. 2017) |
| 29. | Celotex Corp. v. Edwards, 514 U.S. 300 (1995) |
| 30. | In re Cozumel Caribe, S.A. de C.V., 482 B.R. 96 (Bankr. S.D.N.Y. 2012) |
| 31. | In re Credito Real, S.A.B. de C.V., SOFOM, E.N.R., 670 B.R. 150, 169 (Bankr. D. Del. 2025) |
| 32. | Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet), 737 F.3d 238 (2d Cir. 2013) |
| 33. | EMA Garp Fund v. Banro Corp., 2019 WL 773988 (S.D.N.Y. 2019) |
| 34. | In re Fairfield Sentry Ltd., 714 F.3d 127 (2d Cir. 2013) |
| 35. | In re Gold & Honey, Ltd., 410 B.R. 357 (Bankr. E.D.N.Y. 2009) |
| 36. | Harrington v. Purdue Pharma, L.P., 144 S.Ct. 2071 (2024) |
| 37. | In re Hellas Telecomms. (Luxembourg) V, No. 10-13651-KJC (Bankr. D. Del., Doc. No. 38, Dec. 13, 2010) |
| 38. | Highland Capital Management LP v. Schneider, 607 F.3d 322 (2d Cir. 2010) |
| 39. | Hong Kong and Shanghai Banking Corporation Judgment |
| 40. | In re Huachen Energy Co., Ltd., No. 22-10005-LGB (Bankr. S.D.N.Y., Hearing Transcript, Feb. 1, 2022) |
| 41. | In re Huachen Energy Co., Ltd., No. 22-10005-LGB (Bankr. S.D.N.Y., Doc. No. 19, Feb. 2, 2022) |
| 42. | In re InterCement Brasil S.A. et al., 668 B.R. 802 (Bankr. S.D.N.Y. 2025) |

**Appendix B Index**
**NFE Brazil Newco Limited and NFE Global Holding Limited**

| Tab | Document Description |
|---|---|
| 43. | In re JSC BTA Bank, 434 B.R. 334 (Bankr. S.D.N.Y. 2010) |
| 44. | In re K-V Discovery Solutions, Inc., 496 B.R. 330 (Bankr. S.D.N.Y. 2013) |
| 45. | In re Light S.A. – - Em Recuperação Judicial, Case No. 24-90531 (Bankr. S.D. Tex, Doc. No. 29, Nov. 11, 2024) |
| 46. | In re Magyar Telecom B.V., 2013 WL 10399944 (Bankr. S.D.N.Y. 2013) |
| 47. | In re Manley Toys Ltd., 580 B.R. 632 (Bankr. D.N.J. 2018) |
| 48. | In re Mega Newco Ltd., 2025 WL 601463 (Bankr. S.D.N.Y. 2025) |
| 49. | In re Metcalfe & Mansfield Alt. Invs., 421 B.R. 685 (S.D.N.Y. 2010) |
| 50. | In re Metromedia Fiber Network, Inc., 416 F.3d 136 (2d Cir. 2005) |
| 51. | In re Metropolitan Life Ins. Co. v. RJR Nabisco, Inc., 716 F. Supp. 1504 (1989) |
| 52. | In re Millard, 501 B.R. 644 (Bankr. S.D.N.Y. 2013) |
| 53. | In re Millennium Lab Holdings II, LLC, 945 F.3d 126 (3d Cir. 2019) |
| 54. | In re Modern Land (China) Co., Ltd., 641 B.R. 768 (2022) |
| 55. | In re Motors Liquidation Co., 704 F.3d 89 (2012) |
| 56. | In re OAS S.A., 533 B.R. 83 (Bankr. S.D.N.Y. 2015) |
| 57. | In re Ocean Rig UDW Inc., 570 B.R. 687 (S.D.N.Y. 2017) |
| 58. | In re Odebrecht Engenharia e Construção S.A. Em Recuperação Judicial, 669 B.R. 457 (Bankr. S.D.N.Y. 2025) |
| 59. | Olin Corp. v. Am. Home Ins. Co., 704 F.3d 89 (2012) |
| 60. | In re Olinda Star Ltd., 614 B.R. 28 (Bankr. S.D.N.Y. 2020) |
| 61. | Oui Financing LLC v. Dellar, 2013 WL 5568732 (S.D.N.Y. 2013) |
| 62. | Patterson v. Mahwah Bergen Retail Grp., Inc., 2022 WL 33425 (E.D. Vir. 2022) |
| 63. | Peltz v. SHB Commodities, Inc., 115 F.3d 1082 (2d Cir. 1997) |
| 64. | In re Pro-Fit Int'l Ltd., 391 B.R. 850 (Bankr. C.D. Cal. 2008) |

**Appendix B Index**
**NFE Brazil Newco Limited and NFE Global Holding Limited**

| Tab | Document Description |
|-----|---------------------|
| 65. | In re Purdue Pharma, L.P., 635 B.R. 26 (S.D.N.Y. 2021) |
| 66. | In re Purdue Pharma, L.P., 69 F. 4th 45 (2d Cir. 2023) |
| 67. | Quadrant Structured Products Co. v. Vertin, 23 N.Y. 3d 549 (N.Y. App. 2014) |
| 68. | In re Rede Energia S.A., 515 B.R. 69 (Bankr. S.D.N.Y. 2014) |
| 69. | Reyes v. Metromedia Software, Inc., 840 F.Supp. 2d 752 (S.D.N.Y. 2012) |
| 70. | In re Serviços de Petróleo Constellation S.A., 600 B.R. 237 (2019) |
| 71. | In re Sino-Forest Corp., 501 B.R. 655 (Bankr. S.D.N.Y. 2013) |
| 72. | In re Sphinx, Ltd., 351 B.R. 103 (Bankr. S.D.N.Y. 2006) |
| 73. | In re Suntech Power Holdings Co., Ltd., 520 B.R. 399 (Bankr. S.D.N.Y. 2014) |
| 74. | In re TPC Group Inc., 2022 WL 2498751 (Bankr. D. Del. 2022) |
| 75. | In re Tri-Continental Exchange, Ltd., 349 B.R. 627 (Bankr. E.D. Cal. 2006) |
| 76. | Trikona Advisors v. Chugh, 846 F.3d 22 (2d Cir. 2017) |
| 77. | In re Vitro S.A.B. de C.V., 701 F.3d 1031 (5th Cir. 2012) |
| 78. | In re Vitro, S.A.B. de C.V., 473 B.R. 117 (Bankr. N.D. Tex. 2012) |
| 79. | In re Xinyuan Real Estate Co. Ltd., WL 592250 (Bankr. S.D.N.Y. 2026) |

# Tab 01

**Background and Qualifications of Daniel M. Glosband**

1. I am a retired partner and Of Counsel in the law firm of Goodwin Procter LLP(**Goodwin**) and am located in Goodwin's Boston, Massachusetts office.  I am a member in good standing of the bars of two states, Massachusetts and New York, and admitted to practice before the following United States courts: the United States District Courts for the Districts of Massachusetts, Connecticut, Vermont and the Southern District of New York; the United States Courts of Appeal for the First, Second and Eleventh Circuits; and the United States Supreme Court.  I hold a Bachelor of Arts degree from the University of Massachusetts, 1966, and a Juris Doctor degree from the Cornell Law School, 1969.

2. My entire career, beginning in 1969, has focused on sophisticated corporate insolvency matters.  These matters have arisen in insolvency proceedings in state courts and under state common law; bankruptcy courts, district and appellate courts under Federal law, including the Bankruptcy Act (applicable to cases commenced prior to November 1, 1979) and under the Bankruptcy Code (applicable to cases commenced on and after November 1, 1979); courts of several countries outside of the United States; and in connection with the insolvency aspects of transactional matters.  The following are some of the more significant of those engagements:

   (a)   Representation of trustees appointed by the United States District Court for the District of Massachusetts in the proceedings of Colonial Realty Investment Co., et al. (1974); this was a multi-debtor case involving numerous parcels of real property, several investment partnerships, a large number of investors and significant elements of fraud;

   (b)   Representation of receivers appointed by the United States Bankruptcy Court for the District of Massachusetts in the case of Bolton Hall Nursing Homes, et al. (beginning in 1976); this was a multi-debtor case with significant operating and regulatory implications;

ACTIVE/124956312.2

DG-0001

(c)    Representation of the reorganization trustee appointed by the United States District Court for the District of Massachusetts in the case of Continental Investment Corporation (1976-1981), a holding company for a life insurance company, a mutual fund complex and a gas and oil drilling company;

(d)    Representation of the reorganization trustee appointed by the United States District Court, District of Massachusetts in the case of Continental Mortgage Investors (1976-1983), a publicly-owned real estate investment trust that provided financing to over 200 projects;

(e)    Representation of Clarkson Company Limited as Receiver appointed by a Canadian court in the case of Fishery Products, Limited in connection with proceedings in the United States Bankruptcy Court for the District of Massachusetts involving the Canadian debtor (1983);

(f)    Representation of the debtor North Shore Children's Hospital in a liquidation under a common law assignment for the benefit of creditors in Massachusetts (1988-1990);

(g)    Representation of the public utility company minority joint owners of the Seabrook Nuclear Power Plant in the Chapter 11 proceedings in the United States Bankruptcy Court for the District of New Hampshire of the majority joint owner, Public Service Company of New Hampshire (1987–1991);

(h)    Representation of the public company debtor, Alpha Beta Technology under a common law assignment for the benefit of creditors in Massachusetts and a simultaneous receivership in Rhode Island state court (1999);

(i)    Representation of the Joint Official Liquidators appointed in the Bahamas winding up proceeding of Thornhill Global Deposit Fund (1999) in obtaining repatriation of

2

ACTIVE/124956312.2

2672

assets through a proceeding for ancillary relief under former  section 304 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Massachusetts;

(j)      Representation of the scheme administrators of Transcon Insurance Company in a proceeding under former section 304 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Massachusetts seeking to enforce injunctive orders issued by the courts of England and Bermuda prohibiting litigation in the United States against Transcon (2001);

(k)      Representation of General Cinema Corporation in Chapter 11 reorganization proceedings (2001-2002) in the United States Bankruptcy Court for the District of Delaware, including resolution of the affairs of subsidiaries in Latin and South America;

(l)      Representation of Arthur D. Little, Inc. in its Chapter 11 reorganization proceedings (2002-2003) in the United States Bankruptcy Court for the District of Massachusetts, including resolution of the affairs of divisions and subsidiaries in 23 countries, including administration proceedings of UK subsidiaries;

(m)      Counsel to the U.S. group of subsidiaries of Babcock Borsig AG and affiliates in insolvency proceedings in Germany and Austria (2002-2004);

(n)      Counsel to acquirer of Tiger Brands, a debtor in a Canadian Companies Creditors Arrangement Act proceeding (2004-2006);

(o)      Providing an expert opinion to the Supreme Court of Bermuda in the Matter of Electric Mutual Liability Insurance Company, Ltd. (In Liquidation) (2006);

(p)      Representation of the Joint Liquidators of Britannia Bulk, PLC in seeking and obtaining recognition of a foreign main proceeding under Chapter 15 in the United States Bankruptcy Court for the Southern District of New York (2008);

3

2673

(q)      Providing an expert opinion for the Joint Liquidators of <u>Stanford International Bank Ltd.</u> ("SIB") in the liquidation proceedings of SIB pursuant to the provisions of the International Business Corporations Act, Chap. 222, as amended, of the Laws of Antigua and Barbuda on whether the receivership ordered by the United States District Court for the Northern District of Texas in <u>Securities and Exchange Commission v. Stanford International Bank, Ltd., et al.</u>, Case No. 09-0298 (the "US Receivership"), qualified as a "collective procedure" capable of recognition as a "foreign proceeding" under the Model Law on Cross-Border Insolvency adopted by the United Nations Commission on International Trade Law ("UNICTRAL" and the "Model Law") as adopted by the Cross-Border Insolvency Regulations 2006.  My opinion was submitted in 2009 by affidavit to the High Court of Justice, Chancery Division, Companies Court in cases No. 13338 and 13959 of 2009, <u>In the Matter of Stanford International Bank Limited (In Liquidation)</u>;

(r)      Representation of <u>The Education Resources Institute Inc.</u>, a guarantor of some $20 billion in securitized student loans, in its Chapter 11 reorganization proceedings in the United States Bankruptcy Court for the District of Massachusetts (2008–2011);

(s)      Representation of the Receiver appointed by the New York Supreme Court for <u>Ascot Partners, L.P.</u>, one of the larger feeder funds to <u>Bernard L. Madoff Investment Securities, LLC</u> (2011–2013);

3.   I have had substantial experience in working with sophisticated financing documents from the perspective of representing debtors and financial creditors.  Most of the significant engagements described among my qualifications described above that pre-dated my 2014 retirement as a partner and my transition to Of Counsel in Goodwin Procter LLP involved the analysis and modification of complex financing documents, including indentures governed by

4

New York law, to which debtor entities were parties.  In addition, I have provided expert opinions to the High Court of England and Wales and other courts in scheme of arrangement proceedings on matters pertaining to recognition and enforcement in the United States of schemes of arrangement.   Most of these expert opinions required an analysis of matters pertaining to interpretation of indentures and other contracts governed by New York law and several required an opinion on New York law issues implicated by steps taken under the indentures to facilitate the scheme of arrangement (the opinions that involved analysis of New York law documents are identified by one asterisk while those that included opinions on New York law issues are identified by two asterisks): (a) hibu Finance (UK) Ltd.; hibu Connect, SAU; hibu (USA) LLC; hibu Holdings (USA) Inc.; hibu of Pennsylvania, Inc.; hibuTel, Inc.; and ZNODE, Inc.; (b) New World Resources, N.V.*; (c) Afren plc*; (d) Codere S.A.; (e) EnQuest PLC*; (f) Bibby Offshore Services PLC*; (g) Stripes US Holding Inc.; (h) New Look Secured Issuer plc*; (i) Lecta Paper UK Ltd.(2020)**; (j) Swissport Fuelling Ltd. (June 2020)**; (k) New Look Financing Plc.*; (l) E D & F Man Treasury Management PLC*; (m) Matalan Finance plc*; (n) Codere Finance 2 (UK) Limited; (o) Swissport Fuelling Ltd. (November 2020)**; (p) Hertz UK Receivables Ltd. (December 2020)[1]**; (q) DTEK Finance PLC**; (r) Jain International Trading B.V.**; (s) Nostrum Oil & Gas PLC**; (t) Haya Holdco 2 Plc**; (u) SGB-SMIT Gmbh; (v) Praesidiad Limited; (w) Lecta Paper UK Limited** (2023); (x) Arvos BidCo S.à.r.l.; (y) Light S.A. em Recuperaçâo**; (z) Mega Newco Limited; (aa) Petrofac Limited**; and (bb) HSE Finance S.à.r.l. I also provided an opinion for the proposed scheme of arrangement planned by Thomas Cook Group PLC, et al. (which did not ultimately proceed) and have provided opinions on issues of United States law that were submitted to courts in Bermuda, the Cayman Islands, the British Virgin

---

[1] A second Hertz scheme of arrangement was contemplated in early 2021 but was abandoned.

ACTIVE/124956312.2

DG-0005

Islands, Hong Kong and the Republic of Ireland.  I also provided expert opinions on issues arising under New York law-governed indentures (a) to the Cayman Court in the Matter of Shinsun Holdings (Group) Co., Ltd., Case No. FSD 1192 of 2022 (DDJ) and (b) to courts in Hong Kong and the British Virgin Islands.

(vv)     Numerous engagements for creditors and contract counterparties of debtors involved in foreign proceedings and for foreign creditors involved in proceedings under the United States Bankruptcy Code; and

(ww)   Numerous engagements in structuring transactions to anticipate and minimize the implications of the insolvency of U.S. and non-U.S. counterparties.

4.     Since my engagement by the Canadian receivers of <u>Fishery Products</u> in 1983, I have devoted considerable time to the study and reform of international insolvency law by assuming leadership roles in national and international associations and assisting United States government agencies and a United Nations Commission.  My work in this area is summarized below:

(a)     International Bankruptcy Subcommittee of the Business Bankruptcy Committee of the American Bar Association, which I chaired from 1990 to 1995;

(b)     Committee J (Insolvency) of the International Bar Association, where I served as vice chair from 2003 to 2004;

(c)     Adviser to the American Law Institute's Transnational Insolvency Project from 1994 to 2000, which produced International Statements of Bankruptcy Law for the NAFTA countries, published in 2003;

(d)     Founding Member of the International Insolvency Institute;

ACTIVE/124956312.2

2676

DG-0006

(e)     Participant in Colloquia sponsored by UNCITRAL that led to consideration by the UNCITRAL Working Group on Insolvency Law of cross-border insolvency law issues and domestic insolvency law issues;

(f)     Participation in the Working Group on Insolvency Law that produced the Model Law, including participation in the "expert group" and "small drafting group" which were responsible for drafting the Model Law;

(g)     Active participation in the Working Group that produced the UNCITRAL Legislative Guide on Insolvency Law, including active participation in the "expert group";

(h)     Participation in an advisory group formed by the United States Department of State, Office of Legal Advisor, that consulted throughout the two UNCITRAL projects and on the drafting of Chapter 15 of the Bankruptcy Code;

(i)     Primary draftsman (with Professor Jay Westbrook of the University of Texas Law School) of the United States adaptation of the Model Law, Chapter 15 of the United States Bankruptcy Code, *Cross-Border and Other Ancillary Cases* and consultant to Congress in connection with its enactment*;*

(j)     Conferee of the National Bankruptcy Conference and Chair of the Committee on International Aspects.  The Conference is a voluntary, non-profit, self-supporting organization of about sixty-five lawyers, law professors and bankruptcy judges who have achieved scholarly distinction in the field of bankruptcy law.  Its purpose is to study the operation of bankruptcy and related laws and proposals for their reform.  My work with the NBC results in consultation with Congressional staff on issues pertaining to cross-border insolvency and in periodic drafting of amendments to Chapter 15; and

7

2677

(k)   Member of the World Bank Insolvency and Creditor/Debtor Regimes Global Task Force.

(5) In addition to the international insolvency activities noted above, I have been selected for recognition by my peers and to serve in leadership positions of organizations involved in insolvency law, including:

a.   The National Bankruptcy Conference, mentioned above;

b.   Chairman of the Bankruptcy Law Committee of the Boston Bar Association (1977-1980);

c.   Chairman of the Bankruptcy Law Committee of the Massachusetts Bar Association (1980-1983);

d.   Election in 1990 to the first class of Fellows of the American College of Bankruptcy; election as Regent for the First U.S. Judicial Circuit of the College, then as Secretary of the College and, from 2005 until 2009, as Vice-President of the College.  I also served as head of the program on International Fellows and chaired an annual presentation on international insolvency issues;

e.   Recognition in every edition of Best Lawyers in America since 1987; Ranked as a "Senior Statesman" in insolvency in Massachusetts by Chambers USA (2018); the Practical Law Company's The Law and Leading Lawyers Worldwide; Who's Who Legal, *International Who's Who of Insolvency & Restructuring Lawyers* and other guides; recurrently selected by peers as one of 100 Superlawyers in Massachusetts; rated AV Preeminent in Martindale-Hubbell (highest possible rating for legal ability and integrity);

f.   Recipient in 2007 of Special Recognition and Tribute Award from the American College of Bankruptcy, First Circuit, for achievement in the enhancement of bankruptcy law; and

8

2678

DG-0008

g.      Recipient in 2014 of the Charles P. Normandin Lifetime Achievement Award from the Boston Bar Association for contributions to improving the practice of bankruptcy law.

h.      Recipient in 2022 of the Outstanding Contributions Award from the International Insolvency Institute for outstanding service and contributions to international insolvency.

6.      I have frequently written and spoken on topics of insolvency law.  Much of my recent work has focused on cross-border insolvency issues and especially Chapter 15 of the Bankruptcy Code.  Chapter 15 came into effect on October 17, 2005 as a new chapter of the Bankruptcy Code, entitled <u>Cross-Border and Other Ancillary Cases</u>.  Chapter 15 adopts the Model Law and governs both access to the United States court systems by representatives of foreign insolvency proceedings and also coordination and communication between insolvency proceedings pending in the United States and other countries.  I have given presentations on Chapter 15 to over 20 law firms and advisory firms in London and Toronto, have spoken on Chapter 15 at a conference of the Insolvency Institute of Canada, have taught two courses on Chapter 15 to United States Bankruptcy Judges at workshops organized by the Federal Judicial Center, have written the Chapter 15 portion of the leading U.S. insolvency treatise and have spoken at numerous conferences and law schools in the United States, Canada, England, Finland, France, Germany, Spain, Korea, Thailand, Mexico and the Caribbean.  For the spring academic semesters of 2008 through 2019, I served as an adjunct professor teaching a course on international insolvency law with a focus on Chapter 15.  The course was presented at New York University Law School for two years, at Columbia Law School for three years, at St. John's University Law School for five years and at the University of Pennsylvania beginning in 2018.  The course is sponsored by the American College of Bankruptcy and is also taught by simultaneous video conference at several additional law schools.  For 2025, the participating law

9

DG-0009

schools were:  Penn State Law, Penn State Dickinson Law, University of Pittsburgh School of Law, University of Miami School of Law, J. Reuben Clark Law School of Brigham Young University, University of Illinois, and St. Mary's University School of Law.

10

2680

# Tab 02

**Daniel M. Glosband**

**<u>Speaking Engagements and Publications – From 2007</u>**

C5 3d Annual Forum on European Corporate Restructuring – Ch 11 and Ch 15:  Recent Developments – London May 21-22, 2007

C5's 9th Annual Advanced Insolvency and Restructuring Forum – Recent Developments in Chapter 11 and Cross Border Cases – London September 17-18, 2007

International Womens Insolvency and Restructuring Council  – *Chapter 15 – How is it Working* Florida October 10, 2007

Deloitte Reorganization Services Group – *Chapter 15: Ancillary and Other Cross-Border Cases: overview; planning; compared to UK*  – New York November 8, 2007

American Bankruptcy Institute – Principal Editor - *The American Bankruptcy Institute Guide to Cross-Border Insolvency* 2008

American Bankruptcy Institute – Caribbean Insolvency Symposium (Florida) - *Nuts and Bolts of a Chapter 15 Filing:  Cases/Updates* January17, 2008

Maples Investment Fund Forum  – *Troubled Funds – Issues and Lessons* – Cayman Islands February 8, 2008

Deloitte Reorganization Services Group (webcast, New York City) – *Chapter 15:  Ancillary and other Cross-Border Cases* March 11, 2008

American Bankruptcy Institute Spring Meeting (Washington, D.C.) – *The Insolvency of Hedge Funds and other Offshore Entities* April 3- 4, 2008

6th Offshore Alert – Financial Due Diligence Conference (Florida) – *Chapter 15 and Caribbean Hedge Fund Liquidations* April 13-15 2008

Practicing Law Institute (Teleconference) – *Chapter 15 in the Courts – An Update* April 22, 2008

C5's Corporate and Financial Restructuring Conference (London) – *International Cross-Border Restructuring Roundtable:  Restructuring Across Borders – Case Study* April 24-25, 2008

American Bankruptcy Institute Northeast (Massachusetts) – *Cross Border Issues Coming to Your Town*  July 10-11, 2008

ACTIVE/91087640.4

2682

DG-0011

American Bankruptcy Institute Guide to Cross-Border Insolvency (2008), Lead Editor

INSOL Europe Annual Congress – *Bear Stearns – Recognizing the Pitfalls of Chapter 15* – Barcelona  October 2-5, 2008

American Law Institute/American Bar Association Chapter 11 Business Reorganization – *Recent Developments Under Chapter 11* Boston May 14-16, 2009

Practicing Law Institute - REIT and Real Estate M&A Restructurings and Recapitalizations 2010 – *The New Look Of Section 363 Sales*  - New York City January 14, 2010

American Institute of Certified Public Accountants National Forensic Accounting Conference - *Turnaround Consulting for Troubled Companies; Personal Liability Issues and Directors' Duties Issues*  Boston September 29 – October 1, 2010

American Bar Association Spring Meeting – *Divergent National Bankruptcy Court Structures and Insolvency Processes:  Impetus or Impediment to Reform* - Boston April 14-16, 2011

Association of Insolvency and Restructuring Advisors– 27th Annual Bankruptcy and Restructuring Conference – *Madoff:  Customer Claims and Customer Liability* – Boston June 8- June 11, 2011

American Bankruptcy Institute Annual Northeast Bankruptcy Conference – *Ponzi Schemes and Avoidance Actions* – Newport July 21-24, 2011

International Bar Association 18th Annual Insolvency and Restructuring Conference – *Protection of Licensees of Intellectual Property Under Section 365(n) of the United States Bankruptcy Code* – Helsinki, Finland May 20-22, 2012

Association of Insolvency and Restructuring Advisors – 28th Annual Bankruptcy & Restructuring Conference – *Cross Border Insolvency Update – San Francisco* June 7, 2012

International Insolvency Institute 12th Annual Conference – *When is COMI Measured Under Chapter 15* – Paris June 21-22, 2012

Association of Insolvency and Restructuring Advisors – 11th Annual Advanced Restructuring & Plan of Reorganization Conference – *Cross Border Insolvency* – New York November 19, 2012

American Bankruptcy Institute 24th Annual Winter Leadership Conference International/Technology and Intellectual Property – *Handling IP Issues in a Multinational Insolvency Proceeding* – Tucson –November 29-December 1, 2012

Stikeman Elliott *Chapter 15 of the U.S. Bankruptcy Code – Accessing the U.S. Bankruptcy Courts* – Toronto December 7, 2012

Boston College Law School Business Bankruptcy Class – *Section 363 Sales* – Newton, MA
April 11, 2013

William J. O'Neill Great Lakes Regional Bankruptcy Institute One Size Fits All - *Chapter 15: To Be or Not to Be, That is the Question.  Is the Cross-Border Insolvency World Becoming a Smaller Place?*  Cleveland  June 6-7, 2013

Thirteenth Annual International Insolvency Conference– *Granting and Refusing Recognition in Model Law and Chapter 15 Cases* – New York June 17-18, 2013

American Bankruptcy Institute 20th Annual Northeast Bankruptcy Conference – *COMI Migration in the EU:  Establishing Border Controls* – Newport July 11-14, 2013

Instituto Tecnológico Autónomo de Mexico, *Chapter 11 Basics* – January 16, 2014

American College of Bankruptcy/Boston College Law School – *The Legacy of Mr. Ponzi; The Madoff and Stanford Cases* – March 28, 2014

Law 360, *Misconduct Not Grounds to Terminate Chapter 15 Recognition*, May 14, 2014 (Thomas H. Good co-author)

24th Annual Bankruptcy Bench Meets Bar, Boston Bar Associate – *Bankruptcy Then and Now*, May 29, 2014

Bloomberg, BNA Bankruptcy Law Reporter, *Ruling Explains and Extends Application of Good Faith Defense to Fraudulent Transfer Actions in SIPA Context*, July 24, 2014 (Christopher Newcomb co-author)

Law 360, *Genco Valuation Leaves Equity Interests Under Water*, August 20, 2014 (Thomas Good co-author)

Law 360, 2nd Circuit Fails To See the Comity In Chapter 15, October 20, 2014 (Kizzy Jarashow co-author)

American Bankruptcy Institute Mid-Level Professional Development Program – *The Ins and outs of Chapter 15*, Chicago, November 12, 2014

Insol International News Letter, *Rehearing Petition Dramatizes Second Circuit's Comity Rejection*, November 20, 2014 (Kizzy Jarashow co-author)

International Insolvency Review, *Chapter 15 Recognition in the United States:  is a Debtor "Presence" Required?,* February 10, 2015 (Jay Lawrence Westbrook co-author)

American College of Bankruptcy/Boston College Law School – *The World of Insolvency* (March 20, 2015)

*No Debtor Presence Is Required For Chapter 15 Recognition*, American Bankruptcy Institute Journal, May 2015 (Prof. Jay Lawrence Westbrook, co-author)

University of Toronto, Global Professional MBA Program, *Introduction to Chapter 15 of the United States Bankruptcy Code* (July 11, 2015)

National Conference of Bankruptcy Judges, *Developments in Cross-Border Avoidance and Recovery* (September 29, 2015)

American Bankruptcy Institute, Annual Spring Meeting, *Baha Mar's Dismissal and Everything Else You Wanted to Know About Chapter 15* (April 15, 2016)

5th European Insolvency & Restructuring Congress, *Access to U.S. Chapter 11 by Non-U.S. Debtors* (June 17, 2016)

National Conference of Bankruptcy Judges, Recognition of Chapter 11 Cases by Foreign Courts (October 27, 2016)

American College of Bankruptcy, *Chapter 15:  Overview and Current Developments* (March 11, 2017)

Insolvency Intelligence, *Enforcement of Third-Party Releases in Chapter 15*, Issue 3 2017

*The Implications of Brexit for the Restructuring and Insolvency Industry: Views from the United States* (INSOL International, 2017) (co-authored with Hon. Leif M. Clark)

Chicago-Kent College of Law, *The Role of International and Comparative Law in Practice* (November 30, 2017)

University of Toronto (LLM Program): *Introduction to Chapter 15* (June 30, 2018)

Knowledge Group Webinar, *Cross-Border Insolvency and Restructuring: Recent Trends, Developments and Legal Issues* (April 6, 2018)

*The Emergence of Mediation in Cross-Border Cases,* INSOL World, Second Quarter 2018

*Introduction to Chapter 15*, University of Toronto Graduate LLM Program, June 30, 2018

*Brexit and Recognition of Schemes of Arrangement*, National Conference of Bankruptcy Judges, October 29, 2018

Insolvency Intelligence, *Update on Third-Party Releases in Chapters 15 and 11*, Issue 1 2019

International Bankruptcy, Suffolk University Law School, Fall Semester 2019

*Abstention and Chapter 15*, American Bankruptcy Institute Journal, October 2020

*Clashes Between National Insolvency Regimes* (Panel), GRR New York Live, October 6, 2022
*Third-party releases and chapter 15: will Purdue Pharma close the door*, Insolvency and
Restructuring International, Vol. 16 No. 2, October 2022

Boston College Law School LLM Conference, *The Role of Business Law in Global Cri*sis, April
21, 2023

American Bankruptcy Institute 2023 Cross-Border Insolvency Program, Panel with Judge Lisa
Beckerman, Justice Geoffrey Morawetz and Adam Swick, Esq., October 24, 2023

*Is COMI a Problem,* International Insolvency Institute, USA/Canada/Caribbean Regional
Conference, January 17-18, 2024

*A Brief Defense of COMI,* JD Supra, February 19, 2024

*25th Anniversary Retrospective:  Reflecting on the Most Significant Decisions and Changes to the
Insolvency and Restructuring Practice over the Past 25 Years*, International Insolvency Institute
25th Annual International Insolvency Conference, June 9, 2025, Sao Paulo

*Collier on Bankruptcy 16th Ed.--* 35, chapters dealing with cross-border insolvency (current)

*Collier Bankruptcy Practice Guide,* Chapter 19, Foreign Proceedings  (current)

*Collier International Business Insolvency Guide,* Chapter 8, Principles of American
Jurisprudence Underlying the Treatment of Foreign Cases in the United States; Chapter 9, Cases
Under Chapter 15; and Chapter 10, and Chapter 10, Cooperation and Communication; Plenary
Cross-Border Cases *(current)*

International Insolvency – Introduction to Chapter 15 of the Bankruptcy Code (four classes of a
twelve-week spring semester course, annually since 2008).  2023 participating schools:
University of Pennsylvania Law School, University of Pittsburgh School of Law, Delaware Law
School of Widener University, University of Minnesota Law School, University of Miami
School of Law, Rutgers Law School.

International Bankruptcy, Suffolk University Law School, Fall Semester 2019

ACTIVE/91087640.4

DG-0015

# Tab 03

**11 U.S. Code § 101. Definitions**

In this title the following definitions shall apply:

**(23)** The term "foreign proceeding" means a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

**(24)** The term "foreign representative" means a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

**11 U.S. Code § 105.  Power of court**

(a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

**11 U.S. Code § 109. Who may be a debtor**

(a) Notwithstanding any other provision of this section, only a person that resides or has a domicile, a place of business, or property in the United States, or a municipality, may be a debtor under this title.

**11 U.S. Code § 362. Automatic stay**

**(a)** Except as provided in subsection (b) of this section, a petition filed under section 301 , 302 , or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay, applicable to all entities, of--

**(1)** the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

**(2)** the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;

2688

**(3)**   any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

**(4)**   any act to create, perfect, or enforce any lien against property of the estate;

**(5)**   any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;

**(6)**   any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;

**(7)**   the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor;  and

**(8)**   the commencement or continuation of a proceeding before the United States Tax Court concerning a tax liability of a debtor that is a corporation for a taxable period the bankruptcy court may determine or concerning the tax liability of a debtor who is an individual for a taxable period ending before the date of the order for relief under this title.

**(b)**   The filing of a petition under section 301 , 302 , or 303 of this title, or of an application under section 5(a)(3) of the Securities Investor Protection Act of 1970, does not operate as a stay--

**(1)**   under subsection (a) of this section, of the commencement or continuation of a criminal action or proceeding against the debtor;

**(2)**   under subsection (a)--

**(A)**   of the commencement or continuation of a civil action or proceeding--

**(i)**   for the establishment of paternity;

**(ii)**   for the establishment or modification of an order for domestic support obligations;

**(iii)**   concerning child custody or visitation;

**(iv)**   for the dissolution of a marriage, except to the extent that such proceeding seeks to determine the division of property that is property of the estate;  or

**(v)**   regarding domestic violence;

**(B)**   of the collection of a domestic support obligation from property that is not property of the estate;

**(C)**   with respect to the withholding of income that is property of the estate or property of the debtor for payment of a domestic support obligation under a judicial or administrative order or a statute;

2689

**(D)**   of the withholding, suspension, or restriction of a driver's license, a professional or occupational license, or a recreational license, under State law, as specified in section 466(a)(16) of the Social Security Act;

**(E)**   of the reporting of overdue support owed by a parent to any consumer reporting agency as specified in section 466(a)(7) of the Social Security Act;

**(F)**   of the interception of a tax refund, as specified in sections 464 and 466(a)(3) of the Social Security Act or under an analogous State law;  or

**(G)**   of the enforcement of a medical obligation, as specified under title IV of the Social Security Act;

**(3)**   under subsection (a) of this section, of any act to perfect, or to maintain or continue the perfection of, an interest in property to the extent that the trustee's rights and powers are subject to such perfection under section 546(b) of this title or to the extent that such act is accomplished within the period provided under section 547(e)(2)(A) of this title;

**(4)**   under paragraph (1), (2), (3), or (6) of subsection (a) of this section, of the commencement or continuation of an action or proceeding by a governmental unit or any organization exercising authority under the Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on Their Destruction, opened for signature on January 13, 1993, to enforce such governmental unit's or organization's police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's or organization's police or regulatory power;

**[(5)  Repealed.**   Pub.L. 105-277 , Div. I, Title VI, §  603(1), Oct. 21, 1998, 112 Stat. 2681-886]

**(6)**   under subsection (a) of this section, of the exercise by a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency of any contractual right (as defined in section 555 or 556 ) under any security agreement or arrangement or other credit enhancement forming a part of or related to any commodity contract, forward contract or securities contract, or of any contractual right (as defined in section 555 or 556 ) to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such contracts, including any master agreement for such contracts;

**(7)**   under subsection (a) of this section, of the exercise by a repo participant or financial participant of any contractual right (as defined in section 559 ) under any security agreement or arrangement or other credit enhancement forming a part of or related to any repurchase agreement, or of any contractual right (as defined in section 559 ) to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such agreements, including any master agreement for such agreements;

**(8)**   under subsection (a) of this section, of the commencement of any action by the Secretary of Housing and Urban Development to foreclose a mortgage or deed of trust in any case in which the mortgage or deed of trust held by the Secretary is insured or was formerly insured under the

2690

National Housing Act and covers property, or combinations of property, consisting of five or more living units;

**(9)**   under subsection (a), of--

**(A)**   an audit by a governmental unit to determine tax liability;

**(B)**   the issuance to the debtor by a governmental unit of a notice of tax deficiency;

**(C)**   a demand for tax returns;  or

**(D)**   the making of an assessment for any tax and issuance of a notice and demand for payment of such an assessment (but any tax lien that would otherwise attach to property of the estate by reason of such an assessment shall not take effect unless such tax is a debt of the debtor that will not be discharged in the case and such property or its proceeds are transferred out of the estate to, or otherwise revested in, the debtor).

**(10)**   under subsection (a) of this section, of any act by a lessor to the debtor under a lease of nonresidential real property that has terminated by the expiration of the stated term of the lease before the commencement of or during a case under this title to obtain possession of such property;

**(11)**   under subsection (a) of this section, of the presentment of a negotiable instrument and the giving of notice of and protesting dishonor of such an instrument;

**(12)**   under subsection (a) of this section, after the date which is 90 days after the filing of such petition, of the commencement or continuation, and conclusion to the entry of final judgment, of an action which involves a debtor subject to reorganization pursuant to chapter 11 of this title and which was brought by the Secretary of Transportation under section 31325 of title 46 (including distribution of any proceeds of sale) to foreclose a preferred ship or fleet mortgage, or a security interest in or relating to a vessel or vessel under construction, held by the Secretary of Transportation under chapter 537 of title 46 or section 109(h) of title 49 , or under applicable State law;

**(13)**   under subsection (a) of this section, after the date which is 90 days after the filing of such petition, of the commencement or continuation, and conclusion to the entry of final judgment, of an action which involves a debtor subject to reorganization pursuant to chapter 11 of this title and which was brought by the Secretary of Commerce under section 31325 of title 46 (including distribution of any proceeds of sale) to foreclose a preferred ship or fleet mortgage in a vessel or a mortgage, deed of trust, or other security interest in a fishing facility held by the Secretary of Commerce under chapter 537 of title 46;

**(14)**   under subsection (a) of this section, of any action by an accrediting agency regarding the accreditation status of the debtor as an educational institution;

**(15)**   under subsection (a) of this section, of any action by a State licensing body regarding the licensure of the debtor as an educational institution;

2691

**(16)**   under subsection (a) of this section, of any action by a guaranty agency, as defined in section 435(j) of the Higher Education Act of 1965 or the Secretary of Education regarding the eligibility of the debtor to participate in programs authorized under such Act;

**(17)**   under subsection (a) of this section, of the exercise by a swap participant or financial participant of any contractual right (as defined in section 560 ) under any security agreement or arrangement or other credit enhancement forming a part of or related to any swap agreement, or of any contractual right (as defined in section 560 ) to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such agreements, including any master agreement for such agreements;

**(18)**   under subsection (a) of the creation or perfection of a statutory lien for an ad valorem property tax, or a special tax or special assessment on real property whether or not ad valorem, imposed by a governmental unit, if such tax or assessment comes due after the date of the filing of the petition;

**(19)**   under subsection (a), of withholding of income from a debtor's wages and collection of amounts withheld, under the debtor's agreement authorizing that withholding and collection for the benefit of a pension, profit-sharing, stock bonus, or other plan established under section 401 , 403 , 408 , 408A , 414 , 457 , or 501(c) of the Internal Revenue Code of 1986 , that is sponsored by the employer of the debtor, or an affiliate, successor, or predecessor of such employer--

**(A)**   to the extent that the amounts withheld and collected are used solely for payments relating to a loan from a plan under section 408(b)(1) of the Employee Retirement Income Security Act of 1974 or is subject to section 72(p) of the Internal Revenue Code of 1986;  or

**(B)**   a loan from a thrift savings plan permitted under subchapter III of chapter 84 of title 5, that satisfies the requirements of section 8433(g) of such title;

but nothing in this paragraph may be construed to provide that any loan made under a governmental plan under section 414(d) , or a contract or account under section 403(b), of the Internal Revenue Code of 1986 constitutes a claim or a debt under this title;

**(20)**   under subsection (a), of any act to enforce any lien against or security interest in real property following entry of the order under subsection (d)(4) as to such real property in any prior case under this title, for a period of 2 years after the date of the entry of such an order, except that the debtor, in a subsequent case under this title, may move for relief from such order based upon changed circumstances or for other good cause shown, after notice and a hearing;

**(21)**   under subsection (a), of any act to enforce any lien against or security interest in real property--

**(A)**   if the debtor is ineligible under section 109(g) to be a debtor in a case under this title;  or

**(B)**   if the case under this title was filed in violation of a bankruptcy court order in a prior case under this title prohibiting the debtor from being a debtor in another case under this title;

**(22)**   subject to subsection (l), under subsection (a)(3), of the continuation of any eviction, unlawful detainer action, or similar proceeding by a lessor against a debtor involving residential property in which the debtor resides as a tenant under a lease or rental agreement and with respect to which the lessor has obtained before the date of the filing of the bankruptcy petition, a judgment for possession of such property against the debtor;

**(23)**   subject to subsection (m), under subsection (a)(3), of an eviction action that seeks possession of the residential property in which the debtor resides as a tenant under a lease or rental agreement based on endangerment of such property or the illegal use of controlled substances on such property, but only if the lessor files with the court, and serves upon the debtor, a certification under penalty of perjury that such an eviction action has been filed, or that the debtor, during the 30-day period preceding the date of the filing of the certification, has endangered property or illegally used or allowed to be used a controlled substance on the property;

**(24)**   under subsection (a), of any transfer that is not avoidable under section 544 and that is not avoidable under section 549 ;

**(25)**   under subsection (a), of--

**(A)**   the commencement or continuation of an investigation or action by a securities self regulatory organization to enforce such organization's regulatory power;

**(B)**   the enforcement of an order or decision, other than for monetary sanctions, obtained in an action by such securities self regulatory organization to enforce such organization's regulatory power;  or

**(C)**   any act taken by such securities self regulatory organization to delist, delete, or refuse to permit quotation of any stock that does not meet applicable regulatory requirements;

**(26)**   under subsection (a), of the setoff under applicable nonbankruptcy law of an income tax refund, by a governmental unit, with respect to a taxable period that ended before the date of the order for relief against an income tax liability for a taxable period that also ended before the date of the order for relief, except that in any case in which the setoff of an income tax refund is not permitted under applicable nonbankruptcy law because of a pending action to determine the amount or legality of a tax liability, the governmental unit may hold the refund pending the resolution of the action, unless the court, on the motion of the trustee and after notice and a hearing, grants the taxing authority adequate protection (within the meaning of section 361 ) for the secured claim of such authority in the setoff under section 506(a) ;

**(27)**   under subsection (a) of this section, of the exercise by a master netting agreement participant of any contractual right (as defined in section 555 , 556 , 559 , or 560 ) under any security agreement or arrangement or other credit enhancement forming a part of or related to any master netting agreement, or of any contractual right (as defined in section 555 , 556 , 559 , or 560 ) to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such master netting agreements to the extent that such participant is eligible to exercise such rights under paragraph (6), (7), or (17) for each individual contract covered by the master netting agreement in issue;  and

2693

**(28)**   under subsection (a), of the exclusion by the Secretary of Health and Human Services of the debtor from participation in the medicare program or any other Federal health care program (as defined in section 1128B(f) of the Social Security Act pursuant to title XI or XVIII of such Act).

The provisions of paragraphs (12) and (13) of this subsection shall apply with respect to any such petition filed on or before December 31, 1989.

**(c)**   Except as provided in subsections (d), (e), (f), and (h) of this section--

**(1)**   the stay of an act against property of the estate under subsection (a) of this section continues until such property is no longer property of the estate;

**(2)**   the stay of any other act under subsection (a) of this section continues until the earliest of--

**(A)**   the time the case is closed;

**(B)**   the time the case is dismissed;  or

**(C)**   if the case is a case under chapter 7 of this title concerning an individual or a case under chapter 9, 11, 12, or 13 of this title, the time a discharge is granted or denied;

**(3)**   if a single or joint case is filed by or against a debtor who is an individual in a case under chapter 7, 11, or 13, and if a single or joint case of the debtor was pending within the preceding 1-year period but was dismissed, other than a case refiled under a chapter other than chapter 7 after dismissal under section 707(b) --

**(A)**   the stay under subsection (a) with respect to any action taken with respect to a debt or property securing such debt or with respect to any lease shall terminate with respect to the debtor on the 30th day after the filing of the later case;

**(B)**   on the motion of a party in interest for continuation of the automatic stay and upon notice and a hearing, the court may extend the stay in particular cases as to any or all creditors (subject to such conditions or limitations as the court may then impose) after notice and a hearing completed before the expiration of the 30-day period only if the party in interest demonstrates that the filing of the later case is in good faith as to the creditors to be stayed;  and

**(C)**   for purposes of subparagraph (B), a case is presumptively filed not in good faith (but such presumption may be rebutted by clear and convincing evidence to the contrary)--

**(i)**   as to all creditors, if--

**(I)**   more than 1 previous case under any of chapters 7, 11, and 13 in which the individual was a debtor was pending within the preceding 1-year period;

**(II)**   a previous case under any of chapters 7, 11, and 13 in which the individual was a debtor was dismissed within such 1-year period, after the debtor failed to--

2694

**(aa)** file or amend the petition or other documents as required by this title or the court without substantial excuse (but mere inadvertence or negligence shall not be a substantial excuse unless the dismissal was caused by the negligence of the debtor's attorney);

**(bb)** provide adequate protection as ordered by the court; or

**(cc)** perform the terms of a plan confirmed by the court; or

**(III)** there has not been a substantial change in the financial or personal affairs of the debtor since the dismissal of the next most previous case under chapter 7, 11, or 13 or any other reason to conclude that the later case will be concluded--

**(aa)** if a case under chapter 7, with a discharge; or

**(bb)** if a case under chapter 11 or 13, with a confirmed plan that will be fully performed; and

**(ii)** as to any creditor that commenced an action under subsection (d) in a previous case in which the individual was a debtor if, as of the date of dismissal of such case, that action was still pending or had been resolved by terminating, conditioning, or limiting the stay as to actions of such creditor; and

**(4)(A)(i)** if a single or joint case is filed by or against a debtor who is an individual under this title, and if 2 or more single or joint cases of the debtor were pending within the previous year but were dismissed, other than a case refiled under a chapter other than chapter 7 after dismissal under section 707(b) , the stay under subsection (a) shall not go into effect upon the filing of the later case; and

**(ii)** on request of a party in interest, the court shall promptly enter an order confirming that no stay is in effect;

**(B)** if, within 30 days after the filing of the later case, a party in interest requests the court may order the stay to take effect in the case as to any or all creditors (subject to such conditions or limitations as the court may impose), after notice and a hearing, only if the party in interest demonstrates that the filing of the later case is in good faith as to the creditors to be stayed;

**(C)** a stay imposed under subparagraph (B) shall be effective on the date of the entry of the order allowing the stay to go into effect; and

**(D)** for purposes of subparagraph (B), a case is presumptively filed not in good faith (but such presumption may be rebutted by clear and convincing evidence to the contrary)--

**(i)** as to all creditors if--

**(I)** 2 or more previous cases under this title in which the individual was a debtor were pending within the 1-year period;

**(II)** a previous case under this title in which the individual was a debtor was dismissed within the time period stated in this paragraph after the debtor failed to file or amend the petition or

2695

other documents as required by this title or the court without substantial excuse (but mere inadvertence or negligence shall not be substantial excuse unless the dismissal was caused by the negligence of the debtor's attorney), failed to provide adequate protection as ordered by the court, or failed to perform the terms of a plan confirmed by the court;  or

**(III)**   there has not been a substantial change in the financial or personal affairs of the debtor since the dismissal of the next most previous case under this title, or any other reason to conclude that the later case will not be concluded, if a case under chapter 7, with a discharge, and if a case under chapter 11 or 13, with a confirmed plan that will be fully performed;  or

**(ii)**   as to any creditor that commenced an action under subsection (d) in a previous case in which the individual was a debtor if, as of the date of dismissal of such case, such action was still pending or had been resolved by terminating, conditioning, or limiting the stay as to such action of such creditor.

**(d)**   On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay--

**(1)**   for cause, including the lack of adequate protection of an interest in property of such party in interest;

**(2)**   with respect to a stay of an act against property under subsection (a) of this section, if--

**(A)**   the debtor does not have an equity in such property;  and

**(B)**   such property is not necessary to an effective reorganization;

**(3)**   with respect to a stay of an act against single asset real estate under subsection (a), by a creditor whose claim is secured by an interest in such real estate, unless, not later than the date that is 90 days after the entry of the order for relief (or such later date as the court may determine for cause by order entered within that 90-day period) or 30 days after the court determines that the debtor is subject to this paragraph, whichever is later--

**(A)**   the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time;  or

**(B)**   the debtor has commenced monthly payments that--

**(i)**   may, in the debtor's sole discretion, notwithstanding section 363(c)(2) , be made from rents or other income generated before, on, or after the date of the commencement of the case by or from the property to each creditor whose claim is secured by such real estate (other than a claim secured by a judgment lien or by an unmatured statutory lien);  and

**(ii)**   are in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate;  or

**(4)**   with respect to a stay of an act against real property under subsection (a), by a creditor whose claim is secured by an interest in such real property, if the court finds that the filing of the petition was part of a scheme to delay, hinder, or defraud creditors that involved either--

**(A)**   transfer of all or part ownership of, or other interest in, such real property without the consent of the secured creditor or court approval;  or

**(B)**   multiple bankruptcy filings affecting such real property.

If recorded in compliance with applicable State laws governing notices of interests or liens in real property, an order entered under paragraph (4) shall be binding in any other case under this title purporting to affect such real property filed not later than 2 years after the date of the entry of such order by the court, except that a debtor in a subsequent case under this title may move for relief from such order based upon changed circumstances or for good cause shown, after notice and a hearing.  Any Federal, State, or local governmental unit that accepts notices of interests or liens in real property shall accept any certified copy of an order described in this subsection for indexing and recording.

**(e)(1)**   Thirty days after a request under subsection (d) of this section for relief from the stay of any act against property of the estate under subsection (a) of this section, such stay is terminated with respect to the party in interest making such request, unless the court, after notice and a hearing, orders such stay continued in effect pending the conclusion of, or as a result of, a final hearing and determination under subsection (d) of this section.  A hearing under this subsection may be a preliminary hearing, or may be consolidated with the final hearing under subsection (d) of this section.  The court shall order such stay continued in effect pending the conclusion of the final hearing under subsection (d) of this section if there is a reasonable likelihood that the party opposing relief from such stay will prevail at the conclusion of such final hearing.  If the hearing under this subsection is a preliminary hearing, then such final hearing shall be concluded not later than thirty days after the conclusion of such preliminary hearing, unless the 30-day period is extended with the consent of the parties in interest or for a specific time which the court finds is required by compelling circumstances.

**(2)**   Notwithstanding paragraph (1), in a case under chapter 7, 11, or 13 in which the debtor is an individual, the stay under subsection (a) shall terminate on the date that is 60 days after a request is made by a party in interest under subsection (d), unless--

**(A)**   a final decision is rendered by the court during the 60-day period beginning on the date of the request;  or

**(B)**   such 60-day period is extended--

**(i)**   by agreement of all parties in interest;  or

**(ii)**   by the court for such specific period of time as the court finds is required for good cause, as described in findings made by the court.

**(f)**   Upon request of a party in interest, the court, with or without a hearing, shall grant such relief from the stay provided under subsection (a) of this section as is necessary to prevent

2697

irreparable damage to the interest of an entity in property, if such interest will suffer such damage before there is an opportunity for notice and a hearing under subsection (d) or (e) of this section.

**(g)**   In any hearing under subsection (d) or (e) of this section concerning relief from the stay of any act under subsection (a) of this section--

**(1)**   the party requesting such relief has the burden of proof on the issue of the debtor's equity in property;  and

**(2)**   the party opposing such relief has the burden of proof on all other issues.

**(h)(1)**   In a case in which the debtor is an individual, the stay provided by subsection (a) is terminated with respect to personal property of the estate or of the debtor securing in whole or in part a claim, or subject to an unexpired lease, and such personal property shall no longer be property of the estate if the debtor fails within the applicable time set by section 521(a)(2) --

**(A)**   to file timely any statement of intention required under section 521(a)(2) with respect to such personal property or to indicate in such statement that the debtor will either surrender such personal property or retain it and, if retaining such personal property, either redeem such personal property pursuant to section 722 , enter into an agreement of the kind specified in section 524(c) applicable to the debt secured by such personal property, or assume such unexpired lease pursuant to section 365(p) if the trustee does not do so, as applicable;  and

**(B)**   to take timely the action specified in such statement, as it may be amended before expiration of the period for taking action, unless such statement specifies the debtor's intention to reaffirm such debt on the original contract terms and the creditor refuses to agree to the reaffirmation on such terms.

**(2)**   Paragraph (1) does not apply if the court determines, on the motion of the trustee filed before the expiration of the applicable time set by section 521(a)(2) , after notice and a hearing, that such personal property is of consequential value or benefit to the estate, and orders appropriate adequate protection of the creditor's interest, and orders the debtor to deliver any collateral in the debtor's possession to the trustee.  If the court does not so determine, the stay provided by subsection (a) shall terminate upon the conclusion of the hearing on the motion.

**(i)**   If a case commenced under chapter 7, 11, or 13 is dismissed due to the creation of a debt repayment plan, for purposes of subsection (c)(3), any subsequent case commenced by the debtor under any such chapter shall not be presumed to be filed not in good faith.

**(j)**   On request of a party in interest, the court shall issue an order under subsection (c) confirming that the automatic stay has been terminated.

**(k)(1)**   Except as provided in paragraph (2), an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

2698

**(2)** If such violation is based on an action taken by an entity in the good faith belief that subsection (h) applies to the debtor, the recovery under paragraph (1) of this subsection against such entity shall be limited to actual damages.

**(l)(1)** Except as otherwise provided in this subsection, subsection (b) (22) shall apply on the date that is 30 days after the date on which the bankruptcy petition is filed, if the debtor files with the petition and serves upon the lessor a certification under penalty of perjury that--

**(A)** under nonbankruptcy law applicable in the jurisdiction, there are circumstances under which the debtor would be permitted to cure the entire monetary default that gave rise to the judgment for possession, after that judgment for possession was entered;  and

**(B)** the debtor (or an adult dependent of the debtor) has deposited with the clerk of the court, any rent that would become due during the 30-day period after the filing of the bankruptcy petition.

**(2)** If, within the 30-day period after the filing of the bankruptcy petition, the debtor (or an adult dependent of the debtor) complies with paragraph (1) and files with the court and serves upon the lessor a further certification under penalty of perjury that the debtor (or an adult dependent of the debtor) has cured, under nonbankruptcy law applicable in the jurisdiction, the entire monetary default that gave rise to the judgment under which possession is sought by the lessor, subsection (b)(22) shall not apply, unless ordered to apply by the court under paragraph (3).

**(3)(A)** If the lessor files an objection to any certification filed by the debtor under paragraph (1) or (2), and serves such objection upon the debtor, the court shall hold a hearing within 10 days after the filing and service of such objection to determine if the certification filed by the debtor under paragraph (1) or (2) is true.

**(B)** If the court upholds the objection of the lessor filed under subparagraph (A)--

**(i)** subsection (b)(22) shall apply immediately and relief from the stay provided under subsection (a)(3) shall not be required to enable the lessor to complete the process to recover full possession of the property;  and

**(ii)** the clerk of the court shall immediately serve upon the lessor and the debtor a certified copy of the court's order upholding the lessor's objection.

**(4)** If a debtor, in accordance with paragraph (5), indicates on the petition that there was a judgment for possession of the residential rental property in which the debtor resides and does not file a certification under paragraph (1) or (2)--

**(A)** subsection (b)(22) shall apply immediately upon failure to file such certification, and relief from the stay provided under subsection (a)(3) shall not be required to enable the lessor to complete the process to recover full possession of the property;  and

**(B)** the clerk of the court shall immediately serve upon the lessor and the debtor a certified copy of the docket indicating the absence of a filed certification and the applicability of the exception to the stay under subsection (b)(22).

**(5)(A)**   Where a judgment for possession of residential property in which the debtor resides as a tenant under a lease or rental agreement has been obtained by the lessor, the debtor shall so indicate on the bankruptcy petition and shall provide the name and address of the lessor that obtained that pre-petition judgment on the petition and on any certification filed under this subsection.

**(B)**   The form of certification filed with the petition, as specified in this subsection, shall provide for the debtor to certify, and the debtor shall certify--

**(i)**   whether a judgment for possession of residential rental housing in which the debtor resides has been obtained against the debtor before the date of the filing of the petition;  and

**(ii)**   whether the debtor is claiming under paragraph (1) that under nonbankruptcy law applicable in the jurisdiction, there are circumstances under which the debtor would be permitted to cure the entire monetary default that gave rise to the judgment for possession, after that judgment of possession was entered, and has made the appropriate deposit with the court.

**(C)**   The standard forms (electronic and otherwise) used in a bankruptcy proceeding shall be amended to reflect the requirements of this subsection.

**(D)**   The clerk of the court shall arrange for the prompt transmittal of the rent deposited in accordance with paragraph (1)(B) to the lessor.

**(m)(1)**   Except as otherwise provided in this subsection, subsection (b) (23) shall apply on the date that is 15 days after the date on which the lessor files and serves a certification described in subsection (b)(23).

**(2)(A)**   If the debtor files with the court an objection to the truth or legal sufficiency of the certification described in subsection (b)(23) and serves such objection upon the lessor, subsection (b)(23) shall not apply, unless ordered to apply by the court under this subsection.

**(B)**   If the debtor files and serves the objection under subparagraph (A), the court shall hold a hearing within 10 days after the filing and service of such objection to determine if the situation giving rise to the lessor's certification under paragraph (1) existed or has been remedied.

**(C)**   If the debtor can demonstrate to the satisfaction of the court that the situation giving rise to the lessor's certification under paragraph (1) did not exist or has been remedied, the stay provided under subsection (a)(3) shall remain in effect until the termination of the stay under this section.

**(D)**   If the debtor cannot demonstrate to the satisfaction of the court that the situation giving rise to the lessor's certification under paragraph (1) did not exist or has been remedied--

**(i)**   relief from the stay provided under subsection (a)(3) shall not be required to enable the lessor to proceed with the eviction;  and

**(ii)**   the clerk of the court shall immediately serve upon the lessor and the debtor a certified copy of the court's order upholding the lessor's certification.

**(3)**   If the debtor fails to file, within 15 days, an objection under paragraph (2)(A)--

**(A)**   subsection (b)(23) shall apply immediately upon such failure and relief from the stay provided under subsection (a)(3) shall not be required to enable the lessor to complete the process to recover full possession of the property;  and

**(B)**   the clerk of the court shall immediately serve upon the lessor and the debtor a certified copy of the docket indicating such failure.

**(n)(1)**   Except as provided in paragraph (2), subsection (a) does not apply in a case in which the debtor--

**(A)**   is a debtor in a small business case pending at the time the petition is filed;

**(B)**   was a debtor in a small business case that was dismissed for any reason by an order that became final in the 2-year period ending on the date of the order for relief entered with respect to the petition;

**(C)**   was a debtor in a small business case in which a plan was confirmed in the 2-year period ending on the date of the order for relief entered with respect to the petition;  or

**(D)**   is an entity that has acquired substantially all of the assets or business of a small business debtor described in subparagraph (A), (B), or (C), unless such entity establishes by a preponderance of the evidence that such entity acquired substantially all of the assets or business of such small business debtor in good faith and not for the purpose of evading this paragraph.

**(2)**   Paragraph (1) does not apply--

**(A)**   to an involuntary case involving no collusion by the debtor with creditors;  or

**(B)**   to the filing of a petition if--

**(i)**   the debtor proves by a preponderance of the evidence that the filing of the petition resulted from circumstances beyond the control of the debtor not foreseeable at the time the case then pending was filed;  and

**(ii)**   it is more likely than not that the court will confirm a feasible plan, but not a liquidating plan, within a reasonable period of time.

**(o)**   The exercise of rights not subject to the stay arising under subsection (a) pursuant to paragraph (6), (7), (17), or (27) of subsection (b) shall not be stayed by any order of a court or administrative agency in any proceeding under this title.

2701

---

**11 USC Ch. 15: ANCILLARY AND OTHER CROSS-BORDER CASES**

**From Title 11—BANKRUPTCY**

---

### CHAPTER 15—ANCILLARY AND OTHER CROSS-BORDER CASES

Sec.
1501.
Purpose and scope of application.


SUBCHAPTER I—GENERAL PROVISIONS

1502.
Definitions.
1503.
International obligations of the United States.
1504.
Commencement of ancillary case.
1505.
Authorization to act in a foreign country.
1506.
Public policy exception.
1507.
Additional assistance.
1508.
Interpretation.

SUBCHAPTER II—ACCESS OF FOREIGN REPRESENTATIVES AND CREDITORS TO THE COURT
1509.
Right of direct access.
1510.
Limited jurisdiction.
1511.
Commencement of case under section 301 or 303.[1]
1512.
Participation of a foreign representative in a case under this title.
1513.
Access of foreign creditors to a case under this title.
1514.
Notification to foreign creditors concerning a case under this title.

SUBCHAPTER III—RECOGNITION OF A FOREIGN PROCEEDING AND RELIEF

2702

1515.
Application for recognition.
1516.
Presumptions concerning recognition.
1517.
Order granting recognition.
1518.
Subsequent information.
1519.
Relief that may be granted upon filing petition for recognition.
1520.
Effects of recognition of a foreign main proceeding.
1521.
Relief that may be granted upon recognition.
1522.
Protection of creditors and other interested persons.
1523.
Actions to avoid acts detrimental to creditors.
1524.
Intervention by a foreign representative.
    SUBCHAPTER IV—COOPERATION WITH FOREIGN COURTS AND FOREIGN REPRESENTATIVES
1525.
Cooperation and direct communication between the court and foreign courts or foreign
    representatives.
1526.
Cooperation and direct communication between the trustee and foreign courts or foreign
    representatives.
1527.
Forms of cooperation.

SUBCHAPTER V—CONCURRENT PROCEEDINGS
1528.
Commencement of a case under this title after recognition of a foreign main proceeding.
1529.
Coordination of a case under this title and a foreign proceeding.
1530.
Coordination of more than 1 foreign proceeding.
1531.
Presumption of insolvency based on recognition of a foreign main proceeding.
1532.
Rule of payment in concurrent proceedings.

## PRIOR PROVISIONS

A prior chapter 15, consisting of sections 1501 to 151326, related to a pilot program for a United States trustee system, prior to repeal by Pub. L. 99–554, title II, §231, Oct. 27, 1986, 100 Stat. 3103.

[1] *So in original. Section catchline amended by Pub. L. 111–327 without corresponding amendment of chapter analysis.*

## §1501. Purpose and scope of application

(a) The purpose of this chapter is to incorporate the Model Law on Cross-Border Insolvency so as to provide effective mechanisms for dealing with cases of cross-border insolvency with the objectives of—
    (1) cooperation between—
       (A) courts of the United States, United States trustees, trustees, examiners, debtors, and debtors in possession; and
       (B) the courts and other competent authorities of foreign countries involved in cross-border insolvency

2703

cases;

(2) greater legal certainty for trade and investment;
(3) fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor;
(4) protection and maximization of the value of the debtor's assets; and
(5) facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment.

(b) This chapter applies where—
(1) assistance is sought in the United States by a foreign court or a foreign representative in connection with a foreign proceeding;
(2) assistance is sought in a foreign country in connection with a case under this title;
(3) a foreign proceeding and a case under this title with respect to the same debtor are pending concurrently; or
(4) creditors or other interested persons in a foreign country have an interest in requesting the commencement of, or participating in, a case or proceeding under this title.

(c) This chapter does not apply to—
(1) a proceeding concerning an entity, other than a foreign insurance company, identified by exclusion in section 109(b);
(2) an individual, or to an individual and such individual's spouse, who have debts within the limits specified in section 109(e) and who are citizens of the United States or aliens lawfully admitted for permanent residence in the United States; or
(3) an entity subject to a proceeding under the Securities Investor Protection Act of 1970, a stockbroker subject to subchapter III of chapter 7 of this title, or a commodity broker subject to subchapter IV of chapter 7 of this title.

(d) The court may not grant relief under this chapter with respect to any deposit, escrow, trust fund, or other security required or permitted under any applicable State insurance law or regulation for the benefit of claim holders in the United States.

(Added Pub. L. 109–8, title VIII, §801(a), Apr. 20, 2005, 119 Stat. 135.)

## REFERENCES IN TEXT

The Securities Investor Protection Act of 1970, referred to in subsec. (c)(3), is Pub. L. 91–598, Dec. 30, 1970, 84 Stat. 1636, as amended, which is classified generally to chapter 2B–1 (§78aaa et seq.) of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see section 78aaa of Title 15 and Tables.

## PRIOR PROVISIONS

A prior section 1501, Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2652, related to applicability of chapter which provided a pilot program for a United States trustee system, prior to repeal by Pub. L. 99–554, title II, §231, Oct. 27, 1986, 100 Stat. 3103.

## EFFECTIVE DATE

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

### SUBCHAPTER I—GENERAL PROVISIONS

## §1502. Definitions

For the purposes of this chapter, the term—

(1) "debtor" means an entity that is the subject of a foreign proceeding;

(2) "establishment" means any place of operations where the debtor carries out a nontransitory economic activity;

(3) "foreign court" means a judicial or other authority competent to control or supervise a foreign proceeding;

(4) "foreign main proceeding" means a foreign proceeding pending in the country where the debtor has the center of its main interests;

(5) "foreign nonmain proceeding" means a foreign proceeding, other than a foreign main proceeding, pending in a country where the debtor has an establishment;

(6) "trustee" includes a trustee, a debtor in possession in a case under any chapter of this title, or a debtor under chapter 9 of this title;

(7) "recognition" means the entry of an order granting recognition of a foreign main proceeding or foreign nonmain proceeding under this chapter; and

(8) "within the territorial jurisdiction of the United States", when used with reference to property of a debtor, refers to tangible property located within the territory of the United States and intangible property deemed under applicable nonbankruptcy law to be located within that territory, including any property subject to attachment or garnishment that may properly be seized or garnished by an action in a Federal or State court in the United States.

(Added Pub. L. 109–8, title VIII, §801(a), Apr. 20, 2005, 119 Stat. 135.)

## EFFECTIVE DATE

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

## §1503. International obligations of the United States

To the extent that this chapter conflicts with an obligation of the United States arising out of any treaty or other form of agreement to which it is a party with one or more other countries, the requirements of the treaty or agreement prevail.

(Added Pub. L. 109–8, title VIII, §801(a), Apr. 20, 2005, 119 Stat. 136.)

## EFFECTIVE DATE

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

## §1504. Commencement of ancillary case

A case under this chapter is commenced by the filing of a petition for recognition of a foreign proceeding under section 1515.

(Added Pub. L. 109–8, title VIII, §801(a), Apr. 20, 2005, 119 Stat. 136.)

## EFFECTIVE DATE

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

## §1505. Authorization to act in a foreign country

A trustee or another entity (including an examiner) may be authorized by the court to act in a foreign country on behalf of an estate created under section 541. An entity authorized to act under this section may

act in any way permitted by the applicable foreign law.

(Added Pub. L. 109–8, title VIII, §801(a), Apr. 20, 2005, 119 Stat. 136.)

#### EFFECTIVE DATE

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

### §1506. Public policy exception

Nothing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States.

(Added Pub. L. 109–8, title VIII, §801(a), Apr. 20, 2005, 119 Stat. 136.)

#### EFFECTIVE DATE

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

### §1507. Additional assistance

(a) Subject to the specific limitations stated elsewhere in this chapter the court, if recognition is granted, may provide additional assistance to a foreign representative under this title or under other laws of the United States.

(b) In determining whether to provide additional assistance under this title or under other laws of the United States, the court shall consider whether such additional assistance, consistent with the principles of comity, will reasonably assure—

(1) just treatment of all holders of claims against or interests in the debtor's property;

(2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

(3) prevention of preferential or fraudulent dispositions of property of the debtor;

(4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and

(5) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

(Added Pub. L. 109–8, title VIII, §801(a), Apr. 20, 2005, 119 Stat. 136.)

#### EFFECTIVE DATE

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

### §1508. Interpretation

In interpreting this chapter, the court shall consider its international origin, and the need to promote an application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions.

(Added Pub. L. 109–8, title VIII, §801(a), Apr. 20, 2005, 119 Stat. 137.)

#### EFFECTIVE DATE

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases

commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

## SUBCHAPTER II—ACCESS OF FOREIGN REPRESENTATIVES AND CREDITORS TO THE COURT

## §1509. Right of direct access

(a) A foreign representative may commence a case under section 1504 by filing directly with the court a petition for recognition of a foreign proceeding under section 1515.

(b) If the court grants recognition under section 1517, and subject to any limitations that the court may impose consistent with the policy of this chapter—

(1) the foreign representative has the capacity to sue and be sued in a court in the United States;

(2) the foreign representative may apply directly to a court in the United States for appropriate relief in that court; and

(3) a court in the United States shall grant comity or cooperation to the foreign representative.

(c) A request for comity or cooperation by a foreign representative in a court in the United States other than the court which granted recognition shall be accompanied by a certified copy of an order granting recognition under section 1517.

(d) If the court denies recognition under this chapter, the court may issue any appropriate order necessary to prevent the foreign representative from obtaining comity or cooperation from courts in the United States.

(e) Whether or not the court grants recognition, and subject to sections 306 and 1510, a foreign representative is subject to applicable nonbankruptcy law.

(f) Notwithstanding any other provision of this section, the failure of a foreign representative to commence a case or to obtain recognition under this chapter does not affect any right the foreign representative may have to sue in a court in the United States to collect or recover a claim which is the property of the debtor.

(Added Pub. L. 109–8, title VIII, §801(a), Apr. 20, 2005, 119 Stat. 137.)

### EFFECTIVE DATE

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

## §1510. Limited jurisdiction

The sole fact that a foreign representative files a petition under section 1515 does not subject the foreign representative to the jurisdiction of any court in the United States for any other purpose.

(Added Pub. L. 109–8, title VIII, §801(a), Apr. 20, 2005, 119 Stat. 138.)

### EFFECTIVE DATE

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

## §1511. Commencement of case under section 301, 302, or 303

(a) Upon recognition, a foreign representative may commence—

(1) an involuntary case under section 303; or

(2) a voluntary case under section 301 or 302, if the foreign proceeding is a foreign main proceeding.

(b) The petition commencing a case under subsection (a) must be accompanied by a certified copy of an order granting recognition. The court where the petition for recognition has been filed must be advised of the foreign representative's intent to commence a case under subsection (a) prior to such commencement.

(Added Pub. L. 109–8, title VIII, §801(a), Apr. 20, 2005, 119 Stat. 138; amended Pub. L. 111–327, §2(a)(45), Dec. 22, 2010, 124 Stat. 3562.)

### AMENDMENTS

**2010**—Pub. L. 111–327 inserted ", 302," after "301" in section catchline.

### EFFECTIVE DATE

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

## §1512. Participation of a foreign representative in a case under this title

Upon recognition of a foreign proceeding, the foreign representative in the recognized proceeding is entitled to participate as a party in interest in a case regarding the debtor under this title.

(Added Pub. L. 109–8, title VIII, §801(a), Apr. 20, 2005, 119 Stat. 138.)

### EFFECTIVE DATE

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

## §1513. Access of foreign creditors to a case under this title

(a) Foreign creditors have the same rights regarding the commencement of, and participation in, a case under this title as domestic creditors.

(b)(1) Subsection (a) does not change or codify present law as to the priority of claims under section 507 or 726, except that the claim of a foreign creditor under those sections shall not be given a lower priority than that of general unsecured claims without priority solely because the holder of such claim is a foreign creditor.

(2)(A) Subsection (a) and paragraph (1) do not change or codify present law as to the allowability of foreign revenue claims or other foreign public law claims in a proceeding under this title.

(B) Allowance and priority as to a foreign tax claim or other foreign public law claim shall be governed by any applicable tax treaty of the United States, under the conditions and circumstances specified therein.

(Added Pub. L. 109–8, title VIII, §801(a), Apr. 20, 2005, 119 Stat. 138.)

### EFFECTIVE DATE

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

## §1514. Notification to foreign creditors concerning a case under this title

(a) Whenever in a case under this title notice is to be given to creditors generally or to any class or category of creditors, such notice shall also be given to the known creditors generally, or to creditors in the notified class or category, that do not have addresses in the United States. The court may order that appropriate steps be taken with a view to notifying any creditor whose address is not yet known.

(b) Such notification to creditors with foreign addresses described in subsection (a) shall be given

individually, unless the court considers that, under the circumstances, some other form of notification would be more appropriate. No letter or other formality is required.

(c) When a notification of commencement of a case is to be given to foreign creditors, such notification shall—

(1) indicate the time period for filing proofs of claim and specify the place for filing such proofs of claim;

(2) indicate whether secured creditors need to file proofs of claim; and

(3) contain any other information required to be included in such notification to creditors under this title and the orders of the court.

(d) Any rule of procedure or order of the court as to notice or the filing of a proof of claim shall provide such additional time to creditors with foreign addresses as is reasonable under the circumstances.

(Added Pub. L. 109–8, title VIII, §801(a), Apr. 20, 2005, 119 Stat. 138.)

## EFFECTIVE DATE

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

## SUBCHAPTER III—RECOGNITION OF A FOREIGN PROCEEDING AND RELIEF

# §1515. Application for recognition

(a) A foreign representative applies to the court for recognition of a foreign proceeding in which the foreign representative has been appointed by filing a petition for recognition.

(b) A petition for recognition shall be accompanied by—

(1) a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;

(2) a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or

(3) in the absence of evidence referred to in paragraphs (1) and (2), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative.

(c) A petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative.

(d) The documents referred to in paragraphs (1) and (2) of subsection (b) shall be translated into English. The court may require a translation into English of additional documents.

(Added Pub. L. 109–8, title VIII, §801(a), Apr. 20, 2005, 119 Stat. 139.)

## EFFECTIVE DATE

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

# §1516. Presumptions concerning recognition

(a) If the decision or certificate referred to in section 1515(b) indicates that the foreign proceeding is a foreign proceeding and that the person or body is a foreign representative, the court is entitled to so presume.

(b) The court is entitled to presume that documents submitted in support of the petition for recognition are authentic, whether or not they have been legalized.

(c) In the absence of evidence to the contrary, the debtor's registered office, or habitual residence in the case of an individual, is presumed to be the center of the debtor's main interests.

## 2709

(Added Pub. L. 109–8, title VIII, §801(a), Apr. 20, 2005, 119 Stat. 139.)

### EFFECTIVE DATE

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

## §1517. Order granting recognition

(a) Subject to section 1506, after notice and a hearing, an order recognizing a foreign proceeding shall be entered if—
(1) such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502;
(2) the foreign representative applying for recognition is a person or body; and
(3) the petition meets the requirements of section 1515.

(b) Such foreign proceeding shall be recognized—
(1) as a foreign main proceeding if it is pending in the country where the debtor has the center of its main interests; or
(2) as a foreign nonmain proceeding if the debtor has an establishment within the meaning of section 1502 in the foreign country where the proceeding is pending.

(c) A petition for recognition of a foreign proceeding shall be decided upon at the earliest possible time. Entry of an order recognizing a foreign proceeding constitutes recognition under this chapter.
(d) The provisions of this subchapter do not prevent modification or termination of recognition if it is shown that the grounds for granting it were fully or partially lacking or have ceased to exist, but in considering such action the court shall give due weight to possible prejudice to parties that have relied upon the order granting recognition. A case under this chapter may be closed in the manner prescribed under section 350.

(Added Pub. L. 109–8, title VIII, §801(a), Apr. 20, 2005, 119 Stat. 139.)

### EFFECTIVE DATE

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

## §1518. Subsequent information

From the time of filing the petition for recognition of a foreign proceeding, the foreign representative shall file with the court promptly a notice of change of status concerning—
(1) any substantial change in the status of such foreign proceeding or the status of the foreign representative's appointment; and
(2) any other foreign proceeding regarding the debtor that becomes known to the foreign representative.

(Added Pub. L. 109–8, title VIII, §801(a), Apr. 20, 2005, 119 Stat. 140.)

### EFFECTIVE DATE

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

## §1519. Relief that may be granted upon filing petition for recognition

(a) From the time of filing a petition for recognition until the court rules on the petition, the court may, at

the request of the foreign representative, where relief is urgently needed to protect the assets of the debtor or the interests of the creditors, grant relief of a provisional nature, including—

(1) staying execution against the debtor's assets;

(2) entrusting the administration or realization of all or part of the debtor's assets located in the United States to the foreign representative or another person authorized by the court, including an examiner, in order to protect and preserve the value of assets that, by their nature or because of other circumstances, are perishable, susceptible to devaluation or otherwise in jeopardy; and

(3) any relief referred to in paragraph (3), (4), or (7) of section 1521(a).

(b) Unless extended under section 1521(a)(6), the relief granted under this section terminates when the petition for recognition is granted.

(c) It is a ground for denial of relief under this section that such relief would interfere with the administration of a foreign main proceeding.

(d) The court may not enjoin a police or regulatory act of a governmental unit, including a criminal action or proceeding, under this section.

(e) The standards, procedures, and limitations applicable to an injunction shall apply to relief under this section.

(f) The exercise of rights not subject to the stay arising under section 362(a) pursuant to paragraph (6), (7), (17), or (27) of section 362(b) or pursuant to section 362(o) shall not be stayed by any order of a court or administrative agency in any proceeding under this chapter.

(Added Pub. L. 109–8, title VIII, §801(a), Apr. 20, 2005, 119 Stat. 140; amended Pub. L. 111–327, §2(a)(46), Dec. 22, 2010, 124 Stat. 3562.)

## AMENDMENTS

**2010**—Subsec. (f). Pub. L. 111–327 substituted "362(o)" for "362(n)".

## EFFECTIVE DATE

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

## §1520. Effects of recognition of a foreign main proceeding

(a) Upon recognition of a foreign proceeding that is a foreign main proceeding—

(1) sections 361 and 362 apply with respect to the debtor and the property of the debtor that is within the territorial jurisdiction of the United States;

(2) sections 363, 549, and 552 apply to a transfer of an interest of the debtor in property that is within the territorial jurisdiction of the United States to the same extent that the sections would apply to property of an estate;

(3) unless the court orders otherwise, the foreign representative may operate the debtor's business and may exercise the rights and powers of a trustee under and to the extent provided by sections 363 and 552; and

(4) section 552 applies to property of the debtor that is within the territorial jurisdiction of the United States.

(b) Subsection (a) does not affect the right to commence an individual action or proceeding in a foreign country to the extent necessary to preserve a claim against the debtor.

(c) Subsection (a) does not affect the right of a foreign representative or an entity to file a petition commencing a case under this title or the right of any party to file claims or take other proper actions in such a case.

(Added Pub. L. 109–8, title VIII, §801(a), Apr. 20, 2005, 119 Stat. 141.)

## EFFECTIVE DATE

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under

section 101 of this title.

## §1521. Relief that may be granted upon recognition

(a) Upon recognition of a foreign proceeding, whether main or nonmain, where necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the foreign representative, grant any appropriate relief, including—

(1) staying the commencement or continuation of an individual action or proceeding concerning the debtor's assets, rights, obligations or liabilities to the extent they have not been stayed under section 1520 (a);

(2) staying execution against the debtor's assets to the extent it has not been stayed under section 1520 (a);

(3) suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520(a);

(4) providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities;

(5) entrusting the administration or realization of all or part of the debtor's assets within the territorial jurisdiction of the United States to the foreign representative or another person, including an examiner, authorized by the court;

(6) extending relief granted under section 1519(a); and

(7) granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a).

(b) Upon recognition of a foreign proceeding, whether main or nonmain, the court may, at the request of the foreign representative, entrust the distribution of all or part of the debtor's assets located in the United States to the foreign representative or another person, including an examiner, authorized by the court, provided that the court is satisfied that the interests of creditors in the United States are sufficiently protected.

(c) In granting relief under this section to a representative of a foreign nonmain proceeding, the court must be satisfied that the relief relates to assets that, under the law of the United States, should be administered in the foreign nonmain proceeding or concerns information required in that proceeding.

(d) The court may not enjoin a police or regulatory act of a governmental unit, including a criminal action or proceeding, under this section.

(e) The standards, procedures, and limitations applicable to an injunction shall apply to relief under paragraphs (1), (2), (3), and (6) of subsection (a).

(f) The exercise of rights not subject to the stay arising under section 362(a) pursuant to paragraph (6), (7), (17), or (27) of section 362(b) or pursuant to section 362(o) shall not be stayed by any order of a court or administrative agency in any proceeding under this chapter.

(Added Pub. L. 109–8, title VIII, §801(a), Apr. 20, 2005, 119 Stat. 141; amended Pub. L. 111–327, §2(a)(47), Dec. 22, 2010, 124 Stat. 3562.)

### AMENDMENTS

**2010**—Subsec. (f). Pub. L. 111–327 substituted "362(o)" for "362(n)".

### EFFECTIVE DATE

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

## §1522. Protection of creditors and other interested persons

(a) The court may grant relief under section 1519 or 1521, or may modify or terminate relief under subsection (c), only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected.

(b) The court may subject relief granted under section 1519 or 1521, or the operation of the debtor's business under section 1520(a)(3), to conditions it considers appropriate, including the giving of security or

## 2712

the filing of a bond.

(c) The court may, at the request of the foreign representative or an entity affected by relief granted under section 1519 or 1521, or at its own motion, modify or terminate such relief.

(d) Section 1104(d) shall apply to the appointment of an examiner under this chapter. Any examiner shall comply with the qualification requirements imposed on a trustee by section 322.

(Added Pub. L. 109–8, title VIII, §801(a), Apr. 20, 2005, 119 Stat. 142.)

### EFFECTIVE DATE

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

## §1523. Actions to avoid acts detrimental to creditors

(a) Upon recognition of a foreign proceeding, the foreign representative has standing in a case concerning the debtor pending under another chapter of this title to initiate actions under sections 522, 544, 545, 547, 548, 550, 553, and 724(a).

(b) When a foreign proceeding is a foreign nonmain proceeding, the court must be satisfied that an action under subsection (a) relates to assets that, under United States law, should be administered in the foreign nonmain proceeding.

(Added Pub. L. 109–8, title VIII, §801(a), Apr. 20, 2005, 119 Stat. 142.)

### EFFECTIVE DATE

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

## §1524. Intervention by a foreign representative

Upon recognition of a foreign proceeding, the foreign representative may intervene in any proceedings in a State or Federal court in the United States in which the debtor is a party.

(Added Pub. L. 109–8, title VIII, §801(a), Apr. 20, 2005, 119 Stat. 142.)

### EFFECTIVE DATE

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

### SUBCHAPTER IV—COOPERATION WITH FOREIGN COURTS AND FOREIGN REPRESENTATIVES

## §1525. Cooperation and direct communication between the court and foreign courts or foreign representatives

(a) Consistent with section 1501, the court shall cooperate to the maximum extent possible with a foreign court or a foreign representative, either directly or through the trustee.

(b) The court is entitled to communicate directly with, or to request information or assistance directly from, a foreign court or a foreign representative, subject to the rights of a party in interest to notice and participation.

(Added Pub. L. 109–8, title VIII, §801(a), Apr. 20, 2005, 119 Stat. 143.)

2713

## EFFECTIVE DATE

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

## §1526. Cooperation and direct communication between the trustee and foreign courts or foreign representatives

(a) Consistent with section 1501, the trustee or other person, including an examiner, authorized by the court, shall, subject to the supervision of the court, cooperate to the maximum extent possible with a foreign court or a foreign representative.

(b) The trustee or other person, including an examiner, authorized by the court is entitled, subject to the supervision of the court, to communicate directly with a foreign court or a foreign representative.

(Added Pub. L. 109–8, title VIII, §801(a), Apr. 20, 2005, 119 Stat. 143.)

## EFFECTIVE DATE

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

## §1527. Forms of cooperation

Cooperation referred to in sections 1525 and 1526 may be implemented by any appropriate means, including—

(1) appointment of a person or body, including an examiner, to act at the direction of the court;

(2) communication of information by any means considered appropriate by the court;

(3) coordination of the administration and supervision of the debtor's assets and affairs;

(4) approval or implementation of agreements concerning the coordination of proceedings; and

(5) coordination of concurrent proceedings regarding the same debtor.

(Added Pub. L. 109–8, title VIII, §801(a), Apr. 20, 2005, 119 Stat. 143.)

## EFFECTIVE DATE

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

### SUBCHAPTER V—CONCURRENT PROCEEDINGS

## §1528. Commencement of a case under this title after recognition of a foreign main proceeding

After recognition of a foreign main proceeding, a case under another chapter of this title may be commenced only if the debtor has assets in the United States. The effects of such case shall be restricted to the assets of the debtor that are within the territorial jurisdiction of the United States and, to the extent necessary to implement cooperation and coordination under sections 1525, 1526, and 1527, to other assets of the debtor that are within the jurisdiction of the court under sections 541(a) of this title, and 1334(e) of title 28, to the extent that such other assets are not subject to the jurisdiction and control of a foreign proceeding that has been recognized under this chapter.

## 2714

(Added Pub. L. 109–8, title VIII, §801(a), Apr. 20, 2005, 119 Stat. 143.)

### EFFECTIVE DATE

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

## §1529. Coordination of a case under this title and a foreign proceeding

If a foreign proceeding and a case under another chapter of this title are pending concurrently regarding the same debtor, the court shall seek cooperation and coordination under sections 1525, 1526, and 1527, and the following shall apply:

(1) If the case in the United States is pending at the time the petition for recognition of such foreign proceeding is filed—

(A) any relief granted under section 1519 or 1521 must be consistent with the relief granted in the case in the United States; and

(B) section 1520 does not apply even if such foreign proceeding is recognized as a foreign main proceeding.

(2) If a case in the United States under this title commences after recognition, or after the date of the filing of the petition for recognition, of such foreign proceeding—

(A) any relief in effect under section 1519 or 1521 shall be reviewed by the court and shall be modified or terminated if inconsistent with the case in the United States; and

(B) if such foreign proceeding is a foreign main proceeding, the stay and suspension referred to in section 1520(a) shall be modified or terminated if inconsistent with the relief granted in the case in the United States.

(3) In granting, extending, or modifying relief granted to a representative of a foreign nonmain proceeding, the court must be satisfied that the relief relates to assets that, under the laws of the United States, should be administered in the foreign nonmain proceeding or concerns information required in that proceeding.

(4) In achieving cooperation and coordination under sections 1528 and 1529, the court may grant any of the relief authorized under section 305.

(Added Pub. L. 109–8, title VIII, §801(a), Apr. 20, 2005, 119 Stat. 144; amended Pub. L. 111–327, §2(a)(48), Dec. 22, 2010, 124 Stat. 3562.)

### AMENDMENTS

**2010**—Par. (1). Pub. L. 111–327, which directed amendment of par. (1) by inserting "is" after "States", was executed by making the insertion only in introductory provisions to reflect the probable intent of Congress.

### EFFECTIVE DATE

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

## §1530. Coordination of more than 1 foreign proceeding

In matters referred to in section 1501, with respect to more than 1 foreign proceeding regarding the debtor, the court shall seek cooperation and coordination under sections 1525, 1526, and 1527, and the following shall apply:

(1) Any relief granted under section 1519 or 1521 to a representative of a foreign nonmain proceeding after recognition of a foreign main proceeding must be consistent with the foreign main proceeding.

(2) If a foreign main proceeding is recognized after recognition, or after the filing of a petition for

2715

recognition, of a foreign nonmain proceeding, any relief in effect under section 1519 or 1521 shall be reviewed by the court and shall be modified or terminated if inconsistent with the foreign main proceeding.

(3) If, after recognition of a foreign nonmain proceeding, another foreign nonmain proceeding is recognized, the court shall grant, modify, or terminate relief for the purpose of facilitating coordination of the proceedings.

(Added Pub. L. 109–8, title VIII, §801(a), Apr. 20, 2005, 119 Stat. 144.)

### EFFECTIVE DATE

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

## §1531. Presumption of insolvency based on recognition of a foreign main proceeding

In the absence of evidence to the contrary, recognition of a foreign main proceeding is, for the purpose of commencing a proceeding under section 303, proof that the debtor is generally not paying its debts as such debts become due.

(Added Pub. L. 109–8, title VIII, §801(a), Apr. 20, 2005, 119 Stat. 144.)

### EFFECTIVE DATE

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

## §1532. Rule of payment in concurrent proceedings

Without prejudice to secured claims or rights in rem, a creditor who has received payment with respect to its claim in a foreign proceeding pursuant to a law relating to insolvency may not receive a payment for the same claim in a case under any other chapter of this title regarding the debtor, so long as the payment to other creditors of the same class is proportionately less than the payment the creditor has already received.

(Added Pub. L. 109–8, title VIII, §801(a), Apr. 20, 2005, 119 Stat. 145.)

### PRIOR PROVISIONS

Sections 15101 to 151326 of prior chapter 15 were repealed by Pub. L. 99–554, title II, §231, Oct. 27, 1986, 100 Stat. 3103.

Section 15101, Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2652, related to definitions.

Section 15102, Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2652, related to a rule of construction.

Section 15103, Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2652; Pub. L. 98–353, title III, §§311 (b)(3), 318(b), July 10, 1984, 98 Stat. 355, 357, related to applicability of subchapters and sections.

Section 15303, Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2653, related to involuntary cases.

Section 15321, Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2653, related to eligibility to serve as trustee.

Section 15322, Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2653, related to qualification of trustee.

Section 15324, Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2653, related to removal of trustee or examiner.

Section 15326, Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2653, related to limitation on compensation of trustee.

Section 15330, Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2653, related to compensation of officers.

### 2716

Section 15343, Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2653, related to examination of debtor.

Section 15345, Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2654; Pub. L. 97–258, §3(c), Sept. 13, 1982, 96 Stat. 1064, related to money of estates.

Section 15701, Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2654, related to interim trustee.

Section 15703, Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2654, related to successor trustee.

Section 15704, Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2655, related to duties of trustee.

Section 15727, Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2655, related to discharge.

Section 151102, Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2655, related to creditors' and equity security holders' committees.

Section 151104, Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2655, related to appointment of trustee or examiner.

Section 151105, Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2656, related to termination of trustee's appointment.

Section 151163, Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2656, related to appointment of trustee.

Section 151302, Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2656; Pub. L. 98–353, title III, §§311(b)(4), 534, July 10, 1984, 98 Stat. 355, 390, related to trustees.

Section 151326, Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2657, related to payments.

Effective date and applicability of repeal by Pub. L. 99–554 dependent upon the judicial district involved, see section 302(d), (e) of Pub. L. 99–554, set out in an Effective Date of 1986 Amendment; Transition and Administrative Provisions note under section 581 of Title 28, Judiciary and Judicial Procedure.

Pub. L. 95–598, title IV, §408(c), Nov. 6, 1978, 92 Stat. 2687, as amended by Pub. L. 98–166, title II, §200, Nov. 28, 1983, 97 Stat. 1081; Pub. L. 98–353, title III, §323, July 10, 1984, 98 Stat. 358; Pub. L. 99–429, Sept. 30, 1986, 100 Stat. 985; Pub. L. 99–500, §101(b) [title II, §200], Oct. 18, 1986, 100 Stat. 1783–39, 1783-45, and Pub. L. 99–591, §101(b) [title II, §200], Oct. 30, 1986, 100 Stat. 3341–39, 3341-45; Pub. L. 99–554, title III, §307(a), Oct. 27, 1986, 100 Stat. 3125, provided for the repeal of prior chapter 15 at a prospective date, prior to repeal by Pub. L. 99–554, title III, §307(b), Oct. 27, 1986, 100 Stat. 3125.

## EFFECTIVE DATE

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

**11 U.S. Code § 1145 - Exemption from securities laws**

**(a)**Except with respect to an entity that is an underwriter as defined in subsection (b) of this section, section 5 of the Securities Act of 1933 and any State or local law requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security do not apply to—

**(1)**the offer or sale under a plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan—

**(A)**

in exchange for a claim against, an interest in, or a claim for an administrative expense in the case concerning, the debtor or such affiliate; or

**(B)**

principally in such exchange and partly for cash or property;

2718

# Tab 04

Westlaw.

▷

**Effective:[See Notes]**

United States Code Annotated Currentness
 Title 28. Judiciary and Judicial Procedure (Refs & Annos)
  Part IV. Jurisdiction and Venue (Refs & Annos)
   Chapter 85. District Courts; Jurisdiction (Refs & Annos)
   **§ 1334. Bankruptcy cases and proceedings**

**(a)** Except as provided in subsection (b) of this section, the district courts shall have original and exclusive jurisdiction of all cases under title 11.

**(b)** Except as provided in subsection (e)(2), and notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

**(c)(1)** Except with respect to a case under chapter 15 of title 11, nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

**(2)** Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

**(d)** Any decision to abstain or not to abstain made under subsection (c) (other than a decision not to abstain in a proceeding described in subsection (c)(2)) is not reviewable by appeal or otherwise by the court of appeals under section 158(d), 1291, or 1292 of this title or by the Supreme Court of the United States under section 1254 of this title. Subsection (c) and this subsection shall not be construed to limit the applicability of the stay provided for by section 362 of title 11, United States Code, as such section applies to an action affecting the property of the estate in bankruptcy.

**(e)** The district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction--

  **(1)** of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate; and

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(2)** over all claims or causes of action that involve construction of section 327 of title 11, United States Code, or rules relating to disclosure requirements under section 327.

CREDIT(S)

(June 25, 1948, c. 646, 62 Stat. 931; Nov. 6, 1978, Pub.L. 95-598, Title II, § 238(a), 92 Stat. 2667; July 10, 1984, Pub.L. 98-353, Title I, § 101(a), 98 Stat. 333; Oct. 27, 1986, Pub.L. 99-554, Title I, § 144(e), 100 Stat. 3096; Dec. 1, 1990, Pub.L. 101-650, Title III, § 309(b), 104 Stat. 5113; Oct. 22, 1994, Pub.L. 103-394, Title I, § 104(b), 108 Stat. 4109; Apr. 20, 2005, Pub.L. 109-8, Title III, § 324(a), Title VIII, § 802(c)(2), Title XII, § 1219, 119 Stat. 98, 145, 195.)

2005 Acts. Pub.L. 109-8, Title III, § 324(b), Apr. 20, 2005, 119 Stat. 98, provided that: "This section [amending subsecs. (b) and (e) of this section] shall only apply to cases filed after the date of enactment of this Act [Apr. 20, 2005]."

Except as otherwise provided, amendments by Pub.L. 109-8 effective 180 days after April 20, 2005, and inapplicable with respect to cases commenced under Title 11 before the effective date, see Pub.L. 109-8, § 1501, set out as a note under 11 U.S.C.A. § 101.

Current through P.L. 113-120 approved 6-10-14

Westlaw. (C) 2014 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Tab 05

**Schaffer, Eric 2/22/2023**
**For Educational Use Only**

**7 Hawkland UCC Series § 8-503:5**

**Uniform Commercial Code Series** | June 2022 Update

**Uniform Commercial Code**

**Article 8. Investment Securities**
Written by the late William D. Hawkland, James S. Rogers & Carl S. Bjerre; Edited by Carl S. Bjerre

**Part 5. Security Entitlements**

**8-503. Property Interest of Entitlement Holder in Financial Asset Held by Securities Intermediary**

# § 8-503:5 Enforcement of entitlement holders' property interest—In general

While subsections 8-503(a) and (b) recognize that the entitlement holders of a securities intermediary have a special form of property interest in the assets held by the intermediary, it does not follow that this property interest is governed by the ordinary rules of Anglo-American personal property law. As the Official Comment to section 8-503 notes, "the incidents of this property interest are established by the rules of Article 8, not by common law property concepts."[1] As a matter of general common law concepts of personal property, a person who has a property interest in an item of personal property can assert that claim against any person into whose hands the item may fall, except insofar as adverse claim cut-off rules may provide otherwise. The starting point, however, is that the property interest is a claim to a specific item, and the claim follows the item. Those concepts have only limited application to the indirect holding system.

To be sure, a security entitlement is a form of property interest in the assets held by the intermediary—in the sense that the entitlement holders are not merely contract creditors of the intermediary. However, a security entitlement is not a discrete claim to a specific identifiable item. Rather, it is a package of rights against the intermediary and interest in the property held by the intermediary, and it is a package of rights and interest that is inherently held in common with others. The core content of a security entitlement is the right of the entitlement holder to be treated as entitled to all of the economic and corporate rights that comprise the underlying financial asset. That is a right which runs against the entitlement holder's own intermediary. As the Official Comment notes:

> [one of the] fundamental principles of the indirect holding system rules [is] that the entitlement holder can look only to that intermediary for performance of the obligations. The entitlement holder cannot assert rights directly against other persons, such as other intermediaries through whom the intermediary holds the positions, or third parties to whom the intermediary may have wrongfully transferred interests, except in extremely unusual circumstances where the third party was itself a participant in the wrongdoing.[2]

Subsections 8-503(c), (d), and (e) reflect this fundamental principle. Subsection 8-503(c) states how an entitlement holder's property interest may be enforced against the securities intermediary itself. Subsections 8-503(d) and (e) state the limited

**Schaffer, Eric 2/22/2023**
**For Educational Use Only**

§ 8-503:5 Enforcement of entitlement holders' property..., 7 Hawkland UCC...

circumstances in which the entitlement holder's property interest can be asserted against a transferee from the securities intermediary.

Westlaw. © 2022 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

**Footnotes**

[1]     U.C.C. § 8-503, Official Comment 2. See S.E.C. v. Credit Bancorp, Ltd., 43 U.C.C. Rep. Serv. 2d 397 (S.D. N.Y. 2000), order aff'd on other grounds, 290 F.3d 80, 47 U.C.C. Rep. Serv. 2d 1467 (2d Cir. 2002) (rights as between entitlement holder and securities intermediary are established by Part 5 of Article 8 itself and not by the common law of bailment); In re Lehman Brothers Holdings Inc., 95 U.C.C. Rep. Serv. 2d 481 (S.D. N.Y. 2018) (disallowing customer claims based on common law, citing Comment 1).

[2]     U.C.C. § 8-503, Official Comment 2.

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Schaffer, Eric 2/22/2023
For Educational Use Only

**7 Hawkland UCC Series § 8-503:6**

Uniform Commercial Code Series | June 2022 Update

Uniform Commercial Code

Article 8. Investment Securities
Written by the late William D. Hawkland, James S. Rogers & Carl S. Bjerre; Edited by Carl S. Bjerre

Part 5. Security Entitlements

8-503. Property Interest of Entitlement Holder in Financial Asset Held by Securities Intermediary

# § 8-503:6 Enforcement of entitlement holders' property interest against intermediary

Subsection 8-503(c) states that an entitlement holder's property interest in assets held by the intermediary, as described in subsection 8-503(a), may be enforced against the securities intermediary itself only by exercise of the entitlement holders rights under sections 8-505 through 8-508. This statement is, in essence, a definitional truism. A security entitlement is defined in subsection 8-102(a)(17) as "the rights and property interest of an entitlement holder with respect to a financial asset specified in Part 5." Sections 8-505 through 8-508 specify those elements of the package of rights and interests that comprise a security entitlement that vest rights in an individual entitlement holder with respect to that person's individual security entitlement. Section 8-505 provides that the intermediary will pass through to the entitlement holder any payments or distribution made with respect to the securities. Section 8-506 provides that the intermediary will exercise voting rights and other rights and privileges of ownership of the securities in the fashion directed by the entitlement holder. Section 8-507 provides that the intermediary will transfer or otherwise dispose of the positions at the direction of the entitlement holder. Section 8-508 provides that the intermediary will act at the direction of the entitlement holder to convert the position into any other available form of securities holding, e.g., obtain and deliver a certificate. So long as the intermediary remains able to perform these duties, the entitlement holder's expectation of being treated by the securities intermediary as entitled to all of the economic and corporate rights that comprise the underlying security is fully satisfied. Thus, it is neither appropriate nor permissible to allow an individual entitlement holder to seek by some form of legal process to lay claim to some specific representation of that underlying security that may be in the possession or under the control of the intermediary.[1]

Westlaw. © 2022 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

**Footnotes**

[1]    See S.E.C. v. Credit Bancorp, Ltd., 43 U.C.C. Rep. Serv. 2d 397 (S.D. N.Y. 2000), order aff'd on other grounds, 290 F.3d 80, 47 U.C.C. Rep. Serv. 2d 1467 (2d Cir. 2002) (entitlement holder may exercise rights

**Schaffer, Eric 2/22/2023**
**For Educational Use Only**

**§ 8-503:6 Enforcement of entitlement holders' property..., 7 Hawkland UCC...**

against its securities intermediary only through U.C.C. §§ 8-505 through 8-508); see also Harris v. TD Ameritrade Inc., 338 F. Supp. 3d 170, 96 U.C.C. Rep. Serv. 2d 1028 (S.D. N.Y. 2018) in § 8-508:2.

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 06

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

# Union Calendar No. 14

| 109TH CONGRESS<br>*1st Session* } | HOUSE OF REPRESENTATIVES | { REPT. 109–31<br>Part 1 |
|---|---|---|

# BANKRUPTCY ABUSE PREVENTION AND CONSUMER PROTECTION ACT OF 2005

R E P O R T

OF THE

## COMMITTEE ON THE JUDICIARY HOUSE OF REPRESENTATIVES

TO ACCOMPANY

## S. 256

together with

## DISSENTING, ADDITIONAL DISSENTING, AND ADDITIONAL MINORITY VIEWS



APRIL 8, 2005.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

105

the Bankruptcy Code to create an exception to the automatic stay whereby such setoff could occur without court order unless it would not be permitted under applicable nonbankruptcy law because of a pending action to determine the amount or legality of the tax liability. In that circumstance, the governmental authority may hold the refund pending resolution of the action, unless the court, on motion of the trustee and after notice and a hearing, grants the taxing authority adequate protection pursuant to section 361.

*Sec. 719. Special Provisions Related to the Treatment of State and Local Taxes.* Section 719 of the Act conforms state and local income tax administrative issues to the Internal Revenue Code. For example, under Federal law, a bankruptcy petitioner filing on March 5 has two tax years (January 1 to March 4, and March 5 to December 31). Under the Bankruptcy Code, however, state and local tax years are divided differently (January 1 to March 5, and March 6 to December 31). Section 719 requires the states to follow the Federal convention. It conforms state and local tax administration to the Internal Revenue Code in the following areas: division of tax liabilities and responsibilities between the estate and the debtor, tax consequences with respect to partnerships and transfers of property, and the taxable period of a debtor. Section 719 does not conform state and local tax rates to Federal tax rates.

*Sec. 720. Dismissal for Failure to Timely File Tax Returns.* Under existing law, there is no definitive rule with respect to whether a bankruptcy court may dismiss a bankruptcy case if the debtor fails to file returns for taxes incurred postpetition. Section 720 of the Act amends section 521 of the Bankruptcy Code to allow a taxing authority to request that the court dismiss or convert a bankruptcy case if the debtor fails to file a postpetition tax return or obtain an extension. If the debtor does not file the required return or obtain the extension within 90 days from the time of the request by the taxing authority to file the return, the court must convert or dismiss the case, whichever is in the best interest of creditors and the estate.

#### TITLE VIII. ANCILLARY AND OTHER CROSS-BORDER CASES

Title VIII of the Act adds a new chapter to the Bankruptcy Code for transnational bankruptcy cases. It incorporates the Model Law on Cross-Border Insolvency to encourage cooperation between the United States and foreign countries with respect to transnational insolvency cases. Title VIII is intended to provide greater legal certainty for trade and investment as well as to provide for the fair and efficient administration of cross-border insolvencies, which protects the interests of creditors and other interested parties, including the debtor. In addition, it serves to protect and maximize the value of the debtor's assets.

*Sec. 801. Amendment to Add Chapter 15 to Title 11, United States Code.* Section 801 introduces chapter 15 to the Bankruptcy Code, which is the Model Law on Cross-Border Insolvency ("Model Law") promulgated by the United Nations Commission on International Trade Law ("UNCITRAL") at its Thirtieth Session on May 12–30,

106

1997.[101] Cases brought under chapter 15 are intended to be ancillary to cases brought in a debtor's home country, unless a full United States bankruptcy case is brought under another chapter. Even if a full case is brought, the court may decide under section 305 to stay or dismiss the United States case under the other chapter and limit the United States' role to an ancillary case under this chapter.[102] If the full case is not dismissed, it will be subject to the provisions of this chapter governing cooperation, communication and coordination with the foreign courts and representatives. In any case, an order granting recognition is required as a prerequisite to the use of sections 301 and 303 by a foreign representative.

*Sec. 1501. Purpose and scope of application.* Section 1501 combines the Preamble to the Model Law (subsection (1)) with its article 1 (subsections (2) and (3)).[103] It largely tracks the language of the Model Law with appropriate United States references. However, it adds in subsection (3) an exclusion of certain natural persons who may be considered ordinary consumers. Although the consumer exclusion is not in the text of the Model Law, the discussions at UNCITRAL recognized that such exclusion would be necessary in countries like the United States where there are special provisions for consumer debtors in the insolvency laws.[104]

The reference to section 109(e) essentially defines "consumer debtors" for purposes of the exclusion by incorporating the debt limitations of that section, but not its requirement of regular income. The exclusion adds a requirement that the debtor or debtor couple be citizens or long-term legal residents of the United States. This ensures that residents of other countries will not be able to manipulate this exclusion to avoid recognition of foreign proceedings in their home countries or elsewhere.

The first exclusion in subsection (c) constitutes, for the United States, the exclusion provided in article 1, subsection (2), of the Model Law.[105] Foreign representatives of foreign proceedings which are excluded from the scope of chapter 15 may seek comity from courts other than the bankruptcy court since the limitations of section 1509(b)(2) and (3) would not apply to them.

The reference to section 109(b) interpolates into chapter 15 the entities governed by specialized insolvency regimes under United States law which are currently excluded from liquidation proceedings under title 11. Section 1501 contains an exception to the section 109(b) exclusions so that foreign proceedings of foreign insurance companies are eligible for recognition and relief under chapter 15 as they had been under section 304. However, section 1501(d) has the effect of leaving to State regulation any deposit, es-

---

[101] The text of the Model Law and the Report of UNCITRAL on its adoption are found at U.N. G.A., 52d Sess., Supp. No. 17 (A/52/17) ("Report"). That Report and the Guide to Enactment of the UNCITRAL Model Law on Cross-Border Insolvency, U.N. Gen. Ass., UNCITRAL 30th Sess. U.N. Doc. A/CN.9/442 (1997) ("Guide"), which was discussed in the negotiations leading to the Model Law and published by UNCITRAL as an aid to enacting countries, should be consulted for guidance as to the meaning and purpose of its provisions. The development of the provisions in the negotiations at UNCITRAL, in which the United States was an active participant, is recounted in the interim reports of the Working Group that are cited in the Report.
[102] *See* section 1529 and commentary.
[103] Guide at 16–19.
[104] *See id.* at 18, ¶60; 19 ¶66.
[105] *Id.* at 17.

107

crow, trust fund or the like posted by a foreign insurer under State law.

*Sec. 1502. Definitions.* "Debtor" is given a special definition for this chapter. This definition does not come from the Model Law, but is necessary to eliminate the need to refer repeatedly to "the same debtor as in the foreign proceeding." With certain exceptions, the term "person" used in the Model Law has been replaced with "entity," which is defined broadly in section 101(15) to include natural persons and various legal entities, thus matching the intended breadth of the term "person" in the Model Law. The exceptions include contexts in which a natural person is intended and those in which the Model Law language already refers to both persons and entities other than persons. The definition of "trustee" for this chapter ensures that debtors in possession and debtors, as well as trustees, are included in the term.[106]

The definition of "within the territorial jurisdiction of the United States" in subsection (7) is not taken from the Model Law. It has been added because the United States, like some other countries, asserts insolvency jurisdiction over property outside its territorial limits under appropriate circumstances. Thus a limiting phrase is useful where the Model Law and this chapter intend to refer only to property within the territory of the enacting state. In addition, a definition of "recognition" supplements the Model Law definitions and merely simplifies drafting of various other sections of chapter 15.

Two key definitions of "foreign proceeding" and "foreign representative," are found in sections 101(23) and (24), which have been amended consistent with Model Law article 2.[107] The definitions of "establishment," "foreign court," "foreign main proceeding," and "foreign non-main proceeding" have been taken from Model Law article 2, with only minor language variations necessary to comport with United States terminology. Additionally, defined terms have been placed in alphabetical order.[108] In order to be recognized as a foreign non-main proceeding, the debtor must at least have an establishment in that foreign country.[109]

*Sec. 1503. International obligations of the United States.* This section is taken exactly from the Model Law with only minor adaptations of terminology.[110] Although this section makes an international obligation prevail over chapter 15, the courts will attempt to read the Model Law and the international obligation so as not to conflict, especially if the international obligation addresses a subject matter less directly related than the Model Law to a case before the court.

*Sec. 1504. Commencement of ancillary case.* Article 4 of the Model Law is designed for designation of the competent court which will exercise jurisdiction under the Model Law. In United States law, section 1334(a) of title 28 gives exclusive jurisdiction to the district

---

[106] *See* section 1505.
[107] Guide at 19–21, ¶¶67–68.
[108] *See* Guide at 19, (Model Law) 21 ¶75 (concerning establishment); 21 ¶74 (concerning foreign court); 21 ¶¶72, 73 and 75 (concerning foreign main and non-main proceedings).
[109] *See id.* at 21, ¶75.
[110] *See id.* at 22, Art. 3.

108

courts in a "case" under this title.[111] Therefore, since the competent court has been determined in title 28, this section instead provides that a petition for recognition commences a "case," an approach that also invokes a number of other useful procedural provisions. In addition, a new subsection (P) to section 157 of title 28 makes cases under this chapter part of the core jurisdiction of bankruptcy courts if referred by the district courts, thus completing the designation of the competent court. Finally, the particular bankruptcy court that will rule on the petition is determined pursuant to a revised section 1410 of title 28 governing venue and transfer.[112]

The title "ancillary" in the title of this section and in the title of this chapter emphasizes the United States policy in favor of a general rule that countries other than the home country of the debtor, where a main proceeding would be brought, should usually act through ancillary proceedings in aid of the main proceedings, in preference to a system of full bankruptcies (often called "secondary" proceedings) in each state where assets are found. Under the Model Law, notwithstanding the recognition of a foreign main proceeding, full bankruptcy cases are permitted in each country (see sections 1528 and 1529). In the United States, the court will have the power to suspend or dismiss such cases where appropriate under section 305.

*Sec. 1505. Authorization to act in a foreign country.* The language in this section varies from the wording of article 5 of the Model Law as necessary to comport with United States law and terminology. The slight alteration to the language in the last sentence is meant to emphasize that the identification of the trustee or other entity entitled to act is under United States law, while the scope of actions that may be taken by the trustee or other entity under foreign law is limited by the foreign law.[113]

The related amendment to section 586(a)(3) of title 28 makes acting pursuant to authorization under this section an additional power of a trustee or debtor in possession. While the Model Law automatically authorizes an administrator to act abroad, this section requires all trustees and debtors to obtain court approval before acting abroad. That requirement is a change from the language of the Model Law, but one that is purely internal to United States law.[114] Its main purpose is to ensure that the court has knowledge and control of possibly expensive activities, but it will have the collateral benefit of providing further assurance to foreign courts that the United States debtor or representative is under judicial authority and supervision. This requirement means that the

---

[111] *See id.* at 23, Art. 4.
[112] New section 1410 of title 28 provides as follows:

A case under chapter 15 of title 11 may be commenced in the district court for the district——
   (1) in which the debtor has its principal place of business or principal assets in the United States;
   (2) if the debtor does not have a place of business or assets in the United States, in which there is pending against the debtor an action or proceeding or enforcement of judgment in a Federal or State court; or
   (3) in a case other than those specified in paragraph (1) or (2), in which venue will be consistent with the interests of justice and the convenience of the parties having regard to the relief sought by the foreign representative.

[113] *See* Guide at 24.
[114] *See id.* at 24, Art. 5.

109

first-day orders in reorganization cases should include authorization to act under this section where appropriate.

This section also contemplates the designation of an examiner or other natural person to act for the estate in one or more foreign countries where appropriate. One instance might be a case in which the designated person had a special expertise relevant to that assignment. Another might be where the foreign court would be more comfortable with a designated person than with an entity like a debtor in possession. Either are to be recognized under the Model Law.[115]

*Sec. 1506. Public policy exception.* This provision follows the Model Law article 5 exactly, is standard in UNCITRAL texts, and has been narrowly interpreted on a consistent basis in courts around the world. The word "manifestly" in international usage restricts the public policy exception to the most fundamental policies of the United States.[116]

*Sec. 1507. Additional assistance.* Subsection (1) follows the language of Model Law article 7.[117] Subsection (2) makes the authority for additional relief (beyond that permitted under sections 1519–1521, below) subject to the conditions for relief heretofore specified in United States law under section 304, which is repealed. This section is intended to permit the further development of international cooperation begun under section 304, but is not to be the basis for denying or limiting relief otherwise available under this chapter. The additional assistance is made conditional upon the court's consideration of the factors set forth in the current subsection 304(c) in a context of a reasonable balancing of interests following current case law. The references to "estate" in section 304 have been changed to refer to the debtor's property, because many foreign systems do not create an estate in insolvency proceedings of the sort recognized under this chapter. Although the case law construing section 304 makes it clear that comity is the central consideration, its physical placement as one of six factors in subsection (c) of section 304 is misleading, since those factors are essentially elements of the grounds for granting comity. Therefore, in subsection (2) of this section, comity is raised to the introductory language to make it clear that it is the central concept to be addressed.[118]

*Sec. 1508. Interpretation.* This provision follows conceptually Model Law article 8 and is a standard one in recent UNCITRAL treaties and model laws. Changes to the language were made to express the concepts more clearly in United States vernacular.[119] Interpretation of this chapter on a uniform basis will be aided by reference to the Guide and the Reports cited therein, which explain the reasons for the terms used and often cite their origins as well. Uniform interpretation will also be aided by reference to CLOUT, the UNCITRAL Case Law On Uniform Texts, which is a service of UNCITRAL. CLOUT receives reports from national reporters all over the world concerning court decisions interpreting treaties,

---

[115] *See id.* at 23–24, ¶82.
[116] *See id.* at 25.
[117] *Id.* at 26.
[118] *Id.*
[119] *Id.* at 26, ¶91.

110

model laws, and other text promulgated by UNCITRAL. Not only are these sources persuasive, but they advance the crucial goal of uniformity of interpretation. To the extent that the United States courts rely on these sources, their decisions will more likely be regarded as persuasive elsewhere.

*Sec. 1509. Right of direct access.* This section implements the purpose of article 9 of the Model Law, enabling a foreign representative to commence a case under this chapter by filing a petition directly with the court without preliminary formalities that may delay or prevent relief. It varies the language to fit United States procedural requirements and it imposes recognition of the foreign proceeding as a condition to further rights and duties of the foreign representative. If recognition is granted, the foreign representative will have full capacity under United States law (subsection (b)(1)), may request such relief in a state or Federal court other than the bankruptcy court (subsection (b)(2)), and shall be granted comity or cooperation by such non-bankruptcy court (subsection (b)(3) and (c)). Subsections (b)(2), (b)(3), and (c) make it clear that chapter 15 is intended to be the exclusive door to ancillary assistance to foreign proceedings. The goal is to concentrate control of these questions in one court. That goal is important in a Federal system like that of the United States with many different courts, state and federal, that may have pending actions involving the debtor or the debtor's property. This section, therefore, completes for the United States the work of article 4 of the Model Law ("competent court") as well as article 9.[120]

Although a petition under current section 304 is the proper method for achieving deference by a United States court to a foreign insolvency proceeding under present law, some cases in state and Federal courts under current law have granted comity suspension or dismissal of cases involving foreign proceedings without requiring a section 304 petition or even referring to the requirements of that section. Even if the result is correct in a particular case, the procedure is undesirable, because there is room for abuse of comity. Parties would be free to avoid the requirements of this chapter and the expert scrutiny of the bankruptcy court by applying directly to a state or Federal court unfamiliar with the statutory requirements. Such an application could be made after denial of a petition under this chapter. This section concentrates the recognition and deference process in one United States court, ensures against abuse, and empowers a court that will be fully informed of the current status of all foreign proceedings involving the debtor.[121]

Subsection (d) has been added to ensure that a foreign representative cannot seek relief in courts in the United States after being denied recognition by the court under this chapter. Subsection (e) makes activities in the United States by a foreign representative subject to applicable United States law, just as 28 U.S.C. section 959 does for a domestic trustee in bankruptcy.[122] Subsection (f) provides a limited exception to the prior recognition requirement so that collection of a claim which is property of the debtor, for exam-

---

[120] *See id.* at 23, Art. 4, ¶¶79–83; 27 Art. 9, ¶93.
[121] *See id.* at 27, Art. 9; 34–35, Art. 15 and ¶¶116–119; 39–40, Art. 18, ¶¶133–134; *see also* sections 1515(3), 1518.
[122] *Id.* at 27, ¶93.

111

ple an account receivable, by a foreign representative may proceed without commencement of a case or recognition under this chapter.

*Sec. 1510. Limited jurisdiction.* Section 1510, article 10 of the Model Law, is modeled on section 306 of the Bankruptcy Code. Although the language referring to conditional relief in section 306 is not included, the court has the power under section 1522 to attach appropriate conditions to any relief it may grant. Nevertheless, the authority in section 1522 is not intended to permit the imposition of jurisdiction over the foreign representative beyond the boundaries of the case under this chapter and any related actions the foreign representative may take, such as commencing a case under another chapter of this title.

*Sec. 1511. Commencement of Case Under Section 301 or 303.* This section reflects the intent of article 11 of the Model Law, but adds language that conforms to United States law or that is otherwise necessary in the United States given its many bankruptcy court districts and the importance of full information and coordination among them.[123] Article 11 does not distinguish between voluntary and involuntary proceedings, but seems to have implicitly assumed an involuntary proceeding.[124] Subsection 1(a)(2) goes farther and permits a voluntary filing, with its much simpler requirements, if the foreign proceeding that has been recognized is a main proceeding.

*Sec. 1512. Participation of a foreign representative in a case under this title.* This section tracks article 12 of the Model Law with a slight alteration to tie into United States procedural terminology.[125] The effect of this section is to make the recognized foreign representative a party in interest in any pending or later commenced United States bankruptcy case.[126] Throughout this chapter, the word "case" has been substituted for the word "proceeding" in the Model Law when referring to cases under the United States Bankruptcy Code, to conform to United States usage.

*Sec. 1513. Access of foreign creditors to a case under this title.* This section mandates nondiscriminatory or "national" treatment for foreign creditors, except as provided in subsection (b) and section 1514. It follows the intent of Model Law article 13, but the language required alteration to fit into the Bankruptcy Code.[127] The law as to priority for foreign claims that fit within a class given priority treatment under section 507 (for example, foreign employees or spouses) is unsettled. This section permits the continued development of case law on that subject and its general principle of national treatment should be an important factor to be considered. At a minimum, under this section, foreign claims must receive the treatment given to general unsecured claims without priority, unless they are in a class of claims in which domestic creditors would also be subordinated.[128] The Model Law allows for an exception to the policy of nondiscrimination as to foreign revenue and other

---

[123] *See id.* at 28, Art. 11.
[124] *Id.* at 38, ¶¶97–99.
[125] *Id.* at 29, Art. 12.
[126] *Id.* at 29, ¶¶10–102.
[127] *Id.* at 30, ¶103.
[128] *See id.* at 30, ¶104.

112

public law claims.[129] Such claims (such as tax and Social Security claims) have been traditionally denied enforcement in the United States, inside and outside of bankruptcy. The Bankruptcy Code is silent on this point, so the rule is purely a matter of traditional case law. It is not clear if this policy should be maintained or modified, so this section leaves this question to developing case law. It also allows the Department of the Treasury to negotiate reciprocal arrangements with our tax treaty partners in this regard, although it does not mandate any restriction of the evolution of case law pending such negotiations.

*Sec. 1514. Notification of foreign creditors concerning a case under title 11.* This section ensures that foreign creditors receive proper notice of cases in the United States.[130] As "foreign creditor" is not a defined term, foreign addresses are used as the distinguishing factor. The Federal Rules of Bankruptcy Procedure ("Rules") should be amended to conform to the requirements of this section, including a special form for initial notice to such creditors. In particular, the Rules must provide additional time for such creditors to file proofs of claim where appropriate and require the court to make specific orders in that regard in proper circumstances. The notice must specify that secured claims must be asserted, because in many countries such claims are not affected by an insolvency proceeding and need not be filed.[131] If a foreign creditor has made an appropriate request for notice, it will receive notices in every instance where notices would be sent to other creditors who have made such requests. Subsection (d) replaces the reference to "a reasonable time period" in Model Law article 14(3)(a).[132] It makes clear that the Rules, local rules, and court orders must make appropriate adjustments in time periods and bar dates so that foreign creditors have a reasonable time within which to receive notice or take an action.

*Sec. 1515. Application for recognition of a foreign proceeding.* This section follows article 15 of the Model Law with minor changes.[133] The Rules will require amendment to provide forms for some or all of the documents mentioned in this section, to make necessary additions to Rules 1000 and 2002 to facilitate appropriate notices of the hearing on the petition for recognition, and to require filing of lists of creditors and other interested persons who should receive notices. Throughout the Model Law, the question of notice procedure is left to the law of the enacting state.[134]

*Sec. 1516. Presumptions concerning recognition.* This section follows article 16 of the Model Law with minor changes.[135] Although sections 1515 and 1516 are designed to make recognition as simple and expedient as possible, the court may hear proof on any element stated. The ultimate burden as to each element is on the foreign representative, although the court is entitled to shift the burden to the extent indicated in section 1516. The word "proof" in subsection (3) has been changed to "evidence" to make it clearer using United

---

[129] *See id.* at 31, ¶105.
[130] *See* Model Law, Art. 14; Guide at 31–32, ¶¶106–109.
[131] Guide at 33, ¶111.
[132] *Id.* at 31, Art. 14(3)(a).
[133] *Id.* at 33.
[134] *See id.* at 36, ¶121.
[135] *Id.* at 36

113

States terminology that the ultimate burden is on the foreign representative.[136] "Registered office" is the term used in the Model Law to refer to the place of incorporation or the equivalent for an entity that is not a natural person.[137] The presumption that the place of the registered office is also the center of the debtor's main interest is included for speed and convenience of proof where there is no serious controversy.

*Sec. 1517. Order granting recognition.* This section closely tracks article 17 of the Model Law, with a few exceptions.[138] The decision to grant recognition is not dependent upon any findings about the nature of the foreign proceedings of the sort previously mandated by section 304(c) of the Bankruptcy Code. The requirements of this section, which incorporates the definitions in section 1502 and sections 101(23) and (24), are all that must be fulfilled to attain recognition. Reciprocity was specifically suggested as a requirement for recognition on more than one occasion in the negotiations that resulted in the Model Law. It was rejected by overwhelming consensus each time. The United States was one of the leading countries opposing the inclusion of a reciprocity requirement.[139] In this regard, the Model Law conforms to section 304, which has no such requirement.

The drafters of the Model Law understood that only a main proceeding or a non-main proceeding meeting the standards of section 1502 (that is, one brought where the debtor has an establishment) were entitled to recognition under this section. The Model Law has been slightly modified to make this point clear by referring to the section 1502 definition of main and non-main proceedings, as well as to the general definition of a foreign proceeding in section 101(23). A petition under section 1515 must show that proceeding is a main or a qualifying non-main proceeding in order to obtain recognition under this section.

Consistent with the position of various civil law representatives in the drafting of the Model Law, recognition creates a status with the effects set forth in section 1520, so those effects are not viewed as orders to be modified, as are orders granting relief under sections 1519 and 1521. Subsection (4) states the grounds for modifying or terminating recognition. On the other hand, the effects of recognition (found in section 1520 and including an automatic stay) are subject to modification under section 362(d), made applicable by section 1520(2), which permits relief from the automatic stay of section 1520 for cause.

Paragraph 1(d) of section 17 of the Model Law has been omitted as an unnecessary requirement for United States purposes, because a petition submitted to the wrong court will be dismissed or transferred under other provisions of United States law.[140] The reference to section 350 refers to the routine closing of a case that has been completed and will invoke requirements including a final re-

---

[136] *Id.* at 36, Art. 16(3).
[137] *Id.*
[138] *Id.* at 37.
[139] Report of the Working Group on Insolvency Law on the Work of Its Twentieth Session (Vienna, 7–18 Oct. 1996), at 6, ¶¶16–20.
[140] Guide at 37, Art. 17(1)(d).

114

port from the foreign representative in such form as the Rules may provide or a court may order.[141]

*Sec. 1518. Subsequent information.* This section follows the Model Law, except to eliminate the word "same," which is rendered unnecessary by the definition of "debtor" in section 1502, and to provide for a formal document to be filed with the court.[142] Judges in several jurisdictions, including the United States, have reported a need for a requirement of complete and candid reports to the court of all proceedings, worldwide, involving the debtor. This section will ensure that such information is provided to the court on a timely basis. Any failure to comply with this section will be subject to the sanctions available to the court for violations of the statute. The section leaves to the Rules the form of the required notice and related questions of notice to parties in interest, the time for filing, and the like.

*Sec. 1519. Relief may be granted upon petition for recognition of a foreign proceeding.* This section generally follows article 19 of the Model Law.[143] The bankruptcy court will have jurisdiction to grant emergency relief under Rule 7065 pending a hearing on the petition for recognition. This section does not expand or reduce the scope of section 105 as determined by cases under section 105 nor does it modify the sweep of sections 555 to 560. Subsection (d) precludes injunctive relief against police and regulatory action under section 1519, leaving section 105 as the only avenue for such relief. Subsection (e) makes clear that this section contemplates injunctive relief and that such relief is subject to specific rules and a body of jurisprudence. Subsection (f) was added to complement amendments to the Bankruptcy Code provisions dealing with financial contracts.

*Sec. 1520. Effects of recognition of a foreign main proceeding.* In general, this chapter sets forth all the relief that is available as a matter of right based upon recognition hereunder, although additional assistance may be provided under section 1507 and this chapter has no effect on any relief currently available under section 105. The stay created by article 20 of the Model Law is imported to chapter 15 from existing provisions of the Code. Subsection (a)(1) combines subsections 1(a) and (b) of article 20 of the Model Law, because section 362 imposes the restrictions required by those two subsections as well as additional restrictions.[144]

Subsections (a)(2) and (4) apply the Bankruptcy Code sections that impose the restrictions called for by subsection 1(c) of the Model Law. In both cases, the provisions are broader and more complete than those contemplated by the Model Law, but include all the restraints the Model Law provisions would impose.[145] As the foreign proceeding may or may not create an "estate" similar to that created in cases under this title, the restraints are applicable to actions against the debtor under section 362(a) and with respect to the property of the debtor under the remaining sections. The only property covered by this section is property within the

---

[141] *Id.*
[142] *Id.* at 39–40, ¶¶133, 134.
[143] *Id.* at 40.
[144] *Id.* at 42, Art. 20 1(a), (b).
[145] *Id.* at 42, 45.

115

territorial jurisdiction of the United States as defined in section 1502. To achieve effects on property of the debtor which is not within the territorial jurisdiction of the United States, the foreign representative would have to commence a case under another chapter of this title.

By applying sections 361 and 362, subsection (a) makes applicable the United States exceptions and limitations to the restraints imposed on creditors, debtors, and other in a case under this title, as stated in article 20(2) of the Model Law.[146] It also introduces the concept of adequate protection provided in sections 362 and 363. These exceptions and limitations include those set forth in sections 362(b), (c) and (d). As a result, the court has the power to terminate the stay pursuant to section 362(d), for cause, including a failure of adequate protection.[147]

Subsection (a)(2), by its reference to sections 363 and 552 adds to the powers of a foreign representative of a foreign main proceeding an automatic right to operate the debtor's business and exercise the power of a trustee under sections 363 and 542, unless the court orders otherwise. A foreign representative of a foreign main proceeding may need to continue a business operation to maintain value and granting that authority automatically will eliminate the risk of delay. If the court is uncomfortable about this authority in a particular situation, it can "order otherwise" as part of the order granting recognition.

Two special exceptions to the automatic stay are embodied in subsections (b) and (c). To preserve a claim in certain foreign countries, it may be necessary to commence an action. Subsection (b) permits the commencement of such an action, but would not allow for its further prosecution. Subsection (c) provides that there is no stay of the commencement of a full United States bankruptcy case. This essentially provides an escape hatch through which any entity, including the foreign representative, can flee into a full case. The full case, however, will remain subject to subchapters IV and V on cooperation and coordination of proceedings and to section 305 providing for stay or dismissal. Section 108 of the Bankruptcy Code provides the tolling protection intended by Model Law article 20(3), so no exception is necessary for claims that might be extinguished under United States law.[148]

*Sec. 1521. Relief that may be granted upon recognition of a foreign proceeding.* This section follows article 21 of the Model Law, with detailed changes to conform to United States law.[149] The exceptions in subsection (a)(7) relate to avoiding powers. The foreign representative's status as to such powers is governed by section 1523 below. The avoiding power in section 549 and the exceptions to that power are covered by section 1520(a)(2). The word "adequately" in the Model Law, articles 21(2) and 22(1), has been changed to "sufficiently" in sections 1521(b) and 1522(a) to avoid confusion with a very specialized legal term in United States bankruptcy, "adequate protection."[150] Subsection (c) is designed to limit relief to assets having some direct connection with a non-main proceeding, for ex-

---

[146] *Id.* at 42, Art. 20(2); 44, ¶¶ 148, 150.
[147] *Id.* at 42, Art. 20(3); 44–45, ¶¶ 151 152.
[148] *Id.*
[149] *Id.* at 45–46, Art. 21.
[150] *Id.* at 46, Art. 21(2); 47, Art. 22(1).

116

ample where they were part of an operating division in the jurisdiction of the non-main proceeding when they were fraudulently conveyed and then brought to the United States.[151] Subsections (d), (e) and (f) are identical to those same subsections of section 1519. This section does not expand or reduce the scope of relief currently available in ancillary cases under sections 105 and 304 nor does it modify the sweep of sections 555 through 560.

*Sec. 1522. Protection of creditors and other interested persons.* This section follows article 22 of the Model Law with changes for United States usage and references to relevant Bankruptcy Code sections.[152] It gives the bankruptcy court broad latitude to mold relief to meet specific circumstances, including appropriate responses if it is shown that the foreign proceeding is seriously and unjustifiably injuring United States creditors. For a response to a showing that the conditions necessary to recognition did not actually exist or have ceased to exist, see section 1517. Concerning the change of "adequately" in the Model Law to "sufficiently" in this section, see section 1521. Subsection (d) is new and simply makes clear that Bankruptcy Code section 1104(d) shall apply to the appointment of an examiner appointed in a case under chapter 15 and such examiner shall be subject to certain duties and bonding requirements based on those imposed on trustees and examiners under other chapters of this title.

*Sec. 1523. Actions to avoid acts detrimental to creditors.* This section follows article 23 of the Model Law, with wording to fit it within procedure under this title.[153] It confers standing on a recognized foreign representative to assert an avoidance action but only in a pending case under another chapter of this title. The Model Law is not clear about whether it would grant standing in a recognized foreign proceeding if no full case were pending. This limitation reflects concerns raised by the United States delegation during the UNCITRAL debates that a simple grant of standing to bring avoidance actions neglects to address very difficult choice of law and forum issues. This limited grant of standing in section 1523 does not create or establish any legal right of avoidance nor does it create or imply any legal rules with respect to the choice of applicable law as to the avoidance of any transfer of obligation.[154] The courts will determine the nature and extent of any such action and what national law may be applicable to such action.

*Sec. 1524. Intervention by a foreign representative.* The wording is the same as the Model Law, except for a few clarifying words.[155] This section gives the foreign representative whose foreign proceeding has been recognized the right to intervene in United States cases, state or federal, where the debtor is a party. Recognition being an act under Federal bankruptcy law, it must take effect in state as well as Federal courts. This section does not require substituting the foreign representative for the debtor, although that result may be appropriate in some circumstances.

---

[151] *See id.* at 46–47, ¶¶ 158, 160.
[152] *Id.* at 47.
[153] *Id.* at 48–49.
[154] *See id.* at 49, ¶166.
[155] *Id.* at 49.

117

*Sec. 1525. Cooperation and direct communication between the court and foreign courts or foreign representatives.* The wording of this provision is nearly identical to that of the Model Law.[156] The right of courts to communicate with other courts in worldwide insolvency cases is of central importance. This section authorizes courts to do so. This right must be exercised, however, with due regard to the rights of the parties. Guidelines for such communications are left to the Federal rules of bankruptcy procedure.

*Sec. 1526 Cooperation and direct communication between the trustee and foreign courts or foreign representatives.* This section closely tracks the Model Law.[157] The language in Model Law article 26 concerning the trustee's function was eliminated as unnecessary because it is always implied under United States law. The section authorizes the trustee, including a debtor in possession, to cooperate with other proceedings.

*Sec. 1527. Forms of cooperation.* This section is identical to the Model Law.[158] United States bankruptcy courts already engage in most of the forms of cooperation described here, but they now have explicit statutory authorization for acts like the approval of protocols of the sort used in cases.[159]

*Sec. 1528. Commencement of a case under title 11 after recognition of a foreign main proceeding.* This section follows the Model Law, with specifics of United States law replacing the general clause at the end of the section to cover assets normally included within the jurisdiction of the United States courts in bankruptcy cases, except where assets are subject to the jurisdiction of another recognized proceeding.[160] In a full bankruptcy case, the United States bankruptcy court generally has jurisdiction over assets outside the United States. Here that jurisdiction is limited where those assets are controlled by another recognized proceeding, if it is a main proceeding.

The court may use section 305 of this title to dismiss, stay, or limit a case as necessary to promote cooperation and coordination in a cross-border case. In addition, although the jurisdictional limitation applies only to United States bankruptcy cases commenced after recognition of a foreign proceeding, the court has ample authority under the next section and section 305 to exercise its discretion to dismiss, stay, or limit a United States case filed after a petition for recognition of a foreign main proceeding has been filed but before it has been approved, if recognition is ultimately granted.

*Sec. 1529. Coordination of a case under title 11 and a foreign proceeding.* This section follows the Model Law almost exactly, but subsection (4) adds a reference to section 305 to make it clear the bankruptcy court may continue to use that section, as under present law, to dismiss or suspend a United States case as part of coordination and cooperation with foreign proceedings.[161] This provision is consistent with United States policy to act ancillary to a foreign main proceeding whenever possible.

---

[156] *Id.* at 50.
[157] *Id.* at 51.
[158] Guide at 51, 53.
[159] *See e.g., In re* Maxwell Communication Corp., 93 F.2d 1036 (2d Cir. 1996).
[160] Guide at 54–55.
[161] *Id.* at 55–56.

118

*Sec. 1530. Coordination of more than one foreign proceeding.* This section follows article 30 of the Model Law exactly.[162] It ensures that a foreign main proceeding will be given primacy in the United States, consistent with the overall approach of the United States favoring assistance to foreign main proceedings.

*Sec. 1531. Presumption of insolvency based on recognition of a foreign main proceeding.* This section follows the Model Law exactly, inserting a reference to the standard for an involuntary case under this title.[163] Where an insolvency proceeding has begun in the home country of the debtor, and in the absence of contrary evidence, the foreign representative should not have to make a new showing that the debtor is in the sort of financial distress requiring a collective judicial remedy. The word "proof" in this provision here means "presumption." The presumption does not arise for any purpose outside this section.

*Sec. 1532. Rule of payment in concurrent proceeding.* This section follows the Model Law exactly and is very similar to prior section 508(a), which is repealed. The Model Law language is somewhat clearer and broader than the equivalent language of prior section 508(a).[164]

*Sec. 802. Other Amendments to Titles 11 and 28, United States Code.* Section 802(a) amends section 103 of the Bankruptcy Code to clarify the provisions of the Code that apply to chapter 15 and to specify which portions of chapter 15 apply in cases under other chapters of title 11. Section 802(b) amends the Bankruptcy Code's definitions of foreign proceeding and foreign representative in section 101. The new definitions are nearly identical to those contained in the Model Law but add to the phrase "under a law relating to insolvency" the words "or debt adjustment." This addition emphasizes that the scope of the Model Law and chapter 15 is not limited to proceedings involving only debtors which are technically insolvent, but broadly includes all proceedings involving debtors in severe financial distress, so long as those proceedings also meet the other criteria of section 101(24).[165]

Section 802(c) amends section 157(b)(2) of title 28 to provide that proceedings under chapter 15 will be core proceedings while other amendments to title 28 provide that the United States trustee's standing extends to cases under chapter 15 and that the United States trustee's duties include acting in chapter 15 cases. Although the United States will continue to assert worldwide jurisdiction over property of a domestic or foreign debtor in a full bankruptcy case under chapters 7 and 13 of this title, subject to deference to foreign proceedings under chapter 15 and section 305, the situation is different in a case commenced under chapter 15. There the United States is acting solely in an ancillary position, so jurisdiction over property is limited to that stated in chapter 15.

Section 802(d) amends section 109 of the Bankruptcy Code to permit recognition of foreign proceedings involving foreign insurance companies and involving foreign banks which do not have a branch or agency in the United States (as defined in 12 U.S.C.

---

[162] *Id.* at 57.
[163] *Id.* at 58.
[164] *Id.* at 59.
[165] *Id.* at 51–52, 71.

119

3101). While a foreign bank not subject to United States regulation will be eligible for chapter 15 as a consequence of the amendment to section 109, section 303 prohibits the commencement of a full involuntary case against such a foreign bank unless the bank is a debtor in a foreign proceeding.

While section 304 is repealed and replaced by chapter 15, access to the jurisprudence which developed under section 304 is preserved in the context of new section 1507. On deciding whether to grant the additional assistance contemplated by section 1507, the court must consider the same factors specified in former section 304. The venue provisions for cases ancillary to foreign proceedings have been amended to provide a hierarchy of choices beginning with principal place of business in the United States, if any. If there is no principal place of business in the United States, but there is litigation against a debtor, then the district in which the litigation is pending would be the appropriate venue. In any other case, venue must be determined with reference to the interests of justice and the convenience of the parties.

### TITLE IX. FINANCIAL CONTRACT PROVISIONS

*Sec. 901. Treatment of Certain Agreements by Conservators of Receivers of Insured Depository Institutions.* Subsections (a) through (f) of section 901 of the Act amend the definitions of "qualified financial contract," "securities contract," "commodity contract," "forward contract," "repurchase agreement" and "swap agreement" contained in the Federal Deposit Insurance Act (FDIA) and the Federal Credit Union Act (FCUA) to make them consistent with the definitions in the Bankruptcy Code and to reflect the enactment of the Commodity Futures Modernization Act of 2000 (CFMA). It is intended that the legislative history and case law surrounding those terms, to the date of this amendment, be incorporated into the legislative history of the FDIA and the FCUA.

Subsection (b) amends the definition of "securities contract" expressly to encompass margin loans, to clarify the coverage of securities options and to clarify the coverage of repurchase and reverse repurchase transactions. The inclusion of "margin loans" in the definition is intended to encompass only those loans commonly known in the securities industry as "margin loans," such as credit permitted in a margin account under the Federal Reserve Board's Regulation T (whether or not effected in that account) or arrangements where a financial intermediary—a stockbroker, financial institution, financial participant, or securities agency—extends credit in connection with the purchase, sale, carrying, or trading of securities. "Margin loans" do not include, however, other loans that happen to be secured by securities collateral. The reference in subsection (b) to a "guarantee by or to any securities clearing agency" is intended to cover other arrangements, such as novation, that have an effect similar to a guarantee. The reference to a "loan" of a security in the definition is intended to apply to loans of securities, whether or not for a "permitted purpose" under margin regulations. The reference to "repurchase and reverse repurchase transactions" is intended to eliminate any inquiry under the qualified financial contract provisions of the FDIA or FCUA as to whether a repurchase or reverse repurchase transaction is a purchase and sale transaction or a secured financing. Repurchase and reverse re-

# Tab 07

New York Uniform Commercial Code Law

# Sec. 8-501

## Section 8--501. Securities Account; Acquisition of Security Entitlement From Securities Intermediary.

Section 8--501. Securities Account; Acquisition of Security Entitlement from Securities Intermediary.

(a)

"Securities account" means an account to which a financial asset is or may be credited in accordance with an agreement under which the person maintaining the account undertakes to treat the person for whom the account is maintained as entitled to exercise the rights that comprise the financial asset.

(b)

Except as otherwise provided in subsections (d) and (e), a person acquires a security entitlement if a securities intermediary:

(1)

indicates by book entry that a financial asset has been credited to the person's securities account;

(2)

receives a financial asset from the person or acquires a financial asset for the person and, in either case, accepts it for credit to the person's securities account; or

(3)

becomes obligated under other law, regulation, or rule to credit a financial asset to the person's securities account.

(c)

If a condition of subsection (b) has been met, a person has a security entitlement even though the securities intermediary does not itself hold the financial asset.

2745

# Sec. 8-502

## Section 8--502. Assertion of Adverse Claim Against Entitlement Holder.

Section 8--502. Assertion of Adverse Claim against Entitlement Holder. An action based on an adverse claim to a financial asset, whether framed in conversion, replevin, constructive trust, equitable lien, or other theory, may not be asserted against a person who acquires a security entitlement under Section 8--501 for value and without notice of the adverse claim

# Sec. 8-503

## Section 8--503. Property Interest of Entitlement Holder in Financial Asset Held by Securities Intermediary.

Section 8--503. Property Interest of Entitlement Holder in Financial Asset held by Securities Intermediary.

(a)

To the extent necessary for a securities intermediary to satisfy all security entitlements with respect to a particular financial asset, all interests in that financial asset held by the securities intermediary are held by the securities intermediary for the entitlement holders, are not property of the securities intermediary, and are not subject to claims of creditors of the securities intermediary, except as otherwise provided in Section 8--511.

(b)

An entitlement holder's property interest with respect to a particular financial asset under subsection (a) is a pro rata property interest in all interests in that financial asset held by the securities intermediary, without regard to the time the entitlement holder acquired the security entitlement or the time the securities intermediary acquired the interest in that financial asset.

**(c)**

An entitlement holder's property interest with respect to a particular financial asset under subsection (a) may be enforced against the securities intermediary only by exercise of the entitlement holder's rights under Sections 8--505 through 8--508.

**(d)**

An entitlement holder's property interest with respect to a particular financial asset under subsection (a) may be enforced against a purchaser of the financial asset or interest therein only if:

**(1)**

insolvency proceedings have been initiated by or against the securities intermediary;

**(2)**

the securities intermediary does not have sufficient interests in the financial asset to satisfy the security entitlements of all of its entitlement holders to that financial asset;

**(3)**

the securities intermediary violated its obligations under Section 8--504 by transferring the financial asset or interest therein to the purchaser; and

**(4)**

the purchaser is not protected under subsection (e). The trustee or other liquidator, acting on behalf of all entitlement holders having security entitlements with respect to a particular financial asset, may recover the financial asset, or interest therein, from the purchaser. If the trustee or other liquidator elects not to pursue that right, an entitlement holder whose security entitlement remains unsatisfied has the right to recover its interest in the financial asset from the purchaser.

**(e)**

An action based on the entitlement holder's property interest with respect to a particular financial asset under subsection (a), whether framed in conversion, replevin, constructive trust, equitable lien, or other theory, may not be asserted against any purchaser of a financial asset or interest therein who gives value, obtains control, and does not act in collusion with the securities intermediary in violating the securities intermediary's obligations under Section 8--504.

2747

# Sec. 8-504

# Section 8--504. Duty of Securities Intermediary to Maintain Financial Asset.

Section 8--504. Duty of Securities Intermediary to Maintain Financial Asset.

**(a)**

A securities intermediary shall promptly obtain and thereafter maintain a financial asset in a quantity corresponding to the aggregate of all security entitlements it has established in favor of its entitlement holders with respect to that financial asset. The securities intermediary may maintain those financial assets directly or through one or more other securities intermediaries.

**(b)**

Except to the extent otherwise agreed by its entitlement holder, a securities intermediary may not grant any security interests in a financial asset it is obligated to maintain pursuant to subsection (a).

**(c)**

A securities intermediary satisfies the duty in subsection (a) if:

**(1)**

the securities intermediary acts with respect to the duty as agreed upon by the entitlement holder and the securities intermediary; or

**(2)**

in the absence of agreement, the securities intermediary exercises due care in accordance with reasonable commercial standards to obtain and maintain the financial asset.

**(d)**

This section does not apply to a clearing corporation that is itself the obligor of an option or similar obligation to which its entitlement holders have security entitlements.

# Sec. 8-505

# Section 8--505. Duty of Securities

2748

# Intermediary With Respect to Payments and Distributions.

Section 8--505. Duty of Securities Intermediary with respect to Payments and Distributions.

(a)

A securities intermediary shall take action to obtain a payment or distribution made by the issuer of a financial asset. A securities intermediary satisfies the duty if:

(1)

the securities intermediary acts with respect to the duty as agreed upon by the entitlement holder and the securities intermediary; or

(2)

in the absence of agreement, the securities intermediary exercises due care in accordance with reasonable commercial standards to attempt to obtain the payment or distribution.

(b)

A securities intermediary is obligated to its entitlement holder for a payment or distribution made by the issuer of a financial asset if the payment or distribution is received by the securities intermediary.

# Sec. 8-506

# Section 8--506. Duty of Securities Intermediary to Exercise Rights As Directed by Entitlement Holder.

Section 8--506. Duty of Securities Intermediary to Exercise Rights as directed by Entitlement Holder. A securities intermediary shall exercise rights with respect to a financial asset if directed to do so by an entitlement holder. A securities intermediary satisfies the duty if:

(1)

the securities intermediary acts with respect to the duty as agreed upon by the entitlement holder and the securities intermediary; or

2749

**(2)**

in the absence of agreement, the securities intermediary either places the entitlement holder in a position to exercise the rights directly or exercises due care in accordance with reasonable commercial standards to follow the direction of the entitlement holder.

# Sec. 8-507

# Section 8--507. Duty of Securities Intermediary to Comply With Entitlement Order.

Section 8--507. Duty of Securities Intermediary to comply with Entitlement Order.

**(a)**

A securities intermediary shall comply with an entitlement order if the entitlement order is originated by the appropriate person, the securities intermediary has had reasonable opportunity to assure itself that the entitlement order is genuine and authorized, and the securities intermediary has had reasonable opportunity to comply with the entitlement order. A securities intermediary satisfies the duty if:

**(1)**

the securities intermediary acts with respect to the duty as agreed upon by the entitlement holder and the securities intermediary; or

**(2)**

in the absence of agreement, the securities intermediary exercises due care in accordance with reasonable commercial standards to comply with the entitlement order.

**(b)**

If a securities intermediary transfers a financial asset pursuant to an ineffective entitlement order, the securities intermediary shall reestablish a security entitlement in favor of the person entitled to it, and pay or credit any payments or distributions that the person did not receive as a result of the wrongful transfer. If the securities intermediary does not reestablish a security entitlement, the securities intermediary is liable to the entitlement holder for damages.

2750

## Sec. 8-508

# Section 8--508. Duty of Securities Intermediary to Change Entitlement Holder's Position to Other Form of Security

Section 8--508. Duty of Securities Intermediary to change Entitlement Holder's Position to Other Form of Security Holding. A securities intermediary shall act at the direction of an entitlement holder to change a security entitlement into another available form of holding for which the entitlement holder is eligible, or to cause the financial asset to be transferred to a securities account of the entitlement holder with another securities intermediary. A securities intermediary satisfies the duty if:

(1)
the securities intermediary acts as agreed upon by the entitlement holder and the securities intermediary; or

(2)
in the absence of agreement, the securities intermediary exercises due care in accordance with reasonable commercial standards to follow the direction of the entitlement holder.

## Sec. 8-509

# Section 8--509. Specification of Duties of Securities Intermediary by Other Statute or Regulation

Section 8--509. Specification of Duties of Securities Intermediary by Other Statute or Regulation; Manner of Performance of Duties of Securities Intermediary and Exercise of Rights of Entitlement Holder.

(a)

2751

If the substance of a duty imposed upon a securities intermediary by Sections 8--504 through 8--508 is the subject of other statute, regulation, or rule, compliance with that statute, regulation, or rule satisfies the duty.

**(b)**

To the extent that specific standards for the performance of the duties of a securities intermediary or the exercise of the rights of an entitlement holder are not specified by other statute, regulation, or rule or by agreement between the securities intermediary and entitlement holder, the securities intermediary shall perform its duties and the entitlement holder shall exercise its rights in a commercially reasonable manner.

**(c)**

The obligation of a securities intermediary to perform the duties imposed by Sections 8--504 through 8--508 is subject to:

**(1)**

rights of the securities intermediary arising out of a security interest under a security agreement with the entitlement holder or otherwise; and

**(2)**

rights of the securities intermediary under other law, regulation, rule, or agreement to withhold performance of its duties as a result of unfulfilled obligations of the entitlement holder to the securities intermediary.

**(d)**

Sections 8--504 through 8--508 do not require a securities intermediary to take any action that is prohibited by other statute, regulation, or rule.

# Sec. 8-510

# Section 8--510. Rights of Purchaser of Security Entitlement From Entitlement Holder.

Section 8--510. Rights of Purchaser of Security Entitlement from Entitlement Holder.

**(a)**

In a case not covered by the priority rules in Article 9 or the rules stated in subsection (c), an action based on an adverse claim to a financial asset or security entitlement, whether framed in conversion, replevin, constructive trust, equitable lien, or other theory, may not be asserted against a person who purchases a security entitlement, or

2752

an interest therein, from an entitlement holder if the purchaser gives value, does not have notice of the adverse claim, and obtains control.

**(b)**

If an adverse claim could not have been asserted against an entitlement holder under Section 8--502, the adverse claim cannot be asserted against a person who purchases a security entitlement, or an interest therein, from the entitlement holder.

**(c)**

In a case not covered by the priority rules in Article 9, a purchaser for value of a security entitlement, or an interest therein, who obtains control has priority over a purchaser of a security entitlement, or an interest therein, who does not obtain control. Except as otherwise provided in subsection (d), purchasers who have control rank according to priority in time of:

**(1)**

the purchaser's becoming the person for whom the securities account, in which the security entitlement is carried, is maintained, if the purchaser obtained control under Section 8--106(d)(1);

**(2)**

the securities intermediary's agreement to comply with the purchaser's entitlement orders with respect to security entitlements carried or to be carried in the securities account in which the security entitlement is carried, if the purchaser obtained control under Section 8--106(d)(2); or

**(3)**

if the purchaser obtained control through another person under Section 8--106(d)(3), the time on which priority would be based under this subsection if the other person were the secured party.

**(d)**

A securities intermediary as purchaser has priority over a conflicting purchaser who has control unless otherwise agreed by the securities intermediary.

# Sec. 8-511

# Section 8--511. Priority Among Security Interests and Entitlement Holders.

Section 8--511. Priority Among Security Interests and Entitlement Holders.

**(a)**

Except as otherwise provided in subsections (b) and (c), if a securities intermediary does not have sufficient interests in a particular financial asset to satisfy both its obligations to entitlement holders who have security entitlements to that financial asset and its obligation to a creditor of the securities intermediary who has a security interest in that financial asset, the claims of entitlement holders, other than the creditor, have priority over the claim of the creditor.

**(b)**

A claim of a creditor of a securities intermediary who has a security interest in a financial asset held by a securities intermediary has priority over claims of the securities intermediary's entitlement holders who have security entitlements with respect to that financial asset if the creditor has control over the financial asset.

**(c)**

If a clearing corporation does not have sufficient financial assets to satisfy both its obligations to entitlement holders who have security entitlements with respect to a financial asset and its obligation to a creditor of the clearing corporation who has a security interest in that financial asset, the claim of the creditor has priority over the claims of entitlement holders.

2754

# Tab 08

Restatement (Third) Of Agency § 2.01 (2006)

Restatement of the Law - Agency   |   October 2023 Update

Restatement (Third) of Agency

Chapter 2. Principles of Attribution

Topic 1. Actual Authority

## § 2.01 Actual Authority

Comment:

Reporter's Notes

Case Citations - by Jurisdiction

> **An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act.**

**Comment:**

*a. Scope and cross-references.* Section 1.03 defines manifestation. Section 2.02 covers the scope of actual authority, including criteria with which to assess the reasonableness of an agent's belief. Sections 3.01 and 3.02 state the means by which a principal creates actual authority, including circumstances in which a writing is required.

*b. Terminology.* As defined in this section, "actual authority" is a synonym for "true authority," a term used in some opinions. The definition in this section does not attempt to classify different types of actual authority on the basis of the degree of detail in the principal's manifestation, which may consist of written or spoken words or other conduct. See § 1.03. As commonly used, the term "express authority" often means actual authority that a principal has stated in very specific or detailed language.

The term "implied authority" has more than one meaning. "Implied authority" is often used to mean actual authority either (1) to do what is necessary, usual, and proper to accomplish or perform an agent's express responsibilities or (2) to act in a manner in which an agent believes the principal wishes the agent to act based on the agent's reasonable interpretation of the principal's manifestation in light of the principal's objectives and other facts known to the agent. These meanings are not mutually exclusive. Both fall within the definition of actual authority. Section 2.02, which delineates the scope of actual authority, subsumes the practical consequences of implied authority.

The term "inherent agency power," used in Restatement Second, Agency, and defined therein by § 8A, is not used in this Restatement. Inherent agency power is defined as "a term used … to indicate the power of an agent which is derived not from

authority, apparent authority or estoppel, but solely from the agency relation and exists for the protection of persons harmed by or dealing with a servant or other agent." Other doctrines stated in this Restatement encompass the justifications underpinning § 8 A, including the importance of interpretation by the agent in the agent's relationship with the principal, as well as the doctrines of apparent authority, estoppel, and restitution.

*c. Rationale.* Actual authority is a consequence of a principal's expressive conduct toward an agent, through which the principal manifests assent to be affected by the agent's action, and the agent's reasonable understanding of the principal's manifestation. An agent's actions establish the agent's consent to act on the principal's behalf, as does any separate manifestation of assent by the agent. When an agent acts with actual authority, the agent's power to affect the principal's legal relations with third parties is coextensive with the agent's right to do so, which actual authority creates. In contrast, although an agent who acts with only apparent authority also affects the principal's legal relations, the agent lacks the right to do so, and the agent's act is not rightful as toward the principal. Actual authority often overlaps with the presence of apparent authority. See § 2.03, Comment *c*.

The focal point for determining whether an agent acted with actual authority is the agent's reasonable understanding at the time the agent takes action. Although it is commonly said that a principal grants or confers actual authority, the principal's initial manifestation to the agent may often be modified or supplemented by subsequent manifestations from the principal and by other developments that the agent should reasonably consider in determining what the principal wishes to be done. A principal's manifestations may reach the agent directly or indirectly. Often a principal's manifestation will state that the agent should refrain from acting in a particular way. In that situation, the agent's failure to act conforms to the principal's expressed wishes.

> **Illustration:**
> 1. P gives A a power of attorney authorizing A to sell a piece of property owned by P. P subsequently says to A, "Don't sell the property. Lease it instead." After P's statement, A has actual authority only to lease.

The presence of actual authority requires that an agent's belief be reasonable at the time the agent acts. It is also necessary that the agent in fact believes that the principal desires the action taken by the agent.

> **Illustrations:**
> 2. Same facts as Illustration 1, except that A overhears P say to a third party that P no longer wishes to sell the property and wishes A to lease it. A has actual authority only to lease because A knows P does not wish the property to be sold.
>
> 3. Same facts as Illustration 1, except that, after telling A to lease the property instead of selling it, P tells F that P regrets making this statement and wishes that the property be sold. A is unaware of P's statement to F. A sells the property to T, showing T the power of attorney. T is unaware of P's oral statements to A and F. A did not have actual authority to sell the property. A acted with apparent authority as defined in § 2.03.

26-11268-mg    Doc 23-3    Filed 06/24/26    Entered 06/24/26 13:13:49    Exhibit C    Pg
95 of 882

Unless a principal's manifestation expressly states that the authority is irrevocable and constitutes a power given as security or an irrevocable proxy as defined in § 3.12, the principal has power to revoke actual authority even when the principal has contracted not to do so. If a principal's revocation of actual authority breaches a contract with an agent, the agent's authority terminates but the principal is subject to liability to the agent for breach of contract.

> **Illustration:**
>
> 4. Same facts as Illustration 1, except that the power of attorney states that A's authority to sell shall be irrevocable by P for six months, in exchange for A's promise to use best efforts to sell the property. At the end of three months, P tells A that P revokes A's authority. A's authority is terminated, but P is subject to liability for breach of contract.

A principal's manifestation to an agent often consists of an intentional act. However, a principal may also convey actual authority to an agent through unintended conduct that the agent reasonably believes to constitute an expression of the principal's intentions.

> **Illustrations:**
>
> 5. P drafts and executes a power of attorney authorizing A to sell a piece of property. Following a change of mind, P drafts and executes a second power authorizing A only to lease the property. P inadvertently sends the first power to A and does not otherwise communicate with A regarding the nature of A's authority. A has actual authority to sell the property.
>
> 6. Same facts as Illustration 5, except that after A receives the power of attorney from P, P sends A a letter asking for a status report on A's efforts to lease the property. The letter also states that P is glad the property will not be sold. After receiving P's letter, A lacks actual authority to sell the property because it is not reasonable for A to believe that P wishes A to sell it.

A principal's manifestation to an agent may be expressed in a form that is observable by third parties. Such an expression provides guidance to the agent and creates a record of the content of the principal's manifestation to the agent. The principal's expression also constitutes a basis for apparent authority when third parties observe it. Indeed, a primary function of stating an agent's authority in a formal written instrument such as a power of attorney is to enable the agent to display the instrument to third parties to demonstrate the agent's authority. See § 1.04(7), which defines power of attorney. Despite this connection between actual and apparent authority, actual authority itself affects a principal's legal relations with third parties separately and without reference to any apparent authority conferred on the agent by the principal. This is because by conferring actual authority a principal consents to the agent's possession of power to act with legal consequences for the principal regardless of the belief of third parties concerning the existence or extent of that authority. Section 2.03 defines apparent authority and specifies the circumstances under which it is created.

It is misleading to characterize actual authority as reflecting a principal's "intention," without further elaboration. If not expressed in a form observable or discernible by an agent, the principal's intention is ineffective because creating an agency relationship does not merge the agent with the principal, and the agent is not deemed to know all that the principal knows or wishes. An agent's actual authority is grounded in the principal's manifestations (however indirect) to the agent, not the principal's unexpressed will, mental state, or unknown wishes. See § 3.01 for further elaboration.

Most conferrals of authority combine two elements. The first, always present, is a manifestation, however general or specific, by a principal as to the acts or types of acts the principal wishes to be done. The second, less invariably present, consists of instructions or directives that specify how or within what constraints acts are to be done. A principal's communications to an agent begin with an initial expression granting authority, followed in many instances by instructions or directions that clarify matters, prescribe in more specific terms what the principal wishes the agent to do, or reduce or enlarge the scope of the agent's authority. A principal's manifestations may raise questions—at one end, as to whether the principal wishes the agent to move beyond the acts explicitly specified in order to fulfill the principal's implicit purpose and, at the other end, as to whether implicit restrictions apply in addition to the limits the principal has stated. An agent must interpret the principal's manifestations and determine how to act. The context in which the relationship is situated, including the nature of the principal's objectives and the custom generally followed in such circumstances, affects how the agent should interpret the principal's manifestations. On an agent's duty to the principal to act only within the scope of actual authority, see § 8.09.

If a principal states directions to an agent in general or open-ended terms, the agent will have to exercise discretion in determining the specific acts to be performed to a greater degree than if the principal's statement specifies in detail what the agent should do. It should be foreseeable to the principal that an agent's exercise of discretion may not result in the decision the principal would make individually. Regardless of the detail in a principal's statements or other conduct, an agent's duty is to interpret them reasonably to further purposes of the principal that the agent knows or should know, in light of facts that the agent knows or should know when the agent acts. When a principal's instructions are ambiguous, or if circumstances change, it will often be reasonable for the agent to seek clarification from the principal rather than speculating about the principal's wishes. Section 2.02(2) states circumstances under which an agent's interpretation is reasonable. If an agent's interpretation is reasonable at the time the agent acts, the agent is not subject to liability to the principal even if, after the fact, the principal can demonstrate that the agent's interpretation was erroneous.

Many forms of action, including inaction, by an agent may carry legal consequences for the principal if the agent's act is done with actual or apparent authority. Thus, an agent's speech constitutes action for this purpose if the agent's actual or apparent authority encompasses speaking on behalf of the principal.

*d. General and special agents.* Courts have long distinguished between "general agents" and "special agents," a distinction that rests on both the objects of the discretion granted an agent and the mode of regulating the agent's exercise of discretion. The labels matter less than the underlying circumstances that warrant their application. The prototypical special agent is a real-estate broker who is authorized to conduct a single transaction. A special agent may also be authorized to conduct a series of transactions specified by the principal. The prototypical general agent is a manager of a business, who has authority to conduct a

2759

series of transactions and who serves the principal on an ongoing as opposed to an episodic basis. The transaction-by-transaction nature of a principal's relationship with a special agent may limit the principal's potential benefit from associating with the agent while also limiting the principal's risks. Both special and general agents have discretion, but special agents exercise it within compasses more specifically identified by the principal. A special agent may, of course, exercise considerable discretion as, for example, would an art dealer retained by a connoisseur as a special agent to buy on the connoisseur's account a painting to be chosen by the special agent. A principal may provide instructions to general as well as to special agents that further delimit their actual authority by restricting the discretion the agent would otherwise possess.

*e. Organizational principals.* When a principal is an organization, the relationship between actual authority and apparent authority may be difficult to untangle due to the significant role of custom and practice. In many organizations, including large and complicated ones, written job descriptions do not exist for many executive and managerial positions. See Comment *c* to § 1.03 for a discussion of manifestations made by organizations. Apparent authority as it applies to executives of corporations and other legally constituted organizations is discussed in § 3.03, Comments *c-e*.

Actual authority to do an act that is treated as the act of the organization spans its highest levels of hierarchy to its lowest. Executive or managerial capacity is not a sine qua non for the existence of actual authority.

> **Illustration:**
>
> 7. P Corporation employs A as a clerk in its mail room. A's duties include initialing receipts presented by carriers. A initials a receipt for a valuable package shipped by T using C, a carrier. A's action acknowledges receipt by P Corporation.

*f. Agent acts without authority.* An agent's conduct may generate legal consequences for the principal in the principal's relations with third parties even when the agent's conduct exceeds or otherwise diverges from the agent's actual authority. Such deviations by the agent breach the agent's duties to the principal. See § 8.09. If the principal suffers loss as a consequence of the agent's acts, the agent is subject to liability to the principal for loss caused the principal. See id., Comment *b*. Under the circumstances stated in §§ 7.07 and 7.08, the principal will be subject to vicarious liability for an agent's tortious wrongdoing. As to conveyances and transactions entered into by an agent, the doctrine of apparent authority stated in § 2.03 assigns legal consequences to the principal distinct from the consequences of actual authority.

**Reporter's Notes**

*a. Comparison with Restatement Second, Agency, and codifications.* No difference in substance is intended between this definition and its counterpart in Restatement Second, Agency. The definition has been expanded to encompass points made in the commentary to Restatement Second, including the focus of actual authority on the agent's understanding at the time the agent acts. See Restatement Second, Agency § 7 (defining "authority" as "the power of the agent to affect the legal relations of the principal by acts done in accordance with the principal's manifestations of consent to him").

Codifications of agency in the United States do not include a counterpart definition of actual authority. They appear to treat it as an idea too fundamental to require definition. See, e.g., Cal. Civil Code § 2304 (1985) ("WHAT AUTHORITY MAY BE

2760

CONFERRED. An agent may be authorized to do any acts which his principal might do, except those to which the latter is bound to give his personal attention") and § 2299 ("ACTUAL AGENCY. An agency is actual when the agent is really employed by the principal"); La. Civil Code § 2994 (1998) ("The principal may confer on the mandatary general authority to do whatever is appropriate under the circumstances").

*b. Terminology.* "True authority" is used as a synonym for actual authority in Hartong v. Partake, Inc., 72 Cal.Rptr. 722, 737 (Cal.App.1968); SMP, Ltd. v. Syprett, Meshad, Resnick & Lieb, P.A., 584 So. 2d 1051, 1055 (Fla.App.1991); Blake v. Hooker-Barnes, Inc., 378 S.E.2d 716, 718 (Ga.App.1989); Podolan v. Idaho Legal Aid Servs., Inc., 854 P.2d 280, 287 (Idaho App.1993); In re Lester, 386 N.Y.S.2d 509, 514 (Sup.1976); and Diston v. EnviroPak Med. Prods., Inc., 893 P.2d 1071, 1076 (Utah App.1995).

"Implied authority" is defined to mean authority to do acts collateral or incidental to perform the "main authority" in many cases, including Bodell Constr. Co. v. Stewart Title Guar. Co., 945 P.2d 119, 124 (Utah App.1997) and Willey v. Mayer, 876 P.2d 1260, 1264 (Colo.1994). "Implied authority" has also been defined to mean an agent's reasonable interpretation of the agent's authority. See Kanavos v. Hancock Bank & Trust Co., 439 N.E.2d 311, 314-315 (Mass.App.1982), remanded for retrial on other grounds, 479 N.E.2d 168 (Mass.1985). Industry custom is a reference point for implied authority in Johnston v. American Cometra, Inc., 837 S.W.2d 711, 715 (Tex.App.1992) (industry custom supports implied authority of operators of gas well to sell gas on behalf of nonoperator owners of working interests).

For the proposition that a principal's negligent conduct may effectively convey actual authority, see Federal Land Bank of Omaha v. Sullivan, 430 N.W.2d 700 (S.D.1988) (under codification in S.D. Consol. L. § 59-3-2, actual authority is defined as "such as a principal intentionally confers upon the agent, or intentionally or by want of ordinary care, allows the agent to believe himself to possess"; bank created actual authority by acquiescing in its attorney's actions in settling case, thereby leading attorney to believe he had authority to settle).

For assessments of the determination not to use the term "inherent agency power" in this Restatement, see Gregory Scott Crespi, The Proposed Abolition of Inherent Agency Authority by the Restatement (Third) of Agency: An Incomplete Solution, 45 Santa Clara L. Rev. 337 (2005); Kornelia Dormire, Inherent Agency Power: A Modest Proposal for the Restatement (Third) of Agency, 5 J. Small & Emerging Bus. L. 243 (2001); John Dwight Ingram, Inherent Agency Powers: A Mistaken Concept Which Should Be Discarded, 29 Okla. City U. L. Rev. 583 (2004); Matthew P. Ward, A Restatement or a Redefinition: Elimination of Inherent Agency in the Tentative Draft of the Restatement (Third) of Agency, 59 Wash. & Lee L. Rev. 1585 (2002). For earlier assessments of inherent agency power, see Steven A. Fishman, Inherent Agency Power-Should Enterprise Liability Apply to Agents' Unauthorized Contracts?, 19 Rutgers L.J. 1 (1987); Roger J. Goebel, The Authority of the President over Corporate Litigation: A Study in Inherent Agency, 37 St. John's L. Rev. 29 (1962); John A. C. Hetherington, Trends in Enterprise Liability Law and the Unauthorized Agent, 19 Stan. L. Rev. 76 (1966); Edward A. Mearns, Vicarious Liability for Agency Contracts, 48 Va. L. Rev. 50 (1962); Warren A. Seavey, Agency Powers, 1 Okla. L. Rev. 3 (1948).

*c. Rationale.* An account that treats actual authority as a power that is conferred on the agent is Wesley N. Hohfeld, Some Fundamental Legal Conceptions as Applied in Judicial Reasoning, 23 Yale L.J. 16, 46-47 (1913) ("[t]he creation of a relation of agency involves, *inter alia*, the grant of legal powers to the so-called agent, and the creation of correlative liabilities in the principal"). Hohfeld characterizes authority as "an abstract or qualitative term corresponding to the concrete 'authorization,'—the latter consisting of a particular group of operative facts taking place between the principal and the agent." Hohfeld concludes that the powers of agents are "[e]ssentially similar" to powers of appointment in relation to property interests, to the power of a sheriff to sell property under a writ of execution, to the power of a donee to revoke a gift made *causa mortis*, and to the statutory power of sale of a pledgee. As applied to agency, these comparisons tend to emphasize a principal's initial manifestation to an agent and to disregard the importance of the agent's understanding of the principal's wishes at the later time when the agent takes action.

The primary purpose of a power of attorney is characterized as enabling an agent to establish authority in the eyes of third parties in Villanueva v. Brown, 103 F.3d 1128, 1136 (3d Cir.1997); accord, Heine v. Newman, Tannenbaum, Helpern, Syracuse & Hirschtritt, 856 F.Supp. 190, 195-196 (S.D.N.Y.1994).

For the propositions that an agent must hold the belief that the principal desires an action, and that the belief must be reasonable, see Cho Mark Oriental Food, Ltd. v. K & K Int'l., 836 P.2d 1057, 1062 (Haw.1992) (to determine whether an agent acted with implied actual authority, " 'the relevant inquiry is whether the agent reasonably believes, because of the conduct of the principal (including acquiescence) communicated directly or indirectly to him, that the principal desires him so to act' "; agent, who helped friend buy property in exchange for commission, did not have implied authority on behalf of purchaser to help another friend obtain a lease to occupy the same property because agent did not believe he acted for owner in lease transaction and obtained no commission) (quoting Lewis v. Washington Metro. Area Transit Auth., 463 A.2d 666, 670 n.7 (D.C.1983)). Failure to prove that the agent held the belief that the principal authorized an action defeats a claim based on actual authority in Opp v. Wheaton Van Lines, Inc., 231 F.3d 1060, 1065 (7th Cir.2000) (insufficient evidence to support grant of summary judgment for carrier on issue of whether owner's former spouse had actual authority to execute release of liability presented by moving company retained by owner of goods; record contained no testimony from former spouse or movers that would indicate whether he believed he had authority to execute release because owner asked him to open the door for the movers but did not ask him to sign anything). See also Sarkes Tarzian, Inc. v. U.S. Trust Co. of Florida Sav. Bank, 397 F.3d 577, 583-585 (7th Cir.), cert. denied, 126 S. Ct. 398 (2005) (as a matter of law, agent lacked actual authority to bind principal to deal when unrebutted testimony established that agent had actual authority only to negotiate deal).

The principle that an agent's reasonable interpretation protects the agent from subsequent liability to a principal who subsequently argues that the agent interpreted the principal's instructions erroneously is stated in Credit Agricole Indosuez v. Muslim Commercial Bank Ltd., [2000] Lloyd's Law Rep. 275, 280 (Ct. App.) ("an agent is to be excused for acting on a reasonable, even if ultimately wrong, interpretation of his principal [sic] instructions"). The court applied this principle by analogy to the relationship in the case, between a bank that issued a letter of credit and the confirming bank that interpreted the instructions contained in the letter of credit to determine the documents required by the letter of credit. Drafted by the issuing bank, the letter of credit contained inconsistent and ambiguous provisions. The court relied on the statement in Midland Bank, Ltd. v. Seymour, [1955] 2 Lloyd's L. Rep. 147, 153 (Q.B.D.) that "when an agent acts on ambiguous instructions he is not in default if he can show that he adopted what was a reasonable meaning. It is not enough to say afterwards that if he had construed the documents properly he would on the whole have arrived at the conclusion that in an ambiguous document the meaning which he did not give to it would be better supported than the meaning which he did give to it."

d. General and special agents. For a durable discussion of the distinction between general and special agents, see Butler v. Maples, 76 U.S. 766, 773-775 (1869). Restatement Second, Agency, treated "general agent" and "special agent" as defined terms in § 3: "(1) A general agent is an agent authorized to conduct a series of transactions involving a continuity of service. (2) A special agent is an agent authorized to conduct a single transaction or a series of transactions not involving continuity of service." The prototypes of the special and general agent are as stated in J. Dennis Hynes & Mark J. Loewenstein, Agency, Partnership & the LLC: The Law of Unincorporated Business Enterprises xxxii-xxxiii (6th ed. 2003). Although the classification of agents into "general" and "special" might logically draw distinctions on the basis of the extent of authority or the extent of the act, the distinction underlying these labels generally relies on the extent of the act. See 1 Floyd R. Mechem, A Treatise in the Law of Agency 38 (2d ed. 1914). For contemporary usage of "special agent," see, e.g., Guardian Life Ins. Co. v. Chemical Bank, 727 N.E.2d 111, 115 (N.Y.2000) (insurance broker, not a general agent of an insurer, may be insurer's special agent for purposes of collecting premium from insured, processing insured's requests for policy loan or dividend withdrawal, or delivering insurer's check to insured; risk of loss for checks improperly paid on forged endorsements shifted from drawee bank to insurer); Hartzell Fan, Inc. v. Waco, Inc., 505 S.E.2d 196, 201 (Va.1998) (agreement between manufacturer and sales representative made representative a special agent of manufacturer for purpose of receiving customer payments and forwarding them to manufacturer; representative converted customer checks by endorsing and negotiating them, entitling manufacturer to offset commissions due representative against amount of checks converted).

In maritime usage, a "general agent" does many things in advance of the arrival of a vessel or after its departure. There is a presumption that a general agent looks solely to the credit of the owner for payment; unless the presumption is rebutted, the agent may not assert a maritime lien against the vessel. See Sunrise Shipping, Ltd. v. M/V American Chemist, 1999 A.M.C. 2906 (E.D.La.1999). Whether an agent is a general or a special agent depends on the facts. Id. at 2915.

**Case Citations - by Jurisdiction**

—

C.A.1,
C.A.1
C.A.2
C.A.3,
C.A.3
C.A.4
C.A.5,
C.A.5
C.A.6,
C.A.7,
C.A.7
C.A.8
C.A.9,
C.A.9
C.A.9, Bkrtcy.App.
C.A.10
C.A.10,
C.A.10
C.A.11,
C.A.11
Ct.Fed.Cl.
D.Ariz.
C.D.Cal.
S.D.Cal.
D.Del.Bkrtcy.Ct.
D.D.C.
M.D.Fla.
N.D.Ga.
S.D.Ga.
D.Idaho,
N.D.Ill.
D.Kan.
E.D.La.
D.Me.
D.Md.
D.Mass.
E.D.Mich.
W.D.Mich.
W.D.Mich.Bkrtcy.Ct.
N.D.Miss.

D.Nev.

D.N.M.

E.D.N.Y.

S.D.N.Y.

S.D.N.Y.Bkrtcy.Ct.

N.D.Okl.

D.Or.

E.D.Pa.

D.Utah,

E.D.Va.

E.D.Va.Bkrtcy.Ct.

N.D.W.Va.

Alaska

Ariz.App.

Cal.Super.

Colo.

Colo.App.

Conn.App.

Del.

Del.Ch.

Fla.App.

Iowa

Kan.

Ky.

Ky.App.

Mass.

Mass.App.

Neb.

Nev.

N.J.

N.J.Super.App.Div.

Okl.App.

Or.

Pa.

Tenn.App.

Utah App.

Wash.App.

**C.A.1,**

**C.A.1,** 2013. Cit. in sup. Private equity funds that were organized as Delaware limited partnerships sued multiemployer pension fund, seeking a declaratory judgment that they were not liable to the fund under the Multiemployer Pension Plan Amendments Act (MPPAA) for the withdrawal pension obligations of a bankrupt company that was part of their portfolio. The district court granted summary judgment for plaintiffs. Reversing in part and remanding, this court held that one of the private equity funds was a "trade or business" within the meaning of the MPAA for the purpose of imposing on it portfolio company's withdrawal liability. The court reasoned that, under Delaware law, the general partner of that fund, in providing management services to portfolio company, was acting as an agent of the fund, and thus its management activities could be attributed to the fund. Moreover, even absent Delaware law, the partnership agreements themselves granted actual authority for the general partner to provide management services to portfolio companies like the one in this case. Sun Capital Partners III, LP v. New England Teamsters & Trucking Industry Pension Fund, 724 F.3d 129, 147.

### C.A.1

**C.A.1,** 2012. Quot. in sup. Monastery brought a copyright-infringement action against archbishop who was a former member of monastery, alleging that archbishop posted on his website monastery's translations of ancient religious texts from their original Greek into English. The district court granted summary judgment for plaintiff. Affirming, this court held, inter alia, that, regardless of whether the law mandated a showing of volitional conduct to establish direct infringement, defendant engaged in sufficient acts of authority and control over the computer server and material actually posted that he could be held liable for direct infringement of plaintiff's works; because priest-monk who personally uploaded plaintiff's works to defendant's website acted as defendant's agent in both building and handling the technical aspects of the website, defendant as principal could be held liable for the authorized acts of monk as his agent. Society of Holy Transfiguration Monastery, Inc. v. Gregory, 689 F.3d 29, 57.

**C.A.1,** 2011. Com. (c) quot. in ftn. Ophthalmology practice brought a breach-of-contract action against provider of direct-deposit payroll services, alleging that, over a six-year period, plaintiff's employee who was the designated payroll contact with defendant had directed defendant to pay her substantially more than her authorized annual salary, and defendant had in fact done so. Affirming the district court's grant of summary judgment for defendant, this court held that plaintiff, by placing its employee in a position where it appeared that she had authority to order additional checks and by acquiescing in her acts through its failure to examine the payroll reports, created apparent authority in employee such that defendant reasonably relied on her authority to issue the additional paychecks. The court noted that, in contrast to apparent authority, actual authority referred to the manifestation that a principal made to its agent. Ophthalmic Surgeons, Ltd. v. Paychex, Inc., 632 F.3d 31, 38.

### C.A.2

**C.A.2,** 2012. Cit. in sup. Shipowner sued supplier of marine shipping fuel, seeking a declaratory judgment that it was not contractually bound to arbitrate with defendant. The district court dismissed the action. Vacating and remanding, this court held, inter alia, that nothing in the record unequivocally showed that managing company (which had signed, purportedly on plaintiff's behalf, defendant's fuel-order confirmations containing an arbitration clause) had actual authority to act for plaintiff; leasing agreements between plaintiff and the charterers of its vessels, under which plaintiff allegedly retained a variety of rights, did not necessarily show that managing company was acting on plaintiff's behalf, and not on its own. Garanti Finansal Kiralama A.S. v. Aqua Marine and Trading Inc., 697 F.3d 59, 71.

### C.A.3,

**C.A.3,** 2013. Quot. in disc. Female high-school-basketball official brought, inter alia, a Title VII claim against state interscholastic athletic association and international association of basketball officials, among others, alleging that defendants were vicariously liable for the actions of a local board, which was a chapter of state association and whose members were associated with international association, in excluding her from officiating at boys' high-school-varsity-basketball games. The district court dismissed the complaint with prejudice. Affirming in part and remanding in part, this court held, among other things, that defendants lacked sufficient control over the board to be vicariously liable for its alleged Title VII violations In making its decision, the court noted that vicarious liability due to an agency relationship could be based on the agent's actual authority, and it could also be based on apparent authority. Covington v. International Ass'n of Approved Basketball Officials, 710 F.3d 114, 120.

### C.A.3

**C.A.3,** 2011. Quot. in ftn., com. (b) quot. in ftn. Architectural firm sued property owners and replacement firm hired by owners to finish a project begun by plaintiff's architect, alleging, among other things, that defendants violated its copyright in the design for the project. The district court granted summary judgment for defendants on plaintiff's copyright claim, finding that

the copyright was owned by another firm that employed architect when he initiated the design. Affirming that portion of the decision, this court held that there was no evidence to support plaintiff's allegation that the other firm, acting through architect as its executive officer, orally assigned the copyright to plaintiff, noting that the only writing memorializing the alleged assignment was dated nearly nine years after it took place and more than four years after this action was filed. Barefoot Architect, Inc. v. Bunge, 632 F.3d 822, 831.

### C.A.4

**C.A.4,** 2012. Quot. in sup. Nursing-home operator petitioned for judicial review of a National Labor Relations Board (NLRB) order that it cease and desist from refusing to bargain with union as the exclusive bargaining representative of nursing home's employees. This court denied nursing home's petition and enforced the NLRB order, holding that the union was properly certified. The court rejected nursing home's argument that the union-representation election should have been set aside because it was improperly tainted by the allegedly racially inflammatory comments made by the executive director of a civil-rights organization's Virginia chapter, concluding that the Virginia chapter was not union's apparent agent, where the evidence fell far short of showing that it was instrumental in every step of the campaign process, and executive director's remarks were made months before the election. Ashland Facility Operations, LLC v. N.L.R.B., 701 F.3d 983, 990.

### C.A.5,

**C.A.5,** 2020. Quot. in sup. and cit. in ftn. Lender filed an adversary proceeding against Chapter 7 debtor who personally guaranteed lender's loan to debtor's cardiology practice, seeking a determination that debtor's debt on the guaranty could not be discharged, because debtor's wife furnished a materially false personal financial statement to lender when renewing the loan. After a bench trial, the bankruptcy court ruled that the debt was dischargeable even though wife was debtor's agent and her intent to deceive could be imputed to debtor, because lender did not reasonably rely on the statement. The district court affirmed. This court reversed and rendered judgment for lender, holding that lender's reliance was reasonable. In making its decision, the court concluded that the bankruptcy court did not err in finding that wife was debtor's actual and apparent agent under Restatement Third of Agency §§ 2.01 and 2.03, noting that debtor directed wife, who oversaw the cardiology practice's day-to-day finances, to manage their personal affairs, that wife had the authority to prepare the statement, which debtor signed, and that wife worked with lender in securing the loan renewal. Matter of Osborne, 951 F.3d 691, 704.

### C.A.5

**C.A.5,** 2016. Quot. in sup. Personal representative of nursing-home resident brought, inter alia, wrongful-death and negligence actions against nursing home. The district court denied defendant's motion to compel arbitration based on an arbitration agreement that plaintiff signed when resident was first admitted. This court vacated and remanded, holding that there were genuine issues of material fact regarding the existence and scope of an agency relationship between plaintiff and resident. Citing Restatement Third of Agency § 2.01 for the definition of "actual authority," the court explained that plaintiff's deposition testimony was competent evidence of his alleged actual authority, because plaintiff was able to testify about his belief at the time he signed the agreement, which was relevant to a finding that there was an agency relationship. Gross v. GGNSC Southaven, L.L.C., 817 F.3d 169, 179.

### C.A.6,

**C.A.6,** 2019. Cit. in conc. op. §§ 2.01-2.03. Employee sued employer, seeking damages for injuries he allegedly sustained at work. The district court dismissed employee's complaint as a sanction for his and his attorney's conduct in refusing to answer questions at a court-ordered independent medical examination. Affirming, this court held that the record supported a finding that employee and his attorney both acted in bad faith and willfully violated the court's discovery order. The concurring opinion stressed that misconduct by a party was not a precondition to dismissing a case as a sanction for misconduct by the party's

lawyer, because parties became bound by the actions of lawyers taken on their behalf with actual or apparent authority under the Restatement Third of Agency and the Restatement Third of the Law Governing Lawyers. Mager v. Wisconsin Central Ltd., 924 F.3d 831, 841.

**C.A.7,**

**C.A.7,** 2022. Com. (b) quot. in sup. After being indicted for distributing controlled substances, criminal defendant filed a motion to dismiss, alleging that he received federal immunity through a cooperation agreement he entered into with state police. The district court denied defendant's motion to dismiss. This court affirmed, holding, inter alia, that promises made to defendant by state police and defendant's federal probation officer did not bind the U.S. government under the principle of apparent authority. Citing Restatement Third of Agency §§ 2.01 and 2.03, the court explained that defendant had no contact with the U.S. Attorney's Office, the U.S. Attorney's Office made no manifestations indicating that state police and probation officer had the authority to offer federal immunity on the Office's behalf, and state police and probation officer lacked actual authority to bind the U.S. government. United States v. Johnson, 43 F.4th 771, 781.

**C.A.7**

**C.A.7,** 2021. Cit. and quot. in sup. Consumer sued health insurer and its contractor, alleging that contractor hired telemarketers to place unauthorized robocalls selling health insurance to consumer and others in violation of the Telephone Consumer Protection Act and the Illinois Automatic Telephone Dialing Act. The district court granted insurer and contractor's motion to dismiss, finding that consumer failed to plausibly allege that the telemarketers were agents of insurer or contractor such that insurer or contractor were vicariously liable for the telemarketers' actions. This court reversed and remanded, holding that consumer stated a plausible claim for relief under an actual authority theory of agency liability. The court reasoned that consumer's allegations supported an inference that insurer authorized the telemarketers to act on its behalf and subject to its control such that an agency relationship existed under Restatement Third of Agency §§ 1.01 and 2.01. Bilek v. Federal Insurance Company, 8 F.4th 581, 587, 588, 591.

**C.A.7,** 2008. Cit. in disc. Sole shareholder of corporation that operated gas station sued oil company, alleging that defendant violated the Petroleum Marketing Practices Act by terminating gas station's franchise without the statutorily required notice and cause. The trial court granted summary judgment for defendant, holding that plaintiff lacked prudential standing because he suffered only an indirect, derivative injury as sole shareholder of corporation, the real party in interest. Affirming, this court held that there was no factual or legal support for plaintiff's position that he was entitled to bring this suit in his own name as agent for corporation as undisclosed principal, since plaintiff failed to show that he had actual authority, and acted on behalf of an undisclosed principal, and that defendant had notice that plaintiff was acting on behalf of an undisclosed principal. Rawoof v. Texor Petroleum Co., Inc., 521 F.3d 750, 758.

**C.A.8**

**C.A.8,** 2012. Cit. in sup. Former key executives brought a breach-of-contract action against employer, seeking pro rata distributions pursuant to performance and stock agreements issued under employer's unfunded long-term incentive and equity compensation plans, which were not governed by ERISA. The district court entered judgment for plaintiffs. Affirming in part, this court held, inter alia, that defendant's senior vice president of administrative services did not have implied authority to determine that plaintiffs would not receive payments under the agreements; under the plans' structures, the executive compensation committee (ECC), not defendant or its senior executives, was the designated administrator for the agreements, and there was no evidence that the ECC implicitly delegated any authority to defendant's vice president. Schaffart v. ONEOK, Inc., 686 F.3d 461, 472.

**C.A.9,**

**C.A.9,** 2019. Cit. in disc. and in diss. op.; com. (c) quot. in diss. op. Borrower brought a lawsuit against owner of student loans, alleging that defendant was vicariously liable for the violations of federal statutes on telephone use committed by its loan servicers in pursuing loan repayments from plaintiff. The district court granted defendant's motion for summary judgment. This court reversed and remanded, holding that there was a genuine dispute of material fact as to whether, under Restatement Third of Agency § 2.01, defendant had become loan servicers' principal by ratifying their actions. The dissent cited § 2.01 in arguing that defendant could not have ratified loan servicers' actions, because servicers could not have reasonably believed that defendant would have wished for them to violate federal statutes in their service to defendant. Henderson v. United Student Aid Funds, Inc., 918 F.3d 1068, 1073, 1082.

**C.A.9,** 2017. Quot. in sup. Consumers sued seller of vehicle-service contracts, seeking to hold it vicariously liable for telephone calls that a telemarketing vendor made to consumers on seller's behalf in violation of the Telephone Consumer Protection Act. The district court granted summary judgment for seller. This court affirmed, holding that the district court did not err in finding that vendor was seller's independent contractor, rather than its agent, and that seller therefore could not be vicariously liable for vendor's calls. The court reasoned that seller did not have sufficient control over vendor's actions for vendor to be considered seller's agent under the Restatement Third of Agency, noting that vendor sold contracts for multiple companies without seller's direct supervision, provided its own equipment, set its own hours, and only received payment if it actually made a sale. Jones v. Royal Administration Services, Inc., 866 F.3d 1100, 1105.

**C.A.9,** 2017. Cit. in case cit. in disc. Photography company that sold candid photographs of celebrities brought a copyright-infringement action against social-media platform that posted 20 of plaintiff's copyrighted photographs online. The district court granted defendant's motion for summary judgment based on the Digital Millennium Copyright Act's safe-harbor defense. This court reversed, vacated, and remanded, holding that common-law agency principles applied to the determination of whether acts of volunteer moderators who reviewed and approved the photographs and were led by an employee of defendant could be attributed to defendant, and that there were genuine issues of material fact regarding whether the moderators were defendant's agents. The court cited Restatement Third of Agency §§ 2.01, 2.03, and 4.01 in explaining that an agency relationship could be created through actual or apparent authority, and concluded that, here, factual issues existed, given plaintiff's evidence that users may have reasonably believed that the moderators had authority to act for defendant and that defendant maintained significant control over the platform and its moderators. Mavrix Photographs, LLC v. Livejournal, Inc., 873 F.3d 1045, 1054.

**C.A.9,** 2017. Cit. in case cit. in sup. Owner of copyrighted photographs brought an infringement action against owner of a social-media platform, alleging that defendant posted plaintiff's photographs online after its users submitted the photographs to defendant and a team of volunteer moderators led by defendant's employee reviewed and approved them. The district court granted summary judgment for defendant, finding that defendant was protected by the safe-harbor provision of the Digital Millennium Copyright Act. Reversing and remanding, this court held that a genuine factual dispute remained regarding whether the moderators were defendant's agents under the Restatement Third of Agency, such that their acts could be attributed to defendant. The court noted that an agent did not have to receive payment from a principal to be an agent, and pointed to evidence that, unlike other sites where users could independently post content, defendant gave moderators explicit and varying levels of authority to screen posts, as well as express directions about their screening functions, including criteria for accepting or rejecting posts. Mavrix Photographs, LLC v. LiveJournal, Inc., 853 F.3d 1020, 1029.

**C.A.9,** 2014. Cit. in sup. Cellular-phone user brought a putative class action against marketing consultant under the Telephone Consumer Protection Act (TCPA), alleging that defendant instructed or allowed a third-party caller to send unsolicited text messages to his phone on behalf of its client. The district court granted summary judgment for defendant. Vacating and remanding, this court held that, even though defendant outsourced the dialing to the third-party caller and did not actually make any calls on behalf of its client, it could be held vicariously liable for TCPA violations where plaintiff established that an agency relationship, as defined by federal common law, existed between defendant and the third-party caller. The court cited

Restatement Third of Agency § 2.01 in noting that agency could be established by, among other things, express authorization. Gomez v. Campbell-Ewald Co., 768 F.3d 871, 878.

**C.A.9**

**C.A.9,** 2011. Cit. in sup. Argentinian residents sued German corporation under the Alien Tort Statute and the Torture Victims Protection Act, alleging that defendant's Argentinian subsidiary collaborated with state-security forces to kidnap, detain, torture, and kill plaintiffs and/or their relatives during Argentina's "Dirty War." The district court granted defendant's motion to dismiss for lack of personal jurisdiction. Reversing and remanding, this court held that defendant was subject to personal jurisdiction in California through the contacts of its U.S. subsidiary; defendant had more than enough control over its U.S. subsidiary to establish that U.S. subsidiary was defendant's agent for purposes of personal jurisdiction, because defendant had the right to control nearly every aspect of U.S. subsidiary's operations. Bauman v. DaimlerChrysler Corp., 644 F.3d 909, 923.

**C.A.9,** 2009. Com. (d) cit. in diss. op. Argentinean residents sued German manufacturer of motor vehicles, alleging human rights violations committed in Argentina by manufacturer's Argentinean subsidiary during the 1970's military regime. The district court granted defendant's motion to dismiss for lack of personal jurisdiction. Affirming, this court, conducting a minimum-contacts analysis, held that the contacts of manufacturer's United States subsidiary could not be imputed to manufacturer, because manufacturer's United States subsidiary exercised insufficient control over and did not serve as manufacturer's representative. The dissent argued that, at common law, agents could exercise a considerable amount of discretion in performing their functions, and that a less stringent showing of control was required for the limited purpose of establishing personal jurisdiction. Bauman v. DaimlerChrysler Corp., 579 F.3d 1088, 1099.

**C.A.9, Bkrtcy.App.**

**C.A.9, Bkrtcy.App.**2011. Sec. and com. (b) quot. in disc. and cit. in sup. Debtor objected to proofs of claim filed by party to master repurchase agreements through which party had sold debtor's loans to buyer, alleging that party failed to show that it had express authority to file the proofs of claim as buyer's authorized agent. The bankruptcy court held that party had authority to file the proofs of claim. Affirming, this court held that the bankruptcy court did not err when it determined that buyer's express authorization for party to pursue buyer's interests in debtor's case necessarily included an authorization to file the disputed claims. In re Palmdale Hills Property, LLC, 457 B.R. 29, 47, 48, 50.

**C.A.10**

**C.A.10,** 2020. Cit. and quot. in sup. Farm workers sued agricultural employer, alleging, inter alia, that defendant breached an employment agreement entered into between the parties through a labor contractor and violated federal agricultural-labor statutes when labor contractor abruptly terminated plaintiffs' employment. The district court granted defendant's motion for summary judgment. This court reversed in part and remanded, holding that the district court erred in finding that labor contractor's breach of the parties' employment agreement could not be attributed to defendant, because a reasonable jury could find that labor contractor was defendant's agent. Citing Restatement Third of Agency § 2.01, the court explained that there was a genuine dispute of material fact as to whether defendant's manifestations made to labor contractor through their recruitment-services agreement caused labor contractor to reasonably believe that it had the authority to enter into binding agreements on defendant's behalf. Alfaro-Huitron v. Cervantes Agribusiness, 982 F.3d 1242, 1251, 1256.

**C.A.10,**

**C.A.10,** 2013. Quot. in sup. Retailer of replacement contact lenses brought a claim for service-mark infringement under the Lanham Act against competitor, alleging, among other things, that a third-party marketer hired by competitor, known as an affiliate, had purchased keywords resembling plaintiff's 1800CONTACTS mark and was using the mark in the text of its online

ads. The district court granted summary judgment for defendant. Affirming in part, this court held, inter alia, that defendant was not vicariously liable for its affiliate's allegedly infringing actions under agency law, because, even if the affiliate was an agent (or, more precisely, a subagent) of defendant, it lacked actual authority from defendant to include plaintiff's mark in ads for defendant. The court noted that there was undisputed evidence that the affiliate did not believe that defendant authorized him to publish ads displaying plaintiff's mark in his text, and thus the subjective component of actual authority was absent. 1-800 Contacts, Inc. v. Lens.com, Inc., 722 F.3d 1229, 1251.

### C.A.10

**C.A.10,** 2008. Quot. in sup. After passenger who was accompanying her husband in a tanker truck he was driving on a work-related trip was injured when the truck rolled over, she sued husband's employer, alleging that defendant was vicariously liable for husband's negligence. The district court entered summary judgment for defendant. Affirming, this court held that plaintiff failed to establish any basis under Wyoming law on which a rational jury could have decided that her husband had actual authority, whether express or implied, or apparent authority to invite her to travel with him; it was not reasonable for husband to assume that he had implied actual authority, derived from his past dealings with and duties for defendant, to invite plaintiff to accompany him. Beardsley v. Farmland Co-Op, Inc., 530 F.3d 1309, 1316.

### C.A.11,

**C.A.11,** 2017. Quot. in sup. Lessor of telecommunications equipment brought an action against the government of Belize, seeking millions of dollars in unpaid rent based on the parties' lease agreement, which was entered into on behalf of defendant by a government minister. The district court granted defendant's motion to dismiss; the court of appeals vacated and remanded. On remand, the district court denied defendant's motion to dismiss. Affirming, this court held that defendant was bound by a sovereign-immunity waiver contained in the agreement. The court cited Restatement Third of Agency § 2.01 for a definition of "actual authority," and determined that, here, it did not need to decide whether the minister had the authority to enter into the agreement, because defendant subsequently ratified his action by making payments in accordance with the lease schedules for two concurrent five-year leases and by retaining its benefits under the agreement. GDG Acquisitions LLC v. Government of Belize, 849 F.3d 1299, 1308.

### C.A.11

**C.A.11,** 2011. Cit. in sup. Mexican farm workers hired as guest workers through the Department of Labor's H-2A visa program brought suit under the Fair Labor Standards Act against Georgia onion grower that employed them, alleging that they were entitled to reimbursement from defendant for the fees that employment agencies had charged them. The district court granted summary judgment for defendant. Affirming in part, this court held, inter alia, that, under principles of agency law, defendant was not liable for the fees, because plaintiffs failed to present substantial evidence that defendant provided employment agencies with the authority to collect those fees; defendant never expressly permitted nor acquiesced in the collection of the fees, and the agreement that defendant signed with contractor it employed to facilitate the hiring of plaintiffs made no reference to the collection of fees from workers. Ramos-Barrientos v. Bland, 661 F.3d 587, 600.

### Ct.Fed.Cl.

**Ct.Fed.Cl.**2022. Quot. in sup. Licensor of software filed a copyright-infringement action against the government, which had licensed the software from a reseller of licensor, alleging that the government made more copies of the software than permitted under the license. This court denied the government's motion for summary judgment, holding that a question of fact remained as to the validity of a release that the government entered with reseller after reseller discovered that the government had made too many copies of the software. The court rejected licensor's argument that reseller did not have the authority to release copyright-infringement claims, citing Restatement Third of Agency § 2.01 in reasoning that, although licensor claimed that it did not make

reseller its agent, it gave reseller the authority to agree to the release, which encompassed the copyright-infringement claim. 4DD Holdings, LLC v. United States, 159 Fed.Cl. 337, 352.

**Ct.Fed.Cl.**2015. Quot. in sup. Investor-owned utilities brought a breach-of-contract action against the United States, seeking a refund for overcharges for electricity by federal agencies that sold hydroelectric power as part of its wholesale markets, which were operated by nonprofit public utilities, and alleging that, because defendant was liable for breach of power-exchange agreements with the public utilities, it was liable to plaintiffs. The district court entered judgment for plaintiffs. The court of appeals vacated that opinion. This court granted defendant's motion to dismiss, holding that plaintiffs lacked standing to sue. The court cited Restatement Third of Agency § 2.01 and determined that neither of the public utilities that contracted with defendant was an agent of plaintiffs and none of the exceptions to privity applied. Pacific Gas and Electric Company v. United States, 122 Fed.Cl. 315, 333.

**D.Ariz.**

**D.Ariz.**2008. Cit. in case quot. in disc. Manufacturer of indoor tanning products sued Internet reseller that purchased manufacturer's products from tanning salons and resold them on reseller's websites, alleging, among other things, that defendant caused some of plaintiff's distributors to sell plaintiff's products to defendant, thereby breaching their distributorship agreement with plaintiff. Granting in part defendant's motion for summary judgment, this court rejected plaintiff's argument that even if defendant had never purchased the products directly from a distributor, the salons were acting as plaintiff's agents when they purchased the products from the distributors. The court held that the evidence did not support a finding of actual authority, because it did not show that plaintiff had the right to control the salons' transactions with distributors, but rather that plaintiff and the salons entered into arms-length transactions. Designer Skin, LLC v. S & L Vitamins, Inc., 560 F.Supp.2d 811, 826.

**C.D.Cal.**

**C.D.Cal.**2021. Quot. in disc. Cell-phone users brought a putative class action against satellite-television company, alleging that defendant violated the Telephone Consumer Protection Act when its contracted debt collectors sent prerecorded phone calls to plaintiffs in order to collect on television-account fees that were purportedly unpaid, despite the fact that plaintiffs were never defendant's customers. This court granted in part plaintiffs' motion for summary judgment, holding that, according to the undisputed record, defendant ratified the actions of debt collectors, and debt collectors had apparent authority to act on defendant's behalf when they attempted to collect the debts in defendant's name. The court noted that, although plaintiff did not pursue this cause of action, defendant could be liable for violations of the Act under Restatement Third of Agency § 2.01 if debt collectors had actual authority to collect from plaintiffs because they reasonably believed that defendant's manifestations indicated a wish for them to do so. Brown v. DirecTV, LLC, 562 F.Supp.3d 590, 607.

**S.D.Cal.**

**S.D.Cal.**2016. Quot. in sup. Union member brought this breach-of-contract action against apprentice committee and union, alleging that defendants unfairly and unreasonably terminated his apprenticeship agreement in violation of the Labor-Management Relations Act and the Labor-Management Reporting and Disclosure Act. Denying in part defendants' motion to dismiss plaintiff's amended complaint, this court held that plaintiff had pled sufficient facts to support his claim that an agency relationship existed between defendants. The court quoted Restatement Third of Agency § 2.01 in defining when "actual authority" existed and gave rise to an agency relationship. Maurer v. International Brotherhood of Electrical Workers, Local 569, AFL-CIO, 219 F.Supp.3d 1017, 1028.

**D.Del.Bkrtcy.Ct.**

**D.Del.Bkrtcy.Ct.**2007. Quot. in sup. Company that performed maintenance and repair work at Chapter 11 debtor's oil refinery brought an adversary proceeding against debtor, alleging that debtor agreed to pay plaintiff's prepetition claims in full if company rebuilt the refinery's coker unit without delay. Granting judgment for plaintiff, this court held, inter alia, that debtor's chief operating officer (COO), as the senior client representative for debtor in its relationship with plaintiff, had actual and apparent authority to make the oral statements allegedly binding debtor to the agreement, and that the COO's statements to plaintiff were ratified by other members of debtor's senior management. In re Orion Refining Corp., 372 B.R. 688, 694.

**D.D.C.**

**D.D.C.**2012. Cit. in sup. Commercial real estate broker brought a breach-of-contract action against limited-liability company (LLC) and its sole member, alleging that defendants failed to pay it certain commissions pursuant to a brokerage agreement. Granting in part plaintiff's motion for summary judgment, this court held that, because LLC's sole member entered into the brokerage agreement as LLC's agent, and acted within the scope of his actual authority as LLC's agent, LLC was a party to the agreement, and was legally bound by its terms. Uhar & Co., Inc. v. Jacob, 840 F.Supp.2d 287, 290.

**D.D.C.**2011. Sec. and com. (c) quot. in sup. Purported sub-subcontractor on a transit-authority-bridge project sued contractor for breach of a construction contract, alleging that subcontractor's principal had actual authority from contractor to hire plaintiff for dredging work. This court granted summary judgment for defendant on the ground that plaintiff breached the sub-subcontract by failing to purchase insurance; it also concluded that subcontractor's principal did not have actual authority to enter into the sub-subcontract with plaintiff. The court explained that subcontractor and its principal were explicitly prohibited from further contracting out subcontractor's responsibilities under its subcontract with contractor without first obtaining contractor's written permission, and contractor's principal asserted that he neither provided prior written permission nor otherwise consented to plaintiff's sub-subcontract purportedly signed on contractor's behalf. A-J Marine, Inc. v. Corfu Contractors, Inc., 810 F.Supp.2d 168, 175, 176.

**D.D.C.**2007. Cit. in sup. §§ 2.01-2.03. Relator and the United States sued bidders on an Egyptian wastewater project using United States aid agency funds, alleging conspiracy to rig bids and submission of false claims. Denying government's motion to compel production of documents from defendants' expert witnesses, this court rejected government's argument that defendants' counsel accepted service of subpoenas duces tecum for the experts. The court stated that it knew of no authority for the proposition that attorneys who had retained expert witnesses on behalf of their clients became ipso facto agents of those expert witnesses for the purposes of service of process whereby the witnesses delegated to them the right to waive any objection they might have to the subpoenas the lawyers accepted; to determine liability on the principal for the acts of an agent, one looked at what the principal did, and, here, there was no evidence that the witnesses waived their objections. Miller v. Holzmann, 471 F.Supp.2d 119, 121.

**M.D.Fla.**

**M.D.Fla.**2010. Cit. in ftn. Shipyard employee sued the United States, alleging that he was injured while performing contract repair work for a steel renewal project aboard a vessel owned by defendant. After a bench trial, this court found in favor of defendant, holding, among other things, that the conduct of the project's port engineer, who had been retained by defendant's managing agent for the vessel, was not attributable to defendant. The court reasoned, in part, that, even assuming that port engineer was an agent of defendant's managing agent, he was not a subagent of defendant, because managing agent did not have either actual or apparent authority to appoint him as a subagent; plaintiff produced no evidence that defendant authorized managing agent to delegate its responsibilities or that defendant authorized port engineer to act on its behalf. Green v. U.S., 700 F.Supp.2d 1280, 1302.

**M.D.Fla.**2009. Cit. in disc. Estate and family of rental-car passenger who died following an accident in which the car's brake system allegedly seized brought action for negligence, strict liability, and breach of warranty against franchisor of rental-car franchisee that provided the car. Granting summary judgment for defendant, this court held, inter alia, that defendant was not

26-11268-mg Doc 23-3 Filed 06/24/26 Entered 06/24/26 13:13:49 Exhibit C Pg 110 of 882

vicariously liable for franchisee's provision of the allegedly defective vehicle under theories of agency or respondeat superior. The court reasoned, in part, that a franchisee's mere use of a franchisor's trademarks was insufficient as a matter of law to establish the reliance prong of apparent authority, and nothing in the franchise agreement went beyond a typical franchise relationship such that franchisor participated in directing or managing franchisee's business. Estate of Miller v. Thrifty Rent-A-Car System, Inc., 637 F.Supp.2d 1029, 1037.

**N.D.Ga.**

**N.D.Ga.**2014. Cit. in ftn. §§ 2.01-2.03. Daughter and son of patient who died approximately 15 days after being admitted to long-term care facility brought a wrongful-death action against facility, among others, asserting negligence and other claims. This court denied defendants' motion to compel arbitration pursuant to an agreement signed by daughter upon mother's admission to the facility, holding that daughter did not have express, implied, or apparent authority to bind patient to an arbitration agreement. The court pointed out that patient never signed the agreement, that daughter had no legal status as patient's representative, that patient never authorized daughter to sign the agreement on her behalf, and that there was no evidence that patient gave defendants any indication that she agreed to be represented by daughter. Hogsett v. Parkwood Nursing & Rehabilitation Center, Inc., 997 F.Supp.2d 1318, 1324.

**S.D.Ga.**

**S.D.Ga.**2010. Quot. in sup. Mexican farm workers hired through Department of Labor program sued employer under the Fair Labor Standards Act, seeking unpaid wages. Granting in part defendant's motion for summary judgment, this court held that defendant was not responsible for reimbursing plaintiffs for processing and recruiting fees collected from plaintiffs by private employment service companies, because those companies did not have apparent authority to charge the fees in question. The court denied plaintiffs' motion for reconsideration, concluding that companies also lacked actual authority from defendant to collect recruiting and processing fees; there was no evidence that defendant authorized companies to collect the fees. Ramos-Barrientos v. Bland, 728 F.Supp.2d 1360, 1383.

**D.Idaho,**

**D.Idaho,** 2011. Cit. in sup. Direct and indirect purchasers of potatoes sued, among others, nongrowing licensor of brand name, alleging, among other things, that licensor was vicariously liable under the Sherman Antitrust Act for the involvement of licensee potato growers cooperative in a price-fixing scheme. Granting licensor's motion to dismiss, this court held, among other things, that plaintiffs' allegations were insufficient to support the conclusion that licensor invested licensee with actual or apparent authority to act on its behalf; while licensor and licensee had some united interests, this was not enough to plausibly suggest that one entity was the agent of the other without an indication that either was directing or in a position to control the other. In re Fresh and Process Potatoes Antitrust Litigation, 834 F.Supp.2d 1141, 1167.

**N.D.Ill.**

**N.D.Ill.**2020. Quot. in sup. Consumer who resided in Illinois filed a class action against provider of television, internet, and telephone services that was incorporated in Delaware and had its principal place of business in Connecticut, seeking to hold defendant vicariously liable for violating the Telephone Consumer Protection Act based on unsolicited calls that a telemarketer made to plaintiff purportedly on defendant's behalf. This court granted defendant's motion to dismiss for lack of personal jurisdiction, holding, among other things, that plaintiff failed to provide sufficient allegations to support a prima facie case of personal jurisdiction based on an agency relationship between defendant and the telemarketer. The court cited Restatement Third of Agency § 2.01 in pointing out that plaintiff did not allege that defendant explicitly granted the telemarketer actual authority to place the outbound telemarketing calls to plaintiff or other Illinois residents. Moore v. Charter Communications, Inc., 523 F.Supp.3d 1046, 1051.

**N.D.Ill.**2016. Com. (b) quot. in case quot. in sup., cit. in ftn. (general cite). Son, on behalf of his father, brought a personal-injury action against assisted-living facility, alleging that father suffered injuries as a result of defendant's negligence when he was a resident at the facility. This court denied defendant's motion to compel arbitration based on an optional arbitration agreement that son signed while exercising powers of attorney during father's admission to the facility, holding that the powers of attorney given to son by father's Illinois statutory short-form power of attorney and Arizona durable power of attorney did not give son actual, express authority to bind father to the arbitration agreement. The court explained that the Arizona power of attorney did not expressly mention the authority to enter into an arbitration agreement, and Arizona followed Restatement Third of Agency § 2.01 in requiring specific or detailed language to support a finding that a principal intended to create express authority. Testa Testa v. Emeritus Corporation, 168 F.Supp.3d 1103, 1112, 1113, 1115.

**N.D.Ill.**2014. Cit. in sup. Consumer filed a class action against business and telemarketer, alleging that business hired telemarketer to make unsolicited calls to her cellular telephone number in violation of the Telephone Consumer Protection Act. This court denied in part defendants' motion to dismiss, holding that consumer made sufficient allegations to support her claim that business was vicariously liable for the alleged misconduct of telemarketer under a theory of actual agency, as set forth in the Restatement Third of Agency. The court pointed to consumer's allegations that business and telemarketer entered into a written agreement pursuant to which telemarketer agreed to make calls to consumers for the purpose of entering into contracts with recipients on behalf of business, and that business exercised a level of control over telemarketer's activities so as to make the existence of an agency relationship plausible. Toney v. Quality Resources, Inc., 75 F.Supp.3d 727, 742.

**D.Kan.**

**D.Kan.**2017. Com. (b) quot. in case quot. in sup. Cattle seller sued buyer, seeking payment for cattle that buyer's purported agent purchased on behalf of buyer at seller's livestock auction. This court denied buyer's motion to dismiss, holding that seller's allegations—that buyer sent the agent to seller's auction for the purpose of purchasing certain types of cattle on buyer's behalf —supported a plausible inference that buyer gave the agent express authority to buy the cattle at issue for buyer. The court cited Restatement Third of Agency § 2.01 in support of the proposition that express authority existed when a principal delegated authority to an agent in very specific or detailed language that expressly authorized the agent to do a delegable act. Rezac Livestock Commission Company, Inc. v. Pinnacle Bank, 255 F.Supp.3d 1150, 1167.

**D.Kan.**2015. Com. (b) quot. in case quot. in sup. Kansas law firm brought an action against California law firm and its founding partner, alleging that defendants failed to pay attorney's fees owed under the parties' fee-sharing agreement related to various lawsuits against a diabetes-medication manufacturer; defendants filed a motion to compel arbitration pursuant to a settlement agreement that defendants had entered into with the manufacturer. This court denied defendants' motion to compel arbitration, holding that there were genuine issues of material fact as to whether the parties had agreed to arbitrate. Citing Restatement Third of Agency §§ 2.01 and 2.02, the court explained that an agent's signature could bind its principal to an arbitration provision, but determined that, while plaintiff gave defendants authority to settle the cases for their jointly-represented clients, there were factual questions as to whether this authority included the power to agree to the arbitration provision. Hutton & Hutton Law Firm, LLC v. Girardi & Keese, 96 F.Supp.3d 1208, 1230.

**E.D.La.**

**E.D.La.**2020. Cit. in sup. Vessel owner brought an action under the Shipowner's Limitation of Liability Act against sailor and owner of crewboat, alleging that its liability, which arose from a collision that involved plaintiff's vessel and crewboat and that injured sailor, should be limited to the value of its vessel. This court granted defendants' motion to dismiss, holding that plaintiff's action was untimely under the terms of the Act, because it was filed more than six months after plaintiff's claims adjuster sent communications to defendants discussing sailor's injury. Citing Restatement Third of Agency § 2.01, the court pointed out that plaintiff manifested intent for claims adjuster to have actual authority to act on its behalf when it appointed him as its agent. Matter of Bonvillian Marine Service, Inc., 502 F.Supp.3d 1078, 1085.

**E.D.La.**2019. Quot. in sup. Owner of a 48-foot sport-fishing vessel sued shipyard that had filed liens against the vessel for unpaid repairs, seeking a declaratory judgment that the vessel was not subject to the liens because the repairs were not authorized; shipyard counterclaimed and filed a third-party complaint against prior owner, alleging that prior owner's agent had requested the repairs. After a bench trial, this court held that prior owner was liable for the repairs even if his agent lacked actual authority to request them under Restatement Third of Agency § 2.01, because prior owner clearly ratified the acts of his agent by participating in the delivery of the vessel to shipyard, instructing his agent to communicate with shipyard regarding the work, and reimbursing his agent for a portion of shipyard's invoices. RSDC Holdings, LLC v. M.G. Mayer Yacht Services, Inc., 429 F.Supp.3d 246, 257.

**D.Me.**

**D.Me.**2021. Quot. in case quot. in sup. Beneficiary of insured under a voluntary life-insurance policy offered by insured's employer sued insurer that issued the policy to employer, alleging that insurer improperly capped the benefits available to beneficiary under the policy on the ground that it had not received an "evidence of insurability" form from insured. This court granted insurer's motion for judgment on the administrative record, holding that beneficiary had not met her burden of establishing that insurer knowingly and voluntarily waived the requirement to provide the form. The court rejected beneficiary's argument that waiver could be established based on employer's actions because employer acted as insurer's agent, reasoning, in part, that it was not obvious how a participant would have reasonably believed that employer had apparent authority to collect "evidence of insurability" forms on behalf of insurer under Restatement Third of Agency §§ 2.01 and 2.03. Shields v. United of Omaha Life Insurance Company, 527 F.Supp.3d 22, 35.

**D.Md.**

**D.Md.**2019. Cit. in disc. In an action by patrons against owner of an entertainment complex and its purported agents, who allegedly sent text messages to patrons using an automatic-telephone-dialing system in violation of the Telephone Consumer Protection Act (TCPA), this court denied in part defendants' motion to dismiss, holding that a defendant could be vicariously liable for violations of the TCPA where a plaintiff established an agency relationship, and that, in this case, plaintiffs' allegations were sufficient to set forth an agency relationship between the defendants. In making its decision, the court noted that, under Restatement Third of Agency §§ 2.01, 2.03, and 4.01, agency could be established by express authorization, implicit authorization, or ratification. Wilson v. PL Phase One Operations L.P., 422 F.Supp.3d 971, 980.

**D.Md.**2007. Quot. in sup. After a contract to purchase real property fell through, property owner sued prospective buyer's mother for breach of contract, alleging that she was the real party in interest. This court granted mother's motion to dismiss, holding that buyer was a necessary and indispensable party whose participation would destroy diversity jurisdiction. The court rejected plaintiff's argument that buyer was a mere agent of mother who had actual authority to enter into the contract solely on behalf of mother, pointing to evidence suggesting that mother and buyer were joint venturers rather than principal and agent, including evidence that buyer was the one who decided to purchase the property and who approached mother about investing in the property. R-Delight Holding LLC v. Anders, 246 F.R.D. 496, 502.

**D.Mass.**

**D.Mass.**2006. Quot. in disc. (T.D. No. 2, 2001). Seller of out-of-service railcars and parts brought breach-of-contract and related equitable action against company, after company refused to pay for railcars purchased by officer of business that shared offices and resources with company, alleging that officer had represented that he was authorized to act on company's behalf. This court granted summary judgment for company, holding, inter alia, that seller failed to provide any evidence raising a genuine issue as to whether officer acted with the actual authority of company, and that the only possible inference from evidence in the record was that he did not, because he was an officer of the business only. The court noted that the relevant test for actual authority

26-11268-mg Doc 23-3 Filed 06/24/26 Entered 06/24/26 13:13:49 Exhibit C Pg 113 of 882

was the agent's reasonable belief, derived from actions of the principal, about the extent of his authority. CSX Transp., Inc. v. Recovery Express, Inc., 415 F.Supp.2d 6, 9-10.

**E.D.Mich.**

**E.D.Mich.**2009. Com. (c) quot. in sup. Retired union employees and their spouses filed a class action against former employer, asserting, among other things, that they were not bound by an agreement between defendant and union that purportedly relieved defendant of any future liability for plaintiffs' vested health insurance benefits. Denying summary judgment for defendant, this court held, inter alia, that it was not reasonable for union or employer to conclude that union had actual implied authority to enter the agreement on plaintiffs' behalf; while plaintiffs manifested their assent to union negotiating or engaging in discussions with employer to protect and improve their health insurance benefits, they did not manifest their assent to union negotiating reductions to their benefits or relieving employer of its liability for those benefits. Yolton v. El Paso Tennessee Pipeline Co., 668 F.Supp.2d 1023, 1036.

**W.D.Mich.**

**W.D.Mich.**2018. Cit. in disc. Consumers brought a lawsuit against infrared-sauna manufacturer, alleging that the sauna plaintiffs had purchased from defendant had a defect; after failing to serve defendant's initially listed registered agent, plaintiffs served defendant at its newly registered agent, an out-of-state law firm. A default judgment was entered against defendant. This court denied defendant's motion to set aside the default judgment, holding, inter alia, that service against defendant was proper because the law firm's employee, who had accepted service on behalf of her employer, had the authority to do so. The court cited Restatement Third of Agency § 2.01 in explaining that the employee's actual authority to accept service was delegated to her by defendant's registered agent, and that the employee was acting as an agent of her employer when she accepted service on its behalf. Adams v. Sunlighten Incorporated, 328 F.R.D. 477, 482.

**W.D.Mich.**2014. Quot. in sup. Insured sued insurer, seeking to hold insurer liable for its agent's conduct in converting to his own use two large checks given to him by insured, instead of using the checks to purchase new annuities from insurer. After a bench trial, this court held that insurer could be held vicariously liable for agent's tortious actions under a theory of apparent agency, because an ordinarily prudent person would have been reasonable to believe that agent had authority to accept insured's checks, in light of undisputed evidence that, although insurer had terminated agent's actual authority to accept checks for new accounts, it failed to inform insured that it had done so, while at the same time permitting agent to retain the authority to accept checks for existing accounts. The court noted that a principal could be vicariously liable for an agent's actions, despite the absence of actual authority under Restatement Third of Agency § 2.01, if the principal cloaked the agent with apparent authority by holding the agent out to third parties as possessing sufficient authority to commit the particular act in question, and there was reliance on the apparent authority. Mais v. Allianz Life Ins. Co of North America, 34 F.Supp.3d 754, 762.

**W.D.Mich.Bkrtcy.Ct.**

**W.D.Mich.Bkrtcy.Ct.**2016. Quot. in case quot. in sup. After U.S. trustee was informed by Chapter 7 trustee of a pending sale of Chapter 7 debtor's property, U.S. trustee brought an adversary proceeding against debtor, seeking to revoke debtor's discharge, alleging that debtor fraudulently concealed the pending sale, which was for a price that was much higher than the value of the property disclosed in debtor's bankruptcy schedules. This court granted plaintiff's motion for partial summary judgment, holding that the Chapter 7 trustee's knowledge before the discharge of the alleged fraud was not imputed to plaintiff. The court cited Restatement Third of Agency §§ 2.01 and 2.03 in defining when actual authority and apparent authority existed, and determined that the Chapter 7 trustee was not an agent of plaintiff, because they each served different functions in the bankruptcy system, nothing in the statutory framework indicated that such a relationship existed, and plaintiff's supervisory powers were limited. In re Larson, 553 B.R. 646, 651.

### N.D.Miss.

**N.D.Miss.**2018. Quot. in case quot. in sup. Daughter of deceased nursing-home resident brought an action for neglect against owner of the nursing home. This court granted owner's motion to compel daughter to arbitrate pursuant to an arbitration agreement that daughter signed on behalf of resident upon admission, which was not required in order for her to be admitted, holding that daughter's signature of the agreement was within the scope of her actual authority under an informal verbal agency created by resident. The court cited Restatement Third of Agency §§ 2.01, 2.02, and 3.01 in reasoning that the agency was not limited to signing documents that were necessary as a condition to admission to the home, noting that daughter conceded that resident had the mental competency to create an informal agency at the time of her admission, and that daughter testified that she signed a wide variety of documents on behalf of resident due to her physical limitations, but that she used her discretion to decide which documents to discuss with resident before signing. Crowe v. GGNSC Ripley, LLC, 318 F.Supp.3d 970, 975.

### D.Nev.

**D.Nev.**2014. Cit. in ftn. Consumer brought a class action against payday lenders, marketers, and others, alleging that defendants violated the federal Telephone Consumer Protection Act (TCPA) by sending unauthorized text messages to his cellphone without his prior express permission. Denying defendants' motions to dismiss, this court held that plaintiff stated a claim for violation of the TCPA on the basis of the federal common law of agency by alleging a series of contractual relationships starting with lenders, which contracted with marketers, which in turn directed agents or subagents to send text messages to multiple persons, including plaintiff. The court cited Restatement Third of Agency § 2.01 in concluding that plaintiff sufficiently pleaded a plausible agency relationship based on actual authority (arising through contractual relationships), as well as on apparent authority and ratification. Kristensen v. Credit Payment Services, 12 F.Supp.3d 1292, 1301.

### D.N.M.

**D.N.M.**2020. Quot. in ftn., quot. in case quot. in ftn. Motorist sued the United States, alleging that a U.S. Postal Service employee negligently caused plaintiff permanent spinal injuries when she violated state traffic statutes and crashed into plaintiff's vehicle. This court granted plaintiff's motion for partial summary judgment, holding, inter alia, that the undisputed facts demonstrated that employee was negligent per se by failing to obey state traffic laws requiring her to yield at the intersection to plaintiff's vehicle. The court noted that certain medical reports, which were submitted by an independent medical examination panel testifying to plaintiff's injury and the appropriateness of her medical treatments, was admissible non-hearsay evidence introduced as an opponent's report by plaintiff, because defendant expressly granted actual authority, as defined by Restatement Third of Agency § 2.01, to the panel to act as its agent when it tasked the panel to create the reports and to testify at trial. Rawers v. United States, 488 F.Supp.3d 1059, 1084.

**D.N.M.**2019. Cit. and quot. in sup., quot. in case quot. in sup. Consumer filed various claims against seller of a discounted medical-benefit plan and insurance broker, alleging that broker, acting on behalf of seller, repeatedly called and texted her cellular telephone number with a pre-recorded message or artificial voice without her consent, even though she did not have a business relationship with seller or broker and had registered her number with the National Do Not Call Registry. This court denied in part seller's motion to dismiss and granted consumer's request for additional discovery regarding seller's relationship with broker before ruling on seller's motion to dismiss for lack of personal jurisdiction, in which seller claimed that it had no contacts with New Mexico and that it could not be vicariously liable for broker's actions, because she acted as an independent contractor rather than as its agent. The court pointed to consumer's allegations that seller gave broker implied authority under Restatement Third of Agency § 2.01 when it paid for her activities. Mohon v. Agentra LLC, 400 F.Supp.3d 1189, 1205, 1235.

### E.D.N.Y.

2777

**E.D.N.Y.**2019. Quot. in case quot. in sup. Consumer who purchased a weight-loss supplement containing a harmful compound known as sibutramine from online retailer through his wife's account filed a putative class action against retailer, alleging that retailer's sale of the supplement violated the Consumer Product Safety Act. The trial court granted retailer's motion to compel arbitration, finding that wife agreed to arbitrate her disputes with retailer under the terms of a program with retailer that consumer enrolled in using wife's account. The court reasoned that consumer acted with actual authority from wife within the meaning of Restatement Third of Agency § 2.01, because wife testified that he told her about the program, that she gave him the password to her account, and that he told her that he was signing her up for the program. Nicosia v. Amazon.com, Inc., 384 F.Supp.3d 254, 269.

**E.D.N.Y.**2009. Quot. in sup. Surety that issued bid, payment, and performance bonds for a construction project sued, among others, general contractor, seeking to recover losses it sustained as a result of contractor's failure to complete the project. Granting summary judgment for surety, this court held, inter alia, that, while the procurement of the bid bond and submission of the bid were purportedly the unauthorized acts of contractor's employee, contractor's subsequent manifestations of assent were sufficient to ratify employee's actions. The court concluded that the fact that employee was responsible for handling all of the paperwork required to operate contractor and prepared bids, contracts, and specifications for subcontractors was insufficient to show that employee was acting with contractor's actual or apparent authority. RLI Ins. Co. v. Athan Contracting Corp., 667 F.Supp.2d 229, 235.

**S.D.N.Y.**

**S.D.N.Y.**2020. Cit. in case quot. in sup. In an action arising from a collision between a ship and a vessel that was attempting to refuel the ship, insurer of the owner of the ship filed a demand for arbitration against affiliate of fuel supplier pursuant to a bunker delivery note between fuel supplier and time charterer of the vessel that had purchased the fuel; affiliate sought a declaratory judgment that it was not bound by the note and that it was not acting as a principal for fuel supplier. This court granted summary judgment for affiliate, finding that it was not required to arbitrate with insurer pursuant to the note, because neither affiliate nor insurer was a party to the note, and there was no agency relationship between affiliate and fuel supplier. The court reasoned, in part, that the note, standing alone, could not establish either actual or apparent authority under Restatement Third of Agency §§ 1.01, 2.01, or 2.03. Monjasa A/S v. Mund & Fester GMBH & Co. KG, 477 F.Supp.3d 112, 118.

**S.D.N.Y.**2016. Cit. in disc. Purported assignee of rights and interests in supply contracts of a bunker company that had collapsed brought an action against vessel, seeking payment for the value of a bunker that bunker company delivered to vessel before its collapse; physical supplier of the bunker filed an intervening action, alleging that it was entitled to a maritime lien against vessel because it was not paid for its fuel used in supplying the bunker to vessel. This court granted assignee's motion to dismiss supplier's intervening complaint and denied supplier's cross-motion for summary judgment. The court cited Restatement Third of Agency § 1.01 for the definition of "agency" and §§ 2.01 and 2.03 in explaining that an agency relationship could result from either actual or apparent authority, and held, inter alia, that there was no evidence that demonstrated or even suggested that the company that chartered vessel had agreed to be bound by bunker's actions on its behalf or that it had acted in a way that suggested it had so agreed. ING Bank N.V. Temara, 203 F.Supp.3d 355, 363.

**S.D.N.Y.**2010. Quot. in case quot. in sup. Bank sued general partnership and its general partners for breach of contract, seeking to enforce the terms of an interest rate swap agreement that allowed defendants and their various business entities to pay a lower interest rate on their mortgage loans from bank. Granting summary judgment for plaintiff, this court held that defendants were bound by the terms of the agreement. The court rejected defendant's argument that plaintiff did not have reason to believe that one partner's wife, who was partnership's bookkeeper and signed the agreement purportedly on behalf of partnership, had authority to sign the agreement; regardless of wife/bookkeeper's actual or apparent authority to sign, partnership ratified the agreement when one partner signed a confirmation document in connection with the transaction and partnership performed and received benefits pursuant to the agreement for more than three years. U.S. Bank Nat. Ass'n v. Ables & Hall Builders, 696 F.Supp.2d 428, 439.

**S.D.N.Y.**2009. Cit. in sup. Lender sued guarantor, seeking to enforce a guaranty agreement, after it was discovered that the agreement and the underlying loan were part of an alleged fraud scheme perpetrated by certain directors and officers of guarantor. Granting summary judgment for lender, this court held, inter alia, that the guarantee was not unenforceable on the basis that guarantor's agent, who signed the agreement on guarantor's behalf, was aware of or participated in the alleged fraud scheme. The court rejected guarantor's argument that because guarantor's agent was acting in his own interest, adverse to guarantor's, he could not bind guarantor; while this principle would apply to the issue of agent's implied actual authority to sign the agreement, it did not apply to the instant situation, in which guarantor's board had unambiguously conferred express actual authority on agent to execute the agreement. UBS AG, Stamford Branch v. HealthSouth Corp., 645 F.Supp.2d 135, 144.

**S.D.N.Y.Bkrtcy.Ct.**

**S.D.N.Y.Bkrtcy.Ct.**2013. Quot. in sup., cit. in ftn., com. (b) cit. in ftn., com. (c) quot. in sup. and cit. in ftn. Official committee of unsecured creditors in the Chapter 11 bankruptcy case of debtor/automobile manufacturer brought an adversary proceeding against administrative agent of secured creditors that had made a $1.5 billion term loan to debtor prepetition, seeking a determination that the loan was unsecured. Granting summary judgment for defendant, this court held, inter alia, that defendant did not give actual authority to debtor to terminate the term-loan lien when it mistakenly included a termination statement with respect to that lien in a batch of termination statements regarding the liens on an unrelated real-estate financing; neither debtor nor defendant intended, or believed, that their documents would affect anything other than the real-estate-financing liens, and neither thought that defendant had authorized debtor to have them affect anything else. Moreover, debtor did not have implied authority to do tasks other than those that were appropriate to terminating the real-estate financing, for which debtor had been expressly authorized. In re Motors Liquidation Co., 486 B.R. 596, 621, 622, 637.

**S.D.N.Y.Bkrtcy.Ct.**2008. Quot. in sup. Hotel owner brought an adversary proceeding against debtor airline, seeking, in part, a declaration that it was not bound by hotel-service agreements (HSAs) negotiated by its hotel manager that allowed debtor's employees to occupy rooms in the hotel at preferential rates. Denying debtor's motion for summary judgment, this court held that manager lacked actual authority to bind plaintiff to the terms of the HSAs under the management agreement between manager and plaintiff, since the management agreement expressly denied manager the authority to enter into contracts that extended beyond the term of the management agreement and were not terminable at the end of its term. In re Northwest Airlines Corp., 383 B.R. 283, 292.

**N.D.Okl.**

**N.D.Okl.**2014. Quot. in sup. Employee who was demoted from administrative chief for the city's fire department filed, inter alia, a tortious-interference claim against fire chief who demoted him, alleging that defendant tortiously interfered with his employment contract with the city. Granting in part defendant's motion for judgment on the pleadings, this court held that defendant could not be liable for tortious interference because the city was a party to the contract and defendant was acting as the city's agent when he demoted plaintiff. Citing Restatement Third of Agency § 2.01, the court reasoned that defendant acted with actual authority because the city gave him the power to demote a firefighter. Moore v. Tulsa, 55 F.Supp.3d 1337, 1348.

**D.Or.**

**D.Or.**2012. Cit. in ftn. Borrowers sued, among others, nominee/agent for residential mortgage lender and its successors, seeking to stop a nonjudicial foreclosure of their home that nominee commenced as the "beneficiary" listed under the deed of trust. Denying in part defendants' motion to dismiss, this court held that, under the Oregon Trust Deed Act, nominee was not the beneficiary of plaintiffs' trust deed, because it did not make the underlying loan to plaintiffs, and the trust deed did not secure it in the event of plaintiffs' default. The court, however, rejected plaintiffs' argument that, because nominee was not the real beneficiary, it lacked the authority to assign the trust deed to noteholder, reasoning that the Act did not forbid an agent such as nominee, when acting with authority and on behalf of its principal, the beneficiary, from making assignments, recording those

assignments, appointing a successor trustee, or doing anything else that a beneficiary could do on its own. James v. ReconTrust Co., 845 F.Supp.2d 1145, 1152.

**E.D.Pa.**

**E.D.Pa.**2013. Quot. in sup. Homeowners who allegedly were victims of a series of foreclosure rescue scams brought claims for fraud and violations of Pennsylvania's Unfair Trade Practices and Consumer Protection Law against title-insurance company, contending that defendant was liable for the deceptive conduct of its closing agent, because closing agent acted with express authority according to the terms of the agency agreement between itself and defendant. Granting summary judgment for defendant, this court held that liability could not be imputed to defendant, because there was insufficient evidence that an agency relationship existed between closing agent and defendant for anything outside the scope of selling title insurance. The court pointed to evidence that the closing agent's authority was expressly limited to its role as a policy agent for defendant. Duffy v. Lawyers Title Ins. Co., 972 F.Supp.2d 683, 695-696.

**E.D.Pa.**2010. Com. (a) cit. in ftn. Employee of tax-preparation franchisee brought civil-rights action against supervisors, franchisee, and franchisor, alleging that supervisors sexually harassed, assaulted, and threatened her during her employment. Denying in part defendants' motion to dismiss, this court held, inter alia, that plaintiff alleged sufficient facts to raise a plausible claim that she was an employee of franchisor for purposes of federal and state employment laws. The court reasoned, in part, that plaintiff might be able to show that franchisor directly exercised significant control over her daily activities, or that franchisor indirectly exercised, through its authority to control franchisee's operations, significant control over her activities. Myers v. Garfield & Johnson Enterprises, Inc., 679 F.Supp.2d 598, 606.

**D.Utah,**

**D.Utah,** 2019. Quot. in case quot. in sup. Non-profit organization brought a citizen-enforcement action under the Clean Air Act against, among others, used-automobile dealership and diesel-truck apparel company, alleging that defendants shared liability for illegally modifying diesel trucks in order to evade emissions standards. This court denied plaintiff's motion for partial summary judgment, holding, inter alia, that the fact that the two businesses had the same person serving as CEO concurrently did not create a principal–agent relationship between the businesses under Restatement Third of Agency § 2.01, because the record did not indicate that dealership directed or expressed a desire for apparel company to modify the trucks, or ratified company's actions. Utah Physicians for a Healthy Environment v. Diesel Power Gear LLC, 374 F.Supp.3d 1124, 1143.

**E.D.Va.**

**E.D.Va.**2014. Cit. in sup. Seller that provided bunker fuel to a vessel sued the vessel and Greek time-charterer of the vessel, seeking payment for the fuel. Granting summary judgment for provider, this court held, inter alia, that seller was in privity of contract with time-charterer, because the broker through which time-charterer ordered the fuel exercised its ostensible authority to act and enter into the contract with time-charterer on seller's behalf. The court cited Restatement Third of Agency § 2.01 in noting that the applicable Greek doctrine of ostensible authority was much like the agency law recognized in the United States, where the essential underlying principle in the agency relationship was the power of an agent to commit his principal to business relations with third parties on the basis either of his actual authority or his apparent authority. World Fuel Services Trading, DMCC v. M/V HEBEI SHIJIAZHUANG, 12 F.Supp.3d 792, 802.

**E.D.Va.**2013. Quot. in sup., quot. in case quot. in sup. South Korean corporate defendant moved to quash service of process and to dismiss an indictment charging it and five of its officers and employees with violations of federal trade-secret statutes and obstruction of justice. Granting in part defendant's motion to quash service, this court held, inter alia, that the government failed to prove that service of process on defendant's wholly owned New Jersey subsidiary was effective service on defendant under the theory that subsidiary was defendant's managing or general agent, because the government did not present sufficient

2780

facts to show that subsidiary had authority (or acted as if it had authority) to take actions with legal consequences for defendant. While subsidiary sold defendant's products to American and Canadian customers, it did so by binding itself, and not defendant, to contracts, and then purchasing the products from defendant and distributing them to the customers. U.S. v. Kolon Industries, Inc., 926 F.Supp.2d 794, 810, 813.

**E.D.Va.Bkrtcy.Ct.**

**E.D.Va.Bkrtcy.Ct.**2019. Quot. in case quot. in disc. Creditor who had purchased invoices from Chapter 7 debtor's company brought an adversary proceeding against debtor, seeking to except debtor's debt from discharge under federal bankruptcy law, alleging that the debt arose from debtor's sale of invoices to creditor by fraudulent misrepresentation. This court entered judgment for creditor, holding, inter alia, that debtor was liable for the misrepresentations made by his company's bookkeeper. The court explained that the bookkeeper acted under debtor's direction and used debtor's signature stamp to deliver fraudulent invoices to creditor, making the bookkeeper an agent of debtor and imbuing her with actual authority to act on debtor's behalf, as defined by Restatement Third of Agency §§ 1.01 and 2.01. In re Matkins, 605 B.R. 62, 86.

**N.D.W.Va.**

**N.D.W.Va.**2016. Quot. in case quot. in sup. Consumers brought actions under the Telephone Consumer Protection Act against, among others, manufacturers of home-security systems, alleging that manufacturers were vicariously liable for telemarketing calls made by authorized dealers that sold manufacturers' systems. This court granted manufacturers' motions to dismiss, holding that consumers failed to show that dealers had actual or apparent authority from manufacturers under Restatement Third of Agency §§ 2.01 and 2.03, such that dealers could be considered agents of manufacturers. The court explained the evidence did not support findings that dealers were subject to the control of manufacturers, that dealers were acting primarily for manufacturers' benefit, or that manufacturers turned a blind eye when they learned of dealers' illegal telephone calls. In re: Monitronics International, Inc., Telephone Consumer Protection Act Litigation, 223 F.Supp.3d 514, 524.

**Alaska**

**Alaska,** 2009. Quot. in ftn. After native village corporation leased 20 acres of land to school district for the building of a school, corporation sued school to reform or invalidate the lease, which specified a lease rate of $1 per year, alleging, in part, that a valid lease was never formed because corporation's board chairman, who signed the lease on behalf of the corporation, lacked the authority to bind corporation. The trial court entered summary judgment for school. Affirming, this court held, inter alia, that, because it was reasonable for school to believe that corporation had authorized its board chair to sign the lease on its behalf, chair had apparent authority to sign the lease and bind corporation. The court noted that, given the outcome of the apparent-authority issue, there was no need for it to decide whether chair had actual authority, but it observed that there was insufficient evidence to conclude that he reasonably believed that corporation's shareholders had authorized the lease in its final form prior to signing. Askinuk Corp. v. Lower Yukon School Dist., 214 P.3d 259, 264.

**Ariz.App.**

**Ariz.App.**2021. Cit. in sup.; com. (b) cit. in sup. Wife of patient who died while being treated at a center for skilled nursing and rehabilitation filed suit on behalf of patient's estate and statutory beneficiaries against owner of the center and doctor who treated patient, alleging elder abuse, negligence, negligent hiring and supervision, and wrongful death. The trial court denied owner's motion to compel arbitration based on an agreement wife signed upon patient's admission to the center. Affirming, this court held, among other things, that wife lacked actual authority, either express under Restatement Third of Agency § 2.01 or implied under § 2.03, to bind patient and his estate to the agreement. The court reasoned that, because the arbitration agreement specified that it was optional and not required for patient to be admitted, it was not a healthcare decision as contemplated by the

2781

healthcare power of attorney, which only authorized wife to take certain limited actions on patient's behalf. Heaphy v. Willow Canyon Healthcare, Inc., 491 P.3d 1165, 1168.

**Ariz.App.**2011. Com. (b) quot. in case quot. in disc. Captive insurer sued captive manager, among others, alleging breach of contract. The trial court granted summary judgment for manager on the basis that the execution and performance of a release of claims between the parties constituted an accord and satisfaction. Reversing and remanding, this court held that material issues of disputed fact existed as to plaintiff's president's actual or apparent authority to bind plaintiff to the release. The court reasoned that evidence that the release was completely unauthorized and contrary to plaintiff's board's wishes could have permitted a factfinder to conclude that president lacked actual authority; moreover, issues of fact existed regarding the reasonableness of defendant's reliance on president's apparent authority, given that no claims had been asserted, defendant had not requested a release, plaintiff did not obtain much value in exchange for the release, and defendant was negotiating to purchase a company in which president had an ownership interest. Best Choice Fund, LLC v. Low & Childers, P.C., 269 P.3d 678, 687.

**Ariz.App.**2007. Cit. in disc., com. (b) quot. in disc. and cit. in sup. Estate of nursing-home patient sued nursing home for, in part, negligence and breach of contract. The trial court dismissed the complaint and compelled arbitration. Affirming, this court held, inter alia, that patient had implicitly authorized his wife to act as his agent to bind him to the alternative-dispute-resolution agreement that she signed when patient was admitted to defendant's facility. The court concluded that, absent any contrary evidence, the medical records that defendant produced, revealing a history of wife's acting and making decisions on patient's behalf, reflected that patient intended wife to act as his agent. Ruesga v. Kindred Nursing Centers, L.L.C., 215 Ariz. 589, 161 P.3d 1253, 1261, 1262.

**Cal.Super.**

**Cal.Super.**2021. Com. (e) cit. in disc. State department of forestry and fire protection sued owner of a commercial property under a state statute, seeking to recover expenses incurred in fighting a wildfire caused by owner's employee. The trial court overruled owner's demurrer. This court affirmed and remanded for further proceedings, holding that an entity like owner could be held vicariously liable for the cost of suppressing fires that its agent or employee negligently or unlawfully set or allowed to escape. The court cited Restatement Third of Agency §§ 1.03 and 2.01 in noting that the doctrine of respondeat superior served an important function, namely, to allow a plaintiff to proceed against a corporation that could have been liable under a burdensome direct liability theory, but to do so under an alternate theory that presented fewer obstacles to the plaintiff's ability to prove entitlement to relief. Presbyterian Camp & Conference Centers, Inc. v. Superior Court, 501 P.3d 211, 226.

**Colo.**

**Colo.**2017. Quot. in sup.; com. (b) quot. in sup. Insured who was injured while driving a car that he owned with a friend when an underinsured motorist struck the car sued insurer, after it denied his claim for uninsured/underinsured-motorist (UM/UIM) benefits on the ground that the friend, who had acquired the policy on the car from insurer, had rejected UM/UIM coverage. After a bench trial, the trial court entered judgment in favor of insurer. The court of appeals reversed, ruling that the friend's rejection of UM/UIM coverage was not binding on insured. Reversing and remanding, this court held that the friend had implied authority under Restatement Third of Agency § 2.01 to reject UM/UIM coverage on insured's behalf and that she did so under the circumstances. Although insured did not specifically instruct the friend to reject (or not to reject) UM/UIM coverage, that decision was necessary, usual, and proper to the purchase of insurance, which he expressly authorized her to undertake. State Farm Mutual Automobile Insurance Company v. Johnson, 396 P.3d 651, 656.

**Colo.App.**

**Colo.App.**2022. Quot. in case quot. in sup.; com. (b) cit. in sup.; com. (c) quot. in sup. Patient's son, individually and as representative of patient's estate, filed an action against skilled nursing facility, alleging that facility's negligence caused patient's

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.    27

death. The trial court denied facility's motion to compel arbitration pursuant to an arbitration agreement that son signed at the time of patient's admission. Affirming, this court held, as a matter of first impression, that an agent's actual authority to make healthcare decisions for a patient and sign the documents necessary to admit the patient to a healthcare facility did not encompass the authority to bind the patient to an arbitration agreement, unless the patient granted the agent an unlimited power of attorney or otherwise clearly granted the agent the specific authority to bind the patient to an arbitration agreement. The court cited Restatement Third of Agency § 2.01 in reasoning that there was no evidence that son understood that patient had granted him actual authority to bind her to the arbitration agreement. Fresquez v. Trinidad Inn, Inc., 521 P.3d 399, 405, 407.

**Conn.App.**

**Conn.App.**2009. Quot. in sup. Prospective sellers of real property sued limited-liability company and principal of company who sought to acquire the property for a proposed auto raceway, after defendants were unable to obtain the necessary zoning approvals and the sale did not take place. After a bench trial, the trial court rendered judgment for defendants. Affirming, this court held, inter alia, that a licensed real-estate agent who was acting as the parties' dual agent for the sale did not have actual authority to bind defendants by accepting certain unilateral changes made by plaintiffs to the contractual closing date. The court cited testimony by both principal and agent that at no time did principal give agent the authority to bind company, and that everyone involved with company understood that no one except principal himself had the authority to bind company. LeBlanc v. New England Raceway, LLC, 116 Conn.App. 267, 275, 976 A.2d 750, 758.

**Del.**

**Del.**2019. Quot. in case quot. in sup. and cit. in ftn. Borrower under a construction loan filed a claim for reformation on grounds of mutual mistake against lender, alleging that, although the parties had agreed to a time window in which borrower could prepay the loan without penalty, the final, signed loan documents erroneously did not contain the agreed-upon no-penalty window. After a bench trial, the trial court entered judgment in favor of borrower. This court reversed and directed the entry of judgment in lender's favor, holding that, while lender's loan officer represented to borrower during negotiations that there was a no-penalty window, it was undisputed that borrower knew that loan officer did not have authority to bind lender and that any terms proposed by loan officer required both final documentation and approval by lender's loan committee. The court explained that loan officer did not have either actual authority under Restatement Third of Agency § 2.01 or apparent authority under § 2.03, because the parties stipulated that he lacked actual authority and that both parties knew he lacked such authority during the course of negotiation. Parke Bancorp Inc. v. 659 Chestnut LLC, 217 A.3d 701, 712.

**Del.**2013. Quot. in disc., cit. in ftn. Racing official who was suspended by state harness-racing commission for allegedly altering a judging sheet brought a promissory-estoppel claim against commission, claiming that commission reneged on its promise to reinstate him if he was acquitted of the criminal charges against him. After the jury returned a verdict for official, the trial court granted commission's motions for judgment as a matter of law and a new trial. Reversing and remanding for reinstatement of the jury's verdict, this court held that the evidence was sufficient to support a finding that commission promised to reinstate official, and that commission expressly authorized the administrator of racing, its executive officer, to convey that promise to official; the court cited administrator's testimony that, when he posed the question of official's reinstatement to commission, commission members looked at each other and then said "Yes." Harmon v. State, Delaware Harness Racing Com'n, 62 A.3d 1198, 1201.

**Del.Ch.**

**Del.Ch.**2008. Quot. in sup., cit. in ftn. Company's minority shareholder, who had brought an action against majority shareholder for a declaratory judgment concerning her right to compete with the company, moved to enforce an agreement purportedly reached by the parties to settle the dispute, after majority shareholder refused to sign it. Granting plaintiff's motion, this court held that defendant was bound to the settlement agreement, since, under the principles of agency law, defendant's long-time attorney, business associate, and close personal friend, who had agreed to the settlement after protracted negotiations, had actual, implied,

and apparent authority to settle the dispute, even though he was not counsel of record in the case; attorney's implied authority, a form of actual authority that could extend the scope of an agency relationship, was evidenced by defendant's permission for him to speak "in [defendant's] name," along with their course of dealings over 20 years. Dweck v. Nasser, 959 A.2d 29, 40, 43.

**Fla.App.**

**Fla.App.**2018. Cit. in sup. Real-estate broker sued utility company, alleging that he was entitled to a commission in connection with defendant's purchase of a multimillion-dollar property under an agreement that he entered into with its senior project director of development during a tailgate party. The trial court entered judgment on a jury verdict in favor of plaintiff. Reversing and remanding, this court held that plaintiff failed to establish that it was reasonable for him to conclude that defendant's director had the authority to bind defendant. The court reasoned, in part, that plaintiff did not allege any formal or informal act by defendant suggesting that defendant held out its director as possessing the authority to act on its behalf, as required to establish actual authority under Restatement Third of Agency § 2.01 and Restatement Second of Agency § 1. Florida Power & Light Company v. McRoberts, 257 So.3d 1023, 1026.

**Iowa**

**Iowa,** 2010. Cit. in sup. Assignee of lessor sued lessee, after lessee defaulted on an equipment lease for a beverage cart to be used on its golf course. The trial court granted summary judgment for plaintiff. The court of appeals reversed and remanded. Affirming as modified, this court held, inter alia, that questions of fact remained as to whether defendant's employee had actual or apparent authority to enter into the lease on behalf of defendant. The court cited an affidavit by defendant's director/owner, which, in refuting the existence of actual authority, stated that employee was not authorized to enter into the lease, and, in refuting the existence of apparent authority, averred that vendors were aware that golf professionals such as employee did not have authority to enter into the type of transaction at issue. Frontier Leasing Corp. v. Links Engineering, LLC, 781 N.W.2d 772, 776.

**Kan.**

**Kan.**2014. Quot. in sup., com. (b) quot. in sup. Health insurer sought judicial review of a decision of the Kansas Insurance Department that imposed sanctions on insurer for unfair claim-settlement practices based on its denial of coverage to an insured for treatment of a preexisting condition that was not disclosed in her application. The trial court affirmed. The court of appeals reversed, concluding that the licensed insurance intermediary who submitted insured's insurance application to insurer was not acting as insurer's soliciting agent. Reversing in part, this court held, inter alia, that substantial evidence supported the existence of an agency relationship between insurer and intermediary such that insurer was bound by intermediary's acts; moreover, the evidence supported a finding that intermediary had actual authority to solicit and submit applications to insurer. The court cited Restatement Third of Agency § 2.01 in noting that an agent acted with actual authority when, at the time of taking action that had legal consequences for the principal, the agent reasonably believed, in accordance with the principal's manifestations to the agent, that the principal wished the agent so to act. Golden Rule Ins. Co. v. Tomlinson, 335 P.3d 1178, 1188, 1189.

**Ky.**

**Ky.**2016. Coms. (c) and (d) quot. in diss. op. Estate administrators for three nursing-home residents brought separate wrongful-death actions against nursing homes. The trial court denied defendants' motions to dismiss and to compel arbitration pursuant to arbitration agreements executed by residents' attorneys-in-fact at the time of their admission to the homes. This court consolidated the appeals and affirmed, holding that residents' attorneys-in-fact did not have authority to sign the arbitration agreements. Citing Restatement Third of Agency § 2.01, the dissent argued that specific grants of power should not be read as limits on an agent's authority where, as here, the instruments expressly granted residents' attorneys-in-fact authority "including but not limited to" the enumerated powers. Extendicare Homes, Inc. v. Whisman, 478 S.W.3d 306, 360, 361.

**Ky.**2014. Quot. in sup. State emergency-telecommunications board sued provider of prepaid mobile-telephone service, seeking to recover charges for 911 emergency service that mobile-telephone-service providers were required to collect from customers through their monthly bills and remit to the board pursuant to a state statute; defendant contended that it was not possible to collect the charges from prepaid users consistent with the statute because prepaid users never received a monthly bill. After the trial court entered summary judgment against defendant, the court of appeals affirmed. Reversing in part, this court held that the charges did not apply to defendant before the statute was amended to expressly state that prepaid mobile-telephone service was subject to the charges. The court pointed out that, prior to the amendment, the statute mandated that providers acted as collection agents for the board's fund and that the charges were to be collected as a separate item on each monthly bill, without permitting or authorizing any other means of collection; the court cited Restatement Third of Agency § 2.01 in concluding that defendant therefore lacked discretion with regard to how the charges were to be collected or how much to collect. Virgin Mobile U.S.A., L.P. v. Com. ex rel. Commercial Mobile Radio Service Telecommunications Bd., 448 S.W.3d 241, 247-248.

**Ky.App.**

**Ky.App.**2011. Com. (c) quot. in sup. Mother of an incapacitated adult nursing-home resident, in her capacity as resident's guardian, brought negligence and other claims against owners, operators, managers, and administrators of the nursing home, alleging that resident sustained numerous injuries while he was staying at the home. The trial court denied defendants' motion to compel arbitration pursuant to an alternative-dispute-resolution agreement that plaintiff signed during resident's admission to the home, which took place prior to her appointment as his guardian. Affirming, this court pointed out that plaintiff signed the agreement in her own name, without listing in what legal capacity she had to act as resident's representative, and held that the trial court did not err by finding that plaintiff lacked either actual or apparent authority to act on resident's behalf. The court noted that both actual and implied authority were granted to the agent by the principal, and that actual authority could be found when there was a manifestation by the principal to the agent that the agent could act on account of the principal, and consent by the agent so to act. Kindred Nursing Centers Ltd. Partnership v. Brown, 411 S.W.3d 242, 249.

**Mass.**

**Mass.**2018. Cit. in disc. College filed a lawsuit against accounting firm that worked as college's independent auditor, alleging that defendant committed negligence, breach of contract, negligent misrepresentation, and malpractice by failing to detect fraudulent activity by plaintiff's financial-aid director. The trial court granted defendant's motion for summary judgment, finding that plaintiff's claims were barred because director's wrongdoing had benefitted plaintiff, and plaintiff could not recover under a claim for that same wrongdoing. This court reversed and remanded, holding that the doctrine of in pari delicto did not bar all of plaintiff's claims, because director was not a sufficiently senior member of plaintiff's management team such that plaintiff was equally morally blameworthy for the wrongdoing. The court cited Restatement Third of Agency §§ 2.01-2.03 in explaining that, although director's actions could be imputed to plaintiff, the equitable doctrine of in pari delicto was separate and distinct from the legal doctrine of imputation. Merrimack College v. KPMG LLP, 108 N.E.3d 430, 437.

**Mass.**2006. Quot. in sup. (T.D. No. 2, 2001). Landowner sued neighbors, challenging, inter alia, the validity of an escrow agreement, negotiated through neighbors' attorney, concerning the transfer of ownership of a triangular parcel of landowner's property to neighbors. The trial court ruled, among other things, that the agreement was enforceable. Affirming that portion of the decision, this court held, inter alia, that there was ample evidence in the record to support the trial court's finding that neighbors gave their attorney the authority to make appropriate binding agreements on their behalf to obtain title to the parcel. The court noted that an agent acted with actual authority when, at the time of taking action that had legal consequences for the principal, the agent reasonably believed, in accordance with the principal's manifestations to agent, that the principal wished the agent so to act. Haufler v. Zotos, 446 Mass. 489, 498, 845 N.E.2d 322, 330.

**Mass.App.**

**Mass.App.**2019. Cit. in sup. Swiss investor brought a lawsuit against, among others, Swiss investment bank, alleging, inter alia, that defendant failed to properly supervise the conduct of its director, whose investment advice resulted in plaintiff suffering substantial pecuniary harm. The trial court granted defendant's motion to dismiss. This court vacated in part and remanded, holding that there was a genuine dispute of material fact as to whether the director's business transactions in Massachusetts made exercising long-arm jurisdiction over defendant proper. The court explained that a reasonable factfinder could find that the director, as defendant's agent, reasonably believed that he had actual authority under Restatement Third of Agency § 2.01 to conduct the transactions, because correspondences between him and defendant indicated that defendant knew about and approved of the transactions. von Schönau-Riedweg v. Rothschild Bank AG, 128 N.E.3d 96, 110.

**Neb.**

**Neb.**2014. Com. (c) quot. in sup. Certain members of a family farming partnership sued another member, alleging that defendant entered into a series of grain contracts on behalf of the partnership without authority to do so, resulting in significant losses to the partnership. After a bench trial, the trial court found that defendant did not have authority to enter into the contracts and awarded plaintiffs damages. Affirming, this court held that there was sufficient evidence to support the trial court's findings that a majority of the managing partners had not approved the contracts, as required by the partnership agreement. While defendant was generally responsible for handling the paperwork of the partnership, including the signing of contracts on behalf of the partnership, it was undisputed that entering into the contracts was a significant decision requiring approval of a majority of the managing partners, and the trial court found credible plaintiffs' testimony that they were unaware of the contracts before the partnership entered into them. Elting v. Elting, 288 Neb. 404, 415, 849 N.W.2d 444, 452.

**Neb.**2009. Coms. (b) and (c) cit. in ftn. Son, as mother's next of kin and trustee of her estate, sued nursing home in connection with injuries, pain, and suffering allegedly sustained by mother while she was a patient. The trial court granted defendant's motion to compel arbitration pursuant to an arbitration agreement signed by defendant on behalf of mother as part of the paperwork for her admission. Reversing and remanding, this court held that, while mother authorized defendant to sign the required admission papers, his actual authority did not extend to signing the arbitration agreement, because it was not a condition of admission, and defendant was not justified in relying solely on mother's authorization of defendant to sign admission papers as apparent authority to bind her to an arbitration agreement, because nothing in the record suggested that a reasonable person would have expected an arbitration agreement to be included with admission documents for a nursing home. Koricic v. Beverly Enterprises—Nebraska, Inc., 278 Neb. 713, 718, 773 N.W.2d 145, 150.

**Nev.**

**Nev.**2014. Adopted and quot. in sup. Supplier of steel products filed complaints for foreclosure against various properties on which it held mechanics' liens; owners of the properties argued, among other things, that supplier could not foreclose on two properties for which supplier's bookkeeper had executed unconditional waiver and release forms. After a bench trial, the trial court entered a judgment for supplier. While reversing in part on other grounds, this court held that bookkeeper was not an authorized agent of supplier and could not have released the liens for the properties on supplier's behalf. The court pointed out that bookkeeper admitted that she lacked authority to execute the lien-release forms, and, while supplier's CFO had directed bookkeeper via email to prepare the forms, there was nothing in the email to suggest that she should or could sign them; thus, there was substantial evidence to support the trial court's finding that bookkeeper lacked actual authority because she had no reasonable basis for believing that supplier authorized her to sign the forms. Simmons Self-Storage v. Rib Roof, Inc., 331 P.3d 850, 856.

**N.J.**

**N.J.**2010. Quot. in sup. Lawyers' fund for client protection, as subrogee of attorney's clients whose funds deposited with attorney to close on a new home had been misappropriated by attorney from attorney's trust account, sought to recover the amount of

the stolen funds from title insurer from which attorney, after the theft, purchased title insurance for the home. The trial court granted summary judgment for defendant; the appellate division reversed. Reversing and remanding for reinstatement of the original judgment for defendant, this court held that defendant was not liable for the misappropriation by attorney, in part because no agency relationship existed between attorney and defendant at the time the funds were misappropriated; insurer never represented to attorney's clients that attorney had actual or apparent authority to act on its behalf. New Jersey Lawyers' Fund for Client Protection v. Stewart Title Guar. Co., 203 N.J. 208, 220, 1 A.3d 632, 639.

**N.J.Super.App.Div.**

**N.J.Super.App.Div.**2011. Quot. in case quot. in disc. After the roof of its warehouse collapsed, landlord sued, among others, managing general agent of tenant's former liability insurer, alleging that defendant was professionally negligent in causing tenant's policy to be improperly canceled and for failing to reinstate it. The trial court granted summary judgment for defendant. Affirming, this court held, inter alia, that tenant's premium-finance lender had apparent authority to act for tenant in canceling the policy following tenant's default on its payments to lender, and defendant was entitled to rely on that authority to cancel the policy, even if lender's power of attorney authorizing cancellation of the policy for nonpayment did not comply with statutes governing creation of a valid power of attorney; defendant had received no notice that the power of attorney was invalid, and tenant had created the appearance of authority by allowing lender to procure the policy and renew it. AMB Property, LP v. Penn America Ins. Co., 418 N.J.Super. 441, 454, 14 A.3d 65, 72.

**Okl.App.**

**Okl.App.**2020. Quot. in sup. Employment candidate sued university, alleging that defendant breached the parties' employment agreement by declining to employ plaintiff after he accepted an offer letter sent by university department chair. The trial court entered judgment on a jury verdict for plaintiff. This court reversed and remanded, holding that there was no valid employment agreement between the parties, because department chair lacked the authority to enter into a binding contract on defendant's behalf. Citing Restatement Third of Agency § 2.01, the court explained that, according to the undisputed facts, extending an offer of employment to plaintiff without approval by university provosts and the board of regents was beyond the scope of department chair's employment. Franco v. State ex rel. Board of Regents of University of Oklahoma, 482 P.3d 1, 14.

**Or.**

**Or.**2017. Com. (f) cit. in sup. Owner and operator of an adult foster home brought an unjust-enrichment claim against personal representative of patient's estate, alleging that patient's son, acting under a power of attorney, made misrepresentations on patient's application that allowed patient to receive services from plaintiff at a lower rate. After a bench trial, the trial court found in favor of plaintiff. The court of appeals reversed. Reversing and remanding, this court held that plaintiff was entitled to restitution from patient's estate, even though patient had not made the misrepresentations herself, because it would be unjust for patient's beneficiaries to retain the benefits that patient had gained through son's misrepresentation. The court cited Restatement Third of Agency § 2.01 in explaining that, while patient was also a victim of son, who misappropriated her assets, an agent's actions could make a principal liable to a third party even if the agent's actions were themselves a breach of the agent's duty to the principal. Larisa's Home Care, LLC v. Nichols-Shields, 404 P.3d 912, 924.

**Or.**2016. Cit. in ftn. Criminal defendant was convicted of first-degree sexual abuse of his adopted daughter, after his housekeeper spoke with the Department of Human Services (DHS) about her concerns, made statements to the police, and provided them with daughter's underwear that other employees of defendant took, which led police to obtain a warrant, search defendant's house, and arrest defendant; the court of appeals reversed and remanded. This court reversed and remanded, holding that the trial court did not err in denying defendant's motion to suppress evidence obtained through the search and seizure of the underwear, because the actions of defendant's employees constituted private action. The court noted that courts applied a common-law agency analysis in determining whether a private individual acted as the government's agent, and explained, citing Restatement

2787

Third of Agency §§ 2.01 and 2.03, that the agent had to act under actual authority rather than apparent authority. State v. Sines, 379 P.3d 502, 510.

**Pa.**

**Pa.**2010. Cit. in ftn. Committee of creditors established for corporate debtor brought adversary proceeding against corporation's auditor and auditor's successor, alleging that defendants colluded with debtor's officers to fraudulently misstate debtor's finances. After the district court granted summary judgment for defendants on grounds that officers' fraud was imputed to debtor, because they provided auditor with false financial statements in the first place, the court of appeals certified to this court for review questions of first impression centering on the availability of an imputation-based in pari delicto defense in an auditor-liability scenario. Answering the questions, this court held, inter alia, that, in factual circumstances entailing secretive, collusive conduct of an agent and an auditor, Pennsylvania law rendered imputation unavailable, as the auditor had not proceeded in material good faith. Official Committee of Unsecured Creditors of Allegheny Health Educ. and Research Foundation v. PriceWaterhouseCoopers, LLP, 605 Pa. 269, 989 A.2d 313, 336.

**Tenn.App.**

**Tenn.App.**2015. Com. (b) quot. in sup. and cit. in case cit. in sup. Former employee of city sued city to enforce a settlement that he purportedly reached with the assistant city attorney, alleging that, although he was never informed that the settlement was contingent on the mayor's approval, the mayor later rejected the settlement, and the city refused to honor it. The trial court granted summary judgment for employee, finding that the assistant city attorney acted with apparent authority to enter the settlement. This court reversed, holding, among other things, that the assistant city attorney did not have actual or implied authority to bind the city to the settlement without the mayor's express approval. The court cited Restatement Third of Agency § 2.01 in reasoning that there was no evidence of any conduct or course of dealing between the mayor and the city attorney's office from which it could reasonably be inferred that the mayor impliedly authorized the assistant city attorney to enter into the settlement without his approval in violation of the city charter's terms. Savage v. City of Memphis, 464 S.W.3d 326, 336.

**Utah App.**

**Utah App.**2022. Quot. in sup. Hotel sued conference host, alleging that defendant breached the parties' agreement by canceling its conference that was to be held on plaintiff's premises. The trial court entered judgment for plaintiff. This court reversed in part, vacated in part, and remanded, holding, inter alia, that there were genuine issues of material fact as to whether defendant's employee who signed the agreement on defendant's behalf had actual authority to do so. The court relied on Restatement Third of Agency § 2.01 in defining "actual authority." Stein Eriksen Lodge Owners Association Inc. v. MX Technologies Inc., 508 P.3d 138, 147.

**Wash.App.**

**Wash.App.**2018. Cit. in disc.; com. (c) cit. in disc. After his time-loss compensation was terminated by Washington's Department of Labor and Industries when he received an offer for a light-duty position with association, injured worker petitioned for judicial review of the Department's order, alleging, inter alia, that the termination of benefits was invalid because the job offer was not from his employer of injury. The Washington Board of Industrial Insurance Appeals affirmed. The court of appeals affirmed. This court affirmed, holding that the job offer was ultimately from plaintiff's employer of injury because association acted as the employer's agent. The court cited Restatement Third of Agency § 2.01in explaining that the employer's right to control association in matters regarding plaintiff's light-duty position, including the employer's oversight over plaintiff's activities, his hours, and his compensation, established a principal–agent relationship between the employer and association. Richardson v. Department of Labor & Industries, 432 P.3d 841, 848, 849.

**Wash.App.**2015. Cit. in sup. City sued city police officer who had filed a public-records request for records related to city's investigation of a whistleblower complaint against police department officials, seeking, among other things, a declaration that the records requested were exempt from disclosure. The trial court granted partial summary judgment for officer, ordering city to disclose unredacted records revealing the identities of witnesses and accused officers. Affirming, this court held that the records were not "specific investigative records" that were exempt from disclosure under the Public Records Act, even though they were compiled by an outside entity that was hired to conduct the investigation rather than by a law-enforcement agency. The court reasoned that the outside entity acted as city's agent or subagent with actual authority to conduct the investigation under Restatement Third of Agency §§ 2.01 and 3.15, because the outside entity's retention of the materials was attributable to city manager, who was acting in his capacity as supervisor of the police department when he initiated the investigation. City of Fife v. Hicks, 345 P.3d 1, 7.

Restatement of the Law - Agency © 1933-2023 American Law Institute.
Reproduced with permission. Other editorial enhancements © Thomson Reuters.

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 09

LII  > U.S. Code  > Title 15  > CHAPTER 2A  > SUBCHAPTER I  **> § 77c**

Quick search by citation:

**Title**

enter title

**Section**

section

Go!

# 15 U.S. Code § 77c - Classes of securities under this subchapter

U.S. Code        Notes        Authorities (CFR)

**(a)** EXEMPTED SECURITIES

Except as hereinafter expressly provided, the provisions of this subchapter shall not apply to any of the following classes of securities:

**(1)** Reserved.

**(2)** Any security issued or guaranteed by the United States or any territory thereof, or by the District of Columbia, or by any State of the United States, or by any political subdivision of a State or territory, or by any public instrumentality of one or more States or territories, or by any person

2791

controlled or supervised by and acting as an instrumentality of the Government of the United States pursuant to authority granted by the Congress of the United States; or any certificate of deposit for any of the foregoing; or any security issued or guaranteed by any bank; or any security issued by or representing an interest in or a direct obligation of a Federal Reserve bank; or any interest or participation in any common trust fund or similar fund that is excluded from the definition of the term "investment company" under section 3(c)(3) of the Investment Company Act of 1940 [15 U.S.C. 80a–3(c)(3)]; or any security which is an industrial development bond (as defined in section 103(c)(2)[1] of title 26) the interest on which is excludable from gross income under section 103(a)(1)[1] of title 26 if, by reason of the application of paragraph (4) or (6) of section 103(c)[1] of title 26 (determined as if paragraphs (4)(A), (5), and (7) were not included in such section 103(c)),[1] paragraph (1) of such section 103(c)[1] does not apply to such security; or any interest or participation in a single trust fund, or in a collective trust fund maintained by a bank, or any security arising out of a contract issued by an insurance company, which interest, participation, or security is issued in connection with (A) a stock bonus, pension, or profit-sharing plan which meets the requirements for qualification under section 401 of title 26, (B) an annuity plan which meets the requirements for the deduction of the employer's contributions under section 404(a)(2) of title 26, (C) a governmental plan as defined in section 414(d) of title 26 which has been established by an employer for the exclusive benefit of its employees or their beneficiaries for the purpose of distributing to such employees or their beneficiaries the corpus and income of the funds accumulated under such plan, if under such plan it is impossible, prior to the satisfaction of all liabilities with respect to such employees and their beneficiaries, for any part of the corpus or income to be used for, or diverted to, purposes other than the exclusive benefit of such employees or their beneficiaries, or (D) a church plan, company, or account that is excluded from the definition of an investment company under section 3(c)(14) of the Investment Company Act of 1940 [15 U.S.C. 80a–3(c)(14)], other than any plan described in subparagraph (A), (B), (C), or (D) of this paragraph (i) the contributions under which are held in a single trust fund or in a separate account maintained by an insurance company for a single employer and under which an amount in excess of the employer's contribution is allocated to the purchase of securities (other than interests or participations in the trust or separate account itself) issued by the employer or any company directly or indirectly controlling, controlled by, or under common control with the employer, (ii) which covers employees some or all of whom are employees within the meaning of section 401(c)(1) of title 26 (other than a person

2792

participating in a church plan who is described in section 414(e)(3)(B) of title 26), or (iii) which is a plan funded by an annuity contract described in section 403(b) of title 26 (other than a retirement income account described in section 403(b)(9) of title 26, to the extent that the interest or participation in such single trust fund or collective trust fund is issued to a church, a convention or association of churches, or an organization described in section 414(e)(3)(A) of title 26 establishing or maintaining the retirement income account or to a trust established by any such entity in connection with the retirement income account). The Commission, by rules and regulations or order, shall exempt from the provisions of section 77e of this title any interest or participation issued in connection with a stock bonus, pension, profit-sharing, or annuity plan which covers employees some or all of whom are employees within the meaning of section 401(c)(1) of title 26, if and to the extent that the Commission determines this to be necessary or appropriate in the public interest and consistent with the protection of investors and the purposes fairly intended by the policy and provisions of this subchapter. For purposes of this paragraph, a security issued or guaranteed by a bank shall not include any interest or participation in any collective trust fund maintained by a bank; and the term "bank" means any national bank, or banking institution organized under the laws of any State, territory, or the District of Columbia, the business of which is substantially confined to banking and is supervised by the State or territorial banking commission or similar official; except that in the case of a common trust fund or similar fund, or a collective trust fund, the term "bank" has the same meaning as in the Investment Company Act of 1940 [15 U.S.C. 80a–1 et seq.];

**(3)** Any note, draft, bill of exchange, or banker's acceptance which arises out of a current transaction or the proceeds of which have been or are to be used for current transactions, and which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited;

**(4)** Any security issued by a person organized and operated exclusively for religious, educational, benevolent, fraternal, charitable, or reformatory purposes and not for pecuniary profit, and no part of the net earnings of which inures to the benefit of any person, private stockholder, or individual, or any security of a fund that is excluded from the definition of an investment company under section 3(c)(10)(B) of the Investment Company Act of 1940 [15 U.S.C. 80a–3(c)(10)(B)];

**(5)** Any security issued (A) by a savings and loan association, building and loan association, cooperative bank, homestead association, or similar institution,

which is supervised and examined by State or Federal authority having supervision over any such institution; or (B) by (i) a farmer's cooperative organization exempt from tax under section 521 of title 26, (ii) a corporation described in section 501(c)(16) of title 26 and exempt from tax under section 501(a) of title 26, or (iii) a corporation described in section 501(c)(2) of title 26 which is exempt from tax under section 501(a) of title 26 and is organized for the exclusive purpose of holding title to property, collecting income therefrom, and turning over the entire amount thereof, less expenses, to an organization or corporation described in clause (i) or (ii);

**(6)** Any interest in a railroad equipment trust. For purposes of this paragraph "interest in a railroad equipment trust" means any interest in an equipment trust, lease, conditional sales contract, or other similar arrangement entered into, issued, assumed, guaranteed by, or for the benefit of, a common carrier to finance the acquisition of rolling stock, including motive power;

**(7)** Certificates issued by a receiver or by a trustee or debtor in possession in a case under title 11, with the approval of the court;

**(8)** Any insurance or endowment policy or annuity contract or optional annuity contract, issued by a corporation subject to the supervision of the insurance commissioner, bank commissioner, or any agency or officer performing like functions, of any State or Territory of the United States or the District of Columbia;

**(9)** Except with respect to a security exchanged in a case under title 11, any security exchanged by the issuer with its existing security holders exclusively where no commission or other remuneration is paid or given directly or indirectly for soliciting such exchange;

**(10)** Except with respect to a security exchanged in a case under title 11, any security which is issued in exchange for one or more bona fide outstanding securities, claims or property interests, or partly in such exchange and partly for cash, where the terms and conditions of such issuance and exchange are approved, after a hearing upon the fairness of such terms and conditions at which all persons to whom it is proposed to issue securities in such exchange shall have the right to appear, by any court, or by any official or agency of the United States, or by any State or Territorial banking or insurance commission or other governmental authority expressly authorized by law to grant such approval;

**(11)** Any security which is a part of an issue offered and sold only to persons resident within a single State or Territory, where the issuer of such security is a

person resident and doing business within or, if a corporation, incorporated by and doing business within, such State or Territory.

**(12)** Any equity security issued in connection with the acquisition by a holding company of a bank under section 1842(a) of title 12 or a savings association under section 1467a(e) of title 12, if—

**(A)** the acquisition occurs solely as part of a reorganization in which security holders exchange their shares of a bank or savings association for shares of a newly formed holding company with no significant assets other than securities of the bank or savings association and the existing subsidiaries of the bank or savings association;

**(B)** the security holders receive, after that reorganization, substantially the same proportional share interests in the holding company as they held in the bank or savings association, except for nominal changes in shareholders' interests resulting from lawful elimination of fractional interests and the exercise of dissenting shareholders' rights under State or Federal law;

**(C)** the rights and interests of security holders in the holding company are substantially the same as those in the bank or savings association prior to the transaction, other than as may be required by law; and

**(D)** the holding company has substantially the same assets and liabilities, on a consolidated basis, as the bank or savings association had prior to the transaction.

For purposes of this paragraph, the term "savings association" means a savings association (as defined in section 1813(b) of title 12) the deposits of which are insured by the Federal Deposit Insurance Corporation.

**(13)** Any security issued by or any interest or participation in any church plan, company or account that is excluded from the definition of an investment company under section 3(c)(14) of the Investment Company Act of 1940 [15 U.S.C. 80a–3(c)(14)].

**(14)** Any security futures product that is—

**(A)** cleared by a clearing agency registered under section 78q–1 of this title or exempt from registration under subsection (b)(7) of such section 78q–1; and

**(B)** traded on a national securities exchange or a national securities association registered pursuant to section 78o–3(a) of this title.

**(b)** ADDITIONAL EXEMPTIONS

**(1)** SMALL ISSUES EXEMPTIVE AUTHORITY

The Commission may from time to time by its rules and regulations, and subject to such terms and conditions as may be prescribed therein, add any class of securities to the securities exempted as provided in this section, if it finds that the enforcement of this subchapter with respect to such securities is not necessary in the public interest and for the protection of investors by reason of the small amount involved or the limited character of the public offering; but no issue of securities shall be exempted under this subsection where the aggregate amount at which such issue is offered to the public exceeds $5,000,000.

**(2)** ADDITIONAL ISSUES

The Commission shall by rule or regulation add a class of securities to the securities exempted pursuant to this section in accordance with the following terms and conditions:

**(A)** The aggregate offering amount of all securities offered and sold within the prior 12-month period in reliance on the exemption added in accordance with this paragraph shall not exceed $50,000,000.

**(B)** The securities may be offered and sold publicly.

**(C)** The securities shall not be restricted securities within the meaning of the Federal securities laws and the regulations promulgated thereunder.

**(D)** The civil liability provision in section 77l(a)(2) of this title shall apply to any person offering or selling such securities.

**(E)** The issuer may solicit interest in the offering prior to filing any offering statement, on such terms and conditions as the Commission may prescribe in the public interest or for the protection of investors.

**(F)** The Commission shall require the issuer to file audited financial statements with the Commission annually.

**(G)** Such other terms, conditions, or requirements as the Commission may determine necessary in the public interest and for the protection of investors, which may include—

2796

**(i)** a requirement that the issuer prepare and electronically file with the Commission and distribute to prospective investors an offering statement, and any related documents, in such form and with such content as prescribed by the Commission, including audited financial statements, a description of the issuer's business operations, its financial condition, its corporate governance principles, its use of investor funds, and other appropriate matters; and

**(ii)** disqualification provisions under which the exemption shall not be available to the issuer or its predecessors, affiliates, officers, directors, underwriters, or other related persons, which shall be substantially similar to the disqualification provisions contained in the regulations adopted in accordance with section 926 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (15 U.S.C. 77d note).

**(3)** LIMITATION

Only the following types of securities may be exempted under a rule or regulation adopted pursuant to paragraph (2): equity securities, debt securities, and debt securities convertible or exchangeable to equity interests, including any guarantees of such securities.

**(4)** PERIODIC DISCLOSURES

Upon such terms and conditions as the Commission determines necessary in the public interest and for the protection of investors, the Commission by rule or regulation may require an issuer of a class of securities exempted under paragraph (2) to make available to investors and file with the Commission periodic disclosures regarding the issuer, its business operations, its financial condition, its corporate governance principles, its use of investor funds, and other appropriate matters, and also may provide for the suspension and termination of such a requirement with respect to that issuer.

**(5)** ADJUSTMENT

Not later than 2 years after April 5, 2012,[1] and every 2 years thereafter, the Commission shall review the offering amount limitation described in paragraph (2)(A) and shall increase such amount as the Commission determines appropriate. If the Commission determines not to increase such amount, it shall report to the Committee on Financial Services of the House of Representatives and the Committee on Banking, Housing, and Urban Affairs of the Senate on its reasons for not increasing the amount.

2797

**(c)** Securities issued by small investment company

The Commission may from time to time by its rules and regulations and subject to such terms and conditions as may be prescribed therein, add to the securities exempted as provided in this section any class of securities issued by a small business investment company under the Small Business Investment Act of 1958 [15 U.S.C. 661 et seq.] if it finds, having regard to the purposes of that Act, that the enforcement of this subchapter with respect to such securities is not necessary in the public interest and for the protection of investors.

(May 27, 1933, ch. 38, title I, §3, 48 Stat. 75; June 6, 1934, ch. 404, title II, §202, 48 Stat. 906; Feb. 4, 1887, ch. 104, title II, §214, as added Aug. 9, 1935, ch. 498, 49 Stat. 557; amended June 29, 1938, ch. 811, §15, 52 Stat. 1240; May 15, 1945, ch. 122, 59 Stat. 167; Aug. 10, 1954, ch. 667, title I, §5, 68 Stat. 684; Pub. L. 85–699, title III, §307(a), Aug. 21, 1958, 72 Stat. 694; Pub. L. 91–373, title IV, §401(a), Aug. 10, 1970, 84 Stat. 718; Pub. L. 91–547, §27(b), (c), Dec. 14, 1970, 84 Stat. 1434; Pub. L. 91–565, Dec. 19, 1970, 84 Stat. 1480; Pub. L. 91–567, §6(a), Dec. 22, 1970, 84 Stat. 1498; Pub. L. 94–210, title III, §308(a)(1), (3), Feb. 5, 1976, 90 Stat. 56, 57; Pub. L. 95–283, §18, May 21, 1978, 92 Stat. 275; Pub. L. 95–425, §2, Oct. 6, 1978, 92 Stat. 962; Pub. L. 95–598, title III, §306, Nov. 6, 1978, 92 Stat. 2674; Pub. L. 96–477, title III, §301, title VII, §701, Oct. 21, 1980, 94 Stat. 2291, 2294; Pub. L. 97–261, §19(d), Sept. 20, 1982, 96 Stat. 1121; Pub. L. 99–514, §2, Oct. 22, 1986, 100 Stat. 2095; Pub. L. 100–181, title II, §§203, 204, Dec. 4, 1987, 101 Stat. 1252; Pub. L. 103–325, title III, §320, Sept. 23, 1994, 108 Stat. 2225; Pub. L. 104–62, §3, Dec. 8, 1995, 109 Stat. 684; Pub. L. 104–290, title V, §508(b), Oct. 11, 1996, 110 Stat. 3447; Pub. L. 106–102, title II, §221(a), Nov. 12, 1999, 113 Stat. 1401; Pub. L. 106–554, §1(a)(5) [title II, §208(a)(2)], Dec. 21, 2000, 114 Stat. 2763, 2763A–435; Pub. L. 108–359, §1(b), Oct. 25, 2004, 118 Stat. 1666; Pub. L. 111–203, title IX, §985(a)(1), July 21, 2010, 124 Stat. 1933; Pub. L. 112–106, title IV, §401(a), Apr. 5, 2012, 126 Stat. 323; Pub. L. 112–142, §2, July 9, 2012, 126 Stat. 989.)

💼 U.S. Code Toolbox

Law about... Articles from Wex

Table of Popular Names

Parallel Table of Authorities

How current is this?

Accessibility
About LII
Contact us
Advertise here
Help
Terms of use
Privacy

U.S. Securities and Exchange Commission

## Division of Corporation Finance:
## Revised Staff Legal Bulletin No. 3 (CF)

**Action:**   Publication of Corporation Finance Staff Legal Bulletin

**Date:**   October 20, 1999

**Summary:**   This staff legal bulletin provides the Division of Corporation Finance's views regarding the Section 3(a)(10) exemption from the Securities Act of 1933's registration requirements. The bulletin also expresses the Division's views regarding the Securities Act resale status of securities that are received in transactions exempt from registration pursuant to Section 3(a)(10). Finally, the bulletin, originally issued on July 25, 1997, is revised to provide the Division's views on the availability of the Section 3(a)(10) exemption after the enactment of Section 302 of the Securities Litigation Uniform Standards Act of 1998.

**Supplementary Information:**   The statements in this legal bulletin represent the views of the staff of the Division. This bulletin is not a rule, regulation, or statement of the Securities and Exchange Commission. Further, the Commission has neither approved nor disapproved its content.

**Contact Person:**   For further information please contact Cecilia D. Blye, Special Counsel, at (202) 942-2900.

### 1. Overview

Section 3(a)(10)[1] of the Securities Act[2] is an exemption from Securities Act registration for offers and sales of securities in specified exchange transactions.[3] Before the issuer can rely on the exemption, the following conditions must be met.[4]

- The securities must be issued in exchange for securities, claims, or property interests; they can not be offered for cash.[5]

- A court or authorized governmental entity[6] must approve the fairness of the terms and conditions of the exchange.

- The reviewing court or authorized governmental entity must:

  - find, before approving the transaction, that the terms and conditions of the exchange are fair to those to whom securities will be issued;[7] and

  - be advised before the hearing that the issuer will rely on the Section 3(a)(10) exemption based on the court's or authorized governmental entity's approval of the transaction.

- The court or authorized governmental entity must hold a hearing before approving the fairness of the terms and conditions of the transaction.

- A governmental entity must be expressly authorized by law to hold the hearing, although it is not necessary that the law require the

2801

hearing.

- The fairness hearing must be open to everyone to whom securities would be issued in the proposed exchange.

- Adequate notice must be given to all those persons.

- There cannot be any improper impediments to the appearance by those persons at the hearing.

The Section 3(a)(10) exemption is available without any action by the Division or the Commission. Issuers that are unsure of whether the exemption is available for a specific contemplated transaction may, however, seek the Division's views by requesting a "no-action" position from the Division.

This bulletin discusses the issues that commonly arise in those "no-action" requests. The Division believes that, by making its views on these issues more widely known, issuers will better understand when the exemption is available. Also, by making the Division's views more widely known, this bulletin should decrease those situations in which an issuer is uncertain whether the exemption is available for a contemplated transaction.

As originally issued[8], Staff Legal Bulletin No. 3 discussed the effect of the National Securities Markets Improvements Act[9] on exchanges approved by courts and authorized government entities. NSMIA amended Section 18 of the Securities Act[10] to preclude any state from requiring registration or qualification of "covered securities."[11] The bulletin expressed the Staff's view that NSMIA precluded reliance on a fairness hearing conducted under state securities laws as the basis for a claim of exemption pursuant to Section 3(a)(10), for any security that was a "covered security" prior to the hearing.

Section 302 of the Securities Litigation Uniform Standards Act of 1998[12] amends Section 18(b)(4)(C) to add securities issued under Section 3(a)(10) of the Securities Act as a category of securities exempt from the definition of "covered securities." As a result, an issuer now may rely upon a fairness hearing conducted under state securities law to perfect an exemption under Section 3(a)(10) for securities that otherwise would be deemed covered securities. The Division's views on this matter are discussed more completely in Section 4.B.2., below.

### 2. Timing of No-Action Requests

The Division will not issue a no-action response concerning a transaction after the fairness hearing has been held. An issuer must, therefore, submit its no-action request *before* the fairness hearing. If an issuer submits a no-action request very close to the fairness hearing date, the Division may not have adequate time to consider the issues presented and respond before the fairness hearing.[13]

### 3. Timing of Security Holders' Votes

When an issuer solicits security holders' votes on the transaction before the fairness hearing, it is offering the securities to be issued in the transaction. This solicitation ordinarily requires either registration or an exemption.

A practical issue arises because many statutes governing fairness hearings require security holders to vote before the hearing, at a time when the issuer cannot be certain that it will be able to rely on the Section 3(a)(10) exemption. In these situations, the Division has not objected to a vote before the fairness hearing, even though this means an investment decision

is made before the fairness hearing. The Division takes this view because the timing is required by the governing statute and, under that statute, the transaction is not effected unless the court or authorized governmental entity approves it. In the Division's view, the issuer should submit to the court or authorized governmental entity the disclosure materials offering the securities before it mails them to the offerees.

**4. Division Analysis of the Requirements Underlying the Exemption**

A. The Securities Must Be Issued in Exchange for Securities, Claims, or Property Interests[14]

For a discussion of exchanges that are "partly for cash," see footnote 5.

This requirement generally does not raise interpretive issues.[15] However, it is important to note that when options, warrants, or other convertible securities are issued in the Section 3(a)(10) transaction, Section 3(a)(10) does not exempt the later exercise or conversion.

This is different than transactions that are exempt under Section 1145 of the U.S. Bankruptcy Code.[16] Section 1145 specifically exempts the later exercise or conversion from Securities Act registration.[17]

B. A Court or Authorized Governmental Entity Must Approve the Exchange's Terms and Conditions

*1. Appropriate Authorization for Governmental Entity Approval*

If a governmental entity is approving the exchange, that entity must be authorized by statute:

- to hold a hearing on the transaction, although it is not necessary that the statute require the hearing; and

- to approve the fairness of the exchange's terms and conditions.[18]

In this analysis, the statute must require the entity to conclude affirmatively that the exchange is fair to the *security holders participating in the exchange* .[19] For example, the statute must require the governmental entity to conclude that the terms and conditions of the exchange are "in the best interest of shareholders" or "fair" to shareholders, *not* that the exchange is "not unfair," "not unreasonable," "not prejudicial," or "not counter to the best interest of shareholders."[20]. Moreover, as previously discussed in footnote 7, the governmental entity must find the terms and conditions to be fair both procedurally and substantively.

If there is a question as to whether the statute authorizes the governmental entity to hold a hearing on the transaction and to approve the fairness of the exchange's terms and conditions, it may be clear from the actual practice of the authorized governmental entity. For example, in *State Mutual Life Assurance Company* (March 23, 1995), the Division relied on an opinion from counsel to the Division of Insurance of the Commonwealth of Massachusetts that the relevant statute authorized the Massachusetts Insurance Commissioner to make the requisite fairness determination.

If an issuer intends to rely on the Section 3(a)(10) exemption, it may want to look at prior Division no-action responses and see if the particular statute has ever been the basis for a Division no-action position. If the statute has been the basis for a favorable Division position, the issuer should consider

2803

whether the language of the statute has changed since the Division took that favorable position.

### 2. The Effect the Securities Litigation Uniform Standards Act Has on Exchanges Approved by Governmental Entities

Issuers have raised questions on how the recently enacted Securities Litigation Uniform Standards Act affects the scope of the Section 3(a)(10) exemption for transactions approved by governmental entities.

NSMIA amended Section 18 of the Securities Act to preempt any state from requiring the registration of "covered securities." As amended by NSMIA, Section 18 also preempted any state law that authorized a state fairness hearing relating to the registration, or exemption from registration, of securities that were "covered securities" before the hearing. An issuer, therefore, could not use such a hearing as a basis for relying on the Section 3(a)(10) exemption.[21]

Section 302 of SLUSA amends Section 18 to add securities issued under Section 3(a)(10) of the Securities Act as a category of securities exempt from the definition of covered securities.[22] According to congressional statements made during consideration of Section 302 of SLUSA, NSMIA's prohibition of reliance on certain state fairness hearings to perfect a Section 3(a)(10) claim of exemption with respect to "covered" securities was inadvertent. Section 302 is a technical correction that is intended to correct an inadvertent effect of NSMIA.[23] As a result, it is the staff's view that securities that otherwise would be covered securities, and therefore exempt from the registration or qualification provisions of state securities laws, are removed from the definition of "covered security" if they are offered and sold in reliance on Section 3(a)(10).[24] Accordingly, an issuer now may rely upon a fairness hearing conducted under state securities law to perfect an exemption under Section 3(a)(10) for securities that otherwise would be covered securities. An issuer may perfect a claim of exemption under Section 3(a)(10) by relying on any state procedure that provided a valid basis for the Section 3(a)(10) exemption before NSMIA was enacted. Statements to the contrary in the original Staff Bulletin No. 3 therefore are no longer valid.

Because, as amended, Section 18 exempts all securities issued in reliance on Section 3(a)(10) from the definition of "covered securities," such securities are no longer exempt from the registration or qualification provisions of any state securities laws.

### 3. Information That Must Be Available to the Court or Authorized Governmental Entity When It Makes Its Fairness Determination

The issuer must advise the court or authorized governmental entity before the hearing that the issuer will rely on the Section 3(a)(10) exemption based on the court's or authorized governmental entity's approval of the exchange. It is the Division's view that the reviewing court or authorized governmental entity making the fairness determination "must have sufficient information before it to determine the value of both the securities, claims or interests to be surrendered and the securities to be issued in the proposed transaction."[25]

### 4. Foreign Courts

It is the Division's view that the term "any court" in Section 3(a)(10) may include a foreign court.[26]

2804

In connection with no-action requests in these situations:

- all requirements that apply to exchanges approved by U.S. courts must be met; and

- the issuer must provide the Division with an opinion from counsel licensed to practice in the foreign jurisdiction that says that before the foreign court can give its approval, it must consider the fairness of the proposed exchange to persons receiving securities in the exchange.[27]

**C. Before Approval, the Court or Authorized Governmental Entity Must Hold a Hearing on the Fairness of the Exchange; This Hearing Must Be Open to Everyone to Whom Securities Would Be Issued in the Proposed Exchange**

The court or authorized governmental entity must:

- hold a hearing to determine whether the proposed exchange's terms and conditions are fair to all those who will receive securities in the exchange; and

- approve the fairness of the terms and conditions of the proposed exchange.[28]

The hearing must be open to everyone to whom securities would be issued in the proposed exchange.

The issuer must provide appropriate notice of the hearing in a timely manner.[29] Section 3(a)(10) does not specify the information that must be included in the required notice.

Although the anti-fraud requirements of the federal securities laws would govern disclosure, the Division does not address the adequacy or appropriateness of the information provided to persons who have a right to appear at the hearing. In connection with no-action requests, the Division will consider the adequacy of the notice only to the extent that it:

- adequately advises those who are proposed to be issued securities in the exchange of their right to attend the hearing; and

- gives them the information necessary to exercise that right.

An issuer that intends to rely on the Section 3(a)(10) exemption should consider whether, as a practical matter, imposing prerequisites to appearance will prevent those persons from having a meaningful opportunity to appear at that hearing.[30]

**5. Resale Status of Securities Received in a Transaction Exempt From Securities Act Registration Pursuant to Section 3(a)(10)**

In the Division's view, holders must resell securities received in Section 3(a)(10)-exempt exchanges in the manner permitted by Securities Act Rule 145(c) and (d).[31] These Rule 145(c) and (d) resale limitations apply only to holders that were affiliates of any party to the exchange *at the time of the Section 3(a)(10)-exempt sale*.

Generally, Rule 145(d) provides three appropriate methods for unregistered resales by these holders:

- resales that meet all of the Rule 144 requirements, except for the holding period and notice filing requirements (Rule 145(d)(1));

2805

- resales by persons who are not affiliates of the issuer and have held the securities for at least one year from the date of the Section 3(a)(10)-exempt transaction without regard to Rule 144, except for the current public information requirement (Rule 145(d)(2)); and

- resales by persons who are not, and for the last three months have not been, affiliates of the issuer and have held the securities for at least two years from the date of the Section 3(a)(10)-exempt transaction without regard to Rule 144 (Rule 145(d)(3)).

It is the Division's view that securities received in a Section 3(a)(10)-exempt transaction may be resold in the following manner:

1. Persons may resell their Section 3(a)(10) securities without regard to Rules 144 or 145(c) and (d) if they:

   **a)**   are *not* affiliates of any party to the transaction before the transaction;

   ***and***

   **b)**   are *not* affiliates of the issuer of the Section 3(a)(10) securities after the transaction.

2. Persons may resell their Section 3(a)(10) securities in the manner permitted by Rule 145(d)(1), (d)(2), or (d)(3) if they:

   **a)**   are affiliates of any party to the transaction before the transaction;

   ***but***

   **b)**   are *not* affiliates of the issuer of the Section 3(a)(10) securities after the transaction.[32]

3. Persons may resell their Section 3(a)(10) securities in the manner permitted by Rule 145(d)(1) if they:

   **a)**   are affiliates of any party to the transaction;

   ***and***

   **b)**   are affiliates of the issuer of the Section 3(a)(10) securities after the transaction.

The resale provisions of Rule 145(d)(2) or (d)(3) would not be available to this third group because Rule 145(d)(2) and Rule 145(d)(3) are not available to affiliates of the issuer of the Section 3(a)(10) securities.

---

[1]   15 U.S.C. §77c(a)(10). Section 3(a)(10) reads as follows:

Except with respect to a security exchanged in a case under title 11 of the United States Code, any security which is issued in exchange for one or more bona fide outstanding securities, claims or property interests, or partly in such exchange and partly for cash, where the terms and conditions of such issuance and exchange are approved, after a hearing upon the fairness of such terms and conditions at which all persons to whom it is proposed to issue securities in such exchange shall have the right to appear, by any court or by any official or agency of the United States or by any State or Territorial banking or insurance commission or other governmental authority expressly authorized by law to grant such approval.

[2]   15 U.S.C. §77a *et seq*.

[3]   The Trust Indenture Act of 1939 does not include an exemption that is the equivalent of Section 3(a)(10) of the Securities Act. If an issuer is relying on Section 3(a)(10) to offer and sell debt securities without

Securities Act registration, it should note that the Trust Indenture Act would still apply to that offering.

4  The staff derives these conditions from the language of Section 3(a)(10) and positions expressed by the General Counsel of the Commission in a letter excerpted in Securities Act Release No. 312 (March 15, 1935) [11 FR 10953].

5  Section 3(a)(10) also exempts sales of securities that are "partly in such exchange and partly for cash...". It is the Division's view that Section 3(a)(10) exempts transactions that are predominantly exchanges and that the "partly for cash" language is intended merely to permit flexibility in structuring those exchanges. The Division has not received no-action requests that raise the issue of whether the exchange is truly an exchange or whether the level of cash involved changes its nature. Because this analysis necessarily would be very fact-specific, the Division is not able to give specific guidance on the issue in this staff legal bulletin. To the extent the issue is presented in a transaction, an issuer may wish to request a no- action position from the staff on that particular transaction.

6  Authorized governmental entities may include state insurance commissions, state corporation or securities commissions, state banking agencies, etc.

7  In the Division's view, the reviewing court or authorized governmental entity must find the terms and conditions of the exchange to be fair both procedurally and substantively.

8  Staff Legal Bulletin No. 3 (CF) (July 25, 1997).

9  Pub. L. No. 104-290 (1996).

10  15 U.S.C. §77r.

11  "Covered securities" are defined in Section 18 to include, among others, securities listed or approved for listing on the New York Stock Exchange, the American Stock Exchange, or the Nasdaq National Market System.

12  Pub. L. No. 105-353 (1998).

13  Generally, the Division strives to respond to requests for no-action within 30 days of receipt. It makes every effort to satisfy the time schedule of the requestor, but may not be able to accommodate a very short deadline.

14  For a discussion of exchanges that are "partly for cash," see footnote 5.

15  Despite the "exchange" requirement of Section 3(a)(10), the Division has not objected to the issuance of shares as attorneys' fees without registration in reliance on the Section 3(a)(10) exemption, so long as those securities amount to no more than one-third of the securities issued in the settlement. *See e.g.*, *Sulcus Corp.* (June 19, 1996); *The Score Board* (November 3, 1995); *Aura Systems, Inc.* (July 8, 1994).

16  11 U.S.C. §1145.

17  *See*, *e.g.*, *Allied Leisure Industries, Inc.* (October 4, 1979) and *Canadian Conquest Exploration, Inc.* (April 6, 1989).

18  Where an issuer will use court approval as a basis for relying on the Section 3(a)(10) exemption, the court also must make this finding. It is not necessary, however, that the court be expressly authorized by statute to do so. *See* Securities Act Release No. 312 (March 15, 1935). *See also* the discussion in the *Foreign Courts* subsection of this bulletin for the requirements for a foreign court to approve the exchange.

19  In 1938, the staff of the Commission stated its view that:

[A] commission or authority must be authorized to grant approval of the fairness of the terms and conditions of the issuance and exchange, *from the point of view of the persons to whom the securities are issued in the exchange*, and this authority must be express. This seems to be the

2807

proper interpretation if the requirement of a hearing upon the fairness of the terms and conditions is not to be rendered meaningless. As a result many commissions, such as public service commissions, whose authorization may be required for the reorganization of certain companies, will be found not to have the requisite authority because [they are] not authorized to pass upon the interest of the security holders. (emphasis added)

– Milton V. Freeman, A Summary of Administrative Interpretations of the Securities Act of 1933, As Amended at 280-81 (draft of May 1, 1938) (citations omitted). This position was restated in the Report of the Task Force on Disclosure Simplification (March, 1996) (the "Task Force Report").

[20] Examples of appropriate statutory standards in favorable Division responses to no-action requests include requirements that the entity determine that the transaction:

(1) "adequately protects the interests of depositors, other creditors and shareholders" ( *Minowa Bancshares, Inc.*, November 26, 1990); (2) be "fair and equitable" to shareholders ( *Farm Family Mutual Insurance Co.*, April 2, 1996); (3) promotes the "public convenience and advantage and the interest of [the merging] institutions, their members, stockholders and depositors" ( *CFX Corp.*, April 19, 1996); and (4) "is such that an intelligent and honest man, a member of the class concerned and acting in respect of his interest, might reasonably approve" ( *The Hongkong and Shanghai Banking Corporation Ltd.*, January 23, 1991).

[21] Of course, as noted in the original SLB 3, not all state fairness hearings relating to exchanges of securities were preempted by NSMIA. The preemption did not apply to state fairness hearing procedures outside the scope of state securities laws, such as those authorized by state corporation, banking or insurance law and not relating to registration, or an exemption from registration, or securities. Issuers were never precluded from using such hearings as a basis for relying on the Section 3(a)(10) exemption.

[22] Section 18(b)(4)(C), 15 U.S.C. §77r(b)(4)(C).

[23] Congressman Christopher Cox noted in House discussion of SLUSA that Section 302 of SLUSA was intended to make a "... technical correction to [NSMIA]." He explained that:

This correction restores the viability of Section 3(a)(10) of the Securities Act of 1933, which provides a voluntary state-law alternative to federal securities registration. ... Although [NSMIA] does not amend Section 3(a)(10), it inadvertently impeded its operation. I appreciate the Chairman's consideration in including a curative technical amendment endorsed by the California securities regulatory authority in the manager's amendment.*.

* 144 Cong. Rec. H6052, H6060 (daily ed. July 21, 1998)(statement of Rep. Cox).

[24] The Division first published its views regarding this matter in letters to *Food Lion, Inc.* (1/13/99) and *Maverick Networks* (1/25/99).

[25] *See* Task Force Report at page 60. *See also Information Resources, Inc.* (February 27, 1995); *Applied Magnetics Corp.* (May 30, 1995); and *Gensia Inc.* (June 23, 1995).

[26] *See*, *e.g.*, *Lucas Industries plc* (August 20, 1996); *Symantec Corp.* (November 22, 1995); *Orbital Sciences Corp.* (October 13, 1995); *Minera Andes, Inc.* (September 21, 1995); *Cadillac Fairview, Inc.* (May 26, 1995); *LAC Minerals Ltd.* (June 27, 1991); *The Hongkong and Shanghai Banking Corporation Ltd.* (January 23, 1991).

27 The Division requires this additional opinion because the fairness standard in foreign jurisdictions often is derived from case law that interprets and applies the statute(s), rather than from the specific language of the statute(s). The opinion of foreign counsel should state clearly that:

- under applicable law, the court cannot approve the exchange unless it finds the transaction to be fair to the persons who will receive the securities;
- those persons will receive notice of, and have the right to appear at, the fairness hearing; and
- the issuer will advise the court *before* the hearing that it will rely on the Section 3(a)(10) exemption and not register the exchange under the Securities Act based on the court's approval of the exchange.

28 As noted in footnote 7, we believe that the reviewing court or authorized governmental entity must find both the terms of and procedures for the exchange to be fair.

29 For example, if the securities are held in bearer form there must be appropriate publication of the notice.

30 The Division has not objected to the mere requirement to file a notice of an intention to appear. For examples of favorable staff responses to no-action requests where the filing of a notice of an intention to appear was required, *see Digicon Inc.* (August 19, 1996); *Canadian Pacific Ltd.*, (June 26, 1996); *Cadillac Fairview, Inc.*, (May 26, 1995).

31 The Division initially expressed these positions in the no-action response to *St. Ives Holding Company, Inc.* (July 22, 1987) and continues to follow them in its analysis of these issues. The Commission recently proposed to eliminate the resale limitations of Rule 145(c) and (d). If this proposal is adopted, the staff's position regarding resale conditions will be reassessed.

32 In computing the holding period of the Section 3(a)(10) securities for purposes of Rule 145(d)(2) or (d)(3), such persons may not "tack" the holding period of the securities exchanged for the Section 3(a)(10) securities in the Section 3(a)(10)-exempt transaction.

*http://www.sec.gov/interps/legal/cfslb3r.htm*

---

Modified:11/01/1999



**U.S. Securities and Exchange Commission**

Home / Rules and Regulations / Staff Guidance / Staff Legal Bulletins / Staff Legal Bulletin No. 3A (CF)

# Staff Legal Bulletin No. 3A (CF)

## Division of Corporation Finance Securities and Exchange Commission

**Action:** Publication of CF Staff Legal Bulletin

**Date:** June 18, 2008

**Summary:** This staff legal bulletin provides the Division of Corporation Finance's views regarding the Section 3(a)(10) exemption from the Securities Act of 1933's registration requirements. The bulletin also expresses the Division's views regarding the Securities Act resale status of securities that are received in certain transactions exempt from registration pursuant to Section 3(a)(10).[1]

**Supplementary Information:** The statements in this legal bulletin represent the views of the Division of Corporation Finance. This bulletin is not a rule, regulation, or statement of the Securities and Exchange Commission. Further, the Commission has neither approved nor disapproved its content.

**Contacts:** For further information, please contact the Office of Chief Counsel in the Division of Corporation Finance at (202) 551-3500.

2810

# 1. Overview

Section 3(a)(10)[2] of the Securities Act[3] is an exemption from Securities Act registration for offers and sales of securities in specified exchange transactions.[4] Before the issuer can rely on the exemption, the following conditions must be met.[5]

- The securities must be issued in exchange for securities, claims, or property interests; they cannot be offered for cash.[6]
- A court or authorized governmental entity[7] must approve the fairness of the terms and conditions of the exchange.
- The reviewing court or authorized governmental entity must:
  - find, before approving the transaction, that the terms and conditions of the exchange are fair to those to whom securities will be issued;[8] and
  - be advised before the hearing that the issuer will rely on the Section 3(a)(10) exemption based on the court's or authorized governmental entity's approval of the transaction.
- The court or authorized governmental entity must hold a hearing before approving the fairness of the terms and conditions of the transaction.
- A governmental entity must be expressly authorized by law to hold the hearing, although it is not necessary that the law require the hearing.
- The fairness hearing must be open to everyone to whom securities would be issued in the proposed exchange.
- Adequate notice must be given to all those persons.
- There cannot be any improper impediments to the appearance by those persons at the hearing.

The Section 3(a)(10) exemption is available without any action by the Division or the Commission. Issuers that are unsure of whether the exemption is available for a specific contemplated transaction may, however, seek the Division's views by requesting a "no-action" position from the Division.

This bulletin discusses the issues that commonly arise in those "no-action" requests. The Division believes that, by making its views on these issues more widely known, issuers will better understand when the exemption is available. Also, by making the Division's views more widely known, this bulletin should

decrease those situations in which an issuer is uncertain whether the exemption is available for a contemplated transaction.

## 2. Timing of No-Action Requests

The Division will not issue a no-action response concerning a transaction after the fairness hearing has been held. An issuer must, therefore, submit its no-action request *before* the fairness hearing. If an issuer submits a no-action request very close to the fairness hearing date, the Division may not have adequate time to consider the issues presented and respond before the fairness hearing.[9]

## 3. Timing of Security Holders' Votes

When an issuer solicits security holders' votes on the transaction before the fairness hearing, it is offering the securities to be issued in the transaction. This solicitation ordinarily requires either registration or an exemption.

A practical issue arises because many statutes governing fairness hearings require security holders to vote before the hearing, at a time when the issuer cannot be certain that it will be able to rely on the Section 3(a)(10) exemption. In these situations, the Division has not objected to a vote before the fairness hearing, even though this means an investment decision is made before the fairness hearing. The Division takes this view because the timing is required by the governing statute and, under that statute, the transaction is not effected unless the court or authorized governmental entity approves it. In the Division's view, the issuer should submit to the court or authorized governmental entity the disclosure materials offering the securities before it mails them to the offerees.

2812

# 4. Division Analysis of the Requirements Underlying the Exemption

## A. The Securities Must Be Issued in Exchange for Securities, Claims, or Property Interests

This requirement generally does not raise interpretive issues.[10] However, it is important to note that when options, warrants, or other convertible securities are issued in the Section 3(a)(10) transaction, Section 3(a)(10) does not exempt the later exercise or conversion.[11]

This is different than transactions that are exempt under Section 1145 of the U.S. Bankruptcy Code. Section 1145 specifically exempts the later exercise or conversion from Securities Act registration.[12]

## B. A Court or Authorized Governmental Entity Must Approve the Exchange's Terms and Conditions

### 1. Appropriate Authorization for Governmental Entity Approval

If a governmental entity is approving the exchange, that entity must be authorized by statute:

- to hold a hearing on the transaction, although it is not necessary that the statute require the hearing; and
- to approve the fairness of the exchange's terms and conditions.[13]

In this analysis, the statute must require the entity to conclude affirmatively that the exchange is fair to the *security holders participating in the exchange*.[14] For example, the statute must require the governmental entity to conclude that the terms and conditions of the exchange are "in the best interest of shareholders" or "fair" to shareholders, *not* that the exchange is "not unfair," "not unreasonable," "not prejudicial," or "not counter to the best interest of shareholders."[15] Moreover, the governmental entity must find the terms and conditions to be fair both procedurally and substantively.

If there is a question as to whether the statute authorizes the governmental entity to hold a hearing on the transaction and to approve the fairness of the

2813

exchange's terms and conditions, it may be clear from the actual practice of the authorized governmental entity. For example, in *State Mutual Life Assurance Company* (Mar. 23, 1995), the Division relied on an opinion from counsel to the Division of Insurance of the Commonwealth of Massachusetts that the relevant statute authorized the Massachusetts Insurance Commissioner to make the requisite fairness determination.

If an issuer intends to rely on the Section 3(a)(10) exemption, it may want to look at prior Division no-action responses and see if the particular statute has ever been the basis for a Division no-action position. If the statute has been the basis for a Division no-action position, the issuer should consider whether the language of the statute has changed since the Division took that no-action position.

**2. Information That Must Be Available to the Court or Authorized Governmental Entity When It Makes Its Fairness Determination**

The issuer must advise the court or authorized governmental entity before the hearing that the issuer will rely on the Section 3(a)(10) exemption based on the court's or authorized governmental entity's approval of the exchange. It is the Division's view that the reviewing court or authorized governmental entity making the fairness determination "must have sufficient information before it to determine the value of both the securities, claims or interests to be surrendered and the securities to be issued in the proposed transaction."[16]

**3. Fairness Hearings Conducted under State Securities Laws**

Under Section 18 of the Securities Act, securities that otherwise would be covered securities, and therefore exempt from the registration or qualification provisions of state securities laws, are removed from the definition of "covered securities" if they are offered and sold in reliance on the Section 3(a)(10) exemption.[17] Accordingly, an issuer may rely upon a fairness hearing conducted under state securities law to perfect an exemption under Section 3(a)(10) for securities that otherwise would be covered securities.[18]

Because Section 18 exempts all securities issued in reliance on Section 3(a)(10) from the definition of "covered securities," such securities are no longer exempt

2814

from the registration or qualification provisions of any state securities laws.

### 4. Foreign Courts

It is the Division's view that the term "any court" in Section 3(a)(10) may include a foreign court.[19]

In connection with no-action requests in these situations:

- all requirements that apply to exchanges approved by U.S. courts must be met; and
- the issuer must provide the Division with an opinion from counsel licensed to practice in the foreign jurisdiction that says that, before the foreign court can give its approval, it must approve the fairness of the proposed exchange to persons receiving securities in the exchange.[20]

## C. Before Approval, the Court or Authorized Governmental Entity Must Hold a Hearing on the Fairness of the Exchange; This Hearing Must Be Open to Everyone to Whom Securities Would Be Issued in the Proposed Exchange

The court or authorized governmental entity must:

- hold a hearing to determine whether the proposed exchange's terms and conditions are fair to all those who will receive securities in the exchange; and
- approve the fairness of the terms and conditions of the proposed exchange.

The hearing must be open to everyone to whom securities would be issued in the proposed exchange.

The issuer must provide appropriate notice of the hearing in a timely manner.[21] Section 3(a)(10) does not specify the information that must be included in the required notice.

Although the anti-fraud requirements of the federal securities laws would govern disclosure, the Division does not address the adequacy or

2815

appropriateness of the information provided to persons who have a right to appear at the hearing. In connection with no-action requests, the Division will consider the adequacy of the notice only to the extent that it:

- adequately advises those who are proposed to be issued securities in the exchange of their right to attend the hearing; and
- gives them the information necessary to exercise that right.

An issuer that intends to rely on the Section 3(a)(10) exemption should consider whether, as a practical matter, imposing prerequisites to appearance will prevent those persons from having a meaningful opportunity to appear at that hearing.[22]

## 5. Resale Status of Securities Received in a Transaction Exempt From Securities Act Registration Pursuant to Section 3(a)(10)

In Securities Act Release No. 8869 (Dec. 6, 2007), the Commission amended Securities Act Rule 145 to eliminate the presumptive underwriter provision in Rule 145(c) except for transactions involving a shell company, other than a business combination related shell company.

Accordingly, it is the Division's view that securities received in a Rule 145(a) transaction not involving a shell company that was exempt under Section 3(a)(10) may generally be resold without regard to Rule 144 if the sellers are not affiliates of the issuer of the Section 3(a)(10) securities and have not been affiliates within 90 days of the date of the Section 3(a)(10)-exempt transaction, as such securities would not constitute "restricted securities" within the meaning of Rule 144(a)(3) under the Securities Act. In the event that the securities are held by affiliates of the issuer, those holders may be able to resell the securities in accordance with the provisions of Rule 144.[23]

When a Rule 145(a) transaction is exempt from Securities Act registration under Section 3(a)(10) and any party to that transaction is a shell company, other than a business combination related shell company, then the Rule 145(c) and (d) resale limitations apply to any party to that transaction (other than the issuer of the Section 3(a)(10) securities) and to any person who is an affiliate of such party at

the time such transaction is submitted for vote or consent.[24] In those situations, holders who are deemed to be underwriters under Rule 145(c) may resell their securities without registration in the manner permitted by Rule 145(d).[25]

---

[1] The bulletin was originally issued on July 25, 1997 and revised on October 20, 1999 to provide the Division's views on the availability of the Section 3(a)(10) exemption after the enactment of Section 302 of the Securities Litigation Uniform Standards Act of 1998. The bulletin is now further revised to express the Division's views regarding the Securities Act resale status of securities that are received in transactions exempt from registration pursuant to Section 3(a)(10) in light of Securities Act Release No. 8869 (Dec. 6, 2007) [72 FR 71546], which amended Securities Act Rules 144 and 145. This bulletin replaces the two prior bulletins in their entirety.

[2] 15 U.S.C. §77c(a)(10). Section 3(a)(10) reads as follows: "Except with respect to a security exchanged in a case under title 11 of the United States Code, any security which is issued in exchange for one or more bona fide outstanding securities, claims or property interests, or partly in such exchange and partly for cash, where the terms and conditions of such issuance and exchange are approved, after a hearing upon the fairness of such terms and conditions at which all persons to whom it is proposed to issue securities in such exchange shall have the right to appear, by any court, or by any official or agency of the United States, or by any State or Territorial banking or insurance commission or other governmental authority expressly authorized by law to grant such approval."

[3] 15 U.S.C. §77a *et seq.*

[4] The Trust Indenture Act of 1939 does not include an exemption that is the equivalent of Section 3(a)(10) of the Securities Act. If an issuer is relying on Section 3(a)(10) to offer and sell debt securities without Securities Act registration, it should note that the Trust Indenture Act would still apply to that offering.

2817

[5] The staff derives these conditions from the language of Section 3(a)(10) and positions expressed by John J. Burns, the General Counsel of the Commission, in a letter excerpted in Securities Act Release No. 312 (Mar. 15, 1935) [11 FR 10953].

[6] Section 3(a)(10) also exempts sales of securities that are "partly in such exchange and partly for cash…." It is the Division's view that Section 3(a)(10) exempts transactions that are predominantly exchanges and that the "partly for cash" language is intended merely to permit flexibility in structuring those exchanges. Because this analysis necessarily would be very fact-specific, the Division is not able to give specific guidance on the issue in this staff legal bulletin. To the extent the issue is presented in a transaction, an issuer may wish to request a no-action position from the staff on that particular transaction.

[7] Authorized governmental entities may include state insurance commissions, state corporation or securities commissions, state banking agencies, etc.

[8] In the Division's view, the reviewing court or authorized governmental entity must find the terms and conditions of the exchange to be fair both procedurally and substantively.

[9] Generally, the Division strives to respond to requests for no-action within 30 days of receipt. It makes every effort to satisfy the time schedule of the requestor but may not be able to accommodate a very short deadline.

[10] Despite the "exchange" requirement of Section 3(a)(10), the Division has not objected, in limited circumstances, to the issuance of securities as attorneys' fees without registration in reliance on the Section 3(a)(10) exemption, such as when those securities amount to no more than one-third of the securities issued in the settlement. *See, e.g., Hanover Compressor Co.* (Jan. 27, 2004); *Sprint Corp.* (Aug. 25, 2003); *Sulcus Corp.* (June 19, 1996); and *The Score Board* (Nov. 3, 1995). For a discussion of exchanges that are "partly for cash," see footnote 6.

[11] *See, e.g., Canadian Conquest Exploration, Inc.* (Apr. 6, 1989); and *Allied Leisure Industries, Inc.* (Oct. 4, 1979).

[12] 11 U.S.C. §1145(a)(2).

[13] Where an issuer will use court approval as a basis for relying on the Section 3(a)(10) exemption, the court also must make this finding. It is not necessary, however, that the court be expressly authorized by statute to do so. *See* Securities Act Release No. 312, *supra* note 5. See also the discussion in the

2818

*Foreign Courts* subsection of this bulletin for the requirements for a foreign court to approve the exchange.

[14] In 1938, the staff of the Commission stated its view that:

"[A] commission or authority must be authorized to grant approval of the fairness of the terms and conditions of the issuance and exchange, *from the point of view of the persons to whom the securities are issued in the exchange*, and this authority must be express. This seems to be the proper interpretation if the requirement of a hearing upon the fairness of the terms and conditions is not to be rendered meaningless. As a result many commissions, such as public service commissions, whose authorization may be required for the reorganization of certain companies, will be found not to have the requisite authority because [they are] not authorized to pass upon the interest of the security holders." (emphasis added)

— Milton V. Freeman, A Summary of Administrative Interpretations of the Securities Act of 1933, As Amended at 280-81 (draft of May 1, 1938) (citations omitted). This position was restated in the Report of the Task Force on Disclosure Simplification (Mar. 5, 1996), available at http://www.sec.gov/news/studies/smpl.htm (/news/studies/smpl.htm) (the "Task Force Report"). *See also* Securities Act Release No. 312, *supra* note 5 ("In my opinion a State governmental authority...must possess express authority of law to approve the fairness of the terms and conditions of the issuance and exchange of the securities in question. This interpretation seems necessary to give meaning to the express requirement of a hearing upon the fairness of such terms and conditions, which must subsume authority in the supervisory body to pass upon the fairness from the standpoint of the investor, as well as the issuer and consumer, and to disapprove terms and conditions because unfair either to those who are to receive the securities or to other security holders of the issuer, or to the public.").

[15] Examples of appropriate statutory standards in favorable Division responses to no-action requests include requirements that the entity determine that the transaction:

(1) is one where "an intelligent and honest man, a member of the class concerned and acting in respect of his interest, might reasonably approve" (*Transocean Inc.*, Sept. 26, 2007); (2) "adequately protects the interests of depositors, other

creditors and shareholders" (*Minowa Bancshares, Inc.,* Nov. 26, 1990); (3) is "fair and equitable" to shareholders (*Farm Family Mutual Insurance Co.,* Apr. 2, 1996); and (4) promotes the "public convenience and advantage and the interest of [the merging] institutions, their members, stockholders and depositors" (*CFX Corp.,* Apr. 19, 1996).

[16] *See* Task Force Report, *supra* note 14, at page 80. *See also ICICI Bank Limited* (Dec. 13, 2001); *Information Resources, Inc.* (Feb. 27, 1995); and *Applied Magnetics Corp.* (May 30, 1995).

[17] *See* 15 U.S.C. §77r(b)(4)(C). The National Securities Markets Improvements Act, Pub. L. No. 104-290 (1996) ("NSMIA"), amended Section 18 of the Securities Act to preclude any state from requiring registration or qualification of "covered securities." "Covered securities" are defined in Section 18 and Securities Act Rule 146 to include, among others, securities listed or approved for listing on the New York Stock Exchange, the American Stock Exchange, or The NASDAQ Stock Market. The effect of this amendment was to preempt any state law that authorized a state fairness hearing relating to the registration, or exemption from registration, of securities that were "covered securities" before the hearing. An issuer, therefore, could not use such a hearing as a basis for relying on the Section 3(a)(10) exemption. (Of course, as noted in the original SLB 3, not all state fairness hearings relating to exchanges of securities were preempted by NSMIA. The preemption did not apply to state fairness hearing procedures outside the scope of state securities laws, such as those authorized by state corporation, banking or insurance law and not relating to registration, or an exemption from registration, of securities. Issuers were never precluded from using such hearings as a basis for relying on the Section 3(a)(10) exemption.)

NSMIA's prohibition of reliance on certain state fairness hearings to perfect a Section 3(a)(10) claim of exemption with respect to "covered securities" was inadvertent. *See* 144 Cong. Rec. H6052, H6060 (daily ed. July 21, 1998) (statement of Rep. Cox). To correct this, Section 302 of the Securities Litigation Uniform Standards Act of 1998, Pub. L. No. 105-353 (1998), was enacted to amend Section 18(b)(4)(C) to add securities issued under Section 3(a)(10) of the Securities Act as a category of securities exempt from the definition of "covered securities."

[18] The Division first published its views regarding this matter in letters to *Food Lion, Inc.* (Jan. 13, 1999) and *Maverick Networks* (Jan. 25, 1999).

[19] *See, e.g., SanDisk Corp.* (Sept. 21, 2006); *AngloGold Ltd.* (Jan. 15, 2004); *Constellation Brands, Inc.* (Jan. 29, 2003); *Galen Holdings PLC* (Aug. 7, 2000); *Lucas Industries plc* (Aug. 20, 1996); *Symantec Corp.* (Nov. 22, 1995); and *Orbital Sciences Corp.* (Oct. 13, 1995).

[20] The Division requires this additional opinion because the fairness standard in foreign jurisdictions often is derived from case law that interprets and applies the statute(s), rather than from the specific language of the statute(s). The opinion of foreign counsel should state clearly that:

- under applicable law, the court cannot approve the exchange unless it finds the transaction to be fair to the persons who will receive the securities;
- those persons will receive notice of, and have the right to appear at, the fairness hearing; and
- the issuer will advise the court *before* the hearing that it will rely on the Section 3(a)(10) exemption and not register the exchange under the Securities Act based on the court's approval of the exchange.

[21] For example, if the securities are held in bearer form, there must be appropriate publication of the notice.

[22] The Division has not objected to the mere requirement to file a notice of an intention to appear. For examples of favorable staff responses to no-action requests where the filing of a notice of an intention to appear was required, see *ICICI Bank Ltd.* (Dec. 13, 2001); *Digicon Inc.* (Aug. 19, 1996); and *Canadian Pacific Ltd.,* (June 26, 1996).

[23] *See* Rule 144(b)(2) under the Securities Act.

[24] In computing the holding period of the Section 3(a)(10) securities for purposes of Rule 145(d)(2)(ii) or (d)(2)(iii), such persons may not "tack" the holding period of the securities exchanged for the Section 3(a)(10) securities in the Section 3(a)(10)-exempt transaction.

[25] However, Rule 145(d) is not available with respect to any transactions or series of transactions that, although in technical compliance with the rule, is part of a plan or scheme to evade the Securities Act registration requirements. Note to Rule 145(c) and (d) under the Securities Act.

Last Reviewed or Updated: June 18, 2008

# Tab 10

📒 KeyCite Yellow Flag - Negative Treatment

On Reconsideration in Part January 21, 2011

445 B.R. 318
United States Bankruptcy Court, D. Delaware.

In re ABC LEARNING CENTRES
LIMITED n/k/a ZYX Learning Centres
Limited & A.B.C. USA Holdings Pty
Limited, Debtors in Foreign Proceedings.

No. 10–11711 (KG).
|
Nov. 16, 2010.
|
Order Granting Reconsideration
in Part Jan. 21, 2011.

**Synopsis**

**Background:** Foreign liquidators petitioned for recognition, as foreign main or foreign nonmain proceeding, a voluntary winding-up of corporate entities under the Corporations Act of Australia. United States creditor opposed recognition and moved for relief from stay if proceeding were recognized as foreign main proceeding.

**Holdings:** The Bankruptcy Court, Kevin Gross, J., held that:

[1] voluntary winding-up of corporate entities under the Corporations Act of Australia qualified as a "proceeding," a necessary prerequisite for recognition thereof as "foreign main proceeding";

[2] proceeding was either "judicial or administrative in character";

[3] proceeding was "collective" in nature, as involving foreign debtors' relationships with creditors as whole;

[4] foreign debtors' assets and affairs were under the "control or supervision" of foreign court;

[5] voluntary winding-up of corporate entities under the Australian Corporations Act would be recognized as "foreign main proceeding";

[6] court could not refuse to recognize foreign proceeding on "public policy" grounds; but

[7] creditor would be granted limited relief from stay that arose upon recognition of foreign insolvency proceeding as "foreign main proceeding," for purposes of reducing verdict which it had previously obtained against debtor to judgment, in aid of setoff.

Petition granted; motion granted.

Motion for reconsideration granted in part.

West Headnotes (19)

**[1]    Bankruptcy**
    ⚷ Cases Ancillary to Foreign Proceedings

Seven requirements must be met in order for proceeding to qualify as "foreign proceeding," such as may be recognized as either a "foreign main proceeding" or "foreign nonmain proceeding" under Chapter 15 of the Bankruptcy Code: (1) it must be a proceeding; (2) that is either judicial or administrative in character; (3) that is collective in nature; (4) that is being conducted in foreign country; (5) that is authorized or conducted under law relating to insolvency or adjustment of debts; (6) in which debtor's assets and affairs are subject to control or supervision of foreign court; and (7) which is for purpose of reorganization or liquidation. 11 U.S.C.A. §§ 101(23), 1517.

10 Cases that cite this headnote

**[2]    Bankruptcy**
    ⚷ Cases Ancillary to Foreign Proceedings

Voluntary winding-up of corporate entities under the Corporations Act of Australia qualified as a "proceeding," a necessary prerequisite for recognition thereof as "foreign main proceeding" or "foreign nonmain proceeding" under Chapter 15 of the Bankruptcy Code, as process which occurred pursuant to statutory framework

that constrained corporations' actions and regulated final distribution of their assets. 11 U.S.C.A. §§ 101(23), 1517.

Cases that cite this headnote

**[3]    Bankruptcy**
　　　　Cases Ancillary to Foreign Proceedings

Voluntary winding-up of corporate entities under the Corporations Act of Australia was proceeding that was either "judicial or administrative in character," a necessary prerequisite for recognition thereof as "foreign main proceeding" or "foreign nonmain proceeding" under Chapter 15 of the Bankruptcy Code; liquidators that had been appointed to perform this winding-up, in collecting assets, investigating possibly voidable transactions, circulating information to creditors, and convening meetings, performed tasks of administrative nature, and this process became judicial whenever Australian court exercised its supervisory powers under the Corporations Act. 11 U.S.C.A. §§ 101(23), 1517.

Cases that cite this headnote

**[4]    Bankruptcy**
　　　　Cases Ancillary to Foreign Proceedings

Proceeding is "collective" in nature, as required for recognition thereof as "foreign main proceeding" or "foreign nonmain proceeding," if it considers rights and obligations of all creditors. 11 U.S.C.A. §§ 101(23), 1517.

7 Cases that cite this headnote

**[5]    Bankruptcy**
　　　　Cases Ancillary to Foreign Proceedings

Voluntary winding-up of corporate entities under the Corporations Act of Australia was in nature of a "collective" proceeding, a necessary prerequisite for recognition thereof as "foreign main proceeding" or "foreign nonmain proceeding" under Chapter 15 of the Bankruptcy Code, given that 62

creditors, holding approximately $1.9 billion of debt, were represented at meeting of creditors at which this voluntary winding-up was commenced upon vote of majority of the creditors present in both number and amount, that extensive notice of meeting was provided directly to known creditors and by advertisement and internet postings, and that creditors in the United States could seek redress in Australian court. 11 U.S.C.A. §§ 101(23), 1517.

Cases that cite this headnote

**[6]    Bankruptcy**
　　　　Cases Ancillary to Foreign Proceedings

Notice provided to creditors is proper consideration in assessing "collective" nature of proceeding, for purposes of deciding whether it qualifies as "foreign proceeding" capable of being recognized under Chapter 15 of the Bankruptcy Code. 11 U.S.C.A. §§ 101(23), 1517.

Cases that cite this headnote

**[7]    Bankruptcy**
　　　　Cases Ancillary to Foreign Proceedings

In voluntary winding-up of corporate entities under the Corporations Act of Australia, corporations' assets and affairs were under the "control or supervision" of foreign court, as required for recognition of proceeding as foreign main or foreign nonmain proceeding, even though, as under United States bankruptcy law, court proceedings were typically initiated by parties in interest rather than court sua sponte, though Australian court applied deferential "business judgment" rule with respect to day-to-day operations of companies, and though liquidators performed most of their duties without court involvement. 11 U.S.C.A. §§ 101(23), 1517.

3 Cases that cite this headnote

**[8]    Bankruptcy**

🔑 Cases Ancillary to Foreign Proceedings

Voluntary winding-up of corporate entities under the Corporations Act of Australia qualified as "foreign proceeding," such as could be recognized as foreign main or foreign nonmain proceeding, as proceeding that was predominantly administrative, though sometimes judicial, in character, that collectively dealt with creditors as whole under insolvency law concerned with liquidation of corporate assets, and in which corporate assets and affairs were subject to control or supervision of foreign court. 11 U.S.C.A. §§ 101(23), 1517.

7 Cases that cite this headnote

[9] **Bankruptcy**
🔑 Cases Ancillary to Foreign Proceedings

Recognition of foreign proceeding under Chapter 15 of the Bankruptcy Code as either a "foreign main proceeding" or "foreign nonmain proceeding" is not "rubber stamp" exercise, and ultimate burden of proof is on foreign representative. 11 U.S.C.A. § 1517.

4 Cases that cite this headnote

[10] **Bankruptcy**
🔑 Cases Ancillary to Foreign Proceedings

Voluntary winding-up of corporate entities under the Australian Corporations Act would be recognized as "foreign main proceeding," as proceeding that was pending in country where these corporate debtors had their center of main interests (COMI), given that corporations were both incorporated and registered in Australia, were listed on Australian stock exchange, had directors, liquidators and receivers who all resided in Australia, had business that was principally based in Australia, maintained their books and records in Australia, and had Australia as situs for majority of their assets and creditors. 11 U.S.C.A. § 1517.

Cases that cite this headnote

[11] **Bankruptcy**
🔑 Cases Ancillary to Foreign Proceedings

Individuals appointed by foreign debtors' creditors to liquidate their assets pursuant to provisions of the Australian Corporations Act qualified as "foreign representatives," such as could petition for recognition of Australian liquidation proceeding as foreign main or foreign nonmain proceeding. 11 U.S.C.A. §§ 101(24), 1517.

3 Cases that cite this headnote

[12] **Bankruptcy**
🔑 Cases Ancillary to Foreign Proceedings

"Public policy" exception to recognition of foreign insolvency or reorganization proceedings is to be narrowly construed. 11 U.S.C.A. § 1506.

Cases that cite this headnote

[13] **Bankruptcy**
🔑 Cases Ancillary to Foreign Proceedings

Term "manifestly," as used in bankruptcy statute authorizing court to refuse to recognize a foreign proceeding under Chapter 15 if recognition would be "manifestly contrary" to United States public policy, restricts application of this "public policy" exception only to circumstances involving the most fundamental policies of the United States. 11 U.S.C.A. § 1506.

Cases that cite this headnote

[14] **Bankruptcy**
🔑 Cases Ancillary to Foreign Proceedings

While recognition of liquidation proceeding that was pending against foreign corporations in Australia as foreign main proceeding would trigger automatic stay and allegedly disadvantage creditor involved in pending litigation with these corporations in the United States, any such disadvantage was not materially different from that resulting from imposition of stay in cases under United States

bankruptcy law, and did not permit court to refuse to recognize this foreign proceeding on "public policy" grounds, where liquidation proceeding had been commenced, not so that corporation could gain some advantage in this litigation in the United States, but to protect and preserve its assets. 11 U.S.C.A. § 1506.

Cases that cite this headnote

**[15]    Bankruptcy**
    Cases Ancillary to Foreign Proceedings

Creditor that had been named as defendant in pending suit by foreign debtors in the United States would be granted limited relief from stay that arose upon recognition of foreign insolvency proceeding as "foreign main proceeding," for purposes of reducing verdict which it had previously obtained against debtor to judgment, such as could be setoff against any judgment that debtors obtained against creditor in this pending lawsuit; burden to foreign debtors was slight, creditor had probability of success in reducing verdict to judgment, and denial of relief would prejudice creditor by depriving it of possibility of setoff. 11 U.S.C.A. §§ 362(d)(1), 1520.

1 Cases that cite this headnote

**[16]    Bankruptcy**
    Cause;Grounds and Objections
    **Bankruptcy**
    Balancing hardships

"Cause" for relief from stay is flexible concept, and courts, in deciding whether "cause" exists, often conduct a fact-intensive, case-by-case balancing test, examining totality of circumstances to determine whether sufficient cause exists to lift stay. 11 U.S.C.A. § 362(d)(1).

Cases that cite this headnote

**[17]    Bankruptcy**
    Particular Cases

When deciding whether "cause" exists to lift stay to allow movant to pursue litigation in another forum, courts consider the following: (1) whether any great prejudice to either bankruptcy estate or debtor will result from continuation of this litigation; (2) whether hardship to non-debtor party from continuation of stay considerably outweighs hardship to debtor if stay is lifted; and (3) probability that creditor will prevail on merits. 11 U.S.C.A. § 362(d)(1).

Cases that cite this headnote

**[18]    Bankruptcy**
    Particular Cases

In appropriate case, even slight probability of success on merits may be sufficient to support lifting of automatic stay to allow litigation to proceed in another forum. 11 U.S.C.A. § 362(d)(1).

Cases that cite this headnote

**[19]    Bankruptcy**
    Cases Ancillary to Foreign Proceedings

Creditor's request for relief from stay that arose upon recognition of foreign liquidation proceeding as foreign main proceeding, so that it could reduce to judgment the verdict that it had previously obtained against debtor and gain ability to set off this judgment against any judgment ultimately entered in pending lawsuit by debtor against creditor, was not premature prior to entry of judgment in this pending debtor suit; delaying relief provided no benefit to parties and might create judicial inefficiencies if parties had to return to bankruptcy court in future. 11 U.S.C.A. §§ 362(d)(1), 1520.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*322**  Young Conaway Stargatt & Taylor, LLP, Joel A. Waite, Esquire, Ryan M. Bartley, Esquire, Wilmington, DE, Chadbourne & Parke, LLP, Howard Seife, Esquire,

Andrew Rosenblatt, Esquire, New York, NY, for ABC Learning Centres Ltd. & A.B.C. USA Holdings Pty Ltd.

Morris, Nichols, Arsht & Tunnell, LLP, Robert J. Dehney, Esquire, Gregory W. Werkheiser, Esquire, Matthew B. Harvey, Esquire, Wilmington, DE, Baird, Williams, & Greer, LLP, Daryl M. Williams, Esquire, Michael C. Blair, Esquire, Phoenix, AR, for RCS Capital Development, LLC.

### OPINION ON DEBTORS' PETITION FOR RECOGNITION & RCS CAPITAL DEVELOPMENT, LLC'S MOTION FOR RELIEF FROM STAY

KEVIN GROSS, Bankruptcy Judge.

### I. INTRODUCTION

The Court has before it two matters: Debtors' petition seeking recognition of certain insolvency-related legal proceedings in Australia under Chapter 15 of Title 11 of the U.S.Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") and a motion for relief from stay filed by RCS Capital Development, LLC.

On May 26, 2010, Debtors filed petitions seeking recognition pursuant to §§ 1515 and 1517 of the Bankruptcy Code [1] of voluntary administration proceedings (the "Voluntary Administration Proceedings") then ongoing in Australia pursuant to Australia's Corporations Act of 2001(Cth) (the "Corporations Act"), of ABC Learning Centres Limited, n/k/a ZYX Learning Centres Ltd. ("ABC Learning"), and its wholly owned subsidiary A.B.C. USA Holdings Pty. Limited ("ABC Holdings" and, collectively, the "Debtors") (the "Petitions," D.I. 1) [2]. Subsequent to the filing of the Petitions, Debtors' creditors converted the Voluntary Administrations to liquidations (the "Liquidation Proceedings"), as provided for by the Corporations Act. Debtors' provided proper notice to this Court of their entry into liquidation and the Court now considers their Petitions as requests for recognition of the ongoing Liquidation Proceedings.

[1]    All section numbers refer to the Bankruptcy Code, unless otherwise specified.

[2]    ABC Learning was filed under Case No. 10–11711; ABC Holdings was filed under Case No. 10–

11712. Upon Debtors' motion, the cases are jointly administered.

 **\*323**    Debtors seek recognition of the Liquidation Proceedings under § 1517 as "foreign main proceedings," as defined by § 1502(4), or, in the alternative, as "foreign nonmain proceedings," as defined by § 1502(5). This Court's recognition of the Liquidation Proceedings as foreign main proceedings would entitle Debtors to certain protections of the Bankruptcy Code, including the automatic stay provided for by § 362. Recognition of the Liquidation Proceedings as foreign nonmain proceedings would not trigger an automatic stay, but would permit the Court to impose one, which Debtors have requested. [3]

[3]     See 11 U.S.C. § 1520 (the automatic stay of 11 U.S.C. § 362 applies to a Chapter 15 debtor upon recognition of a foreign proceeding as a foreign main proceeding) and 11 U.S.C. § 1521 (the Court may stay certain actions against a debtor's assets, right, obligations or liabilities upon recognition of a foreign proceeding as either a foreign main proceeding or as a foreign nonmain proceeding).

RCS Capital Development, LLC ("RCS"), an Arizona limited liability company, objects to the Petition (the "RCS Obj.," D.I. 57). RCS asserts that the Liquidation Proceedings are not "foreign proceedings" recognizable under Chapter 15 of the Bankruptcy Code because they do not meet the threshold factors set forth in § 101(23). Specifically, RCS argues that the Liquidation Proceedings are not collective in nature and are not supervised by a foreign court. In addition, RCS argues that the Court deny recognition of the Liquidation Proceedings as violative of U.S. public policy, pursuant to § 1506.

On May 14, 2010, RCS received a favorable jury verdict (the "Arizona Verdict") against Debtor ABC Learning and its non-debtor subsidiary ABC Development Learning Centres (USA), a Delaware corporation ("ABC Delaware") in certain litigation (the "Arizona Litigation") in The Superior Court of the State of Arizona In and For the County of Maricopa (the "Arizona State Court") (RCS Obj. at 3). Subsequently, Debtor ABC Learning and ABC Delaware filed a complaint against RCS, American Childcare Properties, Inc., and Kenneth Krynski alleging, in part, breach of contract, fraud, and unjust enrichment, which is currently pending in The District Court, Clark County, Nevada (the "Nevada State Court") (the "Nevada Litigation") (RCS Obj. at 3). RCS filed a motion in the instant case requesting

modification of any stay the Debtors receive as a result of recognition of the Liquidation Proceedings to permit RCS to convert the Arizona Verdict into a judgment (the "Arizona Judgment") and to assert a setoff based on the Arizona Judgment as a defense in the Nevada Litigation (the "Lift Stay Motion," D.I. 85).

Upon consideration of the evidence presented, and for the reasons stated below, the Court grants Debtors' Petitions and recognizes the Liquidation Proceedings as foreign main proceedings. Furthermore, the Court grants RCS's Lift Stay Motion for the limited purposes of (1) allowing RCS to convert its verdict in the Arizona Litigation to a judgment and (2) preserving RCS's right to assert the Arizona Judgment as a setoff in the Nevada Litigation.

## II. *JURISDICTION*

The Court has jurisdiction under 28 U.S.C. § 157(b)(1) and § 1334(b) and (d). Venue is proper in this Court under 28 U.S.C. § 1410. The Debtors' petition for recognition of a foreign proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P); RCS's motion for relief from stay is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G).

## *324  III. *FACTS*

### A. Debtors' Business Operations

Debtor ABC Learning is the parent company of thirty-eight subsidiaries (collectively, the "ABC Group"), including Debtor ABC Holdings and non-debtor ABC Delaware, ABC Learning's co-defendant and co-plaintiff in the litigation with RCS in Arizona and Nevada, respectively. Prior to the commencement of the Voluntary Administration Proceedings, ABC Group owned and operated child care centers primarily in Australia (approximately 1,045 centers), as well as in New Zealand, the United Kingdom, Canada, and the U.S.; "processed" approximately 100,000 child care transactions weekly; and employed approximately 15,000 full-time workers and a significant number of part-time and contractual employees. Declaration of Peter Walker ("Walker Decl.") at 3. The ABC Group's business operations were funded, in part, by loans from eight banks (the "Bank Syndicate"). *Id.* These loans are secured by substantially all of the ABC Group's assets, with an outstanding balance as of May 2010, of approximately $1 billion. [4] *Id.*

[4]  The record does not specify whether the applicable denomination is Australian or U.S. dollars. However, the difference in amount is not significant. Based upon the exchange rate at the time of this Opinion, 1 U.S. dollar = 1.0228 Australian dollars.

ABC Group conducted business in the U.S. through its direct interest in ABC Delaware and its indirect interest in Learning Care Group (US) Inc. ("LCG U.S."). Walker Decl. at 4. ABC Delaware developed childcare centers in the U.S.:

> [ABC Delaware] has no principal places of business or employees in the United States. The management and business decisions relating to [ABC Delaware] are made by ABC Group's management in Australia. [ABC Delaware], amongst other things, contracted with developers for the construction and development of childcare facilities located primarily in Florida, South Carolina, Nevada, Virginia, Arizona, Colorado and Georgia. Once developed, the contracts usually provided for [ABC Delaware] to purchase the childcare facilities....

(Walker Decl. at 4)

LCG U.S., through various subsidiaries, owns and operates child care centers throughout the United States. *Id.* It was acquired by the ABC Group in 2006 and subsequently sold a majority interest to a third-party corporation. *Id.* ABC Group currently holds a 40% minority interest in LCG U.S. through ABC Holdings. *Id.* Debtor ABC Learning, as the parent company of the ABC Group, wholly owns Debtor ABC Holdings. Both Debtors are incorporated in Australia and listed on the Australian Stock Exchange. *Id.* at 11.

### B. Australian Voluntary Administration Proceedings

On November 6, 2008, the boards of directors of Debtor ABC Learning and its thirty-eight subsidiaries resolved that the companies were likely to become insolvent and should enter voluntary administration, pursuant to the Corporations Act. Walker Decl. at 5. In conformity with these resolutions, the directors appointed Peter Walker and Greg Moloney as administrators for each of the entities (the "Administrators" and the "Petitioners"). Walker Decl. at 1 and 5; Transcript of August 9, 2010 hearing ("Tr. 8/9") at 11 (Testimony of Greg Moloney); Petitioners' Exhibits 1–2. The commencement of the

Voluntary Administration Proceedings stayed creditors from initiating or continuing collection actions. Walker Decl. at 5; Declaration of John Kenneth Martin ("Martin Decl.") at **\*325** 6–7; *See* Corporations Act, Part 5.3A, Div. 6.

The Corporations Act requires that companies in voluntary administration conduct two creditors' meetings. At the first meeting, creditors determine 1) whether a committee of creditors should be formed and 2) whether to remove the administrators appointed by the board of directors and appoint alternate administrators. Walker Decl. at 7. The first meeting in the instant cases was held on November 18, 2008, and the creditors elected to form a creditors committee and to continue with Messrs. Walker and Moloney as the Administrators. Tr. 8/9 at 11 (Moloney).

The Debtors and the other ABC Group entities were in Voluntary Administration at the time the Petitions were filed in this Court on May 25, 2010. The Voluntary Administrations continued until the second meeting of creditors on June 2, 2010.

### C. Australian "Winding Up" Proceedings

At the second creditors' meeting for the ABC Group entities, held on June 2, 2010, the creditors resolved to "windup" (i.e., liquidate) the companies. [5] Tr. 8/9 at 23 (Moloney); Petitioners' Exhibits 3–6. The creditors appointed the Administrators, Peter Walker and George Moloney, as liquidators (the "Liquidators") and commenced winding up proceedings (the "Liquidation Proceedings"). Petitioners' Exhibits 3–6. The creditors also created a "committee of inspection" comprised of nine (9) members representing a cross-section of creditors, including general unsecured creditors, the Bank Syndicate, bondholders, employees, and the government of the Commonwealth of Australia. Tr. 8/9 at 29 (Moloney). As required by the Corporations Act, the Liquidators timely filed Form 509D—"Notice of special resolution to wind up a company" and Form 505, reporting the appointment of the liquidators, with the Australian Securities & Investments Corporation ("ASIC") for each ABC Group entity. Petitioners' Exhibits 3–6.

[5]    At the second meeting of creditors, the creditors must choose between three possible outcomes for an

administration: 1) the company under administration executes a Deed of Company Arrangement; 2) the administration ends and control of the company reverts back to the Board of Directors; or 3) the company be wound up (i.e., liquidated). *See* Corporations Act, § 439C; Supplemental Declaration of Peter Walker at 2.

### D. Australian Receivership Proceedings

The commencement of the Voluntary Administration Proceedings breached the terms of Debtors' loan agreements with the Bank Syndicate. Walker Decl. at 5–6; Tr. 8/9 at 10 (Moloney). In response, the members of the Bank Syndicate exercised their right under the Corporations Act as secured creditors to appoint receivers to represent their interests and commence receivership proceedings (the "Receivership Proceedings") to realize their assets. *Id.* CBA Corporation Services (NSW) Pty Limited, acting as agent to the Bank Syndicate, appointed Murray Campbell Smith, John Patrick Cronin, and Christopher Honey as joint receivers and managers of Debtors (the "Receivers"). Walker Decl. at 6. The Receivership Proceedings were proceeding concurrently with the Voluntary Administrations, and are now proceeding concurrently with the Liquidation Proceedings.

### E. Arizona Lawsuit

In June, 2008, ABC Delaware entered into a contract with RCS to develop child care centers in the United States. Walker Decl. at 9; Lift Stay Motion at 16. Debtor **\*326** ABC Learning guaranteed ABC Delaware's obligations under the development contract. RCS brought suit against ABC Learning and ABC Delaware in Arizona State Court for a number of claims, including breach of contract, and sought damages in excess of $107 million. Walker Decl. at 9. On May 14, 2010, following trial, the jury returned a $47 million verdict in favor of RCS. *Id.* The Debtors filed their Petitions twelve (12) days later, at which time the Arizona Verdict had not yet been reduced to judgment. *Id.* RCS seeks relief from stay in part to allow it to reduce its verdict in the Arizona Litigation to judgment.

### F. Nevada Lawsuit

In March 2009, Debtor ABC Learning and non-debtor ABC Delaware filed the Nevada Litigation, naming RCS as one of the defendants. Walker Decl. at 10. The complaint asserts multiple causes of action including, but

not limited to, breach of constructive trust, fraudulent transfer, unjust enrichment, and breach of contract. *Id.* ABC Learning and ABC Delaware seek to recover $30 million or, in the alternative, specific performance to recover certain properties. Walker Decl. at 10; RCS Obj. at 3. The ABC plaintiffs also filed *lis pendins* against the properties subject to the Nevada Litigation. The Nevada Litigation is scheduled for trial in February 2011. Walker Decl. at 10. RCS seeks relief from stay so that it may seek to assert the $47 million favorable verdict it received in the Arizona Litigation, once the verdict is reduced to judgment, as a defense in the Nevada Litigation.

**G. Chapter 15 Filing**

On May 26, 2010, the former Administrators and current Liquidators of Debtors commenced the instant case by filing the Petitions and a Motion for Recognition (D.I. 7). Petitioners seek an order from this Court recognizing the Liquidation Proceedings (originally, the Voluntary Administration Proceedings) as "foreign main proceedings," pursuant to §§ 1502(4) and 1517(b)(1), or, in the alternative, as "foreign nonmain proceeding," under §§ 1502(5) and 1517(b)(2).

The Petitioners seek recognition of the Liquidation Proceedings of both ABC Learning and ABC Holdings. According to Petitioners, they have sought recognition for ABC Holdings' Liquidation Proceeding because RCS indicated the possibility of legal actions against LCG U.S., of which ABC Holdings maintains a 40% minority interest, for the collection and enforcement of the Arizona Verdict. Walker Decl. at 41; *See* letter, dated May 18, 2010 from RCS's counsel to Learning Care Group, et al., Petitioners' Exh. 8.

In its Objection, RCS argues that the Liquidation Proceedings are not foreign proceedings under § 101(23) and, therefore, are ineligible for recognition under Chapter 15. Alternatively, RCS argues that if the Court determines that the Liquidation Proceedings satisfy the Chapter 15 requirements for recognition, the Court nevertheless should deny recognition as contrary to U.S. public policy, as provided for by § 1506. RCS also filed a Lift Stay Motion, seeking modification of any stay imposed through the recognition of the Liquidation Proceedings to allow it to reduce the Arizona Verdict to judgment and to assert such judgment as a defense in the Nevada Litigation. As discussed above, the Court's recognition of the Liquidation Proceedings as foreign

main proceedings would trigger the automatic stay provided by § 362. *Supra* fn. 3. The Court's recognition of the Liquidation Proceedings as foreign nonmain proceedings would not trigger an automatic stay, but **\*327** would permit the Court to impose a stay, which Debtors have requested. *Id.*

## IV. *DISCUSSION*

Two matters are before the Court: 1) Debtors' Petitions for recognition under Chapter 15 of the Liquidation Proceedings and 2) RCS's Motion for Relief From Stay.

**A. Recognition of the Liquidation Proceedings Under Chapter 15**

The Petitioners ask this Court to recognize Debtors' Liquidation Proceedings as foreign main proceedings or, in the alternative, as foreign nonmain proceedings, pursuant to Chapter 15 of the Bankruptcy Code. As a threshold matter, this Court must first determine whether the Liquidation Proceedings are "foreign proceedings" as defined by § 101(23), as only "foreign proceedings" are eligible for recognition under Chapter 15. *See* §§ 1501(b) (1), 1515(a), 1517(a). If the Court concludes that the Liquidation Proceedings are foreign proceedings under § 101(23), the Court must then determine whether they meet the requirements for recognition set forth in § 1517(a). In addition, the Court must consider whether recognition of the Liquidation Proceedings is "manifestly contrary to the public policy of the U.S." and therefore should be denied under the public policy exception of § 1506.

**1. The Liquidation Proceedings Are "Foreign Proceeding(s)" As Defined By § 101(23)**

**[1]** The definition of "foreign proceeding" set forth in § 101(23) reads as follows:

> The term 'foreign proceeding' means a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court,

for the purpose of reorganization or liquidation.

This definition is comprised of the following seven (7) requirements:

(a) a proceeding;

(b) either judicial or administrative in character;

(c) collective in nature;

(d) in a foreign country;

(e) authorized or conducted under a law related to insolvency or the adjustment of debts;

(f) in which the debtor's assets and affairs are subject to the control or supervision of a foreign court; and

(g) which is for the purpose of reorganization or liquidation.

See *In re Betcorp Ltd.,* 400 B.R. 266, 277 (Bankr.D.Nev.2009).

RCS objects that the Liquidation Proceeds are not collective in nature and are not subject to the control or supervision of a foreign court. No other objections have been raised. The Court will examine each requirement in turn.

### a. A Proceeding

 [2]    The United States Bankruptcy Court for the District of Nevada recently ruled that an Australian voluntary winding up proceeding merited recognition under Chapter 15. *In re Betcorp Ltd.,* 400 B.R. 266 (Bankr.D.Nev.2009). [6] In its opinion, **\*328** the Nevada Bankruptcy Court developed a framework for understanding the meaning of "proceeding" in the context of § 101(23):

[6]    Betcorp was an Australian corporation that provided gaming and gambling products and services, primarily online. The majority of its customers resided in the U.S. Betcorp encountered severe financial difficulties when newly enacted U.S. law prevented Betcorp from receiving funds' transfers from its U.S. customers, effectively cutting off the U.S. Market. 400 B.R. at 271. Betcorp's board of

directors voted to liquidate the company through a voluntary wind-up proceeding pursuant to the Corporations Act, and sought recognition of the winding up proceeding in the U.S. Bankruptcy Court for the District of Nevada. A creditor involved in pending U.S. patent litigation with Betcorp objected to recognition. In granting recognition, the Nevada Bankruptcy Court determined that the Australian winding up process was a "foreign proceeding" under § 101(23) and met the requirements for recognition under § 1517.

[The essence of a "proceeding" is] acts and formalities set down in law so that courts, merchants and creditors can know them in advance, and apply them evenly in practice. In the context of corporate insolvencies, the hallmark of a "proceeding" is a statutory framework that constrains a company's actions and that regulates the final distribution of a company's assets.

*In re Betcorp,* 400 B.R. at 278.

The Corporations Act is just such a statutory framework. The mechanism for commencing the Liquidation Proceedings, the effect on corporate governance, the duties and responsibilities of the liquidators, the rights of creditors, including priorities —all are governed by Chapter 5 of the Corporations Act. No objections have been raised alleging that the Liquidation Proceedings fail to meet this requirement. This Court finds that the Liquidation Proceedings are "proceedings" under § 101(23).

### b. Judicial Or Administrative In Character

 [3]    Section § 101(23) requires that a foreign proceeding be judicial or administrative in character. The majority of the Liquidators' tasks are administrative in nature, e.g., collecting assets; distributing assets pursuant to the priorities set forth in the Corporations Act; conducting investigations of possible voidable transactions (e.g., preferences); circulating information to creditors; preparing various required reports; convening meetings. As the court recognized in *Betcorp,* "[a]n Australian voluntary winding up is, generally, a proceeding with an administrative character, although under certain circumstances the proceeding may temporarily become more appropriately characterized as judicial." *Betcorp,* 400 B.R. at 280. A winding up becomes judicial in character whenever the Australian Court exercises its

supervisory powers under the Corporations Act. *See infra* part (f).

The Court finds that the Liquidation Proceedings are primarily administrative in character, and at times judicial in character and therefore satisfy this requirement of § 101(23).

### c. Collective In Nature

**[4]** **[5]** A proceeding is collective if it considers the rights and obligations of all creditors. *In re Betcorp,* 400 B.R. at 281. "Liquidation is, like bankruptcy, a procedure of an inherently collective nature.... The procedure is compulsory, in order to ensure that there is an orderly, cooperative system. The result is that any attempt by a creditor to undermine the collective nature of liquidation is outlawed." *Id.* (quoting the Australian treatise *McPherson's Law of Company Liquidation,* Michael Gronow, at 1–51 (5th ed. 2006)). Various provisions of the Corporations Act reflect the collective nature of liquidation proceedings, e.g., § 501 (liquidator has a duty to consider the rights of all creditors in distributing the corporation's property) and § 555 (subject to priorities, preferences, etc., debts and claims rank equally and are to be paid pro rata).

**\*329** The facts of this case bear out the collective nature of the Liquidation Proceedings. Sixty-two creditors, amounting to approximately $1.9 billion of debt [7], were represented at the second creditors' meeting, at which the Liquidation Proceedings were commenced. Tr. 8/9 at 29 (Moloney). The election to enter liquidation required the votes of the majority of creditors, in both absolute number and amount of debt. Transcript of June 24, 2010 hearing ("Tr. 6/24") at 43 (Testimony of Scott Hedge, counsel to Liquidators); Martin Decl. at 7. The creditors' committee formed at the second meeting (a "committee of inspection" under Australian law) consisted of nine (9) members representing various types of creditors, including, in part, general unsecured creditors, the Bank Syndicate, and bondholders. Tr. 8/9 at 29–30 (Moloney).

7    *Supra* fn. 4.

**[6]** RCS alleges that ABC Group's U.S. creditors did not have adequate notice of the Australian proceedings and the related creditors' meeting and were

thereby excluded from active participation, rendering the Liquidation Proceedings non-collective. The notice provided to creditors is a proper consideration when assessing the collective nature of a proceeding. *See In re British American Insurance Co., Ltd.,* 425 B.R. 884 (Bankr.S.D.Fla.2010). However, there is no allegation that the notices provided by the ABC Group entities, the Administrators, and the Liquidators was inadequate under Australian law. Pursuant to orders by the Australian courts, the Administrators notified all known creditors and employees of the first creditors' meetings. Tr. 6/24 at 74 (Hedge). Notice of the second creditors' meeting, at which the creditors placed the ABC Group entities into liquidation, was more extensive: pursuant again to orders by the Australian Courts, the Administrators placed a notification on the Administrators' website; advertised in a national newspaper; and directly notified those creditors that the companies' directors identified in the "Report[s] as to Affairs" and any additional creditors that had come forward. Tr. 6/24 at 74–76 (Hedge); Tr. 8/9 at 24–25 (Moloney); Australian Court Order at Petitioners' Exh. 11. Petitioners, in their roles as Administrators and then Liquidators, notified approximately 172 non-Australian creditors of the Administration and Liquidation Proceedings, approximately 105 of whom were U.S. creditors. Tr. 8/9 at 35 (Moloney). RCS, specifically, had actual notice of the second creditors meeting. *Id.* at 26–27.

Furthermore, the Corporations Act provides creditors with the right to seek court review. Section § 1321 of the Act provides that "a person [including creditors] aggrieved by any act, omission or decision of ... a liquidator" may appeal to an Australian court and the court "may confirm, reverse or modify the act or decision, or remedy the omission, as the case may be, and make such orders and give such directions as it thinks fit." *See also* § 511 of the Corporations Act and the discussion at (f), *infra.* If RCS feels aggrieved, it may appeal to the Australian court.

Given that notice was proper under Australian Law, RCS had actual notice of the second creditors' meeting, and RCS may seek redress from the Australian court, the Court finds RCS's objection unpersuasive.

RCS further argues that even though the Petitioners seek recognition of the Liquidation Proceedings, the Court should consider the Petitions as requests for recognition

In re ABC Learning Centres Ltd., 445 B.R. 318 (2010)
54 Bankr.Ct.Dec. 25, 54 Bankr.Ct.Dec. 49

of the Receivership Proceedings because, RCS alleges, the Receivers and **\*330** Bank Syndicate control the Liquidation Proceedings and are directing them for their own benefit. RCS argues that the Receivership Proceedings "trump" or "dominate" the Liquidation Proceedings, such that the secured creditors are riding roughshod over the rights of all other creditors. [8]

[8]  The Petitioners and RCS agree that receivership proceedings are not collective in nature as they are, by design, for the benefit of the secured creditor(s) that commence such an action.

The Court does not agree. Australian law provides for the concurrent existence of Liquidation and Receivership Proceedings. Liquidators and Receivers have clearly delineated roles under the Corporations Act. Liquidators are appointed by the creditors as a whole and are responsible for winding up the affairs of a company and ultimately dissolving it; specific duties include: collecting assets; establishing deadlines for proving claims; distributing assets per the priorities set forth in the Corporations Act; convening required meetings; maintaining records; creating and distributing required reports to various parties, including ASIC; and conducting investigations into possibly voidable transactions. *See, e.g.,* Corporations Act §§ 506–509, 533, 539, 556; Tr. 8/9 at 32–33 (Moloney). Receivers, on the other hand, are appointed by a secured creditor and their primary role is to recover secured assets for the benefit of the secured creditor and return any surplus to the company. Martin Decl. at 18. *See, e.g.,* Corporations Act §§ 420, 422, 433.

Pursuant to the Corporations Act, the Receivers took control and possession of the A.B.C. Group's assets in which the Bank Syndicate had a security interest and which were in existence at the time the Receivership Proceedings were commenced. The assets were substantially all of the companies' assets. The Receivers are working to realize those assets for the benefit of the Bank Syndicate. Simultaneously, the Liquidators are realizing the assets under their purview, namely, claims related to potentially voidable transactions antecedent to the Liquidation Proceedings, such as preference payments, insolvent trading, and insider transactions. Tr. 8/9 at 41 (Moloney). (The security interests held by the Bank Syndicate are among the potentially preferential transactions that the Liquidators are investigating. *Id.* at 46.) There are no allegations that the Receivers

have acted beyond the scope of their authority under the Corporations Act, and no allegations that the Liquidators have failed to discharge their duties under the Corporations Act.

The Court finds that the Receivership Proceedings and the Liquidation Proceedings are separate and distinct proceedings under Australian law, and that the Liquidation Proceedings should be evaluated on their own merits. Based upon the provisions of the Corporations Act, case law, and the evidence presented, the Court finds that the Liquidation Proceedings are collective in nature.

### d. Located In A Foreign Country

The fourth requirement of § 101(23) is that the proceeding must be located in a foreign country. The Debtors' Liquidation Proceedings are undisputedly located in Australia. The Debtors are registered Australian corporations. The Liquidation Proceedings were commenced under, and are governed by, Australian law. The Liquidators/Petitioners are based in Australia. Judicial authority rests with the Australian courts and regulatory authority rests with ASIC. Based upon the evidence, the Court finds that the Liquidation Proceedings are located in a foreign country.

### \*331  e. Authorized Or Conducted Under A Law Related To Insolvency Or The Adjustment of Debts

The Corporations Act governs all Australian corporations from the incorporation stage to dissolution. *In re Betcorp, 400 B.R. at 281.* Numerous subsections within the Corporations Act address corporate insolvency and the adjustment of corporate debt. *See* Corporations Act §§ 435A–451D, 461–464, 465A–489E. Australia's Cross–Border Insolvency Bill of 2008 (adopting the United Nations Commission on International Trade Law's Model Law on Cross–Border Insolvency) and the accompanying Explanatory Memorandum by the Australian Senate identify Chapter 5 and § 601CL [9] of the Corporations Act as the Australian laws "relating to" corporate insolvency. (http://www. comlaw.gov.au, select "Advanced Search," enter "C2008B00008," select "Cross–Border Insolvency Bill 2008," last visited Oct. 19, 2010.) The Court finds that as the Liquidation Proceedings are authorized under and

are being conducted pursuant to the Corporations Act, this element of § 101(23) is satisfied.

9    Section 601CL concerns the "cessation of business" of a registered foreign company in Australia. (http://www.comlaw.gov.au, enter "Corporations Act 2001," last visited Oct. 19, 2010.)

### f. Debtor's Assets and Affairs Under A Foreign Court's Control Or Supervision

**[7]** Section 101(23) requires a foreign proceeding be conducted in such a manner that the assets and affairs of the debtor are subject to the control or supervision of a foreign court. Section 1502 of the Bankruptcy Code defines "foreign court" as "a judicial or other authority competent to control or supervise a foreign proceeding."

The Australian Court had significant involvement in Debtors' Voluntary Administration Proceedings. It issued orders, *inter alia,* extending the deadline for convening a second meeting of creditors; providing for notice of employee-creditors; creating a single creditors' committee for all ABC Group entities; and approving a mechanism for terminated employees to access government benefits. Moloney Decl. at 8, 11–13. It conducted contested hearings and public examinations, and issued opinions.

The Australian Court's control and supervisory role continues in the Liquidation Proceedings, as provided for by numerous sections of the Corporations Act. Martin Decl. at 12–14; Tr. 6/24 at 77–80 (Hedge). Sections 482–489 provide that a court may terminate the liquidation, require property to be delivered to the liquidator, appoint a special manager on request of the liquidator, fix a claims bar date, and issue arrest warrants. An Australian court can remove a liquidator from his or her position for cause and appoint another liquidator. *Id.* at § 503. Under § 536 of the Corporations Act, if it appears to a court that the actions of a liquidator are in derogation of the Act, the court "may take such action as it thinks fit." *In re Betcorp,* 400 B.R. at 284 (quoting *Cresvale Far East (in liq) v. Cresvale Sec. Ltd,* (2001) 39 A.C.S.R. 622, ¶ 63, 2001 WL 1353240 (Austl.)* ("In a voluntary winding up, the appointment of the liquidator is consensual but a liquidator's duties and powers are prescribed by the Corporations Act, and there are elements of supervision by the Court.")). Furthermore, numerous provisions allow interested parties to seek relief from the court.

Section 1321 of the Corporations Act provides that "a person aggrieved by any act, omission or decision of ... a liquidator" may appeal to an Australian court and the court "may confirm, reverse **\*332** or modify the act or decision, or remedy the omission, as the case may be, and make such orders and give such directions as it thinks fit." Section 511 of the Corporations Act allows both liquidators and creditors to request a court to determine "any question arising in the winding up of a company." A creditor can file an application with the Australian court to review the decisions of a liquidator. Corporations Act § 536. A creditor can also require the liquidator to hold a creditor formation meeting and, in the event that the liquidator refuses to hold such a meeting, the liquidator's decision is immediately reviewable by an Australian court. *Id.* at §§ 548–52.

In arguing that Australian courts' role in winding up proceedings is extremely limited and does not rise to supervision, RCS points out that 1) actions in the Australian courts related to liquidation proceedings are typically initiated by interested parties, 2) Australian courts give deference to a business' "commercial judgment" and do not direct the day-to-day operations of a debtor, and 3) liquidators proceed with most of their duties without court involvement. Tr. 6/24 at 94, 99–100, 105–107 (Hedge). These examples do not undermine the Australian courts' supervisory role. Most actions in a U.S. Bankruptcy Court are upon the motion of an interested party and are not undertaken *sua sponte,* U.S. Bankruptcy Courts also give deference to business judgments and do not direct the daily activities of debtors, and the majority of U.S. bankruptcies proceed with minimal court involvement.

Based on the provisions of the Corporations Act and the evidence presented, the Court finds that the Liquidation Proceedings are under the control and supervision of a foreign court.

### g. Reorganization Or Liquidation Purpose

The final element of § 101(23) requires that the foreign proceeding have a reorganization or liquidation purpose. The Debtors' creditors resolved at the second creditors' meeting to wind up the companies and commenced the Liquidation Proceedings. *See* Walker Suppl. Decl. at 2–3; Petitioners' Exhibits 3 and 5. The express purpose of

winding up proceedings under the Corporations Act is the orderly liquidation of the subject business. *See, e.g.,* Corporations Act § 493. Tr. 8/9 at 33 (Moloney). The Court finds, therefore, that this final element of § 101(23) is satisfied.

 **[8]**    In summary, the Court finds that the Liquidation Proceedings are "foreign proceedings" pursuant to § 101(23). Having addressed this preliminary issue, the court now addresses the requirements for recognition of foreign proceedings set forth in §§ 1515 and 1517, turning to § 1517 first.

### 2. The Liquidation Proceedings Meet The Requirements For Recognition Under § 1517

Section 1517 requires recognition of a foreign proceeding if:

> (1) such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502;
>
> (2) the foreign representative applying for recognition is a person or body; and
>
> (3) the petition meets the requirements of section 1515.

11 U.S.C. § 1517(a)

 **[9]**    Recognition under § 1517 of the Bankruptcy Code is not a "rubber stamp exercise." **\*333** *In re Gold & Honey, Ltd.,* 410 B.R. 357, 366 (Bankr.E.D.N.Y.2009) (quoting *In re Basis Yield Alpha Fund ( Master),* 381 B.R. 37, 40 (Bankr.S.D.N.Y.2008)). The ultimate burden of proof of each element is on the foreign representative, i.e., the Petitioners. *In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.,* 389 B.R. 325, 335 (S.D.N.Y.2008).

#### a. The Liquidation Proceedings Are Foreign Main Proceedings

 **[10]**    A foreign main proceeding is defined as a "foreign proceeding pending in the country where the debtor has the center of its main interests ["COMI"]." 11 U.S.C. § 1502(4). A foreign nonmain proceeding is any other

proceeding "pending in a country where the debtor has an establishment." 11 U.S.C. § 1502(5). "Establishment" is defined as "any place of operations where the debtor carries out a nontransitory economic activity." 11 U.S.C. § 1502(2).

Section 1516(c) provides that "[i]n the absence of evidence to the contrary, the debtor's registered office ... is presumed to be the center of the debtor's main interests." 11 U.S.C. § 1516(c); *See In re Tri–Continental Exchange Ltd.,* 349 B.R. 627, 635 (Bankr.E.D.Cal.2006) (recognizing the winding up proceedings of insurance companies in St. Vincent and the Grenadines as foreign main proceedings). Debtors are registered in Australia. No objection was raised and no evidence presented rebutting the presumption that Debtors' registered office is their COMI.

For further analysis, the District Court for the Southern District of New York has outlined several factors for courts to consider when making a COMI determination, including:

> 1. the location of the debtor's headquarters;
>
> 2. the location of those who actually manage the debtor;
>
> 3. the location of the debtor's primary assets;
>
> 4. the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or
>
> 5. the jurisdiction whose law would apply to most disputes.

*In re Bear Stearns,* 389 B.R. 325 (S.D.N.Y.2008)

The undisputed evidence overwhelmingly supports the determination that each of the Debtors' COMI is Australia: Debtors are incorporated and registered in Australia; Debtors are listed on the Australian stock exchange; Debtors' directors, the Liquidators, and the Receivers reside in Australia; Debtors' principal place of business is Australia; Debtors' books and records are located in Australia; the majority of Debtors' assets are located in Australia; the majority of Debtors' creditors are located in Australia; the Debtors' liquidations and receiverships were initiated and are proceeding under Australian law. The Court finds that the center of main interests of both Debtors is Australia and that the

Liquidation Proceedings are properly considered foreign main proceedings under §§ 1517(b)(1) and 1502(4).

### b. The Petitioners Are Persons & Foreign Representatives

 [11]   "Foreign Representative" means "a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." § 101(24) "The term 'person' includes individual, partnership, and corporation ..." § 101(41).

 **\*334**  The Petitioners Peter Walker and George Moloney are individuals whom the Debtors' creditors appointed as Debtors' Liquidators and, as Liquidators, they administer the liquidation of those assets not governed by the Receivership Proceedings and act as representatives of the Liquidation Proceedings, thereby meeting the requirements of § 1517(a)(2).

### c. The Petition Meets The Requirements of § 1515

The final requirement for recognition under § 1517 is that the petition for recognition meets the procedural requirements of § 1515:

§ 1515. Application for recognition

(a) A foreign representative applies to the court for recognition of a foreign proceeding in which the foreign representative has been appointed by filing a petition for recognition.

(b) A petition for recognition shall be accompanied by —

(1) a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;

(2) a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or

(3) in the absence of evidence referred to in paragraphs (1) and (2), any other evidence acceptable to the court of the existence of such foreign

proceeding and of the appointment of the foreign representative.

(c) A petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative.

(d) The documents referred to in paragraphs (1) and (2) of subsection (b) shall be translated into English. The court may require a translation into English of additional documents.

11 U.S.C. § 1515

The Court has already determined that the Petitioners are "foreign representatives" and that the Liquidation Proceedings are "foreign proceedings." (§ 1515(a)) The Petitioners properly filed Petitions seeking recognition. (§ 1515(a)) Petitioner Peter Walker's *Statement of Foreign Representative,* at D.I. 4, is acceptable evidence under § 1515(b)(3) of the existence of the foreign proceedings and the appointment of the foreign representatives. The translation requirement of § 1515(d) is inapplicable, as the *Statement* obviates the need for documentary evidence under §§ 1515(b)(1) and (b)(2) and, furthermore, the original language of documents issued by the Australian courts is English. The *Statement* also contains Petitioner Walker's assertion that, to his knowledge, no other foreign proceedings exist with respect to Debtors. (§ 1515(c))

The Petition meets the requirements for recognition under § 1517. The Court now considers RCS's argument that recognition of the Liquidation Proceedings is contrary to U.S. public policy.

### 3. Recognition Of The Liquidation Proceedings Is Not Manifestly Contrary To U.S. Public Policy

Chapter 15 of the Bankruptcy Code was enacted in 2005 to implement the Model Law on Cross–Border Insolvency (the "Model Law") (promulgated by the United Nations Commission on International Trade Law ("UNCITRAL") and available at http://www.uncitral.org/uncitral/en/uncitral_texts/insolvency/1997Model.html, last visited Oct. 27, 2010). *See In re Tri–Continental Exchange Ltd.,* 349 B.R. at 631–32. The purpose of Chapter 15 is to encourage and increase the cooperation **\*335** between U.S. courts and authorities and foreign courts and

2837

authorities in cross-border insolvency cases; to provide greater certainty and consistency in the law for trade and investment; to promote fair and efficient administration of cross-border insolvencies while protecting the interests of all creditors and other interested parties, including the debtor; to protect and maximize the value of a debtor's assets; and to facilitate the rescue of financially troubled businesses. 11 U.S.C. § 1501. *In re Ernst & Young, Inc.,* 383 B.R. 773, 776 (Bankr.D.Col.2008) (recognizing a Canadian receivership as a foreign main proceeding).

 **[12]    [13]**    Section 1506 allows the Court to refuse to recognize a foreign proceeding under Chapter 15 if such recognition is "manifestly contrary" to U.S. public policy.

> *11 U.S.C. § 1506. Public policy exception*
>
> Nothing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States.

This exception is to be narrowly construed. *In re Tri–Continental Exchange, Ltd.,* 349 B.R. at 638–39. "This provision follows the Model Law article 5 exactly, is standard in UNCITRAL texts, and has been narrowly interpreted on a consistent basis in courts around the world. The word 'manifestly' in international usage restricts the public policy exception to the most fundamental policies of the United States." *Id.* at fn. 6, quoting H.R.Rep. No. 109–31(I) at 109, U.S. Code Cong. & Admin.News 2005, at pp. 88, 172. *See also In re Ephedra Products Liability Litigation,* 349 B.R. 333, 336 (S.D.N.Y.2006).

 **[14]**    RCS argues that Debtors are seeking recognition of the Liquidation Proceedings at the behest of the Receivers and Bank Syndicate for the purpose of gaining an unfair advantage in the Arizona and Nevada Litigations. The Court's granting of recognition of the Liquidation Proceedings as foreign main proceedings imposes the automatic stay of § 362 and thereby affects the course of the Arizona and Nevada Litigations to the benefit of ABC Group. However, the Court is not persuaded that the effect on the litigation with RCS was the motivating factor behind the filing of the Petition. Petitioner Moloney testified credibly regarding the Petitioners' reasons for seeking recognition of the Liquidation Proceedings under Chapter 15:

> Because of threats by RCS that they were looking to—or threatening to attach to [sic] American assets of A.B.C. And a fundamental tenet of the Australian solvency and liquidation law is that all creditors should be treated equally and that the assets allowable to a company in liquidation should be distributed equally and ratably amongst creditors—all creditor [sic] —all unsecured creditors. And I also believe that one of my duties as a liquidator was to preserve and protect the assets of the company.

Tr. 8/9 at 35 (Moloney).

These reasons are wholly proper.

Furthermore, the Debtors are not receiving protections beyond what debtors in U.S. bankruptcy proceedings receive. The fact that these protections are disadvantageous to RCS does not mean that they violate U.S. public policy. On the contrary, a stay of litigation against a debtor and of the enforcement of a judgment against a debtor is explicitly provided for by § 362(1) and (2) of the Bankruptcy Code. The District Court for the Eastern District of Virginia recently held that "[a] conflict between foreign law and U.S. law is a necessary prerequisite to the § 1506 analysis—for absent such conflict the comity **\*336** and public policy exception questions become moot." *In re Qimonda AG Bankruptcy Litigation,* 433 B.R. 547, 568 (E.D.Va.2010) (remanding the Bankruptcy Court's recognition of German insolvency proceedings for consideration of § 1506). There is no such conflict here.

While not raised by RSC, inadequate notice might be grounds for refusal to grant recognition, pursuant to § 1506. However, the Court has determined that the notice provided by the ABC Group, the Administrators, and the Liquidators was adequate.

The Court finds that recognition of the Liquidation Proceedings is not manifestly contrary to U.S. public policy and the Court will not deny recognition under the public policy exception of § 1506.

**4. Relief Granted Upon Recognition**

Section 1520 provides that the automatic stay is imposed upon recognition of a foreign proceeding as a foreign main proceeding. [10] Furthermore, § 1521 allows the court to impose additional relief.

[10]     "Upon recognition of a foreign proceeding that is a foreign main proceeding—(1) sections 361 and 362 apply with respect to the debtor and the property of the debtor within the territorial jurisdiction of the United States; ..." 11 U.S.C. § 1520(a).

Upon recognition of a foreign proceeding, whether main or nonmain, where necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interest of the creditors, the court may, at the request of the foreign representatives, grant any appropriate relief ...
11 U.S.C. § 1521(a).

The Petitioners are seeking additional relief pursuant to § 1521, as set forth in the proposed order provided to the Court. RCS has set forth alternative additional relief in its proposed order. Based upon a review of the record and the additional relief suggested by each party, the Court's companion order sets forth the additional relief the Court deems appropriate.

**B. RCS'S Lift Stay Motion Is Granted As For A Limited Purpose**

 **[15]**     Pursuant to § 1520, recognizing the Liquidation Proceedings as foreign main proceedings triggers the automatic stay of § 362. RCS seeks relief from the automatic stay to 1) reduce the Arizona Verdict to judgment and 2) assert the resulting judgment as a setoff in the Nevada Litigation. The Debtors object, arguing that such relief would impose unnecessary costs on Debtors and is premature.

The purpose of the automatic stay is "to prevent certain creditors from gaining a preference for their claims against the debtor; to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor." *St. Croix Condominium Owners v. St. Croix Hotel,* 682 F.2d 446, 448 (3d Cir.1982). The automatic stay is not meant to be absolute, and the Bankruptcy Code provides for relief from stay in appropriate circumstances. *In re The SCO*

*Group, Inc.,* 395 B.R. 852, 856 (Bankr.D.Del.2007) (*citing Wedgewood Inv. Fund, Ltd. v. Wedgewood Realty Group, Ltd., (In re Wedgewood),* 878 F.2d 693, 697 (3d Cir.1989)). Section 362(d)(1) of the Bankruptcy Code provides that:

On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying or conditioning such stay—

 **\*337**  (1) for cause, including the lack of adequate protection of an interest in property of such party in interest....

 **[16]**     Beyond lack of adequate protection, "cause" is not defined in § 362(d)(1). "Cause is a flexible concept and courts often conduct a fact intensive, case-by-case balancing test, examining the totality of the circumstances to determine whether sufficient cause exists to lift the stay." *In re The SCO Group, Inc.,* 395 B.R. at 856 (*citing Baldino v. Wilson (In re Wilson),* 116 F.3d 87, 90 (3d Cir.1997); *In re Laguna Assocs. Ltd.,* 30 F.3d 734, 737 (7th Cir.1994); *American Airlines, Inc. v. Continental Airlines, Inc. (In re Continental Airlines, Inc.),* 152 B.R. 420, 424 (D.Del.1993)).

 **[17]**     This Court has developed a three-prong balancing test to determine whether to grant relief from the stay to pursue litigation in another forum:

1. Whether any great prejudice to either the bankrupt estate or the debtor will result from continuation of the civil suit;

2. Whether the hardship to the non-bankrupt party by maintenance of the stay considerably outweighs the hardship to the debtor; and

3. The probability of the creditor prevailing on the merits.

*In re SCO,* 395 B.R. 852, 857 (Bankr.D.Del.2007); *See also Izzarelli v. Rexene (In re Rexene Prods. Co.),* 141 B.R. 574, 576 (Bankr.D.Del.1992).

**1. Relief From Stay Does Not Result In Great Prejudice To Debtors**

The first factor the Court must consider in determining whether to grant relief from the automatic stay for "cause"

2839

is whether lifting the stay will result in "great prejudice" to the debtors or their estates. Debtors argue that lifting the stay and allowing RCS to convert its verdict into a judgment would force the Debtors to either concede the decision against it or expend considerable funds pursuing its right to appeal. The Debtors have the right to appeal the decision in the Arizona Litigation, but are not required to do so by law. An appeal certainly carries costs, but the Court finds that the costs of appeal do not rise to "great prejudice." Additionally, the Arizona and Nevada Litigations are being pursued and managed by the Receivers, not by the Liquidators/Petitions, *see* Tr. 8/9 at 58 (Moloney), which supports the Court's finding that the Debtors will not suffer "great prejudice" from an appeal.

### 2. The Hardship To RCS Of Maintaining The Stay Considerably Outweighs The Hardship To Debtors

As for the second factor, whether the hardship to the creditor considerably outweighs the hardship to the Debtors and their estates, the Court again finds in favor of RCS. Absent relief from stay, RCS cannot reduce its verdict in the Arizona Litigation to judgment, and therefore cannot seek setoff in the Nevada Litigation. Section 553 of the Bankruptcy Code recognizes and preserves a creditor's setoff rights against a debtor. Even though setoff often results in a creditor receiving a greater percentage of recovery on its claim compared to those creditors without setoff, this seemingly inequitable result is provided for explicitly by the Code. *See* 5 Collier on Bankruptcy ¶ 553.02 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (describing setoff as "a lawful preference."). "Conceivably, Congress might have abrogated setoff rights in all bankruptcy proceedings. In practice, Congress has done precisely the opposite ..." *Id.* (discussing historical reasons for protection of setoff **\*338** rights). The hardship to RCS of not being able to assets its setoff rights in the Nevada Litigation considerably outweighs the minimal hardship to Debtors of appealing the Arizona Verdict.

### 3. RCS Has A Probability Of Success On The Merits

 [18]    Finally, the Court must consider the probability that RCS will succeed in 1) having its Arizona Verdict reduced to judgment and 2) receiving a setoff in the Nevada Litigation. Even a slight probability of success on the merits may be sufficient to support lifting an automatic stay in an appropriate case. *In re SCO Group, Inc.,* 395 B.R. at 859 (*citing Int'l Business Machines v. Fernstrom*

*Storage & Van, Co. (In re Fernstrom Storage & Van Co.),* 938 F.2d 731, 737 (7th Cir.1991); *Rexene,* 141 B.R. at 578).

#### a. Reducing The Arizona Judgment To Verdict

Reducing a verdict to judgment is usually a simple ministerial task that does not constitute the continuation of a judicial proceeding, which would be stayed under § 362(a)(1). *In re Rexnord Holdings, Inc.*, 21 F.3d 522, 527 (7th Cir.1994). However, under Arizona law, reducing the Arizona Verdict to judgment requires more than the mere entry of the judgment by the Clerk of Court. The Arizona Court first must rule on certain post-verdict matters, namely: (1) the application for award of attorneys' fees; (2) the application for costs; (3) the application of award for pre-judgment interest; and (4) the form of judgment. Due to these requirements, and out of an abundance of caution, RCS seeks relief from stay to seek entry of a verdict. Courts routinely grant relief from stay to permit a verdict to be reduced to judgment when fees and costs must first be determined. *See, e.g., In re Beguelin v. Volcano Vision, Inc.,* 220 B.R. 94, 97–98 (9th Cir. BAP 1998); *In re Nugent,* 254 B.R. 14, 40 (Bankr.D.N.J.1998). The rulings that the Arizona Court is required to make prior to entry of judgment do not call into question whether judgment should be entered. Instead, they ensure that the Arizona Court has addressed all related matters. The Court finds a strong probability that RCS will succeed in reducing its Arizona Verdict to judgment.

#### b. Asserting Setoff Rights In The Nevada Litigation

The automatic stay enjoins "the setoff of any debt owing to the debtor that arose before the commencement of the case...." 362(a)(7). RCS's claim arose pre petition. A creditor is entitled to seek relief from the automatic stay in order to assert its setoff rights. *In re NTG Industries, Inc.,* 103 B.R. 195, 197 (Bankr.N.D.Ill.1989). Here, Debtors' representatives are prosecuting an action in the Nevada State Court. The imposition of the automatic stay would place RCS at a disadvantage, thereby prompting the Court to exercise its discretion to grant stay relief to RCS. *See Bernstein v. IDT Corp.,* 76 B.R. 275, 280 (S.D.N.Y.1987).

Section 553(a) of the Code does not create an independent federal right to setoff, but merely preserves whatever setoff

2840

rights may exist under applicable state law. Here, the merits of any setoff defense asserted by RCS in the Nevada Litigation are properly determined by the Nevada Court. Based on the parties' arguments, the Court is convinced that RCS has at least a slight probability of success in receiving recognition of setoff by the Nevada Court, and therefore meets this requirement. Furthermore, even if the Court were to abstain from any conjecture regarding RSC's likely success in asserting setoff, the totality of the circumstances supports granting relief. All other **\*339** factors in the Court's analysis strongly favor granting RCS's request for relief, and this Court finds it appropriate to leave the analysis and application of Nevada law to the Nevada Court.

### 4. The Timing Of Relief From Stay

 **[19]**    Debtors argue that granting relief at this time is premature because RCS's setoff rights will arise only if a Nevada jury enters a verdict in favor of the Debtors, and the Nevada Litigation has not yet gone to trial. In order to assert setoff rights, RCS must first reduce the Arizona Verdict to judgment. Allowing RCS to reduce the Arizona Verdict to judgment now forces Debtors either to concede the Arizona Verdict or to lodge an appeal, when it is unknown whether RCS will ever be in a position to seek a setoff. The Court, however, is not convinced that delaying relief is appropriate. As discussed above, the Court finds that the burden on Debtors of appealing the decision in the Arizona Litigation is minimal. In addition, delaying RCS relief to assert setoff before the Nevada Court provides no benefit to the parties and may create judicial inefficiencies if the parties must return to this Court in the future.

### V. *CONCLUSION*

The Court finds that the Liquidation Proceedings satisfy § 101(23) and §§ 1517 and 1515 of the Bankruptcy Code and therefore grants the Petitions and recognizes the Australian Liquidation Proceedings of Debtors as foreign main proceedings. The Court further grants RCS's Lift Stay Motion for the limited purposes of allowing RCS to convert its Arizona Verdict to judgment and to seek setoff in the Nevada Litigation. An appropriate order will follow.

### *ORDER GRANTING RECOGNITION OF FOREIGN PROCEEDINGS AND RELATED RELIEF*

This matter came before the Court upon the verified petition of Peter Walker and Greg Maloney as foreign representatives of ABC Learning Centres Limited and A.B.C. USA Holdings Pty. Ltd. (collectively "Debtors"), seeking recognition of foreign main proceedings and related relief. The Court has reviewed and considered, among other things, (1) the verified petition and its memorandum of law, (2) the supplement to the petition, (3) the declarations of the foreign representatives, (4) RCS Capital Developments' objections to the petition, and (5) the arguments and testimony presented at the hearing held on June 24 and August 9, 2010. Based on the foregoing and for the reasons described in the Opinion of even date, the Court finds as follows:

a. This Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(P). Venue is proper under 28 U.S.C. § 1410;

b. The Petitioners are appointed to act as administrators and foreign representatives of the Debtors within the meaning of §§ 101(24) and 1517(a)(2) of the Bankruptcy Code;

c. These Chapter 15 cases were properly commenced pursuant to §§ 1504 and 1515 of the Bankruptcy Code;

d. The Chapter 15 Petitions satisfy the requirement of § 1515 of the Bankruptcy Code;

e. The Australian Proceedings are foreign proceedings within the meaning of § 101(23) of the Bankruptcy Code and are entitled to recognition as foreign proceedings by this Court pursuant to §§ 1515 and 1517(a) of the Bankruptcy Code;

 **\*340**   f. The Australian Proceedings are entitled to recognition as foreign main proceedings pursuant to §§ 1502(4) and 1517(b)(1) of the Bankruptcy Code because each of the Debtors has its center of main interests in Australia; and

g. Recognition of the Australian Proceedings as foreign main proceedings is necessary and appropriate, in the

interests of the public and international comity, consistent with the public policy of the United States, and will not cause hardship to plaintiffs in litigation against the Debtors, or any other parties-in-interest, that is not outweighed by the benefits of granting the relief set forth herein;

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1. The Australian proceedings are granted recognition under § 1517(a) of the Code and recognized as foreign main proceedings under § 1517(b)(1).

2. The Debtors shall have all relief afforded foreign main proceedings pursuant to § 1520 of the Bankruptcy Code.

3. The following additional relief is granted pursuant to § 1521:

   a. all persons and entities are permanently enjoined from seizing, repossessing, transferring, relinquishing or disposing of any property of the Debtors or the proceeds thereof in the United States;

   b. all persons and entities are enjoined from commencing or continuing any action or legal proceeding against the Debtors, or any of their property. Nevertheless, nothing in this order shall any way restrict or prohibit RCS Capital Development from having its verdict in *RCS Capital Development v. A.B.C. Learning Centres, et al.* (Maricopa County Case No. CV2008–026273), reduced to judgment. Additionally, nothing in this order shall restrict, terminate or abrogate RCS's right to a setoff in *A.B.C. Learning Centres v. RCS Capital Development, et al.* (Clark County Case No.: A584835, Dept. No.: XI).

   c. the Debtors or their representatives may apply to the Court and upon a showing of good cause, obtain an injunction preventing any person or entity from invoking a statute or rule that requires the Debtor to post a bond or other security as a condition of prosecuting or defending a case.

   d. every creditor of the Debtors and every party to any action or other legal proceeding (including, without limitation, arbitration or any judicial,

quasi-judicial, administrative action, proceeding or process whatsoever) pending in connection with any claim in which a Debtor is or was named as a party, or as a result of which a claim may be established, who receives notice of this Order is required to place the Petitioners' United States counsel (Chadbourne & Parke LLP, 30 Rockefeller Plaza, New York, N.Y. 10112, Attn: Howard Seife, Esq. and Andrew Rosenblatt, Esq.; and Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, Delaware 19801, Attn: Joel Waite, Esq.) on the master service list of any such action or other legal proceeding, and to take such other steps as may be necessary to ensure that such counsel receives: (a) copies of any and all documents served by the parties to such action or **\*341** other legal proceeding or issued by the court, arbitrator, administrator, regulator or similar official having jurisdiction over such action or legal proceeding; and (b) any and all correspondence, or other documents circulated to parties named in the master service list;

   e. the Petitioners have the right to seek, pursuant to Bankruptcy Code sections 542 or 543, as applicable, the turnover of all of the Debtors' property or proceeds from all persons and entities in possession, custody or control of such property or proceeds thereof to the Petitioners;

   f. nothing in this order shall prevent the commencement or continuation of any legal proceeding against any person or entity other than Debtors. If any third party settles with, or obtains a judgment against, any person or entity other than the Debtors, such settlement or judgment shall not be binding on or enforceable against the Debtors, absent further order by the Court.

   g. no action taken by the Petitioners, their successors, directors, officers, agents, employees, representatives, advisors or attorneys, or any of them, in preparing, disseminating, applying for, implementing or otherwise acting in furtherance of the Australian Proceedings, this Order, any further order for additional relief in the ancillary proceedings or cases filed under Chapter 15 of the Bankruptcy Code, or any adversary proceedings in connection therewith as the Bankruptcy Code

2842

may make, will be deemed to constitute a waiver of the immunity afforded to the petitioners and their successors, directors, officers, agents, employees, representatives, advisors or attorneys, pursuant to § 1510 of the Bankruptcy Code

    h. awarding the Petitioners such other relief as the Court may deem just and proper.

4. Nothing herein shall limit or otherwise impair the rights and powers of the Receivers (as defined in the verified petition) with respect to the Debtors or their assets wherever located (whether inside or outside the United States), or in connection with the receivership or any other proceedings related to the Debtors.

5. The Court shall retain jurisdiction with respect to the enforcement, amendment or modification of this order, and requests relief in the Chapter 15 cases and all adversary proceedings in connection therewith properly commenced and within the jurisdiction of the Court.

6. This order shall be served by United States mail, first class postage prepaid, on or before November 23, 2010, upon the master service list, which service is in accordance with this order and shall be deemed good and sufficient service and adequate notice for all purposes.

*MEMORANDUM ORDER (1) GRANTING, IN PART, AND DENYING, IN PART, RCS CAPITAL DEVELOPMENT, LLC'S MOTION FOR RECONSIDERATION OF THIS COURT'S NOVEMBER 16, 2010 ORDER GRANTING RECOGNITION OF FOREIGN PROCEEDINGS AND RELATED RELIEF AND (2) PROVIDING FOR AMENDMENT OF THE COURT'S NOVEMBER 16, 2010 ORDER TO CORRECT ERROR*

The Court has before it the Motion (D.I. 104) of RCS Capital Development, LLC **\*342** ("RCS") [1] for reconsideration of this Court's Order Granting Recognition of Foreign Proceedings and Related Relief (D.I. 102), entered on November 16, 2010 (the "Order"). Upon review of the pleadings, and following a hearing on January 6, 2011, it is hereby ORDERED that the Motion for Reconsideration is GRANTED, IN PART and DENIED, IN PART, as provided below.

[1]    Capitalized terms carry the same meaning as ascribed in the Opinion at D.I. 101 and the Order at D.I. 102.

A motion to reconsider may be granted only "to correct manifest error of law or fact or to present newly discovered evidence." *Harsco Corp. v. Zlotnicki,* 779 F.2d 906, 909 (3d Cir.1985). RCS does not assert that any evidence has been newly discovered. Rather, RCS argues that the Court made a clear error of law in that the Order Granting Recognition (1) appears to grant Chapter 15 recognition to the Debtors' ongoing Receivership Proceedings, and (2) does not limit the protection of the automatic stay to the property controlled by the Liquidators.

### A. Chapter 15 Recognition Is Not Granted To The Receivership Proceedings

To the extent that the Order appears to grant recognition under Chapter 15 to the Receivership Proceedings, it is in error. This Court's Opinion (D.I. 101) grants Chapter 15 recognition solely to the Debtors' Liquidation Proceedings and not to the Receivership Proceedings. (The Receivers have not petitioned for recognition of the Receivership Proceedings, and, for the reasons set forth in the Opinion, such recognition would be denied.) Paragraphs (e), (f) and (g) of the Order refer to "Australian Proceedings." As defined in the Opinion, the term "Australian Proceedings" encompasses both the Liquidation Proceedings and the Receivership Proceedings. Therefore, the Court erred in its use of the term "Australian Proceedings," and will amend the Order replacing "Australian Proceedings" with "Liquidation Proceedings."

### B. Property Of The Debtors' Bankruptcy Estate Includes Property Subject To The Receivership Proceedings

RCS further argues that the Court erred in extending the automatic stay to the property controlled by the Receivers. RCS asserts that the Debtors' property is bifurcated into two categories, that which the Liquidators control and that which the Receivers control, and that Debtors' bankruptcy estate is limited to the former. RCS asserts that the property under the control of the Receivers —which is substantially all of the Debtors' assets, and upon which RCS wants to execute judgment—is not part of the Debtors' bankruptcy estate and therefore is not protected by the automatic stay of 11 U.S.C. § 362, applicable to foreign main proceedings under § 1520(a)(1). The Court rejects this argument. [2]

[2]  The Court is fully aware that RCS is now baldly attempting to reach Debtors' assets after directly and repeatedly disavowing such an effort when it opposed recognition. The Court, in fact, granted RCS the relief it requested. RCS now seeks more in the guise of requesting reconsideration. The Court answers with a resounding "No."

The Liquidators filed the petitions seeking recognition under Chapter 15 *on behalf of* the Debtors ABC Learning Centres Limited, n/k/a ZYX Learning Centres Limited, and A.B.C. USA Holdings Pty Limited. Section 1502(1) defines "debtor" as "an entity that is the subject of a foreign proceeding." The Debtors are the corporate entities, and the property of the **\*343** estate includes the Debtor entities' property, regardless of whether the property is subject to the control of the Liquidators or the Receivers.

This Court's holdings do not offend Australian law, as RCS alleges. To the contrary, the Court's failure to protect the Debtors' U.S. assets would undermine Australia's insolvency laws. The orderly distribution of assets provided for by Australia's Corporations Act of 2001 (*see,* e.g., Corporations Act at § 556) would be defeated if creditors could proceed against the Debtors' assets located outside of Australia as if the foreign main proceeding did not exist.

Chapter 15 provides that "[u]pon recognition of a foreign proceeding that is a foreign main proceeding—(1) sections 361 and 362 apply with respect to the debtor and the property of the debtor that is within the territorial jurisdiction of the United States; ..." 11 U.S.C. § 1520(a)(1). The imposition of an automatic stay upon recognition of a foreign main proceeding is necessary to ensure that the goals of Chapter 15—including cooperation between U.S. courts and foreign courts, fair and efficient administration of cross-border insolvencies, and the protection and maximization of the value of the debtors's assets—are met. (*See* § 1501(a).)

Furthermore, the United States and Australia have adopted the Model Law on Cross–Border Insolvency of the United Nations Commission on International Trade Law (available at http://www.uncitral.org/uncitral/ en/uncitral_ texts/insolvency/1997Model.html last visited January 14, 2010). The U.S. incorporated the Model Law into the Bankruptcy Code through Chapter 15; Australia implemented the Model Law through the Cross–Border Insolvency Act 2008(Cth). (11 U.S.C. § 1501(a). Australian Law Reform Commission at http://www.alrc.gov.au/inquiries/cross-border-civil-remedies, last visited January 14, 2011.)

> [T]he Model Law is designed to assist States to equip their insolvency laws with a modern, harmonized and fair framework to address more effectively instances of cross-border insolvency. Those instances include cases where the insolvent debtor has assets in more than one State or where some of the creditors of the debtor are not from the State where the insolvency proceeding is taking place.

(UNCITRAL's introduction to the Model Law, available at http://www.uncitral. org/uncitral/en/uncitral_texts/ insolvency/1997Model.html, last visited January 13, 2011).

Under Article 13 of the Model Law, foreign creditors have the same rights in an insolvency proceeding as creditors from the country in which the proceeding is located. *Id.* RCS asks the Court to give it greater rights than native Australian creditors, which the Court will not do. Were the Court to permit removal of assets from the purview of the foreign main proceeding, it would undermine the spirit and intent of the Model Law, U.S. law (Chapter 15), and Australian law (Cross–Border Insolvency Act 2008).

Having determined that the Order contains an incorrect phrase, which appears to reflect an error of law, RCS's Motion for Reconsideration is GRANTED, IN PART. The Order is hereby amended to replace "Australian Proceedings" with "Liquidation Proceedings." Having determined that RCS has not demonstrated any additional error of law or any error of fact, either in the Court's Opinion or the related Order, and there being no newly discovered evidence, the Court DENIES RCS's **\*344** Motion for Reconsideration in all other respects.

**All Citations**

445 B.R. 318, 54 Bankr.Ct.Dec. 25, 54 Bankr.Ct.Dec. 49

**In re ABC Learning Centres Ltd., 445 B.R. 318 (2010)**
54 Bankr.Ct.Dec. 25, 54 Bankr.Ct.Dec. 49

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

---

2845

# Tab 11

Page 1

728 F.3d 301, 70 Collier Bankr.Cas.2d 455, 58 Bankr.Ct.Dec. 91, Bankr. L. Rep. P 82,528
**(Cite as: 728 F.3d 301)**

H

United States Court of Appeals,
Third Circuit.
In re ABC LEARNING CENTRES LIMITED, n/
k/a ZYX Learning Centres Limited; A.B.C. USA
Holdings Pty Ltd, Debtors in Foreign Proceedings
RCS Capital Development, LLC, Appellant.

No. 12–2808.
Argued: March 5, 2013.
Filed: Aug. 27, 2013.

**Background:** Foreign liquidators petitioned for re-
cognition, as foreign main or foreign non-main pro-
ceeding, a voluntary winding-up of corporate entit-
ies under the Corporations Act of Australia. The
Bankruptcy Court, Kevin Gross, J., 445 B.R. 318,
granted petition and entered order staying actions
against debtor and its property in United States but
granted limited relief to unsecured creditor. Credit-
or appealed. The United States District Court for
the District of Delaware, Richard G. Andrews, J.,
affirmed. Creditor appealed.

**Holdings:** The Court of Appeals, Scirica, Circuit
Judge, held that:
(1) voluntary winding-up of corporate entities un-
der Corporations Act of Australia was in nature of
collective proceeding;
(2) Australian law that allowed secured creditors to
realize full value of their debts, and tender excess
to company, did not manifestly contravene public
policy of United States; and
(3) foreign corporation retained equitable interests
in its fully leveraged property that was located in
United States, and thus it had to be considered
"property of the debtor."

Affirmed.

West Headnotes

**[1] Bankruptcy 51 ⚷3782**

51 Bankruptcy
  51XIX Review
    51XIX(B) Review of Bankruptcy Court
      51k3782 k. Conclusions of law; de novo
review. Most Cited Cases

**Bankruptcy 51 ⚷3836**

51 Bankruptcy
  51XIX Review
    51XIX(D) Review of District Court
      51k3836 k. Review. Most Cited Cases
    The Court of Appeals reviews the legal stand-
ards applied by the district court and the bankruptcy
court de novo.

**[2] Bankruptcy 51 ⚷2341**

51 Bankruptcy
  51III The Case
    51III(H) Cases Ancillary to Foreign Proceed-
ings
      51k2341 k. In general. Most Cited Cases
    Voluntary winding-up of corporate entities un-
der Corporations Act of Australia was in nature of
collective proceeding, which was necessary pre-
requisite for recognition thereof as "foreign main
proceeding" under Chapter 15 of Bankruptcy Code,
since liquidator had to distribute assets on pro-rata
basis to creditors of same priority; although debtor's
assets were entirely leveraged which left nothing to
distribute to unsecured creditors, there was no ex-
ception to recognition based on debt to value ratio
at time of insolvency. 11 U.S.C.A. § 1517(a).

**[3] Bankruptcy 51 ⚷2341**

51 Bankruptcy
  51III The Case
    51III(H) Cases Ancillary to Foreign Proceed-
ings
      51k2341 k. In general. Most Cited Cases
    Australian law that allowed secured creditors to
realize full value of their debts, and tender excess
to debtor, did not manifestly contravene public

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

728 F.3d 301, 70 Collier Bankr.Cas.2d 455, 58 Bankr.Ct.Dec. 91, Bankr. L. Rep. P 82,528
**(Cite as: 728 F.3d 301)**

policy of United States, and thus public policy exception did not apply to recognition of liquidation proceeding which was pending against foreign corporation in Australia as foreign main proceeding that would trigger automatic stay; although secured creditors in United States generally had to turn over assets and seek distribution from bankruptcy estate, Australian law established different way to achieve similar goals. 11 U.S.C.A. §§ 362(a), 1506.

**[4] Bankruptcy 51 ⬩2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

Foreign corporation in Australia retained equitable interests in its fully leveraged property that was located in United States, and thus it had to be considered "property of the debtor" and subject to automatic stay under Chapter 15 of Bankruptcy Code, since receiver had to repay any amount of realized assets in excess of value of the charges to that corporation, corporation retained right to redeem encumbered property, and liquidator could challenge charges receiver claimed on company assets, and if charges were found invalid, corporation would retain encumbered property. 11 U.S.C.A. §§ 362(a), 1520(a).

**[5] Bankruptcy 51 ⬩2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

A court does not create a separate bankruptcy estate under the portion of the Bankruptcy Code that requires United States bankruptcy courts to recognize a foreign insolvency proceeding; the law provides for an ancillary proceeding so the foreign representative does not need to file a new bankruptcy action in the United States. 11 U.S.C.A. § 1501 et seq.

**[6] Bankruptcy 51 ⬩2532**

51 Bankruptcy
   51V The Estate
      51V(C) Property of Estate in General
         51V(C)1 In General
            51k2532 k. Interest of debtor in general. Most Cited Cases

**Bankruptcy 51 ⬩2543**

51 Bankruptcy
   51V The Estate
      51V(C) Property of Estate in General
         51V(C)2 Particular Items and Interests
            51k2543 k. Property held by debtor as trustee, agent, or bailee. Most Cited Cases

Property rights the debtor does not have do not become part of the bankruptcy estate, such as secondary mortgages and assets the debtor holds in trust for a non-debtor. 11 U.S.C.A. § 541(d).

**\*303** Carson T.H. Emmons, Esq., Craig M. LaChance, Esq. [Argued], Daryl M. Williams, Esq., Baird, Williams & Greer, Phoenix, AZ, Garvan F. McDaniel, Esq., Bifferato Gentilotti, Wilmington, DE, for Appellant.

Ryan M. Bartley, Esq., Young, Conaway, Stargatt & Taylor, Wilmington, DE, Howard Seife, Esq., [Argued], Chadbourne & Parke, New York, NY, for Appellees.

Before: SCIRICA, JORDAN, and ROTH, Circuit Judges.

OPINION OF THE COURT
SCIRICA, Circuit Judge.

RCS Capital Development LLC appeals from an order of recognition of an Australian insolvency proceeding under Chapter 15 of the Bankruptcy Code, and an order staying actions against the debtor, ABC Learning Centres, and its property in the United States. We must determine whether the Australian insolvency proceeding should be recognized

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

728 F.3d 301, 70 Collier Bankr.Cas.2d 455, 58 Bankr.Ct.Dec. 91, Bankr. L. Rep. P 82,528

**(Cite as: 728 F.3d 301)**

as a foreign main proceeding under Chapter 15 of the Bankruptcy Code, and whether the debtor's fully-encumbered property in the United States is subject to the automatic stay under 11 U.S.C. § 1520.

## I.

ABC Learning Centres Ltd. is a publicly-traded Australian company that provided child care and educational services in Australia, the United States and other countries through its 38 subsidiaries. It conducted business in the United States principally through its subsidiaries, ABC Developmental Learning Centres (USA) Inc. (ABC Delaware) and the Learning Care Group. In June 2008, RCS Capital Development LLC contracted with ABC Delaware to develop child care facilities in the United States, and ABC guaranteed ABC Delaware's loan obligations. RCS won a $47 million verdict on a breach of contract claim against ABC Delaware in Arizona state court on May 14, 2010. RCS is a defendant to a Nevada lawsuit brought by ABC Learning and ABC Delaware, seeking $30 million.

In November 2008 ABC's directors entered into Voluntary Administration in Australia, and appointed administrators to determine whether ABC could be restructured to address its insolvency, or whether it had to be liquidated.[FN1] Entering into Voluntary Administration breached ABC's loan agreements with its secured creditors. This breach triggered the secured creditors' rights to realize their assets through the receivership process prescribed by Australia's Corporations Act. Corporations Act 2001 § 554E(3) (Austl.) (hereinafter "Corporations Act"). The secured creditors exercised that right and appointed a receiver. ABC was entirely leveraged, so the value of all its assets was encumbered by its secured creditors' charges.[FN2]

> FN1. Insolvency proceedings under Australia's Corporations Act of 2001 may commence by appointing an administrator to determine the company's solvency.

> FN2. Under Australian law, a charge is a security interest in property similar to a lien in the United States.

ABC's directors voted to enter liquidation proceedings on June 2, 2010, and appointed two of the administrators as the liquidators to wind up the company. The receivership continued through the commencement of liquidation proceedings, and operated in tandem with the winding up. ABC's liquidators granted the receiver permission to manage and operate ABC. A liquidator realizes assets for the benefit of all the creditors, investigates charges **\*304** claimed by the secured creditors, takes an accounting and payment of the value of assets the receiver realized beyond the amount of the debenture, and distributes assets on a pro rata basis among creditors of the same priority.

On May 26, 2010, the administrators-turned-liquidators petitioned the Bankruptcy Court of Delaware as ABC's foreign representatives for recognition of the Australian insolvency proceedings under Chapter 15 of the Bankruptcy Code. The petition was filed before the Arizona verdict was rendered into judgment, and the immediate focus of the stay was ABC's suit against RCS in Nevada state court. The Bankruptcy Court found the liquidation was a foreign main proceeding that met the recognition requirements and did not manifestly contravene U.S. public policy. The Bankruptcy Court ordered recognition and an automatic stay of actions against ABC and ABC's property within the United States' jurisdiction. The Bankruptcy Court granted RCS's motion to lift the stay for the purpose of rendering its Arizona verdict to judgment, and applying the judgment against the Nevada action. The District Court of Delaware upheld the Bankruptcy Court's orders, noting that RCS was granted all the relief it initially sought. RCS appeals from the District Court's order.

## II. [FN3]

> FN3. The Bankruptcy Court had jurisdiction under 11 U.S.C. § 105. The District

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

728 F.3d 301, 70 Collier Bankr.Cas.2d 455, 58 Bankr.Ct.Dec. 91, Bankr. L. Rep. P 82,528
**(Cite as: 728 F.3d 301)**

Court had jurisdiction over the appeal from the Bankruptcy Court's final order under 28 U.S.C. § 158(a). We have jurisdiction over this appeal from the final order of the district court under 28 U.S.C. § 158(d). We review the legal standards applied by the district court and the bankruptcy court de novo. *In re DeSeno,* 17 F.3d 642, 643 (3d Cir.1994).

[1] Congress created Chapter 15 of the Bankruptcy Code in Title VIII of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005. 11 U.S.C. § 1501 *et seq.* Under Chapter 15, U.S. bankruptcy courts must recognize a foreign insolvency proceeding when it is "a collective judicial or administrative proceeding in a foreign country ... under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation." 11 U.S.C. § 101(23); *id.* § 1517(a). FN4 The statute requires recognition when the foreign proceeding meets the requirements of section 1502. *Id.* § 1517(a). "Upon recognition of a foreign [main] proceeding ... sections 361 and 362 apply with respect to the debtor and the property of the debtor that is within the territorial jurisdiction of the United States." *Id.* § 1520(a)(1). Section 362 stays "the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title." *Id.* § 362(a)(2).

> FN4. A foreign representative must petition for recognition, which shall be granted where the proceeding is pending in the country where the debtor has the center of its main interests (main) or where it has an establishment (nonmain), the foreign representative is a person or body, and where the petition meets § 1515 filing requirements. 11 U.S.C. § 1517(a).

Congress enacted Chapter 15 to provide effective mechanisms for dealing with cases of cross-border insolvency with the following objectives:

(1) cooperation between ... courts of the United States, ... and the courts and other competent authorities of foreign countries involved in cross-border insolvency cases;

(2) greater legal certainty for trade and investment;

**\*305** (3) fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor;

(4) protection and maximization of the value of the debtor's assets; and

(5) facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment.

11 U.S.C. § 1501; *see also* UNCITRAL Model Law on Cross–Border Insolvency preamble (stating nearly identical purposes). "Title VIII is intended to provide greater legal certainty for trade and investment as well as to provide for the fair and efficient administration of cross-border insolvencies, which protects the interests of creditors and other interested parties, including the debtor. In addition, it serves to protect and maximize the value of the debtor's assets." H.R.Rep. No. 109–31(1), at 105 *reprinted in* 2005 U.S.C.C.A.N. 88, 169 (2005). The statute adopts, nearly in its entirety, the Model Law on Cross–Border Insolvency promulgated in 1997 by the United Nations Commission on International Trade Law (UNCITRAL). *Id.*

UNCITRAL developed the Model Law on Transnational Insolvency in response to the challenges of multinational bankruptcies where multiple insolvency regimes lacked effective mechanisms for coordination. Multiple systems limited the ability of any one bankruptcy regime to protect assets against dissipation, and allowed creditors to skip ahead of their priority by seizing assets in foreign jurisdictions. The UNCITRAL Legislative Guide

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

728 F.3d 301, 70 Collier Bankr.Cas.2d 455, 58 Bankr.Ct.Dec. 91, Bankr. L. Rep. P 82,528
**(Cite as: 728 F.3d 301)**

explains the Model Law was designed to address

> inadequate and inharmonious legal approaches, which hamper the rescue of financially troubled businesses, are not conducive to a fair and efficient administration of cross-border insolvencies, impede the protection of the assets of the insolvent debtor against dissipation and hinder maximization of the value of those assets. Moreover, the absence of predictability in the handling of cross-border insolvency cases impedes capital flow and is a disincentive to cross-border investment.... Fraud by insolvent debtors, in particular by concealing assets or transferring them to foreign jurisdictions, is an increasing problem, in terms of both its frequency and its magnitude.

U.N. Comm'n on Int'l Trade Law, UNCITRAL Legislative Guide on Insolvency Law, at 310, U.N. Sales No. E.05.V.10 (2005). Both the United States and Australia have adopted the Model Law.

The American Law Institute's Global Principles for Cooperation in International Insolvency Cases elaborates "the overriding objective [is to] enable[ ] courts and insolvency administrators to operate effectively and efficiently in international insolvency cases with the goals of maximizing the value of the debtor's global assets, preserving where appropriate the debtors' business, and furthering the just administration of the proceeding." American Law Institute, Global Principles for Cooperation in Int'l Insolvency Cases 1.1 (2012).[FN5] "[T]he emphasis must be on ensuring that the insolvency administrator, appointed in that proceeding, is accorded every possible assistance to take control of all assets of the debtor that are located in other jurisdictions." *Id.* at cmt. to Global Principle 24. Chapter 15 creates an ancillary proceeding in the United States to provide **\*306** support to the foreign insolvency administrator. Jay Lawrence Westbrook, *Chapter 15 at Last,* 79 Am. Bankr.L.J. 713, 726 (2005). The goal is to direct creditors and assets to the foreign main proceeding for orderly and fair distribution of assets, avoiding the seizure of assets by creditors operating outside the jurisdiction of the

foreign main proceeding.

> FN5. The ALI principles "provide authority for resolution of a number of issues not fully addressed by Chapter 15 or addressed only in part." Jay Lawrence Westbrook, *Chapter 15 at Last,* 79 Am. Bankr.L.J. 713, 714 (2005).

The Model Law reflects a universalism approach to transnational insolvency. It treats the multinational bankruptcy as a single process in the foreign main proceeding, with other courts assisting in that single proceeding. Westbrook, *supra,* at 715. In contrast, under a territorialism approach a debtor must initiate insolvency actions in each country where its property is found. *Id.* This approach is the so-called "grab rule" where each country seizes assets and distributes them according to each country's insolvency proceedings. *Id.; see also* Andrew T. Guzman, *International Bankruptcy: In Defense of Universalism,* 98 Mich. L.Rev. 2177, 2179 (2000).

Chapter 15 embraces the universalism approach. The ancillary nature of Chapter 15 proceedings "emphasizes the United States policy in favor of a general rule" that our courts "act ... in aid of the main proceedings, in preference to a system of full bankruptcies ... in each state where assets are found." H.R.Rep. No. 109–31(1), at 109 (2005) *reprinted in* 2005 U.S.C.C.A.N. 88, 171. Congress rejected the territorialism approach, the "system of full bankruptcies," in favor of aiding one main proceeding. *Id.* "The purpose is to maximize assistance to the foreign court conducting the main proceeding." *In re Fairfield Sentry Ltd. Litig.,* 458 B.R. 665, 678–79 (S.D.N.Y.2011) (citing *In re Condor Ins. Ltd.,* 601 F.3d 319, 329 (5th Cir.2010)). "Thus, a Chapter 15 court in the United States acts as an adjunct or arm of a foreign bankruptcy court where the main proceedings are conducted." *Id.*

Chapter 15 supplanted Section 304 of the Bankruptcy Code, which authorized courts to stay U.S. actions against companies or property subject

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

728 F.3d 301, 70 Collier Bankr.Cas.2d 455, 58 Bankr.Ct.Dec. 91, Bankr. L. Rep. P 82,528

**(Cite as: 728 F.3d 301)**

to a foreign insolvency proceeding. 11 U.S.C. § 304 (2000) (*repealed by* Pub.L. 109–8. Title VIII, § 802(d)(3) (2005)). Section 304 relief was largely discretionary. *See In re Treco,* 240 F.3d 148, 155 (2d Cir.2001) (explaining that Section 304 "by its terms requires an exercise of judicial discretion"). Chapter 15 improved predictability by mandating recognition when a foreign proceeding meets Section 1517 recognition requirements. Leif M. Clark, *Ancillary and Other Cross–Border Insolvency Cases Under Chapter 15 of the Bankruptcy Code* 10–11 (2008). Before the Model Law, many countries did not assist U.S. insolvency proceedings, even though the United States opened its courts to foreign representatives. *In re Condor Ins., Ltd.,* 601 F.3d 319, 321–22 (5th Cir.2010). One of the reasons Congress changed so little of the wording in the Model Law was to endorse it wholesale, and encourage wide adoption by other nations. Westbrook, *supra,* at 719. Mandatory recognition when an insolvency proceeding meets the criteria fosters comity and predictability, and benefits bankruptcy proceedings in the United States that seek to administer property located in foreign countries that have adopted the Model Law.

Chapter 15 also encourages communication and cooperation with foreign courts, and authorizes our courts to communicate directly with foreign courts. 11 U.S.C. § 1525. Foreign representatives can access U.S. courts to request enforcement of orders of the foreign proceeding and to stay actions against foreign debtors' property in the United States. *Id.* §§ 1509, 1520, 1521. Chapter 15 ancillary proceedings**\*307** bring people and property beyond the foreign main proceeding's jurisdiction into the foreign main proceeding through the exercise of the United States' jurisdiction.

### A.

In Australia a company's directors may determine the company is insolvent and initiate liquidation proceedings. Corporations Act § 436A. Here, ABC went into Voluntary Administration, where the appointed administrators determined whether the company was salvageable. *Id.* § 438A. In this case, the administrators decided ABC should be liquidated, and two of the administrators became the liquidators, responsible for collecting and distributing the company's assets to the company's creditors. *Id.* ss 478, 556; Australian Sec. & Invest. Comm'n., *Liquidation: A Guide for Creditors* 2 (2012) *available at* www. asic. gov. au. Only unsecured creditors are barred from initiating or continuing legal proceedings against the company. Corporations Act § 471B–C. Secured creditors have their own proceeding where they may appoint a receiver to realize the secured assets, and distribute the proceeds to satisfy the debts that the property secured. *Id.* § 420.

Receivership can function in tandem with liquidation. *Id.* § 420C(1). Secured creditors may elect to surrender the secured assets to the liquidator, and receive distribution through the liquidation proceeding, or appoint a receiver to realize the assets. *Id.* § 554E(3). The receiver represents the interest of secured creditors, whereas the liquidator represents the interests of all the creditors. *Id.* § 420. The receiver's only duty to unsecured creditors is to sell the assets for a fair price. *Id.* § 420A. But the receiver does not operate entirely independently from the liquidator. The liquidator has authority to review the appointment of the receiver, and monitor the progress of the receivership. Australian Sec. & Invest. Comm'n., *Receivership: A Guide for Creditors* 4 (2008) *available at* www. asic. gov. au [hereinafter *Receivership* ]. The receiver must pay to the company any amount realized above the amount of debt owed to the secured creditors.[FN6] *Id.* at 2; Corporations Act § 441EA. The liquidator investigates the charges claimed by secured creditors, and may challenge asserted charges. *Receivership, supra,* at 4. The liquidator may also grant permission to the receiver to operate and manage the company while the liquidator proceeds with winding up the company. Corporations Act § 420C(1)(a).

FN6. The receiver may also prove to the li-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

728 F.3d 301, 70 Collier Bankr.Cas.2d 455, 58 Bankr.Ct.Dec. 91, Bankr. L. Rep. P 82,528
**(Cite as: 728 F.3d 301)**

quidator it could not realize the value of all the secured creditors' charges through the secured assets, and seek the remainder from the liquidation process. Corporations Act § 554E(4).

### B.

[2] Under Chapter 15 "an order recognizing a foreign proceeding shall be entered if ... such foreign proceeding for which recognition is sought is a foreign main proceeding" and the petition meets the administrative requirements of Section 1515. 11 U.S.C. § 1517(a). " '[F]oreign main proceeding' means a foreign proceeding pending in the country where the debtor has the center of its main interests." *Id.* § 1502(4).

> The term "foreign proceeding" means a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, **\*308** for the purpose of reorganization or liquidation.

*Id.* § 101(23). This definition can be broken down into seven elements: (i) a proceeding; (ii) that is either judicial or administrative; (iii) that is collective in nature; (iv) that is in a foreign country; (v) that is authorized or conducted under a law related to insolvency or the adjustment of debts; (vi) in which the debtor's assets and affairs are subject to the control or supervision of a foreign court; and (vii) which proceeding is for the purpose of reorganization or liquidation.

The Bankruptcy Court in this case thoroughly evaluated these elements and found they were met. RCS does not challenge that ABC has met the Section 1515 administrative requirements, nor that the liquidation is an administrative proceeding in a foreign country for the purpose of liquidation, authorized under a law which relates to insolvency, and is subject to the supervision or control of Australian courts. The only other U.S. court that has con-

sidered Australian liquidation found it was a foreign main proceeding. *In re Betcorp Ltd.,* 400 B.R. 266, 285 (Bankr.D.Nev.2009).

The Bankruptcy Court recognized the liquidation proceeding as the foreign main proceeding. RCS acknowledges that the liquidation is a collective proceeding, because the liquidator must consider the rights of all the creditors in distributing assets, and must distribute assets according to priorities on a pro rata basis. In this case, the practical effect of the receivership leaves little for the liquidator to administer, aside from investigating the charges claimed by the secured creditors.

RCS contends that only the receivership benefits from Chapter 15 recognition, so that only the receivership was effectively granted Chapter 15 recognition. The receivership is not a collective proceeding, because the receiver only represents the interests of the secured creditors. At oral argument, RCS conceded that an Australian liquidation proceeding operating parallel to a receivership could be granted Chapter 15 recognition "in a case where the secured creditors only have a portion of the assets." Oral Argument at 29:24, Mar. 5, 2013. Nevertheless, RCS asserts the receivership dominates the liquidation proceeding in this case because ABC's assets are entirely leveraged, leaving nothing for the liquidator to distribute to the unsecured creditors. But that does not affect the collective nature of the Australian liquidation proceeding. Instead, it turns on the particular facts of ABC's debts.

Chapter 15 makes no exceptions when a debtor's assets are fully leveraged. Subject to the public policy exception, Chapter 15 recognition must be ordered when a court finds the requisite criteria are met,[FN7] replacing the Section 304 list of guiding principles.[FN8] We do not find any exception **\*309** to recognition based on the debtor's debt to value ratio at the time of insolvency. Moreover, we find such an exception could contravene the stated purposes of Chapter 15 and the mandatory language of Chapter 15 recognition.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN7. Subject to section 1506, after notice and a hearing, an order recognizing a foreign proceeding shall be entered if—

(1) such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502;

(2) the foreign representative applying for recognition is a person or body; and

(3) the petition meets the requirements of section 1515.

11 U.S.C. § 1517(a).

FN8. In determining whether to grant relief under subsection (b) of this section, the court shall be guided by what will best assure an economical and expeditious administration of such estate, consistent with—

(1) just treatment of all holders of claims against or interests in such estate;

(2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

(3) prevention of preferential or fraudulent dispositions of property of such estate;

(4) distribution of proceeds of such estate substantially in accordance with the order prescribed by this title;

(5) comity; and

(6) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

11 U.S.C. § 304 (2000) *repealed by* Pub.L. 109–8. Title VIII, § 802(d)(3)

(2005).

### C.

[3] "Nothing in [Chapter 15] prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506. RCS contends we should not recognize the liquidation proceeding or uphold the stay, because the receivership would gain all the benefits of the ordered relief, and because it is a non-collective proceeding which contravenes our public policy in favor of collective insolvency proceedings.

The public policy exception has been narrowly construed, because the "word 'manifestly' in international usage restricts the public policy exception to the most fundamental policies of the United States." H.R.Rep. No. 109–31(1), at 109 (2005) *reprinted in* U.S.C.C.A.N. 88, 172; *see also In re Ephedra Prods. Liab. Litig.,* 349 B.R. 333, 336 (S.D.N.Y.2006) (explaining why the exception is a narrow one). "The purpose of the expression 'manifestly', ... is to emphasize that public policy exceptions should be interpreted restrictively and that [the exception] is only intended to be invoked under exceptional circumstances concerning matters of fundamental importance for the enacting State." U.N. Comm'n on Int'l Trade Law, *Guide to Enactment of the UNCITRAL Model Law on Cross–Border Insolvency,* ¶ 89, U.N. Doc A/CN.9/442 (1997).

The public policy exception applies "where the procedural fairness of the foreign proceeding is in doubt or cannot be cured by the adoption of additional protections" or where recognition "would impinge severely a U.S. constitutional or statutory right." *In re Qimonda AG Bankr. Litig.,* 433 B.R. 547, 570 (E.D.Va.2010). An Israeli insolvency proceeding was found to be manifestly contrary to public policy in *In re Gold & Honey, Ltd.*, because the receivership initiated in Israel after Chapter 11 proceeding began in the U.S. seized the debtor's assets, violating the bankruptcy court's stay order. 410 B.R. 357, 371–72 (Bankr.E.D.N.Y.2009). This

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

728 F.3d 301, 70 Collier Bankr.Cas.2d 455, 58 Bankr.Ct.Dec. 91, Bankr. L. Rep. P 82,528
**(Cite as: 728 F.3d 301)**

conduct hindered two fundamental policy object-ives of the automatic stay: "preventing one creditor from obtaining an advantage over other creditors, and providing for the efficient and orderly distribu-tion of a debtor's assets to all creditors in accord-ance with their relative priorities." *Id.* at 372 (discussing "serious ramifications" if future credit-ors followed suit and seized assets under a United States court's jurisdiction in violation of its orders). In *In re Ephedra Prods.* a Canadian insolvency pro-ceeding was challenged under the public policy ex-ception because it did not afford a right to a jury tri-al. 349 B.R. at 335. Despite our constitutional right to a jury, Canada's lack of a right to a jury trial did not contravene a fundamental policy because the Canada proceedings afforded substantive and pro-cedural due process protections, and "nothing more is required by § 1506 or any other law." *Id.* at 337.

**\*310** The collective proceeding requirement re-flects U.S. policy " 'to provide an orderly liquida-tion procedure under which all creditors are treated equally.' " *In re Schimmelpenninck,* 183 F.3d 347, 351 (5th Cir.1999) (quoting H.R.Rep. No. 95–595, 1st Sess., at 340 (1977)) ("Ultimately, the interests of all creditors, foreign and domestic, are to be put on a level playing field, with like-situated claimants being treated equally."). It is undisputed that the Australian liquidation proceeding is a collective proceeding. The liquidator must distribute assets on a pro-rata basis to creditors of the same priority. Secured creditors are entitled to recover the full value of their debts by realizing the value of the as-sets securing those debts and submitting an ac-counting to the liquidator.

Rather than contravene public policy, recogni-tion advances the policies that animate the collect-ive proceeding requirement. RCS seeks to attach assets before the secured creditors can realize them. Without Chapter 15 recognition, RCS could skip ahead of the priorities of the secured creditors. At oral argument, RCS contended this was fair to the other unsecured creditors, because they too could bring suits in the United States to attach ABC's as-

sets. Oral Argument at 29:54, Mar. 5, 2013. RCS's approach would eviscerate the orderly liquidation proceeding, and ignores all priority of debts. Effi-cient, orderly and fair distribution are not only the policies behind the collective proceeding require-ment, but are some of the "chief purpose[s] of the bankruptcy laws." H.R. Rep. 95–595 1st Sess., at 345 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6006 n.380; *Katchen v. Landy,* 382 U.S. 323, 328, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966). Without bankruptcy proceedings, creditors would race to the courthouse to collect from a troubled entity, deplet-ing assets and enabling some creditors to collect fully on the debts and others not at all, and with no regard for priority. Accordingly, it would contra-vene our policy "to provide an orderly liquidation procedure under which all creditors are treated equally" if RCS could evade collecting its debt through the Australian liquidation proceeding.

Moreover, we are unconvinced the Australian insolvency proceeding conflicts with our own rules. The United States Bankruptcy Code prioritizes se-cured creditors, as does Australia's Corporations Act. 4 *Collier on Bankruptcy* ¶ 506.02 (16th ed.2013). Several courts have refused to turn over assets under Section 304 to foreign insolvency pro-ceedings that did not prioritize secured creditors. *In re Treco,* 240 F.3d 148, 159–60 (2d Cir.2001) (refusing to turn over assets to a Bahamian liquida-tion proceeding because it prioritized administrat-ive expenses over secured creditors, and summariz-ing other cases denying turnover because the for-eign proceeding failed to sufficiently protect prior-itized secured interests). The sole difference here is that Australian law allows secured creditors to real-ize the full value of their debts, and tender the ex-cess to the company, whereas secured creditors in the United States must generally turn over assets and seek distribution from the bankruptcy estate.

The Dutch bankruptcy system also exempts se-cured creditors from surrendering their interests to the liquidation process. *In re Schimmelpenninck,* 183 F.3d at 352. The Court of Appeals for the Fifth

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

728 F.3d 301, 70 Collier Bankr.Cas.2d 455, 58 Bankr.Ct.Dec. 91, Bankr. L. Rep. P 82,528
**(Cite as: 728 F.3d 301)**

Circuit reviewed the Dutch proceedings under the precursor to Chapter 15, Section 304. *Id.* at 351. To enjoin actions against a foreign debtor's property, Section 304 required the estate to be distributed in manner substantially similar to Chapter 11 preferences. *Id.* at 365. The Fifth Circuit found the Dutch proceeding distributed assets in a manner "substantially in accordance with Title 11 " even though it allowed a secured **\*311** creditor who "holds either a mortgage or a pledge encumbering that asset [to] exercise his rights irrespective of the authority of the Curator." *Id.* ("Dutch bankruptcy law clearly is not repugnant to Title 11...."). The court further found if the unsecured creditor was permitted to bring suit he would "unjustly gain a first-come/first-served preference, [and] the remaining creditors ... would suffer a concomitant disadvantage" which "would oppugn the very equitable foundation on which bankruptcy is built." *Id.* at 351–52.

Australia's Corporations Act prioritizes secured creditors with a mechanism similar to the Dutch bankruptcy regime, both allowing independent enforcement of secured interests outside the insolvency proceeding. Despite the different method chosen to create the priority, the Fifth Circuit found the Dutch proceeding was not "repugnant to [U.S.] laws and policies." *Id.* at 365 (finding "sufficient congruity between Dutch and American bankruptcy laws to eschew such repugnance"). The Australian legislators selected a different method to prioritize secured creditors. Rather than manifestly contravene our policy, Australian law established a different way to achieve similar goals. Recognition of the Australian liquidation proceeding does not manifestly contravene public policy. On the contrary, allowing RCS to use U.S. courts to circumvent the Australian liquidation proceedings would undermine the core bankruptcy policies of ordered proceedings and equal treatment.

**D.**

[4] Upon recognition of the foreign main proceeding, the automatic stay under Section 362 ap-

plies to multinational bankruptcies "with respect to the debtor and the property of the debtor that is within the territorial jurisdiction of the United States." 11 U.S.C. § 1520(a). Section 362 provides for an automatic stay of actions "against the debtor or against property of the estate." 11 U.S.C. § 362(a).<sup>FN9</sup> RCS seeks to enforce its state court verdict against ABC property located in the United States. RCS contends the secured creditors, not ABC, effectively own the property because the property is entirely leveraged, and the receiver has the right to use and dispose of those assets at its discretion. But the secured creditors' equitable interest in the property does not resolve the question of ABC's equitable interests.

> FN9. Although the stay is generally automatic, a court may modify, terminate or condition the stay on request of a party. 11 U.S.C. § 362(d). In this case, the Bankruptcy Court modified the stay to allow RCS to bring its verdict to judgment.

RCS contends ABC's assets in the United States are not "property of the debtor" because ABC only holds bare legal title to those assets. This argument is based on the premise that ABC does not hold any equitable interest in its encumbered property because it is entirely leveraged.

We find ABC does retain equitable interest in its encumbered property. First, the receiver must repay any amount of the realized assets in excess of the value of the charges to ABC. Corporations Act § 554H. Second, ABC retains the right to redeem the encumbered property. *Id.* § 554F. Third, the liquidator may challenge the charges the receiver claims on company assets, and if the charges were found invalid, ABC would retain the encumbered property. *Receivership, supra* at 4. Since ABC retains equitable interests in its property, it is "property of the debtor" and is subject to the automatic stay under Section 1520(a).

**1.**

[5] "The Bankruptcy Code does not define

728 F.3d 301, 70 Collier Bankr.Cas.2d 455, 58 Bankr.Ct.Dec. 91, Bankr. L. Rep. P 82,528
**(Cite as: 728 F.3d 301)**

'property of the debtor.' " **\*312***Begier v. I.R.S., 496 U.S. 53, 58, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990).* Outside of the Chapter 15 context, the Supreme Court has looked to Section 541 defining "property of the estate" to interpret "property of the debtor." *Id.* ("[T]he term 'property of the debtor' ... is best understood as that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings."). But under Chapter 15 a court does not create a separate bankruptcy estate. *In re Condor Ins. Ltd.,* 601 F.3d 319, 327 (5th Cir.2010). Chapter 15 provides for an ancillary proceeding so the foreign representative does not need to file a new bankruptcy action in the United States. *Id.* at 320–21 (citing Clark, *supra,* at 35). Accordingly, courts interpreting Chapter 15 have not found Section 541 relevant to defining "property of the debtor." *In re Qimonda AG,* 482 B.R. 879, 887 (Bankr.E.D.Va.2012) ("Upon recognition of a foreign main proceeding, an estate is not created, as Section 541 of the Bankruptcy Code is not among the enumerated Sections of the Bankruptcy Code that become operative upon recognition under Section 1520."); *In re Lee,* 472 B.R. 156, 178 (Bankr.D.Mass.2012) ("[N]either section 541(a) nor 541(c)(1) are applicable to a determination of property of the Hong Kong bankruptcy estates, and the determination of property of the estates must be made under Hong Kong law."); *In re Atlas Shipping A/S,* 404 B.R. 726, 739 (Bankr.S.D.N.Y.2009) ("The statute refers to 'property of the debtor' to distinguish it from the 'property of the estate' that is created under § 541(a)."). On these facts, we need not decide whether Section 541 defines "property of the debtor." Here, ABC's property rights under Australia's Corporations Act would inform an application of Section 541(d). Under Australian law ABC holds several equitable interests in the property. Accordingly, even if we applied Section 541 to define "property of the debtor," Section 541(d) would not exclude ABC's property in the United States from a bankruptcy estate.

**2.**

RCS contends ABC's assets in the United States are not property of the debtor because Section 541 defining "property of the estate" excludes assets in which the debtor holds empty title alone and no equity. RCS asserts ABC holds bare legal title alone because the full value of the assets are leveraged, and the receiver may use or dispose of the assets at will for the benefit of the secured creditors.FN10

> FN10. The Bankruptcy Court's Stay Order appears to apply to the receiver as well. In order to realize ABC assets in the United States, the receiver must go through the liquidator as the foreign representative.

[6] Section 541 defines "property of the estate" as "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541. Section 541(d) excludes property in which the debtor only holds legal title from the debtor's estate. 11 U.S.C. § 541(d). Section 541(d) provides:

Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

**\*313** 11 U.S.C. § 541(d). This provision stands for the unremarkable proposition that property rights the debtor does not have do not become part of the bankruptcy estate. *See Matter of Cont'l Airlines, Inc.,* 134 B.R. 536, 541 (Bankr.D.Del.1991); 124 Cong.Rec. H11096 (daily ed. Sept. 28, 1978) (statement of Congressman Edwards) ("To the extent that such an interest is limited in the hands of the debtor, it is equally limited in the hands of the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

728 F.3d 301, 70 Collier Bankr.Cas.2d 455, 58 Bankr.Ct.Dec. 91, Bankr. L. Rep. P 82,528

**(Cite as: 728 F.3d 301)**

estate...."). It pertains to property such as secondary mortgages and assets the debtor holds in trust for a non-debtor. 5 *Collier on Bankruptcy* ¶ 541.29; *City of Farrell v. Sharon Steel Corp.,* 41 F.3d 92, 96 (3d Cir.1994) (finding the debtor held employee income tax withholdings in a trust, and it was not property of the estate); *Cont'l Airlines, Inc.,* 134 B.R. at 541–42 (" Section 541(d) was enacted to protect the secondary mortgage market but has been read expansively to include express and constructive trusts as well." (citation omitted)). Section 541(d) "reiterates the general principle that where the debtor holds bare legal title without any equitable interest, ... the estate acquires bare legal title without any equitable interest in the property." 124 Cong. Rec. 33999 (1978) (remarks of Sen. DeConcini).

RCS further contends that under Australia's Corporation's Act ABC does not hold any equitable interest in its fully-leveraged property. The only authority RCS cites for this proposition is a treatise on Australian insolvency law, stating "[t]he major practical effect of [debt] crystallization is that the debenture holder is given equitable interest in the property secured, which revokes the company's power to deal with such assets in the ordinary course of business." Michael Murray, *Australian Insolvency Management Pract.* ¶ 65–500(CCH). A floating charge crystallizes and becomes a fixed charge upon default or appointment of a receiver. FN11 In this case there is no question the receiver has the power to operate and manage ABC, and to use and dispose of its encumbered assets. The question is whether the receiver's control over the assets divests ABC of all equitable interests in them.

> FN11. A floating charge is a debt secured by interchangeable property, such as stocks that may be purchased or sold frequently. A fixed charge encumbers a specific item of property. In this case the secured creditors already held fixed charges in addition to the floating charges that crystallized when ABC went into Voluntary Adminis-

tration.

Although the full value of ABC's assets are leveraged, ABC nevertheless holds several important equitable interests in its property. First, it has the right to surplus proceeds from the sale of the encumbered assets. In *United States v. Whiting Pools* the Supreme Court held assets the IRS seized to enforce its lien were part of the debtor's estate. 462 U.S. 198, 210, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983). The IRS was authorized to seize and sell property belonging to the debtor to satisfy the lien imposed on that property, and took physical possession of the assets before the debtor filed for bankruptcy. *Id.* at 211, 103 S.Ct. 2309. The Court held the property was property of the estate, in part, because the IRS was obligated to return to the debtor any proceeds from the sale that exceeded the value of the lien. *Id.* In *Whiting* it was unlikely there would be any surplus because the debt owed to the IRS was $92,000, but the liquidation value of the property seized was only $35,000. *Id.* at 200, 103 S.Ct. 2309. Even though the IRS held an equitable interest in and a right to possess the property, "[o]wnership of the property is transferred only when the property is sold to a bona fide purchaser at a tax sale." *Id.* at 211, 103 S.Ct. 2309.

**\*314** The same obligation to pay any surplus from the sale of assets exists under Australia's Corporations Act. The receiver must pay to the company any proceeds from the sale of assets that exceed the value of the charge. *Receivership, supra,* at 2; Corporations Act § 441EA. Although both parties agree there will be no surplus from the sale of the assets, that same circumstance did not change the Supreme Court's analysis in *Whiting Pools*. Since the IRS's lien and control over the debtor's assets were insufficient to deprive the debtor of all equitable interests in *Whiting Pools*, the same would appear to be true of the charges and control over ABC's assets before they are sold. Since the receiver did not sell ABC's assets in the United States, under U.S. bankruptcy law, the assets would be property of the estate and subject to the automat-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

728 F.3d 301, 70 Collier Bankr.Cas.2d 455, 58 Bankr.Ct.Dec. 91, Bankr. L. Rep. P 82,528

**(Cite as: 728 F.3d 301)**

ic stay under Section 362.[FN12]

> FN12. We note that this comparison is somewhat strained because secured creditors must surrender the assets securing their debts under U.S. bankruptcy law, but not under Australia's Corporations Act. This illustrates one of the challenges of using Section 541 to define "property of the debtor" in the Chapter 15 context.

Second, ABC retains the right of redemption under Australia's Corporations Act. Corporations Act § 554F(2) ("The liquidator may, at any time, redeem the security interest on payment to the creditor of the amount of the creditor's estimate of its value."). U.S. bankruptcy courts consistently recognize the right of redemption as an equitable interest in property, which must be turned over to the debtor's estate. *In re Moffett,* 356 F.3d 518, 521–22 (4th Cir.2004); *Charles R. Hall Motors, Inc. v. Lewis,* 137 F.3d 1280, 1284–85 (11th Cir.1998); 5 *Collier on Bankruptcy* ¶ 541.05. We also find ABC's right of redemption is an equitable interest. Accordingly, Section 541(d) does not exclude ABC's property in the United States from "property of the debtor" because ABC holds more than bare legal title to the property. Since ABC's assets in the United States are "property of the debtor" they are subject to the automatic stay under 11 U.S.C. § 1520.

### III.

RCS could not enforce its judgment against ABC under either the U.S. or Australian insolvency regimes. RCS is an unsecured creditor. Under Australia's Corporation's Act, an unsecured creditor must recover its judgment against ABC through the liquidation proceeding. Under the U.S. Bankruptcy Code an unsecured creditor must seek to recover a judgment through the bankruptcy estate. Allowing an unsecured creditor to recover a judgment under these circumstances would require a hodgepodge of United States and Australian bankruptcy law. This is one of the outcomes Chapter 15 was designed to prevent by recognizing foreign main proceedings in United States courts.

For the foregoing reasons we will affirm the District Court's order affirming the Bankruptcy Court's order recognizing the Australian liquidation proceeding as a foreign main proceeding, and accompanying orders.

C.A.3 (Del.),2013.
In re ABC Learning Centres Ltd.
728 F.3d 301, 70 Collier Bankr.Cas.2d 455, 58 Bankr.Ct.Dec. 91, Bankr. L. Rep. P 82,528

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Tab 12

KeyCite Yellow Flag - Negative Treatment
Distinguished by Webb Mason, Inc. v. Video Plus Print Solutions, Inc., D.Md., December 7, 2018

591 B.R. 163
United States Bankruptcy Court, S.D. New York.

IN RE: AGROKOR D.D., et. al., Foreign Debtors.

Case No. 18-12104
|
Signed October 24, 2018

**Synopsis**
**Background:** Foreign representative of debtor companies that were the subject of restructuring procedure pending in Croatia sought recognition of Croatian proceeding as foreign main proceeding, as well as related relief.

**[Holding:]** The Bankruptcy Court, Martin Glenn, J., held that bankruptcy court, in the exercise of comity, would recognize and enforce restructuring plan reached in Croatian proceeding with respect to foreign debtors within the territorial jurisdiction of the United States, if the approval of the Croatian court became final.

Ordered accordingly.

West Headnotes (11)

**[1]**    **Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

Because the equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding, American courts regularly defer to foreign bankruptcy proceedings.

**[2]**    **Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

Deference to foreign bankruptcy proceedings is appropriate so long as the foreign proceedings are procedurally fair and do not contravene the laws or public policy of the United States.

**[3]**    **Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

Bankruptcy court, in the exercise of comity, would recognize and enforce restructuring plan reached in Croatian proceeding with respect to foreign debtors within the territorial jurisdiction of the United States, if the approval of the Croatian court became final; the Croatian proceeding was procedurally fair, provided proper notice to all creditors and, through settlement agreement, which was approved by over two-thirds of non-insider creditors, determined the rights of all creditors to property that was subject to the jurisdiction of the Croatian court. 11 U.S.C.A. §§ 1507, 1520, 1521.

**[4]**    **Courts** 🔑 Comity between courts of different countries

Federal courts generally extend comity when the foreign court had proper jurisdiction and enforcement does not prejudice the rights of United States citizens or violate domestic public policy.

[5] **Courts** 👈 Comity between courts of different countries

Comity to determination of foreign court takes into account the interests of the United States, the interests of the foreign state or states involved, and the mutual interests of the family of nations in just and efficiently functioning rules of international law.

[6] **Bankruptcy** 👈 Cases Ancillary to Foreign Proceedings

Grant of relief post-recognition of foreign insolvency proceeding is largely discretionary and turns on subjective factors that embody principles of comity.

1 Cases that cite this headnote

[7] **Bankruptcy** 👈 Cases Ancillary to Foreign Proceedings

Once a case is recognized as a foreign main proceeding, the court will exercise its discretion consistent with principles of comity.

4 Cases that cite this headnote

[8] **Bankruptcy** 👈 Cases Ancillary to Foreign Proceedings

Bankruptcy court should be guided by principles of comity and cooperation with foreign courts in deciding whether to grant the foreign representative additional post-recognition relief.

2 Cases that cite this headnote

[9] **Bankruptcy** 👈 Cases Ancillary to Foreign Proceedings

Automatic effect of recognition of a foreign main proceeding is an imposition of an automatic stay on any action regarding the debtor's property located in the United States. 11 U.S.C.A. § 1520(a).

2 Cases that cite this headnote

[10] **Bankruptcy** 👈 Cases Ancillary to Foreign Proceedings

Relief granted to foreign representative under provision of Chapter 15 authorizing court to provide any "additional assistance" available under the Bankruptcy Code or under "other laws of the United States" must be consistent with principles of comity, and must satisfy fairness considerations as set forth in this provision. 11 U.S.C.A. § 1507.

1 Cases that cite this headnote

[11] **Bankruptcy** 👈 Cases Ancillary to Foreign Proceedings

In determining whether to grant comity to a foreign court's action, nonexclusive factors the court considers in analyzing procedural fairness of the foreign proceeding include: (1) whether creditors of the same class are treated equally in the distribution of assets; (2) whether the liquidators are considered fiduciaries and are held accountable to the court; (3) whether creditors have the rights to submit claims which, if denied, can be submitted to a bankruptcy court

2862

for adjudication; (4) whether the liquidators are required to give notice to potential claimants; (5) whether there are provisions for creditors meetings; (6) whether a foreign country's insolvency laws favor its own citizens; (7) whether all assets are marshalled before one body for centralized distribution; and (8) whether there are provisions for an automatic stay and for the lifting of such stays to facilitate the centralization of claims.

**Attorneys and Law Firms**

 **\*165**  KIRKLAND & ELLIS LLP, Counsel to the Foreign Representative, 601 Lexington Avenue, New York, New York 10022, By: James H.M. Sprayregen, Esq., Daniel Rudewicz, Esq.

KIRKLAND & ELLIS LLP, Counsel to the Foreign Representative, 300 North LaSalle, Chicago, Illinois 60654, By: Adam C. Paul, Esq., Brad Weiland, Esq., Whitney Fogelberg, Esq.

## MEMORANDUM OPINION GRANTING RECOGNITION AND ENFORCEMENT OF FOREIGN DEBTORS' SETTLEMENT AGREEMENT WITHIN THE TERRITORIAL JURISDICTION OF THE UNITED STATES

MARTIN GLENN, UNITED STATES BANKRUPTCY JUDGE

Agrokor d.d. ("Agrokor") and eight debtor affiliates filed these Chapter 15 cases. [1] They are a small part of a larger group of 77 companies headquartered in the Republic of Croatia that are the subject of an extraordinary administration proceeding in a Croatian court under a new Croatian law applicable to systemically important business entities or groups. The foreign representative appointed by the Croatian court (the "Foreign Representative" or "Extraordinary Administrator") asks this Court to recognize the Croatian proceeding as a foreign main proceeding, to recognize him as the foreign representative and to recognize and enforce the restructuring plan reached in the Croatian proceeding (the "Settlement Agreement") within the territorial jurisdiction of the United States.

[1]      The Chapter 15 cases were filed by Agrokor d.d.; Agrokor Trgovina d.o.o.; Belje d.d.; Ledo d.d.; Jamnica d.d.; Konzum d.d.; PIK-Vinkovci d.d.; Vupik d.d.; and Zvijezda d.d. (hereinafter, the "Foreign Debtors").

The proceeding in Croatia (the "Croatian Proceeding") was filed under Croatia's "Act on the Extraordinary Administration Proceedings in Companies of Systemic Importance of the Republic of Croatia" (the "EA Law"). The statute's purpose is the "protection of sustainability of operations of the companies of systemic importance for the Republic of Croatia which with its operations individually or together with its controlled or affiliated companies affect the entire economic, social, and financial stability of the Republic of Croatia." The  **\*166**  law was adopted on April 7, 2017, shortly before Agrokor and its debtor affiliates commenced the proceeding in the Croatian court. The new law will be available to all companies that are determined to be systemically important to the Republic of Croatia; it is not a specialized law only applicable to Agrokor. That said, Agrokor and its debtor affiliates' (the "Agrokor Group") financial distress and the resulting threat of systemic impact upon the Croatian economy was, no doubt, the impetus for the creation of the new law.

One of the more controversial aspects of the EA Law is that its provisions for reorganization and adjustment of debts apply to enterprise groups of companies that have a principal place of business in Croatia and exist under Croatian law, though they may operate both in and outside of Croatia. In this case, while 77 companies of the group are based in Croatia, they are part of a larger group of approximately 155 companies that operate outside of Croatia as well. How to deal with the cross-border insolvency of enterprise groups raises some of the most important issues in evolving cross-border insolvency law and practice. [2]

2863

[2]    UNCITRAL Working Group V continues its work developing principles for dealing with such issues. *See* UNCITRAL: WORKING
GROUP V, http://www.uncitral.org/uncitral/en/commission/working_groups/5Insolvency.html (last visited Oct. 22, 2018).

The Agrokor Group was, and remains, the largest private company by revenue in Croatia. It was insolvent and qualified by amount of debt and number of employees for eligibility to file under the EA Law. Once a company qualifies for an extraordinary administration proceeding, the Croatian statute includes provisions for the negotiation, acceptance by creditors and approval by the Croatian court of a settlement agreement—essentially a plan of reorganization that adjusts the debt and ownership interests of distressed companies. In accordance with the law's provisions, the Settlement Agreement was successfully negotiated, approved by the requisite vote of creditors and then approved by the Commercial Court of Zagreb in Croatia. Final approval of the Settlement Agreement is pending in the High Commercial Court, where 92 appeals were lodged against the ruling confirming the Settlement Agreement. According to counsel to the Foreign Representative's *Brief in Further Support*, the decisions of the High Commercial Court are not expected before the end of November 2018. ("Brief in Further Support," ECF Doc. # 24 ¶ 45.) The Foreign Representative asks that, in addition to recognizing him as the "foreign representative" within the meaning of the Bankruptcy Code and recognizing the Croatian Proceeding as a foreign main proceeding within the meaning of the Bankruptcy Code, this Court should also recognize and enforce the Settlement Agreement within the territorial jurisdiction of the United States.

The requests to recognize the Foreign Representative as the "foreign representative," and the Croatian Proceeding as a foreign main proceeding, present relatively straightforward questions of the application of Chapter 15; both requests were approved by this Court in an Order entered on September 21, 2018. (ECF Doc. # 30.) That Order reserved decision on the request to recognize and enforce the Settlement Agreement, as it raised more challenging issues.

Recognition and enforcement of the Settlement Agreement within the territorial jurisdiction of the United States require this Court to determine whether it may and should enforce provisions of the Settlement Agreement that modify English law governed debt. While the Croatian  **\*167**  Proceeding of Agrokor has been recognized as a foreign main proceeding in the High Court of England and Wales, that court has not so far been asked to recognize and enforce the Settlement Agreement. English case law may not permit a court outside of England and Wales (such as the Croatian court that approved the Settlement Agreement) to approve a discharge or modification of English law governed debt so that recognition and enforcement of the Settlement Agreement by that court might not be granted. For the reasons explained below, however, the Court resolves this challenging issue, recognizing and enforcing the Settlement Agreement, including the provisions modifying the English law governed debt, within the territorial jurisdiction of the United States. [3]

[3]    Because final approval of the Settlement Agreement awaits the outcome of the pending appeals in Croatia, this Court will not enter an
order recognizing and enforcing the Settlement Agreement unless and until the Settlement Agreement becomes effective in Croatia. If
material changes are made in the Settlement Agreement before it becomes effective in Croatia, the Foreign Representative will need
to seek further approval from the Court before an order recognizing and enforcing the Settlement Agreement, as amended, is entered.

This case presents challenging issues with very practical consequences. The Foreign Debtors (with their COMI in Croatia) presently have over €1,660 million of debt governed by English law (English Law Governed Loans, defined below) and over €925 million of debt governed by New York law (New York Law Governed Notes, defined below); thus, the majority (about 64%) of the debt to be restructured under the Settlement Agreement is governed by English law. Can it really be that a court in Croatia that properly has jurisdiction over the Foreign Debtors' insolvency proceeding cannot oversee and approve the Foreign Debtors' reorganization, and the resolution of all claims against the Foreign Debtors, under a national insolvency law and court procedures that satisfy widely recognized standards of fairness and due process? More directly to the point, should a U.S. Bankruptcy Court decline to extend comity to the decision of the court in Croatia to recognize and enforce within the territorial jurisdiction of the United States the Settlement Agreement that was approved by the required vote of creditors and by the court in Croatia in a proceeding that satisfied due process standards? Of course, such a decision by this Court recognizing and enforcing the Settlement Agreement would not mean that the Settlement Agreement would be recognized and enforced in other countries. So, the Foreign Debtors might well be wise either to seek recognition and enforcement of the Settlement Agreement in the

courts of England and Wales, or to commence an insolvency proceeding or scheme of arrangement in England, if either of those things can be done, even if it requires costly and duplicative proceedings in England.

The difficulties here arise because the courts in England and Wales still apply the so-called "*Gibbs* " rule, based on an 1890 decision of the Court of Appeal in *Antony Gibbs & Sons v. La Societe Industrielle et Commerciale des Metaux* (1890) 25 QBD 399 (hereinafter, "*Gibbs* "). While *Gibbs* is discussed further below, the essence of the decision is that where a debtor, in that case domiciled in France, made a contract governed by English law and to be performed in England, was declared a bankrupt and its debts discharged under foreign law in a foreign proceeding (there, French law in a French proceeding), the plaintiff was not bound by the discharge and could maintain an action on  **\*168**  the contract and recover damages in an English court. *Id.* at 406. So, then, can Agrokor's creditors holding English law governed debt (or, at least, those creditors who did not approve of the Settlement Agreement or did not submit to the jurisdiction of the court in Croatia) bring an action in the courts of England to recover damages on the old English law governed debt? And, even if the creditors can do so in the courts in England, should that prevent this Court from recognizing and enforcing the Settlement Agreement and barring any efforts by creditors to enforce the original debt obligations within the territorial jurisdiction of the United States? While not determinative of the outcome, it should not be lost on anyone that this Court, based on comity principles, has recognized and enforced an English court decision modifying New York law debt in an English scheme of arrangement proceeding. *See In re Avanti Commc'n Grp. PLC,* 582 B.R. 603 (Bankr. S.D.N.Y. 2018).

Whether the *Gibbs* rule as written still applies more than 120 years after the decision was rendered remains an important issue in cross-border insolvency cases, particularly because of the substantial changes that have taken place across the globe in insolvency laws and recognition and enforcement of decisions of other courts. Courts in England and Wales, and elsewhere, still grapple with the *Gibbs* rule and the issue is currently on appeal in the Court of Appeal of England and Wales. Whatever the outcome of that decision, the matter remains to be decided by this Court whether to recognize and enforce the Settlement Agreement approved by the court in Croatia within the territorial jurisdiction of the United States. [4]

[4]    During the recognition hearing on August 27, 2018 the Court raised questions and suggested that it seemed more appropriate to defer decision whether the Croatian court could approve modification of English law debt to the court in England that has already recognized the Croatian Proceeding as a foreign main proceeding. As explained in this Opinion, the Court has concluded that it is appropriate for this Court to decide whether, in the exercise of comity, the Croatian court-approved Settlement Agreement—including provisions modifying English law debt—should be recognized and enforced *within the territorial jurisdiction of the United States*. Of course, if presented with the issue whether the Settlement Agreement should be recognized and enforced in England and Wales (and perhaps in other Commonwealth jurisdictions), the English court is obviously free to decide the issue as it believes appropriate. The Court has concluded that a U.S. court should not leave to another court (here the High Court in London) the decision whether U.S. comity principles entitle the Croatian court decision to recognition and enforcement. The Foreign Representative's counsel argued that a recognized exception to the *Gibbs* rule (*e.g.*, that creditors holding English law debt filed claims or submitted to the jurisdiction of the Croatian court and are therefore bound by the Settlement Agreement) allows this Court to decide that the *Gibbs* rule does not apply. The Court believes that is an issue for the English court to decide if the issue is raised in a proceeding in England.

In deciding whether to recognize and enforce the Settlement Agreement, the Court will also discuss the outcomes in recognition proceedings the Foreign Debtors filed in other jurisdictions. Those proceedings resulted in a patchwork of decisions, recognizing the Croatian Proceeding in cross-border cases in England and Switzerland and denying recognition in cross-border cases in Bosnia-Herzegovina, Montenegro, Serbia and Slovenia. As already stated, this Court has already entered an order recognizing the Croatian Proceeding as a foreign main proceeding. The Court will discuss the rationale of the courts that have either recognized or refused to recognize the Croatian Proceeding. But recognition of the Croatian Proceeding as a  **\*169**  foreign main proceeding in this Court is determined by the relevant provisions of the Bankruptcy Code and not by the decisions of the other courts.

Additionally, the Settlement Agreement releases and discharges written guarantees by non-debtor affiliates of both the English law and New York law debt. In appropriate circumstances in Chapter 15 cases, this Court has recognized and enforced such

releases. The Court concludes here that those provisions in the Settlement Agreement should be recognized and enforced in these Chapter 15 cases with respect to the nine Foreign Debtors that filed these Chapter 15 cases.

Based upon the analysis that follows, the Court believes that recognition and enforcement of the Settlement Agreement within the United States with respect to the nine Foreign Debtors is an appropriate exercise of comity and application of U.S. law.

## I. BACKGROUND

### A. The Agrokor Group

Agrokor is the parent company of more than 155 direct and indirect subsidiaries, including not fully owned subsidiaries. ("Settlement Agreement," ECF Doc. # 4 Exhibit C § 3.1.2.) It is a joint stock company under the laws of the Republic of Croatia and has registered share capital amounting to HRK 180.1 million. (*Id.* § 3.1.1.) The shares are divided into 360,246 regular registered shares (which are designated AGKR-R-A), each of which hold a nominal value of HRK 500.00 per share. (*Id.*)

According to the *Verified Petition for (I) Recognition of Foreign Main Proceedings, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* ("Verified Petition," ECF Doc. # 4), Agrokor and its subsidiaries that have at least 25% of their shares held by Agrokor are subject to the Croatian Proceeding and are referred to as the EA Group, as set forth in article 5, paragraph 2 of the EA Law, described below. There are currently 77 Agrokor Group entities that are parties in the Croatian Proceeding, although as already indicated, only nine of those companies filed the Chapter 15 petitions in these cases. (Verified Petition at 1.) Approximately 80 direct and indirect affiliates of Agrokor that are part of the Agrokor Group are not based in Croatia and are not parties to the extraordinary administration proceeding in Croatia. Those companies predominately operate in Slovenia, Serbia and Bosnia-Herzegovina. [5]

[5]    Annex 2 to the Settlement Agreement lists the non-Croatian subsidiaries and affiliates of the Agrokor Group. 23 are located in Serbia, 18 are located in Bosnia and Herzegovina, 15 are located in Slovenia, 6 are in the U.S., 4 are in Montenegro, 3 are in Hungary, and 2 are located in both Macedonia and the Netherlands. There are approximately 11 remaining locations that each contain one or fewer Agrokor Group subsidiaries. Only Croatian subsidiaries and affiliates are subject to the Croatian Proceeding.

### B. Business of the Agrokor Group

The Agrokor Group has been in operation since 1989 and, today, is one of the largest companies in Croatia. ("Declaration of Foreign Representative," ECF Doc. # 5 ¶ 4.) The Agrokor Group's primary businesses include Croatia's largest supermarket chain (Konzum d.d.), producer of mineral and spring water (Jamnica d.d.), and producer and distributor of ice cream and frozen foods (Ledo d.d.). In addition, the Agrokor Group contains businesses related to food, agriculture and other sectors. (Declaration of Foreign Representative ¶ 4.)

 **\*170**  In April 2017, at the start of the Croatian Proceeding, Agrokor employed more than 60,000 people across Croatia, Slovenia, Serbia and Bosnia-Herzegovina. Its annual revenue was approximately €6.5 billion, which represents approximately 15 percent of the gross domestic product of Croatia. Suppliers and other businesses that are dependent on the Agrokor Group's operations represent a significant further proportion of Croatia's gross domestic product. (Declaration of Foreign Representative ¶ 5.)

Agrokor is structured as a holding company and has historically overseen M & A transactions on behalf of the Agrokor Group. It also sought to provide group-wide: (1) financial reporting, (2) management of capital markets financing and (3) facilitation of operational synergies following M & A transactions. Agrokor's main assets from a macroeconomic perspective are shareholdings in and loans to its operating subsidiaries. Additionally, these subsidiaries pay management fees to cover the costs of central management. (Settlement Agreement § 3.4.) In more concrete terms, Agrokor owns the following key assets, allowing it to perform the above operations, collectively forming the Agrokor Group: (1) shares in its subsidiaries and minority

shareholdings in certain other entities; (2) loans, deposits and other receivables due to the debtor; and (3) certain directly owned real estate (including buildings, tools, plants and machinery). (*Id.*)

### C. Capital Structure

In late 2016, Agrokor undertook a substantial refinancing of its existing unsecured debt. (Declaration of Foreign Representative ¶ 6.) Lenders were granted springing maturity clauses in new and amended facilities. (*Id.*) The terms of these new and amended facilities were structured such that each facility would mature early if Agrokor failed to refinance a PIK loan issued by its non-debtor parent company, Adria Group Holding BV (the "PIK Loan") by March 8, 2018. (*Id.*) The PIK Loan was, in turn, secured by a pledge granted by Adria Group Holding BV of all shares it held in Agrokor. (*Id.*) As part of this refinancing, Agrokor also sought a syndicated facility (the "F2 Club Loan") to refinance its existing bonds. (*Id.* ¶ 7.) The F2 Club Loan was entered and the syndication process began in September 2016. (*Id.*) However, the syndication process failed approximately half a year later, in January 2017. (*Id.*) Agrokor began to experience liquidity strains because of, among other things, concerns arising from the failure of the F2 Club Loan syndication, the impact of the PIK Loan springing maturity clauses and the information provided in Agrokor's accounting records. (*Id.* ¶ 8.)

In response to these liquidity concerns, Agrokor sought new financing and ultimately entered the €100 million loan with Sberbank ("Sberbank Loan") in early 2017. (*Id.* ¶ 9.) The Sberbank Loan proved insufficient to avoid an insolvency proceeding. (*Id.*) As a result, on April 7, 2017, Agrokor filed for the commencement of the Croatian Proceeding under the EA Law. The Croatian Proceeding was commenced by order of the Commercial Court of Zagreb (the "Croatian Court") on April 10, 2017, supplemented on April 21, 2017, July 5, 2017 and July 13, 2017 (the "Commencement Order"). (*Id.*)

The valuation of the assets of the Agrokor Group took a substantial blow after the commencement of the Croatian Proceeding. Agrokor announced on April 27, 2017 that there were potential irregularities in its 2016 financial statements which would result in a delay of the publication of its financials. Following this announcement, in May of 2017, PricewaterhouseCoopers **\*171** ("PWC") was appointed as auditor of the Agrokor Group's Croatia-based companies. In accordance with audit requirements, PwC undertook an audit of twenty-seven of the Agrokor Group's companies in the Republic of Croatia, three companies in Serbia and three companies in Bosnia-Herzegovina. (Settlement Agreement § 3.7.) The consolidated changes in equity in the period from December 31, 2015 to December 31, 2016 resulted in a total equity reduction of approximately €2.9 billion. Overall, this meant that liabilities exceeded total assets by HRK 14.5 billion (€1.9 billion) for that period. (*Id.*) On December 31, 2017, liabilities exceeded total assets by HRK 23.3 billion, a reduction of approximately HRK 9 billion from the preceding year.

The financial results for 2017, published by the Extraordinary Administrator on May 14, 2018, showed that liabilities exceeded assets for that period as well. This financial statement described a consolidation of 105 companies over which the Foreign Debtors exercised control, 52 of which are in the Republic of Croatia (the consolidated group as described in the 2017 Annual Report, "Consolidated Group"). (*Id.*)

### *1. U.S. Debt*

As of the opening of the EA Proceeding, the Settlement Agreement described the total amount of third-party financial liabilities of Agrokor and some of its subsidiaries at HRK 31.5 billion. One large chunk of this debt is comprised of unsecured notes governed by New York law. According to the Settlement Agreement, the Agrokor Group issued the following unsecured notes (the "New York Law Governed Notes" or "Notes"):

(1) EUR 325 million 9.125% New York law governed senior notes due to mature in 2020 and USD 300 million 8.875% New York law governed senior notes due to mature in 2020 issued by the Debtor pursuant to an indenture dated as of 10 October 2012; and

(2) EUR 300 million 9.875% New York law governed senior notes due to mature in 2019 issued by the Debtor pursuant to an indenture dated as of 25 April 2012.

(Settlement Agreement § 3.5.1.1; *see also* Brief in Further Support, ECF Doc. # 24 ¶ 12.)

### 2. English Debt

The Agrokor Group has substantial additional liabilities governed by English law. The Settlement Agreement lists the following unsecured bank debt obligations (the "English Law Governed Loans"):

(1) EUR 600 million English law governed loan facility agreement dated 14th March 2014, as amended from time to time, between, among others, Agrokor and Sberbank of Russia and Sberbank Europe AG;

(2) EUR 50 million English law governed loan facility agreement dated 16th July 2015, as amended from time to time, between, among others, Agrokor and Sberbank Europe AG;

(3) EUR 350 million English law governed loan facility agreement dated 28th April 2016, as amended from time to time, between, among others, Agrokor and Sberbank of Russia;

(4) EUR 100 million English law governed term loan facility agreement dated 21st February 2017, as amended from time to time, between, among others, Agrokor and Sberbank of Russia (the "EUR 100m Sberbank Loan");

(5) EUR 100 million English law governed loan facility agreement dated 14th September 2016, as amended from time to time, between, among others, Agrokor and a group of lenders;

(6) EUR 100 million English law governed syndicated loan facility agreement  **\*172**  dated 14th September 2016, as amended from time to time, between, among others, Agrokor and a group of lenders (the F2 Club Loan); and

(7) EUR 360 million English law governed loan facility agreement dated 21st June 2014, and as amended by way of an amendment agreement dated 28th October 2016, between, among others, Agrokor and VTB Bank (Austria) AG.

(Settlement Agreement § 3.5.1.2*; see also* Brief in Further Support ¶ 12.)

### 3. Third Party Releases

There are two forms of third-party releases contemplated by the Settlement Agreement. The Verified Petition of the Foreign Debtors argues that this Court should enforce the Settlement Agreement and the third-party releases contemplated therein. The Verified Petition provides, in relevant part: "The Settlement Agreement contains the Trustee Release and the Bosnian-Herzegovinian Guarantor Release. The Trustee Release Parties and the Bosnian-Herzegovinian Guarantors are not debtors in the Croatian Proceeding. As explained below, this Court may nevertheless adhere to principles of comity and enforce the Trustee Release and the Bosnian-Herzegovinian Guarantor Release." (Verified Petition ¶ 70.)

The English Law Governed Loans and New York Law Governed Notes both benefit from guarantees granted by the following entities: Agrokor Trgovina d.o.o.; Ledo d.d.; Jamnica d.d.; Konzum d.d.; PIK-Vinkovci d.d.; Zvijezda d.d.; Belje d.d.; Vupik d.d.; Ledo d.o.o. Čitluk; Sarajevski kiseljak d.d.; and Konzum d.o.o. Sarajevo. (Verified Petition ¶ 20.) Of the guarantors, the following are Foreign Debtors: Agrokor Trgovina d.o.o.; Ledo d.d.; Jamnica d.d.; Konzum d.d.; PIK- Vinkovci d.d.; Zvijezda d.d.; Belje d.d.; and Vupik d.d. The remaining entities—namely Ledo d.o.o. Čitluk; Sarajevski kiseljak d.d.; and Konzum d.o.o. Sarajevo—are the "Bosnian-Herzegovinian Guarantors," as described in the Verified Petition. [6]  (Verified Petition ¶ 63.)

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   2868   8

These three entities are not Foreign Debtors in these Chapter 15 cases and nothing in this Opinion determines the rights of these entities or of their creditors. The Bosnian-Herzegovinian Guarantors are affiliates of Agrokor. (Annex 2 to the Settlement Agreement) (not available on ECF.) The Bosnian-Herzegovinian Guarantor Release is provided for in section 29.8 of the Settlement Agreement, which is titled "Releases." (Settlement Agreement § 29.8.)

[6]    Paragraph 63 of the Verified Petition provides, "As part of this reorganization, the Settlement Agreement contemplates (i) a release of any and all claim claims, obligations, suits judgments, damages, rights, causes of action and liabilities arising from, in connection with, or relating to the Unsecured Notes or related indentures against The Bank of New York Mellon and BNY Mellon Corporate Trustee Services Limited in their respective capacities as trustee of the Unsecured Notes under the relevant indenture and its current and former affiliates and subsidiaries, and such entities' and their current and former officers, directors, managers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, principals, members, employees, agents, attorneys, consultants, advisors, representatives and other professionals (such parties, the 'Trustee Released Parties' and such release, the 'Trustee Release'), *see* Settlement Agreement, 18.3.2, and (ii) a release of certain bond guarantees governed by New York law, including guarantees by three non-debtor entities from Bosnia-Herzegovina granted by Ledo d.o.o. Čitluk, Sarajevski kiseljak d.d., and Konzum d.o.o. Sarajevo (such guarantors, the 'Bosnian-Herzegovinian Guarantors' and such release, the 'Bosnian-Herzegovinian Guarantor Release'), *see* Settlement Agreement, 29.8." (Verified Petition ¶ 63.)

The final sentence of section 29.8.1 of the Settlement Agreement, which deals **\*173**  with releases, contains a carve out. It clarifies that directors, officers and members of management or supervisory boards of any member of the Agrokor Group are not released from liability arising from their conduct. The section states:

> [N]othing in this Cl. 29.8.1 shall operate or be construed to release any person who was a director and/or officer (or member of the management board or supervisory board) of any member of the Agrokor Group prior to the commencement of the EA Proceedings from any liability arising from his or her conduct in such capacity prior to that time.

(Settlement Agreement § 29.8.1.) Two of the Bosnian-Herzegovinian Guarantors—Ledo d.o.o. Čitluk and Sarajevski kiseljak d.d.—are affiliates of the Foreign Debtors and listed as voting "FOR" the Settlement Agreement. ("Croatian Court Order Approving the Settlement Agreement," ECF Doc. # 4 Exhibit B at 302–07.) Both are listed as creditors in voting class B. (*Id.*)

The Court believes it must consider whether these "insider" votes (and any other "insider" votes) taint approval of the Settlement Agreement insofar as recognition and enforcement is concerned. As this Court explained in *In re Avanti Commc'ns. Grp. PLC,* 582 B.R. at 617–18, the Fifth Circuit in *In re Vitro S.A.B. de C.V.,* 701 F.3d 1031, 1043 (5th Cir. 2012), affirmed a bankruptcy court's decision in a Chapter 15 case declining to grant comity and to enforce a Mexican court order approving a Mexican reorganization plan that released guarantees of US-based non-debtor affiliates of the Mexican debtor's debt. The *Vitro* plan created only a single class of unsecured creditors and the necessary creditor votes to approve the plan were only achieved by counting the votes of insiders. *In re Vitro S.A.B. de C.V.,* 701 F.3d at 1039. Insider votes are not counted under the Bankruptcy Code. *See* 11 U.S.C. § 1129(a)(10) ("If a class is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, *determined without including any acceptance of the plan by any insider*.") (emphasis added). Absent the subsidiaries' votes of intercompany debt in favor of the plan, the *Vitro* plan could not have been approved. *Vitro,* 701 F.3d at 1039. Because the Settlement Agreement here was approved by the required majority vote of creditors, even excluding the "insider" affiliate votes, the Court concludes that *Vitro* does not stand in the way of recognition and enforcement of the Settlement Agreement. Of the total number of creditors entitled to vote, 78.52% of non-insiders by claim amount voted in favor of the plan—this is comfortably above the requisite two-thirds of all voting creditors by claim amount necessary to confirm the plan without including the votes of affiliates.

Section 18.3.2 of the Settlement Agreement discusses the trustee release of BNY Mellon. The agreement provides:

2869

To the maximum extent permitted under New York law, having regard for (i) the critical, ministerial services heretofore performed and to be performed by BNY Mellon in its respective capacity as trustee of the Notes under the relevant Indenture and pursuant to this Settlement Plan, (ii) the risk that BNY Mellon could incur further fees and expenses under the broad expense reimbursement and indemnification provisions of the Notes and the Indentures to the detriment of the [Agrokor], the Bond Guarantors, their Creditors and their estates, and (iii) the reasonable, commercial expectations of the Noteholders, the [Agrokor] and the Bond Guarantors that the terms of the Notes and the Indentures will be upheld and enforced as written under New York law, each of the [Agrokor], **\*174** the Bond Guarantors and the Noteholders, as of the Settlement Confirmation Date, shall be deemed to have unconditionally released BNY Mellon in its respective capacity as trustee of the Notes under the relevant Indenture, and its current and former affiliates and subsidiaries, and such entities' and their current and former officers, directors, managers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, principals, members, employees, agents, attorneys, consultants, advisors, representatives and other professionals (the "Trustee Released Parties") from any and all claims, obligations, suits judgments, damages, rights, causes of action and liabilities arising from, in connection with, or relating to the Notes or the Indentures, which any such party may be entitled to assert, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise ....

(Settlement Agreement § 18.3.2.)

The section goes on to clarify that BNY Mellon will not be released from any claims for gross negligence or willful misconduct in BNY Mellon's actions as trustee of the Notes. Additionally, BNY Mellon is not deemed released from its obligations in its capacity as trustee of the Notes to take actions necessary under the Settlement Agreement. BNY Mellon and BNY Mellon Corporate Trustee Services Limited are shown as comprising their own class—class C—out of a list of 664 creditors grouped into classes A through E, as listed in the Croatian Court Order Approving the Settlement Agreement. (ECF Doc. # 4 Exhibit D at 287.)

### D. Settlement Agreement

Under the Settlement Agreement, [7] the following waterfall is provided for the priority of claims:

(1) Estate Claims. Unpaid prepetition employee claims; certain court costs, fees, and expenses incurred in connection with the Croatian Proceeding; and post-petition claims have priority over all other claims of the EA Group.

(2) SPFA Claims. Amounts outstanding under the Super-Priority Term Facilities Agreement.

(3) Unsecured Claims. All unsecured claims including deficiency claims, intercompany claims and unsecured guarantees of other entities' claims.

(4) Equity Value. Equity value consists of the remaining Distributable Value after all debt claims are satisfied in full.

(Settlement Agreement § 7.5.)

[7]    Capitalized terms not defined within this section shall have the meaning attributed to them in the Settlement Agreement.

Impaired claims with a Settlement Recovery amount of less than HRK 40,000 (equivalent to approximately $6,151.48 as of August 10, 2018) (the "Minor Impaired Claims") will receive a payment of a monetary amount in euros, corresponding to

the Settlement Recovery of such claim (the "Cash-Out Payment"). (Settlement Agreement § 16.1.2.) The difference between the registered amount of the Minor Impaired Claim and the Settlement Recovery amount paid as a Cash-Out Payment will be discharged. (*Id.*)

Impaired Claims with a Settlement Recovery amount of HRK 40,000 and above will receive a combination of depository receipts of Aisle STAK, which holds all the shares of Aisle Dutch TopCo (the "Depository Receipts") and convertible bonds of Aisle Dutch TopCo in an aggregate nominal amount of up to €1,149 million (the **\*175** "Convertible Bonds"). (Settlement Agreement § 5.4.) The percentage recovery to the holders of English Law Governed Loans and New York Law Governed Notes is projected to be 50.8 percent.

Each of the Foreign Debtors has secured debt obligations, including loans and operating leases to specific Agrokor Group entities that are secured by share pledges and fixed security over the Agrokor Group's real estate assets. Like section 506(a)(1) of the Bankruptcy Code, a portion of each secured claim against the Foreign Debtors in the Croatian Proceeding will be treated as an unsecured prepetition claim against the debtor entity (and an unsecured prepetition liability) to the extent that the amount of the secured claim exceeds the value of the related secured collateral. (*See* Settlement Agreement § 5.1.)

For secured claims with a separate satisfaction right ("SSR") against any of the Foreign Debtors where the debtor is either (a) the owner of the collateral of the relevant SSR (a "Sole Security Debtor") or (b) if more than one EA Group member granted an SSR, the owner of the collateral that comprises over 50 percent of the total value of SSR securing the relevant claim (a "Main Security Debtor") will assume the secured obligation. More specifically, the holder of such secured claim will retain its SSR and receive a monetary claim in an amount equal to the appraised value of the collateral. (*See* Settlement Agreement § 23.2.1.) This secured claim will be paid back over an eight-year term following a grace period, which is the greater of the original maturity date or two years after the Implementation Commencement Date, at an interest rate of three percent that accrues during the grace period and increases by two percent if in default. (Settlement Agreement § 23.2.1.)

For secured claims with an SSR against any of the Foreign Debtors where the debtor is not a Sole Security Debtor or the Main Security Debtor, the holder of such secured claim will retain its SSR and receive a monetary claim against Aisle HoldCo, in an amount equal to the appraised value of the collateral, and such claim will be paid back over an eight-year term following a grace period, which is the greater of the original maturity date or two years after and the Implementation Commencement Date, at an interest rate of three percent that accrues during the grace period and increases by two percent if in default. The amount of any secured claim of any of the Foreign Debtors that exceeds the appraised value of all objects of the SSR is treated as an unsecured claim. (Settlement Agreement § 23.2.2.)

### E. Recognition of the Croatian Proceeding in Other Jurisdictions

Though the EA Law aims to centralize a debtor's claims in a single court, several jurisdictions have refused to recognize the Croatian Proceeding under their own laws. According to the *Memo on Foreign Recognition Hearings* ("Memo on Foreign Hearings," ECF Doc. # 21) at least some of the Agrokor Group sought recognition of the Croatian Proceeding in six jurisdictions in addition to the United States. Of these foreign recognition requests, only Switzerland has made a final decision to recognize the commencement of the Croatian Proceeding and to give effect to the Extraordinary Administrator to represent debtors and to deal with their assets in Switzerland under the Swiss International Private Law Act. (*Id.* at 4.) The High Court of England and Wales also agreed to recognize the Croatian Proceeding of Agrokor, but an appeal of that decision is pending. Appeals of decisions *rejecting* recognition of the Croatian Proceeding are pending in **\*176** Slovenia, Serbia, Bosnia-Herzegovina and Montenegro. (*Id.* at 13–122.) A summary of the foreign recognition proceedings relating to the Croatian Proceeding follows.[8] These decisions have no direct impact upon the decision to recognize and enforce the Croatian Proceeding and Settlement Agreement in the U.S.

[8] References to ECF Doc. # 21 in the following sections refer to copies or English translations of the foreign recognition opinions, which are appended to the Memo on Foreign Hearings. These opinions are cited according to page number (and paragraph where possible) for clarity.

#### 1. Slovenia

The Supreme Court of the Republic of Slovenia ("Slovenian Court") decided the issue on March 14, 2018. (ECF Doc. # 21 at 13.) The Slovenian Court explained:

> Since the recognition of a foreign court decision means recognition of its legal effects on the territory of the Republic of Slovenia, only a decision (procedure) which corresponds to the fundamental legal principles of procedures due to insolvency under ZFPPIPP may be recognized. A recognition of a foreign extraordinary administration procedure, that does not ensure an equal treatment of creditors, would adversely affect the public interest of the Republic of Slovenia, which in domestic insolvency procedures determines (and safeguards) the common (basic) principle of equal treatment of creditors, whereas in insolvency procedures with an international element (on its territory) recognizes only financial restructuring procedures or liquidation procedures of the debtor for the joint account of all creditors (which corresponds to the principle of equal treatment of creditors).

(*Id.* at 27.)

The Slovenian Court proceeded to explain that the EA Law (and therefore the Croatian Proceeding) should not be recognized, primarily because it does not comply with Slovenia's insolvency rule that creditors of equal standing should be provided equal treatment. The Slovenian Court states, "it does not even provide the basic rights the creditors would have under the Slovenian insolvency legislation." (*Id.* at 28.) Additionally, the Slovenian Court argues that the extraordinary administration procedure envisioned by the EA Law is subordinated to the interests of Croatia, since the Croatian government selects the extraordinary administrator to conduct the debtor's business. (*Id.*) While not entirely clear, it appears that the Slovenian Court was concerned that the EA Law serves the purpose of protecting the Croatian economy by providing a new form of relief on a somewhat *ad hoc* basis as needed for Agrokor and its subsidiaries.

The Slovenian Court also notes that other countries rejected the recognition of the Croatian extraordinary administration procedure and argued that since several of these countries had laws arising out of the former Yugoslavian Compulsory Composition, Bankruptcy and Liquidation Act (SPPSL), that in a broader public policy context of the region, recognition would not be "justified and proportional." (*Id.* at 28.) Four days after the Supreme Court of the Republic of Slovenia rejected the application for recognition of the Croatian Proceeding, the Extraordinary Administrator appealed that decision to the Constitutional Court of Slovenia; that appeal remains pending.

#### 2. Serbia

The Commercial Appellate Court for the Republic of Serbia confirmed rejection of the Croatian Proceeding on November 13, 2017. (*Id.* at 32.) The Serbian court found that under article 174, paragraph 2 of its **\*177** Law on Bankruptcy, the Croatian extraordinary administration procedure could not be found to be a "foreign proceeding." (*Id.* at 45.) The court provides several grounds for this conclusion. One issue the Serbian court notes is that the EA Law is not a general law that governs all insolvency in Croatia, but rather is a *sui generis* regulation adopted to protect companies of systemic importance to the Republic of Croatia. The court found it problematic that the level of protection determined under the EA Law is determined by the interest of the

Republic of Croatia as opposed to the interests of creditors. (*Id.*) The court states, "the aim of this regulation ... is not the aim of the collective settlement of creditors, but the protection of the interests of the state, the creator of such a regulation." (*Id.* at 46.) On December 20, 2017, the Croatian Extraordinary Administrator filed an appeal to the Constitutional Court of Serbia; that appeal remains pending.

### 3. Federation of Bosnia and Herzegovina

Article 205, Paragraph 1, item 3 of the Federation of Bosnia and Herzegovina ("FB & H") Bankruptcy Law states that to recognize a foreign decision on bankruptcy proceedings or proceedings similar to bankruptcy, such decision must not contravene the legal order of the Federation. (*Id.* at 52.) The court explains that the basic purpose of bankruptcy proceedings should be the collective settlement of creditors and that it does not believe that the EA Law was passed with creditors in mind. The court stated:

> The protection of economic, social and financial stability of the Republic of Croatia cannot jeopardize the FB & H legal order, and this opinion of the first instance court, contrary to the appeal, is not different from the international case law, according to which protection and maintenance of economic, social and financial stability of one country in the proceedings of recognition of a foreign ruling, in a situation where the compulsory regulations are opposed - which is the case here- cannot jeopardize the legal order of another country where the decision is to be recognized, as otherwise the principle of equality would be breached.

(*Id.* at 53.) The Extraordinary Administrator filed an appeal at the Constitutional Court on March 16, 2018; that appeal remains pending.

### 4. Montenegro

The Montenegro court held that extraordinary administration procedures under the EA Law did not meet the requirements of the Insolvency Act of Montenegro. The court explained:

> [T]he court finds that the extraordinary administration proceeding is not a foreign proceeding in terms of Article 178 paragraph 2 of the Insolvency Act, since it is not a proceeding aimed at the collective settlement of creditors, but at protecting and maintaining economic, social and financial stability of the Republic of Croatia, that is, the sustainability of business operations of certain companies that are of systemic importance for the Republic of Croatia.

(*Id.* at 109.) In other words, because the EA Law seemed primarily concerned with the protection of the interest of the Republic of Croatia rather than the creditors of a certain debtor, the proceeding did not comply with the requirements for recognition in Montenegro. An appeal filed in the Commercial Court of Montenegro is pending.

### 5. England and Wales

The High Court of England and Wales found that the EA Law and Croatian Proceeding **\*178** sufficiently satisfied the requirements of a foreign main proceeding under the CBIR, England's adaptation of the Model Law, over the objections of respondent Sberbank. As with the above discussed foreign recognition decisions, it should be noted at the outset that the English decision was rendered before the Settlement Agreement was finalized or voted upon. The English decision was issued on September 11, 2017. Nearly a year later, creditors voted to approve the Settlement Agreement on July 4, 2018. The English decision specifically states that, "recognition of the settlement agreement is not the real question here. That is something for the future. Such recognition will depend at that stage on other considerations, for example the submission by the creditors to the jurisdiction of the foreign proceeding." (*Id.* at 97 ¶ 127.) Therefore, the decision only grants recognition of a foreign main proceeding; it does not make any decisions with respect to the later approved Settlement Agreement.

A transcript of the English hearing shows that several contentions were raised against recognition of the Croatian Proceeding under the Model Law and the CBIR. First, Sberbank's counsel argued that recognition of a "foreign proceeding" under the CBIR is limited to a single debtor and that recognition of the Croatian Proceeding would require recognizing a debtor grouped together with related, but separate entities, in one proceeding. [9] Counsel argued this was problematic because it would allow (1) all the members of the group to participate in a restructuring without requiring each individual member to prove insolvency as a gateway issue and (2) in effect, by consolidating a group of entities, the combined procedure could block a creditor from asserting a distinct claim against a particular debtor. Counsel argued that the combined proceeding effectively created a set of third-party releases for affiliated or sub-companies—counsel for Sberbank gives the example that if someone has advanced finance on terms where they also have guarantees from companies B, C, D, E and F as well as principal debt from company A, consolidation into a single pool with one claim would eradicate the value of any guarantee. ("English Recognition Hearing Transcript," ECF Doc. # 24 Exhibit B at 42.) It argued it was further problematic as applied to Agrokor, because unless Agrokor and its affiliates are grouped as one debtor, the threshold number of employees required under the EA Law is not met. (English Recognition Hearing Transcript at 40.) However, when referencing these arguments, Sberbank's attorney also goes through pains to remind the English court that U.S. courts have adopted the Model Law differently and that the English court is only bound by the CBIR and not U.S. precedent. (*Id.* at 47.) Recognition in England also apparently was sought for a single debtor, Agrokor, on behalf of the whole group. As already stated, Chapter 15 cases were filed in this Court on behalf of nine separate entities.

[9]    Though Sberbank opposed recognition of the Croatian Proceeding before the English court, it took an active role in negotiating the Settlement Agreement as one of the members of the five-entity interim creditors council. (Settlement Agreement § 4.1.3.1) (the members of the creditors council are Sberbank of Russia, Knighthead Capital Management LLC, Zagrebacka Banka d.d., KRAS prehrambena industrija d.d., and Toni Raic). Additionally, Sberbank *voted in favor* of the Settlement Agreement. (Croatian Court Order Approving the Settlement Agreement at 301-07.)

The High Court of England and Wales ultimately rejected Sberbank's arguments. The High Court concluded:

> The important point is simply this. There is nothing in the CBIR to prevent **\*179** a foreign proceeding being recognized, which in the foreign court involves a group of companies, but the recognition is sought in this country in relation only to a particular individual debtor. In my judgment, the respondent's objection here is without foundation.

(ECF Doc. # 21 at 78 ¶ 54.)

Additionally, the English court concluded that (1) the Croatian Extraordinary Administration Law is a law relating to insolvency for the purposes of CBIR, (2) it is a proceeding under the control or supervision of a court, (3) it is a collective proceeding, (4) it is a law for the purposes of reorganization or liquidation within the meaning of the CBIR and (5) it is not manifestly contrary to English public policy. (*Id.* at 78–98.) In reaching this final public policy conclusion, the court noted that the principal of *pari passu* can be overridden in appropriate cases under English law. (*Id.* at 98 ¶ 131.) The High Court of England and Wales' decision

is further discussed below in relation to the *Gibbs* rule and the possible effects of that rule on future proceedings in England. The appeal is to be heard by the Court of Appeal, and the stay will remain in effect while the English proceedings are ongoing.

### 6. Switzerland

The Court of the Canton of Zug in Switzerland granted recognition of the Croatian Proceeding in a decision issued on February 2, 2018. (ECF Doc. # 21 at 113.) There has been no appeal of this decision; it is final and binding.

### 7. European Union

On July 4, 2018, the European Parliament added the Recast Insolvency Regulation (EU) 2015/848 to the European Union's Acquis Communautaire the Law on Extraordinary Administration Proceeding for Companies of Systemic Importance for the Republic of Croatia. (Recast Insolvency Regulation, "EU Regulation," ECF Doc. # 21 Appendix D at 161–225.) The EU insolvency regulation was designed to regulate insolvencies. This adoption of the EA Law ostensibly gave the Croatian Proceeding automatic recognition as an insolvency proceeding, entitled to recognition across all European Union member states. (*Id.* at 217.)

## II. DISCUSSION

### A. EA Law

On April 7, 2017, Croatia published Official Gazette No. 31/17, the *Law on Extraordinary Administration Proceeding in Companies of Systemic Importance in the Republic of Croatia*. ("Certified Translation from Croatian Language of the Law on Extraordinary Administration Proceeding in Companies of Systemic Importance for the Republic of Croatia," ECF Doc. # 4 Exhibit B at 46–59.) Part 1, article 1, chapter 1 of the EA Law explains:

> This Law is passed for the purpose of protection of sustainability of operations of the companies of systemic importance for the Republic of Croatia which with its operations individually or together with its controlled or affiliated companies affect the entire economic, social, and financial stability of the Republic of Croatia.

(*Id.* at 46.) The Croatian law was passed to try to prevent a wider economic fallout in Croatia and surrounding global markets through restructuring companies of systemic importance to Croatia. In effect, the new law is somewhat reminiscent of the efforts globally to deal with problems of "too big to fail." The Croatian Law appears to be unique in dealing with systemically important *companies* as opposed to systemically important *financial institutions*.

Article 21 of the EA Law provides that either a debtor of systemic importance or **\*180** such a debtor's creditors, with the debtor's permission, may file an extraordinary proceeding. (*Id.* at 50.) The petition to commence the proceeding is submitted to the Croatian Court, which must then inform the Croatian Government within the same day that a petition has been filed. (*Id.* at 51.) After a petition has been filed, the debtor is estopped from disposing of any assets until the petition is either approved or denied, except for those dispositions necessary for debtor to maintain its ordinary course of business operations. (*Id.*) The Croatian Court issues the final order that commences the extraordinary proceeding, and upon the court's order commencing a proceeding, notice is posted in the relevant Croatian Court districts, on the public books or records of the debtor and on the Croatian Court's web pages. (*Id.* at 52.) After the commencement of a proceeding under the EA Law, all relevant parties, further

detailed below, have fifteen months (twelve months' time is allotted automatically, and the option of an additional three months' time is granted upon request approved by the Croatian Court) to craft a single settlement agreement to resolve all claims against the debtor. (*Id.* at 57.)

The EA Law lists two requirements for a debtor to be considered a company of systemic importance that may file an action under the EA Law. (*Id.* at 46.) Article 4, paragraph 2 provides that in the calendar year preceding the filing of the petition, the debtor, alone or with its controlled or affiliated companies, must (1) employ more than 5,000 employees on average for the year and (2) have balance sheet liabilities of at least the equivalent of HRK 7,500,000,000. (*Id.*) In these calculations determining whether a debtor is of systemic importance to Croatia, article 5, paragraph 2 specifies that affiliated and controlled companies are companies in which the debtor holds at least a 25% ownership interest, have a principal place of business in The Republic of Croatia and exist and operate under Croatian law. (*Id.* at 47.) The requisite amount of debt and employees along with identification of the debtor and its related entities must be proven by the party who files the petition for the extraordinary proceeding (either the debtor or a creditor of the debtor). (*Id.* at 51.)

Article 6 of the EA Law provides that the Croatian Court shall have exclusive jurisdiction in an EA proceeding. (*Id.*) Article 7 further provides that once the EA proceeding has been instituted, there will be a stay of any liquidation or bankruptcy proceedings, as defined under Croatian law, against the debtor. (*Id.*) To the extent that the EA law is silent regarding procedure, article 8 provides that procedural rules from Croatian bankruptcy proceedings will apply. (*Id.*) Article 10 authorizes the Croatian Court to take any actions or pass any decisions that are not expressly conferred on another entity as the responsibility of that other entity under Croatian Law. (*Id.*)

An extraordinary commissioner ("Extraordinary Commissioner") is appointed by the Croatian Court upon the proposal of the Government of the Republic of Croatia who will represent the debtor solely and independently. (*Id.*) The Extraordinary Commissioner is subject to the provisions of the Croatian Bankruptcy Act's rules governing a bankruptcy receiver in instances where no provision of the EA Law governs directly. (*Id.* at 48.) Together with deputies who may assist him, upon the proposal of the Croatian government and appointment by the Croatian Court, the Extraordinary Commissioner may make decisions regarding the debtor's property but may not make decisions regarding the debtor's property without prior approval of a creditors' committee if the **\*181** value of the property exceeds HRK 3,500,000. (*Id.*) The commissioner may also bring legal actions on behalf of the debtor and, with approval of a creditors' committee, may assume new debt on behalf of the debtor when necessary to maintain debtor's operations. (*Id.* at 55.) Additionally, at any time, upon the proposal of the Croatian government, the Croatian Court may remove the Extraordinary Commissioner and appoint a new one. (*Id.* at 48.)

The EA Law requires the Extraordinary Commissioner to submit monthly reports regarding the debtor's financial status and the status of the EA proceedings to the central authority of the government administration responsible for economic operations in Croatia (the "Croatian Ministry") for every month between his appointment and the approval of a settlement agreement under the EA Law. (*Id.*) Additionally, the Extraordinary Commissioner is tasked with electing a restructuring advisor, auditors, legal advisors and other specialized advisors—all of whom must be given prior approval by the Croatian Ministry prior to appointment. (*Id.*)

Article 16 establishes an advisory body ("Advisory Body") that, upon request of the Croatian Ministry or the Croatian Court, will provide opinions regarding the propriety of the Extraordinary Commissioner's decisions under Croatian Law. (*Id.* at 49.) The Advisory Body has five members: one member serves as a representative of the employees of the debtor and may be an employee of the debtor; the other four members must be knowledgeable in business and law, of good reputation and not have been employed by the debtor or any of its affiliates within the ten years leading up to the filing of an EA proceeding. (*Id.*)

In addition to the Advisory Body, EA Law article 18 requires the establishment of a creditors' committee with up to nine members who will serve as representatives of the debtor's creditors. (*Id.*) The Extraordinary Commissioner recommends, and the Croatian Court approves the members of the creditors' committee, who must be categorized according to their legal position and may be subcategorized according to their economic interests in the debtor. (*Id.*) Article 30 provides that each category of

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

creditors is then entitled to designate one member to serve as the category's representative on the creditors' committee. (*Id.* at 53.) The creditors' committee has rights to receive information regarding the debtor and to participate in the preparation and approval of the settlement agreement in conjunction with the Extraordinary Commissioner. (*Id.* at 49–50.) Additionally, article 31 explains that an interim creditors' council ("ICC") will take the role of the permanent creditors' council in the interim until the official committee is established. The ICC assumes and performs all functions of the creditors' council until the official creditors' council is established. (*Id.* at 53–4.)

Articles 32 through 36 provide a procedure for the public listing of claims against debtor and contesting claims. (*Id.* at 54.) The Extraordinary Commissioner creates a table of filed claims, a table of preferential claims and a table of rights to separate satisfaction. (*Id.*) Along with these tables, the Extraordinary Commissioner must clearly indicate whether he contests any of the claims listed in the tables. (*Id.*) The tables of claims and the commissioner's stance on each claim are published on the Croatian Court's website. (*Id.*) If a creditor does not commence a civil proceeding within eight days after publication of the table of claims, the right to contest the claim is deemed waived. (*Id.*) Once a final order is made, a claim, the claim's payment rank and the claim's category of creditors are all considered effective as to  **\*182**  both the debtor and all the debtor's other creditors. (*Id.*)

Part VI of the EA Law includes provisions for the negotiation, acceptance by creditors and approval by the court of a settlement agreement. (*Id.* at 56–8.) The settlement agreement envisioned and negotiated under the EA Law is essentially the same as what is usually referred to as a plan of reorganization in other restructuring contexts. Within the prescribed twelve-month (and optional additional three month) period, the Extraordinary Commissioner and creditors' committee must create a single settlement agreement. (*Id.* at 57.) After a settlement agreement is created, it is published on the Croatian Court's website; three days after publication, all creditors are deemed to have notice of the agreement. (*Id.*) Within fifteen days after publication of the settlement agreement, the creditors vote upon the settlement agreement at a hearing. (*Id.*)

Article 43, paragraph 14 describes the voting outcome necessary to pass the settlement agreement. It states:

> The settlement agreement, or plan of reorganization, shall be deemed adopted if a simple majority of all creditors voted for it and if in each category of the sum of claims of creditors who voted for the settlement agreement exceeds the sum of claims of the creditors who voted against the acceptance of the settlement agreement. Exceptionally, it shall be deemed that the creditors accepted the settlement agreement if the total sum of claims of the creditors who voted for the settlement agreement amounts to at least two thirds of the total claims.

(*Id.*)

Thus, there are two methods of approving a settlement agreement. (*See id.*) The settlement agreement is approved either if (1) more than half of *all creditors by number* (including non-voting creditors) vote in favor of the Settlement Agreement *and* more than half of all creditors in each class [10] *by value of claims* vote in favor of the Settlement Agreement or (2) two-thirds of *all voting creditors by claim amount* vote in favor of the Settlement Agreement. (*Id.*) In other words, even if the first method of approving the Settlement Agreement cannot be achieved, the Settlement Agreement can still be approved if the sum of *all claims who vote in favor* of the agreement is at least two-thirds of the total amount of *all outstanding claims*. (*Id.*) Article 43, paragraph 18 provides that once the settlement agreement is passed in accordance with paragraph 14, all creditors, even those who do not vote, shall be bound by the agreement. (*Id.* at 58.) Therefore, it does not matter whether a creditor has appeared or voted on the settlement; if the settlement receives the requisite votes, it can be approved and has binding effect upon all creditors. (*See Id.*) These portions of the EA Law governing approval of the settlement agreement therefore create a similar effect to Bankruptcy Code § 1141(d)(1)(A)  **\*183**  which provides, in part, that confirmation of a plan "discharges the debtor from any debt that arose before the date of such confirmation ... whether or not ... a proof of claim based on such debt is filed or deemed filed ...." *See* 11 U.S.C. § 1141(d)(1)(A).

10    Section 15 of the Settlement Agreement explains "[c]reditors have been classified into classes on the basis of claim type, meaning a single creditor with several types of claims may be represented in multiple classes. Such classification shall be used for the purposes of voting on this Settlement Plan pursuant to Art. 43 EA Act. The classification of Creditors per the above Court resolution is as follows: small suppliers, in which class Creditors whose claims do not exceed HRK 100,00 are classified; large suppliers, in which class Creditors whose claims exceed HRK 100,00 are classified; Noteholders, in which class Creditors who are holders of notes issued by the Debtor are classified; unsecured creditors, in which class Creditors whose claims are not secured by a separate satisfaction right are classified; and secured creditors, in which class Creditors whose claims are secured by a separate satisfaction right are classified." (Settlement Agreement § 15.)

## B. Model Law

In 1997, the United Nations Commission on International Trade Law ("UNCITRAL") promulgated the Model Law on Cross-Border Insolvency (the "Model Law"). Chapter 15 of the Bankruptcy Code, which is based upon the Model Law, was adopted by Congress in 2005. Before 2005, former section 304 of the Bankruptcy Code provided the statutory framework for dealing with ancillary cases filed in the U.S. relating to foreign insolvency proceedings. Many of the principles—particularly comity—that were applied in ancillary proceedings under section 304 were carried forward and apply today in Chapter 15 cases. *See In re Atlas Shipping A/S*, 404 B.R. 726, 738 (Bankr. S.D.N.Y. 2009) ("Nevertheless, many of the principles underlying § 304 remain in effect under chapter 15. Significantly, chapter 15 specifically contemplates that the court should be guided by principles of comity and cooperation with foreign courts in deciding whether to grant the foreign representative additional post-recognition relief. This is evidenced by the pervasiveness with which comity appears in chapter 15's provisions. For example, § 1509 specifically requires that if the court grants recognition under § 1517, it 'shall grant comity or cooperation to the foreign representative.' 11 U.S.C. § 1509(b)(3). In addition, § 1507 also explicitly directs the court to consider comity in granting additional assistance to the trustee.").

The Model Law is often described as an attempt to create modified universalism, which essentially entails allowing courts outside of debtors' home countries to open and maintain secondary cases supplemental to the main proceedings. *See, e.g.*, Ian G. Williams & Adrian J. Walters, *Modified Universalism in Our Time? A Look at Two Recent Cases in the U.S. and U.K.*, 37-JUL Am. Bankr. Inst. J. 24 (2018). The U.S. has a long tradition of recognizing foreign restructuring proceedings. For example, the Supreme Court's 1883 decision in *Gebhard* approved the recognition of a Canadian scheme of arrangement. *Canada Southern Railway Co. v. Gebhard*, 109 U.S. 527, 3 S.Ct. 363, 27 L.Ed. 1020 (1883). In *Gebhard*, Chief Justice Waite explained that "the true spirit of international comity requires that schemes of this character, legalized at home, should be recognized in other countries." [11] *Id.* at 548, 3 S.Ct. 363. *See also Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713–14 (2d Cir. 1987); *Cunard S.S. Co. v. Salen Reefer Servs. AB*, 773 F.2d 452, 458 (2d Cir. 1985).

11    The Court's decision in *Gebhard* was reached over a strong dissent by Justice Harlan which relied heavily on English case law and commentaries by Joseph Story, James Kent and others that, consistent with the *Gibbs* rule, would not permit a discharge of contractual obligations other than under the law of the place of contracting. *Id.* at 546–47, 3 S.Ct. 363. Justice Harlan was particularly troubled that the discharge in *Gebhard* was based on a legislative act, with no judicial hearing subject to due process requirements, *id.* at 544, 3 S.Ct. 363, which is not an issue in this case because the loan modification here was approved by a creditor vote followed by court approval following notice and a hearing.

[1]    [2]    As the Second Circuit explained in *JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*:

We have repeatedly held that U.S. courts should ordinarily decline to adjudicate **\*184** creditor claims that are the subject of a foreign bankruptcy proceeding. "Since '[t]he equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding,' American courts regularly defer to such actions." *Finanz AG*, 192 F.3d at 246 (*quoting Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713–14 (2d Cir.1987) ); *Allstate Life Ins. Co.*, 994 F.2d at 999. In such cases, deference to the foreign court is appropriate so long as the foreign proceedings are procedurally fair and (consistent with the principles of Lord Mansfield's holding) do not contravene the laws or public policy of the United States.

2878

412 F.3d 418, 424 (2d Cir. 2005).

While *Altos Hornos* was decided based on section 304, before Chapter 15 became effective in the U.S., the same principles are enshrined in Chapter 15. *See Atlas Shipping*, 404 B.R. at 738.

### C. Comity in Chapter 15

Under the prior section 304 and the current Chapter 15, American courts have recognized the need to extend comity to foreign bankruptcy proceedings. The equitable and orderly distribution of a debtor's property requires assembling *all* claims against the limited assets in a single proceeding; if all creditors could not be bound, a plan of reorganization would fail. "The Second Circuit has frequently underscored the importance of judicial deference to foreign bankruptcy proceedings." *In re Int'l Banking Corp. B.S.C.*, 439 B.R. 614, 624 (Bankr. S.D.N.Y. 2010) (citing *Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240, 246 (2d Cir. 1999); *Maxwell,* 93 F.3d at 1048; *Allstate Life Ins. Co. v. Linter Grp. Ltd.*, 994 F.2d 996, 999 (2d Cir. 1993); *Cunard,* 773 F.2d at 458).

 **[3]**    The issue here is whether this Court, in the exercise of comity, should recognize and enforce the Settlement Agreement approved by the Croatian Court following creditor approval. There is nothing exceptional in the Croatian Court's exercise of jurisdiction over the Croatian Foreign Debtors' assets and creditors' claims in the insolvency proceeding.

In section II.A., the Court has described the provisions of the EA Law in considerable detail. In substance and effect, the EA Law tracks closely to the structure of the U.S. Bankruptcy Code and many other foreign insolvency laws. Creditors' rights to meaningful participation in insolvency proceedings is required and creditor approval of a settlement agreement is also required. As explained in section II.D., below, the record establishes that the EA Proceeding was procedurally fair.

While enterprise group aspects of the EA Law are novel, these Chapter 15 cases dealing with nine entities that have their centers of main interest ("COMI") in Croatia do not push the boundaries of cross-border insolvency law. Therefore, recognition and enforcement of the Settlement Agreement with respect to the Foreign Debtors safely fall within established principles. [12] As such, is there any basis to decline to recognize and enforce the results?

[12]    It is noteworthy that no objections were filed to recognition and enforcement of the Settlement Agreement within the territorial jurisdiction of the United States.

The Supreme Court concluded in *Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440, 447, 124 S.Ct. 1905, 158 L.Ed.2d 764 (2004), that the discharge of debt in a U.S. bankruptcy proceeding is proper because it is an *in rem* proceeding. A single court should resolve all claims to property of the debtor, which necessarily **\*185** requires that the court resolve all creditor claims that have been, or could have been, asserted, provided that the creditors have received the notice required by due process. Thus, in an *in rem* proceeding, personal jurisdiction over all creditors is not required; the court determines the creditors' rights to receive distributions from all property of the debtor that is part of the estate. A creditor cannot ignore or avoid a Chapter 11 case and later sue to recover on its prepetition claim. Upon confirmation of a Chapter 11 plan, section 1141(d)(1)(A) discharges the debtor from any debt that arose before the date of confirmation, whether or not the creditors filed a proof of claim or accepted the plan. A successful reorganization would not be possible if creditors could simply ignore the bankruptcy proceeding and then seek to recover on their prior claims. Therefore, the *in rem* classification of a bankruptcy proceeding is key—*in rem* jurisdiction gives the court the authority to administer all the debtor's assets and resolve the rights of all creditors to all the debtor's property, and these are crucial steps in a successful restructuring. There is no reason that these same principles should not apply when considering recognition of the Croatian Proceeding, with the same consequences for a confirmed settlement agreement— namely, the discharge and modification of prepetition claims like the effect of section 1141(d)(1)(A). (*See* Settlement Agreement § 16.1.2.)

2879

 **[4]**    **[5]**  Federal courts generally extend comity when the foreign court had proper jurisdiction and enforcement does not prejudice the rights of United States citizens or violate domestic public policy. *See also Cunard S.S. Co. Ltd., 773 F.2d at 457.* "Comity takes into account the interests of the United States, the interests of the foreign state or states involved, and the mutual interests of the family of nations in just and efficiently functioning rules of international law." *In re Artimm, S.r.L.*, 335 B.R. 149, 161 (Bankr. C.D. Cal. 2005) (citing *Maxwell Commc'n Corp. v. Societe Generale (In re Maxwell Commc'n Corp.)*, 93 F.3d 1036, 1048 (2d Cir. 1996) ).

From the record before this Court—particularly since no objections have been filed—the Court concludes that the Croatian Proceeding was procedurally fair, provided proper notice to all creditors and, through the Settlement Agreement, determined the rights of all creditors to property that was subject to the jurisdiction of the Croatian Court. Is there any reason, then, not to recognize and enforce the Settlement Agreement within the territorial jurisdiction of the United States? This Court believes there is not. Nonetheless, the issue (of whether recognition of the entire Settlement Agreement is appropriate within the territorial U.S.) arises because of the English courts' enforcement of the *Gibbs* rule, discussed below, which could lead an English court to conclude that certain aspects of the Settlement Agreement cannot be enforced in England against creditors holding English law governed debt. Such a refusal of the English court to enforce parts of the Settlement Agreement would most certainly cause the Settlement Agreement to fail considering the amount of prepetition debt governed by English law. [13] That would be unfortunate, indeed.

[13]    As Chief Justice Waite said in *Gebhard*, 109 U.S. at 539, 3 S.Ct. 363, "[u]nless all parties in interest, wherever they reside, can be bound by the arrangement which is sought to have legalized, the scheme may fail. All home creditors can be bound. What is needed is to bind those who are abroad. Under these circumstances the true spirit of international comity requires that schemes of this character, legalized at home, should be recognized in other countries."

 **\*186**  **[6]**    **[7]**  While recognition of the foreign proceeding turns on the objective criteria under section 1517, "relief [post-recognition] is largely discretionary and turns on subjective factors that embody principles of comity." *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 333 (S.D.N.Y. 2008) (citing §§ 1507, 1521 and 1525). Once a case is recognized as a foreign main proceeding, as has already occurred here, Chapter 15 specifically contemplates that the court will exercise its discretion consistent with principles of comity. *See generally* Allan L. Gropper, *Current Devs. in Int'l Insolvency Law: A United States Perspective*, 15 J. BANKR. L. & PRAC. 2, Art. 3, at 3–5 (2006) (hereinafter "Gropper").

 **[8]**  The court should be guided by principles of comity and cooperation with foreign courts in deciding whether to grant the foreign representative additional post-recognition relief. *See In re Cozumel Caribe S.A. de C.V.*, 482 B.R. 96, 114–15 (Bankr. S.D.N.Y. 2012) (concluding that a central tenet of Chapter 15 is the importance of comity in cross-border insolvency proceedings); *Atlas Shipping*, 404 B.R. at 738; *see also In re Rede Energia S.A.*, 515 B.R. 69, 93 (Bankr. S.D.N.Y. 2014) (holding that a request for relief by a foreign representative (1) to enforce a foreign reorganization plan and confirmation decision even where the relief provided in the plan conflicts or is inconsistent with the relief available in a Chapter 11 plan, and (2) to enjoin acts in the U.S. in contravention of the plan and decision is relief of a type that courts have previously granted under section 304).

In addition to providing deference to foreign judgements, comity may also allow a U.S. court "to decline to exercise jurisdiction in favor of a pending foreign proceeding," where "the foreign tribunal has taken jurisdiction but not yet issued a judgement." William S. Dodge, *Int'l Comity in Am. Law*, 115 COLUM. L. REV. 2071, 2106 (2015). As between deferring to a foreign judgement or to a foreign pending proceeding, "[w]hat changes is the time at which the question [whether to defer to a foreign tribunal's resolution of a dispute] is asked." *Id.* Courts have generally recognized their ability to decline to exercise jurisdiction in deference to a case already being adjudicated abroad. *See, e.g., Mujica v. AirScan Inc.*, 771 F.3d 580, 599 (9th Cir. 2014) ("[A]djudicatory comity involves ... the discretion of a national court to decline to exercise jurisdiction over a case before it when that case is pending in a foreign court with proper jurisdiction." (citation and quotation marks omitted) ); *In re Arcapita Bank B.S.C.(c)*, 575 B.R. 229, 238 (Bankr. S.D.N.Y. 2007) ("[C]omity among the courts or adjudicative comity may be viewed as a discretionary act of deference by a national court to decline to exercise jurisdiction in a case properly adjudicated in a foreign state." (citations and quotation marks omitted) ); *In re Ionica PLC*, 241 B.R. 829, 841 (Bankr. S.D.N.Y. 1999) (dismissing ancillary proceeding filed under former section 304 because of pending insolvency proceeding in the U.K.).

In other words, this case presents a unique challenge in the exercise of comity under Chapter 15, because the international litigation surrounding the Croatian Proceeding and Settlement Agreement that this Court is asked to recognize and enforce could be seen as complicating this Court's own comity analysis by requiring the Court to consider all of the other countries' decisions in addition to the analysis of whether to extend comity to the Croatian Proceeding and resulting Settlement Agreement on their own merit. However, the Court does not ultimately need to perform the broader analysis of comity with respect to every nation involved, because **\*187** the Court's decision to recognize and enforce the Settlement Agreement is effective within the territorial jurisdiction of the United States. As such, if a foreign creditor has a claim governed by English law that is modified by the Settlement Agreement and wants to challenge the Croatian modification of that claim, the creditor may still challenge enforcement of the claim in the English courts.

### D. Recognition of the Croatian Proceeding and Settlement Agreement in the United States

As previously stated, on September 21, 2018, the Court entered an order recognizing the Croatian Proceeding as a foreign main proceeding. (ECF Doc. # 30.) The analysis supporting that conclusion will not be repeated here. The effects of the decision to recognize the Croatian Proceeding as a foreign main proceeding merit some discussion.

#### 1. Automatic effects of Chapter 15 Foreign Main Proceeding Recognition

Upon a court's determination that a proceeding constitutes a foreign main proceeding as described above, section 1520 of the Bankruptcy Code provides that certain relief commences immediately, while section 1521 provides additional relief that may be granted at the court's discretion. *Compare* 11 U.S.C. § 1520(a) ("Upon recognition of a foreign proceeding that is a foreign main proceeding- (1) sections 361 and 362 apply with respect to ... property of the debtor that is within the territorial jurisdiction of the United States ..."), *with* 11 U.S.C. § 1521(a) ("Upon recognition of a foreign proceeding, whether main or nonmain, where necessary to effectuate the purposes of this chapter ... *the court may* ... grant *any appropriate relief* ...." (emphasis added) ).

 **[9]**  Section 1520 details the mandatory relief that is automatically granted upon recognition of a foreign main proceeding under Chapter 15. 11 U.S.C. § 1520. Section 1520(a)(1) provides that the automatic stay will apply to all the debtor's property *that is located within the territorial jurisdiction of the United States*. The statute refers specifically to the property of the debtor, as opposed to the property of the estate, since there is no estate in a Chapter 15 case. *See, e.g.*, *Atlas Shipping*, 404 B.R. at 739. Despite this difference, the automatic effect of recognition of a foreign main proceeding under section 1520(a) is an imposition of an automatic stay on any action regarding the debtor's property located in the United States. *Id.*

Additionally, once section 1520(a) applies, sections 363, 549 and 552 apply with respect to any transfers of a debtor's interest in property within the United States. 11 U.S.C. § 1520(a)(2). These provisions allow a foreign representative to operate the debtor's business in the United States by exercising the rights and powers of a trustee under sections 363 and 552.

#### 2. Discretionary Relief including Recognition of a Plan and Third-Party Releases

The grant of additional, discretionary relief under Chapter 15 is largely dependent upon principles of comity discussed above. *See Atlas Shipping*, 404 B.R. at 738 ("While recognition of the foreign proceeding turns on the objective criteria under § 1517, 'relief [post-recognition] is largely discretionary and turns on subjective factors that embody principles of comity' " (quoting *In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 333 (S.D.N.Y. 2008) ). Once a case is recognized as a foreign main proceeding, Chapter 15 specifically contemplates that the court will exercise **\*188** its discretion consistent with principles of comity. *See generally* Gropper, at 3–5.

Whether a foreign proceeding is held to be main or non-main, section 1521(a) outlines the discretionary relief that a court may order upon recognition of a foreign proceeding. 11 U.S.C. § 1521(a); *see Atlas Shipping*, 404 B.R. at 738 ("The discretion that is granted is 'exceedingly broad' since a court may grant 'any appropriate relief' that would further the purposes of chapter 15 and protect the debtor's assets and the interests of creditors."). That said, section 1522(a) only allows courts to provide additional discretionary relief under section 1519 or 1521 if the interests of creditors are sufficiently protected. The list of forms of discretionary relief provided under section 1521 are considered illustrative, as opposed to exclusive. 11 U.S.C. 1521 (the list of discretionary relief options begins with the word 'including,' indicating that discretionary relief includes, but is not limited to, the following listed items).

The Court's discretionary relief under section 1521 of the Code may either allow the foreign representative to merely administer the debtor's assets in the United States, but require that those assets remain here, or may allow the foreign representative to remove the debtor's assets from the United States. 11 U.S.C. §§ 1521(a)(5) and 1521(b); *see, e.g.*, *Atlas Shipping*, 404 B.R. at 740. Section 1521(a)(5) entrusts to the foreign representative the "administration or realization" of the debtor's assets within the United States. 11 U.S.C. § 1521(a)(5). This is part of the relief the Foreign Representative requested in the present case. It is not to be confused with the optional relief provided by section 1521(b), which allows the Court to "entrust the distribution" of the debtor's assets within the United States to the foreign representative. 11 U.S.C. § 1521(b). This alternative provision allows the debtor's assets to exit the United States for *distribution*. See *Atlas Shipping*, 404 B.R. at 740. The Foreign Representative here did not seek relief under section 1521(b).

Finally, section 1507 also deals with additional discretionary relief, which may include recognition and enforcement of a plan reached in a foreign proceeding. As this Court explained in *Atlas Shipping*:

> In addition to § 1521's provisions regarding 'any appropriate relief,' § 1507(b) provides that a court, [i]n determining whether to provide additional assistance ... shall consider whether such additional assistance, consistent with the principles of comity, will reasonably assure—
>
> (1) just treatment of all holders of claims against or interests in the debtor's property;
>
> (2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;
>
> (3) prevention of preferential or fraudulent dispositions of property of the debtor;
>
> (4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and
>
> (5) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

404 B.R. at 740 (internal citations omitted).

 [10]   "Pursuant to section 1507, the court is authorized to grant any 'additional assistance' available under the Bankruptcy Code or under 'other laws of the United States,' provided that such assistance is consistent with the principles of comity and satisfies the fairness considerations set forth in section 1507(b)." **\*189** *Rede Energia*, 515 B.R. at 90. As with section 1521, relief under section 1507 may include recognition and enforcement of a plan approved by a foreign court. *Id.* at 94–5.

Thus, the principal question in determining whether to recognize and enforce the Settlement Agreement's terms under Chapter 15 ultimately boils down to a question of the appropriateness of granting comity to the foreign court approval of the Settlement Agreement. In *Metcalfe & Mansfield*, 421 B.R. 685, 688 (Bankr. S.D.N.Y. 2010), this Court considered recognition of a Canadian plan of reorganization, and specifically questioned whether it would be appropriate to extend comity to the Canadian plan if it contained provisions, such as third-party releases, that may not be allowed in plenary United States bankruptcy proceedings under Chapter 11. Even though the Court noted that it was not clear that the third-party releases contained in the Canadian plan would be permitted under U.S. law, the Court found that the proper inquiry was whether the Canadian

2882

plan's provisions should nevertheless be enforced under Chapter 15. *Id.* at 696. This Court explained, "Chapter 15 specifically contemplates that the court should be guided by principles of comity and cooperation with foreign courts in deciding whether to grant the foreign representative additional post-recognition relief." *Id.* Therefore, even though Chapter 15 contains the explicit public policy exception in section 1506, which provides, "[n]othing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the policy of the U.S.," the *Metcalfe* decision explained that even if the law in the U.S. may have provided differing results, this alone did not prevent a recognition of the Canadian plan under broader principals of comity. *See* 11 U.S.C. § 1506; *see also Metcalfe & Mansfield,* 421 B.R. at 697.

What factors, then, should determine whether a U.S. Court should extend comity to a foreign main proceeding's plan of reorganization? The *Metcalfe & Mansfield* decision noted several factors, including whether the foreign proceeding provided a full and fair opportunity for creditors to be heard consistent with due process, and whether the plan was approved by the debtor's creditors and the foreign court. *See Metcalfe & Mansfield,* 421 B.R. at 698–99.

Courts should also look to circumstances in which U.S. courts have refused to recognize foreign plans of reorganization to further understand when the denial of comity is appropriate. As already discussed, the Fifth Circuit affirmed the bankruptcy court's refusal to recognize a plan of reorganization approved by a Mexican court due to considerations of comity. *See Vitro,* 701 F.3d at 1039. The plan in *Vitro,* like the plan in *Metcalfe & Mansfield,* discharged obligations of creditors as well as of third-party guarantors. The Court of Appeals decision affirming the bankruptcy court focused on the fact that the plan in *Vitro* was only approved with "insider" votes. As a result, the Court of Appeals concluded that the bankruptcy court did not abuse its discretion in refusing to grant comity and enforce the Mexican plan.

This Court's recent decision in *Avanti,* 582 B.R. at 617–18, recognized and enforced a scheme of arrangement, including a release of third-party guarantees, that was approved by creditors and by the High Court of England and Wales. After reviewing *Metcalfe & Mansfield* and *Vitro,* the Court upheld the scheme of arrangement, noting that "Avanti's Scheme Creditors had a full and fair opportunity to vote on, and be heard in connection with, the Scheme." *Avanti,* 582 B.R. at 618. The **\*190** *Avanti* decision also referred to seminal Supreme Court jurisprudence dealing with when a U.S. court should recognize and enforce a foreign judgment under principles of comity. *Id.* at 616. Quoting *Hilton v. Guyot,* the Court stated:

> The Supreme Court has held that a foreign judgment should not be challenged in the US if the foreign forum provides: "[A] full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it [is] sitting ...".

*Id.* (quoting *Hilton v. Guyot,* 159 U.S. 113, 202–03, 16 S.Ct. 139, 40 L.Ed. 95 (1895).

The *Avanti* opinion provides a helpful summary of cases in which courts have enforced third-party releases in foreign proceedings under sections 1507 and 1521. *Avanti,* 582 B.R. at 617; *see also In re Ocean Rig UDW Inc.,* 570 B.R. 687 (Bankr. S.D.N.Y. 2017) (recognizing and enforcing scheme of arrangement that released affiliate guarantees); *In re Towergate Fin. plc,* Case No. 15–10509–SMB (Bankr. S.D.N.Y. Mar. 27, 2015) [ECF Doc. # 16]; *In re New World Res. N.V.,* Case No. 14–12226–SMB (Bankr. S.D.N.Y. Sept. 9, 2014) [ECF Doc. # 20]; *In re Sino–Forest Corp.,* 501 B.R. 655, 665 (Bankr. S.D.N.Y. 2013) (enforcing foreign order containing third-party releases); *In re Magyar Telecom B.V.,* Case No. 13-13508-SHL, 2013 WL 10399944 (Bankr. S.D.N.Y. Dec. 11, 2013) [ECF Doc. # 26]; *Metcalfe & Mansfield,* 421 B.R. at 696 ("[P]rinciples of enforcement of foreign judgments and comity in chapter 15 cases strongly counsel approval of enforcement in the United States of the third-party non-debtor release and injunction provisions included in the Canadian Orders, even if those provisions could not be entered in a plenary chapter 11 case.").

 **[11]**   Finally, the decision-making calculus for determining whether to grant comity to a foreign court's action may be honed by the list of non-exclusive factors used by the Second Circuit to analyze whether foreign proceedings are procedurally fair. In analyzing procedural fairness, the Second Circuit has looked at the following factors:

2883

(1) Whether creditors of the same class are treated equally in the distribution of assets; (2) whether the liquidators are considered fiduciaries and are held accountable to the court; (3) whether creditors have the rights to submit claims which, if denied, can be submitted to a bankruptcy court for adjudication; (4) whether the liquidators are required to give notice to potential claimants; (5) whether there are provisions for creditors meetings; (6) whether a foreign country's insolvency laws favor its own citizens; (7) whether all assets are marshalled before one body for centralized distribution; and (8) whether there are provisions for an automatic stay and for the lifting of such stays to facilitate the centralization of claims.

*Finanz AG Zurich*, 192 F.3d at 249.

With respect to the Croatian Proceeding, the record reflects that the Foreign Debtors' creditors received proper notice of the Croatian Proceeding and of these Chapter 15 cases. The record also reflects that the substance and procedures set forth in the EA Law comport with broadly recognized principles for insolvency laws. Moreover, the creditor distributions approved in the Settlement Agreement closely follow the waterfall provisions of the U.S. Bankruptcy Code. Additionally, as **\*191** discussed above, over two-thirds of non-insider creditors voted to approve the Settlement Agreement, avoiding the taint of the insider votes that prevented recognition and enforcement in the *Vitro* case.

Additionally, the standards for due process set forth in the Second Circuit's nonexclusive list of factors for procedural fairness in *Finanz AG Zurich* were satisfied by the Croatian Proceeding. As outlined in the EA Law, creditors have been grouped into five classes and participated in the drafting and approval of the Settlement Agreement, which provides for payout where creditors of the same class are treated equally, satisfying the first *Finanz* factor.[14] The Foreign Representative acts as a fiduciary and is overseen by the Croatian Court throughout this process, which is consistent with the second *Finanz* factor of procedural fairness. After the Settlement Agreement was approved by a majority of creditors and approved by the Croatian court on July 6, 2018, approximately 92 complaints were filed against confirmation, showing that creditors have the right to submit denied or contested claims for further adjudication, consistent with the third *Finanz* factor for procedural fairness. According to Agrokor's official website, the company responded to all 92 complaints in one submission to the Commercial Court on September 4, 2018. The issue is still pending before the Croatian Court; enforcement of the Settlement Agreement will not commence in Croatia until the Court issues its final order. Thus, creditors who opposed the Settlement Agreement have been able to seek further adjudication in the Croatian Court system.

[14] The Court has already indicated that the percentage recovery to the holders of English Law Governed Loans and New York Law Governed Notes is projected to be 50.8 percent. The Loans and Notes are both unsecured.

Satisfying the fourth *Finanz* factors, the EA Law required published notification to creditors on the Court's website. Satisfying the fifth *Finanz* factor, the EA Law provides for creditors meetings, which were held. Indeed, the Temporary Creditor's Council continues to meet and was informed of the complaints as well as Agrokor's responses to the complaints at the most recent meeting. Agrokor held its 22nd creditor meeting on September 13, 2018. Representatives of all five creditor groups attended the meeting, including Sberbank as a representative of the unsecured creditors, and Knighthead Capital Management, LLC as the representative of the bond holders' creditor group. *Finanz* factors seven and eight—regarding the creation of a centralized distribution and the creation of an automatic stay—are both provided for by the EA Law.

Finally, no objections to the recognition of the Settlement Agreement have been brought before this Court. All evidence before the Court demonstrates that creditors received due process and will be better off under the Settlement Agreement than they would be in a liquidation. The Foreign Representative affirms that the "Croatian proceedings ... will allow the [Foreign] Debtors to restructure in the most efficient manner without jeopardizing creditors' rights." (ECF Doc. # 5 ¶ 40.) The affirmation of a Croatian legal representative who practices complex commercial litigation in Croatia, provides that "[p]ursuant to the Settlement

Agreement, the creditors will receive a better outcome in respect of their claims than they would in a Croatian bankruptcy or liquidation process." (ECF Doc. # 6 ¶ 9.) Thus, the essential contours of a foreign proceeding that should be granted comity in the U.S. are present. As such, the Settlement Agreement should be recognized in full within the territorial jurisdiction of the **\*192** United States, including the provisions modifying the English law governed debt and the New York law governed debt. Courts in other jurisdictions will make their own, independent decisions whether to recognize and enforce the Settlement Agreement.

### E. The Gibbs Rule

Because Chapter 15's principal criterion for recognizing foreign proceedings and recognizing and enforcing a reorganization plan is a comity analysis, it is appropriate for this Court to consider the effects of a decision to extend comity to one nation if doing so could be seen as a refusal to extend comity to the laws of another—particularly where a majority of the debt to be modified is governed by the law of the latter nation. In these circumstances, a complete comity analysis requires at least consideration of, even if not ultimately lending deference to, English law.

The *Gibbs* rule remains the governing law in England despite its seeming incongruence with the principle of modified universalism espoused by the Model Law and a broad consensus of international insolvency practitioners and jurists. *See, e.g.*, Kannan Ramesh, *The Gibbs Principle: A Tether on the Feet of Good Forum Shopping*, 29 Sing. Acad. L.J. 42, 43 (2017) (noting that modified universalism is the theoretical core of the Model Law and is increasingly recognized by an international consensus as the way cross-border insolvencies should be dealt with moving forward). The essence of modified universalism is that "bankruptcy proceedings ... should be unitary and universal, recognized internationally and effective in respect of all the bankrupt's assets." *Id.* The essence of the *Gibbs* rule, on the other hand, is territorialism.

In *Gibbs*, Lord Esher questions, "Why should the plaintiffs be bound by the law of a country to which they do not belong, and by which they have not contracted to be bound?" [15] 25 QDB at 406. Throughout the *Gibbs* opinion, Lord Esher characterizes the recognition of a foreign insolvency proceeding as an issue of contract law between a single debtor and creditor. *Id.* If the contract was made in England and meant to be performed in England, Lord Esher reasoned that a breach of contract should be determined by the laws in England, not discharged by a French insolvency proceeding. *Id.* at 404. Thus, *Gibbs* characterizes the recognition of foreign insolvency proceedings as a contractual issue to be settled in the territory with the governing contract.

[15]    Lord Esher's question may be compared with Supreme Court Justice Waite's commentary seven years earlier in the *Canada Southern Ry. v. Gebhard* case. 109 U.S. 527, 3 S.Ct. 363, 27 L.Ed. 1020 (1883). In that opinion, Justice Waite says, "every person who deals with a foreign corporation impliedly subjects himself to such laws of the foreign government .... It follows, therefore, that anything done at the legal home of the corporation, under the authority of such laws, which discharges it from liability there, discharges it everywhere." *Id.* at 537-38, 3 S.Ct. 363.

Despite the clear territorial slant of the *Gibbs* rule, it was recently followed by the English High Court. In a 2018 decision, Justice Hildyard began his opinion by noting the tension between the *Gibbs* rule and the principle of modified universalism in the CBIR. *Bakshiyeva v. Sberbank of Russia, et al.* [2018] EWHC 59 (Ch). The *Bakshiyeva* court was asked to recognize and enforce proceedings in Azerbaijan that sought to restructure Azerbaijan's largest bank. Bakshiyeva, the foreign representative for the Azerbaijan proceeding, sought a permanent stay imposed in England so that English creditors would have to participate in the centralized, Azerbaijan proceedings. **\*193** Two of the bank's creditors, who held English law governed debt instruments and had not participated in any way in the foreign proceeding, invoked the *Gibbs* rule. Justice Hildyard agreed with the creditors, finding that the CBIR did not allow a foreign court to change or discharge the substantive rights of creditors conferred by English law. The decision reaffirmed the priority of the common law *Gibbs* rule over the more recently adopted CBIR. [16] In addition to governing English cross-border insolvency law for the past century, *Gibbs* has been influential and accepted in other Commonwealth countries including Canada and Australia. *See* Ian F. Fletcher, *Insolvency in Private Int'l Law*, Oxford Private International Law Series at 130 (2d ed, 2005).

[16]    Interestingly, one of the two creditors in the *Bakshiyeva* case, Sberbank, happens to be the largest pre-petition lender of English Law Governed Loans to Agrokor d.d. in the current Croatian Proceeding. In contrast to its position in *Bakshiyeva*, in which it did not

participate in any way in the foreign proceedings, Sberbank was a member of the five member Interim Creditors Committee and voted in favor of the Croatian Settlement Agreement.

Agrokor's counsel argued that although the *Gibbs* rule remains in force in England, an exception to the *Gibbs* rule applies in *Agrokor* to creditors holding English law governed debt because they voted in favor of the Settlement Agreement or otherwise submitted to the jurisdiction of the Croatian court. *Rubin v. Eurofinance SA*, a decision by the Supreme Court of England, was cited as providing the relevant exception to the *Gibbs* rule—when a creditor submits to the jurisdiction of a foreign court, either by submitting its claims in the foreign insolvency proceeding or otherwise agreeing to be bound thereby, then the creditor will be bound in that proceeding and *Gibbs* will no longer apply. *See Rubin v. Eurofinance SA* (2012) UKSC 46 at ¶ 157–67 (Eng.) (holding that creditors who filed proofs of debt and participated in a creditors' meeting, but did not file an appearance, had nonetheless submitted to the jurisdiction of an Australian court and were bound by that Australian proceeding). Agrokor's counsel asserted:

> Here, the Gibbs Rule does not govern the English Law Governed Loans compromised by the Settlement Agreement because all holders of the Agrokor Group's English Law Governed Loans submitted their claims in full in the Croatian Proceedings and, as such, the holders submitted to the jurisdiction of the Croatian courts.

(Brief in Further Support ¶ 48.)

While counsel argued that all holders of English Law Governed Loans submitted their claims in the EA Proceeding, no evidence was presented to support that contention, and the vote tally in the EA Proceeding shows that not all creditors voted on the Settlement Agreement. The appropriate time and place for the Foreign Debtors to raise their argument will be in any further proceedings in the English court.

While the English court has yet to decide whether to recognize and enforce the Settlement Agreement, the English court discussed *Gibbs* before holding that the Croatian Proceeding should be recognized as a foreign main proceeding in England, concluding that the proceeding did not manifestly violate English public policy. (English Decision ¶ 131.) The court did not reach the issue of whether the *Gibbs* rule applies and bars recognition and enforcement of the Settlement Agreement. The decision whether to recognize and enforce the Settlement Agreement is likely to implicate a more demanding analysis under *Gibbs*.

 **\*194**  The fact that England applies the *Gibbs* rule and refuses to recognize a discharge or modification of English law debt approved by a court outside of England is not, in this Court's view, a basis for this Court to decline to recognize and enforce the Settlement Agreement within the territorial jurisdiction of the United States. On this issue, the Court agrees with Justice Kannan Ramesh of the Supreme Court of Singapore in his opinion in *Pacific Andes Resources Development Ltd*, [2016] SGHC 210. Justice Ramesh explains that, in his view, the parties to a contractual relationship governed by the law of a jurisdiction adhering to the *Gibbs* rule should be attributed with the expectation that their claims might be discharged in proceedings in a jurisdiction where the debtor has an established connection based on residence or ties of business. *Pacific Andes*, SGHC 210 at ¶ 48. This view, of course, contrasts with *Gibbs*, where the court did not think that it was fair to attribute any expectation of or consent to the jurisdiction of French bankruptcy law to the English merchant who contracted with the French company that was domiciled in Paris. Justice Ramesh's view also differs from the more recent *Rubin* decision, in which Lord Collins declares it "wholly unrealistic" that "a person who sells goods to a foreign company accepts the risk of the insolvency legislation of the place of incorporation" without providing further explanation on the point. [17] *Rubin* UKSC 46 at ¶ 116 (Eng.).

[17]   Lord Collins' view about what is "unrealistic" obviously differs markedly from the view of the Chief Justice Waites in *Gebhard*, decided in 1883, that everyone who deals with a foreign corporation impliedly subjects himself to foreign law, including a discharge from liability. 109 U.S. at 537–38, 3 S.Ct. 363.

In *Pacific Andes*, Justice Ramesh discusses several academic criticisms of the *Gibbs* rule's continued application in global bankruptcy proceedings. One of the lengthier excerpts is the criticism provided by Look Chan Ho, author of *Cross-Border Insolvency: Principles and Practice* (Sweet & Maxwell 2016). Look Chan Ho criticizes the notion that insolvency proceedings should be characterized as contractual issues. As mentioned above, the original *Gibbs* opinion discussed the idea that parties to a contract should be able to choose the law that would govern their interactions, even in the potentially unexpected situation of a bankruptcy proceeding. The fact that the *Gibbs* rule is premised on a predominately contractual analysis is reinforced by the *Rubin* exception to the rule, which says that if a party, who otherwise would not be bound to a foreign proceeding, nonetheless chooses to consent to the foreign forum's jurisdiction, the rule will no longer apply. Thus, the *Gibbs* rule centers around the idea of a party's contractual or consensual choice to be bound to a certain forum's rules.

A theoretical and practical issue with applying such a contractual analysis in the context of insolvency proceedings, as Look Chan Ho and others argue, is that bankruptcy discharges by their very nature imply diverging from the terms of most of the debtor's prepetition contracts. The primary disputes in a bankruptcy are ordinarily not about the rights of a single creditor against the debtor; insolvency proceedings are collective proceedings in which the rights of *all* creditors are determined for a slice of a pie that is not big enough to repay all creditors in full. A fundamental tenet of the U.S. bankruptcy system, also applied under the new Croatian law and most other modern insolvency laws, is that creditors of the same class are entitled to equality of distribution. Allowing creditors with claims governed by English law to recover a greater percentage **\*195** of their claims than creditors with claims governed, for example, by New York law, would violate the fundamental principle of equality of distribution. As already discussed, the Settlement Agreement provides for equality of distribution between the holders of the English law governed and New York law governed debt.

Additionally, as Look Chan Ho notes, framing the issue of which law should govern a creditor's rights in a bankruptcy as a solely contractual issue between two parties overlooks orthodox English classification of bankruptcy as an *in rem* proceeding. [18] The *Gibbs* rule's contractual analysis seems to be based on the contractual parties' *expectations*; but if parties' expectations created the rule, is it realistic for creditors to multinational corporations to expect that, in the context of an insolvency proceeding, their contractual bargain will ultimately prevail?

[18]    Though Look Chan Ho refers to an orthodox classification of bankruptcy proceedings as *in rem* proceedings, the *Rubin* court definitively stated that bankruptcy proceedings were neither in rem nor in personam. *Rubin* UKSC 46 at ¶ 43 ("if the judgement had to be classified as in personam or in rem the appeal would have to be allowed, but bankruptcy proceedings did not fall into either category ...."). As discussed above, the U.S. Supreme Court in *Tennessee Student Assistance Corp. v. Hood*, 541 U.S. at 447, 124 S.Ct. 1905, concluded that the discharge of debt in a U.S. bankruptcy proceeding is proper because it is an *in rem* proceeding.

As Justice Ramesh argues, a fundamental problem with the use of the *Gibbs* rule in international insolvency cases is that it mischaracterizes the discharge of debt as a contractual issue, rather than as a bankruptcy or insolvency law issue. [19] Kannan Ramesh, *The Gibbs Principle: A Tether on the Feet of Good Forum Shopping*, 29 Sing. Acad. L.J. at 49. A discharge of debts in an insolvency proceeding almost invariably involves some form of cram-down, or modification of creditors' prepetition claims, where a majority of creditors will outweigh a minority of dissenting creditors. *Id.* As justice Ramesh explains, "bankruptcy is undergirded by the philosophy that policy is given primacy *over contractual rights*." *Id.* (emphasis added). Thus, the basic rationale espoused by Lord Esher in *Gibbs*—that parties consensual, contractual decisions should determine the choice of law of all future legal interactions—is inappropriate when applied in the context of insolvency or bankruptcy proceedings, which inherently involve a societal choice to allow collective proceedings to discharge previously existing contractual obligations. The Court agrees with Justice Ramesh that a creditor's autonomy is relevant in the context of an insolvency proceeding only to the extent that it does not impede the underlying public policy that governs a collective insolvency or bankruptcy proceeding. [20] *Id.* at 50.

[19]    This criticism of the *Gibbs* rule is relevant in all cases dealing with the foreign recognition and enforcement of judgments in insolvency proceedings. The Croatian Proceeding is certainly an insolvency proceeding and Agrokor is, most certainly, insolvent. A separate question, unnecessary for the Court to reach in this case, is whether the *Gibbs* rule should be applied when considering whether to

recognize and enforce a foreign scheme of arrangement that modifies English law debt. Statutory authority for schemes of arrangement typically arise from companies' laws rather than insolvency laws. *Gibbs'* reasoning that contract law should be applied in determining whether to recognize and enforce a scheme of arrangement that modifies English law debt may have more force. But this Opinion only deals with application of the *Gibbs* rule in an insolvency proceeding.

[20] Where a contract selects English law, choice of law principles will most likely mean that determining the amount a breach of contract claim should be determined under English law. Choice of law principles should not dictate that English law applies in determining whether a claim can be discharged or modified in a foreign insolvency proceeding.

Professor Ian F. Fletcher, a distinguished professor in England, argues that **\*196** "[t]he Gibbs doctrine belongs to an age of Anglocentric reasoning which should be consigned to history." *Insolvency in Private International Law*, OXFORD PRIVATE INTERNATIONAL LAW SERIES 130 (Oxford University Press, 2d Ed, 2005). In addition to *Gibbs*' failure to create a system that allows for the centralized, collective restructuring of debt, Fletcher finds the rule troubling because English law only narrowly recognizes the effects of foreign discharges in England but asserts that a discharge resulting from an English proceeding has a universal effect, irrespective of the governing law. *Id.* at 129, 209–10 (describing the *Gibbs* rule's effect on English law as "a form of systemic schizophrenia when contemplating the effects of foreign insolvency proceedings on obligations to which the debtor was a party"). England, of course, is free to continue to adhere to the *Gibbs* rule, but that does not mean that a U.S. bankruptcy court must follow the rule in deciding whether to recognize and enforce the decision of a court of another jurisdiction. U.S. Bankruptcy courts have long permitted foreign bankruptcy proceedings to bind U.S. creditors even where the debtor entered into a contract governed by New York law and agreed to a New York forum selection clause. For instance, in *Altos Hornos*, 412 F.3d at 429, the court considered whether contracting parties choice of New York as the forum for all contract disputes was enough to override the preference of extending comity to foreign bankruptcy proceedings. Though the New York forum clause in that case provided a broad grant of exclusive authority to New York courts, [21] the Court of Appeals nevertheless concluded that the Mexican court where the insolvency proceeding was pending should be the court to resolve the contract dispute that affected the resolution of the Mexican insolvency proceeding. *Id.* at 429. As the court explained, "*regardless of the parties' pre-litigation agreement*, once a party declares bankruptcy in a foreign state and a foreign court asserts jurisdiction over the distribution of assets, U.S. courts may defer to the foreign bankruptcy proceeding on international comity grounds." *Id.* (emphasis added); *see also Canada Southern Railway Co. v. Gebhard*, 109 U.S. at 537–38, 3 S.Ct. 363 (where Chief Justice Waite explained that "every person who deals with a foreign corporation impliedly subjects himself to such laws of the foreign government [and] anything done at the legal home of the corporation, under the authority of such laws, which discharges it from liability there, discharges it everywhere").

[21] The forum selection clause stated that the foreign borrower agreed that the loan would be governed by New York law, agreed to submit any dispute to a New York court and agreed to "irrevocably waive to the fullest extent permitted by applicable law, any claim that any action or proceeding ... should be dismissed or stayed by reason ... of any action or proceeding commenced by [debtor] relating in any way to this Agreement ...." 412 F.3d at 428.

In sum, though the concept of comity is broad and may require overlapping considerations of the rights of several parties and nations, the Court believes it is appropriate to extend comity within the territorial jurisdiction of the United States to the Croatian Settlement Agreement if it becomes final, even with respect to the modification or discharge of English law governed debt.

### III. CONCLUSION

For the reasons explained above, the Court concludes that the Settlement **\*197** Agreement should be recognized and enforced with respect to the nine Foreign Debtors within the territorial jurisdiction of the United States, if the approval of the Croatian Court becomes final. When the approval of the Settlement Agreement becomes final, counsel for the Foreign Representative shall submit a proposed order consistent with this Opinion.

**All Citations**

591 B.R. 163

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 13

97 F.4th 1244
United States Court of Appeals, Eleventh Circuit.

IN RE: Talal Qais Abdulmunem AL ZAWAWI, Debtor in a Foreign Proceeding.
Talal Qais Abdulmunem Al Zawawi, Plaintiff-Appellant,
v.
Colin Diss, Hannah Davie, Michael Leeds, Foreign Representatives, Defendants-Appellees.

No. 22-11024
|
Filed: 04/03/2024

**Synopsis**

**Background:** Foreign representatives filed motion for order granting recognition of United Kingdom (UK) insolvency proceedings as foreign main proceeding pursuant to Chapter 15 of the Bankruptcy Code. Foreign debtor opposed motion. The United States Bankruptcy Court for the Middle District of Florida, No. 6:21-bk-01251-LVV, Lori V. Vaughan, J., 634 B.R. 11, granted recognition, and foreign debtor appealed. The District Court, No. 6:21-cv-00894-GAP, Gregory Presnell, Senior District Judge, 637 B.R. 663, affirmed. Foreign debtor appealed.

**Holdings:** The Court of Appeals, Lagoa, Circuit Judge, held that:

[1] the Bankruptcy Court's order granting recognition of foreign proceeding resolved a discrete bankruptcy proceeding and, thus, was "final" for purposes of appellate jurisdiction;

[2] pursuant to circuit precedent, a foreign representative is not required to demonstrate that a foreign debtor meets the eligibility requirements set forth in the section of the Bankruptcy Code governing who may be a debtor under title 11 to obtain recognition of a foreign proceeding under Chapter 15; and

[3] foreign debtor, though a citizen of Oman who asserted that he did not reside or have a domicile, a place of business, or property in the United States as of the petition date, was properly subject to a "foreign proceeding," and so the requirements for recognition set forth in the Bankruptcy Code were met.

Affirmed.

Lagoa, Circuit Judge, filed specially concurring opinion.

Tjoflat, Circuit Judge, filed specially concurring opinion.

West Headnotes (17)

**[1]    Bankruptcy** ⬤—Cases Ancillary to Foreign Proceedings

Recognition of a foreign proceeding under Chapter 15 of the Bankruptcy Code can subject a debtor's assets located in the United States to the Code's automatic stay and opens the door for foreign representatives to seek discovery and other relief related to those assets. 11 U.S.C.A. §§ 362, 1517, 1520, 1521.

**[2]    Bankruptcy** ⬤—Scope of review in general

In bankruptcy appeals, the Court of Appeals acts as a second court of review, independently examining the decisions of the bankruptcy court and applying the same standards as the district court.

**[3]    Bankruptcy** ⬤—Conclusions of law; de novo review
**Bankruptcy** ⬤—Clear error

In bankruptcy appeals, the Court of Appeals considers the bankruptcy court's decision directly, reviewing findings of fact for clear

**In re Al Zawawi, 97 F.4th 1244 (2024)**

30 Fla. L. Weekly Fed. C 823

error and legal conclusions de novo.

**[4]    Bankruptcy**⭠Conclusions of law;  de novo review

In bankruptcy appeals, the Court of Appeals reviews jurisdictional issues de novo.

**[5]    Bankruptcy**⭠Court of Appeals

In bankruptcy appeal, before addressing the central issue on appeal, the Court of Appeals would first determine whether it had jurisdiction to hear the appeal.

**[6]    Federal Courts**⭠Particular Decisions, Matters, or Questions as Reviewable
**Federal Courts**⭠In general;  necessity

In general, the Court of Appeals has jurisdiction over only final judgments and orders. 28 U.S.C.A. § 158(d).

**[7]    Federal Courts**⭠Particular Decisions, Matters, or Questions as Reviewable
**Federal Courts**⭠What constitutes final judgment

Judgment or order is generally considered "final," for purposes of appellate jurisdiction, only if it ends the litigation on the merits and leaves nothing for the court to do but execute the judgment. 28 U.S.C.A. § 158(d).

1 Case that cites this headnote

**[8]    Bankruptcy**⭠Finality

In the bankruptcy context, a judgment or order is considered "final," for purposes of appellate jurisdiction, as long as it resolves a "proceeding," even if it does not resolve the entire case. 28 U.S.C.A. § 158(d).

1 Case that cites this headnote

**[9]    Bankruptcy**⭠Finality

Because bankruptcy cases often encompass numerous individual controversies which would exist as stand-alone lawsuits but for the bankrupt status of the debtor, and which are linked, one dependent on the outcome of another, a different standard governs "finality" in the bankruptcy context than in civil cases generally, for purposes of appellate jurisdiction; delaying appeal of decision that resolves discrete controversy early on in bankruptcy case carries risk of substantial inefficiency in the event of reversal, that is, bankruptcy court could have to "un-ravel" several subsequent adjudications rendered in reliance on its earlier decision. 28 U.S.C.A. § 158(d).

**[10]    Bankruptcy**⭠Finality

Conducting a finality analysis in the bankruptcy context, for purposes of appellate jurisdiction, involves "tricky" task of considerable importance: correctly delineating the dimensions of a bankruptcy "proceeding." 28 U.S.C.A. § 158(d).

**In re Al Zawawi, 97 F.4th 1244 (2024)**

30 Fla. L. Weekly Fed. C 823

[11]    **Bankruptcy**➡Finality

Bankruptcy Court's order granting recognition of United Kingdom (UK) insolvency proceedings as foreign main proceeding pursuant to Chapter 15 of the Bankruptcy Code resolved a discrete bankruptcy "proceeding" and, thus, was considered "final" for purposes of appellate jurisdiction; petition triggered discrete procedural sequence that included notice and a hearing, although adjudication of petition did not occur "before" proceedings on the merits, that is, foreign proceeding, it occurred "apart" from those proceedings, introducing for the first time and fully occurring in a new legal system, federal courts of the United States, entire Chapter 15 action rested on initial decision to recognize foreign proceeding, and adjudication of petition was not dispute over minor details about how bankruptcy case would unfold, but was what determined whether parties to foreign proceeding would have access to judicial resources and power of the United States. 11 U.S.C.A. § 1517; 28 U.S.C.A. § 158(d).

1 Case that cites this headnote

[12]    **Bankruptcy**➡Cases Ancillary to Foreign Proceedings

A foreign representative is not required to demonstrate that a foreign debtor meets the eligibility requirements set forth in the section of the Bankruptcy Code governing who may be a debtor under title 11 to obtain recognition of a foreign proceeding under Chapter 15 of the Code; although "straightforward" interpretation of Code section addressing applicability of chapters plainly provides that entirety of Chapter 1 applies to cases under Chapter 15, including section governing who may be a debtor, pursuant to binding circuit precedent eligibility language of Chapter 1 does not apply to cases ancillary to a foreign proceeding, that is, debtor eligibility under Chapter 1 is not a prerequisite to ancillary assistance. 11 U.S.C.A. §§ 101(13), 101(23), 103(a), 109(a), 1517.

[13]    **Statutes**➡Purpose
        **Statutes**➡Absent terms; silence; omissions

In the context of statutory interpretation, every statute is a compromise of multiple interests, and the purpose of any given statute is shaped by both what the statute says and does not say.

[14]    **Statutes**➡Context

Meaning, and therefore purpose, of any particular statutory language is necessarily shaped by its surrounding statutory context.

[15]    **Bankruptcy**➡Cases Ancillary to Foreign Proceedings

Under Chapter 15 of the Bankruptcy Code, the automatic stay applies upon the recognition of a foreign main proceeding. 11 U.S.C.A. §§ 362, 1520(a)(1).

[16]    **Bankruptcy**➡Cases Ancillary to Foreign Proceedings

Foreign debtor, though a citizen of Oman who asserted that he did not reside or have a domicile, a place of business, or property in the United States as of the petition date, was properly subject to a "foreign proceeding," that is, United Kingdom (UK) insolvency proceedings, and so the requirements for recognition set forth in the Bankruptcy Code were met; foreign representatives seeking recognition were not required to demonstrate that foreign debtor also met the eligibility requirements set forth in the section of the Code governing who may be a debtor under title 11.

In re Al Zawawi, 97 F.4th 1244 (2024)

30 Fla. L. Weekly Fed. C 823

11 U.S.C.A. §§ 109(a), 1502(1), 1517.

**[17]    Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

One of the main aims of Chapter 15 of the Bankruptcy Code is to provide effective mechanisms for dealing with cases of cross-border insolvency. 11 U.S.C.A. § 1501(a).

**\*1247** Appeal from the United States District Court for the Middle District of Florida, D.C. Docket No. 6:21-cv-00894-GAP

**Attorneys and Law Firms**

Nicholas A. Shannin, Shannin Law Firm, PA, Kenneth D. Herron, Jr., Herron Hill Law Group, PLLC, Orlando, FL, for Plaintiff-Appellant.

Leyza Blanco, Juan Jose Mendoza, Sequor Law, PA, Miami, FL, for Defendants-Appellees.

Daniel Glosband, Goodwin Procter, LLP, Boston, MA, Jacqueline Calderin, Agentis, PLLC, Coral Gables, FL, for Amici Curiae.

Before Luck, Lagoa, and Tjoflat, Circuit Judges.

**Opinion**

Lagoa, Circuit Judge:

Does 11 U.S.C. § 109(a) apply to cases brought under Chapter 15 of the Bankruptcy Code? A lot turns on this question because Chapter 15 purports to "provide effective mechanisms for dealing with cases of cross-border insolvency," 11 U.S.C. § 1501(a), and § 109(a) would significantly restrict the class of persons and entities that could constitute a "debtor" in such cases. The plain text of the Bankruptcy Code provides a clear answer: yes, § 109(a) does apply to Chapter 15 cases. *See* 11 U.S.C. § 103(a) (stating that Chapter 1 applies to cases

under Chapter 15). But when confronted with the question of whether debtor eligibility under Chapter 1 was a prerequisite to ancillary assistance under the statutory predecessor to Chapter 15, this Court said no. *See In re Goerg*, 844 F.2d 1562 (11th Cir. 1988). Because we are bound by that decision and understand its reasoning to be sufficiently applicable to the question presented in this case, we are compelled to respond in the same manner today.

After careful review, and with the benefit of oral argument, we affirm the bankruptcy court's determination that, under our precedent, § 109(a) does not apply to **\*1248** Chapter 15 cases and does not establish a prerequisite for the recognition of a foreign proceeding under § 1517. We reason as follows.

**I. FACTUAL AND PROCEDURAL HISTORY**

The appellant in this case is Talal Qais Abdulmunem Al Zawawi ("Al Zawawi"), a citizen of Oman. Al Zawawi owns shares in QAPA Investing Corporation NV ("QAPA"), an entity incorporated in Curacao that wholly owns several Florida entities. Those Florida entities collectively own around ninety-four million dollars' worth of real estate in or around Winter Park, Florida.

In 2015, Al Zawawi moved to the United Kingdom with his wife, Leila Hammoud, and their children. In 2017, Hammoud petitioned for dissolution of marriage in the U.K. As part of that proceeding, Al Zawawi filed a statement of net worth which indicated that, as of April 30, 2017, he owned some assets in the United States.

In March 2019, Hammoud obtained a divorce decree and a judgment in her favor for £24,075,000 from a U.K. court. On April 2, 2019, the U.K. Court issued a worldwide freezing order against Al Zawawi, enjoining him from disposing of any of his assets until the judgment is paid in full.

About a year later, Hammoud petitioned the U.K. Court to place Al Zawawi in involuntary bankruptcy, alleging that he had failed to make payments on the March 2019 judgment. On June 29, 2020, Al Zawawi was adjudged bankrupt and, soon after, Colin Diss, Hannah Davie, and Michael Leeds (collectively, the "Foreign Representatives") were appointed joint trustees in connection with the case.

On March 24, 2021, the Foreign Representatives began the instant action by filing a Chapter 15 Petition for

**In re Al Zawawi, 97 F.4th 1244 (2024)**

30 Fla. L. Weekly Fed. C 823

Recognition of a Foreign Proceeding in the U.S. Bankruptcy Court for the Middle District of Florida.

Chapter 15 of the Bankruptcy Code governs ancillary and other cross-border cases. *See* 11 U.S.C. §§ 1501–32. Its stated purpose is to "incorporate the Model Law on Cross-Border Insolvency so as to provide effective mechanisms for dealing with cases of cross-border insolvency with the objectives of": (1) cooperation; (2) "greater legal certainty for trade and investment"; (3) "fair and efficient administration"; (4) "protection and maximization of the value of the debtor's assets"; and (5) "facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment." 11 U.S.C. § 1501(a)(1)–(5).

[1]One of the mechanisms provided by Chapter 15 is recognition of a foreign proceeding. *See* 11 U.S.C. §§ 1515–24. Recognition of a foreign proceeding can subject a debtor's assets located in the United States to the Bankruptcy Code's automatic stay and opens the door for foreign representatives to seek discovery and other relief related to those assets. *See* 11 U.S.C. §§ 1520–21. The requirements for obtaining an order granting recognition are set forth in § 1517.[1]

[1]    Section 1517 states as follows:
       (a) Subject to section 1506, after notice and a hearing, an order recognizing a foreign proceeding shall be entered if—
          (1) such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502;
          (2) the foreign representative applying for recognition is a person or body; and
          (3) the petition meets the requirements of section 1515.
       (b) Such foreign proceeding shall be recognized—
          (1) as a foreign main proceeding if it is pending in the country where the debtor has the center of its main interests; or
          (2) as a foreign nonmain proceeding if the debtor has an establishment within the meaning of section 1502 in the foreign country where the proceeding is pending.
       (c) A petition for recognition of a foreign proceeding shall be decided upon at the earliest possible time. Entry of an order recognizing a foreign proceeding constitutes recognition under this chapter.
       (d) The provisions of this subchapter do not prevent modification or termination of recognition if it is shown that the grounds for granting it were fully or partially lacking or have ceased to exist, but in considering such action the court shall give due weight to possible prejudice to parties that have relied upon the order granting recognition. A case under this chapter may be closed in the manner prescribed under section 350.

**\*1249** In the memorandum of law accompanying their petition for recognition, the Foreign Representatives argued that all of the requirements of § 1517 were met and therefore an order granting recognition was warranted.

Al Zawawi did not dispute that the requirements of § 1517 had been met but insisted that the petition be denied and the case dismissed because § 109(a) was not satisfied.[2] Section 109(a) governs "[w]ho may be a debtor" under title 11, i.e., the Bankruptcy Code. *See* § 109(a). It states that, "[n]otwithstanding any other provision of this section, only a person that resides or has a domicile, a place of business, or property in the United States, or a municipality, may be a debtor under this title."[3] *Id.* Al Zawawi maintained that he did not "reside[ ] or [have] a domicile, a place of business, or property in the United States" as of the petition date and, as a result, could not properly be a debtor under title 11, including Chapter 15. The Foreign Representatives, meanwhile, rejected the premise that § 109(a) applies to Chapter 15 cases but argued that, even if it did, it is satisfied by Al Zawawi's property interests described above.

[2]    Al Zawawi also initially raised an improper venue objection to recognition, citing 28 U.S.C. § 1410. Al Zawawi has since abandoned that argument.

[3]    Chapter 1's actual *definition* of "debtor" is provided in 11 U.S.C. § 101(13), which states that "[t]he term 'debtor' means person or municipality concerning which a case under this title has been commenced."

Following briefing and a hearing on the petition for recognition, the bankruptcy court issued a ruling from the bench in accordance with 11 U.S.C. § 1517(c). *See id.* ("A petition for recognition of a foreign proceeding shall be decided upon at the earliest possible time."). The bankruptcy court granted the petition for recognition and, in doing so, determined that § 109(a) does not apply to Chapter 15 cases. The bankruptcy court further determined that, even if § 109(a) did apply to such cases, the Foreign Representatives sufficiently showed that Al Zawawi had property interests in the United States. The bankruptcy court also provided notice that, given the expedited nature of its ruling, it may issue "a supplemental opinion later."

The bankruptcy court subsequently entered a written

WESTLAW    © 2024 Thomson Reuters. No claim to original U.S. Government Works.                    5

In re Al Zawawi, 97 F.4th 1244 (2024)

30 Fla. L. Weekly Fed. C 823

order in which it granted the recognition request, recognized the automatic stay, and prohibited the transfer, encumbrance, and disposal of Al Zawawi's assets pursuant to 11 U.S.C. §§ 1520–21. Similar to its bench ruling, the bankruptcy court's written order noted that it "may render a supplemental decision to expand on [its] holding."

Al Zawawi timely appealed the bankruptcy court's order granting recognition to the district court. While that appeal was pending and as contemplated by the initial written order, the bankruptcy court issued a supplemental opinion that expanded upon the ruling offered at the hearing and more thoroughly engaged with the arguments presented.

**\*1250** Following the bankruptcy court's supplemental opinion, the parties filed their appellate briefs with the district court. The district court ultimately affirmed the bankruptcy court's order granting recognition on the basis that § 109(a) does not apply to Chapter 15 cases. The district court did not address the bankruptcy court's alternative determination that Al Zawawi satisfies § 109(a) due to his property interests in the United States. A corresponding judgment was entered the next day.

Al Zawawi then timely appealed to this Court.

## II. STANDARDS OF REVIEW

[2] [3] [4]"In bankruptcy appeals, we act as a second court of review, independently examining the decisions of the [b]ankruptcy [c]ourt and applying the same standards as the [d]istrict [c]ourt." *In re Nica Holdings, Inc.*, 810 F.3d 781, 785–86 (11th Cir. 2015). We therefore consider the bankruptcy court's decision directly, reviewing findings of fact for clear error and legal conclusions *de novo*. *Id.* at 786. For their part, jurisdictional issues are reviewed *de novo*. *In re Donovan*, 532 F.3d 1134, 1136 (11th Cir. 2008).

## III. ANALYSIS

[5]As previewed, the central issue on appeal is whether § 109(a) applies to Chapter 15 cases and imposes a prerequisite for the recognition of a foreign proceeding. Before addressing that issue, however, we first must determine whether we have jurisdiction to hear this appeal. *See Ray v. Edwards*, 725 F.2d 655, 658 n.3 (11th

Cir. 1984) ("This court has a duty to review its jurisdiction of an appeal, *sua sponte* at any point in the appellate process.").

## A. Jurisdiction

[6] [7] [8] [9]In general, this Court "has jurisdiction over only final judgments and orders," *In re F.D.R. Hickory House, Inc.*, 60 F.3d 724, 725 (11th Cir. 1995) (citing 28 U.S.C. § 158(d)), and a judgment or order is considered "final" only if it "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment," *Catlin v. United States*, 324 U.S. 229, 233, 65 S.Ct. 631, 89 L.Ed. 911 (1945). In the bankruptcy context, however, a judgment or order is considered "final" as long as it resolves a "proceeding"—even if it does not resolve the entire case. *See Ritzen Grp., Inc. v. Jackson Masonry, LLC*, 589 U.S. 35, 140 S. Ct. 582, 586–87, 205 L.Ed.2d 419 (2020); *In re Charter Co.*, 778 F.2d 617, 621 (11th Cir. 1985). This is because bankruptcy cases often "encompass[ ] numerous 'individual controversies, ... which would exist as stand-alone lawsuits but for the bankrupt status of the debtor,' " and which are "linked, one dependent on the outcome of another." *Ritzen*, 140 S. Ct. at 586–87 (quoting *Bullard v. Blue Hills Bank*, 575 U.S. 496, 501, 135 S.Ct. 1686, 191 L.Ed.2d 621 (2015)). Delaying appeal of a decision that resolves a discrete controversy early on in a bankruptcy case therefore carries a risk of substantial inefficiency in the event of a reversal, i.e., the bankruptcy court could have to "un-ravel" several subsequent adjudications "rendered in reliance on [the] earlier decision." *Id.* at 587.

[10]Thus, conducting a finality analysis in the bankruptcy context naturally involves a tricky task of "considerable importance": correctly delineating the dimensions of a bankruptcy "proceeding." *Id.* Fortunately, the Supreme Court recently offered guidance on how to navigate these waters in *Ritzen*, where it held that the adjudication of a stay-relief motion in the bankruptcy context constitutes its own "proceeding" for finality purposes. *Id.* at 587–92. In reaching that conclusion, the Supreme Court identified two important features of the adjudication of a stay-relief **\*1251** motion: (1) it involves "a discrete procedural sequence, including notice and a hearing," as set forth by statute, and (2) it "occurs before and apart from the proceedings on the merits of creditors' claims." *Id.* at 589.

[11]In this case, we must determine whether an order granting recognition of a foreign proceeding resolves a discrete bankruptcy "proceeding." Both sides argue that such an order does resolve a "proceeding" and is thus

WESTLAW    © 2024 Thomson Reuters. No claim to original U.S. Government Works.    6

In re Al Zawawi, 97 F.4th 1244 (2024)

30 Fla. L. Weekly Fed. C 823

considered "final" under the *Ritzen* framework. We agree.

Like motions to stay relief, petitions for recognition trigger "a discrete procedural sequence" that includes "notice and a hearing." *See* 11 U.S.C. § 1517(a). And although the adjudication of a petition for recognition does not occur "before" the proceedings on the merits, i.e., the foreign proceeding, it occurs "apart" from those proceedings in the sense that it introduces for the first time and fully occurs in a new legal system, i.e., the federal courts of the United States. Moreover, in cases like this one, the entire Chapter 15 action rests on the initial decision to recognize a foreign proceeding. Thus, in such cases, delaying appeal of orders granting recognition presents precisely the kind of risk to judicial economy highlighted by the Supreme Court. *See Ritzen*, 140 S. Ct. at 587 ("Reversal of a decision made early on could require the bankruptcy court to unravel later adjudications rendered in reliance on an earlier decision."). Lastly, the adjudication of a petition for recognition is not a "dispute[ ] over minor details about how a bankruptcy case will unfold"—it is what determines whether the parties to a foreign proceeding will have access to the judicial resources and power of the United States. *Id.* at 590. That access can have significant implications for enormous amounts of property held in the United States and abroad. For all of these reasons, we are satisfied that an order granting recognition of a foreign proceeding constitutes a final order under the *Ritzen* framework. Thus, the order granting recognition in this case is subject to our jurisdiction under 28 U.S.C. § 158(d).

**B. The Merits**

[12]Having determined that we have jurisdiction over this appeal, we turn now to the central issue presented: whether § 109(a) applies to Chapter 15 cases and imposes a prerequisite for the recognition of a foreign proceeding.

A plain reading of the Bankruptcy Code—specifically § 103(a)—indicates that § 109(a) *does* apply to Chapter 15 cases. Section 103 governs the "[a]pplicability of [the] chapters" of title 11, and subsection (a) states as follows: "Except as provided in section 1161 of this title, chapters 1, 3, and 5 of this title apply in a case under chapter 7, 11, 12, or 13 of this title, *and this chapter, sections 307, 362(o), 555 through 557, and 559 through 562 apply in a case under chapter 15*." 11 U.S.C. § 103(a) (emphasis added). "[T]his chapter," as used above in § 103(a) of Chapter 1 of title 11, refers to Chapter 1.[4] And unlike Chapters 3 and 5, for which § 103(a) identifies the particular sections that apply to Chapter 15 cases, Chapter

1 is referenced as a whole, without any indication that certain sections are excluded from application to Chapter 15. Moreover, nothing in 11 U.S.C. § 1161—the section cited in the subordinating clause at the start of § 103(a)—limits the application of Chapter 1 to cases under Chapter 15. Accordingly, § 103(a) plainly provides that the entirety of Chapter 1 applies to cases under Chapter 15. It therefore necessarily follows that **\*1252** § 109(a), as a part of Chapter 1, applies to cases under Chapter 15.

4    The sections of title 11 are numbered in accordance with the chapter in which they are included. For instance, § 103 is part of chapter 1, § 307 is part of chapter 3, and § 555 is part of chapter 5.

The Second Circuit correctly described this interpretation of § 103(a) as "straightforward." *In re Barnet*, 737 F.3d 238, 247 (2d Cir. 2013). In fact, the Second Circuit addressed the same question on appeal here and concluded that the plain reading of § 103(a) controls. *Id.* at 246–51.

But we are differently situated from the Second Circuit in that we are bound by prior precedent that states that Chapter 1's debtor eligibility language does not apply to cases ancillary to a foreign proceeding. *See In re Goerg*, 844 F.2d 1562 (11th Cir. 1988); *see also Generali v. D'Amico*, 766 F.2d 485, 489 (11th Cir. 1985) ("This Court is bound by the case law of the Eleventh Circuit ...."). In *Goerg*, this Court dealt with the question of whether the would-be debtor in a case brought under the former § 304[5]—the predecessor to Chapter 15—must fall within Chapter 1's definition of a "debtor," and this Court ultimately said no. 844 F.2d at 1566–68.

5    The former 11 U.S.C. § 304 was titled "[c]ases ancillary to foreign proceedings" and read as follows:
    (a) A case ancillary to a foreign proceeding is commenced by the filing with the bankruptcy court of a petition under this section by a foreign representative.
    (b) Subject to the provisions of subsection (c) of this section, if a party in interest does not timely controvert the petition, or after trial, the court may—
        (1) enjoin the commencement or continuation of—
        (A) any action against—
        (i) a debtor with respect to property involved in such foreign proceeding; or
        (ii) such property; or
        (B) the enforcement of any judgment against the debtor with respect to such property, or any act or the commencement or continuation of any judicial proceeding to create or enforce a lien against the property of such estate;
        (2) order turnover of the property of such estate, or the proceeds of such property, to such foreign representative; or

30 Fla. L. Weekly Fed. C 823

(3) order other appropriate relief.

(c) In determining whether to grant relief under subsection (b) of this section, the court shall be guided by what will best assure an economical and expeditious administration of such estate, consistent with—

(1) just treatment of all holders of claims against or interests in such estate;

(2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

(3) prevention of preferential or fraudulent dispositions of property of such estate;

(4) distribution of proceeds of such estate substantially in accordance with the order prescribed by this title;

(5) comity; and

(6) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

In reaching that answer, this Court first identified a point of tension between § 101's definitions of "debtor" and "foreign proceeding." *Id.* at 1566–67. The term "debtor" was defined, at the time, in the same way that it is defined today: to mean a "person or municipality concerning which a case under this title has been commenced." *Compare* 11 U.S.C. § 101(12) (1982), *with* 11 U.S.C. § 101(13). The term "foreign proceeding," meanwhile, was defined as follows:

[A] proceeding whether judicial or administrative and whether or not under bankruptcy law, in a foreign country in which the debtor's domicile, residence, principal place of business, or principal assets were located at the commencement of such proceeding, for the purpose of liquidating an estate, adjusting debts by composition, extension, or discharge, or effecting a reorganization.

11 U.S.C. § 101(22) (Supp. IV 1986). Thus, as this Court highlighted, those two definitions presented the following "anomaly":

**\*1253** [A]lthough the inclusion of the term "debtor" in the definition of "foreign proceeding" suggests that the subject of the foreign proceeding must qualify as a "debtor" under United States bankruptcy law, the [Bankruptcy] Code expressly provides that the foreign proceeding need not even be a bankruptcy proceeding, either under foreign or United States law.

*Goerg*, 844 F.2d at 1566–67.

This Court then identified two possible ways to resolve that anomaly:

First, we could adopt the position ... that the [Bankruptcy] Code's narrow definition of "debtor" controls, notwithstanding the otherwise expansive definition of "foreign proceeding." Alternatively, we could adopt the view that the term "debtor" as used in the section 304 context incorporates the definition of "debtor" used by the forum in which the foreign proceeding is pending. Under this alternative view, the bankruptcy court has jurisdiction to entertain the section 304 petition provided that the debtor qualifies for relief under applicable foreign law, and provided further that the foreign proceeding to which the debtor is subject is "for the purpose of liquidating an estate, adjusting debts by composition, extension, or discharge, or effecting a reorganization."

*Id.* at 1567.

In deciding between those two options, this Court relied on the "purpose" of § 304 to break the tie. *Id.* at 1567–68. This Court identified § 304's purpose as being "to 'prevent dismemberment by local creditors' of assets located in this country that are involved in a foreign insolvency proceeding" and, more generally, "to help further the efficiency of foreign insolvency proceedings involving worldwide assets." *Id.* at 1568 (quoting H.R. Rep. No. 95-595, at 324 (1977)). In light of that understanding of § 304's purpose, this Court concluded that "it would make little sense to require that the subject of the foreign proceeding qualify as a 'debtor' under United States bankruptcy law," and that instead it "would make eminent sense for Congress to define expansively the class of foreign insolvency proceedings for which ancillary assistance is available." *Id.*

Accordingly, in the end, this Court chose the second option for resolving the described tension and held that the debtor in an ancillary assistance case under § 304 "need only be properly subject" to a "foreign proceeding" as defined in the Bankruptcy Code. *Id.* at 1568. In other words, this Court determined that " 'debtor' eligibility under the [Bankruptcy] Code" was not "a prerequisite to section 304 ancillary assistance." *Id.*

As relevant here, the Bankruptcy Code's current definitions of "debtor" and "foreign proceeding" present an "anomaly" for Chapter 15 that is similar to the one identified and resolved in *Goerg*. This is so because: (1) like the former § 304, Chapter 15 concerns ancillary assistance for "foreign proceedings" and (2) since *Goerg*, the definition of "debtor" has remained the same[6] and the definition of "foreign proceeding" has changed only somewhat.[7] Our decision in *Goerg* therefore counsels us to consider the purpose of Chapter 15 in resolving **\*1254** this definitional anomaly and suggests that, if the purpose

of Chapter 15 sufficiently tracks that of the former § 304, we should reach the same outcome.

[6]    *Compare* 11 U.S.C. § 101(12) (1982), *with* 11 U.S.C. § 101(13).

[7]    At the time *Goerg* was decided, Chapter 1 defined "foreign proceeding" to mean:

> [a] proceeding, whether judicial or administrative and whether or not under bankruptcy law, in a foreign country in which the debtor's domicile, residence, principal place of business, or principal assets were located at the commencement of such proceeding, for the purpose of liquidating an estate, adjusting debts by composition, extension, or discharge, or effecting a reorganization.

11 U.S.C. § 101(22) (Supp. IV 1986). Today, Chapter 1 defines "foreign proceeding" to mean:

> a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

11 U.S.C. § 101(23). Thus, both definitions of "foreign proceeding" include the term "debtor" but are not strictly limited to bankruptcy proceedings.

[13]  [14]  [15]Given the inescapable indeterminacy of a purposive approach to statutory interpretation,[8] it is impossible to confidently determine the degree to which *Goerg*'s understanding of the purpose of the former § 304 can be grafted onto Chapter 15. Every statute is a compromise of multiple interests,[9] and the purpose of any given statute is shaped by both what the statute says and does not say. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Texts* 21 (2012) ("[L]imiting provisions (or the absence of more expansive provisions) are no less a reflection of the genuine 'purpose' of [a] statute than the operative provisions, and it is not the court's function to alter the legislative compromise."). Moreover, the meaning—and therefore the purpose—of any particular statutory language is necessarily shaped by its surrounding statutory context. *See id.* § 24, at 167 ("[T]he whole-text canon ... calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts. ... Context is a primary determinant of meaning."); *see also id.* § 39, at 252–53 ("Part of [a] statute's context is the *corpus juris* of which it forms a part ...."). These principles play out in immeasurable ways through the many differences between the former § 304 and Chapter 15. For instance, the former § 304 did not entitle debtors to the automatic stay, as we highlighted in

*Goerg*,[10] whereas Chapter 15 establishes that the automatic stay applies upon the recognition of a foreign main proceeding. *See* 11 U.S.C. § 1520(a)(1). Further, the former § 304 was shaped by a version of Chapter 1 that did not contain an equivalent of § 109(a)'s restriction on who may constitute a debtor or of § 103(a)'s indication that all of Chapter 1 applies to cases ancillary to a foreign proceeding, whereas Chapter 15 is shaped by a version of Chapter 1 that obviously does contain those sections.[11] *See id.* §§ 103(a), 109(a).

[8]    *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 18–19 (2012) ("The most destructive (and most alluring) feature of purposivism is its manipulability. Any provision of law ... can be said to have a number of purposes, which can be placed on a ladder of abstraction. ... The purposivist, who derives the meaning of text from purpose and not purpose from the meaning of text, is free to climb up this ladder of purposes and to 'fill in' or change the text according to the level of generality he has chosen.").

[9]    *See Arangure v. Whitaker*, 911 F.3d 333, 345 (6th Cir. 2018) ("[S]tatutes are motivated by *many* competing—and often contradictory—purposes. Congress addresses these purposes by negotiating, crafting, and enacting statutory text. It is that text that controls, not a court's after-the-fact reevaluation of the purposes behind it.").

[10]   *See Goerg*, 844 F.2d at 1568 ("That the section 304 debtor is denied [the benefit of the automatic stay] strongly suggests that Congress did not intend that 'debtor' eligibility under the [Bankruptcy] Code be a prerequisite to section 304 ancillary assistance.").

[11]   Another difference between the former § 304 and Chapter 15 is that Chapter 15 provides its own definition of the term "debtor"—which is nearly identical to the definition used in *Goerg*—whereas § 304 did not. *See* 11 U.S.C. § 1502(1) (defining "debtor," for purposes of Chapter 15, to mean "an entity that is the subject of a foreign proceeding"). Unlike the other differences highlighted herein, this difference seems to support applying *Goerg*'s reasoning to Chapter 15. *But see Barnet*, 737 F.3d at 249 (reasoning that § 1502(1) supplants § 101(13) but not § 109(a)).

**\*1255** [16]  [17]Despite these differences, however, we believe that the former § 304 and Chapter 15 are sufficiently similar in terms of their purposes such that

our decision in *Goerg* controls our analysis in this case. One of the main aims of Chapter 15, according to the Chapter's own "purpose" clause, is to "provide effective mechanisms for dealing with cases of cross-border insolvency." 11 U.S.C. § 1501(a). In *Goerg*, this Court interpreted the former § 304 as having the same purpose. 844 F.2d at 1568. And, based on that purpose, this Court interpreted the definition of "foreign proceeding" and determined that a debtor in a case ancillary to a foreign proceeding "need only be properly subject, under applicable foreign law," to a "foreign proceeding" as defined in the Bankruptcy Code. *Id.* Given the similarities of the definitions of "foreign proceedings" in both Chapter 15 and the former § 304—e.g., both definitions require a "debtor"—and wary of slicing our binding precedent too thin, we follow the logic of *Goerg* and hold that, based on the definition of "foreign proceeding" in § 101(12), as informed by the purpose of Chapter 15, debtor eligibility under Chapter 1 is not a prerequisite for the recognition of a foreign proceeding under Chapter 15. With § 109(a) therefore out of the picture, no dispute remains. Al Zawawi is properly subject to a "foreign proceeding," and the requirements for recognition listed in § 1517 are met.

## IV. CONCLUSION

Accordingly, we affirm the bankruptcy court's order granting recognition.

**AFFIRMED.**

Lagoa, Circuit Judge, Circuit Judge, Specially Concurring:

For the reasons discussed in the majority opinion, I agree that *Goerg* compels the result reached by the majority opinion. But if we were writing on a clean slate, I would reverse the bankruptcy court's determination that 11 U.S.C. § 109(a) does not apply to Chapter 15 cases in accordance with the plain text of 11 U.S.C. § 103(a). *See* Maj. Op. at 1251–52. I write separately to address the Foreign Representatives' four main arguments supporting the application of *Goerg* and why I do not believe they are supported by the text of the Bankruptcy Code.

The Foreign Representatives' first argument for why § 109(a) does not impose a prerequisite for recognition is rooted in the language of 11 U.S.C. § 1517(a). Section 1517(a) lists requirements for recognition, including the implied requirement that there be proper notice and a hearing, and states that, if those requirements are met, an order granting recognition "*shall* be entered." (Emphasis added). The Foreign Representatives contend that the use of "shall" indicates that § 1517(a) sets forth an exhaustive list of requirements for recognition and, so the argument goes, the absence of any reference in § 1517(a) to § 109(a) indicates that satisfying § 109(a) is not a prerequisite for recognition.

The problem with this argument is it overlooks that debtor eligibility is baked into the requirements of § 1517(a). The requirements of § 1517(a) expressly contemplate and impliedly depend on the existence of some related "foreign proceeding," *see* 11 U.S.C. § 1517(a)(1)–(3), and the **\*1256** Bankruptcy Code's definition of "foreign proceeding" similarly expressly contemplates and impliedly depends on the existence of some related "debtor," *see id.* § 101(23). That is where § 109(a) comes into play: it describes "[w]ho may be a debtor." Thus, when read plainly and together with Chapter 1, the requirements of § 1517(a) themselves require satisfaction of § 109(a), even though § 1517(a) alone does not spell that out.

The Foreign Representatives' second argument purports to highlight an irreconcilable conflict between § 109(a) and 11 U.S.C. § 1502. Section 1502 defines a list of terms "for purposes of [Chapter 15]," and subsection (1) defines the term "debtor" to mean "an entity that is the subject of a foreign proceeding." 11 U.S.C. § 1502(1). The Foreign Representatives contend that § 1502(1)'s use of the broad term "entity" conflicts with § 109(a), which limits debtors under title 11 to "person[s] that reside[ ] or [have] a domicile, a place of business, or property in the United States" and "municipalit[ies]." *See id.* § 101(15) (defining "entity" to include "person[s], estate[s], trust[s], governmental unit[s], and United States trustee[s]"). Specifically, the Foreign Representatives highlight that § 1502(1) seemingly allows for estates, trusts, and certain government units to be debtors whereas § 109(a) appears to categorically exclude them from being such. Even so, the supposed debtor in this case is a person, not an estate, trust, or government unit. And, with respect to persons, § 1502(1) neither contains its own, contrary residency/property requirement, nor clearly spurns the possibility of any such requirement. Thus, as far as this case is concerned, § 1502(1) and § 109(a) can easily be read in harmony: § 1502(1) recognizes that persons can be debtors in Chapter 15 cases, and § 109(a) imposes a residency/property requirement that must be satisfied for a person to be qualify as a debtor. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of*

*Texts* § 27, at 180 (2012) ("The provisions of a text should be interpreted in a way that renders them compatible, not contradictory.").

The Foreign Representatives' third argument is that applying § 109(a) to cases under Chapter 15 would render part of 11 U.S.C. § 1528 superfluous. Section 1528 states, in pertinent part, that "[a]fter recognition of a foreign main proceeding, a case under another chapter of this title may be commenced *only if the debtor has assets in the United States*." (Emphasis added). The Foreign Representatives contend that § 1528's asset requirement has no effect if § 109(a) already independently requires that the debtor be either (1) a person who "resides or has a domicile, a place of business, or property in the United States" or (2) a municipality. *See* 11 U.S.C. § 109(a). But this argument rests on the faulty assumption that any debtor who satisfies § 109(a) necessarily "has assets in the United States." As noted during oral argument in this case, it is possible that an individual debtor might reside in the United States without personally owning any assets in the country—for example, he may rely exclusively on assets held abroad or owned by a trust. It likewise is possible that a municipal debtor might not itself own any assets at all. *See* 11 U.S.C. § 101(40). Thus, there are potential cases where a debtor satisfies § 109(a) but not § 1528's asset requirement. In such cases, if a foreign main proceeding has been recognized, § 1528's asset requirement certainly has an effect: it prohibits the commencement of a case under any other Chapter of title 11.

The Foreign Representatives' fourth argument is that applying § 109(a) to cases under Chapter 15 would render parts of 28 U.S.C. § 1410 superfluous. Section 1410 is the venue statute for Chapter 15 cases and provides:

> **\*1257** A case under chapter 15 of title 11 may be commenced in the district court of the United States for the district—
>
> (1) in which the debtor has its principal place of business or principal assets in the United States;
>
> (2) if the debtor does not have a place of business or assets in the United States, in which there is pending against the debtor an action or proceeding in a Federal or State court; or
>
> (3) in a case other than those specified in paragraph (1) or (2), in which venue will be consistent with the interests of justice and the convenience of the parties, having regard to the relief sought by the foreign representative.

The Foreign Representatives argue that, if § 109(a) applies to cases under Chapter 15, every debtor who satisfies § 109(a) necessarily will have a "principal place of business or principal assets in the United States" and therefore satisfy § 1410(1), rendering subsections (2) and (3) meaningless in all cases. Like the Foreign Representatives' § 1528 argument, this argument rests on a faulty assumption. It is entirely possible that a Chapter 15 debtor might satisfy § 109(a) through residence or domicile in the United States but not have a principal place of business or principal property in the United States and therefore not satisfy § 1410(1). In such cases, § 1410(2) and (3) would come into play and determine where venue lies.

* * * *

In sum, § 103(a) plainly provides that § 109(a) applies to cases under Chapter 15, and I do not find any of the Foreign Representatives' counterarguments based on the text of the Bankruptcy Code to be persuasive. Regardless, this Court's reasoning in *Goerg* suggests that § 109(a) does not apply to cases ancillary to a foreign proceeding, and we are bound by that precedent. "Under the prior precedent rule, we are bound to follow a prior binding precedent 'unless and until it is overruled by this court en banc or by the Supreme Court.' " *See United States v. Vega-Castillo*, 540 F.3d 1235, 1236 (11th Cir. 2008) (quoting *United States v. Brown*, 342 F.3d 1245, 1246 (11th Cir. 2003)). But if we were not so bound, I would adhere to the plain meaning of § 103(a) and reverse the bankruptcy court's determination that § 109(a) does not apply to Chapter 15 cases.

Tjoflat, Circuit Judge, Specially Concurring:

I agree with the majority that we are bound by *In re Goerg*, 844 F.2d 1562 (11th Cir. 1988), where we held that debtor eligibility under the then-applicable bankruptcy code did not limit recognition of foreign proceedings. But I write separately because I respectfully disagree with the majority's interpretation of *In re Goerg* as abstract purposivism. Rather, I believe we are bound by *In re Goerg* because the current definition of a foreign proceeding[1] is substantially the same as the one we soundly interpreted in *In re Goerg*,[2] and **\*1258** whether a court can recognize a foreign proceeding depends on whether the proceeding meets that definition. In any event, the current statute contains additional support for the conclusion that American courts can recognize foreign proceedings regardless of whether the debtor subject to the foreign proceeding is eligible to commence a United States bankruptcy proceeding.

**In re Al Zawawi, 97 F.4th 1244 (2024)**

30 Fla. L. Weekly Fed. C 823

[1]  The current definition of "foreign proceeding" provides, in full:

> The term "foreign proceeding" means a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

11 U.S.C. § 101(23).

[2]  The definition of "foreign proceeding" we interpreted in *In re Goerg* provided, in full:

> "[F]oreign proceeding" means proceeding, whether judicial or administrative and whether or not under bankruptcy law, in a foreign country in which the debtor's domicile, residence, principal place of business, or principal assets were located at the commencement of such proceeding, for the purpose of liquidating an estate, adjusting debts by composition, extension, or discharge, or effecting a reorganization.

844 F.2d at 1565 (quoting 11 U.S.C. § 101(22) (1982)).

In Part I of this special concurrence, I discuss Title 11 of the United States Code (the "Bankruptcy Code"). I cover the basics of how American bankruptcy proceedings work in Part I.A., and how they contrast with ancillary proceedings in Part I.B. In Part II.A., I discuss our interpretation of "foreign proceeding" in *In re Goerg*. In Part II.B., I explain why the current definition of "foreign proceeding" is materially the same as the one we interpreted in *In re Goerg*, showing why we are bound by that case.

In Part II.C., I discuss how § 1502's definition of "debtor" for the purposes of Chapter 15 is broader than § 109(a)'s limit on "who may be a debtor."[3] Section 1502(1)[4] covers foreign proceedings involving "entit[ies]," while § 109(a) only includes "person[s]." *See* 1 Collier on Bankruptcy ¶ 1.01[2][a] ("A 'person' may be eligible for relief under the Code by virtue of section 109, but one who is an 'entity' and not a 'person' "—such as a probate estate, *In re Goerg*, 844 F.2d at 1565–66—"would not be eligible."). I also emphasize that Chapter 15 incorporates the UNCITRAL[5] *Model Law on Cross-Border Insolvency* (1997) (the "Model Law"). *See* § 1501(a) ("The purpose of this chapter is to incorporate the Model Law on Cross-Border Insolvency so as to provide effective mechanisms for dealing with cases of cross-border insolvency."). And interpreting Chapter 15 in light of its "international origin"—as § 1508[6] requires—confirms

that domestic debtor eligibility under § 109(a) is not relevant to recognizing a foreign proceeding under Chapter 15. The Guide Enactment and Interpretation of the UNCITRAL Model Law on Cross-Border Insolvency (the "Enactment Guide") UNCITRAL issued alongside the Model Law says so directly.[7] I then discuss the proceedings in this case, which illustrate why applying debtor eligibility under § 109(a) to recognition **\*1259** of foreign proceedings encourages fraudulent transfers. That flies in the face of what one would expect given the statute's history and purposes.

[3]  Section 109(a) says: "Notwithstanding any other provision of this section, only a person that resides or has a domicile, a place of business, or property in the United States, or a municipality, may be a debtor under this title."

[4]  Section 1502(1) says: " 'debtor' means an entity that is the subject of a foreign proceeding."

[5]  United Nations Commission on International Trade Law ("UNCITRAL").

[6]  Section 1508 mandates that, "[i]n interpreting this chapter, the court *shall* consider its international origin, and the need to promote an application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions."

[7]  UNCITRAL, *Guide to Enactment and Interpretation of the UNCITRAL Model Law on Cross-Border Insolvency*, ¶ 55 (2013), *available at* https://uncitral.un.org/sites/uncitral.un.org/files/media-documents/un-citral/en/1997-model-law-insol-2013-guide-enactment-e.pdf. The Guide was updated in 2013 to help clarify the concept of a "center of main interests" in describing a foreign main proceeding. ¶ 18. Paragraph 55 in the 2013 version of the Guide appeared as ¶ 60 in the 1997 version. UNCITRAL Table of Concordance: Guide to Enactment (1997)—Guide to Enactment and Interpretation (2013), *available at* https://uncitral.un.org/sites/uncitral.un.org/files/media-documents/uncitral/en/table_of_concordance-1997-2013-guide-enactment.pdf.

**In re Al Zawawi, 97 F.4th 1244 (2024)**

30 Fla. L. Weekly Fed. C 823

**I.**

**A.**

"The principal purpose of the Bankruptcy Code is to grant a fresh start to the honest but unfortunate debtor." *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 367, 127 S. Ct. 1105, 1107, 166 L.Ed.2d 956 (2007) (internal quotation marks omitted). In bankruptcy, "through orderly and centralized liquidation or through reorganization or rehabilitation, creditors of equal priority receive ratable and equitable distributions designed to serve 'the prime bankruptcy policy of equality of distribution among creditors of the debtor.' " 1 Collier on Bankruptcy ¶ 1.01[1] (16th ed. 2023) (quoting *Union Bank v. Wolas*, 502 U.S. 151, 161, 112 S. Ct. 527, 533, 116 L.Ed.2d 514 (1991) (quoting H.R. Rep. No. 95-595 at 177–78 (1977)). The goal is to settle the debtor's obligations using the assets he has left before the remaining obligations are discharged. Discharge then enables "the debtor to begin a new financial life." 1 Collier on Bankruptcy, ¶ 1.02 [1] (16th ed. 2023).

The bankruptcy process requires collecting the debtor's assets into a bankruptcy "estate" created under 11 U.S.C. § 541 "that comprises all of the debtor's interests, legal and equitable, in property wherever located and by whomever held .... at the date of the filing of the petition." 1 Collier on Bankruptcy ¶ 1.03[1] (16th ed. 2023). A representative of that estate, the trustee,[8] then lines up the debtor's creditors by priority to decide which can obtain some or all of what the debtor owes them. *See* 1 Collier on Bankruptcy ¶ 1.03[2]–[4] (16th ed. 2023). "In liquidation, this equates to a pro-rata distribution of the debtor's nonexempt assets to creditors; in reorganization, the debtor must pay creditors at least this liquidation amount as a condition of reorganization or rehabilitation." *Id.* at ¶ 1.03[1].

[8]   Under Chapter 7, 11, 12, and 13 proceedings, a trustee is appointed to represent the estate. In Chapter 9 proceedings, which concern municipalities, the bankruptcy court cannot operate the city's affairs or, except for limited purposes specified in § 926(a), appoint a trustee. *See* 1 Collier on Bankruptcy ¶ 1.07[2] (16th ed. 2023) (citing § 903 and the Tenth Amendment). I focus on bankruptcy proceedings for individuals and businesses.

Under the Bankruptcy Code, an individual or business can seek the discharge or restructuring of debts by filing a "voluntary" bankruptcy petition. 1 Collier on Bankruptcy ¶ 1.01[1], ¶ 1.04[1] (16th ed. 2023). The bankruptcy estate is created under § 541 upon the filing of a petition. 1 Collier on Bankruptcy ¶ 1.03[1] (16th ed. 2023). "A voluntary petition automatically constitutes an order for relief," and "[t]here are no specific allegations that are required for the voluntary petition." *Id.* at ¶ 1.04[1] (citing 11 U.S.C. § 301).[9] But under § 301, the petitioner must "identify[ ] the chapter of the Code pursuant to which relief is requested," and "[t]he petitioner must qualify as a 'debtor' under the selected chapter." 2 Collier on Bankruptcy ¶ 301.01 (16th ed. 2023).

[9]   Section 301 says, in full:
   (a) A voluntary case under a chapter of this title is commenced by the filing with the bankruptcy court of a petition under such chapter by an entity that may be a debtor under such chapter.
   (b) The commencement of a voluntary case under a chapter of this title constitutes an order for relief under such chapter.

Section 109 of the Bankruptcy Code lays out who is eligible to "be a debtor" for the purposes of different types of bankruptcy proceedings. Section 109(a) creates a minimum **\*1260** threshold. It provides: "Notwithstanding any other provision of this section, only a person that resides or has a domicile, a place of business, or property in the United States, or a municipality, may be a debtor under this title." § 109(a). That tracks § 101(13)'s definition of debtor, "a person or municipality concerning which a case under this title has been commenced." Then, § 109(b) covers eligibility for Chapter 7 (Liquidation); § 109(c) covers eligibility for Chapter 9 (Adjustment of Debts of a Municipality); § 109(d) covers eligibility for Chapter 11 (Reorganization); § 109(f) covers eligibility for Chapter 12 (Adjustment of Debts of a Family Farmer or Fisherman with Regular Income); and § 109(e) covers eligibility for Chapter 13 (Adjustment of Debts of an Individual with Regular Income). Section 109 does not discuss Chapter 15 or foreign proceedings. *See* 8 Collier on Bankruptcy ¶ 1517.01 (16th ed. 2023) ("Chapter 15 is not listed or mentioned in section 109 because chapter 15 contains a distinct definition of debtor (the subject of the foreign proceeding) who never becomes a debtor under title 11.)").

Creditors can also file an "involuntary" bankruptcy petition under 11 U.S.C. § 303. 1 Collier on Bankruptcy ¶ 1.04[2] (16th ed. 2023). An involuntary proceeding can only travel under Chapter 7 or 11. § 303(a). The creditors' "involuntary petition must allege either that a custodian was appointed to take charge of all or substantially all of the debtor's property within the preceding 120 days or

that the debtor is not generally paying its debts as they become due." 1 Collier on Bankruptcy ¶ 1.04[2] (16th ed. 2023). Creditors typically allege the latter. *See id.* Creditors—especially secured creditors concerned about, for example, the dissipation of collateral—can benefit from prompt and efficient distribution of the debtor's assets so that they obtain at least some of what they are owed.

At the beginning of a bankruptcy case,[10] whether "a voluntary or involuntary case, the debtor must file a schedule of assets and liabilities, a schedule of current income and expenses, a schedule of executory contracts, a statement of financial affairs and, if the debtor is an individual, a statement of intention as required" under 11 U.S.C. § 521. 1 Collier on Bankruptcy ¶ 1.04[3] (16th ed. 2023). A debtor who is an individual must also submit "copies of all 'payment advices' received from the debtor's employer within 60 days of filing, a statement of monthly net income, itemized to show how the amount is calculated and a statement disclosing any reasonably anticipated changes in the debtor's monthly net income during the year" following the petition's filing. *Id.* And under 11 U.S.C. § 109(h), "[i]ndividual debtors must also file with the petition a certificate establishing that the debtor has received a credit counseling briefing within the 180 days preceding the commencement of the case. This certificate is necessary for the individual debtor to establish his or her eligibility to file." 1 Collier on Bankruptcy ¶ 1.04[3] (16th ed. 2023).

[10]    Under Federal Rule of Bankruptcy Procedure 1007, if the petitioner did not file the schedules with the petition, he must file them within 14 days thereafter, except that if the petition is involuntary, the debtor must file the required documents within 14 days of the order for relief. This information is "essential" to providing notice to creditors to submit claims for recovery. *See* 1 Collier on Bankruptcy ¶ 1.04[3] (16th ed. 2023).

We need not cover all the aspects of the Bankruptcy Code, but two main aspects of a full-fledged bankruptcy case under Title 11 are worth mentioning here. One is the automatic stay under 11 U.S.C. § 362. The automatic stay is triggered upon the filing of a bankruptcy petition. § 362. "The automatic stay bars anyone from taking action to recover a debt then owing by the debtor **\*1261** or acting to affect property of the debtor or the estate or in the possession of the estate. It maintains the status quo and prevents dismemberment of the estate by individual action of creditors and others." 1 Collier on Bankruptcy ¶ 1.05[1] (16th ed. 2023). The court can enforce the automatic stay through the contempt power or the imposition of sanctions. *Id.*

The trustee's duties and powers are also important. The trustee in a bankruptcy case "is the representative of the estate," § 323(a), "and as such he owes a fiduciary duty to debtor and creditors alike to act fairly and protect their interests." *In re Whet*, 750 F.2d 149, 149 (1st Cir. 1984). Section 521(a)(3) requires the debtor to "cooperate with the trustee as necessary for the trustee to perform the trustee's duties," which can "include actions necessary to locating and disposing of property of the estate." 4 Collier on Bankruptcy ¶ 521.01 (16th ed. 2023). The trustee can also avoid various kinds of transactions. *See* 1 Collier on Bankruptcy ¶ 1.05[5] (16th ed. 2023). The avoiding power includes the power to help prevent fraudulent transfers. The Bankruptcy Code contains two provisions to that effect. Under § 544(b),[11] the trustee can assert the rights of an unsecured creditor to avoid a pre-bankruptcy transfer under applicable state law on fraudulent transfers. And under § 548,[12] the trustee can avoid a transfer that fits under the Bankruptcy Code's own definition of fraudulent transfers provided in § 548.

[11]    Section 544(b) says:
(1) Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title [11 U.S.C. § 502] or that is not allowable only under section 502(e) of this title [11 U.S.C. § 502(e)].
(2) Paragraph (1) shall not apply to a transfer of a charitable contribution (as that term is defined in section 548(d)(3) [11 U.S.C. § 548(d)(3)]) that is not covered under section 548(a)(1)(B) [11 U.S.C. § 548(a)(1)(B)], by reason of section 548(a)(2) [11 U.S.C. § 548(a)(2)]. Any claim by any person to recover a transferred contribution described in the preceding sentence under Federal or State law in a Federal or State court shall be preempted by the commencement of the case.

[12]    Collier on Bankruptcy summarizes § 548 as follows:
Under section 548, the trustee may avoid a transfer made within two years prior to bankruptcy if there was an actual intent to hinder, delay or defraud creditors. The Code also recognizes presumptive fraudulent transfers. For instance, no specific fraudulent intent is required if the debtor voluntarily or involuntarily received less than a reasonably equivalent value in exchange and (1) was insolvent at the time of the transfer, (2) "was engaged in business or a transaction ... for which any property remaining with the debtor was an unreasonably small capital" or (3) "intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's

30 Fla. L. Weekly Fed. C 823

ability to pay[.]"
1 Collier on Bankruptcy ¶ 1.05[5][c] (quoting § 548(a)(1)).


* * *


The upshot is that a full bankruptcy proceeding involves, early in the case: (1) an initial filing claiming the debtor is eligible for the requested relief, (2) an automatic stay on proceedings related to the debtor's assets, (3) the creation of an estate covering the debtor's assets, (4) the appointment of a trustee to administer and protect the estate, and (5) detailed review of the debtor's assets and obligations. Recognizing a foreign insolvency proceeding occurs in a very different context. By the time a petition for recognition arrives on our shores, the foreign court has already determined the debtor's eligibility under its own law, and the debtor's assets **1262** are already under the control of the foreign proceeding. Nor would there be, for example, § 109(h) credit counseling for a debtor in a foreign proceeding before a Chapter 15 case would commence.


**B.**


On May 30, 1997, UNCITRAL adopted the Model Law on Cross-Border Insolvency. United Nations Commission On International Trade Law, UNCITRAL Model Law On Cross-Border Insolvency (1997), https://uncitral.un.org/en/texts/insolvency/modellaw/cross-border_insolvency. "The Model Law [was] accompanied by a Guide to Enactment and Interpretation. ... directed primarily to executive branches of Governments and legislators preparing the necessary enacting legislation, but it also provides useful insight for those charged with interpretation and application of the Model Law, such as judges." *Id.* "That the final negotiations [on the Model Law] included thirty-six UNCITRAL members—including the United States—representatives of forty observer states, and thirteen international organizations evidences its widespread support." *Tacon v. Petroquest Res. Inc. (In re Condor Ins. Ltd.)*, 601 F.3d 319, 322 (5th Cir. 2010) (citing 1997 Enactment Guide at ¶ 8, which is ¶ 16 in the 2013 version). On December 15, 1997, the United Nations General Assembly passed a resolution recommending that member states consider incorporating UNCITRAL's Model Law, and that "all efforts be made to ensure that the Model Law, together

with the [UNCITRAL Enactment] Guide, become generally known and available." General Assembly Resolution 52/158 ¶ 3–4. In addition, "UNCITRAL has established a reporting system for case law on UNCITRAL texts (CLOUT)" and composes a digest of international caselaw on interpretation of the Model Law to help promote uniform interpretation. UNCITRAL, Digest of Case Law on the UNCITRAL Model Law on Cross-Border Insolvency, ¶ 9–11 (2021), *available at* https://uncitral.un.org/en/case_law/digests ("UNCITRAL Digest").

The Enactment Guide explains that the UNCITRAL Model Law is designed to help ensure the "rescue of financially troubled businesses" and promote "a fair and efficient administration of cross-border insolvencies." ¶ 5. It also states that "[t]he cross-border cooperation mechanisms established by the Model Law are designed to confront" the "increasing problem" of "[f]raud by insolvent debtors, in particular by concealing assets or transferring them to foreign jurisdictions." *Id.* at ¶ 6.

In 2005, Congress adopted the Model Law in Title VIII of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, § 801 (2005). Section 1501(a) says:

> (a) The purpose of this chapter [11 USCS §§ 1501 et seq.] is to incorporate the Model Law on Cross-Border Insolvency so as to provide effective mechanisms for dealing with cases of cross-border insolvency with the objectives of—
>
> (1) cooperation between—
>
> (A) courts of the United States, United States trustees, trustees, examiners, debtors, and debtors in possession; and
>
> (B) the courts and other competent authorities of foreign countries involved in cross-border insolvency cases;
>
> (2) greater legal certainty for trade and investment;
>
> (3) fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor;
>
> (4) protection and maximization of the value of the debtor's assets; and
>
> **1263** (5) facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment.

WESTLAW    © 2024 Thomson Reuters. No claim to original U.S. Government Works.    15

Section 1508, titled "Interpretation," tells us that, "[i]n interpreting this chapter, the court shall consider its international origin, and the need to promote an application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions."

Chapter 15 applies when "assistance is sought in the United States by a foreign court or a foreign representative in connection with a foreign proceeding." § 1501(b)(1). Section 1517 defines when a United States court can recognize a foreign proceeding.[13] A representative of the foreign proceeding must file an application that meets the requirements of § 1515,[14] *see* § 1517(a)(3), which include attaching a "certified copy of the decision commencing such foreign proceeding and appointing the foreign representative," a certified document from the foreign court affirming the legitimacy of the proceeding and the representative's authority, or other evidence of the proceeding's legitimacy. *See* § 1515(b). Section 1516(a) also provides that, "[i]f the decision or certificate referred **\*1264** to in section 1515(b) [11 USCS § 1515(b)] indicates that the foreign proceeding is a foreign proceeding and that the person or body is a foreign representative, the court is entitled to so presume."[15]

[13] Section, 1517, Order granting recognition, provides in full:
(a) Subject to section 1506 [11 U.S.C. § 1506, the public policy exception], after notice and a hearing, an order recognizing a foreign proceeding shall be entered if—
(1) such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502 [11 U.S.C. § 1502];
(2) the foreign representative applying for recognition is a person or body; and
(3) the petition meets the requirements of section 1515 [11 U.S.C. § 1515].
(b) Such foreign proceeding shall be recognized—
(1) as a foreign main proceeding if it is pending in the country where the debtor has the center of its main interests; or
(2) as a foreign nonmain proceeding if the debtor has an establishment within the meaning of section 1502 [11 U.S.C. § 1502] in the foreign country where the proceeding is pending.
(c) A petition for recognition of a foreign proceeding shall be decided upon at the earliest possible time. Entry of an order recognizing a foreign proceeding constitutes recognition under this chapter [11 U.S.C. §§ 1501 et seq.].
(d) The provisions of this subchapter [11 U.S.C. §§ 1515 et seq.] do not prevent modification or termination of recognition if it is shown that the grounds for granting it were fully or partially lacking

or have ceased to exist, but in considering such action the court shall give due weight to possible prejudice to parties that have relied upon the order granting recognition. A case under this chapter [11 U.S.C. §§ 1501 et seq.] may be closed in the manner prescribed under section 350 [11 U.S.C. § 350].

[14] Section 1515 provides:
(a) A foreign representative applies to the court for recognition of a foreign proceeding in which the foreign representative has been appointed by filing a petition for recognition.
(b) A petition for recognition shall be accompanied by—
(1) a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;
(2) a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or
(3) in the absence of evidence referred to in paragraphs (1) and (2), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative.
(c) A petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative.
(d) The documents referred to in paragraphs (1) and (2) of subsection (b) shall be translated into English. The court may require a translation into English of additional documents.

[15] "The term 'foreign representative' means a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." § 101(24).

A foreign representative must be "a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." § 101(24). Upon recognition, the foreign representative can sue and be sued in the United States for the purposes of the ancillary proceeding and may apply directly to a United States court for appropriate relief. § 1509(b)(1)–(2), § 1510. The foreign representative can then "participate as a party in interest in a case regarding the debtor under" the Bankruptcy Code as well. § 1512.

To recognize the foreign proceeding, the court must find that the "foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502." § 1517(a)(1). Section 1502(4) says that " 'foreign main proceeding' means a foreign proceeding pending in the country where the debtor has the center of its main interests." Under § 1502(5), " 'foreign nonmain proceeding' means a foreign proceeding, other than a foreign main proceeding, pending in a country where the debtor has an establishment."

To find the proceeding fits under one of those definitions, the court must find the proceeding meets the definition of a "foreign proceeding." Chapter 1 defines a "foreign proceeding." Under § 101(23):

> The term "foreign proceeding" means a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

Congress adopted this definition of "foreign proceeding" from the Model Law in the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.[16]

[16]    Article 2(a) of the Model Law defines "foreign proceeding" as follows:
"Foreign proceeding" means a collective judicial or administrative proceeding in a foreign State, including an interim proceeding, pursuant to a law relating to insolvency in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.
Other than replacing "pursuant to" with "under" and adding "or adjustment of debt" after "a law relating to insolvency," § 101(23) uses the same definition as the Model Law.

Because Congress told us to consider the law's "international origin" in § 1508, and Congress was presumably aware of the UNCITRAL Enactment Guide, we consider the Guide important context. According to the Enactment Guide, the definition of "foreign proceeding" is designed to be broad and promote substance over form. "The definitions of proceedings or persons emanating from foreign jurisdictions avoid the use of expressions that may have different technical meaning in different legal systems and instead describe their purpose or function." Enactment Guide ¶ 65. The definition "avoid[s] inadvertently narrowing the range of

possible foreign proceedings that might obtain recognition **\*1265** and ... unnecessary conflict with terminology used in the laws of the enacting State." *Id.*

The Guide says the definition of "foreign proceeding" contains four elements. They are: (1) a basis in insolvency-related law of the originating State; (2) involvement of creditors collectively; (3) control or supervision of the assets and affairs of the debtor by a court or another official body; and (4) reorganization or liquidation of the debtor as the purpose of the proceeding. *Id.* at ¶ 66. Essentially, the proceeding must involve a legally authorized entity taking control of a debtor's assets and affairs for the purpose of settling the debtor's obligations with his creditors. Moreover, the Enactment Guide makes clear that "the Model Law was formulated to apply to any proceeding that meets the requirements of article 2, subparagraph *(a)* [definition of foreign proceeding], independently of the nature of the debtor or its particular status under national law." ¶ 55.

Congress incorporated the elements discussed in the Enactment Guide into the text of § 101(23). "The phrase 'under a law relating to insolvency or adjustment of debt' emphasizes that chapter 15 is available not only to debtors that are technically insolvent or facing liquidation but also to debtors who are in financial distress and may need to reorganize." 2 Collier on Bankruptcy ¶ 101.23 (16th ed. 2023). Meanwhile, "the 'collective proceeding' requirement excludes from chapter 15 receivership proceedings that are for the benefit of a single creditor." *Id.* Courts applying § 101(23) have interpreted it "broadly." *Id.* (citing *In re Betcorp Ltd.*, 400 B.R. 266 (Bankr. D. Nev. 2009), and *In re Tri-Continental Exchange Ltd.*, 349 B.R. 627 (Bankr. E.D. Cal. 2006), both of which involved winding-up proceedings under the foreign country's corporate law that qualified as collective proceedings and in which courts had at least some control over the corporations' assets and affairs).

As discussed above, Section 1517 provides for recognition of one of two types of foreign proceedings: foreign main proceedings and foreign nonmain proceedings. The distinction—where the debtor has his "center of main interests"—is undefined in Chapter 15. 8 Collier on Bankruptcy ¶ 1502.01[4] (16th ed. 2023). According to the Enactment Guide, the concept of a "center of main interests" comes from a regulation implementing the European Union Convention on Insolvency Proceedings. ¶ 81. That EU Regulation says: "The 'centre of main interests' should correspond to the place where the debtor conducts the administration of his interests on a regular basis and is therefore ascertainable by third parties." Council Regulation (EC) No 1346/2000

In re Al Zawawi, 97 F.4th 1244 (2024)

30 Fla. L. Weekly Fed. C 823

of 29 May 2000, Preamble ¶ 13. Paragraph 83 of the Enactment Guide quotes this regulation. Chapter 15 also establishes a presumption that the country where a debtor has its registered office is its center of main interests: "In the absence of evidence to the contrary, the debtor's registered office, or habitual residence in the case of an individual, is presumed to be the center of the debtor's main interests." § 1516(c).

A court can also recognize a proceeding occurring outside the debtor's center of main interests if it meets the § 101(23) definition of a "foreign proceeding" and "if the debtor has an establishment within the meaning of section 1502 [11 USCS § 1502] in the foreign country where the proceeding is pending." § 1517(b). Under § 1502(2), " 'establishment' means any place of operations where the debtor carries out a nontransitory economic activity." Essentially, a nonmain proceeding must occur in a country where the debtor has more than just assets. *See* 8 Collier on Bankruptcy ¶ 1517.02 ("By omission, a foreign proceeding that is premised only on the presence **\*1266** of assets in the foreign country is not eligible for recognition.").

When a court recognizes a foreign main proceeding, some relief flows automatically under § 1520.[17] One key form of relief is the automatic stay under 11 U.S.C. § 362. *See* § 1520(a)(1). The foreign representative also automatically gets "the rights and powers of a trustee under and to the extent provided by sections 363 and 552." § 1520(a)(3). And the foreign representative gets the right to void post-petition transactions concerning property in the United States, as a trustee can in a full bankruptcy case under § 549.[18] § 1520(a)(2).

[17]   Section 1520 provides:
(a) Upon recognition of a foreign proceeding that is a foreign main proceeding—
(1) sections 361 and 362 [11 U.S.C. §§ 361 and 362] apply with respect to the debtor and the property of the debtor that is within the territorial jurisdiction of the United States;
(2) sections 363, 549, and 552 [11 U.S.C. §§ 363, 549, and 552] apply to a transfer of an interest of the debtor in property that is within the territorial jurisdiction of the United States to the same extent that the sections would apply to property of an estate;
(3) unless the court orders otherwise, the foreign representative may operate the debtor's business and may exercise the rights and powers of a trustee under and to the extent provided by sections 363 and 552 [11 U.S.C. §§ 363 and 552]; and
(4) section 552 [11 U.S.C. § 552] applies to property of the debtor that is within the territorial jurisdiction of the United States.

(b) Subsection (a) does not affect the right to commence an individual action or proceeding in a foreign country to the extent necessary to preserve a claim against the debtor.
(c) Subsection (a) does not affect the right of a foreign representative or an entity to file a petition commencing a case under this title or the right of any party to file claims or take other proper actions in such a case.

[18]   Section 549(a) provides:
(a) Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate—
(1) that occurs after the commencement of the case; and
(2)
(A) that is authorized only under section 303(f) or 542(c) of this title [11 U.S.C. § 303(f) or 542(c)]; or
(B) that is not authorized under this title or by the court.

Section 1521[19] outlines discretionary relief available to the foreign representative **\*1267** in an ancillary proceeding. Under § 1521(a), the foreign representative of a nonmain proceeding can request that the court provide any relief that automatically flows from recognition of a main proceeding under § 1521, including a stay on proceedings related to, and transfers and disposals of, the debtor's assets. § 1521(a)(1)–(3). Section 1521(a)(4) enables the foreign representative to take discovery, meaning the court can issue discovery orders enforceable with the contempt power. But § 1521(a)(7) denies the foreign representative the ability to utilize the "avoidance provisions of the Bankruptcy Code (sections 522, 544, 545, 547, 548, 550 and 724(a))." 8 Collier on Bankruptcy ¶ 1521.02 (16th ed. 2023). The court also has the discretion to, at the foreign representative's request, "entrust the distribution of all or part of the debtor's assets located in the United States to the foreign representative or another person, including an examiner, authorized by the court, provided that the court is satisfied that the interests of creditors in the United States are sufficiently protected." § 1521(a)(5).

[19]   Section 1521 provides, in full:
(a) Upon recognition of a foreign proceeding, whether main or nonmain, where necessary to effectuate the purpose of this chapter [11 U.S.C. §§ 1501 et seq.] and to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the foreign representative, grant any appropriate relief, including—

(1) staying the commencement or continuation of an individual action or proceeding concerning the debtor's assets, rights, obligations or liabilities to the extent they have not been stayed under section 1520(a) [11 U.S.C. § 1520(a)];

(2) staying execution against the debtor's assets to the extent it has not been stayed under section 1520(a) [11 U.S.C. § 1520(a)];

(3) suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520(a) [11 U.S.C. § 1520(a)];

(4) providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities;

(5) entrusting the administration or realization of all or part of the debtor's assets within the territorial jurisdiction of the United States to the foreign representative or another person, including an examiner, authorized by the court;

(6) extending relief granted under section 1519(a) [11 U.S.C. § 1519(a)]; and

(7) granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a) [11 U.S.C. §§ 522, 544, 545, 547, 548, 550, and 724(a)].

(b) Upon recognition of a foreign proceeding, whether main or nonmain, the court may, at the request of the foreign representative, entrust the distribution of all or part of the debtor's assets located in the United States to the foreign representative or another person, including an examiner, authorized by the court, provided that the court is satisfied that the interests of creditors in the United States are sufficiently protected.

(c) In granting relief under this section to a representative of a foreign nonmain proceeding, the court must be satisfied that the relief relates to assets that, under the law of the United States, should be administered in the foreign nonmain proceeding or concerns information required in that proceeding.

(d) The court may not enjoin a police or regulatory act of a governmental unit, including a criminal action or proceeding, under this section.

(e) The standards, procedures, and limitations applicable to an injunction shall apply to relief under paragraphs (1), (2), (3), and (6) of subsection (a).

(f) The exercise of rights not subject to the stay arising under section 362(a) [11 U.S.C. § 362(a)] pursuant to paragraph (6), (7), (17), or (27) of section 362(b) [11 U.S.C. § 362(b)] or pursuant to section 362(o) [11 U.S.C. § 362(o)] shall not be stayed by any order of a court or administrative agency in any proceeding under this chapter [11 U.S.C. §§ 1501 et seq.].

* * *

Unlike the procedures that begin a full bankruptcy case under Title 11, the procedures for recognizing and assisting a foreign proceeding do not naturally involve consideration of the debtor's eligibility to commence a full case under § 109(a). *See* Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* § 24 at 167 (2012) (discussing how the whole-text canon "calls on the judicial interpreter to consider the entire text, in view of its structure and the physical and logical relation of its many parts"). The focus is on the foreign proceeding's purpose and legitimacy under the foreign law, the foreign debtor's relationship to the country where the proceeding is pending, and the court's authority to grant orders requested by the foreign representative to assist the proceeding. But unlike § 301, which requires a debtor-petitioner to specify the chapter of the Code under which he seeks relief—a reference to the eligibility requirements of § 109—Chapter 15 does not explicitly say that commencement of ancillary proceedings hinges on eligibility requirements in § 109(a). Rather, the foreign representative files for recognition of a foreign proceeding.

In addition, the relief available in ancillary proceedings is designed to assist the foreign proceeding. Such relief permits **\*1268** the foreign representative to preserve property in the United States for distribution via the foreign proceeding and investigate the debtor's American affairs. Discovery is especially important when the foreign representative suspects the debtor has fraudulently transferred assets to another country, a problem UNCITRAL set out to address in the Model Law.

But, in an ancillary proceeding, no new bankruptcy estate is created, and no new, American trustee is appointed to take custody of any American assets the debtor has. The foreign representative also cannot avail itself of the Bankruptcy Code's avoidance powers.[20] And the court need not "entrust the distribution of all or part of the debtor's assets located in the United States" to the foreign representative unless it "is satisfied that the interests of creditors in the United States are sufficiently protected." § 1521(a)(5).

[20]    The Fifth Circuit has held the foreign representative can exercise the avoidance powers available under the foreign law in the United States under § 1521. *Tacon v. Petroquest Res. Inc. (In re Condor Ins. Ltd.)*, 601 F.3d 319 (5th Cir. 2010).

The bottom line: Chapter 15 "focus[es] on eligibility of the foreign proceeding, not of the debtor." 8 Collier on

Bankruptcy ¶ 1517.01 (16th ed. 2023). And "[i]n a chapter 15 case, the debtor in the foreign proceeding is not a debtor under title 11." *Id.* Requiring a court to consider whether a legitimate insolvency proceeding that otherwise meets the definition of a foreign proceeding under § 101(23) has, as its subject matter, the assets and affairs of a debtor who could also file a United States bankruptcy petition puts a square peg in a round hole. Common sense tells us Congress would not do that in an off-handed manner.

According to the Majority opinion, Congress did so explicitly. It points out that § 103(a)[21] makes Chapter One applicable to cases under Chapter 15, and that § 109 is in Chapter One. But the statute's structure and function indicate the debtor subject to the foreign proceeding does not become a debtor under the American Bankruptcy Code. He remains a debtor subject to the foreign proceeding, which the American court helps administer in an ancillary proceeding. That means the foreign debtor need not be eligible to become an American bankruptcy debtor for the court to recognize the foreign proceeding. So, there is no inherent connection between debtor-eligibility under § 109 and recognizing a foreign proceeding.

[21] Section 103(a) says:

> (a) Except as provided in section 1161 of this title [11 U.S.C. § 1161], chapters 1, 3, and 5 of this title [11 U.S.C. §§ 101 et seq., 301 et seq., and 501 et seq.] apply in a case under chapter 7, 11, 12, or 13 of this title [11 U.S.C. §§ 701 et seq., 1101 et seq., 1201 et seq., or 1301 et seq.], and this chapter, sections 307, 362(o), 555 through 557, and 559 through 562 [11 U.S.C. §§ 101 et seq., 307, 362(o), 555–557, and 559–562] apply in a case under chapter 15 [11 U.S.C. §§ 1501 et seq.].

The use of the word "debtor" in the definition of a foreign proceeding in § 101(23), which requires that such proceeding is "under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court," might be read to create a connection between § 109(a) debtor eligibility and recognition of foreign proceedings. Section 1517(b) also refers to "the country where the debtor has the center of its main interests" in describing a foreign main proceeding, and where "the debtor has an establishment" to describe a nonmain proceeding.

Do these uses of the word "debtor" import § 109(a)'s eligibility requirements? True, we should ordinarily presume that **\*1269** "[a] word or phrase ... bear[s] the same meaning throughout a text." Antonin Scalia &

Bryan Garner, *Reading Law: The Interpretation of Legal Texts* § 25 at 170 (2012). But "this canon is particularly defeasible by context." *Id.* at 171.

In *In re Goerg*, we considered a nearly identical question under the then-applicable Bankruptcy Code. And we held that, in the context of a broad definition of "foreign proceeding" designed to allow American courts to assist an expansive set of foreign insolvency proceedings, that definition's reference to "the debtor" referred merely to the entity "properly subject, under applicable foreign law," to the foreign proceeding. *In re Goerg*, 844 F.2d at 1568.

## II.

### A.

In *In re Goerg*, we considered whether a United States court could recognize and assist a West German bankruptcy proceeding. The debtor in the proceeding was a West German decedent's estate. Under West German law, and as in many other countries, a bankruptcy proceeding could be brought with respect to an insolvent decedent's estate. *In re Goerg*, 844 F.2d 1562, 1563 n.1 (11th Cir. 1988). After the decedent's death, separate probate proceedings began in West Germany and in Fulton County, Georgia. The West German administrator petitioned the local court in Cologne to commence bankruptcy proceedings upon finding the estate was insolvent, and the court appointed Klaus Hubert Goerg to serve as bankruptcy trustee. *Id.* at 1563. Part of his task was to take custody of the decedent's foreign assets. *Id.* He petitioned the United States Bankruptcy Court for the Northern District of Georgia under 11 U.S.C. § 304 (1982),[22] seeking to enjoin the Fulton County probate proceeding and take custody of the decedent's property "for distribution in the West German bankruptcy proceeding." *Id.* at 1563–64.

[22] When we decided *In re Goerg,* section 304 provided:

> (a) A case ancillary to a foreign proceeding is commenced by the filing with the bankruptcy court of a petition under this section by a foreign representative.
> (b) Subject to the provisions of subsection (c) of this

WESTLAW    © 2024 Thomson Reuters. No claim to original U.S. Government Works.    20

section, if a party in interest does not timely controvert the petition, or after trial, the court may—
(1) enjoin the commencement or continuation of—
(A) any action against—
(i) a debtor with respect to property involved in such foreign proceeding; or
(ii) such property; or
(B) the enforcement of any judgment against the debtor with respect to such property, or any act or the commencement or continuation of any judicial proceeding to create or enforce a lien against the property of such estate;
(2) order turnover of the property of such estate, or the proceeds of such property, to such foreign representative; or
(3) order other appropriate relief.
(c) In determining whether to grant relief under subsection (b) of this section, the court shall be guided by what will best assure an economical and expeditious administration of such estate, consistent with—
(1) just treatment of all holders of claims against or interests in such estate;
(2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;
(3) prevention of preferential or fraudulent dispositions of property of such estate;
(4) distribution of proceeds of such estate substantially in accordance with the order prescribed by this title;
(5) comity; and
(6) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.
11 U.S.C. § 304 (1982).

The issue was whether the proceeding fit under the then-applicable definition of a foreign proceeding, which provided:

**\*1270** "[F]oreign proceeding" means proceeding, whether judicial or administrative and whether or not under bankruptcy law, in a foreign country in which the debtor's domicile, residence, principal place of business, or principal assets were located at the commencement of such proceeding, for the purpose of liquidating an estate, adjusting debts by composition, extension, or discharge, or effecting a reorganization.

*Id.* at 1565 (quoting 11 U.S.C. § 101(22) (1982)). The bankruptcy court and the district court found that, because the definition of a "foreign proceeding" included the word "debtor," a United States bankruptcy court could not recognize a foreign proceeding unless the debtor subject to that proceeding would qualify as a "debtor" for an American bankruptcy proceeding. *In re Goerg*, 844 F.2d at 1564. Because a "debtor" under the United States

Bankruptcy Code must be a "person"—which then, as now, did not include estates (which are entities but not persons as defined in Chapter 1), the lower courts found they could not assist the proceeding. *See id.* at 1564–66.

We reversed. Because the definition of foreign proceeding "expressly provide[d] that the foreign proceeding need not even be a bankruptcy proceeding, either under foreign or United States law," it would have been an "anomaly" to refuse to recognize the proceeding because the debtor in the West German proceeding was ineligible to commence a United States bankruptcy proceeding. *Id.* at 1566–67. We also noted that the definition of foreign proceeding included proceedings "for the purpose of liquidating an estate," which could be read to cover decedents' estates.[23] *Id.* So, the definition of foreign proceeding was both broad and ambiguous as to whether it covered the West German proceeding at issue. *Id.*

[23] We explained that the word "estate" as used in the definition of foreign proceeding might have referred to bankruptcy estates like those created under § 541, which would not necessarily include decedents' estates, or to decedents' estates. *Id.* at 1567 n.11; *see also* 2 Collier on Bankruptcy ¶ 304.01, at 304–12 (15th ed. 1987) ("That a foreign administration of a decedent's estate is ... a 'foreign proceeding' is suggested by the expansive language of [section 101(22)] which includes within its scope proceedings under laws other than bankruptcy laws brought for the purpose of liquidating an estate.").

We then reasoned that, given the purpose of the statute to "help further the efficiency of foreign insolvency proceedings involving worldwide assets," and "in light of the comity concerns that induced Congress to enact" the ancillary proceedings statute, "it would make eminent sense for Congress to define expansively the class of foreign insolvency proceedings for which ancillary assistance is available." *Id.* at 1568. Put another way, in the context of defining a "foreign proceeding," the word "debtor" referred to the entity that was already the subject of a foreign insolvency proceeding and did not limit the statute's broad definition of a foreign proceeding under 11 U.S.C. § 101(22) (1982).

We derived the statute's purpose by outlining how an ancillary proceeding worked under section 304. We explained: "The filing of a section 304 petition does not commence a full bankruptcy case; a section 304 case is an ancillary case in which a United States bankruptcy court is authorized to apply its processes to give effect to orders entered in a foreign insolvency proceeding." *Id.* at 1567. An ancillary proceeding's "focus" under section 304 was "on making United States processes available in aid of

foreign proceedings, not actual bankruptcy administration." *Id.* at 1568. Whether the foreign debtor would be eligible to commence a bankruptcy proceeding in the United States would be irrelevant to this focus. By the time a petition from a foreign **\*1271** representative arrived, the foreign court would have already decided the debtor's eligibility under its own insolvency law, and a trustee or similar entity would have taken custody of the debtor's assets and affairs. And if granting relief were inappropriate, the American court retained discretion not to grant ancillary relief. *See id.* at 1568 ("[T]he section 304 debtor may ultimately receive no relief at all; it is within the discretion of the bankruptcy court, guided by the factors enumerated in section 304(c), to determine what relief, if any, is appropriate."). That meant the foreign debtor did not necessarily have the benefit of the automatic stay applicable in full American bankruptcy proceedings. *See id.*

So, we concluded "it would make little sense to require that the subject of the foreign proceeding qualify as a 'debtor' under United States bankruptcy law." *Id.* at 1568. The point of the statute was to authorize American courts to recognize and assist foreign proceedings involving insolvencies in the various forms in which they might arrive. In light of this purpose, the reference to "the debtor" in describing the debtor's relationship to the country where the foreign proceeding commenced—"a foreign country in which the debtor's domicile, residence, principal place of business, or principal assets were located at the commencement of such proceeding"—did not import the debtor eligibility requirements for commencing a full bankruptcy proceeding. *See* Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 20 (2012) ("The evident purpose of what a text seeks to achieve is an essential element of context that gives meaning to words.").

**B.**

The reasoning we provided for our holding in *In re Goerg* answers the question presented here. While the current definition of "foreign proceeding" in § 101(23) is not identical to the definition applicable in *In re Goerg*, it contains the same material aspects we relied on in interpreting "foreign proceeding" under 11 U.S.C. § 101(22) (1982).

The current definition of a "foreign proceeding" broadly encompasses "collective judicial or administrative proceeding[s]" which are "under a law relating to insolvency or adjustment of debt" and "for the purpose of reorganization or liquidation," as long as "the assets and affairs of the debtor are subject to control or supervision by a foreign court." While it does not explicitly say the proceeding need not be under bankruptcy law, as § 304 did, the use of the phrases "under a law relating to insolvency or adjustment of debt" and "for the purpose of reorganization or liquidation" convey the same point that the substance and purpose of the proceeding, not its label, control. *See* Enactment Guide ¶ 65 ("The definitions of proceedings or persons emanating from foreign jurisdictions avoid the use of expressions that may have different technical meaning in different legal systems and instead describe their purpose or function."). The "anomaly" we identified in *In re Goerg* was that construing "foreign proceeding" to require a debtor that could qualify as an American bankruptcy debtor would make no sense given the foreign proceeding did not even need to be under the foreign country's bankruptcy law, as long as it was "for the purpose of liquidating an estate, adjusting debts by composition, extension, or discharge, or effecting a reorganization." 11 U.S.C. § 101(22) (1982). The current definition of a "foreign proceeding" broadly covers non-bankruptcy proceedings for the same purposes.

There are some differences between the old definition of "foreign proceeding" and the current version, but they are not material to the issue here. The old definition **\*1272** was not limited to "collective" proceedings, though it was limited to "judicial or administrative" proceedings, as the current definition is. The old definition did not specify that "the assets and affairs of the debtor [must be] subject to control or supervision by a foreign court." § 101(23). There was also no explicit divide between foreign "main" and "nonmain" proceedings as contemplated in § 1517. The old definition did require that the proceeding occur "in a foreign country in which the debtor's domicile, residence, principal place of business, or principal assets were located at the commencement of such proceeding," which is similar to the requirement that a "main proceeding" occur in the debtor's "center of its main interests." § 1517(b)(1); *see* § 1516(c) ("In the absence of evidence to the contrary, the debtor's registered office, or habitual residence in the case of an individual, is presumed to be the center of the debtor's main interests."). Section 1517 also contemplates recognizing foreign proceedings pending where the debtor only has an "establishment." § 1517(b)(2).

These differences may have some impact on the scope of proceedings a United States court will recognize under

Chapter 15. But they do not impact the issue here: whether, in the context of describing "a [foreign] law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court," reference to "the debtor" imposes § 109(a)'s eligibility requirements. We face the same "anomaly" here as we faced in *In re Goerg*, and we should resolve it the same way. *See Generali v. D'Amico*, 766 F.2d 485, 489 (11th Cir. 1985) ("This Court is bound by the case law of the Eleventh Circuit.").

Nor do any differences between the procedures and relief under section 304 and Chapter 15 change that analysis. For one thing, the purpose and function of ancillary proceedings are similar. Just as an ancillary proceeding's "focus" under section 304 was "on making United States processes available in aid of foreign proceedings, not actual bankruptcy administration," *In re Goerg*, 844 F.2d at 1568, the focus of Chapter 15 is on recognizing and assisting foreign insolvency proceedings. *See* 8 Collier on Bankruptcy ¶ 1517.01 (16th ed. 2023). And "[i]n a chapter 15 case, the debtor in the foreign proceeding" does not become "a debtor under title 11." *Id.*

As to differences, some relief, including the automatic stay under § 362, flows automatically upon recognition of a foreign main proceeding. § 1520(a). That was not so under section 304's discretionary regime. But nonmain proceedings do not necessarily benefit from the stay, and regardless, various key aspects of a full proceeding—like the trustee's assumption of avoidance powers and immediate custody of the bankruptcy estate—are not part of an ancillary proceeding.

## C.

If anything, the current statutory provisions related to ancillary proceedings should cause us to double down on the reasoning we applied in *In re Goerg*. Chapter 15 provides its own definition of a "debtor" that controls references to "the debtor" in Chapter 15. Section 1502(a) says: "For the purposes of this chapter, the term ... 'debtor' means an entity that is the subject of a foreign proceeding." That definition aligns with our interpretation of "debtor" in *In re Goerg*.

This definition is not reconcilable with § 109's definition of "who may be a debtor" under Title 11. *See* Antonin

Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 28 at 183 (2012) ("If there is a conflict between a general provision and a specific provision, the specific provision prevails."). Section 109 says "only a *person* ... may be a debtor under **\*1273** this title," while § 1502(1) defines "debtor" as "an *entity* that is the subject of a foreign proceeding." (emphases added). As we discussed in *In re Goerg*, an entity—like a decedent's estate—is not necessarily a "person" under Chapter 1. Chapter 1 provides: "The term 'entity' includes person, estate, trust, governmental unit, and United States trustee." On the other hand, "[t]he term 'person' includes individual, partnership, and corporation, but does not include governmental unit, except ...." 11 U.S.C. § 101(41). *See also* 1 Collier on Bankruptcy ¶ 1.01[2][a] ("A 'person' may be eligible for relief under the Code by virtue of section 109, but one who is an 'entity' and not a 'person' would not be eligible.").

True, statutory provisions presumably "bear the same meaning throughout a text," and "[t]he provisions of a text should be interpreted in a way that renders them compatible, not contradictory." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* §§ 25, 27, at 170, 180 (2012). But "a material variation in terms suggests a variation in meaning." *Id.* § 25 at 170. Congress chose to use the word "entity" in defining a " 'debtor' ... that is the subject of a foreign proceeding" in § 1502(1). " 'Entity' is the broadest of all definitions that relate to bodies or units" in the Bankruptcy Code. 2 Collier on Bankruptcy ¶ 101.15 (16th ed. 2023). And so, the definition of "debtor" for the purposes of Chapter 15 confirms that, when Chapter 15 refers to a "debtor" subject to a foreign proceeding, it means whatever "entity" is the subject of that proceeding, independently of the nature of the debtor and whether such debtor could be a debtor eligible to commence a U.S. bankruptcy case.

Consideration of the "international origins" of Chapter 15 pursuant to § 1508 also supports following *In re Goerg*. The Guide to Enactment of the Model Law says: "the Model Law was formulated to apply to any proceeding that meets the requirements of article 2, subparagraph *(a)* [definition of foreign proceeding], *independently of the nature of the debtor or its particular status under national law*." Enactment Guide ¶ 55 (emphasis added). The Enactment Guide also tells us exclusions from "foreign proceeding" should be clear. It states:

> Article 17 provides that, subject to article 6 [adopted in § 1506, Public Policy Exception], when the specified requirements of article 2 [adopted as § 101(23)] concerning the nature of the foreign proceeding (i.e. that the foreign proceeding is, as a matter of course, a

collective proceeding for the purposes of liquidation or reorganization under the control or supervision of the court) and the foreign representative are met and the evidence required by article 15 [adopted as § 1515] has been provided, the court should recognize the foreign proceeding *without further requirement*.

Enactment Guide ¶ 29 (emphasis added). And the Guide goes on to say, "with a view to making the national insolvency law more transparent (for the benefit of foreign users of a law based on the Model Law), it is advisable that exclusions from the scope of the law be expressly mentioned."[24] *Id.* at ¶ 60.

[24] Section 1501 expressly excludes from the application of Chapter 15, *inter alia*, "a proceeding concerning an entity, other than a foreign insurance company, identified by exclusion in section 109(b) [11 U.S.C. § 109(b)]." § 1501(c)(1). Section 109(b)'s exclusion applies to, *inter alia*, "a domestic insurance company, bank, savings bank, cooperative bank, savings and loan association, building and loan association, homestead association ...." § 109(b)(2). That exclusion tracks the Model Law's suggestion to exclude "types of entities, such as banks or insurance companies, that are subject to a special insolvency regime" from application of the Model Law. Model Law, Art. I(2). The Enactment Guide also explains, "Banks or insurance companies are mentioned as examples of entities that the enacting State might decide to exclude from the scope of the Model Law." ¶ 56.

**\*1274** The UNCITRAL's Digest on case law under the Model Law helps confirm our conclusion. The Digest states, in commenting on *In re Barnet*, 737 F.3d 238 (2d Cir. 2013), which held that § 109(a) eligibility is required in recognizing a foreign proceeding:

The [Model Law] does not define the term "debtor" as it is not an element of the recognition regime; the [Model Law] provides only for recognition of the foreign proceeding at the request of the foreign representative. Nevertheless, there have been cases in which the court has considered whether or not the entity subject to the foreign proceeding is a debtor for the purposes of the law to be applied by the receiving court.

UNCITRAL Digest ¶ 43 (discussing "Use of the term 'debtor' " in interpreting the definition of a foreign proceeding). The Digest does not mention other international cases reaching the same conclusion as the Second Circuit, and the appellant does not cite any such cases here.[25]

[25] The Digest does mention how, in a British case:
the court said that as to whether the company was a debtor, no separate attention had been given to that

requirement in other cases and the expression ["debtor"] was not defined in the [Model Law]. Each of the courts whose decisions on recognition applications were considered had, the court said, apparently been content to work on the basis that an entity subject to a foreign proceeding was, for that reason alone, within the relevant "debtor" concept.
Digest at ¶ 44 (citing *Rubin v. Eurofinance SA* [2009] EWHC 2129 (Ch) ¶ 39, *affirmed by* [2012] UKSC 46).

And so, the reasonable reading of the word "debtor" in the definition of "foreign proceeding" is that it refers to whatever entity is the subject of the foreign insolvency proceeding.

**D.**

The course of proceedings below illustrate the problem with adopting Appellant's position: it would reward fraudulent transfers of a foreign debtor's assets in the United States because once the debtor sells his American property, the foreign proceeding cannot be recognized. The ancillary case began when, on March 24, 2021, Colin Diss, the representative of a United Kingdom bankruptcy proceeding, filed a petition under Chapter 15 for recognition of the U.K. proceeding as a main proceeding.[26] He also filed a motion for an order granting recognition. He requested the automatic relief available under § 1520 and the discretionary relief available under § 1521.

[26] The petition used Official Form 401, as required. 9 Collier on Bankruptcy ¶ 1002.02[7] (16th ed. 2023).

Diss attached a declaration supporting the motion for recognition. In it, he said he was a "joint trustee in bankruptcy and foreign representative of Talal Qais Al Zawawi." The declaration explained that Al Zawawi moved to London with his then-wife in 2015, but she petitioned for divorce in 2017. The U.K. court entered a judgment in the divorce ordering him to pay his ex-wife £24,075,000. The U.K. court then issued a "Worldwide Freezing Order" against Al Zawawi on April 2, 2019, enjoining him "from disposing of, dealing with, or diminishing the value of his assets until the Judgment was paid in full."

When Al Zawawi failed to pay the divorce judgment, his

**In re Al Zawawi, 97 F.4th 1244 (2024)**

30 Fla. L. Weekly Fed. C 823

ex-wife filed an involuntary petition for his bankruptcy on March 19, 2020. The U.K. bankruptcy court adjudged him bankrupt on June 29, 2020. The court also appointed Diss and *1275 two others as joint trustees on July 15, 2020. Diss included certified copies of the U.K. orders finding Al Zawawi bankrupt and appointing the joint trustees with the Chapter 15 petition.

Diss further declared that:

> Upon information and belief, the Debtor has his principal assets in the Middle District of Florida, including an ownership interest [in] the following companies: (i) Qapa Investing Company U.S.A., Inc.; (ii) Qapa Holdings, Inc.; (iii) Hawthorne Village at Port Orange, Inc.; (iv) Hawthorne Groves Apartments, Inc.; and (v) Texas Q Zone, Inc.

Diss also claimed that he was seeking recognition to recover Al Zawawi's assets and investigate whether his funds were used to acquire other assets. Diss then successfully moved the Bankruptcy Court for provisional relief under 11 U.S.C. § 1519 to enjoin anyone from selling, encumbering, or disposing of Al Zawawi's American assets, and authorizing him to take discovery under Rule 2004 of the Federal Rules of Bankruptcy Procedure.

In an objection opposing recognition, Al Zawawi argued that, because he did not fit under § 109(a)'s eligibility requirement, the petition needed to be dismissed. He claimed he had no personal knowledge that he had any assets in the United States, and that Diss's declaration did not provide factual support that he did.

Diss filed an amended declaration on April 20, 2021. He added declarations stating that Al Zawawi "holds an interest in the Companies, indirectly, through a Curaçao company called Qapa Investing Corporation N.V., which in turn ostensibly owns some or all of the Companies" referenced in the first declaration. He attached an organizational chart[27] mapping out his ownership interests in the Florida companies. QAPA Holdings, a Florida corporation, owns QAPA Investing Company USA, Hawthorne Groves Apartments, and Hawthorne Village; QAPA Investing Corporation NV, a Curaçao corporation in which he owns an 18.18% share, owns QAPA Holdings. His family members own the rest of the Curaçao holding company.

[27]

The amended declaration also raised the possibility that Al Zawawi fraudulently transferred his interest in Texas Q Zone, which Diss had alleged Al Zawawi owned in the first declaration. Diss declared that, on or about February 24, 2020—less than a month before his ex-wife filed an involuntary bankruptcy petition—Al Zawawi sold *1276 "600 shares (the totality of [his] shareholding interest) in Texas Q Zone, Inc. to his brother, Azzan Qais Abdul Munem Al Zawawi, for US$1,582,901." According to Diss, this sale violated the freezing order entered in April 2019.

In a brief supporting recognition filed on April 20, 2021, Diss argued that the Bankruptcy Court should not follow *In re Barnet*, and that regardless, Al Zawawi had American assets. Those assets consisted of his beneficial ownership in the Florida companies, along with (1) a retainer Sequor Law—the Foreign representatives' lawyers' firm—"holds ... in its trust account for the benefit of the Debtor's estate," and (2) Al Zawawi's jacket and wallet. Diss obtained Al Zawawi's jacket and wallet and brought them to Sequor's Miami office, according to the brief, "for keeping on behalf of and for the benefit of the Debtor." Diss had declared that he did this in the amended declaration.

Diss attached to the memorandum documents he had obtained purporting to verify Al Zawawi's sale of his shares in Texas Q Zone. These included: a copy of the stock purchase agreement, dated February 24, 2020; a bank record showing Al Zawawi's receipt of the funds for the Texas Q Zone shares from his brother; and a copy of a "high importance" email dated April 8, 2021, from the financial comptroller of the "Zawawi Group"[28] to Alex MacKinnon, CEO of Texas Q Zone, stating that Al Zawawi had sold his 60% share in Texas Q Zone to his brother in February 2020. The email said that COVID-19 disruptions prevented prompter notice.

[28]    The Zawawi Group is a consulting group based in Oman that was founded in 1975 by Abdulmunim Al

**In re Al Zawawi, 97 F.4th 1244 (2024)**

30 Fla. L. Weekly Fed. C 823

Zawawi, an Omani politician. Zawawi Group, *About Us*, https://www.zawawigroup.com/about/.

When this transfer actually occurred was crucial, especially if § 109(a) limited recognition. At a hearing on the motion for recognition in front of the Bankruptcy Court on April 22, 2021, Diss's counsel explained that the trustees only learned of Al Zawawi's transfer of his interests in Texas Q Zone after documents were produced under subpoenas issued pursuant to the Bankruptcy Court's § 1519 relief order. Alex Mackinnon, Texas Q Zone's CEO, testified in a deposition taken the day before the hearing that he also first learned about the transfer of Al Zawawi's interest on April 6, 2021, after the subpoenas were served. The corporate records of the company therefore still said Al Zawawi held 60% of the shares in the company. Diss's counsel characterized the documents reflecting the sale as occurring in February 2020 as "selfserving." Counsel also explained that "under English law this transfer would definitely be a transfer that would be viewable and potentially avoidable depending on additional information reflecting the value or the lack thereof of the alleged consideration, but most importantly is the timing."

Al Zawawi argued, however, that as of the date of the Chapter 15 petition, he "had no interest whatsoever in Texas Q Zone." He also argued the interests in the Curaçao holding company that owned the Florida companies and the retainer should not qualify as property under § 109(a).[29] Accordingly, Al Zawawi had disposed of his only assets in the United States, and thus did not qualify as a debtor under § 109(a). That meant the petition

needed to **\*1277** be dismissed, ending Diss's investigation. Al Zawawi reiterated the same argument on appeal.

[29] As to Al Zawawi's wallet and jacket, his lawyer said he had not heard of Diss's lawyer's possession of them until ten minutes before the hearing and accused Diss's counsel of "planting evidence ... a police tactic of the 1980's." The lawyer for Diss responded by reminding the Bankruptcy Court that Diss mentioned the personal property in paragraph 28 of the amended declaration.

Common sense tells us this result almost certainly cannot be correct. The Model Law that Congress adopted had, as one of its primary purposes, preventing bankruptcy debtors from fraudulently transferring and hiding assets. *See also* § 1501(a)(3) (Chapter 15 has as a purpose promoting "fair and efficient administration of cross-border insolvencies that protects the interests of all creditors"). Yet Appellant's argument is that, if a United States Bankruptcy Court finds a potentially fraudulent transfer of all a foreign debtor's American assets was successfully executed, the Chapter 15 case is over because the debtor would be ineligible to then file for bankruptcy in the United States. Congress *could* write such a selfdefeating statute. But in my view, it did not do so.

### All Citations

97 F.4th 1244, 30 Fla. L. Weekly Fed. C 823

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 14

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) |
| | ) Case No. 23-10092 (MEW) |
| Americanas S.A., *et al.*,[1] | ) |
| | ) Chapter 15 |
| Debtors in a Foreign Proceeding. | ) (Jointly Administered) |
| | ) |

### DECISION AND ORDER GIVING FORCE AND EFFECT
### TO THE BRAZILIAN RJ PLAN AND GRANTING RELATED RELIEF

This matter came before the Court upon the Motion (the "**Motion**" by Antonio Reinaldo
Rabelo Filho, in his capacity as the foreign representative (the "**Foreign Representative**") for
each of the debtors in these jointly administered chapter 15 cases (the "**Debtors**") [ECF No. 65]
for entry of an Order giving effect within the United States to a joint plan of reorganization (the
"**Brazilian RJ Plan**") and to an order of the 4th Business Court of Rio de Janeiro (the "**Brazilian
RJ Court**"), dated February 26, 2024, that confirmed the Brazilian RJ Plan (the "**Brazilian
Confirmation Order**").  The Foreign Representative also seeks supplemental relief in aid of the
implementation and enforcement of the Brazilian RJ Plan.

Under the Brazilian RJ Plan creditors were given various options as to how their claims
were to be treated.  In order to qualify for some of those options the creditors had to agree to release
their own claims against the debtors and against certain current and former directors, officers and
affiliates of the debtors, certain shareholders who have agreed to provide additional funding to the
debtors as part of the plan, and other creditors who had signed a plan support agreement.  The
releases include claims relating to the accounting irregularities that necessitated the Brazilian

---

[1]   The debtors in these chapter 15 cases are Americanas S.A. (06-60 - Brazil); JSM Global S.à.r.l.
(5670 – Grand Duchy of Luxemburg); and B2W Digital Lux S.à.r.l. (8659 – Grand Duchy of
Luxemburg).

bankruptcy proceedings, but they do not apply to claims based on fraud and criminal behavior. The main options given to creditors included the following:

- Some creditors were entitled to participate in a "reverse auction" under which they could bid proposed discounts to their claims (with a minimum discount of 70%). The creditors bidding the highest discounts would be "partially or fully repaid in cash" up to $2 billion. The highest discount that was offered was 73.01%, and creditors who offered discounts of 73% of more will be paid on a *pro rata* basis.

- Creditors (including holders of NY Notes)[2] were entitled to elect to be paid in a combination of new equity and new debentures. Creditors who chose this option were required to grant the releases described above. I was informed that those creditors received recoveries that were equal in value to approximately 80% of their claims.

- Creditors could elect to receive payment in cash at a 70% discount to their claims. Those creditors who made this election were not required to grant releases. However, those creditors will have to wait 15 years (until January 31, 2039) to receive payments.

- Creditors who failed to make any election are not deemed to have granted releases. However, they will only receive cash payments at an 80% discount to their claim amounts, and they will have to wait 20 years (until January 31, 2044) to receive payments.

The debtors conducted a tender offer in New York in April 2024 in order to implement the foregoing options insofar as they relate to holders of certain New York noteholders.

---

[2]    Capitalized terms used but not defined herein have the meanings set forth in the Motion or in the Supplemental Memorandum of Law filed by the Foreign Representative [ECF No. 71].

Approximately 7% of the noteholders made no election, meaning they will only receive cash at an 80% discount to their claims and will not receive payment until January 31, 2044.

No objections to the Motion have been filed. However, I asked some questions about some of the Brazilian RJ Plan at a hearing on July 11, 2024.

First, I asked whether the New York noteholders included any "retail" investors who might not have had the sophistication to understand the options being presented to them. The Debtors have verified that the notes were not registered securities and were available for purchase in the United States only by qualified institutional buyers and accredited investors.

Second, I asked for clarification of the mechanics of the cancellation of NY Notes held by those NY Noteholders who made no elections. The Debtors have agreed to the language that is included in paragraph 13 of this Order to ensure that the NY Noteholders receive clear instructions and communications in this regard.

Third, I asked about the reasons for the large disparities between the recoveries for creditors who elected option 2 (who will receive 80% recoveries right away) and creditors who declined to grant releases (who will receive nominal recoveries of only 20% or 30% but who also will have to wait 15 to 20 years to receive them). The Debtors stated that the disparities are "incentives" for releases. The Debtors have also advised me that some creditors complained that the releases actually were "coercive" as a result of these disparities and that the proposed releases therefore violated Brazilian law, but that the Brazilian RJ Court overruled that objection. *See* Brazilian Confirmation Order at 20-24. [ECF No. 66-4].

It does not appear that any creditors otherwise challenged the disparity in recoveries in Brazil. No creditors have raised issues in this Court regarding the disparate recoveries under the

3

2920

Brazilian RJ Plan or regarding the proposed releases, and no creditors have objected to the enforcement in the United States of the Brazilian RJ Plan and the Brazilian Confirmation Order.

Based on the materials submitted to the Court, and the absence of any objection thereto,

**THIS COURT HEREBY FINDS AND DETERMINES THAT:**

A.      The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.      This Court has jurisdiction to consider this matter and enter this Order pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York dated January 31, 2012, Reference M-431, *In re Standing Order of Reference Re: Title 11*, 12 Misc. 00032 (S.D.N.Y. Jan. 31, 2012) (Preska, C.J.).

C.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(1) and (2)(P).

D.      Venue for this proceeding is proper before this Court pursuant to 28 U.S.C. § 1410.

E.      Pursuant to an order of this Court dated March 3, 2023, the Foreign Representative was duly recognized as the "foreign representative" of the Chapter 15 Debtors within the meaning of section 101(24) of the Bankruptcy Code, and the Brazilian RJ Proceeding was recognized as a "foreign main proceeding" of each of the Chapter 15 Debtors within the meaning of section 1502(4) of the Bankruptcy Code [ECF No. 32] (the "**Recognition Order**").

F.      The Foreign Representative, in his capacity as the Foreign Representative of the Chapter 15 Debtors, pursuant to the Recognition Order, has standing to file the Motion.

4

G.      No objections or other responses to the Motion have been filed.

H.      The terms of the Brazilian RJ Plan are not manifestly contrary to U.S. public policy.

I.      Absent the relief granted hereby, the Brazilian RJ Proceeding and the efforts of the RJ Debtors, their creditors, and other parties in interest to consummate the Brazilian RJ Plan could be impeded or harmed by the actions of certain creditors and/or other persons, a result that would be inconsistent with the purposes of chapter 15 of the Bankruptcy Code as set forth, *inter alia,* in section 1501(a) of the Bankruptcy Code.  If taken, such actions could threaten, frustrate, delay, and ultimately jeopardize the Brazilian RJ Proceeding and implementation of the Brazilian RJ Plan, and, as a result, the Chapter 15 Debtors, their creditors, and such other parties in interest would suffer irreparable harm for which there is no adequate remedy at law.

J.      The relief granted hereby: (i) is within this Court's jurisdiction; (ii) is appropriate to effectuate the purposes and objectives of chapter 15 of the Bankruptcy Code; (iii) is in the interests of international comity; and (iv) is available and warranted pursuant to sections 1507(a) and 1521(a) of the Bankruptcy Code.

K.      Appropriate notice of the filing of, and the setting of the Hearing on, the Motion was given to the parties listed in Exhibit B attached to the Motion, which notice is deemed adequate for all purposes, and no other or further notice need be given.

**ACCORDINGLY, IT IS HEREBY ORDERED THAT:**

1.      The Motion and the relief requested therein are granted to the extent set forth herein.

2.      The Brazilian Confirmation Order and the Brazilian RJ Plan, including, for the avoidance of any doubt, the Non-Litigation Clause and all annexes to the Brazilian RJ Plan, subject to all terms, conditions, and limitations set forth therein, are hereby recognized, granted comity, and given full force and effect, within the territorial jurisdiction of the United States and

5

for purposes of U.S. law with respect to each of the Chapter 15 Debtors, to the same extent that they are given effect in Brazil.  Each of the Brazilian Confirmation Order and the Brazilian RJ Plan is binding on all creditors of the Chapter 15 Debtors, shareholders, and any other holders of claims or interests in the Chapter 15 Debtors, as well as the Directed Parties,[3] and any of their successors or assigns, and all persons having notice of the Motion.

3.      All entities (as that term is defined in section 101(15) of the Bankruptcy Code), including all creditors, shareholders, and any other holders of claims or interests in the Chapter 15 Debtors, as well as the Directed Parties, are permanently enjoined from commencing, continuing, or taking any action or asserting any claim within the territorial jurisdiction of the United States that is in contravention or inconsistent with, or would interfere with, or impede the administration, implementation and/or consummation of the Brazilian RJ Plan, the Brazilian Confirmation Order, or the terms of this Order.  No action may be taken within the territorial jurisdiction of the United States to confirm or enforce any award or judgement that would otherwise be in violation of this Order without first obtaining leave of this Court.

4.      Nothing herein shall enjoin a police or regulatory act of a governmental unit, including a criminal action or proceeding.

5.      Nothing herein shall enjoin or restrict the pursuit of claims against non-Debtors that have not been released under the terms of the Brazilian RJ Plan and the Brazilian Confirmation Order.

6.      Subject to the continuing effectiveness of the Brazilian RJ Plan and Brazilian Confirmation Order and the continuing rights of NY Noteholders to receive distributions directly under the Brazilian RJ Plan, Election Solicitation, and Reverse Auction Tender Offer, the Notes

---

[3]      Collectively, the "**Directed Parties**" are DTC and the Indenture Trustee.

Indentures and the outstanding NY Notes and Temporary Notes, instruments, certificates, and other documents evidencing the NY Noteholders' claims and rights related thereto shall be deemed satisfied, discharged, cancelled, and of no force or effect automatically upon entry of this Order. All remaining positions on account of the NY Notes or Temporary Notes on the books and records of the Indenture Trustee and the DTC shall be terminated.

7.     The Directed Parties are directed to, and the Foreign Representative and the Chapter 15 Debtors are authorized to, subject to the terms of the Brazilian RJ Plan, take any and all lawful actions necessary to give effect to and implement the Brazilian RJ Plan, as approved by the Brazilian Confirmation Order, and the transactions contemplated thereunder, and shall fully cooperate and facilitate distributions of shares or cash, as applicable and provided under the Brazilian RJ Plan, as well as cancellation of the NY Notes and Temporary Notes, as applicable, pursuant to the Brazilian RJ Plan.  Further, the Directed Parties, their agents, attorneys, successors, and assigns are hereby authorized and directed to take any other lawful actions as instructed by, and at the expense of, the Chapter 15 Debtors that may be necessary to cancel the NY Notes and Temporary Notes.

8.     As a condition precedent to the cancellation of the NY Notes and Temporary Notes, the Chapter 15 Debtors shall pay or reimburse the reasonable and documented fees, costs and expenses (including attorneys' fees, costs and expenses) of the Indenture Trustee, and any predecessors thereto, incurred in its capacity as Indenture Trustee in connection with the Brazilian RJ Proceeding, these Chapter 15 Cases, and the implementation of the transactions provided for in Brazilian RJ Plan and this Order when and as would be required by the respective Notes Indentures.

7

9.      The Chapter 15 Debtors are authorized to use any property and to continue operating any businesses within the territorial jurisdiction of the United States.

10.      The Foreign Representative, the Chapter 15 Debtors, and each of their respective successors, agents, representatives, advisors, and counsel shall be entitled to the protections contained in sections 306 and 1510 of the Bankruptcy Code, and no action taken by any such party in preparing, disseminating, applying for, implementing, or otherwise acting in furtherance of, or in connection with, the Brazilian RJ Proceeding, the Brazilian RJ Plan, or any order entered in these Chapter 15 Cases or in any adversary proceedings or contested matters in connection therewith, shall be deemed to constitute a waiver of the rights or benefits afforded such parties under sections 306 and 1510 of the Bankruptcy Code.

11.      Notwithstanding any provision in the Bankruptcy Rules to the contrary: (a) this Order shall be effective immediately and enforceable upon entry; (b) other than as expressly provided in this Order, the Foreign Representative is not subject to any stay of the implementation, enforcement, or realization of the relief granted in this Order; (c) this Order shall constitute a final order within the meaning of 28 U.S.C. § 158(a); and (d) the Foreign Representative is authorized and empowered, and may, in his discretion and without further delay, take any action and perform any act necessary to implement and effectuate the terms of the Brazilian RJ Plan and this Order.

12.      A copy of this Order, confirmed to be true and correct, shall be served, within seven business days of entry thereof, by electronic mail or overnight express delivery, upon all Notice Parties listed in Exhibit B attached to the Motion.  Such service shall be good and sufficient service and adequate notice for all purposes.

13.      Prior to cancelling the NY Notes and Temporary Notes, the Foreign Representative shall cause notice to be sent to the NY Noteholders through DTC detailing the steps required from

the NY Noteholders to obtain their recovery once the NY Notes and Temporary Notes are cancelled and providing relevant contact information.

14.     This Order is without prejudice to the Foreign Representative requesting any additional relief in these Chapter 15 Cases.

15.     This Court shall, and hereby does, retain exclusive jurisdiction with respect to all matters arising from or in relation to the implementation, effect, interpretation, enforcement, amendment, or modification of this Order and all matters arising in and under, and related to, these Chapter 15 Cases, including any requests for additional relief or any adversary proceeding brought in and through these Chapter 15 Cases.

Dated: New York, New York
　　　　July 22, 2024

/s/ **Michael E. Wiles**
HONORABLE MICHAEL E. WILES
UNITED STATES BANKRUPTCY JUDGE

9

# Tab 15

**U.S. Securities and Exchange Commission**

**Securities Act of 1933 —
Section 3(a)(10)**

## No Action, Interpretive and/or Exemptive Letter:
## AngloGold Limited

January 15, 2004

Response of the Office of International Corporate Finance
Division of Corporation Finance

Re:   AngloGold Limited ("AngloGold")
      Incoming letter dated January 12, 2004

Based on the facts presented, the Division will not recommend enforcement
action to the Commission if AngloGold, in reliance on your opinion of
counsel that the exemption under Section 3(a)(10) of the Securities Act of
1933 ("Securities Act") is available, issues its ordinary shares ("AngloGold
Shares"), including AngloGold Shares in the form of AngloGold American
Depositary Shares ("AngloGold ADSs") and AngloGold Ghanian Depositary
Shares ("AngloGold GhDSs"), to the holders of the ordinary shares of
Ashanti Goldfields Company Limited ("Ashanti Shares"), including Ashanti
Shares represented by Ashanti Global Depositary Securities ("Ashanti
GDSs"), Ashanti Depositary Interests ("Ashanti ADIs"), and Ashanti
Zimbabwe Depositary Receipts ("Ashanti ZDRs"), pursuant to the scheme of
arrangement ("Scheme"), each as described in your letter, without
registration under the Securities Act. In reaching this position, we have
noted that:

- the High Court of Ghana ("the Court") will conduct a hearing on the
  fairness of the Scheme to the holders of Ashanti Shares;

- the Court will approve the fairness of the terms and conditions of the
  Scheme to the holders of Ashanti Shares before issuance of the
  AngloGold Shares pursuant to the Scheme;

- all prospective recipients of the AngloGold Shares under the Scheme
  will receive notice of the hearing regarding the Scheme and will have
  the opportunity to be heard at the hearing; and

- the Court will be advised before the hearing that, if the Court
  approves the terms and conditions of the Scheme, its sanctioning of
  the Scheme will constitute the basis for the issuance of the AngloGold
  Shares under the Scheme without registration under the Securities
  Act, in reliance on the exemption from registration provided by
  Securities Act Section 3(a)(10).

The Division is of the view that the AngloGold Shares received pursuant to
the Scheme will not be "restricted securities" within the meaning of
Securities Act Rule 144(a)(3). Further, the Division is of the view that
recipients of the AngloGold Shares may resell these securities as follows:

(1) Persons who are not affiliates of AngloGold or Ashanti before
completion of the Scheme, and who are not affiliates of AngloGold after
completion of the Scheme, may resell the AngloGold Shares they
receive under the Scheme without regard to Securities Act Rule 144 or
145(c) and (d).

(2) Persons who are affiliates of AngloGold or Ashanti before completion
of the Scheme, but who are not affiliates of AngloGold after completion
of the Scheme, may resell the AngloGold Shares they receive under the
Scheme in accordance with Securities Act Rule 145(d)(1), (d)(2) or (d)
(3). However, when computing the holding period of the Section 3(a)
(10) securities for purposes of Rule 145(d)(2) or d)(3), such persons
may not "tack" the holding period of the securities exchanged for the
Section 3(a)(10) securities in the Section 3(a)(10) exempt transaction.

2928

(3) Persons who are affiliates of AngloGold or Ashanti before completion of the Scheme and are affiliates of AngloGold after completion of the Scheme may resell the AngloGold Shares they receive under the Scheme in the manner permitted by Securities Act Rule 145(d)(1).

These positions are based upon the representations made in your letter to the Division. Any different facts or conditions might require a different conclusion. Moreover, regarding whether the Section 3(a)(10) exemption from registration is available for the AngloGold Shares to be issued under the Scheme of Arrangement, this response expresses the Division's position on enforcement action only and does not express any legal conclusion on the question presented.

Sincerely,

Elliot B. Staffin
Special Counsel

---

### Incoming Letter1

### SHEARMAN & STERLING LLP

BROADGATE WEST
9 APPOLD STREET
LONDON EC2A 2AP, ENGLAND
(44-20) 7655-5000

WRITER'S DIRECT NUMBER
+44 (0)207-655-5550

WRITER'S EMAIL ADDRESS:
bgreaves@shearman.com

January 12, 2004

Securities and Exchange Commission
450 Fifth Street, N.W.
Washington, D.C. 20549

Attention: Paula Dubberly, Esq.
Associate Director (Legal)
Division of Corporation Finance

Paul Dudek, Esq.
Chief, Office of International Corporate Finance
Division of Corporation Finance

AngloGold Limited
*Section 3(a)(10); Rule 144; Rule 145*

Ladies and Gentlemen:

We are acting as United States counsel to AngloGold Limited, a publicly listed company incorporated under the laws of the Republic of South Africa ("*AngloGold*"). AngloGold has entered into a Transaction Agreement, dated August 4, 2003, with Ashanti Goldfields Company Limited, a publicly listed company incorporated under the laws of the Republic of Ghana ("*Ashanti*") (as amended on September 2, 2003, on September 23, 2003, on October 29, 2003, on November 13, 2003 and on December 12, 2003, the "*Transaction Agreement*"), pursuant to which AngloGold and Ashanti have agreed to effect a business combination transaction (the "*Transaction*") involving their respective companies. The Transaction will be implemented through a scheme of arrangement (the "*Scheme*") under Section 231 of the Ghana Companies Code, 1963 (Act 179), as amended (the "*Ghana Companies Code*"). Upon the effectiveness of the Scheme, Ashanti will become a wholly owned subsidiary of AngloGold, each issued and outstanding ordinary share, no par value per share, of Ashanti (collectively, the "*Ashanti Shares*") will be transferred to AngloGold and each holder thereof will be entitled to receive in exchange therefor 0.29 ordinary shares, par value ZAR0.25 per share, of AngloGold ("*AngloGold Shares*") (such number of AngloGold Shares issuable in exchange for each Ashanti Share being the "*Scheme Consideration*").

Holders of Ashanti Shares resident in Ghana will be entitled to elect to receive their Scheme Consideration in the form of either (i) AngloGold Shares, (ii) AngloGold American Depositary Shares, each of which

2929

represents one AngloGold Share ("*AngloGold ADSs*")[1] or (iii) AngloGold Ghanaian Depositary Shares, one hundred of which will represent one AngloGold Share ("*AngloGold GhDSs*").[2] If no election is made, such holders will receive AngloGold GhDSs. Holders of Ashanti Shares resident outside of Ghana (other than holders of Ashanti Shares resident in the United States) will be entitled to elect to receive their Scheme Consideration in the form of either (i) AngloGold Shares or (ii) AngloGold ADSs. If no election is made, such holders will receive AngloGold Shares. Holders of Ashanti Shares resident in the United States will be entitled to elect to receive their Scheme Consideration in the form of either (i) AngloGold Shares or (ii) AngloGold ADSs. If no election is made, such holders will receive AngloGold ADSs.

In addition, pursuant to arrangements to be made with The Bank of New York, as depositary for Ashanti Global Depositary Securities, each of which represents one Ashanti Share ("*Ashanti GDSs*"), holders of Ashanti GDSs will be entitled to elect to receive their Scheme Consideration in the form of either (i) AngloGold Shares or (ii) AngloGold ADSs. If no election is made, such holders will receive AngloGold ADSs.

Ashanti has established a depository interest trust facility in the United Kingdom to facilitate the indirect holding of, and settlement of transactions in, Ashanti Shares by participants in CREST.[3] Capita IRG Trustees Limited, as custodian for the Ashanti Depositary Interests, each of which represents one Ashanti Share ("*Ashanti ADIs*"), issued under this facility, has advised Ashanti that, as at December 11, 2003, there were 67,480,178 Ashanti ADIs outstanding, representing approximately 51.7% of the issued and outstanding Ashanti Shares. Of the 67,480,178 Ashanti ADIs outstanding, 65,905,859 Ashanti ADIs (or 97.7% of the Ashanti Shares represented by Ashanti ADIs), are held by BNY (Nominees) Limited, as nominee for The Bank of New York, as depositary for Ashanti GDSs.[4] Pursuant to arrangements to be made with Capita IRG Trustees Limited, as depository for Ashanti ADIs, holders of Ashanti ADIs (other than BNY (Nominees) Limited, which will only receive AngloGold Shares) will be entitled to elect to receive their Scheme Consideration in the form of either (i) AngloGold Shares or (ii) AngloGold ADSs. If no election is made, such holders will receive AngloGold Shares.

Ashanti also has a sponsored Zimbabwe Depositary Receipt ("*Ashanti ZDR*") facility established for purposes of listing Ashanti ZDRs, one hundred of which represent one Ashanti Share, on the Zimbabwe Stock Exchange in order to provide greater liquidity within Zimbabwe. Ashanti has been advised by the registrar of its Zimbabwe share register that there are approximately 138,007 Ashanti Shares underlying Ashanti ZDRs outstanding, representing approximately 0.1% of the issued and outstanding Ashanti Shares. Based on the information received by Ashanti, as of November 4, 2003, there were no holders of Ashanti ZDRs with an address in the United States. AngloGold and Ashanti intend to enter into arrangements with the depositary for the Ashanti ZDRs under which the Scheme Consideration to be distributed to such holders will either be held in trust for the benefit of such holders or distributed or otherwise made available to such holders.

AngloGold intends to pay cash in lieu of any fractional AngloGold Shares or fractional AngloGold ADSs (each, a "*fractional interest*"). Holders of fractional interests resident in Ghana will be entitled to elect to receive AngloGold GhDSs in lieu of cash.

In accordance with Section 231 of the Ghana Companies Code, the Scheme may be effected only if confirmed by the High Court of Ghana (the "*High Court*").

By this letter, we respectfully request confirmation from the staff of the Division of Corporation Finance (the "*Staff*") that, based upon the facts and circumstances described herein, it will not recommend any enforcement action to the Securities and Exchange Commission (the "*SEC*") if, pursuant to the Scheme, AngloGold issues AngloGold Shares to holders of Ashanti Shares (including Ashanti Shares represented by Ashanti GDSs, Ashanti ADIs and Ashanti ZDRs) without registration of such AngloGold Shares under the Securities Act, in reliance on the exemption from the registration requirements of the Securities Act provided by Section 3(a)(10) thereof. In addition, we respectfully request confirmation from the Staff that AngloGold Shares received by holders of Ashanti Shares (and by holders of Ashanti GDSs, Ashanti ADIs and Ashanti ZDRs) may be resold in accordance with the limitations set forth in this letter.

2930

Ashanti and AngloGold have provided us with, and have authorized us to make on their behalf, the factual representations about them set forth in this letter.

### I. Background

AngloGold is one of the world's largest gold producers by volume of gold produced (as determined from the company reports published by the various gold producers), with extensive reserves and production of some 6 million ounces of gold annually. AngloGold Shares are listed on the JSE Securities Exchange South Africa, the London Stock Exchange, the Australian Stock Exchange (in the form of Clearing House Electronic Subregister System Depositary Interests) and Euronext Paris and are quoted on Euronext Brussels (in the form of International Depositary Receipts). AngloGold ADSs are listed and traded on the New York Stock Exchange, and the AngloGold Shares underlying the AngloGold ADSs are also listed on the New York Stock Exchange. In connection with the Scheme, AngloGold will make an application to list AngloGold Shares and AngloGold GhDSs on the Ghana Stock Exchange. AngloGold files periodic reports with the SEC pursuant to Section 13 of the Securities Exchange Act of 1934, as amended (the "*Exchange Act*").

Ashanti is engaged in the mining and processing of gold ores and the exploration and development of gold properties in Africa. In 2002, Ashanti produced some 1.62 million ounces of gold. Ashanti Shares have a dual primary listing on the Ghana Stock Exchange and the London Stock Exchange.[5] Ashanti GDSs (representing approximately 50.5% of the issued and outstanding Ashanti Shares) are listed and traded on the New York Stock Exchange and the London Stock Exchange. Ashanti Shares underlying the Ashanti GDSs are also listed on the New York Stock Exchange. Ashanti Shares and Ashanti ZDRs are listed on the Zimbabwe Stock Exchange. Ashanti files periodic reports with the SEC pursuant to Section 13 of the Exchange Act.

### II. Description of the Scheme

#### A. Introduction

The issuance of AngloGold Shares in exchange for Ashanti Shares (including Ashanti Shares represented by Ashanti GDSs, Ashanti ADIs and Ashanti ZDRs) will be implemented by means of the Scheme to be effected pursuant to Section 231 of the Ghana Companies Code. The following description of the Scheme is based upon discussions with the law firm of JLD Legal Consultancy Services, Ghanaian counsel to AngloGold, and upon its opinion letter dated January 12, 2004 with respect to the Scheme and the operation of Section 231 of the Ghana Companies Code (the "*Opinion Letter*"). A copy of the Opinion Letter is attached hereto.

#### B. Procedure for Confirmation of the Scheme

##### (i) Application to Convene Meetings and Appoint Reporter

Ashanti will file an application (the "*Application*") with the High Court by way of an originating motion on notice requesting that the High Court order that a meeting of holders of Ashanti Shares be convened to consider and approve the Scheme (the "*Scheme Meeting*"). As discussed in the Opinion Letter, the High Court will be expected to hear the Application within 14 days after the Application is filed.[6] At the hearing of the Application, or at a subsequent hearing, the High Court will order that the Scheme Meeting be convened and determine those persons entitled to attend such meeting. Since the Ashanti Shares are the only securities of Ashanti to be exchanged in the Scheme, Ashanti and AngloGold expect that the Ashanti Shares will constitute the only securities of Ashanti affected by the Scheme.[7] Ashanti and AngloGold do not expect the High Court to order a Scheme Meeting for any creditors of Ashanti.[8] Although under the Ghana Companies Code the High Court may require that a postal ballot be taken in lieu of such Scheme Meeting, AngloGold and Ashanti do not expect the High Court to do so as the wide and divergent shareholder base of Ashanti makes a postal ballot impractical. As part of the Application, Ashanti will therefore request the High Court to order that the vote be taken at the Scheme Meeting and not by postal ballot.

A copy of the scheme document (the "*Scheme Document*") and the AngloGold information memorandum (the "*AngloGold Information Memorandum*" and, together with the Scheme Document, the "*Scheme*

*Materials*") to be sent to shareholders in connection with the Scheme Meeting will be filed with the High Court. The Scheme Materials will describe, among other things, AngloGold and the AngloGold Shares, the terms and effects of the Scheme, the reasons for the Scheme and the approvals required and conditions to be satisfied for the Scheme to be effective. In addition, the Scheme Document will (i) include the notice convening the Scheme Meeting, together with appropriate proxy or voting instruction forms, (ii) set forth the scheduled date of the court hearing to be held by the High Court to confirm the Scheme (the "*Court Hearing*") if it is approved by the requisite majority of holders of Ashanti Shares at the Scheme Meeting and (iii) contain information about the right of all Ashanti shareholders to appear and be heard at the Scheme Meeting and the right of any shareholder claiming to be affected by the Scheme to appear at the Court Hearing and object to the Scheme. The AngloGold Information Memorandum will contain financial information about both AngloGold and Ashanti.

As part of the Application and as required by Section 231(2) of the Ghana Companies Code, Ashanti will also request the High Court to instruct the Registrar of Companies in Ghana (the "*Registrar of Companies*") to appoint an independent investment bank or accounting firm (the "*Reporter*") to investigate the fairness of the Scheme and to report thereon to the High Court. Although Section 231(2) of the Ghana Companies Code contemplates the appointment of the Reporter after the Scheme has been approved by the holders of Ashanti Shares at the Scheme Meeting, Ashanti will request that the appointment be made immediately after the hearing of the Application to provide the Reporter with additional time to complete its investigation prior to the Court Hearing. Ashanti and AngloGold will provide, or cause to be provided, to the High Court and the Reporter information sufficient for them to determine the value of the AngloGold Shares and the Ashanti Shares exchanged therefor and will provide, or cause to be provided, to the Reporter such additional information and assistance as may be reasonably requested by the Reporter in connection with its investigation. In accordance with Section 231(3) of the Ghana Companies Code, the fees (which are fixed by the Registrar of Companies) and expenses of the Reporter will be borne by Ashanti or such other party to the application as the High Court may order.

After hearing the Application, the High Court will be expected to order that a Scheme Meeting be convened to consider the Scheme and that the Registrar of Companies appoint the Reporter.

(ii) Notice of Scheme Meeting; Approvals

Ashanti will mail copies of the Scheme Materials (including notice of the Scheme Meeting) to holders of Ashanti Shares (and deliver such copies and notice to the depositaries for the Ashanti GDSs, Ashanti ADIs and Ashanti ZDRs) approximately 30 days prior to the Scheme Meeting.[9] Ashanti will instruct the depositaries for the Ashanti GDSs, Ashanti ADIs and Ashanti ZDRs to deliver copies of the Scheme Materials (including voting instruction forms) and notice of the Scheme Meeting and the Court Hearing to holders of Ashanti GDSs, Ashanti ADIs and Ashanti ZDRs.[10] In addition, simultaneously with the mailing of the Scheme Materials, Ashanti will publish notices of the Scheme Meeting and the Court Hearing in *The Daily Graphic*, a newspaper of national circulation in Ghana, *The Wall Street Journal*, a newspaper of national circulation in the United States and *The Financial Times*, a newspaper of national circulation in the United Kingdom, or in such other manner as the High Court may direct.

In order to proceed with the Court Hearing, the Scheme must be approved by the requisite vote of Ashanti shareholders. In connection with the Transaction Agreement, AngloGold entered into a shareholder support deed of agreement, dated August 4, 2003, as amended on October 17, 2003, with Lonmin Plc ("*Lonmin*"), the holder of approximately 27.6% of the outstanding Ashanti Shares, pursuant to which Lonmin agreed, among other things, to vote its Ashanti Shares in favour of the Scheme. On December 12, 2003, AngloGold entered into a shareholder support deed of agreement with the Government of Ghana, the holder of approximately 16.9% of the outstanding Ashanti Shares, pursuant to which the Government of Ghana agreed, among other things, to vote its Ashanti Shares in favour of the Scheme. [11]

(iii) Court Hearing

2932

Prior to the Court Hearing, the High Court will be advised that, if it confirms the Scheme, such confirmation will be relied upon by AngloGold as an approval of the Scheme for the purpose of qualifying for an exemption from the registration requirements of the Securities Act with respect to the AngloGold Shares provided by Section 3(a)(10) thereof. After the Scheme has been approved at the Scheme Meeting by the requisite vote of Ashanti shareholders, the High Court will be expected to confirm the date for the Court Hearing at which any shareholder claiming to be affected by the Scheme will be entitled to appear and object. The Scheme Materials mailed to shareholders (and to the depositaries for Ashanti GDSs, Ashanti ADIs and Ashanti ZDRs, respectively, for delivery to the holders thereof) in connection with the Scheme Meeting will also include notice of the scheduled date, time and place of the Court Hearing and will state that such shareholders have the right to attend the Court Hearing and object to the Scheme. If the scheduled date of the Court Hearing is changed, Ashanti will give at least five business days' notice thereof by delivering a press release for immediate publication and distribution through the usual media channels in the United States, the United Kingdom, South Africa and Ghana, and through the Regulatory News Service of the London Stock Exchange and by publication of such notice in *The Daily Graphic*, *The Wall Street Journal* and *The Financial Times,* or in such other manner as the High Court may direct. If the scheduled date of the Court Hearing is changed by more than seven days, Ashanti will also mail notice of the date of the rescheduled Court Hearing to holders of Ashanti Shares (and to the depositaries for the Ashanti GDSs, Ashanti ADIs and Ashanti ZDRs for delivery to the holders thereof).

Section 231(5) of the Ghana Companies Code provides that shareholders claiming to be affected by the Scheme have the right to be represented at the Court Hearing and to object to the Scheme. As discussed in the Opinion Letter, shareholders need not retain separate counsel in order to appear at the Court Hearing, but may appear in person. As discussed in the Opinion Letter, the High Court may establish procedures for the submission of objections to the Scheme. In civil proceedings before the High Court, the Ghana Court Rules of Civil Procedure generally require persons who wish to appear at a hearing before the High Court to file a notice of appearance and an affidavit. Although the Ghana Court Rules of Civil Procedure do not expressly apply to schemes of arrangement under Section 231 of the Ghana Companies Code, there is a possibility that the High Court could adopt procedures similar to those required by the Ghana Court Rules of Civil Procedure for purposes of the Scheme. In such case, shareholders who claimed to be affected by the Scheme and wished to appear at the Court Hearing to object would be required to file a notice of appearance and an affidavit with the High Court as directed by the High Court. If any such shareholder did not timely file a notice of appearance and affidavit, such shareholder might not have the right to appear at the Court Hearing, although the High Court in its discretion could, and likely would, permit such shareholder to object if such shareholder made a personal appearance at the Court Hearing. According to the Opinion Letter, although the High Court could adopt similar procedures for purposes of the Scheme, the High Court is not likely to do so; it is likely to follow customary practice in the United Kingdom and permit any shareholder who claims to be affected by the Scheme to appear at the Court Hearing without having previously filed a notice of appearance or affidavit. At the hearing of the Application, Ashanti and AngloGold will request that the High Court adopt procedures for the Court Hearing that follow customary practice in the United Kingdom for schemes of arrangement effected under Section 425 of the United Kingdom Companies Act 1985 (the "*U.K. Companies Act*"). Specifically, Ashanti and AngloGold undertake to request that shareholders have the right to appear and object at the Court Hearing without first having to file a notice of appearance or affidavit.

Holders of Ashanti GDSs, Ashanti ADIs and Ashanti ZDRs will not automatically have the right to appear at the Scheme Meeting or the Court Hearing as such holders are not shareholders of Ashanti. At the hearing of the Application, Ashanti and AngloGold will request the High Court to permit holders of Ashanti GDSs, Ashanti ADIs and Ashanti ZDRs to attend at the Court Hearing and to object. Voting instructions will be solicited from holders of Ashanti GDSs, Ashanti ADIs and Ashanti ZDRs and arrangements will be made with their respective depositaries to vote the underlying Ashanti Shares beneficially owned by such holders at the Scheme Meeting in accordance with their voting instructions. In any event, holders of Ashanti GDSs, Ashanti ADIs and Ashanti ZDRs may present their Ashanti GDSs, Ashanti ADIs or Ashanti ZDRs, as the case may be, for cancellation and arrange for delivery of the underlying Ashanti Shares, which, if

2933

registered in that holder's name in a timely manner, will enable them to attend the Scheme Meeting and participate in the Court Hearing. The Scheme Document will describe the procedures whereby holders of Ashanti GDSs, Ashanti ADIs and Ashanti ZDRs who wish to attend the Scheme Meeting and appear at the Court Hearing may cancel their Ashanti GDSs, Ashanti ADIs or Ashanti ZDRs, as the case may be, and have the underlying Ashanti Shares registered in their names and will advise such holders if the High Court permits their appearance at the Court Hearing.

Ashanti will appear at the Court Hearing on the scheduled date set forth in the written notice and advertisement to request the High Court to confirm the Scheme. If objections are lodged against the Scheme, the High Court may determine to continue the Court Hearing at a later date to permit Ashanti and AngloGold to respond to the objections. If the High Court determines to continue the Court Hearing at a later date, the High Court will notify persons that have lodged objections of the time of the continued hearing. In addition to notice by the High Court, Ashanti will publish notice of the time and date of the continued Court Hearing in *The Daily Graphic*, *The Wall Street Journal* and *The Financial Times,* or in such other manner as the High Court may direct. As discussed in the Opinion Letter, the High Court will consider whether the Scheme is fair, procedurally and substantively, to shareholders and make an independent determination whether to confirm the Scheme notwithstanding the approval of the Scheme by the requisite vote of shareholders at the Scheme Meeting, the findings of the Reporter and any objection raised by a shareholder claiming to be affected by the Scheme.

At the Court Hearing, the High Court will again be advised that, if it confirms the Scheme, such confirmation will be relied upon by AngloGold as an approval of the Scheme for the purpose of qualifying for an exemption from the registration requirements of the Securities Act with respect to the AngloGold Shares provided by Section 3(a)(10) thereof.

### (iv) Effectiveness of the Scheme

Pursuant to the provisions of Section 231 of the Ghana Companies Code and subject to the satisfaction of certain other conditions, the Scheme will not become effective and binding unless and until:

(1) the Scheme is confirmed by the High Court following the Court Hearing at which the High Court considers the fairness report of the Reporter;[12] and

(2) a copy of the order of the High Court confirming the Scheme is delivered to the Registrar of Companies, who will register the order and cause the order to be published in the *Gazette.*

Once the Scheme becomes effective, it will be binding on Ashanti and all shareholders of Ashanti.

### III. Legal Analysis

### A. Section 3(a)(10) Exemption

Section 3(a)(10) of the Securities Act provides an exemption from the registration requirements of the Securities Act for, in relevant part:

". . . any security which is issued in exchange for one or more bona fide outstanding securities, claims or property interests . . . where the terms and conditions of such issuance and exchange are approved, after a hearing upon the fairness of such terms and conditions at which all persons to whom it is proposed to issue securities in such exchange shall have the right to appear, by any court . . . or other governmental authority expressly authorized by law to grant such approval."

In Revised Staff Legal Bulletin No. 3 (CF) (October 20, 1999) (the "*Revised Staff Legal Bulletin No. 3*"), the Staff identified the following conditions that must be satisfied before reliance may be made upon the exemption provided in Section 3(a)(10):

(1) The securities must be issued in exchange for securities, claims or property interests; they cannot be offered for cash.

(2) A court or authorized governmental entity must approve the fairness of the terms and conditions of the exchange.

2934

(3) The reviewing court or authorized governmental entity must (a) find, before approving the transaction, that the terms and conditions of the exchange are fair to those to whom securities will be issued, and (b) be advised before the hearing that the issuer will rely upon the Section 3(a)(10) exemption based on the court's or authorized governmental entity's approval of the transaction.

(4) The court or authorized governmental entity must hold a hearing before approving the fairness of the terms and conditions of the transaction.

(5) A governmental entity must be expressly authorized by law to hold the hearing, although it is not necessary that the law require the hearing.

(6) The fairness hearing must be open to everyone to whom securities would be issued in the proposed exchange.

(7) Adequate notice of the hearing must be given to all those persons.

(8) There cannot be any improper impediments to the appearance by those persons at the hearing.

As explained below, the Scheme will satisfy each of these conditions:

### (i) The Exchange

Pursuant to the Scheme, AngloGold will issue AngloGold Shares in exchange for Ashanti Shares (and Ashanti GDSs, Ashanti ADIs and Ashanti ZDRs), and not for cash or other consideration from the holders of Ashanti Shares (or Ashanti GDSs, Ashanti ADIs or Ashanti ZDRs).

### (ii) High Court Approval

The Staff has stated in Section 4.B.4. of Revised Staff Legal Bulletin No. 3 that the term "any court" as used in Section 3(a)(10) includes a foreign court. Further, the Staff has recognized the High Court of Justice in England and Wales acting under Section 425 of the U.K. Companies Act as a foreign court qualified to approve the fairness of the terms and conditions of an exchange. *See,* e.g., Global TeleSystems (Europe) Limited (available June 14, 2001); Omnicom Group Inc. (available January 28, 1999); The Rank Organisation Plc, The Rank Group Plc (available August 6, 1996). As discussed in the Opinion Letter, the Ghana Companies Code is derived from the United Kingdom Companies Act of 1948 (the "*Companies Act of 1948*") and Section 231 of the Ghana Companies Code is based on Section 206 of the Companies Act of 1948 (the predecessor to Section 425 of the U.K. Companies Act). Section 231 of the Ghana Companies Code is similar in all material respects to Section 425 of the U.K. Companies Act, except for the following differences:

(1) Section 231 of the Ghana Companies Code provides for the appointment of an independent reporter to investigate the fairness of the Scheme and to report thereon to the High Court; and

(2) Section 231 of the Ghana Companies Code requires that the Scheme be approved by a three-fourths majority of shareholders rather than a majority of shareholders in number representing three-fourths in value of shares.[13]

Similarly, the Staff has recognized courts in a number of other jurisdictions as foreign courts qualified to approve the fairness of the terms and conditions of a scheme of arrangement for the purposes of the Section 3(a)(10) exemption. *See,* e.g., Gilat Satellite Networks Ltd. (available December 19, 2002) (Israeli Court); Ashanti Goldfields Company Limited (available June 19, 2002) (Grand Court of the Cayman Islands); Canadian Pacific Limited (available August 15, 2001) (Alberta Court of Queen's Bench); John Wood Group plc (available March 1, 2001) (Court of Session in Scotland); Gold Fields of South Africa Limited (available January 21, 1998) (High Court of South Africa); and China Light & Power Company, Limited (available January 2, 1998) (High Court of Hong Kong Special Administrative Region).

### (iii) Determination of Fairness and Advice of Section 3(a)(10) Reliance

As discussed in the Opinion Letter, the High Court will be required to consider whether the Scheme is fair, procedurally and substantively, to each

2935

class of persons who will receive AngloGold Shares in the Scheme[14] before the High Court can confirm the Scheme. In reaching its determination as to fairness, the High Court will be expected to consider, among other things, the information in the Scheme Document, the findings of the Reporter and any objections to the Scheme raised by shareholders claiming to be affected by the Scheme. The Opinion Letter indicates that the Reporter must be an expert independent of both parties and will be required to ascertain the intrinsic fairness of the Scheme, to monitor procedures and to ensure compliance with the statutory provisions. As discussed in the Opinion Letter, Ashanti and AngloGold will provide, or cause to be provided, to the High Court and the Reporter information sufficient for them to determine the value of the AngloGold Shares and the Ashanti Shares exchanged therefor. Ashanti and AngloGold will also provide, or cause to be provided, to the Reporter such additional information and assistance as may be reasonably requested by the Reporter in connection with its investigation. In addition, the High Court will be provided with the report of the Chairman of the Scheme Meeting on the results of the Scheme Meeting (including the number of shareholders present in person or by proxy, the results of voting and the proxies that have been rejected). Included in the Chairman's report will be a report by a scrutineer on the verification of the counting of votes. In reaching its determination as to fairness, the High Court has the authority to consider any additional factors that it deems relevant.

As discussed in the Opinion Letter, Ghanaian law is derived from English common law, and Ghanaian courts (including the High Court) will consider English precedent persuasive, especially when such precedent interprets legislation that is substantially similar to Ghanaian legislation. As discussed in the Opinion Letter, there is no Ghanaian case law interpreting Section 231 of the Ghana Companies Code. According to the Opinion Letter, given that Ghanaian law originates from English common law and that Section 231 of the Ghana Companies Code is based on Section 206 of the Companies Act of 1948, the High Court would consider and likely follow English cases establishing the role and function of English courts in reviewing applications under Section 425 of the U.K. Companies Act. Also, the Opinion Letter indicates that, in determining whether to exercise its discretion to approve the Scheme, the High Court will likely follow customary practice in the United Kingdom for approving schemes of arrangement under Section 425 of the U.K. Companies Act that the Staff has sanctioned in the past. The High Court will reach an independent decision as to fairness notwithstanding the approval of the Scheme by the requisite vote of Ashanti shareholders at the Scheme Meeting, the findings of the Reporter and any objection raised by a shareholder claiming to be affected by the Scheme.

The Opinion Letter confirms that Ashanti will inform the High Court prior to the convening of the Scheme Meeting and again at the Court Hearing that, upon confirmation of the Scheme by the High Court, such confirmation will be relied upon by AngloGold as an approval of the Scheme for the purpose of qualifying for an exemption from the registration requirements of the Securities Act with respect to the AngloGold Shares provided by Section 3(a)(10) thereof.

### (iv) Court Hearing

As discussed in the Opinion Letter, Section 231(5) of the Ghana Companies Code provides for a hearing by the Court of the application to confirm the scheme of arrangement at which a shareholder claiming to be affected thereby will have the right to appear and to object. The High Court will conduct the Court Hearing to determine whether the terms and conditions of the Scheme are fair to Ashanti's shareholders and to approve the fairness of the terms and conditions of the Scheme.

As discussed in the Opinion Letter, the High Court has an independent obligation to make a determination of fairness, notwithstanding the approval of the Scheme by the requisite vote of Ashanti shareholders at the Scheme Meeting, the findings of the Reporter and any objection raised by a person claiming to be affected by the Scheme.

### (v) Authorization

The Court Hearing will be held by a "court" for the purposes of Section 3(a)(10) of the Securities Act. The High Court is expressly authorized by Section 231 of the Ghana Companies Code to hold a hearing on the Scheme and to confirm the Scheme.

#### (vi) Open Hearing

As discussed above, the Court Hearing will be open to attendance by any shareholder claiming to be affected by the Scheme.

#### (vii) Notice

The Opinion Letter confirms that Ashanti will provide approximately 30 days' notice of the scheduled date of the Court Hearing in the Scheme Document to all shareholders (and holders of Ashanti GDSs, Ashanti ADIs and Ashanti ZDRs). As discussed below, the Scheme Document will also disclose the right of all holders of Ashanti Shares to attend the Court Hearing and will include the information necessary to exercise that right. If the scheduled date of the Court Hearing is changed, Ashanti will give adequate notice of the date of the rescheduled Court Hearing in the manner described above.

#### (viii) No Improper Impediments

There will be no improper impediments to the appearance at the Court Hearing by any shareholder claiming to be affected by the Scheme. Any such shareholder is entitled to appear before the High Court in person and object to the Scheme. As discussed above, the High Court may establish procedures for the submission of such objections. Although the Ghana Court Rules of Civil Procedure do not expressly apply to schemes of arrangement under Section 231 of the Ghana Companies Code, there is a possibility that the High Court could adopt similar procedures for purposes of the Scheme. In that event, shareholders who claimed to be affected by the Scheme and wished to appear at the Court Hearing to object would be required to file a notice of appearance and affidavit with the High Court as directed by the High Court. If any such shareholder did not timely file a notice of appearance and affidavit, such shareholder might not have the right to appear at the Court Hearing, although the High Court in its discretion could, and likely would, permit such shareholder to object if such shareholder made a personal appearance at the Court Hearing. According to the Opinion Letter, although the High Court could adopt procedures similar to those required by the Ghana Court Rules of Civil Procedure for purposes of the Scheme, the High Court is not likely to do so; it is likely to follow customary practice in the United Kingdom and permit any shareholder who claims to be affected by the Scheme to appear at the Court Hearing without having previously filed a notice of appearance or affidavit. The Scheme Document will describe the procedures and timing requirements, if any, that holders of Ashanti Shares (and holders of Ashanti GDSs, Ashanti ADIs and Ashanti ZDRs) will have to follow to appear at the Court Hearing and object to the Scheme. Since the procedures and timing requirements would be directed by the High Court and the Scheme Document will contain information with respect to such procedures and timing requirements, if any, we do not believe that this would create an improper impediment to appearance that will prevent shareholders claiming to be affected by the Scheme from having a meaningful opportunity to appear at the Court Hearing. As discussed above, at the hearing of the Application, Ashanti and AngloGold will request that the High Court adopt procedures for the Court Hearing that follow customary practice in the United Kingdom for schemes of arrangement effected under Section 425 of the U.K. Companies Act. Specifically, Ashanti and AngloGold undertake to request that shareholders have the right to appear and object at the Court Hearing without first having to file a notice of appearance or affidavit.

Holders of Ashanti GDSs, Ashanti ADIs and Ashanti ZDRs will not automatically have the right to appear at the Court Hearing as such holders are not shareholders of Ashanti. At the hearing of the Application, however, Ashanti and AngloGold will request the High Court to permit the holders of Ashanti GDSs, Ashanti ADIs and Ashanti ZDRs to attend the Court Hearing and object. In addition, holders of Ashanti GDSs, Ashanti ADIs and Ashanti ZDRs may present their Ashanti GDSs, Ashanti ADIs or Ashanti ZDRs, as the case may be, for cancellation and arrange for delivery of the underlying Ashanti Shares, which, if registered in that holder's name in a timely manner, will enable them to appear at the Court Hearing. All of the Ashanti Shares underlying Ashanti GDSs are currently held in CREST. Ashanti has been advised by The Bank of New York, as depositary for the Ashanti GDSs, that the exchange of Ashanti GDSs for Ashanti Shares should take approximately five business days for delivery of physical certificates. Ashanti has been advised by Capita IRG Trustees Limited, as depository of the Ashanti ADIs, that the exchange of Ashanti ADIs for underlying Ashanti

2937

Shares should take approximately five business days for delivery of physical certificates. Ashanti has been advised by Temple Assets (Private) Limited, as depository for the Ashanti ZDRs, that the exchange of Ashanti ZDRs for underlying Ashanti Shares should normally take approximately two business days to complete. The Scheme Document will describe the procedures that holders of Ashanti GDSs, Ashanti ADIs and Ashanti ZDRs who wish to appear at the Court Hearing can follow to cancel their Ashanti GDSs, Ashanti ADIs or Ashanti ZDRs, as the case may be, and have the underlying Ashanti Shares registered in their names and will advise such holders if the High Court permits their appearance.

U.S. citizens travelling to Ghana will require a visa to enter Ghana as well as a valid certificate of immunization against yellow fever. According to the information set forth on the web-sites of the U.S. Department of State and the Embassy of Ghana in Washington D.C., a visa application may be submitted by mail and should typically be processed and granted within three business days. Although applications for a business visa must be accompanied by an invitation from principals in Ghana or the U.S., applications for a tourist visa do not require such an invitation. The Scheme Document will, however, contain an invitation that is expected to satisfy the requirements of the Embassy of Ghana in Washington D.C. for the recipient to visit Ghana to attend the Scheme Meeting and the Court Hearing. The Scheme Document will also advise shareholders of the requirement to obtain a visa and immunization against yellow fever (which should be performed two weeks prior to entering Ghana). Given that all shareholders will receive notice of these requirements approximately 30 days prior to the Court Hearing, we do not believe that these requirements create an improper impediment to participation in the Court Hearing.

Based on the foregoing, and in reliance on the Opinion Letter, we are of the opinion that the right of all shareholders to appear at the Court Hearing to object to the Scheme and to express their opinions regarding the fairness of the terms of the Scheme will fulfil the requirements of Section 3(a)(10) of the Securities Act and that the Scheme may be effected as described above without compliance with the registration requirements of the Securities Act in reliance on the exemption from such registration requirements provided by Section 3(a)(10) of the Securities Act.

### IV. Resale of AngloGold Shares

The Staff has adopted the position that securities issued in Section 3(a)(10) transactions must be resold by holders in the manner permitted by Rule 145(c) and (d) under the Securities Act if those holders are affiliates of any party to the exchange at the time of the Section 3(a)(10) exempt sale. *See* Revised Staff Legal Bulletin No. 3, Section 5.

Upon the basis of the foregoing it is our understanding that:

(1) persons may resell their AngloGold Shares without regard to Rule 144 or 145(c) and (d) if they are not affiliates of AngloGold or Ashanti before the completion of the Scheme and are not affiliates of AngloGold after the completion of the Scheme;

(2) persons may resell their AngloGold Shares in the manner permitted by Rule 145(d)(1), (d)(2) or (d)(3) if they (a) are affiliates of Ashanti or AngloGold before the completion of the Scheme but (b) are not affiliates of AngloGold after the completion of the Scheme. In computing the holding period of the Section 3(a)(10) securities for purposes of Rule 145(d)(2) or (d)(3), such persons may not "tack" the holding period of the securities exchanged for the Section 3(a)(10) securities in the Section 3(a)(10) exempt transaction; and

(3) persons may resell their AngloGold Shares in the manner permitted by Rule 145(d)(1) if they are affiliates of Ashanti or AngloGold before the completion of the Scheme and are affiliates of AngloGold after the completion of the Scheme.

We respectfully request that the Staff confirm that it concurs in our view that the AngloGold Shares would be permitted to be sold as described above.

* * *

We respectfully request the Staff's confirmation (a) that it will not recommend any enforcement action to the SEC if the proposed Scheme is effected as described above, without registration under the Securities Act of the AngloGold Shares to be issued in exchange for Ashanti Shares (and

2938

Ashanti GDSs, Ashanti ADIs and Ashanti ADRs, in reliance on our opinion that no such registration is required for the issuance, offer and sale of such securities by virtue of the exemption from such registration provided by Section 3(a)(10) of the Securities Act, and (b) as to the matters concerning resale of the AngloGold Shares set forth under "Resale of AngloGold Shares" above. If for any reason you do not concur with any of the opinions expressed in this letter, we respectfully request an opportunity to confer with you prior to any written response.

If you have any questions about this request or desire any additional information regarding the matters discussed in this letter, please call the undersigned at (+44 20) 7655-5550, George Casey at (+44 20) 7655-5065 or George Karafotias at (+44 20) 7655-5576.

In accordance with SEC Release 33-6269, we have enclosed an original and seven copies of this letter.

Please acknowledge receipt of the foregoing by stamping and returning the enclosed receipt copy of this letter in the self-addressed, stamped envelope enclosed for that purpose.

Very truly yours,

Bonnie Greaves

Attachment

[1] AngloGold ADSs issuable upon the deposit of each AngloGold Share exchangeable for Ashanti Shares with The Bank of New York, as depositary of the AngloGold ADSs, will be registered pursuant to a separate registration statement on Form F-6.

[2] AngloGold will establish a sponsored Ghanaian Depositary Share facility for AngloGold Shares in Ghana. AngloGold GhDSs issuable upon the deposit of each AngloGold Share with the depositary of the Ghanaian Depositary Share facility will be issued without registration in reliance on the safe harbor of Regulation S under the Securities Act of 1933, as amended (the "*Securities Act*").

[3] CREST is a system for the paperless settlement of trades in securities and the holding of uncertificated securities operated by CRESTCo Limited in accordance with the United Kingdom Uncertificated Securities Regulations 2001 (SI No.2001/3755).

[4] Capita IRG Trustees Limited has advised Ashanti that, of the remaining 1,574,319 Ashanti ADIs outstanding (or 2.3% of the Ashanti Shares represented by Ashanti ADIs), (i) 167,894 Ashanti ADIs (or 0.25% of the Ashanti Shares represented by Ashanti ADIs) are beneficially held by residents outside the United States, (ii) 3,967 Ashanti ADIs (or 0.0058% of the Ashanti Shares represented by Ashanti ADIs) are held by nominee holders incorporated in the United States, (iii) 3,000 Ashanti ADIs (or 0.0044% of the Ashanti Shares represented by Ashanti ADIs) are beneficially held by a private individual whose residence has not been determined and (iv) 1,403,425 Ashanti ADIs (or 2.08% of the Ashanti Shares represented by Ashanti ADIs) are held by nominee holders who have not responded to requests to identify the residence of their beneficial holders.

[5] Although it is possible to trade Ashanti Shares in uncertificated form through CREST in the form of Ashanti ADIs, Ashanti ADIs are not listed separately from the underlying Ashanti Shares on the London Stock Exchange.

[6] Upon filing the Application with the High Court, Ashanti will also serve the Application on AngloGold, whereupon AngloGold may enter an appearance in respect of the Application, provided that AngloGold does so within eight days after receipt of such service.

[7] The shareholders of Ashanti comprise (i) holders of Ashanti Shares (including the Government of Ghana) and (ii) the Government of Ghana, as holder of the special rights preference share, no par value per share, of Ashanti (the "*Golden Share*"). The Golden Share will remain outstanding after consummation of the Scheme. Under Section 231 of the Ghana Companies Code, the shareholders of a company with shares incorporated under the Ghana Companies Code are referred to as "members" of the

2939

company. For ease of reference, we use the term "shareholders" in this letter to refer to the members of Ashanti.

[8] Even if the High Court orders a separate Scheme Meeting for creditors of Ashanti that claim to be affected by the Scheme, no creditors will receive AngloGold Shares in the Scheme.

[9] At least 21 days' prior notice of a general meeting is required under Section 152(2) of the Ghana Companies Code.

[10] The Bank of New York, as depositary of the Ashanti GDSs, and Temple Assets (Private) Limited, as depository of the Ashanti ZDRs, are required by the terms of their respective amended and restated deposit agreements with Ashanti and the owners from time to time of Ashanti GDSs and Ashanti ZDRs, to arrange for the mailing of the Scheme Materials to holders of Ashanti GDSs and Ashanti ZDRs as promptly as practicable. Capita IRG Trustees Limited, as depository of the Ashanti ADIs, is required by the terms of the Deed Poll in favour of holders of Ashanti ADIs to pass on the Scheme Materials to holders of Ashanti ADIs forthwith upon receipt.

[11] AngloGold and the Government have also agreed the definitive terms of a stability agreement pursuant to which the Government will make certain fiscal and regulatory undertakings in its role as regulator of Ashanti (the "*Stability Agreement*"). AngloGold and the Government have agreed to enter into the Stability Agreement promptly after approval of the principal terms of the Stability Agreement by the Parliament of Ghana. In consideration of the Government's undertakings in the Stability Agreement, AngloGold will issue to the Government 2,658,000 AngloGold Shares and pay the Government US$5 million in cash promptly after the later to occur of (i) the execution of the Stability Agreement and (ii) the completion of the Transaction. The AngloGold Shares issued to the Government will be issued without registration in reliance on the safe harbor of Regulation S under the Securities Act. AngloGold has also agreed to pay to the Government US$5 million in cash towards the transaction costs incurred by the Government in its role as regulator of Ashanti. In addition, AngloGold has agreed that if the Transaction Agreement is terminated by the mutual written consent of AngloGold and Ashanti or AngloGold wrongfully terminates the Transaction Agreement, in either case after the Parliament has approved the Stability Agreement, AngloGold will promptly pay the Government US$15 million in cash.

[12] Section 231(6) of the Ghana Companies Code provides that the High Court may prescribe such terms as it thinks fit as a condition to confirming the Scheme (including an increase in the consideration payable pursuant to the Scheme). Under the terms of the Transaction Agreement, the obligation of AngloGold to consummate the Scheme is conditional upon there not having been any amendment or modification to the terms and conditions of the Scheme in a manner detrimental to AngloGold without the prior consent of AngloGold.

[13] We understand that, if Ashanti requests the High Court to require that the vote of shareholders at the Scheme Meeting be taken by a poll, the High Court may require that the Scheme be approved by a three-fourths majority of shares held by shareholders present, in person or by proxy, and entitled to vote and voting, at the Scheme Meeting.

[14] As discussed above, Ashanti and AngloGold expect that the Ashanti Shares will constitute the only securities of Ashanti affected by the Scheme.

---

### Incoming Letter 2

### JLD Legal Consultancy Services letterhead

#865A/3, Kanda Highway, North Ridge, Accra
P. O. Box GP 178, Accra, Ghana
Tel : 233 21 226941/254523-5
Fax: 233 21 254411
E-mail jld@africaonline.com.gh

January 12, 2004

Shearman & Sterling
Broadgate West
9 Appold Street

2940

London EC2A 2AP
England

*AngloGold Limited/Ashanti Goldfields Company Limited*

Ladies and Gentlemen:

We are acting as Ghanaian legal counsel to AngloGold Limited, a publicly listed company incorporated under the laws of the Republic of South Africa (" *AngloGold* "), in connection with its proposed business combination transaction with Ashanti Goldfields Company Limited, a publicly listed company incorporated under the laws of the Republic of Ghana (" *Ashanti* "), pursuant to a scheme of arrangement (the " *Scheme* ") to be effected under Section 231 of the Ghana Companies Code, 1963 (Act 179), as amended (the " *Ghana Companies Code* ").

You have asked us for our opinion as to certain matters of Ghanaian law concerning the Scheme pursuant to which Ashanti will become a wholly owned subsidiary of AngloGold and each issued and outstanding ordinary share, no par value per share, of Ashanti (the " *Ashanti Shares* ") will be transferred to AngloGold and each holder thereof will be entitled to receive in exchange therefor 0.29 ordinary shares, par value ZAR0.25 per share, of AngloGold (" *AngloGold Shares* ") (such number of AngloGold Shares issuable in exchange for each Ashanti Share being the " *Share Consideration* ").

Holders of Ashanti Shares resident in Ghana will be entitled to elect to receive their Share Consideration in the form of either (i) AngloGold Shares, (ii) AngloGold American Depositary Shares, each of which represents one AngloGold Share ("*AngloGold ADSs*") or (iii) AngloGold Ghanaian Depositary Shares, one hundred of which will represent one AngloGold Share ("*AngloGold GhDSs*"). If no election is made, such holders will receive AngloGold GhDSs. Holders of Ashanti Shares resident outside of Ghana (other than holders of Ashanti Shares resident in the United States) will be entitled to elect to receive their Share Consideration in the form of either (i) AngloGold Shares or (ii) AngloGold ADSs. If no election is made, such holders will receive AngloGold Shares. Holders of Ashanti Shares resident in the United States will be entitled to elect to receive their Share Consideration in the form of either (i) AngloGold Shares or (ii) AngloGold ADSs. If no election is made, such holders will receive AngloGold ADSs.

We understand that AngloGold intends to make arrangements with The Bank of New York as depositary for Ashanti Global Depositary Securities, each of which represents one Ashanti Share ("*Ashanti GDSs*"), whereby holders of Ashanti GDSs will be entitled to elect to receive their Scheme Consideration in the form of either (i) AngloGold Shares or (ii) AngloGold ADSs. If no election is made, such holders will receive AngloGold ADSs.

We understand that Ashanti has established a depository interest trust facility in the United Kingdom pursuant to which Ashanti Depositary Interests, each of which represents one Ashanti Share ("*Ashanti ADIs*") have been issued to facilitate the indirect holding of, and settlement of transactions in, Ashanti Shares by participants in CREST. We also understand that AngloGold and Ashanti intend to make arrangements with Capita IRG Trustees Limited as depository for Ashanti ADIs, whereby holders of Ashanti ADIs will be entitled to elect to receive their Scheme Consideration in the form of either (i) AngloGold Shares or (ii) AngloGold ADSs. If no election is made, such holders will receive AngloGold Shares.

We understand that Ashanti has a sponsored Zimbabwe depositary receipt facility for purposes of listing Ashanti Zimbabwe Depositary Receipts, one hundred of which represent one Ashanti Share ("*Ashanti ZDRs*"), on the Zimbabwe Stock Exchange. We also understand that AngloGold and Ashanti intend to make arrangements with the depositary for the Ashanti ZDRs under which the Scheme Consideration to be distributed to holders of Ashanti ZDRs will either be held in trust for the benefit of such holders or distributed or otherwise made available to such holders.

We also understand that AngloGold intends to pay cash in lieu of any fractional AngloGold Shares or fractional AngloGold ADSs and that holders of fractional interests resident in Ghana will be entitled to elect to receive AngloGold GhDSs in lieu of cash.

The Scheme must be confirmed by the High Court of Ghana (the " *High Court* " or the "*Court*"), pursuant to Section 231 of Ghana Companies Code in order for the Scheme to be effected.

2941

You have asked for our opinion in order to assist your consideration of whether confirmation of the Scheme by the High Court pursuant to Section 231 of the Ghana Companies Code would enable AngloGold to issue AngloGold Shares in reliance on the exemption from registration contained in Section 3(a)(10) of the U.S. Securities Act of 1933, as amended (the "*Securities Act*").

We understand that Section 3(a)(10) of the Securities Act exempts from the registration requirements of the Securities Act:

> "... any security which is issued in exchange for one or more bona fide outstanding securities, claims or property interests, or partly in such exchange and partly for cash, where the terms and conditions of such issuance and exchange are approved, after a hearing upon the fairness of such terms and conditions at which all persons to whom it is proposed to issue securities in such exchange shall have the right to appear, by any court... or any other governmental authority expressly authorized by law to grant such approval."

You have asked for our opinion in relation to your consideration of the following three requirements of Section 3(a)(10):

> (a) that the High Court cannot confirm the Scheme unless the High Court finds that the terms and conditions of the Scheme are fair to those persons who will receive AngloGold Shares in the Scheme;

> (b) that all persons who will receive AngloGold Shares in the Scheme will receive notice of, and have the right to appear at, the Court Hearing (as defined below); and

> (c) that the High Court will be advised before the Court Hearing that upon confirmation of the Scheme by the High Court, such confirmation will be relied upon by AngloGold as an approval of the Scheme for the purpose of qualifying for an exemption from the registration requirements of the Securities Act with respect to the AngloGold Shares provided by Section 3(a)(10) thereof.

For this purpose, we describe the nature of a scheme of arrangement under Section 231 of the Ghana Companies Code, the functions of the High Court in relation to such scheme and certain related procedural aspects. It is a matter of the laws of the United States (on which we do not express any opinion) whether these fulfil the requirements of Section 3(a)(10) of the Securities Act.

### The Derivation of Ghana Law from English Common Law

Ghanaian law has its origins in the English common law. The Supreme Court Ordinance 1876 (the "*1876 Ordinance*") delineated the Laws of the Gold Coast (Ghana), which was, at that time an English colony.

Section 14 of the 1876 Ordinance provided:

> "*The Common Law, the doctrines of equity and the statutes of general application which were in force in England at the date when the Colony obtained a local legislature, that is to say, on the 24th day of July, 1874, shall be in force within the jurisdiction of the Court*".

By section 19 of the 1876 Ordinance, local laws and customs were to apply in suitable cases, to the extent they were not "repugnant to justice, equity and good conscience."

This dual system of laws — the received English law on the one hand and the customary laws and customs on the other, which together constituted the laws of Ghana introduced by the 1876 Ordinance, have been preserved by all post-Independence Constitutions of Ghana-(See Article 40 of the 1960 Constitution, Article 126 of the 1969 Constitution, Article 4 of the 1979 Constitution and Article 11 of the 1992 Constitution).

Article 11 of the 1992 Constitution provides that the laws of Ghana shall consist of-

> 11. (1) (a) this Constitution;
> (b) enactments made by or under the authority of the Parliament established by this Constitution;
> (c) any Orders, Rules and Regulations made by any person or authority under a power conferred by this Constitution;

2942

(d) the existing law; and
(e) the common law.

(2) The common law shall comprise the rules of law generally known as the common law, the rules generally known as the doctrines of equity and the rules of customary law including those determined by the Superior Court of Judicature.

The English rules of common law and the doctrines of equity, introduced by the 1876 Ordinance, are therefore applicable in Ghana as part of the common law of Ghana.

Of interest to the Ghanaian courts is whether a decision of the English courts founded on the English common law (which falls within the definition of the common law in Ghana) is binding on the courts in Ghana. Given the statutory provisions as to the application of judicial precedent, no Ghanaian Court is bound to follow any English decision founded on the common law, or for that matter any decision in any Commonwealth country exercising common law jurisdiction. However, it is well settled that the Ghanaian courts will consider with respect relevant English decisions especially when such decisions are substantially similar to a pending case before the Ghanaian court and where the English decision turns on an interpretation of legislation, which is substantially the same as Ghanaian legislation.

For example, in *Amponsah v Appiagyei (Consolidated)* [1982-83] (Ghana Law Reports page 96), it was held that although the Ghana courts were not bound to follow decisions of English courts, the courts were aware of the fact that in many spheres the Ghanaian laws were modelled on those of England, and that where with regard to such a piece of legislation an interpretation had previously been given by an English court, the Ghanaian courts could give persuasive effect to that interpretation.

Similarly, in *Fodwoo v Law Chambers & Co.* [1965] (Ghana Law Reports), Apaloo JSC stated inter alia "... We do not hold ourselves bound by this [English] decision in [*Kitchen v Royal Airforce Association* [1958] 1 WLR 563, CA] but the reason underlying the formulation of these principles appeals to us and we respectfully follow it. Indeed, we cannot shut our eyes to the desirability of a homogenous development and application of the law in two Commonwealth countries having cognate jurisprudence."

From the time Ghana attained independence in 1957 and upon the country attaining Republican status in 1960, both the Ghanaian courts and the Ghanaian legislature have acted with the consciousness that Ghana should operate as an independent country, but that legislation as well as judicial decisions from other countries, while not binding, should be of persuasive effect. This is the understanding of the Courts and is how they have operated since independence to the present day.

Since independence, most of the laws have been modelled on English legislation, modified or adapted to fit the peculiar circumstances of Ghana and the policy decisions of the leadership of the country at the time the laws were passed. Section 119(1) of the Courts Act, 1993 (Act 459) preserves the connection between the laws of England and those of Ghana where it states:

"Until provision is made by law in Ghana, the Statutes of England specified in the Second Schedule to this Act shall continue to apply in Ghana as statutes of general application subject to any statute in Ghana."

The said Second Schedule defines the statutes as the Partitions Act, Cestuique Vic Act, Prescription Act, Real Property Act, Libel Act, Trustee Act, and Charitable Trusts Act.

### Historical Background of the Ghanaian Judiciary

The first Courts established in 1822 were the petty debt courts and the appointment of magistrates was from the ranks of the local merchants.

By 1841 the enactment of the British Settlements Act empowered the Queen to "establish all such law, institutions and ordinances, and to constitute such courts and offices, and to make such provisions and regulations for the proceedings in such courts, and for the administration of justice as may be necessary for the peace order, and good government of Her Majesty's subjects".

In furtherance of this Act, a judicial assessor's Court was established.

2943

In 1853 the first Supreme Court was established with jurisdiction of the Common Pleas, Queen's Bench, Exchequer at Westminster and admiralty over treason, piracies, murder, conspiracies and such other offences.

It was not until 1872 when the Dutch transferred all their forts to the British and left the then Gold Coast (Ghana) that the stage was set for active British administration.

The year 1876 saw the passing of the Supreme Court Ordinance (Ordinance No. 4 of 1876), the law that laid the foundation for the modern system of courts in Ghana.

The Supreme Court so established consisted of:

    (a) a Court of Appeal or the Full Court; and

    (b) the Divisional Court.

The lower Courts were extended to the rest of the country under the Courts Ordinance of 1935.

The Judicial Committee of the Privy Council (the Privy Council) was set up in 1833 to hear cases as the highest Court of Appeals for the dominions and territories of the British Crown. Presided over by the same lords that decided cases in the United Kingdom's House of Lords, it heard appeals from the Gold Coast and later Ghana from 1874 to 1960, when its functions were taken over by the Supreme Court.

Between the years of 1960 to 1992, four republican constitutions were promulgated in Ghana. Each of these constitutions maintained, with some modifications, the structure of the courts in Ghana (as described below).

During periods of military rule the Ghanaian courts maintained their structure and independently applied the existing laws.

Today, a single national system of courts operates in the country. Ghana has a three-tier appeals system, that is from the lower courts to the High Court, the High Court to the Court of Appeal and finally from the Court of Appeal to the Supreme Court

### The Role of the Judiciary under the Constitution

Article 125 (3) of the 1992 Constitution of the Republic of Ghana vests the judicial power of Ghana in the judiciary. The same provisions expressly exclude the President, Parliament or any organ or agency of the President from the exercise of final judicial power.

Article 125 (5) vests jurisdiction in all matters civil and criminal, including matters relating to the constitution, and such other jurisdiction as parliament may by law confer on the judiciary.

Under Article 126 (1) the composition of the judiciary is stated to consist of:

    (a) The Superior Courts of Judicature comprising

        (i) The Supreme Court;

        (ii) The Court of Appeal; and

        (iii) The High Court and Regional Tribunals; and

    (b) Such lower courts or tribunals as Parliament may by law establish.

The proceedings of the courts are held in public (Article 126 (3)).

### Appointments, Retirement and Removal of Justices of the Superior Courts

The Chief Justice is appointed by the President acting in consultation with the Council of State (as defined in Article 89 of the Constitution) and with the approval of parliament. The other Supreme Court justices are appointed by the President acting on the advice of the Judicial Council (as defined in Article 153), in consultation with the Council of State and with the approval of parliament. Justices of the Court of Appeal and of the High Court and chairmen of Regional Tribunals are appointed by the President acting on the advice of the Judicial Council (Article 144 (1)- (3)).

2944

The Constitution provides for the retirement of a superior court judge at any time after the age of sixty. Such a judge cannot be removed from office except for stated misconduct, incompetence or on the ground of his inability to perform the functions of his office arising from infirmity of the body or mind (Article 145(1) and 146(1)). The stringent procedures for removal of judges are set forth in Article 146.

### The Concept of Judicial Independence

The elaborate provisions of Article 127 of the 1992 Constitution guarantee the Rule of Law and independence of the judiciary in Ghana.

Article 127 (1) states that:

"...in the exercise of the judicial power of Ghana, the judiciary in both its judicial and administrative functions is subject only to the Constitution and shall not be subject to the control or direction of any person or authority and neither the President nor parliament nor any person acting under the authority of the president or parliament nor any other person whatsoever shall interfere with judges or judicial officers or other persons exercising judicial power, in the exercise of their judicial functions; and all organs and agencies of the State shall accord to the Courts such assistance as the Court may reasonably require to protect the independence, dignity and effectiveness of the Courts, subject to this Constitution" (Article 127 (2)).

Throughout the years, the courts in Ghana have amply demonstrated and asserted their independence by deciding cases against the government of the day, in spite of their political sensitivity and the implied interdiction of ruling adversely against a sitting government *(see Tuffuor v. the Attorney General 1980 GLR 537)*

After the 1992 Constitution, since the case of *Kuenyehia v. Archer Supreme Court, 25th May 1993, Suit No 5/93* (unreported), the Supreme Court has demonstrated its independence from the Executive in the face of enormous pressure to rule in favour of the sitting government in several matters instituted by individuals and organisations against the government. In so doing its decisions have given further impetus to the Rule of Law and separation of powers in Ghana.

### The Ghana Companies Code

The rapid development in the Gold Coast (Ghana) of cocoa, timber and mining industries in the early twentieth century attracted a number of companies into the country.

Due to the increasing activities of these companies, the need to provide legal machinery to regulate their operations was heightened. This led to the enactment of the 1907 Companies Ordinance (the " *Companies Ordinance* "), which was based on the 1862 English Companies Act.

The 1862 Act was found to be unsuitable to the special circumstances prevailing in the Gold Coast at the time and was considered obsolete in the United Kingdom, which subsequently repealed it with the passage of the Companies (Consolidation) Act of 1908.

However, the Companies Ordinance continued in force in Ghana and, according to the prominent legal scholar Professor Gower, was nearly "fifty years behind the times" when enacted, and by the 1960's was "a century out of date."

In 1958 the government of Ghana under President Nkrumah appointed a working party to revise the Companies Ordinance, described as "completely obsolete and quite unfitted to modern commercial needs."

The draft proposals of the working party were found to be unsuitable to Ghanaian conditions as they proved to be nothing more than a carbon copy of the 1948 Companies Act of the UK (the "*English Companies Act 1948*").

In August 1958, Professor Gower was appointed sole commissioner under the Commission of Enquiry Ordinance, Cap 249 (1951 Rev). Professor Gower published his "*Final Report into the Working and Administration of the Company Law of Ghana*" (the " *Gower Report* "), which subsequently formed the basis of the Ghana Companies Code, 1963 (Act 179).

While modifications were made in drawing on the English Companies Act 1948 for inspiration, Professor Gower's draft proposal for the Ghana Companies Code was based on this English Act.

2945

The comments of Professor Gower, although not statutory, have been of great assistance to the courts in understanding the application of the Ghana Companies Code.

Ghanaian courts hold the view that cases based on UK law or practice, are considered to be of persuasive effect. Thus where there is no precedent, counsel can bring the attention of the court to a UK case to persuade the court in respect of a particular interpretation or precedent. Moreover, in practice, the courts are willing to look at what prevails in England and other Commonwealth jurisdictions.

**Section 231 of the Ghana Companies Code**

Section 231 of the Ghana Companies Code was drafted by Professor Gower and provides for the arrangement or amalgamation of a company with High Court approval. In the Gower Report at page 172, Professor Gower explains that Section 231 of the Ghana Companies Code is based on section 206 of the English Companies Act of 1948, the predecessor to section 425 of the 1985 Companies Act of the United Kingdom (the " *UK Act* ").

The following describes the substantive and procedural similarities and differences between a scheme of arrangement or amalgamation under section 231 of the Ghana Companies Code and that under section 425 of the UK Act.

Both processes begin with the summary application of a company to the court for an order to summon a meeting of members in such manner as the court directs. Under the Ghanaian law, however, the Court may direct that in lieu of meetings a postal ballot be taken by the various classes. Professor Gower explains this difference, introduced under section 170 (6) of the Ghana Companies Code, as a means of obtaining a general referendum, where necessary, in order to benefit all shareholders. This is similar to the use of written consents of shareholders in the United States.

Approval of the scheme follows the UK Act except that under section 231 of the Ghana Companies Code, the Scheme must be approved by a three-fourths majority of members[1] rather than a majority of members in number representing three-fourths in value of shares.[2]

A significant difference with the UK Act is the introduction of a reporter appointed under section 231(2) of the Ghana Companies Code to evaluate fairness (the " *Reporter* "). This is a novel safeguard adopted from the laws of Scotland intended to enhance the protection of members and , where applicable, creditors in the scheme process.

With the exception of these differences there are no further significant or relevant differences between the Ghanaian and the UK procedures.

**Procedures For a Scheme Of Arrangement**

Application to Court

Sections 231 to 233 of the Ghana Companies Code govern the procedure to be followed in a scheme of arrangement.

Any company or a member may apply to the High Court for an order that meetings of the various classes of members and creditors concerned (the " *Scheme Meeting(s)* ") be summoned to initiate a proposed scheme of arrangement. A meeting of members is convened in such manner and held in such place as the High Court, taking into consideration submissions made by Ashanti and AngloGold, directs. As an alternative to the meeting, the Court may order that a postal ballot be conducted (Section 231 (1)). We would expect that Ashanti will ask the Court not to order a postal ballot in lieu of the meetings, as the wide and divergent shareholder base of Ashanti make a postal ballot cumbersome and impractical.

We understand that Ashanti will apply to the High Court by way of an originating motion on notice to initiate the Scheme process and will move the Court praying for an order to convene the appropriate meetings. We understand that the application will be supported by an affidavit accompanied by various documents, which are to include the Scheme Materials (as defined and described below). The Application will be filed in the High Court Registry and served on AngloGold as a party to the proceedings.[3] Application, filing and service normally takes between 7-14 days. All things being equal, the High Court will be expected to hear the Application within 14 days after the Application is filed.

On the hearing of the application, or at a subsequent hearing, the Court will give directions as to what form and in which manner the Scheme process is to be carried out; such instructions will include information such as to how the relevant meeting of the holders of Ashanti Shares is to be conducted, how copies of the Scheme Materials are to be sent to shareholders , and the appropriate forms of proxy. At the hearing on the application, or at a subsequent hearing, the Court will order that a meeting of holders of Ashanti Shares be convened and will determine those person entitled to attend this meeting. We expect that the Ashanti Shares will constitute the only securities of Ashanti affected by the Scheme. As Ashanti's creditors will not be affected by the scheme, we do not anticipate that there will be any concerned creditors for whom a scheme meeting would be required .

The Court will also direct indicative time limits for notices, meetings, and hearings.

Before the Court can confirm the Scheme, it will direct the Registrar of Companies (the "*Registrar*") to appoint a Reporter to consider the fairness of the Scheme to each class of shareholders and concerned creditors , if any, of Ashanti. Although the statute requires the appointment of the Reporter after the Scheme Meeting (section 231(2)), we understand that Ashanti will pray the Court to appoint the Reporter at the earliest opportunity (i.e., at the initial hearing) in order that a proper assessment of the Scheme may be made from the outset and be presented to shareholders at the Scheme Meeting.

The Reporter is required to be an expert independent of both parties. The Reporter would be required to ascertain the intrinsic fairness of the Scheme immediately on receipt of the scheme documentation, to monitor procedures, to ensure that the statutory provisions are rightfully carried out, and to make a final report to the Registrar for the Court. Ashanti and AngloGold would be required to provide the High Court and the Reporter with sufficient information to enable them to determine the value of Ashanti and AngloGold Shares. The Reporter's fees will be paid by Ashanti or such other party to the proceedings as the Court directs.

Ashanti will inform the Court prior to convening the Scheme Meeting that, if the Court confirms the Scheme, such confirmation will serve as the basis for reliance by AngloGold upon the Section 3(a)(10) exemption from the registration requirements of the Securities Act with respect to the issuance of the AngloGold Shares.

If the Court orders that a Scheme Meeting be called, we understand that notice of such, as well as notice of the High Court hearing to confirm the Scheme (the "*Court Hearing* "), will be sent to each shareholder at his or her registered address (and to the depositaries for the Ashanti GDSs, the Ashanti ADIs and the Ashanti ZDRs, for delivery to holders of Ashanti GDSs, Ashanti ADIs and Ashanti ZDRs, respectively), in the manner provided in the Regulations of Ashanti. Under the Ghana Companies Code, the required period of notice to call shareholder meetings is at least 21 days. In addition to notifying interested classes of the Scheme Meetings and the expected dates of the Court Hearing, we understand that the notice will be accompanied by a scheme document (the "*Scheme Document*") that will include the Explanatory Statement (as defined below) and an AngloGold information memorandum (the "*AngloGold Information Memorandum*" and, together with the Scheme Document, the "*Scheme Materials*") that will describe, *inter alia*:

    (a) AngloGold and the AngloGold Shares;

    (b) the proposed Scheme and its effects;

    (c) the reasons for the Scheme;

    (d) approvals required to consummate the transaction, and conditions thereto;

    (e) financial information for Ashanti and AngloGold;

    (f) the rights of the parties to attend in person or by proxy at the Scheme Meetings and Court Hearing to either support or oppose the Scheme;

    (g) a recommendation by the Board of Ashanti to Ashanti shareholders in relation to the Scheme; and

2947

(h) the procedures through which holders of Ashanti GDSs, Ashanti ADIs and Ashanti ZDRs may appear and object at the Court Hearing.

Moreover, section 233 requires the Scheme Document to contain a statement to members explaining the effect of the Scheme, and stating in particular any material interests of directors of the target company and the effect of the Scheme on them insofar as it is different from the effect on the like interests of other members (the "*Explanatory Statement*"). The Scheme Materials will be mailed free of charge to all members.

Moreover, we understand that the Explanatory Statement forming part of the Scheme Document will contain the following conditions that must be satisfied (or waived) for the Scheme to be implemented and that the Scheme will become effective upon delivery of the order confirming the Scheme to the Registrar:

(a) the approval of the Scheme by not less than three-fourths of the votes cast by holders of Ashanti Shares present at the Scheme Meeting in person or by proxy and entitled to vote and voting; and

(b) (i) the confirmation of the Scheme by the Court and (ii) delivery of an office copy of the order confirming the Scheme to the Registrar of Companies.

The provision quoted above makes it abundantly clear (a) that shareholder approval is only one of the prerequisites for the Scheme to be effective and (b) that a Court Hearing will be required to take place before the Scheme can be binding.

We also understand that Ashanti intends to include with the Scheme Document an invitation from Ashanti to attend the meeting, which we believe will be sufficient to permit US residents to obtain a business visa to Ghana in order to attend the Scheme Meetings and/or Court Hearing.

### Approval of Scheme

Approval of the Scheme requires, *inter alia*, the approval at the Scheme Meeting by a three-fourths majority of members.[4] We understand that the notice convening the requisite Scheme Meetings will contain a clause along the following lines, or substantially similar thereto:

" the said Scheme will be subject to the final approval of the Court".

The approval given by Ashanti shareholders, therefore, is never in itself the final requirement for a scheme of arrangement.

### Confirmation of the Scheme by the Court

Upon approval of the Scheme by the Ashanti shareholders at the Scheme Meeting, Ashanti will advise the High Court of this fact and request that the High Court confirm the Scheme. This request is supported by an affidavit (which does not normally advance additional reasons for fairness of the Scheme).

Further affidavits proving despatch of the appropriate documents to Ashanti shareholders are also required, including the Chairman's report on the results of the Scheme Meeting (including the number of shareholders present in person or by proxy, the results of voting, and the proxies, which have been rejected). Included in his report will be the report by a scrutineer on verification of the counting of votes. It is proposed that the fairness report by the independent Reporter will also be submitted to the Court at this time.

Under section 233 of the Ghana Companies Code there is no obligation to advertise the Court Hearing. However, it is expected that notice of the Court Hearing, including details of the time, date and place, will be published in a number of newspapers in various jurisdictions (Ghana, the US, the UK and South Africa) with wide circulation and approved by the Court approximately 30 days prior to the date fixed for the Court Hearing. If the date of the Court Hearing differs from the expected date published in newspapers, it is expected that the date of the Court Hearing will be republished in the same newspapers approximately five days prior to the Court Hearing.

Prior to the Court Hearing, the Court may also prescribe rules for the procedure to object to the Scheme at such Court Hearing. By section

2948

231(5) of the Ghana Companies Code, members are expressly given the right to be represented at and to object to the scheme at the sanction hearing. Shareholders need not retain separate counsel in order to appear at the Court Hearing but may appear in person. Although the Ghana Rules of Civil Procedure normally require that a person wishing to appear at a hearing before the High Court must first file an affidavit and notice of appearance, these rules do not expressly apply to schemes of arrangement under section 231. Although it would be open to the Court to apply these rules to the Scheme, we consider this unlikely since, in the Gower Report, Professor Gower states that section 231(5) of the Ghana Companies Code is drafted to codify English practice under the English Companies Act 1948 which we are advised allows persons to attend without first having to file an affidavit and notice of appearance. If the Court does make any such requirement, any person who fails to timely file a notice of appearance and affidavit would not have the right to appear at the Court Hearing, although the Court may decide, and we believe would likely decide, to allow such person to object if he or she has made a personal appearance at the Court Hearing.

Therefore, we believe, the Court is likely to decide to follow customary UK practice and allow any class member claiming to be affected to appear at the Court Hearing without having filed an affidavit or notice of appearance. When AngloGold files its notice of appearance with the Court, it will request that the Court follow the customary UK practice in this regard. It is our understanding that Ashanti also intends to make such a request of the Court. It is also our understanding that both AngloGold and Ashanti will also make an application for holders of Ashanti GDSs, Ashanti ADIs and Ashanti ZDRs to be able to attend or be represented at the Court Hearing notwithstanding that they are not actual members, but rather interested in the shares of Ashanti.

### Court Hearing

The Court Hearing will take place in open Court. In addition to having been publicised in the Scheme Document at least 21 days prior to the Scheme Meeting, and having been published in widely-read newspapers (in the various jurisdictions) approximately 30 days prior to its taking place, the Court Hearing will be listed on a Court list, which becomes available to the public 2 or 3 days prior to the date of the hearing.

Prior to the Court Hearing, the Court will be advised that its sanctioning of the Scheme will serve as a basis for reliance upon an exemption from the registration requirements of section 3(a)(10) of the Securities Act with respect to the AngloGold Shares to be issued pursuant to the Scheme.

In reaching its determination as to the fairness, it is expected that the Court will take into account the following:

- whether adequate notice of the Scheme Meeting(s) had been given;

- whether the Explanatory Statement to shareholders/creditors was properly despatched;

- the adequacy of the disclosure and explanatory information contained in the Scheme Document;

- the relevant majority's approval of the Scheme.

- the report of the Reporter;

- objections to the Scheme raised by concerned shareholders or concerned creditors claiming to be affected by the Scheme.

- any other factors the Court deems relevant.

The Court will reach its decision as to fairness independent of whether the Scheme has been approved by the requisite majority of shareholders at the Scheme Meeting, independent of the findings of the Reporter, and independent of whether any person claiming to be affected by the Scheme objects to the Scheme.

The Court may impose any terms on the Scheme that it desires, including an increase in the consideration paid for the Ashanti Shares.

The hearing to confirm the Scheme is then conducted by the Court after the meetings, provided that the relevant majority has approved the Scheme. Once a court order approving the Scheme is made and filed with the

Registrar, the Scheme becomes binding on the shareholders and the company.

The Scheme does not, however come into effect until a copy of the Court order approving it is lodged with the Registrar for registration and publication in the Gazette.

### Function of the Court

With respect to the procedural and substantive law aspects of the proceedings including the standards for determining the fairness of the transaction, the function of the Court in exercising its discretion to sanction schemes on applications under section 231 is substantially the same as under equivalent English practice and procedure.

As there is no relevant Ghanaian case law on the matter, the Court in ascertaining its standards of fairness applicable under section 231 of the Ghana Companies Code would consider and likely follow the standards followed by the Courts in English applications under the equivalent provision of section 425 of the UK Act (section 206 of the English Companies Act 1948) from whence section 231 of the Ghana Companies Code derives.

The duty of the Court is to assure itself that all the provisions of the statute have been complied with and that the majority have been acting bona fide *(Re Alabama, New Orleans Texas and Pacific Railway Junction Co* [1891] 1Ch 213 CA at page 238).

A number of decided cases, including *In Re Dorman Long & Co Ltd* [1934] Ch 635, place the test as to whether the Court should favour a Scheme as that of a reasonable man, that is to say " ..whether an intelligent honest man, a member of the class concerned and acting in respect of his interest might reasonably approve.."(per Maugham J at page 657). See also *Re National Bank* [1966] 1WLR 819.

The standards discussed in these cases were described in *In Re Anglo-Continental Supply* [1922] 2 Ch 723. There the court held that in exercising its power to sanction the arrangement before the court it should find: "First, that the provisions of the statute have been complied with. Secondly, that the class was fairly represented by those who attended the meeting and that the statutory majority are acting bona fide and are not coercing the minority in order to promote interests adverse to those of the class whom they purport to represent, and Thirdly, that the arrangement is such as a man of business would reasonably approve."

The High Court will therefore ascertain that the procedures as lain down by the Ghana Companies Code have been complied with in a proper and timely manner. Adequacy of notices and the Scheme Materials will be deemed essential in ensuring that shareholders are properly informed about the Scheme and its process. Conformity with the statutory requirements will be regarded as necessary to ensure the protection of shareholder and , if required, creditor rights.

The Court must additionally discern that the majority have acted in good faith and that there has been no collusion, fraud or coercion of the minority to promote interests adverse to those of the class that they purport to represent.

With respect to the substantive aspects of the proceedings and the determination of the fairness of the transaction to the shareholders, although the majority of shareholders may favour the Scheme and although the Scheme may be deemed fair by the independent Reporter, the Court will arrive at an independent decision and will objectively determine whether the Scheme is a reasonable one based on all the facts and criteria before it.

The independent Reporter will be deemed an expert witness as defined under Order 37A of the Rules of Court Amendment Rules 1954 (LN140) and the fairness report will be of great assistance to the Court, which may find the same persuasive in arriving at its determination.

The Court cannot confirm the Scheme unless it is satisfied and finds that the terms and conditions of the Scheme are procedurally and substantively fair to each class of those persons who will receive AngloGold Shares in the Scheme.

2950

**Conclusion**

For the abovementioned reasons and as a matter of Ghanaian law, it is our opinion:

(a) that the High Court cannot confirm the Scheme unless the High Court finds that the terms and conditions of the Scheme are fair to those persons who will receive AngloGold Shares in the Scheme;

(b) that all persons who will receive AngloGold Shares in the Scheme will receive notice of, and have the right to appear at, the Court Hearing; and

(c) that the High Court will be advised prior to the convening of the Scheme Meetings and again at the Court Hearing that upon confirmation of the Scheme by the High Court, such confirmation will be relied upon by AngloGold as an approval of the Scheme for the purpose of qualifying for an exemption from the registration requirements of the Securities Act with respect to the AngloGold Shares provided by Section 3(a)(10) thereof.

Yours truly,

JLD Legal Consultancy Services

[1] Section 231 of the Ghana Companies Code refers to the shareholders of a company incorporated under the Ghana Companies Code as "members" of such company. Accordingly, all shareholders of Ashanti are members of Ashanti.

[2] We understand that, if Ashanti requests the High Court to require that the vote of members at the Scheme Meeting be taken by a poll, the High Court may require that the Scheme be approved by a three-fourths majority of shares held by shareholders present, in person or by proxy, and entitled to vote and voting, at the Scheme Meeting.

[3] Upon receipt of service of the Application, AngloGold may enter an appearance in respect of the Application, provided that AngloGold does so within eight days after receipt of such service.

[4] As noted above, we understand that, if Ashanti requests the High Court to require that the vote of members at the Scheme Meeting be taken by a poll, the High Court may require that the Scheme be approved by a three-fourths majority of shares held by shareholders present, in person or by proxy, and entitled to vote and voting, at the Scheme Meeting.

*http://www.sec.gov/divisions/corpfin/cf-noaction/anglogold011504.htm*

2951

# Tab 16

480 B.R. 129, Bankr. L. Rep. P 82,312
**(Cite as: 480 B.R. 129)**

H

United States District Court,
S.D. New York.
In re ASHAPURA MINECHEM LTD., Debtor.
Armada (Singapore) Pte Ltd., Appellant,
v.
Chetan Shah, in his Capacity as the Foreign Representative of Ashapura Minechem Ltd., Appellee.

Nos. 11–14668 (JMP), 12 Civ. 257 (SAS).
June 28, 2012.

**Background:** Foreign representative for debtor headquartered in India petitioned for recognition of insolvency proceeding voluntarily commenced by debtor in India as foreign proceeding or foreign main proceeding under Chapter 15. The United States Bankruptcy Court for the Southern District of New York, 2011 WL 5855475, granted recognition as foreign main proceeding, and granted stay against order enforcing creditor's arbitration award against debtor. Creditor appealed.

**Holdings:** The District Court, Shira A. Scheindlin, J., held that:

(1) debtor established that its proceeding in India was collective in nature, as required for proceeding to come within Bankruptcy Code's definition of "foreign proceeding";

(2) India's Board for Industrial and Financial Reconstruction (BIFR) was "court" under Chapter 15's definition of "foreign court";

(3) debtor established that BIFR had supervision or control over debtor's assets and affairs, as required for proceeding to come within definition of "foreign proceeding"; and

(4) proceeding was brought under law related to insolvency, as required to come within definition of "foreign proceeding."

Affirmed.

West Headnotes

**[1] Bankruptcy 51 ⬸3786**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3785 Findings of Fact
                51k3786 k. Clear error. Most Cited Cases

Credibility determinations by bankruptcy courts are reviewed for clear error, as are decisions resting on physical or documentary evidence or inference from other facts.

**[2] Bankruptcy 51 ⬸3786**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3785 Findings of Fact
                51k3786 k. Clear error. Most Cited Cases

Finding of fact is "clearly erroneous" if the court is left with the definite and firm conviction that a mistake has been committed.

**[3] Bankruptcy 51 ⬸2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

Recognition of foreign proceeding under Chapter 15 is not a rubber-stamp exercise. 11 U.S.C.A. § 1517.

**[4] Bankruptcy 51 ⬸2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

As a threshold matter, appointed representative of a foreign debtor seeking recognition under

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

480 B.R. 129, Bankr. L. Rep. P 82,312
**(Cite as: 480 B.R. 129)**

Chapter 15 must establish that the proceeding is a "foreign proceeding" as defined by Bankruptcy Code. 11 U.S.C.A. §§ 101(23), 1501(b)(1), 1515(a), 1517(a).

**[5] Bankruptcy 51 ⚷—2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

Foreign representative of debtor seeking recognition under Chapter 15 carries burden of proving each of seven criteria to establish that proceeding is a "foreign proceeding" under Bankruptcy Code: (1) existence of a proceeding, (2) that is either judicial or administrative, (3) that is collective in nature, (4) that is in a foreign country, (5) that is authorized or conducted under a law related to insolvency or the adjustment of debts, (6) in which debtor's assets and affairs are subject to control or supervision of a foreign court, and (7) which proceeding is for the purpose of reorganization or liquidation. 11 U.S.C.A. § 101(23).

**[6] Bankruptcy 51 ⚷—2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

For purposes of Bankruptcy Code's definition of "foreign proceeding," "collective proceeding" is one that considers the rights and obligations of all creditors, for the general benefit of creditors. 11 U.S.C.A. § 101(23).

**[7] Bankruptcy 51 ⚷—2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

In determining whether a particular foreign action is "collective," within meaning of Bankruptcy Code's definition of "foreign proceeding," it is appropriate to consider both the law governing the foreign action and the parameters of the particular proceeding as defined in, for example, orders of a foreign tribunal overseeing the action. 11 U.S.C.A. § 101(23).

**[8] Bankruptcy 51 ⚷—2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

A "collective proceeding," as term is used in Bankruptcy Code's definition of "foreign proceeding," is designed to provide equitable treatment to creditors, by treating similarly situated creditors in the same way, and to maximize the value of debtor's assets for the benefit of all creditors. 11 U.S.C.A. § 101(23).

**[9] Bankruptcy 51 ⚷—2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

To be for the general benefit of creditors, so as to qualify as "collective proceeding" under Bankruptcy Code's definition of "foreign proceeding," a proceeding need not ensure that all creditors receive a share of the distribution. 11 U.S.C.A. § 101(23).

**[10] Bankruptcy 51 ⚷—2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

Characteristics of a "collective proceeding," as

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

480 B.R. 129, Bankr. L. Rep. P 82,312

**(Cite as: 480 B.R. 129)**

term is used in Bankruptcy Code's definition of "foreign proceeding," include adequate notice to creditors under applicable foreign law, provisions for the distribution of assets according to statutory priorities, and a statutory mechanism for creditors to seek court review of the proceeding; however, the standard for notice is not a demanding one. 11 U.S.C.A. § 101(23).

**[11] Bankruptcy 51 ⬦2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

Under requirement of test for establishing that proceeding sought to be recognized under Chapter 15 is "foreign proceeding" specifying that debtor's assets and affairs must be subject to foreign court's jurisdiction, the body conducting the proceeding can be one considered to be a foreign court. 11 U.S.C.A. §§ 101(23), 1502.

**[12] Bankruptcy 51 ⬦2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

Both debtor's assets and its affairs must be subject to judicial control or supervision to satisfy requirement that debtor's assets and affairs be subject to foreign court's jurisdiction under test for establishing that proceeding sought to be recognized under Chapter 15 is "foreign proceeding." 11 U.S.C.A. §§ 101(23), 1502.

**[13] Bankruptcy 51 ⬦2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

Under requirement that debtor's assets and affairs be subject to foreign court's control or supervision as part of test to determine whether proceeding sought to be recognized under Chapter 15 is a "foreign proceeding," foreign court need not control the day-to-day operations of debtor, and it is sufficient, for instance, that the body monitor compliance with the repayment plan negotiated between debtor and creditors. 11 U.S.C.A. § 101(23).

**[14] Bankruptcy 51 ⬦2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

Under prong of test to determine whether proceeding sought to be recognized under Chapter 15 is a "foreign proceeding" requiring that proceeding be authorized or conducted under a law related to insolvency or the adjustment of debts, proceeding must be authorized by a statute that deals with corporate insolvency or the adjustment of corporate debt, and the fact that a proceeding has a unified structure of the external administration provisions favors a finding that a statute meets this criterion. 11 U.S.C.A. § 101(23).

**[15] Bankruptcy 51 ⬦2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

Parties opposing the recognition of foreign proceedings under Chapter 15 generally bear the burden of proof on applying public policy exceptions. 11 U.S.C.A. § 1506.

**[16] Bankruptcy 51 ⬦2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceed-

480 B.R. 129, Bankr. L. Rep. P 82,312
**(Cite as: 480 B.R. 129)**

ings

51k2341 k. In general. Most Cited Cases

A prerequisite to applying statute allowing court to refuse to take action governed by Chapter 15 if action would be manifestly contrary to United States public policy is that there exist a conflict between foreign and United States law; however, that fact alone is not dispositive. 11 U.S.C.A. § 1506.

**[17] Bankruptcy 51 🔑2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings

51k2341 k. In general. Most Cited Cases

Statute allowing court to refuse to take action governed by Chapter 15 if action would be manifestly contrary to United States public policy should be construed narrowly, and is intended to be invoked only under exceptional circumstances concerning matters of fundamental importance for the United States. 11 U.S.C.A. § 1506.

**[18] Bankruptcy 51 🔑2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings

51k2341 k. In general. Most Cited Cases

Pursuant to statute allowing court to refuse to take action governed by Chapter 15 if action would be manifestly contrary to United States public policy, deference to a foreign proceeding should not be afforded in a Chapter 15 proceeding where the procedural fairness of the foreign proceeding is in doubt or cannot be cured by the adoption of additional protections. 11 U.S.C.A. § 1506.

**[19] Bankruptcy 51 🔑2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings

ings

51k2341 k. In general. Most Cited Cases

Pursuant to statute allowing court to refuse to take action governed by Chapter 15 if action would be manifestly contrary to United States public policy, action should not be taken in a Chapter 15 proceeding where taking such action would frustrate a United States court's ability to administer the Chapter 15 proceeding and/or would impinge severely a United States constitutional or statutory right. 11 U.S.C.A. § 1506.

**[20] Bankruptcy 51 🔑2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings

51k2341 k. In general. Most Cited Cases

Mere absence of certain procedural or constitutional rights does not by itself satisfy statute allowing court to refuse to take action governed by Chapter 15 if action would be manifestly contrary to United States public policy. 11 U.S.C.A. § 1506.

**[21] Bankruptcy 51 🔑2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings

51k2341 k. In general. Most Cited Cases

Statute allowing court to refuse to take action governed by Chapter 15 if action would be manifestly contrary to United States public policy does not bar recognition of a proceeding that lacks a right to a jury. 11 U.S.C.A. § 1506.

**[22] Bankruptcy 51 🔑2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings

51k2341 k. In general. Most Cited Cases

Denial of the opportunity to be heard and refus-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

480 B.R. 129, Bankr. L. Rep. P 82,312
**(Cite as: 480 B.R. 129)**

al to receive evidence can violate public policy within meaning of statute allowing court to refuse to take action governed by Chapter 15 if action would be manifestly contrary to United States public policy. 11 U.S.C.A. § 1506.

**[23] Bankruptcy 51 ⚷2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases
    Main test of whether a proceeding for which Chapter 15 recognition is sought is "collective" is whether all creditors' interests were considered in the proceeding. 11 U.S.C.A. § 101(23).

**[24] Bankruptcy 51 ⚷2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases
    Debtor seeking recognition under Chapter 15 of its proceeding before India's Board for Industrial and Financial Reconstruction (BIFR) to rehabilitate its finances under India's The Sick Industrial Companies Act (SICA) established that proceeding was collective in nature, as required for proceeding to come within Bankruptcy Code's definition of "foreign proceeding"; although SICA did not provide formal mechanism for participation by unsecured creditors, debtor's proceeding considered interests of all creditors in practice and involved parties other than just one class of creditor or one party-in-interest, combination of actual and published notice was adequate, there was formal mechanism for court review of adverse determinations, and distribution generally occurred according to statutory priorities. 11 U.S.C.A. §§ 101(23), 1501(b)(1), 1515(a), 1517(a).

**[25] Bankruptcy 51 ⚷2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases
    Bankruptcy court did not clearly err in finding, in support of determination that debtor's proceeding in India was collective in nature, as required for proceeding to be "foreign proceeding" subject to recognition under Chapter 15, that Indian attorney's testimony indicating that creditors had voice in debtor's India proceeding was credible, given evidence that most unsecured creditors had filed written submissions in proceeding and that number of creditors were present at recent hearing, as well as fact that creditor opposing recognition did not call witness to counter attorney's testimony. 11 U.S.C.A. §§ 101(23), 1501(b)(1), 1515(a), 1517(a).

**[26] Bankruptcy 51 ⚷2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases
    India's Board for Industrial and Financial Reconstruction (BIFR) was "court" under Chapter 15's definition of "foreign court" as "judicial or other authority competent to control or supervise foreign proceeding"; BIFR was administrative board that exercised powers similar to court in India and oversaw possible rehabilitation of debtors under its authority, similar to way in which United States bankruptcy courts oversaw Chapter 11 cases, and before BIFR could order winding up of "sick" company, it first had to get approval from the High Court of India. 11 U.S.C.A. § 1502.

**[27] Bankruptcy 51 ⚷2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

480 B.R. 129, Bankr. L. Rep. P 82,312
**(Cite as: 480 B.R. 129)**

Debtor seeking recognition under Chapter 15 of its proceeding before India's Board for Industrial and Financial Reconstruction (BIFR) to rehabilitate its finances under India's The Sick Industrial Companies Act (SICA) established that BIFR had supervision or control over debtor's assets and affairs, as required for proceeding to come within Bankruptcy Code's definition of "foreign proceeding"; fact that proceeding left foreign representative and debtor's board of directors in control of debtor's business and operations was not inconsistent with supervision by foreign court, BIFR had authority to suspend operation of contracts, settlements, and awards under SICA, and SICA regulated against fraudulent and preferential transfers. 11 U.S.C.A. §§ 101(23), 1501(b)(1), 1515(a), 1517(a).

**[28]** Bankruptcy 51 ⚷2341

51 Bankruptcy
  51III The Case
    51III(H) Cases Ancillary to Foreign Proceedings
      51k2341 k. In general. Most Cited Cases

Debtor seeking recognition under Chapter 15 of its proceeding before India's Board for Industrial and Financial Reconstruction (BIFR) to rehabilitate its finances under India's The Sick Industrial Companies Act (SICA) established that proceeding was brought under law related to insolvency, as required for proceeding to come within Bankruptcy Code's definition of "foreign proceeding"; SICA dealt with corporate insolvency and adjustment of corporate debts and included a structure of external administration provision, such that SICA proceeding arranged scheme of rehabilitation, and BIFR had statutory ability to alternate between various remedial measures as warranted by the circumstances. 11 U.S.C.A. §§ 101(23), 1501(b)(1), 1515(a), 1517(a).

**\*133** Robert K. Gross, Esq., Alan Van Praag, Esq., Edward W. Floyd, Esq., Eaton & Van Winkle LLP, New York, NY, for Appellant.

Ira A. Reid, Esq., Joseph Samet, Esq., Kathryn Ryan, Esq., Baker & McKenzie LLP, New York, NY, for Appellee.

### *OPINION AND ORDER*

SHIRA A. SCHEINDLIN, District Judge.

**I. INTRODUCTION**

Appellant Armada (Singapore) Pte Ltd., ("Armada") appeals pursuant to section 158 of Title 28 of the United States Code from a Bench Decision of the Bankruptcy Court for the Southern District of New York granting Appellee Ashapura Minechem Ltd.'s ("Ashapura") petition for recognition as a foreign main proceeding of an insolvency proceeding voluntarily commenced in India by Ashapura. For the reasons set forth below, the Bench Decision is affirmed.

**II. BACKGROUND**

Appellee Chetan Shah is the Managing Director of Ashapura Minechem Ltd., a mining and industrial business headquartered in Mumbai, India.[FN1] He was appointed Foreign Representative by Ashapura's Board of Directors for the purpose of these U.S. proceedings.[FN2] The greater part of Ashapura's assets are situated in India, as are all of its employees.[FN3]

> FN1. *See In re Ashapura Minechem Ltd.,* No. 11 B. 14668, 2011 WL 5855475, at *1 (Bankr.S.D.N.Y. Nov. 22, 2011).
>
> FN2. *See* Amended Response Brief of Appellee Ashapura Minechem Ltd. ("Appellee Mem.") at 15.
>
> FN3. *See* Opening Brief of Appellant Armada (Singapore) Pte Ltd. ("Appellant Mem.") at 10.

In the conduct of its business, Ashapura entered into maritime Contracts of Affreighment ("COAs") to ship minerals to foreign ports with several international shipping companies including Appellant Armada (Singapore) Pte Ltd. ("Armada"), based in Singapore, and Eitzen Bulk A/S ("Eitzen").[FN4] However, when the government of Gujarat, the Indian state where Ashapura

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

480 B.R. 129, Bankr. L. Rep. P 82,312

**(Cite as: 480 B.R. 129)**

conducts its mining activities, placed an indirect embargo on the export **\*134** of bauxite, Ashapura failed to fulfill its part of the contracts. [FN5] Armada sought and in February 2010 obtained an arbitration award against Ashapura totaling sixty-five million dollars. [FN6] Eitzen obtained a separate award as well. [FN7] Ashapura opted not to defend these arbitrations on the ground that the contracts were void ab initio under the doctrine of force majeure. [FN8]

> FN4. *See In re Ashapura Minechem Ltd.,* 2011 WL 5855475, at \*2.

> FN5. *See id.;* Appellee Mem. at 12.

> FN6. *See* Appellee Mem. at 12.

> FN7. *See id.*

> FN8. *See In re Ashapura Minechem Ltd.,* 2011 WL 5855475, at \*2.

In June 2010, Armada filed a petition in the Southern District of New York for an order converting its arbitration award into a judgment against Ashapura. [FN9] The petition was granted and the court entered a judgment for Armada in excess of seventy million dollars. [FN10]

> FN9. *See* Petition for an Order Confirming Foreign Arbitral Awards, *Armada (Singapore) Pte. Ltd. v. Ashapura Minechem Ltd.("Armada"),* No. 10 Civ. 4856, 2010 WL 2652387 (S.D.N.Y. June 22, 2010) (Docket No. 1).

> FN10. *See* Order, *Armada* (July 29, 2010) (Docket No. 14).

In May 2011, Ashapura initiated proceedings before India's Board for Industrial and Financial Reconstruction ("BIFR") to rehabilitate its finances under The Sick Industrial Companies Act ("SICA") of 1985. [FN11] That proceeding is still pending before the BIFR. [FN12] Pursuant to section 22 of SICA, Ashapura obtained a stay of all actions and

proceedings against it in India. [FN13] However, this foreign insolvency law has encountered mounting criticism and led to a repeal of the statute that governs the BIFR proceeding. [FN14] The SICA Repeal Act of 2003 would eliminate section 22 stays on unsecured creditors' collection efforts. [FN15] However, the current iteration of SICA will remain in force until the Indian legislature formally enacts implementing legislation for SICA's substitute. [FN16] The Indian legislature had not done so by the time the Bankruptcy Court made its ruling and the parties have not notified this Court of any change.

> FN11. *See* Appellee Mem. at 15.

> FN12. *See In re Ashapura,* 2011 WL 5855475, at \*1.

> FN13. *See* Appellant Mem. at 11.

> FN14. *See In re Ashapura,* 2011 WL 5855475, at \*1.

> FN15. *See* Recognition Hearing Transcript ("Tr.") 93:23–94:4, Nov. 18, 2011.

> FN16. *See In re Ashapura,* 2011 WL 5855475, at \*1.

In October 2011, Ashapura's Board of Directors authorized Shah to seek relief in bankruptcy court under Chapter 15 of Title 11. [FN17] Shah's initial request for a preliminary injunction against creditor claims was denied. [FN18] Subsequently, Shah filed a petition for recognition of the SICA proceeding as a "foreign proceeding" or "foreign main proceeding" pursuant to Chapter 15 of Title 11. [FN19] A hearing was held on November 18, 2011 during which an Indian attorney at law Mayur Bhatt testified on behalf of Ashapura. [FN20] Bhatt is Ashapura's counsel in the BIFR proceedings and has experience handling other SICA cases. [FN21] Armada did not call any witnesses, but instead offered various exhibits into evidence **\*135** that were downloaded from internet sites. [FN22]

> FN17. *See* Appellee Mem. at 15.

480 B.R. 129, Bankr. L. Rep. P 82,312
**(Cite as: 480 B.R. 129)**

FN18. *See* Appellant Mem. at 14.

FN19. *See In re Ashapura,* 2011 WL 5855475, at *1.

FN20. *See* Tr. 7:23–25.

FN21. *See id.* 7:25–8:1.

FN22. *See In re Ashapura,* 2011 WL 5855475, at *4.

Following that hearing, the bankruptcy court granted recognition as a foreign main proceeding and relief pursuant to section 1521(a) to Ashapura and granted a stay against the order enforcing the arbitration award-rulings which Armada now appeals.[FN23]

FN23. *See id.* at *5.

## III. LEGAL STANDARD

### A. Appellate Jurisdiction

This court has jurisdiction to hear appeals from final orders issued by the Bankruptcy Court under sections 158(a)(1) and 1334 of Title 28.[FN24]

FN24. *See In re Fairfield Sentry Ltd.,* No. 10 Civ. 7311, 2011 WL 4357421, at *2–3, 2011 U.S. Dist. LEXIS 105770, at *7 (S.D.N.Y. Sept. 15, 2011) (treating a Chapter 15 recognition as a final order for purposes of appeal). *Accord In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.,* 389 B.R. 325, 327 (S.D.N.Y.2008) (affirming denial of recognition as a "final" order).

### B. Standard of Review

[1][2] A district court functions as an appellate court in reviewing judgments rendered by bankruptcy courts.[FN25] Findings of fact are reviewed for clear error[FN26] whereas findings that involve questions of law, or mixed questions of fact and law, are reviewed de novo.[FN27] Credibility determinations by bankruptcy courts are reviewed for clear error, as are decisions resting on physical or documentary evidence or inference from other facts.[FN28] A finding of fact is clearly erroneous if the court is " 'left with the definite and firm conviction that a mistake has been committed.' "[FN29]

FN25. *See In re Sanshoe Worldwide Corp.,* 993 F.2d 300, 305 (2d Cir.1993).

FN26. *See* Fed. R. Bankr.P. 8013 ("Findings of fact ... shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."). *Accord In re Cody, Inc.,* 338 F.3d 89, 94 (2d Cir.2003).

FN27. *See In re Bear Stearns,* 389 B.R. at 333.

FN28. *See Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1308 (5th Cir.1985) (citing *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)).

FN29. *In re Manville Forest Prods. Corp.,* 896 F.2d 1384, 1388 (2d Cir.1990) (quoting *United States v. U.S. Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)).

### C. Recognition of a Foreign Insolvency Proceeding

[3] Chapter 15 of Title 11 governs all cross-border insolvency disputes, and specifically petitions for the recognition of foreign insolvency proceedings in the United States.[FN30] The purpose of Chapter 15 is "to incorporate the Model Law on Cross–Border Insolvency," adopted by the United Nations Commission on International Trade Law (UNCITRAL) in 1997.[FN31] "Recognition [under section 1517] is not a rubber stamp exercise, and any such presumption is rebuttable upon the Court's examination of any and all relevant facts."[FN32]

FN30. *See* 11 U.S.C. § 1501(b) (2005).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

480 B.R. 129, Bankr. L. Rep. P 82,312
**(Cite as: 480 B.R. 129)**

FN31. *Id.* § 1501(a).

FN32. *In re Gold & Honey, Ltd.,* 410 B.R. 357, 366 (Bankr.E.D.N.Y.2009) (quotation marks omitted).

[4][5] As a threshold matter, the appointed representative of a foreign debtor **\*136** seeking recognition must establish that the proceeding is a "foreign proceeding" under the meaning of section 101(23).FN33 The foreign representative thus carries the burden of proving each of seven criteria:

> FN33. *See* 11 U.S.C. §§ 1501(b)(1), 1515(a), 1517(a). *Accord In re ABC Learning Centres Ltd.,* 445 B.R. 318, 327 (Bankr.D.Del.2010) ("As a threshold matter, this Court must first determine whether the Liquidation Proceedings are 'foreign proceedings' as defined by [section] 101(23), as only 'foreign proceedings' are eligible for recognition under [c]hapter 15."); *In re Betcorp Ltd.,* 400 B.R. 266, 275 (Bankr.D.Nev.2009) ("As a preliminary matter ... the court must determine whether [debtor]'s winding up is a 'foreign proceeding' within the meaning of [section] 101(23).").

(i) [the existence of] a proceeding; (ii) that is either judicial or administrative; (iii) that is collective in nature; (iv) that is in a foreign country; (v) that is authorized or conducted under a law related to insolvency or the adjustment of debts; (vi) in which the debtor's assets and affairs are subject to the control or supervision of a foreign court; and (vii) which proceeding is for the purpose of reorganization or liquidation.FN34

> FN34. *In re Betcorp Ltd.,* 400 B.R. at 277. *See* 11 U.S.C. § 101(23) (defining a "foreign proceeding" as "a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the

assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation").

Failure to meet the burden of proof on any one of the definitional elements requires denial of the petition.FN35

> FN35. *See In re Betcorp Ltd.,* 400 B.R. at 276–77.

### 1. A Collective Proceeding

[6][7][8][9] To be entitled to Chapter 15 recognition, petitioner must prove that the proceeding at issue was collective in nature. First and foremost, "[a] collective proceeding is one that considers the rights and obligations of *all* creditors"FN36—that is for the general benefit of creditors.

> FN36. *Id.* at 281 (emphasis added) (holding that a voluntary winding up "fits this 'collective' criterion," whereas "a receivership remedy instigated at the request, and for the benefit, of a single secured creditor" does not). *Accord In re British Am. Ins. Co.,* 425 B.R. 884, 902 (Bankr.S.D.Fla.2010) ("For a proceeding to be collective within the meaning of section 101(23), it must be instituted for the benefit of creditors generally rather than for a single creditor or class of creditors."); *In re ABC Learning Centres Ltd.,* 445 B.R. at 328 (citing as a provision of the foreign insolvency statute that evinced the collective nature of the proceeding in question "[section] 501 (liquidator has a duty to consider the rights of all creditors in distributing the corporation's property)"); *In re Bd. of Dirs. of Hopewell Int'l Ins., Ltd.,* 275 B.R. 699, 707 (S.D.N.Y.2002) (deeming a "scheme of arrangement" for creditors to file claims collective in nature because all creditors could object to the scheme); *In re Gold & Honey, Ltd.,* 410 B.R. at 368 (finding a proceeding non-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

480 B.R. 129, Bankr. L. Rep. P 82,312

**(Cite as: 480 B.R. 129)**

collective that was "more akin to a[n] individual creditor's replevin or repossession action than it is to a reorganization or liquidation by an independent trustee").

[T]he word 'collective' ... contemplates both the consideration and eventual treatment of claims of various types of creditors, as well as the possibility that creditors may take part in the foreign action.... In determining whether a particular foreign action is collective ... it is appropriate to consider both the law governing the foreign action and the parameters of the particular proceeding as defined in, for example, orders of a foreign tribunal overseeing the action.[FN37]

> FN37. *In re British Am. Ins. Co.,* 425 B.R. at 902.

"A collective proceeding is designed to provide equitable treatment to creditors, by treating similarly situated creditors in the same way, and to maximize the value of the debtor's assets for the benefit of all **\*137** creditors...."[FN38] Indeed, among Chapter 15's objectives is the "fair and efficient administration of cross-border insolvencies that protects the interests of all creditors."[FN39] Further, UNCITRAL's Guide to Enactment "suggests that a foreign proceeding must contemplate the 'involvement of creditors collectively.' "[FN40] However, to be for the general benefit of creditors, a proceeding need not ensure that all creditors receive a share of the distribution.[FN41]

> FN38. U.N. Comm'n on Int'l Law, Legislative Guide on Insolvency Law, ¶ 35 (2005) http:// www. uncitral. org/ pdf/ english/ texts/ insolven/ 05– 80722_ Ebook. pdf.
>
> FN39. 11 U.S.C. § 1501.
>
> FN40. *In re British Am. Ins. Co.,* 425 B.R. at 902 (quoting U.N. Comm'n on Int'l Law, UNCITRAL Model Law on Cross–Border Insolvency with Guide to Enactment, ¶ 23

(1997) http:// www. uncitral. org/ pdf/ english/ texts/ insolven/ insolvency- e. pdf).

> FN41. *See id.* at 903 ("[The judicial manager] ultimately projects that general creditors of BAICO will receive no distribution in the eventual winding up of the company due to the priority accorded to policyholders under Bahamas law. However, by addressing the potential distribution to other creditors [the judicial manager] acknowledges his overall duty to creditors in general.").

[10] Other characteristics of a collective proceeding include: adequate notice to creditors under applicable foreign law,[FN42] provisions for the distribution of assets according to statutory priorities,[FN43] and a statutory mechanism for creditors to seek court review of the proceeding.[FN44] However, the standard for notice is not a demanding one.[FN45]

> FN42. *See In re ABC Learning Centres Ltd.,* 445 B.R. at 329 ("The notice provided to creditors is a proper consideration when assessing the collective nature of a proceeding.").
>
> FN43. *See, e.g., id.* at 328 (citing as another statutory provision that evinced a proceeding's collective nature "[section] 555 (subject to priorities, preferences, etc., debts and claims rank equally and are to be paid pro rata)"). *Accord In re Gold & Honey, Ltd.,* 410 B.R. at 372 (noting that one of the "most fundamental policies and purposes of the automatic stay" is "[to] provid[e] for the efficient and orderly distribution of a debtor's assets to all creditors in accordance with their relative priorities"); U.N. Comm'n on Int'l Law, Model Law on Cross–Border Insolvency: The Judicial Perspective, ¶ 66 (2012) ("The notion of a 'collective' insolvency proceeding is based on the ability of a single in-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

480 B.R. 129, Bankr. L. Rep. P 82,312
**(Cite as: 480 B.R. 129)**

solvency representative to control the realization of assets for the purposes of pro rata distribution among all creditors (*subject to domestic statutory priorities* ).” (emphasis added)).

FN44. *See In re ABC Learning Centres Ltd.,* 445 B.R. at 329 (“[Section] 1321 of the Act provides that a person including creditors aggrieved by any act, omission or decision of ... a liquidator may appeal to an Australian court and the court may confirm, reverse or modify the act or decision....” (quotation marks omitted)).

FN45. *See In re British Am. Ins. Co.,* 425 B.R. at 902 (finding a foreign proceeding alleged to be for the sole benefit of a single class of creditors a collective proceeding, even though unsecured creditors did not receive notice of actions brought before the court, because they would receive notice at the winding up phase and they were statutorily allowed to be heard in the judicial management process). *Accord In re ABC Learning Centres Ltd.,* 445 B.R. at 329 (finding that notice was adequate where it was proper under the relevant foreign statute and the creditor had actual notice of the creditor's meeting as well as the ability to appeal the outcome of the proceeding at the Australian court).

## 2. Debtor's Assets and Affairs Subject to Foreign Court's Control or Supervision

[11][12] Petitioner must also prove that the debtor's assets and affairs are subject to a foreign court's jurisdiction. Section 1502 of the Bankruptcy Code defines “foreign court” as “a judicial *or other* authority competent to control or supervise a foreign **\*138** proceeding.” FN46 The body conducting the proceeding can be considered a foreign court. FN47 Case law confirms that this is a dual requirement—both the debtor's assets *and* affairs must be subject to judicial control or supervision in the proceeding. FN48 Ashapura does not contest the dual-

ity of this requirement. FN49

FN46. 11 U.S.C. § 1502 (emphasis added).

FN47. *See In re Tradex Swiss AG,* 384 B.R. 34, 42 (Bankr.D.Mass.2008) (“Even if the decree of the [Swiss Federal Banking Commission] were not subject to appeal to the Swiss Federal Administrative Court ... the SFBC itself comes within the definition of a foreign court.”).

FN48. *See In re Gold & Honey, Ltd.,* 410 B.R. at 371 (denying recognition when the party demonstrated control over debtor's assets but not affairs).

FN49. *See* Appellee Mem. at 21.

[13] Supervision or control of the company's affairs is not a demanding standard. The foreign court need not control the day-to-day operations of the debtor. FN50 It is sufficient, for instance, that the body monitor compliance with the repayment plan negotiated between the debtor and creditors. FN51 One court has held that the mere fact that a commission was granted authority from a Spanish court to recover a set-off from an arbitration proceeding for distribution to creditors “plainly demonstrate[d] that the [court] maintains control of [both the debtor's] assets *and affairs”* FN52 By contrast, the fact that actions in a foreign court related to the proceeding are typically initiated by interested parties and that liquidators proceed with most of their duties without court involvement was found “not [to] undermine the ... court['s] supervisory role.” FN53

FN50. *See In re Oversight and Control Commission of Avanzit(“ Avanzit”), S.A.,* 385 B.R. 525, 531–32 (Bankr.S.D.N.Y.2008).

FN51. *See id.* at 536.

FN52. *Id.* at 534 (emphasis added).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

480 B.R. 129, Bankr. L. Rep. P 82,312

**(Cite as: 480 B.R. 129)**

FN53. *In re ABC Learning Centres Ltd.,* 445 B.R. at 332 ("Most actions in a U.S. Bankruptcy Court are upon the motion of an interested party and are not undertaken sua sponte, U.S. Bankruptcy Courts also give deference to business judgments and do not direct the daily activities of debtors, and the majority of U.S. bankruptcies proceed with minimal court involvement.").

### 3. Proceeding Under a Law Related to Insolvency

[14] Petitioner also carries the burden of proving that the SICA filing was a proceeding "authorized or conducted under a law related to insolvency or the adjustment of debts." FN54 The proceeding, therefore, must be authorized by a statute that deals with corporate insolvency or the adjustment of corporate debts. The fact that a proceeding has a "unified structure of the external administration provisions" favors a finding that the statute meets this criterion. FN55 For instance, the fact that "several sub-parts of [c]hapter 5 [of the Australian Corporations Act] ... combined with the statutory ability of [the Act] to shift among various forms of dissolution given changing circumstances[ ] demonstrate[s] that the winding up is achieved under a law relating to insolvency or the adjustment of debts." FN56

FN54. *Id.* at 327.

FN55. *In re Betcorp Ltd.,* 400 B.R. at 282.

FN56. *Id.*

### 4. Public Policy Exception

[15] Finally, under Chapter 15, a court may "refus[e] to take an action governed by this chapter if the action would be manifestly contrary to the public policy of **\*139** the United States." FN57 Parties opposing the recognition of proceedings generally bear the burden of proof on applying public policy exceptions. FN58

FN57. 11 U.S.C. § 1506.

FN58. *See Telenor Mobile Commc'ns AS v. Storm LLC,* 524 F.Supp.2d 332, 356 (S.D.N.Y.2007) (holding that the party opposing enforcement of an arbitration award carries the burden of proving that its enforcement would violate public policy pursuant to the public policy exception of the New York Arbitration Convention), *aff'd,* 584 F.3d 396 (2d Cir.2009).

[16][17] A prerequisite to applying section 1506 is that there exist a conflict between foreign and U.S. law—however "that fact alone is not dispositive." FN59 While Title 11 does not define what is "manifestly contrary" to U.S. public policy, case law prescribes that this public policy exception should be construed narrowly. It "is intended to be invoked only under exceptional circumstances concerning matters of fundamental importance for the United States." FN60 Indeed, only one published decision had found recognition to violate U.S. public policy since Chapter 15 was enacted at the time the Bankruptcy Court made its decision—and only two since. FN61

FN59. *Micron Tech., Inc. v. Qimonda AG (In re Qimonda),* 433 B.R. 547, 568 (E.D.Va.2010) (quotation marks and citation omitted).

FN60. *Lavie v. Ran (In re Ran),* 607 F.3d 1017, 1021 (5th Cir.2010). *Accord Ackermann v. Levine,* 788 F.2d 830, 842 (2d Cir.1986); *In re Toft,* 453 B.R. 186, 195 (Bankr.S.D.N.Y.2011) ("[T]hose courts that have considered the public policy exception codified in [section] 1506 have uniformly read it narrowly and applied it sparingly."); *In re Ephedra Prods. Liab. Litig.,* 349 B.R. 333, 336 (S.D.N.Y.2006).

FN61. *See In re Gold & Honey, Ltd.,* 410 B.R. at 368 (however as the Bankruptcy Court decision being appealed noted, this case is unique in that the bank in question "proceeded in the Israeli Receivership Pro-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

480 B.R. 129, Bankr. L. Rep. P 82,312
**(Cite as: 480 B.R. 129)**

ceeding in spite of and in the face of [the] Court's Stay Order"); *In re Vitro, S.A.B. de C.V.,* No. 11 B. 33335, 2012 WL 2138112, at *13 (Bankr.N.D.Tex. June 13, 2012) (where the rehabilitation scheme wholly extinguished third-party claims).

[18][19] Courts have adhered to two principles in determining whether a fundamental policy is at risk: "[d]eference to a foreign proceeding should not be afforded in a [c]hapter 15 proceeding where the procedural fairness of the foreign proceeding is in doubt or cannot be cured by the adoption of additional protections" [FN62] and "[a]n action should not be taken in a [c]hapter 15 proceeding where taking such action would frustrate a U.S. court's ability to administer the [c]hapter 15 proceeding and/or would impinge severely a U.S. constitutional or statutory right...." [FN63]

> FN62. *In re Qimonda,* 433 B.R. at 570.

> FN63. *Id.*

[20][21][22] As to the first principle, Ashapura is correct that the mere absence of certain procedural or constitutional rights does not by itself satisfy section 1506. For instance, section 1506 does not bar recognition of a proceeding that lacks a right to a jury. [FN64] By contrast, denial of the opportunity to be heard and refusal to receive evidence *can* violate public policy. [FN65] In *In re Metcalfe,* for instance, the court granted comity to a Canadian proceeding that included third-party releases "that arguably could not be granted in a U.S. bankruptcy proceeding" because "the Canadian court **\*140** had statutory authority to grant such relief, the question of the Canadian court's jurisdiction had been fully litigated and carefully considered in Canada, including on appeal, and the procedures used in Canada meet our fundamental standards of fairness." [FN66]

> FN64. *See In re Ephedra,* 349 B.R. at 335–36 ("Federal courts have enforced against U.S. citizens foreign judgments rendered by foreign courts for whom the very idea of a jury trial is foreign.").

> FN65. *See id.* at 335 (ultimately rejecting these due process arguments "because the Ontario Court adopted amendments to the Canadian order that cured the due process problems").

> FN66. *In re Toft,* 453 B.R. 186, 194 (Bankr.S.D.N.Y.2011) (citing *In re Metcalfe & Mansfield Alt. Invs.,* 421 B.R. 685, 697 (Bankr.S.D.N.Y.2010)).

## IV. DISCUSSION

Armada contends that Ashapura has not carried the burden of proving several of the requirement of section 101(23). [FN67] Namely, Armada claims that Ashapura failed to demonstrate that (1) the SICA proceeding was collective in nature, (2) Ashapura's assets and affairs were subject to the control or supervision of the BIFR, and (3) Ashapura's SICA filing is a proceeding under a law related to insolvency. [FN68] Further, Armada contends that recognizing the BIFR proceeding violates public policy. I disagree.

> FN67. *See* Appellant Mem. at 16.

> FN68. *See id.*

## A. Ashapura Met Its Burden of Proving that the BIFR Proceeding Was Collective in Nature

[23][24] The main test of whether a proceeding is collective is whether *all* creditors' interests were considered in the proceeding. The Bankruptcy Court found that the SICA statute does not provide a formal mechanism for participation by unsecured creditors. [FN69] Nonetheless, the Court found that "in practice unsecured creditors were given a voice." [FN70]

> FN69. *See In re Ashapura,* 2011 WL 5855475, at *3.

> FN70. *Id.*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

480 B.R. 129, Bankr. L. Rep. P 82,312
**(Cite as: 480 B.R. 129)**

Armada insisted at the November 18 hearing that "[l]earned authorities on Indian law ... say that there are no rights for unsecured creditors to participate in a SICA reorganization ... while a stay is in effect, precluding unsecured creditors from taking action that they would otherwise be taking."[FN71] Armada further contended that the proceeding is "a two part or a closed-door affair, unless the BIFR chooses to make it different."[FN72]

> FN71. Tr. 25:2–8.

> FN72. *Id.* 154:22–23.

However, Ashapura insisted that whatever their statutory rights, *in practice* creditors "have the right to negotiate the scheme of arrangement—or scheme of rehabilitation"[FN73] and that "[a]ll unsecured creditors have the right to object to the scheme of arrangement when it is put before the BIFR to be ... confirmed or sanctioned."[FN74]

> FN73. *Id.* 10:19–20.

> FN74. *Id.* 10:23–11:1.

Bhatt, Ashapura's witness, testified that unsecured creditors can "make an application to implead themselves as a party to the proceedings."[FN75] In fact, according to Bhatt, most of the unsecured creditors *have* filed written submissions to the BIFR in this proceeding.[FN76] While creditors' participation in the proceedings is at the BIFR's discretion, Bhatt named at least three unsecured creditors that have been impleaded into this proceeding.[FN77] Bhatt's testimony is corroborated by Exhibit 2, introduced by Ashapura, that summarized**\*141** BIFR proceedings held in July 2011,[FN78] That exhibit showed that a number of creditors, including Eitzen, were present at the hearing.[FN79] Moreover, creditors can appeal the BIFR's refusal of impleader to a higher judicial authority.[FN80] Bhatt also testified that unsecured creditors have the right to object to the rehabilitation or distribution scheme once they are impleaded or if they are refused participation, they have the right to appeal it once it has

been formulated.[FN81] Finally, even if unsecured creditors do not actively participate at all, they have a right to receive distribution under the scheme.[FN82]

> FN75. *Id.* 45:8–9.

> FN76. *See id.* 45:11–14.

> FN77. *See id.* 45:18–22.

> FN78. *See id.* 52:23–53:9.

> FN79. *See id.* 62:8–14.

> FN80. *See id.* 48:5–9.

> FN81. *See id.* 48:1–9.

> FN82. *See id.* 48:24–49:2.

[25] The Bankruptcy Court found that the evidence adduced by Armada at the hearing—internet printouts—merely highlighted criticisms of SICA, without demonstrating that the process itself was not collective.[FN83] While Armada insists that the Court was wrongly influenced by Bhatt's testimony, that is a credibility determination which I may only review for clear error. Armada introduced into evidence a report by the Organisation for Economic Co-operation and Development stating that "[p]rovisions of SICA have been abused by errant debtors to seek protection and moratoria from recovery proceedings."[FN84] Nonetheless, the Bankruptcy Court found that the proceeding in question considered the interests of all the creditors. Given the evidence in the record and the fact that Armada did not call any witness to counter Bhatt's testimony, I cannot say with firm conviction that the Bankruptcy Court was mistaken to find Bhatt's testimony that creditors had a voice in this proceeding credible. I therefore agree with the Bankruptcy Court that this proceeding considered the interests of all creditors *in practice.*

> FN83. *See In re Ashapura,* 2011 WL 5855475, at \*4.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

480 B.R. 129, Bankr. L. Rep. P 82,312
**(Cite as: 480 B.R. 129)**

FN84. *Id.* 108:2–4.

The remaining legal question is whether, given the lack of a *formal* statutory mechanism for creditor participation, the Bankruptcy Court was correct to conclude from the fact that creditors participated in this proceeding in practice that it was collective in nature. The law is clear that "[i]n determining whether a particular foreign action is collective ... it is appropriate to consider both the law governing the foreign action and the parameters of the particular proceeding."[FN85] What matters is not just what statutory mechanisms exist but also how involved creditors are in practice. Therefore, the fact that other SICA proceedings may not fairly involve all creditors does not diminish the collective nature of the proceeding being evaluated here.

FN85. *In re British Am. Ins. Co.,* 425 B.R. at 902.

Further, as the Bankruptcy Court stated during the hearing, "even if there were no opportunity by practice and custom for unsecured creditors to participate, I think this may still be a collective proceeding, because it involves parties other than just one class of creditor or just one party-in-interest."[FN86]

FN86. Tr. 157:15–19.

The other relevant factors in the analysis—notice, appellate review and statutory priorities for the distribution of assets—also favor a conclusion that the proceeding was collective. As far as notice is concerned,**\*142** the Bankruptcy Court did not make any explicit findings but impliedly held that notice was adequate under applicable law.[FN87] The record suggests that when a SICA proceeding has been filed, it is published online, although creditors are not given individual notice.[FN88] According to section 18.3 of SICA, once a scheme proposal has been prepared, it is sent in draft form "to any ... company concerned" as well as published in newspapers, though the latter remains at the BIFR's discretion.[FN89] This combina-

tion of actual notice and notice proper under applicable local law certainly meets the low standard of *In re British American Ins. Co.* and *In re ABC Learning Centres Ltd.*

FN87. *See In re Ashapura Minechem Ltd.,* 2011 WL 5855475, at *3.

FN88. *See* Tr. 104:19–20.

FN89. *Id.*

As far as appellate review is concerned, the Bankruptcy Court found that there was a formal mechanism for court review of adverse determinations. Creditors "ha[ve] the ability to appeal adverse determinations made by the BIFR ... within the Indian judicial system."[FN90] Given Bhatt's testimony to that effect[FN91] this finding was not clearly erroneous.

FN90. *In re Ashapura Minechem Ltd.,* 2011 WL 5855475, at *3.

FN91. *See* Tr. 48:8–9 ("From BIFR, you can always appeal to the appellate authority.").

As for statutory priorities, Ashapura again asserted at the hearing that creditors have "a right [at the winding up stage] to a distribution pari passu with other unsecured creditors to the extent of the allowed amounts of their claim. Just like in the United States, they do come after secured creditors and ... various governmental parties."[FN92] Bhatt testified that at the winding up stage, "the proceeding gets transferred to a court and the court applies priorities set forth in [s]ection 529(a) of the company's act."[FN93] Despite the fact that there is no distribution requirement if there is no winding up and notwithstanding Indian case law cited by Armada,[FN94] the Bankruptcy Court's finding that distribution generally occurs according to statutory priorities is not clearly erroneous.

FN92. *Id.* 11:2–6.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

480 B.R. 129, Bankr. L. Rep. P 82,312
**(Cite as: 480 B.R. 129)**

FN93. *Id.* 117:1–3.

FN94. *See* Reply Brief of Appellant Armada (Singapore) Pte Ltd. ("Reply Mem.") at 5–6.

Ultimately, the Bankruptcy Court concluded that "the availability of appellate review and the ability of creditors to participate before the BIFR demonstrate that systematically SICA functions as a collective process that allows for creditor participation."[FN95] I agree.

FN95. *In re Ashapura Minechem Ltd.,* 2011 WL 5855475, at *3.

**B. Ashapura Met Its Burden of Proving that Its Assets and Affairs Are Subject to the Control or Supervision of a Foreign Court**

Because the Bankruptcy Court omitted to address this element of the statute in its decision, I consider this factor de novo.

**1. BIFR Is a Court Under the Meaning of This Statute**

[26] Ashapura claims that BIFR constitutes a court under the meaning of this statute because it is "an administrative board which exercises powers similar to a court in India and oversees the possible rehabilitation of debtors under its authority ... similar to the way that bankruptcy courts oversee Chapter 11 cases in the **\*143** United States."[FN96] Armada does not contest this point. Relying on *In re Tradex,* I find that BIFR comes within the definition of a foreign court.[FN97]

FN96. Appellee Mem. at 21–22. *See also* Declaration of Rajesh Bohra ("Bohra Deck") at 7 ("The BIFR is considered a civil court.").

FN97. Moreover, before BIFR can order the winding up of "sick" company, it must first get approval from the High Court of India. *See* Bohra Deck at 11.

**2. BIFR Had Control or Supervision over**

**Ashapura's Assets and Affairs**

[27] Armada does not dispute that BIFR controlled Ashapura's "assets" during the SICA proceeding, only that Ashapura's "affairs" were left unsupervised.[FN98] Armada is correct that the only references to the record cited by Ashapura on this issue concern the debtor's "assets"—not its "affairs."[FN99] Ashapura's argument that the BIFR oversees "the process of approving the plan of rehabilitation"[FN100] similarly fails to establish that BIFR oversaw Ashapura's affairs.

FN98. *See* Appellant Mem. at 18. *Accord* Tr. 26:11–12 ("Its assets, no doubt, are subject to the control of the BIFR.").

FN99. *See* Reply Mem. at 9 (citing Appellee Mem. at 21 ("The BIFR is considered ... custodian of all the assets of the sick industrial company.... Once the company is before the BIFR ... the company cannot sell its assets without prior permission of the BIFR." (quotation marks omitted))).

FN100. Appellee Mem. at 21.

Armada argued at the hearing that because Ashapura is an international company "with affairs in many countries"[FN101] and "the BIFR doesn't have extraterritorial reach"[FN102] "[o]nly the Indian affairs can be possibly subject to supervision of the BIFR."[FN103] This argument is meritless because every company applying for Chapter 15 recognition has assets worldwide and would therefore fail to satisfy this element.[FN104]

FN101. Tr. 161:1–2.

FN102. *Id.* 123:22–23.

FN103. *Id.* 161:1–3.

FN104. I note that Armada omits this argument from its brief.

By contrast, Ashapura is correct that the fact

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

480 B.R. 129, Bankr. L. Rep. P 82,312

**(Cite as: 480 B.R. 129)**

that the SICA proceeding "leaves the Foreign Representative and Ashapura Board of Directors in control of its business and operations" FN105 is not inconsistent with supervision by a foreign court because the foreign court need not direct the day-to-day operations of a debtor to meet that standard. Again, as the court in *In re ABC Learning Centres Ltd.* pointed out, "the majority of U.S. bankruptcies proceed with minimal court involvement." FN106 Much like the commission in *In re Oversight and Control Commission of Avanzit,* the BIFR has the authority "to suspend the operation of contracts, settlements and awards under [section] 22(3) of SICA." FN107 Further, section 24 of SICA regulates against fraudulent and preferential transfers, including through a set of guidelines of conduct that BIFR imposes on a company once it is declared "sick." FN108 These address not only the debtor's assets but, on the face of it, its affairs, including company management. FN109 Though Ashapura did not **\*144** raise this evidence in its brief, it did enter it into the record before the Bankruptcy Court. FN110 Given the low legal standard for supervision over a debtor's affairs, I conclude that Ashapura did meet its burden of proving that the BIFR had supervision or control over Ashapura's affairs and assets.

> FN105. Appellee Mem. at 21 (quotation marks omitted).

> FN106. *In re ABC Learning Centres Ltd.,* 445 B.R. at 332.

> FN107. Bohra Decl. at 8.

> FN108. *See id.* at 10.

> FN109. *See id.* (citing Board for Indus. & Fin. Reconstruction, Guidelines for Preparation of Rehabilitation Scheme, ¶ 10 (2008), *available at* http:// bifr. nic. in/ guidelines_ for_ rehabilitation_ scheme. pdf ("The company/promoter(s) can induct strategic investor(s)/copromoter(s), but the company/existing promoter(s) would en-

sure that such induction of strategic investor(s)/co-promoter(s) does not entail change of management (COM) of the company. The company/promoter(s) would furnish the details of such strategic investor(s)/co-promoter(s) along with the copies of MOU(s)/ agreement(s) entered into with them.")).

> FN110. *See* Bohra Decl. at 10.

**C. Ashapura Met Its Burden of Proving that the SICA Filing Is a Proceeding Under a Law Related to Insolvency**

[28] The Bankruptcy Court asserted that SICA "on its face, constitutes a law that relates to insolvency or adjustment of debt within the meaning of [s]ection 101(23)." FN111 I agree. There is no doubt that SICA deals with corporate insolvency and the adjustment of corporate debts. Moreover, SICA includes a structure of external administration provision—a SICA proceeding arranges a scheme of rehabilitation. FN112 Just as in *In re Betcorp,* BIFR has the statutory ability to alternate between various remedial measures as warranted by the circumstances. FN113 In fact, Armada appears to concede the point in its reply brief by failing to further address this element. In sum, Ashapura has met its burden on this element.

> FN111. *In re Ashapura Minechem Ltd.,* 2011 WL 5855475, at *1.

> FN112. Declaration of Mayur Bhatt, ¶ 15.

> FN113. *See* Bohra Decl. at 7 ("A number of measures, which can be considered rehabilitation/revival/restructuring in nature, have been provided in section 18 of SICA, and the Operating Agency ... may consider the various such measures while preparing the draft rehabilitation scheme....").

**D. Armada Did Not Meet Its Burden of Showing that the Public Policy Exception Under Section 1506 Applies**

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 18

480 B.R. 129, Bankr. L. Rep. P 82,312
**(Cite as: 480 B.R. 129)**

Armada carried the burden of proof on demonstrating that granting recognition was manifestly contrary to U.S. policy under the meaning of section 1506. The Bankruptcy Court found that Armada did not meet that burden: "none of the evidence offered by [Armada] succeeded in proving [that] key point in dispute." [FN114] Notwithstanding Armada's insistence at the hearing that fundamental principles are violated by the Bankruptcy Court's recognition, its arguments are duplicative of those made under the "collective" element. Nothing in the case law suggests that if the proceeding is collective in nature its recognition can be deemed to be against public policy—nor do the facts warrant such a finding.

> FN114. *In re Ashapura Minechem Ltd.,* 2011 WL 5855475, at *8.

**V. CONCLUSION**

For the foregoing reasons, the decision of the Bankruptcy Court is AFFIRMED. The Clerk of the Court is directed to close this appeal [docket # 1] and this case.

SO ORDERED.

S.D.N.Y.,2012.
In re Ashapura Minechem Ltd.
480 B.R. 129, Bankr. L. Rep. P 82,312

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Tab 17

**582 B.R. 603**
United States Bankruptcy Court, S.D. New York.

IN RE: AVANTI COMMUNICATIONS GROUP

PLC, [1] Debtor in a Foreign Proceeding.

[1]    Avanti Communications Group plc is the Debtor in this chapter 15 case (the "Chapter 15 Case"). The location of the Debtor's corporate headquarters and registered office is Cobham House, 20 Black Friars Lane, London, EC4V 6EB, United Kingdom ("UK").

Case No. 18–10458 (MG)
|
Signed April 9, 2018

**Synopsis**
**Background:** Foreign representative of corporate debtor that was the subject of scheme of arrangement brought under law of the United Kingdom filed petition for recognition of foreign proceeding as "foreign main proceeding" and for enforcement of scheme.

**Holdings:** The Bankruptcy Court, Martin Glenn, J., held that:

[1] foreign debtor had property in the United States, as required for bankruptcy court to grant petition filed by foreign representative for recognition, as foreign main proceeding, of scheme of arrangement concerning debtor that was pending in the United Kingdom;

[2] scheme of arrangement brought under law of the United Kingdom, as judicial proceeding convened and sanctioned by orders issued by British court in country where foreign debtor was incorporated and where its registered offices and headquarters were located, constituted a "foreign main proceeding"; and

[3] bankruptcy court, whether as "appropriate relief" or as "additional assistance" under separate provisions of Chapter 15, would grant foreign representative's request for enforcement of third-party, non-debtor guarantor releases included in scheme of arrangement and approved by British courts.

Petition granted.

West Headnotes (9)

**[1]    Bankruptcy**
 Cases Ancillary to Foreign Proceedings

Statutory presumption that a foreign debtor's center of main interests (COMI) is the place where its registered office is located may be rebutted by showing that head office functions were carried out in a jurisdiction other than where debtor's registered office was located. 11 U.S.C.A. § 1516(c).

Cases that cite this headnote

**[2]    Bankruptcy**
 Cases Ancillary to Foreign Proceedings

To determine a foreign debtor's center of main interests (COMI), courts look to certain nonexclusive factors: location of debtor's headquarters; location of those who actually manage the debtor; location of debtor's primary assets; location of majority of debtor's creditors or of majority of creditors who would be affected by case; and/or jurisdiction whose law would apply to most disputes.

Cases that cite this headnote

**[3]    Bankruptcy**
 Cases Ancillary to Foreign Proceedings

Discretion accorded to bankruptcy court to grant "appropriate relief" upon recognition of foreign proceeding is exceedingly broad, and court may grant any appropriate relief that would further the purposes of Chapter 15 and protect debtor's assets and interests of creditors. 11 U.S.C.A. § 1521(a).

Cases that cite this headnote

**[4]    Bankruptcy**
 Cases Ancillary to Foreign Proceedings

Foreign representative seeking recognition, as foreign main proceeding, of scheme of arrangement that was pending in the United Kingdom had to first satisfy provision defining who was eligible to be a debtor under the Bankruptcy Code by showing that foreign debtor had a domicile, or place of business, or property in the United States. 11 U.S.C.A. §§ 109(a), 1517.

1 Cases that cite this headnote

[5]    **Bankruptcy**

&#128273; Cases Ancillary to Foreign Proceedings

Foreign debtor had property in the United States, as required for bankruptcy court to grant petition filed by foreign representative for recognition, as foreign main proceeding, of scheme of arrangement concerning debtor that was pending in the United Kingdom, based not only on fact that counsel to foreign representative and to foreign debtor held a $100,000 retainer in non-interest bearing account at bank in New York, but that New York law governed indenture under which foreign debtor's notes were issued. 11 U.S.C.A. §§ 109(a), 1517.

Cases that cite this headnote

[6]    **Bankruptcy**

&#128273; Cases Ancillary to Foreign Proceedings

Scheme of arrangement brought under law of the United Kingdom, as judicial proceeding convened and sanctioned by orders issued by British court in country where foreign debtor was incorporated and where its registered offices and headquarters were located, constituted a "foreign main proceeding," as that term was defined in the Bankruptcy Code, and could be recognized as such. 11 U.S.C.A. §§ 101(23), 1516(c), 1517.

Cases that cite this headnote

[7]    **Bankruptcy**

&#128273; Cases Ancillary to Foreign Proceedings

Foreign representative generally satisfies the "just treatment" factor, as required for grant of additional assistance under provision of Chapter 15 providing for such relief only if certain enumerated fairness factors are met, upon showing that applicable foreign law provides a comprehensive procedure for the orderly and equitable distribution of debtor's assets among all of its creditors. 11 U.S.C.A. § 1507(b)(1).

Cases that cite this headnote

[8]    **Bankruptcy**

&#128273; Cases Ancillary to Foreign Proceedings

In deciding, following recognition of foreign proceeding, whether to grant "appropriate relief" or "additional assistance" under provisions of Chapter 15, courts are guided by principles of comity and cooperation with foreign courts. 11 U.S.C.A. §§ 1507, 1521.

Cases that cite this headnote

[9]    **Bankruptcy**

&#128273; Cases Ancillary to Foreign Proceedings

Following recognition, as foreign main proceeding, of scheme of arrangement concerning debtor that had been brought under law of the United Kingdom, bankruptcy court, whether as "appropriate relief" or as "additional assistance" under separate provisions of Chapter 15, would grant foreign representative's request for enforcement of third-party, non-debtor guarantor releases included in scheme of arrangement and approved by British courts, where scheme creditors had full and fair opportunity to vote on, and be heard in connection with, proposed releases and had voted overwhelmingly to approve scheme; refusal to enforce releases could result in prejudicial treatment of creditors to detriment of debtor's reorganization efforts and prevent fair and efficient administration of restructuring. 11 U.S.C.A. §§ 1507, 1521.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*605** MILBANK, TWEED, HADLEY AND MCCLOY LLP, Attorneys for Avanti Communications Group plc and the Foreign Representative Patrick Willcocks, 1 Chase Manhattan Plaza, New York, New York 10005, By: Peter Newman, Esq.

### MEMORANDUM OPINION GRANTING RECOGNITION OF FOREIGN MAIN PROCEEDING AND ENFORCEMENT OF SCHEME OF ARRANGEMENT

MARTIN GLENN, United States Bankruptcy Judge

Recognition and enforcement of schemes of arrangement sanctioned by UK courts **\*606** has become commonplace in chapter 15 cases in the United States (the "US"). Schemes of arrangement are used to restructure balance sheets of foreign companies that often include US dollar-denominated debt. The debt may be issued by one company in a large corporate group, with guarantees of the debt issued by the affiliates. When the debt is restructured, the scheme of arrangement often provides that the affiliate-guarantees are released, even though the affiliates are not parties to the scheme proceeding. Without releasing those guarantees, it would be difficult to restructure the debt because the collective assets and earnings of the group are needed to support the restructured debt without the risk of some creditors that hold the guarantees separately reaching the assets of the affiliates, endangering the ability of the group to meet its restructured debt obligations. This is exactly the situation presented in this Chapter 15 Case of Avanti Communications Group plc (the "Debtor," or "Avanti").

Third-party releases are often problematic in chapter 11 cases—seemingly prohibited entirely in some Circuits but permitted under limited circumstances in other Circuits. Courts must confront the issue whether bankruptcy courts have the power to grant such releases, and under what circumstances. Circuit courts in the Fifth, Ninth, Tenth and the District of Columbia Circuits have held that the Bankruptcy Code only permits a bankruptcy court to grant releases against a debtor, and prohibits third-party releases absent consent. *See, e.g., Maxtile, Inc. v. Jiming Sun (In re Maxtile, Inc.)*, 237 Fed. Appx. 274, 276 (9th Cir. 2007); *Bank of N.Y. Trust Co. v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 251–52 (5th Cir. 2009); *Landsing Diversified Props.–II v. First Nat'l Bank and Trust Co. of Tulsa (In re W. Real Estate Fund, Inc.)*, 922 F.2d 592, 600–02 (10th Cir. 1990) (*per curiam*); *In re AOV Indus., Inc.*, 792 F.2d 1140, 1152 (D.C. Cir. 1986). Circuit courts in the Second, Fourth, Sixth, Seventh and Eleventh Circuits have held that third-party releases may be given consensually and, in limited circumstances, may be approved without consent. *See, e.g., SE Property Holdings, LLC v. Seaside Engineering & Surveying, Inc. (In re Seaside Eng'g & Surveying, Inc.)*, 780 F.3d 1070, 1077–78 (11th Cir. 2015); *Nat'l Heritage Found., Inc. v. Highbourne Found.*, 760 F.3d 344, 347–50 (4th Cir. 2014); *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141–43 (2d Cir. 2005); *Airadigm Commc'ns., Inc. v. FCC (In re Airadigm Commc'ns., Inc.)*, 519 F.3d 640, 655–57 (7th Cir. 2008); *Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648, 657–58 (6th Cir. 2002). Issues with consent arise when less than 100% of the impaired creditors vote to confirm the plan. In the present case, the Scheme was overwhelmingly approved by 98% of the only creditor class whose rights were modified by the Scheme, including the Releases of non-debtor affiliate-guarantees. This leaves open the issue whether the Court should recognize and enforce the Scheme in this case that would bind the small number of non-voting impaired creditors to the Releases.

The issues presented by third-party releases in chapter 15 cases have received a different analysis than in chapter 11 cases, focusing primarily on the foreign court's authority to grant such relief. The issue in chapter 15 cases then is whether to recognize and enforce the foreign court order based on comity. Well-settled case law in the UK expressly authorizes third-party releases in scheme proceedings, particularly the release of affiliate-guarantees. The UK Court sanctioned the Avanti Scheme, and the Court concludes that the Avanti **\*607** Scheme should be recognized and enforced in the US.

Although no objections to the motions seeking to recognize and enforce the Avanti Scheme were filed in this Court—and the Court has already entered an order enforcing the Avanti Scheme—the Court believes that an explanation of the reasons for its ruling is appropriate.

2974

In re Avanti Communications Group PLC, 582 B.R. 603 (2018)
65 Bankr.Ct.Dec. 137

This Chapter 15 Case was filed by Patrick Willcocks, the foreign representative (the "Foreign Representative") of Avanti, a limited liability company incorporated under the laws of England and Wales, in connection with a proceeding (the "UK Proceeding") commenced under Part 26 of the Companies Act 2006 (the "Companies Act") pending before the High Court of Justice of England and Wales (the "UK Court") concerning a scheme of arrangement (the "Scheme").

The Foreign Representative filed a *Verified Petition for Recognition of Foreign Main Proceeding and Certain Related Relief* [ECF Doc. # 2] (the "Verified Petition" and, together with the Voluntary Chapter 15 Petition [ECF Doc. # 1], the "Petition"), seeking (i) recognition of the UK Proceeding as a "foreign main proceeding" under chapter 15 of the Bankruptcy Code, (ii) granting relief afforded to foreign main proceedings under section 1520 of the Bankruptcy Code, (iii) recognizing, granting comity to, and giving full force and effect in the United States, to the UK Proceeding, the Scheme, the Convening Order and the Sanction Order (as defined below), and (iv) enjoining parties from taking any action inconsistent with the Scheme in the US, including giving effect to the releases set out in the Scheme (the "Releases"), including certain releases given in favor of certain of the Debtor's direct and indirect subsidiaries (the "Subsidiary Guarantors") that guaranteed the 2023 Notes (the "Guarantor Releases").

The Petition is supported by the: (i) *Declaration of Patrick Willcocks in Support of Verified Petition for Recognition of Foreign Main Proceeding and Certain Related Relief* (the "Willcocks Declaration," ECF Doc. # 3); and (ii) *Declaration of Nicholas Angel as English Counsel to Debtor in Support of Verified Petition for Recognition of Foreign Main Proceeding and Certain Related Relief* (ECF Doc. # 4). The Foreign Representative also filed the *Second Declaration of Patrick Willcocks in Support of the Verified Petition* (the "Second Declaration," ECF Doc. # 13), indicating that the UK Court sanctioned the Scheme on March 26, 2018. A copy of the UK Court's order sanctioning the Scheme (the "Sanction Order") was attached to the Second Declaration as Exhibit C.

The Avanti Scheme only adjusts the debt of the 2023 Noteholders (as explained below), who overwhelmingly approved the Scheme by a vote of over 98% of that class of creditors. For the reasons set forth below, the Court grants the relief sought in the Petition.

## I. BACKGROUND

The following facts are taken from the Petition and the Willcocks Declaration.

### A. The Debtor

The Debtor is a public limited company incorporated under the laws of England and Wales, with subsidiaries incorporated in England, Isle of Man, Germany, Sweden, Turkey, Cyprus, Kenya, Nigeria, Tanzania and South Africa. The Debtor's headquarters and primary place of business is in London, England. Avanti is a satellite operator providing fixed satellite services in Europe, the Middle East and Africa through its fleet of Ka-band satellites. The Debtor's satellites are positioned in orbital **\*608** slots that are recorded in the International Telecoms Union Master International Frequency Register. Avanti sells satellite data communications services on a wholesale basis to a range of service providers who supply four key end markets: broadband, government, enterprise and backhaul.

Avanti's current fleet consists of two Ka-band satellites, HYLAS 1 and HYLAS 2, which have been commercially operational since April 2011 and November 2012. A further satellite, Artemis, a multiband satellite acquired from the European Space Agency (ESA) on December 31, 2013, was successfully re-orbited in November 2017. Avanti also has leased a steerable Ka-band beam, HYLAS 2–B, under an indefeasible right of use agreement entered into in June 2015 with another satellite operator, and also has a payload, HYLAS 3, under construction which will be deployed on the ESA's EDRS–C satellite. HYLAS 3 is currently under construction and continues to experience delays, but is expected to launch in the first three months of 2019 (although this date is subject to further change).

Avanti's HYLAS 4 satellite, which will complete its coverage of Europe, the Middle East and Africa, has now been constructed after experiencing some delays in the factory and, in February 2017, was successfully delivered to its launch site in Kourou, French Guyana. HYLAS 4 is expected to launch soon, aiming to be in orbital position ready for service in July 2018 with sufficient fuel to support the satellite for up to 19 years in orbit. HYLAS

2975

4 is expected to generate revenue from July 2018, largely within Avanti's existing fixed cost base, and to have a strong positive effect on Avanti's business as it completes EMEA coverage and greatly increases the amount of capacity available in mature markets in Western Europe and new markets in Africa.

### B. Capital Structure

As of December 31, 2017, Avanti's capital structure was composed of the following material financing agreements. As of December 31, 2017, Avanti had approximately $68.0 million of cash and cash equivalents.

1. Avanti is a borrower under a super-senior term loan facility agreement (the "Super Senior Facility Agreement"), maturing in 2020 (the "Super Senior Facility") with approximately $118 million currently outstanding.

2. Avanti issued its 10%/15% Senior Secured Notes due 2021 (the "2021 Notes") under an Indenture, dated as of January 26, 2017 (as amended, the "2021 Indenture"). Approximately $323.3 million in aggregate principal amount of the 2021 Notes are outstanding.

3. Avanti issued its 12%/17.5% Senior Secured Notes due 2023 (the "2023 Notes" and together with the 2021 Notes, the "Notes") under an Indenture, dated as of October 3, 2013 (as amended, the "2023 Indenture" and together with the 2021 Indenture, the "Indentures"). Approximately $557 million in aggregate principal amount of the 2023 Notes are outstanding.

4. The Notes and the Super Senior Facility Agreement are subject to an intercreditor agreement, dated January 26, 2017 (the "Intercreditor Agreement"). Under the Intercreditor Agreement, lenders to the Super Senior Facility Agreement rank pari passu amongst themselves and above both the holders of the 2021 Notes (the "2021 Notes Creditors") and the holders of the 2023 Notes (the "Scheme Creditors").

### C. The Restructuring

Due to delays associated with the manufacture, procurement and launch of two of **\*609** its satellites, Avanti experienced financial difficulties, with a materially over-leveraged capital structure. As a result, Avanti entered into preliminary discussions with Solus Alternative Asset Management LP, Tennenbaum Capital Partners, LLC and Great Elm Capital Management, Inc. (collectively, the "Ad Hoc Group," *see* Petition at 356) for a proposed comprehensive restructuring of its indebtedness that, it hoped, would create a sustainable long-term capital structure. On December 13, 2017, the Debtor and certain members of the Ad Hoc Group and other holders of the Notes (together, the "Consenting Creditors") became parties to a restructuring agreement (the "Restructuring Agreement"), primarily agreeing to equitize the 2023 Notes and to amend the 2021 Notes.

### D. The Scheme

Under the terms of the Scheme, all of the Debtor's outstanding 2023 Notes will be exchanged (the "Exchange") for 92.5% of Avanti's then enlarged issued share capital (the "Exchange Shares"). The Exchange Shares will be allocated and issued to the Scheme Creditors on a *pro rata* basis, based on the principal amount of 2023 Notes held by each Scheme Creditor. The 2023 Notes debt-for-equity exchange under the Scheme will deleverage Avanti by approximately $557 million in aggregate principal amount of the 2023 Notes and save approximately $81 million in interest expense per year.

Under the Scheme, the Scheme Creditors will grant the Releases, including the Guarantor Releases. The Releases include releases of any claim or liability, whether present or future, known or unknown, prospective or contingent, against the Debtor arising directly or indirectly out of, from or in connection with, the 2023 Notes and the 2023 Indenture, including in respect of any accrued but unpaid interest, other than any claim or liability arising after the "Restructuring Effective Date" (as defined in the Scheme). The Guarantor Releases will preclude Scheme Creditors from seeking to recover under guarantees of the 2023 Notes provided by each of the Debtor's subsidiaries.

Avanti previously sought to implement certain aspects of the Restructuring under the Consent Solicitations. [2] The Consent Solicitations sought consents from the holders of the 2021 Notes and the 2023 Notes for the following amendments: (1) Amend the 2021 Indenture to: (a) extend the final maturity date of the 2021 Notes from October 1, 2021 to October 1, 2022; (b) change the interest rate payable on the 2021 Notes from 10% Cash Interest or 15% PIK interest to 9% cash interest or 9% PIK interest for all remaining interest periods beginning October 1, 2017; (c) eliminate the Maintenance of Minimum Consolidated

2976

LTM EBITDA covenant contained in Section 4.30 of the 2021 Indenture, which would require testing on the last day of each fiscal quarter beginning March 31, 2018 and ending March 31, 2020; (d) permit the issuance of up to $30 million of additional Indebtedness which will rank junior to or *pari passu* with the 2021 Notes; (e) eliminate the Margin Increase payable on the 2021 Notes if the relevant Minimum Consolidated LTM EBITDA threshold was not met; and (f) permit interest payments on the 2021 Notes for all remaining interest periods beginning October 1, 2017 (but excluding the final interest payment) to be paid as PIK interest if the Debtor does not have sufficient cash to satisfy the applicable interest coupon (collectively (a)—(f), the "2021 Notes Restructuring Amendments"); **\*610** (2) Amend the submission to jurisdiction provision of the 2023 Indenture so that each party will submit to the exclusive jurisdiction of UK Courts (the "Jurisdiction Amendment") until the Restructuring Agreement is either terminated or no longer in effect; and (3) Amend and waive certain bankruptcy-related events of default within the Indentures (the "Majority Amendments and Waiver," together with the 2021 Notes Restructuring Amendments and the Jurisdiction Amendment, the "Consent Solicitation Amendments"), to prevent the occurrence of an event of default under the Notes and related automatic acceleration of the Notes from being triggered by the filing of a petition for recognition of the Scheme pursuant to chapter 15 of the Bankruptcy Code or by any other part of the Restructuring.

2    Capitalized terms in this paragraph not otherwise defined shall have the meaning assigned to them in the Consent Solicitations or other relevant noted document.

The required consents for each of the Consent Solicitation amendments were received by February 7, 2018 from holders of 98.09% of the aggregate principal amount of the 2021 Notes, and Scheme Creditors holding 87.73% of the aggregate principal amount of the 2023 Notes. The 2021 Notes Restructuring Amendments will become effective conditional on the Restructuring Effective Date; the other Consent Solicitation Amendments have already become effective.

### E. The UK Proceeding

To effectuate the Scheme, on February 15, 2018, the Debtor applied to the UK Court for permission to convene a meeting of its creditors for the purpose of considering and approving the Scheme. The UK Court considered that application at the convening hearing on February 19, 2018, and issued the Convening Order which, among other things: (i) ordered the convening of a meeting of the Scheme Creditors (*i.e.*, holders of the 2023 Notes) (the "Scheme Meeting") on March 20, 2018; (ii) ordered that notice of the Scheme, together with an explanatory statement and proxy forms for voting at the Scheme Meeting, be made available to the Scheme Creditors; and (iii) authorized the appointment of the Foreign Representative to act as a foreign representative in this Chapter 15 Case. *See* Willcocks Declaration ¶ 3. As only the Scheme Creditors, comprised of the holders of the 2023 Notes, are affected by the Scheme, the Scheme contains only one voting class.

The Debtor convened a meeting of the Scheme Creditors on March 20, 2018. At the Scheme Meeting, Scheme Creditors holding in aggregate $547,320,350, representing 98.3% by value of the outstanding 2023 Notes, attended the Scheme Meeting either in person or by proxy and voted in favor of the Scheme. (*See* Second Decl. ¶ 6.) No Scheme Creditors voted against the Scheme. On March 26, 2018, the Debtor asked the UK Court to sanction the Scheme. The UK Court found that all of the requirements for sanctioning the Scheme had been satisfied, including: (a) the Debtor and Scheme complied with the applicable statutory requirements; (b) the classification of Scheme Creditors fairly represented the creditors and the majority acted in a *bona fide* manner; (c) the Scheme was one that an intelligent and honest man, acting in respect of his interest as a creditor, might reasonably approve; and (d) the UK Court had jurisdiction to sanction the Scheme. Accordingly, the UK Court sanctioned the Scheme.

### F. Connection to the United States

Though the Debtor has no place of business in the US, Avanti has two main connections with this country. First, Milbank, Tweed, Hadley & McCloy LLP ("Milbank"), as counsel to the Foreign Representative and the Debtor, holds a $100,000 retainer in a non-interest bearing account **\*611** at JPMorgan Chase in New York (the "Retainer Account"); the funds remain in the Retainer Account and are the Debtor's property. Second, the 2023 Indenture is governed by New York law, which separately satisfies the "property in the United States" requirement for eligibility to file a chapter 15 case under section 109(a) of the Bankruptcy Code.

## II. LEGAL STANDARD

### A. Requirements for Recognition of a Foreign Proceeding

Section 1517(a) of the Bankruptcy Code provides that the court shall, after notice and a hearing, enter an order recognizing a foreign main proceeding if:

(1) such foreign proceeding for which recognition is sought is a foreign main proceeding ... within the meaning of section 1502;

(2) the foreign representative applying for recognition is a person or body; and

(3) the petition meets the requirements of section 1515.

11 U.S.C. § 1517(a). "While not explicit in this section, the foreign proceeding and the foreign representative must meet the definitional requirements set out in sections 101(23) and 101(24)." 8 COLLIER ON BANKRUPTCY ¶ 1517.01 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2014). A foreign proceeding is a "collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation." 11 U.S.C. § 101(23); *see also In re ABC Learning Ctrs. Ltd.*, 445 B.R. 318,327 (Bankr. D. Del. 2010). A foreign representative is "a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." 11 U.S.C. § 101(24).

 [1]    [2]   A foreign main proceeding "shall be recognized ... if it is pending in the country where the debtor has the center of its main interests." *Id.* § 1517(b)(1). The Bankruptcy Code presumes that "[i]n the absence of evidence to the contrary, the debtor's registered office ... is presumed to be the center of the debtor's main interests." *Id.* § 1516(c); *see also In re Bear Stearns*, 374 B.R. 122, 130 (Bankr. S.D.N.Y. 2007). Case law "establishes that the presumption in favor of place of registration can be rebutted by showing that the 'head office' functions were carried out in a jurisdiction other than where the registered office was located." 8 COLLIER ON BANKRUPTCY ¶ 1516.03; *see also Bear Stearns*, 374 B.R. at 130. To determine a debtor's center of main interests, courts look to a nonexclusive list of factors, including "the location of the debtor's headquarters; the location of those who actually manage the debtor ... ; the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes." *Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 137 (2d Cir. 2013) (quoting *In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006) ).

The Bankruptcy Code further provides that a recognition order shall be entered if the foreign representative applying for recognition is a person or body, and that the petition meets the requirements of section 1515. 11 U.S.C. § 1517(a)(2)–(3). Section 1515 requires presentation of (1) a certified copy of the decision commencing **\*612** the foreign proceeding and appointing the foreign representative; (2) a certificate from the foreign court affirming the existence of the proceeding and appointment of the representative; or (3) in the absence of (1) or (2), evidence which the court deems sufficient to confirm the existence of the foreign proceeding and appointment of the foreign representative. *Id.* § 1515(b). The petition must also be accompanied by a statement identifying all known foreign proceedings with respect to the debtor, 11 U.S.C. § 1515(c), and if applicable, a translation of the evidentiary materials into English. *Id.* § 1515(d).

### B. Privileges Provided By Chapter 15 of the Bankruptcy Code

Upon recognition as a foreign main proceeding, section 1520(a) of the Bankruptcy Code makes (1) sections 361 and 362 (automatic stay) applicable to property of the debtor within the jurisdiction of the US; (2) applies sections 363, 549 and 552 to any transfer of a debtor's interest in property within the US; (3) allows a foreign representative to operate a debtor's business by exercising the rights and powers of a trustee under sections 363 and 552; and (4) applies section 552 to property of the debtor within the US. 11 U.S.C. § 1520(a).

 [3]   Section 1521(a) outlines the discretionary relief a court may order upon recognition. *Id.* § 1521(a). The discretion that is granted is "exceedingly broad," since a court may grant "any appropriate relief" that would

2978

65 Bankr.Ct.Dec. 137

further the purposes of chapter 15 and protect the debtor's assets and the interests of creditors. Hon. Leif M. Clark, ANCILLARY AND OTHER CROSS–BORDER INSOLVENCY CASES UNDER CHAPTER 15 OF THE BANKRUPTCY CODE, § 7[2], at 70 (2008). "Section 1521(a)(7) authorizes the court to grant to the foreign representative the sort of relief that might be available to a trustee appointed in a full bankruptcy case," including the turnover of property belonging to the debtor. *Id.* at 73. Section 1521(a)(7), however, carves out avoidance powers under sections 547 and 548, which are only available to the trustee in a full case under another chapter. 8 COLLIER ON BANKRUPTCY ¶ 1521.02.

### C. The Interplay of Section 109(a) and Chapter 15 of the Bankruptcy Code

**[4]** Section 109(a) provides that "[n]otwithstanding any other provision of this section, only a person that resides or has a domicile, a place of business or property in the United States, or a municipality, may be a debtor under this title." 11 U.S.C. § 109(a). In a controversial ruling, the Second Circuit applied the requirements of section 109(a) to eligibility to file a chapter 15 case. *See Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*, 737 F.3d 238, 247 (2d Cir. 2013). Under section 109(a), as interpreted in *Barnet*, a foreign representative must show that the debtor has either (i) a domicile, (ii) a place of business, or (iii) *property* in the United States, to be eligible to file under 11 U.S.C. § 1517 (emphasis added). *See Barnet,* 737 F.3d at 247; *In re Octaviar Admin. Pty. Ltd.*, 511 B.R. 361, 369 (Bankr. S.D.N.Y. 2014). Lower courts in this Circuit and elsewhere have held that a professional's retainer in a U.S. bank account satisfies the "property in the United States" requirement of section 109(a). *See, e.g.*, *Octaviar*, 511 B.R. at 372–73 ("There is a line of authority that supports the fact that prepetition deposits or retainers can supply 'property' sufficient to make a foreign debtor eligible to file in the United States.") (*citing In re Cenargo Int'l PLC*, 294 B.R. 571, 603 (Bankr. S.D.N.Y. 2003) ); *see also In re Yukos Oil Co.*, 321 B.R. 396, 401–03 (Bankr. S.D. Tex. 2005); **\*613** *In re Global Ocean Carriers Ltd.*, 251 B.R. 31, 39 (Bankr. D. Del. 2000).

### D. Schemes of Arrangement Satisfy the Requirement for a Collective Judicial Proceeding in a Foreign Country Under a Law Relating to Adjustment of Debt

A chapter 15 petition may be filed by a foreign representative "for recognition of a foreign proceeding ...." 11 U.S.C. § 1515. Section 101(23) of the Bankruptcy Code defines a "foreign proceeding" to mean "a collective judicial or administrative proceeding in a foreign country ... under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation." *Id.* § 101(23). Schemes of arrangement under UK law have routinely been recognized as foreign proceedings in chapter 15 cases. *See, e.g.*, *In re Metinvest B.V.*, No. 17–10130–LSS (Bankr. D. Del. Feb. 8, 2017); *In re DTK Finance (plc)*, No. 16–13521–shl (Bankr. S.D.N.Y. Jan. 18, 2017); *In re Metinvest B.V.*, No. 16–11424–LSS (Bankr. D. Del. Jun. 30, 2016); *In re Abengoa Concessions Investments Limited*, No. 16–12590–kjc (Bankr. D. Del. Dec. 6, 2016); *In re YH Limited*, No. 16–12262 (Bankr. S.D.N.Y. Sep. 8, 2016); *In re Metinvest B.V.*, No. 16–10105–LSS (Bankr. D. Del. Jan. 29, 2016); *In re OIC Run–Off Limited*, No. 15–13054–scc (Bankr. S.D.N.Y. Jan. 11, 2016); *In re Codere Finance (UK) Limited*, No. 15–13017–jig (Bankr. S.D.N.Y. Dec. 22, 2015); *In re Towergate Finance, plc*, Case No. 15–10509 (SMB) (Bankr. S.D.N.Y. Mar. 27, 2015); *In re New World Resources N.V.*, Case No. 14–12226 (SMB) (Bankr. S.D.N.Y. Sept. 9, 2014); *In re Zlomrex International Finance S.A.*, No. 13–14138 (Bankr. S.D.N.Y. Jan. 31, 2014); *In re Magyar Telecom B.V.*, No 13–13508, 2013 WL 10399944 (Bankr. S.D.N.Y. Dec. 11, 2013); *In re Tokio Marine Europe Insurance Ltd.*, No. 11–13420 (MG) (Bankr. S.D.N.Y. Sept. 08, 2011); *In re Highlands Ins. Co. (U.K.)*, No. 07–13970 (MG) (Bankr. S.D.N.Y. Aug. 18, 2009); *In re Castle Holdco 4, Ltd.*, No. 09–11761 (REG) (Bankr. S.D.N.Y. May 7, 2009).

### III. DISCUSSION

Section 1517(a) of the Bankruptcy Code provides that "an order recognizing a foreign proceeding shall be entered if ... (1) such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502; (2) the foreign representative applying for recognition is a person or body; and (3) the petition meets the requirements of section 1515." 11 U.S.C. § 1517(a). Each of the foregoing requirements is satisfied in this case, and, as explained below, the recognition and enforcement of the Scheme and Sanction Order furthers the goals of chapter 15.

2979

#### A. Avanti Has Property in the United States

**[5]** As a preliminary matter, a foreign representative must show that the debtor has either (i) a domicile, (ii) a place of business, or (iii) *property* in the United States, as a condition to eligibility under 11 U.S.C. § 1517 (emphasis added). *See Barnet* 737 F.3d at 247; *Octaviar,* 511 B.R. at 369. Here, the Debtor does not have a place of business or domicile in the United States, but the Debtor's property within the territorial jurisdiction of the United States includes funds held by Milbank as a retainer, and the 2023 Indenture governed by New York law. Both of these satisfy the "property in the United States" requirement for eligibility under section 109(a). *See In re Berau Capital Resources Pte Ltd.*, 540 B.R. 80, 83–84 (Bankr. S.D.N.Y. 2015) (holding that foreign debtor was eligible **\*614** to be a debtor under section 109(a) of the Bankruptcy Code because of (a) an interest in its US counsel's retainer account, and (b) intangible contract rights under a New York law governed the debt indenture).

#### B. The English Proceeding is a Foreign Main Proceeding

**[6]** The UK Proceeding fits the definition of a "foreign proceeding" in section 101(23) of the Bankruptcy Code as a collective proceeding for the adjustment of debt supervised by a judicial authority. *See* 11 U.S.C. § 1502(3) (defining a "foreign court" as "a judicial or other authority competent to control or supervise a foreign proceeding"). Section 1516(a) of the Bankruptcy Code permits a court to presume that a foreign proceeding is a "foreign proceeding," if the decision commencing the foreign proceeding so indicates. *See* 11 U.S.C. §§ 1516(a), 1515(b)(1). The UK Proceeding is pending in a foreign country under a law that allows companies to effectuate binding compromises or arrangements, including the restructuring of liabilities owed to their members or creditors (or any class of them) (*i.e.*, Part 26 of the Companies Act) and is therefore an "adjustment of debt." *See* Angel Declaration ¶ 10.

The UK Proceeding is a judicial proceeding—it required the Convening Order to convene the Debtor's Scheme Meeting and required the Sanction Order for the Scheme to be sanctioned, each issued by the UK Court. *See id.* at ¶¶ 11–14. Here, the Convening Order authorized the appointment of the Foreign Representative as "foreign representative in any proceedings under chapter 15 of the United States Bankruptcy Code ...". *See* Convening Order at ¶ 21. Furthermore, the Debtor is incorporated in the UK and its registered offices and headquarters are in London. *See* Willcocks Declaration ¶ 7. The Court may therefore presume that the UK constitutes the Debtor's "center of main interests." 11 U.S.C. § 1516(c).

Moreover, a significant proportion of the Debtor's existing assets are located in the UK. *See* Willcocks Declaration at ¶ 7. Given the presumption of section 1516(c) of the Bankruptcy Code and the supporting factual information presented in the Petition, the UK constitutes the Debtor's "center of main interests" and the UK Proceeding constitutes a "foreign main proceeding" under the Bankruptcy Code.

#### C. The Petitioner is Qualified to be the Foreign Representative

The term "foreign representative" is defined under section 101(24) of the Bankruptcy Code as:

> a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24).

The Foreign Representative in this case is an individual who has been (1) duly appointed by the Debtor's board of directors as foreign representative of the UK Proceeding, and (2) authorized by the Convening Order to act as "foreign representative." *See* Willcocks Declaration ¶ 3. Accordingly, Patrick Willcocks is a "foreign representative" as defined in the Bankruptcy Code. *See* 11 U.S.C. § 1516(a) ("If the decision [commencing the foreign proceeding] ... indicates ... that the person or body is a foreign representative, the court is entitled to so presume."); *In re SphinX, Ltd.,* 351 B.R. 103, 116–17 (Bankr. S.D.N.Y. 2006), *aff'd,* **\*615** *Krys v. Official Comm. of Unsecured Creditors of Refco Inc. (In re SphinX Ltd.),* 371 B.R. 10 (S.D.N.Y. 2007) (holding that section 101(24) was satisfied where foreign representatives submitted a "copy of the Cayman Court's order appointing them to administer the [d]ebtors'

2980

In re Avanti Communications Group PLC, 582 B.R. 603 (2018)
65 Bankr.Ct.Dec. 137

winding up under [Cayman law] and authorizing their commencement of these chapter 15 cases ...").

### D. Enforcing the Scheme, Including the Releases, as Discretionary Relief Under Sections 1507 and 1521 is Proper

Upon recognition of a foreign proceeding, section 1521(a) of the Bankruptcy Code authorizes the Court to grant "any appropriate relief" to a foreign representative "where necessary to effectuate the purpose of [chapter 15] and to protect the assets of the debtor or the interests of the creditors," provided that the interests of creditors and other interested entities are sufficiently protected. 11 U.S.C. §§ 1521(a), 1522(a). Such relief may include, but is not limited to: "(1) staying the commencement or continuation of an individual action or proceeding concerning the debtor's assets, rights, obligations or liabilities to the extent they have not been stayed under section 1520(a); (2) staying execution against the debtor's assets to the extent it has not been stayed under section 1520(a); (3) suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520(a); ... and (7) granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a)." Id. § 1521(a).

In addition to section 1521's provisions regarding "any appropriate relief," section 1507(b) provides that a court "[i]n determining whether to provide additional assistance ... shall consider whether such additional assistance, consistent with the principles of comity, will reasonably assure—

(1) just treatment of all holders of claims against or interests in the debtor's property;

(2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

(3) prevention of preferential or fraudulent dispositions of property of the debtor;

(4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and

(5) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns."

11 U.S.C. § 1507(b) (emphasis added). These provisions embody the protections previously contained in section 304 of the Bankruptcy Court with one critical exception: the principle of comity was removed as one of the factors and elevated to the introductory paragraph. The legislative history confirms that the principle of comity was placed in the introductory language to section 1507 to emphasize its importance. *See United States v. J.A. Jones Constr. Group, LLC,* 333 B.R. 637, 638 (E.D.N.Y. 2005) (citing legislative history); *see also* Allan L. Gropper, *Current Devs. in Int'l Insolvency Law: A United States Perspective,* 15 J. BANKR. L. & PRAC. 2, Art. 3, at 3–4 (Apr. 2006) (hereinafter "Gropper") (noting that in light of the elevation of comity to the introductory paragraph of section 1507, and the legislative history of chapter 15, courts will likely consider precedent under section 304 in fashioning appropriate relief).

**[7]** The interplay between the relief available under sections 1507 and 1521 is **\*616** far from clear. *See In re Atlas Shipping A/*S, 404 B.R. 726, 741 (Bankr. S.D.N.Y. 2009). As the court explained in *In re Rede Energia S.A.,* 515 B.R. 69 (Bankr. S.D.N.Y. 2014):

> Section 1507(b)(1) requires that additional relief only be granted if the just treatment of creditors is ensured. 11 U.S.C. § 1507(b)(1). The just treatment factor is generally satisfied upon a showing that the applicable law provides for a comprehensive procedure for the orderly and equitable distribution of [the debtor]'s assets among all of its creditors. The court in *Board of Directors of Telecom Argentina* explained that instances in which a court has held that a foreign proceeding does not satisfy this factor include where the proceeding fails to provide creditors access to information and an opportunity to be heard in a meaningful manner, which are [f]undamental requisites of due process, or where the

proceeding would not recognize a creditor as a claimholder.

*Id.* at 95 (internal quotation marks and citations omitted).

Cases have held that in the exercise of comity that appropriate relief under section 1521 or additional assistance under section 1507 may include recognizing and enforcing a foreign plan confirmation order. *See In re U.S. Steel Canada Inc.*, 571 B.R. 600, 609 (Bankr. S.D.N.Y. 2017); *In re Cell C Proprietary Ltd.*, 571 B.R. 542, 551 (Bankr. S.D.N.Y. 2017); *In re Rede Energia S.A.*, 515 B.R. at 89.

 [8] In deciding whether to grant appropriate relief or additional assistance under chapter 15, courts are guided by principles of comity and cooperation with foreign courts. *See, e.g.*, *In re Atlas Shipping*, 404 B.R. at 738; *In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 333 (S.D.N.Y. 2008). The Supreme Court has held that a foreign judgment should not be challenged in the US if the foreign forum provides: "[A] full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it [is] sitting ...." *Hilton v. Guyot*, 159 U.S. 113, 202–03, 16 S.Ct. 139, 40 L.Ed. 95 (1895); *see also Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713 (2d Cir. 1987) ("Federal courts generally extend comity whenever the foreign court had proper jurisdiction and enforcement does not prejudice the rights of United States citizens or violate domestic public policy."); *In re Bd. of Dirs. of Hopewell Int'l Ins. Ltd.*, 238 B.R. 25, 60, 66–68 (Bankr. S.D.N.Y. 1999), *aff'd*, 275 B.R. 699 (S.D.N.Y. 2002) (concluding that comity should be accorded to foreign court orders as long as "it is shown that the foreign court is a court of competent jurisdiction, and that the laws and public policy of the forum state and the rights of its residents will not be violated" (quoting *In re Gee*, 53 B.R. 891, 901 (Bankr. S.D.N.Y. 1985) ) ).

The issue of granting third-party releases in chapter 11 cases is controversial. Third-party releases are permissible if creditors "consent," but what constitutes consent is the subject of conflicting decisions. For, example, Judge

Bernstein in *In re SunEdison, Inc.* held that a warning in a disclosure statement indicating that the failure to object is "deemed consent" to third-party releases was insufficient to turn a creditor into a consenting creditor. 576 B.R. 453, 461 (Bankr. S.D.N.Y. 2017); *see also* **\*617** *In re Washington Mut. Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011) (holding that "inaction" was not sufficient to manifest consent to support releases). Judge Bernstein's rationale was that there was no identifiable "duty to speak" on behalf of the creditors. *Id.* at 460. On that view, creditors who do not affirmatively vote to grant releases are not bound by the releases. Other cases have found consent when a disclosure statement or voting ballot warned that a failure to vote against the plan would be deemed consent to the releases. *See e.g.*, *In re DBSD N. Am., Inc.*, 419 B.R. 179, 217–29 (Bankr. S.D.N.Y. 2009), *aff'd*, No. 09 CIV. 1016 (LAK), 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010); *aff'd in part, rev'd in part*, 627 F.3d 496 (2d. Cir. 2010); *In re Calpine Corp.*, 2007 WL 4565223, at \*10 (Bankr. S.D.N.Y. Dec. 19, 2007). It is unnecessary for the Court to weigh-in on that issue here.

In the chapter 15 context, judges in this Court have often enforced third-party releases in foreign proceedings under section 1507 of the Bankruptcy Code. *See, e.g.*, *In re Ocean Rig UDW Inc.*, 570 B.R. 687 (Bankr. S.D.N.Y. 2017) (recognizing and enforcing scheme of arrangement that released affiliate guarantees); *In re Towergate Fin. plc*, Case No. 15–10509–SMB (Bankr. S.D.N.Y. Mar. 27, 2015) [ECF Doc. # 16]; *In re New World Res. N.V.*, Case No. 14–12226–SMB (Bankr. S.D.N.Y. Sept. 9, 2014) [ECF Doc. # 20]; *In re Sino–Forest Corp.*, 501 B.R. 655, 665 (Bankr. S.D.N.Y. 2013) (enforcing foreign order containing third-party releases); *In re Magyar Telecom B.V.*, Case No. 13–13508–SHL, 2013 WL 10399944 (Bankr. S.D.N.Y. Dec. 11, 2013) [ECF Doc. # 26]; *In re Metcalfe & Mansfield Alt. Inv.*, 421 B.R. 685, 696 (Bankr. S.D.N.Y. 2010) (concluding that "principles of enforcement of foreign judgments and comity in chapter 15 cases strongly counsel approval of enforcement in the United States of the third-party non-debtor release and injunction provisions included in the Canadian Orders, even if those provisions could not be entered in a plenary chapter 11 case.").

However, the Fifth Circuit in *In re Vitro S.A.B. de C.V.*, 701 F.3d 1031, 1042 (5th Cir. 2012), affirmed a bankruptcy court's decision in a chapter 15 case declining to grant comity and to enforce a Mexican court order approving

2982

a Mexican reorganization plan that released guarantees of US-based non-debtor affiliates of the Mexican debtor's debt. *See also Sino–Forest*, 501 B.R. at 665–66. The court decided that the bankruptcy court did not abuse its discretion in refusing to enforce the order confirming the plan and releasing the guarantees. *See Vitro*, 701 F.3d at 1060.

*Vitro* had a number of very troubling facts that the Fifth Circuit concluded supported the bankruptcy court's exercise of discretion in refusing to enforce the plan approved by the Mexican court. Most significantly, the plan created only a single class of unsecured creditors and the necessary creditor votes to approve the plan were only achieved by counting the votes of insiders. *Id.* at 1039. Insider votes are not counted under the Bankruptcy Code. *See* 11 U.S.C. § 1129(a)(10) ("If a class is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, *determined without including any acceptance of the plan by any insider.*") (emphasis added); *see also CIBC Bank & Trust Co. (Cayman) Ltd.*, 866 F. Supp. 1105, 1114 (S.D.N.Y. 1995) (concluding that "the Code prevents 'insiders' from voting on whether a reorganization plan will be accepted by a class of impaired creditors").

Of the approximately 75% of principal amount of unsecured debt that voted in favor of the plan in *Vitro*, over 50% of all voting claims were held by intercompany **\*618** debt holders. *Id.* Similarly, under Mexican law only 50% in amount had to vote to approve the plan. Absent the subsidiaries' votes of intercompany debt in favor of the plan, that plan could not have been approved. *Id.*

The Fifth Circuit distinguished *Vitro* from other cases allowing third-party releases, including *Metcalfe*. Many of the same distinguishing facts are present here—the Avanti Scheme has near unanimous support (all creditors that voted cast votes in favor of the Scheme), and that support does not rely on votes by insiders.

As explained in the Angel Declaration, third-party non-debtor releases are common in schemes sanctioned under UK law, particularly for releases of affiliate guarantees of the debt that is being adjusted by the scheme. *See In re T & N Ltd and others (No 4) [2006] EWHC 1447 (Ch)* (David Richards J.) (holding that a scheme did not necessarily prohibit the alteration of third-party rights, in this case, creditors' rights to pursue asbestos

claims against insurers); *Re Lehman Brothers International (Europe) (In administration) (No 2) [2009] EWCA Civ 1161* (following *T & N*, Patten LJ held (at paragraph 63) that it was "entirely logical to regard the court's jurisdiction as extending to approving a scheme which varies or releases creditors' claims against the company on terms which require them to bring into account and release rights of action against third-parties designed to recover the same loss. The release of such third-party claims is merely ancillary to the arrangement between the company and its own creditors."); *In Re La Seda de Barcelona SA [2010] EWHC 1364 (Ch)* (Proudman J applied *T & N* and *Lehman*, and concluded that a third-party subsidiary guarantor could be released pursuant to a deed of release executed on behalf of scheme creditors).

Further examples of recent schemes sanctioned by UK courts that included third-party releases include: *Re Magyar Telecom BV [2013] EWHC 3800 (Ch)* (scheme company executed a deed of covenant for each note creditor whereby scheme claims (including guarantee claims of group guarantor companies) were irrevocably released); *In the Matter of New World Resources N.V [2014] EWHC 3143 (Ch)* (scheme provided for broad release of claims arising out of finance documents, among other things, against subsidiary guarantors); *Codere Finance (UK) Limited [2015] EWHC 3778 (Ch)* (scheme creditors irrevocably waived and released scheme claims (including claims against group company guarantors) and undertook to treat the scheme claims as waived and released subject to carve-outs).

**[9]**  The Court concludes that schemes of arrangements sanctioned under UK law that provide third-party non-debtor guarantor releases should be recognized and enforced under chapter 15 of the Bankruptcy Code. Avanti's Scheme Creditors had a full and fair opportunity to vote on, and be heard in connection with, the Scheme. *See* Angel Declaration, ¶¶ 12, 17–18. The proceedings under UK law in the UK courts afford creditors a full and fair opportunity to be heard in a manner consistent with US due process standards. *See, e.g.*, *Society of Lloyd's v. Reinhart*, 402 F.3d 982, 987–88 (10th Cir. 2005).

Under UK law, for a scheme to become legally binding on the company and all creditors in the relevant class, a majority in number representing not less than 75% in value of each class of creditors must vote in favor of the scheme. *Id.* ¶ 14. Unlike chapter 11 of the Bankruptcy Code,

UK law authorizing schemes of arrangement does not provide a mechanism for "cramming down" dissenting classes of creditors. *Id.* ¶ 17. In this case, the Scheme **\*619** only adjusted the claims of a single class of creditors, namely, the holder of the 2023 Notes, and they voted overwhelmingly to approve the Scheme. Under UK law, the entire accepting class is bound by the terms of the Scheme, including the Guarantor Releases.

The failure of a US bankruptcy court to enforce the Guarantor Releases could result in prejudicial treatment of creditors to the detriment of the Debtor's reorganization efforts and prevent the fair and efficient administration of the Restructuring. Principles of comity permit a US bankruptcy court to recognize and enforce the Scheme. *See In re Sino–Forest Corp.*, 501 B.R. at 665 (enforcing foreign order containing third-party releases, noting that, in the Second Circuit, "where the third-party releases are not categorically prohibited, it cannot be argued that the issuance of such releases is manifestly contrary to public policy"); *Metcalfe*, 421 B.R. at 700 ("Principles of comity in chapter 15 cases support enforcement of the Canadian Orders in the United States whether or not the same relief could be ordered in a plenary case under chapter 11.")

## IV. CONCLUSION

Recognizing the UK Proceeding (including the Scheme and Sanction Order) and enforcing the Releases of claims against the Debtor and its non-debtor subsidiaries will assist the orderly administration of the scheme of arrangement by the UK Court and help the implementation of the Scheme for the Debtor. For the reasons explained above, the Court grants the request for recognition and enforcement of the Scheme and Sanction Order.

A separate order granting the requested relief has already been entered.

**All Citations**

582 B.R. 603, 65 Bankr.Ct.Dec. 137

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

2984

# Tab 18

## New York
### Official Reports

KeyCite Yellow Flag - Negative Treatment

Distinguished by In re SunEdison, Inc., Bankr.S.D.N.Y., October 13, 2017

44 Misc.3d 773, 992 N.Y.S.2d
602, 2014 N.Y. Slip Op. 24171

**\*\*1** Barclays Bank PLC, Plaintiff

v

Paul Kemsley, Defendant.

Supreme Court, New York County
June 26, 2014

CITE TITLE AS: Barclays
Bank PLC v Kemsley

### HEADNOTES

Judgments
Foreign Judgment
Comity—Preemption of Common-Law Principles of International Comity

(1) Chapter 15 of the United States Bankruptcy Code, which governs requests for comity by foreign representatives and permits a court which denies recognition to issue an order to prevent the foreign representative from obtaining comity from courts in the United States (see 11 USC 1509 [c], [d]), does not preempt New York common-law principles of international comity as applied to foreign bankruptcy discharge orders issued to individual foreign debtors. Chapter 15's plain language applies only to a "foreign representative" such as a trustee. Moreover, there is no mention of individual debtors in chapter 15, nor any indication that it is applicable to individual debtors' foreign discharge orders. Accordingly, although the United States Bankruptcy Court denied the United Kingdom (UK) trustees' chapter 15 petition for recognition of defendant's UK bankruptcy, the denial did not impair defendant's ability to seek comity in a state court action with respect to the UK discharge.

Judgments
Foreign Judgment

Comity—United Kingdom Bankruptcy Discharge

(2) In an action for breach of contract in connection with a loan agreement by plaintiff—an unsecured creditor in defendant's United Kingdom (UK) bankruptcy proceeding which did not submit a claim against the bankruptcy estate —defendant, a UK citizen residing in New York, was entitled to recognition of his UK bankruptcy discharge in New York under principles of international comity. The UK bankruptcy proceeding was procedurally fair and did not violate public policy. Plaintiff was also afforded procedural and substantive due process in participating in the proceeding, including, among other things, negotiating with the UK trustees and attending hearings before the UK bankruptcy court. Moreover, that the UK trustees may have had no means of investigating and recovering defendant's US assets for the benefit of all of his UK creditors was a direct result of plaintiff having opposed the UK trustees' petition under chapter 15 of the United States Bankruptcy Code in the United States Bankruptcy Court for recognition of defendant's UK bankruptcy, which the court ultimately denied. Furthermore, to deny comity would result in greater inequity and would invite foreign creditors to commence suit to seek recovery outside and in circumvention of their foreign bankruptcy proceedings.

### RESEARCH REFERENCES

Am Jur 2d, Bankruptcy §§ 993, 1000, 1001; NY Jur 2d, Executions and Enforcement of Judgments §§ 665, 670–672.

Carmody-Wait 2d, Judgments §§ 63:606–63:608.

NY Jur 2d, Conflict of Laws §§ 12, 14, 18; NY Jur 2d, Enforcement and Execution of Judgments §§ 351, 352.

**\*774** Siegel, NY Prac § 472.

11 USCA § 1509 (c), (d).

### ANNOTATION REFERENCE

See ALR Index under Bankruptcy and Insolvency; Comity; Foreign Judgments.

### FIND SIMILAR CASES ON WESTLAW

Database: NY-ORCS

Query: bankruptcy /5 discharge & comity

2986

**APPEARANCES OF COUNSEL**

*Clifford Chance US LLP* (*Jeff E. Butler* and *Benjamin Peacock* of counsel) for plaintiff.

*Arent Fox LLP* (*Eugene R. Scheiman* and *Nicholas P. Pavlidis* of counsel) for defendant.

**OPINION OF THE COURT**

Saliann Scarpulla, J.

Plaintiff Barclays Bank PLC (Barclays) brings this action against defendant Paul Kemsley (Kemsley) for breach of contract in connection with a loan agreement. In motion sequence No. 002, Barclays seeks summary judgment against Kemsley on its breach of contract claim. In motion sequence No. 004, Kemsley seeks summary judgment dismissing the complaint based on the principle of comity and the recognition of a bankruptcy discharge granted in his favor in the United Kingdom. The motions are consolidated for disposition.

**Background**

The following facts are undisputed, except as otherwise indicated. Barclays is a banking institution organized under the laws of England and Wales. Kemsley is a UK citizen currently residing in New York, where he relocated from England in about 2010. On January 13, 2012, Kemsley commenced a bankruptcy proceeding (UK bankruptcy) in the High Court of Justice, Chancery Division, Bankruptcy Court (UK Bankruptcy Court). Kemsley's petition was accompanied by a statement of affairs that, among other things, scheduled Barclays as an unsecured creditor in the amount of \P5 million (Barclays debt).

Barclays was informed of Kemsley's UK bankruptcy and the scheduled Barclays debt. Barclays participated in the UK bankruptcy proceeding, including negotiating with the UK Trustees **\*775** with respect to the investigation into Kemsley's bankruptcy estate and his potential discharge from bankruptcy. However, Barclays purposefully chose not to submit a proof of claim against Kemsley's UK bankruptcy estate.

On March 13, 2013, Kemsley and the UK Trustees entered into an income payments agreement which obligates Kemsley to pay to the UK Trustees for the benefit of his bankruptcy creditors—including Barclays—a percentage of his net income over the three years following his discharge. On

March 26, 2012, the UK Bankruptcy Court entered an order adjudging Kemsley to be bankrupt pursuant to the United Kingdom's Insolvency Act (1986, ch 45 [Gr Brit]) (UK discharge). Thereafter, on April 21, 2012, Mark Fry and Kirstie Provan were appointed as joint trustees of Kemsley's bankruptcy estate (UK Trustees). **\*\*2**

Despite its participation in the pending UK bankruptcy, on March 1, 2012, Barclays commenced this New York action seeking recovery of the Barclays debt under breach of contract and unjust enrichment theories. On August 21, 2012, during a temporary stay in this action, the UK Trustees filed a chapter 15 petition (11 USC) with the United States Bankruptcy Court, Southern District of New York (NY Bankruptcy Court)[1] seeking recognition of the UK bankruptcy as a "foreign main proceeding." The UK Trustees also sought to stay all actions against Kemsley in the US so that the UK Trustees could investigate and preserve Kemsley's US assets, if any, for the benefit of all of his creditors, including Barclays. Barclays opposed the chapter 15 petition.

By order dated March 22, 2013, the NY Bankruptcy Court (Peck, J.) declined to recognize the UK bankruptcy proceeding, either as a "foreign main proceeding" or "foreign nonmain proceeding" (nonrecognition order). (*See In re Kemsley,* 489 BR 346 [SD NY 2013].) In his decision, Judge Peck found that recognition was not appropriate because the UK was not Kemsley's center of main interests, as required in 11 USC § 1517. Judge Peck further noted that this was the first *contested* matter involving recognition of an individual's foreign insolvency case to be decided in the Southern District of New York. Judge Peck stated that "Barclays actively contests recognition presumably with the objective of avoiding the consequences of imposition of the automatic stay and retaining control of the state court litigation." (*Id.* at 350.)

**\*776** Because the parties disputed the meaning and effect of the nonrecognition order, on May 15, 2013 Barclays moved the NY Bankruptcy Court to reopen the chapter 15 case and to clarify the nonrecognition order. In its motion, Barclays argued that the nonrecognition order had a preclusive effect such that Kemsley himself could not now directly (as opposed to through the foreign bankruptcy estate representative) ask the New York Supreme Court to recognize the UK discharge on the basis of comity. Kemsley argued in opposition that nothing in the language of chapter 15 precluded him from

2987

directly asking this court to recognize the UK discharge based on comity.

At a hearing on June 5, 2013 (comity hearing), Judge Peck stated that neither the Bankruptcy Code (11 USC) nor the nonrecognition order impaired Kemsley himself from seeking comity with respect to his UK discharge in the courts of the United States, including the state courts. The NY Bankruptcy Court denied Barclays' motion for clarification in a decision dated June 25, 2013.

Thereafter, in November 2012, Kemsley asked the UK Bankruptcy Court to issue an anti-suit injunction to enjoin Barclays from proceeding with lawsuits against him in the United States (in New York and Florida state courts), on the theory that such lawsuits violated his rights as a bankrupt in the UK. Barclays opposed the request for an injunction and participated in the hearing before the UK Bankruptcy Court that took place on March 8 and 11, 2013. The UK Bankruptcy Court denied Kemsley's request and subsequently issued a decision, dated May 15, 2013, reflecting the denial (UK injunction decision). The UK injunction decision did not address issues concerning the application of international comity to the United States proceedings. Instead, it deferred to the United States state courts on the question of whether Barclays should be prohibited from proceeding there.

With the foregoing facts and proceedings in mind, I will now consider the parties' motions **3 for summary judgment.[2]

### *777 Discussion

With respect to Kemsley's motion (sequence No. 004) which requests this court to recognize the UK discharge in accordance with common-law principles of comity, Barclays argues that chapter 15 of the United States Bankruptcy Code preempts state common law in this area, and this court should not grant comity with respect to the UK discharge issued by the UK Bankruptcy Court. Moreover, Barclays insists that even if chapter 15 of the Bankruptcy Code did not preempt state law, this court should exercise its discretion by not granting comity based on the "unusual circumstances" of this case.

Federal Preemption

Barclays argues that state common law on the granting of comity is preempted by section 1509 (c) of the United States Bankruptcy Code which provides, in relevant part, that "[a] request for comity . . . *by a foreign representative* in a

court in the United States other than the court which granted recognition shall be accompanied by a certified copy of an order granting recognition under section 1517." (11 USC § 1509 [c] [emphasis added].) Section 1509 (d) provides that "[i]f the court denies recognition under this chapter, the court may issue any appropriate order necessary *to prevent the foreign representative* from obtaining comity . . . from courts in the United States." (11 USC § 1509 [d] [emphasis added].) Because the NY Bankruptcy Court denied the UK Trustees' application for recognition of the UK discharge, Barclays asserts that these provisions of chapter 15 "clearly indicate that, following the denial of a Chapter 15 petition with respect to a particular foreign proceeding, it would not be appropriate for any court in the United States to recognize or grant comity to that foreign proceeding." (Barclays' mem in opp at 8.)

Barclays' arguments here are substantially the same as the arguments it made before the NY Bankruptcy Court in connection with its motion for clarification. On the record during the June 5, 2013 comity hearing, Judge Peck noted that Barclays' argument was "one of first impression," and that the requested relief was, in essence, under section 1509 (d) of the Bankruptcy Code, "to have [the NY Bankruptcy Court] interdict and preempt a defense by Mr. Kemsley, in his personal capacity, with respect to state court litigation that was pending prior to the [UK] trustee's petition for recognition under Chapter 15." (Comity hearing tr at 28-29.) In that regard, Judge Peck stated that "all of the provisions of Section 1509 deal with rights of the foreign representative" and that

> *778 "[l]ooking literally at the language of Section 1509 (d), which deals, literally, with the situation of nonrecognition, it is apparent from the plain language that the consequence of nonrecognition applies only to prevent the *foreign representative* from obtaining comity or cooperation from courts in the United States, and does not, by its literal terms, preclude the *foreign debtor* from asserting an **4 entitlement to comity . . .

> "I see nothing in Section 1509 (d) that, read literally, would in any way impair the ability of Mr. Kemsley to seek comity with respect to his U.K. discharge. However, my comments are by no means intended to limit the ability of Barclays to make the very same arguments that were made here, in state court, nor are they intended in any way to affect the ability of Mr. Kemsley, through counsel, to raise whatever arguments are appropriate in other courts of competent jurisdiction.

"It is my view that once recognition has been denied, this court does not have residual powers to recognize, except with respect to the foreign representative, to the extent that some party may seek to obtain relief as to a foreign representative that is seeking to act in an ultra vires capacity, in effect, taking action that is not authorized by virtue of recognition." (*Id.* at 28-31 [emphasis added].)

Thus, the NY Bankruptcy Court rejected Barclays' argument that chapter 15, by its terms, preempts New York common-law principles of international comity as applicable to foreign debtors.

Kemsley argues that the foregoing statements by the NY Bankruptcy Court should be given collateral estoppel effect. However, Judge Peck made clear that, having already denied recognition of the UK bankruptcy, the NY Bankruptcy Court did not have "residual powers" to exercise with respect to the question raised by Barclays' motion for clarification, and that the parties were free to make the same arguments before this court. Thus, Judge Peck's observation that there is "nothing in Section 1509 (d) that, read literally, would in any way impair the ability of Mr. Kemsley to seek comity with respect to his U.K. discharge" is not binding on this court.

(1) Nevertheless, Judge Peck's observations and interpretation of chapter 15 are highly persuasive, particularly in this **\*779** case of first impression. Judge Peck properly noted that the plain language of chapter 15 applies only to a "foreign representative" such as a trustee. There is no mention of individual debtors in chapter 15, nor any indication that chapter 15 is applicable to foreign bankruptcy discharge orders issued to individual debtors. Accordingly, I adopt the instructive view and opinion of Judge Peck, that chapter 15 of the Bankruptcy Code does not preempt New York common-law principles of international comity as applied to foreign bankruptcy discharge orders issued to individual foreign debtors.

This Court's Discretionary Power in Granting Comity

Barclays argues in the alternative that even if chapter 15 does not preempt state law here, I should exercise my discretion by not granting comity to the UK discharge due to the "unusual . . . circumstances" of this case. (Barclays' mem in opp at 10.) For instance, Barclays alleges that Kemsley is trying to evade his creditors while protecting his substantial assets in the United States beyond the reach of the UK Trustees.[3]

Barclays also emphasizes that the UK Trustees have no practical means of investigating and recovering Kemsley's US assets, which it contends would lead to Kemsley's unjust enrichment. Barclays claims that it has agreed to transfer the US assets it recovers to the UK Trustees, minus its reasonable costs and expenses. Finally, Barclays argues that comity should not be granted because the UK Bankruptcy Court, in denying Kemsley's request for an anti-suit injunction, stated in the UK decision that it will not intervene in this action.

International comity is "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws." (*Hilton v Guyot*, 159 US 113, 164 [1895]; *see also* **\*780** *Morgenthau v Avion Resources Ltd.*, 11 NY3d 383, 389-390 [2008] ["The doctrine of comity refers to the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states" (internal quotation marks and citation omitted)].) The doctrine is applied not as "an imperative obligation of courts but rather is a discretionary rule of practice, convenience, and expediency." (*Royal & Sun Alliance Ins. Co. of Canada v Century Intl. Arms, Inc.*, 466 F3d 88, 92 [2d Cir 2006] [internal quotation marks and citations omitted]; *Morgenthau*, 11 NY3d at 390 ["Whether to apply the doctrine lies in the sound discretion of the court"].)

"American courts have long recognized the particular need to extend comity to foreign bankruptcy proceedings." (*Victrix S.S. Co., S.A. v Salen Dry Cargo A.B.*, 825 F2d 709, 713 [2d Cir 1987]; *see also* *JP Morgan Chase Bank v Altos Hornos de Mexico, S.A. de C.V.*, 412 F3d 418, 424 [2d Cir 2005] [noting that the Second Circuit has "repeatedly held that US courts should ordinarily decline to adjudicate creditor claims that are the subject of a foreign bankruptcy proceeding"].) Recognition of international bankruptcy orders and judgments is particularly needed because "the equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding" and that "deference to a foreign court of proper jurisdiction is appropriate so long as the foreign proceedings are procedurally fair and do not violate public policy." (*Oui Fin. LLC v Dellar*, 2013 WL 5568732, \*4, 2013 US Dist LEXIS 146214, \*14 [SD NY, Oct. 9, 2013, No. 12-CV-7744] [internal quotation marks and citations omitted]; *see also* *Basile v CAI Master Allocation Fund, Ltd.*, 39 Misc 3d 1217[A], 2013 NY Slip Op 50649 [U], \*8 [Sup Ct, Kings

County, Apr. 17, 2013] [applying principles of comity and dismissing plaintiff's claim because the alleged debt owed to plaintiff was rejected in defendants' corporate winding-up proceeding in Bermuda].) "Where a foreign proceeding is in a sister common law jurisdiction with procedures akin to our own, exceptions to the doctrine of comity are narrowly construed." (*Bertisch v Drory,* 4 Misc 3d 1023[A], 2004 NY Slip Op 51005[U], *3 [Sup Ct, NY County, June 21, 2004] [internal quotation marks and citation omitted].) **5 Here, Barclays does not dispute that the UK bankruptcy proceeding was procedurally fair and did not violate public policy. It also does not dispute that it was afforded procedural and substantive due process in participating in the UK bankruptcy proceeding, including, among other things, negotiating *781 with the UK Trustees and attending hearings before the UK Bankruptcy Court.[4] Neither does Barclays address the body of case law in which courts have extended comity to foreign bankruptcy judgments and declined to adjudicate claims involved in those proceedings. (*See e.g. JP Morgan Chase Bank v Altos Hornos de Mexico, S.A. de C.V.,* 412 F3d 418, 424 [2d Cir 2005]; *Victrix S.S. Co., S.A. v Salen Dry Cargo A.B.,* 825 F2d 709, 713 [2d Cir 1987]; *Cunard S.S. Co. Ltd. v Salen Reefer Servs. AB,* 773 F2d 452, 456-460 [2d Cir 1985]; *Ecoban Fin. Ltd. v Grupo Acerero Del Norte, S.A. de C.V.,* 108 F Supp 2d 349, 351-353 [SD NY 2000], *affd* 2 Fed Appx 80 [2d Cir 2001], *cert denied* 534 US 814 [2001]; *Basile v CAI Master Allocation Fund, Ltd.,* 9 Misc 3d 1217[A], 2013 NY Slip Op 50649[U], *8 [Sup Ct, Kings County 2013]; *Bertisch v Drory,* 4 Misc 3d 1023[A], 2004 NY Slip Op 51005[U], *3 [Sup Ct, NY County 2004].)

(2) I note that the "unusual circumstances" which Barclays argues require denial of comity here are largely a result of Barclays' own actions. The "unusual" fact that the UK Trustees now may have no practical means of investigating and recovering Kemsley's US assets for the benefit of all of his UK creditors, including Barclays, is a direct result of Barclays having opposed the chapter 15 proceeding, which was commenced for that very purpose. As Judge Peck noted during the comity hearing,

"Barclays would have been better off . . . if it had simply allowed the Chapter 15 petition of the trustee to be recognized in the first instance, by not standing in the way of recognition.

"All parties will recall that during early stages of the contested proceedings with reference to recognition, I urged counsel for Barclays and counsel for the U.K. bankruptcy trustee to endeavor to work out some kind of compromise in which they would work together in

a cooperative fashion so as to pursue remedies against Mr. Kemsley's U.S.-based assets for the benefit of creditors in the U.K. I don't need to revisit that now, but it seems to me that Barclays may have mousetrapped itself." (Comity hearing tr at 29.)

While Barclays argues that Kemsley is attempting to evade his *782 creditors and will be unjustly enriched if this court grants comity to the UK discharge, to deny comity would result in greater inequity and would invite foreign creditors, such as Barclays, to commence suit in this court to seek recovery outside and in circumvention of their foreign bankruptcy proceedings. Accordingly, comity should be granted as to the UK discharge.

Finally, Barclays contends that "[g]ranting comity to the UK Discharge would not end this breach of contract action [because] th[is] Court would still have to determine whether, under UK law, the discharge operates to release Mr. Kemsley from his debt to Barclays." (Barclays' mem in opp at 13.) More specifically, Barclays contends that, pursuant to section 281 (3) of the Insolvency Act (1986, ch 45 [Eng & Wales]), "[a] [d]ischarge does not release the bankrupt from any bankruptcy debt which he incurred in respect of, or forbearance in respect of which was secured by means of, any fraud or fraudulent breach of trust to which he was a party." (*Id.*) Barclays asserts in its motion papers that Kemsley made a false statement **6 when he obtained the loan in June 2008 and, because the Barclays debt was incurred "by means of a fraud, the UK Discharge does not operate to release the debt" (Barclays' mem in opp at 14).

The UK discharge, by its terms, released Kemsley from all of his debts, including the Barclays debt. Indeed, in the UK decision, the UK Bankruptcy Court stated that "[u]nless extended on the application of the [UK] Trustees or the official receiver, Mr. Kemsley would be discharged from bankruptcy at the end of a period of a year, i.e. on 26 March 2013," and as a result of the discharge, "he will be released from all bankruptcy debts . . . This includes his debt to Barclays"[5] (UK decision ¶ 20; *see also* Fisher aff in support of Barclays' opposition ¶ 4). To the extent Barclays now seeks to essentially opt out of the UK discharge on the basis of fraud, it must address itself to the UK Bankruptcy Court rather than to this court.

Based upon all of the foregoing, it is hereby ordered that plaintiff's motion (sequence No. 002) seeking summary judgment on its breach of contract claim is denied; and it is further ordered that defendant's motion (sequence No. 004)

2990

seeking summary judgment dismissing all claims is granted, and the complaint is dismissed in its entirety.

### FOOTNOTES

1  The chapter 15 proceeding is captioned *In re Paul Zeital Kemsley* (Bankr Ct, SD NY, No. 12-13570 [JMP]).

2  The court notes that Barclays originally brought its motion for summary judgment (sequence No. 002) prior to the commencement of the chapter 15 proceeding. Barclays' motion was held in abeyance pending the commencement and resolution of that proceeding, and the parties have not supplemented their original briefing in connection with that motion. However, the parties' papers submitted in connection with Kemsley's motion (sequence No. 004) address the relevant facts that have taken place since Barclays first moved, and present the parties' updated arguments.

3  Judge Peck stated that "Mr. Kemsley's motives here are plain: he wants to block collection remedies by Barclays against him in the United States." (*In re Kemsley*, 489 BR 346, 352 [SD NY 2013].) Judge Peck further observed that

> "the Debtor, with the aid of surrogates, has been providing indirect financial support to [UK Trustee] Mr. Fry to cover the trustee's legal expenses in pursuing recognition under chapter 15. . . . This financial support may indicate that the trustee's petition for recognition is an aspect of a coordinated trans-Atlantic litigation strategy orchestrated by Mr. Kemsley and his advisers to shield Debtor's assets from enforcement actions by Barclays." (*Id.* at 351-352.)

4  In fact, Barclays concedes that it "does not dispute the chronology and procedural facts set forth in Mr. Kemsley's motion papers" at all. (Barclays' mem in opp at 2.)

5  The UK Bankruptcy Court went on to explain that the UK discharge "[did] not affect Barclays' right to prove . . . its debt in the bankruptcy" (UK decision ¶ 20).

Copr. (C) 2021, Secretary of State, State of New York

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 19

In re Basis Yield Alpha Fund (Master), 381 B.R. 37 (2008)
59 Collier Bankr.Cas.2d 20, 49 Bankr.Ct.Dec. 89

381 B.R. 37
United States Bankruptcy Court,
S.D. New York.

In re BASIS YIELD ALPHA FUND
(MASTER), Debtor in a Foreign Proceeding.

No. 07–12762(REG).
|
Jan. 16, 2008.

**Synopsis**

**Background:** Joint provisional liquidators (JPLs) of foreign debtor filed petition for recognition of insolvency proceeding pending against debtor in the Cayman Islands as "foreign main proceeding." Relying on statutory presumption that country where debtor's registered office was located was also "center of its main interests" (COMI) and on absence of any objections to their recognition petition by party in interest, these JPLs moved for summary judgment.

**[Holding:]** The Bankruptcy Court, Robert E. Gerber, J., held that genuine issue of material fact as to whether foreign debtor that had registered under Cayman Islands Company Law only as an "exempted company," under provision that applied to companies whose business was to be conducted "mainly outside the Islands," nonetheless had the Cayman Islands as "center of its main interests" (COMI) precluded entry of summary judgment.

Motion denied.

West Headnotes (15)

**[1]** **Bankruptcy**  Cases Ancillary to Foreign Proceedings

Recognition of foreign insolvency proceeding as either a "foreign main proceeding" or "foreign nonmain proceeding" is not a rubber stamp exercise, even in absence of objection to recognition petition by any party in interest; court is not bound by parties' failures to object,

but may, if it is so advised, consider any and all relevant facts. 11 U.S.C.A. § 1517.

8 Cases that cite this headnote

**[2]** **Bankruptcy**  Cases Ancillary to Foreign Proceedings

Among the factors that bankruptcy court may consider in deciding whether foreign country in which insolvency proceeding is pending is also country where debtor has center of its main interests (COMI), as required for recognition of foreign proceeding as "foreign main proceeding," are the following: location of debtor's headquarters; location of those who actually manage debtor; location of debtor's primary assets; location of majority of debtor's creditors, or of majority of creditors who would be affected by case; and/or jurisdiction whose law would apply to most disputes. 11 U.S.C.A. § 1517(b)(1).

4 Cases that cite this headnote

**[3]** **Bankruptcy**  Cases Ancillary to Foreign Proceedings

Concept of the place where foreign debtor has "center of its main interests" (COMI), as used in chapter of Bankruptcy Code implementing the Model Law on Cross-Border Insolvency formulated by the United Nations Commission on International Trade Law (UNCITRAL), generally equates with concept of "principal place of business" under United States law. 11 U.S.C.A. § 1501 et seq.

8 Cases that cite this headnote

**[4]** **Bankruptcy**  Cases Ancillary to Foreign Proceedings

Statutory presumption that, "[i]n the absence of evidence to the contrary," foreign debtor's registered office is also "center of its main interests" (COMI) did not arise, even though debtor's registered office was located in the Cayman Islands, and though no party in interest objected to petition filed by joint provisional liquidators (JPLs) for recognition of Cayman

Islands proceeding as foreign main proceeding, where it was undisputed that debtor had registered as exempted company under provision of Cayman Islands law applicable only to companies whose business will be conducted "mainly outside the Islands"; fact that debtor had registered as exempted company under Cayman Islands law was at least some "evidence to the contrary." 11 U.S.C.A. § 1516(c).

4 Cases that cite this headnote

**[5]** **Bankruptcy** 👈 Cases Ancillary to Foreign Proceedings

On petition for recognition as "foreign main proceeding" of insolvency proceeding that is pending against debtor in country where its registered office is located, foreign representative must prove that debtor's center of main interests (COMI) is in same country as its registered office, where there is evidence that debtor's COMI may be elsewhere. 11 U.S.C.A. § 1516(c).

7 Cases that cite this headnote

**[6]** **Bankruptcy** 👈 Cases Ancillary to Foreign Proceedings

On petition for recognition as "foreign main proceeding" of insolvency proceeding that is pending against debtor in country where its registered office is located, court is not bound by parties' failures to object, and need not blindly follow statutory presumption. 11 U.S.C.A. § 1516(c).

1 Case that cites this headnote

**[7]** **Bankruptcy** 👈 Cases Ancillary to Foreign Proceedings

On petition for recognition as "foreign main proceeding" of insolvency proceeding that is pending against debtor in country where its registered office is located, bankruptcy court always has power to make its own determination on whether requirements for recognition have been met, notwithstanding the presence of statutory presumption and the absence of any

actual objection to recognition petition. 11 U.S.C.A. §§ 1516(c), 1517.

2 Cases that cite this headnote

**[8]** **Bankruptcy** 👈 Judgment or Order

**Bankruptcy** 👈 Cases Ancillary to Foreign Proceedings

Burden of proof as to each element of petition for recognition of foreign insolvency proceeding as either a "foreign main proceeding" or "foreign nonmain proceeding" is on foreign representative, and absence of any objections to recognition petition neither obviates foreign representative's evidentiary burden nor prevents bankruptcy court from concluding that genuine issues of material fact exist so as to prevent determination as matter of law.

12 Cases that cite this headnote

**[9]** **Bankruptcy** 👈 Cases Ancillary to Foreign Proceedings

Statutory presumption, under chapter of the Bankruptcy Code governing ancillary and other cross-border cases, that foreign debtor's registered office is also "center of its main interests" (COMI) is included for speed and convenience, and to save stakeholders costs in straightforward cases, but does not tie hands of court to examine the facts more closely in any instances in which court regards the issues to be sufficiently material to warrant further inquiry. 11 U.S.C.A. § 1516(c).

1 Case that cites this headnote

**[10]** **Bankruptcy** 👈 Cases Ancillary to Foreign Proceedings

Statutory presumption, under chapter of the Bankruptcy Code governing ancillary and other cross-border cases, that foreign debtor's registered office is also "center of its main interests" (COMI) may be of less weight in event of serious dispute. 11 U.S.C.A. § 1516(c).

59 Collier Bankr.Cas.2d 20, 49 Bankr.Ct.Dec. 89

**[11]     Bankruptcy** 👈 Evidence; witnesses

Presumption imposes on party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in sense of the risk of nonpersuasion, which remains throughout trial upon the party on whom it was originally cast.

1 Case that cites this headnote

**[12]     Bankruptcy** 👈 Cases Ancillary to Foreign Proceedings

Bankruptcy statute providing that foreign debtor's registered office is presumed to be "center of its main interests" (COMI), in absence of any evidence to the contrary, merely creates a rebuttable presumption and does not shift burden of proof in support of petition for recognition of foreign insolvency proceeding as "foreign main proceeding." 11 U.S.C.A. § 1516(c).

4 Cases that cite this headnote

**[13]     Bankruptcy** 👈 Cases Ancillary to Foreign Proceedings

While Code provisions governing recognition of foreign insolvency proceeding as either a "foreign main proceeding" or "foreign nonmain proceeding" are designed to make recognition as simple and expedient as possible, bankruptcy court may hear proof on any element stated. 11 U.S.C.A. § 1515, 1516.

9 Cases that cite this headnote

**[14]     Bankruptcy** 👈 Cases Ancillary to Foreign Proceedings

While bankruptcy court, on petition for recognition as "foreign main proceeding" of insolvency proceeding that is pending against debtor in country where its registered office is located, is "entitled" to shift burden of production from foreign representative in reliance on statutory presumption, it is not "required" to do so if it is uncomfortable that a

prima facie case has been made. 11 U.S.C.A. § 1516(c).

2 Cases that cite this headnote

**[15]     Bankruptcy** 👈 Judgment or Order

Genuine issue of material fact as to whether foreign debtor that had registered under Cayman Islands Company Law only as an "exempted company," under provision that applied to companies whose business was to be conducted "mainly outside the Islands," nonetheless had the Cayman Islands as "center of its main interests" (COMI) precluded entry of summary judgment for joint provisional liquidators (JPLs) on their petition for recognition of insolvency proceeding pending against debtor in the Cayman Islands as "foreign main proceeding." 11 U.S.C.A. §§ 1515, 1516(c), 1517(b)(1).

6 Cases that cite this headnote

**Attorneys and Law Firms**

 **\*40**  Pillsbury Winthrop Shaw Pittman LLP, by Karen Dine, David Crichlow (argued), Robyn Schneider, Jerry Hall, New York, NY, for Joint Provisional Liquidators.

Cleary Gottlieb Steen & Hamilton LLP, by Mitchell Lowenthal, Lindsee Granfield, New York, NY, for Citigroup Global Markets Limited.

DECISION AND ORDER ON MOTION FOR SUMMARY JUDGMENT SEEKING RECOGNITION AS FOREIGN MAIN PROCEEDING

ROBERT E. GERBER, Bankruptcy Judge.

In this case under chapter 15 of the Bankruptcy Code, petitioners Hugh Dickson, Stephen John Akers, and Paul Andrew Billingham—the Joint Provisional Liquidators ("JPLs") of Basis Yield Alpha Fund (Master) (In Provisional Liquidation) ("Basis Yield") in a proceeding in the Cayman Islands—by their petition seek recognition in this Court of Basis Yield's liquidation in that country as a "foreign main proceeding," under section 1517(b)(1) of the Code, or alternatively as a foreign nonmain proceeding, under

2995

section 1517(b)(2). With no objections to recognition having been filed,[1] the JPLs move for summary judgment granting the relief sought under the first prong of their petition, recognition of the Cayman Islands Proceeding as a foreign main proceeding.

[1]      As noted below, one creditor, Citigroup Global Markets Ltd. ("Citigroup"), objected to the form of the proposed recognition order, but did not object to recognition itself.

 [1]     The motion raises the issues as to whether failures to object by stakeholders divest the Court of the power to make its own determination as to whether the requirements of Bankruptcy Code section 1517 have been satisfied, and whether a presumption embodied in section 1516 of the Code, discussed below, precludes the Court from considering the actual facts—under circumstances where the JPLs' showing has been strikingly silent and where the few facts that are known raise issues as to their position and make further inquiry appropriate. For reasons set forth below, the Court concurs with the observations of Judge Lifland that recognition under section 1517 is not a rubber stamp exercise.[2] Rather, consistent with Judge Lifland's determination and the views of the drafters of chapter 15 and the UNCITRAL Model Law on which chapter 15 was based, the Court rules that a court engaging in a recognition determination under section 1517 is not bound by parties' failures to object; may, if it is so advised, consider any and all relevant facts (including facts not yet presented); and that the circumstances here make further factual inquiry necessary and appropriate.

[2]      *In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.,* 374 B.R. 122, 130 (Bankr.S.D.N.Y.2007) ("*Bear Stearns*"). *See also id.* at 126 ("However, recognition under section 1517 is not to be rubber stamped by the courts. This Court must make an independent determination as to whether the foreign proceeding meets the definitional requirements of sections 1502 and 1517 of the Bankruptcy Code.").

Accordingly, summary judgment is denied.

 **\*41**  *Facts*

Basis Yield was incorporated in the Cayman Islands on September 14, 2005 as an exempted limited liability company pursuant to section 193 of the Companies Law (2004 Revision) of the Cayman Islands (the "Cayman Companies Law"),[3] and maintains its "registered office" in that country.[4] Prior to the commencement of the Cayman Islands Proceeding, Basis Yield invested in a variety of structured credit securities, including asset-backed securities, mortgage-backed securities, collateralized debt obligations, and collateralized loan obligations.

[3]      Akers Decl. ¶ 2.

[4]      *Id.* ¶ 1.

Following the well-publicized volatility in the global credit markets, and particularly the marked rise in sub-prime lending defaults here in the United States, Basis Yield suffered a significant devaluation of the assets in its portfolio. This devaluation precipitated margin calls from Basis Yield's trade counterparties, which Basis Yield was unable to satisfy. As a result, Basis Yield was issued several default notices and ultimately its trade counterparties exercised their rights under their respective agreements to seize or sell those assets of Basis Yield that had been subject to repurchase agreements or in which they held security interests.

On August 27, 2007, the shareholders of Basis Yield authorized the filing of a petition to liquidate the fund under the provisions of the Cayman Companies Law. The shareholders further resolved to apply for the appointment of the petitioners to serve as JPLs for Basis Yield, subject to the supervision of the Grand Court of the Cayman Islands. On August 28, 2007, that court entered an order appointing the JPLs as Basis Yield's joint provisional liquidators.[4a]

[4a]      The Court has been advised that after the filing of the papers on this motion, the JPLs became "Joint Official Liquidators," by order of the Grand Court of the Cayman Islands. That does not affect the statutory or caselaw analysis set forth below.

As set forth in the petition,[5] Basis Yield is registered in the Cayman Islands, and maintains its registered office there. Basis Yield is the master fund in a master-feeder structure. Its only "investors" are two feeder funds, Basis Yield Alpha Fund (US) ("BYAF (US)") and Basis Yield Alpha Fund ("BYAF"), both domiciled in the Cayman Islands.[6] Fortis Prime Fund Solutions (Cayman) Ltd., a Cayman Islands company, serves as the administrator to both Basis Yield and each of its feeder funds.[7] Pac–Rim Investments, Ltd., also a Cayman Islands company, is Basis Yield's investment manager.[8] Basis Yield's pre- **\*42** filing attorneys and auditor, Walkers and Ernst &

Young, respectively, are similarly Cayman Islands entities. The financial books and records of the fund, including the investor register, are currently located in the Cayman Islands.

5    In accordance with the Court's Case Management Order # 1, dated Sept. 5, 2007, uncontroverted factual allegations in the petition have been taken as true. The petitioners also submitted an affidavit supporting allegations made in the petition, providing an additional basis for taking those allegations as true. But neither addresses factual matters that this Court requested the parties to address in an order it entered early in this case, and of course neither is conclusive with respect to matters of law.

6    Supplement to Verified Petition ¶ 3. "Investors" is not defined or explained, though another document suggests it means shareholders. *See* Verified Petition ¶ 5. The JPLs have failed to provide any meaningful information concerning Basis Yield's "beneficial investors," the term they use to refer to the investors in the feeder funds and the ultimate equity stakeholders of Basis Yield.

7    What Fortis Prime Fund Solutions does as "administrator" is not described, however, nor do the JPLs say where its employees do whatever they do.

8    What Pac–Rim Investments does as "investment manager" is not described, however, nor do the JPLs say where its employees do whatever they do.

However, the petition was strikingly silent as to the nature or extent of any business activity Basis Yield conducts (or in the relevant times conducted) in the Cayman Islands. Likewise, it was silent, *inter alia,* as to whether Basis Yield staffed any employees or managers in the Cayman Islands; whether any of its assets were in the Cayman Islands; and the location from which Basis Yield's funds were in fact managed. The failure to address these matters was commented upon in a submission by creditor Citigroup,[9] and in remarks at a hearing by Citigroup's counsel,[10] but in any event was apparent to any observer—including the Court, which did not need a stakeholder's written submission to note the deficiency.[11]

9    *See* Citigroup Response to Debtors' Request for Entry of Preliminary Injunction, dated Sept. 5, 2007 (ECF # 10) at 2. Citigroup continued that without such information, neither creditors nor the Court could make any determination as to whether Basis has its "Center Of Main Interests" ("COMI") in the Cayman Islands (as necessary for recognition as a foreign main proceeding), or whether Basis maintains an establishment there

(as necessary for recognition as a foreign nonmain proceeding). *See id.* at 3.

10    *See* Tr. of Hrg. of Sept. 6, 2007, at 13–15.

11    In supplements to their petition, the JPLs added allegations, which this Court likewise takes as true, that since filing their petition, the JPLs sought and obtained recognition from the High Court of Justice as Basis Yield's Joint Provisional Liquidators in England, where a "substantial amount" of Basis Yield's repurchase agreement counterparties are located, though they did not say that the English Court had recognized the Cayman Islands Proceeding as a foreign main proceeding, and, indeed, clarified at oral argument that the English Court proceeding "is not an UNCITRAL type proceeding," and "did not determine COMI." *See* Tr. of Hrg. of Jan. 15, 2008 at 49. They also added allegations that they had sought and obtained an order in Australia which, while apparently not granting recognition, had granted an application for orders compelling certain parties to turn over, among other things, documents and funds in their possession. By affidavit, they stated that third parties, including creditors, trading counterparties, and/or investors of Basis Yield, had appeared in the proceedings pending in the Cayman Islands and Australia, but that no foreign court or party appearing before a foreign court has challenged the basis for the liquidation proceeding in the Cayman Islands.

Following the hearing on the JPLs' request for a preliminary injunction blocking the continuation of litigation and seizure of assets,[12] at which scheduling for the future hearing on recognition was also discussed, the Court issued an order with respect to the factual matters raised by the petition, and the matters that had not been addressed in it.[13] The Factual Matters Order provided, *inter alia,* that the Recognition Hearing would be an evidentiary hearing. It further provided that without being foreclosed from introducing any other evidence that the JPLs might consider relevant or helpful to the Court in making the recognition determination, the JPLs were to use best efforts to introduce evidence sufficient for the Court to make **\*43** factual findings with respect to a fair number of specified matters—some or all of which would at least arguably be relevant to a determination as to whether the Cayman Islands were Basis Yield's COMI, or whether Basis Yield maintained an establishment there.

12    Relief of this character was uncontroversial, and the Court granted the requested preliminary injunction (which carved out restrictions on rights parties might assert with respect to settlement payments, under repo

agreements, and with respect to similar transactions), without prejudice to parties' litigation rights as to other issues in this case.

[13]    *See* Order re Upcoming Hearing on Motion for Recognition, dated Sept. 12, 2007 (ECF # 16) (the "Factual Matters Order"). A copy follows this Decision as Appendix A.

Thereafter, however, the JPLs sought and obtained permission from the Court to file a motion for summary judgment in advance of the recognition hearing. They elected to rely on the limited factual showing they had made, without introducing evidence of the character addressed in the Factual Matters Order. They now argue, in substance, that because Basis Yield's registered office is in the Cayman Islands, the Cayman Islands is presumed to be the COMI, under section 1516 of the Code, discussed below—and that with no objections having been filed, there is no evidence to the contrary. Thus, they argue, this Court *must* recognize the Cayman Islands Proceeding as a foreign main proceeding, as a matter of law.

*Discussion*

I.

*Summary Judgment Standard*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[14] The moving party bears the initial burden of showing that the undisputed facts entitle it to judgment as a matter of law.[15]

[14]    Fed.R.Civ.P. 56(c), made applicable here by Fed. R. Bankr.P. 9014 and Case Management Order # 1.

[15]    *See Rodriguez v. City of New York,* 72 F.3d 1051, 1060–61 (2d Cir.1995); *Ferrostaal, Inc. v. Union Pacific R.R. Co.,* 109 F.Supp.2d 146, 148 (S.D.N.Y.2000) ("The initial burden rests on the moving party to demonstrate the absence of a genuine issue of material fact....").

In determining a summary judgment motion, it is well settled that the court should not weigh the evidence or determine the truth of any matter, and must resolve all ambiguities and draw all reasonable inferences against the moving party.[16] A fact is material if it "might affect the outcome of the suit under the governing law."[17] An issue of fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[18]

[16]    *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (holding that summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party"); *Virgin Atlantic Airways Ltd. v. British Airways PLC,* 257 F.3d 256, 262 (2d Cir.2001); *Lovejoy–Wilson v. NOCO Motor Fuel, Inc.,* 263 F.3d 208, 212 (2d Cir.2001) ("We ... constru[e] the evidence in the light most favorable to the non-moving party.").

[17]    *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

[18]    *Id.*

II.

*Chapter 15 of the Code*

Chapter 15 of the Bankruptcy Code was enacted in 2005 to implement the Model Law on Cross–Border Insolvency (the "Model Law") formulated by the United Nations Commission on International Trade Law ("UNCITRAL") in a process in which the United States was an active participant. The language of chapter 15 tracks the Model Law, with some modifications that are designed to conform the Model Law with existing United States **\*44** law.[19] Chapter 15 is fundamentally procedural in nature and does not constitute a change in the basic approach of United States law, which has long been one of honoring principles of comity.[20] Those principles appear, with other purposes of chapter 15, in the first section of that chapter, section 1501. As noted by Judge Drain of this Court:

[19]    *In re Iida,* 377 B.R. 243, 256 (9th Cir. BAP 2007). *See also In re Tri–Cont'l Exch. Ltd.,* 349 B.R. 627, 631–32 (Bankr.E.D.Cal.2006) ("*Tri–Continental Exchange*"); H.R.Rep. No. 109–31, at 105–07 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 88, 167; Jay Lawrence Westbrook, *Chapter 15 at Last,* 79 Am. Bankr.L.J. 713, 720 (2005) ("Westbrook I") (all cited in *Iida).*

In re Basis Yield Alpha Fund (Master), 381 B.R. 37 (2008)
59 Collier Bankr.Cas.2d 20, 49 Bankr.Ct.Dec. 89

[20] *Iida,* 377 B.R. at 256; *Tri–Continental Exchange,* 349 B.R. at 635.

Unique to the Bankruptcy Code, [chapter 15] contains a statement of purpose: "[t]he purpose of this chapter is to incorporate the Model Law on Cross–Border Insolvency ... so as to provide effective mechanisms for dealing with cases of cross-border insolvency," with the express objectives of cooperation between United States courts, trustees, examiners, debtors and debtors in possession and the courts and other competent authorities of foreign countries; greater legal certainty for trade and investment; fair and efficient administration of cross-border insolvencies that protects the interests of all creditors and other interested entities, including the debtor; the protection and maximization of the debtor's assets; and the facilitation of the rescue of financially troubled businesses.[21]

[21] *In re SPhinX, Ltd.,* 351 B.R. 103, 112 (Bankr.S.D.N.Y.2006) (Drain, J.) ("*SPhinX–Bankruptcy*"), aff'd 371 B.R. 10 (S.D.N.Y.2007) (Sweet, J.) ("*SPhinX–District*").

*III.*

*Recognition Under Chapter 15*

Section 1509 of the Code[22] erects a structure in which the foreign representative passes through the bankruptcy court for a recognition decision, the specified consequences of which are that the foreign representative gains the capacity to sue and be sued in United States courts and the authority to apply directly to a court in the United States for appropriate relief, and that all courts in the United States must grant comity or cooperation to the foreign representative.[23]

[22] Section 1509 provides, in relevant part:
(a) A foreign representative may commence a case under section 1504 by filing directly with the court a petition for recognition of a foreign proceeding under section 1515.
(b) If the court grants recognition under section 1517, and subject to any limitations that the court may impose consistent with the policy of this chapter—
(1) the foreign representative has the capacity to sue and be sued in a court in the United States;

(2) the foreign representative may apply directly to a court in the United States for appropriate relief in that court; and
(3) a court in the United States shall grant comity or cooperation to the foreign representative.
...
(d) If the court denies recognition under this chapter, the court may issue any appropriate order necessary to prevent the foreign representative from obtaining comity or cooperation from courts in the United States.
...
(f) Notwithstanding any other provision of this section, the failure of a foreign representative to commence a case or to obtain recognition under this chapter does not affect any right the foreign representative may have to sue in a court in the United States to collect or recover a claim which is the property of the debtor.

[23] *See Iida,* 377 B.R. at 257; *In re Loy,* 380 B.R. 154, 161–62 (Bankr.E.D.Va.2007) (following *Iida*).

**\*45** Congress provided that control of these questions would be concentrated in the bankruptcy court;[24] after a grant of recognition by the bankruptcy court (and subject to any limitations that the bankruptcy court may impose consistent with chapter 15 policy), access, comity and cooperation in other United States courts is mandatory.[25] Conversely, if the bankruptcy court denies recognition, it may issue any appropriate order necessary to prevent the foreign representative from obtaining comity or cooperation from courts in the United States.[26] Thus a decision as to recognition is a serious matter.

[24] *Iida,* 377 B.R. at 257.

[25] *See* section 1509(b)(3) (if the bankruptcy court grants recognition under section 1517, and subject to any limitations that the court may impose consistent with chapter 15, "a court in the United States shall grant comity or cooperation to the foreign representative").
In addition, one of the sections of the Code that addresses the effects of a recognition determination, section 1521, provides that after recognition, the foreign representative may petition the bankruptcy court for a host of relief available to a trustee under the United States Bankruptcy Code. *See Loy,* 380 B.R. at 161–62.

[26] *See* section 1509(d).

Section 1502 of the Code sets forth definitions for use under chapter 15. One of them, section 1502(7), defining "recognition," provides that

"recognition" means the entry of an order granting recognition of a foreign main proceeding or foreign nonmain proceeding under this chapter....

Section 1517 of the Code sets forth the requirements for an order granting recognition, and sets forth a statutory directive that (subject to an exception inapplicable here) when those requirements have been satisfied, a recognition order *shall* be entered. Section 1517 provides, in relevant part:

(a) Subject to section 1506,[27] after notice and a hearing, an order recognizing a foreign proceeding shall be entered if —

[27] Section 1506 of the Bankruptcy Code provides that "[n]othing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States." This provides a safety valve which permits denying recognition in any such instances. But as Judge Drain noted in *SPhinX–Bankruptcy, see* 351 B.R. at 115 n. 15, according to the legislative history, this provision "has been narrowly interpreted on a consistent basis in courts around the world. The word 'manifestly' in international usage restricts the public policy exception to the most fundamental policies of the United States." *See also In re RSM Richter v. Aguilar (In re Ephedra Prods. Liab. Litigation),* 349 B.R. 333 (S.D.N.Y.2006) (Rakoff, J.) ("*Ephedra Products Liability Litigation*") (recognizing that principle, and declining to find a section 1506 exception with respect to proceedings in Canada for that reason). There has been no suggestion, or indication, that a section 1506 exception should be found to be applicable here. The Court emphasizes that the issues before the Court on this motion have nothing whatever to do with the fairness of Cayman Islands law, or the fairness of the Cayman Islands courts.

(1) such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502;

(2) the foreign representative applying for recognition is a person or body; and

(3) the petition meets the requirements of section 1515.

(b) Such foreign proceeding shall be recognized—

**\*46** (1) as a foreign main proceeding if it is pending in the country where the debtor has the center of its main interests; or

(2) as a foreign nonmain proceeding if the debtor has an establishment within the meaning of section 1502 in the foreign country where the proceeding is pending.

Thus, in contrast to the jurisprudence that developed under section 304 that emphasized discretion and flexibility (and that permitted U.S. judicial assistance for a wide array of judicial insolvency proceedings abroad), the new recognition regime under chapter 15 is procedurally quite rigid.[28] To prevail on a petition for recognition, the JPLs must satisfy each of the three requirements of section 1517(a) of the Code.

[28] *See* Jay Lawrence Westbrook, *Locating the Eye of the Financial Storm,* 32 Brooklyn J. Int'l L. 1019, 1024 (2007) ("Westbrook II") ("The Model Law grants great discretion as to specific relief, but imposes a fairly rigid procedural structure for recognition of foreign proceedings."); Daniel Glosband, *SPhinX Chapter 15 Opinion Misses the Mark,* 25 Am. Bankr.Inst. J. 44, 45 (December/January 2007) ("Glosband") ("[F]oreign proceedings are eligible for recognition only if they meet the definitional requirements of either a foreign main proceeding or a nonmain proceeding...."); *Bear Stearns,* 374 B.R. at 126 (quoting Westbrook II and Glosband).

*IV.*

*Application to the Facts Here*

Here there is no question that the JPLs have satisfied two of the three requirements of section 1517(a). The JPLs are "persons" within the meaning of section 101(41)[29] and are "foreign representatives" within the meaning of section 101(24),[30] thus complying with the requirements of section 1517(a)(2). Similarly, the JPLs have fulfilled the application prerequisites set forth in section 1515,[31] thereby comporting with the requirements of 1517(a)(3).

[29] Section 101(41) provides, in relevant part, "[t]he term 'person' includes individual ..." 11 U.S.C. § 101.

[30] Section 101(24) provides, in relevant part, "[t]he term 'foreign representative' means a person or body ... authorized in a foreign proceeding to administer the

reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." *Id.* at § 101. Paragraph 1(e) of the Joint Provisional Liquidator Order issued in the Grand Court of the Cayman Islands on August 28, 2007 clearly designates the petitioners as representatives of the Cayman Proceeding for the purposes of obtaining relief under Chapter 15.

31    Section 1515(b) requires that "[a] petition for recognition be accompanied by—(1) a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative; (2) a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or (3) in the absence of evidence referred to in paragraphs (1) and (2), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative." *Id.* at § 1515(b).

The motion then turns on whether the JPLs have complied with the requirements of section 1517(a)(1)—*i.e.,* whether the JPLs have shown that "such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502." And because the JPLs have sought summary judgment granting recognition as a *main* proceeding, the Court has the related questions as to whether, on the evidence now before the Court, they have shown the propriety of such as a matter of law, and without regard to any other facts—and whether the Court has the right to consider all of the facts when the JPLs elected not to put **\*47** them forth, and instead elected to rely on a statutory presumption embodied in section 1516 of the Code, discussed below.[32]

32    In a conference call with the Court, the JPLs sought and obtained permission to file for summary judgment, and to rely on the presumption in lieu of producing the evidence that had been required under the Factual Matters Order. That excuses them from their earlier obligation to comply with the Factual Matters Order. But it does not excuse them from the *consequences* of having failed to provide additional evidence. Since, as the Court now holds, the JPLs here cannot rely on the presumption as a substitute for real evidence, the JPLs will have to comply with the Factual Matters Order when they continue to seek recognition.

*A. Requirements of Sections 1517 and 1502 for a "Main Proceeding"*

A "foreign main proceeding" is defined, in chapter 15's Definitions section, section 1502(4), as a "foreign proceeding pending in the country where the debtor has the center of its main interests" (referred to in fn. 9 above, and elsewhere, as the "COMI").[33] The Bankruptcy Code does not define COMI, and does not prescribe the type of evidence courts should consider in a COMI analysis.

33    By contrast, a "foreign nonmain proceeding" is defined as any other proceeding "pending in a country where the debtor has an establishment." *Id.* at § 1502(5). And "establishment" is defined as "any place of operations where the debtor carries out a nontransitory economic activity." *Id.* at § 1502(2). Though the JPLs seeks recognition of the Cayman Islands Proceeding as a nonmain proceeding as an alternative prayer for relief in their petition, they are not seeking recognition of it as a nonmain proceeding under this motion for summary judgment.

**[2]**    However, prior courts have looked to an array of factors that could be probative in this regard, including: "the location of the debtor's headquarters; the location of those who actually manage the debtor (which conceivably could be the headquarters of a holding company); the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply in most disputes."[34] While certainly not exhaustive or all necessarily applicable in this or any other case, these objective factors are indicative of the facts a court might find relevant in a COMI determination.[35]

34    *SphinX–Bankruptcy,* 351 B.R. at 117. *See also Bear Stearns,* 374 B.R. at 128.

35    The Court asked for evidence as to these and other matters, see page 42, *supra,* while making it clear that the JPLs would not be limited to evidence of the type the Court requested.

**[3]**    As importantly or more so, as Judge Lifland, one of the authors of the Model Law and chapter 15,[36] observed:

36    *See Bear Stearns,* 374 B.R. at 127 n. 3.

[T]he use of the concept "where the debtor has the centre of its main interests" as the determinant that a foreign proceeding is a "main" proceeding was modeled on the use of that concept in the European Union Convention

on Insolvency Proceedings ("EU Convention") that was already in the process of being adopted when UNCITRAL drafted the Model Law.[37]

[37]      *Id.* at 129.

In the regulation adopting the EU Convention, the COMI concept is elaborated upon as "the place where the debtor conducts the administration of his interests on a regular basis and is therefore ascertainable by third parties."[38]

[38]      *Id.* (quoting Council Reg. (EC) No. 1346/2000, ¶ 13). *See also* Case 341/04, *Bondi v. Bank of America, N.A.* (*In re Eurofood IFSC Ltd.*), 2006 E.C.R. I–3813, p. I8–I9, ¶ 32, 2006 WL 1142304 (E.C.J. May 2, 2006).

 **\*48**  This generally equates with the concept of a "principal place of business" in United States law.[39]

[39]      *See In re Tri–Continental Exchange,* 349 B.R. at 633–34; *Bear Stearns,* 374 B.R. at 129.

In this case, however, and significantly, none of the papers filed by the JPLs to date have addressed, in any meaningful way, any of those factors. The silence is deafening. The JPLs' conspicuous failure to try to establish, or even plead, facts supporting the existence of a main proceeding, even after the Citigroup submission and the Court's own questions in this regard, makes any reasonable observer wonder why. As importantly or more so, the failure of Citigroup ultimately to file an objection does not make the issues Citigroup noted go away—and, as noted, the issues were obvious in any event.

Thus, the Court has questions that need to be answered, unless the JPLs are legally excused from answering them.

### B. Use of *Section 1516*

As a proxy for the submission of evidence, the JPLs rely on section 1516(c) of the Code. That section provides:

> In the absence of evidence to the contrary, the debtor's registered office, or habitual residence in the case of an individual, is presumed to be the center of the debtor's main interests.

The JPLs argue that in the absence of any objections or facts in the record that could put in question the location of Basis Yield's COMI, they are entitled to this presumption. Therefore, their argument continues, if the other recognition requirements have been met, summary judgment recognizing the Cayman Islands Proceeding—and, indeed, as a foreign main proceeding—*must* be granted.

But the Court cannot endorse that approach, and find that there is a section 1517 qualification as a matter of law, for two separate reasons. Here there is evidence to the contrary. And the Court's power to examine the facts underlying a request for recognition under section 1517, and to inquire under Fed.R.Evid. 614, cannot be sidestepped or eliminated by elections to not plead or introduce the relevant facts.

### *1. Evidence to the Contrary*

 **[4]**    First, the Court here sees enough "evidence to the contrary"—organization of the Debtor under a Cayman Islands statute that raises red flags as to whether that jurisdiction could be the Debtor's COMI—to decline to use a section 1516 presumption as a substitute for actual evidence. Among the few facts that have been put forward here is the fact that Basis Yield was incorporated as an "exempted company" under section 193 of the Cayman Companies Law.[40] Concerns on the part of the Court arise by reason of what section 193, and other sections of the Cayman Companies Law relating to "exempted companies," provide.

[40]      *See* Akers Decl. ¶ 2.

Section 193 of the Cayman Companies Law provides:

> An exempted company shall not trade in the Islands with any person, firm or corporation except in furtherance of the business of the exempted company carried on *outside* the Islands:
>
> Provided that nothing in this section shall be construed so as to prevent the exempted company effecting and concluding contracts in the Islands and exercising in the Islands all of its powers  **\*49**  necessary for the carrying on of its business *outside* of the Islands.[41]

[41]      Emphasis added. Although there is also a 2007 Revision to the Cayman Companies Law, it appears that neither section 193 nor sections 184 and 182, discussed below, was amended.

As significantly or more so, section 184 of the Cayman Companies Law provides:

> A proposed exempted company applying for registration as an exempted company shall submit to the Registrar a declaration signed by a subscriber to the effect *that the operation of the proposed exempted company will be conducted mainly outside the Islands.*[42]

42    Emphasis added. To the same effect, though less specific and arguably saying something slightly different, is section 182 of the Cayman Companies Law:

> Any proposed company applying for registration under this Law, *the objects of which are to be carried out mainly outside the Islands,* may apply to be registered as an exempted company.

Without more in the way of facts and explanation, there is at least a question in the Court's mind as to whether this exempted company, organized under section 193, and whose representative at least seemingly was required to sign a declaration of the type required under section 184, would have its COMI in the Cayman Islands. If the "operation of the ... exempted company will be conducted mainly outside the Islands," consistent with the representation required to be made under section 184, is it clear, as a matter of law, in the absence of any additional facts, that the exempted company's principal place of business[43] nevertheless is in the Islands? The Court does not now rule out circumstances under which Basis Yield could engage in activities in the Cayman Islands sufficient to make a COMI showing and still comply with the requirements applicable to exempted companies.[44] But the facts that would support such have not been shown here. While the Court expresses no view on the relevance of section 193 to recognition of a nonmain proceeding (an issue not presented on this motion), it is hardly surprising to this Court that in *Bear Stearns,* on the facts there presented, Judge Lifland considered recognition as a main proceeding of a Cayman Islands insolvency for an "exempted company" organized under section 193 to be inappropriate.[45]

43    Or COMI, to the extent that might be regarded as different.

44    Likewise, the Court is not now holding that compliance with section 193 and the related provisions of the Cayman Companies Law precludes, in all cases, a judicial determination that the exempted company's COMI is in the Cayman Islands.

45    *See Bear Stearns,* 374 B.R. at 130–31 & n. 13. Similarly, while Judge Drain in *SPhinX–Bankruptcy* ultimately based the denial of main proceeding recognition on the petitioners' improper purpose, he manifestly did not rule that a showing of a Cayman Islands COMI had been made in that case. To the contrary (albeit with a more extensive factual record), he observed that "important objective factors point[ed] to the Sphinx Funds' COMI being located outside the Cayman Islands." 351 B.R.

at 119. *See also* Judge Sweet's analysis in *SPhinX–District,* 371 B.R. at 19 ("Based on the facts found, the Bankruptcy Court rightly concluded that objective factors ascertainable to third parties pointed to the SPhinX Funds' COMI not being located within the Cayman Islands, thereby sufficiently rebutting the statutory presumption.").

**[5]**    As Judge Klein observed in *Tri–Continental Exchange:*

> [I]f the foreign proceeding is in the country of the registered office, and if there is evidence that the center of main interests might be elsewhere, then the foreign representative must prove that **\*50** the center of main interests is in the same country as the registered office.[46]

46    349 B.R. at 635.

Thus, unless the Court is bound, by section 1516 of the Code or otherwise, to close its eyes to these issues, the Court needs evidence relevant to the Debtor's COMI, and any main proceeding determination. This is not to say that the JPLs would be unable to make the necessary showing (or the lesser showing required for a nonmain proceeding determination); it is only to say that the Court needs more information.[47]

47    The Court notes that none of *Tri–Continental Exchange, SPhinX–Bankruptcy,* or *Bear Stearns* involved an effort to secure recognition (as a main or nonmain proceeding) on summary judgment, and that each was decided only after extensive factual presentation and analysis.

*2. Court's Power to Examine*

Second, the Court has the power to satisfy itself that the requirements for recognition under section 1517 have been satisfied, and has a right like any other federal court to inquire under Fed.R.Evid. 614. This or any other federal court would have the same power to inquire, if it were so advised, if the JPLs had been even less forthcoming in putting forward relevant facts, and had not stated that Basis Yield is an exempted company under Cayman Islands law. The court's power to ascertain the facts cannot be sidestepped by failures to object. Nor can it be sidestepped by elections not to plead or introduce inconvenient facts.

Textual analysis—where the Court normally starts in any matter of statutory interpretation—is not inconsistent with this conclusion, but is inconclusive. Section 1517 sets forth substantive requirements that must be satisfied. But sections 1517 and 1516 are silent as to whether or not the court's power to ascertain the facts incident to a section 1517 determination

is revoked by parties' failures to object—though section 1517 plainly does *not* say that consent is a substitute for the substantive requirements of that section, or that parties' failures to object deprive the court of the power federal courts customarily exercise when determining whether the requirements of statutes have been satisfied.

Similarly, section 1516(c) would have been clearer (and truer to its stated purpose, see below) if it provided that in the absence of evidence to the contrary, the court "is entitled to presume" that the debtor's registered office is the COMI—rather than providing that the registered office "is presumed" to be the COMI. But neither does section 1516 say that in the absence of objection, the presumption is irrebuttable, or that the court "shall" presume that the registered office is the COMI—which is the normal way of establishing a statutory directive that is binding on a judge. Significantly, each of sections 1517(a), 1517(b), and 1517(c), describing the underlying recognition process, *do* employ the word "shall." And section 1516 does not say, at least expressly, that it trumps the need even to *set forth in a petition* the facts underlying the prima facie case required under section 1517(a).

 **[6]**    But while textual analysis does not resolve the relevant questions, the legislative history, caselaw, and the published views of commentators—several of whom, like Judge Lifland, were drafters of the Model Law and chapter 15—answer those questions clearly and consistently. All make clear that in making a section 1517 determination, the Court is not bound by parties' failures to object, and that the  **\*51** section 1516 presumption need not be blindly followed.

    *(a) Do Failures to Object Bind the Court?*
That failures to object is not conclusive is established by, at the least, legislative history and caselaw. One of the sources that a United States court at least *may* look to, if it is not also *obliged* to treat as persuasive,[48] is the *Guide to Enactment of the UNCITRAL Model Law on Insolvency* (the "*Guide*"),[49] that was promulgated in connection with the approval of the Model Law. As provided in the *Guide,* in its discussion of Article 16 of the Model Law (which sets forth the presumption implemented in the United States in the form of section 1516):

[48]    *See Bear Stearns,* 374 B.R. at 129 (a United States court "may look to" the Guide as persuasive); H.R.Rep. No. 109–31(I), at 106 n. 101, *as reprinted in* 2005

U.S.C.C.A.N. 169 n. 101 (the Guide "should be consulted for guidance as to the meaning and purpose of [Chapter 15's] provisions"); *Ephedra Products Liability Litigation,* 349 B.R. at 336 (quoting the House Report, and noting that the House Judiciary Committee, in enacting Chapter 15, specifically indicated that the *Guide* should be consulted); *Tri–Continental Exchange,* 349 B.R. at 633 (the *Guide* is one of the sources that a United States Court is "obliged" to take as persuasive).

[49]    U.N. Gen. Ass., UNCITRAL 30th Sess., U.N. Doc. A/CN.9/442 (1997).

Article 16 establishes presumptions that allow the court to expedite the evidentiary process; at the same time they do not prevent, in accordance with the applicable procedural law, calling for or assessing other evidence if the conclusion suggested by the presumption is called into question *by the court or* an interested party.[50]

[50]    *Guide* ¶ 122 (emphasis added).

Thus the *Guide* does not require that the presumption be called into question by an interested party. To the contrary, it states, explicitly, that the conclusion suggested by the presumption may likewise be "called into question by the court."

Consistent with that, in *Bear Stearns,* Judge Lifland held that parties' failures to object were not binding upon him in determining that the requirements of section 1517 were satisfied. In connection with the requests for recognition (as main or, alternatively, nonmain, proceedings) in that case, one group of parties filed an ambiguous statement with respect to choice of law issues, and no other party filed a response or objection to the relief requested. Nevertheless, Judge Lifland found that not to be conclusive. After expressly noting the lack of objection, he continued:

However, recognition under section 1517 is not to be rubber stamped by the courts. This Court must make an independent determination as to whether the foreign proceeding meets the definitional requirements of sections 1502 and 1517 of the Bankruptcy Code.[51]

[51]    374 B.R. at 126.

Further on in *Bear Stearns,* Judge Lifland expanded on that:

The Petitioners basically argue *that because no objections have been filed* and the Funds' registered offices are in the Cayman Islands, this Court should recognize the

3004

Foreign Proceedings as main proceedings. In other words, the Petitioners contend that this Court should accept the proposition that the Foreign Proceedings are main proceedings because the Petitioners say so and *because no one else says they aren't. This contention must be rejected.*[52]

52      *Id.* at 129 (footnote omitted; emphasis added).

**\*52**   Though Judge Lifland noted that there was dicta in *SPhinX–Bankruptcy*—relied upon the JPLs here[53]—suggesting that if the parties in interest had not objected to the Cayman Islands proceeding being recognized as main, recognition would have been granted, Judge Lifland disagreed with it: "[t]o the extent that non objection would make the recognition process a rubber stamp exercise, this Court disagrees with the dicta in the *SPhinX* decision."[54]

53      *See* JPLs Br. at 7, 10.

54      374 B.R. at 130. With the benefit of the extensive discussion of this topic that has followed the earliest analysis of it a year and a half ago, this Court concurs with Judge Lifland's analysis, for the reasons stated above and below.

**[7]**   Finally, commentators—including members, along with Judge Lifland, of the Model Act and chapter 15 drafting groups—have (so far as this Court can tell, uniformly) endorsed Judge Lifland's analysis, and/or agreed with the view, expressed by the *Guide* and Judge Lifland, that the court always has the power to make its own determination on qualification under section 1517, notwithstanding the presence of section 1516 and the absence of an actual objection.[55]

55      *See* Glosband, *supra* note 28, at 84; Westbrook II, *supra* note 28, at 1033–34; Kathy Yeatter, *Judicial Vagaries and Their Potential Impact on the Valuation of Distressed Debt,* 26 Am. Bankr.Inst. J. 50, 52, 53 (Nov.2007).

**[8]**   Moreover, the procedural posture in the instant case is relevant to the determination of whether a lack of objections binds the Court. A court may properly deny a motion for summary judgment, even where no opposing evidentiary matters are presented, when the movant bears the burden of proof at trial and fails to establish the absence of genuine issues of fact.[56] As discussed in more detail below, both caselaw and legislative history confirm that the burden of proof as to each element of a petition for recognition is on

the foreign representative.[57] The absence of objections to recognition here neither obviates the JPLs' evidentiary burden nor prevents the Court from concluding on the current record that genuine issues of material fact exist so as to prevent determination as a matter of law.

56      *See, e.g., Resolution Trust Corp. v. Gill,* 960 F.2d 336, 340 (3rd Cir.1992) ("However, where the movant bears the burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the ... court should deny summary judgment even if no opposing evidentiary matter is presented.").

57      *See Tri–Continental Exchange,* 349 B.R. at 635.

*(b) Is the Court Bound by the Section 1516 Presumption?*
**[9]**   Finally, the Court determines that the section 1516 presumption exists for the purposes of speed and convenience, and to save stakeholders costs in straightforward cases, but does not tie the hands of a court to examine the facts more closely in any instances where the court regards the issues to be sufficiently material to warrant further inquiry.

**[10]**   Judge Lifland expressly so held in *Bear Stearns.*[58] And Judges Drain and Sweet noted the speed and convenience purpose in *SPhinX–Bankruptcy* and *SPhinX–District.* As Judge Sweet stated **\*53** in *SPhinX–District,* quoting Judge Drain's *SPhinX–Bankruptcy* observations approvingly:

58      *See* 374 B.R. at 129 (noting the *Eurofood* observation that the presumption may be overcome "particular[ly] in the case of a 'letterbox' company not carrying out any business" in the territory of its registered office, and the provisions of the *Guide,* expressly noting that the presumption does not prevent calling for evidence if the conclusion suggested by the presumption is called into question by the court).

As recognized by the Bankruptcy Court: "The legislative history [ ] indicates that the statutory presumption of § 1516(c) may be of less weight in the event of a serious dispute: '[t]he presumption that the place of the registered office is also the center of the debtor's main interest is included for speed and convenience of proof where there is no serious controversy.' "[59]

59      *SPhinX–District,* 371 B.R. at 18 (quoting *SPhinX–Bankruptcy,* 351 B.R. at 117, which in turn had quoted the House Report, H.R.Rep. No. 109–31, pt. 1, at 112–13

**3005**

(2005), U.S.Code Cong. & Admin.News 2005, pp. 88, 175).

As previously noted, the Guide explains that the Model Act's presumption, embodied in the U.S. Bankruptcy Code's section 1516, does "not prevent, in accordance with applicable procedural law, *calling for* or assessing other evidence if the conclusion suggested by the presumption is called into question *by the court* or an interested party."[60] The court's ability to "call [ ] for" other evidence is expressly noted in the *Guide.* And as noted by the European Court of Justice, the COMI presumption may be overcome "particular[ly] in the case of a 'letterbox' company not carrying out any business in the territory of the Member State in which its registered office is situated."[61]

[60]     Emphasis added.

[61]     *See Eurofood, supra* note 38, at ¶¶ 34, 35; *see also SPhinX–District,* 371 B.R. at 19 (same, citing *Eurofood*).

 **[11]     [12]**     A presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast.[62] Section 1516(c) merely creates a rebuttable presumption and does not shift the burden of proof in supporting a petition for recognition.[63] As Judge Klein noted in *Tri–Continental Exchange,* the word "proof" in subsection (3) was changed to "evidence" to make it clearer using United States terminology that the ultimate burden is on the foreign representative.[64]

[62]     Fed.R.Evid. 301.

[63]     *See Tri–Continental Exchange,* 349 B.R. at 635 ("The registered office, however, does not otherwise have special evidentiary value and does not shift the risk of nonpersuasion, i.e. the burden of proof, away from the foreign representative seeking recognition as a main proceeding.").

[64]     349 B.R. at 635 n. 8.

 **[13]     [14]**     As Judge Klein also noted in *Tri–Continental Exchange,* the House Report for the chapter 15 amendments provided:

Although sections 1515 and 1516 are designed to make recognition as simple and expedient as possible, the court *may hear proof on any element stated.* The ultimate burden

as to each element is on the foreign representative, although the court is *entitled to* shift the burden to the extent indicated in section 1516.[65]

[65]     *Id.* (quoting H.R.Rep. No. 109–31, at 112–13, *as reprinted in* 2005 U.S.C.C.A.N. 88, 175) (emphasis added).

Thus the court is "entitled to" shift the burden to the extent indicated in section 1516, but does not need to, if it is uncomfortable that a prima facie case has been shown.

Finally, the Court's right to call for other evidence is confirmed not just by the *Guide,* but also by the Federal Rules of **\*54**  Evidence. Rule 614 provides, in relevant part:

(a) Calling by court. The court may, on its own motion or at the suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called.

(b) Interrogation by court. The court may interrogate witnesses, whether called by itself or by a party.

Subsection (a) of Rule 614 is particularly relevant. Just as the *Guide* says that the presumption does not prevent "calling for or assessing other evidence if the conclusion suggested by the presumption is called into question by the court," Rule 614(a) gives the court the right, on its own motion, to *call* witnesses. Granting summary judgment here would deny the Court that right. As the Committee Notes with respect to Rule 614(a) provide, "the authority of the judge to call witnesses is well established." The court's right to call witnesses, on its own motion, ensures that "the judge is not imprisoned within the case as made by the parties."[66]

[66]     Fed.R.Evid. 614 Committee Notes for 1972 Proposed Rules.

The showing here can be compared and contrasted to the showings that have been made in all of the other chapter 15 cases that have come up on this Court's watch—in all of which the Court granted the requested recognition, or would in the absence of objection.[67] As a prototypical example of the kind of petition that would be satisfactory in the absence of an objection, the petition for *ING Re* states that the company, a reinsurance company, "is headquartered in London, England"; "its assets are primarily located in England"; "[t]he Company began writing business in the London Market in July 1997"; and "[t]he reinsurance contracts that will be affected by the Scheme of Arrangement were

3006

written predominantly from the Company's headquarters in London."[68] Simple allegations of this type would normally be more than sufficient to give a court comfort that reliance on the section 1516 presumption is appropriate, in the absence of an objection and/or any other evidence to the contrary. Of course, in light of the allegations that have been typical in the other section 1517 petitions that **\*55** this Court has seen, the omissions in this case were particularly striking.

[67]    *See In re Daewoo Corp.,* 06–12242(REG) (Korean insolvency proceeding for the flagship company of the Daewoo Group, one of the largest industrial conglomerates in Korea, recognized as foreign main proceeding); *In re AXA Insurance UK PLC,* 07–07–12110(REG); *Eccleasiastical Insurance Office PLC,* 07–12111(REG); *Global General and Reinsurance Co. Ltd.,* 07–12112(REG); *MMA IARDD Assurance Mutuelles,* 07–12113(REG) (in jointly administered case, English insolvency proceeding for three UK and one non-UK company, all writing reinsurance business in the London market, recognized as main proceeding for the UK companies, and nonmain proceeding for the non-UK company, where alleged, with respect to the UK companies, that "their principal place of business is the UK," and alleged, for the nonmain proceeding recognition for the non-UK company, that it transacted insurance business in England and maintained an establishment there); *In re Europaische Ruckversicheruns–Gesellschaft in Zurich (European Reinsurance Co. of Zurich),* 06–13061(REG) (English insolvency proceeding for Swiss reinsurance company doing business in the London market recognized as nonmain proceeding). In one other chapter 15 case before this Court, *In re ING Re (UK) Ltd.,* 08–10018(REG) ("*ING Re*"), a recently filed case with a petition stating that the debtor is headquartered in London and has written insurance in the London market, the matter of recognition is pending. Parties have not yet been heard on whether there is any dispute as to those allegations, or as to whether there are any facts suggesting that its English insolvency proceeding should not be regarded as a main proceeding.

[68]    *See ING Re* Petition at ¶¶ 5, 6, 10.

Thus, while recognition *may* be granted under a section 1516 presumption (and often that will be appropriate and in the joint interests of parties and the court), the Court cannot agree that it *must* be granted. The JPLs inappropriately transform a labor saving presumption in instances where the basis for recognition is apparent to one that would tie the hands of a court to inquire into the actual facts, in cases where the circumstances require more scrutiny—making recognition turn not on compliance with the requirements of section 1517, but on the happenstance of whether parties might or might not object. Such a result would be exactly *inconsistent* with one of chapter 15's expressly stated purposes, providing predictability to the financial community.[69]

[69]    *See* Bankruptcy Code section 1501 (including, as one of chapter 15's objectives, "greater legal certainty for trade and investment"); Westbrook II, *supra* note 28, at 1019 (noting the importance of predictability in making COMI determinations).

*Conclusion*

This Court shares the attitude of hospitality and willingness to grant comity that underlies the great bulk of section 304 and chapter 15 jurisprudence, and feels no differently with recognition requests under section 1517. And plainly section 1516 provides for a time and labor saving process that is useful. In most cases, the fact that a jurisdiction is a debtor's COMI (or a place where it has an establishment) will be obvious, or will appear from facts set forth in the petition or an accompanying affidavit—especially if members of the bar wishing to invoke section 1516 simply include basic statements, in the petition or an affidavit, of the type that other petitioners have provided to this Court. When facts showing a COMI are already known or have been put forth, and there is no opposition, the Court would hardly suggest that further evidence with respect to recognition would be necessary; it would be in exactly such a circumstance that the section 1516 presumption would be very useful, and would rarely, if ever, be second-guessed. In fact, the Court would be saddened if the pendulum swung too far the other way, depriving parties of the use of the section 1516 presumption when allegations in their petitions or statements in their affidavits foreclose any real controversy.

But the decision necessarily must remain with the court, which may be satisfied with reliance on the presumption or not, consistent with its ultimate responsibility, and power, to determine that the requirements of sections 1502 and 1517 are satisfied.

 **[15]**    In this case, genuine issues of material fact exist as to the location of Basis Yield's COMI. While the Court does not in any way rule out the possibility that facts could be adduced at an evidentiary hearing sufficient to make a case

for entitlement to recognition, the JPLs are not now entitled to recognition as a matter of law.

Summary judgment is denied. Consistent with the requirements of section 1517(c), the Court will hold the evidentiary hearing on the matter of recognition at the earliest practical time. The JPLs' evidentiary presentations shall be made in accordance with Case Management Order # 1, subject to an adjustment of time with respect to the submission of direct testimony affidavits; they will be submitted early enough to permit the Court to advise the JPLs of any desire to call witnesses whose testimony has not already been set forth by affidavit. Duties under the Factual Matters Order are now reinstated.

SO ORDERED.

**\*56**  APPENDIX A

ORDER RE UPCOMING HEARING ON MOTION FOR RECOGNITION

Confirming and amplifying upon matters addressed at the conference in this case on September 6, 2007, and for the purpose of developing a factual record that may be necessary or helpful in determining the issues on the JPLs' motion for recognition,

It is ORDERED:

1. The hearing on the JPLs' motion for recognition will be an evidentiary hearing. The procedures set forth in Case Management Order # 1, dated Sept. 5, 2007 (ECF # 7) (as applicable generally and as to Contested Matters) will apply, except as any may hereafter be modified by any further order of the Court.

2. Without being foreclosed from introducing any other evidence that they might consider relevant or helpful to the Court in making the recognition determination (and without prejudice to the rights of the JPLs or any other parties to submit any evidence relevant to the recognition determination), the JPLs shall use best efforts to introduce evidence sufficient for the Court to make factual findings with respect to at least the following matters:

(a) in what jurisdiction or jurisdictions Basis Yield Alpha Fund (Master) ( "Basis Yield") is organized and/ or registered, and as what kind of business entity (*e.g.,*

corporation, limited liability company, general or limited partnership, business trust, etc.);

(b) to what extent Basis Yield is registered or qualified to do business in any jurisdictions other than the jurisdiction in which it was organized (*e.g.,* as a foreign corporation);

(c) where Basis Yield maintains offices, and what functions are performed at each such office;

(d) the number, locations, and functions of any personnel employed by Basis Yield;

(e) the number, locations, and functions of any personnel who are not employed by Basis Yield but who nevertheless perform services on its behalf;

(f) the extent to which other business entities (such as an investment advisor) exercise managerial control over Basis Yield operations, and if so, where any such entities are headquartered and conduct their business;

(g) the place or places at which investment or portfolio management for Basis Yield is conducted, and the number, locations and functions of persons who are responsible for Basis Yield investment or portfolio management;

(h) the place or places at which any Basis Yield administrative or back-office operations are conducted, and the number, locations and functions of persons who are responsible for any such operations;

(i) the place or places at which assets of the Basis Yield estate are located, and the approximate value of the assets at each locale;

(j) the extent, if any, to which real property is leased or owned by Basis Yield, and, if so, its location;

(k) the extent, if any, to which assets were transferred to or from the Cayman Islands before or after the initiation of the liquidation proceedings in the Grand Court of the Cayman Islands (the "Cayman Islands Proceeding"), and, if applicable, the circumstances surrounding any such transfers;

(*l* ) the identity and location of the members of the Basis Yield governing body before the appointment of the JPLs, and the place or places at which the Basis Yield governing body met personally  **\*57**  within the last several years-or, to the extent meetings were in whole or in part conducted

3008

telephonically, the place or places from which the members of the governing body called in;

(m) the number and location of Basis Yield creditors;

(n) the number and location of equity investors in Basis Yield (or, if more applicable, in the Basis Yield feeder funds) and the relative percentages of the applicable equity that investors in each locale hold;

(*o*) the extent to which Basis Yield had or now has contractual agreements with entities that are (i) organized under the laws of the Cayman Islands; (ii) have offices in the Cayman Islands; or (iii) employ residents of the Cayman Islands;

(p) the locale or locales at which Basis Yield maintains its financial records and, if applicable, equity investor registries, and, if different, where they were maintained before the commencement of the Cayman Islands Proceeding;

(q) the extent, if any, to which Basis Yield is required to keep books or records in the Cayman Islands; the extent to which Basis Yield does so; and the extent to which books or records not required to be kept in the Cayman Islands are nevertheless maintained there;

(r) the locale or locales of obligors with respect to any Basis Yield receivables;

(s) The extent to which Basis Yield is a party to any contractual agreements that set forth the law to be applied in the event of any disputes thereunder;

(t) the nature and extent of nontransitory economic activity carried out by Basis Yield in the Cayman Islands; and

(u) the extent, if any, to which Basis Yield is subject to the prohibitions of Companies Law (2004 Revision) of the Cayman Islands Section 193, and, if applicable, the extent to which Basis Yield's activities, or the locale thereof, are affected by the provisions of Section 193.

3. The JPLs shall submit evidence with respect to these matters whether or not any party in interest ultimately objects.

4. There is no significance to the order in which matters to be addressed have been listed. Nothing in this Order is or shall be deemed to be an expression of views on the merits of the underlying motion; on the relevance, if any, of any of the above matters; or the weight to be afforded to any facts (responding to the above or otherwise) in connection with the motion.

**All Citations**

381 B.R. 37, 59 Collier Bankr.Cas.2d 20, 49 Bankr.Ct.Dec. 89

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 20

**IN RE B.C.I. FINANCES PTY LTD.** **669**
Cite as 671 B.R. 669 (Bkrtcy.S.D.N.Y. 2025)

much as the children pay their own living expenses, the trustee maintains that they are not part of the debtors' economic unit and are therefore not included in the household size for purposes of the means test. Brian and Carrie Powell instead urge application of what they call the "census bureau heads on beds" approach. Because five individuals were residing in the household on the date of bankruptcy filing, the debtors contend that their household unit consists of five individuals, whether or not the children contribute to the funding of a plan.

Discussion

**[1, 2]** "Household size" is a phrase not defined in the bankruptcy code, but for good reason. Living arrangements cover a myriad of possibilities as broad as are variations in the human condition. Individuals living in a particular house may or may not be related to one another. They may or may not contribute to household expenses. They may or may not qualify as dependents of the debtors for tax purposes. Their presence may be allowed for a consideration that might include cash payment or the rendering of services. Still others may reside as an expression of benevolence. This Court is therefore not surprised by the absence of any definitional guidance. Rather, we believe that household size is to be determined by a review of the totality of circumstances. When appropriate, we will consider standards of dependency under the Internal Revenue Code, treatment of occupants for census purposes, and every aspect of economic relationships.

**[3]** Question 4 of Part 1 on Official Form 122C-1 required the debtors to list the following source of income: "All amounts from any source which are regularly paid for household expenses of you or your dependents, including child support. Include regular contributions from an unmarried partner, members of your household, your dependents, parents and roommates." In the present instance, the debtors reported no such contributions. This representation is fully consistent with Schedules I and J that were filed with the bankruptcy petition, wherein Mr. and Mrs. Powell advised that the children were paying their own expenses. But the debtors will not be allowed to adopt inconsistent positions. To the extent that the income and expenses of the adult children are treated outside of the household budget, those adult children are excluded from the determination of household size.

**[4, 5]** In a proper instance, the Chapter 13 trustee may question a debtor's choice to disregard the income of someone residing in the same residence as the debtors. In the absence of any such challenge, however, the debtors will be held to the representations of their filed schedules and Official Form 122C-1, all of which were filed under penalty of perjury. Being financially independent, the adult children will here be excluded from the household for purposes of satisfying the means test of 11 U.S.C. § 1325(b)(1). Accordingly, the trustee shall calculate the applicable commitment period based on a household of two individuals.

So ordered.



**IN RE: B.C.I. FINANCES PTY LIMIT-ED (In Liquidation), et al., Debtors in Foreign Proceedings.**

**Case No. 17-11266 (PB) (Jointly administered)**

United States Bankruptcy Court, S.D. New York.

Signed July 8, 2025

**Background:** Foreign representative who had been appointed as special purpose liq-

**670**                       **671 BANKRUPTCY REPORTER**

uidator for Australian company in Australian liquidation proceedings filed Chapter 15 petition, seeking recognition of Australian proceeding as foreign main proceeding, as well as related relief. Three members of family that previously owned and managed company objected, arguing that company was ineligible to be debtor under Bankruptcy Code because its only property in United States was attorney retainer account created before filing Chapter 15 petition.

**Holdings:** The Bankruptcy Court, Philip Bentley, J., held that under the plain, unambiguous language of the Bankruptcy Code, a Chapter 15 debtor's creation of an attorney retainer in the United States to pay the fees of its Chapter 15 counsel satisfies the Code's eligibility requirement that to be a debtor, a person without a residence or place of business in the United States must have "property in the United States."

Motion granted; objection denied.

See also 668 B.R. 51.

**1. Statutes ⚯1110, 1405**

To modify an unambiguous statutory provision, court must find that applying the provision as written produces an absurd result.

**2. Statutes ⚯1156**

Canon against surplusage, like the other statutory construction canons, is a principle that guides the courts' interpretation of ambiguous statutory provisions, not provisions whose meaning is plain.

**3. Bankruptcy ⚯2341**

Chapter 15 debtor's creation of attorney retainer in the United States to pay the fees of its Chapter 15 counsel satisfies the Bankruptcy Code's eligibility requirement that to be a debtor, a person without a residence or place of business in the

United States must have "property in the United States"; absent from provision is any qualification of "property in the United States" requirement, such as one concerning minimum amount of property or time of ownership, there is no conflict between plain, unambiguous meaning of provision and any other specific Code section, nor with purposes of Chapter 15 or of the Code as a whole, and applying provision as written despite its "toothlessness" furthers core objectives of Chapter 15 and does not produce absurd result.   11 U.S.C.A. §§ 109(a), 1501(a).

**4. Statutes ⚯1102, 1153**

Basic interpretative canons require that, in determining whether statutory language is ambiguous, courts are to consider a provision in its statutory context.

**5. Statutes ⚯1405**

It is exceptionally rare occurrence for court to conclude that result of applying statute's unambiguous text as written is so absurd that legislature cannot have meant what it said in that text, and such conclusion is warranted only where it is quite impossible that Congress could have intended result and where alleged absurdity is so clear as to be obvious to most anyone.

**6. Statutes ⚯1110, 1405**

For court to disregard rule that unambiguous statutory provision is to be applied as written unless it produces an absurd result, it is not sufficient that the statute, as written, produces results that a court or litigant finds anomalous or perhaps unwise.

**7. Bankruptcy ⚯2223, 3502.1**
    **Federal Courts ⚯2650**

In addition to satisfying the Bankruptcy Code's eligibility requirements, Chapter 11 cases filed by foreign companies with minimal United States connections must still pass muster under other

**IN RE B.C.I. FINANCES PTY LTD.** **671**
Cite as 671 B.R. 669 (Bkrtcy.S.D.N.Y. 2025)

bankruptcy doctrines, including abstention and dismissal on bad faith grounds. 11 U.S.C.A. §§ 109(a), 305(a)(1).

**8. Bankruptcy ☞2341**

Absent recognition under Chapter 15, plain terms of Bankruptcy Code bar foreign representative from requesting discovery from any district court or state court in United States. 11 U.S.C.A. §§ 1509(b), 1509(c).

**9. Bankruptcy ☞3040.1**

Discovery under statute governing assistance to foreign and international tribunals is discretionary. 28 U.S.C.A. § 1782.

**10. Bankruptcy ☞2341, 3040.1**

Even when permitted, discovery under statute governing assistance to foreign and international tribunals is often narrower in scope than under Bankruptcy Code section governing relief that may be granted upon recognition of a foreign proceeding: the former allows discovery only for use in a proceeding in a foreign or international tribunal, in contrast to the wide-ranging discovery permitted under the Code concerning the debtor's business dealings, assets, and potential causes of action. 11 U.S.C.A. § 1521(a)(4); 28 U.S.C.A. § 1782.

**11. Bankruptcy ☞2341**
 **Federal Courts ☞2650**

Chapter 15 gives bankruptcy courts ample tools to manage cases that do not serve the chapter's purposes, including abstention, dismissal, or denial of relief that would be contrary to the interests of creditors or other affected parties. 11 U.S.C.A. §§ 305(a)(2), 1501(a), 1521(a), 1522(a).

**12. Bankruptcy ☞2222.1, 2341**

Chapter 15 debtor's creation of an attorney retainer in the United States for the purpose of satisfying the Bankruptcy Code's eligibility requirement that to be a debtor under title 11, a person without a residence or place of business in the United States must have "property in the United States," does not amount to an impermissible manipulation of the Code; instead, such actions are taken to comply with the Code's plain terms, and they further, rather than undermine, the statute's purposes. 11 U.S.C.A. §§ 109(a), 1501(a).

**13. Bankruptcy ☞2341**

Need to protect against manipulation of a foreign debtor's "center of main interests" (COMI) is rooted in the very term, which is derived from European legal sources indicating that COMI should correspond to debtor's regular and ascertainable place of business. 11 U.S.C.A. § 1517(b)(1).

————

MAYER BROWN LLP, Attorneys for Foreign Representative, 1221 Avenue of the Americas, New York, NY 10019, By: Glen A. Kopp, Joaquin M. C. DeBaca.

OLSHAN FROME WOLOSKY LLP, Attorneys for Binetter Parties, 1325 Avenue of the Americas, New York, NY 10019, By: Jonathan T. Koevary, Andrew Lustigman.

UNITED STATES DEPARTMENT OF JUSTICE, United States Trustee, Alexander Hamilton Custom House, New York, NY 10004, By: Mark Bruh.

**MODIFIED BENCH RULING GRANTING MOTION OF DEBTOR ACN 078 881 035 PTY LIMITED FOR RECOGNITION OF FOREIGN MAIN PROCEEDING AND RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

Philip Bentley, U.S. Bankruptcy Judge

**672**                    **671 BANKRUPTCY REPORTER**

### Introduction [1]

The issue before the Court is whether to follow the rule, uniformly applied by bankruptcy courts in this District and elsewhere, that a chapter 15 debtor's creation of an attorney retainer in the United States at the outset of its case satisfies the eligibility requirements of Bankruptcy Code § 109(a). Members of the Binetter family, who owned and managed the debtor before the commencement of its Australian liquidation proceedings, ask the Court to reject this settled rule on the ground that it permits such an easy end-run around section 109(a)'s property requirement—that debtors without a residence or place of business in the United States must have "property in the United States"—that it essentially nullifies that requirement. This result, they argue, contravenes basic canons of statutory construction and permits improper manipulation of the statute's requirements. On this ground, they ask the Court to rule that the debtor, whose only U.S. property is an attorney retainer, is ineligible to file under chapter 15.

The Binetters' argument is not without some force. If the mere creation of an attorney retainer suffices to satisfy section 109(a), then virtually any well-counseled company in the world—including one with no U.S. connections whatsoever—will be able meet the section's eligibility requirements, thereby stripping those requirements of any real teeth. It makes little sense, the Binetters contend, for Congress to have created requirements that are so easily satisfied.

**[1]** This may be true, but it does not warrant the relief the Binetters request: judicial modification of section 109(a) to give the provision teeth that Congress

chose not to give it. As all courts that have addressed this issue have held, the text of section 109(a)'s property requirement is unambiguous: It requires only that the debtor have *some* property in the United States, no matter how small and no matter when or why acquired. To modify an unambiguous statutory provision such as this, the Court would need to find that it produces an absurd result. And that is not the case here: Far from producing a result that Congress could not possibly have intended, a literal reading of section 109(a) furthers a number of chapter 15's core purposes, while undermining none of them. Consequently, no basis exists to modify the section's plain terms or to find that steps taken by a debtor to comply with those terms constitute impermissible manipulation. The settled rule that a debtor's creation of an attorney retainer in the United States satisfies section 109(a) is well-founded, and the Court will follow it.

### Factual and Procedural Background

This case, filed by debtor ACN 078 881 035 Pty Limited (formerly Shield Holdings Australia Pty Limited) (the "Debtor"), is the latest chapter in the long-running saga of the Binetter family and its once-thriving international beverage empire. As chronicled in the Court's recent decision, *In re B.C.I. Finances Pty Ltd. (in Liquidation)*, 668 B.R. 51, 53-55 (2025), the Binetters emigrated from Europe to Australia in the 1950s and proceeded to build a number of successful businesses, including an international beverage business by the name of Nudie Juice. For many years, these businesses prospered and grew. The family employed a complex corporate structure to manage the businesses from their headquarters in Australia.

---

**1.** This decision memorializes and expands upon the bench ruling that the Court read into the record at the conclusion of the May 8, 2025 recognition hearing.

**IN RE B.C.I. FINANCES PTY LTD.**                    **673**
Cite as 671 B.R. 669 (Bkrtcy.S.D.N.Y. 2025)

The family's empire eventually crumbled, after evidence surfaced that the Binetters had engaged in a 20-plus-year tax evasion scheme. In or about 2014, the Australian Tax Office levied tax assessments in excess of AU $100 million against four of the Binetters' companies, finding they had entered into purported lending arrangements with Israeli banks and for decades had fraudulently reported nonexistent interest expense on their Australian tax returns. The Australian courts appointed Mr. John Sheahan to serve as the liquidator for these four companies. On their behalf, he brought suit and obtained judgments of more than $100 million against Binetter family members and a number of their other companies. In 2018, six additional Binetter companies went into liquidation in Australia, and Mr. Sheahan was appointed as their liquidator. In 2024, an eleventh Binetter company—the Debtor—commenced liquidation proceedings in Australia. In January 2025, the Australian court overseeing that liquidation appointed Mr. Sheahan as the Debtor's special purpose liquidator, with authority to take discovery in any foreign jurisdiction for the purpose of identifying the Debtor's assets and investigating its potential claims against third parties.[2]

Beginning in 2017, Mr. Sheahan filed successive chapter 15 petitions in this Court on behalf of the various Binetter companies for which he was appointed liquidator (collectively, the "Binetter Debtors"). He filed the first four of these chapter 15 petitions in 2017, after learning that two members of the Binetter family had moved to the United States. In 2021, he filed chapter 15 petitions for six more Binetter Debtors, and in March 2025, he filed a chapter 15 petition for the Debtor. In each of these cases, Mr. Sheahan serves as the debtor's foreign representative. In each case, he stated that his principal reason for filing under chapter 15 was to take discovery in the United States, so as to identify Binetter family assets located here and to investigate potential claims against parties in the U.S. that may have participated in the Binetters' tax evasion, diversion of assets or other misconduct. The chapter 15 cases of all 11 Binetter Debtors have been consolidated for administrative, but not substantive, purposes.

The petition that Mr. Sheahan filed on behalf of the Debtor in March 2025 seeks recognition of the Debtor's Australian liquidation proceeding, as well as related relief. The only parties that objected to the motion were three members of the Binetter family. A hearing on the motion was held on May 8, 2025, at which time the Binetters withdrew all of their objections except their argument that the Debtor is not eligible to be a debtor under Code § 109(a). No live testimony was given at the May 8 hearing. Instead, the parties agreed to proceed on the basis of the paper record, consisting of the Debtor's petition, Mr. Sheahan's declaration, and the various supporting documents.

Other than the disputed issue of eligibility under section 109(a), there is no dispute that Mr. Sheahan, as the Debtor's foreign representative, has satisfied the various requirements of the Bankruptcy Code for

---

**2.** The Binetters opposed Mr. Sheahan's appointment, contending that it would empower him to take burdensome discovery as to potential claims against them that might eventually be found to be barred by the terms of a 2018 settlement. The Australian court rejected this argument, ruling that it was important that Mr. Sheahan be allowed to take discovery without delay, given the prospect that statutes of limitations may expire and that "the investigative trail will continue to cool." *See In re B.C.I. Finances,* 668 B.R. at 57-58 (discussing Jan. 9, 2025 decision of Justice Cheeseman in *Ligon 158 Pty Limited (in liq) v. Shield Holdings Australia Pty Ltd (in liq),* FCA 3 NSD 10023/2022, at ¶¶ 46-49).

**674**          **671 BANKRUPTCY REPORTER**

recognition and related relief, including the requirements set forth in Code §§ 1507, 1517, 1520, and 1521. The Court finds that, for the reasons set forth in Mr. Sheahan's declaration and other motion papers, those requirements are satisfied; among other things, Mr. Sheahan is a proper foreign representative, the Debtor's Australian liquidation proceeding is a foreign main proceeding, and the related relief Mr. Sheahan seeks is warranted. Because those issues are undisputed and straightforward, this decision will address only the section 109(a) issue.

### Discussion

Bankruptcy Code § 109(a) provides: "Notwithstanding any other provision of this section, only a person that resides or has a domicile, a place of business, or property in the United States, or a municipality, may be a debtor under this title." In *Drawbridge Special Opportunities Fund LP v. Barnet* (*In re Barnet*), 737 F.3d 238, 247-51 (2d Cir. 2013) ("*Barnet*"), the Second Circuit held that section 109(a) applies to chapter 15, as well as to other chapters of the Bankruptcy Code. Although some commentators have criticized that decision, *see, e.g.*, D. Glosband & J. Westbrook, *Chapter 15 Recognition in the U.S.: Is a Debtor "Presence" Required?*, 24 Int. Insolv. Rev. 28–56 (2015) ("*Chapter 15 Recognition*") [https://perma.cc/D59D-SPGM], and the court of appeals of one other circuit has declined to follow it, *see Al Zawawi v. Diss (In re Al Zawawi)*, 97 F.4th 1244 (11th Cir. 2024) (continuing to follow contrary rule adopted under Bankruptcy Act), *Barnet* remains the law of this Circuit.

It is undisputed that the Debtor does not have a residence, domicile or place of business in the United States. Its sole basis for claiming to satisfy section 109(a) is that it has property in the U.S.—specifically, the retainer account that it created at a New York City bank at the outset of this chapter 15 case to cover a portion of its lawyers' fees. The Binetters contend that a property interest of this sort is insufficient to satisfy Code § 109(a)'s requirement that the Debtor have property in the U.S.

The Binetters acknowledge that the courts have uniformly rejected the rule they advocate. Indeed, this Court previously granted recognition in each of the Binetter Debtors' ten prior chapter 15 cases, finding each time that the foreign representative's legal retainer in New York was sufficient to satisfy section 109(a). In 2018, Judge Sean Lane, who presided over these cases before they were transferred to me two years ago, considered the Binetters' arguments and rejected them based on a comprehensive review of the case law. *See In re B.C.I. Finances Pty Ltd.*, 583 B.R. 288, 293-96 (Bankr. S.D.N.Y. 2018); *see also In re B.C.I. Finances Pty Ltd.*, Case No. 17–11266, January 18, 2022 (SHL) (ECF No. 89) (reiterating Court's prior ruling on this issue).

As Judge Lane found, the case law on this issue was uniform at the time of his 2018 decision. Each court that had addressed the issue had ruled that a chapter 15 debtor's creation of a retainer in the U.S. to pay the fees of its chapter 15 counsel was sufficient to satisfy section 109(a). *See B.C.I. Finances*, 583 B.R. at 293–94 (citing *In re U.S. Steel Canada Inc.*, 571 B.R. 600, 610 (Bankr. S.D.N.Y. 2017); *In re Poymanov*, 571 B.R. 24, 29 (Bankr. S.D.N.Y. 2017); *In re Inversora Electrica de Buenos Aires S.A.*, 560 B.R. 650, 655 (Bankr. S.D.N.Y. 2016); *In re Berau Capital Res. Pte Ltd.*, 540 B.R. 80, 82 (Bankr. S.D.N.Y. 2015); *In re Suntech Power Holdings Co., Ltd.*, 520 B.R. 399, 411–13 (Bankr. S.D.N.Y. 2014); *In re Octaviar Admin. Pty Ltd.*, 511 B.R. 361, 373–74 (Bankr. S.D.N.Y. 2014)).

The law on this issue continues to be uniform. Each court that has addressed the issue since 2018 has come to the same conclusion. *See, e.g., In re Agro Santino, OOD*, 653 B.R. 79, 88 (Bankr. S.D.N.Y. 2023); *In re Olinda Star Ltd.*, 614 B.R. 28, 39-40 (Bankr. S.D.N.Y. 2020); *In re Serviços de Petróleo Constellation*, 613 B.R. 497, 504-05 (Bankr. S.D.N.Y. 2020); *In re Ascot Fund Ltd.*, 603 B.R. 271, 277 (Bankr. S.D.N.Y. 2019).

The Binetters ask the Court to reject this settled rule on the ground that it makes section 109(a)'s eligibility requirements so easy to circumvent that it essentially nullifies those requirements. The Binetters contend that this result contravenes basic statutory construction principles and allows debtors to improperly manipulate section 109(a)'s eligibility requirements. We address these two arguments in turn.

**1. The Binetters' contention that a literal reading of Code § 109(a) effectively nullifies that section's eligibility requirements in contravention of the canon against surplusage**

The Binetters contend that permitting an attorney retainer to satisfy section 109(a) makes that section's "property in the United States" requirement so easy to satisfy that it is tantamount to no requirement at all. As a result, they claim, this rule violates the "cardinal principle of statutory construction" that courts should "give effect, if possible, to every clause and word of a statute," so as to avoid treating any statutory term as mere "surplusage." *Duncan v. Walker*, 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001) (citations and internal quotations omitted).

[2] The flaw in this argument is that the canon against surplusage, like the other statutory construction canons, is a prin-

ciple that guides the courts' interpretation of *ambiguous* statutory provisions, not provisions whose meaning is plain. The Second Circuit has repeatedly so held. *See, e.g., Auburn Housing Authority v. Martinez*, 277 F.3d 138, 143 (2d Cir. 2002) (Katzmann, J.) ("*If the meaning of the statute is ambiguous*, the court may resort to canons of statutory interpretation to help resolve the ambiguity.") (emphasis added); *id.* at 146 ("a statute must, *if reasonably possible*, be construed in a way that will give force and effect to each of its provisions rather than render some of them meaningless") (citation and internal quotation omitted) (emphasis added); *U.S. v. Dauray*, 215 F.3d 257, 262 (2d Cir. 2000) (Jacobs, J.) ("Because [the parties] each rely on a reasonable meaning of [the provision in question], we resort to the canons of statutory interpretation to help resolve the ambiguity"); *cf. Duncan v. Walker*, 533 U.S. at 174, 121 S.Ct. 2120 (employing surplusage canon to construe ambiguous statutory provision).

[3] The surplusage canon thus has no application here, because as the courts have uniformly held, the text of section 109(a) is unambiguous. As noted, Code § 109(a) provides: "Notwithstanding any other provision of this section, only a person that resides or has a domicile, a place of business, or *property in the United States*, or a municipality, may be a debtor under this title." 11 U.S.C. § 109(a) (emphasis added). Notably absent from this provision is any qualification of the "property in the United States" requirement. For example, there is no requirement that the debtor have any minimum amount of property in the U.S. or that the debtor have owned its U.S. property for any minimum length of time. Nor does the section contain any restriction on the circumstances in which the debtor acquired its U.S. property, such as an exclusion for

property acquired in connection with the chapter 15 case. Section 109(a) merely requires that the debtor have property—some property, no matter how small and no matter when or why acquired—in the U.S. at the time it files its petition. An attorney retainer created shortly before the chapter 15 filing satisfies this requirement.

[4]   The conclusion that section 109(a) is unambiguous does not change when one considers that section in its statutory context, as basic interpretative canons require. *See, e.g., Barnet,* 737 F.3d at 250 ("In determining whether statutory language is ambiguous, we reference the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.") (quotations and citations omitted). The Binetters identify no conflict between section 109(a)'s plain meaning and any other specific Bankruptcy Code provision, nor with any of the purposes of chapter 15 or of the Code as a whole.

[5, 6]   Consequently, the courts are required to apply section 109(a) as written, unless doing so would produce an absurd result. "It is an 'exceptionally rare occurrence' for a court to conclude that a result is so absurd that a legislature cannot have meant what it said in a statute's text." *Mendez Ramirez v. Decker,* 612 F. Supp. 3d 200, 217 (S.D.N.Y. 2020) (internal citations omitted). Such a conclusion is warranted only "where it is quite impossible that Congress could have intended the result and where the alleged absurdity is so clear as to be obvious to most anyone.' " *Catskill Mountains Chapter of Trout Unlimited, Inc. v. Envtl. Prot. Agency,* 846 F.3d 492, 517 (2d Cir. 2017) (quoting *Pub.*

*Citizen v. U.S. Dep't of Justice,* 491 U.S. 440, 470–71, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989) (Kennedy, J., concurring)); *see also Dubroff v. First Nat'l Bank (In re Dubroff),* 119 F.3d 75, 76 (2d Cir. 1997) (statute's plain meaning should be set aside only when necessary to avoid "manifestly" absurd results). It is not sufficient that the statute, as written, "produces results that a court or litigant finds anomalous or perhaps unwise." *Gibbons v. Bristol-Myers Squibb Co.,* 919 F.3d 699, 705 (2d Cir. 2019).

The Binetters' contention that the plain text of section 109(a) produces absurd results does not surmount this high bar. To be sure, it serves little purpose to create a requirement that virtually any company can satisfy by the simple expedient of creating a retainer shortly before filing. If section 109(a) were ambiguous, its toothlessness might warrant the adoption of an alternative interpretation with teeth. But being toothless does not warrant setting aside the provision on absurdity grounds unless it is "quite impossible that Congress could have intended [this] result," *Catskill Mountains,* 846 F.3d at 517—an "exceptionally rare occurrence," *Mendez Ramirez,* 612 F. Supp. 3d at 217.

[7]   Does section 109(a), as written, produce a result that Congress could not possibly have intended? Not at all. To the contrary, it is eminently plausible that Congress meant to set an extremely low bar to chapter 15 eligibility—a bar so low that virtually any well-counseled company in the world can surmount it—while at the same time giving bankruptcy courts broad discretion to decline to exercise jurisdiction, or to tailor the relief they grant, when the circumstances warrant.[3]

---

**3.**  As Judge Lane noted in his 2018 decision, this approach is consistent with how courts have interpreted section 109(a) in chapter 11

cases filed by foreign companies. *See B.C.I. Finances,* 583 B.R. at 294. Courts have long found foreign companies to be eligible to file

**IN RE B.C.I. FINANCES PTY LTD.**                    **677**
Cite as 671 B.R. 669 (Bkrtcy.S.D.N.Y. 2025)

Indeed, an approach of this sort furthers the core objectives of chapter 15. As expressly stated in chapter 15's "Purpose" section, Code § 1501(a), these objectives include cooperation between U.S. and foreign courts, the fair and efficient administration of cross-border insolvencies so as to protect the interests of creditors and other interested parties, and the protection and maximization of the value of the debtor's assets. *See* 11 U.S.C. § 1501(a)(1), (3), & (4).

Permitting chapter 15 filings by companies without either a residence or any known property in the United States, other than a retainer, furthers these purposes in multiple ways. For instance, many such companies have a pressing need for the automatic stay protections that chapter 15 affords. *See* Bankruptcy Code § 1520(a)(1) (automatic stay protects debtor and its property within the U.S. upon recognition of foreign main proceeding); *id.* § 1519(a)(1) (court may impose stay prior to recognition when "urgently needed"). For example:

- Some debtors with no U.S. residence or property have U.S. dollar-denominated debt, often subject to New York forum selection and governing law clauses. Even without any U.S. assets, these debtors may need the automatic stay to prevent lawsuits on that debt from interfering with their foreign restructuring efforts.

- Other debtors with no U.S. residence or property are defendants in U.S. litigation of other sorts. Absent a stay, these suits could result in judgments that plaintiffs could enforce against the debtor's non-U.S. assets.

- Still other debtors with no known U.S. property on the petition date have unknown U.S. assets that may subsequently be identified through discovery taken in the chapter 15 case. Other debtors have transient assets that are likely to enter the U.S. at future times, such as funds moving through international banks or ships traveling in international waters.

In each of these instances, the automatic stay protects the debtor's assets from piecemeal attachment or seizure, thereby preserving the assets for distribution in accordance with the priorities established in the foreign reorganization or liquidation.

[8–10]  In addition, as this case illustrates, the discovery provisions of chapter 15 can be important to debtors with no U.S. residence or assets. *See* Code § 1521(a)(4) (permitting discovery "concerning the debtor's assets, affairs, rights, obligations or liabilities"). Absent recognition under chapter 15, the plain terms of Bankruptcy Code §§ 1509(b) and (c) appear to bar a foreign representative from requesting discovery from any district court or state court in the United States.[4]

---

under chapter 11 so long as they have at least a minimal amount of property, such as an attorney retainer or a bank account, in the United States. *See id.; see also, e.g., In re Yukos Oil Co.,* 321 B.R. 396 (Bankr. S.D. Tex. 2005) (retainer for U.S. bankruptcy counsel); *In re Global Ocean Carriers, Ltd.,* 251 B.R. 31 (Bankr. D. Del. 2000) (same, plus small U.S. bank account). Of course, chapter 11 cases filed by debtors with minimal U.S. connections must still pass muster under other bankruptcy doctrines, including abstention under

Code § 305(a)(1) and dismissal on bad faith grounds.

**4.** Bankruptcy Code §§ 1509(b) and (c) provide that a foreign representative cannot seek relief in a U.S. court without first obtaining recognition of the foreign proceeding. *See* 11 U.S.C. § 1509(b)(2) ("If the court grants recognition under section 1517, . . . the foreign representative may apply directly to a court in the United States for appropriate relief"); *see also id.* § 1509(b)(3), (c). As the House Report for chapter 15 explains, "Subsections (b)(2),

**678**                    **671 BANKRUPTCY REPORTER**

And even if 28 U.S.C. § 1782 could be read to override that bar and authorize discovery by a foreign representative, discovery under section 1782 is subject to significant limitations. In the first place, such discovery is discretionary. *See Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 247, 124 S.Ct. 2466, 159 L.Ed.2d 355 (2004) ("§ 1782(a) authorizes, but does not require, a federal district court to provide judicial assistance."). Moreover, even when permitted, discovery under section 1782 is often narrower in scope than under Bankruptcy Code § 1521(a)(4): Section 1782 allows discovery only "for use in a proceeding in a foreign or international tribunal," in contrast to the wide-ranging discovery permitted under section 1521(a)(4) concerning the debtor's business dealings, assets and potential causes of action, *see, e.g., In re Markus*, 607 B.R. 379, 390 (Bankr. S.D.N.Y. 2019) (noting that "[b]road discovery under section 1521 promotes a significant chapter 15 objective"), *aff'd in part, vacated in part, remanded sub nom. Markus v. Rozhkov*, 615 B.R. 679 (S.D.N.Y. 2020).

For these and other reasons, the protections and powers afforded by chapter 15 are needed by many debtors that have no U.S. residence or property, and allowing such debtors to file under chapter 15 furthers the statutory objectives noted above—namely, cooperation between U.S. and foreign courts, fair and efficient cross-border administration, and maximization of the value of the debtor's assets, *see* 11 U.S.C. § 1501(a)(1), (3), & (4). The present case illustrates the important role chapter 15's discovery provisions can play in furthering these goals. If this case were dismissed on eligibility grounds, the Debtor might well be barred by Code §§ 1509(b) and (c) from taking any discovery in the U.S., despite the ruling of the Australian court overseeing the Debtor's liquidation that such discovery should proceed without delay (*see* fn. 2 above). Such a result would be antithetical to all three of the chapter 15 objectives just noted.

[11] A final, but equally critical, consideration is that a plain meaning interpretation of section 109(a), so as to permit chapter 15 filings by debtors with no U.S. residence and no U.S. property except an attorney retainer, does not undermine the chapter's purposes in any significant way. To be sure, some chapter 15 cases are improvidently filed, and some chapter 15 debtors seek relief contrary to the interests of creditors or other parties-in-interest. But the Court is aware of no reason to believe such abuses are any more common among debtors without a residence or property in the U.S. than among debtors with such property. And in any event, chapter 15 gives bankruptcy courts ample tools to manage cases that do not serve the chapter's purposes. For example, Code § 305 authorizes the court to abstain from hearing a chapter 15 case, after entry of a

---

(b)(3), and (c) make it clear that Chapter 15 is intended to be the exclusive door to ancillary assistance to foreign proceedings.'' H.R. Rep. No. 109-31, pt. 1, 109th Cong., 1st Sess. (2005) at 110. These provisions, specific to foreign *insolvency* proceedings, *see* Code § 101(23) (defining ''foreign proceeding'' as a reorganization or liquidation proceeding), appear to create an exception to the general power of a district court to order discovery in aid of (other) foreign proceedings pursuant 28 U.S.C. § 1782. *See generally* Glosband & West-

brook, *Chapter 15 Recognition* [https://perma.cc/D59D-SPGM], at 23-24.

In *Barnet*, the Second Circuit seemed to overlook the carveout for foreign representatives created by Bankruptcy Code § 1509, stating in passing that ''28 U.S.C. § 1782(a) provides for discovery in aid of foreign proceedings without any requirement akin to Section 109(a).'' *Barnet*, 737 F.3d at 251. The court's decision makes no mention of Code § 1509, and it is unclear whether the parties had brought that section's provisions to the court's attention.

**IN RE B.C.I. FINANCES PTY LTD.**            **679**
Cite as 671 B.R. 669 (Bkrtcy.S.D.N.Y. 2025)

recognition order, if "the purposes of chapter 15 ... would be best served by such dismissal or suspension." 11 U.S.C. § 305(a)(2).[5] And even absent abstention or dismissal on other grounds, bankruptcy courts are free—indeed, required—to deny relief that would be contrary to the interests of creditors or other affected parties. *See, e.g.*, Code § 1522(a) (court may grant relief under section 1519 or 1521 "only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected"); Code § 1521(a) (court may grant additional relief only "where necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of the creditors"). At oral argument, the Court pressed the Binetters' counsel to identify any purpose of chapter 15 that might be disserved by a literal reading of section 109(a), and he was unable to do so.

**2. The Binetters' argument that a literal reading of Code § 109(a) invites improper manipulation**

[12] The Binetters' contention that a debtor's creation of an attorney retainer for the purpose of satisfying § 109(a)'s eligibility requirements amounts to an impermissible manipulation fails for similar reasons. Putting aside the absence of any evidence as to the Debtor's reasons for creating the attorney retainer (*i.e.*, whether it did so for independent business reasons), the Binetters identify no legal basis to invalidate actions that are taken to comply with a statute's plain terms and that further, rather than undermine, the statute's purposes.

[13] The Binetters point to the Second Circuit's comprehensive discussion, in *Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127 (2d Cir. 2013), of the standards to determine the location of a chapter 15 debtor's center of main interests, or "COMI," a key element in deciding whether to recognize a foreign main proceeding. *See* Bankruptcy Code § 1517(b)(1). As the Binetters note, the court's discussion gives significant weight to the need "to ensure that a debtor has not manipulated its COMI in bad faith." *Id.*, 714 F.3d at 137. But as the Second Circuit explained, the need to protect against COMI manipulation is rooted in the very term "center of main interests," which is derived from European legal sources indicating that COMI should correspond to the debtor's regular and ascertainable place of business. *See Fairfield Sentry*, 714 F.3d at 136-38. Thus, judicial safeguards against maneuvers to shift a debtor's COMI give effect to that statutory language and prevent manipulation that would undermine its purposes. In contrast, the rule the Binetters ask the Court to adopt would both contravene section 109(a)'s plain language and frustrate, rather than further, chapter 15's purposes.

The Binetters also cite *In re Patriot Coal Corp.*, 482 B.R. 718 (Bankr. S.D.N.Y. 2012), as a supposed example of a bankruptcy court's refusal to let parties "create facts" to satisfy a statute's requirements. But that case, too, is entirely consistent with the Court's ruling. The debtors there had filed about 100 chapter 11 cases in this District, even though they had no mean-

---

**5.** Some courts have held that held that 28 U.S.C. § 1334(c)(1) prohibits bankruptcy courts from abstaining in chapter 15 cases. *See, e.g., Firefighters' Retirement Sys. v. Citco Group Ltd.,* 796 F. 3d 520 (5th Cir. 2015); *In re Hellas Telecommunications (Luxembourg) II SCA,* 535 B.R. 543 (Bankr. S.D.N.Y. 2015). However, most of these decisions make no

mention of Code § 305(a)(2), and some commentators have suggested that the decisions are contrary to the intent of chapter 15's drafters. *See* National Bankruptcy Conference Letter to Congress re: Revisions to Chapter 15 of the Bankruptcy Code, at 17 (Aug. 20, 2018) [https://perma.cc/E8XT-KLL6].

ingful business presence here. To comply with the bankruptcy venue statute, 28 U.S.C. § 1408, the Debtors incorporated two of their 98 subsidiaries in New York on the eve of their filing. *Id.* at 726-27, 741. Judge Chapman found that this maneuver "elevate[d] form over substance in a way that would be an affront to the purpose of the bankruptcy venue statute and the integrity of the bankruptcy system." *Id.* at 744; *see also id.* at 746 ("the Debtors created facts in order to satisfy the statute"). The court nevertheless ruled that, by these actions, the debtors satisfied the venue statute, *id.* at 741—a ruling directly contrary to the Binetters' contention that statutory compliance obtained through "manipulative" means should be disregarded.

To be sure, the court in *Patriot Coal* transferred the debtors' bankruptcy cases to St. Louis, where the debtors were headquartered. But it did not do so by grafting unwritten requirements onto the venue statute. Instead, the court relied on a different statute—the bankruptcy venue transfer statute, 28 U.S.C. § 1412—which, unlike section 1408, expressly authorizes the transfer of bankruptcy cases to other districts when doing so is "in the interest of justice or for the convenience of the parties." *Id.* at 743-46. So too, in the chapter 15 context, the courts have ample statutory tools to dispose of or otherwise manage improvidently-filed cases, *see, e.g.*, Bankruptcy Code §§ 305(a)(2), 1522(a), without the need to distort the plain terms of the Code § 109(a)'s eligibility requirements.

### Conclusion

For these reasons, the Court DENIES the Binetters' objection and GRANTS the foreign representative's motion for an order granting recognition and related relief.



**IN RE: ONH AFC CS INVESTORS, LLC, et al., Debtors.**

**Anna Phillips, in her capacity as Liquidating Trustee of the ONH Liquidating Trust, Plaintiff,**

**v.**

**Josmic 2 LLC and Josmic Holdings LLC, Defendants.**

**Case No. 23-10931 (CTG)**
**Adv. Proc. No. 24-50085 (CTG)**

United States Bankruptcy Court,
D. Delaware.

Signed May 8, 2025

**Background:** Trustee of post-confirmation liquidating trust brought adversary proceeding against lenders that allegedly made personal loan to debtor's principal, asserting claims under federal and New York law for fraudulent conveyance and unjust enrichment in relation to allegedly fraudulent transfers that debtor, prior to bankruptcy, made to lenders or for the benefit of lenders. Lenders moved for a stay in the proceedings and also moved to dismiss the fraudulent-conveyance claims on the merits.

**Holdings:** The Bankruptcy Court, Craig T. Goldblatt, J., held that:

(1) expectation that remaining creditors were expected to be paid in full did not preclude liquidating trustee's fraudulent-conveyance claims, given that the record suggested that beneficiaries of the claims were investors who were defrauded into purchasing equity interests in debtor;

(2) alleged actions of debtor's principal that caused debtor's funds to be used to repay the personal loan, on which

# Tab 21

Page 1

374 B.R. 122, 48 Bankr.Ct.Dec. 216
**(Cite as: 374 B.R. 122)**

▷

United States Bankruptcy Court,
S.D. New York.
In re BEAR STEARNS HIGH–GRADE STRUC-
TURED CREDIT STRATEGIES MASTER FUND,
LTD. (In Provisional Liquidation), Debtor in a For-
eign Proceeding.
In re Bear Stearns High–Grade Structured Credit
Strategies Enhanced Leverage Master Fund, Ltd.
(In Provisional Liquidation), Debtor in a Foreign
Proceeding.

Nos. 07–12383 BRL, 07–12384 BRL.
Sept. 5, 2007.

**Background:** Joint provisional liquidators of limited liability companies that were the subject of liquidation proceedings currently pending in the Cayman Islands filed petition for recognition of these Cayman Island proceedings either as main or nonmain proceedings.

**Holdings:** The Bankruptcy Court, Burton R. Lifland, J., held that:

(1) court would not recognize liquidation proceedings pending against limited liability companies in the Cayman Islands as foreign main proceedings, even though companies' registered office was located in the Cayman Islands, and even though no party in interest had objected to recognition petitions; and

(2) Cayman Islands proceedings could not be recognized even as foreign nonmain proceedings.

Petitions denied.

West Headnotes

**[1] Bankruptcy 51 ⚷2341**

51 Bankruptcy
 51III The Case
  51III(H) Cases Ancillary to Foreign Proceedings

51k2341 k. In General. Most Cited Cases

Mere fact that no party in interest had objected or otherwise responded to petitions filed by joint provisional liquidators of foreign debtors for recognition of liquidation proceeding pending against debtors in the Cayman Islands did not mean that bankruptcy court could simply rubber stamp the relief requested; rather, court had to make independent determination of whether definitional requirements for recognition of foreign proceeding were met. 11 U.S.C.A. §§ 1502, 1517.

**[2] Bankruptcy 51 ⚷2341**

51 Bankruptcy
 51III The Case
  51III(H) Cases Ancillary to Foreign Proceedings

51k2341 k. In General. Most Cited Cases

Statutory presumption, under section of Bankruptcy Code governing ancillary and other cross-border cases, that foreign debtor's registered office is also its center of main interest is included for speed and convenience of proof in cases in which there is no serious controversy; presumption is not preferred alternative in cases in which there is separation between foreign debtor's registered office or jurisdiction of incorporation and its real seat. 11 U.S.C.A. § 1516(c).

**[3] Bankruptcy 51 ⚷2341**

51 Bankruptcy
 51III The Case
  51III(H) Cases Ancillary to Foreign Proceedings

51k2341 k. In General. Most Cited Cases

While there is statutory presumption, under section of the Bankruptcy Code governing ancillary and other cross-border cases, that foreign debtor's registered office is also its center of main interest, burden is on foreign representative to prove that foreign debtor's center of main interest is in same country as its registered office, where foreign pro-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

374 B.R. 122, 48 Bankr.Ct.Dec. 216
**(Cite as: 374 B.R. 122)**

ceeding is in country of registered office, and there is evidence that center of main interests might be elsewhere. 11 U.S.C.A. § 1516(c).

**[4] Bankruptcy 51 ⚷2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In General. Most Cited Cases

Among factors that bankruptcy court may consider, on petition for recognition of foreign proceeding as foreign main proceeding, in deciding whether the evidence rebuts statutory presumption that foreign debtor's registered office is also its center of main interest are the following: location of debtor's headquarters; location of those who actually manage debtor; location of debtor's primary assets; location of majority of debtor's creditors, or of majority of creditors who would be affected by case; and/or jurisdiction whose law would apply to most disputes. 11 U.S.C.A. § 1516(c).

**[5] Bankruptcy 51 ⚷2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In General. Most Cited Cases

Statutory presumption, under section of Bankruptcy Code governing ancillary and other cross-border cases, that foreign debtor's registered office is its center of main interest may be overcome, especially in case of "letterbox" company not carrying out any business in territory in which its registered office is situated. 11 U.S.C.A. § 1516(c).

**[6] Bankruptcy 51 ⚷2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In General. Most Cited Cases

Statutory presumption, under section of Bankruptcy Code governing ancillary and other cross-border cases, that foreign debtor's registered office is its center of main interest does not prevent court, on petition for recognition of foreign proceedings as foreign main proceedings, from calling for or assessing other evidence, where the conclusion suggested by this presumption is called into question by court or by interested party. 11 U.S.C.A. § 1516(c).

**[7] Bankruptcy 51 ⚷2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In General. Most Cited Cases

Bankruptcy court would not recognize liquidation proceedings pending against limited liability companies in the Cayman Islands as foreign main proceedings, even though companies' registered office was located in the Cayman Islands, and even though no party in interest had objected to recognition petitions filed by companies' joint provisional liquidators; facts disclosed in petitions themselves, including fact companies had no employees or managers in the Cayman Islands, that companies' investment manager was located in New York, that administrator that ran companies' back-office operations was in the United States, along with companies' books and records prior to commencement of foreign proceedings, and that all of companies' liquid assets were located in United States, were sufficient to rebut statutory presumption that companies' registered office was also their center of main interest. 11 U.S.C.A. § 1516(c).

**[8] Bankruptcy 51 ⚷2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In General. Most Cited Cases

Bankruptcy court would not recognize liquida-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

374 B.R. 122, 48 Bankr.Ct.Dec. 216
**(Cite as: 374 B.R. 122)**

tion proceedings pending against limited liability companies in the Cayman Islands even as foreign nonmain proceedings, though no party in interest had objected to recognition petitions filed by companies' joint provisional liquidators, where there was no pertinent nontransitory economic activity being conducted by companies locally in the Cayman Islands, and where only cash account funds on deposit in the Cayman Islands migrated there after foreign proceedings were initiated. 11 U.S.C.A. § 1502(5).

**[9] Bankruptcy 51 ⌘⟿2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In General. Most Cited Cases

Bankruptcy court's refusal to recognize, either as main or nonmain proceedings, the liquidation proceedings pending against foreign debtors in the Cayman Islands did not mean that debtors' joint provisional liquidators were without remedy, as they could commence involuntary Chapter 7 or 11 case against debtors in the United States. 11 U.S.C.A. § 303(b)(4).

**\*123** Akin Gump Strauss Hauer & Feld LLP, New York, NY, by Fred S. Hodara, Esq., Lisa G. Beckerman, Esq., Abid Qureshi, Esq., for the Joint Provisional Liquidators.

Kaye Scholer LLP, New York, NY, by Madlyn Gleich Primoff, Esq., Jeffrey A. Fuisz, Esq., David M. Eskew, Esq., for the Merrill Lynch Entities.

**\*124** *AMENDED DECISION AND ORDER DENYING RECOGNITION OF FOREIGN PROCEEDING*
BURTON R. LIFLAND, Bankruptcy Judge.

Simon Lovell Clayton Whicker and Kristen Beighton, joint provisional liquidators (the "JPLs" and the "Petitioners") of Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd. (In

Provisional Liquidation) ("High–Grade Fund") and Bear Stearns High–Grade Structured Credit Strategies Enhanced Leverage Master Fund, Ltd. (In Provisional Liquidation) ("Enhanced Fund" and together with High–Grade Fund, the "Funds"), have filed petitions pursuant to section 1515 of title 11 of the United States Code (the "Bankruptcy Code") for entry of orders recognizing the liquidation (the "Foreign Proceedings") of the Funds in the Grand Court of the Cayman Islands (the "Cayman Grand Court") as foreign main proceedings pursuant to section 1517 of the Bankruptcy Code, and thereby granting related relief pursuant to section 1520 of the Bankruptcy Code and granting additional relief pursuant to section 1521(a) of the Bankruptcy Code . In the alternative, if this Court finds that the Foreign Proceedings are not eligible for recognition as foreign main proceedings, Petitioners seek recognition of the Foreign Proceedings as foreign nonmain proceedings, as defined in section 1502(5) and seek relief under section 1521 of the Bankruptcy Code.

*Background*

The Funds are both Cayman Islands exempted limited liability companies with registered offices in the Cayman Islands. The Funds are open-ended investment companies that invested in (I) investment-grade structured finance securities; (ii) asset-backed securities ("ABSs"); (iii) synthetic ABSs; (iv) mortgage-backed securities; (v) global structured asset securitizations; (vi) derivatives; (vii) options; (viii) swaps; (ix) swaptions; (x) futures; (xi) forward contracts; (xii) equity securities; and (xiii) currencies. *See* Verified Petitions for Recognition of Foreign Main Proceeding Pursuant to Sections 1515 and 1517 of the Bankruptcy Code and Related Relief, of High–Grade Fund and Enhanced Fund ("Verified Petitions") at ¶ 2.

PFPC Inc. (Delaware), a Massachusetts corporation (the "Administrator"), is the administrator of the Funds. Pursuant to administrative services agreements between each of the Funds and the Administrator, the Administrator served as administrator, registrar and transfer agent and provided

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

374 B.R. 122, 48 Bankr.Ct.Dec. 216
**(Cite as: 374 B.R. 122)**

day-to-day administrative services to the Funds, including accounting and clerical functions, processing the issuance, transfer and redemption of shares, maintaining all appropriate shareholder registers and ledgers, distributing annual reports and account statements to shareholders, responding to inquiries received from shareholders, prospective investors, and others, maintaining the Funds' principal administrative records, disbursing payment of expenses of the Funds, responding to inquiries from the general public, and notifying the Funds' investment manager of redemption requests. The books and records of the Funds are maintained and stored in Delaware by the Administrator, and Deloitte & Touche, Cayman Islands, signed off on the most recent audited financial statements of the Funds. *See* Verified Petitions at ¶ 3. Bear Stearns Asset Management Inc. ("BSAM"), a corporation formed under the laws of the state of New York, is the investment manager for the Funds and the assets managed by BSAM are located within the Southern District of New York. *See* Verified Petitions at ¶ 9. Other assets of the Funds consist of receivables from broker dealers and all (or virtually all) are also located within this **\*125** judicial district.[FN1] The investor registers, however, are held in Dublin, Ireland by an affiliate of the Administrator. *See* Verified Petitions at 4, n. 1.

> FN1. Subsequent to the filing of the Foreign Proceedings, substantial funds were transferred to accounts in the Cayman Islands.

In early 2007, Enhanced Fund's investments performed poorly. Following the well-publicized volatility in the market related to United States subprime lending, by late May 2007 both Enhanced Fund and High–Grade Fund had begun to suffer a significant devaluation of their asset portfolios. The devaluation of those secured assets led to margin calls from many of their trade counterparts, which the Funds were ultimately unable to meet. This, in turn, resulted in the issuance of default notices by those counterparties and their exercise of rights un-

der their respective agreements to seize and/or sell those assets of the Funds that had been the subject of repurchase agreements or over which they held security interests.

On or about June 20, 2007, Merrill Lynch, a United States secured creditor, issued a bid list to certain of its clients and thereafter sold off certain of these assets. This resulted in further downward pressure on the relevant asset classes and a revaluation of the Funds' assets.

On July 30, 2007, the boards of directors of both Enhanced Fund and High–Grade Fund passed resolutions, authorizing each of the Funds to file petitions seeking orders that the Funds be wound up under the provisions of the Companies Law of the Cayman Islands and to apply for the appointment of the Petitioners to act as JPLs of the Funds, subject to the supervision of the Cayman Grand Court. On July 31, 2007, the Cayman Grand Court entered orders appointing the Petitioners as the JPLs of the Funds.

[1] Treating both petitions as factually similar if not identical, the Petitioners contend that the Foreign Proceedings are "foreign main proceedings" as defined by section 1502(4) of the Bankruptcy Code, because the Foreign Proceedings are pending in the Cayman Islands, which is the "center of main interests" for the Funds as defined by sections 1502(4), 1516(c), 1517(b)(1) of the Bankruptcy Code. The Petitioners contend because: (i) recognition of the Foreign Proceedings would not be contrary to public policy under section 1506; (ii) the Foreign Proceedings are foreign main proceedings under section 1502(4); (iii) the Petitioners are persons authorized in the Foreign Proceedings to administer the liquidation of the Foreign Debtors' assets in the Cayman Grand Court; and (iv) Petitioners have complied with all requirements of section 1515 and Interim Bankruptcy Rule 1007(a)(4), Petitioners are entitled to entry of an order recognizing the Foreign Proceedings as foreign main proceedings under section 1517(b)(1), and are entitled to the appropriate relief as set forth in sections 1520

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

374 B.R. 122, 48 Bankr.Ct.Dec. 216
**(Cite as: 374 B.R. 122)**

and 1521 of the Bankruptcy Code. Merrill Lynch, Pierce, Fenner & Smith, Inc., Merrill Lynch International and Merrill Lynch Capital Services, Inc. (collectively, the "Merrill Lynch Entities"), have filed an ambiguous statement requesting that no finding relating to the Funds' center of main interest would control any choice of law determination for actions brought by the JPLs in the United States. FN2 No other party has filed a response**\*126** or objection to the relief requested. However, recognition under section 1517 is not to be rubber stamped by the courts. This Court must make an independent determination as to whether the foreign proceeding meets the definitional requirements of sections 1502 and 1517 of the Bankruptcy Code.

> FN2. This statement on its face can be construed as a partial objection as it arguably supports that portion of the request for nonmain recognition relegating choice of law and substantive law determinations away from Cayman Islands jurisprudence. The JPLs' responsive offer (*see* Joint Memorandum of Law in Support of Recognition of Foreign Proceedings as Foreign Main Proceedings) to accommodate the Merrill Lynch Entities' concerns by including the requested language in an order recognizing the proceeding as a main proceeding injects little or no clarity regarding choice of law issues as it presumptively presupposes this Court finding a "main proceeding" *and* that the JPLs in their discretion would pursue U.S. actions.

*Discussion*

**Chapter 15 Petition for Recognition**

Chapter 15 of the Bankruptcy Code was enacted in 2005 as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. No. 109–8, 119 Stat. 23 and implemented the Model Law on Cross–Border Insolvency (the "Model Law") promulgated by the United Nations Commission on International Trade Law

("UNCITRAL"); H.R.REP. NO. 109–31, at 105–07 (2005), U.S.Code Cong. & Admin. News 2005, p. 88; *In re Tri–Continental Exchange Ltd.,* 349 B.R. 627, 631–32 (Bankr.E.D.Cal.2006).

Unique to the Bankruptcy Code, Chapter 15 contains a statement of purpose: "[t]he purpose of this chapter is to incorporate the Model Law on Cross–Border Insolvency so as to provide effective mechanisms for dealing with cases of cross-border insolvency," with the express objectives of cooperation between United States courts, trustees, examiners, debtors and debtors in possession and the courts and other competent authorities of foreign countries; greater legal certainty for trade and investment; fair and efficient administration of cross-border insolvencies that protects the interests of all creditors and other interested entities, including the debtor; the protection and maximization of the debtor's assets; and the facilitation of the rescue of financially troubled businesses. 11 U.S.C. § 1501(a)(1)-(5); *In re SPhinX, Ltd.* 351 B.R. 103, 112 (Bankr.S.D.N.Y.2006), *aff'd,* 371 B.R. 10 (S.D.N.Y.2007).

Chapter 15 accords the court substantial discretion and flexibility. However, the process of recognition of a foreign proceeding is a simple single step process incorporating the definitions in sections 1502 and 101(23) and (24) to determine recognition as either a main or nonmain proceeding or nonrecognition. *See* Jay Lawrence Westbrook, *Locating the Eye of the Financial Storm,* 32 BROOK. J. INT'LL L. 3, 6 (2007 publication pending) hereinafter ("Westbrook Article") ("The Model Law grants great discretion as to specific relief, but imposes a fairly rigid procedural structure for recognition of foreign proceedings."); Daniel M. Glosband, *SPhinX Chapter 15 Opinion Misses the Mark,* 25 AM. BANKR.INST. J. 44, 45 (Dec./Jan.2007) (hereinafter "Glosband Article") ("foreign proceedings are eligible for recognition only if they meet the definitional requirements of either a foreign main proceeding or a nonmain proceeding"); FN3 *contra In re SPhinX, Ltd.,* 351 B.R.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

374 B.R. 122, 48 Bankr.Ct.Dec. 216

**(Cite as: 374 B.R. 122)**

103 (discussed below). The determination is a formulaic one. A simple recognition of a foreign proceeding without specifying more (i.e., nondeclaration as to either "main or nonmain") is insufficient as there are substantial eligibility distinctions and consequences. In other words, the recognition **\*127** must be coded as either main or nonmain. *See* H.R. REP. NO. 109–31, p. 114, U.S.Code Cong. & Admin.News 2005, pp. 88, 176 ("A petition under section 1515 must show that a proceeding is main or a qualifying non-main proceeding in order to obtain recognition under this section."); Glosband Article at 85 ("If the foreign proceeding is not pending in a country where the debtor has its [center of main interests] or where it has an establishment, then the foreign proceeding is simply not eligible for recognition under chapter 15."). FN4

> FN3. Both authors, Mr. Glosband and Professor Westbrook, along with myself, were among the authors of the Model Law and Chapter 15 of the Bankruptcy Code.

> FN4. *But see In re Schefenacker plc,* Case No. 07–11482, Order, Pursuant to §§ 105(a), 1507, 1517 and 1521, Recognizing Company Voluntary Arrangement as Either Foreign Main Proceeding or Foreign Nonmain Proceeding, Enforcing Company Voluntary Arrangement in the United States, and Granting Other Appropriate Relief, dated June 14, 2007, ECF 81, *www. nysb. uscourts. gov.* Court granted recognition without distinguishing between main and nonmain proceeding because the foreign proceeding clearly qualified as one or the other and the relief sought-recognition of the injunction contained in the company voluntary arrangement approved by the U.K. Court-would be granted in either a foreign main proceeding or a foreign nonmain proceeding. *See* Transcript of Hearing dated June 14, 2007 at 32, ECF # 90.

A case under chapter 15 is commenced by a foreign representative filing a petition for recognition of a foreign proceeding under section 1515 of the Bankruptcy Code. *See* 11 U.S.C. § 1504. The petition for recognition must be accompanied by evidentiary documents which are presumed to be authentic in the absence of evidence to the contrary. *See* 11 U.S.C. § § 1515(b); 1516(b).

Here, as demonstrated by the Petition and the accompanying Declarations, the Petitioners are duly authorized foreign representatives of the Funds entitled to petition this Court for recognition of the Foreign Proceedings under section 1509.

A foreign representative may obtain recognition of a foreign proceeding as either a foreign main or nonmain proceeding. 11 U.S.C. § 1517(a)(1). Here, the Petitioners seek recognition as a main proceeding or alternatively, as a nonmain proceeding.

### *Main Recognition*
A foreign main proceeding is defined as a "foreign proceeding pending in the country where the debtor has the center of its main interests" (which is referred to as the "COMI"). 11 U.S.C. § 1502(4); *In re Petition of Lloyd,* 2005 WL 3764946, \*2 (Bankr.S.D.N.Y.2005) (Order granting recognition of foreign main proceeding). A foreign nonmain proceeding means any other proceeding "pending in a country where the debtor has an establishment." 11 U.S.C. § 1502(5). "Establishment" is defined as "any place of operations where the debtor carries out a nontransitory economic activity." 11 U.S.C. § 1502(2).

Section 1516(c) provides that "[i]n the absence of evidence to the contrary, the debtor's registered office, ... is presumed to be the center of the debtor's main interests." 11 U.S.C. § 1516(c); *In re Tri–Continental Exchange Ltd.,* 349 B.R. 627, 635 (Bankr.E.D.Cal.2006) "(In effect, the registered office (or place of incorporation) is evidence that is probative of, and that may in the absence of other evidence be accepted as a proxy for, 'center of main interests.' The registered office, however, does not otherwise have special evidentiary value

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

374 B.R. 122, 48 Bankr.Ct.Dec. 216
**(Cite as: 374 B.R. 122)**

and does not shift the risk of nonpersuasion, i.e., the burden of proof, away from the foreign representative seeking recognition as a main proceeding.").

[2] The legislative history to section 1516(c) further explains that "the presumption that the place of the registered office is also the center of the debtor's **\*128** main interest is included for speed and convenience of proof where there is no serious controversy." *See* H.R.REP. NO. 31, 109th Cong., 1st Sess 1516 (2005), U.S.Code Cong. & Admin.News 2005, pp. 88, 175. This presumption "permits and encourages fast action in cases where speed may be essential, while leaving the debtor's true 'center' open to dispute in cases where the facts are more doubtful." *See* Westbrook Article at 15. This presumption is not a preferred alternative where there is a separation between a corporation's jurisdiction of incorporation and its real seat. *Id.*

[3] Chapter 15 changed the Model Law standard that established the presumption in "the absence of ***proof*** to the contrary," to a presumption in "the absence of ***evidence*** to the contrary." The legislative history explains that the word "proof" was changed to "evidence" to make it clearer using United States terminology that the ultimate burden is on the foreign representative. FN5 *See* H.R.REP. NO. 109–31, 112–13 (2005). According to one commentator, "[w]hatever may be the proper interpretation of the EU Regulation, the Model Law and Chapter 15 give limited weight to the presumption of jurisdiction of incorporation as the COMI." *See* Westbrook Article at 15–16. Accordingly, "[i]f the foreign proceeding is in the country of the registered office, and if there is evidence that the center of main interests might be elsewhere, then the foreign representative must prove that the center of main interest is in the same country as the registered office." *See In re Tri–Continental Exchange Ltd.,* 349 B.R. at 635; *see also In re Petition of Lloyd,* Case No. 05–60100(BRL), Verified Petition under Chapter 15 for Recognition of a Foreign Proceeding, ¶ 9 ECF # 2, *www. nysb. uscourts. gov*

(Debtor was mutual insurance company registered in France but demonstrated that center of main interest was located in the United Kingdom ("UK")). FN6

FN5. For a detailed analysis of the differences between the Model Law and Chapter 15 *see* Burton R. Lifland, *Chapter 15 of the United States Bankruptcy Code: An Annotated Section–By–Section Analysis, in Cross-border insolvency and conflict of jurisdictions, A US–EU experience,* (George Affaki ed., Bruylant & FEC 2007)

FN6. In *Lloyd,* the petitioners, foreign representatives of a UK scheme of arrangement, provided evidence sufficient to establish that the main insurance business was primarily conducted in the UK thus rebutting the presumption of COMI in France, the place of registration.

[4] The Bankruptcy Code does not state the type of evidence required to rebut the presumption that the COMI is the debtor's place of registration or incorporation. Various factors could be relevant to such a determination, including: the location of the debtor's headquarters; the location of those who actually manage the debtor (which, conceivably could be the headquarters of a holding company); the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes. *In re SPhinX, Ltd.,* 351 B.R. at 117. Here the factors to inform the Court's determination come from the Petitioners own submissions. Chapter 15 also directs courts to obtain guidance from the application of similar statutes by foreign jurisdictions: "[i]n interpreting this chapter, the court shall consider its international origin, and the need to promote an application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions." 11 U.S.C. § 1508; *In re SPhinX, Ltd.,* 351 B.R. at 118.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

374 B.R. 122, 48 Bankr.Ct.Dec. 216
**(Cite as: 374 B.R. 122)**

**\*129** One of the sources that a United States court may look to as persuasive is the Guide to Enactment of the UNCITRAL Model Law on Cross–Border Insolvency ("Guide") that was promulgated in connection with the approval of the Model Law. *See* Guide to Enactment of the UNCITRAL Model Law on Cross–Border Insolvency, U.N. Gen. Ass., UNCITRAL 30th Sess., U.N. Doc. A/CN.9/442 (1997); *see RSM Richter v. Aguilar (In re Ephedra Products Liability Litigation),* 349 B.R. 333, 336 (S.D.N.Y.2006) (Rakoff, D.J.) ("the House Judiciary Committee, in enacting Chapter 15, specifically indicated that the Guide 'should be consulted for guidance as to the meaning and purpose of [Chapter 15's] provisions.' " *quoting* H.R.REP. NO. 109–31(I), at 106 n. 101, *as reprinted in* 2005 U.S.C.C.A.N. 169 n. 101.). The Guide explains that the use of the concept "where the debtor has the centre of its main interests" as the determinant that a foreign proceeding is a "main" proceeding was modeled on the use of that concept in the European Union Convention on Insolvency Proceedings ("EU Convention") that was already in the process of being adopted when UNCITRAL drafted the Model Law.

In the regulation adopting the EU Convention, the COMI concept is elaborated upon as "the place where the debtor conducts the administration of his interests on a regular basis and is therefore ascertainable by third parties." Council Reg. (EC) No. 1346/2000, ¶ 13; *see also* Case 341/04, *Bondi v. Bank of America, N.A. (In re Eurofood IFSC Ltd.),* 2006 E.C.R. I–3813, p. I8–I9, ¶ 32, 2006 WL 1142304 (E.C.J. May 2, 2006). This generally equates with the concept of a "principal place of business" in United States law. *See In re Tri–Continental Exchange Ltd.,* 349 B.R. at 633–34.

[5][6] As noted by the European Court of Justice, the COMI presumption may be overcome "particular[ly] in the case of a 'letterbox' company not carrying out any business in the territory of the Member State in which its registered office is situ-

ated." *See In re Eurofood IFSC Ltd., supra* at ¶ 35; *see also In re SPhinX, Ltd.,* 371 B.R. 10 (S.D.N.Y.2007). In addition, the Guide explains that the presumption does "not prevent, in accordance with applicable procedural law, calling for or assessing other evidence if the conclusion suggested by the presumption is called into *question by the court* or an interested party." *See* Guide ¶ 122.

[7] The Petitioners basically argue that because no objections have been filed and the Funds' registered offices are in the Cayman Islands, this Court should recognize the Foreign Proceedings as main proceedings. In other words, the Petitioners contend that this Court should accept the proposition that the Foreign Proceedings are main proceedings because the Petitioners say so and because no else says they aren't.[FN7] This contention must be rejected.

> FN7. There may be many reasons for the lack of objections including the fact that many members of the financial communities have their own similar relationships with offshore jurisdictions.

The Petitioners' own pleadings provide the evidence to establish that the Funds' COMI is in the United States, not the Cayman Islands. The only adhesive connection with the Cayman Islands that the Funds have is the fact that they are registered there.[FN8] Section 1516(c) presumes **\*130** that the COMI is the place of the debtor's registered office but only "[i]n the absence of evidence to the contrary." *See* 11 U.S.C. § 1516(c). The Verified Petitions have demonstrated such evidence to the contrary: there are no employees or managers in the Cayman Islands,[FN9] the investment manager for the Funds is located in New York, the Administrator that runs the back-office operations of the Funds is in the United States along with the Funds' books and records and prior to the commencement of the Foreign Proceeding, all of the Funds' liquid assets were located in United States.[FN10] Although two of the three investors in the High–Grade Fund are also registered Cayman Islands companies, Mr.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

374 B.R. 122, 48 Bankr.Ct.Dec. 216
**(Cite as: 374 B.R. 122)**

Whicker, one of the JPLs, testified that both are Bear Stearns entities which appear to have the same minimum Cayman Islands profile as do the Funds. The sole investor in the Enhanced Fund is a U.K. entity. *See* Transcript of Hearing dated August 27, 2007 at 23. The investor registries are maintained and located in the Republic of Ireland; accounts receivables are located throughout Europe and the United States; counterparties to master repurchase and swap agreements are based both inside and outside the United States but none are claimed to be in the Cayman Islands. Moreover, there apparently exists the possibility that prepetition transactions conducted in the United States may be avoidable under U.S. law. Accordingly, the presumption that the COMI is the place of the Funds' registered offices has been rebutted by evidence to the contrary. As noted, each of the Funds' real seat and therefore their COMI is the United States, the place where the Funds conduct the administration of their interests on a regular basis and is therefore ascertainable by third parties, (*see* Council Reg. (EC) No. 1346/2000, ¶ 13; *see also In re Eurofood IFSC Ltd., supra,* at ¶ 32) and, more specifically, is located in this district where principal interests, assets and management are located. *See* Verified Petitions at ¶¶ 1, 3, 9. Thus, I cannot grant recognition of the Foreign Proceedings as main proceedings.

> FN8. The only business done in the Cayman Islands apparently was limited to those steps necessary to maintain the Funds in good standing as registered Cayman Islands companies, thus the Funds closely approximate the "letterbox" companies referred to in the *Eurofoods* decision.

> FN9. Although two of the directors of the Funds reside in the Cayman Islands. *See* Transcript of hearing on Order to Show Cause for Preliminary Injunction, August 9, 2007, ("August 9 Transcript") p 13.

> FN10. The Petitioners' have represented that there now exists bank accounts in the

Cayman Islands to which the funds maintained in the United States were transferred subsequent to the filing of the Foreign Proceedings. *See* August 9 Transcript, p 22

In so holding, I part with the dicta in the *SPhinX* decision opining that if the parties in interest had not objected to the Cayman Islands proceeding being recognized as main, recognition would have been granted under the sole grounds that no party objected and no other proceeding had been initiated anywhere else.[FN11] *See In re SPhinX, Ltd.,* 351 B.R. at 117. To the extent that non objection would make the recognition process a rubber stamp exercise, this Court disagrees with the dicta in the *SPhinX* decision. *See* Westbrook Article at 7. *See also Staton v. Boeing Co.,* 327 F.3d 938, 970 (9th Cir.2003) ("Rubber-stamp approval, even in the absence of objections, is improper.").

> FN11. The court refused "main" status largely on the ground of the *bad faith* motives of those who brought the Cayman Island proceedings.

The two other Cayman Islands chapter 15 cases cited by the Petitioners that have been granted recognition by this Court as main proceedings are inapposite. In addition to having registered offices in the Cayman Islands, the debtors conducted **\*131** business there, thus also meeting the "establishment" requirement. *See Bancredit Cayman Limited (In Liquidation),* Case No. 06–11026, Chapter 15 Petition for Recognition of Foreign Proceeding as Foreign Main Proceeding, ECF # 1, *www. nysb. uscourts. gov* (Debtor was a foreign bank incorporated in 1988 in the Cayman Islands, where it managed deposits, accounts, loans, and provided other credit services primarily for clients located in the Dominican Republic.); *Amerindo Internet Growth Fund Limited,* Case No., 07–10327, Verified Petition for Recognition of Foreign Main Proceeding Pursuant to Sections 1515 and 1517 of the Bankruptcy Code and Related Relief, ECF # 2, *www. nysb. uscourts. gov* (Debtor was an investment company registered in the Cayman Islands

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

374 B.R. 122, 48 Bankr.Ct.Dec. 216
**(Cite as: 374 B.R. 122)**

which commenced business with a Cayman Islands investment manager and a Cayman Islands administrator, who maintained the books and records in the Cayman Islands and managed the Debtor's day-to-day business in the Cayman Islands).

***The Nonmain Recognition Alternative***

[8] If recognition is to be accorded to the Foreign Proceeding as nonmain, the eligibility requirements of section 1502(5) must be met. Specifically, there must be an "establishment" in the Cayman Islands for the conduct of *nontransitory* economic activity, i.e., a local place of business.[FN12] *See* 11 U.S.C. § 1502(5)(emphasis added). Here the bar is rather high, especially in view of the Cayman Islands' statutory prohibition against "exempted companies" engaging in business in the Cayman Islands except in furtherance of their business otherwise carried on *outside* of the Cayman Islands. *See* Companies Law (2004 Revision) of the Cayman Islands § 193.[FN13] As has been shown above, there is no (pertinent) nontransitory economic activity conducted locally in the Cayman Islands by the Funds; only those activities necessary to their offshore "business." *See id.* Additionally, the only cash account funds on deposit (over $15 million) migrated there *after* the Cayman Islands proceedings were initiated. Clearly, even if I were to strain to find sufficient factors to satisfy the "nonmain" eligibility status pursuant to section 1502(5), the effort does not yield a finding of a seat for local business activity (proxy for establishment).

> FN12. This definition of establishment arose from the rejection, in relation to the EC Regulation, of the presence of assets as a sufficient basis for taking local jurisdiction. *See* Glosband Article at 45.

> FN13. As Mr. Whicker testified, the Funds are subject to the prohibitions of section 193, set forth at length:

>> An exempted company shall not trade in the Islands with any person, firm or corporation except in furtherance of the

business of the exempted company carried on *outside* the Islands:

>> Provided that nothing in this section shall be construed so as to prevent the exempted company effecting and concluding contracts in the Islands and exercising in the Islands all of its powers necessary for the carrying on of its business *outside* of the Islands.

>> Companies Law (2004 Revision) of the Cayman Islands § 193 (emphasis added).

I recognize that portions of this holding are at odds with the decisions in *SPhinX,* both the bankruptcy court's decision and the district court's affirmance. However, neither of those courts addressed the "establishment" requirement. Instead, the district court explained that the bankruptcy court's recognition of the foreign proceeding as a nonmain proceeding was a "pragmatic one" as no other proceedings were pending and someone had to conduct the "winding up." *See In re SPhinX,* 371 B.R. at 18–19 ("Collectively, these improper purposes and rebuttal analyses, combined with pragmatic considerations, led the Bankruptcy Court to conclude 'where **\*132** so many objective factors point to the Cayman Islands not being the Debtors' COMI, and no negative consequences would appear to result from recognizing the Cayman Islands proceedings as nonmain proceedings, that is the better choice." *quoting In re SPhinX,* 351 B.R. at 122.)

The Petitioners' reliance on the discretionary and flexibility attributes of caselaw under former section 304 of the Bankruptcy Code is misplaced. While much of the jurisprudence developed under section 304 is preserved in the context of new section 1507, section 304 did not have a recognition requirement as a first step. Moreover, the eligibility requirements of section 109 of the Bankruptcy Code (entitled "Who may be a debtor"), did not apply to section 304 but are very specific as to who qualifies for relief under each of the other chapters of the Bankruptcy Code.[FN14] Section 304 simply

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

374 B.R. 122, 48 Bankr.Ct.Dec. 216
**(Cite as: 374 B.R. 122)**

gave the United States courts the authority to open an ancillary proceeding and grant various broad forms of relief to the foreign representative. *See In re Culmer,* 25 B.R. 621, 624 (Bankr.S.D.N.Y.1982). Chapter 15, on the other hand, imposes a rigid procedural structure for recognition of foreign proceedings as either main or nonmain and thus the jurisprudence developed under section 304 is of no assistance in determining the issues relating to the presumption for recognition under chapter 15.

> FN14. For example, section 109(f) provides that only a family farmer or a family fisherman with regular annual income may be a debtor under chapter 12 of this title. 11 U.S.C. § 109(f).

*Conclusion*

Accordingly, because the Foreign Proceedings are not pending in a country where the Funds have their COMI or where they have an establishment, the Foreign Proceedings are not eligible for relief as main or nonmain proceedings under chapter 15.

[9] Nonrecognition of the Foreign Proceedings, however, does not leave the Petitioners without the ability to obtain relief from U.S. courts. 11 U.S.C. §§ 303(b)(4) and 1509(f); *see also* Jennifer D. Morton, Note, *Recognition of Cross–Border Insolvency Proceedings: an Evaluation of Solvent Schemes of Arrangement and Part VII Transfers under U.S. Chapter 15,* 29 FORDHAM INT'L L.J. 1312, 1363 (2006). While section 304 of the Bankruptcy Code was repealed upon the enactment of chapter 15, section 303 was not repealed. Section 303(b)(4) of the Bankruptcy Code specifically provides that an involuntary case may be commenced under chapter 7 or 11 of the Bankruptcy Code by a foreign representative of the estate in a foreign proceeding so that a foreign representative is not left remediless upon nonrecognition.[FN15] 11 U.S.C. § 303(b)(4); *contra U.S. v. J.A. Jones Construction Group, LLC,* 333 B.R. 637 (E.D.N.Y.2005) (Magistrate Judge Go opined that in the absence of recognition under chapter 15, a federal court has no authority to grant a stay of litigation against a foreign debtor). Section

303(b)(4) does not require that the foreign proceeding be recognized.[FN16] This flexibility leaves open the potential coordination of a case filed here under Title 11 with the **\*133** Foreign Proceeding. *See* 11 U.S.C. § 1529 (implicating cooperation and coordination among proceedings under sections 1525, 1526 and 1527 of the Bankruptcy Code, i.e., section 1527(5), concurrent proceedings involving the same debtor).

> FN15. It would appear that the failure to repeal section 303(b)(4) along with section 304 may be a drafting error in view of the newly enacted section 1511(b) which likewise addresses the commencement of a case under sections 301 and 303. The inconsistencies of the two statutes have not been conformed.

> FN16. Section 101(23) of the Bankruptcy Code simply provides that

>> The term "foreign proceeding" means a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

> Section 101(24) provides that

>> The term "foreign representative" means a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

In addition, section 1509(f) of the Bankruptcy Code provides that the failure of a foreign representative to obtain recognition under this chapter

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

374 B.R. 122, 48 Bankr.Ct.Dec. 216
**(Cite as: 374 B.R. 122)**

does not affect any right the foreign representative may have to sue in a court in the United States to collect or recover a claim which is the property of the debtor. 11 U.S.C. § 1509(f).

Accordingly, the request for recognition as a foreign main proceeding or alternatively, as a foreign nonmain proceeding is denied without prejudice to the filing of a Title 11 case (see below).

In view of the foregoing holding, the preliminary injunction order of August 9, 2007, issued pursuant to section 1519 of the Bankruptcy Code shall remain in effect for a period of 30 days from the date of the original decision and order (August 30, 2007) so as to give parties in interest an opportunity to file a petition for relief under chapters 7 or 11 of the Bankruptcy Code in the district where the seat of the Funds' management functions are located. In the event that there are no such filings, the injunction order of August 9, 2007 shall automatically dissolve upon expiration of the 30 day period.

IT IS SO ORDERED.

Bkrtcy.S.D.N.Y.,2007.
In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.
374 B.R. 122, 48 Bankr.Ct.Dec. 216

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Tab 22

Westlaw.

389 B.R. 325, Bankr. L. Rep. P 81,258
**(Cite as: 389 B.R. 325)**

▷

United States District Court,
S.D. New York.
In re BEAR STEARNS HIGH–GRADE STRUC-
TURED CREDIT STRATEGIES MASTER FUND,
LTD. (In Provisional Liquidation), Debtor in a For-
eign Proceeding and Appellant.
In re Bear Stearns High–Grade Structured Credit
Strategies Enhanced Leverage Master Fund, Ltd.
(In Provisional Liquidation), Debtor in a Foreign
Proceeding and Appellant.

Bankruptcy No. 07–12383.
Civil Case No. 07–8730.
May 27, 2008.

**Background:** Joint provisional liquidators of lim-
ited liability companies (LLCs) that were the sub-
ject of liquidation proceedings pending in the Cay-
man Islands filed petitions for recognition of these
Cayman Island proceedings either as foreign main
or as foreign nonmain proceedings. The Bankruptcy
Court, Burton R. Lifland, J., 374 B.R. 122, entered
order denying petitions, and liquidators appealed.

**Holdings:** The District Court, Sweet, J., held that:
(1) evidence that limited liability companies
(LCCs) had no employees or managers in Cayman
Islands, that their investment manager was located
in New York, that their books and records, at least
prior to commencement of insolvency proceedings
against them under Cayman Islands law, were in
the United States, and that all of companies' liquid
assets were located in the United States, was suffi-
cient to rebut statutory presumption, arising from
fact that Cayman Islands was where LLCs had their
registered offices, that LLCs' center of main in-
terests (COMI) was in the Cayman Islands; and
(2) foreign proceedings could not be recognized
even as foreign nonmain proceedings.

Affirmed.

West Headnotes

**[1] Bankruptcy 51 ⚷3782**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3782 k. Conclusions of Law; De Novo
Review. Most Cited Cases

**Bankruptcy 51 ⚷3786**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3785 Findings of Fact
                51k3786 k. Clear Error. Most Cited
Cases
    Bankruptcy court's findings of fact are re-
viewed for clear error; its conclusions of law are re-
viewed de novo. Fed.Rules Bankr.Proc.Rule 8013,
11 U.S.C.A.

**[2] Bankruptcy 51 ⚷3782**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3782 k. Conclusions of Law; De Novo
Review. Most Cited Cases
    Bankruptcy court's interpretation of the Bank-
ruptcy Code is reviewed de novo.

**[3] Bankruptcy 51 ⚷2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceed-
ings
            51k2341 k. In General. Most Cited Cases
    Recognition of foreign insolvency proceeding,
as either a foreign main or foreign nonmain pro-
ceeding, is distinct from relief that may be granted
post-recognition. 11 U.S.C.A. § 1517.

**[4] Bankruptcy 51 ⚷2341**

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

389 B.R. 325, Bankr. L. Rep. P 81,258

**(Cite as: 389 B.R. 325)**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In General. Most Cited Cases

While recognition of foreign insolvency proceeding, as either a foreign main or foreign nonmain proceeding, turns on strict application of objective criteria, grant of relief post-recognition is largely discretionary and turns on subjective factors that embody principles of comity. 11 U.S.C.A. §§ 1507, 1517, 1521, 1525.

**[5] Bankruptcy 51 ☞2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In General. Most Cited Cases

Bankruptcy court is authorized, following its determination that foreign insolvency proceeding should not be recognized as either a foreign main or foreign nonmain proceeding, to take any action necessary to prevent United States courts from granting comity or cooperation to foreign representatives. 11 U.S.C.A. § 1509(d).

**[6] Bankruptcy 51 ☞2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In General. Most Cited Cases

Principles of comity do not figure in analysis conducted by bankruptcy court in deciding whether to recognize foreign insolvency proceedings as either foreign main or foreign nonmain proceedings; rather, court must first make factual determination with respect to recognition of foreign insolvency proceeding before principles of comity come into play. 11 U.S.C.A. § 1517.

**[7] Bankruptcy 51 ☞2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In General. Most Cited Cases

Statutory presumption, in connection with petition for recognition of foreign insolvency proceedings, that debtor's center of main interests (COMI) is place of its registered offices creates no more than rebuttable evidentiary presumption, and may be rebutted by evidence to contrary even in case in which foreign representatives' recognition petition is unopposed. 11 U.S.C.A. § 1516(c).

**[8] Bankruptcy 51 ☞2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In General. Most Cited Cases

Evidence that limited liability companies (LCCs) had no employees or managers in Cayman Islands, that their investment manager was located in New York, that their books and records, at least prior to commencement of insolvency proceedings against them under Cayman Islands law, were in the United States, and that all of companies' liquid assets were located in the United States, was sufficient to rebut statutory presumption, arising from fact that Cayman Islands was where LLCs had their registered offices, that LLCs' center of main interests (COMI) was in the Cayman Islands; thus, proceedings which were filed against LLCs under the Companies Law of the Cayman Islands could not be recognized as "foreign main proceedings." 11 U.S.C.A. §§ 1516(c), 1517.

**[9] Bankruptcy 51 ☞2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In General. Most Cited Cases

Existence of an "establishment" for debtor in

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

389 B.R. 325, Bankr. L. Rep. P 81,258
**(Cite as: 389 B.R. 325)**

country where foreign insolvency proceedings are pending, as required for recognition of foreign proceedings as foreign main proceedings, is essentially a factual question, with no presumption in its favor. 11 U.S.C.A. § 1502.

**[10] Bankruptcy 51** 🗝2341

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In General. Most Cited Cases

Neither the auditing activities that were performed in the Cayman Islands by limited liability companies' (LLCs') accountants nor preparation of incorporation papers for LLCs in the Cayman Islands constituted "economic activity" by LLCs in the Cayman Islands, such that the LLCs, which had neither any employees or managers nor any assets in the Cayman Islands when foreign proceedings were commenced against them under Cayman Islands law, did not have an establishment in the Cayman Islands, and foreign proceedings could not be recognized even as foreign nonmain proceedings. 11 U.S.C.A. §§ 1502, 1517.

**[11] Bankruptcy 51** 🗝3777

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3777 k. Record; Assignments of Error; Briefs. Most Cited Cases

Touchstone for designation of matter as part of record on appeal is whether that matter was before lower court, or at least considered by that court, in entering the order or judgment appealed from.

**[12] Bankruptcy 51** 🗝3777

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3777 k. Record; Assignments of Error; Briefs. Most Cited Cases

New evidence presented in affidavit submitted after bankruptcy court's ruling on petition for recognition of foreign proceedings, which was not considered by bankruptcy court, was not appropriately part of record on appeal. 11 U.S.C.A. § 1517.

**\*327** Akin Gump Strauss Hauer & Feld LLP, by: Fred S. Hodara, Esq., New York, NY, for Joint Official Liquidators.

Goodwin Procter LLP, by: Daniel Martin Glosband, Esq., Boston, MA, University of Texas, by: Professor Jay L. Westbrook, Austin, TX, for Amici Curiae.

*OPINION*

SWEET, District Judge.

Simon Lovell Clayton Whicker and Kristen Beighton, the joint official liquidators and duly authorized foreign representatives (the "Foreign Representatives" or "Appellants") of Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd. (in Official Liquidation) ("High–Grade Fund") and Bear Stearns High–Grade Structured Credit Strategies Enhanced Leverage Master Fund, Ltd. (in Official Liquidation) ("Enhanced Fund"; collectively, the "Funds"), have appealed the September 5, 2007 order (the "Decision")[FN1] of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") denying their petitions (the "Petitions") for recognition of winding-up proceedings pending in the Cayman Court (the "Foreign Proceedings"), either as "foreign main proceedings" or as "foreign nonmain proceedings" pursuant to Chapter 15 of title 11 of the Bankruptcy Code.[FN2] Their appeal is unopposed by any party but by Amici Curiae. For the reasons set forth below, the Decision is affirmed.

    FN1. *In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.,* 374 B.R. 122 (Bankr.S.D.N.Y.2007).

    FN2. All statutory references are to title 11 of the United States Code (the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

389 B.R. 325, Bankr. L. Rep. P 81,258

**(Cite as: 389 B.R. 325)**

"Bankruptcy Code") unless otherwise indicated.

This appeal involves failed overseas hedge funds, liquidation proceedings in the Cayman Islands, the standard for recognition by the Bankruptcy Court of those proceedings, and in the felicitous phrase of the Appellants' Reply Brief to Briefs of the Amici ("ARB") a number of select dogs as described in Sir Arthur Conan Doyle's *The Hound of the Baskervilles.* ARB 16. The field on which the issues raised play out is the recently enacted Chapter 15 of title 11 of the Bankruptcy Code. While the temptation to simply affirm on the Decision, excellently crafted by the Honorable Burton R. Lifland, United States Bankruptcy Judge, is most powerful, some additional issues have been raised subsequent to the Decision. It is hoped that resolution of these issues may provide some aid to navigation in these uncharted waters. The process by which the financial problems of insolvent hedge funds are resolved appears to be of transcendent importance to the investment community and perhaps even to the society at large.

### Prior Proceedings

This Court has jurisdiction over appeals from final judgments, orders, and decrees of the Bankruptcy Court pursuant to 28 U.S.C. § 158(a)(1). On September 10, 2007, the Foreign Representatives timely filed their Notice of Appeal from the Decision pursuant to Rule 8002 of the Federal Rules of Bankruptcy Procedure. The appeal was heard and marked fully submitted on January 16, 2008.

### The Issue

Did the Bankruptcy Court err in determining that the Cayman Island proceedings were neither main nor nonmain proceedings under Chapter 15?

For the reasons stated in the Decision and described below, it is concluded that it did not.

**\*328** *The Appellants*

The Appellants are the Foreign Representatives of open-ended investment companies incorporated

in the Cayman Islands as limited liability companies subject to Cayman Islands tax law. Both of the Funds are registered as "exempted" companies under Cayman Islands law, which allows qualifying companies to trade in the Cayman Islands provided that they seek to further business outside of the Cayman Islands and not to compete with local businesses.

The Funds were established to attract sophisticated investors who understood and were willing to accept the risk of loss attendant to high income and capital appreciation investments and invested, *inter alia,* in: (i) investment-grade structured finance securities; (ii) asset-backed securities ("ABSs"); (iii) synthetic ABSs; (iv) mortgage-backed securities; (v) global structured asset securitizations; (vi) derivatives; (vii) options; (viii) swaps; (ix) swaptions; (x) futures; (xi) forward contracts; (xii) equity securities; and (xiii) currencies. With respect to the High–Grade Fund, such investors were "feeder funds." FN3 Feeder funds were the only investors in the High–Grade Fund which, like the Enhanced Fund, was a master fund. There were three investors in High–Grade Fund, two of which were registered in the Cayman Islands. The third investor was a U.S. entity. There was only one investor in the Enhanced Fund, a large financial institution based in the United Kingdom. The creditor constituency of the Funds consists of less than twenty large international financial institutions.

> FN3. "The investment adviser of a domestic hedge fund often operates a related offshore hedge fund, either as a separate hedge fund or often by employing a 'master-feeder' structure that allows for the unified management of multiple pools of assets for investors in different taxable categories." Securities and Exchange Commission, Staff Report: Implications of the Growth of Hedge Funds 9 (2003). "The master fund is usually organized as a corporation, such as an international business company, under non-U.S. law. It offers

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

389 B.R. 325, Bankr. L. Rep. P 81,258

**(Cite as: 389 B.R. 325)**

shares to one or more domestic feeder funds and one or more offshore corporate feeder funds, all of which share common investment strategies and objectives." *Id.* at 9 n. 26.

### The Respondents

No creditor or investor has appeared in the proceeding to support or challenge the Decision. The record contains no explanation for the silence of these interests, though both the Appellants and the Amici speculate as to why these interests have not barked.

### The Amici

The initial amici are Professor Jay L. Westbrook of the University of Texas School of Law, Daniel M. Glosband of Goodwin Procter LLP and Professor Kenneth N. Klee of the University of California at Los Angeles School of Law. Professor Westbrook and Mr. Glosband were part of the "small drafting group" that drafted the Model Law on Cross–Border Insolvency (the "Model Law") promulgated by the United Nations Commission on International Trade Law ("UNCITRAL"). Professor Westbrook was the co-head of the United States delegation to the UNCITRAL conference and Mr. Glosband was the principal representative of the International Bar Association at those meetings. They then served as the primary draftsmen assisting the Department of State and Congress in drafting Chapter 15 of the Bankruptcy Code. Professor Klee, one of the draftsmen of the 1978 Code, assisted with the drafting of Chapter 15 and its presentation to Congress.

Subsequent amici are Bart Schwartz, former Chief of the Criminal Division of **\*329** the U.S. Attorney's Office for the Southern District of New York, and FTI Capital Advisors, LLC, a FINRA-registered broker/dealer and a wholly-owned subsidiary of the forensic accounting and financial investigations firm FTI Consulting, Inc. (collectively, the "Elected Representatives"). The Elected Representatives are the recently elected sole directors of the Bear Stearns High–Grade Structured Credit

Strategies Enhanced Leverage (Overseas) Ltd. (the "Overseas Feeder Fund"), a feeder fund that had a contractual relationship with the Enhanced Fund's sole investor. The Elected Representatives seek to examine the affairs of the Overseas Feeder Fund and its counterparties, including the Enhanced Fund, in order to maximize any potential recovery for the shareholders of the Overseas Feeder Fund for their lost investments. The Elected Representatives support affirmance of the Decision, arguing that recognition of the Enhanced Fund's Cayman liquidation proceedings would harm the shareholders of the Overseas Feeder Fund.

### Prior Proceedings

In May 2007, due to the sub-prime mortgage crisis in the United States, the Funds suffered a significant devaluation of their asset portfolios. Many of the Funds' trading counterparties made margin calls that the Funds were unable to meet. Most of the Funds' secured creditors then accelerated repurchase rights or sold off assets that were the subject of repurchase agreements or in which the counterparties held security interests.

The Funds' boards of directors (the "Boards of Directors") filed winding-up petitions in the Cayman Islands (i) seeking orders that they be wound up under the provisions of the Companies Law (2007 Revision) of the Cayman Islands (the "Companies Law"), and (ii) applying for the appointment of the Foreign Representatives, subject to the supervision of the Cayman Court.

On July 31, 2007, the Cayman Court entered Orders (the "JPL Orders") appointing the Foreign Representatives as the joint provisional liquidators (the "JPLs") of the Funds. The JPL Orders authorized the JPLs "to do any acts or things considered by them to be necessary or desirable" for the protection of the assets and property of the Funds in connection with the liquidation of the Funds and the winding up of their affairs.

On September 14, 2007, the Cayman Court entered orders converting the Foreign Proceedings

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

389 B.R. 325, Bankr. L. Rep. P 81,258
**(Cite as: 389 B.R. 325)**

from provisional to official liquidations and directing that the Funds be wound up under the Companies Law. Pursuant to these orders, the JPLs became the joint official liquidators (the "JOLs").

On the day they initiated the Foreign Proceedings in the Cayman Islands, the Foreign Representatives filed petitions in the Bankruptcy Court seeking recognition of the Foreign Proceedings as foreign main proceedings, or, in the alternative, as foreign nonmain proceedings, under Chapter 15. The petitions were unopposed by any party to the bankruptcy. However, Merrill Lynch, Pierce, Fenner & Smith, Inc., Merrill Lynch International and Merrill Lynch Capital Services, Inc. did file a statement requesting that no choice of law determination be made regarding potential U.S. actions in conjunction with a conclusion as to the Funds' center of main interests.

Pursuant to section 1519 of the Bankruptcy Code, the Funds requested entry of an order (i) staying execution against the Funds' assets, (ii) prohibiting all persons from commencing or continuing any litigation or any other proceeding, including, without limitation, appeals, mediation or **\*330** any judicial, quasi judicial, administrative or regulatory action, proceeding or process whatsoever, or taking any other actions against or involving the Foreign Representatives (with respect to the Funds), the Funds and their property in the United States, and (iii) entrusting the administration or realization of the Funds to the Foreign Representatives. On August 1, 2007, the Bankruptcy Court entered a temporary restraining order pending a hearing on a preliminary injunction.

On August 9, 2007, the Bankruptcy Court held a hearing on the applications for a preliminary injunction and granted a preliminary injunction pending the disposition of the Funds' Chapter 15 petitions.

On September 5, 2007, the Bankruptcy Court filed the Decision denying recognition of the Foreign Proceedings as foreign main proceedings or foreign nonmain proceedings.

On September 10, 2007, the Foreign Representatives appealed the Bankruptcy Court's Decision. Because the Petitions were uncontested, there are no appellees.

On September 21, 2007, the Foreign Representatives filed an unopposed motion for a stay pending appeal pursuant to Bankruptcy Rule 8005. The Bankruptcy Court held a hearing on September 24, 2007, at which the Foreign Representatives presented additional evidence from the Foreign Representatives' continuing investigation.

On September 27, 2007, the Bankruptcy Court entered an order requiring that $4 million be maintained in U.S. bank accounts established with respect to each Foreign Debtor and continuing the preliminary injunction pending final disposition of this appeal.

This appeal was heard and marked fully submitted on January 16, 2008.

***The Decision***

The Decision was authored by Judge Liflind who with the Amici participated in the drafting of the Model Law and Chapter 15. His description of the history of Chapter 15 and the elements of main recognition and nonmain recognition are authoritative and generally accepted by the Appellants. In addition there is no substantial challenge to the facts set forth in the Decision.

The Bankruptcy Court denied main recognition on the grounds that each of the Funds' "center of main interests," as defined by Chapter 15, was actually the United States. This determination was based on the facts that the Funds' investment manager, Bear Stearns Asset Management, Inc. ("BSAM") is located in New York, the Administrator that runs the back-office operations of the Funds is in the United States, as are the Funds' books and records, and, prior to the commencement of the Foreign Proceeding, all (or virtually all) of

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

389 B.R. 325, Bankr. L. Rep. P 81,258
**(Cite as: 389 B.R. 325)**

the Funds' liquid assets were located in New York. 374 B.R. at 124–25, 130. The Bankruptcy Court also ruled that the Cayman Islands liquidation proceedings did not qualify as foreign nonmain proceedings, based on the conclusion that the Funds do not have an "establishment" in the Cayman Islands within the meaning of Chapter 15. *Id.* at 131–32.

The Appellants' principal contention is that the Decision failed to accede to the principles of comity and cooperation. Appellants also argue that the COMI presumption was erroneously interpreted and the facts found failed to support the conclusions reached, namely, the denial of main and nonmain recognition.

### Chapter 15 and Its Operation

For the sake of continuity the history and operation of Chapter 15 is summarized below.

**\*331** Section 1504 provides that a Chapter 15 case ancillary to a foreign proceeding is commenced by filing a petition. Section 1509 permits the foreign representative to file the petition directly with the Bankruptcy Court, without need for preliminary formalities, but conditions any other court access by the foreign representative on recognition. Sections 1504 and 1509 direct the foreign representative to file a petition for recognition of a foreign proceeding pursuant to section 1515. Section 1515 sets forth requirements for documentary or other evidence that demonstrates the existence of the foreign proceeding and the appointment of the foreign representative. Section 1516 permits the bankruptcy court to presume that the materials accompanying the petition demonstrate that the foreign proceeding and the foreign representative meet the basic definitional requirements.

Chapter 15 defines "recognition" as "the entry of an order granting recognition of a foreign main proceeding or foreign nonmain proceeding under this Chapter." § 1502(7). " '[F]oreign main proceeding' means a foreign proceeding pending in the country where the debtor has the center of its main interests." § 1502(4). " '[F]oreign nonmain pro-

ceeding' means a foreign proceeding, other than a foreign main proceeding, pending in a country where the debtor has an establishment." § 1502(5). Pursuant to section 1502(2), an "establishment" is "any place of operations where the debtor carries out a nontransitory economic activity." The Bankruptcy Code does not otherwise define center of nonmain interests.

The conditions for recognition of a foreign proceeding are applied in section 1517 which provides as follows:

§ 1517. Order granting recognition

(a) Subject to [the public policy exception in] section 1506, after notice and a hearing, an order recognizing a foreign proceeding shall be entered if—

(1) such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502;

(2) the foreign representative applying for recognition is a person or body; and

(3) the petition meets the requirements of section 1515.

(b) Such foreign proceeding shall be recognized

(1) as a foreign main proceeding if it is pending in the country where the debtor has the center of its main interests; or

(2) as a foreign nonmain proceeding if the debtor has an establishment within the meaning of section 1502 in the foreign country where the proceeding is pending.

The relevant House Report states:
The drafters of the Model Law understood that only a main proceeding or a nonmain proceeding meeting the standards of section 1502 (that is, one brought where the debtor has an establish-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

389 B.R. 325, Bankr. L. Rep. P 81,258

**(Cite as: 389 B.R. 325)**

ment) were entitled to recognition under this section. The Model Law has been slightly modified to make this point clear by referring to the section 1502 definition of main and nonmain proceedings, as well as to the general definition of a foreign proceeding in section 101(23). A petition under section 1515 must show that the proceeding is a main or a qualifying nonmain proceeding in order to obtain recognition under this section.

H.R.Rep. No. 109–31, at 114 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 88, 173 (the "House Report").

With regard to the recognition of foreign main proceedings, the UNCITRAL Guide to Enactment of the Model Law on Cross– **\*332** Border Insolvency (the "Guide"), [FN4] specifically counsels against consideration of factors other than the location of the debtor's COMI:

> FN4. The Guide, *available at* http:// www. uncitral. org/ pdf/ english/ texts/ insolven/ insolvency- e. pdf, was prepared by the United Nations Secretariat pursuant to the request of UNCITRAL made at the close of its thirteenth session, in 1997. "It is based on the deliberations and decisions of [UNCITRAL] at that session, when the Model Law was adopted, as well as considerations of the Working Group on Insolvency Law, which conducted the preparatory work." Guide, para. 10. "UNCITRAL considered that the Model Law would be a more effective tool for legislators if it were accompanied by background and explanatory information. While such information would primarily be directed to executive branches of Government and legislators preparing the necessary legislative revisions, it would also provide useful insight to other users of the text such as judges, practitioners and academics." *Id.* para. 9. The House Report directs that interpretation of Chapter 15 "will be aided by reference to the Guide and the

Reports cited therein, which explain the reasons for the terms used and often cite their origins as well." House Report at 110.

It is not advisable to include more than one criterion for qualifying a foreign proceeding as a main proceeding and provide that on the basis of any of those criteria a proceeding could be deemed a main proceeding. An approach involving such a "multiple criteria" would raise the risk of competing claims from foreign proceedings for recognition as the main proceeding.
Guide, para. 127. The House Report reflects the fact that section 1517 conforms to this guidance:

This section closely tracks article 17 of the Model Law, with a few exceptions. The decisions to grant recognition is not dependent upon any findings about the nature of the foreign proceedings of the sort previously mandate by section 304(c) of the Bankruptcy Code. The requirements of this section, which incorporates the definitions in section 1502 and sections 102(23) and (24), are all that must be fulfilled to attain recognition.

House Report at 113. The shift from the subjective, comity-based process of section 304(c) to Chapter 15's more rigid recognition standard is consistent with the general goals of the Model Law, as articulated by the Guide:
Approaches based purely on the doctrine of comity or on exequatur do not provide the same degree of predictability and reliability as can be provided by specific legislation, such as the one contained in the Model Law, on judicial cooperation, recognition of foreign insolvency proceedings and access for foreign representatives to courts.

Guide, para. 16.

Section 1509 conditions further court access and relief on the grant of recognition, and states:

§ 1509(b): If the court grants recognition under section 1517, and subject to any limitations that

389 B.R. 325, Bankr. L. Rep. P 81,258

**(Cite as: 389 B.R. 325)**

the court may impose consistent with the policy of this Chapter—

...

(3): a court in the United States shall grant comity or cooperation to the foreign representative.

Finally, section 1506 establishes a presumption that the debtor's registered office is the debtor's COMI:

§ 1516. Presumptions concerning recognition.

(c) In the absence of evidence to the contrary, the debtor's registered office, or habitual residence in the case of an individual, is presumed to be the center of the debtor's main interests.

**\*333** *The Standard of Review*

The standard of review is set forth correctly in the Appellants' Opening Brief and is set forth below.

[1][2] When a district court reviews a decision of the Bankruptcy Court, it is authorized to "affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." Fed. R. Bankr.8013. Findings of fact are reviewed for clear error. *Id.* Conclusions of law are reviewed de novo. *In re Enron Corp.,* 419 F.3d 115, 124 (2d Cir.2005); *In re Worldcom, Inc.,* 357 B.R. 223, 226–27 (S.D.N.Y.2006). A bankruptcy court's interpretation of the Bankruptcy Code is reviewed de novo. *In re Caldor Corp.,* 303 F.3d 161, 166 (2d Cir.2002).

***The Bankruptcy Court Correctly Held that Principles of Comity Do Not Figure in the Recognition Analysis***

The Appellants appropriately note the principles of comity and cooperation emphasized in the Model Law, by commentators including Judge Lifland, and in pre-Chapter 15 decisions. Appellants' Opening Brief ("AOB") 15–20. Appellants argue that Chapter 15 "was enacted to foster comity,"

AOB 15, and the courts should therefore apply Chapter 15 "pragmatically, based on their understanding that recognition should be withheld only in very limited circumstances." AOB 3. This argument cannot overcome the plain language of Chapter 15.

[3][4][5] Chapter 15 and the Model Law are designed to optimize disposition of international insolvencies by facilitating appropriate access to the court system of a host country (the United States, in the case of Chapter 15) by a representative of an insolvency proceeding pending in a foreign country. *See* § 1521; Model Law art. 21. If access is granted, then a wide range of relief from the host country's courts may be available. *See* § 1521; Model Law art. 21. "Recognition," the statutory parlance for such access, is distinct from the relief that may be granted post-recognition. Recognition turns on the strict application of objective criteria. *See* § 1517; Model Law art. 17. Conversely, relief is largely discretionary and turns on subjective factors that embody principles of comity. *See, e.g.,* §§ 1507, 1521, 1525; Model Law art. 7, 21, 25. If recognition is refused, then the bankruptcy court is authorized to take any action necessary to prevent the U.S. courts from granting comity or cooperation to the foreign representatives. *See* § 1509(d).

Requiring recognition as a condition to nearly all court access and consequently as a condition to granting comity distinguishes Chapter 15 from its predecessor section 304. Prior to the enactment of Chapter 15, access to the United States courts by a foreign representative was not dependent on recognition; rather, all relief under section 304 was discretionary and based on subjective, comity-influenced factors. *See* Decision, 374 B.R. at 126; *see also In re Basis Yield Alpha Fund (Master),* 381 B.R. 37, 46 (Bankr.S.D.N.Y.2008); Jay Lawrence Westbrook, Locating the Eye of the Financial Storm, 32 Brooklyn J. Int'l L. 1019, 1024 (2007); Daniel Glosband, SPhinX Chapter 15 Opinion Misses the Mark, 25 Am. Bankr.Inst. J. 44, 45 (Dec./Jan.2007). By establishing a simple, objective eligibility requirement for recognition, Chapter 15

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

389 B.R. 325, Bankr. L. Rep. P 81,258
**(Cite as: 389 B.R. 325)**

promotes predictability and reliability. The considerations for post-recognition relief remain flexible and pragmatic in order to foster comity and cooperation in appropriate cases.

The objective criteria for recognition reflect the legislative decision by UNCITRAL and Congress that a foreign proceeding*334 should not be entitled direct access to or assistance from the host country courts unless the debtor had a sufficient pre-petition economic presence in the country of the foreign proceeding. *See* House Report at 110; § 1509(b)(3). If the debtor does not have its center of main interests or at least an establishment in the country of the foreign proceedings, the bankruptcy court should not grant recognition and is not authorized to use its power to effectuate the purposes of the foreign proceeding. *See* House Report at 113; Guide paras. 73, 75, 128. Implicitly, in such an instance the debtor's liquidation or reorganization should be taking place in a country other than the one in which the foreign proceeding was filed to be entitled to assistance from the United States.

[6] Both the plain language and legislative history of Chapter 15 thus requires a factual determination with respect to recognition before principles of comity come into play.

Appellants argue that *In re SPhinX, Ltd.,* 351 B.R. 103 (Bankr.S.D.N.Y.2006) (" *Sphinx I* " ) and *In re SPhinX, Ltd.,* 371 B.R. 10 (S.D.N.Y.2007) (" *Sphinx II* " ) constitute contrary authority.

The review of *Sphinx I* was this Court's initial introduction to Chapter 15. In *Sphinx I*, the bankruptcy court denied main recognition but granted nonmain recognition, and the latter determination was not appealed. The facts found by the bankruptcy court were highly analogous to the facts founds here, although *Sphinx* also involved an improper purpose for seeking recognition as a main proceeding.[FN5] In light of the authorities cited in this appeal, the COMI decision in *Sphinx I* and its affirmance are consistent with the Bankruptcy Court's Decision.

FN5. It is noted that the Elected Representatives, Amici, have contended that the Cayman Island proceedings are designed to frustrate claims against the Enhanced Fund and BSAM. Brief of Elected Representatives, 11. Whatever the motivation, the recognition result remains a factual issue appropriately determined by the Decision.

However, in *Sphinx I*, the bankruptcy court also opined that in light of the COMI determination, the granting of recognition of the nonmain proceedings was a "better choice." 351 B.R. at 122. This Court's affirmance emphasized flexibility and the conclusion that the recognition of a nonmain proceeding was a "pragmatic resolution", 371 B.R. at 19, noting the absence of opposition. *Id.* Here, Amici have provided opposition. And while the Decision here may be "at odds" with *Sphinx II*, Judge Lifland accurately noted that *Sphinx II* did not examine the statutory requirements for nonmain recognition. 374 B.R. at 131. In view of the fact that the nonmain determination was not appealed in *Sphinx II*, any language in that opinion bearing on the bankruptcy court's nonmain determination must be viewed as dicta. Even so, a remand on that issue in view of the *Sphinx I* record would have been appropriate. It must also be noted that there is no presumption applicable to the recognition determination with respect to a nonmain proceeding.

### *The Decision Correctly Interpreted the COMI Presumption*

After recounting the facts found, the Bankruptcy Court held that "the presumption that the COMI is the place of the Funds' registered offices has been rebutted by evidence to the contrary." 374 B.R. at 130.

The Appellants contend that Chapter 15 was intended to create a streamlined process for recognition but that the Bankruptcy Court's refusal to grant recognition and comity to the Foreign Proceedings frustrates*335 Chapter 15's goals by turning what is intended to be a simple and streamlines legal proceeding into a complex, cumbersome, and time

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

389 B.R. 325, Bankr. L. Rep. P 81,258
**(Cite as: 389 B.R. 325)**

consuming process. AOB 4. The Foreign Representatives have suggested that part of the streamlining, the statutory presumption that the debtor's registered office is also its COMI is conclusive if not opposed by a party to the bankruptcy, regardless of evidence that the COMI is elsewhere. AOB 20.

[7] However, section 1516(c) creates no more than a rebuttable evidentiary presumption, which may be rebutted notwithstanding a lack of party opposition. The Guide explains that:

Article 16 establishes presumptions that allow the court to expedite the evidentiary process; at the same time they do not prevent, in accordance with the applicable procedural law, calling for or assessing other evidence if the conclusion suggested by the presumption is called into question *by the court* or an interested party.

Guide para. 122 (emphasis added). Thus, Judge Lifland was right to reject Appellants' position that "this Court should accept the proposition that the Foreign Proceedings are main proceedings because the Petitioners say so and because no [one] else says they aren't." 374 B.R. at 129. As Judge Learned Hand commented a long time ago, "A judge is more than a moderator; he is charged to see that the law is properly administered, and it is a duty which he cannot discharge by remaining inert." *United States v. Marzano,* 149 F.2d 923, 925 (2d Cir.1945) (holding on the facts that trial judge should not have questioned a witness in the manner he did). *See also In re Tri–Continental,* 349 B.R. 627, 634 (Bankr.E.D.Cal.2006) ("The Guide ... explains that the concept is one of a default rule to be applied in the absence of evidence that the debtor's main interests are centered in some place different from the registered office."); House Report at 113 ("[T]he presumption that the place of the registered office is also the center of the debtor's main interest is included for speed and convenience of proof where there is no serious controversy.").

Such a rebuttable presumption at no time relieves a petitioner of its burden of proof/risk of non-persuasion. *See* Fed.R.Evid. 301. It imposes "on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption" and only does so if the petitioner has established a prima facie case. *Id.; County Court of Ulster County v. Allen,* 442 U.S. 140, 157, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979) (permissive inference or deduction allows, but does not require, trier of fact to infer or deduce elemental fact from proof of basic fact and places no burden on any kind on opponent). *See also Tri–Continental,* 349 B.R. at 635 ("[I]f the foreign proceeding is in the country of the registered office, and if there is evidence that the center of main interests might be elsewhere, then the foreign representative must prove that the center of main interests is in the same country as the registered office."); House Report at 112 ("Although sections 1515 and 1516 are designed to make recognition as simple and expedient as possible, the court may hear proof on any element stated. The ultimate burden as to each element is on the foreign representative ....").

In fact, Congress changed the relevant language of the Model Law by substituting rebuttal by "evidence" to the contrary for the Model Law's "proof" to the contrary in order to clarify this very issue. House Report at 112–13 ("The word 'proof' in subsection (3) has been changed to 'evidence' to make it clearer using United **\*336** States terminology that the ultimate burden is on the foreign representative.").

As such, although courts may presume that a debtor's COMI is in the place of its registered offices, this presumption may be rebutted by evidence to the contrary, even in the case of an unopposed petition for recognition. *Cf. Basis Yield,* 381 B.R. 37 (denying unopposed summary judgment on the issue of COMI, regardless of presumption, because foreign representatives of debtor had failed to submit sufficient information for the court to make a determination).

***The Standard for the COMI Determination***
As Judge Lifland noted, the "center of main in-

389 B.R. 325, Bankr. L. Rep. P 81,258

**(Cite as: 389 B.R. 325)**

terests" concept derives from the European Union Convention on Insolvency Proceedings ("EU Convention"), already in the process of adoption when the Model Law was drafted. 374 B.R. at 129. The regulation adopting the EU Convention explains that "center of main interests" means "the place where the debtor conducts the administration of his interests on a regular basis and is therefore ascertainable by third parties." Council Reg. (EC) No. 1346/2000 ¶ 13. An early bankruptcy court decision that addressed the determination of COMI specifically discusses the EU Regulation language and properly equates it to the United States' concept of "principal place of business." *Tri–Continental,* 349 B.R. at 629; *see also Basis Yield,* 381 B.R. at 47–48; Decision, 374 B.R. at 129. In *Tri–Continental,* the court found that debtor's principal place of business was in St. Vincent and the Grenadines ("SVG") and recognized an SVG liquidation as a foreign main proceeding. 349 B.R. at 640. All of the debtor's twenty employees, its lead underwriter, and its principal worked in the SVG and its only office was there. *Id.* at 630.

Noting that the Bankruptcy Code does not state the type of evidence relevant to the COMI determination, the Decision relied on *Sphinx I* for a list of potentially relevant factors, including:

> the location of the debtor's headquarters; the location of those who actually manage the debtor (which, conceivably could be the headquarters of a holding company); the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes.

374 B.R. at 128 (citing *Sphinx I,* 351 B.R. at 117). *See also In re Ernst & Young, Inc.,* 383 B.R. 773, 779 (Bankr.D.Colo.2008) (citing Decision for relevant factors); *Basis Yield,* 381 B.R. at 47 (citing *Sphinx I* for relevant factors); *In re Loy,* 380 B.R. 154, 162 (Bankr.E.D.Va.2007) (same).

The Decision also cites the *Eurofood* decision by the European Court of Justice ("ECJ") for the propositions that COMI is analogous to "principal place of business" and that the COMI presumption may be overcome, particularly in the case of a "letterbox company." *See* 374 B.R. at 129 (citing Case C–341/04, *In re Eurofood IFSC Ltd.,* 2006 E.C.R. I–3813 (*"Eurofood"* ), paras. 34–35).

*Eurofood* resolved a tug of war between Irish and Italian courts over insolvency proceedings of Eurofood IFSC Ltd. by ruling on questions submitted by the Irish Supreme Court. *Eurofood,* paras. 22–24. The *Eurofood* decision was premised on the stipulated fact that the debtor was both registered and conducting its business in Ireland:

> The referring court asks how much relative weight should be given as between, on the one hand, the fact that the subsidiary regularly administers its interests,**\*337** in a manner ascertainable by third parties and in respect for its own corporate identity, in the Member State where its registered office is situated and, on the other hand, the fact that the parent company is in a position, by virtue of its shareholding and power to appoint directors, to control the policy of the subsidiary.

*Eurofood,* para. 27. The ECJ held that the fact a company's economic choices are or can be controlled by a parent company in another state is not enough to rebut the COMI presumption.

Appellants argue that *Eurofood* supports their arguments (1) that a recognition decision should be influenced by principles of comity and (2) in favor of a strong presumption that a debtor's COMI is in its place of incorporation. AOB 24–25. However, *Eurofood* more or less amounts to another non-barking dog, as Appellants concede that the opinion itself states few relevant facts and the development of the facts critical to its COMI decision have been gleaned from commentary. ARB 14 n. 16. In any event, the *Eurofood* decision is not inconsistent with the Bankruptcy Court's reading of the COMI

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

389 B.R. 325, Bankr. L. Rep. P 81,258
**(Cite as: 389 B.R. 325)**

presumption or its analysis of the role of comity in the recognition process.

Appellants also cite *In re Daisytek–ISA Ltd.,* [2003] All E.R. (D) 312 (Ch. May 16, 2003) ( *"Daisytek"* ), an English case that opened main proceedings for a French and German-registered subsidiaries of Daisytek. That court held that the COMI for all concerned companies was the U.K., because "the majority of the administration" of the companies was conducted from their head offices in England. Like *Eurofood, Daisytek* is consistent with the Bankruptcy Court's holding.

### The Facts Found Support the Denial of Main Recognition

[8] The factual findings of the court below will not be overturned unless they are "clearly erroneous." Fed. R. Bankr.Proc. 8013. As the Bankruptcy Court found, the pleadings and facts elicited at hearings before the Bankruptcy Court place the conduct of the Funds' business, their assets, management company and sponsors in New York. 374 B.R. at 130. There is no substantial challenge to the factual findings set forth in the Decision. The Bankruptcy Court found:

There are no employees or managers in the Cayman Islands, the investment manager for the Funds is located in New York, the Administrator that runs the back office operations of the Funds is in the United States along with the Funds' books and records and prior to the commencement of the Foreign Proceeding, all of the Funds' liquid assets were located in [the] United States. Although two of the three investors in the High–Grade Fund are also registered Cayman Islands companies, Mr. Whicker, one of the JPLs, testified that both are Bear Stearns entities which appear to have the same minimum Cayman Islands profile as do the Funds. The sole investor in the Enhanced Fund is a U.K. entity.... The investor registries are maintained and located in the Republic of Ireland; accounts receivables are located throughout Europe and the United States; counterparties to master repurchase and swap

agreements are based both inside and outside the United States but none are claimed to be in the Cayman Islands. Moreover, there apparently exists the possibility that prepetition transactions conducted in the United States may be avoidable under U.S. law.

*Id.* (footnotes omitted).

In an effort to demonstrate the Funds' "substantial connections" to the Cayman Islands, Appellants reassert a number of **\*338** arguments rejected by the Bankruptcy Court.

Appellants argue that most of the Funds' remaining liquid assets are in bank accounts in the Cayman Islands. However, prior to filing the Chapter 15 Petition, all of the Funds' funds were maintained in its accounts with its prime broker in the United States. ROA–2, para. 9. Post-filing, some millions of dollars in cash were directed to accounts in the Cayman Islands instead of their usual destination in the United States. 374 B.R. at 131; ROA–9 at 22:5–22; ROA 12 at 17–19.

Appellants point out that two of the directors of the funds resided in the Cayman Islands. 374 B.R. at 130 n. 9. However, these directors have not been shown to have had any substantial involvement in the business of the Funds.

Appellants also argue that the Funds' investors and creditors knew or should have reasonably known they were dealing with Cayman Islands incorporated entities. The funds were "exempted" companies, a status under Cayman Islands law that severely limits their activities in the Islands. 374 B.R. at 131 (citing Companies Law (2004 Revision) of the Cayman Islands § 193). No evidence has been offered to suggest that any creditor or investor (aside from other Bear Stearns entities) of the funds knew or had reason to know of their Cayman Islands incorporation or of any location of the funds other than at the New York offices of Bear Stearns Asset Management.

389 B.R. 325, Bankr. L. Rep. P 81,258
**(Cite as: 389 B.R. 325)**

It is also alleged that as Cayman Island incorporated companies, the Funds are subject to Cayman Islands tax law and "required" to be wound up in the Cayman Islands and that upon appointment of the joint provisional liquidators, the powers of the boards of directors ceased and the control of the Funds was transferred to Cayman Islands. AOB 12. These allegations do not constitute substantive economic activity in the Cayman Islands.

Finally, Appellants assert that the Funds' pre-filing attorneys are in the Cayman Islands, the funds' pre-filing auditors performed some auditing work in the Cayman Islands, and certain investments made by the Funds were constituted under Cayman Islands law. Assuming the relevance of these facts to the COMI analysis, they are outweighed by the facts found by the Bankruptcy Court.

The Bankruptcy Court correctly held that the Section 1516(c) presumption arising from incorporation has been rebutted by unchallenged facts and properly concluded that the Funds' COMI is New York. Appellants' emphasis on the fact that their petition was unopposed is unavailing. The lack of objection to the petition may result from any number of considerations, unknown to the courts but subject to any assumption. That absence does not relieve the bankruptcy court of its duty to apply the statute as written.

### Appellants Have Failed to Allege Facts Establishing Nonmain Recognition

A foreign nonmain proceeding is "a foreign proceeding, other than a foreign main proceeding, pending in a country where the debtor has an establishment." § 1502(5). An "establishment" is "any place of operations where the debtor carries out nontransitory economic activity." § 1502(2).

[9] Appellants have argued that the Funds' connections to the Cayman Islands are at least sufficient to constitute an "establishment" under § 1502. The existence of an "establishment" is essentially a factual question, with no presumption in its favor.

[10] As the Bankruptcy Court found, Appellants have failed to put forward facts **\*339** establishing that the Funds had a "place of operations" that carried out "nontransitory economic activity" in the Cayman Islands. Auditing activities and preparation of incorporation papers performed by a third party do not in plain language terms constitute "operations" or "economic activity" by the Funds. Nor does the alleged review of insider transactions fall within the ordinary meaning of "economic activity."

Moreover, at the time of the petition there were no assets of the Funds in the Cayman Islands. In general, section 1521(c) of the Bankruptcy Code limits the scope of relief available in a nonmain proceeding to relief related to assets located in the nonmain jurisdiction or closely connected thereto, while a plenary bankruptcy proceeding where the Funds are located would control the Funds' principal assets. The fact that the Funds had no assets in the Cayman Islands at the time of filing supports the conclusion that nonmain recognition would be inappropriate.

### The Post–Hearing Evidence Submitted by Appellants Is Inadmissible

Post-hearing evidence was submitted that two local directors were required to approve certain transactions with the Funds, AOB 15, 30 n. 21, 34, but no evidence was adduced that this requirement was fulfilled in fact or amounted to more than a pro forma technicality. In any event, the affidavit containing this activity was submitted after the Decision issued and is not part of the record. AOB 14–15.

[11][12] The record on appeal is governed by Bankruptcy Rule 8006. "[T]he touchstone for the designation of matter as part of the record is whether the matter was before the lower court (or at least considered by that court) in entering the order or judgment appealed from." *In re Ames Dept. Stores, Inc.,* 320 B.R. 518, 522 (Bankr.S.D.N.Y.2005). Subject to a narrow exception not applicable here, *see In re Food Fair, Inc.,* 15 B.R. 569

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

389 B.R. 325, Bankr. L. Rep. P 81,258
**(Cite as: 389 B.R. 325)**

(Bankr.S.D.N.Y.1981), "if an item was not considered by the court, it should be stricken from the record on appeal." *Id.* at 521. *See also In re Yepremian,* 116 F.3d 1295, 1297 (9th Cir.1997) (holding that deposition and declaration taken after bankruptcy court's grant of summary judgment were not part of record on appeal); *In re Tiana Queen Motel, Inc.,* 34 B.R. 357, 361 (S.D.N.Y.1983) (holding that a district court, "sitting as an appellate court ... should not receive into evidence material that was not before the bankruptcy court").

Thus, the new evidence presented by Appellants is not appropriately part of the record on appeal. Even if the Court were to consider this new evidence, it would not affect the outcome of this case.

***Conclusion***

For the reasons set forth above, the Decision is affirmed.

So ordered.

S.D.N.Y.,2008.
In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.
389 B.R. 325, Bankr. L. Rep. P 81,258

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Tab 23

In re Berau Capital Resources Pte Ltd, 540 B.R. 80 (2015)

2015 WL 6507871, 61 Bankr.Ct.Dec. 198

540 B.R. 80
United States Bankruptcy Court,
S.D. New York.

In re: Berau Capital Resources Pte
Ltd, Debtor in a Foreign Proceeding.

Case No. 15–11804(MG)
|    Signed October 28, 2015

**Synopsis**

**Background:** Foreign representative of debtor that was the subject of insolvency proceedings pending in Singapore sought recognition of those proceedings as foreign main proceeding, and dispute developed as to debtor's eligibility for Chapter 15 relief and where proceeding was properly venued.

**Holdings:** The Bankruptcy Court, Martin Glenn, J., held that:

[1] attorney retainer held by foreign representative's New York counsel qualified as property of foreign debtor which was present in the United States, and satisfied statutory requirement for debtor to be eligible for Chapter 15 relief;

[2] foreign debtor, as obligor on over $450 million of United States dollar denominated debt under debt indenture that contained both a New York choice of law and New York forum selection clause, had additional property in the United States, in form of debt indenture; and

[3] venue was proper in new York.

So ordered.

**Attorneys and Law Firms**

***81** MEYER, SOUZZI, ENGLISH & KLEIN, P.C., Attorneys for Kin Chan, as Foreign Representative, 1350 Broadway, Suite 501, New York, N.Y. 10018, By: Edward J. LoBello, Esq., Thomas R. Slome, Esq., Jil Mazer–Marino, Esq.

*MEMORANDUM OPINION GRANTING RECOGNITION OF FOREIGN MAIN PROCEEDING*

MARTIN GLENN, UNITED STATES BANKRUPTCY JUDGE

***1** **[1]** An issue in chapter 15 cases is whether a foreign debtor must have a place of business or property in the United States to be eligible to file a chapter 15 petition. In *Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet),* 737 F.3d 238 (2d Cir.2013), the Second Circuit held that section 109(a) of the Bankruptcy Code applies to chapter 15 cases and requires that a foreign debtor must reside, have a domicile or place of business, or property in the United States to be eligible to file a chapter 15 petition. The *Barnet* decision continues to be a frequent subject of discussion and criticism at international insolvency conferences and in ***82** scholarly writing. *See generally* Daniel M Glosband and Jay Lawrence Westbrook, *Chapter 15 Recognition in the United States: Is a Debtor "Presence" Required?,* 24 INT'L INSOLV. REV. 28 (2015) (available at Wiley Online Library (wileyonlinelibrary.com)). No other federal circuit appears to have addressed the "property in the United States" issue in chapter 15 cases so far.

*Barnet* is binding on this Court. Foreign debtors who wish to file chapter 15 cases in New York often have no place of business in the United States; therefore, the focus shifts to whether the foreign debtor has property in New York that will establish eligibility and venue in this district. [1]

Section 109(a) of the Bankruptcy Code does not specify how much property must be present or when or for how long property has had a situs in New York. Earlier cases have identified bank accounts, attorney retainers deposited in New York, or causes of action owned by the foreign debtor with a situs in New York, as satisfying the "property in the United States" eligibility requirement. *See In re Octaviar Admin. Pty Ltd,* 511 B.R. 361, 369–74 (Bankr.S.D.N.Y.2014).

**[2]** The foreign debtor in this case, Berau Capital Resources Pte Ltd ("Berau"), does not have a place of business in the United States. Berau filed an insolvency proceeding in Singapore, where the company has its headquarters. The foreign representative originally focused solely on the attorney retainer held by the foreign representative's New York counsel as the basis for eligibility. The Court is satisfied that the retainer provides a sufficient basis for eligibility in this case. *Octaviar,* 511 B.R. at 372–74. However, it is apparent that another substantial (and frequently recurring) basis for chapter 15 eligibility exists here.

3053

**\*\*2**  **[3]**  Berau is an obligor on over $450 million of U.S. dollar denominated debt; New York law expressly governs the debt indenture, which also includes a New York choice of forum clause. Under the indenture, Berau appointed an authorized agent for service of process in New York, and numerous acts must be performed in New York City. [2] The debt was in default when the foreign representative filed the chapter 15 case.

Dollar denominated debt subject to New York governing law and New York forum selection are quite common in international finance. They are highly desirable attributes **\*83** for global trade and investment, providing certainty, predictability and respected courts in the event of disputes. It would be ironic if a foreign debtor's creditors could sue to enforce the debt in New York, but in the event of a foreign insolvency proceeding, the foreign representative could not file and obtain protection under chapter 15 from a New York bankruptcy court. [3] The Court concludes that no such conundrum exists because the indenture is property of Berau in the United States, thereby satisfying the section 109(a) eligibility requirement.

**[4]**  **[5]**  Contracts create property rights for the parties to the contract. A debtor's contract rights are intangible property of the debtor. [4] *U.S. Bank N.A. v. Am. Airlines, Inc.,* 485 B.R. 279, 295 (Bankr.S.D.N.Y.2013), *aff'd,* 730 F.3d 88 (2d Cir.2013); *see also* *Wallach v. Nowak (In re Sherlock Homes of W.N.Y., Inc.),* 246 B.R. 19, 23–24 (Bankr.W.D.N.Y.2000) (stating that listing contracts between the debtor/broker dealer and prospective sellers bestowed contractual rights upon the parties and the contract rights were assets of the debtor); *Slater v. Town of Albion (In re Albion Disposal, Inc.),* 217 B.R. 394, 407–08 (W.D.N.Y.1997) (noting that "it is well-established ... that a debtor's contractual rights—including rights arising under post-petition contracts— are included in the property of the estate"). State law governs property rights in bankruptcy cases. *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). Section 1502(8) of the Bankruptcy Code expressly provides that the location of intangible property rights is to be determined under applicable nonbankruptcy law. *See* *In re Fairfield Sentry Ltd.,* 484 B.R. 615, 623 (Bankr.S.D.N.Y.2013), *aff'd sub nom. Krys v. Farnum Place LLC (In re Fairfield Sentry, Ltd.),* 484 B.R. 615 (S.D.N.Y.2013), *vacated,* 768 F.3d 239 (2d Cir.2014).

**\*\*3**  **[6]**  It has long been recognized under New York law that intangible property rights, such those arising from contracts, may have more than one situs. As Chief

Judge Cardozo wrote in *Severnoe Sec. Corp. v. London & Lancashire Ins. Co.,* 255 N.Y. 120, 174 N.E. 299, 300 (1931), "[t]he situs of intangibles is in truth a legal fiction, but there are times when justice or convenience requires that a legal situs be ascribed to them. The locality selected is for some purposes, the domicile of the creditor; for others, the domicile or place of business of the debtor, the place, that is to say, where the obligation was created or was meant to be discharged; for others, any place where the debtor can be found." Chief Judge Cardozo's framing of the issue has stood the test of time. *See* *Bankers Trust Co. v. Equitable Life Assur. Soc.,* 19 N.Y.2d 552, 281 N.Y.S.2d 57, 227 N.E.2d 863, 865 66 (1967) ("In addition, as Judge Cardozo observed, determination of situs for one purpose has no necessary bearing on its determination for another purpose ... which, of course, follows if determination of situs is to be made upon the basis **\*84** of considerations of 'justice and convenience in particular conditions'."); *Octaviar,* 511 B.R. at 371. In the case of the Berau indenture, as already indicated, the notes issued under the indenture are to be discharged in New York City. The attributes of the indenture would be sufficient to establish the situs of the property in New York, but in addition, the New York Legislature had adopted several laws clearly making New York a situs of the property.

The New York Legislature makes contracts of substantial size with New York governing law and choice of forum provisions—most certainly applicable to this debt indenture —enforceable in this State. Three statutory provisions are relevant here, two in the General Obligations Law and one in the Civil Practice Law and Rules ("CPLR").

N.Y. General Obligations Law § 5–1401 (Choice of Law) provides, with exceptions not relevant here, that the parties to any contract arising out of a transaction covering not less than $250,000 "may agree that the law of this state shall govern their rights and duties in whole or in part, whether or not such contract ... bears a reasonable relation to this state." N.Y. General Obligation Law § 5–1402 (Choice of Forum) provides, again with exceptions not relevant here, that any person may maintain an action in a New York court against a foreign corporation that relates to a contract made in whole or in part pursuant to section 5–1401 and that arises out of a transaction involving not less than $1 million. CPLR 327(b) provides that a court may not stay or dismiss an action on grounds of inconvenient forum where the action relates to a contract to which sections 5–1401 and 5–1402 apply.

3054

These three sections reflect a legislative policy to permit contract counterparties to establish a contract situs in this state by designating New York governing law and a New York forum for contracts involving transactions of the requisite amounts. The Berau indenture easily satisfies these requirements. This is sufficient to fix the situs of the contracts in New York, whether the contract has a situs elsewhere for other purposes. The Court concludes that the presence of the New York choice of law and forum selection clauses in the Berau indenture satisfies the section 109(a) "property in the United States" eligibility requirement. [5] Of course, the other requirements for recognition must also be satisfied, but none of those requirements were in dispute here.

**CONCLUSION**

No objections to recognition were filed and all requirements for recognition were satisfied. On October 16, 2015, the Court entered an order recognizing Berau's Singapore proceeding as a foreign main proceeding. (ECF Doc. # 32.) This Opinion addresses only whether the debt indenture satisfies the section 109(a) requirement of "property in the United States," an issue likely to recur in other cases. As explained above, the Court concludes that the foreign debtor has property in the United States, satisfying the eligibility requirement in section 109(a). Venue in the Southern District of New York was likewise established.

**\*\*4  IT IS SO ORDERED.**

**All Citations**

540 B.R. 80, 2015 WL 6507871, 61 Bankr.Ct.Dec. 198

Footnotes

1    The venue statute for chapter 15 cases, 28 U.S.C. § 1410, permits a chapter 15 case to be filed in a district in which the debtor has its principal place of business or principal assets; and absent a place of business or assets, in a district in which there is an action or proceeding pending against the debtor in a federal or state court. *Id.* § 1410(1)–(2). If neither of those requirements is satisfied, the chapter 15 case may be filed in a district "in which venue will be consistent with the interests of justice and the convenience of the parties, having regard to the relief sought by the foreign representative." *Id.* § 1410(3).

2    The Indenture outlines acts that can only be done at the Bank of New York Mellon in New York City, including: (a) to have the Trustee authenticate and deliver notes issued by the Foreign Debtor to the Foreign Debtor or upon the order of the Foreign Debtor (Indenture § 2.01, ECF Doc. # 24, Ex. B); (b) to have the Trustee maintain a registry of noteholders and to authenticate and deliver notes or new notes to transferees of notes (§ 2.05); (c) to redeem the notes (§§ 3.01, 3.02); (d) to discharge the notes and defease certain covenants (§ 8.01); (e) to recover cash or securities posted in connection with such defeasance (§ 8.04); (f) to make certain amendments to the Indenture without noteholder consents (§§ 9.01, 9.02); and (g) to require the Trustee to release collateral (§ 12.02).

3    *Barnet* concluded that the venue provision in 28 U.S.C. § 1410 does not relieve the foreign debtor of the requirement of property in the United States to satisfy the section 109(a) eligibility requirement. *Barnet,* 737 F.3d at 250.

4    Upon an order recognizing a proceeding as a foreign main proceeding, section 1520 makes sections 361 and 362 applicable with respect to the debtor and property of the debtor within the jurisdiction of the United States. The statute refers to "property of the debtor" to distinguish it from the "property of the estate" that is created under section 541(a). In a chapter 15 case, there is no "estate"; nevertheless, section 1520(a) imposes an automatic stay on any action with respect to the debtor's property located in the United States. *SeeIn re Pro–Fit Holdings Ltd.,* 391 B.R. 850, 864 n. 48 (Bankr.C.D.Cal.2008).

5    Other types of contracts—such as patent, trademark or intellectual property licensing agreements—entered into by a foreign debtor that include New York choice of law and forum selection clauses may satisfy the requirements of N.Y. General Obligation Law §§ 5–1401 and 5–1402. The Court does not decide whether such contracts satisfy the section 109(a) "property in the United States" eligibility requirement.

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 24

400 B.R. 266, 51 Bankr.Ct.Dec. 99
**(Cite as: 400 B.R. 266)**

▷

United States Bankruptcy Court,
D. Nevada.
In re BETCORP LIMITED (In Liquidation), Petitioner.

No. BK–S–08–21594–BAM.
Feb. 9, 2009.

**Background:** Australian liquidator in voluntary winding up conducted, in accordance with provisions of Australian law, for financially troubled gaming corporation petitioned for recognition of this voluntary winding up as "foreign main proceeding."

**Holdings:** The Bankruptcy Court, Bruce A. Markell, J., held that:

(1) voluntary winding up qualified as "proceeding," a necessary prerequisite to its being recognized as "foreign main proceeding" under Chapter 15 of the Bankruptcy Code, though no petition or application was filed by liquidators with any Australian court;

(2) proceeding qualified as "collective" proceeding, as one which was initiated not for benefit of any special class of creditors;

(3) proceeding was authorized or conducted "under a law relating to insolvency or the adjustment of debts," as required for it to qualify as "foreign proceeding";

(4) gaming corporation's assets and affairs were subject to control or supervision of "foreign court," as required for this winding up to qualify as "foreign proceeding"; and

(5) Australia, the country in voluntary winding up had been commenced against financially troubled gaming corporation, was also company's "center of main interests" (COMI), so that this voluntary winding up could be recognized as "foreign main proceeding."

So ordered.

West Headnotes

**[1] Bankruptcy 51 ⚷2341**

51 Bankruptcy

51III The Case
51III(H) Cases Ancillary to Foreign Proceedings
51k2341 k. In General. Most Cited Cases

Seven requirements must be met in order for a proceeding to qualify as a "foreign proceeding," of a kind which may be recognized as either a "foreign main proceeding" or a "foreign nonmain proceeding" under Chapter 15 of the Bankruptcy Code: (1) it must be a proceeding; (2) that is either judicial or administrative; (3) that is collective in nature; (4) that is being conducted in a foreign country; (5) that is authorized or conducted under a law relating to insolvency or adjustment of debts; (6) in which debtor's assets and affairs are subject to control or supervision of "foreign court," broadly defined as any judicial or other authority competent to control or supervise a foreign proceeding; and (7) which proceeding is for purpose of reorganization or liquidation. 11 U.S.C.A. §§ 101(23), 1501 et seq.

**[2] Bankruptcy 51 ⚷2341**

51 Bankruptcy
51III The Case
51III(H) Cases Ancillary to Foreign Proceedings
51k2341 k. In General. Most Cited Cases

Voluntary winding up that was being conducted by Australian liquidators of financially troubled gaming corporation in accordance with provisions of Australian law qualified as "proceeding," a necessary prerequisite to its being recognized as "foreign main proceeding" under Chapter 15 of the Bankruptcy Code, though no petition or application was filed by liquidators with any Australian court; Australian Corporations Act, the legislation that governed this winding up process, established framework which constrained corporation's actions and regulated final distribution of its assets, and once process had been initiated by special resolution of company's equity holders, it could not be stopped but would proceed in regulated fashion to its conclusion, even though, depending upon future development, process might never be placed squarely in front of judge. 11 U.S.C.A. §§ 101(23), 1501 et seq.

**[3] Bankruptcy 51 ⚷2341**

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

400 B.R. 266, 51 Bankr.Ct.Dec. 99
**(Cite as: 400 B.R. 266)**

51 Bankruptcy
  51III The Case
    51III(H) Cases Ancillary to Foreign Proceedings
      51k2341 k. In General. Most Cited Cases

Hallmark of a "proceeding," of kind potentially recognizable as a "foreign main proceeding" under Chapter 15 of the Bankruptcy Code, is statutory framework that constrains company's actions and that regulates final distribution of its assets. 11 U.S.C.A. §§ 101(23), 1501 et seq.

**[4] Bankruptcy 51 ☞2341**

51 Bankruptcy
  51III The Case
    51III(H) Cases Ancillary to Foreign Proceedings
      51k2341 k. In General. Most Cited Cases

Voluntary winding up that was being conducted by Australian liquidators of financially troubled gaming corporation in accordance with the provisions of Australian law was of administrative character and, depending on whether there was need for court involvement in future, might develop into judicial proceeding, for purposes of deciding whether it qualified as "foreign proceeding" capable of being recognized under Chapter 15 of the Bankruptcy Code. 11 U.S.C.A. §§ 101(23), 1501 et seq.

**[5] Bankruptcy 51 ☞2341**

51 Bankruptcy
  51III The Case
    51III(H) Cases Ancillary to Foreign Proceedings
      51k2341 k. In General. Most Cited Cases

Voluntary winding up that was being conducted by Australian liquidators of financially troubled gaming corporation in accordance with the provisions of Australian law qualified as "collective" proceeding, as one which was initiated not for benefit of any special class of creditors and in which proofs of debt were requested of all claimholders in notice of liquidation provided by liquidators; accordingly, assuming that other statutory requirements were met, this voluntary winding up qualified as "foreign proceeding" as that term was used in the Bankruptcy Code. 11 U.S.C.A. §§ 101(23), 1501 et seq.

**[6] Bankruptcy 51 ☞2341**

51 Bankruptcy
  51III The Case
    51III(H) Cases Ancillary to Foreign Proceedings
      51k2341 k. In General. Most Cited Cases

Proceeding is "collective," as required for it to qualify as "foreign proceeding" under the Bankruptcy Code, if it considers rights and obligations of all creditors. 11 U.S.C.A. §§ 101(23), 1501 et seq.

**[7] Bankruptcy 51 ☞2341**

51 Bankruptcy
  51III The Case
    51III(H) Cases Ancillary to Foreign Proceedings
      51k2341 k. In General. Most Cited Cases

Proceeding may be authorized or conducted "under a law relating to insolvency or the adjustment of debts," as required for it to qualify as "foreign proceeding" as that term is used in Bankruptcy Code, though foreign debtor is not insolvent or contemplating using the provisions of foreign law to adjust its debts. 11 U.S.C.A. §§ 101(23), 1501 et seq.

**[8] Bankruptcy 51 ☞2341**

51 Bankruptcy
  51III The Case
    51III(H) Cases Ancillary to Foreign Proceedings
      51k2341 k. In General. Most Cited Cases

Voluntary winding up that was being conducted by Australian liquidators of financially troubled gaming corporation in accordance with the provisions of Australian law was authorized or conducted "under a law relating to insolvency or the adjustment of debts," as required for it to qualify as "foreign proceeding" as term was used in the Bankruptcy Code. 11 U.S.C.A. §§ 101(23), 1501 et seq.

**[9] Bankruptcy 51 ☞2341**

51 Bankruptcy
  51III The Case
    51III(H) Cases Ancillary to Foreign Proceedings
      51k2341 k. In General. Most Cited Cases

In voluntary winding up that was being conducted

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

400 B.R. 266, 51 Bankr.Ct.Dec. 99
**(Cite as: 400 B.R. 266)**

by Australian liquidators of financially troubled gaming corporation in accordance with the provisions of Australian law, gaming corporation's assets and affairs were subject to control or supervision of "foreign court," as required for this winding up to qualify as "foreign proceeding" as that term was used in the Bankruptcy Code, based not only on administrative control exercised by liquidators in accordance with requirements of the Australian Securities and Investments Commission (ASIC), but on supervisory role of courts, under Australian law that accorded both liquidators and individual creditors a right to request judicial determination of questions arising during the winding up process. 11 U.S.C.A. §§ 101(23), 1501 et seq.

**[10] Bankruptcy 51 🔑2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In General. Most Cited Cases

Voluntary winding up that was being conducted by Australian liquidators of financially troubled gaming corporation in accordance with the provisions of Australian law was conducted for purposes of liquidating company's assets, as set forth in special resolution of equity holders commencing the winding up process, and satisfied each of requirements for qualifying as "foreign proceeding" of kind potentially subject to recognition as "foreign main proceeding" under Chapter 15. 11 U.S.C.A. §§ 101(23), 1501 et seq.

**[11] Bankruptcy 51 🔑2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In General. Most Cited Cases

In deciding whether to recognize foreign proceeding as "foreign main proceeding," bankruptcy court could not rely on presumption that debtor's registered office was presumed to be the center of its main interests (COMI), where creditor objecting to foreign liquidator's recognition request introduced evidence raising legitimate questions as to location of debtor's COMI. 11 U.S.C.A. § 1516(c).

**[12] Bankruptcy 51 🔑2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In General. Most Cited Cases

Foreign liquidator seeking recognition, as "foreign main proceeding," of voluntary winding up which was being conducted for gaming company in Australia bore burden of persuading court, by a preponderance of evidence, that company's center of main interests (COMI) was in Australia. 11 U.S.C.A. § 1517.

**[13] Bankruptcy 51 🔑2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In General. Most Cited Cases

In deciding where foreign debtor's center of main interests (COMI) is located, for purpose of deciding whether foreign proceeding can be recognized as "foreign main proceeding," courts analyze a variety of factors to discern, objectively, where debtor has its principal place of business. 11 U.S.C.A. § 1517.

**[14] Bankruptcy 51 🔑2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In General. Most Cited Cases

Among factors that bankruptcy courts consider in deciding where foreign debtor's center of main interests (COMI) is located, for purpose of deciding whether foreign proceeding can be recognized as "foreign main proceeding," are location of debtor's administration, management and operations, along with whether reasonable and ordinary third parties can discern or perceive where debtor is conducting these various functions. 11 U.S.C.A. § 1517.

**[15] Bankruptcy 51 🔑2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

400 B.R. 266, 51 Bankr.Ct.Dec. 99
**(Cite as: 400 B.R. 266)**

51k2341 k. In General. Most Cited Cases

Determination of foreign debtor's center of main interests (COMI) is to be made, for purpose of deciding whether foreign proceeding can be recognized as "foreign main proceeding," as of time that Chapter 15 case was commenced, without regard to debtor's operational history and where its COMI may have been located in past; focusing on debtor's operational history would threaten to destroy uniformity and harmonization that was the goal of employing COMI inquiry and would interfere with important policy that debtor's COMI should be ascertainable by third parties. 11 U.S.C.A. § 1517.

**[16] Bankruptcy 51 �köⁿ2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In General. Most Cited Cases

Australia, the country in voluntary winding up had been commenced against financially troubled gaming corporation, was also company's "center of main interests" (COMI), so that this voluntary winding up could be recognized as "foreign main proceeding," where Australia was company's administrative and executive nerve center, the place where more than 90% of its shareholders resided, where corporate audits were performed, and where company's only asset, cash deposited in bank account, was located; only factor that did not support finding that company's COMI was Australia was location of its creditors, both of which were located in other countries. 11 U.S.C.A. § 1517.

**[17] Bankruptcy 51 ⊦ⁿ2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In General. Most Cited Cases

Even assuming that it were appropriate for bankruptcy court to look beyond circumstances which existed when Chapter 15 case was commenced and to consider foreign debtor's operational history, in deciding where debtor's center of main interests (COMI) was located, such an analysis would not alter court's conclusion that Australia, the country in which debtor was first formed

and in which most of its management and shareholdings were concentrated, even as it expanded its operations and acquired subsidiaries in other countries, was debtor's COMI, such that proceeding initiated against it in Australia could be recognized as "foreign main proceeding." 11 U.S.C.A. § 1517.

**[18] Bankruptcy 51 ⊦ⁿ2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In General. Most Cited Cases

Foreign liquidators who had been appointed in accordance with Australian law to wind up and liquidate assets of financially troubled gaming company were "foreign representatives," authorized to apply for recognition of winding up process as "foreign main proceeding." 11 U.S.C.A. §§ 101(24), 1517.

**[19] Bankruptcy 51 ⊦ⁿ2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In General. Most Cited Cases

Document from the Australian Securities and Investments Commission (ASIC) showing that liquidators had been appointed pursuant to provisions of the Australian Corporations Act to liquidate gaming company's assets was sufficient to establish existence of foreign proceeding, for purpose of permitting recognition thereof, in case in which foreign proceeding consisted of voluntary winding up conducted under Australian law, without any formal court proceedings. 11 U.S.C.A. § 1515(b)(3).

**\*270** Barry F. Irwin, Scott Bennett Kitei, Kirkland & Ellis LLP, Ryan B. Bennett, Chicago, IL, Wade W. Rabenhorst, Campbell & Williams, J. Colby Williams, Las Vegas, NV, for Petitioner.

**OPINION ON PETITION FOR RECOGNITION**
BRUCE A. MARKELL, Bankruptcy Judge.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

400 B.R. 266, 51 Bankr.Ct.Dec. 99
**(Cite as: 400 B.R. 266)**

Table of Contents

| | | |
|---|---|---:|
| I. INTRODUCTION | | 271 |
| II. BACKGROUND | | 271 |
| A. | *Betcorp's Gaming Operations and Corporate Governance* | 272 |
| B. | *Changes in United States Gaming Law, Betcorp's Cessation of Operations, and Its Sub-sequent Winding Up* | 273 |
| C. | *1st Technology's Claim* | 274 |
| III. RECOGNITION OF BETCORP'S WINDING UP | | 275 |
| A. | *Is Betcorp's Winding Up a "Foreign Proceeding" as Defined by 11 U.S.C. § 101(23)?* | 275 |
| | 1. *A "Proceeding"* | 277 |
| | 2. *Judicial or Administrative in Character* | 280 |
| | 3. *A Collective Proceeding* | 281 |
| | 4. *Located in a Foreign Country* | 281 |
| | 5. *Authorized or Conducted under a Law Related to Insolvency or the Adjustment of Debts* | 281 |
| | 6. *Foreign Court's Control or Supervision of the Debtor's Assets and Affairs* | 283 |
| | 7. *Reorganization or Liquidation Purpose* | 284 |
| B. | *Does Betcorp's Winding Up Proceeding Meet the Requirements for Recognition Under Section 1517?* | 285 |
| | 1. *Is the Foreign Proceeding for Which Recognition Is Sought a Foreign Main Proceeding or Foreign Nonmain Proceeding?* | 285 |
| | i. Factors Relevant to the COMI Determination | 286 |
| | ii. Timing of the COMI Determination | 290 |
| | iii. Betcorp's COMI | 292 |
| | 2. *Is the Foreign Representative Applying for Recognition a Person or Body?* | 294 |
| | 3. *Does the Petition Meet the Requirements of Section 1515?* | 294 |
| IV. CONCLUSION | | 295 |

**\*271 *I. INTRODUCTION***

Simon John Cathro, an Australian liquidator, seeks recognition under chapter 15 of the Bankruptcy Code for the ongoing winding up and liquidation, in Australia, of Betcorp Limited, an Australian company. In particular, the petition seeks recognition of the winding up as a "foreign main proceeding." If granted, that recognition would entitle Betcorp to the protections of a variety of Bankruptcy Code provisions, the most important of which for Mr. Cathro's purposes is the automatic stay. *See* 11 U.S.C. § 1520(a)(1) (providing that 11 U.S.C. § 362 applies to a chapter 15 debtor upon re-cognition).

A United States company, 1st Technology LLC, opposes recognition. It has sued Betcorp for patent infringement, and that lawsuit is currently pending in the United States District Court for the District of Nevada. 1st Technology would prefer (and believes it is entitled) to continue to litigate its claims in a United States court, rather than pursue those claims in Betcorp's Australian liquidation.

Upon consideration of the evidence presented and for the reasons stated below, the court grants Mr. Cathro's petition for recognition of the Australian voluntary

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

400 B.R. 266, 51 Bankr.Ct.Dec. 99
**(Cite as: 400 B.R. 266)**

winding up as a foreign main proceeding under chapter 15 of the Bankruptcy Code.[FN1]

> [FN1]. This court has jurisdiction over this proceeding under 28 U.S.C. § 157(b)(1), as this proceeding is a core proceeding, *id.* § 157(b)(2) (P), and this district has entered an order, authorized by 28 U.S.C. § 157(a), referring such matters to this court. NEV. LOC. R.. 1001. Given 1st Technology's pending lawsuit against Betcorp, venue in this district is appropriate under 28 U.S.C. § 1410(2).

### II. Background

Betcorp was formed and registered as a company under Australian law on February 26, 1998. Declaration of Simon John Cathro ¶ 9 (dkt.# 6) ("Cathro Decl."). When it was active in business, Betcorp was a publicly-traded entity regulated by the Australian Securities and Investments Commission ("ASIC").[FN2] *Id.* From the time the company was formed until it ceased operations on October 31, 2006, its business activity involved a mélange of gaming activities, conducted through a variety of affiliate and subsidiary entities.[FN3] Supplemental Declaration of Simon John Cathro ¶ 10 (dkt. # 35) ("Cathro Supp."). The company ceased operations after changes in United States law made its business model unworkable. Betcorp's members **\*272** then voted to liquidate the company through a members' "voluntary winding up" under Australian law, a process which is ongoing. *See* Exhibits to Verified Petition (dkt. # 2, ex. 5 and 6). This process required the appointment of at least one liquidator registered with the ASIC. Throughout most of the winding up process, the appointed liquidators have been in discussions with 1st Technology regarding the patent infringement claims. These events are discussed in more detail below.

> [FN2]. For a period of approximately eight months in 2006, Betcorp also was listed on the London Stock Exchange's Alternative Investment Market. Cathro Decl. ¶ 10. The company was de-listed in conjunction with its termination of operations and liquidation.

> [FN3]. "Gaming" is generally regarded as a mild

euphemism for gambling, although the OXFORD ENGLISH DICTIONARY indicates that "gaming" was in use to describe wagering and other aleatory activities more than 225 years before "gambling" found its way into the language. *Compare* 6 OXFORD ENGLISH DICTIONARY 342–43 (2d ed.1989) (definition of gambling) *with id.* at 349 (definition of gaming).

### A. Betcorp's Gaming Operations and Corporate Governance

When it first began business operations, Betcorp initially created and operated a single subsidiary: Consolidated Sportsbet Australia Pty Limited. Transcript of Testimony of Simon John Cathro, Hearing on Oct. 29, 2008, at p. 54 ("TR").[FN4] Sportsbet operated solely in Australia, and employed between 20 and 30 people.[FN5] *Id.* at 54–55. By the end of 2002, Betcorp's management decided to diversify the company's gaming operations. To that end, on January 23, 2003, the company began offering on-line and telephone gaming services through a subsidiary located in Antigua named Tasman Gaming. Cathro Supp. ¶ 12. This business operated under a gaming license issued by the government of Antigua and Barbuda, West Indies. *Id.*

> [FN4]. The testimony of Mr. Cathro and Mr. Ian Walker, one of Betcorp's legal counsel, was taken by video transmission from Australia, after each witness had submitted his direct evidence by written declaration. Although the parties stipulated to the taking of this testimony by video transmission, the court could have found good cause to permit such method of receiving evidence given the cost of bringing the witnesses to the United States for only a half-day of testimony. *See* FED.R.CIV.P. 43(a) (made applicable to this proceeding by FED. R. BANKR.P. 9017).

> [FN5]. Betcorp sold Sportsbet in October of 2004. TR, pp. 53, 92.

Tasman eventually became the company's primary revenue generator. TR, p. 69. However, Betcorp created

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

400 B.R. 266, 51 Bankr.Ct.Dec. 99
**(Cite as: 400 B.R. 266)**

and operated other subsidiaries in order to further the company's business strategy of providing a "one-stop shop" for online gamblers. *See* Betcorp's "Annual Report and Accounts 2005" (dkt.# 35, ex. 4–8); *see also* TR, p. 65. As of 2005, Betcorp owned and operated the following subsidiaries:

• BCL (Asia) Pty Limited (incorporated in Australia);

• Tasman Gaming, Inc. (incorporated in Antigua);

• WWI AG Limited (incorporated in Antigua);

• Tasman Investments, Inc. (incorporated in Antigua);

• Swan Holdings (incorporated in Antigua);

• Tartar Sauce Investments, Ltd. (incorporated in Antigua);

• Sinsational Intertainment, Inc. (incorporated in Antigua);

• Oasis Antigua Holdings, Inc. (incorporated in Antigua);

• Applewick Holdings Ltd. (incorporated in Cyprus);

• Betcorp (UK) Limited (incorporated in the United Kingdom); and

• Cyber Processing Corp. Ltd. (incorporated in the Federation of St. Kitts and Nevis).

Cathro Supp. ¶ 11.[FN6]

> [FN6]. Betcorp also operated an information technology and marketing office in Toronto, Canada, which supported its various online gaming operations. Cathro Decl. ¶ 12.

Although Betcorp was involved, through these subsidiaries, in business operations in several countries, Australia remained its administrative and executive nerve center. **\*273** Reflecting the fact that the majority of shareholders resided in or were located in Australia, and that it was an Australian corporation, Australian law governed all corporate activities. Cathro Decl. ¶ 13.

The actual statistics overwhelmingly support a center of member ownership in Australia. According to Mr. Cathro, as of September 24, 2007:

• 1,468 of the 1,606 shareholders of Betcorp, or 91.4%, resided in Australia;

• 4,268,617 of the 6,353,426 Betcorp shares (or 67.2%) were held by members who resided in Australia; and

• 138 members (or 8.6%) resided in jurisdictions outside of Australia, of which nine members (or 0.05%) resided in the United States and held but 10,168 (or 0.02%) of the shares of Betcorp.

*Id.* As an Australian company, all Betcorp shareholder meetings have taken place in Australia. Cathro Supp. ¶ 6.

With respect to management, most Betcorp directors have been Australian-born individuals. Of the twenty-five individuals that have served as directors, only five did not reside in Australia. Cathro Supp. ¶ 1. Four of these non-Australian directors resided in the United Kingdom, and one resided in Antigua. *Id.* No Betcorp directors resided in the United States during their tenure. *Id.* These directors participated in both telephonic and in-person meetings. Cathro Supp. ¶ 7. When there were in-person meetings, the majority of them took place in Australia. *Id.*

Corporate audits were performed by the Sydney, Australia offices of two accounting firms: Ernst & Young (prior to 2006), and Grant Thornton (beginning in 2006). Cathro Supp. ¶ 8. Betcorp filed income tax returns with the Australian Tax Office since its incorporation, and paid Australian income tax on its earnings. Cathro Supp. ¶ 9. Finally, Betcorp's registered office has been in Australia from its incorporation to present. Cathro Decl. ¶ 11; TR, pp. 54–55.

***B. Changes in United States Gaming Law, Betcorp's Cessation of Operations, and Its Subsequent Winding Up***

On October 13, 2006, the United States passed the Unlawful Internet Gambling Enforcement Act, Pub.L.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

400 B.R. 266, 51 Bankr.Ct.Dec. 99
**(Cite as: 400 B.R. 266)**

No. 109–347, 120 Stat. 1884 (codified as 31 U.S.C. §§ 5361 –67). The Act prevented Betcorp from receiving funds transfers related to gaming activities from United States customers. This was a major blow to Betcorp's business model since at the time of enactment, most of the company's customers resided in the United States. Cathro Decl. ¶¶ 14–16.

Immediately after the passage of the Unlawful Internet Gambling Enforcement Act, the company ceased operations in the United States, and eventually ceased all operations completely.[FN7] Cathro Decl. ¶ 15. Preparations for the dissolution of the company were made, and in August of 2007, the company engaged the services of two liquidators, Simon John Cathro and Simon Alexander Wallace–Smith, of Deloitte Touche Tohmatsu. Cathro Decl. ¶ 19. An extraordinary general meeting of the company, as provided for under Australian company law, was called for September 28, 2007. Cathro Decl. ¶ 20. At that meeting, held at the company's offices in Australia, the members voted to appoint the liquidators and to begin a voluntary winding up. The vote was 99.9% in favor. **\*274** *See* Cathro Decl. ¶¶ 2, 20; *see also* Form 505 (dkt. # 2, ex. 6, pp. 4–5). On the day of their appointment, as part of their statutory duty to pay all creditors of the company, the liquidators issued a Notice Inviting Formal Proof of Debt or Claim. *See* Form 534 (dkt.# 6, ex. 2, p. 18). In administering this process, the liquidators became aware of 1st Technology's claims.

> FN7. Soon after the company ceased operations, Tasman was sold to Bodog Entertainment. TR, pp. 62–63.

### C. 1st Technology's Claims

1st Technology is owned by Dr. Scott Lewis. Dr. Lewis invented and patented a method and system for interactively transmitting multimedia information over a computer network, in a way that requires less bandwidth than prior art. United States Patent No. 5,564,001 (filed June 24, 1994) (the "'001 patent"). *See* USPTO Patent Full–Text and Image Database, http:// patft. uspto. gov/ netahtml/ PTO/ srchnum. htm (search "5564001") (*last visited* Feb. 9, 2009). According to Dr. Lewis, the method is useful to internet gaming compan-

ies because it enables a company to transmit data more quickly, using less resources, than would otherwise be the case. Declaration of Dr. Scott Lewis ¶¶ 9–11 (dkt.# 41). Dr. Lewis, through 1st Technology,[FN8] asserts that Betcorp infringed the '001 patent (either directly or through contributory infringement or inducement), and has sought to vindicate those claims through legal processes undertaken in both the United States and Australia. *Id.* at ¶¶ 22–39.

> FN8. Betcorp has not questioned that 1st Technology has standing to pursue claims of infringement of a patent originally issued to Dr. Lewis.

In early 2006, before Betcorp had ceased operations, 1st Technology sent a letter to Betcorp's offices in Australia, offering to license the '001 patent and other patents for use in Betcorp's operations. Letter from William W. Flachsbart to Betcorp (Feb. 10, 2006) (dkt.# 2, ex. 6, pp. 19–20). This letter also alleged that Betcorp's technology infringed at least one patent owned by 1st Technology. *Id.* Further letters followed on April 20, 2006, and July 21, 2006; neither of which were responded to by Betcorp in a manner satisfactory to 1st Technology.

On February 11, 2008, 1st Technology filed a complaint against Betcorp in the United States District Court for the District of Nevada, alleging infringement of the '001 patent. *1st Tech. v. Betcorp,* No. 2:08–cv–00175. Although 1st Technology did not immediately serve the complaint, its Australian counsel faxed a letter to the liquidators, dated February 13, 2008, which set forth the claims and enclosed a copy of the complaint. Letter from Leon Zwier to Simon Cathro/Simon Wallace–Smith (dkt.# 2, ex. 6, pp. 7–25). The letter requested additional information from Betcorp regarding some transactions in which Betcorp had been a participant. *Id.* Presumably, this information was sought to assist 1st Technology in the United States lawsuit, as well as in the Australian legal processes that would soon follow.

On April 16, 2008, 1st Technology submitted a proof of debt to the Australian liquidators. Letter from

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

400 B.R. 266, 51 Bankr.Ct.Dec. 99
**(Cite as: 400 B.R. 266)**

Leon Zwier to Ian Walker (April 16, 2008) (dkt.# 2, ex. 7, pp. 2–4). The liquidators responded to this proof of debt with a request for further evidence, pursuant to Regulation 5.6.53(1) of Australia's *Corporations Regulations 2001*.[FN9] Letter from Simon Wallace–Smith **\*275** h to Leon Zwier (April 30, 2008) (dkt.# 2, ex. 7, pp. 6–8).

> [FN9.] This request was made pursuant to authority granted to the liquidators under Australian regulatory law. *See* Corporations Regulations 2001, *available at* http:// www. com-law. gov. au/ (click "Compilations—Current" under "Select Legislative Instruments (SLIs) and Statutory Rules (SRs)"; search for "F2008C00509") (*last visited* Feb. 9, 2009).

1st Technology and the liquidators engaged in further communications, but the liquidators believed that the information received was insufficient to permit the liquidators to make a final decision on the proof of debt.[FN10] With the matter unresolved, 1st Technology then went forward with its United States lawsuit by formally serving it upon the liquidators on August 15, 2008. Return of Service (dkt.# 2, ex. 7, pp. 25–27). Although Betcorp has appeared in the infringement lawsuit, it has not answered the complaint. The liquidators instead prefer to resolve 1st Technology's claims through the Australian winding up process.[FN11] This reasoning lead to Mr. Cathro's filing the petition for recognition on October 2, 2008 (dkt.# 1).

> [FN10.] The liquidators, as of the submission of this matter, still have not made a decision on the proof of debt. At the hearing on the petition for recognition, Betcorp indicated that the liquidators would grant additional extensions after the court's decision to allow 1st Technology to submit additional evidence regarding their proof of debt.

> [FN11.] The parties have stipulated to stay the patent infringement action pending this court's decision on Betcorp's recognition petition.

### III. RECOGNITION OF BETCORP'S WINDING UP

Recognition of any proceeding as a foreign main proceeding requires several findings, and Mr. Cathro's request to recognize Betcorp's voluntary winding up in Australia is no different. As a preliminary matter, however, the court must determine whether Betcorp's winding up is a "foreign proceeding" within the meaning of 11 U.S.C. § 101(23). If 1st Technology is correct that the winding up fails to qualify under section 101(23), the matter ends there, and no recognition will be given. If, however, the winding up is a foreign proceeding, the court must look to section 1517(a) to see if Mr. Cathro has met his burden of proving that the winding up proceeding is entitled to recognition either as a "foreign main" proceeding or as a "foreign nonmain" proceeding. Each of these issues is discussed below.

#### A. Is Betcorp's Winding Up a "Foreign Proceeding" as Defined by 11 U.S.C. § 101(23)?

1st Technology argues that Betcorp's winding up is not a "foreign proceeding" within the meaning of chapter 15. It asserts, correctly, that (i) there is no lawsuit or legal proceeding pending in an Australian court (or anywhere else except the United States) involving any of Betcorp's creditors; (ii) Betcorp is not a bankrupt or in administration under Australian bankruptcy laws, or any other bankruptcy laws; and (iii) there is no lawsuit or other legal process by which a judge or other judicial officer directly supervises the liquidators' actions in the winding up. Based upon these facts, 1st Technology contends that Betcorp's actions are nothing more than a unilateral cessation of business followed by a private and unregulated settling of accounts.

1st Technology's interpretation of Australia's statutory scheme of liquidation is misguided. Both the text and existing interpretations of Australia's corporations statute indicate that an Australian voluntary winding up has all of the necessary elements of a "foreign proceeding" as that term is used in section 101(23). Although no United States court has examined section 101(23) in great detail, the court does not write without guidance. Chapter 15, which uses the term to define its scope, "incorporate[s] the Model Law on Cross–Border Insolvency" drafted by UNCITRAL, the United Nations Commission on International Trade Law. **\*276** 11 U.S.C. §

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

400 B.R. 266, 51 Bankr.Ct.Dec. 99
**(Cite as: 400 B.R. 266)**

1501(a). The statutory intent to meld American law into international law is explicit in the text of section 1501(a), and also is expressed in section 1508, which states that "[i]n interpreting this chapter, the court shall consider its international origin, and the need to promote an application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions." 11 U.S.C. § 1508; *see also* HOUSE REPORT ON THE BANKRUPTCY ABUSE PREVENTION AND CONSUMER PROTECTION ACT OF 2005, H.R.REP. NO. 109–31, pt. I, at 105 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 169 ("[Chapter 15] incorporates the Model Law on Cross–Border Insolvency to encourage cooperation between the United States and foreign countries with respect to transnational insolvency cases.... [These provisions are] intended to provide greater legal certainty for trade and investment as well as to provide for the fair and efficient administration of cross-border insolvencies, which protects the interests of creditors and other interested parties, including the debtor.") [hereinafter "HOUSE REPORT"]; 8 COLLIER ON BANKRUPTCY ¶ 1501.01 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.2008) (explaining the basis for chapter 15).

Against this background, the scope of the Model Law's definition of "proceeding" is quite relevant. The Model Law's *Guide to Enactment,* published by UNCITRAL, states:

> To fall within the scope of the Model Law, a foreign insolvency proceeding needs to possess certain attributes. These include the following: basis in insolvency-related law of the originating State; involvement of creditors collectively; control or supervision of the assets and affairs of the debtor by a court or another official body; and reorganization or liquidation of the debtor as the purpose of the proceeding....

UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW (UNCITRAL), UNCITRAL MODEL LAW ON CROSS–BORDER INSOLVENCY WITH GUIDE TO ENACTMENT ¶ 23, at 10, U.N. Gen. Assembly, UNCITRAL 30th Sess., U.N. Doc. A/CN.9/442 (1997), *available at* http:// www. uncitral. org/ uncitral/ en/ commission/ sessions/ 30 th. html

[hereinafter "*Guide to Enactment* "].FN12

> FN12. As Congress noted, the *Guide to Enactment* is very useful in construing chapter 15. "Interpretation of this chapter [15] on a uniform basis will be aided by reference to the Guide and the Reports cited therein, which explain the reasons for the terms used and often cite their origins as well." HOUSE REPORT, *supra,* at 109.

These attributes, as stated in the *Guide to Enactment,* follow from the text of Article 2(a) of the Model Law, which is codified almost word-for-word in this country in section 101(23).FN13

> FN13. Article 2(a) of the Model Law and section 101(23) have only minor differences. Section 101(23) adds the two words "The term" at the beginning of the definition, uses the term "foreign country" instead of the Model Law's "foreign State", substitutes the phrase "under a law" instead of using the word "pursuant", and adds the phrase "or adjustment of debt" after "insolvency." For purposes of this case, these are insignificant differences.

Section 101(23) states:

> The term "foreign proceeding" means a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

11 U.S.C. § 101(23).

[1] This definition can be broken down in seven criteria or elements, each of which **\*277** must be satisfied before Betcorp's winding up can be called a "foreign proceeding." These elements are:

(i) a proceeding;

(ii) that is either judicial or administrative;

400 B.R. 266, 51 Bankr.Ct.Dec. 99
**(Cite as: 400 B.R. 266)**

(iii) that is collective in nature;

(iv) that is in a foreign country;

(v) that is authorized or conducted under a law related to insolvency or the adjustment of debts;

(vi) in which the debtor's assets and affairs are subject to the control or supervision of a foreign court; and

(vii) which proceeding is for the purpose of reorganization or liquidation.

Each of these is analyzed below.

**1. A "Proceeding"**

[2] The first step in this analysis is to determine whether a "voluntary winding up" under Australian law is even a "proceeding." 1st Technology argues that it is not, since there is no petition or application to any court. To an American ear, this argument has some initial appeal. In cases under title 11, the term "proceeding" has a fairly circumscribed meaning—it is used to refer to in-court events, such as hearings, as well as being used to refer to self-contained lawsuits brought within a particular bankruptcy case, such as adversary proceedings. *See* BLACK'S LAW DICTIONARY 1241 (8th ed.2004) (definition of proceeding); *see also* FED. R. BANKR.P. 7001.

In the context of chapter 15, however, the word "proceeding" requires a broader definition in order to achieve the statutory directive of interpretation consistent with the understandings and the usages of international law and the UNCITRAL Model Law. Although not directly applicable under the circumstances, the *European Union Regulation on Insolvency Proceedings* is helpful with regard to the accepted meaning of the word "proceeding" in international insolvency law.FN14 Paragraph 10 of the introductory recitals of the EU Regulation states:

FN14. The EU Regulation applies in cross-border cases among all members of the European Union except Denmark. After its promulgation in 2000, it came into effect in 2002. That the controlling instrument is a regulation

rather than a law arises because the European Union was unable to agree, for nonbankruptcy reasons, on an earlier draft law, known as the European Union Convention on Insolvency Proceedings (the "EU Convention"). For a brief overview of the history and the current text of the EU Regulation, see Ian F. Fletcher, *The European Union Regulation on Insolvency Proceedings,* reprinted in INSOL INTERNATIONAL, CROSS–BORDER INSOLVENCY: A GUIDE TO RECOGNITION AND ENFORCEMENT, 15–45 (2003).

Even though the EU Convention was never adopted, the *Guide to Enactment's* references to the EU Convention's text are still relevant and valid, inasmuch as the *Guide to Enactment* was drafted during a time when it was possible to think that the EU Convention would be adopted, and the final text of the EU Regulation is based upon and closely parallels the earlier text of the EU Convention. These close connections are discussed in *In re Ran,* 390 B.R. 257, 264 n. 3 (Bankr.S.D.Tex.2008) (quoting the opinion of Mr. Advocate General Ruiz–Jarabo Colomer in Case C–1/04, *Proceedings brought by Staubitz–Schreiber,* [2006] E.C.R. I–701, 2005 WL 2138235 (ECJ Grand Chamber)).

Insolvency proceedings do not necessarily involve the intervention of a judicial authority; the expression "court" in this Regulation should be given a broad meaning and include a person or body empowered by national law to open insolvency proceedings. In order for this Regulation to apply, *proceedings (comprising acts and formalities set down in law)* should not only have to comply with the provisions of this Regulation, but they should also be officially recognized and legally effective in the Member**\*278** State in which the insolvency proceedings are opened....
COUNCIL REGULATION 1346/2000, 2000 O.J. (L 160), at 2, *available at* http:// eurlex. europa. eu/ Lex Uri Serv/ Lex Uri Serv. do? uri= OJ: L: 2000: 160:

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

400 B.R. 266, 51 Bankr.Ct.Dec. 99
**(Cite as: 400 B.R. 266)**

0001: 0018: EN: PDF (emphasis supplied) [hereinafter "EU Regulation"].FN15

> FN15. The breadth of this definition is significant in light of the more restrictive scope of the EU Regulation. The EU Regulation only applies to collective proceedings which "entail the partial or total divestment of a debtor and an appointment of a liquidator." EU Regulation, at 4 (art. 1(1)). Section 101(23) and Article 2(a) of the Model Law, however, have a broader scope, extending to reorganization proceedings such as the United States' chapter 11 when a debtor in possession is in control.

[3] This excerpt identifies the essence of a "proceeding": acts and formalities set down in law so that courts, merchants and creditors can know them in advance, and apply them evenly in practice. In the context of corporate insolvencies, the hallmark of a "proceeding" is a statutory framework that constrains a company's actions and that regulates the final distribution of a company's assets. In this case, that framework is provided by the Australian *Corporations Act (Cth) 2001.*FN16 Under Australian law, this Act governs voluntary winding up, as well as a multitude of other procedures used to end a corporation's existence. Chapter 5 of the *Corporations Act,* entitled "External Administration," governs the termination of businesses through the appointment of an administrator or liquidator, and is applicable to Betcorp.

> FN16. The court permitted Mr. Cathro to introduce the entire Australian *Corporations Act (Cth) 2001* into evidence, but that was not necessary. Rule 44.1 would have permitted the court to have looked to the version generally available on the Internet. *See* FED.R.CIV.P. 44.1 (made applicable to this proceeding by FED. R. BANKR.P. 9017) ("In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.").

The *Corporations Act* is divided into 10 chapters, consisting in total of over 2,000 pages. It is comprehensive, dealing with matters affecting all stages of the corporate life-cycle, from the formation and registration of corporate entities through termination of operations, liquidation and dissolution. Corporations Act (Cth) 2001, *available at* http:// www. comlaw. gov. au/ (click "Compilations—Current" under "Acts"; search for "C2009C00042") (*last visited* Feb. 9, 2009) (The abbreviation "Cth" stands for "Commonwealth of Australia," the full name of that country, and is the official designator for laws enacted by Australia's federal government.)

In this opinion, sections of the *Corporations Act* will be cited as "CA." Although the *Corporations Act* was amended after submission of this matter, the amendments do not affect the analysis of whether Betcorp's winding up is entitled to recognition under chapter 15.

1st Technology argues that a voluntary winding up is not a proceeding because commencement of that type of process does not require an application or petition to any court. Mr. Cathro responds that this bare fact obscures the nature of a voluntary winding up. He argues that to understand the voluntary winding up process, the court must consider all of the *Corporations Act's* external administration provisions, along with the duties those provisions impose on a liquidator (who is necessarily appointed as part of a voluntary winding up). *See CA § 495(1), CA § 499(1).*

Chapter 5 of the Australian *Corporations Act* is obviously intended to be read as an integrated whole. It purports to contain all of the provisions necessary to wind up any company and has been interpreted to be the exclusive procedure under which any such winding up may occur. *See* MICHAEL GRONOW, MCPHERSON'S LAW OF **\*279** COMPANY LIQUIDATION ¶ 1.40, at 1–52 (5th ed.2006); Rosalind Mason, *Local Proceedings in a Multi–State Liquidation: Issues of Jurisdiction,* 30 MELB. U.L.REV. 145, 160–61 & nn. 112–13 (2006) (citing ANDREW KEAY, MCPHER-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

400 B.R. 266, 51 Bankr.Ct.Dec. 99
**(Cite as: 400 B.R. 266)**

SON: THE LAW OF COMPANY LIQUIDATION 2–3 (4th ed.1999)).[FN17] To augment this exclusivity, the provisions allow, but do not require, court involvement, and provide, in appropriate cases, for the conversion from voluntary winding up to court-supervised external administration, and vice versa. *See CA § 459P* (setting out who may apply to a court for a company to be wound up in insolvency); *CA § 461* (setting out grounds other than insolvency upon which a court may wind up a company); *CA § 496* (explaining the duties of liquidators when a company turns out to be insolvent; *CA § 467B* (allowing the court to take control of a voluntary winding up); *CA § 482* (permitting the court to terminate or stay a court ordered winding up and return company control to the corporate principals).

> FN17. It also requires notice to the ASIC, the Australian regulatory agency responsible for and which oversees Australian corporations. *CA § 5B; see* ROBERT P. AUSTIN & IAN M. RAMSAY, FORD'S PRINCIPLES OF CORPORATIONS LAW ¶ 3.140 (13th ed.2007) (describing the functions of the ASIC).

So although a voluntary winding up may never be placed squarely in front of a judge, once the provisions of Part 5 are invoked, the nature of the process changes, and changes in ways that are beyond the debtor's control. The terms of these changes are laid out in the statute, providing the necessary "act and formalities" for conversion and supervision.

As an example, if a company initiates a voluntary winding up, and is found during the course of that winding up to be insolvent, the liquidator must convert to another type of administration or call a creditors' meeting. *CA § 496*. Either action will likely lead to court involvement. Similarly, if a corporation chooses liquidation under a type of court-supervised external administration known as a voluntary administration (not this case), and all creditors are paid 100 cents on the dollar, then that proceeding must be terminated and the company wound up under other Chapter 5 provisions. *See CA § 445FA; CA § 446A*. A court may also order the end of such a voluntary administration if it thinks a company is solvent. *CA § 447A*. Numerous other provisions of

Chapter 5 also require conversion among the various types of external administration or otherwise govern the effects of conversion.[FN18]

> FN18. For example, the provisions of Chapter 5.2, regarding the appointment of a receiver, explain how the receiver's powers are affected when a company is being wound up. *CA § 420C*. The provisions of Chapter 5.3A, in section 436B, explains that a liquidator may appoint an administrator, which is something a liquidator might choose to do after determining the liquidator has a statutory duty to convert a winding up into some other time of external administration. Sections 459 and 462 also provide mechanisms for a liquidator to convert a proceeding from one type of external administration to another.

Australian case law also indicates that viewing the voluntary winding up process as a "proceeding" is appropriate. As stated in *Lofthouse v. Austl. Sec. Invs. Comm'n,* (2004) 82 A.L.D. 481, ¶¶ 50–52, 2004 WL 674816 (Austl.):

Subject to its being solvent and a Court's not having ordered that it be wound up in insolvency, a company may resolve by special resolution that it be wound up [*CA §§ 490, 491*]. If such a resolution is made, a liquidator must be appointed by the company in a general meeting [*CA § 495(1)* ] and all the powers of the directors cease [*CA § 495(2)* ]. If it should transpire that the company **\*280** is insolvent, the liquidator may choose to apply to the Court under [*CA § 459P* ] for the company to be wound up in insolvency, appoint an administrator of the company under [*CA § 436B* ] or convene a meeting of the company's creditors [*CA § 496(1)* ].... Subject to the provisions of the Act as to preferential payments, the property of the company must be applied in satisfaction of its liabilities equally and, subject to the company's constitution, be distributed amongst its members according to their rights and interests in the company [*CA § 501*].

The fact that commencing this type of external administration terminates the authority of the company's

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

400 B.R. 266, 51 Bankr.Ct.Dec. 99
**(Cite as: 400 B.R. 266)**

directors, combined with the fact that the winding up cannot be stopped by the equity interest holders once they have passed the special resolution, lends further support to a finding that this Australian legal process is a proceeding.

1st Technology's sole argument on this issue—that the absence of an application or a petition to an Australian court proves the winding up is not a proceeding—is not persuasive given the explanation found in *Lofthouse* and this court's reading of the Australian *Corporations Act. See also* EU Regulation, Recital ¶ 10 ("Insolvency proceedings do not necessarily involve the intervention of a judicial authority; the expression 'court' in this Regulation should be given a broad meaning and include a person or body empowered by national law to open insolvency proceedings."). The court thus finds that an Australian voluntary winding up is a "proceeding" under section 101(23) and, by extension, chapter 15.

**2. Judicial or Administrative in Character**
[4] Section 101(23) requires that the proceeding be judicial or administrative in character. An Australian voluntary winding is, generally, a proceeding with an administrative character, although under certain circumstances the proceeding may temporarily become more appropriately characterized as judicial.

The Australian *Corporations Act* provides that a company commences a voluntary winding up by passing a "special resolution." *CA § 491.* Once passed, the liquidating company must appoint a liquidator that is registered with the ASIC. *CA § 495(1); see* Part 9.2 of the *Corporations Act.* The initial actions of the liquidator, such as sending a notice of liquidation and requesting proofs of debt, have an administrative character. *See CA §§ 490–581.* The submission of proofs of debt and the ultimate payments to creditors are made pursuant to the administrative framework created by the *Corporations Act. Id.* If no party objects, and every creditor is paid in full, it is possible that the entire voluntary winding up may progress from commencement to final disbursal of funds and company de-registration as a purely administrative proceeding.FN19

FN19. The payment in full is critical; "creditors have no involvement [in a voluntary winding up] because they will be repaid in full." MICHAEL MURRAY, KEAY'S INSOLVENCY: PERSONAL AND CORPORATE LAW AND PRACTICE ¶ 11.10, at 273 (6th ed.2008).

In order to protect creditors' rights, however, a voluntary winding up may change from a proceeding with an administrative character to one with a judicial character. As discussed in Part III.A.6, *infra,* the actions of the liquidator are subject to review by the courts of Australia upon application by parties in interest. If such review is sought, the proceeding will take on a judicial character while a **\*281** judge reviews the request. More importantly, however, if it appears to the liquidators that there may not be sufficient funds to pay all creditors in full, the proceeding will generally have to be converted into a form of external administration requiring more judicial involvement. *Lofthouse,* 82 A.L.D. at ¶ 50.

In any event, section 101(23) requires only that a proceeding have either an administrative *or* a judicial character. Therefore, because the court finds that the voluntary winding up necessarily has an administrative character, this element of section 101(23) is satisfied.

**3. A Collective Proceeding**
[5][6] Section 101(23) also requires the proceeding be "collective." A collective proceeding is one that considers the rights and obligations of all creditors. This is in contrast, for example, to a receivership remedy instigated at the request, and for the benefit, of a single secured creditor.

A voluntary winding up fits this "collective" criterion. As a leading Australian treatise states: "Liquidation is, like bankruptcy, a procedure of an inherently collective nature.... The procedure is compulsory, in order to ensure that there is an orderly, cooperative system. The result is that any attempt by a creditor to undermine the collective nature of liquidation is outlawed." GRONOW, *supra,* ¶ 1.20, at 1–51. Australian courts have also consistently held that private remedies, such as a receivership or a private deed of arrangement,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

400 B.R. 266, 51 Bankr.Ct.Dec. 99
**(Cite as: 400 B.R. 266)**

cannot accomplish the goals of a statutory winding up. *Id.* at ¶ 1.40, at 1–51 (citing cases); Re Island Air Pty Ltd, (1983) 7 ACLR 844 (Austl.) (scheme of arrangement); Re Tillers Pty Ltd, [1970] 3 NSWR 202 (Austl.) (similar); Re Swallow Footwear Ltd, (1956) 222 LT 229 (Austl.) (court-appointed receiver); *see also CA § 501.* FN20

> FN20. The liquidator has a duty to account for the rights of all creditors in the course of distributing a company's property. *CA § 501.* Provisions of the *Corporations Act* facilitate and enhance this collective process by permitting a high degree of creditor involvement. For example, if a creditor so chooses, the liquidator must hold meetings to determine the need for the formation of creditor Committees of Inspection. *CA §§ 548–52.* If the liquidator refuses to form these committees, that decision is immediately appealable to a court, which in turn may order their formation. *Id.*

The voluntary winding up provisions, combined with the case law from Australian courts, provide substantial evidence that this type of external administration is properly understood as collective. Thus, this criterion of section 101(23) is satisfied by Betcorp's proceeding.

**4. Located in a Foreign Country**

The voluntary winding up must be located in a foreign country. The special resolution commencing Betcorp's voluntary winding up was made at a meeting that was held at the company's registered office, which is located in Melbourne, Australia. The voluntary winding up is operating under the provisions of Australian law. The liquidators—whom are currently the only persons authorized to act for the company—are appointed pursuant to Australian law, and both are citizens and residents of Australia. Based on this evidence, the court finds that Betcorp's winding up is located in a foreign country, thereby satisfying this section 101(23) criterion.

**5. Authorized or Conducted under a Law Related to Insolvency or the Adjustment of Debts**

[7][8] For Betcorp's winding up to qualify as a for-

eign proceeding, the winding up must be authorized or conducted **\*282** under a law related to insolvency or the adjustment of debts. Importantly, this element does not require the company to be either insolvent or to be contemplating using the provisions of Australian law to adjust any debts. FN21 Two facts favor a finding that Betcorp's winding up satisfies this fifth criterion: (1) the unified structure of the external administration provisions of the *Corporations Act;* and (2) the Australian Parliament's own interpretation that Australia's company laws qualify under the Model Law.

> FN21. *See* UNCITRAL, Working Group on Insolvency Law, *Draft Legislative Provisions on Judicial Cooperation and Access and Recognition in Cases of Cross-border Insolvency,* p. 9, at n. 2, U.N. Doc. A/CN.9/WG.V/WP.44 (Mar. 8, 1996) (explaining that the phrase "or other law relating to insolvency" is intended to "allude to the fact that liquidations ... might be conducted under other than, strictly speaking, insolvency laws" and giving the example of company laws), *available at* http:// www. uncitral. org/ pdf/ english/ travaux/insolvency/acn9–wg5–wp44–e.pdf.

As explained above, the *Corporations Act* regulates the whole of the corporate life-cycle of an Australian corporation. In this regard, several sub-parts of Chapter 5 contain provisions that deal with corporate insolvency and allow for the adjustment of debts. *See* Parts 5.3, 5.4A, and 5.4B of Chapter 5 of the *Corporations Act.* These facts, combined with the statutory ability to shift among various forms of dissolution given changing circumstances, demonstrate that winding up is achieved under a law relating to insolvency or the adjustment of debts.

Additionally, the court finds persuasive the Australian legislature's interpretation of its *Corporations Act,* published in connection with Australia's adoption of the Model Law. In Australia, proposed legislation is often accompanied by "explanatory memoranda" that serve as an aid to understanding the purpose and structure of the legislation. Pursuant to statutory authority, Australian courts may use these explanatory memor-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

400 B.R. 266, 51 Bankr.Ct.Dec. 99
**(Cite as: 400 B.R. 266)**

anda to interpret legislation that has been enacted. *See* Austl. Acts Interpretation Act 1901 (2009) § 15AB(2)(e) (providing that a court may use an explanatory memorandum to interpret legislation), *available at* http:// www. comlaw. gov. au/ (click "Compilations—Current" under "Acts"; search for "C2009C00046"; click the PDF) (*last visited* Feb. 9, 2009). Given that this court may look to any relevant material or source to interpret foreign law, *see* FED.R.CIV.P. 44.1, the court will thus consider these memoranda as relevant sources and interpretative guides to Australian law.

The Senate of the Parliament of the Commonwealth of Australia has issued an "Explanatory Memorandum" which interprets Australia's version of the UNCITRAL Model Law, enacted as part of Australia's Cross–Border Insolvency Bill 2008. CROSS–BORDER INSOLVENCY BILL 2008, EXPLANATORY MEMORANDUM, *available at* http:// www. comlaw. gov. au/ (click "1996+ by title" under "Bills"; search for "C2008B00008"; select "Cross–Border Insolvency Bill 2008"; click "EM/Supp Material"; click the PDF) (*last visited* Feb. 9, 2009) [hereinafter "Explanatory Memorandum"]. That memorandum states:

> Many articles of the Model Law require an insertion for 'laws of the enacting State relating to insolvency' (or similar). It is intended that the Model Law will apply to collective judicial or administrative proceedings pursuant to a law relating to bankruptcy or corporate insolvency. As such, the relevant Australian laws are the Bankruptcy Act and Chapter 5 (other than Parts 5.2 and 5.4A) of the Corporations Act, and also section **\*283** 601CL of the Corporations Act [Part 2, clause 8].

*Explanatory Memorandum* ¶ .13, at 7–8.

A voluntary winding up is governed by Part 5.5 of Chapter 5 of the *Corporations Act.* It is telling that this is *not* one of the sub-parts excluded in the *Explanatory Memorandum.* Accordingly, based upon the Australian legislature's interpretation of the UNCITRAL Model Law and Australian domestic law, a company engaged in a voluntary winding up is being administered under a law relating to insolvency. This evidence supports the court's determination that Betcorp's winding up satisfies the "law relating to insolvency" criterion of section 101(23). Therefore, the court finds that this element of section 101(23) is satisfied.[FN22]

> FN22. The United States' expansion of the types of laws that can be considered-the addition in section 101(23) of laws related to "adjustment of debt" to laws related to "insolvency," see note 13–bolsters this conclusion but is not necessary to it. For proceedings for which this addition might be relevant, *see* Jennifer D. Morton, Note, *Recognition of Cross–Border Insolvency Proceedings: An Evaluation of Solvent Schemes of Arrangement and Part VII Transfers Under U.S. Chapter 15,* 29 FORD. INT'L L.J. . 1312 (2006).

**6. Foreign Court's Control or Supervision of the Debtor's Assets and Affairs**

[9] Section 101(23) requires that the voluntary winding is conducted such that the assets and affairs of the debtor are subject to control or supervision by a foreign court. In chapter 15, the term "foreign court" has a defined meaning. Section 1502 of the Bankruptcy Code defines "foreign court" as "a judicial or other authority competent to control or supervise a foreign proceeding."[FN23]

> FN23. There is a slight problem with the use and interpretation of "foreign court" in section 101(23). The chapter 15 definition of "foreign court" is not directly applicable to chapter 1 of the Bankruptcy Code in which section 101(23) is found. *Compare* 11 U.S.C. § 103(k) (stating, with exceptions not relevant here, that chapter 15 applies only in cases under that chapter) *with id.* § 1502 (stating that the listed definitions are "[f]or the purposes of this chapter [15]"). The question thus arises as to whether the definition of "foreign court" found in section 1502(3) can be used to interpret that same phrase in section 101(23).
>
> While recognizing that the suggested reading—that an administrative agency is a

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

400 B.R. 266, 51 Bankr.Ct.Dec. 99
**(Cite as: 400 B.R. 266)**

court—is somewhat contrary to plain meaning, this court will use the definition found in section 1502(3) to construe section 101(23). This deviation from accepted methods of statutory interpretation is justified by the international context of this case, and by Congress' directives, contained in section 1501 and 1508, to construe chapter 15 so that it is consistent with international understandings.

Initially, the Model Law was drafted with the definition of "foreign proceeding" and the definition of "foreign court" in the same Article. *Compare* Model Law, Arts. 2(a) (definition of "foreign proceeding") *with id.* Art. 2(e) (definition of "foreign court"). The separation of the two definitions in chapter 15 does not appear to have been done with the intent of limiting the scope of section 101(23). *See* HOUSE REPORT, *supra,* 110 (discussing definitions, including "foreign court," as if adapted without change from Model Law). To the contrary, section 1501(a)'s instruction is to interpret chapter 15 in line with the Model Law so as to promote, among other things, "greater legal certainty." 11 U.S.C. § 1501(a)(3). That certainly would be undermined if United States courts refused to recognize, as a foreign proceeding, foreign liquidations and reorganizations simply because they were being administered by an administrative agency rather than a judicial officer.

In Betcorp's case, the liquidators, Mr. Cathro and Mr. Wallace–Smith, have direct control of the debtor's assets. The ASIC, in turn, directly regulates all liquidators. As stated in section 5B of the *Corporations Act,* "Subject to the ASIC Act, ASIC has the general administration **\*284** of this Act." The ASIC supervises liquidators in the performance of their duties, and requires that liquidators request permission of the ASIC before undertaking certain actions. *See, e.g.,* ASIC POLICY STATEMENT 81, DESTRUCTION OF BOOKS (May 3, 2000) (requiring liquidators conducting a voluntary

winding up to submit a written request to the ASIC before destroying any books and records). Also, pursuant to Part 9.2 of the *Corporations Act,* the ASIC may remove or revoke the authority of any person to be a liquidator. Therefore, a reasonable interpretation of the relationship between the ASIC and any liquidator is that the ASIC itself is "an authority competent to control and supervise a foreign proceeding" within the meaning of sections 101(23) and 1502. *See In re Tradex Swiss AG,* 384 B.R. 34, 42 (Bankr.D.Mass.2008) (Swiss Federal Banking Commission held to be a foreign court under chapter 15 because it controls and supervises liquidation of entities, such as debtor, that are in brokerage trade).

Alternatively, the voluntary winding up proceedings are also subject to supervision by a more traditional judicial authority: the Australian courts. [FN24] Section 511 of the *Corporations Act* allows both liquidators and creditors to request a court to determine "any question arising in the winding up of a company." Even in the absence of a creditor's appeal, the Australian courts have a broad mandate to review actions of liquidators. Under section 536, if it appears to a court that the actions of a liquidator are in derogation of the *Corporations Act,* the court "may take such action as it thinks fit." *See also Cresvale Far East (in liq) v. Cresvale Sec. Ltd,* (2001) 39 A.C.S.R. 622, ¶ 63, 2001 WL 1353240 (Austl.) (reversed in part on unrelated grounds) ("In a voluntary winding up, the appointment of the liquidator is consensual but a liquidator's duties and powers are prescribed by the Corporations Act, and there are elements of supervision by the Court.").

> FN24. As explained in section 58AA of the *Corporations Act,* "Court," as used in the Act, may, under the circumstances, refer to either the Federal Court of Australia or the Supreme Court of a State or Territory.

Further, under section 1321 of the *Corporations Act,* any person "aggrieved by any act, omission or decision of ... a liquidator" may appeal to an Australian court. The court may then "confirm, reverse or modify the act or decision or remedy the omission, as the case may be, and make such orders and give such directions

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

400 B.R. 266, 51 Bankr.Ct.Dec. 99
**(Cite as: 400 B.R. 266)**

as it thinks fit." [FN25] *Id.* If cause is shown, the court may remove the liquidator from his or her position. *CA § 503; cf. Tradex Swiss,* 384 B.R. at 42 (alternatively holding the Swiss Federal Banking Commission to be a foreign court under chapter 15 because its decisions are subject to review by Swiss courts).

> FN25. Also, if a creditor does not believe a liquidator is dealing appropriately with its proof of claim, it "may apply to the Court for a decision in respect of it." *Corporations Regulations 5.6.53(2).*

Based on this evidence, the court finds that Betcorp's winding up proceeding is being conducted such that the assets and affairs of Betcorp are subject to control or supervision by a foreign court, within the meaning of section 101(23).

**7. Reorganization or Liquidation Purpose**

[10] The final requirement of section 101(23) is that the purpose of the foreign proceeding be for reorganization or liquidation. A voluntary winding up is a statutory process under the law of Australia through which a company is liquidated. *See CA § 501.* The directors' minutes and **\*285** memo to equity interest holders explain that the purpose of the winding up is to liquidate Betcorp. *See* Director's Minutes (dkt.# 2, ex. 5, pp. 2–29). The special resolution commencing Betcorp's winding up indicates the same. *See* Resolution (dkt.# 2, ex. 6, p. 2). The declaration filed by Mr. Cathro also states that the purpose of the winding up is to liquidate the company. Cathro Decl. ¶¶ 25, 44. Therefore, the court finds this final element of section 101(23) is satisfied.

Having determined that each of the seven criteria required by section 101(23) are satisfied, the court finds that Betcorp's voluntary winding up is a "foreign proceeding." With this substantial preliminary question settled, the court now turns to the requirements for recognition that are stated in section 1517.

**B. Does Betcorp's Winding Up Proceeding Meet the Requirements for Recognition Under *Section 1517?***

Section 1517 requires recognition of a foreign pro-

ceeding if:

> (1) such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign non-main proceeding within the meaning of section 1502;

> (2) the foreign representative applying for recognition is a person or body; and

> (3) the petition meets the requirements of section 1515.

Assessing whether these three requirements are satisfied necessitates reference to other chapter 15 provisions and the Code's definition section. These elements are addressed in turn.

**1. Is the Foreign Proceeding for Which Recognition Is Sought a Foreign Main Proceeding or Foreign Non-main Proceeding?**

Section 1517's first requirement is that the foreign proceeding for which recognition is sought is either a foreign main or a foreign nonmain proceeding. In this case, Mr. Cathro specifically seeks Betcorp's winding up to be recognized as a foreign main proceeding.

Under section 1502(4), a foreign main proceeding is a "foreign proceeding pending in the country where the debtor has the center of its main interests." As Betcorp's winding up qualifies as a "foreign proceeding," the question then becomes where Betcorp's "center of main interests" or "COMI" as it is often referred to, is located.

COMI is not defined in the Bankruptcy Code or in the Model Law. To aid courts in simple or uncontested cases, section 1516(c) states that, "[i]n the absence of evidence to the contrary, the debtor's registered office ... is presumed to be the center of the debtor's main interests." [FN26] If this presumption applied, it is undisputed that at all times the debtor's registered office was in Australia.

> FN26. "The presumption that the place of the registered office is also the center of the debtor's main interest is included for speed and convenience of proof where there is no serious

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

400 B.R. 266, 51 Bankr.Ct.Dec. 99
**(Cite as: 400 B.R. 266)**

controversy." HOUSE REPORT, *supra* at 113; *see In re Basis Yield Alpha Fund (Master)*, 381 B.R. 37, 52–53 (Bankr.S.D.N.Y.2008).

[11][12] 1st Technology, however, has in good faith introduced evidence raising a legitimate question as to whether Betcorp's COMI is in Australia. Because of this, this court cannot rely solely upon section 1516(c)'s presumption in determining whether Betcorp's COMI is in Australia. It must consider all evidence, while keeping in mind that it is Mr. Cathro's burden to persuade the court, by a preponderance of the evidence, that Betcorp's **\*286** COMI is in Australia. *In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 335–36 (S.D.N.Y.2008) (quoting HOUSE REPORT, *supra,* at 112–13); *Tradex Swiss,* 384 B.R. at 43; *see* FED.R.EVID. 301 (explaining that a party's rebuttal of a presumption does not shift the burden of proof; rather, the risk of nonpersuasion remains upon the party on whom it was originally cast-in this case, the joint liquidators of Betcorp); *see also In re Tri–Continental Exchange Ltd.*, 349 B.R. 627, 635 (Bankr.E.D.Cal.2006) (discussing the 11 U.S.C. § 1516(c) presumption).

The next section, Part III.B.1.i, analyzes cases discussing and applying the COMI concept. Part III.B.1.ii then addresses a particular COMI issue raised by 1st Technology: should COMI be determined as of the time of the filing of the petition for recognition, or should the court look back and determine COMI in light of a debtor's operational history? Following that, Part III.B.1.iii will address Mr. Cathro's contention that Betcorp's COMI is located in Australia.

### i. Factors Relevant to the COMI Determination

The term "center of main interests" is taken from the UNCITRAL Model Law. *Tri–Continental,* 349 B.R. at 633. The *Guide to Enactment* to that law indicates the phrase's origin to be in the EU Convention.[FN27] As stated in paragraph 31 of the *Guide to Enactment:*

> FN27. The connections between the failed EU Convention and the current EU Regulation are examined in note 14, *supra.*

A foreign proceeding is deemed to be the "main" proceeding if it has been commenced in the State where "the debtor has the centre of its main interests". This corresponds to the formulation in the European Union Convention on Insolvency Proceedings (art. 3 of that Convention), thus building on the emerging harmonization as regards the notion of a "main" proceeding.[FN28]

> FN28. This borrowing is confirmed by paragraph 72 of the *Guide to Enactment:*
>
> > The expression "centre of main interests" in subparagraph (b) to define a foreign main proceeding is used also in the European Union Convention on Insolvency Proceedings.
>
> *Guide to Enactment,* ¶ 72.

*Guide to Enactment,* ¶ 31, at 12.

In the preliminary paragraphs of the EU Regulation, in turn, elaborate upon COMI as "the place where the debtor conducts the administration of his interests on a regular basis and is therefore ascertainable by third parties." EU Regulation ¶ 13. As explained in a report generally thought to be expressive of the intent of the EU Convention, and upon which the EU Regulation is based:

> The rationale of this rule is not difficult to explain. Insolvency is a foreseeable risk. It is therefore important that international jurisdiction ... be based on a place known to the debtor's potential creditors. This enables the legal risks which would have to be assumed in the case of insolvency to be calculated.

MIGUEL VIRGOS & ETIENNE SCHMIT, REPORT ON THE CONVENTION ON INSOLVENCY PROCEEDINGS ¶ 75, at 51 (1996), *available at* http:// aei. pitt. edu/ 952/ 01/ insolvency_ report_ schmidt_ 1988. pdf.[FN29]

> FN29. This report was originally designed to be the authorized guide to the EU Convention. While the EU Convention was never adopted, however, it still retains interpretative vitality so

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

long as its origins are properly understood. When discussing the provenance of this report, Professor Ian Fletcher has noted that:

> The exact status of the *Virgos–Schmit* Report is somewhat uncertain since it has never been officially placed in the public domain, although the text has been published in various languages, using the version prepared and revised by the linguistic experts of the EC Council during 1995–1996 in anticipation of formal publication in the *Official Journal.*

Ian F. Fletcher, *The European Union Regulation on Insolvency Proceedings,* reprinted in INSOL INTERNATIONAL, CROSS–BORDER INSOLVENCY: A GUIDE TO RECOGNITION AND ENFORCEMENT 19 (2003). Professor Fletcher goes on to note that:

> To provide for some measure of atonement for the abrogation of the proposed explanatory report, many of the numbered Recitals [of the EU Regulation] attempt to provide a much-compressed summary of the information that the Report contained concerning many of the key provisions or expressions now embodied in the Regulation.

> *Id.*

> Although the Internet citation refers to "Schmidt," the report itself indicates that the author's name does not contain a "d."

**\*287** Although examining these origins helps, it leaves much open; after all, the term "center of main interests" is not specifically defined, either in chapter 15 or the Model Law. Such uncertainty was not intended. One of the United States' representatives to the UNCITRAL meetings that produced the Model Law, Professor Jay Westbrook, has explained that the adoption of the term in chapter 15 was not intended to create a new concept of location, but to build upon existing concepts:

> Chapter 15 was drafted to follow the Model Law as

closely as possible, with the idea of encouraging other countries to do the same. One example is use of the phrase "center of main interests," which could have been replaced by "principal place of business" as a phrase more familiar to American judges and lawyers. The drafters of Chapter 15 believed, however, that such a crucial jurisdictional test should be uniform around the world and hoped that its adoption by the United States would encourage other countries to use it as well.

Jay Lawrence Westbrook, *Chapter 15 at Last,* 79 AM. BANKR.L.J. 713, 719–20 (2005) (citations omitted). This gloss on "center of main interests"—that it is virtually identical to the more commonly used (at least in the United States) concept of "principal place of business"—has been analyzed recently by several domestic courts. *See also* Jay Lawrence Westbrook, *Locating the Eye of the Financial Storm,* 32 BROOK. J. INT'L L.. 1019, 1020 (2007) ("COMI is similar to standards like 'principal place of business,' 'chief executive offices,' or 'real seat' that one finds in many statutes in the United States and elsewhere.") [hereinafter "Westbrook, *Financial Storm* "].

In *Bear Stearns,* the only appellate case thus far to address chapter 15's COMI concept, official liquidators for two hedge funds registered as Cayman Islands limited liability companies sought chapter 15 recognition for liquidation proceedings opened in the Cayman Islands. In determining whether the funds' COMI was in the Cayman Islands, or elsewhere, the court began with *Tri–Continental Exchange's* observation that COMI could be "equate[d]" with "the United States' concept of 'principal place of business.' " *Id.* at 336 (quoting *Tri–Continental,* 349 B.R. at 629); *see also In re Basis Yield Alpha Fund (Master),* 381 B.R. 37, 47 (Bankr.S.D.N.Y.2008).

The *Bear Stearns* court then recited the bankruptcy court's listing of potential factors that could be relevant to a COMI determination. 389 B.R. at 336. These included:

> the location of the debtor's headquarters; the location of those who actually manage the debtor (which, con-

400 B.R. 266, 51 Bankr.Ct.Dec. 99
**(Cite as: 400 B.R. 266)**

ceivably could be the headquarters of a holding company); the location of the debtor's primary assets; the location of the majority **\*288** of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes.

*Id.* (quoting *In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 128 (Bankr.S.D.N.Y.2007)) (in turn quoting *In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr.S.D.N.Y.2007)) . This formulation has been adopted or used by most courts that have subsequently addressed the components of COMI. *See* Tradex Swiss, 384 B.R. at 42–43; *In re Ernst & Young, Inc.*, 383 B.R. 773, 779 (Bankr.D.Colo.2008); *Basis Yield,* 381 B.R. at 47; *In re Loy*, 380 B.R. 154, 162 (Bankr.E.D.Va.2007).

Ultimately, *Bear Stearns* affirmed the bankruptcy court's finding that the debtor's COMI was not in the Cayman Islands, and thus the Cayman Islands proceeding was not entitled to recognition as a foreign main proceeding.[FN30] 389 B.R. at 337–38. Aside from being registered in the Cayman Islands, the bankruptcy court had found that the Funds had no other "adhesive connection" with that country. 374 B.R. at 129–30. Further, no managers or employees were located in the Caymans, the Funds were administered from offices located in the United States, and neither the books and records of the Funds, nor the Funds' assets, were held in the Caymans. *Id.* In sum, the court denied recognition because the Funds existed in the Caymans as merely shells or "letterbox" companies. *Id.* at 130 n. 8.

> FN30. Indeed, the bankruptcy court had gone further and found that the debtor did not even have an "establishment" in the Cayman Islands, and denied recognition as a foreign nonmain proceeding as well. The district court affirmed this finding and conclusion. 389 B.R. at 338–39.

*Tradex Swiss* used the same analysis in a somewhat different setting. There, a foreign exchange trading company had activities in Switzerland and the United States. Swiss banking authorities had commenced an in-

vestigation into the debtor's activities; the testimony was that the Swiss regulator had oversight responsibility for all currency traders such as Tradex (because it acted as a securities broker as defined in Swiss law). 384 B.R. at 37–38. The regulator had the power to act as a bankruptcy court for the restructuring or liquidation of securities brokers such as Tradex. *Id.*

Tradex was registered as a Swiss company, but had offices in the United States and in Switzerland. Tradex's trades were accomplished at its United States office, and the officer with signing authority over bank accounts was located there. *Id.* at 39. Its physical files were in Boston, and its email correspondence with customers originated there. *Id.* Its money was in United States' banks, and a plurality of its creditors (in number) and a majority in amount were in the United States. *Id.* The United States office had 18 employees, and the Swiss office had only 4, one of which was a girlfriend of a principal, and another was a cleaning person. *Id.*

The foreign representatives wanted a halt to United States proceedings, including an involuntary chapter 7 case filed against the debtor. To achieve this goal, they filed a chapter 15 case, seeking to establish that the debtor's COMI was in Switzerland, thus making the Swiss proceeding a foreign main proceeding.

The court did not grant recognition as a foreign main proceeding. Adopting the principal place of business framework, the court analyzed the debtor's business activities as of the chapter 15 filing. *Id.* at 42–43. The court found that the presence of a **\*289** business location, and a principal, of the debtor in Switzerland was not enough to establish COMI there; rather, the fact that the debtor's cash, assets, main trading platform, and records were in the United States made the United States the debtor's COMI.[FN31] *Id.* at 43.

> FN31. The Swiss proceedings were recognized, however, as a foreign nonmain proceeding because the facts indicated that Tradex had an establishment in Switzerland, just not a principal place of business. *Id.* at 43–44.

These domestic decisions do not stand alone. Cases

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

400 B.R. 266, 51 Bankr.Ct.Dec. 99
**(Cite as: 400 B.R. 266)**

from other countries also support a focus on the principal place of business.[FN32] An instructive case from the European Court of Justice is *Bondi v. Bank of America, N.A. (In re Eurofood IFSC Ltd.),* Case 341/04, 2006 E.C.R. I–3813, 2006 ECJ Celex Lexis 777, 2006 WL 1142304 (E.C.J. May 2, 2006). The case concerned an entity named Eurofood, which was a subsidiary of an Italian entity named Parmalat SpA. Eurofood's registered office was in Ireland, and it did business throughout that country. *Id.* at ¶ 17. In January of 2004, Eurofood was sought to be involuntarily wound up, pursuant to the provisions of Irish law. *Id.* at ¶¶ 19–20. That proceeding was immediately opened, and ultimately the Irish court found Ireland to be Eurofood's COMI. *Id.* ¶ 20.

> FN32. Looking at these foreign cases is appropriate. Section 1508 states in interpreting phrases such as "center of main interests," "the court shall consider" how those phrases have been construed in other jurisdictions which have adopted similar statutes. This means looking not only at domestic cases, but also at cases decided by the courts of other countries. As stated in the legislative history, "[n]ot only are these sources persuasive, but they advance the crucial goal of uniformity of interpretation." HOUSE REPORT, *supra,* at 110.

Eurofood's parent Parmalat was, at the time of the commencement of the Eurofood Irish proceeding, itself the subject of an "extraordinary administration" proceeding in Italy. In conjunction with Parmalat's proceeding, an Italian proceeding was opened against Eurofood, and in late February 2004 that court found Eurofood insolvent and declared Italy to be Eurofood's COMI. Finally, in March, the Irish courts determined that the Irish proceeding had primacy under the EU Regulation, found Eurofood's COMI to be in Ireland, and refused to recognize the decisions made in Eurofood's Italian proceeding. *Id.*

The European Court of Justice found that Parmalat, by virtue of its position as corporate parent, had ultimate control over Eurofood, but that Eurofood's main interests were objectively in Ireland, and were ascer-

tainable to be in Ireland by third parties. *Id.* at ¶ 37. Given this conduct, the European court found that the relationship of parent and subsidiary was insufficient to rebut the presumption that the registered office of Eurofood, Ireland, was Eurofood's center of main interests. *Id.*

Other cases confirm the strength of an ascertainable principal place of business even when it is not located in the country in which the debtor is registered or incorporated. In *Re BRAC Budget Rent–a–Car Int'l Inc.,* [2003] EWHC 128(Ch), 2003 WL 117146 (Eng.), for example, a company incorporated in Delaware and with its registered address in the United States, petitioned for an administration order under United Kingdom law. The company had never traded in the United States and, for the most part, conducted its business in the United Kingdom. In addition, most of its employees worked in England and had contracts of employment governed by English law. Given this background, the court found the debtor's COMI to be in the **\*290** United Kingdom, thus giving it the power to take jurisdiction over the proceeding. A similar holding was issued in *Collins & Aikman Corp. Group,* [2005] EWHC (Ch) 1754, ¶ 38, 2005 WL 4829623 (Eng.), in which the court found that the debtor's centralization of human resources systems, cash systems, sales functions and engineering design function in England lead to a finding that England was the debtor's COMI. *See also* Scott A. Bomhof & Adam M. Slavens, *Shifting Gears in Cross–Border Insolvencies: From Comity to COMI,* 24 BANK. & FIN. L.REV. 31, 46–53 (2008).

[13][14] In sum, a commonality of cases analyzing debtors' COMI demonstrates that courts do not apply any rigid formula or consistently find one factor dispositive; instead, courts analyze a variety of factors to discern, objectively, where a particular debtor has its principal place of business. This inquiry examines the debtor's administration, management, and operations along with whether reasonable and ordinary third parties can discern or perceive where the debtor is conducting these various functions.[FN33]

> FN33. Professor Westbrook, in *Financial Storm,* proposes that the determination of

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

400 B.R. 266, 51 Bankr.Ct.Dec. 99
**(Cite as: 400 B.R. 266)**

COMI be influenced not only by the predictability that the principal place of business standard provides, but also by the likelihood of selection of an acceptable substantive law. Westbrook, *Financial Storm, supra,* at 1020. Professor Westbrook's proposal is driven by the understandable desire to avoid the application of law chosen by the debtor which would lead to predictably abusive results for the debtor's creditors. *Id.* at 1030–35. The use of such debtor havens raises the difficulty that "both formally and in action, [the results produced by the haven law] is too likely to fall outside that range of acceptable outcomes. It may also lack essential procedural characteristics, such as sufficient transparency and an acceptable judicial system." *Id.* at 1032. The ultimate result would be a unwelcome drift back to territorialism and the unprincipled preference for local law. *Id.*

> Whatever the merits of this proposal—and they are considerable—this court does not have to decide whether a COMI determination needs to consider the quality of the applicable substantive law. In this case, Betcorp's country of registry, its principal place of business, and the likelihood that an acceptable substantive law will govern its liquidation, all point to Australia as Betcorp's COMI.

**ii. Timing of the COMI Determination**

[15] Even if the objective facts at the time of Betcorp's filing establish its COMI in Australia, 1st Technology has a further argument. It contends that the COMI determination should be made with reference to a company's operational history, and not merely by assessing where COMI lies on the petition date. If this perspective is adopted, so 1st Technology argues, it demonstrates that Australia is not Betcorp's COMI.

This argument is flawed. To accept it would frustrate the goals of using COMI to "harmonize" insolvency proceeding recognition transnationally, and it would make the determination of COMI imprecise and

often incorrect.

A good example of the various policy choices is found in *In re Ran,* 390 B.R. 257 (Bankr.S.D.Tex.2008). In *Ran,* an Israeli bankruptcy trustee sought recognition of the Israeli bankruptcy under chapter 15 as a foreign main proceeding. The bankruptcy involved an individual, one Yuval Ran, an Israeli citizen who had a prolonged history of business activities in Israel, but who had relocated to the United States and continuously resided in Texas for approximately a decade prior to the chapter 15 filing. *Id.* at 260–61.

*Ran* is a prime example of why the court cannot make the COMI determination with an eye toward a debtor's operational history. Timing was a decisive issue in *Ran* **\*291** because, in his past, Mr. Ran had substantial interests in Israel, but on the date of the petition for recognition, he had effectively no interests in that country. *Ran,* 390 B.R. at 260. In an argument closely tracking that of 1st Technology in this case, Mr. Ran essentially argued that the court must consider his entire operational history in making its COMI determination. *Id.* at 300.

Prior to 1997, Mr. Ran was the CEO of a publicly-traded Israeli company and had been associated with nearly 100 Israeli companies. *Id.* at 260, 285. Some of the companies Mr. Ran was associated with began experiencing large losses, prompting Mr. Ran and his family to leave Israel and come to America. *Id.* at 260.[FN34] Since 1998, Mr. Ran had not conducted business in Israel. *Id.* Mr. Ran took up work in America, applied to be a United States citizen, and at the COMI hearing, he stated that he intended to remain in America for the rest of his life. *Id.* Nonetheless, the Israeli bankruptcy trustee argued fervently that a longitudinal assessment of Mr. Ran's business activities proved his COMI was in Israel. *Id.* The trustee pointed out that in 1999, an Israeli court—the District Court of Tel–Aviv–Jaffa—had appointed him as trustee to administer Mr. Ran's assets. *Id.*

> FN34. There were also personal reasons. His car and his brother's office were firebombed, and he and his family had received several

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

400 B.R. 266, 51 Bankr.Ct.Dec. 99

**(Cite as: 400 B.R. 266)**

Page 24

death and kidnaping threats. 390 B.R. at 260–61 n. 1.

*Ran* rejected the trustee's arguments. *Id.* at 300. It based that rejection on a common sense argument: If courts assess COMI with an eye to a debtor's operational history, there is an increased likelihood of conflicting COMI determinations, as courts may tend to attach greater importance to activities in their own countries, or may simply weigh the evidence differently. Giving consideration to a debtor's operational history increases the possibility of competing main proceedings, thus defeating the purpose of using the COMI construct. Requiring courts to give weight to the debtor's interests over the course of its operational history may destroy the uniformity and harmonization that is the goal of employing the COMI inquiry.

Moreover, it is important that the debtor's COMI be ascertainable by third parties. *Ran's* analysis correctly proceeds on the assumption that COMI is affected not only by what a debtor does, but by what a debtor is perceived as doing. *See id.* at 274–75. If the debtor's main interests are in a particular country and third parties observe this situation, it should be irrelevant that the debtor's interests were previously centered in a different country. The presumption is that creditors will look to the law of the jurisdiction in which they perceive the debtor to be operating to resolve any difficulties they have with that debtor, regardless of whether such resolution is informal, administrative or judicial.[FN35]

> FN35. As *Ran* also recognizes, due regard must be given for the debtor's choice to conduct his business where he or she sees fit. *Id.* at 272–75 (citing *Shierson v. Vlieland–Boddy,* [2005] EWCA (Civ) 974, 2005 WL 1860177 (Eng.)).

In fact, an inquiry into the debtor's past interests could lead to a denial of recognition in a country where a debtor's interests are truly centered, merely because of past activities. This frustrates two of the purposes of the COMI inquiry—it decreases the effectiveness of the insolvency proceeding for which recognition is sought, and it may lead to a sub-optimal distribution of the debtor's assets, inasmuch as non-recognition where re-

cognition is due may forestall needed inter-nation cooperation.**\*292** *See* Westbrook, *Financial Storm, supra.*

As a result, *Ran* held that the appropriate time to determine COMI was when the chapter 15 case commenced. This is consistent with English cases interpreting the EU Regulation, which seem to select a time linked to the commencement or service of the relevant insolvency proceeding. *Shierson v. Vlieland–Boddy,* [2005] EWCA (Civ) 974, ¶¶ 39, 55, 2005 WL 1860177(Eng); Re Collins & Aikman Corp. Group, [2005] EWHC (Ch) 1754, ¶ 39, 2005 WL 4829623(Eng).

**iii. Betcorp's COMI**

[16] This brings the analysis to the determination of Betcorp's center of main interests. Viewing Betcorp as of the time of the petition for recognition, almost all of the factors considered by courts lead to a determination that Betcorp's COMI is Australia. *See Bear Stearns,* 389 B.R. at 336 (listing potentially relevant factors such as: the locale of debtor's headquarters; its management; its assets; its creditors and the jurisdiction whose law would apply to most disputes). The location of Betcorp's registered office and the place from where the winding up is being administered is Australia.[FN36] The location of those that manage Betcorp—the liquidators (since commencing the winding up divests the directors of their authority)—is Australia. Betcorp has no employees, save and except for those selected by the liquidators. Betcorp's primary asset; in fact, its only asset, is the cash in its Australian bank account. The voluntary winding up is being conducted pursuant to the Australian *Corporations Act,* and therefore this is the law that would apply to most disputes.

> FN36. Although the presumption of section 1516 does not apply in this case, that does not mean that the location of Betcorp's registered office is irrelevant. *See Bear Stearns,* 389 B.R. at 336; *Tri–Continental,* 349 B.R. at 629–30.

The only factor that does not support a finding that Betcorp's COMI is Australia is the location of its creditors. Betcorp currently has two creditors. One is located in the United Kingdom, and will apparently be paid

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

400 B.R. 266, 51 Bankr.Ct.Dec. 99
**(Cite as: 400 B.R. 266)**

when the liquidators have settled all outstanding creditor disputes. The other creditor is 1st Technology, which is located in the United States. 1st Technology argues that notwithstanding all of the factors indicating Betcorp's COMI is in Australia, the court should determine COMI is in the United States, based upon 1st Technology's allegations of patent infringement.[FN37]

> FN37. 1st Technology also argues that the court should consider that many of Betcorp's former customers were from the United States. The court declines this invitation, considering that Betcorp had no customers as of the date of the petition for recognition, and this date cabins the court's inquiry.

Based on a consideration of all of the relevant factors and the evidence presented, the court finds that Betcorp's COMI is Australia. This is the place from which Betcorp conducts the administration of its interests, and this fact has proved ascertainable not only by third parties, but by 1st Technology itself (e.g., the letters from 1st Technology regarding alleged patent infringement, and submitting its proof of debt to the Australian liquidators). This finding is in line with recent English decisions under the EU Regulation finding that the identity of the country in which an individual debtor's debts were incurred was not a relevant consideration in establishing where COMI might be. *Shierson,* [2005] EWCA (Civ) 974; *Official Receiver v. Eichler,* [2007] B.P.I.R. (Ch D.) 1636, 2007 WL 4947537 (Eng.) .

**\*293** Consideration of the consequences of 1st Technology's argument also support Australian COMI. If 1st Technology is correct, then Betcorp's COMI is in the United States, and only a United States court could open a main proceeding for its assets and creditors. This court would then be faced with administering the estate of an Australian company, with its assets and management some eighteen time zones away, all for the sake of one lawsuit. This is especially wasteful when Australia, the other candidate for Betcorp's COMI, has a liquidation process in place that is both rational and fair, and which provides for full payment to creditors such as 1st Technology, or if Betcorp proves insolvent, for a fair

aliquot share of any remaining assets.[FN38]

> FN38. 1st Technology's focus has been on having a United States court decide its United States patent claims. But chapter 15 recognition will not preclude that from occurring; rather, it simply means that the company's liquidators will have the ability to make the initial determination as to where the claim will be liquidated. It could be that the liquidators may permit the United States lawsuit to proceed, or the parties could agree to some other form of resolution. If 1st Technology disagrees with the liquidators' determination, this court is convinced that it will have appropriate recourse to Australian courts to have that decision reviewed.

[17] Further, even if the court accepted 1st Technology's invitation to determine COMI with respect to the company's operational history—an invitation this court rejects—the outcome would not change. When the company was first formed, its sole subsidiary operated only in Australia. As the company grew, it began to operate subsidiaries in other countries, given rise to "interests" in each place it did business. But as discussed in Part II of this opinion, at all times Betcorp's administrative and executive nerve center was Australia. It is where its decisions were made and where most of its management and shareholdings were concentrated. 1st Technology's evidence with respect to Betcorp's customers, while relevant, is not as probative as the other objective and external indica of where Betcorp's executive decisions were made. Against this, Mr. Cathro has introduced extensive evidence showing Betcorp's COMI was and is Australia. Therefore, the court's decision on Betcorp's COMI would not be changed by taking into account the operational history of the company. Based on the evidence presented, Mr. Cathro has carried his burden of showing Betcorp's center of main interests to be in Australia. Accordingly, the court finds the first element of section 1517 is satisfied and that Betcorp's winding up is a "foreign main" proceeding.[FN39]

> FN39. Because the court has determined that Betcorp's winding up is a foreign main pro-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

400 B.R. 266, 51 Bankr.Ct.Dec. 99
**(Cite as: 400 B.R. 266)**

ceeding, it need not discuss whether the proceeding would qualify as a nonmain proceeding, since the definitions of main and nonmain make those terms mutually exclusive. *See* 11 U.S.C. §§ 1502(4) and (5). This also renders moot 1st Technology's request for denial of recognition on the basis that Betcorp does not have an "establishment" in Australia because of its liquidation. *See* 11 U.S.C. § 1501(2) (definition of establishment).

The existence of an establishment in the country in which the proceeding is pending is only relevant to the determination of whether a foreign proceeding is a "foreign nonmain proceeding." Only that definition uses the definition of "establishment." *Compare* 11 U.S.C. § 1517(b)(1) (providing for recognition as foreign main proceeding if proceeding is pending in country where debtor has center of main interests) *with id.* § 1517(b)(2) (providing for recognition as a foreign nonmain proceeding if proceeding is pending in country where the debtor has an establishment). Since foreign main and foreign nonmain proceedings are mutually exclusive, and since the court has found that Betcorp's winding up qualifies as a foreign main proceeding, there is no legal need to make any findings on whether or where Betcorp has an "establishment."

***294 2. Is the Foreign Representative Applying for Recognition a Person or Body?***

[18] The second requirement under section 1517 is that the foreign representative applying for recognition is a person or body. Section 101(24) defines the term "foreign representative" as "a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." This requirement is satisfied in this case.

The court has already found that the voluntary winding up qualifies as a foreign proceeding under sec-

tion 101(23). In that voluntary winding up, the liquidators are officially authorized by statute to liquidate the debtor's assets. *See CA § 506; see also id. § 501.* The Betcorp member vote authorizing the winding up specifically gave the liquidators control over the debtor's assets and allowed them to liquidate those assets. Cathro Decl. ¶¶ 19–22. Mr. Cathro and Mr. Wallace–Smith are the only representatives of the debtor currently authorized to act on its behalf and have been actively carrying out the duties required of them as liquidators. *See* Cathro Decl. ¶ 23. Mr. Cathro, an individual and the liquidator named in the petition for recognition, is therefore both a person [FN40] and a "foreign representative" applying for recognition. The court thus finds this second requirement of section 1517 is satisfied.

FN40. The Bankruptcy Code states that "[t]he term person includes individual, partnership, and corporation...." 11 U.S.C. § 101(41). As Mr. Cathro is an individual—that is, a living human being—the court need not construe what is meant by "body," a term undefined in either chapter 1 or chapter 15 of the Bankruptcy Code.

***3. Does the Petition Meet the Requirements of Section 1515?***

The final item necessary for recognition is that all four requirements of section 1515 are met. 11 U.S.C. § 1517(a), (b)(1)-(3). Section 1515's first requirement is found in subsection (a) and simply that the foreign representative has filed a petition for recognition. 11 U.S.C. § 1515(a). Mr. Cathro has complied with this requirement. *See* Petition for Recognition (dkt.# 1).

[19] The second requirement of section 1515 is found in subsection (b). It requires that the petitioner establish that a foreign proceeding exists and that the petitioner has been appointed as the foreign representative. The first two paragraphs of section 1515(b) provide for the sufficient evidence; they specify that the petitioner may satisfy this requirement by providing a "certified copy of the decision commencing such foreign proceeding and appointing the foreign representative" and "a certificate from the foreign court affirming the existence of the foreign proceeding and the appointment of the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

400 B.R. 266, 51 Bankr.Ct.Dec. 99
**(Cite as: 400 B.R. 266)**

foreign representative." 11 U.S.C. § 1515(b)(1) & (2). In cases such as Betcorp's, however, in which there is no formal court proceeding, the statute may be satisfied with "any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative." 11 U.S.C. § 1515(b)(3).

Mr. Cathro has satisfied the second requirement. In conjunction with the filing of its petition for recognition, Mr. Cathro filed a document from the ASIC showing that liquidators had been appointed pursuant to provisions of the *Corporations Act. See* Form 505 (dkt.# 2, ex. 6, pp. 4–5). Given that section 1502(3)'s definition of "foreign court" refers to "a judicial *or other***295** *authority* competent to control or supervise a foreign proceeding," documents from the ASIC, for reasons stated earlier, suffice for this requirement.[FN41] In combination with the other evidence presented, this documentary evidence submitted by Mr. Cathro satisfies this section 1517(a)(3).

> FN41. (emphasis supplied). There is no issue of the applicability of section 1502(3)'s definition in this context, as section 1515 is found in chapter 3, the stated scope of the definitions in section 1502.

The third requirement under section 1515 is that the petition for recognition is accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative. 11 U.S.C. § 1515(c). Mr. Cathro's declaration explains that the Australian proceeding is the only foreign proceeding the debtor is involved with, and therefore the court finds this requirement is satisfied. *See* Verified Petition Under Chapter 15 For Recognition of a Foreign Main Proceeding ¶¶ 28–31 (dkt. # 2); *see also* Cathro Decl. ¶ 44.

The fourth and final requirement is simply that certain documents be translated into English. 11 U.S.C. § 1515(d). As the native language of all documents produced is English, this requirement is also satisfied.

Accordingly, all requirements of section 1515 are satisfied.

*IV. CONCLUSION*

As all of the requirements under section 1517(a) have been met, the petition for recognition is granted. In accordance with section 1517(b), Betcorp's winding up is hereby recognized as a foreign main proceeding. This opinion shall constitute the court's findings of fact and conclusions of law, in accordance with FED. R. BANKR.P. 7052 (incorporating FED.R.CIV.P. 52), made applicable to this proceeding under FED. R. BANKR.P. 1018. The court will enter a separate order under FED. R. BANKR.P. 9021.

IT IS SO ORDERED.

Bkrtcy.D.Nev.,2009.
In re Betcorp Ltd.
400 B.R. 266, 51 Bankr.Ct.Dec. 99

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Tab 25

48 Collier Bankr.Cas.2d 362

KeyCite Yellow Flag - Negative Treatment

Distinguished by In re Gold & Honey, Ltd., Bankr.E.D.N.Y., August 21, 2009

275 B.R. 699
United States District Court,
S.D. New York.

In re Petition of BOARD OF DIRECTORS OF
HOPEWELL INTERNATIONAL INSURANCE LTD.,
as Scheme Administrators of Hopewell International
Insurance Ltd., Debtor in Foreign Proceedings.

No. 99 Civ. 11470(DC).
|
March 29, 2002.

**Synopsis**
Board of directors of foreign reinsurance company filed petition for ancillary case to aid in enforcement of court sanctioned scheme of arrangement between company and its creditors in accordance with law of Bermuda. The United States Bankruptcy Court for the Southern District of New York, Tina L. Brozman, Chief Judge, granted petition, 238 B.R. 25. Creditors appealed. The District Court, Chin, J., held that: (1) petition was properly venued, and (2) individual creditors would not to be allowed to bring individual actions or proceedings against foreign reinsurance company in courts throughout United States pursuant to scheme of arrangement.

Affirmed.

West Headnotes (7)

**[1]     Bankruptcy**
          Conclusions of law;de novo review

On appeal from an order of the bankruptcy court, a district court reviews conclusions of law de novo; this standard of review applies to matters of statutory interpretation.

32 Cases that cite this headnote

**[2]     Bankruptcy**
          Discretion

A bankruptcy court's decision to defer to a foreign proceeding is reviewed for abuse of discretion. Bankr.Code, 11 U.S.C.A. § 304(c).

2 Cases that cite this headnote

**[3]     Bankruptcy**
          Clear error

A district court must accept a bankruptcy court's findings of fact, unless such findings are clearly erroneous. Fed.Rules Bankr.Proc.Rule 8013, 11 U.S.C.A.

32 Cases that cite this headnote

**[4]     Bankruptcy**
          Particular cases

**Bankruptcy**
          Cases Ancillary to Foreign Proceedings

Petition for ancillary case to aid in enforcement of court sanctioned scheme of arrangement between foreign reinsurance company and its creditors in accordance with law of Bermuda was properly venued in Southern District of New York; although creditor asserted that arbitration agreement between company and creditor required any proceeding to be in Minnesota, no action or proceeding had been commenced or was pending when company filed its petition and company's principal assets in United States were located in New York. Bankr.Code, 11 U.S.C.A. § 304(c); 28 U.S.C.A. § 1410.

2 Cases that cite this headnote

**[5]     Bankruptcy**
          Cases Ancillary to Foreign Proceedings

Judicial proceeding by which scheme of arrangement was adopted and approved between foreign reinsurance company and its creditors to adjust company's assets and debts in accordance with law of Bermuda was "foreign proceeding"; although process was "stand alone" scheme of arrangement not implemented in tandem with another statutory vehicle for debt manipulation such as voluntary liquidation, administration, or

26-11268-mg    Doc 23-3    Filed 06/24/26    Entered 06/24/26 13:13:49    Exhibit C    Pg 423 of 882

In re Petition of Bd. Of Directors of Hopewell Intern. Insurance Ltd., 275 B.R. 699 (2002)

48 Collier Bankr.Cas.2d 362

court ordered winding up, it was nonetheless subject to court supervision. Bankr.Code, 11 U.S.C.A. § 304(c).

6 Cases that cite this headnote

**[6]    Bankruptcy**
    Cases Ancillary to Foreign Proceedings

Board of directors of solvent foreign reinsurance company was "foreign representative" qualified to file petition for ancillary case to aid in enforcement of court sanctioned scheme of arrangement between company and its creditors in accordance with law of Bermuda; although Board was not appointed by court to act as foreign representative, statute did not require court appointment. Bankr.Code, 11 U.S.C.A. §§ 101(24), 304(c).

2 Cases that cite this headnote

**[7]    Bankruptcy**
    Cases Ancillary to Foreign Proceedings

Individual creditors, as matter of judicial efficiency and fairness to all parties, would not be allowed to bring individual actions or proceedings against foreign reinsurance company in courts throughout United States pursuant to court sanctioned scheme of arrangement between company and its creditors under law of Bermuda; although there was arbitration agreement between company and creditor and United States policy favored arbitration agreements, according comity to Bermuda injunction was consistent with, and certainly would not violate, United States public policy. Bankr.Code, 11 U.S.C.A. § 304(c).

6 Cases that cite this headnote

**Attorneys and Law Firms**

**\*701**  Cozen and O'Connor, By Stephen A. Cozen, Richard M. Mackowsky, Neal D. Colton, David M.

Doret, Ellen M. Spindler, Philadelphia, PA and New York City, for Gold Medal.

Seward & Kissel, LLP, By Ronald L. Cohen, Mark D. Kotwick, Charles M. Miller, New York City, Zelle, Hofmann, Voelbel & Gette, LLP, By Lawrence Zelle, Lawrence T. Hofman, Richard L. Voelbel, Minneapolis, MN, for General Mills.

Chadbourne & Parke, LLP, By Howard Seife, Marjorie L. Cohen, Lisa C. Dorr, Andrew Rosenblatt, New York City, for Hopewell.

*MEMORANDUM DECISION*

CHIN, District Judge.

This is an appeal from an order of the Bankruptcy Court for the Southern District of New York granting the petition of the Board of Directors of Hopewell International Insurance Ltd. ("Hopewell") pursuant to § 304 of the Bankruptcy Code for recognition of a "Scheme of Arrangement" entered into under Bermuda law. The Bankruptcy Court held that the scheme and an injunction issued by a Bermuda court to enforce the scheme were entitled to full force and credit in the United States. Two creditors, Gold Medal Insurance Company ("Gold Medal") and General Mills, Inc. ("General Mills") appeal. For the reasons set forth below, the order of the Bankruptcy Court is affirmed.

*FACTS*

A. *Background*

Hopewell is a Bermuda company that provides reinsurance for "captive insurers." A captive insurer provides insurance only for its parent company and the parent's other subsidiaries. Typically, a captive insurer has few assets and employees and reinsures its risks with a reinsurer.

Gold Medal is the captive insurer of General Mills. Gold Medal reinsured its risk with Hopewell pursuant to a reinsurance agreement dated November 16, 1992 (the "Reinsurance Agreement"). In turn, Hopewell limited its risk through a pool of reinsurance agreements (the "Hopewell Treaties"). The Reinsurance Agreement provided for the arbitration of all disputes in Minneapolis,

3086

Minnesota, under Minnesota substantive and procedural law.

### B. *The Pesticide Claims*

In 1994, General Mills suffered extensive losses when certain oats were treated with a non-FDA approved pesticide. General Mills filed claims for insurance coverage with Gold Medal (the "Pesticide Claims"). Gold Medal initially denied coverage, but eventually submitted the claims to arbitration in Minnesota. Hopewell did not participate in the defense of the claims, and instead informed Gold Medal that it would not be bound by any settlement between General Mills and Gold Medal based on the arbitration.

In November 1999, a Minnesota arbitrator ruled in favor of General Mills and found that the Gold Medal policies covered almost all of the Pesticide Claims. If coverage exists, Gold Medal and General Mills agree that the amount of the loss would be $168 million.

### *702  C. *The Scheme*

Although Hopewell specialized in property reinsurance, it also provided casualty insurance in the 1970s. It incurred liability for substantial losses as a result. The 1987 Pampa vapor cloud explosion, for example, resulted in a $500 million loss. Hopewell began to have difficulty obtaining reinsurance. In 1994, Hopewell began to explore the possibility of a run-off—pursuant to which it would cease assuming new risks and it would wind-down existing business. Hopewell contends that it began considering a run-off before it learned of the Pesticide Claims, but Gold Medal contends otherwise. In late 1994 or early 1995, Hopewell decided to go into a run-off, even though it was still solvent.

In early 1995, Hopewell decided to adopt a "scheme of arrangement," a procedure that would require its creditors to estimate and file claims. Under Bermuda law, a scheme of arrangement is a contractual adjustment of rights between a company and its creditors or shareholders; it is not a liquidation or reorganization. Although schemes of arrangement are most often used in conjunction with insolvent run-offs, Hopewell was solvent. Hopewell contemplated using a scheme not to distribute Hopewell's assets to its creditors, but to pay creditors the amounts due from retrocessionaires. Hopewell's board of directors

approved the drafting of a scheme of arrangement on March 28, 1995.

On May 25, 1995, Hopewell, through its attorney, John Kawaley, initiated the scheme process by seeking leave of the Bermuda Supreme Court to convene the requisite creditors' meeting for approval of a scheme of arrangement (the "Scheme"). After a presentation by counsel, the court signed an order approving the notices, proxy forms, claims valuation, and procedures for voting. Under Bermuda law, the Scheme had to be approved by a majority of the creditors representing more than 75% of the value of actual and contingent claims represented at a statutorily prescribed meeting.

Hopewell divided its creditors into two classes: creditors with liquidated claims who would be paid in full without delay, and creditors with unliquidated claims who would receive payment only to the extent of available assets. Despite their huge potential exposure, the Pesticide Claims were assigned a voting weight of zero because Gold Medal had not submitted a claim to Hopewell for that loss. Gold Medal received the Scheme Explanatory Statement on May 26, 1995, less than a month before the creditors meeting. Gold Medal claims that Walsh, the claims manager for Hopewell, assured Gold Medal that the enactment of the Scheme would not alter the handling of the Pesticide Claims. Although this is disputed, the Bankruptcy Court found that at the June 23, 1995 creditors' meeting, Gold Medal voted to approve the Hopewell Scheme through its proxy John Deters. Gold Medal and General Mills claim that Deters abstained. No dissenting votes were recorded.

On June 23, 1995, the same day as the creditors' meeting, counsel for Hopewell filed a petition with the Bermuda Supreme Court for approval of the Scheme. On June 29, 1995, the court held a hearing. Although creditors had the right to attend and object to the Scheme, no creditor objected. At the end of the hearing, the court signed an order approving the Scheme. On June 30, 1995, Hopewell stopped writing new agreements and began its run-off.

Under the Scheme, creditors had to give notice of all claims, whether liquidated or not, by June 30, 1999. The Scheme also provided that all disputes were to be submitted to binding arbitration in Bermuda under Bermuda law, notwithstanding any **\*703** pre-

3087

26-11268-mg    Doc 23-3    Filed 06/24/26    Entered 06/24/26 13:13:49    Exhibit C    Pg
425 of 882

In re Petition of Bd. Of Directors of Hopewell Intern. Insurance Ltd., 275 B.R. 699 (2002)
48 Collier Bankr.Cas.2d 362

existing arbitration provisions contained in Hopewell's reinsurance agreements.

## D. *The Bermuda Injunction*

At some point in 1998, Gold Medal threatened to sue Hopewell in Minnesota to compel Hopewell to abide by any settlement Gold Medal reached with General Mills. In response, Hopewell sought and obtained, on July 27, 1998, an *ex parte* order from the Bermuda court enjoining Gold Medal from commencing any action inconsistent with the scheme in any court throughout the world (the "Bermuda injunction"). The Bermuda injunction expressly permitted Gold Medal to challenge the injunction upon giving Hopewell seven days notice.

## E. *Hopewell's Petition*

On July 30, 1998, the Board of Directors (the "Board") of Hopewell filed this petition under § 304 in the Bankruptcy Court, alleging that this case was ancillary to a foreign proceeding. The petition sought emergency relief enjoining Gold Medal and all other creditors from commencing any action or arbitration inconsistent with the Scheme in the United States. In addition, Hopewell sought an order granting comity to and enforcing the Bermuda injunction. [1]

[1]     General Mills was allowed to intervene by the Bankruptcy Court. All creditors were given notice of the proposed nationwide injunction, but none except Gold Medal appeared. 238 B.R. at 31 n. 2.

The Bankruptcy Court (Brozman, J.) held an eight-day trial. General Mills argued that venue in the Southern District of New York was improper. It argued that the court should allow Gold Medal to pursue its arbitration in Minnesota. General Mills further argued that if arbitration resulted in an award in favor of Gold Medal, the Scheme could govern the timing and amount of payment. [2]

[2]     Gold Medal's desire to avoid arbitration in Bermuda is understandable. Under the traditional "follow the settlements" doctrine, a reinsurer must abide by the resolution of claims against the reinsured carrier, absent fraud, collusion, or bad faith. The British courts, however, have held that a clause similar to that contained in Gold Medal's reinsurance contract was not a "follow the settlements clause." *See* 238 B.R. at

[65.] If Gold Medal is required to arbitrate in Bermuda, Hopewell would thus have support for its argument that it was not bound by the Minnesota arbitration decision holding Gold Medal responsible for General Mills' losses.

In a lengthy and thorough opinion, the Bankruptcy Court granted Hopewell's petition. *In re Hopewell Int'l Ins. Ltd.,* 238 B.R. 25 (Bankr.S.D.N.Y.1999). It entered an order giving full force and effect to the Scheme, permanently enjoining all creditors covered by the Scheme from taking action inconsistent with the Scheme, and giving full force and effect to the Bermuda injunction.

These appeals followed.

## DISCUSSION

I address (a) the standard of review on appeal, (b) venue, and (c) the merits.

## A. *Standard of Review*

[1] [2]   On appeal from an order of the bankruptcy court, the district court reviews conclusions of law de novo. *In re Manville Forest Prods. Corp.,* 896 F.2d 1384, 1388 (2d Cir.1990). This standard of review applies to matters of statutory interpretation. *See In re Treco,* 240 F.3d 148, 155 (2d Cir.2001). The bankruptcy court's decision to defer to a foreign proceeding under § 304(c) is reviewed for abuse of discretion. *See id.; see also Vesta Fire Ins. Corp. v. New Cap Reinsurance Corp.,* 244 B.R. 209, 212 (S.D.N.Y.2000) ("The bankruptcy court's decision **\*704** under Section 304 to defer to [a foreign proceeding] shall be reviewed under an abuse-of-discretion standard."), *aff'd, In re McKenna,* 238 F.3d 186 (2d Cir.2001); *Allstate Life Ins. Co. v. Linter Group Ltd.,* 994 F.2d 996, 999 (2d Cir.) ("since the extension or denial of comity [to a foreign proceeding] is within the court's discretion, [the Court of Appeals] will reverse the [district] court's decision only when [it] find[s] an abuse of discretion") (citations omitted), *cert. denied,* 510 U.S. 945, 114 S.Ct. 386, 126 L.Ed.2d 334 (1993).

[3]   The district court must accept the bankruptcy court's findings of fact, unless such findings are clearly erroneous; "due regard must be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Fed. R. Bankr.P. 8013.

48 Collier Bankr.Cas.2d 362

## B. *Venue*

 **[4]**    The venue requirements for cases brought under 11 U.S.C. § 304 are set forth in 28 U.S.C. § 1410, which contains three subsections. Subsection (b) applies only to cases seeking to enjoin the enforcement of a lien or to require the turnover of property, and the parties agree it does not apply here. Hence, the relevant choices are subsections (a) and (c).

Subsection (a) provides in pertinent part:

> A case under section 304 of title 11 to enjoin the commencement or continuation of an action or proceeding in a State or Federal court ... may be commenced only in the district court for the district where the State or Federal court sits in which is pending the action or proceeding against which the injunction is sought.

28 U.S.C. § 1410(a).

Subsection (c) provides:

> A case under section 304 of title 11, other than a case specified in subsection (a) or (b) of this section, may be commenced only in the district court for the district in which is located the principal place of business in the United States, or the principal assets in the United States, of the estate that is the subject of such case.

28 U.S.C. § 1410(c). Hence, if subsection (a) does not apply in this case, subsection (c) controls.

Hopewell filed its petition in this District to enjoin Gold Medal and all other creditors from commencing or pursuing any actions or proceedings, including arbitrations, against it anywhere in the United States. No such action or proceeding had been commenced or was pending when Hopewell filed its § 304 petition. Hopewell contends that the case was properly filed in this District pursuant to § 1410(c) because Hopewell's principal assets in the United States are located here.

Gold Medal and General Mills argue that subsection (a) applies and that the petition should have been filed in Minnesota, because that is where Gold Medal threatened to sue. Indeed, General Mills argues that § 1410(a) applies because Minnesota is the only jurisdiction where Gold Medal could have initiated an arbitration proceeding against Hopewell under the Reinsurance Agreement. (*See* General Mills Br. at 50).

The Bankruptcy Court rejected the arguments of General Mills and Gold Medal and held that subsection (c) controls. I affirm.

First, the venue statute is ambiguous. Subsection (a) is poorly worded and consequently is unclear. It consists of one long sentence and starts by referring to a case brought to enjoin the "commencement or continuation" of an "action or proceeding." That language suggests that the subsection covers actions or proceedings that have not yet been commenced. Yet, the sentence concludes by referring to the district **\*705** "in which is *pending* the action or proceeding against which the injunction is sought." (emphasis added). Hence, the latter part of the sentence appears to contemplate enjoining only actions or proceedings already "pending." The problem, of course, is that it is impossible to file a petition to enjoin the *commencement* of an action in the district in which the action is already *pending. See* William Bassin, *Comment, Where Do I Go for Help? The Debtor's Plight for Proper Venue in Cases Ancillary to a Foreign Proceeding,* 10 Bank. Dev. J. 171, 183–84 (1993) (pointing out the contradictory language of § 1410(a)); *In re Officina Conti, S.R.L.,* 118 B.R. 392, 394 (Bankr.D.S.C.1989) (rejecting a "nonsensical construction" of § 1410(a) that "would require the action to be pending before the debtor could seek an injunction to prevent its commencement").

Second, the Bankruptcy Court resolved the ambiguity in the statute by construing it in a logical, common sense manner. The Bankruptcy Court correctly rejected General Mills's argument that subsection (a) must be read as requiring a party to seek an injunction in the district in which it anticipates the "action or proceeding" will be pending, *i.e.,* where it will be filed. This interpretation would require re-writing the statute to replace the words "is pending" with the words "will be pending." Moreover, it will not always be clear where a creditor might commence an action and thus a would-be § 304

3089

petitioner would be left guessing where an action or proceeding might be brought. In addition, where a party faces multiple potential lawsuits by creditors in different jurisdictions, that party would have to file multiple petitions and "chase those creditors around the country." 238 B.R. at 45. As the Bankruptcy Court concluded, such a result would "inhibit judicial economy, administrative efficiency, decisional consistency, and perhaps most important, comity." *Id.; see Collier on Bankruptcy* ¶ 4.03[2] (15th ed. 2001) ("It would be absurd to force a foreign representative to file numerous section 304 petitions throughout the country, which would be a waste of judicial resources and could lead to inconsistent judgments."); *see also In re Saleh,* 175 B.R. 422, 425 (Bankr.S.D.Fla.1994).

General Mills argues that Gold Medal was the only creditor to threaten suit and thus Hopewell was not faced with the possibility of multiple actions or proceedings. The Bankruptcy Court rejected this argument as a factual matter, accepting the testimony of Hopewell's representative that other Hopewell creditors "[we]re waiting in the wings" to see what happened with Gold Medal. 238 B.R. at 45. The Bankruptcy Court's factual determination is not clearly erroneous.

Accordingly, the Bankruptcy Court's determination that venue lies in this District under § 1410(c) is affirmed.

## C. *The Merits*

Section 304 of the Bankruptcy Code provides a mechanism by which bankruptcy courts in the United States can provide assistance—a "helping hand"— to foreign courts that are handling international insolvencies. *See* 238 B.R. at 54 (citing cases). It permits a party to bring an ancillary proceeding—not a "full-scale bankruptcy case"—in bankruptcy court to enjoin suits or actions in the United States against a debtor in insolvency proceedings in another country, to avoid piecemeal litigation and to encourage "deference to the country where the primary insolvency proceeding is located ... and flexible cooperation in administration of assets." *In re Simon,* 153 F.3d 991, 998 (9th Cir.1998), *cert. denied,* 525 U.S. 1141, 119 S.Ct. 1032, 143 L.Ed.2d 41 (1999); *see also Treco,* 240 F.3d at 153–54; *In re Koreag, Controle et Revision S.A.,* 961 F.2d 341, 348 (2d Cir.) (holding that bankruptcy court has broad **\*706** latitude under § 304 to fashion appropriate remedy in ancillary proceedings and that "purpose of a § 304 petition is to

prevent the piecemeal distribution of assets in the United States by means of legal proceedings initiated in domestic courts by local creditors") (citations omitted), *cert. denied,* 506 U.S. 865, 113 S.Ct. 188, 121 L.Ed.2d 132 (1992); *In re Caldas,* 274 B.R. 583 (Bankr.S.D.N.Y.2002).

Section 304 provides in pertinent part as follows:

(a) A case ancillary to a foreign proceeding is commenced by the filing with the bankruptcy court of a petition under this section by a foreign representative.

(b) Subject to the provisions of subsection (c) of this section, if a party in interest does not timely controvert the petition, or after trial, the court may—

(1) enjoin the commencement or continuation of—

(A) any action against—(i) a debtor with respect to property involved in such foreign proceeding; or (ii) such property; or ...

(3) order other appropriate relief.

(c) In determining whether to grant relief under subsection (b) of this section, the court shall be guided by what will best assure an economical and expeditious administration of such estate, consistent with—

(1) just treatment of all holders of claims against or interests in such estate;

(2) protection of claim holders in the United States against prejudice and inconvenience in the processing of such claims in such foreign proceeding;

(3) prevention of preferential or fraudulent dispositions of property of such estate;

(4) distribution of proceeds of such estate substantially in accordance with the order prescribed by this title; [and]

(5) comity ....

11 U.S.C. § 304.[3]

[3]    A sixth factor applies only to cases involving individuals and thus is not relevant here. 11 U.S.C. § 304(c)(6).

Three issues are presented: First, was the process by which the Scheme was adopted and approved in Bermuda a

"foreign proceeding" within the meaning of § 304? Second, is the Board a "foreign representative" within the meaning of the statute? Third, did the Bankruptcy Court abuse its discretion in granting the petition here?

### 1. *Foreign Proceeding*

**[5]** The Bankruptcy Code defines a "foreign proceeding" as:

> [a] proceeding, whether judicial or administrative and whether or not under bankruptcy law, in a foreign country in which the debtor's domicile, residence, principal place of business, or principal assets were located at the commencement of such proceeding, for the purpose of liquidating an estate, adjusting debts by composition, extension, or discharge, or effecting a reorganization.

11 U.S.C. § 101(23). Hence, a "foreign proceeding" must be conducted in a foreign country under judicial or administrative supervision for the specified purposes. *See* Collier ¶ 304.02[1]; *In re Tam,* 170 B.R. 838, 842–43 (Bankr.S.D.N.Y.1994). Here, the Bankruptcy Court held that the process by which the Scheme was adopted and approved was a "foreign proceeding" covered by § 304. I agree.

The proceeding was a judicial proceeding in Bermuda to adjust Hopewell's assets and debts. Although the proceeding was a "stand-alone" scheme of arrangement **\*707** not implemented "in tandem with another statutory vehicle for debt manipulation such as a voluntary liquidation, administration or court-ordered winding up," 238 B.R. at 48, it was nonetheless subject to court supervision. Hopewell had to petition the Bermuda Supreme Court for leave to convene the required creditors' meeting. A hearing was held, after which the Bermuda court signed an order approving the notices, proxy forms, process for valuating claims, and procedures for voting, all of which had been submitted to the court for review.

Hopewell had to file a second petition with the Bermuda court for approval of the Scheme. Creditors had the right to object to the proposed scheme of arrangement. A second hearing was held, after which the Bermuda

court issued an order approving the Scheme. Even thereafter, continued court involvement was required, as the Bermuda court issued the Bermuda injunction in 1998. Recently, during the pendency of this appeal, the parties were before the Bermuda court again. As the Bankruptcy Court noted, the Bermuda court remained available, even after the Scheme was approved, "to resolve classification disputes, enforce the provisions of the scheme and review actions by the scheme administrators." 238 B.R. at 49. *See In re Ward,* 201 B.R. 357, 361 (Bankr.S.D.N.Y.1996).

The Bankruptcy Court's determination that the Bermuda proceeding was a "foreign proceeding" within the meaning of § 304 is affirmed.

### 2. *Foreign Representative*

**[6]** The second threshold issue is whether the Board is a "foreign representative" qualified to file a petition pursuant to § 304.

The Bankruptcy Code defines a "foreign representative" as a "duly selected trustee, administrator, or other representative of an estate in a foreign proceeding." 11 U.S.C. § 101(24). Plainly, the Board fits within this definition.

Although General Mills and Gold Medal argue that the Board was not appointed by a court to act as a "foreign representative," nothing in the statute requires a court appointment. Courts have recognized creditor-elected or creditor-appointed liquidators in foreign voluntary liquidations to be foreign representatives. *See, e.g., In re Ward,* 201 B.R. at 360. Moreover, no logical reason exists to prohibit a board of directors of a solvent debtor company from acting as a foreign representative for purposes of bringing an ancillary proceeding pursuant to § 304. Accordingly, the Bankruptcy Court is affirmed in this respect. *See* 238 B.R. at 53–54; *see also Matter of Kingscroft Ins. Co.,* 138 B.R. 121, 124 (Bankr.S.D.Fla.1992) (boards of directors of insolvent British and Bermuda insurance companies held to qualify as "foreign representatives" under § 304).

### 3. *The Bankruptcy Court's Decision To Grant the Petition*

**[7]** Applying the five relevant factors set forth in § 304(c), the Bankruptcy Court granted Hopewell's petition. It concluded initially that because Hopewell was solvent and

26-11268-mg Doc 23-3 Filed 06/24/26 Entered 06/24/26 13:13:49 Exhibit C Pg 429 of 882

In re Petition of Bd. Of Directors of Hopewell Intern. Insurance Ltd., 275 B.R. 699 (2002)
48 Collier Bankr.Cas.2d 362

there were sufficient funds to pay all creditors in full, "the goals of maximizing the estate for the benefit of all creditors and dividing up that estate so as to achieve equality among class members [were] much less strongly implicated." 238 B.R. at 55. Hence, the Bankruptcy Court concluded that "neither the omission of avoidance powers nor any deviation from the usual distributive provisions applicable in windings-up is cause for any concern." *Id.* at 56.

The Bankruptcy Court also determined that creditors— including Gold Medal—were not unjustly treated under the **\*708** Scheme. The Bankruptcy Court was not receptive to Gold Medal's assertion that it was unfairly treated because Gold Medal had failed to take advantage of numerous opportunities to object in the Bermuda proceedings. As Judge Brozman noted, Gold Medal "accepted its class A claim for voting purposes; it voted in favor of the scheme; it did not object at the sanction hearing; it did not appeal the Sanction Order; and it did not seek to have the Bermuda Injunction altered or rescinded." *Id.* at 60. Although Gold Medal argues that it did not vote in favor of the Scheme, the Bankruptcy Court held otherwise and this factual determination, which is supported by evidence in the record, *see* 238 B.R. at 40–41, is entitled to deference on appeal.

The Bankruptcy Court considered but rejected Gold Medal's contention that it would be prejudiced or inconvenienced if it were required to arbitrate in Bermuda in accordance with Bermuda law instead of in Minnesota under Minnesota law. Although the Reinsurance Agreement provided for arbitration in Minnesota, the Bankruptcy Court again noted that Gold Medal had voted in favor of the Scheme. Moreover, the Bankruptcy Court observed that "Bermuda is a sister common law jurisdiction" and the arbitration would be conducted under rules and procedures consistent with a model law adopted by many states in the United States and often used to supplement federal arbitrations as well. 238 B.R. at 63. The Bankruptcy Court also noted that "[b]ankruptcy sometimes causes changes in contractual rights necessary to benefit the estate as a whole." *Id.* at 63; *see also In re U.S. Lines Inc.,* 197 F.3d 631, 639–40 (2d Cir.1999) (notwithstanding strong federal policy in favor of arbitration, bankruptcy court may stay arbitration in core proceedings in certain circumstances); *Cunard v. Salen Reefer Serv. AB,* 773 F.2d 452, 459 (2d Cir.1985) ("There is ... no compelling policy reason for a general

creditor whose claim is subject to arbitration to receive a preference over other creditors.").

Finally, the Bankruptcy Court considered the question of comity and concluded that the Bermuda Injunction was entitled to comity. It noted that Congress had "explicitly recognized comity as an important principle in transnational insolvency situations when it revised the bankruptcy laws." *Id.* at 67 (citing *Maxwell Comm. Corp. v. Societe Generale,* 93 F.3d 1036, 1048 (2d Cir.1996)). Judge Brozman also noted that the Scheme sought "to concentrate the claims resolution process in one forum and under one law" to "streamline and economically perform that activity and to enhance uniformity of result." 238 B.R. at 66. The Bankruptcy Court held that if Gold Medal, as one creditor, were allowed to deviate from the established procedures, the "efficacy" of the Scheme and Hopewell's "efforts to collect assets and administer them for the collective good of all creditors" would be undermined. *Id.* [4]

[4] As the Second Circuit has made clear, however, although "comity is the ultimate consideration in determining whether to provide relief under § 304," "comity does not ... automatically override the other specified factors." *Treco,* 240 F.3d at 156; *see also id.* at 157 ("The principle of comity has never meant categorical deference to foreign proceedings.").

I conclude that the Bankruptcy Court did not abuse its discretion in granting Hopewell's petition. Applying the statutory factors, and balancing the reasons for and against affording comity, *see Treco,* 240 F.3d at 158, I hold that the Bermuda Injunction should be granted comity. The Scheme is the result of a foreign judicial proceeding intended to adjust all claims against Hopewell in one forum. The Bermuda **\*709** injunction and the Bermuda court's order approving the Scheme were issued only after all creditors—including Gold Medal—were given notice, had an opportunity to be heard, and voted in favor of the Scheme. Although, as Gold Medal and General Mills argue, there is a strong federal policy in favor of arbitration, under the Scheme Gold Medal does not lose its right to arbitrate—it simply has to do so in Bermuda, along with all other creditors with disputed or unliquidated claims. There is no reason to doubt that the arbitration proceedings in Bermuda will be "fair, impartial, procedurally sound, and free from fraud." *Treco,* 240 F.3d at 158.

**In re Petition of Bd. Of Directors of Hopewell Intern. Insurance Ltd., 275 B.R. 699 (2002)**

48 Collier Bankr.Cas.2d 362

Under all the circumstances, and as a matter of judicial efficiency and fairness to all parties, individual creditors ought not to be able to bring individual actions or proceedings against Hopewell in courts throughout the United States. According comity to the Bermuda injunction would be consistent with, and certainly would not violate, United States public policy. *See Victrix Steamship Co. v. Salen Dry Cargo,* 825 F.2d 709 (2d Cir.1987) (upholding extension of comity to foreign insolvency proceedings even though such an extension would not allow creditors to enforce arbitration awards in the United States); *Vesta,* 244 B.R. at 216–17 (affirming bankruptcy court's decision to grant § 304 petition and holding that "[i]n this conflict between the Bankruptcy

Code and the statutory scheme governing arbitration, it is the Bankruptcy Code that prevails").

### CONCLUSION

For the reasons set forth above, the order of the Bankruptcy Court is affirmed, in all respects.

SO ORDERED.

**All Citations**

275 B.R. 699, 48 Collier Bankr.Cas.2d 362

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 26

Westlaw.

Page 1

425 B.R. 884, 52 Bankr.Ct.Dec. 286, 22 Fla. L. Weekly Fed. B 390
**(Cite as: 425 B.R. 884)**

▷

United States Bankruptcy Court,
S.D. Florida,
West Palm Beach Division.
In re BRITISH AMERICAN INSURANCE COMPANY
LIMITED, Debtor in a Foreign Proceeding.

Nos. 09–31881–EPK, 09–35888–EPK.
March 22, 2010.

**Background:** Chapter 15 petitioner, who was appointed in action pending in Commonwealth of the Bahamas, sought recognition of such proceeding as foreign main or foreign nonmain proceeding, and second Chapter 15 petitioner, who was appointed in action pending in Saint Vincent and the Grenadines (SVG) that related to same debtor-insurance company, sought recognition of such proceeding as foreign nonmain proceeding. Creditor opposed both petitions.

**Holdings:** The Bankruptcy Court, Erik P. Kimball, J., held that:

(1) Bahamas proceeding qualified as "foreign proceeding" as defined by Bankruptcy Code;

(2) SVG proceeding qualified as "foreign proceeding" under Code;

(3) Bahamas proceeding was not foreign main proceeding;

(4) Bahamas proceeding was not foreign nonmain proceeding; and

(5) SVG proceeding was foreign nonmain proceeding.

Ordered accordingly.

West Headnotes

**[1] Bankruptcy 51 🗝2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

If a debtor does not have its center of main interests (COMI) or at least an establishment in the country of a foreign proceeding, the bankruptcy court should not grant recognition of such proceeding and is not authorized to use its power to effectuate the purposes of the foreign proceeding. 11 U.S.C.A. §§ 1515-1518.

**[2] Bankruptcy 51 🗝2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

Except with regard to certain relief that may be accorded after recognition of a foreign proceeding, it is not appropriate to rely on case law under former version of Bankruptcy Code in deciding whether to recognize foreign proceeding pursuant to amendments made by Bankruptcy Abuse Prevention and Consumer Protection Act (BAPCPA). 11 U.S.C.A. § 1501 et seq.

**[3] Bankruptcy 51 🗝2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

Even in the absence of objection to recognition, bankruptcy court must review petitions for recognition of proceeding pending in foreign country in light of the statutory requirements, although court may rely on certain presumptions provided by statute if a petition for recognition is unopposed. 11 U.S.C.A. §§ 1501 et seq., 1516.

**[4] Bankruptcy 51 🗝2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

Bankruptcy court has a duty to review each petition for recognition of foreign proceeding to determine whether it satisfies all requisites for recognition. 11 U.S.C.A. § 1501 et seq.

**[5] Bankruptcy 51 🗝2341**

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

425 B.R. 884, 52 Bankr.Ct.Dec. 286, 22 Fla. L. Weekly Fed. B 390
**(Cite as: 425 B.R. 884)**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

In ruling on a petition for recognition of foreign proceeding, court must address the following: (1) whether proposed recognition would be manifestly contrary to the public policy of the United States, (2) whether foreign action is a "foreign proceeding" as defined by Bankruptcy Code, (3) whether foreign representative who filed petition for recognition is person or body, (4) whether petition meets formal requirements of Code, (5) whether foreign proceeding is pending in country in which debtor has the center of its main interest (COMI) and thus a foreign main proceeding, and (6) whether debtor has establishment in foreign country in which proceeding is pending, thus making foreign proceeding a foreign nonmain proceeding. 11 U.S.C.A. §§ 101(23), 1506, 1515, 1517.

**[6] Bankruptcy 51 ⚷2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

To satisfy Bankruptcy Code's definition of "foreign proceeding," a proceeding must (1) be collective in nature, (2) be judicial or administrative, (3) be pending in a foreign country, (4) be under a law relating to insolvency or adjustment of debt, (5) subject the assets and affairs of the debtor to the control and supervision of a foreign court, and (6) be for the purpose of reorganization or liquidation. 11 U.S.C.A. § 101(23).

**[7] Bankruptcy 51 ⚷2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

For a proceeding to be "collective" within the meaning of Bankruptcy Code's definition of "foreign proceeding," it must be instituted for the benefit of creditors generally, rather than for a single creditor or class of creditors. 11 U.S.C.A. § 101(23).

**[8] Bankruptcy 51 ⚷2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

For purposes of Bankruptcy Code's definition of "foreign proceeding," a "collective" proceeding is one that considers the rights and obligations of all creditors; this is in contrast to a receivership remedy instigated at the request, and for the benefit, of a single secured creditor. 11 U.S.C.A. § 101(23).

**[9] Bankruptcy 51 ⚷2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

In determining whether a particular foreign action is "collective" as contemplated under Bankruptcy Code's definition of "foreign proceeding," it is appropriate to consider both the law governing the foreign action and the parameters of the particular proceeding as defined in, for example, orders of a foreign tribunal overseeing the action. 11 U.S.C.A. § 101(23).

**[10] Bankruptcy 51 ⚷2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

Word "collective," as used in Bankruptcy Code's definition of "foreign proceeding," contemplates both the consideration and eventual treatment of claims of various types of creditors, as well as the possibility that creditors may take part in the foreign action; notice to creditors, including general unsecured creditors, may play a role in this analysis. 11 U.S.C.A. § 101(23).

**[11] Bankruptcy 51 ⚷2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

425 B.R. 884, 52 Bankr.Ct.Dec. 286, 22 Fla. L. Weekly Fed. B 390
**(Cite as: 425 B.R. 884)**

Proceeding in which judicial manager was appointed for debtor-insurance company under Bahamas law was "collective" in nature, as required for proceeding to qualify as "foreign proceeding" as defined by Bankruptcy Code, where, under Bahamas law, court was required to consider effect of debtor's financial condition on both policyholders and general creditors in deciding whether to appoint judicial manager, court order contemplated winding up of debtor's affairs in which unsecured creditors were intended to take part, despite policyholders' priority, and judicial manager acknowledged his overall duty to creditors in general. 11 U.S.C.A. § 101(23).

**[12] Bankruptcy 51 ⬿2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

Proceeding in which judicial manager was appointed for debtor-insurance company under laws of Saint Vincent and the Grenadines (SVG) was "collective" in nature, as required for proceeding to qualify as "foreign proceeding" as defined by Bankruptcy Code, where court orders surrounding judicial manager's appointment established that court considered interests of non-policyholder creditors, and proceeding was instituted for benefit of creditors generally and contemplated involvement of creditors collectively. 11 U.S.C.A. § 101(23).

**[13] Bankruptcy 51 ⬿2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

Proceedings in which judicial managers were appointed for debtor-insurance company under Bahamas law and under laws of Saint Vincent and the Grenadines were judicial proceedings, as required for each proceeding to be "foreign proceeding" as defined by Bankruptcy Code. 11 U.S.C.A. § 101(23).

**[14] Bankruptcy 51 ⬿2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

Proceedings in which judicial managers were appointed for debtor-insurance company under insurance laws of the Bahamas and of Saint Vincent and the Grenadines required courts to consider debtor's solvency and provide for adjustment of debt through either direct winding up or through appointment of judicial manager, and thus satisfied requirement under Bankruptcy Code's definition of "foreign proceeding" that action be under a law relating to insolvency or adjustment of debt. 11 U.S.C.A. § 101(23).

**[15] Bankruptcy 51 ⬿2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

Proceedings in which judicial managers were appointed for debtor-insurance company under insurance laws of the Bahamas and of Saint Vincent and the Grenadines subjected debtor's assets and affairs to control and supervision of foreign court, as required for each proceeding to be "foreign proceeding" as defined by Bankruptcy Code, where, under both foreign countries' insurance laws and terms of orders of appointment, judicial managers had control over debtor's assets and affairs and acted under supervision of foreign court. 11 U.S.C.A. § 101(23).

**[16] Bankruptcy 51 ⬿2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

Under phrase "a law relating to insolvency or adjustment of debt" included in Bankruptcy Code's definition of "foreign proceeding," proceeding subject to recognition as foreign proceeding must be for the purpose of reorganization or liquidation. 11 U.S.C.A. § 101(23).

**[17] Bankruptcy 51 ⬿2341**

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

425 B.R. 884, 52 Bankr.Ct.Dec. 286, 22 Fla. L. Weekly Fed. B 390

**(Cite as: 425 B.R. 884)**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

Proceedings in which judicial managers were appointed for debtor-insurance company under Bahamas law and laws of Saint Vincent and the Grenadines were for purpose of reorganization or liquidation, as required for proceeding to be "foreign proceeding" as defined by Bankruptcy Code, even though, at the time each judicial manager's Chapter 15 petition was filed with bankruptcy court, neither foreign court had entered order directing debtor's reorganization or liquidation where, after petitions were filed, both courts entered orders establishing that proceedings were for purpose of partial reorganization followed by liquidation. 11 U.S.C.A. §§ 101(23), 1517(d), 1518(1).

**[18] Bankruptcy 51 ☞2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

Court should consider circumstances arising after filing of Chapter 15 petition in determining whether a foreign action is for the purpose of reorganization or liquidation, as required for action to qualify as "foreign proceeding" as defined by Bankruptcy Code. 11 U.S.C.A. §§ 101(23), 1517(d), 1518(1).

**[19] Bankruptcy 51 ☞2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

Proceeding in which judicial manager was appointed for debtor-insurance company under laws of Saint Vincent and the Grenadines could be for purpose of reorganization or liquidation, such that proceeding could be "foreign proceeding" under Bankruptcy Code, as required for Chapter 15 recognition as foreign nonmain proceeding, even if proceeding pertained only to one of debtor's branch operations and thus could not result in debtor's overall reorganization or liquidation. 11

U.S.C.A. §§ 101(23), 1521(c).

**[20] Bankruptcy 51 ☞2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

Judicial manager seeking recognition of foreign proceeding against debtor-insurance company as foreign main proceeding under Bankruptcy Code bore burden of establishing debtor's center of its main interests (COMI). 11 U.S.C.A. §§ 1502(4), 1516(c).

**[21] Bankruptcy 51 ☞2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

In determining where debtor's center of its main interests (COMI) is located, for purposes of determining whether foreign proceeding is foreign main proceeding, courts typically consider (1) location of debtor's headquarters, (2) location of those who actually manage debtor, which may be headquarters of a holding company, (3) location of debtor's primary assets, (4) location of majority of debtor's creditors or of a majority of creditors who would be affected by the case, and (5) jurisdiction whose law would apply to most disputes; in addition, courts also consider the expectations of third parties. 11 U.S.C.A. § 1502(4).

**[22] Bankruptcy 51 ☞2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

In determining whether foreign proceeding is foreign main proceeding, it is important that the debtor's center of its main interests (COMI) be ascertainable by third parties. 11 U.S.C.A. § 1502(4).

**[23] Bankruptcy 51 ☞2341**

51 Bankruptcy

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

425 B.R. 884, 52 Bankr.Ct.Dec. 286, 22 Fla. L. Weekly Fed. B 390
**(Cite as: 425 B.R. 884)**

51III The Case
   51III(H) Cases Ancillary to Foreign Proceedings
      51k2341 k. In general. Most Cited Cases

Debtor's center of its main interests (COMI), for purposes of determining whether foreign proceeding is foreign main proceeding, is affected not only by what a debtor does, but by what a debtor is perceived as doing. 11 U.S.C.A. § 1502(4).

**[24] Bankruptcy 51 ⚷2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

If the location of a debtor's center of its main interests (COMI) changes between the date on which a Chapter 15 petition is filed and the date a court makes a determination on recognition of proceeding as foreign proceeding, the court may look to the facts on the latter date for purposes of determining COMI. 11 U.S.C.A. §§ 1502(4), 1517(d), 1518(1).

**[25] Bankruptcy 51 ⚷2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

Debtor-insurance company's center of its main interests (COMI) was not in the Bahamas, even though debtor was formed there and judicial manager appointed under Bahamas law was overseeing debtor's business activity from the Bahamas, and therefore Bahamas proceeding was not "foreign main proceeding" where debtor's headquarters were in Trinidad, the country in which, through subsidiary, its financial, administrative, actuarial, legal, policy administration, and claims processing took place, subsidiary's employees managed debtor's day-to-day affairs, majority of debtor's assets were located in its Eastern Caribbean branches, creditors existed primarily outside the Bahamas, and policyholders and creditors had little reason to believe that debtor had its hub of operations in the Bahamas, given debtor's minimal activities there. 11 U.S.C.A. §§ 1502(4).

**[26] Bankruptcy 51 ⚷2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

Allegations that debtor-insurance company was subject to Bahamas law regulating insurance and should be restructured and wound up in the Bahamas, and that judicial manager appointed for debtor under Bahamas law had, upon his appointment, supplanted debtor's board of directors and all corporate control was ceded to him, did not establish substantive economic activity warranting finding that debtor's center of main interests (COMI) was in the Bahamas for purposes of determining whether Bahamas proceeding was foreign main proceeding under Bankruptcy Code. 11 U.S.C.A. §§ 1502(4).

**[27] Bankruptcy 51 ⚷2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

Debtor-insurance company did not have an establishment in the Bahamas, and therefore foreign proceeding in which judicial manager was appointed for debtor in the Bahamas could not be recognized as foreign nonmain proceeding under Bankruptcy Code; debtor had no business operation in the Bahamas, other than judicial manager's activities pursuant to his appointment, and did not do business in the Bahamas, and judicial manager's retention of counsel and accountants, investigation of assets and liabilities, and reporting to Bahamas court did not constitute business activities of debtor. 11 U.S.C.A. § 1502(2, 5).

**[28] Bankruptcy 51 ⚷2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

Petitioner seeking recognition of foreign proceeding as foreign nonmain proceeding has the burden of

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

425 B.R. 884, 52 Bankr.Ct.Dec. 286, 22 Fla. L. Weekly Fed. B 390
**(Cite as: 425 B.R. 884)**

proof on whether debtor has an establishment in the country of the foreign proceeding. 11 U.S.C.A. § 1502 (2, 5).

**[29] Bankruptcy 51 ⌀~2341**

51 Bankruptcy
  51III The Case
    51III(H) Cases Ancillary to Foreign Proceedings
      51k2341 k. In general. Most Cited Cases

Whether the debtor has an "establishment" in a country, for purposes of determining whether foreign proceeding in that country may be recognized as foreign nonmain proceeding, must be determined at the time of the filing of the Chapter 15 petition. 11 U.S.C.A. § 1502 (2, 5).

**[30] Bankruptcy 51 ⌀~2341**

51 Bankruptcy
  51III The Case
    51III(H) Cases Ancillary to Foreign Proceedings
      51k2341 k. In general. Most Cited Cases

To have an establishment in a country, as required for recognition under Bankruptcy Code of foreign proceeding in that country as foreign nonmain proceeding, the debtor must conduct business in that country; the location should constitute a seat for local business activity for the debtor, which requires a showing of a local effect on the marketplace that is more than mere incorporation and record-keeping and more than just the maintenance of property. 11 U.S.C.A. § 1502(2, 5).

**[31] Bankruptcy 51 ⌀~2341**

51 Bankruptcy
  51III The Case
    51III(H) Cases Ancillary to Foreign Proceedings
      51k2341 k. In general. Most Cited Cases

Proceeding under laws of Saint Vincent and the Grenadines (SVG) in which judicial manager was appointed for debtor-insurance company was "foreign nonmain proceeding" under Bankruptcy Code; debtor had property in SVG where it conducted business, debtor retained employees at its SVG branch who performed insurance business activity, debtor maintained accounts in SVG relating to its insurance business in that country, and debtor had existing policyholders in SVG. 11 U.S.C.A. § 1502(2, 5).

**\*888** Leyza F. Blanco, Esq., Miami, FL, for Debtor.

**\*889 *OPINION ON RECOGNITION OF FOREIGN PROCEEDINGS***

ERIK P. KIMBALL, Bankruptcy Judge.

Two petitioners, one appointed in an action pending in the Commonwealth of The Bahamas ("Bahamas") and a second appointed in an action pending in Saint Vincent and the Grenadines ("SVG"), seek recognition of their proceedings under 11 U.S.C. § 1517. The foreign actions relate to the same debtor, British American Insurance Company, Limited ("BAICO"). Petitioner for the Bahamas action seeks recognition of such action as either a foreign main or a foreign nonmain proceeding. Petitioner for the SVG action seeks recognition of such action as a foreign nonmain proceeding.

On the evidence presented, the Court finds that both foreign actions are "foreign proceedings" as defined in 11 U.S.C. § 101(23). Thus, each proceeding meets the threshold for recognition under 11 U.S.C. § 1517.

With regard to the Bahamas proceeding, the petitioner's activities as court-appointed judicial manager are the only evidence offered to support petitioner's allegations that BAICO has the center of its main interest or an establishment in the Bahamas. In the circumstances of this case, such evidence does not support a finding that BAICO has the center of its main interest or an establishment in the Bahamas. Consequently, the Court denies the petition to recognize the Bahamas proceeding as a foreign main or foreign nonmain proceeding.

With regard to the SVG proceeding, the Court finds that BAICO has an establishment in SVG and recognizes the SVG proceeding as a foreign nonmain proceeding.

The petitions request coordination of foreign proceedings under 11 U.S.C. § 1530. Section 1530 contemplates coordination of multiple foreign proceedings re-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

425 B.R. 884, 52 Bankr.Ct.Dec. 286, 22 Fla. L. Weekly Fed. B 390

**(Cite as: 425 B.R. 884)**

cognized under chapter 15. The Court has recognized only a single foreign nonmain proceeding, so relief under 11 U.S.C. § 1530 is denied.

To the extent the petition relating to the Bahamas proceeding requests recognition of multiple foreign actions, through a single petition, such relief is denied. 11 U.S.C. §§ 1504, 1509, and 1515 require a separate petition for each foreign action for which recognition is sought. The Court accepts the petition as requesting recognition only of the proceeding pending in the Bahamas.

Petitioner for the SVG proceeding moves for relief under 11 U.S.C. § 1521. The Court will conduct a further hearing to address such request. In the meantime, the interim relief granted under 11 U.S.C. § 1519 will remain in effect pending order of the Court.

## I. BACKGROUND

On October 9, 2009, Juan M. Lopez a/k/a John M. Lopez ("Mr.Lopez"), as duly appointed Judicial Manager for BAICO, filed an application (the "Bahamas Petition") with this Court pursuant to sections 1515 and 1517 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code").[FN1] The Bahamas Petition requests entry of an order recognizing a judicial action (the "Bahamas Proceeding") pending before the Commercial Division of the Supreme Court of the Commonwealth of The Bahamas (the "Bahamas Court") as a foreign main proceeding or, in the alternative, as a foreign nonmain proceeding. Upon recognition, the Bahamas Petition requests relief under sections 1520 **\*890** and/or 1521, as well as coordination of multiple foreign proceedings under section 1530.

> FN1. Unless otherwise noted, references to "section" or "sections" are references to the relevant section or sections of the Bankruptcy Code.

On October 29, 2009, this Court entered an order [DE 11] granting provisional relief under sections 105(a) and 1519 including, without limitation, a stay of execution against assets of BAICO. The provisional relief granted by that order remains in effect subject to

further order of this Court [DE 24].

On November 6, 2009, the Court commenced an evidentiary hearing on the Bahamas Petition. The presentation of evidence was not complete on that date and so the Court continued the evidentiary hearing.

On November 23, 2009, Brian Glasgow ("Mr. Glasgow" and with Mr. Lopez, the "Petitioners"), as duly appointed Judicial Manager for BAICO, filed a petition (the "SVG Petition" and with the Bahamas Petition, the "Petitions") pursuant to sections 1515 and 1517. The SVG Petition requests entry of an order recognizing a judicial action (the "SVG Proceeding") pending before the Eastern Caribbean Supreme Court in the High Court of Justice Saint Vincent and the Grenadines (the "SVG Court") as a foreign nonmain proceeding. Upon recognition, the SVG Petition requests relief under section 1521, as well as coordination of multiple foreign proceedings under section 1530.

On December 1, 2009, the Court held a preliminary hearing on the SVG Petition and a hearing on a motion to jointly administer the two cases relating to the Petitions. The Court determined to jointly administer the cases and to conduct an evidentiary hearing on the SVG Petition concurrently with a continued evidentiary hearing on the Bahamas Petition on February 1, 2010.

Green Island Holdings, LLC ("Green Island"), a creditor of BAICO, opposes recognition of both the Bahamas Proceeding and the SVG Proceeding.

The Court has jurisdiction over these proceedings pursuant to 28 U.S.C. §§ 157(b) and 1334(b). These are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(P). Venue is proper in this district under 28 U.S.C. § 1410.

## II. FACTS

*Debtor BAICO*

BAICO is an insurance company chartered under the laws of the Bahamas. It has or had branch operations in Anguilla, Antigua and Barbuda, Bermuda, The Cayman Islands, Dominica, Guyana, Grenada, Montserrat, Saint Kitts and Nevis, Panama, Saint Lucia, Cura-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

425 B.R. 884, 52 Bankr.Ct.Dec. 286, 22 Fla. L. Weekly Fed. B 390

**(Cite as: 425 B.R. 884)**

cao, the Turks and Caicos Islands, and SVG. BAICO also operates or operated through subsidiaries in Barbados, Trinidad and Tobago ("Trinidad"), Curacao, Aruba, the Turks and Caicos Islands, and the British Virgin Islands.

*Creditor Green Island*

Green Island is a Florida limited liability company. It is the plaintiff in an action against BAICO and British American Isle of Venice (BVI), Ltd. in the United States District Court for the Southern District of Florida [BAICO Ex. 114], and is the plaintiff in an action against BAICO in the Ninth Judicial Circuit in and for Osceola County, Florida. [09–31881 DE 2 Pet. ¶ 22.]

*BAICO Operations Before Appointment of Petitioners*

For several years prior to the filing of the Petitions in this Court, and thus prior to appointment of the Petitioners by the Bahamas and SVG Courts, BAICO (a) did not issue insurance policies in or from the Bahamas, (b) did not sell policies to residents of the Bahamas, (c) did no claims adjustment or claims processing in the Bahamas, and (d) had no employees in the **\*891** Bahamas. At the time of Mr. Lopez's appointment by the Bahamas Court, BAICO had no bank accounts in the Bahamas. For at least a year prior to Mr. Lopez's appointment, none of BAICO's officers or directors resided in the Bahamas. As of Mr. Lopez's appointment, BAICO's only ties to the Bahamas were that it was chartered in that country and that it had a registered agent in the Bahamas (a law firm). The registered agent maintained required corporate information for BAICO. Mr. Lopez confirmed that at the time of his appointment BAICO was not transacting business in the Bahamas.

Nearly all of BAICO's operations were undertaken by subsidiaries in Trinidad that acted as BAICO's agents. BAICO has two subsidiaries incorporated under the laws of and operated in Trinidad, British–American Insurance Company (Trinidad) Limited ("BAT") and BA Management Services Limited ("BA Management" and with BAT, the "Trinidad Subsidiaries"). BAICO owns 99.86% of BAT and 100% of BA Management. [BAICO Ex. 103 at 26, 141, 144.] Prior to 2005, BAT was the operational hub of the BAICO group of companies, performing various administrative functions. In 2005, to achieve certain tax benefits, BA Management was formed to assume this role; it commenced operations in 2006. [BAICO Ex. 103 at 145.] BAICO and BA Management are parties to a *Services Agreement* (the "Services Agreement"). [BAICO Ex. 107.] Under the Services Agreement, BA Management agreed to provide all financial, administrative, marketing, information technology, investment, actuarial, and legal services for BAICO. BA Management's responsibilities include policy administration and claims processing for the BAICO group. [BAICO EX. 103 at 145.] Mr. Lopez testified that BAICO paid for these services and the cost was shared among BAICO's various branch operations.

Lennox McCartney, the Insurance Commissioner for the Bahamas, testified that certain members of BAICO's board of directors met with him in the Bahamas in 2008 and 2009, at his request, to address the company's financial difficulties. Other than a meeting convened on April 20, 2009 for the purpose of changing the company's registered office [BAICO Ex. 108], these meetings with the Insurance Commissioner were the only business conducted by BAICO board members in the Bahamas in recent years. The Insurance Commission then instituted restrictions on BAICO intended to "ring fence" BAICO's operations to insulate against further loss.

As of June, 2009, BAICO had eight directors. Four were resident in Trinidad, one in the United States, one in Barbados, one in Grenada, and one in Saint Kitts. On June 30, 2009, the remaining members of BAICO's board of directors resigned.

*Appointment of Mr. Lopez by Bahamas Court*

By order dated September 8, 2009 (the "Bahamas Order of Appointment") [BAICO Ex. 17], the Bahamas Court appointed Mr. Lopez as Judicial Manager for BAICO under Section 77(1)(b) of the Insurance Act, 2005 (the "Bahamas Insurance Act"). The Bahamas Order of Appointment empowers Mr. Lopez to: (a) ascertain the assets of BAICO and their location and take steps to obtain possession of such assets; (b) carry on all or any portion of the business of BAICO so far as may be necessary to preserve the value of BAICO including process claims against BAICO, effect reinsurance re-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

425 B.R. 884, 52 Bankr.Ct.Dec. 286, 22 Fla. L. Weekly Fed. B 390
**(Cite as: 425 B.R. 884)**

coveries, and pay any class of creditor and any claims, settlements, and expenses in full; (c) seek the assistance of the United States Bankruptcy Court under the provisions of chapter 15 or any other sections of the Bankruptcy Code or take such other action necessary to secure assets of BAICO, including the **\*892** assets of BAICO's subsidiaries; (d) incur and pay for all reasonable expenses and disbursements in connection with the running, administration, and management of BAICO's records, affairs, and offices; (e) retain or employ professionals or others if appropriate to assist in running the affairs and business of BAICO and to ascertain and quantify the assets, records, and liabilities of BAICO; (f) render invoices for Mr. Lopez's own remuneration at usual and customary rates; (g) take all actions necessary to see, review, secure, and take possession of any books, papers, writings, documents and records relating to BAICO that are located in the offices of auditors or any other person and bring the same under his control and, where appropriate, into the jurisdiction of the Bahamas; (h) take all actions necessary to see, review, secure, and take possession of the claims and financial records of BAICO; (i) open, operate, and maintain bank accounts in the name of the Judicial Manager or BAICO as necessary; (j) conduct investigations and obtain information as is necessary to locate, protect, secure, take possession of, collect, and get in the assets of BAICO and determine liabilities, or to enable the judicial management to proceed in a speedy and efficient manner; (k) do all such things as may be necessary or expedient for the protection of BAICO's property or assets; (*l* ) enter into commutations, settlements, and compromises with any creditors and any debtors of BAICO; (m) employ and dismiss any employees, consultants, and agents of BAICO; (n) discharge rent, salaries of any employees of BAICO, and other current expenses of BAICO; (*o*) grant or accept a surrender of a lease or tenancy of any of BAICO's property, surrender any lease, and take a lease or tenancy of any property required or convenient for the business of BAICO; (p) terminate, complete, or perfect as advised any contracts or transactions relating to the business of BAICO; (q) effect insurance in connection with the management and maintenance of the business, property, and assets of BAICO; (r) do all acts and execute in the name and on behalf of BAICO all deeds receipts or other documents; (s) rank and claim in the bankruptcy, liquidation, or insolvency of any person indebted to BAICO and receive dividends, and accede to trust deeds for the creditors of any such person; (t) manage, adjust, and pay claims against BAICO and/or its policyholders and enter into agreements with third parties for the provision of claims handling and related services to BAICO in relation to BAICO's business; (u) retain and employ barristers, attorneys, solicitors, or other lawyers in any jurisdiction in which BAICO has operations through its subsidiaries or branches and in any other jurisdictions as the Judicial Manager deems appropriate for the purpose of advising and assisting the Judicial Manager in the execution of his powers or in any legal or arbitration proceedings; (v) consider any legal or arbitration proceedings in which BAICO either is a party or of which BAICO presently has conduct or which BAICO would, but for the Bahamas Proceeding, take conduct and pay all fees and expenses and give all instructions and take such action as may be necessary to continue to prosecute or to defend such proceedings or to apply for a stay of such proceedings; (w) consider and if thought advisable commence such actions as may be necessary to protect, recover, or obtain assets and or monies belonging or due to BAICO and commence all other proceedings on BAICO's behalf as may be necessary to have the Judicial Manager's appointment recognized and to protect the assets of BAICO; (x) borrow money from time to time for the proper operation and functioning of BAICO's business; and (y) do all such things reasonably and properly incidental to the exercise of the foregoing powers.

**\*893** The Bahamas Order of Appointment provides that Mr. Lopez is BAICO's legal representative in respect to BAICO's equity investments, including BAICO's investments in subsidiaries and minority interests. Mr. Lopez has all rights and privileges afforded to shareholders including the right to vote BAICO's shares at any meetings held by companies where BAICO has a shareholding interest. If appropriate, in Mr. Lopez's discretion, he is empowered to take management control of any of BAICO's subsidiaries by voting BAICO's shares and removing and appointing directors and officers as he sees fit.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

425 B.R. 884, 52 Bankr.Ct.Dec. 286, 22 Fla. L. Weekly Fed. B 390

**(Cite as: 425 B.R. 884)**

The Bahamas Order of Appointment requires Mr. Lopez to provide an interim report to the Bahamas Court stating which of the following courses is most advantageous to the general interests of the policyholders of BAICO:

(a) The transfer of all or any part of the insurance business of [BAICO] to some other company in pursuance of a scheme to be prepared by the [Judicial Manager] in accordance with the Insurance Act, 2005,

(b) The carrying out of its business by [BAICO] either unconditionally or subject to such conditions as the [Judicial Manager] may suggest,

(c) The winding up of [BAICO], or

(d) (b) Such other course as the [Judicial Manager] considers advisable.

[BAICO Ex. 17.]

Mr. Lopez testified that while policy holders have priority under Bahamas law he has a fiduciary duty to all creditors. Mr. Lopez stated that he has a duty to maximize recovery for all creditors of BAICO.

*Appointment of Mr. Glasgow by SVG Court*

By order entered August 4, 2009 (the "SVG Order of Appointment") [BAICO Ex. 86], the SVG Court appointed Mr. Glasgow as Judicial Manager for BAICO under Section 52 of the Insurance Act, No. 45 of 2003 of the Laws of Saint Vincent and the Grenadines (the "SVG Insurance Act").

The SVG Order of Appointment places the affairs, business, and property of BAICO in SVG under Judicial Management. The SVG Order of Appointment stays all actions, proceedings, and claims against BAICO. It empowers Mr. Glasgow, as Judicial Manager, to: (a) ascertain the assets of BAICO and take all steps necessary to obtain possession of such assets; (b) incur and pay for all reasonable expenses and disbursements in connection with the running, administration, and management of BAICO's records, affairs, and offices; (c) if appropriate, retain or employ professionals or others to assist in running the affairs and business of BAICO and for the purposes of ascertaining and quantifying the assets, records, and liabilities of BAICO, such employment being either in the jurisdiction of SVG or any other jurisdiction where BAICO conducted business or entered into contracts with third parties; (d) render invoices for their remuneration at their usual and customary rates; (e) take all actions necessary to see, review, secure, and take possession of any books, papers, writings, documents, and records relating to BAICO that are located in the offices of its auditors or any other person and to bring the same under his control; (f) take all actions necessary to see, review, secure, and take possession of the claims and financial records of BAICO located in the offices of BAICO or any company affiliated with BAICO or any other person and to bring the same under his control; (g) open, operate, and maintain bank accounts in the name of the Judicial Manager or BAICO as may be necessary; (h) conduct such investigations and obtain such information as is necessary to locate, **\*894** protect, secure, take possession of, collect, and get in the assets of BAICO and determine liabilities, or to enable the Judicial Management to proceed in a speedy and efficient manner; (i) do all such things as may be necessary or expedient for the protection of BAICO's property or assets; (j) enter into commutations, settlements, and compromises with any creditors and any debtors of BAICO; (k) employ and dismiss any employees of BAICO; (*l*) discharge rent, salaries of any employees of BAICO, and other current expenses of BAICO; (m) grant or accept a surrender of a lease or tenancy of any of the property of BAICO and take a lease or tenancy of any property required or convenient for the business of BAICO; (n) terminate, complete, or perfect as advised any contracts or transactions relating to the business of BAICO; (*o*) effect insurance in connection with the management and maintenance of the business, property, and assets of BAICO; (p) do all acts and execute in the name and on behalf of BAICO all deeds receipts or other documents; (q) rank and claim in the bankruptcy, liquidation, or insolvency of any person indebted to BAICO and receive dividends, and accede to trust deeds for the creditors of any such person; (r) manage, adjust, and pay claims against BAICO and/or its policyholders and enter into agreements with third parties for the provision of claims handling and related services to BAICO in relation to

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

425 B.R. 884, 52 Bankr.Ct.Dec. 286, 22 Fla. L. Weekly Fed. B 390
**(Cite as: 425 B.R. 884)**

BAICO's business; (s) carry on all or any portion of the business of BAICO so far as may be necessary to process claims against BAICO, to effect reinsurance recoveries, and to pay any class of creditor and any claims, settlements, and expenses in full; (t) retain and employ barristers, attorneys, solicitors, or other lawyers in jurisdictions as the Judicial Manager sees fit for the purpose of advising and assisting the Judicial Manager in the execution of his powers or in any legal or arbitration proceedings; (u) consider any legal or arbitration proceedings wherever situate in which BAICO either is a party or of which BAICO presently has conduct or which BAICO would, but for the SVG proceeding, take conduct and pay all fees and expenses, give all instructions in connection therewith, and take such action as may be thought necessary to continue to prosecute or to defend such proceedings or to apply for a stay of such proceedings; (v) consider and if thought advisable commence such actions as may be necessary to protect, recover, or obtain assets and/or monies belonging or due to BAICO and commence all other proceedings as may be necessary to have his appointment recognized and protect the assets of BAICO; (w) borrow such money from time to time as he may consider necessary or desirable for the proper operation and functioning of BAICO's business including any monies borrowed or to be borrowed for expenses incurred by the Judicial Manager, subject to the approval of the Minister of Finance, while operating by virtue of his appointment under the SVG Order of Appointment; and (x) do all such things reasonably and properly incidental to the exercise of the foregoing powers.

The SVG Order of Appointment requires Mr. Glasgow to provide an interim report to the SVG court stating which of the following courses is most advantageous to the general interests of the policyholders of the company:

(a) The transfer of the business of the company to some other company in pursuant of a scheme to be prepared in accordance with the Insurance Act (whether the policies of the business continue for the original sums insured, with the addition of bonuses that are attached to the policies or for reduced amounts);

**\*895** (b) The carrying out of its business by the company (whether the policies of the business continue for the original sums insured, with the addition of bonuses that attach to the policies, or for reduced amounts);

(c) The winding up of the company or any part of the business of the company; or

(d) The dealing with part of the business of the company in one manner, and with another part in another company.

[BAICO Ex. 86.]

*Other Proceedings for BAICO*
BAICO is subject to judicial proceedings in numerous countries. Foreign courts have appointed judicial managers, provisional liquidators, or controllers, for BAICO and related entities, as follows:

| Date | Court | Name (Position) |
|---|---|---|
| July 31, 2009 | The Eastern Caribbean Supreme Court in the High Court of Justice Antigua and Barbuda | Cleveland Seaforth (Judicial Manager) |
| July 31, 2009 | The Eastern Caribbean Supreme Court in the High Court of Justice (Anguilla Circuit) | Claudel Romney (Administrator) |
| July 31, 2009 | The Eastern Caribbean Supreme Court in the High Court of Justice Federation of Saint Christopher and Nevis | Lisa Taylor (Judicial Manager) |
| July 31, 2009 | The Eastern Caribbean Supreme Court in the High Court of | Frank Myers (Judicial Man- |

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

425 B.R. 884, 52 Bankr.Ct.Dec. 286, 22 Fla. L. Weekly Fed. B 390

**(Cite as: 425 B.R. 884)**

| | Justice Saint Lucia | ager) |
|---|---|---|
| August 3, 2009 | The Supreme Court of Bermuda Commercial Court Companies (Winding–Up) | Stephen Lowe (Provisional Liquidator) |
| August 5, 2009 | The Eastern Caribbean Supreme Court in the High Court of Justice Montserrat | Casey McDonald (Judicial Manager) |
| August 5, 2009 | The Supreme Court of Grenada and the West Indies Associated States High Court of Justice | Reuben M. John (Judicial Manager) |
| September 15, 2009 | The Grand Court of the Cayman Islands | Simon Whicker and Kris Beighton (Controllers) |
| October 7, 2009 | The Supreme Court of the Turks and Caicos Islands | Juan M. Lopez (Judicial Manager) |

[BAICO Ex. 18–27; 09–31881 DE 2 Pet. ¶¶ 8–10.]

*Reports of Mr. Lopez and Mr. Glasgow*

Mr. Lopez submitted a report to the Bahamas Court, dated November 27, 2009, pursuant to section 81(1) of the Bahamas Insurance Act (the "Lopez Report"). [BAICO Ex. 103.] Reports of judicial managers appointed in the "EC Branches" [FN2] are attached to the Lopez Report as appendices. Included among these is a report of Mr. Glasgow submitted in the SVG Proceeding, dated October 9, 2009, pursuant to section 52 of the SVG Insurance Act (the "Glasgow Report"). The Glasgow Report was separately admitted as BAICO Exhibit 77. The Lopez Report and the Glasgow Report reflect extensive examinations of BAICO, its business operations, and its assets and liabilities. Both reports recommend a course of action by which BAICO will be restructured in part **\*896** using a newly formed entity to assume certain of BAICO's liabilities. [BAICO Ex. 77 at 48–53; BAICO Ex. 103 at 207–17.]

> FN2. The Eastern Caribbean Branches, or "EC Branches," comprise branch operations in Anguilla, Antigua, Dominica, Grenada, Montserrat, Saint Kitts, Saint Lucia, and SVG. [BAICO Ex. 103 at 114.]

The Lopez Report includes a detailed liquidation analysis for BAICO as of June 30, 2009. The liquidation analysis reflects all assets and liabilities of BAICO and its branches other than the Cayman branch, which has been sold, and the Panama, Bermuda, and Curacao branches, which are estimated as having negligible net value. Recovery on BAICO's investment in its subsidiaries is estimated at $5 million. [BAICO Ex. 103 at 44–45.]

The EC Branches represent the vast majority of both BAICO's assets and its liabilities. [BAICO Ex. 103 at 54.] Before adjustments taken for purposes of the liquidation analysis, the EC Branches' assets represent about 83.7% of BAICO's total assets, and the EC Branches' liabilities represent about 77.3% of BAICO's total liabilities. [BAICO Ex. 103 at 44–45.] The Lopez Report includes separate data "for the small number of transactions that were not directly attributable to BAICO's branches or subsidiaries," referred to in the report as "BAICO standalone." [BAICO Ex. 103 at 45, 64.] Before adjustments, BAICO stand-alone represents about 14.2% of BAICO's total assets and 21.1% of BAICO's total liabilities. The liquidation analysis includes adjustments for various items based on Mr. Lopez's estimation with regard to liquidation value. The adjustments are presented in such a way that it is not apparent whether the adjustments are to be applied to the EC Branches, other branches, or "BAICO stand-alone." However, even if the adjustments are applied to the EC Branches assets to the greatest extent possible, the EC Branch assets account for approximately 78% of the total adjusted assets shown in the liquidation analysis. From the Lopez Report and the other evidence presented, it is not possible to determine whether a significant portion of BAICO's realizable assets are located in any particular EC Branch country. The Court can only discern that most of BAICO's assets are not located in the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

425 B.R. 884, 52 Bankr.Ct.Dec. 286, 22 Fla. L. Weekly Fed. B 390
**(Cite as: 425 B.R. 884)**

Bahamas.

Mr. Lopez's liquidation analysis takes into account the fact that BAICO policyholders will be paid in preference to other unsecured creditors. [BAICO Ex. 103 at 43.] He concludes that in a liquidation of BAICO policyholders will receive a dividend of between 15 and 35 cents on the dollar and non-policyholder, unsecured creditors will not receive any distribution. Because BAICO has policies that will not mature for many years, any distribution will be significantly delayed. [BAICO Ex. 103 at 43–46.]

*December Orders of Bahamas Court and SVG Court*

By order dated December 17, 2009 (the "December Bahamas Order"), the Bahamas Court accepted Mr. Lopez's core findings that BAICO is insolvent and should be reorganized and restructured where possible and then wound up. The Bahamas Court directed Mr. Lopez: (1) to continue to negotiate with third parties to sell, transfer, or dispose of the insurance business, or other assets and liabilities of the branches and subsidiaries of BAICO; (2) to transfer or sell the shares of BAT; (3) to take steps to protect the assets of BAICO and its subsidiaries in the United States by obtaining recognition of the Bahamas Proceeding; (4) to effect the winding-up of BAICO's non-insurance subsidiaries; (5) to investigate related party and other antecedent transactions, the conduct of management and the directors of BAICO, and the conduct of third parties providing services to and conducting transactions with BAICO; (6) to commence legal proceedings against CL Financial Ltd. ("CL Financial"), the parent company of BAICO, in respect of sums presently due **\*897** to BAICO; (7) to investigate the assets and liabilities of BAICO's Employee Pension Plan; and (8) to effect the transfer of data and systems from Trinidad to a new administrative hub in the Bahamas. [BAICO Ex. 106.] At the February 1, 2010 hearing, Mr. Lopez testified that his current role involves carrying out the reorganization ordered by the Bahamas Court with a goal toward an eventual winding up of BAICO.

By order dated December 18, 2009 (the "December SVG Order"), based on the recommendations contained in the Glasgow Report, the SVG Court ordered pursuant to section 54(2) of the SVG Insurance Act that: (1) there be a reorganization of BAICO by the transfer of its insurance and investment business to a new company in pursuance of a scheme of arrangement to be prepared in accordance with section 56 of the SVG Insurance Act; (2) the scheme prepared in accordance with the SVG Insurance Act be a plan making provision for the funding of a new company; (3) Mr. Glasgow is authorized to work with other judicial managers or persons similarly appointed, the governments of the Organization of Eastern Caribbean States, and the Eastern Caribbean Central Bank, to develop such a scheme and make arrangements for any required funding; (4) Mr. Glasgow shall consider and do all things necessary with respect to the establishment of the new company and the transfer of assets and liabilities of BAICO into the new company; and (5) Mr. Glasgow is to continue to negotiate with third parties to sell or dispose of its property and health insurance business and to take such action that may be required to effect such sales or disposals subject to the approval of the SVG Court.

*BAICO Operations After Appointment of Petitioners*

Although Mr. Lopez expects to move BAICO's administrative operations to the Bahamas, Mr. Lopez's own report to the Bahamas Court, filed after the petition here, confirms that BAICO's administrative function remains in Trinidad. [BAICO Ex. 103 at 216.] The Glasgow Report similarly states that BAICO's "main business operation is now located in Trinidad & Tobago since its majority shares were acquired by the Trinidadian company [CL Financial] in 1997." [BAICO Ex. 77 at 5.] BA Management continues to serve the BAICO group under the terms of the Services Agreement. [BAICO Ex. 103 at 145.] The services undertaken by BA Management constitute essentially all of BAICO's day-to-day management operations. BAICO's operations in Trinidad, through the Trinidad Subsidiaries, form a hub from which all of BAICO's operations are overseen. The Trinidad Subsidiaries control BAICO's computer network access and business software, including accounting data. The Trinidad Subsidiaries provide remote information technology support. [BAICO Ex. 77 at 59.] The SVG branch is essentially a "local branch sales and administrative unit supported by a group ser-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

425 B.R. 884, 52 Bankr.Ct.Dec. 286, 22 Fla. L. Weekly Fed. B 390

**(Cite as: 425 B.R. 884)**

vice company, [the Trinidad Subsidiaries]." [BAICO Ex. 77 at 58.] The Trinidad Subsidiaries process application forms for insurance products sold through the SVG branch. *[Id.]* The Trinidad Subsidiaries in turn process, adjust, and approve claims routed through the SVG branch. The Trinidad Subsidiaries then issue checks in payment of claims, which are forwarded to the SVG branch for distribution to policyholders. *[Id.]* Employment contracts for employees of the SVG branch are maintained at the Trinidad Subsidiaries. [BAICO Ex. 77 at 59.] The Trinidad Subsidiaries administer the employee benefits and pension plans for the SVG branch employees. [BAICO Ex. 77 at 60.] These are only examples of the extent to which the Trinidad Subsidiaries operate BAICO. The great weight of evidence**\*898** supports the conclusion that BAICO's business remains centered in Trinidad.

The Petitioners note that BAICO has no branch operations in Trinidad, where it acts through its wholly-owned Trinidad Subsidiaries, that BAICO itself does not have an insurance license in Trinidad, and that BAICO has no physical assets in Trinidad in its own name. Petitioners argue that the actions of a subsidiary, such as BA Management, are the actions of a separate corporate entity and should not be attributed to its parent. This argument ignores the broad terms of the Services Agreement and the overwhelming evidence in this case. BAICO delegated its primary business operations to the Trinidad Subsidiaries, and the Trinidad Subsidiaries continue to oversee essentially all of BAICO's ongoing business.

In SVG, BAICO has an administrative staff of nine employees who now act under Mr. Glasgow's control. [Nov. 6, 2009 Tr. 163; BAICO Ex. 77 at 59.] BAICO engages in excess of sixteen full time agents to conduct its businesses in SVG. The SVG branch accepts premiums on old business and conducts all attendant business related to the operation of an insurance company. [Nov. 6, 2009 Tr. 163–64.]

Since their appointment, Mr. Lopez and Mr. Glasgow established bank accounts for BAICO in their respective jurisdictions, engaged lawyers, accountants, and other professionals, and completed extensive investigations of BAICO, its assets and its liabilities. Mr. Lopez oversaw the negotiation and closing of a sale of certain BAICO assets in the Cayman Islands, which sale was approved by the Bahamas Court. [BAICO Ex. 77 at 12–16; BAICO Ex. 103 at 47–59.]

*BAICO Web Site*

After his appointment, Mr. Lopez added a notice of his appointment under the Bahamas Insurance Act to the home page of BAICO's web site. [Green Island Ex. 11.] The notice lists a number of other court-appointed representatives in Caribbean countries. Although the notice includes Mr. Lopez's mailing address, it states: "At this time, we recommend you contact the local BAICO office or Court appointed office holder, for further information." The web site provides telephone contact information for offices in various countries, including a "Head Office" in Trinidad, but none for the Bahamas other than Mr. Lopez's mailing address.

## III. ANALYSIS

These matters arise under the relatively new provisions of chapter 15 of the Bankruptcy Code, entitled "Ancillary and Other Cross–Border Cases." 11 U.S.C. § 1501 *et seq.* Enacted as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, chapter 15 replaced section 304 of the Bankruptcy Code. Section 1501(a) sets out the goals of chapter 15:

(a) The purpose of this chapter is to incorporate the Model Law on Cross–Border Insolvency so as to provide effective mechanisms for dealing with cases of cross-border insolvency with the objectives of—

(1) cooperation between—

(A) courts of the United States, United States trustees, trustees, examiners, debtors, and debtors in possession; and

(B) the courts and other competent authorities of foreign countries involved in cross-border insolvency cases;

(2) greater legal certainty for trade and investment;

(3) fair and efficient administration of cross-border

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

425 B.R. 884, 52 Bankr.Ct.Dec. 286, 22 Fla. L. Weekly Fed. B 390
**(Cite as: 425 B.R. 884)**

insolvencies that protects the interests of all creditors, and other interested entities, including the debtor;

(4) protection and maximization of the value of the debtor's assets; and

**\*899** (5) facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment.

11 U.S.C. § 1501(a).

Chapter 15 represents a nearly verbatim enactment of the Model Law on Cross–Border Insolvency (the "Model Law") promulgated by the United Nations Commission on International Trade Law ("UNCITRAL") in 1997. 11 U.S.C. § 1501(a); *In re Basis Yield Alpha Fund (Master),* 381 B.R. 37, 43 (Bankr.S.D.N.Y.2008) ("The language of chapter 15 tracks the Model Law, with some modifications that are designed to conform the Model Law with existing United States law."). The Model Law has been enacted in the following countries: Australia (2008), British Virgin Islands, overseas territory of the United Kingdom of Great Britain and Northern Ireland (2003), Canada (2009), Colombia (2006), Eritrea (1998), Great Britain (2006), Japan (2000), Mauritius (2009), Mexico (2000), Montenegro (2002), New Zealand (2006), Poland (2003), Republic of Korea (2006), Romania (2003), Serbia (2004), Slovenia (2007), South Africa (2000), and the United States of America (2005). UNCITRAL, Status: 1997–Model Law on Cross-border Insolvency, http:// www. uncitral. org/ uncitral/ en/ uncitral texts/ insolvency/1997Model status.html (last visited Mar. 22, 2010).

International uniformity is a primary goal of the Model Law and thus of chapter 15. 11 U.S.C. §§ 1501(a), 1508. UNCITRAL expressed the desire that the Model Law be enacted by adopting countries with as few changes as possible "in order to achieve a satisfactory degree of harmonization and certainty." United Nations Commission on International Trade Law (UNCITRAL), Cross–Border Insolvency: Guide to Enactment of the UNCITRAL Model Law on Cross–Border Insolvency, ¶ 12, U.N. Doc. A/CN.9/442

(Dec. 19, 1997) [hereinafter "Guide to Enactment"]. FN3 When implementing chapter 15, section 1508 requires the Court to "consider its international origin, and the need to promote an application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions." 11 U.S.C. § 1508. The House Report contemplates courts looking to the Guide to Enactment and the Reports cited therein to aid the courts in achieving a uniform interpretation of chapter 15. H.R.Rep. No. 109–31, pt. 1, at 109–10 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 172–73 (the "House Report").

> FN3. The UNCITRAL Model Law on Cross–Border Insolvency with Guide to Enactment is available at *http:// www. uncitral. org/ pdf/ e nglish/texts/insolven/insolvency-e.pdf.*

[1] Sections 1515 through 1518, inclusive, set out a rigid procedure for recognition of a proceeding pending in a foreign country. *In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.,* 374 B.R. 122, 132 (Bankr.S.D.N.Y.2007), *aff'd,* 389 B.R. 325 (2008). This recognition procedure is completely new to the Bankruptcy Code. It reflects a policy determination by UNCITRAL and Congress that this Court should not assist a representative of a foreign action unless the debtor has a sufficient presence in the country in which the foreign action is taking place. *In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.,* 389 B.R. 325, 333–34 (S.D.N.Y.2008) (citing House Report at 110 (2005); § 1509(b)(3)).

> If the debtor does not have its center of main interests or at least an establishment in the country of the foreign proceedings, the bankruptcy court should not grant recognition and is not authorized to use its power to effectuate the purposes of the foreign proceeding. Implicitly, in such an instance the debtor's **\*900** liquidation or reorganization should be taking place in a country other than the one in which the foreign proceeding was filed to be entitled to assistance from the United States.

*Id.* at 334 (internal citations omitted).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 16

425 B.R. 884, 52 Bankr.Ct.Dec. 286, 22 Fla. L. Weekly Fed. B 390
**(Cite as: 425 B.R. 884)**

[2] The general principles of comity that governed acknowledgement of cross-border matters under former section 304 no longer apply to recognition under chapter 15. *Lavie v. Ran,* 406 B.R. 277, 282 (S.D.Tex.2009).

Approaches based purely on the doctrine of comity or on *exequatur* do not provide the same degree of predictability and reliability as can be provided by specific legislation, such as the one contained in the Model Law, on judicial cooperation, recognition of foreign insolvency proceedings and access for foreign representatives to courts.

Guide to Enactment ¶ 16. Except with regard to certain relief that may be accorded after recognition of a foreign proceeding, it is not appropriate to rely on case law under former section 304. *In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.,* 374 B.R. at 132; House Report at 109–10, 119.

[3][4] Even in the absence of Green Island's objection to recognition, the Court must review the Petitions in light of the requirements of chapter 15. *In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.,* 374 B.R. at 129–30. If a petition for recognition is unopposed, the Court may rely on certain presumptions provided by section 1516. Even so, the Court has a duty to review each petition to determine whether it satisfies all requisites for recognition. *Id.*

A person seeking recognition of a proceeding in a foreign country must file a petition for recognition under sections 1504, 1509, and 1515. Upon filing of a petition for recognition, the court will set a hearing on notice as required by Fed. R. Bankr.P.2002(q).

Section 1517 sets out the substantive test for recognition of a foreign proceeding. It provides as follows:

(a) Subject to section 1506, after notice and a hearing, an order recognizing a foreign proceeding shall be entered if—

(1) such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502;

(2) the foreign representative applying for recognition is a person or body; and

(3) the petition meets the requirements of section 1515.

(b) Such foreign proceeding shall be recognized—

(1) as a foreign main proceeding if it is pending in the country where the debtor has the center of its main interests; or

(2) as a foreign nonmain proceeding if the debtor has an establishment within the meaning of section 1502 in the foreign country where the proceeding is pending.

(c) A petition for recognition of a foreign proceeding shall be decided upon at the earliest possible time. Entry of an order recognizing a foreign proceeding constitutes recognition under this chapter.

(d) The provisions of this subchapter do not prevent modification or termination of recognition if it is shown that the grounds for granting it were fully or partially lacking or have ceased to exist, but in considering such action the court shall give due weight to possible prejudice to parties that have relied upon the order granting recognition. A case under**\*901** this chapter may be closed in the manner prescribed under section 350.

11 U.S.C. § 1517.

[5] In ruling on a petition for recognition under section 1517, the Court must address the following:

1. Would the proposed recognition be "manifestly contrary to the public policy of the United States" as contemplated under section 1506?

2. Is the subject foreign action a "foreign proceeding" as defined in 11 U.S.C. § 101(23)?

3. Is the foreign representative who filed the petition for recognition a person or body?

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

425 B.R. 884, 52 Bankr.Ct.Dec. 286, 22 Fla. L. Weekly Fed. B 390
**(Cite as: 425 B.R. 884)**

4. Does the petition meet the formal requirements of section 1515?

5. Is the foreign proceeding pending in the country where the debtor has the center of its main interest and thus a foreign main proceeding?

6. Does the debtor have an establishment in the foreign country where the proceeding is pending, thus making the foreign proceeding a foreign nonmain proceeding?

Items 1, 3, and 4 are quickly disposed of in the present case. There is no reason to believe that the proposed recognition of either proceeding is contrary to public policy. Mr. Lopez and Mr. Glasgow are persons. Lastly, the Petitions and supporting documentation filed by Mr. Lopez and Mr. Glasgow meet the formal requisites of section 1515. The Court will address in detail whether the Bahamas Proceeding and the SVG Proceeding are foreign proceedings and, if so, whether they are foreign main or foreign nonmain proceedings.

**A. Foreign Proceeding**

[6] Section 1517(a) and the definitions of "foreign main proceeding" and "foreign nonmain proceeding," found in section 1502, each incorporate the defined term "foreign proceeding." As a preliminary matter, the Court must determine whether the Bahamas Proceeding and the SVG Proceeding constitute foreign proceedings. "The term 'foreign proceeding' means a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation." 11 U.S.C. § 101(23). Parsing this definition, the proceeding in question must: (1) be collective in nature; (2) be judicial or administrative; (3) be pending in a foreign country; (4) be under a law relating to insolvency or adjustment of debt; (5) subject the assets and affairs of the debtor to the control and supervision of a foreign court; and (6) be for the purpose of reorganization or liquidation.

1. Collective in Nature

Green Island argues that the Bahamas Proceeding and the SVG Proceeding are not "collective" within the meaning contemplated by section 101(23) because the proceedings allegedly were initiated only to protect the interests of BAICO's policyholders, a single class of creditors, to the exclusion of other creditors of BAICO. According to Green Island, although the orders appointing Mr. Lopez and Mr. Glasgow as judicial managers permit them to deal with other creditors, they are not obligated to act for the benefit of those creditors.

Green Island points to a provision in the Bahamas Order of Appointment requiring Mr. Lopez to recommend courses of action that "are most advantageous to the general interests of the policy holders of [BAICO]." Green Island cites a deposition of Mr. Lopez where he agreed that the primary**\*902** purpose of his appointment was to take steps that are in the best interest of the policyholders. Finally, Green Island argues that neither Bahamas law nor orders in the Bahamas Proceeding require Mr. Lopez to provide notice to creditors of his appointment as judicial manager or of Mr. Lopez's proposed actions even when subject to approval of the Bahamas Court.

Similarly, although the order appointing Mr. Glasgow as judicial manager permits him to deal with other creditors, Green Island alleges he is not obligated to act for the benefit of those creditors. Green Island points out that at the initial evidentiary hearing in this case, prior to the SVG Petition, Mr. Glasgow defined the scope of his duties as follows: "to take control of the assets, to manage the company, to protect the interest of policy holders, and to do all things in relation to these duties." [Mem. in Opp'n, 09–31881–EPK DE 55 at 7.] The SVG Insurance Act, under which Mr. Glasgow was appointed, is silent on whether Mr. Glasgow's duty as judicial manager extends to general creditors. The SVG Insurance Act directs Mr. Glasgow to focus on the interests of policyholders. From this, Green Island asks the Court to conclude that other creditors are excluded from the process.

[7][8] For a proceeding to be collective within the meaning of section 101(23), it must be instituted for the benefit of creditors generally rather than for a single

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

425 B.R. 884, 52 Bankr.Ct.Dec. 286, 22 Fla. L. Weekly Fed. B 390
**(Cite as: 425 B.R. 884)**

creditor or class of creditors. "A collective proceeding is one that considers the rights and obligations of all creditors. This is in contrast, for example, to a receivership remedy instigated at the request, and for the benefit, of a single secured creditor." *In re Betcorp Ltd.,* 400 B.R. 266, 281 (Bankr.D.Nev.2009). Section 1501 lists the "fair and efficient administration of cross-border insolvencies that protects the interests of all creditors" among chapter 15's primary objectives, lending further support to the proposition that a foreign proceeding must be for the general benefit of creditors. *In re Gold & Honey, Ltd.,* 410 B.R. 357, 370 n. 16 (Bankr.E.D.N.Y.2009) (quoting 11 U.S.C. § 1501(a)(3)). The Guide to Enactment suggests that a foreign proceeding must contemplate the "involvement of creditors collectively." Guide to Enactment ¶ 23.

[9][10] From the foregoing, the Court concludes that the word "collective" in section 101(23) contemplates both the consideration and eventual treatment of claims of various types of creditors, as well as the possibility that creditors may take part in the foreign action. Notice to creditors, including general unsecured creditors, may play a role in this analysis. In determining whether a particular foreign action is collective as contemplated under section 101(23), it is appropriate to consider both the law governing the foreign action and the parameters of the particular proceeding as defined in, for example, orders of a foreign tribunal overseeing the action.

*Bahamas Proceeding*

[11] When deciding whether to appoint a judicial manager under Bahamas law, Section 77(b) of the Bahamas Insurance Act directs the Bahamas Court to consider the effect of the debtor's financial condition on both policyholders and general creditors. Other provisions of the Bahamas Insurance Act state that BAICO's policyholders have priority over unsecured creditors, but this does not mean that Mr. Lopez, as judicial manager, has no duty to general creditors. While acknowledging the priority accorded to policyholders under Bahamas law, Mr. Lopez testified that he has a duty to general, unsecured creditors as well.

In the December Bahamas Order, the Bahamas Court found that limited reorganization and restructuring, followed by a **\*903** winding up, "would be most advantageous to the general interest of the policyholders of BAICO, and also for creditors of BAICO," showing that the Bahamas Court considered the interests of creditors other than policyholders. The December Bahamas Order makes it clear that the Bahamas Court intends to oversee a winding up of BAICO after certain contemplated restructuring transactions. Section 91 of the Bahamas Insurance Act provides that in a winding up of BAICO "policyholders have a first priority on the assets of the company and shall rank above all unsecured creditors." Subject to such priority, unsecured creditors obviously are intended to take part in the winding up.

Enacted in 2005, the Bahamas Insurance Act is relatively new. Neither Green Island nor Mr. Lopez offered any case law interpreting the Bahamas Insurance Act. Brian Simms, who testified on behalf of Petitioners as an expert on Bahamas insolvency law,[FN4] stated that a judicial manager safeguards the interests of both policyholders and other creditors. He testified that actions detrimental to the creditors alone, even if the policyholders are protected, may be sufficient for appointment of a judicial manager. The Court found Mr. Simms' testimony credible. In light of Mr. Simms' experience in the area of Bahamas insolvency law, including with insurance companies, the Court found his statements persuasive. Mr. Simms' testimony supplements the Court's conclusions based on a review of the relevant provisions of the Bahamas Insurance Act and orders entered in the Bahamas Proceeding.

> FN4. Fed.R.Civ.P. 44. 1, made applicable to this bankruptcy proceeding by Fed. R. Bankr.P. 9017, provides: "A party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing. In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law."

Mr. Lopez testified that there will be a claims pro-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

425 B.R. 884, 52 Bankr.Ct.Dec. 286, 22 Fla. L. Weekly Fed. B 390
**(Cite as: 425 B.R. 884)**

cess when BAICO reaches the winding up stage. Although Mr. Lopez is not now soliciting claims, both he and Mr. Simms testified that Mr. Lopez is accepting claims of unsecured creditors when tendered.

Mr. Lopez acknowledged that there is no current requirement for notice to general unsecured creditors, either of his appointment or of actions brought before the Bahamas Court. However, Mr. Lopez testified that upon institution of the winding up phase for BAICO all policyholders and creditors identified in BAICO's books will receive required notice. Mr. Simms testified that Bahamas law allows parties, including creditors, to be heard in the judicial management process. He stated that section 82 of the Bahamas Insurance Act provides for parties to be heard in connection with the judicial manager's recommendations to the Bahamas Court.

In the Lopez Report, Mr. Lopez repeatedly addresses the interests of general, unsecured creditors of BAICO. Mr. Lopez ultimately projects that general creditors of BAICO will receive no distribution in the eventual winding up of the company due to the priority accorded to policyholders under Bahamas law. However, by addressing the potential distribution to other creditors Mr. Lopez acknowledges his overall duty to creditors in general.

From the foregoing, the Court concludes that the Bahamas Proceeding is collective in nature and satisfies this prong of the definition of foreign proceeding.

**\*904** *SVG Proceeding*

[12] Although the SVG Insurance Act provides no guidance on this point, the petition seeking Mr. Glasgow's appointment by the SVG Court [BAICO Ex. 88], the SVG Order of Appointment, and the December SVG Order each contemplate the interests of both policyholders and unsecured creditors. In the petition requesting Mr. Glasgow's appointment, the Supervisor of Insurance stated that the appointment of a judicial manager was in the best interests of BAICO and that of its policyholders and creditors. [BAICO Ex. 88.] In the SVG Order of Appointment, the SVG Court authorized Mr. Glasgow "to pay any class of creditor and any claims, settlement, and expenses in full." [BAICO Ex. 86.] While this lan-

guage appears in a paragraph addressing a variety of business concerns, including insurance issues, the quoted language is not limited to claims of or against policyholders. The same order empowers Mr. Glasgow to take all appropriate action in pending "legal or arbitration proceedings" by or against BAICO, of any type. In his role as judicial manager, Mr. Glasgow may be involved in litigation relating to claims other than those under BAICO's insurance policies. In the December SVG Order, the SVG Court accepted Mr. Glasgow's findings that the recommended course of action was "most advantageous to the policy-holders and creditors of [BAICO]." [BAICO Ex. 75.] The orders of the SVG Court make it clear that the court is considering the interests of non-policyholder creditors.

Neither Mr. Glasgow nor Green Island offered case law interpreting the SVG Insurance Act. Geoffrey Graham Bollers, a lawyer admitted to practice in SVG, testified on behalf of the Petitioners as an expert on SVG insolvency law. Mr. Bollers stated that Mr. Glasgow, as judicial manager, is charged to safeguard the interests of policyholders and unsecured creditors including trade creditors. He further testified that the reorganization scheme to be filed by Mr. Glasgow pursuant to the December SVG Order will be subject to input from other parties under the SVG Insurance Act. Mr. Bollers stated that creditors, including foreign creditors, may file claims. Mr. Bollers' testimony was credible. In light of Mr. Bollers' experience with insolvency law in SVG, including insolvency of insurance companies, the Court found his statements persuasive. Mr. Bollers' testimony bolsters the other evidence reviewed above. The SVG Proceeding was instituted for the benefit of creditors generally and contemplates the involvement of creditors collectively.

Based on testimony of Mr. Lopez and Mr. Glasgow, multiple pending foreign actions relating to BAICO are being coordinated through the Bahamas Proceeding for the common benefit of BAICO's policyholders and other creditors. The SVG Proceeding is part of this unified process. The Court found that the Bahamas Proceeding is collective as contemplated under section 101(23). These facts support the conclusion that the SVG Pro-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

425 B.R. 884, 52 Bankr.Ct.Dec. 286, 22 Fla. L. Weekly Fed. B 390
**(Cite as: 425 B.R. 884)**

ceeding is itself collective in nature.

Based on the foregoing, the Court determines that the SVG Proceeding is collective in nature, satisfying this prong of the definition of foreign proceeding.

2. Judicial or Administrative

*Bahamas Proceeding*

[13] The Insurance Commission of The Bahamas petitioned the Bahamas Court pursuant to Section 77(1)(b) of the Bahamas Insurance Act for the appointment of Mr. Lopez as judicial manager. The Bahamas Insurance Act and the orders of the Bahamas Court show that the Bahamas Proceeding is a judicial proceeding.

**\*905** *SVG Proceeding*

The SVG Supervisor of Insurance petitioned the SVG Court pursuant to Section 52 of the SVG Insurance Act for the appointment of Mr. Glasgow as judicial manager. The SVG Insurance Act and the orders of the SVG Court show that the SVG Proceeding is a judicial proceeding.

3. Foreign Country

The Bahamas and SVG are foreign countries.

4. Under a Law Relating to Insolvency or Adjustment of Debt

[14] Both the Bahamas Insurance Act and the SVG Insurance Act require the relevant court to consider the solvency of the debtor and provide for the adjustment of debt through either a direct winding up or through appointment of a judicial manager.

5. Debtor's Assets and Affairs Subject to the Control and Supervision of a Foreign Court

*Bahamas Proceeding*

[15] Under section 79 of the Bahamas Insurance Act and the terms of the Bahamas Order of Appointment, Mr. Lopez has control over the assets and affairs of BAICO. The same section provides that Mr. Lopez acts under the supervision of the Bahamas Court.

*SVG Proceeding*

Under section 53 of the SVG Insurance Act and the terms of the SVG Order of Appointment, Mr. Glasgow has control over the assets and affairs of BAICO in SVG. The same section provides that Mr. Glasgow acts under the supervision of the SVG Court.

6. For the Purpose of Reorganization or Liquidation

[16] The phrase "for the purpose of reorganization or liquidation" appears after a comma, at the end of the definition of "foreign proceeding" in section 101(23). This phrase could relate to one of two concepts in the definition, either the law referenced earlier in the definition, or the subject foreign action itself. Since the definition of "foreign proceeding" already includes the requirement that the proceeding arise under "a law relating to insolvency or adjustment of debt," it would be redundant to conclude the phrase "for the purpose of reorganization or liquidation" also relates to the law governing the foreign action. The only reasonable conclusion is that the definition requires that the particular proceeding subject to recognition be "for the purpose of reorganization or liquidation."

*Bahamas Proceeding*

[17] Prior to the February 1, 2010 hearing in this case, Green Island objected to recognition of the Bahamas Proceeding on the ground that it was not for the purpose of reorganization or liquidation. Under the Bahamas Insurance Act, Mr. Lopez is required to submit a report to the Bahamas Court recommending one of several options outlined in the Bahamas Insurance Act. Bahamas Insurance Act § 81. The Bahamas Court then has the authority to direct whether the proceeding is one for liquidation, partial sale, or continuation of BAICO's business with or without conditions. *Id.* § 82. On the date of the chapter 15 petition here, Mr. Lopez had yet to file his report and the Bahamas Court had issued no order directing reorganization or liquidation. At that time, under the Bahamas Insurance Act, it was possible that the Bahamas Proceeding could be neither a liquidation nor a reorganization; the Bahamas**\*906** Proceeding could have been limited to an examination of BAICO with no further action required by Mr. Lopez or the Bahamas Court. Because the Bahamas Court had ordered

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

425 B.R. 884, 52 Bankr.Ct.Dec. 286, 22 Fla. L. Weekly Fed. B 390
**(Cite as: 425 B.R. 884)**

neither a winding up nor a reorganization of BAICO, on the date of the chapter 15 petition here the Bahamas Proceeding was not "for the purpose of reorganization or liquidation" and therefore was not a "foreign proceeding."

After the filing of the Bahamas Petition, but prior to the February 1, 2010 hearing in this case, the Bahamas Court entered the December Bahamas Order. By the December Bahamas Order, the Bahamas Court accepted the core findings of Mr. Lopez that BAICO is insolvent and should be reorganized and restructured where possible and then wound up. In that order, the Bahamas Court directed Mr. Lopez: (1) to continue to negotiate with third parties to sell, transfer, or dispose of the insurance business, or other assets and liabilities of the branches and subsidiaries of BAICO; (2) to transfer or sell the shares of BAT; (3) to take steps to protect the assets of BAICO and its subsidiaries in the United States by obtaining recognition of the Bahamas Proceeding; (4) to effect the winding-up of BAICO's non-insurance subsidiaries; (5) to investigate related party and other antecedent transactions, the conduct of management and the directors of BAICO, and the conduct of third parties providing services to and conducting transactions with BAICO; (6) to commence legal proceedings against CL Financial in respect of sums presently due to BAICO; (7) to investigate the assets and liabilities of BAICO's Employee Pension Plan; and (8) to effect the transfer of data and systems from Trinidad to a new administrative hub. [BAICO Ex. 106.] The Bahamas Court determined that these actions should "take place prior to the commencement of formal winding-up proceedings" and ordered that these actions be taken "to simplify the eventual winding-up of BAICO." After entry of the December Bahamas Order, it appears without question that the Bahamas Proceeding is for the purpose of partial reorganization followed by liquidation.

At the continued evidentiary hearing on February 1, 2010, Green Island abandoned its argument that the Bahamas Proceeding was not for the purpose of reorganization or liquidation as of the chapter 15 petition date. Although not stated at the hearing, Green Island likely

realized that in light of the December Bahamas Order a determination not to recognize the Bahamas Proceeding on this ground would have resulted only in a delay while Mr. Lopez filed a new chapter 15 petition.

[18] In any case, when determining whether a particular proceeding is for the purpose of reorganization or liquidation, it is appropriate for the Court to consider circumstances arising after the filing of the chapter 15 petition. If facts change after the petition date such that a foreign action formerly for the purpose of reorganization or liquidation loses such status, the Court would decline to recognize such a proceeding. The same logic should apply when, as here, the proceeding has become for the purpose of reorganization or liquidation after the chapter 15 petition date. This approach is consistent with the nature of the recognition process contemplated in sections 1518(1) and 1517(d), which allow for the court to adjust its ruling based on circumstances arising after recognition.

Based on the foregoing analysis, the Court determines that the Bahamas Proceeding satisfies all six components of the definition of "foreign proceeding" under the Bankruptcy Code.

*SVG Proceeding*

Under the SVG Insurance Act, Mr. Glasgow is required to submit a report to the SVG Court recommending one of several**\*907** options outlined in the SVG Insurance Act. SVG Insurance Act § 54(1). The SVG Court is not bound to accept Mr. Glasgow's recommendation. *Id.* § 55(1)(b). The SVG Court then has the authority to direct whether the proceeding is one for liquidation, partial sale, or continuation of BAICO's business with or without conditions. On or about October 9, 2009, Mr. Glasgow submitted the Glasgow Report to the SVG Court as required by the SVG Insurance Act. About six weeks later, on November 23, 2009, Mr. Glasgow filed the SVG Petition with this Court. On the date of the chapter 15 petition here, the SVG Court had issued no order directing reorganization or liquidation. As of that date, under the SVG Insurance Act, it was possible that the SVG Proceeding could be neither a liquidation nor a reorganization; the SVG Proceeding could have been limited to an examination of BAICO

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

425 B.R. 884, 52 Bankr.Ct.Dec. 286, 22 Fla. L. Weekly Fed. B 390

**(Cite as: 425 B.R. 884)**

with no further action required by Mr. Glasgow or the SVG Court. Because the SVG Court had ordered neither a winding up nor a reorganization of BAICO, on the date of the chapter 15 petition here the SVG Proceeding was not "for the purpose of reorganization or liquidation" and therefore was not a "foreign proceeding."

About four weeks after Mr. Glasgow filed the SVG Petition, on or about December 18, 2009, the SVG Court entered the December SVG Order. The December SVG Order accepted Mr. Glasgow's recommendations and directed a reorganization of BAICO pursuant to a scheme, or plan of reorganization, to be filed by Mr. Glasgow. The SVG Court ordered, pursuant to section 54(2) of the SVG Insurance Act, that: (1) there be a reorganization of BAICO by the transfer of its insurance and investment business to a new company in pursuant of a scheme of arrangement to be prepared in accordance with section 56 of the SVG Insurance Act; (2) the scheme prepared in accordance with the SVG Insurance Act be a plan making provision for the funding of a new company; (3) Mr. Glasgow is authorized to work with other judicial managers or persons similarly appointed, the governments of the Organisation of Eastern Caribbean States, and the Eastern Caribbean Central Bank, to develop such a scheme and make arrangements for any required funding; (4) Mr. Glasgow shall consider and do all things necessary with respect to the establishment of the new company and the transfer of assets and liabilities of BAICO into the new company; and (5) Mr. Glasgow is to continue to negotiate with third parties to sell or dispose of BAICO's property and health insurance business and to take such action that may be required to effect such sales or disposals subject to the approval of the SVG Court.

[19] As with the Bahamas Proceeding, Green Island no longer argues that the timing of the December SVG Order, entered the month following the SVG Petition here, necessitates denial of recognition. The Court considers the impact of the December SVG Order, even though entered after the chapter 15 petition date, for the same reasons stated above in connection with the Bahamas Proceeding. Instead, Green Island argues that the SVG Proceeding pertains to only one of BAICO's

branch operations, that the SVG Proceeding cannot by itself result in a reorganization or liquidation of BAICO as a whole, and that the SVG Proceeding is thus not for the purpose of reorganization or liquidation. In short, Green Island argues that for a foreign action to be recognized under chapter 15 it must have comprehensive impact on the debtor such that it could result in an overall reorganization or winding up of the debtor.

Green Island's reading of the requirement that the proceeding be for the purpose of reorganization or liquidation is unduly**\*908** narrow. Chapter 15 recognizes that the scope of a foreign nonmain proceeding may be less than all encompassing. Section 1521(c) directs the bankruptcy court to take into account the potential limited impact of the foreign nonmain proceeding in fashioning post-recognition relief. If the court were to recognize a foreign nonmain proceeding only where the proceeding, by itself, could result in a wholesale reorganization or liquidation of the debtor, section 1521(c) would be unnecessary.

It is possible that a foreign nonmain proceeding could be the center of a complete restructuring or liquidation of a debtor. This may occur, for example, where the proceeding is pending in the country of the debtor's formation, that country's law allows for a comprehensive reorganization or winding up based solely on the debtor's formation there, the debtor maintains some non-transitory economic activity in that country, but the debtor's center of main interest is elsewhere. Based on Green Island's argument, this is the only instance where a bankruptcy court should recognize a foreign nonmain proceeding.

Green Island's restricted view would deny recognition to the majority of potential nonmain proceedings. A foreign main proceeding, by definition pending in the country where the debtor has its center of main interest, is likely the primary tool for a reorganization or liquidation of the debtor. A foreign nonmain proceeding for the same debtor is most likely ancillary to the foreign main proceeding, intended to address operations, assets, and liabilities in the country where the foreign nonmain proceeding is pending. In many international insolvency matters, both types of proceedings are necessary to ob-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

425 B.R. 884, 52 Bankr.Ct.Dec. 286, 22 Fla. L. Weekly Fed. B 390
**(Cite as: 425 B.R. 884)**

tain a comprehensive reorganization or liquidation of the debtor. Consistent with the objective of "fair and efficient administration of cross-border insolvencies," 11 U.S.C. § 1501(a)(3), chapter 15 contemplates recognition of no more than one main proceeding and any combination of nonmain proceedings for the same debtor. To require that each of these foreign proceedings, main and nonmain, be able to result in a global reorganization or liquidation is not consistent with the structure of chapter 15.

Based on the foregoing analysis, the Court determines that the SVG Proceeding satisfies all six components of the definition of "foreign proceeding" under the Bankruptcy Code.

**B. Foreign Main Proceeding**

[20] Mr. Lopez requests that the Court recognize the Bahamas Proceeding as a foreign main proceeding. The term " 'foreign main proceeding' means a foreign proceeding pending in the country where the debtor has the center of its main interests." 11 U.S.C. § 1502(4). The concept "center of its main interests" is often shortened to "COMI." "In the absence of evidence to the contrary, the debtor's registered office, or habitual residence in the case of an individual, is presumed to be the center of the debtor's main interests." 11 U.S.C. § 1516(c). Because there is substantial evidence in this case that BAICO's COMI is not in the Bahamas, the presumption under section 1516(c) is rebutted here. Mr. Lopez bears the burden of proof to establish BAICO's COMI. *In re Tri–Continental Exch. Ltd.,* 349 B.R. 627, 635 (Bankr.E.D.Cal.2006).

[21] Neither the Bankruptcy Code nor the Guide to Enactment define COMI. Several courts have likened COMI to the "principal place of business" concept under United States law. *In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.,* 374 B.R. at 129 (citation omitted). United States case law exhibits a developing consensus on the factors**\*909** for determination of a debtor's COMI. Courts typically consider the following:

1. The location of the debtor's headquarters;

2. The location of those who actually manage the debtor (which may be the headquarters of a holding company);

3. The location of the debtor's primary assets;

4. The location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and

5. The jurisdiction whose law would apply to most disputes.

*In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.,* 374 B.R. at 128 (citation omitted). These are not exclusive factors, nor must they all be met in each case.

[22][23] Courts also consider the expectations of third parties with regard to the location of a debtor's COMI. The Guide to Enactment explains that the Model Law concept of COMI comes from the European Union Convention on Insolvency Proceedings. Guide to Enactment ¶ 31; *In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.,* 374 B.R. at 129. The European Union Convention on Insolvency Proceedings describes COMI as "the place where the debtor conducts the administration of his interests on a regular basis and is therefore ascertainable by third parties." *In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.,* 374 B.R. at 129 (quoting Council Reg. (EC) No. 1346/2000, P 13). Similarly, under chapter 15, "it is important that the debtor's COMI be ascertainable by third parties." *In re Betcorp Ltd.,* 400 B.R. 266, 291 (Bankr.D.Nev.2009). "COMI is affected not only by what a debtor does, but by what a debtor is perceived as doing." *Id.* (citation omitted).

Because the location of a debtor's COMI may change over time, the Court must determine the date on which to apply the COMI analysis. The Petitioners ask the Court to determine COMI as of the filing of their Petitions with this Court. Green Island suggests that the determination should be made as of the date each Petitioner was appointed in the underlying foreign proceedings or, alternatively, that the Court should consider the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

425 B.R. 884, 52 Bankr.Ct.Dec. 286, 22 Fla. L. Weekly Fed. B 390

**(Cite as: 425 B.R. 884)**

operational history of BAICO prior to the appointment of the Petitioners in the Bahamas and SVG.

Two bankruptcy courts have addressed the timing of the COMI determination in detail. In each case, the court determined that COMI should be analyzed as of the date of the chapter 15 petition. *In re Betcorp* involved an internet gambling business organized in and operated from Australia but that did business primarily with residents of the United States. 400 B.R. 266 (Bankr.D.Nev.2009). The liquidator in a voluntary winding up under Australia law requested recognition so as to obtain a stay of litigation in the United States, among other things. The objecting creditor argued that the bankruptcy court should consider the operational history of Betcorp, pointing to Betcorp's substantial course of business in the United States prior to the liquidation proceeding and the presence of a significant creditor here. In rejecting a historical analysis for the COMI determination, the *Betcorp* court expressed concern for the possibility of conflicting COMI determinations in various countries arising from different analyses of a debtor's historical activities. At the time of the chapter 15 petition in *Betcorp,* the Australian liquidator had been in place for more than a year, the debtor had no employees other than those retained by the liquidator, and the liquidator had possession of the debtor's only asset, cash in an Australian bank account. Even if Betcorp's**\*910** COMI had at some prior time been located outside Australia, it had moved to Australia in the substantial time after the liquidator's appointment.

The *Betcorp* decision cites extensively to another bankruptcy court opinion, *In re Ran,* 390 B.R. 257 (Bankr.S.D.Tex.2008), *aff'd, Lavie v. Ran,* 406 B.R. 277 (S.D.Tex.2009). The petitioner in *Ran,* an Israeli bankruptcy trustee, argued that the United States bankruptcy court should consider Mr. Ran's historical ties to Israel, and find his COMI in Israel, in spite of the fact that Mr. Ran had lived in the United States for more than a decade and had no interests in Israel at the time of the chapter 15 petition. In ruling that the chapter 15 petition date is the appropriate time for the COMI determination, as in *Betcorp,* the *Ran* court based its decision primarily on a desire to maintain international uniform-

ity in the determination of a debtor's COMI.

Chapter 15 itself provides guidance on the temporal focus of the COMI analysis. Under section 1517(b)(1), a foreign proceeding is recognized "if it is pending in the country where the debtor *has* the center of its main interests." (emphasis added). This phrase is stated in the present tense. A chapter 15 case is commenced by the filing of a petition for recognition under section 1504. The present, for purposes of a court making a determination under section 1517(b)(1), can be no earlier than the date the chapter 15 petition was filed.

[24] The text of chapter 15 supports making the COMI determination as of the date the court rules on the issue. Section 1518(1) requires that after recognition a foreign representative must promptly file notice with the court of "any substantial change in the status of such foreign proceeding or the status of the foreign representative's appointment." Section 1517(d) authorizes the court to modify or terminate recognition based on changed circumstances. These provisions exhibit a policy that the recognition process remain flexible, taking into account the actual facts relevant to the court's decision rather than setting an arbitrary determination point. In light of these provisions, if the location of a debtor's COMI changes between the date a chapter 15 petition is filed and the date a court makes a determination on recognition, the court may look to the facts on the latter date for purposes of COMI.

Selecting the latest possible date for the COMI analysis is consistent with the aim of international uniformity stressed in *Ran* and *Betcorp.* Over time, the circumstances affecting recognition may change. Guide to Enactment ¶ 130. If all recognition proceedings, wherever pending, consider the latest available evidence, there is a greater likelihood that the appropriate foreign main and foreign nonmain proceedings will be recognized as such in a consistent manner.

In the present case, the facts relevant to the determination of COMI remained essentially unchanged from the date of the Bahamas Petition through the close of the presentation of evidence.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

425 B.R. 884, 52 Bankr.Ct.Dec. 286, 22 Fla. L. Weekly Fed. B 390

**(Cite as: 425 B.R. 884)**

[25] The Court first considers evidence with regard to the location of BAICO's headquarters. Mr. Lopez argues that BAICO's headquarters is in the Bahamas because Mr. Lopez is in the Bahamas. Mr. Lopez oversees BAICO's business activity under the Bahamas Order of Appointment, has legal custody and control over BAICO's business records (but not necessarily physical custody), and makes all high level business decisions for BAICO from his office in the Bahamas. The Bahamas Order of Appointment empowers Mr. Lopez to take certain actions such as hire and fire employees, remit salaries, incur and pay expenses for the running, administration and management of BAICO's**\*911** affairs and offices, and generally carry on all or any part of BAICO's business so far as may be necessary to preserve the value of BAICO. The evidence shows that Mr. Lopez's activities since appointment include the retention of numerous lawyers and accountants, the investigation of assets and liabilities of BAICO, the preparation and filing of the Lopez Report, and overseeing the sale of certain of BAICO's assets. BAICO's entire board of directors resigned prior to Mr. Lopez's appointment as judicial manager. Mr. Simms testified that Mr. Lopez effectively replaced the board of directors of BAICO.

The headquarters of a corporate entity is more than the location of its board of directors. The term headquarters, or head office, contemplates the place where the primary management of an entity's business is undertaken. Management of a corporate entity includes all relevant business functions, such as the financial, administrative, marketing, information technology, investment, and legal functions. Other functions may be relevant depending on the nature of the debtor's business. Here, because BAICO operated as an insurance company, actuarial tasks, underwriting, and claims adjustment should be considered.

The overwhelming evidence presented in this case shows that BAICO's headquarters is not in the Bahamas. In 2005, long prior to the commencement of the Bahamas Proceeding, BAICO entered into the Services Agreement with BA Management, a wholly-owned subsidiary of BAICO located in Trinidad. Under the Services Agreement, BAICO outsourced essentially all of its central management to BA Management. These functions include all financial, administrative, marketing, information technology, investment, actuarial, legal, policy administration, and claims processing for BAICO. BA Management continues to perform all of the same functions for BAICO. Although he plans to move these services to the Bahamas, Mr. Lopez's own report states that BAICO's administrative hub remains in Trinidad. [BAICO Ex. 103 at 216.] The Glasgow Report confirms this fact, going so far as to describe the SVG branch as a "local branch sales and administrative unit supported by a group service company, [the Trinidad Subsidiaries]." [BAICO Ex. 77 at 58.]

In spite of the breadth of management tasks delegated to BA Management, the Petitioners try to distance BAICO from Trinidad. They argue that BAICO has no branch operations in Trinidad, where it acts only through subsidiaries, that BAICO itself does not have an insurance license in Trinidad, and that BAICO has no physical assets in Trinidad in its own name. Petitioners ask the Court to ignore the Services Agreement, and the fact that BA Management continues to perform nearly all central business functions of BAICO, on the ground that BAICO undertakes these functions through an agent, BA Management, rather than in its own name. This arrangement is not unusual. BA Management is a wholly-owned subsidiary of BAICO, which is in turn owned almost entirely by CL Financial. Both CL Financial and BA Management are located in Trinidad. It is not surprising that CL Financial centralized all of BAICO's management tasks near CL Financial's own place of business. It is also not surprising that CL Financial did not set up BAICO's management hub in the Bahamas. For a significant time prior to Mr. Lopez's appointment, BAICO had no tie to the Bahamas other than was absolutely necessary to maintain its corporate existence and insurance license. The Court is not troubled by the fact that BAICO acted and continues to act primarily through a subsidiary. By its nature, a corporate entity **\*912** must carry out its business through employees or agents. It makes no difference that the agent in this case is another corporate entity, and a subsidiary of BAICO, or that BA Management's employees undertake such tasks for BAICO. Indeed, it appears that BA Man-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

425 B.R. 884, 52 Bankr.Ct.Dec. 286, 22 Fla. L. Weekly Fed. B 390
**(Cite as: 425 B.R. 884)**

agement's sole purpose was to perform management tasks for BAICO and its related entities to obtain a positive tax benefit for BAICO.

Next, the Court considers the location of those who actually manage BAICO. While a corporate entity is overseen by a board of directors, in larger organizations the day to day management typically is undertaken by others. A board of directors provides guidance and oversight; others operate the business. The evidence addressed immediately above in review of BAICO's headquarters is equally relevant here. While Mr. Lopez acts in place of a board of directors for BAICO, all of the day to day activity, including all of the primary business functions, remains in Trinidad. Employees of BA Management continue to manage the affairs of BAICO under the terms of the Services Agreement. Mr. Lopez supervises those functions. As suggested in the Lopez Report, Mr. Lopez may in the future move BAICO's administration to the Bahamas. In the meantime, the primary management activities of BAICO continue to take place in Trinidad. For the reasons stated above, it does not matter that these functions are performed through the employees of a wholly-owned corporate agent.

The Court also considers the location of BAICO's primary assets. From the undisputed evidence presented in the Lopez Report, the majority of BAICO's assets is located in the EC Branches and not in the Bahamas.

The Court considers the location of the majority of BAICO's creditors and the jurisdiction whose law would apply to most disputes. The Lopez Report shows that more than 77% of BAICO's liabilities are associated with the EC Branches. About 21 % of BAICO's liabilities are associated with "BAICO stand-alone" in part because BAICO's books do not allow attribution to any particular branch or subsidiary. BAICO has not written insurance policies in the Bahamas since 1997. Since that time, BAICO wrote policies and conducted business in numerous Caribbean countries other than the Bahamas. Prior to Mr. Lopez's appointment, BAICO's activities in the Bahamas were limited to those acts necessary to maintain its corporate existence and licensing. The Court concludes that BAICO's creditors

exist primarily outside the Bahamas. Because BAICO did not do business in the Bahamas for an extended period of time, and BAICO's creditors exist mostly outside the Bahamas, it is unlikely that creditors would bring suit in the Bahamas. From the evidence presented, it appears that policyholders and other creditors dealt with local branch offices and subsidiaries, outside the Bahamas, have been directed after Mr. Lopez's appointment to continue to deal with their local offices, and likely would pursue any claims in the locations of those offices. It appears unlikely that the law of the Bahamas would govern most disputes.

The location of a debtor's COMI should be readily ascertainable by third parties. For an extended period prior to Mr. Lopez's appointment, BAICO did not issue policies in the Bahamas or to Bahamas residents, it had no bank accounts in the Bahamas, BAICO's claims adjustment and processing took place entirely outside the Bahamas, and it had no directors or employees in the Bahamas. From the perspective of policyholders and creditors, little changed after Mr. Lopez's appointment. When Mr. Lopez was appointed, he updated the BAICO web site to reference his appointment and informed regulators and certain other parties of his appointment. **\*913** To facilitate performance of his duties as judicial manager, he opened bank accounts for BAICO in the Bahamas and retained counsel and accountants. Based on the evidence presented, including the Lopez Report, policyholders and creditors continue to deal with their local branch offices and BAICO subsidiaries, all in countries other than the Bahamas. Mr. Lopez's notice on the BAICO web site directs parties to deal with their local offices, outside the Bahamas. There is little reason for BAICO's policyholders and other creditors to believe BAICO has its center of main interest—the hub of its business operations—in the Bahamas.

Mr. Lopez argues that the Court may determine BAICO has its COMI in the Bahamas based on BAICO's insurance license and registration in the Bahamas, the regulation of BAICO in the Bahamas, Mr. Lopez's appointment and the broad powers conferred on him in the Bahamas Order of Appointment, and his initial activity as judicial manager including the retention

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

425 B.R. 884, 52 Bankr.Ct.Dec. 286, 22 Fla. L. Weekly Fed. B 390

**(Cite as: 425 B.R. 884)**

of professionals, investigatory work, and the Lopez Report. The petitioners in *Bear Stearns* made similar arguments.

The debtors in *Bear Stearns* had no employees or managers in the Cayman Islands, where the liquidation proceeding was pending. *In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.,* 389 B.R. 325, 337–38 (S.D.N.Y.2008) (citation omitted). A New York investment manager managed the debtors' affairs. All of the debtors' administrative functions took place in the United States rather than the Cayman Islands. All of the debtors' books and records, other than required corporate records, were maintained in the United States. Prior to the petitioners' appointment in the Cayman Islands, all of the petitioners' liquid assets were located in the United States, although the petitioners redirected the debtors' funds to accounts in the Cayman Islands after their appointment. Other than related entities, the petitioners' sole investor was a United Kingdom entity. Accounts due to the debtors were located outside the Cayman Islands. None of the debtors' contract counterparties were located in the Cayman Islands. *Id.* Evidence of pre-appointment legal and auditing work in the Cayman Islands did not sway the court. Based primarily on these facts, the court in *Bear Stearns* declined to recognize the Cayman Islands proceeding.

The facts presented by Mr. Lopez in this case are substantially identical to those presented in *Bear Stearns.* BAICO had no directors, managers, or other employees in the Bahamas at the time of Mr. Lopez's appointment. A Trinidad based, wholly-owned subsidiary managed BAICO's affairs and still does. Other than the location of its registered office, limited professional representation, and Mr. Lopez's oversight, all of BAICO's administrative functions take place in Trinidad rather than in the Bahamas. None of BAICO's books and records, other than required corporate records, were maintained in the Bahamas. Prior to Mr. Lopez's appointment, none of BAICO's liquid assets were located in the Bahamas, although he established accounts in the Bahamas after his appointment. There is no evidence to show that BAICO has any material creditors in the Ba-

hamas. Other than Mr. Lopez's appointment, BAICO's contacts with the Bahamas are limited to those necessary to retain its charter and insurance license.

The petitioners in *Bear Stearns* were "exempted" companies under Cayman Islands law, a status that prevented them from doing business with parties within the Cayman Islands. *In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.,* 374 B.R. 122, 132 (Bankr.S.D.N.Y.2007), *aff'd,* **\*914**389 B.R. 325 (2008) (citing Companies Law (2004 Revision) of the Cayman Islands § 193). BAICO simply did not do business in the Bahamas. There is no difference for purposes of the COMI determination.

[26] Mr. Lopez argues that BAICO is subject to Bahamas insurance regulation law and should be restructured and wound up in the Bahamas. Mr. Lopez states that upon his appointment he supplanted BAICO's board of directors and all corporate control was ceded to him. Like the court in *Bear Stearns,* this Court finds that "[t]hese allegations do not constitute substantive economic activity" in the Bahamas. *In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.,* 389 B.R. at 338; *accord In re SPhinX, Ltd.,* 351 B.R. 103, 119 (Bankr.S.D.N.Y.2006) ("In light of the foregoing principles, important objective factors point to the SPhinX Funds' COMI being located outside of the Cayman Islands. As far as the administration of the Debtors' interests is concerned, the SPhinX Funds' hedge fund business was conducted by PlusFunds outside of the Cayman Islands, as were most of the SPhinX Funds' back-office operations, by DPM. The only business done in the Cayman Islands apparently was limited to those steps necessary to maintain the SPhinX Funds in good standing as registered Cayman Islands companies and certain SPhinX Funds as SPCs. There were no employees or managers in the Cayman Islands, and the Debtors' boards, which contained no Cayman Islands residents, never met in the Cayman Islands.")

Based on the facts presented, the Court determines that BAICO's formation and regulation in the Bahamas and Mr. Lopez's actions as judicial manager do not constitute sufficient acts to establish BAICO's COMI in the Bahamas. The Court does not conclude that the actions

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

425 B.R. 884, 52 Bankr.Ct.Dec. 286, 22 Fla. L. Weekly Fed. B 390

**(Cite as: 425 B.R. 884)**

of a foreign representative, such as the judicial manager here, could never be considered evidence in support of a finding of COMI. There may be instances where a foreign representative remains in place for an extended period, and relocates all of the primary business activities of the debtor to his location (or brings business to a halt), thereby causing creditors and other parties to look to the judicial manager as the location of a debtor's business. This could lead to the conclusion that the center of its main interest has become lodged with the foreign representative. The court in *Betcorp* considered similar facts in determining that a debtor's COMI was in the place where the liquidation was pending. *In re Betcorp Ltd.,* 400 B.R. 266, 292–93 (Bankr.D.Nev.2009). While Mr. Lopez could take action to move BAICO's COMI to the Bahamas, and it appears from the Lopez Report that he may do so, he has not done so yet. The primary components of BAICO's business, which directly touch policyholders and other creditors, still occur entirely outside the Bahamas.

For the foregoing reasons, the Court determines that BAICO does not have the center of its main interest in the Bahamas and the Bahamas Petition is not a foreign main proceeding.

**C. Foreign Nonmain Proceeding**

*Bahamas Proceeding*

[27] In the alternative, Mr. Lopez requests that this Court recognize the Bahamas Proceeding as a foreign nonmain proceeding. The term " 'foreign nonmain proceeding' means a foreign proceeding, other than a foreign main proceeding, pending in a country where the debtor has an establishment." 11 U.S.C. § 1502(5). " '[E]stablishment' means any place of operations where the debtor carries out a nontransitory economic activity." 11 U.S.C. § 1502(2). "Establishment" has been described as a "local place of business."**\*915** *In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.,* 374 B.R. at 131. To further define establishment, courts look to the Model Law and the sources used to promulgate it. "Per the [European Union's Convention on Insolvency Proceedings]'s legislative history, a 'place of operations' referred to 'a place from which

economic activities are exercised on the market (i.e.externally), whether the said activities are commercial, industrial or professional.' " *Lavie v. Ran,* 406 B.R. 277, 284 (S.D.Tex.2009) (citing Council, Report on the Convention on Insolvency Proceedings, at 49, No. 6500/96).

[28] Unlike with the determination of COMI, chapter 15 provides no evidentiary presumption in connection with the determination of whether a debtor has an establishment in a particular jurisdiction. The petitioner has the burden of proof on whether a debtor has an establishment in the country of the foreign proceeding.

[29] Whether the debtor has an "establishment" in a country must be determined at the time of the filing of the chapter 15 petition.

> The use of the present tense [in section 1502(5) and section 1502(2) ] implies that the court's establishment analysis should focus on whether the debtor has an establishment in the foreign country when the foreign representative files for recognition under Chapter 15.... Because courts undertake the establishment analysis when the foreign representative files for recognition, it follows that the court should weigh only the evidence as it exists at the time of filing in the U.S. court.

*Lavie v. Ran,* 406 B.R. at 284–85.

[30] To have an establishment in a country, the debtor must conduct business in that country. The location should constitute a "seat for local business activity" for the debtor. *In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.,* 374 B.R. at 131. The terms "operations" and "economic activity" require showing of a local effect on the marketplace, more than mere incorporation and record-keeping and more than just the maintenance of property.

It is undisputed that at the time of the Bahamas Petition, BAICO had no business operation in the Bahamas other than the judicial manager's activities pursuant to his appointment. BAICO does not presently do

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

425 B.R. 884, 52 Bankr.Ct.Dec. 286, 22 Fla. L. Weekly Fed. B 390
**(Cite as: 425 B.R. 884)**

business in the Bahamas. Mr. Lopez's retention of counsel and accountants, investigation of assets and liabilities, and reporting to the Bahamas Court, do not constitute business activities of BAICO. The court in *Bear Stearns* rejected this same argument in finding that the petitioners failed to prove an establishment in the Cayman Islands. 389 B.R. at 339; *accord Lavie v. Ran,* 406 B.R. 277, 286 (S.D.Tex.2009) ("From the outset, it stretches credulity to view a bankruptcy proceeding as an industrial or professional activity.... Further, though a bankruptcy proceeding does pertain to economic matters, it does not comport with traditional notions of economic activity in the marketplace.")

As one court observed, finding an establishment based solely on the existence of an insolvency proceeding poses two problems.

First, by definition, an insolvency proceeding is a transitory action. WEBSTER'S NEW INTERNATIONAL DICTIONARY 2692 (2d ed.1939) (defining "transitory action" as "[a]n action which may be brought in any county, [such] as actions for debt, etc."). Transitory actions are tied to the person, rather than a location. *See* BLACK'S LAW DICTIONARY 34 (8th ed.2004) (observing that transitory actions are "universally founded on the supposed **\*916** violation of rights which, in contemplation of law, have no locality"). In stark contrast, the concept of establishment is location-oriented, in that it focuses on the "place of operations" in which the activity occurs. It would seem an odd result to permit a transitory action to suffice as the basis for finding nontransitory economic activity.

Second, if the proceeding and associated debts, alone, could suffice to demonstrate an establishment, it would essentially rule out the possibility that any proceeding would fall into the third, more nebulous category of proceedings that are neither foreign main nor foreign nonmain. But, this third category was clearly envisioned by the drafters. Therefore, such an interpretation would be contrary to statutory intent and thus violate a key canon of statutory interpretation.

*Lavie v. Ran,* 406 B.R. at 286–87.

The Court determines that BAICO does not have an establishment in the Bahamas and thus does not recognize the Bahamas Proceeding as a foreign nonmain proceeding.

*SVG Proceeding*

[31] At the February 1, 2010 hearing, Green Island conceded that the SVG proceeding is pending in a country where BAICO has an establishment as defined in chapter 15. The evidence shows that BAICO has property in SVG where it conducts business, retains employees at its SVG branch who perform insurance business activity, maintains accounts in SVG relating to its insurance business in that country, and has existing policyholders in SVG. BAICO is involved in financial transactions in the local SVG market. BAICO has a place of operations in SVG where it conducts non-transitory economic activity. Consequently, the Court will recognize the SVG Proceeding as a foreign nonmain proceeding.

**IV. ORDER**

Accordingly, it is ORDERED that:

1. The request for recognition of the Bahamas Proceeding as a foreign main proceeding or, in the alternative, a foreign nonmain proceeding, is DENIED.

2. The request for recognition of the SVG Proceeding as a foreign nonmain proceeding is GRANTED.

3. Petitioner for the SVG Proceeding requested relief under 11 U.S.C. § 1521. The Court will conduct a further hearing to address such request. Pursuant to 11 U.S.C. § 1521(a)(6), the interim relief previously granted under 11 U.S.C. § 1519 will remain in effect subject to order of the Court.

Bkrtcy.S.D.Fla.,2010.
In re British American Ins. Co. Ltd.
425 B.R. 884, 52 Bankr.Ct.Dec. 286, 22 Fla. L. Weekly Fed. B 390

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Tab 27

⚑ KeyCite Blue-Striped Flag

Appeal Filed by In Re: Canterbury Securities, Ltd, 2nd Cir., December 23, 2025

675 B.R. 109
United States District Court, S.D. New York.

IN RE: CANTERBURY SECURITIES, LTD., Debtor in a Foreign Proceeding.

Erin Winczura, Appellant,

v.

Karen Scott and Russell Homer,
Foreign Representatives of Canterbury
Securities, Ltd., Appellees.

25 Civ. 2502 (PAE)
|
Signed November 19, 2025

**Synopsis**

**Background:** Joint official liquidators of debtor, a registered Cayman Islands securities investment business, petitioned for recognition of debtor's Cayman insolvency proceeding under Chapter 15 of the United States Bankruptcy Code. The United States Bankruptcy Court for the Southern District of New York, David S. Jones, J., granted petition and related relief over opposition of debtor's former owner and subsequently denied former owner's motion to dismiss the recognition proceeding. Former owner appealed.

**Holdings:** The District Court, Paul A. Engelmayer, J., held that:

[1] the Cayman proceeding was not procedurally unfair, as the first factor in the *Fairfield Sentry I* test, 2011 WL 4357421, used in determining whether recognition and granting related relief would offend United States public policy under Chapter 15's public policy exception, and

[2] under the second *Fairfield I* factor, recognizing and granting relief related to the Cayman proceeding would not impinge on a United States statutory or constitutional right.

Affirmed.

West Headnotes (13)

**[1]** **Bankruptcy** 🔑 Conclusions of law; de novo review

**Bankruptcy** 🔑 Clear error

District court reviews bankruptcy court's legal conclusions de novo and factual findings for clear error. 28 U.S.C.A. § 158(a).

**[2]** **Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

Purpose of Chapter 15 of the Bankruptcy Code is to promote international cooperation, legal certainty, and the protection and maximization of debtors' assets. 11 U.S.C.A. § 1501(a).

**[3]** **Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

Recognition of a foreign proceeding under Chapter 15 of the Bankruptcy Code makes available relief mechanisms to protect debtors' assets and creditors' interests. 11 U.S.C.A. §§ 1517, 1520, 1521.

**[4]** **Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

Upon recognition of a foreign main proceeding under Chapter 15 of the Bankruptcy Code, the Code provides for certain automatic, nondiscretionary relief, including an automatic stay of all proceedings against the debtor in the United States. 11 U.S.C.A. § 1520.

**[5]** **Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

Chapter 15's public policy exception, providing that nothing in Chapter 15 prevents the court from refusing to take an action governed by the chapter if the action would be manifestly contrary to the public policy of the United States, is "narrow," with the word "manifestly"

3125

restricting the exception to the most fundamental policies of the United States. 11 U.S.C.A. § 1506.

**[6]** **Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

Pursuant to the *Fairfield Sentry I* test, 2011 WL 4357421, courts applying Chapter 15's public policy exception inquire whether (1) the foreign proceeding was procedurally unfair, and (2) the application of foreign law or the recognition of a foreign main proceeding under Chapter 15 would severely impinge the value and import of a United States statutory or constitutional right, such that granting comity would severely hinder United States bankruptcy courts' abilities to carry out the most fundamental policies and purposes of these rights. 11 U.S.C.A. § 1506.

**[7]** **Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

Party invoking Chapter 15's public policy exception bears the burden of showing it applies. 11 U.S.C.A. § 1506.

**[8]** **Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

Debtor's Cayman Islands insolvency proceeding was not procedurally unfair, as first factor in *Fairfield Sentry I* test, 2011 WL 4357421, used to determine whether recognition and grant of related relief would offend United States public policy under Chapter 15's public policy exception; for years, debtor's former owner, who had opposed granting recognition and related relief and had sought unsuccessfully to dismiss the recognition proceeding, fully participated in the Cayman proceeding, including testifying during bench trial as to liability and, though she had been debarred from participating in future proceedings as sanction for her repeated violations of Cayman Court's orders, retaining ability to apply for relief from debarment order, and Cayman Islands' legal system was sophisticated and commonly resolved major commercial disputes, and its insolvency

proceedings had been routinely recognized by United States courts. 11 U.S.C.A. § 1506.

**[9]** **Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

Foreign proceedings do not have to be "identical" in form to United States proceedings to warrant recognition under Chapter 15 of the Bankruptcy Code—the key issue is whether the foreign proceedings meet fundamental standards of fairness. 11 U.S.C.A. § 1517.

**[10]** **Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

Recognizing and granting related relief related to Cayman Islands insolvency proceeding of debtor, a registered Cayman securities investment business, would not impinge on a United States statutory or constitutional right, as second factor in *Fairfield Sentry I* test, 2011 WL 4357421, used to determine whether recognition and grant of related relief would offend United States public policy under Chapter 15's public policy exception, despite contention of debtor's former owner that "massive fraud" had been committed on Cayman Court and recognition would enable money laundering and market manipulation; Cayman Court, after nearly two-week bench trial at which extensive documentary evidence was presented, had rejected former owner's fraud allegations, and its rulings were careful, comprehensive, and reasonable, and merited comity. 11 U.S.C.A. § 1506.

**[11]** **Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

In context of determining applicability of Chapter 15's public policy exception, United States courts are not ordinarily to reassess creditor claims resolved in foreign bankruptcy proceedings. 11 U.S.C.A. § 1506.

**[12]** **Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

3126

Pursuant to the *Fairfield Sentry I* test, 2011 WL 4357421, granting recognition and related relief to Cayman Islands insolvency proceeding of debtor, a registered Cayman securities investment business, would not offend United States public policy under Chapter 15's public policy exception; Cayman proceeding was not procedurally unfair, debtor's former owner did not argue that granting recognition or limited related relief would itself violate a United States statute or the Constitution, and although she did contend that "massive fraud" had been committed on the Cayman Court and that recognition would enable money laundering and market manipulation, the Cayman Court, a respected foreign tribunal, had rejected her fraud allegations based on extensive and carefully developed record, in a proceeding that, given the interest in comity, was due "considerable weight." 11 U.S.C.A. § 1506.

[13]    **Bankruptcy** 👉 Cases Ancillary to Foreign Proceedings

Chapter 15's public policy exception is not intended to invite factual challenges to the determinations made in a procedurally sound foreign proceeding. 11 U.S.C.A. § 1506.

**Attorneys and Law Firms**

Alex Lipman, Lipman Law PLLC, New York, NY, for Appellant.

John Evans Jureller, Klestadt, Winters, Jureller, Southard & Stevens LLP, New York, NY, for Appellees/Debtor in a Foreign Proceeding.

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

**\*111**   This appeal arises from a proceeding in which the United States Bankruptcy Court in this District (the "Bankruptcy Court"), acting under Chapter 15 of the U.S. Bankruptcy Code, granted a petition to recognize

a Cayman Islands bankruptcy proceeding relating to Canterbury Securities, Ltd. ("Canterbury"). The Bankruptcy Court also granted related relief. In the Bankruptcy Court, Erin Winczura, Canterbury's former owner and director, opposed recognition and the related relief, and moved to dismiss the Chapter 15 proceeding. Winczura now appeals the Bankruptcy Court's denial of that motion. For the following reasons, the Court affirms the Bankruptcy Court's decision.

**I. Background**

   **A. The Parties**
Canterbury is a limited liability company incorporated in the Cayman Islands. Bankr. Dkt. 2-2 (certificate of incorporation). On January 1, 2020, Canterbury registered with the main financial services regulator of the Cayman Islands "to conduct securities investment business for high net worth" individuals. Bankr. Dkt. 3 (declaration of John Harris, counsel for Canterbury in Cayman proceeding) ("Harris Decl.") ¶ 15.

Winczura is a Canadian national and Cayman Islands resident. Bankr. Dkt. 17 ("Scott Decl.") at 17.

Karen Scott and Russell Homer, the appellees here, are the joint official liquidators of Canterbury. They were appointed such by the Financial Services Division of the Grand Court of the Cayman Islands (the "Cayman Court"). Bankr. Dkt. 17-3 (January 16, 2024 winding up order) ("Winding Up Order") at 2.[1]

   **B. Events Leading to Canterbury's Insolvency**
Between approximately 2015 and late 2023, Winczura, Canterbury's founder, was its owner and chief executive. Bankr. Dkt. 17-1 (August 17, 2023 judgment by the Cayman Court) ("Cayman Liability Decision") ¶ 11; Harris Decl. ¶ 19.

 **\*112**   In May 2018, Canterbury entered into a brokerage agreement with Fortunate Drift Ltd. ("FDL"), a company incorporated in the British Virgin Islands, to hold certain NASDAQ-listed shares ("YRIV shares") on behalf of FDL. Cayman Liability Decision ¶¶ 9–10. To help FDL raise more capital, Winczura introduced FDL representatives to PFS Ltd. ("PFS"), a Cayman Islands company she owned, as a potential source of financing. *Id.* ¶¶ 10, 24. As detailed below, whether Winczura disclosed her stake in PFS to FDL is disputed and the Cayman Court later found that she had not. *Id.* ¶¶ 27, 49 (court had "little difficulty in finding that [Canterbury]

presented PFS to FDL as an unrelated third party in light of the unambiguous contemporaneous record and rejecting [ ] Winczura's evidence on this issue," including her contrary testimony); Harris Decl. ¶ 20 ("Unbeknown to FDL, PFS was also owned and controlled by Winzcura.").

In August 2018, FDL entered into a stock purchase agreement (the "SPA") with PFS. Cayman Liability Decision ¶ 10. Under the SPA, PFS agreed to purchase more than 1.1 million YRIV shares from FDL. *Id.* The SPA included a put option that gave PFS the right to sell the shares back to FDL, within three months, at a strike price of $11.26 per share, for approximately $12.9 million. *Id.* ¶ 45. Under the SPA, PFS would waive the put option if it were to move the shares from Canterbury or short YRIV. *Id.* FDL continued to keep its unsold YRIV shares at Canterbury as collateral, in the event that PFS exercised the put option. *Id.* ¶¶ 25, 65–68.

Disputes among the three companies arose almost immediately. Even before FDL received the purchase money owed under the SPA, PFS started to sell YRIV shares. *Id.* ¶ 126. On September 19, 2018, FDL wrote Canterbury: "The Put Provision of the SPA has been waived, and FDL's stock may no longer be used as collateral." *Id.* ¶ 67. FDL instructed Canterbury to return FDL's remaining shares. *Id.* Canterbury refused, based on ostensible uncertainty as to whether PFS had actually waived the put option. *Id.* ¶¶ 25, 167(b).

On December 6, 2018, negative press reporting as to YRIV caused its stock price to plummet. *Id.* ¶¶ 9, 72(g), 106. That and the following day, Canterbury conducted a "fire-sale" of 1.71 million YRIV shares owned by FDL, which netted nearly $20 million while causing the stock price to drop even further. *Id.* ¶ 72(e), (g). Canterbury did so without FDL's authorization. *Id.* ¶¶ 72(f)–(g), 79. Canterbury asserted that it had been necessary to liquidate these shares to secure FDL's obligations under the put option. *Id.*

Canterbury thereafter, the Cayman Court found, demonstrated a "lack of forthrightness about what happened to the [approximately $20 million in] proceeds of the sell-off." *Id.* ¶ 166; *see also* Harris Decl. ¶ 21 (Canterbury "appropriated the proceeds."). The location of these proceeds remains unresolved.

### C. Proceedings in the Cayman Islands

### 1. Pretrial Proceedings and Trial Evidence

In approximately late 2018, FDL filed suit against Canterbury in the Cayman Court. *See* Cayman Liability Decision at 1. It alleged that Canterbury had unlawfully (1) refused to return FDL's YRIV shares, worth more than $50 million; (2) sold $20 million of such shares; and (3) kept the sale proceeds and FDL's remaining YRIV shares. *Id.* at 2. FDL brought common law claims for breach of fiduciary duty, breach of contract, conversion, and unjust enrichment. *Id.*

**\*113**   Canterbury filed counterclaims and asserted affirmative defenses based on, *inter alia*, illegality, unclean hands, and conspiracy. *Id.* In brief, it alleged that FDL had falsely induced it to provide brokerage services as part of a scheme to manipulate YRIV's share price. *Id.* at 1–2.

Before trial, the Cayman Court received substantial briefing from both sides, made rulings, and held at least one hearing. *See, e.g.*, *id.* ¶¶ 49, 54, 106, 109, 146. Between June 5 and 14, 2023, it presided over a nearly two-week bench trial as to liability. *See id.* at 1. Three fact witnesses (Winczura, PFS director Brian Johnston, and FDL director Dominic Sin), and two expert witnesses (one from each side) testified. *Id.* ¶¶ 14–17 (summarizing Sin testimony), 18–21 (FDL's expert testimony), 22–27 (Winczura testimony), 28–32 (Johnston testimony), 33–36 (Canterbury's expert testimony). The Cayman Court received substantial documentary evidence, including: written contracts between the parties, *e.g.*, *id.* ¶¶ 45–46 (SPA and collateral agreement); correspondence as to the same, *e.g.*, *id.* ¶¶ 48–49 (emails and WhatsApp messages among the parties); and expert and supplemental reports, *e.g.*, *id.* ¶¶ 18–19 (by FDL's expert), 33–35 (by Canterbury's expert).

### 2. Post-Trial Ruling

On August 17, 2023, after circulating a draft judgment to the parties, the Cayman Court delivered its final judgment, which spanned 76 pages. It found as follows:

***Breach of fiduciary duty***: The brokerage agreement between FDL and Canterbury did not create fiduciary duties for Canterbury. *Id.* ¶ 40. But Canterbury separately owed such duties to FDL based on its role helping FDL raise capital and negotiate the SPA with PFS. *Id.* ¶ 61. Canterbury thus had been obliged "to disclose that PFS was a closely

3128

connected entity" with it and to "act in good faith to FDL with a view to mitigate any relevant conflicts of interest." *Id.* Canterbury, however, breached these fiduciary duties by "failing to disclose and ... effectively mitigate the very significant conflicts of interest when it decided to liquidate [FDL's collateral shares] in early December 2018." *Id.* ¶ 63. The Court rejected Winczura's contrary testimony—that she had disclosed to FDL her ownership and control as to PFS—as impeached by "the unambiguous contemporaneous record," which reflected that she had "presented PFS to FDL as an unrelated third party." *Id.* ¶ 49; *see also id.* ¶ 27 (finding that Winczura "difficulty in distinguishing between what actually occurred and what she wished had occurred").

***Breach of contract***: Canterbury had breached its contractual obligations to FDL whether or not PFS had waived the put option under the SPA. If PFS had waived such, Canterbury breached by refusing to return FDL's collateral shares to it and by liquidating them without FDL's authorization, because PFS's waiver obviated the need to hold them as collateral. *Id.* ¶¶ 64–65, 77–79, 84–85. If not, Canterbury still breached by liquidating as much as it had during the fire sale, because a smaller amount could have been liquidated while leaving sufficient collateral to cover the option. On the latter theory, however, Canterbury was arguably liable for a lesser amount in damages. *Id.* The parties had agreed that the threshold question of whether PFS had waived the put option was not to be decided by the Cayman Court. *Id.* ¶¶ 64–65, 92. That was because a lawsuit raising that dispute—which was principally between FDL and PFS—was pending before a state court for the Eighth Judicial District of Nevada (the "Nevada Court"), applying Nevada law. *Id.* ¶¶ 12–13, 64–65. The Cayman Court therefore found for FDL on its breach of contract **\*114** claim and reserved as to the amount of damages, subject to the Nevada Court's determination whether PFS had waived the put option. *Id.* ¶ 167.[2]

***Affirmative defenses and counterclaims***: The Cayman Court rejected Canterbury's affirmative defenses and counterclaims as unsupported. It found no evidence of market manipulation concerning YRIV, *id.* ¶ 118, no evidence of unclean hands, *id*. ¶ 129, and no evidence of fraudulent representation as to FDL's beneficial ownership in connection with the brokerage agreement, *id*. ¶ 145.

### 3. Post-Trial Events

***Attempts to secure proceeds of Canterbury's YRIV share sales***: Canterbury had pledged before trial to keep the proceeds of its sale of FDL's YRIV shares "secure pending the outcome" of the Cayman proceedings. Bankr. Dkt. 17-10 (freezing order) ¶ 20. In approximately May 2023, however, the Cayman Court was notified that such assets could not be located. *Id.* Canterbury presented a screenshot of a purported treasury bill, which it offered as alternative security, and the Cayman Court ordered that the treasury bill be frozen (*i.e.*, not sold or transferred). *Id.* ¶¶ 20–21. Canterbury later represented that it had sold the purported treasury bill, in violation of the freezing order. *Id.* The Cayman Court ordered Canterbury to deposit the cash equivalent of the treasury bill; Canterbury also failed to comply with that order. *Id.* ¶¶ 21–22. The screenshot of the treasury bill later proved to have been a forgery—Canterbury had purchased no such bill. Bankr. Dkt. 17-13 ("Debarring Order") ¶¶ 32–34.

***Appointment of liquidators***: On December 13, 2023, the Cayman Court appointed Scott and Homer as joint provisional liquidators of Canterbury, calling this "the most compelling case imaginable" for such appointment "to prevent the dissipation or misuse of assets and/or misconduct by [Canterbury's] directors." *Id.* ¶ 21; Bankr. Dkt. 17 ("Scott Decl.") ¶ 3. The same day, it ordered Canterbury to pay FDL approximately $2 million, which represented additional funds that Canterbury had held in trust for FDL. Debarring Order ¶ 10.

On January 16, 2024, the Cayman Court issued a winding up order as to Canterbury, and appointed Scott and Homer as Canterbury's joint official liquidators ("JOLs"). Winding Up Order at 2–4.

***Damages judgment***: On February 6, 2024, the Cayman Court issued a judgment as to damages, ordering Canterbury to pay FDL approximately $16 million, without prejudice to a future application by FDL for additional damages after the Nevada court determined whether PFS had waived the put option. *See* Bankr. Dkt. 17-4 (damages order) at 1–2.

***Freeze of Winczura's and others' assets***: On April 26, 2024, the Cayman Court issued an asset-freezing injunction (the "freezing order") as to Winczura, Canterbury Group (a separate Cayman Islands entity owned and controlled by Winczura), and PFS, and ordered those parties to disclose information about their assets. *See* Debarring Order ¶¶ 4, 24. None complied. *Id.* ¶ 28.

*Default judgments and Winczura's non-compliance*: On June 3, 2024, the Cayman Court entered a default judgment as to Canterbury Group and PFS, and on September 25, 2024, entered the same as to Winczura. Scott Decl. ¶ 9.

**\*115** On October 17, 2024, in a 60-page decision, the Cayman Court found that Winczura's "deliberate non-compliance" with its previous orders warranted debarring Winczura and the entities she controlled from defending actions brought against them by the JOLs to recover funds Winczura had misappropriated. Debarring Order ¶¶ 4 ("It is the most shocking non-compliance I have witnessed during my time as a Grand Court Judge."), 29–30, 164.

### D. Proceeding in Nevada[3]

In early December 2023, the Nevada Court held a three-day bench trial to resolve, *inter alia*, whether PFS had waived the put option under the SPA. Dkt. 12 ("Nevada Decision") at 1. Its decision, issued August 21, 2025, largely tracked the Cayman Court's decision as to liability.

Relevant here, the Nevada Court found that, as to the transaction between FDL and PFS, Winczura had "pretend[ed] to be a neutral third party" and had not disclosed—either during the negotiations or before the SPA was fully executed—"that she was the sole owner of PFS." *Id.* ¶ 11. It found that, as to the put option, FDL had agreed to that term, understanding that the option "would be null and void if the [YRIV shares] were moved from Canterbury" and that "selling the stock required the shares to be moved from Canterbury." *Id.* ¶¶ 21–22. It found that, on or about October 30, 2018—before the $10 million owed to FDL under the SPA had been transferred to FDL—PFS began to sell off "all of its YRIV shares" and that "[w]ithin weeks," PFS had sold nearly all such shares. *Id.* ¶¶ 33–35. These sales earned PFS approximately $12.8 million, reflecting an approximately $2.8 million profit over the $10 million value assigned to the shares in the SPA. *See id.* ¶ 36. The Nevada Court found that, starting in late December 2018—after the price of YRIV shares had cratered—PFS repeatedly attempted to exercise the put option by demanding that FDL repurchase—at the much higher strike price—other shares that PFS had purchased on the open market. *Id.* ¶¶ 37–38.

On these facts, the Nevada Court found that PFS had waived the put option. *Id.* ¶¶ 49–69. The option was "susceptible to only one reasonable interpretation—that it would necessarily be waived upon the sale of the [YRIV shares], which

necessarily meant moving [them] out from PFS' account at Canterbury." *Id.* ¶ 49. PFS thus forewent its contractual right to demand that FDL repurchase the shares via the put option. *Id.* ¶ 59. Moreover, the Nevada Court found, PFS's actions had "frustrated the purpose" of the put option: its sell-off of YRIV stock "may have contributed to the decline" of that stock's sale price. *Id.* ¶¶ 60–61. It would thus be "illogical" to require FDL to buy back YRIV shares from PFS, where PFS had "(1) waived the [put option] and (2) caused the [YRIV] share price to drop such that [PFS would] receive an inequitable benefit on both sides of the transaction." *Id.* ¶ 62. "To interpret [the put option] any other way would defy logic, and the plain language of the SPA." *Id.* ¶ 69.

### E. Proceeding in Bankruptcy Court

On October 21, 2024, the JOLs, on behalf of Canterbury, filed a petition in the **\*116** Bankruptcy Court for recognition of the Cayman Islands proceeding and related relief under Chapter 15 of the U.S. Bankruptcy Code. Bankr. Dkt. 1.[4]

### 1. Hearing Granting Recognition

On November 12, 2024, United States Bankruptcy Judge David S. Jones held a hearing on the petition. Dkt. 12 ("Pet. Hr'g Tr.") at 1. Counsel for Winzcura opposed the petition, arguing that recognition would be manifestly contrary to United States public policy, and thus should be denied under 11 U.S.C. § 1506. *E.g.*, Pet. Hr'g Tr. at 7.

Following argument, Judge Jones issued a bench ruling granting the petition. *Id.* at 63–78; *see also* November 15 Order. He noted that Winczura had not adduced any competent evidence to support her last-minute opposition to recognition and related relief. Pet. Hr'g Tr. at 64–65, 67. In contrast, he found, the JOLs had made an "evidence-backed showing" that the Cayman proceeding was entitled to recognition as a "foreign main proceeding." *Id.* at 68–73 (citation omitted). As additional relief, he ordered that the Cayman Court's freezing order be extended to the United States due to "risk of further dissipation of assets," and authorized certain discovery. *Id.* at 65, 68–78. Two weeks later, on November 27, 2024, Judge Jones granted the JOLs' *ex parte* application for discovery from individuals and entities associated with Winczura and/or Canterbury. Bankr. Dkt. 14; *see also* Bankr. Dkt. 13 at 13.

## 2. Winczura's Motion to Dismiss the Recognition Proceeding

On January 7, 2025, Winczura moved to dismiss the recognition proceeding and/or to terminate the related relief the Bankruptcy Court had granted. Bankr. Dkt. 15 ("MTD"). The MTD broadly asserted that the JOLs were acting "at the behest of fraudsters who committed a multimillion-dollar securities fraud," such that recognition or related relief would be "manifestly contrary to the public policy of the United States" under Section 1506. *Id.* at 5. Although it attached numerous exhibits, the MTD lacked a declaration attesting to their authenticity.

On January 29, 2025, the JOLs opposed. Bankr. Dkts. 16 (opposition), 17 (declaration and exhibits). On February 13, 2025, Winczura replied, appending a declaration that attested to the authenticity of the exhibits attached to the MTD and others. Bankr. Dkts. 18 (reply), 18-1 *et seq.* (declaration and additional exhibits).

## 3. The Bankruptcy Court's Denial of Winczura's Motion to Dismiss

On February 27, 2025, the Bankruptcy Court held a hearing on Winczura's motion. Dkt. 7-1 ("Mot. Hr'g Tr.") at 1. After argument, Judges Jones denied the motion from the bench. *Id.* at 67–70.

He reasoned as follows: Section 1506 authorizes a Bankruptcy Court to refuse to take an action governed by Chapter 15 of the Bankruptcy Code "if the action would be manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506. Courts applying that exception inquire whether (1) "the foreign proceeding was procedurally unfair," and (2) "the application of foreign law or the recognition of a foreign main proceeding under Chapter 15 would severely impinge the value and import of a U.S. statutory or constitutional right, such that granting comity would severely hinder United States bankruptcy courts' abilities to carry out the most fundamental policies and purposes of these rights." Mot. Hr'g Tr. at 64–65 (cleaned up) (citing **\*117** *In re Fairfield Sentry Ltd.*, No. 10 Civ. 7311, 2011 WL 4357421, at \*8 (S.D.N.Y. Sept. 16, 2011) ("*Fairfield Sentry I*"), *aff'd*, 714 F.3d 127 (2d Cir. 2013) ("*Fairfield Sentry II*")). Foreign proceedings, however, need not be conducted identically to U.S. proceedings. *Id.* at 65 (citing *In re Schimmelpenninck,*

183 F.3d 347, 365 (5th Cir. 1999)). And it was "abundantly clear" that U.S. courts "routinely support" proceedings in the Cayman Islands, which has "a very sophisticated" legal system "commonly used in major commercial disputes" and which includes "rights of appeals up to U.K.-based adjudicative bodies." *Id.*

Here, Judges Jones found, there had not been any showing that the Cayman proceedings had not been "according to law." *Id.* at 65–66. On the contrary, Winczura had participated in the Cayman proceedings, and "her counsel could not or did not assert that there was any procedural disentitlement that could not be addressed." *Id.* at 66. And although a barring order was now in place against Winczura in the Cayman proceedings as a sanction for her failures to abide by court orders and to be forthcoming, she could apply to the Cayman Court for relief from such. *Id.* at 66–67. Thus, Winczura had not shown "any procedural prejudice or violation of a constitutional or statutory right" that would result from recognizing the Cayman proceedings or granting related relief. *Id.*

Insofar as Winczura opposed recognition based on her claim that there had been "a massive fraud" committed by others, that contention, Judge Jones stated, did not support relief under Section 1506. The focus of that provision, he stated, was "whether the foreign proceeding was procedurally unfair" and whether its outcome, if recognized, "would impinge on [a] U.S. statutory or constitutional right." *Id.* at 66. That, he found, was "not the case here." *Id.* In so holding, Judge Jones noted the weighty need, long recognized by U.S. bankruptcy courts, "to extend comity to foreign bankruptcy proceedings," and that courts in the Second Circuit "have repeatedly held that U.S. courts should ordinarily decline to adjudicate creditor claims that are the subject of a foreign bankruptcy proceeding.' " *Id.* at 67 (quoting *In re Atlas Shipping A/S,* 404 B.R. 726, 733 (Bankr. S.D.N.Y. 2009)). He concluded that Winczura's bid to defeat recognition based on her claim of fraud effectively asked the Bankruptcy Court to adjudicate anew creditor claims resolved in the foreign proceeding. *Id.* Winczura's "detailed fact-based presentation," he stated, "really represents a request that this Court second-guess or engage in collateral challenges to the determinations, outcomes, and pendency of proceedings in the Cayman Islands." *Id.* (cleaned up). That was "something that the case law instructs [a court] not do." *Id.* The exception in Section 1506 had been "applied sparingly and in circumstances that have not been established here." *Id.* at 68.

Judge Jones therefore denied Winczura's motion, while noting that she could pursue relief in the Cayman Court. *Id.* at 69. He found that it would be "inconsistent with comity principles ... [f]or this court to step into the middle of contentions that should in the first instance be raised and pursued in the Cayman Islands[,] and defang and preempt proceedings that belong there and not here." *Id.*

On February 28, 2025, Judge Jones memorialized his bench ruling in a written order. Bankr. Dkt. 19.

### F. Procedural History of This Litigation

On March 26, 2025, Winczura filed a notice of appeal from the order denying her motion to dismiss. Dkt. 1. On April 11, 2025, under **\*118** Federal Rule of Bankruptcy Procedure 8009, Winczura filed a statement of issues for appeal and designated related materials. Dkt. 3. The same day, the foreign representatives designated additional materials for the record on appeal. Dkt. 4. On April 11, 2025, a notice of record of appeal availability was filed. Dkt. 5.

On May 9, 2025, Winczura filed her brief on appeal, attaching the transcript of Judge Jones's bench ruling. Dkt. 7 ("Br."). On June 6, 2025, Canterbury's foreign representatives opposed. Dkt. 8 ("Opp'n"). On June 20, 2025, Winczura replied. Dkt. 9 ("Reply").

On August 29, 2025, the foreign representatives filed a copy of the Nevada Decision, which had issued on August 21, 2025. Dkt. 12.

## II. Standard of Review

 **[1]**  This Court has jurisdiction to hear appeals from "final judgments, orders, and decrees" of bankruptcy courts. 28 U.S.C. § 158(a). It reviews legal conclusions *de novo* and factual findings for clear error. *Fairfield Sentry I*, 2011 WL 4357421, at *3.

## III. Discussion

Winczura argues that recognizing the Cayman proceedings and granting related relief is manifestly contrary to U.S. public policy under Section 1506, and that the Bankruptcy Court erred in denying her motion to dismiss. She claims that the Cayman proceedings revealed "a multimillion-dollar securities fraud," in which FDL and other unspecified actors sold securities at artificially inflated prices in violation of U.S. securities laws. Were the foreign representatives to

return assets to Canterbury's creditors, she argues, they would be transferring "fraud proceeds" in violation of anti–money laundering laws and regulations. She argues that the Bankruptcy Court read Section 1506 too narrowly in purportedly holding that, absent procedural error in the Cayman case, it was compelled to recognize the Cayman proceedings. Reversal is necessary, she argues, because recognition would offend U.S. public policy of "maintain[ing] fair and transparent securities markets and curtail[ing] money laundering." Br. at 5–7.

The foreign representatives defend the Bankruptcy Court's application of Section 1506. It correctly concluded, they argue, that there was no basis to find that either (1) the Cayman proceedings were procedurally deficient, or (2) recognition and related relief would harm U.S. statutory or constitutional rights. They assert that the evidence developed in those proceedings does not support Winczura's allegations of wrongdoing by the foreign representatives, FDL, or persons other than herself; that the Cayman Court rightly found that *Winzcura* misappropriated more than $20 million from the debtor and repeatedly violated court orders to provide information as to the missing money's whereabouts; and that the Cayman proceedings gave Winczura a full opportunity to make the arguments she makes here. They cast Winczura's Section 1506 challenge as an improper collateral attack on the Cayman proceedings. Opp'n at 4–8.

The foreign representatives are correct. The Bankruptcy Court correctly found Section 1506 inapplicable, because recognition of the Cayman proceedings and related relief would not offend U.S. public policy.

### A. Section 1506's Public Policy Exception

 **[2]**  Enacted in 2005, Chapter 15 of the Bankruptcy Code incorporated the Model Law on Cross-Border Insolvency of the United Nations Commission on International **\*119** Trade Law. 11 U.S.C. § 1501(a). Chapter 15's purpose is to promote "international cooperation," "legal certainty," and the "protection and maximization of debtors' assets." *Fairfield Sentry II*, 714 F.3d at 132. To this end, Section 1517 of that chapter directs U.S. courts to enter orders recognizing foreign proceedings where certain conditions are met. 11 U.S.C. § 1517.

 **[3]**   **[4]**  Recognition of a foreign proceeding, in turn, makes available relief mechanisms to protect debtors' assets and creditors' interests. Upon recognition of a foreign main proceeding, Section 1520 provides for "certain automatic,

3132

nondiscretionary relief, including an automatic stay of all proceedings against the debtor in the United States." *Fairfield Sentry II*, 714 F.3d at 133. And, for both main and nonmain foreign proceedings, Section 1521 authorizes U.S. courts, upon recognition, to grant "any appropriate relief" "necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of the creditors," such as taking discovery, entering discretionary stays, and suspending any remaining rights of the debtor to dispose of its assets. 11 U.S.C. § 1521(a).

 **[5]** Salient here, Section 1506 enacts a public policy exception to all of Chapter 15. *Fairfield Sentry II*, 714 F.3d at 133. It reads: "Nothing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506. The Second Circuit has emphasized that this exception is "narrow." *Fairfield Sentry II*, 714 F.3d at 139. As the Circuit has noted, the provision's legislative history states: "The word 'manifestly' ... restricts the public policy exception to *the most fundamental policies of the United States*." *Id.* (emphasis in original) (quoting H.R. Rep. No. 109–31, pt. 1, at 109 (2005)). Every other Circuit to have addressed the provision to date has likewise emphasized its narrowness. *See In re ABC Learning Centres Ltd.*, 728 F.3d 301, 309 (3d Cir. 2013) (exception "is only intended to be invoked under exceptional circumstances concerning matters of fundamental importance" for the United States (citation omitted)); *Jaffé v. Samsung Elecs. Co.*, 737 F.3d 14, 27 (4th Cir. 2013) (similar); *In re Vitro S.A.B. de CV*, 701 F.3d 1031, 1069 (5th Cir. 2012) (similar).

 **[6]** **[7]** Courts applying Section 1506 inquire whether (1) "the foreign proceeding was procedurally unfair," and (2) "the application of foreign law or the recognition of a foreign main proceeding under Chapter 15 would severely impinge the value and import of a United States statutory or constitutional right, such that granting comity would severely hinder United States bankruptcy courts' abilities to carry out the most fundamental policies and purposes of these rights." *Fairfield Sentry I*, 2011 WL 4357421, at *8 (citation omitted). The party invoking the exception bears the burden of showing it applies. *In re Ashapura Minechem Ltd.*, 480 B.R. 129, 144 (S.D.N.Y. 2012).

### B. Evaluation of the Bankruptcy Court's Decision

The Court here evaluates the legal standard applied by the Bankruptcy Court, and then its inquiries into potential procedural or substantive deficiencies.

### 1. Legal Standard

Identifying the governing legal standard, the Bankruptcy Court stated that determining whether Section 1506 applied required applying two factors:

 "(1) whether the foreign proceeding was procedurally unfair, and

 **\*120** (2) whether the application of foreign law or the recognition of a foreign main proceeding under Chapter 15 would severely impinge the value and import of a U.S. statutory or constitutional right, such that granting comity would severely hinder United States bankruptcy courts' abilities to carry out the most fundamental policies and purposes of these rights."

Mot. Hr'g Tr. at 64–65 (cleaned up) (citing *Fairfield Sentry I*, 2011 WL 4357421, at *8).

The Bankruptcy Court correctly recited the governing standard. Its statement above was drawn from *Fairfield Sentry I*, a decision affirmed by the Second Circuit in the only case in which the Circuit has addressed the reach of Section 1506. *Fairfield Sentry I*, 2011 WL 4357421, at *8; *Fairfield Sentry II*, 714 F.3d at 139–40. District and bankruptcy courts in this Circuit (and elsewhere) have widely applied the same, or substantially the same, standard.[5] Winczura acknowledges that the Bankruptcy Court's statement of law accorded with federal courts' "general approach" to the public policy exception. Br. at 20–21 (quoting *In re British Am. Isle of Venice, Ltd.*, 441 B.R. 713, 716–17 (Bankr. S.D. Fla. 2010)); Reply at 10.

### 2. Factor One: Procedural Unfairness

 **[8]** **[9]** The Bankruptcy Court correctly applied the first Section 1506 factor—procedural unfairness—and found no such deficiency. *Id.* at 65–67. Winczura does not challenge that holding. *See, e.g.*, Br. at 12–18. Nor could she. For years, Winzcura and her Cayman counsel fully participated in the Cayman proceedings. Winczura testified during the Cayman bench trial as to liability. Cayman Liability Decision ¶¶ 22–27. She was later debarred from participating in future proceedings as a sanction for her repeated violations of the Cayman Court's orders, but that occurred long after liability and damages had been decided. *See* Debarring Order

3133

¶¶ 29–30, 164. And Winczura retains the ability to apply for relief from that order. Mot. Hr'g Tr. at 65–69. As the Bankruptcy Court rightly noted, the Cayman proceedings did not have to be "identical" in form to U.S. proceedings to warrant recognition—the key issue was whether the Cayman proceedings met "fundamental standards of fairness." *In re Metcalfe & Mansfield Alternative Invs.*, 421 B.R. 685, 697 (Bankr. S.D.N.Y. 2010) (citing *Cunard S.S. Co. v. Salen Reefer Servs. AB*, 773 F.2d 452, 457 (2d Cir. 1985)); *see also* Mot. Hr'g Tr. at 65 (citing *Schimmelpenninck*, 183 F.3d at 365). They did here.

As the Bankruptcy Court further noted, the sophistication of the Cayman legal system reinforced the finding of procedural regularity. United States courts, it noted, have routinely recognized Cayman proceedings, which commonly resolve major commercial disputes and permit appeals "to U.K.-based adjudicative bodies." *Id.*; *see, e.g.*, *In re Mod. Land (China) Co.*, 641 B.R. 768, 790 (Bankr. S.D.N.Y. 2022) (recognizing Cayman proceeding and noting that Cayman courts are uniquely situated to liquidate Cayman-incorporated companies effectively); *In re Ocean Rig UDW Inc.*, 570 B.R. 687, 702, 707 (Bankr. S.D.N.Y. 2017) (recognizing Cayman proceeding and noting that objector had not identified "any case in which a U.S. bankruptcy **\*121** court found that a Cayman liquidation or scheme proceeding did not satisfy the requirements" of Section 101(23) of the Bankruptcy Code).

### 3. Factor Two: U.S. Statutory or Constitutional Violations

The Bankruptcy Court also reasonably found that recognizing and granting relief related to the Cayman proceedings would not "impinge on [a] U.S. statutory or constitutional right." Mot. Hr'g Tr. at 66.

In moving to dismiss, Winzcura argued that recognition would enable money laundering and market manipulation. That argument was based on her characterization of the underlying facts. She asserted that, before the Cayman proceeding, FDL and individuals associated with it had engaged in a pump-and-dump scheme to profit from YRIV stock. She contended that the Cayman Court, in finding Canterbury liable, had "misunderstood, ignored, and discounted evidence of FDL's securities fraud." And, she argued, evidence adduced at the later Nevada bench trial supported that FDL had been aware of Canterbury's relationship with PFS and that FDL had thus "committed fraud on the Cayman Islands court." She argued that

recognition, by assisting the foreign representatives to recover funds owed to FDL as Canterbury's creditor, would thus violate U.S. anti–money laundering laws because such funds were fraud proceeds. *See* MTD at 5–9.

 **[10]**    The Bankruptcy Court carefully considered but rejected these arguments, and rightly so. As it explained, Winczura's claims of a "massive fraud" effectively asked the court to "second-guess or engage in collateral challenges" to the Cayman proceedings, which had found no such thing. Mot. Hr'g Tr. at 66–67 (cleaned up). As the Bankruptcy Court noted, "considerable weight" was due to that proceeding, given case law guidance to "extend comity to foreign bankruptcy proceedings" and "decline to adjudicate creditor claims that are the subject of" such proceedings. *Id.* (quoting *Atlas Shipping*, 404 B.R. at 733). Winczura's recourse, the Bankruptcy Court noted, was in the Cayman Court. *Id.* at 68–69. Accordingly, the court found, Winczura had not met her burden to show that recognition would harm a U.S. statutory or constitutional right. *E.g.*, *id.* at 66–67.

 **[11]**    As the Bankruptcy Court recognized, Winczura's claims of fraud and money laundering misapplied Section 1506. They effectively asked the Bankruptcy Court to revisit and reject the Cayman Court's factual findings, rather than identifying why adoption of those findings would violate U.S. public policy. As the Bankruptcy Court noted, the Second Circuit has repeatedly held that U.S. courts are not ordinarily to reassess creditor claims resolved in foreign bankruptcy proceedings. *E.g.*, *J.P. Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 424 (2d Cir. 2005). The interest in comity is particularly weighty given the nature of these proceedings, as the "equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding[—]if all creditors could not be bound, a plan of reorganization would fail." *Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713–14 (2d Cir. 1987). Winczura's argument that the Cayman Court had erred in rejecting her fraud claims was a quotidian, collateral attack on a judgment by a respected foreign tribunal based on an extensive and carefully developed record. The rejection of her factual take would not offend any fundamental public policy of the United States.

A review of the record before the Bankruptcy Court supports its determination **\*122** that the Cayman Court's rulings were careful, comprehensive, and reasonable, and merited comity. The proceedings spanned years; there was extensive pretrial litigation, *see, e.g.*, Cayman Liability Decision ¶¶ 49, 54, 106,

109, 146; and at the nearly two-week bench trial, Winczura, representatives of PFS and FDL, and an expert witness from each side testified, *id.* ¶¶ 14–36. The Cayman Court also received extensive documentary evidence, including contracts, communications, and expert reports. *E.g.*, *id.* ¶¶ 18–19, 33–35, 45–49. The Cayman Court's ensuing 76-page opinion was meticulous. It recounted and analyzed the evidence, including setting out its assessments of witness credibility based on its observations. *See, e.g.*, *id.* ¶¶ 22–27 (Winczura's testimony).

Salient here, the Cayman Court pointedly rejected the take on the facts that Winczura urged in moving to dismiss. It rejected Winczura's testimony that she had disclosed her ownership in PFS to FDL as belied by the "unambiguous contemporaneous record," which showed that she had held out "PFS to FDL as an unrelated third party.[6] *Id.* ¶ 49. It found "no sufficient evidence" to conclude that "YRIV was operated as a fraudulent market manipulation scheme," dismissing that allegation as speculation. *Id.* ¶¶ 116–20. And it rejected Canterbury's unclean hands defenses, on the ground that neither Winczura's central allegation "that FDL was engaged in [a] fraudulent scheme," *id.* ¶ 129, nor her claim that FDL had induced Canterbury to enter into the initial brokerage agreement "by making fraudulent representations about its beneficial ownership," *id.* ¶ 145, had been proven. The Bankruptcy Court thus had sound, evidence-based reasons to defer to the Cayman Court's factual conclusions.

 **[12]**    **[13]**    The limited case law addressing Section 1506's scope underscores the correctness of the Bankruptcy Court's conclusions that the public policy exception did not apply here, and that the exception is not intended to invite factual challenges to the determinations made in a procedurally sound foreign proceeding. Indeed, only two cases in this Circuit have refused recognition or associated relief as manifestly contrary to U.S. public policy, and each is far afield.

In *In re Toft*, an insolvency administrator in a German action, seeking discovery, initiated a Chapter 15 proceeding to gain access to the email accounts of the debtor, a natural person who had used internet service providers in the United States. 453 B.R. 186, 188 (Bankr. S.D.N.Y. 2011). The request for access, however, far exceeded the categories of discovery ordinarily available to a bankruptcy trustee. The administrator asked the bankruptcy court to enforce a German order compelling the service providers to disclose the debtor's emails *ex parte*, "as well as what can only be described as

a wiretap of [the debtor's] *future* e-mail correspondence." *Id.* at 189 (emphasis added). The bankruptcy court found that adopting such relief would violate **\*123** the Stored Communications Act, 18 U.S.C. §§ 2701 *et seq.*, and the Wiretap Act, 18 U.S.C. §§ 2511 *et seq.*, and might subject anyone involved in its execution to "U.S. criminal liability." *Id.* As a result, the court held, the case was "one of the rare cases" in which Section 1506 barred the relief sought by a foreign representative as manifestly contrary to U.S. public policy. *Id.*

Similarly, in *In re Gold & Honey*, an automatic stay had been imposed as a result of a Chapter 11 filing in the United States. 410 B.R. 357, 360, 363 (Bankr. E.D.N.Y. 2009). A creditor "knowing[ly] and willful[ly]" violated that stay by bringing an insolvency proceeding in Israel as to the same debtor. *Id.* at 368–69. The receivers in the Israeli proceeding, who had been appointed in clear violation of the stay, nonetheless sought recognition of that foreign proceeding, and did so in the same U.S. bankruptcy court that had ordered the stay that was being violated. *Id.* at 363–64, 368–69. The bankruptcy court, acknowledging that Section 1506 "should be applied narrowly," refused to reward the creditor's end-run around the stay. *Id.* at 372. It denied recognition as contrary to public policy. As the bankruptcy court explained, recognizing the Israeli proceeding, given its abusive roots, would "severely hinder United States bankruptcy courts' abilities to carry out two of the most fundamental policies and purposes" of stays under Section 362(a) of the Bankruptcy Code: to prevent one creditor from gaining unfair advantage over others, and to efficiently distribute a debtor's assets in accordance with all creditors' relative priorities. *Id.* at 372–73.

To state the obvious, this case is far afield from *Toft* and *Gold & Honey*. In each of those cases, the relief sought, whether recognizing or additive to a foreign proceeding, would cause blatant facial violations of U.S. law. There is no such argument here. Winczura does not argue that recognizing the Cayman proceedings, or ordering limited related relief, would itself violate a U.S. statute or the Constitution. And, to the extent she alleges that recognition and related relief would facilitate money laundering, the premise of that claim—that others committed a securities fraud, the proceeds of which would be transferred upon recognition—was exhaustively considered and rejected by the Cayman Court, which found no such fraud.

More apposite are the cases rejecting challenges to recognition or relief under Section 1506. These underscore why that exception does not apply here.

In *In re Poymanov*, the bankruptcy court recognized a Russian insolvency proceeding. It rejected an argument that Section 1506 applied because the Russian proceeding was purportedly "part of a corporate raiding scheme against" the debtor. 571 B.R. 24, 38–39 (Bankr. S.D.N.Y. 2017). As in this case, the court held that the evidence did not establish that the petitioner had engaged in any bad faith dealing or criminal activity in connection with the foreign proceeding. *Id.*; *see also In re Sabadash*, 660 B.R. 304, 308–311 (Bankr. C.D. Cal. 2024) (recognizing Russian proceeding while requiring foreign representative to seek future approval to enforce any Russian judgments against debtor, so that U.S. bankruptcy court could evaluate these to ensure that they were not manifestly contrary to U.S. sanctions policy).

In *Fairfield Sentry II*, a creditor argued that recognizing a debtor's liquidation in the British Virgin Islands ("BVI") was manifestly contrary to U.S. public policy because certain court records in the BVI proceedings were sealed. 714 F.3d at 132. The Second Circuit affirmed the bankruptcy and district courts' decisions to recognize **\*124** the BVI proceeding. *Id.* at 132, 140. It held that the limited sealing was not inconsistent with how U.S. courts balance the right of public access against legitimate privacy concerns. *Id.* at 139–40. And it found that the creditor had not established that "unfettered public access to court records" was "so fundamental in the United States that recognition of the BVI liquidation constitutes one of those exceptional circumstances contemplated in Section 1506." *Id.* Other cases in this District are in accord, and have rejected arguments under Section 1506 even when there was a degree of tension between the foreign proceeding and U.S. public policy.[7]

Here, Winczura's challenge consists of a factual dispute. She contends that the Cayman Court factually erred in finding —including based on credibility determinations—that FDL was not engaged in securities fraud. The Bankruptcy Court properly deferred to the well-developed record of the Cayman proceedings on that point. And it rightly held that Winczura's collateral attack on the factfinding in those proceedings does not implicate Section 1506. Winczura has not shown any tension, much less manifest contradiction, between the Cayman proceedings and any fundamental public policy, constitutional or statutory, of the United States.

The Court accordingly affirms the Bankruptcy Court's finding that recognition and related relief did not pose any harm to U.S. statutory or constitutional rights. *See, e.g.*, *Fairfield Sentry II*, 714 F.3d at 140; *Ephedra Prods.*, 349 B.R. at 336–37; *Rede Energia S.A.*, 515 B.R. at 103–07; *Culligan Ltd.*, 2021 WL 2787926, at \*13–16.

### C. Winczura's Remaining Arguments

Winczura makes two additional arguments. Each is quickly put aside.

Winczura argues that her appeal "presents a purely legal question about the scope of Section 1506." Reply at 6. She argues that the Bankruptcy Court misconstrued Section 1506 as inapplicable where recognition would promote securities fraud, and casts the Bankruptcy Court as holding that Section 1506 applied only to procedural deficiencies in the foreign proceeding. Br. at 6. On that basis, she offers hypotheticals in which recognition would cause actions in the United States that violate U.S. laws against human trafficking and controlled substances distribution. *Id.* at 16–20. Winczura's depiction of the Bankruptcy Court's analysis, however, is wrong. The Bankruptcy Court expressly recognized that Section 1506 could bar recognition based on substantive aspects of a foreign proceeding where, if adopted, such could harm U.S. constitutional or statutory rights. It stated:

> The argument presented against or in favor of terminating recognition on the basis of [Section] 1506 is that this is all fuel for a massive fraud, but the focus under [Section 1506 is], again, whether the foreign proceeding was procedurally unfair *and whether the law or the main* **\*125** *proceeding would impinge on [a] U.S. statutory or constitutional right, and I find that that's not the case here.*

Mot. Hr'g Tr. at 66 (emphasis added). The Bankruptcy Court rejected Winczura's arguments that recognition or related relief would impinge on U.S. constitutional or statutory rights. Given the factual record and findings from the Cayman proceedings, that determination was clearly sound.

Winczura relatedly construes the Bankruptcy Court to have held that "a massive fraud" infecting or underpinning the foreign proceeding could not be the basis to deny recognition under Section 1506. The Bankruptcy Court nowhere so held. It merely rejected Winczura's claim that the Cayman Court, following the bench trial, had factually erred in rejecting her claim of such a fraud.

3136

**CONCLUSION**

For the above reasons, the Court affirms the Bankruptcy Court's decision.

The Clerk of Court is respectfully directed to terminate all pending motions and to close this case.

SO ORDERED.

**All Citations**

675 B.R. 109

Footnotes

1    The Bankruptcy Court found Scott and Homer to be Canterbury's duly appointed foreign representatives, within the meaning of 11 U.S.C. § 101(24). Bankr. Dkt. 9 (November 15, 2024 order granting recognition and related relief) ("November 15 Order") ¶ 6.

2    The Cayman Court reserved judgment as to FDL's claims for conversion and unjust enrichment. It stated that the conversion claim would likely succeed based on the factual findings on the breach of contract claim. *Id.* ¶¶ 101–02.

3    On August 21, 2025, the Nevada Court issued its findings of fact and conclusions of law in *PFS Ltd. v. Fortunate Drift Ltd. et al.*, No. A-18-783981-C. For completeness, these are briefly summarized in this subsection. Because the Nevada decision issued after this appeal was taken, however, it was not included in the S.D.N.Y. bankruptcy record designated for appeal and therefore forms no part of this Court's decision or rationale.

4    The petition was supported by a motion, an attorney declaration, and extensive exhibits. Bankr. Dkts. 2 (motion and exhibits), 3 (declaration and additional exhibits).

5    *E.g.*, *In re Ephedra Prods. Liab. Litig.*, 349 B.R. 333, 337 (S.D.N.Y. 2006); *In re Culligan Ltd.*, No. 20-12192, 2021 WL 2787926, at \*14–16 (Bankr. S.D.N.Y. July 2, 2021); *In re Rede Energia S.A.*, 515 B.R. 69, 92 (Bankr. S.D.N.Y. 2014); *In re Toft*, 453 B.R. 186, 195 (Bankr. S.D.N.Y. 2011); *see also* *ABC Learning Centres*, 728 F.3d at 309; *In re Manley Toys Ltd.*, 597 B.R. 578, 586 (D.N.J. 2019); *In re Qimonda AG Bankr. Litig.*, 433 B.R. 547, 570 (E.D. Va. 2010).

6    Winczura cites evidence in the Nevada proceeding that she claims undermines the Cayman Court's findings. *See, e.g.*, MTD at 9 ("The evidence adduced in the Nevada litigating prov[es] that FDL had committed fraud on the Cayman Islands court."). She asserts that in Nevada, "FDL's witness admitted FDL was aware of a relationship between Canterbury and PFS and the relevant facts, at the relevant times." *Id.* at 8. To the extent that that opaque statement implied that FDL had been adequately informed that Winczura controlled PFS, the Nevada Court rejected that premise. It unequivocally found that, as to the transaction between FDL and PFS, Winczura had "pretend[ed] to be a neutral third party" and "did not disclose that she was the sole owner of PFS either during the negotiations or before the SPA was fully executed." Nevada Decision ¶ 11.

7    *See, e.g.*, *In re Ephedra Prods. Liab. Litig.*, 349 B.R. 333, 336–37 (S.D.N.Y. 2006) (rejecting Section 1506 challenge and recognizing Canadian proceeding that did not include right to trial by jury, reasoning that although such right was "an important component of our legal system," federal courts enforce "foreign judgments by foreign courts for whom the very idea of a jury trial is foreign"); *In re Rede Energia S.A.*, 515 B.R. 69, 103–07 (Bankr. S.D.N.Y. 2014) (recognizing Brazilian proceeding despite different distribution priority rules under Brazilian bankruptcy law); *In re Culligan Ltd.*, No. 20-12192, 2021 WL 2787926, at \*13–16 (Bankr. S.D.N.Y. July 2, 2021) ("courts have generally found that section 1506 does not prohibit recognition in situations where the debtor has engaged in bad faith").

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 28

571 B.R. 542
United States Bankruptcy Court, S.D. New York.

IN RE: CELL C PROPRIETARY
LIMITED, Debtor in a foreign proceeding.

Case No. 17–11735 (MG)
|
Dated: July 27, 2017 New York, New York

**Synopsis**
**Background:** Foreign representatives of debtor that was the subject of debt adjustment and reorganization proceeding pending in South Africa sought recognition of South African proceeding as foreign main proceeding, as well as related relief.

**Holdings:** The Bankruptcy Court, Martin Glenn, J., held that:

[1] retainer paid to international law firm representing foreign debtor, which was on deposit in account located in New York, as well as notes that debtor had issued with New York forum selection clause, and which were governed by New York law, qualified as property of debtor located in the United States;

[2] judicial proceeding for adjustment of debtor's debts by means of compromise with its creditors, which was pending in South Africa under the South African Companies Act, was in nature of foreign main proceeding;

[3] individuals who had been specifically authorized by debtor's board of directors to act as its foreign representatives in pursuing recognition of South African proceeding qualified as "foreign representatives," though not appointed by any court;

[4] recognition, as foreign main proceeding, of debt adjustment and reorganization proceeding pending against debtor in South Africa would serve the purposes of Chapter 15; and

[5] recognition and enforcement of sanction order entered by South African court, approving scheme of arrangement negotiated by foreign debtor, was appropriate relief following recognition of foreign proceeding.

So ordered.

West Headnotes (15)

**[1]    Bankruptcy** Cases Ancillary to Foreign Proceedings

Foreign representative must satisfy seven criteria to establish that a proceeding is foreign proceeding, as that term is used in the Bankruptcy Code: (1) existence of] proceeding; (2) that is either judicial or administrative; (3) that is collective in nature; (4) that is in a foreign country; (5) that is authorized or conducted under a law related to insolvency or to adjustment of debts; (6) in which debtor's assets and affairs are subject to control or supervision of foreign court; and (7) which proceeding is for purpose of reorganization or liquidation. 11 U.S.C.A. § 101(23).

**[2]    Bankruptcy** Cases Ancillary to Foreign Proceedings

To determine a foreign debtor's center of main interests (COMI), courts look to nonexclusive list of factors, including: location of debtor's headquarters; location of those who actually manage debtor; location of debtor's primary assets; location of majority of debtor's creditors or of majority of creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes.

**[3]    Bankruptcy** Cases Ancillary to Foreign Proceedings

Foreign representative must show that foreign debtor has a domicile, a place of business, or property in the United States as a condition precedent to eligibility for an order granting recognition of foreign proceeding. 11 U.S.C.A. §§ 109(a), 1517.

2 Cases that cite this headnote

**[4]**    **Bankruptcy**  🔑  Cases Ancillary to Foreign Proceedings

Undrawn retainer paid to foreign debtor's United States counsel may qualify as property of foreign debtor located in the United States, of kind sufficient to satisfy eligibility requirement for an order granting recognition, as may foreign debtor's contract rights. 11 U.S.C.A. §§ 109(a), 1517.

2 Cases that cite this headnote

**[5]**    **Bankruptcy**  🔑  Cases Ancillary to Foreign Proceedings

Appropriate relief that bankruptcy court may grant upon recognition of foreign proceeding includes enforcement of foreign confirmation order. 11 U.S.C.A. § 1521(a).

3 Cases that cite this headnote

**[6]**    **Bankruptcy**  🔑  Cases Ancillary to Foreign Proceedings

Relief will be granted to foreign representative upon recognition of foreign proceeding by bankruptcy court only if interests of creditors and other interested entities, including the foreign debtor, are sufficiently protected. 11 U.S.C.A. §§ 1521(a), 1522(a).

3 Cases that cite this headnote

**[7]**    **Bankruptcy**  🔑  Cases Ancillary to Foreign Proceedings

Among additional assistance that bankruptcy court may grant to foreign representative upon recognition of foreign proceeding is any assistance available under the Bankruptcy Code or under other laws of the United States, as long as such assistance is consistent with principles of comity and satisfies fairness considerations. 11 U.S.C.A. § 1507.

1 Cases that cite this headnote

**[8]**    **Bankruptcy**  🔑  Cases Ancillary to Foreign Proceedings

Additional assistance that bankruptcy court may grant to foreign representative upon recognition of foreign proceeding may include recognition and enforcement of a plan approved by foreign court. 11 U.S.C.A. § 1507(a).

4 Cases that cite this headnote

**[9]**    **Bankruptcy**  🔑  Cases Ancillary to Foreign Proceedings

Retainer paid to international law firm representing foreign debtor, which was on deposit in account located in New York, as well as notes that debtor had issued with New York forum selection clause, and which were governed by New York law, qualified as property of debtor located in the United States, which satisfied eligibility requirement for an order recognizing, as foreign proceeding, a case for reorganization of debtor, which was pending in South Africa under the South African Companies Act. 11 U.S.C.A. §§ 109(a), 1517.

2 Cases that cite this headnote

**[10]**    **Bankruptcy**  🔑  Cases Ancillary to Foreign Proceedings

Judicial proceeding for adjustment of mobile voice and data communication provider's debt by means of compromise with its creditors, which was pending in South Africa under the South African Companies Act, was in nature of foreign main proceeding, where South Africa was location of debtor-provider's registered office, and where debtor-provider was headquartered in South Africa, was organized under laws of South Africa, had majority of its employees and assets located in South Africa, used South Africa as site of nearly all of its decision-making and operations, and had substantially all of its major customers located in South Africa. 11 U.S.C.A. §§ 101(23), 1516(c).

**[11]**    **Bankruptcy**  🔑  Cases Ancillary to Foreign Proceedings

Individuals who had been specifically authorized by foreign debtor's board of directors to act as its

foreign representatives in pursuing recognition of reorganization proceedings pending against debtor in South Africa qualified as "foreign representatives," though not appointed by any court. 11 U.S.C.A. § 101(41).

**[12]    Bankruptcy** 🗝 Cases Ancillary to Foreign Proceedings

Foreign representative, as that term is used in the Bankruptcy Code, need not be judicially appointed; rather, a corporate debtor's board of directors may authorize a person to act as debtor's foreign representative in a Chapter 15 proceeding. 11 U.S.C.A. § 101(41).

**[13]    Bankruptcy** 🗝 Cases Ancillary to Foreign Proceedings

Documents filed by foreign representatives of bankrupt mobile voice and data communication provider, including copy of resolution of debtor-provider's board of directors appointing foreign representatives and authorizing them to commence debt adjustment and reorganization proceeding on debtor-provider's behalf under the South African Companies Act, as well as copy of notice of motion filed with the South African Court, indicating that debtor-provider would be apply for Sanction Order, established that there was ongoing proceeding in South Africa, which was fully authorized by debtor-provider's board, as required for recognition of South African proceeding as foreign main proceeding. 11 U.S.C.A. §§ 1515(b)(3), 1517(a).

**[14]    Bankruptcy** 🗝 Cases Ancillary to Foreign Proceedings

Recognition, as foreign main proceeding, of debt adjustment and reorganization proceeding pending against South African mobile voice and data communication provider in court in South Africa under the South African Companies Act would serve the purposes of Chapter 15, especially given overwhelming creditor support for arrangement negotiated in South African proceeding. 11 U.S.C.A. § 1508.

**[15]    Bankruptcy** 🗝 Cases Ancillary to Foreign Proceedings

Recognition and enforcement of sanction order entered by South African court, approving scheme of arrangement negotiated by foreign debtor with its creditors in debt adjustment and reorganization proceeding pending under the South African Companies Act, was appropriate relief, following recognition of South African proceeding as foreign main proceeding, where this arrangement and sanction order affected only the compromise creditors and was not binding on any other party, no property of debtor was being distributed under arrangement, compromise creditors in the United States were protected against prejudice and inconvenience in processing of their claims, no preferential or fraudulent disposition of property was being made, arrangement did not violate absolute priority rule, and approval of sanction order was adjudicated before South African court. 11 U.S.C.A. §§ 1507, 1521(a).

**Attorneys and Law Firms**

 **\*544**  NORTON ROSE FULBRIGHT US LLP, Attorneys for the Foreign Representatives, 2200 Ross Avenue, Suite 3600, Dallas, TX 75201–7932, By: Kristian W. Gluck, Esq.

**MEMORANDUM OPINION AFTER RECOGNITION
OF FOREIGN MAIN PROCEEDING PENDING
IN THE HIGH COURT OF SOUTH AFRICA
AND RECOGNITION AND ENFORCEMENT OF
SOUTH AFRICAN SCHEME OF ARRANGEMENT**

MARTIN GLENN UNITED, STATES BANKRUPTCY JUDGE

On July 14, 2017, this Court entered an order recognizing as a foreign main proceeding a case pending in the High Court of South Africa (the "South African Court") commenced by Cell C Proprietary Limited ("Cell C"), the foreign debtor in  **\*545** this Chapter 15 case. (ECF Doc. # 30.) On July 18, 2017, the South African Court approved, or "sanctioned," the scheme

64 Bankr.Ct.Dec. 115

of arrangement ("Arrangement") that Cell C negotiated with, and was overwhelming approved by a vote of, certain classes of its financial creditors ("Compromise Creditors"). On July 20, 2017, this Court entered an order recognizing and enforcing the Arrangement. (ECF Doc. # 48.) No objections were raised in this Court either to recognition of the South African Court proceeding as a foreign main proceeding or the recognition and enforcement of the Arrangement. This Opinion explains the reasons for the two orders entered by this Court.

Cell C's foreign representatives filed an application (the "Application," ECF Doc. # 7) for the entry of an order recognizing certain proceedings in South Africa as a foreign main proceeding, or in the alternative, as a foreign non-main proceeding. The Application was supported by the declaration of Paulo Pianezze (the "Pianezze Declaration," ECF Doc. # 9), a foreign representative in this case, along with Robert Killigrew Sabine Pasley, and Graham Mackinnon, who together are the "Foreign Representatives." On July 3, 2017, the Foreign Representatives filed a supplemental declaration (the "Supplemental Declaration," ECF Doc. # 21), indicating that the Compromise Creditors had voted overwhelmingly in favor of the proposed Arrangement. (*See* "Arrangement," ECF Doc. # 9–3.) It also indicated that the South African Court was scheduled to hold a hearing on July 18, 2017, to determine whether to sanction the Arrangement. A separate declaration filed by Haroon Yusuf Laher (the "Laher Declaration," ECF Doc. # 8), counsel for the Foreign Representatives, provides additional detail on the nature of the ongoing proceedings in South Africa (the "Section 155 Proceeding"). Laher filed a supplemental declaration (the "Second Laher Declaration," ECF Doc. # 27) on July 12, 2017, relating to the *Edcon Holdings Limited* case, cited below, specifically with respect to service of process in South Africa.

The Foreign Representatives also filed a motion (the "Comity Motion," ECF Doc. # 11) to enter an order recognizing and granting comity for the South African Court's order sanctioning the Arrangement (the "Sanction Order," ECF Doc. # 31, Ex. A). As already stated, the South African Court granted the Sanction Order and approved the Arrangement on July 18, 2017; this Court granted the Comity Motion and recognized and enforced the Arrangement on July 20, 2017.

## I. BACKGROUND

### A. Cell C's Business

Cell C is the third largest of four mobile network operators in South Africa, and began commercial operations in November of 2001. (Application at 6.) Cell C is 100% owned by 3C Telecommunications Proprietary Limited ("3C Telecommunications"), a South African company. (*Id.* at 4.) 3C Telecommunications, in turn, is 75% owned by Oger Telecom Limited ("OTL"), a company registered in accordance with the laws of the Dubai International Financial Centre in the United Arab Emirates. (*Id.* at 4–5.) Essentially all of Cell C's operations and decision-making occurs in South Africa: Cell C is headquartered in South Africa, it is organized under the laws of South Africa, the majority of its employees and assets are located in South Africa, and substantially all of Cell C's major customers are located in South Africa. (*Id.* at 6.)

Cell C offers mobile voice and data communication services and a range of devices to its customers, which include individuals, businesses, and the South African government. (*Id.*) Cell C's major creditors include the Compromise Creditors and creditors **\*546** not affected by the Section 155 Proceeding. These other creditors are China Development Bank Corporation ("CDB"), the Industrial and Commercial Bank of China Limited ("ICBC"), Nedbank Limited ("Nedbank"), and Development Bank of Southern Africa Limited ("DBSA"). The Compromise Creditors, which are the holders of the Euro 400,000,000 8.625% first priority senior secured notes due 2018 (the "Euro Notes") issued by Cell C, and governed by New York law pursuant to the underlying indenture (the "Indenture"). (*Id.* at 5; *see also* ECF Doc. ## 45, 49 (operative indenture and supplements).)

After pursuing an aggressive pricing strategy against its competitors for a few years, it became clear to Cell C in 2014 that additional equity would be required in the business. (Application at 7.) The company attempted to identify new sources for equity, either through an outright disposal of Cell C's equity or through a combined transaction involving OTL and a new equity investor, but this process was ultimately unsuccessful. (*Id.* at 7–8.)

On November 20, 2016, Cell C failed to make a capital payment due to CDB, which was an event of default under the related facility agreement. (*Id.* at 8.) This default resulted in cross defaults under other facilities with ICBC, Nedbank, and DBSA. (*Id.*) On January 1, 2017, Cell C failed to pay an interest payment due to the Compromise Creditors. (*Id.*) Cell

C then turned to the debt restructuring process provided for under South African law.

### B. Section 155 of the Companies Act

The South African Companies Act 71 of 2008 (the "Companies Act") at Section 155 provides for a process to approve an "arrangement" or "compromise" that may affect some or all of a company's creditors. (Laher Declaration at 2.) In a Section 155 proceeding, the "debtor" or "applicant" proposes an arrangement to its affected creditors, the creditors vote on the arrangement, and if the requisite votes are obtained, the debtor petitions the South African Court for a "sanction order" approving, or "sanctioning," the arrangement. (*Id.* at 2–3.)

To commence the compromise process, a board of directors of a company must propose a restructuring of its financial obligations to all of its creditors, or to all of the members of any class of its creditors, by delivering a copy of the compromise proposal and notice of the meeting to consider such proposal to all its creditors, or to every member of the relevant class of creditors and to the Companies and Intellectual Property Commission [1] (the "Commission"). (*Id.* at 3–4.)

[1]    The Commission is a state institution which has jurisdiction over certain limited affairs of South African companies, similar to the United Kingdom Companies House. (*Id.* at 4.)

The compromise proposal is deemed adopted by the creditors, or the members of a relevant class of creditors, if it is supported by a majority in number, representing more than 75% in value, of the creditors or class (as the case may be) present and voting in person or by proxy at a meeting called for that purpose. (*Id.*) If the affected creditors duly adopt the compromise proposal, the company thereafter may apply to the South Africa Court for an order sanctioning the compromise. (*Id.*) The court may then sanction a compromise if the court considers it "just and equitable" to do so. (*Id.*)

Through the Section 155 Proceeding, Cell C sought to accomplish two main goals, utilizing both debt and equity restructuring mechanisms. First, the debt restructure component of the reorganization reduces Cell C's financial indebtedness (mainly denominated in foreign **\*547** currency and consequently exposed to currency fluctuations) from a level of approximately R24 billion to approximately R6 billion and it also introduces fresh capital into the business

through Blue Label Telecoms Limited ("Blue Label") and Net 1 UEPS Technologies Inc. ("Net 1") as equity partners in Cell C. (Application at 10–11.) Second, as part of an equity restructuring, Blue Label will acquire a 45% equity stake in Cell C and Net 1 will acquire 15%, and Cell C staff and management will acquire 10% of Cell C. (*Id.* at 11.) 3C Telecommunications, an existing owner of 100% of the equity in Cell C, will dilute and subscribe indirectly for new equity of 30% in Cell C through several special purpose vehicles. (*Id.*)

### C. The Terms of the Arrangement

As set forth in the Arrangement, its purpose "is to enable Cell C, insofar as is possible, to continue operating its business on a solvent basis, as a going concern in the ordinary course, taking into account the circumstances and facts available to the Board [of directors] as at the date of this Arrangement. As such if the Arrangement is adopted by the requisite majority of a meeting of the Compromise Creditors and sanctioned by a Court, and the restructure is completed and implemented, Cell C will be able to continue operating its business in the ordinary course." (Arrangement § 4.13(2)). However, "[i]f Cell C were to be placed into liquidation at this point in time, the Compromise Creditors, with CDB and ICBC, as secured creditors, will receive a minimal dividend in respect of the amounts owing to them. No other creditor, including DBSA, Nedbank and ordinary trade creditors, all of whom are unsecured, will receive a dividend in liquidation." (*Id.* § 1.4.)

The financial restructure of the Compromise Creditors' claims pursuant to the Arrangement involves the following:

(2A) on the Closing Date Cell C will pay or cause to be paid and the [Compromise Creditors] will receive in exchange for their listed Euro Notes and in discharge of the Compromise Creditors' Claims:

(a) a cash payment of the accrued but unpaid interest of EUR17.25 million (Interest Payment);

(b) a cash payment of the EUR equivalent of Rand 262 million (converted at the Agreed Close Rate) in respect of capital (the "Day 1 Prepayment");

(c) a new 3–year Irish stock exchange listed bond issued by Cell C, in the USD equivalent of Rand 2.397 million (converted at the Agreed Close Rate) (the "New Cell C Bond");

(d) a new 5–year bond issued by SPV1 (the "SPV1 Bond"), in the USD equivalent of the difference between

(i) the Compromise Creditors' Claims (outstanding as at the date of this Arrangement and Closing Date) minus (ii) the Interest Payment minus (iii) the Day 1 Prepayment minus (iii) the Deferred Prepayment (see 4.9(2B) below) minus (iv) the nominal value of the New Cell C Bonds (all converted at the Agreed Close Rate) (the "SPV1 Bonds Nominal Value") (and SPV1 shall have as its only asset 11.8% of the total issued share capital of Cell C); ...

(*Id.* § 4.9(2A).)

The Arrangement provides that "Cell C will be released from the payment of any amount owing to the Compromise Creditors. Its obligations in that regard will be restructured on the terms of this Arrangement." (*Id.* § 4.12(1); *see id.* § 4.13(1) ("Cell C will be fully and finally released from the obligation to discharge its liabilities to the Compromise Creditors.").) This means that Cell C will no longer have any liabilities to the Compromise Creditors under **\*548** the Euro Notes, but will have liabilities to the Compromise Creditors under the Arrangement, including those representing payments in cash and pursuant to the New Cell C Bonds and SPV1 Bonds.

### D. Procedural Background

#### 1. The Section 155 Proceeding

On June 21, 2017, Cell C sent out to its creditors a "Notice of the Compromise Creditors Meeting," providing notice to affected creditors of a "Compromise Creditors Meeting" pursuant to Section 155 of the Companies Act to approve the Arrangement. (*Id.*) The Compromise Creditors Meeting took place on June 28, 2017, and all of those in attendance, roughly 98% of the Compromise Creditors, voted in favor of the proposed scheme. (Supplemental Declaration at 3.) The Arrangement was approved by more than three-quarters by value of holders of Euro Notes present at the Compromise Creditors Meeting as required by the Companies Act. (*Id.*)

Also on June 21, 2017, Cell C issued a board resolution (the "Board Resolution," ECF Doc. # 9, Ex. 1) appointing the Foreign Representatives and authorizing them to file a chapter 15 case in the United States. (Application at 10.) On June 30, 2017, Cell C applied to the South African Court for a Sanction Order approving the Arrangement. (*Id.*) On July 18, 2017, the South African Court held a hearing and entered the Sanction Order approving the Arrangement. (*See* Sanction Order.)

#### 2. The Preliminary Injunction

On June 22, 2017, the date the chapter 15 petition was filed, the Court entered an order to show cause (the "OSC," ECF Doc. # 15) and a temporary restraining order ("TRO"), which provided the following:

a. all persons and entities subject to this Court's jurisdiction are temporarily restrained from taking or continuing any act to seize, attach, possess, execute upon, exercise control over and/or enforce liens against any assets of the Debtor located in the territorial jurisdiction of the United States; and

b. the automatic stay set forth in Section 362 of the Bankruptcy Code shall be applicable, within the territorial boundaries of the United States, to the Debtor and all of its assets.

(OSC at 5.) The OSC also ordered all parties in interest to show cause why essentially identical relief should not be entered pursuant to a preliminary injunction. (*Id.* at 3.) No objections or responses to the OSC or the relief requested therein were filed, and on July 6, 2017, the Court entered the "Preliminary Injunction Order." [2] (ECF Doc. # 24.) On June 30, 2017, Cell C applied to the South African Court for a Sanction Order approving the Arrangement. (Application at 10.)

[2]    When this Court issued the TRO, the Court did not understand that that the court proceeding in South Africa had not yet been filed. Unlike a scheme of arrangement in the United Kingdom, where a court proceeding is first filed and a court order convening a creditors meeting to vote on the proposed scheme is obtained, a Section 155 proceeding permits the company to send notice and a description of the proposed arrangement to affected creditors, conduct the creditors meeting and obtain a creditor vote, and only then if the required votes are obtained, file a proceeding in the South African Court. The South African Court proceeding with respect to Cell C had been filed before the Preliminary Injunction Order was issued. The Court reserves for another day in another case the issue whether it is appropriate to issue a TRO *before* the foreign court proceeding is filed.

#### 3. Notice of the Recognition Hearing and Comity Motion

All creditors affected by the Arrangement received notice of the proceedings in **\*549** this chapter 15 case. Cell C has filed a "Service List" (*see* ECF Doc. # 14), which includes, among others, a "Bondholders' Committee" primarily comprised of the Compromise Creditors. This Service List also appears as Exhibit A to an affidavit of service of all of the primary documents in the case. (*See* ECF Doc. # 17.) A hearing in this Court on the Comity Motion occurred on July 20, 2017, with a similar noticing process, during which the Court granted the Comity Motion.

### E. Cell C's United States Assets

Cell C does not have a place of business or domicile in the United States, but it has a retainer in the Norton Rose Fulbright US LLP Iolta Trust account, located at Citibank, N.A. in New York, New York. (Application at 15.) Additionally, the Euro Notes issued by Cell C are governed by New York law and contain a New York forum selection clause. (*Id.*; *see also* ECF Doc. ## 45, 49.)

### II. LEGAL STANDARDS

#### A. Requirements for Recognition of a Foreign Proceeding

Section 1517(a) of the Bankruptcy Code provides that the court shall, after notice and a hearing, enter an order recognizing a foreign main proceeding if:

> (1) such foreign proceeding for which recognition is sought is a foreign main proceeding ... within the meaning of section 1502;
>
> (2) the foreign representative applying for recognition is a person or body; and
>
> (3) the petition meets the requirements of section 1515.

11 U.S.C. § 1517(a). "While not explicit in this section, the foreign proceeding and the foreign representative must meet the definitional requirements set out in sections 101(23) and 101(24)." 8 COLLIER ON BANKRUPTCY ¶ 1517.01 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2014).

#### 1. Requirements of a Foreign Proceeding and Foreign Main Proceeding

**[1]** A foreign proceeding is a "collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation." 11 U.S.C. § 101(23); *see also In re ABC Learning Ctrs. Ltd.*, 445 B.R. 318, 327 (Bankr. D. Del. 2010). The foreign representative must satisfy seven criteria to establish that a proceeding is a foreign proceeding:

> (i) [the existence of] a proceeding; (ii) that is either judicial or administrative; (iii) that is collective in nature; (iv) that is in a foreign country; (v) that is authorized or conducted under a law related to insolvency or the adjustment of debts; (vi) in which the debtor's assets and affairs are subject to the control or supervision of a foreign court; and (vii) which proceeding is for the purpose of reorganization or liquidation.

*In re Ashapura Minechem Ltd.*, 480 B.R. 129, 136 (S.D.N.Y. 2012) (footnote omitted).

A foreign main proceeding, defined as "a foreign proceeding in the country where the debtor has the center of its main interest," 11 U.S.C § 1502(4), and "shall be recognized ... if it is pending in the country where the debtor has the center of its main interests." *Id.* § 1517(b)(1). Although the term "center of main interests" ("COMI") is not defined in the Bankruptcy Code, "[i]n the absence of evidence to the contrary, the debtor's registered office ... is presumed to be the center of the debtor's **\*550** main interests." *Id.* § 1516(c); *see also In re Bear Stearns*, 374 B.R. 122, 130 (Bankr. S.D.N.Y. 2007).

**[2]** To determine a debtor's COMI, courts in this circuit look to a nonexclusive list of factors, including "the location of the debtor's headquarters; the location of those who actually manage the debtor ...; the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes." *Morning Mist Holdings Ltd. v. Krys (In re Fairfield*

*Sentry Ltd.)*, 714 F.3d 127, 137 (2d Cir. 2013) (quoting *In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006)).

### 2. Requirements of a Foreign Representative

A foreign representative is "a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." 11 U.S.C. § 101(24). "Person" is defined under section 101(41) of the Bankruptcy Code to include an individual, partnership, or corporation. 11 U.S.C. § 101(41).

In *In re Vitro S.A.B. de CV*, the Fifth Circuit concluded that section 101(24) does not require that a foreign representative be appointed by a foreign tribunal. The court looked to the "plain meaning" of the statute and noted that "[s]ection 101(24)—defining the term 'foreign representative'—is wholly devoid of any statement that a foreign representative must be judicially appointed." *Ad Hoc Group of Vitro Noteholders v. Vitro S.A.B. de CV (In re Vitro S.A.B. de CV)*, 701 F.3d 1031, 1047 (5th Cir. 2012). The court also looked to the history of Model Law Article 2(d), containing language which is closely followed by section 101(24), which "expressly rejected the requirement that a foreign representative be '[specifically] authorized by statute or other order of court (administrative body) to act in connection with a foreign proceeding.' " *Id.* (citation omitted). The court held that a governing body of an entity may authorize a person to act as that entity's foreign representative in a chapter 15 proceeding. *Id.*

### 3. Requirements of Section 1515

The requirements provided by section 1515 include that a petition for recognition be filed and accompanied by:

> (1) a certified copy of the decision commencing the foreign proceeding and appointing the foreign representative;

> (2) a certificate from the foreign court affirming the existence of the proceeding and appointment of the representative; or

> (3) in the absence of (1) or (2), evidence which the court deems sufficient to confirm the existence of the foreign proceeding and appointment of the foreign representative.

11 U.S.C. § 1515(a)–(b). The petition must also be accompanied by a statement identifying all known foreign proceedings with respect to the debtor, *id.* § 1515(c), and if applicable, a translation of the evidentiary materials into English. *Id.* § 1515(d).

### B. The Interplay of Section 109(a) and Chapter 15 of the Bankruptcy Code

**[3]    [4]**  Section 109(a) provides that "[n]otwithstanding any other provision of this section, only a person that resides or has a domicile, a place of business or property in the United States, or a municipality, may be a debtor under this title." *Id.* § 109(a). The Second Circuit has applied the requirements enumerated in section 109(a) of the Bankruptcy Code to debtors under chapter 15. *See* **\*551** *Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*, 737 F.3d 238, 247 (2d Cir. 2013). Accordingly, under section 109(a) and in accordance with *Barnet*, a foreign representative must show that the debtor has either (i) a domicile, (ii) a place of business, or (iii) *property* in the United States, as a condition precedent to eligibility under 11 U.S.C. § 1517. *See In re Barnet*, 737 F.2d at 247; *In re Octaviar Admin. Pty. Ltd.*, 511 B.R. 361, 369 (Bankr. S.D.N.Y. 2014). Some courts, including this Court, have held that a retainer in a United States bank account constitutes property in the United States. *See, e.g.*, *In re Inversora Eléctrica de Buenos Aires S.A.*, 560 B.R. 650, 654 (Bankr. S.D.N.Y. 2016) ("This Court has found that an undrawn attorney retainer held in a United States bank account provides a sufficient basis for jurisdiction.") (citing *In re Berau Cap. Res. Pte Ltd*, 540 B.R. 80, 82 (Bankr. S.D.N.Y. 2015)); *In re Octaviar*, 511 B.R. at 372–73 ("There is a line of authority that supports the fact that prepetition deposits or retainers can supply 'property' sufficient to make a foreign debtor eligible to file in the United States.") (*citing In re Cenargo Int'l PLC*, 294 B.R. 571, 603 (Bankr. S.D.N.Y. 2003)); *see also In re Yukos Oil Co.*, 321 B.R. 396, 401–03 (Bankr. S.D. Tex. 2005); *In re Global Ocean Carriers Ltd.*, 251 B.R. 31, 39 (Bankr. D. Del. 2000).

Courts have also held that debt subject to New York governing law and a New York forum selection clause constitutes property in the United States. *See In re Inversora*, 560 B.R. at 655 ("[D]ollar-denominated debt subject to New York governing law and a New York forum selection clause is independently sufficient to form the basis for jurisdiction.") (citation omitted); *In re Berau Cap.*, 540 B.R. at 84 ("The Court concludes that the presence of the New York choice of law and forum selection clauses in the Berau indenture

satisfies the section 109(a) 'property in the United States' eligibility requirement.") (footnote omitted).

#### C. Standards for Recognition and Enforcement

[5] [6] Upon recognition of a foreign proceeding, at the request of the foreign representative, the Court may grant, with certain express exceptions, "any appropriate relief," including "any additional relief that may be available to a trustee" that the Court determines is necessary to effectuate the purpose of chapter 15 and to protect the assets of the debtor or the interests of the creditors. 11 U.S.C. § 1521(a) (7). Appropriate relief under section 1521 includes enforcing a foreign confirmation order. *See In re Rede Energia S.A.,* 515 B.R. 69, 89 (Bankr. S.D.N.Y. 2014). Relief under section 1521 will be granted "only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected." *Id.* at 90; 11 U.S.C. § 1522(a).

[7] [8] In addition to the types of relief enumerated in section 1521, section 1507(a) of the Bankruptcy Code provides that "[s]ubject to the specific limitations stated elsewhere in this chapter[,] the court, if recognition is granted, may provide additional assistance to a foreign representative under this title or under other laws of the United States." *Id.* § 1507(a). "Pursuant to section 1507, the court is authorized to grant any 'additional assistance' available under the Bankruptcy Code or under 'other laws of the United States,' provided that such assistance is consistent with the principles of comity and satisfies the fairness considerations set forth in section 1507(b)." *In re Rede Energia S.A.,* 515 B.R. at 90. As with section 1521, relief under section 1507 may include recognition and enforcement of a plan approved by a foreign court. *Id.* at 94–95.

#### *552 III. DISCUSSION

Chapter 15 of the Bankruptcy Code is designed to allow a U.S. court to assist the administration of a foreign proceeding in its goal to protect and maximize the value of a debtor's assets and to facilitate the rehabilitation of financially distressed businesses. The relief afforded to a foreign debtor under chapter 15 is intended to avoid disruptions that could otherwise derail a debtor's restructuring in its home country.

The Court now holds that: (i) the Section 155 Proceeding is a foreign proceeding under the definition of 11 U.S.C. § 101(23), (ii) the Foreign Representatives are foreign representatives under the definition of 11 U.S.C. § 101(24) and each is a "person" under the definition of 11 U.S.C. § 101(41), and (iii) the petition for recognition meets the requirements of Section 1515, namely, the evidence in the record is sufficient to show the existence of a foreign proceeding and the appointment of foreign representatives. Accordingly, the requirements for recognition of the Section 155 Proceeding as a foreign proceeding are met and the recognition of the Section 155 Proceeding as a foreign main proceeding furthers the goals of chapter 15. Additionally, the recognition and enforcement of the Sanction Order is "appropriate relief" under sections 1521 and 1507.

#### A. Cell C is Eligible to be a Debtor Under Section 109(a)

[9] As a preliminary matter, a foreign representative must show that the debtor has either (i) a domicile, (ii) a place of business, or (iii) *property* in the United States, as a condition precedent to eligibility under 11 U.S.C. § 1517. *See In re Barnet,* 737 F.2d at 247; *In re Octaviar,* 511 B.R. 361, 369 (Bankr. S.D.N.Y. 2014).

Here, Cell C does not have a place of business or domicile in the United States. However, Cell C has property in the United States. Specifically, Cell C has a retainer in the Norton Rose Fulbright US LLP Iolta Trust account, located at Citibank, N.A. in New York, New York. Additionally, Cell C has issued the Euro Notes which are governed by New York law and contain a New York forum selection clause. Both the retainer and the Euro Notes (governed by New York law) are "independently sufficient" bases for jurisdiction. *See In re Inversora,* 560 B.R. at 654–55; *In re Berau Cap.,* 540 B.R. at 82. Accordingly, Cell C satisfies the "property" requirement of section 109(a) of the Bankruptcy Code.

#### B. Cell C Has Satisfied the Requirements of Section 1517

*1. The Section 155 Proceeding is a Foreign Main Proceeding*

[10] Cell C has shown that the Section 155 Proceeding is a foreign main proceeding. Cell C has satisfied the seven criteria of a foreign proceeding discussed in *In re Ashapura Minechem Ltd.:* (i) Cell C is proceeding with a proposal for a compromise and arrangement under Section 155 of the Companies Act and filed a petition with the South African Court seeking a Sanction Order; (ii) the proceeding

3147

is judicial in that Cell C sought, after notice and hearing, a Sanction Order to be signed by a South African Judge; (iii) the Section 155 Proceeding is collective in that it seeks approval of an Arrangement, which is the adjustment of Cell C's debt with a group of creditors called the Compromise Creditors; (iv) the Section 155 Proceeding is pending in South Africa; (v) Section 155 of the Companies Act is a law that is related to insolvency or the adjustment of debts, and Cell C seeks to adjust its debts and reorganize in the Section 155 Proceeding; (vi) Section 155 of the Companies Act requires that the South African Court approve the Arrangement via a Sanction Order, and the South African Court may **\*553** consider any objection asserted in respect of the Arrangement; and (vii) under the Companies Act, a debtor may reorganize or may liquidate and here Cell C is reorganizing. (Application at 17–18.) Additionally, the United States Bankruptcy Court for the Southern District of New York has previously recognized a South African section 155 proceeding as a foreign proceeding. *See In re Edcon Holdings Ltd.*, No. 16–13475 (Bankr. S.D.N.Y. Jan. 19, 2017).

Cell C has also shown that its COMI is in South Africa. South Africa is presumed to be Cell C's COMI because its registered office is located there. (Application at 5.) No evidence was presented to rebut the presumption and additional factors support this presumption, including the facts that Cell C is headquartered in South Africa, it is organized under the laws of South Africa, the majority of its employees and assets are located in South Africa, nearly all of its decision-making and operations take place in South Africa, and substantially all of its major customers are located in South Africa. (*Id.* at 6.) Therefore, the Section 155 Proceeding is recognized as a foreign main proceeding.

### 2. The Foreign Representatives Are Qualified To Be Foreign Representatives

 **[11]**   The Foreign Representatives are individuals, satisfying section 101(41)'s definition of "person," and can therefore serve as foreign representatives. The Foreign Representatives have been specifically authorized by Cell C's board of directors to act as its foreign representatives. (Board Resolution at 3.)

 **[12]**   This Court agrees with the Fifth Circuit's analysis of section 101(24) in *In re Vitro S.A.B. de CV* that section 101(24) does not require that a foreign representative be judicially appointed. 701 F.3d at 1049 (holding that the

foreign representatives were "not disqualified from serving as foreign representatives merely because they were not the subject of an official court appointment"). Other courts in this district have also recognized that a board of directors may authorize a person to act as the corporation's foreign representative in a chapter 15 proceeding. *See In re OAS S.A.*, 533 B.R. 83, 98 (Bankr. S.D.N.Y. 2015); *In re Compania Mexicana de Aviacion, S.A. de C.V.*, 2010 WL 10063842 (Bankr. S.D.N.Y. Nov. 8, 2010); *In re Edcon Holdings Ltd.*, No. 16–13475 (Bankr. S.D.N.Y. Jan. 19, 2017). The Board Resolution therefore satisfies the requirements of section 101(24) and shows that the Foreign Representatives are qualified to be the foreign representatives in this case.

### 3. The Documents Filed by Cell C Satisfy the Requirements of Section 1515

 **[13]**   A petition for recognition was filed on June 22, 2017, but it was not accompanied by either a certified copy of the decision commencing such foreign proceeding, or a certificate from the foreign court affirming the existence of such foreign proceeding. Cell C asserts that the Board Resolution and the Pianezze Declaration satisfy the requirements of section 1515(b)(3).

The documents attached to the Pianezze Declaration and Supplemental Declaration satisfy the requirements of section 1515(b)(3), as these documents include: (i) a copy of the Board Resolution which shows both (a) the appointment of the Foreign Representatives and their authorization to file this chapter 15 case and (b) authorization to commence the Section 155 Proceeding; and (ii) a copy of a notice of motion filed on June 30, 2017, in the South African Court, stating that Cell C will apply for the Sanction Order in the South African Court on July 18, 2017. (Board Resolution at 3; Supplemental Declaration Ex. A at 5)

 **\*554**   The Court is satisfied with the evidence presented showing the existence of the foreign proceeding as of June 30, 2017, and of the appointment of the foreign representatives by the Cell C board of directors. The exhibits attached to the Pianezze Declaration and Supplemental Declaration establish that there is an ongoing proceeding in South Africa and that the Board Resolution fully authorized the Foreign Representatives to file this case.

Therefore, Cell C's petition meets the requirements of section 1515 of the Bankruptcy Code in satisfaction of the third

3148

requirement under section 1517(a). Because the petition satisfies section 1517, the Court recognizes Cell C's Section 155 Proceeding in this chapter 15 case.

### C. Recognizing the Section 155 Proceeding as a Foreign Main Proceeding Serves the Purposes of Chapter 15

 **[14]**  Moreover, section 1508 of the Bankruptcy Code requires that courts "consider [the] international origin [of chapter 15] and the need to promote an application of [chapter 15] that is consistent with the application of similar statutes adopted by foreign justifications." 11 U.S.C. § 1508. Here, the Compromise Creditors emphatically supported the Arrangement, which the South African Court then sanctioned. Importantly, but not surprisingly (given the near universal support for this reorganization), no objections to the relief sought by the Application were filed.

Accordingly, considerations of judicial cooperation and support for the foreign main proceeding in South Africa dictate that Cell C should be allowed to avail itself of the protections set forth under chapter 15, and obtain recognition as a foreign main proceeding.

### D. Recognizing and Enforcing the Sanction Order Is Warranted Under Sections 1521 and 1507

 **[15]**   The recognition and enforcement of the Sanction Order is "appropriate relief" of a type not specifically enumerated in the non-exhaustive list set forth in section 1521(a). Additionally, courts have held that enforcing a foreign confirmation order falls within "appropriate relief." *See In re Rede Energia S.A.*, 515 B.R. at 89. Recognizing and enforcing the Sanction Order is appropriate for several reasons: (i) the Arrangement and Sanction Order only affect the Compromise Creditors and is not binding on any other party, (ii) no property of Cell C is being distributed under the Arrangement (Arrangement §§ 4.14–4.15), (iii) Compromise Creditors in the United States are protected against prejudice and inconvenience in the processing of claims in the Section 155 Proceeding as Compromise Creditors do not need to file claims to evidence their debt (*id.* § 3.30), (iv) no preferential or fraudulent disposition of property is being made (*id.* § 4.9(2B)), (v) the Arrangement does not violate the absolute priority rule, and (vi) the approval of the Sanction Order was adjudicated before the South African Court.

The concerns raised under section 1522 are not present here; the interests of the creditors and debtor are sufficiently protected if relief is granted under section 1521. An order enforcing the Sanction Order will permit Cell C, the Foreign Representatives, The Bank of New York Mellon, and The Bank of New York Mellon (Luxembourg) S.A., to take the actions necessary to implement the Arrangement. Absent recognition and enforcement, the Arrangement may not be fully implemented as contemplated by and to the detriment of the parties, including the Compromise Creditors, who fully support the Arrangement.

 **\*555**  Therefore, Cell C's request for enforcement of the Sanction Order in the United States is warranted under sections 1521 and 1507 of the Bankruptcy Code. [3]

[3]   The Order recognizing and enforcing the Arrangement specifically provides that "[o]ther than the releases granted in favor of Cell C in the Arrangement, which are given full force and effect in the United States in Paragraph 2 of this Order, this Court has not been asked and is not giving full force and effect in the United States to any other releases in the Arrangement, including, without limitation, the third party releases described in Section 4.12(2)(b) and (c) of the Arrangement." (ECF Doc. # 48, ¶ 3.) Because the Court was not asked to recognize and enforce any third-party releases, it was unnecessary to consider the issues addressed by this Court in *In re Metcalfe & Mansfield Alternative Investments*, 421 B.R. 685 (Bankr. S.D.N.Y. 2015), and in *In re Sino–Forest Corp.*, 501 B.R. 655 (Bankr. S.D.N.Y. 2013).

### IV. CONCLUSION

For the reasons discussed above, Cell C's South African Section 155 proceeding was recognized as a foreign main proceeding and the Sanction Order entered by the South African Court was recognized and enforced by this Court.

### All Citations

571 B.R. 542, 64 Bankr.Ct.Dec. 115

---

**End of Document**
© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 29

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by In re Sybaris Clubs Intern., Inc., Bankr.N.D.Ill., November 30, 1995

115 S.Ct. 1493
Supreme Court of the United States

CELOTEX CORPORATION, Petitioner,

v.

Bennie EDWARDS et ux.

No. 93–1504.
|
Argued Dec. 6, 1994.
|
Decided April 19, 1995.

**Synopsis**

In Chapter 11 case, after bankruptcy court issued order staying all proceedings against debtor including proceedings where matter was on appeal and supersedeas bond had been posted by debtor, judgment creditors in asbestos litigation moved in district court to enforce supersedeas bond against surety after debtor lost appeal for which bond was posted. The United States District Court for the Northern District of Texas, David O. Belew, Jr., J., granted execution against surety on bond. Debtor appealed. The Court of Appeals for the Fifth Circuit, 6 F.3d 312, affirmed. Debtor petitioned for writ of certiorari. The Supreme Court granted certiorari in part, 114 S.Ct. 2099, and dismissed certiorari in part, 114 S.Ct. 2120, and, in an opinion delivered by Chief Justice Rehnquist, held that: (1) whether judgment creditors were entitled to immediate execution on bond against debtor's surety was at least question "related to" debtor's bankruptcy case and was within bankruptcy court's jurisdiction, and (2) judgment creditors were required to obey bankruptcy court injunction until it was modified or reversed, even if they had proper grounds to object to injunction, and they could not collaterally attack injunction on motion to execute.

Reversed.

Justice Stevens dissented and filed opinion in which Justice Ginsburg joined.

West Headnotes (15)

**[1]    Bankruptcy** 🔑 Injunction or stay of other proceedings

Judgment creditors were required to obey bankruptcy court's injunction prohibiting them from executing against debtor's surety on supersedeas bond posted by debtor in asbestos litigation after judgment which occasioned bond had become final, even though they had basis to object to injunction, where judgment creditors failed to challenge injunction in bankruptcy court or to appeal bankruptcy court's ultimate decision to district court or Court of Appeals. Bankr.Code, 11 U.S.C.A. § 105.

33 Cases that cite this headnote

**[2]    Bankruptcy** 🔑 Injunction or stay of other proceedings

Rule that persons subject to injunctive order issued by court with jurisdiction are expected to obey that order until it is modified or reversed, even if they have proper grounds to object to that order, applies to bankruptcy cases.

31 Cases that cite this headnote

**[3]    Bankruptcy** 🔑 Core, Non-Core, or Related Proceedings in General; Nexus

Bankruptcy court has jurisdiction over proceedings "arising under," "arising in," or "related to" Chapter 11 case. 28 U.S.C.A. §§ 157(a), 1334(b).

232 Cases that cite this headnote

**[4]    Bankruptcy** 🔑 Related proceedings

Proceedings "related to" bankruptcy include causes of action owned by debtor which become property of estate, and suits between third parties that have effect on bankruptcy estate. 28 U.S.C.A. §§ 157(a), 1334(b).

339 Cases that cite this headnote

26-11268-mg    Doc 23-3    Filed 06/24/26    Entered 06/24/26 13:13:49    Exhibit C    Pg
489 of 882

Celotex Corp. v. Edwards, 514 U.S. 300 (1995)

115 S.Ct. 1493, 131 L.Ed.2d 403, 63 USLW 4269, 32 Collier Bankr.Cas.2d 685...

**[5]**    **Bankruptcy** 🔑 Bankruptcy Jurisdiction

Congress intended to grant comprehensive jurisdiction to bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with bankruptcy estate. 28 U.S.C.A. §§ 157(a), 1334(b).

164 Cases that cite this headnote

**[6]**    **Bankruptcy** 🔑 Related proceedings

"Related to" jurisdiction must be read to give district courts and bankruptcy courts jurisdiction over more than simply proceedings involving property of debtor or estate. 28 U.S.C.A. §§ 157(a), 1334(b).

405 Cases that cite this headnote

**[7]**    **Bankruptcy** 🔑 Related proceedings

Bankruptcy court's "related to" jurisdiction cannot be limitless. 28 U.S.C.A. §§ 157(a), 1334(b).

335 Cases that cite this headnote

**[8]**    **Bankruptcy** 🔑 Bankruptcy Jurisdiction

Bankruptcy courts have no jurisdiction over proceedings that have no effect on debtor. 28 U.S.C.A. §§ 157(a), 1334(b).

298 Cases that cite this headnote

**[9]**    **Bankruptcy** 🔑 Particular proceedings or issues

Issue of whether judgment creditors could immediately execute on supersedeas bond posted by Chapter 11 debtor in asbestos litigation after judgment in favor of creditors became final was at least question "related to" debtor's bankruptcy case and was within bankruptcy court's jurisdiction; although proceeding against surety did not directly involve debtor, allowing judgment creditor and other bonded judgment creditors to execute immediately on bonds would have direct and substantial adverse affect on debtor's ability to undergo successful Chapter 11 reorganization. 28 U.S.C.A. §§ 157(a), 1334(b).

50 Cases that cite this headnote

**[10]**    **Bankruptcy** 🔑 Particular proceedings or issues

Bankruptcy court injunction prohibiting judgment creditors from executing on supersedeas bond posted by Chapter 11 debtor in asbestos litigation was only interlocutory stay which judgment creditors had yet to challenge, and thus, bankruptcy court did not lack jurisdiction to issue injunction on ground that it was final order or judgment that only district court could issue in related noncore proceedings. Bankr.Code, 11 U.S.C.A. § 105; 28 U.S.C.A. §§ 157(a), (c)(1), 1334(b).

91 Cases that cite this headnote

**[11]**    **Bankruptcy** 🔑 Presentation of grounds for review

Judgment creditors waived any claim that bankruptcy court's granting of injunction prohibiting judgment creditors from executing immediately on supersedeas bond posted by Chapter 11 debtor in asbestos litigation was "noncore" proceeding in which only district court had power to enter final order or judgment, where judgment creditors based their argument for execution solely on claim that injunction was not "related to" bankruptcy case and conceded that bankruptcy court had subject matter jurisdiction to issue orders affecting bond. Bankr.Code, 11 U.S.C.A. § 105; 28 U.S.C.A. §§ 157(a), (c)(1), 1334(b).

53 Cases that cite this headnote

**[12]**    **Bankruptcy** 🔑 Bankruptcy Jurisdiction

Jurisdiction of bankruptcy courts may extend more broadly in Chapter 11 case than in Chapter 7 case.

22 Cases that cite this headnote

**[13]**    **Bankruptcy** 🔑 Injunction or stay of other proceedings

3152

26-11268-mg    Doc 23-3    Filed 06/24/26    Entered 06/24/26 13:13:49    Exhibit C    Pg
490 of 882

Celotex Corp. v. Edwards, 514 U.S. 300 (1995)
115 S.Ct. 1493, 131 L.Ed.2d 403, 63 USLW 4269, 32 Collier Bankr.Cas.2d 685...

Fact that Federal Rules of Civil Procedure provided expedited procedure for executing on supersedeas bonds did not mean that such procedure could not be stayed by lawfully entered injunction. Bankr.Code, 11 U.S.C.A. § 105; 28 U.S.C.A. § 1334(b); Fed.Rules Civ.Proc.Rule 65.1, 28 U.S.C.A.

[14]    **Bankruptcy** 🔑 Scope of review in general

Issue of whether bankruptcy court properly issued injunction prohibiting judgment creditors of Chapter 11 debtor from immediately executing on supersedeas bond posted by debtor in asbestos litigation did not have to be addressed; it was for court of first instance to determine question of validity of law and until its decision was reversed for error by orderly review, its order based on its decision was to be respected. Bankr.Code, 11 U.S.C.A. § 105.

68 Cases that cite this headnote

[15]    **Bankruptcy** 🔑 Injunction or stay of other proceedings

**Judgment** 🔑 Nature of action or other proceeding

Judgment creditors could not collaterally attack bankruptcy court's injunction prohibiting creditors from executing against Chapter 11 debtor's surety on supersedeas bond posted by debtor in asbestos litigation after judgment which occasioned bond had become final in favor of judgment creditors, and instead, judgment creditors should have challenged injunction by appeal to district court and then to Court of Appeals if they believed that the injunction was improper. Bankr.Code, 11 U.S.C.A. § 105.

60 Cases that cite this headnote

**1495  *Syllabus* *

*        The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

 **\*300**  The United States District Court for the Northern District of Texas entered a judgment in favor of respondents and against petitioner Celotex Corp. To stay execution of the judgment pending appeal, petitioner posted a supersedeas bond, with an insurance company (Northbrook) serving as surety. After the Fifth Circuit affirmed the judgment, Celotex filed for Chapter 11 bankruptcy in the Bankruptcy Court for the Middle District of Florida. Exercising its equitable powers under 11 U.S.C. § 105(a), the Bankruptcy Court issued an injunction, which, in pertinent part, prohibited judgment creditors from proceeding against sureties without the Bankruptcy Court's permission. Respondents thereafter filed a motion pursuant to Federal Rule of Civil Procedure 65.1 in the Northern District of Texas seeking permission to execute against Northbrook on the bond. The District Court granted the motion. The Fifth Circuit affirmed and later denied Celotex's petition for rehearing, rejecting the argument that its decision allowed a collateral attack on the Bankruptcy Court order.

*Held:* Respondents must obey the Bankruptcy Court's injunction. The well-established rule that "persons subject to an injunctive order issued by a court with jurisdiction are expected to obey that decree until it is modified or reversed, even if they have proper grounds to object to the order," *GTE Sylvania, Inc. v. Consumers Union of United States, Inc.,* 445 U.S. 375, 386, 100 S.Ct. 1194, 1201, 63 L.Ed.2d 467, applies to bankruptcy cases, *Oriel v. Russell,* 278 U.S. 358, 49 S.Ct. 173, 73 L.Ed. 419. A bankruptcy court has jurisdiction over proceedings "arising under," "arising in," or "related to" a Chapter 11 case. 28 U.S.C. §§ 1334(b) and 157(a). The "related to" language must be read to grant jurisdiction over more than simply proceedings involving the debtor's property or the estate. Respondents' immediate execution on the bond is at least a question "related to" Celotex's bankruptcy. While the proceeding against Northbrook does not directly involve Celotex, the Bankruptcy Court found that allowing respondents and other bonded judgment creditors to execute immediately on the bonds would have a direct and substantial adverse effect on Celotex's ability to undergo a successful Chapter 11 reorganization. The fact that Federal Rule of Civil Procedure 65.1 provides an expedited procedure for executing on supersedeas bonds does not mean that such a procedure

3153

cannot be stayed by a lawfully **\*301** entered injunction. *Board of Governors, FRS v. MCorp Financial, Inc.,* 502 U.S. 32, 112 S.Ct. 459, 116 L.Ed.2d 358, distinguished. The issue whether the Bankruptcy Court properly issued the injunction need not be addressed here. Since it is for the court of first instance to determine the question of the validity of the law, and since its orders are to be respected until its decision is reversed, respondents should have challenged the injunction in the Bankruptcy Court rather than collaterally attacking the injunction in the Texas federal courts. Pp. 1498–1501.

6 F.3d 312, reversed.

REHNQUIST, C.J., delivered the opinion of the Court, in which O'CONNOR, SCALIA, KENNEDY, SOUTER, THOMAS, and BREYER, JJ., joined. STEVENS, J., filed a dissenting opinion, in which GINSBURG, J., joined, *post,* p. 1501.

**Attorneys and Law Firms**

Jeffrey W. Warren, Tampa, FL, for petitioner.

Brent M. Rosenthal, Dallas, TX, for respondents.

**Opinion**

Chief Justice REHNQUIST delivered the opinion of the Court.

The United States Court of Appeals for the Fifth Circuit held that respondents should be allowed to execute against petitioner's surety on a supersedeas bond posted by petitioner where the judgment which occasioned the bond had become final. It so held even though the United States Bankruptcy Court for the Middle District of Florida previously had issued an injunction prohibiting respondents **\*302** from executing on the bond without the Bankruptcy Court's permission. We hold that respondents were obligated to obey the injunction issued by the Bankruptcy Court.

I

In 1987 respondents Bennie and Joann Edwards filed suit in the United States District Court for the Northern District of Texas against petitioner Celotex Corporation (and others) alleging asbestos-related injuries. In April 1989 the District Court entered a $281,025.80 judgment in favor of respondents and against Celotex. To stay execution of the judgment

pending appeal, Celotex posted a supersedeas bond in the amount of $294,987.88, with Northbrook Property and Casualty Insurance Company serving as surety on the bond. As collateral for the bond, Celotex allowed Northbrook to retain money owed to Celotex under a settlement agreement resolving insurance coverage disputes between Northbrook and Celotex.

The United States Court of Appeals for the Fifth Circuit affirmed, issuing its mandate on October 12, 1990, and thus rendering "final" respondents' judgment against Celotex. *Edwards v. Armstrong World Industries, Inc.,* 911 F.2d 1151 (1990). That same day, Celotex filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Middle District of Florida. [1] The filing of the petition automatically stayed both the continuation of "proceeding[s] against" Celotex and the commencement of "any act to obtain possession of property" of Celotex. [2] 11 U.S.C. §§ 362(a)(1) and (3).

[1]    For purposes of this case, we assume respondents' judgment became final before Celotex filed its petition in bankruptcy.

[2]    As of the filing date, more than 141,000 asbestos-related bodily injury lawsuits were pending against Celotex, and over 100 asbestos-related bodily injury cases were in some stage of appeal, with judgments totaling nearly $70 million being stayed by supersedeas bonds that Celotex had posted.

**\*303** On October 17, 1990, the Bankruptcy Court exercised its equitable powers under 11 U.S.C. § 105(a) and issued an injunction (hereinafter Section 105 Injunction) to augment the protection afforded Celotex by the automatic stay. In pertinent part, the Section 105 Injunction stayed all proceedings involving Celotex "regardless of ... whether the matter is on appeal and a supersedeas bond has been posted by [Celotex]." App. to Pet. for Cert. A–28. [3] Respondents, whose bonded judgment against Celotex had already been affirmed on appeal, filed a motion pursuant to Federal Rule of Civil Procedure 65.1 in the District Court seeking permission to execute against Northbrook on the supersedeas bond. Both Celotex and Northbrook opposed this motion, asserting that all proceedings to enforce the bonds had been enjoined by the Bankruptcy Court's Section 105 Injunction. Celotex brought to the District Court's attention the fact that, since respondents had filed their Rule 65.1 motion, the Bankruptcy Court had reaffirmed the **\*\*1497** Section 105 Injunction and made clear that the injunction prohibited judgment creditors like

3154

26-11268-mg    Doc 23-3    Filed 06/24/26    Entered 06/24/26 13:13:49    Exhibit C    Pg
492 of 882

Celotex Corp. v. Edwards, 514 U.S. 300 (1995)

115 S.Ct. 1493, 131 L.Ed.2d 403, 63 USLW 4269, 32 Collier Bankr.Cas.2d 685...

respondents from proceeding against sureties without the Bankruptcy Court's permission:

3    The Bankruptcy Court noted that, upon request of a party in interest and following 30 days' written notice and a hearing, it would "consider granting relief from the restraints imposed" by the Section 105 Injunction. App. to Pet. for Cert. A–28. Several of Celotex's bonded judgment creditors whose cases were still on appeal filed motions requesting that the Bankruptcy Court lift the Section 105 Injunction (1) to enable their pending appellate actions to proceed and (2) to permit them to execute upon the bonds once the appellate process concluded in their favor. The Bankruptcy Court granted the first request but denied the second. In re Celotex, 128 B.R. 478, 484 (1991) (Celotex I).

"Where at the time of filing the petition, the appellate process between Debtor and the judgment creditor had been concluded, the judgment creditor is precluded from proceeding against any supersedeas bond posted by Debtor without first seeking to vacate the Section 105 **\*304** stay entered by this Court." In re Celotex, 128 B.R. 478, 485 (1991) (Celotex I).

Despite the Bankruptcy Court's reaffirmation and clarification of the Section 105 Injunction, the District Court allowed respondents to execute on the bond against Northbrook.[4]

4    Two days after the District Court entered its order, the Bankruptcy Court ruled on motions to lift the Section 105 Injunction that had been filed by several bonded judgment creditors who, like respondents, had prevailed against Celotex on appeal. The Bankruptcy Court again reaffirmed the Section 105 Injunction and it again explained that the injunction prohibited judgment creditors like respondents from executing on the supersedeas bonds against third parties without its permission. In re Celotex, 140 B.R. 912, 914 (1992) (Celotex II). It refused to lift the Section 105 Injunction at that time, finding that Celotex would suffer irreparable harm. It reasoned that if the judgment creditors were allowed to execute against the sureties on the supersedeas bonds, the sureties would in turn seek to lift the Section 105 Injunction to reach Celotex's collateral under the settlement agreements, possibly destroying any chance of a successful reorganization plan. See id., at 914–915. To protect the bonded judgment creditors, the Bankruptcy Court ordered that: (1) the sureties involved, including Northbrook, establish escrow accounts sufficient to insure full payment of the bonds; (2) Celotex create an interest-bearing reserve account

or increase the face amount of any supersedeas bond to cover the full amount of judgment through confirmation; and (3) Celotex provide in any plan that the bonded claimants' claims be paid in full unless otherwise determined by the court or agreed by the claimant. Id., at 917. The Bankruptcy Court also directed Celotex to file "any preference action or any fraudulent transfer action or any other action to avoid or subordinate any judgment creditor's claim against any judgment creditor or against any surety on any supersedeas bond within 60 days of the entry" of its order. Ibid. Accordingly, Celotex filed an adversary proceeding against respondents, 227 other similarly situated bonded judgment creditors in over 100 cases, and the sureties on the supersedeas bonds, including Northbrook. See Second Amended Complaint in Celotex Corp. v. Allstate Ins. Co., Adversary No. 92–584 (Bkrtcy.Ct. MD Fla.). In that proceeding, Celotex asserts that the bonded judgment creditors should not be able to execute on their bonds because, by virtue of the collateralization of the bonds, the bonded judgment creditors are beneficiaries of Celotex asset transfers that are voidable as preferences and fraudulent transfers. See ibid. Celotex also contends that the punitive damages portions of the judgments can be voided or subordinated on other bankruptcy law grounds. See ibid. This adversary proceeding is currently pending in the Bankruptcy Court.

**\*305** Celotex appealed, and the Fifth Circuit affirmed. Edwards v. Armstrong World Industries, Inc., 6 F.3d 312 (1993) (Edwards II). It first held that, because the appellate process for which the supersedeas bond was posted had been completed, Celotex no longer had a property interest in the bond and the automatic stay provisions of 11 U.S.C. § 362 therefore did not prevent respondents from executing against Northbrook. 6 F.3d, at 315–317. The court then acknowledged that "[t]he jurisdiction of bankruptcy courts has been extended to include stays on proceedings involving third parties under the auspices of 28 U.S.C. § 1334(b)," id., at 318, and that the Bankruptcy Court itself had ruled that the Section 105 Injunction enjoined respondents' proceeding against Northbrook to execute on the supersedeas bond. Ibid. The Fifth Circuit nevertheless disagreed with the merits of the Bankruptcy Court's Section 105 Injunction, holding that "the integrity of the estate is not implicated in the present case because the debtor has no present or future interest in this supersedeas bond." Id., at 320. The court reasoned that the Section 105 Injunction was "manifestly unfair" and an "unjust result" because the supersedeas bond was posted "to cover precisely the type of eventuality which occurred in this case, insolvency of the judgment debtor." Id., at 319. In concluding that the Section 105 Injunction was improper,

3155

26-11268-mg   Doc 23-3   Filed 06/24/26   Entered 06/24/26 13:13:49   Exhibit C   Pg
493 of 882

Celotex Corp. v. Edwards, 514 U.S. 300 (1995)

115 S.Ct. 1493, 131 L.Ed.2d 403, 63 USLW 4269, 32 Collier Bankr.Cas.2d 685...

the Fifth Circuit expressly disagreed with the reasoning and result of *Willis v. Celotex Corp.,* 978 F.2d 146 (1992), cert. denied, 507 U.S. 1030, 113 S.Ct. 1846, 123 L.Ed.2d 470 (1993), where the Court of Appeals for the Fourth Circuit, examining the same **\*\*1498** Section 105 Injunction, held that the Bankruptcy Court had the power under 11 U.S.C. § 105(a) to stay proceedings against sureties on the supersedeas bonds. 6 F.3d, at 320.

Celotex filed a petition for rehearing, arguing that the Fifth Circuit's decision allowed a collateral attack on an **\*306** order of the Bankruptcy Court sitting under the jurisdiction of the Court of Appeals for the Eleventh Circuit. The Fifth Circuit denied the petition, stating in part that "we have not held that the bankruptcy court in Florida was necessarily wrong; we have only concluded that the district court, over which we do have appellate jurisdiction, was right." *Id.,* at 321. Because of the conflict between the Fifth Circuit's decision in this case and the Fourth Circuit's decision in *Willis,* we granted certiorari. 511 U.S. 1105, 114 S.Ct. 2099, 128 L.Ed.2d 661 (1994). We now reverse.

## II

**[1]**   **[2]**   Respondents acknowledge that the Bankruptcy Court's Section 105 Injunction prohibited them from attempting to execute against Northbrook on the supersedeas bond posted by Celotex. Brief in Opposition 6, n. 2 (recognizing that the Section 105 Injunction "was intended to, and did, enjoin collection attempts like those made by [respondents] against Northbrook in this case"). In *GTE Sylvania, Inc. v. Consumers Union of United States, Inc.,* 445 U.S. 375, 386, 100 S.Ct. 1194, 1201, 63 L.Ed.2d 467 (1980), we reaffirmed the well-established rule that "persons subject to an injunctive order issued by a court with jurisdiction are expected to obey that decree until it is modified or reversed, even if they have proper grounds to object to the order." In *GTE Sylvania,* we went on to say:

"There is no doubt that the Federal District Court in Delaware had jurisdiction to issue the temporary restraining orders and preliminary and permanent injunctions. Nor were those equitable decrees challenged as only a frivolous pretense to validity, although of course there is disagreement over whether the District Court erred in issuing the permanent injunction. Under these circumstances, the CPSC was required to obey the injunctions out of respect for judicial process." *Id.,* at 386–

387, 100 S.Ct., at 1201–1202 (internal quotation marks, citations, and footnote omitted).

**\*307**   This rule was applied in the bankruptcy context more than 60 years ago in *Oriel v. Russell,* 278 U.S. 358, 49 S.Ct. 173, 73 L.Ed. 419 (1929), where the Court held that turnover orders issued under the old bankruptcy regime could not be collaterally attacked in a later contempt proceeding. Respondents acknowledge the validity of the rule but contend that it has no application here. They argue that the Bankruptcy Court lacked *jurisdiction* to issue the Section 105 Injunction, though much of their argument goes to the correctness of the Bankruptcy Court's decision to issue the injunction rather than to its jurisdiction to do so.

**[3]**   **[4]**   The jurisdiction of the bankruptcy courts, like that of other federal courts, is grounded in, and limited by, statute. Title 28 U.S.C. § 1334(b) provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." The district courts may, in turn, refer "any or all proceedings arising under title 11 or arising in or related to a case under title 11 ... to the bankruptcy judges for the district." 28 U.S.C. § 157(a). Here, the Bankruptcy Court's jurisdiction to enjoin respondents' proceeding against Northbrook must be based on the "arising under," "arising in," or "related to" language of §§ 1334(b) and 157(a).

**[5]**   **[6]**   **[7]**   **[8]**   Respondents argue that the Bankruptcy Court had jurisdiction to issue the Section 105 Injunction only if their proceeding to execute on the bond was "related to" the Celotex bankruptcy. Petitioner argues the Bankruptcy Court indeed had such "related to" jurisdiction. Congress did not delineate the scope of "related to"[5] jurisdiction, **\*\*1499** but its choice **\*308** of words suggests a grant of some breadth. The jurisdictional grant in § 1334(b) was a distinct departure from the jurisdiction conferred under previous Acts, which had been limited to either possession of property by the debtor or consent as a basis for jurisdiction. See S.Rep. No. 95–989, 2nd Sess., pp. 153, 154 (1978) U.S.Code Cong. & Admin.News 1978, pp. 5787, 5939, 5940. We agree with the views expressed by the Court of Appeals for the Third Circuit in *Pacor, Inc. v. Higgins,* 743 F.2d 984 (1984), that "Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate," *id.,* at 994; see also H.R.Rep. No. 95–595, pp. 43–48 (1977), and that the "related to" language of § 1334(b) must be read to give district courts (and bankruptcy courts under

26-11268-mg    Doc 23-3    Filed 06/24/26    Entered 06/24/26 13:13:49    Exhibit C    Pg 494 of 882

Celotex Corp. v. Edwards, 514 U.S. 300 (1995)

115 S.Ct. 1493, 131 L.Ed.2d 403, 63 USLW 4269, 32 Collier Bankr.Cas.2d 685...

§ 157(a)) jurisdiction over more than simple proceedings involving the property of the debtor or the estate. We also agree with that court's observation that a bankruptcy court's "related to" jurisdiction cannot be limitless. See *Pacor, supra,* at 994; cf. *Board of Governors, FRS v. MCorp Financial, Inc.,* 502 U.S. 32, 40, 112 S.Ct. 459, 464, 116 L.Ed.2d 358 (1991) (stating that Congress has vested "limited authority" in bankruptcy courts). [6]

5    Proceedings "related to" the bankruptcy include (1) causes of action owned by the debtor which become property of the estate pursuant to 11 U.S.C. § 541, and (2) suits between third parties which have an effect on the bankruptcy estate. See 1 Collier on Bankruptcy ¶ 3.01[1][c][iv], p. 3–28 (15th ed. 1994). The first type of "related to" proceeding involves a claim like the state-law breach of contract action at issue in *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). The instant case involves the second type of "related to" proceeding.

6    In attempting to strike an appropriate balance, the Third Circuit in *Pacor, Inc. v. Higgins,* 743 F.2d 984 (1984), devised the following test for determining the existence of "related to" jurisdiction:

"The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether *the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy....* Thus, the proceeding need not necessarily be against the debtor or against the debtor's property. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." *Id., at 994* (emphasis in original; citations omitted).

The First, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth, and Eleventh Circuits have adopted the *Pacor* test with little or no variation. See *In re G.S.F. Corp.,* 938 F.2d 1467, 1475 (CA1 1991); *A.H. Robins Co. v. Piccinin,* 788 F.2d 994, 1002, n. 11 (CA4), cert. denied, 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986); *In re Wood,* 825 F.2d 90, 93 (CA5 1987); *Robinson v. Michigan Consol. Gas Co.,* 918 F.2d 579, 583–584 (CA6 1990); *In re Dogpatch U.S.A., Inc.,* 810 F.2d 782, 786 (CA8 1987); *In re Fietz,* 852 F.2d 455, 457 (CA9 1988); *In re Gardner,* 913 F.2d 1515, 1518 (CA10 1990); *In re Lemco Gypsum, Inc.,* 910 F.2d 784, 788, and n. 19 (CA11 1990). The Second and Seventh Circuits, on the other hand, seem to have adopted a slightly different test. See *In re Turner,* 724 F.2d 338, 341 (CA2 1983); *In re Xonics,*

*Inc.,* 813 F.2d 127, 131 (CA7 1987); *Home Ins. Co. v. Cooper & Cooper, Ltd.,* 889 F.2d 746, 749 (CA7 1989). But whatever test is used, these cases make clear that bankruptcy courts have no jurisdiction over proceedings that have no effect on the estate of the debtor.

[9]  [10]  [11]    **\*309** We believe that the issue whether respondents are entitled to immediate execution on the bond against Northbrook is at least a question "related to" Celotex's bankruptcy. [7] Admittedly, a proceeding **\*\*1500** by respondents against Northbrook on the supersedeas bond does not directly involve Celotex, except to satisfy the judgment against it secured by the bond. But to induce Northbrook to serve as surety on the bond, **\*310** Celotex agreed to allow Northbrook to retain the proceeds of a settlement resolving insurance coverage disputes between Northbrook and Celotex. The Bankruptcy Court found that allowing respondents—and 227 other bonded judgment creditors—to execute immediately on the bonds would have a direct and substantial adverse effect on Celotex's ability to undergo a successful reorganization. It stated:

7    The dissent agrees that respondents' proceeding to execute on the supersedeas bond is "related to" Celotex's bankruptcy, *post,* at 1504, n. 5, but noting that "only the district court has the power [under 28 U.S.C. § 157(c)(1) ] to enter 'any final order or judgment' " in related "[n]on-core proceedings," *post,* at 1505, the dissent concludes that the Bankruptcy Court here did not possess sufficient "related to" jurisdiction to issue the Section 105 Injunction, *post,* at 1505. The Section 105 Injunction, however, is only an *interlocutory stay* which respondents have yet to challenge. See *infra,* at 1501. Thus, the Bankruptcy Court did not lack jurisdiction under § 157(c)(1) to issue the Section 105 Injunction because that injunction was not a "final order or judgment."

In any event, respondents have waived any claim that the granting of the Section 105 Injunction was a noncore proceeding under § 157(c)(1). Respondents base their arguments solely on 28 U.S.C. § 1334, and concede in their brief that the "bankruptcy court had subject matter jurisdiction to issue orders affecting the bond, then, only if the proceedings on the bond were 'related' to the Celotex bankruptcy itself within the meaning of § 1334(b)." Brief for Respondents 22. We conclude, and the dissent agrees, that those proceedings are so related. See *post,* at 1503–1504, and n. 5. We thus need not (and do not) reach the question whether the granting of the Section 105 Injunction was a "core" proceeding.

Celotex Corp. v. Edwards, 514 U.S. 300 (1995)

115 S.Ct. 1493, 131 L.Ed.2d 403, 63 USLW 4269, 32 Collier Bankr.Cas.2d 685...

"[I]f the Section 105 stay were lifted to enable the judgment creditors to reach the sureties, the sureties in turn would seek to lift the Section 105 stay to reach Debtor's collateral, with corresponding actions by Debtor to preserve its rights under the settlement agreements. Such a scenario could completely destroy any chance of resolving the prolonged insurance coverage disputes currently being adjudicated in this Court. The settlement of the insurance coverage disputes with all of Debtor's insurers may well be the linchpin of Debtor's formulation of a feasible plan. Absent the confirmation of a feasible plan, Debtor may be liquidated or cease to exist after a carrion feast by the victors in a race to the courthouse." *In re Celotex,* 140 B.R. 912, 915 (1992) (*Celotex II*).

 [12]    In light of these findings by the Bankruptcy Court, it is relevant to note that we are dealing here with a reorganization under Chapter 11, rather than a liquidation under Chapter 7. The jurisdiction of bankruptcy courts may extend more broadly in the former case than in the latter. Cf. *Continental Ill. Nat. Bank & Trust Co. v. Chicago, R.I. & P.R. Co.,* 294 U.S. 648, 676, 55 S.Ct. 595, 606, 79 L.Ed. 1110 (1935). And we think our holding—that respondents' *immediate* execution on the supersedeas bond is at least "related to" the Celotex bankruptcy—is in accord with representative recent decisions of the Courts of Appeals. See, *e.g., American Hardwoods, Inc. v. Deutsche Credit Corp.,* 885 F.2d 621, 623 (CA9 1989) (finding "related to" jurisdiction where enforcement of state-court judgment **\*311** by creditor against debtor's guarantors would affect administration of debtor's reorganization plan); cf. *MacArthur Co. v. Johns–Manville Corp.,* 837 F.2d 89, 93 (CA2) (noting that a bankruptcy court's injunctive powers under § 105(a) allow it to enjoin suits that "might impede the reorganization process"), cert. denied, 488 U.S. 868, 109 S.Ct. 176, 102 L.Ed.2d 145 (1988); *In re A.H. Robins Co.,* 828 F.2d 1023, 1024–1026 (CA4 1987) (affirming Bankruptcy Court's § 105(a) injunction barring products liability plaintiffs from bringing actions against debtor's insurers because such actions would interfere with debtor's reorganization), cert. denied *sub nom.,* 485 U.S. 969, 108 S.Ct. 1246, 99 L.Ed.2d 444 (1988). [8]

---

[8]    We recognize the theoretical possibility of distinguishing between the proceeding to execute on the bond in the Fifth Circuit and the § 105 stay proceeding in the Bankruptcy Court in the Eleventh Circuit. One might argue, technically, that though the proceeding to execute on the bond is "related to" the Title 11 case, the stay proceeding "arises under" Title 11, or "arises in" the Title 11 case. See *In re Monroe Well Serv., Inc.,* 67 B.R. 746,

753 (Bkrtcy.Ct. ED Pa.1986). We need not and do not decide this question here.

 [13]    Respondents, relying on our decision in *Board of Governors, FRS v. MCorp Financial, Inc.,* 502 U.S. 32, 112 S.Ct. 459, 116 L.Ed.2d 358 (1991), contend that § 1334(b)'s statutory grant of jurisdiction must be reconciled and harmonized with Federal Rule of Civil Procedure 65.1, which provides an expedited procedure for executing on supersedeas bonds. In *MCorp,* we held that the grant of jurisdiction in § 1334(b) to district courts sitting in bankruptcy did not authorize an injunction against a regulatory proceeding, but there we relied on "the specific preclusive language" of 12 U.S.C. § 1818(i)(1), which stated that " 'no court shall have jurisdiction to affect by injunction or otherwise the issuance or enforcement of any [Board] notice or order.' " 502 U.S., at 39, 42, 112 S.Ct., at 463, 465. There is no analogous statutory prohibition against enjoining the maintenance of a proceeding under Rule 65.1. That Rule provides:

> "Whenever these rules ... require or permit the giving of security by a party, and **\*\*1501** security is given in the form **\*312** of a bond or stipulation or other undertaking with one or more sureties, each surety submits to the jurisdiction of the court and irrevocably appoints the clerk of the court as the surety's agent upon whom any papers affecting the surety's liability on the bond or undertaking may be served. The surety's liability may be enforced on motion without the necessity of an independent action...."

This Rule outlines a streamlined *procedure* for executing on bonds. It assures judgment creditors like respondents that they do not have to bring a separate action against sureties, and instead allows them to collect on the supersedeas bond by merely filing a motion. Just because the Rule provides a simplified procedure for collecting on a bond, however, does not mean that such a procedure, like the more complicated procedure of a full-fledged lawsuit, cannot be stayed by a lawfully entered injunction.

 [14]    Much of our discussion dealing with the *jurisdiction* of the Bankruptcy Court under the "related to" language of §§ 1334(b) and 157(a) is likewise applicable in determining

whether or not the Bankruptcy Court's Section 105 Injunction has "only a frivolous pretense to validity." *GTE Sylvania,* 445 U.S., at 386, 100 S.Ct., at 1202 (internal quotation marks and citation omitted). The Fourth Circuit has upheld the merits of the Bankruptcy Court's Section 105 Injunction, see *Willis,* 978 F.2d, at 149–150, and even the Fifth Circuit in this case did not find "that the bankruptcy court in Florida was necessarily wrong." See *Edwards II,* 6 F.3d, at 321. But we need not, and do not, address whether the Bankruptcy Court acted properly in issuing the Section 105 Injunction. [9]

[9]    The dissent contends that Celotex's attempts to set aside the supersedeas bond are "patently meritless" because none of Celotex's claims can impair Northbrook's obligation to respondents. See *post,* at 1507. That premise, however, is not so clear as to give the Section 105 Injunction "only a frivolous pretense to validity." There is authority suggesting that, in certain circumstances, transfers from the debtor to another for the benefit of a third party may be recovered from that third party. See *In re Air Conditioning, Inc. of Stuart,* 845 F.2d 293, 296–299 (CA11), cert. denied, 488 U.S. 993, 109 S.Ct. 557, 102 L.Ed.2d 584 (1988); *In re Compton Corp.,* 831 F.2d 586, 595 (1987), modified on other grounds, 835 F.2d 584 (CA5 1988). Although we offer no opinion on the merits of that authority or on whether it fits the facts here, it supports our conclusion that the stay was not frivolous.

[15]    *313  We have made clear that " '[i]t is for the court of first instance to determine the question of the validity of the law, and until its decision is reversed for error by orderly review, either by itself or by a higher court, its orders based on its decision are to be respected.' " *Walker v. Birmingham,* 388 U.S. 307, 314, 87 S.Ct. 1824, 1828, 18 L.Ed.2d 1210 (1967) (quoting *Howat v. Kansas,* 258 U.S. 181, 189–190, 42 S.Ct. 277, 281, 66 L.Ed. 550 (1922)). If respondents believed the Section 105 Injunction was improper, they should have challenged it in the Bankruptcy Court, like other similarly situated bonded judgment creditors have done. See *Celotex II,* 140 B.R., at 912. If dissatisfied with the Bankruptcy Court's ultimate decision, respondents can appeal "to the district court for the judicial district in which the bankruptcy judge is serving," see 28 U.S.C. § 158(a), and then to the Court of Appeals for the Eleventh Circuit, see § 158(d). Respondents chose not to pursue this course of action, but instead to collaterally attack the Bankruptcy Court's Section 105 Injunction in the federal courts in Texas. This they cannot be permitted to do without seriously undercutting the orderly process of the law.

The judgment of the Court of Appeals, accordingly, is reversed.

*It is so ordered.*

Justice STEVENS, with whom Justice GINSBURG joins, dissenting.

Today the majority holds that an Article III court erred when it allowed plaintiffs who prevailed on appeal to collect on a supersedeas bond in the face of an injunction issued by a non-Article III judge. Because, in my view, the majority  *314 attaches insufficient weight to the fact that the challenged injunction was issued by a non-Article III judge, I respectfully dissent.

**1502  I

The outlines of the problems I perceive are best drawn by starting with an examination of the injunctions and opinions issued by the Bankruptcy Judge in this case. As the majority notes, Bennie and Joann Edwards (the Edwards) won a tort judgment against Celotex Corporation for damages Bennie Edwards suffered as a result of exposure to asbestos. To stay the judgment pending appeal, Celotex arranged for Northbrook Property and Casualty Insurance Company (Northbrook) to post a supersedeas bond to cover the full amount of the judgment. On October 12, 1990, before Celotex filed its voluntary petition under Chapter 11 of the Bankruptcy Code, the Court of Appeals for the Fifth Circuit affirmed the Edwards' judgment against Celotex. It is undisputed that, when the Edwards' judgment was affirmed, any property interest that Celotex retained in the supersedeas bond was extinguished.

The filing of Celotex's bankruptcy petition on October 12, 1990, triggered the automatic stay provisions of the Bankruptcy Code. See 11 U.S.C. § 362(a). On October 17, 1990, the Bankruptcy Judge, acting pursuant to 11 U.S.C. § 105(a), [1] supplemented the automatic stay provisions with an emergency order staying, *inter alia,* all proceedings "involving any of the Debtors [*i.e.,* Celotex]." App. to Pet. for Cert. A–28. The supersedeas bond filed in the Edwards' case, however, evidences an independent obligation on the part of  *315 Northbrook. For that reason, neither the automatic stay of proceedings against the debtor pursuant to § 362(a) of the Bankruptcy Code nor the Bankruptcy Judge's October

3159

17, § 105(a) stay restrained the Edwards from proceeding against Northbrook to enforce Northbrook's obligations under the bond. As the Court of Appeals correctly held, the October 17 order enjoined the prosecution of proceedings involving "the Debtors," but did not expressly enjoin the Edwards from proceeding against Northbrook. See *Edwards v. Armstrong World Industries, Inc.,* 6 F.3d 312, 315 (CA5 1993).

1    Title 11 U.S.C. § 105(a) provides:

> "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process."

On May 3, 1991, the Edwards commenced their proceeding against Northbrook by filing a motion pursuant to Rule 65.1 of the Federal Rules of Civil Procedure [2] to enforce the supersedeas bond. Several weeks later—on June 13, 1991—the Bankruptcy Court entered a new three-paragraph order enjoining all of Celotex's judgment creditors from collecting on their supersedeas bonds. Paragraph 1 of the order addressed creditors whose appellate process had not yet concluded. Paragraph 2 addressed creditors whose appellate process concluded only after Celotex had filed for bankruptcy. Paragraph 3 applied to judgment creditors, such as the Edwards, whose appeals had concluded before the filing of the bankruptcy petition. Paragraph 3 expressly precluded those creditors from proceeding against any bond "without first seeking to vacate the Section 105 stay entered by this Court." *In re Celotex Corp.,* 128 B.R. 478, 485 (Bkrtcy.Ct. MD Fla.1991).

2    Rule 65.1 states:

> "Whenever these rules ... require or permit the giving of security by a party, and security is given in the form of a bond or stipulation or other undertaking with one or more sureties, each surety submits to the jurisdiction of the court and irrevocably appoints the clerk of the court as the surety's agent upon whom any papers affecting the surety's liability on the bond or undertaking may be served. The surety's liability may be enforced on motion without the necessity of an independent action."

**\*316** The opinion supporting that order explained that Paragraphs 1 and 2 rested in part on the theory that the debtor retains a property interest in the supersedeas bonds until the appellate process was complete, and any attempt to collect on those bonds was therefore covered in the first instance by § 362(a)'s automatic stay provisions. The opinion recognized that that rationale did not cover supersedeas bonds posted in litigation with judgment creditors, such as the Edwards, whose appellate process was complete. The Bankruptcy Judge concluded, however, that § 105(a) gave him the power to **\*\*1503** stay the collection efforts of such bonded judgment creditors. The Bankruptcy Judge contended that other courts had utilized the § 105(a) stay "to preclude actions which may 'impede the reorganization process,' " *id.,* at 483, quoting *In re Johns–Manville Corp.,* 837 F.2d 89, 93 (CA2), cert. denied, 488 U.S. 868, 109 S.Ct. 176, 102 L.Ed.2d 145 (1988), or " 'which will have an adverse impact on the Debtor's ability to formulate a Chapter 11 plan,' " 128 B.R., at 483, quoting *A.H. Robins Co. v. Piccinin,* 788 F.2d 994 (CA4), cert. denied, 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986). But cf. n. 12, *infra.* Apparently viewing his own authority as virtually limitless, the Bankruptcy Judge described a general bankruptcy power "to stop ongoing litigation and to prevent peripheral court decisions from dealing with issues ... without first allowing the bankruptcy court to have an opportunity to review the potential effect on the debtor." 128 B.R., at 484. He concluded that in "mega" cases in which "potential conflicts with other judicial determinations" might arise, "the powers of the bankruptcy court under Section 105 must in the initial stage be absolute." *Ibid.*

I do not agree that the powers of a bankruptcy judge, a non-Article III judge, "must ... be absolute" at the initial stage or indeed at any stage. Instead, the jurisdiction and the power of bankruptcy judges are cabined by specific and important

**Celotex Corp. v. Edwards, 514 U.S. 300 (1995)**
115 S.Ct. 1493, 131 L.Ed.2d 403, 63 USLW 4269, 32 Collier Bankr.Cas.2d 685...

statutory and constitutional constraints that operate at every phase of a bankruptcy. In my view, those constraints **\*317** require that the judgment of the Court of Appeals be affirmed.

The majority concludes that the Court of Appeals must be reversed because the Bankruptcy Judge had jurisdiction to issue the injunction and because the injunction had more than a " 'frivolous pretense to validity.' " *Ante,* at 1501. Even applying the majority's framework, I would affirm the Court of Appeals. As I will demonstrate, the constraints on the jurisdiction and authority of the Bankruptcy Judge compel the conclusion that the Bankruptcy Judge lacked jurisdiction to issue the challenged injunction, and that the injunction has only a " 'frivolous pretense to validity.' " I will also explain, however, why the majority's deferential approach seems particularly inappropriate as applied to this particular injunction, now in its fifth year of preventing enforcement of supersedeas bonds lodged in an Article III court.

II

In my view, the Bankruptcy Judge lacked jurisdiction to issue an injunction that prevents an Article III court from allowing a judgment creditor to collect on a supersedeas bond posted in that court by a nondebtor. In reaching the contrary conclusion, the majority relies primarily on the Bankruptcy Judge's "related to" jurisdiction, and thus I will address that basis of jurisdiction first. The majority properly observes that, under 28 U.S.C. § 1334(b), the district court has broad bankruptcy jurisdiction, extending to "all civil proceedings arising under title 11, or arising in or related to cases under title 11." [3] The majority also notes correctly **\*318  \*\*1504** that the Edwards' action to enforce the supersedeas bond is within the district court's "related to" jurisdiction, [4] because allowing creditors such as the Edwards "to execute immediately on the bonds would have a direct and substantial adverse effect on Celotex's ability to undergo a successful reorganization." *Ante,* at 1500. [5] The majority then observes **\*319** that, under 28 U.S.C. § 157(a), the district court may "refe[r]" to the bankruptcy judge "any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11." [6] Thus, the majority concludes that, because the Edwards' action to enforce the **\*320** supersedeas bond was within the District Court's "related to" jurisdiction and because the District Court referred all matters to the Bankruptcy Judge, the Bankruptcy Judge had jurisdiction over the Edwards' action.

3    The full text of § 1334 reads as follows:
"(a) Except as provided in subsection (b) of this section, the district courts shall have original and exclusive jurisdiction of all cases under title 11.
"(b) Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.
"(c)(1) Nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.
"(2) Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction. Any decision to abstain or not to abstain made under this subsection is not reviewable by appeal or otherwise by the court of appeals under section 158(d), 1291, or 1292 of this title or by the Supreme Court of the United States under section 1254 of this title. This subsection shall not be construed to limit the applicability of the stay provided for by section 362 of title 11, United States Code, as such section applies to an action affecting the property of the estate in bankruptcy.
"(d) The district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction of all of the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate." 28 U.S.C. § 1334 (1988 ed. and Supp. V).

4    As § 1334(b) indicates, the district court's "related to" jurisdiction is "original but not exclusive."

5    I do not take issue with the conclusion that the Edwards' attempt to collect on the supersedeas bond falls within the "related to" jurisdiction of the district court. Cf. 1 Collier on Bankruptcy ¶ 3.01 [1] [c][iv], p. 3–29 (15th ed. 1994) (hereinafter Collier) (" 'Related' proceedings which involve litigation between third parties, which could have some effect on the administration of the bankruptcy case, are illustrated by suits by creditors against guarantors"). Despite the Edwards' argument to

3161

**Celotex Corp. v. Edwards, 514 U.S. 300 (1995)**
115 S.Ct. 1493, 131 L.Ed.2d 403, 63 USLW 4269, 32 Collier Bankr.Cas.2d 685...

26-11268-mg    Doc 23-3    Filed 06/24/26    Entered 06/24/26 13:13:49    Exhibit C    Pg
499 of 882

the contrary, it seems to me quite clear that allowing the Edwards to recover from Northbrook on the supersedeas bond would have an adverse impact on Celotex because Northbrook would then be able to retain the insurance proceeds that Celotex pledged as collateral when the bond was issued. Indeed, I am willing to assume that if all of the bonds were enforced, the reorganization efforts would fail and Celotex would have to be liquidated. In my judgment, however, the specter of liquidation is not an acceptable basis for concluding that a bankruptcy judge, and not just the district court, has jurisdiction to interfere with the performance of a third party's fixed obligation to a judgment creditor.

I also agree with the majority, *ante,* at 1499, n. 6, that the facts of this case do not require us to resolve whether *Pacor v. Higgins,* 743 F.2d 984 (CA3 1984), articulates the proper test for determining the scope of the district court's "related to" jurisdiction.

6    The text of § 157 reads in relevant part as follows:

"(a) Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district.

"(b)(1) Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title.

\* \* \* \* \* \*

"(c)(1) A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.

"(2) Notwithstanding the provisions of paragraph (1) of this subsection, the district court, with the consent of all the parties to the proceeding, may refer a proceeding related to a case under title 11 to a bankruptcy judge to hear and determine and to enter appropriate orders and judgments, subject to review under section 158 of this title."

In my view, the majority's approach pays insufficient attention to the remaining provisions of § 157, and, more importantly, to the decision of this Court that gave rise to their creation. The current jurisdictional structure of the Bankruptcy Code reflects this Court's decision in *Northern Pipeline Constr.*

*Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), which in turn addressed the Bankruptcy Reform Act of 1978, 92 Stat. 2549. The 1978 Act significantly restructured the Bankruptcy Code. The Act created "bankruptcy courts" and vested in them "jurisdiction over all 'civil proceedings arising under title 11 [the Bankruptcy title] or arising in or related to cases under title 11.' " *Northern Pipeline,* 458 U.S., at 54, 102 S.Ct., at 2862, quoting 28 U.S.C. § 1471(b) (1976 ed., Supp. **\*\*1505** IV). As the plurality opinion in *Northern Pipeline* observed, "[t]his jurisdictional grant empowers bankruptcy courts to entertain a wide variety of cases," involving "claims based on state law as well as those based on federal law." 458 U.S., at 54, 102 S.Ct., at 2863. The Act also bestowed upon the judges of the bankruptcy courts broad powers to accompany this expanded jurisdiction. See n. 6, *supra; Northern Pipeline,* 458 U.S., at 55, 102 S.Ct., at 2863. The Act did not, however, make the newly empowered bankruptcy judges Article III judges. In particular, it denied bankruptcy judges the life tenure and salary protection that the Constitution requires for Article III judges. See U.S. Const., Art. III, § 1.

In *Northern Pipeline,* this Court held that the Act was unconstitutional, at least insofar as it allowed a non-Article III court to "entertain and decide" a purely state-law claim. 458 U.S., at 91, 102 S.Ct., at 2882 (REHNQUIST, J., concurring in judgment); see also *id.,* at 86, 102 S.Ct., at 2879 (plurality opinion). The plurality opinion distinguished the revamped bankruptcy courts from prior **\*321** district court "adjuncts" which the Court had found did not violate Article III. The plurality noted that, in contrast to the narrow, specialized jurisdiction exercised by these prior adjuncts, "the subject-matter jurisdiction of the bankruptcy courts encompasses not only traditional matters of bankruptcy, but also 'all civil proceedings arising under title 11 or arising in or related to cases under title 11.' " *Id.,* at 85, 102 S.Ct., at 2877. In addition, prior adjuncts "engaged in statutorily channeled factfinding functions," while the bankruptcy courts "exercise 'all of the jurisdiction' conferred by the Act on the district courts." [7] *Ibid.*

7    The plurality also noted that, in contrast to the limited powers possessed by prior adjuncts, "the bankruptcy courts exercise all ordinary powers of district courts." 458 U.S., at 85, 102 S.Ct., at 2879. See n. 6, *supra.*

In response to *Northern Pipeline,* Congress passed the Bankruptcy Amendments and Federal Judgeship Act of 1984 (1984 amendments), 98 Stat. 333. Section 157 was passed as part of the 1984 amendments. Section 157 establishes

3162

two broad categories of proceedings: "core proceedings" and "[n]on-core proceedings." For "all core proceedings arising under title 11, or arising in a case under title 11, referred under [§ 157(a) ]," § 157(b)(1) permits bankruptcy judges to "hear and determine" the proceedings and to "enter appropriate orders and judgments." For noncore proceedings "otherwise related to a case under title 11," § 157(c)(1) permits the bankruptcy court only to "hear" the proceedings and to "submit proposed findings of fact and conclusions of law to the district court." See 1 Collier ¶ 3.01[1][c][iv], at 3–28 ("[C]ivil proceedings 'related to cases under title 11' " are "excluded from being treated as 'core proceedings' by 28 U.S.C. § 157(b)(1), and are the subject of special procedures contained in sections 157(c)(1) and (c)(2)"). For these "related proceedings," 1 Collier ¶ 3.01[1][c][iv], at 3–28, only the **\*322** district court has the power to enter "any final order or judgment." [8]

[8] The district court may enter judgment only after *de novo* review of the Bankruptcy Judge's recommendation with respect to any matters to which one of the parties has raised a timely objection. See 28 U.S.C. § 157(c)(1).

In my view, the distinction between the jurisdiction to "hear and determine" core proceedings on the one hand and the jurisdiction only to "hear" related proceedings on the other hand is critical, if not dispositive. I believe that the jurisdiction to hear (and yet not to determine) a case under § 157(c)(1) provides insufficient jurisdiction to a bankruptcy judge to permit him to issue a binding injunction that prevents an Article III court from exercising its conceded jurisdiction over the case. [9] The unambiguous text of **\*\*1506** § 157(c)(1) **\*323** requires that the bankruptcy judge's participation in related proceedings be merely advisory rather than adjudicative. In my view, having jurisdiction to grant injunctions over cases that one may not decide is inconsistent with such an advisory role. An injunction is an extraordinary remedy whose impact on private rights may be just as onerous as a final determination. The constitutional concerns that animate the current jurisdictional provisions of the Bankruptcy Code and that deny non-Article III tribunals the power to determine private controversies apply with equal force to the entry of an injunction interfering with the exercise of the admitted jurisdiction of an Article III tribunal. [10]

[9] It should be noted that the Bankruptcy Judge's order cannot be upheld on the ground that it purported to enjoin only the Edwards and thus did not enjoin directly the Article III court. First, the Bankruptcy Judge's orders

cannot be interpreted so narrowly. The October 17 order enjoined, *inter alia,* "all Entities" from "commencing or continuing any judicial, administrative or other proceeding involving any of the Debtors." App. to Pet. for Cert. A–28. In my view, the word "entities" includes courts. Indeed, the Bankruptcy Judge's order tracks § 362(a)'s automatic stay provisions, which provide, in part, that the automatic stay is applicable "to all entities" and which enjoin "the commencement or continuation ... of a judicial, administrative, or other action or proceeding against the debtor." 11 U.S.C. § 362(a)(1). The Courts of Appeals have uniformly held that "entities," as used in § 362, include courts. See, *e.g., Maritime Electric Co. v. United Jersey Bank,* 959 F.2d 1194, 1206 (CA3 1991) ("§ 362's stay is mandatory and 'applicable to all entities', including state and federal courts"); *Pope v. Manville Forest Products Corp.,* 778 F.2d 238, 239 (CA5 1985) ("just the entry of an order of dismissal, even if entered sua sponte, constitutes a judicial act toward the disposition of the case and hence may be construed as a 'continuation' of a judicial proceeding"); *Ellis v. Consolidated Diesel Electric Corp.,* 894 F.2d 371, 372–373 (CA10 1990) (District Court's entry of summary judgment violated § 362(a)'s automatic stay); see also *Maritime Electric Co.,* 959 F.2d, at 1206 (collecting cases). Cf. 2 Collier ¶ 101.15, at 101–62 to 101–63 (" 'Entity' is the broadest of all definitions which relate to bodies or units").

More importantly, though the Bankruptcy Judge's June 13 order enjoins " 'the judgment creditor,' " *In re Celotex Corp.,* 128 B.R. 478, 485 (Bkrtcy.Ct. MD Fla.1991), the order clearly has the same practical effect as if it enjoined the court directly. My objection to the majority's approach does not at all depend on whether the order that prevents the Article III court from exercising its jurisdiction does so directly or indirectly. Instead, my view is simply that a bankruptcy judge who lacks jurisdiction to decide an issue may not prevent an Article III court that is ready and willing to exercise its conceded jurisdiction from doing so.

[10] In addition, 28 U.S.C. § 1334(c)(2) provides for mandatory abstention in cases involving state-law claims for which the sole basis of bankruptcy jurisdiction is "related to" jurisdiction. That provision thus makes clear that no order could have been entered over the Edwards' objection if their tort action had been tried in a state rather than a federal court. The Bankruptcy Judge's order, which does not distinguish proceedings to enforce supersedeas bonds that were posted in state-court proceedings, fails to address the implications of this mandatory abstention provision.

3163

26-11268-mg    Doc 23-3    Filed 06/24/26    Entered 06/24/26 13:13:49    Exhibit C    Pg
501 of 882

Celotex Corp. v. Edwards, 514 U.S. 300 (1995)
115 S.Ct. 1493, 131 L.Ed.2d 403, 63 USLW 4269, 32 Collier Bankr.Cas.2d 685...

I also believe that Congress would have expected bankruptcy judges to show the same deference to federal courts adjudicating state-law claims under diversity jurisdiction, at least when the bankruptcy judge purports to act on the basis of his "related to" jurisdiction and when the federal action can be "timely adjudicated." *Ibid.*

In sum, my view on the sufficiency of "related to" jurisdiction to sustain the injunction in this case can be stated quite simply: If a bankruptcy judge lacks jurisdiction to "determine" a question, the judge also lacks jurisdiction to issue an injunction that prevents an Article III court, which concededly does have jurisdiction, from determining that question. **\*324** [11] Any conclusion to the contrary would trivialize the constitutional imperatives that shaped the Bankruptcy Code's jurisdictional provisions. [12]

[11]    I agree with the majority that the Bankruptcy Judge's order is a temporary injunction, and thus it is not a "final order or judgment." *Ante,* at 1499, n. 7. The temporary nature of the injunction, however, is irrelevant. As I have stated repeatedly in the text, I believe that a statutory scheme that deprives a bankruptcy judge of jurisdiction to "determine" a case also deprives that judge of jurisdiction to issue binding injunctions—even temporary ones—that would prevent an Article III court with jurisdiction over the case from determining it.

[12]    The cases on which the Bankruptcy Judge relied are entirely consistent with my approach, and they provide at most indirect support for his order. In *A.H. Robins Co. v. Piccinin,* 788 F.2d 994, 997 (CA4), cert. denied, 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986), the challenged injunction was issued by an Article III court ("[T]he district court granted Robins' request for a preliminary injunction"); and in *In re Johns–Manville Corp.,* 837 F.2d 89, 91–92 (CA2), cert. denied, 488 U.S. 868, 109 S.Ct. 176, 102 L.Ed.2d 145 (1988), the Court of Appeals found that the Bankruptcy Judge had jurisdiction to enter the injunction in a core proceeding because the insurance policies that were the subject of the injunction were property of the bankruptcy estate. Thus, those cases do not support the present injunction, which was issued by a non-Article III judge and which affects supersedeas bonds that are concededly not property of the debtor's estate.
    I also note that in *Willis v. Celotex Corp.,* 978 F.2d 146 (1992), cert. denied, 507 U.S. 1030, 113 S.Ct. 1846, 123 L.Ed.2d 470 (1993), though upholding the very injunction at issue in this case, the Fourth Circuit engaged in no detailed jurisdictional analysis and entirely

omitted any discussion of the significance of the Bankruptcy Judge's non-Article III status.

**\*\*1507** III

Petitioner and the majority rely primarily on "related to" jurisdiction. Indeed, the Court's holding appears to rest almost entirely on the view that a bankruptcy judge has jurisdiction to enjoin proceedings in Article III courts whenever those proceedings are "related to" a pending Title 11 case. See *ante,* at 1498–1500. Two footnotes in the Court's opinion, however, might be read as suggesting alternative bases of **\*325** jurisdiction. See *ante,* at 1497, n. 4, 1500, n. 8. Those two footnotes require a brief response.

In footnote 4 of its opinion, the Court refers to two different claims advanced by Celotex in the bankruptcy proceedings: a claim that "the bonded judgment creditors should not be able to execute on their bonds because, by virtue of the collateralization of the bonds, the bonded judgment creditors are beneficiaries of Celotex asset transfers that are voidable as preferences and fraudulent transfers"; and a claim that "the punitive damages portions of the judgments can be voided or subordinated." There is little doubt that those claims are properly characterized as ones "arising under" Title 11 within the meaning of 28 U.S.C. § 1334(b); [13] however, it does not necessarily follow from that characterization that the Bankruptcy Judge had jurisdiction to issue the injunction in support of the prosecution of those claims. Celotex's complaint was not filed until months after the Bankruptcy Judge's injunction issued. The claims raised in that complaint cannot retroactively provide a jurisdictional basis for the Bankruptcy Judge's injunction.

[13]    "[W]hen a cause of action is one which is created by title 11, then that civil proceeding is one 'arising under title 11.' " 1 Collier ¶ 3.01[1][c][iii], at 3–26. A perusal of the complaint reveals that Celotex seeks relief under causes of action created by the Bankruptcy Code. See, *e.g.,* Count I (11 U.S.C. § 547(b) (seeking to avoid preferential transfers)); Count III (11 U.S.C. § 548(a)(2)(A) (seeking to avoid constructively fraudulent transfers)); Count IV (11 U.S.C. § 544 (seeking to avoid transactions that would constitute constructively fraudulent transfers under state law)); Count VII (11 U.S.C. § 502 (seeking to disallow punitive damages awards)); Count VII (11 U.S.C. § 510(c)(1) (seeking equitable subordination of pending punitive damages awards to the claims of unsecured creditors)). Cf.,

26-11268-mg    Doc 23-3    Filed 06/24/26    Entered 06/24/26 13:13:49    Exhibit C    Pg
502 of 882

Celotex Corp. v. Edwards, 514 U.S. 300 (1995)

115 S.Ct. 1493, 131 L.Ed.2d 403, 63 USLW 4269, 32 Collier Bankr.Cas.2d 685...

*e.g.,* 1 Collier ¶ 3.01 [1][c][iii], at 3–27 ("[C]ourts interpreting this language have held that 'arising under title 11' includes causes of action to recover fraudulent conveyances"). My acknowledgment of these claims, of course, is not intended as a suggestion that they have merit.

Moreover, Celotex's attempts to set aside the Edwards' supersedeas bond are patently meritless. It strains credulity, **\*326** to suggest that a supersedeas bond, posted almost a year and a half before the bankruptcy petition was filed, could be set aside as a preference or as a fraudulent transfer for the benefit of Celotex's adversaries in bitterly contested litigation. Conceivably, Celotex's provision of security to Northbrook might be voidable, but that possibility could not impair the rights of the judgment creditors to enforce the bond against Northbrook even though they might be unwitting beneficiaries of the fraud. That possibility, at most, would be relevant to the respective claims of Northbrook and Celotex to the pledged collateral. Similarly, the fact that the Edwards' judgment included punitive as well as compensatory damages does not provide even an arguable basis for reducing Northbrook's obligations under the supersedeas bond. Even if there is a basis for subordinating a portion of Northbrook's eventual claim against Celotex on "bankruptcy law grounds," that has nothing to do with the Edwards' claim against Northbrook. It thus seems obvious that, at least with respect to the Edwards, Celotex has raised frivolous claims in an attempt to manufacture bankruptcy jurisdiction and thereby to justify a bankruptcy judge's injunction that had been issued over one year earlier. Cf. *Siler v. Louisville & Nashville R. Co.,* 213 U.S. 175, 191–192, 29 S.Ct. 451, 455, 53 L.Ed. 753 (1909) ("Of course, the Federal question must not be merely colorable or fraudulently set up for the mere purpose of endeavoring to give the court jurisdiction").

**\*\*1508** In its footnote 8, the Court appears to suggest that the injunction prohibiting the Edwards from proceeding against Northbrook (described in the footnote as the "stay proceeding") may "aris[e] under" Title 11 or may "arise in" the Title 11 case. Perhaps this is accurate in a literal sense: The injunction did, of course, "arise under" Title 11 because 11 U.S.C. § 105(a) created whatever power the bankruptcy judge had to issue the injunction. Similarly, the injunction "arises in" the Title 11 case because that is where it originated. It cannot be the law, however, that a bankruptcy **\*327** judge has jurisdiction to enter any conceivable order that a party might request simply because § 105(a) authorizes some injunctions or because the request was first made in a pending Title 11 case. Cf. 2 Collier ¶ 105.01[1], at 105–3 (Section

105 "is not an independent source of jurisdiction, but rather it grants the courts flexibility to issue orders which preserve and protect their jurisdiction"). The mere filing of a motion for a § 105 injunction to enjoin a proceeding in another forum cannot be a jurisdictional bootstrap enabling a bankruptcy judge to exercise jurisdiction that would not otherwise exist.

IV

Even if I believed that the Bankruptcy Judge had jurisdiction to issue his injunction, I would still affirm the Court of Appeals because in my view the Bankruptcy Judge's injunction has only a "frivolous pretense to validity."

In 1898, Congress codified the bankruptcy laws. Under the 1898 Bankruptcy Act, most bankruptcy proceedings were conducted by "referees" who resolved controversies involving property in the actual or constructive possession of the court, as well as certain disputes involving property in the possession of third parties. In § 2(a)(15) of the 1898 Act, Congress vested in bankruptcy courts the power to:

> "[M]ake such orders, issue such process, and enter such judgments in addition to those specifically provided for as may be necessary for the enforcement of the provisions of this Act." Act of July 1, 1898, 30 Stat. 546.

In 1938, Congress clarified both the powers and the limitations on the injunctive authority of referees in bankruptcy by adding to the end of § 2(a)(15), "*Provided, however,* That an injunction to restrain a court may be issued by the judge only." 52 Stat. 843 (emphasis in original).

In 1978, through the Bankruptcy Reform Act, Congress significantly revised the Bankruptcy Code and the role of **\*328** bankruptcy referees.[14] Though stopping short of making bankruptcy referees Article III judges, Congress significantly increased the status, the duties, and the powers of those referees. For example, as we noted in *Northern Pipeline,* the expanded powers under the new Act included "the power to hold jury trials, ... to issue declaratory judgments, [and] to issue writs of habeas corpus under certain circumstances." 458 U.S., at 55, 102 S.Ct., at 2863. In addition, Congress again provided for broad injunctive powers. Thus, for example, in the place of § 2(a)(15), Congress added 11 U.S.C. § 105, which provided in relevant part: "The [bankruptcy court] may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." See also

26-11268-mg    Doc 23-3    Filed 06/24/26    Entered 06/24/26 13:13:49    Exhibit C    Pg
503 of 882

Celotex Corp. v. Edwards, 514 U.S. 300 (1995)
115 S.Ct. 1493, 131 L.Ed.2d 403, 63 USLW 4269, 32 Collier Bankr.Cas.2d 685...

458 U.S., at 55, 102 S.Ct., at 2863 ("Congress has allowed bankruptcy judges the power ... to issue all writs necessary in aid of the bankruptcy court's expanded jurisdiction"). Once again, however, along with both this marked expansion of the power of bankruptcy judges and the broad delegation of injunctive authority, Congress indicated its intent to limit the power of those judges to enjoin other courts: Although Congress provided that "[a] bankruptcy court shall have the powers of a court of equity, law, and admiralty," it also provided that bankruptcy courts "may not enjoin **1509 another court." 28 U.S.C. § 1481 (1982 ed.). [15] Thus, for well over 50 years prior to the adoption of the 1984 amendments to the Bankruptcy Code, it was clear that Congress intended to deny bankruptcy judges the power to enjoin other courts.

[14]    In 1973, bankruptcy "referees" were redesignated as "judges." See *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 53, n. 2, 102 S.Ct. 2858, 2862, n. 2, 73 L.Ed.2d 598 (1982). As did the plurality opinion in *Northern Pipeline*, see *ibid.,* I will continue to refer to all judges under the pre–1978 Act as "referees."

[15]    Congress also limited the power of bankruptcy courts to "punish a criminal contempt not committed in the presence of the judge of the court or warranting a punishment of imprisonment." 28 U.S.C. § 1481 (1982 ed.).

 *329  The 1984 amendments, *inter alia,* repealed § 1481 (and its express limitation on injunctive authority), leaving § 105 as the only source of the bankruptcy judge's injunctive authority. [16] Given that *Northern Pipeline* required a contraction in the authority of bankruptcy judges, [17] and given that the 1984 amendments regarding the powers of the bankruptcy courts were passed to comply with *Northern Pipeline,* [18] it would be perverse—and in my view "frivolous"—to contend that Congress intended the repeal of § 1481 to operate as an authorization for those judges to enjoin proceedings in other courts, thus significantly expanding the powers of bankruptcy judges.

[16]    The 1984 amendments also repealed the authorization of bankruptcy judges to act pursuant to the All Writs Act. See 2 Collier ¶ 105.01[1], at 105–3.

[17]    The plurality opinion expressly noted its concerns about the bankruptcy judge's exercise of broad injunctive powers. See n. 7, *supra.*

[18]    See, *e.g.,* 130 Cong.Rec. 20089 (1984) ("*[Northern Pipeline]* held that the broad powers granted to

bankruptcy judges under the Bankruptcy Act of 1978 were judicial powers and violated Article III of the Constitution. The present Bill attempts to cure the problem").

My view of the consequence of the 1984 amendments is reinforced by the structure of § 1481. When Congress placed restrictions on the injunctive power of the bankruptcy courts, it did so in § 1481, right after the clause granting those courts "the powers of a court of equity, law, and admiralty." In my view, this suggests that Congress saw § 1481— and not § 105(a)—as the source of any power to enjoin other courts. Thus, the removal of § 1481 by the 1984 amendments is properly viewed as eliminating the sole source of congressionally granted authority to enjoin other courts. Cf. *In re Hipp,* 895 F.2d 1503, 1515–1516 (CA5 1990) (concluding on similar reasoning that § 1481, not § 105(a), was the source of the bankruptcy court's power to punish criminal contempt under the 1978 Act).

 *330  Nor does anything in the 1986 amendments to the Bankruptcy Code alter my analysis. [19] The primary effect of those amendments was to give the bankruptcy judges the power to issue orders *sua sponte.* [20] The 1986 amendments, therefore, do not reflect any expansion of the power of bankruptcy judges to enjoin other courts.

[19]    See Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986, Pub L. 99–554, 100 Stat. 3088. With respect to 11 U.S.C. § 105, the 1986 amendments added the second sentence of the current version of § 105(a). See 100 Stat. 3097.

[20]    The only relevant legislative history regarding the changes to § 105(a) is contained in Senator Hatch's view that the amendment "allows a bankruptcy court to take any action on its own, or to make any necessary determination to prevent an abuse of process and to help expedite a case in a proper and justified manner." 132 Cong.Rec. 28610 (1986).

The Bankruptcy Judge's error with respect to this injunction thus seems clear, and the injunction falls, therefore, within the exception recognized by the majority for injunctions with only a "frivolous pretense to validity." I recognize, of course, that one may legitimately question the "frivolousness" of the injunction in light of the Fourth Circuit's upholding the very injunction at issue in this case, see *Willis v. Celotex Corp.,* 978 F.2d 146 (1992), cert. denied, 507 U.S. 1030, 113 S.Ct. 1846, 123 L.Ed.2d 470 (1993), and the disagreement of a substantial number of my colleagues. In my view, however,

3166

26-11268-mg    Doc 23-3    Filed 06/24/26    Entered 06/24/26 13:13:49    Exhibit C    Pg
504 of 882

**Celotex Corp. V. Edwards, 514 U.S. 300 (1995)**
115 S.Ct. 1493, 131 L.Ed.2d 403, 63 USLW 4269, 32 Collier Bankr.Cas.2d 685...

the Bankruptcy Judge's error is sufficiently plain that the Court of Appeals was justified in allowing the Edwards to collect on their bond. [21]

21    Neither of the cases cited by the majority, *ante,* at 1501, n. 9, provides any reason to conclude otherwise. As the majority notes, those cases hold that the bankruptcy trustee may recover from a third party (*e.g.,* the Edwards) funds transferred from the debtor (*e.g.,* Celotex) to another (*e.g.,* Northbrook) for the benefit of that third party. Both cases, however, make clear that the obligation of the Northbrook-like guarantor (a bank in each case) to pay the third party was not at issue. See *In re Compton Corp.,* 831 F.2d 586, 590 (1987) ("[T]he trustee is not attempting to set aside the post petition payments by [the bank] to [the third party] under the letter of credit as a preference"), modified on other grounds, 835 F.2d 584 (CA5 1988); *In re Air Conditioning, Inc. of Stuart,* 845 F.2d 293, 295–296 (CA11), cert. denied *sub nom. First Interstate Credit Alliance v. American Bank of Martin County,* 488 U.S. 993, 109 S.Ct. 557, 102 L.Ed.2d 584 (1988). Thus, in my view, those cases cannot form the basis for any nonfrivolous argument that Northbrook may avoid its obligation to pay the Edwards.

**\*\*1510  \*331** V

The Court's holding today rests largely on its view that the Edwards' proper remedy is to appeal the Bankruptcy Judge's injunction, first to the District Court and then to the Court of Appeals for the Eleventh Circuit. The Court concedes, however, that the Edwards need not do so if the Bankruptcy Judge exceeded his jurisdiction, or if the injunction is supported by nothing more than "a frivolous pretense to validity." *Ante,* at 1501. For the reasons already stated, I think both of those conditions are satisfied in this case. The non-Article III Bankruptcy Judge simply lacked both jurisdiction and authority to prevent an Article III court from exercising its unquestioned jurisdiction to decide a matter that is related only indirectly to the bankruptcy proceeding. I think it important, however, to add a few brief words explaining why I find this injunction especially troubling and why the injunction should be viewed with a particularly critical eye.

First, the justification offered by the Bankruptcy Judge should give the Court pause. As originally articulated, the justification for this injunction was that emergency relief was required lest the reorganization of Celotex become impossible and liquidation follow. Apart from the fact that

the "emergency" rationale is plainly insufficient to support an otherwise improper injunction that has now lasted for more than four years, the judge's reasoning reveals reliance on the misguided notion that a good end is a sufficient justification for the existence and exercise of power. His reference to the need to exercise "absolute" power to override "potential conflicts with other judicial determinations" that might have a "potential impact on the debtor" should invite far **\*332** more exacting scrutiny of his order than the Court deems appropriate.

Second, that the subject of the injunction was a supersedeas bond makes the injunction suspect. A supersedeas bond may be viewed as putting the integrity of the court in which it is lodged on the line. As the Court of Appeals noted, the Edwards were "promised by the court" that the supersedeas bond would be available if they prevailed on appeal. 6 F.3d, at 320. For that reason, in my opinion, questions relating to the enforceability of a supersedeas bond should generally be answered in the forum in which the bond is posted.

Moreover, whenever possible, such questions should be resolved before the court accepts the bond as security for collection of the judgment being appealed. After a debtor has benefited from the postponement of collection of an adverse judgment, both that debtor and its successors in interest should normally be estopped from asserting that the judgment creditors who relied to their detriment on the validity of the bond had no right to do so. The very purpose of a supersedeas bond is to protect judgment creditors from the risk that insolvency of the debtor may impair their ability to enforce the judgment promptly. When the bond has served the purpose of forestalling immediate levies on the judgment debtor's assets—levies that might have precipitated an earlier bankruptcy—it is inequitable to postpone payment merely because the risk against which the bond was intended to provide protection has actually occurred. See *id.,* at 319 ("It is manifestly unfair to force the judgment creditor to delay the right to collect with a promise to protect the judgment only to later refuse to allow that successful plaintiff to execute the bond because the debtor has sought protection under the laws of bankruptcy"); *In re Southmark,* 138 B.R. 820, 827–828 (Bkrtcy.Ct. ND Tex.1992) (internal quotation marks omitted) ("The principal risk against which such bonds are intended as a **\*\*1511** protection is insolvency. To hold **\*333** that the very contingency against which they guard shall, if it happens, discharge them, seems to us bad law and worse logic"). The inequity that the Court today condones does not, of course, demonstrate that its legal analysis is incorrect. It

3167

**Celotex Corp. v. Edwards, 514 U.S. 300 (1995)**

115 S.Ct. 1493, 131 L.Ed.2d 403, 63 USLW 4269, 32 Collier Bankr.Cas.2d 685...

does, however, persuade me that the Court should not review this case as though it presented an ordinary collateral attack on an injunction entered by an Article III court.[22] Instead, the Court should, I believe, more carefully consider which of the two competing tribunals is guilty of trespassing in the other's domain.

[22]    Indeed, one wonders if the same analysis would apply to a bankruptcy judge's injunction that purported to prevent this Court from allowing a successful litigant to enforce

a supersedeas bond posted by a nondebtor in this Court pursuant to our Rule 23.4.

Accordingly, I respectfully dissent.

### All Citations

514 U.S. 300, 115 S.Ct. 1493, 131 L.Ed.2d 403, 63 USLW 4269, 32 Collier Bankr.Cas.2d 685, 31 Fed.R.Serv.3d 355, 27 Bankr.Ct.Dec. 93, Bankr. L. Rep. P 76,456

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 30

Westlaw.

482 B.R. 96, 57 Bankr.Ct.Dec. 72
**(Cite as: 482 B.R. 96)**

H

United States Bankruptcy Court,
S.D. New York.
In re COZUMEL CARIBE, S.A. de C.V., Debtor in
a Foreign Proceeding.
CT Investment Management Co., LLC., Plaintiff,
v.
Cozumel Caribe, S.A. de C.V., Defendant.

Bankruptcy No. 10–13913 (MG).
Adversary No. 11–02936 (MG).
Nov. 14, 2012.

**Background:** Foreign representatives of debtor that was the subject of insolvency proceedings in Mexico moved for post-recognition relief in nature of stay of creditor action.

**Holdings:** The Bankruptcy Court, Martin Glenn, J., held that:

(1) creditor's rights in funds of non-debtor affiliates would be sufficiently protected if relief were granted;

(2) grant of relief requested by foreign representatives was not manifestly contrary to public policy of the United States; and

(3) bankruptcy court would conditionally grant foreign representatives' request for post-recognition relief in nature of temporary stay of cause of action brought by creditor to exercise its rights against funds of non-debtor affiliates allegedly present in same account with funds of foreign debtor.

So ordered.

West Headnotes

**[1] Judgment 228 ⟶540**

228 Judgment
    228XIII Merger and Bar of Causes of Action and Defenses
        228XIII(A) Judgments Operative as Bar
            228k540 k. Nature and requisites of former recovery as bar in general. Most Cited Cases

**Judgment 228 ⟶634**

228 Judgment
    228XIV Conclusiveness of Adjudication
        228XIV(A) Judgments Conclusive in General
            228k634 k. Nature and requisites of former adjudication as ground of estoppel in general. Most Cited Cases

Fundamental precept embodied in the related doctrines of collateral estoppel and res judicata is that a right, question, or fact distinctly put in issue and directly determined by court of competent jurisdiction cannot be disputed in subsequent suit between the same parties or their privies.

**[2] Judgment 228 ⟶584**

228 Judgment
    228XIII Merger and Bar of Causes of Action and Defenses
        228XIII(B) Causes of Action and Defenses Merged, Barred, or Concluded
            228k584 k. Nature and elements of bar or estoppel by former adjudication. Most Cited Cases

**Judgment 228 ⟶713(2)**

228 Judgment
    228XIV Conclusiveness of Adjudication
        228XIV(C) Matters Concluded
            228k713 Scope and Extent of Estoppel in General
                228k713(2) k. Matters which might have been litigated. Most Cited Cases

Under doctrine of res judicata, final judgment on merits of action precludes parties or their privies from relitigating issues that were, or could have been, raised in that action.

**[3] Judgment 228 ⟶724**

228 Judgment

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

482 B.R. 96, 57 Bankr.Ct.Dec. 72

**(Cite as: 482 B.R. 96)**

228XIV Conclusiveness of Adjudication

228XIV(C) Matters Concluded

228k723 Essentials of Adjudication

228k724 k. In general. Most Cited Cases

**Judgment 228 ☞725(1)**

228 Judgment

228XIV Conclusiveness of Adjudication

228XIV(C) Matters Concluded

228k723 Essentials of Adjudication

228k725 Facts Necessary to Sustain Judgment

228k725(1) k. In general. Most Cited Cases

Under collateral estoppel doctrine, once court has decided issue of fact or law necessary to its judgment, its decision may preclude relitigation of the issue in suit on a different cause of action involving a party to the first case.

**[4] Judgment 228 ☞634**

228 Judgment

228XIV Conclusiveness of Adjudication

228XIV(A) Judgments Conclusive in General

228k634 k. Nature and requisites of former adjudication as ground of estoppel in general. Most Cited Cases

Collateral estoppel serves dual purpose of protecting litigants from burden of relitigating identical issue with same party or his privy and of promoting judicial economy by preventing needless litigation.

**[5] Judgment 228 ☞713(1)**

228 Judgment

228XIV Conclusiveness of Adjudication

228XIV(C) Matters Concluded

228k713 Scope and Extent of Estoppel in General

228k713(1) k. In general. Most Cited Cases

Invocation of collateral estoppel to preclude relitigation of issue requires: (1) that the identical issue was raised in prior proceeding; (2) that issue was actually litigated and decided in prior proceeding; (3) that party to be estopped had full and fair opportunity to litigate the issue; and (4) that resolution of issue was necessary to support a valid and final judgment on merits.

**[6] Judgment 228 ☞649**

228 Judgment

228XIV Conclusiveness of Adjudication

228XIV(A) Judgments Conclusive in General

228k649 k. Nature, rendition, and form of judgment in general. Most Cited Cases

Previous decision of district court, extending comity to protective order entered in foreign insolvency proceedings and staying cause of action against guarantors of foreign debtor's indebtedness, was not final judgment on merits, of kind that could have issue preclusive effect.

**[7] Judgment 228 ☞735**

228 Judgment

228XIV Conclusiveness of Adjudication

228XIV(C) Matters Concluded

228k734 Matters Not in Issue

228k735 k. In general. Most Cited Cases

Even assuming that prior decision of district court, extending comity to protective order entered in foreign insolvency proceedings and staying cause of action against guarantors of foreign debtor's indebtedness, was in nature of final judgment on merits, such as could have issue preclusive effect, decision did not collaterally estop bankruptcy court in proceeding that was brought by creditor of foreign debtor, not to recover from guarantors, but to exercise its rights against funds of non-debtor affiliates present in same account with funds of debtor; question presented to bankruptcy court, of whether creditor could exercise its rights as secured creditor to non-debtor affiliates' funds, was neither

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

482 B.R. 96, 57 Bankr.Ct.Dec. 72
**(Cite as: 482 B.R. 96)**

presented to nor decided by district court in prior lawsuit.

**[8] Bankruptcy 51 🗝2341**

51 Bankruptcy
 51III The Case
  51III(H) Cases Ancillary to Foreign Proceedings
   51k2341 k. In general. Most Cited Cases

Provision of Chapter 15 according to foreign representatives a right to access courts of the United States following recognition of foreign insolvency proceedings, and requiring United States courts to grant comity or cooperation to foreign representative, does not mean that comity must be accorded to all orders entered by foreign court in foreign insolvency proceeding. 11 U.S.C.A. § 1509(b)(3).

**[9] Bankruptcy 51 🗝2341**

51 Bankruptcy
 51III The Case
  51III(H) Cases Ancillary to Foreign Proceedings
   51k2341 k. In general. Most Cited Cases

While recognition of foreign insolvency proceeding turns on objective criteria, relief post-recognition is largely discretionary and turns on subjective factors that embody principles of comity. 11 U.S.C.A. § 1517.

**[10] Bankruptcy 51 🗝2341**

51 Bankruptcy
 51III The Case
  51III(H) Cases Ancillary to Foreign Proceedings
   51k2341 k. In general. Most Cited Cases

If textual provision of Chapter 15 is unclear or ambiguous, bankruptcy court may consider the Model Law on Cross-Border Insolvency and foreign interpretations of it as part of task of interpreting that provision.

**[11] Bankruptcy 51 🗝2021.1**

51 Bankruptcy
 51I In General
  51I(B) Constitutional and Statutory Provisions
   51k2021 Construction and Operation
    51k2021.1 k. In general. Most Cited Cases

**Bankruptcy 51 🗝2341**

51 Bankruptcy
 51III The Case
  51III(H) Cases Ancillary to Foreign Proceedings
   51k2341 k. In general. Most Cited Cases

Court should read Chapter 15 of the Bankruptcy Code consistently with prior law.

**[12] Bankruptcy 51 🗝2341**

51 Bankruptcy
 51III The Case
  51III(H) Cases Ancillary to Foreign Proceedings
   51k2341 k. In general. Most Cited Cases

Creditor's rights in funds of non-debtor affiliates which were allegedly present in same account with those of foreign debtor would be sufficiently protected if bankruptcy court granted relief requested by foreign representatives, and if it stayed creditor from proceeding against funds pending a determination of debtor's and non-debtor affiliates' rights therein by Mexican court where insolvency proceedings were pending, as long as funds remained in account in the United States. 11 U.S.C.A. § 1522(a).

**[13] Bankruptcy 51 🗝2341**

51 Bankruptcy
 51III The Case
  51III(H) Cases Ancillary to Foreign Proceedings
   51k2341 k. In general. Most Cited Cases

Grant of relief requested by foreign representatives of debtor that was the subject of insolvency

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

482 B.R. 96, 57 Bankr.Ct.Dec. 72

**(Cite as: 482 B.R. 96)**

proceedings in Mexico, by staying creditor from attempting to exercise its rights against funds of non-debtor affiliates which were allegedly present in same account with those of foreign debtor, was not manifestly contrary to public policy of the United States. 11 U.S.C.A. § 1506.

**[14] Bankruptcy 51 ⚷2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

    While bankruptcy court, in proceeding ancillary to foreign insolvency case, should extend comity to foreign laws in most instances, bankruptcy courts also have discretion to deny granting comity to foreign laws, court orders, and judgments when unique circumstances warrant it, as long as the interests of creditors are sufficiently protected. 11 U.S.C.A. § 1522(a).

**[15] Bankruptcy 51 ⚷2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

    In proceeding ancillary to foreign insolvency case, bankruptcy court must deny granting comity to foreign laws, court orders, and judgments in exceptional circumstances of fundamental importance, if doing otherwise would be manifestly contrary to public policy of the United States. 11 U.S.C.A. § 1506.

**[16] Bankruptcy 51 ⚷2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases
    Central tenet of Chapter 15 is importance of

comity in cross-border insolvency proceedings.

**[17] Bankruptcy 51 ⚷2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases
    Comity is not an absolute obligation in proceedings under Chapter 15.

**[18] International Law 221 ⚷10.1**

221 International Law
    221k10.1 k. Public policy and comity in general. Most Cited Cases
    Comity takes into account the interests of the United States, the interests of foreign state or states involved, and the mutual interests of family of nations in just and efficiently functioning rules of international law.

**[19] Courts 106 ⚷512**

106 Courts
    106VII Concurrent and Conflicting Jurisdiction
        106VII(C) Courts of Different States or Countries
            106k512 k. Comity between courts of different countries. Most Cited Cases
    Federal courts generally extend comity whenever foreign court had proper jurisdiction and enforcement does not prejudice rights of United States citizens or violate domestic public policy.

**[20] Courts 106 ⚷512**

106 Courts
    106VII Concurrent and Conflicting Jurisdiction
        106VII(C) Courts of Different States or Countries
            106k512 k. Comity between courts of different countries. Most Cited Cases
    Deference to foreign court is appropriate as long as foreign proceedings are procedurally fair and do not contravene the laws or public policy of

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

482 B.R. 96, 57 Bankr.Ct.Dec. 72

**(Cite as: 482 B.R. 96)**

the United States.

**[21] Bankruptcy 51 2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

Factors that bankruptcy courts consider in assessing procedural fairness of foreign insolvency proceedings, for purpose of deciding whether to extend comity in ancillary proceeding under Chapter 15, include: (1) whether creditors of same class are treated equally in distribution of assets; (2) whether foreign liquidators are considered fiduciaries and are held accountable to court; (3) whether creditors have right to submit claims which, if denied, can be submitted to bankruptcy court for adjudication; (4) whether liquidators are required to give notice to potential claimants; (5) whether there are provisions for creditor meetings; (6) whether foreign country's insolvency laws favor its own citizens; (7) whether all assets are marshaled before one body for centralized distribution; and (8) whether there are provisions for automatic stay and for lifting of such stays in order to facilitate the centralization of claims.

**[22] Courts 106 512**

106 Courts
   106VII Concurrent and Conflicting Jurisdiction
      106VII(C) Courts of Different States or Countries
         106k512 k. Comity between courts of different countries. Most Cited Cases

Granting comity to foreign courts does not depend on willingness of one party to participate in foreign proceeding, at least not where parties may be made subject to the jurisdiction of foreign court.

**[23] Constitutional Law 92 3879**

92 Constitutional Law
   92XXVII Due Process

      92XXVII(B) Protections Provided and Deprivations Prohibited in General
         92k3878 Notice and Hearing
            92k3879 k. In general. Most Cited Cases

Due process is not violated by entry of ex parte orders, provided that notice and an opportunity to appear and defend are promptly given. U.S.C.A. Const.Amend. 5.

**[24] Bankruptcy 51 2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

In ancillary proceeding under Chapter 15, bankruptcy court would conditionally grant foreign representatives' request for post-recognition relief in nature of temporary stay of cause of action brought by creditor to exercise its rights against funds of non-debtor affiliates allegedly present in same account with funds of foreign debtor, provided that, within 60 days of entry of stay, debtor and foreign representatives commenced appropriate proceeding in Mexican court where insolvency case was pending to determine what funds in account were protected by precautionary measures previously ordered by Mexican court, and whether these precautionary measures should be modified or terminated. 11 U.S.C.A. § 1522.

**\*99** Sidley Austin LLP By: Lee S. Attanasio, Esq., Martin B. Jackson, Esq., Brian J. Lohan, Esq. (admitted pro hac vice), New York, NY, for Plaintiff CT Investment Management Co., LLC.

Jones Day By: Pedro A. Jimenez, Esq., Jennifer J. O'Neil, Esq., New York, NY, Todd Swatsler, Esq., Columbus, OH, for the Foreign Representative Nemias Esteban Martinez Martinez.

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR**

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

482 B.R. 96, 57 Bankr.Ct.Dec. 72
**(Cite as: 482 B.R. 96)**

**ENTRY OF ORDER EXTENDING COMITY AND STAYING PROCEEDINGS**

MARTIN GLENN, Bankruptcy Judge.

Plaintiff CT Investment Management Co., LLC ("CTIM") filed an adversary complaint (the "Complaint") against Cozumel Caribe, S.A. de C.V. ("Cozumel Caribe" or "Debtor"). Cozumel Caribe is the debtor in a foreign proceeding pursuant to the provisions of the *Ley de Concursos Mercantiles* (the "Mexican Business Reorganization Act"), commenced on July 10, 2010 and currently pending before the Third District Court for the State of Quintana Roo (the "Quintana Roo District Court") Mexico (the "Concurso Proceeding"). On July 20, 2010, Nemias Esteban Martinez Martinez (the "Foreign Representative") commenced a Chapter 15 proceeding in this Court on behalf of Cozumel Caribe. On October 20, 2010, this Court entered an agreed Order Granting Recognition of Foreign Representative and Foreign Main Proceeding and for Additional Relief Under 11 U.S.C. § 1521 (the "Recognition Order") (Case No. 10–13913, ECF Doc. # 45). The Recognition Order prohibits any party from transferring outside of the U.S. the cash in the Cash Management Account held by CTIM in New York without further order from this Court. Recognition Order ¶ 3. The Complaint seeks a declaratory judgment that funds on deposit in the Cash Management Account are not property of the Debtor and therefore are not subject to the automatic stay. CTIM also seeks approval to exercise its rights to those funds pursuant to loan documents governed by New York law. The Foreign Representative responded to the Complaint by filing a motion to stay the adversary proceeding on the grounds of international comity.

For the reasons explained below, the motion for a stay is granted on specified conditions requiring the Debtor and the Foreign Representative to file an appropriate proceeding in the Quintana Roo District Court within 60 days to resolve questions identified below that are more appropriately addressed by the Quintana Roo District Court.

## I. BACKGROUND

Cozumel Caribe is a Mexican company that provides hostelry and tourism services **\*100** in Mexico. It owns and operates the Hotel Park Royal Cozumel in Cozumel, Mexico. Cozumel Caribe's seven non-debtor affiliates, [FN1] also organized under the laws of Mexico, own and operate other vacation and resort properties throughout Mexico. While the Debtor and each of the Non–Debtor Affiliates (together, the "Companies") own and operate separate resort properties, collective timeshare interests in the properties are sold to prospective timeshare owners, allegedly enhancing the value of each property, since timeshare owners may choose to vacation at any property operated by any of the Companies. According to the Debtor, "the viability and success of the timeshare arrangement in which Cozumel Caribe participates depends on the ongoing appeal of all properties operated by the Companies." *See* Declaration of Raul Garcia Herrera (the "Herrera Declaration") ¶ 4 (ECF Doc. # 4).

> FN1. The seven non-debtor affiliates are Promotora de Inmuebles del Caribe, S.A. de C.V.; Consorcio Immobiliario Cancun, S.A. de C.V.; Desarrollo Turistico Piramides Cancun, S.A. de C.V.; Imnobiliaria Cancun Caribe, S.A. de C.V.; Comercializadora Y Desarro Lladora Ocean, S.A. de C.V.; Desarrolladora Imnobiliariadel Sur, S.A. de C.V.; and Servicios Administrativos Etisa, S.A. de C.V. (collectively, the "Non–Debtor Affiliates").

The current dispute centers on the effect of the Concurso Proceeding on the debt repayment obligations of the Companies in connection with a $103 million secured loan for which the Debtor and the Non–Debtor Affiliates are joint obligors. As explained further below, as part of the security for the $103 million loan, the Debtor and the Non–Debtor Affiliates were required to deposit hotel revenues in various lock box accounts. The Cash Management Account in New York is controlled by CTIM, as special servicer for the loan. The Debtor and the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

482 B.R. 96, 57 Bankr.Ct.Dec. 72
**(Cite as: 482 B.R. 96)**

Non–Debtor Affiliates have defaulted on the loans. CTIM seeks to recover some or all of the funds in the Cash Management Account based on the loan defaults. No debt service payments have been made by the Debtor or by the Non–Debtor Affiliates for several years. The Non–Debtor Affiliates ceased depositing hotel revenues in the lock box accounts as they are contractually obligated to do. Only Cozumel Caribe filed a bankruptcy proceeding in Mexico, but, as explained below, on May 27, 2010, the Debtor obtained an *ex parte* order from the Quintana Roo District Court barring CTIM or any other party from taking any action to collect any of the debt from property of the Debtor or the Non–Debtor Affiliates, specifically including any funds in the Cash Management Account (the "May 27 Order," or the "Precautionary Measures"). These so-called Precautionary Measures remain in place and have so far prevented CTIM from applying any of the funds on deposit in the Cash Management Account to any of the debt. A fuller explanation of the loans, loan documentation, the accounts and the Precautionary Measures are necessary to place the current dispute in context and are discussed below.

**A. The $103 Million Loan**

On October 3, 2006, the Debtor and the Non–Debtor Affiliates (collectively, the "Borrowers") executed two (2) promissory notes in the aggregate amount of $103 million (the "Promissory Notes") to finance the operations of the Hotel Park Royal Cozumel and certain properties owned by the Non–Debtor Affiliates. In connection with the Promissory Notes, the Borrowers, on the one hand, and LaSalle Bank N.A. ("LaSalle" or the "Trustee"),[FN2] *101 on the other, entered into a note indenture, dated October 3, 2006 (the "Note Indenture") and a cash management agreement, dated October 3, 2006 (the "Cash Management Agreement," and together with the Promissory Notes and the Note Indenture, the "Loan Documents") governed by New York law. Pursuant to section 2.1(a) of the Cash Management Agreement and section 2.4(a) of the Notes, the Companies established (i) one account with LaSalle into which

all Dollar-denominated rents from all properties were deposited on a daily basis (the "Dollars Lockbox Account") and (ii) one account with Institucion de Banca Multiple into which all Pesos-denominated rents and over-the-counter rents from all properties were deposited on a daily basis (the "Pesos Lockbox Account"). The obligations of the Borrowers under the Promissory Notes are secured by a first priority continuing security interest in and to substantially all assets in the Cash Management Account.

> [FN2.] Bank of America, N.A. is the successor by merger to LaSalle Bank N.A., as trustee for the Noteholders.

Funds in the Dollar Lockbox Account subsequently were swept daily into a centralized account (the "Cash Management Account"), and disbursed or applied pursuant to the terms of the Cash Management Agreement. Funds swept into the Cash Management Account were applied to one or more subaccounts, including the: (i) Tax and Insurance Escrow Subaccount; (ii) Fees Subaccount; (iii) Debt Service Subaccount; (iv) Replacement Reserve Subaccount; (v) BI Insurance Reserve Subaccount; (vi) Extraordinary Expense Subaccount; (vii) Issuers Remainder Subaccount; (viii) Excess Cash Flow Subaccount; and (ix) Alterations Subaccount. Further, Article 10 of the Note Indenture established additional reserve accounts (collectively with the subaccounts, the "Reserve Accounts"). Therefore, U.S. dollar-denominated revenues generated by each Borrowers' Property were swept to a centralized Cash Management Account, applied to various Reserve Accounts and pooled with the funds of the other Borrowers (including the Debtor), but not commingled with the funds of the Trustee or CTIM. Thus, the Cash Management Account and Reserve Accounts (other than the Performance Holdback, BI Holdback and Political Risk Holdback accounts, as discussed below) would contain funds generated by and/or belonging to both the Debtor and the Non–Debtor Affiliates.

Assuming sufficient funds were on deposit in

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

482 B.R. 96, 57 Bankr.Ct.Dec. 72
**(Cite as: 482 B.R. 96)**

the Cash Management Account to pay certain fees, fund certain reserve and deposit accounts and meet monthly debt service obligations, and no event of default or Trigger Event (as defined in the Cash Management Agreement) had occurred, funds on deposit in the Peso Lockbox Account were transferred daily to one or more accounts of the Borrowers for the payment of approved operating expenses. Following a Trigger Event, however, the Borrowers were only entitled to transfer an amount equal to the monthly approved operating expenses (as set forth in an approved budget) from the Peso Lockbox Account and all other amounts would be transferred from the Peso Lockbox Account to the Cash Management Account (and then ultimately to the Excess Cash Flow Account (as defined below)). Under the Cash Management Agreement, a Trigger Event occurs when, among other things, the Borrowers fail to meet certain financial tests, including a debt yield test and a debt service coverage ratio test. Upon the occurrence of a Trigger Event, all funds on deposit in the Dollar Lockbox Accounts and Peso Lockbox Accounts are swept into the Cash Management Account and then ultimately held in the "Excess Cash Flow Subaccount" (the "Excess Cash Flow Account").

**\*102** On or about November 1, 2006, the Loan Documents were contributed to a securitization trust, pursuant to a Pooling and Servicing Agreement (the "PSA") by and among Merrill Lynch Mortgage Investors, Inc., as depositor, KeyCorp Real Estate Capital Markets, Inc. ("KeyCorp"), as servicer and special servicer, U.S. Bank National Association, as trustee, and LaSalle, as paying agent and certificate registrar. Under this arrangement, the financing was pooled with other similar financings and the liabilities were sold to third party investors as commercial mortgage-backed securities. KeyCorp hired Wells Fargo Bank, N.A. ("Wells") to act as sub-servicer on its behalf with responsibility for the day-to-day administration of the financing, including enforcing the consent rights of the Trustee and interfacing primarily with the Borrowers.

As a result of the failure of the Borrowers to meet the required financial tests, a Trigger Event occurred in the fall of 2007. On October 12, a "cash sweep" of the funds on deposit in the Dollar Lockbox Accounts and Peso Lockbox Accounts commenced, which remained in effect as of the Petition Date. Thus, following the Trigger Event, excess funds in the Peso Lockbox Account and Dollar Lockbox Account from both the Defendant and Non–Debtor Affiliates were deposited in the Cash Management Account and ultimately swept into the Excess Cash Flow Account.

On or about July 3, 2009, CTIM assumed the responsibilities of KeyCorp, as special servicer, with responsibility to address material issues that arose with respect to the financing and to deal with any necessary enforcement actions. As special servicer, CTIM endeavors to reach the funds remaining in the Cash Management Account, currently estimated at $8–9 million USD, which are the result of commingled deposits from the Companies' operations (*i.e.,* the Debtor *and* the Non–Debtor Affiliates).

**B. The Mexican Bankruptcy Proceeding**

On May 21, 2010, the Foreign Representative filed a petition to obtain a "business reorganization judgment" authorizing the commencement of a Concurso Mercantil Proceeding (the "Concurso Petition") in the Quintana Roo District Court. As part of its petition under the Mexican Business Reorganization Act, Cozumel Caribe sought certain Precautionary Measures to protect Cozumel Caribe, as well as its Non–Debtor Affiliates, as Cozumel Caribe pursued reorganization. On May 27, 2010, the Quintana Roo District Court approved Cozumel Caribe's application and entered the *ex parte* May 27 Order that, among other things, provided a stay during the pendency of the Mexican Bankruptcy Proceeding of any actions (1) seeking to transfer, or to apply against any outstanding indebtedness, funds in to the Dollars Lockbox Account or Cash Management Account, and (2) to enforce the Guarantee Agreement.[FN3] *See* Herrera Decl., ¶ 6–8.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

482 B.R. 96, 57 Bankr.Ct.Dec. 72
**(Cite as: 482 B.R. 96)**

FN3. Pablo Gonzalez Carbonell and Grupo Costamex, S.A. de C.V. (together, the "Guarantors") entered into a Guarantee Agreement in connection with the development and operation of several resort properties and hotels in Mexico. CTIM alleges that the Guarantors' obligations under the Guarantee Agreement were triggered when Cozumel Caribe, a subsidiary of Grupo Costamex, commenced the Concurso Proceeding in Mexico.

The Foreign Representative argues that the relief was granted only after the Quintana Roo District Court determined that it was necessary in light of the nature of Cozumel Caribe's business, and the manner in which that business was intertwined and integrated with the businesses of the other Companies. *Id.* ¶ 7. The May 27 **\*103** Order, by its terms, required that CTIM be served with a copy of the order. CTIM contends that it received no notice of the filing of the Concurso Petition or of the May 27 Order until reference to both was made in a letter received by CTIM nearly a month later. It was not until sometime in July 2010 that CTIM was served with the order. CTIM never appeared in the Quintana Roo District Court to challenge the Precautionary Measures. Instead, CTIM commenced an "*amparo*" FN4 proceeding in a different Mexican court.

FN4. A party brings an *amparo* action in a Mexican court to seek redress for an alleged constitutional violation.

### C. CTIM's Amparo Proceeding

On August 12, 2010, CTIM challenged the May 27 Order, insofar as its protections extended to non-Debtor affiliates, by filing a claim with the Second District Court of the City of Cancun (the "Cancun District Court") for *amparo* (the "Amparo Action"). CTIM requested a temporary and immediate suspension of the May 27 Order (the "Provisional Suspension Request"), as well as a separate request for a temporary suspension of the May 27 Order pending the outcome of the Amparo Action (the "Definitive Suspension Request"). FN5

FN5. It is the Court's understanding that the Provisional Suspension Request was analogous to a temporary restraining order, and the Definitive Suspension Request was similar to a preliminary and/or permanent injunction.

On August 13, 2010, the Cancun District Court denied the *ex parte* Provisional Suspension Request based on CTIM's failure to demonstrate that it would suffer any harm in the absence of an immediate suspension of the May 27 Order. CTIM appealed the Cancun District Court's denial of the Provisional Suspension Request to the Second Associate Court of the Twenty–Seventh Circuit in Mexico (the "Mexican Appellate Court"). On August 23, 2010, the Mexican Appellate Court affirmed the Cancun District Court's decision and ordered that the Amparo Action be dismissed. On September 7, 2010, the Cancun District Court denied the Definitive Suspension Request, which was also appealed, but became moot upon Mexican Appellate Court's dismissal of the entire Amparo Action.

CTIM maintains that the Amparo Action was dismissed because the remedy CTIM sought was unnecessary. According to CTIM, the Protective Measures were overbroad because they impermissibly protected property that was solely owned by the non-Debtor Affiliates. According to CTIM's interpretation of the Mexican Appellate Court's decision, the Mexican Appellate Court merely clarified that the Protective Measures did not apply to property in the Cash Management Account that was not part of the common business enterprise between the Debtor and the non-Debtor Affiliates. During the September 14, 2012 hearing held by this Court, the Foreign Representative's counsel acknowledged that the Protective Measures did not protect funds solely owned by the non-Debtor Affiliates. *See* September 14, 2012 Hr'g Tr. at 18:24–20:4. The Foreign Representative argues that the dismissal of the Amparo Action leaves the May 27 Order un-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

482 B.R. 96, 57 Bankr.Ct.Dec. 72
**(Cite as: 482 B.R. 96)**

altered, without any gloss or effect from any court in the Amparo Action.

**D. Chapter 15 Petition and Request for Provisional Relief**

On July 20, 2010, the Foreign Representative filed a *Chapter 15 Petition for Recognition of Foreign Proceeding* (Case No. 10–13913, ECF Doc. # 1) and also an *Ex Parte Application of Foreign Representative for Entry of Provisional Relief Pursuant***104** *to 11 U.S.C. § 1519* (*id.,* ECF Doc. # 3). On July 21, 2010, the Court entered an Order to Show Cause, granting interim relief and scheduling a preliminary injunction hearing for August 3, 2010. The provisional relief included a provision that, pending the preliminary injunction hearing, provided:

All persons and entities are enjoined from seizing, attaching, enforcing and/or executing security interests, liens or judgments against Cozumel Caribe's property in the United States, including all of the funds within the Dollars Lockbox Account and the Cash Management Account, or from transferring, encumbering or otherwise disposing of or interfering with Cozumel Caribe's assets or agreements in the United States, including all of the funds within the Dollars Lockbox Account and the Cash Management Account, absent further order of the Court ....

Order to Show Cause, dated July 21, 2010, ¶ 3.a. (*id.,* ECF Doc. # 11).

On August 4, 2010, an order was entered extending the protection of the interim relief pending further order of the Court. Order Granting Provisional Relief, dated August 4, 2010 ¶ 1.a. ("August 4 Order," Case No. 10–13913, ECF Doc. # 23). The August 4 Order provided that "CTIM expressly reserves its right (i) to dispute Cozumel Caribe's ownership interest in the assets subject to this Order, and (ii) to object to any extension or modification of this Order, or the entry of any other or further order in this proceeding..... Martinez expressly reserves the right to seek extension or modification of

this Order, or the entry of other or further orders in this proceeding." *Id.* ¶ 8–9. On October 20, 2010, the Court entered an order providing that "[t]he *Concurso Mercantil* Proceeding is recognized as a foreign main proceeding pursuant to 11 U.S.C. §§ 1517(a) and 1517(b)(1), and all the effects of recognition as set forth in 11 U.S.C. § 1520 shall apply." Recognition Order ¶ 2. The Recognition Order expressly provides that:

The relief granted herein shall not (i) impact the security interests and liens, if any, existing as of July 20, 2010 on property of Cozumel Caribe, including all of the funds in the Dollars Lockbox Account and the Cash Management Account, except as set forth herein as to enforcement; or (ii) prohibit or restrict any action to enforce rights, remedies, claims or defenses against Cozumel Caribe in Mexico..... CTIM expressly reserves its right to dispute Cozumel Caribe's ownership interest in the assets subject to this Order.

Recognition Order ¶¶ 7–8.

**E. CTIM's District Court Action Against the Guarantors**

On September 13, 2010, CTIM filed a complaint in the United States District Court for the Southern District of New York ("District Court") against defendants Pablo Gonzalez Carbonell and Grupo Costamex, S.A. de C.V. (the "Guarantor Defendants") alleging breach of contract under a guarantee agreement (the "Guarantee Agreement") entered into in connection with the $103 million loan for development of vacation and resort properties throughout Mexico. *CT Inv. Mgmt. Co., LLC v. Carbonell,* No. 10–Civ.–6872, 2012 WL 92359, at *1 (S.D.N.Y. Jan. 11, 2012) ("District Court Action"). The Guarantee Agreement contained a "springing" or "Bad Boy" guarantee. CTIM alleged that Cozumel Caribe's voluntary bankruptcy proceeding triggered the Guarantor Defendants' obligations under the Guarantee Agreement. The Guarantor Defendants did not appear to defend the District Court Action; however, before a default judgment was entered, the Foreign Representative**105** ap-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

482 B.R. 96, 57 Bankr.Ct.Dec. 72
**(Cite as: 482 B.R. 96)**

peared in the case and requested that the District Court extend comity to subsection (e) of the May 27 Order, which prevented CTIM from exercising its rights in the Guarantee Agreement against the Guarantor Defendants.

The District Court extended comity to the May 27 Order and stayed CTIM's action against the Guarantor Defendants. The District Court reasoned that because this Court granted Cozumel Caribe's Recognition Order, section 1509 of the Bankruptcy Code required the District Court to grant comity to the May 27 Order as long as doing so was not contrary to the public policy of the United States under section 1506, which the District Court held it was not. CTIM did not appeal the stay order.

**F. CTIM's Adversary Complaint and the Foreign Representative's Motion for a Stay Based on Comity**

CTIM's Complaint in this case was filed on December 20, 2011. The Foreign Representative filed a motion to stay the adversary proceeding based on international comity on January 23, 2012. ("Stay Motion," ECF Doc. # 3.) The Stay Motion resulted in protracted proceedings in this Court, with an evidentiary hearing held on April 11 and 12, 2012, *see* April 11, 2012 Hr'g Tr. (ECF Doc. # 18) and April 12, 2012 Hr'g Tr. (ECF Doc. # 19), followed by several rounds of supplemental briefing.[FN6] The matter was taken under submission following a hearing on September 14, 2012.

> FN6. The following additional pleadings and declarations were submitted in connection with the Stay Motion: Cozumel Caribe filed the Declaration of Raul Garcia Herrera in support of the Stay Motion ("Herrera Declaration," ECF Doc. # 4); CTIM objected to the Stay Motion (the "CTIM Objection," ECF Doc. # 12) and filed the Declaration of Francisco Xavier Cortina Cortina ("Cortina's First Declaration" ECF Doc. # 13); Cozumel Caribe responded to the CTIM Objection ("Caribe Response," ECF Doc. # 15) and filed the

Declaration of Alfonso Peniche (the "Peniche Declaration," ECF Doc. # 16). Upon request by the Court for further briefing, Cozumel Caribe and CTIM filed concurrent supplemental briefs (the "Caribe Supplemental Brief," ECF Doc. # 23; the "CTIM Supplemental Brief," ECF Doc. # 24); CTIM filed a second Declaration of Francisco Xavier Cortina Cortina to support the CTIM Supplemental Brief ("Cortina's Second Declaration," ECF Doc. # 25); Cozumel Caribe and CTIM also filed concurrent supplemental reply briefs (the "Caribe Supplemental Reply," ECF Doc. # 29; the "CTIM Supplemental Reply," ECF Doc. # 28). Cozumel Caribe also filed a response Declaration of Alfonso Peniche (the "Peniche's Second Declaration," ECF Doc. # 41). Several letter submissions were also filed. (*See* ECF Doc. 22, 38, 45, 46, 49 and 50.)

## II. DISCUSSION

**A. This Court Is Not Required To Give Preclusive Effect To The Comity Ruling**

A threshold issue is whether the Comity Ruling has preclusive effect on this Court's ability to determine whether the May 27 Order, in its entirety, should be granted comity in this adversary proceeding. The Foreign Representative argues that the Court must give the Comity Ruling preclusive effect since CTIM and the Foreign Representative fully contested the issue before the District Court, which ruled in favor of the Foreign Representative. The Court concludes that it is not bound by preclusion and must make its own determination whether to enforce the May 27 Order.

[1][2][3][4] "A fundamental precept of common-law adjudication, embodied in the related doctrines of collateral estoppel and res judicata, is that a 'right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction**106** ... cannot be disputed in a subsequent suit between the same parties or their privies ....' "

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

482 B.R. 96, 57 Bankr.Ct.Dec. 72
**(Cite as: 482 B.R. 96)**

*Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979) (quoting *S. Pac. R. Co. v. United States,* 168 U.S. 1, 48, 18 S.Ct. 18, 42 L.Ed. 355 (1897)).

Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action. Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case.

*Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980) (citing *Cromwell v. County of Sac,* 94 U.S. 351, 352, 24 L.Ed. 195 (1876); *Montana,* 440 U.S. at 153, 99 S.Ct. 970). Collateral estoppel "has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 326, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) (citing *Blonder–Tongue Labs., Inc. v. Univ. of Ill. Found.,* 402 U.S. 313, 328–29, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971)).

[5] In the Second Circuit, invocation of collateral estoppel to preclude relitigation of an issue requires that " '(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits.' " *Ball v. A.O. Smith Corp.,* 451 F.3d 66, 69 (2d Cir.2006) (quoting *Purdy v. Zeldes,* 337 F.3d 253, 258 & n. 5 (2d Cir.2003)); *see also* RESTATEMENT (SECOND) OF JUDGMENTS § 27 (1982).

As explained below, for several reasons, the Court concludes that it is not required to give preclusive effect to the Comity Ruling.

[6] Here, an analysis of each of the four factors stated above is unnecessary because the Comity Ruling was not a final decision on the merits. While the District Court decided to grant comity to the May 27 order to stay CTIM's action to enforce rights against the Guarantor Defendants, such a ruling falls short of a final determination on the merits because the District Court never reached the merits of CTIM's action. The District Court recognized that courts may grant a stay in favor of non-debtor affiliates. But such stays are limited in duration and are not final in that sense. *Quigley Co., Inc. v. Law Offices of Peter G. Angelos (In re Quigley Co., Inc.),* 676 F.3d 45, 52 (2d Cir.2012) ("Enjoining litigation to protect bankruptcy estates *during the pendency of bankruptcy proceedings ...* has historically been the province of the bankruptcy courts.") (emphasis added).

[7] Even if the Comity Ruling could be considered as a final determination on the merits, granting comity to the *entire* May 27 Order was not "necessary to support a valid and final judgment on the merits," which is the fourth factor stated above.

CTIM filed the District Court Action against the Guarantors, seeking to enforce the "springing" or "Bad Boy" guarantee contained in the Loan Documents governed by New York law.[FN7] The Guarantee **\*107** Agreement was triggered by the Cozumel's bankruptcy filing in Mexico. Springing guarantees are generally enforceable under New York law. *See, e.g., First Nationwide Bank v. Brookhaven Realty Assocs.,* 223 A.D.2d 618, 637 N.Y.S.2d 418, 421 (1996) (holding that a bankruptcy default clause in a non-recourse mortgage agreement that, upon filing, made the partners of the general partnership personally liable for the partnership's deficiency was "neither inequitable, oppressive, or unconscionable"); *G3–Purves St., LLC v. Thomson Purves, LLC,* 101 A.D.3d 37, 953 N.Y.S.2d 109 (2012) (stating "contrary to the guarantors' contention, the carve-out language in the loan agreement was unambiguous and provided for personal liability for a violation of certain enumer-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

482 B.R. 96, 57 Bankr.Ct.Dec. 72
**(Cite as: 482 B.R. 96)**

ated exceptions, including defined 'springing recourse events' "). The District Court analyzed whether the enforcement of the Guarantee Agreement by a U.S. court was appropriate in light of subsection (e) of the May 27 Order, which provides, "[t]he execution of additional guarantees established in the Guarantee Agreement in case of bankruptcy is suspended, whose responsibility of its credits is trying to be extended to the principal's shareholders (Pablo Ignacio Gonzalez Carbonell) by reason of the bankruptcy request." Herrera Decl., Ex A–1 at 4. Specifically, the District Court held that the May 27 Order "suspends the execution of the guarantees established in the Agreement." *Carbonell,* 2012 WL 92359, at *4. In deciding to extend comity to the May 27 Order, the District Court relied only on subsection (e) of the May 27 Order.

> FN7. CTIM sought *in personam* jurisdiction over the Guarantors, all of whom are Mexican citizens residing in Mexico, based on the provisions in the Loan Documents by which the Guarantors consented to jurisdiction in New York to enforce the Guarantee Agreement.

The issue before this Court is whether CTIM, as special servicer on behalf of secured creditors, may proceed with its adversary proceeding to recover the funds in the Cash Management Account in New York, notwithstanding subsection (a) of the May 27 Order which prohibits CTIM from recovering any funds in the Cash Management Account. The bankruptcy court has *in rem* jurisdiction over the funds on deposit in New York. The Foreign Representative asserts that the May 27 Order should be recognized and given effect; CTIM disputes this contention. The issue—whether CTIM could exercise its rights as a secured creditor to the Non–Debtor Affiliates' funds in the Cash Management Account in New York—was not presented to or decided by the District Court. Therefore, the Court concludes that preclusion does not prevent this Court from considering whether to grant

comity to subsection (a) of the May 27 Order.

Moreover, the District Court's ruling was based on this Court having granted recognition to the Concurso Proceeding as a foreign main proceeding under section 1517 of the Bankruptcy Code. *Carbonell,* 2012 WL 92359, at *4–5. Section 1517(d) permits the Court to modify or terminate the Recognition Order "if it is shown that the grounds for granting it were fully or partially lacking or have ceased to exist ...." 11 U.S.C. § 1517(d). Under section 1518, the Foreign Representative "shall file with the court promptly a notice of change of status concerning (1) any substantial change in the status of such foreign proceeding ...." *Id.* § 1518(1). While the Foreign Representative has not filed a notice of change of status of the Concurso Proceeding, the Court was advised by CTIM on September 14, 2012 that the Concurso Proceeding has been "suspended." FN8 September 14, 2012 Hr'g Tr. at **108** 63:11–19. The precise effect of the suspension is unclear, as is whether a change in recognition is warranted as a result. Since this Court is expressly provided with the authority to modify or terminate recognition, the District Court's Comity Ruling predicated on recognition should not preclude this Court's determination whether to extend comity to a different provision of the May 27 Order.

> FN8. The Foreign Representative is hereby directed to file in this Court within 30 days from the date of this order a notice setting forth the current status of the Concurso Proceeding pursuant to section 1518(2) of the Bankruptcy Code.

Furthermore, the District Court had no reason to consider the relevant provisions of Chapter 15 that this Court must take into account before granting the relief sought by the Foreign Representative. Section 1522(a) provides that "[t]he Court may grant relief under section 1519 or 1521, or may modify or terminate relief under subsection (c), only if the interests of the creditors and other interested entities, including the debtor, are sufficiently

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

482 B.R. 96, 57 Bankr.Ct.Dec. 72

**(Cite as: 482 B.R. 96)**

protected." *Id.* § 1522(a). Section 1522(c) gives a court the power, "at the request of the foreign representative or an entity affected by relief granted under section 1519 or 1521, *or at its own motion,* [to] modify or terminate such relief." *Id.* § 1522(c) (emphasis added). "The purpose this section is to ensure a balance between the relief that may be granted to the foreign representative and the interests of the persons potentially affected by such relief." 8 COLLIER ON BANKRUPTCY 1522.01. As the legislative history makes clear, "[Section 1522] gives the bankruptcy court broad latitude to mold relief to meet specific circumstances, including appropriate response if it is shown that the foreign proceeding is seriously and unjustifiably injuring United States creditors." H.R.Rep. No. 109–31, pt. 1, 109th Cong., 1st Sess. 116 (2005), 2005 U.S.C.C.A.N. 88, 178.

**B. Section 1509 Does Not Direct a Court to Grant Comity to a Foreign Court Order Just Because a U.S. Court Grants Recognition to a Foreign Proceeding**

The District Court based its Comity Ruling on this Court's Recognition Order and on section 1509 of the Bankruptcy Code. The District Court found that section 1509 *required* that comity be granted to the May 27 Order. *Carbonell,* 2012 WL 92359, at *4 (asserting "[o]nce a foreign proceeding has been recognized by a U.S. bankruptcy court, it is mandatory that U.S. courts extend comity to a foreign representative's request for a grant of comity unless granting such request would contravene U.S. public policy").

[8] Section 1509 is entitled "Right of Direct Access." FN9 The language of the section, its legislative history and its original source in the UNCITRAL Model Law, all make clear that section 1509 reflects an "access" principle assuring that a foreign representative—"subject to any limitations that the court may impose consistent with the policy of this chapter," 11 U.S.C. § 1509(b)—may sue or be sued in a court in the United States, *id.* § 1509(b)(1), and may apply directly to a court in the United States

for appropriate relief in that court, **\*109** *id.* § 1509(b)(2). "[A] court in the United States shall grant comity or cooperation *to the foreign representative." Id.* § 1509(b)(3). But nothing in section 1509 commands that comity shall be given to all orders entered by a foreign court in a foreign insolvency proceeding. In short, other than providing access to courts in the United States, section 1509 is not a self-executing relief section of Chapter 15. Relief to a foreign representative must be based on sections 1507, 1519, 1520 and 1521, subject to limitations that may be imposed under section 1522.

> FN9. Section 1509 is entitled "Right of direct access." Subsection (b) states:
>
> (b) If the court grants recognition under section 1517, subject to any limitations that the court may impose consistent with the policy of this chapter—
>
> (1) the foreign representative has the capacity to sue and be sued in a court in the United States;
>
> (2) the foreign representative may apply directly to a court in the United States for appropriate relief in that court; and
>
> (3) a court in the United States shall grant comity or cooperation *to the foreign representative.*
>
> 11 U.S.C. § 1509(b) (emphasis added).

[9] Once recognition is granted under section 1517, "a court in the United States shall grant comity or cooperation *to the foreign representative,*" although such a grant is "subject to any limitations that the court may impose consistent with the policy of this chapter." 11 U.S.C. § 1509(b) (emphasis added). "While this provision [Section 1509(b) ] mandates courtesy and respect for the foreign proceeding, consistent with the statement of purpose of chapter 15 and its international origin, it does not mandate relief. The foreign representative must still make a case that the relief it seeks is war-

482 B.R. 96, 57 Bankr.Ct.Dec. 72

**(Cite as: 482 B.R. 96)**

ranted." 8 COLLIER ON BANKRUPTCY ¶ 1509.02. "While recognition of the foreign proceeding turns on the objective criteria under § 1517, 'relief [post-recognition] is largely discretionary and turns on subjective factors that embody principles of comity.' " *In re Metcalfe & Mansfield Alternative Investments,* 421 B.R. 685, 697 (Bankr.S.D.N.Y.2010) (quoting *In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.,* 389 B.R. 325, 333 (S.D.N.Y.2008)). "Once a case is recognized as a foreign main proceeding, chapter 15 specifically contemplates that the court will exercise its discretion consistent with principles of comity." *Id.* (quoting *In re Atlas Shipping,* 404 B.R. 726, 738 (Bankr.S.D.N.Y.2009)).

[10][11] "As each section of Chapter 15 is based on a corresponding article in the Model Law, if a textual provision of Chapter 15 is unclear or ambiguous, the Court may then consider the Model Law and Foreign interpretations of it as part of its interpretive task." *In re Int'l Banking Corp. B.S.C.,* 439 B.R. 614, 624 (Bankr.S.D.N.Y.2010) (internal quotation marks omitted). "In addition, the Court should read Chapter 15 consistently with prior law under section 304." *Id.* (citing *Atlas Shipping,* 404 B.R. at 738–39).

Like section 1509, Article 9 of the United Nations Commission on International Trade Law on Cross Border Insolvency ("UNCITRAL" or "Model Law"), is also entitled "Right of direct access," and is located in Chapter II entitled "Access of Foreign Representatives and Creditors to Courts in this State." Article 9 of the Model Law simply states that "[a] foreign representative is entitled to apply directly to a court in this State." UNCITRAL, *Model Law on Cross–Border Insolvency,* Part one, Chpt. II, *Art. 9 (Right of direct access)* (1997) (available at http:// www. uncitral. org/ pdf/ english/ texts/ insolven/ insolvency- e. pdf). The Guide to Enactment of the Model Law, included with the published text of the Model Law, explains that "Article 9 is limited to expressing the principle of direct access by the foreign representative to courts of the enacting State, thus freeing the representative from having to meet formal requirements such as licences or consular action." *Id.,* Part two, Guide to Enactment of the UNCITRAL Model Law on Cross–Border Insolvency ("Guide to Enactment") ¶ 93.

The principle of direct access does not dictate the relief that must be accorded to the foreign representative. Article 20 of the Model Law, implemented in section 1520 of the Bankruptcy Code, provides for certain "mandatory relief" upon recognition**\*110** as a foreign main proceeding, *see infra* n. 12, but any further relief is discretionary. "In addition to the mandatory stay and suspension [provided in Article 20], the Model Law authorizes the court to grant 'discretionary' relief for the benefit of any foreign proceeding, whether it is a 'main' proceeding or not (article 21). Such discretionary relief may consist of, for example, *staying proceedings* or suspending the right to encumber assets ... and any other relief that may be available under the laws of the enacting State." *Id.,* Guide to Enactment ¶ 34 (emphasis added).[FN10]

> FN10. The United Nations has published a Judicial Guide to application of the Model Law. With respect to the access principle, the Judicial Guide explains:
>
> A. the "access" principle
>
> 29. The UNCITRAL Model Law envisages a proceeding being opened by an application made to the receiving court by an insolvency representative of a debtor who has been appointed in another State—the "foreign representative". The application may seek:
>
> (a) To commence an insolvency proceeding under the laws of the enacting State;
>
> (b) Recognition of the foreign proceeding in the enacting State, so that the for-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

482 B.R. 96, 57 Bankr.Ct.Dec. 72

**(Cite as: 482 B.R. 96)**

eign representative may:

(i) Participate in an existing insolvency proceeding in that State;

(ii) Apply for relief under the Model Law; or

(iii) To the extent that domestic law permits, intervene in any proceeding to which the debtor is a party.

UNCITRAL Model Law on Cross–Border Insolvency: The Judicial Perspective, III. Interpretation and application of the UNCITRAL Model Law ¶ 29 (United Nations 2012) (footnotes omitted) (available at http:// www. uncitral. org/ pdf/ english/ texts/ insolven/ V 1188129– Judicial_ Perspective_ ebook-E. pdf) (last visited Nov. 12, 2012).

The District Court stated that "[o]nce a foreign proceeding has been recognized by a U.S. bankruptcy court, it is mandatory that U.S. courts extend comity to a foreign representative's request for a grant of comity unless granting such request would contravene U.S. public policy." *Carbonell,* 2012 WL 92359, at *4. In support of this conclusion the District Court relied on *In re Qimonda AG Bankr. Lit.,* 433 B.R. 547, 565 (E.D.Va.2010). The district court in *Qimonda* focused on the words "shall grant comity or cooperation to the foreign representative" in section 1509(b)(3), and apparently concluded based on this language that a court must grant comity, not only to the foreign representative but also to either *a foreign law or a foreign court's order* upon request by the foreign representative.

Granting comity to a *foreign representative* by providing access to courts in the United States is very different from granting *the request* by the foreign representative to extend comity to a foreign law, court order or judgment. *Qimonda* did not cite any authority for the broader proposition that extending comity to foreign laws or court orders is re-

quired so long as that relief is not "manifestly contrary to the public policy of the United States," the limitation imposed by section 1506. If *Qimonda* were correct that comity is *required* to be given to any foreign law, court order or judgment that is not manifestly contrary to U.S. public policy, there would be no point in having the foreign representative "apply" to a U.S. court for discretionary relief.[FN11] The only **\*111** issue left open would be whether the requested relief is manifestly contrary to the public policy of the United States in violation of section 1506, leaving no room for the exercise of discretion; nothing about Chapter 15 supports such an interpretation.

> FN11. *Qimonda* is puzzling in several respects. The district court in reviewing the decision of the bankruptcy court to grant comity to German law stated that that an abuse of discretion standard applied for decisions committed to the discretion of the bankruptcy court. *Qimonda,* 433 B.R. at 555. Furthermore, according to the district court, the abuse of discretion standard applies when a lower court decides to defer to a foreign law under comity principles. *Id.* at 556. But the district court then stated that the parties unnecessarily "spill much ink" regarding whether comity should be granted when, according to the district court, the parties' "arguments are unpersuasive because they address the issue already decided by Congress in § 1509, namely whether courts must grant comity ...." *Id.* at 564–65. The "abuse of discretion" standard of review obviously cannot apply to an issue as to which the court lacks any discretion because the result is mandated by Congress. This Court does not believe that section 1509 can be read as removing the discretion that sections 1507, 1519, 1520 and 1521 expressly provide the bankruptcy court in determining whether to grant relief.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

482 B.R. 96, 57 Bankr.Ct.Dec. 72

**(Cite as: 482 B.R. 96)**

[12] The relief requested by the Foreign Representative—a stay of the adversary proceeding—is available, if at all, under sections 1507 or 1521(a)(7).FN12 Because section 1521 would permit the relief sought by the Foreign Representative, it is unnecessary to look to section 1507 for such authority. *See Atlas Shipping,* 404 B.R. at 741 (concluding that it was unnecessary to determine whether "additional assistance" was available under section 1507). Granting relief to the Foreign Representative under section 1521(a)(7) depends on whether "the interests of the creditors ... are sufficiently protected."FN13 11 U.S.C. § 1522(a). At least with respect to the funds belonging to the Non–Debtor Affiliates remaining in the Cash Management Account, the Court concludes that CTIM is sufficiently protected as a temporary matter as long as the funds remain in the United States. CTIM may be dissatisfied with the status, pace or a ruling in the Concurso Proceeding, but that alone does not justify permitting CTIM to proceed with its adversary proceeding in this Court.

FN12. The effects of recognition of the Concurso Proceeding as a foreign main proceeding are set forth in section 1520. Sections 361 and 362 are made applicable to property of the debtor that is within the United States. But section 362(d)(1) is therefore applicable and permits a bankruptcy court to lift the automatic stay if a creditor is not adequately protected. This express statutory authority for a bankruptcy court to allow a creditor to obtain relief from property of the debtor within the United States (by lifting the automatic stay) appears to trump continued protection of property based on international comity. Protection of property of a non-debtor affiliate may be provided under section 1521(a)(7) only if creditors are "sufficiently protected," as provided in section 1522(a). It would be ironic, to say the least, if property of a non-debtor affiliate received greater protection than property of the debtor.

FN13. Relief might also be possible under section 1521(a)(1) —"staying the commencement or continuation of an individual action or proceeding concerning the debtor's assets, rights, obligations ..."—to the extent the Precautionary Measures affect the Debtor's property. The dispute here appears to be limited to the Non–Debtor Affiliates' funds in the Cash Management Account, and the Precautionary Measures extend protection to property of the Non–Debtor Affiliates so section 1521(a)(7) is necessary for the Foreign Representative to obtain the requested relief.

But the *status quo* is also unsatisfactory. The Foreign Representative acknowledged that not all of the funds remaining in the Cash Management Account may be subject to the Precautionary Measures. *See* September 14 Hr'g Tr. at 14:7–20:6. CTIM is entitled to a determination of the funds that are *not* subject to the Precautionary Measures.

In *JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A.,* 412 F.3d 418 (2d Cir.2005), a pre-Chapter 15 case, the Second Circuit addressed the Circuit's prior decision in *Koreag, Controle et Revision S.A. v. Refco F/X Assocs., Inc. (In re Koreag),* 961 F.2d 341, 349 (2d Cir.1992), and reformulated the circumstances that make **\*112** it appropriate for a U.S. court to defer to a foreign insolvency court to decide issues concerning the treatment of property within the United States. The *Altos Hornos* court stated:

On this appeal we are asked to clarify the scope of our holding in *Koreag, Controle et Revision S.A. v. Refco F/X Assocs., Inc. (In re Koreag),* 961 F.2d 341, 349 (2d Cir.1992), where we ruled that the ownership of property a debtor claims as part of its estate in a foreign bankruptcy proceeding is a question "antecedent to the distributive rules of bankruptcy." Local courts may resolve

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

482 B.R. 96, 57 Bankr.Ct.Dec. 72

**(Cite as: 482 B.R. 96)**

the question because international comity does not require deference to the parallel foreign bankruptcy proceeding in such circumstances. *Id.* at 349. The rule announced in *Koreag,* however, only applies to disputes that present a *bona fide* question of property ownership. It has no application to disputes like this one where a bankruptcy creditor claims to own assets but has a contractual obligation to use those assets to pay down the same debt that is the subject of a foreign bankruptcy proceeding. In such a case, local courts are displaced and must defer to the foreign proceeding. We therefore affirm the district court's order dismissing appellant's complaint on international comity grounds.

*Id.* at 420.

The decisions in *Altos Hornos* and *Koreag* allow a U.S. court to determine ownership of property in the United States that is subject to a *bona fide* question of property ownership arising under U.S. law. Here, some (undetermined) portion of the funds in the Cash Management Account is property of the Non–Debtor Affiliates, and some of those funds may not be subject to the Precautionary Measures. But unlike the situations in *Altos Hornos* or *Koreag,* the Precautionary Measures on their face extend protection to the Non–Debtor Affiliates' funds in the Cash Management Account. In such circumstances, the Court believes that the Quintana Roo District Court is the more appropriate forum to sort out these issues if it chooses to do so in a timely fashion. Additionally, changed circumstances may support modification or termination of the Precautionary Measures by the Quintana Roo District Court.[FN14] The Foreign Representative's counsel conceded (after conferring with the Foreign Representative's Mexican counsel who was present in court during the hearing) that the Quintana Roo District Court can modify the Precautionary Measures based on changed circumstances. September 14 Hr'g Tr. at 45:8–47:17.

FN14. The Precautionary Measures prohibit CTIM from reaching the Non–Debtor

Affiliates' funds in the Cash Management Account. Nothing in the Precautionary Measures relieved the Non–Debtor Affiliates from the obligation to continue making debt service payments on the $103 million loan. Nevertheless, for more than two years, the Non–Debtor Affiliates have simply stopped paying. In a Chapter 11 case, failure to make post-petition payments on secured debt may result in lifting of the automatic stay. The Quintana Roo District Court could consider whether the Non–Debtor Affiliates' failure to make any debt service payments are changed circumstances that support modifying or terminating the Precautionary Measures.

[13] CTIM argues that the stay relief sought by the Foreign Representative is manifestly contrary to public policy in violation of section 1506. The only authority CTIM cites for support is the bankruptcy court decision in *In re Vitro, S.A.B. de C.V.,* 473 B.R. 117 (Bankr.N.D.Tex.2012), which is currently pending on direct appeal to the Fifth Circuit. Whatever the outcome of that appeal, it is clear that the stay relief sought by the Foreign Representative is not manifestly contrary to public**\*113** policy. The issues in this case—at least at this time—are whether this Court or the Quintana Roo District Court that issued the Precautionary Measures should determine the reach of the May 27 Order, and whether any changed circumstances support modifying or terminating the relief granted by the Quintana Roo District Court. As the District Court correctly concluded in *Carbonell,* 2012 WL 92359, at \*5, the type of relief provided in the Precautionary Measures is consistent with the type of relief granted by U.S. courts under appropriate circumstances. *Id.* ("As Plaintiff [CTIM] recognizes, U.S. bankruptcy courts have, as the May 27th Order does, suspended actions against non-debtor parties in order to assist in, and maintain the integrity of, the administration of a debtor's bankruptcy case." (citations omitted)). Precautionary Measures extending protection to non-debtor affiliates may be important and appro-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

482 B.R. 96, 57 Bankr.Ct.Dec. 72
**(Cite as: 482 B.R. 96)**

priate in providing a debtor with a respite from creditors and a chance to reorganize. Far different issues may be presented by a foreign court's final order impairing the rights of U.S. creditors, particularly when those creditors' claims are governed by U.S. law and are against non-debtor affiliates for property in the United States. [FN15] The much-awaited Fifth Circuit decision in *Vitro* may shed more light on such issues, but such issues are not presented by the Precautionary Measures because they were not a final disposition of claims against the Non–Debtor Affiliates. With that said, however, the question remains whether conditions should be imposed on any stay granted here, which will be dealt with separately below.

> FN15. The appeal in *Vitro* centers on whether the bankruptcy court was correct in refusing to grant comity to the provisions in the Mexican concurso plan approved by the Mexican insolvency court that invalidated guarantees to creditors by non-debtor affiliates. The bankruptcy court in *Vitro* did *not* analyze whether sections 1507 or 1522 provide authority to refuse to grant comity to aspects of the concurso plan even if the provisions in question are not manifestly contrary to public policy.

[14][15] While it is well recognized that comity should be extended in most instances, bankruptcy courts should also have the discretion to deny granting comity to foreign laws, court orders and judgments—consistent with over a hundred years of comity precedent—when unique circumstances warrant it, so long as "the interests of the creditors ... are sufficiently protected." 11 U.S.C. § 1522(a). Furthermore, courts *must* deny granting comity in exceptional circumstances of fundamental importance, when doing otherwise would be manifestly contrary to the public policy of the United States.

## C. Comity Should Be Extended to the May 27 Order

[16] The issue here is whether a stay of the ad-

versary proceeding should be granted pursuant to section 1521(a)(7) based on international comity. A central tenet of Chapter 15 is the importance of comity in cross-border insolvency proceedings. Comity is not defined in Chapter 15 but it pervades the statute. The Model Law upon which Chapter 15 is based emphasizes the importance of comity, but fails to define it. Section 304 of the Bankruptcy Code, the predecessor of Chapter 15, likewise called upon courts to apply international comity. The comity doctrine has been extensively analyzed in both bankruptcy and non-bankruptcy cases. [FN16] ***114** A review of traditional comity principles is useful.

> FN16. Whether Chapter 15 changes the calculus for granting, denying, limiting or conditioning the application of comity remains an open question. Sections 1507(b)(1)-(5) and 1522(a) and (c) arguably limit application of comity, allowing a court to reject application of comity in circumstances that might previously have supported its application. "Because the principle of comity does not limit the legislature's power and is, in the final analysis, simply a rule of construction, it has no application where Congress has indicated otherwise." *Maxwell,* 93 F.3d at 1047. It is unnecessary here to explore this issue further as the Court concludes that the relief ordered by the Court would be appropriate in any event.

Comity decisions arising under section 304, the predecessor to Chapter 15, provide useful precedents for the application of comity under the current Chapter 15 regime. Section 304's legislative history suggests the doctrine of comity was a late addition to section 304 to provide judges with flexibility in dealing with ancillary cases related to foreign insolvency proceedings. *Cunard S.S. Co. Ltd. v. Salen Reefer Servs. AB,* 773 F.2d 452, 456 (2d Cir.1985) (explaining that section 304(c) "was subsequently amended before passage in order expressly to direct

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

482 B.R. 96, 57 Bankr.Ct.Dec. 72
**(Cite as: 482 B.R. 96)**

the bankruptcy court to consider comity when evaluating a petition under section 304"). Section 304's legislative history states that "[p]rinciples of international comity and respect for the judgments and laws of other nations suggest that the court be permitted to make the appropriate orders under all of the circumstances of each case, rather than being provided with inflexible rules." *Id.* at 455 (quoting H.R.Rep. No. 595, 95th Cong., 2d Sess. 324–25, *reprinted in* 1978 *U.S.Code Cong. Ad. News* 5963, 6281).

[17] As stated in *Hilton v. Guyot,* 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895), comity is not an "absolute obligation." *Id.* at 164, 16 S.Ct. 139. However, the "doctrine has never been well defined." *Altos Hornos,* 412 F.3d at 423. Modern courts have suggested comity may include two distinct doctrines: "a canon of construction, it might shorten the reach of a statute," and "a discretionary act of deference by a national court to decline to exercise jurisdiction in a case properly adjudicated in a foreign state." *Maxwell Commc'n Corp. v. Societe Generale (In re Maxwell Commc'n Corp.),* 93 F.3d 1036, 1047 (2d Cir.1996).

[18][19][20][21] "Comity takes into account the interests of the United States, the interests of the foreign state or states involved, and the mutual interests of the family of nations in just and efficiently functioning rules of international law." *Atlas Shipping,* 404 B.R. at 733 (quoting *In re Artimm, S.r.L.,* 335 B.R. 149, 161 (Bankr.C.D.Cal.2005) (citing *Maxwell,* 93 F.3d at 1048)). "Federal courts generally extend comity whenever the foreign court had proper jurisdiction and enforcement does not prejudice the rights of United States citizens or violate domestic public policy." *Atlas Shipping,* 404 B.R. at 733 (quoting *Victrix S.S. Co., S.A v. Salen Dry Cargo A.B.,* 825 F.2d 709, 713 (2d Cir.1987)). As the court stated in *Altos Hornos,* "deference to the foreign court is appropriate so long as the foreign proceedings are procedurally fair and ... do not contravene the laws or public policy of the United States." *Altos*

*Hornos,* 412 F.3d at 424. In analyzing procedural fairness, courts have looked to the following nonexclusive factors:

(1) Whether creditors of the same class are treated equally in the distribution of assets; (2) whether the liquidators are considered fiduciaries and are held accountable to the court; (3) whether creditors have the rights to submit claims which, if denied, can be submitted to a bankruptcy court for adjudication; (4) whether the liquidators are required to give notice to potential claimants; (5) whether there are provisions for creditors meetings; (6) whether a foreign country's insolvency laws favor its own citizens; (7) whether all assets are marshalled before one body for centralized **\*115** distribution; and (8) whether there are provisions for an automatic stay and for the lifting of such stays to facilitate the centralization of claims.

*Finanz AG Zurich v. Banco Economico S.A.,* 192 F.3d 240, 249 (2d Cir.1999). FN17

> FN17. Choice-of-law principles and conflicts of law are important in deciding whether to extend comity to foreign law, court orders or judgments where there is an actual conflict between substantive legal rules in jurisdictions with an interest in the pending matter. *See Maxwell,* 93 F.3d at 1046–48, and cases cited therein. Respect for generally recognized choice-of law rules may also play a role in determining whether decisions of foreign courts satisfy requirements for procedural fairness before extending comity to foreign laws, court orders or judgments. Surprisingly few court decisions have followed the clear lead in *Maxwell* and analyzed choice-of-law principles in deciding whether to extend comity, instead deciding the issues on other bases. *See Qimonda,* 433 B.R. 547 (not including any choice of law analysis in evaluating whether to apply German patent law); *but see In re Toft,* 453 B.R. 186, 196

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

482 B.R. 96, 57 Bankr.Ct.Dec. 72
**(Cite as: 482 B.R. 96)**

(Bankr.S.D.N.Y.2011) (Gropper, J.) ("In many cases, these provisions would appear adequate to resolve a dispute arising from a conflict between U.S. and foreign law, and the public policy exception would not have to be invoked. It also appears patent that relief should not be granted or denied in a cross-border case where there is a conflict between U.S. and foreign law without a conflict of law analysis— *i.e.,* should U.S. or foreign law be applied to a particular issue based on familiar choice of law principles coupled with (where appropriate) due regard for the principle of comity.").

> At this stage of this case, the issue is whether this Court should extend comity (deference) to permit the Quintana Roo District Court to address the issues regarding the Precautionary Measures; *Maxwell* and *Altos Hornos* strongly counsel that it should. *See infra* n. 16. The Court is *not* required to resolve whether choice-of-law principles should lead a court (here or in Mexico) to apply New York law regarding enforcement of CTIM's security interest in the Non–Debtor Affiliates' funds in the Cash Management Account in New York. Even if the security interest should be enforced, a stay of the exercise of enforcement rights is an available remedy under U.S. bankruptcy law.

"The Second Circuit has frequently underscored the importance of judicial deference to foreign bankruptcy proceedings." *In re Int'l Banking Corp. B.S.C.,* 439 B.R. 614, 624 (Bankr.S.D.N.Y.2010) (citing *Finanz AG Zurich,* 192 F.3d at 246; *Maxwell,* 93 F.3d at 1048; *Allstate Life Ins. Co. v. Linter Grp. Ltd.,* 994 F.2d 996, 999 (2d Cir.1993); *Cunard,* 773 F.2d at 458). In *Altos Hornos,* the Second Circuit extended comity and deferred to a Mexican court to decide the underlying issues, despite the secured lender's argument that so doing would be procedurally unfair because of a six-year delay in resolving Altos Hornos's debts, and despite a governing New York choice of law and choice of forum provision. 412 F.3d at 428–29.

### 1. A Stay Should Be Granted to Permit the Quintana Roo District Court to Decide the Pending Issues

[22] In this case, some of the funds in the Cash Management Account are property of the Debtor; some of the funds are property of the Non–Debtor Affiliates. With respect to the funds belonging to the Non–Debtor Affiliates, the Foreign Representative acknowledged that some of those funds might be subject to the Precautionary Measures and some not. The parties have not agreed on the correct allocation of the funds. Absent an agreement between the parties, an evidentiary hearing will be required to resolve these disputes. The question now is whether the Quintana Roo District Court that entered the May 27 Order should resolve the open issues which derive from that order. *Maxwell,* 93 F.3d at 1047 (recognizing that comity involves "a discretionary act of deference by a national court to decline to exercise jurisdiction in a case properly adjudicated in a foreign state"), and *Altos Hornos,* 412 F.3d at 424, both strongly counsel that **\*116** deference should be provided to the Quintana Roo District Court to resolve these issues.[FN18] The Quintana Roo District Court entered the May 27 Order on an *ex parte* basis. CTIM chose to challenge the May 27 Order through the separate *amparo* proceeding, and it has never appeared in the Quintana Roo District Court seeking to vacate or modify the order. Granting comity to foreign courts does not depend on the willingness of one party to participate in a foreign proceeding, at least where the parties may be made subject to the jurisdiction of the foreign court.

> FN18. The court in *Altos Hornos* stated:
>
> > International comity ... involves not the choice of law but rather the discretion of

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

482 B.R. 96, 57 Bankr.Ct.Dec. 72

**(Cite as: 482 B.R. 96)**

a national court to decline to exercise jurisdiction over a case before it when that case is pending in a foreign court with proper jurisdiction. We have repeatedly held that U.S. courts should ordinarily decline to adjudicate creditor claims that are the subject of a foreign bankruptcy proceeding. Since [t]he equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding, American courts regularly defer to such actions. In such cases, deference to the foreign court is appropriate so long as the foreign proceedings are procedurally fair and (consistent with the principles of Lord Mansfield's holding) do not contravene the laws or public policy of the United States.

412 F.3d at 424 (internal quotation marks and citations omitted).

*2. Nothing in the Record Supports CTIM's Argument About Procedural Unfairness*

[23] One last point must be discussed. CTIM has been critical of the Quintana Roo District Court proceeding from the start. The criticism seems more appropriately leveled at Cozumel Caribe and the Foreign Representative, rather than at the Quintana Roo District Court. The Precautionary Measures were obtained *ex parte;* that is not uncommon in our courts as well. The initial order entered by the Quintana Roo District Court required that it be served on CTIM, among other parties; that too would be commonplace for *ex parte* orders issued by our courts. Due process is not violated by the entry of *ex parte* orders, provided that notice and an opportunity to appear and defend are promptly given. Cozumel Caribe did not promptly serve the order on CTIM, which learned of the May 27 Order in a letter from counsel to Cozumel Caribe. At the hearing in this case, CTIM acknowledged that the May 27 Order was finally served on

it in or around July 2010. September 14, 2012 Hr'g Tr. at 7:16–8:6. CTIM chose not to challenge the order in the Quintana Roo District Court even after being served; instead, CTIM commenced a separate *amparo* proceeding in a different Mexican court, ultimately with the unsatisfying result (for CTIM) of dismissal of the proceeding. The parties dispute the effect of that final disposition, but that issue need not be resolved here.

In addition to failing to timely serve the Precautionary Measures, the Debtor or its Non–Debtor Affiliates engaged in other questionable conduct. CTIM brought its action in the District Court against the non-debtor Guarantors. *Carbonnel, 2012 WL 92359, at *1* ("On September 13, 2010, plaintiff CT Investment Management Co., LLC, in its capacity as special servicer and attorney-in-fact for Bank of America, National Association, as successor by merger to LaSalle Bank National Association, as trustee for the Noteholders ... commenced the instant action against defendants Pablo Gonzalez Carbonell and Grupo Costamex, S.A. de C.V. ... alleging breach of contract under a guaranty agreement (the 'Agreement') entered into in connection with the development and operation of several resort properties and hotels**\*117** in Mexico.") Carbonell and Grupo Costamex did not appear and CTIM sought to have a default judgment entered. *Id.* Carbonell and Grupo Costamex had consented to New York court jurisdiction in the Guarantee Agreement.[FN19] (*See* ECF Doc. # 38, Ex. D at 12.) Instead of the Guarantors defending the action, the Foreign Representative appeared arguing for a stay based on the Precautionary Measures. (*See* ECF Doc. # 38 at 4.) After the District Court Action was stayed, the Guarantors commenced an action in still another Mexican court seeking to invalidate the Guarantee Agreement. They reportedly served their complaint on a teller in a Bank of America branch in Chicago, rather than serving CTIM (or Bank of America through more appropriate means), and when no one appeared in the Mexican action, the Guarantors obtained a default judgment invalidating the Guarantee Agreement. *Id.* If the default

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

482 B.R. 96, 57 Bankr.Ct.Dec. 72
**(Cite as: 482 B.R. 96)**

judgment withstands challenge in the Mexican courts, a court in the United States may ultimately have to decide whether the judgment can be enforced in this country should enforcement be sought.[FN20] While these circumstances have no direct bearing on the issues here, the Court cannot help but be influenced by this alleged conduct in deciding whether or how to exercise its discretion in granting the relief sought by the Foreign Representative.

> FN19. The existence of a choice of law and forum selection clause does not prevent staying a matter in favor of a foreign forum based on comity. *See Allstate Life Ins. Co.,* 994 F.2d at 1000 ("Appellants emphasize the presence of a forum selection and choice of law clause in the Indenture Agreement which selects New York as a forum and New York law to govern the agreement. Appellants contend that this clause indicates that the court abused its discretion in granting comity in favor of the Australian proceedings. The presence of such clauses, however, does not preclude a court from granting comity where it is otherwise warranted.").

> FN20. In *Hilton v. Guyot,* the Supreme Court held that if the foreign forum provides "a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it is sitting," the judgment should be enforced and not "tried afresh." *Hilton,* 159 U.S. at 202–03, 16 S.Ct. 139; *see also Metcalfe & Mansfield Alternative Investments,* 421 B.R. at 698.

[24] CTIM has so far avoided appearing in the Quintana Roo District Court that entered the order that has given rise to so much controversy. But that is the court that should address the issues in the first instance. Section 1522 permits this Court to impose conditions on relief, and that is what the Court will do. Therefore, the Court will stay the adversary proceeding for a period of 180 days from the date of this order. The stay is expressly conditioned on the following:

1. Within 60 days from the date of this order, the Debtor and Foreign Representative shall commence an appropriate proceeding in the Quintana Roo District Court seeking a determination (i) whether the Precautionary Measures apply to all of the funds in the Cash Management Account, and, if not, what is the amount of funds *not* covered by the Precautionary Measures, and (ii) whether, because of changed circumstances, the Precautionary Measures should be modified or terminated;

2. In commencing that proceeding, the Debtor or Foreign Representative must *promptly* serve CTIM with **\*118** such process as is necessary under Mexican law;

3. CTIM shall advise this Court within 14 days after the Mexican proceeding is commenced whether CTIM will consent to the jurisdiction of the Quintana Roo District Court to decide the issues addressed in this order; and

4. If, for any reason, the Quintana Roo District Court declines to hear and decide the issues identified in this order within 180 days, the parties shall so advise this Court. In that event, the Court will determine whether to maintain the stay of the adversary proceeding.[FN21]

> FN21. While deference to a foreign court may be appropriate, courts in the U.S. may proceed to decide issues relevant to cases before them if the foreign court declines to

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

482 B.R. 96, 57 Bankr.Ct.Dec. 72

**(Cite as: 482 B.R. 96)**

decide the matter. *See International Banking Corp.,* 439 B.R. at 629 ("Accordingly, the Court directs the parties to consent to the jurisdiction of the Bahraini court to decide the voidability of the Attachment Orders, and further directs them to seek a ruling from the Bahraini court as to the voidability of the Attachment Orders under Bahraini law. In the event that the Bahraini court declines to exercise jurisdiction, this Court will decide the dispute.... Finally, the parties should schedule a conference to be held approximately 90 days after the date of this order to report on their progress.").

The Precautionary Measures approved *ex parte* by the Quintana Roo District Court included a requirement that the funds in the CTIM account be returned to Mexico.[FN22] The Foreign Representative has never pressed this aspect of the Precautionary Measures, but to make the matter clear, the Court concludes that CTIM would not be sufficiently protected if the funds in the Cash Management Account—all of which are covered by a perfected security interest governed by New York law—were returned to Mexico absent further order of this Court.

> FN22. Subsection (c) of the May 27 Order directs that "the total balance of the Cash Management Account ... be placed by the current depository available for its owners (Cozumel Caribe, S.A. DE C.V. and its affiliates) for the purpose of its preservation in a sight deposit in the national territory until a conciliator ... is appointed." Herrera Decl., Ex. A–1 at 3.

### III. CONCLUSION

For the foregoing reasons, the motion of the Foreign Representative for a stay of this adversary proceeding is **GRANTED** on the conditions set forth in this Memorandum Opinion and Order.

**IT IS SO ORDERED.**

Bkrtcy.S.D.N.Y.,2012.
In re Cozumel Caribe, S.A. de C.V.
482 B.R. 96, 57 Bankr.Ct.Dec. 72

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Tab 31

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 15 |
| Crédito Real, S.A.B. de C.V., SOFOM, E.N.R.,[1] | Case No. 25-10208 (TMH) |
| Debtor in a foreign proceeding. | |

**OPINION**

In its June 27, 2024 decision in <u>Harrington v. Purdue Pharma, L.P.</u>,[2] the Supreme Court held that a chapter 11 plan of reorganization cannot provide for a nonconsensual third-party release of claims against a non-debtor.[3] Following that decision, the international insolvency community has debated whether, under chapter 15, a bankruptcy court nonetheless may enter an order enforcing a *foreign plan* containing such releases.[4] That is the question presented here. At the recognition hearing held in this chapter 15 case on March 11, 2025, in an oral bench

---

[1] The last four identifying digits of the tax number and the jurisdiction in which the Chapter 15 Debtor pays taxes is Mexico – 6815. The Chapter 15 Debtor's corporate headquarters is located at Avenida Insurgentes Sur No. 730, 20th Floor, Colonia del Valle Norte, Alcaldía Benito Juárez, 03103, Mexico City, Mexico.

[2] 603 U.S. 204 (2024).

[3] <u>Id.</u> at 226–27 ("Confining ourselves to the question presented, we hold only that the bankruptcy code does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of affected claimants.").

[4] <u>See, e.g.</u>, Joshua Kieran-Glennon, <u>Restructuring Update: Third-Party Releases after Purdue Pharma – Solutions in Irish Law</u>, McCann FitzGerald (Nov. 7, 2024), available at https://perma.cc/HR72-YR79; Michelle McGreal, Douglas Deutsch, & Robert Johnson, <u>Purdue Pharma Bankruptcy Ruling Sidesteps Chapter 15 Implications</u>, Bloomberg (July 10, 2024), available at https://perma.cc/5U5G-CXBF.

ruling, this Court held that such an order is permissible after Purdue and granted

enforcement of a Mexican plan containing such releases.

Section 1501 of title 11 of the United States Code (the "Bankruptcy Code")

describes the "purpose and scope of application" of chapter 15.[5] When it enacted

chapter 15, Congress sought to facilitate cooperation between the courts of the

United States and the courts of foreign countries in cross-border insolvency cases

and to empower a court exercising bankruptcy jurisdiction to render assistance to

the foreign court.[6]

In this case, Robert Wagstaff, the foreign representative (the "Foreign

Representative") of Crédito Real, S.A.B. de C.V., SOFOM, E.N.R. (the "Chapter 15

Debtor"), petitioned for entry of an order recognizing the Chapter 15 Debtor's

Mexican bankruptcy case (the "Mexican Prepack Proceeding") as a foreign main

proceeding.[7] That request was unopposed.

The Foreign Representative also asked this Court to render assistance to the

Mexican court by recognizing and enforcing the plan that the Mexican court

---

[5] 11 U.S.C. § 1501.
[6] Id.; see also In re ABC Learning Ctrs. Ltd., 728 F.3d 301, 304–05 (3d Cir. 2013)
(examining Congress's purpose in enacting chapter 15 and explaining the objectives
of the legislation); In re Irish Bank Resol. Corp., No. 13-12159 (CSS), 2014 WL
9953792, at *9–10 (Bankr. D. Del. Apr. 30, 2014), aff'd, 538 B.R. 692 (D. Del. 2015).
[7] Verified Petition for Recognition of Foreign Main Proceeding and Motion for Order
Granting Full Force and Effect to the Concurso Plan and Related Relief Pursuant to
11 U.S.C. §§ 105, 1507(a), 1509(b), 1515, 1517, 1520 and 1521 (the "Verified
Petition") [D.I. 2].

2

approved. The parties refer to that plan as the Concurso Plan[8] and the order approving it as the Concurso Order.[9]

The United States International Development Finance Corporation (the "DFC") opposed this relief, arguing that the nonconsensual third-party releases contained in the Concurso Plan are not authorized under chapter 15 and would be "manifestly contrary to the public policy of the United States."[10] This Court overruled that objection and entered its Order Granting (I) Recognition of Foreign Main Proceeding, (II) Full Force and Effect to Concurso Plan and Certain Related Relief (the "Recognition Order").[11] On March 25, 2024, the DFC filed its notice of appeal.[12] This is the Court's written opinion in support of the Recognition Order.[13]

---

[8] Foreign Rep. Ex 7.

[9] Foreign Rep. Ex. 8.

[10] 11 U.S.C. § 1506.

[11] D.I. 51.

[12] D.I. 58.

[13] See Del. Bankr. L.R. 8003-2 ("Any bankruptcy Judge whose order is the subject of an appeal may file a written opinion that supports the order being appealed or that supplements any earlier written opinion or recorded oral bench ruling or opinion within 7 days after the filing date of the notice of appeal.").

I.     Background[14]

The Chapter 15 Debtor was one of Mexico's largest non-bank financial

lending institutions.[15] Its customers were located predominantly in Mexico,

elsewhere in Latin America, and in the United States.[16] It is a Mexican company,

and it held or holds direct or indirect equity interests in entities located in Mexico,

the United States, Honduras, Panama, Turks and Caicos, Costa Rica, Nicaragua,

Guatemala, and El Salvador.[17]

In 2021, amid a liquidity crisis, the Chapter 15 Debtor began discussions

with its key creditors on a restructuring.[18] These negotiations failed, and in June

2022, an ad hoc group of unsecured creditors (the "Ad Hoc Group") filed an

---

[14] This background section is based on the (i) Verified Petition;, (ii) the Declaration of Juan Pablo Estrada Michel Pursuant to 28 U.S.C. § 1746 in Support of the Petitioner's Verified Petition for Recognition of Foreign Main Proceeding and Motion for Order Granting Full Force and Effect to the Concurso Plan and Related Relief Pursuant to 11 U.S.C. §§ 105, 1507(a), 1509(b), 1515, 1517, 1520 and 1521 (the "Estrada Dec.") [D.I. 3] (Foreign Rep. Ex. 2); and (iii) the Supplemental Declaration of Juan Pablo Estrada Michel Pursuant to 28 U.S.C. § 1746 in Support of the Petitioner's Verified Petition for Recognition of Foreign Main Proceeding and Motion for Order Granting Full Force and Effect to the Concurso Plan and Related Relief Pursuant to 11 U.S.C. §§ 105, 1507(a), 1509(b), 1515, 1517, 1520 and 1521 (the "Estrada Supp. Dec.") [D.I. 41] (Foreign Rep. Ex. 11). The Verified Petition, Estrada Dec., and Estrada Supp. Dec. were admitted without objection. Messrs. Wagstaff and Estrada were not cross-examined.
[15] Verified Petition ¶ 1.
[16] Id.
[17] Id. ¶ 4.
[18] Id. ¶ 11.

4

involuntary chapter 11 petition against the Chapter 15 Debtor (the "Involuntary

Chapter 11 Case").[19]

On June 28, 2022, one of the Chapter 15 Debtor's shareholders commenced a

liquidation proceeding in the 52nd Civil State Court of Mexico City, Mexico (the

"Mexican Liquidation Proceeding").[20] The court appointed Fernando Alonso-de-

Florida Rivero as judicial liquidator (the "Mexican Liquidator").[21]

Then, on July 14, 2022, the Foreign Representative filed a petition under

chapter 15 in this Court (the "Prior Chapter 15 Case"), along with a petition for

recognition of the Mexican Liquidation Proceeding as a foreign main proceeding.[22]

Following these events, the Chapter 15 Debtor, the Mexican Liquidator, the

Foreign Representative, and the Ad Hoc Group adjourned pending disputed matters

in the Involuntary Chapter 11 Case and the Prior Chapter 15 Case to pursue

settlement discussions.[23] These negotiations succeeded, and the Chapter 15 Debtor,

the Mexican Liquidator, and the Ad Hoc Group entered into a restructuring support

agreement (the "RSA") to implement a global restructuring of the Chapter 15

Debtor's assets and liabilities.[24] It was under the terms of the RSA that the Mexican

---

[19] Id. ¶ 12; In re Crédito Real, S.A.B. de C.V., SOFOM, E.N.R., Case No. 22-10696 (TMH) (formerly Case No. 22-10842 (DSJ) in the United States Bankruptcy Court for the Southern District of New York).
[20] Id. ¶ 13.
[21] Estrada Dec. ¶ 48.
[22] Verified Petition ¶ 14; In re Crédito Real, S.A.B. de C.V., SOFOM, E.N.R., Case No. 22-10630 (TMH).
[23] Verified Petition ¶ 15.
[24] Id. ¶ 20; Foreign Rep. Ex. 9.

5

Liquidator commenced the Mexican Prepack Proceeding.[25] The parties agreed that

that Foreign Representative would seek recognition here of the Mexican Prepack

Proceeding as a foreign main proceeding and an order giving full force and effect to

the Concurso Plan.[26]

On October 6, 2023, the Chapter 15 Debtor commenced the Mexican Prepack

Proceeding at the direction of the Mexican Liquidator by filing a voluntary petition

with the Mexican court.[27] On November 13, 2023, the Mexican Court issued a

judgment officially commencing the conciliation stage of the Mexican Prepack

Proceeding (the "Concurso Judgment").[28]

The Concurso Judgment imposed protective measures designed to preserve

the Chapter 15 Debtor's estate, including a stay on all enforcement and collection

actions against the Chapter 15 Debtor's assets and a prohibition on paying

obligations due before the date of the commencement of the Mexican Prepack

Proceeding.[29] Miguel Escamilla Villa was appointed as the Conciliator[30] of the

Mexican Prepack Proceeding.[31] The Concurso Judgment was served on creditors

and other parties through publication in a nationwide newspaper and in the Official

Journal of the Federation; additionally, a summary of the judgement was registered

---

[25] Verified Petition ¶ 20.
[26] Id.
[27] Id. ¶ 21; Foreign Rep. Ex. 4.
[28] Foreign. Rep. Ex. 5.
[29] Estrada Dec. ¶ 55.
[30] Under Mexican bankruptcy law, the court appoints the Conciliator to work with the debtor and its recognized creditors on an agreement about the debtor's restructuring. See id. ¶ 29 for a description of the role of the Conciliator.
[31] Id. ¶ 56.

6

3200

in the Public Registry of Commerce to ensure that all interested parties, including foreign creditors, were adequately informed.[32]

On March 20, 2024, the Mexican Court issued a judgment of recognition that confirmed the ranking and classification of all the creditors' claims (the "Recognition Judgment").[33]

On May 21, 2024, the Concurso Plan was presented to the creditors recognized under the Recognition Judgment, and on July 1, 2024, with the consent of the majority of the recognized creditors, the Conciliator formally submitted the plan to the Mexican Court.[34] On August 15, 2024, the Mexican Court issued the Concurso Order overruling all objections to the Concurso Plan and finding that the Concurso Plan satisfied all of the requirements of the Mexican Bankruptcy Law and did not violate Mexican public policy.[35] The Concurso Plan received support representing 56.55% of the aggregate outstanding unsecured claims.[36]

The Concurso Plan is consistent with the terms of the RSA and provides for the repayment of creditors who are located in the United States.[37] It establishes the creation of a special purpose vehicle through a Mexican trust, to which almost all of

---

[32] Id. ¶ 57.

[33] Id. ¶ 58; Foreign Rep. Ex. 6.

[34] Estrada Dec. ¶ 60.

[35] Id. ¶ 61; see also Ley de Concursos Mercantiles [LCM] (Bankruptcy Law) art. 64, Diario Oficial de la Federación [DOF] 12-5-2000, últimas reformas DOF 14-1-2014 (Mex.) (establishing the requirements for a plan to obtain approval under Mexican Bankruptcy Law).

[36] Estrada Dec. ¶ 62.

[37] Id. ¶ 63.

7

3201

the Chapter 15 Debtor's remaining assets will be transferred.[38] Upon the

monetization, sale, or assignment of such assets, the corresponding proceeds will be

distributed according to the priority scheme set forth in the Mexican Bankruptcy

Law, *pari passu* and *pro rata* among unsecured creditors.[39] Upon the distribution,

the unsecured claims will be cancelled or extinguished in accordance with the

Concurso Plan.[40]

Clause 16 of the Concurso Plan contains exculpatory provisions that shield

certain parties who played roles in the negotiation and implementation of the

Chapter 15 Debtor's restructuring process, including the Ad Hoc Group, the

Mexican Liquidator, the Chapter 15 Debtor's former directors and officers, the

Indenture Trustee, and certain related parties (the "Release").[41] These parties are

exculpated for any actions or inactions taken during the restructuring process prior

to the creditors' formal acceptance of the plan, subject to the Concurso Plan's carve-

outs and exceptions.[42] Specifically, the Concurso Plan provides:

> In any event, [the Chapter 15 Debtor] and the Recognized Creditors
> agree not to bring any action, complaint, suit or claim, as the case may
> be, against the Participating Recognized Creditors nor [the Chapter 15
> Debtor], respectively, as well as their shareholders, its former general
> manager Felipe Guelfi Regules, liquidator, directors, officers,
> secretaries, depositaries and officers, and The Bank of New Mellon, as
> trustee for [the Chapter 15 Debtor]'s foreign-denominated bonds
> denominated in U.S. dollars, legal tender in the United States of
> America, and euros, legal tender in the European Union as the case may
> be, for any act or omission incurred by them during the Bankruptcy

---

[38] Id.
[39] Id.
[40] Id.
[41] Id. ¶ 66; Concurso Plan, Clause 16.
[42] Concurso Plan, Clause 16.

8

Proceeding and at any time prior to the execution of this Agreement, except for actions, complaints, claims or demands, as the case may be, for acts or omissions of [the Chapter 15 Debtor] that have caused damage or impairment to the Bankruptcy Estate and that they have failed to declare or disclose to the Participating Recognized Creditors during the negotiations of this Settlement Agreement and up to the date of its execution.[43]

As written, the Release is customary in Mexican settlement agreements and is permitted under Mexican Bankruptcy Law.[44] Under the Concurso Order, the Mexican Court determined that the Concurso Plan and the Release are consistent with Mexican Bankruptcy Law and not in violation of the public or individual interest of any specific creditor.[45] The Concurso Order has not been subject to a stay in Mexico, so it remains in effect and is enforceable under Mexican law.[46]

The DFC was an active participant in the Mexican Prepack Proceeding.[47] It filed a proof of claim and objected to the approval of the Concurso Plan on grounds that were unrelated to the Release.[48] On November 21, 2024, the DFC appealed the Concurso Order, challenging, among other things, the Release.[49] On December 10, 2024, the Ad Hoc Group, the Chapter 15 Debtor, and the Conciliator each filed a reply to the DFC's appeal.[50] In their respective briefs, the Chapter 15 Debtor and Ad Hoc Group argued that the Release does not violate Mexican Bankruptcy Law,

---

[43] Concurso Plan Clause 16.
[44] See Estrada Supp. Dec. ¶ 17.
[45] Id. ¶ 25.
[46] Id.
[47] Id. ¶ 22.
[48] Id. ¶¶ 23–24.
[49] Id. ¶ 26.
[50] Id. ¶ 27.

9

and they defended the propriety of the Release.[51] The DFC appeal remains pending.[52]

On February 7, 2025, the Foreign Representative filed the Verified Petition, commencing this chapter 15 case and seeking entry of an order recognizing the Mexican Prepack Proceeding and enforcing the Concurso Plan and Concurso Order. The DFC objected.[53]

On March 11, 2025, this Court conducted an evidentiary hearing to consider the Verified Petition and concluded that it possessed the power to grant (i) recognition to the Mexican Prepack Proceeding as a foreign main proceeding, and (ii) comity and full force and effect to the Concurso Plan. The Court accordingly entered the Recognition Order.[54]

II.     The DFC Objection

In the DFC Objection, the DFC argued that the Concurso Plan cannot be recognized in its current form because the Release is not authorized under Bankruptcy Code sections 1507 and 1521.

It contends that Bankruptcy Code section 1521(a) does not include third-party releases as relief available to a foreign debtor. Specifically, the DFC argues

---

[51] Id.

[52] Id. ¶ 23.

[53] See Objection of United States International Development Finance Corporation to Verified Petition for Recognition of Foreign Main Proceeding and Motion for Order Granting Full Force and Effect to the Concurso Plan and Related Relief Pursuant To 11 U.S.C. §§ 105, 1507(a), 1509(b), 1515, 1517, 1520 and 1521 (the "DFC Objection") [D.I. 30].

[54] Following entry of the Recognition Order, this Court entered orders dismissing the Involuntary Chapter 11 Case and the Prior Chapter 15 Case.

10

3204

that the term "any appropriate relief" used in that section refers to relief available under the Bankruptcy Code. The DFC contends that non-consensual third-party releases are not available. Relatedly, it contends that Bankruptcy Code section 1507, which provides that a U.S. court may grant "additional assistance" to a foreign representative, also does not provide for such relief.

The DFC posits that the Foreign Representative wrongly relies on the catchall provisions of Bankruptcy Code section 1521(a)(7) and 1507 to justify enforcement of the Concurso Plan. In so doing, it points to Purdue. However, the DFC does not argue that Purdue's refusal to approve a non-consensual third-party release in that chapter 11 case means that such a release cannot be available in chapter 15. Instead, the DFC argues that Purdue offers a framework for thinking about statutory interpretation that means this Court lacks authority to order enforcement of the Release.

The DFC contends that this Court should read the catchall provisions of Bankruptcy Code sections 1521(a)(7) and 1507 in the same way the Purdue Court read Bankruptcy Code section 1123(b)(6), and therefore conclude that catchall provisions like these are limiting provisions that provide no authority for enforcement of the Release.

The DFC also argues that the Release is "manifestly contrary to the public policy of the United States" as provided in Bankruptcy Code section 1506.

11

3205

III.   Discussion

This is a core proceeding under 28 U.S.C. § 157(b)(2)(P) because it involves "matters under chapter 15 of title 11." The DFC did not contest that recognition of the Mexican Prepack Proceeding under Bankruptcy Code section 1517 was appropriate, and this Court entered an order granting recognition of the Mexican Prepack Proceeding as a foreign main proceeding. As a consequence of that recognition, this Court "shall grant comity or cooperation to the [F]oreign [R]epresentative."[55]

Chapter 15 begins with a policy statement. Section 1501, which is titled "Purpose and scope of application," provides:

> (a) The purpose of this chapter is to incorporate the Model Law on Cross-Border Insolvency so as to provide effective mechanisms for dealing with cases of cross-border insolvency with the objectives of—
>
> (1) cooperation between—
>
>> (A) courts of the United States, United States trustees, trustees, examiners, debtors, and debtors in possession; and
>>
>> (B) the courts and other competent authorities of foreign countries involved in cross-border insolvency cases;
>
> (2) greater legal certainty for trade and investment;
>
> (3) fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor;
>
> (4) protection and maximization of the value of the debtor's assets; and

---

[55] 11 U.S.C. § 1509(b)(3) (directing a court to grant comity if it has granted recognition under section 1517 and subject to any limitations consistent with the policy of chapter 15).

12

3206

(5) facilitation of the rescue of financially troubled businesses,
thereby protecting investment and preserving employment.[56]

No other chapter of the Bankruptcy Code sets forth a similar statement about
its purpose. The inclusion of this policy statement in section 1501 highlights that
the Court should be guided by the main policy goals of chapter 15—cooperation and
comity with foreign courts and deference to those courts within the confines
established by chapter 15.

The importance of comity is reinforced in section 1507(b), which instructs
that the provision of "additional relief" be "consistent with the principles of comity .
. . ."[57] It is then further emphasized in section 1509(b)(3), which provides that when
a U.S. court grants recognition of a foreign proceeding under Bankruptcy Code

---

[56] 11 U.S.C. § 1501(a). The language of this section closely tracks the Preamble of
the UNCITRAL Model Law of Cross-Border Insolvency, which provides that:

> The purpose of this Law is to provide effective mechanisms for dealing
> with cases of cross-border insolvency so as to promote the objectives of:
>
> (a) Cooperation between the courts and other competent authorities
> of this State and foreign States involved in cases of cross-border
> insolvency;
>
> (b) Greater legal certainty for trade and investment;
>
> (c) Fair and efficient administration of cross-border insolvencies that
> protects the interests of all creditors and other interested persons,
> including the debtor;
>
> (d) Protection and maximization of the value of the debtor's assets;
> and
>
> (e) Facilitation of the rescue of financially troubled businesses,
> thereby protecting investment and preserving employment.

[57] 11 U.S.C. § 1507(b).

13

section 1517, it "shall grant comity or cooperation to the foreign representative."[58]

Therefore, in deciding the issues presented here, this Court is mindful of the context

in which it operates and considers the centrality of cooperation and comity in

reaching its decision.

Upon recognition of a foreign main proceeding, the Court has broad discretion

to order enforcement of orders entered in a foreign main proceeding, consistent with

the guiding principles of comity.[59] These principles of comity are particularly

compelling in the bankruptcy context, where "American courts have long recognized

the need to extend comity to foreign bankruptcy proceedings, because the equitable

and orderly distribution of a debtor's property requires assembling all claims

against the limited assets in a single proceeding; if all creditors could not be bound,

a plan of reorganization would fail."[60] Therefore, when considering whether to

---

[58] 11 U.S.C. § 1509(b)(3).

[59] See In re Energy Coal S.P.A., 582 B.R. 619, 626–27 (Bankr. D. Del. 2018) (quoting
In re Daebo Int'l Shipping Co., 543 B.R. 47, 52–53 (Bankr. S.D.N.Y. 2015))
(explaining that the Bankruptcy Code gives courts "broad discretion" and instructs
them to be "guided by principles of comity and cooperation with foreign courts in
deciding whether to grant the foreign representative additional post-recognition
relief"); In re Grant Forest Prods., Inc., 440 B.R. 616, 621 (Bankr. D. Del. 2010)
(stating that this broad power is designed to promote cooperation between U.S.
courts and foreign courts in cross-border insolvency cases); In re Elpida Memory,
Inc., No. 12-10947 CSS, 2012 WL 6090194, at *7–8 (Bankr. D. Del. Nov. 20, 2012)
(reiterating the broad discretion certain sections of chapter 15 accord, consistent
with principles of comity). See generally Hilton v. Guyot, 159 U.S. 113, 164 (1895)
(defining comity as the "recognition which one nation allows within its territory to
the legislative, executive or judicial acts of another nation, having due regard both
to international duty and convenience, and to the rights of its own citizens or of
other persons who are under the protections of its laws").

[60] In re Energy Coal S.P.A., 582 B.R. at 627 (quoting In re Atlas Shipping A/S, 404
B.R. 726, 733 (Bankr. S.D.N.Y. 2009)) (internal quotation marks and alterations
omitted). See generally In re ABC Learning Ctrs. Ltd., 728 F.3d at 304–07

14

enforce an order entered in a foreign main proceeding, U.S. bankruptcy courts should aim to maximize assistance to the foreign court conducting the foreign main proceeding.[61]

Two provisions through which a U.S. bankruptcy court may enforce orders entered in a foreign main proceeding are Bankruptcy Code sections 1521(a) and 1507. The Foreign Representative asked that this Court enforce the Concurso Plan under those sections. Section 1521(a) empowers bankruptcy courts to grant appropriate relief, whereas section 1507 empowers bankruptcy courts to provide additional assistance.

However, Bankruptcy Code section 1521(a)'s and 1507's broad grants of discretion are limited in multiple ways. A main limitation on the court's discretion under these sections is Bankruptcy Code section 1506. That section provides that the court may "refus[e] to take an action governed by [chapter 15] if the action would be manifestly contrary to the public policy of the United States."[62] Refusing to take an action under Bankruptcy Code section 1506 is an extraordinary act. That section should be "narrowly interpreted, as the word 'manifestly' in international

---

(discussing the origins of chapter 15 and emphasizing the role of comity in bankruptcy proceedings).

[61] See In re ABC Learning Ctrs. Ltd., 728 F.3d at 306 (explaining that chapter 15 directs U.S. courts to act "in aid of the main proceedings, in preference to a system of full bankruptcies . . . in each state where assets are found" (quoting H.R. Rep. No. 109–31(1), at 109 (2005) reprinted in 2005 U.S.C.C.A.N. 88, 171)).

[62] 11 U.S.C. § 1506.

15

3209

usage restricts the public policy exception to the most fundamental policies of the

United States."[63] As a consequence, that authority rarely is exercised.[64]

Under Bankruptcy Code section 1506, the Court's discretion to enforce orders

of a foreign court is circumscribed by fundamental policies of fairness. Since before

the enactment of chapter 15, for a U.S. bankruptcy court to enforce an order of a

foreign court in an insolvency proceeding, courts have required that the foreign

proceeding afford litigants the same fundamental protections that they would have

received in a U.S. court.[65] Relief that is granted in a foreign proceeding does not

---

[63] In re Ephedra Prods. Liab. Litig., 349 B.R. 336 (S.D.N.Y. 2006) (citing H.R. Rep. No. 109–31(I) at 109, reprinted in 2005 U.S.C.C.A.N. 88, 172).

[64] See In re PT Bakrie Telecom Tbk, 628 B.R. 859, 890–91 (Bankr. S.D.N.Y. 2021) (reading the public policy exception narrowly because the word "manifestly" restricts it to the "most fundamental" U.S. policies and finding that, prior to Purdue, non-consensual third-party releases were not manifestly contrary to U.S. public policy); In re Sino-Forest Corp., 501 B.R. 655, 665 (Bankr. S.D.N.Y. 2013) (emphasizing that courts should construe this section narrowly and finding that, prior to Purdue, non-consensual third-party releases were not manifestly contrary to U.S. public policy); In re Metcalfe & Mansfield Alternative Invs., 421 B.R. 685, 697 (Bankr. S.D.N.Y. 2010) (construing the section narrowly and finding that, prior to Purdue, U.S. bankruptcy courts could enforce non-consensual third-party releases because they were not manifestly contrary to U.S. public policy). Compare In re Rede Energia S.A., 515 B.R. 69, 98 (Bankr. S.D.N.Y. 2014) (stating that section 1506 should be construed narrowly and used sparingly and finding that to enact the Brazilian plan would not be manifestly contrary to the public policies of the United States because "Brazilian bankruptcy law meets our fundamental standards of fairness and accords with the course of civilized jurisprudence"), with In re Toft, 453 B.R. 186, 198 (Bankr. S.D.N.Y. 2011) (finding that while a difference in U.S. law from the foreign law does not necessarily preclude enforcement under chapter 15, the plan component at issue was affirmatively banned under U.S. law, enforcement would subject the enforcer to criminal liability, and enforcement would directly compromise privacy rights established in a comprehensive statutory scheme and based on constitutional rights).

[65] Courts are divided on the statutory source of this limitation, but they agree that it is a central tenet of whether to afford foreign orders comity in insolvency proceedings, and it has remained so throughout multiple iterations of the

16

have to be identical to relief that might be available in a U.S. proceeding.[66] Instead,

the cases teach that we should look to the fairness of the foreign proceeding.[67]

---

Bankruptcy Code and the U.S. bankruptcy system itself. See Vertiv, Inc. v. Wayne Burt PTE, Ltd., 92 F.4th 169, 180 (3d Cir. 2024) (holding that a court should examine the foreign proceeding's fairness pursuant to principles of comity); In re Irish Bank Resol. Corp., 2014 WL 9953792 at *18 (explaining that a court must examine the procedural fairness of the foreign proceedings pursuant to the public policy exception of section 1506); In re PT Bakrie Telecom Tbk, 628 B.R. at 884 (clarifying that the considerations of fairness a court must examine in its determination of whether to enforce an order of a foreign court overlap with the considerations of Bankruptcy Code sections 1521 and 1507, all combining to "assure the just treatment and protection against prejudice of claim holders in the United States through adequate procedural protections"); In re Rede Energia S.A., 515 B.R. at 90 (holding that Bankruptcy Code section 1507 establishes the fairness considerations that courts must examine in determining whether to grant comity to a foreign court's order); In re Sino-Forest Corp., 501 B.R. at 662–63 (emphasizing the importance of ensuring fairness in the foreign proceeding when determining whether to grant a foreign order comity under chapter 15); In re Atlas Shipping A/S, 404 B.R. at 733 (explaining that before Congress enacted chapter 15, Bankruptcy Code section 304 required bankruptcy courts, when considering whether to enforce foreign orders, to determine that such enforcement would not prejudice the rights of U.S. citizens); Phila. Gear Corp. v. Phila. Gear de Mex., S.A., 44 F.3d 187, 193–94 (3d Cir. 1994) (directing the District Court, in determining whether to grant comity to a Mexican proceeding, to make findings on certain considerations of fairness, including whether the Mexican court was a duly authorized tribunal, whether the plan provided for equal treatment of creditors, whether recognition would be inimical to the U.S. policy of equality, and whether the U.S. creditor would be prejudiced); Canada S. Ry. Co. v. Gebhard, 109 U.S. 527, 536 (1883) (considering whether to afford comity to a Canadian insolvency plan and determining that the Canadian proceedings did not deprive creditors of their property without due process of law).

[66] In re Metcalfe, 421 B.R. at 697 (explaining that enforcement of relief in a foreign plan does not require identical relief to be available in the United States); In re Toft, 453 B.R. at 198 (emphasizing that the mere fact that U.S. law differs from the law of the foreign main proceeding does not preclude enforcement as "manifestly contrary" to U.S. public policy).

[67] See In re Elpida Memory, Inc., 2012 WL 6090194, at *7–8 (explaining that comity is limited to instances where U.S. parties are provided the same fundamental protections that litigants in the United States would receive and finding that Bankruptcy Code section 1520(a) requires U.S. Bankruptcy Courts to apply the standard for a sale of assets under Bankruptcy Code section 363 to comport with

17

Therefore, as a matter of comity, if the forum of the foreign proceeding offers "a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it is sitting," the judgment should be enforced.[68]

---

this limitation); In re Agrokor d.d., 591 B.R. 163, 184 (Bankr. S.D.N.Y. 2018) (construing section 1506 to allow deference to the foreign court so long as the foreign proceedings are procedurally fair and not manifestly contrary to U.S. public policy); In re Atlas Shipping A/S, 404 B.R. at 733 ("Federal courts generally extend comity whenever the foreign court had proper jurisdiction and enforcement does not prejudice the rights of United States citizens or violate domestic public policy.").
[68] Hilton v. Guyot, 159 U.S. 113, 202–03 (1895); accord In re Metcalfe, 421 B.R. at 698; see also In re Elpida Memory, Inc., 2012 WL 6090194, at *7 (requiring, for enforcement of the foreign plan, that the foreign proceeding afford the litigants the same fundamental protections that they would receive in the United States); In re PT Bakrie Telecom Tbk, 628 B.R. at 878–79 (looking to Hilton and other cases for factors of fairness in determining whether to grant comity). In examining the procedural fairness of a foreign main proceeding, courts have also looked at:

> (1) whether creditors of the same class are treated equally in the distribution of assets; (2) whether the liquidators are considered fiduciaries and are held accountable to the court; (3) whether creditors have the right to submit claims which, if denied, can be submitted to a bankruptcy court for adjudication; (4) whether the liquidators are required to give notice to the debtors' potential claimants; (5) whether there are provisions for creditors' meetings; (6) whether a foreign country's insolvency laws favor its own citizens; (7) whether all assets are marshalled before one body for centralized distribution; and (8) whether there are provisions for an automatic stay and for the lifting of such stays to facilitate the centralization of claims.

Vertiv, Inc. v. Wayne Burt PTE, Ltd., 92 F.4th at 181 (internal alterations omitted); accord In re PT Bakrie Telecom Tbk, 628 B.R. at 879 (quoting Allstate Life Ins. v. Linter Grp., 994 F.2d 996, 999 (2d Cir. 1993)); In re Sino-Forest Corp., 501 B.R. at

18

A. <u>Statutory Interpretation of Bankruptcy Code Sections 1521(a) and 1507</u>

The DFC argues that the Supreme Court's analysis of Bankruptcy Code section 1123(b) in <u>Purdue</u> changes the way courts should interpret sections 1521(a) and 1507. It does not.

This section begins by recounting the DFC's argument in further detail. Next, it examines the plain meaning of the language in Bankruptcy Code sections 1521(a) and 1507. Then, it analyzes congressional intent through canons of statutory construction to confirm the plain meaning interpretation. As it proceeds through the plain language analysis and then the canons of construction analysis, it also compares the conclusions derived from sections 1521(a) and 1507 to section 1123(b)(6) and the conclusions the Supreme Court derived from that section. Because the power to enforce the Concurso Plan and the Concurso Order may only derive from Bankruptcy Code sections 1521(a)(7) or 1507(a) (the "<u>Chapter 15 Catchalls</u>"), the focus of this analysis is on those subsections.

The DFC specifically argues that the Chapter 15 Catchalls are analogous to the catchall provision of Bankruptcy Code section 1123(b)(6), so the Court should interpret them all the same way.[69] Section 1123(b) enumerates certain relief that a chapter 11 plan may provide. Subsection (6)—or, as the Supreme Court refers to it in <u>Purdue</u>, the "catchall"—provides that a chapter 11 plan may "include any other

---

662–63 (quoting <u>Finanz AG Zurich v. Banco Economico S.A.,</u> 192 F.3d 240, 249 (2d Cir. 1999)).

[69] DFC Objection at 4.

19

3213

appropriate provision not inconsistent with the applicable provisions of this title."[70]

The <u>Purdue</u> Court held that subsection (6) does not allow a chapter 11 plan to include nonconsensual third-party releases when interpreted in light of its surrounding context pursuant to the statutory canon of *ejusdem generis*.[71] It explained that the other provisions in section 1123(b) authorized relief that concerns the debtor, its rights and responsibilities, and its relationship with its creditors.[72] Because none of the other provisions in section 1123(b) consider a third-party's relationship with a creditor, the Supreme Court explained, subsection (6) must be interpreted in that context and should not extend to govern a third-party's relationship with a creditor by granting nonconsensual third-party releases.[73]

The DFC urges this Court to apply a similar analysis to sections 1521(a)(7) and 1507(a). It asserts that because those subsections are catchalls, like section 1123(b)(6), and because neither section 1521(a) nor 1507 discusses third-party relationships, then the Chapter 15 Catchalls should not extend to allow nonconsensual third-party releases. Neither the plain language nor canons of statutory interpretation support the DFC's arguments.

In determining how to interpret sections 1521(a) and 1507, "[o]ur interpretation . . . starts 'where all such inquiries must begin: with the language of

---

[70] 11 U.S.C. 1123(b)(6).
[71] <u>Purdue</u>, 603 U.S. at 217–18.
[72] <u>Id.</u> at 218.
[73] <u>Id.</u>

20

3214

the statute itself.'"[74] If the text of the statute is unambiguous, we construe it according to its plain meaning.[75] If it is ambiguous, then we turn to legislative history and the canons of construction to determine congressional intent in enacting the statute.[76] However, "[i]n any event, canons of construction are no more than rules of thumb that help courts determine the meaning of legislation[.]"[77]

Section 1521, subsection (a) provides:

Upon recognition of a foreign proceeding, whether main or nonmain, where necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the foreign representative, grant any appropriate relief, including—

(1) staying the commencement or continuation of an individual action or proceeding concerning the debtor's assets, rights,

---

[74] Ransom v. FIA Card Services, N.A., 562 U.S. 61, 69 (2011) (quoting United States v. Ron Pair Enters., 489 U.S. 235, 241 (1989)); see also In re Phila. Newspapers, LLC, 599 F.3d 298, 304 (3d Cir. 2010), as amended (May 7, 2010) ("It is the cardinal canon of statutory interpretation that a court must begin with the statutory language.").

[75] See Jensen v. Pressler & Pressler, 791 F.3d 413, 418 (3d Cir. 2015) ("Our interpretive task begins and ends with the text of the statute unless the text is ambiguous or does not reveal congressional intent with sufficient precision to resolve our inquiry." (internal quotations omitted)); Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253–54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there."); In re Smale, 390 B.R. 111, 113 (Bankr. D. Del. 2008) ("[T]he starting point is to examine the plain meaning of the text of the statute. . . . '[W]hen a statute's language is plain, the sole function of the courts, at least where the disposition by the text is not absurd, is to enforce it according to its terms.'" (quoting Hartford Underwriters Ins. v. Union Planters Bank, N.A., 530 U.S. 1, 6 (2000))).

[76] See In re WW Warehouse, Inc., 313 B.R. 588, 591 (Bankr. D. Del. 2004) ("If, after a studied examination of the statutory context, the natural reading of a provision remains elusive, the statute is ambiguous and the Court must seek guidance beyond the statutory text." (internal quotations omitted)); In re Smale, 390 B.R. at 114 ("[A]pplying the plain meaning of the statute is the default entrance—not the mandatory exit.").

[77] Conn. Nat'l Bank v. Germain, 503 U.S. at 253.

21

obligations or liabilities to the extent they have not been stayed under section 1520(a);

(2) staying execution against the debtor's assets to the extent it has not been stayed under section 1520(a);

(3) suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520(a);

(4) providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities;

(5) entrusting the administration or realization of all or part of the debtor's assets within the territorial jurisdiction of the United States to the foreign representative or another person, including an examiner, authorized by the court;

(6) extending relief granted under section 1519(a); and

(7) granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a).[78]

Meanwhile, section 1507 provides:

(a) Subject to the specific limitations stated elsewhere in this chapter the court, if recognition is granted, may provide additional assistance to a foreign representative under this title or under other laws of the United States.

(b) In determining whether to provide additional assistance under this title or under other laws of the United States, the court shall consider whether such additional assistance, consistent with the principles of comity, will reasonably assure—

(1) just treatment of all holders of claims against or interests in the debtor's property;

---

[78] 11 U.S.C. § 1521(a).

22

(2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

(3) prevention of preferential or fraudulent dispositions of property of the debtor;

(4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and

(5) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.[79]

The plain language of the two sections demonstrates that the DFC's interpretation is incorrect for multiple reasons. Beginning with section 1521, subsection (a) enumerates some relief that a bankruptcy court may grant at the request of a foreign representative. However, the section begins by explaining the court may grant "any" appropriate relief. Even though that statement is followed by a list of some relief a court may grant, the word "including" indicates that the enumerated relief is not a complete and exclusive list. Congress expressly addresses the term "including" at Bankruptcy Code section 102(3), providing that the word "'includes' and 'including' are not limiting."[80] This definition codifies the rule of statutory construction that the terms "includes" and "including" are illustrative, and not exclusive or limiting.[81]

---

[79] 11 U.S.C. § 1507.

[80] 11 U.S.C. § 102(3).

[81] See, e.g., Am. Sur. Co. v. Marotta, 287 U.S. 513, 517 (1933) (overruling lower court that found the word "includes" in section 1(9) of the Bankruptcy Act of 1898 to be one of limitation); Friedman v. P+P, LLC (In re Friedman), 466 B.R. 471, 482, n.20 (B.A.P. 9th Cir. 2012) (explaining and providing sources to support the proposition that "including" is not a word of limitation).

23

It is true that when comparing this "any . . . including" language to that in section 1123(b), they are, at first blush, similar. Section 1521(a) allows a bankruptcy court to "grant any appropriate relief, including . . . any additional relief" while section 1123(b) allows a plan to "include any other appropriate provision." But the critical difference lies in the language that qualifies "any . . . including" in each section.

Section 1521(a) qualifies that language by explaining that any additional relief a court grants should be of the kind that is available to a trustee,[82] and then lists relief that a court should not grant. It is well-settled that enforcement of a third-party release contained in a foreign plan is appropriate under that section.[83]

Meanwhile, section 1123(b) simply states that a court may include any "other" chapter 11 plan provision that is not "inconsistent with the applicable provisions of this title." In Purdue, the Supreme Court explained that the word "other" directs courts to look to the other provisions in section 1123(b) to determine what further relief a court could grant.[84] By looking at section 1123(b)(1)–(5), the Supreme Court thus concludes that subsection (6) should only grant similar relief, as in relief that concerns the debtor and its rights, responsibilities, and

---

[82] The term "trustee" is defined in chapter 15 as "includ[ing] a trustee [and] a debtor in possession in a case under any chapter of this title . . . ." 11 U.S.C. § 1502(6).
[83] See, e.g., In re Arctic Glacier Int'l, Inc., 901 F.3d 162 (3d Cir. 2018) (enforcing third party releases in a Canadian plan of arrangement); In re Avanti Commc'ns Grp. PLC, 582 B.R. at 618 (finding that it had the power to enforce third-party releases under either section 1521(a)(7) or section 1507(a)).
[84] Purdue, 603 U.S. at 218.

24

relationships.[85] However, section 1521(a) does not direct courts to look to the "other"

provisions when providing relief under its catchall.[86] Instead, section 1521(a) allows

courts to grant "any additional relief that may be available to a trustee."[87]

Accordingly, section 1521(a) does not direct courts to limit its relief to the kind

afforded in other provisions, but rather, to relief available to a trustee. Because the

relief in question would be available to a trustee, it is permissible under section

1521(a)(7).

Second, section 1521(a)(7) qualifies its "any . . . including" language by listing

specific relief that a court is not permitted to grant under that section.[88] That list of

prohibited relief does not include nonconsensual third-party releases.[89] By

establishing explicit boundaries, Congress allowed relief that does not exceed those

boundaries.

On the other hand, in section 1123(b), rather than provide specific prohibited

relief, Congress directs courts to look to the whole of the Bankruptcy Code to

determine if the requested provision is consistent with it. In Purdue, the Supreme

Court framed this section as one that "set[s] out a detailed list of powers, followed

by a catchall."[90] It explained, "Congress could have said in [section 1123(b)](6) that

'everything not expressly prohibited is permitted[]'" but instead limited it to "any

---

[85] Id. at 218–19.
[86] 11 U.S.C. § 1521(a)(7).
[87] Id.
[88] 11 U.S.C. § 1521(a)(7) ("except for relief available under sections 522, 544, 545,
547, 548, 550, and 724(a)").
[89] Id.
[90] Purdue, 603 U.S. at 218.

25

3219

other appropriate provision not inconsistent with the applicable provisions of this title."[91] In comparison, in section 1521(a)(7), Congress did expressly enumerate what it wanted to prohibit; in a chapter 15 case, a court cannot grant relief under sections 522, 544, 545, 547, 548, 550, and 724(a). By specifically enumerating relief that the court cannot grant under section 1521, Congress more concretely defined the outer bounds of what the court can grant, thus also more concretely defining what is included in what the court can grant, bearing in mind the guiding principles of comity and cooperation.

Briefly turning to a canon of statutory construction before moving onto examining the plain language of section 1507, the canon of *expressio unius* confirms this reading of the express prohibitions established in section 1521(a)(7). "*Expressio unius est exclusio alterius*" stands for the proposition that the expression of one thing means the exclusion of another.[92] By establishing a list of relief that courts should not grant under section 1521(a)(7), the section implies that other forms of relief not expressly prohibited are permitted. Therefore, enforcing foreign orders providing for nonconsensual third-party releases is within the scope of authority that section 1521(a) provides.

Section 1507 similarly affords courts a broad grant of authority to provide relief while setting out express limitations. Section 1507 establishes that a court may provide "additional assistance to a foreign representative" if the court has

---

[91] Id.; 11 U.S.C. § 1123(b)(6).
[92] In re Thompson, 217 B.R. 375, 378 n.5 (B.A.P. 2d Cir. 1998).

recognized the proceeding. Notwithstanding that the term "additional assistance" is a broad term at the outset, it also suggests that even if a court cannot grant relief under section 1521(a)(7), it may grant relief under section 1507. Thus, section 1507 implies an even more expansive grant of power than already found in section 1521(a).

However, section 1507 does have limitations. First, it states that any assistance should be "[s]ubject to the specific limitations stated elsewhere in this chapter[.]"[93] Therefore, in determining whether relief may be granted as part of section 1507's "additional assistance," a court should look to the remainder of chapter 15 to guide its decision. Nevertheless, this instruction differs from section 1123(b)(6)'s instruction to look at subsections (1)–(5) to contextualize appropriate relief because chapter 15 covers a broader array of topics than section 1123(b)(1)–(5), which is limited to matters concerning and connected to the debtor. Section 1507's instruction also differs from section 1123(b)(6)'s other instruction that any other provisions not be inconsistent with applicable provisions of "this title" (as in, the Bankruptcy Code). Chapter 15 has a much different purpose and context— mainly to promote comity and international cooperation—thus entailing different limitations when compared to the Bankruptcy Code at large.[94] Accordingly, relief that is appropriate subject to limitations in chapter 15 must be different than relief that is not inconsistent with the applicable provisions of the Bankruptcy Code.

---

[93] 11 U.S.C. § 1507(a).
[94] See 11 U.S.C. § 1501 (establishing the scope and purpose of chapter 15).

27

3221

Second, section 1507(b) establishes a list of considerations for courts when determining whether to provide such additional assistance. Those factors, like much of chapter 15, focus on whether relief would be "consistent with principles of comity[.]"[95] They direct a court to confirm that any additional assistance would reasonably assure just treatment of creditors, protection of U.S. claim holders against prejudice, prevention of preferential or fraudulent transfers, equitable distribution of assets in accordance with the Bankruptcy Code, and the provision of an opportunity for a fresh start for the debtor.[96]

By adding this list of considerations, Congress again established boundaries for courts in granting relief under chapter 15 and directed courts on how to determine if it is appropriate to grant relief. And again, these express prohibitions provide a more explicit and fuller picture of the broad relief a court may grant, as compared to that in section 1123(b)(6), and they direct a court to focus on principles of comity when considering granting the relief. Because comity is central to chapter 15, the relief granted in the foreign court does not have to be available in U.S. courts under chapter 11.[97] In other words, U.S. courts do not have to reject relief solely because it would be unavailable in the United States. However, there must be metrics to assess whether the proposed relief is appropriate. Section 1507(b) solves that problem by providing these considerations while prioritizing comity to foreign courts.

---

[95] 11 U.S.C. § 1507(b).
[96] Id.
[97] In re Metcalfe, 421 B.R. at 697.

As with section 1521, section 1507 thus differs from section 1123(b) because section 1123(b) does not expressly establish specific boundaries; instead, it directs courts to look to the rest of the Bankruptcy Code to determine whether a provision is appropriate. Because Congress expressed specific prohibitions, courts do not need to read further into its words like they do for section 1123(b).[98] The plain language of section 1507 (and section 1521) already enumerates the boundaries unambiguously.

Here, the Mexican Prepack Proceeding provided all the protections set out in section 1507(b).[99] Therefore, section 1507 allows this Court to enforce the relief entered in the Mexican Prepack Proceeding.

Accordingly, the plain language of both section 1521(a)(7) and section 1507(a) permit a U.S. court to enforce a foreign order for nonconsensual third-party releases. Nevertheless, even if the Chapter 15 Catchalls are ambiguous, the legislative history and canons of statutory construction confirm this interpretation and corresponding Congressional intent.[100]

---

[98] See Kaufman v. Allstate N.J. Ins., 561 F.3d 144, 155 (3d Cir. 2009) ("In interpreting a statute, the Court looks first to the statute's plain meaning and, if the statutory language is clear and unambiguous, the inquiry comes to an end." (citing Conn. Nat'l Bank v. Germain, 503 U.S. at 253–54)).

[99] For a fuller discussion of the fairness of the Mexican proceeding, see infra section B on section 1506's public policy considerations.

[100] Even where the plain language of a statute is ambiguous, courts will often examine the congressional intent to confirm their interpretation, especially for chapter 15 cases. See In re Elpida Memory, Inc., 2012 WL 6090194, at *5 ("[I]n interpreting Chapter 15, 'the court shall consider its international origin, and the need to promote an application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions.'" (quoting 11 U.S.C. § 1508)); In re Premier Int'l Holdings, Inc., 423 B.R. 58, 63–64 (Bankr. D. Del. 2010)

Congress enacted chapter 15 in 2005 as part of the Bankruptcy Abuse

Prevention and Consumer Protection Act to "provide effective mechanisms for

dealing with cases of cross-border insolvency."[101] The legislative history of chapter

15 shows that a major purpose in its enactment was to promote comity for the

orders of foreign courts. In fact, as discussed above, section 1501 explicitly

establishes one of its purposes as promoting cooperation between U.S. courts and

foreign courts.[102] Further, section 1508 directs courts "[i]n interpreting this chapter,

[to] consider its international origin, and the need to promote an application of this

chapter that is consistent with the application of similar statutes adopted by foreign

jurisdictions."[103] Thus, granting bankruptcy courts the authority to enforce

nonconsensual third-party releases originating in foreign courts would promote

chapter 15's goals of comity and providing assistance to foreign courts during

foreign insolvency proceedings.[104]

Moreover, in examining multinational laws, as chapter 15 directs,

nonconsensual third-party releases are widely accepted by foreign courts. Courts

have previously looked to multinational laws in interpreting chapter 15 and

determining whether certain relief would comport with international insolvency

---

("Moreover, regardless of whether the text is plain or ambiguous, it is appropriate to identify, if possible, a congressional purpose consistent with the Court's interpretation.").

[101] In re ABC Learning Ctrs. Ltd., 728 F.3d at 304.

[102] 11 U.S.C. § 1501.

[103] 11 U.S.C. § 1508.

[104] See In re ABC Learning Ctrs. Ltd., 728 F.3d at 306 (finding that chapter 15 directs courts to act in aid of main proceeding and to maximize assistance).

30

norms and the UNCITRAL Model Law on Cross-Border Insolvency, on which chapter 15 is based.[105] Other countries recognize nonconsensual third-party releases in insolvency proceedings.[106] Most relevant here, Mexican law provides for such releases.[107] That Mexican law provides for such releases further encourages the authority of this Court to enforce such releases in comity with the Mexican court.

Additionally, the DFC is correct that the sections should be read in their context pursuant to the canon of *ejusdem generis*. The Supreme Court has repeatedly stated that "a 'fundamental canon of statutory construction'[ is] that 'the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'"[108] However, the DFC neglects the major differences between the contexts of chapters 11 and 15. Namely, chapter 15 exists to provide assistance to foreign courts by granting comity to their orders.[109] Doing so promotes the purpose of an insolvency proceeding, which is to provide for equitable and

---

[105] See In re Servicos de Petroleo Constellation S.A., 600 B.R. 237, 273–74 (Bankr. S.D.N.Y. 2019) ("[I]t is therefore appropriate for U.S. bankruptcy courts to consider interpretations from other international jurisdictions that have adopted the Model Law." (citing In re Fairfield Sentry Ltd., 714 F.3d 127, 136 (2d Cir. 2013)).

[106] See In re Avanti Commc'ns Grp. PLC, 582 B.R. at 618 (finding such schemes common under United Kingdom law); In re Metcalfe, 421 B.R. at 699 (explaining that a Canadian court had the power to enter such relief).

[107] See supra note 35, 44–46 and accompanying text (explaining that the Mexican court here found the releases to be valid under Mexican law); Ad Hoc Group of Vitro Noteholders v. Vitro S.A.B. de C.V. (In re Vitro S.A.B. de C.V.), 701 F.3d 1031, 1039–40 (5th Cir. 2017) (explaining that a Mexican court approved the releases at issue and that relief available in a foreign court need not be identical to or available under U.S. law).

[108] United States v. Miller, 604 U.S. _, slip op. at 13 (2025) (quoting Davis v. Mich. Dept. of Treasury, 489 U. S. 803, 809 (1989)).

[109] See In re ABC Learning Ctrs. Ltd., 728 F.3d at 306 (explaining courts should "maximize assistance").

31

orderly distribution of a debtor's assets in a manner that is enforceable across

borders.[110]

Of course, a court's ability to enforce a foreign court's order has limitations,

but Congress specified such limitations in the Bankruptcy Code. It specified relief

that a court cannot grant under section 1521(a)(7).[111] It provided protections to

consider before granting relief under section 1507.[112] It established that if such

relief is manifestly contrary to public policy or violates a U.S. citizen's fundamental

rights or procedural fairness, then it is not available.[113] All these limitations provide

boundaries for relief under chapter 15 and ensure that it can have far-reaching

consequences, so long as it is within these boundaries.[114] Accordingly, enforcing

nonconsensual third-party releases granted in a foreign insolvency proceeding

under that country's laws and in a fair proceeding is within this Court's authority

under the Bankruptcy Code.

B.  The Third-Party Releases Are Not Manifestly Contrary to the Public Policy of
    the United States

The DFC also contends that the Concurso Plan should not be enforced under

the public policy exception of Bankruptcy Code section 1506. As explained above

"[t]he public policy exception has been narrowly construed, because the 'word

---

[110] See In re Energy Coal S.P.A., 582 B.R. at 627 (quoting In re Atlas Shipping A/S,
404 B.R. at 733) (explaining how comity to foreign court orders in the bankruptcy
context is particularly important to promote the goals of bankruptcy).
[111] See 11 U.S.C. § 1521(a)(7) ("except for relief available under sections 522, 544,
545, 547, 548, 550, and 724(a)").
[112] See 11 U.S.C. § 1507(b).
[113] See 11 U.S.C. § 1506.
[114] See In re Atlas Shipping A/S, 404 B.R. at 741 (acknowledging the boundaries for
discretionary relief that Congress set in chapter 15).

32

3226

'manifestly' in international usage restricts the public policy exception to the most fundamental policies of the United States.'"[115] Therefore, courts should use this exception to deny enforcing foreign relief sparingly.[116]

"The public policy exception applies 'where the procedural fairness of the foreign proceeding is in doubt or cannot be cured by the adoption of additional protections' or where recognition 'would impinge severely a U.S. constitutional or statutory right.'"[117] The DFC did not object to the fairness of the proceedings, nor did it identify a constitutional or statutory right on which the Concurso Plan impinges. Nonetheless, the facts demonstrate that the Mexican proceeding comported with U.S. standards of procedural fairness, and the Concurso Plan does not violate any constitutional or statutory rights.

In the Mexican Prepack Proceeding, the DFC did not object to the Release and only raised the issue on appeal. There was an opportunity for objection, consistent with our own procedures, but the DFC did not avail itself of that opportunity. Article 164 of the Mexican Bankruptcy Law provides for an opportunity to object to a *concurso* plan, after which the Mexican court is to verify that the *concurso* plan complies with all the requirements for a valid plan and is not contrary to public policy; only then can a *concurso* plan be approved.[118] The DFC,

---

[115] In re ABC Learning Ctrs. Ltd., 728 F.3d at 308 (quoting H.R. Rep. No. 109–31(1), at 109 reprinted in 2005 U.S.C.C.A.N. 88, 172).

[116] In re ENNIA Caribe Holding N.N., 594 B.R. 631, 640 (S.D.N.Y. 2018) (citing In re Toft, 453 B.R. at 193).

[117] In re ABC Learning Ctrs. Ltd., 728 F.3d at 310 (quoting In re Qimonda AG Bankr. Litig., 433 B.R. 547, 570 (E.D. Va. 2010)).

[118] Estrada Supp. Dec. ¶ 25.

33

3227

having failed to object in the Mexican Prepack Proceeding, cannot contend that there was a procedural unfairness, and in fact, does not contend that the Mexican's courts procedures were unfair.

Even though the DFC does not argue the Mexican proceedings were unfair or identify any facts that would support a finding of unfairness, this Court finds that the Mexican proceedings offered "a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it is sitting."[119]

U.S. courts frequently have recognized Mexican *concurso* plans as being the product of a fair process.[120] In so holding, those courts have found that the contested Mexican *concurso* plans embodied arms'-length agreements and conformed to the general distribution priorities established in the Bankruptcy Code.[121] Mexican law

---

[119] Hilton v. Guyot, 159 U.S. at 202–03. Some courts have held that even where a claimant does not object to the fairness of the foreign proceeding, the bankruptcy court should nevertheless make a finding that the foreign proceeding was fair. See In re PT Bakrie Telecom Tbk, 628 B.R. at 884 (finding that, to enforce a foreign plan, a bankruptcy court must make a finding that the foreign proceeding abided by fundamental standards of procedural fairness).

[120] See, e.g., In re Cozumel Caribe, S.A. de C.V., 482 B.R. 96, 114–17 (Bankr. S.D.N.Y. 2012) (finding a Mexican insolvency proceeding fair); In re Metrofinanciera, S.A.P.I. de C.V., Sociedad Financiera de Objeto Multiple, E.N.R., No. 10-20666, 2010 WL 10075953, *3–4 (Bankr. S.D. Tex. Sept. 24, 2010) (same); JP Morgan Chase Bank v. Altos Hornos de Mex., S.A. de C.V., 412 F.3d 418, 428 (2d Cir. 2005) (same).

[121] See, e.g., In re Metrofinanciera, 2010 WL 10075953, at *3.

34

3228

also provides for due process to consider objections to a plan.[122] After creditors have been given the opportunity to object, Mexican law provides that the court may verify the plan if it complies with all the requirements for a valid plan and is not contrary to public policy.[123]

The present decision does not diverge from those prior decisions confirming the fairness of Mexican proceedings. The uncontroverted evidence before the Court is that the Concurso Plan's Release is customary and permitted under Mexican law; the Release is the product of arms'-length negotiations among the Chapter 15 Debtor, the Recognized Creditors, and the Shareholders; and the Concurso Plan was approved by a majority of the Recognized Creditors.[124]

It also is undisputed that the DFC played an active role in the Mexican Prepack Proceeding.[125] The DFC filed a proof of claim asserting that it was a privileged creditor.[126] The Mexican Court instead allowed the DFC's claim as an unsecured creditor and granted the DFC status as a Recognized Creditor.[127] The DFC has appealed that ruling, and the appeal remains pending.[128] The DFC did not

---

[122] See, e.g., id.

[123] Ley de Concursos Mercantiles [LCM] (Bankruptcy Law) art. 64, Diario Oficial de la Federación [DOF] 12-5-2000, últimas reformas DOF 14-1-2014 (Mex.); see also Estrada Supp. Dec. ¶ 25 (confirming the availability under Mexican law).

[124] Estrada Supp. Dec. ¶¶ 15–21.

[125] Id. ¶ 22.

[126] Id. ¶ 23.

[127] Id.

[128] Id. It bears noting that should the Mexican appellate court determine that the Release is impermissible, the Release would become ineffective here. This Court is not granting the Release. Instead, it is simply enforcing the Concurso Plan. If the Release provision of the Concurso Plan is later altered as a result of the DFC's

35

object to the Release but did object to the Concurso Plan on other grounds.[129] The

Mexican Court overruled the DFC's plan objection and entered the Concurso Order

approving the Concurso Plan. In so doing, the Mexican Court found that the

Concurso Plan complied with Mexican law and "neither the public interest nor the

individual interest of any specific creditor is violated, since the terms agreed to will

apply to all creditors equally . . . ."[130] The extent of the DFC's participation and the

Mexican court's finding that the Concurso Plan would not violate the public interest

or the interests of any creditors both emphasize the DFC's opportunity (of which it

did not avail itself) to object to the Release before the approval of the Concurso

Plan. The Mexican court provided the DFC with a full and fair opportunity to be

heard, which is a central tenet of U.S. procedural fairness.[131]

Therefore, in consideration of the fairness of this proceeding, the procedural

safeguards typical under Mexican law, and the fact that the DFC has not identified

an example of lack of fairness, this Court finds that the Mexican proceeding was

procedurally fair.

Likewise, the DFC has identified no constitutional or statutory right upon

which the Concurso Plan impinges. Its only argument is that nonconsensual third-

party releases are manifestly contrary to U.S. public policy because the Purdue

---

appeal, the Release would only be enforceable in the United States—if at all—to the
extent provided by the Concurso Plan.

[129] Id. ¶ 24.

[130] Concurso Order at 60.

[131] Cf. Vertiv, Inc., 92 F.4th at 181 ("[A] United States court is well within its
discretion to deny the extension of comity to foreign proceedings that deny 'notice
and opportunity to be heard' to a party opposing comity.").

36

decision prohibits them in most chapter 11 plans.[132] However, far from being

"manifestly contrary to the public policy of the United States," nonconsensual third-

party releases are expressly permitted under Bankruptcy Code section 524(g) in the

context of asbestos cases. Furthermore, in Purdue, the Supreme Court noted that

while it held that nonconsensual third-party releases are not permitted under

chapter 11 (except in the asbestos context under Bankruptcy Code section 524(g)),

Congress could have authorized them.[133] Indeed, the Supreme Court framed this

issue in terms of the policy choices that Congress is authorized to make. To be

manifestly contrary to U.S. public policy, the contested relief must impinge on some

constitutional or statutory right; if a nonconsensual third-party release impinged on

some constitutional right, the Supreme Court would not have said that Congress

could provide for it. Accordingly, Congress has authorized nonconsensual third-

party releases before, and the Supreme Court has explicitly said that it could do so

again in the context of chapter 11 if it so desired. Lack of specific availability in U.S.

courts does not equate to manifest contrariness to U.S. public policy, especially

where, as here, the contested relief is available in other contexts and could be made

available more broadly by a simple act of Congress.[134]

---

[132] But see In re Metcalf, 421 B.R. at 697 (explaining that even if relief in a foreign order is not typically available in a U.S. proceeding, it may be available in a chapter 15 proceeding pursuant to principles of comity).

[133] See Purdue, 603 B.R. at 222 (noting that "the [Bankruptcy Code] *does* authorize courts to enjoin claims against third parties without their consent, but does so in only *one* context" (emphasis in original)).

[134] See In re Metcalf, 421 B.R. at 697 (so holding); In re Rede Energia S.A., 515 B.R. at 91 (holding the same and emphasizing that the "public policy exception is clearly drafted in narrow terms and the few reported cases that have analyzed section

37

3231

The In re Vitro S.A.B. de C.V. court makes a similar point. While the Fifth Circuit denied enforcement of a Mexican plan's third-party release provisions, it noted that "although our court has firmly pronounced its opposition to [nonconsensual third-party] releases, relief is not thereby precluded under § 1507, which was intended to provide relief not otherwise available under the Bankruptcy Code or United States law."[135] Thus, it found that it could not deny the relief simply on the basis that third-party releases were not available in its jurisdiction.[136] Instead, the In re Vitro court only declined to enforce the plan in that case because of the role in the approval process of the votes of insiders holding intercompany claims.[137]

Simply put, if permitting third-party releases is a policy decision that Congress can and has made, it cannot also be true that enforcing such releases where principles of cooperation and comity so require in chapter 15 would be "manifestly contrary to the public policy of the United States." The simple fact that a U.S. court could not grant such releases in a typical chapter 11 plan does not

---

1506 at length recognize that it is to be applied sparingly" (internal quotations and alterations omitted)); In re ABC Learning Ctrs., 728 F.3d at 311 (finding that although Australian insolvency law used a different prioritization scheme from U.S. bankruptcy law, recognizing and enforcing the Australian proceeding would not be manifestly contrary to U.S. public policy, and in fact, refusing to recognize and enforce it would allow claimants to circumvent the Australian courts and undermine U.S. public policies of ordered proceedings and equal treatment).

[135] In re Vitro, 701 F.3d at 1062.

[136] Id.

[137] Id. at 1067. Because the court decided that case on other grounds, it did not rule on whether third-party releases would be manifestly contrary to public policy under section 1506. Id. at 1069–70

make them manifestly contrary to U.S. public policy so as to require this Court to prohibit enforcement of the Release in this chapter 15 case. The DFC's public policy exception argument fails.

### CONCLUSION

Accordingly, chapter 15 authorizes this Court to enforce nonconsensual third-party releases ordered by foreign courts. The plain language of Bankruptcy Code sections 1521(a) and 1507 give this Court a broad grant of discretion to aid foreign courts in accordance with principles of comity. Nothing in the plain language of these statutes or the legislative history or canons of construction indicates that Congress intended to diverge from this policy of comity to prohibit enforcing releases entered by foreign courts. The Mexican Prepack Proceeding was fair, and the Concurso Plan and the Concurso Order are not manifestly contrary to U.S. public policy. Therefore, this Court enforces the Concurso Plan and the Concurso Order in their entirety.

Dated: April 1, 2025  
Wilmington, Delaware

_____  
Thomas M. Horan  
United States Bankruptcy Judge

39

3233

# Tab 32

Page 1

737 F.3d 238, 70 Collier Bankr.Cas.2d 1203, 58 Bankr.Ct.Dec. 251, Bankr. L. Rep. P 82,554
**(Cite as: 737 F.3d 238)**

C

United States Court of Appeals,
Second Circuit.
In re Katherine Elizabeth BARNET,
Drawbridge Special Opportunities Fund LP, Appellant,
v.
Katherine Elizabeth Barnet, Foreign Representative, William John Fletcher, Foreign Representative, Appellees.

Docket No. 13–612.
Argued: Oct. 15, 2013.
Decided: Dec. 11, 2013.

**Background:** Foreign representatives sought recognition of "external administration" of debtor in Australia as foreign main proceeding. The United States Bankruptcy Court for the Southern District of New York, Shelley C. Chapman, J., granted recognition. The court denied motion to stay discovery that had been brought by United States affiliate of debtor, and granted foreign representatives' discovery motion. Subsequently, the court granted a joint application for certification of recognition order for direct appeal. The Court of Appeals granted the joint application.

**Holdings:** The Court of Appeals, Straub, Circuit Judge, held that:

(1) order by bankruptcy court recognizing "external administration" of debtor in Australia as foreign main proceeding was not appealable by United States affiliate of debtor when issued;

(2) discovery order was appealable;

(3) subsequent appealable discovery order ripened premature notice of appeal from initial recognition order, and thus recognition order was properly before Court of Appeals; and

(4) provision defining eligibility to be a debtor had to be satisfied before a bankruptcy court could grant recognition of foreign proceeding.

Vacated and remanded.

West Headnotes

**[1] Bankruptcy 51 ⚷ 3771**

51 Bankruptcy
 51XIX Review
  51XIX(B) Review of Bankruptcy Court
   51k3771 k. Right of review and persons entitled; parties; waiver or estoppel. Most Cited Cases

Order by bankruptcy court recognizing "external administration" of debtor in Australia as foreign main proceeding was not appealable by United States affiliate of debtor when issued; although foreign representatives who sought recognition stated their "intention to take discovery" of affiliate's directors, potential harm to affiliate was insufficient to justify appellate standing. 11 U.S.C.A. § 1520.

**[2] Bankruptcy 51 ⚷ 3771**

51 Bankruptcy
 51XIX Review
  51XIX(B) Review of Bankruptcy Court
   51k3771 k. Right of review and persons entitled; parties; waiver or estoppel. Most Cited Cases

In order to have standing to appeal from a bankruptcy court ruling, an appellant must be a person aggrieved, which is a person directly and adversely affected pecuniarily by the challenged order of the bankruptcy court; this test is stricter than Article III's "injury in fact" test, and its stringency is rooted in a concern that freely granting open-ended appeals to those persons affected by bankruptcy court orders will sound the death knell of the orderly disposition of bankruptcy matters. U.S.C.A. Const. Art. 3, § 1 et seq.

**[3] Bankruptcy 51 ⚷ 3771**

51 Bankruptcy

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

737 F.3d 238, 70 Collier Bankr.Cas.2d 1203, 58 Bankr.Ct.Dec. 251, Bankr. L. Rep. P 82,554

**(Cite as: 737 F.3d 238)**

51XIX Review
    51XIX(B) Review of Bankruptcy Court
        51k3771 k. Right of review and persons entitled; parties; waiver or estoppel. Most Cited Cases

Even absent a direct pecuniary interest in the litigation, a public interest may give a sufficient stake in the outcome of a bankruptcy case to confer appellate standing.

**[4] Bankruptcy 51 ☞3767**

51 Bankruptcy
    51XIX Review
      51XIX(B) Review of Bankruptcy Court
        51k3766 Decisions Reviewable
          51k3767 k. Finality. Most Cited Cases

Bankruptcy court's order granting foreign representatives' motion for discovery with regard to United States affiliate of foreign debtor, that court had granted after recognizing "external administration" of debtor in Australia as foreign main proceeding, was appealable, since discovery order constituted final resolution of petition to take discovery in aid of foreign proceeding in that there would not be final resolution on the merits beyond discovery relief itself. 11 U.S.C.A. §§ 1515, 1520.

**[5] Bankruptcy 51 ☞3771**

51 Bankruptcy
    51XIX Review
      51XIX(B) Review of Bankruptcy Court
        51k3771 k. Right of review and persons entitled; parties; waiver or estoppel. Most Cited Cases

A bankruptcy court's order recognizing a foreign proceeding as a foreign main proceeding is not itself appealable by a party that is not directly affected by the relief that the order provides. 11 U.S.C.A. § 1520.

**[6] Bankruptcy 51 ☞3766.1**

51 Bankruptcy
    51XIX Review

51XIX(B) Review of Bankruptcy Court
    51k3766 Decisions Reviewable
      51k3766.1 k. In general. Most Cited Cases

As a general rule, discovery orders are not appealable unless the object of the discovery order refuses to comply and is held in contempt.

**[7] Bankruptcy 51 ☞3774.1**

51 Bankruptcy
    51XIX Review
      51XIX(B) Review of Bankruptcy Court
        51k3774 Notice of Appeal; Time
          51k3774.1 k. In general. Most Cited Cases

**Bankruptcy 51 ☞3779**

51 Bankruptcy
    51XIX Review
      51XIX(B) Review of Bankruptcy Court
        51k3779 k. Scope of review in general. Most Cited Cases

Subsequent appealable order granting foreign representatives' motion for discovery with regard to United States affiliate of foreign debtor ripened premature notice of appeal from initial order by bankruptcy court recognizing "external administration" of debtor in Australia as foreign main proceeding, and thus recognition order properly was before Court of Appeals, since direct appeal of recognition order had occurred after court had granted discovery motion and those orders had merged; mistake in form of notice by parties not discussing discovery order in their joint request for direct appeal was not fatal because resolution of validity of recognition order would be dispositive of whether discovery was available and foreign representatives otherwise did not suffer prejudice. 11 U.S.C.A. §§ 1515, 1520, 1521(a)(4), 1782(a); 28 U.S.C.A. § 158(d)(2)(A)(i, iii), (d)(2)(B)(i); F.R.A.P.Rule 3(c)(4), 28 U.S.C.A.

**[8] Bankruptcy 51 ☞3774.1**

737 F.3d 238, 70 Collier Bankr.Cas.2d 1203, 58 Bankr.Ct.Dec. 251, Bankr. L. Rep. P 82,554

**(Cite as: 737 F.3d 238)**

51 Bankruptcy
   51XIX Review
      51XIX(B) Review of Bankruptcy Court
         51k3774 Notice of Appeal; Time
            51k3774.1 k. In general. Most Cited Cases

A premature notice of appeal from a nonfinal order may ripen into a valid notice of appeal if a final judgment has been entered by the time the appeal is heard and the appellee suffers no prejudice; this rule applies even if the final judgment was not itself appealed.

**[9] Bankruptcy 51 ⟜3782**

51 Bankruptcy
   51XIX Review
      51XIX(B) Review of Bankruptcy Court
         51k3782 k. Conclusions of law; de novo review. Most Cited Cases

**Bankruptcy 51 ⟜3786**

51 Bankruptcy
   51XIX Review
      51XIX(B) Review of Bankruptcy Court
         51k3785 Findings of Fact
            51k3786 k. Clear error. Most Cited Cases

The Court of Appeals reviews a bankruptcy court's legal conclusions de novo, accepting the bankruptcy court's factual findings unless clearly erroneous.

**[10] Bankruptcy 51 ⟜3782**

51 Bankruptcy
   51XIX Review
      51XIX(B) Review of Bankruptcy Court
         51k3782 k. Conclusions of law; de novo review. Most Cited Cases

A lower court decision interpreting the meaning of a statute is reviewed de novo.

**[11] Statutes 361 ⟜1368**

361 Statutes

361III Construction
      361III(M) Presumptions and Inferences as to Construction
         361k1366 Language
            361k1368 k. Plain language; plain, ordinary, common, or literal meaning. Most Cited Cases

Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.

**[12] Statutes 361 ⟜1091**

361 Statutes
   361III Construction
      361III(B) Plain Language; Plain, Ordinary, or Common Meaning
         361k1091 k. In general. Most Cited Cases

**Statutes 361 ⟜1367**

361 Statutes
   361III Construction
      361III(M) Presumptions and Inferences as to Construction
         361k1366 Language
            361k1367 k. In general. Most Cited Cases

Where the statute's language is plain, the sole function of the courts is to enforce it according to its terms; indeed, the preeminent canon of statutory interpretation requires Court of Appeals to presume that the legislature says in a statute what it means and means in a statute what it says there.

**[13] Statutes 361 ⟜1151**

361 Statutes
   361III Construction
      361III(E) Statute as a Whole; Relation of Parts to Whole and to One Another
         361k1151 k. In general. Most Cited Cases

Statutory enactments should be read so as to give effect, if possible, to every clause and word of a statute.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

737 F.3d 238, 70 Collier Bankr.Cas.2d 1203, 58 Bankr.Ct.Dec. 251, Bankr. L. Rep. P 82,554

**(Cite as: 737 F.3d 238)**

**[14] Bankruptcy 51 🔑2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

Provision defining eligibility to be a debtor had to be satisfied before a bankruptcy court could grant recognition of foreign proceeding; although foreign representatives, not debtor, sought recognition, presence of debtor was inextricably intertwined with very nature of a foreign proceeding, both in terms of how such proceeding was defined and in terms of relief that could be granted. 11 U.S.C.A. §§ 109(a), 1515, 1520.

**[15] Statutes 361 🔑1153**

361 Statutes
   361III Construction
      361III(E) Statute as a Whole; Relation of Parts to Whole and to One Another
         361k1153 k. Context. Most Cited Cases

A properly limited contextual analysis of statutory language is encompassed within the ambit of a textual analysis.

**\*240** David F. Heroy (Jacob Kaplan, Baker & McKenzie LLP, New York, NY; Erin Elizabeth Broderick, Baker & McKenzie LLP, Chicago, IL, on the brief), Baker & McKenzie LLP, New York, NY, for Appellant.

Howard Seife (Madlyn Gleich Primoff, Kaye Scholer LLP, New York, on the brief), Chadbourne & Parke LLP, New York, NY, for Appellees.

Before: JACOBS, STRAUB, Circuit Judges, and KUNTZ,<sup>FN*</sup> District Judge.

> FN* The Honorable William F. Kuntz, II, of the United States District Court for the Eastern District of New York, sitting by designation.

STRAUB, Circuit Judge:

Drawbridge Special Opportunities Fund LP ("Drawbridge") appeals from a September 6, 2012 order of the United States **\*241** Bankruptcy Court for the Southern District of New York (Shelley C. Chapman, *Bankruptcy Judge* ) granting recognition of a foreign main proceeding ("Recognition Order"). Because we find that 11 U.S.C. § 109(a) applies to the debtor in a foreign main proceeding under Chapter 15 of the Bankruptcy Code, we **VACATE** and **REMAND** to the Bankruptcy Court for further proceedings consistent with this opinion.

## BACKGROUND

Foreign Representatives are the liquidators of Octaviar Administration Pty Ltd. ("OA"), a company incorporated in Queensland, Australia. OA was placed into "external administration" in Australia on October 3, 2008. On July 31, 2009, the Supreme Court of Queensland ordered that OA be liquidated. As part of the investigation into OA's affairs, various Australian affiliates of Drawbridge have been investigated and, on April 3, 2012, a lawsuit was commenced in Australia against certain of those affiliates seeking AUD 210,000,000.

On August 13, 2012, Foreign Representatives petitioned the Bankruptcy Court for an order recognizing the Australian OA liquidation proceeding as a foreign main proceeding pursuant to 11 U.S.C. § 1515. Drawbridge appeared and filed an objection on August 30, 2012. On September 6, 2012, the Bankruptcy Court entered the Recognition Order, and Drawbridge filed a notice of appeal to the District Court on September 20. On October 5, 2012, Foreign Representatives filed a motion seeking discovery from Drawbridge and other parties. On October 9, 2012, Drawbridge sought a stay pending appeal.

On November 28, 2012, the Bankruptcy Court granted a joint application for certification of the Recognition Order for direct appeal to this Court pursuant to 28 U.S.C. § 158(d)(2)(A)(i), (A)(iii) and (B)(i). The same day, the court entered an opinion explaining its decision. The court determined

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

737 F.3d 238, 70 Collier Bankr.Cas.2d 1203, 58 Bankr.Ct.Dec. 251, Bankr. L. Rep. P 82,554
**(Cite as: 737 F.3d 238)**

that (1) there was no controlling precedent governing its holding "that a debtor within the meaning of chapter 15 is not required to have a domicile, residence, place of business or property in the United States"; (2) the same issue was "a matter of public importance" that would "dramatically impact the jurisdiction of the United States bankruptcy courts and the use of Chapter 15 to assist in the administration of cross-border insolvency cases and the legitimate investigation of claims and assets in the United States"; and (3) a direct appeal would "materially advance the progress of this Chapter 15 case." Mem. Op. in Supp. of Certification of Direct Appeal to the Court of Appeals for the Second Circuit at 6, 9, *In re Barnet,* No. 12–13443, Dkt. No. 47 (Bankr.S.D.N.Y. Nov. 28, 2012).

The Bankruptcy Court denied Drawbridge's motion to stay discovery on December 10, 2012, and granted Foreign Representatives' discovery motion on December 12. The parties filed a joint application for direct appeal on December 21. On February 21, 2013, we granted the joint application and issued a stay of 17 discovery.

### DISCUSSION

### I. Appellate Standing

[1] This case presents an unusual jurisdictional thicket. Foreign Representatives argue that Drawbridge lacks appellate standing because Drawbridge is not aggrieved by the Recognition Order—the order named in the parties' joint request for direct appeal. We agree that, under the facts of this case, Drawbridge may not appeal from the Recognition Order. However, that conclusion does not end our **\*242** analysis. The Bankruptcy Court's subsequent discovery order cured the jurisdictional infirmity notwithstanding the parties' failure to discuss the discovery order in the joint request for direct appeal. In effect, we construe the appeal as being from the discovery order, which appeal brings up for review the non-final Recognition Order that was a necessary prerequisite to discovery.

### A. The Recognition Order

We first consider whether Drawbridge is per-

mitted to appeal from the Recognition Order. As this appeal is direct, the issue of appellate standing was not expressly addressed by any lower court opinion. Regardless, we review jurisdictional questions of law *de novo. See Adams v. Zarnel* (*In re Zarnel* ), 619 F.3d 156, 161 (2d Cir.2010) ("[W]e must first determine whether we have jurisdiction. ... We review these legal issues [standing and mootness] *de novo.*").

[2][3] "The current Bankruptcy Code prescribes no limits on standing beyond those implicit in Article III of the United States Constitution. Congress has given us jurisdiction over all final decisions, judgments, orders, and decrees of the district courts in bankruptcy cases...." *DISH Network Corp. v. DBSD N. Am., Inc.* (*In re DBSD N. Am., Inc.*), 634 F.3d 79, 88 (2d Cir.2011) (internal citations and quotation marks omitted). Nonetheless, our precedents establish " 'that in order to have standing to appeal from a bankruptcy court ruling, an appellant must be a person aggrieved—a person directly and adversely affected pecuniarily by the challenged order of the bankruptcy court.' " *Id. at 89* (internal quotation marks omitted) (quoting *Int'l Trade Admin. v. Rensselaer Polytechnic Inst.,* 936 F.2d 744, 747 (2d Cir.1991)).FN1 This test is "stricter than Article III's 'injury in fact' test," and its "stringency ... is rooted in a concern that freely granting open-ended appeals to those persons affected by bankruptcy court orders will sound the death knell of the orderly disposition of bankruptcy matters." *Licensing by Paolo, Inc. v. Sinatra* (*In re Gucci* ), 126 F.3d 380, 388 (2d Cir.1997); *see In re DBSD N. Am., Inc.,* 634 F.3d at 110 (quoting *In re Gucci,* 126 F.3d at 388).

> FN1. " 'While the pecuniary interest formulation is an often used and often useful test of standing in the bankruptcy context, it is not the only test.' " *In re DBSD N. Am., Inc.,* 634 F.3d at 89 n. 3 (quoting *In re Zarnel,* 619 F.3d at 162). "Instead, even absent a direct pecuniary interest in the litigation, a *public* interest may also give a

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

737 F.3d 238, 70 Collier Bankr.Cas.2d 1203, 58 Bankr.Ct.Dec. 251, Bankr. L. Rep. P 82,554

**(Cite as: 737 F.3d 238)**

sufficient stake in the outcome of a bankruptcy case to confer appellate standing." *In re Zarnel,* 619 F.3d at 162 (internal quotation marks omitted); *see id.* (finding that the U.S. Trustee's "responsibility to represent and protect the public interest affords it a substantial interest in, and therefore standing to proceed with" an appeal). In this case, however, no party argues that the pecuniary interest test is not appropriate.

The Recognition Order neither names Drawbridge nor directs any relief against Drawbridge. Nor does Drawbridge argue that it is affected by the automatic relief provided for in 11 U.S.C. § 1520. FN2 *See* **\*243***Morning Mist Holdings Ltd. v. Krys ( In re Fairfield Sentry Ltd.),* 714 F.3d 127 (2d Cir.2013) (considering an appeal from a recognition order by the party aggrieved by the automatic stay imposed by 11 U.S.C. § 1520(a)(1)). Instead, Drawbridge relies on the fact that at oral argument on the Recognition Order, Foreign Representatives stated their "intention ... to take discovery" of the American "directors of the Drawbridge affiliates that were sued in Australia." Tr. of Record at 28:2–5, *In re Octaviar Administration Pty. Ltd.,* No. 12–13443 (Bankr.S.D.N.Y. Sept. 6, 2012).

> FN2. Section 1520 prescribes the "effects of recognition of a foreign main proceeding," which include permitting a foreign representative to "operate the debtor's business and ... exercise the rights and powers of a trustee," limiting the transfer and control of the debtor's property within the United States, and invoking 11 U.S.C. § 362's automatic stay provisions. The automatic relief imposed by Section 1520 stands in contrast to the discretionary relief that "may be granted upon recognition" pursuant to 11 U.S.C. § 1521. That discretionary relief includes enlarging the automatic stay, enforcing additional restrictions on transfer of the debtor's property, the taking of discovery, and granting relief that

"may be available to a trustee," with some exceptions. 11 U.S.C. § 1521(a).

Were we to accept this argument, however, it would undermine the pecuniary interest test and ignore our "concern that if appellate standing is not limited, bankruptcy litigation will become mired in endless appeals brought by the myriad of parties who are indirectly affected by every bankruptcy court order." *Kabro Assocs. of W. Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.),* 111 F.3d 269, 273 (2d Cir.1997) (internal quotation marks omitted). It is not the intentions of a litigant that cause pecuniary harm but the relief directed by a Bankruptcy Court, and here the Recognition Order contained no relief that affected Drawbridge.

Indeed, we have explicitly stated that "potential harm" from a bankruptcy court order is insufficient to justify appellate standing. *See Kane v. Johns–Manville Corp. (In re Johns–Manville Corp. ), 843 F.2d 636, 642 n. 3 (2d Cir.1988)* (noting that "potential harm incident to the bankruptcy court's orders" is insufficient to render a party "directly and pecuniarily affected by them"). *Accord Nat'l Fire Ins. Co. of Hartford v. Thorpe Insulation Co. ( In re Thorpe Insulation Co.), 393 Fed.Appx. 467, 469 (9th Cir.2010)* (summary order) ("Courts of appeal routinely deny standing 'to marginal parties involved in bankruptcy proceedings who, even though they may be exposed to some potential harm incident to the bankruptcy court's order, are not directly affected by that order.' " (quoting *Travelers Ins. Co. v. H.K. Porter Co.,* 45 F.3d 737, 741 (3d Cir.1995))); *Duckor Spradling & Metzger v. Baum Trust (In re P.R.T.C., Inc.),* 177 F.3d 774, 778 (9th Cir.1999) (endorsing our distinction in *In re Johns–Manville* between a "creditor opposing a plan of reorganization," who has standing, and "marginal parties ... who face potential harm," who do not).

Here, the Recognition Order subjected Drawbridge only to potential future harm. To hold otherwise would ignore the Bankruptcy Court's discretion to deny discovery under 11 U.S.C. § 1521. It

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

737 F.3d 238, 70 Collier Bankr.Cas.2d 1203, 58 Bankr.Ct.Dec. 251, Bankr. L. Rep. P 82,554

**(Cite as: 737 F.3d 238)**

follows that the Recognition Order was not appeal-able by Drawbridge when issued.

**B. The Discovery Order**

[4][5] Although we conclude that a recognition order is not itself appealable by a party that is not directly affected by the relief that order provides, this conclusion does not end our standing analysis. Here, Drawbridge is aggrieved by an order of the Bankruptcy Court—the discovery order issued on December 12, 2012. We next consider whether that order is appealable and conclude that it is.

[6] Because they are not final orders, the general rule is that discovery orders are not appealable unless the object of the discovery order refuses to comply and is held in contempt. *See, e.g., Golan v. Am. Airlines, Inc.* (*In re Air Crash at Belle Harbor, N.Y. on Nov. 12, 2001* ), 490 F.3d 99, 104 (2d Cir.2007); *Glotzer v. Stewart* (*In re S.E.C. ex rel. Glotzer* ), 374 F.3d 184, 188 (2d Cir.2004) ("[G]enerally, a litigant who wants to challenge a discovery order must disobey the order, be held in contempt of court, then bring an appeal....").

**\*244** This rule has an exception for discovery orders issued pursuant to 28 U.S.C. § 1782(a), which provides for discovery "for use in a proceeding in a foreign or international tribunal." 28 U.S.C. § 1782(a); *see Chevron Corp. v. Berlinger,* 629 F.3d 297, 306 (2d Cir.2011). In *Chevron Corp.,* we reasoned that the discovery order "constitutes the final resolution of a petition to take discovery in aid of a foreign proceeding" and is, therefore, "immediately appealable." 629 F.3d at 306. The same reasoning applies in this context. Chapter 15 proceedings, like Section 1782 proceedings, are ancillary to a "suit in another tribunal," *id.,* such that there will never be a final resolution on the merits beyond the discovery relief itself. It follows that the discovery order entered by the Bankruptcy Court was appealable.

Moreover, we have previously entertained an appeal from a party aggrieved by the automatic relief imposed by Section 1520. *See In re Fairfield Sentry Ltd.,* 714 F.3d at 131. Appellate standing was warranted in *Fairfield* precisely because once recognition is granted, the imposition of automatic relief requires no further action by the Bankruptcy Court. The discretionary relief permitted by Section 1521 requires an extra step, but once that step is taken and the Bankruptcy Court has chosen to exercise its discretion, a party aggrieved by Section 1521 stands in the same position as one aggrieved by Section 1520. If appellate review is available to one, therefore, it should be available to the other.

[7] Having concluded that we would have jurisdiction over an appeal from the discovery order, two questions remain: (1) whether the discovery order grants us jurisdiction over a premature notice of appeal from the Recognition Order; and (2) if so, whether an appeal from the discovery order brings up for review the Recognition Order. We answer both questions in the affirmative.

The notice of appeal filed on September 20, 2012, was directed to the District Court, not to this Court. Before the District Court assumed jurisdiction, however, the Bankruptcy Court, *sua sponte,* suggested that the parties seek certification for direct appeal to this Court, giving as its reason that Drawbridge and its affiliates "really don't want to produce documents and [Foreign Representatives] really want the documents." Tr. of Record at 25:3–7, *In re Octaviar Administration Pty. Ltd.,* No. 12–13443 (Bankr.S.D.N.Y. Oct. 23, 2012). Earlier in the same proceeding, Foreign Representatives had already made their argument that Drawbridge lacked appellate standing. *See id.* at 6:1–14:11. The Bankruptcy Court's statement that appellate review should be sought to expedite discovery, therefore, did not occur in a vacuum. Rather, the Bankruptcy Court believed that our resolution of the validity of the Recognition Order would be dispositive of whether discovery was available. The parties then jointly petitioned the Bankruptcy Court for certification of direct appeal, which was granted on November 28, 2012. The Bankruptcy Court issued its discovery order on

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

737 F.3d 238, 70 Collier Bankr.Cas.2d 1203, 58 Bankr.Ct.Dec. 251, Bankr. L. Rep. P 82,554

**(Cite as: 737 F.3d 238)**

December 12, 2012, and the parties did not file their joint request for direct appeal to this Court until December 21, 2012. At no time, therefore, was any notice of appeal or request for direct appeal pending in this Court before the 17 discovery order had been issued.

[8] "We have held that a premature notice of appeal from a nonfinal order may ripen into a valid notice of appeal if a final judgment has been entered by the time the appeal is heard and the appellee suffers no prejudice. This rule applies even if the final judgment was not itself appealed." **\*245** *Community Bank, N.A. v. Riffle,* 617 F.3d 171, 174 (2d Cir.2010) (per curiam) (internal citations and quotation marks omitted); *see Berlin v. Renaissance Rental Partners, LLC,* 723 F.3d 119, 128 (2d Cir.2013) (same as first sentence of *Riffle* quote).

In *Riffle,* we exercised jurisdiction over an appeal from a non-final (and, hence, non-appealable) denial of a motion to dismiss because by the time the appeal reached us, the underlying bankruptcy proceeding was rendered final (and appealable) by a subsequent confirmation order. 617 F.3d at 173–74. As in this case, the notice of appeal in *Riffle* was filed after the order that rendered the lower court proceeding final. *Id.* at 173. The discovery order, therefore, caused the "premature notice of appeal from" the Recognition Order to "ripen into a valid notice of appeal." *Id.* at 174.

We would reach the same result applying the Federal Rules of Appellate Procedure. In *Smith v. Barry,* the Supreme Court ruled that "[i]f a document filed 18 within the time specified by Rule 4 gives the notice required by Rule 3, it is effective as a notice of appeal." *Smith v. Barry,* 502 U.S. 244, 248–49, 112 S.Ct. 678, 116 L.Ed.2d 678 (1992); *see id.* ("[W]hen papers are technically at variance with the letter of Rule 3, a court may nonetheless find that the litigant has complied with the rule if the litigant's action is the functional equivalent of what the rule requires.... Although courts should construe Rule 3 liberally when determining whether it has been complied with, noncompliance is fatal to

an appeal." (internal quotation marks and brackets omitted)). The year after *Barry,* the Federal Rules of Appellate Procedure were amended to add what is now Rule 3(c)(4), providing that "[a]n appeal must not be dismissed for informality of form or title of the notice of appeal, or for failure to name a party whose intent to appeal is otherwise clear from the notice." Rule 3(c)(4), therefore, codifies *Barry's* instruction to "construe Rule 3 liberally" and to overlook technical variances.

Our precedents are in accord. Invoking Rule 3(c)(4), we interpreted a notice of appeal from a final judgment entered "on the 25th day of April, 2012, and from each part thereof" as also appealing from orders entered on five other days ranging from June 3, 2008, to April 24, 2012. *L.I. Head Start Child Dev. Servs., Inc. v. Econ. Opportunity Comm'n of Nassau Cnty., Inc.,* 710 F.3d 57, 63 n. 3 (2d Cir.2013). We have similarly construed an appeal from the denial of a habeas petition as also appealing from a subsequent motion for reconsideration. *See Marrero Pichardo v. Ashcroft,* 374 F.3d 46, 54–55 (2d Cir.2004). In *Marrero Pichardo,* we noted that "[i]n determining whether to permit a defective notice of appeal, this court considers the notice of appeal so as to remain faithful to the intent of the appellant, fair to the appellee, and consistent with the jurisdictional authority of this court." *Id.* at 55 (internal quotation marks omitted).

In this case, there can be no argument that Foreign Representatives were in any way deprived of the "notice required by Rule 3" or otherwise suffered prejudice. The only legal issues raised on appeal concern the validity of the Recognition Order, which is mentioned in the joint request for direct appeal. Moreover, the Bankruptcy Court itself suggested that the purpose of direct appeal was to resolve the question of discovery by determining the validity of the Recognition Order. *See* Tr. of Record at 25:3–7, *In re Octaviar Administration Pty. Ltd.,* No. 12–13443 (Bankr.S.D.N.Y. Oct. 23, 2012). On the Bankruptcy Court's suggestion, the parties jointly pursued a direct appeal, which re-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

737 F.3d 238, 70 Collier Bankr.Cas.2d 1203, 58 Bankr.Ct.Dec. 251, Bankr. L. Rep. P 82,554
**(Cite as: 737 F.3d 238)**

quest was only filed with this Court after the appealable order had been issued by **\*246** the Bankruptcy Court. The failure to specifically identify the December 12 discovery order, therefore, was a mistake of form for which the "appeal must not be dismissed." Fed. R.App. P. 3(c)(4).

Finally, a correctly noticed appeal from the discovery order would bring up for review the Recognition Order. Such an appeal, as with an appeal from any other final order, "opens the record and permits review of all rulings that led up to the judgment." 15A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3905.1 (2d ed.); *see Fielding v. Tollaksen,* 510 F.3d 175, 179 (2d Cir.2007) ("[W]hen a district court enters a final judgment in a case, interlocutory orders rendered in the case typically merge with the judgment for purposes of appellate review." (internal quotation marks omitted)); *Anobile v. Pelligrino,* 303 F.3d 107, 115 (2d Cir.2002) ( "Generally, absent prejudice to the appellees, this Court interprets an appeal from a specific order disposing of the case as an appeal from the final judgment, which incorporates all previous interlocutory judgments in that case and permits their review on appeal."). Indeed, in this case, the Recognition Order was a necessary prerequisite to ordering discovery. *See* 11 U.S.C. § 1521(a)(4) (providing for discovery "[u]pon recognition"). The Recognition Order is properly before us, therefore, as it has merged with the subsequent discovery order.

Indeed, in our prior cases considering premature notices of appeal that ripen into valid notices of appeal we have considered the issues raised by the non-final orders appealed from. *See Berlin,* 723 F.3d at 127–28 (considering issues arising from the non-final attorneys' fees order); *Riffle,* 617 F.3d at 173–74 (considering issues arising from the non-final denial of a motion to dismiss). We see no reason not to do the same here.

**II. The Recognition Order**

[9][10] Having determined that we have jurisdiction over this appeal, we now turn to the merits, *i.e.,* whether Section 109(a) applies to a debtor in a Chapter 15 proceeding. We review a "bankruptcy court's legal conclusions *de novo* " "accepting the bankruptcy court's factual findings unless clearly erroneous." *In re Fairfield Sentry,* 714 F.3d at 132; *accord Super Nova 330 LLC v. Gazes,* 693 F.3d 138, 141 (2d Cir.2012) (applying the same standard). A lower court decision "interpreting the meaning of a statute" is also reviewed *de novo. United States v. DiCristina,* 726 F.3d 92, 96 (2d Cir.2013); *see Kreisberg v. HealthBridge Mgmt., LLC,* 732 F.3d 131, 137 (2d Cir.2013) ("We review *de novo* the District Court's ... interpretation of the Constitution and federal statutes and regulations.").

[11][12] "Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *United States v. Kozeny,* 541 F.3d 166, 171 (2d Cir.2008) (internal quotation marks omitted). " 'Where the statute's language is plain, the sole function of the courts is to enforce it according to its terms.' " *DiCristina,* 726 F.3d at 96 (quoting *Kozeny,* 541 F.3d at 171). Indeed, "[t]he preeminent canon of statutory interpretation requires us to 'presume that the legislature says in a statute what it means and means in a statute what it says there.' " *BedRoc Ltd. v. United States,* 541 U.S. 176, 183, 124 S.Ct. 1587, 158 L.Ed.2d 338 (2004) (plurality op.) (internal brackets omitted) (quoting *Ct. Nat'l Bank v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992)); *see* **\*247***Dodd v. United States,* 545 U.S. 353, 357, 125 S.Ct. 2478, 162 L.Ed.2d 343 (2005) (quoting *Germain,* 503 U.S. at 253–54, 112 S.Ct. 1146).

[13] "Statutory enactments should, moreover, be read so as 'to give effect, if possible, to every clause and word of a statute.' " *DiCristina,* 726 F.3d at 96 (quoting *Duncan v. Walker,* 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001)); *see Nwozuzu v. Holder,* 726 F.3d 323, 328 (2d Cir.2013) ("[A] statute must be construed to give effect, if possible, to every clause and word...."

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

737 F.3d 238, 70 Collier Bankr.Cas.2d 1203, 58 Bankr.Ct.Dec. 251, Bankr. L. Rep. P 82,554
**(Cite as: 737 F.3d 238)**

(internal quotation marks omitted)); *Mary Jo C. v. N.Y. State & Local Ret. Sys.,* 707 F.3d 144, 156 (2d Cir.2013) ("One of the most basic interpretive canons is that a statute should be construed so that effect is given to all of its provisions, so that no part will be inoperative or superfluous, void or insignificant." (internal quotation marks and brackets omitted)).

"The recognition of foreign proceedings is governed by Sections 1515 through 1524." *In re Fairfield Sentry,* 714 F.3d at 132. The basic requirements for recognition are outlined in 11 U.S.C. § 1517(a): (1) the proceeding "is a foreign main proceeding or foreign nonmain proceeding" as defined by 11 U.S.C. § 1502; (2) "the foreign representative applying for recognition is a person or body"; and (3) the petition for recognition meets the requirements of 11 U.S.C. § 1515.

A "foreign main proceeding"—the category relevant to this appeal—is "a foreign proceeding pending in the country where the debtor has the center of its main interests." 11 U.S.C. § 1502(4). A "foreign proceeding" is "a collective judicial or administrative proceeding in a foreign country ... under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for 17 the purposes of reorganization or liquidation." 11 U.S.C. § 101(23). Debtor is defined, "[f]or the purposes of this chapter [15]," as "an entity that is the subject of a foreign proceeding." 11 U.S.C. § 1502(1).

[14] The question presented by this appeal is whether 11 U.S.C. § 109(a) applies to a debtor under Chapter 15. Section 109(a) provides: "Notwithstanding any other provision of this section, only a person that resides or has a domicile, a place of business, or property in the United States, or a municipality, may be a debtor under this title." Section 103(a) of Title 11 provides that, other than for an exception not relevant here, Chapter 1 "of this title ... appl[ies] in a case under chapter 15." Section 109, of course, is within Chapter 1 of Title

11 and so, by the plain terms of the statute, it applies "in a case under chapter 15." Because Foreign Representatives made no attempt to establish that OA had a domicile, place of business or property in the United States, recognition should not have been granted.

The straightforward nature of our statutory interpretation bears emphasis. Section 103(a) makes all of Chapter 1 applicable to Chapter 15. Section 109(a)—within Chapter 1—creates a requirement that must be met by any debtor. Chapter 15 governs the recognition of foreign proceedings, which are defined as proceedings in which "the assets and affairs of the debtor are subject to control or supervision by a foreign court." 11 U.S.C. § 101(23). The debtor that is the subject of the foreign proceeding, therefore, must meet the requirements of Section 109(a) before a bankruptcy court may grant recognition of the foreign proceeding.

Commentators have reached the same conclusion. *See* Collier on Bankruptcy ¶ 1501.03 (Alan N. Resnick & Henry J. Somme eds., 16th ed.) ("Although chapter **\*248** 15 is the principal chapter of the Bankruptcy Code that governs the conduct of ancillary cases, several other sections of the Bankruptcy Code ... directly affect cases under chapter 15. These include ... section 109, which limits the types of debtors eligible for chapter 15...."); Susan Power Johnston, *Conflict Between Bankruptcy Code §§ 109(a) and 1515: Do U.S. Bankruptcy Courts Have Jurisdiction Over Chapter 15 Cases If the Foreign Debtor Has No Assets or Presence in the U.S.?,* 17 J. Bankr.L. & Prac. 5, art. 6 (Aug.2008), at 1 ("[S]ection 109(a) cannot be reconciled with Chapter 15 and ... contrary to Congress' intent, foreign representatives of foreign debtors without assets in the U.S. are not, on the face of the statute, entitled to the assistance of U.S. bankruptcy courts.").

Foreign Representatives advance several arguments to resist this conclusion. *First,* they argue that Section 109(a) creates a requirement for debtors "under this title," whereas OA is a debtor under

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

737 F.3d 238, 70 Collier Bankr.Cas.2d 1203, 58 Bankr.Ct.Dec. 251, Bankr. L. Rep. P 82,554

**(Cite as: 737 F.3d 238)**

the Australian Corporations Act, not under Title 11. Put another way, Foreign Representatives argue that they are not seeking recognition of a debtor and that no debtor appeared before the Bankruptcy Court; rather, Foreign Representatives appeared seeking recognition of a foreign proceeding.

This argument fails, however, because the presence of a debtor is inextricably intertwined with the very nature of a Chapter 15 proceeding, both in terms of how such a proceeding is defined and in terms of the relief that can be granted. It stretches credulity to argue that the ubiquitous references to a debtor in both Chapter 15 and the relevant definitions of Chapter 1 do not refer to a debtor under the title that contains both chapters.

Although Foreign Representatives are correct that recognition is sought by a foreign representative, not by a debtor, 11 U.S.C. § 1515(a), "[t]he term 'foreign representative' means a person or body ... authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs," 11 U.S.C. § 101(24). Similarly, as noted above, a foreign main proceeding is a foreign proceeding "pending in the country where the debtor has the center of its main interests." 11 U.S.C. § 1502(4). Moreover, Section 1502 defines a "debtor" as "the subject of a foreign proceeding," and the definition of "foreign proceeding" identifies "the assets and affairs of the debtor" as its subject. 11 U.S.C. §§ 101(23), 1502(1).

In addition, both the automatic and discretionary relief provisions that accompany recognition of a foreign main proceeding are directed towards debtors. 11 U.S.C. § 1520(a) applies 11 U.S.C. §§ 361–63, 549 and 552 to "the debtor," "the property of the debtor," or "an interest of the debtor in property," as appropriate. Section 362, in turn, provides for, *inter alia,* the stay of any "proceeding against the debtor." 11 U.S.C. § 362(a)(1); *see also* 11 U.S.C. § 552(a) (governing post-petition "property acquired by the estate or by the debtor"). The discretionary relief provisions follow the same pattern. *See* 11 U.S.C. § 1521 (providing for, *e.g.,*

"entrusting the administration or realization of all or part of the debtor's assets within the territorial jurisdiction of the United States to the foreign representative," "staying execution against the debtor's assets," and "granting any additional relief that may be available to a trustee"). Even the relief that Foreign Representatives seek requires a debtor under Title 11, as Section 1521(a)(4) provides for "the examination of witnesses ... concerning the debtor's assets, affairs, rights, obligations or liabilities."

**\*249** *Second,* Foreign Representatives argue that even if OA must qualify as a debtor under Title 11, it is only required to meet the Chapter 15–specific definition of "debtor" contained in Section 1502, and not also the requirements of Section 109. As noted above, Section 1502 defines a debtor "[f]or the purposes of this chapter" as "an entity that is the subject of a foreign proceeding." This argument also fails, as we cannot see how such a preclusive reading of Section 1502 is reconcilable with the explicit instruction in Section 103(a) to apply Chapter 1 to Chapter 15.

But even if the definition of "debtor" in Section 1502 blocked application of Section 109 within Chapter 15, that would not support the conclusion that OA need not satisfy Section 109 in order for Foreign Representatives to obtain recognition of the foreign proceeding. Given its broadest reading, Section 1502 still could not affect the definitions contained within Chapter 1 because Section 1502's scope is expressly limited to "this chapter" (Chapter 15). It follows that the definitions of "foreign proceeding" and "foreign representative," which both occur within Chapter 1, would not be affected. 11 U.S.C. § 101(23)-(24). Because 17 they both require a debtor, as discussed above, OA would need to satisfy Section 109 in order to meet the requirements contained within Chapter 15 that rely upon those definitions.

The definition of "debtor" in Section 1502, however, does not block application of Section 109 within Chapter 15. Chapter 1 contains a definition of "debtor" introduced by the phrase, "[t]he term

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

737 F.3d 238, 70 Collier Bankr.Cas.2d 1203, 58 Bankr.Ct.Dec. 251, Bankr. L. Rep. P 82,554

**(Cite as: 737 F.3d 238)**

'debtor' means." 11 U.S.C. § 101(13). Section 109(a) does not say that the term debtor "means" anything. Rather, it adds a requirement for the kinds of "person" that "may be a debtor under this title." 11 U.S.C. § 109(a). Section 1502, like Section 101, introduces its definition with the phrase "the term—(1) 'debtor' means." This linguistic parallelism makes clear that Section 1502 supplants Section 101 — *i.e.,* it supplants the definition of debtor within the context of Chapter 15—but it does not supplant requirements for "a debtor under this title" not included in the definition. *Cf. DiCristina,* 726 F.3d at 99 (" 'When an exclusive definition is intended the word 'means' is employed.' " (internal brackets and ellipsis omitted) (quoting *Groman v. Comm'r of Internal Revenue,* 302 U.S. 82, 86, 58 S.Ct. 108, 82 L.Ed. 63 (1937))).

The Foreign Representatives' proposed interpretation also fails because it would render Section 109(a) meaningless. They argue that what debtor "means" in Chapter 15 supplants a requirement placed on a debtor "under this title." But consistency would then require that what a debtor "means" in Chapter 1 would have the same effect. The result would be that Section 109(a) would have no application under any circumstances because the definition in Chapter 1 applies generally. This violates the "most basic interpretive canon[ ]" requiring us to interpret statutes such that "no part will be inoperative or superfluous." *Mary Jo C.,* 707 F.3d at 156. Foreign Representatives' argument, therefore, must be incorrect.

Finally, Foreign Representatives offer no explanation as to why, if Congress wished to exclude Chapter 15 from the reach of Section 109(a), it did not say as much. Congress' silence is particularly inexplicable in light of the fact that Congress did expressly restrict the application of Section 109(b) to Chapter 15 by removing a prohibition on application to foreign insurance companies. 11 U.S.C. § 1501(c) ("This chapter does not apply to—(1) a proceeding concerning an entity, other than a foreign insurance company, identified by exclusion in

section 109(b).").

**\*250** [15] We would end our "plain meaning" analysis here. However, Foreign Representatives argue that the context and purpose of Chapter 15 support their reading of the statute. A properly limited contextual analysis of statutory language is encompassed within the ambit of a textual analysis. *See In re Application of N.Y. Times Co. to Unseal Wiretap & Search Warrant Materials,* 577 F.3d 401, 406 (2d Cir.2009) ("[W]e examine the text of the statute itself, interpreting provisions in light of their ordinary meaning and their contextual setting."); *United States v. Magassouba,* 544 F.3d 387, 404 (2d Cir.2008) ("In determining whether statutory language is ambiguous, we 'reference the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.' " (internal ellipsis omitted) (quoting *Robinson v. Shell Oil Co.,* 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997))).

Such an analysis, however, supports application of Section 109(a) to Chapter 15. Congress amended Section 103 to state that Chapter 1 applies to Chapter 15 at the same time as it enacted Chapter 15. *See* Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. No. 109–8, §§ 801–02, 119 Stat. 23. This strongly supports the conclusion that Congress intended Section 103(a) to mean what it says, namely, that Chapter 1 applies to Chapter 15. *Cf. United States v. Battista,* 575 F.3d 226, 234 (2d Cir.2009) ("[W]hen two sections share the same purpose, the parallel provisions can, as a matter of general statutory construction, be interpreted to be *in pari materia.*" (internal quotation marks omitted)).

Foreign Representatives argue that application of Section 109(a) to Chapter 15 would be inconsistent with 11 U.S.C. § 1528 and 28 U.S.C. § 1410. Section 1528 states that "[a]fter recognition of a foreign main proceeding, a case under another chapter of this title may be commenced only if the debtor has assets in the United States." Foreign Representatives argue that the necessary implica-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

737 F.3d 238, 70 Collier Bankr.Cas.2d 1203, 58 Bankr.Ct.Dec. 251, Bankr. L. Rep. P 82,554
**(Cite as: 737 F.3d 238)**

tion is that a foreign main proceeding may be recognized even when there are no assets in the United States—*i.e.,* Section 109(a) does not apply to Chapter 15 proceedings.

This argument fails, however, because Section 109(a) requires "a domicile, a place of business, or property in the United States." Section 1528, therefore, is more restrictive than Section 109. It follows that there is nothing contradictory or disharmonious about applying Section 109(a) to Chapter 15 and then further requiring that Section 1528 is met before a case under another chapter of Title 11 may be commenced.

Foreign Representatives come closer to the mark with their argument that 28 U.S.C. § 1410 provides a venue for Chapter 15 cases even when "the debtor does not have a place of business or assets in the United States." This venue statute, however, is purely procedural. Given the unambiguous nature of the substantive and restrictive language used in Sections 103 and 109 of Chapter 15, to allow the venue statute to control the outcome would be to allow the tail to wag the dog.

Finally, Foreign Representatives argue that the purpose of Chapter 15 would be undermined by application of Section 109(a). "[W]e look first to the text and structure of the statute as the surest guide to congressional intent." *Mary Jo C.,* 707 F.3d at 168 (internal quotation marks omitted). Here, Chapter 15 contains an express purpose section that states: "The purpose of this chapter is to incorporate the Model Law on Cross–Border Insolvency so as to provide effective mechanisms for dealing with cases of cross-border insolvency with the objectives of": (1) international**\*251** cooperation; (2) "greater legal certainty for trade and investment"; (3) "fair and efficient administration of cross-border insolvencies"; (4) "protection and maximization of the value of the debtor's assets; and (5) facilitation of the rescue of financially troubled businesses." 11 U.S.C. § 1501(a). None of these stated purposes are dispositive as they could all be accomplished with or without imposition of Section 109(a). It is true

that the Model Law does not contain an express requirement akin to Section 109(a), *see generally* United Nations Commission on International Trade Law, *UNCITRAL Model Law on Cross–Border Insolvency with Guide to Enactment, available at* http:// www. uncitral. org/ pdf/ english/ texts/ insolven/ insolvency- e. pdf (last accessed Dec. 9, 2013), but the Model Law also states that "a State may modify or leave out some of its provisions" *id.* at Part 2 ¶ 12. Regardless, the omission of Section 109(a), or its equivalent, from the Model Law does not suffice to outweigh the express language Congress used in adopting Sections 109(a) and 103(a). This is especially true where other provisions of federal law provide the relief that the Model Law was intended to provide. Here, 28 U.S.C. § 1782(a) provides for discovery in aid of foreign proceedings without any requirement akin to Section 109(a). FN3 Congress, therefore, may have intended to limit the relief provided by Chapter 15 because it knew that additional relief was already 13 available outside of Chapter 15.

> FN3. Indeed, we note that Foreign Representatives have commenced an action under 28 U.S.C. § 1782 and have entered into a stipulation with Drawbridge and others calling for production of documents within sixty days of October 3, 2013. *See* Stip. & Order, *In re Application of Barnet,* 13–Misc.–214, Dkt. No. 32 (S.D.N.Y. Oct. 4, 2013).

### CONCLUSION

Because we find that 11 U.S.C. § 109(a) applies to the debtor in a foreign main proceeding under Chapter 15 of the Bankruptcy Code, we **VACATE** and **REMAND** to the Bankruptcy Court for further proceedings consistent with this opinion.

We direct the Clerk of Court to forward copies of this opinion to Congress following the specified protocol adopted by the Judicial Conference.

C.A.2 (N.Y.),2013.
In re Barnet

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

737 F.3d 238, 70 Collier Bankr.Cas.2d 1203, 58 Bankr.Ct.Dec. 251, Bankr. L. Rep. P 82,554
**(Cite as: 737 F.3d 238)**

737 F.3d 238, 70 Collier Bankr.Cas.2d 1203, 58 Bankr.Ct.Dec. 251, Bankr. L. Rep. P 82,554

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Tab 33

26-11268-mg    Doc 23-3    Filed 06/24/26    Entered 06/24/26 13:13:49    Exhibit C    Pg
587 of 882
EMA GARP Fund v. Banro Corporation, Not Reported in Fed. Supp. (2019)

2019 WL 773988

2019 WL 773988
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

EMA GARP FUND and Lawrence
Lepard, Individually and on Behalf of
All Others Similarly Situated, Plaintiffs,

v.

BANRO CORPORATION and
John A. Clarke, Defendants.

18 Civ. 1986 (KPF)
|
Signed 02/21/2019

**Attorneys and Law Firms**

Kurt Thomas Kalberer, II, Kalberer LLP, New York, NY, for
Plaintiffs.

Stephen Michael Baldini, Ira S. Dizengoff, Sara Lynne
Brauner, Stephanie L. Lindemuth, Akin Gump Strauss Hauer
& Feld LLP, New York, NY, for Defendants.

## OPINION AND ORDER

KATHERINE POLK FAILLA, United States District Judge

**\*1**  The complaint in this case alleges false and misleading
statements, as well as material omissions of fact, in
communications from Banro Corporation, Inc. ("Banro," or
the "Company"), and its former CEO, John A. Clarke, to
Banro's shareholders. Plaintiffs, who are Banro shareholders,
seek compensatory damages for violations of Sections 10(b)
and 20(a) of the Securities and Exchange Act of 1934
(the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and
Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.
Banro has recently undergone a restructuring proceeding in
the Canadian court system, and Defendants have moved to
dismiss this action based on that proceeding. For the reasons
set forth in the remainder of this Opinion, Defendants' motion
to dismiss Plaintiffs' claims on the grounds of international
comity is granted.

## BACKGROUND[1]

[1]  The facts set forth herein are drawn from Plaintiffs' First
Amended Complaint (the "FAC" (Dkt. #13) ), and as
well a declaration submitted by Jane Dietrich in support
of Defendants' motion to dismiss ("Dietrich Decl." (Dkt.
#31) ), which declaration provides information about
Banro's Canadian bankruptcy proceeding. The Court
takes judicial notice of the contents of the Dietrich
declaration pursuant to Federal Rule of Civil Procedure
44.1. *See* Fed. R. Civ. P. 44.1; *see also, e.g.*, *Oui Fin. LLC
v. Dellar*, No. 12 Civ. 7744 (RA), 2013 WL 5568732, at
*1-2 (S.D.N.Y. Oct. 9, 2013). For convenience, the Court
will refer to Defendants' memorandum in support of their
motion to dismiss as "Def. Br." (Dkt. #29), Plaintiffs'
memorandum in opposition as "Pl. Opp." (Dkt. #36), and
Defendants' reply as "Reply Br." (Dkt. #37).

**A. The Banro CCAA Proceeding**
Banro is a public corporation headquartered in Canada and
incorporated under Canadian law. (FAC ¶ 7). On December
22, 2017, Banro commenced a reorganization proceeding
(the "Banro CCAA Proceeding") in the Ontario Superior
Court of Justice pursuant to Canada's Companies' Creditors
Arrangement Act, R.S.C. 1985, c. C-36 (the "CCAA").
(Dietrich Decl. ¶¶ 2, 44). The Court pauses to provide
background information on CCAA proceedings generally,
after which it will return to the details of the Banro CCAA
Proceeding.

During a CCAA proceeding, the CCAA court appoints a
licensed insolvency trustee as a monitor (the "Monitor"), to
act with fiduciary duties to all stakeholders. (Dietrich Decl.
¶ 15). The debtor company's management team and board
of directors generally remain in place, and the board retains
power to approve the disposition of assets, or the restructuring
of the company, subject to oversight by the Monitor. (*Id.*
at ¶ 9). The CCAA court has the power to grant a stay of
proceedings in favor of the debtor for an initial period of
30 days, and subsequently to extend the stay on a showing
that the debtor has acted diligently and in good faith. (*Id.*
at ¶ 12). The Monitor is required to publish notice of the
proceedings in the Canadian newspapers, to send notice to
every known creditor, and to make certain information about
the proceeding publicly available on a website devoted to
the case. (*Id.* at ¶¶ 16, 19). The Monitor also makes publicly
available information about the debtor's state of business
and financial affairs, as well as the Monitor's advice on the
reasonableness and fairness of any proposed restructuring,

3250

EMA GARP Fund v. Banro Corporation, Not Reported in Fed. Supp. (2019)

2019 WL 773988

the latter of which the Canadian courts refer to as a plan of "compromise" or "arrangement." (*Id.* at ¶ 29). CCAA proceedings also have an established "E-Service Protocol" to effect service of documents on interested stakeholders. (*Id.* at ¶ 20). Typically, the CCAA court will issue a claims procedure order providing that creditors with claims against either the debtor, or its directors and officers, must file proof of claims by a specified date (the "Bar Date"), or the potential claims may be extinguished. (*Id.* at ¶ 23). The CCAA court will then hold a creditor meeting where the plan of compromise or arrangement must be approved by a vote, whereupon it may be approved, or "sanctioned," by the court. (*Id.* at ¶ 30).

**\*2** CCAA proceedings have particular rules for equity claims. "[C]reditors having equity claims are to be in the same class of creditors in relation to those claims unless the court orders otherwise and may not, as members of that class, vote at any meeting unless the court orders otherwise." CCAA § 22.1. Under the CCAA, an "equity claim means a claim that is in respect of an equity interest, including a claim for, among others ... a monetary loss resulting from the ownership, purchase or sale of an equity interest or from the rescission, or, in Quebec, the annulment, of a purchase or sale of an equity interest[.]" *Id.* § 2(1). No plan may be sanctioned by the CCAA court if it provides for the payment of *any* equity claims before all non-equity claims are paid in full. *See id.* § 6(8). Shareholder claims are equity claims, even where based on allegations of fraudulent misrepresentation. (Dietrich Decl., Ex. 9).

CCAA proceedings also explicitly provide for claims against the individual directors of the debtor company. *See* CCAA § 5.1(1) ("A compromise or arrangement made in respect of a debtor company may include in its terms provision for the compromise of claims against directors of the company that arose before the commencement of proceedings under this Act and that relate to the obligations of the company where the directors are by law liable in their capacity as directors for the payment of such obligations."). Finally, CCAA proceedings provide mechanisms for appeal. (Dietrich Decl. ¶ 38).

Returning to the specifics of the Banro CCAA Proceeding, on December 22, 2017, the CCAA court issued an initial order staying all claims. (Dietrich Decl. ¶¶ 44, 45). The stay was ultimately extended until May 3, 2018. (*Id.* at ¶ 45). Meanwhile, the CCAA court issued a Bar Date deadline of March 6, 2018, for the filing of any claims against Banro. (*Id.* at ¶ 59). No claims were received from Plaintiffs (or any others) by the March 6, 2018 Bar Date. (*Id.* at ¶ 63).

The CCAA court then considered a proposed reorganization plan that, among other things, exchanged secured debt for equity and extinguished the interests of Banro's current equity holders. (*Id.* at ¶ 65). The reorganization plan also provided releases for both the Banro debtors and their directors and officers. (*Id.* at ¶ 67). The Banro debtors held two meetings of creditors, at which the creditors overwhelmingly approved the proposed reorganization plan. (*Id.* at ¶ 55). The CCAA court then issued a sanction order (the "Sanction Order") approving the reorganization plan on March 27, 2018, specifically finding that the releases provided for the Banro directors and officers were fair and reasonable. (*Id.* at ¶¶ 57, 68).

**B. Plaintiffs' Awareness of the Banro CCAA Proceeding**
Plaintiffs concede that they were aware of the CCAA Proceeding. (Def. Br. 9; FAC ¶ 99). However, rather than participate in that proceeding, they commenced this action by filing a complaint on March 5, 2018, one day prior to the Bar Date deadline. (Dkt. #1). Plaintiffs maintain that they "did not discover the facts which gave rise to their claims until the eve of the filing, and immediately filed the action in this Court without delay and prior to the claims deadline in the CCAA proceeding as a <u>courtesy</u> to the Canadian court." (Pl. Opp. 24 (underscoring in original) ). Defendants reply that, at the time Plaintiffs commenced this action on March 5, 2018, there was still time to participate in the CCAA Proceeding. (Def. Reply 4).

The record bears out Defendants' position. On March 6, 2018, Plaintiffs' counsel informed the Banro Monitor that Plaintiffs had commenced the present action in this Court. (Dietrich Decl. ¶ 77, Ex. 23). Banro's bankruptcy counsel then told Plaintiffs' counsel that a hearing on the reorganization plan pending before the CCAA court had been rescheduled for March 27, 2018, providing Plaintiffs an additional opportunity to participate in the Banro CCAA Proceeding. (*Id.* at ¶ 80, Ex. 26). Nonetheless, Plaintiffs did not appear in the CCAA Proceeding. (*Id.* at ¶ 83). Plaintiffs assert that both the Banro Monitor and Banro wrote to tell Plaintiffs that their letter dated March 6, 2018, was "improper and advis[ed] Plaintiffs they would have to engage Canadian counsel to appear in the action." (Pl. Opp. 25; *see also* Dietrich Decl. ¶ 77, Ex. 26).

**\*3** On March 27, 2018, the CCAA court issued the Sanction Order, which released all equity claims, including Plaintiffs' claims. (Dietrich Decl. ¶¶ 57, 84-85). Specifically, the CCAA court extinguished Plaintiffs' claims against Banro as pre-petition equity claims, and extinguished Plaintiffs' claims

3251

26-11268-mg    Doc 23-3    Filed 06/24/26    Entered 06/24/26 13:13:49    Exhibit C    Pg 589 of 882

EMA GARP Fund v. Banro Corporation, Not Reported in Fed. Supp. (2019)

2019 WL 773988

against Clarke as "barred ... because of non-compliance with the Claims Procedure Order." (*Id.* at Ex. 18 ¶ 11(g); Def. Reply 6). On May 3, 2018, the CCAA court terminated the stay. (Dietrich Decl. ¶¶ 45, 58).

### C. The Instant Motion

On May 18, 2018, Defendants moved to dismiss this action on the basis of comity. (Dkt. #28). Plaintiffs filed their opposition on July 8, 2018 (Dkt. #36), and Defendants replied on July 16, 2018 (Dkt. #37).

## DISCUSSION

### A. Applicable Law

#### 1. Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(1)

In considering a Rule 12(b)(1) motion to dismiss, "the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff." *Natural Res. Def. Council* v. *Johnson*, 461 F.3d 164, 171 (2d Cir. 2006). The Court "may consider affidavits and other materials beyond the pleadings to resolve [a] jurisdictional issue[.]" *J.S. ex rel. N.S.* v. *Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004); *see also Kramer* v. *Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (observing that "courts routinely take judicial notice of documents filed in other courts"); *Lefkowitz* v. *Bank of N.Y.*, 676 F. Supp. 2d 229, 249 (S.D.N.Y. 2009) ("Judicial notice may encompass the status of other lawsuits, including in other courts, and the substance of papers filed in those actions."). Sister courts in this District have considered discretionary motions to dismiss on international comity grounds under Rule 12(b)(1). *See, e.g.*, *Duff & Phelps, LLC* v. *Vitro S.A.B. de C.V.*, 18 F. Supp. 3d 375, 377 (S.D.N.Y. 2014); *United States* v. *Portrait of Wally*, No. 99 Civ. 9940 (MBM), 2002 WL 553532, at *6 (S.D.N.Y. Apr. 12, 2002).

#### 2. Deference to International Bankruptcy Proceedings

International comity is "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." *Hilton* v. *Guyot*, 159 U.S. 113, 164 (1895). In *Allstate Life Insurance Company* v. *Linger Group Limited*, the Second Circuit affirmed the dismissal, on international comity grounds, of two actions for violations of the U.S.

federal securities laws. 994 F.2d 996, 998 (2d Cir. 1993). In its opinion, the Second Circuit also provided guidance for district courts in determining when such dismissals are proper.

To start, the party seeking dismissal bears the burden of proving that comity is appropriate. 994 F.2d at 999. The *Allstate* Court observed that "comity is particularly appropriate where, as here, the court is confronted with foreign bankruptcy proceedings." *Id.* (internal citation and quotation marks omitted). Courts considering whether a foreign bankruptcy proceeding warrants comity should first undertake a multi-factor analysis to determine whether the foreign court satisfies fundamental standards of procedural fairness. *See id.* If it does, courts should then determine whether affording comity would "violate any laws or public policies of the United States." *Id.* at 1000. Where "the granting of comity to a Foreign bankruptcy proceeding enables the assets of a debtor to be dispersed in an equitable, orderly, and systematic manner, rather than in a haphazard, erratic or piecemeal fashion, comity has long been recognized as appropriate." *Id.* (internal citation and quotation marks omitted).

**\*4** Of course, discretionary dismissal on grounds of international comity has its limits, which are especially clear in contexts other than foreign bankruptcy proceedings. For example, in *Royal & Sun Alliance Insurance Company of Canada* v. *Century International Arms, Inc.*, the Second Circuit vacated the dismissal of an action on international comity grounds where the foreign proceeding at issue was not a bankruptcy proceeding, and where it concerned a different (though affiliated) defendant. 466 F.3d 88, 91, 94-95 (2d Cir. 2006). The Second Circuit explained that comity abstention "is not an imperative obligation of courts but rather is [ ] discretionary," and the "mere existence of parallel foreign proceedings does not negate the district courts' 'virtually unflagging obligation ... to exercise the jurisdiction given them.' " *Id.* at 92 (quoting *Colorado River Water Conservation Dist.* v. *United States*, 424 U.S. 800, 817 (1976) ). In that same opinion, however, the Second Circuit

> recognized one discrete category of foreign litigation that generally requires the dismissal of parallel district court actions — foreign bankruptcy proceedings. A foreign nation's interest in the equitable and orderly distribution of a debtor's property is an interest deserving of particular respect and deference, and accordingly we have followed the general practice of American courts and regularly deferred to such actions.

EMA GARP Fund v. Banro Corporation, Not Reported in Fed. Supp. (2019)

2019 WL 773988

*Id.* at 92-93 (internal citation and quotation marks omitted); *see also* [JP Morgan Chase Bank v. Altos Hornos de Mex., S.A. de CV, 412 F.3d 418, 424 (2d Cir. 2005)](#) ("[The Second Circuit has] repeatedly held that U.S. courts should ordinarily decline to adjudicate creditor claims that are the subject of a foreign bankruptcy proceeding.... In such cases, deference to the foreign court is appropriate so long as the foreign proceedings are procedurally fair and ... do not contravene the laws or public policy of the United States."); [Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B., 825 F.2d 709, 713 (2d Cir. 1987)](#) ("American courts have long recognized the particular need to extend comity to foreign bankruptcy proceedings.").

## B. Analysis

### 1. The Court Dismisses Plaintiffs' Claims Against Banro

Defendants argue that the Court should dismiss this action, on the grounds of international comity, because it was filed during the Banro CCAA Proceeding. (Def. Br. 1-2). The Court agrees. Applying the standard that the Second Circuit first articulated in *Allstate*, and later reaffirmed in *Royal & Sun Alliance* and *JP Morgan Chase*, the Court begins by considering whether the Banro CCAA Proceeding satisfied fundamental standards of procedural fairness.

### a. The Banro CCAA Proceeding Satisfied Fundamental Standards of Procedural Fairness

The Second Circuit has instructed courts considering deference to international bankruptcy proceedings to assess "several factors as indicia of procedural fairness," including:

> (1) [W]hether creditors of the same class are treated equally in the distribution of assets; (2) whether the liquidators are considered fiduciaries and are held accountable to the court; (3) whether creditors have the right to submit claims which, if denied, can be submitted to a bankruptcy court for adjudication; (4) whether the liquidators are required to give notice to the debtors' potential claimants; (5) whether there are provisions for creditors' meetings; (6) whether a foreign country's insolvency laws favor its own citizens; (7) whether all assets are marshalled before one body for centralized distribution; and (8) whether there are provisions for an automatic stay and for the lifting of such stays to facilitate the centralization of claims.

[Allstate, 994 F.2d at 999](#).

Defendants argue that the Banro CCAA Proceeding satisfied fundamental standards of procedural fairness because it "treat[ed] creditors equally within separate classes; provide[d] for a Monitor, satisfying the fiduciary requirement; permit[ted] creditors to submit claims and appeal denials of those claims; provide[d] for creditors' meetings; and provide[d] a court-imposed stay[,]" as well as provided notice to the public of the proceedings. (Def. Br. 14-15; Dietrich Decl. ¶¶ 8-40). Further, Defendants contend that the Banro CCAA Proceeding was fair as to Plaintiffs specifically because "Plaintiffs had ample knowledge of: (i) the ongoing nature of the CCAA Proceedings; (ii) the stay imposed by the Canadian Court; (iii) the claims and Plan objection procedures available to them; and (iv) the hearing on the Sanction Order, which was to address the extinguishment of their claims." (Def. Br. 15 (citing Dietrich Decl. ¶¶ 74, 81) ). The Court agrees with Defendants that, for these reasons, the Banro CCAA Proceeding satisfied fundamental standards of procedural fairness.

**\*5** Plaintiffs' piecemeal approach to rebutting this determination is not persuasive. To start, Plaintiffs assert that "no parallel proceeding exists *at present* and that Plaintiffs' claim cannot and will not be adjudicated on the merits in any Canadian proceeding." (Pl. Opp. 6 (emphasis added) ). Relying on the fact that the Canadian restructuring plan did not mention Plaintiffs or their claims until after this action was commenced, Plaintiffs conclude that the Sanction Order extinguishing Plaintiffs' claims resulted entirely from steps taken by Defendants after this action had been filed. (*Id.* at 7, 20). In Plaintiffs' estimation, Defendants' motion effectively seeks "the recognition of the Sanction Order they obtained in response to this action extinguishing Plaintiffs' claims." (*Id.* at 8).

In contrast, Defendants insist — correctly — that the Banro CCAA Proceeding was a parallel proceeding because it was "a forum in which Plaintiffs *could have and should have* pursued their claims." (Def. Reply 4). "[T]he Banro Debtors obtained a Claims Procedure Order, which called for claims against Banro and its directors and officers to be filed in the CCAA Proceedings." (*Id.* (citing Dietrich Decl. ¶¶ 59-64) ). The fact that Plaintiffs chose not to participate does not alter this conclusion, as complete parity of parties and issues is not a required condition of extending comity. *See, e.g.,* [Allstate, 994 F.2d at 999](#); [Royal & Sun Alliance, 466 F.3d at 94](#) ("For two actions to be considered parallel, the parties in the actions need not be the same, but they must be substantially the same, litigating substantially the same issues in both

3253

26-11268-mg    Doc 23-3    Filed 06/24/26    Entered 06/24/26 13:13:49    Exhibit C    Pg 591 of 882

EMA GARP Fund v. Banro Corporation, Not Reported in Fed. Supp. (2019)

2019 WL 773988

actions"). Defendants also contest Plaintiffs' assertion that the Sanction Order's bar of Plaintiffs' claims arose from steps taken by Defendants after the commencement of this action. As Defendants point out, Plaintiffs' claims are pre-petition because they "arise from events predating Banro's CCAA filing." (Def. Reply 6 n.4). And "as pre-petition 'equity claims,' [Plaintiffs'] claims against Banro were extinguished under the Plan from the start." (*Id.* at 6). Therefore, the Banro CCAA Proceeding was a parallel proceeding that extinguished Plaintiffs' claims independent of any conduct taken by Defendants after the filing of this action.

Plaintiffs' next challenge fares no better. Plaintiffs argue that the stay issued in the Banro CCAA Proceeding did not apply to them because, as they never filed a claim in that proceeding, the Canadian court lacked personal jurisdiction over them. (Pl. Opp. 7, 13-14). Plaintiffs note as well that Defendants "failed to file stay or recognition proceedings of the CCAA Proceeding in the US[.]" (*Id.* at 9, 25). Defendants respond, and the Court agrees, that the Canadian court's lack of personal jurisdiction over Plaintiffs is irrelevant to this Court's comity determination. (Def. Reply 5). So too is the fact that Defendants did not file a recognition proceeding in U.S. court. *See, e.g., Allstate*, 994 F.2d at 999; *Victrix*, 825 F.2d at 714. Defendants were under no obligation to file anything in U.S. courts in order to earn for the Canadian courts "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation." *Hilton*, 159 U.S. at 164.

Nor is the Court persuaded by Plaintiffs' argument that dismissal would cause them undue prejudice because "it would deprive them of any avenue for relief of their claims in any forum whatsoever." (Pl. Opp. 19). Plaintiffs assert that the reason they are barred from seeking relief in Canada "is Defendants' actions in response to the filing of this action." (*Id.* at 20). On that basis, Plaintiffs conclude that the balance of equities favors this Court's exercise of jurisdiction over their claims. (*Id.* at 24).

**\*6** Plaintiffs' argument as to prejudice is curious. As Defendants point out, it was Plaintiffs' choice not to participate in the Banro CCAA Proceeding. (Def. Reply 8). The final hearing on the Sanction Order was even adjourned in order to provide Plaintiffs with additional time to review and object to the reorganization plan, which they declined to do. (Def. Br. 15). Moreover, the equities favor Defendants because Plaintiffs have, in effect, engaged in forum-shopping by electing to file an action in this Court in lieu of filing

a claim in the Banro CCAA Proceeding. The Court is not convinced by Plaintiffs' response that they had a right to file this action in a U.S. court, and thus any preference as to forum should not be deemed an attempt "to end-run anything." (Pl. Opp. 20). Plaintiffs had ample opportunity to litigate their claims in the Banro CCAA Proceeding fully and fairly, and cannot now claim prejudice resulting from their own choice not to do so.

Finally, Plaintiffs misstate the standard in this Circuit for courts considering international comity extension in regard to foreign bankruptcy proceedings. Plaintiffs contend that no " 'exceptional circumstances' warranting dismissal in favor of a foreign insolvency proceeding are presented in this matter[.]" (Pl. Opp. 8). But the "exceptional circumstances" standard applies when courts consider extending comity to foreign proceedings *other than* foreign bankruptcy proceedings. *See, e.g., Royal & Sun Alliance*, 466 F.3d at 93-94. Here, the *Allstate* factors apply, which, as stated above, favor dismissal.

The Court is comforted in its analysis by the fact that prior courts in this Circuit have also found that CCAA proceedings satisfy fundamental standards of procedural fairness. *See, e.g., In re Metcalfe & Mansfield Alternative Invs.*, 421 B.R. 685, 698-99 (Bankr. S.D.N.Y. 2010); *E&L Consulting, Ltd.* v. *Doman Indus. Ltd.*, 360 F. Supp. 2d 465, 470 (E.D.N.Y. 2005); *Tradewell, Inc.* v. *Am. Sensors Elecs., Inc.*, No. 96 Civ. 2474 (DAB), 1997 WL 423075, at \*4 (S.D.N.Y. July 29, 1997). "Canada is 'a sister common law jurisdiction with procedures akin to our own,' and thus there need be no concern over the adequacy of the procedural safeguards of Canadian proceedings." *Cornfield* v. *Investors Overseas Servs., Ltd.*, 471 F. Supp. 1255, 1259 (S.D.N.Y. 1979) (quoting *Clarkson Co., Ltd.* v. *Shaheen*, 544 F.2d 624, 630 (2d Cir. 1976) ).

The Court finds that the Banro CCAA Proceeding satisfied fundamental standards of procedural fairness.

**b. Dismissal of the Action Would Not Violate U.S. Law or Public Policy**

"American courts have consistently recognized the interest of foreign courts in liquidating or winding up the affairs of their own domestic business entities." *Allstate*, 994 F.2d at 999 (internal citation and quotation marks omitted). Defendants argue that doing so here would not contravene U.S. law or public policy. The Court agrees. As Defendants rightly assert,

2019 WL 773988

"deference to foreign proceedings is necessary ... to prevent disgruntled members of an out-of-the-money constituency from circumventing and contravening the procedures and rulings of the court overseeing the process in which all other creditors and claimants are participating." (Def. Br. 17).[2]

[2] Defendants analogize to the issue of enforcement of foreign judgments, which the Second Circuit has held are "unenforceable as against public policy [only] to the extent that [they are] repugnant to fundamental notions of what is decent and just in the State where enforcement is sought." *Ackermann* v. *Levine*, 788 F.2d 830, 841 (2d Cir. 1986) (internal citation and quotation marks omitted). Granting comity to the Banro CCAA Proceeding is so far from repugnant that the observation hardly merits comment.

The fact that Plaintiffs' claims arise under U.S. securities law, as opposed to the U.S. bankruptcy code, does not alter the Court's analysis. In *DiRenzo* v. *Philip Services Corporation*, the Second Circuit found that differences between Canadian and U.S. securities law do not necessarily render Canadian courts inadequate forums. 232 F.3d 49, 58-60 (2d Cir. 2000), *vacated on other grounds*, 294 F.3d 21 (2d Cir. 2002). Here, the CCAA Proceeding provided an adequate forum for Plaintiffs to raise the claims asserted in this action.

**\*7** In sum, as the Banro CCAA Proceeding was a parallel proceeding that satisfied fundamental standards of procedural fairness, and as dismissal would not violate U.S. law or public policy, the Court exercises its discretion to dismiss Plaintiffs' claims against Banro on international comity grounds.

### 2. The Court Dismisses Plaintiffs' Claims Against Clarke

Defendants argue as well for dismissal of Plaintiffs' claims against Banro's former CEO, Defendant Clarke, based on principles of international comity. (Def. Br. 20). Once again, Defendants rely on *Allstate*, in which the Second Circuit affirmed the dismissal of securities fraud claims against individual defendants, reasoning:

[I]t would have been inefficient and inequitable to permit the individual claims to go forward. Indeed, since these individuals were sued solely because of their affiliation with the [bankrupt] companies, to allow these claims to go forward in the United States despite the dismissal as to the [bankrupt] companies would defeat the purpose of granting comity in the first place.

994 F.2d at 1000. Similarly, Defendants argue that, here, "the claims against Clarke relate to his role as CEO of Banro prior to its insolvency, and should have been resolved as part of the CCAA Proceedings," and that "allowing litigation to proceed against Clarke" would interfere with the implementation of the CCAA-sanctioned reorganization plan. (Def. Br. 21). Specifically, Defendants argue that Clarke is "closely intertwined" with the Banro restructuring because the claims against Clarke and the claims against Banro both involve allegations of statements that Clarke made as Banro's CEO. (*Id.* at 20-21). Further, without the CCAA court's release of Clarke's individual liability, the CCAA reorganization plan would not have been accepted by the necessary interested parties. (*Id.* at 22).

The Court agrees with Defendants. The CCAA court established procedures for filing claims against Clarke, and the restructuring plan that was voted on, approved, and sanctioned by that court included a release of those claims. (Dietrich Decl. ¶¶ 52, 60, 61, 68). "[T]hese releases were required under the terms of the Support Agreement Banro reached with its primary creditors and were an integral part of the Plan." (Def. Reply 9). Accordingly, permitting Plaintiffs' claims against Clarke to proceed in this Court would interfere with the outcome of the Banro CCAA Proceeding and defeat the purpose of granting comity to the Canadian court.

The Court observes that the Second Circuit has previously affirmed the dismissal of fraud claims against individual defendants pursuant to a grant of international comity to a foreign bankruptcy proceeding. *See Allstate*, 994 F.2d at 1000. Moreover, in *Oui Financing LLC* v. *Dellar*, a sister court in the Southern District of New York dismissed claims against an individual non-debtor guarantor, on the basis of international comity and deference to a foreign bankruptcy proceeding, where the individual was president and shareholder of the entity undergoing restructuring, and where permitting the plaintiff "to obtain a judgment against him in this Court would very likely interfere with the implementation of the recently-adopted safeguard plan." *Oui Financing LLC* v. *Dellar*, No. 12 Civ. 7744 (RA), 2013 WL 5568732, at \*11 (S.D.N.Y. Oct. 9, 2013).[3]

[3] The French law at issue in the international proceeding to which the *Oui Financing* court deferred "operate[d] to stay actions against individual guarantors as well as the debtor itself and ... [once the reorganization plan was approved,] provide[d] that creditors may not seek redress against [the individual] outside the plan's terms."

3255

EMA GARP Fund v. Banro Corporation, Not Reported in Fed. Supp. (2019)

2019 WL 773988

*Oui Financing LLC* v. *Dellar*, No. 12 Civ. 7744 (RA), 2013 WL 5568732, at *11 (S.D.N.Y. Oct. 9, 2013). In *Oui Financing*, dismissal resulted in minimal prejudice to the plaintiff because the foreign reorganization plan "provide[d] for repayment of its loan." *Id.* at *12.

**\*8** Plaintiffs attempt, unsuccessfully, to distinguish these precedents. As to *Allstate*, Plaintiffs seek to distinguish on the basis that, here, failing to grant comity to the individual corporate officer, Clarke, would not defeat the purpose of granting comity to the corporate debtor. (Pl. Opp. 23). Plaintiffs go so far as to argue that not granting comity to Clarke "would have absolutely no impact on Banro whatsoever." (*Id.*). The Court has already rejected this conclusion, finding instead that permitting claims to proceed against Clarke in this Court would directly contravene the CCAA reorganization plan, which released those claims, and thus interfere with the purpose of granting comity in the first place. As to *Oui Financing*, Plaintiffs seek to distinguish on the basis that *Oui Financing* involved a judgment against a *current* president of the debtor, and involved the possibility of only minimal prejudice because the reorganization plan in that case included repayment of the plaintiffs' loan and the plaintiffs had "affirmatively participated in the foreign proceeding." (*Id.* at 22). In contrast, Plaintiffs point out that Clarke is a *former* CEO of Banro, and contend that they face substantial prejudice because there is no plan to compensate them and they did not affirmatively participate in the Banro CCAA Proceeding. (*Id.*). Defendants reply, and the Court agrees, that Clarke's status at the time of the alleged misconduct is what matters, at which point he was the current CEO of Banro. (Def. Reply 10). Moreover, Plaintiffs cannot complain of prejudice that flows from their strategic decision not to participate in the CCAA Proceeding.

Plaintiffs argue against the dismissal of their claims against Clarke on a separate basis: They reason that because Clarke is not a party to, and did not appear in, the Banro CCAA

Proceeding, "there is no parallel proceeding in Canada for the claims asserted in this action against Clarke." (Pl. Opp. 21). Plaintiffs contest Clarke's assertion that, just because their claims against Banro and Clarke arise from overlapping facts, a failure to dismiss him would "interfere with the implementation" of the CCAA reorganization plan. (*Id.*). And they argue that there is no support for the Court "to find any relationship between the restructuring of Banro and Clarke." (*Id.*). Plaintiffs also repeat their argument that the Canadian court lacked jurisdiction over their claims against Clarke, whom Plaintiffs argue is personally liable because his statements sound in fraud and "fraud is not within the scope of one's employment[.]." (*Id.* at 6). Once again, the Court is not persuaded. That the claims against Clarke sound in fraud does not alter the fact that the Banro CCAA Proceeding was the proper, procedurally fair forum for Plaintiffs' claims. And permitting the claims to proceed against Clarke in this Court would undoubtedly interfere with the implementation of the CCAA reorganization plan because that plan encompassed a release of claims against Clarke.

For the reasons above, Plaintiffs' claims against Clarke are dismissed.

## CONCLUSION

For the reasons stated in this Opinion, Defendants' motion to dismiss is GRANTED. The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 773988

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

3256

# Tab 34

Page 1

714 F.3d 127, 69 Collier Bankr.Cas.2d 612, 57 Bankr.Ct.Dec. 232, Bankr. L. Rep. P 82,472
**(Cite as: 714 F.3d 127)**

United States Court of Appeals,
Second Circuit.
In the Matter of FAIRFIELD SENTRY LIMITED,
Debtor,
Morning Mist Holdings Limited, Miguel Lomeli,
Appellants,
v.
Kenneth Krys, Christopher Stride, Appellees.

Docket No. 11–4376.
Argued: Nov. 19, 2012.
Decided: April 16, 2013.

**Background:** Foreign representatives of debtors who were currently being liquidated in accordance with British Virgin Islands (BVI) law filed petition for recognition of BVI proceedings as "foreign main proceedings," or in alternative as "foreign nonmain proceedings," and for grant of ancillary relief. The Bankruptcy Court, Burton R. Lifland, J., 440 B.R. 60, granted the petition. Shareholder appealed. The United States District Court for the Southern District of New York, Daniels, J., 2011 WL 4357421, affirmed. Shareholder appealed.

**Holdings:** The Court of Appeals, Dennis Jacobs, Chief Judge, held that:

(1) debtor's center of main interests (COMI) should be determined based on its activities at or around the time the Chapter 15 petition is filed, but a court may consider the period between the commencement of the foreign insolvency proceeding and filing of petition to ensure that debtor has not manipulated its COMI in bad faith;

(2) recognizing British Virgin Islands (BVI) liquidation as foreign main proceeding was warranted;

(3) "public policy" exception to cross-border insolvencies did not apply.

Affirmed.

West Headnotes

**[1] Bankruptcy 51 ⟵3782**

51 Bankruptcy
   51XIX Review
      51XIX(B) Review of Bankruptcy Court
         51k3782 k. Conclusions of law; de novo review. Most Cited Cases

**Bankruptcy 51 ⟵3786**

51 Bankruptcy
   51XIX Review
      51XIX(B) Review of Bankruptcy Court
         51k3785 Findings of Fact
            51k3786 k. Clear error. Most Cited Cases

The Court of Appeals reviews an appeal from a district court's affirmance of a bankruptcy court decision "independently," accepting the bankruptcy court's factual findings unless clearly erroneous, and reviewing the bankruptcy court's legal conclusions de novo.

**[2] Bankruptcy 51 ⟵2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

To identify the time frame relevant to the center of main interests (COMI) determination regarding foreign liquidation proceedings under the Bankruptcy Abuse Prevention and Consumer Protection Act, a court considers the following: (1) the text of the statute; (2) guidance from other federal courts; and (3) international sources. 11 U.S.C.A. §§ 1502(4, 5), 1516(c).

**[3] Bankruptcy 51 ⟵2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

714 F.3d 127, 69 Collier Bankr.Cas.2d 612, 57 Bankr.Ct.Dec. 232, Bankr. L. Rep. P 82,472

**(Cite as: 714 F.3d 127)**

51k2341 k. In general. Most Cited Cases

A debtor's center of main interests (COMI) for determining foreign main proceeding status is determined as of the time of the filing of the Chapter 15 petition; to offset a debtor's ability to manipulate its COMI, a court may also look at the time period between the initiation of the foreign liquidation proceeding and the filing of the Chapter 15 petition. 11 U.S.C.A. §§ 1502(4, 5), 1516(c).

**[4] Bankruptcy 51 ⬲2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

Any relevant activities, including liquidation activities and administrative functions, may be considered in the center of main interests (COMI) analysis for determining foreign main proceeding status. 11 U.S.C.A. §§ 1502(4, 5), 1516(c).

**[5] Bankruptcy 51 ⬲2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

Various factors, singly or combined, can be relevant, but are not required or dispositive, to a determination of foreign main proceeding status: the location of the debtor's headquarters; the location of those who actually manage the debtor, which conceivably could be the headquarters of a holding company; the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; or the jurisdiction whose law would apply to most disputes. 11 U.S.C.A. §§ 1502(4, 5), 1516(c).

**[6] Statutes 361 ⬲1123**

361 Statutes

361III Construction
   361III(D) Particular Elements of Language
      361k1123 k. Undefined terms. Most Cited Cases

The absence of a statutory definition for a term that is not self-defining signifies that the text is open-ended, and invites development by courts, depending on facts presented, without prescription or limitation.

**[7] Bankruptcy 51 ⬲2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

Recognizing British Virgin Islands (BVI) liquidation as foreign main proceeding was warranted, where debtors had effectively ceased doing any business in United States or elsewhere, had severed their contracts with their New York-based investment managers, and had begun to wind up their affairs through independent litigation committee comprised of non-United-States-based directors, and the majority of the administrative decision-making originated in the BVI. 11 U.S.C.A. §§ 1502(4, 5), 1516(c), 1517(b)(1).

**[8] Bankruptcy 51 ⬲2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

**Records 326 ⬲32**

326 Records
   326II Public Access
      326II(A) In General
         326k32 k. Court records. Most Cited Cases

"Public policy" exception to chapter of Bankruptcy Code governing cross-border insolvencies

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

714 F.3d 127, 69 Collier Bankr.Cas.2d 612, 57 Bankr.Ct.Dec. 232, Bankr. L. Rep. P 82,472
**(Cite as: 714 F.3d 127)**

and grant of ancillary relief by United States bankruptcy courts, which allowed bankruptcy court to decline to act if action would be manifestly contrary to public policy of United States, did not apply to British Virgin Islands (BVI) liquidation despite confidentiality of BVI bankruptcy proceedings, since right to inspect and copy judicial records was not absolute, only certain limited records typically were available to non-parties, public summaries had been made available, and any non-party could apply to court for access to sealed documents. 11 U.S.C.A. § 1506.

**[9] Judgment 228 ⚷830.1**

228 Judgment
   228XVII Foreign Judgments
      228k830 Judgments of Courts of Foreign Countries
         228k830.1 k. In general. Most Cited Cases

In the judgment enforcement context, a foreign judgment is unenforceable as against public policy to the extent that it is repugnant to fundamental notions of what is decent and just in the State where enforcement is sought, but that standard is high, and infrequently met.

**[10] Records 326 ⚷32**

326 Records
   326II Public Access
      326II(A) In General
         326k32 k. Court records. Most Cited Cases

The right to access court documents is not absolute and easily can give way to "privacy interests" or other considerations.

**\*129** Robert A. Wallner, Milberg LLP, New York, NY (Kent A. Bronson, on the brief; Stephen A. Weiss, Seeger Weiss LLP, New York, NY, on the brief), for Appellants.

David J. Molton, Brown Rudnick LLP, New York, NY (Daniel J. Saval, May Orenstein, Kerry L.

Quinn, on the brief), for Appellees.

Before: JACOBS, Chief Judge, WINTER, Circuit Judge, SWAIN, District Judge.FN*

> FN* The Honorable Laura Taylor Swain, United States District Judge for the Southern District of New York, sitting by designation.

DENNIS JACOBS, Chief Judge:

The question presented is where the debtor in this bankruptcy proceeding had its "center of main interests" within the meaning of Chapter 15 of the Bankruptcy Code (enacted as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005). The answer determines whether the pending foreign bankruptcy proceeding is a "foreign main proceeding," in which event U.S. proceedings against the debtor are stayed. Morning Mist Holdings Limited and Miguel Lomeli (collectively, "Morning Mist") appeal from the judgment of the United States District Court for the Southern District of New York (Daniels, *J*.), affirming the order of the United States Bankruptcy Court for the Southern District of New York (Lifland, *J*.), which determined that the debtor, Fairfield Sentry Limited ("Sentry"), had its "center of main interests" in British**\*130** Virgin Islands ("BVI"), and therefore recognized Sentry's liquidation in the BVI as a "foreign main proceeding" under 11 U.S.C. § 1517. For the following reasons, we affirm.

To determine the proper "center of main interests" ("COMI," as the term is abbreviated by the parties and other courts), we consider the relevant time period for weighing the interests, and the principles and factors for determining which jurisdiction predominates. We conclude (as did the bankruptcy court and the district court) that the relevant time period is the time of the Chapter 15 petition, subject to an inquiry into whether the process has been manipulated. The relevant principle (for which

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

714 F.3d 127, 69 Collier Bankr.Cas.2d 612, 57 Bankr.Ct.Dec. 232, Bankr. L. Rep. P 82,472
**(Cite as: 714 F.3d 127)**

we consult foreign law, as directed by the statute) is that the COMI lies where the debtor conducts its regular business, so that the place is ascertainable by third parties. The statute includes a presumption that the COMI is where the debtor's registered office is found. Among other factors that may be considered are the location of headquarters, decision-makers, assets, creditors, and the law applicable to most disputes.

## BACKGROUND

Sentry was organized in 1990 as an International Business Company under the laws of the BVI. From 1990 until Bernard Madoff's arrest on December 11, 2008, Sentry was the largest of the "feeder funds" that invested with Bernard L. Madoff Investment Securities LLC ("BLMIS"). Roughly 95% of Sentry's assets were invested with BLMIS, totaling over $7 billion.

Pursuant to its Memorandum of Association, Sentry administered its business interests from the BVI, where its registered office, registered agent, registered secretary, and corporate documents, among other things, were located. Sentry's Board of Directors oversaw the management, with day-to-day operations handled by an investment manager, Fairfield Greenwich Group ("FGG"), based in New York.[FN1]    Sentry's three directors, Walter Noel, Jr., Jan Naess, and Peter Schmid, resided in New York, Oslo, and Geneva, respectively.

> FN1. Fairfield Greenwich (Bermuda) Ltd., a member company of FGG, served try's investment manager. We refer to those entities collectively as "FGG."

When Madoff was arrested, Sentry's two independent directors, Naess and Schmid, suspended all share redemptions. (Noel was recused from that meeting as the owner and principal of FGG, Sentry's investment manager.) Over the ensuing months, Naess and Schmid focused on winding down Sentry's business and preserving assets in anticipation of litigation and bankruptcy. From December 2008 to July 2009 (when Sentry entered

liquidation in the BVI), they participated in approximately 44 teleconference board meetings initiated by Sentry's registered agent in the BVI. During this time, Naess and Schmid advised Sentry's shareholders as to measures being taken in response to the Madoff scandal. That correspondence issued from Sentry's address in the BVI, as shown on the letterhead.

In February 2009, Naess and Schmid constituted themselves as a litigation committee with the authority to (among other things) consider, commence, and settle litigation to be taken by or against Sentry. Sentry would subsequently become engulfed in lawsuits.

In May 2009, Morning Mist, a Sentry shareholder, filed a derivative action in New York state court, claiming that Sentry's directors, management, and service **\*131** providers breached duties to Sentry (the "derivative action").[FN2]

> FN2. Later that month, Sentry would file a direct lawsuit in New York state court against its investment manager, FGG, and FGG's affiliates.

Back in the BVI, ten of Sentry's shareholders applied for the appointment of a liquidator. On July 21, 2009, the High Court of Justice of the Eastern Caribbean Supreme Court (the "BVI court") entered an order which commenced Sentry's liquidation proceedings under the Virgin Islands Insolvency Act of 2003. The order appointed Kenneth Krys and Christopher Stride (from the BVI liquidation firm of Krys and Associates) as liquidator,[FN3] and gave the liquidator "custody and control of all the assets of the Company."

> FN3. Stride later resigned and was replaced by Joanna Lau, who herself then resigned. Krys is currently Sentry's sole liquidator and the appellee in this case (hereafter referred to as the "liquidator").

On June 14, 2010, pursuant to an order of the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

714 F.3d 127, 69 Collier Bankr.Cas.2d 612, 57 Bankr.Ct.Dec. 232, Bankr. L. Rep. P 82,472
**(Cite as: 714 F.3d 127)**

BVI court, the liquidator petitioned the United States Bankruptcy Court in the Southern District of New York (Lifland, *J.*) for recognition of the BVI liquidation proceedings under Chapter 15 of the Bankruptcy Code (the "Chapter 15 petition").[FN4]

> [FN4.] Recognition of a foreign proceeding under Chapter 15 can have the effect of staying all other actions against the debtor in the United States, as explained in Part I below.

As of that date, Sentry's liquid assets consisted of approximately $73 million in Ireland, $22 million in the United Kingdom, and $17 million in the BVI. Its other assets were claims and causes of action, including claims for approximately: $6 billion in customer funds under the Securities Investor Protection Act; $3 billion from Madoff customers who profited from redemptions in New York; and $150 million in similar redemption claims in the BVI. Other proceedings were commenced in the Netherlands and Ireland. The litigations were undertaken under the supervision of the BVI court and with the assistance of the liquidator's BVI-based counsel.

On July 22, 2010, the bankruptcy court granted the liquidator's Chapter 15 recognition petition. In determining Sentry's COMI for purposes of Chapter 15, the bankruptcy court examined the period between December 2008, when Sentry stopped doing business, and June 2010, when the Chapter 15 petition was filed. The bankruptcy court determined that Sentry's "COMI for the purpose of recognition as a main proceeding is in the BVI, and not elsewhere," and therefore recognized the BVI liquidation as a "foreign main proceeding" under 11 U.S.C. § 1517(b)(1). Modified Bench Mem. & Order Granting Chapter 15 Petitions of Fairfield Sentry Ltd., Fairfield Sigma Ltd. & Fairfield Lambda Ltd. for Recognition of Foreign Proceedings, *In re Fairfield Sentry Ltd.,* No. 10–13164(BRL), at 6 (Bankr. S.D.N.Y. July 30, 2010) (hereinafter "Bankr. Order").

Pursuant to 11 U.S.C. § 1520, recognition of

the BVI liquidation as a foreign main proceeding imposed an automatic stay on any other proceedings against Sentry in the United States—including the derivative action brought by Morning Mist. *Id.* at 9 (recognizing automatic stay); *see also* 11 U.S.C. § 1520(a)(1) (imposing automatic stay from 11 U.S.C. § 362). The bankruptcy court concluded in the alternative that even if the BVI liquidation was a "nonmain" proceeding (in which a stay would not be automatic), a stay of the derivative action was appropriate under 11 U.S.C. § 1521, which allows for such relief. Bankr. Order at 9–11.

**\*132** Morning Mist appealed the bankruptcy court's order to the district court. On September 16, 2011, the United States District Court for the Southern District of New York (Daniels, *J.*) affirmed, holding that the bankruptcy court properly considered Sentry's administrative activities in its COMI analysis, and correctly considered Sentry's COMI as of the filing of the Chapter 15 petition (not over its 18 year operational history). Mem. Decision & Order, *In re Fairfield Sentry Ltd.,* No. 10 Civ. 7311(GBD), at 7–12 (S.D.N.Y. Sept. 16, 2011). Morning Mist had argued there (as it argues here) that recognition of the BVI liquidation would be manifestly contrary to U.S. public policy, and was therefore barred by 11 U.S.C. § 1506, because the court records in the BVI liquidation were sealed. The argument was rejected on the ground that the right of public access to court records is not absolute. *Id.* at 14–17.

Imposition of the automatic stay was affirmed, including the stay of Morning Mist's derivative action against Sentry. *Id.* at 18. Morning Mist timely appealed.

### DISCUSSION

[1] We review an appeal from a district court's affirmance of a bankruptcy court decision "independently," accepting the bankruptcy court's factual findings unless clearly erroneous, and reviewing the bankruptcy court's legal conclusions *de novo. In re Enron Corp.,* 419 F.3d 115, 124 (2d Cir.2005) (quoting *In re AroChem Corp.,* 176 F.3d

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

714 F.3d 127, 69 Collier Bankr.Cas.2d 612, 57 Bankr.Ct.Dec. 232, Bankr. L. Rep. P 82,472
**(Cite as: 714 F.3d 127)**

610, 620 (2d Cir.1999)).

## I

Chapter 15 of the Bankruptcy Code was enacted in 2005 as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109–8, 119 Stat. 23 (codified at 11 U.S.C. §§ 1501–1532). Its goal "is to incorporate the Model Law on Cross–Border Insolvency so as to provide effective mechanisms for dealing with cases of cross-border insolvency," while promoting international cooperation, legal certainty, fair and efficient administration of cross-border insolvencies, protection and maximization of debtors' assets, and the rescue of financially troubled businesses. 11 U.S.C. § 1501(a).

Chapter 15 is derived from the Model Law promulgated by the United Nations Commission on International Trade Law ("UNCITRAL"), and it instructs that "[i]n interpreting [Chapter 15], the court shall consider its international origin, and the need to promote an application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions." 11 U.S.C. § 1508. The legislative history accompanying the passage of Chapter 15 recommends the Guide to Enactment of the Model Law, promulgated by UNCITRAL, "for guidance as to the meaning and purpose of [the Model Law's] provisions." H.R.Rep. No. 109–31, pt. 1, at 106 n. 101 (2005), 2005 U.S.C.C.A.N. 88 (hereinafter "House Report").[FN5]

> FN5. *See also id.* at 109–10 ("Uniform interpretation will also be aided by reference to CLOUT, the UNCITRAL Case Law On Uniform Texts.... Not only are these sources persuasive, but they advance the crucial goal of uniformity of interpretation. To the extent that the United States courts rely on these sources, their decisions will more likely be regarded as persuasive elsewhere.").

The recognition of foreign proceedings is governed by Sections 1515 through 1524. Under Section 1517, "an order recognizing a foreign proceeding shall be entered if—(1) such foreign proceeding ... is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502; (2) the foreign representative applying for recognition is a person or body; **\*133** and (3) the petition meets the requirements of section 1515." 11 U.S.C. § 1517(a). There is no dispute that the second and third requirements are met here. The only point at issue is whether the BVI liquidation qualifies as a foreign main or nonmain proceeding.

Section 1502 defines a foreign main proceeding as a "foreign proceeding pending in the country where the debtor has the center of its main interests," and defines a foreign nonmain proceeding as a "foreign proceeding, other than a foreign main proceeding, pending in a country where the debtor has an establishment."[FN6] 11 U.S.C. § 1502(4)-(5). The statute does not define COMI. It does, however, establish a presumption: "In the absence of evidence to the contrary, the debtor's registered office ... is presumed to be the center of the debtor's main interests." 11 U.S.C. § 1516(c).

> FN6. "Establishment" is defined as "any place of operations where the debtor carries out a nontransitory economic activity." 11 U.S.C. § 1502(2).

Upon recognition of a foreign main proceeding, Section 1520 provides certain automatic, nondiscretionary relief, including an automatic stay of all proceedings against the debtor in the United States. 11 U.S.C. § 1520(a). A discretionary stay is also available under Section 1521, regardless of whether a foreign main proceeding is recognized. 11 U.S.C. § 1521(a).

Finally, Section 1506 provides an overriding public policy exception to all of Chapter 15: "Nothing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

714 F.3d 127, 69 Collier Bankr.Cas.2d 612, 57 Bankr.Ct.Dec. 232, Bankr. L. Rep. P 82,472
**(Cite as: 714 F.3d 127)**

## II

Few courts have considered the meaning of COMI under Chapter 15, especially with respect to the time frame and the factors that bear on the question.[FN7]

> FN7. We have only mentioned Chapter 15 in cases where Section 304 of the Bankruptcy Code, the predecessor provision to Chapter 15, applied. *See, e.g., In re Bd. of Dirs. of Telecom Arg., S.A.,* 528 F.3d 162, 169 (2d Cir.2008) (noting that Section 304 controls because the bankruptcy petition was filed prior to Chapter 15's effective date).

### A. Relevant Time Period

[2][3] Morning Mist argues that the bankruptcy court should have looked at Sentry's entire operational history, while the liquidator advocates affirmance of the determinations that COMI should be considered as of the filing of the chapter 15 petition. To identify the time frame relevant to the COMI determination, we consider: (1) the text of the statute; (2) guidance from other federal courts; and (3) international sources. We conclude that a debtor's COMI is determined as of the time of the filing of the Chapter 15 petition. To offset a debtor's ability to manipulate its COMI, a court may also look at the time period between the initiation of the foreign liquidation proceeding and the filing of the Chapter 15 petition.

*Statutory Text.* Chapter 15 does not define COMI. Section 1517 provides that a "foreign proceeding shall be recognized ... as a foreign main proceeding if it *is pending* in the country where the debtor *has* the center of its main interests." 11 U.S.C. § 1517(b) (emphases added).

The present tense suggests that a court should examine a debtor's COMI at the time the Chapter 15 petition is filed. "Consistent with normal usage, we have **\*134** frequently looked to Congress' choice of verb tense to ascertain a statute's temporal reach." *Carr v. United States,* 560 U.S. 438, 130

S.Ct. 2229, 2236, 176 L.Ed.2d 1152 (2010); *see also Dobrova v. Holder,* 607 F.3d 297, 301 (2d Cir.2010)(relying on Congress's use of present perfect tense in statutory construction). In *In re Aro-Chem Corp.,* we were guided by the tense used in a provision of the Bankruptcy Code allowing bankruptcy trustees to hire professionals (*e.g.,* lawyers, accountants), as long as the professionals " '*do not hold or represent* an interest adverse to the estate.' " *In re AroChem Corp.,* 176 F.3d 610, 623 (2d Cir.1999) (quoting 11 U.S.C. § 327(a)) (emphasis added). The present tense signified that an estate's counsel would not be disqualified based on past or future representations. *Id.*

It therefore matters that the inquiry under Section 1517 is whether a foreign proceeding " *is pending* in the country where the debtor *has* the center of its main interests." 11 U.S.C. § 1517(b)(1) (emphases added). In this light, we reject Morning Mist's invitation for us to consider the debtor's entire operational history. Likewise, a COMI determination based on the date of the *initiation* of the foreign proceeding is not compelled by the statute. A foreign proceeding " *is pending,* " 11 U.S.C. § 1517(b)(1) (emphasis added), only after it has been commenced. Under the text of the statute, therefore, the filing date of the Chapter 15 petition should serve to anchor the COMI analysis.

*Other Federal Courts.* Nearly every federal court to address this question has determined that COMI should be considered as of the time the Chapter 15 petition is filed.

Among circuit courts, only the Fifth has specifically decided the question. The argument that the COMI determination should be made with regard to the debtor's operational history was rejected in *In re Ran:*

Every operative verb is written in the present or present progressive tense.... Congress's choice to use the present tense requires courts to view the COMI determination in the present, *i.e.,* at the time the petition for recognition was filed. If

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

714 F.3d 127, 69 Collier Bankr.Cas.2d 612, 57 Bankr.Ct.Dec. 232, Bankr. L. Rep. P 82,472
**(Cite as: 714 F.3d 127)**

Congress had, in fact, intended bankruptcy courts to view the COMI determination through a look-back period or on a specific past date, it could have easily said so.

*In re Ran,* 607 F.3d 1017, 1025 (5th Cir.2010). The court highlighted a provision in the Bankruptcy Code that explicitly includes a look-back period (11 U.S.C. § 522(b)(3)(A)), as was not done in Chapter 15. *Id.*

The Fifth Circuit observed that its approach would advance Congress's purpose of harmonizing transnational insolvency proceedings because looking at a company's full operational history could make it more difficult to pinpoint single COMI: "In fact, a meandering and never-ending inquiry into the debtor's past interests could lead to a denial of recognition in a country where a debtor's interests are truly centered, merely because he conducted past activities in a country at some point well before the petition for recognition was sought." *Id.*

For similar reasons, the Fifth Circuit emphasized that third parties (primarily creditors) should be able to ascertain a debtor's COMI. *Id.* at 1025–26. We agree.[FN8]

> FN8. The Fifth Circuit pointed to English cases "which seem to select a time linked to the *commencement or service of the relevant insolvency proceeding."* *Id.* at 1026 (emphasis added). But the italicized phrase is (at least) ambiguous, a matter not resolved by the Fifth Circuit. We consider international law on this point in the following section.

**\*135** The Fifth Circuit left open the possibility (albeit in dicta) of looking at a broader time frame in order to frustrate possible bad-faith COMI manipulation:

Lastly, we note that this case does not involve a recent change of domicile by the [debtor] in question. A similar case brought immediately after the

party's arrival in the United States following a long period of domicile in the country where the bankruptcy is pending would likely lead to a different result.

*Id.* at 1026.

Most courts in this Circuit and throughout the country appear to have examined a debtor's COMI as of the time of the Chapter 15 petition. *See, e.g., In re Fairfield Sentry Ltd.,* No. 10 Civ. 7311(GBD), 2011 WL 4357421, at \*6 (S.D.N.Y. Sept. 16, 2011) ; *In re British Am. Isle of Venice (BVI), Ltd.,* 441 B.R. 713, 720–21 (Bankr.S.D.Fla.2010); *In re British Am. Ins. Co.,* 425 B.R. 884, 909–10 (Bankr.S.D.Fla.2010); *In re Betcorp Ltd.,* 400 B.R. 266, 290–92 (Bankr.D.Nev.2009). But there have certainly been courts that have taken a different approach. *See, e.g., In re Millennium Global Emerging Credit Master Fund Ltd.,* 474 B.R. 88, 92 (S.D.N.Y.2012) (recognizing bankruptcy court's conclusion that "COMI should be determined as of the date of the commencement of the foreign proceeding, rather than—as most of the courts that have looked at the issue have concluded—the date on which the Chapter 15 petition was filed").

Morning Mist, taking a cue from a prominent bankruptcy court decision, suggests that we should employ the American jurisdictional concept of "principal place of business" when considering COMI, which would thus require consideration of a debtor's operational history. Appellants' Br. 33 (citing *In re Millennium Global Emerging Credit Master Fund Ltd.,* 458 B.R. 63, 72 (Bankr.S.D.N.Y.2011)). In *In re Millennium Global,* the bankruptcy court suggested substituting principal place of business for COMI, in which case "it is obvious that the date for determining an entity's place of business refers to the business of the entity before it was placed into liquidation." 458 B.R. at 72. In support, the bankruptcy court quoted a law review article by one of the drafters of Chapter 15. *Id.* The quoted text, however, supports the contrary view: Congress's decision to use the term "COMI" instead of "principal place of busi-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

714 F.3d 127, 69 Collier Bankr.Cas.2d 612, 57 Bankr.Ct.Dec. 232, Bankr. L. Rep. P 82,472
**(Cite as: 714 F.3d 127)**

ness" was intentional:

> Chapter 15 was drafted to follow the Model Law as closely as possible, with the idea of encouraging other countries to do the same. One example is use of the phrase "center of main interests," which could have been replaced by "principal place of business" as a phrase more familiar to American judges and lawyers. The drafters of Chapter 15 believed, however, that such a crucial jurisdictional test should be uniform around the world and hoped that its adoption by the United States would encourage other countries to use it as well.

Jay Lawrence Westbrook, *Chapter 15 At Last,* 79 Am. Bankr. L.J. 713, 719–20 (2005).

As further support for the analogy to principal place of business, the bankruptcy court in *In re Millennium Global* pointed to Chapter 15's predecessor, Section 304 of the Bankruptcy Code. 458 B.R. at 73. Section 304, now repealed, allowed a party to commence a proceeding in U.S. bankruptcy court "ancillary" to a "foreign proceeding" and defined "foreign proceeding" as a proceeding "in a foreign country in **\*136** which the debtor's domicile, residence, principal place of business, or principal assets were located at the commencement of such proceeding." 11 U.S.C. § 101(23) (2000). That wording looks to a debtor's principal place of business at the time of the commencement of the foreign liquidation proceeding. But while the concept may be useful in adducing factors that point to a COMI, Congress abandoned that provision in enacting Chapter 15.

*International Interpretations.* Congress instructed that "[i]n interpreting [Chapter 15], the court shall consider its international origin, and the need to promote an application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions." 11 U.S.C. § 1508. Legislative history points to the Guide to Enactment of the UNCITRAL Model Law on Cross–Border Insolvency (the "UNCITRAL

Guide") "for guidance as to the meaning and purpose of [Chapter 15's] provisions." House Report at 106 n. 101. Although the statutory text controls, first and ultimately, we consider international sources to the extent they help us carry out the congressional purpose of achieving international uniformity in cross-border insolvency proceedings.

The UNCITRAL Guide, which does not define COMI, indicates that the concept was drawn from the European Union Convention on Insolvency Proceedings. *See* UNCITRAL Guide ¶¶ 31, 72. In turn, the European Union Council Regulation enacting the Convention on Insolvency Proceedings provides some guidance: "The 'centre of main interests' should correspond to the place where the debtor *conducts the administration of his interests on a regular basis* and *is therefore ascertainable by third parties.*" Council Regulation (EC) No 1346/2000 of 29 May 2000, Preamble ¶ 13 (emphases added) (hereinafter "EU Regulation"). Like the U.S. statute, the EU Regulation employs the present tense. The focus on regularity and ascertainability should also inform our interpretation of the text. The reference to the debtor's administration "on a regular basis," however, could suggest a potentially broader time frame.

But the EU Regulation does not operate as an analog to Chapter 15. Under the EU Regulation, a main insolvency proceeding in one EU member state is automatically recognized by all other EU member states. *See* EU Regulation art. 16. So the EU has no need for a recognition petition such as provided under Chapter 15. (Because the United States and the BVI are not parties to an agreement on the subject and are not otherwise governed by a common legal framework, a debtor must file a Chapter 15 petition in the United States for the BVI proceeding to be recognized).[FN9] Although the EU Regulation might refer to a broader time frame for considering a debtor's COMI, it is not a fit for construing Chapter 15.

> FN9. In *In re Millennium Global,* the bankruptcy court observed that "[t]he EU

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

714 F.3d 127, 69 Collier Bankr.Cas.2d 612, 57 Bankr.Ct.Dec. 232, Bankr. L. Rep. P 82,472
**(Cite as: 714 F.3d 127)**

Regulation does not contemplate the commencement of a separate ancillary proceeding to seek recognition of a foreign insolvency case, as in the Model Law and chapter 15, as the members of the Union are automatically required to recognize foreign proceedings from the date of their opening." 458 B.R. at 74. But that conclusion does not persuade us that we should determine COMI under Chapter 15 based on the date of commencement of the foreign proceeding as the bankruptcy court held in that case; rather, it suggests that the EU Regulation may be a poor analog for interpreting Chapter 15.

Relevant European case law interpreting COMI appears to generally focus on whether a debtor's COMI is regular and ascertainable, as suggested by the EU Regulation. For example, in *In re Eurofood IFSC Ltd.,* the Court of Justice of the European Union focused on "criteria that **\*137** are both objective and ascertainable by third parties" to determine a debtor's COMI. *In re Eurofood IFSC Ltd.,* Case C–341/04, 2006 E.C.R. I–3813, 2006 WL 1142304, ¶ 33 (E.C.J.2006). Likewise, in *In re Stanford International Bank Ltd.,* the England and Wales Court of Appeal (Civil Division) looked to whether third parties could ascertain a debtor's COMI, specifically by examining factors "in the public domain." *In re Stanford Int'l Bank Ltd.,* Case No. A3/2009/1565 & 1643, 2010 EWCA Civ 137, 2010 WL 605796, ¶¶ 54–56 (Ct. of Appeal 2010). These interpretations also reflect a concern about possible COMI manipulation. *See, e.g., In re Eurofood IFSC Ltd.,* 2006 WL 1142304, ¶ 35 (indicating concern with a " 'letterbox' company not carrying out any business in the territory of the Member State in which its registered office is situated"). A COMI that is regular and ascertainable is not easily subject to tactical removal.

Overall, international sources are of limited use in resolving whether U.S. courts should determine COMI at the time of the Chapter 15 petition or in some other way.

\* \* \*

We therefore hold that a debtor's COMI should be determined based on its activities at or around the time the Chapter 15 petition is filed, as the statutory text suggests. But given the EU Regulation and other international interpretations, which focus on the regularity and ascertainability of a debtor's COMI, a court may consider the period between the commencement of the foreign insolvency proceeding and the filing of the Chapter 15 petition to ensure that a debtor has not manipulated its COMI in bad faith.

**B. COMI Factors**

[4] The parties also dispute what factors are relevant for locating a COMI. Morning Mist argues that Sentry's liquidation activities are irrelevant to the COMI determination; the liquidator responds that these activities and the fact of the BVI proceedings are the kind of objective criteria that can be ascertained by third parties, and are therefore critical. We hold that any relevant activities, including liquidation activities and administrative functions, may be considered in the COMI analysis.

[5] Chapter 15 creates a rebuttable presumption that the country where a debtor has its registered office will be its COMI: "In the absence of evidence to the contrary, the debtor's registered office, or habitual residence in the case of an individual, is presumed to be the center of the debtor's main interests." 11 U.S.C. § 1516(c). But federal courts have focused on a variety of other factors as well. The United States Bankruptcy Court for the Southern District of New York has developed a widely adopted list of COMI factors—warning, however, against mechanical application:

Various factors, singly or combined, could be relevant to such a determination: the location of the debtor's headquarters; the location of those who actually manage the debtor (which, conceivably could be the headquarters of a holding company);

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

714 F.3d 127, 69 Collier Bankr.Cas.2d 612, 57 Bankr.Ct.Dec. 232, Bankr. L. Rep. P 82,472
**(Cite as: 714 F.3d 127)**

the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes.

*In re SPhinX, Ltd.,* 351 B.R. 103, 117 (Bankr.S.D.N.Y.2006). This nonexclusive list is a helpful guide, but consideration of these specific factors is neither required nor dispositive.

The *SPhinX* court and other federal courts have also turned to international **\*138** law, as directed by Congress. *See, e.g., In re SPhinX, Ltd.,* 351 B.R. at 118; *In re Tri–Continental Exch. Ltd.,* 349 B.R. 627, 634 (Bankr.E.D.Cal.2006). As discussed in Part II.A above, the EU Regulation enacting the European Union Convention on Insolvency explains that COMI "should correspond to the place where the debtor conducts the administration of his interests on a regular basis and is therefore ascertainable by third parties." EU Regulation, Preamble ¶ 13. While this guidance may have been of limited utility in resolving the timing question discussed in Part II.A, it underscores the importance of factors that indicate regularity and ascertainability. FN10

> FN10. As mentioned above, the bankruptcy court in *In re Millennium Global* employed the concept of "principal place of business" to guide its COMI analysis. Accordingly, it applied the Supreme Court's recent definition of that concept, which looks at a corporation's "nerve center," *i.e.,* "where a corporation's officers direct, control, and coordinate the corporation's activities." *Hertz Corp. v. Friend,* 559 U.S. 77, 130 S.Ct. 1181, 1192, 175 L.Ed.2d 1029 (2010). Given Congress's choice to use COMI instead of "principal place of business," that concept does not control the analysis. But to the extent that the concepts are similar, a court may certainly consider a debtor's "nerve center," including from where the debtor's activities are directed and controlled, in determining

a debtor's COMI.

[6] The absence of a statutory definition for a term that is not self-defining signifies that the text is open-ended, and invites development by courts, depending on facts presented, without prescription or limitation.

### III

[7] Applying the principles set out above, we affirm the decision of the district court (which affirmed the bankruptcy court) recognizing the BVI liquidation as a foreign main proceeding.

In a nutshell: for a proceeding to be recognized as a "foreign main proceeding," it must be "pending in the country where the debtor has the center of its main interests." 11 U.S.C. § 1517(b)(1). That determination is based on a debtor's COMI at the time the Chapter 15 petition is filed. A court may look at the period between the commencement of the foreign proceeding and the filing of the Chapter 15 petition to ensure that a debtor has not manipulated its COMI in bad faith, but there is no support for Morning Mist's contention that a debtor's entire operational history should be considered. The factors that a court may consider in this analysis are not limited and may include the debtor's liquidation activities.

The bankruptcy court made factual findings that place Sentry's COMI in the BVI during the relevant time period:

Upon the revelation of the notorious Madoff fraud in December of 2008, the Debtors discontinued the transfer of funds for investment with BLMIS in New York, which comprised 95% of Sentry's investments. The board of representatives at the Debtors' New York-based investment managers, [FGG], resigned shortly thereafter, and the Debtors' contracts with FGG were severed in 2009, still long before the filing of the Petition. As a result, the Debtors have no place of business, no management, and no tangible assets located in the United States. Rather, the Debtors'

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

714 F.3d 127, 69 Collier Bankr.Cas.2d 612, 57 Bankr.Ct.Dec. 232, Bankr. L. Rep. P 82,472
**(Cite as: 714 F.3d 127)**

activities for an extended period of time have been conducted only in connection with winding up the Debtors' business.... The Court finds that the facts now extant provide a sufficient basis for finding that the Debtors' COMI for the purpose of recognition as a main proceeding is in the BVI, and not elsewhere.

**\*139** Bankr. Order at 5–6. The court went on to find that, even though Sentry had assets in other jurisdictions, the administration of its affairs in the relevant time was orchestrated from the BVI. *Id.* at 6. There was no finding of bad-faith COMI manipulation: "the record here as to the relevant time period beginning December 2008, which straddles the Liquidators' appointment dates, does not support a finding of an opportunistic shift of the Debtors' COMI or any biased activity or motivation to distort factors to establish a COMI in the BVI." *Id.* at 8.

The bankruptcy court's factual findings are not clearly erroneous and support the conclusion that Sentry's COMI was in the BVI at the time of the Chapter 15 petition, and that Sentry did not manipulate its COMI in bad faith between the initiation of the BVI proceeding and the filing of the Chapter 15 petition. True, the relevant time period was when the Chapter 15 petition was filed (with a look backward to thwart manipulation), whereas the bankruptcy court looked at a longer period (beginning with Madoff's arrest), but the difference is not material. We therefore affirm.[FN11]

> FN11. Morning Mist also claims that the bankruptcy court erroneously stayed the derivative action that it brought against Sentry. Appellants' Br. 36–37. Because we affirm the recognition of the BVI liquidation as a foreign main proceeding, the stay was automatic. *See* 11 U.S.C. § 1520(a) (imposing automatic stay on U.S. proceedings against debtor upon recognition of foreign main proceeding).

**IV**

[8] Finally, Morning Mist argues that the bankruptcy court should have applied the public policy exception available under 11 U.S.C. § 1506, because the BVI proceedings, which are in the main confidential, were "cloaked in secrecy." Appellants' Br. 25.

Section 1506 provides: "Nothing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506. This Court has not had occasion to discuss the application of Section 1506.

[9] The statutory wording requires a narrow reading. Section 1506 does not create an exception for *any* action under Chapter 15 that may conflict with public policy, but only an action that is "*manifestly* contrary." 11 U.S.C. § 1506 (emphasis added). The legislative history confirms:

> [Section 1506] follows the Model Law article 5 exactly, is standard in UNCITRAL texts, and has been *narrowly interpreted on a consistent basis in courts around the world.* The word "manifestly" in international usage restricts the public policy exception to *the most fundamental policies of the United States.*

House Report at 109 (emphases added). The UNCITRAL Guide further explains that the exception should be read "restrictively" and invoked only "under exceptional circumstances concerning matters of fundamental importance for the enacting State." UNCITRAL Guide ¶ 89. Federal courts in the United States have adopted this view. *See, e.g., In re Vitro S.A.B. de CV,* 701 F.3d 1031, 1069–70 (5th Cir.2012); *In re Iida,* 377 B.R. 243, 259 (B.A.P. 9th Cir.2007); *In re Ephedra Prods. Liab. Litig.,* 349 B.R. 333, 336 (S.D.N.Y.2006); *In re Toft,* 453 B.R. 186, 193 (Bankr.S.D.N.Y.2011); *In re Metcalfe & Mansfield Alt. Invs.,* 421 B.R. 685, 697 (Bankr.S.D.N.Y.2010).[FN12]

> FN12. Even beyond the bankruptcy con-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

714 F.3d 127, 69 Collier Bankr.Cas.2d 612, 57 Bankr.Ct.Dec. 232, Bankr. L. Rep. P 82,472
**(Cite as: 714 F.3d 127)**

text, we apply public policy exceptions sparingly. For example, in the judgment enforcement context, a foreign judgment "is unenforceable as against public policy to the extent that it is repugnant to fundamental notions of what is decent and just in the State where enforcement is sought," but that "standard is high, and infrequently met." *Ackermann v. Levine,* 788 F.2d 830, 841 (2d Cir.1986) (internal quotation marks omitted).

**\*140** The confidentiality of BVI bankruptcy proceedings does not offend U.S. public policy. Although the BVI liquidation has proceeded under seal, Morning Mist's assertion that they are "shrouded in secrecy" is overwrought. Appellants' Br. 7. The BVI court did seal the various applications and orders in the liquidation, but public summaries have been made available. *See, e.g.,* J.A. 445–46 (summarizing applications and orders before BVI court). Such restricted access to court documents is not unusual in the BVI, as the liquidator explains, because only certain limited records are typically available to non-parties. Appellees' Br. 12–13. And in all cases in the BVI, including this liquidation, any non-party may apply to the court for access to sealed documents. *Id.*

[10] In any event, Morning Mist cannot establish that unfettered public access to court records is so fundamental in the United States that recognition of the BVI liquidation constitutes one of those exceptional circumstances contemplated in Section 1506. "[T]he right to inspect and copy judicial records is not absolute." *Nixon v. Warner Commc'ns, Inc.,* 435 U.S. 589, 598, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978). In *Lugosch v. Pyramid Co. of Onondaga,* we discussed at length the common law and constitutional rights to public access of court documents. *Lugosch v. Pyramid Co. of Onondaga,* 435 F.3d 110, 119–20 (2d Cir.2006). The right to access court documents is not absolute and can easily give way to "privacy interests" or other considerations. *Id.* at 120; *see also United States v. Amodeo,* 44

F.3d 141, 146 (2d Cir.1995) ("Although there is a presumption favoring access to judicial records, the fact that a document is a judicial record does not mean that access to it cannot be restricted." (internal citation omitted)).

Important as public access to court documents may be, it is not an exceptional and fundamental value. It is a qualified right; and many proceedings move forward in U.S. courtrooms with some documents filed under seal, including many cases in this Court. There is no basis on which to hold that recognition of the BVI liquidation is manifestly contrary to U.S. public policy.

**CONCLUSION**

For the foregoing reasons, we affirm.

C.A.2 (N.Y.),2013.
In re Fairfield Sentry Ltd.
714 F.3d 127, 69 Collier Bankr.Cas.2d 612, 57 Bankr.Ct.Dec. 232, Bankr. L. Rep. P 82,472

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Tab 35

Westlaw.

Page 1

410 B.R. 357, 52 Bankr.Ct.Dec. 6
**(Cite as: 410 B.R. 357)**

▷

United States Bankruptcy Court,
E.D. New York.
In re GOLD & HONEY, LTD., Debtor in a Foreign
Proceeding.
In re Gold & Honey (1995) LP, Debtor in a Foreign
Proceeding.

Nos. 09–70463 (AST), 09–70464(AST).
Aug. 21, 2009.

**Background:** In each of two non-consolidated Chapter 15 cases, co-receivers of debtors filed petitions for recognition of Israeli receivership proceeding as "foreign main proceeding."

**Holdings:** The Bankruptcy Court, Alan S. Trust, J., held that:

(1) because each of these debtors had previously filed Chapter 11 petitions in the United States, the postpetition appointment of receivers in the Israeli receivership proceeding was a clear violation of the automatic stay, warranting denial of recognition;

(2) the Israeli receivership proceeding was not "collective in nature";

(3) as to one debtor, the Israeli receivership proceeding did not involve that debtor's "assets and affairs"; and

(4) recognition of the Israeli receivership proceeding would have an adverse effect on public policy.

Petitions for recognition denied.

West Headnotes

**[1] Bankruptcy 51 ☞2224**

51 Bankruptcy
   51III The Case
     51III(B) Debtors
       51k2222 Who May Be a Debtor
         51k2224 k. Corporations. Most Cited Cases

Foreign corporation with assets in the United States is generally amenable to filing bankruptcy in the United States.

**[2] Bankruptcy 51 ☞2341**

51 Bankruptcy
   51III The Case
     51III(H) Cases Ancillary to Foreign Proceedings
       51k2341 k. In General. Most Cited Cases

Recognition of a foreign proceeding under the Bankruptcy Code is not a "rubber stamp exercise." 11 U.S.C.A. § 1517.

**[3] Bankruptcy 51 ☞2341**

51 Bankruptcy
   51III The Case
     51III(H) Cases Ancillary to Foreign Proceedings
       51k2341 k. In General. Most Cited Cases

Although the sections of the Bankruptcy Code governing applications for recognition of foreign proceedings and presumptions concerning recognition are designed to make recognition as simple and expedient as possible, the court may consider proof on any element. 11 U.S.C.A. §§ 1515, 1516.

**[4] Bankruptcy 51 ☞2341**

51 Bankruptcy
   51III The Case
     51III(H) Cases Ancillary to Foreign Proceedings
       51k2341 k. In General. Most Cited Cases

Ultimate burden of proof on each element is on the foreign representative seeking recognition of a foreign proceeding. 11 U.S.C.A. § 1517.

**[5] Bankruptcy 51 ☞2341**

51 Bankruptcy
   51III The Case
     51III(H) Cases Ancillary to Foreign Proceedings

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

410 B.R. 357, 52 Bankr.Ct.Dec. 6
**(Cite as: 410 B.R. 357)**

51k2341 k. In General. Most Cited Cases

**Bankruptcy 51 ☞2395**

51 Bankruptcy
   51IV Effect of Bankruptcy Relief; Injunction and Stay
     51IV(B) Automatic Stay
      51k2394 Proceedings, Acts, or Persons Affected
       51k2395 k. Judicial Proceedings in General. Most Cited Cases

Israeli court's postpetition appointment of receivers for Chapter 11 debtors was a clear violation of the automatic stay, warranting denial of recognition of Israeli receivership proceeding as a foreign main or nonmain proceeding; stay automatically enjoined the continuation of any litigation against debtors and automatically enjoined continuing lien enforcement against debtors to enforce prepetition claims, debtor's prepetition lender proceeded in the Israeli receivership proceeding in spite of and in the face of the bankruptcy court's stay order, having been specifically told that the stay applied to all property of debtors, wherever located and by whomever held, and that the stay prohibited lender's actions in Israel, and though lender eventually filed lift-stay motion seeking, inter alia, stay relief retroactive to cases' petition date, retroactive relief had been denied. 11 U.S.C.A. § 362(a)(1, 3–5), 1502, 1515, 1517.

**[6] Bankruptcy 51 ☞2391**

51 Bankruptcy
   51IV Effect of Bankruptcy Relief; Injunction and Stay
     51IV(B) Automatic Stay
      51k2391 k. In General. Most Cited Cases

Purpose of the automatic stay is to give the debtor a breathing spell from litigation and collection activities. 11 U.S.C.A. § 362.

**[7] Bankruptcy 51 ☞2462**

51 Bankruptcy

   51IV Effect of Bankruptcy Relief; Injunction and Stay
     51IV(D) Enforcement of Injunction or Stay
      51k2462 k. Validity of Acts in Violation of Injunction or Stay. Most Cited Cases

Judicial acts and proceedings in violation of the automatic stay are generally void and of no effect. 11 U.S.C.A. § 362.

**[8] Bankruptcy 51 ☞2391**

51 Bankruptcy
   51IV Effect of Bankruptcy Relief; Injunction and Stay
     51IV(B) Automatic Stay
      51k2391 k. In General. Most Cited Cases

Automatic stay is designed to effect an immediate freeze of the status quo at the outset of the Chapter 11 proceedings. 11 U.S.C.A. § 362.

**[9] Bankruptcy 51 ☞2341**

51 Bankruptcy
   51III The Case
     51III(H) Cases Ancillary to Foreign Proceedings
      51k2341 k. In General. Most Cited Cases

Proceeding that is "collective in nature," within the meaning of the Bankruptcy Code's definition of foreign proceeding, is one that considers the rights and obligations of all creditors. 11 U.S.C.A. § 101(23).

**[10] Bankruptcy 51 ☞2341**

51 Bankruptcy
   51III The Case
     51III(H) Cases Ancillary to Foreign Proceedings
      51k2341 k. In General. Most Cited Cases

Any presumption that a foreign decision certified by another country is a recognizable foreign proceeding is rebuttable upon the bankruptcy court's examination of any and all relevant facts. 11 U.S.C.A. §§ 101(23), 1502, 1515, 1517.

**[11] Bankruptcy 51 ☞2341**

410 B.R. 357, 52 Bankr.Ct.Dec. 6
**(Cite as: 410 B.R. 357)**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In General. Most Cited Cases

Israeli receivership proceeding was not "collective in nature," as required for recognition of proceeding as foreign main proceeding; receivership proceeding did not require debtors' receivers to consider the rights and obligations of all creditors but, having been commenced under the Israeli Companies Ordinance, as opposed to the Israeli Bankruptcy Ordinance, was primarily designed to allow debtors' prepetition lender to collect its debts, and was more akin to an individual creditor's replevin or repossession action than it was to a reorganization or liquidation by an independent trustee. 11 U.S.C.A. §§ 101(23), 1502, 1515, 1517(a).

**[12] Bankruptcy 51 ☞2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In General. Most Cited Cases

Israeli receivership proceeding did not involve debtor's "assets and affairs," as required for recognition of proceeding as foreign main proceeding; while Israeli court may have had jurisdiction over debtor's assets in Israel, including gold, silver, receivables, plants, and equipment, there was no proof that receivers had been given authority over debtor's business affairs. 11 U.S.C.A. §§ 101(23), 1502, 1515, 1517(a).

**[13] Bankruptcy 51 ☞2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In General. Most Cited Cases

For a proceeding to fall within the Bankruptcy Code's definition of "foreign proceeding," both the assets and the affairs of the debtor must be subject to the jurisdiction of a foreign court. 11 U.S.C.A. § 101(23).

**[14] Bankruptcy 51 ☞2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In General. Most Cited Cases

Petition for recognition as a foreign main or nonmain proceeding should be denied if recognition would be manifestly contrary to the public policy of the United States. 11 U.S.C.A. § 1506.

**[15] Bankruptcy 51 ☞2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In General. Most Cited Cases

Where appointment of receivers in Israeli receivership proceeding clearly violated the automatic stay and the court's orders regarding the stay, recognition of Israeli receivership proceeding as a "foreign proceeding" would have been manifestly contrary to the public policy of the United States, warranting denial of recognition; allowing offensive use of stay violation would have severely impinged stay's value and import, recognizing foreign seizure of debtor's assets postpetition would have severely hindered United States bankruptcy courts' abilities to carry out two of the stay's most fundamental policies and purposes, namely, preventing one creditor from obtaining advantage over other creditors and providing for efficient and orderly distribution of debtor's assets to all creditors in accordance with relative priorities, and condoning lender's conduct would have limited a federal court's jurisdiction over all of a debtor's property "wherever located and by whomever held." 11 U.S.c.A. §§ 101(23), 362(a)(1), 1506.

**[16] Bankruptcy 51 ☞2341**

410 B.R. 357, 52 Bankr.Ct.Dec. 6
**(Cite as: 410 B.R. 357)**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In General. Most Cited Cases

While the legislative history of Chapter 15's public policy exception demonstrates that the exception should be applied narrowly, it should be invoked when fundamental policies of the United States are at risk. 11 U.S.C.A. § 1506.

**\*359** Gary M. Kushner, Esq., Forchelli, Curto, Crowe, Deegan, Schwartz, Mineo & Cohn, LLP, Mineola, NY.

Lee Stremba, Esq., Troutman Sanders LLP, New York, NY.

### *MEMORANDUM OPINION DENYING PETITIONS FOR RECOGNITION*

ALAN S. TRUST, Bankruptcy Judge.

#### *Issues Before the Court and Summary of Ruling*

Pending before the Court in each of these non-consolidated chapter 15 cases (collectively, the "Chapter 15 Cases")[FN1] are the petitions for recognition filed by Petitioners Amir Bartov ("Bartov") and Aliza Sharon ("Sharon") (each a "Receiver" and together, the "Receivers").[FN2] The Receivers assert that they are acting as the persons appointed as co-receivers by the Tel–Aviv–Jaffa District Court of the State of Israel (the "Israeli Court"),[FN3] pursuant to **\*360** a receivership proceeding pending before the Israeli Court (the "Israeli Receivership Proceeding").[FN4]

> FN1. Chapter 15 is found under Title 11 of the United States Code; hereinafter, the "Bankruptcy Code" will refer to chapters and sections under Title 11.

> FN2. Citations to documents filed in the Chapter 15 Cases, under 09–70463, are designated as [dkt item -]; citations to documents filed in other cases will be designated by case number as well as document number.

> FN3. Receivership proceedings in Israel are commenced and conducted pursuant to Sections 194–201 of the Companies Ordinance [New Version] 5743–1983 (Title F: Enforcement of Rights)(hereinafter, "Companies Ordinance"). [dkt item 2 ¶ 8]

> FN4. The Israeli Receivership Proceeding is entitled *In the Matter of: The First International Bank of Israel, Ltd.,* Civil Motion File 22348/08, Bankruptcy File 002193/08.

Additionally, the Receivers assert that they are co-receivers of the entities Gold & Honey, Ltd. ("GH Ltd."), a debtor before this Court, and non-debtor entity Lucky Seven Ltd. ("Lucky Seven"), as well as co-receivers over substantially all of the known assets located in the State of Israel of Gold & Honey (1995) L.P., also a debtor before this Court ("GH LP").[FN5] The named debtors in these Chapter 15 Cases are also debtors in administratively consolidated chapter 11 proceedings, which were pending before this Court at the time these Chapter 15 Cases were filed. GH LP is the debtor and debtor-in-possession in case number 08–75237, filed on September 23, 2008. GH Ltd. is the debtor and debtor-in-possession in case number 08–75240, filed on September 23, 2008.[FN6]

> FN5. The cases of GH LP and GH Ltd. are jointly administered under Case No. 08–75237 (collectively, the "Chapter 11 Cases").

> FN6. Almond Jewelers, Inc. ("Almond Jewelers"), an affiliate of GH Ltd. and GH LP, is also a chapter 11 debtor before this Court in case number 08–75238, filed on September 23, 2008. Almond Jewelers is not a party to the Israeli Receivership Proceeding. Hereinafter, GH LP, GH Ltd., and Almond Jewelers, are collectively referred to as "Debtors."

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

410 B.R. 357, 52 Bankr.Ct.Dec. 6
**(Cite as: 410 B.R. 357)**

For the reasons herein, the petitions for recognition in each of the Chapter 15 Cases will be denied.

### Findings of Fact and Conclusions of Law

The following, along with the findings of fact and conclusions of law stated on the record at the ruling conference held July 29, 2009, which are incorporated herein by reference, constitute this Court's findings of fact and conclusions of law made in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure.

### Jurisdiction

This Court has jurisdiction over these core proceedings pursuant to 28 U.S.C. §§ 157(b)(2)(A), (G), (O), and (P), and 28 U.S.C. § 1334(b), and the Standing Order of Reference in effect in the Eastern District of New York.

### The Parties

Debtor GH LP, a New York limited partnership established on January 1, 1994, maintains an office at 16 South Maryland Avenue, Port Washington, New York.

[1] Debtor GH Ltd., a corporation organized under the laws of the State of Israel, [FN7] is a general partner of GH LP and 49.5% equity holder of GH LP.

> FN7. FIBI did not challenge GH Ltd.'s right to seek bankruptcy protection in the United States, even though GH Ltd. is not a United States corporation. Section 109(a) of the Bankruptcy Code defines who may be a debtor as "a person that resides or has a domicile, a place of business, or property in the United States." 11 U.S.C. § 109(a). Section 101(41) defines a "person" to include a corporation and a partnership. 11 U.S.C. § 101(41). A foreign corporation with assets in the United States is generally amenable to filing bankruptcy in the United States. *See Israeli–British Bank (London) Ltd. v. FDIC,* 536 F.2d 509 (2d

Cir.1976) (holding that a British banking corporation not conducting business as a bank in the United States was not a banking corporation under federal law and therefore qualified to file for relief under the Bankruptcy Act and was not disqualified under the former 11 U.S.C. § 22(a)); *see also In re Globo Comunicacoes E Participacoes, S.A.,* 317 B.R. 235 (S.D.N.Y.2004); *In re Aerovias Nacionales de Colombia S.A. Avianca,* 303 B.R. 1 (Bankr.S.D.N.Y.2003). The propriety of GH Ltd. filing for bankruptcy relief in the United States is not before this Court. However, the Israeli Court did express concerns about the propriety of the bankruptcy filings of GH LP and GH Ltd., as further discussed, *infra.*

**\*361** Debtor Almond Jewelers, a corporation organized under the laws of the State of New York, is a general partner of GH LP and a 49.5% equity holder of GH LP.

First International Bank of Israel ("FIBI"), a foreign banking corporation organized and existing under the laws of the State of Israel, is a pre-petition lender to GH Ltd. Those pre-petition loans were guaranteed by GH LP, and possibly by non-debtor entities. Although FIBI conducts business in many countries around the world and has business contacts with the United States, it has no offices or branches within the physical borders of the United States.

The Receivers, appointed by the Israeli Court after the commencement of the Chapter 11 Cases, are the petitioners in the Chapter 15 Cases.

### Background of the Debtors

Almond Jewelers is a New York-based designer, manufacturer, and marketer of jewelry products made primarily from gold and other precious metals. Almond Jewelers has asserted that during the late 1980s it encountered various manufacturing difficulties resulting from the lack of skilled em-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

410 B.R. 357, 52 Bankr.Ct.Dec. 6
**(Cite as: 410 B.R. 357)**

ployees such as tool makers, and experienced competition from other manufacturers who utilized cheap labor in developing countries.

In or about 1993, one or more of the Debtors decided to move the manufacturing facility of precious metal components (the "Components") from Westbury, New York, to Israel. Debtors were attracted to Israel because, *inter alia,* they could obtain substantial governmental financial incentives to build a new factory for the mass production of the Components. In 1994, the Debtors invested close to $50 million (USD) in building a manufacturing plant in Israel. That investment was comprised of: (a) more than 30% from funds contributed or raised by Debtor; (b) approximately 30% in conditional grants from the Israeli government; and (c) approximately 40% through loans from the Israeli government. Abatement of the repayment of the Israeli grants was conditioned upon the Debtors continuing operations in Israel for a period of not less than seven (7) years. Initially, the grants and loans from the Israeli government were provided to GH Ltd., an Israeli corporation, due to the Israeli practice of not providing governmental incentives directly to foreign partnerships. This procedural hurdle was overcome in or about 1996, when the Israeli government agreed to the assignment of the ownership interest of the Israeli factory to GH LP. Thus, by 1996, the manufacturing plant for the mass production of Components in Israel had been completed, and operations in Israel began under the name of GH LP, which remained a New York limited partnership.

### GH LP's Operations and Business Activities

GH LP's business consists of designing, manufacturing, and worldwide marketing and sales of moderately priced jewelry products, including earrings, bangles, pendants, charms, rings, bracelets and necklaces. Typically, GH LP designs, manufactures and sells jewelry directly to large retailers, large wholesalers, and to various other entities as a private label contractor. Debtors assert that the design and marketing were mainly done from GH

LP's United States office in Port Washington, New York, where GH LP's overall management is located and the overall business decisions are allegedly made. Prior to filing the Chapter 11 Cases, GH LP produced the Components in Israel, which were then shipped to Thailand for the **\*362** production of finished jewelry by Almond Thailand Ltd., an affiliated entity of the Debtors ("Almond Thailand"). Almond Thailand is not a debtor before this Court.

As a result of the post-petition continued prosecution of the Israeli Receivership Proceeding, as discussed, *infra,* GH LP and GH Ltd. no longer conduct business in Israel.

### GH Ltd.'s and GH LP's Financial History with Israel and FIBI

In 1994, GH Ltd. obtained loans and conditional grants from the State of Israel and pledged a "floating" charge on all of its assets as collateral security for the repayment of these loans and grants. GH LP also made pledges of some of its machinery and equipment, tools and dies.

In or about 1996, the State of Israel agreed to guaranty a working capital line of credit in the principal amount of $12 million (USD) which would be provided to the Debtors (the "Working Capital Credit Line"). The Working Capital Credit Line was intended, among other uses, to provide GH Ltd. with immediate cash availability to purchase gold and other precious metals. With the backing of the Israeli government's guaranty, GH Ltd. sought a lending institution to fund the Working Capital Credit Line. In or about 1996, GH Ltd. selected FIBI to finance the Working Capital Credit Line, primarily due to FIBI offering a favorable interest rate, and due to FIBI having agreed to finance the Working Capital Credit Line without any guaranty from either the Israeli government or the owners of GH Ltd. FIBI agreed to lend GH Ltd. $9 million (USD). FIBI, as lender, and GH Ltd., as borrower, then executed the documents required to implement the Working Capital Credit Line.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

410 B.R. 357, 52 Bankr.Ct.Dec. 6
**(Cite as: 410 B.R. 357)**

At all relevant times since the inception of the Working Capital Credit Line, the Debtors maintained their primary bank accounts at FIBI. In or about April 1997, GH LP signed a guaranty in favor of FIBI as security for the repayment of the Working Capital Credit Line. In 2003, GH Ltd. and GH LP asked FIBI to increase the Working Capital Credit Line. FIBI agreed, and increased the Working Capital Credit Line to approximately $12 million (USD). As additional collateral for the repayment of the increased Working Capital Credit Line, FIBI required GH LP to pledge certain accounts receivables (the "Existing Contracts"). The pledge of the Existing Contracts was memorialized by appropriate documentation including a pledge agreement (the "Pledge Agreement"). FIBI purportedly recorded the Pledge Agreement as a lien against the Existing Contracts with the Israeli Pledge Registrar and/or the Israeli Companies Registrar.[FN8]

> FN8. This Court is not making any findings or conclusions as to lien validity and provides this information solely for context and background.

In or about March 2008, the Working Capital Credit Line was increased to $16 million (USD). At that time, FIBI required additional collateral from GH Ltd. and GH LP. Consequently, at that time, GH LP provided FIBI with a pledge on certain machinery and equipment.

***Summary of Litigation Between FIBI, GH LP and GH Ltd.***

FIBI commenced litigation in Israel shortly after the Working Capital Credit Line was increased in March 2008. The following briefly summarizes the history of that litigation.

In late July 2008, FIBI seized substantially all of GH Ltd. and GH LP's assets and accounts, and commenced the Israeli Receivership Proceeding. Prior to the filing of the Chapter 11 Cases, a number of **\*363** events occurred in the Israeli Receivership Proceeding, primarily resulting in the Israeli Court denying FIBI's emergency and *ex parte* ap-

plications for the appointment of a receiver.

On September 23, 2008 (the "Petition Date"), the Debtors filed the Chapter 11 Cases.[FN9] Notice of the commencement of the Chapter 11 Cases was provided by Debtors to FIBI. [08–75237, dkt item 12, ¶ 18]

> FN9. On October 6, 2008, this Court entered an order providing for the joint administration of the Chapter 11 Cases. [08–75237, dkt item 16]

On October 2, 2008, notwithstanding the pendency of the Chapter 11 Cases, FIBI continued its application for the appointment of a temporary receiver before the Israeli Court. FIBI took the position before the Israeli Court that the automatic stay, which arose by virtue of the Chapter 11 Cases, did not apply to FIBI's actions or its attempt to obtain control over the property of the bankruptcy estates of GH Ltd. and GH LP. As a result of the proceedings before the Israeli Court, and with the agreement of GH Ltd. and GH LP, on October 2, 2008, Sharon was appointed as supervisor over the Debtors' businesses.[FN10] The Israeli Court then adjourned the October 2 hearing and its decision on FIBI's application for the appointment of a temporary receiver until October 12, 2008. [08–75237, dkt item 20, Exh. 1]

> FN10. GH Ltd. and GH LP have asserted in proceedings before this Court that their agreement to Sharon's appointment was not a voluntary agreement and was made only because they were pressured into doing so.

On October 3, 2008, the Debtors applied to this Court for an order determining that the automatic stay applied to the Debtors' property wherever located and by whomever held, and, in particular, to the Israeli Receivership Proceeding. The hearing on this request was scheduled on an expedited basis before this Court for October 6, 2008 (the "October 6 Hearing"). FIBI specially appeared at the October

410 B.R. 357, 52 Bankr.Ct.Dec. 6
**(Cite as: 410 B.R. 357)**

6 Hearing represented by both New York bank-ruptcy counsel in person, as well as its Israeli counsel, Bartov, who appeared via telephone. FIBI asserted that this Court had no jurisdiction over FIBI and had no jurisdiction over the Israeli Receivership Proceeding.

This Court determined at the October 6 Hearing, over FIBI's objection, that the automatic stay did, in fact, apply to the Debtors' property wherever located and by whomever held, and entered an Order to that effect (the "Stay Order"). Due to the expedited nature of the October 6 Hearing, however, this Court did not reach the issue of whether the automatic stay specifically applied to the Israeli Receivership Proceeding or whether this Court had *in personam* jurisdiction over FIBI. However, this Court advised FIBI that if it proceeded before the Israeli Court in the Israeli Receivership Proceeding, it did so at its own peril. [Tr. at 98:15–17; 08–75237, dkt item 19] The Stay Order includes the following pertinent paragraphs:

ORDERED, that the automatic stay provided under section 362(a) of the Bankruptcy Code (the "Automatic Stay") is in full force and effect in this bankruptcy case; and it is further

ORDERED, that the Automatic Stay stays, among other things, actions arising under section 362(a) of the Bankruptcy Code:

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, **\*364** or to recover a claim against the debtor that arose before the commencement of the case under this title;

(2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate; and it is further

ORDERED, that property of the estate includes property of the Debtors "wherever located and by whomever held" pursuant to section 541(a) of the Bankruptcy Code[.]

[08–75237, dkt item 17]

Following the October 6 Hearing and entry of the Stay Order, FIBI chose to continue to prosecute the Israeli Receivership Proceeding. The Stay Order and the record of the October 6 Hearing were then presented to the Israeli Court. In a thoughtful and thorough opinion dated October 30, 2008 (the "October 30 Decision"), the Israeli Court declined to give effect to the automatic stay or the Stay Order, and determined that it could proceed, regardless of the pendency of the Chapter 11 Cases. However, the Israeli Court based its analysis partially on the presumed illegitimacy of the Chapter 11 Cases, partially on the failure of GH Ltd. and GH LP to properly register the Stay Order in the Israeli Receivership Proceeding, and partially on principles of comity.[FN11] The Israeli Court also stated: "There is indeed no doubt that the Court in the United States is competent to make an order concerning a stay of proceedings, which applies to all the assets of the debtor wherever they are situated." [08–75237, dkt item 99, Exh. 7 at 22].

FN11. With due respect to the Israeli Court, its analysis appeared to overlook the automatic imposition of the stay under Section 362, and the fact that no party at that time, including FIBI, had either sought or obtained dismissal of or abstention by this Court from the Chapter 11 Cases.

As a result of the post-petition proceedings before the Israeli Court, Sharon continued to act as supervisor over the Debtors' businesses.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

410 B.R. 357, 52 Bankr.Ct.Dec. 6
**(Cite as: 410 B.R. 357)**

Debtors then commenced adversary proceeding number 08–8301 against FIBI on October 30, 2008 (the "Adversary"), and sought a temporary restraining order (the "TRO Request"). This Court conducted a hearing on the TRO Request on November 6, 2008. Supplemental briefing was permitted to be filed by November 14, 2008, and a ruling conference was scheduled for December 10, 2008.

On November 30, 2008, the Israeli Court issued a judgment appointing Bartov, an Israeli attorney for FIBI, and Sharon, an accountant, as permanent receivers for GH LP and GH Ltd. in the Israeli Receivership Proceeding. FIBI filed a translation of the Israeli Court's ruling on December 4, 2008, with its motion to dismiss the Adversary for lack of personal jurisdiction (the "Motion to Dismiss"). [08–8301, dkt item 13, Exh. 3] FN12

> FN12. On July 29, 2009, this Court rendered an oral ruling denying the Motion to Dismiss. This ruling is discussed, *infra.*

On December 10, 2008, this Court held the previously scheduled ruling conference on the TRO Request (the "Ruling Conference"). At that time, this Court made its findings of fact and conclusions of law on the record, to the extent applicable, in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure. As memorialized in a written Summary of Decision**365** and Order entered on December 12, 2008 [08–8301, dkt item 18], this Court stated as follows:

After due consideration, this Court denies the issuance of a TRO for the following reasons:

1. A TRO would be redundant to the automatic stay, which is, and has been, in effect, and which prohibits FIBI from proceeding with the continuation of a judicial, administrative, or other action or proceeding against the Debtors that was commenced prior to the petition date herein, and which prohibits FIBI from proceeding to recover a claim against the Debtors that arose before the commencement of these cases,

and which prohibits FIBI from any act to obtain possession of property of the estate or to exercise control over property of the estate, wherever located, and by whomever held;

2. FIBI has demonstrated that it can answer in damages, thus precluding this Court's determination of irreparable harm to Debtors, with such determination a likely prerequisite for the issuance of a specific TRO against FIBI.

This Court does not, and need not, reach the issue of whether FIBI is subject to in personam jurisdiction in the United States. The issue of in personam jurisdiction will be determined in connection with FIBI's pending Motion to Dismiss this adversary proceeding.

[08–8301, dkt item 18]

On January 7, 2009, FIBI filed a motion for relief from the automatic stay or for abstention ("FIBI Lift Stay Motion") in the Chapter 11 Cases of GH LP and GH Ltd. FIBI requested this Court enter an order pursuant to Bankruptcy Code Section 362, subsections (d)(1) and (d)(2), vacating the automatic stay nunc pro tunc with respect to the Israeli Receivership Proceeding, vacating the stay to allow other creditors to take action in Israel or, in the alternative, enter an order pursuant to Section 305(a)(1) abstaining from exercising jurisdiction over and dismissing, the Chapter 11 Cases. FN13 [08–75237, dkt item 98] Additionally, Bartov filed an affirmation in support of the FIBI Lift Stay Motion that included as exhibits, translations of the relevant Israeli law and certain of the various hearings held in Israel ("Bartov Declaration"). [08–75237, dkt item 99]

> FN13. This Court previously issued a bench ruling prior to January 7, 2009, authorizing creditors to file claims in Israel in order to protect their rights vis-a-vis FIBI. On July 29, 2009, this Court rendered an oral ruling granting the FIBI Lift Stay Motion in part, which ruling is

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

410 B.R. 357, 52 Bankr.Ct.Dec. 6
**(Cite as: 410 B.R. 357)**

discussed, *infra.*

On January 28, 2009, the Receivers filed petitions for recognition in these Chapter 15 Cases. They seek recognition of the Israeli Receivership Proceeding as foreign main proceedings of GH LP and GH Ltd., pursuant to Chapter 15 of the Bankruptcy Code (the "Receivers' Petitions"). [dkt item 2] The Receivers each filed declarations in Support of the Receivers' Petitions (the "Receivers' Declarations"). [dkt item 3] This Court has received extensive briefing and submissions on the Receivers' Petitions as well as on the FIBI Motion to Dismiss the Adversary and the FIBI Lift Stay Motion. A ruling conference was held on those matters on July 29, 2009. That ruling conference is discussed, *infra.*

### *Legal Analysis*
### *Procedural Requirements for Recognition of a Foreign Proceeding*

Chapter 15 of the Bankruptcy Code was enacted in 2005 to implement the Model Law on Cross–Border Insolvency **\*366** (the "Model Law"). The Model Law had been formulated by the United Nations Commission on International Trade Law ("UNCITRAL"), in a process in which the United States was an active participant. The language of Chapter 15 tracks the Model Law, with some modifications that were designed to conform the Model Law with existing United States law. *See In re Basis Yield Alpha Fund (Master),* 381 B.R. 37, 44–45 (Bankr.S.D.N.Y.2008)(citing *In re Iida,* 377 B.R. 243, 256 (9th Cir. BAP 2007)); *see also In re Tri–Cont'l Exch. Ltd.,* 349 B.R. 627, 631–32 (Bankr.E.D.Cal.2006); *United States v. J.A. Jones Const.,* 333 B.R. 637, 638–39 (E.D.N.Y.2005).

In order for a petition for recognition to be granted, the petition must meet several requirements. Section 1517 requires recognition of a foreign proceeding if:

(1) such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502;

(2) the foreign representative applying for recognition is a person or body; and

(3) the petition meets the requirements of section 1515.

11 U.S.C. § 1517(a); *see also In re Betcorp Ltd.,* 400 B.R. 266, 285 (Bankr.D.Nev.2009).

[2][3][4] Recognition under Section 1517 of the Bankruptcy Code is not a "rubber stamp exercise." *In re Basis Yield Alpha Fund (Master),* 381 B.R. at 40. The Court can "consider any and all relevant facts." *Id.* at 41. Although Sections 1515 and 1516 are designed to make recognition as simple and expedient as possible, the court may consider proof on any element. The ultimate burden of proof on each element is on the foreign representative. *See In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.,* 389 B.R. 325, 335 (S.D.N.Y.2008) (noting that "the ultimate burden of proof as to each element is on the foreign representative" and citing H.R.REP. NO. 109–31, at 112 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 173 ("House Report")).

Although listed as the third element, the first requirement for recognition under Section 1517 is purely procedural in nature; that is, the petition must meet the pleading requirements of Section 1515. 11 U.S.C. § 1517(a)(3). Section 1515 establishes several pleading requirements. The first factor requires that the foreign representative has filed a petition for recognition. 11 U.S.C. § 1515(a). The Receivers have satisfied this element in each of the Chapter 15 Cases.

The second factor of Section 1515 requires the petitioner establish that a foreign proceeding exists, and that the petitioner has been appointed as the foreign representative. 11 U.S.C. § 1515(b). The first two paragraphs of this subsection provide for what constitutes sufficient evidence, and specify that the petitioner may satisfy this requirement by providing a "certified copy of the decision commencing such foreign proceeding and appointing

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

410 B.R. 357, 52 Bankr.Ct.Dec. 6
**(Cite as: 410 B.R. 357)**

the foreign representative" and "a certificate from the foreign court affirming the existence of the foreign proceeding and the appointment of the foreign representative." *Id.* The Receivers have satisfied this element in each of the Chapter 15 Cases.

The third factor under Section 1515 requires that the petition for recognition must be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative. 11 U.S.C. § 1515(c). The Receivers, have also satisfied this procedural requirement in each of the Chapter 15 Cases. Thus, Section 1517(a)(3) has been satisfied.

**\*367** The Receivers have also met the requirements of the second element of Section 1517(a) because "the foreign representative applying for recognition is a person or body[.]" 11 U.S.C. § 1517(a)(2).

The first substantive issue here becomes the first delineated requirement of Section 1517(a) —whether the foreign proceeding for which recognition is sought, here the Israeli Receivership Proceeding, is a foreign main proceeding or foreign nonmain proceeding within the meaning of Section 1502. 11 U.S.C. § 1517(a)(1).

### *The Israeli Receivership Proceeding is Neither a Foreign Main Proceeding Nor a Foreign Nonmain Proceeding*

The Israeli Receivership Proceeding is neither a foreign main proceeding nor a foreign nonmain proceeding. Section 101(23) of the Bankruptcy Code provides a statutory definition of foreign proceeding, as follows:

> The term "foreign proceeding" means a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

11 U.S.C. § 101(23).

Thus, for the petitions for recognition to be granted, the Receivers must prove that the following elements exist with respect to the Israeli Receivership Proceeding, as follows:

(i) a proceeding;

(ii) that is either judicial or administrative;

(iii) that is collective in nature;

(iv) that is in a foreign country;

(v) that is authorized or conducted under a law related to insolvency or the adjustment of debts;

(vi) in which the debtor's assets and affairs are subject to the control or supervision of a foreign court;FN14 and

> FN14. Section 1502 of the Bankruptcy Code defines "foreign court" as "a judicial or other authority competent to control or supervise a foreign proceeding." 11 U.S.C. § 1502.

(vii) which proceeding is for the purpose of reorganization or liquidation.

*In re Betcorp Ltd.,* 400 B.R. at 276–77. Although the analysis of these elements is different for GH LP than it is for GH Ltd., as noted, *infra,* this Court has determined that the Receivers have not met their burden of proof in either of the Chapter 15 Cases.

The Receivers have demonstrated that all of the following elements are met here in both Chapter 15 Cases:FN15

> FN15. Although several of the reported chapter 15 Cases discuss the requirement of Section 1502(a)(4) that a foreign main proceeding is a "foreign proceeding pending in the country where the debtor has the center of its main interests," this is

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

410 B.R. 357, 52 Bankr.Ct.Dec. 6
**(Cite as: 410 B.R. 357)**

not an impactive issue here. Center of main interests ("COMI") is not defined in the Bankruptcy Code or in the Model Law. To aid courts in simple or uncontested cases, Section 1516(c) states that, "[i]n the absence of evidence to the contrary, the debtor's registered office ... is presumed to be the center of the debtor's main interests." 11 U.S.C. § 1516(c); *see also In re Bear Stearns,* 389 B.R. at 335–36 (quoting House Report at 112–13); *c.f.* FED.R.EVID. 301 (explaining that a party's rebuttal of a presumption does not shift the burden of proof; rather, the risk of nonpersuasion remains upon the party on whom it was originally cast). This Court need not and does not reach the determination of GH LP's or GH Ltd.'s COMI.

Moreover, a foreign nonmain proceeding is "a foreign proceeding, other than a foreign main proceeding, pending in a country where the debtor has an establishment." 11 U.S.C. § 1502(5). An "establishment" is "any place of operations where the debtor carries out non-transitory economic activity." § 1502(2). Here, again, this Court need not and does not reach the determination of where GH LP and GH Ltd. have an establishment under § 1502(5).

**\*368** (i) a proceeding;

(ii) that is either judicial or administrative;

(iv) that is in a foreign country;

(v) that is authorized or conducted under a law related to insolvency or the adjustment of debts; and

(vii) which proceeding is for the purpose of reorganization or liquidation.

The Receivers, however, have not met their burden of showing that the Israeli Receivership Proceeding is collective in nature under Section 101(23)(iii). In addition, the Israeli Receivership Proceeding should not be recognized by this Court for two (2) additional reasons as to GH Ltd. and GH LP, and for a third additional reason as to GH LP. The overlapping reasons are: the Receivers were appointed in violation of the automatic stay; and recognition of the petitions would have an adverse effect on public policy, pursuant to Section 1506; further, as to GH LP, the Receivers have not met their burden of showing in the Israeli Receivership Proceeding that GH LP's assets and affairs are subject to the control or supervision of a foreign court.

### The Receivers Were Appointed in Violation of the Automatic Stay

[5] The appointment of the Receivers in Israel was a clear violation of the automatic stay. It is axiomatic that when the Chapter 11 Cases were filed, the automatic stay went into effect. The stay automatically enjoined the continuation of any litigation against GH Ltd. and GH LP, and automatically enjoined continuing lien enforcement against GH Ltd. and GH LP to enforce a prepetition claim against the debtor. 11 U.S.C. § 362(a)(1), (3), (4), (5), and (6).

Moreover, here, FIBI proceeded in the Israeli Receivership Proceeding in spite of and in the face of this Court's Stay Order. FIBI knew and was specifically told that the stay applied to all property of GH Ltd. and GH LP wherever located and by whomever held. It would fly in the face of the Bankruptcy Code for this Court to recognize the petitions here and authorize the post-petition appointed Receivers to proceed in the United States when they were appointed as the result of a knowing and willful violation of the stay by FIBI. Although on January 7, 2009, FIBI did file its Lift Stay Motion seeking, inter alia, relief from stay retroactive to the petition date of the Chapter 11 Cases, retroactive relief has been denied.

As previously noted, the Israeli Court entered the lengthy and thorough October 30 Decision, in

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

410 B.R. 357, 52 Bankr.Ct.Dec. 6
**(Cite as: 410 B.R. 357)**

which it determined that FIBI could proceed in Israel in spite of the automatic stay and this Court's Stay Order. After reviewing the background of the parties and their respective disputes, the Israeli Court first discusses whether the Stay Order had been properly registered in Israel as a foreign judgment under Israeli law. The Israeli Court determined it had not been. The Israeli Court then discussed cases regarding whether it should recognize the Stay Order under principles of comity, and discussed relevant cases on comity and recognition of foreign judgment, such as *In re Nakash,* 190 B.R. 763 (Bankr.S.D.N.Y.1996), and *Sinatra v. Gucci,* 309 B.R. 679 (S.D.N.Y.2004). [08–75237, dkt item 99, Exh. 7 at 12–14]

With respect specifically to the events of the October 6 Hearing, the Israeli Court noted that this Court expressed concern at that hearing as to whether the Israeli **\*369** Court would give effect to the Stay Order. The Israeli Court agreed that it and this Court should provide reciprocity for properly registered United States federal court orders and recognize comity between them. The Israeli Court also noted that, in spite of the broad, worldwide grant of jurisdiction given to United States federal courts over a debtor's assets wherever located, a United States court cannot control the actions of a foreign court, nor can it exercise control over assets in a foreign country without the assistance of the foreign court.

The Israeli Court then noted that GH LP's and GH Ltd.'s center of operations are in Israel, not New York. [08–75237, dkt item 99, Exh. 7 at 26] Ultimately, however, the Israeli Court decided to proceed, noting, in part, that while it had jurisdiction to recognize the Stay Order, "in the present case no process of rehabilitating the respondent [GH Ltd., GH LP, and Lucky Seven] has begun in the court in New York" and that "it is desirable that only one court should control the overall rehabilitation or winding up of the company." [08–75237, dkt item 99, Exh. 7 at 25]

The Israeli Court did not give effect to the in-

stantaneous imposition of the stay, which arises by operation of law and without the need for an order to impose the stay. In essence, the Israeli Court made a decision to lift the automatic stay. Whether this Court would have granted stay relief in October 2008 is an unanswerable question and moot because no one sought such relief.

Further, FIBI continued to prosecute the Israeli Receivership Proceeding even after this Court orally ruled on December 10, 2008, and again by written order on December 12, 2008, that the stay prohibited FIBI's actions in Israel, and that "the automatic stay applied to the Israeli Receivership Proceeding to the extent property of the bankruptcy estate is involved." [08–8301, dkt item 18].

[6][7][8] The United States Court of Appeals for the Second Circuit has previously recognized that actions taken in violation of the stay are void. *See, e.g., 48th Street Steakhouse, Inc. v. Rockefeller Center, Inc., (In re 48th Street Steakhouse, Inc.),* 61 B.R. 182 (Bankr.S.D.N.Y.1986), aff'd, 835 F.2d 427 (2d Cir.1987), *cert. denied,* 485 U.S. 1035, 108 S.Ct. 1596, 99 L.Ed.2d 910 (1988). The purpose of the stay is to give the debtor a breathing spell from litigation and collection activities. Judicial acts and proceedings in violation of the automatic stay are generally void and of no effect. *Interstate Commerce Comm'n v. Holmes Transp., Inc.,* 931 F.2d 984, 988 (1st Cir.1991) (automatic stay nullifies post-petition actions and proceedings against the debtor). "The automatic stay is designed to effect an immediate freeze of the status quo at the outset of the chapter 11 proceedings." *Id.*

Once the Chapter 11 Cases were filed, the Bankruptcy Code contains a number of provisions which FIBI could have invoked prior to proceeding in Israel. FIBI could have requested this Court to determine that the filing of the Chapter 11 Cases was not legitimate, and sought stay relief under Section 362, abstention under Section 305, and/or dismissal or conversion under Section 1112. FIBI failed to do so. However, it is for this Court, with jurisdiction over the Chapter 11 Cases, to decide

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

410 B.R. 357, 52 Bankr.Ct.Dec. 6
**(Cite as: 410 B.R. 357)**

whether and when to grant relief from the stay, but respectfully, not for the Israeli Court to decide to not recognize and apply the stay.

### *The Israeli Receivership Proceeding Is Not "Collective in Nature" and the Affairs of GH Ltd. and GH LP Are Not Subject to the Control of a Foreign Court*

[9] The Israeli Receivership Proceeding is not "collective in nature" and the **\*370** affairs of GH Ltd. and GH LP are not subject to the control of a foreign court. The Israeli Receivership Proceeding does not meet the requirements of being "collective in nature." A proceeding that is "collective in nature" is one that "considers the rights and obligations of all creditors." FN16 *Betcorp,* 400 B.R. at 281 (holding that a voluntary Australian winding-up proceeding was collective in nature because any attempt by a creditor to undermine the orderly, co-operative system that accounted for the rights of all creditors was outlawed); *In re Bd. of Dirs. of Hopewell Int'l Ins., Ltd.,* 275 B.R. 699, 707 (S.D.N.Y.2002) (holding that a "scheme of arrangement" for creditors to estimate and file claims was collective in nature because all creditors had a right to object to the proposed schemes and the court was involved in approving all plans). The *Betcorp* court noted, "This is in contrast, for example, to a receivership remedy instigated at the request, and for the benefit of, a single secured creditor." *Betcorp,* 400 B.R. at 281.

> FN16. The proposition that a foreign proceeding must be for the general benefit of creditors is also embodied in Section 1501, which lists the "fair and efficient administration of cross-border insolvencies that protects the interests of all creditors," among its primary objectives. 11 U.S.C. § 1501(a)(3).

As the *Betcorp* court also noted, a receivership proceeding, as opposed to a "collective" proceeding, is generally regarded as more prejudicial to the creditor body as a whole than federal bankruptcy proceedings. *Id.* at 281.

[10] The Receivers rely on *Bear Stearns* for the proposition that a foreign decision certified by another country is presumptively a recognizable foreign proceeding, and that all requirements within Section 101(23) are thus presumptively met. *See Bear Stearns,* 389 B.R. at 333. However, recognition is not a "rubber stamp exercise," and any such presumption is rebuttable upon the Court's examination of "any and all relevant facts." *Alpha Fund (Master),* 381 B.R. at 44–45; *see also In re Oversight and Control Comm'n of Avanzit, S.A.,* 385 B.R. 525, 532 (Bankr.S.D.N.Y.2008) (holding that the court is not bound by the presumption and is free to make its own determination).

[11] The Israeli Receivership Proceeding is not simply collective in nature. It does not require the Receivers to consider the rights and obligations of all creditors. The proceeding was commenced under the Israeli Companies Ordinance. As GH Ltd. and GH LP contend, the Receivership is more akin to a individual creditor's replevin or repossession action than it is to a reorganization or liquidation by an independent trustee. The Israeli Receivership Proceeding is primarily designed to allow FIBI to collect its debts, and is not a scheme of arrangement or a winding up proceeding, both of which are instituted by a debtor for the purposes of paying off all creditors with court supervision to ensure even-handedness. Although Bankruptcy Code Section 1502 does recognize that a foreign proceeding may be for the purpose of reorganization or liquidation, the proceeding must still be collective in nature.

The Bartov Declaration acknowledges that there is a distinct difference between a "receiver" and a "liquidator" under Israeli law. [08–75237, dkt item 99 ¶ 9] Section 201 of the applicable Israeli law utilized by FIBI to commence the Israeli Receivership Proceeding identifies, *inter alia,* that a "liquidator" and "receiver" under Israeli law serve separate and unique **\*371** functions. Section 201 also elucidates the difference between an enforcement proceeding and an insolvency proceeding. FN17 [08–75237, dkt item 99, Exh. 2] By way of

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

410 B.R. 357, 52 Bankr.Ct.Dec. 6
**(Cite as: 410 B.R. 357)**

further contrast, Israeli law does provide for collective creditor functions under the Israeli Bankruptcy Ordinance, which models some provisions of the Bankruptcy Code. [08–75237, dkt item 99, Exh. 2] However, the Israeli Receivership Proceeding is not proceeding under the Israeli Bankruptcy Ordinance. This conflict is another example of the singular as opposed to collective nature of the Israeli Receivership Proceeding.

> FN17. Notably, Bartov, as a Receiver, may have a difficult time considering the interests of all creditors as he continues to work as a lawyer for FIBI.

The Receivers do not dispute this material difference between the ordinances, and instead rely upon an article from Standard & Poor's Rating Services ("S & P Article") FN18 that merely recites that a receiver generally must act as an officer of the court and thus impliedly owes a duty to all creditors. [dkt item 17] The S & P Article, however, is neither legal authority nor persuasive.

> FN18. Debt Recovery For Creditors and The Law of Insolvency in Israel, Ratings Direct (Standard & Poor's Rating Services) Aug. 20, 2008, at 5.

Further, the Israeli decision appointing the Receivers heavily examines the loan contract of GH LP and GH Ltd. with FIBI in order to determine whether FIBI had the grounds to demand immediate repayment of the debt. The Israeli Court declared that such grounds existed based on the contract of the parties, inaccurate declarations by the borrowers, admissions of insolvency, and changed ownership. [08–75237, dkt item 99, Exh. 1] Thus, the Israeli Receivership Proceeding does not meet the Bankruptcy Code's requirement that a foreign proceeding be "collective in nature." 11 U.S.C. § 101(23).

### *The Israeli Receivership Proceeding Does Not Involve GH LP's Assets and Affairs*

[12][13] The Israeli Receivership Proceeding

does not involve GH LP's assets and affairs. A debtor's assets *and* affairs must be subject to the jurisdiction of a foreign court. 11 U.S.C. § 101(23) (emphasis supplied). Here, while the Israeli Court may have jurisdiction over the assets of GH LP and GH Ltd., the Receivers have not carried their burden of showing that GH LP's affairs are subject to the Israeli Court's jurisdiction. The Receivers have proven that all of GH LP's assets present in Israel, such as gold, silver, receivables, plants, and equipment, are under the control of the Israeli Court in the receivership proceeding. [08–75237, dkt item 99, Exh. 3] There is, however, no proof of the Receivers having been given authority of GH LP's business affairs. Moreover, FIBI conceded at oral argument that the Receivers were not provided with authority over the business affairs of GH LP.

### *The Receivers' Offensive Use of an Automatic Stay Violation Would Be Manifestly Contrary to the Public Policy of the United States*

[14][15] A petition for recognition should be denied if recognition would be manifestly contrary to the public policy of the United States. 11 U.S.C. § 1506. Recognition of the Israeli Receivership Proceeding as a foreign proceeding would be manifestly contrary to the public policy of the United States because such recognition would reward and legitimize FIBI's violation of both the automatic stay and this Court's Orders regarding the stay.

**\*372** [16] While the legislative history of Section 1506 demonstrates that this exception should be applied narrowly, it should be invoked when fundamental policies of the United States are at risk. *See In re Iida,* 377 B.R. 243 (9th Cir. BAP 2007); *In re Atlas Shipping A/S,* 404 B.R. 726 (Bankr.S.D.N.Y.2009); *In re Ernst & Young, Inc.,* 383 B.R. 773, 781 (Bankr.D.Colo.2008) (citing H.R.REP. NO. 109–31 at 109 (2005), *reprinted in* U.S.C.C.A.N. 88, 172).

In opposing the application of Section 1506, the Receivers rely upon *Ernst & Young,* which involved a minimal loss in the distribution that wronged investors would receive by recognizing

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

410 B.R. 357, 52 Bankr.Ct.Dec. 6
**(Cite as: 410 B.R. 357)**

the foreign proceeding. *Ernst & Young,* 383 B.R. at 781. However, *Ernst & Young* does not involve a fundamental policy of the United States. Small increases in costs of liquidation or decreases in recovery are commonplace in bankruptcy matters. *Ernst & Young,* 383 B.R. at 781.

The other case the Receivers rely upon, *In re Ephedra Prods. Liab. Litig.,* 349 B.R. 333, 335–37 (S.D.N.Y.2006), involved the potential inability for United States claimants to have a jury trial in Canada, the country of the foreign proceeding, if a claims resolution procedure ordered by an Ontario, Canada insolvency court was implemented. A Canadian company which had marketed ephedra commenced an insolvency proceeding in Ontario, Canada, and later agreed to a claims procedure, which the Ontario court approved. *Id.* at 333–35. The procedure at issue would allow the Ontario insolvency court to hear and determine, *inter alia,* claims arising from the alleged use of ephedra, which claims were asserted in lawsuits which had been filed in the United States in various state and federal courts. Those lawsuits had been consolidated before the United States District Court in New York. Although the potential right to a trial by jury involved in *Ephedra* certainly concerns a fundamental United States right, as the *Ephedra* court stated, "neither § 1506 nor any other law prevents a United States court from giving recognition and enforcement to a foreign insolvency procedure for liquidating claims simply because the procedure alone does not include a right to jury." *Ephedra,* 349 B.R. at 335. In addition, the United States District Court only approved the Ontario claims resolution procedure after the Ontario court adopted certain procedural changes requested by the United States court "to assure greater clarity and procedural fairness." *Id.* at 334.

Further, jury trials in bankruptcy courts are quite rare and not typically invoked in a claims allowance process. On the other hand, allowing the offensive use of a stay violation here would severely impinge the value and import of the automatic stay. Recognizing a foreign seizure of a debtor's assets postpetition would severely hinder United States bankruptcy courts' abilities to carry out two of the most fundamental policies and purposes of the automatic stay—namely, preventing one creditor from obtaining an advantage over other creditors, and providing for the efficient and orderly distribution of a debtor's assets to all creditors in accordance with their relative priorities.

Moreover, condoning FIBI's conduct here would limit a federal court's jurisdiction over all of the debtors' property "wherever located and by whomever held," as any future creditor could follow FIBI's lead and violate the stay in order to procure assets that were outside the United States, yet still under the United States court's jurisdiction. *See* 28 U.S.C. § 1334(e). Because of the serious ramifications that would ensue in derogation of fundamental United States policies, this **\*373** Court should not recognize the Israeli Receivership Proceeding as a foreign proceeding.

### *Summary of Rulings On the FIBI Motion to Dismiss the Adversary and the FIBI Lift Stay Motion*

At the Ruling Conference, this Court ruled that Debtors have made a prima facie showing that this Court can exercise specific personal jurisdiction over FIBI. That ruling was based in part on FIBI's extensive business contacts with the United States, as well as in part on FIBI's actions in violating the stay having the effect of eviscerating any prospect GH Ltd. and GH LP may have had to successfully reorganize in the United States. Thus, FIBI's Motion to Dismiss the Adversary was denied.

As for the FIBI Lift Stay Motion, this Court did grant prospective stay relief to FIBI, and did abstain from hearing any issues regarding the rights of FIBI and any other creditors with respect to property of any of the Debtors located in the State of Israel. The evidence before this Court demonstrates that FIBI's collateral is worth far less than the debts owed by GH Ltd. and GH LP. In addition, GH Ltd. and GH LP do not own the plant in Israel from which they operated, and that facility is being fore-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

410 B.R. 357, 52 Bankr.Ct.Dec. 6
**(Cite as: 410 B.R. 357)**

closed or sold to satisfy debts owed to FIBI by the owner of that facility. These cases are now liquidating chapter 11 cases, not candidates for reorganization. This Court also recognizes, under principles of both comity and practicality, that the most efficient and most sensible cross-national use of judicial and parties' resources is to have the Israeli Court decide what the debtor-creditor relationships are as between FIBI, GH Ltd. and GH LP, and how to effectuate each parties' rights and remedies, particularly given the choice of law provisions in the parties' agreements, the situs of FIBI and GH Ltd. being in Israel, and most of the relevant assets being located in Israel.[FN19]

> FN19. Even if recognition were granted for these Chapter 15 Cases, § 1520 only makes §§ 361 and 362 applicable with respect to the debtor and property of the debtor within the United States. *Atlas,* 404 B.R. at 739. The full automatic stay, however, was already in effect as to all assets of GH Ltd. and GH LP wherever located. Further, granting recognition would presumably leave FIBI to consider itself free to continue to violate the stay in Israel and elsewhere outside the United States.

### *Conclusion*

The Receivers have failed to satisfy their burden of proof that the Israeli Receivership Proceeding meets all of the requirements of a foreign proceeding within the definition of Section 101(23) of the Bankruptcy Code. Furthermore, the Israeli Receivership Proceeding was continued by FIBI in violation of both the automatic stay and Orders of this Court reinforcing that stay. Recognition of such a proceeding would harm the United States's ability to carry out fundamental bankruptcy and jurisdictional policies. Therefore, this Court denies the Receivers' Petitions for Recognition of the Israeli Receivership Proceeding as a foreign proceeding under Chapter 15 of the Bankruptcy Code. This Court will issue separate Orders hereon.

Bkrtcy.E.D.N.Y.,2009.

In re Gold & Honey, Ltd.
410 B.R. 357, 52 Bankr.Ct.Dec. 6

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Tab 36

(Slip Opinion)          OCTOBER  TERM,  2023          1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## HARRINGTON, UNITED STATES TRUSTEE, REGION 2 *v*. PURDUE PHARMA L. P. ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 23–124.   Argued December 4, 2023—Decided June 27, 2024

Between 1999 and 2019, approximately 247,000 people in the United States died from prescription-opioid overdoses.  Respondent Purdue Pharma sits at the center of that crisis.  Owned and controlled by the Sackler family, Purdue began marketing OxyContin, an opioid prescription pain reliever, in the mid-1990s.  After Purdue earned billions of dollars in sales on the drug, in 2007 one of its affiliates pleaded guilty to a federal felony for misbranding OxyContin as a less-addictive, less-abusable alternative to other pain medications.  Thousands of lawsuits followed.  Fearful that the litigation would eventually impact them directly, the Sacklers initiated a "milking program," withdrawing from Purdue approximately $11 billion—roughly 75% of the firm's total assets—over the next decade.

Those withdrawals left Purdue in a significantly weakened financial state.  And in 2019, Purdue filed for Chapter 11 bankruptcy.  During that process, the Sacklers proposed to return approximately $4.3 billion to Purdue's bankruptcy estate.  In exchange, the Sacklers sought a judicial order releasing the family from all opioid-related claims and enjoining victims from bringing such claims against them in the future.  The bankruptcy court approved Purdue's proposed reorganization plan, including its provisions concerning the Sackler discharge.  But the district court vacated that decision, holding that nothing in the law authorizes bankruptcy courts to extinguish claims against third parties like the Sacklers, without the claimants' consent.  A divided panel of the Second Circuit reversed the district court and revived the bankruptcy court's order approving a modified reorganization plan.

*Held*: The bankruptcy code does not authorize a release and injunction

2          HARRINGTON *v.* PURDUE PHARMA L. P.

Syllabus

that, as part of a plan of reorganization under Chapter 11, effectively seek to discharge claims against a nondebtor without the consent of affected claimants. Pp. 7–19.

    (a) When a debtor files for bankruptcy, it "creates an estate" that includes virtually all the debtor's assets. 11 U. S. C. §541(a). Under Chapter 11, the debtor must develop a reorganization plan governing the distribution of the estate's assets and present it to the bankruptcy court for approval. §§1121, 1123, 1129, 1141. A bankruptcy court's order confirming a reorganization plan "discharges the debtor" of certain pre-petition debts. §1141(d)(1)(A). In this case, the Sacklers have not filed for bankruptcy or placed all their assets on the table for distribution to creditors, yet they seek what essentially amounts to a discharge. No provision of the code authorizes that kind of relief. Pp. 7–17.

        (1) Section 1123(b) addresses the kinds of provisions that may be included in a Chapter 11 plan. That section contains five specific paragraphs, followed by a catchall provision. The first five paragraphs all concern the debtor's rights and responsibilities, as well as its relationship with its creditors. The catchall provides that a plan "may" also "include any other appropriate provision not inconsistent with the applicable provisions of this title." All agree that the first five paragraphs do not authorize the Sackler discharge. But, according to the plan proponents and the Second Circuit, paragraph (6) broadly permits any term not expressly forbidden by the code so long as a judge deems it "appropriate." Because provisions like the Sackler discharge are not expressly prohibited, they reason, paragraph (6) necessarily permits them. That is not correct. When faced with a catchall phrase like paragraph (6), courts do not necessarily afford it the broadest possible construction it can bear. *Epic Systems Corp.* v. *Lewis*, 584 U. S. 497, 512. Instead, we generally appreciate that the catchall must be interpreted in light of its surrounding context and read to "embrace only objects similar in nature" to the specific examples preceding it. *Ibid.* Here, each of the preceding paragraphs concerns the rights and responsibilities of the debtor; and they authorize a bankruptcy court to adjust claims without consent only to the extent such claims concern the debtor. While paragraph (6) doubtlessly confers additional authorities on a bankruptcy court, it cannot be read under the canon of *ejusdem generis* to endow a bankruptcy court with the "radically different" power to discharge the debts of a nondebtor without the consent of affected claimants. *Epic Systems Corp.*, 584 U. S., at 513. And while the dissent reaches a contrary conclusion, it does so only by elevating its view of the bankruptcy code's purported purpose over the text's clear focus on the debtor. Pp. 7–13.

Cite as: 603 U. S. ____ (2024)          3

Syllabus

(2) The code's statutory scheme further forecloses the Sackler discharge. The code generally reserves discharge for a debtor who places substantially all of their assets on the table. §1141(d)(1)(A); see also §541(a). And, ordinarily, it does not include claims based on "fraud" or those alleging "willful and malicious injury." §§523(a)(2), (4), (6). The Sackler discharge defies these limitations. The Sacklers have not filed for bankruptcy, nor have they placed virtually all their assets on the table for distribution to creditors. Yet, they seek an order discharging a broad sweep of present and future claims against them, including ones for fraud and willful injury. In all of these ways, the Sacklers seek to pay less than the code ordinarily requires and receive more than it normally permits. Contrary to the dissent's suggestion, plan proponents cannot evade these limitations simply by rebranding their discharge a "release." Pp. 13–16.

(3) History offers a final strike against the plan proponents' construction of §1123(b)(6). Pre-code practice, we have said, may sometimes inform the meaning of the code's more "ambiguous" provisions. *RadLAX Gateway Hotel, LLC* v. *Amalgamated Bank*, 566 U. S. 639, 649. And every bankruptcy law cited by the parties and their *amici*— from 1800 until the enactment of the present bankruptcy code in 1978—generally reserved the benefits of discharge to the debtor who offered a "fair and full surrender of [its] property." *Sturges* v. *Crowninshield*, 4 Wheat. 122, 176. Had Congress meant to reshape traditional practice so profoundly in the present bankruptcy code, extending to courts the capacious new power the plan proponents claim, one might have expected it to say so expressly "somewhere in the [c]ode itself." *Dewsnup* v. *Timm*, 502 U. S. 410, 420. Pp. 16–17.

(b) In the end, the plan proponents default to policy. The Sacklers, they say, will not return any funds to Purdue's estate unless the bankruptcy court grants them the sweeping nonconsensual release and injunction they seek. Without the Sackler discharge, they predict, victims will be left without any means of recovery. But the U. S. Trustee disagrees. As he tells it, the potentially massive liability the Sacklers face may induce them to negotiate for *consensual* releases on terms more favorable to all the claimants. In addition, the Trustee warns, a ruling for the Sacklers would provide a roadmap for tortfeasors to misuse the bankruptcy system in future cases. While both sides may have their points, this Court is the wrong audience for such policy disputes. Our only proper task is to interpret and apply the law; and nothing in present law authorizes the Sackler discharge. Pp. 17–19.

(c) Today's decision is a narrow one. Nothing in the opinion should be construed to call into question consensual third-party releases offered in connection with a bankruptcy reorganization plan. Nor does the Court express a view on what qualifies as a consensual release or

3292

4          HARRINGTON *v.* PURDUE PHARMA L. P.

Syllabus

pass upon a plan that provides for the full satisfaction of claims
against a third-party nondebtor.  Additionally, because this case in-
volves only a stayed reorganization plan, the Court does not address
whether its reading of the bankruptcy code would justify unwinding
reorganization plans that have already become effective and been sub-
stantially consummated.  Confining ourselves to the question pre-
sented, the Court holds only that the bankruptcy code does not author-
ize a release and injunction that, as part of a plan of reorganization
under Chapter 11, effectively seeks to discharge claims against a non-
debtor without the consent of affected claimants.  Because the Second
Circuit held otherwise, its judgment is reversed and the case is re-
manded for further proceedings consistent with this opinion.  P. 19.

69 F. 4th 45, reversed and remanded.

GORSUCH, J., delivered the opinion of the Court, in which THOMAS,
ALITO, BARRETT, and JACKSON, JJ., joined.  KAVANAUGH, J., filed a dis-
senting opinion, in which ROBERTS, C. J., and SOTOMAYOR and KAGAN,
JJ., joined.

Cite as: 603 U. S. ____ (2024)          1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the
United States Reports. Readers are requested to notify the Reporter of
Decisions, Supreme Court of the United States, Washington, D. C. 20543,
pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

No. 23–124

## WILLIAM K. HARRINGTON, UNITED STATES TRUSTEE, REGION 2, PETITIONER *v.* PURDUE PHARMA L. P., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[June 27, 2024]

JUSTICE GORSUCH delivered the opinion of the Court.

The bankruptcy code contains hundreds of interlocking rules about "'the relations between'" a "'debtor and [its] creditors.'" *Wright* v. *Union Central Life Ins. Co.*, 304 U. S. 502, 513–514 (1938). But beneath that complexity lies a simple bargain: A debtor can win a discharge of its debts if it proceeds with honesty and places virtually all its assets on the table for its creditors. The debtor in this case, Purdue Pharma L. P., filed for bankruptcy after facing a wave of litigation for its role in the opioid epidemic. Purdue's long-time owners, members of the Sackler family, confronted a growing number of suits too. But instead of declaring bankruptcy, they chose a different path. From the court overseeing Purdue's bankruptcy, they sought and won an order extinguishing vast numbers of existing and potential claims against them. They obtained all this without securing the consent of those affected or placing anything approaching their total assets on the table for their creditors. The question we face is whether the bankruptcy code authorizes a court to issue an order like that.

3294

2    HARRINGTON *v.* PURDUE PHARMA L. P.

## I

### A

The opioid epidemic represents "one of the largest public health crises in this nation's history." *In re Purdue Pharma L. P.*, 69 F. 4th 45, 56 (CA2 2023). Between 1999 and 2019, approximately 247,000 people in the United States died from prescription-opioid overdoses. *In re Purdue Pharma L. P.*, 635 B. R. 26, 44 (SDNY 2021). The U. S. Department of Health and Human Services estimates that the opioid epidemic has cost the country between $53 and $72 billion annually. *Ibid.*

Purdue sits at the center of these events. In the mid-1990s, it began marketing OxyContin, an opioid prescription pain reliever. 69 F. 4th, at 56. Because of the addictive quality of opioids, doctors had traditionally reserved their use for cancer patients and those "with chronic diseases." 635 B. R., at 42. But OxyContin, Purdue claimed, had a novel "time-release" formula that greatly diminished the threat of addiction. *Ibid.* On that basis, Purdue marketed OxyContin for use in "'a much broader range'" of applications, including as a "'first-line therapy for the treatment of arthritis.'" *Ibid.*

Purdue was a "'family company,'" owned and controlled by the Sacklers. *Id.*, at 40. Members of the Sackler family served as president and chief executive officer; they dominated the board of directors; and they "were heavily involved" in the firm's marketing strategies. 69 F. 4th, at 86 (Wesley, J., concurring in judgment). They "pushed sales targets," too, and "accompanied sales representatives on 'ride along' visits to health care providers" in an effort to maximize OxyContin sales. 635 B. R., at 50.

Quickly, OxyContin became "'the most prescribed brand-name narcotic medication'" in the United States. *Id.*, at 43. Between 1996 and 2019, "Purdue generated approximately $34 billion in revenue . . . , most of which came from Oxy-Contin sales." *Id.*, at 39. The company's success propelled

Opinion of the Court

the Sacklers onto lists "of the top twenty wealthiest families in America," with an estimated net worth of $14 billion. *Id.*, at 40.

Eventually, however, the firm came under scrutiny. In 2007, a Purdue affiliate pleaded guilty to a federal felony for misbranding OxyContin as "'less addictive'" and "'less subject to abuse . . . than other pain medications.'" *Id.*, at 48. Thousands of civil lawsuits followed as individuals, families, and governments within and outside the United States sought damages from Purdue and the Sacklers for injuries allegedly caused by their deceptive marketing practices. 69 F. 4th, at 60.

Appreciating this litigation "would eventually impact them directly," *id.*, at 59, the Sacklers began what one family member described as a "'milking' program," 635 B. R., at 57. In the years before the 2007 plea agreement, Purdue's distributions to the Sacklers represented less than 15% of its annual revenue. *Ibid.* After the plea agreement, the Sacklers began taking as much as 70% of the company's revenue each year. *Ibid.* Between 2008 and 2016, the family's distributions totaled approximately $11 billion, draining Purdue's total assets by 75% and leaving it in "a significantly weakened financial" state. 69 F. 4th, at 59. The Sacklers diverted much of that money to overseas trusts and family-owned companies. 635 B. R., at 71.

B

In 2019, Purdue filed for Chapter 11 bankruptcy. Members of the Sackler family saw in that development an opportunity "to get [their own] goals accomplished." *In re Purdue Pharma L. P.*, No. 19–23649 (Bkrtcy. Ct. SDNY, Aug. 18, 2021), ECF Doc. 3599, p. 35 (testimony of David Sackler). They proposed to return to Purdue's bankruptcy estate $4.325 billion of the $11 billion they had withdrawn from the company in recent years. 69 F. 4th, at 61. But they offered to do so only through payments spread out over a

4          HARRINGTON *v.* PURDUE PHARMA L. P.

Opinion of the Court

decade. *Id.*, at 60. And, in return, they sought the estate's agreement on, and a judicial order addressing, two matters. First, the Sacklers wanted to extinguish any claims the estate might have against family members, including for fraudulently transferring funds from Purdue in the years preceding its bankruptcy. *In re Purdue Pharma L. P.*, 633 B. R. 53, 83–84 (Bkrtcy. Ct. SDNY 2021). Second, the Sacklers wanted to end the growing number of lawsuits against them brought by opioid victims (the Sackler discharge). *Ibid.*

The Sackler discharge they proposed comprised a release and an injunction. The release sought to void not just current opioid-related claims against the family, but future ones as well. It sought to ban not just claims by creditors participating in the bankruptcy proceeding, but claims by anyone who might otherwise sue Purdue. It sought to extinguish not only claims for negligence, but also claims for fraud and willful misconduct. 1 App. 193. And it proposed to end all these lawsuits without the consent of the opioid victims who brought them. To enforce this release, the Sacklers sought an injunction "forever stay[ing], restrain[ing,] and enjoin[ing]" claims against them. *Id.*, at 279. That injunction would not just prevent suits against the company's officers and directors but would run in favor of hundreds, if not thousands, of Sackler family members and entities under their control. *Id.*, at 117–190.

Purdue agreed to these terms and included them in the reorganization plan it presented to the bankruptcy court for approval. In that plan, Purdue further proposed to reorganize as a "public benefit" company dedicated primarily to opioid education and abatement efforts. 633 B. R., at 74. As for individual victims harmed by the company's products, Purdue offered, with help from the Sacklers' anticipated contribution, to provide payments from a base amount of $3,500 up to a ceiling of $48,000 (for the most dire cases, and all before deductions for attorney's fees and

Opinion of the Court

other expenses).  See 1 App. 557–559, 573–585; 6 App. in No. 22–110 etc. (CA2), p. 1697.  For those receiving more than the base amount, payments would come in installments spread over as many as 10 years.  7 *id.*, at 1805, 1812.

Creditors were polled on the proposed plan.  Though most who returned ballots supported it, fewer than 20% of eligible creditors participated.  21 *id.*, at 6253, 6258.  Thousands of opioid victims voted against the plan too, and many pleaded with the bankruptcy court not to wipe out their claims against the Sacklers without their consent.  635 B. R., at 35.  "Our system of justice," they wrote, "demands that the allegations against the Sackler family be fully and fairly litigated in a public and open trial, that they be judged by an impartial jury, and that they be held accountable to those they have harmed."  *In re Purdue Pharma L. P.*, No. 7:21–cv–07532 (SDNY, Oct. 25, 2021), ECF Doc. 94, p. 21 (internal quotation marks omitted).  The U. S. Trustee, charged with promoting the integrity of the bankruptcy system for all stakeholders, joined in these objections.  So did eight States, the District of Columbia, the city of Seattle, and various Canadian municipalities and Tribes, each of which sought to pursue its own claims against the Sacklers.  635 B. R., at 35.

C

The bankruptcy court rejected the objectors' arguments and entered an order confirming the plan, including its provisions related to the Sackler discharge.  633 B. R., at 95–115.  Soon, however, the district court vacated that decision.  Nothing in the law, that court held, authorized the bankruptcy court to extinguish claims against the Sacklers without the consent of the opioid victims who brought them.  635 B. R., at 115.

After that setback, plan proponents, including Purdue, members of the Sackler family, and various creditors, ap-

6                       HARRINGTON *v.* PURDUE PHARMA L. P.

Opinion of the Court

pealed to the Second Circuit.  While their appeal was pend-
ing, they also floated a new proposal.  Now, they said, the
Sacklers were willing to contribute an additional $1.175 to
$1.675 billion to Purdue's estate if the eight objecting States
and the District of Columbia would withdraw their objec-
tions to the firm's reorganization plan.  69 F. 4th, at 67.  The
Sacklers' proposed contribution still fell well short of the
$11 billion they received from the company between 2008
and 2016.  Nor did it begin to reflect the earnings the Sack-
lers have enjoyed from that sum over time.  And the pro-
posed contribution would still come in installments spread
over many years.  But the new proposal was enough to per-
suade the States and the District of Columbia to drop their
objections to the plan, even as a number of individual vic-
tims, the Canadian creditors, and the U. S. Trustee per-
sisted in theirs.

Ultimately, a divided panel of the Second Circuit re-
versed the district court and revived the bankruptcy court's
order approving the estate's (now-modified) reorganization
plan.  Writing separately, Judge Wesley acknowledged that
a bankruptcy court enjoys broad authority to modify debtor-
creditor relations.  But, he argued, nothing in the bank-
ruptcy code grants a bankruptcy court the "extraordinary"
power to release and enjoin claims against a third party
without the consent of the affected claimants.  *Id.*, at 89
(opinion concurring in judgment).  The majority's contrary
view, he added, "pin[ned the Second] Circuit firmly on one
side of a weighty issue that, for too long, has split the courts
of appeals."  *Id.*, at 90.

After the Second Circuit ruled, the U. S. Trustee filed an
application with this Court to stay its decision.  We granted
the application and, treating it as a petition for a writ of
certiorari, agreed to take this case to resolve the circuit split
Judge Wesley highlighted.  600 U. S. ___ (2023).[1]

_____

[1] For examples of decisions on both sides of the split, compare *In re*

Opinion of the Court

## II

The plan proponents and U. S. Trustee agree on certain foundational points.  When a debtor files for bankruptcy, it "creates an estate" that includes virtually all the debtor's assets.  11 U. S. C. §541(a).  Under Chapter 11, the debtor can work with its creditors to develop a reorganization plan governing the distribution of the estate's assets; it must then present that plan to the bankruptcy court and win its approval.  §§1121, 1123, 1129, 1141.  Once the bankruptcy court issues an order confirming the plan, that document binds the debtor and its creditors going forward—even those who did not assent to the plan.  §1141(a).

Most relevant here, a bankruptcy court's order confirming a plan "discharges the debtor from any debt that arose before the date of such confirmation," except as provided in the plan, the confirmation order, or the code.  §1141(d)(1)(A).  That discharge not only releases or "void[s] any past or future judgments on the" discharged debt; it also "operat[es] as an injunction . . . prohibit[ing] creditors from attempting to collect or to recover the debt." *Tennessee Student Assistance Corporation* v. *Hood*, 541 U. S. 440, 447 (2004) (citing §§524(a)(1), (2)).  Generally, however, a discharge operates only for the benefit of the debtor against its creditors and "does not affect the liability of any other entity." §524(e).

The Sacklers have not filed for bankruptcy and have not placed virtually all their assets on the table for distribution to creditors, yet they seek what essentially amounts to a

---

*Pacific Lumber Co.*, 584 F. 3d 229 (CA5 2009); *In re Lowenschuss*, 67 F. 3d 1394 (CA9 1995); *In re Western Real Estate Fund, Inc.*, 922 F. 2d 592 (CA10 1990), with *In re Millennium Lab Holdings II, LLC*, 945 F. 3d 126 (CA3 2019); *In re Seaside Engineering & Surveying, Inc.*, 780 F. 3d 1070 (CA11 2015); *In re Airadigm Communications, Inc.*, 519 F. 3d 640 (CA7 2008); *In re Dow Corning Corp.*, 280 F. 3d 648 (CA6 2002); *In re A. H. Robins Co.*, 880 F. 2d 694 (CA4 1989).

8        HARRINGTON *v.* PURDUE PHARMA L. P.

Opinion of the Court

discharge. They hope to win a judicial order releasing pending claims against them brought by opioid victims. They seek an injunction "permanently and forever" foreclosing similar suits in the future. 1 App. 279. And they seek all this without the consent of those affected. The question we face thus boils down to whether a court in bankruptcy may effectively extend to *nondebtors* the benefits of a Chapter 11 discharge usually reserved for *debtors*.

### A

For an answer, we turn to §1123. It addresses the "[c]ontents"—or terms—of the bankruptcy reorganization plan a debtor presents and a court approves in Chapter 11 proceedings. Some plan terms are mandatory, §1123(a); others are optional, §1123(b). No one suggests that anything like the Sackler discharge *must* be included in a debtor's reorganization plan. Instead, plan proponents contend, it is a provision a debtor *may* include and a court *may* approve in a reorganization plan.

Section 1123(b) governs that question. It directs that a plan "may":

> "(1) impair or leave unimpaired any class of claims, secured or unsecured, or of interests;
>
> "(2) . . . provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected under [§365];
>
> "(3) provide for—
>
> "(A) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or
>
> "(B) the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest;
>
> "(4) provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests;

3301

Opinion of the Court

"(5) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims; and

"(6) include any other appropriate provision not inconsistent with the applicable provisions of this title."

We can easily rule out the first five of these paragraphs as potential sources of legal authority for the Sackler discharge. They permit a plan to address claims and property belonging to a debtor or its estate. §§1123(b)(2), (3), (4). They permit a plan to modify the rights of creditors who hold claims against the debtor or its estate. §§1123(b)(1), (5). But nothing in those paragraphs authorizes a plan to extinguish claims against third parties, like the Sacklers, without the consent of the affected claimants, like the opioid victims. If authority for the Sackler discharge can be found anywhere, it must be found in paragraph (6). That is the paragraph on which the Second Circuit primarily rested its decision below, and it is the one on which plan proponents pin their case here.[2]

As the plan proponents see it, paragraph (6) allows a

---

[2] The Sacklers suggest that, if 11 U. S. C. §1123(b) does not permit a bankruptcy court to release and enjoin claims against a nondebtor without the affected claimants' consent, §105(a) does. See Brief for Mortimer-Side Initial Covered Respondents 19 (Brief for Sackler Family). That provision allows a bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the bankruptcy code. §105(a). As the Second Circuit recognized, however, "§105(a) alone cannot justify" the imposition of nonconsensual third-party releases because it serves only to "'carry out'" authorities expressly conferred elsewhere in the code.  69 F. 4th 45, 73 (2023) (quoting §105(a)); see also 2 R. Levin & H. Sommer, Collier on Bankruptcy ¶105.01[1], p. 105–6 (16th ed. 2023).  Purdue concedes this point, Brief for Debtor Respondents 19, n. 5 (Brief for Purdue), as do several other plan proponents, see, *e.g.*, Brief for Respondent Ad Hoc Committee 29. Necessarily, then, our focus trains on §1123(b)(6).

Opinion of the Court

debtor to include in its plan, and a court to order, *any* term not "expressly forbid[den]" by the bankruptcy code as long as a bankruptcy judge deems it "appropriate" and consistent with the broad "purpose[s]" of bankruptcy. 69 F. 4th, at 73–74; *post*, at 41–42 (KAVANAUGH, J., dissenting). And because the code does not expressly forbid a nonconsensual nondebtor discharge, the reasoning goes, the bankruptcy court was free to authorize one here after finding it an "appropriate" provision. See Brief for Sackler Family 19–21; Brief for Purdue 20; *post*, at 13–15.

This understanding of the statute faces an immediate obstacle. Paragraph (6) is a catchall phrase tacked on at the end of a long and detailed list of specific directions. When faced with a catchall phrase like that, courts do not necessarily afford it the broadest possible construction it can bear. *Epic Systems Corp.* v. *Lewis*, 584 U. S. 497, 512 (2018). Instead, we generally appreciate that the catchall must be interpreted in light of its surrounding context and read to "embrace only objects similar in nature" to the specific examples preceding it. *Ibid.* (internal quotation marks omitted). So, for example, when a statute sets out a list discussing "cars, trucks, motorcycles, or any other vehicles," we appreciate that the catchall phrase may reach similar landbound vehicles (perhaps including buses and camper vans), but it does not reach dissimilar "vehicles" (such as airplanes and submarines). See *McBoyle* v. *United States*, 283 U. S. 25, 26–27 (1931). This ancient interpretive principle, sometimes called the *ejusdem generis* canon, seeks to afford a statute the scope a reasonable reader would attribute to it.

Viewed with that much in mind, we do not think paragraph (6) affords a bankruptcy court the authority the plan proponents suppose. In some circumstances, it may be difficult to discern what a statute's specific listed items share in common. See A. Scalia & B. Garner, Reading Law 207–

Opinion of the Court

208 (2012).  But here an obvious link exists:  When Congress authorized "appropriate" plan provisions in paragraph (6), it did so only after enumerating five specific sorts of provisions, all of which concern *the debtor*—its rights and responsibilities, and its relationship with its creditors. Doubtless, paragraph (6) operates to confer additional authorities on a bankruptcy court.  See *United States* v. *Energy Resources Co.*, 495 U. S. 545, 549 (1990).  But the catchall cannot be fairly read to endow a bankruptcy court with the "radically different" power to discharge the debts of a nondebtor without the consent of affected nondebtor claimants.  *Epic Systems Corp.*, 584 U. S., at 513; see also *RadLAX Gateway Hotel, LLC* v. *Amalgamated Bank*, 566 U. S. 639, 645–647 (2012).

The catchall's text underscores the point.  Congress could have said in paragraph (6) that "everything not expressly prohibited is permitted."  But it didn't.  Instead, Congress set out a detailed list of powers, followed by a catchall that it qualified with the term "appropriate."  That quintessentially "context dependent" term often draws its meaning from surrounding provisions.  *Sossamon* v. *Texas*, 563 U. S. 277, 286 (2011).  And we know to look to the statute's preceding specific paragraphs as the relevant "context" here because paragraph (6) tells us so.  It permits "any *other* appropriate provision"—that is, "other" than the provisions already discussed in paragraphs (1) through (5).  (Emphasis added.)  Each of those "other" paragraphs authorizes a bankruptcy court to adjust claims without consent only to the extent such claims concern the debtor.  From this, it follows naturally that an "appropriate provision" adopted pursuant to the catchall that purports to extinguish claims without consent should be similarly constrained.  See, *e.g.*, *Epic Systems Corp.*, 584 U. S., at 512–513.

For its part, the dissent does not dispute that the *ejusdem generis* canon applies to §1123(b)(6).  *Post*, at 33–34; see also Brief for Sackler Family 44; Brief for Purdue 23.  But

12          HARRINGTON *v.* PURDUE PHARMA L. P.

Opinion of the Court

it disagrees with our application of the canon for two reasons. First, the dissent claims, it "is factually incorrect" to suggest that all the provisions of §1123(b) concern the debtor's rights and responsibilities. *Post*, at 35. The dissent points out that a bankruptcy estate may settle creditors' "derivative claims" against nondebtors under paragraph (3). *Post*, at 36. And this "indisputable point," the dissent declares, "defeats the Court's conclusion that §1123(b)'s provisions relate only to the debtor and do not allow releases of claims that victims and creditors hold against nondebtors." *Post*, at 37; see Brief for Purdue 24–25.

But that argument contains a glaring flaw. The dissent neglects *why* a bankruptcy court may resolve derivate claims under paragraph (3): It may because those claims belong to the debtor's estate. See, *e.g.*, *In re Ontos, Inc.*, 478 F. 3d 427, 433 (CA1 2007). In a derivative action, the named plaintiff "is only a nominal plaintiff. The substantive claim belongs to the corporation." 2 J. Macey, Corporation Laws §13.20[D], p. 13–140 (2020–4 Supp.). And no one questions that Purdue may address in its own bankruptcy plan claims "wherever located and by whomever held," §541(a)—including those claims derivatively asserted by another on its behalf, see §1123(b)(3). The problem is, the Sackler discharge is nothing like that. Rather than seek to resolve claims that substantively belong to Purdue, it seeks to extinguish claims against the Sacklers that belong to their victims. And precisely nothing in §1123(b) suggests those claims can be bargained away without the consent of those affected, as if the claims were somehow Purdue's own property.[3]

––––––––––

[3] In an effort to blur this distinction, the dissent points out that the Sackler discharge covers claims for which Purdue's conduct is a "legally relevant factor." *Post*, at 34–35 (quoting 69 F. 4th, at 80). But that does not alter the fact that the Sackler discharge would extinguish *the victims*' claims against *the Sacklers*. Those claims neither belong to Purdue nor are they asserted against Purdue or its estate. The dissent disregards

3305

Cite as: 603 U. S. ____ (2024)           13

Opinion of the Court

Having come up short on the text of §1123(b), the dissent pivots to the statute's purpose. *Post*, at 35. As the dissent sees it, our application of the *ejusdem generis* canon should focus less on the provisions preceding the catchall and more on the overall "purpose of bankruptcy law" in solving "collective-action problem[s]." *Post*, at 5, 35–36; see also Brief for Purdue 21. But there is an obvious difficulty with this approach, too. As this Court has long recognized, "[n]o statute pursues a single policy at all costs." *Bartenwerfer* v. *Buckley*, 598 U. S. 69, 81 (2023). Always, the question we face is *how far* Congress has gone in pursuing one policy or another. See *ibid.* So, yes, bankruptcy law may serve to address some collective-action problems, but no one (save perhaps the dissent) thinks it provides a bankruptcy court with a roving commission to resolve all such problems that happen its way, blind to the role other mechanisms (legislation, class actions, multi-district litigation, consensual settlements, among others) play in addressing them. And here, the five paragraphs that precede the catchall tell us that bankruptcy courts may have many powers, including the power to address certain collective-action problems when they implicate the debtor's rights and responsibilities. But those directions also indicate that a bankruptcy court's powers are not limitless and do not endow it with the power to extinguish without their consent claims held by nondebtors (here, the opioid victims) against other nondebtors (here, the Sacklers).[4]

—————

these elemental distinctions. See, *e.g.*, *post*, at 49 (conflating the estate's power to settle its own fraudulent transfer claims against the Sacklers with the power to extinguish those of the victims against the Sacklers).

[4] The dissent characterizes our analysis of paragraph (6) as "breez[y]," as if the analysis would be correct if only it were belabored. *Post*, at 34. And yet it is the dissent that relegates the text of the relevant statute, §1123(b), to a pair of footnotes bookending a 25-page exposition on collective-action problems and public policy, one that precedes any effort to engage with our statutory analysis. See *post*, at 7, n. 1, 32, n. 5.

14          HARRINGTON *v.* PURDUE PHARMA L. P.

B

When resolving a dispute about a statute's meaning, we sometimes look for guidance not just in its immediate terms but in related provisions as well. See, *e.g.*, *Turkiye Halk Bankasi A. S.* v. *United States*, 598 U. S. 264, 275 (2023). Paragraph (6) itself alludes to this fact by instructing that any plan term adopted under its auspices must not be "inconsistent with the applicable provisions of" the bankruptcy code. Following that direction and looking to Chapter 11 more broadly, we find at least three further reasons why §1123(b)(6) cannot bear the interpretation the plan proponents and the dissent would have us give it.

First, consider what is and who can earn a discharge. As we have seen, a discharge releases the debtor from its debts and enjoins future efforts to collect them—even by those who do not assent to the debtor's reorganization plan. §§524(a)(1)–(2), 1129(b)(1), 1141(a). Generally, too, the bankruptcy code reserves this benefit to "the debtor"—the entity that files for bankruptcy. §1141(d)(1)(A); accord, §524(e); see also §§727(a)–(b). The plan proponents and the dissent's reading of §1123(b)(6) would defy these rules by effectively affording to a nondebtor a discharge usually reserved for the debtor alone.

Second, notice how the code constrains the debtor. To win a discharge, again as we have seen, the code generally requires the debtor to come forward with virtually all its assets. §§541(a)(1), 548. Nor is the discharge a debtor receives unbounded. It does not reach claims based on "fraud" or those alleging "willful and malicious injury." §§523(a)(2), (4), (6). And it cannot "affect any right to trial by jury" a creditor may have "with regard to a personal injury or wrongful death tort claim." 28 U. S. C. §1411(a). The plan proponents and the dissent's reading of §1123(b)(6) transgresses all these limits too. The Sacklers have not agreed to place anything approaching their full assets on the table for opioid victims. Yet they seek a judicial order that would

Opinion of the Court

extinguish virtually all claims against them for fraud, willful injury, and even wrongful death, all without the consent of those who have brought and seek to bring such claims. In each of these ways, the Sacklers seek to pay less than the code ordinarily requires and receive more than it normally permits.

Finally, there is a notable exception to the code's general rules. For asbestos-related bankruptcies—and only for such bankruptcies—Congress has provided that, "[n]otwithstanding" the usual rule that a debtor's discharge does not affect the liabilities of others on that same debt, §524(e), courts may issue "an injunction . . . bar[ring] any action directed against a third party" under certain statutorily specified circumstances. §524(g)(4)(A)(ii). That the code *does* authorize courts to enjoin claims against third parties without their consent, but does so in only *one* context, makes it all the more unlikely that §1123(b)(6) is best read to afford courts that same authority in *every* context. See, *e.g.*, *Bittner* v. *United States*, 598 U. S. 85, 94 (2023); *AMG Capital Management, LLC* v. *FTC*, 593 U. S. 67, 77 (2021).[5]

How do the plan proponents and the dissent reply to all this? Essentially, they ask us to look the other way. Whatever limits the code imposes on debtors and discharges mean nothing, they say, because the Sacklers seek a "release," not a "discharge." See, *e.g.*, *post*, at 46–48. But word

—————

[5] The dissent claims that, in making this observation, we defy §524(g)'s directive that "[n]othing in [it], or in the amendments made by [its addition to the bankruptcy code], shall be construed to modify, impair, or supersede any other authority the court has to issue injunctions in connection with an order confirming a plan of reorganization." 108 Stat. 4117, note following 11 U. S. C. §524; see *post*, at 44–45. That charge misunderstands the point. We do not read §524(g) to "impair" or "modify" authority previously available to courts in bankruptcy. To the contrary, we simply understand §524(g) to illustrate how Congress might proceed if it intended to confer upon bankruptcy courts a novel and extraordinary power to extinguish claims against third parties without claimants' consent. See *Czyzewski* v. *Jevic Holding Corp.*, 580 U. S. 451, 465 (2017).

3308

16          HARRINGTON *v.* PURDUE PHARMA L. P.

Opinion of the Court

games cannot obscure the underlying reality.  Once more, the Sacklers seek greater relief than a bankruptcy discharge normally affords, for they hope to extinguish even claims for wrongful death and fraud, and they seek to do so without putting anything close to all their assets on the table.  Nor is what the Sacklers seek a traditional release, for they hope to have a court extinguish claims of opioid victims without their consent.  See, *e.g.*, J. Macey, Corporate Governance:  Promises Kept, Promises Broken 152 (2008) ("settlements are, by definition, consensual"); accord, *Firefighters* v. *Cleveland*, 478 U. S. 501, 529 (1986).  Describe the relief the Sacklers seek how you will, nothing in the bankruptcy code contemplates (much less authorizes) it.

C

If text and context supply two strikes against the plan proponents and the dissent's construction of §1123(b)(6), history offers a third.  When Congress enacted the present bankruptcy code in 1978, it did "not write 'on a clean slate.'" *Hall* v. *United States*, 566 U. S. 506, 523 (2012) (quoting *Dewsnup* v. *Timm*, 502 U. S. 410, 419 (1992)).  Recognizing as much, this Court has said that pre-code practice may sometimes inform our interpretation of the code's more "ambiguous" provisions.  *RadLAX Gateway Hotel*, 566 U. S., at 649.

While we discern no ambiguity in §1123(b)(6) for the reasons explored above, historical practice confirms the lesson we take from it.  Every bankruptcy law the parties and their *amici* have pointed us to, from 1800 until 1978, generally reserved the benefits of discharge to the debtor who offered a "fair and full surrender of [its] property." *Sturges* v. *Crowninshield*, 4 Wheat. 122, 176 (1819); accord, *Central Va. Community College* v. *Katz*, 546 U. S. 356, 363–364 (2006); see, *e.g.*, Bankruptcy Act of 1800, §5, 2 Stat. 23 (repealed 1803); Act of Aug. 19, 1841, §3, 5 Stat. 442–443 (repealed 1843); Act of Mar. 2, 1867, §§11, 29, 14 Stat. 521,

Opinion of the Court

531–532 (repealed 1878); Bankruptcy Act of 1898, §§7, 14, 30 Stat. 548, 550 (repealed 1978). No one has directed us to a statute or case suggesting American courts in the past enjoyed the power in bankruptcy to discharge claims brought by nondebtors against other nondebtors, all without the consent of those affected. Surely, if Congress had meant to reshape traditional practice so profoundly in the present bankruptcy code, extending to courts the capacious new power the plan proponents claim, one might have expected it to say so expressly "somewhere in the [c]ode itself." *Dewsnup*, 502 U. S., at 420.[6]

### III

Faced with so many marks against its interpretation of the law, plan proponents and the dissent resort to a policy argument. The Sacklers, they remind us, have signaled that they will not return any funds to Purdue's estate unless the bankruptcy court grants them the sweeping nonconsensual release and injunction they seek. Absent these concessions, plan proponents and the dissent emphatically predict, "there will be no viable path" for victims to recover even $3,500 each. Tr. of Oral Arg. 100; Brief for Sackler Family 27; see Brief for Respondent Official Committee of Unsecured Creditors of Purdue Pharma L. P. et al. 45–46; *post*, at 4, 21–28, 52–54.

The U. S. Trustee disputes that assessment. Yes, he says, reversing the Second Circuit may cause Purdue's current reorganization plan to unravel. But that would also

---

[6]The dissent declares pre-code practice irrelevant to the task at hand and insists the power to order nonconsensual releases has been settled by "decades" of bankruptcy court practice. *Post*, at 3, 5, 8, 11, 50–51. But in resisting the notion that pre-code practice may inform our work, the dissent defies our precedents. And in appealing to "decades" of lower court practice, the dissent seems to forget why we took this case in the first place: to resolve a longstanding and deeply entrenched disagreement between lower courts over the legality of nonconsensual third-party releases. See n. 1, *supra*.

18            HARRINGTON *v.* PURDUE PHARMA L. P.

Opinion of the Court

mean the Sacklers would face lawsuits by individual vic-
tims, States, other governmental entities, and perhaps even
fraudulent-transfer claims from the bankruptcy estate. So
much legal exposure, the Trustee asserts, may induce the
Sacklers to negotiate *consensual* releases on terms more fa-
vorable to opioid victims. Brief for Petitioner 47–48. The
Sacklers may "want global peace," the Trustee acknowl-
edges, but that doesn't "mea[n] that they wouldn't pay a lot
for 97.5 percent peace." Tr. of Oral Arg. 26. After all, the
Trustee reminds us, during the appeal in this very case, the
Sacklers agreed to increase their contribution by more than
$1 billion in order to secure the consent of the eight object-
ing States. If past is prologue, the Trustee says, there may
be a better deal on the horizon.[7]

Even putting that aside, the Trustee urges us to consider
the ramifications of this case for others. Nonconsensual
third-party releases, he observes, allow tortfeasors to win
immunity from the claims of their victims, including for
claims (like wrongful death and fraud) they could not dis-
charge in bankruptcy, and do so without placing anything
approaching all of their assets on the table. Endorsing that
maneuver, the Trustee says, would provide a "roadmap for
corporations and wealthy individuals to misuse the bank-
ruptcy system" in future cases "to avoid mass-tort liability."
Brief for Petitioner 44–45.

Both sides of this policy debate may have their points.

_____

[7]The parties likewise spar over whether, absent the Sacklers' dis-
charge, the family could deplete the estate by asserting indemnification
claims against the company. Plan proponents and the dissent point to a
2004 agreement that commits Purdue to cover certain liability and legal
expenses the Sacklers incur. Brief for Purdue 10; *post*, at 21–24. But
here again, the Trustee sees things differently. He underscores the plan
proponents' concession that the 2004 agreement "does not apply if a court
determines the Sacklers 'did not act in good faith.'" Reply Brief 16. And,
he adds, bankruptcy courts have a variety of statutory tools at their dis-
posal to disallow or equitably subordinate any potential indemnification
claims the Sacklers might pursue. *Ibid.* (citing §§502(e)(1)(B), 510(c)(1)).

Opinion of the Court

But, in the end, we are the wrong audience for them. As the people's elected representatives, Members of Congress enjoy the power, consistent with the Constitution, to make policy judgments about the proper scope of a bankruptcy discharge. Someday, Congress may choose to add to the bankruptcy code special rules for opioid-related bankruptcies as it has for asbestos-related cases. Or it may choose not to do so. Either way, if a policy decision like that is to be made, it is for Congress to make. Despite the misimpression left by today's dissent, our only proper task is to interpret and apply the law as we find it; and nothing in present law authorizes the Sackler discharge.

IV

As important as the question we decide today are ones we do not. Nothing in what we have said should be construed to call into question *consensual* third-party releases offered in connection with a bankruptcy reorganization plan; those sorts of releases pose different questions and may rest on different legal grounds than the nonconsensual release at issue here. See, *e.g.*, *In re Specialty Equipment Cos.*, 3 F. 3d 1043, 1047 (CA7 1993). Nor do we have occasion today to express a view on what qualifies as a consensual release or pass upon a plan that provides for the full satisfaction of claims against a third-party nondebtor. Additionally, because this case involves only a stayed reorganization plan, we do not address whether our reading of the bankruptcy code would justify unwinding reorganization plans that have already become effective and been substantially consummated. Confining ourselves to the question presented, we hold only that the bankruptcy code does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of affected claimants. Because the Second Circuit ruled otherwise, its judg-

20          HARRINGTON *v.* PURDUE PHARMA L. P.

Opinion of the Court

ment is reversed and the case is remanded for further pro-
ceedings consistent with this opinion.

*It is so ordered.*

3313

Cite as: 603 U. S. ____ (2024)          1

KAVANAUGH, J., dissenting

# SUPREME COURT OF THE UNITED STATES

———————

No. 23–124

———————

## WILLIAM K. HARRINGTON, UNITED STATES TRUSTEE, REGION 2, PETITIONER *v.* PURDUE PHARMA L. P., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 27, 2024]

JUSTICE KAVANAUGH, with whom THE CHIEF JUSTICE, JUSTICE SOTOMAYOR, and JUSTICE KAGAN join, dissenting.

Today's decision is wrong on the law and devastating for more than 100,000 opioid victims and their families. The Court's decision rewrites the text of the U. S. Bankruptcy Code and restricts the long-established authority of bankruptcy courts to fashion fair and equitable relief for mass-tort victims. As a result, opioid victims are now deprived of the substantial monetary recovery that they long fought for and finally secured after years of litigation.

Bankruptcy seeks to solve a collective-action problem and prevent a race to the courthouse by individual creditors who, if successful, could obtain all of a company's assets, leaving nothing for all the other creditors. The bankruptcy system works to preserve a bankrupt company's limited assets and to then fairly and equitably distribute those assets among the creditors—and in mass-tort bankruptcies, among the victims. To do so, the Bankruptcy Code vests bankruptcy courts with broad discretion to approve "appropriate" plan provisions. 11 U. S. C. §1123(b)(6).

In this mass-tort bankruptcy case, the Bankruptcy Court exercised that discretion appropriately—indeed, admirably. It approved a bankruptcy reorganization plan for Purdue Pharma that built up the estate to

3314

2                    HARRINGTON *v.* PURDUE PHARMA L. P.

KAVANAUGH, J., dissenting

approximately $7 billion by securing a $5.5 to $6 billion settlement payment from the Sacklers, who were officers and directors of Purdue.   The plan then guaranteed substantial and equitable compensation to Purdue's many victims and creditors, including more than 100,000 individual opioid victims.   The plan also provided significant funding for thousands of state and local governments to prevent and treat opioid addiction.

The plan was a shining example of the bankruptcy system at work.  Not surprisingly, therefore, virtually all of the opioid victims and creditors in this case fervently support approval of Purdue's bankruptcy reorganization plan.  And all 50 state Attorneys General have signed on to the plan—a rare consensus.  The only relevant exceptions to the nearly universal desire for plan approval are a small group of Canadian creditors and one lone individual.

But the Court now throws out the plan—and in doing so, categorically prohibits non-debtor releases, which have long been a critical tool for bankruptcy courts to manage mass-tort bankruptcies like this one.  The Court's decision finds no mooring in the Bankruptcy Code.  Under the Code, all agree that a bankruptcy plan can nonconsensually release victims' and creditors' claims *against a bankrupt company*—here, against Purdue.  Yet the Court today says that a plan can *never* release victims' and creditors' claims *against non-debtor officers and directors of the company—* here, against the Sacklers.

That is true, the Court says, even when (as here) those non-debtor releases are necessary to facilitate a fair settlement with the officers and directors and produce a significantly larger bankruptcy estate that can be fairly and equitably distributed among the victims and creditors.  And that is true, the Court also says, even when (as here) those officers and directors are indemnified by the company.  When officers and directors are indemnified by the company, a victim's or creditor's claim against the non-

3315

KAVANAUGH, J., dissenting

debtors "is, in essence, a suit against the debtor" that could "deplete the assets of the estate" for the benefit of only a few, just like a claim against the company itself. *In re Purdue Pharma L. P.*, 69 F. 4th 45, 78 (CA2 2023) (quotation marks omitted).

It therefore makes little legal, practical, or economic sense to say, as the Court does, that the victims' and creditors' claims against the debtor can be released, but that it would be categorically "inappropriate" to release their identical claims against non-debtors even when they are indemnified or when the release generates a significant settlement payment by the non-debtor to the estate.

For decades, bankruptcy courts and courts of appeals have determined that non-debtor releases can be appropriate and essential in mass-tort cases like this one. Non-debtor releases have enabled substantial and equitable relief to victims in cases ranging from asbestos, Dalkon Shield, and Dow Corning silicone breast implants to the Catholic Church and the Boy Scouts. As leading scholars on bankruptcy explain, "the bankruptcy community has recognized the resolution of mass tort claims as a widely accepted core function of bankruptcy courts for decades"—and they emphasize that a "key feature in every mass tort bankruptcy" has been the non-debtor release. A. Casey & J. Macey, In Defense of Chapter 11 for Mass Torts, 90 U. Chi. L. Rev. 973, 974, 977 (2023).

No longer.

Given the broad statutory text—"appropriate"—and the history of bankruptcy practice approving non-debtor releases in mass-tort bankruptcies, there is no good reason for the debilitating effects that the decision today imposes on the opioid victims in this case and on the bankruptcy system at large. To be sure, many Americans have deep hostility toward the Sacklers. But allowing that animosity to infect this bankruptcy case is entirely misdirected and counterproductive, and just piles even more injury onto the

4          HARRINGTON *v.* PURDUE PHARMA L. P.

KAVANAUGH, J., dissenting

opioid victims. And no one can have more hostility toward the Sacklers and a greater desire to go after the Sacklers' assets than the opioid victims themselves. Yet the victims unequivocally seek approval *of this plan.*

With the current plan now gone and non-debtor releases categorically prohibited, the consequences will be severe, as the victims and creditors forcefully explained. Without releases, there will be no $5.5 to $6 billion settlement payment to the estate, and "there will be no viable path to any victim recovery." Tr. of Oral Arg. 100. And without the plan's substantial funding to prevent and treat opioid addiction, the victims and creditors bluntly described further repercussions: "more people will die without this Plan." Brief for Respondent Official Committee of Unsecured Creditors of Purdue Pharma L. P. et al. 55.

In short: Despite the broad term "appropriate" in the statutory text, despite the longstanding precedents approving mass-tort bankruptcy plans with non-debtor releases like these, despite 50 state Attorneys General signing on, and despite the pleas of the opioid victims, today's decision creates a new atextual restriction on the authority of bankruptcy courts to approve appropriate plan provisions. The opioid victims and their families are deprived of their hard-won relief. And the communities devastated by the opioid crisis are deprived of the funding needed to help prevent and treat opioid addiction. As a result of the Court's decision, each victim and creditor receives the essential equivalent of a lottery ticket for a possible future recovery for (at most) a few of them. And as the Bankruptcy Court explained, without the non-debtor releases, there is no good reason to believe that any of the victims or state or local governments will ever recover anything. I respectfully but emphatically dissent.

3317

KAVANAUGH, J., dissenting

## I

To map out this dissent for the reader:  Part I (pages 5 to 18) discusses why non-debtor releases are often appropriate and essential, particularly in mass-tort bankruptcies.  Part II (pages 18 to 31) explains why non-debtor releases were appropriate and essential in the Purdue bankruptcy.  Part III (pages 31 to 52) engages the Court's contrary arguments and why I respectfully disagree with those arguments.  Part IV (pages 52 to 54) sums up.

Throughout this opinion, keep in mind the goal of bankruptcy.  The bankruptcy system is designed to preserve the debtor's estate so as to ensure fair and equitable recovery for creditors.  Bankruptcy courts achieve that overarching objective by, among other things, releasing claims that otherwise could deplete the estate for the benefit of only a few and leave all the other creditors with nothing.  And as courts have recognized for decades, especially in mass-tort cases, non-debtor releases are not merely "appropriate," but can be absolutely critical to achieving the goal of bankruptcy—fair and equitable recovery for victims and creditors.

## A

Article I, §8, of the Constitution affords Congress power to establish "uniform Laws on the subject of Bankruptcies throughout the United States" and to "make all Laws which shall be necessary and proper for carrying into Execution" that power.

Early in the Nation's history, Congress established the bankruptcy system.  In 1978, Congress significantly revamped and reenacted the Bankruptcy Code in its current form.  Bankruptcy Code of 1978, 92 Stat. 2549.

The purpose of bankruptcy law is to address the collective-action problem that a bankruptcy poses.  T. Jackson, The Logic and Limits of Bankruptcy Law 12–13 (1986).  When a company's liabilities exceed its ability to

6          HARRINGTON *v.* PURDUE PHARMA L. P.

KAVANAUGH, J., dissenting

pay creditors, every creditor has an incentive to maximize its own recovery before other creditors deplete the pot. Without a mandatory collective system, the creditors would race to the courthouse to recover first.  One or a few successful creditors could then recover substantial funds, deplete the assets, and drive the company under—leaving other creditors with nothing.  See *id.*, at 7–19; D. Baird, A World Without Bankruptcy, 50 Law & Contemp. Prob. 173, 183–184 (1987); T. Jackson, Bankruptcy, Non-Bankruptcy Entitlements, and the Creditors' Bargain, 91 Yale L. J. 857, 860–868 (1982).

Bankruptcy creates a way for creditors to "act as one, by imposing a *collective* and *compulsory* proceeding on them." Jackson, Logic and Limits of Bankruptcy Law, at 13.  One of the goals of Chapter 11 of the Bankruptcy Code in particular is to fairly distribute estate assets among creditors "in order to prevent a race to the courthouse to dismember the debtor."  7 Collier on Bankruptcy ¶1100.01, p. 1100–3 (R. Levin & H. Sommer eds., 16th ed. 2023). Chapter 11 is aimed at preserving an estate's value for distribution to creditors in the face of that collective-action problem.

The basic Chapter 11 case runs as follows.  After the debtor files for bankruptcy under Chapter 11, the debtor's property becomes property of the bankruptcy estate.  11 U. S. C. §541.  Any litigation that might interfere with the property of the estate is subject to an automatic stay, thus preventing creditors from skipping the line by litigating in a separate forum against the debtor while the bankruptcy is ongoing.  §362.

With litigation paused, the parties craft a plan of reorganization for the debtor.  The Code grants the bankruptcy court sweeping powers to reorganize the debtor company and ensure fair and equitable recovery for the creditors.  For example, the plan may authorize selling or retaining the company's property; merging or consolidating

3319

the company;  or  amending  the  company's  charter.
§1123(a)(5).  The subsection at issue here, §1123(b), also
authorizes many other kinds of provisions that bankruptcy
plans may include.[1]  Most relevant for this case, as I will
explain, the reorganization plan may impair and release
"any class of claims" that creditors hold against the debtor.
§1123(b)(1).  The plan may also settle and release "any
claim or interest" that the debtor company holds against
non-debtors.  §1123(b)(3).  And the plan may include "any
other  appropriate  provision  not  inconsistent  with  the
applicable provisions" of the Bankruptcy Code.  §1123(b)(6).

  To address any collective-action or holdout problem, the
bankruptcy court has the power to approve a reorganization
plan even without the consent of every creditor.  If creditors
holding more than one-half in number (and at least two-
thirds in amount) of the claims in every class accept the
plan,  the  court  can  confirm  the  plan.    §§1126(c),
1129(a)(8)(A).  A plan is "said to be confirmed consensually

─────────

  [1] The full text of §1123(b) provides that "a plan may—

  "(1) impair or leave unimpaired any class of claims, secured or
unsecured, or of interests;

  "(2) subject to section 365 of this title, provide for the assumption,
rejection, or assignment of any executory contract or unexpired lease
of the debtor not previously rejected under such section;

  "(3) provide for—

  "(A) the settlement or adjustment of any claim or interest belonging
to the debtor or to the estate; or

  "(B) the retention and enforcement by the debtor, by the trustee, or
by a representative of the estate appointed for such purpose, of any
such claim or interest;

  "(4) provide for the sale of all or substantially all of the property of
the estate, and the distribution of the proceeds of such sale among
holders of claims or interests;

  "(5) modify the rights of holders of secured claims, other than a claim
secured only by a security interest in real property that is the debtor's
principal residence, or of holders of unsecured claims, or leave
unaffected the rights of holders of any class of claims; and

  "(6) include any other appropriate provision not inconsistent with
the applicable provisions of this title."

8          HARRINGTON *v.* PURDUE PHARMA L. P.

if all classes of creditors vote in favor, even if some classes have dissenting creditors." 7 Collier, Bankruptcy ¶1129.01, at 1129–13. That the bankruptcy system considers a plan with majority (even if not unanimous) support to be "consensual" underscores that the bankruptcy system is designed to benefit creditors collectively and prevent holdout problems.

Confirmation of the plan "generally discharges the debtor from all debts that arose before confirmation." *Id.*, ¶1100.09[2][f], at 1100–42 (citing §1141(d)). And all creditors are bound by the plan's distribution, even if some creditors are not happy and oppose the plan. *Ibid.*

## B

This is a mass-tort bankruptcy case. Mass-tort cases present the same collective-action problem that bankruptcy was designed to address. "Without a mandatory rule that consolidates claims in a single tribunal, tort claimants would rationally enter a race to the courthouse." A. Casey & J. Macey, In Defense of Chapter 11 for Mass Torts, 90 U. Chi. L. Rev. 973, 997 (2023). And the "plaintiffs who bring successful suits earlier are likely to drain the firm's resources, while inconsistent judgments could result in inequitable payouts even among plaintiffs who ultimately do collect." *Id.*, at 994.

For many decades now, bankruptcy law has stepped in as a coordinating tribunal in significant mass-tort cases. When a company that is liable for mass torts files for bankruptcy, the bankruptcy system enables (and requires) the mass-tort victims who are seeking relief from the bankrupt company to work together to reach a fair and equitable distribution of the company's assets.

In many cases, there is no workable alternative other than bankruptcy for achieving fair and equitable recovery for mass-tort victims. "Outside of bankruptcy," victims face "significant administrative costs" of multi-district

3321

Cite as: 603 U. S. \_\_\_\_ (2024)          9

KAVANAUGH, J., dissenting

litigation, "which has limited coordination mechanisms and no tools for binding future claimants." *Id.*, at 1005. And multi-district litigation cannot "solve the collective action problem because dissenting claimants can opt out of settlements even when super majorities favor them." *Ibid.*

Bankruptcy, on the other hand, reduces administrative costs and allows all of the affected parties to come together, pause litigation elsewhere, invoke procedural safeguards including discovery, and reach a collective resolution that considers both current and future victims. Cf. Federal Judicial Center, E. Gibson, Case Studies of Mass Tort Limited Fund Class Action Settlements & Bankruptcy Reorganizations 6 (2000) ("bankruptcy reorganizations provide an inherently fairer method of resolving mass tort claims" than alternative of class-action settlements).

In some cases—including mass-tort cases—it is not only the debtor company, but rather another closely related person or entity such as officers and directors (non-debtors), who may hold valuable assets and also be potentially liable for the company's wrongdoing.

But it may be uncertain whether the victims can recover in tort suits against the non-debtors due to legal hurdles or difficulty reaching the non-debtors' assets. In those cases, a settlement may be reached: In exchange for being released from potential liability for any wrongdoing, the non-debtor must make substantial payments to the company's bankruptcy estate in order to compensate victims. As long as the settlement is fair, the non-debtor's settlement payment will benefit victims "by enlarging the pie of recoverable funds" in the bankruptcy estate. Casey & Macey, 90 U. Chi. L. Rev., at 1001. And it will reduce administrative costs, because the victims' claims against both the debtor and the non-debtor may be resolved "at the same time and in the same tribunal." *Id.*, at 1002.

The non-debtor's settlement payment into the estate can also solve a collective-action problem. Bringing the non-

10          HARRINGTON *v.* PURDUE PHARMA L. P.

KAVANAUGH, J., dissenting

debtor's assets into the bankruptcy estate enables those assets to be distributed fairly and equitably among victims, rather than swallowed up by the first victim to successfully sue the non-debtor. *Id.*, at 1002–1003.

A separate collective-action problem can arise when the insolvent company's officers and directors are indemnified by the company for liability arising out of their job duties. In such cases, "a suit against the non-debtor is, in essence, a suit against the debtor." *In re Purdue Pharma L. P.*, 69 F. 4th 45, 78 (CA2 2023) (quotation marks omitted). If not barred from doing so, the creditors could race to the courthouse against the indemnified officers and directors for basically the same claims that they hold against the debtor company. If successful, such suits would deplete the company's assets because a judgment against the indemnified officers and directors would likely come out of the debtor company's assets.

Another similar collective-action problem can involve liability insurance, a kind of indemnification relationship where the insurer is on the hook for tort victims' claims against the debtor company. See B. Zaretsky, Insurance Proceeds in Bankruptcy, 55 Brooklyn L. Rev. 373, 375–376 (1989). The insurance assets—meaning assets to the limits of the debtor's insurance coverage—are usually a key asset for the bankruptcy estate to compensate victims. But tort victims also "may have direct action rights against the insurance carrier, even, in some cases, bypassing the debtor-insured." 5 Collier, Bankruptcy ¶541.10[3], at 541–60. If victims brought their claims directly against the insurer for the same claims that they hold against the estate, one group of victims could obtain from the insurer the full amount of the debtor's coverage. That would obviously prevent the insurance money from being used as part of the bankruptcy estate. See Zaretsky, 55 Brooklyn L. Rev., at 376–377, 394–395.

Cite as: 603 U. S. ____ (2024)          11

KAVANAUGH, J., dissenting

To address those various collective-action problems, bankruptcy courts have long found non-debtor releases to be appropriate in certain complex bankruptcy cases, especially in mass-tort bankruptcies. Indeed, that is precisely why non-debtor releases emerged in asbestos mass-tort bankruptcies in the 1980s. See *id.*, at 405–414; Casey & Macey, 90 U. Chi. L. Rev., at 998–999; see, *e.g.*, *MacArthur Co.* v. *Johns-Manville Corp.*, 837 F. 2d 89 (CA2 1988). And that is precisely why non-debtor releases have become such a well-established tool in mass-tort bankruptcies in the decades since.

For example, after A. H. Robins declared bankruptcy in 1985 in the face of massive tort liability for injuries from its defective intrauterine device, the Dalkon Shield, nearly 200,000 victims filed proof of claims. *In re A. H. Robins Co.*, 88 B. R. 742, 743–744, 747 (ED Va. 1988), aff'd, 880 F. 2d 694 (CA4 1989). A plan provision releasing the company's directors and insurance company ensured that the estate would not be depleted through indemnity or contribution claims, or claims brought directly against the directors or insurer. 88 B. R., at 751; 880 F. 2d, at 700–702. Preventing the victims from engaging in "piecemeal litigation" against the non-debtor directors and insurance company was the only way to ensure "equality of treatment of similarly situated creditors." 88 B. R., at 751. Therefore, the Bankruptcy Court found (and the Fourth Circuit agreed) that the release was "necessary and essential" to the bankruptcy's success. *Ibid.*; see 880 F. 2d, at 701–702. The plan ultimately provided for the victims to recover in full, and they overwhelmingly approved the plan. *Id.*, at 700–701.

A non-debtor release provision was similarly essential to resolve hundreds of thousands of victims' tort claims against Dow Corning Corporation, which declared bankruptcy in 1995 in the face of liability for its defective silicone breast implants. See *In re Dow Corning Corp.*, 287

3324

12          HARRINGTON *v.* PURDUE PHARMA L. P.

KAVANAUGH, J., dissenting

B. R. 396, 397 (ED Mich. 2002). The non-debtor release provision prevented the victims from suing Dow Corning's insurers and shareholders for their tort claims—which would have depleted Dow Corning's shared insurance assets and other estate assets. *Id.*, at 402–403, 406–408. The non-debtor release provision was "essential" to the bankruptcy reorganization because the reorganization hinged "on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor." *In re Dow Corning Corp.*, 280 F. 3d 648, 658 (CA6 2002); 287 B. R., at 410–413.

The need for such a tool to deal with complex bankruptcy cases has not gone away. Far from it. Indeed, without the option of bankruptcy with non-debtor releases, "tort victims in several recent high-profile cases would have received less compensation; the compensation would have been unfairly distributed; and the administrative costs of resolving their claims would have been higher." Casey & Macey, 90 U. Chi. L. Rev., at 979; see also Brief for Law Professors in Support of Respondents as *Amici Curiae* 21–25; Brief for Certain Former Commissioners of the American Bankruptcy Institute's Commission To Study the Reform of Chapter 11 as *Amici Curiae* 9–11; Brief for Association of the Bar of the City of New York as *Amicus Curiae* 9, 11–15.

Consider two recent examples that ensured recovery for the victims of torts committed by the Boy Scouts of America and by several dioceses of the Catholic Church. In both cases, a national or regional organization was the debtor in the bankruptcy. But that organization shared its liability and its insurance policy with numerous other legally separate and autonomous local entities. Without a coordinating mechanism, a victim's (or group of victims') recovery against one local entity could have eaten up all of the shared insurance assets, leaving all of the other victims with nothing. Brief for Boy Scouts of America as *Amicus*

3325

Cite as: 603 U. S. \_\_\_\_ (2024)            13

KAVANAUGH, J., dissenting

*Curiae* 9–14, 17–19; Brief for U. S. Conference of Catholic Bishops as *Amicus Curiae* 9–22.

Bankruptcy provided a forum to coordinate liability and insurance assets. A non-debtor release provision prevented victims from litigating outside of the bankruptcy plan's procedures. And the provision therefore prevented one victim or group of victims from obtaining all of the insurance funds before other victims recovered. As a result, in each case, the local entities were able to pool their resources to create a substantial fund in a single bankruptcy estate to compensate victims substantially and fairly. Brief for Boy Scouts of America as *Amicus Curiae* 11–12, 20–21; Brief for Ad Hoc Group of Local Councils of the Boy Scouts of America as *Amicus Curiae* 5–6; Brief for U. S. Conference of Catholic Bishops as *Amicus Curiae* 15–16.

As those examples show, in some cases where various closely related but distinct parties share liability or share assets (or both), bankruptcy "provides the *only* forum in the U. S. legal system where a unified and complete resolution of mass-tort cases can reliably occur in a manner that results in a fair recovery and distribution for all claimants." Brief for Association of the Bar of the City of New York as *Amicus Curiae* 15. And the bankruptcy system could not do so without non-debtor releases.

### C

The Bankruptcy Code gives bankruptcy courts authority to approve non-debtor releases to solve the complex collective-action problems that such cases present. As noted above, a Chapter 11 reorganization plan may release creditor claims against debtors. §1123(b)(1). And a plan may settle and release debtor claims against non-debtors. §1123(b)(3).

In addition, the plan may also include "any other appropriate provision not inconsistent with the applicable

14          HARRINGTON *v.* PURDUE PHARMA L. P.

KAVANAUGH, J., dissenting

provisions of" the Code. §1123(b)(6). Section 1123(b)(6) provides ample flexibility for the reorganization plan to settle and release creditor claims against non-debtors who are closely related to the debtor. For example, officers and directors may be indemnified by the debtor company; in those cases, creditor claims against indemnified non-debtors are essentially the same as creditor claims against the debtor business itself. Or the non-debtors may reach a settlement with the victims and creditors where the non-debtors pay a settlement amount to the estate, which in some cases may be the only way to ensure fair and equitable recovery for the victims and creditors. The non-debtor releases—just like debtor releases under §1123(b)(1) and non-debtor releases under §1123(b)(3)—can be essential to preserve and increase the estate's assets and can be essential to ensure fair and equitable victim and creditor recovery.

The key statutory term in §1123(b)(6) is "appropriate." As this Court has often said, "appropriate" is a "broad and all-encompassing term that naturally and traditionally includes consideration of all the relevant factors." *Michigan* v. *EPA*, 576 U. S. 743, 752 (2015) (quotation marks omitted). Because determining propriety requires exercising judgment, the inquiry must include a degree of "flexibility." *Ibid.* The Court has explained on numerous occasions that the "ordinary meaning" of a statute authorizing appropriate relief "confers broad discretion" on a court. *School Comm. of Burlington* v. *Department of Ed. of Mass.*, 471 U. S. 359, 369 (1985); see also, *e.g.*, *Sheet Metal Workers* v. *EEOC*, 478 U. S. 421, 446 (1986) (plurality opinion) (Title VII "vest[s] district courts with broad discretion to award 'appropriate' equitable relief"); *Cooter & Gell* v. *Hartmarx Corp.*, 496 U. S. 384, 400 (1990) ("In directing the district court to impose an 'appropriate' sanction, Rule 11 itself indicates that the district court is empowered to exercise its discretion"). Because the

3327

Cite as: 603 U. S. ____ (2024)          15

KAVANAUGH, J., dissenting

"language is open-ended on its face," whether a provision is "appropriate is inherently context dependent." *Tanzin* v. *Tanvir*, 592 U. S. 43, 49 (2020) (quotation marks omitted).

By allowing "any other appropriate provision," §1123(b)(6) empowers a bankruptcy court to exercise reasonable discretion. That §1123 confers broad discretion makes eminent sense, given "the policies of flexibility and equity built into Chapter 11 of the Bankruptcy Code." *NLRB* v. *Bildisco & Bildisco*, 465 U. S. 513, 525 (1984). Such flexibility is important to achieve Chapter 11's ever-elusive goal of ensuring fair and equitable recovery to creditors. See §§1129(a)(7), (b)(1).

The catchall authority in Chapter 11 therefore empowers a bankruptcy court to exercise its discretion to deal with complex scenarios, like the collective-action problems that plague mass-tort bankruptcies. Non-debtor releases are often appropriate—indeed are essential—in such circumstances.

And courts have therefore long found non-debtor releases to be appropriate in certain narrow circumstances under §1123(b)(6). Indeed, courts have been approving such non-debtor releases almost as long as the current Bankruptcy Code has existed since its enactment in 1978. See, *e.g.*, *In re Johns-Manville Corp.*, 68 B. R. 618, 624–626 (Bkrtcy. Ct. SDNY 1986), aff'd, 837 F. 2d, at 90; *A. H. Robins Co.*, 88 B. R., at 751, aff'd, 880 F. 2d, at 696. Historical and contemporary practice demonstrate that non-debtor releases are especially appropriate when (as here) non-debtor releases and corresponding settlement payments preserve and increase the debtor's estate and thereby ensure fair and equitable recovery for creditors.

Over those decades of practice, courts have developed and applied numerous factors for determining whether a non-debtor release is "appropriate" in a given case. §1123(b)(6); see H. Friendly, Indiscretion About Discretion, 31 Emory L. J. 747, 771–773 (1982) (noting the common-law-like

3328

16          HARRINGTON *v.* PURDUE PHARMA L.P.

KAVANAUGH, J., dissenting

process by which factors important to a discretionary decision develop over time). Those factors reflect the fact that determining whether a non-debtor release is "appropriate" is a holistic inquiry that depends on the precise facts and circumstances of each case. And the factors have served to confine the use of non-debtor releases to well-defined and narrow circumstances—precisely those circumstances where the collective-action problems arise.

For instance, since the 1980s, the Second Circuit has been a leader on the non-debtor release issue. See, *e.g.*, *Johns-Manville Corp.*, 837 F. 2d 89 (1988); *In re Drexel Burnham Lambert Group, Inc.*, 960 F. 2d 285 (1992); *In re Metromedia Fiber Network, Inc.*, 416 F. 3d 136 (2005). Over time, the Second Circuit has developed a non-exhaustive list of factors for determining whether a non-debtor release is appropriately employed and appropriately tailored in a given case.

First, and critically, the court must determine whether the released party is closely related to the debtor—for example, through an indemnification agreement—where "a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate." 69 F. 4th, at 78 (quotation marks omitted). Second, the court must determine if the claims against the non-debtor are "factually and legally intertwined" with claims against the debtor. *Ibid.* Third, the court must ensure that the "scope of the releases" is tailored to only the claims that must be released to protect the plan. *Ibid.* Fourth, even then, the court should approve the release only if it is truly "essential" to the plan's success and the reorganization would fail without it. *Ibid.* Fifth, the court must consider whether, as part of the settlement, the non-debtor party has paid "substantial assets" to the estate. *Ibid.* Sixth, the court should determine if the plan provides "fair payment" to creditors for their released claims. *Id.*, at 79. Seventh, the court must ensure that the creditors "overwhelmingly"

3329

KAVANAUGH, J., dissenting

approve of the release, which the Second Circuit defined as a 75 percent "bare minimum." *Id.*, at 78–79 (quotation marks omitted).[2]

Factors one through four ensure that the releases are necessary to solve collective-action problems that threaten the bankruptcy and prevent fair and equitable recovery for the victims and creditors. Factor five makes sure that the releases are not a free ride for the non-debtor. Factor six ensures that the victims and creditors receive fair compensation. Together, factors five and six assess whether there has been a fair settlement given the probability of victims' and creditors' recovery from the non-debtor and the likely amount of any such recovery. And factor seven ensures that the vast majority of victims and creditors approve, meaning that the release is solving a holdout problem.

As the Courts of Appeals' comprehensive factors illustrate, §1123(b)(6) limits a bankruptcy court's authority in important respects. A non-debtor release must be "appropriate" given all of the facts and circumstances of the case. And as the history of non-debtor releases illustrates, the appropriateness requirement confines the use of non-debtor releases to narrow and relatively rare circumstances where the releases are necessary to help victims and creditors achieve fair and equitable recovery.

As long as every class of victims and creditors supports the plan by a majority vote in number and at least a two-thirds vote in amount, the plan is "said to be confirmed consensually," "even if some classes have dissenting creditors." 7 Collier, Bankruptcy ¶1129.01, at 1129–13. And the Courts of Appeals have allowed non-debtor

---

[2] Other Courts of Appeals have used similar factors for evaluating non-debtor releases. See, *e.g.*, *In re Seaside Engineering & Surveying, Inc.*, 780 F. 3d 1070, 1079–1081 (CA11 2015); *National Heritage Foundation, Inc.* v. *Highbourne Foundation*, 760 F. 3d 344, 347–351 (CA4 2014); *In re Dow Corning Corp.*, 280 F. 3d 648, 658–661 (CA6 2002).

18          HARRINGTON *v.* PURDUE PHARMA L. P.

KAVANAUGH, J., dissenting

releases only when there is an even higher level of supermajority victim and creditor approval. In the mass-tort bankruptcy cases, most plans have easily cleared that bar and received close to 100 percent approval. *E.g.*, *Johns-Manville Corp.*, 68 B. R., at 631 (95 percent approval); *A. H. Robins Co.*, 880 F. 2d, at 700 (over 94 percent approval); *Dow Corning*, 287 B. R., at 413 (over 94 percent approval); 69 F. 4th, at 82 (over 95 percent approval here). So in reality, as opposed to rhetoric, the non-debtor releases in mass-tort bankruptcy plans, including this one, have been approved by all but a comparatively small group of victims and creditors.

In every bankruptcy of this kind, moreover, the plan nonconsensually releases victims' and creditors' claims *against the debtor*. The only difference with non-debtor releases is that they release victims' and creditors' claims not against the debtor but rather against non-debtors who are closely related to the debtor, such as indemnified officers and directors.

## II

In this case, as in many past mass-tort bankruptcies, the non-debtor releases were appropriate and therefore authorized by 11 U. S. C. §1123(b)(6) of the Code. The non-debtor releases were needed to ensure meaningful victim and creditor recovery in the face of multiple collective-action problems.

## A

Purdue Pharma was a pharmaceutical company owned and directed by the extended Sackler family. Brothers Arthur, Mortimer, and Raymond Sackler purchased the company in 1952. Since then, Purdue has been wholly owned by entities and trusts established for the benefit of Mortimer Sackler's and Raymond Sackler's families and

3331

KAVANAUGH, J., dissenting

descendants, and those families also closely controlled Purdue's operations.

In the 1990s, Purdue developed the drug OxyContin, a powerful and addictive opioid painkiller. Purdue aggressively marketed that drug and downplayed or hid its addictive qualities. OxyContin helped people to manage pain. But the drug's addictive qualities led to its widespread abuse. OxyContin played a central role in the opioid-abuse crisis from which millions of Americans and their families continue to suffer.

Starting in the early 2000s, governments and individual plaintiffs began to sue Purdue for the harm caused by OxyContin. In 2007, Purdue settled large swaths of those claims and pled guilty to felony misbranding of OxyContin.

But within the next decade, victims of the opioid crisis and their families, along with state and local governments fighting the crisis, began filing a new wave of lawsuits, this time also naming members of the Sackler family as defendants. Today, those claims amount to more than $40 *trillion* worth of alleged damages against Purdue and the Sacklers. (For perspective, $40 trillion is about seven times the total annual spending of the U. S. Government.)

As the litigation by victims and state and local governments mounted, the U. S. Government then brought federal criminal and civil charges against Purdue. The U. S. Government has not brought criminal charges against any of the Sacklers individually. Nor have any States brought criminal charges against any of the Sacklers individually.

As to the criminal charges against Purdue, the company pled guilty to conspiracy to defraud the United States, to violate the Food, Drug, and Cosmetic Act, and to violate the federal anti-kickback statute. As part of the global resolution of the charges, Purdue agreed to a $2 billion judgment to the U. S. Government that would be "deemed to have the status of an allowed superpriority" claim in

20            HARRINGTON *v.* PURDUE PHARMA L. P.

KAVANAUGH, J., dissenting

bankruptcy. 17 App. in No. 22–110 etc. (CA2), p. 4804. The U. S. Government agreed not to "initiate any further criminal charges against Purdue." 16 *id.,* at 4798.

Unable to pay its colossal potential liabilities, Purdue filed for bankruptcy under Chapter 11 of the Bankruptcy Code. The ensuing case exemplified the flexibility and common sense of the bankruptcy system at work.

The proceedings were extraordinarily complex. The case involved "likely the largest creditor body ever," and the number of claims filed—totaling more than 600,000—was likely "a record." *In re Purdue Pharma L. P.*, 633 B. R. 53, 58 (Bkrtcy. Ct. SDNY 2021). Further complicating matters was the need to allocate funds between, on the one hand, individual victims and the hospitals that urgently needed relief and, on the other hand, government entities at all levels that urgently needed funds for opioid crisis prevention and treatment efforts. *Id.*, at 83.

Aided by perhaps "the most extensive discovery process" that "any court in bankruptcy has ever seen," the parties engaged in prolonged arms-length negotiations. *Id.*, at 85–86. They ultimately agreed on a multi-faceted compensation plan for the victims and creditors and reorganization plan for Purdue. Under that plan, Purdue would cease to exist and would be replaced with a new company that would manufacture opioid-abatement medications. And approximately $7 billion would be distributed among nine trusts to compensate victims and creditors and to fund efforts to abate the opioid crisis by preventing and treating addiction.

To determine how to allocate the $7 billion, the victims and creditors then engaged in a series of "heavily negotiated and intricately woven compromises" and devised a "complex allocation" of the funds to different classes of victims and creditors. *Id.*, at 83, 90. In the end, more than 95 percent of voting victims and creditors approved of the distribution scheme.

3333

KAVANAUGH, J., dissenting

That plan would distribute billions of dollars to communities to use exclusively for prevention and treatment programs. And $700 to $750 million was set aside to compensate individual tort victims and their families. 1 App. 561. Opioid victims and their families would each receive somewhere between $3,500 and $48,000 depending on the category of claim and level of harm. *Id.*, at 573–584; 6 App. in No. 22–110 etc. (CA2), at 1695.

B

Under the reorganization plan, victims' and creditors' claims *against Purdue Pharma* were released (even if some victims and creditors did not consent). As in other mass-tort bankruptcies described above, a related and equally essential facet of the Purdue plan was the non-debtor release provision. Under that provision, the victims' and creditors' claims *against the Sacklers* were also released. As a result, Purdue's victims and creditors could not later sue either Purdue Pharma or members of the Sackler family (the officers and directors of Purdue Pharma) for Purdue's and the Sacklers' opioid-related activities.

The non-debtor release provision prevented a race to the courthouse against the Sacklers. As a result, the non-debtor release provision solved two separate collective-action problems that dogged Purdue's mass-tort bankruptcy: (i) It protected Purdue's estate from the risk of being depleted by indemnification claims, and (ii) it operated as a settlement of potential claims against the Sacklers and thus enabled the Sacklers' large settlement payment to the estate. That settlement payment in turn quadrupled the amount in the Purdue estate and enabled substantially greater recovery for the victims.

I will now explain both of those important points in some detail.

*First*, and critical to a proper understanding of this case, the non-debtor release provision was essential to *preserve*

22          HARRINGTON *v.* PURDUE PHARMA L. P.

KAVANAUGH, J., dissenting

Purdue's existing assets. By preserving the estate, the non-debtor release provision ensured that the assets could be fairly and equitably apportioned among all victims and creditors rather than devoured by one group of potential plaintiffs.

How? Pursuant to a 2004 indemnification agreement, Purdue had agreed to pay for liability and legal expenses that officers and directors of Purdue faced for decisions related to Purdue, including opioid-related decisions. See *In re Purdue Pharma L. P.*, 69 F. 4th 45, 58–59 (CA2 2023). That indemnification agreement covered judgments against the Sacklers and related legal expenses.

As explained above, the Sacklers wholly owned and controlled Purdue, a closely held corporation. The Sacklers "took a major role" in running Purdue, including making decisions about "Purdue's practices regarding its opioid products." 633 B. R., at 93. In short, the Sacklers potentially shared much of the liability that Purdue faced for Purdue's opioid practices. See *In re Purdue Pharma, L. P.*, 635 B. R. 26, 87 (SDNY 2021) (claims against the Sacklers are "deeply connected with, if not entirely identical to," claims against Purdue (quotation marks omitted)); see also 633 B. R., at 108.

But due to the indemnification agreement, if victims and creditors were to sue the Sacklers directly for claims related to Purdue or opioids, the Sacklers would have a reasonable basis to seek reimbursement from Purdue for liability and litigation costs. So Purdue could potentially be on the hook for a substantial amount of the Sacklers' liability and litigation costs. In such indemnification relationships, "a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate." 69 F. 4th, at 78 (quotation marks omitted).

As a real-world matter, therefore, opioid-related claims *against the Sacklers* could come out of the same pot of Purdue money as opioid-related claims *against Purdue.* So

Cite as: 603 U. S. ____ (2024)          23

KAVANAUGH, J., dissenting

releasing claims against the Sacklers is not meaningfully different from releasing claims against Purdue itself, which the bankruptcy plan here of course also mandated. Both sets of releases were necessary to preserve Purdue's estate so that it was available for all victims and creditors to recover fairly and equitably. Otherwise, the estate could be zeroed out: A few victims or creditors could race to the courthouse and obtain recovery from Purdue or the Sacklers (ultimately the same pot of money) and thereby deplete the assets of the company and leave nothing for everyone else.

To fully understand why both sets of releases were necessary—against Purdue and against the Sacklers— suppose that the plan did *not* release the Sacklers from opioid- and Purdue-related liability. Victims' and creditors' opioid-related claims *against Purdue* would be discharged in Purdue's bankruptcy (even without their consent). But any victims or creditors could still sue *the Sacklers* for essentially the same claims.

Suppose that a State or a group of victims sued the Sacklers and received a large reward. The Sacklers "would have a reasonable basis to seek indemnification" from Purdue for judgments and legal expenses. *Id.*, at 72. Therefore, any liability judgments and litigation costs for certain plaintiffs in their suits *against the Sacklers* could "deplete the *res*" of *Purdue's* bankruptcy—meaning that there might well be nothing left for all of the other victims and creditors. *Id.*, at 80. Even if the Sacklers' indemnification claims against Purdue were unsuccessful, Purdue would "be required to litigate" those claims, which would likely diminish the *res*, "no matter the ultimate outcome of those claims." *Ibid.*

Every victim and creditor knows that a single judgment by someone else against the Sacklers could deplete the Purdue estate and leave nothing for anyone else. So every victim and creditor would have an incentive to race to the

3336

24          HARRINGTON *v.* PURDUE PHARMA L. P.

KAVANAUGH, J., dissenting

courthouse to sue the Sacklers.  A classic collective-action problem.

The non-debtor releases of claims against the Sacklers prevented that collective-action problem in the same way that the releases of claims against Purdue itself prevented the identical collective-action problem.  Both protected Purdue's assets from being consumed by the first to sue successfully.  And the non-debtor releases were narrowly tailored to the problem.  The non-debtor releases enjoined victims and creditors from bringing claims against the Sacklers only in cases where Purdue's conduct, or the victims' or creditors' claims asserted against Purdue, was a legal cause or a legally relevant factor to the cause of action against the Sacklers.  633 B. R., at 97–98 (defining the release to encompass only claims that "directly affect the *res* of the Debtors' estates," such as claims that would trigger the Sacklers' "rights to indemnification and contribution"); see also *id*., at 105.  In other words, the releases applied only to claims for which the Sacklers had a reasonable basis to seek coverage or reimbursement from Purdue.

The non-debtor release provision therefore released claims against the Sacklers that are essentially the same as claims against Purdue.  Doing so preserved Purdue's bankruptcy estate so that it could be fairly apportioned among the victims and creditors.

*Second*, the non-debtor releases not only *preserved* the existing Purdue estate; those non-debtor releases also greatly *increased* the funds in the Purdue estate so that the victims and creditors could receive greater compensation.

Standing alone, Purdue's estate is estimated to be worth approximately $1.8 billion—a small fraction of the sizable claims against Purdue.  *Id*., at 90; 22 App. in No. 22–110 etc. (CA2), at 6507.  If that were all the money on the table, the Bankruptcy Court found, the victims and creditors "would probably recover nothing" from Purdue's estate.  633

3337

KAVANAUGH, J., dissenting

B. R., at 109.  That is because the United States holds a $2 billion "superpriority" claim, meaning that the United States would be first in line to recover ahead of all of the victims and other creditors.  The United States' claim would wipe out Purdue's entire $1.8 billion value.  "As a result, many victims of the opioid crisis would go without any assistance."  69 F. 4th, at 80.

So for the victims and other creditors to have any hope of meaningful recovery, Purdue's bankruptcy estate needed more funds.

Where to find those funds?  The Sacklers' assets were the answer.  After vigorous negotiations, a settlement was reached:  In exchange for the releases, the Sacklers ultimately agreed to make significant payments to Purdue's estate—between $5.5 and $6 billion.  Adding that substantial amount to Purdue's comparatively smaller bankruptcy estate enabled Purdue's reorganization plan to distribute an estimated $7 billion or more to the victims and creditors—thereby quadrupling the size of the estate available for distribution.  With that enhanced estate, the plan garnered 95 percent support from the voting victims and creditors.  That high level of support tends to show that this was a very good plan for the victims and creditors.  Because it led to that high level of support, the Sacklers' multi-billion-dollar payment was critical to creating a successful reorganization plan.

That payment was made possible by heavily negotiated settlements among Purdue, the victims and creditors, and the Sacklers.  Most relevant here, in exchange for the Sacklers agreeing to pay billions of dollars to the bankruptcy estate, the victims and creditors agreed to release their claims against the Sacklers.  The settlement— exchanging releases for the Sacklers' $5.5 to $6 billion payment—enabled the victims and creditors to avoid "the significant risk, cost and delay (potentially years) that

26        HARRINGTON *v*. PURDUE PHARMA L. P.

KAVANAUGH, J., dissenting

would result from pursuing the Sacklers and related parties through litigation." 1 App. 31.

Indeed, after a 6-day trial involving 41 witnesses, the Bankruptcy Court found that the settlement provided the best chance for the victims and creditors to ever see any money from the Sacklers. See 633 B. R., at 85, 90. (That is a critical point that the Court today whiffs on.) Indeed, the Bankruptcy Court found that the victims and creditors would be unlikely to recover from the Sacklers by suing the Sacklers directly due to numerous potential weaknesses in and defenses to the victims' and creditors' legal theories. See *id*., at 90–93, 108. Even if the suits were successful, the Bankruptcy Court expressed "significant concern" about the ability to collect any judgments from the Sacklers due to the difficulty of reaching their assets in foreign countries and in spendthrift trusts. *Id*., at 89; see also *id*., at 108–109.

For those reasons, the Bankruptcy Court concluded that the $5.5 to $6 billion settlement payment and the releases were fair and equitable and in the victims' and creditors' best interest. *Id*., at 107–109, 112. The settlement amount of $5.5 to $6 billion was "properly negotiated" and "reflects the underlying strengths and weaknesses of the opposing parties' legal positions and issues of collection." *Id*., at 93.[3]

From the victims' and creditors' perspective, "suing the Sacklers would have been a costly endeavor with a small chance of success. From the Sacklers' perspective, defending those suits would have been a costly endeavor

_____

[3] The Court implies that some victims could recover from the Sacklers in tort litigation up to the total of their combined assets, and that the Sacklers are somehow getting off easy by paying only $5.5 to $6 billion. But the Court's belief is not rooted in reality given the Bankruptcy Court's undisputed factual findings to the contrary: Large tort recoveries against any of the Sacklers were (and remain) far from certain—and in any event would produce recoveries for only a few and leave other victims with nothing.

KAVANAUGH, J., dissenting

with a very small chance of a large liability." A. Casey & J. Macey, In Defense of Chapter 11 for Mass Torts, 90 U. Chi. L. Rev. 973, 1004 (2023). So as in many litigation settlements, the parties agreed to the $5.5 to $6 billion settlement in light of that "very small chance of a large liability." *Ibid.*

Importantly, the victims and creditors—who obviously have no love for the Sacklers—insisted on the releases of their claims against the Sacklers. Tr. of Oral Arg. 61, 93; Brief for Respondent Official Committee of Unsecured Creditors of Purdue Pharma L. P. et al. 10. Why did the releases make sense for the victims and creditors?

For starters, the releases were part of the settlement and enabled the Sacklers' $5.5 to $6 billion settlement payment. Moreover, without the releases, some of Purdue's victims and creditors—maybe a State, maybe some opioid victims— would sue the Sacklers directly for claims "deeply connected with, if not entirely identical to," claims that the victims and creditors held against Purdue. 635 B. R., at 87 (quotation marks omitted). To be sure, the Bankruptcy Court found that those suits would face significant challenges. But the victims and creditors were understandably worried, as they explained during the Bankruptcy Court proceedings, that the Sacklers would "exhaust their collectible assets fighting and/or paying ONLY the claims of certain creditors with the best ability to pursue the Sacklers in court." 1 App. 76. And if even a *single* direct suit against the Sacklers succeeded, the suit could potentially wipe out much if not all of the Sacklers' assets in one fell swoop—making those assets unavailable for the Purdue estate and therefore unavailable for all of the other the victims and creditors.

In sum, if there were no releases, and victims and creditors were therefore free to sue the Sacklers directly, one of three things would likely happen. One possibility is that no lawsuits against the Sacklers would succeed, and

28          HARRINGTON *v.* PURDUE PHARMA L. P.

KAVANAUGH, J., dissenting

no victim or creditor would recover any money from them. And without the $5.5 to $6 billion settlement payment, there would be no recovery from Purdue either. Another possibility is that a large claim or claims would succeed, and the Sacklers would be indemnified by Purdue—thereby wiping out Purdue's estate for all of the other victims and creditors. Last, suppose that a large claim succeeded and that the Sacklers were not indemnified for that liability. Even in that case, only a few victims or creditors would be able to recover from the Sacklers at the expense of fair and equitable distribution to the rest of the victims and creditors.

As the Second Circuit stated, without the releases, the victims and creditors "would go without any assistance and face an uphill battle of litigation (in which a single claimant might disproportionately recover) without fair distribution." 69 F. 4th, at 80. Another classic collective-action problem.

In short, without the releases and the significant settlement payment, two separate collective-action problems stood in the way of fair and equitable recovery for the victims and creditors: (1) the Purdue estate would not be preserved for the victims and creditors to obtain recovery, and (2) the Purdue estate would be much smaller than it would be with the Sacklers' settlement payment. The releases and settlement payment solved those problems and ensured fair and equitable recovery for the opioid victims.

C

For those reasons, the Bankruptcy Court found that without the releases and settlement payment, the reorganization plan would "unravel." 633 B. R., at 107, 109. All of the "heavily negotiated and intricately woven compromises in the plan" that won the victims' and creditors' approval, *id.*, at 90, would "fall apart for lack of

3341

Cite as: 603 U. S. ____ (2024)          29

KAVANAUGH, J., dissenting

funding and the inevitable fighting over a far smaller and less certain recovery with its renewed focus on pursuing individual claims and races to collection." *Id.*, at 84. There simply would not be enough money to support a reorganization plan that the victims and creditors would approve.

Absent the releases and settlement payment, the Bankruptcy Court found, the "most likely result" would be liquidation of a much smaller $1.8 billion estate. *Id.*, at 90. In a liquidation, the United States would recover first with its $2 billion superpriority claim, taking for itself the whole pie. And the victims and other creditors "would probably recover nothing." *Id.*, at 109.

Given that alternative, it is hardly surprising that the opioid victims and creditors almost universally support Purdue's Chapter 11 reorganization plan and the non-debtor releases. That plan promised to obtain significant assets from the Sacklers, to preserve those assets from being depleted by litigation for a few, and to distribute those much-needed funds fairly and equitably.

As a result, the opioid victims' and creditors' support for the reorganization plan was *overwhelming*. Every victim and creditor had a chance to vote on the plan during the bankruptcy proceedings. And of those who voted, more than 95 percent approved of the plan. *Id.*, at 107.

Since then, even more victims and creditors have gotten on board. Now, all 50 States have signed on to the plan. The lineup before this Court is telling. On one side of the case: the tens of thousands of opioid victims and their families; more than 4,000 state, city, county, tribal, and local government entities; and more than 40,000 hospitals and healthcare organizations. They all urge the Court to uphold the plan.

3342

30          HARRINGTON *v.* PURDUE PHARMA L. P.

KAVANAUGH, J., dissenting

At this point, on the other side of this case stand only a sole individual and a small group of Canadian creditors.[4]

Given all of the extraordinary circumstances, the Bankruptcy Court and Second Circuit concluded that the non-debtor releases here not only were appropriate, but were essential to the success of the plan. The Bankruptcy Court and Second Circuit thoroughly analyzed each of the relevant factors before reaching that conclusion: First, the released non-debtors (the Sacklers) closely controlled and were indemnified by the company. 69 F. 4th, at 79. Second, the claims against the Sacklers were based on essentially the same facts and legal theories as the claims against Purdue. *Id.*, at 80. Third, the releases were essential for the reorganization to succeed, because the releases protected the Purdue estate from indemnification claims and expanded the Purdue estate to enable victim and creditor recovery. *Id.*, at 80–81. Fourth, the releases were narrowly tailored to protect the estate from indemnification claims. *Ibid.* Fifth, the releases secured a substantial settlement payment to significantly increase the funds in the estate. *Id.*, at 81. Sixth, that enhanced estate allowed the plan to distribute "fair and equitable" payments to the victims and creditors. *Id.*, at 82 (quotation marks omitted). And seventh, for all those reasons, the victims and creditors do not just urgently and overwhelmingly approve of the releases, they all but demanded the releases. *Ibid.*

Congress invited bankruptcy courts to consider exactly those kinds of extraordinary circumstances when it

───────────

[4] The regional United States Trustee for three States, a Government bankruptcy watchdog appointed to oversee bankruptcy cases in those States, also opposes the plan for reasons that remain mystifying. The U. S. Trustee purports to look out for victims and creditors, but here the victims and creditors made emphatically clear that the "U. S. Trustee does not speak for the victims of the opioid crisis" and is indeed thwarting the opioid victims' efforts at fair and equitable recovery. Tr. of Oral Arg. 93.

Cite as:  603 U. S. ____ (2024)          31

KAVANAUGH, J., dissenting

authorized bankruptcy plans to include "any other appropriate provision" that is "not inconsistent" with the Code.  §1123(b)(6).

### III

The Court decides today to reject the plan by holding that non-debtor releases are categorically impermissible as a matter of law.  That decision contravenes the Bankruptcy Code.  It is regrettable for the opioid victims and creditors, and for the heavily negotiated equitable distribution of assets that they overwhelmingly support.  And it will harm victims in pending and future mass-tort bankruptcies.  The Court's decision deprives the bankruptcy system of a longstanding and critical tool that has been used repeatedly to ensure fair and sizable recovery for victims—to repeat, recovery for *victims*—in mass torts ranging from Dalkon Shield to the Boy Scouts.

On the law, the Court's decision to reject the plan flatly contradicts the Bankruptcy Code.  The Code explicitly grants broad discretion and flexibility for bankruptcy courts to handle bankruptcies of extraordinary complexity like this one.  For several decades, bankruptcy courts have been employing non-debtor releases to facilitate fair and equitable recovery for victims in mass-tort bankruptcies.  In this case, too, the Bankruptcy Court prudently and appropriately employed its discretion to fairly resolve a mass-tort bankruptcy.

At times, the Court seems to view the Sacklers' settlement payment into Purdue's bankruptcy estate as insufficient and the plan as therefore unfair to victims and creditors.  If that were true, one might expect the fight in this case to be over whether the non-debtor releases and settlement amount were "appropriate" given the facts and circumstances of this case.  11 U. S. C. §1123(b)(6).

Yet that is not the path the Court takes.  The Court does not contest the Bankruptcy Court's and Second Circuit's

3344

32          HARRINGTON *v.* PURDUE PHARMA L. P.

KAVANAUGH, J., dissenting

conclusion that a non-debtor release was necessary and appropriate for the settlement and the success of Purdue's reorganization—the best, and perhaps the only, chance for victims and creditors to receive fair and equitable compensation.  Indeed, no party has challenged the Bankruptcy Court's factual findings or made an argument that non-debtor releases were used inappropriately in this specific case.

Instead, the Court categorically decides that non-debtor releases are *never* allowed as a matter of law.  The text of the Bankruptcy Code does not remotely support that categorical prohibition.[5]

As explained, §1123(b)(6)'s catchall authority affords bankruptcy courts broad discretion to approve "any other appropriate provision not inconsistent with the applicable provisions" of the Bankruptcy Code.  Recall that §1123(b)(1) expressly authorizes releases of victims' and creditors' claims against the debtor company—here, against Purdue.

———————

[5] To remind the reader of §1123(b)'s lengthy text: A "plan may—

"(1) impair or leave unimpaired any class of claims, secured or unsecured, or of interests;

"(2) subject to section 365 of this title, provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected under such section;

"(3) provide for—

"(A) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or

"(B) the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest;

"(4) provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests;

"(5) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims; and

"(6) include any other appropriate provision not inconsistent with the applicable provisions of this title."

3345

KAVANAUGH, J., dissenting

And recall that §1123(b)(3) expressly authorizes settlements and releases of the debtor company's claims against non-debtors—here, against the Sacklers.  Section 1123(b)(6)'s catchall authority is easily broad enough to allow settlements and releases of the same victims' and creditors' claims against the same non-debtors (the Sacklers), who are indemnified by the debtor and who made a large settlement payment to the debtor's estate.  After all, the Second Circuit stated that in indemnification relationships "a suit against the non-debtor is, in essence, a suit against the debtor."  *In re Purdue Pharma L. P.*, 69 F. 4th 45, 78 (2023) (quotation marks omitted).  And even when the officers and directors are not indemnified, the releases may enable a settlement where the non-debtor makes a sizable payment to the estate that can be fairly and equitably distributed to the victims and creditors, rather than being zeroed out by the first successful suit.

## A

So how does the Court reach its atextual and ahistorical conclusion?  The Court primarily seizes on the canon of *ejusdem generis*, an interpretive principle that "limits general terms that follow specific ones to matters similar to those specified."  *CSX Transp., Inc.* v. *Alabama Dept. of Revenue*, 562 U. S. 277, 294 (2011) (quotation marks and alteration omitted).  But the Court's use of that canon here is entirely misguided.

The *ejusdem generis* canon "applies when a drafter has tacked on a catchall phrase at the end of an enumeration of specifics, as in *dogs, cats, horses, cattle, and other animals*." A. Scalia & B. Garner, Reading Law 199 (2012); see also *id*., at 200–208 ("trays, glasses, dishes, or other tableware"; "gravel, sand, earth or other material"; and numerous other similar lists (quotation marks omitted)); W. Eskridge, Interpreting Law 77 (2016) ("automobiles, motorcycles, and

34          HARRINGTON *v.* PURDUE PHARMA L. P.

KAVANAUGH, J., dissenting

other mechanisms for conveying persons or things" (quotation marks omitted)).

As a general matter, as Justice Scalia explained for the Court, a catchall at the end of the list should be construed to cover "matters not specifically contemplated—known unknowns." *Republic of Iraq* v. *Beaty*, 556 U. S. 848, 860 (2009). That is the "whole value of a generally phrased residual clause." *Ibid.* Or stated otherwise, the fact that "a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." *Pennsylvania Dept. of Corrections* v. *Yeskey*, 524 U. S. 206, 212 (1998) (quotation marks omitted).

The *ejusdem generis* canon can operate to narrow a broad catchall term in certain circumstances. The canon "parallels common usage," reflecting the assumption that when "the initial terms all belong to an obvious and readily identifiable genus, one presumes that the speaker or writer has that category in mind for the entire passage." Scalia & Garner, Reading Law, at 199. The canon in essence "implies the addition" of the term "similar" in the catchall so that the catchall does not extend so broadly as to defy common sense. *Ibid.* Rather, the catchall extends to similar things or actions that serve the same statutory "purpose." *Id.*, at 208.

Here, the Court applies the canon to breezily conclude that there is an "obvious link" through §§1123(b)(1)–(5) that precludes a non-debtor release provision being approved under §1123(b)(6). *Ante,* at 11. The obvious link, according to the Court, is that plan provisions must "concern *the debtor*—its rights and responsibilities, and its relationship with its creditors." *Ibid.*

As an initial matter, the Court does not explain why its supposed common thread excludes the non-debtor releases at issue here. Those releases obviously "concern" the debtor in multiple overlapping respects. *Ibid.* As explained,

3347

KAVANAUGH, J., dissenting

Purdue's bankruptcy plan released the Sacklers only for claims based on *the debtor's* (Purdue's) misconduct. See 69 F. 4th, at 80 (releasing only claims to which Purdue's conduct was "a legal cause or a legally relevant factor to the cause of action" (quotation marks omitted)). The releases therefore applied only to claims held by *the debtor's* victims and creditors. And the releases protected *the debtor* from indemnification claims. So the non-debtor releases here did not just "concern" the debtor, they were critical to the debtor's reorganization.

So the Court's purported "link" manages the rare feat of being so vague ("concerns the debtor"?) as to be almost meaningless—and if not meaningless, so broad as to plainly cover non-debtor releases. It is hard to conjure up a weaker *ejusdem generis* argument than the one put forth by the Court today.

In any event, even on its own terms, the Court's *ejusdem generis* argument is dead wrong for two independent reasons. First, the Court's purported common thread is factually incorrect as a description of (b)(1) to (b)(5). Second, and independent of the first point, black-letter law says that the *ejusdem generis* canon requires looking at the "evident purpose" of the statute in order to discern a common thread. Scalia & Garner, Reading Law, at 208; see Eskridge, Interpreting Law, at 78. And here, the Court's purported common thread ignores (and indeed guts) the evident purpose of §1123(b).

*First,* the Court's purported common thread is factually incorrect. The Court says that the "obvious link" through paragraphs (b)(1) to (b)(5) is that all are limited to "*the debtor*—its rights and responsibilities, and its relationship with its creditors." *Ante,* at 11. But in multiple respects, that assertion is not accurate.

For one thing, paragraph (b)(3) allows a bankruptcy court to modify the rights of debtors with respect to *non-debtors*. Under (b)(3), a bankruptcy court may approve a

KAVANAUGH, J., dissenting

reorganization plan that settles, adjusts, or enforces "any claim" that the debtor holds against non-debtor third parties. That provision allows the debtor's estate to enter into a settlement agreement with a third party, where the estate agrees to release its claims against the third party in exchange for a settlement payment to the bankruptcy estate. And the bankruptcy court has the power to approve such a settlement if it finds the settlement fair and in the best interests of the estate. The bankruptcy court may later enforce that settlement. See generally 7 Collier on Bankruptcy ¶1123.02[3] (R. Levin & H. Sommer eds., 16th ed. 2023).

Importantly, in some cases, including this one, the debtor's creditors may hold derivative claims against that same non-debtor third party for the same "harm done to the estate." 69 F. 4th, at 70 (quotation marks omitted). So when the debtor settles with the non-debtor third party, that settlement also extinguishes the creditors' derivative claims against the non-debtor. And the creditors' consent is not necessary to do so.

To connect the dots: A plan provision settling the debtor's claims against non-debtors under (b)(3) therefore *nonconsensually extinguishes creditors' derivative claims against those non-debtors*. That fact alone defeats the Court's conclusion that §§1123(b)(1)–(5) deal only with relations between the debtor and creditors. If a plan provision under (b)(3) can nonconsensually release some of the creditors' derivative claims against a non-debtor, a plan provision under the catchall in (b)(6) that nonconsensually releases some of the creditors' direct claims against those same non-debtors is easily of a piece—basically the same thing.

This case illustrates the point. Some of the more substantial assets of Purdue's estate are fraudulent transfer claims worth $11 billion that Purdue holds against the non-debtor Sacklers. *In re Purdue Pharma L. P.*, 633

KAVANAUGH, J., dissenting

B. R. 53, 87 (Bkrtcy. Ct. SDNY 2021). Under (b)(3), as part of its reorganization plan, Purdue settled the fraudulent transfer claims with the non-debtor Sacklers. The Bankruptcy Court approved that settlement as fair and equitable. *Id.*, at 83–95. That settlement resolved the claims that likely would have had "the best chance of material success among all of the claims against" the Sacklers. *Id.*, at 109; see also *id.*, at 83.

Notably, the result of that settlement was to also *nonconsensually* extinguish the victims' and creditors' derivative fraudulent transfer claims against the Sacklers. In the absence of the bankruptcy proceeding, victims and creditors could have litigated the fraudulent transfer claims themselves as derivative claims. But because Purdue settled the claims under §1123(b)(3), the victims and creditors could no longer do so.

Moreover, not all victims and creditors consented to the release of those derivative claims. But no one disputes that the Bankruptcy Code authorized that nonconsensual non-debtor release of derivative claims. See 69 F. 4th, at 70 (that conclusion is "well-settled").

The plan therefore released both the estate's claims against the Sacklers *and* highly valuable derivative claims that the victims and creditors held against the Sacklers. Paragraph (b)(3) therefore demonstrates that §1123(b) reaches beyond just creditor-debtor relationships, particularly when the relationship between creditors and other non-debtors can affect the estate. That indisputable point alone defeats the Court's conclusion that §1123(b)'s provisions relate only to the debtor and do not allow releases of claims that victims and creditors hold against non-debtors.

The Court tries to sidestep that conclusion by distinguishing derivative claims from direct claims. Releases of derivative claims, the Court says, are authorized by paragraph (b)(3) "because those claims

38 HARRINGTON *v.* PURDUE PHARMA L. P.

KAVANAUGH, J., dissenting

belong to the debtor's estate." *Ante,* at 12. No doubt. But the question then becomes whether releases of direct claims under (b)(6)'s catchall are relevantly similar to releases of derivative claims that all agree are authorized under (b)(3). The answer in this case is yes. Here, both the derivative and direct claims against the Sacklers are held by the same victims and creditors, and both the derivative and direct claims against the Sacklers could deplete Purdue's estate.

The Court's purported common thread is further contradicted by several other kinds of non-debtor releases that "are commonplace, important to the bankruptcy system, and broadly accepted by the courts and practitioners as necessary and proper" plan provisions under §1123(b)(6). Brief for American College of Bankruptcy as *Amicus Curiae* 3.

Three examples illustrate the point: consensual non-debtor releases, full-satisfaction non-debtor releases, and exculpation clauses.

Consensual non-debtor releases are routinely included in bankruptcy plans even though those releases apply to claims by victims or creditors against non-debtors—just like the claims here. And it is "well-settled that a bankruptcy court may approve" such consensual releases. 69 F. 4th, at 70; see also Brief for American College of Bankruptcy as *Amicus Curiae* 5–7.

Consensual releases are uncontroversial, but they are not expressly authorized by the Bankruptcy Code. So the only provision that could possibly supply authority to include those releases in the bankruptcy plan is the catchall in §1123(b)(6).

The Court today does not deny that consensual releases are routine in the bankruptcy context and that courts have long approved them. See *ante*, at 18–19. But where, on the Court's reading of the Bankruptcy Code, would the bankruptcy court obtain the authority to enter and later enforce that consensual release?

KAVANAUGH, J., dissenting

One suggestion is that the authority comes from the parties' consent and is akin to a "contractual agreement." Tr. of Oral Arg. 33.  But that theory does not explain what provision of the Bankruptcy Code authorizes consensual releases *in bankruptcy plans*.  After all, contracts are enforceable under state law, ordinarily in state courts.  But in bankruptcy, consensual releases are routinely part of a reorganization plan with voting overseen by the bankruptcy court and conditions enforceable by the bankruptcy court. See Brief for American College of Bankruptcy as *Amicus Curiae* 4–7.

To reiterate, the only provision that could provide such authority is §1123(b)(6).  So if the Court thinks that a consensual release can be part of the plan, even the Court must acknowledge that §1123(b)(6) can reach creditors' claims against non-debtors.

The Court's purported common thread is still further contradicted by yet another regular bankruptcy practice: full-satisfaction releases.  Full-satisfaction releases provide full payment for creditors' claims against non-debtors and then release those claims.  When a full-satisfaction release is included in a reorganization plan, the bankruptcy court exercises control over creditors' claims against non-debtors.

Again, the only provision that could possibly supply authority to include those full-satisfaction releases in a bankruptcy plan is the catchall in §1123(b)(6).  Any contract-law theory would not work for full-satisfaction releases, given that holdout creditors often refuse to consent to full-satisfaction releases.  See, *e.g.*, *In re A. H. Robins Co.*, 880 F. 2d 694, 696, 700, 702 (CA4 1989); *In re Boy Scouts of Am. and Del. BSA, LLC*, 650 B. R. 87, 115–116, 141 (Del. 2023).  So if full-satisfaction releases are to be allowed, §1123(b)(6) must be read to reach creditor claims against non-debtors, even without consent.

The Court does not deny that consensual non-debtor releases and full-satisfaction releases might be permissible

under §1123(b)(6). *Ante*, at 19. If they are permissible, then the Court's purported *ejusdem generis* common thread is thoroughly eviscerated because those releases involve claims by victims or creditors against non-debtors, just like here. (And if the Court instead means to hold open the possibility that consensual and full-satisfaction releases are actually impermissible, then its holding today is even more extreme than it appears.)

Exculpation clauses are yet another example. Exculpation clauses shield the estate's fiduciaries and other professionals (non-debtors) from liability for their work on the reorganization plan. See Brief for American College of Bankruptcy as *Amicus Curiae* 9. Without such exculpation clauses, "competent professionals would be deterred from engaging in the bankruptcy process, which would undermine the main purpose of chapter 11—achieving a successful restructuring." *Id.*, at 11; see also Brief for Highland Capital Management, L. P. as *Amicus Curiae* 3–5. For that reason, bankruptcy courts routinely approve exculpation clauses under §1123(b)(6). For exculpation clauses to be allowed, however, §1123(b)(6) must be read to reach creditor claims against non-debtors. So exculpation clauses further refute the Court's purported common thread.

The fact that plan provisions under §1123(b)(6) can reach non-debtors finds still more support in this Court's only case to analyze the catchall authority in §1123(b)(6), *United States* v. *Energy Resources Co.* The plan provision in *Energy Resources* ordered the IRS, a creditor, to apply the debtor's tax payments to trust-fund tax liability before other kinds of tax liability. *United States* v. *Energy Resources Co.*, 495 U. S. 545, 547 (1990). Importantly, if the debtor did not pay the trust-fund tax liability, then non-debtor officers of the company would be on the hook. *Ibid.* So the plan provision served to protect the company's non-debtor officers from "personal liability" for those taxes.

KAVANAUGH, J., dissenting

*In re Energy Resources Co.*, 59 B. R. 702, 704 (Bkrtcy. Ct. Mass. 1986).  In exchange for that protection, a non-debtor officer contributed funds to the bankruptcy plan.  *Ibid.*

Echoing the Court today, the IRS objected to that plan, arguing that the bankruptcy court exceeded its authority under (b)(6) in part because there was no provision in the Code that expressly supported the plan provision.  *Energy Resources*, 495 U. S., at 549–550.  But this Court disagreed with the IRS and approved the plan based on the "residual authority" in (b)(6).  *Id.*, at 549.

The plan provision in *Energy Resources* operated akin to a non-debtor release:  It reduced the potential liability of a non-debtor (the non-debtor's officers) to another non-debtor (the   IRS).    *Energy   Resources*   therefore   further demonstrates that plan provisions under §1123(b)(6) can affect creditor–non-debtor relationships.

In sum, the Court's statement that §1123(b) reaches only "*the  debtor*—its  rights  and  responsibilities,  and  its relationship with its creditors," *ante,* at 11, is factually incorrect several times over.  Paragraphs 1123(b)(3) and (b)(6) already allow plans to affect creditor claims against non-debtors,  such  as  through  releases  of  creditors' derivative  claims,  consensual  releases,  full-satisfaction releases,  and  exculpation  clauses.    And  this  Court's precedent in *Energy Resources* confirms the point.  The Court's *ejusdem generis* argument rests on quicksand.

*Second*,  independent  of  those  many  flaws,  the  Court's entire approach to *ejusdem generis* is wrong from the get-go.  When courts face a statute with a catchall, it is black-letter law that courts must try to discern the common thread by examining the "evident purpose" of the statute. Scalia & Garner, Reading Law, at 208; see also *Begay* v. *United States*, 553 U. S. 137, 146 (2008) (defining common thread "in terms of the Act's basic purposes"); Eskridge,

42 HARRINGTON *v.* PURDUE PHARMA L. P.

KAVANAUGH, J., dissenting

Interpreting Law, at 78 ("statutory purpose" helps identify the common thread in *ejusdem generis* cases).[6]

Importantly, this Court has already explained that the purpose of §1123(b) is to grant bankruptcy courts "broad power" to approve plan provisions "necessary for a reorganization's success." *Energy Resources*, 495 U. S., at 551. *Energy Resources* demonstrates that the common thread of §1123(b) is bankruptcy court action to preserve the estate and ensure fair and equitable recovery for creditors. See, *e.g.*, *Pioneer Investment Services Co.* v. *Brunswick Associates L. P.*, 507 U. S. 380, 389 (1993); *NLRB* v. *Bildisco & Bildisco*, 465 U. S. 513, 528 (1984); J. Feeney & M. Stepan, 2 Bankruptcy Law Manual §11:1 (5th ed. 2023).

As explained at length above, to maximize recovery, the Court must solve complex collective-action problems. And for a bankruptcy court to solve all of the relevant collective-action problems, §§1123(b)(1)–(5) give the bankruptcy court broad power to modify parties' rights without their consent—most notably, to release creditors' claims against the debtor. §1123(b)(1). Under that provision, the Purdue plan released the victims' and creditors' claims *against Purdue* in order to prevent a collective-action problem in distributing Purdue's assets—and thereby to preserve the estate and ensure fair and equitable recovery for victims and creditors.

--------

[6] The Court protests that we are looking to the "purpose" of the statute. But in *ejusdem generis* cases, courts are *required* to look at "purpose" in order to determine the common link, as Scalia and Garner and Eskridge all say, and as *Begay* indicated. That is longstanding black-letter law. And even outside the *ejusdem generis* context, the Court's allergy to the word "purpose" is strange. After all, "words are given meaning by their context, and context includes the purpose of the text. The difference between textualist interpretation" and "purposive interpretation is not that the former never considers purpose. It almost always does," but "the purpose must be derived from the text." A. Scalia & B. Garner, Reading Law 56 (2012).

Cite as: 603 U. S. ____ (2024)          43

KAVANAUGH, J., dissenting

The non-debtor release provision approved under §1123(b)(6) does the same thing and serves that same statutory purpose. As discussed above, the victims' and creditors' claims against the non-debtor Purdue officers and directors (the Sacklers) are essentially the same as their claims against Purdue. The claims against the Sacklers rest on the same legal theories and facts as the claims against Purdue, largely the Sacklers' opioid-related decisions in running Purdue. And the Sacklers are indemnified by Purdue's estate for their liability. So any liability could potentially come out of the Purdue estate just like the claims against Purdue itself.

Therefore, the nonconsensual releases against the Sacklers are not only of a similar genus, but in effect *the same thing* as the nonconsensual releases against Purdue that everyone agrees §1123(b)(1) already authorizes. Both were necessary to preserve the estate and prevent collective-action problems that could drain Purdue's estate, and thus both were necessary to enable Purdue's reorganization plan to succeed and to equitably distribute assets. And without the releases, there would be no settlement, meaning no $5.5 to $6 billion payment by the Sacklers to Purdue's estate. That would mean either that no victim or creditor could recover anything from the Sacklers (or indeed from Purdue), or that only a few victims or creditors could recover from the Sacklers at the expense of fair and equitable distribution to everyone else.

The statute's evident purpose therefore easily answers the *ejusdem generis* inquiry here. Absent other limitations and restrictions in the Code, §1123(b)(6) authorizes a bankruptcy court to modify parties' claims that could otherwise threaten to deplete the bankruptcy estate when doing so is necessary to preserve the estate and provide fair and equitable recovery for creditors.

In light of the "evident purpose" of §1123(b) to preserve the estate and ensure fair and equitable recovery for

3356

44          HARRINGTON *v.* PURDUE PHARMA L. P.

KAVANAUGH, J., dissenting

creditors in the face of collective-action problems, Scalia & Garner, Reading Law, at 208; see Eskridge, Interpreting Law, at 78, the Court's *ejusdem generis* theory simply falls apart.

In sum, for each of two independent reasons, the Court's *ejusdem generis* argument fails. First, its common thread is factually wrong. And second, its purported common thread disregards the evident purpose of §1123(b).

B

Despite the fact that non-debtor releases address the very collective-action problem that the bankruptcy system was designed to solve, the Court next trots out a few minimally explained arguments that non-debtor release provisions are "inconsistent with" various provisions of the Bankruptcy Code, including: (i) §524(g)'s authorization of non-debtor releases in asbestos cases; (ii) §524(e)'s statement that debtors' discharges do not automatically affect others' liabilities; and (iii) the Code's various restrictions on bankruptcy discharges. None of those arguments is persuasive.

*First*, the Court cites §524(g), which was enacted in 1994 to expressly authorize non-debtor releases in a specific context: cases involving mass harm "caused by the presence of, or exposure to, asbestos or asbestos-containing products." §524(g)(2)(B)(i)(I). From the fact that §524(g) allows non-debtor releases in the asbestos context, the Court infers that non-debtor releases are prohibited in other contexts. *Ante,* at 15.

But the very text of §524(g) *expressly precludes* the Court's inference. The statute says: "Nothing in [§524(g)] shall be construed to modify, impair, or supersede any other authority the court has to issue injunctions in connection with an order confirming a plan of reorganization." 108 Stat. 4117, note following 11 U. S. C. §524. Congress expressly authorized non-debtor releases in one specific

KAVANAUGH, J., dissenting

context that was critically urgent in 1994 when it was enacted.  But Congress also enacted the corresponding rule of construction into binding statutory text to "make clear" that §524(g) did not "alter" the bankruptcy courts' ability to use non-debtor release mechanisms as appropriate in other cases.  140 Cong. Rec. 27692 (1994).

Keep in mind that Congress enacted §524(g) in the early days of non-debtor releases, soon after bankruptcy courts began approving non-debtor releases in asbestos cases. See, *e.g.*, *In re Johns-Manville Corp.*, 68 B. R. 618, 621–622 (Bkrtcy. Ct. SDNY 1986), aff'd, 837 F. 2d 89, 90 (CA2 1988); *UNARCO Bloomington Factory Workers* v. *UNR Industries, Inc.*, 124 B. R. 268, 272, 278–279 (ND Ill. 1990).  Section 524(g) set forth a detailed scheme sensitive to the specific needs of asbestos mass-tort litigation that was then engulfing and overwhelming American courts.  For example, because asbestos injuries often have a long latency period, asbestos mass-tort bankruptcies needed to account for unknown claimants who could come out of the woodwork in the future.  See Bankruptcy Reform Act of 1994, 108 Stat. 4114–4116; *In re Johns-Manville Corp.*, 68 B. R., at 627–629.

But as explained above, throughout the history of the Code and at the time §524(g) was enacted, bankruptcy courts were also issuing non-debtor releases in other contexts as well, such as in the Dalkon Shield mass-tort bankruptcy case.  *A. H. Robins Co.*, 880 F. 2d, at 700–702; see also, *e.g.*, *In re Drexel Burnham Lambert Group, Inc.*, 960 F. 2d 285, 293 (CA2 1992) (securities litigation context). Congress therefore made clear that enacting §524(g) for the urgent asbestos cases did not disturb bankruptcy courts' preexisting authority to issue such releases in other cases.

Bottom line:  The Court's reliance on §524(g) directly contravenes the actual statutory text.

*Second*, the Court cites §524(e), which states that a plan's discharge of the debtor "does not affect the liability of any

KAVANAUGH, J., dissenting

other entity on . . . such debt." By its terms, §524(e) does not purport to preclude releases of creditors' claims against non-debtors.   (And were the rule otherwise, even consensual releases would be prohibited as well.)

Notably, Congress changed §524(e) to its current wording in 1979.  Before 1979, the statute arguably did preclude releases of claims against non-debtors who were co-debtors with a bankrupt company.  See 11 U. S. C. §34 (1976 ed.) (repealed Oct. 1, 1979) ("The liability of a person who is a co-debtor with, or guarantor or in any manner a surety for, a bankrupt *shall not* be altered by the discharge of such bankrupt" (emphasis added)).  But Congress then changed the law.  And the text now means only that the discharge of the debtor does not *itself* automatically wipe away the liability of a non-debtor.  Section 524(e) does not speak to the issue of non-debtor releases or other steps that a plan may take regarding the liability of a non-debtor for the same debt.  As the American College of Bankruptcy says, "Section 524(e) is agnostic as to third-party releases."  Brief for American College of Bankruptcy as *Amicus Curiae* 6, n. 3; see also *In re Airadigm Communications, Inc.*, 519 F. 3d 640, 656 (CA7 2008).

*Third*, citing §§523(a), 524(a), and 541(a), the Court says that the plan improperly grants a "discharge" to the Sacklers. *Ante,* at 4, 14–15.  And the Court suggests that giving the Sacklers a "discharge" in Purdue's bankruptcy plan in exchange for $5.5 to $6 billion allows the Sacklers to get away too easy—without filing for bankruptcy themselves, without having to comply with the Code's various restrictions, and without paying enough.  See *ante,* at 14–15.  That point also fails.

To begin, the premise is incorrect.  The Sacklers did not receive a bankruptcy discharge in this case.  Discharge is a term of art in the Bankruptcy Code.  *Wainer* v. *A. J. Equities, Ltd.*, 984 F. 2d 679, 684 (CA5 1993); J. Silverstein, Hiding in Plain View: A Neglected Supreme Court Decision

Cite as: 603 U. S. ____ (2024)          47

KAVANAUGH, J., dissenting

Resolves the Debate Over Non-Debtor Releases in Chapter 11 Reorganizations, 23 Emory Bkrtcy. Developments J. 13, 130 (2006). When a debtor in bankruptcy receives a discharge, most (if not all) of their pre-petition debts are released, giving the debtor a fresh start. See §1141(d)(1) (Chapter 11 discharge relieves the debtor "from any debt that arose before the date of" plan confirmation, with narrow exceptions); *Taggart* v. *Lorenzen*, 587 U. S. 554, 556, 558 (2019). The Sacklers did not receive such a discharge.

As courts have always recognized, non-debtor releases are different. Non-debtor releases "do not offer the umbrella protection of a discharge in bankruptcy." *Johns-Manville Corp.*, 837 F. 2d, at 91. Rather, non-debtor releases are accompanied by settlement payments to the estate by the non-debtor. So non-debtor releases are simply one part of a settlement of pending or potential claims against the non-debtor that arise out of some torts committed by the debtor. They are in essence a traditional litigation settlement. They are not a blanket discharge for the non-debtor.

Here, therefore, the releases apply only to certain claims against the Sacklers—namely, those "that arise out of or relate to" Purdue's bankruptcy. *Ibid.*; see 69 F. 4th, at 80 (releasing the Sacklers only for claims to which Purdue's conduct was "a legal cause or a legally relevant factor to the cause of action" (quotation marks omitted)). And the non-debtor releases were negotiated in exchange for a significant settlement payment that enabled *Purdue's* bankruptcy reorganization to succeed.

In short, the releases do not grant discharges to non-debtors and cannot be disallowed on that basis.

Next, the Court suggests that the Sacklers must file for bankruptcy themselves in order to be released from liability. That, too, is incorrect. Nowhere does the Code say that a non-debtor may be released from liability only by

3360

48        HARRINGTON *v.* PURDUE PHARMA L. P.

KAVANAUGH, J., dissenting

filing for bankruptcy.  On the contrary, §1123(b)(3) of the
Code already expressly allows a bankruptcy plan to release
a non-debtor from liability to the debtor.

The Court's suggestion that a non-debtor must file for
bankruptcy in order to be released from liability not only is
directly at odds with the text of the Code, but also is at odds
with reality.  Non-debtor releases are often used in
situations where it is not possible or practicable for the non-
debtors to simply file for individual bankruptcies.  This case
is just one example.  The "Sacklers are not a simple group
of a few defendants" that could simply have declared one
bankruptcy.  633 B. R., at 88.  They are "a large family
divided into two sides, Side A and Side B, with eight pods
or groups of family members within those divisions," many
of whom live abroad (beyond bankruptcy jurisdiction).  *Ibid.*
And their assets are spread across trusts that are likely
beyond the jurisdiction of U. S. courts as well.  *Ibid.*; see
also *id.*, at 109.

Likewise, in many other mass-tort bankruptcy cases,
released non-parties could not simply declare their own
bankruptcies either.  Insurers, for example, cannot declare
bankruptcy just because a policy limit is reached.
B. Zaretsky, Insurance Proceeds in Bankruptcy, 55
Brooklyn L. Rev. 373, 394–395, and n. 60 (1989).  And in
cases involving hundreds of affiliated entities who share
liability and share insurance, such as the Boy Scouts and
the Catholic Church, it would be almost impossible to
coordinate assets and ensure equitable victim recovery
across hundreds of distinct bankruptcies.  Section
§1123(b)(6) provides bankruptcy courts with flexibility to
deal with such situations by approving appropriate non-
debtor releases.  See Brief for Boy Scouts of America as
*Amicus Curiae* 18–20; Brief for Ad Hoc Group of Local
Councils of the Boy Scouts of America as *Amicus Curiae* 6;
Brief for U. S. Conference of Catholic Bishops as *Amicus
Curiae* 3–4, 17–22.

Cite as: 603 U. S. ____ (2024)          49

KAVANAUGH, J., dissenting

The Court next says that the non-debtor release allowed the Sacklers to bypass certain restrictions on discharges—for example, that individual debtors are generally not discharged for fraud claims, §523(a). That argument fails for the same reason. Non-debtor releases are part of a negotiated settlement of potential tort claims. They are not a discharge. And nothing in §523(a) prohibits a debtor's reorganization plan from *releasing* non-debtors for fraud claims. Indeed, it is undisputed that Purdue's bankruptcy could release the Sacklers from at least some fraud claims—namely, the fraudulent transfer claims—under §1123(b)(3). No provision in the Code forbids releasing other fraud claims against the Sacklers, too. The Court's concern that the releases apply to claims for "fraud," *ante,* at 15, therefore falls flat.

In all of those scattershot arguments, the Court seems concerned that the Sacklers' $5.5 to $6 billion settlement payment was not enough. To begin with, even if that were true, it would not be a reason to *categorically* disallow non-debtor releases as a matter of law, as the Court does today. In any event, that concern is unsupported by the record and contradicted by the Bankruptcy Court's undisputed findings of fact. The Bankruptcy Court found that the creditors' and victims' ability to recover directly from any of the Sacklers in tort litigation was far from certain. So as in other tort settlements, the settlement amount here reflected the parties' assessments of their probabilities of success and the likely amount of possible recovery. The Court today has no good basis for its subtle second-guessing of the settlement amount.

And lest we miss the forest for the trees, keep in mind that the victims and creditors have no incentive to short their own recoveries or to let the Sacklers off easy. They despise the Sacklers. Yet they strongly support the plan. They call the settlement a "remarkable achievement." Brief for Respondent Ad Hoc Group of Individual Victims of

3362

KAVANAUGH, J., dissenting

Purdue Pharma, L. P. et al. 2.  And given the high level of victim and creditor support, the Bankruptcy Court emphasized: "[T]his is *not* the Sacklers' plan," and "anyone who contends to the contrary" is "simply misleading the public."  633 B. R., at 82.

The Court today unfortunately falls into that trap.  And it is rather paternalistic for the Court to tell the victims that they should have done better—and then to turn around and leave them with potentially nothing.

C

Finally, the Court suggests that non-debtor releases are not "appropriate" because they are inconsistent with history and practice.  That, too, is seriously mistaken.

Importantly, Congress did not enact the current Bankruptcy Code—and with it, §1123(b)(6)—until 1978. Bankruptcy Code of 1978, 92 Stat. 2549.  For nearly the entire life of the Code, courts have approved non-debtor release provisions like this one.  So for decades, Chapter 11 of the Code has been understood to grant authority for such releases when appropriate and necessary to the success of the reorganization.[7]

The Court's citations to pre-Bankruptcy Code cases are an off-point deflection and do not account for important and relevant changes made in the current Bankruptcy Code.

─────────

[7] See, *e.g.*, *In re Johns-Manville Corp.*, 68 B. R. 618, 624–626 (Bkrtcy. Ct. SDNY 1986), aff'd, 837 F. 2d 89, 90, 93–94 (CA2 1988); *In re A. H. Robins Co.*, 88 B. R. 742, 751 (ED Va. 1988), aff'd, 880 F. 2d 694, 700– 702 (CA4 1989); *UNARCO Bloomington Factory Workers* v. *UNR Industries, Inc.*, 124 B. R. 268, 272, 278–279 (ND Ill. 1990); *In re Drexel Burnham Lambert Group, Inc.*, 960 F. 2d 285, 293 (CA2 1992); *In re Master Mortgage Inv. Fund, Inc.*, 168 B. R. 930, 938 (Bkrtcy. Ct. WD Mo. 1994); *In re Dow Corning Corp.*, 280 F. 3d 648, 653 (CA6); *In re Airadigm Communications, Inc.*, 519 F. 3d 640, 655–658 (CA7 2008); *In re Seaside Engineering & Surveying, Inc.*, 780 F. 3d 1070, 1081 (CA11 2015); *In re Boy Scouts of Am. and Del. BSA, LLC*, 650 B. R. 87, 112, 135–143 (Del. 2023).  I could add dozens more citations to this footnote.  But the point is clear.

KAVANAUGH, J., dissenting

For example, unlike the former Bankruptcy Act of 1898, the modern Bankruptcy Code grants courts jurisdiction over "suits between third parties which have an effect on the bankruptcy estate." *Celotex Corp.* v. *Edwards*, 514 U. S. 300, 307, n. 5 (1995); see 28 U. S. C. §§157(a), 1334(b) (giving bankruptcy courts jurisdiction over any litigation "related to" the bankruptcy).

Under the current Bankruptcy Code, it is well settled that Chapter 11 bankruptcies can and do affect relationships between creditors and non-debtors who are intimately related to the bankruptcy. For example, under the modern Bankruptcy Code, bankruptcy courts routinely use their broad jurisdiction and equitable powers to stay any litigation—even litigation entirely between third parties—that would affect the bankruptcy estate. *Celotex*, 514 U. S., at 308–310.

The longstanding practice of staying litigation that could affect the bankruptcy estate is similar in important respects to non-debtor releases. In each situation, a provision of the Code provides an explicit authority: to stay litigation involving the debtor, §362, and to release claims involving the debtor, §§1123(b)(1), (3). And in each, the bankruptcy court invokes its broad jurisdiction and equitable power to "augment" that authority, extending it to litigation and claims against non-debtors that might have a "direct and substantial adverse effect" on the bankruptcy estate. *Celotex*, 514 U. S., at 303, 310.

In short, the common and long-accepted practice of staying litigation that could affect the bankruptcy estate shows that under the modern Code, bankruptcy courts can and do exercise control over relationships between creditors

52          HARRINGTON *v.* PURDUE PHARMA L. P.

KAVANAUGH, J., dissenting

and non-debtors. The Court's reliance on pre-Code practice is misplaced.[8]

### IV

As I see it, today's decision makes little sense legally, practically, or economically. It upends the carefully negotiated Purdue bankruptcy plan and the prompt and substantial recovery guaranteed to opioid victims and creditors. Now the opioid victims and creditors are left holding the bag, with no clear path forward. To reiterate the words of the victims: "Without the release, the plan will unravel," and "there will be no viable path to any victim recovery." Tr. of Oral Arg. 100.

The Court does not say what should happen next. The Court seems to hope that a new deal is possible, with the Sacklers buying off the last holdouts.

But even if it were true that the parties could eventually reach a new deal, that outcome would likely come at a cost. Future negotiations and litigation would mean additional litigation expense that eats away at the recovery that the opioid victims and creditors have already negotiated, as well as years of additional delay even though victims and family members want and need relief *now*.

And more to the point, without non-debtor releases, a new deal will be very difficult to achieve. By eliminating nonconsensual non-debtor releases, today's decision gives every victim and every creditor an absolute right to sue the Sacklers. Some may hold out from any potential future settlement and instead sue because they want to have their day in court to hold the defendants accountable, or because they want to try to hit the jackpot of a large recovery that they can keep all to themselves. Moreover, because every

--------

[8] The Court insists that pre-Code practice "may inform our work." *Ante*, at 17, n. 6. But pre-Code practice certainly does not play a role when that practice has been superseded by an express provision of the modern Bankruptcy Code.

KAVANAUGH, J., dissenting

victim and creditor knows that the Sacklers' resources are limited, they will now have an incentive to promptly sue the Sacklers before others sue.  To be sure, the victims and creditors would face an uphill climb in any such litigation, the Bankruptcy Court found, so it may be that no one will succeed in tort litigation against the Sacklers, meaning that no one will get anything.  But even if just one of the victims or creditors—say, a State or a group of victims—is successful in a suit against the Sacklers, its judgment "could wipe out all of the collectible Sackler assets," which in turn could also deplete Purdue's estate and leave nothing for any other victim or creditor.  *Id*., at 103.  That reality means that everyone has an incentive to race to the courthouse to sue the Sacklers pronto—the classic collective-action problem.

Because some victims or creditors may hold out from any potential future settlement for any one of those reasons and instead still sue, the Sacklers are less likely to settle with anyone in the first place.  Maybe the clouds will part.  But in a world where nonconsensual non-debtor releases are categorically impermissible, any hope for a new deal seems questionable—indeed, the parties to the bankruptcy label it "pure fantasy."  Brief for Debtor Respondents 4.

The bankruptcy system was designed to prevent that exact sort of collective-action problem.  Non-debtor releases have been indispensable to solving that problem and ensuring fair and equitable *victim recovery* in multiple bankruptcy proceedings of extraordinary scale—not only opioids, but also many other mass-tort cases involving asbestos, the Boy Scouts, the Catholic Church, silicone breast implants, the Dalkon Shield, and others.

The Court's apparent concern that the Sacklers' settlement payment of $5.5 to $6 billion was not enough should have led at most to a remand on whether the releases were "appropriate" under 11 U. S. C. §1123(b)(6) (if anyone had raised that argument here, which they have

54          HARRINGTON *v.* PURDUE PHARMA L. P.

KAVANAUGH, J., dissenting

not).  But instead the Court responds with the dramatic step of repudiating the plan and eliminating non-debtor releases altogether.

The Court's decision today jettisons a carefully circumscribed and critically important tool that bankruptcy courts have long used and continue to need to handle mass-tort bankruptcies going forward.  The text of the Bankruptcy Code does not come close to requiring such a ruinous result.  Nor does its structure, context, or history.  Nor does hostility to the Sacklers—no matter how deep: "Nothing is more antithetical to the purpose of bankruptcy than destroying estate value to punish someone."  A. Casey & J. Macey, In Defense of Chapter 11 for Mass Torts, 90 U. Chi. L. Rev. 973, 1017 (2023).  Gutting this longstanding bankruptcy court practice is entirely counterproductive, and simply inflicts still more injury on the opioid victims.

Opioid victims and other future victims of mass torts will suffer greatly in the wake of today's unfortunate and destabilizing decision.  Only Congress can fix the chaos that will now ensue.  The Court's decision will lead to too much harm for too many people for Congress to sit by idly without at least carefully studying the issue.  I respectfully dissent.

3367

# Tab 37

524 B.R. 488
**(Cite as: 524 B.R. 488)**

C

United States Bankruptcy Court,
S.D. New York.
In re: Hellas Telecommunications (Luxembourg) II SCA, Debtor in a Foreign Proceeding.
Andrew Lawrence Hosking and Simon James Bonney, in their capacity as joint compulsory liquidators and duly authorized foreign representative s of Hellas Telecommunications (Luxembourg) II SCA, Plaintiffs,
v.
TPG Capital Management, L.P., et al., Defendants.

Case No. 12–10631 (MG)
Adv. Proc. No. 14–01848 (MG)
Signed January 29, 2015

**Background:** Official liquidators of debtor that was in the process of being liquidated under insolvency law of the United KIngdom brought adversary proceeding, following recognition of foreign proceeding as foreign main proceeding, to recover proceeds from redemption of convertible preferred equity certificates (CPECs) on fraudulent transfer or unjust enrichment theory, and defendants moved to dismiss, inter alia, for lack of personal jurisdiction.

**Holdings:** The Bankruptcy Court, Martin Glenn, J., held that:

(1) bankruptcy court could exercise general personal jurisdiction over those defendants for whom the United States was their domicile, place of incorporation, or principal place of business, as well as over corporate defendant which, while not incorporated or having principal place of business in the United States, allegedly had, as critical hub of its core banking operations, a regional head office in New York;

(2) alleged contacts between non-United-States de-

fendants and the United States were not sufficiently related to fraudulent transfer and other claims asserted by liquidators to permit court to exercise specific personal jurisdiction;

(3) while commencement of Chapter 15 case did not create any "estate," this did not affect bankruptcy court's ability to exercise "related to" jurisdiction over adversary proceeding brought by foreign liquidators to recover more than a billion dollars on fraudulent transfer and unjust enrichment theories;

(4) liquidators could not pursue claim under constructive fraud provisions of New York fraudulent transfer law, given that neither Luxembourg nor the United KIngdom, jurisdictions with greater interests in avoiding challenged transactions, recognized constructive fraudulent transfer claims;

(5) liquidators failed to establish their standing to pursue actual fraudulent transfer claim on creditors' behalf under New York fraudulent transfer provision;

(6) liquidators sufficiently alleged existence of inside relationship between debtor and defendants that court could not determine, at motion-to-dismiss stage, that unjust enrichment claims were barred by the *Wagoner* rule or in pari delicto doctrine;

(7) tolling provision of the Bankruptcy Code applied in Chapter 15 case, so as to prevent six-year statute of limitations on unjust enrichment claims from running; and

(8) liquidators adequately alleged existence of close relationship between parties, as required under New York law to support unjust enrichment claim.

Motion granted in part and denied in part.

West Headnotes

**[1] Constitutional Law 92 🗝3964**

92 Constitutional Law
92XXVII Due Process

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

92XXVII(E) Civil Actions and Proceedings
92k3961 Jurisdiction and Venue
92k3964 k. Non-residents in general.
Most Cited Cases

To establish personal jurisdiction over defendant, plaintiff must, as matter of due process, show: (1) that defendant has certain minimum contacts with relevant forum, and (2) that exercise of jurisdiction is reasonable under the circumstances. U.S. Const. Amend. 5.

**[2] Federal Courts 170B ⚷2726(2)**

170B Federal Courts
170BX Personal Jurisdiction
170BX(B) Actions by or Against Nonresidents; 'Long-Arm' Jurisdiction
170Bk2722 Factors Considered in General
170Bk2726 Connection with Litigation
170Bk2726(2) k. Unrelated contacts and activities; general jurisdiction. Most Cited Cases

**Federal Courts 170B ⚷2726(3)**

170B Federal Courts
170BX Personal Jurisdiction
170BX(B) Actions by or Against Nonresidents; 'Long-Arm' Jurisdiction
170Bk2722 Factors Considered in General
170Bk2726 Connection with Litigation
170Bk2726(3) k. Related contacts and activities; specific jurisdiction. Most Cited Cases

When assessing sufficiency of defendant's minimum contacts with forum, for purposes of deciding whether they can exercise personal jurisdiction, courts distinguish between "general" personal jurisdiction, which allows them to hear any and all claims against defendant, and "specific" personal jurisdiction, which allows them to hear claims that arise out of, or relate to. defendant's contacts with forum.

**[3] Federal Courts 170B ⚷2726(2)**

170B Federal Courts
170BX Personal Jurisdiction
170BX(B) Actions by or Against Nonresidents; 'Long-Arm' Jurisdiction
170Bk2722 Factors Considered in General
170Bk2726 Connection with Litigation
170Bk2726(2) k. Unrelated contacts and activities; general jurisdiction. Most Cited Cases

Only a narrow set of affiliations with forum will subject defendant to general jurisdiction in that forum.

**[4] Federal Courts 170B ⚷2726(2)**

170B Federal Courts
170BX Personal Jurisdiction
170BX(B) Actions by or Against Nonresidents; 'Long-Arm' Jurisdiction
170Bk2722 Factors Considered in General
170Bk2726 Connection with Litigation
170Bk2726(2) k. Unrelated contacts and activities; general jurisdiction. Most Cited Cases

**Federal Courts 170B ⚷2732**

170B Federal Courts
170BX Personal Jurisdiction
170BX(B) Actions by or Against Nonresidents; 'Long-Arm' Jurisdiction
170Bk2729 Particular Nonresident Entities
170Bk2732 k. Corporations and business organizations. Most Cited Cases

Paradigm basis for general jurisdiction when defendant is individual is his or her domicile, whereas with respect to corporation, paradigm bases for general jurisdiction are its place of incorporation and principal place of business.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

**[5] Federal Courts 170B ⚷2726(2)**

170B Federal Courts
   170BX Personal Jurisdiction
      170BX(B) Actions by or Against Nonresidents; 'Long-Arm' Jurisdiction
         170Bk2722 Factors Considered in General
         170Bk2726 Connection with Litigation
            170Bk2726(2) k. Unrelated contacts and activities; general jurisdiction. Most Cited Cases

**Federal Courts 170B ⚷2732**

170B Federal Courts
   170BX Personal Jurisdiction
      170BX(B) Actions by or Against Nonresidents; 'Long-Arm' Jurisdiction
         170Bk2729 Particular Nonresident Entities
         170Bk2732 k. Corporations and business organizations. Most Cited Cases

While place of domicile, and place of incorporation or principal place of business, are paradigm bases for exercise of general jurisdiction over individual and corporate defendants, respectively, they are not the exclusive bases for general jurisdiction.

**[6] Federal Courts 170B ⚷2726(2)**

170B Federal Courts
   170BX Personal Jurisdiction
      170BX(B) Actions by or Against Nonresidents; 'Long-Arm' Jurisdiction
         170Bk2722 Factors Considered in General
         170Bk2726 Connection with Litigation
            170Bk2726(2) k. Unrelated contacts and activities; general jurisdiction. Most Cited Cases

Engaging in a substantial, continuous, and systematic course of business in forum is not alone sufficient to render a defendant subject to general jurisdiction in such forum.

**[7] Federal Courts 170B ⚷2732**

170B Federal Courts
   170BX Personal Jurisdiction
      170BX(B) Actions by or Against Nonresidents; 'Long-Arm' Jurisdiction
         170Bk2729 Particular Nonresident Entities
         170Bk2732 k. Corporations and business organizations. Most Cited Cases

Beyond the paradigm bases for exercising general jurisdiction over corporate defendant, general jurisdiction exists when corporation's affiliations with state are so continuous and systematic as to render it essentially at home in forum state.

**[8] Bankruptcy 51 ⚷2081**

51 Bankruptcy
   51I In General
      51I(D) Venue; Personal Jurisdiction
         51k2081 k. In general. Most Cited Cases

In federal question cases, no inquiry into defendant's minimum contacts with forum state is needed in order for court to exercise jurisdiction pursuant to Bankruptcy Rule dealing with service of process; rather, only a federal "minimum contacts" test must be satisfied. Fed. R. Bankr. P. 7004.

**[9] Bankruptcy 51 ⚷2081**

51 Bankruptcy
   51I In General
      51I(D) Venue; Personal Jurisdiction
         51k2081 k. In general. Most Cited Cases

**Bankruptcy 51 ⚷2341**

51 Bankruptcy

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

51III The Case
    51III(H) Cases Ancillary to Foreign Proceedings
        51k2341 k. In general. Most Cited Cases

To determine whether it could exercise personal jurisdiction over defendants in cause of action brought by liquidators of foreign debtor to set aside alleged fraudulent transfers and recover on unjust enrichment theory, it was appropriate for bankruptcy court to apply nationwide minimum contacts test, though liquidators' claims were all based on New York state law, and though their only jurisdictional hook to federal court was debtor's Chapter 15 proceeding. Fed. R. Bankr. P. 7004.

**[10] Constitutional Law 92 ☞3964**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(E) Civil Actions and Proceedings
            92k3961 Jurisdiction and Venue
                92k3964 k. Non-residents in general. Most Cited Cases

Nationwide contacts satisfy due process requirements for exercise of personal jurisdiction, where court has federal jurisdiction and nationwide service of process is authorized under an applicable federal statute. U.S. Const. Amend. 5.

**[11] Bankruptcy 51 ☞2081**

51 Bankruptcy
    51I In General
        51I(D) Venue; Personal Jurisdiction
            51k2081 k. In general. Most Cited Cases

**Bankruptcy 51 ☞2341**

51 Bankruptcy
    51III The Case

51III(H) Cases Ancillary to Foreign Proceedings
    51k2341 k. In general. Most Cited Cases

In cause of action brought by liquidators of foreign debtor to set aside alleged fraudulent transfers and recover on unjust enrichment theory, bankruptcy court could exercise general personal jurisdiction over those defendants for whom the United States was their domicile, place of incorporation, or principal place of business, as well as over corporate defendant which, while not incorporated or having principal place of business in the United States, allegedly had, as critical hub of its core banking operations, a regional head office in New York, where it had $5 billion in assets and employed some 1,600 personnel, including 1,000 executives; such alleged contacts were more than merely transitory and were sufficiently continuous and systematic as to render defendant essentially at home in the United States.

**[12] Federal Courts 170B ☞2726(3)**

170B Federal Courts
    170BX Personal Jurisdiction
        170BX(B) Actions by or Against Nonresidents; 'Long-Arm' Jurisdiction
            170Bk2722 Factors Considered in General
                170Bk2726 Connection with Litigation
                    170Bk2726(3) k. Related contacts and activities; specific jurisdiction. Most Cited Cases

Inquiry into whether forum state may assert specific jurisdiction over nonresident defendant focuses on relationship among the defendant, the forum, and the litigation.

**[13] Federal Courts 170B ☞2726(3)**

170B Federal Courts
    170BX Personal Jurisdiction
        170BX(B) Actions by or Against Nonresi-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

dents; 'Long-Arm' Jurisdiction

        170Bk2722 Factors Considered in General

          170Bk2726 Connection with Litigation

            170Bk2726(3)  k. Related contacts and activities; specific jurisdiction. Most Cited Cases

When claim arises out of, or relates to, defendant's contacts with forum, minimum contacts necessary to support exercise of personal jurisdiction exist where defendant purposefully availed himself of privilege of doing business in forum and could foresee being haled into court there.

**[14] Bankruptcy 51 🔑 2081**

51 Bankruptcy
    51I In General
      51I(D) Venue; Personal Jurisdiction
        51k2081 k. In general. Most Cited Cases

**Bankruptcy 51 🔑 2341**

51 Bankruptcy
    51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
        51k2341 k. In general. Most Cited Cases

Alleged contacts between non-United-States defendants and the United States were not sufficiently related to fraudulent transfer and other claims asserted by liquidators of foreign debtor, all of which arose out of these non-United-States defendants' receipt and unjust retention of redemption proceeds allegedly belonging to debtor, to permit bankruptcy court to exercise specific personal jurisdiction over these non-United-States defendants; any subsequent transfer of redemption proceeds made by the non-United-States defendants to recipients in the United States was irrelevant to their liability as transferees, and thus could not constitute sufficient minimum contacts to establish specific personal ju-

risdiction.

**[15] Constitutional Law 92 🔑 3964**

92 Constitutional Law
    92XXVII Due Process
      92XXVII(E) Civil Actions and Proceedings
        92k3961 Jurisdiction and Venue
          92k3964 k. Non-residents in general.
Most Cited Cases

In order for it to be reasonable for court to exercise personal jurisdiction over foreign defendant consistent with due process, defendant's contacts with the forum must be such that maintenance of suit does not offend traditional notions of fair play and substantial justice. U.S. Const. Amend. 5.

**[16] Constitutional Law 92 🔑 3964**

92 Constitutional Law
    92XXVII Due Process
      92XXVII(E) Civil Actions and Proceedings
        92k3961 Jurisdiction and Venue
          92k3964 k. Non-residents in general.
Most Cited Cases

In assessing reasonableness of exercising personal jurisdiction over foreign defendant, for purposes of due process fair play and substantial justice analysis, court must take into account: (1) the burden that exercise of jurisdiction will impose on defendant; (2) the interests of forum state in adjudicating the case; (3) plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining most efficient resolution of controversy; and (5) shared interest of states in furthering substantive social policies. U.S. Const. Amend. 5.

**[17] Federal Courts 170B 🔑 2791**

170B Federal Courts

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

170BX Personal Jurisdiction
170BX(C) Objections, Proceedings, and De-termination
170Bk2789 Evidence; Affidavits
170Bk2791 k. Presumptions and burden of proof. Most Cited Cases

When constitutional minimum contacts have been established, interests of plaintiff and the forum in exercise of jurisdiction will often justify even serious burdens placed on foreign defendant, so that in such instances, burden shifts to defendant to present a compelling case that establishing personal jurisdiction would be unreasonable.

**[18] Bankruptcy 51 ☞2081**

51 Bankruptcy
51I In General
51I(D) Venue; Personal Jurisdiction
51k2081 k. In general. Most Cited Cases

**Bankruptcy 51 ☞2341**

51 Bankruptcy
51III The Case
51III(H) Cases Ancillary to Foreign Proceed-ings
51k2341 k. In general. Most Cited Cases

Defendants that were subject to the general ju-risdiction of bankruptcy court in fraudulent trans-fer/unjust enrichment proceeding brought by liquida-tors of foreign debtor, whether because the United States was their domicile, place of incorporation, or principal place of business, or because their contacts with the United States were sufficiently continuous and systematic as to render them essentially at home in the United States, did not satisfy burden of showing that the exercise of general personal jurisdiction would be unreasonable based on conclusory allega-tions that they had no reason to expect being haled into court in United States bankruptcy court in New York.

**[19] Bankruptcy 51 ☞2043(2)**

51 Bankruptcy
51I In General
51I(C) Jurisdiction
51k2043 Core, Non-Core, or Related Pro-ceedings in General; Nexus
51k2043(2) k. Core or non-core pro-ceedings. Most Cited Cases

Distinction between "core" and "noncore" pro-ceedings has to do with allocation of authority to enter final judgments between bankruptcy and district courts, and does not implicate questions of subject matter jurisdiction. 28 U.S.C.A. § 157(b).

**[20] Bankruptcy 51 ☞2043(3)**

51 Bankruptcy
51I In General
51I(C) Jurisdiction
51k2043 Core, Non-Core, or Related Pro-ceedings in General; Nexus
51k2043(3) k. Related proceedings. Most Cited Cases

Test for whether bankruptcy court has "related to" jurisdiction over proceeding Is whether outcome of proceeding might have any conceivable effect on bankruptcy estate, or whether proceeding has a sig-nificant connection with bankruptcy estate. 28 U.S.C.A. § 1334(b).

**[21] Bankruptcy 51 ☞2341**

51 Bankruptcy
51III The Case
51III(H) Cases Ancillary to Foreign Proceed-ings
51k2341 k. In general. Most Cited Cases

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

Commencement of Chapter 15 case does not create any "estate," as that term is used in the Bankruptcy Code.

**[22] Bankruptcy 51 ⚷2045**

51 Bankruptcy
   51I In General
      51I(C) Jurisdiction
         51k2045 k. Particular proceedings or issues.
Most Cited Cases

**Bankruptcy 51 ⚷2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

While commencement of Chapter 15 case did not create any "estate," as that term was used in the Bankruptcy Code, this did not affect bankruptcy court's ability to exercise "related to" jurisdiction over adversary proceeding brought by foreign liquidators to recover more than a billion dollars on fraudulent transfer and unjust enrichment theories, as proceeding could have conceivable effect on preexisting estate existing in country where foreign insolvency action was proceeding. 28 U.S.C.A. § 1334(b).

**[23] Action 13 ⚷17**

13 Action
   13II Nature and Form
      13k17 k. What law governs. Most Cited Cases

Under New York choice of law rules, court must first determine whether there is actual conflict between the relevant laws of the implicated jurisdictions;

if no actual conflict exists, and if New York is among relevant jurisdictions, then court may simply apply New York law.

**[24] Bankruptcy 51 ⚷2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

Actual conflict existed between New York constructive fraudulent transfer law on the one hand and fraudulent transfer law of the United Kingdom and Luxembourg on the other, such that bankruptcy court was required to perform choice-of-law analysis to determine which law governed the constructive fraudulent transfer claims asserted by liquidators of foreign debtor, where New York law permitted avoidance of transfer as constructively fraudulent if made for less than fair consideration, without regard to transferor's intent, while the law of both the United KIngdom and Luxembourg required proof of some degree of purpose or intent. N.Y. Debt. and Cred. Law §§ 273, 274, 275, 277.

**[25] Action 13 ⚷17**

13 Action
   13II Nature and Form
      13k17 k. What law governs. Most Cited Cases

Upon identification of actual conflict among the laws of the relevant jurisdictions, New York choice of law analysis requires court to apply "interests" analysis, under which law of the jurisdiction having the greatest interest in litigation will be applied, and the only facts or contacts of significance in defining those interests are those which relate to the purpose of the particular law in conflict.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

**[26] Fraudulent Conveyances 186 🔑1.5**

186 Fraudulent Conveyances
   186I Transfers and Transactions Invalid
      186I(A) Grounds of Invalidity in General
         186k1.5 k. What law governs. Most Cited Cases

Given that fraudulent transfer laws are conduct regulating, law of the jurisdiction where conduct occurred will generally apply under New York choice-of-law rules, because that jurisdiction has greatest interest in regulating behavior within its borders.

**[27] Torts 379 🔑103**

379 Torts
   379I In General
      379k103 k. What law governs. Most Cited Cases

New York choice-of-law rules do not require blind adherence to the rule that law of jurisdiction where alleged wrongful conduct occurred will generally govern tort claims; however, when alleged wrongful conduct occurs in a place different from place of injury, it is place of alleged wrongful conduct that generally has superior interest in protecting reasonable expectation of parties who relied upon laws of that place to govern their primary conduct and in admonitory effect that applying its law will have on similar conduct in future.

**[28] Bankruptcy 51 🔑2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

Either Luxembourg, as place where convertible preferred equity certificates (CPECs) were redeemed, where corporate resolutions authorizing redemptions were adopted by company that served as debtor's sole manager, and where this company was organized and debtor had its principal place of business, or the United Kingdom, under whose laws debtor was being liquidated, had greater interest than New York, as mere site of resulting injury, in recovering redemption proceeds on fraudulent transfer theory; accordingly, liquidators could not pursue claim in Chapter 15 proceeding under constructive fraud provisions of New York fraudulent transfer law, given that neither Luxembourg nor the United KIngdom recognized constructive fraudulent transfer claim, if transferor had not acted with some degree of purpose or intent. N.Y. Debt. and Cred. Law §§ 273, 274, 275, 277.

**[29] Bankruptcy 51 🔑2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

Official liquidators of foreign debtor that was in the process of being liquidated in the United Kingdom in proceeding that bankruptcy court had recognized as foreign main proceeding failed to satisfy preliminary burden of establishing their standing to pursue claim under actual fraud provision of New York fraudulent transfer law to recover proceeds from redemption of convertible preferred equity certificates (CPECs), where liquidators were not generally authorized to pursue claims on behalf of creditors under the United Kingdom's insolvency law, but on behalf of insolvent company or pursuant to fraudulent transfer provision of the United Kingdom's insolvency law, and where strong-arm powers were not among powers granted to foreign representatives, even following recognition of foreign proceeding, under provisions of Chapter 15 of the Bankruptcy Code. 11 U.S.C.A. §§ 544,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

3376

524 B.R. 488
**(Cite as: 524 B.R. 488)**

1521(a)(7); N.Y. Debt. and Cred. Law § 276.

**[30] Fraudulent Conveyances 186 ☞251**

186 Fraudulent Conveyances
  186III Remedies of Creditors and Purchasers
    186III(G) Parties
      186k250 Plaintiffs
        186k251 k. In general. Most Cited Cases

Standing to assert actual fraudulent transfer claim under New York law is not necessarily limited only to creditors; other parties vested with authority to assert claims on behalf of creditors, for example, also have standing. N.Y. Debt. and Cred. Law § 276.

**[31] Bankruptcy 51 ☞2341**

51 Bankruptcy
  51III The Case
    51III(H) Cases Ancillary to Foreign Proceedings
      51k2341 k. In general. Most Cited Cases

While bankruptcy court is authorized in its discretion to grant broad relief to representatives of foreign debtor who is before it in Chapter 15 proceeding, court's discretion is not without limitation, nor is it so broad as to stretch the laws of the foreign jurisdiction without any basis grounded in that foreign jurisdiction's laws. 11 U.S.C.A. §§ 1521, 1522.

**[32] Bankruptcy 51 ☞2154.1**

51 Bankruptcy
  51II Courts; Proceedings in General
    51II(B) Actions and Proceedings in General
      51k2154 Rights of Action by or on Behalf of Trustee or Debtor
        51k2154.1 k. In general; standing. Most Cited Cases

As general rule, bankruptcy trustee stands in shoes of debtor and has standing to bring any cause of action that debtor could have instituted prepetition.

**[33] Bankruptcy 51 ☞2154.1**

51 Bankruptcy
  51II Courts; Proceedings in General
    51II(B) Actions and Proceedings in General
      51k2154 Rights of Action by or on Behalf of Trustee or Debtor
        51k2154.1 k. In general; standing. Most Cited Cases

While bankruptcy trustee has standing to bring claims belonging to debtor, he does not have standing to assert claims on behalf of individual creditors.

**[34] Bankruptcy 51 ☞2154.1**

51 Bankruptcy
  51II Courts; Proceedings in General
    51II(B) Actions and Proceedings in General
      51k2154 Rights of Action by or on Behalf of Trustee or Debtor
        51k2154.1 k. In general; standing. Most Cited Cases

Whether claim belongs to debtor, so as to be one that his bankruptcy trustee can pursue, or to individual creditors is matter determined by state law.

**[35] Bankruptcy 51 ☞2154.1**

51 Bankruptcy
  51II Courts; Proceedings in General
    51II(B) Actions and Proceedings in General
      51k2154 Rights of Action by or on Behalf of Trustee or Debtor
        51k2154.1 k. In general; standing. Most

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

Cited Cases

Under the *Wagoner* rule, when bankrupt corporation has joined with third party in defrauding corporate creditors, claim belongs to creditors, and trustee cannot recover against third party for damage caused to the creditors.

**[36] Action 13 ⚷4**

13 Action
    13I Grounds and Conditions Precedent
        13k4 k. Illegal or immoral transactions. Most Cited Cases

Doctrine of in pari delicto is a well-established principle of New York law, which is based on notion that one wrongdoer may not recover against another.

**[37] Bankruptcy 51 ⚷2154.1**

51 Bankruptcy
    51II Courts; Proceedings in General
        51II(B) Actions and Proceedings in General
        51k2154 Rights of Action by or on Behalf of Trustee or Debtor
            51k2154.1 k. In general; standing. Most Cited Cases

While in pari delicto is in nature of affirmative defense under New York state law, in bankruptcy court, prudential considerations deprive trustee of standing to even bring a claim that would be barred by in pari delicto.

**[38] Bankruptcy 51 ⚷2154.1**

51 Bankruptcy
    51II Courts; Proceedings in General
        51II(B) Actions and Proceedings in General
        51k2154 Rights of Action by or on Behalf of

Trustee or Debtor
            51k2154.1 k. In general; standing. Most Cited Cases

Both the *Wagoner* rule and the in pari delicto doctrine are grounded in common law agency principles and in the notion that, because a trustee in bankruptcy may assert whatever claims the debtor corporation may have brought prepetition, subject to all available defenses, any wrongdoing imputed to the corporation under theory of agency also taints the trustee's claims.

**[39] Corporations And Business Organizations 101 ⚷2370**

101 Corporations and Business Organizations
    101IX Corporate Powers and Liabilities
        101IX(B) Representation of Corporation by Corporate Principals
            101k2368 Wrongful Acts or Omissions
            101k2370 k. Imputed liability in general. Most Cited Cases

It is fundamental principle of agency that misconduct of corporate managers within scope of their employment will normally be imputed to the corporation.

**[40] Corporations And Business Organizations 101 ⚷2369**

101 Corporations and Business Organizations
    101IX Corporate Powers and Liabilities
        101IX(B) Representation of Corporation by Corporate Principals
            101k2368 Wrongful Acts or Omissions
            101k2369 k. In general. Most Cited Cases

In pari delicto doctrine does not apply to actions of fiduciaries who are corporate insiders in the sense

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

that they either are on the board or in management, or in some other way control corporation; in such situations, element of mutual fault, or in pari delicto, is not present.

**[41] Corporations And Business Organizations 101 ⚷2369**

101 Corporations and Business Organizations
    101IX Corporate Powers and Liabilities
        101IX(B) Representation of Corporation by Corporate Principals
           101k2368 Wrongful Acts or Omissions
               101k2369 k. In general. Most Cited Cases

General partners, sole shareholders, and sole decision makers are paradigmatic "insiders" for purposes of application of in pari delicto doctrine under New York law; however, even third-party professional, typically the quintessential outsider, may surrender an in pari delicto defense where it exerts sufficient domination and control over the guilty corporation to render itself an insider.

**[42] Bankruptcy 51 ⚷2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
           51k2341 k. In general. Most Cited Cases

Allegations in complaint filed by official liquidators of foreign debtor, that defendants, acting through sponsors that they formed, owned and controlled, also controlled Chapter 11 debtor and its affiliates and used that control to unjustly obtain proceeds from redemption of convertible preferred equity certificates (CPECs) that should, in equity and good conscience, have been enjoyed by debtor, sufficiently alleged existence of inside relationship between

debtor and defendants that court could not determine, at motion-to-dismiss stage, that unjust enrichment claims were barred by the *Wagoner* rule or in pari delicto doctrine.

**[43] Limitation Of Actions 241 ⚷49(1)**

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(A) Accrual of Right of Action or Defense
           241k49 Implied Contracts
               241k49(1) k. In general. Most Cited Cases

**Limitation Of Actions 241 ⚷95(9)**

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(F) Ignorance, Mistake, Trust, Fraud, and Concealment or Discovery of Cause of Action
           241k95 Ignorance of Cause of Action
               241k95(9) k. Contracts; warranties. Most Cited Cases

Under New York law, six-year limitations period for unjust enrichment claims accrues upon the occurrence of wrongful act giving rise to duty of restitution and not from time that the facts constituting the fraud are discovered. N.Y. CPLR § 213(1).

**[44] Bankruptcy 51 ⚷2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
           51k2341 k. In general. Most Cited Cases

Tolling provision of the Bankruptcy Code applied in Chapter 15 case, so as to prevent six-year statute of limitations on unjust enrichment claims asserted by

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

official liquidators of foreign debtor, which had not yet run on date that Chapter 15 petition was filed, from running until at least two years after order for relief. 11 U.S.C.A. §§ 103(a), 108(a); N.Y. CPLR § 213(1).

**[45]** Implied And Constructive Contracts 205H ☜81

205H Implied and Constructive Contracts
    205HII Actions
        205HII(B) Pleading
            205Hk81 k. Declaration, complaint, or petition. Most Cited Cases

In order to adequately plead an unjust enrichment claim under New York law, plaintiff must allege: (1) that another party was enriched, (2) at plaintiff's expense, and (3) that it is against equity and good conscience to permit this other to retain what is sought to be recovered.

**[46]** Implied And Constructive Contracts 205H ☜71

205H Implied and Constructive Contracts
    205HI Nature and Grounds of Obligation
        205HI(E) Defenses and Persons Entitled or Liable
            205Hk71 k. Persons entitled. Most Cited Cases

Implied And Constructive Contracts 205H ☜72

205H Implied and Constructive Contracts
    205HI Nature and Grounds of Obligation
        205HI(E) Defenses and Persons Entitled or Liable
            205Hk72 k. Persons liable. Most Cited Cases

Under New York law, plaintiff cannot succeed on unjust enrichment claim unless it has a sufficiently close relationship with the other party; relationship must be one that is not too attenuated.

**[47]** Bankruptcy 51 ☜2341

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

Allegations in complaint filed by official liquidators of foreign debtor, that defendants, acting through sponsors that they formed, owned and controlled, also controlled Chapter 11 debtor and its affiliates and used that control to unjustly obtain proceeds from redemption of convertible preferred equity certificates (CPECs) that should, in equity and good conscience, have been enjoyed by debtor, adequately alleged existence of close relationship between debtor and defendants and stated unjust enrichment claim that was plausible on its face, though defendants were not initial transferees of redemption proceeds, but obtained them only through third parties.

**[48]** Implied And Constructive Contracts 205H ☜72

205H Implied and Constructive Contracts
    205HI Nature and Grounds of Obligation
        205HI(E) Defenses and Persons Entitled or Liable
            205Hk72 k. Persons liable. Most Cited Cases

Under New York law, the fact that money is transferred directly from plaintiff's possession to defendant's, albeit by third party, establishes a relationship that is sufficiently close to sustain claim for unjust enrichment; privity is not required.

CHADBOURNE & PARKE LLP, Attorneys for

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

Plaintiffs as against all Defendants except Deutsche Bank AG, 1301 Avenue of the Americas, New York, New York 10019 By: Howard Seife, Esq., **\*495**Andrew Rosenblatt, Esq., Marc D. Ashley, Esq.

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP, Attorneys for Plaintiffs as against Deutsche Bank AG, 270 Madison Avenue, New York, New York 10016 By: Alexander H. Schmidt, Esq., Alan McDowell, Esq., Jeremy Cohen, Esq.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP, Attorneys for the TPG Defendants, 1633 Broadway, New York, New York 10019 By: Paul M. O'Connor III, Esq., Andrew K. Glenn, Esq.

ROPES & GRAY LLP, Attorneys for the Apax Defendants, 1211 Avenue of the Americas, New York, New York 10036 By: Robert S. Fischler, Esq., Stephen C. Moeller–Sally, Esq.

CAHILL GORDON & REINDEL LLP, Attorneys for Defendant Deutsche Bank AG, 80 Pine Street, New York, New York 10005 By: Charles A. Gilman, Esq., Kevin J. Burke, Esq., Philip V. Tisne, Esq.

LATHAM & WATKINS LLP, Attorneys for the TCW Defendants, 355 South Grand Avenue, Los Angeles, California 90071 By: Wayne S. Flick, Esq. (pro hac vice), Amy C. Quartarolo, Esq. (pro hac vice), Thomas Rickeman, Esq. (pro hac vice)

Chapter 15

***MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS***

MARTIN GLENN, UNITED STATES BANKRUPTCY JUDGE

Pending before the Court are four motions to dismiss (the "Motions to Dismiss") the adversary proceeding complaint (the "Complaint," ECF Doc. # 1) [FN1] filed by Andrew Lawrence Hosking and Bruce Mackay [FN2] (the "Plaintiffs"), in their capacity as Joint Compulsory Liquidators of Hellas Telecommunications (Luxembourg) II SCA ("Hellas II" or the "Debtor").

> FN1. Unless otherwise indicated, all citations to the docket are to Adv. Proc. No. 14–01848.

> FN2. The Court recognized Mr. Mackay's predecessor, Carl Jackson, as one of the foreign representatives in the chapter 15 case. (*See* Case No. 12–10631, ECF Doc. # 17.) Mr. Jackson was succeeded by Mr. Bonney, who was then succeeded by Mr. Mackay.

The Plaintiffs seek to avoid and recover initial transfers of approximately € 1.57 billion made by Hellas II from bank accounts outside the United States (the "U.S.") to parent entities, and to avoid and recover subsequent transfers of approximately €973.7 million made to the defendants in this case. The defendants allegedly played various roles in an orchestrated restructuring, whereby Hellas II and its related entities issued over €1 billion in debt securities to fund the redemption of convertible equity securities issued by Hellas II's parent and held by special purpose vehicles controlled by many of the defendants. The Plaintiffs also seek to recover certain amounts paid by Hellas II as consulting fees to two groups of defendants based on an unjust enrichment claim.

The foreign main proceeding underlying the Debtor's chapter 15 case, in which Hosking and Mackay were appointed as liquidators, is pending in the United Kingdom (the "U.K."); however, Hellas II and several of its related companies were previously based in Luxembourg, and Hellas II's underlying business was a Greek telecommunications company. Some, but not all, of the money transferred from accounts outside the U.S. found its way to transferees in the U.S.; some, but not all, of that money found its

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

way to transferees in New York.

**\*496** The 27 named defendants in this case include 16 entities and individuals that are organized and have their principal places of business or residences in the U.S., but not in New York.[FN3] One Defendant—who allegedly marketed the Hellas II debt issued to fund the challenged transfers—is a bank organized and headquartered in Germany, but with a large office and numerous employees in New York. Nine Defendants are organized and have their principal places of business outside the U.S., with no offices in New York or the U.S., although some of their affiliates are organized and have their principal places of business in the U.S. All but one Defendant—the only one organized and with its principal place of business in New York—move to dismiss the complaint for lack of personal jurisdiction. A separate Motion to Dismiss the Complaint on other grounds was also filed by the Defendants.[FN4]

> **FN3.** The moving defendants (the "Defendants") consist of four groups of related entities and individuals: (i) Apax Partners Europe Managers Ltd., Apax Europe VI GP Co. Ltd., Apax Europe VI GP, L.P., Aapax Europe VI–A, L.P., Apax Europe VI–1, L.P. (collectively, "Apax Europe VI"), Apax Partners LLP ("Apax Partners"), Apax Partners, L.P. ("Apax NY"), Apax WW Nominees Ltd. ("Apax Nominees"), and Martin Halusa ("Halusa" and, together with Apax Europe VI, Apax Partners, Apax NY, and Apax Nominees, "Apax"); (ii) TPG Capital Management, L.P. ("TPG Capital"), David Bonderman ("Bonderman"), James Coulter ("Coulter"), TPG Capital, LLP ("TPG London"), TPG Advisors IV, Inc., TPG GenPar IV, L.P., TPG Partners IV, L.P. ("TPG IV"), T $^3$ Advisors II, Inc., T $^3$ GenPar II, L.P., T $^3$ Partners II, L.P., and T $^3$ Parallel II, L.P. ("TPG T $^3$ II" and, together with TPG Capital, Bonderman, Coulter, TPG London,

and TPG IV, "TPG"); (iii) Deutsche Bank Aktiengesellschaft ("DB"); and (iv) The TCW Group, Inc., TCW Asset Management Company, TCW/Crescent Mezzanine III, LLC, TCW/Crescent Mezzanine Partners III L.P., TCW/ Crescent Mezzanine Trust III, and TCW/Crescent Mezzanine Partners III Netherlands, L.P. (collectively, "TCW").

> **FN4.** The Motion to Dismiss filed by TCW also seeks dismissal on the basis of grounds other than lack of personal jurisdiction.

The Plaintiffs allege actual and constructive fraudulent transfer claims against all of the named Defendants and an unnamed class of transferees (the "Transferee Class") based *only* on the application of the New York Debtor and Creditor Law ("NYDCL").[FN5] The avoidance claims asserted under the NYDCL, where all of the initial transfers were made from outside the U.S., raise a host of issues: whether the Plaintiffs can obtain personal jurisdiction over each Defendant and hale domestic or foreign-based Defendants, that are not organized under New York law and are not "at home" in New York, into the bankruptcy court in New York; whether under applicable choice of law principles, New York law or foreign law should apply to the transfers if the NYDCL could be given extraterritorial effect; whether the avoidance claims can be brought in an adversary proceeding related to a chapter 15 case in light of section 1521(a)(7) of the Bankruptcy Code; whether the Plaintiffs, as Joint Compulsory Liquidators of the Debtor, have standing to bring the avoidance claims (which are "creditor" claims); and whether the NYDCL has extraterritorial effect to reach the transfers. With respect to the unjust enrichment claim, the Defendants assert that the Plaintiffs do not have standing to bring this claim because the so-called *Wagoner* rule and *in pari delicto* doctrine deny standing to a trustee to assert claims against third-parties on behalf of a debtor if the debtor was complicit in the alleged wrongdoing. Several other

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

issues are presented as well.

FN5. N.Y. DEBT. & CRED. LAWW § 270 *et seq.* (McKinney 2010).

Resolution of these issues requires considerable analysis and results in this **\*497** lengthy opinion. As explained below, not all of the issues need to be resolved to dispose of the pending Motions to Dismiss. The Court concludes that the Plaintiffs have established a sufficient basis to assert personal jurisdiction against some, but not all, of the Defendants; choice of law principles require dismissal of the NYDCL constructive fraudulent conveyance claim, because an actual conflict exists between the laws of New York, on the one hand, and of U.K. and Luxembourg (which do not recognize a constructive fraudulent conveyance cause of action), on the other hand, and those two foreign jurisdictions have a more significant interest in applying their laws in this case; the Plaintiffs lack standing under New York law and U.K. law to bring the NYDCL actual fraudulent conveyance claim; and it is unnecessary to decide whether the NYDCL may be given extraterritorial effect to the transfers, or whether the Plaintiffs may bring the avoidance claims in light of Bankruptcy Code section 1521(a)(7), because the NYDCL avoidance claims must be dismissed on other grounds. The Court also concludes that the Complaint sufficiently alleges that the Defendants named in the unjust enrichment claim should be treated as "insiders" that controlled Hellas II and directed or authorized the transfers, such that at this stage the Complaint overcomes the asserted prudential standing challenges.

For the reasons detailed below, the Motions to Dismiss for lack of personal jurisdiction are granted in part and denied in part. The Motions to Dismiss on all other grounds are granted in part and denied in part.

## I. *BACKGROUND*
**A. Factual Background**

In June 2005, eight investment funds (the "Sponsors"), allegedly created by TPG Capital and Apax Partners, acquired approximately 80% of the equity in TIM Hellas Communications S.A. ("TIM Hellas"), a Greek telecommunications services provider, through a special purpose vehicle ("Troy GAC") in a leveraged transaction. (*See* Compl. ¶¶ 84–89.) In preparation for the acquisition of TIM Hellas, in March 2005 TPG and Apax allegedly organized a group of entities under Luxembourg law, including Hellas Telecommunications, S.àr.l. ("Hellas"), Hellas Telecommunications I, S.à.r.l. ("Hellas I"), Hellas II, Hellas Telecommunications Finance SCA ("Hellas Finance"), and other related entities. (*See* Compl. ¶ 86.) Hellas II and Hellas Finance were wholly owned by Hellas I, which in turn was wholly owned by Hellas. (*Id.* ¶ 87.) Hellas, the ultimate parent of the Hellas entities, was wholly owned by the Sponsors. (*Id.*) The Sponsors acquired the remaining shares of TIM Hellas in November 2005 through Troy GAC, and the acquisition was principally funded by debt issued by the Hellas entities. (*See id.* ¶ 91.) Subsequently, the Sponsors' equity interests in TIM Hellas were cancelled and TIM Hellas merged into Troy GAC; the surviving entity became a wholly owned subsidiary of Hellas II. (*See id.* ¶ 92.)

Also in mid-June 2005, Hellas issued 490,000 convertible preferred equity certificates ("CPECs") to the Sponsors with a par value of €49 million. (*Id.* ¶ 97.) At the same time, Hellas I—the direct subsidiary of Hellas and direct parent of Hellas II—issued 490,000 CPECs to Hellas, and Hellas II issued an equivalent number of CPECs to Hellas I. (*Id.*)

TPG and Apax allegedly used Hellas and its related entities to acquire Q–Telecom, a business unit of a large mobile network operator in Greece, in a stock purchase deal that closed on January 31, 2006. (*See id.* ¶ 104.) The acquisition was principally financed with debt issued by a **\*498** subsidiary of Hellas II and cash contributed by certain other Hellas II subsidiaries. (*See id.* ¶ 105.) In exchange for the transfer of €28.3

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

million from the Sponsors to Hellas, Hellas issued an additional 282,681 CPECs to the Sponsors. [FN6] (*Id.* ¶ 106.)

> FN6. Cash was allegedly transferred from Hellas to Hellas I, and then to Hellas II; in exchange, corresponding CPECs were then issued up the corporate structure from Hellas II to Hellas I, and then to Hellas. (*See id.* ¶ 106.)

The Plaintiffs allege that TPG and Apax "put in motion plans to dispose of [Hellas II]'s subsidiaries in a sale to a third party" in June 2006. (*Id.* ¶ 112.) However, the sale process purportedly did not generate interest at the prices sought by TPG and Apax, and subsequently "they instead took steps to extract those returns from [Hellas II] under the guise of a purported 'refinancing' of its debt." (*Id.* ¶ 116.)

In December 2006, through a multi-step transaction (the "December 2006 Transaction"), (i) Hellas II issued €960 million and $275 million of Floating Rate Subordinated Notes due 2015 (the "Sub Notes"); (ii) Hellas Finance and certain subsidiaries of Hellas issued additional series of notes, the proceeds of which were transferred or loaned to Hellas II; and (iii) Hellas II transferred a total of approximately €1.57 billion to its parent, Hellas I, of which approximately €978.7 million was paid to redeem CPECs issued by Hellas II. (*Id.* ¶¶ 117–118.) Subsequently, Hellas I paid approximately €973.7 million to Hellas to redeem CPECs issued by Hellas I, and Hellas then paid the Sponsors approximately €973.7 million to redeem CPECs issued by Hellas (the "December 2006 CPEC Redemption"). (*Id.* at 118.) The remaining portion of the €1.57 billion transferred from Hellas II to Hellas I was allegedly used to retire other outstanding debt issued by the Hellas entities and to pay costs associated with the December 2006 Transaction. (*See id.*)

In February 2007, TPG and Apax sold Hellas and its subsidiaries to Weather Investments S.p.A., later renamed WIND Telecom S.p.A. ("Weather Investments"), a stock corporation organized under the laws of Italy. (*Id.* ¶ 143.) Weather Investments purchased 100% of the equity of Hellas for €500 million, €6,435,736 of which was allocated toward the purchase of the remaining CPECs previously issued by Hellas to the Sponsors at the par value of €1 per CPEC. (*Id.* ¶ 145.) Hellas II's financial statements for the year ending December 31, 2007 indicated that its debt-service obligations grew and resulted in a net financial loss of more than €259.5 million; its "leverage remained high at 12.4x EBIT, while its cash interest coverage declined to 1.2x EBIT." (*Id.* ¶ 148.) On or about June 5, 2008, Apax Partners paid €500 million to Weather Investments for a 5% equity stake in the company. (*Id.* ¶ 149.) Additionally, Hellas II "paid a minimum of €1.22 million in additional 'consulting fees' to Hellas I and, directly or indirectly, Hellas I then paid approximately those same amounts to TPG and Apax (the "Consulting Fees Transfer")." (*Id.* ¶ 142.)

In 2009, Hellas II began considering a potential restructuring of its capital structure. (*See id.* ¶ 151.) Accordingly, in August 2009 Hellas II "moved its center of main interests from Luxembourg to the United Kingdom, including among other steps by moving its head office and operating office to London, England." (*Id.*) On November 26, 2009, the High Court of Justice of England and Wales (the "High Court") approved placing Hellas II into administration in England and appointed joint administrators (the "Administrators"). (*Id.*) On December 1, 2011, the High Court discharged the Administrators **\*499** and ruled that Hellas II should be instead wound-up through a compulsory liquidation. (*Id.* ¶ 152.) The Plaintiffs were thereafter appointed as Joint Compulsory Liquidators. (*See id.* ¶ 18.)

The Plaintiffs allege that Hellas II was insolvent at the time of the December 2006 CPEC Redemption and that the Defendants received portions of the pro-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

ceeds of such transaction from one or more Sponsors. (*See id.* ¶¶ 23–74, 118.) The Plaintiffs seek to avoid the initial transfer of €1.57 billion from Hellas II to Hellas I as an actual or constructive fraudulent transfer under the NYDCL, and to recover the alleged subsequent transfers to the Defendants. (*See id.* ¶¶ 155–168.) The initial transfers were made from accounts maintained in London, England. (*See* Lestelle Decl. Ex. A at 10, ECF Doc. # 93–1.) Also pursuant to the NYDCL, the Plaintiffs seek to avoid and recover the Consulting Fees Transfer allegedly paid to TPG and Apax.[FN7] (*See id.*) Finally, the Plaintiffs assert an unjust enrichment claim against TPG and Apax for their receipt of payments they received in connection with the December 2006 Transaction, the December 2006 CPEC Redemption, and the Consulting Fees Transfer. (*See id.* ¶¶ 169–173.)

> FN7. The parties do not provide information regarding where this transfer originated from; however, in light of the fact that Hellas I's offices and bank accounts were located in Europe, this transfer likely originated from accounts maintained outside the United States.

**B. Procedural History**

On February 16, 2012, the Debtor filed a chapter 15 petition for recognition of its foreign proceeding in this Court. (*See* ECF Doc. # 1, Case No. 12–10631.) The Court entered an order granting recognition of the Debtor's foreign main proceeding on March 14, 2012. (*See* ECF Doc. # 17, Case No. 12–10631.) This adversary proceeding was commenced nearly two years later, on March 13, 2014. (*See* ECF Doc. # 1.)

The Motions to Dismiss include: (1) the motion to dismiss for lack of personal jurisdiction filed by Apax[FN8] and TPG (the "Apax/TPG Motion," ECF Doc. # 37); [FN9] (2) the motion to dismiss on all other grounds filed by Apax and TPG (the "Defendants' Motion," ECF Doc. # 41),[FN10] which is joined in part by DB and TCW; [FN11] (3) DB's motion to dismiss for lack of personal jurisdiction (the "DB Motion," ECF Doc. # 46); [FN12] and (4) TCW's motion **\*500** to dismiss (the "TCW Motion," ECF Doc. # 50).

> FN8. Notably, Apax N.Y. is not a moving Defendant under the Apax/TPG Motion and does not move for dismissal for lack of personal jurisdiction. (*See* Apax/TPG Mot. at 1 n.1, ECF Doc. # 37; Dec. 3, 2014 Hr'g. Tr. 36:14–17, ECF Doc. # 127.)

> FN9. TCW joins in part the Apax/TPG Motion, including the factual background section, the legal standards section, and "those portions [of the argument section] that address the constitutionality of exercising jurisdiction over a defendant based on its contacts with the United States (as opposed to its contacts with the State of New York)." (TCW Mot. at 2 n.2, ECF Doc. # 50.)

> FN10. The Apax/TPG Motion and the Defendants' Motion are supported by the declarations of Andrew K. Glenn (the "Glenn Declaration," ECF Doc. # 42) and Barry Isaacs QC (the "Isaacs Declaration," ECF Doc. # 44), a purported expert on English law.

> FN11. Specifically, (1) DB joins in the arguments made in the Defendants' Motion, with the exception of the arguments related to the Plaintiffs' unjust enrichment claim against Apax and TPG (*see* DB Reply at 1, ECF Doc. # 98); and (2) TCW joins in the arguments made in the Defendants' Motion, with the exception of the sections regarding subsequent transferee liability and unjust enrichment (*see* TCW Mot. at 1, ECF Doc. # 50).

> FN12. The DB Motion is supported by the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

declaration of Philip V. Tisne (the "Tisne Declaration," ECF Doc. # 45).

The Plaintiffs filed two memoranda of law in opposition to the Motions to Dismiss for lack of personal jurisdiction: an opposition to both the Apax/TPG Motion and the TCW Motion (the "PJ Opposition," ECF Doc. # 83), and a separate opposition to the DB Motion (the "DB Opposition," ECF Doc. # 79). [FN13] The Plaintiffs also filed a memorandum of law in opposition to the Defendants' Motion (the "Opposition," ECF Doc. # 84).[FN14]

> **FN13.** The Plaintiffs submitted the declaration of Marc D. Ashley (the "Ashley Declaration," ECF Doc. # 81) in support of the PJ Opposition and the DB Opposition.

> **FN14.** The Opposition is supported by the declaration of Gabriel Moss QC (the "Moss Declaration," ECF Doc. # 82), a purported expert on English law and European Insolvency law.

In response, (1) Apax and TPG filed a reply in support of the Apax/TPG Motion (the "Apax/TPG Reply," ECF Doc. # 91) [FN15] and a reply in support of the Defendants' Motion (the "Defendants' Reply," ECF Doc. # 94); [FN16] (2) DB filed a reply in support of the DB Motion (the "DB Reply," ECF Doc. # 98); [FN17] and (3) TCW filed a reply in support of the TCW Motion (the "TCW Reply," ECF Doc. # 90, and together with the Apax/TPG Reply, the Defendants' Reply, and the DB Reply, the "Reply Briefs").

> **FN15.** The Apax/TPG Reply is supported by the declaration of Evan P. Lestelle (the "Lestelle Reply Declaration," ECF Doc. # 93).

> **FN16.** The Defendants' Reply is supported by the declaration of Barry Isaacs QC (the

"Isaacs Reply Declaration," ECF Doc. # 95), an expert on English law.

> **FN17.** The DB Reply is supported by the declaration of Philip V. Tisne (the "Tisne Reply Declaration," ECF Doc. # 99).

The Plaintiffs filed a supplemental memorandum of law in opposition to the DB Motion (the "DB Supplemental Opposition," ECF Doc. # 104),[FN18] and DB filed a surreply (the "DB Surreply," ECF Doc. # 106).[FN19]

> **FN18.** The DB Supplemental Opposition is supported by the supplemental declaration of Alan A.B. McDowell (the "McDowell Supplemental Declaration," ECF Doc. # 105).

> **FN19.** The DB Surreply is supported by the Supplemental Declaration of Philip V. Tisne (the "Tisne Supplemental Declaration," ECF Doc. # 107).

Pursuant to the Court's *Order Scheduling Oral Argument and Directing Supplemental Briefing* (the "Supplemental Briefing Order," ECF Doc. # 115), the Court scheduled a hearing on the Motions to Dismiss and directed the parties to submit supplemental briefs on choice of law issues. In response to the Supplemental Briefing Order, the Defendants filed a supplemental memorandum of law (the "Defendants' Supplemental Brief," ECF Doc. # 122),[FN20] and the Plaintiffs likewise filed a supplemental memorandum of law (the "Plaintiffs' Supplemental Opposition," ECF Doc. 121).[FN21]

> **FN20.** The Defendants' Supplemental Brief is supported by the declarations of Professor André Prüm (the "Prüm Declaration," ECF Doc. # 120), a purported expert on Luxembourg law, and Barry Isaacs QC (the "Supplemental Isaacs Declaration," ECF Doc. #

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

118).

FN21. The Plaintiffs' Supplemental Opposition is supported by the declarations of Marc D. Ashley (the "Supplemental Ashley Declaration," ECF Doc. # 119), Gabriel Moss QC (the "Supplemental Moss Declaration," ECF Doc. # 117), and Marc Thewes (the "Thewes Declaration," ECF Doc. # 116).

On December 3 and 16, 2014 (together, the "Hearing") the Court heard oral argument on the Motions to Dismiss and took the matter under submission. This Opinion follows.

**\*501 C. The Parties' Positions**
*1. Personal Jurisdiction*

All of the Defendants except for Apax N.Y. argue that the Complaint should be dismissed for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure ("FRCP") 12(b)(2), arguing that the Plaintiffs have failed to adequately allege that either general (i.e.all-purpose) or specific jurisdiction exists over these Defendants. Apax, TPG, and TCW all contend that the applicable forum by which their minimum jurisdictional contacts are to be assessed is New York, rather than the U.S. (*See* Apax/TPG Mot. at 2; TCW Mot. at 8.) They argue that, following the Supreme Court's recent decision in *Daimler AG v. Bauman,* ──── U.S. ────, 134 S.Ct. 746, 187 L.Ed.2d 624 (2014), a defendant is generally only subject to general jurisdiction in its place of incorporation, principal place of business, or domicile; general jurisdiction exists over a foreign defendant only when its contacts with the forum state "are so 'continuous and systematic as to render [it] essentially at home' in the forum state." (Apax/TPG Mot. at 5 (citing *Daimler,* 134 S.Ct. at 761 (alteration in original) (citation omitted)); *see* TCW Mot. at 7.) Since New York is not the state of incorporation, principal place of business, or domicile of any of the Defendants moving to dismiss for lack of personal jurisdiction, and the Plaintiffs have not otherwise sufficiently alleged that such Defendants are

"at home" in New York, the Defendants argue that they are not subject to general jurisdiction. (*See* Apax/TPG Mot. at 7–17; TCW Mot. at 9–14.) DB also argues that it is not subject to general jurisdiction even if the relevant forum for assessing its minimum contacts is the U.S., because it was neither incorporated in the U.S. nor is the U.S. where its principal place of business is located. (*See* DB Mot. at 3 n.1.) According to all of the Defendants, the Plaintiffs have also failed to adequately allege that the Court has specific jurisdiction over the Defendants, because none of the Defendants' suit-related conduct bears a sufficient nexus to New York or the U.S. (*See* Apax/TPG Mot. at 2; TCW Mot. at 14; DB Mot. at 6–7.)

In response, the Plaintiffs argue that the U.S.—not New York—is the pertinent forum with respect to which a defendant's minimum jurisdictional contacts are to be assessed where, as here, nationwide service of process is authorized by a federal statute. (*See* Apax/TPG Mot. at 11–12.) According to the Plaintiffs, all of the Defendants' contacts with the U.S. are sufficient to subject them to personal jurisdiction. (*Id.* at 17; DB Supp. Opp. at 1.) The Apax, TPG, and TCW Defendants with their residence, principal place of business, or place of incorporation in the U.S. are subject to general jurisdiction; the remaining foreign Apax and TPG Defendants are subject to specific jurisdiction based on their suit-related conduct purposefully directed at the U.S. (*See* Apax/TPG Mot. at 17–18.) DB is subject to general jurisdiction because its New York operations are so substantial and of such a nature as to render it at home in New York. (*See* DB Supp. Opp. at 1.) The Plaintiffs contend that DB is also subject to specific jurisdiction because, through its wholly-owned and controlled subsidiary, Deutsche Bank Securities Inc. ("DBSI"), DB marketed and sold Sub Notes to U.S. investors, and proceeds from the Sub Notes were used to fund the December 2006 CPEC Redemption. (*Id.* at 2–12.)

*2. Other Grounds*
The Defendants also collectively move to dismiss

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

the Complaint for lack of subject matter jurisdiction and failure to state a claim pursuant to FRCP 12(b)(1) and (6), respectively. (*See* Defs.' Mot. at 1.) First, the Defendants argue that the Complaint**\*502** should be dismissed on the basis that "the Court lacks core subject matter jurisdiction over this dispute." (*Id.* at 35.) Specifically, the Defendants contend that this adversary proceeding is not a core proceeding within the meaning of 28 U.S.C. § 157, and therefore the Court cannot finally adjudicate the Plaintiffs' claims. (*See id.* at 35–39.) Second, the Defendants argue that Count II of the Complaint, which asserts a constructive fraudulent conveyance claim under the NYDCL, must be dismissed because, under New York choice of law rules, Luxembourg or U.K. law has the greatest interest in regulating the December 2006 CPEC Redemption, and the law of either jurisdiction does not recognize a claim for constructive fraudulent conveyance. (*See* Defs.' Supp. Br. at 1.) The Defendants do not argue that any actual conflict between New York law and either Luxembourg or U.K. law exists with respect to the Plaintiffs' actual fraudulent conveyance claim (Count I of the Complaint) or unjust enrichment claim (Count III of the Complaint). (*See id.*) However, the Defendants contend that the Plaintiffs lack standing to assert these claims. (*See* Defs.' Mot. at 9–10, 18.) With respect to the Plaintiffs' actual fraudulent conveyance claim, the Defendants argue that the Plaintiffs "lack standing because (i) Section 1521(a)(7) of the Bankruptcy Code prohibits them from obtaining relief under Section 544—the only mechanism by which a debtor or trustee may assert state law fraudulent conveyance claims belonging to creditors, ... (ii) the [Plaintiffs] represent Hellas II, not its creditors, and (iii) Section 1521(a)(7)'s bar preempts state law." (*Id.* at 10.) Defendants also argue that the Plaintiffs lack standing to assert their unjust enrichment claim under the *Wagoner* rule, which "bars a trustee from suing to recover for a wrong that he himself essentially took part in." (*Id.* at 18 (citing *O' Connell v. Arthur Anderson, LLP (In re Alphastar Ins. Grp. Ltd.),* 383 B.R. 231, 272 (Bankr.S.D.N.Y.2008) (citations and internal quota-

tions omitted)).)

Finally, the Defendants argue that the Complaint fails to state a claim for five separate reasons.[FN22] First, the Defendants argue that the Plaintiffs' claims are barred by the applicable statutes of limitations. (*Id.* at 19.) Second, the Defendants contend that there is a well-settled presumption against the extraterritorial application of the NYDCL to avoid a foreign transaction lacking a close nexus to New York because the drafters of the NYDCL did not clearly indicate that it should apply extraterritorially. (*See id.* at 21–24.) Third, the Plaintiffs fail to adequately allege subsequent transferee liability against TPG or Apax because they assert no facts "to plausibly show that any portion of the [December 2006 CPEC Redemption] was actually received by any TPG or Apax Defendant." (*Id.* at 30.) Fourth, the Defendants argue that the Plaintiffs' NYDCL claims are barred by section 546(e) of the Bankruptcy Code because the December 2006 CPEC Redemption constitutes a settlement payment made by, to, or for the benefit of a financial institution. (*See id.* at 39–41.) Alternatively, Bankruptcy Code section 546(e) preempts the Plaintiffs' state law claims.[FN23] (*See id.* at 42–44.) **\*503** Lastly, Apax and TPG argue that the Complaint fails to allege an unjust enrichment claim against them, because the Plaintiffs do not plead that a sufficiently close relationship existed between Apax and TPG and the holders of the Sub Notes. (*Id.* at 33.)

> FN22. The Defendants also assert as an affirmative defense that the Plaintiffs' NYDCL claims must be dismissed because the holders of the Sub Notes consented to the December 2006 CPEC Redemption, and therefore the Plaintiffs cannot now seek to avoid the December 2006 CPEC Redemption on their behalf. (*Id.* at 24.)

> FN23. Because the NYDCL claims are dismissed on other grounds, the Court does not reach the merits of the Defendants' remaining

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

arguments regarding these claims, including that the NYDCL does not apply extraterritorially, the Complaint fails to allege subsequent transferee liability, the holders of the Sub Notes consented to the December 2006 CPEC Redemption, and section 546(e) bars or preempts the NYDCL claims.

The Plaintiffs contend that the Court has subject matter jurisdiction over their claims under section 1334 of title 28 of the U.S.Code. (Opp. at 48.) According to the Plaintiffs, "whether this action falls within this Court's 'core' or 'non-core' jurisdiction is irrelevant to whether this Court possesses subject matter jurisdiction, which it plainly does." (*Id.* at 48–49.) The Plaintiffs also argue that New York law, rather than Luxembourg or U.K. law, governs their claims. (*See* Pls.' Supp. Opp. at 1.) However, even if the Court were to apply Luxembourg or U.K. law to their claims, the Plaintiffs contend that they would still have standing to pursue their claims.[FN24] (*See id.* at 15–16.) According to the Plaintiffs, they have standing to bring their claims by virtue of their status as liquidators of the Debtor, and "English law—which defines the scope of the [Debtor's] foreign insolvency estate—vests [them] with authority to bring actions on behalf of the [Debtor's] creditors." (Opp. at 26–27.)

> FN24. Alternatively, the Plaintiffs argue that the Court should decline to make a choice of law determination at this stage in the adversary proceeding, because such a determination is fact intensive and discovery is ongoing. (Pls.' Supp. Opp. at 17–18.)

The Plaintiffs also maintain that they have adequately alleged their claims at this pleading stage and therefore the Motions to Dismiss should be denied.[FN25] (*Id.* at 1.) First, the Plaintiffs argue that their claims are timely because section 108(a) of the Bankruptcy Code extends the time within which a foreign representative may commence adversary proceedings in a chapter 15 case, and the Plaintiffs'

claims vested with the Plaintiffs prior to the commencement of the Debtor's chapter 15 case. (*See id.* at 42–44.) Second, the Plaintiffs argue that the NYDCL may be applied extraterritorially to reach the transfers at issue, regardless of whether they have a close nexus to New York. (*See id.* at 13–15 (citing cases).) Third, the Plaintiffs contend that they satisfied their pleading requirements under FRCP 8(a) in alleging that the Defendants received proceeds from the December 2006 CPEC Redemption. (*See id.* at 9.) Fourth, the Plaintiffs argue that Bankruptcy Code section 546(e)'s safe harbor with respect to settlement payments is not applicable in a chapter 15 case. (*Id.* at 44–45.) Nor does Bankruptcy Code section 546(e) implicitly preempt the Plaintiffs' state law claims. (*Id.* at 45–48.) Finally, the Plaintiffs contend that the Complaint adequately alleges that Apax and TPG had a sufficiently close relationship with Hellas II for purposes of stating an unjust enrichment claim, noting that the Complaint sets forth that the December 2006 CPEC Redemption was planned, approved, and executed by Apax and TPG executives. (*See id.* at 26.)

> FN25. In the event any claims are dismissed, however, the Plaintiffs contend that they should be granted leave to amend their Complaint. (*See* Opp. at 49.)

## II. *DISCUSSION*

### A. Personal Jurisdiction

On a motion to dismiss under FRCP 12(b)(2), a plaintiff bears the burden of making "a *prima facie* showing 'through its own affidavits and supporting materials' **\*504** that personal jurisdiction exists." *Picard v. Cohmad Sec. Corp. (In re Bernard L. Madoff Inv. Sec. LLC),* 418 B.R. 75, 79 (Bankr.S.D.N.Y.2009) (citing *Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 904 (2d Cir.1981)); *see also Metro. Life Ins. Co. v. Robertson–Ceco Corp.,* 84 F.3d 560, 566 (2d Cir.1996) ("On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant." (citation omitted)). The plaintiff must

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

make "legally sufficient allegations of jurisdiction, including an averment of facts that, if credited[,] would suffice to establish jurisdiction over the defendant." *Penguin Grp. (USA) Inc. v. Am. Buddha,* 609 F.3d 30, 35 (2d Cir.2010) (alteration in original) (citations and internal quotation marks omitted). When personal jurisdiction is averred on affidavits or declarations, "all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party." *A.I. Trade Fin., Inc. v. Petra Bank,* 989 F.2d 76, 79–80 (2d Cir.1993) (citations omitted).

Rule 7004(f) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") provides:

[i]f the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service in accordance with this rule ... is effective to establish personal jurisdiction over the person of any defendant with respect to a case under the Code or a civil proceeding arising under the Code, or arising in or related to a case under the Code.

FED. R. BANKR. P.7004(f). Pursuant to Bankruptcy Rule 7004(d), "[t]he summons and complaint and all other process except a subpoena may be served anywhere in the United States." *Id.* 7004(d). The Defendants were served pursuant to Bankruptcy Rule 7004 (PJ Opp. at 17), and they do not object to service (*see* "Response Extension Stipulation," ECF Doc. 7, ¶ 1 ("The Defendants waive any objection to the manner or validity of service of process in the above-captioned action.")). Accordingly, the Defendants are subject to personal jurisdiction so long as constitutional due process requirements are met. *See Bickerton v. Bozel S.A. (In re Bozel S.A.),* 434 B.R. 86, 97 (Bankr.S.D.N.Y.2010) ("Since [the defendant] does not contend that service of process was improper [under Bankruptcy Rule 7004], he is subject to personal jurisdiction in this Court so long as the Due

Process requirements are satisfied.").

[1]"To establish personal jurisdiction over a defendant, due process requires a plaintiff to allege (1) that a defendant has 'certain minimum contacts' with the relevant forum, and (2) that the exercise of jurisdiction is reasonable in the circumstances." *In re Terrorist Attacks on Sept. 11, 2001,* 714 F.3d 659, 673 (2d Cir.2013) (citing *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)).

[2]In assessing the sufficiency of a defendant's "minimum" contacts, courts distinguish between "general" and "specific" personal jurisdiction. *Id.* General, or "all-purpose," jurisdiction over a foreign defendant allows a court to hear any and all claims against such defendant. *Daimler,* 134 S.Ct. at 754 (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown,* 564 U.S. ——, ——, 131 S.Ct. 2846, 2851, 180 L.Ed.2d 796 (2011)). Specific jurisdiction over a foreign defendant allows a court to hear claims that "aris [e] out of or relate[ ] to the defendant's contacts with the forum...." **\*505***Helicopteros Nacionales de Co_lom., S.A. v. Hall,* 466 U.S. 408, 414 n. 8, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) (citation omitted). A determination of the reasonableness of exercising personal jurisdiction over a defendant entails inquiring whether the exercise of jurisdiction "would offend 'traditional notions of fair play and substantial justice.' " *Asahi Metal Indus. Co., Ltd. v. Superior Ct. of Cal., Solano Cnty.,* 480 U.S. 102, 113, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (quoting *Int'l Shoe,* 326 U.S. at 316, 66 S.Ct. 154).

*1. General Jurisdiction*

[3][4][5][6][7]Only a narrow set of affiliations with a forum will subject a defendant to general jurisdiction in that forum. *Daimler,* 134 S.Ct. at 760. An individual's paradigm basis for general jurisdiction is his or her domicile. *Id.* "With respect to a corporation,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

the place of incorporation and principal place of business are 'paradig[m] ... bases for general jurisdiction.' " *Id.* (citing Lea Brilmayer et al., *A General Look at General Jurisdiction,* 66 TEX. L. REV. 721, 735 (1988)). These paradigms are sufficient, but not exclusive, bases for general jurisdiction. *See id.* (" *Goodyear* did not hold that a corporation may be subject to general jurisdiction *only* in a forum where it is incorporated or has its principal place of business; it simply typed those places paradigm all-purpose forums."). At the same time, however, "engag[ing] in a substantial, continuous, and systematic course of business" in a forum is not alone sufficient to render a defendant subject to general jurisdiction in such forum. *Id.* at 761. Rather, beyond the paradigm bases for general jurisdiction over a corporation, general jurisdiction exists where such corporation's "affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Id.* (quoting *Goodyear,* 564 U.S. at ——, 131 S.Ct. at 2851)).

Central to the determination of whether the Defendants are subject to general jurisdiction is the issue whether their minimum contacts are to be assessed with respect to New York or the U.S. If the pertinent forum for assessing minimum jurisdictional contacts is the U.S., then each Defendant who is "at home" in the U.S. is subject to general jurisdiction; however, if minimum contacts must be assessed with respect to New York, then each Defendant's contacts with New York must be evaluated in order to determine whether it is "essentially at home" in New York. *See id.* at 761.

The Plaintiffs contend that a nationwide minimum contacts test is all that is required where a federal statute provides for nationwide service of process, and here, Bankruptcy Rule 7004(d)—a federal rule implicitly authorized by Congress and thus tantamount to a statute—authorizes nationwide service of process. (PJ Opp. at 12–13.) In support for their position, the Plaintiffs cite to several cases holding that a national minimum contacts standard applies to cases impli-

cating Bankruptcy Rule 7004, adversary proceedings asserting purely state law claims, and even to an adversary proceeding related to a chapter 15 case. (*Id.* at 13–15 (collecting cases).)

The Defendants argue that the "Plaintiffs ignore Bankruptcy Rule 7004(f) which expressly requires that personal jurisdiction under this rule be 'consistent with the Constitution and laws of the United States.' " (Apax/TPG Mot. at 12 (quoting FED. R. BANKR.P. 7004(f)).) The Defendants contend that nationwide service of process does not subject a defendant to personal jurisdiction in any bankruptcy court in the country in light of *Daimler,* particularly where, as here, the suit is based solely on state law claims arising out of foreign transactions and therefore has **\*506** no connection to the U.S. (*See id.* at 12–14.)

[8]"[I]n federal question cases ... no inquiry into a defendant's 'minimum contacts' with the forum state is needed to exercise jurisdiction pursuant to Bankruptcy Rule 7004; rather, only a federal 'minimum contacts' test is required, whereby the Fifth Amendment's Due Process Clause limits a bankruptcy court's exercise of personal jurisdiction over a defendant." *Enron Corp. v. Arora (In re Enron Corp.),* 316 B.R. 434, 444 (Bankr.S.D.N.Y.2004) (citing cases); *see also Bozel,* 434 B.R. at 99 (finding that, in the context of an adversary proceeding commenced in a bankruptcy proceeding, "the minimum contacts analysis should evaluate the defendant's contacts with the United States as a whole, not merely contacts with the forum state" (citation omitted)); *British Am. Ins. Co. Ltd. v. Fullerton (In re British Am. Ins. Co. Ltd.),* Adv. Proc. No. 11–03118(EPK), 2013 WL 1881712, at \*2 (Bankr.S.D.Fla. Apr. 30, 2013) (applying nationwide minimum contacts test to evaluate defendant's jurisdictional contacts in an adversary proceeding commenced in a chapter 15 proceeding). The rationale for this holding is that the sovereign exercising jurisdiction under 28 U.S.C. § 1334 is the U.S., not the particular state in which the federal court is situated. *See Diamond Mortg. Corp. of Ill. v. Sugar,* 913 F.2d 1233,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

1244 (7th Cir.1990) ("Since section 1334 provides federal question jurisdiction, the sovereign exercising its authority over the [defendants] is the United States, not the State of Illinois. Hence, whether there exist sufficient minimum contacts between the [defendants] and the State of Illinois has no bearing upon whether the United States may exercise its power over the [defendants] pursuant to its federal question jurisdiction."); *see also Owens–Illinois, Inc. v. Rapid Am. Corp. (In re Celotex Corp.),* 124 F.3d 619, 630 (4th Cir.1997)* ("[W]hen an action is in federal court on 'related to' jurisdiction, the sovereign exercising authority is the United States, not the individual state where the federal court is sitting." (citing *Diamond,* 913 F.2d at 1244; *Am. Freight Sys., Inc. v. W.A. Walker & Assocs., Inc. (In re Am. Freight Sys., Inc.),* 153 B.R. 316, 321 (D.Kan.1993); *J.T. Moran Fin. Corp. v. Am. Consolidated Fin. Corp. (In re J.T. Moran Fin. Corp.),* 124 B.R. 931, 943 (S.D.N.Y.1991)).

[9][10]Despite having been served pursuant to Bankruptcy Rule 7004(f), the Defendants argue that a nationwide minimum contacts test is inappropriate where, as here, the Plaintiffs' claims are all based on state law and the Plaintiffs' only jurisdictional hook to federal court is the Debtor's chapter 15 proceeding. (*See* Apax/TPG Mot. at 12; TCW Mot. at 8.) However, the fact that the Plaintiffs' claims are grounded in state law is not dispositive. *See Diamond,* 913 F.2d at 1244 (holding that nationwide minimum contacts test applies to non-core bankruptcy proceedings involving state law claims, where service has been made pursuant to Bankruptcy Rule 7004(d)); *see also J.T. Moran,* 124 B.R. at 942–43 (noting in dicta that nationwide minimum contacts continue to satisfy due process requirements even after withdrawal of the reference of non-core state law claims). Nationwide contacts satisfy due process requirements where the court has federal jurisdiction and nationwide service of process is authorized under an applicable federal statute. Indeed, courts have routinely held that a nationwide minimum contacts test applies where na-

tionwide service of process is authorized by federal law. *See, e.g., Enron,* 316 B.R. at 444 (noting that, after the 1996 amendments to the Bankruptcy Rules, "courts have recognized in federal question cases **\*507** that no inquiry into a defendant's 'minimum contacts' with the forum state is needed to exercise jurisdiction pursuant to Bankruptcy Rule 7004; rather, only a federal 'minimum contacts' test is required, whereby the Fifth Amendment's Due Process Clause limits a bankruptcy court's exercise of personal jurisdiction over a defendant" (citations omitted)). Accordingly, each Defendant's contacts with the U.S. as a whole, rather than with New York specifically, should be evaluated for purposes of personal jurisdiction.

[11]With the exception of TPG London, which the Plaintiffs allege is organized under U.K. law and has a principal place of business in England (*see* Compl. ¶ 31), all TPG Defendants are subject to general jurisdiction because the U.S. is their domicile, place of incorporation, or principal place of business. *See Daimler,* 134 S.Ct. at 760. The Plaintiffs allege, and TPG admits, that Bonderman resides in Fort Worth, Texas and that Coulter resides in San Francisco, California.[FN26] (*See* Compl. ¶¶ 27, 29; Apax/TPG Mot. at 16.) Additionally, the Plaintiffs allege, and TPG admits, that "[e]ach TPG Advisors IV Defendant, T $^3$ II Defendant, and TPG Capital [Management, L.P.] is ... a company or limited partnership organized under the laws of Texas or Delaware with their principal place of business in Fort Worth, Texas." (*See* Apax/TPG Mot. at 11; Compl. ¶¶ 23, 49–51, 53–56.) Thus, the Complaint sufficiently alleges the paradigm bases for general jurisdiction described in *Daimler* with respect to each TPG Defendant, with the exception of TPG London.

> FN26. While the Plaintiffs do not use the term domicile, the additional allegations that Bonderman and Coulter conduct business in the cities in which they reside support the Court's finding that their place of domicile is adequately alleged. (*See* Compl. ¶¶ 27, 29.)

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

The paradigm bases for general jurisdiction are similarly alleged with respect to each TCW Defendant.[FN27] The Plaintiffs allege, and TCW admits, that each TCW Defendant is organized under the laws of Nevada, California, or Delaware and has principal places of business in those states. (*See* Compl. ¶¶ 65–70; TCW Mot. at 9–13.)

> FN27. This conclusion results in a seeming anomaly. If the Plaintiffs filed the same claims less than one mile away in New York Supreme Court, minimum contacts with New York rather than with the United States would be the applicable test for general jurisdiction. But jurisdiction in the bankruptcy court is based on 28 U.S.C. § 1334 and is intended to permit a single bankruptcy court (or district court) to deal with all claims that arise under the Bankruptcy Code, arise in or are related to a bankruptcy case. The Plaintiffs would still have to show "that the exercise of jurisdiction is reasonable in the circumstances." *In re Terrorist Attacks,* 714 F.3d at 673. As explained below, the Court concludes on the facts here that the exercise of jurisdiction is reasonable.

By contrast, the Plaintiffs do not allege that the U.S. is the domicile, place of incorporation, or principal place of business for any Apax Defendant moving under the Apax/TPG Motion. Nor do the Plaintiffs allege facts establishing that any Apax Defendant's contacts with the U.S. are sufficiently continuous and systematic so as to render it "at home" in the U.S. *See Daimler,* 134 S.Ct. at 761. Thus, no Apax Defendant moving under the Apax/TPG Motion is subject to general jurisdiction.

As to DB, for which an alleged paradigm basis of general jurisdiction in the U.S. is also lacking, the analysis is more nuanced. While *Daimler* suggests that

a corporate defendant's place of incorporation and principal place of business are two paradigm forums where it would be subject to general jurisdiction, the Supreme Court did not hold that such paradigm forums represent the only places where a defendant**\*508** may be subject to general jurisdiction. *Id.* at 760. Here, the Plaintiffs rely on allegations that DB has substantial contacts with the U.S., including a principal location "in New York, where it has $5 billion in assets and operates out of a massive 1.6 million square foot Regional Head Office at 60 Wall Street that employs some 1,600 personnel, including 1,000 executives." (DB Supp. Opp. at 1; *see* McDowell Supp. Ex. 18.) But unlike in *Daimler,* the Plaintiffs do not allege that DB's New York office belongs to a subsidiary or affiliate. *See id.* at 751 ("Jurisdiction over the lawsuit was predicated on the California contacts of Mercedes–Benz USA, LLC (MBUSA), a subsidiary of Daimler incorporated in Delaware with its principal place of business in New Jersey.") Rather, they allege that DB's New York office is the North American Regional Head Office for DB itself, which "serves as a critical hub of [DB's] core banking operations, and physically spans over 1.6 million square feet of space, for which [DB] pays some $67 million annually in rent, pursuant to a 15–year lease." (DB Opp. at 6 (citing McDowell Decl. Ex. 7 at 7).) These allegations portray DB's presence in the U.S. as more than merely transitory, but rather "so 'continuous and systematic' as to render [it] essentially at home [here]." *Daimler,* 134 S.Ct. at 761 (quoting *Goodyear,* 564 U.S. at ——, 131 S.Ct. at 2851). The Plaintiffs allegations establish that DB maintains a substantial, long-term presence in the U.S. and in New York; DB's contacts with the U.S. are not limited to the in-state operations of its affiliate as in *Daimler.* The Plaintiffs therefore adequately allege that DB is subject to general jurisdiction.

In sum, all Defendants are subject to general jurisdiction, with the exception of TPG London and each Apax Defendant moving under the Apax/TPG Motion (collectively, the "Non–U.S. Defendants"). The Court considers whether these Non–U.S. De-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

fendants are subject to specific jurisdiction below.

*2. Specific Jurisdiction*

The Plaintiffs allege that specific jurisdiction exists over the Non–U.S. Defendants by virtue of their suit-related conduct directed at the U.S., including (i) their role in orchestrating the marketing and sale of U.S. dollar-denominated Sub Notes in order to partially fund the December 2006 CPEC Redemption; and (ii) their subsequent transfer of proceeds of the December 2006 CPEC Redemption to the U.S. (*See* PJ Opp. at 4–10.) More specifically, the Plaintiffs assert that, in light of diminished interest in an auction of Hellas II's subsidiaries to potential bidders, in an October 27, 2006 presentation to Apax and TPG, DB proposed "an aggressive recapitalization that will allow shareholders to realize a significant dividend." (*Id.* at 5 (quoting Ashley Decl. Ex. 8 at 07190) (internal quotation marks omitted).) In support of this allegation, the Plaintiffs point to a December 8, 2006 email in which TPG London's "Philippe Costeletos reported to TPG President David Bonderman that 'we decided to move ahead with a recap' and 'w[e] are issuing a 2nd unsecured €1.1 billion FRN [*i.e.,* Sub Notes].' " (*Id.* at 6 (alterations in original) (quoting Ashley Decl. Ex. 11 at 10661).) This email indicates that proceeds of the recapitalization would " 'repay the current €540 million PIK and distribute €900 million to shareholders,' including '€400 million to TPG (on an initial investment of €194 million).' " (*Id.* (quoting Ashley Decl. Ex. 11 at 10661).) The email further indicates that if all went according to plan, TPG London "anticipated wiring funds to Fort Worth on December 19th." (*Id.* (quoting Ashley Decl. Ex. 11 at 10661).)

**\*509** According to the Plaintiffs, TPG, Apax, and DB subsequently endeavored to issue a dollar-denominated tranche of Sub Notes to target investors in the U.S. (*See id.* at 7.) The Plaintiffs allege that these Defendants developed an "agreed storyline for what [they] w[ould] tell the debt markets ... for why [they] ... decided to go down the recap route." (*Id.*

(quoting Ashley Decl. Ex. 19 at 14999).) The alleged "storyline" originated with an Apax employee and set forth that "the auction was 'a limited process to test the market,' and that they 'received offers to refinance the company at attractive valuations, which would enable [them] to ... support the [company's] future growth.' " (*Id.* at 7–8 (alterations in original) (quoting Ashley Decl. Ex. 19 at 14999).) An Apax employee later sent an email to a DB employee, providing "the story line as promised." (*Id.* at 8 (quoting Ashley Decl. Ex. 19 at 14998).)

The Plaintiffs allege that after the fully subscribed Sub Notes were issued, proceeds from the dollar-denominated tranche of Sub Notes were held in a New York bank account maintained by DB, and such proceeds were subsequently transferred to Hellas II. (*Id.* (citing Ashley Decl. Ex. 21 at 1942).) According to the Plaintiffs, Apax and TPG then announced an "outsized dividend" (*id.*), collectively received €800 million in proceeds of the December 2006 CPEC Redemption (*see id.* at 9 (citing Compl. ¶¶ 26, 36–38, 40–43, 49–63; Ashley Decl. Exs. 30–34), and transferred approximately €516 million of those proceeds to the U.S. (*id.* (citing Compl. ¶¶ 26, 36–38, 40–43, 49–63; Ashley Decl. Exs. 30–34)). Specifically, the Plaintiffs assert that "Apax Europe VI GP Co. Ltd., Apax Europe VI GP, L.P., Apax Europe VI–A, L.P., and Apax Europe VI–1, L.P. acknowledge receipt of Apax's €400 million share, of which on December 29, 2006 they distributed €115 million to 57 investors in the U.S. (with €16 million distributed in New York)." (*Id.* at 10 (citing Ashley Decl. Ex. 37).) The Plaintiffs allege that "TPG acknowledges that the full amount of its €400 million share of the proceeds was transferred to the U.S. on December 27, 2006, of which $296 million was distributed that same day to 150 investors in the U.S. (with $45 million distributed in New York)." (*Id.* (citing Ashley Decl. Ex. 38).)

Apax and TPG argue that the Plaintiffs improperly group the various Apax and TPG Defendants together, referring to them collectively as "Apax or

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

"TPG" in the Complaint. (Apax/TPG Reply at 1.) As such, Apax and TPG contend that the Complaint fails to adequately allege that specific jurisdiction exists over any Non–U.S. Defendant individually. (*See id.*) In any event, Apax and TPG argue that DB's contacts with the U.S. do not support the exercise of specific jurisdiction over any Non–U.S. Defendant because the Plaintiff's claims are not sufficiently related to DB's alleged U.S. contacts. (*See id.* at 2.) Because the Plaintiffs' claims are premised on an initial fraudulent conveyance between Hellas II and Hellas I, and on subsequent transfers to the Non–U.S. Defendants, all of which "occurred entirely overseas," Apax and TPG contend that the "potential 'transferee' liability of the Non–U.S. Defendants does not depend on how or to whom DB marketed Sub Notes in the U.S." (*Id.* ("[T]his case is about the transfers, not the Sub Notes sales." (citation omitted)).) Apax and TPG also argue that the dollar-denominated Sub Notes sales and the transfers underlying the Plaintiffs' claims are too attenuated to support the exercise of specific jurisdiction over the Non–U.S. Defendants in light of the fact that (i) "the U.S. tranche represented only 18% of the Sub Notes offering, which primarily was marketed in Europe" (*id.* at 3 (emphasis omitted)); and **\*510** (ii) the Plaintiffs "have made no showing ... that any proceeds raised in the U.S. were transferred to or otherwise touched any Non–U.S. Defendant ...." (*id.* (emphasis omitted)). Apax and TPG further assert that the Plaintiffs have not shown that DB acted as an agent of any Non–U.S. Defendant in marketing and selling Sub Notes in the U.S. (*Id.* at 4.) To the contrary, pursuant to the applicable purchase agreement between Hellas II and DB and other underwriters, TPG and Apax argue that DB engaged in a "firm commitment underwriting" of the Sub Notes whereby it purchased the Sub Notes from Hellas II for its own account.[FN28] (*See id.* (citing Lestelle Decl. Ex. B § 1, at 2).)

FN28. "Indeed, in the Purchase Agreement between Hellas II and the Initial Purchasers (*i.e.,* the underwriters, including DB), Hellas II acknowledged that 'the Initial Purchasers

have acted at arm's length, *are not agents of ... the Issuer or any other person.*' " (*Id.* (emphasis in original) (quoting Lestelle Decl. Ex. B § 12, at 22).)

Moreover, Apax and TPG argue that transfers of proceeds of the December 2006 CPEC Redemption from the Non–U.S. Defendants to the U.S. are not sufficiently connected to the Plaintiffs' claims because the "[P]laintiffs seek to impose *transferee,* not *transferor,* liability on the Non–U.S. Defendants based solely on transfers made *to* them, not *by* them." (*Id.* at 6 (emphasis in original).) Accordingly, any Non–U.S. Defendant's transfer of proceeds made subsequent to its receipt thereof bears no relationship to the Plaintiffs' claims and is therefore irrelevant to a determination of whether specific jurisdiction may be exercised over such Non–U.S. Defendant.[FN29] (*See id.* at 6–7.)

FN29. Apax and TPG also contest the accuracy of the Plaintiffs' allegations regarding the Non–U.S. Defendants' transfers of redemption proceeds to the United States. First, they state that the Non–U.S. Defendants only transferred €115 million of redemption proceeds to the United States, not the €516 million alleged by the Plaintiffs. (*Id.* at 6 (citing Ashley Decl. Ex. 37, Nos. 7–62, 64).) Second, they maintain that the Non–U.S. Defendants did not make "[m]ore than 200 bank transfers totaling $296 million and €115 million," as alleged by the Plaintiffs. (*Id.* (citing PJ Opp. at 19).) "In fact, two Apax Moving Defendants made a total of 56 such transfers totaling €115 million." (*Id.* (citing Ashley Decl. Ex. 37, Nos. 7–62, 64).)

[12][13]"The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore,* —— U.S. ——, 134 S.Ct. 1115, 1121, 188 L.Ed.2d 12 (2014) (quoting *Keeton v. Hustler Maga-*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

*zine, Inc.,* 465 U.S. 770, 775, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984)) (internal quotation marks omitted). The defendant's suit-related conduct with the forum must form the basis for specific jurisdiction. *See id.* at 1121; *Picard,* 418 B.R. at 80 ("Specific personal jurisdiction exists where a foreign defendant 'purposefully direct[s] his activities at residents of the forum,' and the underlying cause of action 'arise[s] out of or relate[s] to those activities.' " (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985))). "Where the claim arises out of, or relates to, the defendant's contacts with the forum—i.e., specific jurisdiction [is asserted]—minimum contacts [necessary to support such jurisdiction] exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL,* 732 F.3d 161, 170 (2d Cir.2013) (alteration in original) (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,* 305 F.3d 120, 127 (2d Cir.2002)).

**\*511** The circuit courts have adopted different approaches for determining whether a claim "arises from or relates to" a defendant's contacts with a forum for purposes of evaluating the existence of specific jurisdiction. *Del Ponte v. Universal City Dev. Partners, Ltd.,* No. 07–CV–2360 (KMK)(LMS), 2008 WL 169358, at \*9 (S.D.N.Y. Jan. 16, 2008). Under one approach, "jurisdiction over a defendant is proper only when the defendant's conduct within the forum is the 'proximate cause' of the plaintiff's injury." *Id.* (citing *Chew v. Dietrich,* 143 F.3d 24, 29 (2d Cir.1998)). Under an alternative approach, sufficient minimum contacts exist when a defendant's forum-related conduct is merely a "but for" cause of the plaintiff's injury. *Id.* (citation omitted). The Second Circuit has adopted a third, more flexible standard:

> Where the defendant has had only limited contacts with the state it may be appropriate to say that he will be subject to suit in that state only if the plain-

tiff's injury was proximately caused by those contacts. Where the defendant's contacts with the jurisdiction that relate to the cause of action are more substantial, however, it is not unreasonable to say that the defendant is subject to personal jurisdiction even though the acts within the state are not the proximate cause of the plaintiff's injury.

*Chew,* 143 F.3d at 29 (citations and internal quotation marks omitted).

[14]In this case, the alleged contacts between the Non–U.S. Defendants and the U.S. are not sufficiently related to the Plaintiffs' claims such that specific jurisdiction over the Non–U.S. Defendants exists. The Plaintiffs allege that "[t]hrough the December 2006 Transaction and the December 2006 CPEC Redemption, [Hellas II] transferred approximately €1.57 billion in cash proceeds to its parent Hellas I, of which at minimum €973,657,610 was transferred" ultimately to the Defendants. (Compl. ¶¶ 156, 162). The remainder of the approximately €1.57 billion transferred to Hellas I was used to pay other outstanding debt and transaction costs associated with the December 2006 Transaction. (*Id.*) Of the €1.57 billion transferred from Hellas II to Hellas I, only 13% was comprised of the $275 million attributable to the dollar-denominated Sub Notes. (DB Reply at 7 n.6.) The dollar-denominated Sub Notes only constituted a fraction of the entire Sub Notes offering, which in turn was "only one series of three separate notes issuances used to fund the ultimate transfer from Hellas II ... to Hellas I, of which '€978,659,712 was paid to Hellas I in redemption of outstanding CPECs.' " (*Id.* at 7 (citations omitted).)

No cause of action is asserted in this case challenging the sale of the Sub Notes; nor is it clear that the Plaintiffs, as foreign representatives (as opposed to the trustee under the note indenture or the note holders), would have standing to challenge that sale.[FN30] Instead, the Plaintiffs' claims arise from challenged transfers, including the December 2006 CPEC Re-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

demption and the Consulting Fees Transfer. (*See* Compl. ¶¶ 155–168.) They are also premised on Apax and TPG unjustly retaining benefits belonging to Hellas II by virtue of their receipt of proceeds from the December 2006 CPEC Redemption and the Consulting Fees Transfer. (*Id.* ¶¶ 169–173.) However, the Non–U.S. Defendants' alleged**\*512** U.S. contacts relating to the challenged transfers were not "but for" causes of such transfers. The proceeds generated from the issuance of dollar-denominated Sub Notes were not required to fund the December 2006 CPEC Redemption. Nor was the Non–U.S. Defendants' transfer of December 2006 CPEC Redemption proceeds to the U.S., after the fact, a cause of the challenged transfers underlying the Plaintiffs' claims. To contend that these subsequent transfers from the Non–U.S. Defendants to the U.S. in any way *caused* the December 2006 CPEC Redemption or the Consulting Fees Transfer is to put the cart before the horse.

> FN30. Indeed, the Hellas transactions at issue in this case have been the source of other litigation in the district court and this Court. *See Cortlandt St. Recovery Corp. v. Aliberti,* No. 12–CV–8686 (JPO), 2014 WL 6907548 (S.D.N.Y. Dec. 9, 2014); *TCS Capital Mgmt., LLC v. Apax Partners, L.P.,* No. 06–CV–13447 (CM), 2008 WL 650385 (S.D.N.Y. Mar. 7, 2008); *In re TPG Troy, LLC,* 492 B.R. 150 (Bankr.S.D.N.Y.2013).

To be sure, the December 2006 CPEC Redemption could have been accomplished if Hellas II never even issued the dollar-denominated Sub Notes. Hellas II possessed over €1 billion before accounting for the proceeds from the dollar-denominated Sub Notes, an amount greater than the amount allegedly transferred to the Defendants. (*See* Compl. ¶ 18 (alleging that approximately € 200 million was transferred to Hellas II from a subsidiary, and €960 million of proceeds were received by Hellas II from the issuance of the euro-denominated Sub Notes).) Accordingly, the Plaintiffs fail to allege that the sale of the dol-

lar-denominated Sub Notes was the proximate, let alone "but for," cause of the December 2006 CPEC Redemption.

Additionally, any attempt of the Plaintiffs to implicate the Non–U.S. Defendants by way of the transfer of the December 2006 CPEC Redemption proceeds is unpersuasive because (1) the Non–U.S. Defendants were the recipients, not the transferors of such proceeds, and (2) the Non–U.S. Defendants' receipt of those proceeds occurred abroad, not in the U.S. (*See* Ashley Decl. Ex. 37 (flow of funds document indicating a foreign country of origin for each transfer of redemption proceeds made by an Apax Defendant); *id.* Ex. 38 (flow of funds document indicating no transfers from TPG London to the U.S.).) Any subsequent transfer of redemption proceeds made by the Non–U.S. Defendants to recipients in the U.S. is irrelevant to their liability as transferees and therefore cannot constitute sufficient minimum contacts for purposes of establishing specific jurisdiction. The Apax/TPG Motion is therefore **GRANTED** in part and all claims against the Non–U.S. Defendants are **DISMISSED**.

*3. Reasonableness of Exercising Personal Jurisdiction*
[15][16][17]In determining the reasonableness of exercising jurisdiction over a defendant, "the defendant's contacts with the forum State must be such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." *World–Wide Volkswagen,* 444 U.S. at 292, 100 S.Ct. at 580 (internal quotation marks omitted) (quoting *Int'l Shoe,* 326 U.S. at 316, 66 S.Ct. 154). "The Court must take into account five factors in this inquiry: (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." *Schutte Bagclosures Inc. v. Kwik Lok*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

*Corp.,* No. 12 Civ. 5541(JGK), —— F.Supp.3d ——, ——, 2014 WL 4802917, at *7 (S.D.N.Y. Sept. 29, 2014) (citations omitted). Where constitutional minimum contacts have been established, "often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." *Bozel,* 434 B.R. at 100 (quoting **\*513***Asahi,* 480 U.S. at 114, 107 S.Ct. 1026) (internal quotation marks omitted). In such instance the burden shifts to the defendant "to present a 'compelling case' that establishing personal jurisdiction would be unreasonable." *Id.* (citations omitted).

[18]The Defendants subject to general jurisdiction do not satisfy their burden of making a compelling case that the exercise of general jurisdiction would be unreasonable. The TPG Defendants raised this argument for the first time in their Reply Brief, stating in a conclusory fashion that "it would be unreasonable to exercise personal jurisdiction over [them] because none of them had reason to expect being haled into court in New York in relation to the claims in this litigation, and neither the [Plaintiffs] nor any Moving Defendant has meaningful ties to the forum." (Apax/TPG Mot. at 17 n.9.) Neither TCW nor DB address whether it would be unreasonable for the Court to exercise personal jurisdiction over them.

The burden on these Defendants to litigate in this Court is not great, as each such Defendant is "at home" in the U.S. and is represented by counsel in the U.S. The U.S. has a significant interest in adjudicating this adversary proceeding, since it facilitates the foreign Plaintiffs' efforts to maximize the value of the Debtor's estate. *See In re British Am. Ins. Co. Ltd. v. Fullerton (In re British Am. Ins. Co. Ltd.),* Adv. Proc. Nos. 11–03118, 11–03117(EPK), 2012 WL 4508611, at *5 (Bankr.S.D.Fla. Sept. 28, 2012) ("By enacting chapter 15 of the Bankruptcy Code, Congress exhibited a clear intent for the United States to participate in a coordinated manner with insolvency proceedings taking place in foreign nations."). The Plaintiffs also have an interest in obtaining convenient and effective

relief. Finally, at this time, there does not appear to be another more efficient forum for resolving the Plaintiffs' claims, as they arise under New York law with which this Court is familiar. Accordingly, with respect to the TPG, DB, and TCW Defendants subject to general jurisdiction, the exercise of personal jurisdiction over such Defendants is reasonable under the circumstances. The Apax/TPG Motion is therefore **DENIED** in part as to all TPG Defendants other than TPG London, and the DB Motion and the TCW Motion are both **DENIED**.

**B. Subject Matter Jurisdiction**

In ruling on a motion to dismiss for lack of subject matter jurisdiction pursuant to FRCP 12(b)(1), "the district court must take all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.,* 752 F.3d 239, 243 (2d Cir.2014) (citing *Amidax Trading Grp. v. S.W.I.F.T. SCRL,* 671 F.3d 140, 145 (2d Cir.2011) (per curiam)). A motion to dismiss for lack of subject matter jurisdiction is properly granted where the court "lacks the statutory or constitutional power to adjudicate it." *Mastafa v. Chevron Corp.,* 770 F.3d 170, 177 (2d Cir.2014) (quoting *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000)) (internal quotation marks omitted). Where the parties dispute jurisdictional facts, the court must decide issues of fact by reference to evidence beyond the pleadings, including affidavits. *Tandon,* 752 F.3d at 243 (quoting *APWU v. Potter,* 343 F.3d 619, 627 (2d Cir.2003)). In the event of such a dispute, "the party asserting subject matter jurisdiction 'has the burden of proving by a preponderance of the evidence that it exists.' " *Id.* (quoting *Makarova,* 201 F.3d at 113).

According to the Defendants, the Complaint should be dismissed on the basis that "the Court lacks core subject matter **\*514** jurisdiction over this dispute." (Defs.' Mot. at 35.) They contend that the Plaintiffs' claims neither arise under title 11 nor arise in proceedings under the Bankruptcy Code, because

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

unlike claims asserted under section 544 of the Bankruptcy Code, the Plaintiffs' NYDCL and unjust enrichment claims "unquestionably exist outside of bankruptcy." (*Id.* at 36 (citation omitted).) Additionally, while 28 U.S.C. § 157(b)(2)(P) provides for core jurisdiction over chapter 15 recognition proceedings, "only that recognition itself is core; whether another proceeding in [c]hapter 15 is core must be determined elsewhere." (*Id.* (citing *In re Fairfield Sentry Ltd.,* 458 B.R. 665, 674 (S.D.N.Y.2011).) The Defendants assert that the Plaintiffs' claims do not fall within 28 U.S.C. § 157(b)(2)(P) because such section applies only to chapter 5 claims, which may not be brought in a chapter 15 proceeding. (*See id.* at 37.) The Defendants emphasize that the Court cannot render a final judgment on the Plaintiffs' claims where, as here, the Defendants did not file proofs of claim; however, they admit that the Court's inability to finally adjudicate the Plaintiffs' claims is not determinative of whether the Court has subject matter jurisdiction. (*Id.* at 38.)

According to the Plaintiffs, the Defendants do not contest the Court's subject matter jurisdiction over the claims at issue in this adversary proceeding pursuant to 28 U.S.C. § 1334; rather, the Defendants conflate the concepts of "subject matter jurisdiction" and "core proceedings" by asserting that "the Court lacks core subject matter jurisdiction over this dispute." (Opp. at 48 (quoting Defs.' Mot. at 45).) The Plaintiffs maintain that the U.S.Code's division of proceedings into "core" and "non-core" has nothing to do with subject matter jurisdiction, but instead "allocates the authority to enter final judgment between the bankruptcy court and the district court." (*Id.* (quoting *Stern v. Marshall,* ––– U.S. ––––, 131 S.Ct. 2594, 2607, 180 L.Ed.2d 475 (2011)) (internal quotation marks omitted).) The Plaintiffs argue that the determination of whether their adversary proceeding is "core" or "non-core" is irrelevant to the Court's subject matter jurisdiction, which exists. (*Id.*)

Section 1334 of title 28 of the U.S.Code provides

federal district courts with jurisdiction over "all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). District courts may refer "any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 ... to the bankruptcy judges for the district." *Id.* § 157(a). Section 157 also divides matters referred to the bankruptcy court into two categories: core and non-core proceedings. *See generally id.* § 157.

[19]While *Stern v. Marshall,* ––– U.S. ––––, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011), and its progeny limit the authority of a bankruptcy judge to enter final orders or judgment on core claims that would not be resolved as part of the claims allowance process, the bankruptcy court's jurisdiction remains unaffected, and the court may submit proposed findings of fact and conclusions of law. As the Supreme Court stated in *Stern,* "[s]ection 157 [of title 28] allocates the authority to enter final judgment between the bankruptcy court and the district court. That allocation does not implicate questions of subject matter jurisdiction." *Stern,* 131 S.Ct. at 2607; *see also Residential Funding Co. v. UBS Real Estate Sec., Inc.,* 515 B.R. 52, 62 (Bankr.S.D.N.Y.2014) (concluding that *Stern* did not alter the subject matter jurisdiction of the bankruptcy courts); *Geron v. Peebler (In re Pali Holdings, Inc.),* 488 B.R. 841, 848 n. 26 (Bankr.S.D.N.Y.2013) (" *Stern,* **\*515** which affects the constitutional power of a bankruptcy judge to issue a final judgment in a matter as to which the bankruptcy court already has subject matter jurisdiction, does not in any way deprive bankruptcy courts of subject matter jurisdiction."). With respect to "a proceeding that is not a core proceeding but that is otherwise related to a case under title 11," a bankruptcy judge may submit proposed findings of fact and conclusions of law to the district court. 28 U.S.C. § 157(c)(1).

[20]This Court has "related to" subject matter jurisdiction over this adversary proceeding under 28 U.S.C. § 1334. Section 1334(b) provides that "district

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). In the Second Circuit, the test for determining the existence of related to jurisdiction under 28 U.S.C. § 1334 is whether the outcome of a proceeding might have any "conceivable effect" on the bankrupt estate, or whether the proceeding has a "significant connection" with the bankrupt estate. *See Publicker Indus. Inc. v. United States (In re Cuyahoga Equip. Corp.),* 980 F.2d 110, 114 (2d Cir. 1992).

[21][22]"[C]ommencement of a chapter 15 case does not create an 'estate' as that term is used in the Bankruptcy Code." *In re JSC BTA Bank,* 434 B.R. 334, 341 (Bankr.S.D.N.Y.2010). However, in the context of a case under former Bankruptcy Code section 304—the precursor to chapter 15—the Second Circuit noted that "[t]he fact that a § 304 proceeding, by definition, involves a bankruptcy estate located abroad does not short circuit the 'related to' analysis." *Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.,* 639 F.3d 572, 579 (2d Cir.2011). In *Parmalat,* the Second Circuit held that the district court properly exercised removal jurisdiction over the foreign debtors' state law civil action filed in state court, finding that the foreign debtors' civil action seeking damages might have a conceivable effect on their bankruptcy estates, and therefore the district court had "related to" jurisdiction over the state law action. *See id.* n. 7 ("State law claims are 'related to' § 304 proceedings so long as they satisfy [the] 'related to' test set forth in *Cuyahoga,* 980 F.2d at 114. Nothing more is required.").

The outcome of this adversary proceeding would clearly have an effect on the Debtor's foreign estate, as it could potentially recover approximately € 1 billion for the benefit of the estate. *See Cuyahoga,* 980 F.2d at 114 (holding that certain section 502 and 506(c) claims were related to the debtors' bankruptcy cases where such "claims bring into question the very distribution of the estate's property"). Notwithstanding that the Plaintiffs' claims are all state law claims

brought in an adversary proceeding related to a chapter 15 proceeding, this adversary proceeding is related to a case under title 11. *See Parmalat,* 639 F.3d at 579.

The Court will assume for purposes of this decision that it would not have authority to finally adjudicate the Plaintiffs' claims without the consent of the parties. The Court would still have authority to issue proposed findings of fact and conclusions of law, regardless of whether the claims are core or non-core. *See Exec. Benefits Ins. Agency v. Arkison, ⸺ U.S. ⸺, 134 S.Ct. 2165, 2168, 189 L.Ed.2d 83 (2014)* ("We hold today that when, under *Stern's* reasoning, the Constitution does not permit a bankruptcy court to enter final judgment on a bankruptcy-related claim, the relevant statute nevertheless permits a bankruptcy court to issue proposed findings of fact and conclusions of law to be reviewed *de novo* by the district court.") And, as already discussed, whether**\*516** this Court has the authority to enter a final judgment on the Plaintiffs' claims does not affect the Court's jurisdiction to consider the claims and enter a non-final judgment. *See British Am. Ins. Co. Ltd. v. Fullerton (In re British Am. Ins. Co. Ltd.),* 488 B.R. 205, 221 (Bankr.S.D.Fla.2013) ("Whether a particular proceeding is core or non-core—whether the bankruptcy court may enter a final order or judgment therein—has no impact on whether there is federal bankruptcy jurisdiction over the proceeding."). The Defendants' Motion is therefore **DENIED** to the extent it seeks dismissal for lack of subject matter jurisdiction.

**C. Choice of Law**

[23]There are three jurisdictions' laws potentially implicated in this case: New York law, U.K. law, and Luxembourg law.[FN31] To determine which of these laws applies to the substance of the causes of action asserted in the Complaint, the parties agree that the Court must employ New York choice of law rules. (*See* Defs.' Supp. Br. at 3; Pls.' Supp. Opp. at 3.) *See also Geron v. Seyfarth Shaw LLP (In re Thelen LLP),* 736 F.3d 213, 219 (2d Cir.2013) ("[W]here no significant federal policy, calling for the imposition of a

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

federal conflicts rule, exists, a bankruptcy court must apply the choice of law rules of the forum state." (alteration in original) (citations and internal quotation marks omitted)). Under New York choice of law rules, the Court must first determine whether there is an "actual conflict" between the relevant laws of the implicated jurisdictions. *GlobalNet Financial.com, Inc. v. Frank Crystal & Co.,* 449 F.3d 377, 382 (2d Cir.2006) (citing *In re Allstate Ins. Co. v. Stolarz,* 81 N.Y.2d 219, 597 N.Y.S.2d 904, 613 N.E.2d 639, 937 (1993); *Zurich Ins. v. Shearson Lehman Hutton, Inc.,* 84 N.Y.2d 309, 618 N.Y.S.2d 609, 642 N.E.2d 1065 (1994)). An actual conflict exists where such laws provide different substantive rules; such differences must be relevant to the issue to be determined and have a "significant *possible* effect on the outcome of the trial." *Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.,* 414 F.3d 325, 331 (2d Cir.2005) (emphasis in original) (citations and internal quotation marks omitted). However, "[i]f no actual conflict exists, and if New York is among the relevant jurisdictions, the court may simply apply New York law." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL,* 672 F.3d 155, 157 (2d Cir.2012) (" *Licci I*") (citations omitted).

> FN31. As an initial matter, "[i]n determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law." FED. R. CIV. P. 44.1.

The Complaint alleges three causes of action: Count I of the Complaint asserts an actual fraudulent conveyance claim against all the Defendants and the Transferee Class under NYDCL section 276; Count II asserts a constructive fraudulent conveyance claim against all Defendants and the Transferee Class under NYDCL sections 273, 274, 275, and 277; and Count III asserts an unjust enrichment claim against Apax

and TPG only. (Compl. ¶¶ 155–173.) With respect to Counts I and III, the parties purport to agree that there is no actual conflict between New York law on the one hand and either U.K. law or Luxembourg law on the other. (*See* Defs.' Supp. Br. at 1 ("Defendants are not at this time aware of an actual conflict between New York law and either Luxembourg law or U.K. law that would require the Court to engage in a choice of law analysis regarding the First Cause of Action or the Third Cause of Action in the Complaint."); **\*517** Dec. 3, 2014 Hr'g. Tr. 118:21–23 (Plaintiffs' counsel stating "we would have actually fraudulent transfer claims and unjust enrichment claims under with [sic] English or Luxembourg [law]."").) New York law therefore applies to Counts I and III of the Complaint. *See Licci I,* 672 F.3d at 157; *see also Park Place Entm't Corp. v. Transcon. Ins. Co.,* 225 F.Supp.2d 406, 408 (S.D.N.Y.2002) ("If the party advocating a choice of law analysis fails to demonstrate an actual conflict between New York and another state's laws, no choice of law analysis need be undertaken." (citations omitted)).[FN32]

> FN32. The twist here is that while the Defendants' counsel state that there is no conflict with respect to the actual fraudulent conveyance claim, they separately argue that the NYDCL does not have extraterritorial application to the transfers challenged in this case, while U.K. or Luxembourg law might apply. The NYDCL's lack of extraterritorial effect may indeed create an actual conflict requiring a further choice of law analysis. *See Meyers v. Kallestead,* No. 91 C 20362, 1992 WL 280450, at \*4 (N.D.Ill. Sept. 30, 1992) (holding that an actual conflict triggering a choice of law analysis existed between the Illinois Dram Shop Act, which does not apply extraterritorially, and the Iowa Dram Shop Act, which does apply extraterritorially); *see also Hartford Fire Ins. Co. v. California,* 509 U.S. 764, 815–18, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993) (discussing

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

extraterritorial reach of statutes as a choice-of-law and/or comity principle); *Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE,* 763 F.3d 198, 220 (2d Cir.2014) ("The question whether the application of [a securities fraud statute] to a particular set of transnational facts would be impermissibly extraterritorial has much in common with the choice-of-law question that arises when a court must determine which state or nation's law most appropriately governs a case involving interstate or transnational facts."); *see also Maxwell Commc'n Corp. plc v. Barclays Bank plc (In re Maxwell Commc'n Corp. plc),* 170 B.R. 800, 809–10 (Bankr.S.D.N.Y.1994) (recognizing the view that extraterritoriality should be construed as a sub-genre of choice of law), *aff'd,* 186 B.R. 807 (S.D.N.Y.1995), *aff'd,* 93 F.3d 1036, 1055 (2d Cir.1996) (affirming lower courts on basis of international comity while declining to decide whether presumption against extraterritorial application of Bankruptcy Code avoidance provisions would "compel a conclusion that the Bankruptcy Code does not reach the pre-petition transactions at issue"). Despite this, the Court will assume, as the parties purport to do, that no conflict exists and that New York law therefore applies to Count I. As explained below, the Court concludes that the NYDCL actual fraudulent conveyance claim must be dismissed for lack of standing, making it further unnecessary to reach the issue of the extraterritorial effect of the statute.

With respect to Count II of the Complaint—the Plaintiffs' constructive fraudulent conveyance claim—the parties agree that there are differences between New York law and the laws of U.K. and Luxembourg. (*See* Defs.' Supp. Br. at 2–3; Pls.' Supp. Opp. 6.) The Plaintiffs, however, dispute the impact of such differences, arguing that the conflicts among the laws are not sufficiently material to constitute "actual conflict[s]" triggering the next inquiry of a New York choice of law analysis. (Pls.' Supp. Opp. at 6–7.) The Court disagrees.

Under NYDCL sections 273, 274, 275, and 277, as cited in the Complaint (*see* Compl. ¶¶ 161–168), "a transfer made without fair consideration constitutes a fraudulent conveyance, regardless of the intent of the transferor." *Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.),* 403 F.3d 43, 53 (2d Cir.2005) (quoting *HBE Leasing Corp. v. Frank,* 48 F.3d 623, 633 (2d Cir.1995) (acknowledging that New York follows the Uniform Fraudulent Conveyance Act, which identifies several types of constructive fraud)). By contrast, the proffered U.K. and Luxembourg law equivalents to the NYDCL require proof of some degree of purpose or intent. [FN33] **\*518** First, under U.K. law, section 423(3) of the Insolvency Act requires a creditor to prove that the " 'actual subjective purpose' of the transferor in entering into the transaction was to (i) put assets beyond the reach of a person who is making or may make a claim against him; or (ii) to otherwise prejudice the interests of such person in relation to the claim which he is making or may make." (Pls.' Supp. Opp. at 3 (citing Supp. Isaacs Decl. ¶¶ 12.2, 16).) Second, article 1167 of the Luxembourg Civil Code, also known as the "*Actio Pauliana,*" requires a plaintiff-creditor to prove the transferor's "actual intent to defraud." (*See* Defs.' Supp. Br. at 2 (citing Prüm Decl. ¶ 7).) Since other causes of action under the NYDCL require a showing of "an intent to defraud," these foreign laws are clearly different from the constructive fraudulent transfer claim asserted in Count II of the Complaint. *See, e.g.,* N.Y. DEBT. & CRED. L.. § 276. Indeed, the Plaintiffs plead a separate actual fraudulent conveyance claim under the applicable NYDCL provisions that require a showing of an intent to defraud, evincing an acknowledgement that there is a distinction between constructive and actual fraudulent conveyance claims under New York law. (*See* Compl. ¶¶ 155–168.)

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

FN33. The Plaintiffs' expert opines that section 238 of the U.K. Insolvency Act 1986 (the "Insolvency Act") is analogous to the NYDCL's provisions governing constructive fraudulent conveyances in that section 238 does not require proof of an "actual subjective purpose," (*see* Pls.' Supp. Opp. at 6 (citing Supp. Moss. Decl. ¶¶ 12, 15)), but both parties' experts agree that the Plaintiffs are not entitled to bring a claim pursuant to section 238 of the Insolvency Act under the circumstances of this case (*see id.* ("[W]hile England's Section 238 is analogous to a claim for a constructive fraudulent conveyance, it appears that such a claim is only available where insolvency proceedings have been commenced within two years of the challenged transfer (which was not the case here)."); Supp. Isaacs Decl. ¶ 7 ("The [December 2006] CPEC Redemption Transaction occurred on 21 December 2006. Hellas II entered administration on 26 November 2009. It follows that the [December 2006] CPEC Redemption Transaction did not take place at a 'relevant time' within the meaning of section 240. Accordingly, no order could now be made under section 238....").) The Plaintiffs also conceded at the hearing that they could not assert this U.K. constructive fraudulent conveyance claim. (*See* Dec. 16, 2014 H'rg. Tr. 28:4–29:18.) Accordingly, the parties, and in turn the Court, focus the analysis with respect to U.K. law on section 423 of the Insolvency Act for purposes of determining the applicable law for Count II of the Complaint.

[24]The Court therefore concludes that an "actual conflict" exists between New York law on the one hand and U.K. and Luxembourg law on the other as to Count II of the Complaint. *See, e.g., Lyman Commerce Solutions, Inc. v. Lung,* No. 12–cv–4398 (TPG), 2014 WL 476307, at *3 (S.D.N.Y. Feb. 6, 2014)

(discussing the court's prior holding that an actual conflict exists between New York constructive fraudulent conveyance law, under which "a plaintiff need not prove [fraudulent] intent," and Iowa and Delaware law, under which "a plaintiff must still prove actual fraudulent intent" (citations and internal quotation marks omitted)); *Fireman's Fund Ins. Co. v. Great Am. Ins. Co.,* 10 F.Supp.3d 460, 495 (S.D.N.Y.2014) (finding an actual conflict between Mississippi and Texas laws governing rescission of an insurance policy based on a misrepresentation of material fact because Mississippi law does not require a finding of an "intent to deceive," whereas "under Texas law, [the plaintiff] must prove intent to deceive and reliance, and any ambiguity will be construed in favor of coverage").

[25][26]Upon the identification of an "actual conflict" among fraudulent conveyance laws, the New York choice of law analysis requires the Court to apply the "interest-analysis." *See, e.g., Drenis v. Haligannis,* 452 F.Supp.2d 418, 427 (S.D.N.Y.2006) (characterizing fraudulent **\*519** conveyance laws as conduct-regulating laws subject to New York's choice of law rules' "interest analysis"); *Lyman,* 2014 WL 476307, at *3 (citing cases finding that fraudulent conveyance laws are conduct-regulating for purposes of applying New York's "interest analysis"). "New York's interest analysis requires that 'the law of the jurisdiction having the greatest interest in the litigation will be applied and ... the [only] facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict.' " *Thelen,* 736 F.3d at 219 (alterations in original) (quoting *GlobalNet,* 449 F.3d at 384). "[G]iven that fraudulent conveyance laws are 'conduct regulating,' the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." *Lyman,* 2014 WL 476307, at *3; *see also United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.,* 216 F.Supp.2d 198, 215–16 (S.D.N.Y.2002) (finding that Canadian law applied to

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

plaintiffs' fraudulent conveyance claim because "the conveyance alleged by [the plaintiffs] to be fraudulent—the transfer of funds held by [one defendant] to the [other defendants]—took place in Canada").

[27]New York choice of law rules do not require a blind adherence to this rule. *See Golden Archer Invs., LLC v. Skynet Fin. Sys.,* 908 F.Supp.2d 526, 539 (S.D.N.Y.2012) (noting that the court "do[es] not blindly follow the *lex loci* rule" in applying the interest analysis to conduct-regulating laws (citations and internal quotation marks omitted)). But when the alleged wrongful conduct occurs in a place different from the place of injury, the Second Circuit dictates that "it is the place of the allegedly wrongful conduct that generally has superior 'interests in protecting the reasonable expectation of the parties who relied [on the laws of that place] to govern their primary conduct and in the admonitory effect that applying its law will have on similar conduct in the future.' " *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL,* 739 F.3d 45, 50–51 (2d Cir.2013) (" *Licci II*") (quoting *Schultz v. Boy Scouts of Am., Inc.,* 65 N.Y.2d 189, 491 N.Y.S.2d 90, 480 N.E.2d 679, 684–85 (1985)); *see also Lyman,* 2014 WL 476307, at *3 (concluding that for fraudulent conveyance claims, "the location of injury does not control; instead, it is the location of the defendant's conduct that controls." (citation omitted)).

[28]The Plaintiffs argue that New York has the greatest interest in seeing its law applied to their claims. (Pls.' Supp. Opp. at 9–15.) According to the Plaintiffs, (i) securities clearing house reports indicate that a greater number of Sub Notes were held by U.S. custodians than Luxembourg custodians (*see* Supp. Ashley Decl. Exs. 22–23, 42); (ii) the majority of U.S. custodians holding Sub Notes were located in New York (*see id.*); (iii) the offering memorandum and indenture for the dollar-denominated Sub Notes were governed by New York law, provided for Hellas II's consent to New York jurisdiction, and appointed a New York trustee, registrar, and paying agent for the Sub Notes (*see* Compl. ¶ 122); (iv) the Sub Notes were

aggressively "marketed and sold to investors located in ... New York and elsewhere in the [U.S.]" (*id.* ¶121; Pls.' Supp. Opp. at 13–14); and (v) a greater sum of the December 2006 CPEC Redemption proceeds obtained by both Apax and TPG was ultimately distributed in New York than in Luxembourg (Pls.' Supp. Opp. at 14–15 (citing Compl. ¶¶ 118–19; Ashley Decl. Exs. 37–38, 50)).

By contrast, the Defendants assert that Luxembourg has a superior interest in seeing its laws applied to Count II because:**\*520** (i) the "conveyances" at issue in Count II are the redemptions of CPECs, not the sale of Sub Notes (*see* Defs.' Supp. Br. at 4–5); (ii) the "principal steps" of the December 2006 CPEC Redemption were carried out in Luxembourg, by Hellas entities formed under Luxembourg law and located in Luxembourg (*see id.* at 4 (citing Compl. ¶ 118)); (iii) Hellas II's principal place of business was located in Luxembourg (*see id.* (citing Glenn Decl. Ex. A at ii; *Thelen,* 736 F.3d at 221 (indicating that for fraudulent conveyance claims, the "principal place of business is certainly relevant in deciding the law applicable to actions taken in the course of that business")); (iv) each series of CPECs was redeemed by Luxembourg-based Hellas entities, and each of the redemption agreements governing those transactions was governed by Luxembourg law (*see id.* at 5 (citing Glenn Decl. Ex. B § 5.6)); and (v) the corporate resolutions authorizing the CPEC redemptions were adopted by Hellas, a Luxembourg entity, in its capacity as the "sole manager and general partner" of Hellas II (*id.* (citing Compl. ¶ 127)).

Applying the Second Circuit's holding in *Licci II,* if the Court only had to choose between New York and Luxembourg law, Luxembourg appears to have a greater interest than New York. According to the parties' arguments, the allegedly wrongful conduct occurred more substantially in Luxembourg, whereas the alleged injury occurred more substantially in New York.[FN34] However, the Court is also faced with the laws of the U.K., which may have a countervailing

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

interest pursuant to the European Union's Council Regulation (EC) No. 1346/2000 of 29 May 2000 on insolvency proceedings (the "EU Insolvency Regulation").[FN35]

> FN34. The argument that the injury sustained occurred in New York is questionable. The Plaintiffs are the liquidators appointed by a U.K. court—recognized in this Court as foreign representatives—seeking to avoid and recover transfers initially made from London or Luxembourg. The alleged injury appears to have been suffered in Luxembourg, where Hellas II was based, or in the U.K., where the Debtor's insolvency proceeding is pending.

> FN35. Council Regulation 1346/2000, On Insolvency Proceedings, 2000 O.J. (L 160) 1(EC).

Article 4 of the EU Insolvency Regulation indicates that the law of a debtor's Centre of Main Interests ("COMI") "continues to govern aspects of that entity's bankruptcy throughout the [European Union], including the choice of which avoidance law will control." Segaal Schorr, Comment, *Avoidance Actions under Chapter 15: Was Condor Correct?,* 35 FORDHAM INT'L L.J. 350, 360 (2011) (citations omitted). This article thus establishes a default rule that the law of the debtor's COMI governs the avoidance of antecedent transactions. *See* Nigel John Howcroft, *Universal vs. Territorial Models for Cross–Border Insolvency: The Theory, the Practice, and the Reality that Universalism Prevails,* 8 U.C. DAVIS BUS. L.J. 366, 414–15 (2008) [hereinafter Howcroft, *Universal vs. Territorial* ]. Since August 2009, the Debtor's COMI is the U.K. (Compl.¶ 151.) The Plaintiffs assert that the EU Insolvency Regulation's default rule effectively displaces the applicability of Luxembourg law and Luxembourg's interests in the instant case. (*See* Pls.' Supp. Opp. at 7–9.) However, the Plaintiffs ignore article 13 of the EU Insolvency Regulation, which provides an exception to the

default rule, "enabl[ing] the disapplication of the [default rule] where the person who benefitted from the impugned transaction can prove that the law of another member state governs the transaction and that the transaction is valid under that law." Howcraft, *Universal vs. Territorial,* at 415.

**\*521** The Defendants assert that, in light of the EU Insolvency Regulation, both Luxembourg and the U.K. arguably have interests superior to that of New York in seeing their laws applied to Count II, but that the Court need not apply the EU Insolvency Regulation to determine which of the two foreign laws apply. (*See* Dec. 3, 2014 Hr'g. Tr. 100:13–17, 19–25, 106:2–8.) According to the Second Circuit, "[i]t is settled law that 'New York courts look to New York and not foreign conflicts provisions' in order to avoid the prospect of *renvoi*." *Weiss v. La Suisse,* 141 Fed.Appx. 31, 34 (2d Cir.2005) (summary order) (citations omitted). Since the EU Insolvency Regulation constitutes a foreign choice of law rule in these circumstances, rather than a substantive law, it is not applicable here. *Id.*

In any event, the Court need not go further in determining which law applies to Count II of the Complaint. The Court concludes that either Luxembourg or U.K. law applies to Count II, not New York law. The Plaintiffs only pleaded Count II under New York law in their Complaint. Count II of the Complaint is therefore **DISMISSED**.[FN36]

> FN36. As explained below, the Court also concludes that the foreign representatives lack standing to bring this claim, which is an independent ground for dismissal.

**D. Count I—NYDCL Section 276**
[29]The Plaintiffs' standing to assert Count I poses a threshold issue. *See Official Comm. of Unsecured Creditors of the Debtors v. Austin Fin. Servs., Inc. (In re KDI Holdings, Inc.),* 277 B.R. 493, 502–03

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

(Bankr.S.D.N.Y.1999) ("Standing is a jurisdictional requirement that must be met in order to have claims litigated in federal court." (citing *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114, 117 (2d Cir.1991))). Because standing is a jurisdictional matter, "it is the burden of the 'party who seeks the exercise of jurisdiction in his favor,' ... 'to [clearly] allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute.' " *Thompson v. Cnty. of Franklin,* 15 F.3d 245, 249 (2d Cir.1994) (quoting *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990)). The court may base its finding regarding a plaintiff's standing on the complaint, the complaint supplemented by undisputed facts, or the complaint and any disputed factual issues resolved by the court. *See id.* at 249.

[30]"It is well settled that in order to set aside a fraudulent conveyance [under NYDCL section 276], one must be a creditor of the transferor; those who are not injured by the transfer lack standing to challenge it." *Eberhard v. Marcu,* 530 F.3d 122, 131–35 (2d Cir.2008) (concluding that the history and plain language of NYDCL section 276 dictate that creditors have standing to assert an actual fraudulent conveyance claim under New York law). Standing to assert a NYDCL actual fraudulent conveyance claim, however, is not necessarily limited to *creditors* only—other plaintiffs vested with the authority to assert claims on behalf of creditors, for example, have standing. *See, e.g., id.* at 132 (recognizing that other courts have held that "receivers [appointed by the Securities and Exchange Commission (the "SEC") ] have standing to pursue fraudulently conveyed assets ... when one of the entities in receivership is a creditor of the transferor" (citing *Troelstrup v. Index Futures Grp., Inc.,* 130 F.3d 1274 (7th Cir.1997); *Scholes v. Lehmann,* 56 F.3d 750 (7th Cir.1995))); *Barnet v. Drawbridge Special Opportunities Fund LP,* No. 14–cv–1376 (PKC), 2014 WL 4393320, at *15 (S.D.N.Y. Sept. 5, 2014) ("In general, the **522** issue of standing does not arise when bankruptcy trustees ... seek to avoid a fraudulent transfer made by the in-

solvent entity. This is because section 544(b) of the Bankruptcy Code confers upon [bankruptcy] trustees the ability to stand in the shoes of the bankruptcy estate's unsecured creditors and 'avoid any transfer of an interest of the debtor in the property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim ....' " (quoting 11 U.S.C. § 544(b)(1))).

Here, the Plaintiffs are liquidators in the Debtor's U.K. insolvency proceeding, and foreign representatives before this Court under chapter 15 of the Bankruptcy Code pursuant to the Court's prior order granting recognition of the Debtor's U.K. insolvency proceeding. (*See* ECF Doc. # 17, Case No. 12–10631.) They are *not* creditors of the Debtor. The parties therefore dispute whether the Plaintiffs have standing to assert their NYDCL section 276 claim by way of some other authority vested in them as foreign representatives or U.K. liquidators.

Upon recognition of a foreign proceeding, foreign representatives are entitled to certain mandatory relief pursuant to section 1520 of the Bankruptcy Code as well as the assistance of the U.S. Bankruptcy Court in administering the foreign main proceeding. *See In re Atlas Shipping A/S,* 404 B.R. 726, 738–39 (Bankr.S.D.N.Y.2009).

In addition to the mandatory provisions under § 1520, two other provisions in chapter 15 ... allow the Court, in its discretion, to grant further relief to the foreign representative. Section 1521(a) outlines the discretionary relief a court may order upon recognition of a foreign proceeding, whether main or non-main. The discretion that is granted is "exceedingly broad" since a court may grant "any appropriate relief" that would further the purposes of chapter 15 and protect the debtor's assets and the interests of creditors.

The exercise of discretion is, however, circum-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

scribed by the Bankruptcy Code. Section 1522(a) provides that the court may only grant discretionary relief under § 1521 if the interests of creditors are sufficiently protected.... Standards that inform the analysis of § 1522 protective measures in connection with discretionary relief emphasize the need to tailor relief and conditions so as to balance the relief granted to the foreign representative and the interest of those affected by such relief, without unduly favoring one group of creditors over another.

*Id.* at 739 (citations and internal quotation marks omitted). In pertinent part, section 1521(a) of the Bankruptcy Code states:

...the court may, at the request of the foreign representative, grant any appropriate relief, including—

...

(5) entrusting the administration or realization of all or part of the debtor's assets within the territorial jurisdiction of the United States to the foreign representative or another person, including an examiner, authorized by the court;

...

(7) granting any additional relief that may be available to the trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a).

11 U.S.C. § 1521(a).

The parties agree that the Plaintiffs, as foreign representatives in the Debtor's chapter 15 proceeding, do not have standing to assert Count I if the Plaintiffs need to rely on section 544 to provide that standing because section 1521(a)(7) of the Bankruptcy Code does not permit a foreign**\*523** representative to utilize section 544 to gain standing in a chapter 15 case.

(Defs.' Mot. at 10–15; Opp. at 27.) *See also* 11 U.S.C. § 1521(a)(7) (granting a foreign representative access to only certain relief available to a bankruptcy trustee); *Barnet,* 2014 WL 4393320, at *15 ("[S]ection 1521(a)(7) of the Bankruptcy Code expressly precludes a court from granting for a foreign representative "relief that may be available to a trustee ... under section ... 544....' In the context of a grant of recognition of a foreign proceeding under Chapter 15, a foreign representative has standing to initiate a fraudulent transfer action only 'in a case concerning the debtor pending under another chapter of [Title 11] ....' " (alterations in original) (internal citations omitted)). The question remains, however, whether the Plaintiffs are entitled to bring their NYDCL actual fraudulent conveyance claim under section 1521(a)(5) (i.e. without using section 544) consistent with New York law's standing requirements. [FN37] Resolving this issue requires an examination of the Plaintiffs' authority as liquidators under U.K. law. *See Barnet,* 2014 WL 4393320, at *15–17 (examining whether the plaintiffs, who were foreign representatives in an ancillary chapter 15 proceeding and liquidators in an Australian insolvency proceeding, were vested with authority under Australian law to assert a NYDCL fraudulent conveyance claim consistent with New York law's standing requirements); *see also Koreag, Controle et Revision S.V. v. Refco F/X Assocs. (In re Koreag, Controle et Revision S.A.),* 961 F.2d 341, 348 (2d Cir.1992) (holding that for purposes of section 304, the predecessor to chapter 15, "the estate of a foreign debtor is defined by the law of the jurisdiction in which the foreign proceeding is pending, with other applicable law serving to define the estate's interest in particular property." (emphasis omitted) (citation omitted)); *In re Atlas Shipping,* 404 B.R. at 741 ("[T]he legislative history confirms that Congress expected courts to interpret the provisions [of chapter 15 of the Bankruptcy Code] consistently with prior law under § 304."). The Plaintiffs' standing, then, turns on whether U.K. law vests the Plaintiffs, as liquidators, with the authority to assert causes **\*524** of action on behalf of the Debtor's creditors.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

FN37. The Court does not decide the issue whether the Plaintiffs have standing to assert avoidance claims under applicable state or foreign law pursuant to section 1521(a)(7) without invoking section 544 to provide such standing. *See* 11 U.S.C. § 1521(a)(7) (authorizing a court to "grant[ ] any additional relief that may be available to the trustee"). This Court has previously recognized and the Fifth Circuit has held that section 1521(a)(7)'s restrictions on a foreign representative's use of certain provisions of chapter 5, such as section 544, do not necessarily bar a foreign representative from asserting an avoidance claim under the applicable foreign law. *See Fogerty v. Petroquest Resources, Inc. (In re Condor Ins. Ltd.),* 601 F.3d 319, 322–29 (5th Cir.2010) (holding that the exceptions listed in section 1521(a)(7) to the relief available to a foreign representative in a chapter 15 ancillary proceeding do not exclude avoidance actions brought pursuant to domestic law of the foreign main proceeding); *In re Atlas Shipping A/S,* 404 B.R. at 743–45, & n. 16 (noting that "it is unclear whether chapter 15's replacement of § 304 precludes a foreign representative from bringing an avoidance action under foreign law"); *In re Metzler,* 78 B.R. 674, 677 (Bankr.S.D.N.Y.1987) (holding "that a foreign representative may assert, under § 304 [or chapter 15's predecessor], only those avoiding powers vested in him by the law applicable to the foreign estate"). The key to this issue, however, is whether the plaintiff-foreign representative has standing to assert such claims *without* reliance on section 544 of the Bankruptcy Code. Although the Plaintiffs argue that New York law, in conjunction with U.K. law, provides them with standing to assert their NYDCL claims without relying on section 544 (*see, e.g.,*

Dec. 16, 2014 H'rg. Tr. 9:15–19:25), it is unnecessary for the Court to reach this section 1521(a)(7) issue here because the Court finds that the Plaintiffs fail to establish that they have standing under the applicable New York and U.K. laws.

The Plaintiffs assert, by way of a four-pronged argument, that they are vested with such authority. (*See* Dec. 16, 2014 Hr'g. Tr. at 15:8–19:25.) The Plaintiffs focus the first two prongs of their argument on the Debtor's U.K. insolvency proceeding. First, the Plaintiffs cite to the U.K. High Court's judgment converting the Debtor's prior U.K. administration into liquidation. (Dec. 16, 2014 Hr'g. Tr. 16:15–17:22.) According to the Plaintiffs, in this judgment, the High Court (1) converted the Debtor into a compulsory liquidation due to the request of "a significant portion of the unsecured creditors ... unopposed by any other creditor;" and (2) contemplated the role of the liquidators as including the investigation into the transactions now at issue before this Court to determine whether there were any viable claims that could be pursued. (*Id.*) Second, the Plaintiffs cite to a resolution of the U.K. Liquidation Committee comprised of certain of the Debtor's creditors that sanctioned the Plaintiffs to pursue this lawsuit in the U.S. (*Id.* at 18:9–25.)

Neither the judgment nor the resolution, however, provides evidence establishing that the Plaintiffs were granted express authority in the Debtor's U.K. insolvency proceeding to assert claims on behalf of the Debtor's creditors. The Plaintiffs ignore that the judgment does not specify that the Plaintiffs have standing to assert any or all of the potentially "viable claims," let alone claims on behalf of the Debtor's creditors. (*See* Pls.' Dec. 16, 2014 Hr'g. Binder, Tab 20, *In the Matter of Hellas Telecommunications (Luxembourg) II SCA (in administration),* [2011] EXHC 3176(Ch) ¶ 91.) The Plaintiffs further ignore that the resolution does not specifically sanction the Plaintiffs to pursue claims on behalf of the Liquidation

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

Committee (i.e.creditors). (*See* Pls.' Dec. 16, 2014 Hr'g. Binder, Tab 21, Resolutions Considered at the Second Meeting of the Liquidation Committee Held on 20 February 2014 at 25 Farrington Street London EC4A 4AB, dated 28 February 2013.)

The second two prongs of the Plaintiffs' argument focus on U.K. statutory law. First, the Plaintiffs argue that they have authority to bring their NYDCL actual fraudulent conveyance claim outside of the U.K. and under New York law. (Moss.Decl.¶¶ 30–44.) According to the Plaintiffs' expert, Moss, the Plaintiffs' assertion of the NYDCL actual fraudulent conveyance claim is "within the express powers granted liquidators by Article 5" of the U.K.'s chapter 15 equivalent, the Cross–Border Insolvency Regulations (the "CBIR"). (*Id.* ¶¶ 15, 34.) Article 5 of the CBIR provides that "[a] British insolvency officeholder [which includes U.K. liquidators] is authorized to act in a foreign State on behalf of a proceeding under British insolvency law, as permitted by the applicable foreign law." The Cross–Border Insolvency Regulations, 2006, No. 1030, art. 5; *see also id.* art. 2, ¶ (b) (defining "British insolvency officeholder"). Moss asserts that the Plaintiffs' NYDCL claim is brought "on behalf of" the Debtor's U.K. insolvency proceeding and that the only U.K. law restriction on the avoidance action is that it be in accordance with New York law. (Moss.Decl.¶ 32.) The Plaintiffs assert that nothing in New York law prevents them from asserting their NYDCL actual fraudulent conveyance claim. According to the Plaintiffs, NYDCL section 276–a confers standing upon them to assert the NYDCL section 276 claim, and the Seventh Circuit's decision in *Scholes v. Lehmann,* 56 F.3d 750 (7th Cir.1995), holding that the SEC receiver had standing to assert a claim under Illinois's then-equivalent version of a NYDCL section 276 claim, further supports**\*525** the Plaintiffs' standing under New York law. (*See* Dec. 16, 2014 Hr'g. Tr. at 9:22–15:20.)

Second, the Plaintiffs argue that the U.K.'s Insolvency Act vests the Plaintiffs, as liquidators, with the authority to assert claims not just on behalf of the company, but also on behalf of the company's creditors more broadly. (*See* Dec. 16, 2014 Hr'g. Tr. at 19:9–25.) The Plaintiffs primarily rely on paragraph 13 of schedule 4 of the Insolvency Act ("Paragraph 13"), which states that the liquidator has the "[p]ower to do all such other things as may be necessary for winding up the company's affairs and distributing its assets." Insolvency Act, 1986, c. 45, §§ 165, 167, sch. 4 ¶ 13. Moss explains that Paragraph 13 is known as a "sweep-up" provision and is to be interpreted broadly so as to "authori[ze] expressly anything 'necessary' for the winding up" of a company. (Moss Decl. ¶ 39.) Moss opines that the NYDCL fraudulent conveyance claim is "undoubtedly 'necessary' in order to reconstitute the estate for the creditors and to distribute the assets to creditors, which in turn is a 'necessary' aspect of winding up the company." (*Id.*) Moss concludes that, "despite there being no specific mention of this in Schedule 4, liquidators have power under the Insolvency Act 1986 inter alia to take proceedings abroad in their own name and under a local statute, and not just to take proceedings in the name of or on behalf of the debtor company." (*Id.* ¶ 43.) In essence, Moss opines that the Plaintiffs have authority to bring their NYDCL fraudulent conveyance claim pursuant to this "sweep-up" provision of the Act. (*Id.* ¶¶ 39–41.)

By contrast, the Defendants' expert, Isaacs, disagrees with both of Moss's conclusions, opining that neither Article 5 of the CBIR nor Paragraph 13 of the Insolvency Act empowers a U.K. liquidator to bring claims outside of the U.K. and under New York law that belong to creditors. (Isaacs Reply Decl. ¶¶ 4, 11.) As to Article 5 of the CBIR, Isaacs underscores Moss's concession that the NYDCL claim may only be brought if permitted by the applicable foreign law. (*Id.* ¶ 6.) Isaacs opines that Article 5 does not vest a liquidator with the substantive authority to override foreign law—instead, it merely authorizes a liquidator to act in accordance with New York law. (*Id.* ¶¶ 9–10; *see also id.* ¶ 6 ("[i]f the Liquidators are not permitted

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

by the [NY]DCL to bring fraudulent conveyance claims which belong to creditors, Article 5 does not authorize them to do so.").) The Defendants argue that because U.K. liquidators cannot act as or on behalf of creditors under U.K. law, it follows that the Plaintiffs are not permitted to assert their actual fraudulent conveyance claim under the NYDCL. (Defs.' Reply at 7–8.)

With regard to Paragraph 13, Isaacs opines that in spite of its function as a "sweep-up" provision, Paragraph 13 should not be read to confer substantive rights upon the liquidator that do not already exist via other U.K. statutes. (Isaacs Reply Decl. ¶ 11.4 (discussing *Re Phoenix Oil & Transport Co Ltd (No 2)* [1958] Ch 565 (rejecting liquidators' contention that the distribution of surplus assets is one of the "other things" which the liquidator had power to do under Paragraph 13, because the provision was properly regarded as a mopping-up provision at the end of a list of functions which the liquidator is enabled to perform in connection with the administration of the particular company's affairs and no more); *Re MF Global Ltd* [2013] 1 BCLC 552 at 565 ("While an administrator has power 'to do all other things incidental to the exercise of the foregoing powers' (para 23 of Sch 1), the equivalent power of a liquidator is limited to doing 'all such other things as may be necessary for wind-**526** up the company's affairs and distributing its assets.' ")).) Isaacs explains that other provisions of schedule 4 of the Insolvency Act, which lists the powers of a U.K. liquidator, are more specific than Paragraph 13 and do not "empower the liquidator to bring a claim which is not already vested in him or the company"; as such, Paragraph 13 should not be interpreted to do so either. (*Id.* ¶ 11.) Even if Paragraph 13 could confer non-existent substantive rights upon a U.K. liquidator, Isaacs opines that the NYDCL actual fraudulent conveyance claim should not be considered "necessary" under Paragraph 13, as Moss suggests. (*Id.* ¶ 11.2 (citing *Re Wreck Recovery & Salvage Co* [1880] 15 Ch D 353, 361 (holding that the word "necessary" in Schedule 4's statutory predecessor

means more than merely beneficial)).) According to Isaacs, the proceeds of such avoidance proceedings are not assets of the company, but rather are assets of the company's creditors. (*Id.*) Although obtaining those assets would be serving interests beneficial to creditors, Isaacs opines that the assets themselves are not in fact "necessary" to the administration of the company's estate in the U.K. within the meaning of the Insolvency Act. (*Id.*) Isaacs also explains that Hellas II's creditors have the right to bring the actions themselves—meaning the U.K. liquidators cannot be construed as the only or "necessary" plaintiff. (*See id.* ¶ 11.3.)

Based on the parties' arguments and the expert declarations, the Court concludes that U.K. law does not vest a liquidator with standing to assert claims on behalf of creditors broadly, despite there being clear authority vested in a liquidator to assert claims on behalf of the insolvent company. *See* Insolvency Act, 1986, c. 45 §§ 165, 167 sch. 4 ¶ 4; *see also* GOODE, PRINCIPLES OF CORPORATE INSOLVENCY LAW ¶ 5–04 (4th ed. 2011) ("On behalf of the creditors, the [U.K.] liquidator can bring proceedings in the name of the company in respect of causes of action vested in the company *but he has no locus standing to pursue claims vested in persons qua creditors*." (emphasis added)).

The parties agree that under the Insolvency Act, a liquidator involved in a winding up of a company by a U.K. court has the power to exercise any powers listed in parts I and II of schedule 4 of the Act "with the sanction of the court or liquidation committee," and to exercise any powers listed in part II of schedule 4 "with or without that sanction." Insolvency Act, 1986, c. 45, § 167; *see also id.* c. 45, §§ 165, 167, sch. 4. Here, only three of the enumerated powers in schedule 4 are potentially relevant to the question of a liquidator's standing: (i) "[p]ower to bring legal proceedings under section 213, 214, 238, 239, 242, 243 or 423" of the Act, *id.* c. 45, §§ 165, 167, sch. 4 ¶ 3A ("Paragraph 3A"); (ii) "[p]ower to bring or defend any action or

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

other legal proceeding in the name and on behalf of the company," *id.* c. 45, §§ 165, 167, sch. 4 ¶ 4 ("Paragraph 4"); and (iii) "[p]ower to do all such other things as may be necessary for winding up the company's affairs and distributing its assets," *id.* c. 45, §§ 165, 167, sch. 4 ¶ 13.

It is clear from Paragraph 4 that a liquidator under U.K. law is vested with the authority to bring actions "in the name and on behalf of the company." *Id.* c. 45, §§ 165, 167, sch. 4 ¶ 4. It is also clear that under Paragraph 3A, a liquidator may assert a claim under the proffered U.K. equivalent to a NYDCL fraudulent conveyance claim, section 423 of the Insolvency Act—the only creditor-like standing that a liquidator appears to have under U.K. law. [FN38] Generally, "a victim of the transaction,"**\*527** or a creditor, has standing to bring a claim under section 423. *Id.* § 424(1)(c). But in the event that a company is bankrupt or undergoing a winding up proceeding, the action may be brought "by the official receiver, by the trustee of the bankrupt's estate or the liquidator or administrator of the body corporate or (with leave of the court) by a victim of the transaction[.]" *Id.* § 424(1)(a). Regardless of which plaintiff under section 424(1) files the action, the action "is to be treated as made on behalf of every victim of the transaction." *Id.* § 424(2).

FN38. Section 423 states in part:

(1) This section relates to transactions entered into at an undervalue; and a person enters into such a transaction with another if —

....

(c) he enters into a transaction with the other for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration pro-

vided by himself.

(2) Where a person has entered into such a transaction, the court may, if satisfied under the next subsection, make such order as it thinks fit for —

(a) restoring the position to what it would have been if the transaction had not been entered into, and

(b) protecting the interests of persons who are victims of the transaction.

Insolvency Act, 1986, c. 45, § 423.

Although liquidators have express authority to bring a section 423 claim on behalf of the company's creditors, it does not follow that liquidators have the authority to bring *any or all* claims on behalf of the company's creditors. Nothing in schedule 4 of the Insolvency Act, the CBIR, or any U.K. law presented to the Court by the parties leads to such a conclusion. Indeed, the Plaintiffs' expert concedes that the Plaintiffs' actual fraudulent conveyance claim was not brought under section 423 of the Insolvency Act, leaving open the question of the Plaintiffs' standing. (Moss Decl. ¶ 30.) Moss further concedes that the CBIR requires that actions brought by a U.K. liquidator abroad be "permitted by the applicable foreign law." (*Id.* ¶ 34 (citing CBIR, 2006, No 1030, art. 5).) The "applicable foreign law" in this case is New York law, and the Second Circuit has clearly set forth the standing requirements for plaintiffs seeking to assert a NYDCL section 276 claim. *See Eberhard,* 530 F.3d at 129–35. The Plaintiffs fail to satisfy their burden in establishing that they meet these requirements. *See Thompson,* 15 F.3d at 249 (holding that the "party who seeks the exercise of jurisdiction in his favor" bears the burden in establishing that he or she is the proper party to do so (citation omitted)).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

*First,* the Plaintiffs cannot argue that they have standing under New York law without looking to U.K. law for supplemental vested authority. In light of the Second Circuit's (1) extensive examination of the history and plain language of NYDCL section 276, and (2) ultimate conclusion that section 276's standing restrictions stem from the section's purpose of affording relief to creditors, *Eberhard,* 530 F.3d at 129–35, the Court finds the Plaintiffs' reliance on NYDCL section 276–a—which merely authorizes a court to award attorney's fees to a successful section 276 plaintiff—unpersuasive.[FN39]    Although **\*528**NYDCL section 276–a contemplates the ability of plaintiffs other than actual creditors to assert a NYDCL section 276 claim, the Court is unconvinced that section 276–a on its own confers standing upon each of those potential plaintiffs. Moreover, the Plaintiffs mischaracterize the Seventh Circuit's holding in *Scholes* in an unsuccessful attempt to circumvent the Second Circuit's detrimental holding in *Eberhard.* At oral argument, the Plaintiffs argued that unlike the Second Circuit in *Eberhard,* the Seventh Circuit found that the SEC receiver in *Scholes* "had a somewhat broader role" such that he had standing to pursue a state law actual fraudulent conveyance claim, "because the receiver, like [the Plaintiffs, as liquidators, was] acting for the benefit of all creditors." (*See* Dec. 16, 2014 Hr'g. Tr. at 11:9–13:6.) The Seventh Circuit, however, did not base its finding of the SEC receiver's standing upon the fact that the receiver was "acting for the benefit of all creditors," but rather on the fact that three creditors were entities subject to the receivership, meaning the SEC receiver was tasked with acting on those creditors' behalves. *See Scholes,* 56 F.3d at 753–55. Indeed, the Second Circuit distinguished the holding in *Scholes* and a similar Seventh Circuit case, because no creditors were subject to the receivership in *Eberhard. See Eberhard,* 530 F.3d at 132–35 (distinguishing *Scholes,* 56 F.3d at 753–55, and *Troelstrup,* 130 F.3d at 1275–76). Without demonstrating under U.K. law that the Plaintiffs are authorized to act on behalf of the Debtor's creditors, the Plaintiffs' reliance on *Scholes* is inapposite.

FN39. NYDCL section 276–a states:

In an action or special proceeding brought by *a creditor, receiver, trustee in bankruptcy, or assignee for the benefit of creditors* to set aside a conveyance by a debtor, where such conveyance is found to have been made by the debtor and received by the transferee with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors, in which action or special proceeding the creditor, receiver, trustee in bankruptcy, or assignee for the benefit of creditors shall recover judgment, the justice or surrogate presiding at the trial shall fix the reasonable attorney's fees of the creditor, receiver, trustee in bankruptcy, or assignee for the benefit of creditors in such action or special proceeding, and the creditor, receiver, trustee in bankruptcy, or assignee for the benefit of creditors shall have judgment therefor against the debtor and the transferee who are defendants in addition to the other relief granted by the judgment. The fee so fixed shall be without prejudice to any agreement, express or implied, between the creditor, receiver, trustee in bankruptcy, or assignee for the benefit of creditors and his attorney with respect to the compensation of such attorney.

N.Y. DEBT. & CRED. LAWW § 276–a (emphasis added).

[31]*Second,* the Plaintiffs' reliance on a broad interpretation of the Insolvency Act's "sweep-up" provision, Paragraph 13, is wholly unsubstantiated. The Plaintiffs could not produce a single case supporting their argument and their expert's opinion that

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

Paragraph 13 confers standing on U.K. liquidators to assert causes of action on behalf of a company's creditors. [FN40] **\*529** While this Court is authorized in its discretion to grant broad relief to the foreign representatives before it, *see In re Atlas Shipping,* 404 B.R. at 738–39 (discussing a bankruptcy court's discretion to grant relief under sections 1521 and 1522 of the Bankruptcy Code), the Court's discretion is not without limitation, nor is it so broad as to stretch the laws of a foreign jurisdiction—certainly without any basis grounded in that foreign jurisdiction's laws.

> FN40. At oral argument, the Plaintiffs provided the Court with a U.K. court case purportedly in support of their argument. (*See* Dec. 16, 2014 Hr'g. Tr. at 20:1–22:22; Pls.' Dec. 16, 2014 Hr'g. Binder, Tab 2, *The Connaught Income Fund, Series 1 (in liquidation) v. Capita Fin. Managers Ltd.,* [2014] EWHC 3619 (Comm).) As the Court indicated at the hearing, the case is insufficient to take the leap the Plaintiffs seek to make with respect to a liquidator's authority to act on behalf of creditors. (*See* Dec. 16, 2014 Hr'g. Tr. at 21:16–22:19 ("COURT: I see where [the case] says [Paragraph 13] is standalone, but I still don't see how it authorizes a liquidator to pursue claims that belong to somebody else.... [Standalone] may mean nothing more than the liquidator can pursue all rights that belong to the *estate,* ... I see this as saying [Paragraph 13] is standalone, it is authority for a liquidator to pursue whatever rights the *estate* may have ... even if there isn't some other section of the insolvency statute that says you can do it." (emphasis added)).)

> Although the Defendants could not provide a case directly on point to the contrary, the Defendants' expert did provide case law holding that Paragraph 13 was not broadly construed in other circumstances.

(*See* Isaacs Decl. ¶ 11.4 (discussing *Re Phoenix Oil & Transport Co Ltd (No 2)* [1958] Ch 565 (rejecting liquidators' contention that the distribution of surplus assets is one of the "other things" which the liquidator had power to do under Paragraph 13 because the provision is merely a sweep-up provision at the end of a list of functions which the liquidator is enabled to perform in connection with the administration of a company's affairs and no more); *Re MF Global Ltd* [2013] 1 BCLC 552 at 565 ("While an administrator has power 'to do all other things incidental to the exercise of the foregoing powers' (para 23 of Sch 1), the equivalent power of a liquidator is *limited* to doing 'all such other things as may be necessary for winding up the company's affairs and distributing its assets.' " (emphasis added))).)

The Court concludes that the Plaintiffs fail to meet their burden in establishing that they have standing to assert their NYDCL section 276 claim. Count I is therefore **DISMISSED**.[FN41]

> FN41. While Count II is dismissed under the Court's choice of law analysis, the claim is also barred for lack of standing for the same reasons articulated as to Count I. *See Tommy Lee Handbags Mfg. Ltd. v._1948 Corp.,* 971 F.Supp.2d 368 (S.D.N.Y.2013) ("In order to bring a fraudulent conveyance claim, the plaintiff must therefore be a creditor of the transferor [as][n]on creditors can find no relief in a statute whose object ... is to enable a creditor to obtain his due despite efforts on the part of a debtor to elude payment." (quoting *Harris v. Coleman,* 863 F.Supp.2d 336, 341 (S.D.N.Y.2012)) (conducting a standing analysis for a NYDCL constructive fraudulent conveyance claim). Since Counts I and II are dismissed on standing and/or

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

choice of law grounds, it is unnecessary for the Court to resolve whether the NYDCL provisions asserted by the Plaintiffs in their Complaint should be afforded extraterritorial effect.

Even though the Court concludes that both Counts I and II asserted under the NYDCL are dismissed with prejudice, the Court does not decide whether, on a motion for leave to amend the Complaint to assert fraudulent conveyance claims under U.K. or other foreign law, the Plaintiffs would have the requisite standing to assert such foreign law claims or the merits of such claims.

**E. Count III—Unjust Enrichment Claim**

Apax and TPG argue that Count III of the Complaint, asserting an unjust enrichment claim against Apax and TPG must be dismissed for three reasons: (1) the Plaintiffs lack standing to assert the unjust enrichment claim (Defs.' Mot. at 18–19); (2) the unjust enrichment claim is not timely (*id.* at 19–21); and (3) the Complaint fails to state a claim for unjust enrichment (*id.* at 33–35). As set forth below, the Court finds that at this stage in the pleadings, the Plaintiffs have adequately alleged standing to bring their unjust enrichment claim against the Apax and TPG Defendants over which the Court has personal jurisdiction (collectively, the "U.S. Apax/TPG Defendants"). The Court also concludes that the unjust enrichment claim is not barred by the applicable statute of limitations and that the Complaint adequately pleads the claim. Therefore, the Defendants' Motion to Dismiss Count III is **DENIED**.

*1. Standing*

Apax and TPG argue that the Plaintiffs lack standing to bring their unjust enrichment claim under the Second Circuit's *Wagoner* rule, which holds that "[a] claim against a third party for defrauding a corporation with the cooperation of management accrues to creditors, not to the guilty corporation." (Defs.' Mot. at 18 (quoting *Giddens v. D.H. Blair & Co. (In re A.R. Baron & Co.),* 280 B.R. 794, 800 (Bankr.S.D.N.Y.2002)).) They contend that "[i]n federal court, prudential considerations deprive a bankruptcy trustee of standing even to bring a claim that would be barred **\*530** by the affirmative defense of *in pari delicto.*" (*Id.* at 18–19 (citing *O'Connell v. Pension Fin. Servs. (In re Arbco Capital Mgmt., LLP),* 498 B.R. 32, 45 (Bankr.S.D.N.Y.2013)).) Apax and TPG base this argument on the following allegation in the Complaint: "The December 2006 CPEC Redemption and the Consulting Fees Transfer were made by the Company, by and through its sole manager Hellas and the members of the Board of Managers of Hellas, with actual intent to hinder, delay, and/or defraud the present and future creditors of the company...." (*Id.* at 19 (quoting Compl. ¶ 158).) According to Apax and TPG, this allegation illustrates that the unjust enrichment claim is based on misconduct that Hellas II "essentially took part in," and the Plaintiffs lack standing as a result. (*Id.* at 18–19.)

The Plaintiffs contend that Apax and TPG may not rely on an *in pari delicto* defense because they are not third parties; rather they are insiders who "advised and managed" Hellas II. (Opp. at 25.) According to the Plaintiffs, the *in pari delicto* defense may not be raised by insiders (*id.* (citing *KDI Holdings,* 277 B.R. at 518; *Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC),* 458 B.R. 87, 124 (Bankr.S.D.N.Y.2011)), and Hellas II's management "was comprised of TPG and Apax executives" (*id.* (citing Compl. ¶¶ 95, 125–27)). Specifically, the Plaintiffs assert that "[w]here, as alleged here, 'controlling shareholder[s] forced the corporation to act for the benefit of the shareholder[s],' the *in pari delicto* defense is 'unavailable.' " (*Id.* (citing *KDI Holdings,* 277 B.R. at 518; *Krys v. Sugrue (In re Refco Inc. Sec. Litig.),* 2010 WL 6549830, at \*15 (S.D.N.Y. Dec. 6, 2010) ("[I]t would be absurd to allow a wrongdoing insider to rely on the imputation of his own conduct to the corporation as a defense."), *adopted in relevant part by* 779 F.Supp.2d

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

372 (S.D.N.Y.2011)).)

In response, Apax and TPG contend that only "[g]eneral partners, sole shareholders, and sole decision makers" are considered insiders barred from asserting an *in pari delicto* defense (Defs.' Reply at 17 (quoting *Picard,* 458 B.R. at 124)); however, the Plaintiffs have not alleged that any Apax or TPG Defendants had such a relationship to Hellas II (*id.* (citing Compl. ¶ 40)). To the contrary, "the Complaint concedes that the Sponsors, only one of which is a Defendant ... were the shareholders of Hellas II's ultimate parent." (*Id.* (citing Compl. ¶ 40)). Moreover, Apax and TPG argue that the Plaintiffs do not allege that any Apax or TPG Defendant was an officer or director of Hellas II; instead, they make "conclusory allegations that unspecified TPG and Apax Defendants 'controlled' Hellas II...." (*Id.* at 17–18 (citing Compl. ¶ 95).) At the Hearing, counsel for Apax and TPG elaborated on this point, arguing that the allegations in the Complaint improperly lumped the Apax and TPG Defendants together, without specifying which such Defendants engaged in conduct amounting to any requisite degree of control. (*See* Dec. 16, 2014 Hrg. Tr. 49:21–50:3, 52:11–20.)

[32][33][34]As discussed above, with the exception of the relief available under the Bankruptcy Code's avoidance powers, the Plaintiffs, as foreign representatives of the Debtor, may be granted any relief available to a trustee. 11 U.S.C. § 1521(a)(7). "As a general matter, a trustee stands in the shoes of the debtor and has standing to bring any action that the debtor could have instituted prepetition." *Giddens,* 280 B.R. at 799 (quoting *Wagoner,* 944 F.2d at 118). While a trustee has standing to bring claims belonging to the debtor, it does not have standing to assert claims on behalf of individual creditors. *Id.* (citations omitted); *see* **\*531***Picard v. Taylor (In re Park S. Sec., LLC),* 326 B.R. 505, 514 (Bankr.S.D.N.Y.2005) ( "[A]bsent another basis for standing, the Trustee may not pursue a claim on the estate's behalf if it is particular only to certain creditors." (citation omitted)).

Whether a claim belongs to the debtor or to individual creditors is determined by state law. *Id.* (citing *Mediators, Inc. v. Manney (In re Mediators, Inc.),* 105 F.3d 822, 826 (2d Cir.1997); *Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1093 (2d Cir.1995)).

[35]In *Wagoner,* the Second Circuit developed a prudential standing rule referred to as the *Wagoner* rule. *McHale v. Citibank, N.A. (In re 1031 Tax Grp., LLC),* 420 B.R. 178, 189–90 (Bankr.S.D.N.Y.2009) (citing *Wight v. BankAmerica Corp.,* 219 F.3d 79, 86–87 (2d Cir.2000)). The *Wagoner* rule provides that "when a bankrupt corporation has joined with a third party in defrauding its creditors, the trustee cannot recover against the third party for the damage to the creditors." *Wagoner,* 944 F.2d at 118; *see Picard v. JPMorgan Chase & Co. (In re Bernard L. Madoff Inv. Sec. LLC),* 721 F.3d 54, 63 (2d Cir.2013) ("The debtor's misconduct is imputed to the trustee because, innocent as he may be, he acts as the debtor's representative." (citations omitted)). Post-*Wagoner,* "courts in this Circuit have consistently held that bankrupt corporations, and trustees standing in the shoes of the bankrupt corporation, lack standing to assert claims against third parties for assisting in defrauding the company where corporate management conducted the alleged fraud." *McHale,* 420 B.R. at 197 (collecting cases).

[36][37]"The doctrine of *in pari delicto* is a well-established principle of New York law based on the notion that 'one wrongdoer may not recover against another.' " *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,* 987 F.Supp.2d 311, 314 (S.D.N.Y.2013) (citation omitted). *In pari delicto* is an "equitable defense similar to the unclean hands doctrine," *McHale,* 420 B.R. at 197 (citation omitted), which "exists because, as a matter of equity, courts should not help plaintiffs profit from their wrongdoings," *id.* (citing *Ross v. Bolton,* 904 F.2d 819, 824 (2d Cir.1990)). "Although, under New York State law, *in pari delicto* is an affirmative defense, in federal court prudential considerations deprive a bankruptcy trustee

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

of standing to even bring a claim that would be barred by *in pari delicto*." *Picard v. HSBC Bank PLC,* 454 B.R. 25, 29 (S.D.N.Y.2011) (citations omitted).

[38]Both the *Wagoner* rule and the *in pari delicto* doctrine are "grounded in common law agency principles." *Id.* (citations omitted). Because a trustee in bankruptcy may assert whatever claims the debtor corporation may have brought prepetition, subject to all available defenses, "any wrongdoing imputed to the corporation under a theory of agency also taints the trustee's claims." *Id.* at 198–99. "Because management's misconduct is imputed to a corporation, and because a trustee stands in the shoes of the corporation, the *Wagoner* rule bars a trustee from suing to recover for a wrong that he himself essentially took part in." *Id.* (citing *Wight,* 219 F.3d at 87). Likewise, under the *in pari delicto* doctrine, "[t]raditional agency principles play an important role in an *in pari delicto* analysis." *Kirschner v. KPMG LLP,* 15 N.Y.3d 446, 912 N.Y.S.2d 508, 938 N.E.2d 941, 950 (2010) (emphasis added).

[39]"It is a 'fundamental principle of agency that the misconduct of managers within the scope of their employment will normally be imputed to the corporation.' " *McHale,* 420 B.R. at 199 (citing *Wight,* 219 F.3d at 86); *see Kirschner,* 912 N.Y.S.2d 508, 938 N.E.2d at 951 ("[A] corporation 'is **\*532** represented by its officers and agents, and their fraud in the course of the corporate dealings [ ] is in law the fraud of the corporation.' " (citations omitted)). This principle is premised on a presumption that agents communicate all information to their principals and thereby receive tacit consent for their actions, *McHale,* 420 B.R. at 199 (citing *Bankr. Servs., Inc. v. Ernst & Young, Ernst & Young LLP (In re CBI Holding Co.),* 529 F.3d 432, 448 (2d Cir.2008)), and a presumption that "the principal is generally better suited than a third party to control the agent's conduct, which at least in part explains why the common law has traditionally placed the risk [of loss] on the principal," *Kirschner,* 912 N.Y.S.2d 508, 938 N.E.2d at 951.

Because both the *Wagoner* rule and *in pari delicto* doctrine "are grounded in substantive agency law, and identical tests appear to apply to both doctrines," this Court will analyze the parties' *in pari delicto* and *Wagoner* rule arguments together.FN42 *McHale,* 420 B.R. at 198 (citations omitted).

> FN42. Because the Court applies New York law to the Plaintiffs' unjust enrichment claim, the Court takes no position whether the *in pari delicto* doctrine would apply to an unjust enrichment claim asserted under U.K. law.

[40]The *in pari delicto* doctrine "does not apply to the actions of fiduciaries who are insiders in the sense that they either are on the board or in management, *or in some other way control the corporation*." *In re Optimal U.S. Litig.,* 813 F.Supp.2d 383, 400 (S.D.N.Y.2011) (emphasis in original) (quoting *Refco,* 2010 WL 6549830, at \*15) (internal quotation marks omitted); *see Mediators,* 105 F.3d at 826–27 (noting that the *Wagoner* rule and the *in pari delicto* doctrine do not prevent "a bankruptcy trustee, suing on behalf of the debtor under New York law, [from] pursu[ing] an action for breach of fiduciary duty against the debtor's fiduciaries" (citing *Keene Corp. v. Coleman (In re Keene Corp.),* 164 B.R. 844, 853 (Bankr.S.D.N.Y.1994))); *Global Crossing Estate Representative v. Winnick,* No. 04 Civ. 2558(GEL), 2006 WL 2212776, at \*15 (S.D.N.Y. Aug. 3, 2006) ("[T]o the extent plaintiff can establish that defendants' alleged control and domination of [the debtor] rendered them corporate insiders and fiduciaries, *Wagoner* and the "in pari delicto" rules will not bar plaintiff's fiduciary duty claims."); *see also Teras Int'l Corp. v. Gimbel,* No. 13–CV 6788(VEC), 2014 WL 7177972, at \*10 (S.D.N.Y. Dec. 17, 2014) (holding that breach of fiduciary duty claims against defendants alleged to be directors of bankrupt corporation were not barred by the *in pari delicto* doctrine). The rationale for not extending the *in pari delicto* defense to insiders is that "[i]n such cases, the element of mutual

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

fault [*in pari delicto* ] is not present, thereby rendering the defense unavailable." *KDI Holdings,* 277 B.R. at 518; *see Kalb, Voorhis & Co. v. Am. Fin. Corp.,* 8 F.3d 130, 133 (2d Cir.1993) ( "[W]here the parties do not stand on equal terms and one party controls the other, the *in pari delicto* doctrine does not apply." (citing *Ross,* 904 F.2d at 824 (2d Cir.1990))).

[41]"General partners, sole shareholders, and sole decision makers" are paradigmatic insiders for purposes of the *in pari delicto* doctrine under New York law. *Picard,* 458 B.R. at 124 (citing *Devon Mobile Commc'ns Liquidating Trst v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.),* 322 B.R. 509, 529 n. 18 (Bankr.S.D.N.Y.2005); *Granite Partners, L.P. v. Bear, Stearns & Co.,* 17 F.Supp.2d 275, 308 (S.D.N.Y.1998)). However, "[e]ven a third-party professional, typically the quintessential outsider, may surrender **\*533** an *in pari delicto* defense where it exerts sufficient domination and control over the guilty corporation to render itself an insider." *Id.* (citing *KDI Holdings,* 277 B.R. at 518; *In re IDI Constr. Co.,* 345 B.R. 60, 67 (Bankr.S.D.N.Y.2006)).

In *KDI Holdings,* the bankruptcy court rejected the defendants' *in pari delicto* defense, finding that the complaint sufficiently alleged that the defendants "may have gained control over the [d]ebtors," thereby rendering them insiders. 277 B.R. at 512. Specifically, the complaint alleged that the defendants, through a partnership with a family member that held an interest in certain unsecured creditors, were granted security interests in the debtors' assets in exchange for certain loans made by the defendants. *See id.* at 499. As a result of the defendants extending such loans, an entity formed by one of the defendants' family members gained control of the each of the debtors' voting stock. *See id.* Thereafter, individuals connected to the defendants were appointed as directors and managers of the debtors, "obtain [ing] unfettered control over the assets of the ... [d]ebtors and the performance of such [d]ebtors' massive pre-petition obligations." *Id.* (citation and internal quotation marks omitted). The court

found that the plaintiff "alleged sufficient facts with regard to [the defendants'] insider status through domination and control to render the *in pari delicto* defense in applicable...." *Id.* at 518–19.

[42]Here, the Complaint is replete with allegations that Apax and TPG dominated and controlled the management of Hellas II and exercised their control to accomplish the December 2006 CPEC Redemption. (*See* Compl. ¶¶ 95, 125–129.)

First, the Complaint alleges that "[a]t all relevant times, TPG and Apax directed and controlled the actions of the Sponsors, the Hellas Entities, [Hellas II], and [Hellas II]'s subsidiaries." (*Id.* ¶ 95.) The Plaintiffs allege that each of the eight Sponsors were formed, owned, and controlled by Apax and TPG. (*See* Compl. ¶¶ 40–47.) The Sponsors "collectively held all of the CPECs and common stock issued by Hellas," and through the Sponsors Apax and TPG "owned and controlled [Hellas II] and its affiliates and obtained proceeds from the December 2006 CPEC Redemption." (*Id.* ¶ 40.) Apax and TPG "install [ed] certain key personnel on the board of directors of TIM Hellas." (*Id.* ¶ 95 (noting that the six of the ten directors of TIM Hellas were employees of Apax and TPG, including three employees of Apax and three employees of TPG).) "Many of those same TPG and Apax personnel (and others) held overlapping positions of authority on the Board of Managers of Hellas (the sole manager of the Company) and in the management of the Sponsors," TPG, and Apax. (*Id.*)

Second, the Plaintiffs allege that Apax and TPG exercised their control in accomplishing the December 2006 CPEC Redemption. Specifically, the Plaintiffs allege that the applicable redemption agreement authorizing Hellas II's initial redemption of CPECs issued to Hellas I was executed by Giancarlo Aliberti and Matthias Calice—members of Apax Partners and TPG London, respectively—on behalf of both Hellas entities. (*Id.* ¶ 125.) A separate redemption agreement authorizing Hellas's redemption of CPECs issued to

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

**524 B.R. 488**
**(Cite as: 524 B.R. 488)**

the Sponsors was also executed by Aliberti and Calice on behalf of Hellas and each of the eight Sponsors. (*Id.* ¶ 126.) Both redemption agreements recited that the applicable redemption price per CPEC had been "determined by the Board of Managers on the basis of the equity value of [Hellas II] and its Subsidiaries by resolutions adopted on December 18, 2006." (*Id.* ¶ 125–126.) **\*534** According to the Plaintiffs, these referenced resolutions adopted by Hellas, as sole manager and general partner of Hellas II, "were executed by the members of the Board of Managers of Hellas, including Maurizio Bottinelli, Giancarlo Aliberti, Matthias Calice, Philippe Costeletos, Guy Harles, and Benoit Duvieusart (all or nearly all of whom were affiliated with TPG or Apax)." (Compl. ¶ 127.)

At this stage in the pleadings, the Court concludes that Apax's and TPG's group pleading argument fails and that the Plaintiffs have sufficiently alleged their standing to bring their unjust enrichment claim, as the allegations in the Complaint plausibly suggest that the U.S. Apax/TPG Defendants, through their affiliates, controlled Hellas II, thereby rendering them insiders. (*See* Compl. ¶¶ 23–32, 40 (describing the relationship among the TPG Defendants, and Bonderman and Coulter's degree of influence over TPG Defendants that allegedly owned and controlled the Sponsors and Hellas II); *id.* ¶¶ 33–40 (describing the relationship among the Apax Defendants. and Apax NY's chairman's degree of influence over the strategies and operations of the Apax Defendants generally)).) Whether the U.S. Apax/TPG Defendants specifically exercised a requisite degree of control such that the *Wagoner* rule and *in pari delicto* doctrine do not apply to them raises factual issues that cannot be resolved on a motion to dismiss.[FN43]

> FN43. Because the Court finds that the Plaintiffs have alleged sufficient facts to support a plausible inference that the U.S. Apax/TPG Defendants were insiders of Hellas II, the Court need not consider ex-

ceptions to the *in pari delicto* doctrine applicable to non-insiders. *See, e.g., Official Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp. (In re Verestar, Inc.),* 343 B.R. 444, 479 (Bankr.S.D.N.Y.2006) ("Misconduct by a corporation's fiduciaries will not be imputed to the corporation, and the doctrine of *in pari delicto* will not apply, where the fiduciaries were acting outside the scope of their employment or engaged in self-dealing and according had an interest 'adverse to the corporation.' " (citations omitted)).

### 2. Timeliness

[43] "Under New York law, the six-year limitations period for unjust enrichment accrues upon the occurrence of the wrongful act giving rise to a duty of restitution and not from the time the facts constituting the fraud are discovered." *Cohen v. S.A.C. Trading Corp.,* 711 F.3d 353, 364 (2d Cir.2013) (citation and internal quotation marks omitted); *see also* N.Y. C.P.L.R. § 213(1) (McKinney 2014) (providing a statute of limitations of six years for claims "for which no limitation is specifically prescribed by law").

[44] With regard to such claims, section 108(a) of the Bankruptcy Code provides:

[i]f applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of—

(1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or

(2) two years after the order for relief.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

11 U.S.C. § 108(a). "While there is no dispositive case law addressing whether [s]ection 108 relief is automatically applicable in ... chapter 15 cases, this question is squarely addressed by section 103(a) of the Code, which incorporates [s]ection 108 into a chapter 15 proceeding." **\*535***In re Fairfield Sentry Ltd.,* 452 B.R. 52, 57 (Bankr.S.D.N.Y.2011) . Section 103(a) of the Bankruptcy Code provides that chapter 1, "sections 307, 362(o), 555 through 557, and 559 through 562 apply in a case under chapter 15." 11 U.S.C. § 103(a). Section 108's tolling provision therefore "appl[ies] in a [c]hapter 15 case by virtue of § 103(a)." *In re Fairfield Sentry Ltd.,* 452 B.R. at 61 (quoting Alesia Ranney–Marinelli, *Overview of Chapter 15 Ancillary and Other Cross–Border Cases,* 82 AM. BANKR.L.J. 269, 313 (2008)).

The challenged transfers underlying the Plaintiffs' unjust enrichment claim occurred in December 2006, well over six years ago. However, the Debtor's chapter 15 petition was filed in February 2012, before the expiration of the six-year limitations period. Pursuant to section 108 of the Bankruptcy Code, made applicable to this case through section 103(a), the statute of limitations was tolled as of the filing of the chapter 15 petition. Consequently, the Plaintiff's unjust enrichment claim is therefore timely.

### 3. Sufficiency of Pleadings

TPG and Apax argue that the Plaintiffs fail to state a claim as a result of the same pleading deficiencies that plague their NYDCL claims. (*See* Defs.' Mot. at 33.) Specifically, they contend that the Plaintiffs do not plead a sufficiently close relationship between TPG and Apax and the holders of the Sub Notes required to allege a claim for unjust enrichment under New York law. (*Id.* at 33.) Additionally, they argue that "the unjust enrichment claim fails because Plaintiffs have not alleged that it would be against 'equity and good conscience' for the Defendants to retain any transfers made to them." (*Id.* at 34.)

[45][46]In order to adequately plead an unjust enrichment claim a plaintiff must allege "that (1) the other party was enriched, (2) at [the plaintiff's] expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Ga. Malone & Co. v. Rieder,* 19 N.Y.3d 511, 950 N.Y.S.2d 333, 973 N.E.2d 743, 746 (2012) (quoting *Mandarin Trading Ltd. v. Wildenstein,* 16 N.Y.3d 173, 919 N.Y.S.2d 465, 944 N.E.2d 1104, 1110 (2011)). The New York Court of Appeals has clarified that "a plaintiff cannot succeed on an unjust enrichment claim unless it has a sufficiently close relationship with the other party." *Id.* (citation omitted). The relationship between the plaintiff and the other party must be one that is "not too attenuated," *id.,* 950 N.Y.S.2d 333, 973 N.E.2d at 747 (citation and internal quotation marks omitted). and the plaintiff's complaint must indicate "a relationship between the parties that could have caused reliance or inducement," *id* (quoting *Mandarin,* 919 N.Y.S.2d 465, 944 N.E.2d at 1111) (internal quotation marks omitted).

[47][48]Here, the Plaintiffs have adequately alleged that a sufficient relationship exists between TPG and Apax, on the one hand, and Hellas II, on the other.[FN44] Indeed, the Complaint sets forth that "[b]y their wrongful acts, statements and omissions, and through the wrongful diversion and receipt of proceeds from the December 2006 Transaction, the December 2006 CPEC Redemption, and the Consulting Fees Transfer, TPG and Apax have unjustly retained benefits that belong to the **\*536** Company, and their retention of those benefits violates fundamental principles of justice, equity and good conscience." (Compl. ¶ 170.) The Plaintiffs need not allege that privity exists between Hellas II and TPG and Apax, nor do they need to allege that TPG and Apax were the direct transferees of the diverted funds. "[T]he fact that money was transferred directly from [plaintiff's possession] to [defendant's] (albeit by a third party) is enough to sustain a claim for unjust enrichment." *T.D. Bank, N.A. v. JP Morgan Chase Bank, N.A.,* No.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

524 B.R. 488
**(Cite as: 524 B.R. 488)**

10–CV–2843 (JG), 2010 WL 4038826, at *5 (E.D.N.Y. Oct. 14, 2010) (quoting *Newbro v. Freed,* No. 06–1722–CV, 2007 WL 642941, at *2 (2d Cir. Feb. 27, 2007)).

> FN44. The Defendants appear to argue that the relevant relationship must be alleged between TPG and Apax and Hellas II at times, and between TPG and Apax and holders of the Sub Notes at other times. Because the Plaintiffs purport to bring their unjust enrichment claim on behalf of the Debtor, the Defendants' relationship with Hellas II is the applicable focal point.

### III. *CONCLUSION*

For the foregoing reasons, the Motions to Dismiss are granted in part and denied in part. The Apax/TPG Motion is **GRANTED** as to the Non–U.S. Defendants, but **DENIED** as to the U.S. Apax/TPG Defendants.[FN45] The DB Motion and the TCW Motion are **DENIED**. The Motions to Dismiss are **GRANTED** as to Counts I and II, but **DENIED** as to Count III.

> FN45. For the avoidance of doubt, the Apax/TPG Motion is granted as to Apax Europe VI, Apax Partners, Apax Nominees, Halusa, and TPG London. The Apax/TPG Motion is denied as to TPG Capital, Bonderman, Coulter, TPG IV, and TPG T $^3$ II.

Bkrtcy.S.D.N.Y., 2015
In re Hellas Telecommunications (Luxembourg) II SCA
524 B.R. 488

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Tab 38

KeyCite Yellow Flag - Negative Treatment
Distinguished by U.S. v. Dupree, E.D.N.Y., January 28, 2013

607 F.3d 322
United States Court of Appeals, Second Circuit.

HIGHLAND CAPITAL MANAGEMENT LP, Plaintiff–Appellee,

RBC Dominion Securities Corp., Third–Party–Defendant–Counter–Claimant–Appellee,

v.

Leonard SCHNEIDER, Leslie Schneider, Scott Schneider, Susan Schneider,

Defendants–Third–Party–Plaintiffs–Counter–Defendants–Appellants,

Jenkins & Gilchrist Parker Chapin LLP, Defendant.

Docket No. 08–4630–cv
|
Argued Sept. 22, 2009.
|
Decided June 11, 2010.

**Synopsis**
**Background:** Attempted buyer of promissory notes sued note holders, alleging that holders had reneged on promise to sell and asserting claims for, inter alia, breach of contract and tortious interference with contractual relations. The United States District Court for the Southern District of New York, Leisure, J., 2008 WL 3884363, denied defendants' motion for judgment as matter of law or for new trial, and entered judgment, upon jury verdict, in favor of plaintiff. Defendants appealed.

**Holdings:** The Court of Appeals, Leval, Circuit Judge, held that:

[1] agent for holders lacked actual authority to enter into contract for sale of notes at 51 percent of their face value, and

[2] agent lacked apparent authority to enter into contract for sale of notes at 51 percent of their face value.

Reversed and remanded with instructions.

West Headnotes (12)

**[1]    Federal Courts**    Taking case or question from jury;  judgment as a matter of law

The court of appeals reviews a denial of motion for judgment as a matter of law de novo. Fed.Rules Civ.Proc.Rule 50(a), 28 U.S.C.A.

8 Cases that cite this headnote

**[2]    Federal Courts**    Taking case or question from jury;  judgment as a matter of law

Highland Capital Management LP v. Schneider, 607 F.3d 322 (2010)

76 Fed.R.Serv.3d 1651

Upon review of the denial of a motion for judgment as a matter of law, the court of appeals views the evidence in the light most favorable to the party against which the motion was made. Fed.Rules Civ.Proc.Rule 50(a), 28 U.S.C.A.

10 Cases that cite this headnote

[3]    **Federal Civil Procedure**  🔑  Construction of evidence

**Federal Civil Procedure**  🔑  Weight and Sufficiency of Evidence

**Federal Civil Procedure**  🔑  Evidence

**Federal Civil Procedure**  🔑  Construction of evidence

A motion for judgment as a matter of law is properly granted only when, drawing all reasonable inferences regarding the weight of the evidence and the credibility of witnesses in favor of the non-movant, a reasonable jury could only have found for the movant. Fed.Rules Civ.Proc.Rule 50(a), 28 U.S.C.A.

6 Cases that cite this headnote

[4]    **Principal and Agent**  🔑  Contracts in general

Under New York law, an agent has "actual authority" if the principal has granted the agent the power to enter into contracts on the principal's behalf, subject to whatever limitations the principal places on this power, either explicitly or implicitly.

29 Cases that cite this headnote

[5]    **Principal and Agent**  🔑  Express Authority

"Actual authority" of an agent is created, under New York law, by direct manifestations from the principal to the agent, and the extent of the agent's actual authority is interpreted in the light of all circumstances attending those manifestations, including the customs of business, the subject matter, any formal agreement between the parties, and the facts of which both parties are aware.

18 Cases that cite this headnote

[6]    **Principal and Agent**  🔑  Negotiable instruments

Under New York law, agent for holders of promissory notes lacked "actual authority" to enter into contract with prospective buyer to sell notes at 51 percent of their face value; recorded phone call between holders' agent and buyer's representative 10 minutes prior to purported sale demonstrated that agent was not authorized to sell notes at that price, there was no showing that holders gave agent any further authorization in the 10 intervening minutes, letter agreement executed by agent and buyer expressly stated that consummation of any transaction was at sole discretion of holders, and during course of parties' negotiations, agent presented firm offers to buyer only after obtaining holders' permission to do so.

[7]    **Principal and Agent**  🔑  Contracts in General

Under New York law, where an agent lacks actual authority, he may nonetheless bind his principal to a contract if the principal has created the appearance of authority, leading the other contracting party to reasonably believe that actual authority exists.

38 Cases that cite this headnote

3423

[8]    **Principal and Agent**  🗝  Implied and Apparent Authority

Under New York law, "apparent authority" exists when a principal, either intentionally or by lack of ordinary care, induces a third party to believe that an individual has been authorized to act on its behalf.

19 Cases that cite this headnote

[9]    **Principal and Agent**  🗝  Implied and Apparent Authority

Under New York law, the mere creation of an agency for some purpose does not automatically invest the agent with apparent authority to bind the principal without limitation.

6 Cases that cite this headnote

[10]    **Principal and Agent**  🗝  Effect of knowledge or notice

Under New York law, a party cannot claim that an agent acted with apparent authority to bind the principal when it knew, or should have known, that the agent was exceeding the scope of its authority.

18 Cases that cite this headnote

[11]    **Principal and Agent**  🗝  Authority to take and transfer notes

Under New York law, agent for holders of promissory notes lacked "apparent authority" to enter into contract with prospective buyer to sell notes at 51 percent of their face value; recorded phone calls between holders' agent and buyer's representative on day of purported sale demonstrated that buyer knew agent was not authorized to sell notes at that price, and in light of parties' prior lengthy negotiations, and fact that sale potentially involved $35 million transaction, there was no showing that buyer could reasonably have understood that agent had finally obtained authorization from holders for sale at that price in the intervening 10 minutes.

1 Case that cites this headnote

[12]    **Federal Courts**  🗝  Conflicting or undisputed evidence

**Federal Courts**  🗝  Taking case or question from jury;  judgment as a matter of law

Upon review of the denial of a motion for judgment as a matter of law, the court of appeals may not disregard undisputed evidence that bears on the interpretation of ambiguous matters. Fed.Rules Civ.Proc.Rule 50(a), 28 U.S.C.A.

2 Cases that cite this headnote

**Attorneys and Law Firms**

 **\*323**  Paul B. Lackey, Lackey & Hershman, LLP, Dallas, TX (Jamie R. Welton and Kristen A. Miller Reinsch, on the brief), for Plaintiff–Appellee.

Michael J. McNamara, Seward & Kissel LLP, New York, N.Y. (Jack Yoskowitz, on the brief), for Third–Party–Defendant–Counter–Claimant–Appellee.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.    3424    3

76 Fed.R.Serv.3d 1651

**\*324**  Edwin G. Schallert, Debevoise & Plimpton LLP, New York, N.Y. (Steven Klugman, Robert H. Chandler, and Courtney M. Dankworth of Debevoise & Plimpton LLP and Alvin M. Stein and Katherine C. Ash of Troutman Sanders LLP, on the brief), for Defendants–Third–Party–Plaintiffs–Counter–Defendants–Appellants.

Before LEVAL and RAGGI, Circuit Judges, and COTE, District Judge.[*]

[*]      The Honorable Denise Cote of the United States District Court for the Southern District of New York, sitting by designation.

**Opinion**

LEVAL, Circuit Judge:

Defendants Leonard Schneider ("Schneider") and his children, Leslie, Scott, and Susan Schneider (collectively, "Defendants" or "the Schneiders") appeal from the judgment of the United States District Court for the Southern District of New York (Leisure, *J.*), which held them liable for damages to Plaintiff Highland Capital Management LP ("Highland") and Counter–Claimant RBC Dominion Securities Corp. ("RBC") (jointly, "Appellees"), pursuant to a jury verdict after trial, in the amount of approximately $40 million for breach of an alleged contract for the sale of promissory notes. Highland claimed to be the third-party beneficiary of an alleged contract by which the Schneiders, acting through an agent, Glen Rauch Securities ("GRS"), agreed to sell promissory notes of the McNaughton Apparel Group, Inc. ("McNaughton") at fifty-one percent of their face value to RBC. Appellees contend that, after several weeks of negotiation between Glen Rauch of GRS, acting for the Schneiders, and RBC, they concluded the alleged contract in an unrecorded telephone conversation on March 14, 2001. The Schneiders argue, among other contentions, that there could be no contract because their agent, GRS, had neither actual nor apparent authority to make the alleged contract on their behalf. We agree with the Schneiders that the evidence cannot support a finding that Rauch had either actual or apparent authority to make the contract or even that he expressed agreement to sell the notes. We therefore remand to the district court with instructions to set aside the verdict and enter judgment in favor of the Schneiders.

**BACKGROUND**

The evidence at trial, seen in the light most favorable to Appellees, showed the following. The Schneiders owned and operated two apparel businesses, which they sold to McNaughton in April 1998. In connection with this sale, they received McNaughton's promissory notes for $69 million. The Schneiders later became interested in selling the notes. To assist them in making the sale, they engaged GRS, which acted through its principal, Glen Rauch. Rauch contacted RBC as a potential purchaser. Before beginning negotiations in earnest over the sale of the notes, RBC and Rauch executed a Letter Agreement outlining the terms of the negotiations. The agreement stated:

> Reference is made to certain promissory notes [of McNaughton] ... held by [the Schneiders].
>
> [RBC] understand[s] that Glen Rauch Securities, Inc. ("GRS") represents [the Schneiders] in the possible resale of some or all of the Notes....
>
> ...
>
> We both understand that the consummation of any transaction remains in the sole discretion and satisfaction of the [Schneiders] and [RBC], including without limitation with respect to price.

**\*325**  Pl.'s Ex. 20. Rauch instructed RBC that its communications concerning the proposed transaction should go through him and that it should not communicate directly with the Schneiders.

RBC intended to purchase the notes incurring only minimal risk by, prior to purchase, arranging to resell them to a third party at a markup over its own purchase price. During the course of its negotiations with the Schneiders, RBC received bids for the notes from Highland and another firm.

Most of the negotiations for RBC's purchase of the notes from the Schneiders were conducted by telephone, between Kenneth Ambrecht of RBC and Rauch. Because of doubts about McNaughton's solvency, the negotiations discussed prices representing a 35–60% discount from the face value of the notes. The content of the negotiations is largely undisputed, because RBC routinely recorded all telephone calls through its trading desk. The recordings of the conversations between Rauch and RBC show that, in accordance with the Letter Agreement, Rauch always sought authorization from the Schneiders before making any firm proposal to RBC and always made clear to RBC that any proposed terms required the Schneiders' approval. For example, on January 31, 2001, Ambrecht asked Rauch, "[I]s there any way you can get a firm [offer]?" J.A. 693. Rauch responded, "I'll tell [the Schneiders] to make you an offer." *Id.* On February 12, after consulting with the Schneiders, Rauch responded to Ambrecht with a "firm" offer at fifty-nine percent of face value. J.A. 708. After RBC rejected this price, Rauch told Ambrecht on February 26 he was "85 percent sure" he could "trade the whole piece at 54 [percent of face value]," explaining his uncertainty by noting, "I mean you know, dealing with individuals that are [laughter]." J.A. 711. Later that day, Rauch told Ambrecht that the Schneiders would "probably" agree to a price of fifty-three for the entire block of their notes. J.A. 719. However, Rauch also told Ambrecht that he had recently spoken with Leonard Schneider and it was Schneider's position that at "anything less than [fifty-four Schneider was] gonna hold on to 'em for a while." *Id.*

The negotiations continued in similar fashion into March. On March 12, Ambrecht made an offer at 50.5. Rauch replied, "I'm going to have to reflect back because the last thing I told [the Schneiders] was fifty-one is firm and now I've got to go back and tell them fifty and a half." J.A. 769. When the Schneiders rejected this price, Ambrecht said he would attempt to raise the price to fifty-one, but Rauch told him, "No, at this point, now, they're not going to do anything for a day and a half." J.A. 774. Yet on March 13 Rauch still thought "they'll probably trade them all at fifty-one." J.A. 802. He told Ambrecht, "You know we're not haggling we're done at fifty-one if it gets done and it will probably be tomorrow morning." J.A. 804.

Unbeknownst to Rauch and RBC, however, the Schneiders had received information from McNaughton that significantly altered prospects for payment of the notes, and hence their value. On March 9, McNaughton informed the Schneiders' attorneys that it had received an inquiry from another company about the purchase of McNaughton. The attorneys contacted Schneider the same day, and advised him that "something good was happening with [McNaughton]." Trial Tr. 837. On March 13, the Schneiders met with the attorneys, who "talked about the possibility ... of a merger or an acquisition of McNaughton ... and that if that happened, that the notes would ... be paid 100 cents on the dollar." Trial Tr. 895.

 **\*326** This case turns on the events of the following day, March 14. Rauch and Ambrecht had two recorded phone calls that day. Approximately ten minutes after the second recorded call, RBC called Rauch back, in an effort to "pin[ ] Mr. Rauch down." Trial Tr. 375. This call, unlike the others, was not recorded, because it was made from the office of Max Holmes, Co–Head of RBC's High–Yield Group, and not from RBC's trading desk. Appellees contend that during the unrecorded call, RBC and Rauch, on behalf of the Schneiders, formed a contract for the sale of the notes at fifty-one. We discuss in detail below the evidence of the content of all three March 14 phone calls. As explained below, the trial evidence was insufficient to sustain a finding, by a preponderance of the evidence, that Rauch had received authorization from the Schneiders to make the sale, that RBC could have reasonably believed that Rauch had received authorization from the Schneiders to conclude the trade, or that, under the circumstances, RBC could have reasonably interpreted Rauch's words as expressing agreement to sell the notes at fifty-one.

Rauch learned soon after the unrecorded call that the Schneiders had lost interest in selling the notes. On the night of March 14, the Schneiders' attorney, Jim Alterbaum, left a message for Rauch telling him that Alterbaum was "not sure [the] Schneiders want [Rauch] to proceed with phone calls" to RBC and advising Rauch not to "spin his wheel." Pl.'s Ex. 26. The Schneiders then told Rauch they had decided to put on hold any sale of the notes. On March 20, Rauch told Ambrecht, "nothing is going to happen with the bonds probably for five weeks." J.A. 907.

3426

Highland Capital Management LP v. Schneider, 607 F.3d 322 (2010)

76 Fed.R.Serv.3d 1651

The Schneiders never sold the notes. On April 16, 2001, Jones Apparel Group announced that it would buy McNaughton. On June 19, the notes were paid in full.

This litigation followed, involving claims by RBC and Highland that, during the unrecorded March 14 call between Rauch and RBC's representatives, the Schneiders contracted to sell their McNaughton notes at fifty-one and that they subsequently breached the contract. The Schneiders denied that Rauch had actual authority to make such a sale, that apparent authority for the transaction was ever communicated to the buyers, or that Rauch ever agreed to sell the notes. After a tortuous pretrial history, which we do not recite because it has no pertinence to the issues on this appeal, the case proceeded to trial. The jury found against the Schneiders and awarded damages for breach of contract totaling approximately $40 million to RBC and Highland. The district court denied the Schneiders' motion for judgment as a matter of law ("JMOL") or a new trial, and this appeal followed.

## DISCUSSION

**[1]** **[2]** **[3]** Under Rule 50 of the Federal Rules of Civil Procedure, a district court may grant JMOL against a party if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party." Fed.R.Civ.P. 50(a). We review a denial of JMOL de novo. *S.E.C. v. DiBella,* 587 F.3d 553, 563 (2d Cir.2009). In undertaking this review, "we view the evidence in the light most favorable to the party against which the motion was made." *Metromedia Co. v. Fugazy,* 983 F.2d 350, 361 (2d Cir.1992), *abrogated on other grounds as noted in Yung v. Lee,* 432 F.3d 142, 147 (2d Cir.2005). JMOL is properly granted "only when, drawing all reasonable inferences regarding the weight of the evidence and the credibility of witnesses in favor of the non-movant, a reasonable jury could only have found for the movant." **\*327** *Kim v. Hurston,* 182 F.3d 113, 117 (2d Cir.1999) (internal quotation marks and alterations omitted).

Appellees' claims rely on a contract between the Schneiders and RBC, which they contend Rauch agreed to on the Schneiders' behalf during the unrecorded phone call of March 14. The evidence would support a finding of such a contract only if it allowed for a reasonable finding that Rauch had actual authority to make the agreement or if RBC relied on his apparent authority to do so. *Merrill Lynch Interfunding, Inc. v. Argenti,* 155 F.3d 113, 122 (2d Cir.1998) ("[A]n agent must have authority, whether apparent, actual or implied, to bind his principal."). We conclude that the record contains insufficient evidence to support either finding, or indeed even a finding that Rauch purported to enter a contract without authorization.

### I. Actual Authority

**[4]** **[5]** Under New York law, an agent has actual authority if the principal has granted the agent the power to enter into contracts on the principal's behalf, subject to whatever limitations the principal places on this power, either explicitly or implicitly. *Ford v. Unity Hosp.,* 32 N.Y.2d 464, 346 N.Y.S.2d 238, 299 N.E.2d 659, 664 (1973) ("An agent's power to bind his principal is coextensive with the principal's grant of authority."). [1] As we have explained:

[1] The parties do not dispute that New York law governs the questions of contract and agency law that arise in this appeal.

Actual authority is created by direct manifestations from the principal to the agent, and the extent of the agent's actual authority is interpreted in the light of all circumstances attending those manifestations, including the customs of business, the subject matter, any formal agreement between the parties, and the facts of which both parties are aware.

*Peltz v. SHB Commodities, Inc.,* 115 F.3d 1082, 1088 (2d Cir.1997) (internal quotation marks omitted).

**[6]** To conclude that Rauch had actual authority to enter a contract to sell the notes at fifty-one, a jury would have to find that the Schneiders authorized a sale of the notes at that price or that they had authorized Rauch to exercise discretion as to the terms of the sale. Leonard Schneider and Rauch, of course, expressly denied that the Schneiders authorized the sale of the notes at fifty-one, Trial Tr. 537–38, 837, and nothing in the record supports a finding that the Schneiders gave Rauch such authorization. At the time of the last recorded call on March 14, ten minutes prior to the unrecorded call, they had not done so, and Appellees put forward no evidence that the Schneiders gave Rauch any further authorization in the ten intervening minutes. Indeed, it

3427

76 Fed.R.Serv.3d 1651

is virtually inconceivable that they would have done so after learning that McNaughton was likely to be acquired and then to pay the notes at their face amount.

Nor does the record contain evidence that Rauch had actual authority to conclude a contract without obtaining the Schneiders' agreement to the terms. The Letter Agreement unequivocally states that "the consummation of any transaction remains in the sole discretion and satisfaction of" the Schneiders and RBC. All the evidence of the behavior of the parties during the course of the negotiations further confirmed that the Schneiders withheld authorization from Rauch to conclude a contract on their behalf without their consent to the terms. Rauch presented **\*328** firm offers to RBC only after obtaining the Schneiders' permission to do so, and he presented RBC's offers to the Schneiders before responding to them. There was, therefore, no basis upon which a jury could conclude that Rauch had received actual authorization to enter into a contract without the Schneiders' express agreement to its terms, which he never received.

Appellees' primary argument in support of a finding that Rauch had actual authority to enter into a contract for a sale of the notes at fifty-one is that "customs of business," *Peltz,* 115 F.3d at 1088, imply that Rauch had actual authority to "accept a price on behalf of his clients." Pl.'s Br. at 38. They argue, "[T]here is no evidence that [the Letter Agreement] foreclosed the possibility that Rauch would be communicating the Schneiders' approval of the transaction." *Id.* This may be true, but the crucial question is not whether Rauch could "accept a price" on behalf of the Schneiders, but whether he could do so without their authorization. Likewise, the question is not whether Rauch was authorized to "communicat[e] the Schneiders' approval," but whether he had received the Schneiders' approval. There was no evidence that Rauch had authorization to exercise his own discretion on behalf of his principals as to the terms of the transaction. To the contrary, all the evidence showed that Rauch had no actual authority to contract except upon receipt of the sellers' approval of the terms, and there was no evidence that he had received such approval.

## II. Apparent Authority

 **[7]**    **[8]**    **[9]**    **[10]**    Appellees also contend that Rauch had apparent authority to bind the Schneiders to a contract for the sale of the notes at fifty-one. Where an agent lacks actual authority, he may nonetheless bind his principal to a contract if the principal has created the appearance of authority, leading the other contracting party to reasonably believe that actual authority exists. "Apparent authority exists when a principal, either intentionally or by lack of ordinary care, induces [a third party] to believe that an individual has been authorized to act on its behalf." *Peltz,* 115 F.3d at 1088 (internal quotation marks omitted); *see also Wells Fargo Home Mortgage, Inc. v. Hiddekel Church of God, Inc.,* 1 Misc.3d 913, 781 N.Y.S.2d 628, 2004 WL 258144, \*6 (Sup.Ct.2004) (" 'Essential to the creation of apparent authority are words or conduct of the principal, communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction.' " (quoting *Standard Funding Corp. v. Lewitt,* 89 N.Y.2d 546, 656 N.Y.S.2d 188, 678 N.E.2d 874, 877 (1997))). However, "[t]he mere creation of an agency for some purpose does not automatically invest the agent with 'apparent authority' to bind the principal without limitation." *Ford,* 346 N.Y.S.2d 238, 299 N.E.2d at 664. A party cannot claim that an agent acted with apparent authority when it "knew, or should have known, that [the agent] was exceeding the scope of its authority." *Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co.,* 263 F.3d 26, 33 (2d Cir.2001).

 **[11]**    To conclude that Rauch had apparent authority to make the contract, a jury would need to find that the Schneiders induced the reasonable belief by RBC that Rauch made the contract having received the authorization of the Schneiders to do so. *See Peltz,* 115 F.3d at 1088. No evidence suggests that the Schneiders did anything to induce RBC to believe that Rauch was authorized to enter an agreement without their specific assent to its terms. The Letter Agreement expressly advised Appellees that he could not, and Rauch repeatedly confirmed this limitation **\*329** on his authority throughout his negotiations with RBC. For example, on January 31, when Ambrecht asked for a firm offer, Rauch replied, "I'll tell [the Schneiders] to make you an offer." J.A. 693. He responded with a firm offer twelve days later, after consulting with the Schneiders.

Rauch had apparent authority, therefore, to conclude an agreement only if the Schneiders induced RBC to reasonably believe that the Schneiders had agreed to make a deal on the terms offered. We assume arguendo that by authorizing Rauch to negotiate with RBC on their behalf, the Schneiders gave Rauch apparent authority to communicate their assent either expressly or by implication (even if they had not in fact assented). Nevertheless, in light of the evidence of the negotiations preceding the

3428

76 Fed.R.Serv.3d 1651

unrecorded March 14 phone call, Appellees failed to introduce sufficient evidence for a reasonable finding, by a preponderance of the evidence, that RBC reasonably believed that Rauch had received authorization from the Schneiders to sell the notes at fifty-one.

The recordings of the first two calls on March 14 make clear that, at the times those calls took place, Rauch lacked authority to sell the notes at fifty-one. In the first call, at 9:40 a.m., Rauch told Ambrecht that he had talked to the Schneiders that morning, but that "they didn't even mention" the deal to sell the notes and he was "not going to know before noon" whether the Schneiders wanted to go forward with the trade. J.A. 821. Rauch explained that he could not conclude an agreement until he spoke with the Schneiders, even though Rauch "would have done the trade yesterday." *Id.* Ambrecht asked whether Rauch thought that the Schneiders had "changed their mind," to which Rauch replied, "No, absolutely not." *Id.* Ambrecht asked why they "just don't say just do it then," to which Rauch responded, "Well, I will let you know as soon as I know...." *Id.*

In the second recorded call, at 2:18 p.m., Rauch continued to make clear that he could not conclude the deal. Ambrecht told Rauch that he was receiving complaints from one of the firms to which RBC planned to sell the notes. He explained that the agent of the other firm had asked him, "[Y]ou got me to step up and now you're not giving me closure here, now what is going on?" J.A. 837. Rauch responded that he "got a call in to the [Schneiders'] attorney and the attorney's supposedly going to call me back." *Id.* Ambrecht asked whether "we need the attorney for a verbal [agreement]" and Rauch insisted that a verbal agreement was not possible at that point because "[the Schneiders] said they wanted to talk to the attorney." *Id.* He explained, "before I say a word, [the attorney's] going to put the words in my mouth." *Id.* Ambrecht asked whether the Schneiders "more or less see if they can like want this, agree to it, it sounds like now?" *Id.* But Rauch responded, "You know, I don't want to go out on a limb because uh I don't know how he's going to tell me, how this goes, you know." *Id.* Ambrecht asked whether Rauch expected to hear from the lawyer soon, to which Rauch replied, "No, no, f[*]cking attorney ... if he calls me at five thirty, I'll be delighted." J.A. 839. Ambrecht asked whether "it will be okay then to try to do the trade" if the lawyers settled on the wording, but Rauch was noncommittal, saying "Yeah, I mean the, based on the, you know, how he tells me to present it, and you know under what conditions and so forth." J.A. 840. Ambrecht again complained that he was receiving "a lot of pressure" to conclude the deal, and Rauch replied, "Hey, if we agreed to the terms two weeks ago, right now we'd go out for dinner tonight ... [a]nd say I'm glad that's done." J.A. 841. The call ended **\*330** with Rauch promising, "I'll call you as soon as I know." J.A. 842.

In light of this undisputed evidence of the content of the recorded calls, none of the evidence of the content of the subsequent unrecorded call supports a reasonable belief on RBC's part that Rauch had received authorization from the Schneiders to make the deal in the intervening minutes. Three people participated in the call on RBC's behalf: Ambrecht, Holmes, and Peter Parent, another Co–Head of the High–Yield Group. Neither Holmes nor Parent had been part of the previous negotiations between RBC and Rauch. Although all the participants in the unrecorded call testified at trial as to the content of the call, Parent's account is the only one that provides even an arguable basis for a finding of apparent authority, and it too is insufficient in light of the other undisputed evidence. Parent testified, "I remember ... that Glen confirmed size and price with us, 69 million at 51, which means that we had a transaction.... Glen was going to get the lawyers to send us a confirm so that we could go to a written form of contract." Tr. 151. However, that the "size and price" under discussion were "69 million at 51" was not in dispute. The issue was whether, under the circumstances, RBC could reasonably understand Rauch to be telling it that the Schneiders had agreed to that price. Parent's addition, "which means that we had a transaction," was a statement about his own thought processes—not Rauch's statements. His belief that they had a contract is insufficient unless the belief was reasonably attributable to Rauch's statements.

[12]    Parent's further addition that "Glen was going to get the lawyers to send us a confirm so that we could go to a written form of contract," was ambiguous and in the context also insufficient. *In the absence of other evidence of the communications between RBC and Rauch*, such a statement by a broker in Rauch's position could perhaps reasonably have been understood by RBC as implying that he had received authorization for the contract and that they had a deal. Such ambiguous words, however, could also have represented nothing more than Rauch's expression of his determination to get the deal done. But while either interpretation might be reasonable if the statement were viewed in isolation, the same is not true once the undisputed evidence of the prior negotiations is taken into account. Highland and RBC are entitled to have us consider the evidence in the light most favorable to them in determining whether the jury's verdict in their favor was based on legally sufficient evidence, but

3429

Highland Capital Management LP v. Schneider, 607 F.3d 322 (2010)

76 Fed.R.Serv.3d 1651

we may not disregard undisputed evidence that bears on the interpretation of ambiguous matters. *See Tomassi v. Insignia Fin. Group, Inc.,* 478 F.3d 111, 115–17 (2d Cir.2007) (evaluating the sufficiency of evidence "in the context of all the evidence"). To prevail on the apparent authority theory, Appellees needed evidence that, taken together with the undisputed evidence of the negotiations, could support a finding that it was more probable than not that RBC reasonably understood Rauch to be saying that he had at last received authorization.

In the context of the other evidence—particularly the undisputed content of the previous recorded calls—a jury could not reasonably find it more probable than not that RBC reasonably understood the words Parent attributed to Rauch to constitute Rauch's affirmation that he had at last received authorization to make the deal. Only ten minutes earlier, Rauch told RBC that he did not have approval for a sale at fifty-one and that he could not agree to the sale unless he received such approval from either the Schneiders or their lawyers. He said that the Schneiders' **\*331** attorney would be dictating what he should say and that he did not expect to hear anything before the end of the day. He made clear that he hoped to receive the approval and would call RBC immediately if he did. Rauch, however, did not call RBC. And when RBC called him after the passage of only ten minutes, nothing in their conversation reported by any of the participants suggested that in that intervening ten minutes anything had changed.[2]

[2]    The testimonies of Holmes, Ambrecht, and Rauch are also insufficient to support a finding of apparent authority. Holmes and Ambrecht did not attribute any words to Rauch that would have led RBC to reasonably believe the Schneiders had authorized Rauch to sell at fifty-one, asserting only their own impressions that a deal had been reached. Indeed, Holmes testified that after the call ended he "shrugged and said, I guess we'll have to wait until tomorrow for Mr. Rauch to call us back." Trial Tr. 401–02. Nor does RBC receive any comfort from Rauch's testimony about the call. He testified that he explicitly told RBC that they did not have a deal:

Max [Holmes] said, Glen, where are we on the transaction? I said, What do you mean? He said, Do we have size and price? I said, No, we don't have size and we don't have price. He said, Then you mean we're nowhere? I said, Yeah, unfortunately that's where we are. He said, OK, that's it, good-bye. And that was it.

Tr. 539.

Notwithstanding that, upon a different record that contained no other evidence of the known limits of his authority, a broker's statement that he would "get the lawyers to send a confirm" relating to a specified size and price might well be a sufficient basis to support a reasonable belief that the broker had his principal's approval and that the deal was done, we cannot disregard the undisputed evidence of the context. In the context of the extensive undisputed evidence of the dealings between Rauch and RBC, that single ambiguous line Parent attributed to Rauch could not sufficiently establish apparent authority. A jury could not reasonably find it more probable than not that RBC reasonably believed, based on that single sentence, that in the ten minutes since the prior recorded call Rauch had finally received the long-awaited authorization to do the $35 million transaction, when Rauch said nothing to suggest that since ten minutes earlier the circumstances had changed. While it is not inconceivable that Rauch's unclear reference to having lawyers send a confirm could have meant that he had received authorization, the complete undisputed circumstances of the call made it so improbable that this was his meaning that RBC could not reasonably draw that inference. A jury could not reasonably conclude, by a preponderance of the evidence, that RBC relied on Rauch's apparent authority to make the deal.

For the same reason, the evidence was insufficient to support a reasonable finding that Rauch expressed agreement to sell the notes during the unrecorded March 14 call or that RBC reasonably construed Rauch's words as expressing agreement to sell at fifty-one. We conclude that, taking all ambiguous or disputed evidence in the light most favorable to the Appellees, but construing it in light of the extensive undisputed evidence, a jury could not reasonably find it more probable than not that Rauch had received authorization to sell at fifty-one, that RBC reasonably believed he had received authorization to sell at fifty-one, or that RBC reasonably understood his words as expressing agreement to sell at fifty-one.

We conclude that the Schneiders were entitled to judgment as a matter of law. We therefore reverse the judgment in favor of Highland and RBC and remand for entry of judgment in favor of the Schneiders.

76 Fed.R.Serv.3d 1651

### *332  CONCLUSION

The district court's order denying Defendants' motion for judgment as a matter of law is hereby REVERSED, and the case is REMANDED with instructions to enter judgment in favor of Defendants.

**All Citations**

607 F.3d 322, 76 Fed.R.Serv.3d 1651

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 39

HCMP000081/1991

1991 MP No.81

IN THE SUPREME COURT OF HONG KONG

HIGH COURT

MISCELLANEOUS PROCEEDINGS

----------------------

IN THE MATTER of THE HONGKONG AND SHANGHAI BANKING CORPORATION LIMITED

and

IN THE MATTER of the Companies Ordinance (Chapter 32)

-------------------

Coram: Hon. Jones J. in Court

Date of hearing: 26 March 1991

Date of delivery of judgment: 26 March 1991

----------------------

J U D G M E N T

----------------------

1. I have before me a petition that was presented on behalf of the Hongkong and Shanghai Banking Corporation Limited (the Bank) on the 4th March 1991 that seeks

# Tab 40

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| Huachen Energy Co., Ltd.,[1] | Case No. 22-10005 (LGB) |
| Debtor in a Foreign Proceeding. | |

**ORDER RECOGNIZING**
**FOREIGN PROCEEDING AND GRANTING RELATED RELIEF**

Upon the *Verified Petition Under Chapter 15 for Recognition of a Foreign Main Proceeding and Related Relief* [Docket No. 2] (the "Verified Petition")[2] of Ernst & Young Hua Ming LLP, in its capacity as the duly authorized foreign representative (the "Foreign Representative") of Huachen Energy Co., Ltd. (the "Debtor"), which is the subject of a bankruptcy reorganization proceeding under PRC law (the "PRC Proceeding") currently pending before the No. 1 Intermediate People's Court of Beijing (the "PRC Court") under Article 71 of the Enterprise Bankruptcy Law of the People's Republic of China (the "Enterprise Bankruptcy Law"), in support of entry of an order:

> a. finding that (i) the Debtor is eligible to be a "debtor" under chapter 15 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code"), (ii) the PRC Proceeding is a "foreign main proceeding" within the meaning of section 1502 of the Bankruptcy Code, (iii) the Foreign Representative satisfies the requirements of a "foreign representative" under section 101(24) of the Bankruptcy Code, and (iv) the Petition was properly filed and meets the requirements of section 1515 of the Bankruptcy Code;
>
> b. granting recognition of the PRC Proceeding as a "foreign main proceeding" under sections 1517 and 1520 of the Bankruptcy Code;

---

[1] The last four digits of the Debtor's Unified Social Credit Code are 6704. The location of the Debtor's registered office is 3/F, Building 4, Guoxingjiayuan, No. 20 Shouti South Road, Haidian District, Beijing, People's Republic of China.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Verified Petition.

3435

c.  granting all relief afforded to foreign main proceedings under section 1520 of the Bankruptcy Code;

d.  recognizing, granting comity to, and giving full force and effect within the territorial jurisdiction of the United States to the PRC Proceeding, the Plan and the order of the PRC Court approving the Plan (the "Approval Order"), including giving effect to the releases set forth in the Plan (the "Releases");

e.  permanently enjoining all parties from commencing or continuing any action or proceeding in the United States against the Debtor or its assets located within the territorial jurisdiction of the United States that is inconsistent with the Plan (the "Injunction");

f.  directing the Debtor, the Trustee (including any replacement trustee, as may be applicable), and any other relevant party to execute and deliver all consents, instruments, releases of liens and encumbrances or documents of similar effect, and other documents necessary to give effect to the Plan, and authorizing the Trustee to file such documents to the extent necessary in connection therewith (the "Direction");

g.  waiving the 14-day stay of effectiveness of the order; and

h.  granting related relief;

and upon the record of this case and the hearing held on February 1, 2022 (the "Hearing") on the Petition and this Court's review and consideration of the Petition and the Liang Declaration; and the Court having found and determined that the relief sought in the Petition is consistent with the purposes of chapter 15 of the Bankruptcy Code and is in the best interests of the Debtor and its creditors; and after due deliberation and sufficient cause appearing therefor; and for the reasons stated on the record at the Hearing;

**IT IS HEREBY FOUND AND DETERMINED THAT:[3]**

A.  This Court has jurisdiction to consider the Petition and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-431

---

[3]  The findings and conclusions set forth herein and on the record of the Hearing constitute this Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable herein by Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). To the extent any of the findings of fact herein constitute conclusions of law, they are adopted as such. To the extent any of the conclusions of law herein constitute findings of fact, they are adopted as such.

2

3436

from the U.S. District Court for the Southern District of New York, dated January 31, 2012 (Preska, C.J.).

B.      The consideration of the Petition and the relief requested therein is a core proceeding pursuant to 28 U.S.C. § 157(b), and this Court may enter a final order consistent with Article III of the United States Constitution.

C.      Venue is proper before this Court pursuant to 28 U.S.C. § 1410(1) because (i) the Debtor has U.S. assets that are located within this District and (ii) the Indenture is governed by New York law and contains a New York forum selection clause.

D.      Good, sufficient, appropriate, and timely notice of the filing of the Petition and the Hearing has been given by the Foreign Representative, pursuant to Bankruptcy Rules 1011(b) and 2002(q) and the *Order Scheduling Hearing on Chapter 15 Petition and Related Relief and Specifying Form and Manner of Service of Notice* [Docket No. 11] to (i) the United States Trustee for the Southern District of New York; (ii) counsel to the Ad Hoc Committee; (iii) the Trustee; (iv) the Plan Creditors (including the Noteholders); and (v) all parties that have filed a notice of appearance in this Chapter 15 Case.  In light of the nature of the relief requested and prior orders of this Court, no other or further notice is required.

E.      No objections or responses were filed that have not been overruled, withdrawn, or otherwise resolved.

F.      The Debtor has property located in this District, and therefore, the Debtor is "eligible" to be a debtor in this Chapter 15 Case pursuant to sections 109 and 1501 of the Bankruptcy Code.

G.      The PRC Proceeding is a "foreign proceeding" as such term is defined in section 101(23) of the Bankruptcy Code.

3437

H.      The PRC Proceeding is pending in the PRC, which is where the Debtor has its "center of main interests" as referred to in section 1517(b)(1) of the Bankruptcy Code.  As such, the PRC Proceeding is a "foreign main proceeding" pursuant to section 1502(4) of the Bankruptcy Code, is entitled to recognition as a foreign main proceeding pursuant to section 1517(b)(1) of the Bankruptcy Code, and is entitled to all relief afforded to foreign main proceedings under section 1520 of the Bankruptcy Code.

I.      The Foreign Representative is a "person" as such term is defined in section 101(41) of the Bankruptcy Code and has been duly appointed and designated as the "foreign representative" of the Debtor as such term is defined in section 101(24) of the Bankruptcy Code.

J.      This Chapter 15 Case was properly commenced pursuant to sections 1504 and 1509 of the Bankruptcy Code, and the Petition satisfies the requirements of section 1515 of the Bankruptcy Code.

K.      The Foreign Representative and the Debtor, as applicable, are entitled to the additional assistance and discretionary relief requested in the Petition (including recognition and enforcement of the Plan (and the Releases contained therein) and the Approval Order) under sections 1507 and 1521 of the Bankruptcy Code.

L.      The relief granted herein is necessary and appropriate, in the interests of the public and of international comity, not inconsistent with the public policy of the United States, warranted pursuant to sections 105(a), 1504, 1507, 1509, 1515, 1517, 1520 and 1521 of the Bankruptcy Code, and will not cause hardship to any party in interest.  To the extent that any hardship or inconvenience may result to such parties, it is outweighed by the benefits of the requested relief to the Foreign Representative, the Debtor and its creditors, and other parties in interest.

M.    The relief granted herein is necessary to effectuate the purposes and objectives of chapter 15 of the Bankruptcy Code and to protect the Debtor and the interests of its creditors and all parties in interest.

N.    Absent the relief granted herein, the Plan, the PRC Proceeding, and the Debtor's efforts to consummate the restructuring set forth in the Plan may be thwarted by the actions of certain creditors or other parties in interest, which would be at odds with the purpose of chapter 15 of the Bankruptcy Code as set forth, *inter alia*, in section 1501(a) of the Bankruptcy Code.  Such results could threaten, frustrate, delay, and ultimately jeopardize the implementation of the restructuring set forth in the Plan.  Absent the Injunction, the Debtor and its assets may be subject to the prosecution of judicial, quasi-judicial, arbitration, administrative, or regulatory actions or proceedings in connection with claims under the PRC Proceeding against the Debtor and its assets located within the territorial jurisdiction of the United States, thereby interfering with and causing irreparable harm to the Debtor, its creditors and other parties in interest.  Similarly, absent the Direction, the Debtor's ability to implement the terms of the Plan and successfully complete the Financial Restructuring may be impaired.

O.    The Injunction and the Direction contained herein (i) are within the Court's jurisdiction to grant; (ii) are essential to the success and objectives of the Plan and the PRC Proceeding; and (iii) confers material benefits on, and is in the best interests of, the Debtor, its creditors, and all other parties in interest.

P.    In accordance with section 1507(b) of the Bankruptcy Code, the relief granted herein will reasonably assure: (i) the just treatment of all holders of claims against or interests in the Debtor's property; (ii) the protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in the PRC Proceeding; (iii) the prevention of

5

3439

preferential or fraudulent dispositions of property of the Debtor; and (iv) the distribution of proceeds of the Debtor's property substantially in accordance with the order prescribed in the Bankruptcy Code.

Q.     All creditors and other parties in interest, including the Debtor, are sufficiently protected in the grant of the relief ordered hereby in compliance with section 1522(a) of the Bankruptcy Code.

**BASED ON THE FOREGOING FINDINGS OF FACT AND AFTER DUE DELIBERATION AND SUFFICIENT CAUSE APPEARING THEREFOR, IT IS HEREBY ORDERED THAT:**

1.     The Petition and the relief requested therein are granted, and any objections or responses thereto that have not been withdrawn or resolved are overruled with prejudice.

2.     The PRC Proceeding is recognized as a "foreign main proceeding" under sections 1517(a) and 1517(b)(1) of the Bankruptcy Code.

3.     The Foreign Representative is recognized as the "foreign representative" as defined in section 101(24) of the Bankruptcy Code in respect of the PRC Proceeding.

4.     All relief and protection afforded to a foreign main proceeding under section 1520 of the Bankruptcy Code is hereby granted to the PRC Proceeding, the Debtor, and the Debtor's assets located in the United States, as applicable, including, without limitation, the application of the automatic stay under section 362 of the Bankruptcy Code to the Debtor and its property located in the territorial jurisdiction of the United States.

5.     As of the effective date of the Plan (the "Plan Effective Date"), the Plan (including the Releases), and the Approval Order granted in the PRC Proceeding shall be recognized, granted comity, and given full force and effect in the United States and are binding and fully enforceable in accordance with their terms pursuant to sections 105(a), 1507, 1521, and 1525 of the Bankruptcy Code on all entities (as that term is defined in section 101(15) of the Bankruptcy Code) whose

6

claims or interests are affected by the Plan and each of their respective heirs, successors, assigns,

trustees, subsidiaries, affiliates, officers, directors, agents, employees, representatives, attorneys,

beneficiaries, guardians and similar officers, or any persons claiming through or in the right of any

such persons or entities (collectively, other than the Debtor and its expressly authorized

representatives and agents, the "<u>Affected Entities</u>"), whether or not the Affected Entity consented

to be bound by or participated in the Plan.

6.     As of the Plan Effective Date, except as expressly permitted by the Plan or any

other document giving effect to the Plan, including the Amendment Documents, all Affected

Entities shall be hereby permanently enjoined from asserting any debt, claim, or interest affected

by the Approval Order and the Plan, including, without limitation:

a.     executing against any of the Debtor's assets;

b.     commencing or continuing, including issuing or employing process, of a judicial, quasi-judicial, administrative, regulatory, arbitral, or other action or proceeding, or to recover a claim, including, without limitation, any and all unpaid judgments, settlements, or otherwise against the Debtor, its property, or any direct or indirect transferee of or successor to any property of the Debtor, or any property of such transferee or successor, or the seeking of any discovery related to any of the foregoing, which in each case is in any way inconsistent with, relates to, or would interfere with, the administration of the Debtor's estate in the PRC Proceeding, PRC law or the implementation or consummation of the Approval Order or the Plan (including the Releases);

c.     taking or continuing any act to create, perfect, or enforce a lien or other security interest, setoff or other claim against the Debtor or any of its property or proceeds thereof, which in each case is in any way inconsistent with, relates to, or would interfere with, the administration of the Debtor's estate in the PRC Proceeding, PRC law or the implementation or consummation of the Approval Order or the Plan (including the Releases);

d.     transferring, relinquishing, or disposing of any property of the Debtor to any entity other than the Foreign Representative and his authorized representatives and agents or taking or continuing any act to obtain possession of, commingle, or exercise control over, such property, which in each case is in any way inconsistent with, relates to, or would interfere with, the administration of the Debtor's estate in the PRC Proceeding, PRC law

3441

or the implementation or consummation of the Approval Order or the Plan (including the Releases);

    e.    commencing or continuing in any manner, directly or indirectly, an individual action or proceeding concerning the Debtor's assets, rights, obligations or liabilities, or to resolve any dispute arising out of any provision of the Plan, including the Releases, or PRC law relating to the Plan, in each case, to the extent they have not been stayed pursuant to sections 1520(a) and 362 of the Bankruptcy Code; and

    f.    declaring or considering the filing of the PRC Proceeding, the Plan, the Approval Order, or this Chapter 15 Case a default or event of default under any agreement, contract or arrangement;

*provided*, in each case, that such injunctions shall be effective solely within the territorial jurisdiction of the United States.

7.    As of the Plan Effective Date, any judgment, wherever and whenever obtained, to the extent such judgment is a determination of the liability of the Debtor or any other person released (a) under the Plan pursuant to the Releases, (b) with respect to any debt canceled, discharged or restructured under the Plan, or (c) as a result of the application of Enterprise Bankruptcy Law in connection with the Plan, shall be unenforceable in the United States, in each case, to the extent inconsistent with the Plan, the Approval Order, or such law.

8.    To the extent any Affected Entity has filed financing statements, mortgages, construction or mechanic's liens, lis pendens or other documents or agreements evidencing claims, liens, interests or encumbrances, in or against the Debtor's assets and has not delivered to the Debtor, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of such encumbrances, (a) each such person or entity is hereby directed to deliver all such statements, instruments and releases; (b) the Debtor is hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity asserting the same, as may be applicable. Each and every federal, state and local governmental unit is hereby directed to accept any and all documents and instruments

8

3442

necessary or appropriate to give effect to the Plan and the transaction contemplated thereunder and by this Order. This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department or office.

9. The Foreign Representative, the Trustee (including any replacement trustee, as may be applicable), and the Debtor (a) are authorized and empowered to, and may in their discretion and without further delay, execute and deliver documents to effectuate the Plan (including the Releases) and take any action and perform any act necessary to implement and effectuate the terms of this Order and, the Approval Order and the Plan and (b) shall be authorized and empowered to exercise all consent and approval rights provided for in the Plan in the manner set forth in the Plan.

10. No action taken by the Foreign Representative, the Debtor, or their respective agents, representatives, advisors, or counsel, in preparing, disseminating, applying for, implementing or otherwise acting in furtherance of the PRC Proceeding, the documents contemplated thereunder, this Order, the Chapter 15 Case, any further order for additional relief in the Chapter 15 Case, or any adversary proceedings in connection therewith, will be deemed to constitute a waiver of the immunity afforded such persons under sections 306 or 1510 of the Bankruptcy Code.

11. No party shall incur any liability for following the terms of this Order (whether by acting or refraining from acting), except in the case of the party's own gross negligence or willful misconduct.

12. Nothing herein shall enjoin, impair, or otherwise supplement or modify in any manner the rights of any party granted under the Plan or any other document giving effect to the Plan, including the Amendment Documents, and nothing herein shall modify the exclusive right

9

of the PRC Court to hear and determine any suit, action, or proceeding and to settle any dispute which may arise out of the any provision of the Plan or the Approval Order, or out of any action to be taken or omitted to be taken under the Plan or Approval Order or in connection with the administration of the Plan or Approval Order.

13.     Nothing herein shall enjoin a police or regulatory act of a governmental unit, including a criminal action or proceeding.

14.     The Foreign Representative, the Debtor, and their respective agents are authorized to serve or provide any notices required under the Bankruptcy Rules or local rules of this Court.

15.     Notwithstanding any provision in the Bankruptcy Code or the Bankruptcy Rules to the contrary, including, but not limited to Bankruptcy Rules 1018, 3020(e), 6004(h), 7062 and 9014, (a) this Order shall be effective immediately and enforceable upon its entry, (b) the Foreign Representative is not subject to any stay in the implementation, enforcement, or realization of the relief granted in this Order, and (c) this Order shall constitute a final order within the meaning of 28 U.S.C. § 158(a).

16.     This Court shall retain jurisdiction with respect to the implementation, enforcement, amendment, or modification of this Order.

Dated: February 2, 2022
        New York, New York

/s/ **Lisa G. Beckerman**
THE HONORABLE LISA G. BECKERMAN
UNITED STATES BANKRUPTCY JUDGE

10

# Tab 41

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| Huachen Energy Co., Ltd.,[1] | Case No. 22-10005 (LGB) |
| Debtor in a Foreign Proceeding. | |

**ORDER RECOGNIZING**
**FOREIGN PROCEEDING AND GRANTING RELATED RELIEF**

Upon the *Verified Petition Under Chapter 15 for Recognition of a Foreign Main Proceeding and Related Relief* [Docket No. 2] (the "Verified Petition")[2] of Ernst & Young Hua Ming LLP, in its capacity as the duly authorized foreign representative (the "Foreign Representative") of Huachen Energy Co., Ltd. (the "Debtor"), which is the subject of a bankruptcy reorganization proceeding under PRC law (the "PRC Proceeding") currently pending before the No. 1 Intermediate People's Court of Beijing (the "PRC Court") under Article 71 of the Enterprise Bankruptcy Law of the People's Republic of China (the "Enterprise Bankruptcy Law"), in support of entry of an order:

      a.      finding that (i) the Debtor is eligible to be a "debtor" under chapter 15 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code"), (ii) the PRC Proceeding is a "foreign main proceeding" within the meaning of section 1502 of the Bankruptcy Code, (iii) the Foreign Representative satisfies the requirements of a "foreign representative" under section 101(24) of the Bankruptcy Code, and (iv) the Petition was properly filed and meets the requirements of section 1515 of the Bankruptcy Code;

      b.      granting recognition of the PRC Proceeding as a "foreign main proceeding" under sections 1517 and 1520 of the Bankruptcy Code;

---

[1]  The last four digits of the Debtor's Unified Social Credit Code are 6704.  The location of the Debtor's registered office is 3/F, Building 4, Guoxingjiayuan, No. 20 Shouti South Road, Haidian District, Beijing, People's Republic of China.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Verified Petition.

c. granting all relief afforded to foreign main proceedings under section 1520 of the Bankruptcy Code;

d. recognizing, granting comity to, and giving full force and effect within the territorial jurisdiction of the United States to the PRC Proceeding, the Plan and the order of the PRC Court approving the Plan (the "Approval Order"), including giving effect to the releases set forth in the Plan (the "Releases");

e. permanently enjoining all parties from commencing or continuing any action or proceeding in the United States against the Debtor or its assets located within the territorial jurisdiction of the United States that is inconsistent with the Plan (the "Injunction");

f. directing the Debtor, the Trustee (including any replacement trustee, as may be applicable), and any other relevant party to execute and deliver all consents, instruments, releases of liens and encumbrances or documents of similar effect, and other documents necessary to give effect to the Plan, and authorizing the Trustee to file such documents to the extent necessary in connection therewith (the "Direction");

g. waiving the 14-day stay of effectiveness of the order; and

h. granting related relief;

and upon the record of this case and the hearing held on February 1, 2022 (the "Hearing") on the Petition and this Court's review and consideration of the Petition and the Liang Declaration; and the Court having found and determined that the relief sought in the Petition is consistent with the purposes of chapter 15 of the Bankruptcy Code and is in the best interests of the Debtor and its creditors; and after due deliberation and sufficient cause appearing therefor; and for the reasons stated on the record at the Hearing;

**IT IS HEREBY FOUND AND DETERMINED THAT:[3]**

A. This Court has jurisdiction to consider the Petition and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-431

---

[3] The findings and conclusions set forth herein and on the record of the Hearing constitute this Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable herein by Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). To the extent any of the findings of fact herein constitute conclusions of law, they are adopted as such. To the extent any of the conclusions of law herein constitute findings of fact, they are adopted as such.

from the U.S. District Court for the Southern District of New York, dated January 31, 2012 (Preska, C.J.).

B.     The consideration of the Petition and the relief requested therein is a core proceeding pursuant to 28 U.S.C. § 157(b), and this Court may enter a final order consistent with Article III of the United States Constitution.

C.     Venue is proper before this Court pursuant to 28 U.S.C. § 1410(1) because (i) the Debtor has U.S. assets that are located within this District and (ii) the Indenture is governed by New York law and contains a New York forum selection clause.

D.     Good, sufficient, appropriate, and timely notice of the filing of the Petition and the Hearing has been given by the Foreign Representative, pursuant to Bankruptcy Rules 1011(b) and 2002(q) and the *Order Scheduling Hearing on Chapter 15 Petition and Related Relief and Specifying Form and Manner of Service of Notice* [Docket No. 11] to (i) the United States Trustee for the Southern District of New York; (ii) counsel to the Ad Hoc Committee; (iii) the Trustee; (iv) the Plan Creditors (including the Noteholders); and (v) all parties that have filed a notice of appearance in this Chapter 15 Case.  In light of the nature of the relief requested and prior orders of this Court, no other or further notice is required.

E.     No objections or responses were filed that have not been overruled, withdrawn, or otherwise resolved.

F.     The Debtor has property located in this District, and therefore, the Debtor is "eligible" to be a debtor in this Chapter 15 Case pursuant to sections 109 and 1501 of the Bankruptcy Code.

G.     The PRC Proceeding is a "foreign proceeding" as such term is defined in section 101(23) of the Bankruptcy Code.

3448

H.    The PRC Proceeding is pending in the PRC, which is where the Debtor has its "center of main interests" as referred to in section 1517(b)(1) of the Bankruptcy Code. As such, the PRC Proceeding is a "foreign main proceeding" pursuant to section 1502(4) of the Bankruptcy Code, is entitled to recognition as a foreign main proceeding pursuant to section 1517(b)(1) of the Bankruptcy Code, and is entitled to all relief afforded to foreign main proceedings under section 1520 of the Bankruptcy Code.

I.    The Foreign Representative is a "person" as such term is defined in section 101(41) of the Bankruptcy Code and has been duly appointed and designated as the "foreign representative" of the Debtor as such term is defined in section 101(24) of the Bankruptcy Code.

J.    This Chapter 15 Case was properly commenced pursuant to sections 1504 and 1509 of the Bankruptcy Code, and the Petition satisfies the requirements of section 1515 of the Bankruptcy Code.

K.    The Foreign Representative and the Debtor, as applicable, are entitled to the additional assistance and discretionary relief requested in the Petition (including recognition and enforcement of the Plan (and the Releases contained therein) and the Approval Order) under sections 1507 and 1521 of the Bankruptcy Code.

L.    The relief granted herein is necessary and appropriate, in the interests of the public and of international comity, not inconsistent with the public policy of the United States, warranted pursuant to sections 105(a), 1504, 1507, 1509, 1515, 1517, 1520 and 1521 of the Bankruptcy Code, and will not cause hardship to any party in interest. To the extent that any hardship or inconvenience may result to such parties, it is outweighed by the benefits of the requested relief to the Foreign Representative, the Debtor and its creditors, and other parties in interest.

M.      The relief granted herein is necessary to effectuate the purposes and objectives of chapter 15 of the Bankruptcy Code and to protect the Debtor and the interests of its creditors and all parties in interest.

N.      Absent the relief granted herein, the Plan, the PRC Proceeding, and the Debtor's efforts to consummate the restructuring set forth in the Plan may be thwarted by the actions of certain creditors or other parties in interest, which would be at odds with the purpose of chapter 15 of the Bankruptcy Code as set forth, *inter alia*, in section 1501(a) of the Bankruptcy Code. Such results could threaten, frustrate, delay, and ultimately jeopardize the implementation of the restructuring set forth in the Plan. Absent the Injunction, the Debtor and its assets may be subject to the prosecution of judicial, quasi-judicial, arbitration, administrative, or regulatory actions or proceedings in connection with claims under the PRC Proceeding against the Debtor and its assets located within the territorial jurisdiction of the United States, thereby interfering with and causing irreparable harm to the Debtor, its creditors and other parties in interest. Similarly, absent the Direction, the Debtor's ability to implement the terms of the Plan and successfully complete the Financial Restructuring may be impaired.

O.      The Injunction and the Direction contained herein (i) are within the Court's jurisdiction to grant; (ii) are essential to the success and objectives of the Plan and the PRC Proceeding; and (iii) confers material benefits on, and is in the best interests of, the Debtor, its creditors, and all other parties in interest.

P.      In accordance with section 1507(b) of the Bankruptcy Code, the relief granted herein will reasonably assure: (i) the just treatment of all holders of claims against or interests in the Debtor's property; (ii) the protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in the PRC Proceeding; (iii) the prevention of

5

preferential or fraudulent dispositions of property of the Debtor; and (iv) the distribution of proceeds of the Debtor's property substantially in accordance with the order prescribed in the Bankruptcy Code.

Q.    All creditors and other parties in interest, including the Debtor, are sufficiently protected in the grant of the relief ordered hereby in compliance with section 1522(a) of the Bankruptcy Code.

**BASED ON THE FOREGOING FINDINGS OF FACT AND AFTER DUE DELIBERATION AND SUFFICIENT CAUSE APPEARING THEREFOR, IT IS HEREBY ORDERED THAT:**

1.    The Petition and the relief requested therein are granted, and any objections or responses thereto that have not been withdrawn or resolved are overruled with prejudice.

2.    The PRC Proceeding is recognized as a "foreign main proceeding" under sections 1517(a) and 1517(b)(1) of the Bankruptcy Code.

3.    The Foreign Representative is recognized as the "foreign representative" as defined in section 101(24) of the Bankruptcy Code in respect of the PRC Proceeding.

4.    All relief and protection afforded to a foreign main proceeding under section 1520 of the Bankruptcy Code is hereby granted to the PRC Proceeding, the Debtor, and the Debtor's assets located in the United States, as applicable, including, without limitation, the application of the automatic stay under section 362 of the Bankruptcy Code to the Debtor and its property located in the territorial jurisdiction of the United States.

5.    As of the effective date of the Plan (the "Plan Effective Date"), the Plan (including the Releases), and the Approval Order granted in the PRC Proceeding shall be recognized, granted comity, and given full force and effect in the United States and are binding and fully enforceable in accordance with their terms pursuant to sections 105(a), 1507, 1521, and 1525 of the Bankruptcy Code on all entities (as that term is defined in section 101(15) of the Bankruptcy Code) whose

6

3451

claims or interests are affected by the Plan and each of their respective heirs, successors, assigns, trustees, subsidiaries, affiliates, officers, directors, agents, employees, representatives, attorneys, beneficiaries, guardians and similar officers, or any persons claiming through or in the right of any such persons or entities (collectively, other than the Debtor and its expressly authorized representatives and agents, the "Affected Entities"), whether or not the Affected Entity consented to be bound by or participated in the Plan.

6.      As of the Plan Effective Date, except as expressly permitted by the Plan or any other document giving effect to the Plan, including the Amendment Documents, all Affected Entities shall be hereby permanently enjoined from asserting any debt, claim, or interest affected by the Approval Order and the Plan, including, without limitation:

a.      executing against any of the Debtor's assets;

b.      commencing or continuing, including issuing or employing process, of a judicial, quasi-judicial, administrative, regulatory, arbitral, or other action or proceeding, or to recover a claim, including, without limitation, any and all unpaid judgments, settlements, or otherwise against the Debtor, its property, or any direct or indirect transferee of or successor to any property of the Debtor, or any property of such transferee or successor, or the seeking of any discovery related to any of the foregoing, which in each case is in any way inconsistent with, relates to, or would interfere with, the administration of the Debtor's estate in the PRC Proceeding, PRC law or the implementation or consummation of the Approval Order or the Plan (including the Releases);

c.      taking or continuing any act to create, perfect, or enforce a lien or other security interest, setoff or other claim against the Debtor or any of its property or proceeds thereof, which in each case is in any way inconsistent with, relates to, or would interfere with, the administration of the Debtor's estate in the PRC Proceeding, PRC law or the implementation or consummation of the Approval Order or the Plan (including the Releases);

d.      transferring, relinquishing, or disposing of any property of the Debtor to any entity other than the Foreign Representative and his authorized representatives and agents or taking or continuing any act to obtain possession of, commingle, or exercise control over, such property, which in each case is in any way inconsistent with, relates to, or would interfere with, the administration of the Debtor's estate in the PRC Proceeding, PRC law

7

3452

or the implementation or consummation of the Approval Order or the Plan (including the Releases);

   e.   commencing or continuing in any manner, directly or indirectly, an individual action or proceeding concerning the Debtor's assets, rights, obligations or liabilities, or to resolve any dispute arising out of any provision of the Plan, including the Releases, or PRC law relating to the Plan, in each case, to the extent they have not been stayed pursuant to sections 1520(a) and 362 of the Bankruptcy Code; and

   f.   declaring or considering the filing of the PRC Proceeding, the Plan, the Approval Order, or this Chapter 15 Case a default or event of default under any agreement, contract or arrangement;

*provided*, in each case, that such injunctions shall be effective solely within the territorial jurisdiction of the United States.

7.     As of the Plan Effective Date, any judgment, wherever and whenever obtained, to the extent such judgment is a determination of the liability of the Debtor or any other person released (a) under the Plan pursuant to the Releases, (b) with respect to any debt canceled, discharged or restructured under the Plan, or (c) as a result of the application of Enterprise Bankruptcy Law in connection with the Plan, shall be unenforceable in the United States, in each case, to the extent inconsistent with the Plan, the Approval Order, or such law.

8.     To the extent any Affected Entity has filed financing statements, mortgages, construction or mechanic's liens, lis pendens or other documents or agreements evidencing claims, liens, interests or encumbrances, in or against the Debtor's assets and has not delivered to the Debtor, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of such encumbrances, (a) each such person or entity is hereby directed to deliver all such statements, instruments and releases; (b) the Debtor is hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity asserting the same, as may be applicable. Each and every federal, state and local governmental unit is hereby directed to accept any and all documents and instruments

8

necessary or appropriate to give effect to the Plan and the transaction contemplated thereunder and by this Order. This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department or office.

9.    The Foreign Representative, the Trustee (including any replacement trustee, as may be applicable), and the Debtor (a) are authorized and empowered to, and may in their discretion and without further delay, execute and deliver documents to effectuate the Plan (including the Releases) and take any action and perform any act necessary to implement and effectuate the terms of this Order and, the Approval Order and the Plan and (b) shall be authorized and empowered to exercise all consent and approval rights provided for in the Plan in the manner set forth in the Plan.

10.    No action taken by the Foreign Representative, the Debtor, or their respective agents, representatives, advisors, or counsel, in preparing, disseminating, applying for, implementing or otherwise acting in furtherance of the PRC Proceeding, the documents contemplated thereunder, this Order, the Chapter 15 Case, any further order for additional relief in the Chapter 15 Case, or any adversary proceedings in connection therewith, will be deemed to constitute a waiver of the immunity afforded such persons under sections 306 or 1510 of the Bankruptcy Code.

11.    No party shall incur any liability for following the terms of this Order (whether by acting or refraining from acting), except in the case of the party's own gross negligence or willful misconduct.

12.    Nothing herein shall enjoin, impair, or otherwise supplement or modify in any manner the rights of any party granted under the Plan or any other document giving effect to the Plan, including the Amendment Documents, and nothing herein shall modify the exclusive right

9

of the PRC Court to hear and determine any suit, action, or proceeding and to settle any dispute which may arise out of the any provision of the Plan or the Approval Order, or out of any action to be taken or omitted to be taken under the Plan or Approval Order or in connection with the administration of the Plan or Approval Order.

13.    Nothing herein shall enjoin a police or regulatory act of a governmental unit, including a criminal action or proceeding.

14.    The Foreign Representative, the Debtor, and their respective agents are authorized to serve or provide any notices required under the Bankruptcy Rules or local rules of this Court.

15.    Notwithstanding any provision in the Bankruptcy Code or the Bankruptcy Rules to the contrary, including, but not limited to Bankruptcy Rules 1018, 3020(e), 6004(h), 7062 and 9014, (a) this Order shall be effective immediately and enforceable upon its entry, (b) the Foreign Representative is not subject to any stay in the implementation, enforcement, or realization of the relief granted in this Order, and (c) this Order shall constitute a final order within the meaning of 28 U.S.C. § 158(a).

16.    This Court shall retain jurisdiction with respect to the implementation, enforcement, amendment, or modification of this Order.

Dated: February 2, 2022
        New York, New York

/s/ **Lisa G. Beckerman**
THE HONORABLE LISA G. BECKERMAN
UNITED STATES BANKRUPTCY JUDGE

10

# Tab 42

668 B.R. 802
United States Bankruptcy Court, S.D. New York.

IN RE: INTERCEMENT BRASIL S.A.,
et al., Debtors in a Foreign Proceeding.

Case No. 24-12291 (MG)
|
Signed March 31, 2025

**Synopsis**
**Background:** Foreign representative in jointly administered Chapter 15 cases filed motion seeking recognition of Brazilian judicial restructuring proceeding as foreign main or nonmain proceeding. Creditors, an ad hoc group of holders of New York law-governed notes, objected.

**Holdings:** The Bankruptcy Court, Martin Glenn, Chief Judge, held that:

[1] center of main interests (COMI) for debtor-parent company was Brazil;

[2] COMI for debtor, a Brazilian operating company and cement production and sales corporation, was Brazil;

[3] COMI for debtor, a special purpose financing vehicle (SPV), was Brazil;

[4] COMI for debtor that had guaranteed debentures was Brazil;

[5] foreign representative satisfied Bankruptcy Code's requirement that recognition petition include certified copy of decision commencing foreign proceeding;

[6] foreign representative satisfied Code's requirement that petition include statement identifying foreign proceedings with respect to debtors; and

[7] Bankruptcy Court would grant discretionary relief by extending provisional relief.

Motion granted; objection overruled.

West Headnotes (24)

[1] **Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

Relevant time period to determine location of foreign debtor's center of main interests (COMI), in foreign main or nonmain proceeding analysis, is date on which Chapter 15 petition is filed. 11 U.S.C.A. §§ 1516(c), 1517.

[2] **Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

List of non-exclusive factors for determining debtor's center of main interests (COMI), in foreign main or nonmain proceeding analysis, include: (1) location of debtor's headquarters, (2) location of those who actually manage debtor, (3) location of debtor's primary assets, (4) location of majority of debtor's creditors or majority of creditors who would be affected by case, and (5) jurisdiction whose law would apply to most disputes; while these factors serve as helpful guide in determining debtor's COMI, factors are not exclusive, and none of the factors is required nor dispositive. 11 U.S.C.A. §§ 1516(c), 1517.

[3] **Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

While factors for determining debtor's center of main interests (COMI), in foreign main or nonmain proceeding analysis, serve as a helpful guide in determining a debtor's COMI, the factors are not exclusive, and none of the factors is required nor dispositive. 11 U.S.C.A. §§ 1516(c), 1517.

[4] **Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

In determining a debtor's center of main interests (COMI), in foreign main or nonmain proceeding analysis, courts examine the expectations of creditors and other interested parties, as a

3457

company's COMI must be ascertainable to third parties. 11 U.S.C.A. §§ 1516(c), 1517.

**[5]    Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

By examining factors in the public domain when determining a debtor's center of main interests (COMI), in foreign main or nonmain proceeding analysis, courts are readily able to determine whether a debtor's COMI is in fact regular and ascertainable and not easily subject to tactical removal. 11 U.S.C.A. §§ 1516(c), 1517.

**[6]    Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

In determining foreign main or nonmain proceeding status, creditor expectations of debtor's center of main interests (COMI) can be evaluated through examination of the public documents and information available to guide creditor understanding of the nature and risks of their investments. 11 U.S.C.A. §§ 1516(c), 1517.

**[7]    Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

Prepetition restructuring efforts may shift debtor's center of main interests (COMI), in foreign main or nonmain proceeding analysis, especially where debtor is an entity with limited operations such that restructuring activity constitutes debtor's primary business activity prior to filing of petition for recognition. 11 U.S.C.A. §§ 1516(c), 1517.

**[8]    Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

Relevant pre-filing restructuring efforts that may shift debtor's center of main interests (COMI), in foreign main or nonmain proceeding analysis, may include the negotiation or execution of a restructuring framework or support agreement, holding of meetings with creditors, or other operational or liquidation activities

or administrative functions. 11 U.S.C.A. §§ 1516(c), 1517.

**[9]    Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

In determining a debtor's center of main interests (COMI), in foreign main or nonmain proceeding analysis, courts may undertake a "holistic analysis" to consider whether debtor has manipulated COMI in bad faith prior to the filing of a Chapter 15 petition in the debtor's preferred locale. 11 U.S.C.A. §§ 1516(c), 1517.

**[10]    Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

Indicators of bad-faith efforts to shift debtor's center of main interests (COMI), for purposes of determining foreign main or nonmain proceeding status, may include insider exploitation, untoward manipulation, and overt thwarting of third party expectations. 11 U.S.C.A. §§ 1516(c), 1517.

**[11]    Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

Location of debtor's "establishment" in a country, as required for recognition of foreign proceeding in that country as foreign nonmain proceeding, should constitute a seat for local business activity for the debtor, which requires a showing of a local effect on the marketplace, more than mere incorporation and record-keeping and more than just the maintenance of property. 11 U.S.C.A. §§ 1502(2), 1502(5), 1517.

**[12]    Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

Discretionary relief that court may order upon recognition of foreign proceeding is exceedingly broad, since court may grant any appropriate relief that would further purposes of Chapter 15 and protect debtor's assets and interests of creditors, provided that interests of creditors

and other interested entities are sufficiently protected. 11 U.S.C.A. §§ 1521(a), 1522(a).

**[13]    Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

Brazilian judicial restructuring proceeding qualified as a "foreign proceeding," as required for recognition of foreign main proceeding under Chapter 15 in debtors' jointly administered cases. 11 U.S.C.A. §§ 101(23), 1502, 1517.

**[14]    Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

Center of main interests (COMI) for Chapter 15 debtor, the parent company of other debtors in jointly administered cases, was Brazil for purposes of foreign main proceeding analysis, where debtor's registered office was in Brazil, its directors, officers, and employees were all based in Brazil, its books and records were maintained in Brazil, and no evidence contradicted Bankruptcy Code's presumption that debtor's COMI was Brazil. 11 U.S.C.A. §§ 1516(c), 1517.

**[15]    Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

Center of main interests (COMI) for Chapter 15 debtor, a Brazilian operating company and cement production and sales corporation, was Brazil for purposes of foreign main proceeding analysis in jointly administered cases, where debtor had near-exclusive ties to Brazil, its registered office was located in Brazil, 99% of debtor's 1,745 employees were based in Brazil, where it represented the country's third-largest cement company, and no evidence undercuts the resultant statutory presumption that debtor's COMI was Brazil. 11 U.S.C.A. §§ 1516(c), 1517.

**[16]    Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

Center of main interests (COMI) for Chapter 15 debtor, a special purpose financing vehicle (SPV) with Brazil-based corporate parent, was Brazil for purposes of foreign main proceeding analysis in jointly administered cases, even though debtor maintained registered office in the Netherlands, contracted with almost exclusively Dutch contractors, and offered no services in Brazil, where applicable restructuring activities occurring as of petition date were in Brazil, debtor's primary business activity, namely, managing relationships with holders of New York law-governed notes issued by another debtor and repaying notes, was channeled through, and its success depended on, the success of the Brazilian restructuring proceeding and related creditor negotiations in Brazil, and debtor participated in the Brazilian proceedings, attending approximately six mediation sessions and commencing extrajudicial proceeding. 11 U.S.C.A. §§ 1516(c), 1517.

**[17]    Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

Where foreign debtor is a special purpose financing vehicle (SPV) with no operations other than managing relationships with creditors and paying off obligations on behalf of a larger corporate parent, the debtor's center of main interests (COMI), in foreign main or nonmain proceeding analysis, should be determined by the location of the corporate "nerve center." 11 U.S.C.A. §§ 1516(c), 1517.

**[18]    Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

Corporate entities are not precluded from having different center of main interests (COMI), for purposes of determining foreign main or nonmain proceeding status, in European and Chapter 15 proceedings, because a COMI finding under European Insolvency Regulation (EIR) is not the same as a COMI finding under Chapter 15 of the Bankruptcy Code. 11 U.S.C.A. §§ 1516(c), 1517.

**[19]    Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

Center of main interests (COMI) for Chapter 15 debtor with Brazil-based corporate parent, that had guaranteed debentures issued by other debtors, was Brazil for purposes of foreign main proceeding analysis in jointly administered cases, even though debtor was incorporated in Spain and its registered office was in Spain, where debtor's primary business activities, at time of commencement of restructuring activities in Brazil and Chapter 15 cases, predominantly occurred in Brazil, debtor participated in Brazilian mediation and was a debtor in the Brazilian proceedings, and its key creditors, including the debenture holders, participated in the Brazilian processes. 11 U.S.C.A. §§ 1516(c), 1517.

**[20]    Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

Petitioner was duly appointed by debtors in jointly administered Chapter 15 cases via corporate resolution to act as foreign representative of Brazilian judicial restructuring proceeding and commence the Chapter 15 cases, as required for recognition of foreign main proceeding. 11 U.S.C.A. §§ 101(24), 1517.

**[21]    Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

Foreign representative in jointly administered Chapter 15 cases satisfied Bankruptcy Code's requirement that recognition petition include certified copy of decision commencing foreign proceeding and appointing foreign representative, for recognition of Brazilian judicial restructuring proceeding as foreign main proceeding, by properly commencing Chapter 15 cases in accordance with applicable provisions of Code and filing original and certified translated copies of the petition in and the order by the Brazilian court, as well as corporate resolutions authorizing foreign representative to act on behalf of each debtor as a foreign representative.

11 U.S.C.A. §§ 1504, 1509(a), 1515(b), 1517(a)(3).

**[22]    Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

Foreign representative in jointly administered Chapter 15 cases satisfied Bankruptcy Code's requirement that recognition petition include statement identifying foreign proceedings with respect to debtors known to the foreign representative, as required for recognition of Brazilian judicial restructuring proceeding as foreign main proceeding, by filing declaration identifying all known foreign proceedings on behalf of the Chapter 15 debtors. 11 U.S.C.A. §§ 1515(c), 1517(a)(3).

**[23]    Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

Determination of whether interests of creditors and other interested entities, including Chapter 15 debtor, are sufficiently protected, as required for court to grant discretionary relief upon recognition of foreign proceeding, requires a balancing of respective parties' interests. 11 U.S.C.A. §§ 1521(a), 1522(a).

**[24]    Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

Upon recognition of Brazilian judicial restructuring proceeding as foreign main proceeding, Bankruptcy Court would grant discretionary relief by extending provisional relief to provide adequate protection to Chapter 15 debtors and their creditors by centralizing the orderly administration of debtors' assets in the United States; balance of the parties' interests weighed in favor of extending provisional relief, as the debtors represented that permitting creditor actions could threaten their ability as a going concern, and the parties previously agreed to extend provisional relief to mirror the relief extended by Brazilian court. 11 U.S.C.A. §§ 1521(a), 1522(a).

**Attorneys and Law Firms**

**\*806** WHITE & CASE LLP, Attorneys for Antonio Reinaldo Rabelo Filho, as Petitioner and Foreign Representative, 1221 Avenue of the Americas, New York, New York 10020-1095, By: John K. Cunningham, Esq., Thomas E. MacWright, Esq., Ricardo M. Pasianotto, Esq., Ashley R. Chase, Esq., Southeast Financial Center, 200 South Biscayne Blvd., Suite 4900, Miami, Florida 33131 By: Richard S. Kebrdle, Esq., Amanda Parra Criste, Esq., 111 South Wacker Drive, Suite 5100 Chicago, Illinois 60606 By: Jason N. Zakia, Esq.

CLEARY GOTTLIEB STEEN & HAMILTON LLP, Counsel to the Ad Hoc Group, One Liberty Plaza, New York, New York 10006, By: Richard J. Cooper, Esq., David H. Botter, Esq., Luke A. Barefoot, Esq., Thomas S. Kessler, Esq., David Z. Schwartz, Esq., Thomas Q. Lynch, Esq.

## MEMORANDUM OPINION AND ORDER RECOGNIZING FOREIGN MAIN PROCEEDINGS

MARTIN GLENN, CHIEF UNITED STATES BANKRUPTCY JUDGE

Antonio Reinaldo Rabelo Filho (the "Petitioner" or "Foreign Representative"), in **\*807** his capacity as the duly authorized foreign representative of InterCement Brasil S.A. ("ICB"), InterCement Participações S.A ("ICP"), InterCement Financial Operations B.V. ("IC Financial" or "ICBV"), and InterCement Trading e Inversiones S.A. ("ITI" and, together with ICB, ICP, and IC Financial, the "Debtors" or "Chapter 15 Debtors"), seeks in the above-captioned cases (the "Chapter 15 Cases") recognition of a Brazilian *recuperação judicial* ("RJ") proceeding (the "Brazilian RJ Proceeding") commenced on December 3, 2024 as a foreign main or nonmain proceeding pursuant to section 1517 of the Bankruptcy Code. *See Chapter 15 Petition for Recognition of Foreign Proceeding* (the "Petition", ECF Doc. # 1) and *Petitioner's Declaration and Verified Petition for Recognition of the Brazilian Proceeding and Motion for Order Granting Related Relief Pursuant to 11 U.S.C. §§ 105(a), 1515, 1517, 1520, and 1521* ("Motion," ECF Doc. # 2). The Petitioner seeks entry of an order (the "Proposed Order," ECF Doc. # 2-1) that:

a) grants the Petition in the Chapter 15 Cases and recognizes the Brazilian RJ Proceeding as the "foreign main proceeding" for each of the Chapter 15 Debtors pursuant to section 1517 of the Bankruptcy Code, or in the alternative, recognizes the Brazilian RJ Proceeding as a "foreign nonmain proceeding" and grants appropriate relief;

b) finds that the Petitioner is the duly appointed "foreign representative" of each of the Chapter 15 Debtors within the meaning of section 101(24) of the Bankruptcy Code and is authorized to act on behalf of each Chapter 15 Debtor; and

c) grants such other and further relief as the Court deems just and proper.

(Motion ¶ 42.)

The Motion is supported by the Declarations of Ana Elisa Laquimia (ECF Doc. # 4) and Guillermo Ruiz Medrano (the "Medrano Declaration," ECF Doc. # 46) pursuant to 28 U.S.C. § 1746.

On January 15, 2025, the Petitioner filed a *Brief on COMI Determination as of the December 9, 2024 Filing Date for Chapter 15 Debtors IC Financial and ITI* ("COMI Brief," ECF Doc. # 30), arguing that recent developments, including the Debtors' pre-Petition restructuring activities, support a determination that the center of main interests of two Chapter 15 Debtors, as of the filing of the Chapter 15 Cases, is Brazil. The COMI Brief is supported by the declaration of Dr. Matthias Haentjens pursuant to 28 U.S.C. § 1746 (ECF Doc. # 32).

On January 31, 2025, an *ad hoc* group of holders (the "Ad Hoc Group") of New York law-governed notes (the "NY Notes"), filed an *(i) Objection to the Petitioner's Verified Petition and (ii) Opposition to the Petitioner's Brief of COMI Determination as of the December 9, 2024 Filing Date for Chapter 15 Debtors IC Financial and ITI* (the "Objection," ECF Doc. # 39). The Objection is supported by the declaration of Thomas Q. Lynch (ECF Doc. # 40). The Objection argues that the COMI of ICBV is the Netherlands, and the COMI of ITI is Spain, notwithstanding the Debtors' pre-Petition restructuring activities in Brazil.[1]

On February 7, 2025, the Foreign Representative filed the *Petitioner's Omnibus Reply on COMI Determination as of the*

*December 9, 2024 Filing Date for Chapter* **\*808** *15 Debtors IC Financial and ITI* (the "Reply," ECF Doc. # 45).

Despite that two of the foreign debtors maintain their registered offices in Spain and the Netherlands, respectively, rather than in Brazil, for the reasons explained below, the Court concludes that all of the foreign debtors, as of the date of the filing of the Brazilian RJ Proceeding, have their COMI in Brazil. Therefore, the Court **GRANTS** the relief sought in the Motion, **RECOGNIZES** the Brazilian RJ Proceeding as a Foreign Main Proceeding, and **OVERRULES** the Ad Hoc Group's Objection.

## I. BACKGROUND

### A. History and Corporate Structure of the Debtors

The InterCement Group (the "InterCement Group" or "InterCement") is a large cement producer in Brazil. (*In re InterCement Brasil S.A.*, Case No. 24-11226 (MG) (Bankr. S.D.N.Y. September 20, 2024) (the "Prior Chapter 15 Cases"), *Declaration of Antonio Reinaldo Rabelo Filho, as Petitioner and Foreign Representative for the Chapter 15 Debtors* (the "Rabelo Declaration," ECF Doc. # 78) ¶¶ 38–39.) It is comprised of a Brazilian holding company ("Mover") and a collection of subsidiaries within and outside of Brazil. A simplified organizational chart documenting the various entities comprising the InterCement Group is set forth below:



(Motion ¶ 9.)

Each of the subsidiaries plays a specific role within the group.

### 1. The Brazilian Entities

Mover, the ultimate parent holding company, engages in capitalization and financing activities for the corporate group, and **\*809** is responsible for business management, including providing the group with "strategic direction on key business matters"; it is incorporated and headquartered in Brazil. (*Id.*)

InterCement Participações S.A, the holding company responsible for "concentrating all of Mover's investments in the cement sector," is also incorporated in Brazil, with its registered office in São Paulo. (*Id.*) All of ICP's directors, officers, and employees are located in Brazil. (Rabelo Declaration ¶ 38, JX-284[2].) ICP functions as the "head" of the InterCement Group, and its board of directors and executive officers make "the main strategic, financial, and operational decisions" for the company as a whole out if its headquarters in Brazil; for example, ICP decides whether the InterCement Group should "market and sell assets, incur or restructure indebtedness, grant collateral, initiate or defend against material lawsuits and commence insolvency proceedings." (Rabelo Declaration ¶ 4.) The Debtors contend that ICP "controls each of the other members of the InterCement Group," citing ICP's ability to "directly or indirectly ... appoint or remove the directors of each of its direct and indirect subsidiaries, including the other Chapter 15 Debtors." (*Id.* ¶ 38.)

InterCement Brasil S.A. is the InterCement Group's primary operating company and Brazil's third-largest cement company. (*Id.* ¶ 5.) ICB is "engaged in all stages of cement production and sales" in Brazil. (*Id.*) The company is incorporated in Brazil and has its registered office in São Paulo. (*Id.*) It has 1,745 employees, 99% of whom are located in Brazil. (JX-284.)

### 2. The Netherlands Entity

InterCement Financial Operations B.V. is a Netherlands-incorporated special purpose financing vehicle created to provide the InterCement Group with "access to the international capital markets to support the InterCement Group's funding needs." (Rabelo Declaration ¶ 6.) ICBV's registered office is in Amsterdam. (*Id.*) It is owned by InterCement Portugal ("IC Portugal"), which is in turn owned by ICP. (*Id.*) As the issuer of the NY Notes, ICBV has two limited functions: managing relationships with the holders of the NY Notes, and paying on the NY Notes. (*Id.* ¶ 41.)

3462

ICBV's primary assets are intercompany claims against ITI and ICP (incorporated in Spain and Brazil, respectively), and its only other asset is $2 million in cash. (*Id.* ¶ 52.) ICBV's intercompany loans are denominated in USD or Euros, and its largest asset, its intercompany claim against ITI, is denominated in Euros and worth over a billion dollars. (*Deposition Designations of Matthijs Paul Adrian Stoop* ("Stoop Dep."), Prior Chapter 15 Cases, ECF Doc. # 81, at 65:4-10, 66:6-17; *Transcript Regarding Hearing Held on 11/20/24* ("Trial Tr. Day 1"), Prior Chapter 15 Cases, ECF Doc. # 93, at 140:4-6 ("Q: So then necessarily, 90 percent of IC Financial's intercompany receivables are located in Spain, right? A: Right.").) As for ICBV's cash, it is kept in six bank accounts, including one Dutch account. Three of the accounts are denominated in Euros, two in USD, and one in Brazilian *reais.* (Stoop Dep. 32:22–33:7.) As of July 2024, the majority of ICBV's cash was located in **\*810** an account in the Bahamas and denominated in USD. (JX-149; Trial Tr. Day 1 at 141:9–19.). ICBV's Brazilian bank accounts have been inactive since 2022 and show a balance of zero *reais* as of October 2024. (JX-272, - 277, -182 at IC_FR_00003838; Trial Tr. Day 1 at 143:6-144:21.)

As for ICBV's liabilities, all holders of the USD-denominated NY Notes, ICBV's largest debt at $750 million, are located outside of both Brazil and the Netherlands (Rabelo Declaration ¶ 53), and its second-largest debt, worth $436.27 million, stems from intercompany loans owed to ICP (*id.* ¶ 54). Apart from the intercompany claims, ICBV has no creditors in Brazil. (JX-232.)

ICBV's key operations involving the NY Notes are governed by two documents: the Offering Memorandum (the "OM," JX-1), a 2014 document which advertised the sale of the NY Notes, and the indenture agreement governing the NY Notes (the "Indenture," JX-209, Prior Chapter 15 Cases, ECF Doc. # 2-5). The Offering Memorandum, which displays ICBV's country of incorporation on the first page, describes the InterCement Group on the first page of its Executive Summary as among the largest "international cement producers ... with operations in South America ... Europe ... and Africa," and as a "market leader[ ] in Argentina, Portugal, Mozambique and Cape Verde, the second largest cement producer in Brazil, and a regional leader in South Africa." (JX-1 at IC_FR_00002669, IC_FR_00002680.) At the same time, the Offering Memorandum makes clear that, at the time, InterCement's largest operations and its controlling shareholder were located or based in Brazil. (*Id.* at IC_FR_00002709 ("Brazilian operations ... account

for the most significant portion of our overall revenues and expenses"), IC_FR_00002728 (describing InterCement as a "Brazilian company with a significant portion of our operations in Brazil").)[3] The OM provides:

> The issuer's [ICBV's] principal business activity is to act as a financing vehicle for our activities and operations. The issuer has no substantial assets (other than in connection with transactions entered into with [Mover] and its affiliates) and its only sources of cash flow are from its financing activities and capital contributions made by us[4] and our other subsidiaries. Accordingly, the ability of the issuer to pay principal, interest and other amounts due on the notes and other indebtedness will depend upon our financial condition and results of operations.

(JX-1 at IC_FR_00002712.)

The OM warns creditors that, in the event of a bankruptcy, the guarantors of the NY notes—ICP and ICB, both Brazilian entities—"may become subject to bankruptcy proceedings in Brazil," which may be "less favorable to creditors" than proceedings in other jurisdictions. (*Id.* at IC_FR_00002714.) However, any insolvency involving the ICBV would likely be affected by, if not governed by, Dutch law: "Any insolvency proceedings with respect to the issuer in the EEA [European Economic Area] (excluding Denmark) would **\*811** most likely be based on and governed by the insolvency laws of the Netherlands. In addition, there can be no assurance as to how the insolvency laws of the Netherlands would be applied in the event that the issuer is subject to one or more insolvency proceedings outside the Netherlands." (*Id.*)

The Indenture Agreement directs investors to send related correspondence to a Brazilian address, and provides that ICBV can be substituted as issuer with either ICP or ICB without the consent of the noteholders. (Rabelo Declaration ¶¶ 61–62; Indenture at 62, 90.) ICBV files taxes solely in the Netherlands. (Stoop Dep. 59:2–13.) ICBV's annual reports (with financial results denominated in euros) are filed with the Dutch Chamber of Commerce and are publicly available. (Stoop Dep. 28:14–25, 32:10–18.) ICBV's original books and records are kept by its vendor Vistra in the Netherlands, with copies separately maintained in Brazil, pursuant to Dutch law. (Rabelo Declaration ¶ 51; Stoop Dep. 25:7–11.)

ICBV has six directors, three of whom are Dutch and reside in the Netherlands and three of whom are Brazilian and reside in Brazil. (Rabelo Declaration ¶ 46.) Any action taken by ICBV's board requires the approval of at least one Dutch

3463

director and at least one Brazilian director. (*Id.*; Stoop Dep. 23:13–25:6.) This means that, without approval from at least one Dutch (or Brazilian) director, the board cannot act. (Trial Tr. Day 1122:8–20.) Because ICBV's Dutch directors are not employees of the InterCement Group, the Dutch directors rely on the Brazilian directors (and other InterCement employees) to provide them with information regarding the corporate group's operations at large. (Rabelo Declaration ¶ 47.)[5] ICBV's board may take into account advice from the Brazilian component of the InterCement Group when determining what course of action to take, but ultimately acts independently and maintains independent judgment in executing its fiduciary duties.[6] In fact, the Foreign Representative was unable to think of a time when the shareholders of ITI and ICBV refused to ratify any action of the companies' respective boards. (Trial Tr. Day 1127:14–19.) Vistra Employment Services, B.V., a Dutch corporation, has a permanent seat on ICBV. (*See* Stoop Dep. 11:7–23.) Over the three years prior to the Petition Date, formal board meetings have been held virtually, with the Dutch directors calling in from the Netherlands and the Brazilian directors from Brazil, but all in-person meetings typically took place in the Netherlands, whether formal or informal. (Rabelo Declaration ¶ 48; Stoop Dep. 29:2–31:16; Trial Tr. Day 1122:3–7.)

ICBV's operations are, in significant part, run out of Brazil: ICP's agents hold calls and meetings with the holders of the NY Notes, prepare investor presentations, audit quarterly financial statements (prepared **\*812** on a consolidated basis for ICP and all its subsidiaries), make market announcements, and run quarterly public investor calls out of Brazil. (Rabelo Declaration ¶¶ 42, 59.) ICP's board of directors and officers makes "material strategic decisions for all entities" within the InterCement Group from the company's Brazilian headquarters, and, according to the Foreign Representative, this encompasses the decision as to "when and how to pay the scheduled interest payments on the NY Notes" and whether to transfer money from other entities to allow ICBV to make such payments.[7] (*Id.* ¶ 43.) However, while ICP determines how to extract the necessary funds from the InterCement Group's operations and provide those funds to ICBV for the purpose of paying on the NY Notes, it is ultimately the ICBV board which decides whether and when to make payments on the Notes.[8]

ICBV has no employees but engages with a number of Dutch contractors in order to run its business. (JX-284; Rabelo Declaration ¶ 44.) ICBV does not have an office of its own, but rents shared office space from Vistra, which provides a number of additional services, including recordkeeping, mail services, tax return preparation, and payment of daily expenses. (Rabelo Declaration ¶ 40; Trial Tr. Day 1115:3–116:4.). Vistra also provides draft annual reports for ICBV, which are prepared by individuals in the Netherlands working in "close connection and interaction with the financial team in Brazil." (Stoop Dep. 27:18–28:2.) ICBV pays Vistra for the services it provides. (Trial Tr. Day 1121:4–14.) Vistra does not any provide services for the InterCement Group in Brazil. (*Id.* 121:18–20.) PricewaterhouseCoopers Nederland prepares the first draft of ICBV's tax returns and Vistra prepares the first drafts of its accounts, but ICP's employees in Brazil review and sign off on these documents before they are finalized. (Rabelo Declaration ¶ 44.) However, ahead of the November 2024 evidentiary hearing, one of ICBV's Dutch board members testified, unchallenged, that it is the responsibility of ICBV's 50% Dutch board of directors to ultimately approve the annual report. (Stoop Dep. 28:3–7.) ICBV's annual financial reports are audited by Ernst & Young Nederland, but ICBV does not have its own audit committee; rather, it shares an Audit Committee with the rest of the InterCement Group. (Rabelo Declaration ¶ 44; JX-182 at IC_FR_00003824.)

The NY Notes ICBV manages are governed by New York law, and ICBV, as a Netherlands-incorporated entity, is subject to Dutch law. (JX-1 at IC_FR_00002837, IC_FR_00002861.) However, as the operations generating cash flow in the InterCement Group, which generate funds used to pay the NY Notes, take place in Brazil, certain disputes likely to affect ICBV **\*813** would largely be governed by Brazilian law. (Rabelo Declaration ¶ 55; *see also* JX-1 at IC_FR_00002694-IC_FR_00002698, IC_FR_00002703-IC_FR_00002714 (citing risk factors, most of which refer to Brazil.)) However, with the exception of intercompany agreements, ICBV is not a party to any third-party agreement governed by Brazilian law. (Trial Tr. Day 1137:21–138:5).

3. The Spanish Sub-Holding Company

InterCement Trading e Inversiones S.A. is a Spanish sub-holding company wholly owned by IC Portugal. (Rabelo Declaration ¶ 7.) ITI is the controlling shareholder of ICB and of ITI Argentina ("ITI ARG") (in turn a sub-holding company which is the controlling shareholder of the Argentine operating company Loma Negra). (*Id.*) ITI and ITI ARG both support InterCement's international financing efforts,

including by guaranteeing debentures (the "Debentures") issued by ICB and ICP in the Brazilian capital markets. (*Id.*) ITI also issues inter-company loans denominated in euros, US dollars, and Brazilian *reais*, most of which are held by Brazilian entities ICP and ICB. (JX-250.) ITI represented to a Spanish court that its corporate purpose consists, in part, of:

> [T]he acquisition, holding and enjoyment, general administration, sale and encumbrance of Spanish securities, fixed or variable income, through the corresponding organization of personal and material resources ... as well as the provision of technical management, auditing, consulting and technical assistance services, as well as technical know-how and implementation of initiatives in the cement sector and its derivative products or raw materials destined for construction companies within and outside the [InterCement G]roup.

(JX-215 at 2.)[9]

ITI is incorporated in Spain, and its registered office is in Bilbao, where it rents a one-room office. (Rabelo Declaration ¶ 68.) Its bylaws are in Spanish and are governed by Spanish law. (JX-165.) ITI has a single employee who is located in Spain, one Spanish director residing in Spain, and two Brazilian directors residing in Brazil (both of whom are ICP employees); it has no officers. (Rabelo Declaration ¶ 69, JX-284.) In recent years, many of ITI's board decisions have been made by written consent, which the two Brazilian directors executed from Brazil and the Spanish director executed from Spain. (Rabelo Declaration ¶ 69.) Most board meetings took place in Spain, as required by Spanish law, with the remainder taking place over videoconference with each director participating from his domicile. (*Id.*) The Foreign Representative testified that while ITI's board of directors "consider[s], take[s] into account, [and has] as part of the total mix of information" the "guidance, information, and recommendation[s] from the Brazilian employees [and] Brazilian directors" of the InterCement Group when making decisions, the ITI board does not take instruction from ICP or any other entity's agents, and makes all final decisions regarding actions carried out by ITI. (Trial Tr. Day 1100:12–101:1, 113:2–4.)

ITI's sole employee "organizes the administrative affairs for ITI in Spain, such as paying the rent and utilities ... preparing **\*814** draft meeting minutes and preparing drafts of ITI's accounts, subject to approval by the ... teams in Brazil," and she "takes direction from ICP's chief financial officer ... in Brazil." (Rabelo Declaration ¶ 69.)) As with ICBV, employees of ICP provide legal, finance, treasury, tax, accounting, compliance, and investor relations services to ITI. (*Id.* ¶ 70.)

ITI's books and records are kept in Spain, with copies separately maintained in Brazil; all entries in the books and records are first approved by an ICP employee. (*Id.*) ITI contracts with a number of Spanish counterparties as needed to support the company's operations, and has retained various Spanish professionals, including legal and tax advisors, auditors, and consultants to provide services in Spain. (Trial Tr. Day 197:10–13; 104:25–105:6.)

ITI's assets consist of its equity interests in ICB, 100% of the shares of ITI ARG, and cash in various bank accounts. (Rabelo Declaration ¶ 71.) Most of ITI's cash is held in bank accounts in Spain. (*Id.*; JX-252, -253.) ITI has a mix of Brazilian and non-Brazilian creditors; the holders of the Debentures (the "Debenture Holders"), which ITI guarantees but is not directly a party to, are mostly based in Brazil. (Rabelo Declaration ¶ 72.) ITI has no other Brazilian creditors; its other creditors are entities within the InterCement Group to which it has made intercompany loans. (JX-232, JX-250.)

While the Debentures are governed by Brazilian law, ITI's intercompany loans are governed by Spanish, Dutch and Brazilian law, and ITI itself is subject to certain Spanish laws as a Spain-incorporated company. (Rabelo Declaration ¶¶ 75–76.) Other than the holders of the Debentures, all of ITI's creditors are located outside of Brazil. (JX-232.)

### B. Prior Chapter 15 Cases

On July 15, 2024 (the "Prior Petition Date"), the Chapter 15 Debtors filed a petition (the "Prior Petition") seeking recognition under chapter 15 of the Bankruptcy Code, initiating the Prior Chapter 15 Cases (*In re InterCement Brasil S.A.*, Case No. 24-11226 (MG) (Bankr. S.D.N.Y. July 18, 2024)). Immediately prior to the filing of the Prior Chapter 15 Cases, a portion of the InterCement Group[10] (the "Brazilian Applicants") had commenced a court-supervised mediation proceeding in in São Paulo (the "Brazilian Mediation") with a number of creditors. (Motion ¶ 1). The 1st Bankruptcy and Restructuring Court of São Paulo (the "Brazilian Bankruptcy Court") granted a 60-day injunction barring creditors from pursuing the Brazilian Applicants' assets. (*Id.*) Three days later, on July 18, 2024, this Court granted a provisional

3465

stay barring potential creditor actions against the Chapter 15 Debtors. (*Id.*)

The Brazilian Applicants were able to reach an agreement in principle with the Debenture Holders (who comprised a majority of their largest creditor constituency) regarding the terms of a restructuring plan (the "EJ Plan"). (*Id.* ¶ 2.) On September 16, 2024, a subset of the Brazilian Applicants (the "EJ Debtors"[11]) filed a petition with the Brazilian Bankruptcy Court **\*815** to convert the Brazilian Mediation into a consensual *recuperação extrajudicial* proceeding (the "Brazilian EJ Proceeding"). (*Id.*) The Brazilian Bankruptcy Court promptly entered an order accepting the Brazilian EJ Proceeding, and granted an additional 120-day stay to provide the EJ Debtors with time to seek support for the EJ Plan. (*Id.*) This Court also granted a further provisional stay on creditor actions against the Chapter 15 Debtors in the United States pending its consideration of the relief requested in the Prior Petition. (*Id.*)

In the Prior Petition, the Foreign Representative sought recognition of the Brazilian EJ Proceeding as a foreign main or nonmain proceeding.[12] The Ad Hoc Group objected to the Prior Petition. A two-day evidentiary hearing was held on November 20 and 21, 2024 to consider factual issues related to each Chapter 15 Debtor's COMI and establishments as of the Prior Petition Date. (*Id.* ¶ 5.) The Court did not rule on the requested relief.

**C. Commencement of Proceedings in the Netherlands and Spain**

1. The Netherlands

On July 9, 2024, a few days before the filing of the Prior Petition, an NY Noteholder filed a petition in the Amsterdam Court (Private Law Department) (the "Dutch Court") seeking the appointment of a restructuring expert with the authority to submit a restructuring plan for ICBV pursuant to a provision of the *Wet homologatie onderhands akkoord* ("WHOA"). (Prior Chapter 15 Cases, *Declaration of Robert van Galen in Support of the Ad Hoc Group's Objection to Verified Petition and Verified Supplement* (the "Van Galen Declaration," ECF Doc. # 79), ¶ 10.) In response, ICBV filed a Commencement Statement on July 17, 2024 (JX-282 at Exhibit 21), requesting that the Dutch Court declare a four-month cooling-off period under a different provision of the WHOA and appoint an observer pursuant to the WHOA rather than a restructuring

expert. (Motion ¶ 30.) In its Commencement Statement, ICBV identified the Netherlands as ICBV's "centre of main interests" on the basis of its "corporate seat" being located in the Netherlands. (Objection ¶ 8; Trial Tr. Day 124:11–20).

By filing the Commencement Statement, ICBV initiated a voluntary public restructuring procedure (the "Dutch Proceeding"). In voluntary proceedings in the Netherlands, Dutch courts remain largely uninvolved with the restructuring, and debtors in public proceedings can secure a pan-European stay on creditor actions if the proceeding is recognized pursuant to the European Insolvency Regulation ("EIR") (Trial Tr. 20:11–19.) However, public proceedings only fall within the scope of the EIR if the debtor's COMI is located within the European Union, according to the EIR's definition of COMI. **\*816** (Van Galen Declaration ¶ 23; *see also* Trial Tr. Day 121:2–7.)

On July 31, 2024, the Dutch Court entered an order (the "Dutch Order") accepting ICBV's voluntary WHOA filing and rejecting the NY Noteholder's request for the appointment of an expert. (Motion ¶ 30.) Instead, as requested by ICBV, the Dutch Court appointed an observer (the "Dutch Observer") pursuant to Section 380 of WHOA to, *inter alia*, oversee the formation of a restructuring plan for ICBV (*Id.*; JX-282 at Exhibit 19). In the Dutch Order, the Dutch Court found that ICBV's COMI is "situated in the Netherlands." (JX282 at Exhibit 5, Section 5.2.)

On November 1, 2024, a member of the Ad Hoc Group filed a petition in the Dutch Court to end the cooling-off period imposed by the Dutch Court, along with a petition for bankruptcy on behalf of ICBV. (Rabelo Declaration ¶ 27.) On December 5, 2024, the Dutch Court denied the request to terminate the cooling-off period and permitted the Dutch Proceeding to continue. (Exhibit F to Motion.) In doing so, the Dutch Court reiterated its earlier finding that ICBV's COMI is the Netherlands, a finding consistent with ICBV's own repeated representations in the Dutch Proceeding. (*Id.* at 8.)

The cooling-off period in the Dutch Proceeding expired on March 1, 2025. (ECF Doc. # 56 at ¶ 7.) The Dutch Court held a hearing on March 14, 2025 to consider the continued necessity of the appointment of the Dutch Observer, and subsequently revoked the appointment of the Dutch Observer on March 21, 2025. (*See* ECF Doc. # 61 at ¶ 1.)

2. Spain

On July 16, 2024, ITI and ITI ARG filed a notice before the Commercial Court No. 2 of Bilbao, Spain (the "Spanish Court") communicating the initiation of creditor negotiations and seeking an initial pre-insolvency protection period of three months (the "Spanish Proceeding"). (Rabelo Declaration ¶¶ 28-29.) The Spanish Court accepted the notice and imposed the requested stay on July 24, 2024. (*Id.* ¶ 29.) The Spanish Court extended the stay for an additional three months on October 15, 2024. (Motion ¶ 30.)

Subsequently, ITI and ITI ARG filed a motion seeking recognition of the Brazilian RJ Proceeding; a separate commercial court in Bilbao granted the motion on January 17, 2025 (the "Spanish Recognition Order"). (*See* ECF Doc. # 56 at ¶ 9.) Members of the Ad Hoc Group have filed a notice of appeal of the Spanish Recognition Order, which remains pending at this time. (*Id.*)

### D. Liquidation Efforts

In Brazil, the success of the Brazilian EJ Proceeding hinged on the proposed sale of all of the EJ Debtors' business. (Motion ¶ 2.) Accordingly, a number of restructuring processes occurred before and during the pendency of the Brazilian EJ Proceeding, beginning with the Brazilian Mediation, and thereafter including the filing of the EJ Plan and a marketing and sales process whereby the InterCement Group provided confidential information to creditors and the leading bidder, Companhia Siderúrgica Nacional ("CSN"). (*Id.*).

Ultimately, after months of negotiations, the EJ Debtors concluded that they would be unable to execute a sale agreement or obtain the requisite creditor support for the EJ Plan prior to the expiration of the deadline required by the Brazilian Bankruptcy Law. (Motion ¶ 3.) Accordingly, on **\*817** December 3, 2024, the Chapter 15 Debtors and certain of their affiliates (collectively, the "RJ Debtors"[13]) commenced the Brazilian RJ Proceeding and obtained a further stay from the Brazilian Bankruptcy Court barring creditor actions. (*Id.*) Because the Brazilian RJ Proceeding added new debtors, it is considered under Brazilian law a distinct insolvency proceeding from the Brazilian EJ Proceeding, rather than a continuation or conversion thereof. (*Id.*)

### E. Chapter 15 Petition and Debtors

On December 9, 2024 (the "New Petition Date"), the Petitioner commenced the Chapter 15 Cases, seeking recognition of the Brazilian RJ Proceeding as a foreign main proceeding (or, in the alternative, a foreign nonmain proceeding) for each of the Chapter 15 Debtors. (Motion ¶ 4). The identities of the Chapter 15 Debtors are identical to the debtors in the Prior Chapter 15 Cases. (*Id.*)

## II. LEGAL STANDARD

### A. Section 1517(a): Foreign Proceeding Recognition

Section 1517(a) of the Bankruptcy Code establishes three requirements for the recognition of a foreign proceeding under chapter 15. In order to recognize the foreign proceeding, a court must conclude that:

(1) The foreign proceeding constitutes a foreign proceeding (either main or nonmain) as are defined under section 1502;

(2) The foreign representative applying for recognition is a person or body; and

(3) the petition meets the requirements of section 1515. 11 U.S.C. § 1517(a).

Recognition of the foreign proceeding is statutorily mandated if the three requirements of section 1517(a) are met and no exception is applicable. *See In re Millard*, 501 B.R. 644, 651 (Bankr. S.D.N.Y. 2013).

1. 1517(a)(1): Foreign Main Proceeding Recognition

Section 1517(a) distinguishes between "foreign main" and "foreign nonmain" proceedings. Section 1517(b) establishes conditions for recognition of each. In relevant part, section 1517(b)(1) states that a foreign proceeding shall be recognized "as a foreign main proceeding if it is pending in the country where the debtor has the center of its main interests." 11 U.S.C. § 1517(b)(1). Section 1502(4) uses the same language to define "foreign main proceeding."

*a. "Foreign Proceeding"*

Section 101(23) defines a "foreign proceeding" as:

[A] collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

11 U.S.C. § 101(23).

Based on this definition, courts have held that a "foreign proceeding" requires:

(i) [the existence of] a proceeding;

(ii) that is either judicial or administrative;

(iii) that is collective in nature;

(iv) that is in a foreign country;

(v) that is authorized or conducted under a law related to insolvency or the adjustment of debts;

**\*818** (vi) in which the debtor's assets and affairs are subject to the control or supervision of a foreign court; and

(vii) which proceeding is for the purpose of reorganization or liquidation.

*See Armada (Singapore) Pte Ltd. v. Shah* (*In re Ashapura Minechem Ltd.*), 480 B.R. 129, 136 (S.D.N.Y. 2012) (*citing In re Betcorp Ltd.*, 400 B.R. 266, 277 (Bankr. D. Nev. 2009)); *see also In re Overnight & Control Com'n of Avánzit, S.A.*, 385 B.R. 525, 532–36 (Bankr. S.D.N.Y 2008) (discussing factors).

### b. "Center of Main Interests"

**[1]** The term "center of [debtor's] main interests" ("COMI") is not defined by the Bankruptcy Code. However, section 1516(c) provides that, in the absence of an objection or evidence to the contrary, a debtor's registered office or habitual residence "is presumed to be the center of the debtor's main interests." 11 U.S.C. § 1516(c); *see also In re Olinda Star I*, 614 B.R. 28, 41 (Bankr. S.D.N.Y. 2020); *In re Ocean Rig UDW Inc.*, 570 B.R. 687, 705 (Bankr. S.D.N.Y. 2017); *In re ABC Learning Centres Ltd.*, 445 B.R. 318, 333 (Bankr. D. Del. 2010), *aff'd*, 728 F.3d 301 (3d Cir. 2013). The relevant time period to determine the location of the debtor's COMI is the date on which the chapter 15 petition is filed. *See Morning*

*Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 137 (2d Cir. 2013) (hereinafter "*Fairfield Sentry*").

**[2]** **[3]** In assessing whether the registered office presumption has been overcome, courts in this District have applied a list of non-exclusive factors for determining the COMI. Those factors include: (i) the location of the debtor's headquarters; (ii) the location of those who actually manage the debtor; (iii) the location of the debtor's primary assets; (iv) the location of the majority of the debtor's creditors or a majority of the creditors who would be affected by the case; and (v) the jurisdiction whose law would apply to most disputes. *Fairfield Sentry*, 714 F.3d at 137 (*citing In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006)). While these factors serve as a "helpful guide" in determining a debtor's COMI, the factors are not exclusive, and none of the factors is required nor dispositive. *Fairfield Sentry*, 714 F.3d at 137 (explaining that "consideration of these specific factors is neither required nor dispositive" and warning against mechanical application).

**[4]** **[5]** **[6]** Additionally, in determining a debtor's COMI, the Second Circuit and this Court have examined the expectations of creditors and other interested parties, as a company's COMI must be "ascertainable to third parties." *See Fairfield Sentry*, 714 F.3d at 136–38; *In re Millennium Global Emerging Credit Master Fund Ltd.*, 474 B.R. 88, 93 (S.D.N.Y. 2012). As the Second Circuit has explained, by examining factors "in the public domain," courts are readily able a debtor's COMI is in fact "regular and ascertainable [and] not easily subject to tactical removal." *See Fairfield Sentry*, 714 F.3d at 136–37. "Creditor expectations can be evaluated through examination of the public documents and information available to guide creditor understanding of the nature and risks of their investments." *In re Oi Brasil Holdings Cooperatief U.A.*, 578 B.R. 169, 228 (Bankr. S.D.N.Y. 2017). In practice, the evaluation of creditor expectations has focused on reviewing disclosures in offering memoranda and indentures. *See id.* at 228–32 (reviewing offering memorandum to establish noteholder expectations as **\*819** part of a COMI analysis); *In re OAS S.A.*, 533 B.R. 83,102–03 (Bankr. S.D.N.Y. 2015) (same); *Millennium Glob.*, 474 B.R. at 93–94 (same); *In re Suntech Power Holdings Co., Ltd.*, 520 B.R. 399, 418 (Bankr. S.D.N.Y. 2014) (considering terms of indenture agreement to establish creditor expectations regarding likely location of a restructuring as part of a COMI analysis).

**[7]**   As noted, the Second Circuit has also clarified that the determination of a debtor's COMI should be based on the facts available at the time the Chapter 15 petition is filed. *Fairfield Sentry*, 714 F.3d at 138. The Court explained that "the factors that a court may consider in this analysis are not limited and may include the debtor's liquidation activities." *Id.* at 137–38. *See also In re Modern Land (China) Co., Ltd.,* 641 B.R. 768, 783 (Bankr. S.D.N.Y. 2022) (finding that a Cayman court's supervision of a debtor's Cayman scheme of arrangement proceeding established the Cayman Islands as the debtor's COMI—although the debtor was a holding company of entities involved with real estate investing in China and the United States—when other factors putting creditors on notice were considered). Pre-filing restructuring efforts may shift a debtor's COMI, especially where a debtor is an entity with limited operations such that restructuring activity constitutes the debtor's "primary business activity" prior to the filing of a petition for recognition. *Modern Land,* 641 B.R. at 789–90.

**[8]    [9]    [10]**    Relevant pre-filing restructuring efforts may include the negotiation or execution of a restructuring framework or support agreement, holding of meetings with creditors, or other operational or liquidation activities or administrative functions. *Oi Brasil*, 578 B.R. at 222 (citing *In re Creative Fin.*, 543 B.R. 498, 517 (Bankr. S.D.N.Y. 2016)); *see, e.g.*, *Modern Land*, 641 B.R. at 778–81, 789–90. However, courts may also undertake a "holistic analysis" to consider whether a debtor has manipulated COMI in bad faith prior to the filing of a chapter 15 petition in the debtor's preferred locale. *Ocean Rig*, 570 B.R. at 706–07. Indicators of bad-faith "COMI-shifting" may include "insider exploitation, untoward manipulation, [and] overt thwarting of third party expectations." *Fairfield Sentry*, 440 B.R. at 66.

### 2. 1502(5): Foreign Non-Main Proceeding

**[11]**   A foreign nonmain proceeding is defined as a "foreign proceeding, other than a foreign main proceeding, pending in a country where the debtor has an establishment." 11 U.S.C. § 1502(5). An "establishment" is "any place of operations where the debtor carries out a nontransitory economic activity." 11 U.S.C. § 1502(2). The location should:

> constitute a 'seat for local business activity' for the debtor. The terms 'operations' and 'economic activity' require a showing of a local effect on the marketplace, more than

mere incorporation and record-keeping and more than just the maintenance of property.

*Creative Fin.*, 543 B.R. at 520.

Recognition as a foreign nonmain proceeding requires "a showing of a local effect on the marketplace, more than mere incorporation and record-keeping and more than just the maintenance of property." *Id.*

### 3. 1517(a)(2): Foreign Representative Recognition

The term "foreign representative" is defined in section 101(24) of the Bankruptcy Code as follows:

> ***820***   [A] person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24).

### 4. 1517(a)(3): Section 1515 and Rule 1007 Requirements

Section 1515 separately imposes the following procedural requirements:

> (a) A foreign representative applies to the court for recognition of a foreign proceeding in which the foreign representative has been appointed by filing a petition for recognition.

> (b) A petition for recognition shall be accompanied by—

>> (1) a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;

>> (2) a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or

>> (3) in the absence of evidence referred to in paragraphs (1) and (2), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative.

> (c) A petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative.

(d) The documents referred to in paragraphs (1) and (2) of subsection (b) shall be translated into English. The court may require a translation into English of additional documents.

11 U.S.C. § 1515.

Additionally, Bankruptcy Rule 1007 imposes additional procedural requirements, including the filing of a corporate disclosure statement. Fed. R. Bankr. P. 1007.

### B. Additional Relief

#### 1. Automatic Relief Under Section 1520

Section 1520(a) of the Bankruptcy Code sets forth a series of statutory protections that automatically result from the recognition of a foreign main proceeding, including the application of the protection afforded by the automatic stay under section 362(a) of the Bankruptcy Code to the debtor and its property located within the territorial jurisdiction of the United States. *See* 11 U.S.C. § 1520(a).

#### 2. Discretionary Relief Under Section 1521

 **[12]**   Section 1521(a) outlines the discretionary relief a court may order upon recognition. *See* 11 U.S.C. § 1521(a). "The discretion that is granted is 'exceedingly broad,' since a court may grant 'any appropriate relief' that would further the purposes of chapter 15 and protect the Debtor's assets and the interests of creditors," provided that the interests of creditors and other interested entities are sufficiently protected. *In re Atlas Shipping A/S*, 404 B.R. 726, 740 (Bankr. S.D.N.Y. 2009) (citing 11 U.S.C. §§ 1521(a), 1522(a)). In *Atlas Shipping*, this Court described "sufficient protection" as embodying three basic principles: "the just treatment of all holders of claims against the bankruptcy estate, the protection of U.S. claimants against prejudice and inconvenience in the processing of claims in the [foreign] proceeding, and the **\*821** distribution of proceeds of the [foreign] estate substantially in accordance with the order prescribed by U.S. law." *Atlas Shipping*, 404 B.R. at 740.

#### 3. Relief Under Section 105

Additionally, section 105(a) of the Bankruptcy Code provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

## III. ANALYSIS

### A. The Brazilian RJ Proceeding Should be Recognized as a Foreign Main Proceeding

#### 1. The Brazilian RJ Proceeding is a "Foreign Main Proceeding" under Sections 1517(a) and 1517(b)

*a. The Brazilian RJ Proceeding Proceeding is a "Foreign Proceeding"*

 **[13]**   The Brazilian RJ Proceeding qualifies as a "foreign proceeding." Courts in this Circuit have long agreed that the Brazilian RJ process satisfies these standards. *See In re Servicos de Petroleo Constellation S.A.*, 600 B.R. 237, 270 (Bankr. S.D.N.Y. 2019) (collecting cases). As such, the Court will not further examine each specific requirement of section 101(23).

*b. Each Chapter 15 Debtor's COMI is Brazil as of the New Petition Date*

i. Uncontested Entities: ICP & ICB

 **[14]**   ICP is the parent company of the other Chapter 15 Debtors. No party contests that ICP's COMI is Brazil. (Rabelo Declaration ¶ 38.) ICP's registered office in São Paulo, Brazil. *Id.* Therefore, absent "evidence to the contrary," the Bankruptcy Code presumes its COMI is Brazil. 11 U.S.C. § 1516(c); *see also In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 130 (Bankr. S.D.N.Y. 2007). Here, no evidence contradicts this presumption: ICP's directors, officers, and employees are all based in Brazil, and its books and records are maintained in Brazil. (Rabelo Declaration ¶ 38.) Accordingly, ICP's COMI is Brazil.

 **[15]**   Similarly, ICB, a Brazilian operating company and cement production and sales corporation, has near-exclusive ties to Brazil, and no party disputes that its COMI is Brazil. (Rabelo Declaration ¶ 39.) ICB's registered office is also

3470

located in São Paulo, and no evidence undercuts the resultant statutory presumption that its COMI is Brazil: 99% of ICB's 1,745 employees are based in Brazil, where it represents the country's third-largest cement company. (*Id*.) As such, ICB's COMI is Brazil.

ii. ICBV

 **[16]**   ICBV's COMI as of the New Petition Date is contested: the Foreign Representative maintains that ICBV's COMI is Brazil, while the Ad Hoc Group asserts that it is the Netherlands. ICBV's registered office is in Amsterdam, (Motion ¶ 40), entitling it to a rebuttable statutory presumption that its COMI is the Netherlands. 11 U.S.C. § 1516(c).

There are several other *Fairfield Sentry* factors that would ordinarily undercut a straightforward determination that ICBV's COMI is Brazil. First, ICBV's Board meetings are typically held in the Netherlands, **\*822**  the entity contracts with almost exclusively Dutch contractors and offers no services in Brazil, and the Board requires consent from at least one of its Dutch constituent directors to make ultimate corporate decisions regarding the payment of the NY Notes. ICBV's assets are dispersed, with its largest (an intercompany receivable) held by a Spanish entity, while the majority of its cash is denominated in USD and held in a Bahamanian bank, and its Brazilian bank accounts are empty. The same pattern applies for ICBV's creditors, the majority of whom are neither based in Brazil nor in the Netherlands. Similarly, the law applicable to ICBV's disputes is mixed: New York law governs the NY Notes, which constitute the majority of ICBV's debt, and its intercompany loans are governed by a mix of New York and Brazilian law. However, as a Dutch-incorporated company, ICBV is bound to certain Dutch laws. *See supra* I(A)(2).

 **[17]**   The analysis of ICBV's creditor and other third-party expectations is more salient—and more complex. Governing law in this District provides that where, as here, a debtor is a special purpose financing vehicle (SPV) with no operations other than managing relationships with creditors and paying off obligations on behalf of a larger corporate parent, the debtor's COMI should be determined by the location of the corporate "nerve center." *Oi Brasil*, 578 B.R. at 222–30. And the developments immediately before the commencement of the Brazilian RJ Process—namely, the Brazilian Mediation and Brazilian EJ Proceeding—bolster

the Foreign Representative's position that ICBV's COMI, as of the New Petition Date, is Brazil.

The facts in *Oi Brasil* were remarkably similar to the circumstances presently before the Court. There, the debtor was an SPV to a large conglomerate in Brazil. The SPV was incorporated in the Netherlands and maintained its registered office in Amsterdam. *Oi Brasil*, 578 B.R. at 177. Like ICBV, the SPV in *Oi Brasil* had no operations or business independent of its Brazil-based corporate parent, had "never held money for any entity" other than a member of the conglomerate, and performed only two functions, primarily "borrowing, or issuing or assuming notes." *Id*. at 177–78. The SPV was the issuer of two series of notes governed by New York law, the governing indentures of which disclosed that the SPV had "no operations other than the issuing and making payments on the Notes and other indebtedness ranking equally with the Notes, and using the proceeds therefrom as permitted by the documents governing these issuances," and explained that the ability of the SPV to "pay principal, interest and other amounts due on the Notes and other indebtedness" would "depend upon the financial condition and results of operations" of the Brazilian parent. *Id*. Similarly, ICBV's OM provides:

> The issuer's principal business activity to act as a financing vehicle for [ICP's] activities and operations. The issuer has no substantial assets ... and its only sources of cash flow are from its financing activities and capital contributions made by [ICP] and [its] other subsidiaries. Accordingly, the ability of the issuer to pay principal, interest, and other amounts due on the notes and other indebtedness will depend upon [ICP's] financial condition and results of operations.

(JX-1 at IC_FR_00002712; *see also id.* at IC_FR_00002670 (clarifying that references to "we," "our company," "ours", and "us" in the OM refer to ICP and its subsidiaries, **\*823** not ICBV).) The notes indentures at issue in *Oi Brasil* also "explicitly warn[ed] of the possibility of a Brazilian bankruptcy" in terms nearly identical to ICBV's OM: "[i]f we are unable to pay our indebtedness, including our obligations under the notes, then we may ***become subject to bankruptcy proceedings in Brazil***. Brazilian bankruptcy laws ***are significantly different from, and may be less favorable to creditors than***, those of the United States." *Oi Brasil*, 578 B.R. at 180 (emphases added). Given these striking similarities, it would be reasonable to find that ICBV's COMI, is, and has always been, Brazil.

However, the Court need not answer this question; rather, it must only identify ICBV's COMI as of the New Petition Date. *Fairfield Sentry*, 714 F.3d at 137. In addressing that more narrow question, the Court finds that applicable restructuring activities occurring as part of the Brazilian Mediation and Brazilian EJ Proceeding establish conclusively that, as of December 9, 2024, ICBV's COMI was Brazil. In the months leading up to the filing of the Chapter 15 Petition, ICBV's "primary business activity" was clearly limited to repayment of the NY Notes. *Modern Land*, 641 B.R. at 789–90. As a practical matter, this effort was channeled through—and its success depended on—the success of the Brazilian Mediation and Brazilian EJ Proceeding and related creditor negotiations in Brazil. *See OAS*, 533 B.R. at 101 (finding that an Austrian-incorporated SPV had "no other business except to pay [notes governed by New York law] off," and observing that this was "the very business [the SPV] and the other Brazilian Debtors were engaged in through the Brazilian [b]ankruptcy [p]roceedings").

Specifically, ICBV participated in the Brazilian Mediation as a debtor, attending approximately six mediation sessions with the Ad Hoc Group's advisors and four sessions with the Indenture Trustee. (Rabelo Declaration ¶ 32; Motion ¶ 31; COMI Brief ¶ 38.) ICBV also commenced the Brazilian EJ Proceeding, and signed the EJ Plan, which was filed with the Brazilian Bankruptcy Court. (COMI Brief ¶ 39.) ICBV actively participated in litigation before the Brazilian Bankruptcy Court and filed pleadings addressing matters substantively affecting its interests in the Brazilian EJ Proceeding. (Laquimia Declaration ¶¶ 9, 12, 13.) ICBV's Brazilian directors also executed non-disclosure agreements in connection with the provision of information regarding the InterCement Group to the Ad Hoc Group and its advisors. (Rabelo Declaration ¶¶ 32–34; COMI Brief ¶ 15.) ICBV's Brazilian advisors and directors met with the Ad Hoc Group's counsel to discuss matters directly impacting the scope of potential recoveries on the NY Notes—the sole focus of ICBV's business operations at that time. (Rabelo Declaration ¶¶ 32–34; COMI Brief ¶ 15.) Finally, the Brazilian Mediation, Brazilian EJ Proceeding, and ultimate commencement of the Brazilian RJ Proceeding were all publicly and widely disclosed by press releases by ICP from Brazil. (COMI Brief ¶ 43.) Accordingly, when considered as a whole, the Brazilian Mediation and Brazilian EJ Proceeding provide strong indicia that ICBV's creditors were on notice of the proceedings in Brazil.[14]

By contrast, no restructuring activities with the capacity to materially impact **\*824** ICBV's ability to conduct its business operations occurred in the Netherlands during this timeframe. While the Ad Hoc Group focuses on the progress of the Dutch Proceeding during this timeframe, the existence of parallel developments in that proceeding fails to negate the fact that, as a matter of United States law, ICBV's COMI as of the New Petition Date was Brazil. The Dutch Observer's activity in the Dutch Proceeding, while continuous and consistent, "do[es] little to change the economic realities associated with [ICBV's] status as a special purpose financing vehicle and the related expectations of its creditors," and separately has minimal impact on the COMI determination because "there are significant legal and pragmatic limitations on the [Observer's] authority with respect to ICBV." *Oi Brasil*, 578 B.R. at 225. As to the first point, ICBV's unique "economic reality," which stems from its structure as an SPV, cannot be ignored and has special implications for its COMI analysis. *Id.* Given that ICBV's primary business activity has, at all relevant times, been limited to the repayment of the NY notes, its economic reality was tied inextricably to Brazil as of the New Petition Date because, up until that point, the Brazilian EJ Proceeding had "provide[d] the only realistic chance to repay [ICBV's] debts." *Id.* at 226. Indeed, even the Dutch Observer acknowledged in his monthly reports that ICBV's financial prospects were wholly dependent on the success of the Brazilian EJ Proceeding. (*See* the "October Report," ECF Doc. # 30-1, at §§ 1.2.3, 2.3.3, 2.3.4; the "November Report," ECF Doc. # 30-2, at § 1.2.3).[15] Therefore, notwithstanding the involvement of the Dutch Observer in the Dutch Proceeding, in totality, all relevant circumstances underscore that, as of the New Petition Date, ICBV's COMI is Brazil.

The Ad Hoc Group also relies on ICBV's representations in the Dutch Proceeding that, ICBV's COMI, pursuant to the EIR, has at various points in time been the Netherlands—a representation which it reiterated in November 2024, a few weeks before the New Petition Date. (Objection ¶ 16.) On December 5, 2024, the Dutch Court referenced this representation in extending the cooling-off period in the Dutch Proceeding, commenting that ICBV had provided "no reason" for the Dutch Court to "reconsider its earlier finding" that ICBV's COMI was the Netherlands. (*Id.*) The Ad Hoc Group further emphasizes ICBV's continued reiteration of this position in the Dutch Proceeding in January 2025, even after the Foreign Representative filed the COMI Brief. (*Id.* ¶ 17.) The Ad Hoc Group asserts that the Petitioner should be estopped from proffering an apparently contradictory

position in these **\*825** Chapter 15 Cases: namely, that contemporaneous developments have shifted ICBV's COMI from the Netherlands to Brazil. (*Id.*)

 **[18]**   The Ad Hoc Group's position is incorrect. Corporate entities are not precluded from having different COMIs in European and Chapter 15 proceedings, because a "COMI finding under the [EIR] in the Dutch proceedings is not the same as a COMI finding under Chapter 15 of the Bankruptcy Code." *Oi Brasil*, 578 B.R. at 206. The Second Circuit made clear in *Fairfield Sentry* that the EIR "does not operate as an analog to Chapter 15." *Fairfield Sentry*, 714 F.3d at 136. Critically, the EIR is a "poor analog" for Chapter 15 "in regards to the timeframe considered in a COMI analysis ... [t]he [EIR] looks to the date of the filing of the foreign insolvency proceedings, whereas in the U.S. the inquiry centers on the date of the Chapter 15 recognition petition." *Oi Brasil*, 578 B.R. at 207 (citing *Fairfield Sentry*, 714 F.3d at 136 n.9 (internal citations omitted)). This distinction alone legitimizes what initially appear to be contradictory COMI positions by ICBV before the Dutch Court and this Court. On the one hand, the EIR's tethering of the COMI analysis to the filing of the foreign insolvency proceedings substantiates ICBV's continued representations to the Dutch Court that no intervening developments would justify a departure from its initial position on ICBV's COMI at the commencement of the Dutch Proceeding. On the other hand, because it is the *Chapter 15 petition date* that controls the analysis under the Bankruptcy Code, the Foreign Representative cannot be estopped from contending that ICBV's COMI in these cases is Brazil. And for the foregoing reasons, the centralization of the Brazilian Mediation and Brazilian EJ Proceeding within Brazil justifies this Court's finding that ICBV's COMI, for purposes of these Chapter 15 Cases, is Brazil.

### iii. ITI

 **[19]**   Like ICBV, ITI's COMI is contested: the Foreign Representative maintains that ITI's COMI is Brazil, while the Ad Hoc Group asserts that its COMI is Spain. ITI's registered office is in Bilbao, Spain, (Motion ¶ 94), entitling it to a rebuttable statutory presumption that its COMI is Spain. 11 U.S.C. § 1516(c).

However, as with ICBV, ITI's COMI analysis as relevant to these Chapter 15 Cases is heavily dependent on the nature of its operations as of time of the New Petition Date. ITI's primary assets are its equity interests in ICB, which

undisputedly has its COMI in Brazil. (Rabelo Declaration ¶ 39; Motion ¶ 97.) As guarantor to the Debentures issued by ICB and ICP, ITI's primary business activities at the time of the commencement of the Brazilian RJ Proceeding, and these Chapter 15 Cases, were the restructuring of its obligations under the Debentures—activities which predominantly occurred in Brazil.

Like ICBV, ITI participated in the Brazilian Mediation and was a debtor in the Brazilian EJ Proceeding, and its key creditors, including the Debenture Holders, participated in these processes as well. (Motion ¶ 31; COMI Brief ¶ 47.) The Debenture Holders and their advisors engaged substantively in the Brazilian EJ Proceeding, and the majority of the Debenture Holders ultimately signed onto the EJ Plan. (COMI Brief ¶ 47.) The Debenture Holders appeared at a creditors' meeting in Brazil and were appointed to a committee to oversee the sales process and **\*826**  negotiations under the EJ Plan. (*Id.*) Like ICBV, ITI's creditors were all made aware of the Brazilian Mediation, Brazilian EJ Proceeding, and ultimate commencement of the Brazilian RJ Proceeding through widely-disseminated press releases issued by ICP from Brazil. (*Id.*) Notably, ITI itself does not contest that its COMI is Brazil, and it previewed as much to the Spanish Court prior to the New Petition Date; a commercial court in Bilbao has since granted ITI's request for recognition of the Brazilian RJ Proceeding.[16] (ECF Doc. # 56 at ¶ 9.)

Accordingly, when considered as a whole, the factual circumstances leading up to the New Petition Date provide strong indicia that ITI's creditors were on notice of the proceedings in Brazil, and, more broadly, that ITI's COMI is Brazil.

### B. The Petitioner is a "Foreign Representative"

 **[20]**   The Petitioner was duly appointed by the Chapter 15 Debtors via corporate resolution to act as the foreign representative of the Brazilian RJ Proceeding and commence the Chapter 15 Cases in accordance with 101(24) of the Bankruptcy Code. (Motion ¶ 112.) The appointment of the Petitioner comports with applicable requirements. *See, e.g.*, *In re Mina Tucano Ltda.*, No. 22-11198 (LGB) (Bankr. S.D.N.Y. Oct. 12, 2022) (ECF Doc. # 26) (approving verified petition where the foreign representative was authorized by chapter 15 debtors' corporate resolution).

### C. The Petition Otherwise Meets Section 1515's and Rule 1007(a)(4)'s Procedural Requirements

The Foreign Representative satisfies section 1517(a)(3) of the Bankruptcy Code, which states that the petition shall meet the requirements of section 1515, which in turn provides applicable requirements in subsections 1515(b) and (c). Those subsections require that a recognition petition include a certified copy of the decision commencing the foreign proceeding and appointing the foreign representative, as well as a statement identifying all foreign proceedings with respect to the Chapter 15 debtors known to the foreign representative. 11 U.S.C. §§ 1515(b)–(c), 1517(a)(3).

 [21]    [22]    The Petitioner has satisfied those requirements. The Foreign Representative properly commenced these Chapter 15 Cases in accordance with  *827  sections 1504 and 1509(a), which require the filing of a petition for recognition along with all the documents and information required under section 1515. (Motion ¶ 114.) In accordance with section 1515(b), the Foreign Representative filed original and certified translated copies of the petition in and the order by the Brazilian Bankruptcy Court accepting the Brazilian RJ Proceeding, as well as the corporate resolutions authorizing the Petitioner to act on behalf of each Chapter 15 Debtor as a foreign representative. (Id. ¶ 115.) As required by section 1515(c) of the Bankruptcy Code, the Foreign Representative also submitted a declaration identifying all known foreign proceedings on behalf of the Chapter 15 Debtors. (Id. ¶ 116.) Finally, the Foreign Representative has satisfied the requirement of Bankruptcy Rule 1007(a)(4) to file a corporate ownership statement including all information required by Rule 7007.1, as well as a list including the names and addresses of all person or bodies authorized to administer the foreign proceedings of the Chapter 15 Debtors and all parties to litigation pending in the United States to which the Chapter 15 Debtors are parties. (Id. ¶ 117; see Fed. R. Bankr. P. 1007.)

Accordingly, all elements of Section 1517 and Rule 1007(a)(4) have satisfied, and the Court should recognize the Brazilian RJ Proceeding as a foreign main proceeding.

### D. The Court Need Not Consider Recognition as a Foreign Nonmain Proceeding

Because the Court has concluded that the COMI of each Chapter 15 Debtor is Brazil and therefore that the Brazilian RJ Proceeding constitutes a foreign main proceeding, the Court need not assess whether to grant recognition of the Brazilian RJ Proceeding as a foreign nonmain proceeding pursuant to section 1517(b)(2) of the Code.

### E. The Debtors Should Receive Additional Relief

1. Automatic Relief Under Section 1520

Upon the recognition of a foreign main proceeding, a debtor is automatically entitled to the protection of the automatic stay under section 362(a) with respect to the debtor and its property within the jurisdiction of the United States. 11 U.S.C. § 1520(a). As the Foreign Representative has shown that the Brazilian RJ Proceeding should be recognized as the foreign main proceeding in these Chapter 15 Cases, the Chapter 15 Debtors are entitled to the automatic relief under section 1520.

2. Discretionary Relief Under Section 1521

 [23]    Upon recognition of a foreign proceeding, section 1521(a) authorizes the Court to grant "any appropriate relief" at the request of the foreign representative "where necessary to effectuate the purpose of [chapter 15] and to protect the assets of the debtor or the interests of the creditors." 11 U.S.C. § 1521(a). Pursuant to section 1521(a)(6), the Foreign Representative requests that any protective relief that is the subject of the Provisional Relief Motion (ECF Doc. # 5) be extended pursuant to section 1521(a)(6) of the Bankruptcy Code. (Motion ¶ 133.) Courts granting discretionary relief pursuant to section 1521 must ensure that the interests of "the creditors and other interested entities, including the debtor, [must be] sufficiently protected." 11 U.S.C. § 1522(a). The Bankruptcy Code does not define "sufficient protection." A determination of sufficient protection "requires a balancing of the respective parties' interests." In re AJW Offshore, Ltd., 488 B.R. 551, 559 (Bankr. E.D.N.Y. 2013) (citing  *828  SNP Boat Serv. S.A. v. Hotel Le St. James, 483 B.R. 776, 784 (S.D. Fla. 2012)).

 [24]    Here, the extension of provisional relief will provide adequate protection to the Chapter 15 Debtors and their creditors by centralizing the orderly administration of the debtors' assets in the United States. Additionally, the balance of the parties' interests weighs in favor of extending provisional relief, as the Chapter 15 Debtors represent that permitting creditor actions "could threaten their ability as a going concern" and the parties have previously agreed to extend provisional relief to mirror the relief extended by the Brazilian Bankruptcy Court. (Motion ¶ 137; see ECF Doc. # 58.).

3474

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** the relief sought in the Foreign Representative's Motion, **RECOGNIZES** the Brazilian RJ Proceeding as a Foreign Main Proceeding, and **OVERRULES** the Ad Hoc Group's Objection.

**IT IS SO ORDERED.**

**All Citations**

668 B.R. 802

Footnotes

1       UMB Bank, N.A., Trustee for the NY Notes, filed a *Joinder to Ad Hoc Group's (i) Objection to the Petitioner's Verified Petition and (ii) Opposition to the Petitioner's Brief of COMI Determination as of the December 9, 2024 Filing Date for Chapter 15 Debtors IC Financial and ITI* (the "UMB Joinder," ECF Doc. # 41).

2       Documents marked with the prefix "JX" were entered as exhibits in the evidentiary hearing held on November 20 and 21, 2024 in the case captioned *In re InterCement Brasil S.A.*, Case No. 24-11226 (MG); page numbers of exhibits are designated by the Bates stamps utilized by the parties if available. *See infra* I(B), Prior Chapter 15 Cases.

3       Since the OM was written, the InterCement Group has sold 48% of its Argentinian interests and all of its other businesses outside Brazil (Rabelo Declaration ¶¶ 66-67; Motion ¶ 67), and announced these divestments publicly (*see, e.g.*, JX-86 (announcing divestment of operations in Egypt), JX-119 (announcing sale of business in rest of Africa).

4       The OM provides that references to terms like "we," "our company," "ours", and "us" refer to ICP and its subsidiaries, rather than ICBV. JX-1 at IC_FR_00002670.

5       *See also* Stoop Dep. 23:13-24:5 ("[T]he Brazilian board members are obviously well integrated into the overall InterCement Group, so they bring that knowledge to" ICBV.)

6       Stoop Dep. 55:5–11, 57:6–16 ("Q: "[Y]ou're not aware of any instances in which Mover provided direction on a resolution to the IC Financial board of directors?" ... A: ... [T]hey can propose something which for the consideration of the board. Ultimately, the board needs to make its own assessment and decision."); Trial Tr. Day 1123:7–10 ("Q: [Y]ou are not aware of an instance in which IC Financial shareholder has instructed IC Financial's board to take an action, are you? A: No.").

7       The Foreign Representative provided an example of the exercise of such power: "For instance, if IC Financial's Dutch directors wanted to make a scheduled interest payment on the NY Notes, the effectuation of such interest payment would in fact be dependent on decisions made in Brazil to transfer funds to pay IC Financial." (Rabelo Declaration ¶ 43.)

8       Trial Tr. Day 1133:21–134:4. ("Q: [T]he ultimate decision to make payments on the notes is made by the IC Financial Board, right? A: When the proceeds arrive in IC Financial's account, yes, the board is entitled to pay it, to press the button. But, of course, all the decision about the region of the money we [ ] provided and how it will be generated and how it's to be paid is derived from IC participants in Brasil.").

9       The Foreign Representative states that ITI no longer sells Spanish securities, and Rabelo testified that ITI has not sold Spanish securities since 2012. (Foreign Representative Closing Demonstrative at 8, Rabelo Declaration at 25 n.14.) However, in a 2024 filing in Spanish court, ITI asserted that it sold such securities more recently. (JX-215 at 2.)

10      The Brazilian Applicants are ICP, ICB, IC Financial, ITI, ITI Argentina, and Mover. (Motion at 2 n.5.)

11      The EJ Debtors are ICP, ICB, IC Financial, ITI, ITI Argentina. The EJ Debtors include all of the Brazilian Applicants except Mover, which consented to the EJ Plan but was not an EJ Debtor as it was not an obligor with respect to any of the claims affected by the EJ Plan. (Motion at 3 n.8.)

12      It is not contested that ICBV, ITI, ICP, and ICB have sufficient connections to the United States to warrant this Court's exercise of jurisdiction over them. As discussed *infra*, ICBV, ICP, and ICB have contract rights under an indenture governed by New York choice-of-law and choice-of-forum provisions. (Rabelo Declaration ¶ 35, 47.) ITI has assets in

3475

the United States consisting of $200 million of the NY Notes held on deposit with an institution in New York. (*Id.* ¶ 36.) These four debtors also have $5,000 each in cash in a trust account located in New York. (*Id.* ¶ 37.) The companies not seeking Chapter 15 protection have no connection to the United States.

13 The other RJ Debtors are ITI Argentina, Sucea Participações S.A. ("Sucea"), Sincro Participações S.A. ("Sincro"), and Mover. (*Id.* at 1 n.1.)

14 The Foreign Representative emphasizes that the Ad Hoc Group had no connection to the Netherlands: no Ad Hoc Group member ever interacted with anyone in the Netherlands. (*See* Prior Chapter 15 Cases, ECF Doc. # 72, Joint Stipulated Facts.) Similarly, the Foreign Representative points out that the Ad Hoc Group stipulated to the fact that its members "anticipated that any main plenary proceeding in which [the NY Notes] would be restructured would be in the Federative Republic of Brazil," (*id.* ¶ 6), and points to email evidence showing that the Ad Hoc Group's members subjectively anticipated a bankruptcy process in Brazil to affect their holdings (*see, e.g.*, JX-15, - 55, -102, -116) and understood the importance of InterCement's operations in Brazil to their investment (*see, e.g.*, JX-17, -61, JX-102). Note, however, that even were this not the case, the subjective beliefs of a debtor's creditors concerning the debtor's COMI does not matter—it is the perspective of the *hypothetical* (i.e., objective) third party/creditor which the Court must consider.

15 In an apparent acknowledgement of ICBV's involvement in the Brazilian EJ Proceeding, the Observer also explained in the November Report that he was kept "sufficiently informed by ICBV (and its advisers and those of the Group) ... about the course of events in the EJ Procedure." (November Report at § 5.3.).

16 The Ad Hoc Group speculates that any "events in Spain" subsequent to the New Petition Date were "plainly engineered to boost Petitioner's recognition efforts." (Objection ¶ 17; *see also id.* at 9 n.51). While the Ad Hoc Group does not directly accuse the Foreign Representative of bad faith conduct or forum-shopping, it is worth briefly addressing this point directly, as courts have authority to "look at the time period between the initiation of the foreign liquidation proceeding and the filing of the Chapter 15 petition" in order to "offset [the] debtor's ability to manipulate its COMI." *Fairfield Sentry,* 714 F.3d at 133. In short, here, neither party's description of the Brazilian Mediation and the Brazilian EJ Proceeding rings of bad faith or COMI manipulation. Courts have declined to find bad faith even where parties have sought to shift COMI from a debtor's principal place of business to a "letterbox" jurisdiction where the debtor plainly does not conduct meaningful business. *See Suntech Power*, 520 B.R. at 419 (liquidators who shifted COMI from China to Cayman Islands did not act in bad faith). Here, the opposite is true: the Foreign Representative's position is that COMI has shifted from a "letterbox" jurisdiction to the undisputed principal place of business of the debtor's corporate family. Under these circumstances, there is no factual basis reasonably supporting a presumption of bad faith.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 3476

# Tab 43

Westlaw.

434 B.R. 334, 63 Collier Bankr.Cas.2d 1711, 53 Bankr.Ct.Dec. 156
**(Cite as: 434 B.R. 334)**

C

United States Bankruptcy Court,
S.D. New York.
In re JSC BTA BANK, Debtor in a Foreign Proceeding.

No. 10–10638 (JMP).
Aug. 23, 2010.

**Background:** Foreign representative of debtor that was subject of reorganization proceedings in the Republic of Kazakhstan sought to hold creditor in contempt for alleged violating automatic stay that arose in Chapter 15 case upon recognition of foreign main proceeding, by commencing arbitration proceedings against debtor in Switzerland.

**Holding:** The Bankruptcy Court, James M. Peck, Bankruptcy Judge, held that, as matter of first impression, automatic stay that arises in Chapter 15 case on recognition of foreign main proceeding applies to debtor within the United States for all purposes, and may extend to the debtor as to proceedings in other jurisdictions for purposes of protecting property of debtor that is within territorial jurisdiction of the United States, but does not apply globally to all proceedings against debtor.

Motion denied.

West Headnotes

**[1] Statutes 361 ☞1091**

361 Statutes
    361III Construction
        361III(B) Plain Language; Plain, Ordinary, or Common Meaning

361k1091 k. In general. Most Cited Cases
(Formerly 361k188)

In matters of statutory interpretation, court is bound by plain meaning of statute.

**[2] Bankruptcy 51 ☞2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

Provision of Chapter 15 indicating that, when interpreting other provisions of that chapter, court must consider the chapter's international origin and need to promote application of chapter that is consistent with application of similar statutes adopted by foreign jurisdictions, provides court with license to take into account more than the words used within particular section of Chapter 15 and to depart when appropriate from well-settled rule of statutory interpretation that court should prefer specific provisions over the general when striving to uncover meaning of statute. 11 U.S.C.A. § 1508.

**[3] Bankruptcy 51 ☞2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

Chapter 15 is the one chapter of the Bankruptcy Code that is predicated on concept of international coordination and cooperation, and that encourages bankruptcy courts to look beyond shores of United

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

434 B.R. 334, 63 Collier Bankr.Cas.2d 1711, 53 Bankr.Ct.Dec. 156
**(Cite as: 434 B.R. 334)**

States for interpretative guidance. 11 U.S.C.A. § 1501 et seq.

**[4] Bankruptcy 51 ⌔2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

Chapter 15 cases are specialized proceedings, unlike plenary cases commenced under the Bankruptcy Code.

**[5] Bankruptcy 51 ⌔2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

Automatic stay that arises in Chapter 15 case upon recognition of foreign main proceeding applies to debtor within the United States for all purposes, and may extend to the debtor as to proceedings in other jurisdictions for purposes of protecting property of debtor that is within territorial jurisdiction of the United States; however, in keeping with more limited extent of bankruptcy court's in rem jurisdiction in Chapter 15 cases, only over property of debtor within the territorial jurisdiction of the United States and not over all property of estate wherever located, stay that arises in cases under Chapter 15 does not apply globally to all proceedings against debtor. 11 U.S.C.A. § 1520(a)(1).

**[6] Bankruptcy 51 ⌔2341**

51 Bankruptcy
    51III The Case

51III(H) Cases Ancillary to Foreign Proceedings
        51k2341 k. In general. Most Cited Cases

Automatic stay which arose in Chapter 15 case upon recognition of foreign main proceeding did not preclude the Swiss branch of French bank, in accordance with choice-of-law provision in contract between itself and foreign debtor that was the subject of reorganization proceedings in the Republic of Kazakhstan, from proceeding with arbitration in Switzerland of dispute between itself and debtor, where arbitration concerned an entirely foreign transaction that had no connection to the United States and no conceivable impact on debtor's property in the United States. 11 U.S.C.A. § 1520(a)(1).

**[7] Statutes 361 ⌔1404**

361 Statutes
    361IV Operation and Effect
        361k1402 Construction in View of Effects, Consequences, or Results
            361k1404 k. Unintended or unreasonable results; absurdity. Most Cited Cases
    (Formerly 361k181(2))

Statutory language must be construed to avoid an absurd result.

**[8] Bankruptcy 51 ⌔2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

Interpreting automatic stay that arises in Chapter 15 case upon recognition of foreign main proceeding as having global effect to prevent proceedings against foreign debtor, without regard to their location or to

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

434 B.R. 334, 63 Collier Bankr.Cas.2d 1711, 53 Bankr.Ct.Dec. 156
**(Cite as: 434 B.R. 334)**

their impact, or lack thereof, on property of the debtor within the United States, would lead to absurd result, as converting bankruptcy court in the United States into what would amount to global clearing house for resolving right to proceed in appropriate foreign tribunal against a foreign business enterprise that might have only insignificant contacts with the United States, and as improperly centralizing global control of dispute resolution within ancillary case in the United States that was meant merely to support, not to supplant, foreign main proceeding. 11 U.S.C.A. § 1520(a)(1).

**[9] Bankruptcy 51** ⚷ **2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

Courts are to consult the Guide to Enactment of the Model Law when construing Chapter 15.

**\*335** White & Case LLP, Evan C. Hollander, Esq., Douglas P. Baumstein, Esq., New York, NY, for Foreign Representative.

Simpson Thacher & Bartlett LLP, William T. Russell, Jr., Esq., Paige E. Fleming, Esq., Robert H. Smit, Esq., New York, NY, for BIC–BRED.

***MEMORANDUM DECISION DENYING MOTION OF FOREIGN REPRESENTATIVE FOR CONTEMPT AND STAY OF ARBITRATION PROCEEDINGS***

JAMES M. PECK, Bankruptcy Judge.

### *Introduction*

On March 2, 2010, the Court entered an order in this chapter 15 case (the "*Recognition Order* ") granting the petition for recognition of the foreign main proceeding of JSC BTA Bank ("*BTA Bank* ") currently pending in the Specialized Financial Court of Almaty City, Republic of Kazakhstan (the "*Kazakh Court* "). The foreign representative for BTA Bank, Anvar Galimullaevich Saidenov (the "*Foreign Representative* "), is Chairman of the Management Board of BTA Bank.

Until recently, this chapter 15 case has been relatively uneventful, but that changed on July 2, 2010 when the Foreign Representative filed a Motion for Contempt and to Stay Arbitration Proceedings (the "*Motion* ") against Banque International de Commerce—BRED Paris, succursale de Geneve, Switzerland ("*BIC–BRED* "). The Motion seeks to hold BIC–BRED, the Swiss branch of a French bank, in contempt for a willful violation of the automatic stay that came into effect upon entry of the Recognition Order.

The alleged stay violation grows out of the arbitration of an uncomplicated commercial dispute between BIC–BRED and BTA Bank pending before a sole arbitrator appointed by the Geneva Chamber of Commerce and Industry in Switzerland **\*336** (the "*Arbitration Proceeding* ").[FN1] The dispute is governed by Swiss law and arises out of a loan agreement dated July 29, 2008 that documents the terms of a $20 million advance from BIC–BRED to BTA Bank. The same financial difficulties that caused BTA Bank to undertake a restructuring of its financial affairs in the Republic of Kazakhstan also led to a default by BTA Bank in the repayment of this loan when due in August, 2009. In response to this payment default, BIC–BRED pursued remedies that included attachment of the shares of two Dutch companies and obtaining authorization to attach assets of BTA Bank held in Switzerland at UBS AG and Credit Suisse. While moving aggressively to protect itself in Switzerland, BIC–BRED also took steps in the main insolvency proceeding in Kazakhstan to participate as a creditor in the restructuring of BTA Bank.

FN1. The Arbitrator, Philippe Pinsolle, en-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

434 B.R. 334, 63 Collier Bankr.Cas.2d 1711, 53 Bankr.Ct.Dec. 156
**(Cite as: 434 B.R. 334)**

tered an award dated July 19, 2010 in favor of BIC–BRED and against BTA Bank for the full amount of the unpaid loan plus interest and costs. Thus, the arbitration has run its course, and the Motion to stay the arbitration is now moot. Therefore, the Court limits its decision to those aspects of the Motion seeking to hold BIC–BRED in contempt. The Award also comments on and rejects the request of BTA Bank to suspend the Arbitration Proceeding due to the alleged worldwide application of the Recognition Order, noting that this issue was not raised until months after commencement of the arbitration. The discussion of this issue in the Award has not influenced the Court's decision.

The law firm of White & Case through its New York office represents the Foreign Representative in this chapter 15 case and through its London office represents BTA Bank in the Swiss arbitration. BTA Bank engaged in activities relating to the arbitration for a number of months following entry of the Recognition Order and sought, without success, to consensually suspend the arbitration in light of the restructuring of the financial affairs of BTA Bank that was then taking place in Kazakhstan pursuant to applicable local law. BTA Bank filed a statement of defense in the Arbitration Proceeding on June 21, 2010, asserting that the Recognition Order, under the authority of section 1520(a)(1) of the Bankruptcy Code, grants a worldwide stay of judicial and arbitration proceedings including the proceeding in Geneva.

The issue presented appears to be one of first impression under chapter 15 jurisprudence—whether the automatic stay that becomes applicable to "the debtor and the property of the debtor that is within the territorial jurisdiction of the United States" operates as a bar to the continuation of a pending arbitration proceeding brought against the debtor entity in a foreign jurisdiction.

Counsel for the Foreign Representative relies on a textual reading of the words used in Section 1520(a)(1) and precedent giving extraterritorial effect to the automatic stay in plenary chapter 11 cases to contend that the automatic stay applies to the debtor entity wherever the debtor may be found. Such a reading of Section 1520(a)(1), while possible in view of the words used in the text, disregards the international origins and purposes of chapter 15 and leads to absurd consequences that could not have been intended by Congress or the international experts in insolvency law who drafted the Model Law on Cross-border Insolvency on which chapter 15 is based.[FN2] If the provision regarding the automatic stay in chapter 15 cases were to be construed in the manner urged **\*337** by the Foreign Representative, even the court in the foreign main proceeding in Kazakhstan would be subject to the stay and would need permission from this Court before taking any action that might impact the foreign debtor. No rational cross-border insolvency regime would give a bankruptcy court in the United States so much unintended automatic extraterritorial power in conjunction with the recognition of a foreign proceeding.

> FN2. Section 1508 states "[i]n interpreting this chapter, the court shall consider its international origin, and the need to promote an application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions."

As explained more fully below, the Court concludes that the automatic stay does not afford broad anti-suit injunctive relief to the debtor entity outside the territorial jurisdiction of the United States upon entry of an order of recognition in a chapter 15 case. This conclusion is based on the need to respect the international aspects of these Bankruptcy Code provisions, the limited and specialized definition of the term "debtor" when used in chapter 15, and the fact that cases under chapter 15 are ancillary in nature and do not create an estate within the meaning of section

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

434 B.R. 334, 63 Collier Bankr.Cas.2d 1711, 53 Bankr.Ct.Dec. 156
**(Cite as: 434 B.R. 334)**

541 of the Bankruptcy Code. Importantly, any application of the language of section 1520(a)(1) should reject an extraterritorial interpretation that would stay miscellaneous foreign litigation or arbitration proceedings having no meaningful nexus to property of the foreign debtor located in the United States. A more restrained reading of the section is appropriate, and in assessing the Motion, the Court has given due consideration to the disruptive consequences of a worldwide stay of all proceedings involving the debtor that would arise automatically upon recognition.

One such potentially disruptive consequence would be to convert a bankruptcy court in the United States into what amounts to a global clearing house for resolving the right to proceed in an appropriate foreign tribunal against a foreign business enterprise that may have only insignificant contacts with the United States. This broadly expansive interpretation of section 1520(a)(1) would be most unwelcome, both here and in other countries, and would improperly centralize global control of dispute resolution within an ancillary case in the United States that is meant to support, not supplant, a main proceeding in a foreign jurisdiction. Additionally, a recognition order under chapter 15 should not be the indirect means for obtaining global relief that could not otherwise have been achieved by order of the court having jurisdiction of the main foreign proceeding. Accordingly, for the reasons stated, the Motion of the Foreign Representative is denied.

### Relevant Facts and Procedural History

The facts underlying the present contested matter are undisputed. BTA Bank is one of the largest banks in the Republic of Kazakhstan, where it serves more than one million retail customers. BTA Bank has no tangible assets or employees within the United States, conducts no business within the United States, and its only connections with the United States are balances in accounts of correspondent banks located in New York City.[FN3] BIC–BRED, the Swiss branch of a French bank, has no assets or employees within the United States, conducts no business within the United States, and appears to have no significant connections with the United States aside from maintaining a correspondent bank account.[FN4]

> **FN3.** Verified Petition For Recognition Of Foreign Main Proceeding And Request For Related Relief, dated February 4, 2010 (ECF Doc. # 2) p. 3(¶¶ 7–8).

> **FN4.** Objection To Motion For Contempt And Stay Or Arbitration Proceedings, dated July 19, 2010 (ECF Doc. # 24) (the "*Objection* ") p. 8–9(¶ 22).

**\*338** In July 2008, BIC–BRED and BTA Bank entered into a loan agreement whereby BIC–BRED loaned BTA Bank $20 million to finance the construction of an entertainment complex in Moscow (the "*Loan Agreement* ").[FN5] The Loan Agreement is governed by Swiss law, and requires the parties to submit any disputes arising from the agreement to arbitration in Switzerland.[FN6] In July 2009, BTA Bank announced that it would cease to pay all principal and interest payments on its debts.[FN7] On August 4, 2009, BTA Bank defaulted on its obligations under the Loan Agreement.[FN8] Thereafter, in September 2009, BIC–BRED obtained an attachment on BTA Bank's shares in two Dutch companies and obtained authorization to attach certain BTA Bank assets held at two Swiss banks. *Id.* p. 10(¶ 56).

> **FN5.** *See* Declaration of Sirin Yuce Pursuant In Support Of Objection, dated July 19, 2010 (ECF Doc. # 25) (the "*Yuce Declaration* ") p. 1(¶ 3).

> **FN6.** *See* Yuce Decl. Ex. A (Loan Agreement) p. 5 ("This transaction shall be governed by and construed in accordance with Swiss law and any dispute arising in connection to this loan agreement will be sub-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

434 B.R. 334, 63 Collier Bankr.Cas.2d 1711, 53 Bankr.Ct.Dec. 156
**(Cite as: 434 B.R. 334)**

mitted to arbitration conducted in accordance with the arbitration rules of the Geneva Court of International Arbitration.").

FN7. Yuce Decl. ¶ 4.

FN8. *See* Award, dated July 19, 2010 (the "*Award* ") p. 10(¶ 55).

### *(i) The Arbitration Proceeding*

On October 29, 2009, BIC–BRED commenced the Arbitration Proceeding against BTA Bank in Switzerland, seeking a determination by the Arbitrator that BTA Bank breached the Loan Agreement and is liable to BIC–BRED for the amount of the loan, including damages and interest.FN9 On June 21, 2010, BTA Bank filed a statement of defense in the Arbitration Proceeding alleging that BIC–BRED's continued proceeding violated the Recognition Order because "the U.S. Recognition Order grants a worldwide stay of court and arbitration proceedings." FN10 On June 24, 2010, counsel for BTA Bank contacted BIC–BRED and requested that it suspend the Arbitration Proceeding in light of the Recognition Order.FN11 BIC–BRED declined that request and denied that the Recognition Order stayed the Arbitration Proceeding.FN12 On July 5, 2010, BTA Bank submitted a reply brief in the Arbitration Proceeding in Switzerland, and the Arbitration Proceeding was closed on July 12, 2010. FN13 Thereafter, on July 19, 2010, the Arbitrator issued the Award in the Arbitration Proceeding. The Award includes a discussion by the Arbitrator concerning the Recognition Order and its impact on the Arbitration Proceeding. FN14

FN9. Yuce Decl. ¶ 6.

FN10. Yuce Decl. Ex. D (Statement of Defense) p. 8(¶ 42).

FN11. Declaration of Evan C. Hollander in Support of Motion, dated July 2, 2010 (ECF Doc. # 20) (the "*Hollander Decl.*") Ex. 2 (Letter, dated June 24, 2010, from White & Case LLP to Mentha & Associes).

FN12. *See* Hollander Decl. Ex. 3 (Answer to Statement of Defense, dated June 28, 2010) p. 7(¶ 36).

FN13. Yuce Decl. ¶¶ 11–12.

FN14. *See* Award, pp. 18–19(¶¶ 96–104) (holding that BTA Bank's argument was inadmissible because it was raised belatedly, and further noting that in any event the Recognition Order did not stay the Arbitration Proceedings).

### *(ii) The Kazakh Proceeding and the Chapter 15 Case*

On October 16, 2009, BTA Bank commenced its reorganization proceedings in Kazakhstan (the "*Kazakh Proceeding* "). **\*339** The Kazakh Proceeding was subsequently recognized in the United Kingdom in December 2009 and in Ukraine in February 2010.FN15 On February 4, 2010, the Foreign Representative filed a petition for recognition of the Kazakh Proceeding as a foreign main proceeding under chapter 15.FN16 Following an uncontested hearing on March 2, 2010, this Court granted the petition and entered the Recognition Order substantially in the form submitted by counsel for the Foreign Representative.FN17 The Recognition Order granted BTA Bank "all of the relief set forth in section 1520 of the Bankruptcy Code including, without limitation, the application of the protection afforded by the automatic stay under section 362(a) of the Bankruptcy Code to the Bank worldwide and to the Bank's property that is within the territorial jurisdiction of the United States." Recognition Order ¶ B.

FN15. Award p. 10(¶ 57).

FN16. ECF Doc. # 1.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

434 B.R. 334, 63 Collier Bankr.Cas.2d 1711, 53 Bankr.Ct.Dec. 156
**(Cite as: 434 B.R. 334)**

FN17. ECF Doc. # 9.

On July 2, 2010, the Foreign Representative filed the Motion,FN18 seeking an order confirming that the Recognition Order stayed the Arbitration Proceeding and seeking to hold BIC–BRED in contempt. BIC–BRED objected to the Motion mainly on jurisdictional grounds. The parties presented oral argument at a hearing on July 20, 2010, and the Court reserved judgment. On July 26, 2010, the Foreign Representative submitted a supplemental letter brief in further support of the Motion (the "*BTA Supplemental Letter*"), and shortly thereafter BIC–BRED responded with its own supplemental letter brief.

FN18. ECF Doc. # 19.

***Discussion***

The question presented is whether BIC–BRED should be held in contempt for an alleged willful violation of the automatic stay that came into effect upon entry of the Recognition Order.FN19 The Foreign Representative bases his argument on a textual analysis of section 1520(a)(1), looking to the plain language and legislative history of section 1520(a)(1) and relying on citations to plenary bankruptcy cases that have recognized the extraterritorial effect of the automatic stay. In response, BIC–BRED argues that the Recognition Order does not stay the Arbitration Proceeding and, in any event, that the Court lacks jurisdiction over BIC–BRED.FN20

FN19. The Foreign Representative seeks sanctions only on account of those actions taken by BIC–BRED in continuing to prosecute the Arbitration Proceeding after being informed on June 24, 2010 of the Foreign Representative's legal position. *See* Hearing Tr. at 9:17–10:4.

FN20. *See* Objection at p. 1 ("BIC–BRED is not subject to this Court's personal jurisdic-

tion and is therefore not within the ambit of the bankruptcy stay"); Hearing Tr. at p. 22:6 ("[T]here simply is no jurisdiction over BIC in the United States").

Upon consideration of the text of the statute in light of its international origins and applications, the Motion fails to establish a basis for finding that the automatic stay applies to BIC–BRED or that BIC–BRED should be sanctioned. Given the facts before the Court and after careful review of section 1520(a)(1) in context, continued prosecution by BIC–BRED of the Arbitration Proceeding in Switzerland did not violate the automatic stay. The Arbitration Proceeding relates to an entirely distinct foreign financing transaction that has no direct or indirect impact upon property within the territorial jurisdiction of the United States. The bankruptcy court, at least in the setting of an ancillary chapter 15 case, should not stand in the way of **\*340** a foreign arbitration process when the outcome will have no foreseeable impact on any property of the foreign debtor in the United States.

**A. *Section 1520(a)(1) stays actions against a foreign debtor within the United States and applies in other countries only to the extent that such actions affect property of the debtor that is "within the territorial jurisdiction of the United States."***

[1][2] In interpreting the meaning of section 1520(a)(1), the Court is bound by the plain meaning of the statute. *See U.S. v. Ron Pair Enters., Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) ("the plain meaning of legislation should be conclusive, except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters"). Section 1508 requires the Court to consider the international origin of chapter 15 when construing the plain language of each of the individual component provisions of chapter 15. *See* 11 U.S.C. § 1508 ("In interpreting this chapter, the court shall consider its international origin, and the need to promote an application of this chapter that is consistent with the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

434 B.R. 334, 63 Collier Bankr.Cas.2d 1711, 53 Bankr.Ct.Dec. 156
**(Cite as: 434 B.R. 334)**

application of similar statutes adopted by foreign jurisdictions."). Section 1508 represents an instruction to take into account more than the words used within a particular section of chapter 15 and is a license to depart where appropriate from the well-settled rule of statutory interpretation that a court should prefer specific provisions over the general when striving to uncover the meaning of a statute. *See United States v. Torres–Echavarria, 129 F.3d 692, 699 n. 3 (2d Cir.1997)* ( "The operative principle of statutory construction is that a specific provision takes precedence over a more general provision.").

[3] The "international origins" of chapter 15 is a dominant and consistent theme that underlies the various specific provisions of this chapter and that distinguishes chapter 15 from all other chapters within the Bankruptcy Code. This is the one chapter of the Bankruptcy Code predicated on the concept of international coordination and cooperation and that encourages bankruptcy courts to look beyond the shores of the United States for interpretative guidance.

Notably, chapter 15 invokes the jurisdiction of the bankruptcy court to assist in the administration of a foreign insolvency or restructuring proceeding. *See Tacon v. Petroquest Res. Inc. (In re Condor Ins. Ltd.), 601 F.3d 319, 329 (5th Cir.2010)* ("... Chapter 15 was intended to facilitate cooperation between U.S. courts and foreign bankruptcy proceedings ..."). Its most basic objective is to foster the orderly administration of cross-border restructurings.[FN21] Section 1501(a) expressly states that the purpose of chapter 15 is "to provide effective mechanisms for dealing with cases of cross-border insolvency." 11 U.S.C. § 1501(a). That section goes on to specify that the chapter is meant to encourage "cooperation between—(A) courts of the United States ... and (B) the courts and other competent authorities of foreign countries involved in cross-border insolvency cases." *Id.* Section 1504 makes clear that any case commenced under chapter 15 is "ancillary" to a foreign proceeding pending elsewhere.[FN22]

FN21. Chapter 15, with additional alterations designed to mesh with United States bankruptcy law, derives from the Model Law on Cross–Border Insolvency (the "*Model Law*") promulgated by the United Nations Commission on International Trade Law in 1997.

FN22. 11 U.S.C. § 1504 (entitled "Commencement of ***ancillary*** case") (emphasis added).

**\*341** [4] Chapter 15 cases are specialized proceedings unlike plenary cases commenced under the Bankruptcy Code. Among the key differences, the term "debtor" has a narrower and more restrictive definition for purposes of chapter 15 and commencement of a chapter 15 case does not create an "estate" as that term is used in the Bankruptcy Code. In a plenary case, a "debtor" is defined as a "person or municipality concerning which a case under this title has been commenced." [FN23] The commencement of such a case "creates an estate" consisting of all of a debtor's property, "wherever located and by whomever held." 11 U.S.C. § 541(a). To protect such property and preserve the estate, the commencement of such a plenary bankruptcy case triggers the operation of a worldwide automatic stay preventing the commencement or continuation of actions against the debtor and its property anywhere in the world. 11 U.S.C. § 362(a)(1).

FN23. 11 U.S.C. § 101(13).

In contrast, the term "debtor" for purposes of chapter 15 identifies "an entity that is the subject of a foreign proceeding." 11 U.S.C. § 1502. Thus, the very definition of the word debtor when used in the chapter 15 context has an international perspective. The definition requires the Court to look outside the United States and recognize that the entity in question is already subject to the authority of a foreign court.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

434 B.R. 334, 63 Collier Bankr.Cas.2d 1711, 53 Bankr.Ct.Dec. 156
**(Cite as: 434 B.R. 334)**

Additionally, the filing of a chapter 15 petition does not lead to automatic relief or the creation of an "estate." Instead, the bankruptcy court administering the chapter 15 case must take action and issue orders (such as the Recognition Order in this case) to grant relief [FN24] in the form of "recognition" of an already-existing, earlier commenced foreign main or nonmain insolvency proceeding.[FN25]

> FN24. *See* 8–1519 Collier on Bankruptcy P 1519.01 ("Unlike voluntary cases filed under section 301, where the filing of a petition commences a case and commencement of the case constitutes an order for relief, a petition for recognition filed under section 1515 of the Bankruptcy Code is only an application.").

> FN25. *See* 11 U.S.C. § 1504 ("A case under this chapter is commenced by the filing of a petition for recognition of a foreign proceeding under section 1515"); § 1517(b) ("Such foreign proceeding shall be recognized—(1) as a foreign main proceeding if it is pending in the country where the debtor has the center of its main interests; or (2) as a foreign nonmain proceeding if the debtor has an establishment within the meaning of section 1502 in the foreign country where the proceeding is pending.").

Despite this ancillary character of a chapter 15 case and the auxiliary role of the bankruptcy court, the Foreign Representative argues that the language of section 1520(a)(1) plainly states that upon recognition section 362 of the Bankruptcy Code applies to the chapter 15 debtor without any territorial limitations. Section 1520(a)(1) delineates the consequences of entry of a recognition order as follows:

(a) Upon recognition of a foreign proceeding that is a foreign main proceeding—(1) sections 361 and 362 apply with respect to the debtor and the property of the debtor that is within the territorial jurisdiction of the United States.

The Foreign Representative submits that the language used in this section must be read to distinguish between the debtor and its property. Under his proposed interpretation, section 362 applies to the debtor in all jurisdictions and to the property of the debtor *that is* within the territorial jurisdiction of the United States—with the modifying words "that is" referring to debtor's property and not to the debtor **\*342** itself.[FN26] When considered purely as a linguistic matter and without regard to context and statutory purpose, the syntax of the words as used in section 1520(a)(1) does lend support to the construction advocated by the Foreign Representative.

> FN26. *See* Motion at p. 4(¶ 9) ("If Congress' intention had been to limit the otherwise extraterritorial application of section 362 to the United States, the statute would have needed to include commas (or different language) as follows: 'sections 361 and 362 apply with respect to the debtor, and the property of the debtor that is, within the territorial jurisdiction of the United States' ") (emphasis in original).

This interpretation, however, is focused too narrowly on scanning the words and ignores the ancillary nature of chapter 15, the specialized definition of the word "debtor," and the interpretative mandate of section 1508. It would be contrary to the essential purposes and structure of a chapter 15 case for recognition of a foreign main proceeding to stay a commercial arbitration proceeding as remote as this one—a proceeding in Switzerland between two foreign banks relating to a loan transaction that has no connection to the United States or to any property of the chapter 15 debtor "that is within the territorial jurisdiction of the United States."

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

434 B.R. 334, 63 Collier Bankr.Cas.2d 1711, 53 Bankr.Ct.Dec. 156
**(Cite as: 434 B.R. 334)**

This concept of territorial jurisdiction is an essential aspect of promoting cooperation and greater legal certainty in cross-border cases. The phrase "within the territorial jurisdiction of the United States," as defined in section 1502(8), highlights the *in rem* nature of jurisdiction in a chapter 15 case and refers to tangible property within the territory of the United States and intangible property deemed under applicable nonbankruptcy law to be located within this country. *See* 11 U.S.C. § 1502(8). The definition is a source of clarity with respect to the intended scope of the automatic stay in a chapter 15 case—it applies only to property within the United States. As such, this territorial delineation serves to eliminate any doubt as to the extent of the authority of the bankruptcy court over property of a foreign debtor.

Such obvious precision appears to be lacking with respect to the application of the automatic stay in a chapter 15 case to the foreign debtor itself. The Foreign Representative propounds an interpretation of section 1520(a)(1) that would result in applying the automatic stay to the debtor entity wherever in the world the debtor may be found for all purposes (including a stay of the Arbitration Proceeding). But the breadth of this proposed interpretation with respect to the debtor itself is difficult to reconcile with language in the same sentence that so carefully circumscribes the application of the automatic stay to property that is within the territorial jurisdiction of the United States. The unmistakable thrust of section 1520(a)(1) is to limit the application of the automatic stay to property located within the United States. This makes it difficult for the Foreign Representative to urge an expansive reading in those instances when the stay is being applied to the debtor rather than to its property. It is internally inconsistent for the same phrase to simultaneously specify both an unrestricted global reach and a tightly restricted territorial approach.

Aside from the unworkable extraterritorial interpretation of section 1520(a)(1) suggested by the Foreign Representative, two alternative interpretations

exist to potentially reconcile what initially appears to be incongruity in that section's language. One possibility, but a terribly strained one, would be to construe the territorial limitation within section 1520(a)(1) as extending to both the debtor and its property. Such **\*343** a reading would limit the effect of the automatic stay to actions against a debtor commenced within the United States and to debtor property located here and would tie the word "debtor" to the phrase "within the territorial jurisdiction of the United States." That reading is consistent with international cooperation and avoids absurd results but fails to account for placement of the words "that is" within the text of this sentence. Those words break the connection between the debtor and the United States.

Such a reading also appears to be inconsistent with certain language identified by the Foreign Representative in the immediately following subsection of chapter 15. Section 1520(b) provides that section 1520(a) "does not affect the right to commence an individual action or proceeding in a foreign country to the extent necessary to preserve a claim against the debtor." The Foreign Representative argues that section 1520(b) would be "entirely unnecessary" if section 1520(a)(1) was not intended to stay actions outside of the United States. Motion p. 4(¶ 10). The argument, while not dispositive on the point, does add support to an alternative interpretation that would extend the automatic stay to the debtor in other jurisdictions in appropriate circumstances.

[5] This leads the Court to conclude that the best reading of section 1520(a)(1), and one that is consistent with the plain meaning of the words as written, is that the stay arising in a chapter 15 case upon recognition of a foreign main proceeding applies to the debtor within the United States for all purposes and may extend to the debtor as to proceedings in other jurisdictions for purposes of protecting property of the debtor that is within the territorial jurisdiction of the United States. This more limited extraterritorial application of the automatic stay to the debtor entity

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

434 B.R. 334, 63 Collier Bankr.Cas.2d 1711, 53 Bankr.Ct.Dec. 156
**(Cite as: 434 B.R. 334)**

fulfills the cross-border purposes of chapter 15 within the United States without broadly imposing a stay on all actions or proceedings against the debtor including those lacking any proper connection to the chapter 15 case.

[6] To illustrate this interpretation of the section with particular reference to the Arbitration Proceeding, that proceeding concerns an entirely foreign transaction that has no connection to the United States and no conceivable impact on debtor property in this country. Even though the Arbitration Proceeding does affect the Kazakh Proceeding, the automatic stay does not apply to an arbitration that is entirely unrelated to proceedings in the chapter 15 case. It is possible, however, to envision the example of a hypothetical foreign arbitration with different facts, one that might involve a determination of rights of a third party in property of a foreign debtor that is within the territorial jurisdiction of the United States. Regardless of its venue in another country, such an arbitration proceeding that affects property interests of the debtor in this country would be subject to the automatic stay under the interpretation of section 1520(a)(1) articulated in this decision.

The Court's interpretation of section 1520(a)(1) is consistent with the other provisions of chapter 15 relied on by the Foreign Representative. For example, the meaning of section 1520(b) is clarified and permits the bringing of an action in a foreign country to preserve a claim in those instances where such an action would affect debtor property in the United States.

Similarly, the Court's interpretation comports with section 1528 [FN27] that extends **\*344** bankruptcy court jurisdiction over certain foreign assets of a chapter 15 debtor upon the commencement of a subsequent plenary bankruptcy case but that does not expand jurisdiction as to the debtor itself. *See* 11 U.S.C. § 1528. From this silence in relation to the debtor, the Foreign Representative deduces that it was unnecessary for the drafters "to expand the protections

afforded the debtor (as opposed to its property) upon the filing of a subsequent plenary case" because recognition already stayed actions against the debtor wherever located pursuant to section 1520(a)(1). *See* BTA Supplemental Letter p. 3. But the silence with respect to jurisdiction over the debtor merely underscores the *in rem* nature of chapter 15 bankruptcy jurisdiction.

FN27. Section 1528 states:

After recognition of a foreign main proceeding, a case under another chapter of this title may be commenced only if the debtor has assets in the United States. The effects of such case shall be restricted to the assets of the debtor that are within the territorial jurisdiction of the United States and, to the extent necessary to implement cooperation and coordination under sections 1525, 1526, and 1527, to other assets of the debtor that are within the jurisdiction of the court under sections 541(a) of this title, and 1334(e) of title 28, to the extent that such other assets are not subject to the jurisdiction and control of a foreign proceeding that has been recognized under this chapter.

11 U.S.C. § 1528.

This emphasis on assets, rather than the debtor entity, is not surprising given the multiple jurisdictions that must interact in cross-border insolvency cases. Most notably, the chapter 15 debtor that later commences a plenary case is already subject to the jurisdiction of at least one foreign court. Section 1528 thus confirms the shared and cooperative nature of the jurisdiction over a chapter 15 debtor, and reinforces the Court's interpretation that jurisdiction over the debtor may only be exercised on the basis of the assets of the debtor.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

434 B.R. 334, 63 Collier Bankr.Cas.2d 1711, 53 Bankr.Ct.Dec. 156
**(Cite as: 434 B.R. 334)**

No reported case under chapter 15 has ever applied the automatic stay to an action or proceeding in a foreign country, and the Motion does not cite any relevant case authority to support the position that the automatic stay should apply globally to all proceedings against the debtor. The Foreign Representative relies on inapposite cases that have recognized the extraterritorial effects of the automatic stay arising in plenary bankruptcy cases outside of the chapter 15 context. *See* *Lykes Bros. S.S. Co. v. Hanseatic Marine Serv., GmBH (In re Lykes Bros. S.S. Co.), 207 B.R. 282, 287 (Bankr.M.D.Fla.1997)* (analyzing the global scope of the automatic stay in chapter 11); *Nakash v. Zur (In re Nakash), 190 B.R. 763, 768 (Bankr.S.D.N.Y.1996)* (same); *In re McLean Indus., 74 B.R. 589, 601 (Bankr.S.D.N.Y.1987)* (same).

The global reach described in these chapter 11 cases has no relation to the shared jurisdictional model of a chapter 15 case that is an adjunct to a foreign proceeding. In a plenary case, the broad application of the automatic stay is a logical consequence of the creation of a worldwide estate consisting of all debtor property wherever located. *11 U.S.C. § 541(a)*. To protect this worldwide estate from the actions of creditors, a bankruptcy court possesses *in rem* jurisdiction over all estate property, regardless of its actual location, effectively treating all such property as if it is legally located "within the jurisdictional boundaries of the district in which the court sits." *H.K. & Shanghai Banking Corp. v. Simon (In Re Simon), 153 F.3d 991, 996 (9th Cir.1998)* (bankruptcy courts have "constructive possession" over all estate property); **\*345***Tultex Corp. v. Freeze Kids, L.L.C., 252 B.R. 32, 40 (S.D.N.Y.2000)* ("[28 U.S.C. § ] 1334(e) allows a bankruptcy court to assert *in rem* jurisdiction over the property of the bankruptcy estate wherever that property may be located.").

Given that litigation against the debtor itself could adversely affect this worldwide estate, and thereby "impugn [a bankruptcy] court's jurisdiction over and administration of the estate," it is necessary for the automatic stay in a plenary case to also stay litigation against the debtor regardless of where such litigation is commenced. *In re Nakash, 190 B.R. at 768 (Bankr.S.D.N.Y.1996)*. *See also* *In Re Simon, 153 F.3d at 996* ("[a]s to actions against the Bankruptcy Estate, Congress clearly intended exterritorial application of the Bankruptcy Code."). In the plenary context, therefore, the expansive reach of a bankruptcy court over actions against a debtor in other countries necessarily derives from a court's *in rem* jurisdiction over the worldwide estate.

By contrast, in the chapter 15 context, a bankruptcy court's jurisdiction over property of the debtor is expressly limited to property located "within the territorial jurisdiction of the United States." *See, e.g., In re Atlas Shipping A/S, 404 B.R. 726, 739 (Bankr.S.D.N.Y.2009)* (noting that section 1520(a) "refers to 'property of the debtor' to distinguish it from the 'property of the estate' that is created under § 541(a). In a chapter 15 case, there is no 'estate'; nevertheless § 1520(a) imposes an automatic stay on any action with respect to the debtor's property located in the United States"); *In re Gold & Honey, Ltd., 410 B.R. 357, 373 n. 19 (Bankr.E.D.N.Y.2009)* (" § 1520 only makes §§ 361 and 362 applicable with respect to the debtor and property of the debtor within the United States ... granting recognition would presumably leave [a creditor] to consider itself free to continue to violate the stay ... outside the United States"); *In re Pro–Fit Holdings Ltd., 391 B.R. 850, 863 (Bankr.C.D.Cal.2008)* (distinguishing in dicta between the automatic stay in a plenary case, which applies worldwide, and the automatic stay arising from a recognition order in a chapter 15 case, which applies only within the territorial jurisdiction of the United States). In the chapter 15 context, therefore, a bankruptcy court's limited *in rem* jurisdiction requires only that the court possess the power to stay actions against a debtor that could impact property located within the United States.[FN28]

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

434 B.R. 334, 63 Collier Bankr.Cas.2d 1711, 53 Bankr.Ct.Dec. 156
**(Cite as: 434 B.R. 334)**

FN28. The Recognition Order does not require the Court to reach a different conclusion. The Recognition Order contains language that could be construed to support the Foreign Representative's interpretation of section 1520: "The Debtor and the Foreign Representative are granted all of the relief set forth in section 1520 of the Bankruptcy Code including ... the application of the protection afforded by the automatic stay ... **to the Bank worldwide** and to the Bank's property that is within the territorial jurisdiction of the United States." Recognition Order ¶ B (emphasis added). As noted at the hearing, however, the Court did not intend the order to create a global stay of actions against the debtor. *See* Hearing Tr. at 17:5–13 ("[A]t the time that I entered the form of order that you had presented at the time of the recognition hearing, which was an uncontested proceeding, I never contemplated that one of the possible uses of that order would be to obtain coercive relief as against a commercial arbitration proceeding being conducted in Switzerland between the foreign debtor and a foreign financial institution"). Other provisions of the Recognition Order confirm the Court's understanding. *See* Recognition Order ¶ D ("The Petitioner shall provide service and notice of this Order ... upon (a) all parties to litigation pending in the United States in which the Debtor is a party ... (d) all known U.S. creditors of the Debtor"). Moreover, the interpretation of section 1520(a)(1) in this decision recognizes the possibility of worldwide application of the automatic stay to the debtor in those circumstances that may affect property of the debtor within the United States.

**\*346 B. The Foreign Representative's interpretation of Section 1520(a)(1) would lead to absurd results unsupported by legislative history**

[7][8] Even if the Court were to find the language of section 1520(a)(1) to be ambiguous, that language must be construed to avoid an absurd result. *See Frank G. v. Bd. of Educ., 459 F.3d 356, 372 (2d Cir.2006)* ( "ambiguous statutes are to be construed so as to avoid absurd results"). With that goal in mind, the process of statutory interpretation must take into account the purpose and scope of chapter 15 as explained in section 1501 and the international nature of chapter 15 cases.

Given the global goals of the chapter, it is unimaginable that Congress intended section 1520(a)(1) to be used as an automatic means to interfere with proceedings that may be pending anywhere in the world, including the Arbitration Proceeding that is the subject of the pending Motion. Section 1520(a)(1), if interpreted in the manner suggested by the Foreign Representative, would convert the recognition of a foreign main proceeding into the granting, by operation of law, of a worldwide anti-suit injunction as to any proceeding against the debtor, regardless of subject matter, that may be pending or threatened against the foreign debtor in any country around the globe. The absurdity of such a far reaching result is obvious.

[9] Additionally, the Foreign Representative's proposed expansive interpretation of section 1520(a)(1) is not supported by legislative history. Courts are to consult the Guide to Enactment of the Model Law (the "*Guide* ") when construing the meaning of chapter 15. *In re RSM Richter Inc. v. Aguilar (In re Ephedra Prods. Liab. Litig.), 349 B.R. 333, 336 (S.D.N.Y.2006)* (Rakoff, D.J.) ("the House Judiciary Committee, in enacting Chapter 15, specifically indicated that the Guide 'should be consulted for guidance as to the meaning and purpose of [Chapter 15's] provisions.' H.R. REP. NO. 109–31(I), at 106 n. 101, *as reprinted in* 2005 U.S.C.C.A.N. [pp. 88,] 169 n. 101.").

The Foreign Representative notes that the Guide "makes clear that one result of the recognition of a

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

434 B.R. 334, 63 Collier Bankr.Cas.2d 1711, 53 Bankr.Ct.Dec. 156
**(Cite as: 434 B.R. 334)**

foreign main proceeding may be the imposition of relief that is greater than the relief that is afforded to the debtor in the main proceeding." BTA Supplemental Letter p. 1. The excerpt quoted by the Foreign Representative, however, merely provides that the legal consequences of recognition within the territorial jurisdiction of the state administering the ancillary proceeding may differ from the legal consequences of the foreign law governing the foreign main proceeding. *See* BTA Supplemental Letter, quoting ¶ 143 of Guide ("it is justified to impose on the insolvent debtor the consequences of article 20 in the enacting State [i.e., the United States] ... even if the automatic effects of the insolvency proceeding in the country of origin are different from the effects of article 20 in the enacting State").

Paragraph 145 of the Guide raises some questions regarding the impact of recognition on a pending arbitration but is inconclusive. According to the Foreign Representative, section 145 of the Guide contemplates that "recognition of a foreign main proceeding may automatically result in the stay of foreign arbitral proceedings ..." BTA Supplemental Letter p. 2. The excerpted language offers guidance that is consistent with this decision. In those instances where the subject matter of an arbitration has an impact **\*347** on property of a foreign debtor within the United States, the order recognizing the foreign main proceeding may in fact lead to the stay of foreign arbitration proceedings. Paragraph 145, however, does not provide support for the extreme notion that recognition carries with it an automatic stay of all foreign arbitration proceedings of every kind, nature and description. That would be an absurd result.

#### C. Equitable and practical concerns support the Court's interpretation of section 1520(a)(1)

Principles of judicial restraint support the Court's conclusion. BTA Bank is a Kazakh bank with no assets, employees or operations in the United States, subject to a pending foreign main restructuring proceeding in Kazakhstan. BIC–BRED is the Switzer-

land-based branch of a French bank with no assets, employees or operations in the United States. The Loan Agreement has no connection to the United States and contemplates the development of real property located in Russia. The Arbitration Proceeding arising from BTA Bank's default under the Loan Agreement was conducted in Switzerland pursuant to Swiss law. The parties' contacts with the United States are insignificant. Holding that the Recognition Order stays such an ordinary payment dispute between two foreign banks would lead to needless intervention by the bankruptcy court into a dispute having no relationship to the United States.

Equitable concerns also militate against the relief sought by the Foreign Representative. The Award determined that BTA Bank's procedural defenses relating to the effect of the Recognition Order were interposed too late. *See* Award p. 18(¶ 98) (noting that BTA Bank failed to timely raise its defense based on the stay under section 1520(a)(1) because "the proper place for the discussion devoted to the U.S. Recognition Order ... was the statement of defense."). Essentially, the Motion is a last ditch attempt by the Foreign Representative to use the automatic stay in a chapter 15 case to discipline one of the creditors of BTA Bank and block the efforts of BIC–BRED to improve its position relative to other creditors. The effort comes too late to affect the outcome of the Arbitration Proceeding.

#### D. BIC–BRED may not be sanctioned in the chapter 15 case

BIC–BRED in opposing the Motion has side stepped policy considerations and questions of statutory interpretation and has focused most of its attention on the question of whether the Court has the authority to enter enforceable orders against a foreign bank that claims to do no business here. While BIC–BRED has provided substantial support for the proposition that it is not subject to jurisdiction of courts in the United States and, consequently, that effective relief may not be granted with respect to the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

434 B.R. 334, 63 Collier Bankr.Cas.2d 1711, 53 Bankr.Ct.Dec. 156
**(Cite as: 434 B.R. 334)**

Motion, the Court does not need to decide whether BIC–BRED is properly subject to the jurisdiction of the Court for purposes of a finding of contempt. While it seems likely that a finding of contempt might not be enforceable as to BIC–BRED, the Court concludes that the automatic stay that came into effect upon entry of the Recognition Order does not apply to the Arbitration Proceeding and that BIC–BRED did not violate the stay in Switzerland. Accordingly, no grounds are present for a finding of contempt.

### *Conclusion*

As a general matter, chapter 15 deals with the protection of assets of a foreign debtor in this country and with claims by and against the debtor that may be **\*348** brought in this country. Other courts of competent jurisdiction have authority over the debtor and are available to administer foreign assets or to exercise personal jurisdiction. Based on the foregoing analysis of the language of section 1520(a)(1) and the ancillary nature of a chapter 15 case, the argument of the Foreign Representative for extraterritorial application of the automatic stay to the debtor in a foreign arbitration or other proceeding is rejected except in those situations where there is a demonstrated relationship between that proceeding and property of the debtor within this country.

The Motion is denied, and BIC–BRED is directed to submit an order consistent with this decision.

Bkrtcy.S.D.N.Y.,2010.
In re JSC BTA Bank
434 B.R. 334, 63 Collier Bankr.Cas.2d 1711, 53 Bankr.Ct.Dec. 156

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Tab 44

496 B.R. 330
United States Bankruptcy Court, S.D. New York.

IN RE K–V DISCOVERY
SOLUTIONS, INC., et al., Debtors.

Silver Point Finance, LLC, Whitebox Advisors,
LLC, Pioneer Investment Management, Inc., and
Wilmington Trust, National Association, solely
as Trustee for the K-V Pharmaceutical Company
12% Senior Secured Notes due 2015, Plaintiffs,

v.

Deutsche Bank Trust Company Americas,
solely as Trustee for the K-V Pharmaceutical
Company 2.5% Contingent Convertible
Subordinated Notes due 2033, Defendant,

and

The Official Committee of Unsecured
Creditors of K-V Discovery Solutions,
Inc., et al., Intervenor Defendant.

Case No. 12–13346 (ALG) (Jointly Administered)
|
Adv. Pro. No. 13–1381 (ALG)
|
Filed August 27, 2013
|
As Corrected Aug. 28, 2013

**Synopsis**
**Background:** Dispute arose in Chapter 11 case of bankrupt drug manufacturer regarding extent of senior noteholders' priority pursuant to terms of subordination agreement, and specifically, whether that priority entitled them to payment of postpetition interest before any payment was made on subordinated debt.

**Holdings:** The Bankruptcy Court, Allan L. Gropper, J., held that:

[1] phrase "with respect to the Credit Facility," as used in subordination agreement that defined "senior indebtedness" as "including, with respect to the Credit Facility, all interest accrued subsequent to the commencement of any bankruptcy or similar proceeding," was limiting provision, which prevented holders of senior notes from asserting right to postpetition interest except to extent that

their notes were issued in connection with amendment, modification, restatement, renewal, replacement, refinancing or restructuring of original Credit Facility, and

[2] senior notes were not a "replacement" for credit facility that manufacturer had in place years earlier.

Judgment for defendants.

West Headnotes (9)

**[1]    Bankruptcy**
  🗝 Subordination agreements

Rule of Explicitness, under which subordination agreement has to provide explicitly for senior creditor's right to postpetition interest in event that debtor files for bankruptcy in order for the senior creditor's postpetition priority rights to be enforced, is alive and well following adoption of Bankruptcy Code provision recognizing enforceability of subordination agreements in bankruptcy, and in order to avoid much uncertainty and lengthy trial, parties should follow the Rule of Explicitness in drafting subordination agreements. 11 U.S.C.A. § 510(a).

1 Cases that cite this headnote

**[2]    Corporations and Business Organizations**
  🗝 Construction, operation, and effect in general

Trust indentures are contracts, to be construed in accordance with ordinary contractual principles.

**[3]    Contracts**
  🗝 Language of Instrument

Under basic principles of New York contract law, words of contract are to be given a plain reading.

**[4]    Contracts**
  🗝 Construction as a whole

3494

When interpreting contract, New York courts consider the entire contract so as to give each part meaning.

**[5]** **Bankruptcy**

👉 Subordination agreements

**Secured Transactions**

👉 Agreements affecting priority

Phrase "with respect to the Credit Facility," as used in subordination agreement that defined "senior indebtedness" as "including, with respect to the Credit Facility, all interest accrued subsequent to the commencement of any bankruptcy or similar proceeding," was limiting provision, which prevented holders of senior notes from asserting right to postpetition interest in debtor-borrower's Chapter 11 case before any payment was made on subordinated debt except to extent that their notes were issued in connection with amendment, modification, restatement, renewal, replacement, refinancing or restructuring of original Credit Facility in place at time parties entered into subordination agreement.

1 Cases that cite this headnote

**[6]** **Contracts**

👉 Intention of Parties

Under New York law, contract must be read to conform to parties' reasonable expectations.

**[7]** **Bankruptcy**

👉 Subordination agreements

To determine extent of any subordination of rights in bankruptcy, bankruptcy court had to look at agreement of creditor who agreed to the subordination, not to debt instrument of the senior creditor.

1 Cases that cite this headnote

**[8]** **Bankruptcy**

👉 Subordination agreements

**Secured Transactions**

👉 Agreements affecting priority

Senior notes that were issued to finance operations of bankrupt drug manufacturer following its return to business of manufacturing drugs, after expiration of consent decree with the Food and Drug Administration (FDA) that had limited it to distributing drugs manufactured by third parties and dramatically reduced its revenues, were not a "replacement" for credit facility that manufacturer had in place years earlier through another lender, as required for senior noteholders to be entitled to priority in payment of postpetition interest pursuant to terms of subordination agreement executed by junior creditor while this credit facility was in place; it did not matter that funds that debtor obtained pursuant to senior notes replaced credit facility in sense that they played same role in its overall capital structure, where senior notes did not replace credit facility in any temporal sense, having been issued years following payoff of credit facility with proceeds of intervening financing which had itself been paid off, after which debtor financed its reduced operations while consent decree was in place using cash on hand.

**[9]** **Contracts**

👉 Construction as a whole

Under New York law, contract must be construed, if possible, so as to give each provision meaning.

**Attorneys and Law Firms**

**\*331** Matthew Allen Feldman, Paul V. Shalhoub, Robin Spigel, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019-6099, Jo Christine Reed, Dentons US LLP, 1221 Avenue of the Americas, New York, NY 10020, for debtor.

Chapter 11

3495

## CORRECTED MEMORANDUM DECISION AND ORDER

[Allan L. Gropper](), UNITED STATES BANKRUPTCY JUDGE

### FACTS

*The Principal Indenture Provisions at Issue*
On May 16, 2003, K–V Pharmaceutical Company ("KV") issued $200 million of **\*332** 2.5% Contingent Convertible Subordinated Notes due 2033 (the "Convertible Notes") pursuant to an indenture, dated as of May 16, 2003 (the "Convertible Notes Indenture") with Deutsche Bank Trust Company Americas, as trustee. (Def. Ex. 1, Convert. Indent.) The Convertible Notes Indenture is governed by New York law. (Convert. Indent., § 12.09).

Section 11.01 of the Convertible Notes Indenture provides that payment of any amounts due on the Convertible Notes are "subordinated in right of payment, in cash or cash equivalent, to the extent and in the manner stated in this Article XI to the prior payment in full when due of all existing and future Senior Indebtedness of [KV]." (Def. Ex. 1, Convert. Indent. § 11.01.) With respect to a distribution of KV's assets in a bankruptcy reorganization, § 11.02 provides that "the holders of all Senior Indebtedness shall first be entitled to receive payment in full, in cash or cash equivalent, of the principal thereof, the interest thereon and any other amounts then due thereon before the [holders of the Convertible Notes] are entitled to receive payment on account of the principal of or interest on or any other amounts due on the [Convertible Notes]." (Def. Ex. 1, Convert. Indent. § 11.02.) Senior Indebtedness is defined in § 1.01 of the Convertible Notes Indenture as

the principal of, premium, if any, interest, *including, with respect to the Credit Facility, all interest accrued subsequent to the commencement of any bankruptcy or similar proceeding, whether or not a claim for post-petition interest is allowable as a claim in any such proceeding,* and rent payable on or in connection with, and all fees, costs, expenses

and other amounts accrued or due on or in connection with, [KV's] Indebtedness whether secured or unsecured, absolute or contingent, due or to become due, outstanding on the date of this Indenture or thereafter created, incurred, assumed, guaranteed or in effect guaranteed by the Company, including all deferrals, renewals, extensions or refundings of, or amendments, modifications or supplements to, the foregoing [with certain exceptions]. (Emphasis added). [1]

[1]   Section 1.01 defines "Indebtedness" as including,
(1) all of the [KV's] indebtedness, obligations and other liabilities (A) for borrowed money, including ... any loans or advances from banks, whether or not evidenced by notes or similar instruments, or (B) evidenced by credit or loan, agreements, bonds, debentures, notes or similar instruments ...
....
and (7) any and all deferrals, renewals, extensions, refinancings and refundings of, or amendments, modifications or supplements to [the previously described indebtedness, obligations or liabilities of KV].

This case primarily involves the construction of one clause and one term in the Convertible Notes Indenture. One is the italicized clause, *"including, with respect to the Credit Facility, all interest accrued subsequent to the commencement of any bankruptcy or similar proceeding, whether or not a claim for post-petition interest is allowable as a claim in any such proceeding."* The other is the definition of one of the terms used in that clause, "Credit Facility," which is defined in § 1.01 of the Convertible Notes Indenture as:

that certain Loan Agreement dated as of June 18, 1997, as amended, among the Company, certain subsidiaries of the Company and LaSalle Bank National Association, including all related notes, guarantees, collateral documents, instruments and agreements executed in connection therewith, *as each may be amended,*

3496

*modified, restated, renewed, **\*333** replaced, refinanced or restructured* (including, without limitation, any amendment increasing the amount of available borrowing) from time to time. (Emphasis added).

*KV's Issuance of Debt*

The background to KV's issuance of the Convertible Notes and its other debt is largely undisputed. In 1997, prior to the issuance of the Convertible Notes, KV had entered into a credit facility with LaSalle Bank that consisted of a $22.6 million revolver and letter of credit facility, as well as a secured term loan of $3.5 million (the "LaSalle Facility"). The LaSalle Facility was amended several times and at the time of the issuance of the Convertible Notes in 2003 consisted of a $40 million revolving line of credit, a $20 million supplemental revolving line of credit and approximately $12.8 million in term debt. The LaSalle Facility provided that KV could not incur certain new debt unless the debt was "subordinated in right of payment to [KV's] Liabilities on terms satisfactory to [LaSalle] in each particular case." (LaSalle Facility, §§ 1.01 and 8.3(c).) There is no dispute that LaSalle consented to the issuance of the Convertible Notes on certain terms and conditions, and as further discussed below, its counsel actually negotiated the language that is critical to a resolution of this dispute. After the issuance of the Convertible Notes, the LaSalle Facility was again amended several times and restated on December 31, 2004, when it consisted of $154.6 million of committed financing. Ultimately, on June 9, 2006, KV entered into a new credit facility (the "2006 Citibank Facility") in which ten institutions led by Citibank provided it with an unsecured $320 million revolving line of credit. The LaSalle facility was paid off and terminated.

In early 2009, KV was prohibited from manufacturing drugs under a consent decree with the United States Food and Drug Authority (the "FDA") and an agreement with the United States Department of Justice. It entered into nationwide voluntary recalls affecting most of its products and agreed to cease drug manufacture and distribution until it had satisfied certain requirements imposed by the FDA. Revenues declined dramatically, from $207.8 million in 2008 to $9.1 million in 2010. The 2006 Citibank Facility defaulted, and the debt was accelerated. On February 20, 2009, KV repaid all outstanding amounts due under the 2006 Citibank Facility in full from cash on hand, and the 2006 Citibank Facility was terminated. Thereafter, new financing was not obtained for more than 18 months, and KV funded its operations from cash on hand and cash raised through the sale of assets, tax refunds, and the sale of products manufactured by others but distributed by KV.

The parties differ as to KV's ability during this 18–month period to obtain financing. Plaintiffs assert that KV was in crisis mode and continuously sought alternate senior financing but was unable to obtain it as long as the FDA prevented KV from undertaking most business operations (*see, e.g.,* Ex. X, Bd. of Dir. Teleconf. Presentation (Apr. 8, 2010) ("senior debt is our goal")). The Defendants assert that KV's two financial advisors during that period expressed the belief that it had the ability to obtain financing during this period had it chosen to do so. (*See, e.g.,* Szlezinger Dep., 7/29/2013 at 27:25–28:11). In any event, in September 2010, the FDA granted KV approval for a limited return to the market. That same month, KV entered into a financing arrangement with affiliates of Centerbridge Partners L.P. ("Centerbridge"). This $20 million secured bridge loan (the "Healthcare I Facility") was refinanced about two months later when KV **\*334** entered into a larger senior secured debt financing package with Centerbridge affiliates (the "Healthcare II Facility"), consisting of a $60 million bridge loan and a commitment for a $120 million multi-draw term loan. The latter commitment was divided into three tranches of debt that would be made available upon KV achieving certain milestones. Apparently, KV did not draw on any of this debt and instead obtained a new facility. Pursuant to an indenture dated as of March 17, 2011, between KV and Wilmington Trust N.A., KV issued $225 million in principal amount of 12% Senior Secured Notes due 2015 (the "Senior Notes"). A portion of the funds from the issuance of the Senior Notes was used to pay off the Healthcare II Facility, which was terminated. The Senior Notes are held by the Plaintiffs in this action.

*Procedural History*

KV and several affiliates (the "Debtors") filed petitions under chapter 11 of the Bankruptcy Code commencing these cases on August 4, 2012. [2] An Official Committee of Unsecured Creditors (the "Committee") was formed on August 13, 2012. The immediate cause of the petition was an imminent default under a contract for the acquisition of a drug called Makena with the developer of the drug, Hologic, Inc. Eventually, certain of the Senior Noteholders provided DIP financing to enable the Debtors to resolve their disputes with Hologic

and assume the Hologic contract, and the Debtors' financial prospects improved materially. Thereafter, the Debtors, the Committee, certain holders of the Convertible Notes (the "Convertible Noteholders"), and certain holders of the Senior Notes (the "Senior Noteholders") entered into a global settlement of various issues that has been incorporated into the Debtors' proposed Sixth Amended Joint Chapter 11 Plan of Reorganization (the "Plan"). As part of that settlement, the parties agreed that a decision in the instant dispute over post-petition interest would be a condition to confirmation of the Plan. (*See* § 11.1(e) of the Plan). The hearing on confirmation of the Plan is scheduled for August 28, 2013.

2      As a result of the filing, all prepetition accrued interest became due; this includes amortized original issue discount (the "OID") to the date of the petition.

The instant adversary proceeding to resolve the post-petition interest dispute was commenced on July 3, 2013 when a group of Senior Noteholders and Wilmington Trust, N.A., as Indenture Trustee for the Senior Noteholders, filed the complaint against Deutsche Bank Trust Company Americas, as Trustee for the Convertible Subordinated Notes. On July 18, 2013, the parties entered into a stipulation allowing the Committee to intervene as a defendant in the action. In the complaint, the Plaintiffs seek a declaratory judgment that the Convertible Notes are subordinated to post-petition interest arising under the Senior Notes and that the Senior Noteholders must be paid post-petition interest before the Convertible Noteholders may receive any distributions from the Debtors. In their answer, filed on July 18, 2013, the Defendants deny that the Senior Notes benefit from the subordination provisions of the Convertible Notes Indenture to the extent of post-petition interest.

In a pretrial order, an expedited trial of the issues in dispute was scheduled for August 23, 2013, and the parties were given the opportunity to file pre-trial briefs. At a subsequent conference, the Defendants indicated a desire to have the schedule adjusted to allow for summary judgment motions to be addressed prior to trial. The Court retained the same schedule but informed the parties that they **\*335** could file summary judgment motions along with their pre-trial briefs. On August 16, 2013, the Plaintiffs filed their pre-trial brief, and the Defendants filed a motion for summary judgment along with their pre-trial brief.

In their summary judgment motion, the Defendant Convertible Noteholders assert that the facts are not in dispute or can be derived from the public record, and that

the terms of the Convertible Notes Indenture are plain and unambiguous and should be construed as a matter of law in their favor. Alternatively, they argue that the evidence will show that the subordination provisions were drafted with the intent of limiting the definition of "Senior Indebtedness" and under the Rule of Explicitness, further discussed below, the Senior Noteholders do not have priority rights to post-petition interest. In contrast, the Plaintiffs argue that the Senior Notes come within the definition of "Credit Facility" under the Convertible Notes Indenture and that they are accordingly entitled to post-petition interest prior to any distribution to the Convertible Noteholders. The Plaintiffs further argue that, even if the Senior Notes do not fall within the definition of "Credit Facility," (i) the priority position of the Senior Notes extends to post-petition interest, and (ii) the Rule of Explicitness has been superseded by § 510(a) of the Bankruptcy Code, giving them a priority position.

*The Rule of Explicitness*

As demonstrated by the foregoing, this case involves the rights of senior creditors to enforce a subordination provision and recover post-petition interest. It involves the so-called Rule of Explicitness, which was developed to deal with this precise issue. The background is as follows.

The Bankruptcy Code, like the prior Bankruptcy Act, generally disallows post-petition interest. 11 U.S.C. §§ 502(b)(2) (Bankruptcy Code); 11 U.S.C. § 63(a) (repealed 1979) (prior Bankruptcy Act). As a result of the disallowance of post-petition interest as a matter of law, the question arose in several Bankruptcy Act cases whether a creditor holding senior debt could enforce subordination rights and demand payment of post-petition interest prior to any distribution to the subordinated creditors even though its claim to such interest was not allowed as a matter of law. The prior Bankruptcy Act did not have an express provision relating to contractual subordination.

Three decisions prior to the adoption of the Bankruptcy Code held that the subordination provisions in the documentation for subordinated debt had to provide explicitly for a senior creditor's right to post-petition interest (rather than merely a right to "interest") if post-petition priority rights were to be enforceable. *Cont'l Ill. Nat'l Bank & Trust Co. of Chi. v. First Nat'l City Bank of N.Y. (In re King Res. Co.),* 528 F.2d 789 (10th Cir.1976); *Bankers Life Co. v. Mfrs. Hanover Trust Co. (In re Kingsboro Mortg. Corp.),* 514 F.2d 400 (2d Cir.1975)); *In re Time Sales Fin. Corp.,* 491 F.2d 841 (3d Cir.1974). This so-called "Rule of Explicitness" was

known to drafters of indentures. In 1983, the American Bar Association (the "ABA") published a model indenture, updating its earlier version and setting forth "an example of the type of explicit language that would prioritize post-petition interest." *HSBC Bank v. Bank of New York Mellon Trust Co., (In re Bank of New England Corp.), 646 F.3d 90, 98 (1st Cir.2011).* [3] The Model **\*336** Debenture Indenture adopted by the ABA in 1999 contained a similar clause also providing for explicit priority rights to post-petition interest, even though not allowed as a claim in a bankruptcy case. The clause in the Indenture in this case generally follows this standard language to the extent it includes in the definition of Senior Indebtedness, "all interest accrued subsequent to the commencement of any bankruptcy or similar proceeding, whether or not a claim for post-petition interest is allowable as a claim in any such proceeding...."

[3]    The 1983 Model Indenture provided that, in the event of bankruptcy or a similar proceeding, before subordinated creditors are entitled to receive any payment, "holders of Senior Debt shall be entitled to receive payment in full in cash of the principal of and interest (*including interest accruing after the commencement of any such proceeding"*). *Id.* quoting § 11.03 of the 1983 Model Indenture (other citation omitted) (emphasis in original).

Unlike the prior Bankruptcy Act, which was silent on the subject of contractual subordination, the Bankruptcy Code provides that "A subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law." *11 U.S.C. § 510(a).* The question therefore arose after the effectiveness of the Code in 1979 whether "the Rule of Explicitness" had survived the adoption of the Code. An early case in this Court held that it had. *In re Ionosphere Clubs,* 134 B.R. 528 (Bankr.S.D.N.Y.1991). A later case in the Eleventh Circuit held that the question was one of "applicable nonbankruptcy law" under *§ 510(a)* and certified to the highest court of New York, whose law governed the indenture there, the question, "What, if any, language does New York law require in a subordination agreement to alert a junior creditor to its assumption of the risk and burden of the senior creditor's post-petition interest?" *In re Southeast Banking Corp.,* 156 F.3d 1114, 1125 (11th Cir.1998). The New York Court of Appeals responded by holding that "this Court can and should recognize the Rule of Explicitness" and that in order to include post-petition interest as senior debt, "New York law would require specific language in a subordination agreement to alert a junior creditor to its assumption of the risk and burden of allowing the payment of a senior creditor's

post-petition interest demand." *Matter of Southeast Banking Corp.,* 93 N.Y.2d 178, 186, 688 N.Y.S.2d 484, 710 N.E.2d 1083 (1999). The New York Court stated that "Parties to subordination agreements undoubtedly relied on the Rule— their lawyers would have been quite remiss if they had not— since recent case law, as well as a leading authority and many commentators have consistently recognized the continued vitality of the Rule." 93 N.Y.2d at 184, 688 N.Y.S.2d 484, 710 N.E.2d 1083, citing *Ionosphere Clubs* and 4 COLLIER ON BANKRUPTCY § 510.03[3] (15th ed. rev). It noted, "In addition to practical realities, however, we are persuaded that the commercial and legal policies underlying the Rule of Explicitness remain sound and relevant." *Southeast Banking,* 93 N.Y.2d at 184, 688 N.Y.S.2d 484, 710 N.E.2d 1083.

**[1]**    In a subsequent decision, the First Circuit held that the Bankruptcy Code had "extinguished the Rule of Explicitness in its classic form" and that even though the Indenture there was governed by New York law, the New York Court of Appeals had no authority to determine an issue that would apply only in a Federal bankruptcy case and that the Rule of Explicitness was not part of "New York's general contract law." *HSBC Bank USA v. Branch (In re Bank of New England Corp.),* 364 F.3d 355, 364–65 (1st Cir.2004). Whatever the validity of this holding, the Court went on to demonstrate why the Rule of Explicitness is alive and well notwithstanding the adoption of **\*337** § 510(a) of the Bankruptcy Code. Since the indenture there was necessarily deemed ambiguous because it provided only for the payment of "interest due or to become due," the Court remanded for trial of the "parties' intent, taking full account of the surrounding facts and circumstances." After a lengthy trial on remand, including testimony from James Gadsden (who testified at the trial here), the Bankruptcy Court held that the language of the indenture there was not sufficiently explicit (my term) to cover post-petition interest, and its holding was affirmed on appeal. *HSBC Bank USA, N.A. v. Bank of New York Mellon Trust Co., N.A. (In re Bank of New England Corp.),* 646 F.3d 90 (1st Cir.2011). It would appear that in order to avoid much uncertainty and a lengthy trial, the Rule of Explicitness should be followed. The Indenture at issue in this case followed the Rule of Explicitness but then inserted in the definition of Senior Indebtedness a non-standard clause, "with respect to the Credit Facility." The main question in this case is what that means.

DISCUSSION

3499

*In re K–V Discovery Solutions, Inc., 496 B.R. 330 (2013)*
58 Bankr.Ct.Dec. 128

Plaintiffs make three arguments in support of declaratory relief that they are entitled to enforce their rights as senior creditors and obtain post-petition interest of approximately $32 million before Convertible Noteholders obtain any distribution. Plaintiffs first argue that the disputed contractual provision is clear on its face, that the words "including, with respect to the Credit Facility," in the definition of "Senior Indebtedness" are inclusive, and that the reference to the Credit Facility is only "illustrative." Plaintiffs next argue that the so-called "Rule of Explicitness" (discussed above) has been abolished and that they are accordingly entitled to post-petition interest by virtue of their admitted priority rights to the recovery of "interest" under the subordination provisions of the Indenture. Finally, Plaintiffs contend that since the definition of "Credit Facility" in the Indenture includes a "replacement" for that facility, and since they hold debt that is the "functional" replacement of the Credit Facility debt, they have priority rights to post-petition interest. We will consider Plaintiffs' three points *seriatim.*

*The Plain Meaning of the Disputed Contractual Provision*
Defendants agree with Plaintiffs that the definition of "Subordinated Indebtedness" in the Indenture is unambiguous but contend that it has precisely the opposite meaning—that the words "with respect to the Credit Facility" are limiting and that only post-petition interest under the "Credit Facility" falls within the definition of Senior Indebtedness. Defendants moved for summary judgment on this point but, in light of the lack of time to issue a separate summary judgment decision, the Court reserved decision on the motion and heard all of the evidence proffered by the parties. It now concludes that the clause is not ambiguous and that Defendants' reading of the clause is the only plausible construction.

 **[2]**    **[3]**    **[4]**    Indentures are contracts, to be construed in accordance with ordinary contractual principles. In a very recent decision, the Second Circuit quoted prior authority and held that "It is a well-established rule in this Circuit that the 'interpretation of Indenture provisions is a matter of basic contract law.' " *Bank of New York Trust Co. N.A. v. Franklin Advisers, Inc.,* 726 F.3d 269, 277–78, 2013 WL 3942430 at *5 (2d Cir. Aug. 1, 2013)*, quoting *Jamie Sec. Co. v. The Ltd., Inc.,* 880 F.2d 1572, 1576 (2d Cir.1989)*, which in turn quoted *Sharon Steel Corp. v. Chase Manhattan Bank,* 691 F.2d 1039, 1049 (2d Cir.1982)*. Under basic principles of contract **\*338** law in New York, whose law governs the Indenture, words are to be given their plain reading. *LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.,* 424 F.3d 195, 206 (2d Cir.2005)* ("under New York law, 'words and phrases ... should be given their plain meaning' "). Moreover, "when interpreting a contract the entire contract must be considered so as to give each part meaning." *Bank of New York v. Franklin Advisers,* 726 F.3d at 278, 2013 WL 3942430 at *5*, quoting *Brooke Group Ltd. v. JCH Syndicate 488,* 87 N.Y.2d 530, 640 N.Y.S.2d 479, 663 N.E.2d 635, 637 (1996).

 **[5]**    Application of these basic principles leads to rejection of Plaintiffs' construction of the provision in question. Plaintiffs insist that the key words, "with respect to the Credit Facility," constitute a dependent clause that modifies the word "including." However, the clause at issue cannot be read to modify the preposition "including." It obviously modifies the words that come immediately after, "all interest accrued subsequent to the commencement of any bankruptcy or similar proceeding ..." The plain meaning is that the inclusion of post-petition interest in the definition of Senior Indebtedness is limited to ("with respect to") the Credit Facility.

Plaintiffs argue, correctly, that the word "including" is defined in the Indenture as "including, without limitation." (Convert. Indent. § 1.04(d).) [4] They contend that we must construe the provision in question as if it read "including [without limitation], with respect to the Credit Facility, all interest accrued subsequent to the commencement of any bankruptcy or similar proceeding...." However, inclusion of the words "without limitation" in the subject clause does not lead to the construction that Plaintiffs want, that the Credit Facility is deemed only one of an inclusive series of borrowings that would get the benefit of **\*339** subordination with respect to post-petition interest. The word "Credit Facility" does not follow the word "including" as if it were one of a series "without limitation." The words between "including" and "Credit Facility" are "with respect to," spelling out that the benefit of subordination of post-petition interest is given to the "Credit Facility," as defined.

[4]    There is a similar rule of construction in the Bankruptcy Code. *See*11 U.S.C. § 102(3) (providing that " 'includes' and 'including' are not limiting.")

The object of the preposition "including" is "all interest accrued subsequent to the commencement of any bankruptcy or similar proceeding...." Construing the term "including" as meaning "including without limitation post-petition interest" makes total sense. The definition of Senior Indebtedness includes "interest" on Indebtedness, and the drafters of the Indenture had every reason to make it clear that the inclusion

3500

of a provision dealing with post-petition interest would not imply that prepetition interest was not within the definition of Senior Indebtedness. [5]

[5]    In fact, there is no issue in this case that Senior Noteholders are entitled to prepetition interest before the Convertible Noteholders receive any distribution. The only dispute relates to post-petition interest.

Based on the foregoing, Defendants were entitled to summary judgment as to the plain meaning of the phrase in question, the first of the issues raised in the Complaint. As a consequence of the pressure of time, as mentioned above, the Court heard evidence on all issues, including background with regard to the drafting of the Indenture for the Convertible Notes and custom and practice with regard to the drafting of clauses providing for the right of senior creditors to obtain the benefit of subordination with respect to a claim for post-petition interest. [6] The available evidence supports the Court's construction of the phrase.

[6]    The Circuit Court held in *Bank of New York Trust Co. v. Franklin Advisors* that the use of such information is not error, especially when construing indenture provisions that are not boilerplate. 726 F.3d at 276–77, 2013 WL 3942430 at *4. As discussed above, some of the language in the definition of Senior Indebtedness may be considered boilerplate but the words "with respect to the Credit Facility" are not.

 **[6]**   It appears that the words "with respect to the Credit Facility" were introduced in an exchange of drafts between counsel for the prospective Convertible Noteholders and counsel for the holder of the then Senior Debt, LaSalle National Bank. The first draft, prepared by counsel for the Convertible Noteholders, had no provision at all relating to post-petition interest, thereby putting the Senior Creditors at risk of not having such rights. [7] A subsequent draft included the boilerplate provision providing that post-petition interest would be covered, and the next draft then inserted the clause at issue, "with respect to the Credit Facility." Although the record does not clearly show who introduced those six words, it seems obvious that they were inserted at the request of counsel for the Convertible Noteholders, as they reduce the scope of the subordination when it counts the most—in the event of a bankruptcy. In any event, the only relevant testimony in the record is that of counsel for LaSalle, who testified that the clause providing for inclusion of post-petition debt in the definition of Senior Indebtedness was drafted so as to give LaSalle protection. The testimony

of LaSalle's counsel is consistent with the construction of the relevant phrase as limiting, as LaSalle held the "Credit Facility" and would be protected even if subsequent holders of Senior Indebtedness were not. A "contract must be read to conform to the parties' reasonable expectations." *Bank of New York Trust Co. v. Franklin Advisors,* 726 F.3d at 279, 2013 WL 3942430 at *6, citing *Spear, Leeds & Kellogg v. Cent. Life Assurance Co.,* 85 F.3d 21, 28 (2d Cir.1996). The foregoing construction of the clause at issue is consistent with the reasonable expectations of the Convertible Noteholders and LaSalle, the parties who negotiated and were most immediately affected by the subject clause.

[7]    See discussion above relating to the Rule of Explicitness.

Plaintiffs nevertheless point out that the Indenture for their Notes, the Senior Indenture, has a definition of the term "Obligation" that contains only the standard language relating to post-petition interest, defining "Obligation" as including post-petition interest and omitting the words, "with respect to the Credit Agreement." (Pl. Ex. 41, Sr. Indent. § 1.01.) They say that KV, as the issuer of the Senior Notes, represented in the Senior Notes Purchase Agreement that "[t]he representations and warranties of the Company and each Guarantor [were] true and correct in all material respects...." Pl. Ex. 42, Sr. Notes Purch. Agmt. § 6(h). [8] They further claim that this demonstrates that KV, as the issuer of both the Senior Notes and the Convertible Notes, "understood the Convertible Notes to be subordinated to the Senior Notes' accrued post-petition interest" and that this constitutes a course of performance under a contract and "the **\*340** best evidence" of the parties' intent in entering into the contract. Pl. Br. at 33, quoting *Waverly Corp. v. City of New York,* 48 A.D.3d 261, 851 N.Y.S.2d 176, 179 (2008).

[8]    The Plaintiffs assert that, in this instrument, KV also represented that entry into the Senior Notes Indenture and issuance of the Senior Notes would not conflict with "any agreement, indenture or instrument to which [KV] or any of its Subsidiaries is a party...." (Pl. Ex. 42, Sr. Notes Purch. Agmt., § 3(d).)

Plaintiffs cannot find a pattern and practice of conduct in the construction of the Convertible Notes Indenture in the history they cite. The term "Obligation" in the Senior Notes Indenture defines the indebtedness that KV is obligated to repay and that is secured by the Collateral. [9] There is no question that an "Obligation" of KV is to pay interest, including post-petition interest in the event of a bankruptcy, and that this Obligation is secured by the Collateral that supports the Senior Notes.

There is also no question that if the Collateral securing the Senior Notes had a value that covered post-petition interest, the Senior Noteholders would be entitled to post-petition interest under § 506(b) of the Bankruptcy Code. Since there is no dispute that the Collateral does not have sufficient value, the Senior Creditors can only obtain post-petition interest if they are able to enforce the subordination provisions of the Convertible Notes Indenture and take it from the distribution to the Convertible Noteholders. There is no inconsistency between a broader definition of the term "Obligation" in the Senior Notes Indenture as compared to the definition of "Senior Indebtedness" in the Convertible Notes Indenture.

9       A Pledge and Security Agreement granted the collateral agent for the Senior Noteholders a security interest in certain of KV's assets, for payment of "Obligations." (Pl. Ex. 94, Pledge and Security Agmt., § 2.1.)

 **[7]**    In any event, to determine the extent of any subordination clause, one has to look at the agreement of the creditor who agreed to the subordination, not to the debt instrument of the senior creditor. In this case, this means the Indenture governing the Convertible Notes. James Gadsden, Defendants' expert on custom and practice in the drafting of indentures, so testified without contradiction. As for the Plaintiffs' claim that KV misrepresented the extent of the subordination, there was no testimony at trial from any of the Plaintiffs, some of whom are the original holders of the Senior Notes, that they or their counsel failed to review the definition of "Senior Indebtedness" in the Convertible Notes Indenture or take account of the explicit limitation contained therein. Indeed, it is disingenuous for Plaintiffs to claim that KV represented in an information memorandum to them that the Convertible Notes "are subordinate to all of [KV's] existing and future obligations." There is no evidence that any of the Senior Noteholders was confused by this overbroad generalization—debt is ordinarily subordinated to Senior Indebtedness, as defined, not all future obligations. In any event, a statement by KV cannot bind the Convertible Noteholders if the subordination is not provided for in their Indenture.

*The Rule of Explicitness*
The Plaintiffs' second argument is that "Rule of Explicitness," which is discussed above, was abrogated by the adoption of § 510(a) of the Bankruptcy Code in 1978 and that they are entitled to priority rights to post-petition interest simply because the Convertible Notes Indenture provides for the recovery of "interest." We suggest above that Plaintiffs are premature in declaring the death of the Rule of Explicitness. In any event, Plaintiffs' argument depends on the proposition that the words, "with respect to the Credit Facility," are not limiting. Whatever the result would have been had the Convertible Notes Indenture not included *any* provision relating to post-petition interest, it *did* have **\*341** such a provision, and it then limited that provision. The Rule of Explicitness provides useful background with respect to the drafting of the Convertible Notes Indenture, but it does not determine the outcome of this case.

*The Senior Notes as a Replacement for the LaSalle Facility*
 **[8]**    Plaintiffs' final and best argument is that the Senior Notes are a "replacement" for the LaSalle facility and thus entitled to priority in the payment of post-petition interest. There is no dispute that debt under the "Credit Facility" is entitled to such priority. As noted above, "Credit Facility" is defined in the Indenture as

> that certain Loan Agreement dated as of June 18, 1997, as amended, among the Company, certain subsidiaries of the Company and LaSalle Bank National Association, including all related notes, guarantees, collateral documents, instruments and agreements executed in connection therewith, as each may be *amended, modified, restated, renewed, replaced, refinanced or restructured* (including, without limitation, any amendment increasing the amount of available borrowing) from time to time. (Convert. Indent. § 1.01.) (Emphasis added)

Plaintiffs contend that the Senior Notes facility falls squarely within the definition of Credit Facility because it constitutes the original LaSalle Credit Facility as it was "amended, modified, restated, renewed, replaced, refinanced or restructured."

As the parties recognize, there was a substantial gap in time between the termination of the LaSalle facility in 2006 and the issuance of the current Senior Secured Notes in 2011. In the interim, the LaSalle facility was amended several times and

restated and then admittedly "replaced" by the 2006 Citibank Facility. In 2010, the Debtor was effectively prohibited from manufacturing drugs under a consent decree with the FDA, Citibank called a default and was repaid in full, and thereafter, the Debtor had no term or revolving borrowings until September 2010. The present Senior Secured Notes, in $225 million principal amount, were issued on or about March 17, 2011.

It is evident from the foregoing history that the Senior Secured Notes did not "replace" the LaSalle facility in a temporal sense, and the Senior Noteholders do not argue otherwise. There is also no dispute that the Senior Notes did not amend, modify, restate, renew, refinance or restructure the LaSalle facility, as each of these terms implies a direct change to or payment of the earlier debt. The Senior Creditors do contend, however, that the term "replace" should be construed in a "structural" sense, and that on a structural basis the Senior Notes took the place of (replaced) the LaSalle facility in the Debtor's capital structure as senior debt for money borrowed, even though there was a substantial gap in the Debtor's borrowing on such terms. The Senior Creditors have collected authority (including dictionary definitions) that supports their position that there can be a replacement notwithstanding a gap in time, and they introduced the testimony of Prof. Bradford Cornell, an expert in finance, that he would expect a company such as KV to have senior debt and that the Senior Notes play the same role in its capital structure as the LaSalle facility did. Plaintiffs conclude that their Notes are a "Credit Facility" for purposes of the definition of Senior Indebtedness because their facility "replaced" LaSalle's structurally.

 **[9]**  Plaintiffs have identified an ambiguity in the use of the term "replacement," but their argument that the term "replacement" should be construed to include any senior debt that was the functional equivalent of the LaSalle debt must be rejected.  **\*342**  The issue before the Court is the intention of the parties to the Convertible Notes Indenture when their lawyers drafted that instrument, and particularly what they intended when they inserted the words "with respect to the Credit Facility" in the definition of Senior Indebtedness and thereby limited the scope of senior creditors' priority. On the record of this case, construction of the term "Credit Facility" as equivalent to "senior indebtedness for money borrowed" would render the phrase "with respect to the Credit Facility" largely illusory, as any senior debt would be entitled to the benefits of subordination. Since there is nothing in the record that any senior debt other than the LaSalle facility existed, or that any such debt was contemplated,[10] there

would have been no reason to insert the limiting words, "with respect to the Credit Facility" if the result would merely prioritize all senior debt for the remaining 22 years of the Convertible Notes. It is a cardinal principle that contracts must be construed, if possible, so as to give each provision meaning. *LaSalle Bank v. Nomura Asset Capital Corp.,* 424 F.3d at 206. Construction of the term "Credit Facility" in a manner that equates it with "senior debt" deprives the limitation in the definition of Senior Indebtedness of any meaning.

[10]    The only indication in the record that the Debtor had any borrowings other than the LaSalle facility and the subsequent senior debt described above, as well as the Convertible Notes, is the testimony of the Debtor's chief financial officer, Thomas McHugh. He testified at deposition, introduced into the record, that when the 2006 Citibank Facility was repaid, he thought that there was some mortgage debt outstanding in addition to the Convertible Subordinated Notes. (McHugh Dep., 223: 9 – 224:10.) However, there was no testimony that this mortgage debt was Senior Indebtedness for purposes of the Convertible Notes, that any such indebtedness was outstanding in 2003 when the Convertible Notes were issued, or that the existence of such debt was considered by the drafters of the Convertible Notes Indenture.

Restriction of the concept of "replacement" to a facility which temporally replaced the LaSalle facility, on the other hand, is consistent with the construction of the clause "with respect to the Credit Facility" as a limiting concept. It is also consistent with the use of the terms "refinance" or "restructure" in the definition of "Credit Facility." A refinancing of the LaSalle facility would encompass a new facility whose proceeds were directed to the prior lender by the new lender. A restructuring would leave the old facility in place, in whole or in part, but change it substantially. A replacement would provide new funds to the debtor that would be used, directly or indirectly, and in part or in whole, to pay off the LaSalle facility. There is in fact one such replacement facility in the record, and there was no dispute among the parties that the 2006 Citibank Facility "replaced" the LaSalle facility. (Def. Ex. 7, Form 10– K.)

Construction of the term "replaced" in the manner discussed above is also supported by the record. The only testimony from the lawyers who actually drafted the Convertible Notes Indenture was that of Matthew O'Connor of the Vedder Price firm in Chicago (by deposition excerpt). O'Connor had no specific recollection of the negotiation of the words, "with respect to the Credit Facility." However, when asked what

3503

he meant by the term "replaced," he replied, "Typically that would encompass an amendment restatement or a refinance." (O'Connor Dep., 8/1/2013 at 33:8–11, 72:4–16.) He added that the word "replace" "would provide a mechanism by which the LaSalle facility would be replaced and taken out and LaSalle would be paid off." (*Id.* at 34:14–16.) If the Company used cash on hand to repay a lender **\*343** and "no other lender came in and provided funds to K–V to pay down the LaSalle facility," he would not "typically" view that as a replacement. (*Id.* at 69:6–16.)

O'Connor also testified that his intent in drafting the Indenture was to protect LaSalle:

A. Our role on behalf of LaSalle was to review the indenture and/or confidential offering memorandum to ensure the notes were subordinate and LaSalle had a priority position.

Q. Did you have any other goal with respect to the transaction?

A. We did not." (O'Connor Dep., 8/1/2013 at 28:13–19.)

Prof. Cornell on behalf of Plaintiffs theorized that this testimony would not rule out a functional definition of the term "replacement" because LaSalle would be better protected if the subordination provisions in the Convertible Notes Indenture covered, as to post-petition interest, not only LaSalle and any replacement, but every senior lender for an indeterminate period of time. Prof. Cornell reasoned that it would be easier to get financing to "replace" the LaSalle debt if the new lender could be confident that *its* replacement would also have the benefit of priority recovery

for post-petition interest in the event of a bankruptcy. This is a reasonable theory, but it cannot substitute for the lack of any record evidence that LaSalle took such a long view. On the contrary, in the negotiation of the Convertible Notes Indenture, in the back and forth between counsel intent on advancing the interests of the Convertible Noteholders, on the one hand, and counsel who sought to protect LaSalle, on the other, the available record evidence is that counsel for LaSalle acceded to a non-traditional amendment that limited post-petition interest that could be claimed in the future since any disadvantage to his client was speculative and remote. His agreement to this language, and the agreement of the Senior Noteholders to extend senior debt to KV notwithstanding the existence of this language, confirms that the Senior Noteholders have no claim to priority payment of post-petition interest.

## CONCLUSION

For the reasons stated above, the Court declares that the Senior Noteholders cannot, under the subordination provisions of the Convertible Notes Indenture, recover post-petition interest from the distribution to the Convertible Noteholders. The Defendants may settle a judgment on three days' notice.

IT IS SO ORDERED.

**All Citations**

496 B.R. 330, 58 Bankr.Ct.Dec. 128

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 45

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re | ) |
| | ) |
| | ) Case No. 24-90531 (CML) |
| *Light S.A. - Em Recuperação Judicial*,[1] | ) |
| | ) |
| Debtor in a Foreign Proceeding. | ) Chapter 15 |
| | ) |

**ORDER GRANTING (I) RECOGNITION OF BRAZILIAN PROCEEDING,
(II) FULL FORCE AND EFFECT TO BRAZILIAN RJ PLAN, AND
(III) CERTAIN RELATED RELIEF**

Upon the *Petitioner's Verified Petition for Recognition of Brazilian Proceeding and Motion for Order Granting Full Force and Effect to Brazilian Proceeding and Related Relief Pursuant to 11 U.S.C. §§ 105, 1145(a), 1507(a), 1509(b), 1515, 1517, 1520 and 1521* [ECF No. 2] (the "**Recognition Motion**")[2], Antonio Reinaldo Rabelo Filho (the "**Petitioner**" or the "**Foreign Representative**"), in his capacity as the duly-appointed foreign representative with respect to the Brazilian Proceeding (as defined below) of the above-captioned debtor (the "**Chapter 15 Debtor**," and the case, the "**Chapter 15 Case**") requesting this Order (the "**Order**") (a) granting the Recognition Motion and recognizing the judicial reorganization proceeding (the "**Brazilian Proceeding**") pending before the 3rd Business Court of Rio de Janeiro (the "**Brazilian Court**")[3] pursuant to Federal Law No. 11,101 of February 9, 2005 (the "**Brazilian Bankruptcy Law**") of the laws of the Federative Republic of Brazil ("**Brazil**") as the foreign main proceeding for the Chapter 15 Debtor as defined in section 1502(4) of title 11

---

[1] The debtor in this chapter 15 case and the last four digits of the tax number in the jurisdiction in which it pays taxes is Light S.A. - Em Recuperação Judicial (01-75 – Brazil).

[2] Capitalized terms used but not otherwise defined shall have the meanings ascribed to them in the Recognition Motion.

[3] The case number for the Brazilian Proceeding before the Brazilian Court is 0843430-58.2023.8.19.0001.

of the United States Code (the "**Bankruptcy Code**") pursuant to section 1517 the Bankruptcy Code; (b) recognizing that the Petitioner as the duly-appointed "foreign representative" of the Chapter 15 Debtor within the meaning of section 101(24) of the Bankruptcy Code and is authorized to act on behalf of the Chapter 15 Debtor in the Chapter 15 Case; (c) giving full force and effect and granting comity in the United States to the Brazilian RJ Plan and the Brazilian Confirmation Order; (d) declaring that the offer and sale (or deemed offer and sale) and, as applicable, the offer and resale of convertible and non-convertible securities governed by either New York law or Brazilian law offered under the Brazilian RJ Plan (the "**Exempt Securities**"), are exempt from the registration requirements of Section 5 of the Securities Act of 1933 (the "**Securities Act**") and any State or local law within the United States requiring registration for offer or sale of a security or licensing of an issuers of, underwriter of, or broker or dealer in, a security (the "**U.S. Registration Requirements**") pursuant to section 1145 of the Bankruptcy Code; (e) authorizing and directing the Directed Parties, and any other parties necessary to effectuate the relief requested herein, to take any and all actions necessary to give effect to the terms of the Brazilian RJ Plan; (f) limiting the liability of the DTC, in any capacity or any other settlement agent, The Bank of New York Mellon, in its capacity as Indenture Trustee, transfer agent, registrar, warrant agent, depositary or in any other capacity, and each of their respective current and former officers, directors, managers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, principals, members, employees, agents, attorneys, consultants, advisors, representatives and other professionals (the "**Directed Parties**") for any action or inaction taken in furtherance of, and/or in accordance with, this Order or the Brazilian RJ Plan, except for any liability arising from any action or inaction constituting gross negligence, fraud or willful misconduct as determined by this Court; (g) permanently enjoining all parties from commencing, continuing, or taking any action in the United States to interfere with the Brazilian Proceeding or the

2

3507

Brazilian RJ Plan; and (h) granting such other and further relief as the Court deems just and proper; and it appearing that this Court has jurisdiction to consider the Recognition Motion pursuant to sections 157 and 1334 of title 28 of the United States Code and the Order of Reference dated May 24, 2012, *In re Order of Reference to Bankruptcy Judges*, General Order 2012-6 (S.D. Tex. May 24, 2012) (Hinojosa, C.J.) (the "**Standing Order**"); and this being a core proceeding pursuant to section 157(b)(2)(P) of title 28 of the United States Code; and venue for this proceeding being proper before this Court pursuant to sections 1409(a) and 1410 of title 28 of the United States Code; and this Court having reviewed (i) the Form of Petition, (ii) the Recognition Motion, along with the exhibits annexed thereto, and (iii) the *Declaration of Luiz Roberto Ayoub Pursuant to 28 U.S.C. § 1746 in Support of the Petitioner's Verified Petition for Recognition of Brazilian Proceeding and Motion for Order Granting Full Force and Effect to Brazilian RJ Plan and Related Relief Pursuant to 11 U.S.C. §§ 105, 1145(a), 1507(a), 1509(b), 1515, 1517, 1520 and 1521* [ECF No. 3] (the "**Brazilian Counsel Declaration**"); and appropriate and timely notice of the filing of the Petition, the Recognition Motion and hearing on the Recognition Motion (the "**Hearing**") having been given; and no other or further notice being necessary or required; and this Court having determined that the legal and factual bases set forth in the Recognition Motion, the Brazilian Counsel Declaration, and all other pleadings and papers in this Chapter 15 Case establish just cause to grant the relief ordered herein; and after notice and a hearing and due deliberation thereon;

**THIS COURT HEREBY FINDS AND DETERMINES THAT:**

A.       The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute

3

3508

conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.     This Court has jurisdiction to consider this matter pursuant to sections 157 and 1334 of title 28 of the United States Code, and the Standing Order. This is a core proceeding pursuant to section 157(b)(2)(P) of title 28 of the United States Code and this Court has the statutory and constitutional authority to issue a final ruling with respect to this matter. Venue for this proceeding is proper before this Court pursuant to sections 1409(a) and 1410 of title 28 of the United States Code.

C.     The Petitioner is the duly appointed "foreign representative," within the meaning of section 101(24) of the Bankruptcy Code, of the Brazilian Proceeding with respect to the Chapter 15 Debtor.

D.     The Chapter 15 Case was properly commenced pursuant to sections 1504, 1509, and 1515 of the Bankruptcy Code.

E.     The Petitioner has satisfied the requirements of section 1515 of the Bankruptcy Code, Bankruptcy Rules 1007(a)(4), 2002(q) and 7007.1, and Rules 2002-4 and 9013-1(d) of the Local Bankruptcy Rules for the Southern District of Texas (the "**Local Rules**").

F.     Due and proper notice of the filing of, and the Hearing on, the Petition has been provided in accordance with the *Order (I) Scheduling Recognition Hearing, and (II) Specifying Form and Manner of Service of Notice* [ECF No. 17] (the "**Scheduling Order**") and in compliance with the requirements of Bankruptcy Rule 2002(q), which notice is deemed adequate for all purposes, and no other or further notice need be provided.

G.     The Brazilian Proceeding is a "foreign proceeding" pursuant to section 101(23) of the Bankruptcy Code.

H.     The Brazilian Proceeding is entitled to recognition by this Court pursuant to section 1517 of the Bankruptcy Code.

3509

I.      Brazil is the center of main interests of the Chapter 15 Debtor.  Accordingly, the Brazilian Proceeding is the "foreign main proceeding" of the Chapter 15 Debtor, as that term is defined in section 1502(4) of the Bankruptcy Code, and is entitled to recognition as such pursuant to section 1517(b)(1) of the Bankruptcy Code.

J.      The Petitioner and the Chapter 15 Debtor, as applicable, are entitled to the relief available pursuant to section 1520 of the Bankruptcy Code and to additional assistance and discretionary relief requested in the Petition pursuant to sections 1507 and 1521(a) of the Bankruptcy Code, to the extent set forth in this Order and subject to the limitation set forth in this Order.

K.      As part of the implementation of the Brazilian RJ Plan, the governing law of the Existing Notes changed from U.S. law (New York) to English law to ensure that the Existing Notes are fully restructured by a court-supervised process.

L.      The Chapter 15 Debtor commenced a scheme of arrangement pursuant to Part 26 of the United Kingdom Companies Act 2006 in the Chancery Division (Companies List) of the High Court of Justice of England and Wales (the "**English Proceeding**") to facilitate and implement the global restructuring of the Existing Notes.

M.      The English Proceeding is an integral part of the Chapter 15 Debtor's restructuring and implementation of the Brazilian RJ Plan.

N.      Absent permanent injunctive relief, the Brazilian Proceeding and the Chapter 15 Debtor's efforts to consummate the Brazilian RJ Plan could be thwarted by the actions of certain creditors, a result that would be inconsistent with the purposes of chapter 15 of the Bankruptcy Code as set forth, *inter alia*, in section 1501(a) of the Bankruptcy Code.  Such actions could threaten, frustrate, delay, and ultimately jeopardize the Brazilian Proceeding and implementation of the Brazilian RJ Plan, and, as a result, the Chapter 15 Debtor, its creditors

5

and such other parties in interest would suffer irreparable injury for which there is no adequate remedy at law.

O.     Each of the injunctions contained in this Order (i) is within the Court's jurisdiction, (ii) is essential to the success of the Brazilian Proceeding and Brazilian RJ Plan, (iii) is an integral element of the Brazilian Proceeding and Brazilian RJ Plan, and/or to their respective effectuation, (iv) confers material benefits on, and is in the best interests of the Chapter 15 Debtor and its creditors, including, without limitation, the Existing Noteholders, and (v) is important to the overall objectives of the Chapter 15 Debtor's restructuring.

P.     The cancellation of the Existing Notes (the "**Release of Guarantees**") as contemplated by the Brazilian RJ Plan as well as the procedures set forth therein and approved by the Brazilian Court with respect to making an election of a certain payment option under the Brazilian RJ Plan (the "**Election Solicitation Procedures**") (subject to the terms and conditions hereof) are essential elements of the Brazilian RJ Plan and are in the best interest of the Chapter 15 Debtor, its non-debtor Affiliates and its creditors, including the Existing Noteholders.

Q.     The relief granted herein will not cause undue hardship or inconvenience to any party in interest and, to the extent that any hardship or inconvenience may result to such parties, it is outweighed by the benefits of the requested relief to the Chapter 15 Debtor, its estate, and all of its creditors.

R.     The relief granted hereby is necessary and appropriate to effectuate the purposes and objectives of chapter 15 and to protect the Chapter 15 Debtor, its non-debtor Affiliates, its creditors and other parties in interest.

S.     Appropriate notice of the filing of Hearing on the Petition was given, which notice is deemed adequate for all purposes, and no other or further notice need be given.

6

3511

T.     The relief requested herein is necessary and appropriate, in the interests of the public and international comity; it is consistent with the public policy of the United States; it is warranted pursuant to sections 105(a), 1145(a), 1507(a), 1509(b), 1515, 1517, 1520, 1521(a) and 1525 of the Bankruptcy Code.

For all of the foregoing reasons, and for the reasons stated in the Recognition Motion and reflected in the record thereof, and after due deliberation and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED AND DECREED THAT:**

1.     The Petition and other relief requested in the Recognition Motion are hereby GRANTED as set forth herein.

2.     The Petitioner is the duly appointed foreign representative of the Brazilian Proceeding with respect to the Chapter 15 Debtor, within the meaning of section 101(24) of the Bankruptcy Code, and is authorized to act on behalf of the Chapter 15 Debtor in this Chapter 15 Case.

3.     The Brazilian Proceeding is granted recognition as the foreign main proceeding of the Chapter 15 Debtor pursuant to section 1517 of the Bankruptcy Code, and, along with the English Proceeding, is an integral part of the Chapter 15 Debtor's restructuring.

4.     The Brazilian Confirmation Order and the Brazilian RJ Plan, including any amendments or modifications thereto, and subject to all limitations and conditions precedent set forth therein, are hereby recognized, granted comity, and given full force and effect to the same extent that they are given effect in Brazil, and each is binding on all creditors of the Chapter 15 Debtor, including all Existing Noteholders, as well as the DTC and the Indenture Trustee, and any of their successors or assigns and all persons having notice of the Petition.

7

5.    All the relief and protection afforded to a foreign main proceeding pursuant to section 1520 of the Bankruptcy Code is hereby granted to the Brazilian Proceeding, the Chapter 15 Debtor, and all parties in interest, as applicable.

6.    The Petitioner, the Chapter 15 Debtor, and each of their respective successors, agents, representatives, advisors, and counsel shall be entitled to the protections contained in sections 306 and 1510 of the Bankruptcy Code.

7.    Subject to the continuing effectiveness of the Brazilian RJ Plan and Brazilian Confirmation Order and the continuing rights of the Existing Noteholders to receive distributions directly under the Brazilian RJ Plan and Election Solicitation Procedures, the Indenture, Existing Notes, instruments, certificates and other documents evidencing the Existing Noteholders' claims and rights related thereto shall be deemed satisfied, discharged, and cancelled automatically and of no force or effect upon entry of this Order; provided, however, that (i) the Indenture Trustee shall have the right to be paid its reasonably and properly incurred and documented fees and expenses incurred in furtherance to this Order and pursuant to the terms of the Indenture (including, for the avoidance of doubt, legal fees); and (ii) the charging lien of the Indenture Trustee shall survive pursuant to the terms of the Indenture.  All remaining positions on account of the Existing Notes on the books and records of the Indenture Trustee and the DTC shall be deemed terminated and cancelled following the termination of the Election Solicitation and the issuance of the New Securities.

8.    Each of the Directed Parties are hereby authorized and directed to take actions necessary to implement the restructuring transactions approved by the Brazilian Confirmation Order and shall fully cooperate and facilitate distributions of the Exempt Securities, as well as the cancellation of the Existing Notes, as applicable, pursuant to and/or in implementation of the Brazilian RJ Plan.  Additionally, the Foreign Representative is specifically authorized and directed to provide DTC with any required documentation for DTC to cancel the Existing

8

Notes.  Further, each of the Directed Parties are hereby authorized and directed to take any other lawful actions as instructed by, and at the expense of, the Chapter 15 Debtor that may be necessary to cancel the Existing Notes; including, but not limited to, that the Directed Parties shall be entitled to reimbursement for any fees, costs or expenses incurred in connection with their compliance with this Order or as otherwise authorized or directed by the Chapter 15 Debtor.

9.      The offer and issuance of the Exempt Securities to be issued, authenticated, and distributed pursuant to and in implementing the Brazilian RJ Plan shall be exempt to the fullest extent permitted from the registration requirements of Section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, registration, or sale of securities by reason of, without limitations, the exemptions afforded by section 1145 of the Bankruptcy Code, Section 4(a)(2) of the Securities Act and Rule 506 of Regulation D and/or other applicable exemption.

10.     Each of the Directed Parties shall be and hereby is permitted and required to accept and conclusively rely upon the Brazilian RJ Plan, the Brazilian Confirmation Order and this Order in lieu of a legal opinion regarding whether the Exempt Securities are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. Notwithstanding anything to the contrary in the Brazilian RJ Plan, Brazilian Confirmation Order or this Order, no Entity[4] (including, for the avoidance of doubt, each of the Directed Parties) may require a legal opinion regarding the validity of any transaction contemplated by the Brazilian RJ Plan, including, for the avoidance of doubt, whether the Exempt Securities, including any American Depositary Receipts (ADRs) and underlying shares of the Chapter 15 Debtor issuable upon the valid conversion or exercise, as applicable, of the foregoing are

---

[4]    *"Entity"* shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

9

3514

exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

11. Each of the Directed Parties shall be entitled to a full limitation of liability from and shall have no liability for any and all claims, obligations, suits, judgments, damages, rights, causes of action, and liabilities arising from, or in connection with, any action or inaction taken in furtherance of this Order, including, without limitation, any claims made by Existing Noteholders based upon the alleged continued existence of the Existing Notes and/or Indenture notwithstanding the cancellations and discharges made pursuant to this Order and/or the Brazilian RJ Plan (or in implementing the Brazilian RJ Plan), except for any liability arising from any action or inaction constituting fraud, willful misconduct or gross negligence as finally determined by the Court.

12. All Entities, other than the Petitioner and his expressly authorized representatives and agents, are hereby enjoined from:

    (a)    executing against any of the Chapter 15 Debtor's assets;

    (b)    the commencement or continuation of a judicial, administrative, arbitral, or other action or proceeding, or attempt to recover a claim, which in either case in any way relates to, or would interfere with or impede, the administration of the Chapter 15 Debtor's estate in the Brazilian Proceeding, or the solicitation, implementation, or consummations of the Brazilian RJ Plan, the Brazilian Confirmation Order, or the terms of this Order, including without limitation any and all unpaid judgments, settlements, notes, or otherwise against the Chapter 15 Debtor in the United States;

    (c)    taking or continuing any act to create, perfect, or enforce a lien or other security interest, set-off, or other claims against the Chapter 15 Debtor or any of their property;

    (d)    transferring, relinquishing, or disposing of any property of the Chapter 15 Debtor to an Entity other than the Petitioner; or

    (e)    commencing or continuing an individual action or proceeding concerning the Chapter 15 Debtor's assets, rights, obligations, or liabilities to the extent they have not been stayed pursuant to sections 1520(a) and 362 of the Bankruptcy Code;

10

*provided*, in each case, that such injunction shall be effective solely within the territorial jurisdiction of the United States and solely with respect to prepetition claims; *provided*, *further*, that all rights under the Brazilian RJ Plan shall be preserved and certain rights of the Indenture Trustee under the Indenture shall be preserved as set forth herein.

13. All Entities are permanently enjoined from taking any action within the territorial jurisdiction of the United States that is in contravention of or that is inconsistent with the Brazilian RJ Plan or the Brazilian Confirmation Order.

14. With respect to claims based upon, concerning or relating in any way to, the Existing Notes or the solicitation and/or implementation of the Brazilian RJ Plan, all persons and entities are enjoined and restrained from taking any action within the territorial jurisdiction of the United States (including, without limitation, commencing or continuing any action or legal proceeding (including, without limitation, bringing suit in any court, arbitration, meditation, or any judicial or quasi-judicial, administrative or regulatory action, proceeding or process whatsoever), whether directly or by way of counterclaim (and from seeking discovery of any nature related thereto)) that would interfere with or impede the administration, implementation and/or consummations of the Brazilian RJ Plan, and/or the terms of this Order against the Chapter 15 Debtor, the Petitioner, and the Directed Parties.

15. Notwithstanding anything to the contrary contained herein, this Order shall not be construed as enjoining (a) the police or regulatory act of a governmental unit, including a criminal action or proceeding, to the extent not stayed pursuant to section 362 of the Bankruptcy Code or staying the exercise of any rights not stayed pursuant to section 362(o) of the Bankruptcy Code, (b) any action permitted or contemplated by or taken with respect to the implementation of (i) the Brazilian RJ Plan, including the enforcement of the same, (ii) the Brazilian Confirmation Order, including the enforcement of the same, or (iii) any agreement entered into in connection with the Brazilian RJ Plan, including the enforcement of the same,

11

3516

or (c) solely to the extent that the Brazilian RJ Plan is no longer effective under Brazilian law for any reason, any action that is not prohibited by the Brazilian Court with jurisdiction over the Brazilian RJ Plan or Brazilian law.

16.     Notwithstanding any provision in the Bankruptcy Rules to the contrary: (a) this Order shall be effective immediately and enforceable upon entry; (b) the Petitioner is not subject to any stay in the implementation, enforcement, or realization of the relief granted in this Order; and (c) the Petitioner is authorized and empowered, and may, in his discretion and without further delay, take any action and perform any act necessary to implement and effectuate the terms of this Order.

17.     A copy of this Order, confirmed to be true and correct, shall be served by the Foreign Representative, within seven business days of entry of this Order, in accordance with this Court's Scheduling Order. Such service shall be good and sufficient service and adequate notice for all purposes.

18.     This Court shall retain jurisdiction with respect to all matters arising from or relating to the interpretation, implementation, enforcement, amendment, or modification of this Order and any requests for additional relief or any adversary proceeding brought in and through this case.

Date:     _____, 2024
          Houston, Texas.

 

 

-----------------------------------------

THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

12

3517

**Exhibit A**

**Blackline Against November 4, 2024 Proposed Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re | ) |
| | ) |
| | ) Case No. 24-90531 (CML) |
| *Light S.A. - Em Recuperação Judicial*,[1] | ) |
| | ) |
| Debtor in a Foreign Proceeding. | ) Chapter 15 |
| | ) |

**ORDER GRANTING (I) RECOGNITION OF BRAZILIAN PROCEEDING,
(II) FULL FORCE AND EFFECT TO BRAZILIAN RJ PLAN, AND
(III) CERTAIN RELATED RELIEF**

Upon the *Petitioner's Verified Petition for Recognition of Brazilian Proceeding and Motion for Order Granting Full Force and Effect to Brazilian Proceeding and Related Relief Pursuant to 11 U.S.C. §§ 105, 1145(a), 1507(a), 1509(b), 1515, 1517, 1520 and 1521* [ECF No. 2] (the "**Recognition Motion**")[2], Antonio Reinaldo Rabelo Filho (the "**Petitioner**" or the "**Foreign Representative**"), in his capacity as the duly-appointed foreign representative with respect to the Brazilian Proceeding (as defined below) of the above-captioned debtor (the "**Chapter 15 Debtor**," and the case, the "**Chapter 15 Case**") requesting this Order (the "**Order**") (a) granting the Recognition Motion and recognizing the judicial reorganization proceeding (the "**Brazilian Proceeding**") pending before the 3rd Business Court of Rio de Janeiro (the "**Brazilian Court**")[3] pursuant to Federal Law No. 11,101 of February 9, 2005 (the "**Brazilian Bankruptcy Law**") of the laws of the Federative Republic of Brazil ("**Brazil**") as the foreign main proceeding for the Chapter 15 Debtor as defined in section

---

[1] The debtor in this chapter 15 case and the last four digits of the tax number in the jurisdiction in which it pays taxes is Light S.A. - Em Recuperação Judicial (01-75 – Brazil).

[2] Capitalized terms used but not otherwise defined shall have the meanings ascribed to them in the Recognition Motion.

[3] The case number for the Brazilian Proceeding before the Brazilian Court is 0843430-58.2023.8.19.0001.

3519

1502(4) of title 11 of the United States Code (the "**Bankruptcy Code**") pursuant to section 1517 the Bankruptcy Code; (b) recognizing that the Petitioner as the duly-appointed "foreign representative" of the Chapter 15 Debtor within the meaning of section 101(24) of the Bankruptcy Code and is authorized to act on behalf of the Chapter 15 Debtor in the Chapter 15 Case; (c) giving full force and effect and granting comity in the United States to the Brazilian RJ Plan and the Brazilian Confirmation Order; (d) declaring that the offer and sale (or deemed offer and sale) and, as applicable, the offer and resale of convertible and non-convertible securities governed by either New York law or Brazilian law offered under the Brazilian RJ Plan (the "**Exempt Securities**"), are exempt from the registration requirements of Section 5 of the Securities Act of 1933 (the "**Securities Act**") and any State or local law within the United States requiring registration for offer or sale of a security or licensing of an issuers of, underwriter of, or broker or dealer in, a security (the "**U.S. Registration Requirements**") pursuant to section 1145 of the Bankruptcy Code; (e) authorizing and directing the Directed Parties, and any other parties necessary to effectuate the relief requested herein, to take any and all actions necessary to give effect to the terms of the Brazilian RJ Plan; (f) limiting the liability of the DTC, in any capacity or any other settlement agent, The Bank of New York Mellon, in its capacity as Indenture Trustee, transfer agent, registrar, warrant agent, depositary or in any other capacity, and each of their respective current and former officers, directors, managers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, principals, members, employees, agents, attorneys, consultants, advisors, representatives and other professionals (the "**Directed Parties**") for any action or inaction taken in furtherance of, and/or in accordance with, this Order or the Brazilian RJ Plan, except for any liability arising from any action or inaction constituting gross negligence, fraud or willful misconduct as determined by this Court; (g) permanently enjoining all parties from commencing,

2

continuing, or taking any action in the United States to interfere with the Brazilian Proceeding or the Brazilian RJ Plan; and (h) granting such other and further relief as the Court deems just and proper; and it appearing that this Court has jurisdiction to consider the Recognition Motion pursuant to sections 157 and 1334 of title 28 of the United States Code and the Order of Reference dated May 24, 2012, *In re Order of Reference to Bankruptcy Judges*, General Order 2012-6 (S.D. Tex. May 24, 2012) (Hinojosa, C.J.) (the "**Standing Order**"); and this being a core proceeding pursuant to section 157(b)(2)(P) of title 28 of the United States Code; and venue for this proceeding being proper before this Court pursuant to sections 1409(a) and 1410 of title 28 of the United States Code; and this Court having reviewed (i) the Form of Petition, (ii) the Recognition Motion, along with the exhibits annexed thereto, and (iii) the *Declaration of Luiz Roberto Ayoub Pursuant to 28 U.S.C. § 1746 in Support of the Petitioner's Verified Petition for Recognition of Brazilian Proceeding and Motion for Order Granting Full Force and Effect to Brazilian RJ Plan and Related Relief Pursuant to 11 U.S.C. §§ 105, 1145(a), 1507(a), 1509(b), 1515, 1517, 1520 and 1521* [ECF No. 3] (the "**Brazilian Counsel Declaration**"); and appropriate and timely notice of the filing of the Petition, the Recognition Motion and hearing on the Recognition Motion (the "**Hearing**") having been given; and no other or further notice being necessary or required; and this Court having determined that the legal and factual bases set forth in the Recognition Motion, the Brazilian Counsel Declaration, and all other pleadings and papers in this Chapter 15 Case establish just cause to grant the relief ordered herein; and after notice and a hearing and due deliberation thereon;

**THIS COURT HEREBY FINDS AND DETERMINES THAT:**

A.      The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), made applicable to this proceeding pursuant to

3

3521

Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B. This Court has jurisdiction to consider this matter pursuant to sections 157 and 1334 of title 28 of the United States Code, and the Standing Order. This is a core proceeding pursuant to section 157(b)(2)(P) of title 28 of the United States Code and this Court has the statutory and constitutional authority to issue a final ruling with respect to this matter. Venue for this proceeding is proper before this Court pursuant to sections 1409(a) and 1410 of title 28 of the United States Code.

C. The Petitioner is the duly appointed "foreign representative," within the meaning of section 101(24) of the Bankruptcy Code, of the Brazilian Proceeding with respect to the Chapter 15 Debtor.

D. The Chapter 15 Case was properly commenced pursuant to sections 1504, 1509, and 1515 of the Bankruptcy Code.

E. The Petitioner has satisfied the requirements of section 1515 of the Bankruptcy Code, Bankruptcy Rules 1007(a)(4), 2002(q) and 7007.1, and Rules 2002-4 and 9013-1(d) of the Local Bankruptcy Rules for the Southern District of Texas (the "**Local Rules**").

F. Due and proper notice of the filing of, and the Hearing on, the Petition has been provided in accordance with the *Order (I) Scheduling Recognition Hearing, and (II) Specifying Form and Manner of Service of Notice* [ECF No. [●]17] (the "**Scheduling Order**") and in compliance with the requirements of Bankruptcy Rule 2002(q), which notice is deemed adequate for all purposes, and no other or further notice need be provided.

G. The Brazilian Proceeding is a "foreign proceeding" pursuant to section 101(23) of the Bankruptcy Code.

4

3522

H.      The Brazilian Proceeding is entitled to recognition by this Court pursuant to section 1517 of the Bankruptcy Code.

I.       Brazil is the center of main interests of the Chapter 15 Debtor.  Accordingly, the Brazilian Proceeding is the "foreign main proceeding" of the Chapter 15 Debtor, as that term is defined in section 1502(4) of the Bankruptcy Code, and is entitled to recognition as such pursuant to section 1517(b)(1) of the Bankruptcy Code.

J.       The Petitioner and the Chapter 15 Debtor, as applicable, are entitled to the relief available pursuant to section 1520 of the Bankruptcy Code and to additional assistance and discretionary relief requested in the Petition pursuant to sections 1507 and 1521(a) of the Bankruptcy Code, to the extent set forth in this Order and subject to the limitation set forth in this Order.

K.      As part of the implementation of the Brazilian RJ Plan, the governing law of the Existing Notes changed from U.S. law (New York) to English law to ensure that the Existing Notes are fully restructured by a court-supervised process.

L.       The Chapter 15 Debtor commenced a scheme of arrangement pursuant to Part 26 of the United Kingdom Companies Act 2006 in the Chancery Division (Companies List) of the High Court of Justice of England and Wales (the "**English Proceeding**") to facilitate and implement the global restructuring of the Existing Notes.

M.      The English Proceeding is an integral part of the Chapter 15 Debtor's restructuring and implementation of the Brazilian RJ Plan.

N.      Absent permanent injunctive relief, the Brazilian Proceeding and the Chapter 15 Debtor's efforts to consummate the Brazilian RJ Plan could be thwarted by the actions of certain creditors, a result that would be inconsistent with the purposes of chapter 15 of the Bankruptcy Code as set forth, *inter alia*, in section 1501(a) of the Bankruptcy Code.  Such actions could threaten, frustrate, delay, and ultimately jeopardize the Brazilian Proceeding

and implementation of the Brazilian RJ Plan, and, as a result, the Chapter 15 Debtor, its creditors and such other parties in interest would suffer irreparable injury for which there is no adequate remedy at law.

O.      Each of the injunctions contained in this Order (i) is within the Court's jurisdiction, (ii) is essential to the success of the Brazilian Proceeding and Brazilian RJ Plan, (iii) is an integral element of the Brazilian Proceeding and Brazilian RJ Plan, and/or to their respective effectuation, (iv) confers material benefits on, and is in the best interests of the Chapter 15 Debtor and its creditors, including, without limitation, the Existing Noteholders, and (v) is important to the overall objectives of the Chapter 15 Debtor's restructuring.

P.      The cancellation of the Existing Notes (the "**Release of Guarantees**") as contemplated by the Brazilian RJ Plan as well as the procedures set forth therein and approved by the Brazilian Court with respect to making an election of a certain payment option under the Brazilian RJ Plan (the "**Election Solicitation Procedures**") (subject to the terms and conditions hereof) are essential elements of the Brazilian RJ Plan and are in the best interest of the Chapter 15 Debtor, its non-debtor Affiliates and its creditors, including the Existing Noteholders.

Q.      The relief granted herein will not cause undue hardship or inconvenience to any party in interest and, to the extent that any hardship or inconvenience may result to such parties, it is outweighed by the benefits of the requested relief to the Chapter 15 Debtor, its estate, and all of its creditors.

R.      The relief granted hereby is necessary and appropriate to effectuate the purposes and objectives of chapter 15 and to protect the Chapter 15 Debtor, its non-debtor Affiliates, its creditors and other parties in interest.

S.      Appropriate notice of the filing of Hearing on the Petition was given, which notice is deemed adequate for all purposes, and no other or further notice need be given.

T.      The relief requested herein is necessary and appropriate, in the interests of the public and international comity; it is consistent with the public policy of the United States; it is warranted pursuant to sections 105(a), 1145(a), 1507(a), 1509(b), 1515, 1517, 1520, 1521(a) and 1525 of the Bankruptcy Code.

For all of the foregoing reasons, and for the reasons stated in the Recognition Motion and reflected in the record thereof, and after due deliberation and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED AND DECREED THAT:**

1.      The Petition and other relief requested in the Recognition Motion are hereby GRANTED as set forth herein.

2.      The Petitioner is the duly appointed foreign representative of the Brazilian Proceeding with respect to the Chapter 15 Debtor, within the meaning of section 101(24) of the Bankruptcy Code, and is authorized to act on behalf of the Chapter 15 Debtor in this Chapter 15 Case.

3.      The Brazilian Proceeding is granted recognition as the foreign main proceeding of the Chapter 15 Debtor pursuant to section 1517 of the Bankruptcy Code, and, along with the English Proceeding, is an integral part of the Chapter 15 Debtor's restructuring.

4.      The Brazilian Confirmation Order and the Brazilian RJ Plan, including any amendments or modifications thereto, and subject to all limitations and conditions precedent set forth therein, are hereby recognized, granted comity, and given full force and effect to the same extent that they are given effect in Brazil, and each is binding on all creditors of the Chapter 15 Debtor, including all Existing Noteholders, as well as the DTC and the Indenture Trustee, and any of their successors or assigns and all persons having notice of the Petition.

7

5. All the relief and protection afforded to a foreign main proceeding pursuant to section 1520 of the Bankruptcy Code is hereby granted to the Brazilian Proceeding, the Chapter 15 Debtor, and all parties in interest, as applicable.

6. The Petitioner, the Chapter 15 Debtor, and each of their respective successors, agents, representatives, advisors, and counsel shall be entitled to the protections contained in sections 306 and 1510 of the Bankruptcy Code.

7. Subject to the continuing effectiveness of the Brazilian RJ Plan and Brazilian Confirmation Order and the continuing rights of the Existing Noteholders to receive distributions directly under the Brazilian RJ Plan and Election Solicitation Procedures, the Indenture, Existing Notes, instruments, certificates and other documents evidencing the Existing Noteholders' claims and rights related thereto shall be deemed satisfied, discharged, and cancelled automatically and of no force or effect upon entry of this Order; provided, however, that (i) the Indenture Trustee shall have the right to be paid its reasonably and properly incurred and documented fees and expenses incurred in furtherance to this Order and pursuant to the terms of the Indenture (including, for the avoidance of doubt, legal fees); and (ii) the charging lien of the Indenture Trustee shall survive pursuant to the terms of the Indenture. All remaining positions on account of the Existing Notes on the books and records of the Indenture Trustee and the DTC shall be deemed terminated and cancelled following the termination of the Election Solicitation and the issuance of the New Securities.

8. Each of the Directed Parties are hereby authorized and directed to take actions necessary to implement the restructuring transactions approved by the Brazilian Confirmation Order and shall fully cooperate and facilitate distributions of the Exempt Securities, as well as the cancellation of the Existing Notes, as applicable, pursuant to and/or in implementation of the Brazilian RJ Plan. Additionally, the Foreign Representative is specifically authorized and directed to provide DTC with any required documentation for DTC to cancel the Existing

8

Notes.  Further, each of the Directed Parties are hereby authorized and directed to take any other lawful actions as instructed by, and at the expense of, the Chapter 15 Debtor that may be necessary to cancel the Existing Notes; including, but not limited to, that the Directed Parties shall be entitled to reimbursement for any fees, costs or expenses incurred in connection with their compliance with this Order or as otherwise authorized or directed by the Chapter 15 Debtor.

9.      The offer and issuance of the Exempt Securities to be issued, authenticated, and distributed pursuant to and in implementing the Brazilian RJ Plan shall be exempt to the fullest extent permitted from the registration requirements of Section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, registration, or sale of securities by reason of, without limitations, the exemptions afforded by section 1145 of the Bankruptcy Code, Section 4(a)(2) of the Securities Act and Rule 506 of Regulation D and/or other applicable exemption.

10.      Each of the Directed Parties shall be and hereby is permitted and required to accept and conclusively rely upon the Brazilian RJ Plan, the Brazilian Confirmation Order and this Order in lieu of a legal opinion regarding whether the Exempt Securities are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.  Notwithstanding anything to the contrary in the Brazilian RJ Plan, Brazilian Confirmation Order or this Order, no Entity[4] (including, for the avoidance of doubt, each of the Directed Parties) may require a legal opinion regarding the validity of any transaction contemplated by the Brazilian RJ Plan, including, for the avoidance of doubt, whether the Exempt Securities, including any American Depositary Receipts (ADRs) and underlying shares of the Chapter 15 Debtor issuable upon the valid conversion or exercise, as applicable,

---

[4]     "*Entity*" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

of the foregoing are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

11. Each of the Directed Parties shall be entitled to a full limitation of liability from and shall have no liability for any and all claims, obligations, suits, judgments, damages, rights, causes of action, and liabilities arising from, or in connection with, any action or inaction taken in furtherance of this Order, including, without limitation, any claims made by Existing Noteholders based upon the alleged continued existence of the Existing Notes and/or Indenture notwithstanding the cancellations and discharges made pursuant to this Order and/or the Brazilian RJ Plan (or in implementing the Brazilian RJ Plan), except for any liability arising from any action or inaction constituting fraud, willful misconduct or gross negligence as finally determined by the Court.

12. All Entities, other than the Petitioner and his expressly authorized representatives and agents, are hereby enjoined from:

(a) executing against any of the Chapter 15 Debtor's assets;

(b) the commencement or continuation of a judicial, administrative, arbitral, or other action or proceeding, or attempt to recover a claim, which in either case in any way relates to, or would interfere with or impede, the administration of the Chapter 15 Debtor's estate in the Brazilian Proceeding, or the solicitation, implementation, or consummations of the Brazilian RJ Plan, the Brazilian Confirmation Order, or the terms of this Order, including without limitation any and all unpaid judgments, settlements, notes, or otherwise against the Chapter 15 Debtor in the United States;

(c) taking or continuing any act to create, perfect, or enforce a lien or other security interest, set-off, or other claims against the Chapter 15 Debtor or any of their property;

(d) transferring, relinquishing, or disposing of any property of the Chapter 15 Debtor to an Entity other than the Petitioner; or

(e) commencing or continuing an individual action or proceeding concerning the Chapter 15 Debtor's assets, rights, obligations, or liabilities to the extent they have not been stayed pursuant to sections 1520(a) and 362 of the Bankruptcy Code;

10

3528

*provided*, in each case, that such injunction shall be effective solely within the territorial jurisdiction of the United States and solely with respect to prepetition claims; *provided, further*, that all rights under the Brazilian RJ Plan shall be preserved and certain rights of the Indenture Trustee under the Indenture shall be preserved as set forth herein.

13.    All Entities are permanently enjoined from taking any action within the territorial jurisdiction of the United States that is in contravention of or that is inconsistent with the Brazilian RJ Plan or the Brazilian Confirmation Order.

14.    With respect to claims based upon, concerning or relating in any way to, the Existing Notes or the solicitation and/or implementation of the Brazilian RJ Plan, all persons and entities are enjoined and restrained from taking any action within the territorial jurisdiction of the United States (including, without limitation, commencing or continuing any action or legal proceeding (including, without limitation, bringing suit in any court, arbitration, meditation, or any judicial or quasi-judicial, administrative or regulatory action, proceeding or process whatsoever), whether directly or by way of counterclaim (and from seeking discovery of any nature related thereto)) that would interfere with or impede the administration, implementation and/or consummations of the Brazilian RJ Plan, and/or the terms of this Order against the Chapter 15 Debtor, the Petitioner, and the Directed Parties.

15.    Notwithstanding anything to the contrary contained herein, this Order shall not be construed as enjoining (a) the police or regulatory act of a governmental unit, including a criminal action or proceeding, to the extent not stayed pursuant to section 362 of the Bankruptcy Code or staying the exercise of any rights not stayed pursuant to section 362(o) of the Bankruptcy Code, (b) any action permitted or contemplated by or taken with respect to the implementation of (i) the Brazilian RJ Plan, including the enforcement of the same, (ii) the Brazilian Confirmation Order, including the enforcement of the same, or (iii) any

11

3529

agreement entered into in connection with the Brazilian RJ Plan, including the enforcement of the same, or (c) solely to the extent that the Brazilian RJ Plan is no longer effective under Brazilian law for any reason, any action that is not prohibited by the Brazilian Court with jurisdiction over the Brazilian RJ Plan or Brazilian law.

16. Notwithstanding any provision in the Bankruptcy Rules to the contrary: (a) this Order shall be effective immediately and enforceable upon entry; (b) the Petitioner is not subject to any stay in the implementation, enforcement, or realization of the relief granted in this Order; and (c) the Petitioner is authorized and empowered, and may, in his discretion and without further delay, take any action and perform any act necessary to implement and effectuate the terms of this Order.

17. A copy of this Order, confirmed to be true and correct, shall be served by the Foreign Representative, within seven business days of entry of this Order, in accordance with this Court's Scheduling Order. Such service shall be good and sufficient service and adequate notice for all purposes.

18. This Court shall retain jurisdiction with respect to all matters arising from or relating to the interpretation, implementation, enforcement, amendment, or modification of this Order and any requests for additional relief or any adversary proceeding brought in and through this case.

Date: _____, 2024
Houston, Texas.

_____
THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

12

3530

## Exhibit B

**Cumulative Blackline**

3531

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re | ) |
| | ) |
| | ) Case No. 24-90531 (CML) |
| *Light S.A. - Em Recuperação Judicial*,[1] | ) |
| | ) |
| Debtor in a Foreign Proceeding. | ) Chapter 15 |
| | ) |

**ORDER GRANTING (I) RECOGNITION OF BRAZILIAN PROCEEDING,**
**(II) FULL FORCE AND EFFECT TO BRAZILIAN RJ PLAN, AND**
**(III) CERTAIN RELATED RELIEF**

Upon the *Petitioner's Verified Petition for Recognition of Brazilian Proceeding and Motion for Order Granting Full Force and Effect to Brazilian Proceeding and Related Relief Pursuant to 11 U.S.C. §§ 105, 1145(a), 1507(a), 1509(b), 1515, 1517, 1520 and 1521* [ECF No. 2] (the "**Recognition Motion**")[2], Antonio Reinaldo Rabelo Filho (the "**Petitioner**" or the "**Foreign Representative**"), in his capacity as the duly-appointed foreign representative with respect to the Brazilian Proceeding (as defined below) of the above-captioned debtor (the "**Chapter 15 Debtor**," and the case, the "**Chapter 15 Case**") requesting this Order (the "**Order**") (a) granting the Recognition Motion and recognizing the judicial reorganization proceeding (the "**Brazilian Proceeding**") pending before the 3rd Business Court of Rio de Janeiro (the "**Brazilian Court**")[3] pursuant to Federal Law No. ~~11.101~~11,101 of February 9, 2005 (the "**Brazilian Bankruptcy Law**") of the laws of the Federative Republic of Brazil ("**Brazil**") as the foreign main proceeding for the Chapter 15 Debtor as defined in section

---

[1]   The debtor in this chapter 15 case and the last four digits of the tax number in the jurisdiction in which it pays taxes is Light S.A. - Em Recuperação Judicial (01-75 – Brazil).

[2]   Capitalized terms used but not otherwise defined shall have the meanings ascribed to them in the Recognition Motion.

[3]   The case number for the Brazilian Proceeding before the Brazilian Court is 0843430-58.2023.8.19.0001.

3532

1502(4) of title 11 of the United States Code (the "**Bankruptcy Code**") pursuant to section 1517 the Bankruptcy Code; (b) recognizing that the Petitioner as the duly-appointed "foreign representative" of the Chapter 15 Debtor within the meaning of section 101(24) of the Bankruptcy Code and is authorized to act on behalf of the Chapter 15 Debtor in the Chapter 15 Case; (c) giving full force and effect and granting comity in the United States to the Brazilian RJ Plan and the Brazilian Confirmation Order; (d) declaring that the offer and sale (or deemed offer and sale) and, as applicable, the offer and resale of ~~the~~ convertible and non-convertible securities governed by either New York law or Brazilian law offered under the Brazilian RJ Plan (the "**Exempt Securities**"), are exempt from the registration requirements of Section 5 of the Securities Act of 1933 (the "**Securities Act**") and any State or local law within the United States requiring registration for offer or sale of a security or licensing of an issuers of, underwriter of, or broker or dealer in, a security (the "**U.S. Registration Requirements**") pursuant to section 1145 of the Bankruptcy Code~~, to the extent a vote on the Brazilian RJ Plan is considered an offer and sale of such securities~~; (e) authorizing and directing the Directed Parties, and any other parties necessary to effectuate the relief requested herein, to take any and all actions necessary to give effect to the terms of the Brazilian RJ Plan; (f) ~~exculpating and releasing the~~ limiting the liability of the DTC, in any capacity or any other settlement agent, The Bank of New York Mellon, in its capacity as Indenture Trustee, transfer agent, registrar, warrant agent, depositary or in any other capacity, and each of their respective current and former officers, directors, managers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, principals, members, employees, agents, attorneys, consultants, advisors, representatives and other professionals (the "**Directed Parties** ~~from any liability~~") for any action or inaction taken in furtherance of, and/or in accordance with, this Order or the Brazilian RJ Plan, except for any liability arising from any action or inaction constituting

gross negligence, fraud or willful misconduct as determined by this Court; (g) permanently enjoining all parties from commencing, continuing, or taking any action in the United States to interfere with the Brazilian Proceeding or the Brazilian RJ Plan; and (h) granting such other and further relief as the Court deems just and proper; and it appearing that this Court has jurisdiction to consider the Recognition Motion pursuant to sections 157 and 1334 of title 28 of the United States Code and the Order of Reference dated May 24, 2012, *In re Order of Reference to Bankruptcy Judges*, General Order 2012-6 (S.D. Tex. May 24, 2012) (Hinojosa, C.J.) (the "**Standing Order**"); and this being a core proceeding pursuant to section 157(b)(2)(P) of title 28 of the United States Code; and venue for this proceeding being proper before this Court pursuant to sections 1409(a) and 1410 of title 28 of the United States Code; and this Court having reviewed (i) the Form of Petition, (ii) the Recognition Motion, along with the exhibits annexed thereto, and (iii) the *Declaration of Luiz Roberto Ayoub Pursuant to 28 U.S.C. § 1746 in Support of the Petitioner's Verified Petition for Recognition of Brazilian Proceeding and Motion for Order Granting Full Force and Effect to Brazilian RJ Plan and Related Relief Pursuant to 11 U.S.C. §§ 105, 1145(a), 1507(a), 1509(b), 1515, 1517, 1520 and 1521* [ECF No. 3] (the "**Brazilian Counsel Declaration**"); and appropriate and timely notice of the filing of the Petition, the Recognition Motion and hearing on the Recognition Motion (the "**Hearing**") having been given; and no other or further notice being necessary or required; and this Court having determined that the legal and factual bases set forth in the Recognition Motion, the Brazilian Counsel Declaration, and all other pleadings and papers in this Chapter 15 Case establish just cause to grant the relief ordered herein; and after notice and a hearing and due deliberation thereon;

THIS COURT HEREBY FINDS AND DETERMINES THAT:

A. The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy

3

3534

Procedure (the "**Bankruptcy Rules**"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.      This Court has jurisdiction to consider this matter pursuant to sections 157 and 1334 of title 28 of the United States Code, and the Standing Order. This is a core proceeding pursuant to section 157(b)(2)(P) of title 28 of the United States Code and this Court has the statutory and constitutional authority to issue a final ruling with respect to this matter. Venue for this proceeding is proper before this Court pursuant to sections 1409(a) and 1410 of title 28 of the United States Code.

C.      The Petitioner is the duly appointed "foreign representative," within the meaning of section 101(24) of the Bankruptcy Code, of the Brazilian Proceeding with respect to the Chapter 15 Debtor.

D.      The Chapter 15 Case was properly commenced pursuant to sections 1504, 1509, and 1515 of the Bankruptcy Code.

E.      The Petitioner has satisfied the requirements of section 1515 of the Bankruptcy Code, Bankruptcy Rules 1007(a)(4), 2002(q) and 7007.1, and Rules 2002-4 and 9013-1(d) of the Local Bankruptcy Rules for the Southern District of Texas (the "**Local Rules**").

F.      Due and proper notice of the filing of, and the Hearing on, the Petition has been provided in accordance with the *Order (I) Scheduling Recognition Hearing, and (II) Specifying Form and Manner of Service of Notice* [ECF No. [●]17] (the "**Scheduling Order**") and in compliance with the requirements of Bankruptcy Rule 2002(q), which notice is deemed adequate for all purposes, and no other or further notice need be provided.

4

3535

G. The Brazilian Proceeding is a "foreign proceeding" pursuant to section 101(23) of the Bankruptcy Code.

H. The Brazilian Proceeding is entitled to recognition by this Court pursuant to section 1517 of the Bankruptcy Code.

I. Brazil is the center of main interests of the Chapter 15 Debtor. Accordingly, the Brazilian Proceeding is the "foreign main proceeding" of the Chapter 15 Debtor, as that term is defined in section 1502(4) of the Bankruptcy Code, and is entitled to recognition as such pursuant to section 1517(b)(1) of the Bankruptcy Code.

J. The Petitioner and the Chapter 15 Debtor, as applicable, are entitled to the relief available pursuant to section 1520 of the Bankruptcy Code and to additional assistance and discretionary relief requested in the Petition pursuant to sections 1507 and 1521(a) of the Bankruptcy Code, to the extent set forth in this Order and subject to the limitation set forth in this Order.

K. As part of the implementation of the Brazilian RJ Plan, the governing law of the Existing Notes changed from U.S. law (New York) to English law to ensure that the Existing Notes are fully restructured by a court-supervised process.

L. The Chapter 15 Debtor commenced a scheme of arrangement pursuant to Part 26 of the United Kingdom Companies Act 2006 in the Chancery Division (Companies List) of the High Court of Justice of England and Wales (the "**English Proceeding**") to facilitate and implement the global restructuring of the Existing Notes.

M. The English Proceeding is an integral part of the Chapter 15 Debtor's restructuring and implementation of the Brazilian RJ Plan.

N. Absent permanent injunctive relief, the Brazilian Proceeding and the Chapter 15 Debtor's efforts to consummate the Brazilian RJ Plan could be thwarted by the actions of certain creditors, a result that would be inconsistent with the purposes of chapter 15 of the

5

Bankruptcy Code as set forth, *inter alia*, in section 1501(a) of the Bankruptcy Code. Such actions could threaten, frustrate, delay, and ultimately jeopardize the Brazilian Proceeding and implementation of the Brazilian RJ Plan, and, as a result, the Chapter 15 Debtor, its creditors and such other parties in interest would suffer irreparable injury for which there is no adequate remedy at law.

O.      Each of the injunctions contained in this Order (i) is within the Court's jurisdiction, (ii) is essential to the success of the Brazilian Proceeding and Brazilian RJ Plan, (iii) is an integral element of the Brazilian Proceeding and Brazilian RJ Plan, and/or to their respective effectuation, (iv) confers material benefits on, and is in the best interests of the Chapter 15 Debtor and its creditors, including, without limitation, the Existing Noteholders, and (v) is important to the overall objectives of the Chapter 15 Debtor's restructuring.

P.      The cancellation of the Existing Notes (the "**Release of Guarantees**") as contemplated by the Brazilian RJ Plan as well as the procedures set forth therein and approved by the Brazilian Court with respect to making an election of a certain payment option under the Brazilian RJ Plan (the "**Election Solicitation Procedures**") (subject to the terms and conditions hereof) are essential elements of the Brazilian RJ Plan and are in the best interest of the Chapter 15 Debtor, its non-debtor Affiliates and its creditors, including the Existing Noteholders.

Q.      The relief granted herein will not cause undue hardship or inconvenience to any party in interest and, to the extent that any hardship or inconvenience may result to such parties, it is outweighed by the benefits of the requested relief to the Chapter 15 Debtor, its estate, and all of its creditors.

R.      The relief granted hereby is necessary and appropriate to effectuate the purposes and objectives of chapter 15 and to protect the Chapter 15 Debtor, its non-debtor Affiliates, its creditors and other parties in interest.

6

S.      Appropriate notice of the filing of Hearing on the Petition was given, which notice is deemed adequate for all purposes, and no other or further notice need be given.

T.      The relief requested herein is necessary and appropriate, in the interests of the public and international comity; it is consistent with the public policy of the United States; it is warranted pursuant to sections 105(a), 1145(a), 1507(a), 1509(b), 1515, 1517, 1520, 1521(a) and 1525 of the Bankruptcy Code.

For all of the foregoing reasons, and for the reasons stated in the Recognition Motion and reflected in the record thereof, and after due deliberation and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED AND DECREED THAT:**

1.      The Petition and other relief requested in the Recognition Motion are hereby GRANTED as set forth herein.

2.      The Petitioner is the duly appointed foreign representative of the Brazilian Proceeding with respect to the Chapter 15 Debtor, within the meaning of section 101(24) of the Bankruptcy Code, and is authorized to act on behalf of the Chapter 15 Debtor in this Chapter 15 Case.

3.      The Brazilian Proceeding is granted recognition as the foreign main proceeding of the Chapter 15 Debtor pursuant to section 1517 of the Bankruptcy Code, and, along with the English Proceeding, is an integral part of the Chapter 15 Debtor's restructuring.

4.      The Brazilian Confirmation Order and the Brazilian RJ Plan, including any amendments or modifications thereto, and subject to all limitations and conditions precedent set forth therein, are hereby recognized, granted comity, and given full force and effect to the same extent that they are given effect in Brazil, and each is binding on all creditors of the

7

Chapter 15 Debtor, including all Existing Noteholders, as well as the DTC and the Indenture Trustee, and any of their successors or assigns and all persons having notice of the Petition.

5. All the relief and protection afforded to a foreign main proceeding pursuant to section 1520 of the Bankruptcy Code is hereby granted to the Brazilian Proceeding, the Chapter 15 Debtor, and all parties in interest, as applicable.

6. The Petitioner, the Chapter 15 Debtor, and each of their respective successors, agents, representatives, advisors, and counsel shall be entitled to the protections contained in sections 306 and 1510 of the Bankruptcy Code.

7. Subject to the continuing effectiveness of the Brazilian RJ Plan and Brazilian Confirmation Order and the continuing rights of the Existing Noteholders to receive distributions directly under the Brazilian RJ Plan and Election Solicitation Procedures, the Indenture, Existing Notes, instruments, certificates and other documents evidencing the Existing Noteholders' claims and rights related thereto shall be deemed satisfied, discharged, and cancelled automatically and of no force or effect upon entry of this Order; provided, however, that (i) the Indenture Trustee shall have the right to be paid its reasonably and properly incurred and documented fees and expenses incurred in furtherance to this Order and pursuant to the terms of the Indenture (including, for the avoidance of doubt, legal fees); and (ii) the charging lien of the Indenture Trustee shall survive pursuant to the terms of the Indenture. All remaining positions on account of the Existing Notes on the books and records of the Indenture Trustee and the DTC shall be deemed terminated and cancelled following the termination of the Election Solicitation and the issuance of the New Securities.

8. The Each of the Directed Parties, their agents, attorneys, successors, and assigns are hereby authorized and directed to take actions necessary to implement the restructuring transactions approved by the Brazilian Confirmation Order, and shall fully cooperate and facilitate distributions of the Exempt Securities, as well as the cancellation of

8

the Existing Notes, as applicable, pursuant to and/or in implementation of the Brazilian RJ Plan. Additionally, the Foreign Representative is specifically authorized and directed to provide DTC with any required documentation for DTC to cancel the Existing Notes. Further, each of the Directed Parties, their agents, attorneys, successors, and assigns are hereby authorized and directed to take any other lawful actions as instructed by, and at the expense of, the Chapter 15 Debtor that may be necessary to cancel the Existing Notes; including, but not limited to, that the Directed Parties shall be entitled to reimbursement for any fees, costs or expenses incurred in connection with their compliance with this Order or as otherwise authorized or directed by the Chapter 15 Debtor.

9.     The offer and issuance of the Exempt Securities to be issued, authenticated, and distributed pursuant to and in implementing the Brazilian RJ Plan shall be exempt to the fullest extent permitted from the registration requirements of Section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, registration, or sale of securities by reason of, without limitations, the exemptions afforded by section 1145 of the Bankruptcy Code, Section 4(a)(2) of the Securities Act and Rule 506 of Regulation D and/or other applicable exemption.

10.     Each of the Directed Parties shall be and hereby is permitted and required to accept and conclusively rely upon the Brazilian RJ Plan, the Brazilian Confirmation Order and this Order in lieu of a legal opinion regarding whether the Exempt Securities are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. Notwithstanding anything to the contrary in the Brazilian RJ Plan, Brazilian Confirmation Order or this Order, no Entity[4] (including, for the avoidance of doubt, each of the Directed Parties) may require a legal opinion regarding the validity of any transaction

---

[4]   *"Entity"* shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

contemplated by the Brazilian RJ Plan, including, for the avoidance of doubt, whether the Exempt Securities, including any American Depositary Receipts (ADRs) and underlying shares of the Chapter 15 Debtor issuable upon the valid conversion or exercise, as applicable, of the foregoing are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

11. 10. Each of the ~~DTC, the Indenture Trustee,~~ Bank of New York Mellon, in its capacity as Indenture Trustee, and each of their respective current and former officers, directors, managers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, principals, members, employees, agents, attorneys, consultants, advisors, representatives and other professionals, ~~shall be exculpated and released from~~Directed Parties shall be entitled to a full limitation of liability from and shall have no liability for any and all claims, obligations, suits, judgments, damages, rights, causes of action, and liabilities arising from, or in connection with, any action or inaction taken in furtherance of this Order, including, without limitation, any claims made by Existing Noteholders based upon the alleged continued existence of the Existing Notes and/or Indenture notwithstanding the cancellations and discharges made pursuant to this Order and/or the Brazilian RJ Plan (or in implementing the Brazilian RJ Plan), except for any liability arising from any action or inaction constituting fraud, willful misconduct or gross negligence as finally determined by the Court.

12. 11. All ~~entities (as that term is defined in section 101(15) of the Bankruptcy Code)~~Entities, other than the Petitioner and his expressly authorized representatives and agents, are hereby enjoined from:

(a) executing against any of the Chapter 15 Debtor's assets;

(b) the commencement or continuation of a judicial, administrative, arbitral, or other action or proceeding, or attempt to recover a claim, which in either case in any way relates to, or would interfere with or impede, the administration of the Chapter 15 Debtor's estate in the

10

Brazilian Proceeding, or the solicitation, implementation, or consummations of the Brazilian RJ Plan, the Brazilian Confirmation Order, or the terms of this Order, including without limitation any and all unpaid judgments, settlements, notes, or otherwise against the Chapter 15 Debtor in the United States;

(c)     taking or continuing any act to create, perfect, or enforce a lien or other security interest, set-off, or other claims against the Chapter 15 Debtor or any of their property;

(d)     transferring, relinquishing, or disposing of any property of the Chapter 15 Debtor to an ~~entity (as that term is defined in section 101(15) of the Bankruptcy Code)~~Entity other than the Petitioner; or

(e)     commencing or continuing an individual action or proceeding concerning the Chapter 15 Debtor's assets, rights, obligations, or liabilities to the extent they have not been stayed pursuant to sections 1520(a) and 362 of the Bankruptcy Code;

*provided*, in each case, that such injunction shall be effective solely within the territorial jurisdiction of the United States and solely with respect to prepetition claims; *provided*, *further*, that all rights under the Brazilian RJ Plan shall be preserved and certain rights of the Indenture Trustee under the Indenture shall be preserved as set forth herein.

13.     ~~12.~~ All ~~entities~~Entities are permanently enjoined from taking any action within the territorial jurisdiction of the United States that is in contravention of or that is inconsistent with the Brazilian RJ Plan or the Brazilian Confirmation Order.

14.     ~~13.~~ With respect to claims based upon, concerning or relating in any way to, the Existing Notes or the solicitation and/or implementation of the Brazilian RJ Plan, all persons and entities are enjoined and restrained from taking any action within the territorial jurisdiction of the United States (including, without limitation, commencing or continuing any action or legal proceeding (including, without limitation, bringing suit in any court, arbitration, meditation, or any judicial or quasi-judicial, administrative or regulatory action, proceeding or process whatsoever), whether directly or by way of counterclaim (and from seeking discovery of any nature related thereto)) that would interfere with or impede the

11

administration, implementation and/or consummations of the Brazilian RJ Plan, and/or the terms of this Order against the Chapter 15 Debtor, the Petitioner, and the ~~Indenture Trustee, or the DTC, and any of their successors or assigns~~Directed Parties.

15. ~~14.~~ Notwithstanding anything to the contrary contained herein, this Order shall not be construed as enjoining (a) the police or regulatory act of a governmental unit, including a criminal action or proceeding, to the extent not stayed pursuant to section 362 of the Bankruptcy Code or staying the exercise of any rights not stayed pursuant to section 362(o) of the Bankruptcy Code, (b) any action permitted or contemplated by or taken with respect to the implementation of (i) the Brazilian RJ Plan, including the enforcement of the same, (ii) the Brazilian Confirmation Order, including the enforcement of the same, or (iii) any agreement entered into in connection with the Brazilian RJ Plan, including the enforcement of the same, or (c) solely to the extent that the Brazilian RJ Plan is no longer effective under Brazilian law for any reason, any action that is not prohibited by the Brazilian Court with jurisdiction over the Brazilian RJ Plan or Brazilian law.

16. ~~15.~~ Notwithstanding any provision in the Bankruptcy Rules to the contrary: (a) this Order shall be effective immediately and enforceable upon entry; (b) the Petitioner is not subject to any stay in the implementation, enforcement, or realization of the relief granted in this Order; and (c) the Petitioner is authorized and empowered, and may, in his discretion and without further delay, take any action and perform any act necessary to implement and effectuate the terms of this Order.

17. ~~16.~~ A copy of this Order, confirmed to be true and correct, shall be served by the Foreign Representative, within seven business days of entry of this Order, in accordance with this Court's Scheduling Order. Such service shall be good and sufficient service and adequate notice for all purposes.

18. 17. This Court shall retain jurisdiction with respect to all matters arising from or relating to the interpretation, implementation, enforcement, amendment, or modification of this Order and any requests for additional relief or any adversary proceeding brought in and through this case.

3544

Date: _____, 2024
Houston, Texas.

_____
THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

14