**EXHIBIT D**

**Appendix B (Tab 46 through Tab 79)**

# Tab 46

2013 WL 10399944
Only the Westlaw citation is currently available.
United States Bankruptcy Court,
S.D. New York.

In re Magyar Telecom B.V.,
Debtor in a Foreign Proceeding.

Case No. 13–13508 (SHL)
|  Signed December 11, 2013

**Attorneys and Law Firms**

Abraham L. Zylberberg, White & Case, New York, NY, for Debtor in a Foreign Proceeding.

*ORDER GRANTING PETITION FOR RECOGNITION OF FOREIGN MAIN PROCEEDING AND REQUEST FOR RELATED RELIEF [ECF NOS. 1 and 2]*

Sean H. Lane, UNITED STATES BANKRUPTCY JUDGE

**\*1**  Upon consideration of the Verified Petition for Recognition of Foreign Main Proceeding and Request for Related Relief dated October 29, 2013 [ECF No. 2] (together with the Form of Voluntary Petition [ECF No. 1], the "*Petition*"), [1] the Bethlen Declaration, the Phillips Declaration, the Viëtor Declaration, and the Réczicza Declaration (together with the Petition, the Bethlen Declaration, the Phillips Declaration and the Viëtor Declaration, the "*Chapter 15 Pleadings*"), each filed on October 29, 2013 by or on behalf of the Petitioner, Nikolaus Bethlen, in his capacity as the duly-appointed foreign representative of Magyar Telecom B.V. ("*Matel,*" or the "*Debtor*"), the debtor in a voluntary restructuring proceeding (the "*UK Proceeding*") concerning the Debtor currently pending before the Chancery Division (Companies Court) of the High Court of Justice of England and Wales (the "*UK Court*"); and upon the Support Of Verified Petition For Recognition Of Foreign Main Proceeding And Motion For Related Relief Giving Full Force And Effect To U.K. Scheme Of Arrangement dated December 2, 2013 [ECF No. 16], filed by the certain Noteholders affected by the Scheme, and upon the Second Declaration of Nikolaus Bethlen Pursuant to 28 U.S.C. § 1746 dated December 2, 2013 [ECF No. 18], the Declaration of Sunjeeve Patel Pursuant to 28 U.S.C. § 1746 dated December 2, 2013 [ECF No. 19], the Declaration of Richard A. Graham Pursuant to 28 U.S.C. § 1746 dated

December 3, 2013 [ECF No. 20], and the Second Declaration of Sunjeeve Patel Pursuant to 28 U.S.C. § 1746 dated December 10, 2013 [ECF No. 25], and it appearing that the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157 and the Amended Standing Order of Reference dated January 31, 2012, Reference M–431, *In re Standing Order of Reference Re: Title 11,* 12 Misc. 00032 (S.D.N.Y. Feb. 2, 2012) (Preska, C.J.); and it appearing that venue is proper before this Court pursuant to 28 U.S.C. § 1410; and the Court having considered and reviewed the Chapter 15 Pleadings and other filings set forth above, and having held a hearing to consider the relief requested in the Petition on December 3 and 11, 2013 (the "*Hearing*"); and it appearing that timely notice of the filing of the Chapter 15 Pleadings and the Recognition Hearing has been given to the Debtor, the Office of the United States Trustee for the Southern District of New York, the Trustee, Counsel to the Ad Hoc Committee, the Information Agent for distribution to the Scheme Creditors and that no other or further notice need be provided; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is hereby

**FOUND**, that:

1. This case was properly commenced pursuant to sections 1504 and 1515 of the Bankruptcy Code.

2. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference dated January 31, 2012, Reference M–431, *In re Standing Order of Reference Re: Title 11,* 12 Misc. 00032 (S.D.N.Y. Feb. 2, 2012) (Preska, C.J.).

**\*2**  3. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).

4. Venue is proper in this district pursuant to 28 U.S.C. § 1410.

5. The UK Proceeding is a "foreign proceeding" within the meaning of section 101(23) of the Bankruptcy Code.

6. The UK Proceeding is pending in England (a constituent member of the political union comprising the UK), which is the country in which the Debtor has the center of its main interests and, as such, the UK Proceeding is a "foreign main proceeding" within the meaning of sections 1502(4) and

1517(b)(1) of the Bankruptcy Code and entitled to recognition as the foreign main proceeding in respect of the Debtor.

7. The Petitioner, Nikolaus Bethlen, has been duly appointed by the Debtor and has been declared by the UK Court as authorized to act as the "foreign representative" with respect to the UK Proceeding within the meaning of section 101(24) of the Bankruptcy Code.

8. The Petition meets all of the requirements set forth in section 1515 of the Bankruptcy Code.

9. The UK Proceeding is entitled to recognition by the Court pursuant to section 1517(a) of the Bankruptcy Code.

10. The Debtor and the Petitioner are entitled to all of the relief set forth in section 1520 of the Bankruptcy Code.

11. Appropriate notice of the filing of, and the Hearing on, the Petition was given, which notice is deemed adequate for all purposes, and no other or further notice need be given.

12. The relief granted hereby is necessary and appropriate, in the interests of the public and of international comity, not inconsistent with the public policy of the United States, warranted pursuant to sections 105(a), 1507(a), 1509(b)(2)–(3), 1520, 1521(a) and 1525 of the Bankruptcy Code, and will not cause hardship to creditors of the Debtors or other parties in interests that is not outweighed by the benefits of granting that relief.

13. The relief granted hereby is necessary to effectuate the purposes and objectives of chapter 15 and to protect the Debtor and the interests of its creditors and other parties in interest.

14. Absent the relief granted hereby, the Debtor and the Protected Parties may be subject to the prosecution of judicial, quasi-judicial, arbitration, administrative or regulatory actions or proceedings in connection with the Scheme Claims against the Debtor and the Protected Parties or their property, thereby interfering with and causing harm to, the Debtor, its creditors, and other parties in interest in the UK Proceeding and, as a result, the Debtor, its creditors and such other parties in interest would suffer irreparable injury for which there is no adequate remedy at law.

15. Absent the requested relief, the efforts of the Debtor, the UK Court and the Petitioner in conducting the UK Proceeding

and effecting the Restructuring under the Scheme, the Restructuring Documents and English law may be thwarted by the actions of certain creditors, a result inimical to the purposes of chapter 15 as reflected in section 1501(a) of the Bankruptcy Code.

16. Each of the injunctions contained in this Order (i) is within the Court's jurisdiction, (ii) is essential to the success of the Scheme, (iii) is an integral element of the Scheme and/or to its effectuation, (iv) confers material benefits on, and is in the best interests of, the Debtor and its creditors, including without limitation the Scheme Creditors, and (v) is important to the overall objectives of the Restructuring.

*3 For all of the foregoing reasons, and for the reasons stated by the Court on the record of the Hearing, and after due deliberation and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED AND DECREED**, that:

(A) the Petition and the Relief Requested are granted, and any objections thereto are overruled with prejudice;

(B) the UK Proceeding is granted recognition as a foreign main proceeding (as defined in section 1502 of the Bankruptcy Code) pursuant to sections 1517(a) and (b)(1) of the Bankruptcy Code;

(C) the Petitioner is recognized as the "foreign representative" as defined in section 101(24) of the Bankruptcy Code in respect of the UK Proceeding;

(D) the Debtor and the Petitioner are granted all of the relief set forth in section 1520 of the Bankruptcy Code including, without limitation, the application of the protection afforded by the automatic stay under section 362(a) of the Bankruptcy Code to the Debtor and to the

(E) Debtor's property that is within the territorial jurisdiction of the United States;

(F) the Petitioner is hereby (i) authorized to examine witnesses, take evidence, and deliver information concerning the Debtor and its business, and (ii) entrusted with the administration of any and all of the Debtor's assets within the territorial jurisdiction of the United States; as of the Scheme Effective Date, the Scheme Sanction Order, the Scheme and the Restructuring Documents are recognized, granted comity,

and entitled to full force and effect against all entities (as that term is defined in section 101(15) of the Bankruptcy Code) in accordance with their terms, and such terms shall be binding and fully enforceable on the Scheme Creditors and the Related Parties whether or not they actually agreed to be bound by the Scheme or the Restructuring Documents or participated in the UK Proceeding;

(G) as of the Scheme Effective Date, any judgment, wherever and whenever obtained, to the extent such judgment is a determination of the personal liability of the Debtor or any Protected Party (herein throughout as defined in the Explanatory Statement) with respect to any debt cancelled, discharged or restructured under the Scheme or other Restructuring Documents and/or as a result of English law relating to the Restructuring, is unenforceable in the United States, *provided, however,* that if such debt is restructured under the Scheme, the Restructuring Documents or such law, the enforceability of such judgment is impaired by this Order only to the extent it is inconsistent with the Scheme, the Restructuring Documents and such law;

(H) as of the Scheme Effective Date, all Scheme Creditors and Related Parties are permanently enjoined from commencing or continuing in any manner, directly or indirectly, including by way of counterclaim, any action, suit or other proceeding (including, without limitation, arbitration, mediation or any judicial, quasi-judicial or administrative action, proceeding or process whatever in any judicial, arbitral, administrative or other forum), employing any process, or performing any act to collect, recover or offset (except as expressly provided in the Scheme and Restructuring Documents) any debt cancelled, discharged or restructured under the Scheme or Restructuring Documents and/or as a result of English law relating to the Restructuring, or seeking discovery related thereto, *provided, however,* that if such debt is restructured under the Scheme, the Restructuring Documents and/or such law, such injunction applies only to the extent that commencing or continuing such action, employing such process or performing such act is inconsistent with the Scheme, the Restructuring Documents and/or such law;

 **\*4**  (I) as of the Scheme Effective Date, all Scheme Creditors and Related Parties are permanently enjoined from commencing or continuing any action (including, without limitation, arbitration, mediation or any judicial, quasi-judicial, or administrative action or proceeding or process whatever in any judicial, arbitral, administrative or other forum), including by way of counterclaim, employing

any process, or performing any act, to collect, recover or offset (except as expressly provided in the Scheme and the Restructuring Documents) any debt cancelled, discharged or restructured under the Scheme, the Restructuring Documents and/or as a result of English law relating to the Restructuring, against property of the Debtor or of the Protected Parties within the territorial jurisdiction of the United States, including (i) enforcing, levying, attaching (including any prejudgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judicial, quasi-judicial or administrative judgment, award, determination, decree, assessment, garnishment, order or arbitration award against the Debtor or the Protected Parties or their respective property, or any direct or indirect transferee of or successor to any property of the Debtor or of the Protected Parties, or any property of such transferee or successor, or (ii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien or encumbrance of any kind against such property, *provided, however,* that if such debt is restructured under the Scheme, the Restructuring Documents and/or such law, such injunction applies only to the extent that commencing or continuing such action, employing such process or performing such act is inconsistent with the Scheme, the Restructuring Documents and/or such law;

(J) as of the Scheme Effective Date, Scheme Creditors and Related Parties are permanently enjoined from (i) transferring, relinquishing or disposing of any property of the Debtor or of the Protected Parties located within the territorial jurisdiction of the United States, or (ii) taking or continuing any act to obtain possession of, comingle, or exercise control over such property, to the extent any such act under (i) or (ii) is inconsistent with the Scheme, the Restructuring Documents and English law relating to the Restructuring;

(K) as of the Scheme Effective Date, all entities (as that term is defined in section 101(15) of the Bankruptcy Code) subject to the U.S. Bankruptcy Court's jurisdiction are permanently enjoined from taking any action inconsistent with the Scheme, including, without limitation, against the Debtor, the Protected Parties or against any property of the Debtor or the Protected Parties; as of the Scheme Effective Date, all entities (as that term is defined in section 101(15)) are permanently enjoined from commencing any suit, action or proceeding in the territorial jurisdiction of the United States to settle any dispute which arises out of any provision of the Scheme, the Restructuring Documents and English law relating to the Restructuring;

3549

(M) as of the Scheme Effective Date, Scheme Creditors and Related Parties are permanently enjoined from commencing or continuing in any manner, directly or indirectly, including by way of counterclaim, any action, suit or other proceeding (including, without limitation, arbitration, mediation, or any judicial, quasi-judicial, or administrative action, proceeding or process whatever in any judicial, arbitral, administrative or other forum), or employing any process, against the Foreign Representative (personally or in such capacity), the Debtor, the Protected Parties, or any of their respective successors, assigns, agents, representatives, advisors or attorneys (collectively, the "*Debtor Parties*") or any of them in respect of any claim or cause of action, in law or in equity, arising out of or relating to any action taken or omitted to be taken by any of the Debtor Parties as of the Scheme Effective Date in connection with this chapter 15 case or in preparing, disseminating, applying for or implementing the Scheme, the Restructuring Documents or the Scheme Sanction Order;

(N) no action taken by the Petitioner in preparing, disseminating, applying for, implementing or otherwise acting in furtherance of the Scheme, the Restructuring Documents, this Order, the chapter 15 case, any further order for additional relief in this chapter 15 case, or any adversary proceedings or contested matters in connection therewith, will be deemed to constitute a waiver of any immunity afforded the Petitioner as Foreign Representative, including without limitation pursuant to section 1510 of the Bankruptcy Code;

(O) the Court shall retain jurisdiction with respect to the enforcement, amendment, or modification of this Order, any request for additional relief and any request by an entity for relief from the provisions of this Order, for cause shown, that is properly commenced and within the jurisdiction of the Court; and

**\*5** (P) this Order shall be effective and enforceable immediately upon entry and shall constitute a final order within the meaning of 28 U.S.C. § 158(a).

**All Citations**

Slip Copy, 2013 WL 10399944

Footnotes

1    Capitalized terms not otherwise defined herein have the meaning ascribed to such terms in the Petition.

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 47

580 B.R. 632
United States Bankruptcy Court, D. New Jersey.

IN RE: MANLEY TOYS LIMITED,
Debtor in a Foreign Proceeding.

Case No. 16–15374 (JNP)
|
Signed February 13, 2018

**Synopsis**

**Background:** Appointed liquidators and foreign representatives of debtor that was the subject of liquidation proceeding in Hong Kong filed motion for recognition of Hong Kong proceeding as foreign main proceeding, or in the alternative, as foreign nonmain proceeding.

**Holdings:** The Bankruptcy Court, Jerrold N. Poslusny, Jr., J., held that:

[1] Hong Kong liquidation proceeding qualified as "proceeding";

[2] Hong Kong liquidation proceeding was judicial or administrative in nature;

[3] Hong Kong liquidation proceeding was "collective" in nature;

[4] Hong Kong liquidation proceeding was in a foreign country;

[5] Hong Kong liquidation proceeding was conducted under a law related to insolvency or adjustment of debtors;

[6] debtor's center of main interests (COMI) was Hong Kong; and

[7] recognition of Hong Kong liquidation proceeding would not be contrary to public policy.

Motion granted.

**West Headnotes (13)**

[1]    **Bankruptcy**
         Cases Ancillary to Foreign Proceedings

Burden of proof is on foreign representative seeking recognition of foreign proceeding under Chapter 15 of the Bankruptcy Code as either a "foreign main proceeding" or "foreign nonmain proceeding." 11 U.S.C.A. §§ 1515, 1517(a).

Cases that cite this headnote

[2]    **Bankruptcy**
         Cases Ancillary to Foreign Proceedings

Hong Kong liquidation proceeding that debtor was the subject of qualified as "proceeding," a necessary prerequisite to its being recognized as "foreign main proceeding" under Chapter 15 of the Bankruptcy Code, where Hong Kong insolvency law set up statutory framework regulating duties and responsibilities of liquidators, including distribution priorities, the right to pursue fraudulent transfers, preferences, and other causes of action. 11 U.S.C.A. §§ 101(23), 1501 et seq.

Cases that cite this headnote

[3]    **Bankruptcy**
         Cases Ancillary to Foreign Proceedings

A "proceeding," of kind potentially recognizable as a "foreign main proceeding" under Chapter 15 of the Bankruptcy Code, is acts and formalities set down in law so that courts, merchants and creditors can know them in advance, and apply them evenly in practice. 11 U.S.C.A. §§ 101(23), 1501 et seq.

Cases that cite this headnote

[4]    **Bankruptcy**
         Cases Ancillary to Foreign Proceedings

Hallmark of a "proceeding," of kind potentially recognizable as a "foreign main

proceeding" under Chapter 15 of the Bankruptcy Code, is statutory framework that constrains company's actions and that regulates final distribution of its assets. 11 U.S.C.A. §§ 101(23), 1501 et seq.

Cases that cite this headnote

[5]    **Bankruptcy**

 Cases Ancillary to Foreign Proceedings

Hong Kong liquidation proceeding that debtor was the subject of was judicial or administrative in nature, a necessary prerequisite to its being recognized as "foreign main proceeding" under Chapter 15 of the Bankruptcy Code, where duties of liquidator under Hong Kong law included taking control of the company's books and records, realizing the company's remaining assets, responding to requests for information from creditors and ownership, investigating the company and potential causes of action, and pursuing those causes of action when appropriate, and parties in interest could access Hong Kong courts to protect their rights and to ensure that the liquidation proceeds according to Hong Kong law. 11 U.S.C.A. §§ 101(23), 1501 et seq.

Cases that cite this headnote

[6]    **Bankruptcy**

 Cases Ancillary to Foreign Proceedings

Hong Kong liquidation proceeding that debtor was the subject of was "collective" in nature, a necessary prerequisite to its being recognized as "foreign main proceeding" under Chapter 15 of the Bankruptcy Code, where liquidator's duty under Hong Kong law was to all creditors, whether those creditors were from Hong Kong or another country, and there were requirements for the collection and distribution of funds as well as a priority scheme and a requirement that similarly situated creditors be treated equally. 11 U.S.C.A. §§ 101(23), 1501 et seq.

Cases that cite this headnote

[7]    **Bankruptcy**

 Cases Ancillary to Foreign Proceedings

Proceeding is "collective" in nature, as required for recognition thereof as "foreign main proceeding" or "foreign nonmain proceeding," if it considers rights and obligations of all creditors. 11 U.S.C.A. §§ 101(23), 1501 et seq.

Cases that cite this headnote

[8]    **Bankruptcy**

 Cases Ancillary to Foreign Proceedings

Hong Kong liquidation proceeding that debtor was the subject of was in a foreign country, a necessary prerequisite to its being recognized as "foreign main proceeding" under Chapter 15 of the Bankruptcy Code, where liquidation proceeding was located in Hong Kong and was commenced in, and subject to, Hong Kong law, and debtor was registered as a Hong Kong company, with a registered office in Hong Kong. 11 U.S.C.A. §§ 101(23), 1501 et seq.

Cases that cite this headnote

[9]    **Bankruptcy**

 Cases Ancillary to Foreign Proceedings

Hong Kong liquidation proceeding that debtor was the subject of was conducted under a law related to insolvency or adjustment of debtors, namely, Companies (Winding Up and Miscellaneous Provisions) Ordinance (CWMPO), which was the law in Hong Kong governing the voluntary winding up of companies, a necessary prerequisite to its being recognized as "foreign main proceeding" under Chapter 15 of the Bankruptcy Code. 11 U.S.C.A. §§ 101(23), 1501 et seq.

Cases that cite this headnote

[10]    **Bankruptcy**

 Cases Ancillary to Foreign Proceedings

3553

Debtor's center of main interests (COMI) for determining foreign main proceeding status was Hong Kong, where debtor's registered office and headquarters were in Hong Kong, the vast majority of debtor's employees were located in Hong Kong, debtor had assets, including bank accounts, in Hong Kong, and the majority of claims against insiders would likely be brought in Hong Kong pursuant to Hong Kong law. 11 U.S.C.A. §§ 101(23), 1501 et seq.

Cases that cite this headnote

**[11]    Bankruptcy**

☞ Cases Ancillary to Foreign Proceedings

Courts construe public policy exception to recognition of proceeding as foreign main or foreign nonmain proceeding very narrowly. 11 U.S.C.A. § 1506.

Cases that cite this headnote

**[12]    Bankruptcy**

☞ Cases Ancillary to Foreign Proceedings

When deciding whether to apply the public policy exception to recognition of proceeding as foreign main or foreign nonmain proceeding, courts generally focus on two factors: (1) whether the foreign proceeding is or was procedurally unfair, and (2) whether the recognition of the foreign proceeding or application of its laws would impinge upon a United States statutory or constitutional right. 11 U.S.C.A. § 1506.

Cases that cite this headnote

**[13]    Bankruptcy**

☞ Cases Ancillary to Foreign Proceedings

Recognition of Hong Kong liquidation proceeding that debtor was the subject of would not be contrary to public policy; while Hong Kong's laws related to fraudulent transfers were not the same as those of the United States, they were not manifestly contrary to United States law, instead, they were a different way to achieve similar goals,

and fact that debtor and insiders may have acted in bad faith in other litigation did not mean that the bankruptcy court should not recognize the foreign proceeding, and thereby force the liquidators to pursue their duties under Hong Kong law without the assistance of the bankruptcy court and the protections of Chapter 15. 11 U.S.C.A. § 1506.

Cases that cite this headnote

**Attorneys and Law Firms**

Stephen M. Packman, Douglas G. Leney, Daniel M. Glosband, Archer & Greiner, P.C., Haddonfield, NJ, for Debtor in a Foreign Proceeding.

**Opinion**

### OPINION GRANTING RECOGNITION OF FOREIGN PROCEEDING

JERROLD N. POSLUSNY, JR., U.S. Bankruptcy Judge

Before the Court is the motion of Mat Ng and John Robert Lees, the Appointed Liquidators and Foreign Representatives (the "Liquidators") of Manley Toys Limited (the "Debtor") for recognition of a foreign proceeding commenced by the Debtor in Hong Kong on March 22, 2016 (the "Motion"). ASI Inc., f/k/a Aviva Sports Inc. ("Aviva"), and Toys "R" Us, Inc. ("TRU"), oppose the Motion.

Recognition of a foreign insolvency proceeding requires that the proceeding: (a) meets the definition of a "foreign proceeding" under section 101(23) of the Bankruptcy Code; (b) meets the requirements for recognition under section 1517(a); and (c) is not "manifestly contrary to the public policy of the United States." See 11 U.S.C. §§ 101(23), 1517(a) and 1506. The Liquidators argue that they have met all of the requirements for recognition and that recognition would not be manifestly contrary to United States public policy. Aviva and TRU argue that the foreign proceeding is not collective in nature; is not a foreign main proceeding; and is manifestly contrary to public policy. TRU further argues that the Court should deny the Motion because (according to TRU) the Debtor is solvent and there is no court oversight or administration

of the Hong Kong liquidation. Aviva further argues that even if the Court recognizes the foreign proceeding, it should be dismissed or suspended under section 305 of the Bankruptcy Code.

Upon consideration of the evidence submitted, the arguments of counsel, and for the reasons discussed below, the Court will grant the Motion and recognize the Hong Kong liquidation as a foreign main proceeding.

### Jurisdiction

This Court has jurisdiction under 28 U.S.C. §§ 157(b)(1) and 1334(b) and (d). Venue is proper in this Court under 28 U.S.C. § 1410. This is a core proceeding under 28 U.S.C. § 157(b)(2)(P). The following constitutes the Court's findings of fact **635** and conclusions of law as required by Fed. R. Bankr. P. 7052. [1]

[1]   To the extent that any of the findings of fact constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

### Background

The Debtor at one time claimed to be the seventh largest toy company in the world and sold toys (including seasonal and water toys) primarily to retailers. The Debtor had as many as fifteen related entities all controlled by the same individuals. See Transcript of Hearing on May 12, 2016 at 160:19–162:17 (the "May 12 Transcript"); Ex. TRU–120. Aviva and TRU argue that these individuals changed the names of the corporate entities as needed to shelter themselves, the corporate entities, and their assets from third parties. See, e.g., Exs. TRU–78–80; Ex. TRU–83; Ex. TRU–87.

After several years of litigation in the United States District Court for the District of Minnesota (the "Minnesota Court"), Aviva obtained an $8.6 million judgment against the Debtor in August 2013. See Ex. Aviva–2. The Minnesota Court entered the judgment by default because the Debtor had not complied with many orders of the Minnesota Court. See Ex. Aviva–92 at 33–34. Thereafter Aviva began attempts to collect

on its judgment and sought post-judgment discovery, which the Debtor did not provide. See Declaration of Mat Ng In Support of Appointed Liquidators' Verified Petition Pursuant to 11 U.S.C. §§ 105(a), 1504, 1507, 1509, 1515, 1517, 1519, 1521, and 1525 for Entry of an Order Recognizing Foreign Main Proceeding and Granting Further Relief and Additional Assistance ¶ 3 (the "Ng Declaration); Supplemental Declaration of Mat Ng In Support of Appointed Liquidators' Verified Petition Pursuant to 11 U.S.C. §§ 105(a), 1504, 1507, 1509, 1515, 1517, 1519, 1521, and 1525 for Entry of an Order Recognizing Foreign Main Proceeding and Granting Further Relief and Additional Assistance ¶¶ 13–14 (the "Ng Supplemental Declaration"); [2] Ex. Aviva–3 at 3–4; Ex. Aviva–94 (order for post-judgment discovery to be produced). In February 2016, Aviva sought sanctions for the Debtor's failure to comply with the Minnesota Court's order. See Ex. Aviva–3. Aviva requested sanctions including: a bar on the sale, importation, distribution, or shipping of the Debtor's products in the United States.

[2]   The Ng Declaration (Dkt. No. 2, Ex. A) and the Ng Supplemental Declaration (Dkt. No. 54) were both admitted into evidence for facts asserted therein, but not for any legal argument or opinion. See Order Regarding Admission of Exhibits ¶ 1.b. (Dkt. No. 179).

TRU is a former customer of the Debtor. The Debtor was supposed to indemnify TRU in a personal injury case in Massachusetts. The case resulted in TRU being held liable for $24 million. When TRU threatened to sue the Debtor on account of that liability, the Debtor proposed providing credits for the Debtor's products for which TRU would otherwise pay. Nevertheless, the Debtor eventually sued TRU in the United States District Court for the District of New Jersey (the "New Jersey Court") and TRU counterclaimed.

In light of the pending sanctions motion in the Minnesota Court and trial in the New Jersey Court; ongoing litigation with other parties; and alleged declining sales, the Debtor determined to enter into voluntary liquidation in Hong Kong. See Ng Declaration ¶¶ 6, 11; Ng Supplemental Declaration ¶¶ 13–17. The Debtor initiated the liquidation prior to the sanctions motion being heard in the Minnesota Court and trial starting in the New Jersey Court.

**\*636** On March 11, 2016, a notice of a "Creditors' Meeting" under Hong Kong law was sent by regular mail to all of the Debtor's known creditors, and notice was published in three Hong Kong newspapers. See May 12 Transcript at 62:2–11; Ng Supplemental Declaration ¶ 21. The notice informed parties that the Creditors' Meeting would be held on March 22. The notice was not sent by email or fax. Mr. Ng attempted to get email or fax information from the Debtor but the information was not provided. See May 12 Transcript at 62:12–23. Despite not being sent by email or fax, the Liquidators' expert Kingsley Tze–Ong and TRU's expert, Stephen Briscoe confirmed the notice provided complied with Hong Kong law. See Declaration of Kingsley Tze–Wei Ong in Support of Appointed Liquidators' Verified Petition Pursuant to 11 U.S.C. §§ 105(a), 1504, 1507, 1509, 1515, 1517, 1519, 1521 and 1525 for Entry of an Order Recognizing Foreign Proceeding and Granting Further Relief and Additional Assistance ¶¶ 13–14 (the "Ong Declaration" Dkt. No. 55); Affidavit of Stephen Briscoe in Support of Toys "R" Us, Inc.'s Objection to Verified Petition Pursuant to 11 U.S.C. §§ 105(a), 1504, 1507, 1509, 1515, 1517, 1521, and 1525 for Entry of an Order Recognizing Foreign Main Proceeding and Granting Further Relief and Additional Assistance ¶ 3 (the "Briscoe Affidavit", Ex. TRU–1). [3]

[3]    The Ong Declaration and the Briscoe Affidavit were admitted into evidence under the Order Regarding Admission of Exhibits (Dkt. No. 179).

On March 22, 2016, the Debtor held an Extraordinary General Meeting of the Company at which the Debtor's shareholders passed a special resolution for the voluntary winding up of the Debtor under Hong Kong law. See Ng Declaration ¶¶ 11–12; Supplemental Ng Declaration ¶ 19. On March 22, the Debtor also convened the Creditors' Meeting for which it had given notice on March 11. See May 13 Transcript at 16:12–19; Ng Declaration ¶ 14. At the Creditors' Meeting a Committee of Inspection ("COI") was appointed and the COI appointed the Liquidators and authorized the Liquidators to take actions under Hong Kong law and to commence this Chapter 15 case. See Ng Declaration ¶ 15; Supplemental Ng Declaration ¶¶ 28, 32. On the same day the Liquidators filed this Chapter 15 case and the Motion.

On March 24, 2016, the Court held a hearing to determine whether to grant provisional recognition pending a full hearing on the Motion. At the conclusion of the hearing, the Court granted provisional recognition of the Hong Kong proceeding, and an order related to provisional relief was entered on April 1, 2016.

An evidentiary hearing on the Motion was held on May 12, 13 and August 11, 2016. Mr. Ng testified on May 12 and 13 and Mr. Ong testified on May 13. Aviva's general counsel, senior vice-president, and corporate secretary, George Koeck, testified on August 11. All witnesses testified credibly. After the hearing concluded, the parties conferred related to admission of certain documents and submitted written arguments to the Court related to exhibits on which the parties could not agree. The Court ruled upon admission of documents on January 23, 2017 (Dkt. No. 179). Thereafter the parties submitted closing briefs and reply briefs.

At the outset of the hearing, the parties agreed that there are three issues related to recognition: (a) whether the Hong Kong liquidation is collective in nature; (b) whether the Debtor's center of main interest ("COMI") is in Hong Kong; and (c) whether the case is manifestly contrary to public policy. See May 12 Transcript at 9:4–12 (Court's inquiry and Liquidators' **\*637** response); 9:25–10:19 (Aviva's response); 11:10–12 (TRU's response). Aviva also argued that the Court could refuse to recognize the Hong Kong liquidation under section 305 of the Bankruptcy Code. See id. at 10:14–19. As part of its closing briefs, and after the record was closed, TRU argued that the Liquidators did not satisfy other elements required for recognition. Although the parties agreed to specific contested issues, this Opinion addresses all of the arguments raised in the briefs, and determines that the Liquidators have satisfied their burden of proof for recognition.

### Discussion

**[1]** The Motion seeks recognition of the Hong Kong liquidation as a foreign main proceeding, or in the alternative, as a foreign non-main proceeding. Under section 1517(a) of the Bankruptcy Code, "an order recognizing a foreign proceeding shall be entered if" the proceeding is a foreign main proceeding or a foreign nonmain proceeding; the foreign representative is a person or body; and the petition meets the requirements of section 1515 of the Bankruptcy Code. 11 U.S.C. § 1517(a). See also In re ABC Learning Ctrs. Ltd., 728 F.3d 301, 307 (3d Cir. 2013), aff'g, ABC Learning Ctrs. Ltd., 445 B.R. 318

(Bankr. D. Del. 2010). The Liquidators have the burden of proof on each of these elements. See ABC Learning Ctrs., 445 B.R. at 333.

Initially the Court must determine whether the Hong Kong liquidation is a "foreign proceeding" under section 101(23) of the Bankruptcy Code. If the Court makes that determination it must then determine if the remaining requirements for recognition under section 1517(a) are satisfied. Finally, the Court must determine if the Hong Kong liquidation is "manifestly contrary to the public policy of the United States" such that it should not be recognized under section 1506. Since Aviva and TRU are the parties invoking the public policy exception, they have the burden of proof on that issue. See In re Poymanov, 571 B.R. 24, 38 (Bankr. S.D.N.Y. 2017).

#### A. The Hong Kong Liquidation is a Foreign Proceeding Under § 101(23)

A "foreign proceeding" is defined as:

> a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

11 U.S.C. § 101(23). The Third Circuit divides this definition into seven elements:

> (i) a proceeding; (ii) that is either judicial or administrative; (iii) that is collective in nature; (iv) that is in a foreign country; (v) that is authorized or conducted under a law related to insolvency or the adjustment of debts; (vi) in which the debtor's assets and affairs are subject to the control or supervision of a foreign court; and (vii) which proceeding is for

the purpose of reorganization or liquidation.

ABC Learning Ctrs., 728 F.3d at 308.

#### i. There is a Proceeding

**[2]** Aviva and TRU initially admitted that the Liquidators had met their burden of proof that there is a proceeding. In its closing brief, however, TRU claimed there was no proceeding. Even if this issue was not conceded, the Liquidators submitted sufficient evidence to meet their burden of proof.

**[3]** **[4]** As noted by the bankruptcy court in ABC Learning Ctrs.:

> [The essence of a "proceeding" is] acts and formalities set down in law so that **\*638** courts, merchants and creditors can know them in advance, and apply them evenly in practice. In the context of corporate insolvencies, the hallmark of a "proceeding" is a statutory framework that constrains a company's actions and that regulates the final distribution of a company's assets.

445 B.R. at 328 (quoting In re Betcorp Ltd., 400 B.R. 266, 278 (Bankr. D. Nev. 2009) ). Mr. Ong, the Liquidators' expert on Hong Kong insolvency law testified that the Companies (Winding Up and Miscellaneous Provisions) Ordinance ("CWMPO"), is a statutory framework that sets forth the duties and responsibilities of liquidators, including distribution priorities, the right to pursue fraudulent transfers, preferences, and other causes of action. See May 13 Transcript at 155:25–163:6; 171:5–9. His declaration in support of the petition also opined that there is a proceeding. See Ong Declaration ¶¶ 6–10.

Mr. Briscoe, TRU's expert on Hong Kong insolvency law, confirmed that CWMPO is a law setting forth the framework for liquidating a company. See Briscoe Affidavit ¶¶ 2.1–2.3.

TRU argues that there is no proceeding because (according to TRU) the Debtor and an affiliated

company, Toy Quest Ltd. ("Toy Quest"), are the same entity, and if they were considered as one entity, that entity is solvent. TRU further argues that the Debtor and Toy Quest use their names interchangeably to sell the same products, and that several United States retailers provided discovery responses showing that they purchased identical products from the Debtor and Toy Quest. See, e.g., Ex. TRU–126. However, the inquiry for this element is not the Debtor's actions or whether the Debtor was solvent; but is whether Hong Kong has a framework in place so that "courts, merchants and creditors can know them in advance, and apply them evenly in practice." ABC Learning Ctrs., 445 B.R. at 328 (quoting Betcorp, 400 B.R. at 278). The Liquidators have met that burden; therefore, there is a "proceeding."

### ii. The Proceeding is Judicial or Administrative

 **[5]**  The second element requires that the Liquidators show that the proceeding is either judicial or administrative. See ABC Learning Ctrs., 728 F.3d at 308. Although Aviva and TRU initially admitted that the Liquidators had met their burden of proof that the proceeding is judicial or administrative in nature, TRU argued that the Liquidators did not meet their burden of proof on this issue in its closing brief. The Liquidators provided sufficient evidence at trial and through the Ng Declaration and Ng Supplemental Declaration to meet their burden of proof.

In ABC Learning Ctrs., the bankruptcy court found that the liquidators satisfied this element because the majority of the liquidators' tasks in that case were administrative, including "collecting assets; distributing assets pursuant to priorities ...; conducting investigations of possible voidable transactions (e.g., preferences); circulating information to creditors; preparing various required reports; [and] convening meetings." ABC Learning Ctrs., 445 B.R. at 328. The court further found that, under certain circumstances, the proceeding could become judicial in nature whenever an Australian court is needed to exercise supervisory powers. See id. (citing Betcorp, 400 B.R. at 280).

Mr. Ong testified that the duties of a liquidator under Hong Kong law include: recovering and distributing assets; investigating why the company failed; and investigating potential claims and causes of action. See

May 13 Transcript at 156:22–25; 158:8–16. See also Ong Declaration ¶¶ 27, 28, 33, 34. Mr. Ong testified that there is a **\*639**  priority scheme of distributions that must be followed. See May 13 Transcript at 157:3–6. See also Ong Declaration ¶¶ 29–30. The Ong Declaration further provides that liquidators have a duty to account for all receipts and disbursements, and to conduct meetings with the company and with creditors on a yearly basis. See Ong Declaration ¶¶ 37–38. Finally, liquidators are required to prepare a final accounting and conduct final meetings with the company and creditors at the conclusion of the liquidation. See May 13 Transcript at 165:18–22; Ong Declaration ¶ 39.

The Briscoe Affidavit listed many of the same duties: taking control of the company's books and records; realizing the company's remaining assets; responding to requests for information from creditors and ownership; investigating the company and potential causes of action; and pursuing those causes of action when appropriate. See Briscoe Affidavit ¶ 9.1.

In addition, Mr. Ong testified that creditors could involve Hong Kong courts when necessary to ensure that liquidators are following their duties, and liquidators could also involve courts to pursue claims on behalf of creditors. See May 13 Transcript at 159:6–22; 162:8–13. He further testified that it is "very common and very easy" for creditors who are not satisfied with the liquidation process to file a complaint in Hong Kong related to the conduct of the liquidation. Id. at 165:23–166:16. The Ong Declaration also notes that parties may seek court assistance in other circumstances, including: litigation of allowance of claims; recovery of assets; pursuing fraudulent transfers and preferences; removal of the liquidator for cause. See Ong Declaration ¶¶ 33, 34, 49; see also Briscoe Affidavit ¶ 8 (noting that parties in interest can apply to courts for direction or to remove a liquidator).

TRU argues that the proceeding is not judicial or administrative in nature because there is no court supervision of the liquidation and because the Liquidators have (according to TRU) failed to exercise their duties under Hong Kong law. But as discussed above, the proceeding is largely administrative in nature. Moreover, parties in interest may access Hong Kong courts to protect their rights and to ensure that the liquidation proceeds according to Hong Kong law. Finally, to the extent that

TRU believes that the Liquidators have not satisfied their duties to creditors, there is a mechanism under Hong Kong law for interested parties to seek court intervention in Hong Kong.

A similar issue was addressed in Betcorp, in which the court was presented with recognition of a voluntary winding up under Australian law. The court reviewed a liquidator's duties under Australian law and noted that in certain circumstances an entire winding up could be completed as a purely administrative proceeding. See Betcorp, 400 B.R. at 280. The court further noted that the winding up may change from an administrative proceeding to a judicial proceeding, and that the actions of a liquidator are subject to review by Australian courts. See id. at 280–81. In concluding that an out of court voluntary winding up under Australian law met the requirement of being judicial or administrative in nature, the court stated that "section 101(23) requires only that a proceeding have either an administrative or judicial character," to satisfy this element. See id. at 281 (emphasis original). It appears that Australian liquidations are similar to Hong Kong liquidations in many ways so that the analysis in Betcorp is applicable in this case and leads to the same conclusion.

Therefore, the Liquidators have met their burden of proof that the Hong Kong **\*640** proceeding is judicial or administrative in nature.

### iii. Collective in Nature

**[6]**    **[7]**  "A proceeding is collective if it considers the rights and obligations of all creditors." ABC Learning Ctrs., 445 B.R. at 328. See also 11 U.S.C. § 1501(a)(3). In ABC Learning Ctrs., the Third Circuit distinguished an Australian liquidation from an Australian receivership process in place for the benefit of ABC Learning Centres' secured creditors. The Third Circuit determined that an Australian liquidation is collective because all creditors are considered, and assets are distributed according to priorities on a pro rata basis. See ABC Learning Ctrs., 728 F.3d at 308. The receivership at issue in ABC Learning Ctrs. was not collective because the receiver represented only the interests of secured creditors. See id. The Third Circuit further noted that "[t]he collective proceeding requirement reflects U.S. policy 'to provide an orderly liquidation procedure under which all creditors are treated equally.' " Id. at 310 (quoting In re Schimmelpenninck,

183 F.3d 347, 351 (5th Cir. 1999) (quoting H.R. Rep. No. 95–595, 1st Sess., at 340 (1977) ).

The Hong Kong liquidation is collective in nature. Mr. Ong testified that the Liquidators' duty under Hong Kong law is to all creditors, whether those creditors are from Hong Kong or another country, including the United States. See May 13 Transcript at 157:18–158:4. Moreover, there are requirements for the collection and distribution of funds as well as a priority scheme and a requirement that similarly situated creditors be treated equally. See May 13 Transcript at 157:3–6; Ong Declaration ¶¶ 27–30.

Aviva argues that the Court should also consider whether this particular proceeding is collective in nature. See In re British Amer. Ins. Co. Ltd., 425 B.R. 884, 902 (Bankr. S.D. Fla. 2010). Although the Third Circuit did not include this as a requirement to satisfy the collective in nature element, see ABC Learning Ctrs., 728 F.3d at 310, the Court nevertheless finds that the Liquidators have met this burden as well. In In re Ashapura Minechem Ltd., 480 B.R. 129 (S.D.N.Y. 2012), the court noted additional characteristics that the bankruptcy court in ABC Learning Ctrs. considered when determining whether the case was collective in nature: "adequate notice to creditors under applicable foreign law, provisions for the distribution of assets according to statutory priorities, and a statutory mechanism for creditors to seek court review of the proceeding. However, the standard for notice is not a demanding one." Ashapura Minechem, 480 B.R. at 137 (citing, inter alia, ABC Learning Ctrs., 445 B.R. at 328, 329).

Aviva and TRU argue that the proceeding is not collective in nature because they did not receive timely notice of the Creditors' Meeting due to the Debtor's manipulation of the timing of the commencement of the liquidation so that Aviva and TRU would not have an opportunity to participate. Mr. Ng testified that his understanding of the notice requirement for the Creditors' Meeting is only that it be sent at the same time the notice of the shareholders meeting is sent to shareholders. See May 12 Transcript at 61:16–23. Mr. Ng testified that notices were sent to creditors on March 11, 2016 by regular mail; and that his understanding is that there is no requirement that the notice be sent by email or fax. See id. at 62:5–14.

Mr. Ng's understanding of these requirements was confirmed by Mr. Briscoe and Mr. Ong who both stated

3559

that the notice period to creditors is normally fourteen days, but can be shortened by a vote of shareholders. See Briscoe Affidavit ¶ 3.3; Ong Certification ¶ 13. Mr. Ong testified **\*641** that there is no notice period requirement under Hong Kong law and that notice by regular mail is sufficient. See May 13 Transcript at 160:9–161:8. Mr. Ong also testified that Hong Kong law includes remedies for creditors that did not attend the meeting, including seeking to become a member of the COI. See id. at 161:17–162:13. Mr. Ong then testified that if procedural requirements were not satisfied, a Hong Kong court could invalidate the liquidation, and referred to a case in which that occurred. See id. at 162:25–163:15.

The facts of this case are similar to ABC Learning Ctrs. where a creditor argued that the proceeding was not collective because United States creditors did not receive notice and were therefore barred from actively participating in the case. The bankruptcy court noted that there was no allegation that the notice did not comport with Australian law, and that creditors could seek court review in Australia. See ABC Learning Ctrs., 445 B.R. at 329. Aviva and TRU have not argued that the notice period violated Hong Kong law (in fact, Mr. Briscoe acknowledged that the notice period could be shortened). Moreover, similar to Australian law, there are safe guards under Hong Kong law to protect Aviva and TRU, including joining the COI or proceeding with an action in Hong Kong courts. Finally, the Liquidators and the COI have offered to place Aviva on the COI to cure any perceived prejudice related to lack of notice, but Aviva has refused. Therefore, even if Aviva and TRU did not receive timely notice of the Creditors' Meeting, that is not sufficient to determine that the proceeding is not collective, especially when considering that the "standard for notice is not a demanding one." See Ashapura Minechem, 480 B.R. at 137 (citing, inter alia, ABC Learning Ctrs., 445 B.R. at 329).

Aviva and TRU also argue that the Hong Kong proceeding is not collective because the Debtor took steps to ensure that the liquidation would benefit only the Debtor and affiliated companies by using affiliates (and payments by affiliates to non-insider creditors) to control the Creditors' Meeting. Aviva and TRU argue that the Debtor and affiliated companies manipulated the Debtor's creditor list by having affiliated entities pay the Debtor's obligations and then accepting assignments of those claims. They also argue that if the Debtor and Toy

Quest were considered as one entity, the overall entity is solvent.

Mr. Ong testified that a company's determination of insolvency is not binding on the liquidator. If a liquidator determines a company is solvent, he is still responsible to complete his duties as a liquidator. See May 13 Transcript at 163:18–164:2. The Ong Declaration notes that if allegations of misconduct on behalf of a debtor are brought to a liquidator's attention, he has a duty to consider the interest of creditors, and to act impartially, especially where wrongdoing by directors appears possible. See Ong Declaration ¶¶ 35–36.

Mr. Ng testified that he has a duty to investigate potential causes of action, and that he has pursued funding creditors and insiders in other cases when he discovered wrongdoing, and that he would pursue such claims in this case if his investigation led him to conclude such actions were appropriate. See May 12 Transcript at 43:1–45:10; 50:14–16. Mr. Ng also testified that he would consider information provided to him by Aviva or TRU that may aid him in determining whether to pursue claims against insiders and affiliates. See id. at 55:19–56:4.

Because the Liquidators have the obligation to investigate and pursue recovery related to any wrongdoing by the Debtor or insiders, the Court concludes that the **\*642** alleged wrongdoing by those parties is not sufficient to render the Hong Kong liquidation non-collective. To the extent that the Debtor or its insiders have acted improperly, the Liquidators (and creditors including Aviva and TRU if the Liquidators will not act) have the capacity to protect the rights and interests of the creditor body. Moreover, both Mr. Ng and Mr. Ong testified that the Liquidators—not insiders—are in control of the liquidation and Mr. Ng testified that he would bring appropriate suits against affiliates and officers if his investigation led him to conclude that such suits were appropriate. Therefore, if Toy Quest or other insiders attempted to control the process to protect their interests, Hong Kong law provides mechanisms for the Liquidators to protect the interests of non-insiders. As such, the potentially improper behavior of the Debtor or its insiders does not mean that the proceeding is not collective.

Aviva further argues that the Liquidators have failed to take any action except trying to obstruct Aviva's collection efforts in the United States. Aviva asserts that

the Liquidators, inter alia, have not: collected the Debtor's books and records; investigated the Debtor's finances; or evaluated claims. Instead, Aviva argues, the Liquidators have fought with independent United States creditors at the direction of insiders. Even if this were all true, the proceeding is nevertheless collective, because as discussed above, creditors have remedies in the Hong Kong courts. See May 13 Transcript at 159:6–22; 162:8–13; 165:23–166:16.

Aviva next argues that the proceeding is not collective because Manley's principals "stripped" the company of all its funds leaving little money available for the Liquidators to be able to pursue causes of action against Toy Quest or other affiliated companies. But Mr. Ng testified that he believes he has sufficient money on-hand to fund such an investigation, and if necessary, he would ask Aviva or TRU to provide funds to allow the Liquidators to complete their investigation and to bring claims against insiders. See May 12 Transcript at 50:24–51:4; 53:1–6; May 13 Transcript at 119:1–8. See also Ng Supplemental Declaration ¶ 10. Therefore, even if insiders attempted to dissipate assets and to leave the Liquidators with insufficient cash to fund a full investigation or to pursue claims, Mr. Ng believes there are sufficient funds remaining and that there may be sources of funds available to pursue those claims.

Finally, TRU argues that the proceeding is not collective because the COI is dominated by the Debtor's insiders. TRU alleges that the Liquidators approved steps taken by the Debtor designed to ensure that Aviva, TRU, and other United States creditors were not included in the Creditors' Meeting. However, Mr. Ng testified "I didn't help to choose the date. I told them that if they want to choose the quickest date for the creditors meeting, that would be the day earliest possible but I didn't choose the date. It's their decision." May 12 Transcript at 126:13–16. The Court understood Mr. Ng's credible testimony to be that he gave the Debtor information related to the required notice period, but that he did not advise the Debtor on a date to choose, nor approve the date that was selected.

Moreover, as discussed above, creditors have numerous remedies available to them, including seeking a position on the COI either by consent or through a court proceeding, or by filing an action in Hong Kong to invalidate the liquidation.

Therefore, the Court concludes that the proceeding is collective in nature.

### *643 iv. In a Foreign Country

[8] The Liquidators must show that the proceeding is in a foreign country. See ABC Learning Ctrs., 728 F.3d at 308. The undisputed testimony is that the liquidation proceeding is located in Hong Kong. The Debtor is registered as a Hong Kong company, with a registered office in Hong Kong. See Ng Declaration ¶ 5; Ng Supplemental Declaration ¶ 7; May 12 Transcript at 29:15–20; 35:5–19. See also Ex. L–21 (Hong Kong Companies Registry). Moreover the liquidation was commenced in, and is subject to, Hong Kong law. See Ng Declaration ¶ 1; Ng Supplemental Declaration ¶ 1

Therefore, the proceeding is in a foreign country.

### v. Conducted Under a Law Related to Insolvency or Adjustment of Debts

[9] Mr. Ong and Mr. Briscoe both stated that CWMPO is the law in Hong Kong governing the voluntary winding up of companies. See Ong Declaration ¶ 6; Briscoe Affidavit ¶ 2.[4] Mr. Ong's testimony mentioned sections of CWMPO on several occasions, including references to priorities of payment and the availability of parties to seek court involvement in a case. See May 13 Transcript at 156:3–8; 157:1–6; 159:9–15. Moreover, the Ong Declaration and the Briscoe Affidavit both have numerous references to sections of CWMPO. Therefore, the Court concludes that the liquidation is conducted under a law related to insolvency or adjustment of debts.

[4]    Several other portions of the Briscoe Affidavit reference provisions and requirements of CWMPO. See, e.g., Briscoe Affidavit ¶¶ 3.1, 5.3, 5.4, 6.3, 6.5, 8.1, 9.1, 11.1.

### vi. The Debtor's Assets and Affairs are Subject to Control or Supervision of a Foreign Court

Although the parties did not dispute this element for recognition, the Court notes that section 1502 of the

Bankruptcy Code defines "foreign court" as "a judicial or other authority competent to control or supervise a foreign proceeding." 11 U.S.C. § 1502(3). As discussed above, there are several circumstances under which creditors can seek court intervention in the liquidation, including to: compel a liquidator to take certain actions, see May 13 Transcript at 159:6–15; to replace members of the COI, see id. at 162:8–13; to remove a liquidator, see Ong Declaration ¶¶ 49–50; Briscoe Affidavit ¶ 8; and to pursue causes of action. See May 13 Transcript at 171:5–9.

Therefore, the proceeding is subject to supervision by a foreign court.

### vii. Purpose of Reorganization of Liquidation

The final element requires that the foreign proceeding have a purpose of reorganization or liquidation. See ABC Learning Ctrs., 445 B.R. at 332. This element was not contested by the parties. Nevertheless, the Court notes that the purpose of winding up under CWMPO is to liquidate insolvent companies. See Ong Declaration ¶¶ 6–7; Briscoe Affidavit ¶ 2. Therefore, this element has been satisfied.

The Court concludes that the Liquidators have satisfied their burden of proof on each of the above elements and that the Hong Kong proceeding is a "foreign proceeding" under section 101(23) of the Bankruptcy Code. The Court, therefore, turns to the requirements for recognition of a foreign proceeding under sections 1515 and 1517 of the Bankruptcy Code.

### B. The Liquidators Have Satisfied the Requirements of § 1515

The parties did not dispute whether the requirements of section 1515 of the Bankruptcy Code have been met, therefore the **\*644** Court concludes that the Liquidators have met their burden on this issue. Even if this were not the case, the Liquidators have met their burden of proof related to section 1515. Section 1515 provides that a foreign representative must be the person to apply to the court for recognition of the foreign proceeding. See 11 U.S.C. § 1515(a). Here the Liquidators have shown that they are the foreign representatives of the Debtor and are the individuals seeking recognition of the foreign

proceeding. See May 12 Transcript at 28:21–24; Ng Declaration ¶¶ 1, 4, 11–12.

Section 1515 also requires that the petition for recognition be accompanied by, inter alia, "a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative." 11 U.S.C. § 1515(b)(1). The Liquidators provided such a copy stating that Mr. Lees was appointed as a liquidator of the Debtor. See Verified Petition Ex. C. See also Ex. TRU–55 (Board Minutes noting appointment of both Liquidators). Moreover, Mr. Ng's testimony and the Ng Declaration were credible evidence upon which the Court may rely in determining that there is a foreign proceeding. See 11 U.S.C. § 1515(b)(3). Therefore, the Court concludes that the Liquidators have met the requirements of section 1515(b).

Next the Liquidators must provide a statement of all foreign proceedings with respect to the Debtor. See id. § 1515(c). The Ng Declaration states that he is aware of no foreign proceeding other than the Hong Kong proceeding. See Ng Declaration ¶ 20(b). Because that statement is sufficient to meet the requirements of section 1515(c), the Court finds that the Liquidators have satisfied this element of section 1515. See ABC Learning Ctrs., 445 B.R. at 334.

Finally, because all of the documents provided to satisfy the requirements of sections 1515(a) and (b) were provided in English, the Liquidators satisfied the requirements of section 1515(d). See 11 U.S.C. § 1515(d).

Therefore, the Court determines that the Liquidators have met all of the requirements of section 1515.

### C. The Liquidators Have Satisfied the Requirements of § 1517

Section 1517(a) of the Bankruptcy Code provides:

> Subject to section 1506, after notice and a hearing, an order recognizing a foreign proceeding shall be entered if-
>
> (1) such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502;

(2) the foreign representative applying for recognition is a person or body; and

(3) the petition meets the requirements of section 1515.

11 U.S.C. § 1517(a). Because the Liquidators are both individuals and the Court has previously determined that the requirements of section 1515 have been met, the Liquidators have met their burden on the second and third elements of section 1517(a). The parties, however, dispute the location of the Debtor's COMI.

With regard to the first element of section 1515, courts must determine whether the proceeding is "main" or "nonmain." A "foreign main proceeding" is a "foreign proceeding pending in the country where the debtor has [its COMI,]" 11 U.S.C. § 1502(4), while a "foreign nonmain proceeding" is a "foreign proceeding, other than a foreign main proceeding, pending in a country where the debtor has an establishment." Id. § 1502(6). The Court has power to grant extensive relief, whether the foreign proceeding is recognized as **\*645** main or nonmain. See In re SPhinX, Ltd., 351 B.R. 103, 115 (Bankr. S.D.N.Y. 2006), aff'd, 371 B.R. 10 (S.D.N.Y. 2007). However, additional relief is available when a proceeding is considered to be "main."

> That is, upon recognition of the foreign proceeding as a "foreign main proceeding," (a) the automatic stay under Bankruptcy Code section 362 (as well as the creditors' right to adequate protection and relief from the automatic stay under sections 361 and 362(d) of the Bankruptcy Code) applies with respect to the debtor and its property within the territorial jurisdiction of the United States, (b) sections 363, 549 and 552 of the Bankruptcy Code apply to restrict the ability to transfer such property absent court approval, and (c) unless the court orders otherwise, the foreign representative may operate the debtor's business and exercise the rights and powers of

a trustee under Bankruptcy Code sections 363 and 552. 11 U.S.C. § 1520(a)(1)–(3).

Id. at 115. The parties dispute whether the Debtor's COMI is in Hong Kong and, in turn, whether the foreign proceeding is main or nonmain.

 [10]  "The term 'center of main interests' is taken from the UNCITRAL Model Law." Betcorp, 400 B.R. at 286. While COMI is not defined in either Chapter 15 or the Model Law, section 1516(c) of the Bankruptcy Code provides that: "[i]n the absence of evidence to the contrary, the debtor's registered office, or habitual residence in the case of an individual, is presumed to be the center of the debtor's main interests." 11 U.S.C. § 1516(c). Because the Debtor's registered office is in Hong Kong, there is a presumption that its COMI is Hong Kong. See Ng Supplemental Declaration ¶¶ 7(a) and (b). Parties may rebut this presumption by presenting "enough evidence ... to withstand a motion for summary judgment ...." In re Millennium Glob. Emerging Credit Master Fund Ltd., 458 B.R. 63, 76 (Bankr. S.D.N.Y. 2011), aff'd, 474 B.R. 88 (S.D.N.Y. 2012). Ultimately the burden of proof in determining COMI is on the Liquidators. See Betcorp, 400 B.R. at 285–86. Aviva and TRU presented sufficient evidence to rebut the presumption, however, the Liquidators have met their burden of proof that the Debtor's COMI is Hong Kong.

In determining the COMI of a foreign debtor, courts have examined a number of factors, including:

> the location of the debtor's headquarters; the location of those who actually manage the debtor (which, conceivably could be the headquarters of a holding company); the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes.

Millennium Glob., 458 B.R. at 76 (quoting SPhinX, 351 B.R. at 117).

The majority of these factors fall in favor of concluding that the Debtor's COMI is in Hong Kong. The Debtor's headquarters is in Hong Kong. See May 12 Transcript at 29:15–17; Ng Declaration ¶ 5. Mr. Ng testified that he reached that conclusion by reviewing the Debtor's filing records and other documents, such as the Debtor's annual return which states that the Debtor is a Hong Kong business. See May 12 Transcript at 29:18–20, 32:2–10. The majority of the Debtor's business decisions and records were in Hong Kong as well as the Debtor's financial operations, such as accounting and marketing. See id. at 33:24–34:12. See also Supplemental Ng Declaration ¶ 7 (198 employees in Hong **\*646** Kong; bank accounts in Hong Kong). Mr. Ng further testified that purchase orders, contracts, invoices, and other documents all state that the Debtor is located in Hong Kong. See id. at 37:2–39:21 (discussing Ex. L–22). Exhibit L–22 is a four-page exhibit of documents sent to a customer (Village Road Show) including a confirmation, purchase order and invoice. Each of the documents lists the Debtor's address as being in Hong Kong. Finally, the vast majority of the Debtor's employees were located in Hong Kong. See id. at 34:13–25 (discussing Ex. L–20). Exhibit L–20 is a list of 198 of Debtor's employees, which is the exact amount of employees mentioned in the Supplemental Ng Declaration. Therefore, the Court concludes that the first factor falls in favor of determining that the Debtor's COMI is in Hong Kong.

Aviva argues that this case is similar to In re Tradex Swiss AG, 384 B.R. 34 (Bankr. D. Mass. 2008), in which the court determined that the foreign representatives did not meet their burden of showing that the debtor's COMI was in Switzerland. However, the facts of Tradex Swiss are distinguishable. Tradex Swiss was an internet-based trading company with offices in Switzerland and the United States. However, eighteen of the company's twenty-two employees were based in Boston.[5] See id. at 39. Tradex Swiss' trades were completed out of Boston, and all important company files such as trading agreements, deposit confirmations, and the debtor's bank accounts were located in Boston. See id. As discussed above, in the present case, although the Debtor had an office and an employee (Mr. Dubinsky) in the United States, the Debtor's main office and bank accounts were in Hong Kong. Moreover, it received orders, sent invoices, and conducted substantial other business in Hong Kong.

[5] The only employees based in Switzerland were Tradex Swiss' owner, his girlfriend, a cleaning person, and an IT consultant.

Aviva further argues that because the Debtor's Hong Kong-based employees were laid off on March 17, five days prior to entering into liquidation, see May 12 Transcript at 110:16–17, the only individuals with knowledge related to the Debtor and its business are not located in Hong Kong. While these individuals may not have been employed by the Debtor at the moment the Debtor entered liquidation, they were laid off during the period between notice of the Creditors' Meeting and the meeting itself. In other words, their employment essentially continued until the Debtor knew with some degree of certainty that its operations were going to cease and the employees were terminated within a period of time in close proximity to liquidation. As such, these individuals likely have knowledge of the Debtor's operations up until just days before the liquidation. Therefore, even though they were not technically employed at the start of the liquidation, their employment was sufficiently close in time as to have the Court consider that as among the facts weighing in favor of finding that the Debtor's COMI is in Hong Kong.

With regard to the location of the Debtor's primary assets, Mr. Ng testified that the Debtor had two primary categories of assets. First, the assets in Hong Kong, which Mr. Ng testified to be bank accounts holding approximately USD 90,000. See May 12 Transcript at 35:20–36:5. Second, the assets in the United States, consisting of a receivable from TRU. The claim against TRU is approximately USD 5 million. See id. at 36:13–16. However, TRU has alleged a claim against the Debtor in the amount of USD 18.5 million. See, e.g., **\*647** Ex. TRU–66. The parties' claims against each other are currently pending in the New Jersey Court. As such, the actual value of this asset in terms of "real" dollars is not certain.[6]

[6] Although not a factor in the Court's analysis, after conclusion of the recognition hearing, TRU and its affiliates filed Chapter 11 petitions in the United States Bankruptcy Court for the Eastern District of Virginia. This will likely further inhibit the realizable value of the Debtor's claim against TRU.

Further, based upon the evidence presented, the Liquidators may have additional assets in Hong Kong

3564

—potential claims against insiders. These claims were discussed during Mr. Ng's testimony as well as in the Ng Declaration. Mr. Ng credibly testified that he intends to investigate and pursue claims against insiders. See May 12 Transcript at 50:14–16; 53:16–54:2. Mr. Ng was also quite believable when he testified that he would have no problem pursuing Toy Quest if there was a claim with merit, even though Toy Quest is a funding creditor. See May 12 Transcript at 44:21–24. He also credibly stated that if a creditor (including Aviva or TRU) provided him with information related to wrong-doing by insiders, he would pursue those claims. See id. at 55:19–56:10. As such, the Court concludes that the Debtor's "hard/realizable" (i.e., cash) assets are located in Hong Kong, and its litigation claims are located both in Hong Kong and in the United States. Moreover, it appears that the majority of claims against insiders would likely be brought in Hong Kong pursuant to Hong Kong law.

Aviva and TRU argue that this factor falls in their favor because the Debtor's largest asset—the TRU receivable— is located in the United States. As discussed above, the issues between the Debtor and TRU were in litigation prior to the liquidation. TRU has asserted that its claims against the Debtor far exceed the Debtor's claims against TRU. While the TRU receivable may have value, it is not the Debtor's only asset, and the Debtor's other litigation claims may have more value. In addition, those claims may lead to judgments from which the Liquidators may be able collect instead of (as TRU argues) being setoff against a much larger claim.

Therefore, this factor falls in favor of determining that the Debtor's COMI is in Hong Kong.

The next factor is the location of the Debtor's creditors. Mr. Ng testified that the Debtor has seventeen non-insider creditors, ten located in the United States and seven located in Hong Kong. In addition, the holders of the majority of the face value of non-insider claims are in the United States. Therefore, this factor falls slightly in favor of concluding that the Debtor's COMI is not in Hong Kong.

The final factor is to consider which jurisdiction's laws will apply to the majority of disputes. While many of the issues pertaining to Aviva and TRU, as well as other United States creditors, would likely be resolved pursuant to laws of the United States, many other issues would likely have to be litigated in Hong Kong under Hong Kong law. For example, it appears that claims of fraudulent transfer or alter ego against insiders, or breaches of duties by management would appropriately be brought in Hong Kong. Moreover, Mr. Ng testified during cross examination that there are likely many different claims or causes of action that could be raised against insiders and affiliates; and that he intends to investigate and pursue those claims. Therefore, it appears that the majority of these types of disputes would apply Hong Kong law, and this factor falls in favor of the Debtor's COMI being in Hong Kong. Even if this factor did not fall **\*648** in favor of the Debtor's COMI being in Hong Kong, it would only marginally fall in favor of the COMI being in the United States.

Because the weight of the factors fall in favor of determining that the Debtor's COMI is in Hong Kong, the Liquidators have met their burden of proof on this issue, and the Court determines that the Debtor's COMI is in Hong Kong.

### D. Recognition Is Not Manifestly Contrary to Public Policy

**[11]** Section 1506 states that the Court may "refus[e] to take any action governed by [Chapter 15] if the action would be manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506 (emphasis added). Aviva and TRU have asserted that recognizing this proceeding would be manifestly contrary to United States public policy. Courts construe this exception very narrowly, because Congress' use of the word "manifestly" indicates that the exception is applicable to "the most fundamental policies of the United States." ABC Learning Ctrs., 728 F.3d at 309 (quoting H.R.Rep. No. 109–31(1) at 109 (2005) reprinted in U.S.C.C.A.N. 88, 172).

**[12]** When deciding whether to apply the public policy exception, courts generally focus on two factors: (1) whether the foreign proceeding is or was procedurally unfair; and (2) whether the recognition of the foreign proceeding or application of its laws would impinge upon a United States statutory or constitutional right. See id.

The Court notes some examples of cases considering what constitutes a violation of public policy. In In re Gold & Honey, Ltd., 410 B.R. 357 (Bankr. E.D.N.Y. 2009), the

court applied section 1506 where the foreign proceeding was filed in violation of the bankruptcy court's automatic stay and court orders. In In re Ephedra Prods. Liab. Litig., 349 B.R. 333, 335 (S.D.N.Y. 2006), claimants objecting to recognition argued that a foreign proceeding that lacks a right to a jury trial violates public policy because of the fundamental importance of due process rights. The court rejected the argument because, while the right to a jury trial is important in the American legal system, it is possible to reach a fair and impartial outcome even in the absence of a jury trial. Id. at 337. The court did emphasize that proceedings should follow a course of "civilized jurisprudence" and be "fair and impartial." Id. at 336 (citation omitted).

In In re Creative Fin. Ltd., 543 B.R. 498, 516 (Bankr. S.D.N.Y. 2016), the court noted that the fact that the debtor engaged in bad acts does not make recognition of its proceeding contrary to public policy. The court explicitly found that the debtor and related associates had acted in bad faith in efforts to avoid various creditors and judgments. Id. at 515. Despite this finding, the court refused to invoke section 1506 to deny recognition. Id. at 515–16. As the court explained, there is no precedent for applying the public policy exception based solely on the behavior of one party and it would seem unfair to apply section 1506 to bad faith filers when United States debtors sometimes engage in the same bad acts under United States law. Id. at 516.

Creative Fin. essentially held that, when gauging whether to recognize a proceeding, the question under section 1506 is not whether the actions of the debtor violate public policy, but rather whether the foreign tribunal's procedures and safeguards do not comport with United States public policy. Therefore, the court determined that the issue of recognition turned on whether the liquidator could satisfy the **\*649** requirement of section 1517, not section 1506. [7]

---

[7]   The court ultimately determined that Creative Finance's insolvency was not a main or nonmain proceeding because Creative Finance's COMI was not in the British Virgin Islands and it was not established in the British Virgin Islands. See Creative Fin., 543 B.R. at 520–21.

**[13]**   This point can also be inferred from ABC Learning Ctrs., 728 F.3d at 310, in which the Third Circuit analyzed the public policy issue by comparing the creditor

protections employed in Australia versus those employed domestically and found that Australian law is similar to the Bankruptcy Code with respect to pro rata distributions among levels of priority. See id. As discussed above, Hong Kong law has the same policy.

One of the bases for violation of public policy that Aviva and TRU raise is lack of appropriate notice of the Creditors' Meeting to United States-based creditors. This issue was discussed in ABC Learning Ctrs., 445 B.R. 318, where the court noted that lack of appropriate notice (although not raised by the parties) could be considered a public policy issue. However, because the notice complied with the requirements of Australian law, the proceeding was not contrary to public policy. See id. at 336. As discussed above, the court in ABC Learning Ctrs. considered the notice issue during its review of whether the Australian proceeding was collective, and determined that Australian law provided protections for creditors that were not properly served. See id. at 329. Similarly, Aviva and TRU have remedies available to them under Hong Kong law related to their argument that notice of the foreign proceeding was insufficient.

Aviva further argues that the Debtor's actions in other courts rise to the level of rendering recognition manifestly contrary to public policy. Aviva and TRU presented evidence of the Debtor's actions in other courts throughout the United States in which the Debtor violated orders of those courts. They argue that entering liquidation in an attempt to further avoid complying with court orders. In support of this argument Aviva relies upon Gold & Honey, in which the foreign representative violated an order of a bankruptcy court. In Gold & Honey, the bankruptcy court held that the automatic stay barred the foreign representative from initiating the foreign proceeding, and ordered that the proceeding not be initiated. See Gold & Honey 410 B.R. at 373. Therefore, the act of initiating an insolvency proceeding violated a United States statute and court order, but that is not so in the present case. Although the Debtor violated many court orders, there was no evidence that the Debtor was forbidden from entering liquidation.

Aviva's final public policy argument is that if the Court recognizes the foreign proceeding, it would encourage other foreign companies to take similar actions. While the Debtor's actions in various courts in the United States appears to have been improper, and its decision

to enter into liquidation may have been the latest step in an effort to avoid a day of reckoning in the United States, a company presumably has the right to liquidate. If it is a foreign company, it has the right to do so in a country other than the United States. Chapter 15 and the UNCITRAL Model Law provide a framework for those cases to be recognized and for debtors, creditors, and other parties in interest to enjoy certain protections in the United States and in the country where the foreign proceeding is located. Similar to the Debtor being an allegedly "bad company" seeking protections of liquidation in Hong Kong, "bad companies" within the United **\*650** States often file bankruptcy. Just as foreign courts should recognize the bankruptcy of a bad company based in the United States when all of the elements for recognition have been met, United States courts should recognize foreign proceedings of bad companies when a foreign representative can establish the requirements for recognition. This is similar to Creative Fin., where the court noted that United States courts are faced with bad faith filings and are able to take actions to deal with those parties, but such bad faith does not rise to the level of a violation of United States public policy. See Creative Fin., 543 B.R. at 516. The court noted "[i]t does not seem right to find a violation of U.S. public policy when U.S. debtors sometimes engage in the same or similar bad faith, under U.S. law." Id.

TRU suggests that proceeding with a Hong Kong liquidation will strip United States creditors of protections of fraudulent transfer and other avoidance actions available under United States laws. TRU argues that Hong Kong's fraudulent transfer laws are more stringent than those in the United States because Hong Kong law does not allow for avoidance of constructively fraudulent transfers, therefore, recognition is manifestly contrary to public policy. TRU appears to be correct that Hong Kong law makes it more difficult to prove a fraudulent transfer because it requires the showing of intent. See Ong Declaration ¶ 34. However, the fact that a foreign law differs from United States law does not mean that recognition would be manifestly contrary to United States public policy. See In re Toft, 453 B.R. 186, 198 (Bankr. S.D.N.Y. 2011) (collecting cases). In Toft a foreign representative sought recognition of a German insolvency proceeding so that the foreign representative could obtain and intercept the debtor's emails. The court held that the relief sought by the foreign representative was banned under United States law, and could result in

criminal liability for anyone that carried out the foreign representative's request. See id. Therefore, the relief sought by the foreign representative " 'would impinge severely on a U.S. constitutional or statutory right.' " Id. (quoting In re Qimonda AG Bankr. Litig., 433 B.R. 547, 570 (E.D. Va. 2010) ). In ABC Learning Ctrs. the Third Circuit discussed the difference between the Bankruptcy Code's general requirement that secured creditors turn assets over to the trustee and seek distributions while Australian law allows the secured creditor to realize the value of their collateral and turn any excess over to the company. See ABC Learning Ctrs., 728 F.3d at 310. The Third Circuit determined that this difference was not manifestly contrary to United States law. See id. at 311. The Third Circuit compared its decision to Schimmelpenninck in which the Fifth's Circuit made a similar determination related to Dutch bankruptcy laws. See id. at 310–11 (citing Schimmelpenninck, 183 F.3d at 365). In this case, while Hong Kong's laws related to fraudulent transfers are not the same as those of the United States, they are not manifestly contrary to United States law, instead they are a different way to achieve similar goals. See id. at 311.

TRU also argues that the Liquidators are not independent, and that their lack of independence is contrary to public policy. TRU alleges that Toy Quest's funding of the liquidation and the Liquidators' motion for recognition show that the Liquidators are beholden to Toy Quest and will not take action against Toy Quest or other insiders. Mr. Ng testified that Toy Quest had provided funds to the Liquidators to fund their work, and that Toy Quest was paying the Liquidators' United States attorneys directly. See May 12 Transcript at 41:8–42:9. He also testified that he has been involved in many cases where creditors **\*651** have funded the case. See id. at 42:10–25. Mr. Ng also credibly testified that he would pursue claims against insiders or a funding creditor. See id. at 44:21–24. He gave examples of cases where he pursued funding creditors and shareholders when he believed that there was a cause of action against those parties. See id. at 43:1–44:20; 44:25–45:10. Mr. Ng explained that if he determines there was a cause of action against an insider, he would reach out to creditors to determine if they would fund litigation. See id. at 45:11–15.

TRU argues that having creditors or insiders fund the Liquidators' efforts is manifestly contrary to public policy, especially because the Liquidators may not use funds from

3567

Toy Quest to pursue any such claims. However, similar agreements have been approved in Chapter 7 cases and are commonplace in Chapter 11 cases. For example, in In re Modanlo, 2006 WL 4606303 (D. Md. 2006), a creditor agreed to lend funds to the Chapter 7 trustee so that the trustee could pursue litigation claims for the benefit of all creditors. The terms of the loan included a provision that the funds could not be used for litigation against the lender and other entities. See id. at *3. The district court affirmed the bankruptcy court's determination there was no conflict of interest related to the loan. See id. at *8–9. Moreover, secured creditors in Chapter 11 cases frequently agree to "carve outs" from their collateral in order to fund a debtor's and creditor committee's professional fees. Those carve outs almost always include a provision that the funds may not be used in the pursuit of claims against the secured creditor. See id. at *5–6 (citing In re FCX, Inc., 54 B.R. 833 (Bankr. E.D.N.C. 1985) ). While Toy Quest's funding of the liquidation may not be exactly the same as lending to a trustee or debtor in possession in a bankruptcy case, it appears to be similar, and therefore, is not manifestly contrary to public policy.

Moreover, Mr. Ng also testified that he intends to continue with his investigation into the Debtor's relationships and transactions with insiders and is willing to pursue causes of action. See May 13 Transcript at 116:10–25. If he believes there are valid claims he will ask Aviva and TRU to fund that litigation. See id. at 119:1–15. As such Toy Quest's funding of a portion of the case is not manifestly contrary to public policy of the United States.

Therefore, the Court concludes that recognition of the foreign proceeding is not manifestly contrary to public policy.

E. Dismissal or Suspension of
Proceedings is Not Appropriate

Aviva argues that if the Court determines to recognize the foreign proceeding, the Court should nevertheless immediately dismiss or suspend the case due to the Debtor's bad faith. Aviva further argues that the

Liquidators are not taking any action other than impeding collection efforts of United States creditors. However, as discussed above, Mr. Ng testified that he intends to investigate potential claims and causes of action, and that he intends to pursue those claims if he believes they are viable. Moreover, dismissing or suspending the case would potentially be harmful to creditors in the United States that have not taken an active role in this case. For example, without a stay in place Aviva and TRU would be free to resume collection efforts and restart the proverbial race to the courthouse as opposed to allowing the Liquidators time to investigate and pursue claims for the benefit of all creditors.

## CONCLUSION

The Court does not doubt that Toy Quest and other insiders have taken actions to avoid paying Aviva's claims and a trial against TRU. There may also be significant claims against Toy Quest and insiders for their apparent efforts to avoid **\*652** paying or to hide assets from creditors. However, as noted above, companies often enter liquidation as a last-ditch effort to avoid creditors, and an independent fiduciary is tasked with sorting everything out for the benefit of all creditors. Here, that liquidation was commenced in Hong Kong rather than the United States. The fact that the Debtor (and insiders), may have acted in bad faith in other litigation, does not mean that the Court should not recognize the foreign proceeding, and thereby force the Liquidators to pursue their duties under Hong Kong law without the assistance of this Court and the protections of Chapter 15.

The Liquidators have met their burden of proof in showing that the Hong Kong proceeding is a foreign main proceeding. Moreover, recognition of the foreign proceeding is not manifestly contrary to United States public policy. The Motion is granted.

**All Citations**

580 B.R. 632, 65 Bankr.Ct.Dec. 66

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 48

2025 WL 601463
Only the Westlaw citation is currently available.
United States Bankruptcy Court, S.D. New York.

IN RE: MEGA NEWCO LIMITED,

Debtor in a Foreign Proceeding

Case No. 24-12031 (MEW)
|
Signed February 24, 2025

**Attorneys and Law Firms**

CLEARY GOTTLIEB STEEN & HAMILTON LLP New York, NY, Attorneys for the Debtor and Foreign Representative, By: David H. Botter, Esq., Thomas S. Kessler, Esq., Miranda Hatch, Esq., Carla Martini, Esq., Kaleinanni Nallira, Esq.

LATHAM & WATKINS LLP, New York, NY, Attorneys for the Ad Hoc Group of Noteholders, By: Adam J. Goldman, Esq. Jonathan J. Weichselbaum, Esq. David Hammerman, Esq.

OFFICE OF THE UNITED STATES TRUSTEE, New York, NY, By: Andrea B. Schwartz, Esq.

**DECISION GRANTING RECOGNITION OF A FOREIGN PROCEEDING AND ENFORCING AN ORDER APPROVING A SCHEME OF ARRANGEMENT**

HONORABLE MICHAEL E. WILES, UNITED STATES BANKRUPTCY JUDGE

**\*1** Mega Newco Limited ("**Mega Newco**") is a wholly owned subsidiary of a Mexican financial services company named Operadora de Servicios Mega, S.A. De C.V., Sofom, E.R. (the "**Parent**"). Mega Newco was formed under the laws of England and Wales on September 30, 2024, for the purpose of assisting its Parent in the completion of a restructuring of obligations under a set of notes (the "**U.S. Notes**") that the Parent issued in 2020 under an Indenture that is governed by New York law. Mega Newco has asked this Court (i) to grant recognition of a foreign proceeding (the "**English Scheme Proceeding**") that Mega Newco commenced in the High Court of Justice Business and Property Courts of England and Wales (the "**English Court**"), and (ii) to enforce, in the United

States, an order entered by the English Court (the "**English Court Order**") that approved the scheme of arrangement (the "**Scheme of Arrangement**") that Mega Newco proposed.

The Parent is based in Guadalajara, Mexico and has its headquarters there. For various reasons, the Parent faced liquidity constraints and needed to restructure its obligations, including its obligations under the U.S. Notes. The Parent negotiated with an ad hoc group of noteholders that collectively owned more than 25 percent of the outstanding U.S. Notes, and the parties reached agreement on the terms of a possible restructuring at some time during 2024. I will not attempt to describe in full the deal that the parties reached, but it provides that holders of the U.S. Notes may choose to receive either partial cash payments from the Parent or to receive equity in the Parent in exchange for their U.S. Notes. The agreement also gives certain holders of the exiting U.S. Notes the opportunity to buy new notes to be issued by the Parent.

The Parent has also negotiated consensual arrangements to refinance and restructure other debt obligations. Those other agreements are contingent on the completion and enforcement of the agreed restructuring of the U.S. Notes. Together all of these negotiated restructurings will improve creditor recoveries, strengthen the finances of the Parent, and preserve the value of the operating business.

However, the agreed restructuring of the U.S. Notes raised practical problems. The U.S. Notes could not be restructured outside of a bankruptcy proceeding except with the affirmative consent of one hundred percent of the holders of the U.S. Notes. As a general matter it is not possible to obtain that level of affirmative consent to a note restructuring, and that is particularly so in this case, where dealings with some of the holders of the U.S. Notes are constrained because they are what the Debtor has referred to as "Sanctioned Persons." Bankruptcy laws would permit a restructuring of the U.S. Notes without one hundred percent consent, but most of those laws would not have permitted a surgical restructuring of just the U.S. Notes. However, U.K. laws permit the approval of a consensual scheme of arrangement that deals with a single set of note obligations, and pursuing such a scheme of arrangement in the English Court also promised to be less expensive and time-consuming than other alternatives. The parties therefore wished to implement the desired restructuring of the U.S. Notes through the English Court under a U.K. scheme of arrangement.

3570

**\*2** U.K. courts have held that they have jurisdiction to approve a scheme of arrangement so long as the debtor has a substantial connection with the U.K., which may include the presence of a registered office or the fact that the relevant obligations are governed by U.K. laws. However, the Parent did not have its registered office in the U.K.; the U.S. Notes are governed by New York law (not English law); and the Parent had no substantial business operations or facilities in the U.K. Counsel conceded during the hearing that I held on February 7, 2025, that the Parent therefore would not have had the right, in its own name and on its own behalf, to seek approval of a proposed scheme of arrangement by the English Court.

Mega Newco was created to address this issue. More particularly:

- Mega Newco was incorporated on September 30, 2024, under the laws of England and Wales, and listed its registered office as an address in London.

- Mega Newco signed documents by which it made itself an additional obligor under the U.S. Notes. Mega Newco also agreed that the Parent could seek contribution from Mega Newco for any payment made by the Parent on the U.S. Notes.

- Mega Newco then filed the necessary papers to commence the English Scheme Proceeding on November 14, 2024. Mega Newco also commenced this Chapter 15 proceeding in November 2024.

The papers submitted to the English Court made clear that Mega Newco was created for the purpose of enabling the English Court to take jurisdiction over the proposed scheme of arrangement. The English Court has approved the exercise of jurisdiction on this basis, and it has approved Mega Newco's proposed Scheme of Arrangement, including those provisions that resolve the noteholders' claims against the Parent as well as against Mega Newco. The holders of U.S. Notes had the right to appear at a meeting that was convened to solicit votes with respect to the proposed Scheme of Arrangement, and the holders of more than seventy-five percent of the U.S. Notes appeared either in person or through proxies. The Scheme of Arrangement was approved unanimously by those who voted, and no objections were filed with the English Court.

No party has objected to the proposed recognition of the English Scheme Proceeding in this Chapter 15 case, or to the enforcement, in the United States, of the English Court Order and the Scheme of Arrangement. The Office of the United States Trustee raised some issues about the release provisions in the Scheme of Arrangement, but it has reached an agreement with the Debtor on a modification to those provisions insofar as they would be given effect in the United States. No other issues have been raised.

Under Chapter 15, a foreign bankruptcy or insolvency proceeding may be recognized, and the orders entered in such a proceeding may be enforced, if the foreign proceeding is either a "foreign main proceeding" or a "foreign nonmain proceeding." 11 U.S.C. § 1517(a)(1). A foreign proceeding is a "foreign nonmain proceeding" if it is pending in a country in which a debtor has an "establishment." I issued a decision in *In re Mood Media Corp.*, 569 B.R. 556, 561-63 (Bankr. S.D.N.Y. 2017), in which I held that for this purpose an "establishment" must be an actual place from which economic market-facing activities are regularly conducted. However, Mega Newco represented to the English Court that it has never engaged in any business, let alone any regular market-facing activities that it conducted from a location in the U.K. Mega Newco has engaged in restructuring activities, but those activities are not themselves sufficient to show the existence of an "establishment" in the U.K. If restructuring activities alone were sufficient, then any proceeding in which a debtor sought relief would automatically qualify as a "foreign nonmain proceeding," and the requirement of an "establishment" would be deprived of any meaning. *See Lavie v. Ran (In re Ran)*, 607 F.3d 1017, 1028 (5th Cir. 2010) (holding that if a foreign "bankruptcy proceeding and associated debts, alone, could suffice to demonstrate an establishment, this would render the framework of Chapter 15 meaningless. There would be no reason to define establishment as engaging in a nontransitory economic activity. The petition for recognition would simply require evidence of the existence of the foreign proceeding."); *see also In re Modern Land (China) Co.*, 641 B.R. 768, 785-86 (Bankr. S.D.N.Y. 2022) (holding that a foreign restructuring proceeding "cannot itself constitute nontransitory economic activity to support recognition as a foreign nonmain proceeding"); *Rozhkov v. Pirogova (In re Pirogova)*, 612 B.R. 475, 484 (S.D.N.Y. 2020) (same).

**\*3** A foreign proceeding is a "foreign main proceeding" if it is taking place in the jurisdiction where the debtor has its center of main interests, or COMI. 11 U.S.C. § 1502(4). Section 1516(c) of the Bankruptcy Code provides that "[i]n the absence of evidence to the contrary, the debtor's registered

3571

office ... is presumed to be the center of the debtor's main interests." 11 U.S.C. § 1516(c). Mega Newco's registered office is in London. Unlike some other cases, there is no "contrary evidence" in the record before me that indicates that Mega Newco's own COMI is located outside the United Kingdom. *See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 129-30 (Bankr. S.D.N.Y. 2007) (holding that other evidence before the Court showed that the debtor's COMI was not situated where the debtor had contended). Mega Newco has engaged in restructuring activities in the U.K., and those may be considered in determining whether its COMI is in the U.K. *See Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 138 (2d Cir. 2013). These restructuring activities apparently are the only activities in which Mega Newco has ever engaged.

As a matter of form, then, Mega Newco argues that the requirements for recognition of the English Scheme Proceeding as a "foreign main proceeding" have been satisfied. I nevertheless cannot help but see significant risks in the structure that has been used here. Chapter 15 is premised on the idea that a debtor who seeks to restructure an obligation is actually the subject of a foreign proceeding, and that the foreign proceeding is located in the country where that debtor has its COMI. Here, the whole structure admittedly was created for the purpose of restructuring the U.S. Notes issued by the Parent. However, the Parent is not a party to the English Scheme Proceeding, and the Parent's COMI is in Mexico, not the U.K. Mega Newco was created, and then voluntarily subjected itself to the Parent's liabilities under the U.S. Notes, just so that the U.S. Notes issued by the Parent could be restructured in a jurisdiction that was not otherwise available.

If we were routinely to allow this structure in all cases, no matter what the circumstances, the ordinary predicates for Chapter 15 relief could be stripped of meaning. Any debtor company could restructure its obligations anywhere it chose without even subjecting itself to a foreign proceeding. All that a debtor would need to do is to form a new subsidiary in a jurisdiction of its choice and then cause that new subsidiary to assume the parent company's obligations. The parent company's COMI would no longer be relevant to the parent's restructuring of its debts. The laws of the chosen jurisdiction would govern a restructuring, no matter how those laws might affect the legitimate expectations of creditors and regardless of whether the debtor had chosen a particular jurisdiction for the purpose of favoring insiders or for other improper reasons.

Courts and commentators have long worried about instances in which a debtor might try to manipulate its COMI, fearing that such a manipulation could be done to thwart creditor expectations or to accomplish other improper objectives. *See, e.g., In re Fairfield Sentry Ltd.,* 440 B.R. 60, 65-66 (Bankr. S.D.N.Y. 2010) (identifying concerns and explaining that courts may make a broader assessment of COMI if there has been an "opportunistic shift to establish COMI (i.e., insider exploitation, untoward manipulation, overt thwarting of third party expectations.)"); *see also In re Modern Land (China) Co.,* 641 B.R. 768, 782-83 (Bankr. S.D.N.Y. 2022) (same); *In re Ocean Rig UDW Inc.*, 570 B.R. 687 (Bankr. S.D.N.Y. 2017) (same). The issue before me, then, boils down to this: does the underlying structure in this case constitute such an improper manipulation of COMI? Should I disregard the form of the transactions and disregard the participation by Mega Newco, and look instead to whether the Parent, on its own, has satisfied the conditions for relief under Chapter 15?

**\*4** Clearly, the structure before me could be used in another case as a way of frustrating and thwarting the legitimate expectations of creditors. This case, however, involves no such frustration or thwarting of creditor rights. Mega Newco was formed, and the English Scheme Proceeding was pursued, for laudable objectives. The Scheme of Arrangement will enable a broader restructuring to be accomplished efficiently and thereby will enhance all parties' recoveries. It will also maximize the value of the underlying businesses. In these respects, the enforcement of the Scheme of Arrangement is fully consistent with the stated purposes of Chapter 15. *See* 11 U.S.C. § 1501(a).

In addition, the procedures that the parties have followed were not implemented in any way that took unfair advantage of the holders of the U.S. Notes. The whole process was worked out with the involvement and consent of the affected creditors, and not for the purpose of harming them or of thwarting their expectations. The Noteholders and their Indenture Trustee are aware of the basis on which U.K. jurisdiction has been asserted and have not objected to it. There similarly is not a single objection to the recognition of the U.K. proceeding or the enforcement of the U.K. order.

If COMI manipulation is a matter of concern because of the risk that creditors' rights and expectations might be thwarted, then one of the main factors I ought to consider, in deciding whether such a manipulation has occurred, is whether the affected creditors have asserted any objection. *See In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y.

3572

2006) (holding that COMI determinations should not be made "mechanically," that COMI should be assessed "in light of chapter 15's emphasis on protecting the reasonable interests of parties in interest pursuant to fair procedures and the maximization of the debtor's value," that creditors presumably are in the bast position to determine whether their own expectations are being thwarted, and therefore that "one generally should defer ... to the creditors' acquiescence in or support of a proposed COMI"). Ironically, the only thing that would thwart creditor expectations in the case before me would be if I were to decline to enforce the English Court Order. It would be absurd for me to thwart the creditors' constructive desires and expectations in the guise of supposedly protecting them.

If there were an actual contention or evidence that the structure at issue here had been used in an unfair way and had thwarted third-party expectations, there would be serious questions in my mind as to whether it ought to be approved. However, in light of the support of all of the affected parties and their overwhelming consent to the English Scheme Proceeding and the approval of the Scheme of Arrangement, and the other factors that I have cited, I see no cause in this particular case to look past the form of the transactions or to pursue theoretical issues that no affected party wishes to pursue. I will therefore recognize the English Scheme Proceeding and enforce the English Court Order.

A separate Order has been issued to reflect the Court's rulings.

**All Citations**

Slip Copy, 2025 WL 601463

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

# Tab 49

Westlaw.

Page 1

421 B.R. 685, 52 Bankr.Ct.Dec. 159
**(Cite as: 421 B.R. 685)**

▷

United States Bankruptcy Court,
S.D. New York.
In re METCALFE & MANSFIELD ALTERNAT-
IVE INVESTMENTS, et al., Debtors in Foreign
Proceedings.

No. 09–16709 (MG).
Jan. 5, 2010.

**Background:** Foreign representative of debtors who were subject of foreign proceedings pending under the Canadian Companies' Creditors Arrangement Act (CCAA) moved for recognition of foreign proceedings and post-recognition relief in form of enforcement of non-debtor, third-party release approved by Canadian courts as part of restructuring plan that was adopted with near-unanimous creditor support.

**Holdings:** The Bankruptcy Court, Martin Glenn, J., held that:

(1) narrow constraints on availability of non-debtor, third-party release as part of Chapter 11 plan confirmed under United States bankruptcy law did not prevent bankruptcy court, in Chapter 15 case commenced by foreign representative of Canadian debtors, from granting post-recognition relief in forum of enforcement of non-debtor, third-party release approved by Canadian courts following specific argument thereon, and

(2) no basis existed for bankruptcy court to second-guess decisions of Canadian courts.

Motion granted.

West Headnotes

**[1] Bankruptcy 51 🗝3555**

51 Bankruptcy
  51XIV Reorganization
    51XIV(B) The Plan
      51k3548 Requisites of Confirmable Plan
      51k3555 k. Settlement, adjustment, or enforcement of claims. Most Cited Cases

Because non-debtor, third-party release may operate as bankruptcy discharge arranged without a filing and without the safeguards of the Bankruptcy Code, it is a rare case in which such a release is properly included in Chapter 11 plan.

**[2] Bankruptcy 51 🗝3555**

51 Bankruptcy
  51XIV Reorganization
    51XIV(B) The Plan
      51k3548 Requisites of Confirmable Plan
      51k3555 k. Settlement, adjustment, or enforcement of claims. Most Cited Cases

Bankruptcy court should not approve a nondebtor release as one of provisions of proposed plan of reorganization, absent a finding that truly unusual circumstances render the release terms important to success of plan.

**[3] Bankruptcy 51 🗝2341**

51 Bankruptcy
  51III The Case
    51III(H) Cases Ancillary to Foreign Proceedings
      51k2341 k. In general. Most Cited Cases

Chapter 15 specifically contemplates that court should be guided by principles of comity and cooperation with foreign courts in deciding whether to grant foreign representative additional, post-recognition relief. 11 U.S.C.A. §§ 1507, 1509.

**[4] Bankruptcy 51 🗝2341**

51 Bankruptcy
  51III The Case
    51III(H) Cases Ancillary to Foreign Proceedings
      51k2341 k. In general. Most Cited Cases

While recognition of foreign proceeding turns on objective criteria, relief post-recognition is largely discretionary and turns on subjective factors

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

421 B.R. 685, 52 Bankr.Ct.Dec. 159
**(Cite as: 421 B.R. 685)**

that embody principles of comity. 11 U.S.C.A. §§ 1507, 1509, 1517.

**[5] Bankruptcy 51 🗝2341**

51 Bankruptcy
   51III The Case
     51III(H) Cases Ancillary to Foreign Proceedings
       51k2341 k. In general. Most Cited Cases
"Public policy" exception to bankruptcy court's ability to grant additional, post-recognition relief to foreign representative is narrowly construed. 11 U.S.C.A. § 1506.

**[6] Bankruptcy 51 🗝2341**

51 Bankruptcy
   51III The Case
     51III(H) Cases Ancillary to Foreign Proceedings
       51k2341 k. In general. Most Cited Cases
For bankruptcy court to grant additional, post-recognition relief to foreign representative, relief requested need not be identical to that available in a United States bankruptcy proceeding. 11 U.S.C.A. §§ 1507, 1509.

**[7] Bankruptcy 51 🗝2341**

51 Bankruptcy
   51III The Case
     51III(H) Cases Ancillary to Foreign Proceedings
       51k2341 k. In general. Most Cited Cases
Under "public policy" exception to bankruptcy court's ability to grant additional, post-recognition relief to foreign representative, United States bankruptcy court is not required to make independent determination about propriety of individual acts of foreign court; key determination required of U.S. bankruptcy court is whether procedures used in foreign court meet fundamental U.S. standards of fairness. 11 U.S.C.A. § 1506.

**[8] Bankruptcy 51 🗝2341**

51 Bankruptcy
   51III The Case
     51III(H) Cases Ancillary to Foreign Proceedings
       51k2341 k. In general. Most Cited Cases
Narrow constraints on availability of non-debtor, third-party release as part of Chapter 11 plan confirmed under United States bankruptcy law did not prevent bankruptcy court, in Chapter 15 case commenced by foreign representative of Canadian debtors, from granting post-recognition relief in form of enforcement of non-debtor, third-party release approved by Canadian courts following specific argument thereon, as part of far-reaching plan that was adopted with near-unanimous creditor support, regardless of whether release would have been proper under United States bankruptcy law; "public policy" exception to availability of post-recognition relief was not implicated. 11 U.S.C.A. § 1506.

**[9] Judgment 228 🗝830.1**

228 Judgment
   228XVII Foreign Judgments
     228k830 Judgments of Courts of Foreign Countries
       228k830.1 k. In general. Most Cited Cases
United States courts apply general comity principles in determining whether to recognize and enforce a foreign judgment.

**[10] Courts 106 🗝512**

106 Courts
   106VII Concurrent and Conflicting Jurisdiction
     106VII(C) Courts of Different States or Countries
       106k512 k. Comity between courts of different countries. Most Cited Cases
When foreign proceeding is in a sister, common law jurisdiction with procedures akin to those in United States courts, comity should be extended with less hesitation, there being fewer concerns over the procedural safeguards employed in those foreign proceedings.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

421 B.R. 685, 52 Bankr.Ct.Dec. 159

**(Cite as: 421 B.R. 685)**

**[11] Judgment 228 ☞830.1**

228 Judgment
    228XVII Foreign Judgments
        228k830 Judgments of Courts of Foreign
Countries
            228k830.1 k. In general. Most Cited
Cases

United States courts may give res judicata effect to foreign judgments on basis of comity.

**[12] Judgment 228 ☞830.1**

228 Judgment
    228XVII Foreign Judgments
        228k830 Judgments of Courts of Foreign
Countries
            228k830.1 k. In general. Most Cited
Cases

Foreign judgments are treated differently from the decisions of other state courts, for res judicata purposes; in case of foreign judgments, res judicata is discretionary.

**[13] Judgment 228 ☞830.1**

228 Judgment
    228XVII Foreign Judgments
        228k830 Judgments of Courts of Foreign
Countries
            228k830.1 k. In general. Most Cited
Cases

In deciding whether to enforce foreign judgment, court in the United States may scrutinize basis for assertion of jurisdiction by foreign court.

**[14] Judgment 228 ☞830.1**

228 Judgment
    228XVII Foreign Judgments
        228k830 Judgments of Courts of Foreign
Countries
            228k830.1 k. In general. Most Cited
Cases

Whether jurisdiction of foreign court was challenged in proceedings resulting in foreign judgment is relevant, but not necessarily decisive, for a United States court in deciding whether to enforce that judgment; however, a renewed challenge to jurisdiction is generally precluded.

**[15] Bankruptcy 51 ☞2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

Bankruptcy court, following grant of foreign representative's request for recognition of foreign proceedings pending under the Canadian Companies' Creditors Arrangement Act (CCAA), would also grant post-recognition relief in form of enforcement of non-debtor, third-party release approved by Canadian courts as part of restructuring plan that was adopted with near-unanimous creditor support, after Canadian courts had specifically considered and ruled on propriety of this third-party release; there was no basis for bankruptcy court to second-guess decisions of the Canadian courts, and principles of comity supported enforcement of this court-approved release, regardless of whether release would have been proper in Chapter 11 plan confirmed under United States bankruptcy law. 11 U.S.C.A. §§ 1507, 1509.

**\*687** Ken Coleman, Esq., Amélie Baudot, Esq., Rowena White, Esq., Allen & Overy LLP, New York, NY, Attorneys for the Foreign Representative.

**MEMORANDUM OPINION GRANTING RECOGNITION OF FOREIGN MAIN PROCEEDING AND ENFORCING CANADIAN AMENDED SANCTION ORDER AND PLAN IMPLEMENTATION ORDER**

MARTIN GLENN, Bankruptcy Judge.

### I. INTRODUCTION

The petitions in this chapter 15 case were filed on November 10, 2009. Ernst & Young Inc. is the court-appointed monitor ("Monitor") and authorized foreign representative of Metcalfe & Mans-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

421 B.R. 685, 52 Bankr.Ct.Dec. 159
**(Cite as: 421 B.R. 685)**

field Alternative Investments II Corp., and the other foreign petitioners (together, "Metcalfe" or "Petitioners"). The Petitioners are debtors in proceedings (the "Canadian Proceedings") under Canada's Companies' Creditors Arrangement Act, R.S.C.1985, c. C–36, as amended (the "CCAA"), commenced on March 17, 2008 and pending before the Ontario Superior Court of Justice (Commercial List) ("Ontario Court"). The Canadian Proceedings were initiated by the Pan–Canadian Investors Committee for the Third–Party Structured Asset–Backed Commercial Paper ("Investors Committee") in order to effect the restructuring of all outstanding third-party (non-bank sponsored) Asset Backed Commercial Paper ("ABCP") obligations, estimated to have a face value at the time of commencement of approximately CAN$ 32 billion. The ABCP restructuring is said to be the largest restructuring in Canadian history.

The Amended Sanction Order and Plan Implementation Order (the "Canadian Orders") were entered by the Ontario Court on June 5, 2008 and affirmed on appeal by unanimous decision of the Ontario Court of Appeal on August 18, 2008. On September 19, 2008, the Canada Supreme Court denied review. The Plan Implementation Order became effective on January 12, 2009. The Plan approved by the Ontario Court was first approved by an overwhelming vote of ABCP Noteholders (96% in number and value of all Noteholders present and voting). On January 21, 2009, new Plan Notes and cash were distributed to existing Noteholders, and assets of the Conduits (described below) were transferred to newly created Master Asset Vehicles securing the new Plan Notes. In May 2009, additional cash was distributed to Noteholders. The Ontario Court has also granted the Monitor's motion to make a final cash distribution to the Noteholders.

The Monitor seeks recognition of the Canadian Proceedings as a foreign main proceeding under Bankruptcy Code § 1517, and also seeks an order enforcing the Canadian Orders in the United States.

Notice of the filing of the chapter 15 petitions and of the relief being sought has been given by mail, email and publication. The deadline for filing objections in this Court was December 16, 2009. No objection to the requested relief was timely filed. One untimely submission was filed **\*688** on December 21, 2009.[FN1] (ECF # 26.) The Court held the recognition hearing on December 23, 2009.

> FN1. The submission (not denominated as an objection) was filed by Michael Miles, M.Sc., who purports to be the "Chairperson of the Retail ABCP Owners Committee." Referring to himself, Miles states "I am a former owner of Canadian Non Bank Asset Backed Commercial Paper and Chairperson of the Canadian Retail ABCP Owners' Committee." The membership and status of the "Committee" is not described. Neither Miles nor anyone purporting to act on behalf of the Committee appeared at the December 23, 2009 recognition hearing. The submission acknowledges that the "[Plan] included a deal in which approximately 1800 'retail' owners such as myself ... had our losses repaid in compensation for voting to support restructuring. One of the provisions of this deal was that it gave blanket immunity from lawsuits to all Companies or individuals involved in the manufacture, credit rating, sale or restructuring of Canadian ABCP." Thus, Miles appears to acknowledge that the Plan approved by the Ontario Court, which he apparently supported, included non-debtor release and injunction provisions.
>
> Miles points to recent action by Canadian securities regulators announcing fines against certain financial institutions that marketed ABCP, and ongoing investigations of others (including U.S. institutions that would obtain the benefit of the non-debtor release and injunc-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

421 B.R. 685, 52 Bankr.Ct.Dec. 159
**(Cite as: 421 B.R. 685)**

tion). Miles asserts that the release and injunction "would deny the right of AB-CP owners to file a lawsuit in U.S. courts against international and U.S. banks who were the asset providers to the Canadian Non Bank ABCP trusts sold to both Canadian and American-affiliated investors." The submission concludes by requesting "that you closely review the request by [the Monitor] to ensure that the benefit of U.S. Security law (which is more stringent that [*sic* ] that in Canada) remain available to potential plaintiffs."

The Canadian Orders and the relief sought from this Court have no effect on any police or regulatory actions brought by securities regulators in Canada or the United States. The enforceability of the non-debtor release and injunction on private civil actions in the United States is the focus of this decision.

It is clear that the Canadian Proceedings should be recognized as a foreign main proceeding. The only issue here arises from the inclusion in the Canadian Orders of a very broad third-party non-debtor release and injunction. During the initial hearing in this case on November 23, 2009, the Court requested that the Monitor's counsel brief whether this Court could properly enter an order enforcing the third-party non-debtor release and injunction. On December 17, 2009, the Monitor's counsel filed a Supplemental Memorandum of Law in Support of Chapter 15 Petitions for Recognition of Foreign Proceedings and Related Relief (ECF # 24) addressing the issue raised by the Court.

For the reasons that follow, the Court concludes the Canadian Orders—including the non-debtor release and injunction—should be enforced in the United States. This opinion discusses only the issues raised by the inclusion of the third-party non-debtor release and injunction.

## II. BACKGROUND

An understanding of the Canadian ABCP market, the various players in the market, how the market nearly collapsed, how the restructuring Plan sought to address these problems and the roles played by third-party non-debtors in the Plan, is helpful in considering the issues raised by the requested relief. The uncontroverted facts described below are taken from the Verified Petition for Recognition of Foreign Proceedings and Enforcement of Canadian Order Relating to the Restructuring of the Canadian Asset–Backed Commercial Paper Market (ECF # 2).

### A. Investors Purchase ABCP Notes

There are 47 series of ABCP affected by the Plan. The money paid by investors to acquire AB-CP was used to purchase a **\*689** portfolio of financial assets that would support and collateralize repayment of each series of ABCP. The assets that "backed" ABCP were sold to the Conduits by various financial institutions (the "Asset Providers"). These assets can be divided into two general categories: (i) exclusively "traditional" securitized assets such as residential and commercial mortgages, credit card receivables and auto-loans, and (ii) collateralized debt obligations ("CDOs"), which are not specific to one type of debt but are a type of asset-backed security and structured credit product. Most of the CDOs were synthetic, thus gaining credit exposure to a portfolio of fixed income assets (without owning those assets) through the use of credit default swaps.

The assets that backed the ABCP were generally long or medium-term assets while the ABCP were short-term obligations of the Issuer Trustees, thus resulting in an inherent timing mismatch between the cash generated by the underlying long-term assets and the cash needed to repay maturing ABCP. Before mid-August 2007, the timing mismatch was addressed by reinvesting or "rolling" existing ABCP at maturity. New ABCP was continually being sold thus generating funds to repay maturing ABCP where investors required payment.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

421 B.R. 685, 52 Bankr.Ct.Dec. 159

**(Cite as: 421 B.R. 685)**

The Asset Providers (all beneficiaries of the non-debtor release and injunction provisions) include: Bank of America, N.A., Canadian Imperial Bank of Commerce, Citbank, N.A., Deutsche Bank AG, HSBC Bank USA, N.A., Merrill Lynch International, Royal Bank of Canada, Royal Bank of Scotland, Swiss Re Financial Products Corporation, UBS AG and Wachovia Bank N.A. and their respective affiliates. The Issuer Trustees also entered into back-up liquidity arrangements with third-party lenders ("Liquidity Providers") who agreed to provide funds to repay maturing ABCP in certain circumstances.

Certain of the Asset Providers also entered into derivative contracts with the Conduits. The vast majority of underlying assets were derivative contracts in the form of credit default swaps. A credit default swap is a contract under which one party (the "Protection Buyer") seeks to protect itself against a defined credit event or pool of credit events. The Protection Buyer pays fees to another party (the "Protection Seller") who undertakes to pay the Protection Buyer if a credit event occurs. A number of the Conduits assumed the role of Protection Seller under credit default swaps with an Asset Provider acting as Protection Buyer.

Of the CAN$26 billion in credit default swaps underlying the ABCP, approximately CAN$17.4 billion were "Leveraged Super Senior" ("LSS") swaps. These swaps are leveraged because the amount of credit protection sold is greater than the amount of collateral posted as security. The LSS swaps contain triggering events that entitle the Protection Buyer to make margin calls for additional collateral from the Protection Seller to ensure that the Protection Buyer continues to have sufficient security. Most of the triggers in the LSS swaps were mark-to-market triggers based on the market value of the swap. The mark-to-market triggers required the Protection Seller to post additional collateral based on an increase in the amount the Protection Buyer would have to pay a third party to enter into a replacement swap that would preserve

the economic value of the current swap for the Protection Buyer.

The majority of the financial assets held by each Conduit that entered into LSS swaps were pledged to the Asset Providers as security. Therefore, if a secured swap was declared to be in default, the Asset Provider had the right to terminate the swap and satisfy any termination payment **\*690** by enforcing its security through seizing and liquidating the collateral. When market conditions were sufficiently depressed, the Noteholders were at risk of significant losses because the value of the assets that supported their notes would first be used to meet any shortfalls incurred by the Asset Providers.

The ABCP market froze during the week of August 13, 2007. The crisis was largely triggered by market sentiment, as news spread of defaults on U.S. sub-prime mortgages. Investors in Canadian ABCP lost confidence because of a perceived lack of transparency in the market. Noteholders and potential new investors feared that the assets backing the ABCP might include substantial exposure to sub-prime mortgages or other overvalued assets. Investors thus stopped buying new ABCP, and Noteholders stopped "rolling" their existing ABCP. As ABCP became due, the Conduits were unable to fund repayments through new issuances or replacement notes. The trustees of some Conduits made requests to Liquidity Providers, who took the position that the conditions for funding had not been met. With no new investment, no reinvestment, and no liquidity funding available, coupled with the timing mismatch between the short-term ABCP and the longer-term underlying assets, payments due on the ABCP could not be made.

On August 14, 2007, in response to this crisis and in order to prevent the destruction of value that a forced liquidation of the underlying assets would cause, representatives of the largest Noteholders and six of the Asset Providers signed an agreement establishing a 60–day standstill period (the "Montréal Accord"). During this period, the 10 relevant stakeholders focused on the restructuring and

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

421 B.R. 685, 52 Bankr.Ct.Dec. 159
**(Cite as: 421 B.R. 685)**

set up the foundation for the Plan. The Montréal Accord provided that all outstanding ABCP would be converted into floating rate term notes maturing at the same time as the corresponding assets. It also allowed for the modification of the margin provisions under the LSS swaps to reduce the risk of margin calls. Shortly after signing the Montréal Accord, the Investors Committee led the restructuring process with the help of the Monitor and J.P. Morgan, as financial advisor.

**B. The Conduits Could Not Meet Their Liabilities**

The Issuer Trustees are either the original or replacement trustees of the Conduits, which issued the ABCP pursuant to trust indentures and through commercial paper placement agents such as financial institutions and broker-dealers, and were therefore liable for amounts owing on the ABCP. The Issuer Trustees had an obligation to administer the trust and maintain proper records. Each Issuer Trustee was also the legal owner of the assets held for each series in the Conduit of which it is the trustee, and was the debtor (to the extent of the assets held in the Conduit) with respect to the ABCP issued by that Conduit. Since mid-August 2007, the Issuer Trustees had insufficient liquidity to make payments on the maturing ABCP. Each remained unable to meet its liabilities to the investors represented on the Investors Committee and to the other holders of each series of ABCP as those obligations became due.

**C. A Plan Is Negotiated**

Notwithstanding the fact that each Issuer Trustee is a separate legal entity and each series of notes is backed only by the assets relating to that series, the ABCP market suffered from common problems and required a common solution. Accordingly, the Monitor, the Investors Committee and other key market participants, believed**691** that one comprehensive Plan best addressed the needs of the ABCP market as a whole. The Plan provides for market-wide transparency in the assets underlying the restructured notes, and a greater opportunity for investors to realize payment of what was due to them under the ABCP. The following is a summary of the key provisions of the Plan.

*1. Restructured Margin Call Triggers*

The risks caused by mark-to-market triggers in the LSS swaps are, under the Plan, reduced as the Asset Providers agreed to restructure the LSS transactions concurrently with Plan implementation. Specifically, the Asset Providers agreed to change the triggers under the LSS swaps from mark-to-market triggers to more remote spread loss triggers which will reduce the likelihood of margin calls and any consequential forced liquidation of assets to fund termination payments. The spread loss triggers, under the Plan, are based on six uniform and verifiable indices of spreads and losses. The change in the triggers also increases transparency, predictability and certainty.

*2. The Master Asset Vehicles*

While the change in the triggers reduced the risk for Noteholders, it increases the risk of the Asset Providers. The Asset Providers required further collateral, beyond the existing assets in the Conduits, to be available through margin funding facilities. In order to address this need for additional security, the Plan transfers all of the assets of the ABCP series backed by synthetic assets into two MAVs ("MAV1" and "MAV2"). The pooling of assets into those two MAVs provides for cross-collateralization making collateral calls less likely. The collateral also includes non-leveraged synthetic assets. Under the Plan, all of the assets of the ABCP series backed solely by traditional assets were transferred to a third MAV ("MAV3"). In MAV1, additional margin funding is provided by the Noteholders participating in that vehicle themselves, through "self-funding." This involves the assumption of additional risk by these Noteholders. Some may be required to post collateral and there may be some impact on their capital. MAV2 is supported by a third-party margin funding facility, in effect a standby line of credit. The Asset Providers as well as several Canadian banks agreed to provide a large

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

421 B.R. 685, 52 Bankr.Ct.Dec. 159
**(Cite as: 421 B.R. 685)**

portion of the funding needed for this margin funding facility at a favorable interest rate.

The Noteholders participating in MAV1 or MAV2 have transferred ABCP (other than the ABCP for which the underlying assets are traditional assets) to the applicable MAV in exchange for a combination of Class A–1 Notes, Class A–2 Notes, Class B Notes, Class C Notes, and ineligible asset tracking notes (collectively referred to as the "Plan Notes"). The different categories of Plan Notes were designed to permit the highest possible credit ratings in the Class A–1 Notes. All Noteholders had the option of participating in MAV1, provided that they met certain financial criteria or posted collateral, as required by the Asset Providers. Investors in MAV1 agreed to self-fund for their entire holdings. An investor could also participate as a margin funding lender in MAV2 for part of its holdings, again subject to certain criteria.

Noteholders have exchanged or have been deemed to have exchanged the affected ABCP owned by them for Plan Notes. The Plan Notes were distributed to Noteholders through the existing securities structure.

**\*692** *3. Matching Assets and Liabilities*

Under the Plan, all ABCP was replaced by Plan Notes that have maturities and interest rates appropriately tied to the underlying assets.

*4. Classification of Creditors*

The Plan had a single class of creditors for voting purposes, being all investors in ABCP, and treated all ABCP holders equitably by accounting for the differing risks and corresponding interests across all of the ABCP.

*5. Claims Procedure*

The Plan approved by the Noteholders and the Ontario Court provided for the exchange of all ABCP for Plan Notes, and for all Noteholders to receive their Plan Notes through the established mechanisms in Canada for distribution of securities to beneficial holders of record. No proof of claim

was required to be filed, but investors were required to confirm the amount of their particular holdings by submitting a voter confirmation form (in the event they had previously disclosed their holdings to the Monitor) or a voter identification form to the Monitor, and to vote in person or by proxy at the meeting.

*6. A Global Release*

The Plan and the Sanction Order provide each participant in the Canadian ABCP market, including the Asset Providers, the Sponsors, the Issuer Trustees, the Conduits, and the Investors Committee (collectively, the "Released Parties"), with a release that protects them from liability and actions on account of any and all past, present and future claims, rights, interests, actions, rights of indemnity, liabilities, demands, duties, injuries, damages, expenses, fees or causes of action of whatsoever kind or nature in any way related to the third-party ABCP market in Canada. The jurisdiction of the Ontario Court to grant the release and injunction provisions was the central issue decided by the Ontario Court and, on the appeal, by the Ontario Court of Appeal. The Canadian Supreme Court denied review. The Ontario Court and the Ontario Court of Appeal decided that under the CCAA, the Ontario Court had jurisdiction and properly exercised its power and discretion in approving the non-debtor release and injunction provisions in the Plan and Sanction Order.

The Verified Petition explains that the comprehensive releases were included because the Asset Providers, whose participation was viewed as vital to the restructuring, made them a condition for their participation. They required comprehensive releases in return for their agreement to: (i) enter into the new LSS swaps whose terms are more favorable to the investors; (ii) provide margin funding facility support at rates significantly below the cost another third party would charge for such funding in the marketplace; and (iii) disclose information concerning the synthetic assets to create transparency, facilitate the restructuring and assist investors in as-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

421 B.R. 685, 52 Bankr.Ct.Dec. 159
**(Cite as: 421 B.R. 685)**

sessing the Plan. The entire restructuring was premised on these key concessions that served to shift the risk from the investors to the Asset Providers to protect more fully the investors from the negative effects of volatile credit markets.

In addition, the Asset Providers required assurances that no claims would remain after Plan implementation that could lead to claims against them for contribution and indemnity. The Monitor argues that indemnity or contribution claims would undermine the finality and certainty that the releases are intended to give. Therefore, the Asset Providers required a release of all parties who might be sued by **\*693** the investors, because such parties might then claim against the Asset Providers.

The Plan specifies that the releases (a) do not stay, release, discharge, bar, enjoin or otherwise interfere with any powers or remedies of, or proceedings or investigations by, any regulatory or self-regulatory body having jurisdiction (pursuant to any applicable statute, regulation, rule or, in the case of the Investment Industry Regulatory Organization of Canada, contract) over any party that would otherwise be released concerning such party's involvement in the creation, issue, sale or rating of any Affected ABCP, provided that (b) the releases would be effective to release and enjoin the making of any order or award to compensate or make restitution to an aggrieved person or company or to pay general or punitive damages to any other person or company. In addition, the Plan provided an exception from the releases with respect to particularized claims ("Excepted Claims") against a specific party by a Noteholder that suffered damages as a direct result of purchasing specific ABCP in reliance on express fraudulent misrepresentations by that party, provided the Noteholder served and filed an initial pleading in a proceeding to pursue the Excepted Claim by a specified date that was approximately ten weeks after the date of the Sanction Order. The Monitor states that no pleadings for Excepted Claims were served or filed within the specified time period.

*7. An Injunction against Proceedings against Non–Debtors*

In addition to the global release, the Plan and the Sanction Order also provide for an injunction against proceedings against the Released Parties. The Monitor argues that the comprehensive restructuring of the ABCP market involved a variety of parties whose interests are so intertwined with the Issuer Trustees that it would have been impossible to grant an injunction affecting the Issuer Trustees without extending that injunction to certain non-debtors including the Investors Committee, the Asset Providers, and the Liquidity Providers. The injunction provided under the Plan was subject to the same exceptions for regulatory proceedings and Excepted Claims described above with respect to the global releases.

**D. Request for Assistance in Carrying Out Canadian Orders**

The Canadian Orders specifically include provisions requesting aid, recognition and assistance by U.S. courts in carrying out the terms of the orders. *See* Sanction Order ¶ 31; Implementation Order ¶ 50.

**E. Canadian Courts Determine that the Ontario Court Had Jurisdiction to Enter the Non–Debtor Release and Injunction Provisions**

A review of the written decisions by the Ontario Court (*see* Supplemental Declaration of Ken Coleman in Support of Petitions for Recognition of Foreign Proceedings and Related Relief, dated November 20, 2009, Exhibit C (ECF # 17)), and the Ontario Court of Appeal (*see id.,* Exhibit B; *ATB Financial v. Metcalfe & Mansfield Alternative Investments II Corp.,* 2008 CarswellOnt 4811), show that the jurisdiction of the Ontario Court to issue the third-party non-debtor release and injunction provisions was the principle disputed legal issue in the Canadian Proceedings. Both courts issued lengthy, reasoned written decisions upholding the jurisdiction of the Ontario Court under the CCAA to approve the non-debtor release and injunction provisions. More than 30 parties appealed

421 B.R. 685, 52 Bankr.Ct.Dec. 159

**(Cite as: 421 B.R. 685)**

the Ontario Court decision approving those provisions. The Ontario Court of Appeal framed the issues as follows:

> **\*694** [Appellants] raise an important point regarding the permissible scope of a restructuring under the *Companies' Creditors Arrangement Act,* R.S.C.1985, c. C–36 as amended ('CCAA'): can the court sanction a Plan that calls for creditors to provide releases to third parties who are themselves solvent and not creditors of the debtor company? They also argue that, if the answer to this question is yes, the application judge erred in holding that this Plan, with its particular releases (which bar some claims even in fraud), was fair and reasonable and therefore in sanctioning it under the CCAA.

> *Id.,* Exhibit B, at 7 ¶ 3.

In its lengthy decision, the Court of Appeal decided "the CCAA permits the inclusion of third party releases in a plan of compromise or arrangement to be sanctioned by the court where those releases are reasonably connected to the proposed restructuring." *Id.,* Exhibit B at 13 ¶ 43. The Court of Appeal held that the Ontario Court had jurisdiction over the parties and the matter before it and correctly decided that the non-debtor release and injunction were properly included in the Plan. *Id.,* Exhibit B at 27 ¶ 105 ("For all of the foregoing reasons, then, I conclude that the application judge had the jurisdiction and legal authority to sanction the Plan as put forward.") The Court of Appeal also concluded that "[w]hether a plan of compromise or arrangement is fair and reasonable is a mixed question of fact and law, and one on which the application judge exercises a large measure of discretion." *Id.,* Exhibit B at 27 ¶ 107. The Court of Appeal concluded that the application judge made findings supported by the record that the Plan here is fair and reasonable. As already mentioned, the Canadian Supreme Court denied review from the decision of the Ontario Court of Appeal.

### III. DISCUSSION

The Monitor argues that the third-party non-debtor release and injunction provisions included in the Plan and Sanction Order should be enforced in the United States because, if this were a plenary case under chapter 11, such provisions would pass muster under the rigorous standards for release and injunction provisions established by the Second Circuit in *SEC v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.),* 960 F.2d 285 (2d Cir.1992); *In re Metromedia Fiber Network, Inc.,* 416 F.3d 136 (2d Cir.2005); and *In re Johns–Manville Corp.,* 517 F.3d 52 (2d Cir.2008) (" *Manville* "), *rev'd on other grounds sub nom. Travelers Indemnity Co. v. Bailey,* ––– U.S. –––, 129 S.Ct. 2195, 174 L.Ed.2d 99 (2009). Additionally, the Monitor argues that whether or not a bankruptcy court within the Second Circuit could issue non-debtor release and injunction provisions in a plenary case under chapter 11, the provisions included in the Canadian Orders should be enforced in the United States pursuant to law applicable to enforcement of foreign judgments, the principles of international comity, and the public policy embodied in chapter 15 of the Bankruptcy Code.

[1][2] The Second Circuit imposes significant limitations on bankruptcy courts ordering non-debtor releases and injunctions in confirmed chapter 11 plans. In *Metromedia,* the court concluded that a third-party non-debtor release "is proper only in rare cases." 416 F.3d at 141. The court emphasized that:

> [A] nondebtor release is a device that lends itself to abuse. By it, a nondebtor can shield itself from liability to third parties. In form, it is a release; in effect, it may operate as a bankruptcy discharge arranged without a filing and **\*695** without the safeguards of the Code. The potential for abuse is heightened when releases afford blanket immunity.

*Id.* at 142. The court held that "[a] nondebtor release in a plan of reorganization should not be approved absent the finding that truly unusual circum-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

421 B.R. 685, 52 Bankr.Ct.Dec. 159
**(Cite as: 421 B.R. 685)**

stances render the release terms important to success of the plan...." *Id.* at 143.

The Monitor argues that the rigorous standard established in *Metromedia* would be satisfied in this case, and that the standard applied by the Ontario Court and the Ontario Court of Appeal was equally rigorous. That may well be so, but the subsequent decision in *Manville* raises a question whether meeting the *Metromedia* standard is enough. *Metromedia* did not address the jurisdictional issue considered by the Second Circuit panel in *Manville.* FN2 But Second Circuit law on approval of a nondebtor release is now uncertain after the Supreme Court's reversal in *Manville.*

> FN2. In *Metromedia,* the court stated that "[a]ppellants sole argument—and the only argument that we consider—is that these nondebtor releases were unauthorized by the Bankruptcy Code, 11 U.S.C. § 101 *et seq.,* at least on the findings made by the bankruptcy court." 416 F.3d at 141.

In *Manville,* the Second Circuit panel concluded that a bankruptcy court only has jurisdiction to issue a non-debtor release where the released claims "directly affect the *res* of the bankruptcy estate." 517 F.3d at 66. In reaching its conclusion, the panel relied heavily on the Fifth Circuit's decision in *Matter of Zale Corp.,* 62 F.3d 746 (5th Cir.1995), which rejected use of a non-debtor release as exceeding the bankruptcy court's "related to" jurisdiction under 28 U.S.C. § 1334:

> Those cases in which courts have upheld related to jurisdiction over third-party actions do so because the subject of the third-party dispute is property of the estate, or because the dispute over the asset would have an effect on the estate. Conversely, courts have held that a third-party action does not create related to jurisdiction when the asset in question is not property of the estate and the dispute has no effect on the estate. Shared facts between the third-party action and a debtor-creditor conflict do not in and of themselves suf-

fice to make the third-party action related to the bankruptcy.

> *Zale,* 62 F.3d at 753.

The Supreme Court reversed the *Manville* panel decision on the grounds that the court had impermissibly permitted a collateral attack on a final judgment of the bankruptcy court issued many years before. 129 S.Ct. at 2206. The Supreme Court's disposition was to "reverse the judgment of the Court of Appeals and remand for further proceedings consistent with this opinion." *Id.* at 2207. It is unclear whether the circuit panel's decision remains binding law in this Circuit on other issues decided by the panel—specifically on the jurisdictional limits on a bankruptcy court's power to approve a third-party non-debtor release and injunction. Even if the circuit panel decision is not binding, it may nevertheless be persuasive with respect to the jurisdictional issue.

Although the Monitor argues that the *Manville* standard has been satisfied here, it is far from clear that the third-party non-debtor release and injunction provisions here would be consistent with the jurisdictional limits *Manville* imposes on a bankruptcy court. No claims have so far been asserted against Asset Providers in the U.S., but it is not clear that any direct claims of investors against Asset Providers seeking to establish liability based solely on the Asset Providers' conduct could **\*696** properly be released in a plenary chapter 11 case under the *Manville* standard. FN3 But, whatever the precise limits of a bankruptcy court's jurisdiction to approve a third-party non-debtor release and injunction in a plenary chapter 11 case, the important point for present purposes is that the jurisdictional limits derive from the scope of bankruptcy court "related to" jurisdiction under 28 U.S.C. § 1334, and the prudential limits courts have applied in chapter 11 cases under the Bankruptcy Code. This Court is not being asked to approve such provisions in a plenary case; rather, the Court is being asked to order enforcement of provisions approved by the Canadian courts. The correct inquiry, therefore, is

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

421 B.R. 685, 52 Bankr.Ct.Dec. 159
**(Cite as: 421 B.R. 685)**

whether the foreign orders should be enforced in the United States in this chapter 15 case. As explained below, principles of enforcement of foreign judgments and comity in chapter 15 cases strongly counsel approval of enforcement in the United States of the third-party non-debtor release and injunction provisions included in the Canadian Orders, even if those provisions could not be entered in a plenary chapter 11 case.

> FN3. For example, during argument on December 23, 2009, the Court asked whether the non-debtor release would bar claims against a U.S.-based Asset Provider that, in its capacity as a fund manager or advisor, negligently or recklessly purchased or recommended the purchase of ABCP to its clients. The Monitor's counsel responded that the release would bar such claims. Such claims would not appear to affect the *res* of the bankruptcy estate.

**A. Principles of Comity in Chapter 15 Cases Support Enforcement of the Canadian Orders**

[3] A determination whether to grant recognition of foreign proceedings and enforcement of foreign court orders is a core proceeding in a chapter 15 case. 28 U.S.C. § 157(b)(2)(P) ("Core proceedings include but are not limited to—... (P) recognition of foreign proceedings and other matters under chapter 15 of title 11.") Chapter 15 specifically contemplates that the court should be guided by principles of comity and cooperation with foreign courts in deciding whether to grant the foreign representative additional post-recognition relief. *In re Atlas Shipping A/S,* 404 B.R. 726, 738 (Bankr.S.D.N.Y.2009). Section 1509 of the Bankruptcy Code requires that if the court grants recognition under § 1517, it "shall grant comity or cooperation to the foreign representative." 11 U.S.C. § 1509(b)(3). Here, the Monitor asks the Court to provide "additional assistance" under § 1507, specifically an order enforcing the Canadian Orders in the United States. Section 1507 directs the court to consider comity in granting additional assistance to

the foreign representative:

> (a) Subject to the specific limitations stated elsewhere in this chapter the court, if recognition is granted, may provide additional assistance to a foreign representative under this title or under other laws of the United States.

> (b) In determining whether to provide additional assistance under this title or under other laws of the United States, the court shall consider whether such additional assistance, consistent with the principles of comity, will reasonably assure—

> > (1) just treatment of all holders of claims against or interests in the debtor's property;

> > (2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

> > (3) prevention of preferential or fraudulent dispositions of property of the debtor;

> > **\*697** (4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and

> > (5) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

11 U.S.C. § 1507. The non-debtor release and injunction provisions included in the Canadian Orders treat all claimants in the Canadian Proceedings similarly. No objections have been lodged that inclusion of these provisions adversely affects any claimant's treatment against any of the debtors' property.

[4] While recognition of the foreign proceeding turns on the objective criteria under § 1517, "relief [post-recognition] is largely discretionary and turns on subjective factors that embody principles of comity." *In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.,* 389 B.R. 325,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

421 B.R. 685, 52 Bankr.Ct.Dec. 159
**(Cite as: 421 B.R. 685)**

333 (S.D.N.Y.2008) (citing §§ 1507, 1521, and 1525). "Once a case is recognized as a foreign main proceeding, chapter 15 specifically contemplates that the court will exercise its discretion consistent with principles of comity." *Atlas Shipping,* 404 B.R. at 738; *see generally* Allan L. Gropper, *Current Devs. in Int'l Insolvency Law: A United States Perspective,* 15 J. BANKR.L. & PRAC. 2, Art. 3, at 3–5 (Apr.2006).

[5] Section 1506, nevertheless, places a limitation on recognition if doing so is manifestly contrary to U.S. public policy:

> Nothing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States.

11 U.S.C. § 1506. But this public policy exception is narrowly construed. *See In re Ephedra Prods. Liab. Litig.,* 349 B.R. 333 (S.D.N.Y.2006). *Ephedra* involved a chapter 15 proceeding in which the foreign representative moved to recognize and enforce in the United States a claims resolution procedure ordered by an Ontario court, even though the procedure arguably deprived parties of the constitutional right to a jury trial. *Id.* at 334–35. In recognizing the order, the district court ruled that the public policy exception embodied in § 1506 should be "narrowly interpreted, as the word 'manifestly' in international usage restricts the public policy exception to the most fundamental policies of the United States." *Id.* at 336 (citing H.R.REP. NO. 109–31(I) at 109, *reprinted in* 2005 U.S.C.C.A.N. 88, 172).

[6][7] The relief granted in the foreign proceeding and the relief available in a U.S. proceeding need not be identical. A U.S. bankruptcy court is not required to make an independent determination about the propriety of individual acts of a foreign court. *See In re Bd. of Dirs. of Multicanal S.A.,* 307 B.R. 384, 391 (Bankr.S.D.N.Y.2004) (noting that neither case law nor section 304 (the statutory predecessor to chapter 15) require a determination

that the foreign proceeding is identical to the U.S. proceeding). The key determination required by this Court is whether the procedures used in Canada meet our fundamental standards of fairness. *See Cunard S.S. Co. Ltd. v. Salen Reefer Servs. AB,* 773 F.2d 452, 457 (2d Cir.1985).

[8] While Second Circuit case law places narrow constraints on bankruptcy court approval of third-party non-debtor release and injunction provisions, the use of such provisions is not entirely precluded. The Second Circuit decision in *Metromedia,* 416 F.3d at 142, and the Ontario Court of Appeal decision in *Metcalfe, see* Supplemental Declaration of Ken Coleman in Support of Petitions for Recognition of Foreign Proceedings and Related Relief, **\*698** dated November 20, 2009, Exhibit B (ECF # 17), at 19–20 ¶¶ 69–73, both reflect similar sensitivity to the circumstances justifying approving such provisions. To the extent that *Manville,* 517 F.3d at 65, 66, identifies an additional jurisdictional limitation, it is a function of the jurisdictional limits placed on U.S. bankruptcy courts by Congress. *Id.* at 65 (recognizing "the jurisdictional predicate necessary to enjoin third-party non-debtor claims"); *id.* at 66 (concluding that "a bankruptcy court only has jurisdiction to enjoin third-party non-debtor claims that directly affect the *res* of the bankruptcy estate"). The Canadian statute, on the other hand, was interpreted in *Metcalfe* to grant jurisdiction to its courts to approve such relief in appropriate circumstances. Therefore, the Court concludes that § 1506 does not preclude giving comity to the Canadian Orders in this case.

### B. The Canadian Orders Are Entitled to Recognition as a Matter of Comity

[9][10] U.S. courts apply general comity principles in determining whether to recognize and enforce a foreign judgment. *See Hilton v. Guyot,* 159 U.S. 113, 166, 16 S.Ct. 139, 40 L.Ed. 95 (1895); *Odd–Bjorn Huse v. Huse–Sporsem, A.S. (In re Birting Fisheries, Inc.),* 300 B.R. 489, 502 (9th Cir. BAP 2003); *Pariente v. Scott Meredith Literary Agency, Inc.,* 771 F.Supp. 609, 615 (S.D.N.Y.1991)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

421 B.R. 685, 52 Bankr.Ct.Dec. 159
**(Cite as: 421 B.R. 685)**

. In *Hilton v. Guyot,* the Supreme Court held that if the foreign forum provides "a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it is sitting," the judgment should be enforced and not "tried afresh." *Hilton,* 159 U.S. at 202–03, 16 S.Ct. 139. "[W]hen the foreign proceeding is in a sister common law jurisdiction with procedures akin to our own, comity should be extended with less hesitation, there being fewer concerns over the procedural safeguards employed in those foreign proceedings." *In re Bd. of Dirs. of Hopewell Intl. Ins. Ltd., Inc.,* 238 B.R. 25, 66 (Bankr.S.D.N.Y.1999), *affd,* 275 B.R. 699 (S.D.N.Y.2002) (internal quotation marks and citations omitted). The U.S. and Canada share the same common law traditions and fundamental principles of law. Canadian courts afford creditors a full and fair opportunity to be heard in a manner consistent with standards of U.S. due process. U.S. federal courts have repeatedly granted comity to Canadian proceedings. *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.,* 216 F.Supp.2d 198, 212 (S.D.N.Y.2002) ("There is no question that bankruptcy proceedings in Canada—a sister common law jurisdiction with procedures akin to our own—are entitled to comity under appropriate circumstances.") (internal quotation marks and citations omitted); *Tradewell, Inc. v. American Sensors Elecs., Inc.,* No. 96 Civ. 2474(DAB), 1997 WL 423075, at *1 n. 3 (S.D.N.Y.1997) ("It is well-settled in actions commenced in New York that judgments of the Canadian courts are to be given effect under principles of comity.") (internal quotation marks and citation omitted); *Cornfeld v. Investors Overseas Servs., Ltd.,* 471 F.Supp. 1255, 1259 (S.D.N.Y.1979) ("The fact that the foreign country involved is Canada is significant. It is well-settled in New York that the judgments of the Ca-

nadian courts are to be given effect under principles of comity. Trustees in bankruptcy appointed by Canadian courts have been recognized in actions**\*699** commenced in the United States. More importantly, Canada is a sister common law jurisdiction with procedures akin to our own, and thus there need be no concern over the adequacy of the procedural safeguards of Canadian proceedings.") (internal quotation marks and citations omitted).

As explained above, the issue of the jurisdiction of the Ontario Court to enter the Plan and Sanction Order, and in particular the third-party non-debtor release and injunction provisions, was contested and fully litigated in the Canadian Courts. The Ontario Court concluded that it had jurisdiction to enter the relief; the Ontario Court of Appeal confirmed the jurisdictional grounding of the Plan and Sanction Order; and the Supreme Court of Canada denied review. In these circumstances, principles for recognition of foreign judgments strongly support the exercise of this Court's discretion to give *res judicata* effect to the Canadian Orders.

*1. U.S. Courts May Give Res Judicata Effect to Foreign Judgments on the Basis of Comity*

[11][12] U.S. courts may give *res judicata* effect to foreign judgments on the basis of comity. FN4 *Diorinou v. Mezitis,* 237 F.3d 133, 139, 143 (2d Cir.2001); *see also Paramedics Electromedicina Comercial, Ltda v. GE Medical Sys. Info. Techs., Inc.,* 369 F.3d 645, 654 (2d Cir.2004); *In re Parmalat Sec. Litig.,* 493 F.Supp.2d 723, 737 n. 74 (S.D.N.Y.2007); *In re Telecom Argentina S.A.,* No. 06 Civ. 2352, 2006 WL 3378687, at *5 (S.D.N.Y. Nov. 20, 2006) (" *res judicata* applies to bar [creditors] from raising ... objections for the first time in the Bankruptcy Court").

> FN4. Foreign judgments are treated differently from the decisions of other State courts. In the case of foreign judgments, *res judicata* is discretionary. However, under domestic law, the principle of *res judicata* will prevent collateral attack on a judgment of another State based on an is-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

421 B.R. 685, 52 Bankr.Ct.Dec. 159
**(Cite as: 421 B.R. 685)**

sue that has been litigated in the rendering court, including issues concerning the jurisdiction of the rendering court. *See, e.g., Durfee Et Ux v. Duke,* 375 U.S. 106, 111, 84 S.Ct. 242, 11 L.Ed.2d 186 (1963) ( "while it is established that a court in one State, when asked to give effect to the judgment of a court in another State, may constitutionally inquire into the foreign court's jurisdiction to render that judgment ... a judgment is entitled to full faith and credit—even as to questions of jurisdiction—when the second court's inquiry discloses that those questions have been fully and fairly litigated and finally decided in the court which rendered the original judgment").

*2. The Decisions of the Canadian Courts Finding Jurisdiction Should Be Recognized*

[13][14] In deciding whether to enforce a foreign judgment, a court in the United States may scrutinize the basis for the assertion of jurisdiction by the foreign court. *See RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 482* cmt. c. ( *Lack of jurisdiction over defendant.* The most common ground for refusal to recognize or enforce a foreign judgment is lack of jurisdiction to adjudicate in respect of the judgment debtor. If the rendering court did not have jurisdiction over the defendant under the laws of its own state, the judgment is void and will not be recognized or enforced in any other state. Even if the rendering court had jurisdiction under the laws of its own state, a court in the United States asked to recognize a foreign judgment should scrutinize the basis for asserting jurisdiction in the light of international concepts of jurisdiction to adjudicate.). Whether jurisdiction was challenged in the foreign court is relevant but not necessarily decisive in deciding whether to enforce a foreign judgment, although a renewed challenge to jurisdiction is generally precluded. *Id.* (If the defendant appeared in **\*700** the foreign court to challenge the jurisdiction of the court and failed to prevail, it is not clear whether such determination will

be considered *res judicata* by a court in the United States asked to recognize the resulting judgment.); *Id.* at § 482 rn.3 ("[i]f the defendant challenged the jurisdiction of the rendering court in the first action and the challenge was unsuccessful or was not carried to conclusion ... a renewed challenge to jurisdiction of the rendering court is generally precluded"). The justifications for giving *res judicata* effect to the Canadian Courts' carefully reasoned determination that the Ontario Court had jurisdiction, and for giving effect to the Plan and Implementation Order, under principles of international comity, are particularly strong in this case.

### IV. CONCLUSION

[15] The Canadian Proceedings were the result of near-cataclysmic turmoil in the Canadian commercial paper market following the onset of the global financial crisis. The far-reaching Plan was adopted with near-unanimous creditor support, approved by the Ontario Court, and then affirmed on appeal by the Ontario Court of Appeal in the face of a jurisdictional challenge to the inclusion of third-party non-debtor release and injunction provisions. There is no basis for this Court to second-guess the decisions of the Canadian courts. Principles of comity in chapter 15 cases support enforcement of the Canadian Orders in the United States whether or not the same relief could be ordered in a plenary case under chapter 11. Therefore, the Court will enter an order recognizing this case as a foreign main proceeding and enforcing the Canadian Orders.

Bkrtcy.S.D.N.Y.,2010.
In re Metcalfe & Mansfield Alternative Investments
421 B.R. 685, 52 Bankr.Ct.Dec. 159

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Tab 50

26-11268-mg    Doc 23-4    Filed 06/24/26    Entered 06/24/26 13:13:49    Exhibit D    Pg 47 of 697

In re Metromedia Fiber Network, Inc., 416 F.3d 136 (2005)
54 Collier Bankr.Cas.2d 1033, 44 Bankr.Ct.Dec. 276, Bankr. L. Rep. P 80,397

KeyCite Yellow Flag - Negative Treatment

**Declined to Follow by**    In re South Edge LLC,    D.Nev.,    August 8, 2012

416 F.3d 136
United States Court of Appeals,
Second Circuit.

In re: METROMEDIA FIBER
NETWORK, INC., et al., Debtors.
Deutsche Bank AG, London Branch and
Bear, Stearns & Co., Inc., Appellants,
v.
Metromedia Fiber Network,
Inc., et al., Debtors–Appellees.

No. 04–2112–BK.    |    Argued: Jan.
31, 2005.    |    Decided: July 21, 2005.

**Synopsis**
**Background:** Order was entered by the United States Bankruptcy Court for the Southern District of New York, Adlai S. Hardin, Jr., J., confirming debtor's proposed Chapter 11 plan, and creditors appealed. The District Court, Charles L. Brieant, J., affirmed.

**Holdings:** On further appeal, the Court of Appeals, Jacobs, Circuit Judge, held that:

[1] X-clause in indenture agreement, in exempting from subordination to rights of senior creditors certain securities allocated to junior note holders in connection with company's reorganization, did not allow noteholders to retain stock warrants;

[2] to confirm Chapter 11 plan containing non-debtor release, bankruptcy court had to find, at minimum, that release itself was important to plan; but

[3] Court of Appeals would not disturb bankruptcy court's unstayed Chapter 11 plan confirmation order, based on equitable mootness of appeal.

Affirmed.

**Attorneys and Law Firms**

**\*138**  Edward J. Estrada, Leboeuf, Lamb, Greene & MacRae, LLP, New York, N.Y. (John S. Kinzey, on the brief), for Appellants.

Ronald R. Sussman, Kronish Lieb Weiner & Hellman LLP, New York, N.Y. (Richard S. Kanowitz, Jeffrey L. Cohen, and Seth Van Aalten, on the brief), for Debtors–Appellees.

Before: JACOBS and CALABRESI, Circuit Judges, and RAKOFF, District Judge. *

**Opinion**

JACOBS, Circuit Judge.

Creditors Deutsche Bank AG (London Branch) and Bear, Stearns & Co., Inc. (collectively, "appellants") challenge the now-largely implemented Plan of Reorganization ("Plan") confirmed in the Chapter 11 bankruptcy proceeding of Metromedia Fiber Network, Inc. and its subsidiaries (collectively, "Metromedia"). This appeal is taken from a March 18, 2004 judgment of the United States District Court for the Southern District of New York (Brieant, *J.*), affirming the August 21, 2003 confirmation order of the Bankruptcy Court (Hardin, Jr., *B.J.*).

First, appellants challenge the reallocation to other creditors of stock warrants that were initially allocated to appellants under Metromedia's Plan. Without contesting that cash and stock allocated to appellants were properly reallocated to those creditors under the terms of a prior subordination agreement, appellants argue that they are allowed to keep the warrants by virtue of an exception in that subordination agreement, a so-called "X–Clause."

Second, appellants argue that releases in the Plan improperly shield certain nondebtors from suit by the creditors.

AboveNet, Inc., f/k/a Metromedia Fiber Network, Inc., and its subsidiaries (collectively, "appellees" or "the Reorganized Debtors") refute these claims on the merits, and also argue that this appeal should be deemed equitably moot because numerous transactions have occurred since the Plan's September 8, 2003 effective date, and because appellants failed to ask the bankruptcy court or the district court for a stay of confirmation pending this appeal.

In re Metromedia Fiber Network, Inc., 416 F.3d 136 (2005)
54 Collier Bankr.Cas.2d 1033, 44 Bankr.Ct.Dec. 276, Bankr. L. Rep. P 80,397

**\*139** Appellants' objections to the Plan were rejected on the merits by the bankruptcy court and the district court. At the same time, the district court ruled that relief (if justified by the merits) would not have been barred by the doctrine of equitable mootness because effective relief could have been afforded without "unraveling the Plan."

**[1]**  This Court exercises plenary review over the decisions of the district court and bankruptcy court; we review conclusions of law *de novo* and findings of fact for clear error. *Superintendent of Ins. v. Ochs (In re First Cent. Fin. Corp.),* 377 F.3d 209, 212 (2d Cir.2004). We conclude that the reallocation of the warrants was proper, but that the bankruptcy court erred in approving the nondebtor releases. Nevertheless, we affirm because this appeal is equitably moot.

### I. The X–Clause

**[2]**  Before the bankruptcy, appellants purchased various Metromedia notes (the "Notes") governed by an indenture agreement that subordinated the rights of the note holders to those of other creditors ("the Senior Indebtedness") as follows:

> Upon the payment or distribution of the assets of [MFN [1] ] of any kind or character ... to creditors upon any dissolution, winding-up, liquidation or reorganization of [MFN] ... any payment or distribution of assets of [MFN] of any kind or character ... to which the Holders [of the Notes] or the Trustee on behalf of the Holders would be entitled ... shall be paid or delivered ... to the holders of the Senior Indebtedness ....

However, a so-called X–Clause exempted from subordination:

> securities of [MFN] as reorganized or readjusted, or securities of [MFN] or any other Person provided for by a plan of reorganization or readjustment, junior, or the payment of which is otherwise subordinate, at least to the extent provided in this Article 12, with

respect to the Notes, to the payment of all Senior Indebtedness.

The Notes were outstanding when Metromedia filed for relief under Chapter 11. The Plan provided in relevant (small) part that [i] on account of the Notes, appellants were to be paid a combination of cash, common stock in the Reorganized Debtors, and five- and seven-year warrants to purchase additional common stock at specified prices; but [ii] under the terms of the subordination agreement described above, appellants' entire distribution would be reallocated to the Senior Indebtedness.

Appellants concede that the Plan properly reallocated the cash and stock to the Senior Indebtedness; but they argue that the X–Clause allowed them to keep the stock warrants.

The stock warrants are covered by the X–Clause if they are "junior," or if their "payment ... is otherwise subordinate ... with respect to the Notes, to the payment of all Senior Indebtedness." But the text is not self-reading; the applicability of the clause in a specific case is not readily apparent; and the parties have submitted no evidence as to the drafters' intentions. Still, such clauses seem to be common in the industry. *See In re Envirodyne Indus.,* 29 F.3d 301, 306 (7th Cir.1994).

Helpful guidance is found in the American Bar Foundation's *Commentaries on Model Debenture Indenture Provisions* (1971) [hereinafter *Commentaries* ]. [2] In a **\*140** nutshell, when subordinated and senior note holders are given securities under a plan of reorganization, an X–Clause allows the subordinated note holder to retain its securities only if the securities given to the senior note holder have higher priority to future distributions and dividends (up to the full amount of the senior notes). This provides for full payment of the senior notes before any payment of the subordinated notes is made. In such a case, the senior note holder enjoys unimpaired the priority to payment that it had under its notes, *i.e.,* payments on the subordinated note holder's securities are "subordinate ... to the payment of all Senior Indebtedness." *See Commentaries, supra,* § 14–5, at 570 (X–Clause is triggered where "mortgage bonds, preferred stock or similar higher class security" are provided to senior note holders and "common stock" is provided to subordinated note holders because "this kind of distribution gives practical effect to the subordination and therefore turnover is not required") [3] ; Ad Hoc Committee for Revision of the 1983 Model Simplified Indenture, *Revised Model Simplified Indenture,* 55 Bus.

3592

26-11268-mg   Doc 23-4   Filed 06/24/26   Entered 06/24/26 13:13:49   Exhibit D   Pg 49 of 697

In re Metromedia Fiber Network, Inc., 416 F.3d 136 (2005)
54 Collier Bankr.Cas.2d 1033, 44 Bankr.Ct.Dec. 276, Bankr. L. Rep. P 80,397

Law. 1115, 1221 (2000) ("If Senior Debt were to receive preferred stock and the subordinated debt were to receive common stock, for example, where the preferred stock precluded distributions to common stockholders until the preferred stock was redeemed, the X–Clause would permit that distribution."). This approach assures that the junior creditor remains fully subordinated without requiring it to yield assets that are not required for full payment of the senior creditor and that would therefore make a round-trip to the senior creditor and back, with the attendant delay, friction, and transaction cost.

The caselaw on X–Clauses is consistent with this approach. The Seventh Circuit considered an X–Clause virtually identical to the X–Clause in this case, and construed it to exempt from subordination securities allocated to junior creditors that "are subordinated to the claims of the senior creditors," and which therefore do not "erase the priority" of the senior class. *Envirodyne,* 29 F.3d at 303, 306; *see also In re PWS Holding Corp.,* 228 F.3d 224, 244–45 (3d Cir.2000) (X–Clause allows securities to be retained if they "are subordinated to the same extent as the existing subordinated debt" (quotation omitted)).

The question thus presented is whether appellants can keep the stock warrants without impairing the priority assured to the Senior Indebtedness by the subordination agreement. The answer is no. Under the Plan, the Senior Indebtedness received cash, common stock, and warrants identical to those at issue here. It is undisputed that the Senior Indebtedness did not receive full payment for its debt under the Plan. If appellants can keep their warrants, they would be able to buy the same class of common stock allocated to the Senior Indebtedness, giving appellants and the Senior Indebtedness *equal* **\*141** priority to any future distribution. Therefore, allowing appellants to retain the warrants would effect an impairment of seniority.

## II. The Nondebtor Releases

Among the claims settled in the Plan are those of the Kluge Trust. [4] Under the Plan, the Kluge Trust would [i] forgive approximately $150 million in unsecured claims against Metromedia; [ii] convert $15.7 million in senior secured claims to equity in the Reorganized Debtors; [iii] invest approximately $12.1 million in the Reorganized Debtors; and [iv] purchase up to $25 million of unsold common stock in the Reorganized Debtors' planned stock offering (collectively,

"Kluge Consideration"). In return, the Kluge Trust would receive [i] 10.8% of the Reorganized Debtors' common stock and [ii] the "Kluge Comprehensive Release," which provides that

> the Kluge Trust and each of the Kluge Insiders shall receive a full and complete release, waiver and discharge from ... any holder of a claim of any nature ... of any and all claims, obligations, rights, causes of action and liabilities arising out of or in connection with any matter related to [Metromedia] or one or more subsidiaries ... based in whole or in part upon any act or omission or transaction taking place on or before the Effective Date.

Appellants challenge this release, as well as two other releases that permanently enjoin creditors from suing various nondebtors.[5] Appellants' sole argument—and the only argument that we consider—is that these nondebtor releases were unauthorized by the Bankruptcy Code, 11 U.S.C. § 101 *et seq.,* at least on the findings made by the bankruptcy court.

 **[3]    [4]**    We have previously held that "[i]n bankruptcy cases, a court may enjoin a creditor from suing a third party, provided the injunction plays an important part in the debtor's reorganization plan." *SEC v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.),* 960 F.2d 285, 293 (2d Cir.1992). While none of our cases explains when a nondebtor release is "important" to a debtor's plan, it is clear that such a release is proper only in rare cases. *See, e.g., Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.),* 280 F.3d 648, 657–58 (6th Cir.2002) ( "[S]uch an injunction is a dramatic measure to be used cautiously ...."); *Gillman v. Cont'l Airlines (In re Cont'l Airlines ),* 203 F.3d 203, 212–13 (3d Cir.2000) (recognizing that nondebtor releases have been approved only in "extraordinary cases"). The Ninth and Tenth Circuits have held that nondebtor releases are *prohibited* by the Code, except in the asbestos context. *See Resorts Int'l, Inc. v. Lowenschuss (In re Lowenschuss ),* 67 F.3d 1394, 1401– 02, 1402 n. 6 (9th Cir.1995); *Landsing Diversified Props.- II v. First Nat'l Bank and Trust Co. of Tulsa (In re W. Real Estate Fund, Inc.),* 922 F.2d 592, 600–02 (10th Cir.1990) (*per curiam* ).

 **\*142    [5]    [6]**    At least two considerations justify the reluctance to approve nondebtor releases. First, the only explicit authorization in the Code for nondebtor releases is 11 U.S.C. § 524(g), which authorizes releases in asbestos cases when specified conditions are satisfied, including the creation

26-11268-mg    Doc 23-4    Filed 06/24/26    Entered 06/24/26 13:13:49    Exhibit D    Pg 50 of 697

In re Metromedia Fiber Network, Inc., 416 F.3d 136 (2005)
54 Collier Bankr.Cas.2d 1033, 44 Bankr.Ct.Dec. 276, Bankr. L. Rep. P 80,397

of a trust to satisfy future claims. *Cont'l Airlines,* 203 F.3d at 211 & n. 6; *see also Dow Corning,* 280 F.3d at 656 ("The Bankruptcy Code does not explicitly prohibit or authorize a bankruptcy court to enjoin a non-consenting creditor's claims against a non-debtor to facilitate a reorganization plan."). True, 11 U.S.C. § 105(a) authorizes the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Code]"; but section 105(a) does not allow the bankruptcy court "to create substantive rights that are otherwise unavailable under applicable law." *New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc.* (*In re Dairy Mart Convenience Stores, Inc.),* 351 F.3d 86, 92 (2d Cir.2003) (quotations and citation omitted). Any "power that a judge enjoys under § 105 must derive ultimately from some other provision of the Bankruptcy Code." Douglas G. Baird, *Elements of Bankruptcy* 6 (3d ed.2001); *accord Dairy Mart,* 351 F.3d at 92 ("Because no provision of the Bankruptcy Code may be successfully invoked in this case, section 105(a) affords [appellant] no independent relief.").

Second, a nondebtor release is a device that lends itself to abuse. By it, a nondebtor can shield itself from liability to third parties. In form, it is a release; in effect, it may operate as a bankruptcy discharge arranged without a filing and without the safeguards of the Code. The potential for abuse is heightened when releases afford blanket immunity. Here, the releases protect against any claims relating to the debtor, "whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, matured or unmatured." [6]

Courts have approved nondebtor releases when: the estate received substantial consideration, *e.g., Drexel Burnham,* 960 F.2d at 293; the enjoined claims were "channeled" to a settlement fund rather than extinguished, *MacArthur Co. v. Johns–Manville Corp.* (*In re Johns–Manville Corp.),* 837 F.2d 89, 93–94 (2d Cir.1988); *Menard–Sanford v. Mabey* (*In re A.H. Robins Co.),* 880 F.2d 694, 701 (4th Cir.1989); the enjoined claims would indirectly impact the debtor's reorganization "by way of indemnity or contribution," *id.;* and the plan otherwise provided for the full payment of the enjoined claims, *id.* Nondebtor releases may also be tolerated if the affected creditors consent. *See In re Specialty Equip. Cos.,* 3 F.3d 1043, 1047 (7th Cir.1993).

But this is not a matter of factors and prongs. No case has tolerated nondebtor releases absent the finding of

circumstances that may be characterized as unique. *See Dow Corning,* 280 F.3d at 658; *accord Cont'l Airlines,* 203 F.3d at 212–13 ("A central focus of these ... reorganizations was the global settlement of massive liabilities against the debtors and co-liable parties. Substantial financial contributions from non-debtor co-liable parties provided compensation to claimants in exchange for the release of their liabilities and made these reorganizations feasible."); *see also, e.g., Drexel Burnham,* 960 F.2d at 288–93 (approving multi-billion **\*143** dollar settlement of 850 securities claims against Drexel, involving $1.3 billion payment into fund by Michael Milken and other co-liable Drexel personnel).

[7]    Here, the sole finding made to justify the Kluge Comprehensive Release is that the Kluge Trust made a "material contribution" to the estate. But there is no finding (or evidence presented) that the Kluge Comprehensive Release was *itself* important to the Plan [7]—which is what *Drexel Burnham* at minimum requires. *See* 960 F.2d at 293 (question is whether "the injunction plays an important part in the debtor's reorganization plan"). Nor was any inquiry made into whether the breadth of the Kluge Comprehensive Release—which covers numerous third parties in addition to the Kluge Trust, and which covers any and all claims relating to Metromedia—was necessary to the Plan. (The two other releases were not separately considered.)

[8]    The bankruptcy court's findings were insufficient. A nondebtor release in a plan of reorganization should not be approved absent the finding that truly unusual circumstances render the release terms important to success of the plan, focusing on the considerations discussed above, *see supra* at 142 – 143. *Cf. Dow Corning,* 280 F.3d at 658 (requiring bankruptcy court to make "specific factual findings that support its conclusions" before authorizing nondebtor releases).

[9]    Appellants also claim that notwithstanding any other limitation on nondebtor releases, good and sufficient consideration must be paid to any enjoined creditor. Such consideration has weight in equity, but it is not required. In *Drexel Burnham,* the complaining creditors received *none* of the proceeds of the settlement with Drexel's personnel. 960 F.2d at 289, 293.

[10]    By the same token, we reject appellees' argument that because appellants were allocated a Plan distribution, they received consideration, and therefore cannot be heard to complain about the nondebtor releases. Appellants' Plan

3594

distribution (ultimately *re*-distributed to other creditors, *see supra,* at 139), was on account of appellants' Notes, not on account of their claims against any nondebtor. *See Cont'l Airlines,* 203 F.3d at 215 & n. 13 (differentiating between plan distribution and consideration for enjoined claims). In any event, a nondebtor release is not adequately supported by consideration simply because the nondebtor contributed something to the reorganization and the enjoined creditor took something out.

### III. Equitable Mootness

 **[11]**   Insufficient findings would ordinarily be remedied by remand to the bankruptcy court. However, appellees argue that this appeal should be dismissed because it is equitably moot. We agree. This court has held that in bankruptcy cases, "[a]n appeal should ... be dismissed as moot when, even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable." *Official Comm. of Unsecured Creditors of LTV Aerospace and Def. Co. v. Official Comm. of Unsecured Creditors of LTV Steel Co.* (*In re Chateaugay Corp.*), 988 F.2d 322, 325 (2d Cir.1993) [hereinafter *Chateaugay I* ].

 **[12]**   Equitable mootness is a doctrine distinct from constitutional mootness, though they have been discussed in the **\*144**  same breath. *See, e.g., id.* Equitable mootness is a prudential doctrine that is invoked to avoid disturbing a reorganization plan once implemented. *See, e.g., In re UNR Indus.,* 20 F.3d 766, 769 (7th Cir.1994) ("There is a big difference between *inability* to alter the outcome (real mootness) and *unwillingness* to alter the outcome ('equitable mootness')."); *see also MAC Panel Co. v. Va. Panel Corp.,* 283 F.3d 622, 625 (4th Cir.2002) ("[E]quitable mootness is a pragmatic principle, grounded in the notion that, with the passage of time after a judgment in equity and implementation of that judgment, effective relief on appeal becomes impractical, imprudent, and therefore inequitable." (emphasis omitted)); *In re Envirodyne Indus.,* 29 F.3d 301, 304 (7th Cir.1994) (defining the doctrine as "merely an application of the age-old principle that in formulating equitable relief a court must consider the effects of the relief on innocent third parties").

 **[13]**   Because equitable mootness bears only upon the proper remedy, and does not raise a threshold question of our power to rule, a court is not inhibited from considering the merits before considering equitable mootness. *See, e.g., id.* at 303–

04. Often, an appraisal of the merits is essential to the framing of an equitable remedy.

As to the merits of the mootness argument, a plan is "substantially consummated" upon [i] transfer of substantially all of the property proposed by the plan to be transferred; [ii] the reorganized debtor's assumption of the debtor's business; and [iii] commencement of distribution under the plan. 11 U.S.C. § 1101(2). In that context, appellees cite the transactions completed since the Plan's September 8, 2003 effective date, including the issuance of substantially all of the Reorganized Debtors' stock (AboveNet, Inc., now publicly traded on NASDAQ), the full receipt of the Kluge Consideration, the cash distributions, and entry into a host of contracts, leases, and other arrangements as part of AboveNet's day-to-day operations. We conclude that Metromedia's Plan has been "substantially consummated" as that term is defined by the Code. Appellants have not argued otherwise on appeal.

 **[14]**   **[15]**   **[16]**   "[T]he ability to achieve finality is essential to the fashioning of effective remedies." *Chateaugay I,* 988 F.2d at 325. When a plan has been substantially consummated, an appeal should be dismissed unless several enumerated requirements are satisfied. *See Frito–Lay, Inc. v. LTV Steel Co.* (*In re Chateaugay Corp.*), 10 F.3d 944, 952–53 (2d Cir.1993) [hereinafter *Chateaugay II* ]; *see also UNR Indus.,* 20 F.3d at 769 ("In common with other courts of appeals, we have recognized that a plan of reorganization, once implemented, should be disturbed only for compelling reasons."). A chief consideration under *Chateaugay II* is whether the appellant sought a stay of confirmation. If a stay was sought, we will provide relief if it is at all feasible, that is, unless relief would "knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation for the Bankruptcy Court." *Chateaugay II,* 10 F.3d at 953 (quotation omitted). But if the appellant failed to seek a stay, we consider additionally whether that failure renders relief inequitable. *Id.* We insist that a party seek a stay even if it may seem highly unlikely that the bankruptcy court will issue one. *See Chateaugay I,* 988 F.2d at 326 ("A party cannot escape the obligation to protect its litigation position by so facile an argument.").

 **[17]**   Here, appellants sought no stay of the confirmation order, and sought no expedited review in this appeal, which was filed over a year ago. Never mind, appellants argue, because (as the district court **\*145**  found) we can provide

effective relief without "unraveling the Plan." Specifically, appellants may be permitted in all equity to pursue any claim barred by the releases. We disagree. In the absence of any request for a stay, the question is not solely whether we *can* provide relief without unraveling the Plan, but also whether we *should* provide such relief in light of fairness concerns. *See Chateaugay II,* 10 F.3d at 952–53; *Chateaugay I,* 988 F.2d at 325.

 [18]    Even if we could carve out appellants' claims from the nondebtor releases, we would not do so. If appellants' claims are substantial (as they urge), it is as likely as not that the bargain struck by the debtor and the released parties might have been different without the releases. *See, e.g., MAC Panel,* 283 F.3d at 626 (declining to vacate injunction and subject nondebtor to lawsuit it paid to avoid); *In re Specialty Equip. Cos.,* 3 F.3d 1043, 1049 (7th Cir.1993) (refusing to nullify nondebtor releases because such a remedy "would amount to imposing a different plan of reorganization on the parties"); *Halliburton Serv. v. Crystal Oil Co.* (*In re Crystal Oil Co.*), 854 F.2d 79, 81 (5th Cir.1988) ("We decline to deprive Bankers Trust of the benefits it bargained for without giving Bankers Trust a chance to reevaluate the concessions it made to get them."). We therefore would not grant relief in any event without vacatur and remand for further findings and proceedings.

Vacatur and remand would, however, unsettle the settlement of the Kluge Trust's claims, a critical component of the Plan: in exchange for the Kluge Comprehensive Release and a 10.8% stake in the Reorganized Debtors, the Kluge Trust forgave about $150 million of unsecured claims, converted to equity another $15 million, invested a further $12.1 million in the Reorganized Debtors, and committed itself to purchase up to $25 million of unsold stock. It appears that all these things have been done, and that none of the completed transactions can be undone without violence to the overall arrangements.

In any event, we cannot predict what will happen if this settlement is in any part altered.

Having sought no stay of the bankruptcy court's order (and no expedited appeal), appellants bear the burden of this uncertainty. *See Chateaugay I,* 988 F.2d at 326 ("The party who appeals without seeking to avail himself of that protection does so at his own risk."); *see also, e.g., Aetna Cas. & Sur. Co. v. LTV Steel Co.* (*In re Chateaugay Corp.*), 94 F.3d 772, 776 (2d Cir.1996) (noting in *dicta* that we "presume that it will be inequitable or impractical to grant relief after substantial consummation," unless, among other things, "the entity seeking relief has diligently pursued a stay of execution of the plan throughout the proceedings"); *Retired Pilots Assoc. of U.S. Airways, Inc. v. U.S. Airways Group, Inc.* (*In re U.S. Airways Group Inc.*), 369 F.3d 806, 810 (4th Cir.2004) (failure to seek a stay or expedited appeal "weighs strongly in favor of a finding of equitable mootness"); *TWA, Inc. v. Texaco, Inc.* (*In re Texaco Inc.*), 92 B.R. 38, 46 (S.D.N.Y.1988) ( "[T]here fairly exists a strong presumption that appellants' challenges have been rendered moot due to their inability or unwillingness to seek a stay." (quotation omitted)).

This appeal is equitably moot.

### CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.

### All Citations

416 F.3d 136, 54 Collier Bankr.Cas.2d 1033, 44 Bankr.Ct.Dec. 276, Bankr. L. Rep. P 80,397

---

Footnotes

\*     The Honorable Jed S. Rakoff, United States District Judge for the Southern District of New York, sitting by designation.

1     "MFN" refers to Metromedia Fiber Network, Inc.

2     We have previously relied on the *Commentaries* to interpret indenture provisions. *See, e.g., Elliott Assocs. v. J. Henry Schroder Bank & Trust Co.,* 838 F.2d 66, 71–72 (2d Cir.1988); *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.,* 691 F.2d 1039, 1048–50 (2d Cir.1982); *see also Envirodyne,* 29 F.3d at 305 (approving of the use of texts, such as the *Commentaries,* which "like trade usage, are in the nature of specialized dictionaries").

3     One of the model X–Clauses in the *Commentaries* closely resembles the X–Clause in this case:
       (other than securities of the Company as reorganized or readjusted or securities of the Company or any other corporation provided for by a plan of reorganization or readjustment the payment of which is subordinate, at least to the extent provided in this Article with respect to the Debentures, to the payment of all indebtedness in the nature

---

of Senior Debt, provided that the rights of the holders of Senior Debt are not altered by such reorganization or readjustment.)

*Commentaries, supra,* § 14–5, at 571.

4     The Kluge Trust is defined by the Plan as a trust between John W. Kluge, "as Grantor, and Stuart Subotnick, Kluge and Chase Manhattan Bank, as Trustees." The Kluge Insiders are any "insider," as defined at 11 U.S.C. § 101(31), of Kluge or the "Metromedia Company," and Kluge, the Metromedia Company, Stuart Subotnick, Silvia Kessel, and David Persing.

5     One release bars claims against former or current Metromedia personnel (among others), that are related to Metromedia's bankruptcy and based on acts or omissions taking place on or before the Plan's Effective Date, unless based upon "gross negligence or willful misconduct." A second (similar) release shields former or current Metromedia personnel from any claim relating to Metromedia, the Reorganized Debtors, or the Plan.

6     Each of the releases contains exceptions for certain identified actions not at issue in this appeal.

7     AboveNet's chief operating officer was asked at the confirmation hearing if he knew "what happens with respect to [the Kluge Settlement] in the event the [Kluge Comprehensive Release] is not granted." He answered, "No, not really."

---

**End of Document**         © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 51

KeyCite Yellow Flag - Negative Treatment

Distinguished by Fifth Third Mortg. Co. v. Chicago Title Ins. Co., 6th Cir. (Ohio), August 30, 2012

716 F.Supp. 1504
United States District Court,
S.D. New York.

METROPOLITAN LIFE INSURANCE
COMPANY and Jefferson–Pilot
Life Insurance Company, Plaintiffs,

v.

RJR NABISCO, INC. and F.
Ross Johnson, Defendants.

No. 88 Civ. 8266 (JMW).
|
June 1, 1989.

**Synopsis**
Bondholders brought action against corporation to recover for loss of value of the bonds following leveraged buy out. The District Court, Walker, J., held that leveraged buy out did not violate any implied covenants in the bond indenture.

Ordered accordingly.

West Headnotes (11)

**[1]** **Evidence** Bonds

Parol evidence rule barred bondholders from arguing that speeches made by issuing company's executives proved that the issuers agreed or acquiesced to a term which did not appear in the indentures.

1 Cases that cite this headnote

**[2]** **Evidence** Bonds, commercial paper, and negotiable instruments

Although no explicit provision in bond indenture either permitted or prohibited leverage buy out, that contractual silence could not create an ambiguity so as to avoid the dictates of the parol

evidence rule, particularly where the indentures imposed no debt limitations.

15 Cases that cite this headnote

**[3]** **Contracts** Terms implied as part of contract

Where one party has effectively deprived the other of the express, exclusively bargained-for benefits of the contract, court will read an implied covenant of good faith and fair dealing into the contract to assure that neither party deprives the other of the fruits of the agreement.

48 Cases that cite this headnote

**[4]** **Corporations and Business Organizations** Construction, operation, and effect in general

There was no implied covenant in bond indenture restricting any action that might subject bondholder's investment to a greater risk of nonpayment.

15 Cases that cite this headnote

**[5]** **Corporations and Business Organizations** Construction, operation, and effect in general

Indentures for corporate bonds did not include implied restrictive covenant that would prevent corporation from incurring new debt to facilitate a leveraged buy out.

23 Cases that cite this headnote

**[6]** **Implied and Constructive Contracts** Unjust enrichment

Unjust enrichment claim requires a court to first find that the circumstances are such that, in equity and good conscience, the defendant should make restitution.

**[7]** **Corporations and Business Organizations** Rights and Remedies of Holders

3599

Equity and good conscience did not require that corporation make restitution to bondholders because of loss of value of the bonds following leveraged buy out, so the bondholders could not recover on theory of unjust enrichment.

**[8] Corporations and Business Organizations** 👈 Rights and Remedies of Holders

Leveraged buy out of corporate issuer of bonds did not result in frustration of purpose of the bonds so as to permit bondholders to recover for loss of value of the bonds following the leveraged buy out.

3 Cases that cite this headnote

**[9] Corporations and Business Organizations** 👈 Nature of obligation

Corporate bond issuer did not have fiduciary duty to bondholders not to engage in leveraged buy out which reduced value of the bonds.

1 Cases that cite this headnote

**[10] Securities Regulation** 👈 Connection with purchase or sale

Claim under Rule 10–5 is limited to purchases or sales during the period of nondisclosure and misrepresentation, and Rule does not afford relief to those who forego a purchase or sale and instead merely hold in reliance on the nondisclosure or misrepresentation.

4 Cases that cite this headnote

**[11] Fraud** 👈 Fraud in particular transactions or for particular purposes

Common-law fraud claims based on nondisclosure in connection with securities are not restricted to purchases and sales.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1505** Philip Howard, Jack P. Levin, C. William Phillips, Howard, Darby & Levin, New York City, for plaintiffs.

Michael Bradley, Scott Tross, Brown & Wood, New York City, for defendant RJR Nabisco.

D. Scott Wise, Davis, Polk & Wardwell, New York City, for defendant F. Ross Johnson.

Kenneth Logan, Michael Lamb, Simpson Thacher & Bartlett, New York City, for KKR.

*OPINION AND ORDER*

WALKER, District Judge:

I. INTRODUCTION

The corporate parties to this action are among the country's most sophisticated financial institutions, as familiar with the Wall Street investment community and the securities market as American consumers are with the Oreo cookies and Winston cigarettes made by defendant RJR Nabisco, Inc. (sometimes "the company" or "RJR Nabisco"). The present action traces its origins to October 20, 1988, when F. Ross Johnson, then the Chief Executive Officer of RJR Nabisco, proposed a $17 billion leveraged buy-out ("LBO") of the company's shareholders, at $75 per share.[1] Within a few days, a bidding war developed among the investment group led by Johnson and the investment firm of Kohlberg Kravis Roberts & Co. ("KKR"), and others. On December 1, 1988, a special committee of RJR Nabisco directors, established by the company specifically to consider the competing proposals, recommended that the company accept the KKR proposal, a $24 billion LBO that called for the purchase of the company's outstanding stock at roughly $109 per share.

[1] A leveraged buy-out occurs when a group of investors, usually including members of a company's management team, buy the company under financial arrangements that include little equity and significant new debt. The necessary debt financing typically includes mortgages or high risk/high yield bonds, popularly known as "junk bonds." Additionally, a portion of this debt is generally secured by the company's assets. Some of the acquired company's assets are usually sold after the transaction

3600

is completed in order to reduce the debt incurred in the acquisition.

The flurry of activity late last year that accompanied the bidding war for RJR Nabisco spawned at least eight lawsuits, filed before this Court, charging the company and its former CEO with a variety of securities and common law violations.[2] The **\*1506** Court agreed to hear the present action—filed even before the company accepted the KKR proposal—on an expedited basis, with an eye toward March 1, 1989, when RJR Nabisco was expected to merge with the KKR holding entities created to facilitate the LBO. On that date, RJR Nabisco was also scheduled to assume roughly $19 billion of new debt.[3] After a delay unrelated to the present action, the merger was ultimately completed during the week of April 24, 1989.

[2]    On December 7, 1989, this Court agreed to accept as related all actions growing out of the RJR Nabisco LBO. On January 4, 1989, the Court consolidated with the present suit an action brought by three KKR affiliates —RJR Holdings Corp., RJR Holdings Group, Inc., and RJR Acquisition Corporation—against the Jefferson– Pilot Life Insurance Company. KKR established those entities to effect the buyout of RJR Nabisco. Throughout this Opinion, these entities and their parent will be referred to collectively as "KKR." When this action was filed, those entities and KKR were not formally named as parties. However, in its January 4 Order, the Court granted KKR's request to participate fully in the present action. Pursuant to that Order, KKR filed joint briefs with RJR Nabisco and participated in oral argument before the Court on February 16, 1989.

[3]    The Court set January 12, 1989 as the close of the expedited discovery period for these motions, which were filed the next day.

Plaintiffs now allege, in short, that RJR Nabisco's actions have drastically impaired the value of bonds previously issued to plaintiffs by, in effect, misappropriating the value of those bonds to help finance the LBO and to distribute an enormous windfall to the company's shareholders. As a result, plaintiffs argue, they have unfairly suffered a multimillion dollar loss in the value of their bonds.[4]

[4]    Agencies like Standard & Poor's and Moody's generally rate bonds in two broad categories: investment grade and speculative grade. Standard & Poor's rates investment grade bonds from "AAA" to "BBB." Moody's rates those bonds from "AAA" to "Baa3." Speculative grade bonds are rated either "BB" and lower, or "Ba1" and lower, by Standard & Poor's and Moody's, respectively. *See, e.g.,*

*Standard and Poor's Debt Rating Criteria* at 10–11. No one disputes that, subsequent to the announcement of the LBO, the RJR Nabisco bonds lost their "A" ratings.

On February 16, 1989, this Court heard oral argument on plaintiffs' motions. At the hearing, the Court denied plaintiffs' request for a preliminary injunction, based on their insufficient showing of irreparable harm.[5] An exchange between the Court and plaintiffs' counsel, like the submissions before it, convinced the Court that plaintiffs had failed to meet their heavy burden:

[5]    In their papers, plaintiffs had argued that the LBO "should be Preliminarily Enjoined Unless Provision is Made to Ensure That Funds for Redemption will be Available after Trial." P.Mem. at 59 (capitalization in original). The preliminary injunction requested "is not intended to stop the transaction, but only to enjoin any substantial encumbrance on the [c]ompany until the [c]ompany posts a bond or otherwise provides security to ensure its ability to redeem Plaintiffs' bonds after trial." P.Mem. at 60.
References throughout this Opinion are as follows: Transcript of February 16, 1989 Argument ("Tr."); Amended Complaint ("Am.Comp."); [Name of affiant] Affidavit ("[Name of affiant] Aff."); [Name of affiant] Response Affidavit ("[Name of affiant] Resp.Aff."); [Name of affiant] Reply Affidavit ("[Name of affiant] Reply Aff."); Exhibit ("Exh."); Plaintiffs' Exhibit ("P.Exh."); [Name of deponent] Deposition ("[Name of deponent] Dep."); Plaintiffs' Memorandum in Support of Summary Judgment ("P.Mem."); Plaintiffs' Answering Brief [in Opposition to Defendants' Motions] ("P.Opp."); Plaintiffs' Reply Brief ("P. Reply"); Defendants' Memorandum in Support of their Motion for Judgment on the Pleadings [and Partial Summary Judgment and Partial Dismissal] ("D.Mem."); Defendants' Memorandum in Opposition to Plaintiffs' Motion ("D.Opp."); Defendants' Reply Memorandum ("D. Reply").

THE COURT: How do you respond to [defendants'] statements on irreparable harm? What we're looking at now is whether or not there's a basis for a preliminary injunction and if there's no irreparable harm then we're in a damage action and that changes ... the contours of the suit.... We're talking about the ability ... of the company to satisfy any judgment.

PLAINTIFFS: That's correct. And our point ... is that if we receive a judgment at any time, six months from now, after a trial for example, that judgment will almost

3601

inevitably be the basis for a judgment for everyone else ... But if we get a judgment, everyone else will get one as well ...

THE COURT: [Y]ou're ... asking me ... [to] infer a huge number of plaintiffs and a lot more damages than your clients could ever recover as being the basis for deciding the question of irreparable harm. And those [potential] actions aren't before me.

**\*1507**  PLAINTIFFS: I think that's correct ...

Tr. at 39. *See also* P. Reply at 33. Plaintiffs failed to respond convincingly to defendants' arguments that, although plaintiffs have invested roughly $350 million in RJR Nabisco, their potential damages nonetheless remain relatively small and that, upon completion of the merger, the company will retain an equity base of $5 billion. *See, e.g.,* Tr. at 32, 35; D. Opp. at 48, 49. Given plaintiffs' failure to show irreparable harm, the Court denied their request for injunctive relief. This initial ruling, however, left intact plaintiffs' underlying motions, which, together with defendants' cross-motions, now require attention.

The motions and cross-motions are based on plaintiffs' Amended Complaint, which sets forth nine counts.[6] Plaintiffs move for summary judgment pursuant to Fed.R.Civ.P. 56 against the company on Count I, which alleges a "Breach of Implied Covenant of Good Faith and Fair Dealing," and against both defendants on Count V, which is labeled simply "In Equity."

[6]   Count I alleges a breach of an implied covenant of good faith and fair dealing (against defendant RJR Nabisco); Count II alleges fraud (against both defendants); Count III alleges violations of Section 10(b) of the Securities Exchange Act of 1934 (against both defendants); Count IV alleges violations of Section 11 of the 1933 Act (on behalf of plaintiff Jefferson–Pilot Life Insurance Company against both defendants); Count V is labeled "In Equity," and is asserted against both defendants; Count VI alleges breach of duties (against defendant Johnson); Count VII alleges tortious interference with property (against Johnson); Count VIII alleges tortious interference with contract (against Johnson); and Count IX alleges a violation of the fraudulent conveyance laws (against RJR Nabisco).

For its part, RJR Nabisco moves pursuant to Fed.R.Civ.P. 12(c) for judgment on the pleadings on Count I in full; on Count II (fraud) and Count III (violations of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder) as to most of the securities at issue;

and on Count V in full. In the alternative, the company moves for summary judgment on Counts I and V. In addition, RJR Nabisco moves pursuant to Fed.R.Civ.P. 9(b) to dismiss Counts II, III and IX (alleging violations of applicable fraudulent conveyance laws) for an alleged failure to plead fraud with requisite particularity. Johnson has moved to dismiss Counts II, III and V.[7]

[7]   Johnson has not filed memoranda in support of his motions but instead incorporates the arguments set forth in the papers filed by RJR Nabisco and KKR. Johnson has not moved with respect to Counts IV, VI, VII or VIII. Counts VI, VII and VIII apply only to Johnson. Count IV is the only count with respect to which RJR Nabisco has not moved.

Although the numbers involved in this case are large, and the financing necessary to complete the LBO unprecedented,[8] the legal principles nonetheless remain discrete and familiar. Yet while the instant motions thus primarily require the Court to evaluate and apply traditional rules of equity and contract interpretation, plaintiffs do raise issues of first impression in the context of an LBO. At the heart of the present motions lies plaintiffs' claim that RJR Nabisco violated a restrictive covenant—not an explicit covenant found within the four corners of the relevant bond indentures, but rather an *implied* covenant of good faith and fair dealing—not to incur the debt necessary to facilitate the LBO and thereby betray what plaintiffs claim was the fundamental basis of their bargain with the company. The company, plaintiffs assert, consistently reassured its bondholders that it had a "mandate" from its Board of Directors to maintain RJR Nabisco's preferred credit rating. Plaintiffs ask this Court first to imply a covenant of good faith and fair dealing that would prevent the recent transaction, then to hold that this covenant has been breached, and finally  **\*1508**  to require RJR Nabisco to redeem their bonds.

[8]   On February 9, 1989, KKR completed its tender offer for roughly 74 percent of RJR Nabisco's common stock (of which approximately 97% of the outstanding shares were tendered) and all of its Series B Cumulative Preferred Stock (of which approximately 95% of the outstanding shares were tendered). Approximately $18 billion in cash was paid out to these stockholders. KKR acquired the remaining stock in the late April merger through the issuance of roughly $4.1 billion of pay-in-kind exchangeable preferred stock and roughly $1.8 billion in face amount of convertible debentures. *See* Bradley Reply Aff. ¶ 2.

RJR Nabisco defends the LBO by pointing to express provisions in the bond indentures that, *inter alia,* permit mergers and the assumption of additional debt. These provisions, as well as others that could have been included but were not, were known to the market and to plaintiffs, sophisticated investors who freely bought the bonds and were equally free to sell them at any time. Any attempt by this Court to create contractual terms *post hoc,* defendants contend, not only finds no basis in the controlling law and undisputed facts of this case, but also would constitute an impermissible invasion into the free and open operation of the marketplace.

For the reasons set forth below, this Court agrees with defendants. There being no express covenant between the parties that would restrict the incurrence of new debt, and no perceived direction to that end from covenants that are express, this Court will not imply a covenant to prevent the recent LBO and thereby create an indenture term that, while bargained for in other contexts, was not bargained for here and was not even within the mutual contemplation of the parties.

## II. BACKGROUND

Summary judgment, of course, is appropriate only where "there is no genuine issue as to any material fact ..." Fed.R.Civ.P. 56(c). A genuine dispute exists if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The burden is on the moving party to show that no relevant facts are in dispute. While the Court must resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought, *see, e.g., Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 444 (2d Cir.1980), the nonmoving party may not rely simply "on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Insurance Co.,* 804 F.2d 9, 12 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

Both sides now move for summary judgment on Counts I and V. In support of their motions, the parties have filed extensive memoranda and supporting exhibits. Having carefully reviewed the submissions before it, the Court agrees with the parties that there is no genuine issue as to any material fact regarding these counts, and given the disposition of the motions as to Counts I and V, the Court, as it must, draws all reasonable inferences in favor of the plaintiffs.

*A. The Parties:*

Metropolitan Life Insurance Co. ("MetLife"), incorporated in New York, is a life insurance company that provides pension benefits for 42 million individuals. According to its most recent annual report, MetLife's assets exceed $88 billion and its debt securities holdings exceed $49 billion. Bradley Aff. ¶ 11. MetLife is a mutual company and therefore has no stockholders and is instead operated for the benefit of its policyholders. Am.Comp. ¶ 5. MetLife alleges that it owns $340,542,000 in principal amount of six separate RJR Nabisco debt issues, bonds allegedly purchased between July 1975 and July 1988. Some bonds become due as early as this year; others will not become due until 2017. The bonds bear interest rates of anywhere from 8 to 10.25 percent. MetLife also owned 186,000 shares of RJR Nabisco common stock at the time this suit was filed. Am.Comp. ¶ 12.

Jefferson–Pilot Life Insurance Co. ("Jefferson–Pilot") is a North Carolina company that has more than $3 billion in total assets, $1.5 billion of which are invested in debt securities. Bradley Aff. ¶ 12. Jefferson–Pilot alleges that it owns $9.34 million in principal amount of three separate RJR Nabisco debt issues, allegedly purchased between June 1978 and June 1988. Those bonds, bearing interest rates of anywhere from 8.45 to 10.75 percent, become due in 1993 and 1998. Am.Comp. ¶ 13.

**\*1509**  RJR Nabisco, a Delaware corporation, is a consumer products holding company that owns some of the country's best known product lines, including LifeSavers candy, Oreo cookies, and Winston cigarettes. The company was formed in 1985, when R.J. Reynolds Industries, Inc. ("R.J. Reynolds") merged with Nabisco Brands, Inc. ("Nabisco Brands"). In 1979, and thus before the R.J. Reynolds–Nabisco Brands merger, R.J. Reynolds acquired the Del Monte Corporation ("Del Monte"), which distributes canned fruits and vegetables. From January 1987 until February 1989, co-defendant Johnson served as the company's CEO. KKR, a private investment firm, organizes funds through which investors provide pools of equity to finance LBOs. Bradley Aff. ¶¶ 12–15.

*B. The Indentures:*

The bonds[9] implicated by this suit are governed by long, detailed indentures, which in turn are governed by New York contract law.[10] No one disputes that the holders of

public bond issues, like plaintiffs here, often enter the market after the indentures have been negotiated and memorialized. Thus, those indentures are often not the product of face-to-face negotiations between the ultimate holders and the issuing company. What remains equally true, however, is that underwriters ordinarily negotiate the terms of the indentures with the issuers. Since the underwriters must then sell or place the bonds, they necessarily negotiate in part with the interests of the buyers in mind. Moreover, these indentures were not secret agreements foisted upon unwitting participants in the bond market. No successive holder is required to accept or to continue to hold the bonds, governed by their accompanying indentures; indeed, plaintiffs readily admit that they could have sold their bonds right up until the announcement of the LBO. Tr. at 15. Instead, sophisticated investors like plaintiffs are well aware of the indenture terms and, presumably, review them carefully before lending hundreds of millions of dollars to any company.

9    For the purposes of this Opinion, the terms "bonds," "debentures," and "notes" will be used interchangeably. Any distinctions among these terms are not relevant to the present motions.

10    Both sides agree that New York law controls this Court's interpretation of the indentures, which contain explicit designations to that effect. *See, e.g.,* P.Mem. at 26; D. Mem at 15 n. 23. The indentures themselves provide that they "shall be deemed to be a contract under the laws of the State of New York, and for all purposes shall be construed in accordance with the laws of said State, except as may otherwise be required by mandatory provisions of law." Bradley Aff., Exh. L, § 12.8.

Indeed, the prospectuses for the indentures contain a statement relevant to this action:

> The Indenture contains no restrictions on the creation of unsecured short-term debt by [RJR Nabisco] or its subsidiaries, no restriction on the creation of unsecured Funded Debt by [RJR Nabisco] or its subsidiaries which are not Restricted Subsidiaries, and no restriction on the payment of dividends by [RJR Nabisco].

Bradley Resp.Aff., Exh. L at 24.[11] Further, as plaintiffs themselves note, the contracts at issue "[do] not impose debt limits, since debt is assumed to be used for productive purposes." P. Reply at 34.

11    While nine securities are at issue in this suit, the parties agree—and the Court's review confirms—that the separate indentures mirror one another in all important

respects, with one exception that is discussed herein. Indeed, plaintiffs have submitted a helpful Addendum in which they outline what they term "[t]ypical RJR Nabisco [i]ndenture [t]erms." *See* P. Reply, Addendum. Thus, the prospectus statement quoted above has its counterpart in each of the other prospectuses. *See* Bradley Aff. ¶ 9.

1. The relevant Articles:

A typical RJR Nabisco indenture contains thirteen Articles. At least four of them are relevant to the present motions and thus merit a brief review.[12]

12    For the following discussion, *see generally,* Indenture dated as of October 15, 1982, between R.J. Reynolds Industries, Inc., Issuer, and Bankers Trust Company, Trustee, included as Bradley Aff.Exh. L, and Plaintiffs' Exh. 1.

Article Three delineates the covenants of the issuer. Most important, it first provides for payment of principal and interest. It then addresses various mechanical provisions regarding such matters as payment **\*1510** terms and trustee vacancies. The Article also contains "negative pledge" and related provisions, which restrict mortgages or other liens on the assets of RJR Nabisco or its subsidiaries and seek to protect the bondholders from being subordinated to other debt.

Article Five describes various procedures to remedy defaults and the responsibilities of the Trustee. This Article includes the distinction in the indentures noted above, *see supra* n. 11. In seven of the nine securities at issue, a provision in Article Five prohibits bondholders from suing for any remedy based on rights in the indentures unless 25 percent of the holders have requested in writing that the indenture trustee seek such relief, and, after 60 days, the trustee has not sued. *See, e.g.,* Bradley Aff.Exh. L, §§ 5.6, 5.7. Defendants argue that this provision precludes plaintiffs from suing on these seven securities. *See* D.Mem. at 22–25. Given its holdings today, *see infra,* the Court need not address this issue.

Article Nine governs the adoption of supplemental indentures. It provides, *inter alia,* that the Issuer and the Trustee can

> add to the covenants of the Issuer such further covenants, restrictions, conditions or provisions as its Board of Directors by Board Resolution and the Trustee shall consider to be for the protection of the holders of Securities,

3604

and to make the occurrence, or the occurrence and continuance, of a default in any such additional covenants, restrictions, conditions or provisions an Event of Default permitting the enforcement of all or any of the several remedies provided in this Indenture as herein set forth ... Bradley Aff.Exh. L, § 9.1(c).

Article Ten addresses a potential "Consolidation, Merger, Sale or Conveyance," and explicitly sets forth the conditions under which the company can consolidate or merge into or with any other corporation. It provides explicitly that RJR Nabisco "may consolidate with, or sell or convey, all or substantially all of its assets to, or merge into or with any other corporation," so long as the new entity is a United States corporation, and so long as it assumes RJR Nabisco's debt. The Article also requires that any such transaction not result in the company's default under any indenture provision.[13]

[13]    The remaining Articles are not relevant to the motions currently before the Court. Article One contains definitions; Article Two contains mechanical terms regarding, for instance, the issuance and transfer of the securities; Article Four concerns such mechanical matters as securityholders' lists and annual reports; Article Six addresses the rights and responsibilities of the Trustee; Article Seven contains mechanical provisions concerning the securityholders; Article Eight concerns procedural matters such as securityholders' meetings and consents; Article Eleven deals with the satisfaction and discharge of the indenture; Article Twelve sets forth various miscellaneous provisions; and Article Thirteen includes provisions regarding the redemption of securities and sinking funds. *See, e.g.,* Bradley Aff.Exh. L.

2. The elimination of restrictive covenants:

In its Amended Complaint, MetLife lists the six debt issues on which it bases its claims. Indentures for two of those issues —the 10.25 percent Notes due in 1990, of which MetLife continues to hold $10 million, and the 8.9 percent Debentures due in 1996, of which MetLife continues to hold $50 million —once contained express covenants that, among other things, restricted the company's ability to incur precisely the sort of debt involved in the recent LBO. In order to eliminate those restrictions, the parties to this action renegotiated the terms of those indentures, first in 1983 and then again in 1985.

MetLife acquired $50 million principal amount of 10.25 percent Notes from Del Monte in July of 1975. To cover the $50 million, MetLife and Del Monte entered into a loan

agreement. That agreement restricted Del Monte's ability, among other things, to incur the sort of indebtedness involved in the RJR Nabisco LBO. *See* promissory note §§ 2.6– 2.15, attached as Exhibit A to Bradley Aff.Exh. E. In 1979, R.J. Reynolds—the corporate predecessor to RJR Nabisco—purchased Del Monte and **\*1511** assumed its indebtedness. Then, in December of 1983, R.J. Reynolds requested MetLife to agree to deletions of those restrictive covenants in exchange for various guarantees from R.J. Reynolds. *See* Bradley Aff. ¶ 17. A few months later, MetLife and R.J. Reynolds entered into a guarantee and amendment agreement reflecting those terms. *See* Bradley Aff. ¶ 17, Exh. G. Pursuant to that agreement, and in the words of Robert E. Chappell, Jr., MetLife's Executive Vice President, MetLife thus "gave up the restrictive covenants applicable to the Del Monte debt ... in return for [the parent company's] guarantee and public covenants." Chappell Dep. at 196.

MetLife acquired the 8.9 percent Debentures from R.J. Reynolds in October of 1976 in a private placement. A promissory note evidenced MetLife's $100 million loan. That note, like the Del Monte agreement, contained covenants that restricted R.J. Reynolds' ability to incur new debt. *See* Bradley Aff., Exh. H, §§ 2.5–2.9. In June of 1985, R.J. Reynolds announced its plans to acquire Nabisco Brands in a $3.6 billion transaction that involved the incurrence of a significant amount of new debt. R.J. Reynolds requested MetLife to waive compliance with these restrictive covenants in light of the Nabisco acquisition. *See* D.Mem. at 45; Bradley Aff. ¶ 18.

In exchange for certain benefits, MetLife agreed to exchange its 8.9 percent debentures—which *did* contain explicit debt limitations—for debentures issued under a public indenture —which contain no explicit limits on new debt. An internal MetLife memorandum explained the parties' understanding:

[MetLife's $100 million financing of the Nabisco Brands purchase] had its origins in discussions with RJR regarding potential covenant violations in the 8.90% Notes. More specifically, *in its acquisition of Nabisco Brands, RJR was slated to incur significant new long-term debt, which would have caused a violation in the funded indebtedness incurrence tests in the 8.90% Notes.* In the discussions regarding [MetLife's] willingness to consent to the additional indebtedness, *it was determined that a mutually beneficial approach to the problem* was to 1) agree on a new financing having a rate and a maturity desirable for [MetLife] and 2) modify the 8.90% Notes. The former was accomplished with agreement on the proposed financing, while the latter was accomplished by

[MetLife] agreeing to substitute RJR's public indenture covenants for the covenants in the 8.90% Notes. In addition to the covenant substitution, RJR has agreed to "debenturize" the 8.90% Notes upon [MetLife's] request. This will permit [MetLife] to sell the 8.90% Notes to the public.

MetLife Southern Office Memorandum, dated July 11, 1985, attached as Bradley Aff.Exh. J, at 2 (emphasis added).

3. The recognition and effect of the LBO trend:

Other internal MetLife documents help frame the background to this action, for they accurately describe the changing securities markets and the responses those changes engendered from sophisticated market participants, such as MetLife and Jefferson–Pilot. At least as early as 1982, MetLife recognized an LBO's effect on bond values.[14] In the spring of that year, MetLife participated in the financing of an LBO of a company called Reeves Brothers ("Reeves"). At the time of that LBO, MetLife also held bonds in that company. Subsequent to the LBO, as a MetLife memorandum explained, the "Debentures of Reeves were downgraded by Standard & Poor's from BBB to B and by Moody's from Baal to Ba3, thereby lowering the value of the Notes and Debentures held by **\*1512** [MetLife]." MetLife Memorandum, dated August 20, 1982, attached as Bradley Reply Aff. Exh D, at 1.

[14]    MetLife itself began investing in LBOs as early as 1980. *See* MetLife Special Projects Memorandum, dated June 17, 1989, attached as Bradley Aff.Exh. V, at 1 ("[MetLife's] history of investing in leveraged buyout transactions dates back to 1980; and through 1984, [MetLife] reviewed a large number of LBO investment opportunities presented to us by various investment banking firms and LBO specialists. Over this five-year period, [MetLife] invested, on a direct basis, approximately $430 million to purchase debt and equity securities in 10 such transactions ...").

MetLife further recognized its "inability to force any type of payout of the [Reeves'] Notes or the Debentures as a result of the buy-out [which] was somewhat disturbing at the time we considered a participation in the new financing. However," the memorandum continued,

our concern was tempered since, as a stockholder in [the holding company used to facilitate the transaction], we would benefit from the increased net income attributable to the continued presence of the low coupon indebtedness. The recent downgrading of the Reeves Debentures and

the consequent "loss" in value has again raised questions regarding our ability to have forced a payout. *Questions have also been raised about our ability to force payouts in similar future situations, particularly when we would not be participating in the buy-out financing.*

*Id.* (emphasis added). In the memorandum, MetLife sought to answer those very "questions" about how it might force payouts in "similar future situations."

*A method of closing this apparent "loophole," thereby forcing a payout of [MetLife's] holdings, would be through a covenant dealing with a change in ownership.* Such a covenant is fairly standard in financings with privately-held companies ... It provides the lender with an option to end a particular borrowing relationship via some type of special redemption ...

*Id.,* at 2 (emphasis added).

A more comprehensive memorandum, prepared in late 1985, evaluated and explained several aspects of the corporate world's increasing use of mergers, takeovers and other debt-financed transactions. That memorandum first reviewed the available protection for lenders such as MetLife:

Covenants are incorporated into loan documents to ensure that after a lender makes a loan, the creditworthiness of the borrower and the lender's ability to reach the borrower's assets do not deteriorate substantially. *Restrictions on the incurrence of debt,* sale of assets, mergers, dividends, restricted payments and loans and advances to affiliates *are some of the traditional negative covenants that can help protect lenders in the event their obligors become involved in undesirable merger/takeover situations.*

MetLife Northeastern Office Memorandum, dated November 27, 1985, attached as Bradley Aff.Exh. U, at 1–2 (emphasis added). The memorandum then surveyed market realities:

Because almost any industrial company is apt to engineer a takeover or be taken over itself, *Business Week* says that investors are beginning to view debt securities of high grade industrial corporations as Wall Street's riskiest investments. In addition, *because public bondholders do not enjoy the protection of any restrictive covenants,* owners of high grade corporates face substantial losses from takeover situations, if not immediately, then when the bond market finally adjusts.... [T]here have been 10–15 merger/takeover/LBO situations where, *due to the lack of covenant protection, [MetLife] has had no choice but to remain a lender to a less creditworthy obligor....* The fact that the quality of our investment portfolio

is greater than the other large insurance companies ... may indicate that we have negotiated better covenant protection than other institutions, thus generally being able to require prepayment when situations become too risky ... [However,] a problem exists. And *because the current merger craze is not likely to decelerate* and because there exist vehicles to circumvent traditional covenants, the problem will probably continue. Therefore, *perhaps it is time to institute appropriate language designed to protect Metropolitan from the negative implications of mergers and takeovers.*

*Id.* at 2–4 (emphasis added).[15]

[15] During discovery, MetLife produced from its files an article that appeared in *The New York Times* on January 7, 1986. The article, like the memoranda discussed above, reviewed the position of bondholders like MetLife and Jefferson–Pilot:

"Debt-financed acquisitions, as well as those defensive actions to thwart takeovers, have generally resulted in lower bond ratings ... Of course, a major problem for debtholders is that, compared with shareholders, they have relatively little power over management decisions. *Their rights are essentially confined to the covenants restricting, say, the level of debt a company can accrue.*" Bradley Reply Aff.Exh. H (emphasis added).

Indeed, MetLife does not dispute that, as a member of a bondholders' association, it **\*1513** received and discussed a proposed model indenture, which included a "comprehensive covenant" entitled "Limitations on Shareholders' Payments."[16] As becomes clear from reading the proposed—but never adopted—provision, it was "intend[ed] to provide protection against all of the types of situations in which shareholders profit at the expense of bondholders." *Id.* The provision dictated that the "[c]orporation will not, and will not permit any [s]ubsidiary to, directly or indirectly, make any [s]hareholder [p]ayment unless ... (1) the aggregate amount of all [s]hareholder payments during the period [at issue] ... shall not exceed [figure left blank]." Bradley Resp.Aff.Exh. H, at 9. The term "shareholder payments" is defined to include "restructuring distributions, stock repurchases, debt incurred or guaranteed to finance merger payments to shareholders, etc." *Id.* at i.

[16] *See* Bradley Resp.Aff.Exh. F. That exhibit is an August 5, 1988 letter from the New York law firm of Kaye, Scholer, Fierman, Hays & Handler. A partner at that firm sent the letter to "Indenture Group Members," including MetLife, who participated in the Institutional

Bondholders' Rights Association ("the IBRA"). The "Limitations on Shareholders' Payments" provision appears in a draft IBRA model indenture. *See* Bradley Resp.Aff. ¶¶ 3, 7.

Apparently, that provision—or provisions with similar intentions—never went beyond the discussion stage at MetLife. That fact is easily understood; indeed, MetLife's own documents articulate several reasonable, undisputed explanations:

While it would be possible to broaden the change in ownership covenant to cover any acquisition-oriented transaction, *we might well encounter significant resistance in implementation with larger public companies* ... With respect to implementation, we would be faced with the task of imposing a non-standard limitation on potential borrowers, *which could be a difficult task in today's highly competitive marketplace. Competitive pressures notwithstanding, it would seem that management of larger public companies would be particularly opposed to such a covenant since its effect would be to increase the cost of an acquisition* (due to an assumed debt repayment), a factor that could well lower the price of any tender offer (thereby impacting shareholders).

Bradley Reply Aff.Exh. D, at 3 (emphasis added). The November 1985 memorandum explained that

[o]bviously, our ability to implement methods of takeover protection will vary between the public and private market. In that public securities do not contain any meaningful covenants, it would be very difficult for [MetLife] to demand takeover protection in public bonds. Such a requirement would effectively take us out of the public industrial market. A recent *Business Week* article does suggest, however, that there is increasing talk among lending institutions about requiring blue chip companies to compensate them for the growing risk of downgradings. *This talk, regarding such protection as restrictions on future debt financings, is met with skepticism by the investment banking community which feels that CFO's are not about to give up the option of adding debt and do not really care if their companies' credit ratings drop a notch or two.*

Bradley Resp.Aff.Exh. A, at 8 (emphasis added).

The Court quotes these documents at such length not because they represent an "admission" or "waiver" from MetLife, or an "assumption of risk" in any tort sense, or its "consent" to any particular course of conduct—all terms discussed at even greater length in the parties' submissions. *See,* **\*1514**

3607

*e.g.,* P. Opp. at 31–36; P. Reply at 16–17; D. Reply at 15–16. Rather, the documents set forth the background to the present action, and highlight the risks inherent in the market itself, for any investor. Investors as sophisticated as MetLife and Jefferson–Pilot would be hard-pressed to plead ignorance of these market risks. Indeed, MetLife has not disputed the facts asserted in its own internal documents. Nor has Jefferson–Pilot—presumably an institution no less sophisticated than MetLife—offered any reason to believe that its understanding of the securities market differed in any material respect from the description and analysis set forth in the MetLife documents. Those documents, after all, were not born in a vacuum. They are descriptions of, and responses to, the market in which investors like MetLife and Jefferson–Pilot knowingly participated.

These documents must be read in conjunction with plaintiffs' Amended Complaint. That document asserts that the LBO "undermines the foundation of the investment grade debt market ...," Am.Comp. ¶ 16; that, although "the indentures do not purport to limit dividends or debt ... [s]uch covenants were believed unnecessary with blue chip companies ...", Am.Comp. ¶ 17[17]; that "the transaction contradicts the premise of the investment grade market ...", Am.Comp. ¶ 33; and, finally, that "[t]his buy-out was not contemplated at the time the debt was issued, contradicts the premise of the investment grade ratings that RJR Nabisco actively solicited and received, and is inconsistent with the understandings of the market ... which [p]laintiffs relied upon." Am.Comp. ¶ 51.

[17]     Due to a typographical error, the Amended Complaint contains two paragraphs numbered "17." The passage above refers to the first such paragraph.

Solely for the purposes of these motions, the Court accepts various factual assertions advanced by plaintiffs: first, that RJR Nabisco actively solicited "investment grade" ratings for its debt; second, that it relied on descriptions of its strong capital structure and earnings record which included prominent display of its ability to pay the interest obligations on its long-term debt several times over, Am.Comp. ¶ 14; and third, that the company made express or implied representations not contained in the relevant indentures concerning its future creditworthiness. *Id.* ¶ 15. In support of those allegations, plaintiffs have marshaled a number of speeches made by co-defendant Johnson and other executives of RJR Nabisco.[18] In addition, plaintiffs rely on an affidavit sworn to by John Dowdle, the former Treasurer and then Senior Vice President of RJR Nabisco from 1970 until 1987.

In his opinion, the LBO "clearly undermines the fundamental premise of the [c]ompany's bargain with the bondholders, and the commitment that I believe the [c]ompany made to the bondholders ... I firmly believe that the company made commitments ... that require it to redeem [these bonds and notes] before paying out the value to the shareholders." Dowdle Aff. ¶¶ 4, 7.

[18]     *See, e.g.,* Address by F. Ross Johnson, November 12, 1987, P.Exh. 8, at 5 ("Our strong balance sheet is a cornerstone of our strategies. It gives us the resources to modernize facilities, develop new technologies, bring on new products, and support our leading brands around the world."); Remarks of Edward J. Robinson, Executive Vice President and Chief Financial Officer, February 15, 1988, P.Exh. 6, at 1 ("RJR Nabisco's financial strategy is ... to enhance the strength of the balance sheet by reducing the level of debt as well as lowering the cost of existing debt."); Remarks by Dr. Robert J. Carbonell, Vice Chairman of RJR Nabisco, June 3, 1987, P.Exh. 10, at 5 ("We will not sacrifice our longer-term health for the sake of short term heroics.").

## III. DISCUSSION

**[1]**     At the outset, the Court notes that nothing in its evaluation is substantively altered by the speeches given or remarks made by RJR Nabisco executives, or the opinions of various individuals—what, for instance, former RJR Nabisco Treasurer Dowdle personally did or did not "firmly believe" the indentures meant. *See supra,* and *generally* Chappell, Dowdle and Howard Affidavits. The parol evidence rule bars plaintiffs from arguing that the speeches made by company executives **\*1515** prove defendants agreed or acquiesced to a term that does not appear in the indentures. *See West, Weir & Bartel, Inc. v. Mary Carter Paint Co.,* 25 N.Y.2d 535, 540, 307 N.Y.S.2d 449, 452, 255 N.E.2d 709, 712 (1969) ("The rule in this State is well settled that the construction of a plain and unambiguous contract is for the Court to pass on, and that circumstances extrinsic to the agreement will not be considered when the intention of the parties can be gathered from the instrument itself.") In interpreting these contracts, this Court must be concerned with what the parties intended, but only to the extent that what they intended is evidenced by what is written in the indentures. *See, e.g., Rodolitz v. Neptune Paper Products, Inc.,* 22 N.Y.2d 383, 386–7, 292 N.Y.S.2d 878, 881, 239 N.E.2d 628, 630 (1968); *Raleigh Associates v. Henry,* 302 N.Y. 467, 473, 99 N.E.2d 289 (1951).

**[2]** The indentures at issue clearly address the eventuality of a merger. They impose certain related restrictions not at issue in this suit, but no restriction that would prevent the recent RJR Nabisco merger transaction. *See supra* at 1510 (discussion of Article 10). The indentures also explicitly set forth provisions for the adoption of new covenants, if such a course is deemed appropriate. *See supra* at 1510 (discussion of Article 9). While it may be true that no explicit provision either permits or prohibits an LBO, such contractual silence itself cannot create ambiguity to avoid the dictates of the parole evidence rule, particularly where the indentures impose no debt limitations.

Under certain circumstances, however, courts will, as plaintiffs note, consider extrinsic evidence to evaluate the scope of an implied covenant of good faith. *See Valley National Bank v. Babylon Chrysler–Plymouth, Inc.,* 53 Misc.2d 1029, 1031–32, 280 N.Y.S.2d 786, 788–89 (Sup.Ct. Nassau), *aff'd,* 28 A.D.2d 1092, 284 N.Y.S.2d 849 (2d Dep't 1967) (Relying on custom and usage because "[w]hen a contract fails to establish the time for performance, the law implies that the act shall be done within a reasonable time ...").[19] However, the Second Circuit has established a different rule for customary, or boilerplate, provisions of detailed indentures used and relied upon throughout the securities market, such as those at issue. Thus, in *Sharon Steel Corporation v. Chase Manhattan Bank, N.A.,* 691 F.2d 1039 (2d Cir.1982), Judge Winter concluded that

[19] In support of this proposition, plaintiffs also rely on *Reback v. Story Productions, Inc.,* 15 Misc.2d 681, 181 N.Y.S.2d 980, *modified and aff'd,* 9 A.D.2d 880, 193 N.Y.S.2d 520 (1st Dep't 1959). The court in that case, however, was presented with an ambiguous written agreement. *See* 181 N.Y.S.2d at 983. Plaintiffs similarly rely on *Van Gemert v. Boeing Co.,* 520 F.2d 1373 (2d Cir.), *cert. denied,* 423 U.S. 947, 96 S.Ct. 364, 46 L.Ed.2d 282 (1975) ("*Van Gemert I* "). In that case, however, the right asserted was addressed by an express provision which provided a framework for determining the scope and effect of the implied covenant. *See infra.*

[b]oilerplate provisions are ... not the consequences of the relationship of particular borrowers and lenders and do not depend upon particularized intentions of the parties to an indenture. There are no adjudicative facts relating to the parties to the litigation for a jury to find and the meaning of boilerplate provisions is, therefore, a matter of law rather than fact. Moreover, uniformity in interpretation is important to the efficiency of capital markets ... Whereas participants in the capital market can adjust their affairs according to a uniform interpretation, whether it be correct or not as an initial proposition, the creation of enduring uncertainties as to the meaning of boilerplate provisions would decrease the value of all debenture issues and greatly impair the efficient working of capital markets ... Just such uncertainties would be created if interpretation of boilerplate provisions were submitted to juries sitting in every judicial district in the nation.

*Id.* at 1048. *See also Morgan Stanley & Co. v. Archer Daniels Midland Co.,* 570 F.Supp. 1529, 1535–36 (S.D.N.Y.1983) (Sand, J.) ("[Plaintiff concedes that the legality of [the transaction at issue] would depend on a factual inquiry ... This case-by-case approach is problematic ... [Plaintiff's **\*1516** theory] appears keyed to the subjective expectations of the bondholders ... and reads a subjective element into what presumably should be an objective determination based on the language appearing in the bond agreement."); *Purcell v. Flying Tiger Line, Inc.,* No. 84–7102, at 5, 8 (S.D.N.Y. Jan. 12, 1984) (CES) ("The Indenture does not contain any such limitation [as the one proposed by plaintiff].... In light of our holding that the Indenture unambiguously permits the transaction at issue in this case, we are precluded from considering any of the extrinsic evidence that plaintiff offers on this motion ... It would be improper to consider evidence as to the subjective intent, collateral representations, and either the statements or the conduct of the parties in performing the contract.") (citations omitted). Ignoring these principles, plaintiffs would have this Court vary what they themselves have admitted is "indenture boilerplate," P. Reply at 2, of "standard" agreements, P. Mem. at 14, to comport with collateral representations and their subjective understandings.[20]

[20] To a certain extent, this discussion is academic. Even if the Court did consider the extrinsic evidence offered by plaintiffs, its ultimate decision would be no different. Based on that extrinsic evidence, plaintiffs attempt to establish that an implied covenant of good faith is necessary to protect the benefits of their agreements. That inquiry necessarily asks the Court to determine whether the existing contractual terms should be construed to preclude defendants from engaging in an LBO along the lines of the recently completed transaction. However, even evaluating *all* facts—such as the public statements made by company executives—in the light most favorable to plaintiffs, these plaintiffs fail as a matter of law to establish that the purported "fundamental basis" of their bargain with defendants created a contractual

3609

obligation on the part of the defendants not to engage in an LBO. It is first worth noting that plaintiffs have quoted selectively from certain speeches and remarks made by RJR Nabisco executives; in some respects, those public statements are more equivocal than plaintiffs would have this Court believe. *See, e.g.,* P.Exh. 3 at 25 ("[W]e believe our strong balance sheet and our debt capacity ... provide us with the flexibility to pursue any conceivable strategy or financial option we choose.") More important, those representations are improperly raised under the rubric of an implied covenant of good faith when they cannot properly or reasonably be construed as evidencing a binding agreement or acquiescence by defendants to substantive restrictive covenants. Moreover, nothing like the mutual understanding plaintiffs now advance has been shown; in fact, as far as these parties are concerned, quite the opposite is true. *See infra* at 39–40. Thus, as a matter of law, and accepting all extrinsic evidence offered, the "implied covenant of good faith" does not serve these plaintiffs in the way they represent. As explained more fully below, by relying on extrinsic evidence and the familiar implied covenant of good faith, plaintiffs do not seek to protect an existing contractual right; they seek to create a new one, and thus to obtain a better bargain than originally agreed upon. Therefore, even if the parole evidence rule did not block plaintiffs' path, their course would not be followed.

The parole evidence rule of course does not bar descriptions of either the background of this suit or market realities consistent with the contracts at issue.

### A. Plaintiffs' Case Against the RJR Nabisco LBO:

#### 1. Count One: The implied covenant:

In their first count, plaintiffs assert that

[d]efendant RJR Nabisco owes a continuing duty of good faith and fair dealing in connection with the contract [i.e., the indentures] through which it borrowed money from MetLife, Jefferson–Pilot and other holders of its debt, including a duty not to frustrate the purpose of the contracts to the debtholders or to deprive the debtholders of the intended object of the contracts—purchase of investment-grade securities.

In the "buy-out," the [c]ompany breaches the duty [or implied covenant] of good faith and fair dealing by, *inter alia,* destroying the investment grade quality of the debt and transferring that value to the "buy-out" proponents and to the shareholders.

Am.Comp. ¶¶ 34, 35. In effect, plaintiffs contend that express covenants were not necessary because an *implied* covenant would prevent what defendants have now done.

**[3]** A plaintiff always can allege a violation of an express covenant. If there has been such a violation, of course, the court need not reach the question of whether or not an *implied* covenant has been violated. **\*1517** That inquiry surfaces where, while the express terms may not have been technically breached, one party has nonetheless effectively deprived the other of those express, explicitly bargained-for benefits. In such a case, a court will read an implied covenant of good faith and fair dealing into a contract to ensure that neither party deprives the other of "the fruits of the agreement." *See, e.g., Greenwich Village Assoc. v. Salle,* 110 A.D.2d 111, 115, 493 N.Y.S.2d 461, 464 (1st Dep't 1985). *See also Van Gemert v. Boeing Co.,* 553 F.2d 812, 815 ("*Van Gemert II* ") (2d. Cir.1977) Such a covenant is implied only where the implied term "is consistent with other mutually agreed upon terms in the contract." *Sabetay v. Sterling Drug, Inc.,* 69 N.Y.2d 329, 335, 514 N.Y.S.2d 209, 212, 506 N.E.2d 919, 922 (1987). In other words, the implied covenant will only aid and further the explicit terms of the agreement and will never impose an obligation " 'which would be inconsistent with other terms of the contractual relationship.' " *Id.* (citation omitted). Viewed another way, the implied covenant of good faith is breached only when one party seeks to prevent the contract's performance or to withhold its benefits. *See Collard v. Incorporated Village of Flower Hill,* 75 A.D.2d 631, 632, 427 N.Y.S.2d 301, 302 (2d Dep't 1980). As a result, it thus ensures that parties to a contract perform the substantive, bargained-for terms of their agreement. *See, e.g., Wakefield v. Northern Telecom, Inc.,* 769 F.2d 109, 112 (2d Cir.1985) (Winter, J.)

In contracts like bond indentures, "an implied covenant ... derives its substance directly from the language of the Indenture, and 'cannot give the holders of Debentures any rights inconsistent with those set out in the Indenture.' *[Where] plaintiffs' contractual rights [have not been] violated, there can have been no breach of an implied covenant." Gardner & Florence Call Cowles Foundation v. Empire Inc.,* 589 F.Supp. 669, 673 (S.D.N.Y.1984), *vacated on procedural grounds,* 754 F.2d 478 (2d Cir.1985) (quoting *Broad v. Rockwell,* 642 F.2d 929, 957 (5th Cir.) (*en banc* ), *cert. denied,* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981)) (emphasis added).

Thus, in cases like *Van Gemert v. Boeing Co.,* 520 F.2d 1373 (2d Cir.), *cert. denied,* 423 U.S. 947, 96 S.Ct. 364, 46 L.Ed.2d 282 (1975) ("*Van Gemert I* "), and *Pittsburgh Terminal Corp. v. Baltimore & Ohio Ry. Co.,* 680 F.2d 933 (3d Cir.), *cert. denied,* 459 U.S. 1056, 103 S.Ct. 475, 74 L.Ed.2d 621 (1982)—both relied upon by plaintiffs—the courts used the implied covenant of good faith and fair dealing to ensure that the bondholders received the benefit of their bargain as determined from the face of the contracts at issue. In *Van Gemert I,* the plaintiff bondholders alleged inadequate notice to them of defendant's intention to redeem the debentures in question and hence an inability to exercise their conversion rights before the applicable deadline. The contract itself provided that notice would be given in the first place. *See, e.g., id.* at 1375 ("A number of provisions in the debenture, the Indenture Agreement, the prospectus, the registration statement ... and the Listing Agreement ... dealt with the possible redemption of the debentures ... and the notice debenture-holders were to receive ..."). Faced with those provisions, defendants in that case unsurprisingly admitted that the indentures specifically required the company to provide the bondholders with notice. *See id.* at 1379. While defendant there issued a press release that mentioned the possible redemption of outstanding convertible debentures, that limited release did not "mention even the tentative dates for redemption and expiration of the conversion rights of debenture holders." *Id.* at 1375. Moreover, defendant did not issue any general publicity or news release. Through an implied covenant, then, the court fleshed out the full extent of the more skeletal right that appeared in the contract itself, and thus protected plaintiff's bargained-for right of conversion.[21] As the court observed,

[21]    Since newspaper notice, for instance, was promised in the indenture, the court used an implied covenant to ensure that meaningful, reasonable newspaper notice was provided. *See id.* at 1383.

 **\*1518**  What one buys when purchasing a convertible debenture in addition to the debt obligation of the company ... is principally the expectation that the stock will increase sufficiently in value that the conversion right will make the debenture worth more than the debt ... *Any loss* occurring to him from failure to convert, as here, *is not from a risk inherent in his investment but rather from unsatisfactory notification procedures.*

*Id.* at 1385 (emphasis added, citations omitted).[22] I also note, in passing, that *Van Gemert I* presented the Second Circuit with "less sophisticated investors." *Id.* at

1383. Similarly, the court in *Pittsburgh Terminal* applied an implied covenant to the indentures at issue because defendants there "took steps to prevent the Bondholders from receiving information which they needed *in order to receive the fruits of their conversion option should they choose to exercise it.*" *Pittsburgh Terminal,* 680 F.2d at 941 (emphasis added).

[22]    *See also id.* at 1383 ("An issuer of [convertible] debentures has a duty to give adequate notice either on the face of the debentures, ... or in some other way, of the notice to be provided in the event the company decides to redeem the debentures. Absent such advice as to the specific notice agreed upon by the issuer and the trustee for the debenture holders, the debenture holders' reasonable expectations as to notice should be protected.").

The appropriate analysis, then, is first to examine the indentures to determine "the fruits of the agreement" between the parties, and then to decide whether those "fruits" have been spoiled—which is to say, whether plaintiffs' contractual rights have been violated by defendants.

The American Bar Foundation's *Commentaries on Indentures* ("the *Commentaries* "), relied upon and respected by both plaintiffs and defendants, describes the rights and risks generally found in bond indentures like those at issue:

The most obvious and important characteristic of long-term debt financing is that the holder ordinarily has not bargained for and does not expect any substantial gain in the value of the security to compensate for the risk of loss ... [T]he significant fact, *which accounts in part for the detailed protective provisions of the typical long-term debt financing instrument,* is that *the lender (the purchaser of the debt security) can expect only interest at the prescribed rate plus the eventual return of the principal.* Except for possible increases in the market value of the debt security because of changes in interest rates, the debt security will seldom be worth more than the lender paid for it ... It may, of course, become worth much less. Accordingly, the typical investor in a long-term debt security is primarily interested in every reasonable assurance that the principal and interest will be paid when due.... Short of bankruptcy, *the debt security holder can do nothing to protect himself against actions of the borrower which jeopardize its ability to pay the debt unless he ... establishes his rights through contractual provisions set forth in the debt agreement or indenture.*

*Id.* at 1–2 (1971) (emphasis added).

3611

**[4]**    A review of the parties' submissions and the indentures themselves satisfies the Court that the substantive "fruits" guaranteed by those contracts and relevant to the present motions include the periodic and regular payment of interest and the eventual repayment of principal. *See, e.g.,* Bradley Aff.Exh. L, § 3.1 ("The Issuer covenants ... that it will duly and punctually pay ... the principal of, and interest on, each of the Securities ... at the respective times and in the manner provided in such Securities ..."). According to a typical indenture, a default shall occur if the company either (1) fails to pay principal when due; (2) fails to make a timely sinking fund payment; (3) fails to pay within 30 days of the due date thereof any interest on the date; or (4) fails duly to observe or perform any of the express covenants or agreements set forth in the agreement. *See, e.g.,* Brad.Aff.Exh.L, § 5.1.[23] Plaintiffs'  **\*1519**  Amended Complaint nowhere alleges that RJR Nabisco has breached these contractual obligations; interest payments continue and there is no reason to believe that the principal will not be paid when due.[24]

[23]    Plaintiffs originally indicated that, depending on the Court's disposition of the instant motions, they might seek to amend their complaint to allege that "they are not equally and ratably secured under the [express terms of the] 'negative pledge' clause of the indentures." P. Reply at 12 n. 7. On May 26, 1989, shortly before this Opinion was filed, the Court granted defendants' request to assert a counterclaim for a declaratory judgment that those "negative pledge" covenants have not been violated by the post-LBO financial structure of RJR Nabisco. This counterclaim was advanced in response to notices of default by plaintiffs based on matters not raised in the Amended Complaint.

The Court of course will not now determine whether an alleged implied covenant flowing from a "negative pledge" provision has been breached. That inquiry necessarily must follow the Court's determination of whether or not the "negative pledge" provision has been expressly breached.

[24]    The Court here incorporates by reference its earlier discussion not only of plaintiffs' failure to demonstrate sufficiently a risk of irreparable harm on their motion for a preliminary injunction, but also defendants' proof concerning the financing of the LBO and the company's current equity base. *See supra* at 4–5. Consequently, the Court rejects plaintiffs' general assertion that the LBO "subjects existing debtholders to dramatically greater risk of non-payment, and the Company to a significant risk of insolvency." Am.Comp. ¶ 26. In brief, there is no implied covenant restricting any action that might subject

plaintiffs' investment to greater risk of non-payment. What plaintiffs have failed to allege is that an interest or principal payment due them has not been paid, or that any other explicit contractual right has not been honored.

**[5]**    It is not necessary to decide that indentures like those at issue could never support a finding of additional benefits, under different circumstances with different parties. Rather, for present purposes, it is sufficient to conclude what obligation is *not* covered, either explicitly or implicitly, by these contracts held by these plaintiffs. Accordingly, this Court holds that the "fruits" of these indentures do not include an implied restrictive covenant that would prevent the incurrence of new debt to facilitate the recent LBO. To hold otherwise would permit these plaintiffs to straightjacket the company in order to guarantee their investment. These plaintiffs do not invoke an implied covenant of good faith to protect a legitimate, mutually contemplated benefit of the indentures; rather, they seek to have this Court create an additional benefit for which they did not bargain.

Although the indentures generally permit mergers and the incurrence of new debt, there admittedly is not an explicit indenture provision to the contrary of what plaintiffs now claim the implied covenant requires. That absence, however, does *not* mean that the Court should imply into those very same indentures a covenant of good faith so broad that it imposes a new, substantive term of enormous scope. This is so particularly where, as here, that very term—a limitation on the incurrence of additional debt—has in other past contexts been expressly bargained for; particularly where the indentures grant the company broad discretion in the management of its affairs, as plaintiffs admit, P.Mem. at 35; particularly where the indentures explicitly set forth specific provisions for the adoption of new covenants and restrictions, *see, e.g.,* Bradley Aff.Exh.L, § 9.1(c); and *especially* where there has been no breach of the parties' bargained-for contractual rights on which the implied covenant necessarily is based. While the Court stands ready to employ an implied covenant of good faith to ensure that such bargained-for rights are performed and upheld, it will not, however, permit an implied covenant to shoehorn into an indenture additional terms plaintiffs now wish had been included. *See also Broad v. Rockwell International Corp.,* 642 F.2d 929 (5th Cir.) (*en banc* ) (applying New York law), *cert. denied,* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981) (finding no liability pursuant to an implied covenant where the terms of the indenture, as bargained for, were enforced).[25]

3612

25    The cases relied on by plaintiffs are not to the contrary. They invoke an implied covenant where it proves necessary to fulfill the explicit terms of an agreement, or to give meaning to ambiguous terms. *See, e.g., Grad v. Roberts,* 14 N.Y.2d 70, 248 N.Y.S.2d 633, 636, 198 N.E.2d 26, 28 (1964) (court relied on implied covenant to effect "performance of [an] option agreement according to its terms"); *Zilg v. Prentice–Hall, Inc.,* 717 F.2d 671 (2d Cir.1983), *cert. denied,* 466 U.S. 938, 104 S.Ct. 1911, 80 L.Ed.2d 460 (1984). In *Zilg,* the Second Circuit first described a contract which, on its face, established the publisher's obligation to publish, advertise and publicize the book at issue. The court then determined that "the contract in question establishes a relationship between the publisher and author which implies an obligation upon the former to make certain [good faith] efforts in publishing a book it has accepted notwithstanding the clause which leaves the number of volumes to be printed and the advertising budget to the publisher's discretion." 717 F.2d at 679. In other words, the court there sought to ensure a meaningful fulfillment of the contract's express terms. *See also Van Gemert I, supra; Pittsburgh Terminal, supra.* In the latter two cases, the courts sought to protect the bondholders' express, bargained-for rights.

 **\*1520**  Plaintiffs argue in the most general terms that the fundamental basis of all these indentures was that an LBO along the lines of the recent RJR Nabisco transaction would never be undertaken, that indeed *no* action would be taken, intentionally or not, that would significantly deplete the company's assets. Accepting plaintiffs' theory, their fundamental bargain with defendants dictated that nothing would be done to jeopardize the extremely high probability that the company would remain able to make interest payments and repay principal over the 20 to 30 year indenture term—and perhaps by logical extension even included the right to ask a court "to make sure that plaintiffs had made a good investment." *Gardner,* 589 F.Supp. at 674. But as Judge Knapp aptly concluded in *Gardner,* "Defendants ... were under a duty to carry out the terms of the contract, but not to make sure that plaintiffs had made a good investment. The former they have done; the latter we have no jurisdiction over." *Id.* Plaintiffs' submissions and MetLife's previous undisputed internal memoranda remind the Court that a "fundamental basis" or a "fruit of an agreement" is often in the eye of the beholder, whose vision may well change along with the market, and who may, with hindsight, imagine a different bargain than the one he actually and initially accepted with open eyes.

The sort of unbounded and one-sided elasticity urged by plaintiffs would interfere with and destabilize the market. And this Court, like the parties to these contracts, cannot ignore or disavow the marketplace in which the contract is performed. Nor can it ignore the expectations of that market—expectations, for instance, that the terms of an indenture will be upheld, and that a court will not, *sua sponte,* add new substantive terms to that indenture as it sees fit.[26] The Court has no reason to believe that the market, in evaluating bonds such as those at issue here, did not discount for the possibility that any company, even one the size of RJR Nabisco, might engage in an LBO heavily financed by debt. That the bonds did not lose any of their value until the October 20, 1988 announcement of a possible RJR Nabisco LBO only suggests that the market had theretofore evaluated the risks of such a transaction as slight.

26    *Cf. Broad v. Rockwell,* 642 F.2d at 943 ("Not least among the parties 'who must comply with or refer to the indenture' are the members of the investing public and their investment advisors. A large degree of uniformity in the language of debenture indentures is essential to the effective functioning of the financial markets: uniformity of the indentures that govern competing debenture issues is what makes it possible meaningfully to compare one debenture issue with another, focusing only on the business provisions of the issue ...") (citation omitted); *Sharon Steel Corporation v. Chase Manhattan Bank, N.A.,* 691 F.2d. 1039, 1048 (2d Cir.1982) (Winter, J.) ("[U]niformity in interpretation is important to the efficiency of capital markets ... [T]he creation of enduring uncertainties as to the meaning of boilerplate provisions would decrease the value of all debenture issues and greatly impair the efficient working of capital markets.").

The Court recognizes that the market is not a static entity, but instead involves what plaintiffs call "evolving understanding[s]." P.Opp. at 21. Just as the growing prevalence of LBO's has helped change certain ground rules and expectations in the field of mergers and acquisitions, so too it has obviously affected the bond market, a fact no one disputes. *See, e.g.,* Chappell Dep. at 136 ("I think we would have been extremely naive not to understand what was happening in the marketplace."). To support their argument that defendants have violated an implied  **\*1521**  covenant, plaintiffs contend that, since the October 20, 1988 announcement, the bond market has "stopped functioning." Tr. at 9. They argue that if they had "sold and abandoned the market [before October 20, 1988], the market, if everyone had the same attitude, would have

disappeared." Tr. at 15. What plaintiffs term "stopped functioning" or "disappeared," however, are properly seen as natural responses and adjustments to market realities. Plaintiffs of course do not contend that no new issues are being sold, or that existing issues are no longer being traded or have become worthless.

To respond to changed market forces, new indenture provisions can be negotiated, such as provisions that were in fact once included in the 8.9 percent and 10.25 percent debentures implicated by this action. New provisions could include special debt restrictions or change-of-control covenants. There is no guarantee, of course, that companies like RJR Nabisco would accept such new covenants; parties retain the freedom to enter into contracts as they choose. But presumably, multi-billion dollar investors like plaintiffs have some say in the terms of the investments they make and continue to hold. And, presumably, companies like RJR Nabisco need the infusions of capital such investors are capable of providing.

Whatever else may be true about this case, it certainly does not present an example of the classic sort of form contract or contract of adhesion often frowned upon by courts. In those cases, what motivates a court is the strikingly inequitable nature of the parties' respective bargaining positions. *See generally,* Rakoff, *Contracts of Adhesion: An Essay in Reconstruction,* 96 Harv.L.Rev. 1173 (1982). Plaintiffs here entered this "liquid trading market," P.Mem. at 17, with their eyes open and were free to leave at any time. Instead they remained there notwithstanding its well understood risks.

Ultimately, plaintiffs cannot escape the inherent illogic of their argument. On the one hand, it is undisputed that investors like plaintiffs recognized that companies like RJR Nabisco strenuously opposed additional restrictive covenants that might limit the incurrence of new debt or the company's ability to engage in a merger.[27] Furthermore, plaintiffs argue that they had no choice other than to accept the indentures as written, without additional restrictive covenants, or to "abandon" the market. Tr. at 14–15.

[27]    *See, e.g.,* MetLife Memorandum, dated August 20, 1982, attached as Bradley Reply Aff.Exh. D, at 3; MetLife Memorandum, dated November 1985, attached as Bradley Resp.Aff.Exh. A, at 8.

Yet on the other hand, plaintiffs ask this Court to imply a covenant that would have just that restrictive effect because, they contend, it reflects precisely the fundamental assumption

of the market and the fundamental basis of their bargain with defendants. If that truly were the case here, it is difficult to imagine why an insistence on that term would have forced the plaintiffs to abandon the market. The Second Circuit has offered a better explanation: "[a] promise by the defendant should be implied only if the court may rightfully assume that the parties would have included it in their written agreement had their attention been called to it ... *Any such assumption in this case would be completely unwarranted.*" Neuman v. Pike, 591 F.2d 191, 195 (2d Cir.1979) (emphasis added, citations omitted).

In the final analysis, plaintiffs offer no objective or reasonable standard for a court to use in its effort to define the sort of actions their "implied covenant" would permit a corporation to take, and those it would not.[28] Plaintiffs say only that investors like themselves rely upon the "skill" and "good faith" of a company's board and management, *see, e.g.,* P.Mem. at 35, and that their covenant would prevent the company **\*1522** from "destroy [ing] ... the legitimate expectations of its long-term bondholders." *Id.* at 54. As is clear from the preceding discussion, however, plaintiffs have failed to convince the Court that by upholding the explicit, bargained-for terms of the indenture, RJR Nabisco has either exhibited bad faith or destroyed plaintiffs' *legitimate,* protected expectations.

[28]    Under plaintiffs' theory, bondholders might ask a court to prohibit a company like RJR Nabisco not only from engaging in an LBO, but also from entering a new line of business—with the attendant costs of building new physical plants and hiring new workers—or from acquiring new businesses such as RJR Nabisco did when it acquired Del Monte.

Plaintiffs argue that defendants have sought to blame plaintiffs themselves for whatever losses they may have incurred. Yet this Court need not address whether plaintiffs are at fault, or whether they assumed a risk in any tort sense, or whether they should never have agreed to exchange the specific debt provisions in at least two of the covenants at issue for alternative benefits and public covenants. Instead, it concludes that courts are properly reluctant to imply into an integrated agreement terms that have been and remain subject to specific, explicit provisions, where the parties are sophisticated investors, well versed in the market's assumptions, and do not stand in a fiduciary relationship with one another.

It is also not to say that defendants were free willfully or knowingly to misrepresent or omit material facts to sell their bonds. Relief on claims based on such allegations would of course be available to plaintiffs, if appropriate[29]—but those claims properly sound in fraud, and come with requisite elements. Plaintiffs also remain free to assert their claims based on the fraudulent conveyance laws, which similarly require specific proof.[30] Those burdens cannot be avoided by resorting to an overbroad, superficially appealing, but legally insufficient, implied covenant of good faith and fair dealing.

[29]    The Court, of course, today takes no position on this issue.

[30]    As noted elsewhere, plaintiffs can also allege violations of express terms of the indentures.

### 2. Count Five: In Equity:

Count Five substantially restates and realleges the contract claims advanced in Count I. *Compare, e.g.,* Am.Comp. ¶¶ 33, 35 ("The transaction contradicts the premise of the investment grade market and invalidates the blue chip rating that [RJR Nabisco] solicited and took the benefit from.... In the 'buy-out,' [RJR Nabisco] breaches the duty of good faith and fair dealing ...") *with* Am.Comp. ¶¶ 51–52 ("The 'buy-out' was not contemplated at the time the debt was issued, contradicts the premise of the investment grade ratings that RJR Nabisco actively solicited and received, and is inconsistent with the understandings of the market.... The 'buy-out' ... is contrary to the implied representations made by RJR Nabisco ... that it would act consistently with its obligations of good faith and fair dealing.") Along with these repetitions, plaintiffs blend in allegations that the transaction "frustrates the commercial purpose" of the parties, under "circumstances [that] are outrageous, and ... it would [therefore] be unconscionable to allow the 'buy-out' to proceed ..." *Id.* ¶¶ 52–53. Those very issues—frustration of purpose and unconscionability— are equally matters of contract law, of course, and plaintiffs could just as easily have advanced them in Count I. Indeed, to some extent plaintiffs did advance these claims in that Count. *See, e.g.,* Am.Comp. ¶ 34 ("RJR Nabisco owes a continuing duty ... not to frustrate the purpose of the contracts ..."). For present purposes, it makes no difference how plaintiffs characterize their arguments.[31] Their equity claims cannot survive  **\*1523**  defendants' motion for summary judgment.

[31]    For much the same reason, the Court rejects defendants' reliance on cases like *In re Kemp & Beatley, Inc.,* 64 N.Y.2d 63, 70, 484 N.Y.S.2d 799, 803, 473 N.E.2d

1173, 1177 (1984), for "the ancient principle that equity jurisdiction will not lie when there exists a remedy at law." *See, e.g.,* D.Mem. at 26. That case contemplated a classic equitable remedy—the dissolution of a corporation. And in that respect, it accurately set forth a rule of law; no court will, for instance, enter an injunction or order specific performance or dissolution if an adequate legal remedy remains available. The Court has already denied plaintiffs' request for an injunction. To the extent that Count V does in fact merely restate plaintiffs' prayer for injunctive relief—"it would be unconscionable to allow the 'buy-out' to proceed until defendants make restitution to the debtholders," Am.Comp. ¶ 53—it is of course inappropriate. As far as the Court can determine, however, and reading plaintiffs' "In Equity" Count as charitably as possible, the claims advanced by plaintiffs in Count V do not necessarily seek such an exclusive remedy. In general, remedies based on claims of unjust enrichment or frustration of purpose are certainly quantifiable and subject to money damages, and would thus support a legal remedy.

 **[6]      [7]**    In their papers, plaintiffs variously attempt to justify Count V as being based on unjust enrichment, frustration of purpose, an alleged breach of something approaching a fiduciary duty, or a general claim of unconscionability. Each claim fails. First, as even plaintiffs recognize, an unjust enrichment claim requires a court first to find that "the circumstances [are] such that in equity and good conscience the defendant should make restitution." *See, e.g., Chase Manhattan Bank v. Banque Intra, S.A.,* 274 F.Supp. 496, 499 (S.D.N.Y.1967); P.Mem. at 56. Plaintiffs have not alleged a violation of a single explicit term of the indentures at issue, and on the facts alleged this Court has determined that an implicit covenant of good faith and fair dealing has not been violated. Under these circumstances, this Court concludes that defendants need not, "in equity and good conscience," make restitution.

 **[8]**    Second, in support of their motions plaintiffs claim frustration of purpose. Yet even resolving all ambiguities and drawing all reasonable inferences in plaintiffs' favor, their claim cannot stand. A claim of frustration of purpose has three elements:

First, the purpose that is frustrated must have been a principal purpose of that party in making the contract.... The object must be so completely the basis of the contract that, as both parties understand, without it the transaction would make little sense. Second, the frustration must be substantial. It is not enough that the transaction has become less profitable for the affected party or even that he will

sustain a loss. The frustration must be so severe that it is not fairly to be regarded as within the risks that he assumed under the contract. Third, the non-occurrence of the frustrating event must have been a basic assumption on which the contract was made.

*Restatement (Second) of Contracts,* 265 comment a (1981). In *The Murphy Door Bed Co., Inc. v. Interior Sleep Systems, Inc.,* 874 F.2d 95 (2d Cir.1989), defendants argued that the contract was void *ab initio* since its purpose, allegedly the conveyance of trademark rights, was frustrated because the mark was generic. However, the Second Circuit concluded, "there is no indication that a transfer of trademark rights was the essence of the distributorship agreement ..." *Id.* at 102–03. Similarly, there is no indication here that an alleged refusal to incur debt to facilitate an LBO was the "essence" or "principal purpose" of the indentures, and no mention of such an alleged restriction is made in the agreements. Further, while plaintiffs' bonds may have lost some of their value, "[d]ischarge under this doctrine has been limited to instances where a virtually cataclysmic, wholly unforeseeable event *renders the contract valueless to one party."* *United States v. General Douglas MacArthur Senior Village, Inc.,* 508 F.2d 377, 381 (2d Cir.1974) (emphasis added). That is not the case here. Moreover, "the frustration of purpose defense is not available where, as here, the event which allegedly frustrated the purpose of the contract ... was clearly foreseeable." *VJK Productions v. Friedman/Meyer Productions,* 565 F.Supp. 916 (S.D.N.Y.1983) (citation omitted). Faced with MetLife's internal memoranda, *see, e.g.,* Bradley Resp.Aff.Exh. A, plaintiffs cannot but admit that "MetLife has been concerned about 'buy-outs' for several years." P.Opp. at 5. Nor do plaintiffs provide any reasonable basis for believing that a party as sophisticated as Jefferson–Pilot was any less cognizant of the market around it.[32]

[32] At least one of Jefferson–Pilot's directors—Clemmie Dixon Spangler—not only was aware of the possibility of an LBO of a company like RJR Nabisco, but he also in fact *proposed* an LBO of RJR Nabisco *itself,* a fact plaintiffs do not dispute. *See* Bradley Aff. ¶ 28, Exh. R. Spangler apparently never mentioned his unsolicited bid for RJR Nabisco to his fellow Jefferson–Pilot directors.

**\*1524** **[9]** Third, plaintiffs advance a claim that remains based, their assertions to the contrary notwithstanding, on an alleged breach of a fiduciary duty.[33] Defendants go to great lengths to prove that the law of Delaware, and not New York, governs this question. Defendants' attempt to rely on Delaware law is readily explained by even a cursory reading of *Simons v. Cogan,* 549 A.2d 300, 303 (Del.1988), the recent

Delaware Supreme Court ruling which held, *inter alia,* that a corporate bond "represents a contractual entitlement to the repayment of a debt and does not represent an equitable interest in the issuing corporation necessary for the imposition of a trust relationship with concomitant fiduciary duties." Before such a fiduciary duty arises, "an existing property right or equitable interest supporting such a duty must exist." *Id.* at 304. A bondholder, that court concluded, "acquires no equitable interest, and remains a creditor of the corporation whose interests are protected by the contractual terms of the indenture." *Id.* Defendants argue that New York law is not to the contrary, but the single Supreme Court case they cite—a case decided over fifty years ago that was not squarely presented with the issue addressed by the *Simons* court—provides something less than dispositive support. *See Marx v. Merchants' National Properties, Inc.,* 148 Misc. 6, 7, 265 N.Y.S. 163, 165 (1933). For their part, plaintiffs more convincingly demonstrate that New York law applies than that New York law recognizes their claim.[34]

[33] While the Court reads plaintiffs' Amended Complaint and submissions as charitably as it can, it nonetheless has trouble with assertions such as this: "The right of unsecured creditors [like plaintiffs] against having the [c]ompany's assets stripped away is not in the nature of broad fiduciary duty, but rather a specific charge, founded in principles of equity and tort law of New York and other jurisdictions ..." P.Mem. at 51–52. Any such "charge"—beyond a potential fiduciary duty the Court now addresses, *see infra*—is not, however, so "specific" as to have been stated with any clarity by any one court. Indeed, cases relied upon by plaintiffs to support their "In Equity" Count focus on fraudulent schemes or conveyances. *See, e.g., United States v. Tabor Court Realty Corp.,* 803 F.2d 1288, 1295 (3d Cir.1986) (explaining lower court's findings in *United States v. Gleneagles Investment Co.,* 565 F.Supp. 556 (M.D.Pa.1983)); *Pepper v. Litton,* 308 U.S. 295, 296, 60 S.Ct. 238, 84 L.Ed. 281 (1939) ("The findings by the District Court, amply supported by the evidence, reveal a scheme to defraud creditors ..."); *Harff v. Kerkorian,* 347 A.2d 133, 134 (Del.1975) (bondholders limited to contract claims in absence of " 'fraud, insolvency, or a violation of a statute.' ") (citation omitted). Moreover, if the Court here were confronted with an insolvent corporation, which is not the case, the company's officers and directors might become trustees of its assets for the protection of its creditors, among others. *See, e.g., New York Credit Men's Adjustment Bureau v. Weiss,* 278 A.D. 501, 503, 105 N.Y.S.2d 604, 606 (1st Dep't 1951), *aff'd,* 305 N.Y. 1, 110 N.E.2d 397 (1953).

If not based on a fiduciary duty and the other equitable principles addressed by the Court, plaintiffs' claim, in effect, asks this Court to use its broad equitable powers to fashion a new cause of action that would adopt precisely the same arguments the Court rejected in Count I.

34   The indenture provision designating New York law as controlling, *see supra* n. 10, would, one might assume, resolve at least the issue of the applicable law. In quoting the relevant indenture provision, however, plaintiffs omit the proviso "except as may otherwise be required by mandatory provisions of law." P.Mem. at 52, n. 46. Defendants, however, fail to argue that the internal affairs doctrine, which they assert dictates that Delaware law controls this question, is such a "mandatory provision of law." Nor do defendants respond to plaintiffs' reliance on *First National City Bank v. Banco Para El Comercio,* 462 U.S. 611, 621, 103 S.Ct. 2591, 2597, 77 L.Ed.2d 46 (1983) ("Different conflicts principles apply, however, where the rights of third parties *external* to the corporation are at issue.") (emphasis in original, citation omitted). Ultimately, the point is academic; as explained below, the Court would grant defendants summary judgment on this Count under either New York or Delaware law.

Regardless, this Court finds *Simons* persuasive, and believes that a New York court would agree with that conclusion. In the venerable case of *Meinhard v. Salmon,* 249 N.Y. 458, 164 N.E. 545 (1928), then Chief Judge Cardozo explained the obligations imposed on a fiduciary, and why those obligations are so special and rare:

Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market **\*1525** place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty ... Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. *Id.* at 464 (citation omitted). Before a court recognizes the duty of a "punctilio of an honor the most sensitive," it must be certain that the complainant is entitled to more than the "morals of the market place," and the protections offered by actions based on fraud, state statutes or the panoply of available federal securities laws. This Court has concluded that the plaintiffs presently before it—sophisticated investors

who are unsecured creditors—are not entitled to such additional protections.

Equally important, plaintiffs' position on this issue—that "A Company May Not Deliberately Deplete its Assets to the Injury of its Debtholders," P.Mem. at 42—provides no reasonable or workable limits, and is thus reminiscent of their implied covenant of good faith. Indeed, many indisputably legitimate corporate transactions would not survive plaintiffs' theory. With no workable limits, plaintiffs' envisioned duty would extend equally to trade creditors, employees, and every other person to whom the defendants are liable in any way. Of all such parties, these informed plaintiffs least require a Court's equitable protection; not only are they willing participants in a largely impersonal market, but they also possess the financial sophistication and size to secure their own protection.

Finally, plaintiffs cannot seriously allege unconscionability, given their sophistication and, at least judging from this action, the sophistication of their legal counsel as well. Under the undisputed facts of this case, *see supra* at 13–20, this Court finds no actionable unconscionability.

*B. Defendants' Remaining Motions:*
Defendants attack plaintiffs' fraud claims on various fronts. The Court has determined that repleading is necessary. In drafting a Second Amended Complaint, plaintiffs must bear in mind the Court's conclusions below.

1. Rule 10b–5:
**[10]   [11]**   Defendants move to dismiss pursuant to Fed.R.Civ.P. 12(c) Count III, the Rule 10b–5 counts, as to those six debt issues purchased by plaintiffs prior to September 1987, which is when plaintiffs allege in their complaint that defendants first began to develop an LBO plan. Plaintiffs admit that Rule 10b–5 is limited to purchases or sales during the period of non-disclosure or misrepresentation. *See Pross v. Katz,* 784 F.2d 455 (2d Cir.1986). The rule does not afford relief to those who forgo a purchase or sale and instead merely hold in reliance of a nondisclosure or misrepresentation. *See, e.g., Bonime v. Doyle,* 416 F.Supp. 1372, 1387 (S.D.N.Y.1976), *aff'd,* 556 F.2d 554 (2d Cir.), *cert. denied,* 434 U.S. 924, 98 S.Ct. 401, 54 L.Ed.2d 281 (1977). The first, second, third, fifth, seventh and eighth securities listed in the Amended Complaint fail to satisfy this requirement, at least on the facts as presently pleaded.[35] Accordingly, the Court grants defendants' motion

on Count III as to those issues. Plaintiffs correctly note, however, that the disclosure-related common law fraud claims are not restricted to purchases and sales. *See Weinberger v. Kendrick,* 698 F.2d 61, 78 (2d Cir.1982) (Friendly, J.), *cert. denied,* 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983); *Continental Insurance Co. v. Mercadante,* 222 A.D. 181, 186, 225 N.Y.S. 488, 494 (1st Dep't 1927). Thus, the Court denies defendants' motion to dismiss Count II on this basis.

35      It remains unclear how the fourth security listed in the Amended Complaint fares under the controlling law. If plaintiffs purchased portions of that issue prior to September 1987, then, of course, the Court's above holding applies equally here.

2. Rule 9(b):

The parties are well aware of the purposes and requirements of Rule 9(b), mandating **\*1526** particularity in pleading fraud. Those principles have often been reaffirmed by the Second Circuit. *See, e.g., Stern v. Leucadia National Corp.,* 844 F.2d 997 (2d Cir.), *cert. denied,* 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 109 (1988); *Di Vittorio v. Equidyne Extractive Industries,* 822 F.2d 1242 (2d Cir.1987). As it now stands, the Amended Complaint cannot on its own survive scrutiny under that rule. Plaintiffs must heed the guidelines established by the controlling Second Circuit authority. On previous occasions, this Court has left little doubt about what it expects to see in a complaint that pleads fraud. It

will not take this opportunity to repeat itself and instead refers the parties to those opinions. *See, e.g., Philan v. Hall,* 712 F.Supp. 339 (S.D.N.Y.1989). The Court notes that the complaint currently before it was filed even before the January 12 close of the expedited discovery period for these motions. Moreover, since January additional discovery has taken place. Today's ruling, of course, should not be misperceived as an invitation to submit a Second Amended Complaint indiscriminately larded with factual recitations and legal boilerplate. The Court has no reason to believe that plaintiffs, represented by skilled counsel, intend to follow that unwise course.

### III. CONCLUSION

For the reasons set forth above, the Court grants defendants summary judgment on Counts I and V, judgment on the pleadings for certain of the securities at issue in Count III, and dismisses for want of requisite particularity Counts II, III, and IX. All remaining motions made by the parties are denied in all respects. Plaintiffs shall have twenty days to replead.

SO ORDERED.

**All Citations**

716 F.Supp. 1504

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

 © 2022 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 52

Westlaw.

Page 1

501 B.R. 644, 58 Bankr.Ct.Dec. 214
**(Cite as: 501 B.R. 644)**

C

United States Bankruptcy Court, S.D. New York.
In re William H. Millard, Individual Debtor in a
Foreign Proceeding
In re Patricia H. Millard, Individual Debtor in a
Foreign Proceeding

Case No. 13–11625 (REG), Case No. 13–11626
(REG)
Filed November 21, 2013

**Background:** Foreign representatives sought recognition of foreign bankruptcy proceeding that debtors had commenced in accordance with Cayman Islands law.

**Holdings:** The Bankruptcy Court, Robert E. Gerber, J., held that:

(1) Cayman Islands bankruptcy proceeding commenced by debtors qualified as "foreign proceeding," such as was eligible for recognition as foreign main, or as foreign nonmain, proceeding;

(2) bankruptcy court would not deny recognition as manifestly contrary to public policy of the United States;

(3) bankruptcy court could not refuse to recognize foreign bankruptcy proceeding, after determining that all of statutory requirements for recognition of proceeding as foreign main proceeding had been met, based on foreign representatives' alleged bad faith; and

(4) recognition would not be conditioned on foreign representatives' posting of bond.

Granted.

West Headnotes

**[1] Bankruptcy 51 ⚷2341**

51 Bankruptcy
　51III The Case
　　51III(H) Cases Ancillary to Foreign Proceedings

51k2341 k. In general. Most Cited Cases
Cayman Islands bankruptcy proceeding commenced by debtors in accordance with Cayman Islands law, in which debtors' assets were subject to exclusive control of foreign representatives under the supervision of Cayman Islands court for purpose of reorganization and/or liquidation, qualified as "foreign proceeding," such as was eligible for recognition as foreign main, or as foreign nonmain, proceeding, regardless of whether debtors were actually insolvent at time they commenced this foreign proceeding; indeed, in deciding whether to grant foreign representatives' application for recognition of foreign proceeding, it was inappropriate for bankruptcy court to look behind judgment of Cayman Islands court to assess debtors' insolvency and whether they qualified for relief under Cayman Islands bankruptcy law. 11 U.S.C.A. §§ 101(23), 1517.

**[2] Bankruptcy 51 ⚷2341**

51 Bankruptcy
　51III The Case
　　51III(H) Cases Ancillary to Foreign Proceedings

51k2341 k. In general. Most Cited Cases
Debtor in a foreign insolvency proceeding need not be insolvent in order to take advantage of Chapter 15 recognition. 11 U.S.C.A. § 1517.

**[3] Bankruptcy 51 ⚷2341**

51 Bankruptcy
　51III The Case
　　51III(H) Cases Ancillary to Foreign Proceedings

51k2341 k. In general. Most Cited Cases
Bankruptcy court would not deny, as manifestly contrary to public policy of the United States, an application filed by foreign representatives for recognition of debtors' Cayman Islands bankruptcy case, though foreign representatives sought recognition, following entry of $18 million default judg-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

501 B.R. 644, 58 Bankr.Ct.Dec. 214
**(Cite as: 501 B.R. 644)**

ment against debtors for taxes allegedly owed to the Commonwealth of the Northern Mariana Islands, in order to obtain review of propriety of default judgment without having to post bond; ability to seek review without posting of supersedeas or similar bond was not at all contrary to United States public policy, much less manifestly so, and there had been no showing that Cayman Islands bankruptcy law was in any way repugnant to United States law, or that procedural protections for creditors under Cayman Islands law varied materially from those provided under United States law. 11 U.S.C.A. § 1506.

**[4] Bankruptcy 51 €⟳2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

Bankruptcy statute permitting court to refuse to recognize a foreign proceeding if this would be manifestly contrary to public policy of the United States is intended to be invoked only under exceptional circumstances involving matters of fundamental importance for the United States. 11 U.S.C.A. § 1506.

**[5] Bankruptcy 51 €⟳2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

Bankruptcy court in which ancillary case under Chapter 15 was pending was not appropriate venue to collaterally attack judgment entered in foreign bankruptcy proceedings.

**[6] Bankruptcy 51 €⟳2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings

51k2341 k. In general. Most Cited Cases

Bankruptcy court could not refuse to recognize foreign bankruptcy proceeding, after determining that all of statutory requirements for recognition of proceeding as foreign main proceeding had been met, based on foreign representatives' alleged bad faith in seeking recognition of foreign proceeding; Congress's use of the word "shall," in specifying that order recognizing foreign proceeding "shall" be entered if statutory requirements are met, deprived bankruptcy court of any discretion in that regard. 11 U.S.C.A. § 1517.

**[7] Bankruptcy 51 €⟳2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

Even assuming that bankruptcy court had authority to refuse to recognize foreign proceeding on bad faith grounds, it was not bad faith for foreign representatives to seek recognition as protection against asset seizure without posting a supersedeas or other bond. 11 U.S.C.A. § 1517.

**[8] Bankruptcy 51 €⟳2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

Bankruptcy court would not condition its recognition of foreign bankruptcy proceeding that debtors had commenced in accordance with Cayman Islands law on posting of bond in favor of foreign taxing authority whose $18 million default judgment the foreign representatives sought to contest; however, court would entertain future request for relief if it appeared that foreign representatives were not acting diligently to obtain judicial review of taxing authority's judgment elsewhere. 11 U.S.C.A. § 1522.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

501 B.R. 644, 58 Bankr.Ct.Dec. 214
**(Cite as: 501 B.R. 644)**

James H. Power, Esq., Warren E. Gluck, Esq., Holland & Knight LLP, Counsel for Foreign Representatives Kenneth M. Krys and Margot McInnis, 31 West 52nd Street, New York, New York 10019, By: James H. Power, Esq. (argued).

Michael S. Kim, Esq., Kobre & Kim LLP, Counsel for Creditor, United States Territory, Commonwealth of the Northern Mariana Islands, 800 Third Avenue, New York, New York 10022, By: Marcus J. Green, Esq. (argued), Michael S. Kim, Esq.

Chapter 15
DECISION ON PETITION FOR RECOGNITION FN1

> FN1. This written decision memorializes the oral decision that I issued after the close of oral argument. Because it had its origins in the originally dictated decision, it speaks as of the time that I issued the original oral decision, and has a more conversational tone.

ROBERT E. GERBER, UNITED STATES BANKRUPTCY JUDGE:

In this case under chapter 15 of the Bankruptcy Code, petitioners Kenneth M. Krys and Margot Macinnis (the "**Foreign Representatives**"), the foreign representatives of the estates of Cayman Islands residents William H. Millard and Patricia H. Millard (the "**Millards**"), seek recognition by this Court of the Millards' Cayman Islands bankruptcy proceeding ("**Cayman Bankruptcy Proceeding**") as a "foreign main proceeding" under section 1517 of the Code.

The Foreign Representatives' motion is opposed by the Commonwealth of the Northern Mariana Islands (the "**Marianas**"), a United States territory, which in 1994 obtained two default judgments, in **\*647** the amount of approximately $18 million each, against the Millards for unpaid taxes. FN2 The Marianas opposes recognition of the Foreign Representatives' chapter 15 petition based on

two assertions that were set forth in its brief, and a third that was made only orally at argument today. The Marianas asserts:

(1) that the petition fails to meet chapter 15's statutory standards for obtaining recognition;

(2) that recognition should be denied on public policy grounds; and

(3) that alleged "bad faith" on the part of the Foreign Representatives—because they wish to secure judicial review of the propriety of the default judgments without posting a bond—justifies denial of recognition.

The Marianas further contends that if I do grant recognition, my order should include conditions nevertheless requiring the Foreign Representatives to post a bond.

> FN2. The Marianas asserts that, after nearly 20 years of interest and penalties, the Millards now owe more than $118 million.

I'm rejecting those contentions, and granting recognition. The Foreign Representatives have met all of the statutory requirements for it. The Marianas has not established any basis for a finding that recognition is or would be contrary to the public policy of the United States—especially *manifestly* contrary to U.S. public policy, as chapter 15 requires. And the bad faith that is alleged to exist is not a legal basis for disregarding the statutory requirements for recognition (although it might later provide a basis for subsequent relief under section 305, which could cause recognition to be later vacated), and, as a factual matter, the Foreign Representatives' desire to seek judicial review of the propriety of the default judgment without posting a bond does not cause me to find bad faith. Finally—as a matter of my discretion, rather than one of law—I will not require the Foreign Representatives to engage in the unheard of requirement to post a bond before allowing chapter 15 recognition.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

501 B.R. 644, 58 Bankr.Ct.Dec. 214
**(Cite as: 501 B.R. 644)**

Thus the Foreign Representatives' motion for recognition is granted. My Findings of Fact and Conclusions of Law in connection with this determination follow.

### Findings of Fact

The facts with respect to the recognition motion before me (as contrasted to matters that may be litigated by the parties in subsequent proceedings) are undisputed. Under my case management order, facts not disputed in motions and motion related papers are taken as true.[FN3] Those facts come from undisputed assertions of fact in the motion papers; undisputed evidence in declarations by Kenneth M. Krys, Kyle Broadhurst, Michael A. Pineiro, James Stenning, Michael S. Kim, David Smith, and J. Ross McDonough; and matters as to which I can take judicial notice under Federal Rule of Evidence 201.

> FN3. *See* Case No. 13-11625, ECF # 18 (Case Management Order) at ¶ 2.

As facts I find that the Millards moved from the mainland U.S. to the Marianas in 1986. Mr. Millard was the founder and majority shareholder of Computerland Corporation, which operated a worldwide chain of retail computer and electronic stores. The Millards sold their interest in that company in 1986 for about $76.8 million. The Millards lived in the Marianas from 1986 through 1990.

In 1993, after the Millards had left the Marianas, the Marianas brought an action against them, for alleged tax liabilities, after notice only by publication.[FN4] As previously**\*648** noted, in 1994 the Marianas obtained two default judgments against the Millards for approximately $18 million each, and the Marianas asserts that after nearly 20 years of interest and fees, the Millards now owe the Marianas more than $118 million.

> FN4. The Millards allege that they never got notice of the Marianas' suit when it was filed in 1993 (and in fact before 2011, when one of their banks accidentally viol-

ated a gag order and revealed the Marianas' collection efforts); that the Marianas submitted a false affidavit concerning its efforts to locate the Millards in support of its application for an order permitting service by publication; and that the Marianas served the Millards by publication when the Marianas could have given notice to their lawyers. They also make other charges, including allegations of alleged corruption in the Marianas. All of these are matters as to which I make no findings.

In 1993, the Millards moved to the Cayman Islands, where (though they are citizens of Ireland) they have lived for the last 20 years. They have not lived in any jurisdiction other than the Cayman Islands since 1993. I find as a fact, or mixed question of fact and law, that the Cayman Islands is the Millards' Center of Main Interests ("**COMI**") as that expression is used in chapter 15.

Beginning in 2011, the Marianas initiated proceedings to enforce its default judgments against the Millards in the U.S. and around the world. On May 10, 2013, the Millards filed a bankruptcy petition in the Grand Court of the Cayman Islands (" **Cayman Court** "). The Foreign Representatives filed a chapter 15 petition for recognition of the Cayman Bankruptcy Proceeding in this Court on May 16, 2013. On June 3, 2013 (over the opposition of the Marianas, which had argued in the Cayman Islands, through Cayman counsel, that the Cayman court should not entertain the Millards' bankruptcy petition there), the Cayman court issued a written judgment [FN5] that the Millards' insolvency petition was valid and that the Cayman Bankruptcy Proceeding would continue there.

> FN5. A "judgment," as used in the Cayman Islands and many Commonwealth countries, is equivalent to an "Opinion" or a "Decision" as we use those expressions in the U.S.

### Conclusions of Law

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

501 B.R. 644, 58 Bankr.Ct.Dec. 214
**(Cite as: 501 B.R. 644)**

*(1) Statutory Requirements for Recognition*

[1]The Marianas first contends that the Foreign Representatives have not met the statutory requirements for chapter 15 recognition. The Marianas argues that chapter 15 may be used to grant recognition only in a foreign "*insolvency* " case. The Marianas then argues that I should make my own finding as to the Millards' insolvency, or alternatively find that the Cayman Bankruptcy Proceeding is not really an insolvency proceeding at all—all based on the Marianas' contention that I should not count the Millards' tax obligation in considering their solvency, as tax obligations are not provable as debts in the Caymans and, to the extent it matters, the U.S. Since the Marianas believes that it will not be able to prove its claims for its $118 million in foreign tax judgments in the Cayman Court, the Marianas asserts that the Millards are not "insolvent" in the Cayman Bankruptcy Proceeding, and that therefore there is no "foreign insolvency proceeding" for me to recognize.

I can't agree, and find, to the contrary, that all of the statutory requirements for recognition in the U.S. have been satisfied.

Section 1517 provides, in relevant part:

(a) Subject to section 1506, after notice and a hearing, an order recognizing a foreign proceeding shall be entered if—

(1) such foreign proceeding for which recognition is sought is a foreign**\*649** main proceeding or foreign nonmain proceeding within the meaning of section 1502;

(2) the foreign representative applying for recognition is a person or body; and

(3) the petition meets the requirements of section 1515.

(b) Such foreign proceeding shall be recognized—

(1) as a foreign main proceeding if it is pending in the country where the debtor has the center of its main interests; or

(2) as a foreign nonmain proceeding if the debtor has an establishment within the meaning of section 1502 in the foreign country where the proceeding is pending.

The presence, or not, of a "foreign proceeding" as used in section 1517(a)(1), as ultimately defined in section 101(23),[FN6] determines whether I should grant recognition here.[FN7] Section 101(23) defines a "foreign proceeding" as:

[A] collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

The Cayman Bankruptcy Proceeding is plainly that.

FN6. Section 1502 of the Code provides, in relevant part:

For the purposes of this chapter, the term—

...

**(3)** "foreign court" means a judicial or other authority competent to control or supervise a foreign proceeding;

**(4)** "foreign main proceeding" means a foreign proceeding pending in the country where the debtor has the center of its main interests;

**(5)** "foreign nonmain proceeding" means a foreign proceeding, other than a foreign main proceeding, pending in a country where the debtor has an establishment....

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

501 B.R. 644, 58 Bankr.Ct.Dec. 214
**(Cite as: 501 B.R. 644)**

Strictly speaking, application of section 1517 requires first going to section 1502, and then going to section 101(23).

FN7. For understandable reasons, there are no contentions of failures to satisfy sections 1517(a)(2) and (3): that the Foreign Representatives be "person[s]," as required under subsection (a)(2), and that their petition satisfy the requirements (addressing satisfactory documentation, and the need of U.S. courts for documents in English) imposed by subsection (a)(3).

The Marianas' odd contention—that I must ignore the fact that the Millards are in a Cayman insolvency proceeding based on the suggested view the Marianas would have me take as to their solvency—is unsupported by the statute or caselaw, and runs contrary to the leading treatise in the U.S. bankruptcy community. Section 1501 confirms Congress' objectives of encouraging cooperation between the U.S. and foreign countries in order to protect the interests of debtors and creditors in international bankruptcy proceedings.FN8 But it is *section 1517* that sets the requirements for granting recognition of a foreign proceeding. I look to the requirements of Section 1517 and (after an intermediate stop at section 1502) section 101(23) of the Code to determine whether the Cayman Bankruptcy Proceeding passes muster for recognition under the requirements of U.S. law.

> FN8. *See* 8 *Collier on Bankruptcy* ¶ 1501.01 (16th ed. 2013) ("***Collier***").

Likewise, *Collier* explains that "[t]he words 'under a law relating to insolvency or adjustment of debt' [in section 101(23) ] emphasize that chapter 15 is available not only to debtors that are technically insolvent or facing liquidation, but also to debtors**650** who are in financial distress and may need to reorganize."FN9

> FN9. 8 *Collier* ¶ 1501.03[1], citing H.R.Rep. No. 109–31, 109th Cong., 1st

Sess. 118 (2005).

[2]As the statutory language makes clear, it is the *nature of the proceeding that is the subject of the request for assistance,* and not the view of the U.S. court of the foreign debtor's condition, that governs the inquiry. The Marianas asks me to disregard the nature of the Cayman insolvency proceeding, and to look behind a judgment of the Cayman Court. Doing either is plainly improper. The Millards' Cayman bankruptcies are collective judicial proceedings in the Cayman Islands, conducted pursuant to the Caymans' bankruptcy law, in which the assets of the Millards are subject to the Foreign Representatives' exclusive control under the supervision of the Cayman Court for the purpose of reorganization and liquidation. The Marianas cites no authority to contradict *Collier*'s observation (and the House Report on which it was based) that a foreign debtor in a foreign insolvency proceeding need not be insolvent to take advantage of chapter 15 recognition. Nor am I aware of any. That is hardly surprising, because it would require a rewriting of the U.S. statute.

The Cayman Court has determined that the Millards are eligible to conduct bankruptcy proceedings in the Cayman Islands under Cayman's bankruptcy law. The Cayman Bankruptcy Proceeding is a foreign proceeding under Section 101(23), and is eligible for recognition under section 1517.FN10

> FN10. It also is clear that the Cayman Islands is the Millards' COMI. They have resided in the Cayman Islands for the last 20 years—putting the COMI issue beyond debate. *See In re Ran,* 607 F.3d 1017, 1022–26 (5th Cir.2010) (" *Ran* ") (determining COMI based on individual debtor's place of habitual residence). Unlike other cases in which judges, including me, have had to wrestle with COMI issues in the past, *see, e.g., In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.,* 374 B.R. 122

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

501 B.R. 644, 58 Bankr.Ct.Dec. 214
**(Cite as: 501 B.R. 644)**

(Bankr.S.D.N.Y.2007); *In re Basis Yield Alpha Fund (Master),* 381 B.R. 37 (Bankr.S.D.N.Y.2008) (Gerber, J.), where foreign debtors' businesses were organized under the law of the Cayman Islands but their assets or principal places of business were located elsewhere, COMI is not an issue here.

*(2) Public Policy of the U.S.*

[3]The Marianas next argues that recognition should be denied pursuant to section 1506, which authorizes a U.S. court to deny recognition if the action "would be manifestly contrary to the public policy of the United States." FN11 In support of that argument, the Marianas contends that "[t]he aim of the Cayman insolvency in this petition is to achieve an unsecured stay of enforcement of the Commonwealth's judgments to enable the Foreign Representative to safely liquidate the Millards' worldwide assets and move them back to Caymans (where they will be insulated against the Commonwealth's claim, because foreign tax judgments are unenforceable)."FN12

> FN11. Section 1506, which applies broadly to actions governed by chapter 15 (including, but not limited to, grants of recognition), provides, in full:
>
>> Nothing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States.
>
> FN12. Case No. 13-11625, ECF # 20 (Marianas' Mem. in Opposition to Recognition) at 11.

That characterization of the Foreign Representatives' goals combines two alleged offenses: (1) obtaining an unbonded stay, and (2) insulating assets from legitimate creditor claims. U.S. assistance to **\*651** one or both of those goals is asserted to be "manifestly contrary" to the public policy of the

U.S. But U.S. assistance with respect to the first of the asserted goals is not at all contrary to U.S. public policy, much less "manifestly" so. And it is too soon to know whether there will ever be a basis for a finding of insulating assets; there certainly is no indication of that now.

[4]The "statutory mandate"FN13 that recognition be granted upon compliance with the requirements of sections 1517(a)(1), (2) and (3) is—as section 1517 provides and caselaw holds—indeed subject to a public policy exception, said by the Fifth Circuit to be "narrow."FN14 As noted above,FN15 section 1506 permits a court to refuse recognition "if the action would be manifestly contrary to the public policy of the United States."FN16 But "the exception is intended to be invoked only under exceptional circumstances concerning matters of fundamental importance for the United States."FN17

> FN13. *Ran,* 607 F.3d at 1021.
>
> FN14. *Id.*
>
> FN15. *See* n.11.
>
> FN16. *Ran,* 607 F.3d at 1021 (quotes in original).
>
> FN17. *Id. See also In re Iida,* 377 B.R. 243 (B.A.P. 9th Cir.2007) ("This public policy exception is narrow and, by virtue of the qualifier "manifestly," is limited only to the most fundamental policies of the United States"); *In re Ephedra Prods. Liability Litig.,* 349 B.R. 333 (S.D.N.Y.2006) (Rakoff, J.) ("In adopting Chapter 15, Congress instructed the courts that the exception provided therein for refusing to take actions "manifestly contrary to the public policy of the United States" should be "narrowly interpreted," as "[t]he word 'manifestly' in international usage restricts the public policy exception to the most fundamental policies of the United States" ").

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

501 B.R. 644, 58 Bankr.Ct.Dec. 214
**(Cite as: 501 B.R. 644)**

The ability to take an appeal without posting of a supersedeas or similar bond is not at all contrary to U.S. public policy, much less is it "manifestly" so. Section 362 effectively provides for such for garden variety U.S. debtors. The avoidance of a supersedeas bond was a major goal in the famous *Texaco* chapter 11 case in this district.[FN18] And even in the absence of bankruptcy, U.S. trial judges have the discretion to stay enforcement of money judgments without the posting of a supersedeas bond.[FN19]

> FN18. *See, e.g., In re Texaco, Inc.,* 76 B.R. 322, 324 (Bankr.S.D.N.Y.1987) (Schwartzberg, J.) (extending plan exclusivity because, *inter alia,* the adverse impact of a multi-billion judgment upon the liquidity and financial condition of Texaco impelled Texaco and its two financial subsidiaries to seek Chapter 11 relief, "especially in light of Texaco's stated inability to post a bond or other security necessary to stay enforcement of the judgment").

> FN19. *See, e.g., Texaco Inc. v. Pennzoil Co.,* 784 F.2d 1133 (2d Cir.1986) ("The court may order partially secured or unsecured stays if they do not unduly endanger the judgment creditor's interest in ultimate recovery.") (internal quote marks deleted); *Teachers Ins. & Annuity Ass'n of America v. Ormesa Geothermal,* 1991 WL 254573, at *3 (S.D.N.Y. Nov. 21, 1991) (Wood, C.J.) ("In spite of the general requirement that a judgment debtor post a supersedeas bond in the full amount of the judgment ... the district court, in its discretion, may use equitable principles to grant such a stay without a full bond if the filing of a supersedeas bond would irreparably harm the judgment debtor and, at the same time, such a stay would not unduly endanger the judgment creditor's interest in ultimate recovery.") (internal quote marks deleted).

Nor, even if one looks at the issues more broadly, has the Marianas shown any exceptional circumstances concerning matters of fundamental importance to warrant invoking section 1506 to deny recognition. No showing has been made that the Caymans' insolvency law is in any way repugnant to U.S. law. Likewise, no showing has been made that Cayman's procedural protections for creditors vary materially **\*652** from U.S. insolvency law, much less that they are repugnant to U.S. law. The ability to enforce a default judgment is not a fundamental public policy of the United States. In fact, the imposition of default judgments is disfavored in U.S. courts.[FN20]

> FN20. *See Pecarsky v. Galaxiworld.com Ltd.,* 249 F.3d 167, 174 (2d Cir.2001) ("It is well established that default judgments are disfavored").

It is not contrary to U.S. public policy to seek judicial review of whether a default judgment should have been entered, or to scrutinize the propriety of service by publication, the need for service by publication, or the extent to which known lawyers for a defendant should have been given notice as an alternative to relying solely upon notice by publication.[FN21] Nor is it a fundamental public policy of the U.S. to allow for the enforcement of foreign tax judgments, since under the U.S. law, foreign tax debts are disallowed too, under our own nation's "Revenue Rule."[FN22]

> FN21. U.S. law *requires,* in instances where notice is required, that it be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cen. Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950). And notice must employ "means ... such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." *Id.* at 315, 70 S.Ct. 652. Notice by publication may be inad-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

501 B.R. 644, 58 Bankr.Ct.Dec. 214
**(Cite as: 501 B.R. 644)**

equate when it is not reasonably calculated to reach those "who could easily be informed by other means at hand." *Id.*

FN22. See, for example, my own decision on this topic, *In re BearingPoint, Inc., 2010 WL 4622458 , 2010 Bankr.LEXIS 3964 (Bankr.S.D.N.Y. Nov. 5, 2010)* disallowing, under the Revenue Rule, two tax claims filed by the Republic of Indonesia in a chapter 11 case.

On the other hand (and as relevant to the Mariana's second premise), allowing debtor assets to be placed beyond the reach of the debtor's creditors might well be manifestly contrary to the public policy of the U.S. But we are far away from that coming to fruition. The Foreign Representatives here ask no more than (1) access to the U.S. courts, and (2) temporary restraints against asset grabbing while they seek judicial review of the default judgments' propriety in other U.S. courts.[FN23] Assuming that the Foreign Representatives are diligent in seeking to secure that review elsewhere, they may continue to have that protection here, fully consistent with U.S. public policy.[FN24] If the default judgments are found to be valid after appropriate judicial review, and if it then appears—though this would surprise me[FN25]—that proceedings in the Caymans or this Court would be used to shelter assets in the U.S. without subjecting them to legitimate debts, the Marianas could come back to me to seek dismissal of this chapter 15 case under section 305.[FN26] The Marianas'**\*653** apprehension that the Foreign Representatives will shield assets is an issue that may be brought to my attention—or better yet, in the Cayman Court—if and when facts supporting such a concern should occur.

FN23. I've previously announced that I will not sit as a court of appeals with respect to the 1994 entry of the default judgment. Review of the propriety of entry of the default judgments, when the Marianas allegedly had the ability to, but did not, provide actual notice by means other than

publication, will necessarily have to take place elsewhere, in the District of the Marianas, the Ninth Circuit, or the U.S. Supreme Court.

FN24. *See* nn. 18 and 19 above, discussing the ability, in the U.S., to obtain protection from the enforcement of judgments while appeals are pending elsewhere, and without necessarily posting a full, or even any, supersedeas bond.

FN25. The Foreign Representatives state in their reply, *see* Case No. 13-11625, ECF # 25 (Foreign Representatives' Reply Mem.) at 10, that they are not empowered to move Millard assets located outside the Cayman Islands into the Caymans without first making an application to the Cayman Court.

FN26. That section provides, in relevant part:

(a) The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if—

(1) the interests of creditors and the debtor would be better served by such dismissal or suspension; or

(2)(A) a petition under section 1515 for recognition of a foreign proceeding has been granted; and

(B) the purposes of chapter 15 of this title would be best served by such dismissal or suspension.

In actuality, the Foreign Representatives here seek recognition of the Cayman Bankruptcies (1) so they may have standing to access the U.S. courts pursuant to section 1509 of the Code (it being remembered that recognition is a *sine qua non* for access to the U.S. courts),[FN27] and (2) to protect

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

501 B.R. 644, 58 Bankr.Ct.Dec. 214
**(Cite as: 501 B.R. 644)**

against asset grabbing in the U.S., which is a traditional basis for the invocation of chapter 15 relief.

> FN27. Section 1509 of the Code, captioned "Right of direct access," effectively establishes the bankruptcy court as a gatekeeper for a foreign representative's access to the U.S. courts, with recognition as the means to open the gate. Section 1509 provides, in relevant part:
>
> > (b) If the court grants recognition under section 1517, and subject to any limitations that the court may impose consistent with the policy of this chapter—
> >
> > (1) the foreign representative has the capacity to sue and be sued in a court in the United States;
> >
> > (2) the foreign representative may apply directly to a court in the United States for appropriate relief in that court; and
> >
> > (3) a court in the United States shall grant comity or cooperation to the foreign representative.
> >
> > ...
> >
> > (d) If the court denies recognition under this chapter, the court may issue any appropriate order necessary to prevent the foreign representative from obtaining comity or cooperation from courts in the United States.

[5]Importantly, to the extent that the Marianas is arguing before me that the Millards should not have been permitted to file the Cayman Bankruptcy Proceeding, this forum is not an appropriate venue to collaterally attack the Cayman judgment.FN28

> FN28. *See In re Bd. of Directors of Telecom Argentina S.A.,* 2006 WL 686867, at *27 (Bankr.S.D.N.Y. Feb. 24, 2006) (Lifland, C.J.), *aff'd,* 2006 WL 3378687

(S.D.N.Y. Nov. 20, 2006), *aff'd,* 528 F.3d 162 (2d Cir.2008) (Argentine court's determination that debtor was insolvent may not be collaterally attacked).

*(3) "Bad Faith"*

The Marianas then argues (not so much in its brief, but in oral argument today), that I can and should find *bad faith* on the part of the Foreign Representatives. The Marianas then argues that the bad faith, when found, should cause me to deny recognition. I do not agree with the legal premise that "bad faith" can result in the denial of recognition, nor do I agree that even if I could find bad faith to be a basis for denying recognition, it would provide a basis for denial of recognition here.

[6]First, as a threshold matter, section 1517 of the Code, quoted above, provides in its subparagraph (a) that subject to section 1506, an order recognizing a foreign proceeding *shall* be entered if the requirements in the three subparagraphs of section 1517(a) have been satisfied. Because section 1517(a) is preceded by the word *shall,* it takes away judicial discretion from me in the first instance. That is not necessarily the end of the inquiry—because after recognition has been granted, section 305 provides additional mechanisms for changing that—but section 1517(a) imposes a mandatory requirement, **\*654** in the first instance, for recognition when its requirements have been met.

I also note that when 1517(a) says it's "subject to" one thing—section 1506, which as we know from our earlier discussion is the public policy exception—that sends a message to the judiciary that *it is not subject to other things that were not so included.*FN29 Otherwise, section 1506 would not be resting there by itself. Instead, section 1506 would have been joined by whatever other things were meant to be included as matters which section 1517 was "subject to," such as the "good cause" requirements, or dismissal for cause requirements, that appear in other sections of the code in chapters 7, 11 and 13. Of course, neither "bad faith" nor "good faith" is mentioned in section 1517.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

501 B.R. 644, 58 Bankr.Ct.Dec. 214

**(Cite as: 501 B.R. 644)**

FN29. When Congress does not want to limit a list, it uses the words "includes" or "including," which are not limiting. Bankruptcy Code section 102(3). As examples, see Bankruptcy Code sections 1112(b)(4) (cause for dismissal); 707(a) (same); 1307(c) (same).

[7]In any event, I do not find the requisite bad faith. The principal basis for the contention of bad faith is that the Foreign Representatives are looking for protection against asset seizure without posting a bond. That is not bad faith. As previously noted, bankruptcy courts rarely, if ever, impose requirements for supersedeas bonds on debtors or estate fiduciaries, as bonds would require the availability and use of scarce estate resources and wholly frustrate bankruptcy policy. Indeed, that's one of the reasons why the Code includes an automatic stay applicable to U.S. debtors in its section 362. Filing an insolvency proceeding in a U.S. court to avoid an onerous bond requirement is a fully permissible purpose, and is hardly indicative of bad faith. *Texaco* FN30 is only the most famous example of that. Nor is it indicative of bad faith to secure a breathing spell while appellate mechanisms elsewhere are pursued. FN31

FN30. *See* nn. 18 & 19 above. *See also Kirk v. Texaco, Inc.,* 82 B.R. 678, 679–80 (S.D.N.Y.1988) (Brieant, J.) (providing a history of the Texaco bankruptcy case).

FN31. Significantly, the Foreign Representatives here are not asking me to review the Marianas' judgment, a measure that would be of much more serious consequence.

[8]That also informs a matter that actually is within my discretion—the Marianas' additional contention that if I nevertheless grant recognition, I still require the Foreign Representatives, under section 1522 of the Code, FN32 to post a bond. I assume that section 1522, given its breadth, authorizes a court like mine to require a bond in appropri-

ate cases as a matter of discretion. But there appears to be no case—certainly none was brought to my attention—where a foreign representative was required to post a bond to obtain recognition (or to enjoy the fruits of recognition), and I am not going to do that here either. As I've noted, if this case had been filed in chapter 11, an automatic stay would stay judgment enforcement without requiring the debtor to post a bond. And using the bankruptcy system to avoid the need to post a bond is, as *Texaco* indicates, an appropriate resort to U.S. insolvency law. FN33

FN32. Section 1522 provides, in relevant part:

(b) The court may subject relief granted under section ... 1521 [which addresses relief that may be granted upon recognition] ... to conditions it considers appropriate, including the giving of security or the filing of a bond.

FN33. I will, however, express my expectation that the Foreign Representatives must act diligently in commencing proceedings to determine the validity of the default judgment that was entered by the Marianas Court. As I've noted, section 305 of the Code permits a court to dismiss or suspend proceedings in a case if a petition for recognition has been granted and the purposes of chapter 15 would be best served by such dismissal or suspension.

**\*655** The express provisions of chapter 15, and the purposes underlying it, authorize and contemplate providing support to the Cayman Bankruptcy Proceeding; protecting U.S. assets from being grabbed (even without a bond); and allowing an opportunity to come into the U.S. courts.

The Marianas has a reservation of rights as to the ability to later seek section 305 relief (as do the Foreign Representatives with respect to any desire to oppose any such request, if and when it is

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

501 B.R. 644, 58 Bankr.Ct.Dec. 214
**(Cite as: 501 B.R. 644)**

made)—though I should say that I would be annoyed, to say the least, if I get any such request from the Marianas before the Foreign Representatives have had a full and fair opportunity to secure judicial review of the default judgment elsewhere.

Except, however, for expressly providing for the reservations of rights, the latter comments are precatory. The order granting recognition should provide that recognition is granted; that the separate request for a bond under section 1522 is denied; and that this order is without prejudice to the rights of the parties with respect to any subsequent request under section 305 to dismiss the chapter 15 case if it later appears that the Foreign Representatives are not acting diligently to secure judicial review of the underlying judgment elsewhere.

Bkrtcy.S.D.N.Y., 2013
In re Millard
501 B.R. 644, 58 Bankr.Ct.Dec. 214

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Tab 53

2017 WL 1032992, Bankr. L. Rep. P 83,087

2017 WL 1032992
United States District Court,
D. Delaware.

IN RE: MILLENNIUM LAB
HOLDINGS II, LLC, et al., Debtors.

Opt–Out Lenders, [1] Appellants,
v.

Millennium Lab Holdings II, LLC, et al., TA
Millenium, Inc., and James Slattery, Appellees.

Bankr. Case No. 15–12284–
LSS (Jointly Administered)
|
Civ. No. 16–110–LPS
|
Signed March 17, 2017
|
As Amended March 20, 2017

[1]    Appellants are identified in Appellants' Brief in
      Support of Appeal from Bankruptcy Court Order
      Confirming Debtors' Plan of Reorganization. (D.I. 13
      at 1)

**Synopsis**
**Background:** Confirmation hearing was held on debtors' proposed Chapter 11 plan, which provided for release of claims that nondebtor third parties might have against equity holders that had made a $325 million contribution to debtors' reorganization. The Bankruptcy Court confirmed plan, and entered order certifying its decision for appeal directly to the Court of Appeals, 543 B.R. 703. The Court of Appeals denied permission to appeal, appeal was docketed in the District Court, and debtors moved to dismiss appeal as equitably moot.

**Holdings:** The District Court, Leonard P. Stark, J., held that:

[1] court could not rule on debtors' motion to dismiss appeal as equitably moot without first determining *Stern* issue of whether constitutional defect in bankruptcy court's decision deprived that it of power to issue that decision;

[2] bankruptcy court's order confirming plan was tantamount to final resolution on the merits of third-party claims that were released, and triggered *Stern* concerns;

[3] any *Stern* problems arising out of bankruptcy court's entry of plan confirmation order were not cured by district court's de novo review; and

[4] plan confirmation issue had to be remanded to bankruptcy court to address, or to clarify its ruling on, *Stern* issue of whether it had constitutional authority, as non-Article-III court to approve nondebtor third-party release.

Motion denied without prejudice; matter remanded.

West Headnotes (15)

[1]    **Bankruptcy**
       Issues between non-debtors

      Bankruptcy court had only "related to" jurisdiction to consider whether to permanently release a non-debtor, third-party's claim against another non-debtor, third party, whether through Chapter 11 plan or otherwise. 28 U.S.C.A. § 1334(b).

      Cases that cite this headnote

[2]    **Bankruptcy**
       Issues between non-debtors

      Proceeding solely between non-debtor parties based on non-bankruptcy law can be heard by bankruptcy court only under its "related to" jurisdiction, and then only if outcome of proceeding could alter debtor's rights, liabilities, options, or freedom of action, either positively or negatively, and it in any way impacted upon the handling and administration of bankruptcy estate. 28 U.S.C.A. § 1334(b).

      Cases that cite this headnote

[3]    **Bankruptcy**

26-11268-mg Doc 23-4 Filed 06/24/26 Entered 06/24/26 13:13:49 Exhibit D Pg 90 of 697

In re Millennium Lab Holdings II, LLC, --- F.Supp.3d ---- (2017)
2017 WL 1032992, Bankr. L. Rep. P 83,087

⚫ Carrying out provisions of Code

Authority granted to bankruptcy courts to issue "necessary or appropriate" orders cannot be used to craft new remedies that contravene existing statutory provisions, or to create substantive rights that are otherwise unavailable under applicable law. 11 U.S.C.A. § 105(a).

Cases that cite this headnote

[4] **Bankruptcy**
⚫ Finality

Order confirming a Chapter 11 reorganization plan is "final order," appealable as of right. 28 U.S.C.A. § 158(a)(1).

Cases that cite this headnote

[5] **Bankruptcy**
⚫ Conclusions of law;de novo review
**Bankruptcy**
⚫ Discretion
**Bankruptcy**
⚫ Clear error

On appeal, district court reviews bankruptcy court's legal determinations de novo, its factual findings for clear error, and its exercise of discretion for abuse thereof. Fed. R. Bankr. P. 8013.

Cases that cite this headnote

[6] **Bankruptcy**
⚫ Moot questions

"Equitable mootness" is judge-made abstention doctrine, which is applicable in the limited context of bankruptcy, usually on appeal following confirmation of plan of reorganization.

Cases that cite this headnote

[7] **Bankruptcy**
⚫ Moot questions

In light of their virtually unflagging obligation to exercise the jurisdiction conferred on them,

bankruptcy appellate courts must proceed most carefully before dismissing an appeal as equitably moot.

Cases that cite this headnote

[8] **Bankruptcy**
⚫ Moot questions

Granting relief on appeal must be almost certain to produce a perverse outcome, chaos in the bankruptcy court from a plan in tatters and/or significant injury to third parties, before bankruptcy appellate court may dismiss appeal as equitably moot.

Cases that cite this headnote

[9] **Bankruptcy**
⚫ Moot questions

In deciding whether to dismiss appeal as equitably moot, bankruptcy appellate court should consider (1) whether a confirmed plan has been substantially consummated, and if so, (2) whether granting the relief requested in the appeal will fatally scramble the plan and/or significantly harm third parties who have justifiably relied on plan confirmation.

Cases that cite this headnote

[10] **Bankruptcy**
⚫ Moot questions

District court could not rule on Chapter 11 debtors' motion to dismiss appeal from plan confirmation order as equitably moot without first determining *Stern* issue of whether constitutional defect in bankruptcy court's decision deprived that it of power to issue that decision.

Cases that cite this headnote

[11] **Bankruptcy**
⚫ Particular proceedings or issues
**Bankruptcy**
⚫ Bankruptcy judges

26-11268-mg    Doc 23-4    Filed 06/24/26    Entered 06/24/26 13:13:49    Exhibit D    Pg 91 of 697

In re Millennium Lab Holdings II, LLC, --- F.Supp.3d ---- (2017)
2017 WL 1032992, Bankr. L. Rep. P 83,087

While bankruptcy court had at least "related to" jurisdiction over whether to confirm Chapter 11 plan that provided for release of claims that nondebtor third parties had against equity holders who together made a $325 million contribution to debtors' reorganization, court still needed to have constitutional authority, as non-Article-III court, to approve such a release; whether court had constitutional authority was separate question from whether it had subject matter jurisdiction. U.S. Const. art. 3, § 1 et seq.

Cases that cite this headnote

**[12]    Bankruptcy**
👉 Settlement, adjustment, or enforcement of claims

Bankruptcy court's order confirming Chapter 11 plan that provided for release of any claims that nondebtor third parties had against equity holders who had made a $325 million contribution to debtors' reorganization, by serving to permanently extinguish these nondebtor third parties' common law fraud and other claims against equity holders, was tantamount to resolution of those claims on the merits, and raised *Stern* concerns that bankruptcy court should have addressed before entering confirmation order and approving this nondebtor release.

Cases that cite this headnote

**[13]    Bankruptcy**
👉 Bankruptcy judges

If Article III prevents bankruptcy court from entering a final order disposing of non-bankruptcy claim against a nondebtor outside of claims allowance process, this prohibition should apply regardless of whether order is issued in adversary proceeding, contested matter, or in connection with confirmation of plan. U.S. Const. art. 3, § 1 et seq.

Cases that cite this headnote

**[14]    Bankruptcy**

👉 Bankruptcy judges

**Bankruptcy**
👉 Settlement, adjustment, or enforcement of claims

Any *Stern* problems arising out of bankruptcy court's entry of order confirming Chapter 11 plan that provided for release of any claims that nondebtor third parties had against equity holders who had made a $325 million contribution to debtors' reorganization, owing to fact that release operated as final resolution of any such claims on the merits, were not cured by district court's review of confirmation order; even with district court's review of plan confirmation order, there would no adjudication on the merits by Article III court of claims that were released by plan. U.S. Const. art. 3, § 1 et seq.

Cases that cite this headnote

**[15]    Bankruptcy**
👉 Remand

Plan confirmation issue had to be remanded to bankruptcy court to address, or to clarify its ruling on, *Stern* issue of whether it had constitutional authority, as non-Article-III court to approve nondebtor third-party release provision of plan that was tantamount to final decision on claims barred by this third-party release.

Cases that cite this headnote

**West Codenotes**

**Limitation Recognized**
28 U.S.C.A. § 157(b)(2)(C)

**Attorneys and Law Firms**

Ryan M. Bartley, Young Conaway Stargatt & Taylor, LLP, Anthony W. Clark, Skadden Arps Slate Meagher & Flom LLP, Jason M. Liberi, Skadden, Arps, Slate, Meagher & Flom LLP, Pauline K. Morgan, Young Conaway Stargatt & Taylor, LLP, Wilmington, DE, Andrew Breidenbach, Holwell Shuster & Goldberg LLP,

In re Millennium Lab Holdings II, LLC, --- F.Supp.3d ---- (2017)

2017 WL 1032992, Bankr. L. Rep. P 83,087

John M. DiMatteo, Holwell Shuster & Goldberg LLP, Raquelle L. Kaye, Skadden Arps Slate Meagher & Flom LLP, New York, NY, Matthew N Kriegel, Skadden, Arps, Slate, Meagher & Flom LLP, Felicia Gerber Perlman, Skadden, Arps,Slate,Meagher & Flom LLP, Chicago, IL, for debtor.

David Gerardi, Juliet M. Sarkessian, Wilmington, DE, for U.S. Trustee.

## MEMORANDUM OPINION

HON. LEONARD P. STARK, UNITED STATES DISTRICT JUDGE

 **\*1** Millennium Lab Holdings II, LLC, and its affiliated reorganized debtors (collectively, the "Debtors"), move this Court (D.I. 6) (the "Motion to Dismiss")[2] to dismiss the appeal filed by ISL Loan Trust and certain affiliated funds (collectively, "Appellants") from an order (B.D.I. 195)[3] ("Confirmation Order") entered by the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court") confirming the Debtors' Amended Prepackaged Joint Chapter 11 Plan of Reorganization (B.D.I. 182) (as amended, the "Plan"), on the basis that the appeal is equitably moot. For the reasons stated below, the Court will deny the Motion to Dismiss without prejudice and remand to the Bankruptcy Court for further proceedings.

---

[2]  The Motion to Dismiss (D.I. 6) is joined by James Slattery (D.I. 10) as well as TA Millennium, Inc. and TA Associates Management L.P. (D.I. 11).

[3]  The docket of the Chapter 11 cases, *In re Millennium Lab Holdings II, LLC, et al.*, Case No. 15–12284–LSS (Bankr. D. Del.), is referred to herein as "B.D.I. ____."

## I. INTRODUCTION[4]

The appeal of the Confirmation Order concerns a matter of some controversy: the approval of nonconsensual third-party releases (*i.e.*, the involuntary extinguishment of a non-debtor, third-party's claim against another non-debtor, third party) as part of a chapter 11 plan of reorganization. Here, the Plan released a non-debtor, third-party's direct, non-bankruptcy, common law fraud and RICO claims against non-debtor equity holders. The issues on appeal include, *inter alia*, (1) whether

the Bankruptcy Court had subject matter jurisdiction to approve the nonconsensual third-party releases, and (2) whether the Bankruptcy Court had constitutional authority to permanently release the claims *post-Stern.*[5]

---

[4]  In the original version of this Opinion (issued on March 17, 2017), the Court inadvertently failed to include a citation to an insightful article that was of substantial assistance to the Court as it evaluated the issues addressed here. The article is entitled *On a "Related" Point: Rethinking Whether Bankruptcy Courts Can "Order" the Involuntary Release of Non-Debtor Third-Party Claims, 23 Am. Bankr. Inst. L. Rev. 531 (2015)*, and was written by Eamonn O'Hagan. The Court apologizes to Mr. O'Hagan for its oversight.

[5]  *Stern v. Marshall, 564 U.S. 462, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011).*

### A. Adjudicatory Authority and Subject Matter Jurisdiction

Article III imposes a structural limitation on the power of an Article I court to enter final orders or judgments on state law claims without the parties' consent. As the Supreme Court explained in *Wellness Int'l Network, Ltd. v. Sharif*:

Article III, § 1, of the Constitution provides that "[t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." Congress has in turn established 94 District Courts and 13 Courts of Appeals, composed of judges who enjoy the protections of Article III: life tenure and pay that cannot be diminished. Because these protections help to ensure the integrity and independence of the Judiciary, "we have long recognized that, in general, Congress may not withdraw from" the Article III courts "any matter which, from its nature, is the subject of a suit at the common law ...."

Congress has also authorized the appointment of bankruptcy and magistrate judges, who do not enjoy the protections of Article III, to assist Article III courts in their work .... Congress' efforts to align the responsibilities of non-Article III judges with the boundaries set by the Constitution have not always been successful .... [R]ecently in *Stern*, this Court held that Congress violated Article III by authorizing bankruptcy

3636

26-11268-mg    Doc 23-4    Filed 06/24/26    Entered 06/24/26 13:13:49    Exhibit D    Pg
93 of 697

In re Millennium Lab Holdings II, LLC, --- F.Supp.3d ---- (2017)
2017 WL 1032992, Bankr. L. Rep. P 83,087

judges to decide certain claims for which litigants are constitutionally entitled to an Article III adjudication.

**\*2** —— U.S. ——, 135 S.Ct. 1932, 1938–39, 191 L.Ed.2d 911 (2015) (internal citations omitted). It is clear from these recent Supreme Court cases that parties have a constitutional right to have their common law claims adjudicated by an Article III court, and that right cannot be abridged by Congressional action.

Federal bankruptcy jurisdiction is a Congressional creation under 28 U.S.C. § 1334(b), which provides that "district courts shall have original and exclusive jurisdiction of all cases under title 11," and original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." The authority of Bankruptcy Courts to oversee bankruptcy matters derives from 28 U.S.C. § 157(a), which sets out that "[e]ach district court may provide for any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district."

Despite the District Court's general referral of bankruptcy matters to the Bankruptcy Court, the extent of the Bankruptcy Court's adjudicatory authority depends on the type of proceeding before it and is subject to the bounds of the constitutional limitations described above. Thus, Bankruptcy Courts may "enter appropriate orders and judgments" *only* in "cases under title 11" and "core proceedings arising under title 11, or arising in a case under title 11." 28 U.S.C. § 157(b)(1). When a matter is not a "core" proceeding but rather is "related to" a bankruptcy case, Bankruptcy Courts have authority only to "hear" the matter and submit proposed findings of fact and conclusions of law to the Article III District Court. 28 U.S.C. § 157(c)(1).⁶ This limitation on the power of Article I judges to enter final orders in non-core proceedings protects a party's constitutional right to have its common law claims adjudicated by an Article III court. An exception to this limitation applies where all of the parties to the proceeding consent to the Bankruptcy Court's entry of final orders. *See* 28 U.S.C. § 157(c)(2); *Wellness*, 135 S.Ct. at 1942 (holding that Article III permits consent-based adjudication by Bankruptcy Court).

⁶    The District Court may then "accept, reject or modify the proposed findings of fact or conclusions

of law, receive further evidence, or recommit the matter to the bankruptcy judge with instructions." Fed. R. Bankr. P. 9033(d). Any final order of judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing *de novo* those matters to which any party has timely and specifically objected. *See* 28 U.S.C. § 157(c)(1).

### B. Subject Matter Jurisdiction Over Nonconsensual Third–Party Releases

**[1]    [2]** The permanent release of a non-debtor, third-party's claim against another non-debtor, third party—whether through a, chapter 11 plan or otherwise—is an exercise of the Bankruptcy Court's "related to" jurisdiction. *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 224, 233 (3d Cir. 2005) (holding that chapter 11 plan could not permanently enjoin third-party claims because "related to" jurisdiction did not exist over such claims); *In re Congoleum Corp.*, 362 B.R. 167, 190–91 (Bankr. D.N.J. 2007) (stating that "first hurdle" to approval of release is establishing that court had related to jurisdiction). This is because a non-debtor's pre-bankruptcy claim against another non-debtor does not "aris[e] under title 11" and does not "aris[e] in a case under title 11." 28 U.S.C. § 157(b)(1); *see also In re Digital Impact, Inc.*, 223 B.R. 1, 11 (Bankr. N.D. Okla. 1998) (holding that controversies are not "cases under" title 11 where parties thereto are not debtors in bankruptcy, and that controversies did not "arise under" Code, because "controversies contemplated [between the parties] are not limited to causes of action under the Bankruptcy Code, such as avoidance actions"). Thus, a proceeding solely between non-debtor parties based on non-bankruptcy law can only be heard by Bankruptcy Courts under "related to" jurisdiction, and then only "if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984); *see also Celotex Corp. v. Edwards*, 514 U.S. 300, 307 n.5, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995) ( "Proceedings 'related to' the bankruptcy include ... suits between third parties which have an effect on the bankruptcy estate."). As such, whether a Bankruptcy Court has "related to" subject matter jurisdiction over the nonconsensual release of third-party claims is frequently litigated. Once established, a common plan objection is based on the statutory edict that a Bankruptcy Court exercising "related to" jurisdiction over non-core proceedings cannot issue final

26-11268-mg    Doc 23-4    Filed 06/24/26    Entered 06/24/26 13:13:49    Exhibit D    Pg
94 of 697

In re Millennium Lab Holdings II, LLC, --- F.Supp.3d ---- (2017)
2017 WL 1032992, Bankr. L. Rep. P 83,087

orders or judgments but is instead limited to issuing proposed findings of fact and conclusions of law. *See* 28 U.S.C. § 157(c)(1).

**\*3** Conversely, plan proponents frequently argue that because Congress included "confirmations of plans" in its list of "core proceedings" under the statute, the nonconsensual release of third-party claims is an exercise of the Bankruptcy Court's "arising in" or "arising under" jurisdiction when accomplished in the context of the plan, and therefore the Bankruptcy Court has authority to enter a final order releasing those claims. *See* 28 U.S.C. § 157(b)(2). The weakness of this argument is its treatment of a chapter 11 plan as a jurisdictional and adjudicatory "blank check." Indeed, courts have repeatedly rejected this type of jurisdictional and adjudicatory bootstrapping. [7]

[7]   *See, e.g., Combustion Eng'g*, 391 F.3d at 224–25 (explaining that even if Bankruptcy Code § 105(a) provides statutory authority for Bankruptcy Court to approve third-party release, "[section] 105 does not provide an independent source of federal subject matter jurisdiction .... 'Related to' jurisdiction must therefore exist independently of any plan provision purporting to involve or enjoin claims against non-debtors."); *Digital Impact*, 223 B.R. at 11 ("If proceedings over which the Court has no independent jurisdiction could be metamorphisized into proceedings within the Court's jurisdiction by simply including their release in the proposed plan, this court could acquire infinite jurisdiction").

### C. Adjudicatory Authority Post–*Stern*

In *Stern*, the Supreme Court held it unconstitutional for Congress to give Bankruptcy Courts—which are not established under Article III of the Constitution—final adjudicatory authority over a bankruptcy estate's defamation counterclaim against an estate creditor, notwithstanding that such counterclaims are among the proceedings that Congress has listed as "core." *See* 131 U.S. at 2600–01, 131 S.Ct. 2594 (concluding that although Bankruptcy Court had statutory authority to enter final judgment on certain counterclaims pursuant to 28 U.S.C. § 157(b)(2)(C), it lacked constitutional authority to render final judgment). According to the Supreme Court, the counterclaim at issue did not fall within the narrow "public rights" exception to Article III requirements; [8] rather, the claim arose under state law between private

parties and was, therefore, a matter of "private right, that is, of the liability of one individual to another." *Id.* at 2611–12, 2614 (internal quotations omitted). That the defendant filed a proof of claim in the bankruptcy case did not alter this conclusion because: (i) the counterclaim did not arise from the bankruptcy itself; and (ii) it was not necessary to resolve the counterclaim as part of the process of allowing or disallowing the creditor's proof of claim. *See id.* at 2611. *Stern* made clear the limitation on a Bankruptcy Court's authority to enter a final order on a non-core claim for which the claimant has a constitutional right to adjudication by an Article III court. The Supreme Court later clarified that parties could consent to final adjudication by a non-Article III court. *See Wellness*, 135 S.Ct. at 1944–45.

[8]   As explained by the Supreme Court, the "public rights" exception is limited "to cases in which the claim at issue derives from a federal regulatory scheme, or in which the resolution of the claim by an expert government agency is deemed essential to a limited regulatory objective within the agency's authority. In other words, it is still the case that what makes a right 'public' rather than private is that the right is integrally related to particular federal government action." *Stern*, 131 S.Ct. at 2613. Applied to bankruptcy, the Supreme Court held that the "public rights" exception extended no farther than to claims that "stem [ ] from the bankruptcy itself or would necessarily be resolved in the claims allowance process." *Id.* at 2618. By contrast, claims "between two private parties" based on state common law or statutes that are not closely intertwined with a federal regulatory program are "private" rights that must be adjudicated by an Article III Court. *See id.* at 2614.

**\*4** Following *Stern*, it is clear that regardless of whether the Bankruptcy Court has subject matter jurisdiction over proceedings—both core and non-core—it cannot enter a final order releasing third-party claims unless it has constitutional authority to do so as well.

## II. BACKGROUND

### A. Events Leading to Chapter 11 Filing

Appellants [9] were lenders of approximately $106.3 million of aggregate principal amount of senior secured debt issued in April 2014 pursuant to a $1,825 billion senior secured credit facility (the "Credit Facility") which was governed by a credit agreement dated April 16, 2014

3638

In re Millennium Lab Holdings II, LLC, --- F.Supp.3d ---- (2017)

2017 WL 1032992, Bankr. L. Rep. P 83,087

(the "Credit Agreement") among, *inter alia*, Debtors Millennium Lab Holdings II, LLC ("Holdings") and Millennium Health, LLC, f/k/a Millennium Laboratories, LLC ("Millennium"), and several other lenders (the "Lenders"). (*See* D.I. 14 at A108, Al 128) The Credit Facility was issued as part of a "dividend recapitalization" transaction for the benefit of what would then be the non-debtor stockholders of Millennium's parent company, Holdings. (D.I. 14 at A108) The stock of Holdings was owned approximately 55% by non-debtor Millennium Lab Holdings, Inc. ("MLH"), [10] and approximately 45% by non-debtor TA Millennium, Inc. ("TA") [11] (MLH and TA, collectively, the "Non–Debtor Equity Holders"). (*Id.*) Of the $1.775 billion of term loan proceeds under the Credit Facility, nearly $1.3 billion was paid out as a special dividend to the Non–Debtor Equity Holders. (B.D.I. 206, 12/11/15 Hr'g. Tr. at 8:9–8:13; D.I. 14 at A2386)

[9]     Appellants are investment funds and accounts managed by Voya Investment Management Co. LLC and Voya Alternative Asset Management LLC.

[10]    The stock of non-debtor MLH was owned in "various amounts" by 14 different trusts. (*See* B.D.I. 181, Ex. B (Guarantee Agreement)) Seven of the 14 trusts were established by Millennium founder, Chairman and former-CEO James Slattery ("Slattery") for the benefit of himself and/or various members of his family; these seven trusts collectively owned approximately 79.896% of the stock of non-debtor MLH. (*Id.*)

[11]    TA is an affiliate of private equity firm TA Associates Management, L.P.

The Debtors are providers of laboratory-based diagnostic testing services that derive significant revenue from Medicare and Medicaid reimbursements. (D.I. 9 at M7) As such, they are subject to substantial regulation and oversight, including by federal and state agencies. (D.I. 14 at Al07) As of early 2012, the United States Department of Justice (the "DOJ") was conducting joint criminal and civil investigations into Millennium (the "DOJ Investigation"). (*Id.* at A109) In the course of the DOJ Investigation (and prior to the issuance of the Credit Agreement), Millennium met with the DOJ "on numerous occasions" to discuss the allegations under investigation and produced to the DOJ approximately 11 million pages of documents. (*Id.*) In December 2014, the DOJ confirmed to Millennium that the DOJ would pursue claims against Millennium. (*Id.*) By February

2015, the Centers for Medicare & Medicaid Services ("CMS") notified Millennium that it was revoking Millennium's Medicare billing privileges based on billings submitted for 59 deceased patients. (*Id.*) On May 4, 2015, Millennium received a notification that its Medicare billing privileges would be revoked also on account of its alleged submission of fraudulent claims for services without valid physician orders. (*Id.*)

**\*5** On May 21, 2015, Millennium disclosed to its Lenders that it had entered into an agreement in principle with the DOJ, CMS, and various other government entities, to settle *inter alia* claims under the False Claims Act for Medicare fraud for a settlement payment of approximately $250 million. (*See* D.I. 14 at A867) On October 29, 2015, Millennium sought approval from its Lenders to restructure its debt obligations through either an out-of-court transaction or a prepackaged plan of reorganization. (*Id.* atA80) Consummation of an out-of-court transaction was not achieved. On November 10, 2015, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Contemporaneously therewith, the Debtors filed their Plan (B.D.I. 14) and accompanying Disclosure Statement (B.D.I. 15).

### B. The Proposed Nonconsensual Third–Party Release and Related Provisions

The Plan provided a basis for the continuation of the Debtors' business. Relevant to this appeal, the Plan also provided for a $325 million contribution by the Non–Debtor Equity Holders, specifically $178.75 million from MLH and $146.25 million from TA. Of the Non–Debtor Equity Holders' $325 million contribution, $256 million would fund Millennium's settlement of the DOJ's claims, $50 million would be paid to certain Lenders in exchange for their early commitment to support Millennium's restructuring, and the remaining $19 million could be used as Millennium operating capital. (D.I. 14 at A92, A94, A169–A170) In exchange for the $325 million contribution, the proposed Plan provided the Non–Debtor Equity Holders with full releases and discharges of any and all claims against them and related parties —including any claims brought directly by non-Debtor lenders such as Appellants—and including claims relating to the $1.3 billion special dividend that had been paid to the Non–Debtor Equity Holders while the Debtors were in the midst of the DOJ Investigation. (*See* B.D.I. 195–1, Plan at Art. X at H–K; D.I. 14 at A2208) The proposed Plan provided no ability for parties to "opt-out"

26-11268-mg    Doc 23-4    Filed 06/24/26    Entered 06/24/26 13:13:49    Exhibit D    Pg
96 of 697

In re Millennium Lab Holdings II, LLC, --- F.Supp.3d ---- (2017)
2017 WL 1032992, Bankr. L. Rep. P 83,087

of the third-party releases, meaning the releases would be granted upon confirmation of the Plan regardless of whether a creditor consented. (*See* Plan, Art. X at H–K) The proposed Plan also permanently enjoined Appellants from commencing or prosecuting claims released pursuant to the Plan against MLH, TA, or their Related Parties (as defined in the Plan). (*See id.*)

### C. The Fraud Action

On December 9, 2015, prior to the plan confirmation hearing, Appellants filed a complaint in this Court (the "Fraud Action") against MLH, TA, TA Associates Management, L.P., and two corporate executives who are beneficiaries of the Plan's third-party releases, James Slattery and Howard Appel ("Defendants"). (*See ISL Loan Trust v. TA Associates Management, L.P., et al.*, Civ. No. 15–1138 (GMS) (D. Del.)) The complaint demands a jury trial and asserts the following causes of action: (i) violation of RICO and conspiracy to violate RICO (18 U.S.C. §§ 1962(c) & (d)), based on allegations that Defendants engaged in fraudulent billing practices, including sending illegal reimbursement requests to Medicare and state Medicaid agencies; (ii) fraud and deceit based on intentional misrepresentation, aiding and abetting fraud, and conspiracy to commit fraud, based on allegations that Defendants made false and misleading representations, for the purpose of inducing Appellants to enter into the Credit Agreement, regarding the accuracy of Debtors' financial records, Debtors' compliance with applicable laws, and the existence of pending investigations and litigation against the Debtors; and (iii) restitution, based on allegations that, as a result of the fraudulent inducement, Defendants received a benefit of more than $100 million of loans issued under the Credit Agreement, which benefits Defendants have retained at Appellants' expense. (*See* Civ. No. 15–1138 (GMS), D.I. 7 (redacted complaint)) The Fraud Action is currently stayed pending the outcome of this appeal. (*See id*, D.I. 11)

### D. Appellants' Objections to Plan Confirmation

**\*6** **[3]** Appellants raised a litany of objections to confirmation of the Plan. In addition to various objections regarding the content and adequacy of the Disclosure Statement, Appellants argued that the Bankruptcy Court lacked either "arising in" or "related to" subject matter jurisdiction to approve the nonconsensual third-party release contained in the Plan. (*See* B.D.I. 122 at 17–25; B.D.I. 174 at 4–9) Appellants further asserted that, even if

the Bankruptcy Court had subject matter jurisdiction, the proposed approval of the releases under section 105(a) [12] of the Bankruptcy Code would contravene other sections of the Bankruptcy Code, including section 524(e), and hence the Bankruptcy Court lacked statutory authority to approve the release provisions. [13] (*See* B.D.I. 122 at 26–28) Appellants further argued that the Plan could not be confirmed unless it permitted creditors to opt out of the third-party release (*see id.* at 29–31), and even if the Plan were so amended, exceptional circumstances did not exist to justify limiting the liability of a non-debtor to another non-debtor under Third Circuit law. (*See id.* at 31–32 (citing *In re Continental Airlines*, 203 F.3d 203, 213, n. 9 (3d Cir. 2000) ("*Continental II*"))

[12]    Section 105(a) permits Bankruptcy Courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code.]" 11 U.S.C. § 105(a). However, section 105(a) cannot be used to craft new remedies that contravene existing statutory provisions, *Law v. Siegel*, ––– U.S. ––––, 134 S.Ct. 1188, 1194, 188 L.Ed.2d 146 (2014), or create substantive rights that are otherwise unavailable under applicable law, *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003).

[13]    The Bankruptcy Code provides that the discharge of a debtor's indebtedness "does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e). Notwithstanding section 524(e), the Bankruptcy Code grants Bankruptcy Courts the ability to enjoin non-debtors' claims against other non-debtors with respect to asbestos-related liability. *See* 11 U.S.C. § 524(g) (authorizing non-debtor releases in asbestos liability cases when specified conditions are satisfied, including creation of trust to satisfy future claims); *Combustion Eng'g*, 391 F.3d at 236 n.48 (discussing same).

In pre-confirmation briefing, Appellants' Plan objection did no more than touch upon the Bankruptcy Court's lack of adjudicatory authority, in a section addressing its lack of subject matter jurisdiction (and seemingly conflating those concepts):

> The jurisdiction of the Bankruptcy Courts is statutorily defined, and is confined to the boundaries of that statutory definition. *Stern v. Marshall*, 564 U.S. 462, 131 S.Ct. 2594, 2603, 180 L.Ed.2d 475 (2011) (noting

In re Millennium Lab Holdings II, LLC, --- F.Supp.3d ---- (2017)
2017 WL 1032992, Bankr. L. Rep. P 83,087

that Bankruptcy Courts may only "hear and enter final judgments in all core proceedings arising under title 11, or arising in a case under title 11"); *see also Wellness Int'l Network, Ltd. v. Sharif*, —— U.S. ——, 135 S.Ct. 1932, 1945, 191 L.Ed.2d 911 (2015) (observing that "bankruptcy courts possess no free-floating authority to decide claims traditionally heard by Article III courts"); 28 U.S.C. § 157(a). Rather, Bankruptcy Courts may only enter final judgments on non-core matters with the consent of the affected parties. *Wellness*, 135 S.Ct. at 1949. Because the Third–Party Release would impact direct, non-bankruptcy claims held by non-Debtors against other non-Debtors and which would not trigger the Court's jurisdiction, the Court does not have *jurisdiction* to approve the Third–Party Release without the consent of the Third Party Releasing Parties. [Appellants] have not given such consent.

(B.D.I. 122 at 17) (emphasis added)

In response, Debtors accused Appellants of reading *Stern* too broadly, asserting instead that *Stern* had left intact the Bankruptcy Court's constitutional authority to approve the third-party releases. (*See* B.D.I. 131 at 17) Debtors argued that courts in this jurisdiction and others have rejected *Stern* challenges regarding the Bankruptcy Courts' constitutional authority, including in connection with the consideration and approval of nonconsensual third-party releases in a plan. (*See id.* at 17–18) Debtors argued that adjudication of the Plan is "a unitary omnibus civil proceeding for the reorganization of all obligations of the debtor and disposition of all its assets" unique to bankruptcy and "not an adjudication of the various disputes it touches upon." (*See* B.D.I. 131 (quoting *In re Charles Street African Methodist Episcopal Church of Boston*, 499 B.R. 66, 99 (Bankr. D. Mass. 2013))

 **\*7** The foregoing is the extent of the pre-confirmation briefing on the Bankruptcy Court's adjudicatory authority. (*See* D.I. 174 (Appellants' supplemental plan objection, focusing on subject matter jurisdiction and not mentioning lack of adjudicatory authority under *Stern* ))

### E. The Confirmation Ruling
On December 10, 2015, the Bankruptcy Court held a contested hearing to consider the adequacy of the Disclosure Statement and confirmation of the Plan; at the hearing the Bankruptcy Court's lack of adjudicatory

authority was only briefly addressed. (*See* B.D.I. 190 at 33–34) The Debtors referred to the *Stern* argument as a "total red herring." (*Id.* at 33) Because *Stern* addressed a Bankruptcy Court's constitutional authority to adjudicate state law claims, and because and the Plan did not adjudicate any claims, the Debtors argued *Stern's* holding was inapplicable. (*See id.* at 33–34) Debtors cited two cases from outside of this circuit, *In re MPM Silicones LLC*, 2014 WL 4436335, at *2 (Bankr. S.D.N.Y. Sept. 9, 2014), which overruled a *Stern* challenge to a plan's nonconsensual third-party releases, and the *Charles Street* case, which held that plan confirmation, including any third-party releases contained in the plan, were matters coming within the "public rights" exception, such that Congress may constitutionally assign them to a non-Article III adjudicator. (*See id.* at 33–34 (citing *Charles Street*, 499 B.R. at 99)) No further mention of the issue of the Bankruptcy Court's adjudicatory authority was made at the confirmation hearing. [14]

[14]    The remaining arguments presented by the Debtors, Appellants, and the Office of the United States Trustee focused on whether the Bankruptcy Court had subject matter jurisdiction to approve the nonconsensual third-party releases; if so, whether the Third Circuit permitted nonconsensual third-party releases; if so, what standard applied; and whether the Plan releases met that standard. (*See* B.D.I 190)

In a bench ruling on December 11, 2015, the Bankruptcy Court overruled Appellants' objection to the nonconsensual third-party releases and confirmed the Plan. (*See* B.D.I. 206, 12/11/15 Hr'g. Tr.) Addressing Appellants' subject matter jurisdiction arguments, the Bankruptcy Court held that it had, at the very least, "related to" subject matter jurisdiction over the claims based on contractual indemnification and fee advancement obligations that satisfied the *Pacor* [15] test under Third Circuit law. (*See id.* at 13:1–15:22) The Bankruptcy Court further noted that "*Stern v. Marshall* does not change the conclusion that this Bankruptcy Court has *jurisdiction*":

The holding in *Stern* was meant to be a narrow one; one that does not, quote, "meaningfully change the division of labor between the Bankruptcy Court and the District Court." To this end, debtors cite cases rejecting a *Stern* challenge, regarding the Bankruptcy Court's constitutional authority to consider approval of third-party releases in a plan, including Judge Drain's

3641

26-11268-mg    Doc 23-4    Filed 06/24/26    Entered 06/24/26 13:13:49    Exhibit D    Pg
98 of 697

In re Millennium Lab Holdings II, LLC, --- F.Supp.3d ---- (2017)
2017 WL 1032992, Bankr. L. Rep. P 83,087

decision in *MPM Silicones*, but not any decisions in this district. These Courts may be correct. But because of the necessities of this case, I have not had time to address that argument. ***But I need not do so, given my finding that I have related-to jurisdiction.*** Having decided I have jurisdiction, I now turn to whether third-party releases are appropriate in this case ...

**\*8**  (*See* id. at 15:23–16:11 (emphasis added)) [16] Thus while the Bankruptcy Court's confirmation ruling included a finding that it had "related to" subject matter jurisdiction over the claims, its ruling did not address whether the Bankruptcy Court lacked adjudicatory authority to enter a final order releasing those claims.

[15]    *Pacor v. Higgins*, 743 F.2d 984 (3d Cir. 1984).

[16]    The Plan Confirmation Order simply stated that the Bankruptcy Court had jurisdiction under 28 U.S.C. § 1334(a) to approve the injunction, bar order, exculpation, and releases set forth in Article X of the Plan. (*See* D.I. 14, Plan Confirmation Order at A2094)

The Bankruptcy Court then turned to whether the third-party release was fair and necessary to the reorganization, applying five factors articulated in *Master Mortgage* [17] and ultimately returning to the *Continental II* hallmarks. (*See id.* at 17:9–26:14) Having found the releases were fair and necessary to the reorganization, the Bankruptcy Court entered the Confirmation Order. (B.D.I. 195)

[17]    *See* B.D.I. 206, 12/11/15 Hr'g. Tr. at 17:9–24:18 (referring to *In re Master Mortgage Inv. Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994)).

On the same day, Appellants filed this appeal along with a motion to stay the Confirmation Order (B.D.I. 204) ("Stay Motion"). [18] The Stay Motion was subsequently denied by the Bankruptcy Court. (B.D.I. 227) Appellants did not seek a stay in this Court or the Third Circuit, and the Debtors filed a notice of the occurrence of the Plan's effective date on December 18, 2015 (the "Effective Date"). (B.D.I. 229)

[18]    In the bench ruling, the Bankruptcy Court stated: "[T]his is a package deal. The releases were necessary to induce the equity holders to make their three-hundred-and-twenty-five-million-dollar payment to the debtors, and to induce the ad hoc [lender] group's support of the [RS A] and the plan. Without the

releases, there will be no cash contribution to pay the government settlements, and the lenders, including [Appellants], would not receive the equity of the company, valued at in excess of $900 million." (*See* B.D.I. 232, 12/18/15 Hr'g. Tr. at 14:20-15:3)

**F. Certification of Direct Appeal**
Contemporaneously with their appeal, Appellants also filed a motion pursuant to 28 U.S.C. § 158(d)(2)(A) for certification of a direct appeal to the Third Circuit (B.D.I. 203) ("Certification Motion") with respect to several issues, including Issue 2: whether Bankruptcy Courts "have the authority to release a non-debtor's direct, fraud-based claims for willful misconduct against other non-debtors without the consent of the releasing non-debtor?" (B.D.I. 203 at 5) Although this issue speaks of "authority" to release clams—presumably referring to adjudicatory authority under *Stern*—the arguments raised in support of certification centered on permissibility of non-consensual third-party releases under Third Circuit precedent.

Appellants argued that in *Continental II*, the Third Circuit merely recognized that some courts look to whether a nonconsensual third-party release is fair and necessary to the reorganization, and that those courts have recognized certain "hallmarks of permissible non-consensual releases." (*See id.* at 7 (citing *Continental II, 203 F.3d at 214*)) According to Appellants, however, the Third Circuit expressly declined to adopt that or any other standard for approving nonconsensual third-party releases, observing in a later opinion that *Continental II* merely "left open the possibility that some small subset of non-consensual third-party releases might be confirmable where the release is 'both necessary [to the plan of reorganization] and given in exchange for fair consideration.' " *In re Lower Bucks Hospital*, 571 Fed.Appx. 139, 144 (3d Cir. 2014) (quoting *Continental II*, 203 F.3d at 214, n.11). Because "the Third Circuit has never ruled that releases of non-debtors' claims against other non-debtors are permissible ***at all*** outside the context of asbestos related mass tort liability, and thus never pronounced a binding legal standard for assessing whether such releases are permissible," Appellants argued that direct appeal of this issue would "enable the Third Circuit to clarify two crucial legal issues that remain undetermined in this Circuit: whether non-consensual releases of non-debtors' direct claims against other non-debtors are permissible and if so, under what circumstances." (B.D.I. 203 at 3–4)

**\*9** Arguing against certification of this issue, Debtors responded that post-*Stern*, Bankruptcy Courts in this and other circuits have rejected arguments that they lack subject matter jurisdiction and authority to approve third-party releases in core proceedings such as plan confirmation. (*See* B.D.I. 234 at 9) Appellants countered that the release at issue "is the most expansive non-debtor release ever approved in this District" (*see* B.D.I. 203 at 3) and that a Plan provision "that releases and enjoins a vast universe of direct claims against numerous non-Debtors represents an incredibly expansive view of the Bankruptcy Court's powers, barring [Appellants'] direct claims (pending in an Article III court) against non-Debtors without their consent" (B.D.I. 203 at 8). In reply, Appellants further argued that the Debtors and other parties had, throughout the bankruptcy proceedings, repeatedly mischaracterized their reliance on *Stern*:

> The only propositions for which [Appellants] have cited *Stern* are that (a) absent the consent of all affected parties, the [Bankruptcy] Court's subject matter jurisdiction is subject to strict statutory boundaries and (b) as an Article I court, the [Bankruptcy] Court lacks the power to restrict a future Article III court's ability to award damages to [Appellants] on account of their claims against [Non–Debtor Equity Holders].

(*See* B.D.I. 243 at 7) This comprises the extent of briefing on the Bankruptcy Court's lack of authority in connection with the Certification Motion.

At a hearing on the Certification Motion on December 30, 2015, Appellants argued that the issue should be certified for direct appeal in order to resolve conflicting decisions within the Third Circuit. Appellants argued that the Confirmation Order conflicted with decisions within this District that did not permit nonconsensual third-party releases. (*See* B.D.I. 253, 12/30/15 Hr'g. Tr.) Conversely, Debtors argued that the different outcomes in cases addressing third-party releases within the Third Circuit are driven by the unique facts of each case and, thus, were not conflicting decisions. Lack of adjudicatory authority was not the focus of these proceedings.

On January 12, 2016, the Bankruptcy Court certified for direct appeal to the Third Circuit, as a question of law requiring the resolution of conflicting decisions pursuant to 158(d)(2)(A)(ii), the issue of "whether a bankruptcy court has the authority to grant nonconsensual third party releases over objection." *In re Millennium Lab Holdings*, 543 B.R. 703 (Bankr. D. Del. 2016). In a thorough memorandum opinion, the Bankruptcy Court first concluded that there is controlling precedent in the Third Circuit regarding the efficacy of nonconsensual third party releases, citing "[t]he hallmarks of permissible nonconsensual releases—fairness, necessity to the reorganization, and specific factual findings to support these conclusions ..."—which the Third Circuit set forth in *Continental II* and referred to again in *Global Industrial*. [19] *See id.* at 713. The Bankruptcy Court further concluded that the Confirmation Order, which approved the third-party releases without Appellants' consent, conflicted with the Bankruptcy Court's prior holding in the *Washington Mutual* case, [20] which held that any third-party release of a non-debtor must be based on the consent of the releasing party (by contract or the mechanism of voting in favor of the plan). (*See id.* at 715) Because a resolution of these conflicting decisions under Third Circuit law was required, the Bankruptcy Court granted certification on this particular issue. (*See id.* at 717). [21] Relevant to this appeal, the *Washington Mutual* decision, issued in January 2011, pre-dates the Supreme Court's decisions in *Stern* (June 2011) and *Wellness* (May 2015), and the memorandum opinion granting certification does not include any discussion of *Stern* or its progeny. Rather, the memorandum opinion addresses the issue on whether a third-party release of a non-debtor must be based on the consent of the releasing party, regardless of the type of claim at issue. On February 22, 2016, the Third Circuit denied Appellants' petition for permission to appeal pursuant to 28 U.S.C. § 158(d)(2), and the appeal was docketed in this Court on February 26, 2016.

19    *Continental II* identified the hallmarks of permissible nonconsensual releases—fairness, necessity to the reorganization, and specific factual findings to support those conclusions—but in the absence of those factors, declined to "speculate upon whether there are circumstances under which we might validate a nonconsensual release that is both necessary and given in exchange for fair consideration." *Continental II, 203 F.3d at 214*. In

26-11268-mg    Doc 23-4    Filed 06/24/26    Entered 06/24/26 13:13:49    Exhibit D    Pg
100 of 697

In re Millennium Lab Holdings II, LLC, --- F.Supp.3d ---- (2017)
2017 WL 1032992, Bankr. L. Rep. P 83,087

*Global Industrial*, the Third Circuit specifically relied in the *Continental II* hallmarks in remanding to the Bankruptcy Court to make sufficient findings so that, if there was a subsequent appeal, "a determination can be made on whether there is a legitimate basis for concluding that [the injunction is] necessary to the reorganization and fair." *See In re Global Industrial, 645 F.3d 201, 215 (3d Cir. 2011)*.

[20]    *In re Washington Mutual*, 442 B.R. 314, 352 (Bankr. D. Del. 2011) ("This Court has previously held that it does not have the power to grant a third party release of a non-debtor .... Rather, any such release must be based on consent of the releasing party (by contract or the mechanism of voting in favor of the plan). Therefore, the original language in the Plan that would mandate third party releases even in the place of an indication on the ballot that the party did not wish to grant the release would not pass muster.") (internal citations omitted). Ultimately, over objection, the *Washington Mutual* Court found that a "release for distribution" provision did not violate the best interest of creditor test and was purely voluntary. *See In re Washington Mutual*, 461 B.R. 200 (Bankr. D. Del. 2011).

[21]    The Bankruptcy Court held: "Here, all of the cases within the Third Circuit cited by the parties recognize *Continental*, even *Washington Mutual.* But, my interpretation [of] what is meant by *Continental*'s hallmarks—fairness and necessity to the reorganization—differs from that of the *Washington Mutual* court. Accordingly, I find that Issue 2 meets the criteria of section 158(d)(2)(A)(ii)." *Millennium, 543 B.R. at 715*.

**\*10**  The Debtors' Motion to Dismiss the Appeal on the basis of equitable mootness has been fully briefed. (D.I. 6, 7, 8, 9, 10, 11, 28, 33, 34, 35) Merits briefing is also complete. (D.I. 12, 13, 14, 24, 25, 26, 27, 31, 32) On October 7, 2016, the Court heard oral argument on the Motion to Dismiss and the merits of the appeal. (D.I. 44)

### III. PARTIES' CONTENTIONS

Appellants raise several issues on appeal, but their principal challenge centers on the Bankruptcy Court's lack of adjudicatory authority: "The key question presented by this appeal is whether non-debtor Appellants' direct, state law and federal RICO claims against certain non-debtors, with respect to which Appellants have a constitutional right to adjudication by an Article III Court, can be released and permanently enjoined by an Article I

Bankruptcy Court without Appellants' consent." (*See* D.I. 13 at 2) Appellants argue that regardless of whether *Continental II* intended to approve nonconsensual third-party releases in any context, that decision predated *Stern*, and *Continental II* is inconsistent with *Stern.* The impact of *Stern* is that a finding of "related to" subject matter jurisdiction under the statute does not end the inquiry. The Bankruptcy Court must have constitutional adjudicatory authority as well. Appellants argue that the release and permanent injunction of their direct, non-bankruptcy claims against other non-debtors is a final order, which the Supreme Court's decisions in *Stern* and *Wellness* forbid. [22] (*Id.*)

[22]    Appellants further argue that the Bankruptcy Court lacked statutory authority to enter the Confirmation Order approving non-consensual third-party releases over Appellants' objection; the Bankruptcy Court lacked subject matter jurisdiction to approve the releases; and even if the Bankruptcy Court had authority and jurisdiction to approve the releases, the Bankruptcy Court erred in holding that the facts of this case warranted that extraordinary relief. (*See* D.I. 13 at 2–3)

Conversely, Debtors argue that *Stern* left intact the Bankruptcy Court's constitutional authority to approve a plan of reorganization including third-party releases and that courts in this District have rejected *Stern* challenges regarding a Bankruptcy Court's authority to do so. (*See* D.I. 21 at 31–34) Debtors further argue that even if the Bankruptcy Court lacked the necessary constitutional authority to enter a final order approving the nonconsensual releases of Appellants' claims, review and approval of the Confirmation Order by this Court moots Appellants' constitutional authority argument. (*See id.* at 35)

By the Motion to Dismiss, Debtors contend that, notwithstanding any merits of the appeal, it must be dismissed as equitably moot, as the Plan has been substantially consummated since the Effective Date. (*See* D.I 7 at 14 (arguing that complete change of ownership and control of successor Reorganized Debtors has been effected; substantially all transfers of property contemplated by Plan have been completed; and other substantial distributions under Plan have been made and are continuing)) In support of dismissal, Debtors argue that Appellants failed to exhaust their opportunities to seek a stay of the Confirmation Order, and cannot now

26-11268-mg    Doc 23-4    Filed 06/24/26    Entered 06/24/26 13:13:49    Exhibit D    Pg
101 of 697

In re Millennium Lab Holdings II, LLC, --- F.Supp.3d ---- (2017)
2017 WL 1032992, Bankr. L. Rep. P 83,087

ask the Court to unwind the global settlement and releases that serve as the foundation of the Plan, while retaining the full benefit of the $325 million settlement contribution. (*Id.* at 2) Debtors argue that the relief sought in the appeal threatens both to fatally scramble the Plan and significantly harm third parties who justifiably have relied on the Plan Confirmation Order. (*Id.*)

## IV. JURISDICTION AND STANDARDS OF REVIEW

### A. Appeal of the Confirmation Order

**\*11**  **[4]**    **[5]**  This Court has jurisdiction over all final judgments, orders, and decrees of the Bankruptcy Court pursuant to 28 U.S.C. § 158(a)(1). An order confirming a plan of reorganization is a final order. When reviewing a case on appeal, the Court reviews the Bankruptcy Court's legal determinations *de novo*, its factual findings for clear error, and its exercise of discretion for abuse thereof. *See In re United Healthcare Systems, Inc.*, 396 F.3d 247, 249 (3d Cir. 2005).

### B. Motion to Dismiss Appeal as Equitably Moot

**[6]**    **[7]**    **[8]**  Equitable mootness is a judge-made abstention doctrine which finds applicability in the limited context of bankruptcy, usually in an appeal following the confirmation of a plan of reorganization. *See In re SemCrude*, 728 F.3d 314, 317 (3d Cir. 2013). "Once effective, reorganizations typically implement complex transactions requiring significant financial investment." *Id.* Notwithstanding an aggrieved party's statutory right to appeal, and a federal court's "virtually unflagging obligation" to exercise the jurisdiction conferred on them, *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), in some circumstances granting the relief requested in the appeal "would disrupt the effected plan or harm third parties." *SemCrude*, 728 F.3d at 317. Parties seeking to dismiss an appeal as equitably moot contend that "even if the implemented plan is imperfect, granting the relief requested [in the appeal] would cause more harm than good." *Id.* In light of the responsibility of federal courts to exercise their jurisdictional mandate, the Third Circuit has cautioned that an appellate court must "proceed most carefully before dismissing an appeal as equitably moot." *Id.* at 318. "Before there is a basis to forgo jurisdiction, granting relief on appeal must be almost certain to produce a perverse outcome—chaos in the bankruptcy

court from a plan in tatters and/or significant injury to third parties. Only then is equitable mootness a valid consideration." *Id.* at 320 (citing *In re Phila. Newspapers LLC*, 690 F.3d 161, 168 (3d Cir. 2012) (internal citations and quotations omitted)).

**[9]**  In *In re Continental Airlines*, 91 F.3d 553 (3d Cir. 1996) (*en banc* ) ("*Continental I*"), the Third Circuit established five prudential factors to be considered in determining whether to dismiss an appeal of a bankruptcy order as equitably moot. [23] More recently, to reduce uncertainty in applying *Continental I*'s "interconnected and overlapping" factors, *Phila. Newspapers*, 690 F.3d at 168, the Third Circuit collapsed these five factors into a two-step inquiry. *See In re Tribune Media Co.*, 799 F.3d 272, 278 (3d Cir. 2015). The Court's considerations should be as follows: "(1) whether a confirmed plan has been substantially consummated; and (2) if so, whether granting the relief requested in the appeal will (a) fatally scramble the plan and/or (b) significantly harm third parties who have justifiably relied on plan confirmation." *Id.* at 278 (citing *SemCrude*, 728 F.3d at 321).

23    *See Continental I*, 91 F.3d at 560 ("(1) whether the reorganization plan has been substantially consummated, (2) whether a stay has been obtained, (3) whether the relief requested would affect the rights of parties not before the court, (4) whether the relief requested would affect the success of the plan, and (5) the public policy of affording finality to bankruptcy judgments.")

## V. DISCUSSION

### A. Equitable Mootness

**\*12**  **[10]**  Debtors' arguments in favor of dismissal on equitable mootness grounds are persuasive. Appellants, however, argue that equitable mootness cannot prevent this Court's review of the *Stern* issue. Appellants argue that the appeal implicates the Bankruptcy Court's constitutional power to act, and under well-established Supreme Court precedent this Court is obligated to decide whether the Bankruptcy Court had such power before considering whether the appeal should be dismissed under the judge-made equitable mootness doctrine. (*See* D.I. 28 at 16–19) (citing *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 93–104, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998); *Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 541–42, 106 S.Ct. 1326, 89

26-11268-mg    Doc 23-4    Filed 06/24/26    Entered 06/24/26 13:13:49    Exhibit D    Pg 102 of 697

In re Millennium Lab Holdings II, LLC, --- F.Supp.3d ---- (2017)
2017 WL 1032992, Bankr. L. Rep. P 83,087

L.Ed.2d 501 (1986)) Conversely, Debtors argue that in the *One2One* [24] and *Tribune*, [25] the Third Circuit has made clear that "*Stern* does not in any way impact dismissals for equitable mootness." (*See* D.I. 33 at 9–10) However, neither of those cases involved a claim that the Bankruptcy Court had acted in violation of Article III or *Stern.* Thus, the Court agrees with Appellants that it cannot consider the Debtors' motion to dismiss the appeal on equitable mootness grounds without first determining whether a constitutional defect in the Bankruptcy Court's decision deprived that court of the power to issue that decision. [26]

[24]    *In re One2One Commc'ns, LLC*, 805 F.3d 428 (3d Cir. 2015).

[25]    *Tribune*, 799 F.3d at 286.

[26]    Debtors noted at oral argument that they had "no objection to Your Honor dismissing this case as equitably moot except for dealing with the so-called *Stern v. Marshall* issue ..." (D.I. 44, 10/7/16 Hr'g. Tr. at 46) "Your Honor can decide, and we cited many cases that have decided, that say that Bankruptcy Court subject matter jurisdiction to confirm plans, the central role that bankruptcy courts play under the Bankruptcy Code is completely unaffected by *Stern v. Marshall.* There is Third Circuit authority to that effect and there are many other cases. So we have no problem with Your Honor deciding that limited issue, if you feel a need to, but [the Debtors] don't think you need to." (*Id.* at 46–47)

The Court turns to Appellants' *Stern* argument.

### B. Lack of Adjudicatory Authority

[11] The Bankruptcy Court held that it had, at a minimum, "related to" subject matter jurisdiction under *Pacor*, based on its holding that certain "indemnification rights and the advancement rights ... provide a sufficient nexus, such that I have jurisdiction." (B.D.I. 206, 12/11/15 Hr'g. Tr. at 13:1–14:2) The Bankruptcy Court further held that "*Stern v. Marshall* does not change the conclusion that this Bankruptcy Court has **jurisdiction.**" (*Id.* at 15:23–15:24 (emphasis added)

This Court agrees. However, as discussed above, subject matter jurisdiction is not the end of the inquiry, as the Bankruptcy Court must have constitutional authority as well. It is unclear to what extent the Bankruptcy Court had the opportunity to consider what is now the main issue on appeal—the Bankruptcy Court's authority post-*Stern* to enter a final order discharging Appellants' non-bankruptcy state law claims against non-debtors without Appellants' consent—given the lack of time and attention the parties ascribed to this issue in their briefing and arguments below. What is clear is that the Bankruptcy Court had no occasion to explain its reasoning on this issue. As the Bankruptcy Court explained: "because of the necessities of this case, I have not had time to address that argument. ***But I need not do so, given my finding that I have related-to jurisdiction.***" (*Id.* at 16:4–16:11 (emphasis added))

Appellants argue that by holding that statutory "related to" jurisdiction is the same as constitutional adjudicatory authority to release and permanently enjoin non-debtor Appellants' non-bankruptcy state law claims against non-debtors without Appellants' consent—or that "related to" jurisdiction confers such constitutional adjudicatory authority on the Bankruptcy Court— the Bankruptcy Court's analysis was incorrect. That Appellants' constitutional authority objection was not addressed in the confirmation ruling is hardly surprising, given that the argument was set forth less than clearly in the papers and at oral argument. As summarized at length above, this objection was barely mentioned in pre-confirmation briefing, subsumed as it was in Appellants' subject matter jurisdiction arguments, and was not meaningfully addressed at oral argument on Plan confirmation or the Certification Motion. Adjudicatory authority was not central to the Bankruptcy Court's certification opinion either.

**\*13** Based on the foregoing lack of clarity in the parties' papers, coupled with the exigencies of these chapter 11 cases—including the short timeframe within which the Bankruptcy Court had to address Plan objections and rule on Plan confirmation, in order to avoid government-ordered shutdown of the Debtors' business—the Court is not convinced that the Bankruptcy Court ever had the opportunity to hear and rule on the adjudicatory authority issue. [27]

[27]    *See* B.D.I. 206, 12/11/16 Hr'g. Tr. at 4 ("I'm ruling from the bench because a prompt ruling is needed in this case, given the looming December 30 deadline under the settlement agreement with the United— the U.S. settling parties; such that, a written decision is not possible. Because of this, my ruling is not as

26-11268-mg  Doc 23-4  Filed 06/24/26  Entered 06/24/26 13:13:49  Exhibit D  Pg 103 of 697

In re Millennium Lab Holdings II, LLC, --- F.Supp.3d ---- (2017)
2017 WL 1032992, Bankr. L. Rep. P 83,087

concise as it would be, and it's not as precise as it would be, or probably as well said as it would be if I had the time to draft an opinion.").

### C.—Merits of Appellants' Arguments

 **[12]**   **[13]**   There appears to be no dispute between the parties that Appellants' state common law fraud and RICO claims are non-bankruptcy claims between non-debtors which do not "stem[ ] from the bankruptcy itself" and would not "necessarily be resolved in the claims allowance process." *See Stern*, 131 S.Ct. at 2618. Despite Debtors' reliance on *Charles Street*, the Court is not persuaded that these claims involve matters of "public rights" which could be assigned to a non-Article III court. Rather these are claims "between two private parties" based on state common law or statutes that are not closely intertwined with a federal regulatory program. *See Stern*, 131 S.Ct. at 2614. As such, Appellants appear to be entitled to Article III adjudication of these claims, and *Stern* dictates that no final order could be entered on such claims by an Article I court, barring consent of the parties (which has not been provided here). The Court is further persuaded by Appellants' argument that the Plan's release, which permanently extinguished Appellants' claims, is tantamount to resolution of those claims on the merits against Appellants. *See, e.g., Digital Impact*, 223 B.R. at 13 n.6 ("A release, or permanent injunction, contained in a confirmed plan ... has the effect of a judgment—a judgment against the claimant and in favor of the non-debtor, accomplished without due process. Neither the non-debtor, nor the claimant, have an opportunity to present their claims or defenses to the court for determination ...."); *see also CoreStates Bank N.A. v. Huls America, Inc.*, 176 F.3d 187, 194 (3d Cir. 1999) ("The principle of claim preclusion applies to final orders overruling objections to a reorganization plan in bankruptcy proceedings just as it does to any other final judgment on a claim.") The Court does not agree with Debtors that the Plan release did not run afoul of *Stern* because it was not a final adjudication of the claims. If Article III prevents the Bankruptcy Court from entering a final order disposing of a non-bankruptcy claim against a nondebtor outside of the proof of claim process, it follows that this prohibition should be applied regardless of the proceeding (*i.e.*, adversary proceeding, contested matter, plan confirmation).

 **[14]**   Debtors contend that any concerns that an Article III court must consider the third party releases on a final basis may be cured and mooted by this Court's *de novo* review, relying on the Supreme Court's decision in *Executive Benefits Ins. Agency v. Arkison*, —— U.S. ——, 134 S.Ct. 2165, 189 L.Ed.2d 83 (2014). [28] But this Court's review of the Plan confirmation order does not satisfy constitutional concerns set forth in *Stern* and its progeny because there has been no adjudication on the merits of the actions released by the Plan: Appellants' Fraud Action. The Bankruptcy Court did not conduct any proceedings on the merits of the Fraud Action, and this Court is not in any position at this point to adjudicate those claims (on which, among other things, no discovery has been taken). [29] Debtors' argument that this Court's *de novo* review of the confirmation order can cure *Stern* concerns —as "the factual record is uncontroverted and satisfies the controlling standard for approval of nonconsensual third party releases"—misses the point. As Appellants argue, affirming the Bankruptcy Court's approval of the release would do nothing more than ratify the entry of a judgment extinguishing Appellants' claims without an actual adjudication of them on the merits by an Article III judge. Thus, this Court's review of the Plan Confirmation Order cannot resolve the constitutional concerns set forth in *Stern.*

---

28   In *Executive Benefits*, the Bankruptcy Court conducted summary judgment proceedings on the merits of the trustee's fraudulent conveyance claims and entered judgment in the trustee's favor. *Id.* at 2169. The District Court conducted *de novo* review and affirmed. *See id.* at 2174. Because the District Court would have done the same thing had the Bankruptcy Court issued proposed findings of facts and conclusions of law, the Supreme Court concluded that the District Court had in fact adjudicated the fraudulent conveyance claims and entered a valid final judgment in compliance with Article III. *See id.* at 2175.

29   Debtors assert that Appellants had the opportunity in the Bankruptcy Court to present whatever evidence they wished at the Plan confirmation hearing, suggesting that Appellants have already been offered the trial to which Appellants claim they have been unconstitutionally deprived. (*See* D.I. 44, 10/7/16 Hr'g. Tr. at 14–15; 69–70) The Court understands Debtors' argument essentially to be that even if Appellants are correct that they had a right to a trial on their fraud and RICO claims, Appellants waived that right. This issue has not been presented yet to the Bankruptcy Court. As part of the proceedings

In re Millennium Lab Holdings II, LLC, --- F.Supp.3d ---- (2017)

2017 WL 1032992, Bankr. L. Rep. P 83,087

on remand, the Bankruptcy Court is free to consider whether, even if Appellants had a right to a trial that was impermissibly eliminated by the third-party nonconsensual releases that, in any event, Appellants independently waived their right to such a trial. The Court does not mean to suggest it has already determined the correct answer to this question.

### D. Remand for Further Proceedings

**\*14** **[15]** Notwithstanding the seeming merits of Appellants' arguments, the Court will not rule on an issue that the Bankruptcy Court itself may not have ruled upon, especially in light of the fact that this issue has now become Appellants' primary argument on appeal. Further proceedings are necessary. The Court will therefore remand this case to the Bankruptcy Court to consider whether, or clarify its ruling that, the Bankruptcy Court had constitutional adjudicatory authority to approve the nonconsensual release of Appellants' direct non-bankruptcy common law fraud and RICO claims against the Non-Debtor Equity Holders; and, if it does not have such authority, to submit proposed findings of fact and conclusions of law regarding the final disposition of these claims through the Confirmation Order, or, alternatively, to strike the nonconsensual release of Appellants' claims from the Confirmation Order.

The Court recognizes such a remand is far from ideal at this stage of the Chapter 11 proceedings. Still, given its experience and expertise, the Bankruptcy Court should rule on this issue first.

### VI. CONCLUSION

For the reasons explained above, the Court will deny without prejudice the Motion to Dismiss the Appeal as equitably moot and remand to the Bankruptcy Court for further proceedings. A separate Order will be entered.

### ORDER

At Wilmington, this 17th day of March, 2017, for the reasons set forth in the accompanying Memorandum issued this date, IT IS HEREBY ORDERED that:

1. The Motion to Dismiss (D.I. 6) is DENIED WITHOUT PREJUDICE.

2. The Confirmation Order is remanded for further proceedings: (i) the Bankruptcy Court shall consider whether, or clarify its ruling that, it had constitutional adjudicatory authority to approve the nonconsensual release of Appellants' direct non-bankruptcy common law fraud and RICO claims against the Non–Debtor Equity Holders; (ii) if not, to issue proposed findings of fact and conclusions of law regarding final disposition of these claims through the Confirmation Order, or alternatively, to strike the nonconsensual release of Appellants' claims from the Confirmation Order; and (iii) in connection with the foregoing, to conduct any further proceedings the Bankruptcy Court deems just and necessary.

### All Citations

--- F.Supp.3d ----, 2017 WL 1032992, Bankr. L. Rep. P 83,087

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 54

**In re Modern Land (China) Co., Ltd., 641 B.R. 768 (2022)**

2022 WL 2794014

641 B.R. 768
United States Bankruptcy Court, S.D. New York.

IN RE: MODERN LAND (CHINA) CO., LTD., Debtor in a Foreign Proceeding.

Case No. 22-10707 (MG)
|
Signed July 22, 2022

**Synopsis**
**Background:** Authorized foreign representative of debtor, a Cayman-incorporated holding company for a large group of businesses involved in real estate investment and development that largely were incorporated in the Cayman Islands or the British Virgin Islands (BVI) but conducted most or all of their business in the People's Republic of China (PRC), filed motion for recognition, as a foreign main proceeding, of Cayman Islands proceeding involving consensual scheme of arrangement between debtor and certain holders of notes that were issued by debtor and governed by New York law. No objections were filed.

**Holdings:** The Bankruptcy Court, Martin Glenn, Chief Judge, held that:

[1] the fact that debtor's Cayman Islands proceeding did not involve court-appointed joint provisional liquidators did not preclude a determination that debtor's center of main interests (COMI) was in the Cayman Islands;

[2] recognition of the Cayman Islands proceeding as a foreign nonmain proceeding was not warranted; but

[3] recognition as a foreign main proceeding was warranted.

Motion granted.

West Headnotes (23)

**[1]** **Bankruptcy** Cases Ancillary to Foreign Proceedings

Based on the UNCITRAL Model Law on Cross-Border Insolvency, Chapter 15 of the Bankruptcy Code adopts the center of main interests (COMI) concept, permitting recognition of a foreign proceeding in a debtor's center of main interests, that is, a "foreign main proceeding," or, alternatively, recognition of a "foreign nonmain proceeding" in a place where the debtor maintains an "establishment." 11 U.S.C.A. §§ 1502(2), 1502(4), 1517(a)(1), 1517(b)(2).

**[2]** **Bankruptcy** Cases Ancillary to Foreign Proceedings

Pursuant to Chapter 15 of the Bankruptcy Code, provided that a foreign court properly exercises jurisdiction over a foreign debtor in an insolvency proceeding, and the foreign court's procedures comport with broadly accepted due process principles, a decision of the foreign court approving a scheme or plan that modifies or discharges New York law-governed debt is enforceable. U.S. Const. Amend. 15; 11 U.S.C.A. § 1501 et seq.

**[3]** **Bankruptcy** Cases Ancillary to Foreign Proceedings

Chapter 15 of the Bankruptcy Code limits a United States bankruptcy court's authority to enjoin conduct outside the territorial jurisdiction of the United States, but it does not make a discharge of New York law-governed debt any less controlling. 11 U.S.C.A. § 1501 et seq.

**[4]** **Bankruptcy** Cases Ancillary to Foreign Proceedings

To obtain recognition under Chapter 15, a

foreign proceeding must be either a foreign main or foreign nonmain proceeding. 11 U.S.C.A. § 1517(a)(1).

**[5]**   **Bankruptcy**⚷Cases Ancillary to Foreign Proceedings

Chapter 15 debtor's center of main interests (COMI) is determined as of the filing date of the Chapter 15 petition, without regard to the debtor's historic operational activity. 11 U.S.C.A. § 1502(4).

**[6]**   **Bankruptcy**⚷Cases Ancillary to Foreign Proceedings

Although, in absence of evidence to contrary, Chapter 15 debtor's registered office is presumed to be center of debtor's main interests (COMI), this presumption can be overcome. 11 U.S.C.A. §§ 1502(4), 1516(c).

**[7]**   **Bankruptcy**⚷Cases Ancillary to Foreign Proceedings

In determining whether the presumption that a Chapter 15 debtor's center of main interests (COMI) is in the country where its registered office is located has been overcome, among the factors that courts consider are the location of debtor's headquarters, the location of those who actually manage debtor, the location of debtor's primary assets, the location of the majority of debtor's creditors or of a majority of the creditors who would be affected by the case, and/or the jurisdiction whose law would apply to most disputes; courts also may consider whether the location in question is where debtor conducts its regular business, so that the place is ascertainable by third parties. 11 U.S.C.A. §§ 1502(4), 1516(c).

**[8]**   **Bankruptcy**⚷Cases Ancillary to Foreign Proceedings

In determining whether the presumption that a Chapter 15 debtor's center of main interests (COMI) is in the country where its registered office is located has been overcome, courts are readily able to determine whether debtor's COMI is in fact regular and ascertainable, and not easily subject to tactical removal, by examining factors in the public domain. 11 U.S.C.A. §§ 1502(4), 1516(c).

**[9]**   **Bankruptcy**⚷Cases Ancillary to Foreign Proceedings

If debtor's center of main interests (COMI) has "shifted" prior to filing its Chapter 15 petition, courts may engage in holistic analysis to ensure that debtor has not manipulated center in bad faith; courts ask whether there is evidence pointing to any insider exploitation, untoward manipulation, and overt thwarting of third-party expectations that would support denying recognition. 11 U.S.C.A. §§ 1502(4), 1516(c).

**[10]**   **Bankruptcy**⚷Cases Ancillary to Foreign Proceedings

In the Chapter 15 case of debtor, a Cayman-incorporated holding company for a large group of businesses involved in real estate investment and development that largely were incorporated in the Cayman Islands or the British Virgin Islands (BVI) but conducted most or all of their business in the People's Republic of China (PRC), the fact that the Cayman Islands proceeding for which debtor sought

In re Modern Land (China) Co., Ltd., 641 B.R. 768 (2022)
2022 WL 2794014

recognition, which concerned a consensual scheme of arrangement between debtor and certain holders of notes issued by debtor, did not involve court-appointed joint provisional liquidators did not preclude a determination that debtor's center of main interests (COMI) was in the Cayman Islands. 11 U.S.C.A. §§ 1502(4), 1516(c).

**[11]    Bankruptcy**⬤⟜Cases Ancillary to Foreign Proceedings

With respect to a foreign proceeding, recognition and enforcement can be granted as discretionary relief under Chapter 15 of the Bankruptcy Code even in a nonmain proceeding. 11 U.S.C.A. §§ 1507, 1517(b)(2), 1521.

**[12]    Bankruptcy**⬤⟜Cases Ancillary to Foreign Proceedings

Whether foreign debtor has an "establishment" in a country, as required for recognition of a foreign proceeding as a "foreign nonmain proceeding" under the Bankruptcy Code, is determined at the time of filing the Chapter 15 petition. 11 U.S.C.A. §§ 1502(2), 1517(b)(2).

**[13]    Bankruptcy**⬤⟜Cases Ancillary to Foreign Proceedings

Several factors contribute to identifying an "establishment" in a country, as required for recognition of a foreign proceeding as a "foreign nonmain proceeding" under the Bankruptcy Code: the economic impact of debtor's operations on the market, the maintenance of a minimum level of organization for a period of time, and the objective appearance to creditors whether debtor has a local presence, as

evidenced by engagement of local counsel and commitment of capital to local banks. 11 U.S.C.A. §§ 1502(2), 1517(b)(2).

**[14]    Bankruptcy**⬤⟜Cases Ancillary to Foreign Proceedings

Recognition was not warranted, as a foreign nonmain proceeding, of Cayman Islands proceeding involving consensual scheme of arrangement between Chapter 15 debtor, a Cayman Islands holding company for businesses involved in real estate investment and development that largely were incorporated in the Cayman Islands or the British Virgin Islands (BVI) but conducted most or all of their business in the People's Republic of China (PRC), and creditors that held notes issued by debtor and governed by New York law; recognition would have been inconsistent with goals of foreign nonmain proceedings, as notes in question were not assets in the Cayman Islands, neither the Cayman restructuring itself nor debtor's bookkeeping activities there constituted nontransitory economic activity, and debtor's business activities had negligible effect on the local marketplace. 11 U.S.C.A. §§ 1502(2), 1517(b)(2).

**[15]    Bankruptcy**⬤⟜Cases Ancillary to Foreign Proceedings

Provisions of the UNCITRAL Model Law on Cross-Border Insolvency, upon which Chapter 15 of the Bankruptcy Code is based, governing foreign nonmain proceedings support the administration of a restructuring proceeding by a single foreign court. 11 U.S.C.A. § 1501 et seq.

**[16]    Bankruptcy**⬤⟜Cases Ancillary to Foreign Proceedings

In re Modern Land (China) Co., Ltd., 641 B.R. 768 (2022)

2022 WL 2794014

The foreign insolvency proceeding of a foreign debtor cannot itself constitute "nontransitory economic activity" within meaning of the Bankruptcy Code's definition of "establishment," as required to support recognition of proceeding as a foreign nonmain proceeding. 11 U.S.C.A. §§ 1502(2), 1517(b)(2).

**[17]** **Bankruptcy**⚷Cases Ancillary to Foreign Proceedings

Recognition was warranted, as a foreign main proceeding, of Cayman Islands proceeding involving consensual scheme of arrangement between Chapter 15 debtor, a Cayman-incorporated holding company whose subsidiaries largely were incorporated in the Cayman Islands or the British Virgin Islands (BVI) and were involved in real estate investment and development around the world, and creditors that held notes issued by debtor and governed by New York law; there were no objections to recognition, recognition was consistent with goals of Chapter 15, including cooperation with foreign courts, maximizing value of debtors' assets, and facilitating protection for debtors, as well as with creditors' expectations, debtor had ongoing Cayman restructuring efforts which constituted its primary business activity at time of filing, Cayman choice-of-law principles supported recognition, and debtor did not engage in center of main interests (COMI)-shifting behavior or bad faith. 11 U.S.C.A. §§ 1501(a)(1)-(5), 1502(4), 1516(c).

**[18]** **Bankruptcy**⚷Cases Ancillary to Foreign Proceedings

Chapter 15 of the Bankruptcy Code contemplates cooperation between American and foreign bankruptcy courts. 11 U.S.C.A. § 1501 et seq.

**[19]** **Bankruptcy**⚷Cases Ancillary to Foreign Proceedings

When determining debtor's center of main interests (COMI), for purposes of determining whether foreign proceeding is foreign main proceeding, creditor expectations can be evaluated through examination of the public documents and information available to guide creditor understanding of the nature and risks of their investments. 11 U.S.C.A. §§ 1502(4), 1517(a)(1).

**[20]** **Bankruptcy**⚷Cases Ancillary to Foreign Proceedings

Factors considered in determining a foreign debtor's center of main interests (COMI) are not meant to be applied "mechanically" but, rather, are to be viewed in light of Chapter 15's emphasis on protecting the reasonable interests of parties in interest pursuant to fair procedures and the maximization of the debtor's value. 11 U.S.C.A. §§ 1502(4), 1516(c).

**[21]** **Bankruptcy**⚷Cases Ancillary to Foreign Proceedings

When court considers the factors for determining a debtor's center of main interests (COMI), for purposes of determining whether foreign proceeding is foreign main proceeding, the protection of creditors' interests is paramount. 11 U.S.C.A. §§ 1502(4), 1516(c).

In re Modern Land (China) Co., Ltd., 641 B.R. 768 (2022)

2022 WL 2794014

**[22]    Bankruptcy** 🗝 Cases Ancillary to Foreign Proceedings

Exempted-company status of debtor, a Cayman-incorporated holding company for large group of businesses involved in real estate investment and development that largely were incorporated in the Cayman Islands or the British Virgin Islands (BVI) but conducted most or all of their business in the People's Republic of China (PRC), did not jeopardize its ability to have its center of main interests (COMI) in the Cayman Islands, even though, as an exempted company with limited liability, debtor's operations in the Cayman Islands were subject to certain limitations. 11 U.S.C.A. §§ 1502(4), 1516(c).

**[23]    Bankruptcy** 🗝 Cases Ancillary to Foreign Proceedings

When conducting analysis of foreign debtor's center of main interests (COMI), courts may consider jurisdiction whose law would apply to most disputes; this choice-of-law factor favors a COMI in the jurisdiction whose law applies. 11 U.S.C.A. § 1502(4).

**Attorneys and Law Firms**

**\*772** SIDLEY AUSTIN LLP, Counsel to the Foreign Representative, 787 Seventh Avenue, New York, NY 10019, By: Anthony Grossi, Esq.

MAPLES AND CALDER (CAYMAN) LLP, Attorneys for Debtor in a Foreign Proceeding for the Cayman Islands, Ugland House, South Church Street, Grand Cayman, KYI-1104, By: Caroline Moran

KIRKLAND ELLIS LLP, Attorneys for the Ad Hoc Group, 26th Floor, Gloucester Tower, the Landma, 15 Queen's Road Central, Hong Kong, 00000, By: Willa Wang, Esq.

KIRKLAND ELLIS LLP, Attorneys for the Ad Hoc

Group, 300 N. Lasalle, Chicago, IL 60654, By: Heidi Hockberger, Esq.

**MEMORANDUM OPINION GRANTING MOTION FOR RECOGNITION AND RELATED RELIEF**

MARTIN GLENN, CHIEF UNITED STATES BANKRUPTCY JUDGE

**\*\*1** [1]This case raises the important questions of whether and when, under Chapter 15 of the Bankruptcy Code, a bankruptcy court may recognize and enforce a scheme of arrangement sanctioned by a court in the Cayman Islands, the debtor's place of incorporation, that modifies or discharges New York law governed debt. The Debtor here is a holding company for a large group of businesses, most of which are incorporated in the Cayman Islands or the British Virgin Islands ("BVI"), but that conduct most or all of their business in the People's Republic of China ("PRC"). Based on the UNCITRAL Model Law on Cross-Border Insolvency, Chapter 15 adopts the center of main interest ("COMI") concept, permitting recognition of a foreign proceeding in a debtor's center of main interest (a "foreign main proceeding") or, alternatively, recognition of a "foreign nonmain proceeding" in a place where the debtor maintains an "establishment." While the statute establishes a presumption that a debtor's COMI is its place of incorporation, the presumption can be overcome where other factors support finding the COMI to be elsewhere. Should this Debtor's Cayman sanctioned Scheme be recognized and enforced by this Court? On the facts of this case, the Court concludes the answer is yes. For the reasons explained below, this Court **GRANTS** the Motion recognizing the Cayman Proceeding as a foreign main proceeding and recognizing and enforcing the Scheme.

**\*773 I. BACKGROUND**

**A. The Motion for Recognition and Enforcement**

Pending before the Court is the *Motion for (I) Recognition of a Foreign Main Proceeding, (II) Recognition of a Foreign Representative, and (III) Related Relief under*

2022 WL 2794014

*Chapter 15 of the Bankruptcy Code* (the "Motion," ECF Doc. # 4), filed by Mr. Zhang Peng, in his capacity as the authorized foreign representative (the "Foreign Representative") of Modern Land (China) Co., Limited (the "Debtor"). A proposed recognition order is attached to the Motion as Exhibit A. ("Proposed Recognition Order," ECF Doc. # 4-1.) The Debtor is the subject of a foreign proceeding (the "Cayman Proceeding") concerning a scheme of arrangement (the "Scheme" or "Cayman Scheme") between the Debtor and certain holders of the existing notes (the "Scheme Creditors"), under section 86 of the Cayman Islands Companies Act 2022 (the "Companies Act") and currently pending before the Grand Court of the Cayman Islands (the "Cayman Court").

The following declarations were filed in support of the Motion: (i) a declaration of the Foreign Representative ("Peng Declaration," ECF Doc. # 5); (ii) a declaration of the Debtor's Cayman Islands counsel, Caroline Moran ("Ms. Moran") (ECF Doc. # 6); and (iii) the Foreign Representative's statements required by section 1515(c) of the Bankruptcy Code and Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure (ECF Doc. # 3). The Foreign Representative also filed supplemental briefing addressing the *In the Matter of Rare Earth Magnesium Technology Group Holdings Limited* [2022] HKCFI 1686 ("Rare Earth Briefing," ECF Doc. # 12) and *In the Matter of an application for recognition and assistance by the provisional liquidator of Global Brands Group Holding Limited (in liquidation)*, HCMP 644/2022, [2022] HKCFI 1789 ("Global Brands Briefing," ECF Doc. # 19.)

**\*\*2** The objection deadline was set for June 29, 2022, at 4:00 p.m. (*See* ECF Doc. # 9). There were no objections filed in response to the Motion. The hearing to sanction the Scheme by the Cayman Court was scheduled for July 5, 2022, at 11:00 a.m. (Motion ¶ 34.)

On July 5, 2022, the Debtor filed a supplemental declaration of Ms. Moran addressing the hearing to sanction the Scheme. ("Supplemental Moran Declaration," ECF Doc. # 20.) Annexed to the Supplemental Moran Declaration as Exhibit A is a report of the scheme meeting held on June 30, 2022 (ECF Doc. # 20-1) and as Exhibit B a copy of the order sanctioning the Scheme issued by the Cayman Court ("Sanction Order," ECF Doc. # 20-2).

A hearing on the Motion was held on July 7, 2022. At the hearing, the Court directed the Foreign Representative's counsel to file further supplemental briefing by July 12, 2022. On July 12, 2022, the Foreign Representative filed

(i) a supplemental brief ("Supplemental Brief," ECF Doc. # 23), (ii) a second declaration by the Foreign Representative ("Supplemental Peng Declaration," ECF Doc. # 24), and (iii) a third declaration by Ms. Moran ("Third Moran Declaration," ECF Doc. # 25).

**B.   The Debtor's Business Operations and Preexisting Capital Structure**

On June 28, 2006, the Debtor was incorporated in the Cayman Islands under the Companies Act as an exempted company with limited liability. (Motion ¶ 6.) The Debtor is the ultimate holding company of a group of companies comprising the Debtor and its subsidiaries, including the following: Great Trade Technology Ltd., a holding company incorporated with limited **\*774** liability in the BVI; the Modern Land HK Companies; and Jiu Yun Development Co., Ltd., a holding company incorporated with limited liability in Hong Kong (collectively with Great Trade Technology Ltd., the Modern Land HK Companies, and together with the Debtor, the "Company"), that carries out real estate investment and development in the PRC and the United States. (*Id.* ¶ 7.) The Company is a property developer focused on eco-friendly residences in the PRC with four product lines: MOMA; Modern Eminence MOMA; Modern Horizon MOMA; and Modern City MOMA. (*Id.* ¶¶ 8, 10.)

As of June 30, 2021, the Company had a contracted sales gross floor area of 2.08 million square meters and aggregate unsold gross floor area of 16.77 million square meters in the PRC. (*Id.* ¶ 11.) During the first half of 2021, the Company purchased a total of 20 new projects with an aggregate gross floor area of 3.56 million square feet. (*Id.*)

The Debtor's shares have been listed on the Stock Exchange of Hong Kong Limited since July 12, 2013. (*Id.* ¶ 9.) As of December 31, 2021, the authorized share capital of the Debtor was $80 million divided into eight billion ordinary shares of a par value of $0.01 each, of which 2.79 billion of the ordinary shares were issued and fully paid.[1] (*Id.*) As of June 30, 2021, the Company's total indebtedness was $4.32 billion, including: (i) short-term borrowings of $972.33 million; (ii) long-term borrowings of $1.92 billion; and (iii) bonds payable of $1.42 billion. (*Id.* ¶ 12.) Additionally, as of June 30, 2021, the Company's contingent liabilities amounted to $2.57 billion. (*Id.*)

[1]   All dollar amounts are calculated in USD.

As part of the Company's $1.42 billion of bonds payable, the total principal amount outstanding under the existing notes ("Existing Notes") is $1.34 billion. (*Id.* ¶ 13.) The Existing Notes are the subject of the Scheme with each series of notes issued by the Debtor having different maturity dates and different interest rates. (*Id.* ¶¶ 13–14.) The remaining indebtedness is not being restructured and will be unaffected by the Scheme and this Chapter 15 case. (*Id.* ¶ 14.) As of June 30, 2021, the Debtor's current assets amounted to $12.49 billion on a consolidated basis[2] and these assets were located in the PRC and the United States. (*Id.* ¶ 15.) Some of the assets were pledged to secure certain banking and other facilities granted to the Company and mortgage loans granted to buyers of sold properties. (*Id.*)

[2]   As of June 30, 2021, the Company's current assets consist of the following: a) inventory of $145.79 million; b) properties under development for sale of $6.92 billion; c) properties held for sale of $895 million; d) trade and other receivables of $1.78 billion; e) amount due from related parties of $129.27 million; f) restricted cash of $570.69 million; and g) bank balances and cash of $2.06 billion. (Motion ¶ 15.)

### C. The Cayman Proceeding

**3** Market concerns over the operations of Chinese property developers were intensified due to reduced lending for real estate development, the impact of COVID-19 on macroeconomic conditions, and certain negative credit events. (*Id.* ¶ 18.) These conditions led the Company to experience liquidity pressures due to limited access to external capital to refinance debt and reduced cash generated from sales. (*Id.*) The Company failed to meet two repayments arranged for October 2021 and February 2021 which constituted events of default. (*Id.*) These amounts remain unpaid. (*Id.*)

On October 26, 2021, the Debtor appointed Sidley Austin LLP as its legal advisor. (*Id.* ¶ 20.) On November 5, 2021, the Debtor appointed Houlihan Lokey **775** (China) Limited as its financial advisor. (*Id.*) The Company commenced discussions with the ad hoc group of holders of the Existing Notes, who are advised by Kirkland & Ellis LLP. (*Id.* ¶ 19.)

On February 25, 2022, after negotiations with the ad hoc group, the Debtor entered into a restructuring support agreement (the "RSA") with the Scheme Creditors. (*Id.* ¶ 21; *see also* Peng Decl., Ex. A.) As of May 31, 2022, certain Scheme Creditors holding $1,083,272,000 of the Existing Notes—representing 80.75% of the aggregate outstanding principal amount of all Existing Notes—had agreed to the RSA. (Motion ¶ 24.)

On April 14, 2022, the Debtor filed a petition (the "Scheme Petition," ECF Doc. # 6-1) with the Cayman Court commencing the Cayman Proceeding, seeking an order that (i) directed the Company to convene a meeting on the Scheme for a single class of creditors only (the "Scheme Meeting"), (ii) requested a convening hearing (the "Convening Hearing"), and (iii) sought the appointment of the Foreign Representative. (*Id.* ¶ 32.) Following the Convening Hearing on May 31, 2022, the Cayman Court entered the order (the "Convening Order") scheduling the Scheme Meeting for June 29, 2022, scheduling the Sanction Hearing for July 5, 2022, and appointing the Foreign Representative. (*Id.* ¶ 34; Peng Decl., Ex. B.)

The Convening Order states that Scheme Creditors will be notified properly of the Scheme Meeting and will have the opportunity to raise questions and objections to the Scheme at the Scheme Meeting and/or at the Sanction Hearing. (Motion ¶ 37; Peng Decl., Ex. B.) At the Scheme Meeting, a vote will be held to determine whether the Scheme Creditors that are present and voting in person or by proxy will approve the Scheme. (Motion ¶ 38.) If a majority of creditors representing at least seventy-five percent in value of the Scheme Creditors present and voting at the Scheme Meeting votes in favor of the scheme, the Scheme is approved.[3] (*Id.*)

[3]   As detailed in Section I.G., below, the Scheme Creditors voted overwhelmingly to approve the Scheme—99% in number and 94.8% in amount. No objections to the Scheme were raised either in connection with the Cayman sanction hearing or this Court's recognition hearing.

### D. Description of the Scheme and Issuance of New Notes

The Scheme's effect will be to release the Scheme Creditors' claims related to the Existing Notes documents. (*Id.* ¶ 26.) In return, each Scheme Creditor will receive a pro rata share of the following consideration (the "Scheme Consideration"): cash consideration of $22.916 million; and the new notes ("New Notes"), in an aggregate principal amount equal to the sum of (i) 98.3%

of the outstanding principal amount of the Existing Notes held by the Scheme Creditors; and (ii) accrued and unpaid interest up to but excluding the day the restructuring becomes effective (the "Restructuring Effective Date"). (*Id.*) This will enable the Company to restructure its existing indebtedness under the Existing Notes. (*Id.* ¶ 28.) The Debtor will also be issuing the New Notes on the Restructuring Effective Date. (*Id.*)

**\*\*4** On the Restructuring Effective Date, following the distribution of the Scheme Consideration and the issuance of the New Notes, all outstanding Existing Notes will be canceled and all guarantees in connection with the Existing Notes will be released. (*Id.* ¶ 29.) Additionally, the Scheme provides for releases by Scheme Creditors of any claim related to the restructuring against the Debtor and its affiliates. (*Id.* ¶ 30.) If the Scheme is approved by the requisite majorities of creditors and sanctioned **\*776** by the Cayman Court with a sealed copy of the Sanction Order filed with the Cayman Islands Registrar of Companies, the Scheme will then bind all Scheme Creditors regardless of how, or if, they voted. (*Id.* ¶ 31.)

### E. Rare Earth Briefing

On June 6, 2022, the High Court of the Hong Kong Special Administrative Region Court of First Instance (the "Hong Kong Court") ruled in *In the Matter of Rare Earth Magnesium Technology Group Holdings Limited* [2022] HKCFI 1686 (the "*Rare Earth* Opinion"). In dicta, the *Rare Earth* Opinion speculated that "recognition under *Chapter 15* is limited in territorial effect and I think it is reasonable to assume that the reason for this is that the procedure does not discharge the debt." *Rare Earth* Opinion ¶ 36. The *Rare Earth* Opinion relies heavily upon this Court's decision in *In re Agrokor d.d.*, 591 B.R. 163, 169 (Bankr. S.D.N.Y. 2018). Specifically, the Hong Kong Court points to this Court's explanation that "Section 1520(a)(1) provides that the automatic stay will apply to all the debtor's property *that is located within the territorial jurisdiction of the United States*." *Rare Earth* Opinion ¶ 35 (citing *In re Agrokor*, 591 B.R. at 187). From this statement, the Hong Kong Court concludes that "[r]ecognition does not appear as a matter of United States' law to discharge the debt." *Id.* ¶ 36.

On June 17, 2022, the Debtor filed the Rare Earth Briefing noting that the Hong Kong Court's statements principally rely on the application of United States law. (Rare Earth Briefing ¶ 8.) The Debtor notes that a federal court's Chapter 15 order that recognizes a discharge of New York law governed debt granted in a foreign

proceeding is a complete and valid discharge of that debt as a matter of United States law. (*Id.* ¶ 9.) The Debtor asserts that because the Proposed Recognition Order recognizes a discharge to the extent granted in the foreign Cayman Proceeding, it serves as a complete and valid discharge of the Existing Notes, which are governed by New York law, as a matter of New York state law. (*Id.*)

This is a critically important issue. The Scheme in this case, and in many other scheme or restructuring plan cases, modifies or discharges existing debt and related guarantees governed by New York law, and provides for the issuance of new debt and guarantees governed by New York law. An indenture trustee will only take the actions authorized by the scheme or plan if enforceable orders have been entered by the foreign court and a Chapter 15 court.

[2] [3]With great respect for the Hong Kong court in *Rare Earth*, that court misinterprets this Court's earlier decision in *Agrokor*, as well as many other decisions in the United States which have recognized and enforced foreign court sanctioned schemes or restructuring plans that have modified or discharged New York law governed debt. Provided that the foreign court properly exercises jurisdiction over the foreign debtor in an insolvency proceeding, and the foreign court's procedures comport with broadly accepted due process principles, a decision of the foreign court approving a scheme or plan that modifies or discharges New York law governed debt is enforceable. Under U.S. law, that is an unremarkable proposition that has been firmly established in the U.S. at least since the Supreme Court decision in *Canada Southern Ry. Co. v. Gebhard*, 109 U.S. 527, 3 S.Ct. 363, 27 L.Ed. 1020 (1883), which granted international comity and enforced a Canadian scheme that discharged New York law governed debt and provided for the issuance of new debt governed by New York law. As Chief Justice Waite said in *Gebhard*, "the true spirit of international **\*777** comity requires that schemes of this character, legalized at home, should be recognized in other countries." *Id.* at 548, 3 S.Ct. 363. Chapter 15 limits a U.S. bankruptcy court's authority to enjoin conduct outside the territorial jurisdiction of the United States, but it does not make a discharge of New York law governed debt any less controlling.

**\*\*5** To be clear, in recognizing and enforcing the Scheme in this case, the Court concludes that the discharge of the Existing Notes and issuance of the replacement notes is binding and effective.[4]

---

4    What *Agrokor* discussed at length (and will not be repeated here) is that English and some commonwealth courts continue to apply the *Gibbs* Rule, based on an

1890 decision of the Court of Appeal in *Antony Gibbs & Sons v. La Societe Industrielle et Commerciale des Metaux* (1890) 25 QBD 399, which refuses to recognize a discharge or modification of English law governed debt approved by a court outside of England. *See Agrokor*, 591 B.R. at 192-96.

**F. The Global Brands Briefing**

1. The Debtor Does Not Intend or Expect to Seek Recognition of the Scheme or any Chapter 15 Order of this Court in Hong Kong

The Court entered an order on June 27, 2022 (ECF Doc. # 18) requiring the Foreign Representative to file a supplemental brief addressing another recent Hong Kong court judgment, *In the Matter of an application for recognition and assistance by the provisional liquidator of Global Brands Group Holding Limited (in liquidation)*, HCMP 644/2022, [2022] HKCFI 1789 ("*Global Brands*"). The court in *Global Brands* stated that, in the future, recognition and enforcement by the Hong Kong court of schemes sanctioned in the Cayman Islands and BVI depended upon common law principles developed by Hong Kong courts that would ordinarily apply a center of main interests test rather than the place of incorporation as had been done in the past. Because the Debtor and its affiliates conduct their business in the PRC, and the Debtor's common stock trades on the Stock Exchange of Hong Kong Limited, this Court wanted to know whether the Debtor intends to seek recognition and enforcement in Hong Kong of the Cayman Scheme and of any order of this Court recognizing and enforcing the Cayman Scheme. In short, the Foreign Representative's answer is that the Debtor does not intend or expect to seek recognition and enforcement of the Scheme or this Court's order recognizing and enforcing the Scheme in Hong Kong.

Given that the Existing Notes are issued by a Cayman Islands entity and are governed by New York law, the Foreign Representative submits that the implementation and effectuation of a Cayman Islands scheme of arrangement and recognition and enforcement of the scheme under Chapter 15 of the Bankruptcy Code are all that is required to effectuate the Restructuring. (Global Brands Briefing ¶ 5.) Further, the Foreign Representative notes that the solely affected creditors, the holders of the Existing Notes, also agree with this position. (*Id.* ¶ 6.) The

RSA and the Scheme documents, which were negotiated at arm's-length with sophisticated creditors represented by able counsel, do not require recognition of the Scheme in Hong Kong. (*Id.*)

2. The Scheme Can Become Effective Without Recognition in Hong Kong

According to the Foreign Representative, nothing in the RSA or in any of the Scheme documents necessitates or requires recognition and/or enforcement of the Scheme by the Hong Kong Court for the Scheme to be effective. (*Id.* ¶ 8.) Under **\*778** the terms of the Scheme, once the Cayman Court sanctions the Scheme and the Sanction Order has been delivered to the Cayman Companies Registrar, the Scheme will become effective. (*Id.*) The Foreign Representative notes that the restructuring will ultimately become effective upon entry of the Sanction Order by the Cayman Court and the Proposed Recognition Order by this Court. (*Id.*) Further, the Foreign Representative argues that this Court does not need to consider whether the Scheme would be recognized and enforced in Hong Kong in making its determination whether to recognize and enforce the Scheme pursuant to section 1521 of the Bankruptcy Code. (*Id.* ¶ 9.) This argument relies on the *Agrokor* case, where this Court enforced the modification of both English law and New York law-governed debts pursuant to a Croatian insolvency proceeding, even though jurisdictions following the *Gibbs* Rule may not have treated the modification of English law-governed debts as effective. (*Id.* ¶ 10.)

3. Global Brands is Distinguishable

**\*\*6** The Foreign Representative believes it is unlikely that a court in Hong Kong will be asked to consider whether the Scheme is effective in Hong Kong. (*Id.* ¶ 15.) The Foreign Representative does not intend to seek relief in Hong Kong or to obtain any assets located in Hong Kong, and they argue the risk of a dissenting Scheme Creditor seeking enforcement of the Existing Notes in Hong Kong is de minimis. (*Id.*) It is, of course, for the Debtor to decide whether to seek recognition and enforcement in Hong Kong, and for Hong Kong Court to decide whether to recognize and enforce the Scheme if the issue is presented by the Debtor or any other party that has standing to raise the issue in Hong Kong.

In re Modern Land (China) Co., Ltd., 641 B.R. 768 (2022)

2022 WL 2794014

**G. The Outcome of the Cayman Proceeding**

Ms. Moran notes that the Scheme Creditors overwhelmingly approved the Scheme in the required majorities. (Supp. Moran Decl. ¶ 4.) Ms. Moran states that there were 372 creditors who voted (and one creditor that abstained), with over 99% (370) of those voting to support the Scheme. (*Id.*) Further, the supporting creditors represented 94.78% ($1,271,425,000) of the total principal amount outstanding under the Existing Notes. (*Id.*) Only two creditors voted against the Scheme representing less than 1.23% ($16,319,000) of the total principal amount outstanding under the Existing Notes. (*Id.*)

On July 5, 2022, the Cayman Court presided over the Sanction Hearing and found that the Scheme satisfied the requisite elements to be sanctioned. (*Id.* ¶ 7.) Ms. Moran notes that no creditor raised any objection during the Sanction Hearing. (*Id.*) The Cayman Court entered the Sanction Order which sanctions and approves consummation of the Scheme and authorizes and effectuates the Scheme Restructuring. (*Id.* ¶ 8.)

**H. Supplemental Briefs**

A hearing on the Motion was held on July 6, 2022. ("Transcript," ECF Doc. # 21.) The Court expressed its concerns regarding the Debtor's COMI and, with respect to possible recognition as a foreign nonmain proceeding, whether the Debtor established that it was engaged in "non-transitory activity." (Transcript at 45:6–24.) Counsel to the Foreign Representative filed the Supplemental Brief on July 12, 2022.

The Debtor asserts that it's COMI is in the Cayman Islands because it is, and publicly identifies as, a Cayman-incorporated company. (Supp. Brief ¶ 1.) The **\*779** Foreign Representative states that the Debtor's historical corporate counsel is a Cayman Islands law firm, Conyers Dill & Pearman, which provided general corporate advice on the issuance of the Existing Notes. (*Id.* ¶ 2.) The offering memoranda for the Existing Notes make clear that the Debtor is a Cayman entity. (*Id.* ¶ 3.) The Debtor notes that when it first defaulted under the Existing Notes, BFAM Asian Opportunities Master Fund, LP ("BFAM,") issued a "statutory demand" (the "Statutory Demand") against the Debtor, threatening a winding up petition that would be filed under the laws of the Cayman Islands. (*Id.* ¶ 4.) The Statutory Demand prompted the restructuring negotiations and the RSA. (*Id.* ¶ 5.)

1. Insolvency Procedures in the Cayman Islands

The Debtor notes that liquidation of a Cayman Islands incorporated company is required to be implemented pursuant to Cayman law through insolvency practitioners appointed by the Cayman Court. (*Id.* ¶ 5 (citing Third Moran Decl. ¶¶ 16–18).) The Cayman courts generally do not recognize a non-Cayman Islands liquidation as being capable of liquidating and dissolving a Cayman Islands company. (*Id.* (citing Third Moran Decl. ¶¶ 18–23).)

The Foreign Representative notes that most of the Restructuring-related activities took place in the Cayman Islands. (Supp. Peng Decl ¶ 6.) Maples and Calder (Cayman) LLP ("Maples"), the Debtor's Cayman counsel since November 2021, advised the Debtor with respect to practical elements of the Restructuring during negotiations of the RSA. (Third Moran Decl. ¶ 25.) The RSA put Scheme Creditors on notice that the proceeding to sanction the Scheme would occur in the Cayman Islands. (Supp. Brief ¶ 8.) The Debtor completed each of the steps needed to sanction the Scheme by the Cayman Court. (Supp. Peng Decl. ¶ 10.) These steps included holding the Scheme Meeting in the Cayman Islands that was chaired by an individual who resides in the Cayman Islands and was engaged directly by the Debtor for the purposes of the Scheme Meeting. (Third Moran Decl. ¶ 25.) The chairman of the Scheme Meeting held proxies for the majority of the Scheme Creditors and attended and voted at the meeting in the Cayman Islands on their behalf. (*Id.*)

2. Debtor's Arguments in Favor of Foreign Main

**\*\*7** The Debtor relies on the Scheme Creditor's expectations that the Debtor's COMI is the Cayman Islands. (Supp. Brief ¶ 11.) The Debtor notes that creditor expectations were formed via the publicly available descriptions of the Debtor in (i) the offering memoranda of the Existing Notes that stated that "an insolvency proceeding relating to us, even if brought in the United States, would likely involve Cayman Islands insolvency law" and (ii) the Debtor's press releases, pointing to the Debtor as a company "incorporated in the Cayman Islands." (*Id.*) The Debtor notes that creditor expectations

2022 WL 2794014

were reinforced by certain actions including: (i) BFAM's negotiations related to the Restructuring by issuing the Statutory Demand and threatening a Cayman Islands winding up petition and (ii) the RSA contemplating an insolvency proceeding in the Cayman Islands. (*Id.*)

The Debtor notes that no Scheme Creditor—including the two Scheme Creditors that voted against the Scheme—objected to the Debtor's COMI being in the Cayman Islands. (*Id.* ¶ 12.) The Debtor argues that the consensus of those affected by the Scheme points in favor of a Cayman COMI. (*Id.*)

The Debtor notes that Cayman Islands law requires that liquidation proceedings of Cayman Islands-incorporated companies take place in the Cayman Islands under the supervision of a Cayman Islands-appointed **\*780** liquidator. (*Id.* ¶ 13.) This requirement was made clear in the documents related to the issuance of the Existing Notes.[5] (*Id.*)

[5]   The Debtor's argument is misleading. Neither the Debtor nor any of its creditors filed a winding up petition that would have resulted in the appointment by the Cayman court of one or more provisional liquidators, who are independent fiduciaries. *See* Cayman Companies Act §§ 94, 104. Rather, here, the Debtor filed the Scheme Petition under section 86 of the Cayman Companies Act, which does not by itself result in the appointment of JPLs. The benefit of a winding up order is that it enables the court in appropriate cases to issue a moratorium similar to our automatic stay preventing creditors from taking action to recover on their claims while the parties try to reach agreement on a scheme.

The Cayman court in this case issued the Convening Order appointing the Debtor's president as the Foreign Representative and scheduling the Scheme Meeting. No JPLs were appointed, meaning that there was no independent fiduciary overseeing the process. The Debtor and its professionals had already negotiated the RSA and were proceeding rapidly to a consensual scheme of arrangement without the necessity of a winding up petition, JPLs and a moratorium.

In many Cayman cases where the debtor hopes to negotiate a scheme of arrangement, a winding up order and appointment of JPLs precedes the negotiation of the scheme. Such matters are often referred to as a "light touch" restructuring. *See In the Matter of Midway Resources Int'l*, Grand Court of the Cayman Islands, Cause Number: FSD 51 of 2021 (NSD) (Nicholas Segal J.) (30 March 2021), at [68] ("I am satisfied that this is an appropriate case in which the PLs should be appointed on a soft touch basis (although I would reiterate my plea to substitute 'light-touch' for 'soft touch', since the latter expression has always seemed to me to bring with it associations of someone being duped and defrauded!").

The Debtor maintains its registered office in the Cayman Islands to which all communications may be addressed, and where matters such as the administration of annual filings and the payment of annual fees with the Cayman Registrar are dealt with. (*Id.* ¶ 14.) The Debtor is also required to maintain statutory registers of members (*i.e.*, shareholders), mortgages and charges, and directors in the Cayman Islands. (*Id.*)

The Debtor is also tied to the Cayman Islands by way of its asset holdings and the location of certain creditors. (*Id.* ¶ 15.) Nearly half of the Debtor's wholly owned direct subsidiaries are Cayman entities. (*Id.*) Additionally, the Debtor identified at least 35 entities—representing a minimum of over half a billion dollars of the outstanding principal of the Existing Notes—that are domiciled in the Cayman Islands. (*Id.*) But it is undisputed that despite its domicile in the Cayman Islands, the Debtor and its affiliates are managed and conduct their business in the PRC.

**\*\*8** Finally, the Debtor's restructuring activities have been centralized in the Cayman Islands and undertaken by Cayman Islands actors. (*Id.* ¶ 16.) These activities include: (i) Maples advising the Debtor on all aspects of the Restructuring, including the terms of the RSA, the Practice Statement Letter, the Explanatory Statement, and all Cayman Court documents; (ii) preparing for and appearing at hearings in front of the Cayman Court in the Cayman Islands; (iii) the convening of the Scheme Meeting by the Cayman Court; and (iv) the Scheme Meeting, which was chaired by an individual who resides in the Cayman Islands, was engaged directly by the Debtor for the purposes of the Scheme Meeting, and who held proxies for the majority of the Scheme Creditors and attended and voted at the Scheme Meeting in the Cayman Islands on their behalf. (*Id.*) The Debtor notes that its board of directors did not host meetings that were physically located in the Cayman Islands during the restructuring due to international travel restrictions and changes in business practices **\*781** resulting from the COVID-19 pandemic. (*Id.*)

The Debtor also argues that it was not necessary for its Cayman counsel or its Scheme Chairperson to wrest control of the Debtor from its previously existing management or take possession of its property like a joint provisional liquidator ("JPL"). (*Id.*) The Debtor asserts that such activities are not required or appropriate in a consensual scheme of arrangement. (*Id.*) A scheme of arrangement, by its nature, is driven by negotiation and compromises between a company and its creditors. (*Id.*)

2022 WL 2794014

The Debtor argues that holding scheme chairpersons to the same standard as a JPL would create a perverse incentive for companies to enter into liquidations rather than a value maximizing, consensual resolution with their creditors via a scheme of arrangement.[6] (*Id.*) The Debtor argues that this would dictate that the restructuring activities in liquidations, but not schemes, would merit recognition under Chapter 15. (*Id.*)

[6]    Ms. Moran notes that a company would seek the appointment of JPLs and avail of the stay afforded by section 97(1) of the Companies Act to facilitate a restructuring if: (a) there were issues with the propriety of actions taken by management, with a view to suspending the powers of the directors and/or (b) the scheme of arrangement was contentious including where there is a risk that minority creditor(s) might seek to frustrate the restructuring through the presentation of a winding up petition. (Third Moran Decl. ¶ 7.)

### 3. Foreign Nonmain Arguments

The Debtor asserts that it has substantial connections to the Caymans including issuing debt and holding assets in the Caymans, retaining counsel and employing professionals in the Caymans, and holding itself as an entity that could only be liquidated effectively in the Caymans. (*Id.* ¶ 19.) The Debtor argues that this is sufficient to find that the Debtor has non-transitory business connections with the Caymans. (*Id.*) The Debtor notes that its maintenance of a registered office in the Cayman Islands, compliance with the corporate formalities required to maintain its status as a Cayman entity, and representations to creditors that it is a Cayman-incorporated entity also support finding non-transitory connections with the Caymans. (*Id.*)

The Debtor also argues that the alternative to recognition of the Cayman Proceeding is to potentially deny the Debtor the ability to implement a consensual restructuring and force the Debtor into a Cayman liquidation. (*Id.* ¶ 20.) The Debtor argues that it would leave all parties in a worse position. (*Id.*)

## II. **LEGAL STANDARD**

### A. Foreign Main Proceeding

[4] [5]To obtain recognition, the foreign proceeding must be either a foreign main or foreign nonmain proceeding. 11 U.S.C. § 1517(a)(1). Under section 1502(4) of the Bankruptcy Code, the term "foreign main proceeding" means "a foreign proceeding pending in the country where the debtor has the center of its main interests." 11 U.S.C. § 1502(4); *see, e.g., In re Ocean Rig UDW Inc.*, 570 B.R. 687, 702 (Bankr. S.DN.Y. 2017) (recognizing foreign main proceeding); *In re Suntech Power Holdings Co.*, 520 B.R. 399, 416–17 (Bankr. S.DN.Y. 2014) (recognizing foreign main proceeding); *see also Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 138 (2d Cir. 2013) (hereinafter "*Fairfield Sentry*") (affirming recognition of foreign main proceeding). A Chapter 15 debtor's COMI is determined as of the filing date of the Chapter 15 petition, without regard to the debtor's historic operational activity. *See Fairfield Sentry*, 714 F.3d at 137 ("[A] debtor's COMI should be determined based on its activities at or around the time the chapter **\*782** 15 petition is filed, as the statutory text suggests.").

**\*\*9** [6]The Bankruptcy Code establishes that "[i]n the absence of evidence to the contrary, the debtor's registered office ... is presumed to be the center of the debtor's main interests." 11 U.S.C. § 1516(c). However, this presumption can be overcome. *See, e.g. ABC Learning*, 445 B.R. 318, 328 (Bankr. D. Del. 2010); *aff'd*, 728 F.3d 301 (3d Cir. 2013) (stating that "the COMI presumption may be overcome particularly in the case of a 'letterbox' company not carrying out any business" in the country where its registered office is located); *In re Basis-Yield Alpha Fund (Master)*, 381 B.R. 37, 51–54 (Bankr. S.D.N.Y. 2008) (concluding that the absence of objections to COMI were not binding; the court must make an independent determination of COMI).

[7]Courts consider several additional factors to determine whether the COMI presumption has been overcome, including: "the location of the debtor's headquarters; the location of those who actually manage the debtor ... the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes." *In re SphinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006). In *SphinX*, this court explained that these factors should not be applied "mechanically"; rather, "they should be viewed in light of Chapter 15's emphasis on protecting the reasonable interests of parties in interest pursuant to fair procedures and the maximization of the debtor's value." *Id.*; *see also Fairfield Sentry*, 714 F.3d at 137 (explaining that "consideration of these specific

**In re Modern Land (China) Co., Ltd., 641 B.R. 768 (2022)**

2022 WL 2794014

factors is neither required nor dispositive" and warning against mechanical application). The *SphinX* court also noted that "because their money is ultimately at stake, one generally should defer ... to the creditors' acquiescence in or support of a proposed COMI." 351 B.R. at 117.

[8]The Second Circuit and other courts often examine whether a Chapter 15 debtor's COMI would have been ascertainable to interested third parties, finding "the relevant principle is that the COMI lies where the debtor conducts its regular business, so that the place is ascertainable by third parties. Among other factors that may be considered are the location of headquarters, decision-makers, assets, creditors, and the law applicable to most disputes." *Fairfield Sentry*, 714 F.3d at 130. As the Second Circuit explained, by examining factors "in the public domain," courts are readily able to determine whether a debtor's COMI is in fact "regular and ascertainable [and] not easily subject to tactical removal." *Id.* at 136–37; *see also In re British Am. Ins. Co.*, 425 B.R. 884, 912 (Bankr. S.D. Fla. 2010) ("The location of a debtor's COMI should be readily ascertainable by third parties."); *In re Betcorp Ltd.*, 400 B.R. 266, 289 (Bankr. D. Nev. 2009) (looking to ascertainability of COMI by creditors).

[9]If a debtor's COMI has "shifted" prior to filing its Chapter 15 petition, courts may engage in a more holistic analysis to ensure that the debtor has not manipulated COMI in bad faith. *See Fairfield Sentry*, 714 F.3d at 138 (concluding that "a court may look at the period between the commencement of the foreign proceeding and the filing of the Chapter 15 petition to ensure that a debtor has not manipulated its COMI in bad faith .... The factors that a court may consider in the analysis are not limited and may include the debtor's liquidation activities"). Courts ask whether there is evidence pointing to any "insider exploitation, untoward manipulation, [and] overt thwarting of third-party expectations" that would support denying recognition. *Id.*; *see also* **\*783** *Ocean Rig*, 570 B.R. at 687 (granting recognition of foreign main proceeding where debtors shifted COMI from jurisdiction that only provided a liquidation option to jurisdiction that permitted reorganization, taking steps to shift COMI beginning one year before the foreign filing and where notice was given to creditors throughout the process of shifting COMI). The court in *Suntech* noted how "[A] debtor's COMI is determined as of the time of the filing of the Chapter 15 petition," but, "[t]o offset a debtor's ability to manipulate its COMI, a court may also look at the time period between the initiation of the foreign liquidation proceeding and the filing of the Chapter 15 petition." 520 B.R. at 416. Various factors could be relevant, such as "the location of the debtor's

headquarters; the location of those who actually manage the debtor (which, conceivably could be the headquarters of a holding company); the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes." *Id.*

**\*\*10** In *Suntech,* the debtor's presumptive COMI was the Cayman Islands, where it was incorporated, however, the Cayman Islands was not its actual COMI when the Foreign Proceeding was commenced. *Id.* Notably, the *Suntech* debtor did not conduct any activities in the Cayman Islands, and maintained its principal executive offices in Wuxi, China from where it managed the Suntech Group. *Id.* So, the issue was whether the debtor's COMI should be measured at the time of the commencement of the Chapter 15 case or when the Foreign Proceeding was commenced. *Id.* But in *Suntech*, the Cayman Court appointed JPLs and authorized them to exercise a host of additional powers (including acts on behalf of the debtor, possession of its property and collect all debts, dealing with all questions relating to or affecting the assets or the restructuring etc.) *Id.* at 417–18. The JPLs assumed control of the debtor's affairs, met with employees and creditors, opened a bank account in the Cayman Islands funded with transfers from one of the debtor's other accounts, and filed claims. *Id.* The *Suntech* court found the debtor's COMI on the date of the commencement of the chapter 15 case was the Cayman Islands and the JPLs did not manipulate the debtor's COMI in bad faith. *Id.* Therefore, the court overruled a creditor's objection to finding the debtor's COMI to be in the Cayman Islands.

[10]The *Suntech* court's analysis and conclusion that COMI was in the Cayman Islands was consistent with the Second Circuit's analysis in *Fairfield Sentry*. In both cases, court-appointed fiduciaries assumed substantial control over the debtors' liquidation (in the case of *Fairfield Sentry*) and scheme proceeding (in the case of *Suntech*). So, the question is whether the absence of court-supervised fiduciaries, such as JPLs, requires a different result in finding COMI in the Cayman Islands in this case given that no JPLs were appointed. While this would be an easier case if JPLs had been appointed, the Court concludes that the Cayman court's supervision of the Debtor's Scheme Proceeding, in light of the other factors present here, is enough for the Court to conclude that the Debtor's COMI for the proceeding involving the single class of Existing Note holders was in the Cayman Islands.[7]

7    It would be ironic if a scheme proceeding, following the appointment of JPLs in a contentious case where

JPLs were needed to facilitate agreement between the debtor and its creditors, was recognized as a foreign main proceeding, but in a case such as this one where the Debtor and its professionals successfully negotiated the RSA with overwhelming creditor support without the need to file a winding up petition and the appointment of JPLs before obtaining sanction of the Scheme could not be recognized as a foreign main proceeding.

**\*784 B. Foreign Nonmain Proceeding**

[11]The Foreign Representative's counsel argues, in the alternative, that the Scheme Proceeding satisfies the requirements to be a foreign nonmain proceeding. Recognition and enforcement can be granted as discretionary relief under sections 1507 and 1521 of the Bankruptcy Code even in a nonmain proceeding. The Court concludes that the Scheme Proceeding was not a foreign nonmain proceeding.

Courts recognize a foreign proceeding as a "foreign nonmain proceeding" if "the debtor has an establishment within the meaning of section 1502 in the foreign country where the proceeding is pending." 11 U.S.C. § 1517(b)(2). Section 1502(2) defines "[e]stablishment" as "any place of operations where the debtor carries out a nontransitory economic activity." 11 U.S.C. § 1502(2); see also In re Millennium Glob. Emerging Credit Master Fund Ltd., 458 B.R. 63, 70 (Bankr. S.D.N.Y. 2011), aff'd 474 B.R. 88 (S.D.N.Y. 2012) ("Millennium Glob. I"). Additionally, courts have required proof of more than a "mail-drop presence" to satisfy the establishment requirement. In re Serviços de Petróleo Constellation S.A., 600 B.R. 237, 277 (Bankr. S.D.N.Y. 2019) ("Constellation I") (citation omitted). Due to the "paucity of U.S. authority" on this question, the court in Millennium Glob. I cited a "persuasive" English law holding that the presence of an asset and minimal management or organization can create a debtor establishment. 458 B.R. at 84–85 (citing Shierson v. Vlieland-Boddy, [2005] EWCA Civ. 974, [2005] W.L.R. 3966 (2005)).

**\*\*11** [12] [13]Whether the debtor has an "establishment" in a country is determined at the time of filing the Chapter 15 petition. See Beveridge v. Vidunas (In re O'Reilly), 598 B.R. 784, 803 (Bankr. W.D. Pa. 2019). Several factors "contribute to identifying an establishment: the economic impact of the debtor's operations on the market, the maintenance of a 'minimum level of organization' for

a period of time, and the objective appearance to creditors whether the debtor has a local presence." Millennium Glob. I, 458 B.R. at 85. See In re Creative Fin., Ltd., 543 B.R. 498, 520 (Bankr. S.D.N.Y. 2016) (citing In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd., 374 B.R. 122, 131 (Bankr. S.D.N.Y. 2007)) (finding that an "establishment" requires a "showing of a local effect on the marketplace, more than mere incorporation and record-keeping and more than just the maintenance of property.") This is evidenced by engagement of "local counsel and commitment of capital to local banks." Millennium Glob. I, 458 B.R. at 86–67. See also Lavie v. Ran (In re Ran), 607 F.3d 1017, 1028 (5th Cir. 2010) (If a foreign "bankruptcy proceeding and associated debts [themselves] ... demonstrate an establishment ... [t]here would be no reason to define establishment as engaging in a nontransitory economic activity. The petition for recognition would simply require evidence of the existence of the foreign proceeding."); Rozhkov v. Pirogova (In re Pirogova), 612 B.R. 475, 484 (S.D.N.Y. 2020) (finding that a foreign insolvency proceeding on its own cannot suffice to count as nontransitory economic activity in support of recognition as a foreign nonmain proceeding.)

## III. DISCUSSION

For the reasons outlined below, the Court **GRANTS** the Motion for recognition of the Cayman Proceeding as a foreign main proceeding. The Court does not explicitly address the following aspects of the **\*785** Motion because they are uncontroversial and satisfied by the uncontested facts: (i) whether the Debtor meets the eligibility requirements under section 109(a) of the Bankruptcy Code; (ii) whether the Cayman Proceeding is a foreign proceeding as defined in section 101(23) of the Bankruptcy Code; (iii) whether the Cayman Proceeding has been commenced by a duly authorized foreign representative; (iv) whether the Scheme Petition meets the requirements of section 1515 of the Bankruptcy Code; (v) whether the Debtor is entitled to additional relief under section 1521 of the Bankruptcy Code; (vi) whether the Scheme is procedurally fair; (vii) whether the interests of creditors and other interested parties are sufficiently protected; (viii) whether the Foreign Representative is entitled to additional relief under section 1507 of the Bankruptcy Code; and (ix) whether recognition of the foreign proceeding is contrary to the public policy of the United States.

In re Modern Land (China) Co., Ltd., 641 B.R. 768 (2022)

2022 WL 2794014

**A. Recognition is Not Warranted as a Foreign Nonmain Proceeding.**

[14]The Court finds that recognition of the Cayman Proceeding as a foreign nonmain proceeding is not warranted because recognition would be inconsistent with the goals of foreign nonmain proceedings. Further, neither the bankruptcy proceeding itself nor the Debtor's bookkeeping activities constitute nontransitory economic activity, and the Debtor does not otherwise affect the local marketplace in the Cayman Islands.

**1. Recognition as a Nonmain Proceeding Would Be Inconsistent with the Goals of UNCITRAL Model Law**

[15]The Court declines to recognize the Cayman Proceeding as a foreign nonmain proceeding because such a recognition would not comport with the stated goals of foreign nonmain proceedings. The UNCITRAL Model Law on Cross-Border Insolvency explains that in a foreign nonmain proceeding, "the court must be satisfied that the action relates to assets that, under the law of this State, should be administered in the foreign non-main proceeding." United Nations, Uncitral Model Law on Cross-Border Insolvency With Guide to Enactment and Interpretation, 12 (2014) (the "GUIDE"). The GUIDE further explains that "[u]nlike 'foreign main proceeding,' there is no presumption with respect to the determination of establishment ... [t]he commencement of insolvency proceedings, the existence of debts, and the presence alone of goods in isolation, of bank accounts, or of property would not in principle satisfy the definition of establishment." *Id.* at 47. These provisions support the administration of a restructuring proceeding by a single foreign court.

**\*\*12** In the present case, the Cayman Scheme pertains to the Existing Notes held by the Scheme Creditors. (Motion ¶ 13.) The language of the UNCITRAL Model Law on Cross-Border Insolvency therefore requires, for the purposes of recognition of the Cayman Proceeding as a foreign nonmain proceeding, that the Existing Notes be assets in the Cayman Islands. However, this Court is not persuaded that the Existing Notes are assets within the meaning of Article 23, subsection 2 of the Model Law. As the GUIDE explains, "the existence of debts ... would not in principle satisfy the definition of establishment." GUIDE at 47.

**2. There is Insufficient Evidence to Support a Finding of**

Nontransitory Economic Activity in the Caymans

[16]The Cayman restructuring cannot itself constitute nontransitory economic activity to support recognition as a foreign nonmain proceeding. In *Lavie v. Ran*, 406 B.R. 277, 286–87 (S.D. Tex. 2009), the bankruptcy court explained that if "the **\*786** proceeding and associated debts alone could suffice to demonstrate an establishment, it would essentially rule out the possibility that any proceeding would fall into the ... category of proceedings that are neither foreign main nor foreign nonmain. But, this third category was clearly envisioned by the drafters." Further, in *In re Pirogova*, 612 B.R. at 484, the court cited *Ran* and agreed that if "a foreign trustee could merely point to a foreign bankruptcy itself, which is subject to a recognition petition, as evidence of an establishment, the statutory requirements for recognition would be pointless." The court in *Pirogova* denied recognition of a foreign nonmain proceeding despite the Debtor's ownership of an apartment in Russia, her Russian utility bills, her vehicles in Russia, and her Russian yacht club membership, as well as the debtor's ongoing bankruptcy proceeding in Russia. *Id.* at 480.

In the present case, the Debtor's connections to the Cayman economy are far more tenuous than those discussed in *Pirogova*. The Debtor maintains a registered office in the Cayman Islands to which all communications may be addressed or served, and where the administration of annual filings and the payment of annual fees are registered. (Supp. Brief ¶ 1.) The Debtor also initiated the restructuring proceeding in its country of incorporation, the Cayman Islands. (*Id.*) However, the Debtor has been unable to point to any additional connections to the Cayman Islands that might constitute nontransitory economic activity, and therefore falls well short of the standards set in *Ran* and *Pirogova*.

**3. The Debtor's Business Activities Have No Local Effect on the Marketplace**

The court explained the standard for nontransitory economic activity in *In re Creative Fin., Ltd.*, 543 B.R. at 520–21. There, the court explained that recognition required "a showing of a *local effect on the marketplace*, more than mere incorporation and record-keeping and more than just the maintenance of property." *Id.* at 520 (emphasis added). In that case, the debtor, a foreign exchange trading business, was organized under the laws of the BVI, and admittedly engaged in bad-faith actions to pursue a restructuring proceeding there. *Id.* at 513. Nevertheless, the tenuous nature of the connection

between the debtor's business activities and the BVI marketplace supported the court's denial of recognition as a foreign nonmain proceeding. *Id.* at 521.

In the present case, despite the absence of apparent bad faith, the Debtor similarly has a negligible effect on the local marketplace. The Debtor is a Cayman-incorporated investor and developer in real-estate that carries out its business in the PRC and maintains its books and records in the Cayman Islands. (*Id.* ¶¶ 6–7, 64.) However, the Debtor has not provided the Court evidence of "more than mere incorporation and record-keeping and more than just the maintenance of property." *In re Creative Fin., Ltd.,* 543 B.R. at 520. The failure to engage the local economy excludes the Debtor from a foreign nonmain classification.

### B. Recognition Is Warranted as a Foreign Main Proceeding

**\*\*13** [17]The Court recognizes the Debtor's COMI in the Cayman Islands. Section 1516(c) provides that "[i]n the absence of evidence to the contrary, the debtor's registered office ... is presumed to be the center of the debtor's main interest." 11 U.S.C. § 1516(c). Given the evidence in this case, the Court considers the totality of the circumstances before it, including the goals of Chapter 15, the Scheme Creditors' expectations and intentions, the judicial role in the Cayman Scheme, the function **\*787** of the Cayman Scheme Chairperson, the insolvency activities in the Caymans, Cayman choice of law principles and the Debtor's good-faith petition for recognition of the Cayman Proceeding. Each of these factors function together to support a finding of COMI in the Cayman Islands.

#### 1. Recognition as a Foreign Main Proceeding is Consistent with the Goals of Chapter 15

Recognition of the Cayman proceeding as a foreign main proceeding would comport with the goals of Chapter 15. In *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.,* 374 B.R. at 126, *aff'd,* 389 B.R. 325 (S.D.N.Y. 2008), the court explained that:

Unique to the Bankruptcy Code, Chapter 15 contains a statement of purpose: "[t]he purpose of this chapter is to incorporate the Model Law on Cross–Border Insolvency so as to provide effective mechanisms for

dealing with cases of cross-border insolvency," with the express objectives of cooperation between United States courts, trustees, examiners, debtors and debtors in possession and the courts and other competent authorities of foreign countries; greater legal certainty for trade and investment; fair and efficient administration of cross-border insolvencies that protects the interests of all creditors and other interested entities, including the debtor; the protection and maximization of the debtor's assets; and the facilitation of the rescue of financially troubled businesses. 11 U.S.C. § 1501(a)(1)–(5); *In re SPhinX, Ltd.,* 351 B.R. 103, 112 (Bankr. S.D.N.Y. 2006), *aff'd,* 371 B.R. 10 (S.D.N.Y. 2007).

[18]Chapter 15 contemplates cooperation between American and foreign bankruptcy courts, as well as facilitating protection for the Debtor in this case before the Court.

The Second Circuit has recognized that "[t]he absence of a statutory definition for a term that is not self-defining signifies that the text is open-ended, and invites development by courts, depending on facts presented, without prescription or limitation." *Fairfield Sentry,* 714 F.3d at 138.

Here, the Debtor argues that denial of recognition of the Debtor's COMI in the Cayman Islands may leave the Debtor "with the alternative of converting a highly consensual Scheme into a Cayman liquidation in an effort to obtain such chapter 15 recognition at a later date." (Supp. Brief ¶ 23.) The Debtor also contends that this "would not maximize the value of the Debtor's assets, as it would divert additional funds towards an entirely new insolvency process in an effort to potentially achieve the relief requested" in the Motion. (*Id.*) Such an outcome would clearly diverge from Chapter 15's stated goal of maximizing the value of the debtor's assets, as well as facilitating the rescue of a financially troubled business. Further, recognition of the Cayman Proceeding would promote cooperation between the American and Cayman courts, by helping facilitate the Cayman Proceeding and maximizing the chances of a successful reorganization.

#### 2. Recognition of this Proceeding is Consistent with Creditors' Expectations

[19]The Scheme Creditors' expectations that their loan agreements would be governed by Cayman law supports recognition of COMI in the Cayman Islands. (Supp. Brief ¶ 11.) When determining a Debtor's COMI, "creditor

expectations can be evaluated through examination of the public documents and information available to guide creditor understanding of the nature and risks of their investments." *788 *In re Oi Brasil Holdings Cooperatief U.A.*, 578 B.R. 169, 228 (Bankr. S.D.N.Y. 2017); *see also Constellation I*, 600 B.R. at 274 (listing cases in which offering memoranda and indentures were evaluated for purposes of determining creditors' expectations). Here, this expectation was reasonable considering the publicly available descriptions of the Debtor as a Cayman company in (i) the offering memoranda of the Existing Notes that stated that "an insolvency proceeding relating to us, even if brought in the United States, would likely involve Cayman Islands insolvency law" and (ii) the Debtor's press releases, pointing to the Debtor as a company "incorporated in the Cayman Islands." (Supp. Brief ¶ 11.)

**14 The Debtor's actions reinforced these expectations, particularly the fact that (i) BFAM initiated negotiations related to the Restructuring by issuing the Statutory Demand and threatening a Cayman Islands winding up petition and (ii) the RSA contemplated an insolvency proceeding in the Cayman Islands. (*Id.*) It is incontrovertible that the Scheme Creditors understood that the Debtor is a Cayman Islands company and expected that its debts would be restructured pursuant to the law of the Cayman Islands if a restructuring became necessary. (*Id.*) *See In re Ascot Fund Ltd.*, 603 B.R. 271, 283 (Bankr. S.D.N.Y. 2019) (finding COMI in the Caymans, in part, because "[f]rom the Ascot Fund investors' point of view, and as a matter of fact and law, they invested in a Cayman fund and their rights were to be determined under Cayman law.")

[20]  [21]In *In re SPhinX, Ltd.*, 351 B.R. at 117, the Court explained that "[v]arious factors, singly or combined, could be relevant" to a COMI determination. The factors are not meant to be applied "mechanically," but rather, "viewed in light of chapter 15's emphasis on protecting the reasonable interests of parties in interest pursuant to fair procedures and the maximization of the debtor's value." *Id.* The *SPhinX* court reasoned that "because their money is ultimately at stake, one generally should defer, therefore, to the creditors' acquiescence in or support of a proposed COMI." *Id.* In *SPhinx*, ultimately, the Court found that COMI was outside of the Caymans, but the concept remains, when a Court considers COMI factors, the protection of the creditors' interests is paramount. *Id.*

The decision in *In re Serviços de Petróleo Constellation S.A.* ("*Constellation II*") also underscores how "Courts in the Second Circuit also look to the expectations of creditors with regard to the location of a debtor's COMI."

613 B.R. 497 (Bankr. S.D.N.Y. 2019) (finding COMI in Luxembourg, in part, because the creditors' expectations of the location of the insolvency proceeding); *see In re Chiang*, 437 B.R. 397 (Bankr. C.D. Cal. 2010) (noting how "the location of the COMI is an objective determination based on the viewpoint of third parties (usually creditors)"); *see also In re Codere Finance 2(UK) Ltd.*, Case No. 20-12151 (MG), (Bankr. S.D.N.Y. Oct. 9, 2020) ("*Codere* Transcript," ECF Doc. # 13 at 21:17–23:6) (concluding that COMI in the UK was supported by lack of objections, overwhelming support of the scheme, no evidence of exploitation or untoward manipulation or thwarting of third-party expectations, and interests of creditors and other interested parties sufficiently protected).

In *In re Oi Brasil Holdings*, 578 B.R. at 226–229, the court considered whether, having initially recognized Brazil as the Debtor's COMI, subsequent events caused the COMI to shift to the Netherlands. To evaluate whether the COMI had shifted, the court considered creditor expectations, concluding "that purchasers of the notes understood that they were investing in Brazilian-based businesses, and [the debtor's] place of incorporation, or for that *789 matter its very existence, was immaterial to their decision to purchase their notes." *Id.* at 229. It was notable in this case that "the [noteholders] had no legitimate expectation that the Austrian courts would play any role in the determination or payment." *Id.* at 226; *see also In re Olinda Star Ltd.*, 614 B.R. 28, 44 (Bankr. S.D.N.Y. 2020) (holding third party and creditors' expectations weigh in favor of finding COMI); *Constellation II*, 613 B.R. at 508 (noting "[c]ourts in the Second Circuit also look to the expectations of creditors with regard to the location of a Debtor's COMI.")

In the present case, the Scheme Creditors made loans to Modern Land, a Cayman-incorporated holding company that carries out the business of real estate development in the PRC. (Motion ¶¶ 6–7.) Given the statutory presumption included in section 1516(c) of the Bankruptcy Code, the creditors could reasonably have concluded that the Debtor's registered office in the Cayman Islands was its COMI, subjecting it to the Cayman Companies Act, and in turn subjecting the creditors' agreements with the Debtor to Cayman law. Further, "nearly half of the Debtor's wholly owned subsidiaries are Cayman entities." (Supp. Brief ¶ 7.) Given the proclivity of Courts in the Second Circuit to consider creditor expectations when making a COMI determination, therefore, this factor supports a finding of the Cayman Islands being the Debtor's COMI.

**15 The creditor expectations in this case are further

*In re Modern Land (China) Co., Ltd.*, 641 B.R. 768 (2022)

2022 WL 2794014

evidenced by the overwhelming creditor support. Not one Scheme Creditor objected to the Debtor's COMI being located in the Cayman Islands, including the two dissenting Scheme Creditors that voted against the Scheme. (Supp. Brief ¶ 12.) Over 99% in number of the Scheme Creditors present and voting at the Scheme Meeting, representing approximately 95% in value of the outstanding principal of the Existing Notes, voted in favor of the Scheme. (*Id.*, Supp. Moran Decl. ¶ 4.) In this case, definitive creditor expectations and overwhelming creditor support solidify a finding of COMI in the Cayman Islands.

### 3. The Judicial Role in the Cayman Scheme is Prevalent in this Case

Another factor supporting COMI being in the Cayman Islands is the ongoing restructuring proceeding itself. In *In re Suntech Power Holdings Co.*, 520 B.R. at 418, a Cayman-incorporated holding company primarily conducting business in China filed for Chapter 15, seeking recognition. Over creditors' objections, this Court found COMI in the Cayman at the time of the filing, while acknowledging that COMI had been in China prior to the filing. *Id.* The *Suntech* court discussed at length the role of the JPLs, who conducted much of the Debtor's business from the Cayman Islands following the petition. *Id.*

In the present case, unlike in *Suntech*, there are no objections to recognition as a foreign main proceeding. The Scheme Creditors in this case overwhelmingly approved the Scheme. (Motion ¶ 65.) Modern Land is not subject to the control of JPLs, but there were no issues about the propriety if any actions by management, and the Debtor and its professionals successfully negotiated an RSA with very broad creditor support. (Third Moran Decl. ¶ 7.) There was no need for the appointment of JPLs. (Supp. Brief ¶ 16.)

Furthermore, the Debtor in this case identifies itself as a Cayman-incorporated company in press releases and in official memoranda. (*Id.* ¶ 1.) The Debtor maintains its registered office in the Cayman Islands, and maintains a statutory register of members (i.e. shareholders), mortgages, charges, and directors in the Cayman Islands. (*Id.*) The Debtor's historical corporate counsel, who additionally advised the Debtor on the issuance of the Existing **\*790** Notes, is a law firm located in the Cayman Islands. (*Id.* ¶ 2.) The offering memoranda for the Existing Notes indicated in several places that, if needed, the Debtor would initiate an insolvency proceeding in the

Cayman Islands. (*Id.* ¶ 3.) Lastly, the first demand upon the Debtor following its initial default under the Existing Notes threatened a winding up petition pursuant to the laws of the Cayman Islands. (*Id.* ¶ 4.)

The RSA expressly requires a Cayman Islands scheme of arrangement, and approximately 80.75% of the aggregate principal outstanding amount of all Existing Notes acceded to the RSA. (*Id.* ¶ 5.) No Scheme Creditors objected to the Debtor's COMI being located in the Cayman Islands, and 99% in number of the Scheme Creditors present and voting at the Scheme Meeting representing approximately 95% in value of the outstanding principal of the Existing Notes, voted in favor of the Scheme. (*Id.* ¶ 12.)

Cayman law further provides that only the Cayman Court can conduct an effective liquidation of a Cayman Islands-incorporated company. (Third Moran Decl. ¶ 16.) The Debtors assert that, pursuant to Cayman law, a suit against a member of the Debtor's board of directors would require the application of Cayman law, even if such director did not live in the Cayman Islands. (*Id.* ¶ 24.) Next, nearly half of the Debtor's direct wholly owned subsidiaries are Cayman entities. (Supp. Brief ¶ 7.) The Debtor further identified at least 35 entities—representing a minimum of over half a billion dollars of the outstanding principal of the Existing Notes—that are domiciled in the Cayman Islands. (*Id.*)

**\*\*16** The Debtor asserts, importantly, that as of the time of the filing of the Chapter 15 petition, the restructuring efforts were the Debtor's "primary business activity ... to ensure the Debtor's survival." (*Id.* ¶ 8.) The "vast majority of Restructuring-related activities took place in the Caymans," and the Debtor's Cayman counsel advised the Debtor as a matter of Cayman Islands law. (*Id.*) For example, the Scheme Meeting took place in the Cayman Islands, the Scheme Meeting was presided over by a Cayman Islands resident, and the chairman of the meeting held proxies for the majority of the Scheme Creditors and attended and voted at the meeting in the Cayman Islands on their behalf. (*Id.*) The Debtor's Cayman counsel also appeared at both hearings before the Cayman Court to obtain permission to convene the Scheme Meeting and to sanction the Scheme. (Third Moran Decl. ¶ 25.) The Scheme received the support of Scheme Creditors representing approximately 95% of the value of the Existing Notes. (Supp. Brief ¶ 9.) Given the strong support for the Scheme, the fact that the restructuring was the primary business activity of the Debtor at the time of the filing of the Chapter 15, the ongoing activities pertaining to the restructuring itself support recognition of the Cayman Islands as the Debtor's COMI in the present

2022 WL 2794014

case.

[22]Further, the fact that the Debtor is an exempted company does not jeopardize its ability to have a COMI in the Cayman Islands. The Debtor was incorporated in the Cayman Islands under the Companies Act as an exempted company with limited liability. (Motion ¶ 6.) While the Debtor's exempted company status places certain limitations upon its operations in the Cayman Islands, this Court has held that exempted companies can have a Cayman COMI. In *Ocean Rig.*, 570 B.R. at 705, this Court held that "[i]t also does not matter that [the debtor] is classified as 'exempted' under the Cayman Companies Law, even though 'exempted' company status appears to limit that company's activities in the Cayman Islands ... [w]hile exempted companies are prohibited from **\*791** *trading* in the Cayman Islands, except in furtherance of their business outside the Cayman Islands, they may still be *managed* from there." The *Ocean Rig* Court subsequently concluded that the Cayman Islands was indeed the debtor's COMI, and recognized the foreign main proceeding. *Id.* at 707. Therefore, in the present case, the Debtor's status as an exempted company does not jeopardize its COMI in the Cayman Islands.

4. Choice of Law Principles Support a Finding of COMI in the Cayman Islands

[23]When conducting a COMI analysis, Courts in this Circuit additionally consider the jurisdiction whose law would apply to most disputes. *Olinda Star*, 614 B.R. at 43. "[T]his factor weighs in favor of a COMI in" the jurisdiction whose law applies. *Id.* at 44; *see also Constellation I*, 600 B.R. at 280 (stating that "because Parent/Constellation is a Luxembourg incorporated entity, that depends upon Luxembourg law for its existence and its corporate operations, the Court found that Luxembourg law should be considered the law that applies to *most* of Parent/Constellation's disputes"). In the present case, the Foreign Representative explained that the Debtor, as a Cayman-incorporated company, "depends on Cayman Islands law for its existence and is subject to Cayman Islands laws and regulations." (Supp. Brief ¶ 13.) The Foreign Representative further explained that the requirements of Cayman law were "made clear in the documents related to the issuance of the Existing Notes." (*Id.*) While the Existing Notes as governed by New York law, the Cayman Islands is the jurisdiction whose law would apply to most disputes over corporate actions that may arise in the Cayman Proceeding, this factor supports finding a COMI in the Cayman Islands. And, to the extent that any New York law issues arose concerning the Existing Notes, the Second Circuit explained in *JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 424 (2d Cir. 2005), that "[w]e have repeatedly held that U.S. courts should ordinarily decline to adjudicate creditor claims that are the subject of a foreign bankruptcy proceeding."

The Scheme Creditors here include only holders of Existing Notes. The Debtor's capital structure includes substantial debt governed by Hon Kong law. The Court has no reason to address the COMI of any insolvency or scheme proceeding involving creditors with claims other than holders of the Existing Notes. Creditor expectations in such a case could point to COMI somewhere other than the Cayman Islands.

5. The Debtors Seek Recognition in Good Faith

**\*\*17** Many of the cases in which courts have denied recognition of a foreign main proceeding in a debtor's country of incorporation involved instances of bad faith, which are not present in the Debtor's petition for recognition. For example, in *Creative Finance*, the court found that the debtor's principal "and his associates—and hence the Debtors—were guilty of bad faith in numerous respects." 543 B.R. at 513. Among other transgressions, the debtors in *Creative Finance* sought to manipulate a liquidator, ignored important inquiries, and sought to deny a disfavored creditor the opportunity to benefit from the proceeding. *Id.* In contrast, in *In re Fairfield Sentry Ltd.*, 440 B.R. 60, 64-65 (Bankr. S.D.N.Y. 2010), the Court held that "[t]here being no showing of bad faith on the part of the BVI Liquidators, and given that the [d]ebtors are incorporated in and maintain their registered offices in the BVI, the Court finds it more compelling that the [d]ebtor's COMI lies in the BVI." *See also Codere* Transcript at 20:1–21:25 (reasoning that "the lack of objections **\*792** and the overwhelming support for the scheme of arrangement in this case suggests that there has not been insider exploitation, untoward manipulation, overt thwarting of third-party expectations.... Those sorts of things could evidence bad faith COMI manipulation.").

*SPhinX* was even more explicit in its consideration of the Debtor's bad faith as the basis for rejecting recognition. There, the Bankruptcy Court explained that "a primary basis for the Petition, and the investors' tacit consent to the Cayman Islands proceedings as foreign main proceedings, is improper ... this litigation strategy [seeking to frustrate a settlement agreement by exploiting the automatic stay] appears to be the only reason for their request for recognition." *In re SPhinX*, 351 B.R. at 121.

2022 WL 2794014

The *SPhinX* Court therefore rejected a finding of COMI supporting recognition of a foreign main proceeding, and instead proceeded to consider the existence of a foreign nonmain proceeding not subject to the debtor's bad faith. *Id.*

In *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, the court denied recognition of a Cayman scheme proceeding seeking to restructure an open-end investment firm as either a foreign main or nonmain proceeding. 374 B.R. at 126. The *Bear Stearns* court emphasized the Debtor's operational history, considering the location of its employees, managers, books and records, and liquid assets. *Id*. at 130. The court therefore denied recognition of COMI in the Cayman Islands because the United States, not the Cayman Islands, was "the place where the Funds conduct the administration of their interests on a regular basis." *Id.* However, *Fairfield Sentry* subsequently clarified that:

> A court may look at the period between the commencement of the foreign proceeding and the filing of the chapter 15 petition to ensure that a debtor has not manipulated its COMI in bad faith, but there is no support for [the] contention that a debtor's entire operational history should be considered. The factors that a court may consider in this analysis are not limited and may include the debtor's liquidation activities.

714 F.3d at 138.

The *Fairfield Sentry* court also emphasized that "[t]here was no finding of bad-faith COMI manipulation." *Id.* at 139. In the present case, like in *Fairfield Sentry*, the Debtor is a holding company with subsidiaries that conduct business around the world. (Motion ¶ 7.) The Debtor is similarly engaged in a restructuring proceeding pursuant to the laws of its country of incorporation. (*Id.* ¶ 21.) The *Fairfield Sentry* court explained that "[it] matters that the inquiry under Section 1517 is whether a foreign proceeding '*is pending* in the country where the debtor *has* the center of its main interests.' 11 U.S.C. § 1517(b)(1) (emphasis added)." 714 F.3d at 134. The same is true in this case too.

In *In re Ran*, 390 B.R. 257 (Bankr. S.D. Tex. 2008), the bankruptcy court denied recognition of an Israeli bankruptcy proceeding as either a foreign main or nonmain proceeding. On remand from the district court, the bankruptcy court "decline[d] to make findings on whether or not Lavie [a trustee overseeing the bankruptcy] acted in bad faith." *Id.* at 298. However, the court explained that "[b]y citing favorably to *In re SPhinX*, ... in its order of remand, the district court suggests that a foreign representative's bad faith motive in seeking recognition of a foreign proceeding may appropriately be considered in determining the location of a debtor's center of main interests." *Id.* at 297. Indeed, despite the court's distaste for making findings based upon the debtor's apparent bad faith, the court nevertheless devoted an entire section of its **\*793** analysis to the foreign representative's motive. *Id.* at 295. So, while the presence of bad faith did not play an explicit role in the court's decision in *Ran*, the questionable motivations of the foreign representative clearly informed the court's analysis.

**\*\*18** In the present case, the Debtor has not engaged in COMI-shifting behavior, nor has it sought to deceive the Court or the Scheme Creditors in its pursuit of a Cayman restructuring. Instead, as discussed above, the Debtor seeks recognition of a proceeding under Cayman law, a fact which the Scheme Creditors likely factored into their decision to conduct business with the Debtor in the first place.[8] Given the absence of COMI-shifting and the Debtor's good-faith petition for recognition under chapter 15, this factor supports recognition of COMI in the Cayman Islands.

[8]    *See Suntech*, 520 B.R. at 418:
> Nor does the evidence support a finding that the Debtor's creditors would have expected it to restructure its businesses in China. The Debtor's largest creditor group was the Noteholders. The Indenture was governed by New York law and the parties to the Indenture submitted to the non-exclusive jurisdiction of the New York state and federal courts. In addition, when the representatives ... who held approximately 50% of the debt, met with the Debtor's representatives, they urged the Cayman Islands as the most logical restructuring venue. The Debtor was incorporated in the Cayman Islands and the Cayman Islands employed a predictable, flexible and cost effective method for dealing with restructuring.

## IV. CONCLUSION

For the reasons explained above, the Court **FINDS** that the Cayman Islands is the Debtor's COMI. All other requirements for recognition have been satisfied.

Therefore, the Court recognizes the Cayman Proceeding as a foreign main proceeding. Additionally, the Court, in the exercise of discretion, recognizes and enforces the Cayman Scheme.

A separate order will be entered granting the requested relief.

**In re Modern Land (China) Co., Ltd., 641 B.R. 768 (2022)**

2022 WL 2794014

641 B.R. 768, 2022 WL 2794014

**All Citations**

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

3670

# Tab 55

105 Fed.R.Serv.3d 171

943 F.3d 125
United States Court of Appeals, Second Circuit.

IN RE MOTORS LIQUIDATION
COMPANY, fka General
Motors Corporation, Debtor

Those Certain Post-Closing Accident Plaintiffs
Represented By Butler Wooten & Peak
LLP, Denney & Barrett, P.C., Hilliard
Martinez Gonzales L.L.P., and Turner &
Associates, P.A, ADR Provider - Appellants,
Jennifer Lankford, Plaintiff,
v.
General Motors LLC, Appellee.

No. 18-1940
|
August Term 2019
|
Argued: September 24, 2019
|
Decided: November 19, 2019

**Synopsis**
**Background:** After Chapter 11 debtor-automobile
manufacturer sought bankruptcy relief and subsequently sold,
outside the ordinary course of business, substantially all of
its assets "free and clear" of most of its liabilities, asset
purchaser filed adversary claim with respect to whether and
to what extent claimants could, consistent with bankruptcy
law, bring claims against asset purchaser related to, inter
alia, ignition-switch defects in vehicles manufactured by
debtor. The United States Bankruptcy Court for the Southern
District of New York, Martin Glenn, J.,529 B.R. 510, entered
judgment partially in favor of claimants, and in favor of
asset purchaser with respect to punitive damages claims.
Claimants appealed. The United States District Court for the
Southern District of New York, Jesse M. Furman, J., 590 B.R.
39, affirmed in part, and vacated in part. Claimants again
appealed.

**Holdings:** The Court of Appeals, Jacobs, Circuit Judge, held
that:

[1] notice of appeal was sufficient;

[2] Bankruptcy Court's order was not res judicata as to
claimants who were not parties to the bankruptcy proceedings
prior to the date of the order; and

[3] asset purchaser was not required to pay punitive damages
claims.

Affirmed.

West Headnotes (15)

[1] **Bankruptcy** Conclusions of law; de novo
review
The Court of Appeals exercises plenary review
over a district court's affirmance of a bankruptcy
court's decisions, reviewing de novo the
bankruptcy court's conclusions of law, and
reviewing its findings of facts for clear error. 28
U.S.C.A. § 158.

3 Cases that cite this headnote

[2] **Federal Courts** Requisites and
sufficiency; defects
The requirement that a notice of appeal name the
parties taking the appeal is jurisdictional. Fed. R.
App. P. 3(c)(1)(A).

1 Cases that cite this headnote

[3] **Federal Courts** Requisites and
sufficiency; defects
A notice of appeal must provide notice both to
the opposition and to the court of the identity of
the appellant or appellants. Fed. R. App. P. 3(c)
(1)(A).

[4] **Federal Courts** Requisites and
sufficiency; defects
If there is a failure to name a party whose intent
to appeal is otherwise clear from the notice of
appeal, the appeal should not be dismissed for

failure to meet the specification requirement. Fed. R. App. P. 3(c)(1)(A).

1 Cases that cite this headnote

**[5]    Federal Courts**  Requisites and sufficiency; defects

In general, the Court of Appeals liberally construes the requirements of the federal rule of appellate procedure governing notices of appeal. Fed. R. App. P. 3.

**[6]    Federal Courts**  Requisites and sufficiency; defects

Notice of appeal naming as plaintiffs "certain Post-Closing Accident Plaintiffs" represented by named law firms satisfied requirement that notice of appeal name the parties taking the appeal, upon appeal from District Court order entering judgment, in part, in favor of purchaser of substantially all of Chapter 11 debtor-automobile manufacturer with respect to plaintiffs' claims for punitive damages, in asset purchaser's adversary proceeding; notice was not so deficient that parties and court could not ascertain the identities of the plaintiffs. Fed. R. App. P. 3(c)(1)(A), 3(c)(4).

1 Cases that cite this headnote

**[7]    Res Judicata**  Res Judicata

To determine whether the doctrine of res judicata bars a subsequent action, a court considers whether (1) the prior decision was a final judgment on the merits, (2) the litigants were the same parties, (3) the prior court was of competent jurisdiction, and (4) the causes of action were the same.

4 Cases that cite this headnote

**[8]    Res Judicata**  Issues or questions

**Res Judicata**  Issues or questions in general

The doctrine of "res judicata," or "claim preclusion," provides that a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.

4 Cases that cite this headnote

**[9]    Res Judicata**  Bankruptcy

Bankruptcy Court's order, including its ruling that purchaser of assets of Chapter 11 debtor-automobile manufacturer was not liable for punitive damages related to claims against debtor, was not res judicata as to claimants who were not parties to the bankruptcy proceedings prior to the date of the order.

**[10]    Contracts**  Language of contract

When interpreting a contract under New York law, a court's primary objective is to give effect to the intent of the parties as revealed by the language of their agreement.

1 Cases that cite this headnote

**[11]    Contracts**  Construction as a whole

**Contracts**  Language of Instrument

Under New York law, the words and phrases in a contract should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions.

1 Cases that cite this headnote

**[12]    Evidence**  Nature and Existence of Ambiguity in General

Under New York law, if an ambiguity in a contract is found, the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract.

3 Cases that cite this headnote

**[13]    Corporations and Business Organizations**  Torts

Under New York law, sale agreement between automobile manufacturer and purchaser of substantially all of manufacturer's assets,

3673

containing provision that purchaser assumed manufacturer's liabilities to third parties for death or other injury to persons caused by vehicles manufactured by manufacturer, did not require purchaser to pay punitive damages for claims related to ignition-switch and other defects in manufacturer's vehicles; damages for death and personal injuries were compensatory, punitive damages were not paid for death and injuries, punitive damages did not arise directly out of death or injuries, other provision of agreement stated that purchaser was not responsible for any of manufacturer's liabilities other than those expressly assumed by it, and no other provision of agreement stated that purchaser would assume punitive damages claims.

4 Cases that cite this headnote

[14]   **Bankruptcy** 🗝 Adequate protection; sale free of liens

A bankruptcy court may approve a sale of a debtor's assets "free and clear" of successor liability claims if those claims flow from the debtor's ownership of the sold assets; such a claim must arise from a (1) right to payment (2) that arose before the filing of the bankruptcy petition or resulted from pre-petition conduct fairly giving rise to the claim. 11 U.S.C.A. § 363.

2 Cases that cite this headnote

[15]   **Damages** 🗝 Nature and Theory of Damages Additional to Compensation

Under New York law, a punitive damages claim is not a tort claim; it does not compensate for a tortious injury.

1 Cases that cite this headnote

**\*127**  Appeal from the United States District Court for the Southern District of New York (Furman, J.)

**Attorneys and Law Firms**

GREGORY W. FOX, William P. Weintraub (on the brief), Goodwin Procter LLP, New York, New York, for appellants.

RICHARD C. GODFREY, Andrew B. Bloomer (on the brief), Kirkland & Ellis LLP, Chicago, Illinois; ERIN E. MURPHY, C. Harker Rhodes IV (on the brief), Kirkland & Ellis LLP, Washington, District of Columbia; Arthur J. Steinberg, David M. Fine, Scott I. Davidson (on the brief), King & Spalding LLP, New York, New York, for appellees.

BEFORE: Jacobs, Sack, Hall, Circuit Judges.

**Opinion**

DENNIS JACOBS, Circuit Judge:

The history of this sprawling bankruptcy is set forth in several opinions, including the comprehensive opinion of the United States Bankruptcy Court for the Southern District of New York (Glenn, J.), which was reviewed and affirmed in relevant part by the district court (Furman, J.) in the judgment from which this appeal is taken. In a nutshell, the 2009 bankruptcy of General Motors Company ("Old GM") resulted in a sale under 11 U.S.C. § 363 of the bulk of its assets to a new entity that has continued the business (the "Sale"). That new entity became General Motors LLC ("New GM").

There is a single question on this appeal. New GM assumed the liability of Old GM with respect to post-Sale accidents involving automobiles manufactured by Old GM; the claims thus assumed include those by persons who did not transact business with Old GM, such as individuals who never owned Old GM vehicles (but collided with one) and (hypothetical) persons who bought Old GM cars used after the Sale. The question on appeal is whether New GM is liable for punitive damages with respect to such claims. We conclude, as a matter of contract interpretation, that New GM is not.

The bankruptcy court ruled New GM cannot be held liable for punitive damages based on Old GM's conduct for two reasons: an earlier decision by the bankruptcy court had resolved this issue and was the law of the case; and the structure of the Bankruptcy Code's priority scheme precludes successor liability punitive damages claims in this case. See In re Motors Liquidation Co. ("July 2017 Decision"), 571 B.R. 565, 575-77 (Bankr. S.D.N.Y. 2017). The district court affirmed on the same grounds. See In re Motors Liquidation Co. ("May 2018 Decision"), 590 B.R. 39, 61-64 (S.D.N.Y. 2018).

This appeal was initiated by certain Post-Closing Accident Plaintiffs represented by multiple law firms ("Appellants"). "Post-Closing Accident Plaintiffs" is a term of art in these

bankruptcy proceedings; it means plaintiffs asserting claims based on an accident or incident that occurred on or after the closing date of the Sale. July 2017 Decision, 571 B.R. at 578. Since filing the Notice of Appeal, some of the Appellants have settled their lawsuits against New GM or decided not to pursue this appeal. For res judicata purposes, it matters that the remaining Appellants are the plaintiffs in **\*128** Eason v. General Motors LLC ("Eason"), Case No. 15A-1940-7 (State Court of Cobb County, Ga.). (The disposition of the case involving the plaintiff in Reichwaldt v. General Motors LLC, Case No. 1:16-cv-02171 (N.D. Ga.) is addressed in a summary order that is issued on the same day as this opinion.)

To confirm appellate jurisdiction, we consider the Notice of Appeal and conclude that it is (barely) adequate (Part I). We then consider the merits: contractual assumption (Part II) and successor liability (Part III). Because New GM did not contractually assume liability for punitive damages, the judgment is affirmed.

## BACKGROUND

In 2009, Old GM filed for bankruptcy under chapter 11, and took steps under 11 U.S.C. § 363(f) to sell substantially all of its assets, "free and clear" of any associated liabilities, to (the entity that later became) New GM. The terms of the Sale are governed by a contract (the "Sale Agreement"), under which New GM assumed a narrow set of Old GM's liabilities (the "Assumed Liabilities"). All other liabilities remained with Old GM.

Prior to the Sale, interested parties and the general public received notice of a proposed Sale Agreement; and the bankruptcy court received and considered hundreds of objections. In response to some objections, the parties amended the Sale Agreement for New GM's Assumed Liabilities to include claims arising out of post-Sale car accidents involving Old GM vehicles. Having received the objections and amendments, the bankruptcy court entered an order on July 5, 2009 approving the terms of the Sale Agreement (the "Sale Order"). In re General Motors Corp., 407 B.R. 463 (Bankr. S.D.N.Y. 2009) (Gerber, J.).

Between February 2014 and October 2014, New GM recalled certain Old GM vehicles with alleged defects that could (among other things) disable critical safety features. The recalls prompted numerous lawsuits against New GM, including those seeking punitive damages based on Old

GM's design, manufacture, and sale of the defective vehicles. In response to these lawsuits, New GM moved in the bankruptcy court to enforce the "free and clear" provision of the Sale Order that, in accordance with 11 U.S.C. § 363(f), extinguishes all liability arising out of Old GM assets other than Assumed Liabilities.

Since the 2014 recalls, many questions have arisen about the breadth of the Sale Order's free and clear provision and the scope of the Sale Agreement's Assumed Liabilities. In November 2015, the bankruptcy court resolved some questions bearing on which claims could proceed against New GM. See In re Motors Liquidation Co. ("November 2015 Decision"), 541 B.R. 104 (Bankr. S.D.N.Y. 2015) (Gerber, J.). Relevant to this appeal, the court considered the extent to which punitive damages are available to Post-Closing Accident Plaintiffs, and concluded that under the Sale Agreement, New GM could not be liable for punitive damages imposed by reason of Old GM's conduct. Id. at 116-21. This ruling was never appealed.

In July 2017, the bankruptcy court undertook to resolve persistent issues arising out of the Sale. Among the claimants were the Appellants, who argued that they were not bound by the November 2015 Decision (on the punitive damages issue) because they were not yet party to the bankruptcy court proceedings. The bankruptcy court applied the November 2015 Decision as the law of the case and ruled that "New GM cannot be held liable for punitive damages on a contractual basis." July 2017 Decision, 571 B.R. at 576. The court went on to consider whether the Sale Order's free and **\*129** clear provision could bar the punitive damages claims of Appellants, who suffered post-Sale injuries. Id. at 576-77. The court observed that, since Old GM was deeply insolvent at the time of the Sale, the structure of the Bankruptcy Code's claim priority scheme would insulate Old GM from having to pay punitive damages. Id. at 580 (citing 11 U.S.C. 726(a)(4)). The court therefore concluded that New GM could not be held liable as a successor corporation for claims that its predecessor would never have paid. Id. at 579-80.

Pursuant to 28 U.S.C. § 158, the district court reviewed the July 2017 Decision and affirmed on both grounds. May 2018 Decision, 590 B.R. at 61-64. This appeal followed.

## DISCUSSION

[1] "We exercise plenary review over a district court's affirmance of a bankruptcy court's decisions, reviewing de novo the bankruptcy court's conclusions of law, and reviewing its findings of facts for clear error." Matter of MPM Silicones, L.L.C., 874 F.3d 787, 794 (2d Cir. 2017) (internal quotation marks omitted) (quoting In re Lehman Bros., Inc., 808 F.3d 942, 946 (2d Cir. 2015)).

**I**

[2] There is an issue at the outset as to the sufficiency of the Notice of Appeal. New GM argues that appellate jurisdiction is lacking because the Notice of Appeal fails to "specify the party or parties taking the appeal by naming each one in the caption or body of the notice." Fed. R. App. P. 3(c)(1)(A). This specification requirement is jurisdictional. Gusler v. City of Long Beach, 700 F.3d 646, 648 (2d Cir. 2012). Here, the Notice of Appeal identifies as Appellants "those certain Post-Closing Accident Plaintiffs represented by Butler Wooten & Peak LLP, Denney & Barrett, P.C., Hilliard Martinez Gonzales L.L.P., and Turner & Associates, P.A."

[3] [4] [5] A notice of appeal must "provide notice both to the opposition and to the court of the identity of the appellant or appellants." Torres v. Oakland Scavenger Co., 487 U.S. 312, 318, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988). In Torres, the Supreme Court ruled insufficient a notice of appeal utilizing an "et al." designation rather than listing each plaintiff by name; but Congress relaxed that requirement in an amendment to the Federal Rules of Appellate Procedure. Now, a notice of appeal need not list every appellant; "such terms as 'all plaintiffs,' 'the defendants,' 'the plaintiffs A, B, et al.,' or 'all defendants except X' " are acceptable. Fed. R. App. P. 3(c)(1)(A). If there is a "failure to name a party whose intent to appeal is otherwise clear from the notice," the appeal must not be dismissed. Id. 3(c)(4). In general, this Court liberally construes the requirements of Rule 3. See, e.g., PHL Variable Ins. Co. v. Town of Oyster Bay, 929 F.3d 79, 87 (2d Cir. 2019).

[6] It was careless of counsel on this appeal to file a notice on behalf of "certain Post-Closing Accident Plaintiffs" represented by named law firms. The Post-Closing Accident Plaintiffs differ in circumstance, and the date on which they joined the bankruptcy court proceedings matters in deciding whether res judicata bars a challenge to the November 2015 Decision. See Section II.A, infra. Although Appellants identified themselves in subsequent submissions and oral

statements to the Court, these clarifications cannot cure a deficiency in a notice of appeal.

Nevertheless, under a liberal construction of the Rule 3 requirements, we conclude the Notice of Appeal is adequate. It is not so deficient as those in prior appeals that were dismissed for lack of jurisdiction. **\*130** See, e.g., M.E.S., Inc. v. Snell, 712 F.3d 666, 668 (2d Cir. 2013) (finding no jurisdiction to review claim advanced by individual who was entirely absent from the original timely notice of appeal); Gusler, 700 F.3d at 648-50 (dismissing appeal in which only a non-party was named in the body of the notice). Here, it is sufficiently clear to the parties and ascertainable to the court (with effort) to identify Appellants by the law firms listed in the notice. New GM has identified Appellants by law firm in the bankruptcy court proceedings. Therefore, there is no insurmountable impediment to our jurisdiction. At the same time, notwithstanding the Court's obligation to ascertain our jurisdiction, it is not our task to conduct a review of the bankruptcy court docket. Counsel expecting us to do so proceed at peril.

In summary, even if the plaintiffs in Eason are not expressly named in the notice, their intent to appeal is otherwise clear by reference to the law firm representing them. Accordingly, we have jurisdiction over this appeal.

**II**

A second threshold question is whether res judicata bars the Court from reaching the issue of whether New GM assumed liability for punitive damages as a matter of contract.

**A. Res Judicata**

In November 2015, the bankruptcy court ruled that claims for punitive damages are not part of New GM's Assumed Liabilities in the Sale Agreement. November 2015 Decision, 541 B.R. at 116-21. This decision was never appealed. Now, New GM claims that the doctrine of res judicata bars Appellants from challenging the reasoning in that decision, which the bankruptcy court applied as the law of the case in July 2017.

[7] [8] "To determine whether the doctrine of res judicata bars a subsequent action, we consider whether (1) the prior decision was a final judgment on the merits, (2) the litigants were the same parties, (3) the prior court was of competent

jurisdiction, and (4) the causes of action were the same." Brown Media Corp. v. K&L Gates, LLP, 854 F.3d 150, 157 (2d Cir. 2017) (internal quotation marks omitted) (quoting In re Layo, 460 F.3d 289, 292 (2d Cir. 2006)). "The doctrine of res judicata, or claim preclusion, holds that 'a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.' " Monahan v. N.Y.C. Dep't of Corr., 214 F.3d 275, 284 (2d Cir. 2000) (quoting Allen v. McCurry, 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980)).

 **[9]** Of the four considerations, the only one contested is whether Appellants were parties to the bankruptcy proceedings prior to the November 2015 Decision. New GM asserts that even if Appellants did not participate in the briefing leading to the November 2015 Decision, they were a part of the larger bankruptcy litigation at that time and are thereby bound by their failure to appeal that ruling. We disagree.

The only remaining Appellants are the plaintiffs in Eason, who initiated their lawsuit on August 12, 2015. Several weeks later, the bankruptcy court issued a scheduling order specifying open issues that were later addressed in the November 2015 Decision and setting a briefing schedule. However, this order was not served on the plaintiffs in Eason. Appellants apparently were not brought into the bankruptcy court proceedings until after the November 2015 Decision. (That is reasonably **\*131** clear though not free from doubt.[1]) Therefore, the doctrine of res judicata does not bar them from challenging the bankruptcy court's application of the November 2015 Decision as the law of the case in the July 2017 Decision.

[1]    On June 20, 2016, counsel for Appellants told the bankruptcy court that New GM had not served a motion to enforce the Sale Order on the plaintiffs in Eason. This statement leads us to conclude that Appellants did not join the bankruptcy proceedings until sometime after June 2016.

### B. Contractual Assumption of Punitive Damages

 **[10]**    **[11]**    **[12]** "When interpreting a contract under New York law, our 'primary objective is to give effect to the intent of the parties as revealed by the language of their agreement.' " Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co., 773 F.3d 110, 113-14 (2d Cir. 2014) (quoting Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 232 F.3d 153,

157 (2d Cir. 2000)).[2] "The words and phrases in a contract should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." Id. at 114 (internal quotation marks omitted) (quoting Olin Corp. v. Am. Home Assur. Co., 704 F.3d 89, 99 (2d Cir. 2012)). "If an ambiguity is found, 'the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract.' " Int'l Multifoods Corp. v. Commercial Union Ins. Co., 309 F.3d 76, 83 (2d Cir. 2002) (quoting Morgan Stanley Group Inc. v. New Eng. Ins. Co., 225 F.3d 270, 275-76 (2d Cir. 2000)).

[2]    The Sale Agreement contains a New York choice-of-law clause.

At issue is Section 2.3(a)(ix) of the Sale Agreement (re-formatted below), which provides that New GM has assumed:

> [1] all Liabilities

> [2] to third parties

> [3] for death, personal injury, or other injury to Persons ... caused by motor vehicles designed for operation on public roadways ...

> [4] and, in each case, manufactured, sold or delivered by [Old GM] (collectively, "Product Liabilities"),

> [5] which arise directly out of death, personal injury or other injury to Persons ... caused by accidents or incidents first occurring on or after the Closing Date and arising from such motor vehicles' operation or performance ....

J.A. 184. "Liabilities" is expansively defined as "any and all liabilities and obligations of every kind and description whatsoever, whether such liabilities or obligations are known or unknown, disclosed or undisclosed, matured or unmatured, accrued, fixed, absolute, contingent, determined or undeterminable, on or off-balance sheet or otherwise, or due or to become due, including Indebtedness and those arising under any Law, Claim, Order, Contract or otherwise." J.A. 88.

 **[13]** Appellants read Section 2.3(a)(ix) reductively to mean that New GM assumed "all Liabilities," including "all liabilities and obligations of every kind and description whatsoever," and thereby assumed claims for punitive damages. However, the bankruptcy court soundly observed

3677

that "the phrase 'all Liabilities' does not exist alone." November 2015 Decision, 541 B.R. at 119.

Reading Section 2.3(a)(ix) phrases [1], [3], and [5] together, New GM's assumption of "all Liabilities" is limited to those that (1) are "*for*" death and injuries and **\*132** those that (2) "*arise directly out of*" death and injuries. It is clear that punitive damages are not paid "for" death and injuries. Rather, they are paid to punish "egregious, reprehensible behavior." Virgilio v. City of New York, 407 F.3d 105, 116 (2d Cir. 2005). Damages "for" death and injuries are compensatory.

Likewise, claims for punitive damages do not "arise directly out of" death and injuries. If reprehensible conduct--such as careless automobile design--led to an accident that caused an injury, a claim for punitive damages to punish that conduct does not arise directly out of the injury. Arguably, the claim might be said to arise out of the injury indirectly. Most accurately, the claim for punitive damages does not arise out of the injury at all.

Appellants next assert that because the Sale Agreement does not expressly carve out punitive damages in Section 2.3(a)(ix), New GM must have contractually assumed them as Liabilities. However, this argument neglects other provisions of the Sale Agreement demonstrating that the enumerations in Section 2.3(a) are exclusive. Section 2.3(b), in defining Old GM's "Retained Liabilities," provides that New GM "shall not assume, or become liable to pay, perform or discharge, any Liability of [Old GM] ... other than the Assumed Liabilities." J.A. 107. And Section 2.3(a) provides that New GM's "Assumed Liabilities shall consist *only* of the following Liabilities" defined in subsections (i)-(xv). J.A. 105 (emphasis added). Punitive damages are not among those defined categories. Under these provisions, the default rule is that unless the Sale Agreement states that New GM assumed a Liability, the Liability remained with Old GM. There was therefore no need to expressly carve out punitive damages in Section 2.3(a)(ix).

Even if Section 2.3(a)(ix) is deemed ambiguous as to whether New GM assumed Liabilities for punitive damages, the extrinsic evidence confirms that New GM did not. In 2015, the bankruptcy court made the following factual findings (inter alia):

- New GM assumed Old GM's obligations "only to the extent commercially necessary."

- Section 2.3(a)(ix) was amended in response to concern voiced by state Attorneys General and others that it would be unfair to deprive future claimants of their rights to bring claims arising out of post-Sale accidents. However, those objectors "never asked [the bankruptcy court] to require New GM to assume anything more than compensatory damages, and in none of those submissions was punitive damages mentioned."

November 2015 Decision, 541 B.R. at 119-20. Appellants offer no convincing reason why it was commercially advantageous for New GM to contractually assume claims for punitive damages. Nor do they account for the telling fact that, when Section 2.3(a)(ix) was amended, nobody appears to have contemplated New GM assuming Liabilities for punitive damages. Furthermore, as the bankruptcy court observed, the idea that New GM would silently choose to assume inestimable millions of dollars in punitive damages "is entirely implausible." Id. at 120.

Accordingly, the terms of the Sale Agreement reflect-- and extrinsic evidence confirms--that New GM did not contractually assume claims for punitive damages based on Old GM's conduct.

## III

Appellants argue that even if Old GM's liabilities for punitive damages were not contractually assumed, New GM must pay them under the theory of successor liability. **\*133** This argument misjudges the scope of the Sale Order's free and clear provision.

 **[14]**   The Sale Order provides that "[e]xcept for the Assumed Liabilities" in the Sale Agreement, the assets acquired by New GM "shall be free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever ... including rights or claims based on any successor or transferee liability." J.A. 42. Nevertheless, Appellants argue that under Second Circuit law, this provision cannot bar their punitive damages claims because they had no relationship with Old GM at the time of the Sale:

[A] bankruptcy court may approve a § 363 sale "free and clear" of successor liability claims if those claims flow from the debtor's ownership of the sold assets. Such a claim must arise from a (1) right to payment (2) that arose before the filing of the petition or resulted from pre-petition conduct fairly giving rise to the claim. *Further, there must*

3678

*be some contact or relationship between the debtor and the claimant such that the claimant is identifiable.*
In re Motors Liquidation Co., 829 F.3d 135, 156 (2d Cir. 2016) (emphasis added). Appellants emphasize that they did not own an Old GM car at the time of the Sale, that they had no pre-Sale relationship with Old GM, and that they therefore were not identifiable when the Sale Order was entered.

 [15] In our 2016 decision, the issue was whether a bankruptcy court may approve a sale "free and clear" of claims if those claims arose from pre-petition conduct that had not resulted in "detectable injury" at the time of the bankruptcy sale, but that might lead to a "tortious" injury after the sale. Id. at 154-56. That has no bearing on punitive damages: a punitive damages claim is not a tort claim; it does not compensate for a "tortious" injury; and there is no "detectable injury." Moreover, any alleged egregious act committed by Old GM that might justify punitive damages was over and done by the time of the Sale Order. Therefore, such claims are subject to the Sale Order's successor liability bar.

* * *

The district court and bankruptcy court did not address whether the scope of the Sale Order could preclude Appellants' punitive damages claims. Instead, those courts concluded that because Old GM was insolvent, the structure of the federal Bankruptcy Code's priority scheme precluded punitive damages claims against New GM. See May 2018 Decision, 590 B.R. at 63; July 2017 Decision, 571 B.R. at 579-80.

We need not decide whether the Bankruptcy Code's priority scheme precludes liability for punitive damages in the case of an insolvent debtor such as Old GM. Here, punitive damages are not an Assumed Liability in the Sale Agreement, and the Sale Order's free and clear provision bars punitive damages claims under a theory of successor liability. These conclusions are sufficient for us to rule that Appellants may not seek punitive damages against New GM based on Old GM's conduct.

**CONCLUSION**

For the foregoing reasons, we AFFIRM the judgment of the district court.

**All Citations**

943 F.3d 125, 105 Fed.R.Serv.3d 171

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 56

533 B.R. 83
United States Bankruptcy Court,
S.D. New York.

In re: OAS S.A., et al., [1] Debtors
in Foreign Proceedings.

Case No. 15–10937 (SMB) (Jointly
Administered)    |    Signed July 13, 2015

**Synopsis**

**Background:** Proposed foreign representative of debtor infrastructure engineering companies filed petition for recognition of three foreign proceedings pending in Brazil as foreign main proceedings pursuant to Chapter 15. Noteholders objected.

**Holdings:** The Bankruptcy Court, Stuart M. Bernstein, J., held that:

[1] debtor companies were debtors-in-possession within meaning of the Model Law, as required for debtors to appoint foreign representative;

[2] noteholders were precluded from arguing that debtor company did not operate as a debtor-in-possession within meaning of the Model Law;

[3] legal officer of debtor companies was duly appointed and qualified to act as foreign representative in Chapter 15 proceedings;

[4] debtor company's center of main interests (COMI) for determining foreign main proceeding status was Brazil; and

[5] Chapter 15's narrow "public policy" exception did not apply to Brazilian bankruptcy proceedings of debtor companies.

Petitions granted.

**Attorneys and Law Firms**

WHITE & CASE LLP, 1155 Avenue of the Americas, New York, NY 10036, John K. Cunningham, Esq., Gregory M. Starner, Esq., Kimberly A. Haviv, Esq., Richard S. Kebrdle, Esq., Of Counsel QUINN EMANUEL URQUHART & SULLIVAN LLP, 51 Madison Ave., 22nd Floor, New York, NY 10010, Susheel Kirpalani, Esq., Michael Carlinsky, Esq., Benjamin Finestone, Esq., Of Counsel Attorneys for Renato **\*86** Fermiano Tavares as Petitioner and Foreign Representative

DECHERT LLP, 1095 Avenue of the Americas, New York, NY 10036, Allan S. Brilliant, Esq., Robert J. Jossen, Esq., Gary J. Mennitt, Esq., Craig P. Druehl, Esq., Stephen M. Wolpert, Esq., Of Counsel Attorneys for Aurelius Capital Management, LP, and Alden Global Capital LLC

CHADBOURNE & PARKE LLP, 1301 Avenue of the Americas, New York, NY 10019, Howard Seife, Esq., Andrew Rosenblatt, Esq., Eric Daucher, Esq., Of Counsel Attorneys for the Joint Provisional Liquidators of OAS Finance Limited

ALLEN & OVERY LLP, 1221 Avenue of the Americas, New York, NY 10020, Ken Coleman, Esq., Laura R. Hall, Esq., Of Counsel Attorneys for HSBC Bank USA, National Association

**MEMORANDUM DECISION
RECOGNIZING DEBTORS' BRAZILIAN
BANKRUPTCY PROCEEDINGS AS
FOREIGN MAIN PROCEEDINGS**

STUART M. BERNSTEIN, United States Bankruptcy Judge:

Renato Fermiano Tavares, as proposed foreign representative, requests recognition of three foreign proceedings pending in Brazil as foreign main proceedings pursuant to chapter 15 of the United States Bankruptcy Code. (*See Verified Petition for Recognition of Brazilian Bankruptcy Proceedings and Motion for Order Granting Related Relief Pursuant to 11 U.S.C. §§ 1515, 1517, 1520 and 1521,* dated Apr. 15, 2015 (ECF Doc. # 3) (together with the *Voluntary Petitions for each debtor,* dated Apr. 15, 2015, filed in Adv. Pro. Nos. 15–10937 through 15–10940).) The foreign debtors—OAS S.A. ("OAS"), Construtora OAS S.A. ("Construtora") and OAS Investments GmbH ("OAS Investments," and together with OAS and Construtora, collectively, the "OAS Debtors") [2] — are currently debtors in judicial reorganization proceedings (the "Brazilian Bankruptcy Proceedings") pending in the First Specialized Bankruptcy Court of São Paulo (the "Brazilian

3681

Court") pursuant to Federal Law No. 11.101 of February 9, 2005 of the laws of the Federative Republic of Brazil (the "Brazilian Bankruptcy Law"). The Court conducted an evidentiary hearing on May 19, 2015 (the "Recognition Hearing") [3] and concludes based upon the factual findings and legal conclusions that follow that the OAS Debtors' petitions for recognition as foreign main proceedings are granted.

## BACKGROUND

### A. The OAS Debtors

The OAS Debtors are part of the OAS Group. The OAS Group consists of infrastructure companies that focus on heavy engineering and equity investments in infrastructure projects located in and outside Brazil, and provides a range of services that includes public concessions, construction, engineering, planning, execution and works management for the transportation, power, sanitation, infrastructure and real estate industries, providing services in twenty-two countries in Latin America, the Caribbean and Africa. (*Declaration of Re* **\*87** *nato Fermiano Tavares Pursuant to 28 U.S.C. § 1746 in Support of Verified Petition for Recognition of Brazilian Bankruptcy Proceedings and Motion for Order Granting Related Relief Pursuant to 11 U.S.C. §§ 1515, 1517, 1520 and 1521,* dated Apr. 15, 2015 ("*Tavares Declaration*") at ¶ 9 (ECF Doc. # 4).) [4] Its principal operating activities are organized into two major divisions: engineering, which engages in heavy civil engineering and construction projects, and investments, which is focused on private investments in infrastructure and public and private services concessions. (*Id.*)

Most of the OAS Group's foreign construction contracts are with the national governments of countries in Latin America and Africa and relate to the construction of, among other things, highways, hospitals, water and sewage systems and affordable housing. (*Id.* at ¶ 10.) The OAS Group's domestic construction contracts are with private companies holding concessions, other private companies and the federal and local Brazilian governments. (*Id.*) The OAS Group employs, directly or indirectly, approximately 110,000 people. (*Id.*)

OAS, as the holding company, sits at the apex of the OAS Group. (*Id.* at ¶ 12.) It directly or indirectly owns 100% of the share capital of Construtora, the holding company atop the engineering division. (*Id.* at ¶¶ 12–13.) Construtora, through its subsidiaries and branches, conducts

business in Brazil, Peru, Trinidad and Tobago, Ghana, Uruguay, Chile, Honduras, Argentina, Bolivia, Colombia, Mozambique, Guinea, Ecuador, Equatorial Guinea, Haiti, Costa Rica, Panama, Angola, and Guatemala. (*Id.* at ¶ 13.) Its operations in Brazil consist of more than eighty construction projects that generate more revenue for Construtora than its operations in any other country. (*Id.*)

OAS Investments maintains its registered office in Vienna, Austria, and is directly and wholly-owned by OAS. (*Id.* at ¶ 15.) Pursuant to its articles of association, its principal corporate purpose is the financing of the operations of the OAS Group. (OASX 27, at 113; OASX 28, at 118.) [5] In or around October 2012, OAS Investments issued $500 million of 8.25% senior notes due 2019 (the "2019–1 Notes"). The 2019–1 Notes were guaranteed by OAS, Construtora, and OAS Investimentos, S.A. ("Investimentos"). (OASX 27, at 122, 123.) Investimentos, a Brazilian company, is not one of the OAS Debtors seeking recognition and should not be confused with OAS Investments, the note issuer. The OAS Group intended to use the proceeds to refinance a substantial portion of its existing debt, fund certain capital expenditures, and use the remainder for general corporate purposes. (OASX 27, at 45.) The 2019–1 Notes were governed by New York law. (*See* OASX 27, at v.)

In or around October 2013, OAS Investments issued an additional $375 million of 8.25% senior notes due 2019 (the "2019–2 Notes" and together with the 2019–1 Notes, the "2019 Notes"; holders of the 2019 Notes are referred to herein as the "2019 Noteholders"). The 2019–2 Notes were guaranteed, again by OAS, Construtora, and Investimentos. (OASX 28, at 128.) The OAS Group intended to use the **\*88** proceeds to refinance a substantial portion of its existing debt. (OASX 28, at 48.) The 2019–2 Notes were also governed by New York law. (*See* OASX 28, at vi.)

### B. Events Leading Up to the Brazilian Bankruptcy Proceedings

The OAS Group's immediate financial problems can be traced to its dealings with Petrobras. The Brazilian oil company Petrobras had been the target of an anti-corruption investigation by the Brazilian federal government since March 2014. The investigation also involved Brazil's largest construction companies and several suppliers. (*Tavares Declaration* at ¶ 24.) On November 21, 2014, Petrobras released a list of twenty-three firms—including OAS—that were temporarily blocked from competing for new contracts

3682

with Petrobras, leading Standard & Poor's to downgrade OAS to 'B+' from 'BB-'. (*Id.*) These events, together with the general slowdown in the Brazilian economy, resulting cash flow problems and the lower credit ratings made it difficult and expensive for the OAS Group to obtain credit to finance its projects. (*Id.* at ¶ 25.) In addition, the decline in value of the Brazilian *real* relative to other currencies (including the U.S. dollar) added to the OAS Group's inability to service its existing total debt. (*Id.*) As a result, in January of 2015, the OAS Group announced that it would cease making payments to its financial creditors while it worked to propose a global restructuring plan to its creditors. (*Id.* at ¶ 26.)

### 1. The December 2014 Transactions

Prior to the default, in December 2014, the OAS Group engaged in three transactions that are, to a large extent, driving the opposition to recognition by Aurelius and Alden, holders of the 2019 Notes. First, on December 1, 2014, Construtora, a guarantor of the 2019 Notes, transferred assets valued at R$301 million to OAS Engenharia e Construção S.A. ("Engenharia"), another subsidiary of OAS that did not guarantee the 2019 Notes. (*See* AAX 32.)

Second, on December 26, 2014, Investimentos, a guarantor, was merged into OAS, also a guarantor (the "Merger"). (AAX 12, at OAS–00001984–1997; AAX 13, at OAS–8773.) The merger agreement provided that Investimentos would be dissolved following the Merger. (AAX 12, at OAS–00001995.) Tavares signed the merger agreement in his capacity as Investimentos' Head of Legal Affairs. (AAX 12, at OAS–00001997.) According to Aurelius and Alden, the Merger eliminated their structural seniority in the separate assets of Investimentos that were now part of the OAS asset pool. OAS justified the Merger explaining that it was intended to simplify the OAS Group's corporate structure and reduce administrative and operational costs. (AAX 13, at OAS–8773.)

Third, also on December 26, 2014, Investimentos transferred its ownership stake in Investimentos e Participações em Infraestrutura S.A. INVEPAR ("Invepar") to its subsidiary OAS Infraestrutura, a non-guarantor. (AAX19; AAX13 at OAS–8773.) The Notice to the Market issued by OAS was signed on behalf of both parties by Fabio Hori Yonamine as CEO and Tavares as Legal Officer. (AAX 19, at 2.) According to OAS, the purpose of the transfer was to restructure the OAS Group's shareholding interests in Invepar, (AAX 19, at 1), and segregate the shares for a potential sale to raise new financing. (AAX 13, at OAS–8773.)

The three transactions will be referred to collectively as the December Transactions.

### *89  2. The New York Litigations

Litigation in New York followed on the heels of the December Transactions and the default under the 2019 Notes. [6] Aurelius filed an action on February 4, 2015 and Alden filed its own action on February 18, 2015, both in New York state court, against OAS, OAS Finance, Construtora, and Investimentos. (*See* OASX 34, 35.) The plaintiffs sought to recover the amounts due on the 2019 Notes they held. Their claims aggregate over $140 million. Aurelius sought and obtained an *ex parte* order of attachment, and Alden moved for the same relief. In addition, Huxley Capital Corporation, an Aurelius affiliate, sued OAS, Construtora, Investimentos, OAS Infraestrutura S.A. and Engenharia in the United States District Court for the Southern District of New York. *See Huxley Capital Corp. v. OAS S.A., et al.,* No. 15–cv–01637, 2015 WL 971722 (S.D.N.Y. filed Mar. 5, 2015). That action seeks to avoid the three December Transactions as fraudulent transfers under New York law. [7]

### 3. The Brazilian Bankruptcy Proceedings

On March 31, 2015, the OAS Debtors together with other OAS affiliates (collectively, the "Brazilian Debtors") commenced the Brazilian Bankruptcy Proceedings under Brazilian Bankruptcy Law. (*See* AAX 27.) On April 1, 2015, the Brazilian Court issued a decision and order approving the continuation of the joint reorganization proceedings. (*See* Decision, Proceeding No. 1030812–77.2015.8.26.0100, 1st District Bankruptcy and Judicial Reorganization Court, São Paulo, Brazil, Apr. 1, 2015 (OASX 1, OASX 2 (English Translation).)) The Brazilian Court observed that although Brazil had not yet adopted the UNCITRAL Model Code, the center of main interests of OAS was Brazil, and the Brazilian Debtors, including those incorporated abroad, were part of the same economic group controlled from Brazil.

Aurelius, Alden and another entity (Turnpike Limited) sought reconsideration complaining about the prejudicial effect of the Merger on the 2019 Noteholders. They argued that Investimentos had the financial ability to honor its guarantee to the 2019 Noteholders before the Merger, (OASX 18, at ¶ 19), but OAS, on the other hand, did not, (*id.* at ¶¶ 21–22), and the Merger therefore caused tremendous losses to the 2019 Noteholders. (*Id.* at ¶ 22.) The applicants noted that

another Brazilian court had already preliminarily enjoined (suspended) the effects of the Merger. (*Id.* at ¶ 23.) In conclusion, they asked the Brazilian Court to process the reorganizations of each Brazilian Debtor separately, require each Brazilian Debtor to file a separate plan to be voted on by the creditors of that debtor, and preclude one Brazilian Debtor from using the assets of another Brazilian Debtor to pay its **\*90** debts absent a binding legal relationship that justified doing so. (*Id.* at ¶¶ 55–56.) On April 6, 2015, the Brazilian Court issued a decision affirming its earlier ruling to supervise the reorganization on a consolidated basis. (*See* OASX 19.)

The applicants appealed. In addition to the relief sought in the Brazilian Court, they asked the appellate court to exclude the three foreign Brazilian Debtors (OAS Investments, OAS Finance and OAS Investments Limited ("OAS Investments (BVI)") from the Brazilian proceedings. (OASX 20, at ¶ 108.) The appellate court affirmed the Brazilian Court, noting that the challenge was premature. No plan had been submitted, no creditors meeting had been held, the order was subject to modification, and with additional information, "it will certainly be possible to become better acquainted with the facts and the relationship between the companies and their creditors in order to reach a sound decision with regard to what must be ordered." (*Id.* at pp. 2439–40.)

The Brazilian Court also appointed Alvarez & Marsal Consultoria Empresarial do Brasil ("A & M") as judicial administrator. (OASX 2.) The role is statutory under Brazilian Bankruptcy Law. (*See* AAX 20.) The duties of a judicial administrator include providing information requested by creditors, (*id.* at Art. 22–I(b)), demanding information from creditors, the debtor or their officers, (*id.* at Art. 22–I(d)), publishing notice of the creditor list, (*id.* at Art. 7 § 2, Art. 18), sending certain specific information about the case to creditors, (*id.* at Art. 22–I(a)), applying to the judge to convene a creditors' meetings (*id.* at Art. 22–I(g)) and chairing those meetings. (*Id.* at Art. 37.) In addition, the judicial administrator reconciles claims, (*id.* at Art. 7), has standing to object to claims, (*id.* at Art. 19), oversees the debtor's activities and its compliance with the restructuring plan, (*id.* at Art. 22–II(a)), hires professionals, (*id.* at Art. 22–I(h)), files for bankruptcy (*i.e.,* liquidation) if the debtor breaches the obligations under the plan, (*id.* at Art. 22–II(b)), and submits monthly reports to the judge on the debtor's activities. (*Id.* at Art. 22–II(c).) Finally, the order appointing A & M directed it to report the company's situation, bear responsibility for supervising the process and for seeing that the debtors meet all deadlines, and submit a proposal of fees. (OASX 2.)

**C. The Chapter 15 Cases**

On April 2, 2015, the Board of Directors of OAS, Construtora, OAS Finance and OAS Investments resolved to grant Tavares a power of attorney for one year to represent the entities with respect to their judicial reorganization proceedings before the Brazilian Court and administer the reorganization of the debtors' assets and affairs in the Brazilian Bankruptcy Proceedings. In addition, the Boards of Directors specifically appointed Tavares as the OAS Debtors' agent and attorney-in-fact for the purpose of seeking relief available to a "foreign representative" under chapter 15 of the United States Bankruptcy Code. The resolutions were accompanied by powers of attorney evidencing his authority. (OASX 3, 4.)

On April 15, 2015, Tavares commenced the chapter 15 cases and sought immediate relief in the form of an injunction against continued litigation and collection efforts. (*Motion for Provisional Relief Pursuant to Section 1519 of the Bankruptcy Code,* dated Apr. 15, 2015 (ECF Doc. # 7).) Aurelius and Alden objected to the provisional relief. (*See Noteholders' Objection to Motion for Provisional Relief Pursuant to Section 1519 of the Bankruptcy Code,* dated Apr. 17, 2015 (ECF Doc. # 17).) At the hearing, the Court granted the relief but only in part.

**\*91** On May 15, 2015, Aurelius and Alden filed their *Objection to Petition for Recognition,* dated May 15, 2015 (ECF Doc. # 60). The objection and the ensuing Recognition Hearing identified four areas of dispute. First, Tavares was not qualified to file the petitions or serve as foreign representative because he had not been authorized by the Brazilian Court to exercise those powers. Second, even if court authorization was not required, Tavares was not qualified to serve as the foreign representative because the OAS Debtors lacked the authority to appoint Tavares, and Tavares was personally disqualified or unable to perform the functions of a foreign representative. Third, OAS Investments' center of main interests was in Vienna, and its Brazilian reorganization could not be recognized as a foreign main or non-main proceeding. Fourth, certain rules and procedures of the Brazilian judicial and/or bankruptcy system were manifestly contrary to the public policy of the United States.

**D. The British Virgin Islands Proceeding**

On or about April 16, 2015, Aurelius, Alden and others (the "BVI Petitioners") filed a petition in the Eastern Caribbean

Supreme Court, High Court of Justice, British Virgin Islands (the "BVI Court") to appoint liquidators for OAS Finance. (*See* OASX 10.) The BVI Court granted the petition and appointed Marcus Allender Wide and Mark T. McDonald as joint provisional liquidators (the "JPLs"). The JPLs directed Tavares to withdraw the chapter 15 petition for recognition filed on behalf of OAS Finance, and advised him that he had no further authority to direct the affairs of that company. Although Tavares has not withdrawn the petition, he did not go forward with his own petition to grant recognition to OAS Finance. The JPLs subsequently filed their own petition for recognition under chapter 15, and that petition is the subject of a separate proceeding.

## DISCUSSION

### A. Introduction

 **[1]**   Congress adopted chapter 15 as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005. Chapter 15 incorporates the Model Law on Cross–Border Insolvency (the "Model Law") promulgated by the United Nations Commission on International Trade Law ("UNCITRAL"). 11 U.S.C. § 1501(a); *see Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 132 (2d Cir.2013) ("*Fairfield Sentry* "); *Ad Hoc Grp. of Vitro Noteholders v. Vitro S.A.B. de C.V. (In re Vitro S.A.B. de C.V.)*, 701 F.3d 1031, 1043 (5th Cir.2012) ("*Vitro* "), *cert. dismissed,* ––– U.S. ––––, 133 S.Ct. 1862, 185 L.Ed.2d 862 (2013). Chapter 15 is intended to promote "cooperation between United States courts, trustees, examiners, debtors and debtors in possession and the courts and other competent authorities of foreign countries; greater legal certainty for trade and investment; fair and efficient administration of cross-border insolvencies that protects the interests of all creditors and other interested entities, including the debtor; the protection and maximization of the debtor's assets; and the facilitation of the rescue of financially troubled businesses." *In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.,* 374 B.R. 122, 126 (Bankr.S.D.N.Y.2007), *aff'd,* 389 B.R. 325 (S.D.N.Y.2008); *accord* 11 U.S.C. § 1501(a).

 **[2]**   "In interpreting this chapter, the court shall consider its international origin, and the need to promote an application of this chapter that is consistent with the application of similar statutes adopted by **\*92** foreign jurisdictions." 11 U.S.C. § 1508. "As each section of Chapter 15 is based on a corresponding article in the Model Law, if a textual provision of Chapter 15 is unclear or ambiguous, the Court may then consider the Model Law and foreign interpretations of it as part of its 'interpretive task.' " *O'Sullivan v. Loy (In re Loy )*, 432 B.R. 551, 560 (E.D.Va.2010) (footnote omitted) (citing 11 U.S.C. § 1508); *accord Fairfield Sentry,* 714 F.3d at 136; *Fogerty v. Petroquest Res., Inc. (In re Condor Ins. Ltd.),* 601 F.3d 319, 321 (5th Cir.2010). When interpreting Chapter 15, the Court should also consult the GUIDE TO ENACTMENT OF THE UNCITRAL MODEL LAW ON CROSS–BORDER INSOLVENCY (the "GUIDE") promulgated by UNCITRAL. *See* H.R.REP. NO. 109–31, at 105 (2005); LEIF M. CLARK, ANCILLARY & OTHER CROSS–BORDER INSOLVENCY CASES UNDER CHAPTER 15 OF THE BANKRUPTCY CODE § 3[1][a][i], at 17 (2008).

Bankruptcy Code § 1517 states the grounds for granting recognition:

> (a) Subject to section 1506, after notice and a hearing, an order recognizing a foreign proceeding shall be entered if —
>
> (1) such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502;
>
> (2) the foreign representative applying for recognition is a person or body; and
>
> (3) the petition meets the requirements of section 1515.

Section 1517(b) clarifies the distinction between foreign main and nonmain proceedings referred to in § 1517(a)(1):

> (b) Such foreign proceeding shall be recognized—
>
> (1) as a foreign main proceeding if it is pending in the country where the debtor has the center of its main interests; or
>
> (2) as a foreign nonmain proceeding if the debtor has an establishment within the meaning of section 1502 in the foreign country where the proceeding is pending.

The parties agree that OAS and Construtora maintain their center of main interests ("COMI") in Brazil.[8] They are registered in Brazil where they maintain their main offices, and their registration creates a rebuttable presumption that Brazil is their COMI. 11 U.S.C. § 1516(c). Furthermore, the earlier description of their activities, which are predominantly

in Brazil, confirms that their COMI is in Brazil. Aurelius and Alden do, however, dispute that OAS Investments' COMI is in Brazil, and that issue is addressed later. And although Tavares is clearly a person within the meaning of 11 U.S.C. § 1517(a)(2), Aurelius and Alden maintain that he does not satisfy the definition of "foreign representative" under 11 U.S.C. § 101(24). That issue is discussed next.

### B. Tavares as the Foreign Representative

### 1. The Requirement for Judicial Authorization

The definition of "foreign representative" includes a requirement, *inter alia,* that he must be authorized in a foreign proceeding to administer the reorganization of the debtors assets or affairs:

> **\*93**  The term foreign representative means a person or body, including a person or body *appointed* on an interim basis, *authorized in a foreign proceeding* to administer the reorganization or the liquidation of the debtors assets or affairs or to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24) (emphasis added). In addition, Bankruptcy Code § 1515, which states the requirements for a petition for recognition, includes several references to proof of the "appointment" of the foreign representative:

(a) A foreign representative applies to the court for recognition of a foreign proceeding in which the foreign representative has been *appointed* by filing a petition for recognition.

(b) A petition for recognition shall be accompanied by—

(1) a certified copy of the decision commencing such foreign proceeding and *appointing* the foreign representative;

(2) a certificate from the foreign court affirming the existence of such foreign proceeding and of the *appointment* of the foreign representative; or

(3) in the absence of evidence referred to in paragraphs (1) and (2), any other evidence acceptable to the court of the existence of such foreign proceeding and of the *appointment* of the foreign representative.

(Emphasis added). Aurelius and Alden argue, in the main, that Tavares had to be authorized or appointed by the Brazilian Court to act as the "foreign representative," but he was not..

In *Vitro,* the Fifth Circuit Court of Appeals addressed this very argument at length and rejected it. There, a large Mexico-based glass manufacturer initiated a *concurso* proceeding (analogous to a chapter 11 reorganization) under the Mexican Reorganization Act. *Vitro,* 701 F.3d at 1038. Vitro's board of directors appointed two individuals to serve as co-foreign representatives, and they commenced chapter 15 proceedings seeking recognition. *Id.* at 1040–41. Like Aurelius and Alden here, the *Vitro* noteholders objected arguing that the foreign representatives failed to meet the definition of "foreign representative" because, among other reasons, they were not appointed by a foreign court or administrative tribunal.[9] *Id.* at 1046.

The District Court specifically addressed the argument, rejected it and affirmed the Bankruptcy Court order granting recognition. Initially, the District Court concluded that the phrase "authorized in a foreign proceeding" was ambiguous, and could be interpreted broadly to mean "authorized *in the context of* a foreign bankruptcy proceeding." *Ad Hoc Grp. of Vitro Noteholders v. Vitro, S.A.B. de C.V.* (*In re Vitro, S.A.B. de C.V.*), 470 B.R. 408, 411–12 (N.D.Tex.2012) ("*Vitro District Court Opinion* ") (emphasis in original). In addition, although the case law on the issue was sparse, the New York Bankruptcy Court had addressed the issue in *In re Compania Mexicana de Aviacion, S.A. de C.V.,* No. 10–14182 (MG), 2010 WL 10063842 (Bankr.S.D.N.Y. Nov. 8, 2010). *Vitro District Court Opinion,* 470 B.R. at 411–12. In *Compania Mexicana de Aviacion,* the Bankruptcy Court had ruled from the bench that a Mexican corporation could authorize a person to act as a foreign representative in a chapter 15 case because under Mexican law, the debtor essentially **\*94** acted as a debtor in possession and managed its own affairs. *Vitro District Court Opinion,* 470 B.R. at 412.

The District Court agreed that the conclusion of the New York Bankruptcy Court in *Compania Mexicana de Aviacion* was consistent with the definition of foreign representative under Bankruptcy Code § 101(24). Under the first prong of the statute, those authorized to administer the reorganization or liquidation of the debtors assets and affairs are also authorized to be the foreign representative, and Mexican law allowed the debtor to manage its business enterprise during the *concurso* proceeding. *Id.* at 412. Finally, while there were differences

3686

between the concepts of debtor-in-possession under U.S. and Mexican law, the District Court was not persuaded that they were of sufficient magnitude to warrant the conclusion that Vitro could not appoint its own foreign representative. *Id.*

The Fifth Circuit affirmed the District Court. Construing the phrase "authorized in a foreign proceeding," the Court stated that while that statement is "compatible with appointment by a foreign court ... it is hardly necessary." *Vitro,* 701 F.3d at 1047. Agreeing with the District Court, the Fifth Circuit explained that "it would be equally compatible with a requirement that an individual be appointed 'in the context of' ... or in the course of, a foreign proceeding." *Id.* (quoting *Vitro District Court Opinion,* 470 B.R. at 411). The Court added that the references to "appointment" (quoted above) in Bankruptcy Code § 1515 suffered from the same defect, and at best, required that the foreign representative must be appointed but did not say by whom. *Id.*

Case law also supported the interpretation. The District Court had identified examples of bankruptcy courts routinely granting recognition to foreign representatives appointed by Mexican debtors. *Id.* at 1047–48. Although those decisions did not entail challenges to the foreign representative's appointment, they were nevertheless persuasive because even in the absence of an objection, "the [bankruptcy] court would still need to determine whether the appointment was correct as a threshold matter prior to granting recognition." *Id.* at 1048 n. 15.

The Court found additional support for its interpretation in the Model Law and the reports of the Working Group on Insolvency Law (the "Working Group"). The definition of foreign representatives in § 101(24) is essentially identical to the corresponding definition in Model Law Article 2(d). [10] "In drafting this definition, the Working Group expressly rejected the requirement that a foreign representative be specifically authorized by statute or other order of court (administrative body) to act in connection with a foreign proceeding." *Id.* at 1048 (quoting UNCITRAL Rep. of the Working Group on Insolvency Law on the Work of the Eighteenth Session, ¶ 111, U.N. Doc. A/CN.9/419 (Dec. 1, 1995) ("*Eighteenth Session* "), *available at* http:// www.uncitral.org/uncitral/en/ commission/working_groups/5Insolvency.html (Dec.1995 Rep.) (internal quotation marks omitted)). According to the Circuit Court, the Working Group rejected the requirement for which the *Vitro* noteholders argued because of concerns that "the expressions [of various specific terms and titles]

would be unfamiliar and might have the unintended effect of being unduly restrictive, since the list would inevitably be incomplete." *Id.* at 1048 (quoting *Eighteenth Session* at ¶ 112) (internal quotation marks **\*95** omitted). Finally, "the Working Group also declined to include the word 'specifically' because 'it would be unusual for a State to appoint an insolvency representative specifically to act abroad.' This supports our conclusion that the [n]oteholders' proposed interpretation—which would require exactly such an appointment—is wrong." *Vitro,* 701 F.3d at 1048–49 (quoting *Eighteenth Session* at ¶ 113) (footnote omitted).

Aurelius and Alden are correct that the facts of *Vitro* differed from those presented in the OAS Debtors' cases in one respect. The *Vitro* foreign court had denied a motion to enjoin the foreign representatives and refused to declare the *conciliador* [11] to be the only person authorized to act as foreign representative. The Fifth Circuit viewed the Mexican court's ruling as "tacit approval" of the representatives appointed by the *Vitro* board. *Vitro,* 701 F.3d at 1048. That statement, however, played no part in the Fifth Circuit's interpretation of chapter 15 and its conclusion that the Bankruptcy Code did not require the foreign representative to be authorized by the foreign bankruptcy court.

 **[3]** Based on the foregoing, the Court concludes that the Bankruptcy Code does not require the judicial authorization or appointment of the foreign representative.

## 2. The Authority of the OAS Debtors' Boards of Directors

Aurelius and Alden next contend that even if judicial authorization is not required as a matter of law, the OAS Debtors could not appoint Tavares as foreign representative because they are not debtors-in-possession. The Model Law does not define the characteristics of a debtor-in-possession, but the GUIDE suggests that it includes a debtor that retains "some measure of control over its assets" although under court supervision. GUIDE ¶¶ 71, 74. The UNCITRAL Practice Guide on Cross–Border Insolvency Cooperation (2009) ( "PRACTICE GUIDE"), published after Congress adopted chapter 15, defines a "debtor in possession" as a debtor that "retains full control over the business, with the consequence that the court does not appoint an insolvency representative." PRACTICE GUIDE, at ¶ 13(j).

 **[4]** The OAS Debtors are debtors-in-possession within the meaning of the Model Law as amplified by the GUIDE

and the PRACTICE GUIDE. Article 64 of the Brazilian Bankruptcy Law provides, with certain exceptions that do not apply, that "[d]uring the in-court restructuring procedure, the debtor and his officers shall be kept in the management of the business activity, overseen by the Committee, if any, and by the judicial administrator." (AAX 20, at Art. 64.) The debtor's management retains full control over the debtor's business and assets, subject to the type of oversight that ordinarily characterizes a judicially-supervised reorganization. (*See Declaration of Eduardo Secchi Munhoz Pursuant to 28 U.S.C. § 1746 in Support of Petition for Recognition of Brazilian Bankruptcy Proceedings and Motion for Order Granting Related Relief Pursuant to 11 U.S.C. §§ 1515, 1517, 1520 and 1521,* dated Apr. 15, 2015 ("*Munhoz Declaration*") (ECF **\*96** Doc. # 5).) [12] In contrast, the judicial administrator represents the estate in a *liquidation,* and has the authority to seize the debtor's assets, sell perishable assets with the court's approval, collect its receivables and preserve the debtor's assets. (AAX 20, at ¶ 22–III(c), (f), (j), (i), (n), (q).)

 **[5]**  Furthermore, Aurelius and Alden are precluded from making the contrary argument because it is inconsistent with the position they successfully took before the BVI Court. *See Adrogue Chico S.A. v. FleetBoston Fin. Corp.,* 427 Fed.Appx. 43, 45 (2d Cir.2011) (judicial estoppel precluded a plaintiff from asserting a claim, its largest asset, that it failed to disclose in its Argentine bankruptcy); *Rapture Shipping, Ltd. v. Allround Fuel Trading, B.V.,* 350 F.Supp.2d 369, 373–75 (S.D.N.Y.2004) (party who successfully argued in Rotterdam court that a contractual relationship existed with the defendant was precluded under the doctrines of judicial estoppel and comity from arguing that no contract existed in a subsequent federal court action). The BVI Petitioners, including Aurelius and Alden, petitioned the BVI Court to place OAS Finance into liquidation and immediately appoint a provisional liquidator. Under BVI law, and absent the consent of the debtor, the BVI Court may appoint a provisional liquidator if it finds that the appointment "is necessary for the purpose of maintaining the value of assets owned or managed by the company, or ... is in the public interest." Insolvency Act, 2003 § 170(4)(b).

Their *ex parte* submissions to the BVI Court warned that OAS's existing management was still in control of the Brazilian Debtors and the Brazilian reorganization process, and that control warranted the appointment of a provisional liquidator. In their *Written Submissions of Applicants Ex Parte Hearing on 16 April 2015 for Appointment of Provisional Liquidators,* dated Apr. 16, 2015 (OASX 9), the BVI Petitioners argued:

> Notwithstanding the corruption charges against senior OAS Group management and the OAS Group itself, *the Brazilian proceedings leave the directors in control of the Respondent and OAS Investments.* Alvarez and Marsal have been appointed as trustee in the Brazilian proceedings, but as the affidavit of the Applicants' Brazilian lawyer Marcelo Carpenter explains, *this role is largely administrative. The substantive proposals for restructuring the OAS Group are in the hands of those who have overseen its involvement in the corruption scandal and its subsequent economic collapse.*

(OASX 9, at ¶ 16) (emphasis added).

Furthermore, the judicial administrator had little power to interfere with the management of the Brazilian Debtors. In the expert affidavit referred to in the preceding quote, their Brazilian law expert detailed the limited authority of the judicial administrator:

> *The judicial administrator in Brazilian recovery proceedings has very limited powers and acts more as an inspector than an administrator, since he has no administrative powers. It is important to understand that, during the recovery process, management of the company remains in the hands of its duly appointed directors. Neither the creditors nor the judicial administrator can replace them.* The debtor is, however, prevented from selling or encumbering its permanent assets without the prior **\*97** consent of the court in consultation with the creditors' committee.

(OASX 11, at ¶ 12) (emphasis added).

The BVI Court accepted the argument and appointed the JPLs. This implies that the BVI Court found that a provisional liquidator was needed to maintain the value of OAS Finance's assets or was in the public interest, or both, based on the BVI Petitioners' arguments that the existing OAS management remained in control of the Brazilian Debtors and the Brazilian reorganization proceedings, and the limited powers of the

3688

judicial administrator did not permit interference with that control. Having successfully made the latter argument to the BVI Court, principles of judicial estoppel and comity preclude Aurelius and Alden from arguing to this Court that the powers of the OAS management are so minimal or those of the judicial administrator so robust that OAS does not operate as a debtor-in-possession because it lacks control of its business and assets or has been supplanted by the judicial administrator.

Finally, Aurelius and Alden argue that the OAS Debtors are not debtors-in-possession because they do not have the same duties and responsibilities of a debtor-in-possession under the United States Bankruptcy Code. For example, they cite to Bankruptcy Code §§ 1107 and 1108 [13] in an attempt to draw a distinction between the authority to manage the debtor's business and assets and "the authority to administer the reorganization or liquidation of its assets and affairs for the benefit of creditors and other stakeholders." (*Alden and Aurelius' Proposed Findings of Fact and Conclusions of Law on Chapter 15 Petitions,* dated June 4, 2015 ("*AA Proposed Findings & Conclusions* ") at ¶ 163 (ECF Doc. # 73).)

The law they cite does not support a distinction they attempt to draw. Section 1107 grants the debtor in possession the rights and powers of a trustee serving under chapter 11. A trustee appointed under Bankruptcy Code § 1106(a) is vested with most of the powers and duties conferred on a chapter 7 trustee other than the mandate to liquidate the debtor's assets pursuant to Bankruptcy Code § 704(a)(1). *See* 11 U.S.C. § 1106(a)(1). A chapter 7 trustee does not have the authority to operate a debtor's business unless expressly authorized to do so by the bankruptcy court. *See* 11 U.S.C. §§ 704(8), 721. Section 1108 grants the trustee, and hence, the debtor-in-possession, the authority to operate the debtor's business without the need to procure a separate order. H.R.REP. NO. 95–595, at 404 (1977); S. REP. No. 95–989, at 116 (1978). Bankruptcy Code §§ 1107 and 1108 reflect the distinction between a trustee's authority to operate the debtor's business under chapter 7 and chapter 11 and not between the debtor's power to control its business and administer its reorganization.

Aurelius and Alden also argue that the OAS Debtors do not have the same duties and responsibilities as an American bankruptcy trustee, they are not fiduciaries and they lack the power to avoid preferential and fraudulent transfers. (*AA Proposed Findings & Conclusions* at ¶ 165.) In addition, the Brazilian Bankruptcy Law does not confer the administrative powers and duties of an American trustee or debtor-in- **\*98**

possession on the OAS Debtors other than the right to propose a plan, and Brazilian Bankruptcy Law does not create an estate. (*Id.* at ¶ 166.) Instead, these administrative duties are conferred on the judicial administrator. (*Id.* at ¶ 167.)

The *Vitro* Court rejected a similar argument. It proceeds from the incorrect assumption that only those who meet the criteria of a debtor-in-possession under U.S. law can be deemed a debtor-in-possession in a foreign proceeding with the power to appoint a foreign representative. The drafters of the Model Law did not base their concept of "debtor-in-possession" on how United States law defined the term, and "under Chapter 15 the correct analogy is not to whether a debtor meets Chapter 11's definition of a 'debtor in possession,' but whether it meets that definition originally envisioned by the drafters of the Model Law and incorporated into § 101(24)." *Vitro,* 701 F.3d at 1050. As stated earlier, the OAS Debtors retain control of their assets and business affairs, and are debtors-in-possession within the meaning of the Model Law.

### 3. Tavares as Foreign Representative

 [6]   Aurelius' and Alden's final challenge focuses on Tavares. They contend that under Bankruptcy Code § 101(24) the foreign representative must be the one who administers the assets and affairs in the foreign proceeding, and Tavares has not assumed and does not intend to assume those duties. (*AA Proposed Findings & Conclusions* at ¶ 174.) In addition, the foreign representative must be neutral and accountable, (*id.* at ¶¶ 174–75), and must be a representative of the Brazilian Court, not the Brazilian Debtors. (*See id.* at ¶ 177.) Having constructed this test, Aurelius and Alden maintain that Tavares cannot meet the neutrality and accountability criteria because he represents the interests of the OAS Debtors, not the Brazilian Court or the Brazilian Bankruptcy Proceedings, he was involved in the December Transactions, he owes his allegiance to OAS Group's shareholders and he has a conflict inherent in his representation of OAS Investments. (*Id.* at ¶ 178.)

Neither the Bankruptcy Code nor the Model Law explains what it means to administer the reorganization of the debtor's assets and affairs. The GUIDE states, however, that "the foreign representative may be a person authorized in the foreign proceeding to *administer those proceedings, which would include seeking recognition, relief and cooperation in another jurisdiction ....*" GUIDE at ¶ 86 (emphasis added). Tavares was expressly authorized by the OAS Debtors' Boards of Directors to represent the OAS Debtors and act as their agent in administering the reorganization of their assets

and affairs in the Brazilian Bankruptcy Proceedings and to exercise the authority available to a foreign representative as defined in the Bankruptcy Code to seek relief under chapter 15. The powers granted to him authorized Tavares to administer the OAS Debtors' assets and affairs, and the filing of the chapter 15 cases themselves constituted the administration of their assets and affairs. Whether he performs those duties satisfactorily is a question different from whether he is authorized to perform those duties. Here, Tavares was plainly authorized to administer the OAS Debtors' reorganization, and accordingly, he has the powers necessary to qualify as the OAS Debtors' foreign representative.

In addition, Aurelius' and Alden's neutrality and accountability is not supported by the law they cite. For example, they rely on Bankruptcy Code § 1509(b)(3) to argue that the foreign representative represents the foreign court, not the foreign debtor. Section 1509(b)(3) states that if **\*99** the court grants recognition "a court of the United States shall grant comity or cooperation to the foreign representative." Aurelius and Alden reason that a court can only grant comity to another court, and the foreign representative must, therefore, represent the court to receive comity. (*See AA Proposed Findings & Conclusions* at ¶ 177.)

Section 1509 is derived from Model Law § 9. Its purpose is to ensure that once recognition is granted, the foreign representative will have full access to state and federal courts within the United States. H.R.REP. NO. 109–31, at 110 (2005). It also limits that access by implementing the "single point of entry" concept, 8 ALAN N. RESNICK & HENRY J. SOMMER, COLLIER ON BANKRUPTCY ¶ 1509.02, at 1509–4 (16th ed. 2015) ("COLLIER"), and providing the "exclusive door to ancillary assistance for the foreign proceedings." H.R.REP. NO. 109–31, at 110 (2005). In other words, it is the one key that unlocks the foreign representative's access to courts in the United States, but once the door is unlocked, the access is complete.

 [7]  The reference to comity does not equate the foreign representative with the foreign court or the foreign proceeding. "Although use of the word 'comity' connotes recognition of another judicial proceeding, the word 'cooperation' suggests a much broader meaning." *Vitro, 701 F.3d at 1047.* Section 1509 addresses the rights and privileges of the foreign representative and means that the foreign proceeding must receive courtesy and cooperation when the foreign representative proceeds in another court.

8 COLLIER ¶ 1509.02, at 1509–5 to 1509–6. It does not, however, mandate comity with respect to all acts in the foreign proceeding without regard to the satisfaction of the other provisions of chapter 15 that pertain to comity. *Id.* at ¶ 1509.02, at 1509–6.

In addition, Aurelius' and Alden's interpretation ignores the definition of "foreign representative." Under Bankruptcy Code § 101(24), a foreign representative is one authorized in the foreign proceeding to (1) administer the reorganization or the liquidation of the debtors assets or affairs *or* (2) act as a representative of such foreign proceeding. If the foreign representative had to demonstrate that he acted as the representative of the foreign proceeding, the first prong of the disjunctive test would be superfluous.

Aurelius and Alden also rely on Bankruptcy Code § 1505 to support their contention that the foreign representative must satisfy a neutrality and accountability test. Section 1505 states:

> A trustee or another entity (including an examiner) may be authorized by the court to act in a foreign country on behalf of an estate created under section 541. An entity authorized to act under this section may act in any way permitted by the applicable foreign law.

According to the legislative history, section 1505's "main purpose is to ensure that the court has knowledge and control of possibly expensive activities [and] have the collateral benefit of providing further assurance to foreign courts that the United States debtor or representative is under judicial authority and supervision." H.R. REP. NO. 109–31, at 108 (2005). Section 1505 focuses on the authorization of United States trustees and similar entities to appear in foreign courts, not the other way around. In fact, Congress recognized that it changed the language of the Model Law and was purely internal to United States law. H.R.REP. NO. 109–31, at 108 (2005). [14] **\*100** It does not modify or otherwise impose unstated requirements on the definition of "foreign representative" in Bankruptcy Code § 101(24) which tracks the Model Law.

One last observation concerns Tavares' relationship to the OAS Group shareholders and his participation in the December Transactions. Those involved in the Petrobras scandal have been arrested and removed from their

management of the OAS Debtors. Tavares was not charged. (*See* AAX 7.) There is no suggestion much less evidence presented to this Court that Tavares had a role in any wrongdoing; rather, the allegation of his unfitness is based on his association with those charged with wrongdoing by the Brazilian authorities relating to the business activities of the OAS Group. Furthermore, while his name appears on certain documents associated with the December Transactions, including the execution of the merger agreement and the Notice to the Market published in connection with the Invepar transfer, no court has judged the transactions to be wrongful or, apparently, raised the issue of Tavares' qualifications with the Brazilian Court.

Accordingly, the Court concludes that Tavares was duly appointed and qualified to act as the "foreign representative" in these chapter 15 proceedings.

## C. The COMI of OAS Investments

 [8] Tavares seeks recognition of the OAS Investments' Brazilian Bankruptcy Proceeding as a foreign main proceeding. [15] A " 'foreign main proceeding' means a foreign proceeding pending in the country where the debtor has the center of its main interests," 11 U.S.C. § 1502(4), or COMI. "In the absence of evidence to the contrary, the debtor's registered office ... is presumed to be the center of the debtor's main interests." 11 U.S.C. § 1516(c). "[A] debtor's COMI is determined as of the time of the filing of the Chapter 15 petition," but, "[t]o offset a debtor's ability to manipulate its COMI, a court may also look at the time period between the initiation of the foreign liquidation proceeding and the filing of the Chapter 15 petition." *Fairfield Sentry,* 714 F.3d at 133.

 [9]    [10]    [11]    [12] The COMI analysis permits consideration of any relevant activities, including liquidation activities and administrative functions. *Id.* at 137. The following non-exclusive group of factors guides the analysis, "but consideration of these specific factors is neither required nor dispositive," *id.:*

> Various factors, singly or combined, could be relevant to such a determination: the location of the debtor's headquarters; the location of those who actually manage the debtor (which, conceivably could be the headquarters of a holding company); the location of the debtor's primary assets; the location of the majority

of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes.

*Id.* (quoting *In re SPhinX, Ltd.,* 351 B.R. 103, 117 (Bankr.S.D.N.Y.2006), *aff'd,* 371 B.R. 10 (S.D.N.Y.2007)). In addition, the court may consider the location of the debtor's "nerve center," "including from where the debtor's activities are directed **\*101** and controlled, in determining a debtor's COMI." *Fairfield Sentry,* 714 F.3d at 138 n. 10. Finally, international sources of law that the court may consider "underscore [ ] the importance of factors that indicate regularity and ascertainability." *Id.* at 138. The party seeking recognition as a foreign main proceeding has the burden of proving that the debtor's COMI is in the jurisdiction where the foreign main proceeding is pending. *SPhinX,* 351 B.R. at 117.

 [13] As this case shows, the COMI analysis when applied to a special purpose financing vehicle proves less straightforward than the typical case. OAS Investments is incorporated in Austria, and in the absence of contrary evidence, Austria is its presumed COMI. The evidence, however, indicates that it was not. OAS Investments is a subsidiary of OAS that was formed to serve as a special purpose vehicle. It issued the 2019 Notes, and then loaned the proceeds to OAS Investments (BVI), a direct OAS subsidiary, (*see* AAX 4, at 7518), which apparently loaned the proceeds to the members of the OAS Group in accordance with the uses stated in the offering memoranda. Although OAS Investments' registered office is located in Vienna, Austria, it only maintains a post office box there. (Tr. at 85:12–19.) Furthermore, it does not conduct business, own assets, have a physical location, or employ anyone in Austria. (*Tavares Declaration* at ¶ 18.) It has just a handful of trade creditors located in Austria, (AAX 4, at 7451), who provide services relating to the establishment and maintenance of OAS Investments' registered office in Austria and services required under Austrian law. (*Tavares Declaration* ¶ 18.) The predominant creditors are the beneficial holders of the 2019 Notes located worldwide. [16]

Having issued the 2019 Notes, OAS Investments had no other business except to pay them off. This was the very business it and the other Brazilian Debtors were engaged in through the Brazilian Bankruptcy Proceedings when Tavares filed the chapter 15 case on April 15, 2015. Moreover, the Brazilian Bankruptcy Proceedings provide the only realistic

3691

chance to repay the 2019 Notes. OAS Investments principal asset is a receivable owed by OAS Investments (BVI). The latter appears to be a conduit for the distribution of financing proceeds to the ultimate beneficiaries of the financing; it was not mentioned in the offering memoranda and does not appear to have any other purpose. In addition, it is currently the subject of a provisional liquidation proceeding (along with OAS Finance) in the BVI, and lacks the means to repay OAS Investments unless its own OAS Group borrowers repay that debt. In truth, the only source of repayment that will ultimately discharge the obligations to the 2019 Noteholders must come from the OAS Group pursuant to the reorganization of their financial affairs.

Brazil, in this regard, is OAS Investments' nerve center and headquarters. OAS, a Brazilian entity and its sole shareholder, has the power to elect OAS Investments' executive officers and "determine the outcome of any action requiring shareholder approval, including transactions **\*102** with related parties, acquisitions and dispositions of assets and the timing and payment of any future dividends, according to the Brazilian Corporation Law." (OASX 27, at 42; OASX 28, at 44.) The offering memoranda explained that although OAS Investments was organized under the laws of Austria, "[a]ll of its directors and [OAS Group's] officers and certain advisors named herein reside in Brazil." (OASX 27, at 42; OASX 28, at 44.) There is no evidence that its Board of Directors ever convened a meeting except to pass the resolution appointing Tavares as its foreign representative, and that resolution was executed by its Brazilian directors in Brazil. [17]

The conclusion that Brazil is the nerve center and headquarters of OAS Investments is consistent with the expectation of the creditors, especially the 2019 Noteholders. The first page of each offering memoranda stated that the 2019 Notes were "unconditionally and irrevocably guaranteed by OAS S.A., Construtora OAS Ltda. and OAS Investimentos S.A. (*each organized under the laws of Brazil).*" (Emphasis in original.) The offering memoranda described OAS Investments as "a special purpose finance company and [the OAS Group's] wholly owned subsidiary," (OASX 27, at 15; OASX 28, at 17), and "[p]ursuant to section three of [OAS Investments'] articles of association, [OAS Investments'] principal purpose is the financing of the operations of the OAS group, its affiliates and direct and indirect subsidiaries." (OASX 27, at 113; OASX 28, at 118.) The offering memoranda discussed the businesses of the OAS Group, (OASX 27, at 80–112; OASX 28, at 82–

117), supplied the condensed financial statements of OAS, (OASX 27, at F–1 to F–301; OASX 28, at F–1 to F–299), and the three Brazilian guarantors, (OASX 27, at A–1 to A–11; OASX 28, at A–1 to A–10), and identified the management of OAS, Construtora and Investimentos. (OASX 27, at 114–19; OASX 28, at 119–24.) Notably, the offering memoranda did not include any financial information regarding OAS Investments, (*see* OASX 27, at 113; OASX 28, at 118), or identify its management. It is also noteworthy that any notices under the Indentures that needed to be directed to OAS Investments had to be sent to Construtora in Brazil, with copies to Investimentos, also in Brazil. (*See* OASX 31, at § 13.01.) [18] The Indentures did not require any notices to be sent to OAS Investments in Austria or anywhere else in its own name.

Most importantly, the "Risk Factors" that all note purchasers were warned to "carefully consider" before deciding to purchase the notes described the risks associated with the businesses of the OAS Group, not OAS Investments, (OASX 27, at 25–44; OASX 28, at 26–47), and included a separate discussion focusing on the special risks relating to investments that could be affected by the Brazilian economy and Brazilian government actions. (OASX 27, at 39–42; OASX 28, at 41–44.) Potential purchasers were also warned that if OAS and its subsidiaries could not pay their indebtedness, including the obligations under the guarantees, they might become subject to bankruptcy proceedings in Brazil, and Brazilian laws might be less **\*103** favorable to creditors compared to the laws of the United States or other jurisdictions. (OASX 27, at 43; OASX 28, at 45.) In contrast, the offering memoranda do not discuss the risks of operating in Austria. The only risk factor that mentioned Austria stated that Austria would not enforce U.S. judgments, the U.S. securities laws or awards of punitive damages. (OASX 27, at v; OASX 28, at vi.)

In conclusion, purchasers of the 2019 Notes understood that they were investing in Brazilian-based businesses, and OAS Investments' place of incorporation, or for that matter its very existence, was immaterial to their decision to purchase their notes. While their rights were governed by New York law, (OASX 31, at § 13.08), and OAS Investments consented to the jurisdiction and service of process in New York, (*id.* at § 13.12), the purchasers expected to receive repayment from the cash generated by the operations of the OAS Group, and in the event of a default, might ultimately have to enforce their rights in a Brazilian bankruptcy proceeding. OAS Investments had no separate, ascertainable presence

in Austria; it was part of, and inseparable from, the OAS Group located in Brazil. Finally, the 2019 Noteholders had no legitimate expectation that the Austrian courts would play any role in the determination or payment of their claims. For the reasons stated, the Court concludes that OAS Investments' COMI was also located in Brazil when Tavares filed its chapter 15 case.

### D. Public Policy

[14] Bankruptcy Code § 1506 states:

> Nothing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States.

The public policy exception "requires a narrow reading." *Fairfield Sentry,* 714 F.3d at 139; *accord* H.R.REP. NO. 109–31, pt. 1, at 109 (2005) ( "[Section 1506] follows the Model Law article 5[sic] exactly, is standard in UNCITRAL texts, and has been narrowly interpreted on a consistent basis in courts around the world. The word "manifestly" in international usage restricts the public policy exception to the most fundamental policies of the United States."); GUIDE at ¶ 104 ("The purpose of the expression 'manifestly' ... is to emphasize that public policy exceptions should be interpreted restrictively and that article 6 is only intended to be invoked under exceptional circumstances concerning matters of fundamental importance for the enacting State."). As the Second Circuit observed, federal courts in the United States have uniformly adopted the narrow application of the public policy exception. *Fairfield Sentry,* 714 F.3d at 139 (listing cases).

[15] Aurelius and Alden have not mounted a serious challenge to the fairness of the Brazilian Bankruptcy Proceedings on a "macro system" level, and this Court recently held that "Brazilian bankruptcy law meets our fundamental standards of fairness and accords with the course of civilized jurisprudence." *In re Rede Energia S.A.,* 515 B.R. 69, 98 (Bankr.S.D.N.Y.2014). As explained by the OAS Debtors' Brazilian insolvency law expert, Brazil has a comprehensive bankruptcy law that in many ways mirrors our own. The debtor must file a petition which requires judicial approval before it can proceed. (*Munhoz Declaration* at ¶ 11.) If approved, the debtor operates as a debtor-in-possession subject to varying levels of oversight by the court, the creditors committee and the judicial administrator. (*See*

*id.* at ¶¶ 12, 14–15.) The debtor submits a reorganization plan which, with limited exceptions, deals with all pre-petition debt. (*Id.* at ¶ 17.) The plan must demonstrate feasibility, and separate the creditors into four classes labor-related, secured, general **\*104** unsecured and "small business companies" unsecured claims. (*Id.* at ¶¶ 20, 21.) The plan must be approved by the requisite majority of creditors in each class, (*id.* at ¶ 22), but may be crammed down over the vote of a rejecting class under certain circumstances. (*Id.* at ¶ 23.) The Brazilian bankruptcy court must then approve the plan for it to become effective. (*Id.* at ¶ 24.) Finally, as noted above, Brazilian Bankruptcy Law provides for a claims allowance process, and the Brazilian Bankruptcy Law includes detailed provisions relating to a creditor's challenge to the proposed disallowance of his claim. (AAX 20, at Art. 11–18.)

Instead, Aurelius and Alden focus on certain aspects of Brazilian Bankruptcy Law or the Brazilian Bankruptcy Proceedings that they argue are or were manifestly contrary to public policy and preclude recognition. First, the Brazilian Bankruptcy Court entered a "substantive consolidation" order *ex parte* without procedural and substantive fairness to the 2019 Noteholders or due process of law. (*AA Proposed Findings & Conclusions* at ¶ 189 & nn. 18, 19.) Second, the Brazilian Debtors are unable to avoid and recover the fraudulent transfers made in connection with the December Transactions. (*Id.* at ¶ 190.) Although creditors may still bring fraudulent transfer actions, "the Brazilian plan will likely be based on substantive consolidation, which would wipe out any creditor ability to avoid inter-debtor fraudulent transfers," and "[e]ven if ... separate plans are confirmed, the evidence shows that any pending fraudulent transfer actions will be superseded by the Brazilian plan." (*Id.*) Third, "given that there likely will be no redress for the [December] Transactions and no benefit to holders of claims against guarantors in Brazil, any distribution to Noteholders under a plan confirmed in the Brazilian Bankruptcy Proceedings will necessarily deviate materially from distributions that would occur under a United States plan." (*Id.* at ¶ 191.) In addition, Aurelius and Alden contend that Tavares has refused to cooperate in discovery, has evidenced a disregard for United States process, and intends to withhold relevant information from the JPLs until substantive consolidation is "definitively granted in Brazil." (*Id.* at ¶ 193.)

Objections based on the speculation that the Brazilian Court will approve a plan or plans that permit substantive consolidation, unfair distributions or the elimination of creditor fraudulent transfer claims are premature. They

3693

depend on the contents and effect of one or more plans that the Brazilian Court has not yet approved and may never approve.

Moreover, as is evident from the record, Aurelius and Alden have received due process in Brazil. A Brazilian court preliminarily enjoined the consummation of the Merger upon application by Aurelius and Alden. Aurelius and Alden also challenged the consolidation order through their motion for reconsideration and their subsequent appeal of the Brazilian Court's consolidation order. Aurelius and Alden concede that substantive consolidation has not been "definitively granted," and Brazilian appellate court affirmed the Brazilian Bankruptcy Court's consolidation order observing that it was subject to modification and "it will certainly be possible to become better acquainted with the facts and the relationship between the companies and their creditors in order to reach a sound decision." (OASX 21, at 2439–40.) In addition, Aurelius and Alden will have the chance to object to any plans in Brazil and challenge any motion in this Court seeking recognition and enforcement of any plans approved by the Brazilian Court.

 **[16]**   Furthermore, "even the absence of certain procedural or constitutional rights will not itself be a bar under § 1506." *Vitro,* 701 F.3d at 1069. In particular,  **\*105**  the practice in Brazil of the different sides meeting *ex parte* with the Brazilian judge, (*see* Tr. at 103:16–104:6), is not manifestly contrary to United States public policy. *See Vitro District Court Decision,* 473 B.R. at 130–31 ("A number of the objections raised by the Objecting Parties fall under the category of general unfairness. For example, they emphasize that Vitro SAB had many *ex parte* meetings with the presiding judges. *Ex parte* contact with judges is apparently common in Mexico; in fact, the Objecting Parties' counsel had *ex parte* meetings of their own."). Even United States recognizes exceptions to the general rule forbidding *ex parte* communications and procedures. Requests for examination pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure are "filed and usually granted *ex parte* ", 9 COLLIER ¶ 2004.01[2] at 2004–4, temporary restraining orders may be issued under certain circumstances without notice, FED.R.CIV.P. 65(b), and settlement conferences often involve *ex parte* communications with judges and/or mediators. And Aurelius and Alden overlook that Aurelius obtained an *ex parte* order of attachment from the New York state court and attached some of the defendants' bank accounts, they filed an *ex parte* application with the BVI Court to place OAS Finance in liquidation, and as part of that same application, obtained *ex parte* the appointment of

the JPLs. Due process is satisfied because these *ex parte* proceedings and orders are subject to *ex post* review, just as the consolidation order has been subject to *ex post* review in Brazil.

Furthermore, even a "definitive" substantive consolidation order is not manifestly contrary to United States law. The Bankruptcy Code expressly authorizes substantive consolidation, *see* 11 U.S.C. § 1123(a)(5) (a plan must provide an adequate means for its implementation, including "the merger or consolidation of the debtor with one or more persons"); *see also In re Stone & Webster, Inc.,* 286 B.R. 532, 546 (Bankr.D.Del.2002) ("I find that § 1123(a)(5)(C) clearly authorizes a bankruptcy court to confirm a Chapter 11 plan containing a provision which substantively consolidates the estates of the two or more debtors."), and substantive consolidation is often ordered by United States bankruptcy courts. *E.g., Union Sav. Bank v. Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Baking Co., Ltd.),* 860 F.2d 515, 518–20 (2d Cir.1988) (discussing factors to consider when determining substantive consolidation); *see e. g., In re H.H. Distributions, L.P.,* 400 B.R. 44, 53–55 (Bankr.E.D.Pa.2009) (approving substantive consolidation); *In re Am. Homepatient, Inc.,* 298 B.R. 152, 165–66 (Bankr.M.D.Tenn.2003) (same), *aff'd on other grounds,* 420 F.3d 559 (6th Cir.2005), *cert. denied,* 549 U.S. 942, 127 S.Ct. 55, 166 L.Ed.2d 251 (2006). Although Brazilian law may impose different requirements for substantive consolidation, the different standards, standing alone, do not signify that Brazilian Bankruptcy Law is manifestly contrary to our own public policy. *See In re Compania de Alimentos Fargo, S.A.,* 376 B.R. 427, 437 (Bankr.S.D.N.Y.2007) ("A foreign bankruptcy system need not ... mirror United States law for comity to be granted, so long as foreign law is substantially similar and not repugnant to United States law."); GUIDE 30 ("Differences in insolvency schemes do not themselves justify a finding that enforcing one State's laws would violate the public policy of another State.").

Finally, the record does not support the finding that the OAS Debtors have abused the discovery process in this Court or the District Court, that Tavares has refused to cooperate with legitimate discovery requests, that Tavares has evidenced his "disregard for United States process" or that the OAS Debtors "intend to withhold relevant information from the JPLs until substantive consolidation is definitively granted  **\*106**  in Brazil." (*AA Proposed Findings & Conclusions* at ¶ 193.) Here, Aurelius and Alden made discovery demands, and the OAS Debtors objected to certain requests and asked for a

discovery conference. (*See Letter from Susheel Kirpalani, Esq. to the Court,* dated May 4, 2015 (ECF Doc. # 39).) The Court conducted a conference and sustained the majority of the objections.

Accordingly, the Court concludes that recognition of the OAS Debtors' Brazilian Bankruptcy Proceedings is not manifestly contrary to the public policy of the United States, and recognition is granted. This conclusion is without prejudice to Aurelius' and Alden's right to challenge any action that Tavares seeks to take in this Court, including, in particular, a request to recognize and enforce a plan or plans approved by the Brazilian Court. Settle order on notice.

**All Citations**

533 B.R. 83

Footnotes

1    The Debtors in these chapter 15 cases, along with the last four digits of each debtor's tax identification or corporate registry number, are: OAS S.A. (01–05), Construtora OAS S.A. (01–08), OAS Investments GmbH (4557), and OAS Finance Limited (6299).

2    Tavares filed a fourth petition seeking recognition for the Brazilian debtor OAS Finance Limited ("OAS Finance"). For reasons discussed later in this opinion, Tavares did not go forward on that recognition petition, and hence, these findings of fact and conclusions of law do not address the recognition of OAS Finance.

3    References to the Recognition Hearing transcript are cited as "Tr. at ——: ——."

4    The *Tavares Declaration* was received as his direct testimony at the Recognition Hearing. He was present and cross-examined.

5    "OASX" refers to Tavares' exhibits received in evidence at the Recognition Hearing. "AAX" refers to Recognition Hearing exhibits proffered by Aurelius Capital Management, LP (together with its affiliates, "Aurelius") and Alden Global Capital LLC (together with its affiliates, "Alden").

6    OAS Finance and the same guarantors also defaulted under other notes that are not the subject of these proceedings.

7    Additional litigation ensued. On April 27, 2015, HSBC sued Aurelius in New York State Court seeking a declaration that any assets attached by Aurelius must be shared ratably with the other creditors. (*See HSBC Bank USA, N.A. v. Aurelius Inv. LLC,* No. 15–cv–651399 (N.Y. Sup.Ct. filed Apr. 27, 2015) (OASX 16).) On May 12, 2015, Aurelius filed an action against Citibank, N.A. and certain of its affiliates seeking the turnover of $276,000 in an account belonging to Construtora on deposit in a New York Citibank branch. (*Aurelius Inv. LLC v. Citibank Global Mkts., Inc., et al.,* No. 15–cv–651633 (N.Y. Sup.Ct. filed May 12, 2015) (OASX 43).) On the same day, Aurelius filed a turnover action against OAS Finance, OAS, Construtora and Investimentos seeking the same relief. (*Aurelius Inv., LLC v. OAS Fin. Ltd., et al.,* No. 15–cv–651632 (N.Y. Sup.Ct. filed May 12, 2015) (OASX 17).)

8    The Brazilian Court concluded that the COMI of all of the Brazilian Debtors, including the OAS Debtors, was in Brazil. This Court has considered the COMI issue for each OAS Debtor *de novo* in light of the evidence adduced in connection with the Recognition Hearing.

9    The objecting *Vitro* noteholders were represented by the same counsel that represents Aurelius and Alden in these proceedings.

10   The only change in 11 U.S.C. § 101(24) is the addition of the words "including a person or body appointed," in lieu of the original "including one appointed."

11   "A *conciliador* is an individual appointed by the *Instituto Federal de Especialistas de Concursos Mercantiles*—the Federal Institute of Specialists of Insolvency Procedures—to serve as a quasi-judicial officer with certain responsibilities in a *concurso* proceeding, including filing an initial list of recognized claims, mediating a plan, and, if necessary to protect the debtor's estate, managing the debtor's business." *Vitro,* 701 F.3d at 1038 n. 2.

12   Munhoz testified as Tavares' expert on Brazilian insolvency law. The Court received the *Munhoz Declaration* as his direct testimony at the Recognition Hearing. He was present and was cross-examined.

13   Bankruptcy Code § 1107 provides in pertinent part that "a debtor in possession shall have all the rights ... and powers, and shall perform all the functions and duties, ... of a trustee serving in a case under this chapter." Bankruptcy Code 1108 states in pertinent part that "[u]nless the court ... orders otherwise, the trustee may operate the debtor's business."

14   Section 1505 is derived from Article 5 of the Model Law. The latter automatically authorizes the person administering the foreign reorganization or liquidation here, Tavares to act on behalf of the foreign proceeding as permitted by applicable foreign law.

In the alternative, Tavares seeks recognition of the Brazilian proceeding as a foreign nonmain proceeding. In light of the disposition of Tavares' principal request, it is unnecessary to reach the alternative request.

If OAS, Construtora or Investimentos honor their guarantees and pay the 2019 Noteholders, they will be entitled to indemnity from the principal obligor, OAS Investments, under New York law. *Varsames v. Palazzolo,* 96 F.Supp.2d 361, 368 (S.D.N.Y.2000); *Fredericks v. Shapiro,* 160 F.R.D. 26, 28 (S.D.N.Y.1995) ("If a guarantee is enforced, the original obligor is liable to the guarantor for the amounts required to be paid."). As discussed in the succeeding text, this seems more likely than payment coming from OAS Investments. In the end, it may be more accurate to say that the Brazilian guarantors, contingent creditors of OAS Investments, are the principal creditors.

Dr. Klaus Hafner, a former OAS Investments director residing in Austria, resigned on February 28, 2015. (AAX 21.)

The parties provided the Indenture for the first tranche of 2019 Notes, (OASX 31), but not the second. Nevertheless, the Court infers that the notice provisions for the second tranche were the same. In this regard, the Court also received the Indentures relating to two tranches of other notes issued by OAS Finance, and each required that any notices directed to OAS Finance should be sent to OAS with copies to Construtora and Investimentos. (OASX 29, at § 13.01; OASX 30, at § 12.01.)

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 57

🟡 KeyCite Yellow Flag - Negative Treatment

Distinguished by In re Oi Brasil Holdings Cooperatief U.A., Bankr.S.D.N.Y., December 4, 2017

570 B.R. 687
United States Bankruptcy Court, S.D. New York.

IN RE OCEAN RIG UDW INC., et al., Debtors in Foreign Proceedings.

Case No. 17–10736 (MG)
|
Signed: August 24, 2017

**Synopsis**

**Background:** In jointly administered Chapter 15 cases, joint provisional liquidators and authorized foreign representatives of foreign corporate debtors petitioned for recognition of four proceedings pending before Cayman Islands court as foreign main or nonmain proceedings.

**Holdings:** The Bankruptcy Court, Martin Glenn, J., held that:

[1] attorney retainer held by foreign debtors' New York counsel qualified as property of foreign debtor which was present in the United States;

[2] joint provisional liquidators and authorized foreign representatives appointed by Cayman Islands court were proper "foreign representatives";

[3] Cayman Islands provisional liquidation proceedings were "foreign proceedings";

[4] center of main interests (COMI) of foreign debtors was the Cayman Islands; and

[5] recognition of Cayman Islands proceedings would not be manifestly contrary to United States policy.

Petitions granted.

**West Headnotes (11)**

**[1]    Contracts** 🔑 Effect in general;  enforcement in general

Contracts create property rights for the parties to the contract.

**[2]    Bankruptcy** 🔑 Effect of state law in general

**Bankruptcy** 🔑 Rights under contracts

Contract rights are intangible property of the debtor, and those property rights can be and typically are tied to the location of the governing law of the contract.

**[3]    Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

Attorney retainer held by foreign corporate debtors' New York counsel qualified as property of foreign debtor which was present in the United States, and not only satisfied statutory requirement for debtor to be eligible for Chapter 15 relief, but enabled foreign representative to commence Chapter 15 proceedings in New York, as place where venue was proper. 11 U.S.C.A. § 109(a); 28 U.S.C.A. § 1410.

2 Cases that cite this headnote

**[4]    Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

Joint provisional liquidators and authorized foreign representatives of foreign corporate debtors appointed by Cayman Islands court and authorized by that court to seek relief under Chapter 15 and seek recognition of their appointment in any jurisdiction they deemed necessary were proper "foreign representatives" under Bankruptcy Code. 11 U.S.C.A. § 101(24).

1 Cases that cite this headnote

**[5]    Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

Cayman Islands provisional liquidation proceedings were "foreign proceedings" under Chapter 15. 11 U.S.C.A. §§ 101(23), 1517(a).

6 Cases that cite this headnote

[6]    **Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

Center of main interests (COMI) of foreign corporate debtors, holding companies that owned non-debtor companies that directly or indirectly owned a fleet of deepwater oil drilling rigs leased to exploration oil and gas companies, was the Cayman Islands; debtors conducted their management and operations in the Cayman Islands, had offices in the Cayman Islands, held their board meetings in the Cayman Islands, had officers with residences in the Cayman Islands, had bank accounts in the Cayman Islands, maintained their books and records in the Cayman Islands, and conducted restructuring activities from the Cayman Islands. 11 U.S.C.A. §§ 1502(4), 1516(c).

2 Cases that cite this headnote

[7]    **Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

Among other factors that may be considered in the center of main interests (COMI) analysis for determining foreign main proceeding status are the location of headquarters, decision-makers, assets, creditors, and the law applicable to most disputes. 11 U.S.C.A. §§ 1502(4), 1516(c).

1 Cases that cite this headnote

[8]    **Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

In deciding foreign main proceeding status, courts determine whether a debtor's center of main interests (COMI) is in fact regular and ascertainable and not easily subject to tactical removal. 11 U.S.C.A. §§ 1502(4), 1516(c).

1 Cases that cite this headnote

[9]    **Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

Foreign debtor's center of main interests (COMI) is determined as of the filing date of Chapter 15 petition, without regard to the debtor's historic operational activity. 11 U.S.C.A. §§ 1502(4), 1516(c).

[10]    **Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

Recognition of Cayman Islands provisional liquidation proceedings would not be manifestly contrary to United States policy, as required for recognition of proceedings as foreign main proceeding under Chapter 15. 11 U.S.C.A. §§ 1506, 1517(a).

5 Cases that cite this headnote

[11]    **Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

Public policy exception to recognition of foreign main proceeding under Chapter 15 is narrowly construed. 11 U.S.C.A. §§ 1506, 1517(a).

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*689** ORRICK, HERRINGTON & SUTCLIFFE LLP, Counsel for the Petitioners, Simon Appell and Eleanor Fisher, in their capacities as the Joint Provisional Liquidators and Proposed Foreign Representatives, 51 West 52nd Street, New York, New York 10019, By: Evan C. Hollander, Esq., Raniero D'Aversa, Jr., Esq., Monica A. Perrigino, Esq.

LAW OFFICE OF STEVEN J. FINK PLLC, Counsel for the Petitioners, Simon Appell and Eleanor Fisher, in their capacities as the Joint Provisional Liquidators and Proposed Foreign Representatives, 81 Main Street, Suite 405, White Plains, NY 10601, By: Steven J. Fink, Esq.

LAW OFFICES OF TALLY M. WIENER, ESQ., Objector to Recognition, 119 West 72nd Street, PMB 350, New York, NY 10023, By: Tally M. Wiener, Esq.

## MEMORANDUM OPINION GRANTING RECOGNITION OF FOREIGN DEBTORS' CAYMAN ISLANDS PROCEEDINGS AS FOREIGN MAIN PROCEEDINGS

[MARTIN GLENN](), UNITED STATES BANKRUPTCY JUDGE

In these four jointly administered chapter 15 cases, Simon Appell and Eleanor Fisher, the joint provisional liquidators and authorized foreign representatives (the "JPLs") of Ocean Rig UDW Inc. ("UDW"), Drill Rigs Holdings Inc. ("DRH"), Drillships Financing Holding Inc. ("DFH") and Drillships Ocean Ventures Inc. ("DOV") (UDW, DRH, DFH and DOV, together, the "Foreign Debtors"), seek recognition in this Court as foreign main proceedings or foreign nonmain proceedings of four proceedings pending before the Grand Court of the Cayman Islands (the "Cayman Court"). The four proceedings in the Cayman Court are Financial Services Division Cause Nos. FSD0057/2017 (UDW), FSD0059/2017 (DRH), FSD0056/2017 (DFH) and FSD0058/2017 (DOV) (the "Cayman Provisional Liquidation Proceedings"). The Foreign Debtors are each holding companies, with UDW owning each of the other three Foreign Debtors and they, in turn, owning a large group of non-debtor companies that directly or indirectly own a fleet of deepwater oil drilling rigs that are generally leased to exploration oil and gas companies. UDW stock is publicly traded in the U.S. and elsewhere. The sharp decline in oil and gas prices over the last few years has taken a major toll on the finances of the Foreign Debtors, with most of their drilling rigs currently not in operation.

The JPLs' goal is to have the Cayman Court sanction four schemes of arrangement (one for each of the Foreign Debtors) negotiated and proposed by the Foreign **\*690** Debtors, and then, if sanctioned by the Cayman Court, have this Court recognize and enforce the schemes in these chapter 15 cases. The four schemes propose a major restructuring of the Foreign Debtors' financial debt, issuing new debt and cash and converting much of their fixed debt into equity, very substantially diluting the current equity ownership of UDW. The Cayman Court authorized the Foreign Debtors to convene creditors' meetings and vote on the four proposed schemes. The creditors' meetings took place on August 11, 2017, and according to a status report filed in this Court by the JPLs, the creditors voted to support the four schemes.[1] Sanction hearings are scheduled in the Cayman Court on

September 4, 5, and 6, 2017. *See Fourth Status Report of Joint Provisional Liquidators and Foreign Representatives Simon Appell and Eleanor Fisher* (ECF Doc. # 109).

[1]    The specific terms of the four schemes of arrangement are not at issue at this time. The only issues currently before the Court concern recognition of the four Cayman Court proceedings.

At least one substantial UDW creditor, Highland Capital Management LP ("Highland"), is expected to oppose sanctioning of the UDW scheme. If the Cayman Court nevertheless sanctions the schemes, this Court anticipates that Highland will oppose recognition and enforcement of the UDW scheme in this Court. Highland previously objected to recognition of the UDW proceeding as a foreign main or nonmain proceeding, but Highland dropped that objection, reserving its right to contend that the UDW scheme should not be recognized and enforced by this Court if it is sanctioned by the Cayman Court. But after Highland withdrew its objection to recognition, Tally M. Wiener, Esq. ("Wiener"), a lawyer who asserts that she is a shareholder of UDW, filed an objection to recognition. The Court held an evidentiary hearing on the contested recognition motion on August 16, 2017. Until sometime in 2016, each of the Foreign Debtors had its center of main interests ("COMI") in the Republic of the Marshall Islands ("RMI"). It is the shift in COMI from the RMI to the Cayman Islands, where the provisional liquidation and scheme of arrangement proceedings are pending, that is the focus of the issues that must be addressed in determining whether to recognize the foreign proceedings as foreign main, or in the alternative, foreign nonmain proceedings.

For the reasons explained below, the Court concludes that each the four Cayman Court proceedings should be recognized as a foreign main proceeding.

### I. BACKGROUND [2]

[2]    The Background section includes the Court's findings of fact pursuant to [FED. R. BANKR. P. 7052](), which incorporates [FED. R. CIV. P. 52]().

The JPLs commenced chapter 15 cases for each of the Foreign Debtors (collectively, the "Chapter 15 Cases") by filing the *Verified Petition of Ocean Rig UDW Inc., et al. (in Provisional Liquidations) and Motion of the Joint Provisional Liquidators for (A) Recognition of the Cayman Proceedings as Foreign Main Proceedings or, in the Alternative, as Foreign Nonmain*

*Proceedings, and (B) Certain Related Relief* (ECF Doc. # 1) (together with each Foreign Debtor's Form of Voluntary Petition, the "Verified Petition"). The JPLs seek (i) entry of an order granting recognition of (a) the Cayman Provisional Liquidation Proceedings and (b) subsequent applications for the sanctioning of schemes of arrangement in respect of the Foreign Debtors under section 86 of Part **\*691** IV of the Companies Law (the "Cayman Schemes," and, together with the Cayman Provisional Liquidation Proceedings, the "Cayman Proceedings") as foreign main proceedings or, in the alternative, as foreign nonmain proceedings, and (ii) certain related relief. In support of the Verified Petition, the JPLs submitted a Memorandum of Law (ECF Doc. # 3). The JPLs supported their requested relief with the *Declaration of Simon Appell Pursuant to 28 U.S.C. § 1746 and Statements and Lists Required by Bankruptcy Rule 1007(a)(4)* (the "Appell Declaration," ECF Doc. # 4), the *Declaration of Antonios Kandylidis Pursuant to 28 U.S.C. § 1746* (the "Kandylidis Declaration," ECF Doc. # 5), the *Declaration of Rachael Reynolds in Support of the Verified Petition* (the "Reynolds Declaration," ECF Doc. # 6) [3] and the *Declaration of Dennis Reeder Pursuant to 28 U.S.C. § 1746* (the "Reeder Declaration," ECF Doc. # 7). On July 10, 2017, Wiener filed an objection to the JPLs' recognition request. *See Objection to the Motion of the Joint Provisional Liquidators of Ocean Rig UDW Inc. et al. for Recognition of Foreign Main or Nonmain Proceedings* ("Wiener Objection," ECF Doc. # 89). The Wiener Objections asserts that Wiener is a shareholder of Ocean Rig UDW Inc., an assertion she has never backed up with any evidence. (*Id.* at 1.)

[3]       Reynolds is a lawyer who practices law in the Cayman Islands. Her declaration was offered and admitted in evidence supporting an explanation of Cayman Islands law pursuant to FED. R. CIV. P. 44.1.

As directed by the Court, the counsel for the JPLs and Wiener prepared a *Recognition Hearing Joint Pretrial Order* ("Pretrial Order") that was approved and entered by the Court on July 26, 2017. (ECF Doc. # 102.) The Pretrial Order identified the issues to be tried, and included the JPLs' witness list (with direct evidence offered by declaration and with in-court cross examination), and the list of trial exhibits that each side proposed to offer. The JPLs identified four trial witnesses, but based on a stipulation between counsel, only three of the witnesses—Simon Appell, Antonios Kandylidis, and Rachel Reynolds—testified at trial with direct testimony by declaration (Appell Declaration, PX–5; Kandylidis Declarations, PX–6 and PX–10 and exhibits; and Reynolds Declaration, PX–8). Wiener objected to portions

of the Appell, Kandylidis and Reynolds Declarations; the Court ruled on the objections at the final pretrial conference on August 14, 2017. As limited by the stipulation of the parties and the Court's ruling on Wiener's objections, the Appell, Kandylidis and Reynolds Declarations were admitted in evidence as the witnesses' direct testimony. Wiener cross-examined each of these witnesses during the trial. Wiener did not identify any witnesses in the Pretrial Order or call any witnesses during the trial. Numerous exhibits offered by both sides were admitted in evidence during the trial as well.

In a letter to the Court dated August 15, 2017, Wiener challenged whether venue of these chapter 15 cases in the Southern District of New York is proper. (ECF Doc. # 112.) The JPLs responded to and opposed Wiener's venue argument in a letter also filed on August 15, 2017. (ECF Doc. # 114.) Venue was not identified as an issue for trial in the Pretrial Order. In any event, as set forth below, Wiener's venue argument is simply wrong; venue properly lies in this Court.

While Wiener asserted in her Objection that she is a UDW Inc. shareholder, she in fact offered no evidence at trial supporting that contention. Therefore, Wiener failed to establish that she is a party-in-interest with standing to contest recognition of the **\*692** Foreign Debtors' Cayman Proceedings. Because this Court nevertheless must find that the JPLs have established that recognition is proper in order to grant the recognition motion, the Court will treat Wiener's Objection as if she had established her standing to object to recognition and rule on her arguments on the merits.

**A. The Businesses of the Foreign Debtors**

UDW is the holding company of the Ocean Rig Group (the "Group") and the direct parent of the three other Foreign Debtors (DFH, DOV and DOH (collectively, the "Subsidiary Debtors")).

UDW registered in April 2016 as an exempted company limited by shares under § 202 of the Cayman Companies Law. Before then, UDW was registered as a non-resident corporation in the RMI. The Subsidiary Debtors are registered as non-resident corporations in the RMI and are registered as foreign companies under § 186 of the Cayman Companies Law. UDW and the Subsidiary Debtors maintain their only offices in the Cayman Islands. None of the Foreign Debtors has ever conducted operations or directed their affairs from the RMI. (Kandylidis Decl. ¶ 4.)

3701

The Group is composed of four separate operating divisions. Each of the Subsidiary Debtors is a holding company and the parent of one of three of these operating Subsidiary Debtors' divisions. [4] Each of the operating divisions has its own financing, but UDW has guaranteed that debt and has pledged the shares of the applicable Subsidiary Debtor to secure its respective guaranty obligations (*e.g.*, the shares of DRH have been pledged to secure the DRH facility). (*Id.* ¶ 5.)

[4]    The parent holding company of the fourth operating division, Drillship Alonissos Shareholders Inc. ("DAS") is not a debtor herein or a part of the restructuring.

### B. The Financial Debt of the Group

UDW and the Subsidiary Debtors incurred the following financial debt:

#### 1. The DRH Facility

DRH issued US $800 million of 6.5% Senior Secured Notes due 2017 (the "SSNs"), pursuant to an indenture dated September 20, 2012 (as amended by a supplemental indenture dated January 23, 2013) (as amended, the "DRH Indenture"). U.S. Bank National Association is the Indenture Trustee under the DRH Indenture and Deutsche Bank Trust Company Americas is the collateral trustee. The SSNs are guaranteed by UDW (the "DRH Indenture Guaranty") and certain of DRH's direct and indirect subsidiaries (the "DRH Subsidiary Guarantors"). UDW pledged the shares of DRH to secure the DRH Indenture Guaranty, and DRH and the DRH Subsidiary Guarantors have pledged their assets (including shares of their subsidiaries) to secure their obligations in respect of the DRH Indenture. All pledged shares are held by the collateral trustee in the United States. Approximately US $460 million remains outstanding under the DRH Indenture. (*Id.* ¶ 6(a).)

#### 2. The DFH Facility

DFH is a borrower under a US $1.9 billion Credit Agreement dated July 12, 2013 (as amended and restated from time to time, including on February 7, 2014) between, amongst others, DFH and Drillships Projects Inc., as borrowers and Deutsche Bank AG New York Branch, as administrative and collateral agent (the "DFH Credit Agreement"). The DFH Credit Agreement has been guaranteed by UDW (the "DFH Credit Agreement Guaranty") and certain of DFH's

direct and indirect subsidiaries (the "DFH Subsidiary **\*693** Guarantors"). UDW pledged the shares of DFH to secure the DFH Credit Agreement Guaranty, and DFH and the DFH Subsidiary Guarantors have pledged their assets (including shares of their subsidiaries) to secure their obligations in respect of the DFH Credit Agreement. All pledged shares are held by the collateral agent in the United States. Approximately US $1.83 billion remains outstanding under the DFH Credit Agreement. (*Id.* ¶ 6(b).)

#### 3. The DOV Facility

DOV is a borrower under a US $1.3 billion Credit Agreement dated July 25, 2014 between, amongst others, DOV and Drillships Ventures Projects Inc., as borrowers, and Deutsche Bank AG New York Branch, as administrative and collateral agent (the "DOV Credit Agreement" and, together with the DFH Credit Agreement, the "Credit Agreements"). The DOV Credit Agreement has been guaranteed by UDW (the "DOV Credit Agreement Guaranty") and certain of DOV's direct and indirect subsidiaries (the "DOV Subsidiary Guarantors"). UDW has pledged the shares of DOV to secure the DOV Credit Agreement Guaranty, and DOV and the DOV Subsidiary Guarantors have pledged their assets (including shares of their subsidiaries) to secure their obligations in respect of the DOV Credit Agreement. All pledged shares are held by the collateral agent in the United States. Approximately US $1.27 billion remains outstanding under the DOV Credit Agreement. (*Id.* ¶ 6(c).)

#### 4. The UDW Facility

UDW issued US $500 million of 7.25% Senior Unsecured Notes due 2017 (the "SUNs"), pursuant to an indenture dated March 26, 2014 (the "SUN Indenture"). Deutsche Bank Trust Company Americas is the Indenture Trustee under the SUN Indenture. The SUNs are not guaranteed by any member of the Group. Approximately US $131 million of unsecured notes remain outstanding under the SUN Indenture. The amounts outstanding in respect of the SUN Indenture, the DRH Indenture and the Credit Agreements are collectively referred to as the "Scheme Indebtedness." (*Id.* ¶ 6(d).)

### C. The Business of the Group

The Group operates as an international offshore oil drilling contractor, owner and operator of drilling rigs. It provides

drilling services for offshore oil and gas exploration, development and production, and specializes in the ultra-deepwater and harsh-environment segments of the offshore drilling industry. Through various subsidiaries, the Group operates 11 ultra-deepwater offshore drilling units, the details of which are set forth in the Kandylidis Declaration and will not be repeated here. (*See id.* ¶ 8.) Additionally, the Group has contracted for the construction of an additional three so-called seventh generation drilling units with a major shipyard in South Korea. The delivery dates for these new vessels were previously scheduled for 2017, 2018, and 2019, respectively, but the delivery dates of two vessels have been postponed, and construction on the third vessel has been suspended. UDW's guarantees in respect of these drilling rigs have also been released. (*Id.* ¶ 9.)

The Group employs the drilling rigs to drill wells for customers primarily on a "day rate" basis for periods of between two months and six years. Payments are set at a fixed amount for each day that the rig is operating under a contract at full efficiency. A higher "day rate" is charged on days when actual drilling operations are being undertaken; lower rates are charged during periods of mobilization, or when drilling operations are interrupted or restricted by equipment breakdowns, adverse environmental conditions or other **\*694** conditions beyond the company's control. Contracts are generally obtained through a competitive bidding process with other contractors. The Group's customers are typically major oil companies, integrated oil and gas companies, state-owned national oil companies and independent oil and gas companies. (*Id.* ¶ 10.)

Currently, the Group's revenues are dependent on five drilling rigs, operating offshore near Norway, Brazil, and Angola; six other rigs are currently uncontracted and have been laid-up. Only one rig is under a long term contract, expiring in September 2020; two rigs are under contracts that expire during the second half of 2017, and two rigs are under contracts that expire during the first half of 2018. Laid-up rigs must be deactivated and either "cold stacked" or "warm stacked" to preserve the rigs pending reactivation. Rig deactivation costs are approximately $5 million per unit. The daily costs for "warm stacked" rigs are approximately $40,000 per day; the daily costs for "cold stacked" rigs are approximately $5,000 per day. (*Id.* ¶ 12.)

### D. The Group's Financial Situation

The oil and gas drilling industry is currently in a down-cycle. Crude oil prices have fallen during the past several years, falling from over $100 per barrel in March 2014, to approximately $52 per barrel in March 2017. UDW's share price has fallen from a high of $19.87 on June 20, 2014, to $0.73 as of March 24, 2017. UDW expects that the significant decrease in oil prices will continue to reduce customer demand in the industry during 2017. Many of the Groups' customers have revised their budgets, decreasing projected expenditures for offshore drilling. "Day rates" and rig utilization have declined, putting severe financial pressure on the Group. UDW does not expect that its inactive rigs will begin work under new contracts until January 2020 at the earliest. Deepwater rig demand, currently at a utilization rate of only approximately 45% of available rigs, is not expected to begin to improve until 2019. Rig utilization rates are expected to remain below 60% of rig availability until the first quarter of 2020. (*Id.* ¶ 13.)

### E. The Foreign Debtors' Decision to Restructure

The Foreign Debtors had significant debt payments due during 2017. They did not expect to have sufficient cash available to make these payments without further borrowing. Failure to make any of these payments when due would trigger cross-default provisions under the Credit Agreements. Faced with expected payment defaults and cross-defaults, the Foreign Debtors explored restructuring alternatives. The parties stipulated that the RMI, where these Foreign Debtors previously maintained their COMI, does not have a statute or any procedures permitting reorganization, making liquidation the likely outcome. The Cayman Islands, however, does have statutory laws and procedures permitting restructuring. It is the premise of chapter 11 of the Bankruptcy Code, and the law of an increasing number of jurisdictions, that reorganization of a potentially viable entity (as opposed to liquidation) may be value maximizing, benefitting creditors, employees faced with the prospect of loss of employment, and other public and private interests.

Increasingly, foreign jurisdictions—including the United Kingdom, Hong Kong, Singapore, and the Cayman Islands—provide statutory authority for schemes of arrangement as a way of permitting companies in financial distress to restructure their financial debt, as these Foreign Debtors are attempting to do here. While the U.S. Bankruptcy Code does not currently **\*695** include provisions authorizing schemes of arrangement,[5] U.S. bankruptcy courts, including this Court, have found that a foreign scheme of arrangement proceeding (including in the Cayman Islands) may satisfy section 101(23)'s definition of a collective judicial proceeding

3703

providing for the adjustment of debt that qualifies for recognition.

5　　The National Bankruptcy Conference has recommended adoption of a new chapter 16 of the Bankruptcy Code that would permit restructuring of bond and credit agreement debt, similar to foreign schemes of arrangement. See http://nbconf.org/our-work/2015 December 18 Proposed Amendments to Bankruptcy Code to Facilitate Restructuring of Bond and Credit Agreement Debt.

The Foreign Debtors in these proceedings acted prudently in exploring their restructuring alternatives. The Court finds that the directors of the Foreign Debtors properly concluded that changing their COMI to the Cayman Islands, and, if necessary, commencing restructuring proceedings there, and also commencing chapter 15 proceedings in the U.S., offered them the best opportunity for successful restructuring and survival under difficult financial conditions.

Of course, more than good intentions are required before a U.S. bankruptcy court can recognize a foreign proceeding as either a foreign main or foreign nonmain proceeding. For example, a so-called "letter box company," with no real establishment or other required indicia for its proposed COMI, cannot support recognition. *See In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd., 374 B.R. 122, 129–31 & n.8 (Bankr. S.D.N.Y.), aff'd, 389 B.R. 325 (S.D.N.Y. 2007)* (stating that "the COMI presumption may be overcome particularly in the case of a 'letterbox' company not carrying out any business" in the country where its registered office is located) (citation omitted). The question that must be addressed here is whether the Foreign Debtors' change of COMI from the RMI to the Cayman Islands satisfies the requirements of the Bankruptcy Code, permitting this Court to recognize the Cayman Proceedings as a foreign main proceeding. A U.S. bankruptcy court that is asked to recognize a foreign proceeding as a foreign main proceeding must decide where a foreign debtor has its center of main interest.

### F. The Debtors' Move to and Current Connections with the Cayman Islands

As previously noted, UDW is now a Cayman Islands registered corporation. UDW migrated from the RMI, where it had been a non-resident domestic corporation, on April 14, 2016. The Subsidiary Debtors are each wholly-owned direct subsidiaries of UDW. They are RMI non-resident domestic

corporations; they registered as foreign companies in the Cayman Islands on October 18, 2016. Each of the Foreign Debtors is a holding company whose primary assets are the equity interests in their respective subsidiaries. Each Foreign Debtor maintains its head office in the Cayman Islands in office space provided by an affiliate, Ocean Rig SEZ Co. (defined below). (Kandylidis Decl. ¶ 23.)

UDW was previously a tax resident of Cyprus, but it ceased being a tax resident there effective December 31, 2016. UDW no longer maintains any presence in Cyprus. UDW also maintains a "law 89 establishment" in Greece. Law 89 permits foreign commercial and industrial companies to maintain an establishment in Greece exclusively for the provision of limited types of services for head offices or affiliates outside of Greece. (*Id.* ¶ 24.)

**\*696** Foreign companies with a law 89 license in Greece are required to spend US $50,000 per year in Greece. UDW established its "law 89 establishment" with the intention of providing ship-brokerage services to affiliates, but the brokerage services were never provided as intended. As a result, the company is in the process of having its law 89 establishment license terminated. Affiliates of the Foreign Debtors also maintain offices in Norway, Angola, Brazil and Jersey. (*Id.*)

The evidence establishes that none of the Foreign Debtors have ever conducted operations or directed their affairs from the RMI, have ever maintained administrative, management or executive offices in the RMI, have ever had any directors who were residents or citizens of the RMI, or have ever held a meeting of its directors or shareholders in the RMI. Public notice of the opening of UDW's head office in the Cayman Islands was provided by SEC Form 6–K on September 27, 2016 and the Foreign Debtors gave notice of their registration in the Caymans by subsequent press release. (*Id.* ¶ 25.) Other indicia likewise support the *bona fides* of the COMI shift to the Cayman Islands. The Court concludes with no difficulty that the Foreign Debtors have established by a preponderance of the evidence that each of their COMIs, as of the filing of the chapter 15 petitions, was the Cayman Islands. The Court summarizes the evidence supporting this conclusion:

#### 1. Directors and Board Meetings

Michael Pearson, one of six members of the board of directors of UDW, has his primary residence in the Cayman Islands.

3704

The other five UDW directors reside in Monaco and Greece. Two of four directors of DRH, Michael Pearson and Casey McDonald, have their primary residences in the Cayman Islands. The boards of directors of DFH and DOV each has three directors, one of whom, Michael Pearson, has his primary residence in the Cayman Islands, and the other two directors have residences in the Cayman Islands. (*Id.* ¶ 26.)

UDW board meetings have been held exclusively in the Cayman Islands since a regular meeting held in the Cayman Islands on November 17, 2016. Meetings of the UDW board were also held in the Cayman Islands on February 3, 2017, February 21, 2017 and March 23, 2017. Meetings of a special committee of the UDW board were held in the Cayman Islands on March 7, 2017 and March 16, 2017. Board meetings of the Subsidiary Debtors have been held exclusively in the Cayman Islands since February 3, 2017. Meetings of the boards of the Subsidiary Debtors were also held in the Cayman Islands on February 21, 2017 and March 23, 2017, and meetings of special committees of each of the Subsidiary Debtors were held in the Cayman Islands on March 7, 2017 and March 16, 2017. As noted, no directors have ever been located in the RMI and no directors' meetings ever took place there. (*Id.* ¶ 27.)

### *2. Company Officers*

The President and Chief Financial Officer, the Company Secretary, and the Vice President of Business Development of UDW have residences in the Cayman Islands and work in the Cayman Islands in office space provided by Ocean Rig SEZ Co. pursuant to the terms of their Zone Employment Certificates. All of the officers of the Subsidiary Debtors have residences in the Cayman Islands and work in the Cayman Islands in office space provided by Ocean Rig SEZ Co. pursuant to the terms of their Zone Employment Certificates. Each of these officers use mobile phones with Cayman Islands phone numbers. (*Id.* ¶ 28.)

### **\*697**  *3. Notice of Relocation to Cayman Islands*

#### a) Paying Agents

The paying agent under the SUNs issued by UDW was notified on November 1, 2016 to address all future invoices for payment to the registered office of Ocean Rig SEZ Co. in

the Cayman Islands. The paying agent under the SSNs issued by DRH was notified on November 2, 2016 to address all future invoices for payment to the registered office of Ocean Rig SEZ Co. in the Cayman Islands. The paying agent under the DFH Credit Agreement was notified on January 23, 2017 to address all future invoices for payment to the registered office of Ocean Rig SEZ Co. in the Cayman Islands. The paying agent under the DOV Credit Agreement was notified on January 23, 2017 to address all future invoices for payment to the registered office of Ocean Rig SEZ Co. in the Cayman Islands. (*Id.* ¶ 29(a).)

#### b) Indenture Trustees, Administrative and Collateral Agents

The Indenture Trustee under the SUN Indenture was notified on February 6, 2017 to direct all notices for UDW to the registered office of Ocean Rig SEZ Co. in the Cayman Islands. The Indenture Trustee and the Collateral Agent, Registrar and Paying Agent under the DRH Indenture were notified on February 6, 2017 to direct all notices for UDW and DRH to the registered office of the Ocean Rig SEZ Co. in the Cayman Islands. The Administrative Agent and the Collateral Agent under the DFH Credit Agreement was notified on February 6, 2017 to direct all notices for UDW and DFH to the registered office of the Ocean Rig SEZ Co. in the Cayman Islands. The Administrative Agent and the Collateral Agent under the DOV Credit Agreement was notified on February 6, 2017 to direct all notices for UDW and DOV to the registered office of the Ocean Rig SEZ Co. in the Cayman Islands. (*Id.* ¶ 29(b).)

#### c) Investment Service Providers

Investment service providers, including Moody's Investors Service, Inveshare, Broadridge and Standard & Poor Global Ratings, were notified of UDW's change of address in November 2016 and have remitted invoices, as directed, to the company in the Cayman Islands. (*Id.* ¶ 29(c).)

#### d) Public Notice and General Recognition of Relocation

On September 27, 2016, UDW filed a Form 6–K report with the SEC updating the address of its principal executive offices to its registered office in the Cayman Islands. On February 6, 2017, each of the Debtors issued a press release advising that it had relocated its principal place of business to the Cayman

3705

Islands and that the address for all postal communications to the companies should be directed to Ocean Rig SEZ Co. in the Cayman Islands. Also on February 6, 2017, UDW announced that its 2017 Annual General Meeting would be held on April 24, 2017 at the company's business office in the Cayman Islands. The contact details for the Debtors on the Group's website list the Foreign Debtors' Cayman Islands address. Media reports have been published acknowledging the relocation of UDW's principal executive offices to the Cayman Islands. The Company has been served in an English legal proceeding in the Cayman Islands. (*Id.* ¶ 29(d).)

### 4. Location of Operations

The Foreign Debtors' subsidiaries do business throughout the world, principally on the high seas. Head office and administrative service functions for the Foreign Debtors, formerly performed by an affiliate located in Cyprus, are now performed by an affiliate, Ocean Rig SEZ Co., in the Cayman Islands. Ocean Rig SEZ Co. is  **\*698**  licensed to operate and is located in the Maritime Park in the Special Economic Zone at Cayman Enterprise City in the Cayman Islands, where it provides office space and administrative support services to the Foreign Debtors. One of the employees of Ocean Rig SEZ Co. has her primary residence in the Cayman Islands. All of the other employees of Ocean Rig SEZ Co. have residences in the Cayman Islands. The Services Agreement between Ocean Rig SEZ Co. and the Foreign Debtors is governed by Cayman Islands law. (*Id.* ¶ 30.)

### 5. Location of Assets

Each of the Foreign Debtors is a holding company. The share certificates of DRH, DFH and DOV are pledged to secure the UDW Guarantees and are held by the respective collateral agents and collateral trustee in the United States. The share certificates of the subsidiary guarantors under the DRH Indenture, the DFH Credit Agreement and the DOV Credit Agreement are also held by the respective collateral agents and collateral trustee. The share certificates of other subsidiaries are unpledged and represent valuable interests in these subsidiaries' cash and rigs. These certificates are held in the Cayman Islands. (*Id.* ¶ 31.)

### 6. Location of Bank Accounts

Each of the Foreign Debtors has a bank account in the Cayman Islands. The paying agents for the Foreign Debtors' financial indebtedness have been instructed to address all invoices for payment due to the office of Ocean Rig SEZ Co. in the Cayman Islands. Payments to professionals have been made from the Cayman accounts, including a retainer of $250,000 paid by each of the Foreign Debtors (total $1 million) to the Foreign Debtors' U.S. restructuring counsel, Orrick, Herrington & Sutcliffe LLP. These retainers are being held in their counsel's client trust account at Citibank Private Bank in New York. (*Id.* ¶ 32.)

### 7. Books and records

The minute book of UDW has been maintained in the Cayman Islands since November 2016. The minute books of each of the Subsidiary Debtors have been maintained in the Cayman Islands since January 2017. (*Id.* ¶ 33.)

### 8. Restructuring Activities

Face-to-face creditor meetings were held in the Cayman Islands on November 21–23, 2016 and February 7–9, 2017. Numerous conference calls with creditors have been hosted by the Foreign Debtors from the Cayman Islands. The Foreign Debtors' have also met frequently in the Cayman Islands with their legal and financial advisers. (*Id.* ¶ 34.)

## II. DISCUSSION

### A. Standards for Recognition of Foreign Main and Nonmain Proceedings

The Second Circuit has held that foreign debtors seeking chapter 15 relief must satisfy the debtor eligibility requirements set forth in section 109(a) of the Bankruptcy Code. *See Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*, 737 F.3d 238, 247–51 (2d Cir. 2013). As explained below, each of the Foreign Debtors satisfies the requirements of section 109(a). The remaining requirements for recognition of a foreign proceeding under chapter 15 are set forth in section 1517(a). Subject to section 1506, a foreign proceeding must be recognized if the following requirements are met:

(1) such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502;

**\*699**    (2) the foreign representative applying for recognition is a person or body; and

(3) the petition meets the requirements of section 1515.

11 U.S.C. § 1517(a); *see also In re Millard*, 501 B.R. 644, 651 (Bankr. S.D.N.Y. 2013) (stating that section 1517 provides a " 'statutory mandate' that recognition be granted upon compliance with the requirements of section 1517(a)(1), (2) and (3)") (citing *Lavie v. Ran (In re Ran)*, 607 F.3d 1017, 1021 (5th Cir. 2010)); *see also In re ABC Learning Centres Ltd.*, 728 F.3d 301, 306 (3d Cir. 2013) (stating that recognition is mandatory when an insolvency proceeding meets the criteria of section 1502).

### B. The Debtors Satisfy Section 109(a)

 **[1]**    **[2]**    Section 109(a) provides that "only a person that resides or has a domicile, a place of business, or property in the United States, or a municipality, may be a debtor" under the Code. 11 U.S.C. § 109(a). Where a foreign debtor does not have a place of business in the United States, the question often arises whether the foreign debtor has "property in the United States" as a condition precedent to eligibility under section 1517. *See In re Cell C Proprietary Ltd.*, Case No. 17-11735 (MG), 571 B.R. 542, 550–52, 2017 WL 3190568, at \*6–7 (Bankr. S.D.N.Y. July 27, 2017). Section 109(a) does not address how much property must be present or when or how long property must have a situs in the United States. As this Court recently explained in *In re U.S. Steel Canada Inc.*, Case No. 17-11519 (MG), 571 B.R. 600, 2017 WL 3225914 (Bankr. S.D.N.Y. July 31, 2017):

Some courts, including this one, have held that an undrawn retainer in a United States bank account qualifies as property in satisfaction of section 109(a). *See, e.g.*, [*In re Octaviar Admin. Pty Ltd.*, 511 B.R. 361, 372–73 (Bankr. S.D.N.Y. 2014) ] ("There is a line of authority that supports the fact that prepetition deposits or retainers can supply 'property' sufficient to make a foreign debtor eligible to file in the United States.") (citing *In re Cenargo Int'l PLC*, 294 B.R. 571, 603 (Bankr. S.D.N.Y. 2003)); *see also In re Berau Capital Resources Pte Ltd.*, 540 B.R. 80, 82 (Bankr. S.D.N.Y. 2015) ("The Court is satisfied that the retainer provides a sufficient basis for eligibility in this case."); *In re Global Ocean Carriers Ltd.*, 251 B.R. 31, 39 (Bankr. D.

Del. 2000) (holding that a $400,000 retainer paid on behalf of the debtors to bankruptcy counsel in that case qualifies as sufficient property in the United States under section 109(a)).

Further, "[c]ontracts create property rights for the parties to the contract. A debtor's contract rights are intangible property of the debtor." *Berau Capital*, 540 B.R. at 83 (citing *U.S. Bank N.A. v. Am. Airlines, Inc.*, 485 B.R. 279, 295 (Bankr. S.D.N.Y. 2013), *aff'd*, 730 F.3d 88 (2d Cir. 2013)). Those property rights can be and typically are tied to the location of the governing law of the contract. *See id.* at 84 (holding that the situs of intangible property rights governed by New York law was New York). Accordingly, debt subject to a New York governing law clause and a New York forum selection clause constitutes property in the United States. *See In re Inversora Eléctrica de Buenos Aires S.A.*, 560 B.R. 650, 655 (Bankr. S.D.N.Y. 2016) ("[D]ollar-denominated debt subject to New York governing law and a New York forum selection clause is independently sufficient to form the basis for jurisdiction.") (citation omitted); *Berau Capital*, 540 B.R. at 84 ("The Court concludes that the presence of the New York choice of law and forum selection **\*700** clauses in the Berau indenture satisfies the section 109(a) 'property in the United States' eligibility requirement.") (footnote omitted).

*Id.* at 609–11, 2017 WL 3225914 at \*7–8; *see also In re Suntech Power Holdings Co.*, 520 B.R. 399, 412–13 (Bankr. S.D.N.Y. 2014) (concluding that establishment of a bank account in New York prior to commencement of the chapter 15 proceeding was sufficient to satisfy section 109(a)); *In re Paper I Partners, L.P.*, 283 B.R. 661, 674 (Bankr. S.D.N.Y. 2002) (finding that debtors' maintenance of original business documents in the United States constituted "property in the United States" under section 109).

In *Berau Capital*, 540 B.R. at 83, this Court held that New York governing law and forum selection clauses in a debtor's indenture satisfied the "property in the United States" requirement in section 109(a). *See id.* at 84 ("The Court concludes that the presence of the New York choice of law and forum selection clauses in the Berau indenture satisfies the section 109(a) 'property in the United States' eligibility requirement.").

 **[3]**    The Foreign Debtors satisfy section 109(a)'s requirement of property in the United States. Each of the four Foreign Debtors paid its New York counsel a separate $250,000

retainer, for a total of $1 million, currently held in counsel's client trust account in New York, where they will remain pending final billing in these proceedings. (Kandylidis Decl. ¶ 32; Appell Declaration ¶ 32(f).) The indebtedness that is the subject of the Debtors' restructuring efforts consists of approximately $4.5 billion face amount of U.S. dollar denominated debt, with approximately $3.7 billion outstanding on the Petition Date. (*Id.* at ¶ 6.) This debt is governed by four instruments, each of which was admitted in evidence at the hearing (PX–11, PX–12, PX–13 and PX–14), and each of those debt instruments is governed by New York law. (PX–11 § 12.06, PX–12 § 13.06, PX–13 § 6, and PX–14 § 10.08.) The two term loan agreements, accounting for $3.2 billion face amount of the $4.5 billion total indebtedness, include exclusive New York forum selection provisions. (PX–13 § 6, PX–14 § 10.08; *see also* Kandylidis Declaration ¶ 6.)

The Foreign Debtors' debt instruments governed by New York law also satisfy the venue requirements for these proceedings in the Southern District of New York. The Foreign Debtors have no substantial assets in the United States other than the New York law governed debt. The venue requirement in 28 U.S.C. § 1410 to maintain these chapter 15 cases in the Southern District of New York is satisfied. *See Berau Capital,* 540 B.R. at 82 n.1.

### C. The Verified Petition Meets the Requirements of Section 1515

These chapter 15 cases were properly commenced in accordance with sections 1504, 1509 and 1515. The Verified Petition for recognition of foreign proceedings was filed pursuant to section 1515(a), and were accompanied by all documents and information required by sections 1515(b) and (c) and the relevant Bankruptcy Rules.

### D. Each of the JPLs Qualifies as a "Foreign Representative"

A chapter 15 case is commenced by the filing of a petition for recognition (and related documents) by the "foreign representative." *See* 11 U.S.C. 1504, 1509(a), 1515(a). A bankruptcy court may presume that the person petitioning for chapter 15 recognition is a foreign representative if the decision or certificate from the foreign court so indicates. 11 U.S.C. § 1516(a). The Bankruptcy Code defines "foreign representative" as "a person or body, including **\*701** a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as

a representative of such foreign proceeding." 11 U.S.C. § 101(24).

**[4]**  The Cayman Court appointed the JPLs as "the duly authorised foreign representative[s] of the [Foreign Debtors]" and authorized the JPLs "to seek relief under Chapter 15 of Title 11 of the United States Bankruptcy Code, and to take such steps arising in connection therewith that the JPLs may consider appropriate." (PX–3 (the "Cayman Orders") ¶ 3.) The Cayman Court granted the JPLs the power to "seek recognition of their appointment in any jurisdiction the JPLs deem necessary." (*Id.* ¶ 5(e); *see also* Reynolds Declaration ¶ 53.) The JPLs are each proper "foreign representatives" of the Foreign Debtors within the meaning of section 101(24). (*See also* Appell Declaration ¶¶ 23–26; Reynolds Declaration ¶¶ 52–53.)

### E. The Cayman Proceedings Are "Foreign Proceedings"

The Cayman Proceedings are "foreign proceedings" as required for recognition under section 1517(a) of the Bankruptcy Code. *See* 11 U.S.C. 1517(a)(1). A "foreign proceeding" is defined as

> a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

11 U.S.C. § 101(23).

**[5]**  The Cayman Provisional Liquidation Proceedings and the proposed Cayman Schemes are "collective judicial proceedings" commenced under Parts V and IV, respectively, of the Cayman Companies Law. The statute is applicable to corporate insolvencies (in the case of the provisional liquidations) or the adjustment of debt (in the case of the contemplated schemes)—it is a "law relating to insolvency or adjustment of debt." (*See* Reynolds Decl. ¶ 51.) Under the Cayman Companies Law, a Cayman Court may (i) give

regard to the wishes of creditors for all matters related to the winding up of an insolvent company, (ii) make all debts payable on a contingency basis and all present or future, certain or contingent claims against the company admissible in the proceeding, (iii) appoint a liquidator who is required to convene meetings of the creditors, and (iv) apply the property of the debtor in satisfaction of its liabilities *pari passu* and distribute such property to creditors according to their rights and interests. (*See* SX–3 (the "Companies Law") §§ 105, 115, 139(1), 140(1).) The JPLs are "[o]fficers of the [Cayman] Court," and subject to the control of the Cayman Court. The JPLs or any creditor may apply to the Cayman Court for an order for the continuation of the winding up under the supervision of the Cayman Court. (*See* Companies Law §§ 108(2), 104(4), 131–133; *see also* Reynolds Decl. ¶¶ 31, 34.) A Cayman debtor's assets and affairs are subject to the control or supervision of the Cayman Court in both provisional liquidation proceedings and proceedings seeking sanctioning of schemes of arrangement. (*See id.* ¶ 51.) The purpose of the Cayman Provisional Liquidation Proceedings is reorganization or, should the reorganization fail, liquidation; the purpose of the contemplated Cayman Schemes is reorganization by way of an adjustment of debt. (*See generally* Cayman Orders; Reynolds Decl. ¶ 51.)

This Court and others have previously held that insolvency or debt adjustment proceedings (including provisional liquidations) **\*702** and schemes of arrangement under Cayman Islands law qualify as foreign proceedings under chapter 15 of the Bankruptcy Code. *See, e.g.*, *In re Suntech Power Holdings Co.*, 520 B.R. 399 (Bankr. S.D.N.Y. 2014) (provisional liquidation); *In re Platinum Partners Value Arbitrage Fund et al.*, No. 16–12925 (SCC) (Bankr. S.D.N.Y. Nov. 23, 2016) (ECF Doc. # No. 27) (official liquidation); *In re Ardent Harmony Fund, Inc.*, No. 16–12282 (MG) (Bankr. S.D.N.Y. Sept. 1, 2016) (official liquidation) (ECF Doc. # 17); *In re Caledonian Bank Ltd.*, No. 15–10324 (MG) (Bankr. S.D.N.Y. Mar. 17, 2015) (ECF Doc. # 39) (official liquidation); *In re LDK Solar Co.*, No. 14–12387 (PJW) (Bankr. D. Del. Nov. 21, 2014) (ECF Doc. # 43, 44) (provisional liquidation and scheme of arrangement). In response to a question from the Court during trial, Wiener could not point to any case in which a U.S. bankruptcy court found that a Cayman liquidation or scheme proceeding did not satisfy the requirements of section 101(23) as a collective insolvency or debt adjustment proceeding subject to judicial control.

**F. The Cayman Proceedings Are "Foreign Main Proceedings"**

The Cayman Proceedings are "foreign main proceedings" within the meaning of section 1502(4) of the Bankruptcy Code because each Debtor's COMI is the Cayman Islands.

*1. Each Debtor's COMI is in the Cayman Islands*

 **[6]** The Bankruptcy Code defines a "foreign main proceeding" as "a foreign proceeding pending in the country where the debtor has the center of its main interests." *See* 11 U.S.C. § 1502(4). A foreign proceeding "shall be recognized" as a foreign main proceeding if it is pending where the debtor has its COMI.[6] *See* **\*703** 11 U.S.C. § 1517(b)(1). While the Bankruptcy Code does not define "center of main interests," section 1516(c) provides that, in the absence of evidence to the contrary, a debtor's registered office or habitual residence "is presumed to be the center of the debtor's main interests." *See* 11 U.S.C. § 1516(c); *see also In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 458 B.R. 63, 76 (Bankr. S.D.N.Y. 2011), *aff'd*, 474 B.R. 88 (S.D.N.Y. 2012) ("The party seeking to rebut a statutory presumption must present enough evidence to withstand a motion for summary judgment"); *In re ABC Learning Centres Ltd.*, 445 B.R. 318, 333 (Bankr. D. Del. 2010), *aff'd*, 728 F.3d 301 (3d Cir. 2013) (holding that debtor's registered jurisdiction was its COMI where no objection was raised or evidence presented rebutting the section 1516 presumption). The legislative history indicates that this presumption was "designed to make recognition as simple and expedient as possible" in cases where COMI is not controversial. H. Rep. No. 109–31, Pt. 1, 109th Cong., 1st Sess. 112–13 (2005). "This presumption is not a preferred alternative where there is a separation between a corporation's jurisdiction of incorporation and its real seat." *In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. at 128 (emphasis added) (citation omitted). In this case, the Foreign Debtors shifted their COMI from the RMI to the Cayman Islands. The Court finds that the Foreign Debtors' COMI shift was done for proper purposes to facilitate a value-maximizing restructuring of the Foreign Debtors' financial debt. The Foreign Debtors' COMI shift to the Cayman Islands was "real," satisfying the factors or indicia considered by courts in determining a foreign debtor's COMI.

[6]     The construct of the "center of main interests" was first used in insolvency laws in countries in the

European Union. UNCITRAL's Model Law on Cross–Border Insolvency ("Model Law") incorporated the construct in the Model Law. Article 2 (Definitions) of the Model Law provides that "*(b)* 'Foreign main proceeding' means a foreign proceeding taking place in the State where the debtor has the centre of its main interests ...." The UNCITRAL Guide to Enactment of the Model Law explains that "[t]he Model Law does not define the concept 'centre of main interests'. However, an explanatory report (the Virgos–Schmit Report), prepared with respect to the European Convention, provided guidance on the concept of 'main insolvency proceedings' and notwithstanding the subsequent demise of the Convention, the Report has been accepted generally as an aid to interpretation of the term 'centre of main interests' in the EC Regulation. Since the formulation 'centre of main interests' in the EC Regulation corresponds to that of the Model Law, albeit for different purposes ..., jurisprudence interpreting the EC Regulation may also be relevant to interpretation of the Model Law." *UNCITRAL Model Law on Cross Border Insolvency with Guide to Enactment and Interpretation* ¶ 82 (2014).

The terms "center of main interests" is used but not defined in chapter 15 of the Bankruptcy Code. *See* 11 U.S.C. §§ 1502(4), 1516(c), 1517(b)(1). "Center of main interests," included within chapter 15, is not used in other chapters of the Bankruptcy Code; eligibility to file under chapters 7 or 11, for example, is controlled by section 109(a), discussed elsewhere in this Opinion. Section 1508 directs a court interpreting chapter 15 to "consider its international origin, and the need to promote application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions." 11 U.S.C. § 1508. It is therefore appropriate for U.S. bankruptcy courts to consider interpretations from other international jurisdictions that have adopted the Model Law. The Cayman Islands has not adopted the Model Law, and it does not appear that center of main interests provides a standard for eligibility to file in the Cayman Islands. To the extent that a determination of center (or "centre," as spelled elsewhere) of main interests is relevant to eligibility to file proceedings in other countries, and has been decided by the foreign court, it may well be appropriate for a U.S. bankruptcy court to give deference or comity to the determination of the foreign court in the jurisdiction in which the foreign proceeding is filed. But since the Cayman Court has not decided the issue here, no issue of deference or comity arises.

Courts have identified several additional factors that may be considered in a COMI analysis, including:

the location of the debtor's headquarters; the location of those who actually manage the debtor (which, conceivably could be the headquarters of a holding company); the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes.

*In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006); *In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. at 128. While each of these factors is a "helpful guide" in determining a debtor's COMI, the factors are not exclusive, and none of the factors is required nor dispositive. *See Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 137 (2d Cir. 2013) (explaining that "consideration of these specific factors is neither required nor dispositive" and warning against mechanical application).

**[7]** **[8]** The Second Circuit and other courts often examine whether a chapter 15 debtor's COMI would have been ascertainable to interested third parties, finding "the relevant principle ... is that the COMI lies where the debtor conducts its regular business, so that the place is ascertainable by third parties .... Among other factors that may be considered are the location of headquarters, decision-makers, assets, creditors, and the law applicable to most disputes." **\*704** *In re Fairfield Sentry*, 714 F.3d at 130. As the Second Circuit explained, by examining factors "in the public domain," courts are readily able to determine whether a debtor's COMI is in fact "regular and ascertainable [and] not easily subject to tactical removal." *Id.* at 136–37; *see also In re British Am. Ins. Co.*, 425 B.R. 884, 912 (Bankr. S.D. Fla. 2010) ("The location of a debtor's COMI should be readily ascertainable by third parties."); *In re Betcorp Ltd.*, 400 B.R. 266, 289 (Bankr. D. Nev. 2009) (looking to ascertainability of COMI by creditors).

**[9]** In assessing these factors, a chapter 15 debtor's COMI is determined as of the filing date of the chapter 15 petition, without regard to the debtor's historic operational activity. *See*

3710

*In re Fairfield Sentry*, 714 F.3d at 137 ("[A] debtor's COMI should be determined based on its activities at or around the time the chapter 15 petition is filed, as the statutory text suggests."). However, as discussed in greater detail below, to the extent that a debtor's COMI has shifted prior to filing its chapter 15 petition, courts may engage in a more holistic analysis to ensure that the debtor has not manipulated COMI in bad faith.

The JPLs submit that, as of the Petition Date, each Debtor's "center of main interests" within the meaning of chapter 15 of the Bankruptcy Code was in the Cayman Islands and that COMI was not manipulated prior to the filing in bad faith. As explained more fully below, the Court agrees. The Court concludes that the Cayman Proceedings are foreign main proceedings based on the facts discussed at considerable length in Section F. of the Background section (I.) above. Those facts establish that, among other things, the Foreign Debtors (i) conduct their management and operations in the Cayman Islands, (ii) have offices in the Cayman Islands, (iii) hold their board meetings in the Cayman Islands, (iv) have officers with residences in the Cayman Islands, (v) have bank accounts in the Cayman Islands, (vi) maintain their books and records in the Cayman Islands, (vii) conducted restructuring activities from the Cayman Islands, (viii) provided notices of relocation to the Cayman Islands to paying agents, indenture trustees, administrative and collateral agents, and investment service providers, and (ix) filed a Form 6–K with the SEC showing that their office was in the Cayman Islands.

### 2. Each Debtor Established its COMI in the Cayman Islands Prior to the Petition Date

As described above, the Foreign Debtors are holding companies of the Group and conduct their business throughout the world, principally on the high seas. (*See* Kandylidis Decl. ¶ 30.) Accordingly, the nature of the Group's business and the mobility of their assets complicate the COMI analysis.

However, the Foreign Debtors have engaged in various activities supporting their COMI in the Cayman Islands for almost a year—beginning with the incorporation of UDW in the Cayman Islands in April 2016. Among other things, the Foreign Debtors have (i) hosted meetings with creditors and advisors in relation to the proposed restructuring in the Cayman Islands, (ii) provided specific notice of relocation to paying agents, parties to the SUN Indenture,

DRH Indenture, DFH Credit Agreement and DOV Credit Agreement, and investment service providers, and, perhaps most importantly, (iii) provided public notice and general recognition of relocation through UDW's Form 6–K report with the SEC, press releases and media reports. (*See generally* Kandylidis Decl. ¶¶ 23–34.) Additionally, the Foreign Debtors' boards of directors and officers have been actively managing the Debtors from the Cayman **\*705** Islands by, among other things, convening regular and special meetings in the Cayman Islands over the last few months. (*See id.* ¶¶ 24–26.) The Cayman Orders specifically grant them the authority "to continue to exercise all powers of management conferred on them by the [Foreign Debtors] and conduct the ordinary, day-to-day, business operations of the [Foreign Debtors]." (Cayman Orders ¶ 6.) Courts have found activities such as these to establish a debtor's COMI. *See In re Suntech*, 520 B.R. at 418 ("Centered in the Cayman Islands, the JPLs took the necessary steps to centralize the administration of the Foreign Proceeding there. They published notices of the Foreign Proceeding directing interested parties to contact [management] in the Cayman Islands. They changed the Debtor's address on SEC filings and informed the Debtor's lenders to send future notices to their offices in the Cayman Islands. They conducted Board meetings and creditor meetings, largely through telephonic participation, from the Cayman Islands and appointed a Cayman Island[s] director."). Thus, the Foreign Debtors' COMI was clearly the Cayman Islands before and on the Petition Date. (*See also* Appell Decl. ¶ 31.)

Moreover, it does not matter that the Subsidiary Debtors are registered as non-resident corporations in the RMI. While section 1516(c) creates a presumption that a debtor's COMI is the situs of its registered office, such presumption is rebuttable and should only be invoked "[i]n the absence of evidence to the contrary." 11 U.S.C. § 1516(c); *see also In re Fairfield Sentry Ltd.*, 440 B.R. 60, 64 (Bankr. S.D.N.Y. 2010) ("[A]s the Objectors have advanced evidence in support of their position that New York is the proper COMI, the Court cannot rely solely upon this presumption, but rather must consider all of the relevant evidence."); *In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. at 335 ("However, section 1516(c) creates no more than a rebuttable evidentiary presumption, which may be rebutted notwithstanding a lack of party opposition.... Such a rebuttable presumption at no time relieves a petitioner of its burden of proof/risk of non-persuasion.") (citation omitted); *In re Basis Yield Alpha Fund (Master)*, 381 B.R. 37, 48–49 (Bankr. S.D.N.Y. 2008) (declining to presume that the

debtor's COMI is where its registered office is located because there is enough "evidence to the contrary" to rebut section 1516(c)). The Subsidiary Debtors are *also* registered as foreign companies under the Companies Law in the Cayman Islands where, together with UDW, they maintain offices. (*See* Kandylidis Decl. ¶ 4.) Thus, section 1516(c) does not indicate that the Subsidiary Debtors' COMI is the RMI.

It also does not matter that UDW is classified as "exempted" under the Cayman Companies Law, even though "exempted" company status appears to limit that company's activities in the Cayman Islands. Section 163 of the Cayman Companies Law provides: "Any proposed company applying for registration under this Law, *the objects of which are to be carried out mainly outside the Islands*, may apply to be registered as an exempted company." (Companies Law § 163 (emphasis added); *see also id.* § 174 (prohibiting exempted companies from trading in the Cayman Islands except in furtherance of its business outside the Cayman Islands).) The vast majority of Cayman companies are incorporated as exempted companies under the Companies Law. (*See* Reynolds Decl. ¶ 16.) While exempted companies are prohibited from *trading* in the Cayman Islands, except in furtherance of their business outside the Cayman Islands, they may still be *managed* from there:

> **\*706** Section 174 clarifies that it is not to be construed so as to prevent the exempted company from effecting and concluding contracts in the Cayman Islands and exercising in the Cayman Islands all of its powers necessary for the carrying on of its business outside the Cayman Islands. An exempted company can therefore, for example, maintain premises and employ staff and appoint directors and other agents who are resident in the Cayman Islands, in furtherance of the company's business outside the Cayman Islands.

*Id.* ¶ 18; *cf. In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. at 338 (mentioning the debtors' status as exempted companies in discussing the debtors' lack of activities in the Cayman Islands); *In re Basis Yield*, 381 B.R. at 49 (finding that the debtor

was not entitled to the presumption under section 1516(c) because "there is at least a *question* in the Court's mind as to whether this exempted company ... would have its COMI in the Cayman Islands") (emphasis added). Because the business of the Ocean Rig Group is primarily conducted on the high seas, the Court finds that the Group's business is generally conducted outside of any jurisdiction in which it was managed. Accordingly, the Cayman Islands is the site of the Debtors' "main interests"—it is the site where their business is run.

No evidence in the record suggests any other potential location for the Foreign Debtors' COMI. First, the RMI is not the COMI for the Foreign Debtors—even the Subsidiary Debtors. The trial evidence shows that the Foreign Debtors never conducted operations or directed their affairs from the RMI; they never maintained administrative, management or executive offices in the RMI; never had any directors who were residents or citizens of the RMI; and never held a meeting of its directors or shareholders in the RMI. (*See* Kandylidis Decl. ¶¶ 4, 25.)

Second, although UDW was previously a tax resident of Cyprus, it has not been a tax resident there since December 2016 and it no longer maintains any presence there. (*See id.* ¶ 24.) The mobile nature of the Foreign Debtors' business, and the majority of COMI factors, point to the Cayman Islands as their COMI. The Court expressly finds that the Foreign Debtors had their COMI in the Cayman Islands before the Petition Date and that it remains there today. *See In re Millennium Glob.*, 458 B.R. at 79 ("In addition to the fact that Bermuda was the only COMI reasonably ascertainable by third parties, *there is insufficient evidence in this case that establishes the COMI in a location other than Bermuda.... On this record, the proof does not establish an alternative COMI.* Since every entity has a center of main interests, the fact that the evidence does not disclose a COMI other than Bermuda operates in favor of granting recognition of the Bermuda proceedings as foreign main proceedings.") (emphasis added) (internal citation omitted).

### 3. The Debtors Have Not Manipulated COMI in Bad Faith

"In any proceeding for foreign recognition, of great concern to the Court is the potential for mischief and COMI manipulation.... Thus, even courts that have recently relegated the COMI focus to the time of the petition for recognition ... would likely support a totality of the circumstances approach

where appropriate." *In re Fairfield Sentry*, 440 B.R. at 65–66 (internal citations omitted). The Court finds that the Foreign Debtors purposefully established the Cayman Islands as their COMI before the Petition Date. The Foreign Debtors' actions in doing so were not taken in bad faith. There is no evidence in the record pointing to any "insider exploitation, untoward manipulation, [and] overt **\*707** thwarting of third party expectations," that would support denying recognition here. *See id.* The evidence establishes that the Foreign Debtors had a legitimate, good faith purpose for shifting their COMI from the RMI to the Cayman Islands.

Although UDW was a non-resident corporation incorporated in the RMI until April 2016, and DRH, DFH and DOV are still non-resident corporations in the RMI, the RMI has not adopted a bankruptcy law or other insolvency statute. (*See Stipulation as to Republic of Marshall Islands Law* (ECF Doc. # 115) ("The RMI has not adopted the federal Bankruptcy Code, has no bankruptcy or insolvency statute currently in force, and has no statutory, regulatory, or administrative provisions regarding corporate restructuring. In addition, there is no judicial process under RMI law equivalent to a United States Chapter 11 or a Cayman scheme of arrangement.").) The only provisions under RMI law that address financially distressed corporations—the Business Corporations Act and the Uniform Foreign Money–Judgments Recognition Act—contemplate dissolution and, therefore, any insolvency process in the RMI would invariably result in a value-destroying liquidation process. Accordingly, the Foreign Debtors' COMI shift to the Cayman Islands was done for legitimate reasons, motivated by the intent to maximize value for their creditors and preserve their assets. The Court finds that the Foreign Debtors' COMI was not manipulated in bad faith.

### G. Recognition of the Cayman Proceedings Would Not Be Manifestly Contrary to United States Policy

[10]    [11]    Section 1506 provides that a bankruptcy court may decline to grant relief requested if the action would be "manifestly contrary to the public policy of the United States." 11 U.S.C. §§ 1506, 1517(a). This public policy exception is narrowly construed. *In re Sino–Forest Corporation*, 501 B.R. 655, 665 (Bankr. S.D.N.Y., 2013) (explaining that section 1506's "public policy exception is narrowly construed"); *In re Toft*, 453 B.R. 186, 195 (Bankr.

S.D.N.Y. 2011) ("[T]hose courts that have considered the public policy exception codified in [section] 1506 have uniformly read it narrowly and applied it sparingly."); *see also Armada (Singapore) Pte Ltd. v. Shah (In re Ashapura Minechem Ltd.)*, 480 B.R. 129, 139 (S.D.N.Y. 2012); *In re Ephedra Prods. Liab. Litig.*, 349 B.R. 333, 336 (S.D.N.Y. 2006). Granting recognition of the Cayman Proceedings advances the public policy objectives of sections 1501(a) and 1508; nothing that has transpired here trenches upon the policy concerns underlying section 1506.

### III. CONCLUSION

For the reasons explained above, following an evidentiary hearing, the Court finds and concludes that the Foreign Representatives established by a preponderance of the evidence that each of the four Foreign Debtors' proceedings pending in the Cayman Court is entitled to recognition as a foreign main proceeding.

If the Cayman Court sanctions the Foreign Debtors' schemes of arrangement, upon application of the Foreign Representatives, the Court will proceed to determine whether each scheme of arrangement should be recognized and enforced by this Court. [7]

7    Nothing in this Opinion addresses any of the issues that may need to be resolved if the Cayman Court sanctions the four schemes and this Court is asked to recognize and enforce the schemes. Highland, for one, has indicated that it will oppose recognition and enforcement of the UDW scheme if it is sanctioned by the Cayman Court. At the same time, nothing in this Opinion is intended to express any reasons why this Court will not recognize and enforce any of the schemes if they are sanctioned by the Cayman Court.

**\*708**    A separate order recognizing the Foreign Debtors' Cayman Islands Proceedings as foreign main proceedings will be entered.

### All Citations

570 B.R. 687

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 58

669 B.R. 457
United States Bankruptcy Court, S.D. New York.

IN RE: ODEBRECHT ENGENHARIA E CONSTRUÇ[O S.A. - EM RECUPERAÇ[O JUDICIAL, et al.,

Debtors in a Foreign Proceeding.

Case No. 25-10482 (MG)
|
Signed April 21, 2025

**Synopsis**

**Background:** Foreign representative of Brazilian debtors filed motion seeking recognition of debtors' Brazilian judicial reorganization proceeding as foreign main proceeding and enforcement of related reorganization plan in the United States. United States Trustee (UST) objected to the extent language in proposed recognition order provided additional relief, including exculpation of certain non-debtor parties and injunction that UST argued constituted an impermissible nonconsensual third-party release.

**Holdings:** The Bankruptcy Court, Martin Glenn, Chief Judge, held that:

[1] under Chapter 15, courts are not limited in the discretionary relief they grant by that relief afforded by the foreign court or the plan of reorganization;

[2] the Court would approve enforcement mechanism of proposed order that prevented disgruntled creditors who were bound by debtors' Brazilian plan from suing in the United States to recover on claims that were barred by the plan;

[3] the Court would approve the proposed order's exculpation provision; and

[4] as a matter of first impression for the court, assuming arguendo that subject paragraph of order created a nonconsensual third-party release, the Court had the power to issue such order in support of a foreign proceeding, pursuant to at least its power under the section of the Bankruptcy Code outlining the discretionary relief a court may order upon recognition of a foreign proceeding.

Objections overruled; motion granted.

West Headnotes (28)

**[1]** **Bankruptcy** Cases Ancillary to Foreign Proceedings

Although Chapter 15 of the Bankruptcy Code, based on the Model Law on Cross-Border Insolvency proposed by the United Nations Commission on International Trade Law, replaced the section of the Code setting forth the statutory framework for cases filed in the United States that are ancillary to insolvency proceedings filed in foreign countries, many of the principles underlying that section remain in effect under Chapter 15, including the principles of comity and cooperation with foreign courts in deciding whether to grant foreign representative additional post-recognition relief. 11 U.S.C.A. § 304 (repealed); 11 U.S.C.A. § 1501 et seq.

**[2]** **Bankruptcy** Cases Ancillary to Foreign Proceedings

Bankruptcy court's discretion to order recognition of foreign proceeding is exceedingly broad, since court may grant "any appropriate relief" that would further purposes of Chapter 15 and protect debtor's assets and the interests of creditors. 11 U.S.C.A. § 1521(a).

2 Cases that cite this headnote

**[3]** **Bankruptcy** Cases Ancillary to Foreign Proceedings

To determine what relief could fall under catch-all "additional relief" language in the section of the Bankruptcy Court outlining the discretionary relief a court may order upon recognition of a foreign proceeding, courts look to relief available under the now-deleted section of the Code setting forth the statutory framework for cases filed in the United States that are ancillary to insolvency proceedings filed in

foreign countries. 11 U.S.C.A. § 304 (repealed); 11 U.S.C.A. § 1521(a)(7).

1 Case that cites this headnote

**[4]    Bankruptcy** 👈 Cases Ancillary to Foreign Proceedings

Relief under the section of the Bankruptcy Court outlining the discretionary relief a court may order upon recognition of a foreign proceeding will be granted only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected. 11 U.S.C.A. §§ 1521, 1522(a).

4 Cases that cite this headnote

**[5]    Bankruptcy** 👈 Cases Ancillary to Foreign Proceedings

Section of the Bankruptcy Code governing additional assistance the court may provide if recognition of a foreign proceeding is granted provides additional discretionary grounds for the court to grant relief to a foreign representative. 11 U.S.C.A. § 1507.

**[6]    Bankruptcy** 👈 Cases Ancillary to Foreign Proceedings

Public policy exception to Chapter 15, providing that a bankruptcy court may decline to grant relief requested in a Chapter 15 case if the action would be manifestly contrary to the public policy of the United States, is narrowly construed. 11 U.S.C.A. § 1506.

**[7]    Bankruptcy** 👈 Settlement, adjustment, or enforcement of claims

Exculpation provisions in a Chapter 11 plan are designed to insulate court-supervised fiduciaries and some other parties from claims that are based on actions that relate to a debtor's restructuring.

**[8]    Bankruptcy** 👈 Settlement, adjustment, or enforcement of claims

Exculpation clause approved at confirmation of a Chapter 11 plan may exculpate estate fiduciaries like a committee, its members, and estate professionals for their actions in the bankruptcy case, except where those actions amount to willful misconduct or gross negligence.

1 Case that cites this headnote

**[9]    Bankruptcy** 👈 Settlement, adjustment, or enforcement of claims

Exculpation provisions in Chapter 11 plans are "not uncommon" and are generally permissible so long as they are properly limited and not overly broad.

**[10]    Bankruptcy** 👈 Settlement, adjustment, or enforcement of claims

A proper exculpation provision in a Chapter 11 plan is a protection not only of court-supervised fiduciaries, but also of court-supervised and court-approved transactions; in absence of gross negligence or intentional wrongdoing, parties should not be liable for doing things that court authorized them to do and that court decided were reasonable things to do.

**[11]    Bankruptcy** 👈 Settlement, adjustment, or enforcement of claims

In the Chapter 11 context, exculpated parties who are not estate fiduciaries generally are entitled to benefit from a broad exculpation provision where they have been actively involved in all aspects of the cases and have made significant contributions to the success of the cases.

**[12]    Bankruptcy** 👈 Settlement, adjustment, or enforcement of claims

In determining whether to approve exculpation provisions in Chapter 11 plans, among factors that courts consider are whether the beneficiaries of the exculpation participated in good faith in negotiating the plan and bringing it to fruition, and whether the provision is integral to the plan.

3716

**[13]    Bankruptcy** 🔑 Cases Ancillary to Foreign
Proceedings

Under Chapter 15 of the Bankruptcy Code,
courts, despite being ancillaries to foreign
proceedings, are not limited in the discretionary
relief they grant by that relief afforded by the
foreign court or the plan of reorganization;
although there are limitations to courts'
discretionary powers under Chapter 15, they are
not obligated to grant only that relief which
is similar or parallel to that granted abroad or
specified in the plan at issue. 11 U.S.C.A. §§
1507, 1521.

**[14]    Bankruptcy** 🔑 Cases Ancillary to Foreign
Proceedings

Under the expansive grant of power in the
section of the Bankruptcy Code governing
"additional assistance" the court may provide if
recognition of a foreign proceeding is granted,
even if a court cannot grant relief under the
"additional relief" language in the catch-all
subsection of the section of the Code outlining
the discretionary relief a court may order upon
recognition, the court may grant relief under the
"additional assistance" section. 11 U.S.C.A. §§
1507, 1521(a)(7).

1 Case that cites this headnote

**[15]    Bankruptcy** 🔑 Cases Ancillary to Foreign
Proceedings

When a bankruptcy court is determining what
relief to grant to a foreign representative upon
recognition of a foreign proceeding, the drafters
of Chapter 15 referenced principles of comity
as limiting factors, rather than foreign rulings or
even the availability of relief under foreign law.
11 U.S.C.A. §§ 1507, 1521.

**[16]    Bankruptcy** 🔑 Cases Ancillary to Foreign
Proceedings

Bankruptcy Court, on motion by foreign
representative of Brazilian debtors seeking

recognition of debtors' Brazilian judicial
reorganization proceeding as foreign main
proceeding and enforcement of related
reorganization plan in the United States, would
approve enforcement mechanism in proposed
recognition order that prevented disgruntled
creditors who were bound by debtors' Brazilian
plan from suing in the United States to recover
on claims that were barred by the plan, despite
United States Trustee's (UST) objection that
the provision provided relief beyond the scope
provided by the Brazilian confirmation order and
plan; granting the requested relief to the foreign
representative was in furtherance of comity, as it
enabled the full enforcement of debtors' plan by
closing the door to potential workarounds to the
plan. 11 U.S.C.A. § 1521.

**[17]    Courts** 🔑 Decisions in other circuits

Courts in the Southern District of New York are
not bound by the analytical approach taken in a
Fifth Circuit case.

**[18]    Bankruptcy** 🔑 Cases Ancillary to Foreign
Proceedings

**Bankruptcy** 🔑 Settlement, adjustment, or
enforcement of claims

Courts can provide exculpations in Chapter 15
proceedings to the same extent they can in
Chapter 11 cases, so long as the exculpation is
not contrary to United States public policy. 11
U.S.C.A. §§ 1506, 1507, 1521.

**[19]    Bankruptcy** 🔑 Cases Ancillary to Foreign
Proceedings

**Bankruptcy** 🔑 Settlement, adjustment, or
enforcement of claims

Exculpation provision in Chapter 15 debtors'
proposed recognition order complied with
requirements placed on exculpation provisions
in Chapter 11 cases, and so would be approved
by the Bankruptcy Court over United States
Trustee's (UST) objection, where exculpated
parties were indenture trustee of certain notes
cancelled pursuant to debtors' Brazilian plan,

3717

custodians of those notes, and clearing system involved with effectuation of plan, those parties were clearly essential to implementation of plan, which was being supervised by Brazilian court, there was no indication in the record that exculpated parties acted in anything but good faith, it was uncontested that cancellation of subject notes was a central part of plan and that absent cooperation of exculpated parties the notes could not be cancelled, and so order's exculpation provision was integral to recognition and enforcement of plan. 11 U.S.C.A. §§ 1507, 1521.

**[20]    Bankruptcy** 👉 Cases Ancillary to Foreign Proceedings

Given that, in Chapter 11 context, estate fiduciaries are entitled to exculpation when they have been actively involved in bankruptcy proceeding and made significant contributions to its success, and when exculpation applies to court-supervised and-approved transactions, although gross negligence and willful misconduct must be excluded from scope of exculpation provision, the logical analogue in the Chapter 15 context is exculpation of parties who have been actively involved in the foreign restructuring, and who are exculpated for behavior relating to court-supervised and -approved transactions, whether those transactions are supervised in the United States or abroad.

**[21]    Bankruptcy** 👉 Cases Ancillary to Foreign Proceedings

Assuming arguendo that paragraph of proposed recognition order barring actions within territorial jurisdiction of United States that contravened relief provided in foreign debtors' Brazilian plan and confirmation order created a nonconsensual third-party release, Bankruptcy Court had power to issue such order, pursuant to at least its power under section of Bankruptcy Code outlining the discretionary relief court may order upon recognition of foreign proceeding; although *Harrington v. Purdue Pharma*, 144

S.Ct. 2071, prohibited nonconsensual third-party releases in Chapter 11 plans, Court wielded significantly more power under subject section of Chapter 15, whose plain text authorized it to grant "any" appropriate relief available to a trustee, than under Code provision at issue in *Purdue*, release enabled just treatment of all claimants and was not contrary to public policy of United States, and pre-*Purdue* caselaw as well as that under Chapter 15's predecessor supported Court's reading. 11 U.S.C.A. § 304 (repealed); 11 U.S.C.A. §§ 1123(b), 1506, 1521, 1522(a).

**[22]    Bankruptcy** 👉 Cases Ancillary to Foreign Proceedings

Where subsections of section of the Bankruptcy Court outlining the discretionary relief a court may order upon recognition of a foreign proceeding do not expressly authorize the relief requested in a Chapter 15 case, to determine whether the relief can be considered "appropriate relief" under that section of the Code, court must first examine plain language of section, after which it looks at caselaw from Chapter 15's statutory predecessor. 11 U.S.C.A. § 304 (repealed); 11 U.S.C.A. § 1521(a).

**[23]    Bankruptcy** 👉 Cases Ancillary to Foreign Proceedings

Under section of the Bankruptcy Code permitting court to grant relief pursuant to Code section outlining the discretionary relief a court may order upon recognition of a foreign proceeding only if the interests of creditors, the debtor, and other interested entities are "sufficiently protected," term "sufficient protection" embodies three basic principles: the just treatment of all holders of claims against the bankruptcy estate, the protection of United States claimants against prejudice and inconvenience in the processing of claims in the foreign proceeding, and the distribution of proceeds of the foreign estate substantially in accordance with the order prescribed by United States law. 11 U.S.C.A. §§ 1521, 1522(a).

2 Cases that cite this headnote

**[24]** **Bankruptcy** 🗝 Settlement, adjustment, or enforcement of claims

Bankruptcy Code does not provide bankruptcy courts, in Chapter 11 cases, with the authority to authorize nonconsensual third-party releases. 11 U.S.C.A. § 1123(b).

**[25]** **Bankruptcy** 🗝 Cases Ancillary to Foreign Proceedings

A party can lose rights in an ancillary proceeding under Chapter 15 which it otherwise would have had in a plenary case under the Bankruptcy Code.

**[26]** **Bankruptcy** 🗝 Cases Ancillary to Foreign Proceedings

In an ancillary proceeding under Chapter 15, deference to the foreign court is appropriate so long as the foreign proceedings are procedurally fair and do not contravene the laws or public policy of the United States. 11 U.S.C.A. § 1506.

1 Case that cites this headnote

**[27]** **Bankruptcy** 🗝 Cases Ancillary to Foreign Proceedings

Bankruptcy courts, acting as ancillaries to foreign proceedings, may extinguish claims that would be available in plenary actions in the United States in the name of comity.

**[28]** **Bankruptcy** 🗝 Cases Ancillary to Foreign Proceedings

Bankruptcy courts, pursuant to the section of the Bankruptcy Code outlining the discretionary relief court may order upon recognition of a foreign proceeding, may issue orders pursuant to their discretionary powers which contain nonconsensual third-party releases, whether or not those releases originate from a foreign court. 11 U.S.C.A. § 1521.

**Attorneys and Law Firms**

**\*461** CLEARY GOTTLIEB STEEN & HAMILTON LLP, Attorneys for the Foreign Representative of Odebrecht Engenharia e Construção S.A. - Em Recuperação Judicial and affiliated debtors, One Liberty Plaza, New York, New York 10006, By: Luke A. Barefoot, Esq., Thomas S. Kessler, Esq.

WILLIAM K. HARRINGTON, UNITED STATES TRUSTEE, REGION 2, Alexander Hamilton Custom House, One Bowling Green, Room 534, New York, NY 10004, By: Greg M. Zipes, Esq.

**MEMORANDUM OPINION GRANTING MOTION FOR RECOGNITION OF FOREIGN MAIN PROCEEDINGS AND OVERRULING UST OBJECTIONS**

MARTIN GLENN, CHIEF UNITED STATES BANKRUPTCY JUDGE

This Court has already entered an order ("Order," ECF Doc. 21) granting all the relief requested by the foreign representative (Adriana Henry Meirelles, or "Foreign Representative") of the above-captioned foreign debtors ("Debtors"): recognizing the Debtors' Brazilian *recuperação judicial* ("RJ") proceeding as the Debtors' foreign main proceeding, recognizing the full force and effect of the subsequent RJ plan ("RJ Plan"), giving full force and effect to the related Brazilian court confirmation order, and providing further relief which this Court deemed just and proper. No party objected to the recognition of the Brazilian RJ proceeding as the foreign main proceeding, nor to the recognition and enforcement of the RJ Plan in the United States. The only objection was filed by the United States Trustee ("UST"), which objected to language in the Debtors' proposed order[1] which provided additional relief. ("Objection," ECF Doc. # 16.) The Foreign Representative filed a reply ("Reply," ECF Doc. # 18).

The Court entered the Debtors' final proposed order without further modifications. **\*462** The Court now writes separately to address two of the UST's objections, both of which were overruled at the hearing, to provide further clarification, as the UST has made similar objections in multiple Chapter 15 cases.

## I. BACKGROUND

### A. Company Structure and History

The Debtors, along with certain other related entities and affiliates (the "OEC Group"), are part of the business division of Novonor S.A. – Em Recuperação Judicial ("Novonor") and its related entities and affiliates (the "Novonor Group"), one of the largest private business groups in Brazil today, with businesses in engineering, construction and in the development and operation of infrastructure. (ECF Doc. # 2 at 3.) The OEC Group is one of the largest construction companies in the world and employs over 17,000 people. (*Id.* at 10.) The OEC Group's operational and economic activities are primarily concentrated in Brazil. (*Id.* at 12.) The Foreign Representative's motion seeking recognition and enforcement of the RJ Plan provides additional details on each of the Debtors and on the OEC Group as a whole. (*See generally id.*)

The Debtors or their affiliates have filed two previous Chapter 15 proceedings. On August 26, 2019, Novonor (formerly known as Odebrecht S.A.) and certain affiliates (the "Novonor Debtors") filed a petition ("Novonor Petition") seeking recognition of the jointly administered judicial reorganization proceeding pending at the time before a Brazilian court. (*Id.* at 3 n.3.) On September 18, 2019, this Court entered an order granting the relief sought in the Novonor Petition and recognizing the Brazilian RJ proceeding as a foreign main proceeding for all the Novonor Debtors. (*Id.*) A bit over a year later, on November 24, 2020, a subset of three of the Debtors sought recognition of an extrajudicial reorganization (*recuperação extrajudicial*, or "EJ") and enforcement of an agreed plan of reorganization ("EJ Plan") which had been approved by the First Bankruptcy and Judicial Recovery Court of the District of the Capital of the State of São Paulo. (*Id.* at 3–4.) The aim of the Brazilian EJ Proceeding was to optimize the OEC Group's capital structure and provide additional runway for the OEC Group to reach an environment favorable to the resumption of its growth. (*Id.*) The EJ Plan only involved the obligations of a subset of the current set of Debtors and resulted in the replacement of certain New York law-governed notes with new notes, enabling a restructuring of a financial liability exceeding $3.1 billion. (*Id.* at 4–5.)

Due to the pressures of the pandemic, a financial crisis in Brazil, a reduction in infrastructure investments, and lower demand for infrastructure projects in countries where the OEC Group operates, a broader restructuring became necessary. (*Id.* at 5.) In June 2024, the Debtors filed the Brazilian RJ Proceeding to implement a comprehensive restructuring of the OEC Group's liabilities to ensure the preservation and continuation of its business through an agreed plan of reorganization (the RJ Plan). In broad strokes, the RJ Plan involves (i) a restructuring of the OEC Group's existing capital structure both to satisfy the OEC Group's existing debt and strengthen its cash flow; (ii) the creation of a new business unit, with a healthy capital structure and high technical capacity; and (iii) an injection of liquidity to finance future projects through a minimum $120 million debtor-in-possession financing facility, subject to certain conditions precedent being met. (*Id.* at 6.) After two rounds of voting, the ultimate result was a resounding vote in favor of the RJ Plan by the creditor classes and claimants **\*463** present to vote, and after resolving certain objections and finding that the requisite amount of creditor support and all other legal requirements were met, the Brazilian court issued an order confirming the RJ Plan (the "Brazilian Confirmation Order") on March 7, 2025. (*Id.* at 26–28.)

On March 14, 2025, the Foreign Representative filed in this Court a motion for recognition and enforcement, along with a proposed order and a copy of the RJ Plan. (ECF Doc. # 2.) The proposed order was modified before becoming the ultimate Order, but the relevant provisions, excerpted below, did not change. The United States Trustee objected to portions of the proposed order, as discussed below.

### B. Terms of RJ Plan

The only term of the RJ Plan that matters for the following discussion can be found at clause 11.5 of the RJ Plan:

> 11.5. Settlement. The fulfillment of the payment obligations in accordance with the terms and conditions established in this Plan will entail, automatically and regardless of any additional, broad, general and unrestricted formality, the discharge of all Bankruptcy Credits against the Companies under Reorganization and their officers, directors, agents, employees and representatives.

(Objection at 5 (citing RJ Plan).) All parties agreed during the recognition hearing that this provision does not constitute a nonconsensual third-party release.

### C. UST Objection

The UST objected to portions of the proposed order granting recognition (but *not* to the recognition of the Brazilian RJ proceeding or to the enforcement of the RJ Plan as written). The Court overruled the UST's objections. However, two of the UST's objections merit further discussion, as they have recurred throughout multiple Chapter 15 cases.

First, the UST argued that the following limitation on liability is inappropriate because it is a "veiled exculpation clause," it goes beyond the relief granted by the Brazilian court, and there is no statutory basis for granting the limitation:

> The Directed Parties[2] and their respective officers, directors, employees, representatives, advisors, attorneys, professionals and managers, in each case, solely in their respective capacities as a Directed Party, shall be entitled to a full limitation of liability from and shall have no liability for any and all claims, obligations, suits, judgments, damages, rights, causes of action, liabilities from, or in connection with, any action or inaction taken in furtherance of and/or in accordance with this Order, these Chapter 15 Cases, the Brazilian RJ Proceeding, the Brazilian Confirmation Order and the RJ Plan, except for any liability arising from any action or inaction constituting gross negligence, fraud, willful misconduct or professional malpractice as determined by this Court.

(Order ¶ 7; Objection at 11.) Assuming *arguendo* that the limitation on liability is appropriate, the UST also objected on the grounds that the limitation "lacks the hallmarks of an acceptable exculpation provision in a chapter 11 proceeding": there is **\*464** no temporal limitation, and the clause creates "prospective immunity by exculpation." (Objection at 13–14.) Furthermore, the UST argued, the exculpation applies to too many parties—it applies to anyone in connection with "any action or inaction taken in furtherance of and/or in accordance with this Order, this Chapter 15 Case, the Brazilian RJ Proceeding, the Brazilian Confirmation Order and the RJ Plan," so the exact parties to whom the exculpation applies are not known, and it also covers non-estate fiduciaries. (*Id* at 15.) (The UST also objected to the absence of a carveout for bad faith, breach of fiduciary duty, and legal malpractice, all of which are required by the New York Rules of Professional Conduct; the Order was amended to include a carveout for malpractice claims.) Second, the UST argued that the proposed order created impermissible nonconsensual third-party releases. As compared to the release of the debtors contemplated by the RJ Plan (cited above, Section 11.5 of the RJ Plan), the order provides as follows:

> Except as provided in paragraph 12 of this Order, all persons and entities are permanently enjoined and restrained from (i) commencing or taking any action or asserting any claim, within the territorial jurisdiction of the United States, that is inconsistent with, in contravention with, or would interfere with or impede the administration, implementation and/or consummation of the RJ Plan, the Brazilian Confirmation Order or the terms of this Order; and (ii) taking any action against the Debtors or their property located in the territorial jurisdiction of the United States to recover or offset any debt or claims that are extinguished, novated, cancelled, discharged or released under the RJ Plan and the Brazilian Confirmation Order. No action may be taken within the territorial jurisdiction of the United States to confirm or enforce any award or judgment that would otherwise be in violation of this Order without first obtaining leave of this Court.

(Order ¶ 11.) The UST took the position that (1) this language creates "an expansive third-party release" because it "enjoins *all persons and entities* from *taking any action*." (Objection at 16–17.) The UST argued that section 1521(a) of the Code does not provide courts with a statutory basis for issuing orders which contain third-party releases: applying the canon of *ejusdem generis* as the Supreme Court did in *Harrington v. Purdue Pharma*, 603 U.S. 204, 144 S.Ct. 2071, 219 L.Ed.2d 721 (2024) (henceforth "*Purdue*"), the UST claimed that third-party releases are "not similar in nature to the relief provided in section 1521(a)" because third-party releases are not designed to protect a debtor (unlike the provisions of section 1521(a)), so cannot fit under that subsection of the Code. (Objection at 17–18.) The UST also argued that the release supposedly created by the above section of the Order does not fall within the category of "appropriate relief" under section 1521(a) of the Code because "third-party releases may not be imposed without consent through a bankruptcy plan under United States law," citing *Purdue*. (*Id.* at 18.)

### D. Foreign Representative's Reply

The Foreign Representative's reply can be summarized as follows. First, the language of the order limiting liability is customary and similar to language this Court approved in other chapter 15 cases. (Reply at 4–5.) Second, the provision in Section 11.5 of the RJ Plan is proper under both Brazilian and U.S. law, as it does not create a third-party release. (*Id.* at 5–6.) The Foreign Representative then argued that the UST misread the language of the proposed confirmation order, as it does not **\*465** create a wide-reaching release but rather bars only those "actions that contravene relief set forth in

the RJ Plan and Brazilian Confirmation Order" —i.e., the order sought only "enforcement of the relief granted in the Brazilian RJ Proceeding within the territorial jurisdiction of the United States and nothing more." (*Id.* at 6.) Even if Section 11.5 of the RJ Plan did create nonconsensual third-party releases, however, the Foreign Representative maintained that enforcement of such a provision is acceptable because *Purdue* does not apply in Chapter 15 cases. (*Id.* at 7–9.)

## II. LEGAL STANDARD

### A. Relief in a Chapter 15 Proceeding

 **[1]**   In 2005, Congress adopted Chapter 15 of the Bankruptcy Code based on the Model Law on Cross-Border Insolvency proposed by the United Nations Commission on International Trade Law in 1997. Chapter 15 replaced section 304 of the Bankruptcy Code, which originally provided the statutory framework for cases filed in the United States that are ancillary to insolvency proceedings filed in foreign countries. Section 304 provided a bankruptcy court with broad discretion in fashioning an appropriate remedy in a particular case. While Chapter 15 replaced section 304, many of the principles underlying section 304 remain in effect under chapter 15, including the principles of comity and cooperation with foreign courts in deciding whether to grant the foreign representative additional post-recognition relief. *In re SPhinX, Ltd.*, 351 B.R. 103, 112 (Bankr. S.D.N.Y. 2006) ("[C]hapter 15 maintains—and in some respects enhances —the 'maximum flexibility,' that section 304 provided bankruptcy courts ... in light of principles of international comity and respect for the laws and judgments of other nations." (internal citation omitted)).

Section 1520 outlines the mandatory relief automatically granted upon recognition of a foreign main proceeding under Chapter 15. The relief available under this provision is not at issue in this case. Rather, it is the relief available to the foreign representative at the Court's discretion under sections 1521 and 1507 of the Code which are relevant.

 **[2]**    **[3]**    **[4]**   "Section 1521(a) outlines the discretionary relief a court may order upon recognition of a foreign proceeding, whether main or non-main .... The discretion that is granted is 'exceedingly broad' since a court may grant 'any appropriate relief' that would further the purposes of chapter 15 and protect the debtor's assets and the interests of creditors." *In re Atlas Shipping A/S*, 404 B.R. 726, 739 (Bankr.

S.D.N.Y. 2009) (internal citation omitted). Section 1521(a) reads as follows:

> (a) Upon recognition of a foreign proceeding, whether main or nonmain, where necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the foreign representative, grant any appropriate relief, including—

> (1) staying the commencement or continuation of an individual action or proceeding concerning the debtor's assets, rights, obligations or liabilities to the extent they have not been stayed under section 1520(a);

> (2) staying execution against the debtor's assets to the extent it has not been stayed under section 1520(a);

> (3) suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520(a);

> (4) providing for the examination of witnesses, the taking of evidence or the delivery of information concerning **\*466**  the debtor's assets, affairs, rights, obligations or liabilities;

> (5) entrusting the administration or realization of all or part of the debtor's assets within the territorial jurisdiction of the United States to the foreign representative or another person, including an examiner, authorized by the court;

> (6) extending relief granted under section 1519(a); and

> (7) granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a).

11 U.S.C. § 1521(a). To determine what relief could fall under the catch-all at the beginning of the subsection ("additional relief"), courts look to relief available under the now-deleted section 304 of the Code. Courts give varying weight to section 304 precedent. *See In re Vitro S.A.B. de CV*, 701 F.3d 1031, 1057 (5th Cir. 2012) (holding that relief available under section 1521(a) is "co-extensive" with that available under section 304); *compare In re Cozumel Caribe, S.A. de C.V.*, 482 B.R. 96, 114 (Bankr. S.D.N.Y. 2012) (viewing section 304 caselaw as providing "useful precedents"). Relief under section 1521 will be granted only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected. 11 U.S.C. § 1522(a).

3722

[5]   Section 1507 provides additional discretionary grounds for the Court to grant relief to the foreign representative. Section 1507 reads:

(a) Subject to the specific limitations stated elsewhere in this chapter the court, if re cognition is granted, may provide additional assistance to a foreign representative under this title or under other laws of the United States.

(b) In determining whether to provide additional assistance under this title or under other laws of the United States, the court shall consider whether such additional assistance, consistent with the principles of comity, will reasonably assure—

(1) just treatment of all holders of claims against or interests in the debtor's property;

(2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

(3) prevention of preferential or fraudulent dispositions of property of the debtor;

(4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and

(5) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

11 U.S.C. § 1507.

[6]   Section 1506 provides that a bankruptcy court may decline to grant relief requested in a chapter 15 case if the action would be "manifestly contrary to the public policy of the United States." 11 U.S.C. §§ 1506. This public policy exception is narrowly construed. *See In re Ocean Rig UDW Inc.*, 570 B.R. 687, 707 (Bankr. S.D.N.Y. 2017); *see also In re Toft*, 453 B.R. 186, 195 (Bankr. S.D.N.Y. 2011) ("[T]hose courts that have considered the public policy exception codified in [section] 1506 have uniformly read it narrowly and applied it sparingly.").

### B. Exculpations in Chapter 11s

[7]   [8]   [9]   "Exculpation provisions are designed to 'insulate court-supervised fiduciaries and some other parties from claims that are based on actions that relate to the restructuring.' "   **\*467** *In re Genesis Glob. HoldCo, LLC*, 660 B.R. 439, 527 (Bankr. S.D.N.Y. 2024) (quoting *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 720 (Bankr. S.D.N.Y. 2019)). "It is well settled that an exculpation clause approved at confirmation may exculpate estate fiduciaries like a committee, its members, and estate professionals for their actions in the bankruptcy case except where those actions amount to willful misconduct or gross negligence." *In re LATAM Airlines Grp. S.A.*, No. 20-11254 (JLG), 2022 WL 2206829, at \*50 (Bankr. S.D.N.Y. June 18, 2022) (citations omitted). Such provisions in chapter 11 plans are "not uncommon" and are generally permissible "so long as they are properly limited and not overly broad." *Id*. at \*49 (quoting *In re Nat'l Heritage Found., Inc.*, 478 B.R. 216, 233 (Bankr. E.D. Va. 2012)).

[10]   Generally, it has been recognized that:

[A] proper exculpation provision is a protection not only of court-supervised fiduciaries, but also of court-supervised and court-approved transactions. If this Court has approved a transaction as being in the best interests of the estate and has authorized the transaction to proceed, then the parties to those transactions should not be subject to claims that effectively seek to undermine or second-guess this Court's determinations. In the absence of gross negligence or intentional wrongdoing, parties should not be liable for doing things that the Court authorized them to do and that the Court decided were reasonable things to do.

*Aegean Marine Petroleum Network*, 599 B.R. at 721.

[11]   [12]   In the Chapter 11 context, "in general, exculpated parties who are not estate fiduciaries are entitled to benefit from a broad exculpation provision where they have been actively involved in all aspects of the Chapter 11 Cases and have made significant contributions to the success of the cases." *In re Wythe Berry Fee Owner LLC*, No. 22-11340 (MG), 2024 WL 2767121, at \*13 (Bankr. S.D.N.Y. May 29, 2024) (cleaned up). This Court in *Wythe Berry* exculpated a creditor group, among others, because its participation "was instrumental to the Debtor formulating a plan on an expedited basis, and their support was essential to the successful negotiation of the Plan" and related agreements. *Id.* (cleaned up). And while the exculpation reached beyond the set of estate fiduciaries, it still was limited just to "court-supervised and court-approved transactions." *Aegean Marine Petroleum Network*, 599 B.R. at 721. *See also In re Residential Cap. LLC*, Case No. 12-12020 (MG), 2013 WL 12161584, at \*13 (Bankr. S.D.N.Y. Dec. 11, 2013) (order confirming plan contained exculpations for parties

"instrumental to the successful prosecution of the Chapter 11 Cases or their resolution pursuant to the Plan, and/or provided a substantial contribution to the Debtors"); *KG Winddown, LLC, et al.*, Case No. 20-11723 (MG) (Bankr. S.D.N.Y. 2020) (ECF Doc. # 494) (permitting exculpation of purchaser as non-estate fiduciary); *Genco Shipping & Trading Ltd.*, 513 B.R. 233 (Bankr. S.D.N.Y. 2014) (ECF Doc. # 322) (approving exculpation provision in plan providing exculpation for non-estate fiduciaries). "In determining whether to approve exculpation provisions, courts also consider whether the beneficiaries of the exculpation participated in good faith in negotiating the plan and bringing it to fruition, and whether the provision is integral to the plan .... Courts in this and other districts have approved exculpation provisions ... for estate fiduciaries and non-estate fiduciaries." **\*468** *In re: Klaynberg*, No. 22-10165 (MG), 2023 WL 5426748, at \*17–18 (Bankr. S.D.N.Y. Aug. 22, 2023). Finally, courts in the Second Circuit allow exculpation provisions so long as they apply to post-petition conduct and explicitly exclude gross negligence and willful misconduct. *Id.* ("Courts in the Second Circuit have held that [exculpation provisions] ... are appropriate when confined to postpetition activity and explicitly exclude gross negligence and willful misconduct."). *But see In re PTL Holdings LLC*, No. 11-12676 BLS, 2011 WL 5509031, at \*12 (Bankr. D. Del. Nov. 10, 2011) (sustaining UST's objection to exculpation of non-estate fiduciaries and limiting exculpation clause to just estate fiduciaries).

Additionally, courts in this district have exculpated behavior that occurred after the effective date of a plan of reorganization when that behavior was "authorized by bankruptcy courts to carry out the bankruptcy process." *See In re Ditech Holding Corp.*, No. 19-10412 (JLG), 2021 WL 3716398, at \*9 (Bankr. S.D.N.Y. Aug. 20, 2021) ("It is settled that exculpatory provisions are proper to protect those authorized by bankruptcy courts to carry out the bankruptcy process, even after the effective date of a plan .... The Exculpation Provision expressly covers acts falling under the 'administration of the Plan'—which by definition occurs post-Effective Date .... [T]he Exculpation Provision in Section 10.7 of the Plan applies to shield the conduct of these Individual Defendants [in implementing the plan] from collateral attack in a separate lawsuit."); *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. at 720 ("I think that a proper exculpation provision is a protection not only of court-supervised fiduciaries, but also of court supervised and court-approved transactions .... In the absence of gross negligence or intentional wrongdoing, parties should not be liable for doing things that the Court authorized them to do and that the Court decided were reasonable things to do."); *In re Granite Broad. Corp.*, 369 B.R. 120, 139 (Bankr. S.D.N.Y. 2007) (approving exculpation clause "for actions in connection, related to, or arising out of the Reorganization Cases," noting that the language "generally follows the text that has become standard in this district and is sufficiently narrow to be unexceptional" and that "the Plan provides exculpation only for acts or omissions in connection with the Plan and the bankruptcy cases. It requires, in effect, that any claims in connection with the bankruptcy case be raised in the case and not be saved for future litigation."); *In re Flushing Hosp. & Med. Ctr.*, 395 B.R. 229, 235 (Bankr. E.D.N.Y. 2008) ("It is apparent that the exculpation provisions quoted above are not limited to pre-effective date claims. By their terms, these provisions apply to 'any act or omission in connection with, or arising out of ... the administration of the Plan.' Adopting [the objector's] interpretation would render the 'administration of the Plan' clause meaningless, because conduct during the administration of the Plan necessarily occurs after the effective date of the Plan.").

Exculpations have been granted by courts in this district in Chapter 15 cases, including protection of non-fiduciaries. *See, e.g.*, *In re Olinda Star Ltd.*, 614 B.R. 28, 48 (Bankr. S.D.N.Y. 2020) (exculpating, among others, the indenture trustees and record holders of certain debtor-issued notes, as well as an information agent, because "such relief is necessary and appropriate to prevent interference with the consummation of" the foreign scheme of arrangement and "because without such exculpations the ability of [the foreign debtors' liquidators] and their advisors to take action to effectuate the restructuring would be limited"); *In re Oi S.A.*, 587 B.R. 253, 269 n.3 (Bankr. S.D.N.Y. 2018) (noting that the court found that the exculpation **\*469** requested by the foreign representative was "appropriate under the circumstances").

### C. *Purdue* in Chapter 15s

Courts in this district have long enforced foreign restructuring plans in Chapter 15 cases which include nonconsensual third-party releases, most doing so pursuant to sections 1507 and 1521 of the Code. *See, e.g.*, *In re Ocean Rig UDW Inc.*, 570 B.R. 687 (Bankr. S.D.N.Y. 2017) (recognizing and enforcing scheme of arrangement that released affiliate guarantees); *In re Towergate Fin. plc*, Case No. 15–10509–SMB (Bankr. S.D.N.Y. Mar. 27, 2015) (ECF Doc. # 16); *In re New World Res. N.V.*, Case No. 14-12226-SMB (Bankr. S.D.N.Y. Sept. 9, 2014) (ECF Doc. # 20); *In re Sino–Forest Corp.*, 501

3724

B.R. 655, 665 (Bankr. S.D.N.Y. 2013) (enforcing foreign order containing third-party releases); *In re Magyar Telecom B.V.*, Case No. 13-13508-SHL, 2013 WL 10399944 (Bankr. S.D.N.Y. Dec. 11, 2013) (ECF Doc. # 26); *In re Metcalfe & Mansfield Alt. Inv.,* 421 B.R. 685, 696 (Bankr. S.D.N.Y. 2010) (concluding that "principles of enforcement of foreign judgments and comity in chapter 15 cases strongly counsel approval of enforcement in the United States of the third-party non-debtor release and injunction provisions included in the Canadian Orders, even if those provisions could not be entered in a plenary chapter 11 case.").

The Supreme Court held in *Purdue* that "the Bankruptcy Code does not authorize a bankruptcy court to approve, as part of a plan of reorganization under Chapter 11, a release and injunction that extinguishes claims against non-debtor third parties without the consent of affected claimants." 603 U.S. 204, 204, 144 S.Ct. 2071, 219 L.Ed.2d 721 (2024). To date, only one written decision has been issued on the question whether *Purdue* applies in chapter 15 proceedings: *In re: Credito Real, S.A.B. de C.V., SOFOM, E.N.R.*, No. 25-10208 (TMH), 2025 WL 977967, at *1 (Bankr. D. Del. Apr. 1, 2025). The *Credito Real* case is discussed below.

### III. DISCUSSION

For this Court to provide the relief requested by the Foreign Representative, it must be available to the Foreign Representative under either sections 1507 or 1521 of the Code. The authority to issue the exculpation and the third-party release contained in the Order must, therefore, stem from one of these two sections of the Code.

One of the UST's objections is consistent across both provisions: that the provision provides relief beyond the scope provided by the Brazilian Confirmation Order and the RJ Plan. This objection is addressed first, followed by provision-specific objections.

#### A. Provision of Relief Outside Scope of Foreign Court Orders and Plan

[13] Both the text of Chapter 15 and caselaw building upon it indicate that U.S. courts operating pursuant to Chapter 15 are *not* limited in the discretionary relief they grant by that relief afforded by the foreign court or the plan of reorganization. There are limitations to courts' discretionary powers under Chapter 15, but they are not obligated to grant only that relief

which is similar or parallel to that granted abroad or specified in the plan at issue.

[14] [15] The text of Chapter 15 of the Code indicates that U.S. courts, despite being ancillaries to foreign proceedings when operating under Chapter 15, *see In re Foreign Econ. Indus. Bank Ltd., "Vneshprombank" Ltd.*, 607 B.R. 160, 168 (Bankr. S.D.N.Y. 2019), are not hamstrung by the operations of foreign courts and law when determining what relief to grant to **\*470** the foreign representative. Section 1521(a) enables courts to grant "any appropriate relief" so long as that relief is "necessary to effectuate the purpose of [Chapter 15] and to protect the assets of the debtor or the interests of the creditors" (followed by a non-exclusive list of examples of the type of relief the court may grant). Section 1507 permits a court to grant "additional assistance" subject to "specific limitations stated elsewhere in" Chapter 15, so long as the "additional assistance" is available "under this title or under other laws of the United States." Under the "expansive grant of power" in section 1507, "even if a court cannot grant relief under section 1521(a)(7), it may grant relief under section 1507." *Credito Real*, 2025 WL 977967, at *11. The drafters of Chapter 15 referenced principles of comity as limiting factors, rather than foreign rulings or even the availability of relief under foreign law. *See* 11 U.S.C. § 1507(b) (requiring court to consider "the principles of comity" when deciding whether to grant relief); *In re Comair Ltd.*, No. 21-10298(JLG), 2021 WL 5312988, at *9 (Bankr. S.D.N.Y. Nov. 14, 2021) ("Post-recognition relief under section 1521 'is largely discretionary and turns on subjective factors that embody the principles of comity.' ") (internal citation omitted).

[16] The relief provided in the Recognition Order puts an enforcement mechanism in the U.S. order that prevents disgruntled creditors who are bound by the RJ Plan from suing in the U.S. to recover on claims that are barred by the RJ Plan. Granting this relief to the Foreign Representative is in furtherance of comity, as it enables the full enforcement of the RJ Plan by closing the door to potential workarounds to the Plan.

#### B. Exculpation

The provision in the Order which provides for an exculpation reads as follows:

> The Directed Parties and their respective officers, directors, employees, representatives, advisors, attorneys, professionals and managers, in each case, solely in their respective capacities as a Directed Party, shall be entitled

to a full limitation of liability from and shall have no liability for any and all claims, obligations, suits, judgments, damages, rights, causes of action, liabilities from, or in connection with, any action or inaction taken in furtherance of and/or in accordance with this Order, these Chapter 15 Cases, the Brazilian RJ Proceeding, the Brazilian Confirmation Order and the RJ Plan, except for any liability arising from any action or inaction constituting gross negligence, fraud, willful misconduct or professional malpractice as determined by this Court.

(Order ¶ 7.)

The UST objected to the provision of this relief, as discussed above. It relies on a Fifth Circuit case, *Vitro S.A.B. de C.V.*, 701 F.3d 1031, 1044 (5th Cir. 2012), to structure its analysis of section 1521 and 1507. The Fifth Circuit in *Vitro* adopted a three-step framework to determine whether relief requested by a foreign representative is available: "a court ... should first consider the specific relief enumerated under § 1521(a) and (b). If the relief is not explicitly provided for there, a court should then consider whether the requested relief falls more generally under § 1521's grant of any appropriate relief. We understand 'appropriate relief' to be relief previously available under Chapter 15's predecessor, § 304. Only if a court determines that the requested relief was not formerly available under § 304 should a court consider whether relief would be appropriate as 'additional assistance' under § 1507." *Id.* at 1054. Following this rubric, the UST argued that none of the seven **\*471** enumerated bases for relief under section 1521 apply: the first five concern the debtor and do not explicitly authorize exculpations, the sixth concerns extension of relief upon the filing of a petition, and the seventh concerns the relief available to a trustee which the UST claimed is irrelevant to the limitation of liability in the Order. (Objection at 12.) The UST also found no support for the exculpation in section 1507. Without providing much support for its argument, it claimed that the foreign representative "can only get the relief that is set forth in the RJ Plan or is otherwise sanctioned by the Bankruptcy Code—neither of which circumstance exists here." (Objection at 17.) The first part of this argument—that this Court cannot grant such an exculpation because the exact relief is not in the RJ Plan —is addressed and rejected above. The second part of the argument—that such exculpation is not "sanctioned by the Bankruptcy Code"—is addressed below.

 **[17]** First, courts in this district are not bound by the analytical approach taken in *Vitro*. *See, e.g.*, *In re PT Bakrie Telecom Tbk*, 628 B.R. 859, 877 (Bankr. S.D.N.Y. 2021)

(noting that, as between sections 1521 and 1507, "often courts have found it unnecessary to determine the primacy of these two provisions if the outcome would be the same under either section," and collecting cases); *In re Atlas Shipping*, 404 B.R. at 741 (granting relief under section 1521 and concluding that it was unnecessary to determine whether "additional assistance" was available under section 1507).

 **[18]** Courts can provide exculpations in Chapter 15 proceedings to the same extent they can in Chapter 11 cases pursuant to sections 1507 and 1521, so long as the exculpation is not contrary to U.S. public policy in violation of section 1506.

 **[19]** **[20]** In the Chapter 11 context, at least in this district, non-estate fiduciaries are entitled to exculpation when they have been actively involved in the bankruptcy proceeding and made significant contributions to its success, and when the exculpation applies to court-supervised and -approved transactions. *In re Wythe Berry Fee Owner LLC*, 2024 WL 2767121, at \*13; *In re: Klaynberg*, No. 22-10165 (MG), 2023 WL 5426748, at \*17 (Bankr. S.D.N.Y. Aug. 22, 2023) (noting that courts also look to whether parties have acted in good faith and look to whether the exculpation provision is critical to plan implementation). Gross negligence and willful misconduct must be excluded from the scope of the exculpation provision. *In re Wythe Berry Fee Owner LLC*, 2024 WL 2767121, at \*13. The logical analogue in the Chapter 15 context is exculpation of parties who have been actively involved in the foreign restructuring, and who are exculpated for behavior relating to court-supervised and -approved transactions, whether those transactions are supervised here or abroad. (Where a foreign plan is enforced in the U.S. pursuant to a Chapter 15 recognition proceeding, the U.S. court may also be the one supervising and approving.) Here, the exculpated parties (the Directed Parties) are the indenture trustee of certain notes cancelled pursuant to the RJ Plan, the custodians of those notes, and the clearing system involved with the effectuation of the RJ Plan. (Order ¶ 7.) These parties are clearly essential to the implementation of the RJ Plan, which is being supervised by a Brazilian court. There is no indication in the record before the Court that the Directed Parties have acted in anything but good faith. Moreover, the Foreign Representative has submitted that the cancellation of these notes is "one of the central parts of the RJ Plan" and that without the cooperation of the Directed Parties, they cannot be cancelled; **\*472** no party has contested this claim. (Reply at 9.) The exculpation provision in the Order is, therefore, integral to the recognition and enforcement of

the RJ Plan. The Court finds that the exculpation provision in the Order complies with the requirements courts place on exculpation provisions in Chapter 11 cases. *See also In re Olinda Star*, 614 B.R. at 48 (granting exculpation when "necessary and appropriate to prevent interference with the consummation of the foreign restructuring scheme").

### C. Putative Nonconsensual Third-Party Release

The provision in the Order which the UST claims creates impermissible third-party releases reads as follows:

> Except as provided in paragraph 12 of this Order, all persons and entities are permanently enjoined and restrained from (i) commencing or taking any action or asserting any claim, within the territorial jurisdiction of the United States, that is inconsistent with, in contravention with, or would interfere with or impede the administration, implementation and/or consummation of the RJ Plan, the Brazilian Confirmation Order or the terms of this Order; and (ii) taking any action against the Debtors or their property located in the territorial jurisdiction of the United States to recover or offset any debt or claims that are extinguished, novated, cancelled, discharged or released under the RJ Plan and the Brazilian Confirmation Order. No action may be taken within the territorial jurisdiction of the United States to confirm or enforce any award or judgment that would otherwise be in violation of this Order without first obtaining leave of this Court.

(Order ¶ 11.)

 **[21]**  It is not clear that this language creates a third-party release: unlike most third-party releases, the third parties are on the plaintiff's side of the "v." ("all persons and entities," language which conceivably covers more than just the debtors' creditors and claimholders), as the defendant's side consists only of "the Debtors [and] their property."[3] Assuming *arguendo* that paragraph 11 of the Order does create nonconsensual third-party releases, the Court finds that it has the power to issue such an order in a Chapter 15 case, pursuant to at least section 1521, in support of a foreign proceeding.

 **[22]**  Since subsections 1521(a)(1)–(7) do not expressly authorize non-debtor third-party releases, a court should decide whether the requested relief can be considered "appropriate relief" under section 1521(a). To do so, the Court must first examine the plain language of section 1521. *Grajales v. Comm'r of Internal Revenue*, 47 F.4th 58, 62 (2d Cir. 2022) ("Statutory interpretation always begins with the plain language of the statute.") (internal citation and quotation marks omitted). It will then look at caselaw from Chapter 15's predecessor, section 304, which, as noted above, is instructive in interpreting the scope of section 1521(a).

 **\*473**  1. Text of Chapter 15

Judge Horan's recent opinion in *Credito Real* provides a lucid explanation why courts can enforce nonconsensual third-party releases found in foreign plans of reorganization. Here, all parties agreed during the recognition hearing that there is no third-party release in the RJ Plan, or even in the Brazilian court order confirming the RJ Plan. Rather, there is a provision in *this* Court's order recognizing the Brazilian proceeding as the foreign main proceeding and enforcing the RJ Plan which might be construed as a nonconsensual third-party release. However, there is no meaningful difference between *enforcing, via order, a foreign plan* with a third-party release provision, and *issuing an order enforcing a foreign plan*, which order contains a third-party release which itself is not in the foreign plan. The practical effect is the same—a U.S. court issues an order, which takes effect in the United States, which releases claims over which the U.S. court has jurisdiction.

In *Credito Real*, Judge Horan addressed a common objection to the grant of third-party releases under sections 1521 and 1507, one which the UST made here: that courts must apply *Purdue*'s *ejusdem generis* approach to interpreting section 1123(b) of the Code to sections 1521 and 1507, and in so doing, find that courts have no authority to grant third-party releases under those sections. Judge Horan walked through the differences in language between section 1123(b) and, in turn, 1521 and 1507, to find that courts wield significantly more power under the latter two sections. Regarding section 1521, he notes first that it allows a court to grant "any" appropriate relief, and then provides a non-exhaustive list of examples. 2025 WL 977967 at \*9. Section 1521(a)(7) qualifies the "any ... including" language in the section "by explaining that any additional relief a court grants should be of the kind that is available to a trustee." *Id.* at \*10. (Per Judge Horan, it is "well-settled that enforcement of a third-party release contained in a foreign plan is appropriate under that section." *Id.* (*citing In re Arctic Glacier Int'l, Inc.*, 901 F.3d 162 (3d Cir. 2018) (enforcing third party releases in a Canadian plan of arrangement); *In re Avanti Commc'ns Grp. PLC*, 582 B.R. at 618 (finding that it had the power to enforce third-party releases under either section 1521(a)(7) or section

1507(a))).) Section 1521 thus differs from section 1123(b), which "simply states that a court may include any 'other' chapter 11 plan provision that is not "inconsistent with the applicable provisions of this title.' " *Id.* The Supreme Court in *Purdue* read "other" as directing courts to look to the other provisions of 1123(b) to determine what further relief a court could grant. But "section 1521(a) does not direct courts to look to the 'other' provisions"—listed in subsections (a)(1)–(7)—"when providing relief under its catchall," instead allowing "courts to grant 'any additional relief that may be available to a trustee.' " *Id.* The limitation in section 1521(a), therefore, is not whether the relief is similar to those listed in 1521(a)(1)–(7), but whether the relief is available to the trustee. Moreover, section 1521(a)(7) qualifies its "any ... including" language by listing specific relief a court is *barred* from granting under that section—and that list of prohibited relief does not include nonconsensual third-party releases. "By establishing explicit boundaries, Congress allowed relief that does not exceed those boundaries .... By specifically enumerating relief that the court cannot grant under section 1521, Congress more concretely defined the outer bounds of what the court can grant, thus also more concretely defining what is included in what the court can grant, bearing in mind the guiding principles of comity and cooperation." **\*474** *Id.*; *see also id.* at \*11 (citing the canon of *expressio unius* to support the conclusion). Judge Horan conducts a similar analysis of section 1507 to again find that, unlike section 1123(b), it establishes a broad set of powers and precisely defines the court's limitations under that section, "provid[ing] a more explicit and fuller picture of the broad relief a court may grant, as compared to that in section 1123(b)(6)." *Id.* at \*11. In sum, both sections 1521 and 1507 differ from 1123(b) "because section 1123(b) does not expressly establish specific boundaries; instead, it directs courts to look to the rest of the Bankruptcy Code to determine whether a provision is appropriate. Because Congress expressed specific prohibitions [in 1521 and 1507], courts do not need to read further into its words like they do for section 1123(b). The plain language of section 1507 (and section 1521) already enumerates the boundaries unambiguously." *Id.* at \*12.

**[23]** Section 1522(a) permits the Court to grant relief pursuant to section 1521 only if the interests of creditors, the debtor, and other interested entities are "sufficiently protected." "Sufficient protection" embodies "three basic principles: 'the just treatment of all holders of claims against the bankruptcy estate, the protection of U.S. claimants against prejudice and inconvenience in the processing of claims in the [foreign] proceeding, and the distribution of proceeds

of the [foreign] estate substantially in accordance with the order prescribed by U.S. law.' " *Atlas Shipping*, 404 B.R. at 740. The Court finds that, in the present case, the issuance of a third-party release which enables the distribution of the foreign debtor's estate in the manner set forth in the RJ Plan enables the just treatment of all claimants, substantially in accordance with U.S. law.

**[24]** Section 1506 provides another boundary: a bankruptcy court may decline to grant relief requested in a Chapter 15 case if the action would be "manifestly contrary to the public policy of the United States." 11 U.S.C. §§ 1506. This public policy exception is narrowly construed. *See In re Ocean Rig UDW Inc.*, 570 B.R. at 707. *Purdue* did not hold that nonconsensual third-party releases are contrary to the public policy of the U.S. In fact, the majority expressly stated that "[b]oth sides of this policy debate may have their points." *Purdue*, 603 U.S. at 226, 144 S.Ct. 2071. The Supreme Court's holding was narrow: Chapter 11 of Title 11 does not provide bankruptcy courts, in Chapter 11 cases, with the authority to authorize such releases. It cannot be read to hold that nonconsensual third-party releases are "manifestly contrary to" U.S. public policy such that they would be barred by section 1506. *See also Credito Real*, 2025 WL 977967, at \*15–16 (similar).

Following the logic of *Credito Real* and *Purdue*, the Court finds that the text of section 1521 permits the grant of a nonconsensual third-party release in support of a foreign debtor's plan of reorganization. Pre-Code caselaw, as well as opinions interpreting section 304, also support this finding.

Longstanding precedent holds that bankruptcy courts can strip U.S. parties of rights they have under the laws of the United States. As far back as 1883, the Supreme Court sanctioned the enforcement of a Canadian scheme of arrangement under which certain bonds would be issued to replace prior ones. U.S. bondholders argued that the scheme of arrangement, to which they had not consented, was imposed in such a way that violated the U.S. Constitution's bar on certain contractual impairments and hence the scheme should not be recognized by U.S. courts; the Supreme Court rejected this argument:

> **\*475** [E]very person who deals with a foreign corporation impliedly subjects himself to such laws of the foreign government, affecting the powers and obligations of the corporation with which he voluntarily contracts, as the known and established policy of that government authorizes. To all intents and purposes, he submits his

3728

contract with the corporation to such a policy of the foreign government, and whatever is done by that government in furtherance of that policy which binds those in like situation with himself, who are subjects of the government, in respect to the operation and effect of their contracts with the corporation, will necessarily bind him.

*Canada Southern Ry. Co. v. Gebhard*, 109 U.S. 527, 537–38, 3 S.Ct. 363, 27 L.Ed. 1020 (1883). And building on *Gebhard*, the Second Circuit in *Cunard* dismissed a U.S. lawsuit solely on the grant of comity to a foreign proceeding. *Cunard S.S. Co. Ltd. v. Salen Reefer Servs. A.B.*, 49 B.R. 614, 618 (S.D.N.Y. 1985), *aff'd sub nom. Cunard S.S. Co. v. Salen Reefer Servs. AB*, 773 F.2d 452, 452 (2d Cir. 1985). The sole concern of the Second Circuit was that the foreign court governing the foreign proceeding was a court of competent jurisdiction, and that enforcement of the foreign proceeding would not violate public policy in the U.S.; the fact that U.S. law would have led to a different outcome, and even the fact that a right granted by U.S. law was being stripped by enforcement, did not matter. *Id.* at 617–19.

 [25]   A battery of similar cases makes it clear that a party can lose rights in an ancillary proceeding which it otherwise would have had in a plenary case under the Bankruptcy Code. *See, e.g.*, *In re Ephedra Prods. Liab. Litig.*, 349 B.R. 333, 337 (S.D.N.Y. 2006) (recognizing Canadian order as an exercise of comity even though it overrode a defendant's constitutional right to a civil jury trial); *In re Bd. of Directors of Multicanal S.A.*, 307 B.R. 384, 389–91 (Bankr. S.D.N.Y. 2004) (holding that foreign law can "override" U.S. law (specifically, the Trust Indenture Act) via the enforcement of a foreign plan pursuant to section 304 which deprived a creditor of rights that he would have had under the TIA); *see also* *Allstate Life Ins. Co. v. Linter Group Ltd.*, 994 F.2d 996, 999–1000 (2d Cir.1993) (dismissing bondholders' federal securities fraud action in granting comity to Australian insolvency proceeding, as it would have been "inefficient and inequitable to permit the individual claims to go forward. Indeed, since these individuals were sued solely because of their affiliation with the [foreign debtors], to allow these claims to go forward in the United States ... would defeat the purpose of granting comity in the first place."); *Lindner Fund, Inc. v. Polly Peck Int'l PLC*, 143 B.R. 807, 807–11 (S.D.N.Y.1992) (dismissing federal securities fraud action in favor of foreign reorganization based on comity and noting that "American courts have traditionally extended comity to foreign bankruptcy proceedings by dismissing actions filed by creditors in United States courts"); *Smith v. Dominion Bridge Corp.*, No. 96-7580, 1999 WL 111465, at *1–5 (E.D.

Pa. Mar. 2, 1999) (staying action against foreign debtor in U.S. courts out of comity considerations, and noting that courts have, under certain circumstances, extended the stay to cover non-debtor co-defendants).

 [26]    [27]   As the Second Circuit has previously stated, "deference to the foreign court is appropriate so long as the foreign proceedings are procedurally fair and ... do not contravene the laws or public policy of the United States." *United JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 424 (2d Cir. 2005). So long as these guidelines are respected,  **\*476**  a long string of caselaw indicates that bankruptcy courts may, acting as ancillaries to foreign proceedings, extinguish claims that would be available in plenary actions in the U.S. in the name of comity.

2. Pre-*Purdue* Caselaw

Given the above analysis, it is not surprising that pre-*Purdue* chapter 15 courts which faced the question whether limitations on a bankruptcy court's powers in plenary cases carried over into the chapter 15 context came to the same conclusion that courts operating under section 304 did: ancillary cases are fundamentally different, and limitations that exist in plenary cases do not always carry over. In *In re Metcalfe & Mansfield Alternative Invs.*, the court had to determine whether a third-party release which might not be available in a plenary case under chapter 11 should be granted in a chapter 15. 421 B.R. at 694. The potential limiting factor there was not the appropriateness of the release under *Metromedia* (moot post-*Purdue*), but a more fundamental one—the *jurisdictional* limitation on chapter 11 courts in *Manville*. The *Metcalfe* court determined that the scope of its authority to release non-debtors in plenary proceedings did not matter because such jurisdictional limitations did not carry over into the chapter 15 context: "whatever the precise limits of a bankruptcy court's jurisdiction to approve a third-party non-debtor release and injunction in a plenary chapter 11 case, the important point for present purposes is that the jurisdictional limits derive from the scope of bankruptcy court 'related to' jurisdiction under 28 U.S.C. § 1334, and the prudential limits courts have applied in chapter 11 cases under the Bankruptcy Code. This Court is not being asked to approve such provisions in a plenary case; rather, the Court is being asked to order enforcement of provisions approved by the Canadian courts. The correct inquiry, therefore, is whether the foreign orders should be enforced in the United States in this chapter 15 case." *Id.* at 695–96. The *Metcalfe*

court then moved onto what it considered to be the sole limiting factor: whether *principles of comity* counseled in favor of the grant. *Id.* *Metcalfe* was a section 1507 case, but its holding carries over into section 1521: there is no reason why a jurisdictional limitation *on bankruptcy courts acting in plenary cases* should hamper courts' ability to act as ancillaries to foreign proceedings. Its logic still holds after *Purdue*: *Purdue* only held that *chapter 11* of the Code does not give courts the power to grant such releases, and did not say anything about limitations on the power of courts to act as ancillaries to foreign proceedings under chapter 15.

 [28]  To summarize, (1) the plain text of Chapter 15, (2) caselaw under its predecessor (section 304), and (3) pre-*Purdue* caselaw in this district all support a finding that courts can, pursuant to section 1521 of the Code, issue orders pursuant to their discretionary powers under section 1521 which contain nonconsensual third-party releases, whether or not those releases originate from a foreign court. Having

found that this power exists under section 1521, this Court need not conduct a full analysis of section 1507 to determine whether it, too, so permits. *See In re Sino-Forest Corp.*, 501 B.R. at 666 (recognizing and enforcing foreign court order approving non-debtor release); *In re Avanti Commc'ns Grp. PLC*, 582 B.R. at 618 (same); *Metcalfe & Mansfield*, 421 B.R. at 696 (same).

## IV. CONCLUSION

For the foregoing reasons, this Court finds that it had the authority under the Code to issue the Order as written. The **\*477** United States Trustee's objections were **OVERRULED**.

## All Citations

669 B.R. 457

## Footnotes

1    The proposed order was edited twice, but the language to which the UST objected remained the same throughout. This opinion therefore relies on the language in the order ultimately entered, *see* ECF Doc. # 21.

2    The "Directed Parties" are: (i) The Bank of New York Mellon, as the indenture trustee (the "Indenture Trustee") under the indentures related to the 2024 Notes, the 2026 Notes, the 2027 Notes, the 2029 Notes, the 2033 Notes, the 2046 Notes, and the Perpetual Notes (collectively, the "NY Notes"); (ii) the Depository Trust Company ("DTC"), Euroclear Bank S.A./N.V., and/or Clearstream Banking, Société Anonyme, as clearing systems, as applicable; (iii) Epiq Corporate Restructuring LLC; and (iv) the custodians of the NY Notes. (Order ¶ 5 n.3.)

3    If this provision is not, in fact, a third-party release, it should be considered an injunction in support of the RJ Plan, given that, as the Foreign Representative convincingly explained, this section of the Order is carefully limited to bar only those actions that contravene relief provided in the RJ Plan and the Brazilian Confirmation Order. (Reply at 6.) All this provision does, per the Foreign Representative, is enforce the relief granted in the Brazilian RJ Proceeding within the territorial jurisdiction of the United States. (*Id.*) Under this reading, the provision would be enforced as a foreign plan-supporting injunction, a type of relief available under section 1521 of the Code. *See, e.g.*, *In re Rede Energia S.A.*, 515 B.R. 69, 93 (Bankr. S.D.N.Y. 2014); *In re Olinda Star*, 614 B.R. at 47–48.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 59

26-11268-mg Doc 23-4 Filed 06/24/26 Entered 06/24/26 13:13:49 Exhibit D Pg 188 of 697

Olin Corp. v. American Home Assur. Co., 704 F.3d 89 (2012)

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by In re Viking Pump, Inc., N.Y., May 3, 2016

704 F.3d 89
United States Court of Appeals, Second Circuit.

OLIN CORPORATION, Plaintiff–Appellant,

v.

AMERICAN HOME ASSURANCE
COMPANY, Defendant–Appellee,

Olin–Hunt Specialty Products
Inc., Third–Party–Defendant,

OneBeacon American Insurance Company,
referred to in this litigation as Commercial
Union Insurance Company, Cross–Defendant,
Insurance Company of North America,
Hanover Insurance Company, as successor
to Massachusetts Bonding and Insurance
Company, American Re–Insurance Company,
Certain Underwriters at Lloyd's London and
London Market Insurance Companies, London
Market Insurance Companies, Commercial
Union Insurance Company, as successor to
Employers Liability Assurance Corporation
Ltd. and Employers Commercial Union
Insurance Company America, Continental
Casualty Company, Employers Insurance
of Wausau, C.E. Health Compensation &
Liability Insurance Co., as successor to
Falcon Insurance Company, successor to
Employers Surplus Lines Insurance Company,
Federal Insurance Company, Fireman's
Fund Insurance Company, Great American
Insurance Company, Lexington Insurance
Company, London & Edinburgh Insurance
Company Limited, Capital Markets Assurance
Corp., as successor to National American
Insurance Company of New York, successor
to Stuyvesant Insurance Company, National

Union Fire Insurance Company of Pittsburgh,
PA, North River Insurance Company, Allstate
Insurance Company a/s/o Marco Del Gado, as
successor to Northbrook Excess and Surplus
Insurance Company, Employers Insurance
Company of Wausau, OneBeacon America
Insurance Company, formerly referred to in
this litigation as Commercial Union Insurance
Company, Aetna Casualty & Surety Company,
General Reinsurance Corporation, Government
Employees Insurance Company, Granite
State Insurance Company, Home Insurance
Company, Indemnity Insurance Company of
North America, Integrity Insurance Company,
Greenwich Insurance Company, as successor to
Harbor Insurance Company, National Casualty
Company, Transit Casualty Company, AIU
Insurance Company, Continental Corporation,
Government Employees Insurance Company,
Granite State Insurance Company, Harbor
Insurance Company, National American
Insurance Company of California, as successor
to Stuyvesant Insurance Company, National
Casualty Company, New York Property/
Casualty Insurance Security Fund, Century
Indemnity Company, as successor to Insurance
Company of North America, Defendants.

Docket No. 11–4055–cv
|
Argued: Sept. 28, 2012.
|
Decided: Dec. 19, 2012.

**Synopsis**

**Background:** Insured manufacturer of industrial chemicals sought declaration that its primary and excess insurers owed duty to indemnify it for its costs of remediating environmental contamination at one of its plant sites pursuant to Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA). Excess insurer moved for

26-11268-mg    Doc 23-4    Filed 06/24/26    Entered 06/24/26 13:13:49    Exhibit D    Pg 189 of 697

Olin Corp. V. American Home Assur. Co., 704 F.3d 89 (2012)

summary judgment. The United States District Court for the Southern District of New York, Thomas P. Griesa, J., granted motion. Insured appealed.

**Holdings:** The Court of Appeals, Droney, Circuit Judge, held that:

[1] law of the case doctrine did not apply to bar insured from arguing application of continuing coverage provision;

[2] insured was not collaterally estopped from arguing application of continuing coverage provision;

[3] plain language of continuing coverage provision required insurer to indemnify insured; and

[4] prior insurance provision reduced insurer's liability only to the extent that a prior insurance policy at the same level of coverage indemnified for a loss that was also covered by insurer's excess policies.

Vacated and remanded.

West Headnotes (17)

**[1]**     **Courts**   Other particular matters, rulings relating to

Determinations in prior related actions as to how liability for insured's damages for progressive environmental injury would allocated across multiple commercial general liability (CGL) insurance policies did not bar insured, under law of the case doctrine, from arguing that condition in CGL excess policies obligated excess insurer to indemnify it not only for the damage occurring within the three years of each policy, but also for damage that continued after the policies had terminated, where such policy condition was not raised or decided in prior actions.

3 Cases that cite this headnote

**[2]**     **Insurance**   Particular matters concluded

Insured was not collaterally estopped from arguing that condition in commercial general liability (CGL) excess insurance policies obligated insurer to indemnify it not only for environmental damage occurring on its site within the three years of each policy, but also for damage that continued after the policies had terminated, where such policy condition was not raised or decided in prior actions.

1 Cases that cite this headnote

**[3]**     **Res Judicata**   Issues or questions

Collateral estoppel only prevents relitigation in a subsequent action of an issue of law or fact actually litigated and decided by a court of competent jurisdiction in a prior action.

4 Cases that cite this headnote

**[4]**     **Federal Courts**   Pleading

A district court's determination that a party has not waived an argument by raising it earlier is reviewed for abuse of discretion.

3 Cases that cite this headnote

**[5]**     **Insurance**   Application of rules of contract construction

Under New York law, insurance policies are interpreted according to general rules of contract interpretation.

64 Cases that cite this headnote

**[6]**     **Contracts**   Construction as a whole
        **Contracts**   Language of Instrument

Under New York law, words and phrases in a contract should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions.

73 Cases that cite this headnote

**[7]**     **Contracts**   Construction as a whole

Under New York law, any interpretation of a contract that has the effect of rendering at least

Olin Corp. V. American Home Assur. Co., 704 F.3d 89 (2012)

26-11268-mg   Doc 23-4   Filed 06/24/26   Entered 06/24/26 13:13:49   Exhibit D   Pg
190 of 697

one clause superfluous or meaningless is not preferred and will be avoided if possible.

24 Cases that cite this headnote

**[8]** **Contracts** 🔑 Existence of ambiguity

Under New York law, contract terms are ambiguous only if they are capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

50 Cases that cite this headnote

**[9]** **Evidence** 🔑 Insurance

Under New York law, if a court concludes a provision in an insurance contract is ambiguous, it may consider extrinsic evidence to ascertain the parties' intent at the formation of the contract.

15 Cases that cite this headnote

**[10]** **Insurance** 🔑 Application of rules of contract construction

**Insurance** 🔑 Ambiguity, Uncertainty or Conflict

Under New York law, if extrinsic evidence fails to establish the parties' intent, for purpose of interpreting an ambiguous insurance contract, courts may apply other rules of contract interpretation, including the rule of contra proferentem, according to which ambiguity should be resolved in favor of the insured.

35 Cases that cite this headnote

**[11]** **Contracts** 🔑 Existence of ambiguity

Under New York law, ambiguity is absent where the contract's language provides a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion.

51 Cases that cite this headnote

**[12]** **Contracts** 🔑 Existence of ambiguity

Under New York law, contractual language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation.

25 Cases that cite this headnote

**[13]** **Contracts** 🔑 Application to Contracts in General

**Contracts** 🔑 Language of Instrument

**Evidence** 🔑 Contracts and agreements in general

Under New York law, an unambiguous provision of the contract should be given its "plain and ordinary meaning" and the contract should be construed without reference to extrinsic evidence.

60 Cases that cite this headnote

**[14]** **Insurance** 🔑 Continuous acts and injuries; trigger

Under New York law, plain language of continuing coverage provision of commercial general liability (CGL) excess insurance policies required insurer to indemnify insured for environmental damage at insured's site continuing after the termination of the policy for damages that exceeded $30.3 attachment point; insured met all three conditions for application of continuing coverage provision in that groundwater contamination constituted property damage that occurred during coverage periods, damage arose out of an occurrence covered by the policies, and groundwater contamination was continuing at the time of termination of policies.

9 Cases that cite this headnote

**[15]** **Insurance** 🔑 Scope of coverage

Under New York law, commercial general liability (CGL) excess insurer was required to

26-11268-mg    Doc 23-4    Filed 06/24/26    Entered 06/24/26 13:13:49    Exhibit D    Pg 191 of 697

Olin Corp. v. American Home Assur. Co., 704 F.3d 89 (2012)

indemnify insured for environmental damage at insured's site, where total amount of damages exceeded the $30.3 million attachment point for excess policies.

**[16]    Insurance**  👉  Continuous acts and injuries; trigger

      **Insurance**  👉  Proration and Allocation

Under New York law, continuing coverage provision of commercial general liability (CGL) excess insurance policies did not require imposition of joint and several liability among triggered policies, but, rather, simply added additional years of exposure, using the same pro rata allocation method for determining the amount of damage attributed to each year.

10 Cases that cite this headnote

**[17]    Insurance**  👉  Proration and Allocation

Under New York law, prior insurance provision of commercial general liability (CGL) excess insurance policies reduced insurer's liability only to the extent that a prior insurance policy at the same level of coverage indemnified for a loss that was also covered by insurer's excess policies.

9 Cases that cite this headnote

**Attorneys and Law Firms**

**\*92**  Craig C. Martin, Jenner & Block LLP, Chicago, IL, for Plaintiff–Appellant.

Michael H. Cohen, Saiber LLC, Florham Park, NJ, for Defendant–Appellee.

Mary Beth Forshaw, Bryce L. Friedman, Simpson Thacher & Bartlett LLP, New York, NY, for OneBeacon American Insurance Company as amicus curiae in support of Defendant–Appellee.

Before: CHIN, LOHIER, and DRONEY, Circuit Judges.

**Opinion**

DRONEY, Circuit Judge:

Plaintiff–Appellant Olin Corporation ("Olin") appeals from a grant of summary judgment in favor of Defendant–Appellee American Home Assurance Company ("American Home") in the United States District Court for the Southern District of New York (Griesa, *J.*). Olin brought this action against its insurers, including American Home, regarding environmental contamination at Olin sites in the United States. This appeal arises from proceedings related to Olin's Morgan Hill, California, manufacturing site. At issue is whether the $30.3 million attachment point for American Home's excess policies for the years 1966–69 and 1969–72 could be reached by the alleged property damage at Morgan Hill.

For the reasons that follow, we vacate and remand.

**BACKGROUND**

This case began in 1984 when Olin brought a diversity action against its insurers seeking indemnification for environmental damage at Olin manufacturing sites throughout the United States.[1] Because each site raised its own factual and legal issues, the district court has addressed coverage on a site-by-site basis. This appeal arises out of the most recent of these site-specific proceedings, concerning contamination at Olin's manufacturing site at Morgan Hill, California, between 1957 and  **\*93**  1987. In the course of this proceeding, the district court granted summary judgment to American Home, which issued two excess policies during this period, on the ground that the attachment point for these excess policies could not be met. That ruling is the basis of the present appeal.

[1]    This action was originally filed in United States District Court for the District of Columbia but was transferred to the Southern District of New York.

**I. Olin's Morgan Hill Site**

Olin began manufacturing signal flares at Morgan Hill, California, in 1956.[2] Olin used the chemical potassium perchlorate ("perchlorate") in the manufacturing process. As part of this process, perchlorate was combined with other chemicals by various means including the use of cement mixers. This produced a large volume of perchlorate dust, which was dispersed throughout the site by wind and foot

3735

traffic. Perchlorate powder on the ground was then dissolved by rainfall and carried via run-off into dry wells at the site, where it seeped into the ground, contaminating the water table below the site. Changes in Olin's manufacturing process in the 1970s decreased the volume of perchlorate spilled, but regular spillage appears to have continued in some quantity until at least 1986.

[2] For the purposes of summary judgment, the excess insurers assumed as true the facts presented by Olin's expert witness, William L. Hall, because the insurers believed they were entitled to summary judgment even on that basis. We will follow the district court in assuming those facts are accurate for the sake of deciding the present appeal.

Throughout this period, the concentration of perchlorate in the water table below the site increased, generating an underground plume of perchlorate that gradually spread down the valley. This underground plume reached equilibrium in 1987, meaning that the contamination of additional soil or groundwater ceased. By then, the plume extended approximately ten miles from the site. Olin estimated that it would incur costs of more than $102 million to fully remedy the damage caused by the underground perchlorate plume.[3]

[3] These costs include $50 million Olin has spent to remedy contamination ordered by the California Regional Water Quality Control Board, $47 million it will spend in the future on such remediation, and $5.3 million in costs associated with a suit filed by the Santa Clara Valley Water District.

## II. The American Home Policies

Olin had an insurance program consisting of general commercial liability insurance and layered excess policies. Two excess policies provided by American Home are at issue here: policy number CE351099 and policy number CE355541.[4] The first of these covers the period of January 1, 1966, to January 1, 1969. The second covers the period of January 1, 1969, to January 1, 1972. Each policy covers ten percent of up to $10 million in damages in excess of $30.3 million for the three-year policy period.[5] Thus American Home has no coverage obligation unless the damages attributable to one of the policies exceed this $30.3 million attachment point.[6] Each policy also "follows **\*94** form" to lower-level excess policies, which means that it adopts their terms and conditions.

[4] Olin originally sought indemnification under a third American Home policy, CE245707. Olin no longer appears to be pursuing this policy, however, and it is not before us.

[5] The maximum payout on each policy is therefore $1 million.

[6] Olin's general commercial liability policy for the relevant periods had a maximum liability of $300,000. Damages that exceeded this threshold would be covered by the first excess policy. Damages exceeding the liability limit of that first excess policy would implicate the next excess policy, and so on. The American Home policies would be required to indemnify Olin only if a loss exceeded the liability limits of the lower-level policies, which here would require $30.3 million in damages.

The 1969–72 American Home policy follows form to a policy issued by Underwriters at Lloyd's ("Lloyd's"). According to the terms of the Lloyd's policy, American Home is obligated

to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of the liability ... imposed upon the Assured by law ... for damages, direct or consequential and expenses ... on account of ... Property Damage ... caused by or arising out of each occurrence happening anywhere in the World.

The Lloyd's policy defines "property damage" as "loss of or direct damage to or destruction of tangible property (other than property owned by the Named Assured)." The policy defines "occurrence" as "an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally result in personal injury, property damage or advertising liability during the policy period" and further specifies that "[a]ll such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence."

The Lloyd's policy also contains a Condition C: "Prior Insurance and Non–Cumulation of Liability." This provision, the principal subject of this appeal, states the following:

It is agreed that if any loss covered hereunder is also covered in whole or in part under any other excess policy issued to the Assured prior to the inception date hereof, the limit of liability hereon ... shall be reduced by any amounts due to the Assured on account of such loss under such prior insurance.

Subject to the foregoing paragraph and to all the other terms and conditions of this Policy, in the event that personal injury or property damage arising out of an occurrence covered hereunder is continuing at the time of termination of this Policy, Underwriters will continue to protect the Assured for Liability in respect of such personal injury or property damage without payment of additional premium.

The 1966–69 American Home policy follows form to a policy issued by the Home Insurance Company, which in turn mostly follows form to a policy issued by Lloyd's. That Lloyd's policy appears to be identical to the policy underlying the 1969–72 American Home policy in nearly all relevant respects, employing the same definitions of "occurrence" and "property damage" and including an identical Condition C. The difference between the two American Home policies is that the Home Insurance Company policy underlying the 1966–69 American Home policy specifies that it only provides coverage for "accidents or occurrences ... taking place during the period of the Policy." No such language applies to the 1969–72 American Home policy.[7]

[7]    The parties therefore agree that under the 1966–69 policy, an occurrence is only covered if damage and the event causing the damage take place within the policy period. Olin argues that under the 1969–72 policy, only the damage from an event need take place within the policy period in order to be a covered occurrence; the event causing the damage need not. For the reasons stated below, this difference in language does not affect our resolution of this appeal.

### III. Proceedings Related to the Morgan Hill Site

On June 14, 2010, Olin filed a third amended complaint seeking indemnity related **\*95** to the Morgan Hill site. Olin sought coverage from American Home under its policies. American Home moved for summary judgment, arguing that the $30.3 million attachment point was not reached for either policy. American Home relied on our decision in *Olin Corp. v. Insurance Co. of North America,* 221 F.3d 307 (2d Cir.2000) ("*Olin I*"), discussed further below, which provides for pro rata allocation of damage in cases of progressive environmental injury. Under this approach, the total $102 million in damages from the cleanup of the Morgan Hill site should be equally divided among the years in which property damage occurred. And under our decision in *Olin Corp. v. Certain Underwriters at Lloyd's London,* 468 F.3d 120 (2d Cir.2006) ( "*Olin II*"), also discussed further below, property damage occurred from the time when contamination began

until the time when the underground plume of perchlorate reached its maximum extent. Assuming that contamination began in 1957 and the plume reached equilibrium in 1987, property damage occurred in thirty-one years. Pursuant to *Olin I* and *Olin II*, the total damage of $102 million should be divided by 31, yielding a per-year damage figure of $3.3 million. Since each American Home policy had a coverage period of three years, the total property damage attributable to each policy from the perchlorate spill amounted to only $9.9 million. Thus neither policy's attachment point of $30.3 million could be reached.

Olin did not dispute this basic analysis but argued that American Home had ignored the effect of Condition C on the policies. In Olin's view, the second paragraph of Condition C requires American Home to indemnify Olin not only for damage occurring during the policy periods but also for any damage in subsequent years. This is because property damage arising from a "covered occurrence" was "continuing at the time of termination" of each policy, and thus American Home's liability for the 1966–69 policy includes all damage from 1966 to 1987, and its liability for the 1969–72 policy includes all damage from 1969 to 1987. Using the pro rata approach of *Olin I*, $72.6 million in damage should be assigned to the 1966–69 policy, and $62.7 million should be assigned to the 1969–72 policy. Since these amounts far exceed the $30.3 million attachment point, each policy would be reached.

The district court rendered an oral decision regarding the effect of Condition C, and based on this decision it later granted American Home's motion for summary judgment on Olin's claims. We interpret the district court's decision as turning on the definition of "occurrence." In the district court's view, Condition C covers only damage resulting from an occurrence that takes place within the policy period. The district court appears to have concluded that the actual spilling of perchlorate on the ground was the occurrence here, with each spill of the chemical being a separate occurrence. On this basis, Condition C would only implicate American Home's 1966–69 policy if the perchlorate spilled between 1966 and 1969 caused more than $30.3 million of the $102 million total damage, with the same being true for the 1969–72 policy regarding spills from 1969 to 1972. The district court thus granted American Home's motion because Olin had failed to raise a triable issue of material fact regarding whether the spills of perchlorate from 1966 to 1969 or 1969 to 1972 were sufficient to cause $30.3 million in damage. On September 20, 2011, the district court entered final judgment

26-11268-mg   Doc 23-4   Filed 06/24/26   Entered 06/24/26 13:13:49   Exhibit D   Pg
194 of 697

Olin Corp. V. American Home Assur. Co., 704 F.3d 89 (2012)

under Rule 54(b) of the Federal Rules of Civil Procedure in favor of American Home. Olin proceeded to trial against the remaining insurers implicated in the Morgan Hill site and settled with the other excess insurers **\*96** prior to a verdict.[8] Olin timely appealed the district court's dismissal of its claims against American Home.

[8]   Amicus OneBeacon American Insurance Company ("OneBeacon"), whose interest in this case is discussed further below, was one of the excess insurers that settled with Olin regarding Olin's Morgan Hill site.

## DISCUSSION

We review *de novo* a district court's grant of summary judgment. *Kaytor v. Elec. Boat Corp.,* 609 F.3d 537, 546 (2d Cir.2010). Summary judgment may be granted only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In making this determination, a court should "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

## I. This Court's Prior *Olin* Decisions

Two of our decisions involving other Olin sites are central to the issues of this case. *Olin I,* 221 F.3d 307, involved the allocation of damages related to an Olin fertilizer plant in Williamston, North Carolina. Olin produced pesticides at that site from 1950 to 1967. *Id.* at 311–12. Nearly two decades later, substantial contamination of the soil and groundwater of the site was discovered, requiring Olin to incur more than $4 million in cleanup costs. *Id.* at 313. At trial, the jury found injury to property at the Williamston site from 1951 through 1985, raising the issue of how the total damages should be allocated under New York law to the various insurance policies in effect during this thirty-five year period. Olin argued for the joint and several approach, in which Olin could select a particular year during the period of damage, collect damages up to the policy limits from the policies in effect that year, and the selected insurers could then seek contribution from other policies in effect during other years of the loss period. *Id.* at 322. The insurers argued that liability should be allocated among the policies according to "some objective factor." *Id.* Finding the language of the policies "inconclusive" on this question, we turned to

public policy and equitable considerations and found these to "clearly indicate allocation" as the correct methodology. *Id.* at 324. Because the evidence in the case provided no basis on which to allocate liability for damages to any particular year or period, we affirmed the district court's decision to allocate damages equally to each year in which the jury found damage had occurred. *Id.* at 325, 327. The New York Court of Appeals subsequently confirmed our prediction of New York law on this point, holding that in the absence of contractual language to the contrary, courts should use the pro rata approach to allocating liability for damages in cases of progressive environmental injury under these circumstances. *Consol. Edison Co. of N.Y. v. Allstate Ins. Co.,* 98 N.Y.2d 208, 746 N.Y.S.2d 622, 774 N.E.2d 687, 695 (2002).

Our second decision is *Olin II,* 468 F.3d 120. That case involved four Olin sites near Niagara Falls, New York. *Id.* at 123. As in the present case, chemical spills at these sites contaminated the soil, and subsequent groundwater flows spread this contamination. The contamination was not discovered for decades. When it was discovered, Olin incurred substantial cleanup costs, which it sought to recover from some of the very same policies involved **\*97** here.[9] We began by reaffirming our holding in *Olin I* that in cases when "continuous property damage takes place over a number of policy periods, the liability for that injury is allocated over the time during which property damage occurred." *Id.* at 126. We also clarified that equally allocating damage pro rata is a default rule; if the evidence allows for more specific assignment of liability to particular years, then responsibility should be determined in that way. *Id.* at 127. The primary issue of *Olin II*, however, concerned the definition of "property damage." Given that *Olin I* requires damage to be allocated equally among all years in which property damage occurred, the question of *Olin II* was whether "property damage" occurred only in those years in which "active pollution" took place—that is, "the placing of pollutants at a source where they will leach into the environment"— or whether property damage also occurred in those years when groundwater spread already spilled pollutants into new areas. *Id.* at 129. Because the insurance contracts did not adequately define "property damage," we held that New York courts would likely conclude that "property damage occurs as long as contamination continues to increase or spread, whether or not the contamination is based on active pollution or the passive migration of contamination into the soil and groundwater." *Id.* at 131.

26-11268-mg    Doc 23-4    Filed 06/24/26    Entered 06/24/26 13:13:49    Exhibit D    Pg 195 of 697

Olin Corp. v. American Home Assur. Co., 704 F.3d 89 (2012)

[9]    The 1966–69 American Home policy follows form to a Home Insurance policy that follows form to one of the Lloyd's policies against which Olin sought recovery in *Olin II*. This Lloyd's policy is the ultimate source of Condition C in the 1966–69 American Home policy. The Lloyd's policy underlying the 1969–72 American Home policy is identical in all relevant respects to the Lloyd's policy implicated in *Olin II*.

The effect of these two decisions on the instant case is clear. Under *Olin I*, in the absence of contractual provisions to the contrary or evidence indicating that ascertainable amounts of damage occurred in certain years, the $102 million in property damage in this case should be allocated equally to each year in which the property damage occurred. And under *Olin II*, property damage occurred from the time when perchlorate contamination first began until the time when this contamination reached its maximum extent through the spread of the underground plume in the water table.[10] Here, the parties assumed for the purposes of summary judgment that contamination began in 1957 and that the plume reached equilibrium in 1987. Thus under *Olin II*, "property damage" occurred in those 31 years. Dividing the total damage of $102 million by the 31 years in which damage occurred, $3.3 million in damage should be allocated to each year between 1957 to 1987.[11] This, however, does not resolve the principal issue of this appeal. *Olin I* and *Olin II* were based, in part, on the specific language of the insurance contracts at issue there. Olin contends that Condition C in the two policies here obligates American Home to indemnify it not only for the damage occurring within the three years of each policy, but also for damage that continued after the policies had terminated until the plume reached equilibrium in 1987.

[10]    Because the insurance contracts in *Olin II* employed the same definition of "property damage" as the contracts here, we see no reason why the spread of the plume of perchlorate should not be deemed "property damage" under the American Home policies.

[11]    This, of course, is merely the result of the record relied upon by the district court in granting summary judgment and not a factual finding regarding the actual damage.

## II. Law of the Case, Estoppel, and Waiver

[1]    Before considering the effect of Condition C, we first must decide whether **\*98** Olin is permitted to raise it as a basis for indemnification. American Home argues that the law of the case doctrine prevents Olin from making its Condition C argument because we previously decided how liability

for damage for progressive environmental injury should be allocated across multiple policies in *Olin I* and *Olin II*, and Condition C was present in some of those policies.[12] At oral argument, however, counsel for American Home conceded that the interpretation of Condition C was never raised or decided in those cases before either this Court or the district court. As such, the law of the case doctrine is no bar to considering Olin's Condition C arguments. *See Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber,* 407 F.3d 34, 44–45 (2d Cir.2005).

[12]    As mentioned above, *Olin II* involved, among others, the same Lloyd's policy whose form the 1966–69 American Home policy follows.

[2]    [3]    Amicus OneBeacon[13] argues that Olin is collaterally estopped from raising Condition C, but this argument is also unavailing. Collateral estoppel only prevents relitigation in a subsequent action of "an issue of law or fact actually litigated and decided by a court of competent jurisdiction in a prior action." *Ali v. Mukasey,* 529 F.3d 478, 489 (2d Cir.2008) (internal quotation marks and emphasis omitted). Because the meaning of Condition C was not "actually litigated and decided" in our previous opinions, collateral estoppel does not apply.

[13]    OneBeacon issued at least nine high-level excess policies to Olin. Olin sought to recover from some of these policies for the damage at Morgan Hill. The district court dismissed some of Olin's claims against OneBeacon when it granted summary judgment to American Home. Olin and OneBeacon settled the remaining claims before trial. In its notice of appeal, Olin designated only American Home and itself as the parties to this appeal. Thus OneBeacon is not an appellee in the present action. However, some of OneBeacon's policies follow form to the same policies underlying the American Home policies. As a result, they contain Condition C. This means that our interpretation of Condition C may affect OneBeacon's liability to Olin regarding other Olin sites. Because of this, OneBeacon moved to amend the caption to include it as an appellee and, in the alternative, for leave to file an amicus brief. On April 3, 2012, we denied OneBeacon's motion to amend the caption but granted its motion to file an amicus brief.

[4]    The estoppel claim raised by American Home and OneBeacon could also be framed as a waiver issue. However, the district court expressly found that Olin had not waived its argument regarding Condition C by failing to raise it

3739

26-11268-mg Doc 23-4 Filed 06/24/26 Entered 06/24/26 13:13:49 Exhibit D Pg 196 of 697

*Olin Corp. V. American Home Assur. Co.,* 704 F.3d 89 (2012)

earlier, because the effect of Condition C was not an issue in earlier proceedings involving other Olin sites. A district court's determination that a party has not waived an argument by raising it earlier is reviewed for abuse of discretion. *Saybolt Int'l,* 407 F.3d at 45. Neither American Home nor OneBeacon has shown that the district court abused its discretion in finding no waiver. *See id.* at 45–46. For these reasons, we see no merit to the contention that we are unable to consider the proper interpretation of Condition C, and we now turn to that question.

### III. Relevant Principles of New York Contract Interpretation

[5] [6] [7] [8] [9] [10] [11] [12] [13] Under New York law,[14] insurance policies are interpreted according to general rules of contract interpretation. *E.g., World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co.,* 345 F.3d 154, 183–84 (2d Cir.2003), *abrogated on other grounds,* **\*99** *Wachovia Bank v. Schmidt,* 546 U.S. 303, 126 S.Ct. 941, 163 L.Ed.2d 797 (2006). Two of these rules are particularly relevant here. First, the "words and phrases [in a contract] should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.,* 424 F.3d 195, 206 (2d Cir.2005) (internal quotation marks and ellipsis omitted). Any interpretation of a contract that "has the effect of rendering at least one clause superfluous or meaningless ... is not preferred and will be avoided if possible." *Id.* (citation omitted).

14      The parties agree that New York law applies.

Second, contract terms are ambiguous if they are

capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

*Nowak v. Ironworkers Local 6 Pension Fund,* 81 F.3d 1182, 1192 (2d Cir.1996) (citation omitted). If a court concludes a provision in an insurance contract is ambiguous, it may consider extrinsic evidence to ascertain the parties' intent at the formation of the contract. *JA Apparel Corp. v. Abboud,* 568 F.3d 390, 397 (2d Cir.2009). If the extrinsic evidence fails to establish the parties' intent, courts may apply other rules of contract interpretation, including New York's rule of *contra proferentem,* according to which ambiguity

should be resolved in favor of the insured. *See Haber v. St. Paul Guardian Ins. Co.,* 137 F.3d 691, 697–98 (2d Cir.1998). Ambiguity is absent where the contract's language provides "a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *Hunt Ltd. v. Lifschultz Fast Freight, Inc.,* 889 F.2d 1274, 1277 (2d Cir.1989) (internal quotation marks and alteration omitted). "Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation." *Id.* An unambiguous provision of the contract should be given its "plain and ordinary meaning" and the contract should be construed without reference to extrinsic evidence. *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London,* 136 F.3d 82, 86 (2d Cir.1998). With these principles in mind, we turn to Condition C.

### IV. Condition C

Condition C, the full text of which is quoted above, appears in both of the relevant American Home policies through their following form with the underlying Lloyd's policies.[15] It consists of two paragraphs. We will refer to the first paragraph of Condition C as the "prior insurance provision" and the second as the "continuing coverage provision." It is the application of this second provision that is the primary issue here. It provides:

15      Condition C was apparently written by Lloyd's underwriters in 1960 when Lloyd's adopted an "occurrence"-based form in place of an "accident"-based form. The provision's purpose was to "thwart" policyholders from attempting to obtain double recovery when the triggering event occurred while an accident-based policy was in effect but the injury did not manifest until an occurrence-based policy was in effect. *See* Christopher C. French, *The "Non–Cumulation Clause": An "Other Insurance" Clause by Another Name,* 60 U. Kan. L.Rev. 375, 386–87 (2011).

Subject to the [prior insurance provision] and to all the other terms and conditions of this Policy, in the event that personal injury or property damage arising out of an occurrence covered **\*100** hereunder is continuing at the time of termination of this Policy, Underwriters will continue to protect the Assured for Liability in respect of such personal injury or property damage without payment of additional premium.

Olin Corp. V. American Home Assur. Co., 704 F.3d 89 (2012)

26-11268-mg    Doc 23-4    Filed 06/24/26    Entered 06/24/26 13:13:49    Exhibit D    Pg 197 of 697

[14]    By virtue of its plain language, we see three requirements for the application of the continuing coverage provision. First, there must be "personal injury or property damage." Second, this personal injury or property damage must "aris[e] out of an occurrence covered" by the policy. And third, this personal injury or property damage must be "continuing at the time of termination" of the policy. When these three conditions are met, the plain language of the provision requires the insurer to indemnify the insured for personal injury or property damage continuing after the termination of the policy. We conclude that all three of these conditions are met.

First, "property damage" occurred during both the 1966–69 and the 1969–72 coverage periods. This conclusion follows from *Olin II*, which held that the spread of earlier contamination met the definition of property damage in the same policies at issue here. The parties have assumed for the purpose of summary judgment that the perchlorate plume began in 1957 and reached equilibrium in 1987. No evidence was presented suggesting that the plume did not expand between 1966 and 1972. Thus we presume that the plume was spreading during this period, causing property damage. The parties agree on this point.

Second, this property damage arose out of an occurrence covered by both the 1966–69 and the 1969–72 policies. The policies define an "occurrence" as "an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally result in personal injury, property damage or advertising liability *during the policy period* " and specifies that "[a]ll such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence" (emphasis added).[16] Olin argues that based on this language, the continuous absorption of perchlorate into the soil and groundwater from 1956 to 1987 is a single, multi-year occurrence. That absorption was a continuous or repeated exposure to conditions that resulted in property damage. And because both the absorption itself and the property damage caused by it took place *during the policy period* of both the 1966–69 and 1969–72 policies, it is a covered occurrence for the purposes of each policy.[17] This accords with the plain language  **\*101**  of the policy. It also is the correct application of New York law. *Cf. Appalachian Ins. Co. v. Gen. Elec. Co.,* 8 N.Y.3d 162, 831 N.Y.S.2d 742, 863 N.E.2d 994, 1000–01 & n. 3 (2007); *Ramirez v. Allstate Ins. Co.,* 26 A.D.3d 266, 811 N.Y.S.2d 19, 20 (1st Dep't 2006).

16    It may seem that the continuing coverage provision has only two, not three requirements: a "covered occurrence" and continuing damage. This is so because an event is an "occurrence" only if it causes damage during the policy period, and thus it appears that any event meeting the definition of an "occurrence" will also meet the first requirement of the continuing coverage provision: that there be personal injury or property damage during the policy period. This interpretation, however, ignores an important difference in the language of the policies. An event is also an "occurrence" if it causes *advertising liability* during the policy period. But the continuing coverage provision covers only *personal injury* or *property damage* that begins during the policy and continues after its termination. Thus there is no continuing coverage for advertising liability by the plain terms of the continuing coverage provision. The fact that not all injuries covered by the policy are covered by the continuing coverage provision provides an additional reason why we cannot treat this provision as redundant or superfluous.

17    Olin argues that the 1966–69 policy requires that both the property damage and the happening or event causing the damage take place within the policy period in order to meet the definition of an "occurrence," while the 1969–72 policy only requires that the property damage take place within the period. We need not consider this issue, however, because the evidence shows that both the property damage and the event that caused it (namely the exposure of the soil and groundwater to perchlorate) took place (in part) during each policy period, and thus a covered occurrence took place for the purposes of each policy.

American Home agrees that the perchlorate contamination at Morgan Hill qualifies as a single, multi-year occurrence "for purposes of determining applicability limits of liability and retentions." However, American Home argues that a single, multi-year occurrence spanning the policy period does not satisfy Condition C. We see no basis in the language of the policy for concluding that "occurrence" in Condition C has a different meaning than "occurrence" elsewhere in the policies. Indeed, the policies rule out such an interpretation by expressly stating that "occurrence" shall have the meaning provided by the policy "wherever used herein." Thus, if, as American Home concedes, thirty years of constant perchlorate exposure on the same site that through the same process caused property damage by the slow expansion of the plume satisfies the definition of "occurrence" for the purposes of applying other provisions of the policy, it suffices for Condition C. The second requirement of Condition C is

therefore met because the property damage discussed above "arose out of" an "occurrence" covered by the policy.

The third requirement of Condition C is also met here: the property damage occurring during the policy period was clearly "continuing" at the time of termination of each policy. For the purposes of summary judgment, the parties assumed that the property damage—namely, the spread of the perchlorate plume—began in 1957 and continued until 1987. No evidence was presented that this damage was not "continuing" in 1969 when the first policy expired or that it did not continue until 1987. The same is true for the 1969–72 policy.

American Home and amicus OneBeacon argue, however, that the post-policy damage was "new" damage rather than "continuing" damage. Under this view, any additional damage occurring after the policy period is "new" and thus damage "continuing at the time of termination" of the policy means only prior damage that has not been fully remedied when the policy terminates. However, this interpretation deprives Condition C of any effect, since even without Condition C American Home would be obligated to indemnify Olin for damage occurring during the policy period that had not yet been remedied. *See LaSalle Bank,* 424 F.3d at 206 (stating that contracts "should be construed so as to give full meaning and effect to all [their] provisions" (internal quotation marks omitted)). We conclude instead that damage "continuing at the time of termination" of the policy clearly contemplates property damage from the migration of chemicals in the expanding groundwater plume during the term of the policy and continuing after the policy terminated. This is consistent with *Olin II,* which characterizes such damage as both "additional" and "continuing." *See Olin II,* 468 F.3d at 129–30.

 **[15]**  Because the three requirements of Condition C are met, that provision applies here. American Home thereby could be obligated to indemnify Olin up to the limits of its policies for all property damage  **\*102**  caused by the perchlorate plume that occurred during and after the termination of each policy. Since there is not yet any basis for attributing greater or lesser damage to individual years, we follow the district court in allocating $3.3 million of damage to each year between 1957 and 1987. The 1966–69 policy is thus exposed to twenty-two years of damage, a total of $72.6 million. The 1969–72 policy is exposed to nineteen years of damage, a total of $62.7 million. Because each of these figures exceeds

the $30.3 million attachment point, summary judgment was inappropriate.

American Home's main argument against applying the plain language of the continuing coverage provision of Condition C is that this result would be contrary to the pro rata allocation rule applied in *Olin I* and *Olin II*. However, those decisions simply provide that when insurance contracts do not adequately define how progressive environmental damage is to be apportioned across multiple triggered policies, and the evidence cannot make that distinction, New York law requires damage to be allocated pro rata. New York law does not preclude parties from contracting to indemnify the insured for damage allocated to years after the termination of the policy. This is precisely what American Home's policies do here with Condition C. American Home has agreed to indemnify Olin not only for damage taking place during the policy period but also continuing after the termination of the policy. The provision thus simply adds additional years of exposure, using the same pro rata allocation method for determining the amount of damage attributed to each year.

 **[16]**  Some state courts in other jurisdictions interpreting policies containing Condition C have concluded that the language of those policies is "inconsistent" with the pro rata approach and have imposed joint and several liability among triggered policies in cases involving so-called long-tail liability. *See, e.g., Hercules, Inc. v. AIU Ins. Co.,* 784 A.2d 481, 493–94 (Del.2001); *Chi. Bridge & Iron Co. v. Certain Underwriters at Lloyd's, London,* 59 Mass.App.Ct. 646, 797 N.E.2d 434, 441–44 (2003); *Dow Corning Corp. v. Cont'l Cas. Co.,* No. 200143, 1999 WL 33435067, at *6–7 (Mich.Ct.App. Oct. 12, 1999) (per curiam) (unpublished opinion). American Home argues that these decisions support its view that the interpretation of Condition C we adopt here is inconsistent with our pro rata decisions in *Olin I* and *Olin II*. We agree with American Home that New York state court decisions and those prior decisions of this Court endorsing the pro rata approach foreclose us from interpreting Condition C as imposing joint and several liability. However, the decisions from other jurisdictions endorsing joint and several liability did not principally rely on Condition C to reach that outcome. Instead, those decisions relied on language in the policies providing coverage for "all sums which the Assured shall be obligated to pay." *See, e.g., Hercules,* 784 A.2d at 489–90, 493–94. This same "all sums" language appears in the American Home policies, but both this Court in *Olin I* and the New York Court of Appeals in *Consolidated Edison* have expressly rejected the conclusion that such language requires

3742

joint and several allocation of damages and instead have endorsed the pro rata allocation method for policies with that language. *See Olin I,* 221 F.3d at 323–24; *Consol. Edison,* 746 N.Y.S.2d 622, 774 N.E.2d at 695. Thus the only difference in language between the American Home policies here and the provisions of the policies considered by the *Olin I* and *Consolidated Edison* courts is Condition ***103** C.[18] That is not enough to impose joint and several liability and reject pro rata allocation, given that the continuing coverage provision of Condition C applies only to damages continuing *after* the termination of the policy and is silent regarding damages occurring *before* the policy period. Thus Condition C alone cannot trigger joint and several liability in lieu of the pro rata allocation methodology employed in *Olin I* and *Consolidated Edison.*

18 These cases, particularly *Consolidated Edison,* concerned damage over extended periods of time. It may be that some of the policies implicated in these cases did in fact contain Condition C, but if so, the parties never raised it and those decisions did not discuss it.

Our prior holdings regarding pro rata allocation and those of the New York state courts call for us to endorse the pro rata allocation method and allocate $3.3 million in damage to each year from 1957 to 1987. But the plain language of the continuing coverage provision of Condition C extends liability *temporally* by providing that the insurer will cover damage allocated pro rata to years after the termination of the policy if that damage (1) is "continuing" at the time of the policy's termination and (2) arises from an occurrence covered by the policy. Thus the continuing coverage provision of the 1966–69 policy applies to all damage allocated to the years 1966 until the time when property damage ceases (here 1987). The same is true of the 1969–72 policy for the period of 1969–1987. We believe that this interpretation best harmonizes the plain language of Condition C with the holdings of our Court involving similar policies.[19] We also believe this honors the intent of the parties, because declining to enforce the continuing coverage provision of Condition C while allocating damages pro rata may excuse high-level excess insurers from providing coverage paid for by their insureds. Allocating damages over a lengthy period typically results in attachment points for certain excess policies not being reached. Giving effect to the plain language of Condition C thus allows insureds to look to excess policies for some indemnification when those policies include Condition C.

19 Because Condition C is unambiguous, we do not consider extrinsic evidence in interpreting the provision, *see Alexander,* 136 F.3d at 86, nor do we apply the rule of *contra proferentem.* We observe, however, that if the meaning of Condition C *were* unclear and the extrinsic evidence did not resolve the ambiguity, we would be required to construe the provision against the insurer.

American Home argues that this interpretation of Condition C would produce a result inconsistent with the other terms of the policies. Specifically, the 1966–69 policy (with the application of Condition C) covers property damage from the perchlorate plume for the period of 1966 to 1987. This would be anomalous, it is argued, because perchlorate continued to be spilled at the site into the mid–1980s. Thus under the 1966–69 policy, Olin could potentially recover for property damage occurring in 1985 that was contributed to by chemicals spilled in 1982, making American Home liable for the release of chemicals that occurred long after the policy had terminated. However, this result follows not from our interpretation of whether the damage is "continuing" but rather from the fact that the American Home policies define the constant, three-decade-long exposure of the soil and groundwater to perchlorate dust as one, multi-year occurrence, as well as from the holding of *Olin II* that the spread of the perchlorate plume is property damage.

We now turn to the final issue: how the "prior insurance" provision of Condition C applies to the two American Home policies. ***104** American Home contends that this provision prevents it from having any responsibility under either policy, because the damage caused by the perchlorate spill is covered "in whole or in part" by Olin's other policies, namely policies that provided coverage before the dates of the American Home policies. Olin has already recovered from some of these policies, but at levels below the American Home policies' attachment point. Olin argues that American Home misreads the prior insurance provision, which applies only to policies that are (1) provided by the same insurer (2) at the same level of coverage. Since Olin had no coverage at the $30.3 million level provided by American Home before the 1966–69 American Home policy, these conditions are not met. But Olin concedes that the prior insurance provision of Condition C does apply to the 1969–72 American Home policy, because the 1966–69 policy meets these two conditions. Olin therefore argues that the most it can recover from the two policies is $1 million, since Olin's recovery from the 1969–72 policy is reduced by the amount it recovers from the 1966–69 policy via the operation of the prior insurance provision.

26-11268-mg    Doc 23-4    Filed 06/24/26    Entered 06/24/26 13:13:49    Exhibit D    Pg 200 of 697

Olin Corp. V. American Home Assur. Co., 704 F.3d 89 (2012)

**[17]**   We agree with Olin that the prior insurance provision does not apply to prior insurance policies at a lower level of excess coverage. An excess insurance policy, such as the American Home policies here, is not triggered unless the coverage limits of lower-level policies have first been exhausted. Reducing American Home's liability on an excess policy at the $30.3 million level because of damages paid by a policy, for example, at the $20 million level would conflict with the terms of the higher-level excess policy, since the intent of purchasing insurance at the $30.3 million level is to be indemnified only when lower-level policies are unable to fully indemnify a particular loss and the total damages reach that higher-level policy's attachment point. American Home's $30.3 million excess policy insures against a different loss than an excess policy at the $20 million level: a loss in excess of $30.3 million. Thus we conclude that the prior insurance provision reduces American Home's liability only to the extent that a prior insurance policy at the same level of coverage, here $30.3 million, indemnifies for a loss that is also covered by an American Home policy. This accords with Condition C's apparent purpose of sweeping a continuing loss into the earliest triggered policy, with that policy then fully indemnifying the insured for that loss.[20] As a result, only one of the American Home policies here indemnifies Olin.

[20]   We acknowledge that courts typically do not enforce the similar "other insurance" provision in pro rata jurisdictions, because enforcing it gives insurers a "double credit": the pro rata methodology allocates only a portion of the total loss to each insurer, but enforcing an "other insurance" provision would then allow insurers to reduce their liability for their portion of the loss to the extent another insurer pays damages for that insurer's portion of the loss. *See, e.g., Spaulding Composites Co. v. Aetna Cas. & Sur. Co.,* 176 N.J. 25, 819 A.2d 410, 422 (2003); *Outboard Marine Corp. v. Liberty Mut. Ins. Co.,* 283 Ill.App.3d 630, 219 Ill.Dec. 62, 670 N.E.2d 740, 750 (1996). This rule is not applicable here, however, because the continuing coverage provision is expressly limited by the prior insurance provision. Thus, to the extent the continuing coverage provision expands an insurer's liability, it does so subject to the limitations of the prior insurance provision. We therefore cannot give effect to the continuing coverage provision while disregarding the prior insurance provision, but we instead must give effect to both parts of Condition C.

Based on this interpretation of the prior insurance provision, the most Olin can recover from the two American Home policies is the policy limit of one policy, $1  **\*105**  million. The record before the district court established that Olin did not have any insurance at the $30.3 million level until the 1966–69 policy. Because no prior policy exists from which Olin could recover damages in excess of $30.3 million, Olin's recovery from the 1966–69 policy cannot be reduced by its recovery under any other policy.[21] Since the 1966–69 policy is at the same $30.3 million level as the 1969–72 policy, though, any amount Olin recovers from the former reduces its recovery under the latter according to the terms of the prior insurance provision.

[21]   We need not address Olin's contention that the prior insurance provision applies only to a prior policy from the same insurer, as no previous policies issued by insurers other than American Home had attachment points at the same level as the American Home policies.

## V. Proceedings on Remand

For the reasons stated above, we conclude that the district court's basis for granting summary judgment was in error. Condition C obligates American Home to indemnify Olin not only for property damage occurring during the policy period, but also for property damage arising from covered occurrences that continues after the policy period. Three decades of perchlorate exposure and the damage it created are treated as a single, multi-year occurrence for the purposes of this policy. And because this single, multi-year occurrence took place in part during each of the two policy periods here, the district court was incorrect to conclude that neither policy would be reached because of the allocation method. On the record before the district court, $72.6 million in damage falls within the coverage of the 1966–69 policy, while $62.7 million falls within the coverage of the 1969–72 policy. These figures exceed the American Home policies' $30.3 million attachment points.

On remand, American Home may demonstrate that these attachment points cannot be reached for other reasons. For example, this estimate of the years in which property damage occurred may be inaccurate. Or the evidence may permit the court to assign greater damage to the years before the inception of the two policies. We decide only that issues of material fact remain regarding American Home's liability.

## CONCLUSION

For the foregoing reasons, we VACATE the district court's grant of summary judgment to the defendant and REMAND for further proceedings.

**All Citations**

704 F.3d 89

---

**End of Document**                                                    © 2022 Thomson Reuters. No claim to original U.S.
Government Works.

# Tab 60

614 B.R. 28
United States Bankruptcy Court, S.D. New York.

IN RE: OLINDA STAR LTD., (In Provisional
Liquidation), Debtor in a foreign proceeding.

Case No. 20-10712 (MG)
|
Signed April 3, 2020 New York, New York

**Synopsis**
**Background:** Chapter 15 debtor's purported foreign representative sought to be recognized as foreign representative, sought recognition of British Virgin Islands (BVI) provisional liquidation proceeding as debtor's foreign main proceeding, and sought to have full force and effect and comity granted to the BVI proceeding.

**Holdings:** The Bankruptcy Court, Martin Glenn, J., held that:

[1] debtor's center of its main interests (COMI) was the BVI;

[2] purported foreign representative qualified as debtor's foreign representative; and

[3] the foreign main proceedings in the BVI would be granted full force and effect and comity.

Motion granted.

West Headnotes (18)

**[1]    Bankruptcy**  🔑  Who May Be a Debtor
**Bankruptcy**  🔑  Cases Ancillary to Foreign Proceedings

Special purpose entity incorporated in the British Virgin Islands held property in the United States, and thus the entity qualified as a "debtor" for purpose of seeking Chapter 15 relief, where foreign debtor had a client trust account with a New York law firm with a balance of $1,000.67, notes at issue in entity's bankruptcy case, which were notes for which entity was

guarantor and grantor and which included proposed restructured notes, were governed by a New York law indenture, which contemplated New York as a venue for disputes. 11 U.S.C.A. §§ 109(a), 1501 et seq.

**[2]    Bankruptcy**  🔑  Cases Ancillary to Foreign Proceedings

Southern District of New York was proper venue for foreign debtor's chapter 15 bankruptcy case, where debtor's principal United States assets were a client trust account with a New York law firm and notes, for which entity was guarantor and grantor, that were governed by a New York law indenture, which contemplated New York as a venue for disputes. 28 U.S.C.A. § 1410(1).

**[3]    Bankruptcy**  🔑  Cases Ancillary to Foreign Proceedings

Every debtor has one and only one center of its main interests (COMI), as is relevant to determining if a foreign proceeding is a foreign main proceeding. 11 U.S.C.A. § 1502(4).

**[4]    Bankruptcy**  🔑  Cases Ancillary to Foreign Proceedings

Although a debtor's center of its main interests (COMI), as is relevant to determining if a foreign proceeding is a foreign main proceeding, is determined as of the time of the chapter 15 filing, without regard to a debtor's historical operational activity, to the extent that the debtor's COMI has shifted prior to filing its chapter 15 petition, courts may engage in a more holistic analysis to ensure that the debtor has not manipulated COMI in bad faith. 11 U.S.C.A. § 1502(4).

1 Case that cites this headnote

**[5]    Bankruptcy**  🔑  Cases Ancillary to Foreign Proceedings

There is a rebuttable presumption that a debtor's center of its main interests (COMI), as is relevant to determining if a foreign proceeding is a foreign main proceeding, is where the debtor

3747

has its registered office or habitual residence. 11 U.S.C.A. §§ 1502(4), 1516(c).

5 Cases that cite this headnote

**[6]    Bankruptcy** 👉 Cases Ancillary to Foreign Proceedings

While each of the factors that courts in the Southern District of New York use when determining a debtor's center of its main interests (COMI), i.e., (1) the location of the debtor's headquarters, (2) the location of those who actually manage the debtor, which, conceivably could be the headquarters of a holding company, (3) the location of the debtor's primary assets, (4) the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case, (5) and/or the jurisdiction whose law would apply to most disputes, is a helpful guide in determining a debtor's COMI, as is relevant to determining if a foreign proceeding is a foreign main proceeding, the factors are not exclusive, and none of the factors is required nor dispositive. 11 U.S.C.A. §§ 1502(4), 1516(c).

2 Cases that cite this headnote

**[7]    Bankruptcy** 👉 Cases Ancillary to Foreign Proceedings

Chapter 15 foreign debtor's center of its main interests (COMI) was the British Virgin Islands (BVI), and thus proceedings in the BVI were "foreign main proceedings"; debtor, although it was a special purpose vehicle that conducted its business primarily on the high seas, was incorporated in the BVI and maintained its registered office there, BVI-appointed joint provisional liquidators (JPLs) had been actively centralizing debtor's restructuring in the BVI for over a year, and creditors at issue overwhelmingly supported debtor's BVI restructuring. 11 U.S.C.A. §§ 1502(4), 1516(c).

**[8]    Bankruptcy** 👉 Cases Ancillary to Foreign Proceedings

When determining the location of those who actually manage the debtor, as is relevant to determining where a debtor's center of its main interests (COMI) is, as is in turn relevant to determining if a foreign proceeding is a foreign main proceeding, courts may consider more than the location of the board of directors of the debtor. 11 U.S.C.A. § 1502(4).

4 Cases that cite this headnote

**[9]    Bankruptcy** 👉 Cases Ancillary to Foreign Proceedings

Courts may consider the activities of liquidators and provisional liquidators in their analyses determining where a debtor's center of its main interests (COMI) is, as is relevant to determining if a foreign proceeding is a foreign main proceeding. 11 U.S.C.A. § 1502(4).

2 Cases that cite this headnote

**[10]    Bankruptcy** 👉 Cases Ancillary to Foreign Proceedings

Courts may consider the expectations of creditors and third parties in determining a debtor's center of its main interests (COMI), as is relevant to determining if a foreign proceeding is a foreign main proceeding. 11 U.S.C.A. § 1502(4).

6 Cases that cite this headnote

**[11]    Bankruptcy** 👉 Cases Ancillary to Foreign Proceedings

When determining where a debtor's center of its main interests (COMI) is, as is relevant to determining if a foreign proceeding is a foreign main proceeding, courts consider whether there is any objective evidence, e.g., offering memoranda and indentures, that could provide interested parties with notice that a debtor's COMI was in a particular jurisdiction other than the place of its registered office. 11 U.S.C.A. § 1502(4).

1 Case that cites this headnote

**[12]    Bankruptcy** 🔑 Cases Ancillary to Foreign
Proceedings

Chapter 15 foreign debtor's purported foreign
representative, who was one of debtor's joint
provisional liquidators (JPLs) in proceedings
in the British Virgin Islands (BVI), qualified
as debtor's foreign representative under the
Bankruptcy Code; representative was an officer
of the BVI court, and representative was
appointed and was duly authorized by the BVI
court to (1) administer the provisional liquidation
of debtor's assets and affairs, (2) implement
the BVI scheme in her capacity as JPL and
scheme administrator, and (3) serve as foreign
representative in debtor's chapter 15 case. 11
U.S.C.A. §§ 101(24), 101(41), 1504, 1515(a),
1517(a)(2).

2 Cases that cite this headnote

**[13]    Bankruptcy** 🔑 Cases Ancillary to Foreign
Proceedings

The discretion that is granted to a district court
upon recognition of a foreign proceeding is
exceedingly broad, since the court may grant any
appropriate relief that would further the purposes
of chapter 15 and protect the debtor's assets
and the interests of creditors, provided that the
interests of creditors and other interested entities
are sufficiently protected. 11 U.S.C.A. § 1521(a).

1 Case that cites this headnote

**[14]    Bankruptcy** 🔑 Cases Ancillary to Foreign
Proceedings

Assistance that a court may provide a debtor's
foreign representative may include recognition
and enforcement of a plan approved by a foreign
court. 11 U.S.C.A. §§ 1507, 1521.

1 Case that cites this headnote

**[15]    Bankruptcy** 🔑 Cases Ancillary to Foreign
Proceedings

Chapter 15 foreign debtor's foreign main
proceedings in the British Virgin Islands
(BVI) would be granted full force and effect

and comity; the United States and the BVI
shared common-law traditions and fundamental
principles of law, including an emphasis on
procedural fairness, creditors had a full and
fair opportunity to vote and be heard in
connection with the BVI scheme, consistent with
United States due process standards. U.S. Const.
Amend. 5; 11 U.S.C.A. §§ 1507, 1521.

**[16]    Bankruptcy** 🔑 Cases Ancillary to Foreign
Proceedings

Chapter 15 foreign debtor was entitled to a
permanent injunction against acts that would
interfere with its foreign main proceedings in the
British Virgin Islands (BVI); there was a threat of
irreparable harm without an injunction because
one or more persons or entities could take action
that was inconsistent with or in contravention of
the terms of the BVI scheme, including seeking
to enforce a notes guarantee against debtor in
New York, jeopardizing debtor's contracts and
resources. 11 U.S.C.A. § 1521.

**[17]    Bankruptcy** 🔑 Cases Ancillary to Foreign
Proceedings

Chapter 15 foreign debtor was entitled to an
order directing certain parties to carry out all
actions required by foreign main proceedings
in the British Virgin Islands (BVI); such relief
would give clear direction and authority under
United States law to the directed parties to carry
out the requirements of the BVI scheme and
would therefore benefit debtor and its estate. 11
U.S.C.A. § 1521(a).

**[18]    Bankruptcy** 🔑 Cases Ancillary to Foreign
Proceedings

Chapter 15 foreign debtor was entitled to an
order exculpating certain parties and its joint
provisional liquidators (JPLs) in foreign main
proceedings in the British Virgin Islands (BVI);
such relief was necessary and appropriate to
prevent interference with the consummation of
the BVI scheme and issuance of a new notes
guarantee because without such exculpations the

ability of the JPLs and their advisors to take action to effectuate the restructuring would be limited. 11 U.S.C.A. § 1521.

1 Case that cites this headnote

**Attorneys and Law Firms**

**\*31** WHITE & CASE LLP, Attorneys for Eleanor Fisher, as Petitioner and Foreign Representative, 1221 Avenue of the Americas, New York, NY 10020 By: John K. Cunningham, Esq., Thomas E. MacWright, Esq., Samuel P. Hershey, Esq.

200 South Biscayne Boulevard, Suite 4900, Miami, FL 33131, By: Richard S. Kebrdle, Esq.

111 South Wacker Drive, Chicago, IL 60606, By: Jason N. Zakia, Esq.

**MEMORANDUM OPINION GRANTING THE FOREIGN REPRESENTATIVE'S VERIFIED PETITION OF OLINDA STAR LTD FOR RECOGNITION OF BVI PROCEEDING AND MOTION REQUESTING ADDITIONAL RELIEF**

MARTIN GLENN, United States Bankruptcy Judge

Pending before the Court is the Verified Petition of Eleanor Fisher (the "Petitioner" or "Foreign Representative"), in her capacity as the duly-authorized foreign representative of Olinda Star Ltd.'s ("Olinda" or "Debtor") provisional liquidation proceeding (the "BVI Proceeding") pending in the BVI Commercial Court (the "BVI Court"), seeking entry of an order:

(i) granting recognition of the BVI Proceeding pursuant to section 1517 of title 11 of the United States Code (the "Bankruptcy Code") as the "foreign main proceeding" of the Debtor, **\*32** and all relief included therewith as provided in section 1520 of the Bankruptcy Code;

(ii) recognizing the Petitioner as the "foreign representative" of the BVI Proceeding;

(iii) granting full force and effect and comity to the BVI Scheme (as defined below) and additional relief set forth pursuant to section 1521(a) or 1507(a) of the Bankruptcy Code; and

(iv) granting such other and further relief as the Court deems just and proper.

("Verified Petition," ECF Doc. # 2 at 8; "Proposed Order," ECF Doc. # 2, Ex. A.) In the alternative, the Foreign Representative requests that the Court recognize the BVI Proceeding as a foreign nonmain proceeding of the Debtor, and grant the discretionary relief requested pursuant to sections 1521(a), 1507(a) and 105(a) of the Bankruptcy Code. (Verified Petition at 8 n.4; Proposed Order.)

The Verified Petition is supported by the Declaration of Grant Carroll Pursuant to 28 U.S.C. § 1746 ("Carroll Declaration," ECF Doc. # 3) and the *Omnibus Motion of the Foreign Representative for Entry of an Order (I) Approving the Withdrawal by the Foreign Representative of the Verified Petition for Recognition of the Brazilian RJ Proceeding as to Olinda Star Ltd. (In Provisional Liquidation) and Dismissal of its Chapter 15 Case, and (II) Granting the Foreign Representative's Renewed Request for Recognition of the Brazilian RJ Proceeding as to Arazi S.a.r.l. Pursuant to 11 U.S.C. §§ 1515, 1517, and 1520 and Giving Full Force and Effect to the Brazilian Reorganization Plan as to Arazi S.a.r.l. Pursuant to 11 U.S.C. §§ 105(a), 1507(a), 1145, 1521(a) and 1525(a)* (the "Omnibus Motion," Case No. 18-13952 (MG), ECF Doc. # 197) pending before this Court in the related chapter 15 proceeding, *Serviços de Petróleo Constellation S.A., et al.*, Case No. 18-13952 (MG) (the "First Chapter 15 Proceeding").

The Court assumes familiarity with the facts in this case and refers to its previous opinion in the First Chapter 15 Proceeding, *In re Serviços de Petróleo Constellation S.A., et al.*, 600 B.R. 237 (Bankr. S.D.N.Y. 2019) [hereinafter "*SPC Opinion*"], recounting the circumstances leading to Olinda's restructuring in the BVI and the pending Verified Petition. The foreign representative in the First Chapter 15 Proceeding, Andrew Childe, sought this Court's recognition of the joint judicial reorganization (*recuperação judicial* or "RJ") of certain entities within the Constellation group of companies (the "Constellation Group")[1] in the jointly administered judicial organization proceeding (the "Brazilian RJ Proceeding") pending in the 1st Business Court of Rio de Janeiro (the "Brazilian RJ Court"). *SPC Opinion* at 243–44. On the same day that Olinda and certain of its affiliates filed as debtors in the Brazilian RJ Proceeding and the First Chapter 15 Proceeding, Olinda commenced the BVI Proceeding pending in the BVI Court. (Verified Petition at 9.)

In June 2019, the Brazilian Court of Appeals upheld a decision to remove Olinda from the Brazilian RJ Proceeding for **\*33** lack of jurisdiction. (Verified Petition at 10; *SPC Opinion* at 264.) In the *SPC Opinion*, this Court granted recognition as a foreign nonmain proceeding to Parent/Constellation and granted recognition as a foreign main proceeding for Petróleo Constellation, Constellation Overseas, Alpha Star, Gold Star, Lone Star, Star International, and Snover. *SPC Opinion* at 246. In light of Olinda's exclusion from the Brazilian RJ Proceeding, however, this Court found that because "[t]he Brazilian Court of Appeals determined that Olinda Star should be removed from the Brazilian RJ Proceeding ... discussion of this Chapter 15 Debtor's possible recognition is unnecessary." *Id.* at 264.

After this Court declined to grant recognition to Olinda in the First Chapter 15 Proceeding, Olinda's restructuring changed course. (Verified Petition at 10.) On August 5, 2019, Olinda, the joint provisional liquidators ("JPLs"), certain consenting 2024 Noteholders (as defined below) and other parties to the Constellation Group's plan support agreement (the "PSA Parties") dated June 28, 2019 entered into a term sheet (the "Olinda Term Sheet") governing a parallel restructuring of Olinda's guarantee obligations in the BVI. (*Id.*) The Olinda Term Sheet permitted the transactions contemplated by the RJ Plan to close without a restructuring of Olinda, provided that Olinda's guarantee obligations were modified under BVI law in the BVI Proceeding. (*Id.*)

As of December 18, 2019, the Constellation Group's approximately $1.5 billion of prepetition debt has been substantially restructured pursuant to the RJ Plan. (*Id.*) On February 25, 2020, following a meeting of Olinda's scheme creditors (the "Scheme Meeting"), and upon notice and a hearing, the BVI Court approved Olinda's BVI law scheme of arrangement (the "BVI Scheme") pursuant to the BVI Business Companies Act, 2004, restructuring the existing guarantee granted by Olinda (the "Prior 2024 Notes Guarantee") in favor of holders (the "2024 Noteholders") of certain 9.00% Cash /0.500% PIK senior secured notes due 2024 (the "Prior 2024 Notes") and allowing Olinda to accede as a guarantor of restructured 2024 Notes (the "Restructured 2024 Notes") as contemplated under the RJ Plan. (Verified Petition 10–11.)

As set forth in the Verified Petition, aside from the relief requested in the Omnibus Motion (which includes dismissal of Olinda in the First Chapter 15 Proceeding), only one step remains in consummating the Constellation Group's global restructuring—granting comity to the Prior 2024 Notes Guarantee, which is governed by New York law. (*Id.* at 11.)

For the reasons set forth below, the Court **GRANTS** the relief sought in the Foreign Representative's Verified Petition in this Memorandum Opinion. The Court will issue a separate memorandum opinion and order addressing the relief requested by the foreign representative in the Omnibus Motion pending in the First Chapter 15 Proceeding, and approving (1) withdrawal by the foreign representative of the Verified Petition for recognition of the Brazilian RJ Proceeding as to Olinda and dismissal of Olinda's chapter 15 case and (2) granting the foreign representative's renewed request for recognition of the Brazilian RJ Proceeding and recognizing and enforcing the RJ Plan with respect to Arazi S.à.r.l.

## I. BACKGROUND

Having set forth the context for the Pending Verified Petition, this Court discusses facts relevant for this Court's decision to grant the relief requested.

### \*34  A. Location of Olinda's Registered Office and Records

On September 7, 2006, Olinda was incorporated in the BVI and registered as a Business Company under the laws of the BVI. (Verified Petition ¶ 1; Carroll Declaration, ¶ 12 n.1, Ex. A.) Olinda maintains its registered office at Tortola Pier Park, Building 1, Second Floor, Wickhams Cay 1, Road Town, Tortola VG1110 in the BVI. (Verified Petition ¶ 1; Carroll Declaration, ¶ 12 n.3, Ex. A.) Olinda's statutory books and records are held in Panama, together with the statutory books and records of certain Constellation Group entities. (Carroll Declaration, ¶ 12 n.3.) Olinda's membership interests are also located in the BVI. (Verified Petition ¶ 1.)

### B. Location of Olinda's Assets and Operations

Olinda is a special purpose vehicle that conducts its business principally on the high seas. (*Id.* ¶ 2.) Its primary asset, the *Olinda Star* drilling rig, is presently completing a contract for a large international oil and gas company in the Indian Ocean. (*Id.*) Olinda also has a client trust account at White & Case LLP, in New York, with a balance of $1,000.67. (*Id.*)

### C. Olinda's Capital Structure and Location of its Creditors

Olinda is a guarantor and grantor of 2024 Notes, issued by its indirect parent company, Constellation Oil Services Holding S.A. ("Constellation Parent"). (*Id.* ¶ 3.) As of February 6, 2020, the Foreign Representative came to understand that an aggregate principal amount of $608,455,375 was outstanding under the then-existing 2024 Notes (the "Prior 2024 Notes") pursuant to a New York law-governed indenture (the "Prior 2024 Notes Indenture"). (*Id.*) The Prior 2024 Notes were restructured pursuant to the Brazilian RJ Plan, but the Prior 2024 Notes Guarantee remains in place until the BVI Scheme is consummated. (*Id.*) Petitioner represents that the indenture trustee of the Restructured 2024 Notes is located in New York and, upon information and belief, the participants comprise investment funds and individuals incorporated in various jurisdictions around the world. (*Id.*)

To secure the Prior 2024 Notes, Olinda granted security over certain collateral, including a mortgage over its drilling rig, the *Olinda Star.* (*Id.* ¶ 4.) Olinda also granted an assignment of insurance policies and pledges on related accounts. (*Id.*) Certain Olinda affiliates were also guarantors and grantors in respect of the Prior 2024 Notes and are now guarantors and grantors in respect of the 2024 Restructured Notes. (*Id.*)

### D. Olinda's Management and Joint Provisional Liquidation in the BVI

Olinda's operational management team is based in Brazil, its treasury function is located in Panama, and its sole director resides in the Cayman Islands. (*Id.* ¶ 5.) For more than a year, however, the BVI court-appointed JPLs have actively overseen and implemented its restructuring in the BVI. (*Id.*)

With respect to Olinda's restructuring in the BVI, there is no process or procedure in place under BVI law equivalent to chapter 11 of the Bankruptcy Code. (*Id.* ¶ 7.) The BVI has a common-law system. (*Id.* ¶ 6.) In the BVI, a company that requires protection of a stay order to present a compromise or arrangement to its creditors must seek the appointment of a provisional liquidator. (*Id.* ¶ 7.) Provisional liquidators are officers of the BVI Court and occupy a fiduciary position with respect to the company's assets and creditors. (*Id.*) The provisional liquidators represent the **\*35** collective interests of the creditors of the company and protect its assets from undue dissipation. (*Id.*)

Provisional liquidation is a BVI Court-originated and supervised process. (*Id.* ¶ 9.) The process begins when Debtors file an application with the BVI Court. (*Id.*) After an initial six-month period, an application must be made to the BVI Court every three months thereafter to extend the life of the "originating application" commencing the BVI Proceeding. (*Id.*) The BVI Court also requires that the provisional liquidators submit reports on the status of the proceeding every 60 days. (*Id.*) Provisional liquidators must get express court approval for certain action outside the scope of their appointment order, including the power to make a compromise or arrangement with creditors. (*Id.*)

Olinda has engaged in a "soft-touch" provisional liquidation, with a view to implementing the successful reorganization of Olinda. (*Id.* ¶ 12.) In a "soft-touch" BVI provisional liquidation the directors typically retain day-to-day control of the company, but the provisional liquidators are kept apprised of the actions taken by directors in the ordinary course of business. (*Id.* ¶ 8.) However, corporate authority to pursue a course of action that is outside the ordinary course of business (such as proposing entry into a scheme of arrangement to creditors) rests with the provisional liquidators. (*Id.*)

Under BVI law, at least one JPL of a company must be a BVI resident and hold a BVI insolvency practitioner's license. (Carroll Declaration ¶ 18.) However, a foreign insolvency practitioner meeting the requirements of the BVI Financial Services Commission may be appointed to a company jointly with one or more qualified insolvency practitioners who are resident in the BVI. (*Id.*) On December 7, 2018, Olinda filed an application for the appointment of JPLs. (*Id.* ¶ 19.) Following a hearing on December 13, 2018, the BVI Court issued an order appointing the Petitioner and Paul Pretlove, a qualified insolvency practitioner, as JPLs. (*Id.*, Ex. B.) Mr. Pretlove resides in the BVI and the Petitioner resides in the Cayman Islands. (Verified Petition ¶ 11.) They are both officers of the BVI Court and their authority to act on Olinda's behalf derives from the BVI's Court orders. (*Id.*) Due to the Insolvency Act's residency requirements, the Foreign Representative's ability to serve as a provisional liquidator of Olinda is contingent on the ongoing appointment of BVI-resident provisional liquidator, Mr. Pretlove, with whom she exercises joint and several authority, and is in regular contact. (*Id.*)

The core powers conferred on the JPLs by the BVI Court are to oversee the exercise of power of the sole director outside the ordinary course of business, and ultimately implement

the restructuring. (*Id.*) More specifically, the JPLs have the authority to do all acts and execute, in the name of and on behalf of Olinda, all deeds, receipts and other documents, and for those purposes, use the company seal of Olinda when necessary. (Carroll Declaration ¶ 22.) The BVI Court also requires the sole director to include the JPLs in his decision-making process and to meet with the JPLs on at least a weekly basis. (*Id.*)

The JPLs have conducted the BVI Proceeding pursuant to a BVI Court-approved Insolvency Protocol. (Verified Petition ¶ 14.) The Insolvency Protocol ensures the just, efficient, orderly and expeditious administration of the provisional liquidation. (*Id.*) It also facilitates communication between management and the JPLs to ensure that the JPLs receive adequate information to discharge their duties. (*Id.*) Pursuant to the BVI Insolvency Protocol, Olinda's sole director, **\*36** management, and advisors provide regular information and updates to the JPLs and provide the JPLs with such information as is reasonably requested by the JPLs. (*Id.*) The JPLs are also entitled to receive and comment on drafts of written resolutions of Olinda, and to be included in any board meetings. (*Id.*) Since the JPLs were appointed in December 2018, they have actively exercised the authority conferred on them by the BVI Court. (*Id.* ¶ 15.)

On December 20, 2019, the BVI Court authorized Petitioner to act as foreign representative for proceedings commenced under chapter 15 of the Bankruptcy Code in the United States or elsewhere under local laws. (Verified Petition ¶ 13.)

### E. Exclusion of Olinda from the RJ Proceeding and Corresponding Shift to BVI-Centered Restructuring

The JPLs supported Olinda's attempts to restructure through the Brazilian RJ Proceedings and a finding of COMI for Olinda in Brazil. (*Id.* ¶ 16.) After the Brazilian Court of Appeals decided to exclude Olinda from the Brazilian RJ Proceeding, the JPLs decided to restructure Olinda's Prior 2024 Notes Guarantee under a BVI plan or scheme of arrangement. (*Id.*) Brazilian counsel retained by Constellation Group advised Olinda to do the same. (*Id.*)

To efficiently restructure Olinda, the JPLs participated in negotiations with PSA Parties and their advisors to facilitate Olinda's restructuring in the BVI. (*Id.* ¶ 17.) The JPLs considered, reviewed, and commented on the Olinda Term Sheet and BVI Scheme, and authorized Olinda to enter into the Olinda Term Sheet and put forward the BVI Scheme to its creditors. (*Id.*)

The Petitioner engaged with creditors in respect to the BVI Scheme, including by serving as a point of contact in the BVI for questions and overseeing the dissemination of scheme materials. (*Id.*) The Petitioner also caused Olinda to request the convening of the Scheme Meeting, chaired that meeting, and caused Olinda to seek approval of the BVI Scheme from the BVI Court. (*Id.*) These steps were not contemplated at the time of the JPL's initial appointment in December 2018, but were rather undertaken in connection with the shift to restructuring Olinda through a BVI-centered process. (*Id.*) Accordingly, the JPLs now support the restructuring of Olinda's Prior 2024 Notes Guarantee through the BVI Scheme, and further support a finding of COMI in BVI. (*Id.*)

### F. Expectations of Olinda's Creditors and Their Support for the BVI Proceeding and BVI Scheme

The Verified Petition states that exchange offering documentation made clear that several entities within Constellation Group were incorporated in and subject to the laws of the BVI. (*Id.* ¶ 18.) Additionally, noteholders could have reasonably foreseen BVI proceedings affecting the Constellation Group's BVI-incorporated debtors. (*Id.* (citing *SPC Opinion* at 284).) After Olinda was excluded from the Brazilian RJ Proceeding, the ad hoc group of 2024 Noteholders that had entered into the plan support agreement (the "Consenting 2024 Noteholders"), along with the other PSA Parties conferred with Olinda and its affiliates about how best to restructure the 2024 Notes Guarantee in the BVI. (*Id.*)

On August 5, 2019, Olinda and certain PSA Parties, including 2024 Noteholders, entered into the Olinda Term Sheet, which provided for the restructuring of Olinda in the BVI. (*Id.* ¶ 19.) An offering memorandum **\*37** issued on July 17, 2019 in connection with a rights offering for certain of the Restructured 2024 Notes (the "Rights Offering Memorandum," ECF Doc. # 2-3) confirmed that Olinda was subject to provisional liquidation in the BVI and intended to restructure its guarantee in the BVI. (Verified Petition ¶ 1; Rights Offering Memorandum at 5, 103 ("Olinda Star intends to restructure its indebtedness in a way that mirrors the RJ Proceedings (to the extent possible) by way of a restructuring process that is permissible under BVI law. Olinda Star remains in provisional liquidation and the joint provisional liquidators appointed on December 19, 2018 by the BVI court remain in place.").) Additionally, New Indentures (ECF Doc. # 2-4) expressly include insolvency laws of the BVI in the definitions of bankruptcy laws. (Verified Petition ¶ 19.)

Since mid-2019, the PSA Parties have been in regular contact with the JPLs and their advisors regarding implementing the Olinda Term Sheet. (*Id.* ¶ 20.) The JPLs have prepared for the meeting of Olinda's scheme creditors and responded to queries from those creditors in the months leading to the meeting. (*Id.*) The Petitioner also served as a point of contact for creditor inquiries and chaired the Scheme Meeting. (*Id.*)

### G. Overview of the Process by Which the BVI Scheme Was Approved by Creditors and Sanctioned by the BVI Court

BVI joint provisional liquidation proceedings are fair, equitable, and collective. (Carroll Declaration ¶ 28.) They operate to preserve value for all creditors and stakeholders. (*Id.*) Moreover, in BVI joint provisional liquidation proceedings, all creditors receive ample notice and opportunity to be heard by the BVI Court. (*Id.* ¶ 30.)

Approval of a BVI scheme of arrangement commences when the debtor company, through its directors, passes a resolution to enter into a scheme of arrangement with its creditors. (Verified Petition ¶ 23.) Where a company is in provisional liquidation, as here, the resolution requires the prior approval of provisional liquidators. (*Id.*) In deciding whether to allow a scheme to proceed, the provisional liquidators consider whether the scheme secures a better return for the company's creditors than they would otherwise receive in a liquidation. (*Id.*) If satisfied, the provisional liquidators will authorize the company to begin the process of approving and implementing the scheme, subject to the provisional liquidators' oversight and ultimate control. (*Id.*)

On December 13, 2019, the JPLs, having concluded that entry into the BVI Scheme was in the interests of Olinda's creditors, authorized Olinda's sole director to pass the resolution necessary to commence the approval process for the BVI Scheme, and counter-signed that resolution. (*Id.* ¶ 24.) On that same date, Olinda, with authorization from the JPLs, applied to the BVI Court and requested that a Scheme Meeting be convened. (*Id.* ¶ 25.) On December 20, 2019, the BVI Court issued an order (the "Convening Order," ECF Doc. # 2-5) scheduling the Scheme Meeting for January 14, 2020. (Verified Petition ¶ 25.) The Convening Order also provided that creditors must receive copies of the notice convening the Scheme Meeting and the BVI Scheme at least 14 days before the Scheme Meeting. (*Id.*)

Pursuant to the Convening Order, advertisements of the Scheme Meeting were posted on Constellation Group's website and distributed to Olinda's scheme creditors. (*Id.* ¶ 26.) The Petitioner was appointed as chair at the Scheme Meeting, thereby extending the scope of the Petitioner's **\*38** fiduciary duties to include oversight of the implementation of the BVI Scheme. (*Id.* ¶ 27.) On January 14, 2020, the Petitioner convened the Scheme Meeting and exercised her authority to adjourn the Scheme Meeting until February 6, 2020. (*Id.* ¶ 28.) The Petitioner ensured that notice of the adjournment, along with any documents to be considered at the adjourned Scheme Meeting, were made available through the Depository Trust Company and Constellation Group's public website. (*Id.*) Creditors were informed that all voting and proxy forms that had already been provided would be retained and accepted at the adjourned Scheme Meeting, unless the JPLs were informed otherwise. (*Id.*)

For a scheme to be approved by the BVI Court, it must be approved by a majority in number representing 75% in value of the creditors or class of creditors or members or class of members present and voting either in person or by proxy at the meeting. (*Id.* ¶ 29.) On February 6, 2020, the Scheme Meeting was reconvened and 100% of the scheme creditors present or voting by proxy voted to approve the Scheme, representing 82.99% by value of the total debt subject to the BVI Scheme. (*Id.*)

Once the BVI Scheme was approved by creditors, the Petitioner sought BVI Court sanction of the BVI Scheme (the "Sanction Hearing"). (*Id.* ¶ 30.) On February 6, 2020, the Petitioner caused a notice of the Sanction Hearing to be served on all scheme creditors via the Depository Trust Company, notifying them that: (1) the BVI Scheme had been approved by the scheme creditors, (2) the Sanction Hearing would be held on February 25, 2020, and (3) "any interested party may appear at the Sanction Hearing." (*Id.*) Notice of the Sanction Hearing was also posted on Constellation Group's public website. (*Id.*)

At the Sanction Hearing, the BVI Court's role is not to assess the commercial benefits of the scheme. Nor, however, is BVI Court approval of a scheme of arrangement a "rubber stamp" exercise. (*Id.* ¶ 31.) Rather, at the Sanction Hearing, the applicant must demonstrate (usually through an affidavit of the Scheme Administrator) that (i) the relevant statutory requirements have been met; (ii) the classes of creditors were properly identified; (iii) each class was fairly represented by those attending the Scheme Meeting and the statutory majority was acting in the bona fide interests of the class; and (iv) it would be reasonable to approve the scheme. (*Id.*)

3754

On February 25, 2020, the BVI Court held the Sanction Hearing. (*Id.* ¶ 32.) No scheme creditor or any party objected to the issuance of the Sanction Order. (*Id.*) Once the BVI Court sanctions a scheme of arrangement, the Scheme Administrator may then ensure that it is filed with the BVI Registrar. (*Id.* ¶ 33.) A scheme will become effective upon such filing. (*Id.*)

### H. The Objectives of Olinda's BVI Scheme

The purpose of Olinda's BVI Scheme is to restructure Olinda's guarantee obligations "so that they mirror the debtor restructuring of the RJ Debtors in the RJ Plan in an efficient and timely manner in order to secure a better return for [Olinda's] creditors than they would otherwise receive in a liquidation." (*Id.* ¶ 34 (citing Carroll Declaration, Ex. J).) Olinda is a guarantor and grantor pursuant to the Prior 2024 Notes Guarantee. (*Id.* ¶ 34.) Olinda's value derives from its long-term contract with a large Indian oil and gas company, not from the scrap value of the *Olinda Star* rig. Accordingly, it is unlikely that Olinda's creditors (the holders of the Prior 2024 Notes) would recover more in a liquidation wherein the contract would be **\*39** terminated and the rig sold, than through a restructuring of Olinda's debts. (*Id.*) Through a successful restructuring of Olinda, the rig will continue to operate and generate revenue, not only for the life of the existing contract but through subsequent contracts as well. (*Id.*) Furthermore, a failure to restructure the Prior 2024 Notes Guarantee would result in Olinda incurring a financial penalty in the form of additional interest on the Restructured 2024 Notes, which would impose a financial burden on the Constellation Group. (*Id.*) It is therefore not surprising that all creditors that voted on the Scheme voted in favor of Olinda's restructuring.

In essence, the BVI Scheme seeks to accomplish the following key objectives:

- release Olinda from the Prior 2024 Notes Guarantee and terminate all other obligations under the Prior 2024 Notes Indenture and the Prior 2024 Notes;

- allow Olinda to accede to the Participating 2024 Notes Indenture, the Stub 2024 Notes Indenture and the Non-Participating Notes Indenture in accordance with the terms set out therein and become a guarantor under the Restructured 2024 Notes pursuant to the terms of the guarantee set forth in each of the foregoing indentures (the "New 2024 Notes Guarantee");

- release all of the security over the assets granted by Olinda and over the shares of Olinda in relation to the Prior 2024 Notes;

- allow Olinda to grant new security over the assets and shares of the company in accordance with the Restructured 2024 Notes; and

- allow Olinda to guarantee the obligations of affiliate Constellation Overseas Ltd. under working capital and letter of credit facilities provided by Banco Bradesco S.A., secured by the same collateral as the Restructured 2024 Notes in accordance with the priorities set forth therein and pursuant to an intercreditor agreement between, among others, Constellation Overseas Ltd. and the indenture trustee of the Restructured 2024 Notes.

(*Id.* ¶ 35.)

Following the implementation of the BVI Scheme and the granting of the New 2024 Notes Guarantee, the former holders of the Prior 2024 Notes (Olinda's sole financial creditor constituency) will have received new notes on substantially the same terms as the Prior 2024 Notes, but with certain modifications, including an enhanced collateral package for the Participating 2024 Noteholders, more restrictive covenants on the Constellation Group and an increased interest rate. (*Id.* ¶ 36.) None of Olinda's other creditors are impacted by the BVI Scheme. (*Id.*)

## II. DISCUSSION

### A. Olinda Satisfies Section 109(a) and Venue is Proper in this District

**[1]** Foreign debtors seeking relief under chapter 15 must satisfy the debtor eligibility requirements set forth in section 109(a) of the Bankruptcy Code. *See In re Ocean Rig UDW Inc.*, 570 B.R. 687, 698 (Bankr. S.D.N.Y. 2017) (citing *Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*, 737 F.3d 238, 247–51 (2d Cir. 2013)). Section 109(a) provides that "only a person that resides or has a domicile, a place of business, or property in the United States, or a municipality, may be a debtor" under the Bankruptcy Code. 11 U.S.C. § 109(a). Courts in this Circuit have held that section 109(a) can be satisfied by bank accounts in the United States, including by an undrawn retainer. *See, e.g.*, **\*40** *In re U.S. Steel Can. Inc.*, 571 B.R. 600, 610 (Bankr. S.D.N.Y. 2017) ("Some courts, including this one, have held that an

undrawn retainer in a United States bank account qualifies as property in satisfaction of section 109(a).").

[2]   This Court has previously held that a debtor's contract rights, including rights pursuant to debt that contains a New York governing law and forum selection clause, constitute intangible property of the debtor in New York for purposes of section 109(a). *See, e.g.*, *SPC Opinion* at 268–69 (finding that the debtor's New York law-governed prepetition debt obligations and a per-entity $1,000 retainer in New York bank accounts satisfied section 109(a) of the Bankruptcy Code and venue requirements of section 1410(1) of title 28 of the United States Code). Olinda has property in the United States. The Prior 2024 Notes and Restructured 2024 Notes are governed by a New York law indenture, which contemplates New York as a venue for disputes. (Verified Petition ¶ 37.) Olinda also owns a client trust account at White & Case LLP, in New York, with a balance of $1,000.67. (*Id.* ¶ 2.) Together, this property constitutes the principal U.S. assets of Olinda, in satisfaction of section 109(a). Additionally, because of the location of these accounts, venue is proper pursuant to section 1410(1) of title 28 of the United States Code.

**B.  Olinda Satisfies the Recognition Requirements Contained in Section 1517**

Section 1517(a) provides the remaining requirements for the recognition of a foreign proceeding under chapter 15. *In re Ocean Rig UDW Inc.*, 570 B.R. at 698. To grant recognition, the Court must first find that the BVI Proceeding constitutes either a main or nonmain proceeding with respect to Olinda. *See SPC Opinion* at 270; *see also In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 126–27 (Bankr. S.D.N.Y. 2007), *aff'd*, 389 B.R. 325 (S.D.N.Y. 2008) ("[T]he recognition must be coded as either main or nonmain."). Pursuant to section 1517, the Court must also find that the foreign representative applying for recognition is a person or body and the petition meets the requirements of section 1515. 11 U.S.C. § 1517(a); *see also SPC Opinion* at 269; *In re Ocean Rig UDW Inc.*, 570 B.R. at 698–99. Therefore, recognition of the foreign proceeding is statutorily mandated if the three requirements of section 1517(a) are met and no exception applies. *See In re Millard*, 501 B.R. 644, 651 (Bankr. S.D.N.Y. 2013).

For the reasons discussed below, the Court finds that the Foreign Representative satisfies each of the requirements of section 1517(a) and grants recognition to the BVI Proceeding as a foreign main proceeding.

*1. The BVI Proceeding Is A Foreign Main Proceeding*

Courts determine if a proceeding is main or nonmain using section 1502's definitions of each term. Section 1502 defines a "foreign main proceeding" as a "foreign proceeding pending in the country where the debtor has the center of its main interests." 11 U.S.C. § 1502(4). A foreign nonmain proceeding is defined as a "foreign proceeding, other than a foreign main proceeding, pending in a country where the debtor has an *establishment*." *Id.* § 1502(5) (emphasis added). Establishment is defined in chapter 15 as "any place of operations where the debtor carries out a nontransitory economic activity." *Id.* § 1502(2).

[3]   [4]   While the statute provides that a foreign main proceeding is one where the debtor has its COMI, the statute does not further define the term COMI. *See generally id.* §§ 1501–1532. "[E]very debtor has **\*41** one and only one COMI." *SPC Opinion* at 276. The Second Circuit has made clear that COMI is determined as of the time of the chapter 15 filing, without regard to a debtor's historical operational activity. *See Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 137 (2d Cir. 2013) (*Fairfield Sentry II*) ("[A] debtor's COMI should be determined based on its activities at or around the time the Chapter 15 petition is filed.") "However, ... to the extent that a debtor's COMI has shifted prior to filing its chapter 15 petition, courts may engage in a more holistic analysis to ensure that the debtor has not manipulated COMI in bad faith." *In re Ocean Rig UDW Inc.*, 570 B.R. at 704.[2]

[5]   There is a rebuttable presumption that COMI is where the debtor has its "registered office" or "habitual residence." *Id.* at 705; *see also* 11 U.S.C. § 1516(c) ("In the absence of evidence to the contrary, the debtor's registered office ... is presumed to be the center of the debtor's main interests."). Courts have found that a debtor's registered jurisdiction is its COMI where no objection was raised or evidence presented rebutting the section 1516 presumption. *In re ABC Learning Centres Ltd.*, 445 B.R. 318, 333 (Bankr. D. Del. 2010), *aff'd*, 728 F.3d 301 (3d Cir. 2013).

[6]   Courts in this district have developed a list of non-exclusive factors that may be considered when determining COMI:

[1] the location of the debtor's headquarters; [2] the location of those who actually manage the debtor (which,

3756

conceivably could be the headquarters of a holding company); [3] the location of the debtor's primary assets; [4] the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; [5] and/or the jurisdiction whose law would apply to most disputes. *SPC Opinion* at 273 (quoting *In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006)). "While each of these factors is a 'helpful guide' in determining a debtor's COMI, the factors are not exclusive, and none of the factors is required nor dispositive." *In re Ocean Rig UDW Inc.*, 570 B.R. at 703.

 **[7]**   Based upon the Court's findings of fact related to Olinda and the most relevant COMI factors discussed below, the Court finds that, as of the Petition Date, Olinda's COMI was located in BVI as a matter of law.

*a. Olinda's Registered Office and Place of Incorporation is BVI*

The Court finds that Olinda was incorporated in the BVI on September 7, 2006, maintains its registered office in the BVI, and its membership interests are located in the BVI. (Verified Petition ¶ 1.) Here, no objection was raised and no evidence presented rebutting the presumption that Olinda's registered office is its COMI. Thus, the COMI presumption holds with respect to Olinda. *See SPC Opinion* at 293.

*b. The Location of Those Who Actually Manage Olinda Is BVI*

Nevertheless, the Court considers other factors supporting the conclusion that  **\*42**  Olinda's COMI is BVI. With respect to the second factor, while Olinda's operational management team is based in Brazil, its treasury function is based in Panama, and its sole director, Michael Pearson, resides in the Cayman Islands, BVI-appointed JPLs have actively centralized Olinda's restructuring in the BVI for over a year. (Verified Petition ¶ 5.)

 **[8]     [9]**   This Court finds persuasive Petitioner's argument that when determining the "location of those who actually manage the debtor," courts may consider more than the location of the board of directors of the debtor. (Verified Petition ¶ 53 (citing *SPC Opinion* at 273 (holding that the analysis of the location of management should be "flexible" and reflect the realities of a particular business)).) Courts may consider the activities of liquidators and provisional

liquidators in their analyses. *See In re Ocean Rig UDW Inc.*, 570 B.R. at 706 (finding debtors' COMI in the Cayman Islands to be "the site where their business [had been] run" by JPLs pursuant to a protocol with the directors); *In re Fairfield Sentry Ltd.*, 10 Civ. 7311 (GBD), 2011 WL 4357421, at \*5, 2011 LEXIS 105770, at \*20 (Sept. 16, 2011) (*Fairfield Sentry I*) (finding COMI in the BVI where BVI liquidators had been "directing and coordinating" the debtor's affairs since their appointment); *In re Betcorp Ltd.*, 400 B.R. 266, 292 (Bankr. D. Nev. 2009) (finding COMI in Australia where "[t]he location of those that manage Betcorp—the liquidators" were located); *In re Suntech Power Holdings Co., Ltd.*, 520 B.R. 399, 418 (Bankr. S.D.N.Y. 2014) (finding COMI in the Cayman Islands where joint provisional liquidators had "centralized the administration of the Debtor's affairs and its restructuring in the Cayman Islands"). Thus, JPLs have a "profound effect on the business of the debtor" because the debtor's traditional business may depend on the restructuring process. *See Suntech*, 520 B.R. at 417.

For over a year, Olinda has been in provisional liquidation and under the supervision of the BVI Court and its Court-appointed provisional liquidators, the Petitioner and Mr. Paul Pretlove. (Verified Petition ¶ 10.) The JPLs have been conducting the provisional liquidation of Olinda in a "soft touch" manner, with a view to implementing a successful reorganization of Olinda. (*Id.* ¶ 12.) They oversee the exercise of power of the sole director outside the ordinary course of business, and ultimately implement the restructuring. (*Id.*) Pursuant to BVI Court orders, the JPLs: (1) keep apprised of Olinda's general operations, (2) retain BVI counsel with whom they regularly seek advice, (3) reviewed and commented on Olinda's draft board resolutions, court filings and other documents concerning Olinda's restructuring, and (4) supported various BVI Court applications. (*Id.* ¶ 55.)

This Court finds that the JPLs also played a pivotal role in overseeing non-ordinary course transactions in connection with Olinda's BVI restructuring. They took steps necessary to ensure that the BVI Scheme was in the best interests of creditors and caused the BVI Scheme to be put forward to creditors and the BVI Court for approval. (*Id.* ¶ 56.) The JPLs oversaw the dissemination of notices and documents to scheme creditors and extensively engaged with creditors, responding to their questions and requests for information. (*Id.*) The Petitioner is also responsible, in her role as JPL and Scheme Administrator, with implementing the BVI Scheme. (*Id.*)[3]  **\*43**  Mr. Pretlove has been involved in strategy discussions in respect of Olinda's provisional liquidation

and has reviewed and commented on the JPLs' reports and filings with the BVI Court. (*Id.*) The efforts of the JPLs in Olinda's restructuring process in the BVI supports a finding that Olinda's COMI is in the BVI.

### c. The Location of Olinda's Primary Assets

The third factor, location of Olinda's assets and operations, is less clear because Olinda is a special purpose vehicle that conducts its business principally on the high seas. (*Id.* ¶ 2.) Olinda's primary asset, the *Olinda Star* drilling rig, is presently completing a contract for a large international oil and gas company in the Indian Ocean.

Despite its status as a special purpose vehicle, the Court can look to evidence that Olinda's business is run from the BVI by JPLs. *In re Ocean Rig UDW Inc.* is instructive in this regard. There, this Court found that although the nature of debtors' business and the mobility of their assets complicated the COMI analysis, the debtors "have engaged in various activities supporting their COMI in the Cayman Islands for almost a year." *In re Ocean Rig UDW Inc.*, 570 B.R. at 704. For example, debtors incorporated in the Cayman Islands, hosted meetings with creditors and advisors relating to their restructuring in the Cayman Islands, and provided public notice and general recognition of relocation through UDW's Form 6–K report with the SEC, press releases and media reports. *See id.* In *In re Ocean Rig UDW Inc.*, the debtor was engaged in a "soft touch" provisional liquidation where the majority of the board of directors resided outside of the Cayman Islands, as is the case here since Michael Pearson, Olinda's sole director, resides in the Cayman Islands.[4]

As set forth above, Olinda has been incorporated in the BVI since 2006 and the JPLs hosted meetings with creditors relating to Olinda's restructuring in the BVI. Olinda's sole director and the JPLs have managed the affairs of Olinda pursuant to the BVI Insolvency Protocol, which was approved by the BVI Court in the BVI Proceeding and is substantially similar to the protocol entered in *In re Ocean Rig UDW Inc*. Because Olinda's "business is generally conducted outside of any jurisdiction in which it was managed," the BVI is the "site of [Olinda's] 'main interests'—it is the site where their business is run." *Id.* at 706.

### d. The Location of the Majority of Olinda's Creditors or of a Majority of Creditors Who Would Be Affected by the Case Is Indeterminate

With respect to the fourth factor, Olinda is a guarantor and grantor of the 2024 Notes. (Verified Petition ¶ 3.) The indenture trustees of the 2024 Notes are located in New York and there is no evidence in the record regarding the location of the beneficial holders of the 2019 Notes and 2024 Notes. (*Id.*) This factor is neutral for purposes of the COMI analysis.

### e. The Jurisdiction Whose Law Would Apply to Most Disputes

By virtue of being incorporated in the BVI, Olinda is subject to the BVI's laws, regulations and jurisdiction, including with **\*44** respect to corporate disputes. *See SPC Opinion* at 287. However, because of Olinda's operations on the high seas, it may be subject to other regulatory regimes. Nevertheless, this factor weighs in favor of a COMI in the BVI.

### f. The Reasonable Expectation of Third Parties and Creditors

 [10]    [11]    Additionally, the Court may also consider the expectations of creditors and third parties in determining COMI. *See SPC Opinion* at 262; *Fairfield Sentry II*, 714 F.3d at 130 ("The relevant principle ... is that the COMI lies where the debtor conducts its regular business, so that the place is ascertainable to third parties."); *In re British Am. Ins. Co.*, 425 B.R. 884, 912 (Bankr. S.D. Fla. 2010) ("The location of a debtor's COMI should be readily ascertainable by third parties."). Courts consider whether there is any "objective evidence that could provide interested parties with notice that a debtor's COMI was in a particular jurisdiction other than the place of its registered office." *SPC Opinion* at 274. For creditors, such evidence may include: disclosures in offering memoranda and indentures. *See id.* (citing *In re Oi Brasil Holdings Cooperatief U.A.*, 578 B.R. 169, 228–32 (Bankr. S.D.N.Y. 2017) (reviewing offering memorandum to establish noteholder expectations as part of a COMI analysis); *In re Suntech Power Holdings Co., Ltd.*, 520 B.R. at 418 (considering terms of indenture to establish expectations regarding likely location of a restructuring as part of a COMI analysis)).

Here, Olinda's scheme creditors understood Olinda's COMI to be in the BVI. The Verified Petition was filed over a year

3758

after the BVI Proceeding began, and the appointment of JPLs had been advertised, putting those who had dealings with Olinda on notice to correspond with the JPLs. In addition, the Verified Petition provides that a majority of the 2024 Noteholders—Olinda's only scheme creditor constituency—had expressly required Olinda to centralize its restructuring in the BVI. (Verified Petition ¶ 58.)

Disclosures in the debt documents for the Restructured 2024 Notes for which Olinda is a guarantor also provided creditors with objectively determinable evidence that Olinda's COMI was BVI. An offering memorandum issued on July 17, 2019 in connection with a rights offering for certain of the Restructured 2024 Notes—*i.e.*, the Rights Offering Memorandum—confirmed that Olinda was subject to provisional liquidation in the BVI and intended to restructure its guarantee in the BVI. (*Id.*; Rights Offering Memorandum at 5, 103 ("Olinda Star intends to restructure its indebtedness in a way that mirrors the RJ Proceedings (to the extent possible) by way of a restructuring process that is permissible under BVI law. Olinda Star remains in provisional liquidation and the joint provisional liquidators appointed on December 19, 2018 by the BVI court remain in place.").) Additionally, New Indentures (ECF Doc. # 2-4) expressly include insolvency laws of the BVI in the definitions of bankruptcy laws. (Verified Petition ¶ 19.) Thus, third party and creditors' expectations weigh in favor of finding that Olinda's COMI is the BVI.

### g. Creditor Support

Finally, creditor support also supports a finding of COMI in the BVI. *See SPhinX*, 351 B.R. at 117 ("Because their money is ultimately at stake, one generally should defer ... to the creditors' acquiescence in or support of a proposed COMI ... [for they] can ... best determine how to maximize the efficiency of a ... reorganization and, ultimately, the value of the debtor."). Olinda's scheme creditors overwhelmingly support Olinda's BVI restructuring. The BVI Scheme was approved by 100% of scheme creditors present and voting, and **\*45** 82.99% of the scheme creditors by total value. (Verified Petition ¶ 22.) Moreover, the Consenting 2024 Noteholders funded $27 million of new money pursuant to the Rights Offering on the understanding that the Prior 2024 Notes Guarantee would be restructured in the BVI pursuant to the Olinda Term Sheet. (*Id.* ¶ 13.) No creditor has opposed recognition of the BVI Proceeding or the enforcement of the BVI Scheme. (*Id.* ¶ 59.)

In addition to finding that Olinda's registered office is in the BVI, the Court finds that an analysis of the COMI factors also weighs in favor of a COMI in the BVI. Accordingly, the Court holds that BVI Proceeding is recognized as a foreign main proceeding.

### 2. The Foreign Representative Meets 1517(a)(2)'s Requirements

 **[12]**   A chapter 15 case is properly commenced by the filing of a petition for recognition by a "foreign representative." *See* 11 U.S.C. §§ 1504, 1515(a). The Bankruptcy Code defines a "foreign representative" as "a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." 11 U.S.C. § 101(24). This Court has previously found that offshore provisional liquidators qualify as "foreign representatives" within the meaning of section 101(24). *See, e.g.*, *In re Ocean Rig UDW Inc.*, 570 B.R. at 701 (recognizing Cayman Islands JPLs as foreign representatives); *accord Fairfield Sentry I*, 2011 WL 4357421, at *5, 2011 U.S. Dist. LEXIS 105770, at *8 (noting that it was undisputed that BVI provisional liquidators were foreign representatives).

The Petitioner is a "person" as defined under 11 U.S.C. § 101(41). The Petitioner was appointed and is duly authorized and empowered by the BVI Court to: (1) administer the provisional liquidation of Olinda's assets and affairs, (2) implement the BVI Scheme in her capacity as JPL and scheme administrator, and (3) serve as foreign representative in this chapter 15 case. (Verified Petition ¶ 47.) The Petitioner is also an officer of the BVI Court. (*Id.*) Therefore, the Petitioner is a proper "foreign representative" within the meaning of section 101(24) of the Bankruptcy Code with respect to Olinda, and thus section 1517(a)(2) of the Bankruptcy Code is satisfied.

### 3. The Petition Meets the Additional Requirements of Section 1515

Olinda's chapter 15 case meets the additional requirements of section 1515 of the Bankruptcy Code. *See* 11 U.S.C. § 1517(a)(3). The Verified Petition was filed pursuant to section 1515(a) and includes all disclosures and documents required by sections 1515(b) and (c). (*See* Carroll Declaration, Ex. B

(attaching a certified copy of the decision commencing the BVI Proceeding and appointing the Foreign Representative and a certificate from the BVI Proceeding affirming the existence of the foreign proceeding, as required by section 1515(b)); Verified Petition, Ex. 4 (attaching Petitioner's statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative pursuant to section 1515(c)).)

### C. Discretionary Relief Pursuant to Sections 1521, 1507, and 105 of the Bankruptcy Code

Pursuant to sections 1521 and 1507 of the Bankruptcy Code, the Petitioner requests that this Court (1) grant full force and effect to the BVI Scheme within the territorial jurisdiction of the United States; (2) issue a permanent injunction enjoining actions that would interfere with **\*46** the implementation of the BVI Scheme and BVI Sanction Order, (3) direct the Directed Parties[5] to take any and all lawful actions that may be necessary to give effect to and implement the BVI Scheme and (4) exculpate the JPLs (including, for the avoidance of doubt, the Petitioner as Scheme Administrator) and Directed Parties from liability on the terms set forth in the Proposed Order. (Verified Petition ¶ 64.)

 [13]  Section 1521(a) outlines the discretionary relief a court may order upon recognition. 11 U.S.C. § 1521(a). "The discretion that is granted is 'exceedingly broad,' since a court may grant 'any appropriate relief' that would further the purposes of chapter 15 and protect the Debtor's assets and the interests of creditors," provided that the interests of creditors and other interested entities are sufficiently protected. *In re Atlas Shipping A/S*, 404 B.R. 726, 740 (Bankr. S.D.N.Y. 2009) (citing 11 U.S.C. §§ 1521(a), 1522(a)). In *In re Atlas Shipping A/S*, this Court described "sufficient protection" as embodying three basic principles: "the just treatment of all holders of claims against the bankruptcy estate, the protection of U.S. claimants against prejudice and inconvenience in the processing of claims in the [foreign] proceeding, and the distribution of proceeds of the [foreign] estate substantially in accordance with the order prescribed by U.S. law." 404 B.R. at 740 (citing *In re Artimm S.r.l.*, 335 B.R. 149, 160 (Bankr. C.D. Cal. 2005) (analyzing under § 304(c) of the old Code but noting that analysis would be "essentially the same" under § 1521(b) of the current Code)).

 [14]  In addition to section 1521's provisions regarding "any appropriate relief," section 1507(b) provides that a court:

[i]n determining whether to provide additional assistance ... shall consider whether such additional assistance, consistent with the principles of comity, will reasonably assure—(1) just treatment of all holders of claims against or interests in the debtor's property; (2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding; (3) prevention of preferential or fraudulent dispositions of property of the debtor; (4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and (5) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

11 U.S.C. § 1507(b). "Pursuant to section 1507, the court is authorized to grant any 'additional assistance' available under the Bankruptcy Code or under 'other laws of the United States,' provided that such assistance is consistent with the principles of comity and satisfies the fairness considerations set forth in section 1507(b)." *In re Agrokor d.d.*, 591 B.R. 163, 188–89 (Bankr. S.D.N.Y. 2018) (quoting **\*47** *In re Rede Energia S.A.*, 515 B.R. 69, 90 (Bankr. S.D.N.Y. 2014)). "As with section 1521, relief under section 1507 may include recognition and enforcement of a plan approved by a foreign court." *Id.* (citing *In re Rede Energia S.A.*, 515 B.R. at 94–95).

This Court has indicated on several occasions that "[t]he interplay between the relief available under sections 1507 and 1521 is far from clear." *In re Avanti Comm'cns Grp. PLC*, 582 B.R. 603, 615–16 (Bankr. S.D.N.Y. 2018). The Fifth Circuit in *Ad Hoc Grp. of Vitro Noteholders v. Vitro SAB De CV (In re Vitro S.A.B. de CV)*, held that courts must

first consider the specific relief enumerated under § 1521(a) and (b). If the relief is not explicitly provided for there, a court should then consider ... § 1521's grant of any appropriate relief ... [which is] relief previously available under Chapter 15's predecessor, § 304. Only if a court determines that the requested relief was not formerly available under § 304 should a court consider whether relief would be appropriate as "additional assistance" under § 1507.

701 F.3d 1031, 1054 (5th Cir. 2012).

The Court concludes that Petitioner's request for discretionary relief comports with sections 1521 and 1507 for the reasons set forth below.

### 1. Enforcement of the BVI Scheme

"[T]he principal question in determining whether to recognize and enforce the [BVI Scheme] under Chapter 15 ultimately boils down to a question of the appropriateness of granting comity to the foreign court approval of the [BVI Scheme]." *In re Agrokor d.d.*, 591 B.R. at 189. Pursuant to section 1521, bankruptcy courts have "authority to enforce reorganization plans approved in foreign proceedings." *See* 8 Collier on Bankruptcy ¶ 1521.02 (16th ed. 2019). In *Avanti*, this Court recognized and enforced a scheme of arrangement that was approved by creditors and the High Court of England and Wales. *See* 582 B.R. at 617–19. The Court upheld the scheme of arrangement, noting that "Avanti's Scheme Creditors had a full and fair opportunity to vote on, and be heard in connection with, the Scheme. ... The proceedings under UK law in the UK courts afford creditors a full and fair opportunity to be heard in a manner consistent with US due process standards." *Id.* at 618.

 **[15]**  The Court finds persuasive the Foreign Representative's argument that recognizing the BVI Scheme and the BVI Sanction Order is necessary and appropriate pursuant to section 1521 of the Bankruptcy Code. (Verified Petition ¶¶ 68–69.) This Court agrees that the United States and BVI share common-law traditions and fundamental principles of law, including an emphasis on procedural fairness. (*Id.* ¶ 69.) Scheme creditors received notice of Olinda's provisional liquidation proceedings and entry into the BVI Scheme. (*Id.*) Creditors had a full and fair opportunity to vote and be heard in connection with the BVI Scheme, consistent with U.S. due process standards. Moreover, the BVI Court has approved the BVI Scheme, issuing the Sanction Order after notice and a hearing. The matters considered by the BVI Court reflect the foreign court's similar sensitivity to issues of due process and just treatment of creditors considered by U.S. bankruptcy courts when approving reorganization plans.

### 2. Issuance of a Permanent Injunction

 **[16]**  The Court also agrees that the issuance of a permanent injunction against acts that would interfere with the BVI Scheme and BVI Sanction Order is also appropriates under section 1521. Pursuant to section 1521(e), this Court must apply the "standards, procedures and limitations **\*48** applicable to an injunction" in chapter 15 cases with respect to relief requested under sections 1521(a)(1), (2), (3) and (6). 11 U.S.C. § 1521(e). This Court has granted permanent injunctions in several cases to support proper implementation of a scheme of arrangement. *See, e.g.*, *In re Avanti*, Case No. 18-10458 (MG), ECF Doc. # 7 (Bankr. S.D.N.Y. Apr. 6, 2018); *In re Ocean Rig*, No. 17-10736 (MG), ECF Doc. # 153 (Bankr. S.D.N.Y. Sept. 20, 2017).

This Court finds persuasive that there is a threat of irreparable harm without an injunction because one or more persons or entities could take action that is inconsistent with or in contravention of the terms of the BVI Scheme, including seeking to enforce the accelerated Prior 2024 Notes Guarantee against Olinda in New York, jeopardizing Olinda's contracts and resources. (Verified Petition ¶ 72.)

### 3. Directing the Directed Parties to Take Required Action Under the BVI Scheme

 **[17]**  The Petitioner's request for the Court's assistance in directing the Directed Parties to carry out all actions required by the BVI Scheme is also consistent with section 1521(a). As this Court stated in *In re Invesora Electrica de Buenos Aires S.A.*, such relief "will give a clear direction and authority under United State[s] law to the [Directed Parties] to carry out the requirements of the [BVI Scheme]" and will therefore benefit Olinda and its estate. 560 B.R. 650, 657 (Bankr. S.D.N.Y. 2016).

### 4. Exculpation of the JPLs and Directed Parties

 **[18]**  Exculpating the JPLs and Directed Parties is also appropriate under the circumstances and consistent with relief granted in other chapter 15 cases. *See In re Oi S.A.*, 587 B.R. 253, 269 n.3 (Bankr. S.D.N.Y. 2018); *In re Ocean Rig UDW Inc.*, No. 17-10736 (MG), ECF Doc. ## 122, 153 (Bankr. S.D.N.Y. Aug. 22, 2017). This Court agrees that such relief is necessary and appropriate to prevent interference with the consummation of the BVI Scheme, and issuance of the New 2024 Notes Guarantee because without such exculpations the ability of the JPLs and their advisors to take action to effectuate the restructuring would be limited. (Verified Petition ¶ 76.)

Finally, the Court finds that the requested relief is not manifestly contrary to public policy of the United States pursuant to section 1506.

### III. CONCLUSION

For the foregoing reasons, this Court **GRANTS** the Foreign Representative's request for the relief sought in the Verified Petition.

**IT IS SO ORDERED.**

**All Citations**

614 B.R. 28

Footnotes

1    The chapter 15 debtors in the First Chapter 15 Proceeding and their countries of incorporation include: (1) Serviços de Petróleo Constellation S.A. (Brazil); (2) Lone Star Offshore Ltd. (BVI); (3) Gold Star Equities Ltd. (BVI); (4) Olinda Star Ltd. (BVI); (5) Star International Drilling Limited (Cayman Islands); (6) Alpha Star Equities Ltd. (BVI); (7) Snover International Inc. (BVI); (8) Arazi S.à.r.l. (Luxembourg); (9) Constellation Oil Services Holding S.A. (Luxembourg); and (10) Constellation Overseas Ltd. (BVI). *See SPC Opinion* at 246.

2    The Court notes for purposes of this Memorandum Opinion that when the First Chapter 15 Proceeding was commenced on December 6, 2018, the JPLs supported Olinda's initial attempts to restructure through the Brazilian RJ Proceeding and further supported a finding of COMI in Brazil. (Verified Petition ¶ 16.) After Olinda was excluded from the RJ Proceeding, however, the JPLs' restructuring plan changed course through the BVI Scheme. The Court therefore conducts its COMI analysis based on Olinda's restructuring activities on or around March 6, 2020 (the "Petition Date").

3    The Court notes that Petitioner is not a resident of the BVI, so her authority to act for Olinda emanates squarely from orders of the BVI Court and her ability to act is contingent upon the ongoing appointment of BVI-resident provisional liquidator, Mr. Pretlove. (*Id.*)

4    At oral argument, the Foreign Representative's counsel indicated that they were unable to find any case regarding a "soft-touch" provisional liquidation in the BVI. This Court is not aware of such a case either, but it remains satisfied that the "soft-touch" provisional liquidation in the BVI meets a similar standard of fairness to the "soft-touch" liquidation procedures in the Cayman Islands.

5    Collectively, the Directed Parties are (i) Eleanor Fisher in her capacity as joint provisional liquidator of the Debtor and scheme administrator of the BVI Scheme; (ii) Paul Pretlove in his capacity as joint provisional liquidator of the Debtor; (iii) Wilmington Trust, National Association ("Wilmington Trust"), in its capacity as the indenture trustee of the Prior 2024 Notes, the Restructured 2024 Notes and as indenture trustee under the Prior 2024 Notes Indenture and the New Indentures; (iv) the Depository Trust Company ("DTC") in its capacity as record holder of the Prior 2024 Notes and the Restructured 2024 Notes; (v) Euroclear Bank S.A./N.V. ("Euroclear") and Clearstream Banking, société anonyme ("Clearstream");and (vi) D.F. King & Co., Inc. in its capacity as information agent.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 61

Oui Financing LLC v. Dellar, Not Reported in F.Supp.2d (2013)

2013 WL 5568732

2013 WL 5568732
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

OUI FINANCING LLC, Plaintiff,

v.

Steven DELLAR and Oui
Management Sas, Defendant.

No. 12 Civ. 7744(RA).
|
Oct. 9, 2013.

*OPINION AND ORDER*

[RONNIE ABRAMS](), District Judge.

**\*1** Plaintiff Oui Financing LLC ("Oui Financing") brings this declaratory judgment, breach of contract and fraud action against Defendants Steven Dellar and Oui Management SAS ("Oui Management"). Defendants move the Court pursuant to [Federal Rules of Civil Procedure 12(b)(3)]() and [12(b)(6)]() on the grounds that the doctrines of international comity and forum non conveniens require dismissal and alternatively that Plaintiff's fraud claim should be dismissed as duplicative of its breach of contract claim. Plaintiff cross-moves for partial summary judgment on its declaratory judgment and breach of contract claims against Dellar. The Court agrees with Defendants that comity is warranted. Accordingly, Defendants'' motion to dismiss is granted, and Plaintiff's partial summary judgment motion is denied.

### 1. Factual Background[1]

[1]    The information in this section is drawn from the allegations in Plaintiffs Amended Complaint, the exhibits attached thereto and matters of which the Court may take judicial notice. *See [Chambers v. Time Warner. Inc.,]() 282 F.3d 147, 153 (2d Cir.2002).*

On August 27, 2010, pursuant to a loan agreement and promissory note, Plaintiff made loans to Oui Management, a French *societe par actions simplifiée*[2] with its principal place of business in Paris. (Am.Compl.¶ ¶ 1,6, Exs.B, C.) Dellar, the president and a shareholder of Oui Management, contemporaneously executed a guaranty pursuant to which he unconditionally guaranteed repayment of the loans and other related sums. (*Id.* ¶¶ 1, 7, Ex. A.) The principal, interest and other amounts due under the loans were required to be paid in full no later than September 30, 2012, but Oui Management and Dellar did not make payment. (*Id.* ¶ 12.) Rather, on September 24, 2012, Oui Management voluntarily commenced a *procédure de sauvegarde* ("safeguard procedure") in the Paris Commercial Court. (*Id.* ¶ 16, Ex. B.)[3]

[2]    "A *société par actions simplifiée* ... is a form of a simplified French business entity and is treated as a corporation under French law." *[Pritired 1, LLC v. United States,]() 816 F.Supp.2d 693, 697 n.1 (S.D.Iowa 2011); see also [In re Air Crash at Belle Harbor, New York on November 12, 2001,]() No. MDL 1448(RWS), 2006 WL 1288298, at \*2 (S.D.N.Y. May 9, 2006)* (equating a *société par actions simplifiée* to a limited liability company).

[3]    As discussed in further detail below, the French safeguard procedure affords a distressed, but not insolvent, company a mechanism through which it may restructure its indebtedness and continue to operate its business.

Oui Management's commencement of the safeguard procedure constituted an automatic event of default under the loan agreement. (*[Id.]()* ¶ 16.) Plaintiff sent Oui Management a letter on October 2, 2012 demanding it be paid the money owed under the loan agreement. (*[Id.]()* ¶ 17.) Oui Management responded on October 8, 2012, advising Plaintiff that, due to the safeguard procedure, it was prohibited under French law from paying any debt that accrued before September 24, 2012. (*[Id.]()* ¶ 18, Ex. G.)

On October 17, 2012, Plaintiff filed a complaint asserting declaratory judgment and breach of contract claims against Dellar alone. (Dkt.1.) On November 27, 2012, Dellar moved to dismiss. (*Id.* 5.) After that motion was fully briefed, but before the Court issued a ruling, Plaintiff received leave from the Court to file the Amended Complaint, which Plaintiff filed on March 8, 2013. (*Id.* 19.) The Amended Complaint named Oui Management as an additional Defendant and asserted new claims for breach and fraud. (*Id.* 18.) Before the Court are Defendants' motion to dismiss the Amended Complaint and Plaintiff's cross-motion for partial summary judgment.

Shortly before briefing was completed, on May 13, 2013, the Paris Commercial Court issued a judgment approving Oui Management's "safeguard"-i.e., restructuring-plan, which

3764

Oui Financing LLC v. Dellar, Not Reported in F.Supp.2d (2013)

2013 WL 5568732

provides for the repayment of Oui Management's debts over a seven-year period.[4]

[4]      While the Paris Commercial Court issued a judgment adopting the safeguard plan on May 13, 2013, *see* Balensi Reply Aff Ex. 3, it apparently did not provide Defendants' counsel with a full opinion until May 28, 2013. This latter document, of which the Court may take judicial notice, *see Sprague & Rhodes Commodity Corp. v. Instituto Mexicano Del Cafe,* 566 F.2d 861, 862 (2d Cir.1977), was submitted to the Court by letter. Because it is a judicial document, *see Lugosch v. Pyramid Co. of Onondaga,* 435 F.3d 110, 119 (2d Cir.2006). the Court has docketed the letter and the attached opinion.

### 2. French Safeguard Procedure[5]

[5]      "In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed.R.Civ.P. 44.1. "The court's determination must be treated as a ruling on a question of law." *Id.* Accordingly, although the Court relies primarily on its independent examination of the relevant provisions of the French Commercial Code, the Court has considered two affidavits submitted by Defendants' French counsel, Julien Balensi, in connection with Defendants' opening and reply briefs. The Court has also considered an affidavit submitted by Plaintiff's French counsel, Marie Danis, in connection with Plaintiff's opposition brief. Mr. Balensi and Ms. Danis are partners in prominent Paris law firms and both are experienced in matters of corporate restructuring. Although Mr. Balensi and Ms. Danis contest specific points made in each other's affidavits, neither party suggests that the other is unqualified to assist the Court in determining French law. Unless otherwise noted, the Court has relied on the translation of the French Commercial Code available on Westlaw. *See The French Commercial Code in English* (Philip Raworth, trans., Thompson Reuters 2010) ("Raworth Translation").

**\*2** "[A] comprehensive reform of French bankruptcy law, known as the Business Safeguard Act was enacted on July 26, 2005 and became effective on January 1, 2006." Stephen J. Lubben, *Business Liquidation,* 81 Am. Bankr.L.J. 65, 84 n.64 (2007); *see also* Eric Cafritz and James Gillespie, *French Bankruptcy Law Reform Assessed,* lnt'l Fin. L.Rev., Dec. 2005, at 41 (hereinafter, "Cafritz"). A centerpiece of the Business Safeguard Act is the safeguard procedure, which, under the provisions of the French Commercial Code, is:

instituted and opened on the application of a debtor ... who, without being insolvent, shows proof of difficulties that he is not in a position to surmount. This procedure is aimed at facilitating the reorganization of the [business] in order to permit it to continue its economic activity, maintain jobs and discharge its debts.

French Comm.Code ("FCC"), Art. L 620–1; *see also* Anja Droege Gagnier, *French Safeguard Proceedings: Paris Court of Appeal Controls the Risk of Abuse,* 4 Insolvency & Restructuring Int'l 2, 17 (2010) (hereinafter, "Gagnier"). The safeguard procedure is therefore a "pre-insolvency" proceeding. Danis Aff. Ex. A ¶ 44.

A safeguard procedure is commenced when a French Commercial Court issues a judgment that serves to open a "period of observation" of the debtor's business. FCC Art. L. 621–3; Balensi Aff. ¶ 2. During the period of observation, the "debtor remains largely in control of its operations." Balensi Aff. ¶ 4, The Commercial Court, however, also appoints certain individuals who play a role in the safeguard procedure. These individuals include:

- a "supervising judge" who "is charged with ensuring the rapid conduct of the procedure and with protecting the interests present." FCC Art. L. 621–4, 621–9;

- an "agent"[6] who is "empowered to act in the name and collective interest of the creditors." *Id.* 621–4, 622–20; Danis Aff. Ex. A ¶ 7. The FCC provides that "any creditor may request the replacement of the court-appointed [agent]." FCC Art. L. 621–7; and

[6]      The FCC uses the term "*mandataire,*" which the Raworth Translation translates as "administrator" and the parties translate as "agent." The Court opts for the latter translation.

- a "receiver" charged "to supervise the debtor in his business management or to assist him for all management acts or for certain of them." *Id.* 621–4; 622–1.

The agent and receiver "keep the supervising judge ... informed of the progress of the [safeguard] procedure." *Id.* 621–8.

The Commercial Court's judgment opening the period of observation also serves to prohibit the debtor from "paying any claims arising prior to the judgment." *Id.* 622–7. It also stays legal proceedings brought by creditors against the debtor or against the debtor's guarantors. *Id.* 622–21–

I, 622–28; Balensi Aff. ¶ 6 ("[T]he commencement of safeguard proceedings triggers a general automatic stay of legal actions against the debtor and its property for pre-petition liabilities or agreements."); *see also* Cafritz, at 41–42 ("The commencement of a safeguard procedure, like a U.S. bankruptcy case, results in an automatic stay against creditors in favor of the debtor and guarantors or joint obligors of the debtor."); Adam Gallagher, *France's New FastTrack Safeguard Law,* Am. Bankr.Inst. J., Mar. 2011, at 30 ("Safeguard ... is a public procedure that confers immediate protection from., creditor actions ... The debtor's payment obligations are frozen during the safeguard."). The effect of such a stay is to "give[ ] the debtor the necessary breathing space to complete its reorganisation." Gagnier, at 17; *see also* Cafritz, at 41 ("[A] mandatory stay of creditors' claims ... will give breathing room to companies on the brink of insolvency.' ").

 **\*3** The supervising judge may also appoint one or more "controller creditors"[7] from among the creditors who request such an appointment. FCC Art. L. 621–10. Controller creditors "assist the court-appointed [agent] in his duties and the supervising judge in his task of supervising the administration of the [debtor's business]" during the safeguard procedure. *Id.* 621–11. They are entitled to examine all the documents provided to the receiver and the agent, subject to the requirement that they observe confidentiality. *Id.* 621–11; Danis Aff. Ex. A ¶ 9. The agent is charged with notifying the supervising judge of any "comments" provided to him by controller creditors during the procedure. FCC Art. L. 622–20.

7        The FCC uses the term *"contr ô leurs,"* which the Raworth Translation translates as "supervisors." The parties advise the Court, however, that this term is more commonly translated as "controller creditors."

After the procedure is opened, the debtor must provide the receiver and agent with, *inter alia,* a list of its creditors. *Id.* 622–6. The creditors, for their part, submit "declaration[s] of their claims" to the agent, indicating "the amount of the claim due" and the "nature of the priority or guarantee from which the claim may benefit," as well as other information. *Id.* 622–24, 622–25. French creditors "are not treated any differently, and do not have any additional or superceding rights over [non-French] creditors in [safeguard] proceedings." Balensi Aff. ¶ 35.

The receiver and the debtor (with expert assistance, if necessary) prepare an "assessment" of the business documenting the "the origin, seriousness and nature" of the debtor's "difficulties." FCC Art. L. 623–1. In light of this assessment, the debtor and receiver propose a safeguard plan which, *inter alia,* "determines the perspectives for restructuring" and "sets out the procedure for settling liabilities and the possible guarantees that the debtor must give to make sure this is done." *Id.* 626–2, 623–1. The receiver shares the plan with, *inter alia,* the agent and any controller creditor(s). *Id.* 626–5. The agent, in turn, "draws up a list of the replies [to the plan] given by the creditors," which is forwarded to the debtor, the receiver and any controller creditor(s). *Id.* 626–7.

Following a hearing on the safeguard plan, in which controller (but not other) creditors may participate, the Commercial Court makes a ruling as to whether to adopt or reject the plan. *Id.* 626–9; Danis Aff. Ex. A ¶ 12. If the plan is approved, the debtor may then continue its business, subject to its compliance with the repayment plan. Danis Aff. Ex. A ¶ 4. "The judgment adopting the plan renders its provisions binding on everyone," and "persons who have granted a personal guarantee ... may rely on [i.e., invoke] it." FCC Art. L. 626–11; Balensi Reply Aff. ¶ 20.

The debtor, the receiver and the agent (among others) may appeal the court's decision as to the safeguard plan. FCC Art. L. 661–1; Balensi Aff. ¶ 11; Danis Aff. Ex. A ¶ 13, No creditor, including a controller creditor, may appeal. Danis Aff. Ex. A ¶ 13. Under certain conditions, however, a creditor may challenge the commencement of a safeguard procedure by initiating a *tierce opposition* ("third party objection") proceeding in the Commercial Court. FCC Art. L. 661–2; Balensi Aff. ¶ 34; Danis Aff. Ex. A ¶ 37. "The judgment ruling on the third party objection may be appealed to a court of appeal or to the Court of Cassation by the objecting third party." FCC Art. L. 661–2.

### 3. Comity Principles
 **\*4** International comity is "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws." *Hilton v. Guyot,* 159 U.S. 113, 164 (1895); *see also Morgenthau v. Avion Res. Ltd.,* 11 N.Y.3d 383, 389 (2008) ("The doctrine of comity 'refers to the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states.' " (quoting *Byblos Bank Europe, S.A. v.*

3766

*Sekerbank Turk Anonym Syrketi,* 10 N.Y.3d 243, 247 (2008))). The doctrine is applied not as "an imperative obligation of courts but rather [a]s a discretionary rule of practice, convenience, and expediency." *Royal & Sun Alliance Ins. Co. of Canada v. Century Int'l Arms, Inc.,* 466 F.3d 88, 92 (2d Cir.2006)* (citation and internal quotation marks omitted); *see also Johnston v. Compagnie Generale Transatlantique,* 242 N.Y. 381, 387 (1926); *Morganthau,* 11 N.Y.3d at 390 ("Whether to apply the doctrine lies in the sound discretion of the court."). The Second Circuit has explained that "[c]omity should be withheld only when its acceptance would be contrary or prejudicial to the interest of the nation called upon to give it effect." *Cunard Steamship Co. v. Salen Reefer Servs. AB,* 773 F.2d 452, 457 (2d Cir.1985) (quoting *Somportex Ltd. v. Philadelphia Chewing Gum Corp.,* 453 F.2d 435, 440 (3d Cir.1971)). A defendant carries the burden of showing that comity is appropriate. *Allstate Life Ins. Co. v. Linter Group Ltd .,* 994 F.2d 996, 999 (2d Cir.1993).

The Second Circuit has further "repeatedly held that U.S. courts should ordinarily decline to adjudicate creditor claims that are the subject of a foreign bankruptcy proceeding." *JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. dc C.V.,* 412 F.3d 418, 424 (2d Cir.2005); *see also Finanz AG Zurich v. Banco Economico S.A.,* 192 F.3d 240, 246 (2d Cir.1999) ("American courts regularly defer to such [foreign bankruptcy] actions."); *Allstate,* 994 F.2d at 999 ("[W]e have recognized that comity is particularly appropriate where ... the court is confronted with foreign bankruptcy proceedings."); *Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.,* 825 F.2d 709, 713 (2d Cir.1987) ("American courts have long recognized the particular need to extend comity to foreign bankruptcy proceedings.").

The rationale underlying this principle is that "[t]he equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding; if all creditors could not be bound, a plan of reorganization would fail." *Victrix,* 825 F.2d at 713–14. In such cases, deference to a foreign court of proper jurisdiction is appropriate so long as the foreign proceedings are procedurally fair and do not violate public policy. *J.P. Morgan,* 412 F.3d at 424; *see also Canada Southern Ry. v. Gebhard,* 109 U.S. 527, 539 (1883) (American creditors could not sue debtor in New York and were bound to a foreign reorganization plan that was approved by a majority of creditors and was consistent with the "spirit of U.S. bankrupt[cy] law[ ].").[8]

[8] The comity doctrine in the context of foreign bankruptcy proceedings is applied similarly under both federal and New York law, the latter of which governs this diversity suit. *See Drexel Burnham Lambert Grp. v. A.W. Galadari,* 777 F.2d 877, 880 (2d Cir.1985); *Ecoban Fin. Ltd. v. Grupo Acerero Del Norte, S.A. de C.V.,* 108 F.Supp.2d 349, 352 (S.D.N.Y.2000) ("As subject matter jurisdiction in this matter is premised on diversity of citizenship, New York law governs.... But whether under federal law or New York law, the rule appears to be the same. Under New York law, courts will defer to foreign bankruptcy proceedings unless the foreign court lacks jurisdiction over the bankrupt, or the foreign proceeding will result in injustice to New York citizens, prejudice to creditors' New York statutory remedies, or violation of the laws or public policy of New York.") (citations omitted).

**\*5** Courts have extended these principles to pre-insolvency proceedings not dissimilar to French safeguard procedures that are designed to assist distressed businesses in avoiding liquidation by relieving them from the immediate pressure of creditors' claims so they may restructure, and ultimately pay, their debts. *See, e.g., Ecoban Fin. Ltd. v. Grupo Acerero Del Norte, S.A. de C.V.,* 108 F.Supp.2d 349, 350–51 (S.D.N.Y.2000). For example, in *J.P. Morgan,* a lending bank sued a foreign borrower seeking a declaratory judgment that certain funds held in a collection account at the bank belonged to it. 412 F.3d at 419. The borrower had defaulted on its loan and filed for *suspensi ó n de pagos* ("suspension of payments" or "SOP") in Mexican civil court. *Id.* at 421. The Second Circuit explained that "[m]uch like Chapter 11 reorganization in the United States, SOP is a judicial order authorized under Mexican law that allows a debtor to suspend payments to its creditors and continue normal operations until such time as the debtor and creditors, under the auspices of the court, reorganize the debt." *Id.* The court rejected the bank's effort to "use U.S. courts to circumvent" the foreign proceeding and affirmed the district court's dismissal of the bank's suit on comity grounds. Id at 427; *see also Ecoban,* 108 F.Supp.2d at 351 (S.D.N.Y.2000) (dismissing complaint filed by the domestic holder of past-due promissory notes purchased from Mexican corporations that were subject to SOP proceedings in Mexican courts).

### 4.   Procedural Fairness and Public Policy Considerations

The Paris Commercial Court is a court of competent jurisdiction. FCC Art. L. 621–2 (The French Commercial Court has jurisdiction over debtors engaged in "commercial ...

2013 WL 5568732

activity."). As indicated above, the remaining inquiry in the comity analysis is whether the French safeguard procedure is (a) procedurally fair and (b) does not contravene public policy. *J.P. Morgan,* 412 F.3d at 424. The Court is satisfied that the safeguard procedure meets these criteria.

### a. *Procedural Fairness*

"[I]n order for comity to be extended, the foreign court must abide by fundamental standards of procedural fairness." *Cunard,* 773 F.2d at 457. In analyzing procedural fairness of foreign bankruptcy proceedings, the Second Circuit has explained that "what is important is that the [foreign] law provides a stay procedure to centralize all claims and 'enable[ ] the assets of a debtor to be dispersed in an equitable, orderly, and systematic manner.' " *Allstate,* 994 F.2d at 999 (quoting *Cunard,* 773 F.2d at 458). The *Allstate* court made equally clear that "there is no requirement" that the relevant foreign proceedings "be identical to United States bankruptcy proceedings," *Id.; see also In re Brierley,* 145 B.R. 151, 166 (Bankr.S.D.N.Y.1992) ("Nothing dictates that the foreign law be a carbon copy of our law ."). Nor must the district court "split hairs" to determine that the foreign proceeding "in general, provides a fair forum in which to litigate [Plaintiff's] claims," *Allstate,* 994 F.2d at 999. That the foreign proceeding "differs slightly" in certain respects from domestic bankruptcy law is therefore "irrelevant." *Id.; see also Ecoban,* 108 F.Supp.2d at 353 (comity appropriate although "some of the Mexican procedures may [have] differ [ed] significantly from their American counterparts").[9]

[9]   The *Allstate* court listed eight illustrative factors to assist courts in addressing the procedural fairness prong of the comity analysis. 994 F.2d at 999. As the Ecoban court explained, "[t]hese factors generally indicate that the foreign procedures must provide adequate notice and opportunity to be heard, and must treat creditors equally." 108 F.Supp.2d at 352 n.4. As most of these factors "contemplate a liquidation," however, the *Ecoban* court did not find them to be "clearly relevant or applicable" to pre-insolvency proceedings, like the SOP proceedings there or the safeguard procedure here. *Id.*

**\*6**   On these principles, the Court is satisfied that French safeguard procedure affords creditors adequate procedural protections:

- The safeguard regime ensures that claims against the debtor are centralized by imposing stays at the outset of the procedure to prevent creditors from advancing

legal claims in other fora and to prohibit the debtor from "paying any claims arising prior to the judgment."

- Creditors are afforded the opportunity to submit their claims to the agent and to inform him or her as to "the amount of the claim due" and as to the "nature of the priority or guarantee from which the claim may benefit," as well as other information. The FCC makes no distinction between the rights of foreign and domestic creditors.

- Creditors' interests in the safeguard procedure are represented by the agent, who is "empowered to act in the name and collective interest of the creditors." As Plaintiff acknowledges, the agent (referred to by Plaintiff as the "creditors' representative")" "is responsible for oversight of the claims and interests of creditors" in the safeguard procedure. (Am.Compl.n.27 .) The judge supervising the safeguard procedure also is charged with generally "protect[ing] the interests present."

- Creditors who so request may be appointed controller creditors and in that capacity may assist the judge and agent in supervising the debtor during the safeguard procedure, direct comments to the supervising judge, review documents relevant to the procedure and participate in the hearing prior to the decision to adopt or reject the safeguard plan.

- The agent solicits and lists creditors' "replies" to the safeguard plan (i.e., acceptance or refusal), which are submitted to the receiver.

- Dissatisfied creditors may commence a third party objection proceeding in French Commercial Court, the judgment of which may be appealed.

The Court is satisfied that these mechanisms support the French safeguard procedure as a procedurally fair process for creditors. At least one district court found extending comity principles to a safeguard procedure to be appropriate after finding "no reason to determine" that "creditors' interests are not sufficiently protected under French *sauvegarde* law." *SNP Boat Servs. S.A. v. Hotel Le St. James,* 483 B.R. 776, 786 (S.D.Fla.2012). Other U.S. federal courts concerned with French judicial proceedings have determined them to be procedurally fair. *See, e.g., Int'l Nutrition Co. v. Horphag Research Ltd.,* 257 F.3d 1324, 1330–31 (Fed.Cir.2001) (stating that "the French courts abided by 'fundamental standards of procedural fairness,' ... and [finding] no abuse of discretion in the district court's judgment that international

3768

**Oui Financing LLC v. Dellar, Not Reported in F.Supp.2d (2013)**

2013 WL 5568732

comity should be extended" (quoting *Cunard,* 773 F,2d at 457)); *Gambra v. Int'l Lease Fin. Corp.,* 377 F.Supp.2d 810, 817 (C.D.Cal.2005) (granting motion to dismiss on forum non conveniens grounds in part because "French courts have a rigorous judicial system that seeks to promote fair proceedings and debate.").

 **\*7** Plaintiff's arguments that the French safeguard procedure is not procedurally fair are unavailing. Plaintiff argues that procedural fairness is lacking because creditors may not appeal a judge's decision on the safeguard plan. But the agent, charged with protecting the creditors' interests, may do so. If a creditor is not satisfied that the agent is sufficiently protecting its interests, a creditor "may request [his or her] replacement." The French law also provides dissatisfied creditors with an alternative grievance mechanism: a creditor may initiate a third party objection proceeding to challenge the debtor's opening of the safeguard procedure.

Plaintiff further complains that "[n]o creditor ... has any right to vote on, consent to or reject a proposed or approved repayment plan" and that its priority rights were "not respected." (Opp'n 4.) These arguments are particularly unimpressive here since, as discussed below, Plaintiff participated in Oui Management's safeguard proceeding, "submitted objections to th[e] repayment plan," (Opp'n 2), and does not dispute that the terms of the adopted plan provide that Plaintiff's loan to Oui Management will be repaid. *See Zurich v. Banco Economico S.A.,* No. 98 Civ. 0005(SAS), 1998 WL 205341, at \*3 (S.D.N.Y. Apr. 28, 1998) (comity appropriate where, *inter alia,* there was no evidence that a Brazilian liquidation proceeding "threaten[ed] the very enforceability of the ... notes"). In any event, Plaintiff cites no authority for the proposition that a restructuring proceeding must be consensual or must "respect[ ]" priority rights in order to satisfy basic standards of procedural fairness.

The remainder of Plaintiff's arguments that the French safeguard procedure is not procedurally fair focus not on the law itself, but rather on specific frustrations it encountered during the procedure. The focus of the comity analysis, however, is whether the foreign proceeding "*in general,* provides a fair forum in which to litigate [Plaintiff's] claims." *Allstate,* 994 F.2d at 999 (emphasis added). That Plaintiff is disappointed with the specific outcome of Oui Management's safeguard procedure is not relevant. *See Ecoban,* 108 F.Supp.2d at 355 ("Ecoban's unhappiness with the results produced by that [SOP] law is not a legitimate ground for denying the laws and courts of Mexico the comity to which

American legal precedent and basic principles of international cooperation entitle them."); *see also Johnston,* 242 N.Y. at 387 (1926) (stating, in the context of reciprocity, "[w]hen the whole of the facts appear to have been inquired into by the French courts, judicially, honestly and with full jurisdiction and with the intention to arrive at the right conclusion, and when they have heard the facts and come to a conclusion, it should no longer be open to the party invoking the foreign court against a resident of France to ask the American court to sit as a court of appeal from that which gave the judgment."); *c.f. Italverde Trading, Inc. v. Four Bills of Lading,* No. 04–CV–2793 (NGG)(VVP), 2009 WL 499502, at \*8 (E.D.N.Y. Feb. 27, 2009) ("In addition to the reasons set forth above, the court is disinclined to allow the bankrupt Italian entity, having adjudicated claims in an Italian court, to proceed here on an issue already decided by the Italian court.").

 **\*8** In any event, Plaintiff's representations that it had no opportunity to be heard during the procedure are belied by documents, attached to its Amended Complaint, demonstrating that Plaintiff was given such an opportunity:

- A December 11, 2012 letter from Plaintiff's U.S. counsel to the receiver reflects that Plaintiff attended a "meeting on November 28th [2012] regarding the safeguard proceeding" which Plaintiff found "useful in clarifying issues and confirming facts." (Am.Compl.Ex. T.) In this letter, Plaintiff voices its position that "Oui Management and its President and controlling shareholder, Steven Dellar, are using the safeguard proceeding for purposes other than the intended goals of the safeguard process," namely, "to avoid their obligations" to Plaintiff. *Id.* The letter further reflects that the receiver suggested to Plaintiff's French counsel that an independent auditor be appointed "to conduct an independent current business review of Oui Management." *Id.*

- In a January 11, 2013 letter from Plaintiffs U.S. counsel to the agent, whom Plaintiff describes as "the appointed representative of the creditors of Oui Management in the safeguard proceeding," Plaintiff voiced its position that "[a]ny objective observer of this situation must conclude that Qui Management and Mr. Dellar are using the safeguard proceeding as for improper purposes, including to continue to misappropriate the collateral of Oui Financing." (Am.Compl.Ex.U.) Plaintiff requested that the agent, "as the representative of the Oui Management creditors," "demand that an independent auditor be appointed immediately." *Id.* The letter further requests that the agent "support Oui Financing's petition

to dismiss the safeguard proceeding and to proceed immediately with the liquidation of Oui Management." *Id.* The letter finally notes "that a hearing on Oui Financing's objections to the safeguard proceeding is scheduled for January 25th" and requests that the agent "appear at that hearing with Oui Financing's counsel to support Oui Financing's petition." *Id.*

• The Paris Commercial Court's May 13, 2013 judgment adopting Oui Management's safeguard plan states that "[a]ll of the 13 creditors of Oui Management have been consulted, the holder of Oui Finance [sic] loan representing 80.98% of the liability to be repaid ." The judgment notes that Oui Financing "answered the safeguard plan unfavorably."

Contrary to Plaintiff's assertion that it received "no notice of significant developments in the safeguard proceeding," (Opp'n 5), it appears that Plaintiff not only received notice, but was afforded the opportunity to participate in, and voice its opposition to, the procedure. *Baker v. Latham Sparrowbush Assocs.,* 72 F.3d 246, 254 (2d Cir.1995) ("If a party receives actual notice that apprises it of the pendency of the action and affords an opportunity to respond, the due process clause is not offended."); *Finanz AG.* 192 F.3d at 249 ("[A]lthough the Brazilian proceeding apparently does not require individualized notice, Finanz received actual notice of the Brazilian proceeding ... and subsequently filed a timely claim. Accordingly, the District Court correctly concluded that there was no due process violation."); *Allstate,* 994 F.2d at 1000 (evidence of plaintiffs' participation in foreign liquidation process supported determination that comity was warranted).

**\*9** In short, the Court finds Plaintiff's attacks on the French proceeding to be, at best, emblematic of precisely the type of hair-splitting the Second Circuit has counseled against. *Allstate,* 994 F.2d at 999. The Court declines to rule that French safeguard procedures are procedurally unfair.

### b. *Public Policy*

The Court is also satisfied that French safeguard procedures do not offend public policy. The overarching policy of the French safeguard procedure-to enable distressed debtors to reorganize their debts so as to avoid insolvency and repay their creditors-is the same as the U.S. Bankruptcy Code's "strong policy in favor of reorganization." *In re Northwest Airlines Corp.,* 349 B.R. 338, 380 (S.D.N.Y.2006); *see also N.L.R.B. v. Bildisco and Bildisco,* 465 U.S. 513, 528 (1984)

("The fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources."); *In re Chateaugay Corp.,* 94 F.3d 772, 775 (2d Cir.1996) (noting "important public policy favoring orderly reorganization and settlement of debtor estates"); *In re Stanwich Fin. Servs. Corp.,* 288 B.R. 24, 26–27 (Bankr.D.Conn.2002) ("A basic assumption that underlies American bankruptcy law is that it is often preferable to encourage and facilitate rehabilitation of businesses in financial trouble instead of providing for liquidation only.") (citation omitted).

This comes as no surprise. French safeguard procedure was modeled after, and is regularly compared to, proceedings under Chapter 11 of the United States Bankruptcy Code. *See* Cafritz at 41 (noting that safeguard procedure was "inspired by the U.S. bankruptcy system's Chapter 11 process"); Fabrice Robert–Tissot, *The Effects of a Reorganization on (Executory) Contracts: A Comparative Law and Policy Study [United States, France, Germany and Switzerland* ], 21 Norton J. Bankr.L. & Prac. 5 Art. 4 (2012) (noting that the safeguard procedure "seems to be directly inspired from Chapter 11 of the U.S. Bankruptcy Code"); Adam Gallagher, *Pre–Packs U.K. Style, French Debt Cancellation Law,* Am. Bankr.Inst. J., Dec/Jan.2008, at 94 (describing safeguard proceedings as "a kind of chapter 11 *à la fran ç aise* to allow a company that is in difficulty but is not yet formally insolvent to seek court protection before it actually becomes insolvent."); Weil, Gotshal & Manges LLP, *Comparative Guide to Restructuring Procedures 2012,* at 42–60 (2012) (noting that the safeguard procedure was modeled on Chapter 11 proceedings). That French safeguard procedure reflects the policies of U.S. bankruptcy law by design militates strongly in favor of extending comity. *See Cunard,* 773 F.2d at 459 (comity appropriate after determining that "[t]he principles of Swedish bankruptcy law [we]re not dissimilar to those of our Bankruptcy Code.").

Plaintiff asserts that under Chapter 11, unlike under French safeguard procedure, "creditors have a significant say in any reorganization plan that would modify the terms on which creditors will be paid" and that Chapter 11 provides protections for "the single largest, first ranking creditor." (Opp'n 13 n.42.) Again, however, Plaintiff cites no authority for the proposition that the treatment of first-line creditors under French safeguard procedures diverges so significantly from treatment of creditors under U.S. law such that this Court should hold the former regime to be violative of the public policy of the latter. *See J.P. Morgan,* 412 F.3d at

*Oui Financing LLC v. Dellar*, Not Reported in F.Supp.2d (2013)
2013 WL 5568732

428 ("Nothing in the record before us suggests that the actions taken by the Mexican bankruptcy court are not approved or allowed by American law.").

**5. Dellar's Guarantor Status**

**\*10** Plaintiff argues that "Dellar should not be allowed to use a foreign proceeding to prevent Plaintiff from pursuing claims against Dellar as a non-debtor guarantor in accordance with Dellar's New York law governed contract." (Opp'n 15.) Specifically, Plaintiff argues that:

Dellar entered into a valid New York contract to induce Plaintiff to loan money to Borrower, and he expressly waived all defenses to enforcement of that contract in New York. If Dellar is allowed to avoid and rewrite his personal and direct obligations to Plaintiff via a safeguard repayment plan to which Plaintiff, as the largest and only secured creditor of Borrower, has not consented, that result will violate clear United States and New York law and public policy. New York and United States law favors enforceability of non-debtor guaranties (as does French law in a true insolvency proceeding). Dellar should not be permitted to effect an end-run around New York law.

*Id.* 15–16 (internal citations omitted).

The issue here is properly framed not as whether Dellar seeks an impermissible "end-run" around his contractual obligations, but rather, as the Second Circuit has framed it, whether, Plaintiffs attempt to sue Dellar here constitutes "the sort of end-run around a parallel foreign bankruptcy proceeding of which [the Second Circuit has] repeatedly disapproved." *JP Morgan,* 412 F.3d at 427 (citing cases).

Courts have regularly answered that question in the affirmative, holding that parties' private agreements as to choice of forum or applicable law, or even as to waiver of the comity defense, must be subordinated to the "overarching concerns" the comity doctrine addresses, including "demonstrating a proper level of respect for the acts of other sovereign nations, ensuring fairness to litigants, and efficiently using scarce judicial resources." *See United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.,* 216 F.Supp.2d 198, 212 (S.D.N.Y.2002) (citation and internal quotation marks omitted). Rather, "[t]he presence of such clauses ... does not preclude a court from granting comity where it is otherwise warranted." *Allstate.* 994 F.2d at 1000.

As Judge Baer explained in *JP Morgan,* where the relevant agreement contained a "waiver provision that appear[ed] to encompass the comity argument":

In short, the presence of this waiver provision fails to change the rule and the result. As with a contract that contains only a forum-selection and choice-of-law provision, courts still determine that the considerations associated with comity trump the parties' express wishes. That the parties here appear to have stated their intentions with even more emphasis does not change the fact that there are important considerations that may not have concerned the parties then but which must concern this Court now-for example, Altos Hornos's other creditors and the importance of a unified administration rather than a piecemeal administration of its estate in the SOP proceeding. Dismissal on the ground of comity should prevail.

**\*11** 2004 WL 42268. at \*7 (S.D.N.Y. Jan. 8, 2004); *see also Cunard.* 773 F.2d at 459 (policy of deference to foreign bankruptcy proceedings prevails despite that "the strong public policy in favor of arbitration is well recognized"); *Export–Import Bank of Republic of China v. Grenada.* 876 F.Supp.2d 263, 269 (S.D.N.Y.2012) (" 'While the enforcement of valid contracts and the collection of valid judgments ... are certainly important considerations, they do not outweigh the commitment of the United States to principles of comity.") (citation and internal quotation marks omitted); *Kenner Prods. Co. v. Societe Fonciere et Financiere Agache–Willot,* 532 F.Supp. 478, 479–80 (S.D.N.Y.1982) ("Nor do we find that the choice of venue clause contained in the guaranty at issue overrides these concerns for comity and judicial efficiency. While such clauses are prima facie valid, they are not enforceable if such enforcement would be 'unreasonable.' " (quoting *M/S Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 10 (1972))).

Dellar is the president and a shareholder of Oui Management, and his obligations are clearly closely intertwined with Oui Management's. Permitting Plaintiff to obtain a judgment against him in this Court would very likely interfere with the implementation of the recently-adopted safeguard plan. This is presumably why the FCC operates to stay actions against individual guarantors as well as the debtor itself and why, now that the safeguard plan has been approved, the FCC provides that creditors may not seek redress against Dellar outside the plan's terms.

Under such circumstances, courts have declined to permit actions against debtor's representatives when the debtor

3771

is subject to foreign proceedings. For example, upon determining that dismissal of claims against the bankrupt entities was appropriate, the *Allstate* court explained, as to claims against individual defendants:

> it cannot be said that the court abused its discretion where, as here, it would have been inefficient and inequitable to permit the individual claims to go forward. Indeed, since these individuals were sued solely because of their affiliation with the [bankrupt] companies, to allow these claims to go forward in the United States despite the dismissal as to the [bankrupt] companies would defeat the purpose of granting comity in the first place,

994 F.2d at 1000; *see also Finanz AG,* 192 F.3d at 242 (affirming district court's dismissal, on comity grounds, of complaint seeking to recover on promissory notes guaranteed by a defendant subject to Brazilian liquidation proceedings); *Victrix,* 825 F.2d at 714 (creditors "who obeyed the Swedish court's stay and sought relief only in the bankruptcy proceeding" would be affected by plaintiff's attempt to secure a "captive fund" elsewhere); *United Feature Syndicate,* 216 F.Supp.2d at 212–213 (declining to consider breach of contract claims brought by New York distributor of newspaper features against officers of bankrupt Canadian corporation, to the extent that adjudication of claims "might interfere" with the equitable and orderly distribution of Canadian corporation through ongoing Canadian bankruptcy proceedings); *Tradewell. Inc. v. Am. Sensors Electronics,* No. 96 CIV. 2474(DAB), 1997 WL 423075, at *4 (S.D.N.Y. July 29, 1997) (applying comity to breach of contract claim that would interfere with foreign bankruptcy proceedings).

 **\*12**  To support its argument that it may proceed against Dellar, Plaintiff cites to *Elliott Int'l L.P. v. Vitro, S.A.B. de C.V.,* 95 A.D.3d 565 (1st Dep't 2012), which affirmed judgments entered in two related actions in New York Supreme Court against guarantors of notes issued by a bankrupt Mexican glass manufacturer. On appeal, the defendants argued that comity required deference to the Mexican court supervising the company's bankruptcy proceeding. *Id.* at 565. Pointing to the fact that defendants executed a "broad, unconditional guaranty, signed indentures that included the express agreement that their obligations would be governed by New York law, waived any rights under Mexican laws, and irrevocably submitted themselves to the jurisdiction of New York courts," the First Department held that "[i]t would prejudice plaintiffs for a New York court to ignore the express language of their bargained-for rights." *Id.* at 565–66.

*Elliott* is distinguishable. As noted above, there is minimal "prejudice" to Plaintiff here, as the already-approved safeguard plan provides for repayment of its loan. Further, in *Elliott,* the Mexican court rejected defendants' attempt to stay the New York case, "finding it unnecessary to involve itself in the action. *Id.* at 566. This Court has received no such indication from French authorities. Indeed, the FCC expressly states that guarantors may invoke the plan. Finally, at least one recent case has distinghuished *Elliott* where the plaintiff "chose to affirmatively participate in the [foreign] proceeding," as the Court has found Plaintiff did here. *Basile v. CAI Master Allocation Fund, Ltd.,* 966 N.Y.S.2d 344, at *8 (Sup.Ct.2013).

The Court recognizes, as did the *Elliott* court, that New York generally has a "strong interest ... in protecting the justifiable expectation of the parties who choose New York law as the governing law of a letter of credit," 95 A.D.3d at 566 (quoting *Banco Nacional De Mexico, S.A. v. Societe Generale,* 34 A.D.3d 124, 130 (1st Dep't 2006)). *Elliott* does not suggest, however, that the mere (and commonplace) insertion of a governing law clause in a guaranty by contracting parties must operate to foreclose courts' ability to later apply the principle of comity. Such a reading would allow private parties, unconcerned with the "spirit of cooperation" with which domestic courts must "approach[ ] the resolution of cases touching on the laws and interests of other sovereign states," *Morgenthau,* 11 N.Y.3d at 389, to strip those courts of the valuable discretion they are afforded in such cases. Rather, *Elliott* narrowly held that, on balance, "defendants-appellants failed to show that circumstances exist that warrant the extension of comity to a foreign court." 95 A.D.3d at 565; *see also Sebastian Holdings, Inc. v. Deutsche Bank AG,* 78 A .D.3d 446, 454 (2010) (A court is required to balance " 'international duty' against its obligation to protect the rights of 'persons ... under the protection of its laws.' " (quoting *Hilton,* 159 U.S. at 163–64)). The balance here tips in the other direction, as it has in many other cases. *See, e.g., Finanz AG,* 192 F.3d at 247 (finding that "the particular need to extend comity to foreign bankruptcy proceedings" outweighed the United States' "strong interest in ensuring the enforceability of valid debts under the principles of contract law and in maintaining New York's status as one of the foremost commercial centers in the world ."") (internal citations and quotation marks omitted). "To hold otherwise would undermine the fundamental principles of comity by interfering with the acts of a foreign jurisdiction's legislature or judicial body." *Sung Hwan Co., Ltd. v. Rite Aid Corp.,* 7 N.Y.3d 78, 85 (2006).[10]

3772

[10]    Because the Court grants Defendants' motion to dismiss on comity grounds, it does not reach their other asserted bases for dismissal or the arguments raised in Plaintiff's motion.

### 6. Conclusion

*13  For the reasons set forth above, comity is warranted. Accordingly, Defendants' motion to dismiss is granted and Plaintiff's partial motion for summary judgment is denied. The Clerk of Court is respectfully directed to close items 22 and 31 on the docket and to terminate this case.

SO ORDERED.

**Rooney PC**

May 29, 2013

*VIA EMAIL*

The Honorable Ronnie Abrams

United States District Judge

Southern District of New York

500 Pearl Street

New York. N.Y. 10017
Re: *Oui Financing LLC v. Dellar and Oui Management SAS,* 12–cv–7744

Dear Judge Abrams:
We write on behalf of Defendants Steven Dellar and Oui Management SAS ("Oui Management") to provide this Court with the appended opinion of the Commercial Court of Paris (the "Commercial Court"), as translated by our French counsel, setting forth the Commercial Court's reasons for approving the "Safeguard Plan" submitted by Oui Management in Safeguard Proceedings underway in that Court.

We respectfully submit that the contents of the opinion may be useful to this Court's consideration of Defendants' pending Motion to Dismiss, as well as Plaintiff's Motion for Partial Summary Judgment. The opinion, which we did not receive from the Commercial Court until yesterday, May 28, 2013, was not available in time for submission by Defendants in conjunction with either motion.

If the Court feels it would be helpful, we would welcome the opportunity to elaborate on why we believe the contents of the opinion support Defendants' positions with regard to both motions.

Very Truly Yours,

s/ *Alex Kriegsman*

Alex Kriegsman

cc: Ronald R. Jewell

Samuel J. Abate, Jr.

Laura M. Leitner

Counsel for Plaintiff

Copies:

SELARL (limited liability independent contractor) Michel-

Miroite–Gorins

SELALFA (independent-contractor corp.) MJA, in the person of

Maître–Thomas Leloup

TPC

Prosecutor

Maître Julien Balensi (Selarl Altana) attorney

*Registered letter with acknowledgement of receipt*

SAS Oui Management

Ms. Caroline Doumeng

Mr. Steven Dellar
**PARIS COMMERCIAL COURT**

**JUDGMENT OF MONDAY MAY 13, 2013–9AM**

**SECOND CHAMBER**

General registry; 2013018271

2013 WL 5568732

22.04.2013

P.C. P201202512

SAS OUI MANAGEMENT, Paris business registry B 523
006 807, with headquarters at 20–22 Passage Dauphine,
75006 Paris.

**ADOPTS THE SAFEGUARD PLAN**

— Mr. Steven Dellar, residing at 33 Rue du Four, 75006
Paris, President of SAS Oui

— Management, present and assisted by Maitre Julien
Balensi of Selarl Altana, attorney (R21);

— Mr. Mickael Lorieul, Cabinet DSA, 22 Place du
General Catroux, 75017 Paris, partner in certified
public accounting firm, present;

— Ms. Caroline Doumeng, in her capacity of
Representative of Employees, residing at 95 Rue de
la Faisanderie, 75016 Paris, present;

— Selarl Michel–Miroite–Gorins in the person of
Maitre Gorins, 48 Rue La Fayette, 75009 Paris,
judicial administrator, present;

**\*14** — SELAFA MJA, in the person of Maître
Leloup–Thomas, 102 Rue du Faubourg Saint
Denis, CS 10023, 75479 Paris Cedex 10, judicial
agent, present.

**AFTER COMMUNICATION OF THE PROCEEDINGS
TO THE PUBLIC PROSECUTOR AND AFTER
HAVING DELIBERATED**

In a judgment of September 24, 2012, the court opened
a safeguard proceeding regarding SAS Oui Management
with headquarters at 20–22 Passage Dauphine, 75006 Paris,
represented by Mr Steven Dellar, of English nationality,
President, residing at 33 Rue du Four, 75006 Paris.

This same judgment named Selarl A. Miroite–F. Michel–C.
Gorins–N. Deshayes–C. Bidan in the person of Maitre Gorins
as Administrator, in its mission of supervision, and Selafa
MJA in the person of Maitre Leloup–Thomas as judicial
agent, The said judgment opened a six-month period of
observation, extended to June 24, 2013.

The company Oui Management, created in November 2010,
is held for 99% by the English company Rosebery Investment
Ltd, Mr Steven Dellar holding 1%.

Oui Management operates a modeling agency specialized in
women's models over 16 years of age. This activity is strictly
regulated in France. To exercise it, a license must be obtained
and a financial guarantee must also be proven.

By decision 75,10.018 of September 24, 2010, the Prefect
of the Ile de France Region awarded the License to Oui
Management for a term of three years starting September 24,
2010, or until September 23, 2013.

The company also proves parental authorizations for models
between 16 and 18 years of age, Lastly, Oui Management
provides a financial guarantee of an amount of 30,554.94
granted by Monte Paschi Banque until 31 July 2013,

The bulk of the company's activity consists in "placing" the
models, in other words finding them contracts with stylists,
photographers and advertisers. The company also manages
all the operational part by organizing and coordinating the
scheduling, transport, and lodging of its models.

The models are paid for each service.

Oui Management employs a staff of 9 permanent employees
and had achieved a turnover of 3,239,142 as of March 31,
2012.

Oui Management also employs some one hundred models,
whose status is stipulated by the terms of articles L.7123–
5 and seq., and R.7123–1 and seq. of the Labor Code. A
tripartite relation exists between Oui Management, the model
and the customer of the Agencyso that several contractual
relations exist.

Generally, a collaboration and representation agreement
is concluded between Oui Management and the model,
which defines the relations between them all through their
collaboration. Furthermore, for each service, a specific
employment contract is concluded between Oui Management
and the model, which produces its effects only during the
service furnished by the model.

Lastly, an availability contract is concluded between the
Agency and the user specifying chiefly the characteristics of
the services requested of the model.

3774

The difficulties result from the inability, for lack of liquidity, to reimburse all of the loan from Oui Financing LLC concerning the total amount of 1,090,312.88, the term of which was initially set at September 30, 2011. After negotiation, the term was extended to September 30, 2012. After the first repayments, the sum (capital and interest) that should have been repaid at this date came to nearly 870,000.

**\*15** Thus, the burden of these financial commitments turns out to be too heavy with regard to the ability of Oui Management to generate adequate financing capacity.

Maître Gorins, judicial administrator, reported to the court by drawing up an economic and corporate assessment.

This report of March 15, 2013 has been filed with the clerk. It was communicated to the debtor, to the judicial agent, to the public prosecutor and, as the need may be, to the administrative authority competent in labor law,

The parties were asked to come to the Council Chamber on April 22, 2013 in accordance with the terms of article R.626–17 of the Commercial Code, and there appeared:

— Maître Gorins, judicial administrator;

— Maitre Leloup–Thomas, judicial agent;

— Mr. Steven Dellar, President, assisted by Maitre Julien Balensi, attorney;

— Ms. Caroline Doumeng, employee representative;

— and Mr. Mickael Lorieul of the Cabinet DSA, certified public accountant.

The public prosecutor was lawfully advised of the hearing of the Council Chamber and was present

*The reports presented showed:*

Oui Management's annual turnover comes to to;

For 2010, 1,640,246 with operating income of–725,856.

For 2011, 3,239,142, with operating income of–91,881.

The verified and filed liabilities come to the following:

### Reference liability

| | |
|---|---|
| Preferred | 952,812 |
| Unsecured (including current account of 500,000) | 504,482 |
| Disputed | 51,234 |
| Liabilities to fall due | 95,802 |
| Rejected liability | 16,681 |
| Admitted reference liability | 1,104,329.16 |

The procedures for discharging the liability of 1,104,329.16 will be the following:

# 100% payment of debts less than 300: settlement upon adoption of the plan in accordance with the terms of articles L .626–5 of the Commercial Code.

# Repayment of the balance of the liabilities in seven linear payments of 14.28%, the last being 14.32%. The first such payment shall occur at the latest on the anniversary date of the adoption of the safeguard plan.

# Repayment of the debt of the parent company Rosebery (500,0001 after discharging all the third-party liabilities subject to the plan.

All of the 13 creditors of Oui Management have been consulted, the holder of the Oui Finance loan representing 80.98% of the liability to be repaid:

— Six creditors answered the safeguard plan project favorably, or 7.40%;

— One creditor answered the safeguard plan unfavorably, or 80.98%;

3775

— Five creditors did not answer in time, or 11.62%, while it is specified that these creditors are considered to have acquiesced to the safeguard plan.

During the Council Chamber of April 22, 2013, the following observations and answers were presented;

# *By the official administrator*

Maitre Gorins feels that the forecasts established are reasonable and that the self-financing capacity is compatible with a repayment of the declared liabilities over only seven years without jeopardizing the sustainability of the company, and declares himself favorable to the adoption of the plan.

# *By the official agent*

 **\*16**  Maitre Leloup–Thomas indicates that the liabilities to be discharged could be increased in the event Oui Financing is relieved from the effects of the expiration of time, and issues a favorable opinion insofar as the settlement plan has received the agreement of all the other creditors and benefits from the support of its main shareholder, the debt of which is subordinate to the perfect execution of the plan, and it meets the criteria set by article L.620–1 of the Commercial Code.

# *By Mr. Steven Dellar*

Mr. Steven Dellar confirms his confidence in the future profitability of the operation and capacity of Oui Management to repay the liabilities, and agreed to institute an acceleration of repayment of the liabilities if the financial conditions allow it.

# *By Ms. Caroline Doumeng, employee representative*

Ms. Caroline Doumeng indicates she is favorable to the adoption of the safeguard plan.

# *By the official receiver*

The official receiver issued a favorable opinion.

# *By the vice-prosecutor*

Ms, Garrigue, first Vice Prosecutor, issued a favorable opinion to the adoption of the safeguard plan.

**WHEREUPON**

Given articles L.626–1 and seq. of the Commercial Code;

Given articles R.631–27 and seq. of the Commercial Code;

Given:

the provisions of articles L.620.1, L.626.1 and L.626.2 of the Commercial Code;

that the elements furnished by the judicial administrator verified the economic conditions of the continuance of operation;

Whereas:

Oui Management is operating in a regulated, competitive sector; the proceedings made it possible to lay down the foundations for its growth and to confirm its longevity;

the plan proposed allows the maintenance of jobs and business and proposes the full repayment of the creditors in seven annual payments;

even if the plan proposed were rejected by the main creditor, who represents more than 80% of the liabilities, no alternative for maintaining employment, business and repayment of the liabilities is known;

thus there exists no other alternative to the safeguard plan except to consider official winding-up which, by definition allows neither the maintenance of the business and employment nor, in this case, repayment of the liabilities; at the hearing of the Council Chamber of April 22, 2013, Mr. Steven Dellar agreed to an acceleration of the liability repayment if the economic and/or financial conditions so allow;

subsequently, this plan seems credible;

the parties to the proceedings declared themselves favorable to the adoption of the safeguard plan; therefore, after deliberation, the court shall adopt the proposed safeguard plan.

**ON SUCH GROUNDS**

The court, deciding after a public, adversarial hearing at first instance, the Official Receiver heard in his report;

adopts the safeguard plan of SAS Oui Management, with headquarters at 20–22 Passage Dauphine, 75006 Paris, listed in the Paris business registry under B523006807 (2010B15978), operating a business of provision of services; operation of a modeling agency and provision of photographic models; the presentation, promotion, dissemination of models and photographic and

3776

cinematographic models, the placing of models in the context of events, publications and advertising campaigns organized by third parties; the leasing of all premises, offices and depots, shops related to this purpose;

**\*17** which will be implemented under his supervision by the receiver executing the plan, who will be designated hereafter;

Terminates the period of observation.

Sets the plan term at seven years.

Holds that the plan includes the following terms:

# 100% payment of debts less than 300: settlement upon adoption of the plan in accordance with the provisions of articles L.626–5 of the Commercial Code;

# Repayment of the balance of the liabilities in seven linear annuities of 14.28%, the last being 14.32%. The first such payment shall occur no later than the anniversary day of the adoption of the safeguard plan.

# Repayment of the debt of the parent firm Rosebery (500,000) after settlement of the entirety of the third-party liabilities subject to the plan.

Names Mr. Steven Dellar to joint performance of the plan, and acknowledges the commitments taken in this regard and chiefly those expressed at the hearing of April 22, 2013.

If need be, orders the inalienability of the business of Oui Management for the duration of this plan.

States that the publicity of this inalienability shall be made by the agent upon execution of the plan under the conditions provided for in article R.626–25 of the Commercial Code.

Maintains Mr. Perraud as official receiver.

Names Mr. Messinesi as substitute official receiver.

Terminates the mission of Selarl A. Miroite–F. Michel–C. Goris–N. Deshayes–C Bidan, 48 rue La Fayette, 75009 Paris, in the person of Maftre Charles Gorins, judicial administrator, and names him as agent for the performance of the plan.

States that SAS Oui Management must establish a semi-annual accounting situation at its cost throughout the duration of the plan, by the certified public accountant of its choice, and remit it to the agent for the performance of the plan no later than 45 days after the retained date of adoption. If this situation is not remitted in this time, or if the situation

presented reveals a degradation of the operation, the Agent for the performance of the plan must advise the court.

Likewise if the situation presented allows the implementation of the acceleration of the repayment of the liabilities.

Holds that the agent for performance of the plan must file an annual report with the clerk of the

Paris Commercial Court, on the conditions of performance of the plan in accordance with article R.626–43 of the Commercial Code.

Maintains Selafa MJA in the person of Maftre Leloup–Thomas, 102 Rue du Faubourg Saint Denis, CS 10023, 75479 Paris Cedex 10, in his capacity as judicial agent until the end of the proceedings of verification of receivables, and the end-of-mission report.

Holds that the present decision is rightfully enforceable provisionally by application of article R.661–1 of the Commercial Code.

Holds that the expenses of this judgment liquidated at the sum of 129.02 including all taxes, 20.94 of which are VAT, as well as the publicity and notification costs to come, shall be included in the safeguard proceedings as preferential debts.

**\*18** Retained at the hearing of the Council Chamber of April 22, 2013 where presided their honors Jean–Philippe Lotiz, Remy Perraud, Noel Pouderoux, Jean Messinesi and Philippe Bernard; Deliberated upon by the same magistrates and issued at the public hearing of May 13, 2013 where presided their honors Mr. Jean–Philippe Klotz, Presiding Judge, Messrs Rémy Perraud, Noel Pouderoux, Jean Messinesi and Philippe Bernard, Judges, assisted by Mr. Laurent Cuny, Clerk.

The Original Copy of the Judgment is signed by Mr. Jean–Philippe Klotz, presiding the deliberations, and Mr. Laurent Cuny, Clerk.

[*signatures* ]

*Copies:*

SELARL Michel–Miroite–*Gorins*

SELAFA MJA prise en la personne de

Me Leloup–Thomas

T.P.G.

3777

2013 WL 5568732

Parquet

Me Julien Balensi (Selarl Altana) avocat

*LRAR:*

SAS OUI MANAGEMErJT

Mme Carolina Doumeng

M. Steven Dellar

**TRIBUNAL DE COMMERCE DE PARIS**

**JUGEMENT DU LUNDI 13 MAI 2013-09H00**

**DEUXIEME CHAMBRE**

RG: 2013018271

22.04.2013

P.C.P201202512

— SAS OUI MANAGEMENT, RCS Paris n° B 523 006 807, dont le siège social est 20–22 passage Dauphtne 75006 Paris.

**ARRETE LE PLAN DE SAUVEGARDE**

— M. Steven Dellar, demeurant 33 rue du Four 75006 Paris, president de la SAS OUI MANAGEMENT, present assists de Me Julien Balensi de la Selarl Altana, avocat (R21),

— M. Mickael Lorieul–Cabinet DSA, 22 place du general Catroux 75017 Paris, associé cabinet expertise-comptable, présent,

— Mme Caroline Doumeng, en sa qualite de Representant des Salaries, demeurant 95 rue de la Faisanderis 75016 Paris, présente.

— SELARL Michel–Miroite–Gorins en la personne de Me Gorins, 48 rue La Fayette 75009 Paris, administrateur judiciaire present.

— la SELAFA MJA prise en la personne de Me Leloup–Thomas, 102 rue du faubourg Saint Denis–CS 10023–75479 Paris cedex 10, mandataire judiciaire, présente.

**APRES COMMUNICATION DE LA PROCEDURE AU MINISTERE PUBLIC ET APRES EN AVOIR DELIBERE**

Par jugement en date du 24 septembre 2012, le tribunal a ouvert une procedure de sauvegarde a I'egard de la SAS OUI MANAGEMENT dont le siege social est 20–22 passage Dauphine 75006 Paris représentée par M. Steven Dellar de nationalité anglaise, président, demeurant 33 rue du Four 75006 Paris.

Ce même jugement a désigné la SELARL A.Miroite–F.Michel–C .Gorins–N.Deshayes–C.Bidan en la personne de Me Gorins en qualite d'Administrateur, dans sa mission de surveillance et la SELAFA MJA en la personne de Me Leloup–Thomas en qualité de mandataire judiciaire. Ledit jugement a ouvert une période d'observation de 6 mois prorogée pour s'achever le 24 juin 2013.

La societe OUI MANAGEMENT créée en novembre 2010 est détenue à 99% par la societe ROSEBERY INVESTMENT LTD de droit anglais. M. Steven Dellar detenant 1%.

La societe OUI MANAGEMENT exploite une agence de mannequins spécialisée dans les modéles féminins àgés de plus de 16 ans. Cette activité est strictement réglementée en France, pour l'exercer il est necessaire d'obtenir une licence et de pouvoir justifier en outre d'une garantie financiere.

 **\*19**  Par arrêté n° 75.10.018 en date du 24 septembre 2010, le Préfet de la Région lle-de-France a attribue la Licence a la societe OUI MANAGEMENT, pour une duree de 3 ans, a compter du 24 septembre 2010, soit jusqu'au 23 septembre 2013.

La société justifie également d'autorisations parentales pour les mannequins âgés entre 16 et 18 ans.

Enfin la societe OUI MANAGEMENT justifie d'une garantie financiere d'un montant de 30 554,94 consentie par la MONTE PASCHI BANQUE jusqu'au 31 juillet 2013.

L'essentiel de I'activité de la société consiste à « placer » les modèles, autrement dit à trouver des contrats aupres des stylistes, photographes et publicitaires. La société gère également toute la partie opérationnelle en organisant et coordonnant le planning, le transport, le logement de ses mannequins.

Les mannequins sont rémunérés pour chaque prestation.

La société OUI MANAGEMENT emploie un effectif de 9 salariés permanents et a réalisé au 31 mars 2012 un chiffre d'affaires de 3.239.142.

WESTLAW    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

La societ6 OUI MANAGEMENT emploie egalement une centaine de mannequins dont le statut est prevu par les dispositions des articles L.7123–5 et suivants et R.7123–1 et suivants du Code du Travail. Une relation tripartite existe entre la societe OUI MANAGEMENT, le mannequin et le client de I'Agence) de sorte que plusieurs relations contractuelles existent.

Généralement une convention de collaboration et de representation est conclue entre la societe OUI MANAGEMENT et le mannequin, laquelle definit les rapports entre eux tout au long de leur collaboration. Par ailleurs, pour chaque prestation, un contrat de travail specifique est conclu entre la societ6 OUI MANAGEMENT et le mannequin qui ne produit toutefois effet que pendant la duree de la prestation fournie par le mannequin.

Enfin, un contrat de mise à disposition est conclu entre I'Agence et I'utilisateur precisant notamment les caracteristiques de la prestation demandée au mannequin.

Les difficultés résultent de l'incapacité, par manque de liquidités, de rembourser en totalité de son emprunt auprès de la société OUI FINANCING LLC portant sur la somme totale de 1.090.312,88 et dont le terme était fixé initialement au 30 septembre 2011. Après négociation, le terme a été reporté au 30 septembre 2012

Suite à des premiers remboursements, la somme qui aurait dü ëtre remboursée à cette date (capital et interets) s'élevatt à près de 870.000.

Ainsi la charge de ces engagements financiers s'avere trop lourde aux regards de I'aptitude de la société OUI MANAGEMENT à génerer une capacité de financement suffisante.

Me Gorins, administrateur judiciaire, a fait rapport au tribunal en dressant le bilan économique et social;

Ledit rapport en date du 15 mars 2013 a été déposé au greffe. II a ete communique au debiteur, au mandataira judiciaire, au ministere public et en tant que de besoin a I'autorite administrative compétente en matière de droit du travail.

 *20  Les parties ont ete invites a se presenter en chambre du conseil le 22 avril 2013 conformément aux dispositions de Particle R.626–17 du code de commerce, et ont comparu:

— Me Gorins, administrateur judiciaire,

— Me Leloup–Thomas, mandataire judiciaire,

— M. Steven Dellar président, assists de Me Julien Balensi, avocat,

— Mme Caroline Doumeng representant des salaries,

— Et M. Mickael Lorieul du Cabinet DSA, expert-comptable,

Le ministere public a été régulièrement avise de I'audience de la chambre du conseil et etait present.

*Les rapports présentés font ressortir:*

Le chiffre d'affaires de la société OUI MANAGEMENT s'élève:

Pour 2010 à la somme de 1,640.246, avec résultat d'exploitation de–725.856.

Pour 2011 à la somme de 3.239.142, avec résultat d'exploitation de–91.881.

Le passif vérifié et déposé s'établit comme suit:

### Passif de référence

| | |
|---|---|
| Privilégiés | 952.812 |
| Chirographaires (dont 500.000 de compte courant) | 504.482 |
| Contests | 51.234 |
| Passif à échoir | 95,802 |
| Passif rejete | 16.681 |
| Passif admis de référence | 1.104.329,16 |

3779

**Oui Financing LLC v. Dellar, Not Reported in F.Supp.2d (2013)**
2013 WL 5568732

Les modalités d'apurement du passif de 1.104.329,16 seront les suivantes;

# Paiement à 100% creances inferieures a 300: règlement dès I'arr222eté du plan conformément aux dispositions des articles L.626–5 du Code de commerce.

# Remboursement du solde du passif en 7 echéances linéaires de 14.28% la dernière etant de 14,32%. Le règlement de la premiere intervenant au plus tard le jour anniversaire de I'arretè du plan de sauvegarde:

# Remboursement de la creance de la societe mere ROSEBERY (500.000) après apurement de I'intÍ11egralité du passif tiers soumis au plan.

La totalite des 13 creancers de la societe OUI MANAGEMENT ont ete consultes, le titulaire du pret OUI FINANCE representant 80.98% du passif à rembourser:

— 6 creanciers ont repondu favorablement au projet de plan de sauvegarde soit 7,40%.

–1 créancier a répondu défavorablement au projet de plan de sauvegarde soit 80,98%

— 5 creanciers n'ont pas repondu dans les delais soit 11,62% etant precise que ces creanciers sont reputes avoir acquiesce au plan de sauvegarde.

Au cours de la chambre du conseil du 22 avril 2013, les observalions et les reponses suivantes ont ete présentées:

☐ *Par I'admlnistrateur judiclaire:*

Me Gorins estime que les previsions etablies sont raisonnables et qu'ainsi la capacité d'autofinancement est compatible avec un remboursement du passif declare que sur 7 ans sans hypothéquer la pérennité de la société et se declare favorable a I'adoption du plan.

☐ *Par le mandatalre judiciaire:*

Me Leloup–Thomas indique que le passif a apurer pourrait étre augmenté en cas de relevé de forclusion de la societe OUI FINANCING et émet un avis favorable dans la mesure où le plan d'apurement,

 **\*21**  a reçu I'accord de tous les autres creanciers et bénéficie du soutien de son principal actionnaire dont la creance est subordonnee a la parfaite execution du plan et qu'il répond aux critères fixés par ('article L 620–1 du Code de commerce.

☐ *Par M. Steven Dellar:*

M. Steven Dellar confirme sa confiance dans la rentabilite a venir de I'exploitation et de la capacité de OUI MANAGEMENT à rembourser le passif et s'est engagé à mettre en place une accélération du remboursement du passif si les conditions flnancières le permettraient.

☐ *Par Mme Caroline Doumeng représentante des salariés:*

Mme Caroline Doumeng indique etre favorable a I'adoption du plan de sauvegarde.

☐ *Par le juge-commissaire* :
M. le juge commlssaire emet un avis favorable,

☐ *Par le vice procureur de ta République* :

Mme Garrigue 1ere Vice Procureur de la République émet un avis favorable a son adoption du plan de sauvegarde.

**SUR QUOI,**

Vu les articles L.626–1 et suivants du Code de commerce,

Vu les articles R.631–27 et suivants du Code de commerce,

Attendu des dispositions des articles L.620.1, L.626.1 et L.626.2 du code de commerce;

Attendu que les éléments fournis par I'administrateur judiciaire ont permis de vérifier les conditions économiques de la poursuite d'exploitation;

Attendu que la société OUI MANAGEMENT evolue dans un secteur réglementé et concurrentiel;

Attendu que la procedure a permis de poser les bases de sa croissance et d'en confirmer la pérennité:

Attendu que le plan proposé permet le maintien des emplois et de I'activite et propose le remboursement integral des creancers en 7 annuites;

Attendu que mème si le plan proposé a été rejeté par le créancier principal qui représente plus de 80% du passif aucune alternative pour maintenir I'emploi, I'activité et rembourser le passif n'est connue;

Attendu qu'ainsi n'existe pas d'autre alternative au plan de sauvegarde sauf a considerer la liquidation judiciaire qui par

2013 WL 5568732

essence ne permet ni le maintien de I'activite et de I'emploi ni en I'espèce de rembourser le passif;

Attendu qu'a I'audience de la chambre du conseil du 22 avril 2013 M. Steven Dellar s'est engagé à une acceleration du remboursement du passif si les conditions economiques et/ou flnancieres le permettraient;

Attendu subsàquemment que ce plan apparalt cràdible;

Attendu que les parties a la procedure se sont declarees favorables à l'adoption du plan de sauvegarde;

En conséquence après en avoir délibéré, le tribunal adoptera le plan de sauvegarde proposé.

**PAR CES MOTIFS**

Le tribunal statuant publiquement par jugement contradidoire et en premier ressort, monsieur le juge commissaire entendu en son rapport;

Arréte le plan de sauvegarde de la SAS OUI MANAGEMENT dont le siege social est 20–22 passage Dauphine 75006, immatriculée sous le numéro B523006807 (2010B15978) au Registre du Commerce et des Sociétés de Paris, exerçant comme activité la prestation de services; I'exploitation d'une agence de mannequins et modeles photographiques; la presentation, la promotion la diffusion de mannequins et de modeles photographiques et cinématographiques; le placement de mannequins et modéles dans le cadre d'évènements, publications et campagnes publicitaires organisés par des tiers; la prise a bail en location gerance de tout local, bureau et entrepot, boutique ayant trait à cet objet; qui sera mis en ceuvre sous son controls par le commissaire a I'execution du plan qui sera designe ci-après;

**\*22** Met fin à la périod e d'observation.

Fixe la duree du plan à 7 ans.

Dit que le plan comprend les dispositions suivantes:

# Paiement à 100% creances inferieures a 300: reglement des I'arrete du plan conformement aux dispositions des articles L 626–5 du Code de commerce.

# Remboursement du solde du passif en 7 echeances lineaires de 14.28% la dernière étant de 14,32%. Le règlement de la premiere intervenant au plus tard le Jour anniversaire de I'arrete du plan de sauvegarde:

# Remboursement de la creance de la societe mere ROSEBERY (500.000) après apurement de I'intÍ11egralité du passif tiers soumis au plan.

Designe M, Steven Cellar, comme tenu d'executer conjointement ie plan, et constate les engagements pris a cet egard et notamment ceux exprimés à I'audience du 22 avril 2013.

Prononce en tant que de besoin I'inalienabilite du fonds de commerce de la société OUI MANAGEMENT pendant la duree du present plan.

Dit que la publicite de cette inalienabilite sera effectuee par le commissaire a I'execution du plan dans les conditions prévues à I'article R.626–25 du code de commerce.

Maintient M. Perraud juge commissaire.

Designe M. Messinesi juge commissaire supplant.

Met fin a la mission de la SELARL A.Mtroite–F.Michel–C.Gorins–N.Deshayes–C.Bidan, 48 rue La

Fayette 75009 Paris, en la personne de Me Charles Gorins administrateur judiciaire et la d6signe en qualité de commissaire à I'exécutiondu plan

Dit que la'SAS OUI MANAGEMENT pendant toute la duree du plan, devra faire etablir, a ses frais, une situation comptable semestrielle, par I'expert-comptable de son choix et la remettre à M. le commissaire a I'execution du plan au plus tard 45 jours apres la date d'arrété retenue. Si cette situation n'est pas remise dans ce délai ou si la situation presentee revelait une degradation de I'exploitation, M. le commissaire a I'execution du plan devra saisir le tribunal il en sera de même si la situation présentée permettrait la mise en ceuvre de I'accÍ11elération du remboursement du passif. Dit que le commissaire a I'execution du plan devra deposer au greffe du tribunal de commerce de Paris un rapport annuel sur les conditions d'execution du plan conformement a I'article R.626–43 du Code de commerce.

Maintient la SELAFA MJA prise en la personne de Me Leloup–Thomas, 102 rue du faubourg Saint Denis–CS 10023–75479 Paris cedex 10, en sa qualité de mandataire judiciaire jusqu'a la fin de la procédure de verification des creances, et le compte rendu de fin de mission.

Dit que la presente decision est executoire de plein droit a litre provisoire en application de I'article R.661–1 du Code de commerce.

Dit que les depens du présent jugement liquidés a la somme de: 129,02 T.T.C. dont 20,94 de T.V.A., ainsi que les frais de publicite et de notification a venir, seront portés en frais privilégiés de la procedure de sauvegarde.

 **\*23** Retenu a I'audience de la chambre du conseil du 22 avril 2013 ou siegeaient MM. Jean–Philippe Klotz, Remy Perraud, Noel Pouderoux, Jean Messinesi et Philippe Bernard; Délibéré par les mêmes magistrats et prononcé à I'audience publique du 13 mai 2013 où siegeaient: M. Jean–Philippe Klotz, president, MM. Rémy Perraud, Noel Pouderoux, Jean Messinesi et Philippe Bernard, juges, assistés de M. Laurent Cuny, greffier;

La Minute du Jugement est signée par M. Jean–Philippe Klotz, président du delibéré, et M. Laurent Cuny, greffier

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 5568732

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 62

2022 WL 135398

2022 WL 135398
Only the Westlaw citation is currently available.
United States District Court, E.D. Virginia,
Richmond Division.

Joel PATTERSON, et al., Appellants,

v.

MAHWAH BERGEN RETAIL
GROUP, INC., Appellee.

Civil No. 3:21cv167 (DJN)
|
Signed 01/13/2022

**Attorneys and Law Firms**

Ronald Allen Page, Jr., Ronald Page, PLC, N. Chesterfield, VA, John Phillip Schneider, Pro Hac Vice, Lowenstein Sandler LLP, New York, NY, Andrew David Behlmann, Pro Hac Vice, Michael Seth Etkin, Pro Hac Vice, Michael Papandrea, Pro Hac Vice, Lowenstein Sandler LLP, Roseland, NJ, for Appellants Joel Patterson, Michaella Corporation.

Kathryn R. Montgomery, United States Department of Justice Office of the United States Trustee, Richmond, VA, Hugh Michael Bernstein, Pro Hac Vice, US Department of Justice, Baltimore, MD, Sumi Sakata, Pro Hac Vice, United States Department of Justice, Washington, DC, for Appellant John P. Fitzgerald.

Cullen Drescher Speckhart, Pro Hac Vice, Cooley LLP, Andrew C. Lawrence, Pro Hac Vice, George Hicks, Jr., Pro Hac Vice, Kirkland & Ellis LLP, Washington, DC, John R. Luze, Pro Hac Vice, Kirkland & Ellis LLP, Chicago, IL, for Appellee.

**MEMORANDUM OPINION**

David J. Novak, United States District Judge

 **\*1**  This case arises out of the bankruptcy cases commenced by Mahwah Bergen Retail Group, Inc. (f/k/a Ascena Retail Group, Inc.) ("Mahwah" or "Ascena") and sixty-three of its affiliates (collectively, the "Debtors"). The United States Bankruptcy Court for the Eastern District of Virginia ("Bankruptcy Court") confirmed the reorganization plan ("the Plan") set forth by the parties in interest, and Joel

Patterson and Michaella Corporation ("Securities Litigation Lead Plaintiffs") filed notices of appeal to this Court. Likewise, the United States Trustee ("Trustee") filed a notice of appeal of the confirmation to this Court.[1] The appeals were consolidated into this action.[2] In these appeals, Appellants challenge third-party (non-debtor) releases, as well as an exculpation provision, contained in the Plan.

[1]    The United States Securities and Exchange Commission (SEC) supported the Trustee's appeal as an amicus.

[2]    The other appeals consolidated into this action are Case No. 3:21cv166 and Case No. 3:21cv205.

This appeal implicates the most fundamental right guaranteed by the due process clause in our judicial system: the right to be heard before the loss of one's rights. "For more than a century the central meaning of procedural due process has been clear: 'Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.' " *Fuentes v. Shevin*, 407 U.S. 67, 80, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) (quoting *Baldwin v. Hale*, 68 U.S. 1 Wall. 223, 233, 17 L.Ed. 531 (1863)). "And, the Supreme Court has explained that the particular constitutional protection afforded by access to the courts is 'the right conservative of all other rights, and lies at the foundation of orderly government.' " *Cromer v. Kraft Foods N. Am., Inc.*, 390 F.3d 812, 817 (4th Cir. 2004) (quoting *Chambers v. Baltimore & O. R. Co.*, 207 U.S. 142, 148, 28 S.Ct. 34, 52 L.Ed. 143 (1907)). Furthermore, "[t]his right ... has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest." *Schroeder v. City of New York*, 371 U.S. 208, 212, 83 S.Ct. 279, 9 L.Ed.2d 255 (1962) (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950)). Relatedly, "parties who choose to resolve litigation through settlement may not dispose of the claims of a third party, and *a fortiori* may not impose duties or obligations on a third party, without that party's agreement." *Loc. No. 93, Int'l Ass'n of Firefighters AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 529 (1986). This is so, because the general rule provides "that a person cannot be deprived of his legal rights in a proceeding to which he is not a party." *Martin v. Wilks*, 490 U.S. 755, 759, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989); *see also id.* at 762, 109 S.Ct. 2180 ("A judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings.").

3784

These fundamental principles resonate with force in this appeal from the Bankruptcy Court, as third-party releases strike at the heart of these foundational rights. The United States Trustee — a statutory watchdog over bankruptcy proceedings — and the Securities Litigation Lead Plaintiffs, as designated by a United States District Judge in a putative class action alleging securities fraud, challenge the approval by the Bankruptcy Court[3] of exceedingly broad third-party (non-debtor) releases, as well as an exculpation provision, contained in the Plan submitted by Debtors.

[3]    The Honorable Kevin R. Huennekens, United States Bankruptcy Judge for the Eastern District of Virginia (Richmond Division).

 **\*2**  Third-party releases, such as those at issue here, carry much controversy, for they are a "device that lends itself to abuse." *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005). Indeed, several Courts of Appeals (the Fifth, Ninth and Tenth Circuits) prohibit the use of third-party releases. *See, e.g.*, *In re Pac. Lumber Co.*, 584 F.3d 229, 251-53 (5th Cir. 2009); *In re Lowenschuss*, 67 F.3d 1394, 1401-02 (9th Cir. 1995); *In re W. Real Estate Fund, Inc.*, 922 F.2d 592, 600-02 (10th Cir. 1990). And a District Judge in the Southern District of New York recently concluded in a thoughtful opinion that no statutory basis exists for their use. *In re Purdue Pharma, L.P.*, 2021 WL 5979108 (S.D.N.Y. Dec. 16, 2021).

The Fourth Circuit has made clear that the use of third-party releases is disfavored, saying that such releases should be "granted cautiously and infrequently." *Behrmann v. Nat'l Heritage Found.*, 663 F.3d 704, 712 (4th Cir. 2011). Other circuits that permit their use likewise reserve their utilization for the rare or exceptional case. *See, e.g.*, *In re Millennium Lab Holdings II, LLC*, 945 F.3d 126, 139 (3d Cir. 2019) (directing that "courts considering such releases do so with caution .... [and] with the utmost care and to thoroughly explain the justification for any such inclusion"); *In re Seaside Eng'g & Surveying, Inc.*, 780 F.3d 1070, 1078 (11th Cir. 2015) (permitting releases and bar orders but cautioning that they "ought not to be issued lightly, and should be reserved for those unusual cases in which such an order is necessary for the success of the reorganization, and only in situations in which such an order is fair and equitable under all the facts and circumstances"); *In re Metromedia Fiber Network, Inc.*, 416 F.3d at 141-43 (holding that involuntary releases should only be approved if they form an important part in a reorganization plan, and that they are proper "only in rare cases"); *In re Dow Corning Corp.*, 280 F.3d 648, 657-58 (6th Cir. 2002) ("Because such an injunction is a dramatic measure to be used cautiously, we follow those circuits that have held that enjoining a non-consenting creditor's claim is only appropriate in 'unusual circumstances.' ").

Despite these admonitions, the Bankruptcy Court for the Richmond Division of this district regularly approves third-party releases, as acknowledged by Debtors' counsel during oral argument. (Tr. of Dec. 20, 2021 Argument ("Arg. Tr.") at 6:8-14 (ECF No. 75).) This recurrent practice contributes to major companies like Mahwah (a New Jersey company) using the permissive venue provisions of the Bankruptcy Code to file for bankruptcy here.[4] Indeed, according to the Trustee, the Richmond Division (just the division, not the entire Eastern District of Virginia) joins the District of Delaware, the Southern District of New York, and the Houston Division of the Southern District of Texas as the venue choice for 91% of the "mega" bankruptcy cases. (Reply Br. of Appellant John P. Fitzgerald, III, Acting United States Trustee for Region 4 ("Trustee Reply Br.") at 22-23 (ECF No. 45).) The ubiquity of third-party releases in the Richmond Division demands even greater scrutiny of the propriety of such releases. And, their prevalence also undermines assertions that they are integral to the success of this particular reorganization plan. As District Judge Colleen McMahon astutely observed: "When every case is unique, none is unique." *In re Purdue Pharma, L.P.*, 2021 WL 5979108, at \*3.

[4]    To be clear, venue properly exists in the Richmond Division, as Debtors latched onto the existing bankruptcy of one of their affiliates, Dress Barn, which is incorporated in Virginia, as the basis for venue. 28 U.S.C. § 1408. Consequently, the question is not whether venue was proper here, but instead why Debtors chose this venue over the many other venue options that it had available to it. During oral argument, counsel for Debtors had no explanation for his client's choice of Richmond to file for bankruptcy. (Arg. Tr. at 78:20-22.)

 **\*3**  The Third-Party Releases at issue in this case represent the worst of this all-too-common practice, as they have no bounds. The sheer breadth of the releases can only be described as shocking. They release the claims of *at least* hundreds of thousands of potential plaintiffs not involved in the bankruptcy, shielding an incalculable number of individuals associated with Debtors in some form, from every conceivable claim — both federal and state claims — for an unspecified time period stretching back to time immemorial. In doing so, the releases close the courthouse doors to an immeasurable number of potential plaintiffs, while protecting

corporate insiders who had no role in the reorganization of the company. Yet, the Bankruptcy Court — acting with its limited Article I powers — extinguished these claims with little or no analysis. In doing so, the Bankruptcy Court exceeded the constitutional limits of its authority as delineated by the Supreme Court in *Stern v. Marshall*, 564 U.S. 462, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011), ignored the mandates of the Fourth Circuit in *Behrmann*, and offended the most fundamental precepts of due process.

Likewise, the Bankruptcy Court erred by approving an overly broad Exculpation Provision that exceeds the bounds of similar provisions approved in other cases. However, unlike the Third-Party Releases that must be voided and severed from the reorganization plan, redrafting can salvage the Exculpation Provision on remand.

Accordingly, this case will be remanded to the Bankruptcy Court for further proceedings consistent with this opinion.

# I. FACTUAL BACKGROUND[5]

[5] Unless otherwise cited, the Court takes these facts from the Bankruptcy Court's Opinion ("Bankr. Confirm. Op.") explaining its reasoning for confirming the Plan, found at pages USTAPP 2837-2876 of the Trustee's Appendix (("USTAPP") (ECF Nos. 35-1 through 35-3)). In citing pages contained in the Trustee's Appendix, the Court will cite to the page numbers following "UST" in the Trustee's Appendix.

Ascena provided specialty retail apparel for women and girls, operating approximately 2,800 stores in the United States, Canada and Puerto Rico, which served more than 12.5 million customers and employed nearly 40,000 employees. Debtors held a portfolio of recognizable brands, including Ann Taylor, LOFT, Lane Bryant, Catherines, Justice, Lou & Grey and Cacique.

Beginning in March 2020, Debtors had to temporarily close all of their retail stores due to the COVID-19 pandemic, and in so doing, furloughed nearly all of their store-level workforce as well as a substantial portion of their corporate workforce. At the time, Debtors had approximately $1.6 billion in secured debt and $700 to $800 million in unsecured debt. (USTAPP 1592, 1599.) Before filing for bankruptcy, Debtors negotiated with many of their secured lenders to arrive at a restructuring support agreement, which formed the basis of the original chapter 11 plan. (USTAPP 1591.) Then,

on July 23, 2020, Debtors commenced the Bankruptcy Cases that ultimately were consolidated into Case No. 20bk33113 in the Bankruptcy Court. However, rather than reorganize, Debtors ultimately largely liquidated the businesses, selling substantially all of the assets for a total sale price of $651.8 million. (USTAPP 2259-61, 2262-64, 2265-67, 2320.) Thereafter, they filed an amended chapter 11 plan. (Amended Joint Chapter 11 Plan of Reorganization of Mahwah Bergan Retail Group, Inc. and Its Debtor Affiliates (the "Plan") (USTAPP 2410-2529).)

## A. The Plan

The Plan provided that some secured lenders would be paid in full, general unsecured creditors would receive pro rata payments from a trust funded by $7.25 million in cash and the remaining class of secured claims would receive the remainder of Debtors' cash. (USTAPP 2621-36.) The shareholders would receive nothing and the Plan would extinguish their equity interest. (USTAPP 2634.)

On February 25, 2021, the Bankruptcy Court conducted an evidentiary hearing to consider the Debtors' Plan in addition to the unresolved objections filed by the SEC and the Trustee, as well as those raised by Joel Patterson and Michaella Corporation, the lead plaintiffs in a securities fraud action against Ascena and two of its former executives pending in the United States District Court for the District of New Jersey (the "Securities Litigation"). The Bankruptcy Court overruled the objections and confirmed the Plan and, on February 25, 2021, entered the Confirmation Order confirming the Plan. Then, on March 9, 2021, the Bankruptcy Court entered its Memorandum Opinion to supplement its findings of facts and conclusions of law in the Confirmation Order.

**\*4** Before confirming the Plan, the Bankruptcy Court had to first approve a Disclosure Statement that would supply creditors and interest holders with information about the proposed plan as a part of the solicitation process. Accordingly, on September 10, 2020, the Bankruptcy Court held a hearing regarding the Disclosure Statement. In response to objections by the SEC, the Bankruptcy Court required Debtors to amend the Disclosure Statement to include language recommended by the SEC, so that the notice would more clearly convey information to non-voting equity holders about the provisions of the Plan, including the inclusion of Third-Party Releases, the right of each non-voting equity holder to opt out of the Third-Party Releases and the process for doing so. Additionally, in response to objections by the Securities Litigation Lead

3786

Plaintiffs, the Bankruptcy Court adopted additional steps to effectuate notice of the Disclosure Statement. However, the Bankruptcy Court overruled the Trustee's objections, which closely resembled the issues that he raises in this appeal.

The sale of Debtors' brands for $651 million allowed their brands to continue under new ownership and brought proceeds into Debtors' estate for the benefit of creditors. Debtors' term lenders and the Creditors' Committee endorsed the Plan. The Plan provided for certain payment structures to Debtors' creditors. The unsecured creditors also received a waiver of any avoidance actions that Debtors' estate could bring against them. The holders of equity interest in Ascena were not projected to receive any distribution and, therefore, were deemed to reject the Plan. The Plan also included broad releases that form the basis of this appeal.

### B. The Releases Contained in the Plan

As part of the Plan, the major stakeholders negotiated and included extremely broad and convoluted releases and an exculpation provision. Specifically, the Plan provides for the following Debtors' Releases:

> [E]ach Released Party is conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates ... from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors ... based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the purchase, sale, or rescission of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan,... or any other related agreement, or upon any other act, omission, transaction, agreement, event, or other occurrence (in each case, related to any of the foregoing) taking place on or before the Effective Date.

(USTAPP 2460-61.) The Plan further provides for the following Release by holders of Claims or Interests ("Third-Party Releases"):

> Effective as of the Effective Date, each Releasing Party in each case except for Claims arising under, or preserved by, the Plan, Each Releasing Party (other than the Debtors and the Reorganized Debtors), in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other Entities who

may purport to assert any claim, Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, is deemed to have released and discharged each Debtor, Reorganized Debtor, and each other Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Debtors ... based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the purchase, sale, or rescission of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the ABL Credit Agreement, the Term Loan Credit Agreement, the Chapter 11 Cases, the Restructuring Support Agreement and related prepetition transactions, the Backstop Commitment Letter, the Disclosure Statement, the New Corporate Governance Documents, the Exit Facilities, the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act, omission, transaction, agreement, event, or other occurrence (in each case, related to any of the foregoing) taking place on or before the Effective Date.

**\*5** (USTAPP 2461.)

The Plan defines "Releasing Party" broadly to include:

> [C]ollectively, and in each case in its capacity as such: (a) each of the Debtors; (b) the Reorganized Debtors; (c) each of the Consenting Stakeholders; (d) the ABL Agent; (e) the ABL Lenders; (f) Term Loan Agent; (g) the Term Loan Lenders; (h) each of the lenders and administrative agents under the Exit Facilities; (i) the Backstop Parties; (j) the DIP ABL Agent; (k) the DIP ABL Lenders; (1) the DIP Term Agent; (m) the DIP Lenders; (n) all holders of Impaired Claims who voted to accept the Plan; (o) all holders of Impaired Claims who abstained from voting on

3787

the Plan or voted to reject the Plan but did not timely opt out of or object to the applicable release; (p) all holders of Unimpaired Claims who did not timely opt out of or object to the applicable release; (q) all holders of Interests; (r) the Plan Administrator; (s) each current and former Affiliate of each Entity in foregoing clause (a) through the following clause (t); (t) each Related Party of each Entity in the foregoing clause (a) through clause (t); and (u) the Creditors' Committee; *provided* that, in each case, an Entity shall not be a Releasing Party if it: (x) elects to opt of the releases contained in the Plan, or (y) timely objects to the releases contained in the Plan and such objection is not resolved before Confirmation; *provided further* that any such Entity shall not receive the Avoidance Action waiver. (USTAPP 2427.) Thus, Releasing Parties includes all holders of claims and interests who do not timely opt out of or object to the Third-Party Releases.

Likewise, the Plan defines "Released Party" broadly, to include:

> [C]ollectively, each of the following in their capacity as such: (a) each of the Debtors; (b) the Reorganized Debtors; (c) each of the Consenting Stakeholders; (d) the ABL Agent; (e) the ABL Lenders; (f) the Term Loan Agent; (g) the Term Loan Lenders; (h) each of the lenders and administrative agents under the Exit Facilities; (i) the Backstop Parties; (j) the DIP ABL Agent; (k) the DIP ABL Lenders; (1) the DIP Term Agent; (m) the DIP Term Lenders; (n) the Plan Administrator; (o) each current and former Affiliate of Each Entity in the foregoing clause (a) through this clause (p); (p) each Related Party of each Entity in the foregoing clause (a) through this clause (p); and (q) the Creditors' Committee; *provided* that any holder of a Claim or Interest that opts out of the releases shall not be a "Released Party."

(USTAPP 2427.)

In turn, the Plan then defines the term "Related Party" to include:

> [W]ith respect to any person or Entity, each of, and in each case in its capacity as such, current and former directors, managers, officers, investment committee members, special or other committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals,

members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors of such person or Entity, and any such Person's or Entity's respective heirs, executors, estates, and nominees.

**\*6** (USTAPP 2426.)

Finally, the Plan provides for the following Exculpation Provision:

> [N]o Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action or any claim arising from the Petition Date through the Effective Date related to any act or omission in connection with, relating to or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Exit Facilities, the Backstop Commitment Letter, the DIP Financing Order, Cash Collateral Order, or any Restructuring Document, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omissions that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation

3788

of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

(USTAPP 2461-62.)

The Plan defines "Exculpated Parties," in turn, to include:

> (a) each of the Debtors; (b) each of the Reorganized Debtors; (c) each of the Consenting Stakeholders; the Creditors' Committee and its members; (e) the Term Loan Agent; (f) each current and former Affiliate of each Entity in clause (a) through the following clause (g); and (g) each Related Party of each Entity in clause (a) through this clause (g).

(USTAPP 2422.)

### C. The Notice

Any reasonable review of the Third-Party Releases leads to a conclusion that the releases cover any type of claim that existed or could have been brought against anyone associated with Debtors as of the effective date of the plan. Yet, the Bankruptcy Court (and now Debtors as well) only focused on one claim against Ascena and two of its former corporate officers: a putative class action alleging securities fraud brought against Ascena, former CEO David Jaffe and former CFO Robert Giammatteo. By doing so, the Bankruptcy Court ignored all of the other potential claims (both federal and state claims) released against others covered by the releases, as well as neglected to address any other potential claims against Jaffe and Giammatteo. This tunnel vision proves fatal to any notions of proper notice (as well as consent) in this case.

 **\*7**  With its focus on the securities fraud litigation, the Bankruptcy Court approved a disclosure statement for dissemination to creditors and shareholders after a hearing. (USTAPP 0942, 0980-82.) The Bankruptcy Court required a Notice of Non-Voting Status to be sent to both current and former shareholders of Ascena during the Putative Class Period. The Notice of Non-Voting Status informed the recipients that they could opt out of the Third-Party Releases by returning an enclosed form no later than November 15, 2020. The Notice of Non-Voting Status stated in bold and underlined text that, under Debtors' Plan, **"you will be deemed to have released whatever claims you may have against many other people and entities (including company officers and directors) unless you return the enclosed 'Release Opt-Out Form'."** The recipient could

return a hardcopy form in the pre-addressed, pre-paid envelope or electronically through an online portal, which would effectuate the opt-out.

The Bankruptcy Court did not order that any notice or opt-out forms be sent to all of the Releasing Parties, including the current and former employees, consultants, accountants or attorneys of Debtors, their affiliates, lenders, creditors or interest holders. Nor did it even examine other possible causes of action released. Prime Clerk — essentially a middleman in this process — bore responsibility for notifying the equity holders. Prime Clerk sent the notice and opt-out forms by first-class mail to all current and former registered holders identified by Ascena's transfer agent, American Stock Transfer & Trust Company, LLC ("AST"). As to the beneficial holders, Prime Clerk served the notice and opt-out forms on the list of Nominees with instructions to forward the materials to their beneficial holder clients as of the voting record date and their beneficial holder clients who had purchased or otherwise acquired the equity interest during the Putative Class Period. Additionally, the Bankruptcy Court ordered publication of a general notice of the confirmation hearing in *USA Today* and *The New York Times*. (USTAPP 0985-86.) This notice ran for one day and included the day and time of the hearing, the deadline by which to object to the Plan and that the Plan contained a third-party release. (USTAPP 1559.)

Throughout this process, Debtors sent notice of the Third-Party Releases and the opt-out procedure to roughly 300,000 parties believed to be potential members of the putative class action case pending in the New Jersey district court. The record lacks any information about how many of the parties actually received the notice or any mention of efforts to determine the success of the attempts at notice regarding the securities fraud litigation. As of November 18, 2020, Debtors had received approximately 596 Release Opt-Out Forms — approximately 0.2% of those targeted by the notice.

### D. The Securities Litigation

Although not directly related to the procedural or factual history of the bankruptcy proceeding, the Third-Party Releases essentially thwart a lawsuit filed in a separate federal court. In June 2019, the Securities Litigation Lead Plaintiffs filed a federal securities putative class action in the United States District Court for the District of New Jersey.[6] On November 21, 2019, the Securities Litigation Lead Plaintiffs filed a Consolidated Amended Complaint against Debtors

3789

and the Individual Defendants, which included Debtors' former CEO (Jaffe) and CFO (Giammatteo). The proposed class included all persons, other than the defendants, who purchased or otherwise acquired Debtors' common stock between December 1, 2015 and May 17, 2017. The Amended Complaint asserts claims under the Securities Exchange Act of 1934 and generally alleges that the defendants engaged in a deceptive scheme and made false and misleading statements and omissions that artificially inflated the price of the common stock during the class period.

6        *Newman v. Ascena Retail Group, Inc., et al.*, 2:19cv13529 (D.N.J.).

**\*8**  The Securities Litigation Lead Plaintiffs objected to the Third-Party Releases, but the Bankruptcy Court overruled their objections. Moreover, they attempted to opt out of the Third-Party Releases on behalf of the putative class, but the Bankruptcy Court denied that request. The Securities Litigation Lead Plaintiffs now appeal those decisions, as the Third-Party Releases in this case has halted the New Jersey case before reaching the class certification stage.

## II. PROCEDURAL HISTORY

On March 12, 2021, the Securities Litigation Lead Plaintiffs filed two notices of appeal of the Confirmation Order to this Court.[7] In their appeals, the Securities Litigation Lead Plaintiffs argue that the Bankruptcy Court erred in approving the Third-Party Releases to the extent that the Third-Party Releases relate to the claims asserted in the Securities Litigation. (Opening Br. of Appellants Joel Patterson and Michaella Corp. ("Appellants' Br.") at 7 (ECF No. 30).) The Securities Litigation Lead Plaintiffs further argue that the Bankruptcy Court erred in finding that they lack standing to object to the Third-Party Releases and that they could not opt out on behalf of the class that they seek to represent. (Appellants' Br. at 7-8.)

7        The Securities Litigation Lead Plaintiff's other notice of appeal initiated Case No. 3:21cv166, which the Court then consolidated into this action.

On March 26, 2021, the Trustee filed a notice of appeal of the Confirmation Order to this Court.[8] The Court consolidated the Trustee's appeal with the other pending appeals into this case and set a briefing schedule. (ECF Nos. 11, 15.) In his appeal, the Trustee argues that the Bankruptcy Court erred by approving the Third-Party Releases and Exculpation

Provision contained in the Plan and approved by the Confirmation Order. (Br. of Appellee [*sic*] John P. Fitzgerald, III, Acting United States Trustee For Region 4 ("Trustee Br.") at 2 (ECF No. 35).) The Trustee further argues that the Bankruptcy Court erred in the manner in which it conducted the confirmation approval process. (Trustee Br. at 47-50.)

8        The Trustee's notice of appeal initiated Case No. 3:21cv205, which the Court then consolidated into this action.

After filing the appeal, the Trustee filed a motion to stay in the Bankruptcy Court, asking the Bankruptcy Court to stay the application of the Plan's exculpation and release provisions pending the adjudication of this appeal. On May 13, 2021, the Bankruptcy Court conducted a hearing on the stay motion below. Then, on May 28, 2021, the Bankruptcy Court denied the Trustee's stay motion and entered a Memorandum Opinion ("Bankr. Stay. Op." (USTAPP 2877-2904)) setting forth its findings of facts and conclusions of law.

On June 2, 2021, the Trustee filed a Motion to Stay in this Court (ECF No. 18), in which the Securities Litigation Lead Plaintiffs joined. (ECF No. 28.) Debtors opposed the stay. (ECF No. 27.) On June 28, 2021, the Court denied the Motion to Stay, finding that the Trustee had failed to meet the high burden required for a party seeking a stay. (ECF Nos. 33-34.)

On September 10, 2021, Debtors filed their Response Brief for Appellee Mahwah Bergen Retail Group, Inc. (("Appellee Br.") (ECF No. 43).) On October 11, 2021, the Securities Litigation Lead Plaintiffs and the Trustee each filed a reply brief, respectively. (("Trustee Reply Br.") (ECF No. 45); (Reply Br. of Appellants Joel Patterson and Michaela Corp.) ("Appellants' Reply Br.") (ECF No. 46).) On December 20, 2021, the Court held oral argument on this appeal, rendering it ripe for review. For the reasons stated below, the Court finds that the Bankruptcy Court erred in its approval of the Third-Party Releases and the Exculpation Provision.

## III. STANDARD OF REVIEW

**\*9**  "When reviewing a decision of the bankruptcy court [rendered in a core proceeding], a district court functions as an appellate court and applies the standards of review in federal courts of appeal." *Paramount Home Ent. Inc. v. Cir. City Stores, Inc.*, 445 B.R. 521, 526-27 (E.D. Va. 2010) (citing *In re Webb*, 954 F.2d 1102, 1103-04 (5th Cir. 1992)). Specifically, "[t]he district court reviews the bankruptcy court's legal

2022 WL 135398

conclusions *de novo* and its factual findings for clear error." *Mar-Bow Value Partners, LLC v. McKinsey Recovery & Transformation Serv. US, LLC*, 578 B.R. 325, 328 (E.D. Va. 2017) (citing *In re Harford Sands Inc.*, 372 F.3d 637, 639 (4th Cir. 2004)). Clear error exists when the district court " 'is left with the definite and firm conviction that a mistake has been committed.' " *Id.* (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)). In cases involving questions of law and fact, the Court reviews findings of fact under the clearly erroneous standard and reviews *de novo* the legal conclusions derived from those facts. *Gilbane Bldg. Co. v. Fed. Rsv. Bank of Richmond, Charlotte Branch*, 80 F.3d 895, 905 (4th Cir. 1996).

Conversely, if the proceeding before the Bankruptcy Court constitutes a non-core proceeding and the parties did not consent to the Bankruptcy Court's jurisdiction, "the district court ... undertake[s] de novo analysis of both the factual findings to which [the appellant] objected and the law." *In re Apex Express Corp.*, 190 F.3d 624, 630 (4th Cir. 1999). Indeed, 28 U.S.C. § 157(c)(1) directs:

> A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.

Relatedly, Bankruptcy Rule 8018.1 provides that:

> If, on appeal, a district court determines that the bankruptcy court did not have the power under Article III of the Constitution to enter the judgment, order, or decree appealed from, the district court may treat it as proposed findings of fact and conclusions of law.

Fed. R. Bankr. P. 8018.1. The district court then reviews such proposed findings of fact and conclusions of law *de novo*. Fed. R. Bankr. P. 9033(d).

## IV. ANALYSIS

This appeal requires the Court to first determine whether the Bankruptcy Court exceeded its authority under the Constitution when it released the claims included in the Third-Party Releases. This analysis will encompass whether the Releasing Parties consented to the jurisdiction of the Bankruptcy Court. Next, the Court must determine whether the Bankruptcy Court erred in approving the Third-Party Releases under applicable Fourth Circuit standards. This, again, will require an analysis of whether the parties consented to the Third-Party Releases. Then, the Court will address Appellee's argument that the Court must dismiss this appeal on equitable mootness grounds. Finally, the Court will examine the challenge to the Exculpation Provision. However, before addressing the merits of the appeal, the Court will address whether Appellants have standing to press this appeal.

### A. Standing to Appeal

#### 1. The United States Trustee's Standing to Appeal

During oral argument, Debtors' counsel conceded that Debtors have no challenge to the standing of the Trustee to appeal. (Arg. Tr. at 20:10-11.) Debtors make this concession for good reason. The Bankruptcy Code gives the United States Trustee standing, providing that the Trustee "may raise and may appear and be heard on any issue in any case or proceeding under this title but may not file a plan pursuant to section 1121(c) of this title." 11 U.S.C. § 307. The Trustee serves the role of "protecting the public interest and ensuring that bankruptcy cases are conducted according to law." *In re Clark*, 927 F.2d 793, 795 (4th Cir. 1991) (quotations omitted). Given their role, the Fourth Circuit has recognized that a trustee could never satisfy the "person aggrieved standard," discussed below, but still has standing to appeal adverse bankruptcy decisions in its role as a "public watchdog" over bankruptcy proceedings. *See id.* at 796 ("[S]tanding to appeal under the Bankruptcy Act as a 'party aggrieved' may arise from a party's official duty to enforce the bankruptcy law in the public interest."). The Fourth Circuit noted that, "had Congress intended to prohibit U.S. trustees from appealing adverse bankruptcy court rulings, it would have done so explicitly." *Id.* Accordingly, the Trustee has standing to appeal to this Court. And, his appeal of the Third-Party Releases encompasses the appeal advanced by the Securities Litigation Lead Plaintiffs. This leaves the Court with no reservations that it can consider the merits of the appeal regardless of whether the Securities Litigation Lead Plaintiffs have standing.

#### 2. The Securities Litigation Lead Plaintiffs' Lack of Standing to Appeal

**\*10** The Debtors do, however, challenge the Securities Litigation Lead Plaintiffs' standing to prosecute this appeal. (Appellee Br. at 48.) Specifically, Debtors argue that by objecting to the Third-Party Releases, the Securities Litigation Lead Plaintiffs opted out of the release and, therefore, it has no impact on them. The Court agrees and finds that the Securities Litigation Lead Plaintiffs lack standing to prosecute this appeal.

"The test for standing to appeal a bankruptcy court's order to the district court is well-established: the appellant must be a *person aggrieved* by the bankruptcy order." *Mar-Bow Value Partners, LLC v. McKinsey Recovery & Transformation Serv. US LLC*, 469 F. Supp. 3d 505, 523 (E.D. Va. 2020) (internal quotations omitted). To satisfy the person aggrieved standard, "the appellant must show that the order diminishes its property, increases its burdens, or impairs its rights." *Id.* (internal quotations omitted).

Here, the Securities Litigation Lead Plaintiffs argue that they were placed in a "death trap" by being forced to choose between either not opting out, and thereby waiving significant rights, or opting out (as they ultimately chose) and risking a challenge to their standing. Although the Court is sympathetic to the conundrum in which they were placed, tough strategic decisions do not confer standing. Moreover, this tough strategic decision resulted in the Third-Party Releases having no binding effect on them as individuals. They may still pursue any and all claims that the Third-Party Releases purport to release. Thus, they cannot complain of any diminution of property, increase in burden or impairment of rights in their individual capacity. Although they claim that the Third-Party Releases inhibit their ability to enlarge their recovery in the Securities Action (Appellants' Reply at 18), they actually seek to enlarge the recovery of the putative class — *i.e.*, more class members obtaining a recovery, leading to a greater overall class recovery — not necessarily their own personal recovery. As such, the Securities Litigation Lead Plaintiffs must pin their hopes of establishing standing on harm suffered in their capacity as putative representatives of the class.

However, the Securities Litigation Lead Plaintiffs' capacity as putative representatives of a class in the District of New Jersey does not confer standing to appeal in this Court. The Securities Litigation Lead Plaintiffs claim that they have standing "because they are fiduciaries for the Class, have rights closely aligned with those of Class members, and are the court-appointed advocate for Class members' rights." (Appellants' Reply at 19.) However, this argument puts too much weight on their role as putative class representatives. As lead plaintiffs in a *putative* class action, the Securities Litigation Lead Plaintiffs have no special status; consequently, they must establish individualized harm. *See Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 165, 136 S.Ct. 663, 193 L.Ed.2d 571 (2016) ("While a class lacks independent status until certified,... a would-be class representative with a live claim of her own must be accorded a fair opportunity to show that certification is warranted."). As the Fourth Circuit has noted, "[n]ot every effort to represent a class will succeed; the representative is an agent only if the class is certified." *Gentry v. Siegel*, 668 F.3d 83, 90 (4th Cir. 2012). Accordingly, the Securities Litigation Lead Plaintiffs' argument that their representative capacity confers standing on them relies on the speculation that they will eventually represent a certified class. But, "[s]peculation and conjecture do not give rise to bankruptcy appellate standing." *Mar-Bow*, 469 F. Supp. 3d at 532.

**\*11** Two appellate decisions support this conclusion. In *Gentry*, the Fourth Circuit concluded that the named plaintiffs in putative classes lacked standing to challenge the notice procedures employed by the bankruptcy court. 668 F.3d at 95. The plaintiffs had received the actual notice, such that they could not challenge the notice on behalf of themselves, and the Fourth Circuit concluded that they did "not have standing to assert the due process rights of others who are not parties." *Id.* Similarly, here, the Securities Plaintiffs cannot challenge on their own behalf the Third-Party Releases that no longer (due to the opt out) release their own individual claims, and they lack standing to challenge the Third-Party Releases on behalf of others who are not parties.

Likewise, the Second Circuit encountered a nearly identical circumstance to the facts here in *In re Dynegy, Inc.*, 770 F.3d 1064 (2d Cir. 2014). There, a named plaintiff in a putative securities class action sought to challenge the third-party releases in a confirmation plan that would release non-debtor officers. *Id.* at 1067. The Second Circuit agreed with the district court that the named plaintiff lacked standing to personally challenge the plan, because he had opted out of the release. *Id.* Likewise, the Second Circuit found that he lacked standing to opt out of or object to the releases on behalf of the putative class, because the class had not been certified in either the trial court or the bankruptcy court. *Id.* at 1068-70. The same facts exist here, and the Court reaches the same conclusion.

3792

Accordingly, the Court finds that the Securities Litigation Lead Plaintiffs lack standing to prosecute this appeal.[9] Again, however, the Court stresses that the Trustee has standing to raise the same challenges to the Third-Party Releases as the Securities Litigation Lead Plaintiffs have raised.

[9] The Securities Litigation Lead Plaintiffs have raised additional issues in this appeal. Specifically, they claim that the Bankruptcy Court erred in finding that they lacked the authority to opt out on behalf of the putative class and in declining to certify the class for the limited purpose of opting out on behalf of the class. (Appellants' Br. at 82-85.) However, the Court's ultimate conclusion that the Third-Party Releases are unenforceable renders moot the question of whether the Bankruptcy Court should have provided some mechanism to opt out of the class from the Third-Party Releases.

**B. The Constitutional Implications of the Third-Party Releases**

In assessing whether the Bankruptcy Court erred in approving the Third-Party Releases, the Court will begin with a discussion of the jurisdiction of bankruptcy courts generally and whether they have the constitutional power to approve such releases. The Court will then examine whether the Releasing Parties consented to adjudication of their claims by an Article I court. The Court answers both questions in the negative.

**1. The Limitations of the Jurisdiction of the Bankruptcy Courts**

Federal district courts exercise "original and exclusive jurisdiction of all cases" under the Bankruptcy Code. 28 U.S.C. § 1334(a). District courts may refer all bankruptcy matters to bankruptcy judges, which this District has done as a matter of course since 1984. 28 U.S.C. § 157(a); *see In the Matter of: The Administration of the Bankruptcy Courts and Reference of Bankruptcy Cases and Proceedings to the Bankruptcy Judges of this District* (E.D. Va. Aug. 15, 1984) (Standing Order referring all bankruptcy matters to Bankruptcy Court). District courts retain the authority to withdraw, in whole or in part, any case or proceeding that they had referred. *See Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 481 (4th Cir. 2015) (citing 28 U.S.C. § 157(d)). "In short, while the district courts were given jurisdiction over bankruptcy cases, Congress also delegated to the bankruptcy courts, 'as judicial officers of the district courts,' ... adjudicatory authority, subject to the district courts' supervision as particularized in § 157 and the limits imposed by the Constitution." *Id.* (quoting *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 679, 135 S.Ct. 1932, 191 L.Ed.2d 911 (2015)). This case implicates those limits imposed by Article III of the Constitution.

**\*12** Article III provides that "[t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." Congress has established 94 District Courts and 13 Courts of Appeals, "composed of judges who enjoy the protections of Article III: life tenure and pay that cannot be diminished." *Wellness Int'l*, 575 U.S. at 668, 135 S.Ct. 1932. The Supreme Court has long recognized that "Congress may not withdraw from" the Article III courts "any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty." *Stern*, 564 U.S. at 484, 131 S.Ct. 2594. This limitation finds its basis in the protections of life tenure and against salary diminution that Article III provides, which "help to ensure the integrity and independence of the Judiciary." *Wellness Int'l*, 575 U.S. at 668, 135 S.Ct. 1932. In authorizing the appointment of bankruptcy judges (who do not enjoy the Article III protections), Congress has attempted to align the responsibilities of bankruptcy judges with the boundaries set by the Constitution. However, as discussed below, the Supreme Court has found that Congress violated Article III in authorizing bankruptcy judges to decide certain claims for which litigants enjoy an entitlement to an Article III adjudication.

**2. *Northern Pipeline* and Congress' Reaction**

In *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, the Supreme Court considered the constitutionality of the Bankruptcy Reform Act enacted by Congress in 1978, and specifically whether the bankruptcy court had the judicial authority to adjudicate a state-law contract claim filed by the debtor against a third party. 458 U.S. 50, 54, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). The Bankruptcy Reform Act gave the newly created bankruptcy courts power "much broader than that exercised under the former" system and enabled bankruptcy courts to decide "all civil proceedings arising under title 11 or arising in or related to cases under title 11." *Id.* at 55, 102 S.Ct. 2858. Thus, Congress vested the bankruptcy judges with most of the "powers of a court of equity, law, and admiralty" without affording them the protections of

3793

2022 WL 135398

Article III. *Id.* Because the Bankruptcy Reform Act vested "the essential attributes of the judicial power" in a non-Article III adjunct, the Supreme Court held that "[s]uch a grant of jurisdiction cannot be sustained as an exercise of Congress' power to create adjuncts to Art. III courts." *Id.* at 87, 102 S.Ct. 2858. Thus, it found the "broad grant of jurisdiction to the bankruptcy courts" unconstitutional and concluded that the bankruptcy court lacked jurisdiction to adjudicate the state-law contract claim against an entity not otherwise part of the bankruptcy proceedings. *Id.* at 69-72, 87, 102 S.Ct. 2858.

Following the decision in *Northern Pipeline*, Congress passed the Bankruptcy Amendments and Federal Judgeship Act of 1984 (the "1984 Act"), revising the statutes governing bankruptcy judges and their jurisdiction. Pub. L. No. 98-353, 98 Stat. 333. Under the 1984 Act, "[t]he manner in which a bankruptcy judge may act ... depends on the type of proceeding involved." *Stern*, 564 U.S. at 473, 131 S.Ct. 2594. "Congress has divided bankruptcy proceedings into three categories: (1) those that arise under title 11, (2) those that arise in a title 11 case, and (3) those that are related to a case under title 11." *Chesapeake Tr. v. Chesapeake Bay Enters., Inc.*, 2014 WL 202028, at *2 (E.D. Va. Jan. 17, 2014) (citing *Stern*, 564 U.S. at 473, 131 S.Ct. 2594). The first two categories constitute "core proceedings" such that a bankruptcy judge has the statutory authority to "hear and enter final judgments." *Stern*, 564 U.S. at 474, 131 S.Ct. 2594. With respect to the third category, non-core proceedings, a bankruptcy judge may hear a "proceeding that is not a core proceeding but that is otherwise related to a case under title 11," but, unless the parties consent, the bankruptcy judge cannot enter final judgments and instead must submit "proposed findings of fact and conclusions of law to the district court." 28 U.S.C. § 157(c)(1).

Section 157 sets forth a non-exhaustive list of examples of core proceedings. The list includes, for example, "the allowance or disallowance of claims against the estate," and "counterclaims by the estate against persons filing claims against the estate." 28 U.S.C. § 157(b)(2)(B)-(C). A party may appeal the final judgment of a bankruptcy court to the district court, which reviews it under traditional appellate standards. 28 U.S.C. § 158(a); Fed. R. Bankr. Proc. 8013. However, when a bankruptcy judge determines that a "proceeding ... is not a core proceeding but ... is otherwise related to a case under title 11," the bankruptcy judge may only "submit proposed findings of fact and conclusions of law to the district court," which then reviews de novo any matter to which a party objects. 28 U.S.C. § 157(c)(1).

### 3. *Stern v. Marshall*

**\*13** The Supreme Court took up the constitutionality of the 1984 Act in *Stern v. Marshall*. 564 U.S. at 471, 131 S.Ct. 2594. There, the Court faced the issue of whether the bankruptcy court had jurisdiction to enter a final judgment on a counterclaim brought by the debtor against an individual who had filed a proof of claim in the bankruptcy action. *Id.* The Court noted that the debtor's counterclaim plainly constituted a "core" proceeding under the statute, thus giving the bankruptcy judge the *statutory* authority to enter a final judgment on the claim. *Id.* at 475, 131 S.Ct. 2594. However, the Court concluded that Article III of the Constitution did not permit the bankruptcy court to enter final judgment on the counterclaim. *Id.* at 482, 131 S.Ct. 2594. The counterclaim "[was] a state law action independent of the federal bankruptcy law and not necessarily resolvable by a ruling on the creditor's proof of claim in bankruptcy." *Id.* at 487, 131 S.Ct. 2594. The Supreme Court reaffirmed that "Congress may not bypass Article III simply because a proceeding may have some bearing on a bankruptcy case ...." *Id.* at 499, 131 S.Ct. 2594. Instead, "the question is whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process." *Id.* The Court found that the bankruptcy court had gone beyond constitutional limits when it "exercised the 'judicial Power of the United States' in purporting to resolve and enter final judgment on a state common law claim." *Stern*, 564 U.S. at 487, 131 S.Ct. 2594. Accordingly, the bankruptcy court lacked the constitutional authority to adjudicate the claim. *Id.* at 503, 131 S.Ct. 2594.

In sum, the Supreme Court mandates that bankruptcy courts only have the constitutional authority to adjudicate core claims, even if Congress has granted them the statutory authority to resolve other claims. Naturally, this constitutional limitation applies to a bankruptcy court's authority to grant releases. *See In re Millennium Lab Holdings II, LLC*, 945 F.3d at 137 (holding that an approval of releases by a bankruptcy court is only "permissible if it involves a matter integral to the restructuring of the debtor-creditor relationship"); *In re Purdue Pharma, L.P.*, 2021 WL 5979108, at *40 ("Nothing in *Stern* or any other case suggests that a party otherwise entitled to have a matter adjudicated by an Article III court forfeits that constitutional right if the matter is disposed of as part of a plan of reorganization in bankruptcy. Were it otherwise, then parties could manufacture a bankruptcy court's *Stern*

3794

2022 WL 135398

authority simply by inserting the resolution of some otherwise non-core matter into a plan.").

Here, by granting the Third-Party Releases, the Bankruptcy Court took jurisdiction over and extinguished the liability of an extraordinarily vast range of claims held by an immeasurable number of individuals against a broad range of potential defendants. However, before doing so, the Bankruptcy Court took no steps to determine if it had the power to extinguish the liability on any particular claim. Indeed, the only extinguished claims that the Bankruptcy Court considered were the securities fraud claims against the Individual Defendants (Jaffe and Giammatteo), and it ignored all of the other potential claims that it terminated by approving the releases. In so doing, the Bankruptcy Court failed to take the proper steps to ensure that it had the authority to grant the releases.

**4. Classification of Core v. Non-Core**

A bankruptcy court has the responsibility to properly classify the claims before it based on the content of the claims and adjudicate them according to those classifications. "It is the bankruptcy court's responsibility to determine whether each claim before it is core or non-core." *Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 33, 134 S.Ct. 2165, 189 L.Ed.2d 83 (2014). "A cause of action is constitutionally core when it 'stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process.' " *Allied Title Lending, LLC v. Taylor*, 420 F. Supp. 3d 436, 448 (E.D. Va. 2019) (quoting *Stern*, 564 U.S. at 499, 131 S.Ct. 2594). A bankruptcy estate's claim against a creditor "would necessarily be resolved in the claims allowance process when it shares common questions of fact and law with the creditor's claims and when it seeks to directly reduce or recoup the amount claimed." *Id.* (internal quotations omitted). A claim can become core when it "become[s] integral to the restructuring of the debtor-creditor relationship." *Stern*, 564 U.S. at 497, 131 S.Ct. 2594. Conversely, claims by the bankruptcy estate that seek to "augment the estate" but do not "directly modify the amount claimed" do not qualify as a core claim "to be resolved in ruling on the proof of claim." *Allied Title Lending, LLC*, 420 F. Supp. 3d at 448.

 **\*14**  When confronted with a so-called *Stern* claim — "a claim designated for final adjudication in the bankruptcy court as a statutory matter, but prohibited from proceeding in that way as a constitutional matter," — the bankruptcy court

should proceed with the claim as it would for non-core claims. *Exec. Benefits Ins. Agency*, 573 U.S. at 35-36, 134 S.Ct. 2165. That requires the bankruptcy court to "determine whether the claim may be adjudicated as a non-core claim — specifically, whether it is 'not a core proceeding' but is 'otherwise related to a case under title 11.' " *Id.* at 36, 134 S.Ct. 2165. If it satisfies the "otherwise related to a case under title 11" as required by 28 U.S.C. § 157(c)(1), then the bankruptcy court "should hear the proceeding and submit proposed findings of fact and conclusions of law to the district court for *de novo* review and entry of judgment." *Id.* at 36, 134 S.Ct. 2165. Of course, if the claim has no relation to a case under title 11, then the bankruptcy court lacks any authority to act on it.

*Stern* teaches that courts should focus on the content of the proceeding rather than the category of the proceeding when determining whether a bankruptcy court has acted within its constitutional authority. The *Stern* Court explained that counterclaims that do not "stem[ ] from the bankruptcy itself or would [not] necessarily be resolved in the claims allowance process" must be decided by Article III courts. *Stern*, 564 U.S. at 497, 131 S.Ct. 2594. The Court never declared that all counterclaims by a debtor fall outside of a bankruptcy court's jurisdiction. Instead, the Court looked to the content of the debtor's counterclaim and compared the factual and legal determinations necessary to resolve the counterclaim to those necessary to resolve the original claim. *Id.* at 498-99, 131 S.Ct. 2594. It did so to assess whether the counterclaim would necessarily be resolved in the claims-allowance process. *Id.* In doing so, the Court focused on the basis for the counterclaim to determine whether it stemmed from the bankruptcy itself. *Id.* Given *Stern's* focus on the content of the claim over its categorization, courts cannot bypass the constitutional limitations simply by categorizing a widely varying swath of claims as "core" and then assuming jurisdiction over them.

**a. The Bankruptcy Court Failed to Identify Whether it had Jurisdiction Over the Claims That it Released.**

Here, the Bankruptcy Court engaged in none of the content-based analysis demanded by *Stern.* The Bankruptcy Court did not parse the content of the claims that it purported to release to determine if each claim constituted a core claim, a non-core claim or a claim unrelated to the bankruptcy case. The sheer breadth of the Third-Party Releases renders this a herculean undertaking and underscores the constitutional questionability of the Bankruptcy Court's actions. However, the enormity of the task does not absolve the Bankruptcy

Court of its responsibility to properly identify the content of the claims before it and ensure that it has jurisdiction to rule on each of them. In fact, because of the constitutional implications of extinguishing these claims, this undertaking carries even greater import. As an appellate court, this Court will not speculate as to the claims released and then parse each purportedly released claim to determine whether the Bankruptcy Court had the power to extinguish that claim — that was the responsibility of the Bankruptcy Court. *In re Continental Airlines*, 203 F.3d 203, 214 (3d Cir. 2000) ("The hallmarks of permissible non-consensual releases — fairness, necessity to the reorganization, and specific factual findings to support these conclusions — are all absent here."). The sheer breadth of the releases and the lack of findings with respect to each released claim renders appellate review virtually impossible and speaks to the impropriety of the approval of the Third-Party Releases.

### b. The Bankruptcy Court Lacks Jurisdiction Over Many Released Claims.

 **\*15**  Although the Court cannot determine precisely which Released Claims the Bankruptcy Court could have adjudicated, it takes only a cursory review of the Third-Party Releases and the Releasing Parties to find released claims that the Bankruptcy Court lacked the authority to adjudicate. The universe of released claims includes claims between non-debtors which may have no connection to the property of Mahwah's bankruptcy estate or the administration of the Bankruptcy Proceeding. For example, the Third-Party Release would bar securities claims, such as those brought by the Securities Plaintiffs, against former directors and officers of Mahwah, even if the claims arose before Mahwah filed for bankruptcy and those directors and officers had no involvement in the Bankruptcy Proceeding. And it bears noting that "federal courts disfavor indemnity for federal securities law violations, calling into question the enforceability of these obligations." *In re Continental Airlines*, 203 F.3d at 216 (citing cases). Thus, the only type of released claim that the Bankruptcy Court actually considered finds antipathy in the case law.

The Trustee points out numerous other potential claims that the Bankruptcy Court released. (Trustee Br. at 33.) These include hostile work environment claims by a former Mahwah employee against another Mahwah employee; negligence by a Mahwah employee against a consultant hired by Mahwah to counsel employees on retirement plans;

slander by a former employee of Mahwah's term lenders against a current employee of the lender for remarks that the former employee mishandled the lender's deal with Mahwah; a breach of contract action by an accountant of one of Mahwah's loan agents against the agent for failure to pay for the work that the account performed on the agent's transaction with Mahwah; and malpractice by an affiliate of Mahwah against its law firm for the firm's simultaneous representation of both the affiliate and Mahwah when their interests diverged. (Trustee Br. at 33.) None of these claims appear even related — much less integral — to the restructuring of the debtor-creditor relationship, such that the Bankruptcy Court could adjudicate them without running afoul of the Constitution. And, given the breadth of the releases, the above examples likely represent only a fraction of the purportedly released claims that lack an integral connection to the bankruptcy process, such that the Bankruptcy Court lacked the power to release them.

### 5. The Implication of *Stern's* Constitutional Analysis on the Released Claims

Debtors' argument that the Third-Party Releases do not implicate *Stern's* constitutional limitations fails. Essentially, Debtors ask the Court not to parse the released claims in any way and, instead, find that the Bankruptcy Court had constitutional authority based on the inclusion of the Releases in the Plan. (Appellee Br. at 57-59.) This argument would require the Court to conclude that only the Plan Confirmation Order constitutes a judgment and that jurisdiction over confirmation proceedings cures any jurisdictional defects within those proceedings. The Court concludes neither.

### a. The Bankruptcy Court Must Have Jurisdiction Over a Claim to Release it.

First, the releases here implicate the constitutional limits on the Bankruptcy Court's ability to adjudicate claims, even if they do not constitute a judgment following a hearing on the merits of the claim. Once the Plan became final, the provisions therein, including the Third-Party Releases, became *res judicata* for subsequent parties trying to bring the claims. *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 152, 129 S.Ct. 2195, 174 L.Ed.2d 99 (2009); *In re Purdue Pharma, L.P.*, 2021 WL 5979108, at \*41 ("Nor is there any doubt that the entry of an order releasing a claim has former adjudication effects, which is a key attribute of a final judgment. The

Supreme Court has twice held that non-consensual third-party releases confirmed by final order are entitled to *res judicata* claim preclusion barring any subsequent action bringing a released claim ....”). Likewise, when the Bankruptcy Court declared the releases consensual settlements of the claims, they became final judgments on the merits for purposes of further litigation. *See Larken, Inc. v. Wray*, 189 F.3d 729, 732 (8th Cir. 1999) (stating that a voluntary dismissal with prejudice “constitutes a final judgment on the merits”); *Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1050 (5th Cir. 1987) (holding that order confirming plan that released creditor's claims against guarantor was a final judgment on the merits of those claims); *see also In re Digital Impact, Inc.*, 223 B.R. 1, 12, 13 n.6 (Bankr. N.D. Okla. 1998) (“A release, or permanent injunction, contained in a confirmed plan ... has the effect of a judgment — a judgment against the claimant and in favor of the non-debtor, accomplished without due process.”).

 **\*16**  At bottom, the Bankruptcy Court extinguished the Released Claims, which amounts to adjudication of the claim for *Stern* purposes. *In re Purdue Pharma, L.P.*, 2021 WL 5979108, at \*41 (“There really can be no dispute that the release of a claim ‘finally determines’ that claim. It does so by extinguishing the claim, so that it cannot be adjudicated on the merits. A nonconsensual third-party release is essentially a final judgment against the claimant, in favor of the non-debtor, entered ‘without any hearing on the merits.’ ”). To claim that the Bankruptcy Court can fully extinguish these claims based solely on their inclusion in the Plan — without any hearing on them or any findings about them —amounts to arguing that courts need not have the authority to extinguish claims so long as they provide no procedural safeguards in extinguishing the claims. Obviously, this cannot be.

Likewise, the argument that the Bankruptcy Court possesses the power to extinguish these claims based only on its jurisdiction over confirmation proceedings misses the mark. True, bankruptcy courts have jurisdiction over Chapter 11 proceedings under 28 U.S.C. § 157(a), and plan confirmation proceedings constitute core proceedings that the bankruptcy court may adjudicate on a final basis. 28 U.S.C. § 157(b)(2) (L). Further, 11 U.S.C. § 105(a) permits the bankruptcy court to “issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.” But, this grant of authority has limits.

Although § 105 permits a bankruptcy court to issue orders necessary or appropriate to carry out the provisions of the Bankruptcy Code, that section does not provide an independent source of federal subject matter jurisdiction. *In re Combustion Engineering, Inc.*, 391 F.3d 190, 224-25 (3d Cir. 2004) (“But as the statute makes clear, § 105 does not provide an independent source of federal subject matter jurisdiction.”). Thus, independent statutory basis must exist for the bankruptcy court to exercise jurisdiction over the claims. *See In re Johns-Manville Corp.*, 801 F.2d 60, 63 (2d Cir. 1986) (“Section 105(a) does not, however, broaden the bankruptcy court's jurisdiction, which must be established separately ....”).

Without an independent source of jurisdiction, a bankruptcy court must rely on its own jurisdiction, which comes in the form of *in rem* jurisdiction over the debtor's property and the disposition of that property. *See Cent. Virginia Cmty. Coll. v. Katz*, 546 U.S. 356, 362, 126 S.Ct. 990, 163 L.Ed.2d 945 (2006) (“Bankruptcy jurisdiction, at its core, is *in rem*.”). It is certainly true “that bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships.” *United States v. Energy Res. Co., Inc.*, 495 U.S. 545, 549, 110 S.Ct. 2139, 109 L.Ed.2d 580 (1990). Yet, third-party claims belong to third parties, not the debtor's estate. “As a general rule, a bankruptcy court has no power to say what happens to property that belongs to a third party, even if that third party is a creditor or otherwise is a party in interest.” *In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717, 723 (Bankr. S.D.N.Y. 2019) (*citing Callaway v. Benton*, 336 U.S. 132, 136-41, 69 S.Ct. 435, 93 L.Ed. 553 (1949)).

Similarly, although a bankruptcy court's *in rem* jurisdiction gives it authority over claims against the estate, it has no *in rem* jurisdiction over third-party claims not against the estate or property of the estate. *See In re Johns-Manville Corp.*, 600 F.3d at 153-54 (holding that a bankruptcy court did not have *in rem* jurisdiction over a third party's direct claims against a non-debtor insurer). Additionally, bankruptcy courts have subject matter jurisdiction over “civil proceedings” that are “related to” a bankruptcy case. 28 U.S.C. §§ 157, 1334. However, the Third-Party Releases here purport to release claims that may not yet constitute any pending civil proceeding.

 **\*17**  Additionally, many of the claims lack any relation to the bankruptcy case, even affording “related to” jurisdiction the most liberal reading. Debtors' argument that bankruptcy courts must be able to confirm plans even if those plans affect other cases has it backwards. (Appellee's Br. at 59.) The Plan confirmation does not merely have a “tangential effect” on the Securities Litigation and other claims. Rather, the Plan has

the ultimate effect — extinguishment — on the claims despite having — at most — a tangential effect on the bankruptcy estate. Therefore, the bankruptcy court has no independent authority on which to rely.

Indeed, as discussed above, *Stern* and its progeny stand for the proposition that Congress cannot enlarge the subject matter jurisdiction of the bankruptcy courts beyond permissible constitutional limits. Thus, Congress could not eviscerate the limits of Article III jurisdiction by enacting § 105. Article III simply does not allow third-party non-debtors to bootstrap any and all of their disputes into a bankruptcy case to obtain relief. *See In re Midway Gold US, Inc.*, 575 B.R. 475, 519 (Bankr. D. Colo. 2017) ("If proceedings over which the Court has no independent jurisdiction could be metamorphisized into proceedings within the Court's jurisdiction by simply by including their release in a proposed plan, this [Bankruptcy] Court could acquire infinite jurisdiction.") (citations omitted). Moreover, the Court does not view releasing a claim held by a third-party non-debtor against another third-party non-debtor as an "appropriate" order to carry out the Bankruptcy Code. And certainly, given many of the released claims' complete attenuation to the bankruptcy estate and proceeding, these releases cannot be considered "necessary." Any finding by the Bankruptcy Court otherwise constitutes a clear error.

**b. The Parties did not Consent to Article I Adjudication of Non-Core Claims.**

The Debtors further argue that the Third-Party Releases do not implicate the jurisdictional constraints of *Stern*, because the parties consented to the Releases. (Appellee Br. at 55-56.) This argument ignores the standard that the Supreme Court has set for consenting to bankruptcy court jurisdiction. Likewise, the Bankruptcy Court ignored the standard that must be met to find that a party has consented to its jurisdiction. As discussed below, the record contains no evidence that could meet the Supreme Court's standard for consent to non-Article III jurisdiction.

*i. The Supreme Court's Standard for Consent*

Following *Stern*, the Supreme Court took up the issue of whether a party could consent to having the bankruptcy court decide a *Stern* claim in *Wellness International Network, Ltd. v. Sharif*, 575 U.S. 665, 135 S.Ct. 1932, 191 L.Ed.2d 911 (2015). The Court first answered the question of whether a litigant

could waive the right to an Article III court, concluding that "allowing bankruptcy litigants to waive the right to Article III adjudication of *Stern* claims does not usurp the constitutional prerogatives of Article III courts." *Id.* at 679, 135 S.Ct. 1932. In reaching this decision, the Court relied on the fact that "*Stern* — like its predecessor, *Northern Pipeline* — turned on the fact that the litigant did not truly consent to resolution of the claim against it in a non-Article III forum." *Id.* at 681, 135 S.Ct. 1932 (quotations omitted).

However, the Court next determined what constituted valid consent to adjudication by a bankruptcy court. The Court rejected the argument that "such consent must be express." *Id.* at 683, 135 S.Ct. 1932. Instead, it held that "[t]he implied consent standard articulated in *Roell* supplies the appropriate rule for adjudications by bankruptcy courts under § 157." *Id.* at 684, 135 S.Ct. 1932. Therefore, "the key inquiry is whether the litigant or counsel was made aware of the need for consent and the right to refuse it, and still voluntarily appeared to try the case before the non-Article III adjudicator." *Id.* at 685, 135 S.Ct. 1932 (cleaned up). An understanding of the standard in *Wellness* necessitates a brief review of *Roell v. Withrow*, 538 U.S. 580, 123 S.Ct. 1696, 155 L.Ed.2d 775 (2003).

**\*18** In *Roell*, the Supreme Court held that consent to proceedings before a magistrate judge under 28 U.S.C. § 636(c) need not be express and instead can be inferred from a party's conduct during litigation. 538 U.S. at 582, 123 S.Ct. 1696. In *Roell*, the plaintiff agreed orally and in writing to having the magistrate judge preside over the entire case. *Id.* at 582-83, 123 S.Ct. 1696. The district judge then referred the case to the magistrate judge for final disposition, but with the caveat that the defendants would have the opportunity to consent and the referral order would be vacated if they did not consent. *Id.* at 583, 123 S.Ct. 1696. The clerk then sent the referral order to the defendants with instructions to submit a separate pleading indicating whether they consented or not. *Id.* One defendant consented to magistrate judge jurisdiction, but two others did not take a position at all. *Id.* The magistrate judge then proceeded to preside over a jury trial all the way to a verdict and judgment. *Id.* On at least three different instances, the parties did nothing when the magistrate judge stated that the parties had consented to her jurisdiction. *Id.* at 584, n.1, 123 S.Ct. 1696. Following the judgment, the defendants submitted their consent in writing, but the district court and the Fifth Circuit Court of Appeals nevertheless vacated the judgment, ruling that consent had to be express under § 636(c). *Id.* at 585, 123 S.Ct. 1696.

The Supreme Court disagreed that consent to magistrate judge jurisdiction had to be expressly written. *Id.* at 586, 123 S.Ct. 1696. Instead, it found that the parties had "clearly implied their consent by their decision to appear before the Magistrate Judge, without expressing any reservation, after being notified of their right to refuse and after being told that she intended to exercise case-dispositive authority." *Id.* The Court noted that allowing the conduct of the parties to determine consent "checks the risk of gamesmanship by depriving parties of the luxury of waiting for the outcome before denying the magistrate judge's authority." *Id.* at 590, 123 S.Ct. 1696. Accordingly, it concluded that "the better rule is to accept implied consent where, as here, the litigant or counsel was made aware of the need for consent and the right to refuse it, and still voluntarily appeared to try the case before the Magistrate Judge." *Id.*

In *Wellness*, the Supreme Court found that applying the same standard in the bankruptcy context possessed the same pragmatic virtues that motivated its adoption in the magistrate judge concept. 575 U.S. at 684-85, 135 S.Ct. 1932. However, the Court made clear that this standard has teeth: "[i]t bears emphasizing, however, that a litigant's consent — whether express or implied — must still be knowing and voluntary." *Id.* at 685, 135 S.Ct. 1932 (citing *Roell*, 538 U.S. at 587, n.5, 123 S.Ct. 1696 ("notification of the right to refuse" adjudication by a non-Article III court "is a prerequisite to any inference of consent")).

### ii. The Bankruptcy Court Incorrect Application of the Standard for Consent

Applying this standard here, it becomes clear that the Bankruptcy Court erred as a matter of law in finding that failure to return the opt-out form could constitute consent to Article I adjudication. The Bankruptcy Court relied on the fact that the Releasing Parties received notice and an opportunity to opt out of the Third-Party Releases as the basis for consent. (Bankr. Confirm. Op. at 31-33.) But, the Bankruptcy Court made this determination in the context of whether the Releasing Parties consented to the Third-Party Releases, not the threshold question of whether they consented to having the Bankruptcy Court adjudicate the released claims.[10] This will not suffice to support a finding of consent to Article I adjudication for all of the Releasing Parties.

10      As the Bankruptcy Court made no attempt to discern whether the Releasing Parties consented to it adjudicating their non-core claims, the Court must assume that it would have relied on the same manner of consent that it relied on in finding that the Releasing Parties consented to the Third-Party Releases.

*Wellness* and *Roell* make clear that courts can discern the implication of consent to a non-Article III court based on a party's *actions*. However, they do not permit a finding of consent based on *inaction*. In finding consent to Article I adjudication, *Roell* relied on the litigation conduct of the parties and the fact that they appeared before the magistrate judge to try their case after notification of the referral. Indeed, the Court even cited the definition of an appearance as an "overt act by which a party submits himself to the court's jurisdiction." *Roell*, 538 U.S. at 586, n.3, 123 S.Ct. 1696. This reliance on the overt act of appearing in the non-Article III court demonstrates the importance of actions over inactions. Likewise, *Wellness* cited to *Roell* for the proposition that "actions rather than words" can support a finding of consent and that "the key inquiry is whether the litigant or counsel was made aware of the need for consent and the right to refuse it, and still voluntarily appeared to try the case before the non-Article III adjudicator." *Wellness Int'l*, 575 U.S. at 684-85, 135 S.Ct. 1932 (cleaned up). Importantly, any consent "must still be knowing and voluntary." *Id.* at 685, 135 S.Ct. 1932.

**\*19** Here, the Court cannot discern any actions undertaken by the Releasing Parties to support a finding that they knowingly and voluntarily consented to Article I adjudication of the claims that they released. Despite the enormous breadth of Releasing Parties deemed to have released claims, the Bankruptcy Court undertook no analysis to determine which Releasing Parties (if any) had consented to bankruptcy jurisdiction and which had not. Instead, as previously noted, the Bankruptcy Court took a myopic approach to the Releasing Parties, focusing only on the putative securities fraud class action members, ignoring all other Releasing Parties. And, because the Bankruptcy Court failed to parse the core claims from non-core claims in the Third-Party Releases, the Bankruptcy Court took no steps to determine which Releasing Parties needed to consent to Article I adjudication of their claims before the Bankruptcy Court could act on them. Rather, the Bankruptcy Court merely relied on the fact that a document was mailed out with the goal of reaching thousands of individuals. Then, without regard to whether those individuals received the document, and without regard as to whether those individuals took any overt actions in

response to the document, the Bankruptcy Court determined that they had surrendered their constitutional right to an Article III court.

Again, the Bankruptcy Court ignored a wide swath of those releasing claims and, even for those targeted with the notice, the notice contained no information about agreeing to Article I adjudication. Indeed, counsel for Debtors conceded during oral argument that the distributed releases made no mention of agreeing to adjudication of their claims by an Article I court. (Arg. Tr. at 41:10-11.) In any event, the record is silent as to how many of the targeted shareholders actually received the notice. Yet, hoping (without proving) that someone received a deficient document — without any further action from that person — does not meet the standard for knowing and voluntary consent to adjudication of a non-core claim by a bankruptcy court, as set forth by the Supreme Court in *Wellness.*

Additionally, the Supreme Court in both *Wellness* and *Roell* indicated that the implied consent standard that it set forth had its basis in the elimination of gamesmanship. *See, e.g.,* *Wellness Int'l*, 575 U.S. at 685, 135 S.Ct. 1932 (noting that "checking gamesmanship" motivated the adoption of the consent standard). Yet, allowing inaction to imply consent encourages the very gamesmanship that the Supreme Court intended to check. That is, non-debtors could tuck releases unrelated to a bankruptcy proceeding into bankruptcy plans, then secrete an opt-out opportunity into a convoluted legal document, send the document to non-parties previously unaware of the bankruptcy proceeding and use their non-response to extinguish all of their claims. This type of gamesmanship, aimed at extinguishing claims of unwitting individuals and providing a golden parachute to the parties drafting the plan, cannot be tolerated.

In words that apply equally well here, Judge McMahon wrote the following in *In re Purdue Pharma, L.P.*:

> The third-party claims at issue neither stem from [the debtor's] bankruptcy nor can they be resolved in the claims allowance process. Yet those claims are being finally disposed of pursuant to the Plan; they are being released and extinguished, without the claimants' consent and without any payment, and the claimants are being enjoined from prosecuting them. Debtors and their affiliated non-debtor parties cannot manufacture constitutional authority to resolve a non-core claim by the artifice of including a release of that claim in a plan of reorganization.

2021 WL 5979108, at \*41. The Bankruptcy Court here exceeded its constitutional authority without any inquiry or factfinding. Accordingly, the Bankruptcy Court erred in adjudicating the *Stern* claims without the knowing and voluntary consent of the Releasing Parties.

## 6. Consequence of a *Stern* Violation

Having determined that the Bankruptcy Court violated *Stern* by exceeding its authority, the Court must vacate the Confirmation Order and treat it as a Report and Recommendation with proposed findings of fact and conclusions of law, which the Court reviews *de novo. Purdue Pharma, L.P.*, 2021 WL 5979108, at \*42; 28 U.S.C. § 157(c)(1); Bankruptcy Rule 8018.1. Here, unfortunately, the Bankruptcy Court's opinion lacks any meaningful factfinding, so the Court will need to set forth its own factual findings based on the record from the confirmation hearing. Bankruptcy Rule 9033(d).

 **\*20** Before turning to the factual findings in this case, the Court pauses for an observation about the procedure for the handling of third-party releases by bankruptcy courts going forward. Due to the substantial constitutional issues at play with the use of this perilous tool, it seems preferrable for a bankruptcy court to submit any third-party releases to the district court for approval via a Report and Recommendation in the rare and exceptional case that warrants the use of third-party releases. The Report and Recommendation should identify with specificity the claims and individuals released and provide detailed proposed findings of fact and conclusions of law to ensure that the released claims are truly integral to the reorganization. *See In re Seaside Engineering & Surveying, Inc.*, 780 F.3d at 1079 (noting that this "inquiry is fact intensive in the extreme"); *In re Dow Corning Corp.*, 280 F.3d at 657-58 (criticizing conclusory statements and mandating specific evidentiary findings with separate analysis for each individual release). This practice would necessarily avoid any *Stern* issues.

Moreover, it would serve as an extra safeguard to ensure that third-party releases are reserved for the truly appropriate case, mindful that the use of third-party releases should be utilized "cautiously and infrequently." *Behrmann*, 663 F.3d at 712. As one bankruptcy court has observed:

> [t]hird-party releases are not a merit badge that somebody gets in return for making a positive contribution to a

3800

restructuring. They are not a participation trophy, and they are not a gold star for doing a good job. Doing positive things in a restructuring case — even important positive things — is not enough. Nonconsensual releases are not supposed to be granted unless barring a particular claim is important in order to accomplish a particular feature of the restructuring.

*In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. at 726-27.

### C. Factual Findings Under Bankruptcy Rule 9032

The Court will now set forth its findings of facts in accordance with Rule 9033(d). The findings are based on the evidence submitted during the confirmation hearing.[11] For the hearing, Debtors tendered declarations from Carrie W. Teffner (President and Executive Chair of Debtors), Gary W. Begeman (a disinterested director of the Board of Directors for Debtors), Alex Orchowski (Director of Global Corporate Acts at Prime Clerk LLC), and William Kosturos (Managing Director of Alvarez & Marsal North America, LLC, who served as Debtors' financial advisor). Teffner and Begeman also testified during the confirmation hearing on February 25, 2021.

[11]    Notably, the evidence was uncontroverted; therefore, there is no need to assess the credibility of the witnesses.

The Court finds the following facts as relevant to the issues presented in this appeal:

1. On June 7, 2019, Securities Litigation Lead Plaintiffs filed a complaint as a putative class action in the District of New Jersey alleging securities fraud against Ascena Retail Group, Inc., David Jaffe and Robert Giammatteo in *Newman v. Ascena Retail Group, Inc., et al*, Case No. 2:19cv13529 (D.N.J.). On August 23, 2019, United States District Judge Kevin McNulty appointed Securities Litigation Lead Plaintiffs and their counsel as lead plaintiff and lead counsel, respectively. (Dkt. No. 26, *Newman v. Ascena Retail Group, Inc., et al*, Case No. 2:19cv13529 (D.N.J.) ("D.N.J. Dkt.").) On February 7, 2020, the defendants in that case filed a motion to dismiss that remains pending. (D.N.J. Dkt. No. 47). On July 27, 2020, the defendants in that case filed a pleading entitled "Suggestion of Bankruptcy" (D.N.J. Dkt. No. 58) that resulted in a stay of all proceedings in that case being entered the next day, July 28, 2020 (D.N.J. Dkt. No. 59). The case remains stayed as of the date of this Opinion.

2. David Jaffe previously served as the Chief Executive Officer of Debtors, while Robert Giammatteo previously served as Debtors' Chief Financial Officer. Both Jaffe and Giammatteo left their employment with Debtors several months before Debtors filed for bankruptcy. (USTAPP 0929, 1030.)

**\*21** 3. On July 23, 2020, Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. (USTAPP 0001-18.)

4. With the Bankruptcy Court's approval, Debtors consummated three transactions involving the sale of their businesses. On September 24, 2020, the Bankruptcy Court approved the sale of Debtors' Catherines enterprise. On November 12, 2020, the Bankruptcy Court approved the sale of Debtors' Justice enterprise. On December 8, 2020, the Bankruptcy Court approved the sale of Debtors' remaining businesses, including the sale of the Lane Bryant brand and the Premium business segment, which included Ann Taylor, LOFT, and Lou & Grey, to buyer Premium Apparel LLC. The last of these sales closed on December 23, 2020. These sales consisted of substantially all of the Debtors' assets. (Decl. of Carrie W. Teffner in Supp. of Confirmation of the Amended Joint Chapter 11 Plan ("Teffner Decl.") ¶ 5 (USTAPP 2318-2335).) The sale of the Debtors' Premium and Lane Bryant business resulted in Debtors receiving approximately $472 million in net cash proceeds. (Decl. of William Kosturos in Supp. of Confirmation of the Amended Joint Chapter 11 Plan ("Kosturos Decl.") ¶ 5 (Dkt. No. 1761, *In re Retail Group, Inc.*, Case No. 20bk33113 ("Bankr. Dkt.")).)

5. As a result of the sale of its assets, all that was left for the reorganization after December 23, 2020, was the distribution of Debtors' remaining estate cash. (Teffner Decl. ¶5.) By February 22, 2021, the Debtors had sold substantially all of their assets and all that remained was to distribute cash proceeds in accordance with the terms of the Plan. (Teffner Decl. ¶30.)

6. The Reorganization Plan reflects a global resolution with the Creditors' Committee and contemplates payment in full in cash of all allowed administrative and priority claims. The Reorganization Plan had the support of 97% of the Term Lenders. (Teffner Decl. ¶ 5.)

7. The Reorganization Plan resulted from the collaborative efforts between Debtors, their advisors and legal counsel, and their stakeholders. The Amended Plan reflects the

wind down process and maximizes value to the Debtors' stakeholders. (Teffner Decl. ¶ 26.)

8. The Reorganization Plan contains third-party releases, an exculpation provision, and an injunction provision. According to Ms. Teffner, these provisions were the product of extensive good faith, arm's-length negotiations and were material inducements for the parties to enter into the comprehensive settlement embodied in the Plan. (Teffner Decl. ¶ 41.) The negotiations involved the Debtors and their lenders. (Tr. of Feb. 25, 2021 Hr'g ("Confirm. Tr.") at 22:24-25 (USTAPP 2673-2836).) None of the putative members of the securities fraud class action participated in the negotiation. And, Ms. Teffner acknowledged that none of the Releasing Parties had a seat at the table during the negotiations. (Confirm. Tr. at 23:5-10.)

9. David Jaffe and Robert Giammatteo did not participate in the negotiations involving the Third-Party Releases. Furthermore, the Third-Party Releases as they related to Jaffe and Giammatteo were not material inducements for the comprehensive settlement for the Reorganization Plan. (Confirm. Tr. at 23:11-24:2.). Moreover, neither Jaffe nor Giammatteo participated at all (directly or indirectly) in the Debtors' Chapter 11 process. Indeed, they were no longer employed by Debtors at the time of the reorganization. (Confirm. Tr. at 26:10-21.) Consequently, neither Jaffe nor Giammatteo played an integral (or any) role in the formulation and negotiation of the Debtors' plan. (Confirm. Tr. at 34:9-16; 48:20-23.) The Court therefore finds that the releases for Jaffe and Giammatteo were not integral to the reorganization.

*22  10. The negotiations surrounding the Third-Party Releases were focused on all existing and prior officers and directors (including Jaffe and Giammatteo) and were designed to be broad. (Confirm. Tr. at 27:11-12; 32:23-25.) Ms. Teffner did not know whether the Third-Party Releases covered former employees and consultants. (Confirm. Tr. at 41:3-16.) Because the negotiations surrounding the Third-Party Releases were addressed to only officers and directors, the Third-Party Releases exceeded the terms of the negotiations.

11. At the time of the reorganization, Debtors had Director & Officer liability insurance coverage of at least $50 million. (Confirm. Tr. at 29:1-31:4.) No evidence exists in the record that any of the claims released by the Third-Party

Releases would exceed the D&O insurance coverage and thereby cause a financial depletion of the estate.

12. The Third-Party Releases were designed to limit time spent defending any type of litigation, which would deplete assets and resources of the estate. (Confirm. Tr. 33:19-24.) The failure to approve the Third-Party Releases included in the Reorganization Plan could potentially increase the time and expense of the Debtors' wind-down process to the detriment of the Debtors' stakeholders. According to Ms. Teffner, the *quid pro quo* for the contributions, concessions and support offered by the Released Parties was the Third-Party Releases. (Teffner Decl. ¶ 45.)

13. Debtors created a Special Committee that consisted of Mr. Begeman and one other disinterested director. (Decl. of Gary D. Begeman in Supp. of Confirmation of Amended Joint Chapter 11 Plan ("Begeman Decl.") ¶ 1 (Bankr. Dkt. No. 1759).) The purpose of the Special Committee was to conduct and oversee an investigation into historical transactions and evaluate any proposed release of any claims or causes of actions by Debtors in connection with a future transaction. The Special Committee retained Kirkland & Ellis (Debtors' counsel) to investigate potential causes of action that the Debtors could bring against any of the Related Parties during a six-year lookback period. (Begeman Decl. ¶¶ 6-8.) The investigation found no material claims in favor of the Debtors. (Begeman Decl. ¶ 9.)

14. After an extensive investigation, the Debtors were unable to uncover any material claims or causes of actions that could be brought against the Releasing Parties, and it is unlikely that the Debtors would recover material amounts, if any, from the Releasing Parties. (Teffner Decl. ¶ 42.) As such, the release by the Released Parties of claims against the Releasing Parties (described as the "mutual release" in this appeal) has no value and is fictional.

15. Mr. Begeman also reviewed the pending securities fraud class action filed in the District of New Jersey against the Debtor and its former directors and officers (Jaffe and Giammatteo) in Case No. 2:19cv12529. The Special Committee (Mr. Begeman and one other disinterested director) determined that the claims in the class action lacked merit and had no material value as related to the Debtors' estates. (Begeman Decl. ¶ 14.) Notably, the Bankruptcy Court did not accept this as an expert opinion; instead, it only received it as a report from the Special

Committee. (Confirm. Tr. at 12:10-18.) This Court gives no credit to Mr. Begeman's assessment for this reason.

16. This Court explicitly rejects the Bankruptcy Court's finding that the Third-Party Releases were consensual. (Bankr. Confirm. Op. at 31.) Instead, the Court finds the Third-Party Releases to be nonconsensual both as a matter of fact and as a matter of law. In terms of factual grounds, the Bankruptcy Court's opt-out notice was directed only to the putative class members in the securities fraud case. The Bankruptcy Court made no effort to provide notice and obtain consent from the numerous other Releasing Parties as described in the Third-Party Releases.

 *23  17. As to the putative class members in the securities fraud case, the record fails to establish that *any* consented to the release of their claims against Jaffe and Giammatteo. Debtors used Prime Clerk to ensure to the best of their ability to get access to putative members of the class action and to distribute the notices to the putative members. (Confirm. Tr. 21:3-16.) Prime Clerk worked with third parties to attempt to identify putative members of the class action and then to communicate the Notice to them. (Decl. of Craig E. Johnson of Prime Clerk LLC in Supp. of the Debtors' Objection to Securities Lead Plaintiffs' Motion for Entry of an Order Authorizing Lead Plaintiffs to Opt Out of Third-Party Releases on Behalf of the Class ("Johnson Decl.") ¶¶ 7-9 (Bankr. Dkt. No. 947).) Prime Clerk sent the notice to approximately 300,000 individuals; however, the record contains no information about the success of their efforts to reach this group. (Bankr. Confirm. Op. at 13.) Indeed, Prime Clerk received only 596 opt-outs, which corresponds to 0.2% of those targeted. (Confirm. Tr. at 52:22-24.) The Court therefore finds that this effort was insufficient to establish notice of the opt-out provision in the Notice. Further, the record lacks any information establishing as a matter of fact that *any* of the targeted recipients of the Notice affirmatively consented to the release of their claims as provided in the Third-Party Release.

18. As to the shareholders who were putative class members in the securities fraud action, those who were deemed to have opted out did not receive anything of value for their releases. (Confirm. Tr. 18:13-22.)

19. There is no evidence in the record of any evaluation of any other potential claims that the Releasing Parties could have brought against the Debtors other than the securities fraud class action filed in the District of New Jersey, nor

does the record contain any effort to provide notice of the releases to any Releasing Party beyond the securities fraud class action.

20. According to Ms. Teffner, the Exculpation Provision resulted from good faith, arm's-length negotiations and was designed to protect those who served and assisted with the restructuring process, including those who did not necessarily owe a fiduciary duty to the Debtors. (Teffner Decl. ¶ 47.)

Against this factual backdrop, the Court will now turn its attention to the propriety of the Third-Party Releases.

**D. The Application of *Behrmann* to the Third-Party Releases**

In addition to the factual and constitutional defects in the approval of the Third-Party Releases outlined above, Appellants argue that the Bankruptcy Court erred in approving the Third-Party Releases under the applicable standards in the Fourth Circuit for approving nonconsensual third-party releases as set forth in *Behrmann.* (Trustee Br. at 37; Appellants' Br. at 73.) Debtors respond that the Releasing Parties consented to the releases, rendering the *Behrmann* factors inapplicable. (Appellee Br. at 41.) Additionally, Debtors contend that the Third-Party Releases satisfy the *Behrmann* factors. (Appellee Br. at 75.)

Thus, beyond the *Stern* issues, this appeal boils down to two questions: (1) whether the Bankruptcy Court erred by finding the releases consensual, and (2) whether the Bankruptcy Court erred by failing to conduct the seven-factor *Behrmann* analysis. The Court finds that the Bankruptcy Court erred on both fronts.

**1. Third-Party Releases and *Behrmann* Generally**

As previously noted, some Courts of Appeal have held that bankruptcy courts lack the power to grant nonconsensual third-party releases of the kind approved here. The Fifth, Ninth and Tenth Circuits prohibit nonconsensual third-party releases. *See, e.g.*, *In re Pac. Lumber Co.*, 584 F.3d at 251-53; *In re Lowenschuss*, 67 F.3d at 1401-02; *In re W. Real Estate Fund, Inc.*, 922 F.2d at 600-02. These Circuits generally base this prohibition on 11 U.S.C. § 524(e), which states that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." *See, e.g.*, *In re Pac. Lumber Co.*, 584 F.3d at 252 ("In a variety of contexts, this court has held that

3803

Section 524(e) only releases the debtor, not co-liable third parties.") (collecting cases); *In re Am. Hardwoods, Inc.*, 885 F.2d 621, 626 (9th Cir. 1989) ("We therefore conclude that the specific provisions of section 524 displace the court's equitable powers under section 105 to order the permanent relief sought by American.").

**\*24**  Other Circuits have held that bankruptcy courts have the power to impose involuntary releases, but that such involuntary releases should be imposed in "only rare cases." *See, e.g.*, *In re Metromedia Fiber Network, Inc.*, 416 F.3d at 141-43 (holding that involuntary releases should only be approved if they form an important part of a reorganization plan, and that they are proper "only in rare cases"); *In re Seaside Eng'g & Surveying, Inc.*, 780 F.3d at 1078 (permitting releases and bar orders but cautioning that they "ought not to be issued lightly, and should be reserved for those unusual cases in which such an order is necessary for the success of the reorganization, and only in situations in which such an order is fair and equitable under all the facts and circumstances"); *In re Dow Corning Corp.*, 280 F.3d at 657-58 ("Because such an injunction is a dramatic measure to be used cautiously, we follow those circuits that have held that enjoining a non-consenting creditor's claim is only appropriate in 'unusual circumstances.' ").

The Fourth Circuit has joined the circuits that allow non-debtor releases, but only "cautiously and infrequently." *Behrmann*, 663 F.3d at 712. In *Behrmann*, the Fourth Circuit confirmed that it had previously "rejected the notion that 11 U.S.C. § 524(e) forecloses bankruptcy courts from releasing and enjoining causes of action against nondebtors." 663 F.3d at 710 (citing *In re A.H. Robins Co.*, 880 F.2d 694 (4th Cir. 1989)). It noted that it had "declined to retreat from this holding" in a subsequent opinion and then, again, rejected as "without merit" the "blanket assertion that equitable relief in the form of non-debtor releases is never permissible under the Bankruptcy Code." *Id.* In rejecting this blanket assertion, the Fourth Circuit adopted the Sixth Circuit's test for approving non-debtor releases outlined in *In re Dow Corning Corp.* The Fourth Circuit quoted in full from *In re Dow Corning Corp.*:

> We hold that when the following seven factors are present, the bankruptcy court may enjoin a non-consenting creditor's claims against a non-debtor:
>
> (1) There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate;

> (2) The non-debtor has contributed substantial assets to the reorganization;
>
> (3) The injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor;
>
> (4) The impacted class, or classes, has overwhelmingly voted to accept the plan;
>
> (5) The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction;
>
> (6) The plan provides an opportunity for those claimants who choose not to settle to recover in full; and,
>
> (7) The bankruptcy court made a record of specific factual findings that support its conclusions.

*Behrmann*, 663 F.3d at 711-12 (quoting *In re Dow Corning Corp.*, 280 F.3d at 658).

Given the dramatic effect of third-party releases and that they are to be approved only in unique circumstances, "the meaningful exercise of appellate review at a minimum requires that the court make specific factual findings in support of its decision to grant equitable relief." *Id.* at 712. Ultimately, the Fourth Circuit remanded the case, because the bankruptcy court's conclusory statements regarding the factors "[were] meaningless in the absence of specific factual findings explaining why this is so." *Id.* at 713. Underscoring the point that non-debtor releases only have a place in unique circumstances, the Fourth Circuit found that the bankruptcy court's "conclusions could apply just as well to any number of reorganizing debtors." *Id.* Therefore, it remanded the case "to set forth specific factual findings supporting its conclusions" that the debtor's circumstances entitled it to the non-debtor releases. *Id.*

**\*25**  Following remand, a different bankruptcy judge found the releases unenforceable and the district court affirmed the bankruptcy court. *Nat'l Heritage Found., Inc. v. Highbourne Found.*, 760 F.3d 344, 347 (4th Cir. 2014). The Fourth Circuit affirmed, concluding that the debtor had "failed to carry its burden of proving that the facts and circumstances of this case justify the Release Provision." *Id.* at 347.

3804

## 2. The Interrelationship Between *Stern* and *Behrmann*

The exacting caution and detailed findings demanded of a bankruptcy court in granting a non-debtor release in a unique circumstance stems from the constitutional limitations placed on the bankruptcy court's jurisdiction. As the *Stern* analysis demonstrates, the Constitution limits bankruptcy courts — as non-Article III courts — to adjudicating only matters integral to a bankruptcy proceeding. In essence, the *Behrmann* factors task a reviewing court with determining how integral the releases are to a bankruptcy plan. Indeed, one factor asks the court to consider whether the release "is essential to the reorganization" such that the "reorganization hinges on the debtor being free from indirect suits." *Behrmann*, 663 F.3d at 711-12. Another factor requires that the non-debtor "contributed substantial assets to the reorganization." *Id.* at 711. Yet another examines the identity of interests between the debtor and the third party and the extent to which the suit against the third party would deplete the assets of the estate. *Id.* Clearly, these factors ask the bankruptcy court to determine the extent of the entanglement between the released claim and the bankruptcy case. Likewise, a bankruptcy court determining whether it has "core" constitutional authority over a matter looks to the same relationship. *See Allied Title Lending, LLC*, 420 F. Supp. 3d at 448 ("A cause of action is constitutionally core when it 'stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process.' ") (quoting *Stern*, 564 U.S. at 499, 131 S.Ct. 2594).

The Third Circuit's decision in *In re Millennium Lab Holdings II, LLC* illustrates this connection between the *Stern* analysis and the *Behrmann*-type analysis, and stands in stark contrast to what occurred here. There, the court examined a release in the debtor's restructuring agreement that released the debtor's two primary shareholders from conduct that occurred before the restructuring agreement. 945 F.3d at 131. Eventually, the bankruptcy court confirmed the plan that included the releases, over a lender's objection. *Id.* at 132. The bankruptcy court and district court both overruled the lender's objection that *Stern* prohibited the confirmation of a plan releasing its claims, stating that *Stern* did not apply to plan confirmation proceedings. *Id.* at 133. The lender appealed to the Third Circuit.

On appeal, the Third Circuit affirmed the confirmation, but not because it determined that *Stern* did not apply to plan confirmation proceedings.[12] Rather, the Third Circuit conducted an exhaustive discussion of *Stern* and the

limitations that it places on the authority of bankruptcy courts. *Id.* at 133-37. It concluded its discussion as follows:

> In sum, *Stern* teaches that the exercise of "core" statutory authority by a bankruptcy court can implicate the limits imposed by Article III. Such an exercise of authority is permissible if it involves a matter integral to the restructuring of the debtor-creditor relationship. And, in determining whether that is the case, we can consider the content of the "core" proceeding at issue.

**\*26** *Id.* at 137.

[12]    Indeed, in a footnote, the court acknowledged the appellees' argument that a bankruptcy court could always constitutionally confirm a plan. However, it stated that "[w]e have our doubts about so broad a statement but we do not need to address it to decide this case." *Id.* at 137, n.10.

Applying those principles, the Third Circuit concluded that the bankruptcy court possessed constitutional authority to confirm the plan with the releases. Borrowing from its *Stern* analysis, the court stated that "the question is whether," in examining the release provisions at issue, "the Bankruptcy Court was resolving a matter integral to the restructuring of the debtor-creditor relationship." *Id.* at 137. Although it did not apply the facts to explicit factors like courts in the Fourth Circuit must, the court's reasoning closely resembles the *Behrmann* factors. For example, the court relied on the contributions made by the released parties — $325 million transfers of their equity to the lenders — and how the restructuring could not have occurred without those contributions. *Id.* at 137. The court noted how the releases resulted from protracted arm's-length negotiations in exchange for the contributions that allowed the debtor to continue operating. In short, "[r]estructuring in this case was possible only because of the release provision." *Id.* Ultimately, because the "Bankruptcy Court's conclusion that the release provisions were integral to the restructuring was well-reasoned and well-supported by the record," the bankruptcy court "was constitutionally authorized to confirm the plan in which those provisions appeared." *Id.* at 140. But even then, the Third Circuit made clear that the situation was an outlier. *Id.* at 140 ("In short, our holding today is specific and limited. It is that, under the particular facts of this case, the Bankruptcy Court's conclusion that the release provisions were integral to the restructuring was well-reasoned and well-supported by the record.").

3805

The Third Circuit's reliance on the detailed factual findings below supporting the releases underscore the importance of a bankruptcy court fully supporting its basis for approving a non-debtor release. The detailed factual findings in *In re Millennium Lab* further highlight the lack of factual findings in this case. Here, the Bankruptcy Court stated in conclusory fashion that the Third-Party Releases were integral to the Plan, but it based this only on the fact that the Plan stated as much. Thus, instead of making detailed factual findings as to whether unique circumstances warranted the inclusion of non-debtor releases, the Bankruptcy Court abdicated this crucial function to the negotiators of the Plan — the very negotiators who stood to benefit from the Releases. However, the Bankruptcy Court cannot delegate to private citizens the determination of whether a court has the constitutional power to approve the releases. Thus, the Bankruptcy Court's lack of explanation constitutes clear error, in addition to erring both factually and as a matter of law in its determination that the parties' consent obviated the need to conduct the *Behrmann* analysis, as explained below.

### 3. Consent and the *Behrmann* Analysis

**\*27** Debtors argue that *Behrmann* does not apply to consensual releases (Appellee Br. at 60), whereas the Trustee argues that consent does not obviate the need to conduct the *Behrmann* analysis. (Trustee Br. at 24.) Aside from adopting the Sixth Circuit's approach for *nonconsensual* releases, the Fourth Circuit has not spoken directly on whether the *Behrmann* analysis applies to consensual releases. Again, courts around the country have split on the issue.

Several courts have found that a party can consent to a third-party release and eliminate the need for a *Behrmann* analysis. For example, the Seventh Circuit has noted approvingly that "courts have found releases that are consensual and non-coercive to be in accord with the strictures of the Bankruptcy Code." *In re Specialty Equip. Cos., Inc.*, 3 F.3d 1043, 1047 (7th Cir. 1993). Likewise, the United States Bankruptcy Court for the District of Maryland distinguished consensual releases from those requiring a *Behrmann* analysis, because "[i]t is well recognized that, where the application of the *Dow Corning* or other applicable factors leads to the conclusion that the third party releases should not be approved, the court can nevertheless approve the releases with the consent of the releasing parties." *In re Neogenix Oncology, Inc.*, 508 B.R. 345, 361 (Bankr. D. Md. 2014). The Second Circuit has also indicated that "[n]ondebtor releases may

also be tolerated if the affected creditors consent." *In re Metromedia Fiber Network, Inc.*, 416 F.3d at 142. Similarly, the Northern District of Texas has noted that "[m]ost courts allow consensual nondebtor releases to be included in a plan." *In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 775 (Bankr. N.D. Tex. 2007).

**a. Failing to Opt Out Does Not Rise to the Level of Consent Required to Obviate *Behrmann*.**

Even if consent can obviate the need for a *Behrmann* analysis, the level of consent required to eliminate the need for a *Behrmann*-type analysis varies. Debtors contend that failing to opt out of a release evidences consent to that release. (Appellee Br. at 41.) The Trustee argues that the Bankruptcy Court erred in finding that this type of implied consent suffices. (Trustee Br. at 24.) The Court agrees with the Trustee as a matter of law and as a matter of fact (as previously determined).

The Fourth Circuit does not appear to have spoken on the issue of whether implied consent can give rise to a consensual non-debtor release. *See In re Neogenix Oncology, Inc.*, 2015 WL 5786345, at \*5 (Bankr. D. Md. Oct. 1, 2015) ("The Fourth Circuit has not expressly faced the issue presented here, whether a 'consensual' third party release must be express or whether implied consent can be sufficient."). Other courts have diverged on whether implied consent can suffice for a release.

Some courts, like the District of New Jersey, look to the principles of contract law rather than the bankruptcy court's confirmation authority to conclude that the validity of the releases requires affirmative consent. For example, in *In re Congoleum Corp.*, the court determined that a creditor must have "unambiguously manifested assent to the release of the nondebtor from liability on its debt." 362 B.R. 167, 194 (Bankr. D.N.J. 2007). Likewise, in *In re Arrowmill Development Corp.*, the court held that it was "not enough for a creditor to abstain from voting for a plan, or even to simply vote 'yes' as to a plan." 211 B.R. 497, 507 (Bankr. D.N.J. 1997).

**\*28** Yet, other courts have found that a creditor must individually consent by voting in favor of the plan. In *In re Coram Healthcare Corp.*, the court stated that "to the extent creditors or shareholders voted in favor of the Trustee's Plan, which provides for the release of claims they may have

3806

against the Noteholders, they are bound by that." 315 B.R. 321, 336 (Bankr. D.Del. 2004). Likewise, in *In re Washington Mutual, Inc.*, the court found the opt-out mechanism in the plan insufficient to support the third-party releases with respect to the parties who did not return a ballot. 442 B.R. 314, 355 (Bankr. D. Del. 2011).

However, other courts have determined that failure to return a ballot constitutes consent to a third-party release when the creditor received notice of implications of releasing parties. For example, in *In re Indianapolis Downs, LLC,* the court found that providing an opportunity to opt out along with detailed instructions for how to opt out warranted approval of the releases. 486 B.R. 286, 305-06 (Bankr. D. Del. 2013). However, the court allowed the "deemed" acceptance by the unimpaired creditors, because "these creditors are being paid in full and have therefore received consideration for the releases." *Id.* at 305. Likewise, in *In re Spansion, Inc.*, the court found that parties who had accepted the plan and not opted-out would be bound by the release. 426 B.R. 114, 144 (Bankr. D. Del. 2010).

Still, other courts have allowed implied consent releases. In *In re DBSD North America, Inc.*, the court approved third-party releases when the releasing parties received adequate notice of the release and they had an opportunity to opt out of the release. 419 B.R. 179, 218-19 (Bankr. S.D.N.Y. 2009); *see also In re Calpine Corp.*, 2007 WL 4565223 (Bankr. S.D.N.Y. Dec. 19, 2007) ("[parties] choosing not to opt out of the releases were given due and adequate notice that they would be granting the releases by acting in such a manner"). Similarly, in *In re Conseco, Inc.*, the court found that impaired creditors who did not opt out had impliedly consented to the releases. 301 B.R. 525, 527-28 (Bankr. N.D. Ill. 2003).

Debtors advance this last approach by comparing the opt-out provisions to contract law and class action procedures. (Appellee Br. at 65.) However, both comparisons cut sharply against their argument.

### i. Contract Law Does Not Support Consent by Failure to Opt Out.

First, contrary to Debtors' statement that "actual principles of contract law have long provided that the manifestation of assent may be made wholly by failure to act" (Appellee Br. at 65), black letter contract law dictates otherwise. *See Meekins v. Lakeview Loan Servicing, LLC*, 2020 WL 1922765, at *4 (E.D. Va. Apr. 21, 2020) ("A party's silence, however, is insufficient to show its intention to be bound by the terms of a contract.") (quotations omitted). Indeed, in one of the cases cited by Debtors for its acceptance-by-silence proposition, the First Circuit stated, "it's basic contract law that an offeror cannot unilaterally impose on another party the obligation to respond and reject their offer." *Rivera-Colon v. AT&T Mobility Puerto Rico, Inc.*, 913 F.3d 200, 211 (1st Cir. 2019) (citing 1 Corbin on Contracts § 3.19 (2018) ("It should here be plainly set forth that an offeror has no power to cause the silence of the offeree to operate as an acceptance when the offeree does not intend it to do so."); 2 Williston on Contracts § 6:50 (4th ed. 1993) ("Merely sending an unsolicited offer does not impose upon the party receiving it any duty to speak or deprive the party of its privilege of remaining silent without accepting.")). Limited exceptions to this rule exist, such as previous dealings or when an offeror gives the offeree reason to believe that silence or inaction will manifest assent, and the offeree remains silent or inactive with the intent to accept the offer. Restatement (Second) of Contracts § 69(1)(b). However, neither Debtors nor the Bankruptcy Court identified any facts that would support the application of an exception to the general rule of contracts that silence cannot manifest assent. Nor does the record reveal any such facts. Indeed, the Court has already found as a matter of fact that consent did not occur. Accordingly, any attempt to claim that contract law supports a finding of consent to third-party releases based on inaction rings hollow.

### ii. Class Action Law Does Not Support Finding Consent by Failing to Opt Out.

**\*29** Likewise, Debtors' comparison to class actions falls short of providing support of their contention that a failure to opt out constitutes consent to the releases. In fact, the comparison to class action litigation highlights the impropriety of finding releases consensual based merely on a failure to opt out. True, as noted by Debtors, courts (notably, Article III judges) may bind absent class members to a judgment so long as they provide them notice of the action and the opportunity to either opt out or participate. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). But to do so, courts must ensure that the class action complies with the unique requirements of Rule 23 of the Federal Rules of Civil Procedure.

Importantly, Rule 23(a), in relevant part, allows an individual to sue on behalf of other class members only if he will "fairly

3807

and adequately protect the interests of the class" and his claims "are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3)-(4). Further, the class must be specifically defined to identify the class members and the class claims. Fed. R. Civ. P. 23(c)(1)(B). Moreover, the court must appoint class counsel that can best "represent the interests of the class." Fed. R. Civ. P. 23(g). Indeed, the court *must* appoint class counsel to represent the class, as pro se litigants cannot represent absent class members. *See Oxendine v. Williams,* 509 F.2d 1405, 1407 (4th Cir. 1975) ("Ability to protect the interests of the class depends in part on the quality of counsel, and we consider the competence of a layman representing himself to be clearly too limited to allow him to risk the rights of others.") (internal citations omitted). And, the presiding court bears responsibility for ensuring compliance with all of the above requirements. Most, if not all, of these requirements become heavily litigated throughout the life of a class action.

None of these protections exist in the context of a non-debtor release in a bankruptcy action. First and foremost, no party litigates on behalf of the absent releasing party. No party with a typical claim has a duty to ensure that he fairly and adequately represents the best interests of the absent releasing party. Moreover, the absent releasing party does not enjoy counsel that will represent his best interests in his stead. Indeed, the facts of this case highlight that distinction. The Bankruptcy Court expressly rejected the ability of certain absent releasing parties to have a party and counsel represent their best interests. Yet, the Bankruptcy Court still sought to extinguish their claims.

Similarly, and importantly, any class settlement that would bind absent class members requires court approval. Fed. R. Civ. P. 23(e). After giving notice to all class members of the proposed settlement, the court may only approve the settlement "after a hearing and only on finding that it is fair, reasonable, and adequate" taking into account whether "(A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate; and (D) the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2). "The inquiry appropriate under Rule 23(e) ... protects unnamed class members from unjust or unfair settlements affecting their rights ...." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (internal quotations omitted). And it is an Article III judge, acting with all of their powers and protections as described in *Stern*, that approves the settlement.

Conversely, if mere failure to opt out obviates the need to conduct a *Behrmann* analysis, then no court carries an obligation to ensure the fairness, reasonableness and adequacy of the relief afforded the absent releasing parties. The *Behrmann* analysis at least provides some oversight that resembles the scrutiny given by a court to class settlement under Rule 23, even if it falls short of ensuring that the release of the claims is fair, reasonable and adequate. Again, the facts of this case highlight the need for scrutiny of what Debtors call a "settlement" of the released claims. No court would find this "settlement" fair, reasonable and adequate under Rule 23, as application of those factors demonstrate. No party or counsel represented the interests of the class, much less represented them adequately. The settlement of the released claims did not result from any negotiation with the Releasing Parties, much less one that occurred at arm's length. Instead, it appears that negotiations only occurred between the individuals and entities that would benefit from releases in an effort to shield themselves from any liability, not those who would confer the benefit in exchange for some other benefit.

 **\*30**  Along those lines, the settlement of the released claims provides no relief to the Releasing Parties, much less adequate relief. The fact that the Releasing Parties also receive a release provides nothing more than illusory consideration. The Court cannot envision a potential claim that a former officer or director of Debtors could have against a former shareholder that would give a mutual release any real value. Indeed, the Court has already found as a matter of fact that the mutual release lacked any value and was purely fictional.

The protections provided to absent class members under Rule 23 highlight the lack of protections provided to absent releasing parties in this context. Moreover, the comparison to class actions also demonstrates the due process issues that result from releasing a claim based only on the failure to opt out.

**b. Releasing These Claims Raises Serious Due Process Concerns.**

Third-party releases in bankruptcy actions based only on a failure to opt out also raise serious due process concerns, because they lack the critical due process protections of Rule 23. *See Bell v. Brockett*, 922 F.3d 502, 511 (4th Cir. 2019) ("Rule 23's adequacy requirements provide critical safeguards against the due process concerns inherent in all class actions."). In the seminal case on due process in class

3808

2022 WL 135398

actions, the Supreme Court held that when "a fully descriptive notice is sent [by] first-class mail to each class member, with an explanation of the right to 'opt out,' [that procedure] satisfies due process" even if the absent class member would be bound absent an affirmative opt in. *Shutts*, 472 U.S. at 812, 105 S.Ct. 2965.

However, the Supreme Court's basis for this holding underscores the lack of due process present here. First, "[t]he notice must be the best practicable, reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* at 812, 105 S.Ct. 2965 (quotations omitted). Second, the "notice should describe the action and the plaintiffs' rights in it." *Id.* Third, "an absent plaintiff [must] be provided with an opportunity to remove himself from the class by executing and returning an 'opt out' or 'request for exclusion' form to the court." *Id.* Fourth, "the Due Process Clause of course requires that the named plaintiff at all times adequately represent the interests of the absent class members." *Id.*

In this case, the Third-Party Releases fail three of the four elements required to afford due process. First, the Bankruptcy Court found the notice "sufficient." (Bankr. Confirm. Op. at 31.) But, "sufficient" falls short of the "best practicable, reasonably calculated" standard set forth by the Supreme Court. Although the Court will not now fully undertake the analysis of whether the notice constituted the "best practicable, reasonably calculated" notice "under the circumstances," it seems unlikely that the notice would meet that higher standard. Second, the notice did not describe the released claims or the rights given up by the absent Releasing Parties. Nor did it mention the only purported benefit (the illusory "mutual release") to the Releasing Parties as consideration for their release. Describing the bankruptcy action and generally stating that the absent party would release all claims does not identify the specific claims subject to release. It does not "describe the action and the plaintiffs' rights in it." The notice satisfies the third element of providing the absent Releasing Parties the opportunity to opt out. Finally, as discussed above, the absent class members had no one to adequately represent their interests. Accordingly, allowing the release of claims based only on the failure to opt out does not comport with due process.

**\*31** In conclusion, the Court finds that the Bankruptcy Court erred both factually and legally in finding the Third-Party Releases to be consensual. Failure to opt out, without

more, cannot form the basis of consent to the release of a claim. Whether the Court labels these "nonconsensual" or based on "implied consent" matters not, because in either case there is a lack of sufficient affirmation of consent. *See In re Neogenix Oncology, Inc.*, 2015 WL 5786345, at \*6 ("*Behrmann* provides sufficient guidance on whether a court should approve a release for which there is insufficient affirmation of consent, whether the release is said to be 'nonconsensual' or based on 'implied consent.' "). And, it bears emphasizing again that Debtors' argument about consent focuses only on the pending securities fraud case in the District of New Jersey, which constitutes only the tip of the release iceberg, as the Third-Party Releases cover far more than a single case against two former officers. No argument about consent can be raised about all of the other Releasing Parties that the Bankruptcy Court never even considered.

Accordingly, the mandates of *Behrmann* unquestionably apply, and the Bankruptcy Court should have conducted the *Behrmann* analysis to determine if this case constitutes the rare case warranting such third-party releases.

**4. The Bankruptcy Court's Error in Failing to Conduct a *Behrmann* Analysis**

*Behrmann* commands that a bankruptcy court may only grant nonconsensual non-debtor releases "cautiously and infrequently." *Behrmann*, 663 F.3d at 712. Because only cases with unique circumstances warrant granting such releases, a bankruptcy court must make "specific factual findings" demonstrating why the debtor's circumstances entitle it to the benefit of the releases. *Id.* at 712-13.

Here, the Bankruptcy Court failed to conduct any *Behrmann* analysis, precluding any meaningful appellate review. Indeed, the Bankruptcy Court addressed the *Behrmann* factors in a single footnote — again, a single footnote — that merely said: "were the *Behrmann* factors applicable to the Third-Party Releases, the Court would find the *Behrmann* factors were satisfied for the reasons stated in the *Debtors' Memorandum of Law* ...." (Bankr. Confirm. Op. at 38, n.28). It should be obvious that a court may not satisfy its judicial responsibilities by simply incorporating by reference a party's brief. *Cuthbertson v. Biggers Bros.*, 702 F.2d 454, 458 (4th Cir. 1983) ("We have previously condemned the practice of adopting the prevailing party's proposed findings of facts and conclusions of law, and we repeat that admonition here."). As

3809

2022 WL 135398

the Third Circuit reminded in *Bright v. Westmoreland County,* 380 F.3d 729 (3d Cir. 2004):

> Judicial opinions are the core work-product of judges. They are much more than findings of fact and conclusions of law; they constitute the logical and analytical explanations of why a judge arrived at a specific decision. They are tangible proof to the litigants that the judge actively wrestled with their claims and arguments and made a scholarly decision based on his or her own reason and logic. When a court adopts a party's proposed opinion as its own, the court vitiates the vital purposes served by judicial opinions.

*Id.* at 732. And such a cursory consideration of the *Behrmann* factors disregards the Fourth Circuit's command to limit the use of third-party releases to the exceptional case warranting them.

Moreover, the vast Third-Party Releases broadly release a wide variety of claims, against a wide variety of individuals, held by a wide variety of individuals. The variety of claims released here necessarily means that the specific factual findings supporting the propriety of releasing each type of claim will also vary. Accordingly, the Court cannot conduct meaningful appellate review as a result of the Bankruptcy Court's failure to address that which has been released, setting forth the specific factual findings for each type of claim released. Meaningful review requires detailed findings of fact by the Bankruptcy Court. That did not happen here.

**\*32** Indeed, the only identified claims released in this appeal are those against the Individual Defendants (Jaffe and Giammatteo) as asserted in the putative class action filed in the District of New Jersey. Yet, by way of example, they demonstrate the Third-Party Releases' inability to meet the *Behrmann* factors. A brief examination of the *Behrmann* factors as applied to these claims follows.

### a. Identity of Interests

Under the first factor, "a court must consider whether there is an identity of interests — usually an indemnity obligation — between the debtor and the released parties," such that the "suit against the non-debtor may, in essence, be a suit against the debtor that risks depleting the assets of the estate." *Nat'l Heritage Found., Inc.,* 760 F.3d at 348 (cleaned up). Debtors claim that they had an indemnification obligation to the Individual Defendants. (Appellee Br. at 78-79.) But, Debtors have essentially liquidated and, therefore, it remains

uncertain whether Debtors have a continuing indemnification obligation to the Individual Defendants. Moreover, the Court agrees with the Third Circuit's view in *In re Continental Airlines*:

> We conclude that granting permanent injunctions to protect non-debtor parties on the bases of theoretical identity of interest alone would turn bankruptcy principles on their head. Nothing in the Bankruptcy Code can be construed to establish such extraordinary protection for non-debtor parties.

203 F.3d at 217. Consequently, this factor does not weigh in favor of the releases.

### b. Substantial Contribution

The second factor requires Debtors "to demonstrate that the Released Parties made a substantial contribution of assets to its reorganization." *Nat'l Heritage Found., Inc.,* 760 F.3d at 348. The record does not support that the Individual Defendants made any financial contribution to the reorganization or any other contribution. Indeed, the Court has already made a factual finding that the Individual Defendants played no role in the reorganization (they had already left Debtors' employment) and their releases were not integral to the reorganization. The fact that they also provided releases to Debtors does not amount to a "substantial contribution of assets," especially given the illusory nature of the releases. Even if it could, the record does not support that the releases provided by the Individual Defendants could amount to a contribution of substantial assets. Accordingly, this factor weighs heavily against granting the release.

### c. Essential to the Reorganization

To satisfy the third factor, "a debtor must demonstrate that the non-debtor release is essential to its reorganization, such that the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor." *Id.* As an initial matter, Debtor largely liquidated, rather than reorganized. This alone cuts against the essential nature of the releases. The third and final asset sale transaction closed on December 23, 2020 — well before confirmation of the Plan. That the deals closed and the assets changed hands well before any release was finalized or went into effect demonstrates that the Plan does not hinge on the inclusion of the releases.

3810

Patterson v. Mahwah Bergen Retail Group, Inc., --- B.R. ---- (2022)
2022 WL 135398

Moreover, the record does not reveal that the Plan would be doomed if the Individual Defendants did not obtain a release. Indeed, as previously noted, the releases of the Individual Defendants were not integral to the reorganization. And, the Court cannot discern any reason why a lack of release for the Individual Defendants would prove fatal to the implementation of the Plan. Accordingly, this factor also weighs heavily against granting the release.

### d. Approval by the Affected Class

**\*33** The fourth factor requires Debtor "to prove that the class or classes affected by the Release Provision overwhelmingly voted in favor of the Plan." *Id.* at 350. Here, the Class Members, as a class receiving nothing under the Plan, were deemed to reject the Plan as a matter of law. 11 U.S.C. § 1126(g). Debtors claim that the small number of opt outs satisfy this prong. However, for the reasons stated above, the Court gives little weight to the failure to opt out of the Plan and will not view it as analogous to an affirmative vote in favor of the Plan. Therefore, this factor also weighs heavily against the release.

### e. Mechanism to Pay Substantially All of the Class Affected

Under the fifth factor, the court considers "whether the debtor's reorganization plan provides a mechanism to consider and pay all or substantially all of the class or classes affected by the non-debtor release." *Id.* at 350. Here, the Plan does not create a separate fund to pay the claims released or provide any other mechanism to consider or pay the securities claims. Indeed, the Third-Party Releases are so broad that there has been no effort to even discern the full extent of the claims. Because the Plan extinguishes these claims entirely without giving any value in return, this weighs strongly against granting the Release. *See id.* at 351 (concluding that "the absence of such a [channeling fund] can weigh against the validity of a non-debtor release, especially when the result is that the impacted class's claims are extinguished entirely").

### f. Opportunity to Recover

The final substantive factor "is whether the plan provides an opportunity for those who chose not to settle to recover in full." *Id.* at 351. Here, the Plan provides the class members an opportunity to opt out of the Release and pursue the Securities claims. However, given the deficient notice, the Court has already found that here, as a matter of fact, notice did not occur. Accordingly, this factor also weighs against granting the Release.

In sum, the *Behrmann* factors clearly weigh against releasing the Individual Defendants from liability in the Securities Claims. As with the *Stern* analysis, these claims have no meaningful connection to the bankruptcy case. Indeed, the Court has already made a factual finding that these releases were not integral to the Plan. Therefore, they do not implicate the unique circumstances that would warrant a bankruptcy court — or, at least one that grants non-debtor releases only cautiously and infrequently — to release these claims as part of the bankruptcy proceedings. Debtors' claim that "virtually every confirmed plan in every complex bankruptcy case [in the Eastern District of Virginia] includes consensual third-party release provisions of this variety" (Appellees' Br. at 8), harms, rather than helps, its argument. That the Bankruptcy Court grants such non-debtor releases as a matter of course, rather than "cautiously and infrequently" and only when warranted by unique circumstances, underscores the lack of specific factual findings supporting the releases here.

For these reasons, the Bankruptcy Court clearly erred in finding that the releases satisfied the *Behrmann* factors. Consequently, the Third-Party Releases must be voided and rendered unenforceable. The Court will now turn to the impact on the Plan of the voiding of the Third-Party Releases and whether the voided releases may be severed from the Plan.

### E. Severability

The Court finds that it can sever the unenforceable releases from the Plan. Debtors argue that the nonseverability provision renders the Third-Party Releases nonseverable from the Plan. (Appellee Br. at 34-35.) The provision relied upon by Debtors follows in its entirety:

**\*34** If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or

interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' or the Reorganized Debtors' consent, as applicable; and (3) nonseverable and mutually dependent.

(the "Nonseverability Provision") (USTAPP 2528).) Boiled down to its essence, the Plan explicitly provides that the Bankruptcy Court could sever any provision before confirmation without it affecting the rest of the Plan, but following confirmation all provisions are integral and only the Debtors can consent to severance of a particular provision. It does not explain why each provision becomes integral only upon confirmation.

As explained above, after having found a *Stern* violation and vacated the Confirmation Order, the Plan now comes before the Court under Rule 8018.1 "as proposed findings of fact and conclusions of law." Therefore, the Court steps into the shoes of the Bankruptcy Court in terms of the Nonseverability Provision. That is, the first half of the Nonseverability provision remains the operative provision, and the Plan itself has not declared the Third-Party Releases nonseverable. Consequently, the Plan provides that the Court should sever the voided Third-Party Releases from the Plan. And the Court will do so. However, just as the Court would not find the Third-Party Releases nonseverable after confirmation based only on the boilerplate Nonseverability Provision, it will not rely solely on the Nonseverability Provision to find the provisions severable now that the Plan returns to the pre-confirmation phase. Instead, the Court will analyze the law surrounding severability and the record to determine that it can sever these Third-Party Releases that lack any connection to the reorganization.

**1. The Nonseverability Provision's Textual Support for Severability**

As described above, the Nonseverability Provision provides that, before confirmation, the Plan remains in full effect in the event that the Bankruptcy Court finds any provision

unenforceable. Having now vacated the Confirmation Order, the Court steps into the shoes of the Bankruptcy Court before confirmation, when the parties agreed that the Third-Party Releases could be severed. Yet, Debtors maintain that the Nonseverability Provision reinforces that the Third-Party Releases carry too much import in the Plan for it to survive without the Releases.

However, the contradictory text and operation of the Nonseverability Provision belies the argument that the Plan cannot survive without the Third-Party Releases. The Nonseverability Provision expressly provides that, before confirmation, the Bankruptcy Court could find the Third-Party Releases (or any provision) unenforceable, as the Court is now doing. In the event of such a holding, the Plan would "in no way be affected, impaired, or invalidated." The fact that the Plan would have survived if the Bankruptcy Court had severed the Third-Party Releases just before confirmation, without any further changes, demonstrates that the Third-Party Releases are not inextricably tied to the rest of the Plan. Therefore, just as the Bankruptcy Court could sever the Third-Party Releases before confirmation, this Court can sever the Third-Party Releases after vacating the Confirmation Order.

 **\*35** Likewise, the Nonseverability Provision provides that a provision of the Plan can be deleted with Debtors' consent. Again, this demonstrates that the Plan could survive in the absence of any particular provision. Debtors attempted to reserve for themselves the right to sever provisions of the Plan — without the consent of any other affected parties — while arguing here that the Court lacks the same authority to sever legally unenforceable provisions. This confirms that the Nonseverability Provision amounts to nothing more than a hollow attempt to evade judicial review of the Third-Party Releases. The negotiating parties here have attempted to release a wide variety of claims of a wide variety of absent and nonconsenting individuals and then use a boilerplate Nonseverability Provision to constrain Article III review of those releases. The Court cannot let such gamesmanship occur. Therefore, the Court will look to the record in determining that the releases do not form an integral part of the Plan and, consequently, the Court may sever this provision without upending the entire Plan.

**2. The Importance of the Provision to the Plan's Determination of Severability**

In determining severability, courts must look to the evidence in the record and not simply whether the parties state in a conclusory fashion that the provision cannot be severed. As the Second Circuit has explained, "normally a nonseverability clause standing on its own cannot support a finding of equitable mootness." *In re Charter Commc'ns, Inc.*, 691 F.3d 476, 485 (2d Cir. 2012). The Second Circuit's reasoning in the equitable mootness context provides sound guidance in examining severability generally. The Second Circuit explained that "[a]llowing a boilerplate nonseverability clause, without more, to determine the equitable mootness question would give the debtor and other negotiating parties too much power to constrain Article III review," and would "moot virtually every appeal where a stay had not been granted." *Id.* Importantly, "[w]hile a nonseverability clause may be one indication that a particular term was important to the bargaining parties, a district court cannot rely on such a clause to the exclusion of other evidence." *Id.*

The Second Circuit ultimately found the release provisions nonseverable, but only because courts below "did not rest [their] decision exclusively on the nonseverability clause." *Id.* at 486. Instead, it relied on specific testimony regarding the importance of the releases. *Id.* This included an examination of how the releases induced a specific released party to settle and an explanation of why the plan required that released party's contribution. *Id.* The court relied on evidence that "these provisions could not be excised without seriously threatening Charter's ability to re-emerge successfully from bankruptcy," because the parties would need to reenter negotiations. *Id.*

Other circuits, including the Fourth Circuit, have followed a similar approach in looking to the facts to determine severability. For example, in *Behrmann*, the Fourth Circuit rejected the equitable mootness argument based not only on a severability provision, but also on the absence of any factual support that the releases "[were] important to the overall objectives of the Plan" as argued. 663 F.3d at 714. The debtor had "failed to demonstrate how the relief requested by Appellants would jeopardize the success of the Confirmed Plan." *Id.* After explaining that the importance of the releases to the overall plan lacked factual support, the Fourth Circuit "also note[d]" the existence of a severability provision — allowing provisions to be severed, like the posture here now — "suggests that the plan would remain viable absent the Release Provisions." *Id.* Thus, the Fourth Circuit relied on the facts to determine the importance of a provision to the plan, not just the provisions in the plan addressing severability.

Similarly, in the *In re Continental Airlines* case, the Third Circuit rejected an argument as to the essential nature of third-party releases to a plan where the debtors presented "[n]o evidence or arguments ... that Plaintiffs' appeal, if successful, would necessitate the reversal or unraveling of the entire plan of reorganization." 203 F.3d at 210. It explained that the debtors had provided no evidence that "investors and creditors, in deciding whether to support the Continental Debtors' plan, ever considered Plaintiffs' claims." *Id.* The Third Circuit ultimately invalidated the releases. *Id.* at 217-18.

### 3. Other Areas of the Law's Support for Focusing on the Provision's Importance to the Plan

**\*36**  This focus on the overall importance of the provision proposed to be severed finds support in other areas of severability. For example, when confronted with an unconstitutional provision in a statute, courts typically "sever[ ] any problematic portions while leaving the remainder intact." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 508, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010). This presumption operates in the presence or absence of a severability provision. *See Barr v. Am. Ass'n of Pol. Consultants, Inc.*, —— U.S. ——, 140 S. Ct. 2335, 2352-53, 207 L.Ed.2d 784 (2020) ("Even if the severability clause did not apply to the government-debt provision at issue in this case (or even if there were no severability clause in the Communications Act), we would apply the presumption of severability as described and applied in cases such as *Free Enterprise Fund.* And under that presumption, we likewise would sever the 2015 government-debt exception, the constitutionally offending provision.").

With this presumption in mind, courts look to the importance of the provision to the overall statute. "The more relevant inquiry in evaluating severability is whether the statute will function in a manner consistent with the intent of Congress." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685, 107 S.Ct. 1476, 94 L.Ed.2d 661 (1987). Indeed, if "the unconstitutionality of a part of an Act does not necessarily defeat or affect the validity of its remaining provisions," then courts will invalidate only the unconstitutional portion. *Free Enter. Fund*, 561 U.S. at 508, 130 S.Ct. 3138. Thus, courts look to whether severing the offending provision would upend the entire statute and, if not, they default to severing the provision.

Likewise, contract law supports looking to the overall importance of the unenforceable provision. As the Fourth Circuit has described Virginia contract law: "Generally, when a contract covers several subjects, some of whose provisions are valid and some void, those which are valid will be upheld if they are not so interwoven with those illegal as to make divisibility impossible." *Alston Studios, Inc. v. Lloyd V. Gress & Assocs.*, 492 F.2d 279, 285 (4th Cir. 1974). Similarly, "Delaware law is clear that an invalid term of an otherwise valid contract, if severable, will not defeat the contract. Thus, a court will enforce a contract with an indefinite provision if the provision is not a material or essential term." *VICI Racing, LLC v. T-Mobile USA, Inc.*, 763 F.3d 273, 284-85 (3d Cir. 2014) (cleaned up). Thus, when faced with an unenforceable provision in a contract, courts will look to whether severing the provision will upset the entire contract.

**4. The Evidence in This Case Supports Severing the Third-Party Releases**

Applying these principles, the Court finds that severing the Third-Party Releases at this stage would not upset the viability of the Plan. In fact, the evidence demonstrates otherwise. Indeed, Carrie Teffner testified that, as of February 22, 2021, "Debtors have sold substantially all of their assets and all that remains is to distribute cash proceeds in accordance with the terms of the plan." (Teffner Decl. ¶ 30.) To that end, the three main sales of the assets had all closed months before the confirmation hearing. No evidence exists that severing the Third-Party Releases would upset these already-closed sales, require Debtors to return any of the funds generated by the sales or disrupt the distribution of the cash proceeds.

Teffner further testified that the various release provisions "are the product of extensive good faith, arm's-length negotiations and were material inducements for the parties to enter into the comprehensive settlement embodied in the plan." (Teffner Decl. ¶ 41.) Yet, this "arm's-length" negotiation occurred without the Releasing Parties having a seat at the negotiating table. Teffner admitted as much during cross-examination during the Confirmation hearing. (Confirm. Tr. at 23:1-10.) Moreover, she did not describe how the releases operated as a material inducement for the parties to enter into the settlement, especially given that many of the parties did not enter into the settlement. Instead, she testified that it was the Debtors, not third parties, who sought the

broad releases. (Confirm. Tr. at 36:1-4.) Again, she admitted as much on cross-examination. (Confirm Tr. at 23:21-24:2.) In fact, she admitted that with respect to her statement regarding the material inducement, "the third-party releases were addressed in totality with no specific individuals called out." (Confirm. Tr. 23:25-24:2.) The Court cannot agree that the Third-Party Releases provided a material inducement to such a broad array of individuals without examining the inducement to each individual. Additionally, Teffner admitted that the Releasing Parties had no participation in the bankruptcy process at all. (Confirm. Tr. at 26:10-14.)

**\*37**  Furthermore, Teffner claimed that not approving the Third-Party Releases "could potentially significantly increase the time and expense of the Debtors' wind down process, to the detriment of the Debtors' stakeholders." (Teffner Decl. ¶ 45.) On cross-examination, she expanded that this referred to the time and expense of engaging in discovery and defending litigation. (Confirm. Tr. at 33:19-22.) However, expending additional time and expense to respond to discovery does not amount to unwinding the Plan, especially with the presence of substantial insurance to offset certain litigation costs. Indeed, Debtors had in excess of $50 million in insurance, and perhaps in excess of $100 million dollars. (Confirm. Tr. 30:14-31:4.)

Critically, during the Confirmation Hearing, Teffner could not offer specific reasons why the Third-Party Releases comprised a necessary part of the Plan. (Confirm. Tr. at 36:1-4.) Instead, she offered only general statements that the overall intent of Debtors was to provide releases for everyone. (Confirm. Tr. at 36:1-4.) And she admitted that the negotiations focused only on past/current officers and directors, not the vast universe of Released Parties contained in the Third-Party Releases. (Confirm. Tr. at 27:19-24; 42:3-9.) She refused to answer whether the reorganization would fail absent the releases.[13] (Confirm. Tr. at 36:10-19.)

[13]    Likewise, Gary Begeman refused to testify when asked whether the confirmation could proceed absent the Third-Party Releases. (Confirm. Tr. at 47:18-21.)

In fact, Teffner confirmed that the most important reasons for the inclusion of the Third-Party Releases — pushing the Plan to completion, playing an integral role in the bankruptcy, expending time and resources, and making concessions — would not apply to individuals or entities that worked for Debtors before the bankruptcy filing. (Confirm. Tr. at 42:3-44:6.) Yet, the only addressed Released Parties involves two former executives (Jaffe and Giammatteo) who had left

3814

their employment with Debtors months before the bankruptcy and played no role in the reorganization.

In sum, the record contains no evidence of how the Third-Party Releases induced specific releasing parties to settle, or why the Plan required that Releasing Party's contribution. It contains no evidence as to why the Court could not excise the Third-Party Releases without seriously threatening Debtors' ability to re-emerge successfully from bankruptcy. Nor does the record suggest that the parties would need to reenter any negotiations. Indeed, Debtors have made clear that the Plan "is substantially consummated — and then some." (Appellee Br. at 30.) Simply saying that the Third-Party Releases form an integral part after confirmation of the Plan does not make it so. And, by saying the Third-Party Releases do not form an integral part of the Plan before confirmation, Debtors essentially admit that they do not form an integral part at any time.

The Court will not allow parties who gifted themselves a release in the Plan to hold this appeal hostage with a Nonseverability Provision, especially when the parties have not articulated a sound basis for nonseverability. For these reasons, the Court has no difficulty in severing the voided Third-Party Releases from the Plan.

### F. Equitable Mootness

Debtors also argue that the Court should dismiss this appeal on the grounds of equitable mootness. (Appellee Br. at 30.) The Court declines the invitation to use its equitable powers to ignore the serious errors that have occurred here.

### 1. Equitable Mootness Doctrine Generally

"Equitable mootness is a pragmatic doctrine grounded in the notion that, with the passage of time after a judgment in equity and implementation of that judgment, effective relief on appeal becomes impractical, imprudent, and therefore inequitable." *In re Bate Land & Timber LLC*, 877 F.3d 188, 195 (4th Cir. 2017). The doctrine's application "is based on practicality and prudence, does not employ rigid rules, and requires that a court determine whether judicial relief on appeal can, as a pragmatic matter, be granted." *Id.* In making this determination, courts can examine the following relevant factors:

*38 (1) whether the appellant sought and obtained a stay;

(2) whether the reorganization plan or other equitable relief has been substantially consummated;

(3) the extent to which the relief requested on appeal would affect the success of the reorganization plan or other equitable relief granted; and,

(4) the extent to which the relief requested on appeal would affect the interests of third parties.

*Id.* The reviewing court has discretion whether to find an appeal equitably moot. *Behrmann*, 663 F.3d at 714 ("In sum, we decline to exercise our discretion to dismiss this appeal as equitably moot."). And, notably, "equitable mootness applies to specific claims, not entire appeals and must be applied with a scalpel rather than an axe." *In re Charter Commc'ns, Inc.*, 691 F.3d at 481-82 (cleaned up).

Before addressing the factors, the Court notes that four threshold issues weigh against a finding of equitable mootness. First and foremost, vacating the Confirmation Order undercuts the argument in support of equitable mootness. The Confirmation Order no longer constitutes a final judgment, such that the Court no longer faces "the passage of time after a judgment in equity and implementation of that judgment," *In re Bate Land & Timber LLC*, 877 F.3d at 195, that the equitable mootness doctrine is based upon. The inquiry could end here. However, the Court will continue its analysis of the equitable mootness doctrine and find that it does not apply even if the Confirmation Order had not been converted into a Report and Recommendation.

Second, the fact that the Trustee brings this appeal counsels against applying the equitable doctrine. The Trustee argues that equitable mootness should never apply against an appeal brought by the Government. (Trustee Reply at 30.) Although the Court need not adopt such an ironclad rule, the Court believes that equitable mootness should not lie against the Trustee under these or similar circumstances. *See Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 423, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990) ("But it remains true that we need not embrace a rule that no [equitable] estoppel will lie against the Government in any case in order to decide this case.").

As the Fourth Circuit has articulated, the equitable mootness doctrine applies especially "when a party, seeking a return to the status quo ante, sits idly by and permits intervening events to extinguish old rights and create new ones." *Mac Panel Co. v. Virginia Panel Corp.*, 283 F.3d 622, 625 (4th Cir. 2002). This reasoning does not apply when the Trustee

2022 WL 135398

brings an appeal on behalf of absent individuals. The Trustee does not occupy the normal status as a "party" attempting to create or enlarge its own rights. Rather, the Trustee acts as a "watchdog" serving the role of "protecting the public interest and ensuring that bankruptcy cases are conducted according to law." *In re Clark*, 927 F.2d 793, 795 (4th Cir. 1991). As the Supreme Court has recognized, when the public interest rather than private rights are at stake, equitable doctrines take on a different role in favor of protecting the public interests. *See Kansas v. Nebraska*, 574 U.S. 445, 456, 135 S.Ct. 1042, 191 L.Ed.2d 1 (2015) ("As we have previously put the point: When federal law is at issue and 'the public interest is involved,' a federal court's 'equitable powers assume an even broader and more flexible character than when only a private controversy is at stake.' "); *Off. of Pers. Mgmt.*, 496 U.S. at 419, 110 S.Ct. 2465 ("From our earliest cases, we have recognized that equitable estoppel will not lie against the Government as it lies against private litigants.").

 **\*39**  Here, a finding of equitable mootness would preclude the Trustee from fulfilling its duty of protecting the public interest and preventing the abuse of the bankruptcy system. In fact, these facts demonstrate the need for the Trustee to discharge his statutory responsibilities. Not only did the parties craft a release that would extinguish the rights of countless individuals, they did so in a way that would insulate the release from judicial review. As the Securities Litigation Lead Plaintiffs' plight reveals, any party that challenges the Third-Party Releases loses standing to challenge the Third-Party Releases. Indeed, Debtors have argued vehemently that the Securities Litigation Lead Plaintiffs lack standing to challenge the releases. Without the Trustee's ability to serve as a watchdog, the Court might not ever endeavor to conduct a merits-based review of the Third-Party Releases that discharge the claims of thousands of absent individuals. The Trustee must have the ability to speak for those parties affected by a bankruptcy proceeding when the other interested parties have been effectively silenced from speaking on behalf of themselves. Accordingly, the Court will not apply the doctrine of equitable mootness against the Trustee when the Trustee seeks to protect the rights of absent individuals.

Third, the seriousness of the Bankruptcy Court's errors counsels against a finding of equitable mootness. As the Eighth Circuit recently explained in response to the assertion of equitable mootness, "invoking this doctrine often results in the refusal of the Article III courts to entertain a live appeal over which they indisputably possess statutory jurisdiction and in which meaningful relief can be awarded. An Article

III appellate court has a virtually unflagging obligation to exercise its subject matter jurisdiction." *In re VeroBlue Farms USA, Inc.*, 6 F.4th 880, 883 (8th Cir. 2021) (cleaned up). Here, the Bankruptcy Court extinguished the claims of absent and nonconsenting parties without the constitutional authority to adjudicate those claims. Pragmatism does not outweigh the need to remedy constitutional errors. *See Stern*, 564 U.S. at 501, 131 S.Ct. 2594 ("It goes without saying that the fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution.") (cleaned up). These constitutional errors directly concern the integrity of the bankruptcy process. "Equity strongly supports appellate review of issues consequential to the integrity and transparency of the Chapter 11 process." *In re Pac. Lumber Co.*, 584 F.3d at 251-53.

Fourth, the facts here do not suggest that "effective judicial relief is no longer practically available." *In re Bate Land & Timber, LLC*, 877 F.3d at 195. Debtors have offered no reason for the Court to conclude that it could not sever the Third-Party Releases here, and the Court has already found them severable. Such relief would not alter any creditor's recovery or affect the bankruptcy estate in any way. *Id.* Indeed, the overriding defect in the Third-Party Releases arises from the fact that it releases claims entirely attenuated from the Bankruptcy Case — claims that have no connection to the Bankruptcy Case against non-debtors held by third parties. Although Debtors point to the Nonseverability Provision, the Court does not believe that this provision constrains the ability to offer effective judicial relief. For one, without a valid Confirmation Order in place, the Nonseverability Provision now provides that the Court can sever the offending releases. In any event, a boilerplate nonseverability clause included by a debtor and other negotiating parties must not preclude appellate review of provisions that extinguish the rights of others in favor of those negotiating parties. *In re Charter Commc'ns, Inc.*, 691 F.3d at 485 ("Allowing a boilerplate nonseverability clause, without more, to determine the equitable mootness question would give the debtor and other negotiating parties too much power to constrain Article III review.").

## 2. Application of the Equitable Mootness Factors

Turning to the factors, they do not support a finding of equitable mootness and the Court will decline to exercise its discretion to avoid reviewing the merits of this appeal. *See*

*Behrmann*, 663 F.3d at 711 ("[W]hether a court should lend its aid in equity to a Chapter 11 debtor will turn on the particular facts and circumstances of the case ....")

**\*40** First, Appellants sought a stay in the Bankruptcy Court and this Court but failed in both attempts. Although they failed to obtain a stay, they moved for one at both levels, so this differs from the case where a party makes a strategic choice that "allow[s] the reorganization plan to go into effect, taking the risks that attended such a decision." *Mac Panel Co. v. Virginia Panel Corp.*, 283 F.3d 622, 625 (4th Cir. 2002) (moving for a stay in the bankruptcy court but choosing not to in the district court weighs in favor of a finding of equitable mootness). Moreover, the Trustee's requested relief does not seek to affect the recovery of any creditor; therefore, its unsuccessful attempts to obtain a stay would not render it inequitable for the Court to rule on the appeal. *See In re Bate Land & Timber, LLC*, 877 F.3d at 196 ("But because BLC merely seeks to add to its recovery from the Debtor's pocket without affecting the recovery of any other creditor, we conclude that BLC's unsuccessful attempt to obtain a stay would not render it inequitable for this court to provide the requested relief."). Additionally, this Court denied the request for a stay based on the high burden placed on a party requesting a stay. It expressly left open the door for Appellants to prevail on the merits. Closing that door now, simply because the Court did not previously grant a stay, would itself cause inequity.

Second, the substantial consummation of the Plan does not render it inequitable to rule on this appeal. When "the relief requested does not seek to undo any aspect of the Confirmed Plan that has been consummated, it would not be impractical, imprudent, or inequitable to allow the appeal to proceed." *Id.* The Plan is no longer in the post-confirmation phase. Moreover, the Trustee does not seek to undo any transactions that have occurred in the Plan's undertaking. Indeed, the requested relief — invalidating all or parts of the releases at issue — would only prospectively affect the ability of parties to bring suits based on past events. It would require no unwinding.

Similarly, the third factor, the extent to which the relief requested would affect the success of the reorganization plan, counsels against a finding of equitable mootness. Invalidating or altering the releases would not impact the recovery of any creditors. Indeed, the Plan itself states that the Third-Party Releases can be severed. The Plan would not be disturbed in any material way by allowing third parties to retain their causes of action against non-debtors.

The fourth — and most important — factor concerns the effect on the interests of third parties. *In re VeroBlue Farms USA, Inc.*, 6 F.4th at 889-90 (stressing that the most important factor in this analysis is the impact on third parties). As the releases here only apply to claims arising on or before the Effective Date, no post-confirmation transactions with third parties have occurred in reliance on the releases. Thus, considering the merits of the appeal would not negatively affect any third parties who relied on the confirmation of the Plan. *See In re Bate Land & Timber, LLC*, 877 F.3d at 196 ("The Debtor has not engaged in significant transactions with third parties who relied on the Confirmed Plan's terms such that alteration of the Confirmed Plan would negatively impact the Confirmed Plan and the third parties who relied upon it."). Conversely, extinguishing the claims of thousands of individuals without compensation, without consent and without due process reeks of inequity to third parties. *See In re Continental Airlines*, 203 F.3d at 211 ("In balancing the policy favoring finality of bankruptcy court judgments — particularly reorganization plans — against other considerations, we note as well that the equities here would not dictate dismissal. Plaintiffs, who have never had their day in court, have been forced to forfeit their claims against non-debtors with no consideration in return.").

Finally, the doctrine of equitable mootness is all too often invoked to avoid judicial review, as Debtors seek to do here. *In re VeroBlue Farms USA, Inc.*, 6 F.4th at 889-91; *In re Charter Commc'ns, Inc.*, 691 F.3d at 485. That concern takes on greater import here with the shockingly broad releases and the inclusion in the Plan of an attempted "poison pill" Nonseverability Provision. The errors committed by the Bankruptcy Court here are serious and command review by an Article III court. That Debtors invoke an equitable principle designed to promote a fair outcome embodies the height of irony.

**\*41** Consequently, the Court concludes that the equities strongly favor considering the merits of this appeal. Debtors' doomsday scenarios all stem from the inclusion of the Nonseverability Provision. However, the Court will not allow that provision or an equitable doctrine to preclude appellate review of plainly erroneous release provisions. Indeed, the Released Parties have given themselves broad releases and have sought to immunize the unconstitutional releases from appellate review with the inclusion of an

### G. The Exculpation Provision

The Trustee further argues that the Bankruptcy Court erred in approving the Exculpation Provision. (Trustee Br. at 43.) First, the Trustee submits that the Bankruptcy Court should have applied the *Behrmann* factors to the Exculpation Provision. (Trustee Br. at 43.) Second, the Trustee asserts that the Exculpation Provision bars claims against an overly broad set of parties and fails to include an exception for claims to proceed with court approval. (Trustee Br. at 44.) The Exculpation Provision provides:

> [N]o Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action or any claim arising from the Petition Date through the Effective Date related to any act or omission in connection with, relating to or arising out of, the Chapter 11 Cases ... except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence.

In contrast to third-party releases that offer protection to non-debtors for preconfirmation liability, an exculpation provision serves to protect court professionals who act reasonably while carrying out their responsibilities in connection with the bankruptcy case. Exculpation provisions do not release parties, but instead raise the liability standard of fiduciaries for their conduct during their case. *In re Health Diagnostic Lab. Inc.*, 551 B.R. 218, 232 (Bankr. E.D. Va. 2016). Exculpation provisions "generally are permissible, so long as they are properly limited and not overly broad." *In re Nat'l Heritage Found., Inc.*, 478 B.R. 216, 233 (Bankr. E.D. Va. 2012). To that end, courts will approve an exculpation provision "so long as it is limited to those parties who have served the debtor, is narrowly tailored and complies with the applicable standards." *In re Alpha Nat. Res., Inc.*, 556 B.R. 249, 260 (Bankr. E.D. Va. 2016). "Exculpation is appropriate when it is solely limited to fiduciaries who have served a debtor through a chapter 11 proceeding." *In re Health Diagnostic Lab., Inc.*, 551 B.R. at 232-33.

Exculpation clauses have their genesis in two different sources: the *Barton* Rule and Section 1103(c) of the Bankruptcy Code. *In re Nat'l Heritage Found., Inc.*, 478 B.R. at 233. Under the *Barton* Rule, based on *Barton v. Barbour*, 104 U.S. 126, 26 L.Ed. 672 (1881), a party cannot bring a suit against a bankruptcy trustee or the trustee's attorneys for acts within the trustee's duties of recovering assets for the estate without first obtaining leave of court. *McDaniel v. Blust*, 668 F.3d 153, 157 (4th Cir. 2012). "The Barton doctrine serves the principle that a bankruptcy trustee is an officer of the court that appoints him and therefore that court has a strong interest in protecting him from unjustified personal liability for acts taken within the scope of his official duties." *Id.* In *McDaniel*, the Fourth Circuit affirmed dismissal of claims against the trustee's counsel, because the plaintiff's allegations "can be considered by the bankruptcy court ... in its role as gatekeeper." *Id.* at 157.

**\*42**  Under Section 1103(c) of the Bankruptcy Code, the Creditors' Committee possesses broad authority to formulate a plan and perform "such other services as are in the interest of those represented." 11 U.S.C. § 1103(c). Courts have interpreted this section to imply both a fiduciary duty to committee constituents and a limited grant of immunity to committee members. *In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000). "This immunity covers committee members for actions within the scope of their duties." *Id.* "[A] proper exculpation provision is a protection not only of court-supervised fiduciaries, but also of court-supervised and court-approved transactions." *In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. at 721. Thus, a narrowly tailored exculpation provision serves only those aims of protecting parties who have performed necessary duties in connection with the case.

### 1. *Behrmann* and Exculpation Provisions

The Trustee argues that the Bankruptcy Court erred in failing to apply the *Behrmann* factors to the Exculpation Provision. (Trustee Br. at 43.) However, he cites no case law in support of his argument. Further, the Fourth Circuit in *Behrmann* did not analyze the exculpation provision at issue; instead, the Court only mentioned it as being part of the plan.

Moreover, the purposes behind the *Behrmann* factors do not fully align with the purposes of an exculpation provision. As discussed above, the *Behrmann* factors seek to determine the necessity of a release to the ultimate success of a particular plan and the release's effect on the impacted classes. Exculpation provisions, on the other hand, serve to ensure that court-supervised parties can carry out transactions to effectuate the plan without fear of liability for court-authorized actions. Accordingly, the Court concludes that the

3818

Bankruptcy Court did not err by failing to apply the *Behrmann* factors to the Exculpation Provision. However, that does not end the analysis of the Exculpation Provision.

**2. The Bankruptcy Court's Error in Approving the Exculpation Provision**

On remand from the Fourth Circuit, the bankruptcy court in the *Behrmann* case approved the exculpation provision there (but not the third-party release provision). *In re National Heritage Found., Inc.*, 478 B.R. at 234.[14] Specifically, the bankruptcy court approved the exculpation provision because it:

> (a) is narrowly tailored to meet the needs of the bankruptcy estate; (b) is limited to parties who have performed necessary and valuable duties in connection with the case (excluding estate professionals); (c) is limited to acts and omissions taken in connection with the bankruptcy case; (d) does not purport to release any pre-petition claims; and (e) contains a gatekeeper function by which the Court may, in its discretion, permit an action to go forward against the exculpated parties.

*Id.* The Court finds these factors persuasive, with additional limitations found in the case law and the underpinnings of the bases for exculpation provisions. Therefore, an exculpation provision that "is limited to those parties who have served the debtor, is narrowly tailored and complies with the applicable standards," *In re Alpha Nat. Res., Inc.*, 556 B.R. at 260, must contain the following limitations:

> (a) it must be limited to the fiduciaries who have performed necessary and valuable duties in connection with the bankruptcy case;
>
> (b) is limited to acts and omissions taken in connection with the bankruptcy case;
>
> (c) does not purport to release any pre-petition claims;
>
> (d) contains a carve out for gross negligence, actual fraud or willful misconduct; and,
>
> (e) contains a gatekeeper function.

[14]    The parties thereafter did not appeal the approval of the exculpation provision.

**\*43** An exculpation clause narrowly tailored to these factors serves the purposes underpinning exculpation provisions.

Additionally, adhering to these limitations ensures that a court need not test the exculpation provision against the *Behrmann* factors. The further that an exculpation provision stretches beyond these limitations, the closer that it becomes in substance to a more general non-debtor release to which the *Behrmann* analysis must apply.

Here, the Exculpation Provision satisfies some, but not all, of these limiting factors. In support of approval, it is limited to acts and omissions taken in connection with the bankruptcy case, does not release any pre-petition conduct and contains a carve out for gross negligence, actual fraud or willful misconduct. However, it extends beyond fiduciaries who have performed necessary and valuable duties. Instead, the "Exculpated Parties" include all current and former employees, attorneys, accountants, managers, financial advisors and consultants of every party being exculpated. Additionally, it lacks a gatekeeping function.

In conclusion, the Exculpation Provision extends beyond the permissible parties and fails to contain a gatekeeper function that would allow an avenue into court for some claims. Therefore, the Court concludes that the Bankruptcy Court clearly erred in approving the Exculpation Provisions. However, unlike the Third-Party Releases, the Court believes that this can be redrafted on remand to comply with the requirements outlined here.

**IV. CONCLUSION**

The Bankruptcy Court extinguished a broad swath of claims held by a wide variety of people. However, despite this drastic action, the Bankruptcy Court failed to determine whether it had the authority to rule on those claims or whether the facts supported extinguishing those claims. Indeed, the Bankruptcy Court plainly lacked the constitutional power to adjudicate many of the claims encompassed by the Third-Party Releases and to confirm the Reorganization Plan. Therefore, the Court VACATES the Bankruptcy Court's Order (Bankr. Dkt. No. 1811; USTAPP 2530-2672) confirming Debtors' Reorganization Plan, VOIDS the Third-Party Releases and RENDERS the Third-Party Releases UNENFORCEABLE. The Court FINDS the voided Third-Party Releases to be SEVERABLE from the Reorganization Plan and, therefore, SEVERS the voided Third-Party Releases from Debtors' Reorganization Plan.

2022 WL 135398

Additionally, the Court FINDS the Exculpation Provision to be overly broad and, therefore, VOIDS the Exculpation Provision as currently drafted. However, the Court believes that the Exculpation Clause could be redrafted to comply with the applicable law in a manner consistent with this Opinion. Consequently, the Court hereby REMANDS this case to the Bankruptcy Court with instructions to redraft the Exculpation Provision in a manner consistent with this Opinion and then to proceed with confirmation of the Plan without the voided Third-Party Releases.[15]

[15]     The Court notes that the Exculpation Provision does not implicate *Stern* issues, so the Bankruptcy Court possesses the constitutional authority to confirm Debtors' Reorganization Plan without the voided Third-Party Releases. Additionally, no party objects to any other aspect of the Plan than addressed here.

Finally, the Court FINDS that the interests of justice warrant reassigning this case to another Bankruptcy Judge in this district outside of the Richmond Division and therefore ORDERS the Chief Judge of the Bankruptcy Court for this district to REASSIGN this case on remand to another Bankruptcy Judge in this district outside of the Richmond Division.[16] The Chief Judge may reassign the case to himself if he believes the interests of justice so warrant.[17]

[16]     The Court has considered the factors for reassignment as set forth in *United States v. McCall*, 934 F.3d 380, 384 (4th Cir. 2019), and believes that reassignment is warranted here due to the practice of issuing third-party releases in the Richmond Division in contravention of the Fourth Circuit's admonitions in *Behrmann.* To be clear, the undersigned does not question the integrity or impartiality of Judge Huennekens. Indeed, the contrary is true, as the undersigned holds Judge Huennekens in high regard. However, the practice of regularly approving third-party releases and the related concerns about forum shopping call into question public confidence in the manner that these cases are being handled by the Bankruptcy Court in the Richmond Division.

[17]     Even though the case shall be reassigned to a Bankruptcy Judge outside of the Richmond Division, the case shall remain a Richmond Division case and any appeal after remand shall be assigned to the undersigned.

**\*44**    Accordingly, this case will be remanded to the Bankruptcy Court in accordance with the instructions herein. An appropriate order shall issue.

The Clerk is directed to file this Memorandum Opinion electronically, notify all counsel of record and forward a copy to the chambers of Chief United States Bankruptcy Judge Frank J. Santoro and United States Bankruptcy Judge Kevin R. Huennekens.

It is so ORDERED.

**All Citations**

--- B.R. ----, 2022 WL 135398

---

**End of Document**                              © 2022 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 63

65 USLW 2800, Comm. Fut. L. Rep. P 27,052

115 F.3d 1082
United States Court of Appeals,
Second Circuit.

Samuel PELTZ, Appellant,

v.

SHB COMMODITIES, INC., Isaac Mayer, Solomon Mayer, and Bezalel Mayer, Appellees.

No. 96–7401.
|
Argued Jan. 7, 1997.
|
Decided May 15, 1997.

**Synopsis**

Futures commission merchant's (FCM) customer sued FCM to recover amount of money FCM charged to him to cover short position he took in his scheme with floor broker to manipulate commodities market. The United States District Court for the Southern District of New York, Keenan, J., 1996 WL 97178, entered judgment for FCM. Customer appealed. The Court of Appeals, McLaughlin, Circuit Judge, held that: (1) floor broker, as customer's designee, had actual authority from customer to conduct short sales, and (2) even if such authority were lacking, doctrine of in pari delicto potior est conditio defendentis precluded FCM's liability.

Affirmed.

West Headnotes (12)

**[1]** **Commodity Futures Trading Regulation** 👉 Unauthorized or Unsuitable Trading;  Churning

Futures commission merchant (FCM) needs written authorization to make trades for customer only when FCM has not received specific authorization for transaction. 17 C.F.R. § 166.2.

1 Case that cites this headnote

**[2]** **Commodity Futures Trading Regulation** 👉 Unauthorized or Unsuitable Trading;  Churning

There is no requirement that, before futures commission merchant (FCM) makes trades specifically authorized by designee, FCM has to get written authorization from customer appointing designee. 17 C.F.R. § 166.2(a).

**[3]** **Commodity Futures Trading Regulation** 👉 Unauthorized or Unsuitable Trading;  Churning

Futures commission merchant (FCM) may make trades ordered by someone other than customer himself when that someone is designated by customer to control customer's account. 17 C.F.R. § 166.2.

2 Cases that cite this headnote

**[4]** **Commodity Futures Trading Regulation** 👉 Unauthorized or Unsuitable Trading;  Churning

3822

26-11268-mg    Doc 23-4    Filed 06/24/26    Entered 06/24/26 13:13:49    Exhibit D    Pg
279 of 697

Peltz v. SHB Commodities, Inc., 115 F.3d 1082 (1997)

65 USLW 2800, Comm. Fut. L. Rep. P 27,052

Generally, before accepting trades from third party, futures commission merchant (FCM) must make reasonable inquiry into nature and extent of individual's authority. 17 C.F.R. § 166.2.

**[5]**    **Commodity Futures Trading Regulation**    👈 Unauthorized or Unsuitable Trading;  Churning

"Apparent authority" for futures commission merchant (FCM) to accept trades from third party against FCM customer's account exists when customer, either intentionally or by lack of ordinary care, induces FCM to believe that third party has been authorized to act on its behalf. 17 C.F.R. § 166.2.

12 Cases that cite this headnote

**[6]**    **Commodity Futures Trading Regulation**    👈 Unauthorized or Unsuitable Trading;  Churning

"Actual authority" for third party to order futures commission merchant (FCM) to make trades against FCM customer's account is created by direct manifestations from principal to agent, and extent of agent's actual authority is interpreted in light of all circumstances attending these manifestations, including customs of business, subject matter, any formal agreement between parties, and facts of which both parties are aware. 17 C.F.R. § 166.2.

42 Cases that cite this headnote

**[7]**    **Commodity Futures Trading Regulation**    👈 Unauthorized or Unsuitable Trading;  Churning

Floor broker, as designee of futures commission merchant's (FCM) customer, had "actual authority" from customer to make short sales of 2667 copper futures contracts against customer's account as part of scheme to manipulate commodities market, even though there was no written power of attorney to that effect, and thus, when customer failed to purchase all contracts necessary to cover short position broker created, FCM properly purchased contracts required to clear broker's trades, resulting in charge to customer's account of over $1.3 million; although customer claimed that he allowed broker to sell only 500 contracts at $135.50 or better, broker testified that customer granted him absolute authority, and events of day's trading, including fact that customer knew broker was selling far more than 500 contracts at prices below $135.50, supported broker's claim. 17 C.F.R. § 166.2(a).

2 Cases that cite this headnote

**[8]**    **Commodity Futures Trading Regulation**    👈 Unauthorized or Unsuitable Trading;  Churning

Where it is clear that designee of futures commission merchant's (FCM) customer had actual authority from customer to make trades against customer's account, it is unnecessary to inquire into designee's apparent authority. 17 C.F.R. § 166.2(a).

2 Cases that cite this headnote

**[9]**    **Commodity Futures Trading Regulation**    👈 Unauthorized or Unsuitable Trading;  Churning

When futures commission merchant (FCM) is sued for permitting allegedly unauthorized trades against FCM's customer's account by third party who possessed apparent authority, FCM may raise defense that it made reasonable inquiry into extent of such authority; court may accept such defense in order to encourage FCM to make reasonable inquiry, thereby reducing frequency of unauthorized trades, and because it is unjust to hold FCM liable after it acted in reasonably prudent fashion. 17 C.F.R. § 166.2.

**[10]**    **Equity**  👈 He Who Comes Into Equity Must Come with Clean Hands

**3823**

Defense of in pari delicto potior est conditio defendentis, i.e., when there is mutual wrongdoing, law favors defending party, is narrowly defined in litigation under federal regulatory statutes.

11 Cases that cite this headnote

**[11]    Commodity Futures Trading Regulation** 🔑 Liability of Brokers or Commission Merchants

Even if futures commission merchant (FCM) lacked proper authorization to clear floor broker's short sales of copper futures contracts against customer's account, resulting in charge to that account of over $1.3 million, doctrine of in pari delicto potior est conditio defendentis precluded FCM's liability to customer; customer bore greater responsibility for creating margin call that resulted in FCM's actions, as customer's agreement with broker to short sell copper contracts and then depress price of copper contracts to reap profit violated Commodities Exchange Act (CEA), and allowing customer's suit would significantly interfere with enforcement of statutes designed to protect investing public. Commodity Exchange Act, § 6(c), as amended, 7 U.S.C.A. § 13b; 17 C.F.R. § 166.2.

2 Cases that cite this headnote

**[12]    Equity** 🔑 He Who Comes Into Equity Must Come with Clean Hands

For doctrine of in pari delicto potior est conditio defendentis to apply, it is not necessary that wrongdoing of plaintiff and defendant be clearly mutual, simultaneous, and relatively equal.

13 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1084** Daniel V. Gsovski, Herzfeld & Rubin, New York City, for Appellant.

Martin H. Kaplan, Grusae, Kaplan & Bruno, New York City (Melvyn J. Falis and John E. Bersin, of counsel), for Appellees.

Before: NEWMAN, Chief Judge, FEINBERG and McLAUGHLIN, Circuit Judges.

McLAUGHLIN, Circuit Judge:

**BACKGROUND**

A. *The Players*

Samuel Peltz is an investor in commodities. Commodities, unlike stocks, comprise various items such as agricultural products, metals or energy. Investors purchase commodities "contracts," which represent a specific amount of the commodity. One of the principal markets where investors trade commodities contracts is the Commodities Exchange ("COMEX") in New York.

SHB Commodities, Inc. is a registered "futures commission merchant" ("FCM"), a firm authorized to deal on the COMEX. It is owned by defendants Solomon ("Shlomo") and Bezalel ("Buzzy") Mayer. As a "futures commission merchant," SHB solicits or accepts orders to buy or sell commodities for future delivery; in that regard, SHB accepts money or extends credit to margin, to guarantee or to secure any resulting trades. *See* 7 U.S.C. § 6. Peltz maintained an account at SHB through which he negotiated commodity trades.

3824

26-11268-mg   Doc 23-4   Filed 06/24/26   Entered 06/24/26 13:13:49   Exhibit D   Pg
281 of 697

Peltz v. SHB Commodities, Inc., 115 F.3d 1082 (1997)
65 USLW 2800, Comm. Fut. L. Rep. P 27,052

Ludwig ("Leo") Weingarten, although not a party to this litigation, occupies center stage. Weingarten was a "floor broker" on the COMEX, i.e., one who literally stands on the floor of the COMEX, and does the work of buying and selling the commodities. He was never employed by SHB.


B. *The Play*

On March 23, 1989, in the morning hours before the COMEX opened, Peltz and Weingarten met for coffee in Lord's Coffee Shop in lower Manhattan. Apparently, the two had never had prior business dealings. Despite their unfamiliarity, Peltz agreed to let Weingarten sell copper futures contracts **\*1085** from the floor of the COMEX that morning against Peltz's account at SHB. Peltz never gave Weingarten written authority to make trades against or otherwise control his account, and SHB never received any written authorization.

Weingarten and Peltz also agreed to "short sell" copper futures contracts, i.e., to sell contracts that one does not yet own. One who sells such a phantom contract is said to be in a "short position." The short seller gambles that the market will decline and he thus expects to purchase a contract sometime in the future at a price lower than that at which he sold it. This will "cover" his short position, and he will realize a profit.

The profit potential is very high. There is, of course, the unhappy possibility that the price of copper will rise, resulting in serious economic loss. Weingarten testified that he and Peltz conspired to short sell copper contracts, and, to ensure a profit, also conspired to then depress the copper market with high volume offers to sell contracts. Once the price was depressed, Peltz was to buy these artificially reduced-price contracts to cover the short position created by Weingarten, and realize a great profit.

The two conspirators disagree as to how much authority Peltz gave Weingarten. Peltz says that the coffee shop agreement was that Weingarten would trade 500 contracts at prices no lower than $135.50. Peltz adds that he made clear that his position was to be "flat" at the end of the trading day (i.e., the short position was to be fully covered). Weingarten's version, on the other hand, was that Peltz gave him unfettered discretion to make whatever trades he thought would be profitable.

After the kaffeeklatsch, Peltz repaired to the SHB offices, and Weingarten to the copper pit on the floor of the COMEX. Peltz took a chair next to SHB's order clerk, in front of the commodities ticker, where he could observe the day's trade in commodities. During the morning, Weingarten phoned SHB and an employee named Eis answered. Weingarten explained that he would be "doing paper" for Peltz that day, to which Eis responded "okay." As soon as the copper futures market opened, Weingarten began to sell huge amounts of copper contracts.

Throughout the fateful day, Peltz and Weingarten kept in telephonic contact. SHB recorded these conversations. While it is difficult to discern the precise conversations, it is clear that Peltz knew that Weingarten was selling more than 500 contracts, and was doing it at prices lower than $135.50. Indeed, just minutes after the market opened, Weingarten was selling copper contracts at $135.20 and $135.30. Peltz maintained a tally sheet throughout the trading day and he noted that at 10:02 AM most of Weingarten's trades were at prices below $135.50, and that by 10:55 AM Weingarten had already sold over 1000 contracts.

Weingarten, from the trading floor, repeatedly warned Peltz to start buying contracts to cover the mushrooming short position. In the middle of the trading day, the situation began to turn sour. A jittery Peltz warned Weingarten to "be careful" because people on the floor were beginning to realize that "things ... [were] not normal." At 11:40 AM the two spoke. Weingarten said that he "sold twelve—fourteen hundred" contracts. Peltz responded that he bought only 675. Back and forth calls continued in this vein. The numbers were not adding up.

It was apparent by mid-afternoon that the short-selling plan was going awry. Weingarten told Peltz that COMEX officials threatened to remove him from the floor unless Weingarten could maintain $50,000 in his own personal trading account. Peltz immediately wrote Weingarten a personal check, keeping Weingarten on the trading floor, and breathing new life into the scheme.

26-11268-mg    Doc 23-4    Filed 06/24/26    Entered 06/24/26 13:13:49    Exhibit D    Pg
282 of 697

Peltz v. SHB Commodities, Inc., 115 F.3d 1082 (1997)
65 USLW 2800, Comm. Fut. L. Rep. P 27,052

At 2:30 PM, Buzzy Mayer, SHB's co-owner, first learned that SHB had acted as clearing agent for a significant amount of copper contracts. He also found out that Weingarten was the seller, and that the sales were against Peltz's account. Mayer went looking for Weingarten, who told Mayer that he had been selling all day for Peltz, and was now a few contracts short.

At 3:45 PM, COMEX officials summoned a representative of SHB to inform the company that, as the clearing member of the exchange **\*1086** involved in all these sales, it now faced a margin call for the short-selling of copper futures contracts. At 4:48 PM, Mayer called Peltz and asked him to describe the agreement with Weingarten. Peltz stated that he had agreed to only 500 or 600 contracts, but he would accept more from Weingarten so long as Peltz's position remained "flat" for the day.

By day's end, Weingarten had sold a total of 2667 contracts against Peltz's SHB account. Peltz, for his part, placed buy orders through SHB for 1165 contracts. In sum, Peltz failed to purchase the more than 1500 contracts necessary to cover fully the short position Weingarten had created.

Shortly after realizing that he had not fully covered his short position, Peltz telephoned SHB to protest that Weingarten had no authority to make trades against Peltz's account; and he disclaimed the short sales for which he had not purchased offsetting contracts. At 5:00 PM, SHB tried to disavow formally, or "dk" (literally, "doesn't know"), the trades with COMEX. COMEX officials rejected this effort.

C. *Denouement*

The next day the COMEX was closed for Good Friday. Weingarten testified that on Saturday Peltz called, first to threaten him, and then to bribe him. Weingarten testified that Peltz offered "to take care of him" if Weingarten would just say he went "crazy." The following Monday, SHB officials issued a margin call of over $3 million against Peltz's account at SHB. Peltz could not meet the call, forcing SHB to purchase the contracts. The net result was a charge to Peltz's account of $1,332,054.72.

Peltz sued SHB, the Mayer brothers and Weingarten, but soon dropped the suit against Weingarten. Peltz asserted claims against SHB and the Mayers for various violations of the Commodities Exchange Act ("CEA") and New York common law, claiming that SHB was liable for the loss incurred when it purchased the copper contracts to cover Peltz's short position. The theory driving Peltz's case was that SHB was responsible for the short position Weingarten created because, under 17 C.F.R. § 166.2, SHB should have received from Peltz either written or "specific" authorization for the sales. Peltz argued that SHB wrongfully cleared Weingarten's trades, thereby defrauding Peltz.

Peltz claimed that SHB was liable under § 4b of the CEA for willfully deceiving him regarding the disposition of an order. *See* 7 U.S.C. § 6(b). Peltz also alleged that SHB criminally intended to convert Peltz's money, and wilfully induced the commission of a violation of CEA regulations. *See* 7 U.S.C. § 1 *et seq.* Peltz added state law claims for breach of fiduciary duty, breach of contract, and fraud.

After a nine-day bench trial, the district court rejected Peltz's claims, concluding that Peltz had lied when he said he limited Weingarten's authority to make only 500 sales at prices exceeding $135.50. The court rejected Peltz's federal claims, finding that Peltz failed to show that SHB intended to defraud Peltz.

The district court also rebuffed Peltz's fraud, contract, and fiduciary duty claims, reasoning that there was no intent to deceive, and that Peltz failed to show the breach of any duty arising out of the relationship or the contract between himself and SHB. Any losses, the district court concluded, were caused by Peltz and Weingarten's ill-conceived scheme to manipulate the copper markets. "To allow Peltz to reject certain transactions undertaken by his independent, rogue-FCM [Weingarten] only after Peltz concluded that the transactions would be unprofitable," the district court wrote, "would be to offer [Peltz] a 'no risk, win-win, situation.' "

3826

Peltz v. SHB Commodities, Inc., 115 F.3d 1082 (1997)
65 USLW 2800, Comm. Fut. L. Rep. P 27,052

Peltz appeals, arguing that SHB is responsible for the margin call because, under 17 C.F.R. § 166.2, SHB never had proper authorization from Peltz to accept Weingarten's trades against Peltz's accounts. The central question on this appeal is whether SHB had sufficient authority to clear Weingarten's trades against Peltz's account.

**DISCUSSION**

I. *The Authority of a Customer's Third–Party Designee*

Section 4b(A) of the CEA makes it unlawful for SHB to make trades against a customer's **\*1087** account without the customer's permission. 7 U.S.C. § 6(b). Peltz concludes that he is not responsible for the margin call SHB charged to his account because SHB failed to get permission under 17 C.F.R. § 166.2 before SHB cleared Weingarten's trades. This failure, Peltz contends, shifts liability exclusively to SHB. SHB responds that Weingarten had sufficient authority to make the trades, and therefore, Peltz must pay the debit to his account.

Rule 166.2 was promulgated under the CEA, and states that

> [n]o futures commission merchant, introducing broker or any of their associated persons may directly or indirectly effect a transaction in a commodity interest for the account of any customer unless before the transaction the customer, or person designated by the customer to control the account—(a) Specifically authorized the futures commission merchant, introducing broker or any of their associated persons to effect the transaction (a transaction is "specifically authorized" if the customer or person designated by the customer to control the account specifies (1) the precise commodity interest to be purchased or sold and (2) the exact amount of the commodity interest to be purchased or sold); or (b) Authorized in writing the futures commission merchant ... to effect transactions in commodity interests for the account without the customer's specific authorization.

17 C.F.R. § 166.2. In sum, an FCM may execute trades for a customer only after the customer or someone designated by the customer to control the account "specifically authorize[s]" the trades under § 166.2(a), or provides the FCM with written authorization for the trades under § 166.2(b).

 **[1]**    It is clear from the rather straightforward language of the regulation that an FCM needs *written* authorization to make trades only when the FCM has not received "specific[ ] authoriz[ation]" for the transaction. *See* 17 C.F.R. § 166.2(b). Under the regulation, only two persons can give such "specific[ ] authoriz[ation]"—the customer himself, or the "person designated by the customer to control the account." 17 C.F.R. § 166.2. Peltz adds a requirement, appearing nowhere in the Rule, that the designation of a person to control the account must be by a written power of attorney. From this Peltz reasons that because he did not execute such written power of attorney, and did not authorize the trades in writing under 166.2(b), SHB should not have made the trades. Peltz's interpretation of the regulation does not bear scrutiny.

 **[2]**    Everyone agrees that Peltz did not give SHB a written authorization to make the trades, nor a written power of attorney allowing Weingarten to make trades on his behalf. While lack of written authorization for SHB to make the trades means that SHB could not execute the transactions under 166.2(*b*), the lack of a written power of attorney designating Weingarten to control the account does not rule out the possibility that SHB had "specific [ ] authoriz[ation]" from the customer's designee to accept the orders under § 166.2(*a*). Nothing in the regulation or in the caselaw interpreting subdivision (a) requires that, before an FCM makes trades specifically authorized by a designee, the FCM has to get written authorization from a customer appointing the designee. While written authorization may help an FCM to determine whether an individual is indeed a person designated by a customer to control the account, it is not a legal necessity.

Peltz argues that this lax interpretation runs contrary to that announced by the Commodity Futures Trading Commission[1], the entity responsible for policing the COMEX and those who trade in futures, in *Matter of Heitschmidt. See Matter of Heitschmidt,* [1994–1996 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 26,263 at 42,204 (CFTC Nov. 9, 1994). In *Heitschmidt,* the CFTC announced that

3827

26-11268-mg    Doc 23-4    Filed 06/24/26    Entered 06/24/26 13:13:49    Exhibit D    Pg
284 of 697

Peltz v. SHB Commodities, Inc., 115 F.3d 1082 (1997)

65 USLW 2800, Comm. Fut. L. Rep. P 27,052

[1]     After oral argument, the panel solicited the Commodity Futures Trading Commission's ("CFTC") understanding of 17 C.F.R. § 166.2. The CFTC filed a brief as a friend of the court, and this panel's views accord with the CFTC's position.

[a] liability analysis under Commission Rule 166.2 focuses on two issues: (1) whether there was a written power of attorney in effect at the time of the transaction at issue and, if not, (2) whether the  *1088  transaction was specifically authorized by the customer in advance of its execution. *See Wolken v. Refco, Inc.,* [1987–1990 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 24,509 at 36,188 (CFTC July 18, 1989). Under Rule 166.2, a customer's oral grant of general discretion to an account executive is irrelevant to the analysis of liability because the rule renders such agreements void.

*Id.* Peltz concludes from this statement that "a broker accepting trades from a person other than the customer without written authorization commits a *prima facie* violation of the [CEA]." Appellant's Brief at p. 29. Peltz misinterprets *Heitschmidt.* *Heitschmidt* involved unauthorized trading by an "associated person" ("AP") (a person associated with an FCM) of both discretionary and non-discretionary accounts. The CFTC found that the AP's trades against the discretionary account violated Rule 166.2 because, despite the customer's oral revocation of written authorization it had sent the AP to make the trades under 166.2(b), the AP made trades without consulting the customer. ¶ 26,263 at 42,205. As to the nondiscretionary accounts, the Commission found that the AP had made trades beyond the customer's general instructions.

*Heitschmidt* thus stands for the unexceptional proposition that an FCM or AP must have written authorization to make trades against a customer's account when those trades are not specifically authorized by the customer or one designated by the customer to control the account. Peltz confuses the role the AP played in *Heitschmidt* with the role played by Weingarten in the coffee shop scheme. The AP, like an FCM, had to follow the instructions of a customer or one designated by the customer to control an account. These instructions had to come in one of two forms: (1) a specific authorization under 166.2(a); or (2) a written authorization under 166.2(b). The *Heitschmidt* AP failed to get written or specific authorization for the trades he made, thus making him liable.

Weingarten, on the other hand, was acting as a designee, not an AP or an FCM. Under the regulation and *Heitschmidt,* all SHB needed before clearing the trades was either "written" or "specific" authorization from the customer, Peltz, or the customer's designee. It did not, however, need a written authorization from Peltz giving Weingarten a power of attorney over the account. The only question for us now is, in the absence of a written power of attorney from Peltz appointing Weingarten as his designee, what type of proof will suffice, for purposes of exonerating SHB, to show that Weingarten was in fact the designee, authorized to order trades against Peltz's account?

 **[3]**     There is no question that an FCM may make trades ordered by someone other than the customer himself when that someone is designated by the customer to control the customer's account. *See* 17 C.F.R. § 166.2. The FCM may make trades ordered by the third party who has either actual or apparent authority to make the trades. *See Sansom Refining Co. v. Drexel Burnham Lambert, Inc.,* [1986–1987 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 23,796 at 34,107 (CFTC July 20, 1987), *aff'd in part, rev'd in part and remanded sub nom. Drexel Burnham Lambert Inc. v. CFTC,* 850 F.2d 742 (D.C.Cir.1988).

 **[4]    [5]    [6]**     Generally, before accepting trades from a third party, the FCM must make a reasonable inquiry into the nature and extent of the individual's authority. *See id.* ¶ 23,796 at 34,108. Apparent authority exists "when a principal, either intentionally or by lack of ordinary care, induces [the FCM] to believe that an individual has been authorized to act on its behalf." *Id.* (citing *Wheeler v. Investment Managers Commodity Corp.,* [1984–1986 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 22,770 at 31,220 (CFTC Oct. 30, 1984)). Actual authority "is created by direct manifestations from the principal to the agent, and the extent of the agent's actual authority is interpreted in the light of all circumstances attending these manifestations, including the customs of business, the subject matter, any formal agreement between the parties, and the facts of which both parties are aware." *Demarco v. Edens,* 390 F.2d 836, 844 (2d Cir.1968).

 **[7]**     It is not clear from the record that Weingarten had apparent authority to make  **\*1089**  the trades. We cannot say that Peltz's statements and actions reasonably induced SHB to believe that Weingarten had the power to make the trades. However, we

3828

hold that the district court's factual findings support the conclusion that, at the coffee shop, Peltz granted Weingarten the actual authority to sell all the copper futures contracts in question.

Only two people know what transpired across the table at Lord's Coffee Shop on that ill-fated morning. Peltz maintained that he allowed Weingarten to sell only 500 contracts at $135.50 or better. Weingarten had a different version: that Peltz granted him absolute discretion to make the trades. The district court weighed the testimony, made credibility determinations, and found that the events of that morning did not support Peltz's version of the meeting.

Peltz admits that he granted Weingarten authority to make some trades. It was clear to the district court that Weingarten's authority was basically unfettered. From the first trades to the last conversation of the day between the conspirators, Peltz knew full well that Weingarten was selling far more than 500 contracts and at prices below $135.50. With every phone call, Peltz received instructions from Weingarten to cover the swelling short position. Peltz did nothing to stop Weingarten from trading. Furthermore, Peltz expressly told Buzzy Mayer that he was willing to accept more than 500 trades from Weingarten so long as his position remained "flat" for the day. The district court was not in error when it concluded, based on this abundant evidence, that Weingarten had the actual authority to make the trades in question.

 [8]    In some cases, the next question would be whether SHB made a reasonable inquiry into the extent of Weingarten's authority, or merely acquiesced in Weingarten's representations that he had actual authority. We need not answer this question in this particular case. Where it is clear that the designee had *actual* authority from the customer, it would be superfluous (as a legal matter but, perhaps, not as a practical matter) to require an FCM to make an inquiry into the designee's authority.

 [9]    In cases of *apparent* authority, it makes eminently good sense to require a reasonable inquiry before imposing liability on the principal. When an FCM relies on a defense of reasonable inquiry that revealed apparent authority, we accept the defense for two reasons: (1) to encourage the FCM to make a reasonable inquiry, thereby reducing the frequency of unauthorized trades; and (2) it is unjust to hold an FCM liable after it acted in a reasonably prudent fashion.

These policy matters do not concern us when there is actual authority. First—and most basically—when there is actual authority there is no unauthorized trade to avoid. Second, it is unsound and illogical to hold an FCM liable when its failure to perform a reasonable inquiry did not result in the acceptance of an unauthorized trade. Hence, we hold that courts need determine if there was a reasonable inquiry only when the question is whether the designee had apparent, rather than actual authority.

We hasten to add, lest FCM's become lackadaisical in their everyday duties, that as a practical matter FCM's should not gamble with the possibility that the designee has actual authority. A reasonable inquiry can never hurt. Admittedly, on some occasions it will be unnecessary because the inquiry reveals that a customer granted actual authority to the designee. However, there will be instances in which a designee has only apparent authority, and the only defense from liability for the FCM will be a reasonable inquiry.

It follows, therefore, that SHB is not liable for the margin call. SHB was specifically authorized to accept every trade made by Peltz's designated agent, Weingarten. Hence, SHB had proper authorization to complete Weingarten's transactions under 17 C.F.R. § 166.2(a).

II. *The In Pari Delicto Defense*

Even if Peltz had not given Weingarten actual authority to make the trades, SHB should bear no responsibility for the margin call. Peltz was at least equally culpable with SHB for creating the short position. Thus, SHB is not liable because *in pari delicto* **\*1090** *potior est conditio defendentis:* when there is mutual wrongdoing, the law favors the defending party. *See Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 306, 105 S.Ct. 2622, 2626–27, 86 L.Ed.2d 215 (1985).

 [10]    The *in pari delicto* defense is used sparingly, and is narrowly defined in litigation under federal regulatory statutes. *See Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 145, 88 S.Ct. 1981, 1987–88, 20 L.Ed.2d 982 (1968) (not

3829

Peltz v. SHB Commodities, Inc., 115 F.3d 1082 (1997)

65 USLW 2800, Comm. Fut. L. Rep. P 27,052

recognizing defense in antitrust action); *Ross v. Bolton,* 904 F.2d 819, 824 (2d Cir.1990) (recognizing defense in securities case). To ensure that the defense is narrowly applied in securities cases the Supreme Court in *Bateman Eichler, Hill Richards, Inc. v. Berner,* set forth a two-part test for the application of the defense in private causes of action under the securities law. *Bateman Eichler,* 472 U.S. at 310–11, 105 S.Ct. at 2628–29. The *Bateman Eichler* Court noted that the doctrine may bar an action "where (1) as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress, and (2) preclusion of suit would not significantly interfere with the effective enforcement of the securities laws and protection of the investing public." *Id.*

The first prong of the test sets forth the essential elements of the doctrine. *See Pinter v. Dahl,* 486 U.S. 622, 633, 108 S.Ct. 2063, 2071, 100 L.Ed.2d 658 (1988). Courts apply the defense where the plaintiff has participated in some of "the same sort of wrongdoing" as the defendant, *Bateman Eichler,* 472 U.S. at 307, 105 S.Ct. at 2627, and should not allow the defense "unless the degrees of fault are essentially indistinguishable or the plaintiff's responsibility is clearly greater." *Pinter,* 486 U.S. at 636, 108 S.Ct. at 2073. The second prong of the *Bateman Eichler* test instructs courts to consider the public policy implications of applying the defense.

 **[11]**    Assuming SHB committed a wrong, Peltz's responsibility for creating the margin call is clearly greater. Under the CEA it is unlawful to attempt to manipulate or to manipulate the price of any commodity in interstate commerce. *See* 7 U.S.C. § 13b. As Weingarten testified, he and Peltz arranged to short sell copper contracts and then depress the price of copper contracts to reap a profit. The recorded telephone conversations between Peltz and Weingarten paint a clear picture of commodities price manipulation. The district court did not err when it concluded that the Peltz–Weingarten agreement was in violation of the CEA. Peltz's conduct thus falls within first prong of the *Bateman Eichler* test: his manipulation of the commodities market was far more reprehensible than SHB's violation of the regulations promulgated under the CEA.

 **[12]**    Peltz seeks to evade the *in pari delicto* defense by noting that the wrongdoing of which he is accused (i.e., manipulating markets), is not the *same* wrongdoing he seeks to redress (i.e., SHB's clearing Weingarten's transactions through Peltz's account without proper authorization in violation of 17 C.F.R. § 166.2).

Peltz's hypertechnical interpretation of the *in pari delicto* doctrine is outdated. At one time this Court recognized that the *in pari delicto* defense was available only when the "fault of the parties [is] 'clearly mutual, simultaneous, and relatively equal,' " *Mallis v. Bankers Trust Co.,* 615 F.2d 68, 76 n. 6 (2d Cir.1980) (citation omitted), and that mutuality of fault meant that the parties had to have a related purpose, or act as confederates. Our limitation of the defense reflected the general tenor set by the Supreme Court in *Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), *modified, Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), which we, as many other courts, saw as a signpost "that the High Court had little enthusiasm for the *in pari delicto* defense." *Ross,* 904 F.2d at 825.

That message changed somewhat, however, when the Supreme Court decided *Bateman Eichler,* and we noted that change in tone when we decided *Ross v. Bolton. Id.* In *Ross,* the plaintiff agreed to purchase securities from R.E. Bolton & Co., Inc. ("Bolton") and resell the securities instantaneously at a higher, agreed upon price. *Id.* at **\*1091**  821–22. Defendant Bear Stearns & Co. ("Bear Stearns") acted as the clearing broker for the trades, but there was no evidence that it knew of the prearranged scheme. *Id.* at 820. When the plan did not work, Ross sued, among others, Bear Stearns, alleging that Bear Stearns fraudulently misled the plaintiffs into believing that Bolton was solvent. *Id.* at 822.

Ross declared that if he had known Bolton's true financial condition, he would not have involved himself in the scheme. We held that "because Ross intentionally entered into the prearranged trade with [Bolton], with its supposed guaranteed profit, he rather than Bear Stearns must bear the responsibility for the risks of the transaction." *Id.* at 825. The *in pari delicto* defense, we concluded, served as a complete bar to the plaintiff's suit against Bear Stearns.

*Ross* illustrates that we now recognize a broader notion of mutuality of fault, and, consequently, how Peltz's argument misses the mark. The alleged wrong committed by Bear Stearns in *Ross,* misleading the plaintiff into believing that Bolton was solvent,

was qualitatively different from the wrong in which Ross participated—a prearranged stock parking scheme. Yet, that did not stop us from allowing Bear Stearns to bar Ross's suit through the application of the *in pari delicto* defense. So too, although the alleged violation of the CEA by SHB in this case is of a different quality than the market manipulation in which Peltz participated, the lack of an identical nature does not destroy the defense. We conclude therefore, that the first prong of the *Bateman Eichler* test is satisfied.

So too, the second prong of the *Bateman Eichler* test is satisfied: preclusion of Peltz's suit will not significantly interfere with the effective enforcement of the laws and protection of the public. *Au contraire,* allowing his suit would significantly interfere with the enforcement of statutes designed to protect the investing public. Assuming SHB did violate the regulations promulgated under the CEA, we would overlook that ministerial wrong when to do otherwise would protect a market manipulator without any benefit to the public.

Accordingly, both prongs of the *Bateman Eichler* test having been satisfied, we hold that Peltz cannot pursue his claims.

CONCLUSION

We have considered all of Peltz's other arguments and consider them to be without merit. Accordingly, the judgment of the district court is affirmed.

**All Citations**

115 F.3d 1082, 65 USLW 2800, Comm. Fut. L. Rep. P 27,052

---

End of Document    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 64

Page 1

391 B.R. 850
**(Cite as: 391 B.R. 850)**

▷

United States Bankruptcy Court,
C.D. California.
In re PRO–FIT INTERNATIONAL LIMITED,
Debtor in a Foreign Proceeding.
In re Pro–Fit International Limited, Debtor in a
Foreign Proceeding.
In re Genesis Bradford Limited, Debtor in a For-
eign Proceeding.

Nos. LA08–17043SB, LA08–17049SB,
LA08–17054SB.
July 11, 2008.

**Background:** After seeking recognition of United
Kingdom reorganization proceedings as "foreign
main proceedings," joint administrators of three re-
lated Chapter 15 debtors filed application for provi-
sional relief, seeking to stay the enforcement of a
federal district court order attaching the United
States assets of two of the debtors. Judgment credit-
or opposed application.

**Holding:** Addressing a matter of apparent first im-
pression, the Bankruptcy Court, Samuel L. Bufford,
J., held that application of the automatic stay on an
interim basis, during the "gap period" between the
filing of a petition for recognition of foreign pro-
ceedings and the court's ruling on recognition, does
not require an adversary proceeding.

Interim relief granted.

West Headnotes

**[1] Bankruptcy 51 🔑2164.1**

51 Bankruptcy
    51II Courts; Proceedings in General
        51II(B) Actions and Proceedings in General
            51k2164 Judgment or Order
                51k2164.1 k. In general. Most Cited
Cases
    Federal law in the United States does not

provide directly for a writ of attachment; instead,
post-judgment remedies are provided by the law of
the state where the federal court sits. Fed.Rules
Bankr.Proc.Rules 7064, 9014(c), 11 U.S.C.A.;
Fed.Rules Civ.Proc.Rule 64, 28 U.S.C.A.

**[2] Bankruptcy 51 🔑2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceed-
ings
            51k2341 k. In general. Most Cited Cases
    In interpreting Chapter 15 of the Bankruptcy
Code, United States courts must take into account
the statute's international origin and promote ap-
plications of the chapter that are consistent with
versions of the Model Law on Cross-Border Insolv-
ency adopted in other jurisdictions. 11 U.S.C.A. §
1508.

**[3] Bankruptcy 51 🔑2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceed-
ings
            51k2341 k. In general. Most Cited Cases
    Bankruptcy law in the United Kingdom is not
unified: there is one law for England and Wales,
one for Scotland, and one for Northern Ireland.

**[4] Attorney and Client 45 🔑14**

45 Attorney and Client
    45I The Office of Attorney
        45I(B) Privileges, Disabilities, and Liabilities
            45k14 k. Nature and term of office. Most
Cited Cases
    Practice of law in the United Kingdom is not
unified: most of what corresponds to United States
law practice is carried out by "solicitors," who of-
ten practice in law firms of substantial size, while
most court appearances are made by "barristers,"
who are separately licensed and are hired by solicit-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

391 B.R. 850
**(Cite as: 391 B.R. 850)**

ors to conduct court proceedings.

**[5] Bankruptcy 51 🗝2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

Notices of administrators' appointment signed by solicitor in England were sufficient to show both the existence of the foreign proceedings involving Chapter 15 debtors and the appointment of the foreign representatives. 11 U.S.C.A. § 1515(b)(3).

**[6] Bankruptcy 51 🗝2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

Purpose of the section of the Bankruptcy Code requiring that a petition for recognition of a foreign proceeding be accompanied by specified documentation of the foreign proceedings is to circumvent the usual requirement of exequatur for the proof of a foreign legal document, which requires a very complex and time-consuming procedure involving certifications by both foreign and United States officials. 11 U.S.C.A. § 1515(b).

**[7] Bankruptcy 51 🗝2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

To authorize relief during the gap period between the time of filing a petition for recognition of a foreign proceeding and the court ruling on recognition, the Bankruptcy Code provides that the court may grant relief of a provisional nature, at the request of the foreign representative, where relief is urgently needed to protect the assets of the debtor

or the interests of the creditors. 11 U.S.C.A. § 1519(a).

**[8] Bankruptcy 51 🗝2156**

51 Bankruptcy
    51II Courts; Proceedings in General
        51II(B) Actions and Proceedings in General
            51k2156 k. Nature and form; adversary proceedings. Most Cited Cases

Proceeding to obtain an injunction must comply with the adversary proceeding provisions set forth in the bankruptcy rules: the applicant must file a complaint, naming the parties against whom injunctive relief is sought, that complies with the federal pleading requirements. Fed.Rules Bankr.Proc.Rule 7001, 11 U.S.C.A.

**[9] Injunction 212 🗝1092**

212 Injunction
    212II Preliminary, Temporary, and Interlocutory Injunctions in General
        212II(B) Factors Considered in General
            212k1092 k. Grounds in general; multiple factors. Most Cited Cases
    (Formerly 212k138.1)

Under Ninth Circuit law, a party seeking a preliminary injunction must demonstrate either: (1) a likelihood of success on the merits and the possibility of irreparable injury, or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor.

**[10] Bankruptcy 51 🗝2374**

51 Bankruptcy
    51IV Effect of Bankruptcy Relief; Injunction and Stay
        51IV(A) In General
            51k2363 Protection Against Discrimination or Collection Efforts in General; "Fresh Start."
            51k2374 k. Preliminary injunctions and restraining orders. Most Cited Cases

Temporary restraining order must describe in reasonable detail the act or acts sought to be re-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

391 B.R. 850
**(Cite as: 391 B.R. 850)**

strained, must set forth the reasons for its issuance, and is binding only upon the parties to the action, including their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order. Fed.Rules Bankr.Proc.Rule 7065, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 65, 28 U.S.C.A.

**[11] Bankruptcy 51 ⚷2156**

51 Bankruptcy
    51II Courts; Proceedings in General
        51II(B) Actions and Proceedings in General
            51k2156 k. Nature and form; adversary proceedings. Most Cited Cases

Joint administrators of Chapter 15 debtors were not required to bring an adversary proceeding in order to obtain application of the automatic stay on an interim basis during the "gap period" between the filing of their petition for recognition of foreign proceedings and the bankruptcy court's ruling on recognition. 11 U.S.C.A. §§ 105(a), 362, 1519, 1519(a, e).

**[12] Bankruptcy 51 ⚷2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

Prerequisites for obtaining injunctive relief specified in the section of the Bankruptcy Code governing relief that may be granted upon filing petition for recognition of foreign proceedings do not apply to all relief under that section of the Code; instead, these requirements should apply only where the relief sought is injunctive relief, such as the staying of execution against the debtor's assets. 11 U.S.C.A. §§ 1519, 1519(a, e).

**[13] Bankruptcy 51 ⚷2394.1**

51 Bankruptcy
    51IV Effect of Bankruptcy Relief; Injunction and Stay
        51IV(B) Automatic Stay
            51k2394 Proceedings, Acts, or Persons Affected
                51k2394.1 k. In general. Most Cited Cases

Automatic stay stops virtually every creditor action to collect a debt from a bankruptcy debtor. 11 U.S.C.A. § 362.

**[14] Bankruptcy 51 ⚷2393**

51 Bankruptcy
    51IV Effect of Bankruptcy Relief; Injunction and Stay
        51IV(B) Automatic Stay
            51k2393 k. Notice to creditors; commencement. Most Cited Cases

Except in a Chapter 15 case, the automatic stay applies from the moment that a bankruptcy case is filed. 11 U.S.C.A. § 362.

**[15] Bankruptcy 51 ⚷2391**

51 Bankruptcy
    51IV Effect of Bankruptcy Relief; Injunction and Stay
        51IV(B) Automatic Stay
            51k2391 k. In general. Most Cited Cases

Automatic stay has four main purposes in bankruptcy cases: (1) to stop collection efforts against a debtor so that the debtor has time to devise a plan to get out of the financial situation that caused the bankruptcy filing in the first place, (2) to give time to permit the trustee to undertake the collective procedure of collecting the debtor's assets and liquidating them for the benefit of all creditors, (3) to give assurance to all creditors that other creditors are not pursuing independent remedies, either judicial or non-judicial, to drain the debtor's assets, and (4) to harmonize the interests of the creditors and the debtor. 11 U.S.C.A. § 362.

**[16] Bankruptcy 51 ⚷2404**

51 Bankruptcy

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

391 B.R. 850
**(Cite as: 391 B.R. 850)**

51IV Effect of Bankruptcy Relief; Injunction and Stay

51IV(B) Automatic Stay

51k2404 k. Duration and termination. Most Cited Cases

Automatic stay is provisional relief; in a plenary bankruptcy case, in due course it is replaced by a permanent injunction, if the debtor is an individual and receives a discharge, a plan of reorganization, or the closing or dismissal of the case. 11 U.S.C.A. §§ 362, 362(c), 727(b), 944, 1141, 1227, 1327.

**[17] Bankruptcy 51 ⟿2404**

51 Bankruptcy

51IV Effect of Bankruptcy Relief; Injunction and Stay

51IV(B) Automatic Stay

51k2404 k. Duration and termination. Most Cited Cases

**Bankruptcy 51 ⟿3481**

51 Bankruptcy

51XIII Adjustment of Debts of a Municipality

51k3481 k. In general. Most Cited Cases

**Bankruptcy 51 ⟿3568(2)**

51 Bankruptcy

51XIV Reorganization

51XIV(B) The Plan

51k3566 Confirmation; Objections

51k3568 Effect

51k3568(2) k. Conclusiveness. Most Cited Cases

**Bankruptcy 51 ⟿3683.1**

51 Bankruptcy

51XVII Adjustment of Debts of Family Farmer

51XVII(B) The Plan

51k3683 Confirmation

51k3683.1 k. In general. Most Cited Cases

**Bankruptcy 51 ⟿3715(10)**

51 Bankruptcy

51XVIII Individual Debt Adjustment

51k3704 Plan

51k3715 Acceptance and Confirmation

51k3715(9) Effect

51k3715(10) k. Conclusiveness; res judicata; collateral estoppel. Most Cited Cases

Plan of reorganization, under Chapters 9, 11, 12, and 13, is binding on all creditors, and normally replaces the automatic stay. 11 U.S.C.A. §§ 362, 944, 1141, 1227, 1327.

**[18] Bankruptcy 51 ⟿2393**

51 Bankruptcy

51IV Effect of Bankruptcy Relief; Injunction and Stay

51IV(B) Automatic Stay

51k2393 k. Notice to creditors; commencement. Most Cited Cases

Unlike other forms of preliminary relief, the automatic stay is truly automatic: it does not depend on the issuance of any order by the court. 11 U.S.C.A. § 362.

**[19] Bankruptcy 51 ⟿2393**

51 Bankruptcy

51IV Effect of Bankruptcy Relief; Injunction and Stay

51IV(B) Automatic Stay

51k2393 k. Notice to creditors; commencement. Most Cited Cases

Automatic stay takes effect without any notice whatever to creditors, without an opportunity to oppose its imposition, or even an opportunity to be heard thereon. 11 U.S.C.A. § 362.

**[20] Bankruptcy 51 ⟿2392**

51 Bankruptcy

51IV Effect of Bankruptcy Relief; Injunction and Stay

51IV(B) Automatic Stay

51k2392 k. Property and claims subject to

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

391 B.R. 850

**(Cite as: 391 B.R. 850)**

stay. Most Cited Cases

**Bankruptcy 51 ☞2394.1**

51 Bankruptcy
   51IV Effect of Bankruptcy Relief; Injunction and Stay
     51IV(B) Automatic Stay
      51k2394 Proceedings, Acts, or Persons Affected
       51k2394.1 k. In general. Most Cited Cases

United States automatic stay applies worldwide, whether or not this is consistent with domestic law in the relevant foreign country. 11 U.S.C.A. § 362.

**[21] Bankruptcy 51 ☞2464**

51 Bankruptcy
   51IV Effect of Bankruptcy Relief; Injunction and Stay
     51IV(D) Enforcement of Injunction or Stay
      51k2464 k. Sanctions, in general. Most Cited Cases

If a creditor violates the automatic stay anywhere in the world, that creditor is subject to sanctions in the United States. 11 U.S.C.A. §§ 105, 362.

**[22] Bankruptcy 51 ☞2464**

51 Bankruptcy
   51IV Effect of Bankruptcy Relief; Injunction and Stay
     51IV(D) Enforcement of Injunction or Stay
      51k2464 k. Sanctions, in general. Most Cited Cases

Sanctions for a creditor's violation of the automatic stay may include the denial of creditor's claim in a United States bankruptcy case, monetary sanctions, and, in an extreme case, injunctive relief. 11 U.S.C.A. § 362.

**[23] Bankruptcy 51 ☞2464**

51 Bankruptcy
   51IV Effect of Bankruptcy Relief; Injunction and Stay
     51IV(D) Enforcement of Injunction or Stay
      51k2464 k. Sanctions, in general. Most Cited Cases

If a foreign creditor has assets that are subject to the jurisdiction of a United States court or has filed a claim in the relevant bankruptcy case, the bankruptcy court will be able to enforce sanctions for violation of the automatic stay, even if the violation occurred outside the United States. 11 U.S.C.A. § 362.

**[24] Bankruptcy 51 ☞2341**

51 Bankruptcy
   51III The Case
     51III(H) Cases Ancillary to Foreign Proceedings
      51k2341 k. In general. Most Cited Cases

In a Chapter 15 case, the automatic stay set forth in the section of the Bankruptcy Code governing effects of recognition of a foreign main proceeding applies only to the debtor and the debtor's property that is within the territorial jurisdiction of the United States; a stay imposed under the section of the Code governing relief that may be granted upon recognition, after the recognition of a foreign nonmain proceeding, or on a preliminary basis under the section of the Code governing relief that may be granted upon filing petition for recognition, should likewise be so limited. 11 U.S.C.A. §§ 362, 1519, 1520, 1521.

**[25] Bankruptcy 51 ☞2421**

51 Bankruptcy
   51IV Effect of Bankruptcy Relief; Injunction and Stay
     51IV(C) Relief from Stay
      51k2421 k. Vacation, continuance, modification, or dissolution in general. Most Cited Cases

Creditors affected by the automatic stay are protected by its procedure authorizing relief from the automatic stay in certain circumstances. 11 U.S.C.A. § 362.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

391 B.R. 850

**(Cite as: 391 B.R. 850)**

**[26] Bankruptcy 51 ⬯2422.5(1)**

51 Bankruptcy
 51IV Effect of Bankruptcy Relief; Injunction and Stay
  51IV(C) Relief from Stay
   51k2422 Cause; Grounds and Objections
    51k2422.5 In General
     51k2422.5(1) k. In general. Most Cited Cases

**Bankruptcy 51 ⬯2429(1)**

51 Bankruptcy
 51IV Effect of Bankruptcy Relief; Injunction and Stay
  51IV(C) Relief from Stay
   51k2422 Cause; Grounds and Objections
    51k2429 Necessity of Asset for Reorganization or Rehabilitation
     51k2429(1) k. In general. Most Cited Cases

**Bankruptcy 51 ⬯2430.1**

51 Bankruptcy
 51IV Effect of Bankruptcy Relief; Injunction and Stay
  51IV(C) Relief from Stay
   51k2430 Adequate Protection
    51k2430.1 k. In general. Most Cited Cases

 Creditor may qualify for relief from the automatic stay upon a showing of "cause," including a lack of adequate protection of a movant's interest in property, or that the debtor lacks equity in the property and it is not necessary for an effective reorganization. 11 U.S.C.A. § 362(d)(1, 2).

**[27] Bankruptcy 51 ⬯2462**

51 Bankruptcy
 51IV Effect of Bankruptcy Relief; Injunction and Stay
  51IV(D) Enforcement of Injunction or Stay
   51k2462 k. Validity of acts in violation of injunction or stay. Most Cited Cases

 In the Ninth Circuit, any action taken in violation of the automatic stay is void, whether or not the creditor had notice of the stay at the time of the action at issue. 11 U.S.C.A. § 362.

**[28] Bankruptcy 51 ⬯2341**

51 Bankruptcy
 51III The Case
  51III(H) Cases Ancillary to Foreign Proceedings
   51k2341 k. In general. Most Cited Cases

**Bankruptcy 51 ⬯2393**

51 Bankruptcy
 51IV Effect of Bankruptcy Relief; Injunction and Stay
  51IV(B) Automatic Stay
   51k2393 k. Notice to creditors; commencement. Most Cited Cases

 Unlike cases filed under other chapters of the United States Bankruptcy Code, the filing of a Chapter 15 petition does not automatically impose a stay on creditor collection efforts. 11 U.S.C.A. § 362.

**[29] Bankruptcy 51 ⬯2251**

51 Bankruptcy
 51III The Case
  51III(C) Voluntary Cases
   51k2251 k. In general. Most Cited Cases

**Bankruptcy 51 ⬯2341**

51 Bankruptcy
 51III The Case
  51III(H) Cases Ancillary to Foreign Proceedings
   51k2341 k. In general. Most Cited Cases

**Bankruptcy 51 ⬯3481**

51 Bankruptcy
 51XIII Adjustment of Debts of a Municipality
  51k3481 k. In general. Most Cited Cases

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

391 B.R. 850

**(Cite as: 391 B.R. 850)**

**Bankruptcy 51 ☞3501**

51 Bankruptcy
   51XIV Reorganization
      51XIV(A) In General
         51k3501 k. In general; nature and purpose. Most Cited Cases

**Bankruptcy 51 ☞3671**

51 Bankruptcy
   51XVII Adjustment of Debts of Family Farmer
      51XVII(A) In General
         51k3671 k. In general. Most Cited Cases

**Bankruptcy 51 ☞3701**

51 Bankruptcy
   51XVIII Individual Debt Adjustment
      51k3701 k. In general. Most Cited Cases

United States bankruptcy case may be filed under Chapter 7, Chapter 9, Chapter 11, Chapter 12, Chapter 13, or Chapter 15.

**[30] Bankruptcy 51 ☞2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

If a foreign proceeding is recognized as a main proceeding, the stay comes into effect automatically upon the issuance of the order for recognition. 11 U.S.C.A. §§ 362, 1520.

**[31] Bankruptcy 51 ☞2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

If a foreign proceeding is recognized as a nonmain proceeding in a Chapter 15 case, a stay comes into effect only if it is specially ordered by the court: there is no automatic stay as to the debtor's United States assets upon the recognition of a foreign proceeding as a nonmain proceeding. 11 U.S.C.A. §§ 362, 1521.

**[32] Injunction 212 ☞1002**

212 Injunction
   212I Injunctions in General; Permanent Injunctions in General
      212I(A) Nature, Form, and Scope of Remedy
         212k1002 k. Nature of remedy in general. Most Cited Cases
   (Formerly 212k1)

"Injunction" is a court order, directed to a party, enforceable by contempt, and designed to accord or protect some or all of the substantive relief sought by a complaint in more than temporary fashion.

**[33] Bankruptcy 51 ☞2392**

51 Bankruptcy
   51IV Effect of Bankruptcy Relief; Injunction and Stay
      51IV(B) Automatic Stay
         51k2392 k. Property and claims subject to stay. Most Cited Cases

Automatic stay is in rem: its purpose is to protect property that is in custodia legis in consequence of the bankruptcy filing. 11 U.S.C.A. § 362.

**[34] Bankruptcy 51 ☞2394.1**

51 Bankruptcy
   51IV Effect of Bankruptcy Relief; Injunction and Stay
      51IV(B) Automatic Stay
         51k2394 Proceedings, Acts, or Persons Affected
           51k2394.1 k. In general. Most Cited Cases

Automatic stay is not directed to a party in litigation, or even to any particular person; instead, it is directed to the world at large, including all individuals and corporate entities. 11 U.S.C.A. § 362.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

391 B.R. 850

**(Cite as: 391 B.R. 850)**

**[35] Bankruptcy 51 🔑2391**

51 Bankruptcy
    51IV Effect of Bankruptcy Relief; Injunction and Stay
        51IV(B) Automatic Stay
            51k2391 k. In general. Most Cited Cases

**Bankruptcy 51 🔑2394.1**

51 Bankruptcy
    51IV Effect of Bankruptcy Relief; Injunction and Stay
        51IV(B) Automatic Stay
            51k2394 Proceedings, Acts, or Persons Affected
                51k2394.1 k. In general. Most Cited Cases

Purpose of the automatic stay is to protect the property for the benefit of the creditors, and to shield it from particular creditors who seek to obtain preferential payment of their debts to the disadvantage of other creditors. 11 U.S.C.A. § 362.

**[36] Bankruptcy 51 🔑2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

Because, in the section of the Bankruptcy Code governing relief that may be granted after filing petition for recognition of foreign proceedings, the list of the sections from the other parts of the Code that may be adopted as provisional relief is incomplete, a number of other Code provisions may be applied provisionally while an application for recognition is pending. 11 U.S.C.A. § 1519.

*854 Joel K. Belway, San Francisco, CA, for Debtors.

Jill Sturtevant, Los Angeles, CA, for U.S. Trustee.

**Amended Opinion Granting Interim Relief to**

**Chapter 15 Debtors Under 11 U.S.C. § 1519**
SAMUEL L. BUFFORD, Bankruptcy Judge.
**I. Introduction**

The recently appointed joint administrators of three chapter 15 debtors, Pro–Fit Holdings Limited ("Pro–Fit Holdings"), Pro–Fit International Limited ("Pro–Fit International"), and Genesis Bradford Limited ("Genesis") (collectively, "Pro–Fit"), bring this application for provisional relief under § 1519 FN1 to apply § 362 to stay the enforcement of a U.S. district court order, following judgment on the merits, attaching the U.S. assets of Pro–Fit Holdings**855** and Pro–Fit International. These three related corporations are currently in administration under the applicable bankruptcy law in the United Kingdom, a reorganization procedure akin to the U.S. chapter 11. The joint administrators are awaiting a hearing on their application for recognition of the U.K. proceedings as "foreign main proceedings" as defined by § 1502(4). Judgment creditor Libra Securities LLC ("Libra") opposes the motion mainly on the grounds that the applicants have not followed the "standards, procedures, and limitations applicable to an injunction" pursuant to § 1519(e).

> FN1. Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C.A. §§ 101–1532 (West 2008) and to the Federal Rules of Bankruptcy Procedure, Rules 1001 – 9036.

The court holds that the relief requested falls outside of § 1519(e), because it is not an injunction or temporary restraining order. Rather, the relief requested is the application of § 362 on a provisional basis, which does not require an adversary proceeding. Consequently, pursuant to § 1519, the court orders that § 362 apply in these chapter 15 cases with respect to Pro–Fit's U.S. assets pending this court's ruling on the application for recognition of the foreign proceedings as foreign main proceedings. In addition, by consent of the petitioners, and at the request of a creditor that has expressed an interest in purchasing substantially all of Pro–Fit's assets, §

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

391 B.R. 850
**(Cite as: 391 B.R. 850)**

363 also applies provisionally with respect to the debtors' U.S. assets pending the recognition determination.

### II. Relevant Facts

Petitioners J.N.R. Pitts and M.E.G. Saville were appointed joint administrators [FN2] of Pro–Fit International on April 4, 2008, and of Pro–Fit Holdings and Genesis Bradford on April 7, 2008. These three related companies are registered under the laws of the United Kingdom, and are currently in administration in the High Court of Justice of England and Wales, Leeds District Registry.[FN3] Among their assets, the companies claim the rights to certain patents relating to waistband technology used in manufacturing athletic clothing, and have licensees both in the United Kingdom and the United States.

> FN2. Pursuant to Schedule B1 of the Insolvency Act of 1986, an administrator is an officer of the court, appointed by order of the court, or by the company or its directors, with the objective of (a) rescuing the company as a gong concern, (b) achieving a better result for the company's creditors as a whole than would be likely if the company were wound up (without first being in administration), or (c) realizing property in order to make a distribution to one or more secured or preferential creditors.

> FN3. Court Case No. 473 of 2008.

In light of Pro–Fit's interests in the United States, the administrators filed a chapter 15 petition for recognition [FN4] on May 21, 2003 for each of the three companies. In addition to Official Form 1, each petition includes a "Verified Petition for Recognition of Foreign Main Proceeding Pursuant to Sections 1515 and 1517 of the Bankruptcy Code and Related Relief," which requests a hearing for recognition of the foreign proceeding as a foreign main proceeding.[FN5] To each petition is attached the notices of appointment of the administrators in

each of the three cases in Leeds, England. Further, each petition is accompanied by a notice of related cases, which include the pending administration cases in the United Kingdom [FN6] and pending litigation in the United States.

> FN4. Section 1504 provides: "A case under [chapter 15] is commenced by the filing of a petition for recognition of a foreign proceeding under section 1515."

> FN5. The hearing on these motions, originally set for July 8, 2008, is now scheduled on July 23, 2008.

> FN6. While each of the foreign proceedings is pending in the High Court in Leeds, the foreign administrators do not have a court order from England appointing them as administrators because English law does not require such an order for the entry of a corporate debtor in administration under the applicable insolvency law.

**\*856** In addition to their intellectual properties, Pro–Fit Holdings and Pro–Fit International are parties to three pending civil actions in the District Court for the Central District of California.[FN7] Two of these actions were commenced in 2004 and 2007 by Tag–It Pacific Inc. (known today as Talon International Inc.), a U.S. licensee of Pro–Fit's waistband patents. Neither case is active. Talon's main concern in this chapter 15 case is not its pending litigation with Pro–Fit, but rather its interest in purchasing, in due course, substantially all of Pro–Fit's assets (either pursuant to § 363 or pursuant to applicable English law).

> FN7. Those actions are: (a) *Libra Securities LLC v. Pro–Fit Int'l Ltd.,* No. 2:07–cv–02520–SVW–JWJ; (b) *Tag–It Pacific Inc. v. Pro–Fit Holdings Ltd.,* No. 2:04–cv–02694–AHM–RC; and (c) *Tag–It Pacific Inc. v. Pro–Fit Holdings Ltd.,* No. 2:07–cv–01484–AHM–RC.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

391 B.R. 850
**(Cite as: 391 B.R. 850)**

[1] Libra commenced a third action against Pro–Fit Holdings and Pro–Fit International in 2007 in the U.S. District Court for the Central District of California. In that action, Libra obtained summary judgment on May 19, 2008. Pursuant to this judgment, Libra obtained an order [FN8] on May 21, 2008 (after the filing of these chapter 15 cases) attaching the U.S. assets of Pro–Fit Holdings and Profit International, including the stream of royalties from the U.S. patents.

> FN8. Federal law in the United States does not provide directly for a writ of attachment. Instead, post-judgment remedies are provided by the law of the state where the federal court sits. *See* Rule 9014(c) (making Rule 7064 applicable to contested matters); Rule 7064 (adopting by reference FED. R. CIV. P. 64).

Libra's writ of attachment prompted the debtors' foreign administrators to file an *ex parte* application for an order to show cause, on notice to counsel for both Talon and Libra, for a preliminary injunction and for an interim temporary restraining order. At the hearing, however, the petitioners changed their request to seek the imposition of the automatic stay under § 362 as to the two actions involving Talon, and most urgently the action involving Libra. Libra initially objected to this change in position, but was ultimately satisfied with an opportunity at the hearing to address petitioners' request for a stay under § 362, rather than a temporary restraining order and injunction. [FN9]

> FN9. To protect Talon's due process rights, the court set a further hearing two days later to consider further the propriety of imposing the automatic stay of § 362 on the creditors in these three cases. The next day Talon informed the court that it would not take advantage of the further hearing on this issue.

Libra opposes the application before the court on three grounds. First, Libra contends that §

1519(e) requires the filing of an adversary proceeding, which the foreign administrators have not done, to obtain the relief requested. Second, Libra argues that the foreign administrators have made no showing of imminent harm to justify the entry of a temporary restraining order. Finally, Libra maintains that the foreign administrators have provided no explanation for their delay in filing these chapter 15 cases, pursuant to which they now request relief on an emergency basis.

Talon, on the other hand—a licensee of the debtors who is also in litigation with them—does not oppose the emergency relief requested. On the contrary, Talon's concern is that the joint administrators, since the date of their appointment, have been working at less than arm's length with the insiders of Pro–Fit to consummate**\*857** a sale transaction to insiders. Because it has an interest in buying the worldwide assets of the respective debtors. Talon welcomes the imposition of a stay on the debtors' assets, and further requests that the provisions of § 363 be made applicable for all worldwide assets of Pro–Fit during the gap period, pursuant to § 1519, until the foreign proceeding is recognized (at which time § 363 will apply pursuant to § 1520).

### III. Discussion

This application for provisional relief raises three issues under the new chapter 15. The first issue is whether § 1519(e) should be read broadly to require the filing of an adversary proceeding to obtain any relief under § 1519. The second issue is whether, even on a narrower reading of § 1521(e), the adoption § 362 for a chapter 15 case is in the nature of issuing an injunction that requires an adversary proceeding. The third issue is whether the court may grant provisional relief under § 1519 by adopting other sections of the bankruptcy code and making them applicable in a particular chapter 15 case on a provisional basis pending a decision on recognition.

### A. Background of Chapter 15

[2] Congress enacted chapter 15 in 2005 as an implementation of the Model Law on Cross–Border

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

391 B.R. 850
**(Cite as: 391 B.R. 850)**

Insolvency ("the Model Law") promulgated by the United Nations Commission on International Trade Law ("UNCITRAL") in 1997.[FN10] The language of chapter 15 tracks the Model Law, with adaptations designed to mesh with United States law.[FN11] Congress prescribed a rule of interpretation that expressly requires United States courts to take into account the statute's international origin and to promote applications of chapter 15 that are consistent with versions of the Model Law adopted in other jurisdictions.[FN12]

> FN10. The United States was an active participant in the discussions leading to the adoption of the Model Law. *See* H.R. REP. NO. 109–31, at 105–07 (2005), U.S. CODE CONG. & ADMIN. NEWS 2005, at 88; Jay Lawrence Westbrook, *Chapter 15 at Last,* 79 AM. BANKR. L.J. 713, 719–20 (2005). *See also In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.,* 374 B.R. 122, 127 n. 3 (Bankr.S.D.N.Y.) (Lifland, J.) (stating that Judge Lifland, Professor Jay Westbrook and Daniel Glosband were among the authors of the Model Law).

> FN11. H.R. REP. NO. 109–31, at 105–07; Westbrook, *supra* note 11, at 719.

> FN12. *See* § 1508; H.R. REP. NO. 109–31, at 109–10.

However, the matters presently before the court in this case do not implicate provisions of chapter 15 derived from the Model Law. Instead, they arise from provisions that Congress specially added in adapting the Model Law to the U.S. bankruptcy code.

## B. Pendency of Foreign Proceeding and Qualification of Administrators

[3] Section 1515 imposes the following requirements on a chapter 15 petition for recognition:

(a) A foreign representative applies to the court for recognition of a foreign proceeding in which the foreign representative has been appointed by filing a petition for recognition.

(b) A petition for recognition shall be accompanied by—

(1) a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;

(2) a certificate from the foreign court affirming the existence of such **\*858** foreign proceeding and of the appointment of the foreign representative; or

(3) in the absence of evidence referred to in paragraphs (1) and (2), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative.

(c) A petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative.

(d) The documents referred to in paragraphs (1) and (2) of subsection (b) shall be translated into English. The court may require a translation into English of additional documents.

While compliance with subparagraphs (c) and (d) is clear, compliance with subparagraph (b) requires further explanation.

[4][5][6] The Insolvency Act 1986 for England and Wales[FN13] authorizes a company to enter into administration by filing a petition with the high court.[FN14] After filing the case, the company may elect to enter into "administration," pursuant to which one or more administrators are appointed by the directors of the company, and not by the court, to reorganize or to liquidate the company.[FN15] Under this procedure, there is no court order for the appointment of the administrators. In these cases, instead of such a court order, the debtors have each

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

391 B.R. 850
**(Cite as: 391 B.R. 850)**

attached a notice of appointment signed by Phillip Morris, a Leeds solicitor,[FN16] giving notice of their appointment. The court provisionally finds that these notices are sufficient, pursuant to § 1515(b)(3), to show both the existence of the foreign proceedings and the appointment of the foreign representatives.[FN17]

FN13. *See* Margaret R. Cole, *The Insolvency Laws of the United Kingdom,* in 2 INTERNATIONAL INSOLVENCY, U.K. (Carl Felsenfeld et al., eds.2003). The bankruptcy law in the United Kingdom is not unified: there is one law for England and Wales, one for Scotland and one for Northern Ireland. All three laws were enacted by the United Kingdom Parliament in Westminster, and they vary mainly in details that are not relevant herein. Because the administration for the companies in these chapter 15 cases is pending in Leeds, England, it is the law for England and Wales that applies to the administration of these three entities.

FN14. *See* Insolvency Act 1986, ch. 45, Pt. II, s. 9. Administration may also be commenced by the directors of a company without filing a case at all under the Bankruptcy Act 1986. *See id.* Schedule B1, ¶ 22(2).

FN15. *See id.*

FN16. The practice of law in the United Kingdom is not unified. Most of what corresponds to U.S. law practice is carried out by solicitors, who often practice in law firms of substantial size. Most court appearances, however, are made by barristers, who are separately licensed and are hired by solicitors to conduct court proceedings.

FN17. The purpose of § 1515(b) is to circumvent the usual requirement of ex-

equatur for the proof of a foreign legal document, which requires a very complex and time-consuming procedure involving certifications by both foreign and U.S. officials.

### C. Provisional Relief Under § 1519

[7] To authorize relief during the gap period between the time of filing a petition for recognition and the court ruling on recognition, § 1519(a) provides that "the court may grant relief of a provisional nature," at the request of the foreign representative, where relief is urgently needed to protect the assets of the debtor or the interests of the creditors.[FN18]

FN18. Section 1519 states:

(a) From the time of filing a petition for recognition until the court rules on the petition, the court may, at the request of the foreign representative, where relief is urgently needed to protect the assets of the debtor or the interests of the creditors, grant relief of a provisional nature, including—

(1) staying execution against the debtor's assets;

(2) entrusting the administration or realization of all or part of the debtor's assets located in the United States to the foreign representative or another person authorized by the court, including an examiner, in order to protect and preserve the value of assets that, by their nature or because of other circumstances, are perishable, susceptible to devaluation or otherwise in jeopardy; and

(3) any relief referred to in paragraph (3), (4), or (7) of section 1521(a).

(b) Unless extended under section 1521(a)(6), the relief granted under this section terminates when the petition for

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

391 B.R. 850
**(Cite as: 391 B.R. 850)**

recognition is granted.

(c) It is a ground for denial of relief under this section that such relief would interfere with the administration of a foreign main proceeding.

(d) The court may not enjoin a police or regulatory act of a governmental unit, including a criminal action or proceeding, under this section.

(e) The standards, procedures, and limitations applicable to an injunction shall apply to relief under this section.

(f) The exercise of rights not subject to the stay arising under section 362(a) pursuant to paragraph (6), (7), (17). or (27) of section 362(b) or pursuant to section 362(n) shall not be stayed by any order of a court or administrative agency in any proceeding under this chapter.

**\*859** As with any provisional relief under § 1519, the court's preliminary order lasts until the court enters an order on recognition. FN19 If the court ultimately grants recognition pursuant to § 1517, a main administrative order may then replace the interim order pursuant to § 1521(a), which authorizes the court to grant "any appropriate relief" after the recognition of a foreign proceeding as either a main or nonmain proceeding. FN20

FN19. *See* § 1519(a).

FN20. *See* § 1521(a).

**1. Applicability of § 1519(e)**

Libra argues that the joint administrators have not properly followed the procedural requirements to bring before the court the imposition of the § 362 stay. Libra contends that, pursuant to § 1519(e), no provisional relief under § 1519 can be granted unless the movant complies with the standards, procedures, and limitations applicable to an injunction, which are provided under Rules 7001 and 7065.

Under this interpretation, relief is available to stay Libra's execution against the debtors' assets during the gap period between petition and recognition only pursuant to an adversary proceeding under Rule 7001. In addition, such injunctive relief would be subject to the standards and limitations applicable generally to injunctions (which the debtors have not attempted to satisfy).

**a. Injunctions—Standards, Procedures & Limitations**

[8] Rule 7001 imposes specific procedures for obtaining an injunction. FN21 A proceeding to obtain an injunction must comply with the adversary proceeding provisions of Part VII: the applicant must file a complaint under Federal Rule of Bankruptcy Procedure 7001, naming the parties against whom injunctive relief is sought, that complies with the federal pleading requirements.

FN21. Rule 7001 provides in relevant part: An adversary proceeding is governed by the rules of this Part VII. The following are adversary proceedings: ... (7) a proceeding to obtain an injunction or other equitable relief ...

[9] The standards for obtaining a preliminary injunction are substantial. Under Ninth Circuit law, a party seeking a preliminary injunction (usually the plaintiff) must demonstrate either: (1) a likelihood of success on the merits and the possibility **\*860** of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor. FN22 A preliminary injunction is most often requested to preserve the status quo pending a decision by the court on the merits of the underlying dispute. FN23

FN22. *See, e.g., E. & J. Gallo Winery v. Andina Licores S.A.,* 446 F.3d 984, 990 (9th Cir.2006).

FN23. *See, e.g., Keirnan v. Utah Transit Auth.,* 339 F.3d 1217, 1220 (10th Cir.2003)* ("A preliminary injunction

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

391 B.R. 850
**(Cite as: 391 B.R. 850)**

serves to preserve the status quo pending a final determination of the case on the merits.").

[10] Rule 65 of the Federal Rules of Civil Procedure, which Rule 7065 makes applicable in adversary proceedings, imposes limitations on a temporary restraining order (which is a form of preliminary injunction). Such an order must "describe in reasonable detail the act or acts sought to be restrained," must "set forth the reasons for its issuance," and is binding only upon the parties to the action (including their officers, agents, servants, employees and attorneys), and upon those persons in active concert or participation with them who receive actual notice of the order. Further requirements and limitations apply if the temporary restraining order is granted *ex parte (i.e.,* without notice to the party enjoined). [FN24]

FN24. *See* FED.R.CIV.P. 65(b).

[11] The question before the court is whether the foreign administrators in these chapter 15 cases must comply with the foregoing requirements to permit the court to issue an order imposing the automatic stay on all U.S. creditors on a preliminary basis under § 1519. To make this determination, we look at three considerations: the consequences in § 1519 of applying this interpretation; the larger context in which this provision of § 1519 appears; and the nature of the § 362 automatic stay.

**b. Applicability of Injunction Standards to § 1519 Relief**

While one could perhaps read 1519(e) as broadly as Libra contends, such a reading would impose procedural barriers that are unknown in the bankruptcy law to the availability of at least some § 1519 remedies. For example, § 1519(a)(3) authorizes "any relief referred to in paragraph (3), (4), or (7) of section 1521(a)." This relief includes the "examination of witnesses pursuant to Rule 2004 and the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities" (§ 1521(a)(4)). It is implausible to require an

adversary proceeding for such actions in a chapter 15 case, where no adversary proceeding is required for such activity in a case under any other bankruptcy code chapter.

The legislative history of § 1519(e) also belies Libra's interpretation. The legislative history states: "Subsection (e) makes clear that this section contemplates injunctive relief and that such relief is subject to specific rules and a body of jurisprudence." [FN25] According to this legislative comment, the rules and jurisprudence for an injunction apply, pursuant to § 1519(e), only where a foreign representative seeks an injunction under § 1519, and not where the relief sought is not an injunction.

FN25. H.R. REP. NO. 109–31(1) at 116 (2005), *as reprinted in* 1005 U.S.C.C.A.N. 88, 178.

Nonetheless, it is clear that § 1519(e) applies at least to certain kinds of relief under § 1519. Section 1519(a)(1) specifically authorizes relief "staying execution against the debtor's assets." If nothing **\*861** else, relief under § 1519(a)(1) is the kind of relief that is subject to the procedural requirements of § 1519(e). In their moving papers, the joint administrators in fact have requested such a stay of execution, which would require an adversary proceeding as Libra contends. However, at the hearing the foreign administrators changed their motion to request only the imposition of § 362 on a provisional basis pending a decision on recognition of the foreign proceedings.

[12] Thus the analysis of § 1519 itself indicates that the prerequisites for obtaining injunctive relief specified by § 1519(e) do not apply to all relief under § 1519. Instead, these requirements should apply only where the relief sought under § 1519 is injunctive relief, such as the staying of execution pursuant to § 1519(a). In contrast, if the foreign representative is seeking different relief, and not an injunction, subsection (e) does not apply.

**c. Context of § 1519(e)**

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

391 B.R. 850
**(Cite as: 391 B.R. 850)**

Section 1519(e) must be interpreted in the context of its nearly identical counterpart in § 1521, which supports the same determination. Section 1521 provides the very broad scope of relief that a court may grant upon the recognition of a foreign proceeding as either a main proceeding or a nonmain proceeding (which has not yet occurred in these cases). Like § 1519(e), § 1521(e) provides: "The standards, procedures, and limitations applicable to an injunction shall apply to relief under paragraphs (1), (2), (3) and (6) of subsection (a)."

Section 1521 is complemented by § 1520 which provides that, upon the recognition of a foreign main proceeding (but not the recognition of a foreign nonmain proceeding), a number of other provisions of the bankruptcy code either apply automatically (§§ 361, 362, 363, 549 and 552) or apply unless the court orders otherwise (operation of the debtor's business pursuant to §§ 363 and 552). Notably, § 1520 lacks any provision remotely similar to §§ 1519(e) and 1521(e).

Section 1521(e) thus may require an adversary proceeding for granting an injunction after recognition of a foreign proceeding (whether as a main proceeding or as a nonmain proceeding) if the foreign administrator seeks any of the following orders; (a) staying the commencement or continuation of an individual action (i.e., outside the chapter 15 case) by a creditor (§ 1521(a)(1)); (b) staying execution against the debtor's assets (§ 1521(a)(2)); (c) suspending the debtor's right to transfer, encumber or otherwise dispose of assets (§ 1521(a)(3)); or (d) extending provisional relief granted under § 1519 (§ 1521(a)(6)). Notably, however, no such adversary proceeding is required if the first two kinds of relief (staying the commencement or continuation of an individual action by a creditor, or staying execution against the debtor's assets) are imposed automatically under § 1520.

The only published opinion interpreting § 1521(e) is Ho Seok Lee, [FN26] which finds that § 1521(e) does not require an adversary proceeding to grant an injunction after an order for recognition.

The court in that case had recognized a Korean bankruptcy case as the main proceeding for the debtor. However, the automatic stay provided by § 1520(a) was not sufficient for the debtor, because the debtor wanted a permanent injunction (and not just the temporary stay that § 362 provided) to prohibit a creditor from suing the debtor for the resulting deficiency after the payments provided in the Korean ***862** reorganization plan. The court found that an adversary proceeding was not required, notwithstanding § 1521(e), because the legislative history states, "[t]his section does not expand or reduce the scope of relief currently available in ancillary cases under sections 105 and 304," [FN27] and prior case law authorized a preliminary injunction under § 304 without requiring an adversary proceeding.[FN28]

> FN26. *In re Ho Seok Lee,* 348 B.R. 799 (Bankr.W.D.Wash.2006).
>
> FN27. *Id.* at 802 (*citing* H.R. REP. NO. 109–31(1), at 116, *as reprinted in* 2005 U.S.C.C.A.N. 88, 178).
>
> FN28. *Id., citing In re Rukavina,* 227 B.R. 234 (Bankr.S.D.N.Y.1998).

To support the position of the foreign administrators in these cases, this court need not agree with the interpretation of § 1521(e) (and its cognate in § 1519(e)) in the *Ho Seok Lee* opinion. More modestly, the court in these cases only needs to find that the relief sought here, the application of § 362 on a provisional basis, does not require an adversary proceeding. The foregoing analysis of the cognate provision to § 1519(e) in § 1521(e) does not support the position that all relief sought under § 1519 requires an adversary proceeding.

#### d. The Automatic Stay— § 362

An analysis of the nature of the automatic stay itself also suggests that no adversary proceeding should be required before it is imposed on creditors on a provisional basis in a chapter 15 case.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

391 B.R. 850
**(Cite as: 391 B.R. 850)**

### 1. Nature of the Automatic Stay

[13][14] The automatic stay (moratorium) is one of the most powerful forms of preliminary relief available in a U.S. court. It stops virtually every creditor action to collect a debt from a bankruptcy debtor. Such a petition, when filed, "operates as a stay ... [on] the commencement or continuation ... of a judicial action ... against the debtor that was or could have been commenced" before the petition date, as well as against "the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title".[FN29] Except in a chapter 15 case, the automatic stay applies from the moment that a bankruptcy case is filed.

FN29. § 362(a)(1), (3).

[15] The automatic stay has four main purposes in bankruptcy cases: (1) to stop collection efforts against a debtor so that the debtor has time to devise a plan to get out of the financial situation that caused the bankruptcy filing in the first place; (2) to give time to permit the trustee to undertake the collective procedure of collecting the debtor's assets and liquidating them for the benefit of all creditors; (3) to give assurance to all creditors that other creditors are not pursuing independent remedies (either judicial or non-judicial) to drain the debtor's assets; (4) to harmonize the interests of the creditors and the debtor.[FN30] These goals are clearly important in these chapter 15 cases.

FN30. *Cf. Caffey v. Russell (In re Caffey),* 384 B.R. 297, 305 (Bankr.S.D.Ala.2008); *Johnston v. Parker (In re Johnston),* 321 B.R. 262, 273–74 (D.Ariz.2005) (internal citations omitted); *see also,* H.R. REP. NO. 95–595, at 340 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6296–97.

[16][17] The automatic stay of § 362 is provisional relief. In a plenary bankruptcy case, in due course it is replaced by a permanent injunction (if the debtor is an individual and receives a discharge),[FN31] a plan of reorganization,[FN32] or the closing or dismissal of the case.[FN33]

FN31. *See* §§ 727(b) (liquidations); 944 (municipal cases); 1141 (reorganizations).

FN32. A plan of reorganization, under chapters 9, 11, 12 and 13, is binding on all creditors, and normally replaces the automatic stay. *See* §§ 944(a) (municipal cases), 1141 (reorganizations), 1227 (family farmers and fishermen), 1327 (debts of individuals).

FN33. *See* § 362(c).

**\*863** [18][19] Unlike other forms of preliminary relief, the automatic stay is truly automatic: it does not depend on the issuance of any order by the court. The automatic stay takes effect without any notice whatever to creditors, without an opportunity to oppose its imposition, or even an opportunity to be heard thereon.

[20][21][22][23][24] The United States automatic stay applies worldwide,[FN34] whether or not this is consistent with domestic law in the relevant foreign country. If a creditor violates the stay anywhere in the world, that creditor is subject to sanctions in the United States.[FN35] Sanctions may include the denial of a creditor's claim in a U.S. bankruptcy case, monetary sanctions and, in an extreme case, injunctive relief.[FN36] If a foreign creditor has assets that are subject to the jurisdiction of a United States court or has filed a claim in the relevant bankruptcy case,[FN37] the bankruptcy court will be able to enforce sanctions for violation of the automatic stay, even if the violation occurred outside the United States. However, in a chapter 15 case, the automatic stay of § 1520 applies only to the debtor and the debtor's property that is within the territorial jurisdiction of the United States.[FN38] A stay imposed under § 1521, after the recognition of a foreign nonmain proceeding, or on a preliminary basis under § 1519, should likewise be so limited.

FN34. *See, e.g., Nakash v. Zur (In re Na-*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

391 B.R. 850
**(Cite as: 391 B.R. 850)**

*kash),* 190 B.R. 763, 768 (Bankr.S.D.N.Y.1996).

FN35. *See* § 105.

FN36. *See Underwood v. Hilliard (In re Rimsat, Ltd.),* 98 F.3d 956, 962 (7th Cir.1996); *Lykes Bros. S.S. Co. v. Hanseatic Marine Serv. (In re Lykes Bros. S.S. Co.),* 207 B.R. 282, 287 (Bankr.M.D.Fla.1997).

FN37. *See Hong Kong & Shanghai Banking Corp. v. Simon (In re Simon),* 153 F.3d 991, 997 (9th Cir.1998) (filing proof of claim in bankruptcy case submits creditor to general jurisdiction of the bankruptcy court); *Lykes Bros. S.S. Co. v. Hanseatic Marine Serv., (In re Lykes Bros. S.S. Co.),* 207 B.R. 282 (Bankr.M.D.Fla.1997).

FN38. *See* § 1520(a)(1).

[25][26] Creditors affected by the automatic stay are protected by its procedure authorizing relief from the automatic stay in certain circumstances. A creditor may qualify for relief from the automatic stay upon a showing of "cause," including a lack of adequate protection of a movant's interest in property,[FN39] or that the debtor lacks equity in the property and it is not necessary for an effective reorganization.[FN40] It is chiefly secured creditors who may obtain relief from the automatic stay under these provisions.[FN41]

FN39. *See* § 362(d)(1).

FN40. *See* § 362(d)(2).

FN41. Relief from the automatic stay is also available under a shortened time frame in a single asset real estate case (§ 362(d)(3)) and under certain circumstances where the bankruptcy petition is part of a scheme to delay, hinder and defraud creditors (§ 362(d)(4)).

[27] In the Ninth Circuit, any action taken in violation of the automatic stay is void, whether or not the creditor had notice of the stay at the time of the action at issue.[FN42] Indeed, the chief benefit to a creditor of its lack of notice of the automatic stay is that the lack of notice is a **\*864** defense to the imposition of punitive damages against the offending creditor.[FN43]

FN42. *See, e.g., Schwartz v. United States (In re Schwartz),* 954 F.2d 569, 571–72 (9th Cir.1992).

FN43. *See, e.g., In re Augustino Enters., Inc.,* 13 B.R. 210, 212 (Bankr.D.Mass.1981).

[28][29] Unlike cases filed under other chapters of the U.S. bankruptcy code,[FN44] the filing of a chapter 15 petition does not automatically impose a stay on creditor collection efforts. Indeed, in some chapter 15 cases, the automatic stay never comes into effect.

FN44. A U.S. bankruptcy case may be filed under chapter 7, chapter 9, chapter 11, chapter 12, chapter 13 or chapter 15. Chapters 1, 3 and 5 have general provisions that are typically applicable to cases under any chapter. The remaining chapter numbers are unused.

[30][31] If a foreign proceeding is recognized as a main proceeding, the stay comes into effect automatically upon the issuance of the order for recognition. However, if a foreign proceeding is recognized as a nonmain proceeding in a chapter 15 case, a stay comes into effect only if it is specially ordered by the court: there is no automatic stay as to the debtor's U.S. assets upon the recognition of a foreign proceeding as a nonmain proceeding.[FN45]

FN45. There may be a foreign stay, nonetheless, that applies worldwide and is effective in the United States. *See, e.g., In re Artimm,* 278 B.R. 832

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

391 B.R. 850
**(Cite as: 391 B.R. 850)**

(Bankr.C.D.Cal.2002) (recognizing that the Italian automatic stay applied to the debtor's assets in the United States in consequence of its filing a bankruptcy case in Rome, Italy). Such a stay would apply to the U.S. assets in a chapter 15 case, both before and after the issuance of a recognition order. However, none of the parties before the court has claimed that the Pro–Fit assets in the United Slates are subject to an automatic stay that is in force in the Leeds cases.

### 2. Differences Between Automatic Stay and Injunction

As Libra argues, the relief that § 362 gives a debtor and creditors is at least similar to an injunction, albeit without either the limitations or the procedural safeguards of an injunction. Nonetheless, the automatic stay is quite a different animal from an injunction.

[32] An injunction is a court order, "directed to a party, enforceable by contempt, and designed to accord or protect some or all of the substantive relief sought by a complaint in more than temporary fashion." FN46 An order that does not encompass all of the branches of this definition does not normally qualify as an injunction. FN47

> FN46. 16 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE 2d § 3922 (1996) (internal quotations omitted); *accord, U.S. v. E–Gold, Ltd.,* 521 F.3d 411, 415 (D.C.Cir.2008).

> FN47. See 16 WRIGHT, MILLER & COOPER, Note 46, § 3922.

[33][34] The stay under § 362 is fundamentally different in several respects from an injunction. Perhaps the most important difference is that the stay is *in rem:* its purpose is to protect property that is *in custodia legis* in consequence of the bank-

ruptcy filing. FN48 Accordingly, it is not directed to a party in litigation, or even to any particular person. Instead, it is directed to the world at large, including all individuals and corporate entities.

> FN48. In a plenary bankruptcy case, the property at issue is property of the estate pursuant to § 541(a). In a chapter 15 case, normally there is no estate created. However, the U.S. property of the debtor is protected by the automatic stay once recognition is granted. *See* § 1520(a)(1). It is this property that may be entitled to interim protection by applying § 362 on an interim basis until an order for recognition is granted.

The *in rem* status of bankruptcy cases is most clearly articulated by the United States Supreme Court in **\*865**_Central Virginia Community College v. Katz,_ FN49 where the Supreme Court stated:

> FN49. *See Cent. Va. Comm. College v. Katz,* 546 U.S. 356, 126 S.Ct. 990, 163 L.Ed.2d 945 (2006).

Bankruptcy jurisdiction, at its core, is *in rem*.... Critical features of every bankruptcy proceeding are the exercise of exclusive jurisdiction over all of the debtor's property, the equitable distribution of that property among the debtor's creditors, and the ultimate discharge that gives the debtor a "fresh start" by releasing him, her, or it from further liability for old debts. FN50

> FN50. *Id.* at 362–64, 126 S.Ct. 990.

The court further stated: "Bankruptcy jurisdiction, as understood today and at the time of the framing, is principally *in rem* jurisdiction (citing cases)". In bankruptcy, the court's jurisdiction is premised on the debtor and his estate, and not on the creditors. FN51

> FN51. *Id.* at 357, 126 S.Ct. 990 (inner quotations omitted).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

391 B.R. 850
**(Cite as: 391 B.R. 850)**

[35] The issuance of a stay to protect the property of the debtor is in particular an exercise of the bankruptcy court's *in rem* jurisdiction. Its purpose is to protect the property for the benefit of the creditors, and to shield it from particular creditors who seek to obtain preferential payment of their debts to the disadvantage of other creditors. This is precisely the purpose for which the foreign administrators seek an interim stay order in these cases.

Furthermore, the fact that § 362 takes effect automatically in all bankruptcy cases, except those filed under chapter 15, without the limitations or procedural safeguards of an injunction, supports the inference that these limitations and procedural safeguards are not needed when a court imposes § 362 in a chapter 15 case on an interim basis.

Indeed, in chapter 15 itself, § 362 takes effect automatically upon the recognition of a foreign main proceeding. Section 1521 makes it clear that an adversary proceeding is not required to achieve this result.

In sum, an adversary proceeding is never needed under the bankruptcy code for the imposition of the automatic stay, and satisfaction of the requirements for an injunction is never required.

### D. Adoption of Other Provisions of the Bankruptcy Code

Further analysis is useful with respect to the technique of adopting a non-chapter 15 provision by reference in a chapter 15 case. This technique can be useful with respect to a number of provisions in other chapters of the bankruptcy code.

Chapter 15 generally does not specify what other bankruptcy code provisions should be applied in a chapter 15 case. Section 103(a) specifies that, for all chapter 15 cases, §§ 307, 362(n), 555–557, and 559–562 apply. In addition, § 1520 provides that, if a foreign proceeding is recognized as a foreign main proceeding, several other sections (notably including §§ 361 and 362) apply to the chapter 15 case from that point forward. A much

smaller set of sections applies automatically under § 1521 upon the recognition of a foreign nonmain proceeding.

It is highly unlikely that a court can simply ignore all the rest of the bankruptcy code and the other provisions relating to bankruptcy cases in the United States, just because they are not specifically mentioned in chapter 15 or § 103. The better reading is that many other provisions of the bankruptcy code can be applicable in a chapter 15 case: Some should apply in **\*866** most cases, while others should be applied only on a case by case basis.

Thus, the specific provisions of chapter 15 only designate the sections of the bankruptcy code apart from chapter 15 that apply automatically to a chapter 15 case upon the recognition of a foreign proceeding as a main proceeding or as a nonmain proceeding. The question of which other bankruptcy code provisions may be made applicable by court order in a particular chapter 15 case is left open.

[36] Furthermore, and more important for these chapter 15 cases, the list in § 1519 of the sections from the other parts of the bankruptcy code that can be adopted as provisional relief under § 1519 is incomplete. Thus, a number of other provisions of the bankruptcy code may be applied provisionally under § 1519 while an application for recognition is pending.

The adoption of a section or sections of another part of the bankruptcy code, in appropriate circumstances, is often a far better procedure than adopting a court order that specifies in detail the rights and obligations of the debtor and the creditors. By incorporating a section of the bankruptcy code (such as § 362) by reference, the court thereby imports both the statutory language (which is ten pages long for § 362), and the case law arising from that statutory provision. For § 362, for example, adopting it by reference imports all of the details of the circumstances where § 362 applies and does not apply. In addition, it imports the provisions for

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

391 B.R. 850
**(Cite as: 391 B.R. 850)**

automatic termination of the automatic stay, and the provisions for obtaining relief from the stay. A simple phrase making § 362 applicable in a chapter 15 case imports all of this law into the case.

This conclusion is further supported by § 105(a), which provides: "The court may issue any order process, or judgment that is necessary or appropriate to carry out the provisions of this title." Section 103 specifically makes chapter 1 (including § 105) applicable to cases under chapter 15.

### E. Change in Request for Provisional Relief

Notwithstanding Libra's acquiescence at the hearing on this application, the court notes that the papers before the court are cast as if they are requesting something in the nature of a temporary restraining order and preliminary injunction, rather than the application of §§ 361 and 362. The court finds this to be a change in the position of the applications, and by no means a trivial change, given the court's analysis. Nonetheless, the court holds that the provisional application of §§ 362 and 361 —by way of § 1519—may be ordered on a provisional basis pending the hearing on recognition.

To protect Libra's due process rights and its right to be informed of the relief that the foreign representatives seek, the court set a further hearing two days after the first hearing, where the relief granted herein could be reconsidered at Libra's request. The next day, Libra informed the court that it declined to proceed with that hearing.

### F. § 363 Relief Under § 1519

Talon's main interest in this chapter 15 case is that any assets of the UK companies be sold pursuant to § 363. It is Talon's fear that the administration proceeding in the United Kingdom would lack the supervision of a sale process like that in a U.S. bankruptcy case. For this reason, Talon and its related entities have welcomed this chapter 15 case, because pursuant to § 1520, once a foreign proceeding is recognized as a foreign main proceeding, § 363 applies "to any transfer of an interest of the debtor in property that is within **\*867** the territorial

jurisdiction of the United States." § 1520(a)(2).

Talon's initial concern at the hearing was that the foreign administrators, in their application, had requested the entry of a temporary restraining order "entrusting the administration or realization of the foreign debtor's property to the foreign representatives." Such relief would be available to the foreign representatives on an interim basis pursuant to § 1519(a)(2).

Talon reads § 1519(a)(2) as allowing the court to authorize the joint administrators to dispose of assets in a manner other than as provided under § 363. Since it now appears, however, that petitioners are not requesting the relief provided under § 1519(a)(2), the court need not reach the question of whether § 1519(a)(2) could allow a petitioner to override the requirements of § 363 during the gap period before recognition.

Talon nevertheless welcomes the application of § 362 in this case, as this will maintain the status quo so that the § 363 process may eventually occur. In addition, Talon requests that the provisions of § 363 be made immediately applicable in this case to all the assets of the debtors. It appears to the court, however, that while it may make the provisions of § 363 applicable in this case pursuant to §§ 1519(a), 105(a), and 105(d), the court does not have the authority under chapter 15 alone to make these provisions applicable to assets outside of the United States.

### IV. Conclusions

For the foregoing reasons, the court finds that the imposition of the § 362 automatic stay as provisional relief under § 1519 is not injunctive relief that is subject to the § 1519(e) requirement imposing the standards for an injunction. For this reason, the requirements of § 1519(e) do not apply to such an order.

The court concludes that sufficient authority exists under §§ 1519(a), 105(a). and 105(d) for the adoption of § 362 provisionally in these cases, to

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

391 B.R. 850
**(Cite as: 391 B.R. 850)**

apply to all of the debtors' property in the United States pending a ruling on recognition of the foreign proceedings relating to the debtors herein.

Further, the provisions of § 363, by consent of the petitioners, also apply provisionally with respect to United States assets. In addition to these statutory provisions, each of which applies in its entirety, all of the case law thereunder is hereby made applicable to these cases. The court denies such relief with respect to assets outside the territorial jurisdiction of the United States, on the grounds that chapter 15 alone does not provide the court with the authority to grant such relief at this time.

Bkrtcy.C.D.Cal.,2008.
In re Pro-Fit Holdings Ltd.
391 B.R. 850

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Tab 65

KeyCite Red Flag - Severe Negative Treatment
Reversed and Remanded by In Re Purdue Pharma L.P., 2nd Cir., May 30, 2023

635 B.R. 26
United States District Court, S.D. New York.

IN RE: PURDUE PHARMA, L.P.

This Filing Relates to All Matters

21 cv 7532 (CM) [Master Case]
|
[rel: 21 cv 7585 (CM)
|
21 cv 7961 (CM), 21 cv 7962 (CM), 21 cv 7966 (CM), 21 cv 7969 (CM), 21 cv 8034 (CM), 21 cv 8042 (CM), 21 cv 8049 (CM), 21 cv 8055 (CM), 21 cv 8139 (CM), 21 cv 8258 (CM), 21 cv 8271 (CM), 21 cv 8548 (CM), 21 cv 8557 (CM), 21 cv 8566 (CM)]
|
Signed 12/16/2021

**Synopsis**

**Background:** Chapter 11 debtors, a privately-held pharmaceutical company and affiliated entities involved in the manufacture and promotion of a proprietary prescription opioid pain reliever, sought confirmation of proposed plan of reorganization which, inter alia, contained broad releases of civil claims against non-debtor family members who owned debtors and against their related entities. United States Trustee (UST), numerous states and municipalities, and others objected. The Bankruptcy Court, Robert D. Drain, J., 633 B.R. 53, entered order confirming plan. Appeal was taken from that order as well as two merged and related orders, one approving debtors' disclosure statement and solicitation materials, and the other authorizing the implementation of certain preliminary aspects of plan.

**Holdings:** The District Court, Colleen McMahon, J., held that:

[1] the Bankruptcy Court lacked constitutional authority to enter a final order approving the non-consensual releases, even though they were incorporated into proposed plan, and so standard of review was de novo as to both the Bankruptcy Court's factual findings and its conclusions of law;

[2] the Bankruptcy Court had subject matter jurisdiction to approve the release of claims against non-debtors;

[3] addressing an issue of apparent first impression for the court, the Bankruptcy Code does not authorize a bankruptcy court to order the non-consensual release of non-derivative third-party claims against non-debtors in connection with confirmation of a Chapter 11 plan; and

[4] the plan's classification and treatment of the claims of Canadian unsecured creditors vis-a-vis those of their domestic unsecured creditor "counterparts" did not violate the Code.

Vacated.

West Headnotes (70)

**[1]**  **Bankruptcy** 🗝 Number of creditors and amount of claims concurring

Under the Bankruptcy Code, a Chapter 11 plan must be approved, not by a supermajority of all eligible voters, but by a supermajority of all actual voters. 11 U.S.C.A. § 1126.

**[2]**  **Bankruptcy** 🗝 Appointment;  Election

**Bankruptcy** 🗝 Representation of debtor, estate, or creditors

United States Trustee (UST) is a Department of Justice (DOJ) official appointed by the Attorney General to supervise the administration of bankruptcy cases and, under the Bankruptcy Code, has standing to appear in bankruptcy cases and comment on proposed disclosure statements and Chapter 11 plans. 11 U.S.C.A. § 307; 28 U.S.C.A. §§ 581-589.

**[3]**  **Bankruptcy** 🗝 Construction and Operation

Bankruptcy Code is "comprehensive scheme" devised by Congress for resolving debtor-creditor relations.

**[4]**  **Bankruptcy** 🗝 Judicial authority or approval

Bankruptcy courts consider the factors set forth by the Second Circuit in *Iridium*, 478 F.3d 452, in evaluating the fairness of proposed settlements.

**[5]**  **Bankruptcy** 🗝 Property held in trust or custody for debtor;  deposits

Spendthrift trusts can and often do insulate assets from the bankruptcy process.

**[6]**  **Bankruptcy** 🗝 Conclusions of law;  de novo review

**Bankruptcy** 🗝 Clear error

Generally, in bankruptcy appeals, the district court reviews the bankruptcy court's factual findings for clear error and its conclusions of law de novo. Fed. R. Bankr. P. 8013.

**[7]**  **Bankruptcy** 🗝 Conclusions of law;  de novo review

Bankruptcy court's conclusions of law, reviewed de novo, include rulings as to the bankruptcy court's jurisdiction and interpretations of the Constitution. Fed. R. Bankr. P. 8013.

**[8]**  **Bankruptcy** 🗝 Clear error

Clear error standard used by the district court in reviewing a bankruptcy court's findings of fact is a deferential one. Fed. R. Bankr. P. 8013.

3856

**[9]    Bankruptcy** 🔑 Clear error

Bankruptcy court's finding of fact is "clearly erroneous" only if the district court is left with the definite and firm conviction that a mistake has been committed. Fed. R. Bankr. P. 8013.

**[10]    Bankruptcy** 🔑 Submission to district court for judgment

**Bankruptcy** 🔑 District court review or decision

Standard of review applied by the district court in reviewing a bankruptcy court's findings of fact is far less deferential if bankruptcy court is presented with something it cannot adjudicate to final judgment as constitutional matter unless parties consent; in such circumstance, bankruptcy judge has authority only to hear the proceeding and submit proposed findings of fact and conclusions of law to the district court for de novo review and entry of judgment. Fed. R. Bankr. P. 8013.

**[11]    Bankruptcy** 🔑 District court review or decision

If bankruptcy court issues final order in mistaken belief that it has constitutional authority to do so, district court can treat bankruptcy court's order as report and recommendation, but it must review proceeding de novo and enter final judgment.

**[12]    Bankruptcy** 🔑 Particular proceedings or issues

**Bankruptcy** 🔑 Issues between non-debtors

On Chapter 11 debtors' motion to confirm proposed plan of reorganization, the Bankruptcy Court lacked constitutional authority under *Stern* to enter a final order approving the non-consensual third-party releases incorporated into the plan, and so, on appeal of the Bankruptcy Court's confirmation order, the standard of review was de novo as to both the Bankruptcy Court's factual findings and its conclusions of law; even though the Bankruptcy Court had authority to confirm the plan, which was a core function of a bankruptcy court, the non-consensual releases applied to third-party claims against non-debtors, such third-party claims neither stemmed from debtors' bankruptcy nor would necessarily be resolved in the claims allowance process, and the Bankruptcy Court had only "related to" jurisdiction over them. 28 U.S.C.A. § 157(a); Fed. R. Bankr. P. 8013.

7 Cases that cite this headnote

**[13]    Bankruptcy** 🔑 Core, Non-Core, or Related Proceedings in General;  Nexus

Under statute governing bankruptcy procedure, Congress divided bankruptcy proceedings into three types: (1) those that "arise under" title 11, (2) those that "arise in" a title 11 case, (3) and those that are "related to" a title 11 case. 28 U.S.C.A. § 157(a).

**[14]    Bankruptcy** 🔑 Core or non-core proceedings

Cases that "arise under" or "arise in" a title 11 matter are known as "core" bankruptcy proceedings, while "related to" proceedings are "non-core." 28 U.S.C.A. §§ 157(a), 157(b)(1)-(2)(C).

**[15]    Bankruptcy** 🔑 Core or non-core proceedings

3857

Every proceeding pending before a bankruptcy court is either core or non-core. 28 U.S.C.A. § 157(a).

**[16]** **Bankruptcy** 🔑 Core or non-core proceedings

Core versus non-core distinction is critical when assessing bankruptcy court's constitutional authority to enter final judgment disposing of particular proceeding. 28 U.S.C.A. § 157(a).

**[17]** **Bankruptcy** 🔑 Core or non-core proceedings

Core/non-core distinction is critically important when assessing the bankruptcy court's subject matter jurisdiction. 28 U.S.C.A. § 157(a).

**[18]** **Bankruptcy** 🔑 Related proceedings

**Bankruptcy** 🔑 Consent to or Waiver of Objections to Jurisdiction or Venue

Bankruptcy court lacks constitutional authority to enter final judgment in proceeding over which it has only "related to" subject matter jurisdiction unless all parties consent. 28 U.S.C.A. § 157(a).

**[19]** **Bankruptcy** 🔑 Consent to or Waiver of Objections to Jurisdiction or Venue

A party otherwise entitled to have a matter adjudicated by an Article III court does not forfeit that constitutional right if the matter is disposed of as part of a plan of reorganization in bankruptcy. U.S. Const. art. 3.

1 Case that cites this headnote

**[20]** **Bankruptcy** 🔑 Bankruptcy Jurisdiction

Pursuant to *Stern*, bankruptcy courts have the power to enter a final judgment only in proceedings that stem from the bankruptcy itself or would necessarily be resolved in the claims allowance process.

**[21]** **Bankruptcy** 🔑 Settlement, adjustment, or enforcement of claims

Debtors and their affiliated non-debtor parties cannot manufacture constitutional authority for bankruptcy court to resolve non-core claim by artifice of including release of that claim in plan of reorganization.

2 Cases that cite this headnote

**[22]** **Bankruptcy** 🔑 Settlement, adjustment, or enforcement of claims

In assessing a bankruptcy court's jurisdiction to enjoin a third-party dispute under a plan, the question is not whether the court has jurisdiction over the settlement that incorporates the third-party release, but whether it has jurisdiction over the attempts to enjoin the creditors' unasserted claims against the third party.

1 Case that cites this headnote

**[23]** **Bankruptcy** 🔑 Consent to or Waiver of Objections to Jurisdiction or Venue

**Bankruptcy** 🔑 Settlement, adjustment, or enforcement of claims

3858

A bankruptcy court's order extinguishing a non-core claim and enjoining its prosecution without an adjudication on the merits finally determines that claim and is equivalent to entering a judgment dismissing the claim and bars the claim under principles of former adjudication; therefore, Congress may not allow a bankruptcy court to enter such an order absent the parties' consent.

[24]   **Bankruptcy** 🔑 Bankruptcy Jurisdiction

Bankruptcy court is creature of statute.

[25]   **Bankruptcy** 🔑 Jurisdiction over property

Bankruptcy court's subject matter jurisdiction is in rem and is limited to res of estate.

[26]   **Bankruptcy** 🔑 Core, Non-Core, or Related Proceedings in General;  Nexus

A proceeding "arises under" title 11, for jurisdictional purposes, if the claims invoke substantive rights created by that title. 28 U.S.C.A. § 1334(b).

[27]   **Bankruptcy** 🔑 Core, Non-Core, or Related Proceedings in General;  Nexus

A proceeding "arises in" a title 11 case, for jurisdictional purposes, if, for example, parties, by their conduct, submit themselves to the bankruptcy court's jurisdiction by litigating proofs of claim without contesting personal jurisdiction. 28 U.S.C.A. § 1334(b).

[28]   **Bankruptcy** 🔑 Related proceedings

A proceeding is "related to" a title 11 proceeding, for jurisdictional purposes, if its outcome might have any conceivable effect on the bankrupt estate. 28 U.S.C.A. § 1334(b).

1 Case that cites this headnote

[29]   **Bankruptcy** 🔑 Issues between non-debtors

Release of most third-party claims against non-debtor touches outer limit of bankruptcy court's jurisdiction. 28 U.S.C.A. § 1334(b).

1 Case that cites this headnote

[30]   **Bankruptcy** 🔑 Related proceedings

Standard for bankruptcy court's jurisdiction is not that action's outcome will certainly have, or even that it is likely to have, an effect on res of estate; rather, it is whether it might have any conceivable impact on estate. 28 U.S.C.A. § 1334(b).

1 Case that cites this headnote

[31]   **Bankruptcy** 🔑 Related proceedings

3859

The only question a bankruptcy court need ask in determining whether it can exercise "related to" jurisdiction is whether the action's outcome might have any conceivable effect on the bankrupt estate; if the answer to that question is yes, then related to jurisdiction exists, no matter how implausible it is that the action's outcome actually will have an effect on the estate. 28 U.S.C.A. § 1334(b).

1 Case that cites this headnote

[32]    **Bankruptcy**  👉 Particular proceedings or issues

Under governing broad standard, the Bankruptcy Court had "related to" subject matter jurisdiction to approve, as part of proposed plan of reorganization, a release of non-derivative third-party claims against non-debtor family members who owned Chapter 11 debtors; civil proceedings asserted against non-debtor family members might have had conceivable impact on the rest of the estate, as pursuit of such claims threatened to unravel plan's intricate settlements, to alter liabilities of the estate, and to change amount available for distribution to other creditors, all claims in case had high degree of interconnectedness with lawsuits against debtors and against family members, and it was likely that debtors' litigation of their indemnification, contribution, and/or insurance obligations to family members who had served as their directors, officers, or managers would burden estate assets. 28 U.S.C.A. § 1334(b).

[33]    **Insurance**  👉 Public policy limitations in general

**Insurance**  👉 Defense Costs, Supplementary Payments and Related Expenses

**Insurance**  👉 Scope of Duty

California law specifically prohibits indemnity or insurance coverage for losses resulting from a violation of its false advertising law or unfair competition law, and under that law an insurer has no duty to defend or advance costs. Cal. Ins. Code § 533.5.

[34]    **Bankruptcy**  👉 Equitable powers and principles

**Bankruptcy**  👉 Carrying out provisions of Code

**Bankruptcy**  👉 Settlement, adjustment, or enforcement of claims

Bankruptcy Code does not authorize a bankruptcy court to order the non-consensual release of non-derivative third-party claims against non-debtors in connection with confirmation of a Chapter 11 plan; sole section of Code expressly authorizing court to enjoin third-party claims against non-debtors without consent of third parties is limited to asbestos cases, neither section of Code authorizing court to enter any "necessary or appropriate" order to carry out provisions of Code nor subsections authorizing a plan to provide adequate means for its implementation or providing that a plan may include "any other appropriate provision" not inconsistent with applicable provisions of Code, whether read individually or together, provide court with such authority, there is no such thing as "equitable authority" or "residual authority" in a bankruptcy court untethered to some specific, substantive grant of authority in Code, and any congressional silence on matter could not be deemed consent. 11 U.S.C.A. §§ 105(a), 524(e), 524(g), 1123(a)(5), 1123(b)(6).

4 Cases that cite this headnote

[35]    **Bankruptcy**  👉 Rights of Action;  Contract Rights Generally

**Bankruptcy**  👉 Claims allowable;  what constitutes "claim."

"Derivative" claims are those that seek to recover from the bankruptcy estate indirectly on the basis of the debtor's conduct, as opposed to a non-debtor's own conduct.

**[36]**     **Bankruptcy** 🔑 Rights of Action;  Contract Rights Generally

Derivative claims in every sense relate to adjustment of debtor-creditor relationship, because they are claims that relate to injury to corporation itself; if creditor's claim is one that bankruptcy trustee could bring on behalf of estate, then it is "derivative."

**[37]**     **Bankruptcy** 🔑 Claims allowable;  what constitutes "claim."

In the bankruptcy context, "direct" claims are based upon a "particularized" injury to a third party that can be directly traced to a non-debtor's conduct.

**[38]**     **Bankruptcy** 🔑 Rights of Action;  Contract Rights Generally

Claims asserted by states against non-debtor family members who had served as Chapter 11 debtors' officers, directors, or managers, based on family members' alleged violation of state laws under which individuals who serve in certain capacities in a corporation are individually and personally liable for their personal participation in certain unfair trade practices, were not derivative; claims arose out of out of a separate and independent duty that was imposed by statute on individuals who, by virtue of their positions, were alleged to have personally participated in acts of corporate fraud, misrepresentation, and/or willful misconduct.

**[39]**     **Statutes** 🔑 Language

When assessing statutory authority, courts should turn first to the text of the statute.

**[40]**     **Bankruptcy** 🔑 Injunction or stay of other proceedings

Bankruptcy Code expressly authorizes a bankruptcy court to enjoin third-party claims against non-debtors without the consent of those third parties solely and exclusively in cases involving injuries arising from the manufacture and sale of asbestos, and such injunctions cannot be entered in favor of just any non-debtor, but are limited to enjoin actions against a specific set of non-debtors, namely, those who have a particular relationship to the debtor, including owners, managers, officers, directors, employees, insurers, and financiers. 11 U.S.C.A. §§ 524(g), 524(g)(4)(A).

    1 Case that cites this headnote

**[41]**     **Bankruptcy** 🔑 Exemptions

Bankruptcy Code explicitly exempts certain debtor assets from the bankruptcy estate and provides a finite number of exceptions and limitations to those asset exemptions; courts are not authorized to create additional exceptions. 11 U.S.C.A. § 522.

**[42]**     **Bankruptcy** 🔑 Preservation of priority

In Chapter 11 bankruptcies, a plan that does not follow normal priority rules cannot be confirmed over the objection of an impaired class of creditors. 11 U.S.C.A. § 1129(b).

**[43]**    **Bankruptcy** 👈 Effect;  proceedings in converted case

In a "structured dismissal," the debtor obtains an order that simultaneously dismisses its Chapter 11 case and provides for the administration and distribution of its remaining assets.

**[44]**    **Bankruptcy** 👈 Carrying out provisions of Code

Equitable power conferred on the bankruptcy court by the section of the Bankruptcy Code authorizing a court to enter any "necessary or appropriate" order to carry out the provisions of title 11 is the power to exercise equity in carrying out the provisions of the Code, rather than to further the purposes of the Code generally, or otherwise to do the right thing. 11 U.S.C.A. § 105(a).

**[45]**    **Bankruptcy** 👈 Contents in general

Subsection of Bankruptcy Code providing that Chapter 11 plan may include "any other appropriate provision" not inconsistent with applicable provisions of Code does not confer substantive authority on the bankruptcy court. 11 U.S.C.A. § 1123(b)(6).

**[46]**    **Bankruptcy** 👈 Fraud

Congress intended that the Bankruptcy Code ensure that all debts arising out of fraud are excepted from discharge no matter what their form. 11 U.S.C.A. § 523(a)(2), (4), (6).

**[47]**    **Bankruptcy** 👈 Fines, penalties, and forfeitures;  punitive damages, and interest

Civil penalties payable to and for the benefit of governmental units are not dischargeable in bankruptcy. 11 U.S.C.A. § 523(a)(7).

**[48]**    **Bankruptcy** 👈 Effect as to co-debtors, guarantors, and sureties

Under the Bankruptcy Code, releasing a debtor on a debt owed to a creditor does not affect the liability that a non-debtor may have for the same debt. 11 U.S.C.A. § 524(e).

**[49]**    **Bankruptcy** 👈 Means of implementation

Section of the Bankruptcy Code providing that a plan of reorganization must provide adequate means for its implementation contains a laundry list of things that a Chapter 11 plan can include in order to make sure that resources are available to implement the plan, any of which can be ordered by a bankruptcy court. 11 U.S.C.A. § 1123(a)(5).

**[50]**    **Bankruptcy** 👈 Means of implementation

Under the section of the Bankruptcy Code providing that a plan of reorganization must provide adequate means for its implementation, it is the debtor's resources, not the resources of some third party, that are supposed to be used to implement a plan that will adjust the debtor's relations with its creditors. 11 U.S.C.A. § 1123(a)(5).

**[51]** **Bankruptcy** 🔑 Means of implementation

Section of the Bankruptcy Code providing that a plan of reorganization must provide adequate means for its implementation does not confer any special power on the bankruptcy court. 11 U.S.C.A. § 1123(a)(5).

**[52]** **Bankruptcy** 🔑 Means of implementation

Section of the Bankruptcy Code providing that a plan of reorganization must provide adequate means for its implementation does not authorize a court to give its imprimatur to something the Code does not otherwise authorize, simply because doing so would ensure funding for a plan. 11 U.S.C.A. § 1123(a)(5).

**[53]** **Bankruptcy** 🔑 Means of implementation

Under the section of the Bankruptcy Code providing that a plan of reorganization must provide adequate means for its implementation, the mere fact that money is being used to fund implementation of the plan does not give a bankruptcy court statutory authority to enter an otherwise impermissible order in order to obtain that funding. 11 U.S.C.A. § 1123(a)(5).

**[54]** **Bankruptcy** 🔑 Carrying out provisions of Code

**Bankruptcy** 🔑 Construction, execution, and performance

Section of the Bankruptcy Code providing that a bankruptcy court shall confirm a Chapter 11 plan only if the plan complies with applicable provisions of title 11 confers no substantive right that could be used to undergird an injunction under the section of the Code authorizing the court to enter any "necessary or appropriate" order to carry out the provisions of title 11. 11 U.S.C.A. §§ 105(a), 1129(a)(1).

**[55]** **Bankruptcy** 🔑 Construction and Operation

Bankruptcy Code provides comprehensive federal system to govern orderly conduct of debtors' affairs and creditors' rights.

**[56]** **Bankruptcy** 🔑 Purpose

Bankruptcy Code was intended to free the debtor of personal obligations while ensuring that no one else reaps a similar benefit.

**[57]** **Statutes** 🔑 General and specific terms and provisions; ejusdem generis

**Statutes** 🔑 General and specific statutes

It is a commonplace of statutory construction that the specific governs the general.

**[58]** **Bankruptcy** 🔑 Construction and Operation

The "general/specific canon" of statutory interpretation applies with particular force in bankruptcy, where Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions.

3863

**[59]**   **Bankruptcy** 🔑 Power and Authority

Any "residual authority" of a bankruptcy court, if it even exists, cannot be exercised in contravention of specific provisions of the Bankruptcy Code.

**[60]**   **Bankruptcy** 🔑 Issues between non-debtors

"Special remedial scheme" contemplated by the Bankruptcy Code addresses the rights of persons who have claims against a debtor in bankruptcy, not claims against other non-debtors.

**[61]**   **Bankruptcy** 🔑 Determination

Bankruptcy Code lays out a claims allowance process so that creditors can file their claims against someone who has invoked the protection of the Code; it provides a mechanism for those parties to litigate those claims against the debtor and to determine their value.

**[62]**   **Bankruptcy** 🔑 Effect of Bankruptcy Relief;  Injunction and Stay

In order to take advantage of the "special remedial scheme" set forth in the Bankruptcy Code, debtors have to declare bankruptcy, disclose their assets, and apply them, that is, all of them, with de minimis exceptions, to the resolution of the claims of their creditors.

**[63]**   **Bankruptcy** 🔑 Issues between non-debtors

Just as a bankruptcy court's ability to provide finality to a third party is defined by its jurisdiction, not its good intentions, so too its power to grant relief to a non-debtor from non-derivative third-party claims can only be exercised within confines of Bankruptcy Code.

**[64]**   **Bankruptcy** 🔑 Classification of claims

Classification and treatment of the claims of Canadian claimants vis-a-vis those of their domestic unsecured creditor "counterparts" by Chapter 11 plan of debtors, a privately-held pharmaceutical company and affiliated entities, did not violate the Bankruptcy Code; under the plan, Canadian claimants belonged to a different class, general unsecured creditors, than their domestic unsecured creditor "counterparts," which were placed in classes as "non-federal domestic governmental" claimants and "tribe" claimants, respectively, for legitimate reasons, given, inter alia, that Canadian claimants operated under different regulatory regimes with regard to opioids and abatement than their domestic counterparts and that the bulk of their legal claims arose in Canada, and there was no argument that the separate classification was done to disenfranchise a group, to engineer an assenting impaired class, or to manipulate class voting. 11 U.S.C.A. §§ 1129(a)(4), 1129(b)(1).

**[65]**   **Bankruptcy** 🔑 Classification of claims

Bankruptcy Code does not require that all creditor classes be treated equally, only that there be a reasonable basis for any differentiation. 11 U.S.C.A. §§ 1129, 1129(a)(4).

**[66]**   **Bankruptcy** 🔑 Classification of claims

3864

Bankruptcy Code expressly permits differentiation between classes of creditors.

[67]    **Bankruptcy** 🔑 Equality of treatment within classes

Bankruptcy Code's "equal-treatment mandate" with respect to a Chapter 11 plan's treatment of creditors applies only to claims of all creditors within the same class. 11 U.S.C.A. § 1129(a)(4).

[68]    **Bankruptcy** 🔑 Classification of claims

It does not matter that certain creditors' claims are purportedly "indistinguishable" from those held by other creditors; a Chapter 11 plan may separately classify similar claims so long as the classification scheme has a reasonable basis for doing so. 11 U.S.C.A. § 1129.

[69]    **Bankruptcy** 🔑 Classification of claims

In evaluating a Chapter 11 plan's separate classification of creditors, the court must carefully scrutinize whether such classification was done for the purpose of disenfranchising a particular group in a manner inconsistent with the Bankruptcy Code, to engineer an assenting impaired class, or manipulate class voting. 11 U.S.C.A. § 1129.

[70]    **Bankruptcy** 🔑 Fairness and Equity; "Cram Down."

Under the Bankruptcy Code, only creditors of a dissenting class can object to the confirmation of a Chapter 11 plan on the grounds that the plan discriminates against their creditor class. 11 U.S.C.A. § 1129(b)(1).

**Attorneys and Law Firms**

**\*34** Timothy E. Graulich, Marshall Scott Huebner, Benjamin S. Kaminetzky, Christopher Scott Robertson, Eli James Vonnegut, Davis Polk & Wardwell LLP, New York, NY, for In re: Purdue Pharma, L.P.

**DECISION AND ORDER ON APPEAL**

McMahon, J.:

This is an appeal from an order of the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court") (Drain, B.J.), announced from the bench on September 1, 2021, and filed on September 17, 2021, confirming the Plan of Reorganization proposed by Debtors Purdue Pharma L.P. ("Purdue Pharma") and certain associated companies[1] (the "Confirmation Order"). Appeal is also taken from two merged and related orders of the Bankruptcy Court: the June 3, 2021, order approving Purdue's disclosure statement and solicitation materials (the "Disclosure Order") and the September 15, 2021, order authorizing the implementation of certain preliminary aspects of the Plan (the "Advance Order").

[1]    Purdue Pharma Inc. ("PPI"), Purdue Transdermal Technologies L.P., Purdue Pharma Manufacturing L.P., Purdue Pharmaceuticals L.P., Imbrium Therapeutics L.P., Adlon Therapeutics L.P., Greenfield BioVentures L.P., Seven Seas Hill Corp., Ophir Green Corp., Purdue Pharma of Puerto Rico, Avrio Health L.P., Purdue Pharmaceutical Products L.P., Purdue Neuroscience Company, Nayatt

3865

Cove Lifescience Inc., Button Land L.P., Rhodes Associates L.P., Paul Land Inc., Quidnick Land L.P., Rhodes Pharmaceuticals L.P., Rhodes Technologies, UDF LP, SVC Pharma LP, and SVC Pharma Inc. (together, the "Debtors" or "Purdue").

Purdue's bankruptcy was occasioned by a health crisis that was, in significant part, of its own making: an explosion of opioid addiction in the United States over the past two decades, which can be traced largely to the over-prescription of highly addictive medications, including, specifically and principally, Purdue's proprietary, OxyContin.

Despite a 2007 Plea Agreement with the United States – in which Purdue admitted that it had falsely marketed OxyContin as non-addictive and had submitted false claims to the federal government for reimbursement of medically unnecessary opioid prescriptions ("2007 Plea Agreement") – Purdue's profits after 2007 were driven almost exclusively by its aggressive marketing of OxyContin. (*See* JX-2094.0047-88; JX-2481). But by 2019, Purdue was facing thousands of lawsuits brought by persons who had become addicted to OxyContin and by the estates of addicts who had overdosed – either on OxyContin itself or on the street drugs (heroin, fentanyl) for which Purdue's product served as a feeder. It also faced new federal, state and local Medicare reimbursement claims and a number of new false marketing claims brought under various state consumer protection **\*35** laws. Finally, in November 2020, Purdue pled guilty to a criminal Information filed by the Department of Justice ("DOJ") in the United States District Court for the District of New Jersey; in its plea agreement, the company (though not the people through whom the company acted) admitted to substantial deliberate wrongful conduct ("2020 Plea Agreement"). *See USA v. Purdue Pharma L.P.*, No. 2:20-cr-01028.

Engulfed in a veritable tsunami of litigation, Purdue filed for chapter 11 bankruptcy in September 2019. The intent was for a "*Manville*-style" bankruptcy that would resolve both existing and future claims against the company arising from the prescription of OxyContin. The automatic stay brought a stop to civil litigation against Purdue; and a court-ordered stay halted litigation against certain non-debtors affiliated with the company – principally members of the Sackler family (the "Sacklers" or "Sackler family"),[2] which had long owned the privately-held company – to buy time to craft a resolution. For two years, committees of various classes of creditors – individuals, state and local governments, indigenous North American tribes, even representatives of unborn children who were destined to suffer from opioid addiction – negotiated with Purdue and the Sacklers under the watchful eye of the experienced Bankruptcy Judge, with the assistance of two of this country's finest and most experienced mediators (Layn Phillips and Kenneth Feinberg), as well as a second Bankruptcy Judge (The Hon. Shelley Chapman).

[2]    The Sacklers or Sackler family in this opinion means the Mortimer D. Sackler Family (also known as "Side A" of the Sackler family) and the Raymond R. Sackler Family (also known as "Side B" of the Sackler family).

 **[1]**    Eventually, the parties crafted a plan of reorganization for Purdue that would, if implemented, afford billions of dollars for the resolution of both private and public claims, while funding opioid relief and education programs that could provide tremendous benefit to the consuming public at large (the "Plan").[3] That Plan was approved by supermajority of the votes cast by the members of each class of creditors.[4] It was confirmed by Judge Drain, who had invested so much of himself in the effort to find a workable solution to a seemingly intractable problem.

[3]    The Plan refers to confirmed chapter 11 bankruptcy plan of reorganization at Bankruptcy Docket Number 3726. (*See* Dkt. No. 91-3, at App.1070-1227).

[4]    It is true that many members of some creditor classes did not cast a vote, but the law provides that a plan must be approved, not by a supermajority of all eligible voters, but by a supermajority of all actual voters. 11 U.S.C. § 1126. That being so, there is no merit to Appellants' argument that the court should not deem the Plan approved by a supermajority of the affected creditor classes.

 **[2]**    But not everyone voted yes. Eight states and the District of Columbia ("D.C."), as well as certain Canadian municipalities and Canadian indigenous tribes, the City of Seattle (alone among all voting municipalities in the United States), as well as some 2,683 individual personal injury claimants, voted against the adoption of the Plan. The same states, municipalities and tribes, together with three of those individual claimants (representing themselves), filed formal objections to the Plan and have

3866

appealed from its confirmation.[5] The United States Trustee (the "U.S. Trustee") in Bankruptcy[6] and the U.S.  **\*36**  Attorney's Office for this District on behalf of the United States of America join in their objections.

[5]     While the City of Seattle objected to the Plan before the Bankruptcy Court, it did not appeal.

[6]     The U.S. Trustee "is a DOJ official appointed by the Attorney General to supervise the administration of bankruptcy cases" and has standing under 11 U.S.C. § 307 to appear in bankruptcy cases and "comment on proposed disclosure statements and chapter 11 plans." (Dkt. No. 91, at 8 (citing 28 U.S.C. §§ 581-589 and 28 U.S.C. § 586(a)(3)(B)).

All Appellants assign the same reason for their opposition: the Plan provides broad releases, not just of derivative, but of particularized or direct claims – including claims predicated on fraud, misrepresentation, and willful misconduct under various state consumer protection statutes – to the members of the Sackler family (none of whom is a debtor in the bankruptcy case) and to their affiliates and related entities. As the opioid crisis continued and worsened in the wake of Purdue's 2007 Plea Agreement, the Sacklers – or at least those members of the family who were actively involved in the day to day management of Purdue[7] – were well aware that they were exposed to personal liability over OxyContin. Concerned about how their personal financial situation might be affected, the family began what one member described as an "aggressive[ ]" program of withdrawing money from Purdue almost as soon as the ink was dry on the 2007 papers. The Sacklers upstreaming some $10.4 billion out of the company between 2008 and 2017, which, according to their own expert, substantially reduced Purdue's "solvency cushion." Over half of that money was either invested in offshore companies owned by the Sacklers or deposited into spendthrift trusts that could not be reached in bankruptcy and off-shore entities located in places like the Bailiwick of Jersey.

[7]     Ilene Sackler Lefcourt, Kathe Sackler, Mortimer D.A. Sackler, Theresa Sackler, Richard Sackler, Jonathan Sackler, and David Sackler were at some or all relevant times directors of Purdue and its related enterprises. Mortimer D. Sackler and Raymond Sackler had management roles at the company as co-chief executive officers; Richard Sackler also served as president; and Mortimer D.A. Sackler, Ilene Sackler Lefcourt, and Kathe Sackler held officer roles as vice presidents. Mariana Sackler worked at Purdue in research and development.

When the family fortune was secure, the Sackler family members withdrew from Purdue's Board and management. Bankruptcy discussions commenced the following year. As part of those pre-filing discussions, the Sacklers offered to contribute toward a settlement, but if – and only if – every member of the family could "achieve global peace" from all civil (not criminal) litigation, including litigation by Purdue to claw back the money that had been taken out of the corporation. The Plan confirmed by the Bankruptcy Court extinguishes all civil claims against the Sacklers that relate in any way to the operations of Purdue – including claims on which certain members of the Sackler family could be held personally liable to entities other than Purdue (principally the various states). These claims could not be released if the Sacklers were themselves debtors in bankruptcy.

Appellants attack the legality of the Plan's non-consensual release of third-party claims against non-debtors on a number of grounds. They argue that the release (referred to in this opinion as the "Section 10.7 Shareholder Release") is both constitutionally defective and not statutorily authorized; that the Bankruptcy Court lacks constitutional authority and subject matter jurisdiction to approve the release or to carry out certain "gatekeeping" aspects of the Plan that relate to it; and that granting a release to the non-debtor Sacklers is unwarranted as a matter of fact and would constitute an abuse of the bankruptcy process.

 **\*37**  Debtors and those who voted in favor of the Plan – buttressed by Judge Drain's comprehensive Confirmation Order – argue that the Bankruptcy Court had undoubted jurisdiction to impose these broad third-party releases; insist that they are a necessary feature of the Plan; point out the tremendous public benefit that will be realized by implementing the Plan's many forward-looking provisions; and urge that the alternative – Purdue's liquidation – will inevitably yield far less benefit to all creditors and victims, in light of the cost and extraordinary hurdles that would have to be surmounted in order to claw back the billions of dollars that the Sacklers have taken out of Purdue.

3867

Two of the questions raised by appellants are easily answered. The Bankruptcy Court had undoubted subject matter jurisdiction to enter the challenged releases. And while it may have lacked constitutional authority to give them final approval under the rule of *Stern v. Marshall*, 564 U.S. 462 (2011), that matters little in the great scheme of things; it changes the level of deference this court should give to Judge Drain's findings of fact, but those findings are essentially unchallenged.

The great unsettled question in this case is whether the Bankruptcy Court – or any court – is statutorily authorized to grant such releases. This issue has split the federal Circuits for decades. While the Circuits that say no are united in their reasoning, the Circuits that say yes offer various justifications for their conclusions. And – crucially for this case – although the Second Circuit identified the question as open back in 2005, it has not yet had occasion to analyze the issue. Its only guidance to the lower courts, uttered in that 2005 opinion, is this: because statutory authority is questionable and such releases can be abused, they should be granted sparingly and only in "unique" cases.

This will no longer do. Either statutory authority exists or it does not. There is no principled basis for acting on questionable authority in "rare" or "unique" cases, especially as the United States Supreme Court has recently held that there is no "rare case" rule in bankruptcy that allows a court to trump the Bankruptcy Code. *See Czyzewski v. Jevic Holding Corp.,* ––– U.S. ––––, 137 S. Ct. 973, 986, 197 L.Ed.2d 398 (2017).

 **[3]**    Moreover, the lower courts desperately need a clear answer. As one of my colleagues on the Bankruptcy Court recently noted, plans releasing non-debtors from third party claims are no rarity: "Unfortunately, in actual practice the parties ... often seek to impose involuntary releases based solely on the contention that anybody who makes a contribution to the case has earned a third-party release. *Almost every proposed Chapter 11 Plan that I receive includes proposed releases*." *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 726 (S.D.N.Y. 2019) (Wiles, B.J.) (emphasis added). When every case is unique, none is unique. Given the frequency with which this issue arises, the time has come for a comprehensive analysis of whether authority for such releases can be found in the Bankruptcy Code – that "comprehensive scheme" devised by Congress for resolving debtor-creditor relations. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645, 132 S.Ct. 2065, 182 L.Ed.2d 967 (2012).

Aided by superb briefing and argument on both sides of the question, and by extended ruminations on the subject by several esteemed bankruptcy judges of our own District – Judge Drain not the least – this Court concludes that the Bankruptcy Code does not authorize such non-consensual non-debtor releases: not in its express  **\*38**  text (which is conceded); not in its silence (which is disputed); and not in any section or sections of the Bankruptcy Code that, read singly or together, purport to confer generalized or "residual" powers on a court sitting in bankruptcy. For that reason, the Confirmation Order (and the Advance Order that flows from it) must be vacated.

Because I conclude that the Bankruptcy Court lacked statutory authority to impose the Section 10.7 Shareholder Release, I need not and do not reach the constitutional questions that have been raised by the parties. Nor do I need to decide whether this is a case in which such releases should be imposed if my statutory analysis is incorrect. Those issues may need to be addressed some day, but they do not need to be addressed in order to dispose of this appeal.

This opinion will not be the last word on the subject, nor should it be. This issue has hovered over bankruptcy law for thirty-five years – ever since Congress added §§ 524(g) and (h) to the Bankruptcy Code. It must be put to rest sometime; at least in this Circuit, it should be put to rest now.

PARTIES[8]

[8]    In this decision, docket numbers abbreviated "Dkt. No." refer to the consolidated docketed appeals at 7:21-cv-7532; docket numbers abbreviated "Bankr. Dkt. No." refer to the underlying bankruptcy docket at 19-23649.

3868

The Appellants in this case are the U.S. Trustee William K. Harrington; the States of California, Connecticut, Delaware, Maryland, Oregon, Rhode Island, Vermont, Washington, and D.C. (together, the "State Appellants"); the City of Grande Prairie as Representative for a Class Consisting of All Canadian Municipalities, the Cities of Brantford, Grand Prairie, Lethbridge, and Wetaskiwin; the Peter Ballantyne Cree Nation on behalf of All Canadian First Nations and Metis People; the Peter Ballantyne Cree Nation on behalf itself, and the Lac La Ronge Indian Band (together, the "Canadian Appellants"); and *pro se* Appellants Ronald Bass, Marie Ecke, Andrew Ecke, Richard Ecke, and Ellen Isaacs on Behalf of Patrick Ryan Wroblewski (together, the "Pro Se Appellants").

The Appellees are the Purdue Debtors, as well as the Official Committee of Unsecured Creditors of Purdue Pharma L.P., et al. (the "UCC"),[9] the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants ("AHC"),[10] the Ad Hoc Group of Individual Victims of Purdue Pharma, L.P. ("PI Ad Hoc Group"), the Multi-State Governmental Entities Group ("MSGE"), the Mortimer-side Initial Covered Sackler Persons ("Side A"), and the Raymond Sackler Family ("Side B").

[9]    The UCC is also referred to in court filings and the appellate record as the "Creditors' Committee." The Court uses the terminology "UCC" consistent with the language provided in the glossary at Docket Number 115-1.

[10]   The AHC is also referred to in court filings and the appellate record as the "Ad Hoc Committee." The Court uses the terminology "AHC" consistent with the language provided in the glossary at Docket Number 115-1.

The Ad Hoc Committee of NAS Children ("NAS Children") appears as *amicus curiae* and has filed an *amicus* brief. (Dkt. No. 158). The U.S. Attorney's Office for this District also appears on behalf of the United States of America as *amicus curiae* and has filed a statement of interest in this case. (Dkt. No. 94).

## BACKGROUND

The following facts are derived from the appellate record as designated by the parties to this appeal, unless indicated otherwise. (*See* Dkt. Nos. 78-1, 105, 255). The **\*39**  Court judicially notices certain public court records and other matters that are subject to judicial notice. *See* Fed. R. Evid. 201(b)-(d).[11]

[11]   *See Garber v. Legg Mason Inc.*, 347 F. App'x 665, 669 (2d Cir. 2009) ( " '[a] court may take judicial notice, whether requested or not.' ") (quoting Fed. R. Evid. 201(c)); *Hotel Emps. & Rest. Emps. Union, Local 100 of New York, N.Y. & Vicinity, AFL-CIO v. City of NY Dep't of Parks & Recreation*, 311 F.3d 534, 540 n.1 (2d Cir. 2002) ( " 'Judicial notice may be taken at any stage of the proceeding.' ") (quoting Fed. R. Evid. 201(d)); *Schenk v. Citibank/Citigroup/Citicorp*, No. 10-CV-5056 (SAS), 2010 WL 5094360, at \*2 (S.D.N.Y. Dec. 9, 2010) (citing *Anderson v. Rochester–Genesee Reg'l Transp. Auth.*, 337 F.3d 201, 205 n.4 (2d Cir. 2003)) ("Judicial notice may encompass the status of other lawsuits in other courts and the substance of papers filed in those actions"); *Giraldo v. Kessler*, 694 F.3d 161, 163 (2d Cir. 2012) (courts may "take judicial notice of relevant matters of public record.").

### I. Purdue Pharma, L.P.

Purdue – originally known as "Purdue Frederick Company" – was founded by John Purdue Gray and George Frederick Bingham in 1892. The company was sold to brothers Arthur, Mortimer and Raymond Sackler in 1952. (*See* JX-2148; JX-1985, at 33:12-13).

Purdue Pharma, the Debtors' main operating entity, is a Delaware limited partnership headquartered in Stamford, Connecticut. (Dkt. No. 91-4, at App.1244). Purdue Pharma's general partner is Purdue Pharma Inc. ("PPI"), a New York corporation, also headquartered in Stamford, Connecticut. (*Id.*, JX-1221). The board of directors of PPI manages Purdue Pharma (the "Board"). (Dkt. No. 91-4, at App.1250). Purdue Pharma has 22 wholly owned subsidiaries in the United States and the British Virgin Islands. (*Id.* at App.1244).

3869

Purdue Pharma is wholly owned by Pharmaceutical Research Associates, L.P. ("PRA"), a Delaware limited partnership that is not a debtor in this case. (*Id.* at App.1252). PRA is 99.5% owned, in equal parts, by non-debtors Beacon Company ("Beacon"), a Delaware general partnership, and Rosebay Medical Company L.P. ("Rosebay"), a Delaware limited partnership, which are in turn owned by certain trusts established for the benefit of the Sackler Families. (*Id.*). Beacon is the partnership of Side A of the Sackler family; Rosebay is the partnership of Side B of the Sackler family. (*See* JX-1987, at 42:10-23; JX-3298 at 160:8-10).[12]

[12]    In this opinion, unless otherwise specified, where reference is made to the "Sackler entities" this means Rosebay and Beacon, as well as other Sackler family affiliated trusts and entities relevant to this appeal, including those in Exhibit X to the Settlement Agreement, incorporated into the Plan. (*See* Dkt. No. 91-3, at App. 1112, App.1041-1069).

Purdue Pharma operates Purdue's branded prescription pharmaceutical business, which includes both opioid and non-opioid products. (Dkt. No. 91-4, at App.1244). OxyContin is one of Purdue Pharma's three principal branded opioid medications. (*Id.*). The other two are Hysingla and Butrans. (*Id.*). Purdue generated approximately $34 billion in revenue total between 1996-2019, most of which came from OxyContin sales (*See e.g.*, JX-2481); prior to bankruptcy, OxyContin accounted for some 91% of Purdue's U.S. revenue. (*See* JX-1984, at 40:24-41:5; JX-3275, at 338:6-9; JX-0999).

Purdue Pharma manufactures OxyContin for itself and, in limited quantities, for certain foreign independent associated companies ("IAC"), which are ultimately owned by the Sackler family. (Dkt. No. 91-4, at App.1245). Purdue Pharma receives royalties from IACs' sales for OxyContin **\*40**  abroad. (*Id.*). The IACs are not debtors in this case.

Until early 2019, members of the Sackler family served as directors of Purdue; the last Sackler's resignation from the Board became effective in the beginning of that year, although many family members stepped down during 2018.

## II. The Sackler Family

Since Purdue was sold to brothers Arthur, Mortimer and Raymond Sackler in 1952 (*see* JX-1985, at 33:12-13),[13] the company has been closely held and closely run by members of the Sackler family, many of whom took on an active role in the company comparable to that of senior management prior to 2018. *See In re Purdue Pharma L.P.*, No. 19-23649, 2021 WL 4240974, at \*33 (Bankr. S.D.N.Y. Sept. 17, 2021). In large part due to the success of their pharmaceutical business, the Sackler family have long been ranked on Forbes' list of America's Richest Families, becoming one of the top twenty wealthiest families in America in 2015, with a reported net worth of $14 billion dollars. (*See* JX-1985, at 40:24-42:10).

[13]    The Arthur Sackler family sold its interest in Purdue to the other two branches of the family prior to the invention of OxyContin and has no involvement in the company or in this bankruptcy.

Mortimer Sackler's side of the family is known as "Side A," and Raymond Sackler's side is known as "Side B." (Dkt. No. 91-4, at App.1250). From approximately 1993 until 2018, there were always at least six or seven members of the Sackler family on the Board; independent directors never equaled or outnumbered the number of Sackler family directors on the Board. (*See* Confr. Hr'g Tr., Aug. 19, 2021, at 159:17-25, 22:5-9; Dkt. No. 91-4, at App.1345).

In addition to Purdue, certain members of the Sackler family served as directors of an entity called "MNP," later "MNC" ("MNP/MNC"), which operated as an advisory board for IACs worldwide, including for "specific pharmaceutical manufacturer IACs" and "corporations throughout the world that [the Sackler] family owns and that are in the ... pharmaceutical business." (*See* Confr. Hr'g Tr., Aug. 18, 2021, at 31:8-18; Confr. Hr'g Tr., Aug. 19, 2021, at 24:12-23). MNP/MNC's recommendations were typically followed by the IACs. (Confr. Hr'g Tr., Aug. 19, 2021, at 23:9-17).

### A. Side A

Mortimer D. Sackler, who died in 2010, served as the co-chief executive officer of Purdue with his brother Raymond until the end of his life. (JX-3275.0168-69; Dkt. No. 91-5, at App.2089).

Three of his seven children – Ilene Sackler Lefcourt, Kathe Sackler, and Mortimer David Alfons Sackler ("Mortimer D.A. Sackler") – sat on the Board of Purdue for nearly 30 years, until 2018. (Confr. Hr'g Tr., Aug. 19, 2021, at 19:13-20, 158:6-15; JX-3298.0037; Dkt. No. 91-5, at App.2089). They also served as officers of Purdue, with Mortimer D.A. and Ilene holding the title of vice president and Kathe the title of senior vice president. (Confr. Hr'g Tr., Aug. 19, 2021, at 19:21-25, 22:18-23:4, 158:16-21; JX-3298.0075; JX3275.0169).

Mortimer Sackler's wife Theresa Sackler also served on the Board of Purdue from 1993 until 2018, explaining that her "husband asked me to join ... it was a family company and he felt that family members should be on the board." (JX-3275.0034, 36; Dkt. No. 91-4, at App.1345).

All four – Ilene, Kathe, Theresa, and Mortimer D.A. Sackler – served as directors on the board of MNP/MNC for many years. (Confr. Hr'g Tr., Aug. 19,  **\*41**  2021, at 19:21-25, 22:18-23:4, 161:2-11; JX-3298.0080; JX-3275.0059).

### B. Side B

Raymond Sackler, who died in 2017, served as co-chief executive officer of Purdue with his brother Mortimer D. Sackler. (*See* JX-3275.0168-69).

Raymond Sackler's wife and two sons served as Board members of Purdue. (*See* Dkt. No. 91-4, at App.1345). His sons, Jonathan and Richard Sackler, served from 1990 until 2018, and his wife Beverly Sackler from approximately 1993 until 2017. (*See id.*; Confr. Hr'g Tr., Aug. 18, 2021, at 30:6-8).

In addition to his role as director, Richard Sackler also served as president of Purdue from 2000-2003, co-chair of the Board from 2003-2007, and chair of the Board from approximately 2008 until 2010 or 2011. (Confr. Hr'g Tr., Aug. 18, 2021, at 30:6-22, 44:20-21). He served as a director of MNP/MNC until 2018 and has served as director of at least one IAC. (*Id.* at 31:23-32:19).

Richard Sackler's son David Sacker also served on the Board from 2012 until 2018 and as a director of MNP/MNC. (Confr. Hr'g Tr., Aug. 17, 2021, at 43:12-14, 44:6-13).

Finally, Mariana Sackler, Richard Sackler's daughter, held several roles within the "family business" (JX-1991, at 58:19-25), including working as a consultant in the "research and development department" of Purdue on OxyContin projects and a "PR" role at Mundipharma Italy, an IAC, advancing "information around topics about pain in Italy" and "marketing and selling OxyContin" there. (*Id.* at 30:4-18; 32:12-33:3; 58:19-64:25). Marianna has never been an officer or director of Purdue.

## III. OxyContin

OxyContin is a synthetic opioid analgesic – a powerful narcotic substance designed to relieve pain. (*See* JX-2181; JX-2195.0048; JX-2195.0059). Opioid analgesics have been available for several decades to treat moderate to severe pain. (JX-2181; Dkt. No. 91-4, at App.1259). But until the early 1980's they were limited to immediate-release dosage forms. (JX-2181; *see* JX-2199). Immediate-release pain killers are less than ideal because they control pain for only 4-6 hours at a time; by contrast, a controlled-release pain killer can provide relief from serious pain for up to 12 hours at a time. (*See* Dkt. No. 91-4, at App.1259; JX-2181; JX-2199; JX-2185-0010).

In the early 1980's, Purdue developed its first controlled-release morphine drug which it marketed as "MS Contin" (also called "MSContin" and "MS-Contin"). (JX-2181; *see* JX-2199; JX-2180-0030, 0084). MS Contin solved many of the difficulties associated with immediate-release opioids, and it was marketed, largely without abuse, throughout the 1980's and 1990's. (JX-2180-0015, 0078; Dkt. No. 91-4, at App.1262). However, morphine's stigma as an addictive narcotic caused patients and physicians alike to avoid it. (*See* JX-2180-0030).

So Purdue concentrated on the research, development, and testing of a non-morphine drug: its controlled-release semisynthetic opioid analgesic named "OxyContin." (*See* JX-2181; JX-2199; Dkt. No. 91-4, at App.1261-62). In December 1995, the Food and Drug Administration ("FDA") approved OxyContin for use. (*Id.*). OxyContin's formulations were labeled as "extended release" or "time release" doses because the active ingredients continuously enter into a patient's system over time; a single dose could provide relief from serious pain for up to 12 hours. (*See* JX-2181). **\*42** A 2000 *Time* Magazine article explains that OxyContin was quickly "hailed as a miracle" after its introduction in 1995, because "it eases chronic pain because its dissolvable coating allows a measured does of the opiate oxycodone to be released into the bloodstream." (JX-2147).

For years, Purdue contended that OxyContin, due to its "time release" formulation, posed virtually no threat of either abuse or addiction – as opposed to other pain relief drugs, such as Percocet or Vicodin, which are not controlled-release painkillers. *See the Purdue Frederick Company, Inc.*, No. 1:07-cr-00029, Dkt. No. 5-1, at ¶¶20-27 ("Agreed Statement"); (Dkt. No. 91-4, at App.1268-1269). Purdue delivered that message to prescribing physicians and patients alike.

But time-release OxyContin proved to have an efficacy and safety profile similar to that of immediate-release opioid pain relievers. (*See* JX-2195.0027, 48-49, 59). Indeed, in 2001, the FDA required that Purdue remove from its drug label the claim that OxyContin had a very low risk of iatrogenic addiction; Purdue was ordered to add instead the highest level of safety warning that the FDA can place on an approved drug product. (*See* JX-2181; JX-2199; JX-2220).

**IV. Purdue's Deceptive Marketing of OxyContin**

To promote its new product OxyContin, Purdue launched an aggressive marketing campaign. (*See* JX-2153). That campaign was multi-fold, aiming in part to combat concerns about the abuse potential of opioids and to encourage doctors to prescribe OxyContin for more and different types of pain. (*See* Dkt. No. 91-4, at App.1268-1269; Agreed Statement, at ¶20; JX-2181.0002).

Before OxyContin, opioid pain relievers were usually prescribed for cancer patients and patients with chronic diseases whose pain was "undertreated." (*See* JX-2181.0002). But Purdue pushed OxyContin as a treatment for many types of pain patients, including those with "noncancer pain" and other "nonmalignant" pain. (*Id.*; *see id.* at 0023, 0044). Purdue repeatedly published advertisements claiming, for example, that OxyContin can be an effective "first-line therapy for the treatment of arthritis" and safely used for "osteoarthritis pain" (JX-2218) and in many cases "mak[ing] unsubstantiated efficacy claims promoting the use of OxyContin for pain relief," "promoting OxyContin for a much broader range of patients with pain than are appropriate for the drug," "overstat[ing] the safety profile of OxyContin," and repeatedly omitting OxyContin's "abuse liability" (JX-2221) – all of which was contemporaneously documented in FDA warning letters to the company throughout the early 2000's. (*See, e.g.*, JX-2218; JX-2221).

By its marketing campaign, Purdue sought to eliminate concerns regarding "OxyContin's addictive potential." (*See* Agreed Statement, at ¶¶19-20; Dkt. No. 91-4, at App.1268-1269). To do this, Purdue needed to encourage doctors and patients to overcome their reservations about the use of opioids. For this purpose, Purdue created a website called "*In The Face of Pain*," which promoted OxyContin pain treatment and urged patients to "overcome" their "concerns about addiction." *See* Petition, *State of Kansas, ex rel. Derek Schmidt, Attorney General v. Purdue Pharma L.P., et al.*, Case No. 2019-cv-000369, at ¶89 (Shawnee Cnty. Dist. Ct. May 16, 2019). Testimonials on the website were allegedly presented as personal stories of OxyContin patients who had overcome life-long struggles with debilitating pain, although they were allegedly written **\*43** by Purdue consultants who were paid to promote the drug. *Id.*

Purdue also allegedly distributed pamphlets to doctors. *Id.* at ¶33. In one such pamphlet, *Providing Relief, Preventing Abuse: A Reference Guide To Controlled Substance Prescribing Practices*, Purdue wrote that addiction "is not caused by drugs." *Id.* In another, the "Resource Guide for People with Pain," Purdue explained, "Many people living with pain and even some healthcare providers believe that opioid medications are addictive. The truth is that when properly prescribed by a healthcare professional and taken as directed, these medications give relief – not a 'high.' " *Id.* at ¶35.

Purdue's marketing campaign proved successful. OxyContin was widely prescribed; bonuses to Purdue sales representatives for the sale of OxyContin increased from $1 million in 1996 to $40 million by 2001; and by 2001, annual sales of OxyContin reached $1 billion. (JX-2181.0007; JX-2151). By 2001, OxyContin was "the most prescribed brand-name narcotic medication" in the U.S. (JX-2181.0002, 0007).

**V. The Opioid Crisis**

But OxyContin's popularity as a pain reliever coincided with the scourge of widespread abuse of the drug around the country. (*See, e.g.*, JX-2147; JX-2148; JX-2149; JX-2180-0078; JX-2181). Many individuals who had been prescribed OxyContin by their doctors for legitimate pain conditions became addicted to the drug. (*See* JX-2181). And hundreds of thousands of seasoned addicts and novice drug abusers, including teenagers, quickly discovered that crushing an OxyContin tablet and then snorting or injecting it resulted in a quick "morphine-like high." (*See* JX-2148; JX-2149; JX-2183; JX-2195.0059).

By the early 2000's, rates of opioid addiction in connection with OxyContin use were skyrocketing throughout the country. (*See* JX-2147; JX-2148; JX-2149). In the early years, "remote, rural areas" were particularly hard hit, due in part to the fact that these areas are

> home to large populations of disabled and chronically ill people who are in need of pain relief; they're marked by high unemployment and a lack of economic opportunity; they're remote, far from the network of Interstates and metropolises through which heroin and cocaine travel; and they're areas where prescription drugs have been abused—though in much smaller numbers—in the past.

*Foister v. Purdue Pharma, L.P.*, 295 F. Supp. 2d 693, 696 (E.D. Ky. 2003) (quotation and internal citation omitted).

However, the crisis was not limited to one type of community or part of the country. (*See* JX-2147). Pill mills opened in urban areas, as unscrupulous physicians began writing prescriptions for OxyContin to stooge purchasers (often drug addicts themselves), who were recruited to obtain and fill prescriptions, turning over the pills to drug dealers, who resold them on the street, making astronomical profits. (*See* JX-2175; JX-2176). This Court presided over the criminal trial of a doctor who ran such a pill mill in Hamilton Heights on the Upper West Side of Manhattan, through which he garnered millions of dollars in ill-gotten gains at the expense of desperate people who were addicted to OxyContin. *See United States v. Mirilashvili*, No. 14-cr-0810 (CM), Dkt. No. 1 (S.D.N.Y. Dec. 9, 2014).

Prosecutions like the one of Dr. Mirilashvili, coupled with enhanced regulatory oversight over both prescribers of opioids and pharmacies that had filled suspiciously high numbers of prescriptions, reduced the number of illicit prescriptions of OxyContin. **\*44** But drying up the source. did not end the problem of addiction. Individuals who had been feeding an OxyContin habit turned to alternative sources to get their fix – including street drugs like heroin and its even stronger and more lethal cousin, fentanyl, which is fast acting and 100 times more potent than morphine. (*See* JX-2195.0050-52). The recent increase in overdose deaths in this country is driven in significant part by the increasingly widespread use of fentanyl. (*See* Dkt. No. 91-4, at App.1271).

In 2017, the U.S. Department of Health and Human Services ("DHHS") declared the opioid epidemic to be a national public health emergency.[14] According to the Centers for Disease Control and Prevention, from 1999 to 2019, nearly 247,000 people died in the United States from overdoses involving prescription opioids.[15] DHHS estimates the "economic burden" of prescription opioid misuse in the United States is between $53-72 billion a year, including medical costs, lost work productivity, addiction treatment, and criminal justice costs.[16]

---

[14]   *HHS Acting Secretary Declares Public Health Emergency to Address National Opioid Crisis*, DHHS (Oct. 26, 2017), https://www.hhs.gov/about/news/2017/10/26/hhs-acting-secretary-declares-public-health-emergency-address-national-opioid-crisis.html.

[15]    *Drug Overdose: Overview*, Centers for Disease Control and Prevention (Mar. 17, 2021), https://www.cdc.gov/drugoverdose/deaths/prescription/overview.html.

[16]    DHHS, "Addressing Prescription Drug Abuse in the United States," *available at* https://www.cdc.gov/drugoverdose/pdf/hhs_prescription_drug_abuse_report_09.2013.pdf.

Today, it is estimated that between 21-29% of patients who are prescribed opioids for chronic pain misuse them.[17] Between 8-12% of people who are using an opioid for chronic pain develop an opioid use disorder. *Id*. An estimated 4-6% of those who misuse prescription opioids transition to using heroin. *Id*. About 80% of people who use heroin first misused prescription opioids. *Id*. OxyContin, it seems, is the ultimate "gateway" drug.

[17]    *Opioid Overdose Crisis*, National Institute on Drug Abuse (Mar. 11, 2021), https://www.drugabuse.gov/drug-topics/opioids/opioid-overdose-crisis.

## VI. Pre-Bankruptcy Litigation Involving Purdue and Members of the Sackler Family

With the swelling opioid crisis, Purdue began to face inquiries about and investigations into OxyContin.

In 2000, the U.S. Attorney of Maine alerted the company to widespread abuse of the drug in rural Maine. (*See* JX-2151; JX-2180-0078; JX-2181). In 2001, the Attorney General of Virginia Mark Earley requested a meeting with company officials regarding widespread abuse of the drug in Virginia. (*See* JX-2151). By 2002, the then-Purdue spokesman Tim Bannon confirmed that there were federal investigations into Purdue's marketing of OxyContin. (*Id.*).

Two decades of litigation, both civil and criminal, ensued.

### A. The First Round of Lawsuit: 2001-2007

By 2001, plaintiffs across the country had begun to file individual and class actions against Purdue in state and federal courts, including in the U.S. District Court for the Southern District of New York and in the Supreme Court of the State of New York. (*See e.g.*, JX-2181; Dkt. No. 91-5, at App.2037-2038).[18] Members of the Sackler **\*45** family were not named as defendants in these lawsuits. (*See* Dkt. No. 91-5, at App.2040).

[18]    *See Hurtado, et al. v. The Purdue Pharma Co.*, No. 12648/03 (Richmond Cnty., filed 2003); *Sara v. The Purdue Pharma Co.*, No. 13699/03 (Richmond Cnty., filed 2003); *Serafin v. Purdue Pharma, L.P.*, No. 103031/04 (New York Cnty., filed 2004); *Washington v. Purdue Pharma L.P.*, No. 107841/04 (New York Cnty., filed 2004); *Machey v. The Purdue Pharma Co.*, No. 1:04-cv-02098 (S.D.N.Y., filed 2004); *Pratt v. The Purdue Pharma Co.,* No. 1:04-cv-02100 (S.D.N.Y., filed 2004); *Wilson v. The Purdue Pharma Co.*, No. 1:04-cv-02103 (S.D.N.Y., filed 2004); *Ruth v. The Purdue Pharma Co.*, No. 1:04-cv-02101 (S.D.N.Y., filed 2004); *Terry v. The Purdue Pharma Co.*, No. 1:04-cv-02102 (S.D.N.Y., filed 2004); *Foister v. Purdue Pharma L.P.*, No. 6:01-cv-00268 (E.D. Ky., removed 2001); *Gevedon v. Purdue Pharma*, No. 7:02-cv-00008 (E.D. Ky., removed 2002); *Campbell v. Purdue Pharma, L.P.*, No. 1:02-cv-00163 TCM (ED Mo. removed 2002); *Howland et al. v. Purdue Pharma, L.P. et al.*, No. CV01 07 1651 (Butler Cnty. Ohio, filed 2001); *see also In re OxyContin Products Liability Litigation*, 268 F.Supp.2d 1380, 1380 (J.P.M.L 2003) (stating 20 actions then pending in five federal districts in South Carolina, Mississippi, Alabama, and Louisiana).

Plaintiffs in early cases plead a variety of theories of liability pursuant to which Purdue could be held liable as a result of its development, testing, manufacturing, distributing and marketing of OxyContin, including: negligence, strict product liability, failure to warn, breach of express and/or implied warranty, violation of state consumer protection statutes, conspiracy, fraud, and unjust enrichment. *See e.g.*, *Wethington v. Purdue Pharma LP*, 218 F.R.D. 577, 581 n. 1 (S.D. Ohio 2003).

Many of the early cases filed were class actions that sought certification of classes of people who had been prescribed OxyContin and suffered harm as a result. *See e.g.*, *Hurtado v. Purdue Pharma Co.*, No. 12648/03, 6 Misc.3d 1015A, 800 N.Y.S.2d 347, 2005 WL 192351, at \*\*9-14 (Sup. Ct. Richmond Cnty. Jan. 24, 2005) (discussing cases). But given the stringent requirements for class certification, class certification motions in these cases were often denied. For example, in *Foister v. Purdue Pharma*

3874

In re Purdue Pharma, L.P., 635 B.R. 26 (2021)

*L.P.*, plaintiffs in the Eastern District of Kentucky sought unsuccessfully to certify class of "all persons who have been harmed due to the addictive nature of OxyContin." No. Civ.A. 01-268-DCR, 2002 WL 1008608, at *1 (E.D. Ky. Feb. 26, 2002); *see also Gevedon v. Purdue Pharma*, 212 F.R.D. 333, 336 (E.D. Ky. Oct. 17, 2002) (denying class certification); *Campbell v. Purdue Pharma, L.P.*, No. 1:02 CV 00163 TCM, 2004 WL 5840206, at *1 (ED Mo. June 25, 2004) (denying class certification). Class certification was generally deemed inappropriate because courts concluded that individual questions predominated ("addiction to the drug is an individualized question of fact"), thus precluding a finding of commonality. *See Howland et al. v. Purdue Pharma, L.P. et al.*, 104 Ohio St.3d 584, 821 N.E.2d 141, 146-147 (Oh. Sup. Ct. Dec. 15, 2004). When such motions were granted, the decisions were often reversed. *See id.*

Absent class certification, the sheer number of individual cases that were filed meant that cases had to be sent to judicial coordinating panels. In New York, for example, five state cases were transferred to the New York Litigation Coordinating Panel in 2005 – after which 1,117 additional lawsuits were filed and coordinated. *See Hurtado*, 2005 WL 192351, at *15, 6 Misc.3d 1015(A), 800 N.Y.S.2d 347; *Matter of OxyContin*, 15 Misc.3d 388, 390, 833 N.Y.S.2d 357 (Sup. Ct. Richmond Cnty. 2007). Within these coordinated cases, after much discovery, settlements were pursued. *See e.g.*, *Matter of OxyContin II*, 23 Misc.3d 974, 975, 881 N.Y.S.2d 812 (Sup. Ct. Richmond Cnty. 2009) (discussing efforts in 2006-2007 to reach a "universal settlement" of the thousands of New York cases).

Discovery in these lawsuits proved useful to state and federal regulatory agencies **\*46** that were also investigating Purdue's role in the opioid crisis. Attorney Jayne Conroy, who testified at the Confirmation Hearing on behalf of the AHC, explained that the discovery taken by her firm in hundreds of New York cases against Purdue was later subpoenaed by the Justice Department as part of the federal government's 2006-2007 investigation into Purdue. (Dkt. No. 91-5, at App.2038-2039).

## B. The 2007 Settlement and 2007 Plea Agreement

1. Purdue's 2007 Settlements with 26 States and the District of Columbia

In 2007, twenty-six states[19] and D.C. settled investigations into Purdue's promotional and marketing practices regarding OxyContin for $19.5 million ("2007 Settlement").[20] (Dkt. No. 91-4, at App.1269-70; *see* JX-2152). As part of the 2007 Settlement, Purdue entered into a consent judgment with each government party. (Dkt. No. 91-4, at App.1270); *see, e.g.*, Consent Judgement, *Washington v. Purdue Pharma L.P.*, Cause No. 07-2-00917-2 (Sup. Ct. Wash. Thurston Cnty. May 9, 2007), at Section I(M), ¶25 ("Consent Judgment").

[19]    Settling states were Arizona, Arkansas, California, Connecticut, Idaho, Illinois, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Montana, Nebraska, Nevada, New Mexico, North Carolina, Ohio, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Vermont, Virginia, Washington, and Wisconsin. This includes all State Appellants except Delaware and Rhode Island.

[20]    Purdue is defined in the Consent Judgment as Purdue Pharma, PPI, The Purdue Frederick Company, and all of their United States affiliates, subsidiaries, predecessors, successors, parents and assigns, who manufacture, sell, distribute and/or promote OxyContin.

Pursuant to the Consent Judgment, Purdue agreed to "establish, implement and follow an OxyContin abuse and diversion detection" ("ADD") program which "consist[ed] of internal procedures designed to identify potential abuse or diversion of OxyContin" for a minimum of ten years. (*See* Dkt. No. 91-4, at App.1270; Consent Judgment, ¶¶13-14). Purdue also agreed to submit "annual compliance certifications to a multistate group of attorneys general for three years." (Dkt. No. 91-4, at App.1270).

In exchange for Purdue's payment and compliance, the settling States agreed to:

release[ ] and forever discharge[ ], to the fullest extent permitted by law, *Purdue and its past and present officers, directors, shareholders,* employees, co-promoters, affiliates, parents, subsidiaries, predecessors, assigns, and successors (collectively,

3875

the "Releasees"), of and from any and all civil causes of action, claims, damages, costs, attorney's fees, or penalties that the Attorney General could have asserted against the Releasees under the State Consumer Protection Law by reason· of any conduct that has occurred at any time up to and including the Effective Date of this Judgment relating to or based upon the Subject Matter of this Judgment ("Released Claims").

(Consent Judgement, Section VI) (emphasis added). According to Judge Drain, these 2007 releases covered about seventy-seven members of the Sackler family. *In re Purdue Pharma L.P.*, 2021 WL 4240974, at \*31. The release covered only claims that could have been asserted by the Attorneys General of the settling states; among the claims that were not released were: (1) private rights of action by consumers, (2) claims relating to best price, average wholesale price or wholesale acquisition cost reporting practices or Medicaid fraud or abuse; (3) claims asserting antitrust, environmental or tax liability; **\*47** (4) claims for property damage; (5) claims to enforce the terms and conditions of the judgment; and (6) any state or federal criminal liability that any person or entity, including Releasees, has or may have to the settling state.

Some of the states did not participate in this 2007 Settlement. Several had already entered into individual settlements with Purdue, while others entered into separate settlements subsequently. (*See* Dkt. No. 91-4, at App.1270). For example, in 2002, Florida settled an investigation into Purdue for $500,000 (*id.*); in 2004, West Virginia settled an action against Purdue for $10 million (*id.*); in 2006, Mississippi settled its investigation into Purdue for $250,000 (*id.*). In 2015, New York signed an assurance of discontinuance of its investigation in exchange for Purdue's payment of a $75,000 penalty and certain promises, including ongoing implementation of the ADD program in New York and submission to annual reviews and monitoring by the Attorney General. *Id.*; *In the Matter of Purdue Pharma L.P.*, Attorney General of the State of New York Assurance No. 15-151, at ¶¶8, 28, 38, 40, 49 (Aug. 19, 2015). In 2016, Kentucky settled an action against Purdue for $24 million. (Dkt. No. 91-4, at App.1270). And in March 2019, Purdue agreed to pay the State of Oklahoma $270 million to settle that state's opioid claims. (*Id.* at App.1278); *see* Consent Judgment, *Oklahoma v. Purdue Pharma et al.*, No. CJ-2017-816, § 4.1 (Dist. Ct. Cleveland Cnty. Mar. 26, 2019).

The releases in these separate cases generally extinguished the claims of the respective state against Purdue for opioid-related misconduct. For example, the West Virginia settlement released "any and all claims and demands" of the Attorney General of West Virginia (on behalf of the state and state agencies) against Purdue and its affiliates, shareholders, officers, directors, and others[21] that were "sustained or incurred as a result of the manufacture, marketing and sale of OxyContin" in West Virginia. (*See* JX-2225). Similarly, the Oklahoma settlement released "any and all claims of any nature" of the Attorney General (the state and its subdivisions) against Purdue, its officers, directors, shareholders, direct and indirect owners, beneficiaries of the owners, and enumerated others, arising out of the conduct alleged in the complaint, including conduct related to the marketing and sale of opioids in Oklahoma. *See* Consent Judgment, *Oklahoma v. Purdue Pharma et al.*, No. CJ-2017-816, §§ 1.1, 5.1, 5.2 (Dist. Ct. Cleveland Cnty. Mar. 26, 2019).

21    "all ... present, former, or future masters, insurers, principals, agents, assigns, officers, directors, shareholders, owners, employees, attorneys, representatives. subsidiaries, divisions, affiliates, associated companies, holding companies, partnerships, and joint ventures ..." (JX-2225).

### 2. Purdue Frederick Company, Inc.'s 2007 Plea Agreement and Related Civil Settlements

Also in 2007, Purdue Frederick Company[22] pled guilty to one felony count of misbranding OxyContin, with the intent to defraud or mislead, in violation of 21 U.S.C. §§ 331(a), 333(a)(2). (Dkt. No. 91-4, at App.1268-69; *see* JX-2153–JX-2168); *see* JX-1899. Purdue Frederick's President and CEO Michael Friedman, its Executive Vice President and Chief Legal Officer Howard R. Udell, and its Chief Scientific Officer Paul D. Goldenheim, in their capacity as corporate officers, each pled guilty to a misdemeanor charge of misbranding. **\*48** (Dkt. No. 91-4, at App.1268); *see The Purdue Frederick Company, Inc.,* No. 1:07-cr-00029, at Dkt. Nos. 7-9.

22    Purdue Frederick Company is an affiliate of Purdue that manufactures and distributes OxyContin. (Dkt. No. 91-4, at App.1268).

3876

As part of the Agreed Statement of Facts, the Purdue Frederick Company admitted that:

> [b]eginning on or about December 12, 1995, and continuing until on or about June 30, 2001, certain PURDUE supervisors and employees, with the intent to defraud or mislead, marketed and promoted OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications ...

(Agreed Statement, at ¶20; *see* Dkt. No. 91-4, at App.1268-1269).

As part of the 2007 Plea Agreement, Purdue Frederick agreed to pay over $600 million dollars in fines and various other payments.[23] (Dkt. No. 91-4, at App.1269; JX-1899, at § 3). This included $160 million to the United States and the states to settle various civil claims that had been asserted by governments – over $100 million to the United States and over $59 million to "Each state that elects to participate in this settlement ..." (JX-1899, at § 3(b)). In the federal government's settlement agreement, the United States and its various departments agreed to release "*Purdue and its current and former directors, officers, employees, affiliates, owners*, predecessors, successors and assigns from any civil or administrative monetary claim the United States has or may have" under federal statutes creating causes of action for civil damages or penalties, as well as from administrative actions under various federal departments and programs. (*See id.* at Dkt. No. 5-4, at § IIII). The participating states' settlement agreement and release were limited to Medicaid fraud claims:

> release and forever discharge [the] Company *and its current and former directors, officers, employees, affiliates, owners*, predecessors, successors and assigns from any civil or administrative monetary claim that the State has or may have for any claim submitted or caused to be submitted to the State Medicaid Program for the Covered Conduct ...

*See The Purdue Frederick Company, Inc., et al.*, No. 1:07-cr-00029, Dkt. No. 5-14, at § III(2)) (emphasis added).

[23]   The fine and payments include: approximately $276.1 million forfeited to the United States; approximately $160 million paid to federal and state government agencies to resolve liability for false claims made to Medicaid and other government healthcare programs; approximately $130 million set aside to resolve private civil claims; approximately $5.3 million paid to the Virginia Attorney General's Medicaid Fraud Control Unit; approximately $20 million paid to fund the Virginia Prescription Monitoring Program; approximately $3 million to Federal and State Medicaid programs for improperly calculated Medicaid rebates; approximately $5 million in monitoring costs; and a $500,000 maximum statutory fine.

All states except Kentucky opted into the federal settlement. *See id.* at Dkt. No. 141, at 5.

An additional $130 million was set aside to settle private civil liability claims related to OxyContin. (*Id.* at § 3(d)). Ms. Conroy of the AHC testified in the Confirmation Hearing that her approximately 5,000 clients received a total of $75 million out of this settlement fund. (Dkt. No. 91-5, at App.2039).

As part of the resolution of the criminal case, Purdue agreed to a five-year corporate integrity program with the DHHS, pursuant to which DHHS was to monitor Purdue's compliance with federal healthcare law. This monitoring period expired on July 30, 2012. (Dkt. No. 91-4, at App.1269);   **\*49**   *see The Purdue Frederick Company, Inc.*, No. 1:07-cr-00029, at Dkt. No. 5-5. In 2013, Purdue completed the corporate integrity program with no significant adverse findings. (Dkt. No. 91-4, at App.1269).

The Honorable James P. Jones approved the 2007 Plea Agreement in July of that year. *See The Purdue Frederick Company, Inc.*, No. 1:07-cr-00029, at Dkt. No. 77.

### C. The Second Round of Lawsuits: 2014-2019

The 2007 Settlement and Plea Agreement were intended to resolve for all time issues relating to Purdue's misrepresentations about OxyContin. (Dkt. No. 91-5, at App.2039). The corporate integrity agreement with DHHS meant ongoing monitoring (*see The Purdue Frederick Company, Inc.*, No. 1:07-cr-00029, at Dkt. No. 5-5), and the ADD program agreed to with the 26 states and D.C. was meant to create internal procedures that would identify and interrupt abuse or diversion related to OxyContin. (Consent Judgment, ¶14). Purdue, for its part, insisted in its Informational Brief before the Bankruptcy Court that it "accepted responsibility for the misconduct in 2007 and has since then strived never to repeat it." (Dkt. No. 91-4, at App.1268).

However, if Purdue's admissions in its 2020 Plea Agreement are believed, this purported acceptance of responsibility was a charade, and the oversight mechanisms built into the settlements were a conspicuous failure. Judge Drain found that the Sacklers had an "evident desire to continue to drive profits from the products' sale," *In re Purdue Pharma L.P.*, 2021 WL 4240974, at *33, and as they did so, the opioid crisis not only continued, it worsened. (*See* Dkt. No. 91-5, at App.2039-2040; JX-2185). As Mortimer D.A. Sackler testified in the Confirmation Hearing, "overdose deaths ... continued to rise ... The overdose deaths kept going up and up." (Confr. Hr'g Tr. Aug. 19, 2021, at 52:7-12).

Starting in about 2014, new lawsuits began to be filed against Purdue concerning its promotion and marketing of OxyContin. (*See e.g.*, JX-2411). But this time, members of the Sackler family were named as defendants. (*See, e.g.*, Confr. Hr'g Tr. Aug. 16, 2021, at 69: 4-15).

1. <u>The Federal Multi-District Litigation in the Northern District of Ohio</u>

At the end of 2017, sixty-four federal cases that had been brought in nine districts across the country by various government entities (state, cities, and counties) against Purdue and other defendants – including pharmacies (like Rite Aid), pharmaceutical companies (like Johnson & Johnson), and pharmaceutical distributors (like McKesson Corporation) – were sent to coordinated multi-district litigation in the Northern District of Ohio ("Opioid MDL"). *See IN RE: National Prescription Opiate Litigation*, MDL-2804, Dkt. No. 1, at Schedule A. The cases in the Opioid MDL asserted a variety of claims against Purdue and others for their role in the opioid crisis, under theories of liability including: (1) public nuisance, (2) false representations, (3) unjust enrichment, (4) common law *parens patriae*, (5) negligence, (6) gross negligence, and (7) consumer protection act claims. (Dkt. No. 91-4, at App.1276); *see e.g.*, Complaint, *County of San Joaquin, et al. v. Purdue Pharma L.P., et al.*, No. 2:17-cv-01485, Dkt. No. 1, Ex. 1 (E.D. Ca. May 24, 2017); Complaint, *Everett v. Purdue Pharma LP et al.*, No. 2:17-00209, Dkt. No. 1-1 (W.D. Wa. Jan. 18, 2017).

The Opioid MDL was assigned to The Honorable Dan A. Polster. At the time of **\*50** Purdue's filing for bankruptcy, approximately 2,200 actions against Purdue related to the opioid crisis were pending before Judge Polster. (*See* Dkt. No. 91-4, at App.1273).

Judge Polster put the cases before him on a settlement track and litigation track and assigned a Special Master to assist in their management. (*See* MDL Dkt. No. 2676, at 3). Given "the immense scope of the opioid crisis" Judge Polster was "very active from the outset of [the] MDL in encouraging all sides to consider settlement." (MDL Dkt. No. 2676, at 11).

Within the litigation track, Judge Polster designated attorneys to coordinate discovery in related state and federal cases (MDL Dkt. No. 616) and issued a case management order meant to "facilitate, to the maximum extent possible, coordination with parallel state court cases." (MDL Dkt. No. 876, at ¶I(b)). Judge Polster ordered the establishment of a joint database of all prescription opiate cases filed in state and federal courts, so that information and documents could be tracked and discovery cross-noticed. (*Id.* at ¶¶III-V). Over 450 depositions were taken under the Opioid MDL umbrella, and over 160 million pages of documents were produced. (MDL Dkt. No. 2676, at 5; *see* Dkt. No. 91-4, at App.1276).

The extensive discovery in the Opioid MDL, and the discovery coordination it facilitated, revealed for the first time the involvement of certain members of the Sackler family in acts that Purdue had agreed not to commit as part of the 2007 Plea Agreement. Schedule A to the 2020 Plea Agreement – to which facts the corporation has stipulated, so they are deemed proved[24] – chronicles Purdue's extensive violation of the 2007 Plea Agreement, which began almost from the time the ink was dry on the papers. (*See* JX-2094.0006, 0015-18). Unable to deny what was apparent from the Opioid MDL discovery, the corporation admitted that Purdue had engaged in aggressive efforts to boost opioid sales, including: offering payments to induce health care providers to write more prescriptions of Purdue opioid products, offering "prescription savings cards" for health care providers to give patients to encourage them to fill prescriptions for opioids, and failing to maintain effective controls against diversion,

3878

which included failing to inform the United States Drug Enforcement Administration that health care providers flagged for abuse filled over 1.4 million OxyContin prescriptions. (*Id.*).

24      The Sacklers do not concede the truth of Purdue's admissions.

Evidence produced in discovery also "subjected the Sacklers to increasing scrutiny and pointed towards culpability of certain members of the family ..." (Dkt. No. 91-5, at App.2040). This evidence demonstrated that members of the Sackler family were heavily involved in decisions on how to market and sell opioids (*see* JX-2944-45, JX-2952, JX-3013-14, JX-1652). Certain Sacklers, notably Richard, Mortimer D.A., and Theresa, aggressively set and pushed sales targets for OxyContin that were higher than those recommended by Purdue executives (*see* Confr. Hr'g Tr., Aug. 18, 2021, at 84:2-6; Dkt. No. 91-4, at App.1350-51); accompanied sales representatives on "ride along" visits to health care providers to promote "the sale of Purdue's opioids" (Confr. Hr'g Tr., Aug. 18, 2021, at 70:2-7); approved countless settlements related to Purdue's culpable conduct (*id.* at 126:2-18); and oversaw sales and marketing budgets and corresponding upward trends in OxyContin prescribing. (Confr. Hr'g Tr., Aug. 19, 2021, at 106:15-109:6).

As discovery turned up evidence of the involvement of members of the Sackler  **\*51**  family in Purdue's misconduct, those family members were added as defendants in a number of cases pending against Purdue. For example, attorney Jayne Conroy testified that, as a result of information disclosed during the Opioid MDL discovery, she added the Sacklers as defendants in the lawsuits her firm was pursuing against Purdue in New York State Supreme Court. (Confr. Hr'g Tr. Aug. 16, 2021, at 70:16-25; *see also* Dkt. No. 91-5, at App.2040). Peter Weinberger, another attorney with AHC, similarly acknowledged to the Bankruptcy Court that, "State complaints naming Sackler family members relied on MDL documents extensively." (Bankr. Dkt. No. 3449, at ¶¶ 36-37, 40).

## 2. State Multi-District Litigations

In addition to the Opioid MDL, over 390 parallel actions against Purdue proliferated in state courts, as well as in local courts in D.C., Puerto Rico, and Guam. (Dkt. No. 91-4, at App.1273). The causes of actions asserted in these various litigations included: (1) violations of state false claims acts; (2) violations of state consumer protection laws; (3) public nuisance; (4) fraud; (5) negligence; (6) unjust enrichment; (7) civil conspiracy; (8) violations of state controlled-substances acts; (9) fraudulent transfer; (10) strict products liability; and (11) wrongful death and loss of consortium. (*Id.*, at App.1276).

In some states, these lawsuits were consolidated in coordinated state proceedings. (*Id.* at App.1273-1274; *see e.g.*, Dkt. No. 91-5, at App.2039-2040). Such coordination occurred in Connecticut, Illinois, New York, Pennsylvania, Texas, and South Carolina. (Dkt. No. 91-4, at App.1273). In New York, cases brought by 58 counties and two dozen cities against Purdue were transferred to and coordinated in Suffolk County. (Dkt. No. 91-5, at App.2040).

While members of the Sackler family were not originally named as defendants in these state court coordinated actions, once their role in the marketing of OxyContin post-2007 was revealed in the Opioid MDL discovery, complaints in many state litigations were amended to name members of the Sackler family as defendants. (*See, e.g.*, Dkt. No. 91-5, at App.2040; *see* Bankr. Dkt. No. 3449, at ¶¶ 36-37, 40). Specifically, Richard Sackler, Jonathan Sackler, Mortimer D.A. Sackler, Kathy Sackler, Ilene Sackler Lefcourt, Beverly Sackler, Theresa Sackler, Mariana Sackler, and David Sackler were named as defendants in various lawsuits. (*See e.g.*, Dkt. No. 91-7, at App.2402-2597). In at least three of these cases, state courts denied the Sackler defendants' motions to dismiss the claims against them. (*See* Dkt. No. 94, at 5; Dkt. No. 91-5, At App.2041); *see e.g.*, Order, *In re Opioid Litigation*, No. 400000/2017, Dkt. No. 1191 (Sup. Ct. Suffolk Cnty. June 21, 2019).

Thus, when Purdue filed for bankruptcy in September 2019, "... the threat of liability for at least some members of the [Sackler] family was real and [ ] without the protections of bankruptcy, individual family members were at risk of substantial judgments against them." (*See* Dkt. No. 91-5, at App.2040). As explained by the UCC in the Confirmation Hearing, it was estimated that

In re Purdue Pharma, L.P., 635 B.R. 26 (2021)

"... litigating against the Sacklers could eventually lead to a judgment or multiple judgments greater than $4.275 billion." (Bankr. Dkt. No. 3460, at 33; *see also* Bankr. Dkt. No. 3449, at ¶ 10).

3. The Renewed Lawsuits Against Purdue and Members of the Sackler Family by the Individual States

But private litigation was far from the only game in town. By the middle of 2019, forty-nine states' Attorneys General had filed new or amended lawsuits against Purdue, all of which named specific members of the Sackler family and/or Sackler-related entities. (*See* App.1274); *see e.g.*, **\*52** Amended Complaint, *New York v. Purdue Pharma L.P., et al.*, No. 400016/2018 (Sup. Ct. Suffolk Cnty. Mar. 28, 2019). For example, in March 2019, the New York Attorney General amended its earlier complaint against Purdue to add claims against the same eight members of the Sackler family and various Sackler entities.[25] *Id.* at ¶¶814-900. The newly-asserted claims included claims for public nuisance, fraud, gross negligence, willful misconduct, unjust enrichment, fraudulent conveyances, violations of state finance laws and social services laws, and "repeated and persistent" fraud and illegality in violation of Executive Law § 63(12). *Id.* Against the "Sackler entities," the complaint asserted claims for unjust enrichment and fraudulent conveyance. *Id.*

[25]    The entities were described as those "known and unknown entities" that the Sacklers allegedly "used as vehicles to transfer funds from Purdue directly or indirectly to themselves," including Rosebay and Beacon. *Id.* at ¶¶49-54.

The Attorneys General of all but one of the State Appellants – California, Connecticut, Delaware, Maryland, Oregon, Rhode Island, Vermont, and D.C. – filed or amended complaints that include a range of charges against both Purdue and members of the Sackler family. (*See, e.g.*, Dkt. No. 103-7, at A-1553; Dkt. No. 95-1, at A0008; Dkt. No. 91-7, at App.2598; Dkt. No. 91-8, at App.2661; Dkt. No. 91-9, at App.3153; Dkt. No. 121-2, at MDA-008; JX-1647; JX-0946). The State of Washington did not assert claims against members of the Sackler family specifically but asserted claims against "Does 1 through 99" and "Doe Corporations 1 through 99" who – although not yet named – allegedly acted with Purdue "in committing all acts" in their complaint. (*See* Dkt No. 103-3, at App-630; JX-0944). This left open the possibility of naming members of the Sackler family and Sackler family entities.

The State Appellants' asserted claims included:

  • fraudulent transfer (*see e.g.*, Dkt. No. 91-7, at App. 2649; Dkt. No. 91-9, at App.3194);

  • fraud and fraudulent misrepresentation (*see e.g.*, Dkt. No. 91-9, at App.3184);

  • unjust enrichment (*see e.g.*, Dkt. No. 91-9, at App.3192; Dkt. No. 103-7, at A-1752; JX-1647.0199);

  • negligence (*see e.g.*, Dkt. No. 91-8, at App.2766; Dkt. No. 91-9, at App.3187; JX-0944.0123);

  • public nuisance (*see e.g.*, Dkt. No. 91-8, at App.2768-69; Dkt. No. 91-9, at App.3175; Dkt. No. 103-7, at A-1749; Dkt. No. 95-1, at A0068; JX-1647.0197; JX-0944.0120); and

  • violation of state consumer protection statutes by deceptive and unfair acts and practices. (*see e.g.*, Dkt. No. 91-7, at App.2642-2648; Dkt. No. 91-8, at App.2764; Dkt. No. 103-7, at A-1746-47; Dkt. No. 95-1, at A0066-67; Dkt. No. 121-2, at MDA-110; JX-1647.0194; JX-0944.0118).

For example, California asserted two claims for violations of its False Advertising Law (Cal. Bus. & Prof. Code § 17500 *et seq.*), and Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 *et seq.*), as well as a public nuisance claim (Cal. Civ. Code § 3494 *et seq.*), against Purdue and nine individual members of the Sackler family, including Mariana Sackler.[26] ( **\*53** Dkt. No. 95-1, at A0066-68; JX-0947). California sought, *inter alia*, the assessment of civil penalties against each defendant and an order directing Purdue and the Sacklers to abate the public nuisance.

3880

26    A California court recently issued a "tentative decision" rejecting the public nuisance theory of liability against Johnson & Johnson and other pharmaceutical companies, including Teva, Allergan, Endo and Janssen. *See* Tentative Decision, *California v. Purdue Pharma, L.P., et al.*, No. 30-2014-00725287-CU-BT-CXC, Dkt. No. 7939 (Cal. Sup. Ct. Nov. 1, 2021). The same theory of liability was thrown out by the Oklahoma Supreme Court in a case against Johnson & Johnson. *See State ex rel. Hunter v. Johnson & Johnson*, 499 P.3d 719 (Okla. Sup. Ct. Nov. 9, 2021). However, also last month, an Ohio jury found three major pharmacy chains liable for damages on the theory that their filling of pill mill prescriptions for opioids created a public nuisance. *See Ohio jury holds CVS, Walgreens and Walmart liable for opioid crisis*, NPR (Nov. 23, 2021), *available at* https://www.npr.org/2021/11/23/1058539458/a-jury-in-ohio-says-americas-big-pharmacy-chains-are-liable-for-the-opioid-epide.

Connecticut – the state where Purdue's headquarters are located – asserted four claims for violations of its Unfair Trade Practices Act (Conn. Gen. Stat. § 42-110a *et seq.*) and one claim for fraudulent transfer against Purdue and eight individual members of the Sackler family. (Dkt. No. 91-7, at App.2642-49; JX-0840). Connecticut sought, *inter alia*, civil penalties, restitution, and disgorgement from all defendants, including the Sacklers.

Delaware – where Purdue Pharma's limited partnership was formed – asserted three claims for violations of Delaware's Consumer Fraud Act (6 Del. C. § 2511 *et seq.*) as well as claims for negligence and public nuisance against seven individual members of the Sackler family.[27] (Dkt. No. 91-8, at App.2764-2768; JX-0945; JX-1646). Delaware sought, *inter alia*, civil penalties and abatement.

27    Beverly Sackler was not sued in Delaware or Maryland. Mariana Sackler was only sued in California.

Maryland asserted a claim for violation of the state's consumer protection laws (Md. Code Ann., Com. Law §§ 13-301 *et seq.*) against the same seven individual members of the Sackler family. (*See* Dkt. No. 121-2, at MDA-008). Maryland, like the other opposing states, sought civil penalties against the Sackler defendants, among other relief.

Oregon asserted three claims against Purdue and eight individual members of the Sackler family – the first seeking a declaratory judgment that Purdue and related entities are the alter egos of the Sacklers and that the state may pierce the corporate veil; the other two asserting claims for fraudulent conveyance. (*See* JX-1647). Oregon sought, *inter alia*, a judgment restraining the Sackler defendants from disposing of property and ordering a return of the conveyed funds.

Rhode Island asserted six claims against Purdue and the eight individual members of the Sackler family for public nuisance, fraud and fraudulent misrepresentation, fraudulent and voidable transfers, violations of Rhode Island's State False Claims Act (R.I. Gen. Laws § 9-1.1-1 *et seq.*), negligence, and unjust enrichment. (Dkt. No. 91-9, at App.3175-94; JX-1648; JX-2214). Rhode Island sought, *inter alia*, civil penalties, treble damages, disgorgement, and restitution.

Vermont asserted four claims against the eight individual members of the Sackler family: two violations of the Vermont Consumer Protection Act (9 V.S.A. § 2451 *et seq.*), unjust enrichment, and public nuisance. (Dkt. No. 103-7, at A-1746-52; JX-1649). Vermont also sought civil penalties, among other relief.

Washington State brought an action against Purdue, "Does 1 through 99," and "Doe Corporations 1 through 99" for violating the Washington's Consumer Protection Act (Wash. Rev. Code § 19.86), for causing a public nuisance, and for breaching **\*54** Washington's common law of negligence. (JX-0944). The Complaint sought abatement, restitution, and statutory penalties, among other relief.

D.C. brought two claims against Purdue and Richard Sackler for violations of its consumer protection statutes (D.C. Code § 28-3904(f)). (*See* JX-0946). D.C. sought, like the others and among other relief, statutory civil penalties against each defendant.

Each State Appellant filed its claims before Purdue filed for bankruptcy in September 2019. None of the cases had been litigated to judgment.[28] (*See* Dkt. 91-4, at App.1278). These cases were not subject to the automatic stay that stopped private litigation in its tracks once Purdue filed, (11 USCA § 362(b)), but the Bankruptcy Court preliminarily enjoined all litigation against Purdue

3881

and the Sacklers; that order was affirmed by this court, *In re Purdue Pharms. L.P.*, 619 B.R. 38 (S.D.N.Y. 2020). As a result, no activity has taken place in any of these lawsuits since shortly after Purdue's filing.

28      Prior to bankruptcy, the lawsuit brought by North Dakota was litigated to judgment, and that judgment was in favor of Purdue. (*See* Dkt. No. 91-4, at App.1278).

4. Lawsuits in Canada

In Canada, a number of class actions were filed against certain of the Debtors with allegations similar to those made in the U.S. (*See* Dkt. No. 91-4, at App.1273, 1477; *see e.g.*, Dkt No. 98-1, at 13–102, 113–202). Prior to Purdue's Chapter 11 filing, the lead plaintiffs in ten of the Canadian class actions settled their claims for $20 million, and Purdue Pharma (Canada) ("Purdue Canada")[29] placed that amount in trust pending approval of the settlement by the Ontario Superior Court of Justice, the Superior Court of Quebec, the Supreme Court of Nova Scotia and the Saskatchewan Court of Queen's Bench (the "Canadian Settlement"). (Dkt. No. 91-4, at App.1477-1478). The Canadian Settlement, once approved and after funds are disbursed, "completely and unconditionally released, forever discharged, and acquitted [the Debtors] from any and all Settled Patient Claims against the Debtors and from any other Proof of Claim or portion thereof in respect of any Settled Patient Claim filed against any Debtor." (*Id.*). Under the Canadian Settlement, no member of the Canadian classes party to that settlement can recover from any source other than the Canadian Settlement trust, and every class member in a settling class bears the burden of proving in the U.S. bankruptcy that its claim was not released and discharged by the Canadian Settlement. (*Id.*).

29      Purdue Canada is an IAC. It is not a Debtor in this case. Purdue Canada as defined in the Shareholder Settlement Agreement, means Bard Pharmaceuticals Inc., Elvium Life Sciences GP Inc., Elvium Life Sciences Limited Partnership, Elvium ULC, Purdue Frederick Inc. (Canada), Purdue Pharma (Canada), Purdue Pharma Inc. (Canada), and Purdue Pharma ULC. (JX-1625.0027).

However, the Canadian Settlement did not cover the claims of the Canadian Appellants, which are Canadian municipalities and indigenous tribes. The Canadian Appellants' lawsuits concerned sales and distribution of OxyContin in Canada, affecting Canadian communities, by Purdue Canada, which the Canadian Appellants assert was controlled by Sackler family members. (Dkt. 98, at 5; Bank. Dkt. No. 3421, at 89-92). The Canadian Appellants' lawsuits against Purdue Canada assert, *inter alia*, claims for conspiracy, public nuisance, negligence, fraud, and unjust enrichment. (Dkt No. 98-1, at 18-19). The Canadian Appellants also stated at oral argument that that they "were barred by **\*55** the imposition of the stay and the stay-related orders" – the preliminary injunction described above – "from actually naming [certain] Competition Act claim[s] against the Sacklers and the [Shareholder Released Parties]," which they would assert if given the opportunity. (Oral Arg. Tr., Nov. 30, 2021, at 80:11-16).

The Canadian Appellants do not include the Canadian federal government or any Canadian province – all of whom seem to be content with the fact that the Plan excludes claims against Purdue Canada. (*See* Plan, at 10). Indeed, the ten Canadian provinces for their part seem to believe their claims are excluded and have decided to pursue their claims in Canada instead. For example, in press on the topic, Reidar Mogerman, counsel for the British Columbia government, explained that the provinces gave up their claims (worth US$67.4 billion) before the Bankruptcy Court in the U.S. to protect lawsuits they filed against Purdue's Canadian entities.[30] "We didn't want to get swallowed in competition with the U.S. claims and lose our Canadian claims," he explained to the press. *Id.* To date, in Canada, the various Canadian provinces have asked the Ontario Superior Court of Justice to continue to pursue their separate class actions against Purdue Canada. *Id.*

30      *Provinces plan legal push against Purdue Pharma in wake of U.S. opioid deal*, The Globe and Mail (Sept. 3, 2021), https://www.theglobeandmail.com/canada/article-provinces-plan-legal-push-against-purdue-pharma-in-wake-of-us-opioid.

**VII. Members of The Sackler Family Insulate Themselves Against Creditors**

As Judge Drain found, the evidence indicates members of the Sackler family distributed significant sums of Purdue money to themselves in the years 2008-2016, during which time those Sackler family members were closely involved in the operations of

Purdue and aware of the opioid crisis and the litigation risk. *See In re Purdue Pharma L.P.*, 2021 WL 4240974, at *32. As detailed below, this "aggressive[ ]" (to use Richard Sackler's word, *see* JX-1703) pattern of distribution of earnings to shareholders represented a sharp departure from prior practice in two ways.

First, during the period 1996-2007, Purdue up-streamed on average 9% of its revenue per year to the Sacklers; but during the period 2008-2016, Purdue up-streamed on average 53%, and as much as 70%, of its revenue to the Sacklers. (*See* JX-2481).

Second, during the earlier period (1996-2007), the Sacklers kept less than 10% of the money that was distributed by Purdue for themselves, while using over 90% of those distributions to pay taxes on Purdue's earnings; but during the years between 2008-2016, the Sacklers retained, in one form or another, 56% of those distributed earnings, while using just 44% to pay taxes. (Bankr. Dkt. 3410-2).

The 2008-2016 distributions to shareholders also contrasted with the practices of Purdue's peer pharmaceutical companies. (*See* JX 1703).

According to the Sacklers' own expert, this pattern of upstreaming corporate earnings substantially depleted Purdue's treasury during that eight-year period. (JX-0431, p. 77, Fig. 10).

*A. The Sacklers Cause the Transfer of Billions of Dollars from Purdue to Themselves*

In March 2007, Richard, Jonathan, Kathe, and Mortimer Sackler exchanged emails noting that the "future course [for the business] is uncertain" (JX-2976) and identified the "emergence of numerous new lawsuits" as a "risk[ ] ... we're not **\*56** really braced for." (JX-2957). Just a few months later, in May, shortly after the 2007 guilty plea and settlement, David Sackler emailed Jonathan Sackler, Richard Sackler, and their financial advisor, expressing concern about the family's personal liability for the opioid crisis: "what do you think is going on in all of these courtrooms right now? We're rich? For how long? Until suits get through to the family?" (JX-2237; *see also* JX-2096, at ¶ 161). In his deposition, David Sackler agreed that his May 17, 2007, email reflects "concern[ ] that the family would be sued in connection with Purdue's sale of OxyContin." (JX-1989, at 183:14-184:20, 187:18-188:20). Less than a week after David Sackler sent his email, Richard and Jonathan Sackler met with a bankruptcy attorney, though Purdue was not in debt and not at risk of bankruptcy. (*See* JX-2985; JX-2986).

Thereafter, on July 26, 2007, a family financial advisor sent a confidential memorandum to Jonathan Sackler, in which he advised that Purdue faced "[u]ncapped liabilities" that posed "a huge valuation question" for Purdue at that very moment – the moment when the Plea and settlements were ostensibly ending any illegal behavior and putting further corporate liability – and potential shareholder liability – in the rear view mirror. (JX-1660, at 2-3). He added, "I presume the family has taken most of the appropriate defensive measures." (*Id.* at 3; *see also* JX-2241). One such measure, proposed in a separate memorandum, was "to distribute more free cash flow so [the owners] can purchase diversifying assets." (JX-2254; *see also* JX-2096, at ¶ 162).

By January 2008, the anxiety over impending lawsuits was apparent; Richard Sackler emailed Mortimer Sackler that, "I've been told by Silbert that I will be [sued] and probably soon." (JX-3001). Mortimer Sackler lamented in a later email in February 2008 that he wished to get out of the pharmaceutical business altogether "given the horrible risks, outlooks, difficulties, etc." (Bankr. Dkt. No. 2161, at Ex. 67). In this vein, in April 18, 2008, Richard Sackler warned in a memo that the business posed a "dangerous concentration of risk" and proposed that the family either sell the company or "distribute more free cash flow" to themselves. (JX-2214, ¶ 86; JX-3004; JX-3104). The family chose the latter course.

Beginning in 2008, Purdue began to make significant cash distributions to and for the benefit of the Sacklers. (JX-1988, at 226:13-19 (deposition of Richard Sackler); Confr. Hr'g Tr., Aug. 19, 2021, at 149:6-14 (testimony of Mortimer D.A. Sackler); Confr. Hr'g Tr., Aug. 18, 2021, at 65:8-17 (testimony of Richard Sackler); *see also* Dkt. No. 91-4, at App.1544). As noted above, about 44% of the money distributed went to pay taxes; a small fraction was invested in the IACs, which were owned by the Sacklers; and the rest went to Rosebay and Beacon, the Side A and B Sackler family trusts. (*See* JX-1987, at 156:8-158:4; Confr. Hr'g Tr., Aug. 19, 2021, at 27:7-28:1-12).

3883

In the years leading up to the 2007 Plea Agreement and Settlement, the Sackler family had been content to leave most of Purdue's earnings in the company, except insofar as was necessary to pay taxes. In response to a question from this Court, Debtors acknowledged that, between January 1, 1995 and December 31, 2007, distributions to the Sacklers totaled $1.322 billion, of which $1.192 billion (or 90.2%) was used to pay taxes. (Dkt. No. 177; *see* JX-3050.0042; JX-2481; Bankr. Dkt. 3410-2). In the twelve years prior to 2008, the Sacklers took personal distributions from Purdue that averaged 9% of Purdue's revenue. (*See* JX-2481).

**\*57**  After 2007, Purdue went from distributing less than 15% of its revenue to distributing as much as 70% of revenue.[31] (*Id.*). It also jumped from distributing approximately 38% of its free cash flow in 2006 to distributing 167.4% of free cash flow in 2007 and continued to distribute free cash flow in the 90% range for the next decade. (*Id.*). These distributions totaled approximately $10.4 Billion. (*See* Dkt. No. 91-4, at App.1544; Bankr. Dkt. No. 3410-1, at ¶ 12; Confr. Hr'g Tr., Aug. 18, 2021, at 65:8-17 (testimony of Richard Sackler); Confr. Hr'g Tr., Aug. 19, 2021, at 27:7-28:1-12, 149:6-14 (testimony of Mortimer D.A. Sackler)).

[31]    The absolute amount of these distributions dwarfed distributions for the 1995-2007 period because concerns about the validity of Purdue's OxyContin patent capped its earnings until 2008, when it was definitively held that the patent was valid. (*See* Dkt. No. 241, at 6). After that, Purdue's earnings soared – as did both the amount owed in taxes and the amount that ended up in the Sackler family trusts.

Approximately $4.6 billion of that amount was used to pay pass through taxes (*see* Bankr. Dkt. 3410-2), which attests to the tremendous profitability of Purdue's OxyContin business during that same eleven-year period. In fact, the vast majority of Purdue's earnings between 2008-2017 came from OxyContin sales. (*See* JX-1984, at 40:24-41:5; JX-3275, at 338:6-9; JX-0999).

According to the Sacklers' own expert, the change in distribution pattern drained Purdue's total assets by 75% and Purdue's "solvency cushion" by 82% between 2008 and 2016. (JX-0431, p 77, Fig. 10). Richard Sackler later acknowledged in an email in 2014 that, "in the years when the business was producing massive amounts of cash, the shareholders departed from the practice of our industry peers and took the money out of the business." (JX 1703). In at least one email in 2014, Jonathan Sackler referred to this distributing of cash flow from OxyContin as a "milking" program. (JX-2974).

The obvious implication of this evidence was recognized by Judge Drain in his bankruptcy decision, discussed *infra* in Background Section XII. *See In re Purdue Pharma L.P.*, 2021 WL 4240974, at \*27, 31, 32–33. In particular, Judge Drain noted, "I do have an extensive report and trial declarations as to the nature of the assertedly over $11 billion of avoidable transfers, when they occurred, what they comprised, and who they were made to," *id.* at 31; and found, "The record suggest[s] that at least some of the Sacklers were very aware of the risk of opioid-related litigation claims against Purdue and sought to shield themselves from the economic effect of such claims by causing Purdue to make billions of dollars of transfers to them and to shield their own assets, as well, from collection." *Id.* at 32. While he made no finding that these distributions qualified as fraudulent conveyances, or that they could be recouped by Purdue, Judge Drain also acknowledged that the estate had potential claims of "over $11 billon of assertedly avoidable transfers." *Id.* at 27.

As Judge Drain also acknowledged, the distribution of Purdue money to the Sackler family occurred during a time when members of the Sackler family, including those named in many pending cases, were closely involved in the operations of Purdue and well aware of the opioid crisis and the litigation risk. He said, "The testimony that I heard from the Sacklers tended to show, that as a closely held company Purdue was run differently than a public company and that its Board and shareholders took a major role in corporate decision-making, including Purdue's practices regarding its opioid products that was more **\*58** akin to the role of senior management." *Id.* at 33. As Richard Sackler acknowledged in the Confirmation Hearing, he oversaw as director "many settlements," stating, "I was director, and I cannot count up all the settlements that the company entered into while I was a director. But there were many settlements, both private and public." (Confr. Hr'g Tr., Aug. 18, 2021, at 126:2-18). For example, as part of the Board, he approved the settlement of $24 million to the State of Kentucky to resolve unlawful and unfair deceptive trade practice allegations against Purdue in 2015. (*Id.* at 124:16-125:1).

The Sacklers vehemently deny any suggestion that any of these transfers would qualify as fraudulent conveyances. (*See* JX-2096, at ¶G). However, in Addendum A to the 2020 "Settlement Agreement" with the DOJ, the Government asserted its confidence that it could prove that: "From approximately 2008 to 2018, at the Named Sacklers' request, billions of dollars were transferred out of Purdue as cash distributions of profits and transfers of assets into Sackler family holding companies and trusts. Certain of these distributions and transfers were made with the intent to hinder future creditors and/or were otherwise voidable as fraudulent transfers." (*Id.* at Addendum A, ¶6; *see also id.* at ¶¶158-159)

The fact of these extensive transfers of money out of Purdue and into the family coffers is not contested. For example, during the Confirmation Hearing, when Richard Sackler was asked if it were "true that during that time period generally [2008-2018] ... the Purdue Board of Directors transferred out billions of dollars to Sackler family trusts or holding companies," he answered, "Yes ... yes, that we did." (Confr. Hr'g Tr., Aug. 18, 2021, at 65:8-17). Only whether those transfers (or any of them) would qualify as fraudulent conveyances is in dispute. But while that presents an important and interesting question, I agree with Judge Drain that it was not one he needed to resolve in order to rule on the confirmability of the Plan. But at some point – certainly by 2018 – Purdue itself was in a precarious financial position in face of the lawsuits. At the time of the bankruptcy filing, Purdue represented that, while it had "no funded debt and no material past due trade obligations" – or even any "judgment creditors" – "the onslaught of lawsuits has proved unmanageable" and "will result only in the financial and operational destruction of the Debtors and the immense value they could otherwise provide ..." (Dkt. No. 91-4, at App.1237).

*B. A Pre-Petition Settlement Framework Is Proposed That Would Release the Sackler Family From Liability.*

In the months before Purdue filed for bankruptcy, Purdue, the Sackler family (now no longer represented on Purdue's Board) and Sackler entities were engaged in discussions about a potential framework for settlement of all claims against Purdue and the Sacklers with "the various parties in the MDL litigation" and certain "subgroups" of creditors and potential creditors. (*See* Confr. Hr'g Tr., Aug. 12, 2021, at 152:23-153:22). John Dubel testified in the Confirmation Hearing[32] that the pre-petition settlement framework discussions involved the concept of third-party releases *and* the concept of using the bankruptcy **\*59** process to release all claims against the Sacklers in exchange for their contribution of funding to the settlement. (*Id.* at 154:1-5). Mr. Dubel explained:

> [I]t was very clear from the ... Sacklers that if they were going to post up X amount of dollars – and I believe at the time, the settlement framework was somewhere around $3 billion or so – that they were going to seek broad third party releases, and releases from the Debtors, releases of all the estate claims, etc., so that they could be able to put all of that – all of the litigation behind them ... *it was something that was a prerequisite or a condition to them posting the amount of money that was in the settlement framework* and then ultimately what is in the plan of organization we were seeking approval of.

(*Id.* at 155:25-156:1-12; *see id.* at 209:1-4, 214:8-19) (emphasis added).

[32]   Mr. Dubel served as the Chairman of the Special Committee of the Board. He was appointed to the Board in July 2019 and chaired the Special Committee investigating the potential claims of Purdue or its estates against the Sacklers. (*See* Bankr. Dkt. No. 3433, at ¶1).

So the Sacklers made it clear well before the Debtors filed for chapter 11 bankruptcy that they would contribute toward Purdue's bankruptcy estate only if they received blanket releases that would put "all of the litigation behind them." (*Id.* at 155:25-156:1-12). This was reported heavily in the press at the time of the bankruptcy filing.[33]

[33]   *See e.g.*, *Purdue Pharma's bankruptcy plan includes special protection for the Sackler family fortune*, The Washington Post (Sept. 19, 2019), https://www.washingtonpost.com/business/2019/09/18/purdue-pharmas-bankruptcy-plan-includes-special-protection-sackler-family-fortune; *Where did the Sacklers move cash from their opioid maker?*, ABC News (Sept. 5, 2019), https://abcnews.go.com/US/wireStory/sacklers-move-cash-opioid-maker-65407504.

This pre-petition settlement framework was then imported into the bankruptcy process. As Mr. Dubel testified, once a pre-petition settlement framework was created, the plan was to "Us[e] the Chapter 11 process to enable us to then organize all

3885

of the various claimants into one group under ... the auspices of the Chapter 11 bankruptcy process." (*Id.* at 154:14-18). He further explained that, "It was the framework that would help us continue to bring all of the various creditor groups towards a decision as to whether it was better to litigate against the Sacklers or attempt to come up with a settlement that would be fair and equitable for all the creditors of the Debtor's estates." (*Id.* at 155:2-9). He testified that some 24 states "were supportive of us moving forward in the process of filing a Chapter 11 and using this [bankruptcy] as a means of coalescing all the parties into one organized spot to address the potential claims that the estates would have against the Sacklers." (*Id.* at 157:4-9).

Purdue's bankruptcy was thus a critical part of a strategy to secure for the Sacklers a release from any liability for past and even future opioid-related litigation without having to pursue personal bankruptcy. David Sackler acknowledged as much in his testimony, "I don't know of another forum that would allow this kind of global solution, this kind of equitable solution for all parties." (Confr. Hr'g Tr., Aug. 17, 2021, at 35:4-6).

## VIII. The Underlying Bankruptcy

Facing the mounting lawsuits against both Purdue and members of the Sackler family in the U.S. and abroad, certain U.S. based Purdue entities (Debtors) filed for bankruptcy relief on September 15, 2019. (Bankr. Dkt. No. 1). Members of the Sackler family and the Sackler entities – such as Rosebay and Beacon – did not file for **\*60** bankruptcy, despite having been named as defendants in opioid-related lawsuits.

### A. Pending Actions Against Purdue and Members of the Sackler Family Are Halted

Purdue quickly moved on September 18, 2019, before the Bankruptcy Court for an injunction halting all actions against Purdue as well as "against their current and former owners (including any trusts and their respective trustees and beneficiaries), officers, directors, employees, and associated entities." (Dkt. No. 91-4, at App.1471, 1562). This meant enjoining over 2,900 actions against Purdue and at least 400 civil suits against the Sacklers. (*Id.*, at App.1562).

Purdue argued that enjoining all litigation was necessary to facilitate the parties' work towards a global settlement in a single forum – the Bankruptcy Court. After an evidentiary hearing, on October 11, 2019, the Bankruptcy Court temporarily halted all such litigation until November 6, 2019 (*Id.* at App.1472), at which point it granted Purdue's motion enjoining all plaintiffs from continuing or commencing any judicial, administrative, or investigative actions, as well as any other enforcement proceeding, against Purdue or the non-debtor related parties, including against members of the Sackler family. (*Id.*; *see* Bankr. Dkt., No. 2983, at 171). This Court affirmed the Bankruptcy Court's grant of the preliminary injunction. *Dunaway v. Purdue Pharma. L.P. (In re Purdue Pharma. L.P.)*, 619 B.R. 38 (S.D.N.Y. 2020). The expiration date of the preliminary injunction has been extended 18 times, during which period the parties negotiated to come up with the Plan. (*See* Dkt. No. 91-4, at App.1402, 1429, 1472-73; Bankr. Dkt. Nos. 2897, 2488).

### B. The Creditor Constituencies in the Bankruptcy

On September 27, 2019, the U.S. Trustee appointed nine creditors to the UCC, an independent fiduciary to represent the interests of all unsecured creditors in the Purdue bankruptcy. (Dkt. No. 91-1, at App.7).[34] The UCC's appointees are Blue Cross and Blue Shield Association; CVS Caremark Part D Services L.L.C. and CaremarkPCS Health, L.L.C.; Cheryl Juaire; LTS Lohmann Therapy Systems, Corp.; Pension Benefit Guaranty Corporation; Walter Lee Salmons; Kara Trainor; and West Boca Medical Center. (Bankr. Dkt. No. 1294; *see* Dkt. No. 115-1, at 5). The UCC also has several ex-officio, non-voting representatives: (i) Cameron County, Texas, on behalf of the MSGE; (ii) the Cheyenne and Arapaho Tribes, on behalf of certain Native American Tribes and Native American-affiliated creditors; and (iii) Thornton Township High School District 205, on behalf of certain public school districts. (*See* Bankr. Dkt. No. 1294).

[34]     See Official Committee of Unsecured Creditors of Purdue Pharma L.P. and Affiliated Debtors: General Information, KKC, available at http://www.kccllc.net/PurdueCreditors.

Between September and November 2019, various other creditor groups were formed to represent creditor constituencies in the bankruptcy, including as follows:

- The AHC was formed in September 2019 and is comprised of ten States, six counties, cites, parishes, or municipalities, one federally recognized American Indian Tribe (the Muscogee (Creek) Nation, as well as the court-appointed Co-Lead Counsel on behalf of the Plaintiffs' Executive Committee in the Opioid MDL (*see* Bankr. Dkt. No. 279);

- NAS Children was formed in September 2019 and is comprised of around 3,500 children, who born with "neonatal abstinence syndrome" due  **\*61**  to exposure to opioids in utero, and/or their guardians (*see* Bankr. Dkt. No. 1582; Dkt. No. 115-1, at 3);

- The PI Ad Hoc Group was formed in October 2019 and is comprised of 60,761 personal injury claimants, each holding "one or more unsecured, unliquidated, opioid-related personal injury claims against one or more of the Debtors" (*see* Bankr. Dkt. Nos. 3939, 348);

- MSGE was formed in October 2019 and is comprised of 1,317 entities: 1,245 cities, counties and other governmental entities, 9 tribal nations, 13 hospital districts, 16 independent public school districts, 32 medical groups, and 2 funds across 38 states and territories (*see* Bankr. Dkt. No. 1794);

- The Ad Hoc Group of Non-Consenting States ("NCSG") was formed in October 2019 and is comprised of 25 states that did not reach a pre-petition agreement with Purdue or the Sacklers regarding "the general contours of a potential chapter 11 plan" to settle their claims – California, Colorado, Connecticut, Delaware, D.C., Hawaii, Idaho, Illinois, Iowa, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Hampshire, New Jersey, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington, and Wisconsin (*see* Bankr. Dkt. No. 296);

- The Ratepayer Mediation Participants ("Ratepayers") was formed in October 2019 and is comprised of "proposed representatives of classes of privately insured parties who are plaintiffs and proposed class representatives in their individual and representative capacities in suits brought against [Purdue]" in 25 actions in 25 states (*see* Bankr. Dkt. No. 333; Dkt. No. 91-3, at App.1108); and

- The Ad Hoc Group of Hospitals ("Hospitals") was formed in November 2019 and is comprised of hundreds of hospitals that have treated and treat patients for conditions related to the use of opiates manufactured by Purdue (*see* Bankr. Dkt. 1536).

Other groups that formed during the pendency of the bankruptcy proceedings include:

- The Third-Party Payor Group ("TPP Group"), comprised of certain holders of third-party payor claims (*see* Dkt. No. 91-3, at App.1114);

- The Native American Tribes Group ("Tribes Group"), comprised of the Muscogee (Creek) Nation, the Cheyenne & Arapaho Tribes, an ex officio member of the Creditors' Committee, and other Tribes represented by various counsel from the Tribal Leadership Committee and the Opioid MDL Plaintiffs' Executive Committee (*see id.* at App.1096); and

- The Public School District Claimants ("Public Schools"), comprised of over 60 public school districts in the United States (*see id.* at App.1106; Bankr. Dkt. Nos. 2707, 2304).

Each of these groups was representative of certain creditor constituencies, whose "members" (there was no certified class) held similar types of claims against Purdue.

*C. The Court Sets A Bar Date for Filing of Proof of Claims*

On January 3, 2020, Purdue filed a "Motion for Entry of an Order (I) Establishing Deadlines for Filing Proofs of Claim and Procedures Relating Thereto, (II) Approving  **\*62**  the Proof of Claim Forms, and (III) Approving the Form and Manner of

3887

Notice Thereof" (the "Bar Date Motion")." (*See* Dkt. No. 91-4, at App.1475). On February 3, 2020, the Bankruptcy Court approved the Bar Date Motion, setting June 30, 2020 as the deadline for all persons and entities holding a prepetition claim against Purdue, as defined in section 101(5) of the Bankruptcy Code (a "Claim"), to file a proof of claim. (*Id.*). On June 3, 2020, the Bankruptcy Court entered an order extending the Bar Date to July 30, 2020. (*Id.*; *see id.* at App.1298).

During the five months while the window for filing proofs of claims was open, over 614,000 claimants did so. Just 10% of the claims so filed would give rise to over $140 trillion in aggregate liability – more than the whole world's gross domestic product. (Dkt. No. 91-4, at App.1421; *see* Dkt. No. 91-1, at App.28).[35] The claimants included the federal government, states and political subdivisions, Native American Tribes, hospitals, third-party payors, ratepayers, public schools, NAS monitoring claims,[36] more than 130,000 personal injury victims, and others. (*See* Dkt. No. 91-4, at App.1425-1429; *see* Dkt. No. 91-1, at App.28).

[35]    As of October 21, 2021, 628,389 claims have been filed. *See* Bankruptcy Claim Report, *available at* https://restructuring.primeclerk.com/purduepharma/Home-DownloadPDF?id1=MTMwMjM2Mw%3D%3D&id2=0.

[36]    NAS monitoring claims are those of legal guardians of children born with neonatal abstinence syndrome due to exposure to opioids in utero. (Dkt. No. 91-4, at App.1404; *see* Dkt. No. 115-1 at 3).

### D. The Court Approves Mediation and Appoints Mediators to Facilitate Resolution

On February 20, 2020, Purdue filed an unopposed "Motion for Entry of an Order Appointing Mediators," seeking the appointment of mediators and mandating that the various creditor constituencies participate in mediation. (Dkt. No. 91-4, at App.1486). On March 2, 2020, the Bankruptcy Court approved Purdue's motion and appointed The Honorable Layn Phillips (ret.) and Mr. Kenneth Feinberg as co-mediators (*Id.*; Bankr. Dkt. No. 895). Both are among the most experienced and respected mediators in the country.

## IX. The Negotiation of the Bankruptcy Plan

Through mediation, Purdue and stakeholders worked to negotiate a complex settlement framework that would ultimately direct the Debtors' assets and $4.275 billion from the Sackler families toward abating the opioid crisis and restoring victims of the crisis. (*See* Dkt. No.91-4, at App.1402, 1429; *see* Bankr. Dkt. 2488).

The parties involved in the negotiations included the Debtors and non-debtor related parties (*i.e.*, members of the Sackler family) and the various creditor constituencies. Together, as defined in the court's mediation order, the participating "Mediation Parties" were the Debtors, the UCC, the AHC, the NCSG, the MSGE, the PI Ad Hoc Group, NAS Children, the Hospitals, the TPP group, and the Ratepayers. (Dkt. No. 91-4, at App.1486). The Tribes Group, the Public Schools, the National Association for the Advancement of Colored People, and others also participated in mediation, although not as official Mediation Parties. (*Id.*; *see* Bankr. Dkt. No. 2548).

The mediation progressed in three phases (*id.* at App.1404), as follows:

**\*63**   *A. Phase 1: March 2020-September 2020*

Phase one of the mediation addressed "the allocation of value/proceeds available from the Debtors' Estates" as disputed between the "Non-Federal Public Claimants" (the states, federal districts and U.S. territories, political subdivisions, and Native American tribes) and "Private Claimants" (hospitals, private health insurance carriers and third-party payors, and individuals and estates asserting personal injury, including NAS Children). (Dkt. No. 91-4, at App.1487; Bankr. Dkt. No. 855, at 6-7). It proceeded with a "series of rigorous formal mediation sessions during the period from March 6, 2020 to September 11, 2020." (Dkt. No. 91-4, at App.1487).

The mediation resulted in certain resolutions (*see generally* Bankr. Dkt. 1716), the most critical of which included value allocation between and among the various parties, such as:

3888

First, the Non-Federal Public Claimants agreed that all value received by them through the Chapter 11 Cases would be exclusively dedicated to programs designed to abate the opioid crisis ...

Second, the Non-Federal Public Claimants addressed and resolved ... value allocation for all Native American Tribes ... and a default mechanism that, in the absence of a stand-alone agreement between a State or territory and its political subdivisions, provides a structure and process for applying funds to abate the opioid crisis ...

Third, agreement was reached on written term sheets with certain individual Private Claimant groups that addressed allocation of estate value to each Private Claimant group. These agreements provided, among other things, that each class of Private Claimants will receive fixed cash distributions over time, the values and time periods varying for each class. Moreover, the Ad Hoc Group of Hospitals, the Third-Party Payors, and the NAS Committee (with regard to medical monitoring) each agreed to dedicate substantially all the distributions from their respective Private Creditor Trusts to abate the opioid crisis.

(*See* Dkt. No. 91-4, at App.1487). Ultimately, all participants except "the public school districts and the NAS children physical injury group" were able to achieve "agreement *inter se* as to their respective allocations as a result of the mediation process." (Bankr. Dkt. 2548, at 8).

Each of the term sheets with the private plaintiffs was conditioned on the confirmation of a plan of reorganization that includes participation by the Sackler Families in the plan of reorganization. (Bankr. Dkt. 1716, at 5).

However, not all issues were resolved. On September 23, 2020, while phase one of the mediation had reached "substantial completion" (Bankr. Dkt. 2548), the mediators' report indicated that "there remain terms to be negotiated by the parties with respect to each of the term sheets in order to reach final agreements ..." (Bankr. Dkt. 1716, at 5-6). With several open terms and the estate claims still to be negotiated, on September 30, the Bankruptcy Court entered a Supplemental Mediation Order, authorizing further mediation to resolve the open issues and to mediate the estate claims (phase 2). (Dkt. No. 91-4, at App.1551; Bankr. Dkt. Nos. 1756).

*B. Phase 2: October 2020-January 31, 2021*

The Bankruptcy Court's Supplemental Mediation Order authorized the mediators "to mediate any and all potential claims or causes of action that may be asserted by the estate or any of the Non-Federal Public **\*64** Claimants" against the Sackler families and entities "or that may otherwise become the subject of releases potentially granted to" members of the Sackler families and entities (defined as the "Shareholder Claims"). (*See* Bankr. Dkt. Nos. 1756, at 2; 2584, at 1; 518, at 4). This Order also "narrowed the number of mediating parties on the Shareholder Claims aspect of the mediation" to the Debtors, the UCC, the "Consenting Ad Hoc Committee,"[37] the NCSG, the MSGE, and representatives of the Sacklers. (Bankr. Dkt. Nos. 2584, at 1; 2548, at 2).

[37]     The Bankruptcy Court did not define what the "Consenting Ad Hoc Committee" was, but the mediators' March 23, 2021 report lists "the Consenting States and the Ad Hoc Committee" as consisting of the AHC plus the various consenting states listed there – notably Texas, Tennessee, and Florida. (*See* Bankr. Dkt. No. 2548, at 2). The Court assumes this is what is meant by the "Consenting Ad Hoc Committee."

In phase two, the mediators received presentations from the parties on their positions regarding the estate claims, including a presentation by the UCC of its "views and findings on its investigation of estate causes of action." (Dkt. No. 91-4, at at App.1551-52; Bankr. Dkt. No. 2584).[38] After the presentations, "numerical negotiation began," with offers and counteroffers proposed. However, no "mutually agreed resolution" was reached among all constituencies before the end of the phase two on January 31, 2021. (Bankr. Dkt. No. 2584).

[38]     Occurring contemporaneously with the mediation was a Special Committee's "comprehensive investigation into potential claims that the Debtors may have against the Sackler Families and Sackler Entities," led by attorneys from Davis Polk, who represent the Debtors in the bankruptcy. (Dkt. No. 91-4, at App.1537-1553). Throughout the mediation, the Special Committee was kept apprised

of the "offers and counteroffers that had been communicated through the Mediators by the NCSG, on the one hand, and the Sackler Families, on the other hand." (*Id.* at App.1552).

*C. Phase 2 Negotiations Continue with the Sackler families: January 2021 to March 2021*

Although court-ordered mediation formally ended on January 31, 2021, settlement negotiations continued among the Sackler families and entities, the Debtors, the NCSG, the UCC, the ACH, and the MSGE regarding the "Sackler contribution" to the Debtors' estate. (*See* Bankr. Dkt. No. 2584, at 9; Dkt. No. 91-4, at App.1552-53). Eight more offers and counteroffers were exchanged between the end of January 2021 and February 18, 2021. (Dkt. No. 91-4, at App.1553).

Ultimately, the Sackler families and entities, the Debtors, the AHC, the "Consenting Ad Hoc Committee," and the MSGE reached an agreement in principle, which settled on a guaranteed amount that the Sackler families would be required to contribute to the Debtors' estate – $4.275 billion over nine years (or ten years if certain amounts were paid ahead of schedule in the first six years). (*Id.* at App.1552-53; *see* Bankr. Dkt. Nos. 2488, 2879). The principal consideration for this payment was the "Shareholder Release" that was to be included in the Debtors' plan of reorganization. (*See* Bankr. Dkt. 2487, at § 10.8). That plan, along with the Debtors' "Disclosure Statement" containing the "Sackler Settlement Agreement Term Sheet" reached in negotiation, were filed with the Bankruptcy Court on March 15, 2021. (*See* Bankr. Dkt. Nos. 2487, 2488).

*D. Phase 3: May 7, 2021-June 29, 2021*

Phase three of the mediation involved a final push to resolve the dispute of the **\*65** NCSG[39] over the terms of the agreement reached in phase two of the mediation between and among the Sackler families and entities, the Debtors, the AHC, the "Consenting Ad Hoc Committee," and the MSGE. (Bankr. Dkt. Nos. 2820, 2879). To that end, on May 7, 2021, the Bankruptcy Court asked his colleague, the Honorable Shelley C. Chapman, to preside over a mediation between the NCSG and the Sackler Families with respect to the terms of the settlement. (Bankr. Dkt. No. 2820). Between May 7 and June 29, 2021, Judge Chapman conducted 145 telephone meetings and several in-person sessions between the NCSG and the Sackler families and entities. (*See* Bankr. Dkt. No. 3119).

[39] At that time, the non-consenting states included Colorado, Connecticut, Delaware, the District of Columbia, Hawaii, Idaho, Illinois, Iowa, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Hampshire, New Jersey, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington, and Wisconsin.

The result of the mediation was a modified shareholder settlement with the Sackler families and entities, which was agreed to in principle by a fifteen of the twenty-five non-consenting states – specifically, Colorado, Hawaii, Idaho, Illinois, Iowa, Maine, Massachusetts, Minnesota, Nevada, New Jersey, New York, North Carolina, Pennsylvania, Virginia, and Wisconsin. (*Id.* at 2). Those states that reached agreement in principle also agreed to support and/or not object to the Plan.

The remaining non-consenting states – most of which are parties to this appeal – did not agree to the revised settlement. (*Id.*).

The new terms of the settlement included additional payments of $50 million by the Sackler families, and the acceleration of another $50 million in previously agreed settlement payments, resulting in total payments of $4.325 billion. In addition to the money, Judge Chapman induced the parties to agree to several non-monetary terms; specifically, a "material expansion of the scope of the public document repository" to be established under the Plan, and certain prohibitions on Sackler family demands for naming rights in exchange for charitable contributions, together with a few other, minor concessions. (*See* Bankr. Dkt. No. 3119).[40] The Shareholder Release was unchanged. (*See id.*).

[40] The value of the "naming rights" concession is dubious, since institution after institution, both here and abroad, is taking the Sacklers' name off various endowed facilities, including the Louvre and the Metropolitan Museum of Art. *See Louvre Removes Sackler Family Name From Its Walls*, The N.Y. Times (Jul. 17, 2019), https://www.nytimes.com/2019/07/17/arts/design/sackler-

3890

family-louvre.html; *Met Museum Removes Sackler Name From Wing Over Opioid Ties*, The N.Y. Times (Dec. 9, 2021), https://www.nytimes.com/2021/12/09/arts/design/met-museum-sackler-wing.html

On July 7, 2021, Purdue filed the mediator's report in the bankruptcy proceeding, informing Judge Drain of the result of the mediation.

### X. Confirmation of the Plan: Summary of the Order on Appeal

Purdue filed the first version of the Plan on March 15, 2021. (Bankr. Dkt. No. 2487). It has subsequently filed twelve amendments to the Plan, the last of which was dictated by Judge Drain as a condition of confirmation. (*See* Bankr. Dkt. No. 3787).

On August 9, 2021, the Confirmation Hearing began before the Bankruptcy Court (Dkt. No. 91-3, at App.651), a six-day event during which 41 witnesses testified (by declaration or otherwise), after which the parties engaged in extensive oral argument. *See In re Purdue Pharma L.P.*, 2021 WL 4240974, at *2.

 **\*66**  On September 1, 2021, the Bankruptcy Court rendered an oral ruling, stating it would confirm the proposed plan provided certain changes were made to it, the most relevant of which for purposes of this appeal was a modification of the Section 10.7 Shareholder Release:

> I ... require that the shareholder releases in paragraph 10.7(b) [the release of third-party claims against the shareholder released parties], by the releasing parties, be further qualified than they now are. To apply [only] where ... a debtor's conduct or the claims asserted against it [are] a legal cause or a legally relevant factor to the cause of action against the shareholder released party.

(Confr. Hr'g Tr., Sept. 1, 2021, at 134:18-135:2); *see also In re Purdue Pharma L.P.*, 2021 WL 4240974, at *45; *see* Plan, at § 10.7(b) (modifying the Plan in accordance with Judge Drain's instructions). Purdue filed the final version of the Plan the next day (Bankr. Dkt., No. 3726), and on September 17, 2021, Judge Drain issued his edited written decision confirming the Plan.

The salient features of the Plan are as follows:

Trusts to Administer Abatement and Distribution. Under the Plan, the majority of Purdue's current value will be distributed among nine "creditor trusts" that will fund opioid abatement efforts and compensate personal injury claimants, including the National Opioid Abatement Trust ("NOAT"), which will make distributions to qualified governmental entities. (Bankr. Dkt. No. 3456, at ¶¶ 5-6). Most of the creditor trusts are abatement trusts and may only make distributions for the purpose of opioid abatement or to pay attorneys' fees and associated costs. (*Id.* ¶¶ 5-6). Two trusts – the "PI Trust" and "PI Futures Trust" – are the only exceptions: those creditor trusts will make distributions to qualifying personal injury claimants. (*Id.*)

The Public Document Repository. Under the Plan the Debtors are required to create a public document repository of Purdue material available for public review. (Bankr. Dkt. No. 3440, at ¶ 7.) The AHC testified at the Confirmation Hearing that the establishment of this public document repository was among their highest priorities. (Confr. Hr'g Tr., Aug. 13, 2021, at 151:17-152:9 ("[O]f all the aspects of ... the injunctive relief part of [the Plan], [the public document repository] ... is extremely important from the standpoint of, not only what it is that we developed in terms of evidence, [but also] lessons to be learned from the conduct that was uncovered and revealed."); Confr. Hr'g Tr., Aug. 16, 2021, at 83:20-22, 84:12-23 ("[I]it could be that the document repository is actually the most valuable piece of this settlement.")). The public document repository will be hosted by an academic institution or library and will include more than 13,000,000 documents (consisting of more than 100,000,000 pages) produced in the chapter 11 case and tens of millions of additional documents, including certain documents currently subject to the attorney client privilege that would not have been produced in litigation. (Bankr. Dkt. No. 3440, at ¶ 7.) The Plan ensures that scholars and the public can have access to all of these materials.

Purdue Pharma Will Cease to Exist. Under the Plan, Purdue Pharma will cease to exist. Its current business operating assets will be transferred to and operated by a new entity, known as "NewCo" in the Plan (Plan, at 28), but to be named KNOA. (Oral Arg. Tr., Nov. 30, 2021, at 158:1-17). NewCo will be governed by a board of five or seven disinterested and independent managers

3891

initially selected by the AHC and the MSGE, in consultation with the  *67  Debtors and UCC, subject to a right of observation by the DOJ. (Plan, at § 5.4). NewCo will manufacture products, including Betadine, Denokot, Colace, magnesium products, opioids and opioid-abatement medications, and oncology therapies. (*See* Oral Arg. Tr., Nov. 30, 2021, at 157:19-159:23). Additionally, NewCo will continue the Debtors' development of opioid overdose reversal and addiction treatment medications, and it must deliver millions of doses of those medications at low or no cost when development is complete (these will be distributed to groups or entities to be determined post-emergence). (*Id.* at 159:19-160:7). NewCo will be subject to an "Operating Injunction" that prohibits it from, among other things, promoting opioid products and providing financial incentives to its sales and marketing employees that are "directly" (but not indirectly) based on sales volumes or sales quotas for opioid products. (Bankr. Dkt. No. 3456, at ¶10). It also is subject to "Governance Covenants" that ensure that NewCo provides all its products in a "safe manner," complies with settlement obligations, pursues public health initiatives, and follows pharmaceutical best practices. (*Id.* at ¶11). The Plan provides for the appointment of a monitor to ensure that NewCo complies with the Operating Injunction and Governance Covenants; the monitor will provide the public with regular updates and seek relief from the Bankruptcy Court to the extent necessary to carry out the monitor's obligations. (*Id.* at ¶13). Above all, NewCo is not intended to operate indefinitely: The Plan instruct the managers to use reasonable best efforts to sell the assets of NewCo by December 21, 2024. (*Id.* at ¶15).

Shareholder Settlement Agreement. The Plan incorporates the "Shareholder Settlement Agreement" and the transactions contemplated therein whereby, in exchange for the release of third-party claims against over 1,000 individuals and entities related to the Sackler family ("Shareholder Released Parties"), the Sackler family will give $4.275 billion toward the Purdue estate. (Plan, at 37; Dkt. No. 91-3, at App.1042, 1045-1046, 1050).

Section 10.7(b) of the Plan sets out the terms of the release that the Sacklers, from the inception of the bankruptcy and earlier, insisted on in exchange for contributing funds to Purdue's estate. The Plan "releases and discharges" certain claims that third parties (including states and personal injury claimants) have asserted or might in the future assert against the Shareholder Released Parties. The release of claims against the Shareholder Released Parties permanently enjoins third parties from pursuing their current claims against the Shareholder Released Parties and precludes the commencement of future litigation against any of the Sacklers and their related entities, as long as (i) those claims are "based on or related to the Debtors, their estates, or the chapter 11 cases," and (ii) the "conduct, omission or liability of any Debtor or any Estate is the legal cause or is otherwise a legally relevant factor." (Plan § 10.7(b)). The third-party releases under the Plan are non-consensual; they bind the objecting parties as well as the parties who consented. All present and potential claims connected with OxyContin and other opioids would be covered by the Section 10.7 Shareholder Release.

Channeling Injunction. Under the Plan, all enjoined claims against the Debtors and those against the Shareholder Released Parties are to be channeled to the nine creditor trusts for treatment according to the trust documents of each respective trust ("Channeling Injunction"). (Plan, at p. 10 and § 10.8). However – as the U.S. Trustee points out, and the Debtors do not contest (*see* Dkt. No. 91, at 19-20; Dkt. No. 151, at 23-24) – the claims against the Shareholder Released Parties are effectively  *68  being extinguished for nothing, even though they are described as being "channeled." (*See e.g.*, Oral Arg. Tr., Nov. 30, 2021, at 37:9-14; 29:16-17). The U.S. Trustee explains that the Plan documents expressly prohibit value being paid based on causes of action (whether pre-or post-petition) against the Sackler family or other non-debtors for opioid-related claims. (Dkt. No. 91, at 19-20; *see, e.g.*, Dkt. No. 91-2, at App.333 ("Distributions hereunder are determined only with consideration to a Non-NAS PI Claim held against the Debtors, *and not to any associated Non-NAS PI Channeled Claim against a non-Debtor party*.") (emphasis added); *id.* at App.392 ("Distributions hereunder are determined only with consideration to an NAS PI Claim held against the Debtors, *and not to any associated NAS PI Channeled Claim against a non-Debtor party*.") (emphasis added); *id.* at App.433 ("A Future PI Claimant may not pursue litigation against the PI Futures Trust for any Future PI Channeled Claim *formerly held or that would have been held against a non-Debtor party*.") (emphasis added)). And to assert any third-party claim against the trust, the claimant must have filed a proof of claim in the bankruptcy prior to the bar dates, but each of the bar dates passed by the time anyone was notified of the claims' extinguishment. (Dkt. No. 91, at 20). And to get an exception for an untimely filing, a party must proceed through multiple steps, after which the Bankruptcy Court – which serves as a gatekeeper – determines, in its discretion, that the untimely claim qualified under the Plan and granted leave to assert the claim. (*Id.*).

3892

Debtors sidestepped the Plan's effective extinguishment of purportedly channeled third-party claims in its brief by not addressing the U.S. Trustee's points; they made no effort to clarify this in oral argument for the Court. (*See* Dkt. No. 151, at 23-27).

## XI. Objections to the Plan

On June 3, 2021, the Bankruptcy Court approved Purdue's disclosure statement. (*See* Bankr. Dkt., No. 2988).

On July 19, 2021, the U.S. Trustee objected to confirmation of the Plan, arguing that the Section 10.7 Shareholder Release was unconstitutional, violates the Bankruptcy Code, and is inconsistent with Second Circuit law. (*See* Bankr. Dkt. No. 3256). Eight states – California, Connecticut, Delaware, Maryland, Oregon, Rhode Island, Washington, Vermont – and D.C. all filed objections, as did the City of Seattle, four Canadian municipalities, two Canadian First Nations and three *pro se* plaintiffs. (Bankr. Dkt. No. 3787, at 28; *see also* Bankr. Dkt. No. 3594). The U.S. Attorney's Office for this District on behalf of the United States of America filed a statement of interest supporting these objections to the Section 10.7 Shareholder Release. (*See* Bankr. Dkt. No. 3268).

The objectors argued, *inter alia* and as applicable to them, that the Section 10.7 Shareholder Release (1) violates the third-party claimants' rights to due process, (2) violates the objecting states' sovereignty and police power, (3) is not permitted under the Bankruptcy Code, and (4) the Bankruptcy Court lacks constitutional, statutory, and equitable authority to approve the Section 10.7 Shareholder Release.

## XII. Judge Drain's Decision to Confirm the Plan

Judge Drain's opinion is a judicial *tour de force* – delivered from the bench only days after the end of a lengthy trial, it included extensive findings of fact and addressed every conceivable legal argument in great detail. Sixteen days later, on September 17, the learned bankruptcy judge  **\*69**  filed a written version of that oral decision, running to 54 pages on Westlaw, which is the version summarized here. *See In re Purdue Pharma L.P.*, 633 B.R. 53 (Bankr. S.D.N.Y. Sept. 17, 2021).

Judge Drain began by describing the highly unusual and complex nature of the situation before him – a "massive public health crisis," with a potential creditor body that included "every person in the range of the Debtors' opioid products sold throughout the United States" – individuals, local, state and territorial governments, Indian tribes, hospitals, first responders, and the United States itself. *Id.* at 58. He noted that over 618,000 claims, in an amount exceeding two trillion dollars, had been filed in the bankruptcy. And he commended the parties for working in "unique and trailblazing ways to address the public health crisis that underlies those claims." *Id.*

In his opening remarks, Judge Drain also addressed the elephant in the room:

> These cases are complex also because the Debtors' assets include enormous claims against their controlling shareholders, and in some instances directors and officers, who are members of the Sackler family, whose aggregate net worth, though greater than the Debtors', also may well be insufficient to satisfy the Debtors' claims against them and other very closely related claims that are separately asserted by third parties who are also creditors of the Debtors.

*Id.*

Judge Drain then announced the ultimate result:

First, he concluded that there existed no other reasonably conceivable means to achieve the result that would be accomplished by the Plan in addressing the problems presented by this case. Second, he found that well-established precedent – which he described as "Congress in the Bankruptcy Code and the courts interpreting it" – authorized him to confirm the Plan. *Id.* Insofar as is relevant to this appeal,[41] Judge Drain reached the following conclusions.

3893

41   Many issues addressed by Judge Drain in his comprehensive opinion are not implicated by any of the appeals to this Court, and so will not be addressed in this decision. These include: objections from insurers that the Plan was not insurance neutral; from the U.S. Trustee to the Plan's treatment of certain attorney fees and expenses; to objections by certain prisoners who filed claims but challenged the sufficiency of notice and what they perceived as a compromising of their rights under the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A; objections by certain states to their classification in the same voting class as their political subdivisions; an objection by the State of West Virginia to the allocation plan for states from the NOAT; and objections by certain Pro Se Appellants to the Plan's release of the Sacklers from criminal liability (it does not).

### A. The Section 10.7 Shareholder Release and Settlement with the Sacklers

The meat of this case, both before Judge Drain and on this appeal, is the Bankruptcy Court's approval of the broad releases that the Plan affords to all members of the Sackler family and to their related entities, including businesses and trusts.

The Plan includes two settlements with every member of the Sackler family – whether or not that individual had anything to do with the management of Purdue or personally exercised any control over Purdue – and with a variety of entities related to the Sacklers, including various trusts, businesses, and IACs. Taken together these individuals and entities (not all of whom have been or apparently can **\*70** be identified) are known as the "Shareholder Released Parties." *Id.* at 82-83.

The first settlement disposed of claims that the Debtors could assert against the Shareholder Released Parties for the benefit its creditors. *Id.* These included claims for (1) breach of fiduciary duty against those members of the Sackler family who were involved in – indeed, who drove – the business decisions that were the basis for Purdue's criminal and civil liability, and (2) fraudulent conveyance arising out of the Sackler family's removal of nearly $11 billion from the Debtor corporations over the course of a decade. *See id.* at 90-92.

The second settlement disposed of certain third-party claims that could not be asserted by the Debtors against the Shareholder Released Parties, but were particularized to others. Chief among these claims are claims asserted by the states – both the consenting states and the objecting states – arising under various unfair trade practices and consumer protection laws that make officers, directors and managers who are responsible for corporate misconduct personally liable for their actions. Judge Drain did not review on a state-by-state basis the various state laws applicable to these objector claims, including laws that might forbid insurance coverage or indemnification and contribution claims by those individuals, such that their personal assets are very much at risk. *Id.* at 107-108.

In exchange for these releases, the Shareholder Released Parties agreed to contribute $4.325 billion to a fund that would be used to resolve both public and private civil claims as well as both civil and criminal settlements with the federal government. *Id.* at 84-85. The Sacklers also agreed to the dedication of two charities worth at least $175 million for abatement purposes; to a resolution that barred them from insisting on naming rights in exchange for charitable contributions; to refrain from engaging in any business with NewCo and to dispose of their interest in the non-U.S. Purdue entities within seven years; to certain "snap back" provisions that were designed to ensure the collectability of their settlement payments; and to the creation of an extensive document repository that would archive in a comprehensive manner the history of the Debtors and their involvement in the development, production and sale of opioids. *Id.*

Judge Drain made three fundamental findings relating to these settlements: that the Sackler Settlements were necessary to the Plan; that they were fair and reasonable; and that it was necessary and appropriate for him to approve the non-consensual release of certain third-party claims against the Sacklers, even though they are not debtors.

### B. The Sackler Settlements Were Necessary

Judge Drain concluded that these settlements were necessary to the Plan. He noted that a variety of other settlements that were essential components of the Plan – including agreed-upon allocations of the pot of money to be created by the Debtors' estate and the Sackler contribution – would unravel for lack of funding if the Sacklers did not make their $4.325 billion contribution.

And he found that they would not make that contribution unless they obtained broad releases from past and future liability. *Id.* at 105-07.

### 1. The Sackler Settlements Were Fair and Reasonable in Amount

 **[4]**    Judge Drain evaluated the fairness of the settlement in light of the factors laid out by the Second Circuit in  **\*71**  *Motorola Inc. v. Official Committee of Unsecured Creditors & JP Morgan Chase Bank, N.A. (In re Iridium Operating LLC),* 478 F. 3d 452, 464-66 (2d Cir. 2007),* which is controlling law in this Circuit on the questions. He made the following findings:[42]

[42]    Judge Drain considered all of the *Iridium* factors, but not in the order in which they are discussed in *Iridium*. I employ Judge Drain's framework in this decision.

(a) The Sackler settlements were the product of arms-length bargaining conducted by able counsel in two separate mediations presided over by three outstanding mediators and preceded by what he described as the "most extensive discovery process not only I have seen after practicing bankruptcy law since 1984 and being on the bench since 2002, but I believe any court in bankruptcy has ever seen." *In re Purdue Pharma L.P.,* 633 B.R. at 85-86. That process led to the production of almost 100 million pages of documents, through which all interested parties could learn "anything suggesting a claim against the shareholder released parties." *Id.*

(b) The settlements were negotiated by exceedingly competent counsel who were, as a result of the discovery process described above, well-informed about both the claims they might bring against the Shareholder Released Parties and the difficulties they would have in pursuing those claims. *Id.* at 86-88.

(c) Purdue's creditors overwhelmingly supported the settlement. *Id.* at 87-88. Some 120,000 votes were cast on the Plan – a number far exceeding the voting in any other bankruptcy case. *Id.* at 60-61. Over 95% of those voting in the aggregate favored the Plan: over 79% of the states and territories supported the Plan; over 96% of other governmental entities and tribes; and over 96% of the personal injury claimants; together with a supermajority of all other claimants. *Id.* at 87-88.

(d) The failure to approve the settlement was likely to result in complex and protracted litigation, with attendant cost and delay, while the settlement offered significant and immediate benefits to the estate and its creditors. *Id.* at 87-89.

 **[5]**    (e) Judge Drain focused particularly on the difficulty of collecting any judgments that might be obtained against the Sacklers. *Id.* at 88-89. Ordinarily this factor would rest on things like the paucity of assets available to satisfy judgments. But in this case the problems with collection were the result of what the Sacklers did with the money that they admittedly took out of the corporations between 2008-2016. The assets of family members are held principally in purportedly spendthrift trusts located in the United States and offshore – many of them on the Bailiwick of Jersey – and many of those assets cannot readily be liquidated. As Judge Drain correctly observed, spendthrift trusts can and often do insulate assets from the bankruptcy process. And while generally applicable law governing U.S. trusts allows those trusts to be invaded when they are funded by fraudulent conveyances, there is a substantial question whether the same is true under Jersey law. Additionally, he noted that many Sackler family members live abroad, raising a barrier to an American court's acquiring personal jurisdiction over them. Although the learned bankruptcy judge did not reach any final conclusion about these complicated issues, he readily drew the conclusion that collectability presented a significant concern, one that was obviated by the settlement.

 **\*72**  (f) Judge Drain also noted that the cost and delay attendant to the pursuit of the Sacklers – which was in and of itself substantial – would be compounded by the unraveling of the other settlements that were baked into the Plan. Judge Drain concluded that the unraveling of the Plan would inevitably result in the liquidation of Debtors under Chapter 7, which would in turn lead to no recovery for the unsecured creditors (including the personal injury plaintiffs), and no money for any abatement programs. *Id.* at 89-90. This conclusion was reinforced by the fact that, absent confirmation of the Plan, the United States would

3895

have a superpriority administrative expense claim in an amount ($2 billion) that would wipe out the value of Purdue's business as a going concern ($1.8 billion). *Id.* at 74-75.

(g) Finally, Judge Drain considered the legal risks of the estates' pursuit of claims against the Sacklers against the benefits of settlement. *Id.* at 90-93.

Judge Drain first chronicled the problems Purdue would have in proving that the admitted conveyances qualified as fraudulent. He noted that over 40% of the purportedly avoidable transfers were used to pay federal and states taxes associated with Purdue, none of which was going to be refunded. *Id.* at 90-91. He identified various technical defenses that the Sacklers could assert to fraudulent conveyance claims, including statutes of limitations and the impact of prior settlements. *Id.* at 91-92. And while admitting that at least some of the Sacklers appeared to have been very much aware of the risk of opioid litigation to Purdue's solvency and their own, he also pointed to evidence that Purdue may not have been "insolvent, unable to pay its debts when due, or left with unreasonably small capital" – which would be necessary to make a conveyance fraudulent – until as late as 2017 or 2018, by which time most or all of the conveyances had been made. *Id.*

As for alter ego, veil-piercing and breach of fiduciary duty claims, Judge Drain noted that most of the Sackler family members had nothing to do with Purdue's operations, and that no one had identified any action taken by any of them in their capacity as passive shareholders that would make them liable on such claims. *Id.* He also identified the extensive government oversight of Purdue after its 2007 Plea Agreement and Settlement with the federal government and certain states, and the fact that neither DHHS nor various state reviews ever identified any improper actions. *Id.* at 92-93.[43]

[43]    Given Purdue's admissions in connection with its 2020 Plea Agreement, this Court cannot assign much weight to the "oversight" factor.

Judge Drain made no findings about the actual merit of any of the estates' claims against any member of the Sackler family. But weighing these difficulties against the benefits that would be derived from the settlement, he concluded:

> I believe that in a vacuum the ultimate judgments that could be achieved on the estates' claims ... might well be higher than the amount that the Sacklers are contributing. But I do not believe that recoveries on such judgments would be higher after taking into account the catastrophic effects on recoveries that would result from pursuing those claims and unravelling the plan's intricate settlements. And as I said at the beginning of this analysis, there is also the serious issue of problems that would be faced in **\*73** collection that the plan settlements materially reduce.

*Id.*

Judge Drain ended his discussion of the *Iridium* factors with a deeply personal reflection – dare I say, a *cri de coeur* – that is perfectly understandable coming from one who had labored so long and so hard to try to achieve a better result. Admitting that he had "expected a higher settlement," he said:

> This is a bitter result. B-I-T-T-E-R. It is incredibly frustrating that the law recognizes, albeit with some exceptions, although fairly narrow ones, the enforceability of spendthrift trusts. It is incredibly frustrating that people can send their money offshore in a way that might frustrate U.S. law. It is frustrating, although a long-established principle of U.S. law, that it is so difficult to hold board members and controlling shareholders liable for their corporation's conduct.
>
> It is incredibly frustrating that the vast size of the claims against the Debtors and the vast number of claimants creates the need for this plan's intricate settlements. But those things are all facts that anyone who is a fiduciary for the creditor body would have to recognize, and that I recognize.

*Id.*

Ultimately, however, the learned bankruptcy judge decided that the perfect was the enemy of the good:

3896

> I am not prepared, given the record before me, to risk [the parties'] agreement. I do not have the ability to impose what I would like on the parties.

*Id.* at 94. And so, albeit with obvious reluctance, he concluded that the settlement was reasonable as that term is understood at law.

2. The Section 10.7 Shareholder Release Was In all Respects Legal

Having concluded that the settlements were fair and reasonable in amount, Judge Drain went on to address a number of challenges to his legal authority to impose the most controversial element of those settlements: The Section 10.7 Shareholder Release. *Id.* at *35. He rejected each such challenge.

**Subject matter jurisdiction.** First, Judge Drain concluded that he had subject matter jurisdiction to impose the third-party releases and injunctions. Citing *Celotex Corp. v. Edwards*, 514 U.S. 300, 307-08, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995) and *SPV OSUS, Ltd. v. UBS AG*, 882 F. 3d 333, 339-40 (2d Cir. 2018), he held that he had the undoubted power to enjoin the claims of third parties that had "any conceivable effect" on the Debtors' estates as part of a Bankruptcy Court's "related to" jurisdiction, conferred by Congress in 28 U.S.C. § 1334(b). *In re Purdue Pharma L.P.*, 633 B.R. at 95-98. He concluded that the third-party claims covered by the Section 10.7 Shareholder Release would directly affect the *res* of the Debtors' estates in three different ways: insurance rights, the Shareholder Released Parties' right to indemnification and contribution, and the Debtors' ability to pursue its own overlapping claims against the Sacklers. He concluded by saying, "Depending on the kinds of third-party claims covered by a plan's release and injunction of such claims, *I conclude, therefore, that the Court has jurisdiction to impose such relief, based upon the effect of the claims on the estate rather than on whether the claims are 'derivative ...'"* *Id.* at 98 (emphasis added).

**Due process.** Next, Judge Drain concluded that the Section 10.7 Shareholder Release did not violate the third-party **\*74** claimants' right to due process. *Id.* at 97-99. He rejected the argument that a release constitutes a *de facto* adjudication of the claim, holding that such a release "is part of the settlement of the claim that channels settlement funds to the estate." *Id.* at 98. And he held that claimants had been provided with constitutionally sufficient notice of the proposed releases. Uncontroverted testimony that Judge Drain found credible established that messages tailored to reach persons who may have been harmed by Debtors' products had reached roughly 98% of the adult population of the United States and 86% of the adult population of Canada, with supplemental notice reaching an estimated 87% of all U.S. adults and 82% of Canadian adults, as well as audiences in 39 countries, with billions of hits on the internet and social media in addition to notice delivered by TV, radio, publications, billboards and outreach to victim advocate and abatement-centered groups. While references contained in the notices sent readers to complex lawyerly descriptions of the release provisions, the notices themselves were written in plain English and specifically mentioned that the Plan contemplated a broad release of civil (not criminal) claims against the members of the Sackler family and related entities.

**Constitutional authority.** Judge Drain next concluded that he had constitutional power to issue a final order confirming a plan that contains a third-party claims release. *Id.* at 99-100. He determined that a proceeding to determine whether a chapter 11 plan containing such a release was a "core" proceeding, so ordering the non-debtor releases and enjoining the prosecution of third-party claims against non-the Sacklers qualified as "constitutionally core" under *Stern v. Marshall*, 564 U.S. 462 (2011) and its progeny.

**Statutory authority.** Finally, Judge Drain concluded that he had statutory power to confirm and enter the third-party releases. *In re Purdue Pharma L.P.*, 2021 WL 4240974, at *40-43. He started from the proposition that the Second Circuit, in *Deutsche Bank A.G. v. Metromedia Fiber Network, Inc., (In re Metromedia Fiber Network, Inc.)*, 416 F. 3d 136, 141 (2d Cir. 2005), had indicated that non-consensual third-party releases of claims against non-debtors could be approved, albeit only in "appropriate, narrow circumstances." *In re Purdue Pharma L.P.*, 2021 WL 4240974, at *40. He noted that most of the Circuits were of that

3897

view and rejected the reasoning of those courts of appeal that held otherwise. Indeed, he asserted that the view of those Circuits (the Fifth, Ninth, and Tenth Circuits) – which is that Section 524(e) of the Bankruptcy Code precluded the grant of any such release in the context of a settlement – "has been effectively refuted." *Id.* at 101. He analogized the enjoining of third-party claims against non-debtors to his undoubted power to impose a preliminary injunction against the temporary prosecution of third-party claims in order to facilitate the reorganization process. And he asked rhetorically why such a stay could not become permanent if it was crucial to a reorganization process involving massive numbers of overlapping estate and third-party claims. *Id.* at 101-02.

Having concluded that Section 524(e) was not a statutory impediment to a Bankruptcy Court's approval of third-party releases, the Bankruptcy Judge then addressed the question of exactly what provision or provisions in the Bankruptcy Code conferred the necessary authority over claims against non-debtors on him. *Id.* at 101-03. He found such authority in the "necessary or appropriate" power in **\*75** Section 105(a) of the Bankruptcy Code coupled with Section 1123(b)(6)'s grant of power to "include any other appropriate provision not inconsistent with the applicable provisions of this title" – what the Seventh Circuit referred to in *In re Airadigm Communications, Inc.*, 519 F. 3d 640, 657 (7th Cir. 2008) as a bankruptcy court's "residual authority." *In re Purdue Pharma L.P.*, 2021 WL 4240974, at \*43. He also cited Sections 1123(b)(5) and 1129 of the Bankruptcy Code.

Judge Drain carefully noted that the release in this case extended beyond so-called "derivative" claims – claims that the Debtors could bring against the Sacklers– which claims could assuredly be released by a bankruptcy court exercising *in rem* jurisdiction over the *res* of the estate. But he concluded – largely in reliance on *In re Quigley Co., Inc.*, 676 F.3d 45, 59-60 (2d Cir. 2012) – that he had statutory authority to authorize the release of non-derivative – direct or particularized – claims, because the third party claims to be released in this case were "premised as a legal matter on a meaningful overlap with the debtor's conduct." *In re Purdue Pharma L.P.*, 2021 WL 4240974, at \*43-47. Such a claim – one that "essentially dovetail[s] with the facts of the claimants' third-party claims against the Debtors" – was, in Judge Drain's view, "sufficiently close to the claims against the debtor to be subject to settlement under the debtor's plan if enough other considerations support the settlement." *Id.* at 105.

As noted above, Judge Drain did insist that the Section 10.7 Shareholder Release be modified so that it covered only third-party claims in which "a Debtor's conduct, or a claim asserted against the Debtor, must be a legal cause of the released claim, or a legally relevant factor to the third-party cause of action against the shareholder released party." *Id.* at 105. In other words, he insisted that there be substantial factual overlap between the released particularized claims and the derivative claims that no one disputes he had the power to release, such that the released non-derivative claims were "sufficiently close to the claims against the debtor."

*Metromedia* **analysis.** Having disposed of all constitutional, jurisdictional, and statutory challenges to his authority to enter the Section 10.7 Shareholder Release (as modified), Judge Drain turned finally to whether this was the "unique" case in which it would be was appropriate to impose them. *Id.* at 105-06. He concluded that it was.

In this regard, he reviewed the law in the various circuits on the subject, viewing with special interest the Third Circuit's conclusion that:

> "To grant non-consensual releases a court must assess 'fairness, necessity to the reorganization' and make specific actual findings to support these conclusions." *In re Cont'l Airlines*, 203 F. 3d 203, 214 (3d Cir. 2001). Relevant consideration might include whether the non-consensual release is necessary to the success of the reorganization; whether the releasees have provided a critical financial contribution to the debtor's plan and whether that financial contribution is necessary to make the plan feasible; and whether the non-consenting creditors received reasonable compensation in exchange for the release, such that the release is fair." *In re Spansion, Inc.,* 426 B.R. 114, 144 (Bankr. D. Del 2010).
>
> *In re Purdue Pharma L.P.*, 2021 WL 4240974, at \*46.

Judge Drain also cited with approval the Seventh Circuit's practice of engaging in a **\*76** fact-based inquiry into such matters as whether the release is "narrowly tailored, not blanket" (unlike the Section 10.7 Shareholder Release, which releases all types of conduct, including fraud and willful misconduct); whether the release is an essential component of the plan; and whether it

was achieved by the exchange of good and valuable consideration that will enable unsecured creditors to realize distributions (which is in fact going to happen in this case). *Id.* at 106.

Judge Drain also noted that the Fourth, Sixth and Eleventh Circuits apply a multi-factor test in deciding when it is appropriate to impose a non-consensual release of third-party claims. (*Id.* at 105-06).

Then, while recognizing that "this is not a matter of factors or prongs" (*id.* citing *Metromedia*, 416 F. 3d at 142), Judge Drain made a long list of findings about why this was the "rare" and "unique" case in which a nonconsensual third-party claims release was appropriate. *Id.* at 105-10. These include the following: (i) the Purdue bankruptcy was exceedingly complex; (ii) the Plan has overwhelming creditor support; (iii) without the Sackler payment the settlements would unravel; (iv) while not every Sackler would be making a specific payment toward the settlement,[44] the aggregate settlement payment hinged on each member of the family's being released; (v) the settlement amount was substantial; (vi) the release "is narrowly tailored;"[45] (vii) the settlement was fundamentally fair to the third parties; and (viii) for the reasons discussed at length *supra*, Background Section XII(B)(1), the cost and likelihood of success on the third party claims against the Sacklers – including both the merits and the impediments to collection of any judgment – was outweighed by the immediate and definite benefits of the settlement.

[44]    It is actually not clear what members of the Sackler family are contributing to the settlement and in what amounts. The record contains some suggestion that the various trusts that are contributing are for the benefit of all members of the family.

[45]    Judge Drain did not explain what he meant by that, except to say that the release would be further narrowed so that it was limited in the manner discussed above. I assume that he meant that the release was limited to claims involving the Debtor's conduct, and claims in which the Debtor's conduct is "a legal cause of the released claim, or a legally relevant factor to the third-party cause of action." *In re Purdue Pharma L.P.*, 2021 WL 4240974, at *45.

**"Best interests" analysis.** Section 1129 of the Bankruptcy Code requires that a plan of reorganization may be confirmed only if a litany of requirements is met. One such requirement is found in Subsection (a)(7) of Section 1129, which provides that, for any impaired creditor or class of creditors, if all members of the class do not approve the plan, each member of the class "will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date." *In re Purdue Pharma L.P.*, 2021 WL 4240974, at *50.

Judge Drain applied this so-called "best interests" test to conclude that the holders of claims against non-debtor third parties would receive, on account of the Plan (and taking into account their claims against the Debtors as well as the third parties), materially more than they would receive in a  **\*77**  hypothetical chapter 7 liquidation.[46] *Id.* at 110-12.

[46]    Judge Drain also argued that the best interest test under section 1129(a)(7) requires that the amount that an objecting creditor stands to receive under the plan on account of its claim be at least as much it would receive if the debtor were liquidated under chapter 7. *In re Purdue Pharma L.P.*, 2021 WL 4240974, at *50. Thus, he concluded, the best interest test does not require analysis of the claimant's rights against third parties. *Id.* He acknowledged that his reading of the statute was at odds with at least two of his colleagues' reading of the same statute. I mention this fact but it has nothing to do with the ultimate decision on this appeal.

**State police powers.** Judge Drain concluded that his ordering of the non-debtor releases did not violate state sovereignty or any state police power. *Id.* at 111-14. He concluded that actions exempted from the automatic stay by virtue of Section 362(b)(4) were nonetheless subject to court-ordered (*i.e.*, not automatic) injunctive relief, and that Congress' express power under the bankruptcy clause of the Constitution to enact uniform bankruptcy laws overrode any state regulatory or sovereignty argument.

**The classification of the Canadians**. Finally, Judge Drain addressed whether that the Canadian creditor's classification as Class 11(c) creditors, rather than as Class 4 and 5 creditors, was impermissible. Certain Canadian creditor groups objected to the confirmation of the Plan, arguing that they should be classified with the U.S. unsecured creditor groups in Classes 4 and 5 to participate in the opioid abatement trusts created under the Plan for those classes, rather than receiving their pro rata

3899

share of the cash payment to Class 11(c). But Judge Drain concluded that, because there were legitimate reasons for separately classifying the Canadian unsecured creditors from there domestic counterparts, the classification was perfectly permissible. First, the Canadian creditors operate under "different regulatory regimes ... with regard to opioids and abatement" than their domestic counterparts. *In re Purdue Pharma L.P.*, 2021 WL 4240974, at *12. And second, "the allocation mediation conducted by Messrs. Feinberg and Phillips that resulted in the plan's division of the Debtors' assets ... involved only *U.S.-based* public claimants with their own regulatory interests and characteristics." *Id.* (emphasis added).

## XIII. The Appeal

The U.S. Trustee, eight states,[47] D.C., certain Canadian municipalities and First Nation groups,[48] and five *pro se* individuals[49] filed notices of appeal of Judge Drain's Confirmation Order in September 2021. (*See* Bankr. Dkt. No. 3724 (amended by Dkt. No. 3812), 3725, 3774 (amended by 3949), 3775 (amended by 3948), 3776 (amended by 3799), 3780 (amended by Dkt. No. 3839), 3784 (amended by Dkt. No. 3818), 3810, 3813, 3832, 3849, 3851, 3853, 3877, 3878). The U.S. Trustee also appealed the Advance Order (Bankr. Dkt. No. 3777) and the Disclosure Order (Dkt. No. 3776).

[47]    California, Connecticut, Delaware, Maryland, Oregon, Rhode Island, Vermont, and Washington.

[48]    The City of Grande Prairie as Representative for a Class Consisting of All Canadian Municipalities, the Cities of Brantford, Grand Prairie, Lethbridge, and Wetaskiwin; the Peter Ballantyne Cree Nation on behalf of All Canadian First Nations and Metis People and on behalf itself and the Lac La Ronge Indian Band.

[49]    Ronald Bass, Marie Ecke, Andrew Ecke, Richard Ecke, and Ellen Isaacs on Behalf of Patrick Ryan Wroblewski.

 **\*78**  Among those who did not appeal the Plan were the UCC, the ACH, MSGE, the PI Ad Hoc Group, and other creditors supporting the Plan.

## ISSUES ON APPEAL AND CONCLUSIONS OF LAW

This Court's answers to the questions that are being decided on appeal are summarized as follows:

   1. Does the Bankruptcy Court have subject matter jurisdiction to impose a release of non-debtor claims?

Yes. Under the law of this Circuit, as most recently set forth in *SPV OSUS Ltd. v. UBS*, 882 F.3d 333 (2d Cir. 2018), the Bankruptcy Court has broad "related to" jurisdiction over any civil proceedings that "might have any conceivable effect" on the estate. *Id.* 339-340. Because the civil proceedings asserted against the non-debtor Sackler family members *might have* a conceivable impact on the estate, the Bankruptcy Court has subject matter jurisdiction to approve the Section 10.7 Shareholder Release and release the claims against the non-debtor Shareholder Released Parties.

   2. Does the Bankruptcy Court have statutory authority to approve the non-debtor releases?

No. The Bankruptcy Code does not authorize a bankruptcy court to order the non-consensual release of third-party claims against non-debtors in connection with the confirmation of a chapter 11 bankruptcy plan. The Confirmation Order fails to identify any provision of the Bankruptcy Code that provides such authority. Contrary to the bankruptcy judge's conclusion, Sections 105(a) and 1123(a)(5) & (b)(6), whether read individually or together, do not provide a bankruptcy court with such authority; and there is no such thing as "equitable authority" or "residual authority" in a bankruptcy court untethered to some specific, substantive grant of authority in the Bankruptcy Code. Second Circuit law is not to the contrary; indeed, the Second Circuit has not yet taken a position on this question.

3900

   3. Did the Bankruptcy Court fail to provide equal treatment between the Canadian Appellants and their domestic unsecured
   creditor counterparts?

No. Under the Plan, the Canadian Appellants belong to a different class than their domestic, unsecured creditor "counterparts" – the non-federal governmental claimants and tribe claimants – but legitimate reasons are proffered for that differentiation. The Code does not require that all creditor classes be treated the same – only that there be a reasonable basis for any differentiation between classes. *See Boston Post Rd. Ltd. P'ship v. FDIC (In re Boston Post Rd. Ltd. P'ship)*, 21 F.3d 477, 482-83 (2d Cir. 1994). Here, Judge Drain identified a reasonable basis for differentiating between the Canadian Appellants and the non-federal governmental claimants and tribe claimants. The Plan's classification of the Canadian Appellants thus does not violate the Bankruptcy Code.

It is not necessary to reach any of the other issues that were briefed. The issues identified above are dispositive of all the appeals that have been filed.[50] Nor is it **\*79** necessary to reach either the various constitutional challenges to the Section 10.7 Shareholder Release (lack of due process, infringement on state police powers), or to decide whether, if there were no other legal impediment to approving the Section 10.7 Shareholder Release, it should be approved on the facts of this particular case.

[50]   Beyond the above issues, (1) the State Appellants asserts a further issue that the bankruptcy court improperly applied the best interest of creditors test; (2) the Canadian Appellants assert that the Bankruptcy Court does not have personal jurisdiction over their claims, and that the bankruptcy court's approval of the release violated their foreign sovereign immunity and the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 et seq.; and (3) the U.S. Trustee also asserts that the Bankruptcy Court erred by approving the Debtors' disclosure statement and plan solicitation materials and by authorizing the Debtors to advance funds under Advance Order.

**STANDARD OF REVIEW**

 **[6]    [7]    [8]    [9]**   The Court has jurisdiction to hear bankruptcy appeals pursuant to 28 U.S.C. § 158(a). "Generally in bankruptcy appeals, the district court reviews the bankruptcy court's factual findings for clear error and its conclusions of law *de novo*." *In re Charter Commc'ns, Inc.*, 691 F.3d 476, 482-83 (2d Cir. 2012) (citing Fed. R. Bankr. P. 8013). Conclusions of law reviewed *de novo* include "rulings as to the bankruptcy court's jurisdiction" and "interpretations of the Constitution." *In re Motors Liquidation Co.*, 829 F.3d 135, 152, 158 (2d Cir. 2016). As to findings of fact, the "clear error standard is a deferential one." *Id.* at 158. A finding of fact is clearly erroneous only if this Court is "left with the definite and firm conviction that a mistake has been committed." *In re Lehman Bros. 3 Holdings Inc.*, 855 F.3d 459, 469 (2d Cir. 2017).

 **[10]    [11]**   The standard of review of findings of act is far less deferential if a bankruptcy court is presented with something it cannot adjudicate to final judgment as a constitutional matter unless the parties consent. *Stern v. Marshall*, 564 U.S. 462, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011). In such a circumstance, a bankruptcy judge has authority only to "hear the proceeding and submit proposed findings of fact and conclusions of law to the district court for *de novo* review and entry of judgment." *Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 34-36, 134 S.Ct. 2165, 189 L.Ed.2d 83 (2014). In that case, the findings of fact are reviewed *de novo* as well. If a bankruptcy court issues a final order in the mistaken belief that it has constitutional authority to do so, the district court can treat a bankruptcy court's order as a report and recommendation, but it "must review the proceeding *de novo* and enter final judgment." *Id.* at 34, 134 S.Ct. 2165.

 **[12]**   In this case, the Bankruptcy Court concluded that it had constitutional authority under *Stern* to enter a final order granting the release, because the issue arose in the context of confirming a plan of reorganization – the most "core" of bankruptcy proceedings. *In re Purdue Pharma L.P.*, 2021 WL 4240974, at \*40. Appellants urge that Judge Drain misreads *Stern* and argue that he lacked authority to give final approval to those releases, even though they were incorporated into a plan of reorganization.

I agree with Appellants.

3901

[13] [14] [15] In 28 U.S.C. § 157(a), Congress divided bankruptcy proceedings into three types: (1) those that "arise under" title 11; (2) those that "arise in" a title 11 case; (3) and those that are "related to" a title 11 case. Cases that "arise under" or "arise in" a title 11 matter are known as core bankruptcy proceedings, while "related to" proceedings are non-core. 28 U.S.C. § 157(b)(1)-(2)(C). Every proceeding pending before a bankruptcy court is either core or non-core.[51]

[51] "Non-core" proceedings are interchangeably referred to as "related to" proceedings.

*80 [16] [17] [18] The core vs. non-core distinction is critical when assessing a bankruptcy court's constitutional authority to enter a final judgment disposing of that proceeding.[52] In particular, a bankruptcy court lacks the constitutional authority to enter a final judgment in a proceeding over which it has only "related to" subject matter jurisdiction unless all parties consent. Any doubt on that score was put to rest by the United States Supreme Court in *Stern v. Marshall*, 564 U.S. 462, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011). In that case, the Supreme Court held that a bankruptcy court lacked constitutional power to adjudicate and enter judgment on a counterclaim asserted by a debtor, Vickie Marshall (aka Anna Nicole Smith) in an adversary proceeding that a creditor (her stepson) had filed against her. The counterclaim (for tortious interference with an *inter vivos* gift from the debtor Marshall's late husband, who was also the creditor's father) did not arise under title 11, nor did it arise in a title 11 case. Even though the claim was asserted in the context of a bankruptcy proceeding, it existed prior to and was independent of debtor Marshall's bankruptcy case.

[52] The core/non-core distinction is also critically important when assessing the bankruptcy court's subject matter jurisdiction, a topic that will be taken in that section.

The Supreme Court ruled that Congress could not "withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at common law, or in equity, or in admiralty." *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 284, 18 How. 272, 15 L.Ed. 372 (1855). Because Marshall's counterclaim for tortious interference was just such a claim, it could only be adjudicated to final judgment by an Article III court; and Congress had no power to alter that simply because the counterclaim might have "some bearing on a bankruptcy case." *Stern,* 564 U.S. at 499, 131 S.Ct. 2594.

In this case, the learned Bankruptcy Judge improperly elided his authority to confirm a plan of reorganization (indubitably a core function of a bankruptcy court) with his authority to finally dispose of claims that were non-consensually extinguished pursuant to that plan over which – as he himself recognized – he has only "related to" jurisdiction over the third-party claims against the non-debtor Sacklers. *In re Purdue Pharma L.P.*, 2021 WL 4240974, at *36-38. *Stern* itself illustrates that not every issue that is litigated under the umbrella of a core proceeding is, to use Judge Drain's phrase, "constitutionally core." The stepson-creditor's claim against Marshall's estate was properly litigated to judgment by the bankruptcy court in a claims allowance adversary proceeding – a core proceeding – but because the debtor's counterclaim was not a "core" claim, it could not be adjudicated to final judgment by the Bankruptcy Court, even though it would impact how much the creditor was ultimately owed.

[19] Judge Drain reasoned that the non-consensual third-party releases that he was approving were "constitutionally core" under *Stern* because plan confirmation is a "fundamentally central aspect of a Chapter 11 case's adjustment of the debtor/ creditor relationship." *Id.* at *40. But nothing in *Stern* or any other case suggests that a party otherwise entitled to have a matter adjudicated by an Article III court forfeits that constitutional right if the matter is disposed of as part of a plan of reorganization in bankruptcy. Were it otherwise, then parties could manufacture a bankruptcy court's *Stern* authority simply by inserting the resolution of some otherwise non-core matter into a plan.

*81 The learned bankruptcy judge relied on the Third Circuit's recent decision in *In re Millennium Lab Holdings II, LLC.*, 945 F.3d 126, 139 (3d Cir. 2019), *cert. denied sub nom. ISL Loan Tr. v. Millennium Lab Holdings II, LLC*, ––– U.S. ––––, 140 S. Ct. 2805, 207 L.Ed.2d 142 (2020). In *Millennium,* the court, like Judge Drain in this case, concluded that the "operative proceeding" for purposes of *Stern* analysis was the confirmation proceeding, not the underlying third-party claim against a non-debtor that was being released pursuant to the plan. *In re Millennium Lab Holdings II, LLC*, 591 B.R. 559, 574 (D. Del. 2018), *aff'd sub nom. In re Millennium Lab Holdings II, LLC.*, 945 F.3d 126 (3d Cir. 2019). The Third Circuit read *Stern* to allow a bankruptcy court to confirm a plan containing such releases "because the existence of the releases and injunctions" are "

3902

'integral to the restructuring of the debtor-creditor relationship.' " *Millennium Lab Holdings II, LLC.*, 945 F.3d at 129 (quoting *Stern*, 564 U.S. at 497, 131 S.Ct. 2594).

 [20]   Perhaps they are, but that is beside the point. In *Stern*, the Supreme Court held that bankruptcy courts have the power to enter a final judgment only in proceedings that "stem[ ] from the bankruptcy itself or would necessarily be resolved in the claims allowance process." *Stern*, 564 U.S. at 499, 131 S.Ct. 2594. It did not say that a bankruptcy court could finally dispose of non-core proceedings as long as they were "integral to the restructuring of the debtor-creditor relationship." The counterclaim in the lawsuit between debtor Marshall and her stepson-creditor was integral to the restructuring of their debtor-creditor relationship, but it was not a core proceeding, so the bankruptcy court could not finally adjudicate it. The correct constitutional question, and the question on which the Bankruptcy Court should have focused in this case, is whether the third-party claims released and enjoined by the Bankruptcy Court either stem from the bankruptcy itself or would necessarily be resolved in the claims allowance process – not whether the release and injunction are "integral to the restructuring of the debtor-creditor relationship."

 [21]    [22]   The third-party claims at issue neither stem from Purdue's bankruptcy nor can they be resolved in the claims allowance process. Yet those claims are being finally disposed of pursuant to the Plan; they are being released and extinguished, without the claimants' consent and without any payment, and the claimants are being enjoined from prosecuting them. Debtors and their affiliated non-debtor parties cannot manufacture constitutional authority to resolve a non-core claim by the artifice of including a release of that claim in a plan of reorganization. As Bankruptcy Judge Bernstein made clear in *In re SunEdison, Inc.*, 576 B.R. 453, 461 (Bankr. S.D.N.Y. 2017), "In assessing a court's jurisdiction to enjoin a third party dispute under a plan, the question is not whether the court has jurisdiction over the settlement that incorporates the third party release, but whether it has jurisdiction over the attempts to enjoin the creditors' unasserted claims against the third party." That proposition applies with equal force to a bankruptcy court's *Stern* authority.

 [23]   Appellees' argument that *Stern* only limits a bankruptcy court's authority to *adjudicate* claims – not its authority to enter judgments that terminate claims without adjudicating them on the merits – is also flawed. As the U.S. Trustee correctly points out, *Stern's* holding is to the contrary: "The Bankruptcy Court in this case exercised the judicial power of the United States by *entering a final judgment* on a common law tort claim, even  **\*82**  though the judges of such courts enjoy neither tenure during good behavior nor salary protection." *Stern*, 564 U.S. at 469, 131 S.Ct. 2594 (emphasis added). A bankruptcy court's order extinguishing a non-core claim and enjoining its prosecution without an adjudication on the merits "finally determines" that claim. It is equivalent to entering a judgment dismissing the claim. It bars the claim under principles of former adjudication. Therefore, Congress may not allow a bankruptcy court to enter such an order absent the parties' consent – and consent is lacking here. *See Stern* at 484, 131 S.Ct. 2594.

There really can be no dispute that the release of a claim "finally determines" that claim. It does so by extinguishing the claim, so that it cannot be adjudicated on the merits. A nonconsensual third-party release is essentially a final judgment against the claimant, in favor of the non-debtor, entered "without any hearing on the merits." *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 725 (Bankr. S.D.N.Y. 2019) (citing *In re Digital Impact*, 223 B.R. 1, 13 n. 6 (Bankr. N.D. Okla. 1998)) (noting that a third-party release has "the effect of a judgment – a judgment against the claimant and in favor of the non-debtor, accomplished without due process."). The fact that the releases are being ordered in the overall context of a plan confirmation that "settles" many disputed matters (against the Debtors, not against non-debtors) does not alter this. The Appellants in this case do not want to settle their claims against the non-debtors – at least, not on the terms set forth in the Plan. This "settlement" is non-consensual – which means that, under *Stern*, a bankruptcy court cannot enter the order that finally disposes of their claims against those non-debtors.

Nor is there any doubt that the entry of an order releasing a claim has former adjudication effects, which is a key attribute of a final judgment. The Supreme Court has twice held that non-consensual third-party releases confirmed by final order are entitled to *res judicata* claim preclusion barring any subsequent action bringing a released claim: First in *Stoll v. Gottlieb*, 305 U.S. 165, 171, 59 S.Ct. 134, 83 L.Ed. 104 (1938), and again in *Travelers Indemnity Co. v. Bailey*, 557 U.S. 137, 155, 129 S.Ct. 2195, 174 L.Ed.2d 99 (2009).[53]

53    This court's decision in *In re Kirwan Offices S.à.R.L.,* 594 B.R. 489 (S.D.N.Y. 2018) does not stand for the proposition that *Stern* authorizes a bankruptcy court to release non-core claims because a release is not a final judgment on the merits of the third-party claim. In that case, *Stern* was of no moment because, as this court held and the Second Circuit affirmed, all parties had consented to the bankruptcy court's exercise of jurisdiction. *In re Kirwan Offices S.à.R.L*, 792 F. App'x 99, 103 (2d Cir. 2019).

Because the non-consensual releases and injunction are the equivalent of a final judgment for *Stern* purposes, Judge Drain did not have the power to enter an order finally approving them. To the extent of his approval of the Section 10.7 Shareholder Releases, his opinion should have been tendered as proposed findings of fact and conclusions of law, both of which this court could review *de novo*. 11 U.S.C. § 157(c)(1). *Stern*, 564 U.S. at 475, 131 S.Ct. 2594. If approved by this Court, those releases would of course be incorporated into the Plan.

So the standard of review in this case is *de novo* as to both the Bankruptcy Court's factual findings and its conclusions of law.[54]

54    The practical impact of this holding is non-existent, as no one has challenged any of Judge Drain's findings of fact – only the conclusions he drew from them – and the court has always had the obligation to review those conclusions *de novo*.

**\*83  DISCUSSION**

**I. The Bankruptcy Court Has Subject Matter Jurisdiction Over Third-Party Claims Against Non-Debtors That Might Have Any Conceivable Effect on the Debtors' Estate.**

**[24]    [25]**  A bankruptcy court is a creature of statute. See *Celotex Corp. v. Edwards*, 514 U.S. 300, 307, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995). Its subject matter jurisdiction is *in rem* and is limited to the *res* of the estate. *Central Virginia Community College v. Katz*, 546 U.S. 356, 362, 126 S.Ct. 990, 163 L.Ed.2d 945 (2006) ("Bankruptcy jurisdiction, at its core, is *in rem*."). Its jurisdiction is limited to "civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b).

**[26]    [27]    [28]**  A proceeding "arises under" title 11 if the claims "invoke substantive rights created by" that title. *See In re Housecraft Industries USA, Inc.*, 310 F.3d 64, 70 (2d Cir. 2002). A proceeding "arises in" a title 11 case if for example "Parties ..., by their conduct, submit themselves to the bankruptcy court's jurisdiction" by litigating proofs of claim without contesting personal jurisdiction. *In re Millenium Seacarriers, Inc.*, 419 F.3d 83, 98 (2d Cir. 2005); *see In re S.G. Phillips Constructors, Inc.*, 45 F.3d 702, 706 (2d Cir. 1995) ("*a claim filed against the estate ... could arise only in the context of bankruptcy*") (emphasis in original) (quotation omitted). And a proceeding is "related to" a title 11 proceeding if its "outcome might have any conceivable effect on the bankrupt estate." *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 114 (2d Cir.1992) *Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.*, 639 F.3d 572, 579 (2d Cir. 2011); *SPV OSUS Ltd. v. UBS*, 882 F.3d 333, 339-340 (2d Cir. 2018).

**[29]    [30]**  The release of most third-party claims against a non-debtor touches the outer limit of the Bankruptcy Court's jurisdiction. *See In re Johns-Manville Corp.*, 517 F.3d 52, 55 (2d Cir. 2008) ("*Manville III*"), *rev'd and remanded on other grounds sub nom. Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 129 S.Ct. 2195, 174 L.Ed.2d 99 (2009). But the Second Circuit defines that limit quite broadly. *See SPV OSUS Ltd.*, 882 F.3d at 339-340. The standard is not that an action's outcome will certainly have, or even that it is likely to have, an effect on the *res* of the estate, as is the case in some other Circuits. It is, rather, whether it *might have any conceivable impact* on the estate. *Id.*

Bound to adhere to this broad standard, which has been consistently followed in this Circuit for almost three decades and was applied most recently in *SPV Osus*, I agree with the Debtors that the Bankruptcy Court had subject matter jurisdiction over the direct (non-derivative) third party claims against the Sacklers, under the "related to" prong of bankruptcy jurisdiction.

*A. Governing Law*

Decades ago, the Second Circuit concluded that the outer limit of a bankruptcy court's *in rem* jurisdiction was defined by whether the outcome of a proceeding asserting a particular claim "might have any conceivable effect" on the *res* of the estate. *See In re Cuyahoga Equipment Corp.*, 980 F.2d at 114. In that case, a liquor distillery and its site of operation containing hazardous wastes was sold to a purchaser that subsequently went bankrupt; the bankruptcy court was asked to resolve not only the proceedings in bankruptcy but approve a settlement that released a creditor bank from claims related to separate environmental cleanup litigation (brought by the  **\*84**  creditor Environmental Protection Agency (the "EPA")). *Id.* at 111-112. The original owner of the liquor distillery site – a non-debtor third party and defendant in the environmental cleanup litigation – objected and appealed arguing, *inter alia*, that the court lacked jurisdiction to approve the settlement. The Second Circuit found that the court had related to jurisdiction because the bank's and the EPA's claims against the estate "bring into question the very distribution of the estate's property." *Id.* at 114. "[Section] 1334(b) undoubtedly vested the district court with the power to approve the agreement between the parties at least to the extent it compromised the bankruptcy claims asserted by the bank and the government." *Id.* at 115.

In *Celotex Corp. v. Edwards*, 514 U.S. 300, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995), the United States Supreme Court decreed that "related to" jurisdiction was "a grant of some breadth" and that "jurisdiction of bankruptcy courts may extend ... broadly" in "reorganization under Chapter 11." *Id.* at 308, 115 S.Ct. 1493. And while some courts of appeal have circumscribed the scope of "related to" jurisdiction in their circuits, *see e.g.*, *In re W.R. Grace & Co.*, 900 F.3d 126 (3d Cir. 2018), the Second Circuit has never backed away from its broad reading of "related to" jurisdiction. *See, e.g., In re Ampal-American Israel Corporation*, 677 Fed.Appx. 5, 6 (2d Cir. 2017) (summary order).

The Circuit's most recent discussion of the subject can be found in *SPV OSUS Ltd. v. UBS AG*, 882 F.3d 333 (2d Cir. 2018). SPV Osus Ltd. ("SPV") had sued UBS AG ("UBS") (among others) in the New York State Supreme Court for aiding and abetting Bernie Madoff ("Madoff") and Bernard L. Madoff Investment Securities LLC ("BLMIS") in perpetrating their massive Ponzi scheme. *Id.* at 337-338. If UBS was indeed a joint tortfeasor with Madoff, it had a contingent claim for contribution against the Madoff estate. *Id.* at 340. However, it had not yet asserted such a claim (it was not yet ripe), and the unwaivable bar date for filing claims against the Madoff estate under the Securities Investor Protection Act ("SIPA") had already passed. *Id.* Moreover, there was no realistic possibility that there would be any money available at the end of the day to fund a claim for contribution. *Id.* SPV argued that these facts meant there was no possibility that the outcome of UBS' contribution case "might have any conceivable effect" on the *res* of the Madoff estate. *Id.* It is indeed hard to quarrel with that factual analysis.

But Judge Pooler, writing for a unanimous panel, concluded that UBS's contingent claim for joint tortfeasor contribution against the Madoff estate "might" have an effect on the Madoff estate if there were any "reasonable legal basis" for its assertion. *Id.* at 340-41 (quotation omitted). She explained that the broad jurisdictional standard reflects Congress' intent " 'to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate.' " *Id.* at 340 (quoting *Celotex*, 514 U.S. at 308, 115 S.Ct. 1493). While recognizing that " 'related to' jurisdiction is not 'limitless,' " Judge Pooler indicated that "it is fairly capacious." *Id.* And she said, " 'An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.' " *Id.* (quoting *Celotex*, 514 U.S. at 308, n. 6, 115 S.Ct. 1493).

The fact that UBS and the debtor (Madoff) were alleged to be joint tortfeasors – who, as a matter of state law, have a right  **\*85**  of contribution against one another – provided a "reasonable legal basis" why UBS might someday be able to assert its contingent claim. And while Judge Pooler recognized that "... a payout by the estate to defendants may be improbable, it is not impossible." *Id.* at 342. Since "any claim by defendants potentially alters that distribution of assets among the estates' creditors," *id.*, that was all it took to make the contingent claim "conceivably related" to the Madoff bankruptcy.

Finally – and of particular importance for the case at bar – Judge Pooler found that the "high degree of interconnectedness between this action and the Madoff bankruptcies" supported a finding of "related to" jurisdiction. *Id.* She explained that, "SPV can only proceed on [its claims against UBS] if it establishes that the Madoff fraud occurred" and "it is difficult to imagine

a scenario wherein SPV would not also sue Madoff and BLMIS, given that SPV alleges that UBS aided and abetted in their fraud." *Id.*

 **[31]**   So in this Circuit, it is well settled that the only question a court need ask is whether "the action's outcome *might have* any conceivable effect on the bankrupt estate." *Id.* (emphasis added). If the answer to that question is yes, then related to jurisdiction exists – no matter how implausible it is that the action's outcome actually will have an effect on the estate.

### *B. Application of the Law to the Facts*

 **[32]**   Under the broad standard set forth in *SPV Osus*, I find that the Bankruptcy Court had "related to" subject matter jurisdiction to approve the release of direct, non-derivative third-party claims against the Sacklers. There is absolutely no question that the answer to the question of whether the third-party claims *might have* any conceivable impact on the res of the debtors' estate is yes. Moreover, the intertwining of direct and derivative claims against certain members of the Sackler family, as well as the congruence between the only claim that anyone has identified against the other Sacklers and Purdue's own claim for fraudulent conveyance, justifies the assertion of "related to" jurisdiction under *SPV Osus*'s "interconnectedness" test.

**First,** the non-derivative third-party claims that are being or might be asserted against the Sacklers are, as in *In re Cuyahoga Equipment Corp.*, the type of claims that "bring into question the very distribution of the estate's property." 980 F.2d at 114. As the Debtors pointed out in oral argument, and as Judge Drain recognized in his opinion, pursuit of the third-party claims threatens to "unravel[ ] the plan's intricate settlements" and "recoveries on ... judgments" against the Sacklers would have a "catastrophic effect" on all parties' possible recovery under the Plan. *See In re Purdue Pharma L.P.*, 2021 WL 4240974, at *33; (Oral Arg. Tr., Nov. 30, 2021, at 124:14-16 ("Continued litigation against the Sacklers destroys all of the interlocking intercreditor settlements enshrined in the plan.")).

**Second,** as in *SPV Osus*, the claims raised against the Sacklers might have a conceivable impact on the estate, in that they threaten to alter "the liabilities of the estate" and "change" "the amount available for distribution to other creditors." *SPV Osus,* 882 F.3d at 341. This "is sufficient to find that litigation among non-debtors is related to the bankruptcy proceeding." *Id.*

Here, the non-derivative litigation against the Sacklers *might* alter the liabilities and change the amount available for distribution. If, for example, the Appellants were successful in their related claims against the Sacklers, the findings  **\*86**  could alter, or even determine, Purdue's own liability on similar claims, as well as the amount owed to Appellants as creditors. Further, as the Debtors explained at oral argument, there also is the threat that the Appellants' claims could affect "the debtors' ability to pursue the estate's own closely related, indeed, fundamentally overlapping claims against the Sacklers"; this is so because, if the related third-party claims were litigated poorly, the debtor's estate might be less likely to recover on its own claims against the Sacklers, which are worth billions. (*See* Oral Arg. Tr., Nov. 30, 2021, at 123:17-124:13).

Judge Drain pointed out the conceivable effect that the potential alteration of liabilities and ultimate amounts owed creditors and the estate would have on the *res* in his opinion. *See In re Purdue Pharma L.P.*, 2021 WL 4240974, at *37. I agree that these potential effects support a finding of "related to" jurisdiction.

**Third,** as in *SPV Osus*, all the claims in this case have a high degree of interconnectedness with the lawsuits against the debtors and against the Sacklers – especially those members of the family who can be sued derivatively as well as directly.

As the *SPV Osus* Court explained, " 'The existence of strong interconnections between the third-party action and the bankruptcy has been cited frequently by courts in concluding that the third-party litigation is related to the bankruptcy proceeding.' " *SPV OSUS*, 882 F.3d at 342 (quoting *In re WorldCom, Inc. Sec. Litig.*, 293 B.R. 308, 321 (S.D.N.Y. 2003)). Here, the Section 10.7 Shareholder Release only extends to those claims where the "debtor's conduct or the claims asserted against it [are] a legal cause or a legally relevant factor." (Confr. Hr'g Tr., Sept. 1, 2021, at 134:18-135:2); *see In re Purdue Pharma L.P.*, 2021 WL 4240974, at *45; Plan, at § 10.7(b)). This limitation alone supports a conclusion that any claim that could fall within the scope of the release would necessarily have a high degree of interconnectedness with the debtor's conduct.

Looking at the claims of the Appellants themselves, the interconnectedness of the claims against the Sacklers with those against the Debtors is patent. (*See, e.g.*, Dkt. No. 103-7, at A-1553; Dkt. No. 95-1, at A0008; Dkt. No. 91-7, at App.2598; Dkt. No. 91-8, at App.2661; Dkt. No. 91-9, at App.3153). In fact, the direct and derivative claims against the "insider" or "managerial" Sacklers are essentially congruent. The Appellants have asserted claims in multiple instances against both Purdue and the Sacklers, and in every case they rely on detailed and virtually identical sets of facts to make the claims. Because various state statutes authorize the assertion of direct claims against certain managerial personnel of a corporation who can be held independently liable for the same conduct that subjects the corporation to liability (and them to liability to the corporation for faithless service in their corporate roles), a determination in one of the State Appellants' cases would likely have preclusive impact on a case alleging derivative liability against the same people – a case over which the Bankruptcy Court has undoubted jurisdiction. As the Debtor pointed out at oral argument, there is an obvious inconsistency in bringing "lawsuits against the Sackler[s] alleging that they controlled Purdue, and that Purdue did terrible things, and 500,000 people's lives were maybe snuffed out by Purdue's conduct" yet arguing that those suits "will [not] affect the debtors in any conceivable way." (*See* Oral Arg. Tr., Nov. 30, 2021, at 123:12-17). Some things have not changed since this court decided *Dunaway v. Purdue Pharma. L.P.*, 619 B.R. 38 (S.D.N.Y. 2020); one that has not is this: "Appellants would rely on the same facts to establish  **\*87**  the liability of both parties" and there would be "no way for the Appellants to pursue the allegations against Dr. Sackler without implicating Purdue, and vice versa." *Id.* at 51. The acts of the Sacklers that could form the basis of any released claim "are deeply connected with, if not entirely identical to, Purdue's alleged misconduct." *See id.*

In so holding, I acknowledge that in *In re Johns-Manville Corp.*, 517 F.3d 52 (2d Cir. 2008) ("*Manville III*"), *rev'd and remanded on other grounds sub nom. Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 129 S.Ct. 2195, 174 L.Ed.2d 99 (2009) and *In re Johns-Manville Corporation v. Chubb Insurance*, 600 F. 3d 135 (2d Cir. 2010) ("*Manville IV*"), the Second Circuit said that the existence of shared facts between claims against the debtor and claims against the non-debtor arising out of an independent legal duty that was owed by the non-debtor to a third party was not sufficient to confer "related to" subject matter jurisdiction over the claims against the non-debtors. *Manville III*, 517 F.3d at 64-65. As a result, the Court of Appeals held that the bankruptcy court lacked jurisdiction to enjoin the prosecution of claims asserted by third parties against Travelers, Manville's erstwhile insurer, that arose out of Travelers' alleged failure to alert those third parties to the harmful properties of asbestos, about which Travelers had allegedly learned during its long relationship with Manville. *Id.* at 65. However, while there was a substantial factual overlap between defective product claims against Manville and the failure to disclose claims asserted against its insurer Travelers that were discussed in *Manville III*, there was absolutely no basis for asserting that there could be any impact on the res of Manville's bankruptcy estate if the third party claims were not enjoined. For that reason, *Manville III/IV* is not inconsistent with *SPV OSUS*.

The fact that the release extends to members of the Sackler family who played no role in running the affairs of the company does not alter the analysis. At the present time, the court is not aware of any lawsuits that have been brought against any of those individuals; and despite months of my asking, no one can identify any claim against them that would be released by the Section 10.7 Shareholder Release, other than as the recipients of money taken out of Purdue and up-streamed to the family trusts. But any claims relating to those transfers rightfully belong to the Debtors, whose claims against the world either "arise under" or "arise in" the bankruptcy. And those claims are not implicated by the Section 10.7 Shareholder Release.

**Fourth**, it is more than conceivable that Purdue's litigation of the question of its indemnification, contribution, or insurance obligations to the director/officer/manager Sacklers could burden the assets of the estate.

Appellants – most particularly the State and Canadian Appellants – insist that their claims lie beyond the "related to" jurisdiction of the Bankruptcy Court in part because their laws bar indemnification, contribution, or insurance coverage for actions like those of the Sacklers (*see* Dkt. Nos. 224, 228-231), and so the claims cannot be extinguished by that court. Without viable claims for indemnification, contribution, or insurance claims, the Appellants argue that their claims against the Sacklers will not have any conceivable effect on the Debtors' estate, thereby depriving the Bankruptcy Court of subject matter jurisdiction.

I begin by noting that this is precisely the type of reasoning that Judge Pooler rejected in *SPV Osus* – a case, I submit, in which the actual possibility that a contingent **\*88** contribution claim would have any impact on the *res* of the Madoff estate was far less likely than it is in this case. The issue is not whether, at the end of the day, the Sacklers would lose on their contingent claims; it is whether they have a reasonable legal basis for asserting them. (*See* Dkt. Nos. 154, 156).

 **[33]**   And the Sacklers do have a reasonable legal basis to assert those claims. The Sacklers named in the State Appellants' suits served as officers, directors or managers of Purdue. As a result, they have claims against Purdue for indemnification and contribution, as well as a call on any D&O insurance proceeds that cover Purdue's officer and directors. As this court noted almost two years ago in *Dunaway*, Purdue's current and former directors and officers of the company are covered by various Limited Partnership Agreements ("LPA"), which provide that Purdue shall indemnify these directors and officers "so long as the Indemnitee shall be subject to any possible Proceeding by reason of the fact that the Indemnitee is or was ... a director, officer or Agent of [the Purdue entities]." (JX-1773; *see also* JX-1806; JX-1049). The various state unfair trade practices laws that have been cited to this court all subject the Sacklers to the potential for liability because of their status as officers, directors or managers of the corporation – even though that liability is direct, not derivative. Moreover, the LPAs are governed by Delaware law, which allows for indemnification (*see* 6 Del. C. § 17-108; 8 Del. C. § 145), and the states as a general matter look to the state of incorporation for the availability of indemnity. (*See, e.g.*, Dkt. No. 230, at 3, 8–9, 13, 17). Similarly, the Purdue insurance policies that cover the Sackler former directors could be depleted, *inter alia*, if a Sackler former director prevailed in litigation or a plaintiff prevailed in litigation on a non-fraud claim. (*See* Dkt. No. 156, at 15).[55] Under various state laws, the Sacklers parties can also seek an advance against defense costs; even if those costs are ultimately recouped, those defense funds will, for at least some time, leave the estate. *See* CT Gen Stat § 33-776; 8 Del. C. § 145. The law governing insurance coverage is generally the law governing the policy – not the law of the objecting state. Only one state has an exception to that – California, whose law specifically prohibits indemnity or insurance coverage for losses resulting from a violation of its false advertising law or unfair competition law, and under which law an insurer has no duty to defend or advance costs. (Dkt. No. 95, at 3-4); *see* Cal. Ins. Code § 533.5; *Adir International, LLC v. Starr Indemnity and Liability Co.*, 994 F.3d 1032, 1045 (9th Cir. 2021).

[55]    The debtors clarified at oral argument that for the relevant periods of time "like 2017 when the claims were made and those policies got triggered" there are applicable claims-made insurance policies, as well as "over a billion dollars of general liability policies" and other policy language that "creates the risk that all Sackler-owned entities could assert claims under those policies." (Oral Arg. Tr., Nov. 30, 2021, at 125:21-12614).

And while each objecting state asserts that its laws would bar one or more of indemnification, contribution or insurance in certain instances, no state's law bars all three – not even California's. (*See* Dkt. Nos. 228-231; *see also* Dkt. No. 224).

Recognizing this, the states argue that there can be no indemnification, contribution, or insurance on these facts, including on public policy grounds, because the Sacklers acted in bad faith. (*See e.g.*, Dkt. No. 230, at 2). However, the question of bad faith in this case is hotly disputed. There is no doubt that the Shareholder Released Parties' right to indemnification, **\*89** contribution, and/or insurance will be vigorously litigated, as Judge Drain rightly pointed out below. *See In re Purdue Pharma L.P.*, 2021 WL 4240974, at *38. That litigation will cost money. And so it very well *might have* an impact on the estate; in fact, it likely *will have* such an impact.

Given the breadth of the Second Circuit law under *SPV Osus*, I must and I do find that the claims asserted against the Shareholder Released Parties *might have* some conceivable effect on the estate of a debtor, for each of the foregoing reasons, and thus fall within the "related to" jurisdiction of the Bankruptcy Court.

But that only gets us to the next question. And it is the next question that is, in my view, dispositive.

**II. The Bankruptcy Court Does Not Have Statutory Power to Release Particularized Third-Party Claims Against Non-Debtors.**

[34]   Appellants argue that the Bankruptcy Court has no statutory authority to approve a release of third-party claims against non-debtors.

One would think that this had been long ago settled.

It has not been.

There is a long-standing conflict among the Circuits that have ruled on the question, which gives rise to the anomaly that whether a bankruptcy court can bar third parties from asserting non-derivative claim against a non-debtor– a matter that surely ought to be uniform throughout the country – is entirely a function of where the debtor files for bankruptcy.

And while the Second Circuit long ago identified as questionable a court's statutory authority to do this outside of asbestos cases, *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136 (2d Cir. 2005), it has not yet been required to identify any source for such authority.

Lacking definitive guidance from our own Court of Appeals, Judge Drain consulted the law in every Circuit. He concluded that he was statutorily authorized to approve the Section 10.7 Shareholder Release because it is "subject to 11 U.S.C. 1129(a)(1), 1123(a)(5) & (b)(6), 105, and 524(e)." *In re Purdue Pharma L.P.*, 2021 WL 4240974, at *43. "In other words," he stated, "those releases flow from a federal statutory scheme." *Id.*

I appreciate that this Court has, on a prior occasion, said exactly the same thing, using exactly the same language – albeit in the context of affirming a plan that contained an easily distinguishable injunction that barred third parties (one in particular) from bringing one specific type of claim against non-debtors (his former partners) in order to protect the integrity of bankruptcy court orders. *In re Kirwan Offices S.à.R.L.*, 592 B.R. 489, 511 (S.D.N.Y. 2018*), aff'd sub nom. In re Kirwan Offices S.a.R.L.*, 792 F. App'x 99 (2d Cir. 2019). But in *Kirwan,* this Court did not analyze whether there was a statutory (as opposed to a jurisdictional or constitutional) basis for the injunction that was at issue in that case. Indeed, no statutory argument was made.[56]

---

[56]      In *Kirwan*, the appellant chalked up his failure to raise the issue of statutory authority to his belief that the U.S. Trustee ought to have done so. *In re Kirwan Offices S.à.R.L.*, 592 B.R. at 501. The U.S. Trustee, for perfectly understandable reasons that will be noted when *Kirwan* is discussed below, had no particular interest in using that case as a vehicle to mount such an attack.

In this case, however, Appellants – most particularly, the U.S. Trustee, with the United States Attorney for this District appearing as *amicus* – have mounted a  **\*90**  full-throated attack on a court's statutory authority to release third-party claims against non-debtors in connection with someone else's bankruptcy.

With the benefit of full briefing and extensive argument from experienced counsel, it is possible to decide whether a court adjudicating a bankruptcy case has the power to release third-party claims against non-debtors. Moreover, it is necessary to reach a conclusion on this subject before delving into constitutional issues that need not be reached if Appellants are correct.

I conclude that the sections of the Code on which the learned Bankruptcy Judge explicitly relied, whether read separately or together, do not confer on any court the power to approve the release of non-derivative third-party claims against non-debtors, including specifically the Section 10.7 Shareholder Release that is under attack on this appeal.

As no party has pointed to any other section of the Bankruptcy Code that confers such authority, I am constrained to conclude that such approval is not authorized by statute.

**A Caveat and Some Definitions**: I begin this discussion with a caveat. The topic under discussion is a bankruptcy court's power to release, on a non-consensual basis, *direct/particularized* claims asserted *by third parties* against *non-debtors* pursuant to the Section 10.7 Shareholder Release. This speaks to a very narrow range of claims that might be asserted against the Sacklers.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

[35]    [36]    For these purposes, by derivative claims, I mean claims that would render the Sacklers liable because of Purdue's actions (which conduct may or may not have been committed because of the Sacklers). "Derivative" claims are those seek to recover from the estate indirectly "on the basis of [the debtor's] conduct," as opposed to the non-debtor's own conduct. *Manville III*, 517 F.3d at 62 (quoting *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89 (2d Cir. 1988)). Derivative claims in every sense relate to the adjustment of the debtor-creditor relationship, because they are claims that relate to injury to the corporation itself. If the creditor's claim is one that a bankruptcy trustee could bring on behalf of the estate, then it is derivative. *Madoff*, 40 F.3d at 90.

[37]    By direct claims, I mean claims that are not derivative of Purdue's liability, but are based on the Sacklers' own, individual liability, predicated on their own alleged misconduct and the breach of duties owed to claimants other than Purdue. "Direct" claims are based upon a "particularized" injury to a third party that can be directly traced to a non-debtor's conduct. *Id*.

The release of claims against the Sacklers that are derivative of the estate's claims them is effected by Section 10.6(b) of the Plan, which is not attacked as being beyond the power of the Bankruptcy Court.

[38]    The Section 10.7 Shareholder Release under attack is different. It releases all members of the Sackler families, as well as a variety of trusts, partnerships and corporations associated with the family and the people who run and advise those entities,[57] from liability for claims that  *91  have been brought against them personally by third parties – claims that are not derivative, but as to which Purdue's conduct is a legally relevant factor. Example: nearly all of the State Appellants have a law under which individuals who serve in certain capacities in a corporation are individually and personally liable for their personal participation in certain unfair trade practices. As Judge Drain recognized (*see In re Purdue Pharma L.P.*, 2021 WL 4240974, at *44), the liability imposed by these statutes is not derivative; the claims arise out of a separate and independent duty that is imposed by statute on individuals who, by virtue of their positions, personally participated in acts of corporate fraud, misrepresentation and/or willful misconduct. Liability under those laws is limited to persons who occupied the roles of officer, manager or director of a corporation – which means that there is considerable *factual* overlap, perhaps even complete congruence, between those claims and the derivative claims against the same individuals that Judge Drain had undoubted authority to release and enjoin. But it is undisputed that these laws impose liability, and even penalties, on such persons independent of any corporate liability (or lack of same), and independent of any claim the corporation could assert against them for faithless service as a result of those same acts.[58]

---

[57]    The Section 10.7 Shareholder Release extends to every Sackler presently alive, to their unborn progeny, and to various trusts, partnerships, corporations, and enterprises with which they are affiliated or that have been formed for their benefit. Exhibit X to the Settlement Agreement, expressly incorporated into the Plan (*see* Dkt. No. 91-3, at App. 1112), identifies over 1,000 separate released parties, either by name or by some "identifying" feature, such as "the assets, businesses and entities owned by" the named released parties. (*See* Dkt. No. 91-3, at App.1041-1069).

[58]    While Judge Drain expressly found that these claims were not derivative (*In re Purdue Pharma L.P.*, 2021 WL 4240974, at *44), he was quite clear that the congruence between these claims and derivative claims against the same individuals was critically important to his conclusion that they could be released.

The discussion that follows, then, applies only to direct (non-derivative) claims – sometimes referred to as "particularized" claims – that arise out of the Sacklers' own conduct (*In re Purdue Pharma L.P.*, 2021 WL 4240974, at *45), and that either have been or could be asserted against the non-debtor members of the Sackler family and their affiliates (the Shareholder Released Parties) by parties other than the Debtors' estate.

**The Text of the Bankruptcy Code**

[39]    As one always should when assessing statutory authority, we turn first to the text of the statute.

**[40]**  All parties agree that one and only one section of the Bankruptcy Code expressly authorizes a bankruptcy court to enjoin third party claims against non-debtors without the consent of those third parties. That section is 11 U.S.C. § 524(g), which was passed by Congress in 1994. It provides for such an injunction solely and exclusively in cases involving injuries arising from the manufacture and sale of asbestos. And it sets out a host of conditions that must be satisfied before any such injunction can be entered, including all of the following:

> (i) the injunction is to be implemented in connection with a trust the is to be funded in whole or in party by the securities of the debtor and that the debtor will make future payments, including dividends, to that trust 524(g)(2)(B)(i)(I);

> (ii) the extent of such alleged liability of a third party arises by reason of one of four enumerated relationships between the debtor and third party (524(g)(4)(A)(ii));

> (iii) as part of the proceedings leading to issuance of such injunction, the court appoints a legal representative for the purpose of protecting the rights of persons that might  **\*92**  subsequently assert demands of such kind (524(g)(4)(B)(i)); and

> (iv) the court determines the injunction is fair and equitable to persons that might subsequently assert such demands, and, in light of the benefits provided to such trust on behalf of such third parties. § 524(g)(4)(B)(ii)).

Section 524(g) injunctions barring third party claims against non-debtors cannot be entered in favor of just any non-debtor. They are limited to enjoin actions against a specific set of non-debtors: those who have a particular relationship to the debtor, including owners, managers, officers, directors, employees, insurers, and financiers. 11 U.S.C. § 524(g)(4)(A).

The language of the statute plainly indicates that Congress believed that Section 524(g) created an exception to what would otherwise be the applicable rule of law. Subsection 524(g)(4)(A)(ii) says: "Notwithstanding the provisions of section 524(e), such an injunction may bar any action directed against a third party who is identifiable from the terms of such injunction (by name or as part of an identifiable group) and is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor." 11 U.S.C. § 524(g)(4)(A)(ii). Section 524(e) provides: "Except as provided in subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e). The word "notwithstanding," suggests that the type of injunction Congress was authorizing in § 524(g) would be barred by § 524(e) in the absence of the statute.

### A. Legislative History of the Statute

Section 524(g) was passed after the United States Court of Appeals for the Second Circuit had affirmed the entry of an unprecedented injunction barring claims against certain non-debtors in connection with the bankruptcy of the nation's leading manufacturer of asbestos, the Johns Manville Corporation. *MacArthur Co. v. Johns–Manville Corp.* (*In re Johns–Manville Corp.*), 837 F.2d 89, 91 (2d Cir. 1988) ("*Manville I*"). The permanent injunction in that case extended to actions against Manville's insurers, all of whom had dedicated the entire proceeds of their policies – proceeds on which parties other than Manville were additional insureds and had a call – to a settlement fund into which the claims of asbestos victims would be channeled, valued, and resolved. The Second Circuit concluded that the bankruptcy court could permanently enjoin and channel lawsuits against a debtor's insurer relating to those insurance policies because those policies were "property of the debtor's estate." *Id*. at 90. The Court of Appeals did not cite to a single section of the Bankruptcy Code as authorizing entry of the injunction.

Despite the Second Circuit's affirmance of the *Manville I* injunction, questions continued to be raised about its legality. Congress passed Sections 524(g) and (h) of the Bankruptcy Code to remove any doubt that those injunctions were authorized. *See* H.R. Rep. 103-835 at \*41 (noting that Subsection (g) was added to Section 524 "in order to strengthen the Manville and UNR trust/injunction mechanisms and to offer similar certitude to other asbestos trust/injunction mechanisms that meet the same kind of high standard with respect to regard for the rights of claimants, present and future, as displayed in the two pioneering cases").

3911

That Section 524(g) applies only to asbestos cases is clear. The statute explicitly states than the trust that "is to assume the liabilities of a debtor" be set up in connection **\*93** with "actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products" (11 U.S.C. § 524(g)(B)(i)(I)). If that were not clear enough, Congress passed another section to provide that injunctions that had previously been entered *in asbestos cases* – not in any other kind of case – would automatically be deemed statutorily compliant, even if those injunctions did not have all the features required by § 524(g). *See*, 11 U.S.C. § 524(h) ("Application to Existing Injunctions"). The limitation of § 524(h) to asbestos injunctions is important because, prior to the statute's passage, injunctions releasing third party claims against non-debtors had been entered by a few courts in cases involving other industries. *See e.g.*, *In re Drexel Burnham Lambert Grp.*, Inc., 960 F. 2d 285 (2d Cir. 1992) (securities); *In re A.H. Robins Co., Inc.*, 880 F.2d 694 (4th Cir. 1989) (medical devices). The revisions to the Bankruptcy Code neither extend to those injunctions nor deem them to be statutorily compliant.

At the same Congress passed Sections 524(g) and (h), it passed Public Law 111, which provided a rule of construction for Section 524(g). It states that nothing in the 1994 amendments to the Bankruptcy Code, including 524(g), "shall be construed to modify, impair, or supersede any other authority the court has to issue injunctions in connection with an order confirming a plan of reorganization." Pub. L. 103–394 § 111(b) (uncodified). Congress made this statement because the parties in non-asbestos bankruptcy cases took the position that Sections 524(g) and (h) were unnecessary, in that bankruptcy courts already authorized the entry of such injunctions and corresponding approval of non-debtor releases – viz, *Robins* and *Drexel*. But the passage of Public Law 111 did not mean that Congress agreed with that position. As the House Committee on the Judiciary noted in the legislative history of these new provisions:

> Section 111(b) ... make[s] clear that the special rule being devised for the asbestos claim trust/injunction mechanism is not intended to alter any authority bankruptcy courts *may* already have to issue injunctions in connection with a plan [of] reorganization. Indeed, [asbestos suppliers] Johns–Manville and UNR firmly believe that the court in their cases had full authority to approve the trust/injunction mechanism. And other debtors in other industries are reportedly beginning to experiment with similar mechanisms. *The Committee expresses no opinion as to how much authority a bankruptcy court may generally have under its traditional equitable powers to issue an enforceable injunction of this kind.*

Vol. E., *Collier on Bankruptcy,* at App. Pt. 9–78 (reprinting legislative history pertaining to the 1994 Code amendments) (emphasis added). P.L. 111 was not incorporated into the Bankruptcy Code.

Congress' used of the word "may" indicates that a bankruptcy court's authority to enter such an injunction was at best uncertain. And in light of the last sentence – in which the Committee made it clear that Congress expressed no opinion on that subject – one cannot read this tidbit of legislative history as indicating that Congress had concluded that a bankruptcy court already had such authority under its "traditional equitable powers."

During the course of this appeal, it has been suggested that P.L. 111 expresses Congress' intent to pass a limited law and then allow the courts to work out the contours of whether and how to extend § 524(g)-style authority outside the asbestos context.[59] The very next sentence from **\*94** that statute's legislative history reveals that nothing could be further from the truth:

> The Committee has decided to provide explicit authority in the asbestos area because of the singular cumulative magnitude of the claims involved. How the new statutory mechanism works *in the asbestos area* may help the Committee judge whether the concept should be extended into other areas.

*Id*. (Emphasis added)

[59]    I can only assume that this argument derives from Congress' mention of the fact that courts dealing with non-asbestos bankruptcies were "reportedly beginning to experiment with similar mechanism."

Plainly, Congress made a decision to limit the scope of the experimenting that was "reportedly" to be happening (and that was in fact happening) in other industries. And it left to itself, not the courts, the task of determining whether and how to extend a rule permitting non-debtor releases "notwithstanding the provisions of section 524(e)" into other areas.

Since 1994, Congress has been deafeningly silent on this subject.

*B. Survey of the Relevant Case Law*

1. Supreme Court Law

The United States Supreme Court has never specifically considered whether the non-consensual release of non-derivative claims asserted by third parties against non-debtors can be approved in the context of a debtor's bankruptcy. Indeed, on *certiorari* to the Second Circuit from one of its orders in the ongoing *Manville* saga, the High Court announced that its opinion did "not resolve whether a bankruptcy court, in 1986 or today, could properly enjoin claims against nondebtor insurers that are not derivative of the debtor's wrongdoing." *Travelers Indem. Co. v. Bailey*, 557 U.S. at 155, 129 S.Ct. 2195.

The Court has, however, spoken on several occasions about issues that are germane to the consideration of that question.

For one thing, the Court has indicated that the Bankruptcy Code was intended to be "comprehensive." *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645, 132 S.Ct. 2065, 182 L.Ed.2d 967 (2012) ("Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions") (quoting *Varity Corp. v. Howe*, 516 U.S. 489, 519, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996) (Thomas, J., dissenting)).

For another, it has held that the "traditional equitable power" of a bankruptcy court "can only be exercised within the confines of the Bankruptcy Code." *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988).

And in two recent cases, the Supreme Court has held, albeit in contexts different from the one at bar, that a bankruptcy court lacks the power to award relief that varies or exceeds the protections contained in the Bankruptcy Code – not even in "rare" cases, and not even when those orders would help facilitate a particular reorganization.

For example, in *Law v. Siegel*, 571 U.S. 415, 134 S.Ct. 1188, 188 L.Ed.2d 146 (2014), the Supreme Court unanimously held the bankruptcy court does not have "a general, equitable power" to order that a debtor's statutorily exempt assets be made available to cover attorney's fees incurred by an estate's trustee in the course of the chapter 7 bankruptcy case. Section 522 of the Bankruptcy Code, by reference to applicable state law, entitled the debtor in **\*95** that case to exempt equity in his home from the bankruptcy estate. *See* 11 U.S.C. § 522(b)(3)(A). A dispute arose between the debtor and the trustee of the estate, causing the trustee to incur substantial legal fees, purportedly as a result of the debtor's "abusive litigation practices." *Law v. Siegel*, 571 U.S. at 415-16, 134 S.Ct. 1188. Seeking to recoup the cost of resolving the dispute with the debtor, the trustee asked the bankruptcy court to order that the otherwise exempt assets be made available to cover his attorney's fees. He argued that such an order was authorized by the "inherent power" of the Bankruptcy Court and by Section 105(a) of the Bankruptcy Code, which provides:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a).

**[41]**   The High Court disagreed, stating flatly, "A bankruptcy court may not exercise its authority to 'carry out' the provisions of the Code" by taking an action inconsistent with its other provisions. *Law v. Siegel*, 571 U.S. at 425, 134 S.Ct. 1188. It announced that there is "no authority for bankruptcy courts to deny an exemption on a ground not specified in the Code," because the Bankruptcy Code was intended to be a *comprehensive* statement of the rights and procedures applicable in bankruptcy. *Id.* at 416, 134 S.Ct. 1188. The Code explicitly exempts certain debtor assets from the bankruptcy estate and provides a finite number of exceptions and limitations to those asset exemptions. *See* 11 U.S.C. § 522. To the Supreme Court, "comprehensive" means precisely that: "The Code's meticulous – not to say mind-numbingly detailed – enumeration of exemptions and exceptions to

those exemptions confirms that courts are not authorized to create additional exceptions." *Law v. Siegel*, 571 U.S. at 424, 134 S.Ct. 1188.

 **[42]    [43]**   More recently, in *Czyzewski v. Jevic Holding Corp.*, —— U.S. ——, 137 S. Ct. 973, 197 L.Ed.2d 398 (2017), the Court held that the protections explicitly afforded by the Bankruptcy Code could not be overridden in a "rare" case, even if doing so would carry out certain bankruptcy objectives. In chapter 11 bankruptcies, a plan that does not follow normal priority rules cannot be confirmed over the objection of an impaired class of creditors. 11 U.S.C § 1129(b). Notwithstanding that, the bankruptcy court in *Jevic* approved the structured dismissal[60] of a chapter 11 case in which unsecured creditors were prioritized over non-consenting judgment creditors – a violation of ordinary priority rules. The bankruptcy court and the proponents of the structured dismissal argued that the Bankruptcy Code did not specifically state whether normal priority rules had to be followed in chapter 11 (as opposed to chapter 7) cases – that is, the statute was "silent" on the subject – so the court could exercise such authority in "rare" cases in which there were "sufficient reasons" to disregard priority. But the Supreme Court disagreed that any such power existed. It observed that the priority system applicable to those distributions had long been considered fundamental to the Bankruptcy  **\*96**   Code's purposes and held that the "importance of the priority system leads us to expect more than simply statutory silence if, and when, Congress were to intend a major departure." *Jevic Holding Corp.*, 137 S. Ct. at 984. To the argument that a bankruptcy court could disregard priority if there were "sufficient reasons" to do so, Justice Breyer aptly noted: "It is difficult to give precise content to the concept 'sufficient reasons.' That fact threatens to turn a 'rare case' exception into a more general rule." *Id.* at 986.

60      In a structured dismissal, the debtor obtains an order that simultaneously dismisses its chapter 11 case and provides for the administration and distribution of its remaining assets.

It is with these holdings in mind that I examine the law in the various Circuits on the subject of non-consensual release of third-party claims against non-debtors.

I begin, of course, with our own.

### 2. Second Circuit Law

**Manville I:** The relevant law in the Second Circuit begins with *Manville I*, which has already been discussed. *Manville's I*'s injunction was subsequently codified in §§ 524(g) and (h)[61] – which, as noted above, are plainly in the Bankruptcy Code, and are limited to the asbestos context, and have never been extended by Congress to other areas of endeavor. It is, moreover, significant that the injunction authorized by the Second Circuit in *Manville I* extended only to claims against parties (insurance companies) holding property that was indisputably part of the *res* of the debtor's estate (policies covering Manville for the manufacture and sale of asbestos). As will be seen when we get to *Manville III/IV*, when the non-debtor was seeking a release in exchange for contributing property to the debtor's estate – as opposed to surrendering property that already was part of the debtor's estate – the result, even in a statutorily authorized asbestos case, was different.

61      The Court is advised that the *Manville I* injunction did not conform in every particular to the rules set out in Section 524(g), and that Section 524(h) was included in the Bankruptcy Code to be sure that the *Manville I* injunction was deemed to be Code-compliant notwithstanding that fact.

**Drexel:** The debtor in *In re Drexel Burnham Lambert Grp.*, Inc., 960 F.2d 285 (2d Cir. 1992) was the investment bank Drexel Burnham Lambert Group ("DBL"), which filed for bankruptcy in 1990. DBL's principal creditor was the Securities and Exchange Commission, which was owed $150 million pursuant to a prior settlement. But over 15,000 creditors filed proof of claims against the estate, alleging fraud in connection with four different types of securities transactions.

Judge Milton Pollack of this district withdrew all of these securities claims from the bankruptcy court pursuant to 28 U.S.C. § 157(d) in order to facilitate their settlement. The parties negotiated a settlement that had as its key feature the certification

of all the securities claimants into a single, mandatory, non-opt-out class (Rule 23(b)(1)(B)), which was itself divided into two subclasses: A and B. The members of Subclass B – comprised of securities fraud class action plaintiffs – were, as part of the settlement, enjoined from bringing any future actions against the former officers and directors of DBL; while not themselves debtors, those individuals had contributed to DBL's estate.

The district court certified the classes and approved the settlement over the objections of 8 of the 850 proposed class members. Three of the objectors filed appeals, contending in relevant part that the district court had erred by approving the settlement with it the mandatory injunction against the pursuit of third-party claims by non-consenting plaintiffs.

The Second Circuit affirmed the settlement of the securities fraud cases. It noted **\*97** in passing that, "In bankruptcy cases, a court may enjoin a creditor from suing a third party, provided this injunction plays an important part in the debtor's reorganization plan." *Drexel, 960 F. 2d at 293* (citing *In re A.H. Robins Co., 880 F.2d 694, 701 (4th Cir.)*). But it cited no section of the Bankruptcy Code that authorized this proposition. In its brief discussion of the objectors' challenge to the provision in the settlement agreement that barred members of subclass B from bringing or maintaining suits against DBL's officers and directors, the Court of Appeals, reasoning tautologically, said this:

> The Settlement Agreement is unquestionably an essential element of Drexel's reorganization. In turn, the injunction is a key component of the Settlement Agreement. As the district court noted, the injunction limits the number of lawsuits that may be brought against Drexel's former directors and officers. This enables the directors and officers to settle those suits without fear that future suits will be filed. Without the injunction, the directors and officers would be less likely to settle. Thus, we hold that the district court did not abuse its discretion in approving the injunction.

*In re Drexel Burnham Lambert Grp., Inc., 960 F. 2d at 293*. In other words, the Circuit held that the district court had discretion to approve non-debtor releases as part of the settlement of numerous securities fraud class actions in the context of a bankruptcy, simply and solely because funds were being funneled to the estate that would not otherwise be contributed.

There are numerous reasons why *Drexel* does not answer the question about a court's statutory authority under the Bankruptcy Code to release non-debtors over the objection of third parties who have direct claims against them. Two, however, are dispositive.

First and foremost, the Second Circuit simply did not address this question in *Drexel. Drexel* mentioned in passing something about a bankruptcy court's power to enjoin claims but did not identify any source of that power in the Bankruptcy Code. It appears to have assumed *sub silentio* that such authority existed.

Second, *Drexel* was decided two years before Congress passed Sections 524(g) and (h). The opinion's passing mention of a bankruptcy court's power to enjoin a creditor from suing a non-debtor became far less persuasive after Congress (1) amended the Bankruptcy Code to authorize such injunctions, but only in asbestos cases; (2) expressed agnosticism about whether any such authority existed outside of its new legislation; and (3) indicated its intent to consider at some later time whether to extend this authority to industries that were "reportedly experimenting" with such injunctions – which it never has.[62]

[62] It bears reiterating that *Drexel* was one of those cases to which the Judiciary Committee referred when it said that debtors in other industries were "reportedly experimenting" with non-debtor injunctions in the years prior to the passage of Section 524(g). *See supra*, note 59.

There are other reasons to question the continuing viability of *Drexel*. Whether its reasoning can be extended to mass tort cases like this one is highly dubious. Seven years after the Second Circuit's opinion in *Drexel,* the Supreme Court expressed grave doubt about whether the Rule 23(b)(1)(B) "limited fund class action" device that was employed in *Drexel* could ever be employed in the mass tort context like this one, *Ortiz v. Fibreboard Corp., 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999)*. Subsequent to *Ortiz*, courts have consistently rejected attempts to apply the limited fund mandatory class action **\*98** device to mass torts. *See, e.g., In re Simon II Litig., 407 F.3d 125, 137-38 (2d Cir. 2005)* (tobacco punitive damages litigation);

*Doe v. Karadzic*, 192 F.R.D. 133, 140-44 (S.D.N.Y. 2000) (actions by victims of war crimes committed by Bosnia–Herzegovina brought under the Alien Tort Claims Act).

Moreover, the Supreme Court also said in *Ortiz* that a fund which is "limited" only because the contributing party keeps a large portion of its wealth (*a la* the Sacklers) is "irreconcilable with the justification of necessity in denying any opportunity for withdrawal of class members whose jury trial rights will be compromised, whose damages will be capped, and whose payments will be delayed." *Ortiz v. Fibreboard Corp.*, 527 U.S. at 860, 119 S.Ct. 2295. The exact same thing could be said of the third parties whose claims are being extinguished as part of the Debtors' Plan.

Subsequent Second Circuit law in the *Manville* cases also casts doubt on a bankruptcy court's subject matter jurisdiction to authorize the release of third-party claims against the officers and directors of DBL simply because they would not otherwise have made a contribution to the debtor's estate. *Manville III*, 517 F.3d at 66. In *Manville III/IV,* the Second Circuit concluded that "a bankruptcy court only has jurisdiction to enjoin third-party non-debtor claims that directly affect the *res* of the bankruptcy estate," and held that claims asserted against non-debtors that sought "to recover directly from [the] debtor's insurer for the insurer's own independent wrongdoing" did not have such impact. *Manville III*, 517 F.3d at 65-66. In so ruling the Second Circuit held it of no moment for jurisdictional purposes that the non-debtor was making made a financial contribution to a debtor's estate (*id.*), saying: "It was inappropriate for the bankruptcy court to enjoin claims brought against a third-party non-debtor *solely on the basis of that third-party's financial contribution to a debtor's estate.*" *Id.* (Emphasis added) For this proposition, the *Manville III* panel cited with approval the Third Circuit's warning from *In re Combustion Engineering*, where the court had observed that:

> a debtor could create subject matter jurisdiction over any on-debtor third-party [simply] by structuring a plan in such a way that it depended upon third party contribution. As we have made clear, subject matter jurisdiction cannot be conferred by consent of the parties. Where a court lacks subject matter jurisdiction over a dispute, the parties cannot create it by agreement even in a plan of reorganization.

*In re Combustion Engineering*, 391 F. 3d 190, 228 (3d Cir. 2004).

Finally, changes in class action law since *Drexel* was decided have rendered its facile analysis of the Rule 23(a) factors, especially commonality and typicality, highly suspect. *Amchem Products, Inc., v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999). I strongly suspect that the *Drexel* class certification, and so the *Drexel* settlement, would not and could not be approved today.[63]

63    It is, of course, for the Second Circuit to make that call – not a district court in the Second Circuit.

But one thing is clear: *Drexel* sheds no light whatsoever on the issue of whether releases like the one at bar are authorized *by the Bankruptcy Code*. That statute was never mentioned.

 **[44]   New England Dairies/Metromedia**:  **\*99**  In *New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc., (In re Dairy Mart Conveniences Stores),* 351 F. 3d 86, 92 (2d Cir. 2003), the Court of Appeals for this circuit definitively rejected the argument that § 105(a) of the Bankruptcy Code (*see supra*, at p. 94-95) could "create substantive rights that are otherwise unavailable under applicable law." As the author of the opinion (Judge Jacobs) recognized:

> The equitable power conferred on the bankruptcy court by section 105(a) is the power to exercise equity in carrying out the *provisions* of the Bankruptcy Code, rather than to further the purposes of the Bankruptcy Code generally, or otherwise to do the right thing. This language "suggests that an exercise of section 105 power be tied to another Bankruptcy Code section and not merely to a general bankruptcy concept or objective." 2 *Collier on Bankruptcy* ¶ 105.01[1].[64]

*In re Dairy Mart Conveniences Stores,* 351 F. 3d at 92.

64    *In re Dairy Mart* was hardly the first time this settled principle had been recognized by the Second Circuit. *See, e.g., FDIC v. Colonial Realty Co.,* 966 F.2d 57, 59 (2d Cir. 1992) ("105(a) limits the bankruptcy courts equitable powers, which 'must and can only be

exercised within the confines of the Bankruptcy Code") (quoting *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169, (1988)).

*In re Dairy Mart* did not involve the confirmation of a plan containing non-debtor releases of third-party claims, so technically it did not speak to the question pending before this Court. But two years later, Judge Jacobs authored *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136 (2d Cir. 2005), which did.

Metromedia Fiber Network, Inc. and its subsidiaries declared bankruptcy. *See Metromedia*, 416 F.3d 136, 138 (2d. Cir. 2005). The company's founder, John W. Kluge, did not. However, as part of the plan of reorganization, Kluge, as grantor, established the "Kluge Trust." *Id.* at 141 n.4. Under the plan of reorganization proposed to the court, the Kluge Trust was to make "a 'material contribution' to the estate" in the bankruptcy, (*id.* at 143), by "[i] forgiv[ing] approximately $150 million in unsecured claims against Metromedia; [ii] convert[ing] $15.7 million in senior secured claims to equity in the Reorganized Debtors; [iii] invest[ing] approximately $12.1 million in the Reorganized Debtors; and [iv] purchas[ing] up to $25 million of unsold common stock in the Reorganized Debtors' planned stock offering." *Id.* at 141. Metromedia itself would continue to exist after its reorganization – albeit under a new name, AboveNET – and to engage in the business of providing high bandwidth telecommunications circuits, which was its historic business model.

In exchange for the Kluge Trust's contributions, the Kluge Trust and certain "Kluge Insiders" were to receive 10.8% of the Reorganized Debtors' common stock and something called the "Kluge Comprehensive Release." *Id.* The Kluge Comprehensive Release provided:

> the Kluge Trust and each of the Kluge Insider shall receive a full and complete release, waiver and discharge from ... any holder of a claim of any nature ... of any and all claims, obligations, rights, causes of action and liabilities arising out of or in connection with any matter related to [Metromedia] or one or more subsidiaries ... based in whole or in part upon any act or omission or transaction taking place on or before the Effective Date.

*Id.*

The release was broad and did not carve out any exception – even for claims that could not be discharged against a debtor in **\*100** bankruptcy, such as those predicated on fraud or willful misconduct.

Following confirmation of the plan, appellant creditors Deutsche Bank AG (London Branch) and Bear, Stearns & Co., Inc. challenged the "largely implemented" plan of reorganization and argued that the releases in the plan of reorganization "improperly shield certain nondebtors from suit by the creditors." *Id.* at 138. On appeal, the district court both affirmed the plan of reorganization and ruled that the relief sought by the two banks was not "barred by the doctrine of equitable mootness because effective relief could have been afforded without 'unraveling the plan.' " *Id.* at 139.

The Second Circuit vacated the district court's affirmance of the plan, on the ground that the bankruptcy court had failed to make certain findings necessary to a determination that the non-consensual third-party releases should be approved. *Id.* at 143. But the plan had been substantially consummated by the time the appeal was heard, so the Circuit concluded that the matter was indeed equitably moot. As a result, it declined to remand so that a lower court could make the missing findings and reconsider the propriety of the releases. *Id.* at 145.

Before reaching this result, the panel discussed whether non-debtor releases were available in connection with someone else's bankruptcy. The Circuit identified "two considerations that justify ... reluctance to approve non-debtor releases." *Id.* at 141. It noted that such releases were not specifically authorized outside of the asbestos context:

> [T]he only explicit authorization in the Bankruptcy Code for nondebtor releases is 11 U.S.C. § 524(g), which authorizes releases in asbestos cases when specified conditions are satisfied, including the creation of a trust to satisfy future claims ...

*Metromedia Fiber Network, Inc.*, 416 F.3d at 142. And it held, consistent with *In re Dairy Mart*, that Section 105(a) of the Bankruptcy Code did not authorize the approval of such releases:

True, 11 U.S.C. § 105(a) authorizes the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]"; but section 105(a) does not allow the bankruptcy court "to create substantive rights that are otherwise unavailable under applicable law." *New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart Convenience Stores, Inc.),* 351 F.3d 86, 92 (2d Cir.2003) (quotations and citation omitted). Any "power that a judge enjoys under § 105 must derive ultimately from some other provision of the Bankruptcy Code." Douglas G. Baird, Elements of Bankruptcy 6 (3d ed.2001); accord *Dairy Mart,* 351 F.3d at 92 ("Because no provision of the Bankruptcy Code may be successfully invoked in this case, section 105(a) affords [appellant] no independent relief."). *Metromedia,* 416 F. 3d at 142.

The panel also cautioned that courts should be careful about approving a non-consensual non-debtor release because the device "lends itself to abuse." *Id.* One particular form of abuse identified by the panel manifests when the release, in effect, "operate[s] as a bankruptcy discharge arrange without a filing and without the safeguards of the Bankruptcy Code." *Id.* Indeed, "The potential for abuse is heightened when releases afford blanket immunity." *Id.*

After observing that, "No case has tolerated nondebtor releases absent a finding of circumstances that may be characterized *\*101* as unique,." *Id.*, the panel listed circumstances in which such releases had been authorized in the past, and identified factors that a court should consider when evaluating such releases in the future: (1) the release is important to the plan, (2) the enjoined claims would be channeled to a settlement fund rather than extinguished, (3) the estate receives substantial consideration in return, (4) the released claims would otherwise indirectly impact the debtors' reorganization by way of indemnity or contribution, and (5) the plan otherwise provided for the full payment of the enjoined claims. *Id.* at 141–42. However, the Circuit insisted that the ultimate decision about whether to authorize such releases was "not a matter of factors and prongs." *Id.* 142.

Having said all that, the *Metromedia* court did not rule on whether any or all of the factors it had identified were satisfied in the particular case before it. Nor did it conclude that a non-debtor release should be approved if the factors were satisfied, or consider whether, in the case before it, there might be other reasons why the proposed non-debtor releases should not be approved.

Instead, as noted above, the Circuit vacated approval of the plan and declined to remand for further consideration because the matter had become equitably moot – thereby guaranteeing that those open questions – including the question about whether there was statutory authority for such releases – would not be answered.

So to summarize: No third-party releases were approved in *Metromedia.* The Court of Appeals did not conclude that such releases were consistent with or authorized by the Bankruptcy Code. It did not conclude that the case before it was one of the "unique" instances in which a court's reluctance to approve such releases might (assuming they were authorized) be overcome. And it did not decide whether the Kluge releases measured up to the level that might justify approving them if the case qualified as "unique." *In re Metromedia Fiber Network,* 416 F.3d at 142–143.

In other words, while *Metromedia* said a great deal, the case did not hold much of anything.[65] Its relevance, for present purposes, is that Judge Jacobs cautioned that statutory authority for non-consensual non-debtor releases outside of the asbestos context was at best uncertain – and then disposed of the case on other grounds, without identifying what section or sections of the Bankruptcy Code might actually authorize such relief in non-asbestos bankruptcy.[66]

---

[65]    I disagree with Appellants that *Metromedia*'s discussion of non-consensual third-party releases is dictum. (*See id.*). The actual holding in the case is that the bankruptcy court failed to make the findings in order to justify approval of such a release. *Metromedia,* 416 F.3d at 143. A discussion of what type of findings would be necessary to approve a non-consensual third-party release was, at least arguably, a necessary predicate to that holding. The court's equitable mootness ruling only justified the decision not to remand so that the missing findings could be made. The court did not vacate approval of the releases on equitable mootness grounds, so it was not the actual holding in the case.

66      Further to the discussion of *Drexel* – the case was cited by a Second Circuit in *Metromedia*, but only for the proposition that a contribution to a debtor's estate from a released third party was one factor that had in the past been relied on by a court to justify a non-debtor release. That is true as a matter of simple fact. As far as this Court can tell, that is about all that can be said to be left of *Drexel.*

No subsequent Second Circuit case has filled in the blank.

**\*102  Manville III/IV and In re Quigley**[67]: These were asbestos cases, in which a court's statutory authority to impose such non-debtor injunctions is undoubted, as long as all the conditions listed in § 524(g) are met.

67      *Manville III*, 517 F.3d at 66; *Manville IV*, 600 F. 3d at 152; *In re Quigley Co.*, 676 F.3d 45 (2d Cir. 2012).

As discussed above, in *Manville III*/*IV*, the Second Circuit concluded that the bankruptcy court lacked subject matter jurisdiction over third party claims against Manville's non-debtor insurer that arose out of an alleged independent duty owed by the insurer to those third parties, rather than out of its contractual relationship as Manville's insurer. The court did not discuss any issue of statutory authority.

And in *Quigley*, the Circuit held that certain claims against the debtor's parent—claims based on the use of the parent's name on the debtors' asbestos products—could not be enjoined pursuant to § 524(g) because the alleged liability was not "by reason of" any of the four "statutory relationships" identified in that section. *Quigley*, 676 F.3d at 49, 60-61. Had the proposed injunction fallen within one of the express statutory relationships, it would have been authorized because the case involved asbestos.

**Madoff**: *In re Bernard L. Madoff Inv. Securities LLC*, 740 F.3d 81 (2d Cir. 2014) involved a chapter 7 liquidation under the Securities Investor Protection Act (SIPA). The debtor, Bernie L. Madoff Investment Securities ("BLMIS"), was an investment enterprise created to effect the Ponzi scheme of its principal, Bernie Madoff. The bankruptcy estate settled its claims against the estate of Jeffry M. Picower, an alleged Madoff co-conspirator, releasing its claims in exchange for a $5 billion dollar contribution to Madoff bankruptcy estate. In addition to approving that settlement and release, the bankruptcy court permanently enjoined two of the debtor's customers from pursuing putative state tort law class actions against the estate of Jeffry M. Picower in the United States District Court for the Southern District of Florida, to the extent those claims arose from or related to the Madoff Ponzi scheme.

The Second Circuit affirmed the non-debtor injunction because the customer's complaints were predicated on secondary harms flowing from to them from BLMIS, and so were derivative claims that a bankruptcy court had power to discharge pursuant to Section 105(a). The *Madoff* court explained that the Florida plaintiffs had not alleged any direct claim against Picower's estate, because they failed to allege that Picower took any actions aimed at BLMIS customers (such as making misrepresentations to them) that caused particularized injury to those customers. *Id.* at 93.

However, the Second Circuit was careful to note that factual congruence between an estate's claim and an individual creditor's claim against the same non-debtor was not what rendered the asserted claims derivative. It held that, "there is nothing illogical or contradictory" about factual overlap between the allegations asserted in direct claim and a derivative claim; a non-debtor "might have inflicted direct injuries on both the [estate's creditors] and [the debtor estate] during the course of dealings that form the backdrop of both sets of claims." *Id.* at 91 (quoting *In re Seven Seas Petroleum, Inc.*, 522 F.3d 575, 587 (5th Cir. 2008)). A creditor could, therefore, bring a direct claim against a non-debtor, even though the debtor might have **\*103**  suffered an identical injury – provided the creditor was not seeking to recover for injuries suffered by the debtor, but for injuries it suffered *directly*. *Id.*

Significantly for our purposes, the Second Circuit did not simply sweep away the Florida class actions; it permitted the creditors to amend their Florida complaints to assert direct claims if they could identify some direct injury that Picower caused them, as there was "conceivably some particularized claim" that the customers could assert against the non-debtor that could not also be asserted or released by the estate. *Id.* at 94.

**Tronox:** *In re Tronox, Inc.*, 855 F.3d 84 (2d Cir. 2017) was not an asbestos case, but it adds nothing to the above discussion, for two reasons. First and foremost, the Court of Appeals dismissed the appeal for lack of appellate jurisdiction. Second, in that case, the claims asserted against the non-debtors by the third party were again derivative, not direct, claims (*e.g.*, alter ego, piercing the corporate veil, and successor liability) – as in *Madoff*, the plaintiff alleged "no particularized injury" to the claimant. *Id*. Because success on a derivative claim benefits all creditors of the estate, the Circuit held that the bankruptcy "trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action." *In re Tronox Inc.*, 855 F.3d at 103 (internal quotation omitted).

But the court went on to say that, "when creditors have a claim for injury that is particularized as to them, they are exclusively entitled to pursue that claim, and the bankruptcy estate is precluded from doing so." *Id.* at 99 (internal citation omitted). There was no discussion of enjoining such particularized claims, let alone any discussion of statutory authority for doing so.

**Kirwan (Lynch v. Lapidem):** And so we come to *Lynch v. Lapidem* (*In re Kirwan Offs. S.à.R.L.*) 792 Fed. Appx. 99 (2d Cir. 2019) ("*Kirwan*").

In *Kirwan,* the Second Circuit affirmed a bankruptcy court injunction that was included in a plan of reorganization in order to prevent collateral attacks on prior orders of that court. The appellant in *Kirwan* (Lynch) was one of three shareholders in the bankrupt enterprise. He challenged the *bona fides* of the bankruptcy filed by his former partners but lost after trial. The dissident shareholder then absented himself from the hearing on the plan of reorganization, of which he had notice. He did so in the (mistaken) belief that he could avoid any *res judicata* effect of the bankruptcy court's orders as long as he did not participate. *See In re Kirwan Offs. S.à.R.L.*, 592 B.R. 489, 501 (S.D.N.Y. 2018), *aff'd sub nom. In re Kirwan Offs. S.à.R.L.*, 792 F. App'x 99 (2d Cir. 2019).

Anticipating that the dissident shareholder would try to mount a collateral attack on the bankruptcy court's order confirming the plan, the other two shareholders had included therein a provision enjoining any person, including Lynch, from suing anyone in any forum on a claim arising out of the bankruptcy proceeding and the court-approved reorganization. Judge Drain confirmed the plan containing that provision. At the time he entered the order confirming the plan, the Bankruptcy Judge made it clear that Lynch's "opposition to any reasonable restructuring ... scurried, if not crossed the line, over into bad faith" (*Kirwan,* 592 B.R. at 499), and said it was "in that context ... that I am prepared to approve the exculpation and injunction provisions of the plan." *Id*. He specifically found that the provision was narrowly tailored and necessary in order to forestall "back-door attacks and collateral litigation for their activities related to  **\*104**  those things," which would impact the reorganized debtor as well the non-debtors who had proceeded in good faith throughout the bankruptcy. *Id*.

In short, the injunction affirmed in *Kirwan* was plainly one designed to preserve and protect the authority of the bankruptcy court and the integrity of its actions *vis a vis* the debtor's estate. Unlike the third-party claims in this case, Lynch's claims against his erstwhile partnership inherently involved the property of the estate – the relief sought would have redistributed *post hoc* the estate following the bankruptcy court's confirmation of the plan.

As noted earlier (*see* footnote 56), Lynch did not argue, either in this Court or in the Second Circuit, that the injunction was not statutorily authorized by the Bankruptcy Code. The grounds asserted and decided were jurisdictional and constitutional, not statutory. Neither this Court nor the Second Circuit analyzed the question of statutory authority, even in the context of the very limited and specially targeted injunction that was included in the debtor's plan.

**Summary of Second Circuit Law**: The only fair characterization of the law on the subject of statutory authority to release and enjoin the prosecution of third-party claims against non-debtors in a bankruptcy case is: unsettled, except in asbestos cases, where statutory authority is clear. Because the Court of Appeals has decided every other case on non-statutory grounds, its only clear statement is that Section 105(a), standing alone, does not confer such authority on the bankruptcy court outside the asbestos context.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   **3920**

3. The Law in Other Circuits

All but three of the other Circuits have spoken directly to the issue of statutory authority. They have reached conflicting results – a most unfortunate circumstance when dealing with a supposedly uniform and comprehensive nationwide scheme to adjust debtor-creditor relations.

Three of the eleven Circuits – the Fifth, Ninth, and Tenth – reject entirely the notion that a court can authorize non-debtor releases outside the asbestos context. *See In re Pacific Lumber Co.*, 584 F.3d 229, 252 (5th Cir. 2009); *In re Lowenschuss*, 67 F.3d 1394, 1401-02 (9th Cir. 1995); *In re W. Real Estate Fund*, 922 F.2d 592, 600 (10th Cir. 1990). Those courts read § 524(e) as barring the granting of such relief – put otherwise, they under Congress' use of the phrase "Notwithstanding the provisions of § 524(e)" in § 524(g) as creating an exception to an otherwise applicable rule.

The Third Circuit also has not identified any section of the Bankruptcy Code that authorizes such non-debtor releases. Judge Drain points to *In re Millennium Lab Holdings II, LLC*, 945 F.3d 126, 133-40 (3d Cir. 2019) (*In re Purdue Pharma L.P.,* 2021 WL 4240974, at *40), but as in the Second Circuit cases like *Manville III/IV* and *Tronox*, the Third Circuit does not discuss statutory authority in that case. Instead, the *Millennium* court concluded that the bankruptcy court had *constitutional* authority to extinguish certain third-party claims by confirming a chapter 11 plan. *In re Millennium Lab Holdings II, LLC*, 945 F.3d 139-40.

On those occasions when the Third Circuit did address a bankruptcy court's *statutory* authority to impose non-debtor releases, it overturned bankruptcy court orders granting them. For example, in *In re Continental Airlines*, 203 F.3d 203 (3d Cir. 2000), the Court of Appeals *rejected as extra-statutory* the provision in a plan of reorganization that released claims against current and former directors of Continental, and that permanently enjoined shareholder actions against them, finding that the Bankruptcy Code "does **\*105** not explicitly authorize the release and permanent injunction of claims against non-debtors, except in one instance not applicable here" – that being asbestos cases. *Id*. at 211; 11 U.S.C. § 524(g). And in *In re Combustion Engineering, Inc.*, 391 F.3d 190 (3d Cir. 2004), the Third Circuit, like the Second Circuit in *Metromedia*, held that Section 105(a) does not give the court the power to create substantive rights that would otherwise be unavailable under the Bankruptcy Code, and vacated the channeling injunction. *Id*. at 238. Neither *Continental Airlines* nor *Combustion Engineering* has ever been overruled by the Third Circuit.

The First, Eighth, and D.C. Circuits have yet to weigh in on the question of whether statutory authority to impose non-debtor releases exists. Judge Drain contends that the First Circuit did decide that issue, in *Monarch Life Ins. Co. v. Ropes & Gray*, 65 F. 3d 973 (1st Cir. 1995), but again, the First Circuit did not identify any statutory authority to impose non-debtor releases in that case. It declined to decide whether Section 105(a) authorized the imposition of a non-debtor release; and it did not cite any other section of the Bankruptcy Code as conferring that authority. *Id*. at 983-94.

Judge Drain cited *In re AOV Indus., Inc.*, 792 F.2d 1140, 1153 (D.C. Cir. 1986) for the proposition that the D.C. Circuit has approved the non-consensual release of third-party claims against non-debtors. But that is wrong. The *AOV Industries* court did not say a word about whether such relief was authorized by statute. The court simply found that the issue before it – whether the bankruptcy court had *constitutional* authority to enter an order releasing non-debtor claims – was equitably moot. *Id.*

The Fourth and Eleventh Circuits have concluded that Section 105(a), without more, authorizes such releases. *See Nat'l Heritage Found., Inc. v. Highbourne Found., Inc.*, 760 F.3d 344, 350 (4th Cir. 2014); *In re Seaside Eng'g & Surveying*, 780 F.3d 1070, 1076-79 (11th Cir. 2015). After *In re Dairy Mart* and *Metromedia,* we know that is not the law in the Second Circuit. So Fourth and Eleventh Circuit law contradict Second Circuit law, and cannot be relied on as authority for the proposition that such releases are statutorily authorized.

That leaves the Sixth and Seventh Circuits, both of which have concluded that Sections 105(a) and 1123(b)(6) of the Bankruptcy Code, read together, codify something that they call a bankruptcy court's "residual authority," and hold that a bankruptcy court

3921

can impose non-consensual releases of third-party claims against non-debtors in connection with a chapter 11 plan pursuant to that "residual authority."[68] As discussed in my summary of his opinion, Judge Drain adopted the reasoning of these courts, and added two other sections of the Bankruptcy Code to buttress the analysis.

[68]     They get the phrase "residual authority" from *United States v. Energy Res. Co.*, 495 U.S. 545, 549, 110 S.Ct. 2139, 109 L.Ed.2d 580 (1990), which I discuss in detail below.

**Summary of Extra-Circuit Law**: A majority of the Circuits that have spoken to the statutory authority question either dismiss the idea that such authority exists or, as with the Second Circuit, (i) reject the notion that such authority can be found by looking solely to Section 105(a) and then (ii) fail to answer the question of where such authority can be found. Two Circuits rely solely on Section 105(a), and so have law that conflicts with the Second Circuit's pronouncement. Only two Circuits support the position taken by the learned Bankruptcy Judge.

**\*106** It is against that backdrop of higher court authority that I turn to the order on appeal.

*C. The Statutory Provisions Upon Which the Bankruptcy Court Relied*

Judge Drain was quite explicit about the statutory provisions that he believed gave him authority to approve these releases as "necessary or appropriate" to carry out the provisions of the Bankruptcy Code: Sections 105(a), 1123(a)(5) and (b)(6), and 1129, together with "residual authority." *In re Purdue Pharma L.P.*, 2021 WL 4240974, at \*43.

The question that arises is whether any of the sections other than Section 105(a) confers some substantive right such that a release to enforce that right could be entered pursuant to Section 105(a).

I conclude that they do not.

Rather, each of the cited sections, like Section 105(a), confers on the Bankruptcy Court only the power to enter orders that carry out other, substantive provisions of the Bankruptcy Code. None of them creates any substantive right; neither do they create some sort of "residual authority" that authorizes the action taken by the Bankruptcy Court.

**Section 1123(b)(6):** Subsections (a) and (b) of 11 U.S.C. § 1123, entitled "Contents of Plan," lay out in considerable detail what a plan of reorganization *must* (subsection (a)) and *may* (subsection (b)) contain in order to be confirmed.

We can quickly dispense with the notion that Section 1123(b)(6) provides the substantive authority for a Section 105(a) injunction or approval of a release.

[45]   Section 1123(b)(6) provides that a plan may "include any other appropriate provision not inconsistent with the applicable provisions of this title." 11 U.S.C § 1123(b)(6). In form, Section 1123(b)(6) is substantively analogous to Section 105(a)'s authorization of "any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). If the latter does not confer any substantive authority on the bankruptcy court – and that proposition is well settled, at least in this Circuit – then the former can in no way be read to do so.

That alone would be reason to conclude that Section 1123(b)(6) does not provide the statutory authorization we are seeking. But as Appellants point out, various aspects of the non-consensual Section 10.7 Shareholder Release are indeed inconsistent with certain other provisions of title 11.

[46]   First and foremost, the Section 10.7 Shareholder Release is inconsistent with the Bankruptcy Code because it discharges a non-debtor from debts that Congress specifically said could not be discharged by a debtor in bankruptcy. The Section 10.7 Shareholder Release does not carve out or exempt claims for fraud or willful and malicious conduct, liabilities from which Purdue cannot be discharged in its own bankruptcy. *See* 11 U.S.C. §§ 523(a)(2), (4), (6). Reading the Bankruptcy Code as

3922

authorizing a bankruptcy court to discharge a non-debtor from fraud liability – something it is strictly forbidden from doing for a debtor – cannot be squared with the fact that Congress intended that the Bankruptcy Code "ensure that all debts arising out of fraud are excepted from discharge no matter what their form." *Archer v. Warner*, 538 U.S. 314, 321, 123 S.Ct. 1462, 155 L.Ed.2d 454 (2003) (internal citation omitted). In other cases in which the releases at issue called for relief from suit that encompassed otherwise non-dischargeable claims, courts either ensured fraud claims were exempt from the releases before approving them, **\*107** *In re Airadigm Commc'ns, Inc.*, 519 F.3d 640, 657 (7th Cir. 2008), or simply refused to approve the releases because they included otherwise non-dischargeable claims. *See e.g.*, *In re Fusion Connect, Inc.*, No. 20-05798, 2021 WL 3932346, at \*7 (S.D.N.Y. Sept. 2, 2021) (reversing the bankruptcy court's decision to discharge a debtor from an outstanding civil penalty because liability "arising from fraud on consumers" and payable to a governmental entity is "nondischargeable" in a chapter 11 bankruptcy under Section 523(a)(2)). Aside from *Drexel* – which, for all the reasons discussed above, is probably no longer good law – the Second Circuit has never approved a non-consensual release of claims against non-debtors of this sort, nor has it ever explained what provision of the Bankruptcy Code authorizes a bankruptcy court to do so.

 **[47]**   Second, as the State Appellants point out, a debtor's discharge cannot relieve him of "any debt ... to the extent such debt is for a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit, and is not compensation for actual pecuniary loss, other than a tax penalty..." 11 U.S.C. § 523(a)(7). At least some of the claims asserted by the State Appellants seek relief in the nature of non-dischargeable civil penalties payable to and for the benefit of governmental units. Such claims could not be discharged if the Sacklers had filed for personal bankruptcy.

To the extent that Judge Drain held that the Section 10.7 Shareholder Release was not inconsistent with these sections, I respectfully disagree.

Appellants also argue that the Section 10.7 Shareholder Release and corresponding injunctions are inconsistent with Section 524(e) of the Bankruptcy Code, which provides that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e). On the facts of this case, I cannot agree with that argument – but not because the Code is silent on the subject.

 **[48]**   Section 524(e) says, in sum and substance, that releasing a debtor on a debt owed to a creditor does not affect the liability that a non-debtor may have for the same debt. But the claims that would be released by the Section 10.7 Shareholder Release are not claims on which the Sacklers are jointly liable with Purdue. The various state statutes being invoked by Appellants give rise to Sackler liability *independent* of Purdue's liability – albeit for the very same violations of the very same laws – because those laws impose an independent duty on persons who occupy certain managerial positions in a corporation. We would not have this appeal if the Sackler debts being eliminated by the Section 10.7 Shareholder Release were also debts owed by Purdue; we would be back in Section 10.6 land, dealing with derivative claims, where the Bankruptcy Court's power is unchallenged.

It is true that, when passing Section 524(g), Congress stated explicitly that the non-debtor releases therein authorized were being allowed "notwithstanding the provisions of sect. 524(e)." 11 U.S.C. § 524(g). It is hard to read that phrase and not conclude that Congress thought it was creating an exception to Section 524(e) by authorizing the release of third-party claims against non-debtors in certain limited circumstances.

However, back when Congress was considering § 524(g), it had before it a specific situation: the claims being released were against non-debtor insurance companies whose liability was premised on the conduct of their insureds that fell within the terms of the policies they had issued. Everything  **\*108**  that was being released was part and parcel of the bankruptcy estate; the debts owed by Manville and its insurers were the same debts; § 524(e) was obviously implicated. There is no indication, either in the text of the statute or in the legislative history, that Congress ever envisioned that a bankruptcy court could discharge the debts of non-debtors that were not also debts of the debtor. That being so, I cannot read the "notwithstanding" language to create an inconsistency on the facts of this case.

I am, therefore, constrained to conclude that the Section 10.7 Shareholder Release is not inconsistent with § 524(e), because it contains the discharge of debts that are not contemplated by § 524(e).

 [49]   **Section 1123(a)(5):** Section 1123(a)(5) of the Bankruptcy Code provides that a plan of reorganization must "provide adequate means for [its] implementation." 11 U.S.C. § 1123(a)(5). That section contains a laundry list of things that a plan can include in order to make sure that resources are available to implement the plan – any of which can be ordered by a bankruptcy court.

 [50]   Injunctions against the prosecution of third-party claims against non-debtors, and the release of such claims, are nowhere to be found on that list. Every single example listed in Subsections 5(A) through (J) authorizes the court to do something with the *debtor's assets* (retaining estate property; transfer of property; sale of property; satisfaction or modification of a lien; cancellation or modification of an indenture or similar instrument; curing or waiving defaults; extension of maturity dates; issuing securities; even amending the debtor's charter). Since the bankruptcy court has *in rem* jurisdiction over the *res* of the debtor's estate, none of that should be surprising. It is equally unsurprising that none of the types of relief listed in Section 1123(a)(5) involves disposing of property belonging to someone other than the debtor or a creditor of the debtor. That is because it is the debtor's resources – not the resources of some third party – that are supposed to be used to implement a plan that will adjust the debtor's relations with its creditors.

Of course, this is not the first case in which the resources of non-debtors are being used to implement a plan; and § 1123(a)(5) does not pretend to contain an exhaustive list of all ways that a plan can provide means for its implementation. The Section begins, after all, with the words "such as." In this case, Debtors argue that the only way to get the resources necessary to implement a viable plan was to agree to the Sacklers' demand for broad releases in exchange for their contribution of money to the bankruptcy estate. They insist that the Section 10.7 Shareholder Release and corresponding injunctions carry out the requirements of Section 1123(a)(5) by ensuring that the Plan has the funding it needs – and if that funding was obtained from some third-party funder on condition of a release and an injunction, then those forms of relief are authorized because the money is needed to fund the Plan.

But the fact that Purdue needs the Sacklers to give the money back does not mean that Section 1123(a)(5) confers on the Debtors or the Sacklers any right to have the non-debtors receive a release from non-derivative third-party claims in exchange for a contribution to Purdue's estate. The Debtors' suggestion that this Section confers some substantive right is exactly the sort of circular reasoning that was rejected by Judge Jacobs where Section 105(a) was concerned. *See In re Dairy Mart,* 351 F.3d at 92 (any such power conferred by Section 105(a) must "be tied **\*109**  to another Bankruptcy Code section and not merely to a general bankruptcy concept or objective") (quoting 2 *Collier on Bankruptcy* ¶ 105.01[1]). Getting to a confirmable plan is the general bankruptcy objective, nothing more.

 [51]   Nor does Section 1123(a)(5) confer any special power on the Bankruptcy Court. A court does not propose the plan; the debtor and its creditors put the plan together and present it to the court, which cannot approve the plan unless it contains the required provisions and need not approve it even then. To the extent that any court order is contemplated by Section 1123(a), it is the Confirmation Order – not an injunction and release of claims against non-debtors in order to obtaining funding for a plan, which is essentially what Debtors are proposing.

 [52]    [53]   Finally, and most important, Section 1123(a)(5) does not authorize a court to give its imprimatur to something the Bankruptcy Code does not otherwise authorize, simply because doing so would ensure funding for a plan. Nothing in Section 1123(a)(5) suggests that a debtor has the right to secure sufficient funds for implementation by any means necessary. Section 1123(a)(5) would not, for example, authorize a court to enter an order enjoining a bank from suing a non-debtor employee who embezzled funds and then offered them to her bankrupt brother's estate in exchange for a release of all claims a third party could assert against her. That example is silly, of course, but the point is simple: the mere fact that the money is being used to fund implementation of the plan does give a bankruptcy court statutory authority to enter an otherwise impermissible order in order to obtain that funding. As was the case with Section 1123(b)(6), Judge Drain's reliance on Section 1123(a)(5)

begs the ultimate question that must be answered: whether the court has some *independent* statutory authority to issue the non-debtor releases and enjoin third party claims against the Sacklers, such that the Bankruptcy Court can enter a "necessary and appropriate" order to obtain the funding.

 [54]   **Section 1129(a)(1):** Finally, Section 1129(a)(1) does not provide the substantive authority for a Section 105(a) injunction or approval of a release. Section 1129 is entitled "Confirmation of plan," and Subsection 1129(a)(1) provides that a bankruptcy court "shall confirm a plan only if ... the plan complies with the applicable provisions of this title." 11 U.S.C.A. § 1129. Like the cited sections of § 1123, § 1129(a) confers no substantive right that could be used to undergird a § 105(a) injunction. One highly general provision simply does not confer substantive authority that is required to invoke another highly general provision.

**Lack of Any Statutory Prohibition:** Having exhausted the statutory provisions on which Judge Drain relied and finding that none of them confers any substantive right as required by *Metromedia,* our exercise should be at an end. But it is not. The Debtors argue that the Bankruptcy Court must be statutorily authorized to approve these releases because no provision of the Bankruptcy Code – including but not limited to § 524(e) – expressly prohibits them.

The notion that statutory authority can be inferred from Congressional silence is counterintuitive when, as with the Bankruptcy Code, Congress put together a "comprehensive scheme" designed to target "specific problems with specific solutions." *RadLAX Gateway Hotel,* 566 U.S. at 645, 132 S.Ct. 2065. In this particular case, a number of red flags suggest that Congressional silence (if indeed Congress  **\*110**  was silent) was not intended to mean consent.

 [55]   The first is that silence is inconsistent with comprehensiveness, and the Bankruptcy Code "provides a *comprehensive* federal system ... to govern the orderly conduct of debtors' affairs and creditors' rights." *E. Equip. & Servs. Corp. v. Factory Point Nat. Bank, Bennington,* 236 F.3d 117, 120 (2d Cir. 2001) (emphasis added). "Comprehensive" means "complete, including all elements." Reading elements that do not appear in the text of the Code into the Code is the antithesis of comprehensiveness.

Then-District Judge Sullivan recognized as much in *In re Lehman Bros. Holdings Inc.,* 508 B.R. 283 (S.D.N.Y. 2014). There, the bankruptcy court granted a certain creditor's application for reimbursement of post-petition counsel fees over the U.S. Trustee's objection that the Bankruptcy Code only permitted reimbursement of post-petition administrative expenses. On appeal, Judge Sullivan was not persuaded by appellees' argument that reimbursement for professional fees was authorized by the Bankruptcy Code simply because nothing in the Bankruptcy Code expressly forbade it. He held that, "no such explicit prohibition is necessary" because the requested reimbursement clearly goes against the *purpose* of a reorganization – "Reorganization plans exist to pay claims ... [the] professional fee expenses were all incurred post-petition, and thus cannot be treated as 'claims.' " *Id. at 293.* He further noted that the federal bankruptcy scheme "cannot remain comprehensive if interested parties and bankruptcy courts in each case are free to tweak the law to fit their preferences." *In re Lehman Bros. Holdings Inc.,* 508 B.R. 283, 294 (S.D.N.Y. 2014) (internal citations omitted).

As I noted above, Justice Breyer recently wrote when discussing the priority scheme set out in the Bankruptcy Code, the importance of certain critical aspects of the bankruptcy scheme "leads us to expect more than simple statutory silence if, and when, Congress were to intend a major departure." *Jevic Holdings Corp.,* 137 S. Ct. at 984. Granting releases to non-debtors for claims that could not be released in favor of the debtors themselves is so far outside the scope of the Bankruptcy Code and the purposes of bankruptcy that the "silence does not necessarily mean consent" principle applies with equal force.

 [56]   Second, it is hard to infer consent from silence in circumstances when one would not expect Congress to speak. The Code was intended "to free the debtor of his personal obligations *while ensuring that no one else reaps a similar benefit*" *Green v. Welsh,* 956 F.2d 30, 33 (2d Cir. 1992) (emphasis added). It is counterintuitive to imagine that Congress would have thought it necessary to include language specifically forbidding things that that ran counter to that purpose. As one of Judge Drain's colleagues recently reminded us, the ordering of an involuntary release of third-party claims against non-debtors is "an extraordinary thing" that is "different ... from what courts ordinarily do." *In re Aegean Marine Petroleum Network Inc.,* 599 B.R. 717, 723 (S.D.N.Y. 2019). That is especially true where, as is proposed here, we find ourselves in what Judge Wiles called

"the odd situation where we are being asked to use an unwritten authority to release non-debtor officers and directors from claims when the Bankruptcy Code would bar us from giving similar relief to those persons if they were debtors in their own cases." *Id.* at 726 (citing *Metromedia*, 416 F.3d at 142).

Third, Congress has in fact spoken on this subject, and what it has said suggests that it intended Sections 524(g) and (h) to preempt the field where non-debtor releases *111 were concerned. I will not repeat the extensive discussion about the law and its legislative history that appears above, except to say that Congress in its wisdom elected to limit Code-based authority to release third party claims against non-debtors to asbestos litigation – and it declined either to agree with those who argued that bankruptcy courts already had a broader power to authorize such releases. Congress was not unaware that there were non-asbestos bankruptcies with thousands of claimants and nationwide implications in the early 1990s. Other mass tort bankruptcies with thousands upon thousands of potential claimants were pending (*i.e.*, in *A.H. Robins/Dalkon Shield*), as was the highly publicized bankruptcy of a major investment bank (*Drexel*). The Judiciary Committee mentioned the "experimentation" with *Manville*-like relief that was beginning in other industries.

Yet Congress declined to make this extraordinary form of relief – relief that ran counter to the fundamental purpose of the Bankruptcy Code – available in circumstances other than asbestos bankruptcies. And it reserved for itself the right to change that.

So the silence that speaks volumes is not Congress' failure to say, "And you can't give involuntary non-debtor releases to anyone except in an asbestos case." The silence that speaks volumes is the twenty-seven years of unbroken silence that have passed since Congress said, "We are limiting this to asbestos for now, and maybe, when we see how it works in that context, we will extend it later."

 [57]   Fourth, but by no means least, "it is a commonplace of statutory construction that the specific governs the general." *RadLAX Gateway Hotel*, 504 U.S. at 384. The Supreme Court of the United States has relied on that principle on multiple occasions in refusing to allow generalized provisions of the Bankruptcy Code to override specific directives on a particular subject.

Take, for example, *RadLAX* itself. The plan proposed by the debtors in *RadLAX* provided for the sale of unencumbered assets securing a bank creditor's claim free and clear of all liens. But, in contravention of the provision governing such a "cram down" plan under the Bankruptcy Code, the bid procedures proposed by the debtors precluded the bank holding the mortgage on the property from credit-bidding the amount of its claim, which the Bankruptcy Code specifically authorized the bank to do. 11 U.S.C. § 1129(b)(2)(A)(ii). Nonetheless, the bankruptcy court approved the plan. It agreed with the debtors that the bank did not need to be permitted to bid on the property as long as it was provided with the "indubitable equivalent" of its claim in some other fashion – in this particular case, the cash generated by the auction. 11 U.S.C. § 1129(b)(2)(A)(i)-(iii).

 [58]   The Supreme Court rejected the debtors' justification, holding that the "indubitable equivalents" subclause (subclause iii) was a general subclause that could not be used to circumvent the specific requirement of subclause (ii) that the bank be permitted to credit-bid at the sale. The Court stated that the debtors' reading of the statute – that clause (iii) permits precisely what clause (ii) proscribes – is "hyperliterally contrary to common sense." *RadLAX Gateway Hotel*, 566 U.S. at 640, 132 S.Ct. 2065. The Court called it "axiomatic" that specific statutory provisions control over general provisions and emphasized that the "general/specific canon" applies with particular force in bankruptcy, because "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." *Id.*

 *112   Where, as here, Congress has deliberately limited a specific targeted solution (the release of third-party claims against non-debtors) to a specific identified problem (asbestos bankruptcies) – and has even denominated that solution as an exception to the usual rule – *RadLAX* strongly suggests that the general/specific canon should apply with particular force.

*Ginsberg & Sons v. Popkin*, 285 U.S. 204, 52 S.Ct. 322, 76 L.Ed. 704 (1932) is a pre-Code case, but it illustrates the same principle. There, petitioner argued that Clause 15 of Section 2 of the Bankruptcy Act empowered district judges to issue

3926

orders directing the arrest of the former officers and directors of the debtor. Clause 15 provided, "The courts of bankruptcy are hereby invested with such jurisdiction at law and in equity as will enable them to exercise original jurisdiction in bankruptcy proceedings ... [t]o] make such orders, issue such process, and enter such judgments in addition to those specifically provided for as may be necessary for the enforcement of the provisions of this title." Section 2, 11 USCA s 11(15). The reader will immediately appreciate that Clause 15 is the Bankruptcy Act's equivalent of Section 105(a) of the Bankruptcy Code – it was the "necessary and appropriate" clause in the old statutory scheme.

But Section 9(a) of the Bankruptcy Act specifically precluded "a court of bankruptcy" from directing the arrest of former directors and officers, except for contempt or disobedience of its lawful orders. And Section 9(b) prescribed in great detail the conditions to and procedures for invoking the exception under which the court could direct the arrest and detention of such former directors and officers who posed a flight risk.

The Supreme Court refused to read Clause 15 of Section 2 in a way that would render the specific prohibitions and procedures enumerated in Sections 9(a) and (b) superfluous: "In view of the general exemption of bankrupts from arrest under section 9a and the carefully guarded exception made by section 9b as to those about to leave the district to avoid examination, there is no support for petitioner's contention that the general language of section 2(15) is a limitation upon section 9(b) or grants additional authority in respect of arrests of bankrupts." *D. Ginsberg & Sons v. Popkin*, 285 U.S. at 207–08, 52 S.Ct. 322.

The Supreme Court's holdings in these cases old and new are instructive in the present context. Here, Debtors and their allies seek to apply general provisions – Sections 105(a) and 1123(a)(5) and (b)(6) – to justify expanding the express authority conferred by Congress under § 524(g) into a situation that is manifestly not comprehended by that statute. Because the specific controls the general, that reliance is misplaced.

For all these reasons, I cannot conclude that Congressional "silence" should be deemed consent to an expansion of Section 524(g). In fact, I do not believe that Congress has been silent at all. But to the extent it has, its silence supports the Appellants' position, not the Debtors'.

**Residual Authority:** Finally, I turn to the concept of "residual statutory authority." In these circumstances, I conclude that such authority simply does not exist.

Judge Drain framed the question before him as, "whether the court has statutory *or other power* to confirm a plan with a third-party claim release," and, if so, "what is the statutory *or other source of power* for such a release?" *In re Purdue Pharma L.P.*, 2021 WL 4240974, at *40, *43 (emphasis added). He identified the "other source of power" as the residual power of bankruptcy courts.

 *113   [59]   But such power, if it even exists, is of no help where, as here, it is being exercised in contravention of specific provisions of the Bankruptcy Code.

Debtors rely heavily on the Supreme Court's decision in *In re Energy Resources Co*, 495 U.S. 545, 110 S.Ct. 2139, 109 L.Ed.2d 580 (1990) for the proposition that a bankruptcy court has "residual authority" to approve reorganization plans that includes all "necessary and appropriate" provisions, as long as those provisions are not inconsistent with title 11. In that case, the Court concluded that two bankruptcy courts – which were forbidden by the Bankruptcy Code from discharging a tax debt[69] and required not to confirm a plan unless satisfied that the IRS would in all likelihood be able to collect taxes owed within six years[70] – had not "transgressed one of the limitations on their equitable power" by directing in a plan of reorganization that certain tax payments be credited in the first instance to so-called "trust fund" tax debt, and only when that debt was satisfied to so-called "non-trust fund" tax debt. *In re Energy Resources Co.*, 495 U.S. 499-50. Trust fund tax debt is guaranteed by third parties; an order directing that the guaranteed debt be paid first meant that if there were any unpaid taxes at the end of the plan period, the IRS could probably not look to third parties for payment. The IRS argued that this provision of the plan was

3927

inconsistent with the Bankruptcy Code, because requiring the debtor to pay non-trust fund taxes first would give the IRS a greater chance of recovering 100 cents on the dollar.

69    11 U.S.C. §§ 507(a)(7), 523(a)(1)(A).

70    11 U.S.C. § 1129(a)(9)(C).

But the Supreme Court ruled that the Bankruptcy Code did not require that a plan of reorganization be structured so that the unsecured tax debt was paid first. The bankruptcy court had found (as required by the Bankruptcy Code) that the plan of reorganization proposed by the debtors was likely to succeed. It further found that, if the plan did succeed, all taxes would be fully paid within six years. The express terms of the Bankruptcy Code required nothing more. Therefore, the order directing that tax payments be credited first to back taxes secured by the trust fund, and then to unsecured back taxes, was not inconsistent with any applicable provision of title 11. All the substantive guarantees that the Bankruptcy Code afforded to the IRS were baked into the court's approval of the plan.

No reference in *Energy Resources* to a bankruptcy court's "residual power" authorizes the learned Bankruptcy Judge's approval of the Section 10.7 Shareholder Release under any "residual power" theory. Just two years prior to the *In re Energy Resources* decision, the same Supreme Court – made up of the same nine justices – held that the bankruptcy court's residual equitable authority was bounded by the provisions of the Bankruptcy Code. *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988) (holding "whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code"). *Energy Resources* is consistent with this principle. Congress legislated a particular right into the Bankruptcy Code; the Supreme Court refused to allow lower courts to expand that right and held that the Bankruptcy Court had the power to authorize anything that was not inconsistent with that right. But the Bankruptcy Code conferred a specific right. In this case, there is nothing in the Bankruptcy Code that specifically authorizes the Section 10.7 Shareholder Release;  **\*114**  the Bankruptcy Court (and this Court) is being asked to insert a right that does not appear in the Bankruptcy Code in order to achieve a bankruptcy objective. That is precisely what *In re Dairy Mart* and *Metromedia* prohibit.

Additionally, the *Energy Resources* Court, echoing its own holding of two years earlier, recognized that any residuary power enjoyed by a bankruptcy court must be exercised in a way that "is not inconsistent with the applicable provisions of this title." I have become convinced, for the reasons discussed in great detail above, that the Section 10.7 non-debtor releases are in fact inconsistent with applicable provisions of title 11 – with Sections 524 (g) and (h), with Section 523, and with Section 1141(d), and possibly even with Section 524(e). Therefore, no residual power can authorize such an order.

As a corollary to the "residual authority" argument, several Appellees argue the release of claims against the non-debtor Sacklers and their related entities are proper because the Bankruptcy Code, taken as a whole, creates a "special remedial scheme" in which certain legal proceedings may terminate preexisting rights if the scheme is otherwise consistent with due process. They cite *Martin v. Wilks*, 490 U.S. 755, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989) for their proposition.

In *Martin v. Wilks*, the Supreme Court announced that, as a general rule, "A judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings." It affirmed the Eleventh Circuit's judgment allowing certain individuals who were *not* parties to an original action to challenge consent decrees entered in that original case. *Id*. at 762, 109 S.Ct. 2180. But, in a footnote, the Court acknowledged an exception to the general rule exists "where a special remedial scheme exists expressly foreclosing successive litigation by nonlitigants, as for example in bankruptcy or probate, legal proceedings may terminate preexisting rights if the scheme is otherwise consistent with due process." *Id*. at 762, 109 S.Ct. 2180, n. 2.

 [60]    [61]    [62]   Judge Drain did not adopt this reasoning or rest his view about his statutory authority on the Bankruptcy Code's "special remedial scheme" – and rightly so, because it is contrary to Second Circuit law. The "special remedial scheme" contemplated by the Bankruptcy Code addresses the rights of persons who have claims against a debtor in bankruptcy – not claims against other non-debtors. The Code lays out a claims allowance process so that creditors can file their claims against

3928

someone who has invoked the protection of the Bankruptcy Code; it provides a mechanism for those parties to litigate those claims against the debtor and to determine their value. In order to take advantage of this "special remedial scheme," debtors have to declare bankruptcy, disclose their assets, and apply them – all of them, with *de minimis* exceptions – to the resolution of the claims of their creditors.

Non-debtors have no such obligations, and so do not have any rights at all under the "special remedial scheme" that is bankruptcy – certainly not the "right" to have claims that are being asserted against them outside the bankruptcy process released. As the Second Circuit held in *Manville III*, the "special remedial scheme" due process exception relating to *in rem* bankruptcy proceedings simply does not give a bankruptcy court subject matter jurisdiction to release *in personam* third-party claims against a non-debtor. *In re Johns-Manville Corp.*, 600 F. 3d 135, 158 (2d Cir. 2010).

 **\*115**   **Conclusion: No Statutory Authority.** In *Metromedia*, the Second Circuit signaled that a Bankruptcy Code could not order the non-consensual release of third-party claims against non-debtors unless some provision of the Bankruptcy Code aside from Section 105(a) authorized it to do so. For the reasons stated above, I conclude that there is no such section, and so no such authority.

It is indeed unfortunate that that this decision comes very late in a process that, from its earliest days in 2019, has proceeded on the assumption that releases of the sort contemplated in Section 10.7 of the Debtors' Plan would be authorized – this despite the language of the Bankruptcy Code and the lack of any clear ruling to that effect. I am sure that the last few years would have proceeded in a very different way if the parties had thought otherwise. But that is why the time to resolve this question for once and for all is now – for this bankruptcy, and for the sake of future bankruptcies. It should not be left to debtors and their creditors to guess whether such releases are statutorily authorized; and it most certainly should not be the case that their availability, or lack of same, should be a function of where a bankruptcy filing is made.

 **[63]**   I also acknowledge that the invalidating of these releases will almost certainly lead to the undoing of a carefully crafted plan that would bring about many wonderful things, including especially the funding of desperately needed programs to counter opioid addiction. But just as, "A court's ability to provide finality to a third-party is defined by its jurisdiction, not its good intentions" (*Manville III*, 517 F.3d at 66), so too its power to grant relief to a non-debtor from non-derivative third party claims "can only be exercised within the confines of the Bankruptcy Code." *Norwest Bank Worthington*, 485 U.S. at 206, 108 S.Ct. 963.

Because the Bankruptcy Code confers no such authority, the order confirming the Plan must be vacated. Because the Advance Order is an adjunct of and follows from the Confirmation Order, it, too, must be vacated.[71]

[71]   The U.S. Trustee has also appealed from the Disclosure Order, asserting that it was inaccurate in certain respects. (Dkt. No. 91, at 10; Dkt. No. 191, at 10). As the Confirmation Order has been vacated without reaching the notice/due process constitutional issues that were raised by the U.S. Trustee, I do not understand that any substantive ruling is needed with respect to the Disclosure Order. Like everything else connected with the Plan, it simply falls by the wayside.

**III. The Plan's Classification and Treatment of the Canadian Appellants' Claims Does Not Violate the Bankruptcy Code.**
Because the court reverses on the ground that there is no statutory authorization in the Bankruptcy Code for the Bankruptcy Court to impose a non-voluntary release of third-party claims against non-debtors, I do not reach the Canadian Appellants' separate attack on the Section 10.7 Shareholder Release. But part of the Canadian Appellants' argument on appeal is that the Plan as confirmed violates the Bankruptcy Code by treating the Canadian Appellants' unsecured claims unfavorably as compared to the claims of their domestic counterpart creditors. The Canadian Appellants explained at Oral Argument that this "inequality" issue must be decided, regardless of how the court ruled on the Section 10.7 Shareholder Release. (*See* Oral Arg. Tr., Nov. 30, 2021, at 71:6-21).

 **[64]**   Pursuant to the Plan, the Canadian Appellants are entitled to a share of the  **\*116**  $15 million dollars distributed to a trust that will be divided among all of the general unsecured creditors of the Debtor. (Dkt. No. 59, at 47). At the same time, domestic

government and tribe unsecured creditors are not classified as "general" unsecured creditors but are placed in classes 4 and 5 as "Non-Federal Domestic Governmental" claimants and "Tribe" claimants respectively. (*See* Plan, at 2). The Canadian Appellants argue that the Bankruptcy Code contains an "equal-treatment mandate" in Section 1129(a)(4) requiring that "all creditors within the same class enjoy the same 'opportunity' to recover." (Dkt. No. 59, at 47). Because, they argue, the domestic non-federal government claims (Class 4) and tribal claims (Class 5) are "indistinguishable" from theirs (*id.*), the Canadian Appellants posit that they are "similarly situated" to their "domestic counterparts" and thus should be part of the same creditor "class." Since the Plan does not allow the Canadian Appellants to "enjoy shares in trusts seeded with $4.5 billion—300 times as much" as would be available to the general unsecured creditors of Purdue (*Id.*) – the Canadian Appellants argue that there exists "an inequality that is independently fatal to the Plan's treatment of the Canadian Appellants' claims." (*Id.*).

 [65]   The Court disagrees. Under the Plan, the Canadian Appellants belong to a different class than their domestic, unsecured creditor "counterparts" for perfectly legitimate reasons. The Code does not require that all creditor classes be treated equally, only that there be a reasonable basis for any differentiation. *See Boston Post Rd. Ltd. P'ship v. FDIC (In re Boston Post Rd. Ltd. P'ship)*, 21 F.3d 477, 482-83 (2d Cir. 1994).

 [66]    [67]    [68]   First, the Bankruptcy Code expressly permits differentiation *between* classes of creditors and the Canadian Appellants rightly recognize that their "equal-treatment mandate" applies only to claims of "all creditors within the same class." (*See* Dkt. No. 59, at 47). The Canadian Appellants' argument that they are of the same "class" as the non-federal government and tribe claimants is unconvincing. It does not matter that the Canadian Appellants' claims are purportedly "indistinguishable" from those held by the domestic unsecured creditors in Classes 4 and 5; a chapter 11 plan may separately classify similar claims so long as the classification scheme has a reasonable basis for doing so. *See In re Boston Post Rd. Ltd. P'ship*, 21 F.3d at 482-83.

In *Boston Post Rd. Ltd. P'ship*, the chapter 11 plan classified unsecured claims against the insolvent Debtor, the Boston Post Road Limited Partnership ("BRP"), differently between the Federal Deposit Insurance Corporation ("FDIC") and BPR's other trade creditors. The classification treated the unsecured trade creditors more favorably than FDIC, while FDIC was BPR's largest unsecured creditor and an anticipated objector to the plan; the differentiation between these classes was done to achieve a "cramdown" of the plan over FDIC's objections. *Id.* at 479. The bankruptcy court denied confirmation of a chapter 11 plan on the basis that the plan impermissibly separately classified similar claims, holding that FDIC's unsecured claims should have been placed in the same class with other unsecured creditors, and the District Court affirmed. *Id.* On appeal, the Second Circuit found that the "Debtor was unable and failed to adduce credible proof of any legitimate reason for segregating the FDIC's unsecured claim from the unsecured claims of BPR's trade creditors." *Id.* at 483. The Debtor's only reasons were that the FDIC's claim purportedly "were created from different circumstances" and "BPR's future viability as a business depends on treating its trade **\*117**   creditors more favorably than the FDIC." *Id.* These reasons were "availing" to the Circuit. *Id.* In particular, the Circuit took issue with classifying similar claims differently "in order to gerrymander an affirmative vote on a reorganization plan." *Id.* at 482-83 (quotation omitted). The Circuit explained, "approving a plan that aims to disenfranchise the overwhelmingly largest creditor through artificial classification is simply inconsistent with the principles underlying the Bankruptcy Code." *Id.*

 [69]   In this case, unlike in *Boston Post Rd.* Judge Drain identified a reasonable basis for separately classifying the Canadian Appellants from the domestic unsecured creditors: First, Judge Drain explained that the Canadian creditors operate under "different regulatory regimes ... with regard to opioids and abatement" than their domestic counterparts. *In re Purdue Pharma L.P.*, 2021 WL 4240974, at *12. Second, Judge Drain explained that "the allocation mediation conducted by Messrs. Feinberg and Phillips that resulted in the plan's division of the Debtors' assets ... involved only *U.S.-based* public claimants with their own regulatory interests and characteristics." *Id.* (emphasis added). As the Debtors point out, the Canadian Appellants themselves differentiate themselves from the other classes in this manner, explaining (i) "[t]he Canadian Appellants are in Canada, [(ii) the bulk of their legal claims arise in Canada, [(iii)] those claims concern the operations of Purdue Canada," and (iv) the Canadian Appellants' claims "bear no relation to the Shareholder Released Parties' control, direction, and oversight of the Debtors or their U.S. operations." (Dkt. No. 59, at 17-18; Dkt. No. 151, at 120-121). That very classification on the part of the Canadian Appellants accords with Judge Drain's findings that there is a reasonable basis for the separate classifications. And there is

3930

no argument that such separate classification was done for the purpose of disenfranchising a particular group in a manner inconsistent with the Bankruptcy Code, to engineer an assenting impaired class; or manipulate class voting, all of which must be carefully scrutinized by the court. Indeed, it was not.

Under the Plan, the Canadian creditors are classified in Class 11(c), while the domestic municipalities and domestic Indian tribes are classified as Class 4 and 5 creditors. These are perfectly legitimate classifications and the proffered reasons for doing so are reasonable. And the Canadian Appellants do not (and cannot) argue that under the Plan their claims will receive unequal treatment as compared to other claims in their class, Class 11(c), as indeed all claims classified as Class 11(c) are treated equally under the Plan. (Dkt. No. 59, at 44, 47-48).

 **[70]**   Finally, Canadian Appellants *cannot* argue that their Class 11(c) claims are treated unfavorably as compared the other creditor classes (like Class 4 and/or Class 5) because their class, Class 11(c), voted to accept the Plan. Under the Bankruptcy Code, only creditors of a *dissenting* class can object to the confirmation of a plan on the grounds that the plan discriminates against its creditor class. Pursuant to section 1129(b)(1) of the Bankruptcy Code, a plan shall be confirmed "if the plan does not discriminate unfairly ... with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1). Because the Canadian creditors – as part of Class 11(c) – voted to accept the Plan, the Canadian Appellants cannot contend that they are being treated unfavorably.

The classification and treatment of the Canadian Appellants' claims under the  **\*118**  Plan does not violate the Bankruptcy Code.

## CONCLUSION

For the foregoing reasons, the Bankruptcy Court's Confirmation Order and related Advance Order must be vacated.

This decision leaves on the table a number of critically important issues that were briefed and argued on appeal – principal among them, whether the Section 10.7 Shareholder Release can or should be approved on the peculiar facts of this case, assuming all the other legal challenges to their validity were resolved in Debtors' favor.

But sufficient unto the day. This and the other issues raised by the parties can be addressed if they need to be addressed – which is to say, if this ruling is reversed.

This constitutes the decision and order of the court. This is a written opinion.

**All Citations**

635 B.R. 26

**End of Document**                                  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 66

69 F.4th 45
United States Court of Appeals, Second Circuit.

IN RE: PURDUE PHARMA L.P., Purdue Pharma Inc, Purdue Transdermal Technologies L.P., Purdue Pharma Manufacturing L.P., Purdue Pharmaceuticals L.P., Imbrium Therapeutics L.P., Adlon Therapeutics L.P., Greenfield BioVentures L.P., Seven Seas Hill Corp., Ophir Green Corp., Purdue Pharma of Puerto Rico, Avrio Health L.P., Purdue Pharmaceutical Products L.P., Purdue Neuroscience Company, Nayatt Cove Lifescience Inc., Button Land L.P., Rhodes Associates L.P., Paul Land Inc., Quidnick Land L.P., Rhodes Pharmaceuticals L.P., Rhodes Technologies, UDF LP, SVC Pharma LP, SVC Pharma Inc., Debtors.
Purdue Pharma, L. P., Purdue Pharma Inc, Purdue Transdermal Technologies L.P., Purdue Pharma Manufacturing L.P., Purdue Pharmaceuticals L.P., Imbrium Therapeutics L.P., Adlon Therapeutics L.P., Greenfield BioVentures L.P., Seven Seas Hill Corp., Ophir Green Corp., Purdue Pharma of Puerto Rico, Avrio Health L.P., Purdue Pharmaceutical Products L.P., Purdue Neuroscience Company, Nayatt Cove Lifescience Inc., Button Land L.P., Rhodes Associates L.P., Paul Land Inc., Quidnick Land L.P., Rhodes Pharmaceuticals L.P., Rhodes Technologies, UDF LP, SVC Pharma LP, SVC Pharma Inc., Debtors-Appellants-Cross-Appellees, The Official Committee of Unsecured Creditors of Purdue Pharma L.P., et al., Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants, the Raymond Sackler Family, Ad Hoc Group of Individual Victims of Purdue Pharma, L.P., Multi-state Governmental Entities Group, Mortimer-Side Initial Covered Sackler Persons, Appellants-Cross-Appellees,
v.
The City of Grande Prairie, as Representative Plaintiff for a Class Consisting of All Canadian Municipalities, the Cities of Brantford, Grand Prairie, Lethbridge, and Wetaskiwin, the Peter Ballantyne Cree Nation, on Behalf of All Canadian First Nations and Metis People, the Peter Ballantyne Cree Nation on Behalf Itself, and the Lac La Ronge Indian Band, Appellees-Cross Appellants, The State of Washington, State of Maryland, District of Columbia, U.S. Trustee William K. Harrington, State of Connecticut, Ronald Bass, State of California, People of the State of California, By and Through Attorney General Rob Bonta, State of Oregon, State of Delaware, By and Through Attorney General Jennings, State of Rhode Island, State of Vermont, Ellen Isaacs, on Behalf of Patrick Ryan Wroblewski, Maria Ecke, Andrew Ecke, Richard Ecke, Appellees.

NOS. 22-110-bk (L), 22-113-bk, 22-115-bk, 22-116-bk, 22-117-bk, 22-119-bk, 22-121-bk, 22-299-bk, 22-203-bk
|
Argued: April 29, 2022
|
August Term 2021
|

3933

Decided: May 30, 2023

**Synopsis**
**Background:** Chapter 11 debtors, a privately-held pharmaceutical company and affiliated entities involved in manufacture and promotion of proprietary prescription opioid pain reliever that was the subject of mass tort litigation, sought confirmation of proposed plan of reorganization which, inter alia, contained broad releases of civil claims against non-debtor family members who owned and/or were directors and officers of debtors. United States Trustee (UST), numerous states and municipalities, and others objected. The United States Bankruptcy Court for the Southern District of New York, Robert D. Drain, J., 633 B.R. 53, entered order confirming plan, as modified to limit "shareholder release" of claims against family members. Appeal was taken from that order as well as two merged and related orders. The District Court, Colleen McMahon, J., 635 B.R. 26, vacated the confirmation order, ruling that the Bankruptcy Code does not permit nonconsensual releases of third-party direct claims against non-debtors, and also that Canadian creditors' claims were properly classified differently than those of domestic claimants. Debtors, various creditor and claimant groups, and certain family members appealed. Canadian creditors filed cross-appeal.

**Holdings:** The Court of Appeals, Lee, Circuit Judge, held that:

[1] under *Stern*, the Bankruptcy Court lacked constitutional authority to finally approve of the subject releases;

[2] the Bankruptcy Court had subject-matter jurisdiction, pursuant to the Code, to impose the releases;

[3] as a matter of first impression for the court, a bankruptcy court has authority, including under the section of the Bankruptcy Code permitting the inclusion of "any other appropriate provision" in a Chapter 11 plan so long as it is "not inconsistent" with other sections of the Code, to approve a plan that includes nonconsensual third-party releases of direct claims against non-debtors;

[4] bankruptcy courts should look to the seven factors set forth by the Court of Appeals before imposing nonconsensual third-party releases of direct claims against a non-debtor;

[5] the text of the Code, the factual record, and equitable considerations supported the Bankruptcy Court's approval of the plan;

[6] the releases comported with due process;

[7] the plan did not violate the sovereign immunity of Canadian creditors; and

[8] the plan properly differentiated Canadian creditors' claims from those of their domestic counterparts.

District court's order affirmed in part and reversed in part, bankruptcy court's order affirmed, and case remanded.

Wesley, Senior Circuit Judge, filed opinion concurring in the judgment.

West Headnotes (58)

**[1]**    **Bankruptcy** 🔑 Property held in trust or custody for debtor;  deposits
        Spendthrift trusts in the United States, as opposed to offshore, may be reachable via bankruptcy proceedings if the transfers to such trusts are fraudulent.

3934

**[2]**     **Bankruptcy**   Appointment;  Election

The Attorney General is authorized by Congress to appoint United States Trustees (UST), who are Department of Justice officials, to supervise the administration of bankruptcy cases. 28 U.S.C.A. §§ 581-589a.

**[3]**     **Bankruptcy**   Powers, Duties and Fiduciary Capacity

Congress specifically empowered United States Trustees (UST) to comment on proposed disclosure statements and Chapter 11 plans of reorganization. 28 U.S.C.A. § 586(a)(3)(B).

**[4]**     **Bankruptcy**   Particular proceedings or issues

         **Bankruptcy**   Submission to district court for judgment

         **Bankruptcy**   District court review or decision

Under *Stern*, the Bankruptcy Court lacked constitutional authority to finally approve of nonconsensual third-party releases of direct claims against non-debtors which were contained in Chapter 11 plan, and so its decision approving the releases was properly construed as setting forth its proposed findings of fact and conclusions of law for the District Court's de novo review, even though resolution of the third-party claims might have impacted the res of the estate; the released claims at issue, which, pursuant to the plan, were permanently enjoined, had res judicata effect, and, as such, were effectively finally resolved, did not stem "from the bankruptcy itself," but were direct claims, arising under state law, against non-debtors held by third parties who had not sought to recover on those claims in bankruptcy, or otherwise consented to a bankruptcy court's adjudication of those claims.

**[5]**     **Bankruptcy**   Submission to district court for judgment

         **Bankruptcy**   District court review or decision

To the extent claims encompassed by a proposed Chapter 11 plan's third-party releases are non-core under *Stern*, the bankruptcy court is required to submit proposed findings of fact and conclusions of law to the district court, for that court's de novo review and issuance of final judgment.

**[6]**     **Bankruptcy**   Core or non-core proceedings

Under *Stern*, "core" claims are those stemming from the bankruptcy itself, or those which would necessarily be resolved in the claims allowance process.

**[7]**     **Bankruptcy**   Core or non-core proceedings

Focus of the analysis in *Stern* concerning a bankruptcy court's constitutional authority to finally adjudicate claims does not turn on the extent to which a non-core claim might alter the creditor-debtor relations in a given bankruptcy.

**[8]**     **Bankruptcy**   Conclusions of law;  de novo review

         **Bankruptcy**   Clear error

In an appeal from a district court's review of a bankruptcy court's decision, the Court of Appeals independently reviews the bankruptcy court's conclusions of law de novo and its factual findings for clear error.

**[9]**    **Bankruptcy** 🔑 Clear error

Bankruptcy court's factual finding is "clearly erroneous" when the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

**[10]**    **Federal Courts** 🔑 "Clearly erroneous" standard of review in general

In reviewing factual findings for clear error, an appellate court is not confined to evidence cited in a lower court's opinion, but must instead review all of the record evidence.

**[11]**    **Bankruptcy** 🔑 Scope of review in general

In an appeal from a district court's review of a bankruptcy court's decision, the Court of Appeals may uphold the bankruptcy court's decision on any ground, even one not relied upon by the district court.

**[12]**    **Bankruptcy** 🔑 Settlement, adjustment, or enforcement of claims

In the context of a proposed Chapter 11 plan's nonconsensual release of claims against non-debtors, "direct claims" are causes of action brought to redress a direct harm to a plaintiff caused by a non-debtor third party.

**[13]**    **Bankruptcy** 🔑 Settlement, adjustment, or enforcement of claims

In the context of a proposed Chapter 11 plan's nonconsensual release of claims against non-debtors, "derivative claims" are ones that arise from harm done to the estate and that seek relief against the third party that pushed the debtor into bankruptcy.

**[14]**    **Bankruptcy** 🔑 Settlement, adjustment, or enforcement of claims

It is well-settled that a bankruptcy court may approve, in a proposed Chapter 11 plan, not only third-party releases which are consensual, but also third-party releases of derivative claims because those claims really belong to the estate of the debtor. 11 U.S.C.A. § 1123(b)(3)(A).

**[15]**    **Bankruptcy** 🔑 Effect as to co-debtors, guarantors, and sureties

Bankruptcy court's ability to release claims against third parties derives from its power of discharge. 11 U.S.C.A. § 524(a).

**[16]**    **Bankruptcy** 🔑 Effect of Discharge

Under the Bankruptcy Code, a discharge releases a debtor from personal liability with respect to any debt by enjoining creditors from attempting to collect on that debt, so long as the debtor discloses all its financial information and puts those assets towards its estate. 11 U.S.C.A. § 524.

**[17]**    **Bankruptcy** 🔑 Jurisdiction over property

3936

Extraordinary remedy of a bankruptcy discharge is based on bankruptcy courts' in rem jurisdiction over the property of the debtor. 11 U.S.C.A. § 524.

**[18]    Bankruptcy** 🔑 Related proceedings

Bankruptcy court's subject-matter jurisdiction under the Bankruptcy Code is broad; it extends to all civil actions so long as the action's outcome might have any conceivable effect on the bankruptcy estate. 28 U.S.C.A. §§ 157(a), 1334.

**[19]    Bankruptcy** 🔑 Issues between non-debtors

Bankruptcy court's jurisdictional reach under the Bankruptcy Code is not endless: bankruptcy court may only enjoin third-party non-debtor claims that directly affect the res of the bankruptcy estate. 28 U.S.C.A. §§ 157(a), 1334.

**[20]    Bankruptcy** 🔑 Issues between non-debtors

Bankruptcy court's subject-matter jurisdiction under the Bankruptcy Code extends to actions against certain third parties, as well as suits against debtors themselves, to protect the assets of the estate so as to ensure a fair distribution of those assets at a later point in time. 28 U.S.C.A. §§ 157(a), 1334.

**[21]    Bankruptcy** 🔑 Issues between non-debtors

Direct claim brought against non-debtors that nevertheless poses specter of direct impact on res of bankrupt estate may just as surely impair bankruptcy court's ability to make fair distribution of the debtor's assets as third-party suit alleging derivative liability; accordingly, if, for example, the litigation of settled claims would almost certainly result in the drawing down of the bankruptcy estate of the debtor, the exercise of bankruptcy jurisdiction to enjoin third-party direct claims is appropriate. 28 U.S.C.A. §§ 157(a), 1334.

**[22]    Bankruptcy** 🔑 Issues between non-debtors

On debtors' motion to confirm proposed Chapter 11 plan containing nonconsensual releases of third-party direct claims against non-debtors, in particular, non-debtor family members who owned and/or were officers of debtors, the Bankruptcy Court had statutory jurisdiction to impose releases because it was conceivable, indeed likely, that resolution of released claims would directly impact the res of the estate; at least some of the claims, though directly asserted against family members, were closely related to derivative claims which the estate might bring against those members and, given the overlap, would likely impact debtors' ability to recover on the estate's own claims, members had reasonable basis to seek indemnification from debtors, at least where they were not determined by a court to have acted in bad faith, and members also might assert claims against the estate for either insurance coverage or contribution. 28 U.S.C.A. §§ 157(a), 1334.

**[23]    Bankruptcy** 🔑 Issues between non-debtors

Possibility that non-debtors who were the subject of third-party direct claims that would be released in proposed Chapter 11 plan would have a reasonable basis to seek indemnification from debtors was enough to implicate the bankruptcy court's "related to" jurisdiction over the releases. 28 U.S.C.A. §§ 157(a), 1334.

**[24]**    **Bankruptcy** 🔑 Carrying out provisions of Code

**Bankruptcy** 🔑 Settlement, adjustment, or enforcement of claims

A bankruptcy court has authority to approve a Chapter 11 plan that includes nonconsensual third-party releases of direct claims against non-debtors; there is a statutory basis for such authority, as although the Bankruptcy Code does not explicitly authorize third-party releases, nowhere does it expressly forbid them, the section of the Code authorizing bankruptcy courts to issue any order that is necessary or appropriate to carry out the provisions of title 11 gives courts broad equitable power to carry out the Code's provisions, and another section of the Code permits the inclusion of "any other appropriate provision" in a Chapter 11 plan so long as it is "not inconsistent" with other Code sections, and circuit precedent both permits the imposition of third-party releases jointly under the subject sections of the Code and confirms that such releases are neither the equivalent of inappropriate discharges nor allowable only in the context of asbestos cases. 11 U.S.C.A. §§ 105(a), 1123(b)(6).

**[25]**    **Bankruptcy** 🔑 Carrying out provisions of Code

**Bankruptcy** 🔑 Settlement, adjustment, or enforcement of claims

Although the section of the Bankruptcy Code authorizing bankruptcy courts to issue any order that is necessary or appropriate to carry out the provisions of title 11 gives courts broad equitable power to carry out the provisions of the Code, that section, alone, cannot justify the imposition of third-party releases in a Chapter 11 plan. 11 U.S.C.A. § 105(a).

**[26]**    **Bankruptcy** 🔑 Contents in general

Section of the Bankruptcy Code permitting the inclusion of "any other appropriate provision" in a Chapter 11 plan so long as it is "not inconsistent" with other sections of the Code is limited only by what the Code expressly forbids, not what the Code explicitly allows. 11 U.S.C.A. § 1123(b)(6).

**[27]**    **Bankruptcy** 🔑 Settlement, adjustment, or enforcement of claims

Bankruptcy courts' equitable powers under the section of the Bankruptcy Code permitting the inclusion of "any other appropriate provision" in a Chapter 11 plan so long as it is "not inconsistent" with other sections of the Code include the power to release third parties from liability. 11 U.S.C.A. § 1123(b)(6).

**[28]**    **Bankruptcy** 🔑 Effect as to co-debtors, guarantors, and sureties

Section of the Bankruptcy Code providing that discharge of a debt of the debtor does not affect the liability of any other entity on such debt assures that an entity also liable with a bankruptcy debtor for "such debt," such as an entity that is jointly liable for the debt, remains liable notwithstanding the debtor's discharge of its obligation. 11 U.S.C.A. § 524(e).

**[29]**    **Bankruptcy** 🔑 Effect as to co-debtors, guarantors, and sureties

**Bankruptcy** 🔑 Settlement, adjustment, or enforcement of claims

Section of the Bankruptcy Code providing that discharge of a debt of the debtor does not affect the liability of any other entity on such debt is not a bar to a Chapter 11 plan's inclusion of nonconsensual third-party releases of direct claims against non-debtors. 11 U.S.C.A. §§ 524(e), 1123(b)(6).

**[30]**    **Bankruptcy** 🔑 Settlement, adjustment, or enforcement of claims

Bankruptcy Code permits "channeling orders," that is, the funneling of claims into one proceeding to preserve the debtors' estate, under certain circumstances. 11 U.S.C.A. § 363(f).

**[31]**    **Bankruptcy** 🔑 Settlement, adjustment, or enforcement of claims

In enacting the subsection of the Bankruptcy Code allowing for the injunction of third-party claims against non-debtors in asbestos cases, Congress expressly intended not to change the pre-existing powers of bankruptcy courts. 11 U.S.C.A. § 524(g).

**[32]**    **Bankruptcy** 🔑 Settlement, adjustment, or enforcement of claims

In the context of a proposed Chapter 11 plan, it is abusive for a bankruptcy court to enjoin third-party claims against a non-debtor based solely on the non-debtor's financial contribution to the estate.

**[33]**    **Bankruptcy** 🔑 Settlement, adjustment, or enforcement of claims

In the context of a proposed Chapter 11 plan, third-party releases are not a merit badge that somebody gets in return for making positive contribution to a restructuring, nor are they a participation trophy or gold star for doing a good job.

**[34]**    **Bankruptcy** 🔑 Settlement, adjustment, or enforcement of claims

In context of proposed Chapter 11 plan, bankruptcy courts should look to seven factors before imposing nonconsensual third-party releases of direct claims against a non-debtor, namely, whether: (1) there is identity of interests between debtor and released third parties, including indemnification relationships, such that suit against non-debtor is, in essence, suit against debtor, or will deplete assets of the estate, (2) claims against debtor and nondebtor are factually and legally intertwined, including whether debtor and released parties share common defenses, insurance coverage, or levels of culpability, (3) scope of releases is appropriate, (4) releases are essential to reorganization, in that debtor needs claims to be settled in order for the res to be allocated, rather than because released party is somehow manipulating the process to its own advantage, such that, without releases, there is little likelihood of plan's success, (5) non-debtor contributed substantial assets to reorganization, (6) impacted class of creditors "overwhelmingly" voted in support of plan with releases, and (7) plan provides for fair payment of enjoined claims. 11 U.S.C.A. §§ 105(a), 1123(b)(6).

**[35]**    **Bankruptcy** 🔑 Settlement, adjustment, or enforcement of claims

Nonconsensual third-party release of direct claims against a non-debtor is proper in scope when its "breadth" is "necessary" to the proposed Chapter 11 plan. 11 U.S.C.A. §§ 105(a), 1123(b)(6).

**[36]**    **Bankruptcy** 🔑 Settlement, adjustment, or enforcement of claims

In assessing whether impacted class of creditors "overwhelmingly" voted in support of plan with releases, as factor in determining whether nonconsensual third-party releases of direct claims against a non-debtor should be imposed via Chapter 11 plan, reference point is subsection of Bankruptcy Code requiring approval by a minimum of 75% of voting creditors in favor of a Chapter 11 plan, though, in this context, that threshold is the bare minimum. 11 U.S.C.A. §§ 105(a), 524(g)(2)(B)(ii)(IV)(bb), 1123(b)(6).

**[37]    Bankruptcy** 🔑 Settlement, adjustment, or enforcement of claims

In determining whether proposed Chapter 11 plan containing nonconsensual third-party releases of direct claims against a non-debtor provides for the fair payment of enjoined claims, the concern is with the fairness of the payment, as opposed to the final amount of payment; because amount of payment does not necessarily indicate its fairness, determinative question is not whether there is full payment but, rather, whether contributed sum permits the fair resolution of enjoined claims. 11 U.S.C.A. §§ 105(a), 1123(b)(6).

**[38]    Bankruptcy** 🔑 Settlement, adjustment, or enforcement of claims

Although, in determining whether bankruptcy court should approve proposed Chapter 11 plan containing nonconsensual third-party releases of direct claims against a non-debtor, consideration of each of seven pertinent factors is required, it is not necessarily sufficient; there may be cases in which all factors are present, but the inclusion of third-party releases in a plan of reorganization should not be approved. 11 U.S.C.A. §§ 105(a), 1123(b)(6).

**[39]    Bankruptcy** 🔑 Settlement, adjustment, or enforcement of claims

In determining whether to approve proposed Chapter 11 plan containing nonconsensual third-party releases of direct claims against a non-debtor, the bankruptcy court is required to support each of the pertinent seven factors with specific and detailed findings, which usually will require extensive discovery into facts surrounding claims against released parties. 11 U.S.C.A. §§ 105(a), 1123(b)(6).

**[40]    Bankruptcy** 🔑 Settlement, adjustment, or enforcement of claims

As with any term in a bankruptcy plan, a Chapter 11 plan provision containing nonconsensual third-party releases of direct claims against a non-debtor must be imposed against a backdrop of equity. 11 U.S.C.A. §§ 105(a), 1123(b)(6).

**[41]    Bankruptcy** 🔑 Settlement, adjustment, or enforcement of claims

Given the potential for abuse, courts determining whether to approve proposed Chapter 11 plan containing nonconsensual third-party releases of direct claims against a non-debtor should exercise particular care when evaluating such releases. 11 U.S.C.A. §§ 105(a), 1123(b)(6).

**[42]    Bankruptcy** 🔑 Settlement, adjustment, or enforcement of claims

Bankruptcy Court's approval of Chapter 11 plan of debtors, a privately-held pharmaceutical company and its affiliates, which contained nonconsensual third-party releases of direct claims against non-debtor family members who owned and/or were directors and officers of debtors, was equitable and appropriate; debtors and family members had sufficient identity of interests, releases applied only where debtors' conduct was legal cause or legally relevant factor of released cause of action against family member, so released claims directly affected res of the estate, releases were essential to reorganization and proper in scope, as they were required to ensure that valuation of res was settled and that $1.8 billion res would not be depleted by government's $2 billion priority claim, leaving nothing for many victims of opioid crisis, family members' contribution of at least $5.5 billion was substantial, claimants overwhelmingly approved plan, and plan provided for fair payment of claims. 11 U.S.C.A. §§ 105(a), 1123(b)(6).

3940

**[43]    Bankruptcy** 🗝 Scope of review in general

In reviewing the Bankruptcy Court's approval of a Chapter 11 plan which contained nonconsensual third-party releases of direct claims against non-debtor family members who owned and/or were directors and officers of debtors, it was not the role of the Court of Appeals to determine whether the family members in question were worthy of receiving the benefit of the releases; the various equities of the plan had been carefully considered by the Bankruptcy Court. 11 U.S.C.A. §§ 105(a), 1123(b)(6).

**[44]    Bankruptcy** 🗝 Settlement, adjustment, or enforcement of claims

Acts taken in contemplation of' bankruptcy have long been, and continue to be, associated with abusive conduct, for purposes of determining whether to confirm proposed Chapter 11 plan containing nonconsensual third-party releases of direct claims against non-debtors.

**[45]    Bankruptcy** 🗝 Settlement, adjustment, or enforcement of claims

If only reason for inclusion of nonconsensual third-party release of claims against a non-debtor is the non-debtor's financial contribution to the restructuring plan, then the release is not essential to the bankruptcy. 11 U.S.C.A. §§ 105(a), 1123(b)(6).

**[46]    Bankruptcy** 🗝 Scope of review in general

In reviewing the Bankruptcy Court's approval of a Chapter 11 plan which contained nonconsensual third-party releases of direct claims against non-debtor family members who owned and/or were directors and officers of debtors, in particular, in evaluating the substantial nature of the released parties' contribution to the reorganization, it was not for the Court of Appeals to determine whether a greater contribution from the family members would have been desirable; instead, appellate court's role was simply to decide whether the Bankruptcy Court erred in finding the family members' contribution substantial. 11 U.S.C.A. §§ 105(a), 1123(b)(6).

**[47]    Bankruptcy** 🗝 Settlement, adjustment, or enforcement of claims

**Constitutional Law** 🗝 Bankruptcy

Nonconsensual third-party releases of direct claims against non-debtor family members who owned and/or were directors and officers of debtors, which were contained in Chapter 11 plan of reorganization, comported with due process; although releases extinguished causes of action, which were a constitutionally protected property interest, claimants had adequate notice, as notice of the confirmation hearing was widespread through a variety of media, direct notice was provided to any creditors of debtors, and, though legal training might have been helpful to understanding initial wording of releases, the narrowed releases were written more clearly and in simple, plain English, the Bankruptcy Court gave process, that is, a meaningful opportunity to be heard, at confirmation hearing, which lasted for six days, and the Court acted within its jurisdiction over the bankruptcy estate, even if the third-party claims were not actually the property of the estate. U.S. Const. Amend. 5; 11 U.S.C.A. §§ 105(a), 1123(b)(6).

**[48]    Constitutional Law** 🗝 Procedural due process in general

**Constitutional Law** 🗝 Notice and Hearing

Procedural due process claim entails two-part inquiry: whether claimants were deprived of protected interest and, if so, whether claimants received adequate notice and meaningful opportunity to be heard. U.S. Const. Amends. 5, 14.

**[49]** **Constitutional Law** 🔑 Protections Provided and Deprivations Prohibited in General

Once due process is triggered, the question becomes what process is due. U.S. Const. Amends. 5, 14.

**[50]** **Constitutional Law** 🔑 Notice

Due process requires notice reasonably calculated to apprise interested parties of pendency of action. U.S. Const. Amends. 5, 14.

**[51]** **Constitutional Law** 🔑 Notice

There is no rigid formula as to kind of notice that must be given to comport with due process; notice required will vary with circumstances and conditions. U.S. Const. Amends. 5, 14.

**[52]** **Constitutional Law** 🔑 Protections Provided and Deprivations Prohibited in General

Due Process Clause does not absolutely protect against the deprivation of property; it instead ensures that a deprivation does not occur without due process. U.S. Const. Amends. 5, 14.

**[53]** **Constitutional Law** 🔑 Bankruptcy

In bankruptcy, the sufficiency of process, as required to comport with the Due Process Clause, turns on the adequacy of notice and a meaningful opportunity to be heard. U.S. Const. Amends. 5, 14.

**[54]** **Bankruptcy** 🔑 Consent to or Waiver of Objections to Jurisdiction or Venue

**Bankruptcy** 🔑 Settlement, adjustment, or enforcement of claims

**International Law** 🔑 Persons Entitled to Immunity

Chapter 11 plan containing nonconsensual third-party releases of direct claims against non-debtor family members who owned and/or were directors and officers of debtors did not violate the sovereign immunity of Canadian creditors; releases in question did not require a suit to be maintained against Canadian creditors, nor did they seek to impose personal liability on Canadian creditors, Canadian creditors could not be described as unwilling with regard to the judicial process of the case at bar, in which they had fully and voluntarily participated, and those of the creditors that were Canadian municipalities were not protected by the Foreign Sovereign Immunities Act (FSIA). 28 U.S.C.A. § 1605(a)(1).

**[55]** **International Law** 🔑 Express waiver in general

**International Law** 🔑 Implied waiver in general

Under the Foreign Sovereign Immunities Act (FSIA), a foreign state will not be immune from jurisdiction of the courts where the foreign state has waived its immunity either explicitly or by implication. 28 U.S.C.A. § 1605(a)(1).

**[56]** **Bankruptcy** 🔑 Classification of claims

Chapter 11 plan of debtors, a privately-held pharmaceutical company and affiliated entities, properly differentiated Canadian creditors' claims from those of their domestic counterparts; in addition to being subject to different regulatory regimes, there were substantive differences among the claims, including both the types of claims and elements of causes of action, and Canadian creditors had another source of recovery, namely, a non-debtor foreign independent associated company of debtors. 11 U.S.C.A. §§ 1122(a), 1123(a)(1).

[57]    **Bankruptcy** 👉 Classification of claims

Although, under the Bankruptcy Code, Chapter 11 plans may classify claims in a particular class so long as those claims are "substantially similar" to the other claims or interests of such class, the statute itself does not explicitly address whether similar claims must be placed in the same class. 11 U.S.C.A. § 1122(a).

[58]    **Bankruptcy** 👉 Classification of claims

Under the Bankruptcy Code, similar claims may not be separately classified in a Chapter 11 plan solely to engineer an assenting impaired class; instead, the separation of similar claims can only be justified by a legitimate reason. 11 U.S.C.A. § 1122(a).

**Attorneys and Law Firms**

**\*54** Marshall S. Huebner, (Benjamin S. Kaminetzky, Eli J. Vonnegut, James I. McClammy, Marc J. Tobak, Christopher S. Robertson, Gerard X. McCarthy, and Garrett L. Cardillo, on the brief), Davis Polk & Wardwell LLP, New York, New York; Gregory G. Garre, Charles S. Dameron, Eric J. Konopka, and Joshua J. Craddock, Latham & Watkins LLP, Washington, D.C. (on the brief), for Debtors-Appellants-Cross-Appellees Purdue Pharma L.P., Purdue Pharma Inc., Purdue Transdermal Technologies L.P., Purdue Pharma Manufacturing L.P., Purdue Pharmaceuticals L.P., Imbrium Therapeutics L.P., Adlon Therapeutics L.P., Greenfield BioVentures L.P., Seven Seas Hill Corp., Ophir Green Corp., Purdue Pharma of Puerto Rico, Avrio Health L.P., Purdue Pharmaceutical Products L.P., Purdue Neuroscience Company, Nayatt Cove Lifescience Inc., Button Land L.P., Rhodes Associates L.P., Paul Land Inc., Quidnick Land L.P., Rhodes Pharmaceuticals L.P., Rhodes Technologies, UDF LP, SVC Pharma LP, and SVC Pharma Inc.

Mitchell P. Hurley (Erik Y. Preis and Sara L. Brauner, on the brief), Akin Gump Strauss Hauer & Feld LLP, New York, New York; Z.W. Julius Chen, Akin Gump Strauss Hauer & Feld LLP, Washington, D.C. (on the brief), for Appellant-Cross-Appellee The Official Committee of Unsecured Creditors of Purdue Pharma L.P., et al.

Roy T. Englert, Jr., (Lawrence S. Robbins, on the brief), Robbins, Russell, Englert, Orseck & Untereiner LLP, Washington, D.C.; Kenneth H. Eckstein, Rachael Ringer, and David E. Blabey Jr., Kramer Levin Naftalis & Frankel LLP, New York, New York (on the brief); David J. Molton, Brown Rudnick LLP, New York, New York (on the brief); Richard J. Leveridge, Richard D. Shore, and Daniel I. Wolf, Gilbert LLP, Washington, D.C. (on the brief); Melanie L. Cyganowski, Otterbourg P.C., New York, New York (on the brief), for Appellant-Cross-Appellee Ad Hoc Committee of Governmental & Other Contingent Litigation Claimants.

J. Christopher Shore (Michele J. Meises and Alice Tsier, on the brief), White & Case LLP, New York, New York; Edward E. Neiger, ASK LLP, New York, New York (on the brief), for Appellant-Cross-Appellee Ad Hoc Group of Individual Victims of Purdue Pharma, L.P.

Jeffrey A. Liesemer (Kevin C. Maclay, Todd E. Phillips, and Lucas H. Self, on the brief), Caplin & Drysdale, Chartered, Washington, D.C., for Appellant-Cross-Appellee Multi-State Governmental Entities Group.

3943

Maura Kathleen Monaghan (Jasmine Ball, on the brief), Debevoise & Plimpton LLP, New York, New York, for Appellant-Cross-Appellee Mortimer-Side Initial Covered Sackler Persons.

Gregory P. Joseph, Mara Leventhal, Joseph Hage Aaronson LLC, New York, New York; Gerard Uzzi, Alexander B. Lees, Milbank LLP, New York, New York, for Appellant-Cross-Appellee The Raymond Sackler Family.

J. Carl Cecere, Cecere PC, Dallas, Texas; Allen J. Underwood, II, Lite Depalma Greenberg & Afanador, LLC, Newark, New Jersey (on the brief), for Appellees-Cross-Appellants The City of Grand Prairie, as Representative Plaintiff for a Class Consisting of All Canadian Municipalities, The Cities of Brantford, Grand Prairie, Lethbridge, and Wetaskiwin, The Peter Ballantyne Cree Nation, on behalf of All Canadian First Nations and Metis People, the Peter Ballantyne Cree Nation, on behalf of itself, and the Lac La Ronge Indian Band.

Michael Shih, Attorney, Appellate Staff Civil Division, (Michael S. Raab and Sean R. Janda, Attorneys, Appellate Staff Civil Division, on the brief), for Sarah E. Harrington, Deputy Assistant Attorney General, (Beth A. Levene and Sumi K. Sakata, Trial Attorneys, for P. Matthew Sutko, Associate General Counsel, for Ramona D. Elliot, Deputy Director/General Counsel, Executive Office for United States Trustees, on the brief), United States Department of Justice, Washington, D.C.; Lawrence H. Fogelman, Peter Aronoff, Danielle J. Levine, Assistant United States Attorneys, for Damian Williams, United States Attorney for the Southern District of New York, New York, New York (on the brief), for Appellee U.S. Trustee William K. Harrington.

Ronald Bass, pro se, North Plainfield, New Jersey.

Ellen Isaacs, pro se, on behalf of Patrick Ryan Wroblewski, and all similarly situated persons, Floyd, Virginia.

Maria Ecke, Andrew Ecke, Richard Ecke, pro se, West Simsbury, Connecticut.

Gregg M. Galardi, Ropes & Gray LLP, New York, New York; Douglas Hallward-Driemeier, Ropes & Gray LLP, Washington, D.C.; Andrew G. Devore, Ropes & Gray LLP, Boston, Massachusetts; Ryan Preston Dahl, Ropes & Gray LLP, Chicago, Illinois, for Amici Curiae Law Professors in support of Appellants.

Paul H. Zumbro, George E. Zobitz, Lauren A. Moskowitz, Cravath, Swaine & Moore LLP, New York, New York, for Amicus Curiae The Association of the Bar of the City of New York.

Tara S. Morrissey, U.S. Chamber Litigation Center, Washington, D.C., for the Chamber of Commerce of the United States of America; David H. Thompson, Brian W. Barnes, John W. Tienken, Cooper & Kirk, PLLC, Washington, D.C., for Amici Curiae the Chamber of Commerce of the United States of America, the American Tort Reform Association, and Product Liability Advisory Council, Inc.

Andrew K. Glenn, Jed I. Bergman, Shai Schmidt, Glenn Agre Bergman & Fuentes LLP, New York, New York, for Amici Curiae Bankruptcy Law Professors Ralph Brubaker, George W. Kuney, and Bruce A. Markell.

Joshua L. Seifert, Joshua. L. Seifert PLLC, New York, New York, for Amici Curiae Law Professors in Support of Appellees Regarding the "Abuse" Standard.

Robert J. Keach, Bernstein Shur Sawyer & Nelson, P.A., Portland, Maine; Albert Togut, Togut, Segal & Segal LLP, New York, New York, for Amici Curiae Commissioners of the American Bankruptcy Institute's Commission to Study the Reform of Chapter 11.

Daniel R. Walfish, Walfish & Fissell PLLC, for Amicus Curiae Professor Adam J. Levitin.

Harold D. Israel, Levenfeld Pearlstein, LLC, Chicago, Illinois; Scott R. Bickford, Martzell, Bickford & Centola, New Orleans, Louisiana, for Amicus Curiae the Ad Hoc Committee of NAS Children.

Before: Newman, Wesley, and Lee, Circuit Judges.

**Opinion**

Eunice C. Lee, Circuit Judge:

 **\*56** Bankruptcy is inherently a creature of competing interests, compromises, and less-than-perfect outcomes. Because of these defining characteristics, total satisfaction of all that is owed—whether in money or in justice—rarely occurs. When a bankruptcy is the result of mass tort litigation against the debtor, the complexities are magnified because the debts owed are wide-ranging and the harm caused goes beyond the financial. That is the circumstance here.

The Debtor, Purdue Pharma L.P. ("Purdue"), was owned and operated by the Sackler family[1] for decades. In the 1990s, Purdue introduced to market—and promoted as non-addictive—OxyContin, a controlled-release semisynthetic opioid analgesic. In the years following, OxyContin has been blamed for significantly contributing to one of the largest public health crises in this nation's history: the opioid epidemic.

[1] The district court explained that the "Sackler Family," as used in the court's opinion, "means the Mortimer D. Sackler Family (also known as 'Side A' of the Sackler family) and the Raymond R. Sackler Family (also known as 'Side B' of the Sackler family.)." *In re Purdue Pharma, L.P.*, 635 B.R. 26, 35 n.2 (S.D.N.Y. 2021). The Mortimer D. Sackler family explains that the "Mortimer-side Initial Covered Sackler Persons include Theresa Sackler, Ilene Sackler Lefcourt, Kathe Sackler, and Mortimer D.A. Sackler, as well as trusts of which they are beneficiaries and the trustees of those trusts, and Beacon Company." Br. for Appellant-Cross-Appellee Mortimer-Side Initial Covered Sackler Persons at 1 n.1. The Raymond R. Sackler family explains that the "Raymond Sackler family is comprised of natural persons who are descendants of Raymond R. Sackler and current and former spouses of their descendants." Br. for Appellant-Cross-Appellee the Raymond Sackler Family at 1 n.1.

The fallout from this crisis led to a veritable deluge of litigation against both Purdue and individual members of the Sackler family. Claimants, spread across the United States and Canada, included many sufferers of opioid addiction and the families of those lost to opioid overdoses. To settle the mass of civil claims, the parties, including Purdue and the Sacklers, agreed that in exchange for Purdue filing for bankruptcy, the Sacklers would personally contribute billions of dollars to the bankruptcy if all civil claims against them were released.[2]

[2] The district court explained that the Sacklers' contribution would go "to a fund that would be used to resolve both public and private civil claims as well as both civil and criminal settlements with the federal government." *In re Purdue Pharma, L.P.*, 635 B.R. at 70.

In accordance with that plan, Purdue and its related entities (together, the "Debtors" or "Purdue") filed for bankruptcy; the Sacklers did not. Following an intensive months-long and multi-phase mediation involving various interested parties and potential creditors of Purdue, the bankruptcy court approved the proposed bankruptcy plan. In doing so, the court **\*57** limited the release of claims against the Sacklers to *only* claims that directly affected the Debtors' estate and for which Purdue's conduct was a legal cause, or a legally relevant factor, of any released cause of action against the Sacklers. In exchange, the Sacklers agreed to contribute a total $5.5-6.0 billion to the bankruptcy. On subsequent appeal, however, the district court for the Southern District of New York reversed the bankruptcy court and vacated the court's confirmation order, ruling that the Bankruptcy Code did not permit such releases.

This appeal followed. During the pendency of the appeal, the various parties to the mediation engaged in further negotiations, resulting in additional changes to the proposed bankruptcy plan. These changes resulted in several more parties dropping their opposition and supporting the further-revised bankruptcy plan. The Appellants, who are challenging the district court's rejection of the proposed plan, include the Debtors, various creditor and claimant groups, and certain Sackler family members. The Appellees are those parties opposed to the proposed plan, although, as noted, their number has dropped since the initial filing of this appeal. These remaining Appellees consist of the U.S. Trustee, several Canadian municipalities and indigenous nations, and several individual *pro se* plaintiffs.

Aside from their legal arguments, the parties contend that various policy considerations should inform whether a bankruptcy plan containing nonconsensual third-party releases of direct claims may be approved. They also raise questions about fairness and accountability, particularly as it relates to the Sacklers, in releasing parties from liability for actions that cause great societal harm. They debate the very nature of bankruptcy, including the role it is intended to serve and the parties it is intended to benefit.

But, our role in this appeal does not require us to answer all of these serious and difficult questions. Instead, we are tasked only with resolving two key questions: *First*, does the Bankruptcy Code permit nonconsensual third-party releases of direct claims against non-debtors, and, *Second*, if so, were such releases proper here in light of all equitable considerations and the facts of this case. We answer both in the affirmative.

We conclude that two sections of the Bankruptcy Code, 11 U.S.C. §§ 105(a), 1123(b)(6), jointly provide the statutory basis for the bankruptcy court's authority to approve a plan that includes nonconsensual releases of third-party claims against non-debtors. In addition, this Court has recognized that in specific circumstances—such as those presented by this appeal—bankruptcy courts are permitted to approve of restructuring plans that include such releases. We accordingly hold that the bankruptcy court's approval of the releases here is permissible both statutorily and under this Court's case law. We further hold that the bankruptcy court's inclusion of the releases is equitable and appropriate under the specific factual circumstances of this case, and we articulate several factors to guide the analysis as to when to allow similar releases in reorganization plans.

Accordingly, we **REVERSE** the district court's order holding that the Bankruptcy Code does not permit nonconsensual releases of third-party direct claims against non-debtors, **AFFIRM** the bankruptcy court's approval of the reorganization plan, and **REMAND** the case to the district court for such further proceedings as may be required, consistent with this opinion. We also **AFFIRM** the district court's denial of the Canadian Creditors' cross-appeal.

**\*58  BACKGROUND**

### I. Factual Background

The following discussion is limited to those underlying facts that are necessary for a determination of the issues on appeal.[3]

[3]    The decisions of the bankruptcy and district courts provide a more detailed recitation of the background facts. *See In re Purdue Pharma L.P.*, 633 B.R. 53 (Bankr. S.D.N.Y. 2021) ("*Purdue I*"); *In re Purdue Pharma, L.P.*, 635 B.R. 26 (S.D.N.Y. 2021) ("*Purdue II*").

### A. Purdue and OxyContin

The Sackler brothers, including Mortimer and Raymond Sackler,[4] purchased Purdue, a privately held pharmaceutical company, in the 1950s. Members of the Sackler family held various director and officer positions throughout the company and, from approximately 1993 to 2018, Purdue's Board of Directors contained at least six members of the Sackler family. Beyond the board, Sackler family members held other positions of influence in the company. For example, Mortimer and Raymond Sackler served as co-chief executive officers until their deaths, Richard Sackler served as a president, and Mortimer D.A., Ilene, and Kathe Sackler all served as officers.

[4]    Arthur Sackler sold any interest in Purdue before the development of OxyContin. He and his heirs are therefore not involved in this action.

In 1995, Purdue developed, and the Food and Drug Administration ("FDA") approved, OxyContin, a controlled-release semisynthetic opioid analgesic. At that time, and for years following, Purdue advertised that the time-release formulation prevented OxyContin from posing a threat of abuse or addiction. OxyContin's FDA label reflected a purportedly low risk of addiction. From 1996 to 2001, Purdue aggressively marketed OxyContin to patients and doctors while downplaying growing addiction concerns. Over this time-period, both prescribed and illegal use of OxyContin increased across the country.

3946

Starting in 2000, state governments began to alert Purdue to the widespread abuse of OxyContin, and, in 2001, the FDA required Purdue to remove from its label that OxyContin had a low risk of addiction. In the years that followed, lawsuits against Purdue —brought by, among others, individuals, state governments, and federal agencies—proliferated across the United States.

### B. The 2004 Indemnity Agreement

At the end of 2004, Purdue's Board of Directors voted to indemnify, among others, Purdue's directors and officers against claims made in connection with their service to the company. *Bryant C. Dunaway v. Purdue Pharma L.P.* (*In re Purdue Pharma L.P.*), No. 19-cv-10941-CM (S.D.N.Y. June 22, 2020), ECF No. 24-2 (Appellees' Suppl. App'x at SA 627–36) (the "Sackler-Purdue Indemnity Agreement" or the "Indemnity Agreement"). As part of its obligations under the agreement, Purdue agreed to:

> indemnify and hold harmless each Indemnitee from and against any and all expenses (including attorneys' fees), amounts paid or incurred in satisfaction of or as part of settlements, judgments, fines, penalties, liabilities and similar or related items incurred or suffered or threatened to be incurred or suffered as a result of or in connection with such Indemnitee being made or threatened to be made a party to or participant in any pending, threatened or completed actions, suits or proceedings, whether civil, criminal, administrative, arbitrative or investigative ....

 **\*59**  *Id.* at 628–29. Purdue further agreed to "advance all costs and expenses (including attorneys' fees and expenses) incurred by the Indemnitee in defending any one or more Proceedings." *Id.* at 630.

The protections conferred by the Indemnity Agreement were expansive and had no immediate time limit. The agreement ensured that "[t]he Indemnitee's rights under these provisions shall continue after the Indemnitee has ceased to serve" in his or her official capacity at Purdue, and "shall be binding on and inure to the benefit of successors, assigns, legatees, distributees, heirs, executors, guardians, administrators, estates and other legal representatives." *Id.* at 635.

At the same time, the Indemnity Agreement contained a bad faith carveout. Purdue's indemnification obligations did not extend to matters where "a final decision by a court ... establishe[d] that the Indemnitee did not act in good faith." *Id.* at 629.

### C. Sackler Conduct Between 2007 and 2019

Starting in 2007, the Sacklers anticipated that the effects of litigation against Purdue would eventually impact them directly. *See, e.g.*, Deferred Joint App'x at 5059 (David Sackler emailed Jonathan and Richard Sackler, "We will be sued .... [A]sk yourself how long it will take these lawyers to figure out that we might settle with them if they can freeze our assets and threaten us."). From 2008 to 2016, Purdue distributed a significant proportion of the company's revenue—an approximated $11 billion in total —to Sackler family trusts and holding companies. This represented an increase in the distribution pattern from years prior and "drained Purdue's total assets by 75% and Purdue's 'solvency cushion' by 82%" during that same time period. Special App'x at 40. By 2018, Purdue defended the many lawsuits against it from a significantly weakened financial position, and, by 2019, all Sacklers had stepped down from Purdue's Board of Directors.

### D. The DOJ Suit

In 2019, the United States Attorneys' Offices for the Districts of New Jersey and Vermont, and the United States Department of Justice ("DOJ") brought federal criminal and civil charges against Purdue. The criminal counts alleged that Purdue defrauded the government by inducing healthcare providers to prescribe OxyContin and violated the federal anti-kickback statute. The DOJ also brought civil claims under various federal statutes and common law doctrines (such as mistake, unjust enrichment, fraud, nuisance, and negligent entrustment).

In 2020, after filing for bankruptcy, Purdue entered into a plea agreement with the DOJ, the terms of which created future obligations on Purdue. First, in exchange for Purdue pleading guilty to violations of the federal anti-kickback statute, the DOJ agreed it would "not initiate any further criminal charges against Purdue." Deferred Joint App'x at 4798. Second, regarding its civil liability, Purdue agreed to a forfeiture judgment of $2 billion; the judgment gave the DOJ "superpriority" to collect on the

forfeiture judgment in the event of a liquidation of Purdue's estate. Deferred Joint App'x at 4804. Thus, in any future bankruptcy proceedings, the plea required that Purdue satisfy the DOJ's $2 billion claim ahead of all other creditors' claims.

However, the plea agreement also stipulated that the DOJ would agree to release $1.775 billion of its $2 billion claim so long as a future distribution plan met certain requirements, specifically that an abatement trust for the public benefit would be **\*60** established and a document repository created. Finally, while the plea agreement released Purdue from any additional civil or administrative monetary claims by the government for the covered conduct, it expressly did not release criminal liability.

### E. Purdue Files for Bankruptcy

On September 15, 2019, Purdue and its related entities[5] declared bankruptcy; the Sacklers did not. The Estate of the Debtors (the "Estate" or the "*res*") is estimated at approximately $1.8 billion.

[5]    Purdue consists of Purdue Pharma L.P., Purdue Pharma Inc., Purdue Transdermal Technologies L.P., Purdue Pharma Manufacturing L.P., Purdue Pharmaceuticals L.P., Imbrium Therapeutics L.P., Adlon Therapeutics L.P., Greenfield BioVentures L.P., Seven Seas Hill Corp., Ophir Green Corp., Purdue Pharma of Puerto Rico, Avrio Health L.P., Purdue Pharmaceutical Products L.P., Purdue Neuroscience Company, Nayatt Cove Lifescience Inc., Button Land L.P., Rhodes Associates L.P., Paul Land Inc., Quidnick Land L.P., Rhodes Pharmaceuticals L.P., Rhodes Technologies, UDF L.P., SVC Pharma L.P., and SVC Pharma Inc.

Three days after the bankruptcy filing, the Debtors sought an injunction halting all other lawsuits (almost 3,000 actions against Purdue and over 400 actions against the Sacklers concerning liability for OxyContin). On October 11, 2019, the bankruptcy court enjoined all litigation. At the time, claims against the Debtors and Sacklers were estimated at more than $40 trillion.

## II. Procedural History

### A. The Mediation and Confirmation Process

Following discovery, as is typical in Chapter 11 bankruptcy, the bankruptcy court ordered mediation to reach a plan of reorganization and avoid liquidation of the Estate. In addition to Purdue and the Sacklers, there were a number of groups that participated in the mediation.[6]

[6]    The Debtors, Official Committee of Unsecured Creditors of Purdue Pharma L.P., et al. (the "UCC"), Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants ("AHC"), Ad Hoc Group of Non-Consenting States ("NCSG"), Multi-State Governmental Entities Group ("MSGE"), Ad Hoc Group of Individual Victims of Purdue Pharma, L.P. ("PI Ad Hoc Group"), Ad Hoc Committee of NAS Children ("NAS Children"), Ad Hoc Group of Hospitals ("Hospitals"), Third-Party Payor Group ("TPP Group"), and Ratepayer Mediation Participants ("Ratepayers") all participated in the mediation as official Mediation Parties. The Native American Tribes Group ("Tribes Group"), Public School District Claimants ("Public Schools"), the National Association for the Advancement of Colored People, and others also participated in mediation, although not as official Mediation Parties.

The first phase of the mediation addressed the allocation of the Estate's available funds to non-federal public claimants, such as states and political subdivisions, and private claimants. The second phase largely focused on determining what the Sacklers would contribute to the Debtors' estate. While this second phase resulted in an agreement in principle among the Sacklers, the Debtors, and several creditors, a group of twenty-five non-consenting states, among others, rejected the agreement.

That agreement guaranteed that the Sacklers would contribute at least $4.275 billion to the Debtors' estate over approximately nine years. In exchange, the Debtors' plan of reorganization contained several nonconsensual releases (the "Shareholder Release," the "Release," or the "Releases") that, in effect, permanently enjoined certain third-party claims against the Sacklers. As initially proposed, the Release provisions were extremely broad and included the release of claims pertaining to, *inter alia*, the same subject **\*61** matter as any claim treated in the plan; any business or other contractual arrangements including transfers; any employment-related conduct; any pending opioid actions and opioid-related activities; and the bankruptcy process.

3948

In the third phase of the mediation, the Sacklers reached a modified agreement with fifteen out of the twenty-five non-consenting states.[7] The new terms of the modified settlement included additional payments of $50 million by the Sacklers, and the accelerated payment of an additional $50 million from a previously agreed-upon settlement payment. These modifications raised the Sacklers' aggregate contribution to the proposed plan to $4.325 billion. At that time, no changes were made to the Shareholder Release.

[7]     The majority of the non-consenting states (California, Connecticut, Delaware, Maryland, Oregon, Rhode Island, Vermont, Washington, and the District of Columbia) (the "Nine") maintained their objections to the plan and were parties to the appeal to the district court.

Following mediation, a vote on the proposed plan was set in motion. Notice of the confirmation hearing was published in the summer of 2021, with votes for or against confirmation due by mid-July 2021, and reached 98% of adults in the United States and 86% of adults in Canada. More than 120,000 votes were cast, and each voting class voted "overwhelmingly" in favor of the plan. Special App'x at 150–51 ("In the aggregate, the vote was over 95 percent in favor of confirmation .... In each class the percent voting in favor of the plan was above 93 percent with the exception of the class of hospital claims, which was over 88 percent ....").

Ultimately, on September 1, 2021—after a confirmation hearing that included the live testimony of 41 witnesses and extensive oral argument—the bankruptcy court rendered an oral ruling stating that it would confirm the proposed plan, but with a few changes. Most relevantly, the court modified the Shareholder Release to ensure that the Debtors' conduct must be a legal cause or a legally relevant factor of any released cause of action against the Sacklers:

> I ... require that the shareholder releases ... be further qualified than they now are. To apply [only] where ... a debtor's conduct or the claims asserted against it [are] a legal cause or a legally relevant factor to the cause of action against the shareholder released party ....

Deferred Joint App'x at 1330–31. The new Shareholder Release thus read in pertinent part:

> [T]he Shareholder Released Parties ... shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released ... from any and all Causes of Action, including any derivative claims [and future claims] ... (x) based on or relating to, or in any manner arising from, in whole or in part, (i) the Debtors, ... (ii) the Estates or (iii) the Chapter 11 Cases and (y) as to which any conduct, omission or liability of any Debtor or any Estate is the legal cause or is otherwise a legally relevant factor.

Special App'x at 920.

### B. Bankruptcy Court Order Confirming the Plan[8]

[8]     This opinion describes the bankruptcy court's opinion and the subsequent district court opinion only to the extent required to explain our reasoning today.

The bankruptcy court confirmed its modified version of the proposed plan ("the Plan") on September 17, 2021, and issued **\*62** an extensive opinion memorializing its decision. *See In re Purdue Pharma L.P.* ("*Purdue I*"), 633 B.R. 53 (Bankr. S.D.N.Y. 2021) (Robert D. Drain, *Bankr. J.*).

The bankruptcy court order began by describing its task as "resolv[ing] the collective problem presented by an insolvent debtor and a large body of creditors competing for its insufficient assets ... especially when there are mass claims premised on ... massive harm." *Purdue I*, 633 B.R. at 58. The court found that the confirmation hearing established that the Plan was the *only* "reasonably conceivable" way to resolve the issues in the case, *id.* at 59, and, in doing so, grounded its opinion on the principle that, in bankruptcy, courts "focus the solution away from individual litigations to a fair collective result subject to the unique ability under bankruptcy law to bind holdouts under well-defined circumstances who could not otherwise be bound under non-bankruptcy law." *Id.* at 58.

3949

1. Equitable Considerations

From there, the bankruptcy court asked whether the terms of the Plan created an equitable plan and answered in the affirmative. *Purdue I*, 633 B.R. at 84–95. The court explained that to approve a settlement, a bankruptcy court must determine whether the proposed terms are fair, equitable, and in the estate's best interest. *Id.* at 84. Here, in exchange for the Shareholder Release, the terms included:

> $4.325 billion, coupled with the Sackler[s'] other agreements, including the dedication of the two charities worth at least $175 million for abatement purposes, the Sacklers' agreement to a resolution on naming rights, their agreement not to engage in any business with NewCo [Purdue's successor company], their agreement to exit their foreign companies within a prescribed time, their agreement to various 'snap back' protections to ensure the collectability of their settlement payments, and their agreement to an unprecedented extensive document depository accessible to the public that will archive in a comprehensive way the Debtors' history, including as it relates to the development, production, and sale of opioids.

*Id.* The bankruptcy court also highlighted the extensive mediation and discovery processes that led to the development of these terms. *Id.* at 85–87.

As a legal framework for balancing the equities and determining whether to approve the plan, the court was guided by the factors from *In re Iridium Operating LLC*, 478 F.3d 452, 464–66 (2d Cir. 2007):

> (1) The probability of success, should the issues be litigated, versus the present and future benefits of the settlement; (2) the likelihood of complex and protracted litigation if the settlement is not approved, with its attendant expense, inconvenience and delay, including the difficulty of collecting on a judgment; (3) the interests of the creditors, including the degree to which creditors support the proposed settlement; (4) whether other interested parties support the settlement; (5) the competence and experience of counsel supporting, and the experience and knowledge of the court in reviewing, the settlement; (6) the nature and breadth of the releases to be obtained by officers and directors or other insiders; and (7) the extent to which the settlement is the product of arms-length bargaining.

*Purdue I*, 633 B.R. at 85.

 **[1]**   In applying the *Iridium* factors, the bankruptcy court observed that, in this case, counsel on both sides were experienced and formidable. *Id.* at 86–87. Over 95% of the voters approved the Plan, showing clear creditor support, and the **\*63**  potential difficulty in collecting from the Sacklers and their related entities on any successfully litigated claims was an issue of "significant concern." *Id.* at 89. The court noted that while the Sacklers are worth approximately $11 billion, they are a large family whose assets are "widely scattered and primarily held" in spendthrift trusts—both offshore and in the United States—that are largely unreachable via bankruptcy proceedings.[9] *Id.* at 88. Moreover, certain members of the Sackler family live "outside of the territorial jurisdiction of the United States and might not have subjected themselves sufficiently to the U.S." such that a U.S. court would have personal jurisdiction over them. *Id.* And, perhaps most importantly, according to the court, continued litigation —even if it were limited to the claims at issue—would be extremely expensive and lead to delays. *Id.* at 89–90. Thus, the court reasoned, an order against confirmation would not only destroy the entire settlement but would also result in a major escalation of costs and time. *Id.*

9       Spendthrift trusts in the United States may be recovered from, however, if the transfers to such trusts are fraudulent. *Id.* at 88–89.

The bankruptcy court also noted that, in exchange for the Shareholder Release, the Sacklers were contributing "the largest amount that shareholders have ever paid in such a context of these types of third party claims and closely related claims" and that "the non-monetary consideration under the settlement also is substantial." *Id.* at 107. And, according to the bankruptcy court's findings, without approval of the Plan including the Release, Purdue would be forced into liquidation, the DOJ would recover its $2 billion claim first, and recovery by all other creditors would be extremely limited because it would not be supplemented with Sackler funds. *Id.* at 108–09; *see also id.* at 84 ("Without the $4.325 billion being paid by the Sacklers under the plan and the other elements of the Sackler settlements, those other elements of the plan would not happen. The record is clear on

that."). Thus, the court concluded that, in a world without the Plan, the Sacklers would likely be mired in litigation, but it would also be likely that they could successfully shield much of their estimated $11 billion fortune from creditors through spendthrift trusts and offshore accounts, and broader creditor recovery from Purdue's estate would be extremely limited due to the DOJ's superpriority. *Id.* at 84, 109.

2. The Authority of the Bankruptcy Court to Release Third-Party Claims Against the Sacklers

The bankruptcy court next turned to the Plan's release of third-party claims against the Sacklers, which included all claims that had by then been asserted in litigations against the Sacklers by third parties. The Release encompassed both those based on a direct injury to the third-party claimant and those where the claim properly lay with the Debtors (including, for example, whether the Sacklers fraudulently transferred Purdue funds to family spendthrift trusts and other offshore accounts). *Purdue I*, 633 B.R. at 91–95. This overview of claims led the court to the thornier legal issue: whether direct claims by a third-party against a non-debtor (here, the Sacklers) could ever be released through the bankruptcy process. *Id.* at 95.

In addressing the question of its own authority, the bankruptcy court first evaluated threshold arguments and determined that it had subject-matter jurisdiction over the released claims. *Id.* at 95–98. But, in so finding, the court narrowed the Release **\*64** even further to cover only those claims that directly affect the *res*—these claims included "insurance rights" and "the shareholder released parties' rights to indemnification and contribution" from the Debtors. *Id.* at 97. Likewise, the court noted that "the Debtors' ability to pursue the estates' own closely related, indeed fundamentally overlapping, claims" against the Sacklers also directly affected the *res*. *Id.* at 97–98. The court did not exclude derivative claims from the Release, reasoning that those claims were similarly likely to affect the *res*. *Id.* at 98.

The bankruptcy court next addressed the objectors' due process arguments and found that they reduced to two claims—neither of which it found meritorious. *Id.* at 98–99. The first due process claim argued that the Release was an impermissible "adjudication of the claim." *Id.* at 98. The court disagreed, and instead characterized a release as "part of the settlement of the claim that channels the settlement funds to the estate." *Id.* As such, the bankruptcy court held that the Release did not rule on the underlying merits of the claims being released. *Id.* The objectors' second due process argument claimed that there was inadequate notice. *Id.* at 98–99. The court found adequate notice because the holders of claims against the Debtors had received notice of "the plan's intention to provide a broad release of third-party claims against the shareholders" and other "entities related to the Debtors." *Id.* at 98. As the final part of its due process analysis, the bankruptcy court also found that the claims released by the Plan were constitutionally core claims, so the bankruptcy court had the constitutional power to issue "a final order under Article III of the Constitution." *Purdue I*, 633 B.R. at 99–100.

After clearing the constitutional hurdles, the bankruptcy court began its analysis of statutory authority by noting that the majority of Circuits permit nonconsensual third-party releases, while only three Circuits—the Fifth, Ninth, and Tenth—do not. *Id.* at 100–01. The bankruptcy court concluded that the provision of the Bankruptcy Code relied upon by that minority, 11 U.S.C. § 524(e), is not a statutory impediment to third-party releases. *Id.* at 101–02.

The bankruptcy court instead looked to 11 U.S.C. § 105(a) and § 1123(b)(6) as two potential sources of a bankruptcy court's equitable authority to approve the releases. *Id.* at 102–05. Following a review of pertinent case law, the bankruptcy court held that so long as the releases are limited to those claims legally intertwined with the Debtors' conduct, they are appropriately subject to settlement under both statutory and common law frameworks. *Id.* at 103–05.

The bankruptcy court then looked to this Court's decision in *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136 (2d Cir. 2005), and other case law from this Circuit, to determine which factors a bankruptcy court should consider when determining whether third-party releases are appropriate. *Id.* at 105–06. The court identified the following factors: (1) the third-party releases were narrowly tailored; (2) monetary contributions were critical to the Plan; (3) the success of the Plan hinged on the third-party releases; (4) the affected class or classes overwhelmingly accepted the Plan; (5) the amount being paid under the Plan was

substantial (which, the court noted, is not determined by the Sacklers' net worth because defendants' wealth should not dictate settlement terms); and (6) claimants would be compensated fairly under the Plan. *Id.* at 106–09.

Evaluating those factors, the bankruptcy court found that they supported approval of the Plan. It pointed to the significant **\*65** overlap in third-party claims against both the Debtors and the Sacklers, chiefly that: (1) claims against both derived from the Debtors' conduct, and (2) to the extent that one or more of the Sacklers could be said to have directed that conduct, or to have possessed the knowledge and power to do so, the Sacklers' and Debtors' defenses would be the same. *Id.* at 108. And it added that the potential difficulty, as discussed above, of collecting on any judgment, the existence of spendthrift trusts, and the Estate's limited resources that the litigation process would likely deplete, also weighed in favor of approval of the Plan. *Id.* at 108–09.

In sum, the bankruptcy court predicated confirmation of the Plan on a few limitations to the third-party releases (namely that the Debtors' conduct amount to a legally relevant factor to a released cause of action and that the settled claims affect the *res*), but otherwise—having established its authority to do so—confirmed the Plan. *Id.* at 115.

3. Canadian Creditors' Objections

The bankruptcy court also rejected the objections of certain Canadian municipalities and First Nations (the "Canadian Creditors") to the Plan, which were essentially based on an argument that the Plan improperly classified their claims. *Id.* at 69–72. Specifically, they objected on the basis that those claims should have been classified like the claims of American non-federal governmental creditors and tribal entities, such that they could participate in abatement trusts. *Id.* at 69. Yet, the bankruptcy court observed that, even if the Canadian claims had been otherwise classified, notwithstanding the resulting change in the Canadian Creditors' voting status, the Plan still would have been approved. *Id.* The bankruptcy court's reasons for classifying the Canadian claims separately boiled down to: (1) different regulatory regimes of the United States and Canada, and (2) that the Canadian Creditors did not participate in the mediation process. *Id.* at 70. The bankruptcy court also noted that certain decisions to recognize or confirm the Plan would be left to the Canadian courts. *Id.* at 71.

4. *Pro Se* Objections

Several *pro se* parties also objected to the Plan, but the bankruptcy court similarly found their objections to be without merit. For example, one *pro se* objector asserted that it was improper and unfair that the Plan provided only $700–$750 million to a particular claimant group's personal injury claims. *Id.* at 78. The bankruptcy court looked to the length of the mediation, rigor of the legal analysis and negotiation, and quality of mediators and lawyers, all to support that the valuation of personal injury claims was reasonable. *Id.* at 78–79. Another *pro se* objector claimed that releasing the Sacklers from civil liability under the Plan was unfair and should not be approved because this plan is "the Sacklers' plan." *Id.* at 82. However, the bankruptcy court disagreed and emphasized that the Plan was "*not* the Sacklers' plan" because it involved an arms-length negotiation among all interested parties with three experienced mediators. *Id.* at 82–83 (emphasis in original).

**C. District Court Order Rejecting the Plan**

In a December 16, 2021 opinion, the district court vacated the bankruptcy court's decision to confirm the Plan. *In re Purdue Pharma, L.P.* ("*Purdue II*"), 635 B.R. 26 (S.D.N.Y. 2021) (Colleen McMahon, *J.*). Principally, the court ruled that no statutory authority permits third-party releases such as the ones found in the Plan. *Id.* at 89–90. The court based its **\*66** reasoning on two propositions: first, that the Bankruptcy Code does not expressly allow such releases; and second, that this Circuit's case law "has not yet been required to identify any source [in the Bankruptcy Code] for [the] authority" to grant such releases. *Id.*

3952

### 1. Subject-Matter Jurisdiction

The district court's analysis of statutory authority was preceded by the preliminary question of the bankruptcy court's jurisdictional reach under the Bankruptcy Code to release the claims encompassed by the Shareholder Release. The district court agreed that the bankruptcy court had subject-matter jurisdiction over all claims because: (1) the third-party claims raised questions as to the distribution of the Estates' property, *id.* at 85; (2) the third-party claims might have altered the liabilities of the Debtors and changed the amount available from the *res*, *id.* at 85–86; (3) the claims had a high degree of interconnectedness with claims against the Debtors, *id.* at 86–87; and (4) Purdue's insurance obligations to members of the Sacklers who were officers of Purdue could have burdened the *res*. *Id.* at 87–88. Accordingly, having found that the release of the third-party claims "*might have* some conceivable effect on the estate of a debtor," the district court concluded that they fell within the bankruptcy court's jurisdiction. *Id.* at 89 (emphasis in original).

### 2. Statutory Power to Release Third-Party Claims

Turning to the primary issue in this appeal, the district court next ruled that the bankruptcy court did not have statutory authority to release third-party direct claims against the Sacklers because the Sacklers were not the Debtors, and the Bankruptcy Code does not authorize the "non-consensual" release of "*direct/particularized* claims asserted by *third parties* against *non-debtors*." *Purdue II,* 635 B.R. at 90 (emphasis in original).

The district court's analysis on this issue considered the case law from this Court, the Supreme Court, and other circuit courts. It characterized this Court's holding in *Metromedia* as indicating that third-party releases could be permissible, but as being inconclusive as to whether "such releases [a]re consistent with or authorized by the Bankruptcy Code." *Purdue II,* 635 B.R. at 101. And, to the extent that *Metromedia* suggested that such releases would be permissible in "unique instances," the district court viewed the opinion as having failed to identify what those instances are. *Id.* (internal quotation marks omitted). Due to this perceived lack of clarity, the district court concluded that "while *Metromedia* said a great deal, the case did not hold much of anything," *id.*, and thus a bankruptcy court's statutory authority to impose third-party releases is "questionable." *Id.* at 89.

Moving on to the Supreme Court, the district court acknowledged that although the Court has never spoken directly on whether the Bankruptcy Code provides authority for these types of releases, it has held, "albeit in contexts different from the one at bar, that a bankruptcy court lacks the power to award relief that varies or exceeds the protections contained in the Bankruptcy Code," and it lacks such power "even in 'rare' cases, and [ ] even when those orders would help facilitate a particular reorganization." *Id.* at 94–96 (citing *Law v. Siegel,* 571 U.S. 415, 134 S.Ct. 1188, 188 L.Ed.2d 146 (2014) and *Czyzewski v. Jevic Holding Corp.,* 580 U.S. 451, 137 S.Ct. 973, 197 L.Ed.2d 398 (2017)).

At bottom, the district court concluded that no section of the Bankruptcy Code expressly or impliedly provided the requisite statutory authority for the Releases. **\*67** *Id.* at 115. The district court also rejected the argument that the bankruptcy court possessed residual equitable authority to impose the Releases. *Id.* at 112–14. The district court further ruled that the fact that the Plan required the Releases for confirmation did not vest the bankruptcy court with authority to approve them. *Id.* at 108–09.

### 3. Classification of Canadian Claims

Finally, the district court agreed with the bankruptcy court that the Canadian Appellants' claims were properly classified differently than those of the domestic claimants, and that all the Bankruptcy Code requires is a reasonable basis for differentiation. *Id.* at 116–17. The equal treatment mandate applies only to creditors within the same class, and the district court held that, under this Court's precedent, there was a reasonable basis to differentiate the Canadian creditors' claims because different regulatory regimes apply, and because the mediation solely involved U.S.-based claimants. *Id.*

3953

This Appeal followed.

### D. This Appeal

The Appellants include a variety of interests unified in favor of the confirmation of the Plan: the Debtors, the Official Committee of Unsecured Creditors (the "UCC"),[10] the Ad Hoc Committee of Governmental and Contingent Litigation Claimants (the "AHC"),[11] the Ad Hoc Group of Individual Victims of Purdue Pharma, L.P. ("Pl. Ad Hoc Group"),[12] the Multi-State Governmental Entities Group (the "MSGE"),[13] the Mortimer-side Initial Covered Sackler Persons (the "Mortimer Sacklers"), and the Raymond Sackler Family (the "Raymond Sacklers," and together with the Mortimer Sacklers, the "Sacklers" or "Sackler family").

[10]    The UCC is composed of eight dedicated members, including individuals who are themselves (or whose loved ones are) victims of the opioid epidemic, representatives of a trade association for 35 independent health insurance companies collectively insuring 110 million members, a member of one of the largest hospital systems in the United States, the Pension Benefit Guaranty Corporation (the federal entity responsible for insuring defined benefit pension plans), a co-defendant in opioid litigation that has asserted indemnification claims against the Debtors, and *three ex officio* members that represent political subdivisions, tribes, and public school districts.

[11]    The AHC is composed of ten States, the court-appointed Plaintiffs' Executive Committee in the multi-district litigation captioned *In re National Prescription Opiate Litigation*, Case No. 17-md-02804 (DAP) (N.D. Ohio), six counties, cities, parishes, or municipalities, and one federally recognized American Indian Tribe.

[12]    This group comprises over 60,000 individuals who were injured by direct exposure to Purdue's opioid products, who together make up approximately one-half of those who filed personal injury claims in Purdue's Chapter 11 Cases.

[13]    Members of the MSGE Group are creditors of the Debtors, and many filed prebankruptcy lawsuits against them for their role in fostering the nationwide opioid crisis.

While this Appeal was pending, eight states—California, Connecticut, Delaware, Maryland, Oregon, Rhode Island, Vermont, and Washington—and the District of Columbia (the "Nine") that had appealed the confirmation of the original settlement, the Debtors, and the Sacklers filed a new settlement agreement with the bankruptcy court that provided for an additional $1.175–$1.675 billion in Sackler contributions (resulting in an aggregate $5.5 to $6.0 billion contribution to the Plan). *See* **\*68** Order Pursuant to 11 U.S.C. §§ 105 and 363(b) Authorizing and Approving Settlement Term Sheet, *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y. Mar. 10, 2022), ECF No. 4503. The bankruptcy court granted the motion to confirm the revised plan but noted that its confirmation would require one or more orders by this Court or the district court. *Id*. As part of the revised settlement agreement, the Nine agreed to withdraw their opposition to the Plan, including the Shareholder Releases. *Id*.

**[2]    [3]**    As a result, the Appellees currently left defending the district court's decision include only U.S. Trustee William K. Harrington ("the Trustee"),[14] several Canadian municipalities and indigenous nations (the "Canadian Creditors"), and several individual *pro se* personal injury claimants (Ronald Bass, Ellen Isaacs, Maria Ecke, Richard Ecke, Andrew Ecke, the Estate of David Jonathan Ecke, and Peter Sottile).

[14]    Congress has authorized the Attorney General to appoint U.S. Trustees, who are Department of Justice officials, to supervise the administration of bankruptcy cases. 28 U.S.C. §§ 581–589a. U.S. Trustees "serve as bankruptcy watch-dogs to prevent fraud, dishonesty, and overreaching in the bankruptcy arena." H.R. Rep. No. 95-595, at 88 (1977). They "may raise and may appear and be heard on any issue in any case or proceeding" brought under the Bankruptcy Code. 11 U.S.C. § 307. Congress specifically empowered U.S. Trustees to comment on proposed disclosure statements and Chapter 11 plans of reorganization. 28 U.S.C. § 586(a)(3)(B).

3954

## DISCUSSION

### I. Standard of Review

#### A. The Bankruptcy Court's Adjudicatory Authority

[4]  [5]  [6]  As stated by the district court, to the extent claims encompassed by the third-party releases are non-core under *Stern v. Marshall*, the bankruptcy court was required to submit "proposed findings of fact and conclusions of law to the district court, for that court's [de novo] review and issuance of final judgment." 564 U.S. 462, 471, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011). *Stern* defines core claims as those stemming "from the bankruptcy itself" or those which "would necessarily be resolved in the claims allowance process." *Id.* at 499, 131 S.Ct. 2594. For substantially the same reasons articulated by the district court, *see Purdue II*, 635 B.R. at 79-83, we agree that the bankruptcy court lacked constitutional authority to finally approve of the releases, and, therefore, that the district court correctly construed the bankruptcy court's decision as setting forth its proposed findings of fact and conclusions of law for the district court's de novo review. In short, the released claims at issue here—which, pursuant to the Plan, are permanently enjoined, have res judicata effect, and, as such, are effectively finally resolved—do not stem "from the bankruptcy itself," *Stern*, 564 U.S. at 499, 131 S.Ct. 2594, but are direct claims, arising under state law, against non-debtors held by third parties who have not sought to recover on those claims in bankruptcy, or otherwise consented to a bankruptcy court's adjudication of those claims.

[7]  It is true, as Debtors note, that the resolution of the third-party claims might impact the *res* of the Estate—a fact determinative of the district court's statutory jurisdiction under the Code—but the same was true for the counterclaims held in *Stern* to be beyond the bankruptcy court's constitutional reach to finally determine. To the point, had the debtor in *Stern* been successful on her counterclaim against the creditor, the value of the estate would have been impacted; she would have had a property interest in the resulting damages award, which would have, in turn, increased the value of her estate. *See id.* The focus of the constitutional analysis in *Stern*  **\*69**  does not turn on the extent to which the non-core claim might alter the creditor-debtor relations in a given bankruptcy. That said, we agree with the district court that the practical import of the *Stern* issue is nonexistent given that only conclusions of law are at issue here, requiring our de novo review under any standard. *See Purdue II*, 635 B.R. at 82 n.54.

#### B. Appellate Review of the District Court

[8]  [9]  [10]  In an appeal from a district court's review of a bankruptcy court's decision, this Court "independently" reviews the bankruptcy court's conclusions of law de novo and its factual findings for clear error. *Morning Mist Holdings Ltd. v. Krys* (*In re Fairfield Sentry Ltd.*), 714 F.3d 127, 132 (2d Cir. 2013). A factual finding is clearly erroneous when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). "[I]n reviewing factual findings for clear error, an appellate court is not confined to evidence cited in a lower court's opinion, but must instead review all of the record evidence." *Bankr. Servs, Inc. v. Ernst & Young* (*In re CBI Holding Co.*), 529 F.3d 432, 449 (2d Cir. 2008).

[11]  This Court may uphold a bankruptcy court decision on any ground—even one not relied upon by the district court. *Resol. Tr. Corp. v. Best Prods. Co.* (*In re Best Prods. Co.*), 68 F.3d 26, 30 (2d Cir. 1995). As such, we decide all pertinent issues necessary to confirm the Plan and do not limit our analysis solely to the issues addressed below.

### II. Nonconsensual Third-Party Releases of Direct Claims

The two primary questions posed on appeal are: (1) whether the bankruptcy court had the authority to approve the nonconsensual release of direct third-party claims against the Sacklers, a non-debtor, through the Plan; and (2) whether the text of the Bankruptcy Code, factual record, and equitable considerations support the bankruptcy court's approval of the Plan. We answer both in the affirmative.

To explain our reasoning, we begin by describing the scope of the Shareholder Releases (including the types of claims covered and the claims at issue here). We then address the various statutory and constitutional arguments raised by the parties. Finally, we evaluate the bankruptcy court's findings regarding the fairness and equitable nature of the Plan, and we articulate factors to help guide future courts evaluating similar issues.

### A. The Scope of the Releases

The original version of the Release from the September 2, 2021 Plan of Reorganization settles

> any and all Causes of Action, including ... [present and future claims], (x) based on or relating to, or in any manner arising from, in whole or in part, (i) the Debtors, ... (including the Debtors' Opioid-Related Activities, manufacture, marketing and sale of Products, interaction with regulators concerning Opioid-Related Activities or Products, and involvement in the subject matter of the Pending Opioid Actions, and the past, present or future use or misuse of any opioid by a Releasing Party) ... and (y) as to which any conduct, omission or liability of any Debtor or any Estate is the legal cause or is otherwise a legally relevant factor.

Special App'x at 920. As discussed *supra*, the bankruptcy court subsequently limited  **\*70**  the releases such that they only "apply where ... a debtor's conduct or the claims asserted against it [are] a legal cause or a legally relevant factor to the cause of action against the shareholder released party," Deferred Joint App'x at 1330–31, and the released claims directly affect the *res*, *Purdue I*, 633 B.R. at 97–98.

 **[12]**    **[13]**    **[14]**    The released claims can be grouped into two categories: direct claims and derivative claims. In this context, direct claims are causes of action brought to redress a direct harm to a plaintiff caused by a non-debtor third party. *See Marshall v. Picard* (*In re Bernard L. Madoff Inv. Secs. LLC*), 740 F.3d 81, 89 n.9 (2d Cir. 2014). By contrast, derivative claims are "ones that arise from harm done to the estate and that seek relief against [the] third part[y] that pushed the debtor[s] into bankruptcy." *Id.* at 89 (internal quotation marks and alterations omitted); *see also Tronox Inc. v. Kerr-McGee Corp.* (*In re Tronox Inc.*), 855 F.3d 84, 100-04 (2d Cir. 2017) (explaining the law of derivative claims in the bankruptcy context). The potential claims released against the Sacklers include, *inter alia*, fraudulent transfer, constructive fraudulent transfer, deceptive marketing, public nuisance, unfair competition, fraudulent misrepresentation, violation of state consumer protection acts, civil conspiracy, negligence, and unjust enrichment. Some of these claims are direct, and some are derivative. As conceded by the parties, fraudulent transfer claims, for example, are typically derivative claims in that the real injury is to the Debtors' estate,[15] and it is well-settled that a bankruptcy court may approve not only third-party releases which are consensual, but also third-party releases of derivative claims because those claims really belong to the estate of the debtor. *See, e.g.*, 11 U.S.C. § 1123(b)(3)(A) (permitting release of claims as to the estate's property); *Madoff*, 740 F.3d at 88 ("A claim based on rights derivative of, or derived from, the debtor's typically involves property of the estate. By contrast, a bankruptcy court generally has limited authority to approve releases of a nondebtor's independent claims." (internal citation and quotation marks omitted)). The more controversial issue, however, is this Plan's likely release of some direct claims against the Sacklers.

[15]    Although the Plaintiff Ad Hoc Group contends that the district court erred in concluding the claims against the Sacklers are not all derivative, we find no error because certain consumer protection act claims at a minimum constitute direct claims in that the injury belongs directly to the claimant, and not to the Debtors. We need not define the exact claims which fall under the umbrella of direct claims but note that certain state law claims under consumer protection acts likely do.

 **[15]**    **[16]**    **[17]**    The bankruptcy court's ability to release claims at all derives from its power of discharge. *See generally* 11 U.S.C. § 524(a). Under the Bankruptcy Code, a bankruptcy discharge releases a debtor from personal liability with respect to any debt by enjoining creditors from attempting to collect on that debt, so long as the debtor discloses all its financial information and puts those assets towards its estate. 11 U.S.C. § 524; *Tenn. Student Assistance Corp. v. Hood*, 541 U.S. 440, 447, 124 S.Ct. 1905, 158 L.Ed.2d 764 (2004) ("The discharge order releases a debtor from personal liability with respect to any discharged debt by voiding any past or future judgments on the debt and by operating as an injunction to prohibit creditors from attempting to collect or to recover the debt."); *see also* 11 U.S.C. §§ 521–523. This extraordinary remedy is based on bankruptcy courts' *in rem* jurisdiction over the property of the debtor. While the Bankruptcy Code forbids a *discharge* of a non-debtor's claim

3956

under  *71  11 U.S.C. § 524(e), the releases at issue on appeal do not constitute a discharge of debt for the Sacklers because the releases neither offer umbrella protection against liability nor extinguish all claims. *See MacArthur Co. v. Johns-Manville Corp.* ("*Manville I*"), 837 F.2d 89, 91 (2d Cir. 1988) (ruling that the bankruptcy court had the authority to enjoin third-party claims because "the injunctive orders d[id] not offer the umbrella protection of a discharge in bankruptcy" and were instead limited to suits "that ar[o]se out of or relate[d] to" specific issues central to the bankruptcy).

Thus, the primary dispute is whether direct claims brought by creditors of Purdue against the Sacklers (for which the Debtors' conduct is legally relevant) can be released. As described in the following sections, we conclude that the bankruptcy court possessed both jurisdiction and statutory authority to approve the Releases because the limitations on the scope of the releases are significant and no other argument bars their imposition.

### B. Subject-Matter Jurisdiction

As an initial matter, we must ensure the bankruptcy court had subject-matter jurisdiction, pursuant to the Bankruptcy Code, over the released claims. *See Joseph v. Leavitt*, 465 F.3d 87, 89 (2d Cir. 2006) ("[W]e have an independent obligation to consider the presence or absence of subject matter jurisdiction *sua sponte*.").

 [18]    [19]    [20]    A bankruptcy court's subject-matter jurisdiction under the Code is broad. It extends to all civil actions so long as "the action's outcome might have any conceivable effect on the bankrupt estate." *Parmalat Cap. Fin. Ltd. v. Bank of Am. Corp.*, 639 F.3d 572, 579 (2d Cir. 2011) (internal quotation marks omitted); *see also* 28 U.S.C. §§ 157(a), 1334. However, that jurisdictional reach is not endless: a bankruptcy court may only "enjoin third-party non-debtor claims that directly affect the *res* of the bankruptcy estate." *Johns-Manville Corp. v. Chubb Indemnity Ins. Co.* ("*Manville III*"), 517 F.3d 52, 66 (2d Cir. 2008). That limitation is in line with the goal that "extending bankruptcy jurisdiction to actions against certain third parties, as well as suits against debtors themselves, is to protect the assets of the estate so as to ensure a fair distribution of those assets at a later point in time." *Pfizer Inc. v. Law Offices of Peter G. Angelos* (*In re Quigley Co.*), 676 F.3d 45, 57 (2d Cir. 2012) (internal quotation marks and alteration marks omitted).

 [21]    A direct claim brought against non-debtors, such as the Sacklers, "that nevertheless poses the specter of direct impact on the *res* of the bankrupt estate may just as surely impair the bankruptcy court's ability to make a fair distribution of the bankrupt's assets as a third-party suit alleging derivative liability." *Id.* at 58. Accordingly, if, for example, the litigation of the settled claims "would almost certainly result in the drawing down of ... the bankruptcy estate of [the debtor], the exercise of bankruptcy jurisdiction to enjoin [third-party direct claims is] appropriate." *Id.* Thus, as to statutory jurisdiction, our key inquiry is into the likely impact on the *res*.

 [22]    We agree with both the bankruptcy court and the district court that the bankruptcy court had statutory jurisdiction to impose the Releases because it is conceivable, indeed likely, that the resolution of the released claims would directly impact the *res*.

First, as both courts below noted, at least some of the third-party claims, although directly asserted against the Sacklers, are closely related to the derivative claims which the Estate might bring against the Sacklers. For example, many  *72  of the states that, below, objected to the Plan (but have since withdrawn their claims in favor of settlement) have laws which impose direct liability on individuals who, as officers of a corporation, personally participated in acts of corporate fraud. *See, e.g.*, U.S. Trustee's App'x at 2644–47, 2765, *In re Purdue Pharma L.P.*, No. 21-07532 (S.D.N.Y. Sept. 9, 2021), ECF Nos. 91-7, 91-8. However, although the various state statutes ensure that managerial personnel can be held independently liable for the same conduct that subjects the corporation to liability, those claims often "rely on detailed and virtually identical set of facts to make the claims" against both Purdue and the Sacklers. *Purdue II*, 635 B.R. at 86. As a result of that substantial overlap, the litigation of third-party direct claims against the Sacklers would likely impact the Debtor's ability to pursue, and the likelihood of recovering on, the Estate's own claims against the Sacklers.

**[23]** Second, the Sacklers are covered by the Sackler-Purdue Indemnity Agreement, and, therefore, depending on the outcome of any given claims against them, would have a reasonable basis to seek indemnification from the Debtors.[16] That possibility is enough to implicate the bankruptcy court's "related to" jurisdiction under our precedent. *See SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 341-42 (2d Cir. 2018).[17]

[16]    In addition to indemnification claims, the Sacklers might also assert claims against the Estate for either insurance coverage or contribution. *See generally* Appellees' Suppl. App'x at 627–35, *Bryant Dunaway v. Purdue Pharma L.P.* (*In re Purdue Pharma L.P.*), No. 19-10941 (CM) (S.D.N.Y. June 22, 2020), ECF No. 24-2.

[17]    In *SPV*, the plaintiffs asserted direct claims against, among other defendants, UBS AG, alleging principally that UBS had aided and abetted the infamous fraud perpetrated by the debtor, Bernard L. Madoff Investment Securities LLC. *See SPV*, 882 F.3d at 338. Although the plaintiffs sought recovery from UBS itself, UBS, in turn, had viable claims for indemnification and contribution against the debtor. *See id.* at 340–42. The possibility that those claims might have succeeded—and the fact that the debtor would incur expense in litigating such claims—was enough to confer jurisdiction on the bankruptcy court to enjoin the plaintiff's direct claims against UBS. *See id.* at 341-42.

To be sure, the Indemnity Agreement plainly bars any indemnification obligation flowing from the Debtors to the Sacklers where a court determines the Sacklers "did not act in good faith." SA 629. Consequently, as to any successful claims against the Sacklers sounding in fraud (such as the state consumer protection claims), the Sacklers would not have any reasonable basis to seek indemnification. Yet, as the district court noted, "the question of bad faith in this case is hotly disputed." *Purdue II*, 635 B.R. at 88. In the end, the jurisdictional issue does not require us to resolve that question; the relevant inquiry is whether the claims for indemnification "*might have* any conceivable effect on the bankrupt estate." *SPV*, 882 F.3d at 339-40 (emphasis added) (internal citation omitted). That standard is plainly satisfied here.

### C. Bankruptcy Code Authority

**[24]** The ultimate authority for the imposition of nonconsensual releases of direct third-party claims against non-debtors is rooted—as it must be—in the Bankruptcy Code, specifically 11 U.S.C. §§ 105(a) and 1123(b)(6). Further bolstering this statutory authority is this Circuit's caselaw stating that a bankruptcy court has authority to impose such releases.

#### 1. Statutory Authority

The bankruptcy court correctly grounded its authority for approving the Releases **\*73** in §§ 105(a) and 1123(b)(6), which provide the statutory basis for the bankruptcy court's equitable authority and permit the bankruptcy court's approval of the Plan. 11 U.S.C. § 105(a) states that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 1123(b)(6) states that "a plan may ... include any other appropriate provision not inconsistent with the applicable provisions of this title." We deem Appellees' arguments—that since the Bankruptcy Code does not explicitly authorize third-party releases, they are outside of a bankruptcy court's statutory authority—unpersuasive.

**[25]** First, although we have stated that § 105(a) gives "*broad equitable power* to the bankruptcy courts to carry out the provisions of the Bankruptcy Code," *Adelphia Bus. Sols., Inc. v. Abnos*, 482 F.3d 602, 609 (2d Cir. 2007) (emphasis added), we reject Appellants' suggestion that § 105(a) alone supports the imposition of the releases in this action. Indeed, our case law, and that of the majority of our sister circuits, support the proposition that § 105(a) alone cannot justify the imposition of third-party releases. *See New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart Convenience Stores, Inc.)*, 351 F.3d 86, 92 (2d Cir. 2003) (ruling that an exercise of § 105(a) power must "be tied to another Bankruptcy Code section and not merely to a general bankruptcy concept or objective"); *see, e.g.*, *Brown v. Viegelahn (In re Brown)*, 960 F.3d 711, 719–20 (5th Cir. 2020) (ruling that bankruptcy courts must link Section 105(a) with another provision of the Bankruptcy Code); *Bird v. Carl's Grocery Co. (In re NWFX, Inc.)*, 864 F.2d 593, 595 (8th Cir. 1989) (same); *Southern Ry. Co. v. Johnson Bronze Co.* (*In*

3958

*re Johnson Bronze Co.*), 758 F.2d 137, 141 (3d Cir. 1985) (same). Thus, at least one other provision of the Bankruptcy Code must provide the requisite statutory authority. Section 1123(b)(6) does.

As previously stated, 11 U.S.C. § 1123(b)(6) permits the inclusion of "any other appropriate provision" in a plan so long as it is "not inconsistent" with other sections of the Bankruptcy Code. In *United States v. Energy Resources Co., Inc.*, the Supreme Court held that this provision—acting in tandem with § 105(a)—grants bankruptcy courts a "*residual authority*" consistent with "the traditional understanding that bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships." 495 U.S. 545, 549, 110 S.Ct. 2139, 109 L.Ed.2d 580 (1990) (emphasis added).[18] Thus, in *Energy Resources*, the Court, relying on § 1123(b)(6), permitted bankruptcy courts "to approve reorganization plans designating tax payments as either trust fund or nontrust fund"—even absent express authorization from the Bankruptcy Code. *Id.* at 545, 110 S.Ct. 2139. Appellees, however, nevertheless argue that *Energy Resources* does not permit reliance on § 1123(b)(6) because the third-party releases at issue here are "not specifically authorized by the Code." Trustee Br. at 48. Appellees further maintain that *Energy Resources* only speaks to the ability of bankruptcy courts to modify "creditor-debtor" relationships, and that these releases go beyond such relationships. Trustee Br. at 54.

18      *Energy Resources* refers to 11 U.S.C. § 1123(b)(5). That provision was later recodified as § 1123(b)(6).

 **[26]**   **[27]**   We are not persuaded by Appellees' arguments. First, as the Court's language in *Energy Resources* indicates, **\*74** § 1123(b)(6) is limited only by what the Code expressly forbids, not what the Code explicitly allows. Second, and as the Seventh Circuit convincingly has held, bankruptcy courts' equitable powers under § 1123(b)(6) include the power "to release third parties from liability." *Airadigm Commc'ns, Inc. v. FEC* (*In re Airadigm Commc'ns, Inc.*), 519 F.3d 640, 657 (7th Cir. 2008). The Sixth Circuit has also ruled that the residual authority grounded in §§ 105(a) and 1123(b)(6) supports a bankruptcy court's power to impose third-party releases. *Class Five Nev. Claimants (00-2516) v. Dow Corning Corp.* (*In re Dow Corning Corp.*), 280 F.3d 648, 656–58 (6th Cir. 2002) (concluding that third-party releases can be appropriate, but that the factual findings presented did not support them). Although our case law has never expressly cited § 1123(b)(6) to support the imposition of third-party releases, we now explicitly agree with these Circuits and conclude that § 1123(b)(6), with § 105(a), permit bankruptcy courts' imposition of third-party releases.

Our sister circuits that have held that the Bankruptcy Code does not support the imposition of nonconsensual third-party releases rely upon the provisions limiting the discharge of debt under 11 U.S.C. § 524(e). *See Bank of N.Y. Tr. Co. v. Official Unsecured Creditors' Comm.* (*In re Pac. Lumber Co.*), 584 F.3d 229, 251–53 (5th Cir. 2009); *Resorts Int'l, Inc. v. Lowenschuss* (*In re Lowenschuss*), 67 F.3d 1394, 1401–02 (9th Cir. 1995); *Landsing Diversified Props.-II v. First Nat'l Bank and Tr. Co. of Tulsa* (*In re W. Real Estate Fund, Inc.*), 922 F.2d 592, 600–02 (10th Cir. 1990). Section 524(e) states that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e).

 **[28]**   This language assures that an entity also liable with a bankruptcy debtor for "such debt" remains liable notwithstanding the debtor's discharge of its obligation. For example, the entity might be jointly liable for the debt.

The circuits that have read § 524(e) as a bar to third-party releases have reasoned that "it is the debtor[ ] who has invoked and submitted to the bankruptcy process, that is entitled to its protections; Congress did not intend to extend such benefits to third-party bystanders." *In re W. Real Estate Fund, Inc.*, 922 F.2d at 600–02 (quoting 11 U.S.C. § 524(e)); *In re Pac. Lumber Co.*, 584 F.3d at 252 ("In a variety of contexts, this court has held that Section 524(e) only releases the debtor, not co-liable third parties. These cases seem broadly to foreclose non-consensual nondebtor releases and permanent injunctions." (internal citations omitted)); *In re Lowenschuss*, 67 F.3d at 1401 ("This court has repeatedly held, without exception, that § 524(e) precludes bankruptcy courts from discharging the liabilities of nondebtors.").

 **[29]**   In contrast to these holdings, we do not consider 11 U.S.C. § 524(e) to be a bar to such releases. As explained by the Seventh Circuit in *Airadigm*:

§ 524(e) does not purport to limit the bankruptcy court's powers to release a non-debtor from a creditor's claims. If Congress meant to include such a limit, it would have used the mandatory terms "shall" or "will" rather than the definitional term "does." And it would have omitted the prepositional phrase "on, or ... for, such debt," ensuring that the "discharge of a debt of the debtor *shall* not affect the liability of another entity"—whether related to a debt or not.

519 F.3d at 656. Moreover, "where Congress has limited the powers of the bankruptcy court, it has done so clearly—for **\*75** example, by expressly limiting the court's power ... or by creating requirements for plan confirmation." *Id.* (citing to 11 U.S.C. § 105(b) ("a court may not appoint a receiver in a case under this title") and 11 U.S.C. § 1129(a) ("The court shall confirm a plan only if the following requirements are met") as illustrative examples). Following this logic, we see no reason grounded in the text of the Bankruptcy Code to bar the inclusion of third-party releases in plans of reorganization.

2. Second Circuit Case Law

Despite the district court's pronouncement to the contrary, *Purdue II*, 635 B.R. at 89, this Court's precedents permit the imposition of nonconsensual third-party releases. Appellants uniformly agree that our precedents support the approval of a plan containing nonconsensual third-party releases. *See, e.g.*, AHC Br. at 18 ("This Court has held on multiple occasions that third-party releases are allowed in appropriate circumstances."); Debtors Br. at 32 ("For more than three decades, this Court has held that bankruptcy courts are authorized to enjoin and release third-party claims against non-debtors, as part of a plan of reorganization, in appropriate circumstances."). But Appellees contend that such releases are the equivalent of an inappropriate discharge, that this Circuit at no point has permitted the release of direct third-party claims in non-asbestos actions, and that no case supports a plan doing so here. Trustee Br. at 69–77; Canadian Creditors Br. at 27–35. That reading is incorrect in the face of our case law, most explicitly *Drexel*, where we concluded: "In bankruptcy cases, a court may enjoin a creditor from suing a third party, provided the injunction plays an important part in the debtor's reorganization plan." *In re Drexel Burnham Lambert Group, Inc.* ("*Drexel*"), 960 F.2d 285, 293 (2d Cir. 1992). Our opinions in *Manville I* and *Metromedia* further confirm that such releases are neither discharges nor allowable only in the context of asbestos cases.

*Manville I* stated that injunctive orders barring third-party claims are not necessarily impermissible discharges. 837 F.2d at 91. There, we were presented with a Chapter 11 bankruptcy plan that released over $2 billion in asbestos victims' claims against the insurers of Manville, a distributor of asbestos products. 837 F.2d at 90. While Manville was a debtor in the bankruptcy, its insurers were not. *Id.* at 91. Thus, to obtain the releases, the insurers paid Manville a $770 million settlement. *Id.* at 94. Before this Court, the appellant (a distributor of Manville's products) challenged the bankruptcy court's jurisdiction and authority by arguing that the third-party releases operated as a bankruptcy discharge that cannot be granted to non-debtors under the Bankruptcy Code. *Id.* at 91. We disagreed and ruled that the releases did not constitute a bankruptcy discharge because they (1) did not offer the umbrella protection of a discharge, and (2) did not extinguish the claims against the insurer, but rather "channeled" them "away from the insurers and redirected [them to] the proceeds of the settlement." *Id.* at 91. Moreover, the insurers' rights were "completely derivative of" and "inseparable from" the debtor's rights. *Id.* at 92–93. Thus, plaintiffs' released claims fell well-within the bankruptcy court's jurisdiction over the debtor's estate. *Id.*

 **[30]**   We also stated in *Manville I* that the bankruptcy court properly imposed the releases under the Bankruptcy Code. While the bankruptcy court primarily relied on § 363(f)—which permits channeling orders (the funneling of claims into one proceeding to preserve the debtors' estate) under certain circumstances applicable to *Manville I*—it also looked to § 105(a) for additional support. *Id.* at 93; *id.* at 94  **\*76**  (noting both statutory and equitable powers to dispose of the debtor's property free from third-party interests). Moreover, the releases there were "essential" to a "workable reorganization." *Id.* at 94. Thus, although *Manville I* was in the asbestos context, its premise that this Circuit permits third-party releases in bankruptcy still stands. *See In re Metromedia Fiber Network, Inc.* ("*Metromedia*"), 416 F.3d 136, 142 (2d Cir. 2005) (citing *Manville I*); *Drexel*, 960 F.2d at 293 (recognizing the propriety of third-party releases in a reorganization).

3960

Appellees argue, however, that it is significant that *Manville I*, unlike the current appeal, concerned asbestos products because the Bankruptcy Code now explicitly authorizes releases in such circumstances. Trustee Br. at 41–42. That is because in 1994 Congress enacted 11 U.S.C. § 524(g), which expressly allows for the injunction of third-party claims against non-debtors in "actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products." 11 U.S.C. § 524(g)(2)(B)(i)(I); *see* Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, 108 Stat. 4106 (1994). Thus, under Appellees' view, "[h]ad Congress intended to allow bankruptcy courts to adjust the relationship between non-debtors and other non-debtors in this manner, it would have said so expressly—as it did when it authorized narrow non-debtor releases in the context of bankruptcies involving asbestos." Trustee Br. at 3.

 [31]   The first blow to Appellees' restrictive reading of the statute comes from the text of the Bankruptcy Reform Act of 1994 itself, which states:

> RULE OF CONSTRUCTION.—Nothing in [the language since enacted as § 524(g)], shall be construed to modify, impair, or supersede any other authority the court has to issue injunctions in connection with an order confirming a plan of reorganization.

Pub. L. 103-394, § 111(b), 108 Stat. 4106, 4117 (1994). Thus, in enacting § 524(g), Congress expressly intended not to change the pre-existing powers of bankruptcy courts. Therefore, neither *Manville I* nor the subsequent adoption of § 524(g) supports a limitation of its reasoning to asbestos claims.

More importantly, this Court's opinion in *Metromedia* flatly rejects a restrictive interpretation of the Bankruptcy Code by stating that third-party releases can be valid outside of the asbestos context. 416 F.3d at 141. In that case, the debtor Metromedia's reorganization plan allowed certain non-debtor directors and officers of the company to "receive a full and complete release, waiver and discharge from ... any holder of a claim of any nature ... arising out of or in connection with any matter related to" Metromedia or its subsidiaries. *Id.* at 141 (alterations in original). Creditors challenged the imposition of these types of releases generally on statutory grounds, and specifically on equitable grounds. Although this Court ultimately rejected the imposition of the releases, we did so based on insufficient factual findings, *not* because we found that such releases could not ever be approved. *Id.* at 143.

Regarding the third-party releases themselves, the *Metromedia* court faced many of the same arguments we are presented with today. There, appellants had primarily contended that the non-debtor releases were unauthorized by the Bankruptcy Code, at least on the findings made by the bankruptcy court. *Id.* at 141. But in *Metromedia*, we did not accept those arguments. Instead, we noted that "[w]e have previously held that 'in bankruptcy cases, a court may enjoin a creditor from suing a third party, provided the injunction plays  **\*77**  an important part in the debtor's reorganization plan.' " *Id.* at 141 (alterations adopted) (quoting *Drexel*, 960 F.2d at 293); *see also Metromedia*, 416 F.3d at 141 ("it is clear that such a release is proper only in rare cases"). And, while we acknowledged that some circuits have permitted such releases only in the asbestos context, *id.*, we focused on the circumstances under which other circuits "have approved nondebtor releases," such as when: "the estate received substantial consideration," the plan channeled enjoined claims to a settlement fund as opposed to extinguishing them, "the enjoined claims would indirectly impact the debtor's reorganization" due to factors like indemnification, "the plan otherwise provided for the full payment of the enjoined claims," and affected creditors consent to such releases. *Id.* at 142. Following this review, we then articulated two requirements for the imposition of such releases in this Circuit. First, in order for the inclusion of a release to be approved, the release "*itself*" must be "important to the Plan." *Id.* at 143 (emphasis in the original). Second, the "breadth" of the release must also be "necessary to the Plan." *Id.*

Thus, while we ultimately ruled that the bankruptcy court's findings were insufficient for the imposition of releases under the facts of that case, *Metromedia* nevertheless rests upon the premise that such releases *may* be permitted so long as bankruptcy courts make sufficient factual findings and satisfy certain equitable considerations. *Id.* at 143.

For these reasons, our precedents permit the imposition of third-party releases *jointly* under 11 U.S.C. § 105(a) and 11 U.S.C. § 1123(b)(6).

**D. Factors Relevant to Releasing Direct Third-Party Claims Against Non-Debtors**

Having upheld the bankruptcy court's statutory authority and jurisdiction to impose such releases, we now turn to the circumstances under which releases may be approved. The Trustee appears to take issue with the fact that the Releases were approved despite their failing to satisfy certain factors stated in *Metromedia*. The Debtors, by contrast, contend that this is exactly the sort of case that epitomizes when third-party nonconsensual releases are proper because (1) the releases are essential to the confirmation of the Plan (including serving as its primary financing); (2) litigation of the settled claims would negatively impact the *res* of the Debtors' estates; (3) the bankruptcy court already narrowed the scope of the releases; and (4) this case is highly unusual and complex given the "inextricable interrelation between the claims against the Debtors and against the Sacklers," Debtors Br. at 65.

**[32]**    **[33]**    We now clarify any ambiguity and identify the factors that should be considered in order for a bankruptcy court to approve of nonconsensual third-party releases of direct claims against a non-debtor and to include them in a plan. In doing so, we remain conscious of the "heightened" "potential for abuse" posed by such releases, and our analysis of pertinent factors is informed by that risk.[19] *Metromedia*, 416 F.3d at 140. We wholeheartedly endorse the view that "third-party **\*78** releases are not a merit badge that somebody gets in return for making a positive contribution to a restructuring," nor are they "a participation trophy" or "gold star for doing a good job." *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 726–27 (Bankr. S.D.N.Y. 2019).

[19]    This Court has also observed that it is abusive for a bankruptcy court to enjoin third-party claims against a non-debtor based solely on the non-debtor's financial contribution to the estate. *Manville III*, 517 F.3d at 66. "It is ... precisely this conditioning of financial participation by non-debtors on releases that is subject to the sort of abuse foreseen in *Metromedia*." *Id.* (internal quotation marks omitted).

**[34]**    With that said, bankruptcy courts should look to the following seven factors before imposing nonconsensual third-party releases:

*First*, courts should consider whether there is an identity of interests between the debtors and released third parties, including indemnification relationships, "such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate." *Dow Corning*, 280 F.3d at 658; *see also In re Master Mortgage Investment Fund*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994) (same).[20] This requirement reflects our observation in *Metromedia* that nondebtor releases have been allowed in circumstances including those where "the enjoined claims would indirectly impact the debtor's reorganization by way of indemnity or contribution." *Metromedia*, 416 F.3d at 142 (internal quotation marks omitted).

[20]    The multifactor test articulated in *In re Master Mortgage Investment Fund* has been widely cited by courts in other circuits. *See, e.g., Monarch Life Ins. Co. v. Ropes & Gray*, 65 F.3d 973, 980 (1st Cir. 1995); *Gillman v. Continental Airlines* (*In re Cont'l Airlines*), 203 F.3d 203, 217 n.17 (3d Cir. 2000); *In re Chicago Invs., LLC*, 470 B.R. 32, 95 (Bankr. D. Mass. 2012); *In re U.S. Fidelis, Inc.*, 481 B.R. 503, 519 (Bankr. E.D. Mo. 2012).

*Second*, courts should consider whether claims against the debtor and nondebtor are factually and legally intertwined, including whether the debtors and the released parties share common defenses, insurance coverage, or levels of culpability. We note that although the bankruptcy court did not list this as a factor, it discussed that releases limited to those claims legally intertwined with the Debtors' conduct are appropriately subject to settlement. *Purdue I*, 633 B.R. at 104. We agree.

**[35]**    *Third*, courts should consider whether the scope of the releases is appropriate. This is the second factor evaluated in *Metromedia*. 416 F.3d at 143. In our view, a release is proper in scope when its "breadth" is "necessary to the Plan." *Id.*

*Fourth*, courts should consider whether the releases are essential to the reorganization, in that the debtor needs the claims to be settled in order for the *res* to be allocated, rather than because the released party is somehow manipulating the process to its own advantage. In other words, it must be the case that, without the releases, "there is little likelihood of [a plan's] success."

3962

*Master Mortg. Inv. Fund*, 168 B.R. at 935. This factor also reflects the first factor required by *Metromedia*—that the release be important to the plan. 416 F.3d at 143.

*Fifth*, courts should consider whether the non-debtor contributed substantial assets to the reorganization. This factor was mentioned by this Court in *Metromedia*, 416 F.3d at 142–43, and is emphasized in *Dow Corning*, 280 F.3d at 658, and *Master Mortgage Investment Fund*, 168 B.R. at 935.

 **[36]**   *Sixth*, courts should consider whether the impacted class of creditors "overwhelmingly" voted in support of the plan with the releases. *Master Mortg. Inv. Fund*, 168 B.R. at 935. A reference point to define "overwhelmingly" can be found in 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb), which requires approval by a minimum of 75% of voting creditors in favor of the plan. However, we consider that threshold to be the  **\*79**  bare minimum, and instead express approval for requiring overwhelming approval of the plan.

 **[37]**   *Seventh*, and finally, courts should consider whether the plan provides for the fair payment of enjoined claims. In *Metromedia*, we noted that other courts have found such releases permissible when "the plan ... provided for the full payment of the enjoined claims." 416 F.3d at 142; *see also Dow Corning*, 280 F.3d at 658 (requiring that "[t]he plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction"). While the full payment of the enjoined claims would of course tend to favor the approval of a plan containing such releases, we are concerned with the fairness of the payment, as opposed to the final amount of payment. Because the amount of the payment does not necessarily indicate its fairness, the determinative question is not whether there is full payment, but rather whether the contributed sum permits the fair resolution of the enjoined claims.

 **[38]**    **[39]**   Although consideration of each factor is required, it is not necessarily sufficient—there may even be cases in which all factors are present, but the inclusion of third-party releases in a plan of reorganization should not be approved. Further, as contemplated by *Dow Corning*, the bankruptcy court is required to support each of these factors with specific and detailed findings. 280 F.3d at 658. For the bankruptcy court to make such findings, extensive discovery into the facts surrounding the claims against the released parties will most often be required.

 **[40]**    **[41]**   Finally, as with any term in a bankruptcy plan, a provision imposing releases of claims like that at issue here must be imposed against a backdrop of equity. *See Energy Resources*, 495 U.S. at 549, 110 S.Ct. 2139 (describing the authority conferred by § 1123(b)(6) as deriving from bankruptcy courts' status as "courts of equity"); *see also Adelphia Bus. Sols., Inc. v. Abnos*, 482 F.3d 602, 609 (2d Cir. 2007) ("Section 105(a) grants broad equitable power to the bankruptcy courts to carry out the provisions of the Bankruptcy Code so long as that power is exercised within the confines of the Bankruptcy Code."). Given the potential for abuse, courts should exercise particular care when evaluating these types of releases.

### E. Application of These Factors Based Upon the Bankruptcy Court's Findings

 **[42]**   In light of these factors, we now evaluate the bankruptcy court's findings supporting its approval of the Plan. The thorough bankruptcy court opinion, which indicated that it grounded its findings in the tens of millions of documents produced in discovery, informs our analysis.[21]

[21]   The extensive discovery provided by the parties is exactly the sort that bankruptcy courts should expect when permitting broad third-party releases.

Factor 1. Identity of Interests Between Debtors and Released Parties

We have described *supra* the identity of interests between the Debtors and those Sacklers named as defendants in the litigations, chiefly that the named Sacklers were directors and officers of the Debtors. Purdue was a closely held corporation, and, according to the bankruptcy court, the record tended to show that the Sacklers "took a major role in corporate decision-making, including

Purdue's practices regarding its opioid products that was more akin to the role of senior management." *Purdue I,* 633 B.R. at 93. This overlap constitutes a sufficient **\*80** identity of interests between the Debtors and the Sacklers.

Factor 2. Factual and Legal Overlap Between Claims Against Debtors and Settled Third-Party Claims

In the prior sections, we also discussed the factually and legally intertwined nature of the claims against both the Debtors and the Sacklers. More importantly, the bankruptcy court required that the releases only "apply where ... a debtor's conduct or the claims asserted against it [are] a legal cause or a legally relevant factor to the cause of action against the shareholder released party," Deferred Joint App'x at 1330–31, and the released claims directly affect the *res, Purdue I,* 633 B.R. at 97–98. *Cf. Metromedia,* 416 F.3d at 141 (ruling that factual circumstances and equitable considerations did not support a broad release that included the "waiver and discharge from ... *any* holder of a claim of *any* nature ... of *any and all* claims ... arising out of or in connection with *any matter* related to [the Debtor] or one or more subsidiaries ... based in whole or in part upon *any act* or omission or transaction" (alterations in original, emphasis added)). By so narrowing the Releases, the bankruptcy court ensured sufficient overlap between claims against the Debtors and the settled third-party claims.

Factors 3. and 4. The Releases are Essential to the Reorganization & Proper in Scope

We next evaluate, in tandem with our analysis of the Releases' scope, whether the Releases are essential to reorganization.[22] *See Metromedia,* 416 F.3d at 143. The Releases are essential to reorganization for two reasons. First and foremost, as described *supra,* the Releases are required to ensure that the valuation of the *res* is settled. Otherwise, the Debtors would, in all likelihood, be required to litigate indemnity and contribution claims brought against them by the Sacklers, which would likely deplete the *res,* no matter the ultimate outcome of those claims. The bankruptcy court limited the Releases extensively in order not to exceed its jurisdiction, restricting their scope to ensure that the released claims related to the Debtors' conduct and the Estate. Second, the *res* itself amounted to only approximately $1.8 billion. Without the Plan, the government would recover its $2 billion first, thereby depleting the *res* completely. As a result, many victims of the opioid crisis would go without any assistance and face an uphill battle of litigation (in which a single claimant might disproportionately recover) without fair distribution.

[22]      Although we describe these as two separate factors, following *Metromedia,* we analyze them together in this case because the two factors are interrelated. We nevertheless acknowledge that a case with a different factual record might require them to be considered separately.

 **[43]    [44]**    On the question of what is essential to the Plan, the Trustee argues that the Sacklers themselves created the conditions that make these releases essential, and that, as a term of their contribution, the Sacklers had insisted upon these releases before the Debtors even entered bankruptcy. Per the Trustee, these facts demonstrate the Sacklers' unworthiness of receiving the benefit of the releases. First, we are not called upon to determine whether the Sacklers are worthy of receiving the benefit of the releases. As noted *supra,* the various equities of the Plan were carefully considered by the bankruptcy court. However, to the extent that there is a fear that this opinion could be read as a blueprint for how individuals can obtain third-party releases in the face of a tsunami **\*81** of litigation, we caution that the key fact regarding the indemnity agreements at issue is that they were entered into by the end of 2004—well before the contemplation of bankruptcy. Acts taken " 'in contemplation of' bankruptcy ha[ve] long been, and continue[ ] to be, associated with abusive conduct." *Milavetz, Gallop & Milavetz, P.A. v. United States,* 559 U.S. 229, 240, 130 S.Ct. 1324, 176 L.Ed.2d 79 (2010). We would be far less persuaded if the party seeking to be released entered into this type of indemnity agreement in contemplation of such a third-party release in bankruptcy. Of course, this similar restriction falls in line with our decision in *Manville I,* where we approved of releases in favor of insurance companies. 837 F.2d at 90. Similarly, in that action, there was no suggestion that the insurance policies were taken out in contemplation of bankruptcy. *See id.* at 90–91.

3964

**[45]**   As our precedents have suggested, and as we make clear today, if the only reason for the inclusion of a release is the non-debtor's financial contribution to a restructuring plan, then the release is not essential to the bankruptcy. *See Manville III,* 517 F.3d at 66 (cautioning against this type of situation as abusive). But that is not the present case. Here, the Releases are both needed for the distribution of the *res* and to ensure the fair distribution of any recovery for claimants. Thus, we deem the scope of the Releases—as limited by the bankruptcy court—appropriate and the Releases essential to the reorganization.

Factor 5. Substantial Contribution to the Reorganization

When evaluating the substantial nature of the released parties' contribution, our primary focus is on the impact of the financial contribution. The bankruptcy court found the financial contribution by the Sacklers, which totaled approximately $4.325 billion, to be substantial and of course did not change its mind when the Sacklers agreed, after the initial approval of the Plan and during the pendency of this appeal, to increase their contribution to make the settlement equal approximately $5.5-6.0 billion. Order Pursuant to 11 U.S.C. §§ 105 and 363(b) Authorizing and Approving Settlement Term Sheet, *In re Purdue Pharma L.P.*, No. 19-23649-shl (Bankr. S.D.N.Y. Mar. 10, 2022), ECF No. 4503. The bankruptcy court stated its belief that this is one of the largest contributions to bankruptcy anywhere in the country. *Purdue I,* 633 B.R. at 107; *cf. In re Mallinckrodt PLC,* 639 B.R. 837, 852 (Bankr. D. Del. 2022) (approving of bankruptcy plan with releases where the non-debtor third-party contributed $1.6 billion).

**[46]**   The Trustee primarily argues that the Plan is inequitable because it improperly provides a *quid pro quo* to the Debtors, and that if the Sacklers had declared bankruptcy, under the Bankruptcy Code they would have had to dedicate substantially all of their net worth (an estimated $11 billion) to the Estate—well more than the approximately $5.5-6.0 billion they have agreed at this point to fund.[23] It is not for this Court to determine whether a greater contribution from the Sacklers would be desirable, but rather our role is simply to decide whether the bankruptcy court erred in finding the Sacklers' contribution substantial. It did not. Five and a half billion dollars—purportedly the largest contribution in history for such releases—is a significant sum.

[23]    At oral argument, answering a question from the Court, the Trustee conceded that it would oppose the releases even if the Sacklers contributed $10 billion. Oral Arg. Hr'g at 1:27:45–58.

**\*82**   Factor 6. Overwhelming Approval by Creditors

The claimants voted overwhelmingly to approve the Plan. Over 95% of the personal injury classes voted to accept the plan, which is well above the 75% benchmark. Moreover, with the Nine no longer pursuing their objection, the main challenge to this appeal is not by creditors, but by the Trustee—a government entity without a financial stake in the litigation.

Factor 7. Fair Payment of Enjoined Claims

Finally, the Plan provides for the fair payment of claims. As Appellees concede, the valuation of the claims—estimated at $40 trillion—far exceeds the total funds available, as well as the Sacklers' personal wealth. The bankruptcy court also acknowledged that although "in a vacuum the ultimate judgments that could be achieved on the estates' claims (and the closely related third-party claims that are being settled under the plan) might well be higher than" the Sacklers' contribution to the plan, "the vast size of the claims against the Debtors and the vast number of claimants creates the need for the plan's intricate settlements." *Purdue I,* 633 B.R. at 93. Thus, as it is not possible to require the full payment of all claims, we do prioritize fair allocation over the full payment of any one claim. The Trustee has not alleged any unequal treatment of claimants, and no party gives us reason to disturb the bankruptcy court's findings that the settlements and allocations were "fair and equitable." *Purdue I,* 633 B.R. at 84 (internal quotation marks omitted).

\* \* \*

3965

For the reasons stated, the bankruptcy court's detailed findings support approval of the Plan under each of the seven factors that we announce in this opinion. We would also note the additional concessions made by the Sacklers—including governance requirements, abatement trusts, the public document archive, and divestment of the Sacklers from the opioid business worldwide —contribute to the Plan's equity. *Purdue I*, 633 B.R. at 107. We therefore find no error with the bankruptcy court's weighing of the equitable considerations.

### III. Due Process

[47]   Although the bankruptcy court found that there was adequate notice to impose the releases,[24] on appeal, the Trustee asserts that the releases in this action did not comply with due process. We, however, find no due process violation.

[24]    The district court did not reach this issue.

[48]    [49]   A procedural due process claim entails a two-part inquiry: whether claimants were deprived of a protected interest and, if so, whether claimants received adequate notice and a meaningful opportunity to be heard. *Spinelli v. City of New York*, 579 F.3d 160, 168 (2d Cir. 2009). The releases extinguish causes of action, which, as the parties impliedly concede, are a constitutionally protected property interest. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982) ("a cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause"); *Rosu v. City of New York*, 742 F.3d 523, 526 (2d Cir. 2014) ("[T]he cause of action itself constitutes a cognizable property interest."). Thus, the only remaining question is whether claimants lacked adequate notice or a meaningful opportunity to be heard. *Spinelli*, 579 F.3d at 168.[25]

[25]    In this respect, the Trustee is correct that the Release "permanently extinguish[es] virtually all opioid-related claims against the Sacklers and other non-debtors without the consent of every affected claimant." Trustee Br. at 50. Certainly, that aspect of the Release raises due process concerns—but it does not resolve them. "Once due process is triggered, the question becomes what process is due." *In Matter of Motors Liquidation Co.*, 829 F.3d 135, 158 (2d Cir. 2016). The Trustee's focus on the effect of the Release only gets it so far.

*83 [50]    [51]   The Trustee argues that there was a denial of due process because the bankruptcy court failed to provide adequate notice of the confirmation hearing and because the language of the Release is dense. "Due process requires notice reasonably calculated ... to apprise interested parties of the pendency of the action." *Burda Media, Inc. v. Viertel*, 417 F.3d 292, 303 (2d Cir. 2005) (alteration in original, internal quotation marks omitted). "There is no rigid formula as to the kind of notice that must be given; notice required will vary with circumstances and conditions." *Baker v. Latham Sparrowbush Assocs.*, 72 F.3d 246, 254 (2d Cir. 1995) (internal quotation marks omitted). Here, the bankruptcy court made detailed findings that notice of the confirmation hearing was widespread through a variety of media and that direct notice was provided to any creditors of the Debtors (potential claimants here). The bankruptcy court further observed that although legal training may have been helpful to understanding the initial wording of the releases, the narrowed releases were written more clearly and in "simple ... plain English." *Purdue I*, 633 B.R. at 60. The Trustee has given no reason to consider such findings error. *See also Mallinckrodt*, 639 B.R. at 876–77 (rejecting similar arguments by the Trustee because of the extensive notice, the representation of the victims by a UCC, the lack of a deadline on claims that can access the opioid trusts, and the fact that the court considered those who might not have received or understood notice). Moreover, the bankruptcy court gave process—*i.e.*, meaningful opportunity to be heard—at the confirmation hearing, which lasted for six days.

[52]    [53]   The Trustee also questions whether such a release, without an ability to opt-out, can comply with due process because it effectively denies claimants their day in court. But, again, the Due Process Clause does not absolutely protect against the deprivation of property; it instead ensures that a deprivation does not occur without due process. In bankruptcy, the sufficiency of process turns on the adequacy of notice and a meaningful opportunity to be heard, both of which, as explained above, occurred here.[26] The Trustee's argument would essentially call into question all releases through bankruptcy, including bankruptcy discharges (which are one of the most important features of bankruptcy). We decline to so undermine such a critical

3966

component of bankruptcy. As described *supra*, the bankruptcy court here acted within its jurisdiction over the bankruptcy estate —even if the third-party claims were not actually the property of the estate—and therefore did not violate due process.

26        Whatever other constitutional concerns might be raised by the extinguishing of state law claims in bankruptcy, the parties have not argued them here.

\* \* \*

In sum, we reverse the district court's holding that the bankruptcy court lacked the authority to approve the Plan that included the nonconsensual third-party releases. We instead hold that the bankruptcy court properly approved the Plan and made the requisite detailed factual findings to approve of the Shareholder Releases.

### *84  IV. The Canadian Creditors' Foreign Sovereign Immunity Act Claim

 [54]   The Canadian Creditors raise various arguments based upon their contention that Section 10.7(b) of the Plan imposes liability personal to the Canadian Creditors in a manner that violates their sovereign immunity.

 [55]   As a threshold matter, it is not clear that sovereign immunity is even implicated by the releases. To the contrary, at least in the context of discharging claims against a debtor, "[a] debtor does not seek monetary damages or any affirmative relief from a State by seeking to discharge a debt; nor does he subject an unwilling State to a coercive judicial process. He seeks only a discharge of his debts." *Tenn. Student Assistance Corp. v. Hood*, 541 U.S. 440, 450, 124 S.Ct. 1905, 158 L.Ed.2d 764 (2004). The releases here do not require a suit to be maintained against the Canadian Creditors. Nor do they seek to impose personal liability on the Canadian Creditors. The Canadian Creditors also cannot be described as unwilling with regard to this judicial process, in which they have fully and voluntarily participated. *S.G. Phillips Constructors, Inc. v. City of Burlington* (*In re S.G. Phillips Constructors, Inc.*), 45 F.3d 702, 707 (2d Cir. 1995) ("The Supreme Court and this court have consistently held that in filing a proof of claim the petitioner submits to the bankruptcy court's equitable jurisdiction."). Moreover, the Foreign Sovereign Immunities Act also does not protect the Canadian municipalities because 28 U.S.C. § 1605(a)(1) provides that a foreign state will not be immune from jurisdiction of the courts where the foreign state has waived its immunity either explicitly or by implication. For these reasons, we find that the Plan does not violate the sovereign immunity of the Canadian Creditors.

### V. The Cross-Appeal

 [56]   The bankruptcy court and the district court both determined that the Plan properly differentiated the Canadian objectors' claims from their domestic counterparts. The Canadian Creditors contend it is inequitable that they do not have access to the abatement trusts, but domestic creditors do. Thus, in their view, because § 1129(a)(1) requires equal treatment, the Plan fails. We do not find those arguments persuasive and affirm the district court.

 [57]    [58]  Section 1123(a)(1) provides that "[n]otwithstanding any otherwise applicable non-bankruptcy law, a plan shall designate, subject to section 1122 of this title, classes of claims." 11 U.S.C. § 1123(a)(1). Under 11 U.S.C. § 1122(a), plans may classify claims in a particular class so long as those claims are "substantially similar to the other claims or interests of such class." Yet, the statute itself "does not explicitly address whether similar claims *must* be placed in the same class." *Boston Post Rd. Ltd. P'Ship v. FDIC* (*In re Boston Post Rd. Ltd. P'ship*), 21 F.3d 477, 481 (2d Cir. 1994). Looking to other circuits, which "have generally held that separate classification of similar claims is permissible only upon proof of a legitimate reason for separate classification, and that separate classification to gerrymander an affirmative vote is impermissible," *id.*, this Court has held that "similar claims may not be separately classified solely to engineer an assenting impaired class," *id.* at 482. Instead, the separation of similar claims can only be justified by a legitimate reason. *Id.* at 483; *see also In re W.R. Grace & Co.*, 729 F.3d 311, 329 (3d Cir. 2013) (ruling that the separate classification of Canadian claims is appropriate because the "Canadian and U.S. property damage claimants ... operate  *85  under separate tort regimes[ ] and reached separate settlement agreements"); *Dow Corning*, 280 F.3d at 662 (approving the separate classification of foreign claims because "the bankruptcy court determined that the evidence supported the factual assumptions upon which the classifications are based," including clear expert witness

testimony about tort recovery in other nations). Here, both the bankruptcy court and the district court found that the claims were properly differentiated in the Plan because the claims are subject to different regulatory regimes that result in different types of recovery and the Canadian creditors did not participate in the mediation allocation. *Purdue I*, 633 B.R. at 70; *Purdue II*, 635 B.R. at 117.

The Cross-Appellants argue regulatory differences do not suffice to account for the different classification. However, we see no reason to disturb the conclusions of the bankruptcy court and the district court. There are substantive differences among the claims, including both the types of claims and elements of causes of action. Moreover, the Canadian objectors have another source of recovery: Purdue Canada.[27] We believe those reasons alone provide enough support to differentiate the claims, and thus to affirm the district court's holding on the cross-appeal.

[27]    Of note, Purdue Canada reached a separate settlement of $150 million. *See Settlement reached with Purdue Pharma (Canada) for opioid damages*, British Columbia Government News (June 29, 2022), https://news.gov.bc.ca/releases/2022AG0044-001031.

**CONCLUSION**

For the reasons set forth above, we **REVERSE** the district court's order holding that the Bankruptcy Code does not permit nonconsensual third-party releases of direct claims, and **AFFIRM** the bankruptcy court's approval of the Plan, including the modification made on March 10, 2022, and the case is **REMANDED** to the district court for such further proceedings as may be required, consistent with this opinion. We also **AFFIRM** the district court's denial of the Canadian Creditors' cross-appeal.

Judge Wesley concurs in the judgment in a separate opinion.

Richard C. Wesley, Circuit Judge, concurring in the judgment:
Does a bankruptcy court have the power to release direct or particularized claims asserted by third parties against nondebtors without the third parties' consent? Yes—this Court said so in *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992). *Drexel* has not been overruled either by the Supreme Court or by this Court sitting *en banc*. It is binding. Consequently, although the parties have sacrificed a forest on the matter—and rightly so, weighty as it is—that ship has, for better or worse, sailed. I therefore reluctantly concur with the majority's conclusion that a bankruptcy court has the authority to approve a Chapter 11 reorganization plan that includes nonconsensual nondebtor releases. Again: *Drexel* says so.

That said, neither *Drexel*, nor our subsequent discussion of nonconsensual nondebtor releases in *Metromedia*, traces that power back to any provision of the Bankruptcy Code. *See In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005). In fact, although *Metromedia* acknowledged that *Drexel* had already crossed the bridge, it also appreciated its questionable structure, and was wary to traverse it once more. To the point, Judge Jacobs carefully explained "the reluctance to approve nondebtor releases," and cautioned **\*86** that nowhere—apart from asbestos-related bankruptcies—does the Code authorize them. *See id.* The majority concedes as much; it recognizes that "whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code." *Law v. Siegel*, 571 U.S. 415, 421, 134 S.Ct. 1188, 188 L.Ed.2d 146 (2014). Today, it fills that gap with §§ 105 and 1123(b)(6).

Those provisions of the Bankruptcy Code say nothing about nondebtor releases, and I am not convinced that statutory footing is up to the task. Accordingly, although mindful that, for this Court, the issue has already been settled (albeit without any basis in the Code), I write separately to highlight my concerns.

Those concerns are, in brief: extinguishing direct, particularized claims against nondebtors without the claimholder's consent, and without compensating the claimholder, is an extraordinarily powerful tool for a bankruptcy court to wield—indeed, for any court to wield. Congress once before provided clarity on the propriety of third-party releases in bankruptcy. It could do so again,

3968

but, since 1994, has not. Absent any movement on that front, the question, which has divided the courts of appeals for decades, would benefit from nationwide resolution by the Supreme Court. In that event, a uniform view of the problem would emerge.

## I

The majority's overview of the facts, procedural history, and opinions below, is thorough and well stated. For present purposes, it is sufficient to emphasize exactly what the Shareholder Release[1] purports to do.

[1]   Defined terms here coincide with the those in the majority opinion.

Prior to Purdue's Chapter 11 filing, widespread efforts to hold Purdue legally accountable for its role in the opioid epidemic eventually revealed, at least in the eyes of countless plaintiffs, that certain members of the Sackler family were heavily involved with unlawful efforts to boost Purdue's opioid sales. *See In re Purdue Pharma, L.P.* ("*Purdue II*"), 635 B.R. 26, 50–51 (S.D.N.Y. 2021). Seeking to hold the Sackler family members directly liable for their part in perpetuating the opioid epidemic, both private litigants as well as state Attorneys General turned to various state statutes, including consumer protection laws, which, notwithstanding considerable factual overlap with allegations of corporate liability, impose a separate and independent duty on individuals who, by virtue of their role as either officer, manager, or director of a corporation, personally participated in corporate wrongdoing. *See id.* As Judge McMahon aptly put it:

> [I]t is undisputed that these laws impose liability, and even penalties, on such persons independent of any corporate liability (or lack of same), and independent of any claim the corporation could assert against them for faithless service as a result of those same acts.

*Id.* at 91. These claims "arise out of the Sacklers' own conduct." *Id.*

The Shareholder Release forever halts those proceedings in their tracks. It permanently enjoins the private and state litigants, as well as all future plaintiffs, from pursuing those claims against the Sacklers—indeed, any claim "of any kind, character[,] or nature whatsoever, Special App'x 798—so long as the Debtors' "conduct, omission, or liability" is "the legal cause or is otherwise a legally relevant factor."[2] *Id.* at 920. No carveout exists for claims based on fraud—claims from which **\*87** a debtor *could not* seek a discharge under the Code. *See* 11 U.S.C. § 523(a)(2)(A); *see also Archer v. Warner*, 538 U.S. 314, 321, 123 S.Ct. 1462, 155 L.Ed.2d 454 (2003) ("[The Code] ensure[s] that all debts arising out of fraud are excepted from discharge no matter their form." (quotation omitted)). Appellants seek a release broader than that which Congress decided was wise to make available to a debtor in bankruptcy.

[2]   The limiting effect of the "legally relevant" requirement is elusive, and its precise reach has, understandably, not been articulated either by the parties, the bankruptcy court, or the majority. Their failure to do so is no fault of their own; it is difficult to predict the various claims which might be asserted directly against the Sacklers, and future litigation will determine whether any given claim falls within the provision. Still, one can envision an exceedingly broad understanding of "legal relevance," and I, for one, am skeptical of the requirement's limiting effect. To illustrate, at issue in *Manville III* were direct claims against Manville's primary insurer alleging that the insurer violated purported state-imposed duties to disclose certain asbestos-related information it learned from Manville. *See In re Johns-Manville Corp.* ("*Manville III*"), 517 F.3d 52, 66 (2d Cir. 2008) *rev'd and remanded on other grounds sub nom. Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 129 S.Ct. 2195, 174 L.Ed.2d 99 (2009). We held that notwithstanding the factual overlap of those claims with claims which might be asserted against Manville, or by Manville against the insurer, the bankruptcy court was without jurisdiction to release the direct claims against the insurer. *See id.* As to those direct claims, Manville's "conduct" or "omission" might be described as legally relevant: they were based on what the insurer learned *from Manville*. I am concerned that "legal relevance" might release claims mirroring those which we have previously held did not fall within bankruptcy jurisdiction.

On top of that, the Release does not "channel[ ]" the enjoined claims "to a settlement fund" for compensation, *Metromedia*, 416 F.3d at 142, but instead mandates that any value paid to personal injury claimants regarding, for example, the opioid-related death of another person, be based only upon claims "held against the Debtors, and not to any associated ... Channeled Claim

3969

against a non-Debtor party." Special App'x 634, 693, 734–35. In other words, the value of a channeled claim is only the value of claims against the estate.[3]

[3]   Consider this example. Someone has a claim against only Purdue and it's worth $100,000. They file a proof of claim and receive a check for some percentage of that claim. Another person has the same claim for the same amount, *and* a direct claim against the Sacklers worth another $100,000. Under the Plan, that party receives only the same amount as the first claimant; they receive no payout on their direct claim against the Sacklers, even though the Sacklers are released from that claim.

This aspect of the Release substantially broadens its reach as compared with the release approved in *Manville I*. *See MacArthur Co. v. Johns-Manville Corp.* ("*Manville I*"), 837 F.2d 89 (2d Cir. 1988). There, we rejected the notion that a release constituted a bankruptcy discharge because the released claims were not extinguished, but were "channeled away from the insurers and redirected at the proceeds of the settlement." *Id.* at 91. Here, the Plan expressly disallows value being paid based on claims against nondebtors, that is, the Sacklers.[4] *Manville I* therefore does not lay the groundwork for the Release's approval.

[4]   Appellants dispute that characterization; they point to the Plan's language that any distribution "is deemed to be a distribution in satisfaction of all [personal injury] Channeled Claims," and argue that payments from the personal injury trust is in satisfaction of claims both against the Debtors and Sacklers. Mortimer Side Br. at 49 (quoting Special App'x 693). Yet simply stating as much does not make it so where, as here, the amount of distribution is based only upon claims as against the Debtors.

Finally, the Release is non-consensual; it binds consenting and objecting parties, **\*88**  without providing an opt-out option to those who object.

In summary, the Release enjoins a broader swath of claims than a debtor himself could seek to discharge under the Bankruptcy Code, and it does so without providing any compensation to the claimholders, who must abide by its terms whether they like it or not. The Release encompasses a potentially wide range of claims and cloaks the Sacklers with blanket immunity. It is "in effect ... a [ ] discharge." *Metromedia*, 416 F.3d at 142.

In exchange, the Sacklers have agreed, under the Plan, to offer a substantial sum of money to the Debtors' estate.[5] No doubt, those funds help make possible (a) a more meaningful distribution of the Debtors' estate to its creditors and (b) recovery for those who hold claims against the Debtors. It is equally apparent that the Sacklers mean what they've said: no release, no money. However, our task today is not to decide whether, as a policy matter, the Release is justified. Instead, without ignoring that the Sacklers' substantial contribution will likely play a meaningful role in providing some measure of finality to the countless families who have suffered as a result of the opioid crisis, the dispositive question is whether, under the Bankruptcy Code, a bankruptcy court is authorized to approve the Release.[6]

[5]   Again, however, their contribution is not directed at the satisfaction of third parties' direct claims against them in their individual capacity, but, instead, at the satisfaction of either claims against the Debtors, or claims held by the estate against the Sacklers. As to the latter set of claims, the Sacklers have, in essence, settled derivative claims belonging to the estate and, in return, received a release not just from those derivative claims, but also from claims independently held by third parties.

[6]   Of course, the majority correctly recognizes that the antecedent question to the statutory authority analysis is whether the bankruptcy court had jurisdiction under the Code to approve the Release. I do not dispute its conclusion that it did; it is settled law in this Circuit that a bankruptcy court has broad "related to" jurisdiction over any civil proceedings that "might have any conceivable effect" on the estate. *See SPV OSUS Ltd. v. UBS AG*, 882 F.3d 333, 339–40 (2d Cir. 2018). In the easy case, that effect can be direct, as it was in *Manville I*. There, the claims asserted against the insurer sought recovery from the *res* itself. *See Manville I*, 837 F.2d at 93. The bankruptcy court had jurisdiction to prevent the third party from "collect[ing] out of the proceeds of Manville's insurance policies...." *Id.* In the harder case, the effect is less direct. In *SPV*, for example, the plaintiffs asserted direct claims against, among other defendants, UBS AG, alleging principally that UBS had aided and abetted the infamous fraud perpetrated by the debtor, Bernard L. Madoff Investment Securities LLC. *See SPV*, 882 F.3d at 338. Although the plaintiffs sought recovery from UBS itself, UBS, in turn, had viable claims for indemnification and contribution against the debtor. *See id.* at 340–42. The possibility that those claims might succeed—and the fact that the debtor would incur expense in litigating such claims—was enough to confer jurisdiction on

3970

the bankruptcy court to enjoin the plaintiff's direct claims against UBS. *See id.* at 341–42. This case looks more like *SPV*, and the majority's explanation as to how the direct claims against the Sacklers might affect the Debtors' estate is sound.

## II

The Bankruptcy Code is silent on the matter. That is no surprise. Bankruptcy is the "subject of the relations between a[ ] ... debtor[ ] and his creditors, extending to his and their relief." *Wright v. Union Cent. Life Ins. Co.*, 304 U.S. 502, 513–14, 58 S.Ct. 1025, 82 L.Ed. 1490 (1938). To that end, Congress created a "comprehensive federal system ... to govern the orderly conduct of debtors' affairs and creditors' rights." *Eastern Equip. & Servs. Corp. v. Factory Point Nat'l Bank*, 236 F.3d 117, 120 (2d Cir. 2001). In short, the Bankruptcy Code's central focus is on the **\*89** adjustment of the debtor-creditor relationship. Of course, that adjustment can implicate the interests of third-party nondebtors.[7] But as to their own independent obligations, third-party nondebtors are, simply, a nonconcern.

[7]    For example, the automatic stay triggered by a debtor's bankruptcy filing can apply to nondebtors in certain circumstances. *See, e.g.*, *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287 (2d Cir. 2003).

Against that backdrop, there is little to glean from Congressional silence where, as Judge McMahon put it, "one would not expect Congress to speak." *Purdue II*, 635 B.R. at 110. Appellants ask us to accept the remarkable premise that Congress, while believing it wise to except certain claims (*i.e.*, claims for fraud) from a debtor's discharge, took no issue with the idea that such claims could be effectively discharged for nondebtors, who might contribute funds to settle claims against the *debtor*, but who would face *no* consequences from their own, independent liability—even though state laws mandate otherwise. Not only that, appellants ask us to ground this grant of authority in congressional silence, as, again, the Bankruptcy Code does not expressly authorize the practice.

And yet that silence is, effectively, what the majority sees as granting the bankruptcy court a power that is nothing short of extraordinary. It points to 11 U.S.C. § 1123(b)(6), which it says encompasses a bankruptcy court's residual equitable authority, and empowers a bankruptcy court to do all but that which the Code expressly forbids. Maj. Op. at 73–74.[8]

[8]    The majority recognizes that the Release cannot be justified solely by § 105. *See Metromedia*, 416 F.3d at 142 ("Any power that a judge enjoys under § 105 must derive ultimately from some other provision of the Bankruptcy Code." (internal citation omitted)). In other words, the Release turns on § 1123(b)(6). I focus my analysis there.

To be sure, the Court in *Energy Resources* characterized § 1123(b)(6) as Congress's recognition of a bankruptcy court's residual equitable authority. But it did so in connection with its observation that "bankruptcy courts, as courts of equity, have broad authority to modify *creditor-debtor relationships*." *United States v. Energy Resources Co., Inc.*, 495 U.S. 545, 549, 110 S.Ct. 2139, 109 L.Ed.2d 580 (1990) (emphasis added). That case concerned whether a *debtor's* tax liabilities could be satisfied in an order as determined by the bankruptcy court, over the objection of the Internal Revenue Service. Nothing in *Energy Resources* suggests that within § 1123(b)(6)'s equitable repository is the power to extinguish an individual's claims against a nondebtor without their consent, and without providing them any value in return. Indeed, that case says nothing about a nondebtor's obligations under the Bankruptcy Code whatsoever.

Instead, *Energy Resources* reminds us that bankruptcy courts are courts of equity, and that their ability to carry out the Code's provisions must be understood with that principle in mind. But it does not answer whether under that umbrella of equitable authority exists the power to release, on a nonconsensual basis, nondebtors from direct claims held by third parties. Nor does *Energy Resources* suggest that a bankruptcy court's well of residual equitable authority, so long as it does not run up against a more specific provision of the Code, is bottomless.

Again: that case concerned the adjustment of a creditor-debtor relationship, which, as provided above, is a bankruptcy court's *raison d'etre*. Courts should understand any congressional grant of equitable **\*90** authority to the bankruptcy court with that

principal purpose in mind. Releasing nondebtors from their own liability—provided for under state law—over the objection of a claimholder and without compensating that claimholder is so far afield from that purpose that plugging-and-playing *Energy Resources*' description of § 1123(b)(6) can't be right.[9]

[9]    The decisions from our sister circuits cited by the majority are no more persuasive. Those decisions also rely on *Energy Resources*' characterization of § 1123(b)(6). *See, e.g., In re Airadigm Commc'ns, Inc.*, 519 F.3d 640, 657 (7th Cir. 2008). In any event, in *Airadigm* itself, the release did not cover, as the Release here does, claims for willful misconduct, a fact emphasized by the Seventh Circuit as justifying its confirmation. *See id.* That case does not signal a green light to the approval of the Shareholder Release. Neither does *In re Dow Corning Corp.*, 280 F.3d 648 (6th Cir. 2002). There, the Sixth Circuit rejected the third-party release *because* it did not provide an opportunity for objecting claimholders to recover in full. *See id.* at 659–61.

Moreover, the Court has, in other contexts, explained that a bankruptcy court's equitable authority is not "unlimited," but instead incorporates "traditional standards in equity practice," and that courts can look to "cases outside the bankruptcy context" to help understand the limits of that authority. *Taggart v. Lorenzen*, ——— U.S. ———, 139 S. Ct. 1795, 1801–02, 204 L.Ed.2d 129 (2019).[10] The majority does not liken the equitable authority recognized today to anything traditionally recognized at equity. I too am at a loss. Indeed, the idea that bankruptcy courts can order the involuntary release of direct claims against nondebtors is "an extraordinary thing" that is "different ... from what courts ordinarily do." *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 723 (Bankr. S.D.N.Y. 2019).

[10]    In *Taggart*, the Court drew on traditional equitable standards for civil contempt sanctions outside the bankruptcy context to define a bankruptcy court's authority to hold a party in civil contempt for violating § 523(a)(2)'s discharge injunction. If, as the majority and appellants would have us believe, a bankruptcy court's ability to enforce its injunction were limited only by that which the Code did not forbid, then *Taggart*'s invocation of traditional civil contempt standards would seem misplaced.

At bottom, if Congress intended so extraordinary a grant of authority, it should say so. *See Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 465, 137 S.Ct. 973, 197 L.Ed.2d 398 (2017) (requiring "more than simple statutory silence if, and when, Congress were to intend a major departure" from the Code). It has before; in 1994, it amended the Bankruptcy Code to provide express authorization for nondebtor releases in asbestos-related bankruptcies, subject to a stringent set of requirements. *See* 11 U.S.C. 524(g).[11] That amendment occurred when, at that time, courts, such as in *Drexel*, were then approving nondebtor releases in non-asbestos bankruptcies. Yet Congress endorsed nondebtor releases in only the asbestos context. The parties debate whether Congress' express but limited approval in § 524(g) was an implicit rejection of nondebtor releases in non-asbestos contexts. The majority says no. Regardless of the right answer, the majority's answer pins this Circuit firmly on one side of a weighty issue that, for too long, has split the courts of appeals.

[11]    Even there, however, the injunction may extend to nondebtors only where the nondebtor is "directly liable or indirectly liable for the conduct of, claims against, or demands on the debtor...." 11 U.S.C. § 524(g)(4)(A)(ii). The Release here is broader; it covers claims aimed at the Sacklers' liability even if it is *independent* from the Debtors' liability. Even under § 524(g), it's far from clear the Release would survive.

This difference in views has consequences. As it stands, a nondebtor's ability **\*91** to be released through bankruptcy turns on where a debtor files. Forum-dependent results are anathema to the establishment of "uniform Laws on the subject of Bankruptcies throughout the United States." U.S. Const. art. I, § 8, cl. 4. Finding implicit grants of extraordinary powers in congressional silence is at cross purposes with the Code's "comprehensive scheme." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645, 132 S.Ct. 2065, 182 L.Ed.2d 967 (2012). Absent direction from Congress—and, since 1994, there has been none—or the High Court, the answer is a function of geography.

**All Citations**

69 F.4th 45

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 67

26-11268-mg Doc 23-4 Filed 06/24/26 Entered 06/24/26 13:13:49 Exhibit D Pg 431 of 697

Quadrant Structured Prods. Co., Ltd. v Vertin, 23 N.Y.3d 549 (2014)
16 N.E.3d 1165, 992 N.Y.S.2d 687, 2014 N.Y. Slip Op. 04114

KeyCite Yellow Flag - Negative Treatment
Declined to Extend by Cortlandt Street Recovery Corp. v. Hellas Telecommunications, S.a.r.l., N.Y.Sup., September 16, 2014

23 N.Y.3d 549, 16 N.E.3d 1165, 992 N.Y.S.2d 687, 2014 N.Y. Slip Op. 04114

**\*\*1** Quadrant Structured Products Co., Ltd., Individually and Derivatively on Behalf of Athilon Capital Corp., Appellant

v

Vincent Vertin et al., Respondents.

Court of Appeals of New York
Argued May 7, 2014
Decided June 10, 2014

CITE TITLE AS: Quadrant Structured Prods. Co., Ltd. v Vertin

### SUMMARY

Proceeding, pursuant to NY Constitution, article VI, § 3 (b) (9) and Rules of the Court of Appeals (22 NYCRR) § 500.27, to review questions certified to the New York State Court of Appeals by the Supreme Court of Delaware. The following questions were certified by the Supreme Court of Delaware and accepted by the New York State Court of Appeals: "(1) A trust indenture no-action clause expressly precludes a security holder[,] who fails to comply with that clause's preconditions, from initiating any action or proceeding upon or under or with respect to 'this Indenture,' but makes no reference to actions or proceedings pertaining to 'the Securities.' The question is whether, under New York law, the absence of any reference in the no-action clause to 'the Securities' precludes enforcement only of contractual claims arising under the Indenture, or whether the clause also precludes enforcement of all common-law and statutory claims that security holders as a group may have. (2) In its Report on Remand, the Court of Chancery found that the Athilon no-action clause, which refers only to 'this Indenture,' precludes enforcement only of contractual claims arising under the Indenture. The question is whether that finding is a correct application of New York law to the Athilon no-action clause."

### HEADNOTES

Secured Transactions

Security Agreements
Trust Indenture—Claims Arising Outside Scope of Indenture Not Barred by "No-Action" Clause

([1]) A "no-action" clause in a trust indenture agreement governing a securities issuance that by its language applies to rights and remedies under the provisions of the indenture, but makes no mention of individual suits on the securities, does not preclude enforcement of a securityholder's independent common-law or statutory rights. Accordingly, in an action for alleged wrongdoing related to notes purchased by plaintiff from defendant issuer, the "no-action" clause contained in the governing trust indenture providing that no securityholder "shall have any right by virtue or by availing of any provision of this Indenture" to institute any action or proceeding "upon or under or with respect to this Indenture"—in contrast to a no-action provision referring specifically to claims arising under the indenture and the securities—on its **\*550** face was limited to the contract rights recognized by the indenture itself and thus, when strictly construed and afforded its plain meaning, did not apply to claims arising outside the indenture's scope. Such interpretation did not frustrate the clause's purpose of preventing minority securityholders from pursuing litigation against the issuer, in favor of a single action initiated by a Trustee appointed to administer the issuance upon request of a majority of the securityholders. The clause's sole textual reference to "securities" appeared in the provision permitting a Trustee-initiated suit after notice of a continuing "default in respect of the series of Securities" and upon approval by a majority of securityholders. The clause thus applied when the Trustee was authorized to decide whether to act but did not serve as an outright prohibition on a securityholder-filed suit where the Trustee was without authorization to act. Such interpretation also did not upset the parties' expectations. The indenture defined "indenture" and "securities" separately, recognizing them as distinct, and the parties could not have expected a different interpretation, given the clause's plain language.

Secured Transactions
Security Agreements
Trust Indenture—Claims Arising Outside Scope of Indenture Not Barred by "No-Action" Clause

([2]) In an action alleging wrongdoing related to senior subordinated notes purchased by plaintiff from defendant issuer as part of a securities issuance, the Delaware Chancery

26-11268-mg    Doc 23-4    Filed 06/24/26    Entered 06/24/26 13:13:49    Exhibit D    Pg 432 of 697

Quadrant Structured Prods. Co., Ltd. v Vertin, 23 N.Y.3d 549 (2014)
16 N.E.3d 1165, 992 N.Y.S.2d 687, 2014 N.Y. Slip Op. 04114

Court correctly concluded that the governing trust indenture's "no-action" clause, which referred only to claims "upon or under or with respect to this Indenture," applied to the contractual claims arising under the indenture but did not bar its remaining individual and derivative claims seeking damages and injunctive relief for breaches of fiduciary duty, fraudulent transfer and conspiracy. The "no-action" clause made no reference to claims arising under the securities and did not apply to plaintiff's common-law and statutory claims. In addition, the "no-action" clause permitted a Trustee-initiated suit only after notice of a continuing "default in respect of the series of Securities" and upon approval by a majority of securityholders. In its complaint, plaintiff claimed that defendant issuer's board, installed and controlled by defendant holder of junior notes acquired as part of the issuance, acted pursuant to a scheme that ensured that junior securityholders were paid, despite their inferior status vis-à-vis plaintiff's senior notes, and, as a consequence, payment of the senior securities was imperiled. Plaintiff described defendant issuer's actions as an effort to siphon off capital for the benefit of defendant junior securityholders. Thus understood, the Trustee could not address plaintiff's claims as they were not based on any default on the securities.

## RESEARCH REFERENCES

Am Jur 2d, Secured Transactions §§ 31, 654–656.

NY Jur 2d, Business Relationships § 336; NY Jur 2d, Mortgages and Deeds of Trust §§ 24, 27, 228; NY Jur 2d, Secured Transactions § 304.

## ANNOTATION REFERENCE

See ALR Index under Bonds and Securities; Secured Transactions; Securities Regulation.

## *551  FIND SIMILAR CASES ON WESTLAW

Database: NY-ORCS

Query: securities & indenture /s no-action

## POINTS OF COUNSEL

*Bingham McCutchen LLP* (*Sabin Willett*, of the Massachusetts bar, admitted pro hac vice, and *Samuel Rowley*, of the Massachusetts bar, admitted pro hac vice, of counsel), and *Richards, Layton & Finger, P.A.*, Wilmington, Delaware

(*Lisa A. Schmidt, Catherine G. Dearlove* and *Russell C. Silberglied* of counsel), for appellant.

I. Under New York law, as a matter of plain language, the absence of the phrase "or the securities" from the no-action clause renders it inapplicable to Quadrant Structured Products Company, Ltd.'s claims. (*Racepoint Partners, LLC v JPMorgan Chase Bank, N.A.*, 14 NY3d 419; *Greenfield v Philles Records*, 98 NY2d 562; *Helmsley-Spear, Inc. v New York Blood Ctr.*, 257 AD2d 64; *Suffolk County Water Auth. v Village of Greenport*, 21 AD3d 947; *Greenwich Capital Fin. Prods., Inc. v Negrin*, 74 AD3d 413; *Maurice Goldman & Sons v Hanover Ins. Co.*, 80 NY2d 986; *Roberts v Tishman Speyer Props., L.P.*, 62 AD3d 71, 13 NY3d 270.) II. New York law shows that, by its plain language, the no-action clause does not bar Quadrant Structured Products Company, Ltd.'s claims. (*General Inv. Co. v Interborough R.T. Co.*, 200 App Div 794, 235 NY 133; *Deutsch v Gutehoffnungshutte, Aktienverein Fur Bergbau und Huttenbetrieb*, 168 Misc 872; *Lidgerwood v Hale & Kilburn Corp.*, 47 F2d 318; *Rudick v Ulster & Delaware R.R.*, 147 Misc 637; *Cruden v Bank of N.Y.*, 957 F2d 961; *Walnut Place LLC v Countrywide Home Loans, Inc.*, 96 AD3d 684, 35 Misc 3d 1207[A], 2012 NY Slip Op 50601[U]; *Elliott Assoc. v J. Henry Schroder Bank & Trust Co.*, 838 F2d 66; *AMBAC Indem. Corp. v Bankers Trust Co.*, 151 Misc 2d 334; *Emmet & Co., Inc. v Catholic Health E.*, 37 Misc 3d 854.) III. Neither New York law nor the indenture has conferred upon the indenture trustee the power to bring Quadrant Structured Products Company, Ltd.'s claims. (*Navarro Savings Assn. v Lee*, 446 US 458; *Meckel v Continental Resources Co.*, 758 F2d 811.) IV. Allowing Quadrant Structured Products Company, Ltd.'s claims to proceed would not subvert the purpose of the no-action clause.

*Quinn Emanuel Urquhart & Sullivan, LLP*, New York City (*Kathleen M. Sullivan, Philippe Z. Selendy, Nicholas F. Joseph, Sean P. Baldwin* and *Alicia K. Cobb* of counsel), *Potter Anderson* **\*552** *& Corroon LLP*, Wilmington, Delaware (*Philip A. Rovner* of counsel), and *Seitz Ross Aronstam & Moritz LLP* (*Garrett B. Moritz* of counsel) for respondents.

I. The parties' failure to use the particular words "the securities" does not, in and of itself, restrict coverage of a no-action clause. (*Wood v Duff-Gordon*, 222 NY 88; *Riverside S. Planning Corp. v CRP/Extell Riverside, L.P.*, 13 NY3d 398; *Matter of Westmoreland Coal Co. v Entech, Inc.*, 100 NY2d 352; *Batchelder v Council Grove Water Co.*, 131 NY 42; *Campbell v Hudson & Manhattan R.R. Co.*, 277 App Div 731; *Emmet & Co., Inc. v Catholic Health E.*, 114 AD3d 605; *Walnut Place LLC v Countrywide Home Loans, Inc.*, 96 AD3d

3976

Quadrant Structured Prods. Co., Ltd. v Vertin, 23 N.Y.3d 549 (2014)
16 N.E.3d 1165, 992 N.Y.S.2d 687, 2014 N.Y. Slip Op. 04114

684; *Bank of N.Y. v Battery Park City Auth.*, 251 AD2d 211; *Greene v New York United Hotels, Inc.*, 236 App Div 647, 261 NY 698; *Akanthos Capital Mgt., LLC v CompuCredit Holdings Corp.*, 677 F3d 1286.) II. The Athilon Capital Corp. no-action clause covers all claims a noteholder has based on its status as a noteholder. (*Matter of Express Indus. & Term. Corp. v New York State Dept. of Transp.*, 93 NY2d 584; *Travelers Cas. & Sur. Co. v Certain Underwriters at Lloyd's of London*, 96 NY2d 583; *Suffolk County Water Auth. v Village of Greenport*, 21 AD3d 947; *Akanthos Capital Mgt., LLC v CompuCredit Holdings Corp.*, 677 F3d 1286; *Allan v Moline Plow Co.*, 14 F2d 912; *Beal Sav. Bank v Sommer*, 8 NY3d 318; *Roberts v Tishman Speyer Props., L.P.*, 62 AD3d 71; *Greene v New York United Hotels, Inc.*, 236 App Div 647, 261 NY 698; *ABN AMRO Bank, N.V. v MBIA Inc.*, 17 NY3d 208; *Walnut Place LLC v Countrywide Home Loans, Inc.*, 96 AD3d 684.)

## OPINION OF THE COURT

Rivera, J.

In response to the first certified question from the Supreme Court of the State of **\*\*2** Delaware, we conclude that a trust indenture's "no-action" clause that specifically precludes enforcement of contractual claims arising under the indenture, but omits reference to "the Securities," does not bar a securityholder's independent common-law or statutory claims. Accordingly, we answer the second question in the affirmative.

### I.

The Delaware litigation underlying the certified questions is a reminder of the continued effects of the 2008 financial crisis and the economic fallout associated with the utilization of complex financial instruments that mask investment risk levels (*see generally* Kristin N. Johnson, *Things Fall Apart: Regulating* **\*553** *the Credit Default Swap Commons*, 82 U Colo L Rev 167 [2011]; Brendan Sapien, *Financial Weapons of Mass Destruction: From Bucket Shops to Credit Default Swaps*, 19 S Cal Interdisc LJ 411 [2010]). Against this backdrop of high-stakes securities transactions and downward spiraling financial fortunes, the certified questions present for our consideration familiar efforts to prohibit individual lawsuits of securityholders, by the use of a contractual provision referred to as a "no-action" clause.

### II.

Quadrant Structured Products Company, Ltd. (Quadrant)[1] sued several defendants in the Delaware Court of Chancery for alleged wrongdoing related to notes purchased by Quadrant and issued by defendant Athilon Capital Corp. (Athilon),[2] a business which plaintiff alleges is now insolvent. Defendant EBF & Associates, LP (EBF) acquired Athilon in 2010, installed and now controls its Board. Like Quadrant, EBF holds certain Athilon issued securities. Defendants moved to dismiss the suit as barred by a no-action clause contained in the indenture agreement governing Quadrant's notes. The notes and indenture were a necessary part of Athilon's financing scheme, which has its roots in Athilon's initial formation. Athilon was founded in 2004 with $100 million in equity and, along with its wholly owned subsidiary Athilon Asset Acceptance Corp., sold credit derivative products in the form of "credit default swaps" which afforded credit protection for large financial institutions.[3] These credit default swaps **\*\*3** provided that Athilon would pay the **\*554** purchaser in the case of a default on the debt that was the subject of the swap. As a risk containment measure, Athilon's operating guidelines mandated that it invest conservatively, and that when certain "suspension events" occurred, enter "runoff mode"—a period during which it could not issue new credit swaps and was required to pay off existing swaps as claims arose.

As part of its capital raising strategy, Athilon incurred debt through the issuance of a series of securities,[4] as relevant here, consisting of $350 million in senior subordinated notes, **\*\*4** $200 million in three series of subordinated notes and $50 million in junior notes.[5] Athilon raised $600 million in capital through this debt structure. Debt subordination is common in commercial finance, and as the name of these different classes of notes implies, payment of senior subordinated notes takes priority over payment of junior notes.[6] Quadrant owns certain classes of **\*555** these subordinated notes, including senior subordinated notes, while EBF owns junior notes.

As part of this debt financing, Athilon entered agreements, referred to as trust indentures (indentures), with two separate Trustees, who serve as third-party administrators of the issuance of the securities.[7] An indenture is essentially a written agreement that bestows legal title of the securities in a single Trustee to protect the interests of individual investors who may be numerous or unknown to each other (*see generally* **\*\*5** George G. Bogert & George T. Bogert, The Law of Trusts and Trustees § 250 at 280 [2d ed rev 1992]).

3977

As is typical of these agreements, the Athilon indentures set forth Athilon's obligations as the issuer of the securities, the securityholders' rights and remedies in the case of Athilon's default on the provisions of the indenture, and the duties and obligations of the Trustee (*see* Thomas Lee Hazen, The Law of Securities Regulation § 19.1 at 467 [6th ed], citing 15 USC § 77ccc [7] ["The contract, or 'indenture,' identifies the rights of all parties concerned, as well as the duties of the trustee (a third-party administrator), the obligations of the borrower, and the remedies available to the investors"]).

By 2008, Athilon had undertaken $50 billion in nominal credit default risk, far exceeding its $700 million in capital reserves, which consisted of the $100 million in equity and $600 million in security debt. Quadrant contends that at this rate a mere 0.2% loss on the collateralized debt obligations covered by Athilon's credit default swaps would strip Athilon of its equity and render it insolvent. [8] Indeed, in the aftermath of the 2008 financial crisis, in early 2009, Athilon and its subsidiary **\*556** sustained several suspension events and entered into runoff mode as per its operating guidelines.

In October 2011, Quadrant sued Athilon, Athilon's officers and directors, EBF, and EBF affiliate Athilon Structured Investment Advisors LLC (ASIA), asserting various counts directly and derivatively as a creditor of Athilon. Quadrant asserted claims for breaches of fiduciary duty, seeking damages and injunctive relief, and also asserted fraudulent transfer claims against EBF and ASIA. According to Quadrant, EBF acquired Athilon in 2010, and controls the Athilon Board by virtue of having installed its board members. Quadrant claimed that the Board failed to preserve Athilon's value in anticipation of liquidation in 2014 when the last credit swap was set to expire, and instead took actions in direct contravention of its duties, but which favored EBF and its affiliate. Specifically, Quadrant alleged that the EBF-controlled Board paid interest on the junior notes, notwithstanding that Athilon agreed to defer interest payments on these notes and that junior notes would not receive a return during liquidation. As a consequence, EBF received payment on its junior notes, to the detriment of senior subordinated securities, including Quadrant's subordinated notes. Quadrant also alleged the Board paid ASIA **\*\*6** above-market-rate service fees to manage Athilon's day-to-day operations.

The Court of Chancery characterized Athilon's investment strategy as "high risk" and "contrary to the terms of Athilon's governing documents," which was designed to ensure EBF benefitted financially, regardless of the risk associated with the investment, and regardless of the status of the EBF junior notes (*Quadrant Structured Prods. Co., Ltd. v Vertin*, 2013 WL 3233130, \*2, 2013 Del Ch LEXIS 152, \*7 [June 20, 2013, CA No. 6990-VCL]). All the while, the owners of the senior notes suffered the loss of the failed high-risk investment. [9]

Defendants moved to dismiss, asserting that Quadrant's claims were barred by a no-action clause (Athilon clause) contained in article 7, § 7.06 of the indenture governing the subordinated notes. The Athilon clause provides:

> "*Limitations on Suits by Securityholder*. No holder of any Security shall have any right by virtue or by **\*557** availing of any provision of this Indenture to institute any action or proceeding at law or in equity or in bankruptcy or otherwise upon or under or with respect to this Indenture, or for the appointment of a trustee, receiver, liquidator, custodian or other similar official or for any other remedy hereunder, unless such holder previously shall have given to the Trustee written notice of default in respect of the series of Securities held by such Securityholder and of the continuance thereof, as hereinbefore provided, and unless also the holders of not less than 50% of the aggregate principal amount of the relevant series of Securities at the time Outstanding shall have made written request upon the Trustee to institute such action or proceedings in its own name as trustee hereunder and shall have offered to the Trustee such reasonable indemnity as it may require against the costs, expenses and liabilities to be incurred therein or thereby and the Trustee for 60 days after its receipt of such notice, request and offer of indemnity shall have failed to institute any such action or proceedings and no direction inconsistent with such written request shall have been given to the Trustee pursuant to Section 7.08 hereof within such 60 days."

Defendants argued that the clause permitted only Trustee-initiated suits upon request of a majority of securityholders, and prohibited individual securityholder actions. In support of this argument defendants relied on *Feldbaum v McCrory Corp.* (1992 WL 119095, 1992 Del Ch LEXIS 113, 18 Del J Corp L 630 [June 1, 1992]) and *Lange v Citibank, N.A.* (2002 WL 2005728, \*1, 2002 Del Ch LEXIS 101, \*1-2 [Aug. 13, 2002, CA No. 19245-NC]), Delaware Court of Chancery cases applying New York law, wherein the court dismissed the respective plaintiffs' claims based on a no-action clause. The clauses at issue in those cases **\*\*7** barred a securityholder's action "with respect to this Indenture *or the Securities* unless [specified conditions are met]" (*Feldbaum*, 1992 WL 119095

at *5, 1992 Del Ch LEXIS 113 at *17, 18 Del J Corp L at 641; *Lange*, 2002 WL 2005728 at *5, 2002 Del Ch LEXIS 101 at *16 [emphasis added]).

The Delaware Chancery Court dismissed Quadrant's complaint, citing *Feldbaum* and *Lange* ( **\*558** *Quadrant Structured Prods. Co., Ltd. v Vertin*, 2012 WL 2051753, 2012 Del Ch LEXIS 300 [June 5, 2012, CA No. 6990-VCL]). On appeal to the Delaware Supreme Court, Quadrant asserted for the first time that the *Feldbaum* and *Lange* clauses were distinguishable because the clauses in those cases specifically mentioned claims arising under both the indenture *and* "the Securities," whereas the Athilon clause only applies to claims under the indenture. Therefore, the clause did not bar common-law or statutory claims arising under the securities. The Delaware Supreme Court remanded the case back to the Court of Chancery, ordering it "to issue an opinion analyzing the significance (if any) under New York law of the differences between the no-action clauses in the *Lange* and *Feldbaum* indentures and the Athilon Indenture" (*Quadrant Structured Prods. Co., Ltd. v Vertin*, 2013 WL 8858605, *2, 2013 Del LEXIS 380, *5-6 [Feb. 12, 2013, No. 338, 2012]; *see* — A3d at —, 2013 WL 5962813 at *8, 2013 Del LEXIS 570 at *23).

Thereafter, the Court of Chancery issued a Report on Remand in which the court concluded that the no-action clause applies only to contractual claims arising under the indenture. After a thorough analysis of New York cases and *Feldbaum* and *Lange*, the court found the Athilon clause differed from a *Feldbaum* and *Lange*-type clause, and only extended to actions or proceedings where a securityholder claims a right by virtue or by availing of any provision of the indenture. The court, therefore, concluded that the majority of Quadrant's claims were not barred under the clause, and that dismissal was warranted with respect to two claims and partial dismissal with respect to a third because only those claims arose under the Athilon indenture. [10]

Upon receipt of the Report, the Delaware Supreme Court certified the following questions to us:

"(1) A trust indenture no-action clause expressly precludes a security holder [,] who fails to comply with that clause's preconditions, from initiating any action or proceeding upon or under or with respect to 'this Indenture,' but makes no reference to actions or proceedings pertaining to 'the Securities.'

**\*559** "The question is whether, under New York law, the absence of any reference in the no-action **\*\*8** clause to 'the Securities' precludes enforcement only of contractual claims arising under the Indenture, or whether the clause also precludes enforcement of all common law and statutory claims that security holders as a group may have.

"(2) In its Report on Remand . . . , the Court of Chancery found that the Athilon no-action clause, which refers only to 'this Indenture,' precludes enforcement only of contractual claims arising under the Indenture. The question is whether that finding is a correct application of New York law to the Athilon no-action clause" (— A3d at —, 2013 WL 5962813 at *5, 2013 Del LEXIS 570 at *14-15).

Pursuant to section 500.27 of the Rules of Practice of the Court of Appeals (22 NYCRR), we accepted both certified questions (*Quadrant Structured Prods. Co., Ltd. v Vertin*, 22 NY3d 1008 [2013]).

### III.

#### A.

([1])In response to the first question, for the reasons discussed in detail below, we conclude that a no-action clause which by its language applies to rights and remedies under the provisions of the indenture agreement, but makes no mention of individual suits on the securities, does not preclude enforcement of a securityholder's independent common-law or statutory rights. We reach this conclusion based on the legal standards applicable to indenture agreements, as well as the analyses of no-action clauses in *Feldbaum* and *Lange*, and cases from New York.

A trust indenture is a contract, and under New York law "[i]nterpretation of indenture provisions is a matter of basic contract law" (*Sharon Steel Corp. v Chase Manhattan Bank, N.A.*, 691 F2d 1039, 1049 [2d Cir 1982]; *see also* Thomas Lee Hazen, The Law of Securities Regulation § 19.1 at 467 [6th ed] [referring to indenture as a contract]; *Racepoint Partners, LLC v JPMorgan Chase Bank, N.A.*, 14 NY3d 419 [2010] [same]; *AG Capital Funding Partners, L.P. v State St. Bank & Trust Co.*, 11 NY3d 146 [2008] [same]).

In construing a contract we look to its language, for "a written agreement that is complete, clear and unambiguous on its **\*560** face must be enforced according to the plain meaning

26-11268-mg Doc 23-4 Filed 06/24/26 Entered 06/24/26 13:13:49 Exhibit D Pg 436 of 697

Quadrant Structured Prods. Co., Ltd. v Vertin, 23 N.Y.3d 549 (2014)

16 N.E.3d 1165, 992 N.Y.S.2d 687, 2014 N.Y. Slip Op. 04114

of its terms" (*Greenfield v Philles Records*, 98 NY2d 562, 569 [2002]; *accord J. D'Addario & Co., Inc. v Embassy Indus., Inc.*, 20 NY3d 113, 118 [2012]; *Vermont Teddy Bear Co. v 538 Madison Realty Co.*, 1 NY3d 470, 475 [2004]; *W.W.W. Assoc. v Giancontieri*, 77 NY2d 157, 162 [1990]; *Nichols v Nichols*, 306 NY 490, 496 [1954]). As the case law further establishes, we read a no-action clause to give effect to the precise words and language used, for the clause must be "strictly construed" (*Cruden v Bank of N.Y.*, 957 F2d 961, 968 [2d Cir 1992] [citation omitted]; *cf. Feldbaum*, 1992 WL 119095, *7-8, 1992 Del Ch LEXIS 113, *25, 18 Del J Corp L at 645; *Lange*, 2002 WL 2005728 at *7, 2002 Del Ch LEXIS 101 at *20-22; *Cruden v Bank of N.Y.*, 1990 WL 131350, *12, 1990 US Dist LEXIS 11564, *35 [SD NY, Sept. 4, 1990, Nos. 85 Civ. 4170 (JFK), 85 Civ. 4219 (JFK), 85 Civ. 4570 (JFK), 87 Civ. 5493 (JFK)]; *Victor v Riklis*, 1992 WL 122911, *6 n 7, 1992 US Dist LEXIS 7025, *20 n 7 [SD NY, May 15, 1992, No. 91 Civ. 2897 (LJF)]; *McMahan & Co. v Wherehouse Entertainment, Inc.*, 859 F Supp 743 [SD NY 1994]).

Even where there is ambiguity, if parties to a contract omit terms—particularly, terms that are readily found in other, similar contracts—the inescapable conclusion is that the parties intended the omission. The maxim *expressio unius est exclusio alterius*, as used in the interpretation of contracts, supports precisely this conclusion (*see generally* Glen Banks, New York Contract Law § 10.13 [West's NY Prac Series 2006]; *see also In re Ore Cargo, Inc.*, 544 F2d 80, 82 [2d Cir 1976] [where sophisticated drafter omits a term, *expressio unius* precludes the court from implying it from the general language of the agreement]).

Applying these well established principles of contract interpretation, and with the understanding that no-action clauses are to be construed strictly and thus read narrowly, we turn to the language of the no-action clause presented by the certified question. The no-action clause here states that no securityholder "shall have any right *by virtue or by availing of any provision of this Indenture* to institute any action or proceeding at law or in equity or in bankruptcy or otherwise *upon or under or with respect to this Indenture* . . . ." The clear and unambiguous text of this no-action clause, with its specific reference to the indenture, on its face limits the clause to the contract rights recognized by the indenture agreement itself. Further supporting this construction of the clause is the sole textual reference to securities, which is contained in the clause's provision for a **\*561** Trustee-initiated suit for a continuing "default in respect of the series of Securities."[11] This part of the no-action clause permits

the trustee to sue in its name, after notice by a securityholder of a continuing default and upon approval of the suit by a majority of securityholders. Thus, the clear import of the no-action clause is to leave a securityholder free to **\*\*9** pursue independent claims involving rights not arising from the indenture agreement.

This no-action clause, with its specific limit on the enforcement of indenture contract rights, is in contrast to no-action clauses which extend beyond the four corners of the indenture agreement to cover securities-based claims. As the cases illustrate, where the no-action clause refers to both the indenture and the securities the securityholder's claims are subject to the terms of the clause, whether those claims be contractual in nature and based on the indenture agreement, or arise from common law and statute.

Thus, in *Feldbaum*, where the no-action clause stated, in pertinent part, that "[a] Securityholder may not pursue *any remedy with respect to this Indenture or the Securities* unless [specified conditions are met]" (1992 WL 119095, *5, 1992 Del Ch LEXIS 113, *17, 18 Del J Corp L at 641), the court held that the clause barred the securityholders' fraud and breach of contract claims against the issuers of the securities (1992 WL 119095 at *2-3, 1992 Del Ch LEXIS 113 at *7-10, 18 Del J Corp L at 636-638). The court concluded that by its language the no-action clause barred not only contractual claims arising from the indenture itself, but also any claims individuals may have based on their status as securityholders (1992 WL 119095 at *7-8, 1992 Del Ch LEXIS 113 at *26-27, 18 Del J Corp L at 645).

 **\*562** Similarly, in *Lange*, the court dismissed plaintiffs' claims as barred by a trust indenture no-action clause that provided "[a] Securityholder may not pursue a remedy with respect to this Indenture or the Securities unless [specified conditions are met]" (2002 WL 2005728 at *5, 2002 Del Ch LEXIS 101 at *16). Plaintiffs in *Lange* were a group of securityholders who sued the issuer for having sold off its subsidiaries for an unfair value (2002 WL 2005728 at *1, 2002 Del Ch LEXIS 101 at *1-2). Plaintiffs sought to rescind the sales or disgorge the proceeds arguing, inter alia, breach of the issuer's fiduciary duty. The court applied the reasoning in *Feldbaum* to find that the no-action clause barred all claims "with respect to the Indenture or the Debentures themselves" (2002 WL 2005728 at *7, 2002 Del Ch LEXIS 101 at *21).

3980

Quadrant Structured Prods. Co., Ltd. v Vertin, 23 N.Y.3d 549 (2014)
16 N.E.3d 1165, 992 N.Y.S.2d 687, 2014 N.Y. Slip Op. 04114

The decisions in *Feldbaum* and *Lange* relied on the language of the clause, which was broad enough to encompass conditions on enforcement of indenture and securities-based claims (*Feldbaum*, 1992 WL 119095 at *6, 1992 Del Ch LEXIS 113 at *17-18, 18 Del J Corp L at 641; *Lange*, 2002 WL 2005728 at *7, 2002 Del Ch LEXIS 101 at *20-22). Here, unlike the *Feldbaum* and *Lange* clauses, the Athilon no-action clause omits the phrase "or the Securities," indicating its coverage is limited to the indenture and rights thereunder.

Decisions from New York further support this interpretation of the words contained in the no-action clause. For example, in *General Inv. Co. v Interborough R.T. Co.* (200 App Div 794 [1st Dept 1922]), plaintiff sought to recover payment on five promissory notes. Defendant argued the no-action clause barred recovery, relying on language in the clause that provided:

> "No holder of any note hereby secured shall have any right to institute any suit, action or proceeding in equity or at law for the enforcement of this indenture, or for the execution of any trust hereof, or for the appointment of a receiver, or for any other remedy hereunder, unless such holder [meets specified requirements]" **10 (*id.* at 796 [emphasis omitted]).

The Appellate Division held that the no-action clause did not bar plaintiff's suit because the clause applied to proceedings arising from the enforcement of the indenture and plaintiff's action "is not to affect, disturb or prejudice the lien of the **563 collateral indenture or to enforce any right thereunder" (*id.* at 801). [12]

In *Cruden*, plaintiffs sought to assert fraud and civil claims under the Racketeer Influenced and Corrupt Organizations Act (RICO) against the issuer. Defendants argued a no-action clause barred their claims. The clause therein provided:

> "No holder of any Debenture shall have any right by virtue of or by availing himself of any provision of this Indenture to institute any action or proceedings at law or in equity or in bankruptcy or otherwise, upon or under or with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder . . . ." (1990 WL 131350, *12, 1990 US Dist LEXIS 11564, *35-36.)

Although reversing in part, the Second Circuit agreed with the District Court's conclusion that plaintiffs' fraud and RICO claims were not made under the indenture and, thus, could not be barred by the no-action clause (*Cruden*, 957 F2d at 968). [13]

In contrast, in *Victor*, the District Court dismissed plaintiff's RICO claims as barred by a no-action clause (1992 WL 122911 at *1, 1992 US Dist LEXIS 7025 at *2). The clause at issue, similar to the clause in *Feldbaum*, prohibited "any remedy with respect to [the] Indenture or the Securities" unless specified conditions were met (1992 WL 122911 at *6, 1992 US Dist LEXIS 7025 at *19 [emphasis omitted]). The District Court distinguished the clause from the no-action clause in *Cruden* because the former was "not as broad as the one [here]" (1992 WL 122911, *6 n 7, 1992 US Dist LEXIS 7025, *20 n 7).

In *McMahan*, a no-action clause barred actions seeking "any remedy with respect to [the] Indenture or the Securities" (859 F Supp at 747). Plaintiffs brought federal securities claims arguing, inter alia, that they were entitled to immediate tender of their securities as a consequence of the issuer's merger with two other entities. The District Court held federal securities laws preclude application of a no-action clause to plaintiffs' federal securities claims, allowing those claims to proceed, but **564 concluded the state law claims were properly barred by the **11 no-action clause (*id.* at 749). [14]

As these cases illustrate, a no-action clause, like the Athilon clause, that refers only to actions under the indenture, is limited by its language to indenture-based contract claims. However, a no-action clause similar to the clauses in *Feldbaum* and *Lange*, that refers specifically to claims and remedies arising under the indenture and the securities, applies to all claims, except those excluded from coverage as a matter of law. Here, the Athilon no-action clause when strictly construed and afforded its plain meaning, makes no reference to the securities, and therefore does not apply to claims arising outside the scope of the indenture. Accordingly, we agree with the Delaware Chancery Court's Report on Remand that *Feldbaum* and *Lange* are distinguishable, and the Athilon no-action clause applies only to contract claims under the indenture, not to Quadrant's common-law and statutory claims.

Defendants argue that under New York law, what matters is the parties' intent, not any "legal talismans," and that the parties' intent was for the no-action clause to apply to all individual securityholder suits. This is no argument at all, for under our law where the language of the contract is clear we rely on the terms of the document to give effect to the parties' intent (*see J. D'Addario & Co.*, 20 NY3d at 118; *Vermont Teddy Bear Co.*, 1 NY3d at 475; *Nichols*, 306

3981

Quadrant Structured Prods. Co., Ltd. v Vertin, 23 N.Y.3d 549 (2014)
16 N.E.3d 1165, 992 N.Y.S.2d 687, 2014 N.Y. Slip Op. 04114

NY at 496). As we have discussed, the no-action clause is clear on its face and applies to indenture contract claims only. The New York cases upon which defendants rely fail to persuade us otherwise, for they involve rights under the indenture, or securityholder rights which a no-action clause may not abridge as a matter of law (*see e.g. Greene v New York United Hotels, Inc.*, 236 App Div 647, 648 [1st Dept 1932] [petition for receivership dismissed as defective; debentureholder failed to plead compliance with no-action clause for claims of past-due payment]; *Emmet & Co., Inc. v Catholic Health E.*, 37 Misc 3d 854, 856 [Sup Ct, NY County 2012] [claim arising under indenture]; *Walnut Place LLC v Countrywide Home Loans, Inc.*, 35 Misc 3d 1207[A], 2012 NY Slip Op 50601[U] [Sup Ct, NY County 2012] [claim against Trustee]). The reasoning in these cases provides no basis to alter our **\*565** conclusion that a no-action clause that omits language specifically referencing the securities does not extend to a securityholder's common-law and statutory claims.

Nevertheless, defendants argue that, regardless of the actual words used, the language of the no-action clause includes all securityholder actions. Defendants essentially argue that references to the indenture should be interpreted to include the securities, and that to do otherwise will upset the parties' expectations. These arguments are unsupported by the no-action clause itself. **\*\*12**

In support of their argument that indenture also means securities, defendants point to the purpose of the no-action clause, which they argue is to prevent unpopular duplicative suits, by channeling all securityholder claims through the Trustee. They contend that a no-action clause prohibits what they call the "lone ranger" lawsuit: individuals asserting claims that foster the interests of minority securityholders at the potential expense of the majority's interest. Quadrant's suit, defendants argue, is exactly the type of litigation the no-action clause is intended to prevent. Given this understanding of the intent of the no-action clause, the omission of the words "the Securities" is logical because they would be superfluous, adding nothing to the already expansive coverage of the clause.

Defendants are correct that generally a no-action clause prevents minority securityholders from pursuing litigation against the issuer, in favor of a single action initiated by a Trustee upon request of a majority of the securityholders (*see* American Bar Foundation, Commentaries on Indentures § 5.7 at 232 [1971] [discussing proposed no-action clause in model

indenture, finding "(t)he major purpose of this (proposed no-action clause) is to deter individual debentureholders from bringing independent law suits for unworthy or unjustifiable reasons, causing expense to the Company and diminishing its assets"]).

As the court in *Feldbaum* noted, limitations on individual securityholder suits serve the primary purpose of a no-action clause, which is "to protect issuers from the expense involved in defending [individual] lawsuits that are either frivolous or otherwise not in the economic interest of the corporation and its creditors" (1992 WL 119095 at \*6, 1992 Del Ch LEXIS 113 at \*20, 18 Del J Corp L at 642). These limitations further "protect[ ] against the risk of strike suits" (*id.*). Indeed, a no-action **\*566** clause "make[s] it more difficult for individual bondholders to bring suits that are unpopular with their fellow bondholders" (1992 WL 119095, \*5, 1992 Del Ch LEXIS 113, \*19, 18 Del J Corp L at 642). The no-action clause achieves these goals

> "by delegating the right to bring a suit enforcing rights of bondholders to the trustee, or to the holders of a substantial amount of bonds, and by delegating to the trustee the right to prosecute such a suit in the first instance. These clauses also ensure that the proceeds of any litigation actually prosecuted will be shared ratably by all bondholders" (1992 WL 119095 at \*6, 1992 Del Ch LEXIS 113 at \*21, 18 Del J Corp L at 643 [citation omitted]).

However, even defendants admit that the Athilon clause is not a complete bar to any and all securityholder suits. There are claims which, by law, cannot be prohibited by a no-action clause, most notably claims against the trustee (*see e.g.* 15 USC § 77*ooo* [d] ["The indenture . . . shall not contain any provisions relieving the indenture trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct"]; *see also Cruden*, 957 F2d at 968 [no-action clause will not bar securityholder suit against Trustee because "it would be absurd to require the debenture holders to ask the Trustee to sue itself"]).

Defendants appear to argue that the enactment of the Trust Indenture Act of 1939 (TIA) eliminated the need to reference the securities in a no-action clause because the TIA prohibits the clause from barring a securityholder's action against the Trustee for breach of duties recognized by the TIA, or for past-due interest or principal on the securities (*see* 15 USC § 77*ppp* [b]). Of course, as Quadrant's case illustrates, a securityholder may have claims apart from claims against the Trustee, or for past-due payments. Moreover, as long as the indenture does

3982

Quadrant Structured Prods. Co., Ltd. v Vertin, 23 N.Y.3d 549 (2014)

16 N.E.3d 1165, 992 N.Y.S.2d 687, 2014 N.Y. Slip Op. 04114

not violate or conflict with the TIA, the parties may structure the indenture agreement to address their respective interests and obligations, including placing limits on certain claims of right.

Most significant here is that the no-action clause, by its own terms, is concerned with minority holders' actions in the case of a default by the issuer of the securities. The no-action clause requires a written request for the Trustee to commence an action or proceeding *regarding a default* with respect to the series of securities held by the noteholder and approval by a majority **\*567** of securityholders. [15] Logically then, the no-action clause applies when the Trustee is authorized to decide whether to act; it cannot serve as an outright prohibition on a suit filed by a securityholder in the case where the Trustee is without authorization to act. Otherwise, the purpose of the no-action clause—to avoid duplicative suits and protect the majority interests by mandating that actions be channeled through the Trustee—would be subverted (*Feldbaum*, 1992 WL 119095 at \*6, 1992 Del Ch LEXIS 113 at \*19, 18 Del J Corp L at 642). This is what the parties intended. Of course, they were free to not limit the no-action clause in this way. Here, therefore, the purpose of the Athilon no-action clause is not frustrated where the Trustee is without authority to act.

Defendants' argument that interpreting the no-action clause to exclude certain claims would upset the contracting parties' expectations is unpersuasive. The indenture itself defines "indenture" and "securities" separately, recognizing them as distinct. [16] Therefore, defendants' functional equivalency argument is merely another version of the argument we have already rejected on the law: that the parties intended other than what the words in the document mean. As our law makes clear, we rely on the unambiguous terms of the agreement when construing contract provisions like the indenture no-action clause (*see* **\*\*13** *J. D'Addario & Co.*, 20 NY3d at 118; *Vermont Teddy Bear Co.*, 1 NY3d at 475; *Nichols*, 306 NY at 496). Quadrant's claims are based not on the indenture agreement—under which the Trustee administers the debt issuance by Athilon—but rather arise from Quadrant's status as a securityholder. The parties could not have expected otherwise, given the plain language of the clause. If the parties sought to prohibit these types of suits, they were free to include them within the Athilon no-action clause.

We also note that in 2000, the Ad Hoc Committee for Revision of the 1983 Model Simplified Indenture produced a model no-action clause which provides "[a] Securityholder may pursue a remedy with respect to this Indenture or the Securities only if **\*568** [the holder complies with the terms of the clause]" (55 Bus Law 1115, 1137-1138 [2000]). By its terms, the no-action clause references the indenture and the securities. Even this broad model clause is not without limits. In its commentary to this provision, the Committee states: "[t]he clause applies, however, only to suits brought to enforce contract rights under the Indenture or the Securities, not to suits asserting rights arising under other laws" (*id.* at 1191). The Committee intended the model no-action clause to limit only contract rights, not to encompass all securityholder suits. We express no opinion on whether no-action clauses should be so narrowly construed, but note only that parties sophisticated and well versed in this area of the law—like the parties here—are well aware of these commentaries and, thus, we find unsupportable defendants' argument that a construction of the no-action clause that permits Quadrant's claims to proceed would be unsettling to the parties' expectations.

**B.**

([2])The second certified question asks whether the Vice Chancellor's Report on Remand correctly interpreted New York law. We answer this question in the affirmative. In its complaint, Quadrant asserts individual and derivative claims seeking damages and injunctive relief for breaches of fiduciary duty, fraudulent transfer, breach of covenant of good faith and fair dealing, intentional interference with contractual relations, and conspiracy. Essentially, Quadrant claims that Athilon's Board, installed and controlled by EBF, acted pursuant to a scheme which ensures that the junior securityholders are paid, despite their inferior status vis-à-vis Quadrant's senior notes, and, as a consequence, payment of the junior securities imperils payment of the senior securities. As described by Quadrant, Athilon's actions are an effort to siphon off as much capital as possible, as quickly as possible, for the benefit of EBF. Thus understood, the Trustee cannot address these claims because the Trustee's duties, as per the indenture, are only triggered upon an event of default— exactly what Quadrant seeks to avoid, at least with respect to the senior securities.

Accordingly, the Vice Chancellor correctly concluded that, with the exception of two claims and part of a third, the no-action clause did not bar plaintiff's action. The claims the Vice Chancellor found viable are those that the Trustee cannot assert, as they are not based on **\*\*14** any default on the securities. **\*569** Specifically, the Vice Chancellor correctly found that those claims sounding in breach of contract and

arising from the indenture are barred—requiring the majority securityholders to bring those actions through the Trustee.

### IV.

Accordingly, the certified questions should be answered in accordance with this opinion.

Chief Judge Lippman and Judges Graffeo, Read, Smith, Pigott and Abdus-Salaam concur.

Following certification of questions by the Supreme Court of the State of Delaware and acceptance of the questions by this Court pursuant to section 500.27 of this Court's Rules of Practice, and after hearing argument by counsel for the parties and consideration of the briefs and the record submitted, certified questions answered in accordance with the opinion herein.

### FOOTNOTES

1     Quadrant is a Cayman Islands limited liability company with its principal place of business in Connecticut.

2     Athilon is a Delaware corporation with its principal place of business in New York.

3     A credit default swap is a financial instrument that serves as "a promise by one party to pay another party in the event that a third party defaults on its debt" (Jeremy C. Kress, *Credit Default Swaps, Clearinghouses, and Systemic Risk: Why Centralized Counterparties Must Have Access to Central Bank Liquidity*, 48 Harv J on Legis 49, 52 [2011] [citation omitted]). A credit default swap contract "obligates a protection buyer to make periodic premium payments to a protection seller, who in turn must pay the buyer if one or more underlying reference entities experiences a credit event [such as default, bankruptcy or credit rating downgrade]" (*id.* [citation omitted]). Such financial instruments were viewed with skepticism and concern by some critics who feared "that a spike in interest rates could trigger a 'derivatives tsunami' that would bring all of the major banks to their knees and cause a 'blowup' in world credit markets" (Robert F. Schwartz, *Risk Distribution in the Capital Markets: Credit Default Swaps, Insurance and a Theory of Demarcation*, 12 Fordham J Corp & Fin L 167, 170 [2007] [citation omitted]).

4     A security is
     "any note, stock, treasury stock, security future, security-based swap, bond, debenture, certificate

of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a 'security'; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited" (15 USC § 78c [a] [10]).

5     A "note" is defined as "A written promise by one party (the *maker*) to pay money to another party (the *payee*) or to bearer" (Black's Law Dictionary [9th ed 2009]).

6     "[T]he basic concept of a subordination agreement is simple: It is the subordination of the right to receive payment of certain indebtedness . . . prior [to] payment of certain other indebtedness (the senior debt) of the same debtor. Put another way—in the circumstances specified in the subordination agreement, the senior debt must be paid in full before payment may be made on the subordinated debt and retained by the subordinating creditor" (Dee Martin Calligar, *Subordination Agreements*, 70 Yale LJ 376, 376 [1961]).

7     Deutsche Bank Trust Company serves as Trustee under the indenture governing subordinated notes, and The Bank of New York serves as Trustee pursuant to the indenture governing senior subordinated notes (*see Quadrant Structured Prods. Co., Ltd. v Vertin,* — A3d —, —, 2013 WL 5962813, \*2, 2013 Del LEXIS 570, \*5 [Nov. 7, 2013, No. 338, 2012]).

8     A collateralized debt obligation is a type of asset-backed security (*see* Neal Deckant, *X. Reforms of Collateralized Debt Obligations: Enforcement, Accounting and Regulatory Proposals*, 29 Rev Banking & Fin L 79, 80 [2009]). The underlying assets are "pooled together, split into subordinated repayment rights ('tranches'), rated by a credit rating agency and

Quadrant Structured Prods. Co., Ltd. v Vertin, 23 N.Y.3d 549 (2014)

16 N.E.3d 1165, 992 N.Y.S.2d 687, 2014 N.Y. Slip Op. 04114

sold to investors" (*see* Neal Deckant, *Criticisms of Collateralized Debt Obligations in the Wake of the Goldman Sachs Scandal*, 30 Rev Banking & Fin L 407, 410 [2010] [citation omitted]).

The Court of Chancery described a strategy "that amounts to a 'heads EBF wins, tails everyone else loses' bet. If the high-risk investments succeed, then the underwater Junior Notes and equity will benefit. If the investments fail, then the more senior tranches of Notes will bear the loss" (*Quadrant*, 2013 WL 3233130, \*2, 2013 Del Ch LEXIS 152, \*7).

Specifically, the court identified as subject to dismissal count VII, which alleged breach of the implied covenant of good faith and fair dealing; count VIII, which alleged tortious interference with the implied covenant referenced in count VII; and part of count X, which alleged civil conspiracy relating to all other counts in Quadrant's complaint (*see Quadrant Structured Prods. Co., Ltd. v Vertin*, 2013 WL 3233130, \*23, 2013 Del Ch LEXIS 152, \*84-85 [June 20, 2013, CA No. 6990-VCL]).

Specifically, section 7.06 of the indenture provides that no action may be commenced

"unless such holder previously shall have given to the Trustee written notice of default in respect of the series of Securities held by such Securityholder . . . , and unless also the holders of not less than 50% of the aggregate principal amount of the relevant series of Securities at the time Outstanding shall have made written request upon the Trustee to institute such action or proceedings in its own name as trustee hereunder . . . and the Trustee [after 60 days] . . . shall have failed to institute any such action or proceedings and no direction inconsistent with such written request shall have been given to the Trustee pursuant to [the indenture] within such 60 days . . . ."

This Court affirmed without discussion of the no-action clause (*see General Inv. Co. v Interborough R.T. Co.*, 235 NY 133 [1923]).

The Second Circuit reversed the District Court's ruling that some of plaintiffs' claims against the Trustees were time-barred (*Cruden*, 957 F2d at 978).

The Second Circuit affirmed, but remanded back to the District Court for a recalculation of damages under the Securities Act of 1933 (*McMahan & Co. v Wherehouse Entertainment, Inc.*, 65 F3d 1044, 1051 [2d Cir 1995]).

The requirement of notice to the Trustee and majority securityholder approval makes sense because litigation by a minority securityholder upon a default is an attempt to secure payment, and resolution of the matter is of interest to the entire class of securityholders.

Section 1.01 defines "Indenture" as "this instrument as originally executed," and "Securities" as the "Series A Notes and the Series B Notes," i.e., the notes purchased by plaintiff securityholder.

Copr. (C) 2019, Secretary of State, State of New York

---

**End of Document**    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 68

515 B.R. 69
United States Bankruptcy Court, S.D. New York.

IN RE: REDE ENERGIA S.A.,[1]

Debtor in a Foreign Proceeding.

Case No. 14-10078 (SCC)
|
Signed August 27, 2014

**Synopsis**
**Background:** Foreign representatives of debtors that were the subject of reorganization case which was pending in Brazil, and which had been recognized as foreign main proceeding, requested relief in aid of plan that had been confirmed in foreign bankruptcy proceedings.

**Holdings:** The Bankruptcy Court, Shelley C. Chapman, J., held that:

[1] relief requested by foreign representatives, consisting of order from United States Bankruptcy Court enforcing the foreign plan confirmation order, enjoining acts in contravention of order, and requiring action necessary to carry out terms of plan, while not specifically enumerated in provision of Chapter 15 dealing with relief that may be granted upon recognition, was type of relief appropriately granted under this provision;

[2] relief was also available as additional assistance under provision of Chapter 15 allowing such assistance, consistent with principles of comity, if certain enumerated fairness factors were satisfied; and

[3] requested relief could not be denied as "manifestly contrary to United States public policy."

Relief granted.

West Headnotes (18)

**[1]** **Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

Central tenet of Chapter 15 of the Bankruptcy Code is the importance of comity in cross-border insolvency proceedings.

5 Cases that cite this headnote

**[2]** **Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

Relief granted to foreign representative under provision of Chapter 15 authorizing court to provide any "additional assistance" available under the Bankruptcy Code or under "other laws of the United States" must be consistent with principles of comity, and must satisfy fairness considerations as set forth in this provision. 11 U.S.C.A. § 1507.

7 Cases that cite this headnote

**[3]** **Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

Chapter 15 of the Bankruptcy Code provides courts with broad, flexible rules to fashion relief that is appropriate to effectuate objectives of the Chapter in accordance with comity.

4 Cases that cite this headnote

**[4]** **Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

Assistance available to foreign representative upon recognition of foreign proceeding is largely discretionary and turns on subjective factors that embody principles of comity. 11 U.S.C.A. §§ 1507, 1521.

3 Cases that cite this headnote

**[5]** **Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

Relief granted in foreign proceeding and relief available in the United States in proceeding ancillary to foreign case under Chapter 15 of the Bankruptcy Code need not be identical.

5 Cases that cite this headnote

3987

**[6]**    **Bankruptcy**  👉 Cases Ancillary to Foreign Proceedings

Principle of comity, as embodied in Chapter 15 of the Bankruptcy Code, has never meant categorical deference to foreign proceedings; implicit in the concept is that deference should be withheld where appropriate to avoid violation of laws, public policies or rights of citizens of the United States.

**[7]**    **Bankruptcy**  👉 Cases Ancillary to Foreign Proceedings

All relief under Chapter 15, including the additional relief or assistance available following recognition of foreign proceeding, is subject to limitation that permits court to decline to take any action if such action would be "manifestly contrary" to public policy of the United States. 11 U.S.C.A. §§ 1506, 1507, 1521.

7 Cases that cite this headnote

**[8]**    **Bankruptcy**  👉 Cases Ancillary to Foreign Proceedings

"Public policy" exception to Chapter 15 is drafted in narrow terms to apply only when requested relief would be "manifestly contrary" to public policy of the United States and is to be applied sparingly. 11 U.S.C.A. § 1506.

4 Cases that cite this headnote

**[9]**    **Bankruptcy**  👉 Cases Ancillary to Foreign Proceedings

Foreign judgments are generally granted comity in proceeding ancillary to foreign case under Chapter 15 of the Bankruptcy Code, as long as the proceedings in foreign court were "according to the course of a civilized jurisprudence," i.e., fair and impartial.

6 Cases that cite this headnote

**[10]**    **Bankruptcy**  👉 Cases Ancillary to Foreign Proceedings

Relief requested by foreign representatives of debtors that were the subject of reorganization case which was pending in Brazil and which had been recognized as foreign main proceeding, consisting of order from United States Bankruptcy Court enforcing the foreign plan confirmation order, enjoining acts in contravention of order, and requiring indenture trustee to take action necessary to carry out terms of confirmed plan by executing assignment and making payments to beneficial noteholders, while not specifically enumerated in provision of Chapter 15 dealing with relief that may be granted upon recognition, was type of relief that was available prior to enactment of Chapter 15 in case ancillary to foreign proceeding, as well as type of relief routinely granted under United States bankruptcy law, and was appropriately granted under this provision; refusal to grant such relief would mean that Brazilian reorganization plan, which had already been substantially consummated, could not be fully implemented, and that distributions to noteholders would be prevented or substantially delayed, simply to allow objecting party another chance to renegotiate terms of plan with no evidence that its efforts in this regard would be successful. 11 U.S.C.A. § 1521.

4 Cases that cite this headnote

**[11]**    **Bankruptcy**  👉 Cases Ancillary to Foreign Proceedings

Relief requested by foreign representatives of debtors that were the subject of reorganization case which was pending in Brazil and which had been recognized as foreign main proceeding, consisting of order from United States Bankruptcy Court enforcing the foreign plan confirmation order, enjoining acts in contravention of order, and requiring indenture trustee to take action necessary to carry out terms of confirmed plan by executing assignment and making payments to beneficial noteholders, was available as additional assistance under provision of Chapter 15 allowing such assistance, consistent with principles of comity, if certain enumerated fairness factors were satisfied; creditors were

3988

given access to information and a meaningful opportunity to be heard in the Brazilian bankruptcy proceeding, Brazilian law provided a comprehensive procedure for orderly and equitable distribution of debtors' assets to creditors, there was no prejudice to United States creditors in processing of claims in the Brazilian bankruptcy proceeding nor any evidence of preferential or fraudulent property distributions, and Brazilian law, while not recognizing an "absolute priority" rule identical to that applicable under United States law to prevent equity holders from retaining interest if creditors were not paid in full, provided for distribution of debtors' assets in manner "substantially in accordance with United States law." 11 U.S.C.A. § 1507.

6 Cases that cite this headnote

[12]   **Bankruptcy**  👈 Cases Ancillary to Foreign Proceedings

Foreign representative generally satisfies the "just treatment" factor, as required for grant of additional assistance under provision of Chapter 15 providing for such relief, consistent with principles of comity, only if certain enumerated fairness factors are met, upon showing that the applicable foreign law provides a comprehensive procedure for the orderly and equitable distribution of debtor's assets among all of its creditors. 11 U.S.C.A. § 1507(b)(1).

3 Cases that cite this headnote

[13]   **Bankruptcy**  👈 Cases Ancillary to Foreign Proceedings

Courts hold that foreign proceeding does not satisfy the "just treatment" factor, as required for grant of additional assistance under provision of Chapter 15 providing for such relief, consistent with principles of comity, only if certain enumerated fairness factors are met, where the foreign proceeding fails to provide creditors with access to information and an opportunity to be heard in meaningful manner, or where the proceeding would not recognize creditor as claim holder. 11 U.S.C.A. § 1507(b)(1).

2 Cases that cite this headnote

[14]   **Bankruptcy**  👈 Cases Ancillary to Foreign Proceedings

Foreign insolvency regime need not contain an "absolute priority" rule identical to that of United States bankruptcy law in order for distribution of proceeds of foreign debtor's property under this foreign insolvency regime to be "substantially in accordance with the Bankruptcy Code," as required for grant of additional assistance under provision of Chapter 15 providing for such relief, consistent with principles of comity, only if certain enumerated fairness factors are met. 11 U.S.C.A. § 1507(b)(4).

3 Cases that cite this headnote

[15]   **Bankruptcy**  👈 Cases Ancillary to Foreign Proceedings

Relief requested by foreign representatives of debtors that were the subject of reorganization case which was pending in Brazil and which had been recognized as foreign main proceeding, consisting of order from United States Bankruptcy Court enforcing the foreign plan confirmation order, enjoining acts in contravention of order, and requiring indenture trustee to take action necessary to carry out terms of confirmed plan, could not be denied under public policy exception to Chapter 15 as "manifestly contrary to United States public policy"; neither the process by which debtors' assets were marketed, which involved competitive bidding and resulted in evolution and improvement of return to unsecured creditors, nor Brazilian court's decision to substantively consolidate debtors for plan purposes, relief that may, in appropriate circumstances, be granted in Chapter 11 cases under United States law, rendered the Brazilian proceedings manifestly contrary to United States law, and mere fact that plan was crammed down, on acceptance of single secured creditor, while equity holders retained interest in reorganized debtors and unsecured creditors received less than full payment on their

claims, was insufficient to trigger application of public policy exception, especially where equity holders' interest would be vastly diluted upon confirmation, and where plan, which was accepted by 66.34% in amount and 47.7% in number of unsecured creditors, fell short only 0.3% in amount and 2.3% in number of what would have been required under the Bankruptcy Code to find that plan was accepted by unsecured class. 11 U.S.C.A. § 1506.

5 Cases that cite this headnote

[16]    **Bankruptcy**    Cases Ancillary to Foreign Proceedings

Bankruptcy court will not decline, on public policy grounds, to extend comity and grant additional relief to foreign representative of debtor that is the subject of bankruptcy proceedings in foreign country simply because foreign bankruptcy law is not identical to United States bankruptcy law. 11 U.S.C.A. § 1506.

4 Cases that cite this headnote

[17]    **Bankruptcy**    Cases Ancillary to Foreign Proceedings

Mere fact that, under reorganization plan confirmed in Brazilian bankruptcy proceedings, certain unsecured creditors, concessionaires that provided utility service to consumers in Brazil and that were barred by Brazilian law from filing for bankruptcy relief, would receive full payment on their claims, while other unsecured creditors would receive only a 25% distribution on their claims, did not preclude grant of foreign representatives' request for post-recognition assistance in aid of plan, as allegedly being manifestly contrary to United States public policy; such disparate treatment was necessary as result of law validly adopted by Brazilian government in exercise of its regulatory powers to preclude concessionaires from filing for bankruptcy, and different treatment of groups of unsecured creditors was not uncommon under United States bankruptcy law. 11 U.S.C.A. § 1506.

1 Case that cites this headnote

[18]    **Bankruptcy**    Cases Ancillary to Foreign Proceedings

Party challenging relief requested by foreign representatives of debtors that were the subject of bankruptcy proceedings in Brazil in aid of reorganization plan confirmed by Brazilian court failed to show that grant of such relief would be manifestly contrary to public policy of the United States, on theory that Brazilian law allegedly discriminated against United States creditors, where Brazilian law required that Brazilians and foreigners be treated equally before the law and required that foreign creditors receive a full and fair opportunity to participate in the Brazilian bankruptcy proceedings, and where there was only a single United States creditor that had not voted in favor of plan, and party declined to present any evidence that Brazilian bankruptcy proceedings targeted this lone dissenting creditor. 11 U.S.C.A. § 1506.

5 Cases that cite this headnote

**Attorneys and Law Firms**

 **\*73**   White & Case LLP, 1155 Avenue of the Americas, New York, New York 10036, By: J. Christopher Shore, Esq., Thomas MacWright, Esq., Southeast Financial Center, 200 South Biscayne Blvd., Suite 4900, Miami, Florida 33131, By: John K. Cunningham, Esq., Richard S. Kebrdle, Esq., Attorneys for Foreign Representative, José Carlos Santos

Bingham McCutchen LLP, 399 Park Avenue, New York, New York 10022, By: Timothy B. DeSieno, Esq., Mark W. Deveno, Esq., Attorneys for Ad Hoc Group of Rede Noteholders

In a Case Under Chapter 15 of the Bankruptcy Code

***MEMORANDUM DECISION GRANTING PLAN ENFORCEMENT RELIEF PURSUANT TO CHAPTER 15 OF THE BANKRUPTCY CODE***

SHELLEY C. CHAPMAN, UNITED STATES BANKRUPTCY JUDGE

*TABLE OF CONTENTS*

FACTUAL BACKGROUND ... 75

   I. The Rede Group ... 75

   II. Rede Issues the Perpetual Notes ... 76

   III. Events Leading to the Brazilian Bankruptcy Proceeding ... 77

   IV. The Brazilian Bankruptcy Proceeding ... 79

      A. Competing Plans are Submitted ... 79

      B. Creditors Vote on the Brazilian Reorganization Plan ... 81

      C. The Brazilian Reorganization Plan is Approved Via Cram–Down ... 82

   V. The Terms and Provisions of the Brazilian Reorganization Plan ... 84

      A. Substantive Consolidation of the Rede Debtors ... 84

      B. Classification of Claims Generally ... 85

   **\*74** C. Treatment of Secured Claims ... 85

      D. Treatment of Unsecured Claims ... 86

         1. Treatment of Concessionaire Creditor Claims ... 86

         2. Treatment of Subsidiary Concessionaire Claims ... 87

         3. Treatment of General Unsecured Claims ... 87

   VI. The Foreign Representative Commences a Chapter 15 Proceeding in the United States ... 88

DISCUSSION ... 89

   I. Applicable Law ... 89

   II. The Plan Enforcement Relief is Proper Under Section 1521 of the Bankruptcy Code ... 92

   III. The Plan Enforcement Relief is Also Proper Under Section 1507 of the Bankruptcy Code ... 94

      A. Creditors Were Treated Justly in Brazil ... 95

      B. There is No Prejudice to U.S. Creditors in the Processing of Claims in Brazil ... 96

      C. There Were No Preferential or Fraudulent Property Distributions in the Brazilian Bankruptcy Proceeding ... 96

      D. The Distribution of Proceeds Under the Brazilian Reorganization Plan Was Substantially in Accordance with U.S. Law ... 97

   IV. With Respect to Section 1506, the Brazilian Bankruptcy Proceeding Was Administered in a Manner Consistent With U.S. Public Policy ... 98

      A. The Marketing Process of the Rede Debtors' Assets, the Consolidation of the Rede Debtors, and the Confirmation of the Brazilian Reorganization Plan Did Not Violate Creditors' Due Process Rights and Were Not Manifestly Contrary to U.S. Public Policy ... 98

         1. The Marketing Process of the Rede Debtors' Assets ... 98

         2. The Determination by the Brazilian Bankruptcy Court That the Rede Debtors' Assets and Liabilities Could be Consolidated for Plan Purposes ... 100

         3. The Voting Process and Approval of the Plan Through Cram–Down ... 101

      B. The Distribution Scheme in the Brazilian Reorganization Plan is Not Manifestly Contrary to U.S. Public Policy ... 103

      C. Differing Treatment of Similarly Situated Creditors by the Brazilian Reorganization Plan Was For a Valid Purpose and Is Not Inconsistent With U.S. Law ... 105

      D. To the Extent That There is Disparate Treatment, Such Treatment is Not Targeted at U.S.-Based Creditors and There is No Evidence of Protection of Local Creditors to the Detriment of U.S.-Based Creditors ... 106

CONCLUSION ... 107

In this proceeding brought pursuant to chapter 15 of the Bankruptcy Code, José Carlos Santos, the Foreign Representative of Rede Energia S.A., seeks this Court's

assistance, pursuant to sections 1507 and 1521, in enforcing the terms of Rede's Brazilian reorganization plan. Specifically, the Foreign Representative requests the following relief: (i) an order granting full faith and credit to (a) the Brazilian reorganization plan and (b) the Brazilian court order confirming the plan, including a continuation of the injunction of acts in the United States in contravention of the confirmation order, and (ii) an order authorizing and directing the Indenture Trustee **\*75** for Rede's 11.125 percent perpetual notes and the Depository Trust Company to take the actions necessary to carry out the terms of the Brazilian reorganization plan, including making payments to Rede's noteholders. Certain of Rede's noteholders object to the relief as being contrary to public policy of the United States and urge the Court to allow them to return to Brazil and negotiate for an improvement on the distribution they are to receive under the Brazilian reorganization plan. These noteholders allege that what the Foreign Representative describes as a proceeding that indisputably comports with fundamental principles of U.S. bankruptcy law and civilized jurisprudence is in fact a wholesale trampling of their rights that was conceived of and executed by the Brazilian government and rubberstamped by the Brazilian bankruptcy court. While there are certainly aspects of the Brazilian proceeding that differ in form and substance from what might occur in the United States, the Court nonetheless concludes, for the reasons set forth herein, that Rede's Foreign Representative is entitled to the relief requested.

*FACTUAL BACKGROUND*

An understanding of the structure of Rede Energia S.A. ("*Rede* " or the "*Debtor* "), the events leading to Rede's Brazilian bankruptcy proceeding (the *"Brazilian Bankruptcy Proceeding* "), and the Brazilian Bankruptcy proceeding itself, including the terms of Rede's reorganization plan and its treatment of Rede's creditors, is essential to the Court's consideration and analysis of the relief requested by José Carlos Santos, the authorized foreign representative of Rede (the "*Foreign Representative* ") and the objections to such relief. The uncontroverted facts and summary of applicable Brazilian law set forth below are taken from (i) the Stipulation of Facts for Purposes of a Hearing on the Objection by the Ad Hoc Group of Rede Noteholders to Relief Related to Recognition of a Foreign Proceeding [Docket No. 26] ("*Stipulation of Facts* " or "*Fact Stip.* ") and (ii) the Stipulation of Brazilian Law for Purposes of a Hearing on the Objection by the Ad Hoc Group of Rede Noteholders to Relief

Related to Recognition of Foreign Proceeding [Docket No. 27] ("*Stipulation of Law* " or "*Law Stip.* ").[2]

**I. The Rede Group**

Rede is one of the largest electric power companies in Brazil; it is the parent company of a group of operating and non-operating subsidiary entities (collectively, with Rede, the "*Rede Group* "). (Foreign Representative's Petition for Recognition of Brazilian Bankruptcy Proceeding and Motion for Order Granting Related Relief Pursuant to 11 U.S.C. § 105(a), 1507(a), 1509(b), 1515, 1517, 1520 and 1521) [Docket No. 2] (the "*Petition* " at 3.) Through its operating subsidiaries, the Rede Group distributes electricity to millions of customers throughout Brazil, including customers in the States of São Paulo, Minas Gerais, Paraná, Mato Grosso, and Tocantins. (Petition at 3.) By 2012, the Rede Group had become one of Brazil's largest electricity distributors, providing electricity to 578 municipalities in seven states in Brazil, serving approximately five million consumer units, 165 indigenous villages, and 787 rural settlements. (Fact Stip. at ¶ 1.)

Five members of the Rede Group are debtors in the Brazilian Bankruptcy Proceeding **\*76** (collectively, the "*Rede Debtors* "), consisting of:

- Rede, an intermediate holding company, holding interests in fourteen subsidiaries;

- Empresa de Eletricidade Vale Paranapanema S.A. ("*EEVP* "), a holding company that is the direct parent and controlling shareholder of Rede;

- Denerge Desenvolvimento Energético S.A. ("*Denerge* "), another holding company that is the direct parent and controlling shareholder of EEVP and the indirect parent of Rede;

- Companhia Técnica de Comercialização de Energia ("*CTCE* "), an electricity-trading subsidiary of Rede; and

- QMRA Participações S.A., a subsidiary of Rede and the former intermediate holding company parent of Centrais Elétricas Do Pará S.A. ("*CELPA* ").[3]

(Fact Stip. at ¶ 2.)

The Rede Debtors have eight electricity distribution operating subsidiaries, known as the "Rede Concessionaires,"[4] that are not debtors in the Brazilian Bankruptcy Proceeding.[5]

(Fact Stip. at ¶ 3.) Rede holds the equity in the Rede Concessionaires, and substantially all of the Rede Group's business activities are conducted through them. The electricity distribution activities of the Rede Concessionaires are subject to extensive regulation by the Brazilian government through various regulatory authorities, including Agência Nacional de Energia Elétrica ("*ANEEL* "). (Fact Stip. at ¶ 8.)

## II. Rede Issues the Perpetual Notes

Pursuant to an indenture dated April 2, 2007 (the "*Indenture* "), Rede issued 11.125 percent notes in the aggregate principal amount of USD$400 million[6] that **\*77** have no fixed final maturity date and are not subject to any mandatory redemption provisions (the "*Perpetual Notes* "). (Fact Stip. at ¶ 4.) In September 2007, Rede exercised its right under the Indenture to issue additional Perpetual Notes in the aggregate principal amount of USD$175 million. Approximately USD $496 million of the Perpetual Notes remained outstanding as of the date of the commencement of the Brazilian Bankruptcy Proceeding on November 23, 2012. (Fact Stip. at ¶ 4.)

The Perpetual Notes are general unsecured obligations of Rede and are not guaranteed by any of Rede's operating subsidiaries or other affiliates. (Fact Stip. at ¶ 5.) The notes are held in global note form (the "*Global Note* ") with the Depository Trustee Company ("*DTC* "). The Bank of New York Mellon is the indenture trustee for the Perpetual Notes (the "*Indenture Trustee* "). Interest payments on the Perpetual Notes historically have been made by Rede to the Indenture Trustee in New York and have been distributed to the beneficial owners of the Perpetual Notes (the "*Noteholders* ") through DTC. The Indenture and the Perpetual Notes are governed by New York law.[7] (Fact Stip. at ¶¶ 5–6.)

The members of the Ad Hoc Group of Rede Noteholders (the "*Ad Hoc Group* ") in the aggregate hold approximately 37 percent of the Perpetual Notes. (Fact Stip. at ¶ 80.) The members of the Ad Hoc Group are Merrill Lynch Pierce, Fenner & Smith Incorporated ("*Merrill* "); Finanzas Y Negocios Internacional Inc.; and multiple funds managed by Moneda Asset Management. (Fact Stip. at 31 n.16.) The majority of the members of the Ad Hoc Group are based in Latin America. (Fact Stip. at ¶ 80.) Only one of its members, Merrill (which holds approximately 8.1 percent of the Perpetual Notes), is based in the United States. (Fact Stip. at ¶¶ 79–80; 5/9/14 Tr. at 23:19–24:4.)

## III. Events Leading to the Brazilian Bankruptcy Proceeding

On August 29, 2012, the Brazilian government passed and published Provisional Measure No. 577 ("*MP 577* "),[8] which permitted ANEEL, among other things, to intervene and take operational control of an electricity distribution concessionaire "to ensure its proper performance and to ensure compliance with the relevant contractual, regulatory and legal standards." (Fact Stip. at ¶ 18.) MP 577 also provided that electricity distribution concessionaires are no longer permitted to commence judicial and extrajudicial restructuring proceedings under Brazilian bankruptcy law prior to termination of the concession.[9] **\*78** (Fact Stip. at ¶ 19.) Within two days of publication of MP 577, on August 31, 2012, ANEEL intervened and seized operational control of the Rede Concessionaries. (Fact Stip. at ¶ 22.) Pursuant to MP 577, Rede was required to provide ANEEL with a plan, over which ANEEL had unilateral approval rights, to correct the failures and infractions that led to ANEEL's intervention and which demonstrated Rede's economic and financial viability (the "*Correctional Plan* "). (Fact Stip. at ¶ 27.) In order to lift its intervention, ANEEL required that the Rede Debtors adequately capitalize the Rede Concessionaires to ensure the provision of electric service to consumers. (Fact Stip. at ¶¶ 24–27.)

The Ad Hoc Group alleges that (i) the timing of MP 577's passage; (ii) the timing of the seizure of the Rede Concessionaires by ANEEL; (iii) the treatment of FI–FGTS's claim (defined and discussed below); and (iv) the end result for creditors of the Rede Concessionaires (who were not forced to restructure claims in bankruptcy) suggest that the protection of local interests may have been involved in both the passage of MP 577 and in ANEEL's activities. The Rede Debtors dispute such allegations and believe the evidence is to the contrary. (Fact Stip at ¶ 24.)

Following ANEEL's intervention, the Rothschild Group ("*Rothschild* "), whom Rede had previously hired as its financial advisor, began marketing the shares of the Rede Group while calling for any purchaser to make a capital injection in the Rede Concessionaires and pay an additional amount that could be used to fund distributions to the creditors of the Rede Debtors. (Fact Stip. at ¶¶ 26–29.) Rothschild received two binding offers by the October 11, 2012 deadline, and Rede selected the joint bid submitted by CPFL Energia ("*CPFL* ") and Equatorial Energia ("*Equatorial,*" and together with CPFL, "*Equatorial–CPFL* ").[10] (Fact Stip.

at ¶ 30.) Rede also developed a Correctional Plan that was submitted to ANEEL on October 26, 2012.[11] (Fact Stip. at ¶ 31.)

On November 22, 2012, Fundo de Investimento do Fundo de Garantia por Tempo de Serviço ("*FI–FGTS* "), an investment fund wholly-owned by an employee severance payment guarantee fund created by the Brazilian government, exercised a "put" right under its 2010 investment agreement with Rede. (Fact Stip. at ¶¶ 64–65.) Pursuant to the investment agreement, FI–FGTS held 37.1 percent of the shares of EEVP and a right to "put" such shares to Denerge[12] in return for a secured debt claim. Accordingly, by exercising its put right one day before the Rede Debtors filed for bankruptcy in Brazil, FI–FGTS obtained a secured claim against Denerge, one of the Rede Debtors, in an amount of R$712.5 million. (Fact Stip. at **\*79** ¶ 66.) As further described below, the Ad Hoc Group contends that, as of the petition date, FI–FGTS remained a shareholder and should not be treated as a secured creditor entitled to vote on the Brazilian Reorganization Plan (as defined below).

On November 23, 2012, the Rede Debtors voluntarily filed petitions for judicial reorganization under Brazilian bankruptcy law.[13] None of the Rede Concessionaires filed a petition. (Fact Stip. at ¶ 33.)

**IV. The Brazilian Bankruptcy Proceeding**

**A. Competing Plans Are Submitted**

On December 19, 2012, the Second Court of Bankruptcies and Judicial Restructuring Court of the Central Civil Court of the City of São Paulo, State of São Paulo (the "*Brazilian Bankruptcy Court* ") granted the Rede Debtors' request to commence reorganization proceedings. (Fact Stip. at ¶ 34.) On March 15, 2013, the Rede Debtors presented a reorganization plan to the Brazilian Bankruptcy Court based on an investment and share purchase agreement (the "*Equatorial–CPFL SPA* ") executed between the Rede Debtors and Equatorial–CPFL (the "*Equatorial–CPFL Plan* "), which provided for Mr. Jorge Queiroz de Moraes Junior (the "*Controlling Shareholder* ") of the Rede Group to transfer his stock in the Rede Group to Equatorial–CPFL. (Fact Stip. at ¶¶ 34–35.) The Equatorial–CPFL SPA also prohibited the Rede Debtors from marketing the company to other potential bidders until June 30, 2013, at which time the agreement could be terminated by either party.[14] (Fact Stip. at ¶ 34.) The Equatorial–CPFL Plan provided that certain creditors of

the Rede Debtors, including the Noteholders, would receive their choice of either: (i) cash equal to fifteen percent of the principal amount of their claim in return for assignment of such claim to Equatorial–CPFL or (ii) reinstatement of 65 percent of the principal amount of their claim paid out over 27 years, without interest. (Fact Stip. at ¶ 35.)

On April 4, 2013, the Indenture Trustee and the Ad Hoc Group filed petitions with the Brazilian Bankruptcy Court objecting to a number of issues related to the Equatorial–CPFL Plan, including (i) the proposed substantive consolidation of the Rede Debtors for plan purposes and (ii) the voting rights of FI–FGTS under the Equatorial–CPFL Plan, based on the Ad Hoc Group's belief that FI–FGTS qualified as an insider (as more fully discussed *infra* ). (Fact Stip. at ¶ 56.) Interested parties COPEL and Energisa S.A. also filed a petition with the Brazilian Bankruptcy Court challenging the exclusivity that had been granted to Equatorial–CPFL under the Equatorial–CPFL SPA and requesting access to the dataroom for purposes of forming a competing bid. (Fact Stip. at ¶ 36.)

**\*80** On May 14, 2013, the Judicial Administrator published a preliminary official list of claims, listing FI–FGTS as holding a secured claim against Denerge.[15] (Fact Stip. at ¶ 67.) On May 27, 2013, FI–FGTS informed the Brazilian Bankruptcy Court that the put option that it held pursuant to its 2010 investment agreement had been exercised one day prior to the bankruptcy filing, and it offered the shares to the Brazilian Bankruptcy Court to dispose of them.[16] (Fact Stip. at ¶ 66.)

On May 27, 2013, the Brazilian Bankruptcy Court ruled on eleven issues, including those raised by the Ad Hoc Group on April 4, 2013, finding, among other things, that FI–FGTS was a secured creditor.[17] (Fact Stip. at ¶¶ 5 8, 71.) The Indenture Trustee then sought an expedited appeal of such order and an injunction of the solicitation of the Equatorial–CPFL Plan with the São Paulo State Court of Appeals (the "*Brazilian Court of Appeals* "). The Brazilian Court of Appeals denied the request for an injunction and the appeal remains pending. (Fact Stip. at ¶ 60.)

On May 29, 2013, COPEL and Energisa (together, "*COPEL– Energisa* ") publicly announced a competing bid to purchase certain assets of the Rede Debtors (the "*COPEL–Energisa Proposal* "). (Fact Stip. at ¶ 37.) The COPEL–Engerisa Proposal provided, among other things, for the purchase of the Rede Concessionaires' stock held by Rede for approximately R$3.2 billion. (Fact Stip. at ¶ 37.) The COPEL–Energisa

Proposal was not a plan of reorganization; it neither (i) provided for allowance or distribution to particular claims nor (ii) opined on the consolidation of the Rede Debtors. (Fact Stip. at ¶ 37.) Although the Ad Hoc Group supported the COPEL–Energisa Proposal, the Rede Debtors rejected it on June 5, 2013, the date of the first Rede creditors' meeting (discussed *infra* ), reasoning, among other things, that (i) the proposal was not binding, as it required certain condition precedents to be met; (ii) it did not satisfy the restructuring requirements imposed by ANEEL; (iii) the estimated creditor recoveries it promised were inflated; and (iv) it would strip the Rede Debtors of their business activity and/or assets. (Fact Stip. at ¶ 38.)

On June 5, 2013, the first Rede creditors' meeting was held and an official committee of creditors was formed.[18] (Fact **\*81** Stip. at ¶ 49.) The meeting was discontinued prior to creditors voting on the Equatorial–CPFL Plan. (Fact Stip. at ¶ 40.) On June 12, 2013, COPEL–Energisa withdrew the COPEL–Engerisa Proposal due to lack of information necessary to confirm the proposal and tight deadlines for its confirmation. (Fact Stip. at ¶ 41.)

On July 2, 2013, one day prior to the second creditors' meeting, Energisa submitted a revised proposal and plan of reorganization that largely mirrored the structure of the Equatorial–CPFL SPA and the Equatorial–CPFL Plan (the "*Revised Energisa Proposal* "). (Fact Stip. at ¶¶ 41–43.) On July 3, 2013, the second creditors' meeting was held, but this meeting was also discontinued prior to voting on any plan of reorganization. (Fact Stip. at ¶ 44.)

**B. Creditors Vote on the Brazilian Reorganization Plan**
Prior to the third creditors' meeting, the Brazilian Bankruptcy Court suggested that it would not allow a vote on both the Revised Energisa Proposal and the Equatorial–CPFL Plan. (Fact Stip. at ¶ 45.) As a result, at the third creditors' meeting held on July 5, 2013, representatives of Energisa and Equatorial–CPFL presented their respective plans to creditors of the Rede Debtors, after which the Rede Debtors adjourned the meeting and requested that the creditors tell them informally which plan they preferred. (Fact Stip. at ¶ 45.) The Ad Hoc Group and the Indenture Trustee did not participate in the poll due to, among other things, their view that both plans contained inappropriate consolidation of the debtor entities. The majority of the remaining creditors who did participate indicated a preference for the Revised Energisa Proposal. (Fact Stip. at ¶ 45.) Accordingly, Equatorial–CPFL

withdrew its bid, and, upon resuming the third creditors' meeting, the Rede Debtors proposed a plan embodying the Revised Energisa Proposal (the "*Brazilian Reorganization Plan* " or "*Plan* ") and the final votes of the Rede Debtors' creditors on the Plan were solicited.

Secured creditor FI–FGTS voted in favor of the Brazilian Reorganization Plan.[19] (Fact Stip. at ¶ 69.) Each of the members of the Ad Hoc Group voted to reject the Brazilian Reorganization Plan. (Fact Stip. at ¶ 98.) Having obtained a ruling from the Brazilian Bankruptcy Court that the Indenture Trustee would be permitted to vote, the Indenture Trustee, on behalf of all Noteholders other than the members of the Ad Hoc Group (including those Noteholders **\*82** who did not direct or authorize the Indenture Trustee to vote on their behalf), also voted to reject the Brazilian Reorganization Plan. (Fact Stip. at ¶ 99.) On July 15, 2013, Rede appealed to the Brazilian Court of Appeals and sought injunctive relief and reconsideration of the Brazilian Bankruptcy Court's decision allowing the Indenture Trustee to vote, but the Brazilian Court of Appeals denied this request. (Fact Stip. at ¶ 100.)

At the time of the third creditors' meeting, several objections to the treatment of claims or the right of certain creditors to vote remained pending before the Brazilian Bankruptcy Court, including the Ad Hoc Group's objection to FI–FGTS's status as a secured creditor. (Fact Stip. at ¶ 5 1.) While all creditors on the official list of creditors (the "*Creditors' List* ") were permitted to attend the general meetings of creditors and to vote on the Brazilian Reorganization Plan, in many cases in which a dispute remained outstanding with respect to a creditor's right to vote, the Brazilian Bankruptcy Court ordered that the applicable creditor be permitted to cast a provisional vote. The Brazilian Bankruptcy Court then instructed the Judicial Administrator to make two calculations of voting results: one considering all such provisional votes and one disregarding such provisional votes. (Fact Stip. at ¶ 51.)

On July 26, 2013, after the final votes were solicited, the Ad Hoc Group objected to confirmation of the Brazilian Reorganization Plan, again raising an objection to consolidation of the Rede Debtors; Rede and Energisa filed replies. (Fact Stip. at ¶ 61.)

On September 9, 2013, the Brazilian Bankruptcy Court entered its decision confirming the Brazilian Reorganization Plan. (Fact Stip. at ¶ 61.) As part of this decision, the Brazilian Bankruptcy Court reversed its prior decision and

3995

held that that the Indenture Trustee could not vote on behalf of those Noteholders from whom it did not receive direction or authorization, finding that under the terms of the Indenture, the Indenture Trustee did not have the power, without the consent of each of the individual beneficial holders of Perpetual Notes, to effect any alteration to the values, charges, conditions, or maturity dates of the Perpetual Notes. (Fact Stip. at ¶ 100.) The Brazilian Bankruptcy Court determined that the Brazilian Reorganization Plan should nevertheless be confirmed because, even without the vote of the Indenture Trustee, both the secured and unsecured creditor classes had voted to accept the Brazilian Reorganization Plan. (Fact Stip. at ¶ 101.)

### C. The Brazilian Reorganization Plan is Approved Via Cram–Down

On September 24, 2013, the Ad Hoc Group filed an objection to the Brazilian Bankruptcy Court's September 9, 2013 order confirming the Brazilian Reorganization Plan, arguing that (i) the vote of Denerge and EEVP-level creditors should not be permitted to control the outcome of the Rede-level assets and (ii) FI–FGTS's vote should not be counted because FI–FGTS remained a shareholder of EEVP (and thus, an insider ineligible to vote) due to the fact that, at the time the Rede Debtors filed for reorganization, FI–FGTS's exercise of its put right had not been perfected by a share transfer in the appropriate corporate books. (Fact Stip. at ¶ 70.) The Brazilian Bankruptcy Court overruled the Ad Hoc Group's objections, and the Ad Hoc Group appealed. (Fact Stip. at ¶¶ 70–73.)

On November 14, 2013, after determining that it had miscalculated the voting results, the Brazilian Bankruptcy Court entered an order clarifying its September **\*83** 9, 2013 order (together, the "*Confirmation Decision*"). The November 14, 2013 order clarified that, even after disregarding the vote of the Indenture Trustee, the unsecured creditor class had narrowly missed the numerosity requirement for confirming the Brazilian Reorganization Plan;[20] therefore, the Brazilian Bankruptcy Court had confirmed the Brazilian Reorganization Plan pursuant to the cram-down provisions of Brazilian bankruptcy law.[21] (Fact Stip. at ¶¶ 101–02.)

The Rede Debtors have appealed the Confirmation Decision, arguing that the Brazilian Reorganization Plan was approved by both the secured and unsecured creditor classes by consensual means and without the need for cram-down. (Fact

Stip. at ¶ 104.) Specifically, the Rede Debtors have appealed the Confirmation Decision's denial of Rede's argument that the votes of parties arguably related to Equatorial and CPFL —which together held seven votes—should be designated because such parties were related to the losing bidders, competitors of the Rede Debtors who had publicly declared that they were interested in investing in the Rede Debtors if the Brazilian Reorganization Plan was rejected. (Fact Stip. at ¶ 104.) The Ad Hoc Group also has appealed, arguing (i) that the Indenture Trustee had the right to vote on behalf of all Noteholders and (ii) that FI–FGTS did not have a right to vote as a secured creditor. (Fact Stip. at ¶ 102.) Both parties' appeals remain pending with the Brazilian Court of Appeals. (Fact Stip. at ¶¶ 61, 104.)

**\*84** If the Rede Debtors are successful on appeal and the Brazilian Court of Appeals otherwise affirms the Confirmation Decision, the Brazilian Reorganization Plan may be deemed approved by both the secured and unsecured creditor classes by consensual means (without the need for cram-down under Brazilian bankruptcy law). If the Ad Hoc Group prevails in its appeal with respect to the right of the Indenture Trustee to vote, the unsecured class would reject the Brazilian Reorganization Plan by amount, notwithstanding the results with respect to numerosity. Moreover, if the Ad Hoc Group also prevails in its appeal with respect to FI–FGTS's right to vote, the Brazilian Reorganization Plan will be unable to satisfy the requirement of a consenting class for cram-down purposes. Finally, if the Ad Hoc Group prevails in its appeal with respect to consolidation, the Brazilian Reorganization Plan will be unable to satisfy any requirement for either ordinary confirmation or confirmation by cram-down under Brazilian bankruptcy law. (Fact Stip. at ¶ 104.)

### V. The Terms and Provisions of the Brazilian Reorganization Plan

Under the Brazilian Reorganization Plan, Energisa will invest R$1.2 billion in the Rede Concessionaires and R$1.95 billion to pay the creditors of the Rede Debtors. The investment in the Rede Concessionaires may be derived from a variety of sources, including the sale of one or more Rede Concessionaires by Energisa, although Energisa has announced that no such sale is contemplated in the foreseeable future.

The Brazilian Reorganization Plan generally provides that certain creditors of the Rede Debtors, including the Noteholders, will have the option to receive either (i) cash equal to 25 percent of the principal amount of their claims

3996

in return for an assignment of such claims to Energisa or (ii) reinstatement of 100 percent of the principal amount of their claims paid out over 22 years, without interest. (Fact Stip. at ¶ 43.) The Brazilian Reorganization Plan also requires the Controlling Shareholder of the Rede Debtors to transfer his equity interests in the Rede Group to Energisa in consideration for the symbolic price of R$1.00, and it requires the assumption by Energisa of certain guarantees of the debts of the Rede Group that had been provided by the Controlling Shareholder of the Rede Debtors. (Fact Stip. at ¶ 43.)

### A. Substantive Consolidation of the Rede Debtors

The Brazilian Reorganization Plan is premised on the consolidation of the assets and liabilities of all five Rede Debtors for voting and distribution purposes. (Fact Stip. at ¶ 55.) The Brazilian Reorganization Plan does not result in the actual corporate consolidation or merger of the Rede Debtors. (Fact Stip. at 23 n.13.) However, the Plan permits Energisa to modify the corporate structure of the Rede Group after the consummation of the transaction. (Fact Stip. at 23 n.13 (citing Ex. L (Brazilian Reorganization Plan) § 3.5).) In addition, Article 9.7.2 of the Brazilian Reorganization Plan specifies means for payment of all intercompany claims other than claims held by the Rede Concessionaires. (Fact Stip. at 23 n.13.) As described above, the Ad Hoc Group and the Indenture Trustee filed petitions with the Brazilian Bankruptcy Court objecting to, among other things, the presentation of a consolidated plan. (Fact Stip. at ¶¶ 58–61.) On May 27, 2013, the Brazilian Bankruptcy Court issued a decision finding that the consolidation of the Rede Debtors was appropriate and permitting the joint processing and consolidation of the Rede **\*85** Debtors for plan purposes. The Brazilian Bankruptcy Court found that the consolidation of the Rede Debtors was appropriate because,

> The "Rede" group, subject to reorganization, is in fact organized as a corporate group, with a common controlling company and credit inter-dependence, as loans exist between the companies that comprise the group, and cross corporate guarantees to honor obligations to third parties. Moreover, the plan is based on the joint cash flow of all the companies, in such a way to find an effective means of reorganization.[22]

On July 26, 2013, the Ad Hoc Group renewed its objection to consolidation in its objection to the confirmation of the Brazilian Reorganization Plan. (Fact Stip. at ¶ 61.) The substantive consolidation of the Rede Debtors is one of the infirmities of the Brazilian Reorganization Plan that is cited by the Ad Hoc Group as a reason to deny the relief requested by the Foreign Representative in this Court.[23]

### B. Classification of Claims Generally

There were 111 claims asserted against the five Rede Debtors, totaling approximately R$3.990 billion and USD $655 million. Of those claims, 33 were asserted against multiple Rede Debtors. (Fact Stip. at ¶ 53.) Under Brazilian bankruptcy law, claims are divided into three classes: (i) labor related claims ("*Class I* "); (ii) secured claims ("*Class II* "); and (iii) unsecured claims, claims entitled to general and special privilege, and subordinated claims ("*Class III* "). (Law Stip. at ¶ 16.) No Class I claims were asserted against the Rede Debtors. Class II (secured) claims were filed by two creditors: (i) FI–FGTS, which asserted a R$712.5 million Class II secured claim against Denerge, secured by equity interests in other Rede Debtors, and (ii) BNDES, which asserted a R$135.5 million Class II secured claim against Rede. (Fact Stip. at ¶ 53.) Most of the Class III unsecured and other claims, totaling approximately R$1.89 million plus USD$655 million, were asserted against Rede. (Fact Stip. at ¶ 53.) Approximately R$775 million in claims were owed by certain Rede Debtors to other Rede Debtors, and, if netted, would result in R$500 million owing to Rede from other Rede Debtors. (Fact Stip. at ¶ 53.)

The Brazilian Reorganization Plan does not provide for treatment of the shareholders of the Rede Debtors as, under Brazilian bankruptcy law, shareholders cannot be deprived of their interests without their consent.[24] (Fact Stip. at ¶ 93.)

### C. Treatment of Secured Claims

Under the Brazilian Reorganization Plan, secured claim holders were permitted to choose from three options for the treatment of their claims.[25] (Fact Stip. at **\*86** ¶¶ 74–75.) BNDES chose to assign its debt to Energisa in return for a 25 percent cash distribution paid on the closing date.[26] (Fact Stip. at ¶ 74.) FI–FGTS chose a 22–year note bearing four percent interest in exchange for committing to provide future financing to the Rede Debtors. (Fact Stip. at ¶ 76.) FI–FGTS is to provide future financing to the Rede Debtors in an amount equal to 90 percent of its claim, for a minimum period of payment of twenty years, with (i) at least a twelve-year period without the payment of principal; (ii) monthly amortization after the twelve-year period; and (iii) a maximum interest rate of seven percent per year, payable as agreed between the parties, as adjusted annually.[27] (Fact Stip. at ¶ 76.)

**D. Treatment of Unsecured Claims**

Although all unsecured claims are contained in one class under the Brazilian Reorganization Plan, the Plan distinguishes among three types of unsecured claims:

1. *Concessionaire Creditor Claims:* unsecured guaranty, surety, or joint claims against the Rede Debtors where the creditor's underlying principal claim is against one or more of the non-debtor Rede Concessionaires;

2. *Subsidiary Concessionaire Claims*: claims of non-debtor Rede Concessionaires; and

3. *General Unsecured Claims*: all unsecured claims (other than Concessionaire Creditor Claims and Subsidiary Concessionaire Claims), including claims by Noteholders.

(Fact Stip. at ¶ 77.) As more fully described below, under the Brazilian Reorganization Plan, Concessionaire Creditor Claims and Subsidiary Concessionaire Claims will be satisfied in full, whereas General Unsecured Claims, including claims of Noteholders, are entitled to a 25 percent recovery. The Ad Hoc Group maintains that such "disparate" treatment is a basis for denying the Plan Enforcement Relief (as defined below).

**1. Treatment of Concessionaire Creditor Claims**

There are eleven allowed Concessionaire Creditor Claims on the Creditors' List, totaling approximately R$421 million. (Fact Stip. at ¶ 83.) The holders of these claims, the "*Concessionaire Creditors,*"[28] were permitted to vote on the Brazilian **\*87** Reorganization Plan because they hold guarantee or surety claims against one or more of the Rede Debtors (and therefore, the Rede Debtors are jointly and severally liable for the payment of such claims). (Fact Stip. at ¶ 83.)

While the Concessionaire Creditors were permitted to choose from the three Plan treatment options available to holders of General Unsecured Claims (discussed *infra* ), if a Concessionaire Creditor agreed not to take further enforcement actions and waived all defaults, fines, and penalties against the Rede Concessionaires and the Rede Debtors, such Concessionaire Creditor (i) will receive (within 60 days of the closing date) payment in full of any portion of its obligations that have already matured pursuant to their

original schedule and (ii) will have its surety, guarantee, or joint obligations replaced by Energisa on the same terms and conditions thereof. (Fact Stip. at ¶ 85.)

**2. Treatment of Subsidiary Concessionaire Claims**

Each of the eight Rede Concessionaires holds a Subsidiary Concessionaire Claim against the Rede Debtors, which, in the aggregate, total approximately R$504 million. (Fact Stip. at ¶ 87.) None of these parties was permitted to vote on the Brazilian Reorganization Plan, as the Rede Concessionaires are affiliates of the Rede Debtors. (Fact Stip. at ¶ 87.)

The Brazilian Reorganization Plan provides that holders of Subsidiary Concessionaire Claims will have their claims satisfied in full pursuant to the ANEEL Plan.[29] (Fact Stip. at ¶¶ 88–89.) As discussed above, Energisa has committed to invest at least R$1.2 million in the Rede Concessionaires under the ANEEL Plan; a significant portion of such amount will be used to cause the Rede Debtors to settle the Subsidiary Concessionaire Claims. (Fact Stip. at ¶ 90.)

**3. Treatment of General Unsecured Claims**

There are 109 General Unsecured Claims against the Rede Debtors,[30] including those of the Noteholders, totaling approximately R$3.142 billion plus approximately USD$655 million. (Fact Stip. at ¶ 78.) The Brazilian Reorganization Plan offers three plan treatment options to holders of General Unsecured Claims,[31] **\*88** and it provides that the type of consideration chosen by the majority of Noteholders (in principal amount) who indicated a preference for a type of consideration would govern the form of consideration provided to all Noteholders.[32] (Fact Stip. at ¶ 82.) After the Brazilian Reorganization Plan was approved, in response to the Rede Debtors' solicitation of Noteholders' preference, a majority in principal amount of the Noteholders (including all members of the Ad Hoc Group) chose Option C—to assign their claims to Energisa in return for a 25 percent cash distribution to be paid on the closing date. (Fact Stip. at ¶ 82.)

**VI. The Foreign Representative Commences a Chapter 15 Proceeding in the United States**

On January 16, 2014, the Foreign Representative filed the Petition, requesting recognition of the Brazilian Bankruptcy

3998

Proceeding as a foreign main proceeding.[33] The Petition also requested additional relief, pursuant to sections 1521 and 1507 of the Bankruptcy Code, enforcing the Brazilian Reorganization Plan in the United States, including an order (i) granting full faith and credit to (a) the Brazilian Reorganization Plan and (b) the Confirmation Decision and enjoining acts in the U.S. in contravention of the Confirmation Decision; and (ii) authorizing and directing the Indenture Trustee and DTC to take actions to carry out the terms of the Brazilian Reorganization Plan, including assigning the Global Note to Energisa and making the associated payments to the beneficial Noteholders (collectively, the "*Plan Enforcement Relief* ").[34] According to the Foreign Representative, the latter is necessary because the Indenture Trustee has indicated that it will not assign the Global Note to Energisa (in accordance with the Confirmation Decision) without obtaining a directive from this Court. (Fact Stip. at ¶ 117.) In addition, the Foreign Representative has stated that, while Energisa may deposit funds with the Brazilian Bankruptcy Court for the benefit of the holders of the Perpetual Notes, Energisa is unlikely to fund the distribution directly to the Indenture Trustee without assurance of such assignment. (Fact Stip. at ¶ 117.)

The Ad Hoc Group did not object to entry of an order recognizing (i) the Brazilian Bankruptcy Proceeding as a foreign main proceeding pursuant to chapter 15 of the Bankruptcy Code and (ii) José Carlos Santos, the Petitioner, as Rede's Foreign Representative. Accordingly, the parties agreed to, and the Court approved, a stipulated order granting recognition to the Brazilian Bankruptcy Proceeding as a foreign main proceeding.[35] Then, on February 25, 2014, the Ad Hoc Group filed an objection to the requested Plan Enforcement **\*89** Relief (the "*Objection* "),[36] arguing that (i) the Foreign Representative is not entitled to relief under sections 1521 or 1507 of the Bankruptcy Code and (ii) granting the Plan Enforcement Relief would be manifestly contrary to U.S. public policy and should be denied pursuant to section 1506.[37] In particular, the Ad Hoc Group argues that the Brazilian Reorganization Plan has been "fraught with infirmities," including (i) a significant extraction of value for shareholders; (ii) disparate treatment of similarly situated creditors; (iii) targeting of such disparate treatment at U.S.-based creditors; (iv) protection of local creditor interests by fiat; and (v) the use of "phantom" consolidation and a single insider vote to cram down an otherwise unconfirmable plan.[38]

On May 2, 2014, the Foreign Representative filed a reply to the Objection (the "*Reply* "),[39] arguing that the Brazilian Bankruptcy Proceeding was not administered in a manner manifestly contrary to U.S. principles and that the requested relief is proper under sections 1521 and 1507 of the Code.[40] Although both the Foreign Representative and the Ad Hoc Group were entitled to an evidentiary hearing on the propriety of the Plan Enforcement Relief, the parties instead agreed to file the Stipulation of Facts and the Stipulation of Law rather than conduct an evidentiary hearing. On May 9, 2014, the Court heard argument on whether the Plan Enforcement Relief requested by the Foreign Representative should be granted.

*DISCUSSION*

**I. Applicable Law**

 **[1]**  Chapter 15 of the Bankruptcy Code, which adopted the substance and most of the text of the United Nations Commission on International Trade Law's ("*UNCITRAL* ") Model Law on Cross–Border Insolvency, provides a framework for recognizing and giving effect to foreign insolvency proceedings. *Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.),* 714 F.3d 127, 132 (2d Cir.2013). A central tenet of chapter 15 is the importance of comity in cross-border insolvency proceedings. *In re Cozumel Caribe S.A. de C.V.,* 482 B.R. 96, 114–15 (Bankr.S.D.N.Y.2012). If a foreign case is recognized as a foreign main proceeding, as it was here, certain relief automatically goes into effect, pursuant to 11 U.S.C. § 1520, and, under section 1521, a bankruptcy court may grant "any appropriate relief" in order to "effectuate the purpose of this chapter [15] and to protect the assets of the debtor or the interests of the creditors." 11 U.S.C. § 1521(a). Such relief expressly includes:

(1) staying the commencement or continuation of an individual action or proceeding concerning the debtor's assets, rights, obligations or liabilities to the extent they have not been stayed under section 1520(a);

(2) staying execution against the debtor's assets to the extent it has not been stayed under section 1520(a);

 **\*90**  (3) suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520(a);

3999

(4) providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities;

(5) entrusting the administration or realization of all or part of the debtor's assets within the territorial jurisdiction of the United States to the foreign representative or another person, including an examiner, authorized by the court;

(6) extending relief granted under section 1519(a); and

(7) granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a).

11 U.S.C. § 1521(a).

There are nonetheless certain restrictions. The court may grant relief under section 1521(a) "only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected,"[41] and it may subject any relief granted under section 1521 to "conditions it considers appropriate." 11 U.S.C. § 1522(b). One court has observed that the policy underlying section 1522 is that there should be "a balance between relief that may be granted to the foreign representative and the interests of the person that may be affected by such relief." *In re Int'l Banking Corp. B.S.C.,* 439 B.R. 614, 626 (Bankr.S.D.N.Y.2010) (citing Guide to Enactment of the UNCITRAL Model Law on Cross–Border Insolvency); *see also* H.R.Rep. No. 109–31, at 116 (2005).

 [2]  In addition to the types of relief enumerated in section 1521, section 1507(a) of the Bankruptcy Code provides that "[s]ubject to the specific limitations stated elsewhere in this chapter[,] the court, if recognition is granted, may provide additional assistance to a foreign representative under this title or under other laws of the United States." 11 U.S.C. § 1507(a); *see also* H.R.Rep. No. 109–31 (2005). Pursuant to section 1507, the court is authorized to grant any "additional assistance" available under the Bankruptcy Code or under "other laws of the United States," provided that such assistance is consistent with the principles of comity and satisfies the fairness considerations set forth in section 1507(b).[42] *In re Toft,* 453 B.R. 186, 190 (Bankr. S.D.N.Y.2011). As noted in *Toft,* however, the relationship between sections 1507 and 1521 "is not entirely clear." *Id.* The Fifth Circuit in *In re Vitro S.A.B. de C.V.,* 701 F.3d 1031, 1054 (5th Cir.2012), considered, as a matter of first **\*91** impression, whether a foreign representative may independently seek relief under either section 1521 or section

1507 and whether a court may itself determine under which provision such relief would fall. The *Vitro* court concluded that a court confronted by this situation should first consider the specific relief enumerated under section 1521(a) and (b), and, if the relief is not provided for there, the court should then consider whether the requested relief falls more generally under section 1521's grant of any appropriate relief. *Id.* at 1054. "Appropriate relief," the Fifth Circuit concluded, is "relief previously available under Chapter 15's predecessor, § 304." *Id.* "Only if a court determines that the requested relief was not formerly available under § 304," the Fifth Circuit continued, "should a court consider whether relief would be appropriate as 'additional assistance' under § 1507." *Id.* It remains to be seen whether the three-part analysis crafted by the *Vitro* court is embraced by other courts.

 [3]   [4]  Chapter 15 thus provides courts with broad, flexible rules to fashion relief that is appropriate to effectuate the objectives of the chapter in accordance with comity. *See In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.,* 389 B.R. 325, 333–34 (S.D.N.Y.2008); *In re SPhinX, Ltd.,* 351 B.R. 103, 112 (Bankr.S.D.N.Y.2006) ("chapter 15 maintains—and in some respects enhances—the 'maximum flexibility' ... that section 304 provided bankruptcy courts in handling ancillary cases in light of principles of international comity and respect for the laws and judgments of other nations") (citations omitted), *aff'd,* 371 B.R. 10 (S.D.N.Y.2007). While the interplay between the relief available under sections 1507 and 1521 is far from clear, it is evident that recognition assistance of the types available under those sections is "largely discretionary and turns on subjective factors that embody principles of comity." *Toft,* 453 B.R. at 190 (citing *Bear Stearns High–Grade Structured Credit Strategies Master Fund,* 389 B.R. at 333, *aff'g* 374 B.R. 122 (Bankr.S.D.N.Y.2007)).

 [5]   [6]  Of particular significance to the case at bar is the well-established principle that the relief granted in a foreign proceeding and the relief available in the United States do not need to be identical. *In re Metcalfe & Mansfield Alt. Invs.,* 421 B.R. 685, 697 (Bankr.S.D.N.Y.2010). On the other hand, it is also clear that "[t]he principle of comity has never meant categorical deference to foreign proceedings. It is implicit in the concept that deference should be withheld where appropriate to avoid the violation of the laws, public policies, or rights of the citizens of the United States." *Bank of New York v. Treco (In re Treco),* 240 F.3d 148, 157 (2d Cir.2001); *see also Argo Fund Ltd. v. Bd. of Dirs. of Telecom Arg., S.A. (In re Bd. of Dirs. of Telecom Arg., S.A.),* 528 F.3d

4000

162, 171–73 (2d Cir.2008); *Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru,* 109 F.3d 850, 854 (2d Cir.1997); *Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.,* 825 F.2d 709, 713 (2d Cir.1987); *Cunard S.S. Co. Ltd. v. Salen Reefer Servs. AB,* 773 F.2d 452, 457 (2d Cir.1985); *Toft,* 453 B.R. at 190–191.

 **[7]**  Moreover, all relief under chapter 15, including relief requested under either section 1521 or section 1507, is subject to the limits in section 1506, which permits a court to decline to take any action, including granting additional relief pursuant to section 1521 or additional assistance pursuant to section 1507 of the Bankruptcy Code, if such action would be "manifestly contrary" to the public policy of this country. **\*92** [43] *Toft,* 453 B.R. at 193 (citing 11 U.S.C. § 1506).

 **[8]**   **[9]**  However, the public policy exception is clearly drafted in narrow terms and "the few reported cases that have analyzed [section] 1506 at length recognize that it is to be applied sparingly." *Toft,* 453 B.R. at 193; *see In re Ephedra Prods. Liab. Litig.,* 349 B.R. 333, 336 (S.D.N.Y.2006) (the public policy exception embodied in section 1506 should be "narrowly interpreted, as the word 'manifestly' in international usage restricts the public policy exception to the most fundamental policies of the United States") (citing H.R.Rep. No. 109–31(I), at 109, *reprinted in* 2005 U.S.C.C.A.N. 88, 172) (grammatical changes omitted); *see also Fairfield Sentry,* 714 F.3d at 139–40; *Bd. of Dirs. of Telecom Arg. S.A.,* No. 05–17811, 2006 WL 686867, at \*25 (Bankr.S.D.N.Y. Feb. 24, 2006) ("the foreign law ... must not be repugnant to the American laws and policies") (citing *In re Brierley,* 145 B.R. 151, 166 (Bankr.S.D.N.Y.1992)), *aff'd,* 528 F.3d 162 (2d Cir.2008); *In re Culmer,* 25 B.R. 621, 631 (Bankr.S.D.N.Y.1982); *see also In re Sino–Forest Corp.,* 501 B.R. 655, 664–665 (Bankr.S.D.N.Y.2013). Foreign judgments "are generally granted comity as long as the proceedings in the foreign court 'are according to the course of a civilized jurisprudence, *i.e.* fair and impartial.' " *Toft,* 453 B.R. at 194 (citing *In re Ephedra Prods. Liab. Litig.,* 349 B.R. at 336 (citing and quoting the seminal case on comity, *Hilton v. Guyot,* 159 U.S. 113, 205–06, 16 S.Ct. 139, 40 L.Ed. 95 (1895))); *see also Metcalfe,* 421 B.R. at 697 (the key determination required under section 1506 is whether the procedures used in the foreign jurisdiction "meet our fundamental standards of fairness").

As described in detail above, the Foreign Representative has requested that the Court grant the additional Plan Enforcement Relief, which consists of the following:

(i) an order granting full faith and credit[44] to the [Confirmation Decision] and the Brazilian Reorganization Plan, and an injunction of acts in the U.S. in contravention of that order; and (ii) an order authorizing and directing the Indenture Trustee and DTC to take the necessary actions to carry out the terms of the Brazilian Reorganization Plan, including assigning the Global Note to Energisa and making the associated payments to the beneficial Noteholders.

(Reply at ¶ 11.) For the reasons that follow, the Court finds that the requested Plan Enforcement Relief is proper under both sections 1521 and 1507 of the Bankruptcy Code and should not be denied pursuant to the public policy exception in section 1506, and it therefore grants the Plan Enforcement Relief.

## II. The Plan Enforcement Relief is Proper Under Section 1521 of the Bankruptcy Code

 **[10]**  The Plan Enforcement Relief requested by the Foreign Representative is "appropriate relief" of a type not specifically enumerated in the non-exhaustive list set forth in section 1521(a), which the Foreign Representative asserts is nonetheless proper because it is the type of relief that was "available under section 304 [of the **\*93** Bankruptcy Code] and is routinely granted under U.S. law." (Reply at ¶¶ 25–26 (citing *In re Vitro S.A.B. de C.V.,* 701 F.3d 1031, 1054 (5th Cir.2012)).) The Foreign Representative asserts that requests for an order (i) enforcing a foreign confirmation order, including the request for an injunction of acts in contravention of such order, and (ii) directing the Indenture Trustee and DTC to take steps to assign the Global Note and make payments to the Noteholders, are each types of requested relief that were available under section 304 of the Bankruptcy Code and are types of relief typically granted in chapter 11 plenary proceedings as well. (Reply at ¶¶ 26–27.) Accordingly, the Foreign Representative maintains, such relief is available under section 1521.

The Court agrees. The request by the Foreign Representative that the Court (i) enforce the Brazilian Reorganization Plan and the Confirmation Decision and (ii) enjoin acts in the U.S. in contravention of the Confirmation Decision is relief of a type that courts have previously granted under section 304 of the Bankruptcy Code and other applicable U.S. law. *See, e.g., Bd. of Dirs. of Telecom Arg.,* 528 F.3d at 174–76; *see also In re Petition of Garcia Avila,* 296 B.R. 95, 114–15 (Bankr.S.D.N.Y.2003); *see generally* 11 U.S.C. § 1141(d)(1)(A) (granting discharge to chapter 11

debtor upon confirmation except as otherwise provided for in the plan); 11 U.S.C. § 524(a) (describing the effect of a discharge). Similarly, the Foreign Representative's request for an instruction directing the Indenture Trustee and DTC to take the actions necessary to carry out the terms of the Brazilian Reorganization Plan, including assigning the Global Note to Energisa and making payments to beneficial Noteholders, is also relief of a type available under U.S. law. *See, e.g.,* 11 U.S.C. § 1142(b) (providing that a court "may direct ... any ... necessary party to execute or deliver or join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act ... that is necessary for the consummation of the plan"); *In re Washington Mut., Inc.,* No. 08–12229, 2012 WL 1563880 at *38 (Bankr.D.Del. Feb. 24, 2012) (directing indenture trustee to make distributions in order to effectuate plan transactions).

The Ad Hoc Group does not challenge the Foreign Representative's position that the Plan Enforcement Relief is available under section 1521 of the Bankruptcy Code. Rather, the Ad Hoc Group asserts that the Court should consider the particular facts of the case at hand and balance the equities of the requested relief against those facts. The Ad Hoc Group believes that the Foreign Representative cannot meet his burden with respect to the applicable balancing tests and factors[45] and **\*94** urges that the Court exercise its discretion and deny the requested Plan Enforcement Relief. (Objection at 14–17.)

As discussed above, relief under section 1521 may be granted "only if the interests of creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. § 1522(a); *Int'l Banking Corp.,* 439 B.R. at 626. Section 1522 requires the bankruptcy court to ensure the protection of both the creditor(s) and the debtor(s). The Court finds that the interests of the Rede Debtors and their creditors, including the members of the Ad Hoc Group, will be sufficiently protected by the granting of the Plan Enforcement Relief. Enforcement of the Confirmation Decision—and ordering an injunction against actions the Ad Hoc Group may pursue in the United States in contravention of such decision—will allow the Rede Debtors to reorganize and to make distributions to creditors (including to the 63 percent of Noteholders who are not members of the Ad Hoc Group and who are not contesting any aspect of the Brazilian Reorganization Plan), consistent with the Brazilian Reorganization Plan. The Brazilian Reorganization Plan contemplates, as a condition precedent to its full implementation, this Court's approval

of the Plan Enforcement Relief. In fact, the Foreign Representative has represented that the Indenture Trustee will likely decline to make the assignment of the Global Note without the directive of this Court. The Court's refusal to grant the Plan Enforcement Relief would thus mean that the Brazilian Reorganization Plan, which has already been substantially consummated, could not be fully implemented and the distributions to Noteholders would be prevented or substantially delayed. Denying the relief would also mean that the Ad Hoc Group would likely return to Brazil to attempt to renegotiate and seek a higher distribution, or would commence lawsuits against the Debtor in the United States to recover further on its claims. In short, the Ad Hoc Group simply wants another chance to renegotiate the terms of the Brazilian Reorganization Plan and offers no evidence that its efforts would be successful. Moreover, the Plan Enforcement Relief does not prevent the Ad Hoc Group from continuing to assert its rights under Brazilian law in the pending appeals of the decisions of the Brazilian Bankruptcy Court. In balancing the interests of the Rede Debtors against those of the Ad Hoc Group, the Court concludes that the Plan Enforcement Relief passes muster under section 1522(a) and is relief that is proper under section 1521.

### III. The Plan Enforcement Relief is Also Proper Under Section 1507 of the Bankruptcy Code

 **[11]**  As discussed above, if recognition is granted, the bankruptcy court may grant "additional assistance" to a foreign representative under chapter 15 or under other laws of the United States, pursuant to section 1507 of the Code. Section 1507(b) directs the Court to "consider whether such assistance, consistent with principles of comity, will reasonably assure" the following:

(1) just treatment of all holders of claims against or interests in the debtor's property;

(2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

(3) prevention of preferential or fraudulent dispositions of property of the debtor;

 **\*95**  (4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and

4002

(5) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

11 U.S.C. § 1507(b)(1)-(5). These provisions embody the protections that were previously contained in section 304 of the Bankruptcy Code, "with one critical exception: the principle of comity was removed as one of the factors and elevated to the introductory paragraph." *Atlas Shipping,* 404 B.R. at 740.

Although the Court need not reach the issue,[46] the Court has also considered whether the Plan Enforcement Relief would be available as "additional assistance" under section 1507 and concludes that it is. The Court has determined that granting the Plan Enforcement Relief meets the requirements of section 1507(b) inasmuch as it reasonably assures (a) the just treatment of creditors; (b) protection of U.S. creditors against prejudice or inconvenience in the processing of their claims; (c) prevention of preferential or fraudulent transfers; and (d) distribution of proceeds substantially in accordance with the Code's priority scheme. Thus, the Plan Enforcement Relief also may be granted as "additional assistance" pursuant to section 1507.

### A. Creditors Were Treated Justly in Brazil

 [12]    [13]   Section 1507(b)(1) requires that additional relief only be granted if the just treatment of creditors is ensured. 11 U.S.C. § 1507(b)(1). The "just treatment" factor is generally satisfied upon a showing that the applicable law "provides for a comprehensive procedure for the orderly and equitable distribution of [the debtor]'s assets among all of its creditors." *Bd. of Dirs. of Telecom Arg.,* 528 F.3d at 170 (citations omitted and grammatical changes in original) (discussing the "just treatment" factor under 11 U.S.C. § 304(c)). The court in *Board of Directors of Telecom Argentina* explained that instances in which a court has held that a foreign proceeding does not satisfy this factor include where the proceeding "fails to provide creditors 'access to information and an opportunity to be heard in a meaningful manner,' which are '[f]undamental requisites of due process,' " or where the proceeding "would not recognize a creditor as a claimholder." *Id.* (citations omitted).

Here, the Foreign Representative has demonstrated that creditors were given access to information and a meaningful opportunity to be heard in the Brazilian

Bankruptcy Proceeding and that Brazilian law provides for a "comprehensive procedure" for the orderly and equitable distribution of the Rede Debtors' assets to creditors. Specifically, the Brazilian Bankruptcy Proceeding provided creditors with ample opportunity to obtain information about the Rede Debtors and the terms of the various plan proposals. It also provided creditors with the right and ability to vote on a plan of reorganization, to submit proofs of claim, and to file objections to and appeals of the decisions of the Brazilian Bankruptcy Court. It is clear that the Brazilian Reorganization Plan provides for equitable distribution of the Rede Debtors' assets based on the claims that creditors submitted, once the Brazilian Reorganization Plan becomes fully implemented.  **\*96**  [47] As such, the Court finds that the Plan Enforcement Relief meets the requirements of section 1507(b)(1) to reasonably assure the just treatment of creditors.

### B. There is No Prejudice to U.S. Creditors in the Processing of Claims in Brazil

The second factor of section 1507(b) requires that U.S. creditors be protected against "prejudice and inconvenience in the processing of claims" in the foreign proceeding. 11 U.S.C. § 1507(b)(2). Straining to find a basis to fit its arguments within this factor, the Ad Hoc Group argues that U.S. creditors were prejudiced in the processing of Noteholders' votes because the Indenture Trustee had the "rug pulled out from [under] it during the voting process" and voting on an individual basis by Noteholders required the satisfaction of various procedural hurdles. (Objection at 17.) The Foreign Representative points out, however, that all Noteholders who wished to appear at the creditors' meetings and vote independently of the Indenture Trustee were permitted to do so after submitting documentation verifying their identity and holdings. (Reply at ¶ 36.) Moreover, in evaluating the propriety of the Indenture Trustee's vote, the Brazilian Bankruptcy Court recognized the right of individual Noteholders to vote. Indeed, the entire issue is a red herring inasmuch as the Ad Hoc Group admits that the vote of the Indenture Trustee was rendered irrelevant because the unsecured class voted against the Brazilian Reorganization Plan, notwithstanding the elimination of the Indenture Trustee's vote.[48] (Objection at 18.) To the extent that the Ad Hoc Group invites the Court to draw an inference that the Brazilian Bankruptcy Court acted in a prejudicial, result-oriented fashion by reversing its own determination on the Indenture Trustee's right to vote, the Court declines the invitation. Nothing in the record supports such an inference.

As such, the Court finds that the second factor of section 1507(b) is satisfied.

## C. There Were No Preferential or Fraudulent Property Distributions in the Brazilian Bankruptcy Proceeding

The third factor of section 1507(b) requires that the additional assistance reasonably assure the "prevention of preferential or fraudulent dispositions of property of the debtor." 11 U.S.C. § 1507(b)(3). The Ad Hoc Group argues summarily that the Brazilian Reorganization Plan would promote, rather than prevent, fraudulent dispositions of property by permitting FI–FGTS and BNDESPar to recover significant value on their claims, notwithstanding that such recovery will flow from equity *97 and/or structurally subordinated positions. (Objection at 18.) It is not at all apparent that this was the intent of this subsection of section 1507. In any event, the record is devoid of evidence indicating fraudulent dispositions of property to either FI–FGTS or BNDESPar. As the record clearly demonstrates, the Brazilian Bankruptcy Court determined that FI–FGTS is a secured creditor, even though it exercised its put right to obtain a secured claim against Denerge one day prior to the date that the Rede Debtors filed for bankruptcy. (Fact Stip. at ¶¶ 64–65.) Therefore, the distribution it receives on account of its secured claim cannot be considered fraudulent. BNDESPar, on the other hand, is a minority shareholder, owning 15.9 percent of the shares of the Rede Debtors. (Fact Stip. at ¶¶ 63, 91.) BNDESPar held a right to sell its Rede shares to EEVP in return for a debt claim of R$390 million, but it never exercised such right. As a result, BNDESPar will not receive any new distribution under the Brazilian Reorganization Plan, though it will retain its Rede shares. (Fact Stip. at ¶ 9 1.) While equity cannot be extinguished under Brazilian bankruptcy law, the record indicates that BNDESPar's Rede shares will be substantially diluted as a result of Energisa's substantial capital investment in the Rede Group as required by the ANEEL Plan. Any distribution to BNDESPar cannot be considered a fraudulent or preferential disposition of property. The Court finds, therefore, that the third factor under section 1507(b) has been satisfied.

## D. The Distribution of Proceeds Under the Brazilian Reorganization Plan Was Substantially in Accordance With U.S. Law

[14] The fourth factor of section 1507(b) requires that the additional assistance provided to a foreign representative will reasonably assure the "distribution of proceeds of the debtor's property substantially in accordance with the [Bankruptcy Code]." 11 U.S.C. § 1507(b)(4). The Ad Hoc Group argues that the distribution of the Rede Debtors' property violates the Bankruptcy Code because the Brazilian Reorganization Plan runs afoul of the absolute priority rule[49] by preserving value for equity and/or structurally subordinated creditors FI–FGTS and BNDESPar, and that the Confirmation Decision wrongly approved such treatment through "cram-down," exactly when the absolute priority rule should protect creditors. (Objection at 19.)

As discussed in sections IV.B. and IV.C. below, the cram-down provisions of Brazilian bankruptcy law provide meaningful protections that are similar to the protections embodied in U.S. law and the Plan's different treatment of certain unsecured creditors has a reasonable basis and was necessary to consummate the Plan. As such, proceeds under the Brazilian Reorganization Plan are being distributed substantially in accordance with U.S. law pursuant to section 1507(b)(4).[50]

## *98 IV. With Respect to Section 1506, the Brazilian Bankruptcy Proceeding Was Administered in a Manner Consistent With U.S. Public Policy

[15] The centerpiece of the Ad Hoc Group's objection is that the Plan Enforcement Relief would be fundamentally inconsistent with U.S. public policy, and accordingly, runs afoul of section 1506 of the Bankruptcy Code. The Ad Hoc Group specifically cites to five aspects of the Brazilian Reorganization Proceeding that it asserts violate U.S. public policy: (i) an unfair marketing process; (ii) the use of "phantom" consolidation and a single insider vote to cram down an otherwise unconfirmable plan; (iii) a significant extraction of value for shareholders which is violative of the distribution scheme under U.S. law; (iv) disparate treatment of similarly situated creditors; and (v) targeting of that disparate treatment at U.S.-based creditors, including to protect local creditor interests. (Objection at 2.)

As discussed above, the public policy exception embodied in section 1506 of the Bankruptcy Code is to be narrowly construed and applied "sparingly." *Toft,* 453 B.R. at 193 ("the few reported cases that have analyzed [section] 1506 at length recognize that it is to be applied sparingly"). The Court finds that neither the Brazilian Reorganization Plan

nor the Brazilian bankruptcy law concepts which are the bases of the Confirmation Decision are manifestly contrary to U.S. public policy. Brazilian bankruptcy law meets our fundamental standards of fairness and accords with the course of civilized jurisprudence. Accordingly, the public policy exception reflected in section 1506 does not provide a basis for denial of the Plan Enforcement Relief.

### A. The Marketing Process of the Rede Debtors' Assets, the Consolidation of the Rede Debtors, and the Confirmation of the Brazilian Reorganization Plan Did Not Violate Creditors' Due Process Rights and Were Not Manifestly Contrary to U.S. Public Policy

While the members of the Ad Hoc Group complain about virtually every aspect of the Brazilian Bankruptcy Proceeding from start to finish, their chief complaints center around the process by which the Brazilian Reorganization Plan was approved; *i.e.,* the manner in which the Rede Debtors' assets were marketed; the determination by the Brazilian Bankruptcy Court that the Rede Debtors' assets and liabilities could be consolidated for plan purposes; and the voting process, which they argue was procedurally unfair and violated creditors' due process rights. The Court considers these arguments in turn.

### 1. The Marketing Process of the Rede Debtors' Assets

The Ad Hoc Group asserts that the marketing process of the Rede Debtors' assets was flawed and favored local stakeholders and insiders. In particular, the Ad Hoc Group argues that the Rede Debtors initially chose the Equatorial–CPFL Plan without competitive bidding and then inappropriately granted the bidder exclusivity, such that Energisa was only able to submit a competing proposal after a contest at the second creditors' meeting. (Objection at 9.) The Ad Hoc Group also contends that it was improper for the Rede Debtors to refuse to accept the first Energisa proposal, alleging that it would have resulted in a materially better recovery for Noteholders and for all structurally senior creditors. (Objection at 9.)[51]

 **\*99**  The record reflects otherwise. The Rede Debtors' assets were widely marketed through a competitive bidding process. Rothschild obtained a number of binding offers, including the joint bid by CPFL and Equatorial which was initially selected by the Rede Debtors and was presented to the

Brazilian Bankruptcy Court in the form of the Equatorial–CPFL Plan. (Fact Stip. at ¶¶ 28–30; 34–35.) Though the Ad Hoc Group contends that the Equatorial–CPFL SPA improperly prohibited the Rede Debtors from marketing the company to other potential bidders for some time, such a prohibition is recognized in large chapter 11 cases. *See, e.g., In re Global Crossing, Ltd.,* 295 B.R. 726, 741 n.55 (Bankr.S.D.N.Y.2003) (approving debtor's compliance with a no-shop provision in a purchase agreement that included a carve-out for communications required for the debtors to comply with their fiduciary duties). Furthermore, the record illustrates that COPEL–Energisa was eventually able to make not one, but two competing bids, the first of which the Rede Debtors evaluated but ultimately rejected for various valid reasons, including that it was inferior to the Equatorial–CPFL proposal. (Fact Stip. at ¶¶ 37–42.)

The Ad Hoc Group offers no evidence to substantiate its arguments that the Rede Debtors should not have rejected the original Energisa proposal and that it would have resulted in a better recovery for Noteholders. The bald assertion that a party should have or could have received a higher distribution, especially without supporting evidence as to how much more creditors should have or could have received, is insufficient to make a showing that the requested ancillary relief should be denied or that creditors' due process rights were violated. *See generally Bd. of Dirs. of Telecom Arg.,* 528 F.3d at 173 (creditor's argument that court should not grant comity because creditors may receive a smaller distribution in the foreign jurisdiction than they would receive in the United States was irrelevant if the other factors under former section 304(c) of the Bankruptcy Code were met, as the Bankruptcy Code "does not require that the amount of a distribution in a foreign insolvency proceeding be equal to the hypothetical amount the creditor would have received in a proceeding under U.S. law").

Moreover, when Energisa submitted its revised proposal, the Rede Debtors presented it to creditors along with the Equatorial–CPFL Plan. Rede's creditors preferred the revised Energisa proposal to the Equatorial–CPFL Plan because it raised unsecured creditor recoveries from fifteen percent (under the Equatorial–CPFL Plan) to 25 percent (under the Energisa proposal which became the Brazilian Reorganization Plan). (Fact Stip. at ¶ 43.) The marketing process of the Rede Debtors' assets and the resulting evolution and improvement of the return to unsecured creditors resemble chapter 11 processes and section 363 sales that take place routinely in U.S. bankruptcies. *See,*

**4005**

e.g., *In re Boston Generating, LLC,* 440 B.R. 302, 310–313 (Bankr.S.D.N.Y.2010) (discussing the extensive marketing and sale process of a 363 sale of a debtor, in which the debtor set a bid deadline that permitted competing bidders to submit competing bids in the form of chapter 11 plans of reorganization). Accordingly, the Court finds that the marketing process was not manifestly contrary to U.S. public policy.

**\*100  2. The Determination by the Brazilian Bankruptcy Court That the Rede Debtors' Assets and Liabilities Could be Consolidated for Plan Purposes**

The Ad Hoc Group next argues that the Brazilian Bankruptcy Court erred, as a matter of Brazilian law, when it allowed the substantive consolidation of the Rede Debtors for plan purposes and that a United States court would not, under *Union Savings Bank v. Augie/Restivo Baking Company, Ltd. (In re Augie/Restivo Baking Company, Ltd),* 860 F.2d 515 (2d Cir.1988), grant substantive consolidation under similar circumstances. In addition to arguing that substantive consolidation was inappropriate as a matter of law, the Ad Hoc Group contends that substantive consolidation inappropriately enabled the confirmation of an otherwise unconfirmable plan as a result of FI–FGTS's vote. (Objection at 11.)

As a threshold matter, substantive consolidation for plan purposes, in and of itself, is not manifestly contrary to U.S. public policy, and while not routinely granted, substantive consolidation of certain debtors in appropriate circumstances has been approved by courts in chapter 11 cases. *See, e.g., Augie/Restivo,* 860 F.2d at 518–21; *FDIC v. Colonial Realty Co.,* 966 F.2d 57 (2d Cir.1992) (affirming district court's decision that the bankruptcy court properly directed substantive consolidation of the bankruptcy estates over the objection of creditors); *In re Drexel Burnham Lambert Group, Inc.,* 138 B.R. 723, 764 (Bankr.S.D.N.Y.1992) (approving plan with substantive consolidation of debtors and stating that "[t]he equitable doctrine of substantive consolidation permits a Court in a bankruptcy case involving one or more related corporate entities, in appropriate circumstances, to disregard the separate identity of corporate entities, and to consolidate and pool their assets and liabilities and treat them as though held and incurred by one entity"); *In re Value City Holdings, Inc.,* No. 08–14197, 2010 WL 4916389, at *7 (Bankr.S.D.N.Y. May 17, 2010) (confirming a plan that involved substantive consolidation of the debtors).

Here, the Brazilian Bankruptcy Court made specific findings that substantive consolidation of the Rede Debtors was appropriate for plan purposes. The Brazilian Bankruptcy Court found that the Rede debtors were "organized as a corporate group, with a common controlling company and credit inter-dependence" as a result of loans that exist between the companies in the group and cross-corporate guarantees to third parties. (Fact Stip. at ¶ 58.) Though the Ad Hoc Group argues that the Brazilian Bankruptcy Court did not address factors which may "ordinarily" be considered by a United States court confronted with the issue of substantive consolidation, it is not appropriate for this Court to superimpose requirements of U.S. law on a case in Brazil or to second-guess the findings of the foreign court. *See In re Cozumel Caribe,* 508 B.R. 330, 337 (Bankr.S.D.N.Y.2014) ("To inquire into a specific foreign proceeding is not only inefficient and a waste of judicial resources, but more importantly, necessarily undermines the equitable and orderly distribution of a debtor's property by transforming a domestic court into a foreign appellate court where the creditors are always provided the proverbial 'second bite at the apple.' ") (citation omitted). Moreover, the record is clear that the Ad Hoc Group exercised its due process rights to object to the Brazilian Bankruptcy Court's decision to allow substantive consolidation of the Rede Debtors and, later, its right to appeal such decision. For the foregoing reasons, the Court finds that substantive consolidation of the Rede Debtors for plan **\*101** purposes was not manifestly contrary to U.S. public policy.

**3. The Voting Process and Approval of the Plan Through Cram–Down**

The next set of arguments raised by the Ad Hoc Group is that the creditors' due process rights were violated because the Brazilian Bankruptcy Court excluded the Indenture Trustee's vote on the Brazilian Reorganization Plan and that the Plan was approved through cram-down in a procedurally unfair manner. We address these arguments in turn.

The Ad Hoc Group argues that it was improper for the Brazilian Bankruptcy Court to exclude the Indenture Trustee's vote on the Brazilian Reorganization Plan, focusing on the fact that the Brazilian Bankruptcy Court first ruled that the Indenture Trustee would be permitted to vote on the Brazilian Reorganization Plan, and then "reconsidered" and reversed that ruling after the Indenture Trustee had voted against the

4006

Plan. (Objection at 10, 20.) Such action, combined with the "arbitrary" consolidation of the Rede Debtors, the Ad Hoc Group argues, operated to deprive Noteholders of a "meaningful opportunity to be heard (or at least to vote) in the Brazilian Bankruptcy Proceeding." (Objection at 20.)

Despite the inferences that the Ad Hoc Group wishes the Court to draw, there is no evidence that the Brazilian Bankruptcy Court disregarded the Indenture Trustee's vote *because* it voted against the Brazilian Reorganization Plan. Rather, there is ample evidence that the Brazilian Bankruptcy Court determined that, based on the terms of the Indenture, the Indenture Trustee did not have the power, without the consent of each of the individual beneficial holders of the Perpetual Notes, to vote on the Plan. (Fact Stip. at ¶¶ 99–102.) Notably, the Ad Hoc Group does not contend that this decision was wrong as a matter of U.S. law; it is well-accepted that indenture trustees do *not* vote on chapter 11 plans. In any event, the Ad Hoc Group admits that, although the Indenture Trustee was not permitted to vote on the Plan, its vote "proved largely irrelevant," as the unsecured class lacked the requisite votes to accept the Plan, and the Brazilian Bankruptcy Court eventually approved the Plan through cram-down procedures. (Objection at 10.)

The Ad Hoc Group next argues that the Brazilian cram-down procedures were not properly followed by the Brazilian Bankruptcy Court. Specifically, the Ad Hoc Group contends that, because the affirmative vote of the secured creditor class required for cram-down purposes was cast by FI–FGTS, which was not a secured creditor, but rather, an affiliated entity (*i.e.,* a shareholder), the requirements for cram-down were not satisfied, and the Plan was approved in a procedurally unfair manner. (Objection at 18.)

Assuming *arguendo* that this Court can review the decision of a Brazilian court on an issue of Brazilian law, and it cannot, the record is clear with respect to (i) the determination that FI–FGTS is a secured creditor and (ii) the Brazilian Bankruptcy Court's compliance with cram-down pursuant to Brazilian law. FI–FGTS held a put option to sell its shares in exchange for a secured claim against Denerge, one of the Rede Debtors, pursuant to an investment agreement signed in 2010, over two years prior to the Brazilian Bankruptcy Proceeding. (Fact Stip. at ¶ 65.) Although FI–FGTS's shares were not returned to EEVP in connection with the exercise of FI–FGTS's put right prior to the filing, FI–FGTS filed a petition with the Brazilian Bankruptcy Court showing that the put option had been exercised prior to the bankruptcy

filing and offering those shares **\*102** to the Brazilian Bankruptcy Court to dispose of them. (Fact Stip. at ¶ 66.) The Judicial Administrator then made a determination that FI–FGTS had a secured claim against Denerge in the amount R$712.5 million. After the Ad Hoc Group objected to this determination, the Brazilian Bankruptcy Court ordered that the votes be counted both with and without FI–FGTS's affirmative vote, pending resolution of the dispute. (Fact Stip. at ¶ 67.) In its Confirmation Decision, the Brazilian Bankruptcy Court subsequently concluded that FI–FGTS had validly exercised its put option prior to the filing of the Brazilian Bankruptcy Proceeding and was therefore a secured creditor. (Fact Stip. at ¶ 7 1.) FI–FGTS voted to accept the Plan; its claim was the only voting claim in Class II, the secured creditor class,[52] and the Plan was confirmed via cram-down based on the acceptance of such class.[53]

The Court finds that the Brazilian Bankruptcy Court properly followed cram-down procedures and did not violate creditors' due process rights. There is no showing that the Brazilian Bankruptcy Court ignored the Ad Hoc Group's concerns; rather it counted the results of the vote both with and without FI–FGTS's vote. The court later determined that FI–FGTS had become a secured creditor prior to the time that the Rede Debtors filed for bankruptcy, and the vote of FI–FGTS enabled the Plan to be confirmed in accordance with cram-down procedures.

In any event, the Ad Hoc Group cannot plausibly assert that cram-down was a sham based on FI–FGTS' validly exercised put right, as the Ad Hoc Group voluntarily entered a capital structure that permitted FI–FGTS to obtain and exercise the put option which gave it the right to obtain a secured claim. The Ad Hoc Group had the opportunity to contest the status of FI–FGTS as a secured creditor during the pendency of the Brazilian Bankruptcy Proceeding, and it also has exercised its right to appeal the Confirmation Decision, which appeal is still pending. If the Ad Hoc Group prevails on appeal with respect to FI–FGTS's right to vote, the Brazilian Reorganization Plan will be unable to satisfy the requirement of a consenting class for cram-down purposes —but that is an issue for the Brazilian Bankruptcy Court, rather than this Court, to decide. The record here is clear that, notwithstanding its disappointment with the outcome of the Brazilian Bankruptcy Proceeding, due process has been afforded to the Ad Hoc Group; **\*103** the voting and cram-down process was not, as the Ad Hoc Group maintains, "fraught with procedural infirmities." (Objection at 10.)

**B. The Distribution Scheme in the Brazilian Reorganization Plan is Not Manifestly Contrary to U.S. Public Policy**

The Ad Hoc Group asserts that the Brazilian Reorganization Plan results in distributions that are manifestly contrary to priority rules in the United States. Under section 304, courts recognized that a foreign proceeding must produce results that are "substantially" in accordance with the priority rules of the Bankruptcy Code, but "the priority rules of the foreign jurisdiction need not be identical to those of the United States." *Bd. of Dirs. of Telecom Arg.,* 528 F.3d at 170 n.9 (stating that the fourth factor of former section 304(c) of the Bankruptcy Code—assurance of just treatment of creditors—"looks to whether the priority rules of the foreign jurisdiction are 'substantially in accordance' with U.S. priority rules"); *see, e.g., Garcia Avila,* 296 B.R. at 111–12 (Bankr.S.D.N.Y.2003) (in granting a preliminary injunction, overruling an objection that a foreign plan violated the absolute priority rule, noting that the provisions of Mexican insolvency law "largely mirror" section 1129(b) of the Bankruptcy Code); *In re Axona Int'l Credit & Commerce Ltd.,* 88 B.R. 597, 610 (Bankr.S.D.N.Y.1988); *In re Schimmelpenninck,* 183 F.3d 347, 365 (5th Cir.1999). In any event, the Ad Hoc Group cites no authority that an insolvency scheme is manifestly contrary to U.S. public policy because it fails to mirror U.S. insolvency law.

Despite its lack of authority, the Ad Hoc Group argues that the Brazilian Reorganization Plan violates the absolute priority rule and is therefore manifestly contrary to U.S. law because it "preserves value for equity and/or structurally subordinated creditors (FI–FGTS and BNDESPar)" and "goes so far as to potentially call for, or at least to enable, the repayment in full of one or both of such parties" at the expense of the structurally senior Noteholders. (Objection at 19.) Citing *Treco,* 240 F.3d at 159, the Ad Hoc Group argues that, in cases where foreign bankruptcy law does not provide protections similar to those found in U.S. law, the U.S. bankruptcy court has denied the ancillary relief requested.

The Ad Hoc Group's citation to *Treco* in this context is unpersuasive. In *Treco,* liquidators of a bank incorporated in the Bahamas and undergoing bankruptcy proceedings there filed a petition under section 304(a) of the Bankruptcy Code, seeking the turnover of certain funds held by Bank of New York and other entities located in the United States. *Id.* at 151. The bankruptcy court and the district court held that turnover was appropriate under section 304(c)(4), irrespective of whether Bank of New York's claim to the funds held by it was secured. *Id.* The Second Circuit disagreed, vacated the district court's judgment, and remanded the case, holding that, to the extent that the Bahamian proceeding subordinated Bank of New York's secured claim to administrative expenses, such treatment directly conflicted with the priority rules prescribed by U.S. law and thus violated section 304(c)(4). *Id.* at 159. *Treco* did not suggest that Bahamian law was manifestly contrary to U.S. public policy, which is the issue under section 1506. It involved the rights of a secured creditor claiming a security interest in assets in the United States created under U.S. law. Chapter 15 also has special protection for this class of creditors, requiring that their interests be sufficiently protected before the collateral can be entrusted to the foreign representative **\*104** for distribution. *See* 11 U.S.C. § 1521(b).

Brazilian bankruptcy law's cram-down requirements provide protections against junior stakeholders receiving or retaining value when dissenting senior stakeholders are not paid in full; such protections are similar (but not identical) to those in the United States. Under Brazilian bankruptcy law, a plan may only be crammed down if, among other things, (i) the dissenting class approves by at least one-third in amount and at least one-third in number and (ii) all classes, in the aggregate, approve by a majority in amount. (Law Stip. at ¶ 18.) Here, 74 percent of all claims, in amount, voted in favor of the Brazilian Reorganization Plan, and, in the class of unsecured claims, 66.34 percent, in amount, and 47.7 percent, in number, voted to accept.[54] This is only 0.3 percent less in amount and 2.3 percent less in number than would be required under the Bankruptcy Code for the class to have accepted, such that the absolute priority rule would not apply. *See* 11 U.S.C. § 1126(c). The Foreign Representative argues that, with a difference this small, it is difficult to see how the Brazilian Reorganization Plan could be considered manifestly contrary to U.S. public policy. The Court finds this argument persuasive.[55]

With respect to the treatment of shareholders, although Brazilian law does not permit the cancellation of equity without the consent of shareholders, Rede equity holders do not retain meaningful value under the Plan at the expense of the Rede Debtors' unsecured creditors. The remaining minority shares will be vastly diluted upon consummation of the Brazilian Reorganization Plan. First, the Rede Debtors will make a capital call to repay Energisa approximately R $498 billion for the amount Energisa paid to the creditors

of the Rede Debtors in exchange for the assignment of their approximately R$2 billion in claims, within one year of such assignment and with 12.5 percent interest. (Fact Stip. at ¶ 95.) Under the Plan, Energisa will also assume certain guarantees of the debts of the Rede Group that had been provided by the Controlling Shareholder. (Fact Stip. at ¶ 43.) In addition, pursuant to the ANEEL Plan, Energisa will invest a minimum of R$1.2 billion in the Rede Concessionaires, which Energisa anticipates accomplishing by flowing such funds through the Rede Debtors via a series of capital calls. (Fact Stip. at ¶ 95.) This significant dilution of outstanding equity under the Brazilian Reorganization Plan is consistent with the purpose of the absolute priority rule in the U.S., which is designed to prevent shareholders from retaining equity in reorganized companies without contributing new value. *See Case v. Los Angeles Lumber Prods. Co.,* 308 U.S. 106, 121–22, 60 S.Ct. 1, 84 L.Ed. 110 (1939). Moreover, approval of such treatment here also was obtained from the dissenting unsecured class according to a Brazilian procedure designed to protect creditors' rights.

 [16] Therefore, although Brazilian bankruptcy law does indeed differ from U.S. law in certain respects, the Foreign Representative has successfully demonstrated that the distribution scheme in the Brazilian Reorganization Plan is not manifestly contrary to the public policy of the United States. This Court will not decline to extend comity and grant additional relief simply because Brazilian bankruptcy law is not identical to U.S. bankruptcy law. *See* **\*105** *Ackermann v. Levine,* 788 F.2d 830, 842 (2d Cir.1986) (" 'We are not so provincial as to say that every solution of a problem is wrong because we deal with it otherwise at home.' ") (quoting *Loucks v. Standard Oil Co. of N.Y.,* 224 N.Y. 99, 110–11, 120 N.E. 198 (1918) (Cardozo, J.)).

**C. Differing Treatment of Similarly Situated Creditors by the Brazilian Reorganization Plan Was For a Valid Purpose and is Not Inconsistent With U.S. Law**

 [17] The Ad Hoc Group argues that the Brazilian Reorganization Plan discriminates unfairly among the Class III (Unsecured) creditors, pointing to the Plan's disparate treatment of the Class III claims: Noteholders are receiving a 25 percent recovery while other Class III creditors, the holders of Subsidiary Concessionaire Claims and Concessionaire Creditor Claims, are being paid in full or essentially left unimpaired. (Objection at 17.)[56] However, the Ad Hoc Group ignores the fact that this favorable treatment is necessary,

and indeed required, under Brazilian law. Pursuant to MP 577, the Brazilian government, in a valid exercise of its regulatory powers, prohibits all concessionaires, including the Rede Concessionaires (*i.e.,* the Rede Debtors' nondebtor operating subsidiaries in which ANEEL intervened), from entering bankruptcy; therefore, the Rede Concessionaires' claims against the Rede Debtors must be paid in full[57] under the Correctional Plan approved by ANEEL before ANEEL will lift its intervention in the Rede Concessionaires.[58] (Reply at ¶ 10.) As the Foreign Representative makes clear, although certain Class III (Unsecured) members may be treated differently under the Brazilian Reorganization Plan, such disparate treatment is justified where, as here, a government regulator charged with protecting the resources in its country has required different treatment of a creditor involved in reorganization proceedings. Indeed, different treatment of groups of unsecured creditors is not uncommon under chapter 11.

The question before this Court is only whether such treatment of similarly situated claims is wholly at odds with U.S. public policy. The Court finds that it is not. **\*106** *See, e.g., JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns Corp.),* 419 B.R. 221, 267 (Bankr.S.D.N.Y.2009) (holding that plan did not unfairly discriminate against unsecured noteholder class receiving 32.7 percent recovery while awarding general unsecured creditors a 100 percent recovery because differing treatment was justified); *In re Adelphia Commc'ns,* 368 B.R. 140, 246–47 (Bankr.S.D.N.Y.2007) (permitting differing treatment of unsecured creditors when done for a valid purpose, including to separate liquidated and unliquidated claims); *see also In re LightSquared Inc.,* 513 B.R. 56, 82–83 (Bankr.S.D.N.Y.2014).

Accordingly, the different treatment of the Class III (Unsecured) creditors under the Brazilian Reorganization Plan is not manifestly contrary to U.S. public policy, where the Rede Debtors have demonstrated that such treatment is reasonable due to ANEEL's intervention and where such treatment is necessary in order to confirm the Plan.

**D. To the Extent That There is Disparate Treatment, Such Treatment is Not Targeted at U.S.-Based Creditors and There is No Evidence of Protection of Local Creditors to the Detriment of U.S.-Based Creditors**

**[18]** Finally, the Ad Hoc Group attempts to demonstrate that U.S.-based creditors, including U.S.-based Noteholders, were the targets of prejudice or mistreatment in the Brazilian Bankruptcy Proceeding. The facts are to the contrary. As described in the Law Stipulation, the Brazilian Constitution requires that Brazilians and foreigners be treated equally before the law. (Law Stip. at ¶ 24.) In accordance with the laws of Brazil, and as provided in the Stipulation of Facts, all of the Rede Debtors' creditors, including the Ad Hoc Group and U.S.-based creditors, received a full and fair opportunity to participate in the Brazilian Bankruptcy Proceeding by, among other things, objecting to the bankruptcy filing; filing proofs of claim; filing motions concerning substantive consolidation of the Rede Debtors for plan purposes; attending creditors' meeting and having a representative appointed to the creditors' committee; voting on the Plan; and filing numerous objections, motions for clarification, appeals, and requests for stays pending appeal. There is no evidence that U.S.-based creditors failed to receive notice of the Brazilian Bankruptcy Proceeding or were prevented from participating in the Brazilian Bankruptcy Proceeding. No proof of mistreatment of U.S.-based creditors has been provided to the Court.

More importantly, however, it appears that only two of the Rede Debtors' known creditors, including known Noteholders, are located in the United States: (i) Merrill, a member of the Ad Hoc Group, which holds approximately 8.1 percent of the Perpetual Notes (worth approximately USD$40 million in face amount)[59] and (ii) the IADB, the holder of the majority in amount of the Concessionaire Creditor Claims, which is not a member of the Ad Hoc Group and which supported confirmation of the Brazilian Reorganization Plan. (Reply at ¶ 37.) In any event, the members of the Ad Hoc Group hold, in the aggregate, only 37 percent of the outstanding Perpetual Notes, and Merrill is the only Ad Hoc Group member located in the United States. (Fact Stip. at ¶ 80.) In essence, the Ad Hoc Group is complaining of mistreatment directed at U.S.-based creditors generally, but Merrill is the sole U.S. creditor that does not support the Brazilian Reorganization Plan. There is no evidence in the record that demonstrates that Merrill or any other U.S.-based creditor **\*107** was targeted, and the Ad Hoc Group declined the opportunity to present evidence to the Court to support this contention.

The Ad Hoc Group also argues that, in adopting MP 577, which prohibits bankruptcy filings by electricity distribution concessionaires, the Brazilian government and ANEEL attempted to ensure that "local creditors, primarily at the operating level, would be unimpaired by any restructuring process." (Objection at 8.) The Ad Hoc Group argues that MP 577 did so by "shift[ing] all the risk to a much smaller (in number) pool of financial creditors at the holding company level." (*Id.*) Creditors at the holding company level always have greater risk than creditors of the operating companies, as they have no right of payment before subsidiary debt is paid in full. Moreover, the Ad Hoc Group fails to demonstrate that the purpose of MP 577 was to protect local, operating level creditors. Rather, the Stipulation of Facts makes clear that the main objective of the Brazilian government in passing the MP 577 legislation was to give more security to the energy supply in Brazil. (Fact Stip. at ¶ 20 (discussing press release issued by the MME of Brazil).) The legislative history of MP 577 also indicates that the Brazilian government passed the measure in order to prevent public electric power concessionaires or permit holders from entering into bankruptcy, as CELPA did. (Fact Stip. at ¶ 19.) The Brazilian government's exercise of its regulatory power in this manner is not manifestly contrary to U.S. public policy. As in Brazil, electricity distribution utilities in the United States are heavily regulated by U.S. state and federal governmental regulators in order to protect the public interest. U.S. regulators routinely engage in various activities designed to regulate electricity distribution utilities, including by setting the rates such utilities charge customers, licensing market entrants, approving the utilities' financial transactions, and setting service quality standards. Accordingly, the Court finds no evidence of targeted mistreatment of U.S.-based creditors by the passage of MP 577.

The public policy exception embodied in section 1506 permits a court to decline to take any action, including granting additional relief or assistance pursuant to section 1521 and 1507 of the Bankruptcy Code, if such action would be manifestly contrary to the public policy of this country. Where, as here, the proceedings in the foreign court progressed according to the course of a civilized jurisprudence and where the procedures followed in the foreign jurisdiction meet our fundamental standards of fairness, there is no violation of public policy.

### CONCLUSION

Based on the foregoing, the Plan Enforcement Relief is granted. The parties are directed to submit an order granting the Plan Enforcement Relief in accordance with this Decision.

4010

**All Citations**

515 B.R. 69

Footnotes

1 The last four digits of the Debtor's Brazilian Corporate Taxpayer Registration Number are 01–49. The Debtor's executive headquarters are located at Avenida Paulista, 2439, 5th Floor, Cerqueira Cesar, City of São Paulo, State of São Paulo, Brazil. The Debtor was formerly known as Caiuá Serviços de Eletricidade S.A. and Rede Empresas de Energia Elétrica S.A.

2 The Stipulation of Facts and the Stipulation of Law were admitted into evidence at the hearing on May 9, 2014.

3 CELPA commenced judicial reorganization proceedings under Brazilian bankruptcy law in February 2012. (Fact Stip. at ¶ 13.) On November 9, 2012, CELPA's foreign representative sought chapter 15 recognition in this Court of CELPA's Brazilian judicial reorganization proceeding as a foreign main proceeding, along with certain relief to enforce the confirmed plan of reorganization. (Fact Stip. at ¶ 15.) The plan enforcement relief sought by the foreign representative of CELPA was similar to the relief sought here and included a request that the indenture trustee and the Depository Trust Company be directed and authorized to take actions to assign the notes to the plan sponsor pursuant to CELPA's Brazilian plan of reorganization. (Fact Stip. at ¶ 15.) No party in interest challenged the chapter 15 relief sought by CELPA's foreign representative. (Fact Stip. at ¶ 16.) On December 12, 2012, this Court entered an order granting recognition and the requested plan enforcement relief. *In re Centrais Elétricas Do Pará S.A.—EM Recuperação Judicial,* Order Granting Recognition of Foreign Main Proceeding and Certain Related Relief, Case No. 12–14568(SCC) [Docket No. 19]. At the time the Court entered such order, transfer of the shares contemplated under CELPA's plan had already closed, and appeals of the order confirming CELPA's plan were pending with the Brazilian appellate courts. (Fact Stip. at ¶ 17.) As of March 17, 2014, such appeals were still pending in Brazil. (Fact Stip. at ¶ 17.)

4 The Rede Concessionaires consist of the following eight electricity distribution subsidiaries: CEMAT, CELTINS, ENERSUL, Caiuá Distribuição de Energia S.A., Empresa Elétrica Bragantina S.A., Companhia Nacional de Energia Elétrica (*"CNEE"* ), Companhia Forc#a e Luz do Oeste, and Empresa de Distribuição de Energia Vale Paranapanema S.A. (Fact Stip. at ¶ 10.)

5 Four other subsidiaries of Rede (that are not Rede Concessionaires) also are not debtors in the Brazilian Bankruptcy Proceeding. (Fact Stip. at ¶ 3.)

6 For the purposes of this decision, all amounts will be indicated in either U.S. Dollars (*"USD$ "*) or Brazilian Real (*"R$ "*) and have not been converted except where specified.

7 The Indenture contains a permissive jurisdiction clause that would allow, absent a court order to the contrary, any holder of the Perpetual Notes to commence an action in the United States against Rede to recover on the Perpetual Notes. (Fact Stip. at ¶ 6.)

8 MP 577 subsequently became Law 12,767/2012, which was published on December 27, 2012. (Fact Stip. at n.6.)

9 The Legislative History of MP 577 explains that

> The electric power sector currently faces a situation of having a concessionaire under judicial intervention [*i.e.,* CELPA], on the verge of bankruptcy, making regulatory action that is within the power of the granting authority once this event occurs urgent. Moreover, to keep any other similar situation from occurring, there is an urgent need to derogate from judicial and nonjudicial reorganization of public electric power concessionaires (or permit holders), as it is understood conducting this type of reorganization by means of intervention, which the provisions of this measure seek to do, better suits the specific considerations of these public electric power concessionaires (or permit holders).

(Fact Stip. at ¶ 19 (citing Ex. F, a Correct Copy and Certified Translation of MP 577 and its official legislative history).) The Ministe#rio de Minas e Energia (*"MME"*), the Brazilian government's primary regulator of the power industry, issued

a press release on August 31, 2012, which explained that the main objective of MP 577 was to give more security to the energy supply in Brazil, and MP 577's rules regarding intervention "were inspired by the practices applicable to the financial system, another sector that deserves special attention from regulators and the [Brazilian government], for its relevance in the life of the citizen and Brazilian economy." (Reply at ¶ 20 (citing Exhibit G, a certified translation of the MME Press Release).)

Rothschild sent invitations to at least ten potential buyers (both foreign and domestic) and granted seven credentialed groups access to a dataroom. (Fact Stip. at ¶ 29.)

On November 20, 2012, ANEEL revoked the license granted to Rede's electricity trading subsidiary, CTCE, to market and trade electricity. (Fact Stip. at ¶ 32.)

As discussed above, Denerge is a holding company that is the direct parent and controlling shareholder of EEVP and is the indirect parent of Rede. (Fact Stip. at ¶ 2.)

Under Brazilian law, a debtor retains the right to administer its assets and affairs and may continue to run its business once a judicial reorganization has commenced. A judicial administrator is appointed by the court and is responsible for, among other things, overseeing the debtor's management of its day-to-day affairs and managing the claims verification process. (Law Stip. at ¶ 8.) On December 19, 2012, the Brazilian Court appointed Deloitte Touche Tohmatsu Consultores Ltda. (the "*Judicial Administrator*") as the independent judicial administrator for the Rede Debtors' judicial reorganization case. (Fact Stip. at ¶ 48.)

COPEL and Energisa had access to the dataroom from approximately December 2011 until February 2012, and again for several days prior to the October 11, 2012 bid deadline. (Fact Stip. at ¶ 36.)

Under Brazilian bankruptcy law, creditors have ten days to object to a claim's allowance after publication of the preliminary official list. (Fact Stip. at ¶ 68.) In general, however, creditors may separately object to a claimant's right to vote on a plan of reorganization outside of this timeframe. (Fact Stip. at ¶ 68.) The parties dispute whether the ten-day objection deadline should have applied to any objection to FI–FGTS's claim and its right to vote as a secured creditor. (Fact Stip. at ¶ 68.)

FI–FGTS's shares of EEVP were never returned to EEVP in connection with the exercise of FI–FGTS's put right. (Fact Stip. at ¶ 66.)

The Brazilian Bankruptcy Court reasoned that,

> There can be no doubt that this fund [FI–FGTS] is a creditor of the companies under reorganization; however, in the past, it had been a shareholder, but since it validly exercised a sale option prior to joining the legal reorganization proceedings, it no longer has the status of shareholder. Proof of notification of exercise of the option has been provided, which is an undisputed fact in the case files ... Its vote was completely valid in its status as secured creditor.

(Fact Stip. at ¶ 71 (citing Exhibit P (Decision of the Brazilian Bankruptcy Court, dated May 27, 2013) at 4 (changes in original)).)

The official committee of creditors had the duty to obtain and inform all creditors of information regarding the Rede Debtors. (Fact Stip. at ¶ 49.) The members of the creditors' committee were (i) FI–FGTS, acting through its attorney-in-fact, Cassio Viana de Jesus, representing itself as the sole voting secured creditor, and (ii) Moneda Deuda LatinoAmericana Fondo de Inversion ("*Moneda*"), acting through its counsel Eduardo Augusto Mattar, representing the class of unsecured creditors. (Fact Stip. at ¶ 49.) Moneda is a Chilean investment fund and the largest member, by holdings, of the Ad Hoc Group. (Fact Stip. at ¶ 49.)

The other secured creditor, Banco Nacional de Desenvolvimento Econo#mico e Social ("*BNDES"*), was not permitted to vote on the Brazilian Reorganization Plan because its subsidiary, BNDES Participações S.A. ("*BNDESPar*"), is a minority shareholder in the Rede Debtors. (Fact Stip. at ¶ 63.) Brazilian bankruptcy law prevents shareholders, affiliates, controlling and controlled companies of the debtor or entities which have a partner or shareholder with an equity interest above ten percent in the debtor's capital stock, or in the capital stock of which the debtor or any of his partners have an equity interest exceeding ten percent, from voting on account of claims against the debtor. (Law Stip. at ¶ 16.) BNDES

4012

held a claim that was allowed against Rede in the amount of R$134.5 million and was secured by, among other things, Rede's equity interests in one of the Rede Concessionaires, CNEE. (Fact Stip. at ¶ 63.)

Approval of a plan under Brazilian law may be obtained in one of two ways: (1) through a "regular creditor majorities" procedure or (2) through a "cram-down" procedure. Approval of a plan through the regular creditor majorities procedure requires that the plan be approved by each class of claims. In Classes II and III, the plan must be approved by (i) more than 50 percent of the creditors present at the creditors' meeting, in number, in each class and (ii) creditors that hold more than 50 percent in amount of the allowed claims present at the creditors' meeting, in each class. All such 50 percent thresholds are calculated only over the base of creditors who, cumulatively, (a) are present at the meeting; (b) are allowed to vote; and (c) actually do so (*i.e.,* do not voluntarily abstain from voting). (Law Stip. at ¶ 17.) Here, at least four more accepting votes from unsecured creditors in Class III in the Brazilian Reorganization Plan were required for such class to accept the Plan. (Fact Stip. at ¶ 104.)

If the required majorities are not met for acceptance of the plan under Brazilian law, the plan may still be approved via a cram-down of the rejecting class. Approval of a plan through the cram-down procedure requires the court to approve the plan if the following cumulative requisites are met: (1) holders of a simple majority (more than 50 percent) in amount of the total allowed claims who (a) are present at the creditors' meeting, (b) are allowed to vote, and (c) actually do so, vote for approval of the plan; (2) the required majorities are met in one class of claims (if there are only two classes of claims); and (3)(a) if the required majorities are not met in Class II or in Class III, more than one-third (1/3) of the creditors that (i) are present at the creditors' meeting, (ii) are allowed to vote, and (iii) actually do so, in number, in such class, must have voted in favor of the plan and, cumulatively, creditors that hold more than one-third (1/3) in amount of the allowed claims and that (a) are present at the creditors' meeting, (b) are allowed to vote, and (c) actually do so, in such class, must have voted in favor of the plan. In addition, Brazilian bankruptcy law expressly provides that confirmation via cram-down is only possible if the plan does not entail different treatment among the creditors of the class that rejected it. The parties disagree regarding whether Brazilian law permits cram-down where the plan provides different treatment to creditors in the dissenting class under some circumstances if done for a fair and valid justification (*e.g.,* to enforce subordination rights or legislative priority). This issue has been extensively briefed by the parties and is currently on appeal in Brazil. (Law Stip. at ¶ 18.)

Fact Stip. at ¶ 58 (citing Ex. P (Decision of the Brazilian Bankruptcy Court, dated May 27, 2013) at 1–3).

The May 27, 2013 decision by the Brazilian Court did not address factors that, according to the Ad Hoc Group, would ordinarily be considered by a United States court considering the issue of substantive consolidation. Such factors include: disregard of corporate separateness, creditor confusion about which entity with which they were doing business, intermingling of funds, or fraud. (Fact Stip. at ¶ 59.)

Although the Brazilian Reorganization Plan does not extinguish the remaining equity interests held by minority shareholders, as discussed below, such remaining minority shares will be diluted upon consummation of the Brazilian Reorganization Plan. (Fact Stip. at ¶¶ 94–95.)

The three options consisted of:

(A) retention of security interest and restatement [sic] of the principal amount of its debt in full to be paid over 22 years at a two percent interest rate, with a balloon principal payment in year 22;

(B) if the secured creditor chooses to commit to future financing of the reorganized companies on terms set forth in section 1.2.22 of the Plan, retention of security interest and restatement [sic] of the principal amount of its debt in full to be paid over 22 years at a four percent interest rate, with a balloon payment in year 22; and

(C) the secured creditor may assign its debt to Energisa in return for a 25 percent cash distribution paid on the closing date.

Fact Stip. at ¶ 74 (citing Ex. L (Brazilian Reorganization Plan) at Articles 6 and 8).

BNDESPar, a subsidiary of BNDES and the holder of 15.9 percent of the shares of Rede, held a right to sell its Rede shares to EEVP in return for a debt claim of R$390 million, which right was never exercised. (Fact Stip. at ¶ 91.) As a

result, BNDESPar did not have a claim listed on the Creditors' List and will not receive a new distribution as a claimant under the Brazilian Reorganization Plan. (Fact Stip. at ¶ 91.) However, BNDESPar's claim for the exercise of the put remains a contingent liability for which Energisa may ultimately be responsible. (Fact Stip. at ¶ 92.)

27  Fact Stip. at ¶ 76 (citing Ex. L (Brazilian Reorganization Plan) at § 1.2.22).

28  A U.S.-based entity, the Inter–American Development Bank ("*IADB*") holds the majority in amount of the Concessionaire Creditor Claims, holding approximately USD$151 million against the Rede Concessionaires, CEMAT and CELTINS, which claims are guaranteed by Rede. (Fact Stip. at ¶ 84.) The remaining Concessionaire Creditors are Brazilian-based entities. (Fact Stip. at ¶ 84.)

29  To satisfy ANEEL's requirements, the Rede Debtors originally submitted their Correctional Plan to ANEEL on October 26, 2012, and such plan was subsequently revised. Among other things, this plan laid out Energisa's proposal for the assumption and reorganization of the Rede Concessionaires (as amended on October 1, 2013 and presented by the Rede Debtors and Energisa, the "*ANEEL Plan*").

30  Except for certain holders of the Perpetual Notes and the IADB, all known holders of the General Unsecured Claims are Brazilian-based entities. (Fact Stip. at ¶ 78.) Because the Perpetual Notes are held in global note form with DTC, neither the Rede Debtors nor the Ad Hoc Group knows with certainty the identities or nationalities of the beneficial holders of the Perpetual Notes (other than the members of the Ad Hoc Group). The Ad Hoc Group purports to have been in contact with other holders of Perpetual Notes, one or more of which are also based in the U.S. The Perpetual Note claims were issued only to (i) non-U.S. persons in accordance with Regulation S of the U.S. Securities Act of 1933, as amended (the "*Securities Act*") and (ii) qualified institutional buyers in accordance with Rule 144A of the Securities Act. (Fact Stip. at ¶ 79.)

31  The three plan treatment options available to a holder of an allowed General Unsecured Claim are:

(A) restatement [sic] of the principal amount of its debt in full to be paid over 22 years at a one percent interest rate, with a balloon principal payment in year 22;

(B) if the unsecured creditor chooses to commit to future financing of the reorganized companies on terms defined in section 1.2.23 of the Plan, restatement [sic] of the principal amount of its debt in full to be paid over 22 years at a one percent interest rate, subject to annual monetary adjustment on the value of the principal balance, with a balloon payment in year 22; and

(C) the unsecured creditor may assign its claim(s) to Energisa in return for a 25 percent cash distribution paid on the closing date.

(Fact Stip. at ¶ 81 (citing Ex. L (Brazilian Reorganization Plan) at Articles 7 and 8).)

32  Fact Stip. at ¶ 81 (citing Ex. L (Brazilian Reorganization Plan) at § 7.1.4).

33  Petition at ¶ 35.

34  Petition at ¶¶ 53–68.

35  Order Granting Recognition of Foreign Main Proceeding [Docket No. 18].

36  Objection of Ad Hoc Group of Rede Noteholders to Foreign Representative's Petition for Recognition of Brazilian Bankruptcy Proceeding and Motion for Order Granting Related Relief Pursuant to 11 U.S.C. §§ 105(a), 1509(b), 1515, 1517, 1520 and 1521 [Docket No. 16].

37  Objection at 14–21.

38  Objection at 2.

4014

39    Foreign Representative's Reply to Objection of Ad Hoc Group of Rede Noteholders to Foreign Representative's Motion for Order Granting Plan Enforcement [Docket No. 29].

40    Reply at ¶¶ 24–42; *see also* Petition at ¶¶ 57–88.

41    11 U.S.C. § 1522(a).

42    Section 1507(b) of the Bankruptcy Code provides that,

> In determining whether to provide additional assistance under this title or under other laws of the United States, the court shall consider whether such additional assistance, consistent with the principles of comity, will reasonably assure—
>
> > (1) just treatment of all holders of claims against or interests in the debtor's property;
> >
> > (2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;
> >
> > (3) prevention of preferential or fraudulent dispositions of property of the debtor;
> >
> > (4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and
> >
> > (5) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.
>
> 11 U.S.C. § 1507(b).

43    Section 1506 of the Bankruptcy Code provides that "[n]othing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506.

44    As a technical matter, the Confirmation Decision and the Brazilian Reorganization Plan are not entitled to "full faith and credit" inasmuch as these are words taken from Article IV of the Constitution of the United States and are inapplicable to foreign judgments.

45    The Ad Hoc Group contends that a "very similar set of factors are to be considered when granting relief under either section 1521 or 1507." (Objection at 16.) As noted in *Sino–Forest,* "[t]he factors listed in section 1507(b)(1)-(5), to be considered in deciding whether to extend comity under section 1507, are not included in section 1521(a).... [S]ection 1522 places limitations on the relief under section 1521: relief may be granted 'only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected.' " *Sino–Forest Corp.,* 501 B.R. at 664 n.4; *see also In re Atlas Shipping A/S,* 404 B.R. 726, 740 (Bankr.S.D.N.Y.2009) (noting that the relief under section 1521(b), entrusting the distribution of all or part of the debtor's assets located in the United States to the foreign representative or another person, may be granted only if the interests of local creditors are "sufficiently protected," but making no mention that the other balancing factors listed in section 1507(b) apply to the relief available under section 1521(a)). *See infra* for a discussion of whether the Plan Enforcement Relief may be granted as "additional assistance" under section 1507.

46    *See Atlas Shipping,* 404 B.R. at 741 (granting relief under section 1521 and concluding that it was unnecessary to determine whether "additional assistance" was available under section 1507).

47    In arguing that creditors were not treated justly in Brazil, the Ad Hoc Group also points to the fact that the Brazilian Reorganization Plan provides different treatment to certain types of unsecured claims. For the reasons discussed at section IV.C., *infra,* the Court finds that the disparate treatment of the claims of the Rede Concessionaires and the Concessionaire Creditors under the plan was necessary in order to comply with ANEEL's requirement that the Rede Concessionaires be adequately capitalized before ANEEL would lift its intervention. As the Foreign Representative points out, had ANEEL refused to lift its intervention and instead terminated the Rede Concessionaires' concession agreements with the Brazilian government, the Rede Group would be left with only "an unprecedented and lengthy litigation claim

against the Brazilian government," the recoveries of which have already been partially assigned to secure certain debts of the Rede Concessionaires. (Reply at ¶¶ 32–33.)

Moreover, indenture trustees are not entitled to vote on chapter 11 plans in the United States.

A foreign insolvency regime need not contain an absolute priority rule identical to that of U.S. law. *Garcia Avila*, 296 B.R. at 111; *see also Bd. of Dirs. of Telecom Arg.*, 528 F.3d at 173.

Moreover, both the Rede Debtors and the Ad Hoc Group have appealed the confirmation of the Brazilian Reorganization Plan, which was approved via cram-down. If, after all appeals are taken by the parties in Brazil, the cram-down requirements are not found to have been satisfied, the Brazilian Reorganization Plan will be rejected and a liquidation proceeding will be commenced.

Specifically, the Ad Hoc Group asserts that the original proposal submitted by Energisa (that offered to purchase operating subsidiaries directly from Rede) would have caused the purchase price to flow solely to Rede's creditors, thus maximizing creditor value. (Objection at 9.)

Fact Stip. at ¶ 69. The Ad Hoc Group also asserts that the term "secured creditor class" is a "misnomer" because such class only consisted of *one single voting creditor,* FI–FGTS. (Objection at 11.) The Court notes that, even under U.S. bankruptcy law, it is not uncommon for certain classes of creditors, particularly a class of secured claims, to contain only one claim. The fact that the secured creditor class under the Brazilian Reorganization Plan contained only one secured claim does not establish unfairness or manipulation of the vote, as the Ad Hoc Secured Group alleges.

As explained in footnote 21, *supra,* approval of a plan through the cram-down procedure under Brazilian law requires the court to approve the plan if holders of a simple majority (more than 50 percent) in amount of the total allowed claims vote for approval of the plan (here, 74 percent of all creditors voted to approve the Plan); (2) the required majorities are met in one of the two classes of claims (here, the secured class); and (3)(a) if the required majorities are not met in Class II or in Class III, more than one-third (1/3) of the creditors that (i) are present at the creditors' meeting, (ii) are allowed to vote, and (iii) actually do so, in number, in such class, must have voted in favor of the plan and, cumulatively, creditors that hold more than one-third (1/3) in amount of the allowed claims and that (a) are present at the creditors' meeting, (b) are allowed to vote, and (c) actually do so, in such class, must have voted in favor of the plan.

Fact Stip. at 22 n.12 (citing Ex. R (chart providing voting results as calculated by the Brazilian Bankruptcy Court)).

*See also supra* note 49.

Specifically, the Ad Hoc Group criticizes the "special" treatment of two groups of Class III Claims: (i) intercompany claims owed to non-debtor subsidiaries that are electricity distribution concessionaires (the Rede Concessionaires), which claims are being paid in full under the Plan and (ii) obligations of electricity distribution concessionaires (the Subsidiary Concessionaires) that are also joint obligations of a Rede Debtor, which obligations are required to be brought current and then assumed by Energisa under the Brazilian Reorganization Plan (*i.e.,* paid in full). *See* Objection at 6.

In addition to the claims of the Rede Concessionaires, under the Brazilian Reorganization Plan, the claims of the Concessionaire Creditors (*i.e.,* the creditors of the Rede Concessionaires that also hold guarantee or surety claims against one or more of the Rede Debtors) are entitled to the same treatment as all other general unsecured creditors, but, if the Concessionaire Creditors agree to waive further enforcement rights, defaults, and penalties against the Rede Concessionaires and the Rede Debtors, such creditors will have their surety or guarantee claims replaced by Energisa.

In order to lift its intervention in the Rede Concessionaires, ANEEL required that Energisa (or any potential investor in the Rede Debtors) address and mitigate the risks of potential defaults under the concession agreements with the Brazilian government by adequately capitalizing the Rede Concessionaires, including by settling the debts owed to the Rede Concessionaires by the Rede Debtors, curing the Rede Concessionaires' outstanding defaults, and assuming or paying down the Rede Concessionaires' outstanding debts. (Fact Stip. at ¶ 86.)

5/9/14 Tr. at 23:19–24:4.

In re Rede Energia S.A., 515 B.R. 69 (2014)

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2026 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 69

KeyCite Yellow Flag - Negative Treatment

Distinguished by Morelli v. Patient Safety Technologies, Inc., C.D.Cal., December 22, 2015

840 F.Supp.2d 752
United States District Court,
S.D. New York.

Valdenor REYES, Plaintiff,
v.
METROMEDIA SOFTWARE, INC., Defendant.

No. 11 Civ. 02155 (GWG).
|
Jan. 4, 2012.

**Synopsis**
**Background:** Former employee filed suit against employer for allegedly breaching employment contract. Employee moved for partial judgment on pleadings seeking declaration of entitlement to post-termination commission payments under terms of contract and that employer breached those terms.

**[Holding:]** The District Court, Gabriel W. Gorenstein, United States Magistrate Judge, held that employee's post-termination commission payments were required by contract.

Motion granted.

West Headnotes (8)

**[1]**    **Contracts** 🔑 Language of contract

Under New York law, a court interpreting a contract must give effect to the intent of the parties as revealed by the language they chose to use.

3 Cases that cite this headnote

**[2]**    **Contracts** 🔑 Application to Contracts in General

**Contracts** 🔑 Ambiguity in general

Under New York law, the proper interpretation of an unambiguous contract is a question of law for the court, and courts are to enforce the contracts as written.

6 Cases that cite this headnote

**[3]**    **Contracts** 🔑 Ambiguity in general

Under New York law, when the meaning of the contract is ambiguous and the intent of the parties becomes a matter of inquiry, a question of fact is presented.

1 Cases that cite this headnote

**[4]**    **Contracts** 🔑 Ambiguity in general

Under New York law, whether a contractual provision is ambiguous or not is a threshold question of law to be determined by the court.

4 Cases that cite this headnote

**[5]**    **Evidence** 🔑 Grounds for admission of extrinsic evidence

Under New York law, if a court determines that a contractual provision is ambiguous, the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract.

**[6]**    **Contracts** 🔑 Existence of ambiguity

Under New York law, a contract is not ambiguous simply because the parties have urged conflicting interpretations; rather, a contractual provision is ambiguous only when it is reasonably susceptible to more than one reading.

7 Cases that cite this headnote

**[7]**    **Contracts** 🔑 Construction as a whole

Under New York law, a court must evaluate the disputed language in the context of the entire agreement to safeguard against adopting an interpretation that would render any individual provision superfluous.

3 Cases that cite this headnote

**[8]** **Labor and Employment** 🗝 Effect of termination of employment

Under New York law, employer was required to pay former employee post-termination commissions, pursuant to unambiguous terms of employment contract providing that for seven years after employee was terminated, he was entitled to payment of same commissions to which he was entitled "only" during his employment, in accordance with other terms of contract that did not conflict with terms governing post-termination commissions that continued to apply after parties executed second agreement.

**Attorneys and Law Firms**

 **\*752** Scott A. Korenbaum, Scott A. Korenbaum, Esq., New York, NY, for Plaintiff.

David Glenn Ebert, Mioko Catherine Tajika, Ingram Yuzek Gainen Car, Roll & Bertolotti, LLP New York, NY, for Defendant.

**\*753** *OPINION AND ORDER*

GABRIEL W. GORENSTEIN, United States Magistrate Judge.

Plaintiff Valdenor Reyes brings this action against his former employer Metromedia Software, Inc. on the ground that Metromedia violated his employment contract. Reyes has moved for partial judgment on the pleadings seeking a declaration that he is entitled to certain commission payments under the terms of his employment contract and that Metromedia has breached those terms.[1] For the reasons discussed below, Reyes's motion is granted.[2]

[1]     *See* Plaintiff's Motion and Notice of Motion for Partial Judgment on the Pleadings, filed July 12, 2011 (Docket # 11) ("Notice"); Declaration of Scott A. Korenbaum in Support of Plaintiff's Motion for Partial Judgment on the

Pleadings, filed July 12, 2011 (Docket # 12); Plaintiff's Memorandum of Law in Support of His Motion for Partial Judgment on the Pleadings, filed July 12, 2011 (Docket # 14); Declaration of Valdenor Reyes in Support of his Motion for Judgment on the Pleadings, filed July 13, 2011 (Docket # 15) ("Reyes Decl."); Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Partial Judgment on the Pleadings, filed Sept. 9, 2011 (Docket # 17) ("Opp. Mem.").

[2]     The parties have consented to having this matter decided by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

I. *BACKGROUND*

   A. *Facts*

The facts relevant to this motion are undisputed.

Defendant Metromedia Software, Inc. ("Metromedia") entered into an employment contract with Reyes, which was drafted by Metromedia and is dated January 1, 1998. *See* Employment Agreement, dated Jan. 1, 1998 (annexed as Ex. A to Reyes Decl.); Complaint, filed Mar. 29, 2011 (Docket # 1) ("Compl.") ¶ 8. Reyes's responsibilities under the contract included selling Metromedia's "HotelEXPERT product" and providing training and support services relating to the use of that product. *See* Employment Agreement ¶ 1.

Paragraph 2 of the Employment Agreement, entitled "Compensation," is divided into two parts. The first part provided for compensation as consideration for "the due and faithful performance of the Services under this Agreement, and only for so long as you are an employee of the Company ... and only for so long as you are rendering such Services to the Company." *Id.* ¶ 2(a). The provisions of this paragraph promise Reyes three forms of compensation: (i) commissions equal to 6% of annual "gross revenues"; (ii) $50,000 for services rendered between May 20 and December 31, 1998; and (iii) a weekly salary of $2,884.62 beginning on January 1, 1999. *Id.* ¶¶ 2(a)(i)-(iii). The second part provided for the issuance of 53 shares of stock to Reyes as compensation for past services. *Id.* ¶ 2(b).

A separate section of the Employment Agreement, ¶ 4, is entitled "Term and Termination." This paragraph provides that Reyes's employment would commence on January 1, 1998 and continue for five years unless Metromedia terminated him for cause, the possible bases for which are listed in the agreement. *See id.* ¶ 4(a). This section also provides that if Reyes continued to perform services

4020

after the termination date of the agreement—that is, after December 31, 2002—without a written extension, the parties' continued employment relationship would be governed by the same terms and conditions contained in the Employment Agreement unless the parties entered into a new agreement or either party terminated the existing agreement on 30 days notice. *Id.* ¶ 4(b).

The next section of ¶ 4 provided that if the contract were "terminated for any reason **\*754** whatsoever, other than fraud, embezzlement, or gross negligence, commissions will be paid to [Reyes] pursuant to Section 2(a)(i) above for a period of seven (7) years from the date of such termination." *Id.* ¶ 4(c).

The parties executed a second agreement, dated November 9, 2007, entitled "Memorandum of Agreement." *See* Memorandum of Agreement, dated Nov. 9, 2007 (annexed as Ex. B to Reyes Decl.) ("Mem. of Agreement"); Compl. ¶ 15. The Memorandum of Agreement provided that "[i]t is the intention of both [Reyes] and [Metromedia] to extend the terms of [the Employment Agreement]" and that "[a]ll terms contained in the Employment Agreement, unless otherwise modified by this Memorandum, shall continue in effect until June 30, 2008 ("Employment Term")." Mem. of Agreement at 1. Furthermore, the Memorandum of Agreement provided that the original Employment Agreement "shall automatically be extended until December 31, 2008," unless either party notified the other of its intention not to extend the contract by May 31, 2008. *Id.*

The Memorandum of Agreement's substantive modifications to the Employment Agreement principally related to the terms of Reyes's agreement not to compete with Metromedia in the event the Employment Agreement were terminated and to the commissions Reyes would receive under sales contracts arising out of an agreement Reyes was then negotiating with Hilton Hotels Corporation on behalf of Metromedia. *See id.* at 1–3.

Metromedia terminated Reyes's employment on January 8, 2010. Compl. ¶ 28. Metromedia did not terminate Reyes's employment for any of the reasons listed in ¶ 4(c) of the Employment Agreement. Compl. ¶ 29. Metromedia paid commissions owed to Reyes pursuant to the Memorandum of Agreement for the years 2008 and 2009, and some commissions for 2010—presumably consisting of commissions earned prior to his termination. Compl. ¶ 24; Answer ¶ 10. But Metromedia believes it is not obligated to

pay Reyes post-termination commissions. *See* Opp. Mem. at 9.

#### B. *The Instant Motion*

Reyes has moved for partial judgment on the pleadings requesting a declaration that Metromedia is obligated to pay Reyes "commissions, in accordance with the terms of their Employment Agreement ..., dated as of January 1, 1998, for seven years following the termination of his employment on January 8, 2010." Notice at 1. Reyes also requests a declaration that Metromedia breached the Employment Agreement "by failing to pay Mr. Reyes commissions, in accordance with the terms of the Employment Agreement, following the termination of his employment on January 8, 2010, to the present." *Id.* at 1–2.

Metromedia contends that summary judgement should be denied because it is not obligated to pay commissions to Reyes following his termination. It argues that paragraphs 2(a)(i) and 4(c) are irreconcilable or that the contract is otherwise ambiguous. Opp. Mem. at 7–16. It therefore requests the opportunity to present extrinsic evidence to resolve the alleged ambiguity or a ruling that ¶ 4(c) of the Employment Agreement is invalid. *Id.* at 9.

### II. *DISCUSSION*

#### A. *Principles of Contract Interpretation*

Because the parties have relied on New York State law in presenting their arguments, we apply New York law to Reyes's claims. *See, e.g., Merrill Lynch Interfunding, Inc. v. Argenti,* 155 F.3d 113, 121 n. 5 (2d Cir.1998) (citing *Hannex Corp. v. GMI, Inc.,* 140 F.3d 194, 203 n. 7 (2d Cir.1998)).

**\*755** **[1]** **[2]** Under New York law, a court interpreting a contract must "give effect to the intent of the parties as revealed by the language they chose to use." *Seiden Assocs., Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir.1992) (citing *Slatt v. Slatt,* 64 N.Y.2d 966, 967, 488 N.Y.S.2d 645, 477 N.E.2d 1099 (1985)). "The proper interpretation of an unambiguous contract is a question of law for the court," *Omni Quartz, Ltd. v. CVS Corp.,* 287 F.3d 61, 64 (2d Cir.2002) (citing *Seiden,* 959 F.2d at 428); *accord Citibank, N.A. v. Morgan Stanley & Co. Int'l,* 724 F.Supp.2d 398, 404 (S.D.N.Y.2010), and "courts are to enforce them as written," *Vill. of Sylvan Beach v. Travelers Indem. Co.,* 55 F.3d 114, 115 (2d Cir.1995) (citing *Maurice Goldman & Sons, Inc. v.*

*Hanover Ins. Co.,* 80 N.Y.2d 986, 987, 592 N.Y.S.2d 645, 607 N.E.2d 792 (1992)).

**[3]** **[4]** **[5]** "However, when the meaning of the contract is ambiguous and the intent of the parties becomes a matter of inquiry, a question of fact is presented," *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.,* 424 F.3d 195, 205 (2d Cir.2005) (quoting *Postlewaite v. McGraw–Hill, Inc.,* 411 F.3d 63, 67 (2d Cir.2005)). Whether a contractual provision is ambiguous or not is a "threshold question of law to be determined by the court." *Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.,* 472 F.3d 33, 42 (2d Cir.2006) (quoting *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.,* 411 F.3d 384, 390 (2d Cir.2005)). If a court determines that a contractual provision is ambiguous, "the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." *Id.* at 43 (quoting *Morgan Stanley Grp. Inc. v. New England Ins. Co.,* 225 F.3d 270, 275–76 (2d Cir.2000)).

**[6]** **[7]** A contract is not ambiguous simply because the parties have urged conflicting interpretations. *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan,* 7 F.3d 1091, 1095 (2d Cir.1993) (citing cases). Rather, a contractual provision is ambiguous only "when it is reasonably susceptible to more than one reading." *U.S. Fire Ins. Co. v. Gen. Reinsurance Corp.,* 949 F.2d 569, 572 (2d Cir.1991). Importantly, a court must evaluate the disputed language "in the context of the entire agreement .... [to] safeguard against adopting an interpretation that would render any individual provision superfluous." *Sayers,* 7 F.3d at 1095 (citations and internal quotations omitted).

### B. *Analysis*

**[8]** The Employment Agreement's provisions regarding the payment of commissions are clear and unambiguous. Paragraph 2(a)(i) governs the payment of commissions while Reyes is employed by Metromedia. *See* Employment Agreement ¶ 2(a)(i). Paragraph 4(c) of the Employment Agreement governs the payment of commissions in the event Reyes's employment were to terminate, and provides that Metromedia must pay him the same commissions to which he is entitled under ¶ 2(a)(i) for seven years from the termination date, unless it terminates him for certain wrongdoing. *See* Employment Agreement ¶ 4(c).

In the face of this apparent clarity as to the commission obligation, Metromedia argues that its obligation to pay Reyes commissions terminated when Metromedia discharged Reyes from his employment. Metromedia's main argument is that ¶ 2(a)(i) and ¶ 4(c) are "irreconcilable." Opp. Mem. at 9. To support this argument, Metromedia points to the opening sentence of ¶ 2(a), which states that Metromedia's obligation to pay Reyes a salary and commissions exists "only for so long as [Reyes is] an employee of the Company ... and only for so long as [Reyes is] **\*756** rendering ... Services to the Company." *Id.* at 8. Metromedia contends that because the obligation to pay commissions pursuant to ¶ 2(a)(i) exists "only" while Reyes is an employee, Metromedia's promise in ¶ 4(c) to pay Reyes commissions after his termination is inconsistent with ¶ 2(a)(i). Essentially, Metromedia argues that the introductory description in ¶ 2(a)—referring to compensation that is to be paid during the period Reyes is employed by and rendering services to Metromedia—applies to the promise contained in ¶ 4(c), even though ¶ 4(c) addresses only the compensation Reyes would receive after he was terminated. Under Metromedia's interpretation, therefore, Metromedia's promise in ¶ 4(c) to pay Reyes commissions for seven years after Reyes's termination was meaningless and illusory. It could never have been fulfilled under any set of circumstances because once Reyes was terminated, Reyes would no longer be employed by Metromedia and thus would fail to come within the introductory description contained in ¶ 2(a). Therefore, Metromedia argues, the contract is ambiguous.

Accepting Metromedia's interpretation, however, requires a strained—indeed, almost nonsensical—reading of the contract and violates the cardinal rule that a contract should not be read to render any provision superfluous. *See Scholastic, Inc. v. Harris,* 259 F.3d 73, 83 (2d Cir.2001) ("In determining whether a contract is ambiguous, a court must look at 'the entire integrated agreement,' to 'safeguard against adopting an interpretation that would render any individual provision superfluous.' ") (quoting *Sayers,* 7 F.3d at 1094–95). The structure of the contract itself, along with the contractual language, reflect that the purpose of ¶ 2(a) was to set forth the compensation Metromedia had to pay Reyes while Reyes was with the company. It therefore makes sense that, as a means of compensating Reyes for services performed in furtherance of Metromedia's interests, the commission component of Reyes's compensation—like his weekly salary—would be available to Reyes "only" for the duration of Reyes's employment with Metromedia.

Paragraph ¶ 4(c), by contrast, serves a different purpose to set forth the compensation Reyes was entitled to receive in the event the employment relationship terminated. The fact

4022

that these commissions were to be paid post-termination, however, is not inconsistent with Metromedia's obligation to pay Reyes certain defined salary and commissions "only" while Reyes was employed. Indeed, the independent purpose and function of ¶ 4(c) are rendered all the more obvious because ¶ 4(c) *specifically mentions* ¶ 2(a)(i) that is, ¶ 4(c) ties the amount of the post-termination commissions to the very amounts that would have been due to Reyes under ¶ 2(a)(i) had he remained an employee. The drafters of the contract thus understood that, in creating the obligation to pay post-termination commissions in ¶ 4(c), they were doing so in the face of a separate obligation to pay commissions during the term of Reyes's employment. [3]

[3]   It is hardly surprising that an employer would enter into an agreement with a salesman under which the salesman is entitled to collect commissions once his employment ended. From the employee's perspective, guaranteeing post-termination commissions provides a disincentive to the employer to terminate an employee in order to avoid paying commissions that had been generated by the employee's efforts. From the employer's perspective, it incentivizes the employee to maximize the generation of sales up until the last moments of his employment, secure in the knowledge that if he quits or were suddenly terminated, he would not lose the commissions on the sales generated late in his tenure. Therefore, not only are the two provisions in the Employment Agreement not irreconcilable, the termination provision in ¶ 4(c) actually operates to ensure that Reyes will give the "due and faithful performance" of the services for which he receives salary and commissions under ¶ 2(a)(i).

In sum, all the provisions of the Employment Agreement survive by giving the two allegedly conflicting provisions their **\*757** natural readings. The "only for so long as you are an employee of [Metromedia]" condition in the opening sentence of ¶ 2(a) applies to commissions provided as compensation while Reyes worked for Metromedia. Paragraph 4(c)'s post–termination provision applies to commissions paid as termination compensation. Putting aside the clarity of the language, this interpretation, unlike the interpretation proffered by Metromedia, renders neither provision superfluous.

Metromedia makes some additional arguments relying on the later Memorandum of Agreement, but none of them are persuasive. First, it points to a provision of the Memorandum of Agreement regarding payment of the particular class of commissions relating to the Hilton Hotel, and argues that this provision reflects on the intent of the parties to the

Employment Agreement. *See* Opp. Mem. at 13–14; Mem. of Agreement at 2. However, in light of the fact that the Employment Agreement is unambiguous, the Memorandum of Agreement cannot be used as extrinsic evidence to cast light on the meaning of the Employment Agreement's provisions. In any event, there is nothing inconsistent about the Hilton Hotel provision in the Memorandum of Agreement, as it was clear that the Memorandum of Agreement was making special provisions for the payment of the Hilton-related commissions and was not otherwise altering the commission obligation arising from other sales. Indeed, after the discussion of the Hilton-related commissions, the Memorandum of Agreement has a separate section entitled "Other Commissions" which specifically refers to commissions "[e]xcluding commissions earned under the Hilton Agreement." Mem. of Agreement at 3. This makes clear, to the extent there could otherwise be any doubt, that the conditions imposed on Reyes's receipt of commissions under the Hilton Agreement were unrelated to Reyes's receipt of non-Hilton commissions under the Employment Agreement.

Metromedia also points to the provision in the "Other Commissions" section that obligates Metromedia to pay Reyes commissions within five days of Reyes's delivering "the monthly financial statements for the current month." Opp. Mem. at 14. Again, in light of the Employment Agreement's clarity, this provision is irrelevant to its interpretation. In any event, the provision is consistent with the Employment Agreement because the paragraph is most reasonably and naturally read as requiring Metromedia to make prompt payment to Reyes during the time he has access to those financial statements—that is, while he is employed. It thus gave Reyes a right to prompt payment of his commissions under ¶ 2(a)(i) that had not previously existed.

Finally, Metromedia argues that the "continued enforceability" of ¶ 4(b)—stating that the Employment Agreement was to continue in effect after its expiration unless one party terminated it on 30–days notice—is an "open issue" and "questionable" because "[i]t is unclear" if ¶ 4(b) survived the Memorandum of Agreement. Opp. Mem. at 15, 16. Metromedia bases this argument on the fact that the Memorandum of Agreement states in relevant part that the Employment Agreement shall "automatically be extended until December 31, 2008" but does not state what happens after that date. Mem. of Agreement at 1; *see also* Opp. Mem. At 15–16. Metromedia does not explain what contractual **\*758** arrangement it thinks governed the parties' employment relationship after December 2008. In any

event, the contractual documents are clear on this point as well the Memorandum of Agreement states that it is "the intention of both the Employee and the Employer to extend the terms of their employment relationship" as stated in the Employment Agreement, subject to "certain modifications" contained in the Memorandum of Agreement. Mem. of Agreement at 1. The Memorandum of Agreement contains no provision modifying the Employment Agreement's general provision that if Reyes continued to provide services *after* the termination date of the Employment Agreement, the term of the Employment Agreement would be extended unless it were terminated on 30 days notice by either party. *See* Employment Agreement ¶ 4(b). Thus, the continued applicability of the Employment Agreement to the employment relationship as of Reyes's termination date is unambiguous [4]

[4]    Metromedia finds it "odd" that under the Employment Agreement, Reyes would be entitled to receive post-termination commissions under ¶ 4(c) if he was terminated due to criminal convictions or breach of

the employment agreement as long as the conviction or breach did not involve fraud, embezzlement or gross negligence. *See* Opp. Mem. at 14–15. Accepting *arguendo* the assertion that such a situation is "odd," its purported oddness does not render ambiguous the contractual provisions at issue in this motion.

Because Metromedia does not dispute that it has failed to pay Reyes for the amounts owing pursuant to ¶ 4(c) of the Employment Agreement, Reyes is entitled to partial summary judgment on the issue of Metromedia's breach.

III. *CONCLUSION*

For the foregoing reasons, the plaintiff's motion for partial judgment on the pleadings (Docket # 11) is granted.

SO ORDERED.

**All Citations**

840 F.Supp.2d 752

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 70

600 B.R. 237
United States Bankruptcy Court, S.D. New York.

IN RE: SERVIÇOS DE PETRÓLEO

CONSTELLATION S.A., et al.,[1] Foreign Debtors.

[1]    The debtors in these chapter 15 cases (the "Chapter 15 Cases") are: Serviços de Petróleo Constellation S.A. ("Petróleo Constellation"); Lone Star Offshore Ltd. (In Provisional Liquidation) ("Lone Star"); Gold Star Equities Ltd. (In Provisional Liquidation) ("Gold Star"); Olinda Star Ltd. (In Provisional Liquidation) ("Olinda Star"); Star International Drilling Limited ("Star Int'l."); Alpha Star Equities Ltd. (In Provisional Liquidation) ("Alpha Star"); Snover International Inc. (In Provisional Liquidation) ("Snover"); Arazi S.à r.l. ("Arazi"); Constellation Oil Services Holding S.A. ("Parent/Constellation"); and Constellation Overseas Ltd. (In Provisional Liquidation) ("Constellation Overseas") (together, the "Chapter 15 Debtors"). ("Verified Petition," ECF Doc. # 7 at 1 n.1.)

Case No. 18-13952 (MG)
|
Signed May 9, 2019

**Synopsis**
**Background:** Foreign representative in jointly administered Chapter 15 cases filed motion seeking recognition of Brazilian joint judicial reorganization of each debtor as foreign main or nonmain proceeding.

**Holdings:** The Bankruptcy Court, Martin Glenn, J., held that:

[1] foreign debtors, members of an integrated enterprise group, satisfied debtor eligibility requirements under the Bankruptcy Code, as each debtor had property in the United States;

[2] venue was proper in New York for determining foreign representative's motion;

[3] petitioner was a proper "foreign representative" with respect to each debtor;

[4] location of ultimate parent holding company's center of main interests (COMI) was Luxembourg;

[5] although ultimate parent holding company's COMI was Luxembourg, debtor-parent had sufficient ties with Brazil for recognition of Brazilian reorganization as foreign nonmain proceeding;

[6] location of holding company's COMI was Brazil; and

[7] location of COMI for certain members of the integrated enterprise group was Brazil.

Motion granted in part.

West Headnotes (45)

**[1]    Bankruptcy**
🔑 Cases Ancillary to Foreign Proceedings
When deciding whether to grant recognition of a foreign proceeding, whether as a foreign main or foreign nonmain proceeding, the bankruptcy court begins with the statutorily prescribed presumption that the center of main interests (COMI) of each foreign debtor entity is the place where that entity has its registered office. 11 U.S.C.A. §§ 101-1532.

**[2]    Bankruptcy**
🔑 Cases Ancillary to Foreign Proceedings
Although Chapter 15 debtors are members of an integrated enterprise group, the court's recognition of foreign main or nonmain proceeding is granted on an individual debtor by debtor basis.

**[3]    Bankruptcy**
🔑 Cases Ancillary to Foreign Proceedings
Bankruptcy court may refuse to recognize and enforce a plan in foreign proceeding if approval was obtained by an unfair voting system, even when the plan is approved in a country that usually enjoys comity from the United States.

**[4]    Bankruptcy**

☞ Cases Ancillary to Foreign Proceedings

Foreign debtors seeking relief under Chapter 15 must satisfy the Bankruptcy Code's debtor eligibility requirements. 11 U.S.C.A. § 109(a).

**[5]    Bankruptcy**

☞ Cases Ancillary to Foreign Proceedings

Foreign debtors, members of an integrated enterprise group, seeking relief under Chapter 15 satisfied debtor eligibility requirements under the Bankruptcy Code, as each debtor had property in the United States; all of the principal documents setting forth the ultimate parent holding company's prepetition debt obligations were governed by New York law and generally contemplated New York as a venue for disputes, and each debtor owned $1,000 cash in United States bank accounts principally located in New York.

**[6]    Bankruptcy**

☞ Cases Ancillary to Foreign Proceedings

Venue was proper in New York in determining motion filed by foreign representative in jointly administered Chapter 15 cases seeking recognition of Brazilian joint judicial reorganization of each debtor as foreign main or nonmain proceeding, as each debtor owned $1,000 cash in United States bank accounts principally located in New York. 28 U.S.C.A. § 1410(1).

**[7]    Bankruptcy**

☞ Cases Ancillary to Foreign Proceedings

Recognition of foreign proceeding under Chapter 15 of Bankruptcy Code is statutorily mandated if the three requirements are met and no exception applies. 11 U.S.C.A. § 1517(a).

**[8]    Bankruptcy**

☞ Cases Ancillary to Foreign Proceedings

Petitioner was a proper "foreign representative" with respect to each debtor in jointly administered Chapter 15 cases, for purposes of seeking recognition of Brazilian joint judicial reorganization of each debtor as foreign main or nonmain proceeding, where petitioner was a "person" as defined by Bankruptcy Code and, pursuant to the resolutions authorizing commencement of the Brazilian proceeding and the appointment of the foreign representative, was authorized to commence the Brazilian proceeding and a Chapter 15 Case on behalf of each of the debtors and to take all necessary actions as the foreign representative. 11 U.S.C.A. §§ 101(24), 1504, 1515(a).

**[9]    Bankruptcy**

☞ Cases Ancillary to Foreign Proceedings

A Chapter 15 case is properly commenced by the filing of a petition for recognition by a "foreign representative," namely, a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding. 11 U.S.C.A. §§ 101(24), 1504, 1515(a).

**[10]    Bankruptcy**

☞ Cases Ancillary to Foreign Proceedings

A "foreign proceeding," for purposes of determining foreign main proceeding status in Chapter 15 case, is (1) a collective judicial or administrative proceeding under a law relating to insolvency or adjustment of debt, (2) pending in a foreign country, (3) in which the assets and affairs of the debtor are subject to control or supervision of a foreign court, and (4) for the purpose of reorganization or liquidation. 11 U.S.C.A. §§ 101(23), 1517(a)(1).

**[11]    Bankruptcy**

☞ Cases Ancillary to Foreign Proceedings

When a Chapter 15 debtor seeks recognition of a foreign proceeding, the bankruptcy court

may (1) recognize the proceeding as a foreign main proceeding, (2) recognize the proceeding as a foreign nonmain proceeding, or (3) refuse recognition. 11 U.S.C.A. § 1517(a).

**[12]    Bankruptcy**

   Cases Ancillary to Foreign Proceedings

A "foreign main proceeding," for purposes of recognition under Chapter 15, is foreign proceeding pending in the country where the debtor has the center of its main interests. 11 U.S.C.A. § 1502(4).

**[13]    Bankruptcy**

   Cases Ancillary to Foreign Proceedings

A "foreign nonmain proceeding," for purposes of recognition under Chapter 15, is a foreign proceeding, other than a foreign main proceeding, pending in a country where the debtor has an establishment, i.e., any place of operations where the debtor carries out a nontransitory economic activity. 11 U.S.C.A. §§ 1502(2), 1502(5).

**[14]    Bankruptcy**

   Cases Ancillary to Foreign Proceedings

If a proceeding does not qualify as a foreign main or nonmain proceeding, it cannot be recognized under Chapter 15. 11 U.S.C.A. §§ 1502(4), 1502(5), 1517.

**[15]    Bankruptcy**

   Application of state or federal law in general

Where the Bankruptcy Code provides the standard for a court's determination, comity does not enter the equation.

**[16]    Bankruptcy**

   Cases Ancillary to Foreign Proceedings

Both the plain language and legislative history of Chapter 15 requires a bankruptcy court to make a

factual determination with respect to recognition of a foreign proceeding before principles of comity come into play. 11 U.S.C.A. § 1517.

**[17]    Bankruptcy**

   Cases Ancillary to Foreign Proceedings

While comity governs recognition of a foreign judgment, it does not govern the initial recognition of a foreign proceeding under Chapter 15. 11 U.S.C.A. § 1517.

**[18]    Bankruptcy**

   Cases Ancillary to Foreign Proceedings

Recognition of a foreign proceeding under Chapter 15 requires the application of objective criteria, and it is only post-recognition relief which turns on subjective factors that embody principles of comity. 11 U.S.C.A. § 1517.

**[19]    Bankruptcy**

   Cases Ancillary to Foreign Proceedings

Once the decision to grant recognition of a foreign proceeding is made, principles of comity and the provisions of Chapter 15 can provide substantially similar relief to a debtor, whether a proceeding is recognized as main or nonmain. 11 U.S.C.A. § 1517.

**[20]    Bankruptcy**

   Cases Ancillary to Foreign Proceedings

The statutory presumption that the center of main interests (COMI) of a foreign debtor entity is the place where that entity has its registered office is rebuttable where other factors suggest that the true COMI of the debtor lies elsewhere. 11 U.S.C.A. § 1516(c).

**[21]    Bankruptcy**

   Cases Ancillary to Foreign Proceedings

Factors to determine a foreign debtor's center of main interests (COMI) in a foreign main proceeding determination under Chapter 15

4028

are not to be applied mechanically and are nonexclusive. 11 U.S.C.A. § 1516(c).

**[22]    Bankruptcy**

    Cases Ancillary to Foreign Proceedings

Factors to determine a foreign debtor's center of main interests (COMI) in a foreign main proceeding determination under Chapter 15 include: (1) the location of the debtor's headquarters, (2) the location of those who actually manage the debtor, which conceivably could be the headquarters of a holding company, (3) the location of the debtor's primary assets, (4) the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case, and (5) the jurisdiction whose law would apply to most disputes. 11 U.S.C.A. § 1516(c).

**[23]    Bankruptcy**

    Cases Ancillary to Foreign Proceedings

When determining the location of those who actually manage the debtor, as factor in determining a foreign debtor's center of main interests (COMI) in a foreign main proceeding determination under Chapter 15, courts consider more than the location of the board of directors of the debtor in isolation, and their analysis of the location of management is somewhat flexible to reflect the realities of the management of a particular business. 11 U.S.C.A. § 1516(c).

**[24]    Bankruptcy**

    Cases Ancillary to Foreign Proceedings

The headquarters of a corporate entity, for purposes of determining a foreign debtor's center of main interests (COMI) in a foreign main proceeding determination under Chapter 15, is more than the location of its board of directors; the term headquarters, or head office, contemplates the place where the primary management of an entity's business is undertaken. 11 U.S.C.A. § 1516(c).

**[25]    Bankruptcy**

    Cases Ancillary to Foreign Proceedings

Management of a corporate entity, for purposes of determining the location of those who actually manage the debtor, as factor in determining a foreign debtor's center of main interests (COMI) in a foreign main proceeding determination under Chapter 15, includes all relevant business functions, such as the financial, administrative, marketing, information technology, investment, and legal functions; other functions may be relevant depending on the nature of the debtor's business. 11 U.S.C.A. § 1516(c).

**[26]    Bankruptcy**

    Cases Ancillary to Foreign Proceedings

As each section of Chapter 15 is based on a corresponding article in the Model Law, if a textual provision of Chapter 15 is unclear or ambiguous, the court may then consider the Model Law and foreign interpretations of it as part of its interpretive task. 11 U.S.C.A. § 1508.

**[27]    Bankruptcy**

    Cases Ancillary to Foreign Proceedings

Because there is no statutory definition of a foreign debtor's center of main interests (COMI) in a foreign main proceeding determination under Chapter 15, courts have some latitude to consider the factors that may be relevant in determining the COMI, given the facts in a particular case. 11 U.S.C.A. § 1516(c).

**[28]    Bankruptcy**

    Cases Ancillary to Foreign Proceedings

Bankruptcy court may examine factors in the public domain to determine whether a foreign debtor's center of main interests (COMI), in a foreign main proceeding determination under Chapter 15, is in fact regular and ascertainable by third parties and not easily subject to tactical removal. 11 U.S.C.A. § 1516(c).

4029

**[29]    Bankruptcy**

    Cases Ancillary to Foreign Proceedings

Bankruptcy court looks to the expectations of creditors with regard to the location of a foreign debtor's center of main interests (COMI), in a foreign main proceeding determination under Chapter 15; creditor expectations can be evaluated through examination of the public documents and information available to guide creditor understanding of the nature and risks of their investments. 11 U.S.C.A. § 1516(c).

**[30]    Bankruptcy**

    Cases Ancillary to Foreign Proceedings

Bankruptcy court should not apply factors to determine a foreign debtor's center of main interests (COMI) in a foreign main proceeding determination under Chapter 15 mechanically, instead, the factors should be viewed in light of Chapter 15's emphasis on protecting the reasonable interests of parties in interest pursuant to fair procedures and the maximization of the debtor's value. 11 U.S.C.A. § 1516(c).

**[31]    Bankruptcy**

    Cases Ancillary to Foreign Proceedings

To the extent that the concepts of a foreign debtor's "center of main interests" (COMI) and "nerve center," in a foreign main proceeding determination under Chapter 15 are similar, a court may consider a debtor's "nerve center," including from where the debtor's activities are directed and controlled, in determining the debtor's COMI. 11 U.S.C.A. § 1516(c).

**[32]    Bankruptcy**

    Cases Ancillary to Foreign Proceedings

Bankruptcy courts should not perfunctorily rely upon the place of incorporation or location of board meetings to establish a foreign debtor's ultimate center of main interests (COMI) in a foreign main proceeding determination under Chapter 15. 11 U.S.C.A. § 1516(c).

**[33]    Bankruptcy**

    Cases Ancillary to Foreign Proceedings

While complications may arise when a group of debtors have shifted their center of main interests (COMI) over time, every debtor has one and only one COMI in a foreign main proceeding determination under Chapter 15. 11 U.S.C.A. § 1516(c).

**[34]    Bankruptcy**

    Cases Ancillary to Foreign Proceedings

There are circumstances in which courts applying Chapter 15 should refuse to recognize foreign proceedings, whether as main or nonmain proceedings, for instance, where a foreign debtor seeking recognition under chapter 15 maintains only what can be described as a "letter box" company in the location of the foreign proceeding. 11 U.S.C.A. §§ 1502(2), 1502(5).

**[35]    Bankruptcy**

    Cases Ancillary to Foreign Proceedings

Even in cases of "letterbox" companies or other cases where the bankruptcy court refuses to grant any recognition of the foreign proceeding, the foreign representative may still obtain certain forms of relief from United States courts, including filing a case under title 11 in coordination with the foreign proceeding and suing in a court in the United States to collect or recover a claim which is the property of the debtor. 11 U.S.C.A. §§ 1502(4), 1502(5), 1517.

**[36]    Bankruptcy**

    Cases Ancillary to Foreign Proceedings

On the issue of recognition of foreign proceedings as "main" or "nonmain," the Bankruptcy Code provides considerable but not complete discretion. 1 U.S.C.A. §§ 1502(4), 1502(5), 1517.

**[37]    Bankruptcy**

👉 Cases Ancillary to Foreign Proceedings

A Chapter 15 debtor's "center of main interests" (COMI) is determined as of the filing date of the Chapter 15 petition, without regard to the debtor's historic operational activity. 11 U.S.C.A. § 1516(c).

**[38]    Bankruptcy**
👉 Cases Ancillary to Foreign Proceedings

The ultimate aim of the analysis of a foreign debtor's "center of main interests" (COMI) in a foreign main proceeding determination under Chapter 15 is to locate the "real seat" of the debtor. 11 U.S.C.A. § 1516(c).

**[39]    Bankruptcy**
👉 Cases Ancillary to Foreign Proceedings

Bankruptcy court has an independent obligation to determine a foreign debtor's "center of main interests" (COMI) before recognizing a foreign proceeding as a foreign main proceeding under Chapter 15. 11 U.S.C.A. §§ 1502(4), 1502(5), 1516(c), 1517.

**[40]    Bankruptcy**
👉 Cases Ancillary to Foreign Proceedings

The evidentiary burden to show where a foreign debtor has its "center of main interests" (COMI) in a foreign main proceeding determination under Chapter 15 is on the foreign representative. 11 U.S.C.A. § 1516(c).

**[41]    Bankruptcy**
👉 Cases Ancillary to Foreign Proceedings

The rebuttable presumption that a foreign debtor's center of main interests (COMI) in a foreign main proceeding determination under Chapter 15 lies in the place of the registered office at no time relieves a petitioner of its burden of proof/risk of non-persuasion and it imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption. 11 U.S.C.A. § 1516(c).

**[42]    Bankruptcy**
👉 Cases Ancillary to Foreign Proceedings

Location of ultimate parent holding company's center of main interests (COMI), for determining foreign main proceeding status in jointly administered Chapter 15 cases of foreign debtors, members of an integrated enterprise group, was Luxembourg; although parent's physical assets were primarily located in Brazil, parent's headquarters were in Luxembourg and it was incorporated, was a tax resident, and had its registered office in Luxembourg, its board of directors met in Luxembourg, offering memoranda clearly expressed that parent was a Luxembourg company, and its activities were directed, controlled, and coordinated in Luxembourg. 11 U.S.C.A. § 1516(c).

**[43]    Bankruptcy**
👉 Cases Ancillary to Foreign Proceedings

Although ultimate parent holding company's center of main interests (COMI) in jointly administered Chapter 15 cases of foreign debtors, members of an integrated enterprise group, was Luxembourg, debtor-parent had sufficient ties with Brazil for recognition of Brazilian reorganization as foreign nonmain proceeding; all of debtor-parent's subsidiaries had substantial and ongoing business connections in Brazil, and debtor-parent's physical assets were primarily located in Brazil. 11 U.S.C.A. §§ 1502(4), 1517.

**[44]    Bankruptcy**
👉 Cases Ancillary to Foreign Proceedings

Location of holding company's center of main interests (COMI), for determining foreign main proceeding status in jointly administered Chapter 15 cases of foreign debtors, members of an integrated enterprise group, was Brazil; while holding company was incorporated in British Virgin Islands (BVI), and its sole director was a resident of the Cayman Islands and a citizen of the United Kingdom, it benefited from day-

to-day operational management of Brazilian offices and relied on persons employed by its affiliates, most of whom were Brazilian citizens working at Brazilian offices, and holding company's primary assets were located in Brazil. 11 U.S.C.A. § 1516(c).

### [45] Bankruptcy
☞ Cases Ancillary to Foreign Proceedings

Location of center of main interests (COMI) for certain members of an integrated enterprise group, for determining foreign main proceeding status in jointly administered Chapter 15 cases of foreign debtors, was Brazil; operation and management of debtor-entities occurred from Brazilian offices, primary assets were located in Brazil, and Brazilian located assets were subject to Brazilian regulatory regimes. 11 U.S.C.A. § 1516(c).

**Attorneys and Law Firms**

**\*242** WHITE & CASE LLP, Attorneys for Andrew Childe, as Petitioner and Foreign Representative, 1221 Avenue of the Americas, New York, NY 10020, By: John K. Cunningham, Esq., Thomas E. MacWright, Esq., Gregory Starner, Esq.

WHITE & CASE LLP, Attorneys for Andrew Childe, as Petitioner and Foreign Representative, Southeast Financial Center, 200 South Biscayne Blvd., Suite 4900, Miami, FL 33131, By: Richard S. Kebrdle, Esq. (admitted pro hac vice), Laura L. Femino, Esq. (admitted pro hac vice)

MILBANK, TWEED, HADLEY & MCCLOY LLP, Attorneys for the 2024 Bond Noteholders, 28 Liberty Street, New York, NY 10005, By: Mary Doheny, Esq.

PRYOR CASHMAN LLP, Attorneys for Wilmington Trust, National Association as Indenture Trustee for the 9.00%/0.50% PIK Senior Secured Notes Due 2024, 7 Times Square, New York, NY 10036, By: Andrew S. Richmond, Esq., Seth H. Lieberman, Esq.

HOLLAND & KNIGHT, Attorneys for the Trustee to Deutsche Bank Trust Company Americas as Trustee for the 6.250% Senior Notes Due 2019, 31 West 52 nd Street, New York, NY 10019, By: Barbara R. Parlin, Esq.

SULLIVAN & CROMWELL LLP, Attorneys for Alperton Capital Ltd., 125 Broad Street, New York, NY 10004, By: Andrew G. Dietderich, Esq., Joseph E. Neuhaus, Esq., Brian D. Glueckstein, Esq.

CLEARLY GOTTLIEB STEEN & HAMILTON LLP, Attorneys for Certain Consenting A/L/B Lenders, One Liberty Plaza, New York, NY 10006, By: Luke A. Barefoot, Esq.

### MEMORANDUM OPINION RECOGNIZING FOREIGN DEBTORS' FOREIGN MAIN AND FOREIGN NONMAIN PROCEEDING

MARTIN GLENN, UNITED STATES BANKRUPTCY JUDGE

#### \*243 I. INTRODUCTION

On December 7, 2018, Andrew Childe (the "Foreign Representative" or "Petitioner") commenced the jointly administered Chapter 15 Cases and sought this Court's recognition of the joint judicial reorganization (*recuperação judicial* or "RJ") of each of the Chapter 15 Debtors in the jointly administered judicial organization proceeding (the "Brazilian RJ Proceeding") pending in the 1 st Business Court of Rio de Janeiro (the "Brazilian RJ Court") pursuant to Federal Law No. 11.101 of February 9, 2005 (the "Brazilian Bankruptcy Law") of the laws of the Federative Republic of Brazil ("Brazil"). [2] (Verified Petition at 7.) The Foreign Representative seeks recognition of the Brazilian RJ Proceeding for each of the Chapter 15 Debtors as either a foreign main proceeding or, in the alternative, as a foreign nonmain proceeding, pursuant to chapter 15 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"). The Court must therefore determine the center of main interests (the "COMI") for each Chapter 15 Debtor in the enterprise group to determine whether—and to what extent—it should grant recognition of the Brazilian RJ Proceeding with respect to each.

[2] Childe seeks recognition as the "foreign representative," as defined in 11 U.S.C. §§ 101(24), 1509, and 1517. There is no dispute that Childe was properly designated as the foreign representative of each Chapter 15 Debtor.

[1]   When deciding whether to grant recognition of a foreign proceeding, whether as a foreign main or foreign nonmain proceeding, the Court begins with the statutorily prescribed presumption that the COMI of each foreign debtor entity is the place where that entity has its registered office. Of these Chapter 15 Debtors, two have registered offices in Luxembourg, one has a registered office in the Cayman Islands, one has a registered office in Brazil, and six have registered offices in the British Virgin Islands. Because the Foreign **\*244** Representative seeks recognition of the Brazilian RJ Proceeding as main (or nonmain in the alternative), the Foreign Representative bears the burden of providing sufficient evidence to rebut the registered office presumption for each of the Chapter 15 Debtors that is incorporated outside of Brazil. [3]

3    Although nine of the ten Chapter 15 Debtors are incorporated outside of Brazil, this opinion will only determine recognition with respect to seven of them. Since the recognition hearing, a Brazilian appellate court determined that two of the Chapter 15 Debtors should be dismissed from the Brazilian RJ Proceeding. Until the Brazilian court determines whether these entities will proceed in the Brazilian RJ Proceeding, this Court will not make a decision on recognition of the proceeding with respect to these entities.

[2]   As a broad overview, the Chapter 15 Debtors are members of an integrated enterprise group known as the Constellation Group. [4] While the Constellation Group is discussed as a group entity at times throughout this opinion's opening sections for context, it is important to bear in mind that the Court's recognition is granted on an individual debtor by debtor basis. The Constellation Group's tripartite business enterprise consists of (i) offshore drilling, (ii) onshore drilling, and (iii) investments in several joint ventures and associated entities related to the operation of floating production storage and offloading units ("FPSOs"). The Chapter 15 Debtors are a subset of the Constellation Group. The ten Chapter 15 Debtors along with their direct and indirect affiliates comprise the Constellation Group ("Constellation Group"), and the Chapter 15 Debtors along with their affiliates that are debtors in the RJ Proceeding are referred to as the RJ Debtors ("RJ Debtors").

4    The United Nations Commission on International Trade Law's Working Group V (Insolvency Law) has met multiple times and issued several updates regarding the drafting of an addition to the Model Law that would apply to and address issues specifically related to enterprise groups. Recent drafts suggest that the enterprise group law will maintain the concept of COMI for each individual enterprise within a group enterprise. Working Group V has defined "enterprise group" as "two or more enterprises that are interconnected by control or significant ownership." *See* A/CN.9/WG.V/WP.158 Facilitating the cross-border insolvency of enterprise groups: draft legislative provisions, UNCITRAL: Working Group V (Feb. 26, 2018), http://www.uncitral.org/uncitral/en/commission/working_groups/5Insolvency.html.

The Constellation Group's current financial distress is attributable, in large part, to the cyclical nature of the deepwater drilling market, which entered a sustained down cycle and created a number of major bankruptcies in the sector. [5] By the time of filing, seven of the Constellation Group's eight offshore drilling rigs were either no longer contracted or soon to come off contracts. As of November 30, 2018, the Constellation Group was liable for approximately US$ 1.5 billion in aggregate outstanding third-party financial indebtedness (including accrued interest) under four credit facilities and two bond issuances.

5    Major recent bankruptcies in the industry include *Ocean Rig* (*see In re Ocean Rig UDW Inc.*, 570 B.R. 687 (Bankr. S.D.N.Y. 2017)), *Seadrill (see In re Seadrill Ltd.*, Case No. 17-60079 (Bankr. S.D. Tex. 2017)), and *Pacific Drilling (see In re Pacific Drilling S.A.*, Case No. 17-13193 (Bankr. S.D.N.Y. 2017)).

On January 29, 2019, Alperton Capital Ltd. ("Alperton"), a contingent creditor of one of the ten Chapter 15 Debtors (Constellation Overseas), filed its *Limited Objection of Alperton to the Petition for Recognition of the Brazilian RJ Proceeding.* ("Alperton Objection," ECF Doc. # 35.) Alperton's limited objection contends that the Chapter 15 Debtors "have not satisfied their burden of proof that the location of **\*245** the Debtors' [COMI] is in Brazil and Alperton objects to recognition of the RJ Proceeding as a foreign main proceeding." (*See id.* ¶ 8.) In support of the Alperton Objection, Alperton submits and incorporates by reference the Declaration of Andrew G. Dietderich, which was filed concurrently therewith. ("Dietderich Decl.," ECF Doc. # 36.) On February 4, 2019, counsel for Alperton filed the Second Declaration of Andrew G. Dietderich. ("Second Dietderich Decl.," ECF Doc. # 44.) Additionally, the Chapter 15 Debtors and Alperton agreed to a *Joint Stipulation of Undisputed Facts*, dated February 5, 2019, in lieu of cross-examination of the Debtors' declarants. ("Stipulation," ECF Doc. # 46.)

On February 5, 2019, the Court held the hearing on the Chapter 15 Debtors' Petition (the "Recognition Hearing"). (*See* "Hr'g Tr.," ECF Doc. # 59.) At the Recognition Hearing, the Court received evidence and heard oral argument regarding the Verified Petition.[6] The Court reserved judgment on recognition of the Verified Petition and directed the parties to submit proposed findings of fact and conclusions of law regarding recognition of the Brazilian RJ Proceeding.[7] (*See id.* at 74:2-7, 156:11-25.)

[6] The Court accepted into evidence Petitioner's exhibits 1 through 19 ("Pet'r Ex.") and the Second Dietderich Decl. (Hr'g Tr. 38:11-17.) The Verified Petition is in evidence as Pet'r Ex. 14.

[7] The Foreign Representative's corrected proposed findings of fact ("FRFOF") are located at ECF Doc. # 57 and Alperton's proposed findings of fact ("Alperton FOF") are located at ECF Doc. # 54.

Alperton does not object to recognition of the Brazilian RJ Proceeding as a foreign *nonmain* proceeding. (*Id.* at 15:7-11 ("[W]e have no objection to the recognition of the Brazilian RJ as a foreign non-main.").) Rather, Alperton argues that the COMI for the entire Constellation Group is not in Brazil. (*Id.* at 15:24–25 ("[W]e believe COMI is not in Brazil for the group.").) It argues that the "COMI for all ten foreign debtors in the international group is Luxembourg." (*Id.* at 96:3-4.) Additionally, Alperton asks that "the Court allow the Brazilian court in the RJ Proceedings the opportunity to decide the question of COMI, and recognize the RJ Proceeding in these Chapter 15 Cases for the time being as *either* a foreign non-main proceeding or a foreign main proceeding ...." (Alperton Objection ¶ 9.)[8]

[8] Alperton also argued at the Recognition Hearing and in its later proposed findings of fact that "[i]n practice, U.S. courts may accord less deference to foreign representatives of foreign nonmain proceedings than they typically accord to representatives of main proceedings under section 1521. Alperton points to no specific provision that *requires* this Court ... to provide the Brazilian Proceeding, once recognized as a foreign main proceeding for each Chapter 15 Debtor, with more deference than the Court would provide the Brazilian Proceeding if only recognized as a foreign nonmain proceeding." (Alperton FOF ¶ 137.) Nonetheless, Alperton goes on to note that it worries that a recognition as a foreign main proceeding "for each of the Chapter 15 Debtors" might prejudice their future

rights. This concern seems to be the root of Alperton's objection.

The Brazilian Court of Appeals recently announced a decision to dismiss the RJ Proceeding with respect to two of the Chapter 15 Debtors—Arazi and Olinda Star—and an additional RJ Debtor—Lancaster Projects Corp. The Foreign Representative informed the Court that it intends to seek a clarification of this judgment, implying that the Brazilian Court of Appeals' dismissal is not final. However, until the Brazilian Courts determine whether the Chapter 15 Debtors Arazi and Olinda Star are proper parties in the Brazilian RJ Proceeding, this **\*246** Court will not decide whether the proceedings are main or nonmain with respect to them. If any other Chapter 15 Debtors are subsequently dismissed from the Brazilian RJ Proceedings, the Court may modify its present decision regarding recognition respecting those entities pursuant to section 1519(d).

At the Recognition Hearing the Court also questioned Alperton's standing to object to recognition of any of the Chapter 15 Debtors other than Constellation Overseas, an entity with which it is a contingent creditor based on a pending arbitration claim. (Hr'g Tr. 22:16-19, 23:8-10.) Alperton requested the opportunity to brief the issue, but ultimately conceded that based upon the facts in the record, it did not have standing with respect to any Chapter 15 Debtor other than Constellation Overseas. The Court nonetheless analyzes the evidence and objections to recognition raised by Alperton. This requires the Court to analyze whether a proceeding should be recognized as main, nonmain, or not recognized at all, *regardless of whether objections have been raised. See In re Ocean Rig UDW Inc.,* 570 B.R. at 692 (considering an objecting party's arguments to deny recognition on the merits, even though the Court found the objecting party had failed to establish standing because the Court had an independent obligation to establish that recognition was proper).

The ultimate issue presently before the Court is how to apply the Chapter 15 COMI standards to each Chapter 15 Debtor in a highly interrelated enterprise group whose management and operations are increasingly becoming detached from any specific locale as the business aims towards increased globalization.[9] For the reasons further discussed below, the Court now grants recognition as a foreign nonmain proceeding for Parent/Constellation, and grants recognition as a foreign main proceeding for Petróleo Constellation, Constellation Overseas, Alpha Star, Gold Star, Lone Star, Star Int'l, and Snover.

4034

9    This Court recently recognized a foreign proceeding for a group of debtors in another large, global enterprise group in *Agrokor*. *See In re Agrokor d.d.*, 591 B.R. 163, 165 (Bankr. S.D.N.Y. 2018). In *Agrokor*, a parent company and eight debtor affiliates filed for recognition under chapter 15; these debtors were part of a larger group of 77 companies based in Croatia and approximately 80 affiliates not located in Croatia who were all part of the Croatian restructuring proceeding. (*Id.* at 169.) The Court made it clear that its further discretionary relief, like its recognition of the settlement agreement ultimately reached in that proceeding, was only recognized and enforced with respect to the Chapter 15 entities within the group. (*Id.* at 197.)

## II. BACKGROUND [10]

10    The Background section includes the Court's findings of fact pursuant to FED. R. BANKR. P. 7052, which incorporates FED. R. CIV. P. 52.

There is a total of ten Chapter 15 Debtors seeking recognition in these consolidated Chapter 15 Cases. The Chapter 15 Debtors (and their countries of incorporation in parenthesis) are: (1) Servicos de Petróleo Constellation S.A. (Brazil), (2) Lone Star Offshore Ltd. (BVI), (3) Gold Star Equities Ltd. (BVI), (4) Olinda Star Ltd. (BVI), (5) Star International Drilling Limited, (Cayman Islands) (6) Alpha Star Equities Ltd. (BVI), (7) Snover International Inc. (BVI), (8) Arazi S.a.r.l. (Luxembourg), (9) Constellation Oil Services Holding S.A. (Luxembourg), and (10) Constellation Overseas Ltd (BVI). (Verified Petition at 1 n.1.)

### A. Events Leading Up to the Brazilian RJ Proceeding

The sharp decline in oil prices over recent years led to reduced capital spending **\*247** and credit as well as an oversupply of rigs in the oil and gas industry. Oil prices began to decline rapidly in mid-2014, eventually reaching less than $ 30 per barrel in early 2016. (*Id.* ¶ 24.) As a consequence, exploration and production companies reduced their capital spending, yielding an oversupply in the offshore rig industry and a corresponding decrease in the daily fees earned by each individual drilling unit (referred to as "dayrates" in Parent/Constellation's notes offering memoranda discussed below) and revenues generated from them. (*Id.*) Reduced revenues that resulted from reduced dayrates in turn further damaged oil and gas companies by reducing their creditworthiness and restricting their access to the credit markets. (*Id.*) At roughly the same time as oil prices began plummeting, the

Brazilian economy entered a recession. (*Id.* ¶¶ 24-25.) The recession, political instability, and budget deficits affecting Brazil chilled foreign investments in Brazilian operations. (*Id.* ¶ 25.)

The Constellation Group's key assets are nine onshore drilling rigs, [11] eight offshore rigs and drillships, [12] and five FPSO units [13] (the "JV FPSOs"). (*Id.* ¶¶ 8-9.) Of the twenty-two drilling rigs that the Constellation Group owns, twenty were located in Brazil as of the petition date and either served, or had recently served, customers in the Brazilian market under Brazilian law governed contracts. (*Id.* ¶¶ 9, 62, 69.) This is why the Constellation Group was profoundly affected by the Brazilian market's downturn. As of the petition date, only one of the Constellation Group's nine onshore drilling rigs was under contract and only five of the Constellation Group's eight offshore rigs were under contract. (*Id.* ¶ 17; *see also* "Certified Translation of the RJ Petition," ECF Doc. # 7-2, Pet'r Ex. 2 at 39.) [14]

11    The onshore rigs are: the *QG-I*, the *QG-II*, the *QG-III*, the *QG-IV*, the *QG-V*, the *QG-VI*, the *QG-VII*, the *QG-VIII*, and the *QG-IX*). (Verified Petition ¶ 8.)

12    These consist of three ultra-deepwater semi-submersible rigs (the *Alpha Star*, the *Lone Star*, and the *Gold Star*), one deepwater semi-submersible rig (the *Olinda Star*) and three ultra-deepwater drillships (the *Amaralina Star*, the *Laguna Star*, and the *Brava Star*). (Verified Petition ¶ 8.)

13    These include the *Capixaba*, the *Cidade de Paraty*, the *Cidade de Ilhabela*, the *Cidade de Marica*, and the *Cidade de Saquarema*. (Verified Petition ¶ 8.)

14    The three offshore drilling rigs were that were no longer under contract—*Alpha Star, Gold Star*, and *Lone Star*—are each owned by a Chapter 15 Debtor—Alpha Star, Gold Star, and Lone Star. (Verified Petition ¶ 14.) Of the nine onshore drilling rigs, the Verified Petition notes that these rigs are owned by either Petróleo Constellation or Snover, which does not provide a clear understanding of which of these two Chapter 15 Debtors—whether the Brazilian based Chapter 15 Debtor or the BVI based Chapter 15 Debtor, respectively—owns more of these largely non-operational rigs. (*Id.* ¶ 17.)

The Constellation Group's losses in new investments and lowered dayrates meant that the Constellation Group was no longer able to fund the investments it incurred when the oil market was in an upswing. In 2012, when the price of a barrel of oil had risen to over $ 125, the Constellation Group, along

with much of the industry, experienced tremendous growth and incurred new debt obligations to expand its operations and investments, including the A/L/B Project Financings, which are discussed below and were used to finance the acquisition of the *Amaralina Star*, *Laguna Star*, and *Brava Star* drillships. (*Id.*) The Constellation Group's incurring of greater leverage prior to the oil downturn compounded cash flow issues for the group enterprise.

**\*248  B. The Parties**

### 1. The Chapter 15 Debtors

Each Chapter 15 Debtor will be described *individually* in detail in section II.I below. However, a brief overview of the Constellation Group as an enterprise group is discussed first in this overview of the parties. Although the Court must make a COMI determination for each Chapter 15 Debtor individually, shared functions of the group are relevant to that analysis to the extent they exist, and an understanding of the holding structure of the group is also necessary.

### a. Structure of the Constellation Group

Parent/Constellation serves as the ultimate parent holding company at the apex of the entire Constellation Group. (Verified Petition ¶ 4 (Organizational Chart).) Parent/ Constellation is an entity organized under the laws of Luxembourg with its registered office in Luxembourg, and is the direct or indirect parent to the other nine Chapter 15 Debtors in these Chapter 15 Cases. (*Id.*)

Parent/Constellation is the indirect parent of the BVI incorporated entity Constellation Overseas. Constellation Overseas, in turn, holds all of the remaining seven Chapter 15 Debtors that presently remain subject to the Brazilian RJ Proceeding. (*Id.*) Constellation Overseas holds the five BVI incorporated Chapter 15 Debtors, the Cayman Chapter 15 Debtor, and is the indirect parent of Petróleo Constellation, the Brazilian Chapter 15 Debtor. (*Id.*)

### b. Management of the Constellation Group

The Foreign Representative argues that the Constellation Group shares a single senior executive management team. This is supported by the evidence. One of Parent/

Constellation's notes offerings, for instance, describes a group of "senior management" who will be "responsible for the day to day management of *our* operations." ("2019 Offering Memorandum," ECF Doc. # 42-1, Pet'r Ex. 4 at 118 (emphasis added); *see also* 2019 Offering Memorandum at 4 (defining "our" as referring to Parent/Constellation together with its affiliates throughout the document).) [15] The senior management team listed in the 2019 Notes Offering Memorandum consists of a CEO, CFO, COO, Chief FPSO Operations Officer, CCO, Chief Administrative Director, and General Counsel. (*Id.* at 118.) This group of senior management is listed first in the 2019 Notes Offering Memorandum's section titled "Management," before the document goes on to discuss the board of directors of Parent/Constellation. This objective evidence in the record makes it clear that a senior executive management team does, in fact, govern the operations of the entire enterprise group.

[15]    All page numbers in this opinion refer to ECF pagination rather than internal document pagination.

The CEO and the CFO—each described as serving the entire Constellation Group—are based in London and are employed by a non-Chapter 15 Debtor Constellation Oil Services U.K. Ltd. (Stipulation ¶ 4; Verified Petition at 14 n.14.) The CCO, COO and General Counsel are based in Brazil; these Brazilian based individuals exercise their activities from the Chapter 15 Debtor Petróleo Constellation. (Stipulation ¶ 5.) The other two members of the senior management team described in the 2019 Notes Offering Memorandum—the Chief FPSO Operations Officer and the Chief Administrative Director—are not mentioned in the Stipulation. However, both individuals received degrees from **\*249**  Brazilian institutions, had most of their work experience in Brazil, and appeared to be based in Brazil at the time of the issuance of the offering memorandum. (2019 Notes Offering Memorandum at 119.)

The Foreign Representative also argues that the operational and day-to-day management of the entire Constellation Group are predominately conducted from Brazil. (Verified Petition ¶ 63.) This is supported by the Offering Memorandum for the 2019 Notes. It provides, "*[w]e are a market leading Brazilian-controlled* provider of offshore oil and gas contract drilling and FPSO services in Brazil." (2019 Notes Offering Memorandum at 15 (emphasis added); *see also* 2019 Notes Offering Memorandum at 4 (defining "we" as the entire Constellation Group.).) Another of Parent/Constellation's debt documents shows that the Constellation Group's drilling

rigs, which are the primary revenue drivers for the group, were predominately located in Brazil and chartered to Brazilian customer Petrobras. ("Original Exchange Offer Memorandum," ECF Doc. # 43-1, Pet'r Ex. 6, at 230, 296.) Further evidence of the location of daily operations will be discussed in greater detail with respect to each entity.

#### c. Employees of the Constellation Group

The Petitioner describes the entire Constellation Group as "employ[ing] over 1,200 individuals, with the vast majority (approximately 93%) located in Brazil." (Verified Petition ¶ 7.) Although there is a lack of clarity provided by the Foreign Representative regarding which Chapter 15 Debtors employ these individuals, this lack of clarity is echoed in the various offering memoranda of the notes issued by Parent/Constellation. For example, one memorandum states "*[w]e* employ skilled personnel to operate and provide support for our rigs. As of December 31, 2016, *we* had a total of 1,885 employees, 99% of which were Brazilian nationals." (Original Exchange Offer Memorandum at 23 (emphasis added).) Parent/Constellation's notes offerings all explain that "[t]he terms 'our company,' 'we,' 'our,' or 'us,' as used herein, refer to [Parent/Constellation] *and its consolidated subsidiaries unless otherwise stated or indicated by context.*" (*Id.* at 6 (emphasis added); *see also* "Supplemental Exchange Offer Memorandum," ECF Doc. # 42-2, Pet'r Ex. 5 at 3 (including the same quote in the introduction); 2019 Notes Offering Memorandum (also including the same quote in the introduction).)

The Original Exchange Offer Memorandum of Parent/ Constellation also explains, "[a]s of December 31, 2016, *we* had a total of 1,885 employees working across six sites, four of which are located in Brazil and one of which is located in the United Kingdom." (Original Exchange Offer Memorandum at 123 (emphasis added).) The Original Exchange Offer Memorandum goes on to provide a table with a breakdown of employees of the Constellation Group by location. In 2016, "QGOG-Brazil" employed 1,850 workers across three Brazilian locations, "Constellation Services" employed 16 workers in Brazil, "Constellation Panama Corp." employed 15 workers in Panama, and "QGOG Constellation UK" employed 4 workers in the United Kingdom. (*Id.* at 124.) The table makes no reference to any employees located in Luxembourg. (*Id.*)

#### 2. Alperton

Alperton is a family investment vehicle that entered into a joint venture with Constellation Overseas to build two ultra-deepwater drillships. (*See* Alperton Objection ¶ 1.) Alperton is a contingent and unliquidated creditor of the Chapter 15 Debtor Constellation Overseas, pending the outcome of arbitration in the United States. (*See* Hr'g Tr. at 59:4-9, 59:12-14.) Alperton **\*250** is incorporated in the BVI, but all beneficial owners and/or principals of Alperton are Brazilian citizens and/or residents of Brazil. (Stipulation ¶ 12.)

Pursuant to the joint venture, Alperton and Constellation Overseas established two special purpose offshore holding companies organized under the laws of the BVI, the Amaralina Star Ltd. and Laguna Star Ltd. (together, the "Disputed Companies"). (Alperton Objection ¶ 1.) Two substantially similar shareholders' agreements governed by New York law (together, the "Shareholders' Agreements" or "SHAs") [16] apply to the Disputed Companies. (Alperton Objection ¶ 1.) Prior to the events that are subject to the arbitration described below, Constellation Overseas owned 55% and Alperton owned 45% of each of the Disputed Companies. (Original Exchange Offer Memorandum at 108.)

[16]    The Shareholders' Agreements related to the Star Unit I Drilling Vessel (*Amaralina Star*) and Star Unit II Drilling Vessel (*Laguna Star*), dated as of June 24, 2010 and as subsequently amended on September 10, 2010, September 28, 2010, November 10, 2011, April 12, 2012 and January 17, 2013 are exhibits to the first Dietderich Declaration. (ECF Doc. ## Nos. 36-1, 36-2.)

In addition, the Shareholders' Agreements include covenants relating to the separateness and corporate governance of the Disputed Companies. For example, section 4.8 of each of the Shareholders' Agreements states that each of Constellation Overseas and Alperton will cause the directors each appoints to act in the best interests of each Disputed Company (as opposed to the best interests of the Constellation Group as a whole). (*See* "SHA 1," ECF Doc. # 36-1 § 4.8; *see also* SHA 1 at 1 (defining Company for purposes of the SHA 1); "SHA 2," ECF Doc. # 36-2 § 4.8; SHA 2 at 1 (defining Company for purposes of SHA 2.) Furthermore, the SHAs provide that decisions regarding the "corporate reorganization, liquidation or dissolution of either [Disputed Company]," any change in the business [17] of the company, and any investments in other companies are fundamental business decisions that require

the unanimous consent of both Alperton and Constellation. (SHA 1 § 4.9(b); SHA 2 § 4.9(b).)

[17]    The business of each Disputed Company is defined as "(i) the chartering of the Unit to the Charterer under the Charter Contract and the borrowing of the Project Loan from the Project Lenders or (ii) such other business as the Shareholders [Alperton and Constellation] may agree from time to time in writing." (SHA 1 § 12.1; SHA 2 § 12.1.)

Although the Disputed Companies are not debtors in these Chapter 15 Cases, the Disputed Companies are RJ Debtors. (Certified Translation of the RJ Petition at 35-36.) Under the PSA (discussed below), the Disputed Companies are "Subsequent Chapter 15 Filing Entities," which means that they are to be filed as debtors in these Chapter 15 Cases at a later date. ("PSA," ECF Doc. # 6-1, Pet'r Ex. 1 at 10 ("Subsequent Chapter 15 Filing Entities' shall mean Amarlina Star Ltd., Laguna Star Ltd. and Brava Star Ltd. and those other Filing Entities that may be included in the Chapter 15 Proceedings ....").) The subsequent filing of the Disputed Companies in these Chapter 15 Cases is a mandatory milestone under the PSA. (PSA § 11.01(p)(viii)(C) (located at page 31).)

### C. Arbitration Between the Parties

The Shareholders' Agreements include an arbitration clause, pursuant to which the Shareholders agreed to binding arbitration in New York under the International Chamber of Commerce (the "ICC") Rules of all disputes, controversies or differences related to the Shareholders' Agreements. (SHA 1 § 18.2; SHA 2 **\*251** § 18.2.) As a result of an ongoing dispute between Alperton and Constellation Overseas, arbitration concerning the joint venture commenced on August 7, 2018 and a panel (the "Tribunal") was constituted on December 19, 2018. (Alperton Objection ¶ 3.) The case name and number is *Constellation Overseas Ltd. v. Alperton Capital Ltd., Capinvest Fund Ltd., Universal Investment Fund Ltd., Comercial Perfuradora Delba Baiana Ltda. and Interoil Representação Ltda.*, International Chamber of Commerce International Court of Arbitration, Case No. 23856/MK (the "Arbitration"). (*Id.* at 3 n.3.) In the arbitration, Constellation Overseas asserts that a "deadlock" occurred and it is allowed to buyout Alperton's interests under the Shareholders' Agreements. (*Id.* ¶ 3.) Alperton asserts that there is no "deadlock," that Alperton's rights as a shareholder have been ignored and that Constellation Overseas committed fraud and overcharged the Disputed Companies by "potentially

hundreds of millions of dollars over a multi-year period." [18] (*Id.*)

[18]    On April 26, 2019, the arbitral Tribunal issued an interim award that prevents Constellation Overseas from taking actions that would effectively destroy Alperton's potential interest in the Disputed Companies prior to the ultimate resolution of the arbitration. ("Interim Award," ECF Doc. # 81-1, Neuhaus Decl. Ex. 1.) The Interim Award prevents Constellation Overseas from taking certain actions such as, *inter alia*, "pledging, transferring or otherwise encumbering [Alperton's 45% shareholding in the Disputed Companies] pending a final Award." (*Id.* at 50.) Alperton filed a motion seeking an order granting Alperton leave to seek relief from the United States District Court for the Southern District of New York confirming and enforcing the Interim Award. ("Alperton's Motion for Leave to Seek Confirmation of Interim Award," ECF Doc. # 80 at 4.) A hearing on that motion is currently scheduled to take place on May 17, 2019.

### D. Brazilian RJ Proceeding

On December 6, 2018, each of the Chapter 15 Debtors and the RJ Debtors initiated bankruptcy proceedings in Brazil by filing the RJ Petition with the Brazilian Court. (Verified Petition at 8; *see also* Certified Translation of the RJ Petition at 64.) The RJ Petition requests that the Brazilian Court substantially consolidate the judicial reorganization of the entire group; this request is based upon the support of creditors. (Certified Translation of the RJ Petition ¶ 69.)

The Brazilian Court entered an order formally accepting the RJ Debtors into the Brazilian Proceeding and authorizing the requested "substantial consolidation." (*Id.* at 8.) Although the RJ Debtors are being consolidated for the purposes of voting on the RJ Debtors' plan of reorganization in the RJ Proceeding (the "RJ Plan"), the RJ Plan is not premised on "substantive consolidation," as that term is used in the United States (*i.e.*, the RJ Plan does not pool all debtors' assets and liabilities for purposes of pro rata distributions). ("Petitioner's March 25, 2019 MOL," ECF Doc. # 72 ¶ 4.) Whether the creditors will, in fact, vote as a group will be put to the vote of the group of creditors; consolidating group voting will not be ordered by the Brazilian court. ("Majority Opinion English Translation," ECF Doc. # 79-1 at 70.) [19] However, the purpose of this opinion is to determine the COMI of each of the Chapter 15 Debtors and that determination is separate from this Court's decision whether to recognize and enforce any plan **\*252** that may be approved by creditors and the Brazilian Court in

the Brazilian RJ Proceeding. If a future plan is approved in Brazil and includes substantive consolidation of the debtors' assets and liabilities, such that interest owners and creditors of any of the substantively consolidated entities are unfairly diluted, this Court will need to scrutinize whether the plan can be recognized and enforced in the United States consistent with principles of comity. [20]

[19] The English Translation of the Brazilian Court of Appeals' majority opinion concludes, "My vote, therefore, is to give partial relief to the appeal to ... 2) determine the separate presentation of lists of creditors, to be voted separately in the respective meetings of creditors, which shall approve or reject the proposed substantive consolidation ...." (Majority Opinion English Translation at 70.)

[20] These considerations are currently premature as no plan has so far been approved in Brazil. Alperton has raised the issue of substantive consolidation in Brazil, alleging that it could wipe out Alperton's equity interest in certain solvent subsidiaries of the group. A plan with such an effect might not be recognized and enforced in the U.S. *Cf. Bank of New York v. Treco (In re Treco)*, 240 F.3d 148 (2d Cir. 2001). The issue in *Treco*, decided under former section 304, arose because the priority scheme of the foreign jurisdiction differed from the priority scheme in the U.S., with a very substantial impact on the objecting secured U.S. creditor. Importantly, the court made clear that "we begin by recognizing that the priority rules of a foreign jurisdiction need not be identical to those in the United States." *Id.* The court concluded that "[w]e expect that the case-specific analysis required by section 304 [and now by sections 1507(b)(5) and 1522(a) ] will in many cases support the granting of the requested relief." *Id.* at 161. In other words, deviation from the U.S. priority scheme may be acceptable. *See also In re Rede Energia S.A.*, 515 B.R. 69, 93 (Bankr. S.D.N.Y. 2014) (recognizing and enforcing Brazilian plan that included substantive consolidation and that authorized distributions with priorities that differ from those provided in the U.S. Bankruptcy Code).

Appellate proceedings are still pending in Brazil. Several recent decisions appear to have determined that the Brazilian RJ Proceedings of several of companies within the group must be dismissed because they are not eligible to file within Brazil. On January 28, 2019, Alperton filed an interlocutory appeal in the Brazilian Proceeding with the Court of Appeals of the State of Rio de Janeiro (the "Brazilian Court of Appeals"). (Hr'g Tr. 132:22-23.) Among other relief, Alperton requests that the Brazilian Court of Appeals:

(i) dismiss the Brazilian Proceeding as it applies to each Disputed Company on the ground that there was no proper corporate authority to file the Disputed Companies (neither of which are Chapter 15 Debtors) in the RJ Proceeding, (ii) enter an order declaring that the Brazilian Court is not competent to process the Brazilian RJ Proceeding as a main proceeding, and (iii) to order the RJ petitioners to produce the documentation required under Brazilian bankruptcy law, which Alperton alleges they have failed to provide the Brazilian Court. (Alperton Objection ¶ 29.) In the alternative, Alperton says that it requests that the Brazilian Court of Appeals overturn the "substantive consolidation order" and separate the Brazilian Proceeding of the Disputed Companies from the Brazilian Proceeding of the other RJ Debtors. (*Id.*) Alperton also requests that the Brazilian Court of Appeals recognize the primacy of the arbitral Tribunal constituted on December 19, 2018 in New York to resolve the ownership dispute between Alperton and Constellation Overseas and not authorize the consummation of any restructuring that would be irreconcilable with an arbitral award confirming Alperton's ownership interest in the Disputed Companies. (*Id.*)

Additionally, the *Procuradoria de Justiça do Ministério Público do Estado do Rio de Janeiro* (the "Brazilian Public Prosecutor") filed an appeal challenging the Brazilian Court's acceptance order, which challenges both the grounds for RJ eligibility for the RJ Debtors incorporated outside of Brazil and the matter of consolidation **\*253** of the RJ Debtors. ("April 3 Status Update," ECF Doc. # 73 ¶ 2.)

The Brazilian Court of Appeals held a hearing to rule on the merits of the Brazilian Public Prosecutor's appeal on March 26, 2019. (*Id.*) The English Translation of the Brazilian Court of Appeals hearing was filed before the Court. (Majority Opinion English Translation.) In advance of the filing of the English translation resulting from that hearing, the Foreign Representative informed the Court that at the March 26 hearing, the Brazilian Court of Appeals determined that three of the RJ Debtors should be removed from the Brazilian RJ Proceeding. (*Id.* ¶ 3.) [21] Two of these RJ Debtors are also Chapter 15 Debtors—Olinda Star and Arazi. Given the Brazilian Court's decision to dismiss Olinda Star and Arazi from the Brazilian RJ Proceedings, it is unnecessary for the Court to determine whether Brazilian proceedings should be recognized with respect to these two Chapter 15 Debtors.

[21] The later filed Majority Opinion English Translation confirms that the Brazilian Court of Appeals dismissed Arazi, Olinda Star, and Lancaster Projects from the

4039

Brazilian RJ Proceedings. (Majority English Opinion Translation at 59.)

On February 28, 2019, the RJ Debtors filed a revised reorganization plan with the Brazilian RJ Court. ("March 14 Update," ECF Doc. # 60.) The English translation of the Amended and Restated RJ Plan was filed on March 22, 2019. ("Amended and Restated RJ Plan," ECF Doc. # 71-1.) The Foreign Representative is to keep the Court informed of any developments or further amendments to this plan. ("March 22 Update," ECF Doc. # 71.)

On February 13, 2019, the Brazilian RJ Court issued an order scheduling the general meeting of creditors for March 25, 2019 in Rio de Janeiro, Brazil. ("February 19 Update," ECF Doc. # 50.) The Brazilian RJ Court subsequently issued two orders, each further postponing these meetings; currently the first meeting is rescheduled for April 30, 2019 and the adjourned meeting, if necessary, is scheduled for May 9, 2019. ("April 9 Update," ECF Doc. # 74 ¶ 2.)

### E. Joint Provisional Liquidators

On December 7, 2018, a subset of the Chapter 15 Debtors which are incorporated in the British Virgin Islands (the "BVI")—(i) Constellation Overseas, (ii) Lone Star, (iii) Gold Star, (iv) Olinda Star, (v) Snover and (vi) Alpha Star (the "BVI Debtors")—each filed an Originating Application and Ordinary Application (the "BVI Applications") in the BVI Commercial Court (the "BVI Court") pursuant to section 170 of the BVI Insolvency Act 2003 seeking the appointment of Eleanor Fisher ("Fisher") of Kalo (Cayman) Limited and Paul Pretlove ("Pretlove") of Kalo (BVI) Limited as Joint Provisional Liquidators for each of the BVI Debtors (such BVI proceedings, the "BVI Proceedings"). (*Notice of Change in Status Pursuant to* 11 U.S.C. § 1518 *and* 28 U.S.C. § 1746, ECF Doc. # 21, Pet'r Ex. 18.) The BVI Proceedings were commenced to (i) protect the BVI Debtors in that jurisdiction, (ii) provide support to the Brazilian RJ Proceeding pending in the Brazilian RJ Court, and (iii) otherwise ensure the successful and global implementation of the Constellation Group's restructuring. (*Id.* ¶ 2.) Following a hearing on December 13, 2018, the BVI Court appointed Fisher and Pretlove as Joint Provisional Liquidators over each of the BVI Debtors (as appointed, the "JPLs"). ("BVI JPL Appointment Orders," ECF Doc. # 31-1, Pet'r Ex. 7-11.) The JPLs are conducting the BVI Proceedings as so-called "soft-touch" provisional liquidations in which the JPLs will independently oversee the restructuring of the **\*254** BVI Debtors while leaving the form and terms of that restructuring to be proposed

by the BVI Debtors in the Brazilian RJ Proceeding. (*See id.* at 27-28 (explaining the Brazilian RJ Debtors' duty to keep the JPL's informed of their continuing management decisions); "JPL Statement in Support," ECF Doc. # 31-3, Pet'r Ex. 13 ¶ 1 ("The BVI JPLs are presently conducting the BVI Proceedings as 'soft-touch' proceedings pursuant to the BVI JPL Appointment Orders.").)

The JPLs are officers of the BVI Court whose function is to represent the collective interests of the creditors of each debtor for which they are appointed, in particular by overseeing and protecting from undue dissipation the assets of that debtor and protecting the interests of creditors in the course of restructuring negotiations. ("BVI JPL Appointment Decision," ECF Doc. # 48-1 at 26-27.) In this way, they are a voice for the collective creditors of each BVI Debtor—including Constellation Overseas.

The JPLs support the efforts of the Foreign Representative in obtaining recognition in the United States of the Brazilian RJ Proceeding pursuant to Chapter 15 of the Bankruptcy Code. (JPL Statement in Support ¶¶ 2, 4.) Fisher is based in the Cayman Islands and Pretlove is based in the BVI. ("JPL Protocol," ECF Doc. # 31-2, Pet'r Ex. 12 at 2.) Subject to the JPLs' oversight and monitoring, and unless ordered otherwise by the BVI Court, Constellation Overseas is "operat[ing] [its] [business] in the ordinary course ... subject to limitations within the Brazilian RJ Proceeding," which was commenced prior to the appointment of the JPLs. (JPL Protocol ¶ 2.) "It is the understanding of the BVI JPLs that Brazil is the *principal estabelecimento* or 'principal place of business' of the Chapter 15 Debtors' group for purposes of Brazilian law, and that Brazil is the 'centre of main interests' or 'COMI' of each of the BVI Debtors for the purposes of U.S. restructuring law." (JPL Statement in Support ¶ 2.) Further, the JPLs "understand that both the BVI JPL Proceedings and these Chapter 15 Cases were commenced in support of the Chapter 15 Debtors' global restructuring centered in Brazil [and] the BVI Proceedings are intended to work alongside the Chapter 15 Cases in providing support to the Brazilian RJ Proceeding." (*Id.* ¶ 3.)

### F. The Constellation Group's Capital Structure

#### 1. Capital Stock

The Verified Petition contains a single paragraph describing the capital structure of the Constellation Group, which

4040

seems to use its defined terms referring Parent/Constellation and the entire Constellation Group interchangeably. (*See* Verified Petition ¶ 19.) For instance, the Verified Petition begins by providing that the Constellation Group's controlling shareholder is LUX Oil and Gas International S.a.r.l. ("LuxCo"), an entity organized under the laws of Luxembourg and indirectly wholly-owned by the private equity fund SUN STAR [Fundo de Investimento em Participacoes Multiestrategia Investimento no Exterior] ("SUN STAR"). (*Id.*) The next sentence goes on to explain:

> As of the RJ Petition Date, LuxCo owned 74.14% of the total capital stock and 75.10% of the voting stock of *Constellation*, and various holding companies and limited partnerships that are affiliates of and/or ultimately managed by Capital International, Inc. ("Capital") owned the remaining 25.86% and 24.90% of the *Company's* total capital and voting stock, respectively.

(*Id.* (emphasis added).) Notably, while this excerpt begins by discussing the owner of **\*255** the majority of *Parent/Constellation's* stock (which is defined as "Constellation" in the Verified Petition), it goes on to discuss the minority owners of the entire *Constellation Group's* stock (the Constellation Group is defined as the "Company" in the Verified Petition). In doing so, the sentence implicitly presumes that *Parent/Constellation* and the *Constellation Group* are equivalent entities (indeed, it combines their stocks to reach 100% ownership for each of capital and voting stock). While these statements may be derivatively true, since Parent/Constellation owns all of the other members of the Constellation Group, meaning the shareholding of one could be equated with the other, the imprecision in this presentation of facts for the purposes of recognition should also be noted.

## 2. Prepetition Debt Structure

The evidence provided by the Petitioner related to the Chapter 15 Debtors' debt obligations was also presented to the Court predominately in terms of the entire Constellation Group, rather than by each entity. The Verified Petition explains

that as of November 30, 2018, the Constellation Group, as a whole, "was liable for approximately $ 1.5 billion in aggregate outstanding third-party financial indebtedness (including accrued interest) under four credit facilities and two bond issuances (the 'Prepetition Debt')." (*Id.* ¶ 20.) The Prepetition Debt is as follows:

(a) "secured syndicated credit facility to finance the *Amaralina Star* and *Laguna Star* drillships (the 'A&L Project Loan Facility') with an aggregate principal amount of $ 943.9 million entered into with various banks and financial parties and governed by New York law, and secured by mortgages over these drillships, assignments of certain receivables, and other collateral" (Verified Petition ¶ 20); Amaralina Star Ltd. and Laguna Star Ltd. (*i.e.* the Disputed Companies, both of which are Brazilian RJ Debtors) were the initial borrowers (PSA at 6 (discussed as part of the definition of Credit Agreements under the PSA)); Parent/Constellation is now a guarantor of this debt (Stipulation ¶ 8);

(b) "secured syndicated credit facility to finance the *Brava Star* drillship (the 'Brava Project Loan Facility' and, together with the A&L Project Loan Facility, the 'A/L/B Project Financings') with an aggregate principal amount of $ 475 million entered into with various banks and financial parties and governed by New York law, and secured by a mortgage over the *Brava Star,* assignments of certain receivables, and other collateral" (Verified Petition ¶ 20); Brava Star Ltd., the borrower (PSA at 6), is a Brazilian RJ Debtor; Parent/Constellation is now a guarantor of this debt (Stipulation ¶ 8);

(c) 6.25% senior unsecured notes due November 2019 (the "2019 Notes") issued by Parent/Constellation in an aggregate principal amount outstanding of $ 95,432,000 under a New York law-governed indenture [22] (Verified Petition ¶ 20);

(d) 9.00% Cash/0.500% PIK senior secured notes due 2024 (the "2024 Notes") issued by Parent/Constellation in an aggregate principal amount outstanding of $ 604,568,000 under a New York law-governed indenture, and secured by mortgages over "certain of the Offshore **\*256** Drilling Rigs," pledges on " certain accounts," and " other collateral" (Verified Petition ¶ 20) [23] ; and

(e) two unsecured working capital facilities under which Banco Bradesco S.A., Grand Cayman Branch ("Bradesco") made available advances in principal amount of up to $ 150

million (the "Bradesco I Working Capital Facility") and $ 75 million (the "Bradesco II Working Capital Facility" and, together with the Bradesco I Working Capital Facility, the "Bradesco Working Capital Facilities"), respectively, and which are governed by New York law. (Verified Petition ¶ 20.) Constellation Overseas was the borrower and Parent/ Constellation became a guarantor of the Bradesco Working Capital Facilities. (PSA at 4.)

22    Deutsche Bank Trust Company Americas (the "2019 Notes Trustee") serves as trustee, paying agent, transfer agent, and registrar for the 2019 Notes. Prior to the Exchange Offer (defined below), the principal amount of the 2019 Notes totaled $ 700 million. (Verified Petition at 14 n.17.)

23    Wilmington Trust, National Association (the "2024 Notes Trustee" and, together with the 2019 Notes Trustee, the "Notes Trustees") serves as trustee, paying agent, transfer agent, and registrar for the 2024 Notes. (Verified Petition at 14 n.18.)

The 2024 Notes were the result of negotiations and two separate offering memoranda—the Original Exchange Offer Memorandum and the Supplemental Exchange Offer Memorandum. Parent/Constellation's noteholders rejected the exchange as proposed in the Original Exchange Offer Memorandum and an ad hoc group of holders formed (the "2019 Group") to seek better terms for new notes. (Verified Petition ¶ 26.) Following multiple rounds of negotiations, Parent/Constellation issued the Supplemental Exchange Offer Memorandum setting forth the revised terms of the 2024 Notes, including changes to interest rates, guarantees, security, disclosures, and covenants. (*Id.* ¶ 26; *see also* Supplemental Exchange Offer Memorandum at 10-17.) The Supplemental Exchange Offer Memorandum updated and amended the Original Exchange Offer Memorandum with the terms set forth therein, and otherwise maintained the terms of the Original Exchange Offer Memorandum, which were not modified. (Supplemental Exchange Offer Memorandum at 2 ("[E]xcept as set forth herein, the contents of the Offering Memorandum, including the terms of the Exchange Offer and Consent Solicitation, remain as set forth therein.").) The noteholders accepted this revised exchange offer, which ultimately exchanged 86.4% of Parent/Constellation's 2019 Notes for an equal aggregate principal amount of the 2024 Notes. (*See* Verified Petition ¶ 26.)

Unfortunately, the maturity extensions achieved by the exchange were not sufficient to solve all of the Constellation Group's financial issues. (*Id.* ¶ 27.) Thus, in the months

leading up to the commencement of the Brazilian RJ Proceeding, the Constellation Group sought to obtain a comprehensive restructuring of its debt obligations. Those restructurings ultimately resulted in the PSA. Under the PSA, the Constellation Group essentially entered the Brazilian RJ Proceeding with a pre-negotiated restructuring deal. (*Id.* ¶ 31.) On November 29, 2018, (i) 16 entities in the Constellation Group (including all Chapter 15 Debtors), (ii) the shareholders of the Constellation Group, (iii) 97.5% of the A/L/B Lenders (the "Consenting A/L/B Lenders"), and (iv) Bradesco entered into the PSA. (PSA at 2.)

In another example of entity blurring, the Verified Petition explains the terms of the PSA as:

> Consenting A/L/B Lenders have agreed to re-lend approximately $ 39 million in funds that were escrowed in August and September of 2018, Bradesco agreed to provide a $ 15 million letter of credit, and the shareholders agreed to invest $ 27 million of new money at closing, all to ensure that **\*257** the Constellation Group had ample liquidity to survive a prolonged downturn in the market post-restructuring.

(*Id.* ¶ 31.) Notably, the Verified Petition does not clarify the specific entities or accounts that received access to funds or letters of credit through the PSA. Again, the Petitioner presented the evidence to the Court in terms of the Constellation Group as a whole.

Alperton also noted several provisions in the PSA that affect their potential interests in the Disputed Companies. (*See* Alperton FOF ¶ 32.) The PSA provides for cross-collateralizing the Brava Project Loan Facility and the A&L Project Loan Facility. (*See* PSA at 54-63 (Schedule 1).) If performed in accordance with its terms, the PSA would provide lenders under the Brava Project Loan Facility with liens on each of the *Amaralina Star* and *Laguna Star* vessels and a pledge on 100% of the shares of each of Laguna Star Ltd. and Amaralina Star Ltd. (*Id.*)

4042

The PSA requires as a condition precedent to the implementation of the restructuring transactions that the Chapter 15 Debtors (and later another group of the RJ Debtors) receive an order from this Court granting recognition of the Brazilian RJ Proceeding with respect to those entities. (Verified Petition ¶ 31; *see also* PSA at 8 (defining the Chapter 15 Debtors as the Initial Chapter 15 Filing Entities); *see also* PSA at 9 (defining the Subsequent Chapter 15 Filing Entities).)

In parallel with the negotiations towards the PSA, the Constellation Group also engaged in negotiations with Bradesco that led to Parent/Constellation becoming a guarantor of Constellation Overseas debt. Specifically, Bradesco agreed to several extensions of the final maturity payments under the Bradesco Working Capital Facilities in exchange for, *inter alia*, Parent/Constellation becoming a guarantor for the obligations of Constellation Overseas under the Bradesco Working Capital Facilities. (Verified Petition ¶ 29; *see also* Verified Petition at 24 n.22.)

**G. Galdino Declaration on Brazilian Bankruptcy Law**

Flavio Galdino, counsel for the Constellation Group in the Brazilian Proceeding, provided a declaration pursuant to 28 U.S.C. § 1746. ("Galdino Declaration," ECF Doc. # 4, Pet'r Ex. 15.) Galdino declares that "Brazil has not adopted the UNCITRAL Model Law on Cross-Border Insolvency and currently has no statutory definition of center of main interests ('COMI') for the purposes of establishing the competent country of jurisdiction for the main insolvency proceedings either of a company or of a group of companies." (*Id.* ¶ 9.) According to Galdino, under Brazilian law, "[a]n entity commences an RJ by filing a petition with the business court (the 'RJ Court') in the jurisdiction in which it maintains its principal place of business ...." (*Id.* ¶ 8.) Galdino further explains that the Brazilian Court's jurisdictional requirement is referred to as *principal estabelecimento,* and Brazilian Court's must find that a debtor or group of debtors have their *principal estabelecimento* in Brazil. (*Id.* ¶ 9.) That said, he also explains that *principal estabelecimento* is interpreted broadly and that the RJ Court can focus on either the location of a debtor's assets and operations or on the location of management and decision makers. (*Id.* ¶ 10.)

With respect to what Galdino refers to as "substantive consolidation" as it is "referred to in the United States," Galdino notes that while some RJ Courts have allowed substantive consolidation, "[w]hether a court will allow substantive consolidation is a fact-intensive determination

heavily dependent upon the nature of the relationship among the affiliated debtors **\*258** and any interrelated debt subject to restructuring." (*Id.* ¶ 12.)

[3] Alperton's Proposed Findings of Fact highlights this portion of the Galdino Declaration and emphasizes that substantive consolidation of creditors for negotiation and voting on a single plan has, in fact, been allowed in Brazil and could be allowed here. (Alperton FOF ¶ 38.) However, the Court emphasizes that this opinion will only determine recognition of the *proceedings*; the decisions reached in this opinion do not assure that further discretionary relief will follow—such as this Court's recognition and enforcement of any plan that may be approved in Brazil. Indeed, ample precedent dictates that the Court may refuse to recognize and enforce a plan if approval was obtained by an unfair voting system, even when the plan is approved in a country that usually enjoys comity from the United States. *See, e.g., Ad Hoc Grp. of Vitro Noteholders v. Vitro S.A.B. de C.V. (In re Vitro S.A.B. de C.V.),* 701 F.3d 1031 (5th Cir. 2012); *In re Cozumel Caribe, S.A. de C.V.,* 482 B.R. 96, 108-113 (Bankr. S.D.N.Y. 2012).

**H. Analysis of Individual Chapter 15 Debtors**

1. Parent/Constellation

Parent/Constellation is a tax resident of Luxembourg with its central administration in Luxembourg as a matter of Luxembourg tax law. (Stipulation ¶ 7.) Parent/Constellation is a holding and financing company that owns equity interests in subsidiaries in the Constellation Group and engages in the necessary activities for borrowing and guaranteeing debt. (Verified Petition ¶ 75.) The Court finds that Parent/ Constellation's registered office is in Luxembourg.

Parent/Constellation's board of directors is composed of six members. (Stipulation ¶ 1.) Three directors are residents and citizens of Brazil; two are residents and citizens of Luxembourg; and one is a resident and citizen of Switzerland. (*Id.*) Parent/Constellation holds its board of directors' meetings and shareholder meetings in Luxembourg, as required for companies incorporated under Luxembourg law. (Stipulation ¶ 6; Hr'g Tr. 50: 6-10.) The Original Exchange Offer Memorandum states, "[i]n accordance with Luxembourg law, [Parent/Constellation's] Board of Directors is the sole responsible body for managing [Parent/ Constellation and its consolidated subsidiaries'] affairs and

4043

ensuring that [Parent/Constellation and its consolidated subsidiaries'] operations are organized in a satisfactory manner." (Original Exchange Offer Memorandum at 131.) The 2019 Notes Offering Memorandum further states that Parent/Constellation's "Board of Directors is empowered to take any action necessary or desirable for carrying out [its] corporate objective, except for the powers specifically allocated to the general meeting of [its] shareholders by Luxembourg law and/or by [its] Articles." (2019 Notes Offering Memorandum at 121.) The Court finds that Parent/Constellation's management is located in Luxembourg, where the board of directors conducts business.

As a holding company, Parent/Constellation does not have any assets other than its ownership interests in its subsidiaries. (*Id.* at 39.) The 2019 Notes Offering Memorandum explains: "The issuer is a holding company, and all of its assets are held by its direct and indirect subsidiaries." (*Id.*) The Supplemental Exchange Offering Memorandum describes Parent/Constellation's operations by explaining, "[Parent/Constellation] is incorporated in the laws of the Grand Duchy of Luxembourg, *and [Parent/Constellation] conducts most of its business from Brazil*." (Supplemental **\*259** Exchange Offering Memorandum at 21 (emphasis added).) The Original Exchange Offer Memorandum states, "[t]he issuer is a holding company with no independent operations or assets and it is dependent on cash flow generated by its subsidiaries." (Original Exchange Offer Memorandum at 53.) It goes on to explain, "[r]epayment of our indebtedness, including the New Notes, is dependent on the generation of cash flow by our subsidiaries and their ability to make such cash available to us, by dividend, debt repayment or otherwise." (*Id.*) Parent/Constellation's key indirect assets are its drilling rigs, which, with the exception of the *Olinda Star* and one of its onshore drilling rigs, were all located in Brazil as of the Petition Date. (Verified Petition ¶¶ 9, 14-18.) At the Hearing, Alperton suggested that, as of the Petition Date, several of the drilling rigs were operating on the high seas and were not located in Brazil. (Hr'g Tr. 108:18-24.) However, the evidence in the record demonstrates that 20 of the 22 drilling rigs were located in Brazil as of the petition date; the two that were not in Brazil were in India and Paraguay. (Verified Petition ¶¶ 9, 14-18; *see also* Certified Translation of the RJ Petition at 39.) The Verified Petition explains: "The Offshore Drilling Rigs and Onshore Drilling Rigs are the Company's primary operating assets. Seven of the eight Offshore Drilling Rigs are presently located in Brazil, eight of its nine Onshore Drilling Rigs are located in Brazil, and all of the JV FPSO Units in which it holds an interest are located

in Brazil." (Verified Petition ¶ 9.) Based on the foregoing evidence, the Court finds that Parent/Constellation's assets are primarily located in Brazil.

Parent/Constellation has no officers. (2019 Offering Memorandum at 118 ("There are no statutory officers under Luxembourg law ... members of senior management set forth below currently serve as senior managers of QGOG *and will be responsible for the day-to-day management of our operations*.") (emphasis added); *see also* Stipulation ¶¶ 4-5.) Parent/Constellation makes use of the Constellation Group's shared corporate management team, its operational management team, and its employees, who are employed by Parent/Constellation's direct or indirect subsidiaries. As discussed above, the shared corporate management team are located in both London and Brazil. The court finds that the location of executive management team of Parent/Constellation is split between London and Brazil.

Parent/Constellation is the issuer of the 2019 Notes and the 2024 Notes; it is also guarantor of the A/L/B Project Financings and guarantor of the Bradesco Working Capital Facilities. (Stipulation ¶¶ 8-11.) The indenture trustees of the 2019 Notes and the 2024 Notes are located in New York and there is no evidence in the record regarding the location of the beneficial holders of the 2019 Notes and 2024 Notes, other than a holder of 2019 Notes that is a Brazilian national located in New York. (*See* "Noteholder Letter," ECF Doc. # 38.) There is no evidence in the record that any of Parent/Constellation's creditors are located in Luxembourg or Brazil. (*See* "Notice List," ECF Doc. # 7-6 at 8-9.) As such, the Court finds that the location of most of Parent/Constellation's creditors is indeterminate.

The Supplemental Exchange Offer states:

> The Company [defined to be the issuer, Parent/Constellation][24] and Arazi **\*260** are incorporated under the laws of Luxembourg, and as such, any insolvency proceedings applicable to them are in principle governed by Luxembourg law.

(Supplemental Exchange Offer Memorandum at 21.) Further, the Supplemental Exchange Offer explains that the section titled "Certain Luxembourg Insolvency Law Considerations"

4044

in the 2019 Notes Offering Memorandum should be read as applicable to "both the Company and Arazi." (Supplemental Exchange Offer Memorandum at 22.) The Supplemental Exchange Offer Memorandum also explicitly explains to investors that restructuring proceedings could be commenced in Brazil due to the Constellation Group's significant ties there, stating:

> [I]n the event of any bankruptcy, insolvency, liquidation, dissolution, reorganization or similar proceedings involving us or any of our subsidiaries, bankruptcy laws other than those of the United States could apply.... [I]n the event that we do experience financial difficulty, it is not possible to predict with certainty in which jurisdiction insolvency proceedings would be commenced or the outcome of such proceedings, but it may include, among other jurisdictions, Brazil, where certain decisions of the Company [25] are made, certain members of the Company's management are located and the location of substantially all of the Company's business is conducted (and, therefore, from which substantially all of the operating revenues that may be available to service the Company's obligations under the New Notes are currently derived).

(Supplemental Exchange Offer Memorandum at 21.)

[24] The Original Exchange Offer Memorandum explains "by the 'Company,' we mean QGOG Constellation S.A., and not its Subsidiaries")." (Original Exchange Offer OM, ECF Doc. # 43-1 at 140.)

[25] The Supplemental Exchange Offer Memorandum defines the "Company" as QGOG Constellation S.A. (Exchange Offer Memorandum at 10.)

The Supplemental Exchange Offer Memorandum further explains risks associated with Brazilian insolvency proceedings:

> In Brazil, the right of the Collateral Trustee to repossess and dispose of the Collateral securing the New Notes upon acceleration may be significantly impaired by applicable bankruptcy law if bankruptcy proceedings were commenced by or against the issuer or the Subsidiary Guarantors prior to or possibly even after the time that the Collateral Trustee repossesses and disposes of the Collateral. In the event of a cross-border insolvency, Brazilian courts may impair the seizure of the Drilling Rigs located in Brazil, in order to protect the business activities in Brazil and/or ensure the payment of the relevant debt in accordance with Brazilian laws.
>
> In addition, in case of judicial reorganization or liquidation under Brazilian law, it is impossible to estimate the period that payments under the New Notes could be delayed following commencement of a bankruptcy proceeding. With respect to the judicial reorganization, the debtor may continue to retain and to use the collateral and the proceeds, products, rents or profits therefrom. The judicial reorganization proceeding binds all pre-filing secured debts, even those not yet due, and they will be paid in accordance with the restructuring plan submitted by the debtor, which must be approved by the majority of creditors in a creditors' meeting and, subsequently, **\*261** ratified by the Brazilian court. In certain circumstances, the Brazilian bankruptcy law also grants the debtor the possibility to cram down the plan. The reorganization plan results in the replacement and renewal of all debts existing prior to the filing of the reorganization, and is binding on the debtor and all creditors subject to it.
>
> In relation to a bankruptcy proceeding, the Collateral Trustee is prohibited from repossessing or disposing of the Collateral securing the New Notes because all assets of the debtor, including the Collateral, will be sold in order to pay the creditors according to the priority order established in the Brazilian bankruptcy law. Secured debt have priority in the ranking and are paid just after labors' claims, up to the amount of the Collateral. Any shortfall will be classified as "unsecured debt".

(*Id.*)

The Court therefore finds that the objective indicia of Parent/Constellation's creditors' expectations of an insolvency proceeding's location could be in either Brazil or Luxembourg. However, unlike Parent/Constellation's subsidiaries, Parent/Constellation is the original issuer of both the 2019 and 2024 Notes. Even though the memoranda for these notes frequently discusses the entire Constellation Group, which it refers to as "we," "us," *etc.*, this does not change the fact that the issuer listed at the beginning of each of the notes is described as a public limited liability company incorporated in the Grand Duchy of Luxembourg. (*See* 2019 Notes Offering Memorandum at 3; Original Exchange Offer Memorandum at 2; Supplemental Exchange Offer Memorandum at 2.) As such, the Court finds that the objective expectations of creditors with respect to Parent/Constellation's COMI should be determined to be predominately in Luxembourg.

New York law is the governing law of all of the Prepetition Debt of the Constellation Group, which Parent/Constellation either issued or now guarantees. (Verified Petition ¶ 20; Alperton FOF ¶ 62.) Alperton asserts that New York is the jurisdiction whose law would apply to most of Parent/Constellation's disputes. (Alperton FOF ¶ 101.) The documentation relevant to all prepetition debt is in English. While there is no evidence in the record of a current dispute about Luxembourg law, Luxembourg law is an unavoidable part of the reorganization for Parent/Constellation, because Luxembourg law will determine, *inter alia*: (i) the fiduciary duties applicable to Parent/Constellation's board, (ii) the extent to which foreign proceedings outside Luxembourg are consistent or inconsistent with these fiduciary duties, and (iii) the authority for and validity of any actions taken by Parent/Constellation under corporate law. (Alperton FOF ¶ 102.) The Court therefore determines that while many countries laws could govern the range of feasible disputes that Parent/Constellation could be involved in, Luxembourg law should be considered the most relevant law governing Parent/Constellation's disputes for purposes of the COMI determination.

### 2. Alpha Star

Chapter 15 Debtors Alpha Star, Gold Star, Olinda Star, Lone Star, and Star Int'l are the offshore rig owners ("Offshore Rig Owner Debtors"). (Verified Petition at 13.) Alpha Star owns the *Alpha Star* offshore drilling rig, which is not presently under contract and is being maintained in a shipyard in Brazil.

(*Id.* ¶¶ 9, 14.) The Alpha Star is classified as capable of ultra-deepwater drilling. (Certified Translation of the RJ Petition at 38.)

**\*262** Alpha Star is organized under the laws of the BVI; it maintains its registered office in the BVI. (Verified Petition ¶ 73.) The sole director of Alpha Star is Michael Pearson, a citizen of the United Kingdom, who resides in the Cayman Islands. (Stipulation ¶ 2.)

The Alpha Star's offshore rig is operated and maintained by Chapter 15 Debtor Petróleo Constellation and other Brazilian subsidiaries pursuant to operating and maintenance agreements, through its operational management team and operational staff located in the Brazilian offices. (Verified Petition ¶ 70.) The Original Exchange Offer Memorandum explains that QGOG (which is the former name of Chapter 15 Debtor Petróleo Constellation) [26] agreed to manage, be technically responsible for, and/or perform the activities and works of maintenance necessary to maintain and preserve *Alpha Star* and all its parts, components, and equipment. (Original Exchange Offer Memorandum at 118.) The operations of Alpha Star are therefore predominately in Brazil.

[26]    Page 17 of the Original Exchange Offer Memorandum defines "QGOG" as "Queiroz Galvao Oleo and Gas S.A., one of our Brazilian subsidiaries." The Plan Support and Lock Up Agreement explains on page 2 that Petróleo Constellation was formerly known Queiroz Galvao Oil & Gas S.A.

Alpha Star is a guarantor of the 2024 Notes issued by Parent/Constellation. (Stipulation ¶ 10.) The indenture trustees of the 2024 Notes are in New York. Otherwise, there is no evidence in the record regarding the location of the beneficial holders of the 2024 Notes.

The expectations of the creditors of the 2024 Notes, the key creditor constituency of the offshore drilling rigs, may be objectively determinable by reference to the offering memoranda related to the 2024 notes. The initial offering document described the Constellation Group by explaining "[w]e are a market leading provider of offshore oil and gas contract drilling and FPSO services in Brazil." (Original Exchange Offer Memorandum at 20.) The overview section of the document further explains "[i]n particular, we believe that we are well positioned to benefit from the ultra-deepwater drilling activity in Brazil ...." (*Id.*) Since Alpha Star owns an ultra-deepwater rig, this would have put 2024 Note purchasers

4046

on notice that *Alpha Star* was not only located in Brazil, but also had its future operations in Brazil. Indeed, a map provided in the same document shows that *Alpha Star* is located off the coast of Brazil. (*Id.* at 108.) The document states that all of the Offshore Drilling Rigs other than *Olinda Star* are under charter contracts with Petrobras. (*Id.*) Finally, the offering expressly refers several times to the chartering and operations of the offshore drilling rigs, explaining that those rigs operated "mainly in Brazil" and were currently chartered "mainly to [Petrobras]." (*Id.* at 230, 296.)

The Supplemental Exchange Offer to the Original Exchange Offer Memorandum conveys to the holders of the 2024 Notes that insolvency proceedings may be commenced in Brazil and explains the consequences that a Brazilian restructuring or liquidation proceeding could have on their ability to enforce their collateral, including the mortgages granted to them over the offshore drilling rigs. (Supplemental Exchange Offer Memorandum at 21 (describing Brazil as the location "from which substantially all of the operating revenues that may be available to service [Parent/Constellation's] obligations under the New Notes are currently derived.").)

The Supplemental Exchange Offer Memorandum also contains evidence of the laws applicable to *Alpha Star* and other **\*263** rigs. For example, because the *Alpha Star* rig is in Brazil, the arrest and seizure of the rig would take place under Brazilian law and require a judicial order issued by a Brazilian Court. (*Id.* at 22.) The same paragraph explains that there could be third-party claims under maritime liens such as ports and maritime costs and taxes; seamen's wages; salvage and general average; repairs, supplies and necessaries contracted outside the mortgaged drilling rigs' home port; collision and tort liens; and simple and general damages to the drilling rigs. (*Id.*)

The JPLs have been appointed with respect to each of Lone Star, Gold Star, Olinda Star, and Alpha Star, and function to protect the interests of the collective creditors of each. (JPL Statement in Support ¶ 2.) They have expressed support for the Brazilian RJ Proceeding and for a finding of COMI in Brazil for each of these BVI Debtors. (*Id.*)

### 3. Gold Star

Gold Star is an offshore rig owner organized under the laws of the BVI and maintains its registered office in the BVI. (Verified Petition ¶ 73.) The sole director is Michael Pearson,

a citizen of the United Kingdom, who resides in the Cayman Islands. (Stipulation ¶ 2.) Gold Star owns the *Gold Star* offshore drilling rig, which is not presently under contract and is being maintained in a shipyard in Brazil. (Verified Petition ¶¶ 9, 14.) The Gold Star is classified as capable of ultra-deepwater drilling. (Certified Translation of the RJ Petition at 38.)

The Gold Star's offshore rig is operated and maintained by Chapter 15 Debtor Petróleo Constellation and other Brazilian subsidiaries pursuant to operating and maintenance agreements, through its operational management team and operational staff located in the Brazilian Offices. (Verified Petition ¶ 70.) The Original Exchange Offer Memorandum explains that QGOG (defined as one of "our Brazilian subsidiaries" on page 17 of the Original Exchange Offer Memorandum) agreed to manage, be technically responsible for, and/or perform the activities and works of maintenance necessary to maintain and preserve *Gold Star* and all its parts, components, and equipment. (Original Exchange Offer Memorandum at 118.)

Gold Star is a guarantor of the 2024 Notes issued by Parent/Constellation. (Stipulation ¶ 10.) The indenture trustees of the 2024 Notes are located in New York; otherwise, there is no evidence in the record regarding the location of the beneficial holders of the 2024 Notes.

The expectations of the creditors of the 2024 Notes, the key creditor constituency of the offshore drilling rigs, may be objectively determinable by reference to the offering memoranda related to the 2024 notes. The Original Exchange Offer Memorandum describes the Constellation Group as "[w]e are a market leading provider of offshore oil and gas contract drilling and FPSO services in Brazil." (Original Exchange Offer Memorandum at 20.) Additionally, the overview paragraph states "[i]n particular, we believe that we are well positioned to benefit from the ultra-deepwater drilling activity in Brazil ...." (*Id.*) Since Gold Star owns an ultra-deepwater rig, this would have put 2024 Note purchasers on notice that *Gold Star* was not only located in Brazil, but had its future operations in Brazil. Indeed, a map provided in the Original Exchange Offer Memorandum shows that *Gold Star* is located off the coast of Brazil. (*Id.* at 108.) The same page of the document states that all the offshore drilling rigs other than *Olinda Star* are under charter contracts with Petrobras. (*Id.*) Finally, the Original Exchange Offer Memorandum expressly refers several times to the chartering and **\*264** operations of the offshore drilling rigs, explaining that those rigs operate

4047

mainly in Brazil and were currently chartered "mainly to [Petrobras]." (*Id.* at 230, 296.)

The Supplemental Exchange Offer to the Original Exchange Offer Memorandum conveys to the holders of the 2024 Notes that insolvency proceedings may be commenced in Brazil and explains the consequences that a Brazilian restructuring or liquidation proceeding could have on their ability to enforce their collateral, including the mortgages granted to them over the offshore drilling rigs. (Supplemental Exchange Offer Memorandum at 21 (describing Brazil as the location "from which substantially all of the operating revenues that may be available to service [Parent/Constellation's] obligations under the New Notes are currently derived.").)

The Supplemental Exchange Offer Memorandum also contains evidence of the laws applicable to *Gold Star* and other rigs. For example, because the *Gold Star* rig is in Brazil, the arrest and seizure of the rig would take place under Brazilian law and require a judicial order issued by a Brazilian Court. (*Id.* at 22.) The same paragraph explains that there could be third-party claims under maritime liens such as ports and maritime costs and taxes; seamen's wages; salvage and general average; repairs, supplies and necessaries contracted outside the mortgaged drilling rigs' home port; collision and tort liens; and simple and general damages to the drilling rigs. (*Id.*)

The JPLs have been appointed with respect to each of Lone Star, Gold Star, Olinda Star, and Alpha Star, and function to protect the interests of the collective creditors of each. (FRFOF ¶ 79.) They have expressed support for the Brazilian RJ Proceeding and for a finding of COMI in Brazil for each of these BVI Debtors. (FRFOF ¶ 79.)

#### 4. Olinda Star

The Brazilian Court of Appeals determined that Olinda Star should be removed from the Brazilian RJ Proceeding. Thus, discussion of this Chapter 15 Debtor's possible recognition is unnecessary.

#### 5. Lone Star

Lone Star is an offshore rig owner organized under the laws of the BVI and maintains its registered office in the BVI. (Verified Petition ¶ 73.) The sole director is Michael Pearson, a citizen of the United Kingdom, who resides in the Cayman Islands. (Stipulation ¶ 2.) Lone Star owns the *Lone Star* offshore drilling rig, which is not presently under contract and is being maintained in a shipyard in Brazil. (Verified Petition ¶¶ 9, 14.) The *Lone Star* rig is classified as capable of ultra-deepwater drilling. (Certified Translation of the RJ Petition at 38.)

The Lone Star's offshore rig is operated and maintained by Chapter 15 Debtor Petróleo Constellation and other Brazilian subsidiaries pursuant to operating and maintenance agreements, through its operational management team and operational staff located in the Brazilian Offices. (Verified Petition ¶ 70.) The Original Exchange Offer Memorandum explains that QGOG (defined as one of "our Brazilian subsidiaries" on page 17 of the Original Exchange Offer Memorandum) agreed to manage, be technically responsible for, and/or perform the activities and works of maintenance necessary to maintain and preserve *Lone Star* and all its parts, components, and equipment. (Original Exchange Offer Memorandum at 118.)

Lone Star is a guarantor of the 2024 Notes issued by Parent/Constellation. (Stipulation ¶ 10.) The indenture trustees of the 2024 Notes are located in New York; otherwise, there is no evidence in the record regarding the location of the **\*265** beneficial holders of the 2024 Notes. The expectations of the creditors of the 2024 Notes, the key creditor constituency of the offshore drilling rigs, may be considered to be objectively determinable by reference to the offering memoranda related to the 2024 notes. The Original Exchange Offer Memorandum explains the Constellation Group, as a whole, as "[w]e are a market leading provider of offshore oil and gas contract drilling and FPSO services in Brazil." (Original Exchange Offer Memorandum at 20.) Additionally, the overview paragraph states "[i]n particular, we believe that we are well positioned to benefit from the ultra-deepwater drilling activity in Brazil ...." (*Id.*) Since Lone Star owns an ultra-deepwater rig, this would have put 2024 Note purchasers on notice that a rig like *Lone Star* was not only located in Brazil but had its future operations in Brazil. Indeed, a map provided in the Original Exchange Offer Memorandum shows that *Lone Star* is located off of the coast of Brazil. (*Id.* at 108.) The same page of the document states that all of the offshore drilling rigs other than *Olinda Star* are under charter contracts with Petrobras. (*Id.*) Finally, the Original Exchange Offer Memorandum expressly refers several times to the chartering and operations of the offshore drilling rigs, explaining that those rigs operate

"mainly in Brazil" and were currently chartered "mainly to [Petrobras]." (*Id.* at 230, 296.)

The Supplemental Exchange Offer to the Original Exchange Offer expressly conveys to the holders of the 2024 Notes that insolvency proceedings may be commenced in Brazil and explains the consequences that a Brazilian restructuring or liquidation proceeding could have on their ability to enforce their collateral, including the mortgages granted to them over the offshore drilling rigs. (Supplemental Exchange Offer at 21 (describing Brazil as "the location ... from which substantially all of the operating revenues that may be available to service the Company's obligations under the New Notes are currently derived.").)

The Supplemental Exchange Offer also contains evidence of the laws applicable to *Lone Star* and other rigs. For example, because the *Lone Star* rig is in Brazil, the arrest and seizure of the rig would take place under Brazilian law and require a judicial order issued by a Brazilian Court. (*Id.* at 22.) The same paragraph explains that there could be third-party claims under maritime liens such as ports and maritime costs and taxes; seamen's wages; salvage and general average; repairs, supplies and necessaries contracted outside the mortgaged drilling rigs' home port; collision and tort liens; and simple and general damages to the drilling rigs. (*Id.*)

The JPLs have been appointed with respect to each of Lone Star, Gold Star, Olinda Star, and Alpha Star, and function to protect the interests of the collective creditors of each. (FRFOF ¶ 79.) They have expressed support for the Brazilian RJ Proceeding and for a finding of COMI in Brazil for each of these BVI Debtors. (FRFOF ¶ 79.)

### 6. Star Int'l

Star Int'l is an offshore rig owner organized under the laws of the Cayman Islands and maintains its registered office there. (Verified Petition ¶ 73.) The sole director is Michael Pearson, a citizen of the United Kingdom, who resides in the Cayman Islands. (Stipulation ¶ 2.) Star Int'l owns the *Atlantic Star* offshore drilling rig; as of the petition date, the *Atlantic Star* was under contract with Petrobras and operating in Brazilian waters. (Verified Petition ¶ 14.) The *Atlantic Star* rig is classified as a midwater drilling rig. (Certified Translation of the RJ Petition at 38.)

**\*266** Star Int'l's offshore rig is operated and maintained by Chapter 15 Debtor Petróleo Constellation and other Brazilian subsidiaries pursuant to operating and maintenance agreements, through its operational management team and operational staff located in the Brazilian Offices. (Verified Petition ¶ 70.) The Original Exchange Offer Memorandum explains that QGOG (defined as one of "our Brazilian subsidiaries" on page 17 of the Original Exchange Offer Memorandum) agreed to manage, be technically responsible for, and/or perform the activities and works of maintenance necessary to maintain and preserve *Atlantic Star* (the rig owned by Star Int'l) and all its parts, components, and equipment. (Original Exchange Offer Memorandum at 118.)

Star Int'l is a guarantor of the 2024 Notes issued by Parent/Constellation. (Stipulation ¶ 10.) The indenture trustees of the 2024 Notes are located in New York; otherwise, there is no evidence in the record regarding the location of the beneficial holders of the 2024 Notes.

The expectations of the creditors of the 2024 Notes, the key creditor constituency of the offshore drilling rigs, may be considered to be objectively determinable by reference to the offering memoranda related to the 2024 notes. The Original Exchange Offer Memorandum describes the Constellation Group, as a whole, as "[w]e are a market leading provider of offshore oil and gas contract drilling and FPSO services in Brazil." (Original Exchange Offer Memorandum at 20.) A map provided in the Original Exchange Offer Memorandum shows that the *Atlantic Star* is located off of the coast of Brazil. (*Id.* at 108.) The same page of the document states that all of the offshore drilling rigs other than *Olinda Star* are under charter contracts with Petrobras. (*Id.*) Finally, the Original Exchange Offer Memorandum expressly refers several times to the chartering and operations of the offshore drilling rigs, explaining that those rigs operate "mainly in Brazil" and were currently chartered "mainly to [Petrobras]." (*Id.* at 230, 296.)

The Supplemental Exchange Offer Memorandum conveys to the holders of the 2024 Notes that insolvency proceedings may be commenced in Brazil and explains the consequences that a Brazilian restructuring or liquidation proceeding could have on their ability to enforce their collateral, including the mortgages granted to them over the offshore drilling rigs. (Supplemental Exchange Offer at 21 (describing Brazil as "the location ... from which substantially all of the operating revenues that may be available to service the Company's obligations under the New Notes are currently derived.")

The Supplemental Exchange Offer Memorandum also contains evidence of the laws applicable to Star Int'l and other rig owners. For example, because the *Atlantic Star* rig is in Brazil, the arrest and seizure of the rig would take place under Brazilian law and require a judicial order issued by a Brazilian Court. (*Id.* at 22.) The same paragraph explains that there could be third-party claims under maritime liens such as ports and maritime costs and taxes; seamen's wages; salvage and general average; repairs, supplies and necessaries contracted outside the mortgaged drilling rigs' home port; collision and tort liens; and simple and general damages to the drilling rigs. (*Id.*)

### 7. Snover

All of Snover's rigs were located in Brazil as of the petition date. (Verified Petition ¶ 71.) Snover sits within the Constellation Group's onshore drilling operation segment. It serves as the owner of three Onshore Drilling Rigs (the *QG-V*, the *QG-VIII* and the *QG-IX*). (FRFOF ¶ 81.) The **\*267** Court therefore finds that Snover's primary assets are in Brazil.

Snover's sole director is Michael Pearson, a citizen of the United Kingdom, who resides in the Cayman Islands. (Stipulation ¶ 2.) The record contains no evidence that any of Snover's decisions are made from Luxembourg. (FRFOF at 42 n.29.) Snover's active Onshore Rig is operated by, and its inactive Onshore Rigs are maintained by, Debtor Petróleo Constellation through the Group's operational management team located in Brazil. (*Id.* ¶ 83.) The Court therefore finds that Snover's day-to-day management, like that of other drillship owning entities is in Brazil. Snover's senior management is best described as the senior executive team of the Constellation Group, which is located in both London and Brazil. Cumulatively, given that this entity is a drillship owner and makes use of predominately Brazilian employees, daily management, and given that most of the Constellation Group's executive management team is located in Brazil, the Court finds that Snover's senior management is best described as located in Brazil.

All of Snover's onshore drilling rigs are located in Brazil. (*Id.* ¶ 84.) As in its offshore operational segment, the Constellation Group charters its onshore drilling rigs to oil and gas customers and provides corresponding operating services. (*Id.* ¶ 84.) Snover is a fully integrated participant in the Constellation Group's onshore drilling operations—

operations that take place primarily in Brazil, utilize Brazilian employees, and are accordingly subject to certain Brazilian legal and regulatory regimes. (*Id.* ¶ 84.) Its assets, consisting of onshore drilling rigs, are all located in Brazil, and its revenues ultimately derive from operations with primarily Brazilian customers under the customer contracts which historically have been primarily governed by Brazilian law. (*Id.* ¶ 84.)

Snover is a guarantor of the 2024 Notes. (Stipulation ¶ 10.) The indenture trustees of the 2024 Notes are located in New York and there is no evidence in the record regarding the location of the beneficial holders of the 2024 Notes. (FRFOF ¶ 45.) The location of the majority of Snover's creditors is therefore not strong evidence in favor of any particular COMI for Snover.

As a guarantor of the 2024 Notes, Snover's creditors were advised that their investment was essentially an investment in Brazil and were expressly cautioned that insolvency proceedings could take place in Brazil due to the strong ties to Brazil disclosed in the various offering memoranda. (Supplemental Exchange Offer Memorandum at 21 (stating that the jurisdiction of insolvency proceedings could be in Brazil); *see also* Original Exchange Offer Memorandum at 20 ("We are a market leading provider of offshore oil and gas contract drilling and FPSO services in Brazil.").)

In their appointment with respect to Snover, the JPLs speak for the interests of its collective creditors, and have expressed support for the Brazilian RJ Proceeding and for a finding of COMI in Brazil for each of these Debtors. (JPL Statement in Support ¶ 2.) Given that the 2024 notes offering memoranda heavily emphasize Brazil as the location of the Constellation Group's rigs and daily operations and given that the JPLs support a COMI in Brazil for Snover, the Court finds that creditor expectations and interests weigh in favor of a COMI in Brazil.

### 8. Arazi

Arazi is not discussed at this time. The Brazilian Court of Appeals determined that this company should be removed from the Brazilian RJ Proceeding, thus no consideration by this Court is necessary.

4050

**\*268** 9. Petróleo Constellation

Petróleo Constellation is an entity organized under the laws of Brazil with its registered office at the Rio Office in Rio de Janeiro, Brazil. (Verified Petition ¶ 70.) No objections were filed to the recognition of the Brazilian RJ Proceeding for Petróleo Constellation, and Alperton does not object to foreign main recognition in respect of Petróleo Constellation. (Hr'g Tr. at 95:13-17.)

Petróleo Constellation participates in all three of the Constellation Group's business segments—onshore, offshore, and FPSO investments. (Verified Petition ¶¶ 15, 17, 18.) It is the owner of six of the nine Onshore Drilling Rigs, the operator of all of the offshore drilling rigs and also provides a limited number of employees to the JV FPSO Units. (*Id.*) It employs the majority of the Constellation Group's employees and serves as the counterparty on the largely Brazilian law-governed Customer Service Agreements for the offshore drilling rigs. (*Id.* ¶ 70.) It owns several of the Constellation Group's Onshore Drilling Rigs and in most cases has historically served as the operator for the Constellation Group's onshore drilling rigs. (*Id.*)

Petróleo Constellation is not a guarantor of any indebtedness for borrowed money of other entities of the Constellation Group. (Stipulation ¶ 9.)

10. Constellation Overseas

Constellation Overseas is incorporated in the British Virgin Islands and has its registered office in the BVI. (Verified Petition ¶¶ 75, 76.) Constellation Overseas is the direct owner of 100% of the equity of Lone Star, Gold Star, Olinda Star, Snover and Alpha Star and is an indirect wholly owned subsidiary of Parent. (*Id.* ¶ 37.) The sole director of Constellation Overseas is Michael Pearson, who resides in the Cayman Islands and is a citizen of the United Kingdom. (Stipulation ¶ 2.)

Constellation Overseas is the Chapter 15 Debtor in the dispute with Alperton. Alperton and Constellation Overseas entered into a joint venture to build two ultra-deepwater drillships. They established two special purpose offshore holding companies organized under the laws of the BVI: Amaralina Star Ltd. and Laguna Star Ltd. Constellation

Overseas' relationship with Alperton is discussed more fully above, in sections I.B.2 and I.C of this opinion.

Constellation Overseas is either the primary obligor or the guarantor for each category of Prepetition Debt set forth in the Verified Petition. (Verified Petition ¶¶ 20-21; Stipulation ¶¶ 10-11.) Parent/Constellation is a guarantor of the obligations of Constellation Overseas under the Bradesco Working Capital Facilities. (Stipulation ¶ 8.)

## III. DISCUSSION

### A. The Debtors Satisfy Section 109(a) and Venue Is Proper in this District

 **[4]**   Foreign debtors seeking relief under chapter 15 must satisfy the debtor eligibility requirements set forth in section 109(a) of the Bankruptcy Code. *See In re Ocean Rig UDW Inc.*, 570 B.R. at 698 (citing *Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*, 737 F.3d 238, 247-51 (2d Cir. 2013)). Section 109(a) provides that "only a person that resides or has a domicile, a place of business or property in the United States, or a municipality, may be a debtor" under the Bankruptcy Code. 11 U.S.C. § 109(a). Courts in this Circuit have held that section 109(a) can be satisfied by bank accounts in the United States, including by an undrawn retainer. *See, e.g., In re U.S. Steel Can. Inc.*, 571 B.R. 600, 610 (Bankr. S.D.N.Y. 2017) ("Some courts, including this one, have held that an undrawn retainer **\*269** in a United States bank account qualifies as property in satisfaction of section 109(a)."). This Court has previously held that a debtor's contract rights, including rights pursuant to debt that contains a New York governing law and forum selection clause, constitute intangible property of the debtor in New York for purposes of section 109(a). *See, e.g., In re Berau Capital Res. PTE Ltd.,* 540 B.R. 80, 83-84 (Bankr. S.D.N.Y. 2015) ("Contracts create property rights for the parties to the contract. A debtor's contract rights are intangible property of the debtor.... The Court concludes that the presence of the New York choice of law and forum selection clauses ... satisfies the section 109(a) 'property in the United States' eligibility requirement") (internal citations omitted); *see also In re Cell C Proprietary Ltd.*, 571 B.R. 542, 552 (Bankr. S.D.N.Y. 2017) (finding that a debtor's issuance of notes governed by New York law and containing a New York forum selection clause as an "independently sufficient bas[is] for jurisdiction") (internal quotations omitted); *In re Inversora Eléctrica de Buenos Aires S.A.*, 560 B.R. 650, 655 (Bankr. S.D.N.Y. 2016) ("[D]ollar-denominated debt

subject to New York governing law and a New York forum selection clause is independently sufficient to form the basis for jurisdiction.") (citation omitted).

 **[5]**    **[6]**    Each of the Chapter 15 Debtors has property in the United States. (Hr'g Tr. 42:25, 43:1-3.) All of the principal documents setting forth Parent/Constellation's prepetition debt obligations are governed by New York law and generally contemplate New York as a venue for disputes. Second, each of the Chapter 15 Debtors owns $ 1,000 cash in U.S. bank accounts principally located in Manhattan, New York. (FRFOF ¶ 107.) Together, this property constitutes the principal U.S. assets of each of the Chapter 15 Debtors, in satisfaction of section 109(a). Additionally, because of the location of these accounts, venue is also proper pursuant to section 1410(1) of title 28 of the United States Code.

## B. The Debtors Satisfy the Recognition Requirements Contained in Sections 1517(a)(2) & 1517(a)(3)

Section 1517(a) provides the remaining requirements for the recognition of a foreign proceeding under chapter 15. *In re Ocean Rig UDW Inc.*, 570 B.R. at 698. Subject to the public policy exception contained in section 1506, a foreign proceeding must be recognized if the following requirements are met:

> (1) such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502;
>
> (2) the foreign representative applying for recognition is a person or body; and
>
> (3) the petition meets the requirements of section 1515.

11 U.S.C. § 1517(a); *see also In re Ocean Rig UDW Inc.*, 570 B.R. at 698–99.

 **[7]**    Therefore, recognition of the foreign proceeding is statutorily mandated if the three requirements of section 1517(a) are met and no exception applies. *See In re Millard*, 501 B.R. 644, 651 (Bankr. S.D.N.Y. 2013). The first of section 1517(a)'s three factors requires that the Court determine that a proceeding is either foreign main proceeding or a foreign nonmain proceeding before it can recognize the proceeding. 11 U.S.C. § 1517(a). That determination is the more complex issue which will be further discussed below. The other two requirements of section 1517 are more straightforward on these facts and are both met.

### *270   1. The Foreign Representative Meets 1517(a)(2)'s Requirements

 **[8]**    **[9]**    A chapter 15 case is properly commenced by the filing of a petition for recognition by a "foreign representative." *See* 11 U.S.C. §§ 1504, 1515(a). The Bankruptcy Code defines a "foreign representative" as "a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." 11 U.S.C. § 101(24). The Petitioner is a "person" as defined under 11 U.S.C. § 101(41) and, pursuant to the resolutions authorizing the commencement of the RJ and the appointment of the Foreign Representative, which are located in Exhibit D to the Verified Petition, is authorized to commence a Brazilian RJ Proceeding and a Chapter 15 Case on behalf of each of the Debtors and to take all necessary actions as the Foreign Representative. (*See* "Resolutions," ECF Doc. # 7-4.) Therefore, the Petitioner is a proper "foreign representative" within the meaning of section 101(24) with respect to each of the Chapter 15 Debtors, and thus section 1517(a)(2) is satisfied.

### 2. The Petition Meets the Additional Requirements of Section 1515

These Chapter 15 Cases were properly commenced with respect to each of the Chapter 15 Debtors in accordance with sections 1504, 1509(a) and 1515. The Verified Petition was filed pursuant to section 1515(a) and included all disclosures and documents required by sections 1515(b) and (c).

 **[10]**    The Brazilian RJ Proceeding is a "foreign proceeding" as set forth in 1517(a)(1) of the Bankruptcy Code. Section 101(23) defines a "foreign proceeding" as (1) a collective judicial or administrative proceeding under a law relating to insolvency or adjustment of debt, (2) pending in a foreign country, (3) in which the assets and affairs of the debtor are subject to control or supervision of a foreign court, and (4) for the purpose of reorganization or liquidation. 11 U.S.C. § 101(23). Courts in this Circuit have long agreed that the Brazilian RJ process satisfies these standards. *See, e.g., In re S.A.*, Case No. 16-11791 (SHL), ECF Doc. # 38 (Bankr. S.D.N.Y. July 22, 2016); *In re OAS S.A.*, 533 B.R. 83, 83 (Bankr. S.D.N.Y. 2015); *In re Aralco S.A. Industria e*

*Comercio, et al.*, No. 15-10419 (REG), ECF Doc. # 22 (Bankr. S.D.N.Y. Apr. 21, 2015).

## C. Recognition Under Chapter 15

[11]   In order to grant recognition, the Court must first find that the Brazilian RJ Proceeding constitutes either a main or nonmain proceeding with respect to each Chapter 15 Debtor. *See, e.g., In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.,* 374 B.R. 122, 126-27 (Bankr. S.D.N.Y. 2007) (hereinafter *Bear Stearns I*), *aff'd,* 389 B.R. 325 (S.D.N.Y. 2008) (hereinafter *Bear Stearns II*) ("[T]he recognition must be coded as either main or nonmain."). When a debtor seeks recognition of a foreign proceeding, the Court may (i) recognize the proceeding as a *foreign main proceeding*, (ii) recognize the proceeding as a *foreign nonmain proceeding*, or (iii) refuse recognition. *See id.* (refusing to recognize foreign proceedings as main or nonmain proceedings since the debtors did not meet the nonmain proceeding requirement of having an "establishment" in the location of the proceeding).

[12]   [13]   Courts determine if a proceeding is main or nonmain using section 1502's definitions of each term. Section 1502 defines a "foreign main proceeding" as a "foreign proceeding pending in the country **\*271** where the debtor has the center of its main interests." 11 U.S.C. § 1502(4). A foreign nonmain proceeding is defined as a "foreign proceeding, other than a foreign main proceeding, pending in a country where the debtor has an *establishment*." 11 U.S.C. § 1502(5) (emphasis added). Establishment is defined in Chapter 15 as "any place of operations where the debtor carries out a nontransitory economic activity." 11 U.S.C. § 1502(2). [27]

---

[27]   The UNCITRAL "Guide to Enactment" provides a slightly different definition of establishment. Article 2(f) explains that " 'Establishment' means any place of operations where the debtor carries out a non-transitory economic activity with human means and goods or services."

---

[14]   If a proceeding does not qualify as a main or nonmain proceeding, it cannot be recognized under chapter 15. The *Bear Stearns* court explained:

> [T]he process of recognition of a foreign proceeding is a simple single step process incorporating the definitions in sections 1502 and 101(23) and (24) to determine recognition as either a main or nonmain proceeding or

nonrecognition. *See* Jay Lawrence Westbrook, *Locating the Eye of the Financial Storm,* 32 BROOK. J. INT'L L. 3, 6 (2007 publication pending) hereinafter ("Westbrook Article") ("The Model Law grants great discretion as to specific relief, but imposes a fairly rigid procedural structure for recognition of foreign proceedings.")

*Bear Stearns I,* 374 B.R. at 126; *see In re Iida,* 377 B.R. 243, 253–54 (9th Cir. BAP 2007); *see also Halo Creative & Design Ltd. v. Comptoir Des Indes Inc.,* No. 14 C 8196, 2018 WL 4742066, at \*2 (N.D. Ill. Oct. 2, 2018); *Reserve Intern. Liquidity Fund Lt. v. Caxton Intern. Ltd.,* 2010 WL 1779282, at \*5 (S.D.N.Y. 2010).

[15]   [16]   [17]   [18]   The Court in *In re Oi Brasil Holdings* further explained that the recognition decision is one of the few pieces of the chapter 15 process in which courts are *not* to be guided by the general principles of comity, since the text of the statute "provides the standard for a court's determination" and therefore "comity does not enter the equation." *In re Oi Brasil Holdings Cooperatief U.A.,* 578 B.R. 169, 213 (Bankr. S.D.N.Y. 2017), *reconsideration denied,* 582 B.R. 358 (Bankr. S.D.N.Y. 2018). The *Oi* court explained:

> In the case of recognition under Chapter 15, "[b]oth the plain language and legislative history of Chapter 15 ... requires [a bankruptcy court to make] a factual determination with respect to recognition before principles of comity come into play." *In re Bear Stearns,* 389 B.R. at 334. So while comity governs recognition of a foreign judgment (*see Rapture Shipping* [*Ltd. v. Allround Fuel Trading B.V.*], 350 F.Supp.2d [369] at 373 [ (S.D.N.Y. 2004) ]), it does not govern the initial recognition of a foreign proceeding under Chapter 15. Recognition of a proceeding requires the application of "objective criteria," and it is only post-recognition relief which "turns on subjective factors that embody principles of comity." *In re Atlas Shipping,* 404 B.R. [726] at 738 [ (Bankr. S.D.N.Y. 2009) ] (*quoting In re Bear Stearns,* 389 B.R. at 333 (*citing* 11 U.S.C. §§ 1507, 1517, 1521, 1525; Model Law Art. 7, 17, 21, 25)); *see also In re Ran,* 390 B.R. 257, 292 (Bankr. S.D. Tex. 2008) ("By arguing comity without satisfying the conditions for recognition, [the foreign trustee] urges this Court to ignore the statutory requirements of 11 U.S.C. § 1517 ... comity is not an element of recognition; it is **\*272** rather, a consideration once recognition is granted.").

*Id.* at 214.

[19] However, once the decision to grant recognition is made, principles of comity and the provisions of chapter 15 can provide substantially similar relief to a debtor— whether a proceeding is recognized as main or nonmain. This Court repeatedly emphasized during the Recognition Hearing that there may be no statutory and practical effects of distinguishing recognition as a foreign main proceeding, as opposed recognition as a foreign nonmain proceeding. Indeed, a foreign nonmain proceeding can be granted nearly identical relief as the relief provided to a main proceeding. The *SPhinX* Court explained:

> Under either approach, the Court would be able to grant the [foreign representatives] the same significant relief upon a proper showing, given the Court's view that Congress separated the concept of "recognition" under Bankruptcy Code section 1517(a) from the concept of "recognition as a foreign nonmain proceeding" under section 1517(b)(2). (Indeed, as noted above, except for the applicability of the automatic stay, the potential relief available to the [foreign representatives] under chapter 15 in almost all respects does not depend on whether the Cayman Islands proceedings are recognized as "main" or "nonmain.")

*In re SPhinX, Ltd.,* 351 B.R. 103, 122 (Bankr. S.D.N.Y. 2006), *aff'd,* 371 B.R. 10 (S.D.N.Y. 2007).

As previously noted, however, further discretionary relief beyond the decision of the form of recognition of the foreign proceeding for each Chapter 15 Debtor is a separate determination based on different factors and is not the main subject of this opinion. This opinion solely seeks to establish the appropriate form of recognition (*e.g.,* main or nonmain) for each Chapter 15 Debtor as required by chapter 15. Since Brazil has not adopted the Model Law, the fact that Brazil recognizes the eligibility of particular debtors to reorganize under Brazil law does not control the COMI determination here. *In re Oi Brasil,* 578 B.R. at 216 (explaining that no issues of deference or comity arise in countries that have not adopted the Model Law, including Brazil). On the other hand, if the Brazil court dismisses a debtor from the Brazilian RJ Proceeding, as has now occurred, it does preclude a decision by this Court that the Brazilian RJ Proceeding of a dismissed debtor is either a foreign main or nonmain proceeding.

**D. Recognition as a Foreign Main Proceeding**

[20] While the statute provides that a foreign main proceeding is one where the debtor has its COMI, the statute does not further define the term COMI. *See* 11 U.S.C. §§ 1501–1532. There is a rebuttable presumption that COMI is where the debtor has its "registered office." 11 U.S.C. § 1516(c) ("In the absence of evidence to the contrary, the debtor's registered office ... is presumed to be the center of the debtor's main interests."). However, the COMI presumption is rebuttable where other factors suggest that the true COMI of a debtor lies elsewhere. *See, e.g., In re Bear Stearns II,* 389 B.R. at 335 ("[S]ection 1516(c) creates no more than a rebuttable evidentiary presumption, which may be rebutted notwithstanding a lack of party opposition.").

### 1. The *SPhinX* Factors

[21] [22] Courts in this District have developed a widely adopted list of factors for determining COMI. *In re Fairfield Sentry Ltd.,* 714 F.3d 127, 137 (2d Cir. 2013) **\*273** (referring to and citing the factors from *In re SPhinX, Ltd.,* 351 B.R. at 117). These factors, enumerated below (hereinafter, "*SPhinX* Factors"), are not to be applied mechanically and are nonexclusive. In fact, a consideration of the factors is neither required nor dispositive. *Id.* The factors are, however, helpful. The *SPhinX* Court explained:

> Various factors, singly or combined, could be relevant to such a [COMI] determination: [1] the location of the debtor's headquarters; [2] the location of those who actually manage the debtor (which, conceivably could be the headquarters of a holding company); [3] the location of the debtor's primary assets; [4] the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; [5] and/or the jurisdiction whose law would apply to most disputes.

*In re SPhinX, Ltd.,* 351 B.R. at 117.

 **[23]**    **[24]**    **[25]**   When determining the "location of those who actually manage the debtor," courts consider more than the location of the board of directors of the debtor in isolation, and their analysis of the location of management is somewhat flexible to reflect the realities of the management of a particular business. For example,

> The headquarters of a corporate entity is more than the location of its board of directors. The term headquarters, or head office, contemplates the place where the primary management of an entity's business is undertaken. Management of a corporate entity includes all relevant business functions, such as the financial, administrative, marketing, information technology, investment, and legal functions. Other functions may be relevant depending on the nature of the debtor's business. Here, because [the debtor] operated as an insurance company, actuarial tasks, underwriting, and claims adjustment should be considered.

*In re British Am. Ins. Co. Ltd.,* 425 B.R. 884, 911 (Bankr. S.D. Fla. 2010).

### 2. International Interpretations

 **[26]**   In addition to the *SPhinX* Factors, the Court also considers foreign case law interpreting identical provisions of the Model Law when interpreting chapter 15's provisions. Because each section within chapter 15 is based on a corresponding article in the Model Law, "if a textual provision of Chapter 15 is unclear or ambiguous, the Court may then consider the Model Law and foreign interpretations of it as part of its interpretive task." *In re OAS S.A.,* 533 B.R. 83, 92 (Bankr. S.D.N.Y. 2015) (internal quotations omitted) (quoting *O'Sullivan v. Loy (In re Loy),* 432 B.R. 551, 560 (E.D. Va. 2010)). The Court also considers the UNCITRAL Model Law on Cross-Border Insolvency with Guide to Enactment and Interpretation (2013) ("Guide to

Enactment") when interpreting chapter 15. *In re OAS S.A.,* 533 B.R. at 92; *see* H.R. Rep. No. 109–31, at 105 (2005); Leif M. Clark, Ancillary & Other Cross-Border Insolvency Cases Under Chapter 15 of the Bankruptcy Code § 3[1] [a][i], at 17 (2008). As this Court stated in *Ocean Rig,* because section 1508 of the Bankruptcy Code directs a court interpreting chapter 15 to "consider its international origin, and the need to promote application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions," 11 U.S.C. § 1508, it is therefore appropriate for U.S. bankruptcy courts to consider interpretations from other international jurisdictions that have adopted the Model Law. *In re Ocean Rig,* 570 B.R. at 702 n.6;
 **\*274**  *see also In re Fairfield Sentry,* 714 F.3d at 136 (holding that international sources may be considered to the extent they assist in "carry[ing] out the congressional purpose of achieving international uniformity in cross-border insolvency proceedings").

### 3. Third Party Expectations

 **[27]**   Additionally, because there is no statutory definition of COMI, courts have some latitude to consider the factors that may be relevant, given the facts in a particular case. *In re Creative Fin., Ltd. (In Liquidation),* 543 B.R. 498, 517 (Bankr. S.D.N.Y. 2016); *see also In re Fairfield Sentry Ltd.,* 714 F.3d at 137 ("The absence of a statutory definition for a term that is not self-defining signifies that the text is open-ended, and invites development by courts, depending on facts presented, without prescription or limitation.").

 **[28]**   Beyond the *SPhinX* Factors, the Second Circuit and other courts have examined as an additional relevant factor whether there exists any objective evidence that could provide interested parties with notice that a debtor's COMI was in a particular jurisdiction other than the place of its registered office. *See In re Fairfield Sentry,* 714 F.3d at 130 ("[T]he relevant principle ... is that the COMI lies where the debtor conducts its regular business, so that the place is ascertainable by third parties ...."). As the Second Circuit explained, by examining factors "in the public domain," courts are readily able to determine whether a debtor's COMI is in fact "regular and ascertainable [and] not easily subject to tactical removal." *See In re Fairfield Sentry,* 714 F.3d at 136-37; *see also Bear Stearns I,* 374 B.R. at 129-30 (looking at whether the proposed COMI was ascertainable by third parties as part of its COMI analysis). The Second Circuit's focus on readily ascertainable evidence of COMI derives from the regulation

adopting the European Union Convention on Insolvency Proceedings, where the COMI concept (which corresponds to that of the Model Law) is elaborated upon as "the place where the debtor conducts the administration of his interests on a regular basis and is therefore ascertainable by third parties." *In re Fairfield Sentry*, 714 F.3d at 136 (citing the Council Reg. (EC) No. 1346/2000 of May 29, 2000 on Insolvency Proceedings).

### 4. Expectations of Creditors

 [29]    [30]    Courts in the Second Circuit also look to the expectations of creditors with regard to the location of a debtor's COMI. For example, "[c]reditor expectations can be evaluated through examination of the public documents and information available to guide creditor understanding of the nature and risks of their investments." *In re Oi Brasil Holdings Cooperatief U.A.*, 578 B.R. at 228. In practice, the evaluation of creditor expectations has focused on reviewing disclosures in offering memoranda and indentures. *See id.* at 228-32 (reviewing offering memorandum to establish noteholder expectations as part of a COMI analysis); *In re OAS S.A.*, 533 B.R. at 101-03 (same); *In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 474 B.R. 88, 93-4 (S.D.N.Y. 2012) (same); *In re Suntech Power Holdings Co., Ltd.*, 520 B.R. 399, 418 (Bankr. S.D.N.Y. 2014) (considering terms of indenture to establish creditor expectations regarding likely location of a restructuring as part of a COMI analysis). The *SPhinX* Court explained:

> [T]he flexibility inherent in chapter 15 strongly suggests, however, that the Court should not apply such factors mechanically. Instead, they should be viewed in light of chapter 15's emphasis **\*275** on protecting the reasonable interests of parties in interest pursuant to fair procedures and the maximization of the debtor's value. Because their money is ultimately at stake, one generally should defer, therefore, to the creditors' acquiescence in or support of a proposed COMI. It is reasonable to assume that the debtor and its creditors (and shareholders, if they have an economic stake

in the proceeding) can, absent an improper purpose, best determine how to maximize the efficiency of a liquidation or reorganization and, ultimately, the value of the debtor, assuming also, of course, that chapter 15 requires the court to protect the legitimate interests of dissenters (even to the extent of enabling the modification of a recognition order under Bankruptcy Code section 1517(d)), particularly where other objective factors point to a different COMI. Relatedly, if the parties in interest are in a legitimate dispute over the debtor's COMI, it is probably safe to assume that promoting cooperation among courts and the parties will play a greater role than artificially choosing one proceeding as a "primary" proceeding. At least this is what the Court takes away from the stated objectives and structure of the statute.

*In re SPhinX, Ltd.,* 351 B.R. at 117–18.

The court in *In re Chiang*, 437 B.R. 397 (Bankr. C.D. Cal. 2010), explained, that "the location of the COMI is an objective determination based on the viewpoint of third parties (usually creditors)." *Id.* at 403. The *OAS* Court found that notice to creditors of "Risk Factors" contained within offering memoranda of a debtor's notes were particularly important. *In re OAS S.A.*, 533 B.R. at 102–03. The Court explained:

> [T]he "Risk Factors" that all note purchasers were warned to "carefully consider" before deciding to purchase the notes described the risks associated with the businesses of the OAS Group, not OAS Investments, and included a separate discussion focusing on the special risks relating to investments that could

4056

be affected by the Brazilian economy and Brazilian government actions. Potential purchasers were also warned that if OAS and its subsidiaries could not pay their indebtedness, including the obligations under the guarantees, they might become subject to bankruptcy proceedings in Brazil, and Brazilian laws might be less favorable to creditors compared to the laws of the United States or other jurisdictions. In contrast, the offering memoranda do not discuss the risks of operating in Austria. The only risk factor that mentioned Austria stated that Austria would not enforce U.S. judgments, the U.S. securities laws or awards of punitive damages.

*Id.* (internal citations omitted).

The *OAS* Court concluded that the creditors would have understood that they were investing in a Brazilian based business, even though (i) the offering memoranda provided that their rights were governed by New York law and they consented to jurisdiction and service of process in New York and (ii) the creditors expected to receive payment from cash generated by the operations of the group and in the event of default were only warned that they "might ultimately have to enforce their rights in a Brazilian bankruptcy proceeding" as opposed to an Austrian proceeding, where the holding company was incorporated. *Id.* at 103. Despite the foreign debtor's Austrian incorporation, the *OAS* Court found that "OAS Investments' place of incorporation, or for **\*276** that matter its very existence, was immaterial to their decision to purchase their notes." *Id.* Ultimately, the court found that the creditors' expectation of COMI should weigh in favor of a Brazilian COMI where "OAS Investments had no separate, ascertainable presence in Austria; it was part of, and inseparable from, the OAS Group located in Brazil. Finally, the 2019 Noteholders had no legitimate expectation that the Austrian courts would play any role in the determination or payment of their claims." *Id.*

### 5. PPB or Nerve Center Analysis

 **[31]**   Additionally, some courts have employed the concept of "principal place of business" to guide their COMI analysis and, accordingly, have applied the Supreme Court's definition of that concept, which looks at a corporation's "nerve center," *i.e.*, "where a corporation's *officers* direct, control, and coordinate the corporation's activities." *See In re Fairfield Sentry Ltd.,* 714 F. 3d at 138 n.10 (emphasis added) (citing *Hertz Corp. v. Friend,* 559 U.S. 77, 130 S.Ct. 1181, 1192, 175 L.Ed.2d 1029 (2010)). The Second Circuit clarified in *Fairfield Sentry* that given Congress's choice to use "COMI" instead of "principal place of business" in chapter 15, the "nerve center" concept does not control, "[b]ut to the extent that the concepts are similar, a court may certainly consider a debtor's 'nerve center,' including from where the debtor's activities are directed and controlled, in determining a debtor's COMI." *See id.* at 138.

 **[32]**   The "nerve center" analysis, like most other factors in the COMI analysis, is not at all a straightforward standard when applied to most international conglomerates. However, it can provide a helpful reminder that courts should not perfunctorily rely upon the place of incorporation or location of board meetings to establish the corporation's ultimate COMI. *See, e.g., In re OAS S.A.,* 533 B.R. at 102 (finding Brazil as the nerve center where "[t]here is no evidence that its Board of Directors ever convened a meeting except to pass the resolution appointing Tavares as its foreign representative, and that resolution was executed by its Brazilian directors in Brazil.").

### 6. Additional Considerations

There are circumstances that make the COMI analysis more complicated with respect to certain of the Chapter 15 Debtors. For example, in *In re OAS S.A.*, the court noted that "the COMI analysis when applied to a special purpose financing vehicle proves less straightforward than the typical case." *Id.* at 101. Additionally, in *In re Ocean Rig UDW Inc.,* this Court discussed the COMI of another group of international drilling rigs and explained that "the Foreign Debtors are holding companies of the Group and conduct their business throughout the world, principally on the high seas. Accordingly, the nature of the Group's business and the mobility of their assets complicate the COMI analysis." *In re Ocean Rig UDW Inc.,* 570 B.R. at 704. Also discussed by the

Court in *Ocean Rig* are the possible complications that arise when a group of debtors have shifted their COMI over time. *Id.*

 **[33]**   While the above complications are all present in the analysis before the Court, it is nonetheless true that every debtor has one and only one COMI. *See In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 458 B.R. 63, 79 (Bankr. S.D.N.Y. 2011) ("[E]very entity has a center of main interests."); *In re Chiang*, 437 B.R. at 403 ("[A] debtor may not have more than one COMI.... In addition, a debtor must have a COMI and it must be in a specific country.").

 **\*277  E. Recognition as a Foreign Nonmain Proceeding**

An alternative form of recognition is recognition as a foreign nonmain proceeding. To be recognized as a nonmain proceeding, the foreign debtor must establish a degree of stable connections with the jurisdiction to constitute a nontransitory "establishment." 11 U.S.C. § 1502(2). An article in the Norton Journal of Bankruptcy Law and Practice summarizes:

> Before *Bear Stearns*, it seems fair to say that many practitioners believed—based on section 1515— that by making these two showings, the statutory requirements for commencing a valid and proper Chapter 15 proceeding had been met. *Bear Stearns* revealed, however, that when a foreign debtor commences a proceeding in a jurisdiction where it has no real "presence"—i.e., no nontransitory business activity— the foreign proceeding will not be recognized under Chapter 15, either as a "main" or "nonmain" proceeding. The "establishment" requirement for "nonmain" status requires, as a prerequisite for any relief under Chapter 15, a base level of connection between the foreign debtor and the foreign jurisdiction that prevents a debtor from commencing a case in a

jurisdiction where it has nothing more than a mail-drop presence.

William H. Schrag, William C. Heuer, and Robert E. Cortes, *Cross-Border Insolvencies and Chapter 15: Recent U.S. Case Law Determining Whether a Foreign Proceeding Is "Main" or "Nonmain" or Neither*, 17 J. BANKR. L. & PRAC. 5 Art. 4 (Aug. 2008).

Thus, on one end of the spectrum, a debtor may have activities so centered in the location of the foreign proceeding that the location is the debtor's COMI, and on the other end of the spectrum, the debtor may be so disconnected from the location of the proceeding that courts should refuse to recognize it at all. Somewhere between these two extremes are companies that have sufficient non-transitory business connections with the jurisdiction of the proceeding to determine that the proceeding is nonmain.

The English judgment in *In the Matter of Videology Limited*, *[2018] EWHC 2186 (Ch)* (Snowden J.), provides a helpful example of a company that falls into this middle category of recognition as a nonmain proceeding. Justice Snowden was asked to recognize a chapter 11 case of Videology Ltd. Videology was incorporated and had its registered office in England but was part of a larger, international corporate group that was incorporated in Delaware. *Videology*, EWHC 2186 (Ch) ¶ 4. The sole director of the parent and Videology was a resident of the United States, who conducted regular business on behalf of the group of companies from the United States. A shared "senior executive team" for the group of the companies was also located in the United States. Nevertheless, the court refused to find a COMI in the United States for Videology. The court explained:

> Taking all of these factors together, I was not persuaded that the presumption that the COMI of [Videology Ltd.] is located in the place of its registered office had been displaced. In addition to being the place of its registered office, the UK is where the [Videology Ltd.'s] trading premises and staff are located, where its customer and creditor relationships are established, where it administers

its relations with its trade creditors on a day-to-day basis using those premises and local staff, and where its main assets (the receivables and cash at bank) are located. All of those factors will be visible and immediately ascertainable **\*278** by the customers, and in particular by the trade creditors, of the Company. The UK is also, importantly, where representations were made to the Company's main finance creditor that its COMI was situated.

*Videology* ¶ 72.

Thus, even though the ultimate COMI analysis resulted in a COMI in the UK, shared aspects of the management of the international corporate group provided enough presence in the United States to find that the chapter 11 case was a nonmain proceeding.

Moreover, the *Videology* judgment shows that courts should be wary of using the location of the senior management of groups of internationally operated companies as evidence of the COMI of one subsidiary company within the international group. For example, after noting that the CEO and senior executive team were permanently based in the United States, Justice Snowden dismissed this evidence as non-persuasive in changing Videology Ltd.'s COMI by explaining that there was no evidence suggesting that the senior management of Videology Ltd. were "in fact separately employed by, or only hold their positions within" Videology Ltd. *Videology* ¶ 57. Rather, the senior management of the group of companies, like that of the Constellation Group's executive team, was apparently responsible for certain high-level business decisions on behalf of the whole group of companies. This evidence regarding the senior management was sufficient to establish a nonmain proceeding in the U.S., but insufficient to establish Videology Ltd.'s COMI in the U.S.

### F. Non-Recognition

**[34]** There are circumstances in which courts applying chapter 15 should refuse to recognize foreign proceedings, whether as main or nonmain proceedings. For instance, where a foreign debtor seeking recognition under chapter

15 maintains only what can be described as a "letter box" company in the location of the foreign proceeding. *See, e.g., Bear Stearns I*, 374 B.R. at 129-31. The *Bear Stearns* opinion explains that if the only business done in the jurisdiction where a proceeding is sought to be recognized consists of "those steps necessary to maintain the [companies] in good standing as registered ... companies" in those jurisdictions, this is a close approximation of a "letterbox" company. *Id.* at 129 n.8.

**[35]** However, even in cases of letterbox companies or other cases where the court refuses to grant any recognition of the foreign proceeding, the foreign representative may still obtain certain forms of relief from U.S. Courts. *Id.* at 132. Other forms of relief that the foreign representative may obtain after the court refuses to recognize a foreign proceeding include (i) filing a case under Title 11 in coordination with the foreign proceeding and (ii) suing in a court in the United States to collect or recover a claim which is the property of the debtor. *Id.* at 132–33. In this case, it is not clear that each of the Chapter 15 Debtors has its COMI or an establishment within Brazil.

### G. COMI Analysis Applied to Each Chapter 15 Debtor

**[36]    [37]    [38]** As the *SPhinX* court explained, "[o]n the issue of recognition of foreign proceedings as 'main' or 'nonmain,' the Bankruptcy Code provides considerable but not complete discretion. 351 B.R. at 117. Based on the legal discussion above and the understanding that COMI is a flexible determination and not a rigid application of factors, the Court will now review the COMI of Chapter 15 Debtors and in the process consider any COMI-relevant **\*279** evidence that is available in the evidentiary record regarding each Chapter 15 Debtor individually, *inter alia*: (1) the *SPhinX* Factors, (2) international interpretations of COMI, (3) the reasonable expectations of interested third parties, (4) the expectations or support of creditors, and (5) interpretations of a corporation's "principal place of business" as the "nerve center" of a corporation. In assessing these factors, the Court is mindful that a Chapter 15 Debtor's COMI is determined as of the filing date of the chapter 15 petition, without regard to the debtor's historic operational activity. [28] *See In re Fairfield Sentry Ltd.,* 714 F. 3d at 137. The ultimate aim of the analysis is to locate the "real seat" of each of the Chapter 15 Debtors. *See Bear Stearns I.*, 374 B.R. at 130.

28    The dates used for determining COMI differ under the Model Law (using the date when the foreign proceeding was filed) and under Chapter 15 (using the date when the Chapter 15 petition was filed).

**[39]** Although Alperton recognizes that COMI must be determined on a company-by-company basis, the crux of its argument for the majority of the Chapter 15 Debtors is that "an examination of the evidentiary record shows that each International Company is controlled and managed by Parent from Luxembourg, and as a result, the COMI of each International Company also lies in Luxembourg, not in Brazil." (Alperton FOF ¶ 122.) While the Court and all parties recognize that these entities are highly inter-related, each debtor entity must be considered, rather than making a single top-down decision on the basis of the COMI of the parent company of the group. *See In re Oi Brasil*, 578 B.R. at 206. Additionally, the Court has an independent obligation to determine COMI before recognizing a foreign proceeding as a foreign main proceeding. *See In re Alpha Fund (Master)*, 381 B.R. 37, 40 (Bankr. S.D.N.Y. 2008) ("[A] court engaging in a recognition determination under section 1517 is not bound by parties' failures to object; may, if it is so advised, consider any and all relevant facts (including facts not yet presented); and that the circumstances here make further factual inquiry necessary and appropriate."); *Bear Stearns I,* 374 B.R. at 126 ("[R]ecognition under section 1517 is not to be rubber stamped by the courts. This Court must make an independent determination as to whether the foreign proceeding meets the definitional requirements of sections 1502 and 1517 of the Bankruptcy Code.").

**[40]**    **[41]** The evidentiary burden to show where each debtor has its COMI is on the foreign representative. H. Report No. 109-31, 112-13 ("The ultimate burden as to each element is on the foreign representative"); *see In re Oi Brasil,* 578 B.R. at 194 (stating that "the burden rests on the foreign representative to prove each of the requirements of Section 1517"). The rebuttable presumption that COMI lies in the place of the registered office "at no time relieves a petitioner of its burden of proof/risk of non-persuasion" and it imposes "on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption." *Bear Stearns II,* 389 B.R. at 335. The legislative history of chapter 15 further indicates that the evidentiary burden lies with the foreign representative. Chapter 15 is modeled after the Model Law, but chapter 15 changed the standard that established the presumption in "the absence of *proof* to the contrary," to a presumption in "the absence of *evidence* to the contrary." *Id.* at 128. The legislative history of chapter

15 explains that the word "proof" was changed to "evidence" to make it clearer, using United States terminology, that the foreign representative has the **\*280** ultimate burden of showing where each debtor has its COMI. *See* H. Report No. 109-31, 112-13 (2005); *see also In re Tri-Continental Exchange Ltd.*, 349 B.R. 627, 635 (Bankr. E.D. Cal. 2006). The evidentiary burden for the foreign representative is the same whether or not there is a creditor objection. *See In re Basis Yield Alpha Fund (Master)*, 381 B.R. at 40; *Bear Stearns I,* 374 B.R. at 126.

#### 1. Parent/Constellation's COMI is Luxembourg

**[42]** Based upon the Court's foregoing findings of fact related to Parent/Constellation and the most relevant COMI factors, discussed below, the Court finds that Parent/Constellation's COMI is located in Luxembourg.

##### a. The Location of the Debtor's Headquarters is Luxembourg

The location of Parent/Constellation's headquarters is Luxembourg, where it is incorporated, is a tax resident, and has its registered office. (*See supra* § II.H.1.)

##### b. The Location of those who Actually Manage the Debtor is Luxembourg

As noted in the discussion section, Parent/Constellation's board of directors meets in Luxembourg. (*Id.*) Parent/Constellation's board of directors appoints the executives, based in London and Brazil, who serve the entire Constellation Group. (*Id.*) Because Parent/Constellation is ultimately a parent company that exists for the task of high level management of all subsidiaries, it makes sense that the location from which the board of directors conducts its activities should weigh more heavily than the daily operational staff's location—which is spread between two nations, in any case and therefore would not provide a strong weight against finding management to be principally located in Luxembourg. Thus, the Court finds that the location of those who manage Constellation is Luxembourg.

##### c. The Location of the Debtor's Primary Assets is Brazil

4060

For a holding company, the location of its subsidiaries and the location of their principal assets is relevant to the COMI analysis. *See In re Inversora Electrica de Buenos Aires S.A.*, 560 B.R. at 656 (recognizing COMI in Argentina where a holding company's assets were located in Argentina). As noted in the background section, Parent/Constellation's physical assets are primarily located in Brazil. (*See supra* § II.H.1.)

### d. The Location of the Majority of the Debtor's Creditors or of a Majority of Creditors who would Be Affected by the Case is Neutral

The Court found that the location of most of Parent/Constellation's creditors is indeterminate, as a matter of fact. (*Id.*) Therefore, this factor does not impact the COMI analysis of Parent/Constellation.

### e. The Jurisdiction Whose Law Would Apply to Most Disputes is Luxembourg

As discussed above, an array of international law could apply to Parent/Constellation since it is the parent of an international group of companies and since all of the debt it issued is written in English and governed by New York law. (*Id.*) However, because Parent/Constellation is a Luxembourg incorporated entity, that depends upon Luxembourg law for its existence and its corporate operations, the Court found that Luxembourg law should be considered the law that would apply to *most* of Parent/Constellation's disputes. (*Id.*)

### f. The Reasonable Expectations of Interested Third Parties and Creditors is Luxembourg

The Chapter 15 Debtors have stipulated that Parent/Constellation has its "central **\*281** administration" in Luxembourg for purposes of Luxembourg tax law. (Stipulation ¶ 7.) The meaning of the phrase "central administration" under Luxembourg tax law is not before the Court, but the fact that Parent/Constellation takes the position with Luxembourg authorities that its "central administration" is in Luxembourg, for tax or any other purpose, is itself readily ascertainable evidence to third parties of a connection to Luxembourg beyond a letter box.

Additionally, when the Constellation Group makes important decisions, it issues press releases from its Luxembourg office. These press releases are available to the public on the Constellation Group's website and are therefore in the "public domain." (Alperton FOF ¶ 94.) [29] For example, when the Constellation Group announced its restructuring on December 6, 2018, it issued a press release from Luxembourg. When an issue was identified with the 2017 consolidated financial statements for Parent (encompassing the financial statements for its subsidiaries, including each of the Chapter 15 Debtors), Parent issued a press release from Luxembourg notifying users of the financial statements that they should not place reliance on them. (*Id.*) Therefore, an interested third party that visits and reads these press releases would readily ascertain that the Parent/Constellation is headquartered in, and makes key decisions from, Luxembourg. (*See id.*) As an extension, it seems reasonable that—at the very least—these press releases would put interested third parties on notice that Parent/Constellation makes key decisions from Luxembourg.

[29] Since the Recognition Hearing, the Constellation *Group's* website appears to have changed. If one visits the web address discussed by Alperton for the group, qgogconstellation.com, a pop-up box appears notifying users that the investor relations portion of the website is under construction, but for more information about Constellation, it directs users to a link to theconstellation.com. The Constellation Group's main website, which now appears to be located at theconstellation.com, loads in Portuguese but provides a link to convert the website to English. The contacts portion of this website provides Brazilian phone numbers. The website details the business of the "the Constellation" as onshore rigs, offshore rigs, and FPSOs; thus the website now predominately represents the entire Constellation Group as a Brazilian enterprise group. Its vision statement beings with the vision to "Consolidate the Company's leadership position in Brazil." *See* Constellation, qgogconstellation.com (last visited Apr. 26, 2019.).

In sum, while creditors were notified of the underlying operations of the Constellation Group as being in Brazil, the offering memoranda clearly express that Parent/Constellation is a Luxembourg company. Given that Luxembourg was chosen and well publicized to creditors as the jurisdiction from which ultimate board meetings, tax laws, and corporate laws would take place, the Court found that objective creditors expectations of Parent/Constellation's COMI weighs in favor of a Luxembourg COMI. (*Supra* § II.H.1.)

### g. The Nerve Center Analysis Weighs in Favor of COMI in Luxembourg

Parent/Constellation's activities are directed, controlled and coordinated in Luxembourg. (*Id.*) Luxembourg therefore meets the criteria for a "principal place of business" set forth by the Supreme Court in *Hertz Corp. See Hertz Corp.*, 130 S. Ct. at 1193-94. The Court therefore finds that Parent/Constellation's nerve center is in Luxembourg.

### h. Parent/Constellation has Sufficient Ties to Brazil for Foreign Nonmain Proceeding Recognition

 **[43]** Although Parent/Constellation's COMI is in Luxembourg, all of its subsidiaries have substantial and ongoing business **\*282** connections in Brazil. These non-transitory ties to Brazil are sufficient to recognize the Brazilian Proceeding as a foreign nonmain proceeding with respect to Parent/Constellation. Alperton does not argue otherwise.

### 2. Constellation Overseas' COMI is Brazil

 **[44]** Based upon the Court's foregoing findings of fact related to Constellation Overseas and the most relevant COMI factors, discussed below, the Court finds that Constellation Overseas' COMI is located in Brazil as a matter of law.

### a. Location of the Debtor's Incorporation and Registered Office is the BVI

Constellation Overseas is incorporated in the BVI and has registered office in the BVI. (*Supra* § II.H.10.)

### b. Location of those who Actually Manage the Debtor is Neutral

Constellation Overseas' sole director (Michael Pearson) is a resident of the Cayman Islands and a citizen of the United Kingdom. (Stipulation ¶ 2.) It benefits from the day-to-day operational management of the Brazilian Offices, which, together with those in the Panama offices, co-ordinate its operational management activities with the activities of its affiliates. (FRFOF at 66.)

The Brazilian Offices are of particular importance to the management of Constellation Overseas, because its role in the Constellation Group—in addition to acting as a holding and financing company—is to centralize treasury services. (FRFOF ¶ 143.) As holding company of several Chapter 15 Debtors and an integrated member of the Constellation Group, Constellation Overseas relies on persons employed by its affiliates, most of whom are Brazilian citizens working at Brazilian Offices. (*Supra* § II.B.1(c).) Although the Brazilian office's functions are carried out predominately by Petróleo Constellation, this does not fully detract from the Brazilian office's inclusion in the COMI consideration for Constellation Overseas or other affiliates. *See In re British Am. Ins. Co.*, 425 B.R. at 911 (where debtor "outsourced essentially all of its central management" to a wholly-owned subsidiary in Trinidad, the debtor's "administrative hub" was located in Trinidad); *see also In re Ocean Rig UDW Inc.*, 570 B.R. at 697-98 (finding COMI in Cayman Islands where, *inter alia*, debtors were managed by a non-debtor affiliate that performed operations for the debtors in the Cayman Islands).

Because the various forms of Constellation Overseas management are so diffuse—ranging across a sole director who is a citizen of the UK, day-to-day management in Brazil, and ultimate legal control of a Parent company incorporated in Luxembourg—this factor does not strongly indicate any particular COMI.

### c. The Location of the Debtor's Primary Assets is Brazil

Constellation Overseas is the sole owner of Lone Star, Gold Star, Olinda Star, Snover, and Alpha Star. Its direct ownership of assets is therefore the equity in these companies that it holds in the BVI. Given its role as a holding company, it has no employees, officers, or customers of its own, instead its limited functions are to own equity in subsidiaries, guarantee debt and centralize certain treasury functions to support subsidiaries operating and generating revenue in Brazil. (FRFOF ¶ 150.) However, for a holding company, the location of its subsidiaries and the location of their principal assets is relevant to the COMI analysis. *See In re Inversora Electrica de Buenos Aires S.A.*, 560 B.R. at 656. Through Constellation Overseas' holdings **\*283** of the Offshore Rig Owners incorporated in the Cayman Islands and BVI, Constellation Overseas indirectly owns the Group's

drilling rigs that were principally located in Brazil at the time of the chapter 15 filing. (*Supra* § II.B.1(a).) Additionally, the vast majority of the dividends it receives from its subsidiaries are generated in Brazil. (FRFOF ¶ 150.)

Because the assets held by Constellation Overseas are all of the Constellation Group's rigs, which with the exception of Olinda Star are located in Brazil, this factor weighs in favor of a COMI in Brazil.

#### d. The Location of the Majority of the Debtor's Creditors or of a Majority of Creditors who would Be Affected by the Case is Neutral

Constellation Overseas has obligations under the 2024 Notes and is an obligor under the 2019 Notes. (FRFOF ¶ 166.) There is no evidence in the record regarding the location of the beneficial holders of the 2019 Notes and the 2024 Notes (except one holder of the 2019 Notes that is a Brazilian national located in New York). (FRFOF ¶ 166.) Thus, the Court draws no conclusion relevant to a finding of COMI for obligors of this debt.

Constellation Overseas is also an obligor under the Bradesco Working Capital Facility. (FRFOF ¶ 167.) Bradesco is a local Brazilian bank and the Group's ongoing unsecured working capital lender. (FRFOF ¶ 167.) The Bradesco Working Capital Facility was advanced by Bradesco's Cayman branch, but originated by principals based in Brazil. (*Id.*) Bradesco filed a support statement which states, *inter alia*, that it is a "local Brazilian bank." ("Bradesco Support Statement," ECF Doc. # 16 at 2.) Thus, the location of this creditor may either weigh in favor of a COMI in Brazil or the Cayman Islands.

Constellation Overseas also has obligations under the A/L/B facility. The lenders on the A/L/B facility are a syndicate of various international financial institutions, none of which are located in Luxembourg or Brazil.

Finally, Alperton is a contingent, unliquidated creditor of Constellation Overseas. (*Supra* § II.B.2.) Alperton's principals and beneficial owners are Brazilian nationals and their business with Constellation Overseas is rooted in serving Brazilian customers and accessing Brazilian markets. (FRFOF ¶ 168.) Thus, for purposes of this element in the COMI analysis, the potential creditor Alperton is located in Brazil.

In sum, there is no clear location of a majority of Constellation Overseas' creditors. This factor is neutral in the COMI analysis.

#### e. The Jurisdiction Whose Law Would Apply to Most Disputes Weighs Weakly in Favor of a COMI in BVI

Constellation Overseas has a primary interest in the operational business activities of the Constellation Group, which are almost exclusively centered in Brazil and, therefore, is greatly impacted by Brazil's regulations and laws. (FRFOF ¶ 158.) By virtue of being incorporated in the BVI, Constellation Overseas is subject to the BVI's laws, regulations, and jurisdiction, including with respect to potential corporate disputes. It is also subject to BVI law with respect to potential tax disputes. (FRFOF ¶ 158.)

New York is the governing law of all of the Prepetition Debt of the Constellation Group. (Verified Petition ¶ 20; Alperton FOF ¶ 62.) New York law also governs the Shareholders' Agreement between Alperton and Constellation Overseas. (Alperton FOF ¶ 63.) Alperton's claims against Constellation Overseas to be resolved by the arbitral tribunal are, therefore, New York **\*284** law governed claims.[30] (Alperton FOF ¶ 63.)

[30] Although the arbitral Tribunal issued the Interim Award aimed at preserving Alperton's potential 45% shareholding in the Disputed Companies during the pending arbitration, the ultimate determination of whether Alperton was wrongfully deprived of its 45% interest in the Disputed Companies has not been reached. The Interim Award is described as "interim relief ... pending a final Award in this arbitration ...." (Interim Award at 4.)

As an entity that is ultimately owned (though through a non-debtor intermediary) by a Parent incorporated and acting under the Law of Luxembourg, Constellation Overseas is also impacted by Luxembourg law. Thus, one could view Constellation Overseas as receiving a trickle-down effect from Luxembourg law and a bottom-up effect from Brazilian law, but the company always maintains the direct governance of BVI law. Thus, on balance, this factor likely loosely weighs in favor of a BVI COMI.

#### f. The Reasonable Expectations of Interested Third Parties Weighs in Favor of a COMI in Brazil

An important element for each of the BVI incorporated Chapter 15 Debtors is the support of the JPLs. The JPLs are independent, court-appointed officers who favor recognition of the Brazilian RJ Proceeding as a foreign main proceeding. (FRFOF ¶ 176.) The JPLs are officers of the BVI Court whose function is to represent the collective interests of the creditors of each debtor for which they are appointed by overseeing and protecting their interests in the restructuring process. In this way, they arguably serve as a collective voice for the creditors of the BVI debtors. The JPLs Support Statement provided that "It is the understanding of the BVI JPLs ... that Brazil is the 'center of main interests' or 'COMI' of each of the BVI Debtors for the purposes of U.S. restructuring law." (JPL Support Statement, ECF Doc. # 31-3 ¶ 2.)

Creditors' reasonable expectations are a factor in COMI analysis. The Offering Memoranda are indicia of the Noteholders' objectively ascertainable expectations. Many disclosures within the Offering Memoranda would have put Noteholders on notice that their investment was, in substance, Brazilian-centered. The Offering Memoranda also informed Noteholders that the vast majority of revenues that would repay their notes were derived in Brazil from Brazilian operations with Brazilian customers and contracts and operations governed and regulated by Brazilian laws. (FRFOF ¶ 170.) That said, Noteholders were also aware of the ultimate reality described in the Notes—that the Constellation Group is a highly integrated group of companies with its parent in Luxembourg, its main source of revenues in Brazil, and several of its subsidiaries place of incorporation in the BVI. Thus, Noteholders could have reasonably foreseen Brazilian, Luxembourg, and BVI proceedings affecting Constellation Overseas.

If anything weighs heavily for Constellation Overseas' COMI to be located in Brazil, it is the factor of creditor support. As the *SPhinX* Court explained, "[b]ecause their money is ultimately at stake, one generally should defer ... to the creditors' acquiescence in or support of a proposed COMI ... [they] can ... best determine how to maximize the efficiency ... of a reorganization and ultimately, the value of the debtor." 351 B.R. at 117. Bradesco and the Consenting A/L/B Lenders collectively hold over 60% of the Constellation Group's debts and Constellation Overseas is an obligor and/or grantor to both the A/L/B Lenders and Bradesco. These two groups

of creditors collectively, therefore, have the most at stake in these proceedings. **\*285** Each of them expressed their support of COMI in Brazil. (*See* Bradesco Support Statement ("Bradesco's expectation and understanding is, and always has been, that Constellation Overseas' and its Debtor affiliates' center of main interests is in Brazil."); "A/L/B Lender Support Statement," ECF. Doc. # 8 ¶ 3 ("The A/L/B Lenders have always understood and operated with the expectation that the center of main interests ('COMI') of each Debtor was and remains located firmly in Brazil.").) Further, the 2024 Ad Hoc Group—who hold a majority of the 2024 Notes—also support the finding of COMI in Brazil for each of the Debtors incorporated outside of Brazil. (FRFOF ¶ 175.)

Because the offering memoranda of the notes heavily discuss the Constellation Group's economic base in Brazil, the BVI JPLs have expressed their support of a Brazilian COMI, and all creditors other than Alperton have expressed support for Brazil as the COMI of Constellation Overseas, this factor weighs in favor of a COMI in Brazil.

#### g. The Nerve Center Analysis Weighs in Favor of Brazil

Constellation Overseas is a holding/financing company that centralizes treasury and financial services for certain companies in the Constellation Group. (FRFOF at 66.) It is a mid-level holding company that Parent/Constellation fully owns through a non-debtor intermediary. (Alperton FOF ¶ 124.) In *OAS*, the SPV debtor's parent was the debtor's sole shareholder and had the power to "determine the outcome of any action requiring shareholder approval, including transaction with related parties, acquisitions and dispositions of assets and the timing and payment of any future dividends." *In re OAS*, 533 B.R. at 101-02. In noting that the COMI of the SPV depended upon the location of the nerve center of the corporate group the SPV served, the *OAS* Court held that the SPV debtor's COMI was with its parent. *Id.* Here, Constellation Overseas is an SPV that is controlled and partially managed by its parent (management is described as partial, since day-to-day operations of the Constellation Group entities takes place in Brazil and Constellation Overseas' sole director is not located in Luxembourg). Thus, the nerve-center test should point towards Luxembourg, as in *OAS*, since the Parent of this SPV is in Luxembourg.

Ultimately, determining the COMI of Constellation Overseas is the most difficult of the Court's recognition determinations. From the perspective of technical, top-down legal control,

4064

the Parent/Constellation, which is based in Luxembourg "controls" the company. That said, from a realistic consideration of the perspective of the true seat of Constellation Overseas, it is difficult to overlook the fact that its revenues used to pay creditors *and* the day-to-day management of those revenue streams come from Brazil. Essentially, the Court is asked, with respect to Constellation Overseas, to choose between the importance of high-level management or the location of the management of the generation of actual positive cash flows (as opposed to debt incursion) for the group of companies. Given the relatively equal pulls of the analysis in favor of Luxembourg or Brazil, the Court's determination here essentially makes one of two conclusions: (1) a determination that senior management should always be considered more important in similar cases or (2) a determination that when a proper analysis of COMI has been conducted and it leads to essentially a toss-up between locales as the "ultimate-seat," the Court should allow the weight of the relevant factors in evidence to determine the outcome. Because there appears to be such strong creditor support in favor of a Brazilian COMI *and* Constellation **\*286** Overseas has significant management, interest, and revenue generation in Brazil, the Court finds that the weight of evidence favors a COMI in Brazil. Although Constellation/Parent indirectly owns Constellation Overseas and the Court found Constellation/Parent's COMI to be in Luxembourg, this location of the parent company's management should not be a strong enough factor to sway all of the other factors that point toward Brazilian recognition (particularly when half of Parent's Board of Directors are Brazilian citizens) for Constellation Overseas.

Indeed, Alperton seeks to oversimplify the COMI analysis for the Group of companies by essentially equating the COMI of the ultimate parent as the de-facto COMI for the group. In its proposed findings of fact, where it argues that all Chapter 15 Debtors other than Petróleo Constellation have a Luxembourg COMI, Alperton asserts:

> The fact that each of Constellation Overseas, the Drillship Subsidiaries and Snover has the same sole director illustrates that the decision making for these entities is not done at the Drillship Subsidiary or the Constellation Overseas levels. Instead, they are ultimately wholly owned, controlled and managed by

Parent and, as a result, the COMI of each of these entities also lies with Parent in Luxembourg.

(Alperton FOF ¶ 128.)

However, this would be fundamentally improper as a governing rule; it is simply untrue that looking at the location of the board of directors for a group of companies, in isolation, can be determinative of the COMI of each company within the group. It overlooks the important fact that board meetings are for most large companies, far less routine or central to management than the work performed by the executives of a company. It overlooks the fact that 98.7% of the Constellation Group's revenue is generated in Brazil, the vast majority of the Group's 1,200 employees are in Brazil, Brazil law regulates the operation of most of the Group's physical assets, most of the strategic day to day operations for the Group take place in Brazil, and more of Parent/Constellation's board members reside in Brazil than in Luxembourg. To suggest that the true COMI of the entire group is in Brazil based on the number and location of board members of the subsidiaries combined with the fact that the Parent's COMI is Luxembourg misinterprets the law. If anything, the case law asks the Court to look at a spectrum of factors—including non-board management, the location of assets, the expectations of creditors, the desires of creditors, and the jurisdiction with the greatest interest in the outcome etc. When the Court considers the spectrum of these factors with respect to Constellation Overseas, Brazil seems to be the real COMI.

### 3. Alpha Star's COMI is in Brazil

**[45]** Based upon the Court's foregoing findings of fact related to Alpha Star and the most relevant COMI factors, discussed below, the Court finds that Alpha Star's COMI is located in Brazil at this time as a matter of law.

#### a. Location of the Debtor's Place of Incorporation is the BVI

Alpha Star is incorporated in the BVI. (*Supra* § II.H.2.)

#### b. The Location of those who Actually Manage the Debtor is Brazil

Alpha Star's sole director is Michael Pearson, who resides in the Cayman Islands and is a citizen of the United Kingdom. (*Id.*)

As discussed above, the Brazilian Offices are of particular importance to the rig-owning **\*287** entities insofar as all operation and management of their rigs—their primary assets—are run from those locations. The Court found that Alpha Star's operations, including day-to-day operations are managed by the Brazilian Offices. (*Id.*) Alpha Star also benefits from the Constellation Group's shared management in Brazil that is responsible for its shared financial, legal, investor relations services and operational co-ordination activities. (*Supra* § II.B.1(b).) Petróleo Constellation, the Brazilian incorporated Chapter 15 Debtor, maintains and operates Alpha Star's sole asset—the offshore drilling rig. (*Supra* § II.H.2.) As such, the Court finds that the location of those who actually manage Alpha Star is Brazil.

#### c. Location of the Debtor's Primary Assets is in Brazil

Alpha Star's function is to own an offshore drilling rig, which is presently located in Brazil and typically operates in Brazilian waters. (*Id.*) This factor points towards Brazil.

#### d. Location of the Majority of the Debtor's Creditors or of a Majority of Creditors who would Be Affected by the Case is Indeterminate

Alpha Star has obligations under the 2024 Notes. There is no evidence in the record regarding the location of the beneficial owners of the 2024 Notes. (*Id.*)

#### e. The Jurisdiction Whose Law Would Apply to Most Disputes Weighs Moderately in Favor of Brazil

The operation of Alpha Star's Brazilian located assets are subject to Brazilian regulatory regimes (including contract law, maritime law, employee law, environmental law, and Brazilian regulatory approvals necessary for the operation of drilling rigs). (*Id.*)

By virtue of being incorporated in the BVI, Alpha Star is also subject to the BVI's laws, regulations, and jurisdiction, including with respect to potential corporate disputes. It is

also subject to BVI law with respect to potential tax disputes. (FRFOF ¶ 158.)

Because operations are more likely to create legal disputes, this factor weighs moderately in greater favor of a COMI in Brazil.

#### f. Relevant International Interpretations Weigh in Favor of Brazil

As discussed in *Videology*, a parent company's management and the fact that a parent's board of directors operate the high-level management of a group of companies does not dictate the COMI of all subsidiaries where other evidence suggests that the subsidiaries' real operations take place elsewhere. Like *Videology*, most of the drill ship corporations within the Constellation Group have day-to-day management in Brazil, a location of assets in Brazil, and the group as a whole has a substantial presence in Brazil. As such, *Videology* reminds, with respect to all the drillship companies in the group that the location of the management of the parent holding companies should not be given undue weight. Thus, evidence showing the majority of the Constellation Group's employees and day-to-day management in Brazil weigh more heavily on the Court's COMI analysis than evidence regarding Parent/ Constellation's COMI for drillship owning debtors, such as Alpha Star.

#### g. The Reasonable Expectations of Interested Third Parties Weighs in Favor of COMI in Brazil

The debt documents for the 2024 Notes for which Alpha Star is a guarantor explain that operations and customers are located in Brazil. The 2024 Notes documents also explain potential restructurings in Brazil. (*Supra* § II.H.2.) Additionally, the JPLs support a finding of COMI in Brazil. (*Id.*) Based on these facts, the **\*288** Court finds that the reasonable expectations of interested third parties weighs in favor of recognizing Alpha Star's COMI in Brazil.

#### h. The Nerve Center Analysis Favors a COMI in Brazil

The central coordination of the rigs is particularly important to the nerve center concept in a business where asset ownership and asset operation are separated, as is the case here. The location of the sole director of each of these entities

4066

in the Cayman Islands is outweighed by the importance of the day-to-day management in Brazil, particularly where few factors point to the Cayman Islands and no party in interest (including the JPLs) suggests the Cayman Islands as the COMI.

The central coordination of the rigs in Brazil is also important as weighed against Alperton's suggestion that the COMI of these drillship subsidiary entities should be in Luxembourg. In addition to arguing that their sole director located in the Cayman Islands suggests that these entities should have a COMI in Luxembourg, Alperton argues that *Oi* supports a finding of COMI in Luxembourg for these entities, because in *Oi* the court considered that the larger corporate group was "headquartered and managed from the principal executive office of Oi in Rio de Janeiro Brazil." (Alpteron FOF ¶ 129 (citing *In re Oi Brasil,* 578 B.R. at 227).) However, Alperton's own quote seems to support a COMI in Brazil for these entities in the sense that the *Oi* court looked to the principal *executive office* of the group of companies (not the location of the headquarters). There are no executives of any of the Constellation Group of companies located in Luxembourg. Rather, all of the executives of the Constellation Group are either in London or Brazil.[31] The weight of the evidence also supports the fact that the day-to-day operations of the management, the Chief Operational Officer, Chief Commercial Officer, Chief Legal Officer, and additional staff in charge of operational finances and investor relations are located in Brazil. The Court finds that the nerve center analysis weighs in favor of a COMI in Brazil for Alpha Star.

[31] Alperton notes that members of senior management are appointed from time to time by vote of the Parent's board of directors. (Alperton FOF ¶ 49.) However, this is not persuasive that Luxembourg is the true seat of management of the drillship subsidiaries since: (1) the majority of the board of directors of even the Parent/Constellation are citizens of Brazil and (2) the facts at the time of filing the Chapter 15 Petitions were that *no* executives were located in Luxembourg, while many were located in Brazil.

#### 4. Lone Star's COMI is in Brazil

Based upon the Court's foregoing findings of fact related to Lone Star and the most relevant COMI factors, discussed below, the Court finds that Lone Star's COMI is located in Brazil at this time as a matter of law.

##### a. Location of the Debtor's Place of Incorporation is the BVI

Lone Star is incorporated in and subject to the jurisdiction of the BVI. (*Supra* § II.H.5.)

##### b. Location of those who Actually Manage the Debtor is Brazil

Lone Star's sole director is Michael Pearson, who resides in the Cayman Islands and is a citizen of the United Kingdom. (*Id.*)

As discussed above, the Brazilian Offices are of particular importance to the rig-owning entities insofar as all operation and management of their rigs—their primary assets—are run from those locations. The Court found that Lone Star's operations, including day-to-day operations are managed by the Brazilian Offices. (*Id.*) Lone Star also benefits from the Constellation **\*289** Group's shared management in Brazil that is responsible for its shared financial, legal, investor relations services and operational co-ordination activities. (*Supra* § II.B.1(b).) Petróleo Constellation, the Brazilian incorporated Chapter 15 Debtor, maintains and operates Lone Star's sole asset—the offshore drilling rig. (*Supra* § II.H.5.) As such, the Court finds that the location of those who actually manage Lone Star is Brazil.

##### c. The Location of the Debtor's Primary Assets is in Brazil

Lone Star maintains and operates an offshore drilling rig. (FRFOF at 78.). The rig is located in Brazil.

##### d. The Location of the Majority of the Debtor's Creditors or of a Majority of Creditors who would Be Affected by the Case is Indeterminate

Lone Star has obligations under the 2024 Notes. There is no evidence in the record regarding the location of the beneficial owners of the 2024 Notes. (FRFOF at 79.)

##### e. The Jurisdiction Whose Law Would Apply to Most Disputes Weighs Moderately in Favor of Brazil

4067

The Operation of its Brazilian located assets are subject to Brazilian regulatory regimes (including contract law, maritime law, employee law, environmental law, and Brazilian regulatory approvals necessary for the operation of drilling rigs.) (FRFOF at 67.)

By virtue of being incorporated in the BVI, Lone Star is subject to the BVI's laws, regulations, and jurisdiction, including with respect to potential corporate or tax disputes. (FRFOF ¶ 158.)

#### f. Relevant International Interpretations

As discussed in *Videology*, a parent company's management and the fact that a parent's board of directors operate the high-level management of a group of companies does not dictate the COMI of all subsidiaries where other evidence suggests that the subsidiaries real operations take place elsewhere. Similar to *Videology*, most of the drill ship corporations within the Constellation Group have day-to-day management in Brazil, a location of assets in Brazil, and the group as a whole has a substantial presence in Brazil. As such, *Videology* reminds, with respect to all the drillship companies in the group that the location of the management of the parent holding companies should not be given undue weight.

#### g. The Reasonable Expectations of Interested Third Parties

The debt documents for the 2024 Notes for which Lone Star is a guarantor explain that operations and customers are located in Brazil. The 2024 Notes documents also explain potential restructurings in Brazil. (FRFOF at 68.) Additionally, the JPLs support a finding of COMI in Brazil. (*Id.*)

#### h. The Nerve Center Analysis

The nerve center analysis for Lone Star is the same as that applied to Alpha Star, as such, the Court finds that this factor weighs in favor of COMI in Brazil.

#### 5. Gold Star's COMI is in Brazil

Based upon the Court's foregoing findings of fact related to Gold Star and the most relevant COMI factors, discussed below, the Court finds that Gold Star's COMI is located in Brazil at this time as a matter of law.

#### a. The Location of the Debtor's Place of Incorporation is the BVI

Gold Star is incorporated in and subject to the jurisdiction of the BVI. (*Supra* § II.H.3.)

#### b. Location of those who Actually Manage the Debtor is Brazil

The Brazilian Offices are of particular importance to the rig-owning entities insofar **\*290** as all operation and management of their rigs—their primary assets—are run from those locations. Gold Star's day-to-day operations are managed by the Brazilian Offices, responsible for its shared financial, legal, investor relations services and operational co-ordination activities. (*Id.*) Petróleo Constellation, the Brazilian incorporated Chapter 15 Debtor, maintains and operates its sole asset—the offshore drilling rig. (*Id.*)

The sole director is Michael Pearson, a citizen of the United Kingdom, who resides in the Cayman Islands. (*Id.*)

Based upon the foregoing, the Court finds that Gold Star's management is best described as located in Brazil for COMI purposes.

#### c. The Location of the Debtor's Primary Assets is in Brazil

Gold Star owns the *Gold Star* offshore drilling rig, which is not presently under contract and is being maintained in a shipyard in Brazil. (*Id.*) The offshore rig is operated and maintained by Debtor Petróleo Constellation pursuant to operating and maintenance agreements, through its operational management team and operational staff located in the Brazilian Offices. (*Id.*) The Court finds that this factor weighs in favor of a COMI in Brazil.

#### d. The Location of the Majority of the Debtor's Creditors or of a Majority of Creditors who would Be Affected by the Case is Indeterminate

Gold Star has obligations under the 2024 Notes. There is no evidence in the record regarding the location of the beneficial owners of the 2024 Notes. (*Id.*)

### e. The Jurisdiction Whose Law Would Apply to Most Disputes is Brazil

Gold Star's Brazilian located assets are subject to Brazilian regulatory regimes (including contract law, maritime law, employee law, environmental law, and Brazilian regulatory approvals necessary for the operation of drilling rigs.) (*Id.*) However, by virtue of being incorporated in the BVI, Gold Star is subject to the BVI's laws, regulations, and jurisdiction, including with respect to potential corporate or tax disputes. (FRFOF ¶ 158.)

On balance, the Court finds that this factor weighs in favor of a COMI in Brazil.

### f. Relevant International Interpretations Favor Gold Star's COMI in Brazil

As discussed in *Videology*, a parent company's management and the fact that a parent's board of directors operate the high-level management of a group of companies does not dictate the COMI of all subsidiaries where other evidence suggests that the subsidiaries real operations take place elsewhere. Similar to *Videology*, most of the drill ship corporations within the Constellation Group have day-to-day management in Brazil, a location of assets in Brazil, and the group as a whole has a substantial presence in Brazil. As such, *Videology* reminds, with respect to all the drillship companies in the Constellation Group, that the location of the management of the parent holding companies should not be given undue weight.

### g. The Reasonable Expectations of Interested Third Parties Weighs in Favor of Finding COMI in Brazil

The debt documents for the 2024 Notes for which Gold Star is a guarantor explain that operations and customers are located in Brazil. The 2024 Notes documents also explain potential restructurings in Brazil. (*Supra* § II.H.3.)

The JPLs have been appointed with respect to each of Lone Star, Gold Star, Olinda Star, and Alpha Star, and function to

protect the interests of the collective creditors of each. (*Supra* § II.E.) They have expressed support for the Brazilian **\*291** RJ Proceeding and for a finding of COMI in Brazil for each of these Debtors. (*Id.*)

### h. The Nerve Center Analysis Weighs in Favor of Brazil

The nerve center analysis for Gold Star is the same as that applied to Alpha Star. Thus, the Court finds that the nerve center factor weighs in favor of a COMI in Brazil.

### 6. Star Int'l Has a COMI in Brazil

Based upon the Court's foregoing findings of fact related to Star Int'l and the most relevant COMI factors, discussed below, the Court finds that Star Int'l's COMI is located in Brazil at this time as a matter of law.

### a. The Location of the Debtor's Place of Incorporation is the Cayman Islands

Star Int'l is incorporated in and subject to the jurisdiction of the Cayman Islands. (*Supra* § II.H.6.)

### b. The Location of those who Actually Manage the Debtor is Brazil

The Brazilian Offices are of particular importance to the rig-owning entities insofar as all operation and management of their rigs—their primary assets—are run from those locations. Star Int'l's day-to-day operations are managed by the Brazilian Offices, responsible for its shared financial, legal, investor relations services and operational co-ordination activities. (*Id.*) Petróleo Constellation, the Brazilian incorporated Chapter 15 Debtor, maintains and operates its sole asset—the offshore drilling rig. (*Id.*) The location of those who manage Star Int'l is best described as Brazil for purposes of Star Int'l's COMI analysis.

### c. Location of the Debtor's Primary Assets is Brazil

Star Int'l owns the *Atlantic Star* offshore drilling rig; as of the petition date, the *Atlantic Star* was under contract with

Petrobras and operating in Brazilian waters. (*Id.*) This factor weighs strongly in favor of Star Int'l's COMI in Brazil.

#### d. The Location of the Majority of the Debtor's Creditors is Indeterminate

Star Int'l has obligations under the 2024 Notes. There is no evidence in the record regarding the location of the beneficial owners of the 2024 Notes. (*Id.*) This factor does not affect the Court's COMI analysis for Star Int'l.

#### e. Brazilian Law Would Apply to Most Disputes

The operation of Star Int'l's drilling rig is subject to Brazilian regulatory regimes (including contract law, maritime law, employee law, environmental law, and Brazilian regulatory approvals necessary for the operation of drilling rigs.) (*Id.*) Additionally, by virtue of being incorporated in the Cayman Islands, Star Int'l is subject to the Cayman Island's laws, regulations, and jurisdiction, including with respect to potential corporate or tax disputes. (FRFOF ¶ 158.)

The Court finds that this factor weighs in favor of a COMI in Brazil for Star Int'l.

#### f. Relevant International Interpretations Weigh in Favor of COMI in Brazil

As discussed in *Videology*, a parent company's management and the fact that a parent's board of directors operate the high-level management of a group of companies does not dictate the COMI of all subsidiaries where other evidence suggests that the subsidiaries real operations take place elsewhere. Similar to *Videology*, most of the drill ship corporations within the Constellation Group have day-to-day management in Brazil, a location of assets in Brazil, and the group as a whole has a substantial presence in Brazil. As such, *Videology* reminds, with respect to all the drillship companies in the Constellation **\*292** Group that the location of the management of the parent holding companies should not be given undue weight.

#### g. The Reasonable Expectations of Interested Third Parties Weigh in Favor of COMI in Brazil

The debt documents for the 2024 Notes, for which Star Int'l is a guarantor, explain that the offshore drilling rigs operate "mainly in Brazil" and were currently chartered mainly to Petrobras. (*Supra* § II.H.6.) The 2024 Notes documents also explain potential restructurings in Brazil. (*Id.*) Additionally, Star Int'l operated a drilling rig that was under contract with Petrobas and operating in Brazilian waters as of the petition date. (*Id.*) The Court therefore finds that this factor weighs in favor of COMI in Brazil for Star Int'l.

#### h. The Nerve Center Analysis Weighs in Favor of COMI in Brazil

The nerve center analysis with respect to Star Int'l is the same as that applied with respect to Alpha Star, as above. Thus, this factor weighs in favor of a COMI in Brazil.

#### 7. Snover's COMI is in Brazil

Based upon the Court's foregoing findings of fact related to Snover and the most relevant COMI factors, discussed below, the Court finds that Snover's COMI is located in Brazil at this time as a matter of law.

#### a. The Location of the Debtor's Place of Incorporation is the BVI

Snover is incorporated in and subject to the jurisdiction of the BVI. (*Supra* § II.H.7.)

#### b. The Location of those who Actually Manage the Debtor is Brazil

Petróleo Constellation maintains and operates Snover's Onshore Drilling Rigs from Brazil. (*Id.*) Snover's rigs are all located, operated, and maintained in Brazil. (*Id.*) For this reason, despite two members of the Constellation Group's executive management being located in London and its sole director being located in the Cayman Islands, the Court found that the location of those who actually manage Snover are best described as located in Brazil. (*Id.*)

4070

#### c. The Location of the Debtor's Primary Assets is Brazil

Snover's only assets are three Onshore Drilling Rigs (the *QG-V, QG-VIII*, and *QG-IX*). Each of these Onshore Drilling Rigs is located in Brazil. (*Id.*) As decided above, the Court finds that Snover's assets are located in Brazil for purposes of COMI. (*Id.*)

#### d. The Location of the Majority of the Debtor's Creditors or of a Majority of Creditors who would Be Affected by the Case is Indeterminate

The location of the majority of creditors is unclear and does not affect the COMI analysis of Snover. (*Id.*)

#### e. Brazilian Law Would Apply to Most Disputes

Snover's active onshore rig is operated and maintained by debtor Petróleo Constellation. Any actions related to the rig or its operations, as well as Snover's non-operational onshore rigs would therefore be subject to Brazilian law. The Court therefore finds that the jurisdiction whose law would apply to most disputes is Brazil.

#### f. Relevant International Interpretations Favor Finding Management in Brazil

As discussed in *Videology*, a parent company's management and the fact that a parent's board of directors operate the high-level management of a group of companies does not dictate the COMI of all subsidiaries where other evidence suggests that the subsidiaries real operations take place elsewhere. Similar to *Videology*, **\*293** most of the drill ship corporations within the Constellation Group have day-to-day management in Brazil, a location of assets in Brazil, and the group as a whole has a substantial presence in Brazil. (*Supra* § II.B.1(b).) As such, *Videology* reminds, with respect to all the drillship companies in the group that the location of the management of the parent holding companies should not be given undue weight. Thus, for Snover and other entities owning drillships, the location of the day-to-day management in Brazil should be given greater weight than the location of Parent/Constellation's registered office.

#### g. The Reasonable Expectations of Interested Third Parties

Parent/Constellation's offering memoranda for the 2024 Notes, for which Snover is a guarantor, explain that operations and customers are located in Brazil. The 2024 Notes documents also explain potential restructurings in Brazil. (*Supra* § II.H.7.) Additionally, the JPLs support a finding of COMI in Brazil. (*Id.*) The Court therefore found that the reasonable expectations of interested third parties, here creditors or proxies for creditors interests, weighed in favor of finding Snover's COMI in Brazil. (*Id.*)

#### h. The Nerve Center Analysis Weighs in Favor of COMI in Brazil

The nerve center analysis for Snover points strongly in favor of Brazil because it is the owner of three onshore rigs located in Brazil, with operation and management of those rigs emanating from Brazil.

#### 8. Petróleo Constellation's COMI is in Brazil

Petróleo Constellation is an entity organized under the laws of Brazil with its registered office at the Rio Office in Rio de Janeiro, Brazil. (*Supra* § II.H.9.) No objections were filed to the recognition of the Brazilian RJ Proceeding for Petróleo Constellation, and Alperton does not object to foreign main recognition in respect of Petróleo Constellation. (*Id.*) No evidence has been submitted to suggest that the COMI of Petróleo Constellation is located anywhere other than its registered office. (*Id.*) Thus, the COMI presumption holds with respect to this Chapter 15 Debtor. The Court holds that Petróleo Constellation's COMI is in Brazil.

#### H. Discretionary Relief that May be Applied to Foreign Debtors after Recognition as a Non-Foreign Main Proceeding

Debtors who are recognized as participating in foreign nonmain proceedings may be afforded nearly identical relief as those recognized as operating in foreign main proceedings. Section 1521(a) outlines the discretionary relief a court may order upon recognition of a foreign proceeding, whether recognized as main or nonmain. 11 U.S.C. § 1521(a).

4071

In *Winsway Enterprises Holdings Limited*, this Court recognized a proceeding in Hong Kong as a foreign nonmain proceeding. (*See Order Granting Motion for Related Relief*, the "Winsway Order," Case No. 16-10833, ECF Doc. # 22.). The Court recognized the Hong Kong proceeding of the BVI incorporated debtor as a foreign nonmain proceeding but fully recognized the scheme of arrangement that was entered by the Hong Kong Court. (Winsway Order ¶ 2.) [32] The Winsway Order went on **\*294** to provide that certain aspects of the scheme (such as creditor releases) would be "given full force and effect within the territorial jurisdiction of the United States in accordance with their terms and to the maximum extent enforceable under Hong Kong law; ...." (Winsway Order ¶ 4.) The Winsway Order went on to clarify that all scheme creditors would be permanently enjoined from, *inter alia*, "commencing any suit, action or proceeding in the territorial jurisdiction of the United States to settle any dispute which arises out of any provision of the Scheme and/ or relating to the Scheme." (Winsway Order ¶ 5(b).)

[32]   The Winsway Order states, "The Scheme and the Sanction Order entered by the Hong Kong Court are granted comity and entitled to full force and effect against all entities (as that term is defined in section 101(15) of the Bankruptcy Code) in accordance with their terms, and such terms shall be binding and fully enforceable on all creditors whether or not they actually agreed to be bound by the Scheme or participated in the Hong Kong Proceeding."

Thus, Parent/Constellation, although currently recognized as operating in a foreign nonmain proceeding, may receive nearly identical relief as the relief afforded to the Chapter 15 Debtors whose COMI was determined to be in Brazil. The only discretionary relief granted so far is to extend the stay to the Parent/Constellation within the territorial jurisdiction of the United States. Of course, the issues of what, if any, further discretionary relief should be granted to the Chapter 15 Debtors will have to await further action in the Brazilian RJ Proceeding.

### III. CONCLUSION

In sum, as set forth above, the Court grants recognition as a foreign main as to the following Chapter 15 Debtors: Petróleo Constellation, Constellation Overseas, Alpha Star, Gold Star, Lone Star, Star Int'l, and Snover.

The Court grants recognition as a foreign nonmain proceeding as to Parent/Constellation.

The Court reaches no decision about recognition as to Olinda Star and Arazi since the Brazil courts have ordered the Brazilian RJ Proceeding dismissed as to those two entities.

A determination of the COMI may be revisited and the Court may change its COMI determination if parties provide new evidence of changed circumstances of any of the Chapter 15 Debtors.

**IT IS SO ORDERED.**

**All Citations**

600 B.R. 237

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

4072

# Tab 71

Westlaw.

501 B.R. 655, 58 Bankr.Ct.Dec. 226
**(Cite as: 501 B.R. 655)**

C

United States Bankruptcy Court, S.D. New York.
In re Sino–Forest Corporation, Debtor in a Foreign Proceeding.

Case No. 13–10361 (MG)
Filed November 25, 2013

**Background:** External auditor for foreign corporate debtor moved, in debtor's Chapter 15 case, for order giving full force and effect in the United States to settlement order that was entered by Canadian court in debtor's foreign main proceeding and approved settlement of securities class claims against auditor and implemented global release in auditor's favor under debtor's plan of compromise and reorganization. Foreign representative and class-action plaintiffs joined in motion.

**Holding:** The Bankruptcy Court, Martin Glenn, J., held that extending comity to settlement order was warranted.

Motion granted.

West Headnotes

**[1] Judgment 228 ☞830.1**

228 Judgment
 228XVII Foreign Judgments
  228k830 Judgments of Courts of Foreign Countries
   228k830.1 k. In general. Most Cited Cases

Federal courts generally extend comity to foreign judgments whenever the foreign court had proper jurisdiction and enforcement does not prejudice the rights of United States citizens or violate domestic public policy.

**[2] Courts 106 ☞512**

106 Courts

106VII Concurrent and Conflicting Jurisdiction
 106VII(C) Courts of Different States or Countries
  106k512 k. Comity between courts of different countries. Most Cited Cases

**Judgment 228 ☞830.1**

228 Judgment
 228XVII Foreign Judgments
  228k830 Judgments of Courts of Foreign Countries
   228k830.1 k. In general. Most Cited Cases

Deference to foreign court is appropriate so long as foreign proceedings are procedurally fair and do not contravene the laws or public policy of the United States.

**[3] Bankruptcy 51 ☞2341**

51 Bankruptcy
 51III The Case
  51III(H) Cases Ancillary to Foreign Proceedings
   51k2341 k. In general. Most Cited Cases

Extending comity to settlement order entered by Canadian court in corporate debtor's foreign main proceeding was warranted in debtor's Chapter 15 case, so as to give full force and effect in United States to order, which approved settlement of securities class claims against debtor's external auditor and implemented global release in auditor's favor under debtor's plan of compromise and reorganization; parties to Canadian proceedings had full and fair opportunity to litigate the issues, trial court reached reasoned decision that it had jurisdiction to grant requested relief and that relief was appropriate, objectors' appeal to intermediate appellate court had failed, and relief was proper as additional assistance under Bankruptcy Code and was not manifestly contrary to public policy. 11 U.S.C.A. §§ 1506, 1507.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

501 B.R. 655, 58 Bankr.Ct.Dec. 226
**(Cite as: 501 B.R. 655)**

**[4] Bankruptcy 51 ⬿2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

While recognition of foreign proceeding under Chapter 15 turns on the objective statutory criteria, relief post-recognition is largely discretionary and turns on subjective factors that embody principles of comity. 11 U.S.C.A. § 1517.

**[5] Bankruptcy 51 ⬿2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

Once a case is recognized as a foreign main proceeding, Chapter 15 specifically contemplates that the court will exercise its discretion consistent with principles of comity.

**[6] International Law 221 ⬿10.1**

221 International Law
    221k10.1 k. Public policy and comity in general. Most Cited Cases

Because the principle of comity does not limit the legislature's power and is, in the final analysis, simply a rule of construction, it has no application where Congress has indicated otherwise.

**[7] Bankruptcy 51 ⬿2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

Public policy exception allowing court to refuse to take action under Chapter 15 is narrowly construed. 11 U.S.C.A. § 1506.

Milbank, Tweed, Hadley & McCloy LLP, Attor-

neys to FTI Consulting Canada Inc., as Foreign Representative of the Canadian Proceeding of Sino–Forest Corporation,One ChaseManhattan Plaza, New York, NY 10005–1413, By: Dennis F. Dunne, Esq., Thomas J. Matz, Esq., Jeremy C. Hollembeak, Esq.

Allen & Overy LLP, Attorneys for Ernst & Young LLP, 1221 Avenue of the Americas, New York, NY 10020, By: Ken Coleman, Esq., Jonathan Cho, Esq.

Lowenstein Sandler LLP, Chapter 15 Counsel for Class Action Plaintiffs, 1251 Avenue of the Americas New York, NY 10020, By: Michael S. Etkin, Esq., Tatiana Ingman, Esq.

Chapter 15
**MEMORANDUM OPINION GRANTING MOTION TO RECOGNIZE AND ENFORCE ORDER OF ONTARIO COURT APPROVING E & Y SETTLEMENT INCLUDING THIRD–PARTY RELEASE**

MARTIN GLENN, UNITED STATES BANKRUPTCY JUDGE

Before the Court is Ernst & Young LLP's ("E & Y") *Motion to Recognize and Enforce Order of Ontario Court Approving E & Y Settlement* (the "Motion"). (ECF Doc. # 18.) The Motion is supported by a *Memorandum of Law in Support of Motion to Recognize and Enforce Order of Ontario Court Approving Ernst & Young Settlement* (ECF Doc. # 19), along with the *Declaration of Ken Coleman in Support of Petition for Recognition of Foreign Proceedings* (ECF Doc. # 21), which attaches various orders issued **\*657** by the Canadian courts. Two joinders in the Motion were also filed: (1) *Joinder of Foreign Representative in (I) Motion to Recognize and Enforce Order of Ontario Court Approving Ernst & Young Settlement and (II) Memorandum of Law in Support of Motion to Recognize and Enforce Order of Ontario Court Approving Ernst & Young Settlement* (the "FTI Joinder," ECF Doc. # 22), and (2) *U.S. Class Action Plaintiffs' and Canadian Class Action Plaintiffs' Joinder to the Motion to Recognize and Enforce Order of Ontario*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

501 B.R. 655, 58 Bankr.Ct.Dec. 226
**(Cite as: 501 B.R. 655)**

*Court Approving Ernst & Young Settlement* (the "Class Action Plaintiffs' Joinder," ECF Doc. # 25). A *Notice of Filing of Order of Quebec Court Permanently Staying Class Action Against E & Y* was filed. (ECF Doc. # 26.) Additionally, the *Declaration of Kurt J. Elgie Regarding Notice to the Class* (ECF Doc. # 27), and the *Supplemental Declaration of Kurt J. Elgie Regarding Notice to the Class* (ECF Doc. # 28) were also filed. The Motion is unopposed.

Through the Motion, E & Y seeks entry of an order giving full force and effect in the United States to the March 20, 2013 order (the "Settlement Order") of the Ontario Superior Court of Justice (Commercial List) (the "Ontario Court") in the proceeding (the "Canadian Proceeding") of Sino–Forest Corporation ("SFC") under Canada's *Companies Creditors Arrangement Act* (as amended, the "CCAA"). The Settlement Order approves the settlement of class action claims against E & Y and implements a global release in favor of E & Y (the "E & Y Settlement") under SFC's plan of compromise and reorganization dated December 3, 2012 (the "Plan").

This is the first time this Court has been asked to grant comity in a chapter 15 case to a foreign court order approving a third-party non-debtor release since the Fifth Circuit's decision in *In re Vitro S.A.B. de C.V.,* 701 F.3d 1031 (5th Cir.2012), affirming a bankruptcy court decision declining to grant comity in a chapter 15 case to a Mexican court order that included third-party releases. In a decision preceding the *Vitro* decision, this Court granted comity to a Canadian court order that included third-party releases. *See In re Metcalfe & Mansfield Alternative Investments,* 421 B.R. 685 (Bankr.S.D.N.Y.2010). *Metcalfe* is almost on all fours with this case, and the Court concludes below that nothing in *Vitro* would require a different result here. Therefore, the Motion to recognize and enforce the Canadian court order is **GRANTED**.

## I. BACKGROUND

On February 4, 2013, FTI, as Foreign Repres-entative and Monitor, commenced this case by filing a *Verified Petition for Recognition of Foreign Proceeding and Related Relief* (the "Verified Petition," ECF Doc. # 1). On April 15, 2013, this Court granted the relief requested in the Verified Petition and entered an order (the "Recognition Order," ECF Doc. # 16) (a) recognizing the Canadian Proceeding as a "foreign main proceeding" under section 1517 of the Bankruptcy Code and (b) enforcing in the United States (i) certain provisions of the Ontario Court's Initial Order dated March 30, 2012 (the "Initial Order") and (ii) the Ontario Court's Plan Sanction Order dated December 10, 2012, sanctioning the Plan (the "Plan Sanction Order").

The Motion seeks the recognition and enforcement of the Settlement Order approving the E & Y Settlement, pursuant to which E & Y will pay CAD $117 million to resolve claims asserted against it in class action litigations filed by plaintiffs in Canada (the "Canadian Class Actions") and the United States (the "U.S. Class Action," and together with the Canadian Class Actions,**\*658** the "Class Actions") on behalf of all persons and entities, wherever they may reside, who acquired any securities of SFC, including securities acquired in the primary, secondary, and over-the-counter markets (the "Securities Claimants"). Those proceedings were commenced against SFC and certain of its former officers, directors, underwriters, and auditors, including E & Y (together, the "Third Party Defendants"), on the basis of alleged misrepresentations in SFC's financial statements issued before 2011. E & Y, SFC's external auditor from 2007 to 2012, is a named defendant in the Class Actions.

In the course of the Canadian Proceeding, E & Y and the plaintiffs in the Canadian Class Actions successfully negotiated the terms of a settlement that is supported by substantially all constituents in the Canadian Proceeding, including the lead plaintiffs in each of the Class Actions. In addition, the plaintiffs in the U.S. Class Action filed a claim in the Canadian Proceeding, and Canadian counsel for the U.S. plaintiffs appeared on their behalf at

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

501 B.R. 655, 58 Bankr.Ct.Dec. 226
**(Cite as: 501 B.R. 655)**

the respective hearings on the Plan Sanction Order and the Settlement Order. The terms of the E & Y Settlement provide that following E & Y's CAD $117 million payment into a settlement trust fund (the "Settlement Fund") for the benefit of the Securities Claimants, Article 11.1(a) of the Plan will grant E & Y a global release and the benefit of certain injunctions under the Plan. E & Y also agreed to release all claims, including indemnification claims, it may have against each of SFC and SFC's subsidiaries, officers, and directors. E & Y also relinquished its rights to any distributions under the Plan and agreed to support the Plan's approval.

The Ontario Court approved the E & Y Settlement with the entry of the Settlement Order on March 20, 2013, and on June 26, 2013, the Court of Appeal for Ontario dismissed motions for leave to appeal the Plan Sanction Order and the Settlement Order brought by certain minority investors in SFC. FN1 Both courts specifically found that the approval of the Plan Sanction Order and the Settlement Order was consistent with a prior opinion of the Court of Appeal for Ontario establishing the requirements for third-party releases under the CCAA. FN2

> FN1. These minority investors (the "Objectors") held, in the aggregate, approximately 1.62% of SFC's outstanding equity on June 30, 2011, and first appeared in the Canadian Proceeding shortly before the hearing to consider the sanction of the Plan. E & Y refrained from seeking enforcement of the Settlement Order in the United States until the resolution of the Objectors' motion for leave to appeal the Settlement Order.

> FN2. *ATB Financial v. Metcalfe and Mansfield Alternative Investments II Corp.,* 2008 ONCA 587 at ¶¶ 26–28, 92 O.R. (3d) 513, *leave to appeal refused,* [2008] S.C.C.A. No. 337.

The principal remaining condition that must be satisfied before the E & Y Settlement can be implemented is the recognition and enforcement of the Settlement Order in the United States. The Ontario Court expressly requested this Court's assistance in implementing and enforcing the Settlement Order in this jurisdiction and has authorized E & Y to apply to any appropriate court for the relief requested.

**A. The Plan**

Article 11.1 of the Plan contains the agreed framework for giving effect to the E & Y Settlement. Article 11.1(a) of the Plan provides that if: (1) the Plan Sanction Order is entered, (2) the Ontario Court approves by order the E & Y Settlement, (3) the Plan Sanction Order and the Settlement Order are enforced in the United States through chapter 15 of the Bankruptcy Code, (4) all orders are final orders **\*659** not subject to further appeal or challenge, and (5) all other conditions precedent to the E & Y Settlement are met, E & Y will pay CAD $117 million into a settlement trust fund for the benefit of the Securities Claimants in settlement of all claims asserted against it in the Class Actions. Upon that payment, Article 11.1(b) of the Plan provides that E & Y will receive a global release and the benefit of certain injunctions under the Plan. Further, none of the Securities Claimants will be entitled to claim from any Third Party Defendant any portion of damages that corresponds to the liability of E & Y, proven at trial or otherwise, that is the subject of the E & Y Settlement.

At the hearing to consider the sanctioning of the Plan and in entering the Plan Sanction Order, the Ontario Court fully considered and dismissed the Objectors' concerns—which focused on Article 11 of the Plan—and found that the Plan was fair and reasonable and satisfied the applicable test for sanction under the CCAA. Soon after, three of the Objectors filed a notice of motion (the "Sanction Appeal Motion") for leave to appeal those portions of the Plan Sanction Order relating to Article 11 of the Plan, but did not seek an intervening stay of the Plan's implementation. Accordingly, the Plan be-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

501 B.R. 655, 58 Bankr.Ct.Dec. 226
**(Cite as: 501 B.R. 655)**

came effective on January 30, 2013.

**B. The E & Y Settlement**

The E & Y Settlement principally provides that E & Y will pay CAD $117 million into the Settlement Fund in settlement of all claims asserted against E & Y in the Class Actions, upon satisfaction of certain conditions precedent. Once payment is made, E & Y will benefit from the release and injunction provisions of the Plan as against all parties. The Settlement Fund will be distributed to or for the benefit of eligible Securities Claimants pursuant to a plan of allocation to be submitted to the Ontario Court for approval. Aside from this significant monetary payment and the obvious benefit to affected Canadian and U.S. investors, E & Y has made substantial non-monetary concessions and contributions that further warrant recognition and enforcement of the E & Y Settlement in the United States.

In particular, E & Y also: (1) released all claims, including indemnification claims, asserted against SFC and SFC's subsidiaries, officers, and directors; (2) relinquished all rights to distributions under the Plan; (3) agreed not to seek leave to further appeal a decision relating to equity claims, and a related decision of the Court of Appeal for Ontario, to the Supreme Court of Canada; (4) voted in favor of the Plan; and (5) supported the entry of the Plan Sanction Order. By making these additional concessions, E & Y not only waived substantial claims which, if allowed, would have diluted recoveries to other creditors, but E & Y also eliminated the expense and delay of litigating these claims in full. Numerous parties, including the Monitor, SFC, and the Ontario Court, have recognized that the deterioration of SFC's assets made an expedited implementation of the Plan essential. Moreover, the Ontario Court observed in a settlement endorsement (the "Settlement Endorsement," attached as Ex. B to Coleman Decl.) that the "unencumbered participation of the SFC subsidiaries is crucial to the restructuring," and the Plan intended to facilitate the subsidiaries' continued operations free from the

claims and uncertainty associated with SFC. Settlement Endorsement ¶¶ 68–69. Thus, E & Y's concessions in the E & Y Settlement provided additional benefits to the restructuring effort and removed a potentially substantial obstacle to an expeditious implementation of the Plan.

**\*660 C. Canadian Court Approval and *ATB Financial***

The Ontario Court approved the E & Y Settlement and entered the Settlement Order on March 20, 2013, following a February 4, 2013 hearing at which the court considered and overruled the objections of the Objectors (who were the only parties who appeared in opposition). In addition, the Ontario Court entered an order, also dated March 20, 2013, denying the Objectors' motion to be appointed as representative of all proposed class members who opposed the E & Y Settlement (the "Representation Dismissal Order").

The Ontario Court's bases for its decision are detailed in the Settlement Endorsement. As a threshold matter, the Ontario Court noted that outstanding litigation claims against third parties are regularly compromised and settled in CCAA proceedings, and in particular that "[i]t is well established that class proceedings can be settled in a CCAA proceeding." Settlement Endorsement ¶¶ 36–37. It further observed that "[s]uch compromises fully and finally dispose of such claims, and it follows that there are no continuing procedural or other rights in such proceedings ...*[s]imply put, there are no 'opt-outs' in the CCAA,*" thereby making clear that it was considering the approval of the E & Y Settlement within the context of the Canadian Proceeding and the CCAA. *Id.* ¶36 (emphasis added). With respect to the E & Y Settlement's release provisions, the Ontario Court noted that "third-party releases are not an uncommon feature of complex restructurings under the CCAA" and considered whether the release in the E & Y Settlement satisfied the applicable standards for third-party releases in CCAA proceedings established by the Court of Appeal for Ontario in *ATB Financial.*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

501 B.R. 655, 58 Bankr.Ct.Dec. 226
**(Cite as: 501 B.R. 655)**

In *ATB Financial,* a decision rendered in connection with the restructuring of the Canadian asset-backed commercial paper market, the Court of Appeal for Ontario held that third-party releases are permissible in CCAA restructurings where there is "a reasonable connection between the third party claim being compromised in the plan and the restructuring achieved by the plan to warrant inclusion of the third party release in the plan." Settlement Endorsement ¶ 50 (citing *ATB Financial* at ¶ 70). As set forth in paragraph 50 of the Settlement Endorsement, in determining whether the requisite nexus exists, a CCAA court must consider the following factors:

a) Whether the claims to be released are rationally related to the purpose of the plan;

b) Whether the claims to be released are necessary for the plan of arrangement;

c) Whether the parties who have claims released against them contributed in a tangible and realistic way; and

d) Whether the plan will benefit the debtor and the creditors generally.

*Id.* Further, as set forth in paragraph 49 of the Settlement Endorsement, in considering a settlement within the CCAA context, a court considers the following factors:
a) Whether the settlement is fair and reasonable;

b) Whether it provides substantial benefits to the other stakeholders; and

c) Whether it is consistent with the purpose and spirit of the CCAA.

*Id.* ¶49.

The Ontario Court ultimately concluded that "[i]n [its] view, the [E & Y] Settlement is fair and reasonable, provides substantial benefits to relevant stakeholders, and is consistent with the purpose and spirit of the CCAA. In addition, in [its] **\*661** view,

the factors associated with the *ATB Financial* nexus test favour approving the Ernst & Young Release." *Id.* ¶66. Accordingly, it granted the Settlement Order and approved the E & Y Settlement including the release. On April 9, 2013, the Objectors filed a notice of motion for leave to appeal both the Settlement Order and the Representation Dismissal Order with the Court of Appeal for Ontario (the "Settlement Appeal Motion," and with the Sanction Appeal Motion, the "Appeal Motions"). On April 18, 2013, while the Settlement Appeal Motion remained pending, the Objectors separately served in the Ontario Class Action a notice of appeal of the Settlement Order and the Representation Dismissal Order to the Court of Appeal for Ontario (the "Settlement Appeal"). The Objectors are the only parties who sought to appeal any of the Plan Sanction Order, the Settlement Order, and the Representation Dismissal Order. No other party supported these appeals, and several major constituents in the Canadian Proceeding opposed the Appeal Motions and the Settlement Appeal.

The Court of Appeal for Ontario consolidated the Appeal Motions, and on June 26, 2013, the court dismissed the Appeal Motions ("Appeal Endorsement," attached as Ex. C to Coleman Decl.). As for the Sanction Appeal Motion, the Court of Appeal for Ontario held that the Objectors' proposed appeal had been mooted by the intervening implementation of the Plan, but noted that in any event, it saw no basis for interfering with the Ontario Court's decision. The Court of Appeal for Ontario likewise saw no basis for interfering with Ontario Court's decision with respect to the Settlement Order, agreeing that "the issues raised on this proposed appeal are, at their core, the very issues settled by this court in *ATB Financial.*" Appeal Endorsement ¶ 14. Since entry of the Representation Dismissal Order naturally followed from the entry of the Settlement Order, the Court of Appeal for Ontario dismissed the Settlement Appeal Motion.

In addition to the dismissal of the Settlement Appeal Motion, on June 28, 2013, the Court of Ap-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

501 B.R. 655, 58 Bankr.Ct.Dec. 226
**(Cite as: 501 B.R. 655)**

peal for Ontario granted a motion to quash the Settlement Appeal on the basis that the Objectors had no jurisdiction to bring the appeal. According to E & Y, the Objectors intend to file a motion seeking leave to appeal the Court of Appeal for Ontario's orders to the Supreme Court of Canada. As of the filing of this Motion, the Objectors had not followed through on that plan. (Motion ¶ 32.) The Objectors were served with notice of the hearing in this Court seeking recognition and enforcement of the E & Y Settlement, including the release provisions, but they did not file any objections here.

## II. DISCUSSION

In *Metcalfe,* 421 B.R. 685, the Court faced an almost identical request for relief. The Court was also asked to enforce a Canadian order granting a non-debtor release and injunction. The Court began by analyzing whether the requested relief could be granted in a plenary case under chapter 11. The Court recognized that under *In re Metromedia Fiber Network, Inc.,* 416 F.3d 136, 141 (2d Cir.2005), the law in the Second Circuit limits availability of third-party non-debtor releases; they are "proper only in rare cases." While this Court thought that the facts in *Metcalfe* may have satisfied the "rigorous standard established in *Metromedia,*" *Metcalfe,* 421 B.R. at 695, it was unclear whether the separate jurisdictional requirement before a bankruptcy court may even consider whether to approve a third-party release in a plenary bankruptcy case could be satisfied. *See In re Johns–Manville Corp.,* 517 F.3d 52 (2d Cir.2008), *rev'd and remanded sub nom.* **\*662***Travelers Indem. Co. v. Bailey,* 557 U.S. 137, 129 S.Ct. 2195, 174 L.Ed.2d 99 (2009). After the *Metcalfe* decision, the Second Circuit in dealing with *Manville* on remand from the Supreme Court, adhered to its earlier view that the bankruptcy court in a plenary chapter 11 case lacks jurisdiction to approve third-party releases unless the third-party claims may affect the *res* of the estate. *In re Johns–Manville Corp.,* 600 F.3d 135, 153 & n.13 (2d Cir.2010). But in *Metcalfe,* the Court held that the correct inquiry in a chapter 15 case was not whether the Canadian

orders could be enforced under U.S. law in a plenary chapter 11 case, but whether recognition of the Canadian courts' decision was proper in the exercise of comity in a case under chapter 15. 421 B.R. at 696. The Court explained:

[W]hatever the precise limits of a bankruptcy court's jurisdiction to approve a third-party non-debtor release and injunction in a plenary chapter 11 case, the important point for present purposes is that the jurisdictional limits derive from the scope of bankruptcy court "related to" jurisdiction under 28 U.S.C. § 1334, and the prudential limits courts have applied in chapter 11 cases under the Bankruptcy Code. This Court is not being asked to approve such provisions in a plenary case; rather, the Court is being asked to order enforcement of provisions approved by the Canadian courts. The correct inquiry, therefore, is whether the foreign orders should be enforced in the United States in this chapter 15 case.... [P]rinciples of enforcement of foreign judgments and comity in chapter 15 cases strongly counsel approval of enforcement in the United States of the third-party non-debtor release and injunction provisions included in the Canadian Orders, even if those provisions could not be entered in a plenary chapter 11 case.

*Id.*

The Court then discussed the principles of comity that underpin chapter 15. *Id.*("Chapter 15 specifically contemplates that the court should be guided by principles of comity and cooperation with foreign courts in deciding whether to grant the foreign representative additional post-recognition relief."). The Court quoted the seminal comity case, *Hilton v. Guyot,* 159 U.S. 113, 202–03, 16 S.Ct. 139, 40 L.Ed. 95 (1895), where the Supreme Court held that if the foreign forum provides "a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

501 B.R. 655, 58 Bankr.Ct.Dec. 226
**(Cite as: 501 B.R. 655)**

justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it is sitting," the judgment should be enforced and not "tried afresh."

[1][2] "Federal courts generally extend comity whenever the foreign court had proper jurisdiction and enforcement does not prejudice the rights of United States citizens or violate domestic public policy." *In re Atlas Shipping A/S,* 404 B.R. 726, 733 (Bankr.S.D.N.Y.2009) (quoting *Victrix S.S. Co., S.A v. Salen Dry Cargo A.B.,* 825 F.2d 709, 713 (2d Cir.1987)). As the court stated in *JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A.,* 412 F.3d 418, 424 (2d Cir.2005), "deference to the foreign court is appropriate so long as the foreign proceedings are procedurally fair and ... do not contravene the laws or public policy of the United States." In analyzing procedural fairness, courts have looked to the following nonexclusive factors:

(1) Whether creditors of the same class are treated equally in the distribution of assets; (2) whether the liquidators are considered fiduciaries and are held accountable**\*663** to the court; (3) whether creditors have the rights to submit claims which, if denied, can be submitted to a bankruptcy court for adjudication; (4) whether the liquidators are required to give notice to potential claimants; (5) whether there are provisions for creditors meetings; (6) whether a foreign country's insolvency laws favor its own citizens; (7) whether all assets are marshalled before one body for centralized distribution; and (8) whether there are provisions for an automatic stay and for the lifting of such stays to facilitate the centralization of claims.

*Finanz AG Zurich v. Banco Economico S.A.,* 192 F.3d 240, 249 (2d Cir.1999); *see also In re Cozumel Caribe, S.A. de C.V.,* 482 B.R. 96, 114–15 (Bankr.S.D.N.Y.2012).

[3]In *Metcalfe,* focusing specifically on extending comity to orders of Canadian courts, the Court explained that "[t]he U.S. and Canada share the same common law traditions and fundamental principles of law. Canadian courts afford creditors a full and fair opportunity to be heard in a manner consistent with standards of U.S. due process. U.S. federal courts have repeatedly granted comity to Canadian proceedings." *Metcalfe,* 421 B.R. at 698. Applying the doctrine of comity, and recognizing that the issue of the third-party non-debtor release had been fully and fairly litigated in the Canadian courts, the Court held that it could recognize and enforce the release. *Id.* at 699. The same analysis, with the same conclusion, applies here. The parties to the Canadian proceedings in this case had a full and fair opportunity to litigate the issues, and the trial court reached a reasoned decision that it had the jurisdiction to grant the requested relief and that such relief was appropriate in the circumstances. The Objectors' appeal to the Court of Appeal for Ontario failed. While an additional motion for leave to appeal may be filed in the Supreme Court of Canada, this Court sees no reason to await the outcome of such at motion (if it is made) before ruling on the pending matter; the issues raised are not novel here or in Canada, as this Court's decision in *Metcalfe* demonstrates.

Similar to *Metcalfe,* relief here is proper as "additional assistance" under section 1507 of the Bankruptcy Code.[FN3] Section 1507 provides as follows:

(a) Subject to the specific limitations stated elsewhere in this chapter the **\*664** court, if recognition is granted, may provide additional assistance to a foreign representative under this title or under other laws of the United States.

(b) In determining whether to provide additional assistance under this title or under other laws of the United States, the court shall consider whether such additional assistance, consistent with the principles of comity, will reasonably assure—

(1) just treatment of all holders of claims against or interests in the debtor's property;

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

501 B.R. 655, 58 Bankr.Ct.Dec. 226
**(Cite as: 501 B.R. 655)**

(2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

(3) prevention of preferential or fraudulent dispositions of property of the debtor;

(4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and

(5) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

11 U.S.C. § 1507.

> FN3. E & Y also requests relief under section 1521(a), which provides that "Upon recognition of a foreign proceeding ... the court may ... grant *any appropriate relief* —including [under subparagraphs (a)(1)–(7) ]." 11 U.S.C. § 1521(a) (emphasis added). In *Vitro,* the Fifth Circuit applied a three-step process in considering similar relief, also requested under sections 1521 and 1507. The court stated:
>
> > We conclude that a court confronted by this situation should first consider the specific relief enumerated under § 1521(a) and (b). If the relief is not explicitly provided for there, a court should then consider whether the requested relief falls more generally under § 1521's grant of any appropriate relief. We understand "appropriate relief" to be relief previously available under Chapter 15's predecessor, § 304. Only if a court determines that the requested relief was not formerly available under § 304 should a court consider whether relief would be appropriate as "additional assistance" under § 1507.
>
> 701 F.3d at 1054. This Court has, on a prior occasion, considered relief

formerly available under old section 304. *See Atlas Shipping A/S,* 404 B.R. at 726. But while the Fifth Circuit's approach may be appropriate in certain circumstances—*e.g.,* so that "courts begin their analysis in familiar territory," *Vitro,* 701 F.3d at 1057 —the Court believes that *Vitro*'s three-step approach is unnecessary here because the Court already decided in *Metcalfe* that the relief sought is available under section 1507. Therefore, the Court declines to decide whether the "any appropriate relief" language in section 1521 would also provide a basis for the relief.

[4][5] "While recognition of the foreign proceeding turns on the objective criteria under § 1517 , 'relief [post-recognition] is largely discretionary and turns on subjective factors that embody principles of comity.' " *Metcalfe,* 421 B.R. at 697 (quoting *In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.,* 389 B.R. 325, 333 (S.D.N.Y.2008)). "Once a case is recognized as a foreign main proceeding, chapter 15 specifically contemplates that the court will exercise its discretion consistent with principles of comity." *Atlas Shipping A/S,* 404 B.R. at 738.

[6]While the factors identified in section 1507(b)(1)–(5), required to be considered in determining whether to extend comity in a case under chapter 15, may, in some circumstances, narrow application of the common law rules for extending comity, none of those factors comes into play here.[FN4] Extending comity here does not affect (1) the just treatment of creditors, (2) protection of creditors in the United States against prejudice or inconvenience, (3) prevention of preferential or fraudulent disposition of property of the debtor, (4) distribution of proceeds substantially in accordance with Bankruptcy Code priorities, or (5) the opportunity for a fresh start.

> FN4. "Because the principle of comity does not limit the legislature's power and

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

501 B.R. 655, 58 Bankr.Ct.Dec. 226
**(Cite as: 501 B.R. 655)**

is, in the final analysis, simply a rule of construction, it has no application where Congress has indicated otherwise." *Maxwell Commc'n Corp. v. Societe Generale (In re Maxwell Commc'n Corp.),* 93 F.3d 1036, 1047 (2d Cir.1996). Here, Congress has identified a series of factors to consider in determining whether to extend comity under section 1507; they may narrow circumstances when comity is appropriate. But as the Court concluded in *Cozumel,* "[i]t is unnecessary here to explore this issue further as the Court concludes that the relief ordered by the Court would be appropriate in any event." 482 B.R. at 114–15 n.16. The factors listed in section 1507(b)(1)–(5), to be considered in deciding whether to extend comity under section 1507, are not included in section 1521(a). Whether it is appropriate, consistent with principles of comity, to grant "any appropriate relief" under section 1521, if granting comity would be inconsistent with the factors in section 1507, need not be addressed in this case. In any event, section 1522 places limitations on relief available under section 1521: relief may be granted "only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. 1522(a); *see also Vitro,* 701 F.3d at 1060.

[7]Section 1506 nevertheless places a limitation on recognition if doing so is manifestly contrary to U.S. public policy:

*\*665* Nothing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States.

11 U.S.C. § 1506. But this public policy exception is narrowly construed. *See In re Ephedra Prods. Liab. Litig.,* 349 B.R. 333 (S.D.N.Y.2006); *see also Vitro,* 701 F.3d at 1069 (stating that "§

1506 was intended to be read narrowly, a fact that does not sit well with the bankruptcy court's broad description of the fundamental policy at stake as the protection of third party claims in a bankruptcy case") (internal quotation marks omitted). In *Metcalfe,* the Court specifically rejected the argument that section 1506 precludes granting third-party releases in appropriate cases. The Court explained:

The relief granted in the foreign proceeding and the relief available in a U.S. proceeding need not be identical. A U.S. bankruptcy court is not required to make an independent determination about the propriety of individual acts of a foreign court. The key determination required by this Court is whether the procedures used in Canada meet our fundamental standards of fairness.

421 B.R. at 697 (citations omitted). In this Circuit, where the third-party releases are not categorically prohibited, it cannot be argued that the issuance of such releases is manifestly contrary to public policy. *See Metromedia,* 416 F.3d at 141.

The Fifth Circuit's decision in *Vitro* does not dictate a different result. [FN5] The Fifth Circuit, on direct appeal from the bankruptcy court, affirmed the bankruptcy judge's decision refusing to extend comity to a Mexican court order approving a reorganization plan that vitiated guarantees issued by Vitro's U.S.-based affiliates, under loan agreements governed by U.S. law. The Fifth Circuit concluded that the bankruptcy court did not abuse the discretion expressly provided in section 1507(b). *See Vitro,* 701 F.3d at 1042 ("A court's decision to grant comity is ... reviewed for abuse of discretion."); *id.* at 1069 ("[W]e hold that Vitro has not met its burden of showing that the relief requested under the Plan—a non-consensual discharge of non-debtor guarantors—is substantially in accordance with the circumstances that would warrant such relief in the United States. In so holding, we stress the deferential standard under which we review the bankruptcy court's determination.... Our only task is to determine whether the bankruptcy court's decision was reasonable. Having reviewed

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

501 B.R. 655, 58 Bankr.Ct.Dec. 226
**(Cite as: 501 B.R. 655)**

the record and relevant caselaw, we conclude that the bankruptcy court's decision was reasonable.") (internal citations omitted). The court specifically declined to decide the case on one of the alternative bases of the bankruptcy court's ruling—namely, whether the third-party release was manifestly contrary to public policy. *Id.* at 1070. The Fifth Circuit decision was largely premised on an analysis of section 1507(b)(4) —"distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title [11] ..."—concluding that the bankruptcy court did not abuse its discretion in finding that Vitro did not carry its burden under that subsection. *See Vitro, 701 F.3d at 1065–66.* The court distinguished *Vitro* from *Metcalfe,* and many of the same distinguishing facts are present here: the Plan has near unanimous support, that support does not rely on votes by insiders and "the Canadian court's decision to approve**\*666** the non-debtor release 'reflect[ed] similar sensitivity to the circumstances justifying approving such provisions' " as those considered by U.S. courts. *Id.* at 1068 (quoting *Metcalfe,* 421 B.R. at 698). No one has objected to the relief requested here, and as already stated, the requested relief does not run afoul of any of the subsections of section 1507(b).

> FN5. Obviously, a decision of the Fifth Circuit is not binding precedent on this Court. But to be clear, as explained below, the Court does not believe that *Vitro* would require a different result here.

### III. CONCLUSION

E & Y, supported by the Foreign Representative and the Canadian and U.S. Class Action Plaintiffs, seeks an order granting comity to a Canadian court order approving class action settlements that include a third-party release and injunction in favor of E & Y in return for a payment of CAD $117 million. Broad notice of the motion seeking relief and of the hearing in the bankruptcy court was timely provided. No objections to the requested relief were filed.

This case is virtually on all fours with *Metcalfe.* The procedural posture is almost exactly the same. The Ontario Court has already approved the E & Y Settlement and has asked this Court to assist in its enforcement. The Court of Appeal for Ontario has denied a motion for leave to appeal. While a motion for leave to appeal to the Supreme Court of Canada may be filed, the Court believes that the law in Canada and in the Second Circuit is well settled so there is no reason to wait before ruling. Furthermore, at least one additional ruling is required from the trial court in Canada, seeking approval of a plan of distribution, before the settlement can become final, so this Court's ruling does not provide the last word in any event.

For the reasons explained above, the Court concludes that the requested relief should be approved. Therefore, the Motion is **GRANTED**. A separate order will be entered granting the requested relief.

Bkrtcy.S.D.N.Y., 2013
In re Sino-Forest Corporation
501 B.R. 655, 58 Bankr.Ct.Dec. 226

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Tab 72

Westlaw.

Page 1

351 B.R. 103, 56 Collier Bankr.Cas.2d 1176, 47 Bankr.Ct.Dec. 17
**(Cite as: 351 B.R. 103)**

United States Bankruptcy Court,
S.D. New York.
In re: SPHINX, LTD., et al., Debtors in Foreign Pro-
ceedings.

No. 06–11760 RDD.
Sept. 6, 2006.

**Background:** Joint official liquidators appointed in hedge funds' voluntary winding-up proceedings under supervision of Cayman Islands court filed Chapter 15 petitions, seeking recognizing of Cayman Islands proceedings as foreign main proceedings and additional relief under Bankruptcy Code upon recognition.

**Holdings:** The Bankruptcy Court, Robert D. Drain, J., held that:

(1) proceedings were entitled to recognition as foreign proceedings under Bankruptcy Code;

(2) recognition of proceedings as foreign nonmain proceedings, subject to later modification, was warranted; and

(3) under Chapter 15, foreign nonmain proceeding can exist when there are no other pending proceedings.

Ordered accordingly.

West Headnotes

**[1] Bankruptcy 51 2222.1**

51 Bankruptcy
    51III The Case
        51III(B) Debtors
            51k2222 Who May Be a Debtor
                51k2222.1 k. In general. Most Cited Cases

**Bankruptcy 51 2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

Bankruptcy Code permits a case to be filed by or against a foreign debtor without a concurrent case having been filed abroad, if the debtor satisfies the Code's jurisdictional requirements.

**[2] Bankruptcy 51 2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

In cases in which the court is asked under Chapter 15 to reconcile conflicting claims to primacy between or among proceedings, the interests of the debtor's estate, creditors, and other parties should generally be a significant and perhaps deciding factor, absent evidence that they support a primary proceeding for an improper purpose.

**[3] Courts 106 512**

106 Courts
    106VII Concurrent and Conflicting Jurisdiction
        106VII(C) Courts of Different States or Countries
            106k512 k. Comity between courts of different countries. Most Cited Cases

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

351 B.R. 103, 56 Collier Bankr.Cas.2d 1176, 47 Bankr.Ct.Dec. 17
**(Cite as: 351 B.R. 103)**

Comity is a doctrine of adjustment, not a mandate for inaction, and, in the case of parallel inconsistent proceedings in domestic and foreign courts, one must yield, and there is no blanket presumption that it is the domestic.

**[4] Bankruptcy 51 ⚷2341**

51 Bankruptcy
 51III The Case
  51III(H) Cases Ancillary to Foreign Proceedings
   51k2341 k. In general. Most Cited Cases

First step to obtaining relief under Chapter 15, with the exception of interim relief, is receiving recognition of the foreign proceeding under Bankruptcy Code. 11 U.S.C.A. §§ 1515, 1517(a), 1519.

**[5] Bankruptcy 51 ⚷2341**

51 Bankruptcy
 51III The Case
  51III(H) Cases Ancillary to Foreign Proceedings
   51k2341 k. In general. Most Cited Cases

After recognition of a foreign main proceeding, a concurrent case under the Bankruptcy Code should generally serve the interests of the foreign main proceeding, subject to the court's duty to condition or modify relief to protect creditors. 11 U.S.C.A. § 1528.

**[6] Bankruptcy 51 ⚷2341**

51 Bankruptcy
 51III The Case
  51III(H) Cases Ancillary to Foreign Proceedings
   51k2341 k. In general. Most Cited Cases

Although recognition of a foreign main proceeding under Chapter 15 may serve to indicate that the reasonable interests of creditors and the maximization of value, as well as considerations of international comity, generally support the bankruptcy court's deference to such proceeding, the Bankruptcy Code does not expressly mandate such across-the-board deference, and recognition of a foreign main proceeding would not necessarily be binding on choice of law determinations.

**[7] Bankruptcy 51 ⚷2341**

51 Bankruptcy
 51III The Case
  51III(H) Cases Ancillary to Foreign Proceedings
   51k2341 k. In general. Most Cited Cases

Recognition of foreign proceeding as "main," under Chapter 15, is subject to review and modification under Bankruptcy Code. 11 U.S.C.A. § 1517(d).

**[8] Bankruptcy 51 ⚷2341**

51 Bankruptcy
 51III The Case
  51III(H) Cases Ancillary to Foreign Proceedings
   51k2341 k. In general. Most Cited Cases

Cayman Islands proceedings, under which hedge funds were being wound up subject to supervision of Cayman Islands court, were "foreign proceedings" under Bankruptcy Code. 11 U.S.C.A. § 101(23).

**[9] Bankruptcy 51 ⚷2341**

51 Bankruptcy
 51III The Case
  51III(H) Cases Ancillary to Foreign Proceedings

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

351 B.R. 103, 56 Collier Bankr.Cas.2d 1176, 47 Bankr.Ct.Dec. 17
**(Cite as: 351 B.R. 103)**

51k2341 k. In general. Most Cited Cases

Cayman Islands proceedings under which hedge funds were being wound up, subject to the supervision of Cayman Islands court, were entitled to recognition as foreign proceedings under Bankruptcy Code, given that joint official liquidators appointed in funds' winding-up proceedings submitted certified copy of order of Cayman Islands court appointing them to administer funds' winding up and authorizing their commencement of Chapter 15 cases, and stated that they did not know of any other foreign proceedings respecting funds. 11 U.S.C.A. §§ 101(23, 24), 1515(b, c), 1517(a)(1-3).

**[10] Bankruptcy 51 ⌷2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

Under Bankruptcy Code, Cayman Islands proceedings under which hedge funds were being wound up, subject to the supervision of Cayman Islands court, were presumed to be foreign main proceedings, given that funds' center of main interests (COMI) was presumed to be Cayman Islands, where each fund was registered. 11 U.S.C.A. §§ 1402(4), 1516(c).

**[11] Bankruptcy 51 ⌷2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

Statutory presumption that foreign debtor's registered office is its center of main interests (COMI), for purposes of determining whether foreign pro-

ceeding is foreign main proceeding, can be rebutted. 11 U.S.C.A. §§ 1502(4), 1516(c).

**[12] Bankruptcy 51 ⌷2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

Factors, singly or combined, that could be relevant to determining whether presumption, under Bankruptcy Code, that foreign debtor's place of registration or incorporation is its center of main interests (COMI) has been rebutted, for purposes of determining whether proceeding is foreign main proceeding, include the location of debtor's headquarters; the location of those who actually manage debtor, which, conceivably, could be the headquarters of a holding company; the location of debtor's primary assets; the location of the majority of debtor's creditors or of a majority of the creditors who would be affected by the bankruptcy case; and the jurisdiction the law of which would apply to most disputes. 11 U.S.C.A. §§ 1502(4), 1516(c).

**[13] Bankruptcy 51 ⌷2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

Given that their money is ultimately at stake, court deciding whether foreign proceeding is foreign main proceeding for Chapter 15 purposes generally should defer to creditors' acquiescence in or support of a proposed center of main interests (COMI). 11 U.S.C.A. §§ 1502(4), 1516(c).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

351 B.R. 103, 56 Collier Bankr.Cas.2d 1176, 47 Bankr.Ct.Dec. 17
**(Cite as: 351 B.R. 103)**

**[14] Bankruptcy 51 ⬤2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

Case under Chapter 15 is ancillary regardless of whether the foreign proceeding is main or nonmain. 11 U.S.C.A. § 1504.

**[15] Bankruptcy 51 ⬤2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

**Judgment 228 ⬤830.1**

228 Judgment
    228XVII Foreign Judgments
        228k830 Judgments of Courts of Foreign Countries
            228k830.1 k. In general. Most Cited Cases

Any determination by Cayman Islands court that Cayman Islands proceedings under which hedge funds were being wound up were primary was not binding upon bankruptcy court in deciding whether such foreign proceedings were main or nonmain under Chapter 15. 11 U.S.C.A. § 1504.

**[16] Bankruptcy 51 ⬤2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings

51k2341 k. In general. Most Cited Cases

Circumstances warranted recognition of Cayman Islands proceedings under which hedge funds were being wound up, subject to the supervision of a Cayman Islands court, as foreign nonmain proceedings under Chapter 15, subject to later modification under Bankruptcy Code, rather than deferring request of joint official liquidators (JOLs) appointed in proceedings to recognize those proceedings as foreign main proceedings, even though, under either approach, court could grant JOLs significant relief upon proper showing, given that many objective factors pointed to Cayman Islands not being funds' center of main interests (COMI), and that no negative consequences appeared to result from recognition of proceedings as nonmain proceedings. 11 U.S.C.A. § 1517(b)(1), (d).

**[17] Bankruptcy 51 ⬤2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

Under Chapter 15, foreign nonmain proceeding can exist when there are no other pending proceedings.

**\*105** Kaye Scholer LLP, New York City, by Madlyn Gleich Primoff, Benjamin Mintz, Lovells, Chicago, IL, by Gary Lee, for Kenneth M. Krys and Christopher Stride, as Joint Official Liquidators.

Milbank, Tweed, Hadley & McCloy, by Luc A. Despins, Esq. and Andrew M. Leblanc, Esq., for the Official Committee of Unsecured Creditors of Refco Inc., et al.

Bingham McCutchen LLP, New York, NY, by Tina L.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

351 B.R. 103, 56 Collier Bankr.Cas.2d 1176, 47 Bankr.Ct.Dec. 17
**(Cite as: 351 B.R. 103)**

Brozman, Timothy B. DeSieno, for Marc S. Kirschner, as Chapter 11 Trustee for Refco Capital Markets, Ltd.

**\*106** *MEMORANDUM OF DECISION ON PETITION OF FOREIGN REPRESENTATIVES FOR RECOGNITION OF FOREIGN MAIN PROCEEDINGS UNDER 11 U.S.C. §§ 1515 AND 1517(b)(1) AND REQUEST FOR RELIEF UNDER 11 U.S.C § 1521(a) THAT MAY BE GRANTED UPON RECOGNITION*

ROBERT D. DRAIN, Bankruptcy Judge.

On July 31, 2006, Kenneth M. Krys and Christopher Stride (together, the "JOLs"), as Joint Official Liquidators of all but one of the above-captioned debtors and as Joint Provisional Liquidators of the remaining debtor, SPhinX Managed Futures Fund, SPC [FN1] ("SMFF"; with the other debtors, the "SPhinX Funds" or the "Debtors"), in the SPhinX Funds' voluntary winding up proceedings under the supervision of the Grand Court of the Cayman Islands (the "Cayman Court"), filed petitions in this Court under chapter 15 of the Bankruptcy Code, 11 U.S.C. §§ 101 et seq.

> FN1. The Grand Court of the Cayman Islands later appointed the JOLs as Joint Official Liquidators of SMFF.

On the same day, the JOLs obtained an order (Bernstein, C.J.) scheduling and approving the form of notice of an expedited hearing on their petition for recognition of the Cayman Islands proceedings as "foreign main proceedings" under sections 1515 and 1517(b)(1) of the Bankruptcy Code and their request for additional relief under section 1521(a) of the Bankruptcy Code that may be granted upon recognition (the "Petition"). They also sought a temporary restraining order under section 1519(a) of the Bankruptcy Code pending the hearing on their petition for recognition, but Judge Bernstein denied that request.

On August 16, 2006, the Court held an evidentiary hearing on the Petition and the joint objection thereto of the Official Committee of Unsecured Creditors of Refco Inc., *et al.* (the "Refco Committee") and Marc S. Kirschner (the "RCM Trustee"), as chapter 11 trustee for Refco Capital Markets, Ltd. ("RCM"), and issued a bench ruling granting the Petition in part, denying it in part and partially taking it under advisement.

More specifically, the Court held that the Cayman Islands proceedings should be recognized as foreign proceedings under sections 1515 and 1517(a) of the Bankruptcy Code but took under advisement whether they should be recognized as foreign main proceedings or, alternatively, foreign nonmain proceedings under sections 1517(b)(1) and (2), respectively. Given the lack of specificity in the JOLs' request for additional relief under section 1521(a) of the Bankruptcy Code, with the exception of a request made at the hearing for which the JOLs had not provided adequate notice, and their related failure to show irreparable harm, the Court denied substantially all of the JOLs' request for additional relief, without prejudice.

This memorandum of decision states in greater detail the rationale for concluding that the Cayman Islands proceedings are foreign nonmain proceedings under 11 U.S.C. § 1517(b)(2), subject, however, to possible modification under 11 U.S.C. § 1517(d).

***Facts***
**A. The SPhinX Funds' Business and Contacts with the Cayman Islands.** Each of the SPhinX Funds is either a limited liability company or a segregated **\*107** portfolio company ("SPC") incorporated and registered in the Cayman Islands. Declaration of Kenneth M. Krys dated July 31, 2006 ("Krys Decl.") ¶ 6.

The SPhinX Funds are hedge funds whose business consisted of buying and selling securities and

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

351 B.R. 103, 56 Collier Bankr.Cas.2d 1176, 47 Bankr.Ct.Dec. 17
**(Cite as: 351 B.R. 103)**

commodities in a manner that tracked, under a license from Standard & Poor's, certain S & P Hedge Fund Indexes. Transcript of hearing on the Petition dated August 16, 2006 ("Tr.") at 34–5; Krys Decl. ¶ 7.

The SPhinX Funds were established as offshore entities apparently to attract non-U.S. and U.S. tax-exempt investors in the light of favorable Cayman Islands tax benefits and regulations. August 2002 PlusFunds Due Diligence Review ("PlusFunds Review") at 5, attached as Exhibit E to the Declaration of Christopher Stride dated August 15, 2006 ("Stride Decl."); Declaration of Cherry Jane Bridges dated August 14, 2006 ("Bridges Decl.") ¶ 19. Although regulated in the Cayman Islands (with the SPCs subject to more regulation than the other SPhinX Funds), the SPhinX Funds did not conduct a trade or business in the Cayman Islands. Tr. at 34.[FN2] They had no employees and no physical offices in the Cayman Islands (or elsewhere, for that matter). Transcript of Deposition of Robert Aaron 32:11–32:15, February 23, 2006 ("Aaron Dep."); Transcript of Deposition of Patrina Farquarson 29:22–29:23, 33:16–33:18, February 16, 2006 ("Farquarson Dep.").[FN3]

> FN2. The SPhinX Funds were prohibited, as "exempted companies" from engaging in business in the Cayman Islands except in furtherance of their business carried on outside of the Cayman Islands. Companies Law (2004 Revision) of the Cayman Islands ("Companies Law") § 193; *see also* Bridges Decl. ¶ 20.

> FN3. Mr. Aaron and Ms. Farquarson were directors of the SPhinX Funds at the time of their depositions.

Indeed, except for corporate books and records (minute books and other statutory documents, not records of operations) required to be maintained under Cayman Islands law, the Debtors apparently have no assets in the Cayman Islands. Tr. at 32–3. At least the JOLs have not alleged the existence of any Cayman Islands assets, and they have acknowledged instead that "substantially all" of the Debtors' assets are in the United States. Krys Decl. ¶ 10. At the hearing, Mr. Stride clarified that at least ninety percent of the SPhinX Funds' approximately $500 million of assets are located in accounts in the United States. Tr. at 45.

From the SPhinX Funds' inception, their hedge fund business was actually conducted under a fully discretionary investment management contract by PlusFunds Group Inc. ("PlusFunds"), a Delaware corporation located in New York City, Tr. at 34–35, which also was responsible for creating the SPhinX Funds. (Aaron Dep. 56:20–57:3, 224:8–224:12; Farquarson Dep. 233:19–234:1, 53:6–53:8). *See also* PlusFunds Review; Offering Memorandum for shares of SPhinX Ltd., dated July 1, 2003, a copy of which is attached as Exhibit B to the Stride Decl. ("Offering Memorandum"), at 2, 16 (stating that PlusFunds "sponsors, and acts as investment manager to," each of the SPhinX Funds). PlusFunds is a debtor in this Court, Chapter 11 Case No. 06–10402(JMP). Like the SPhinX Funds, PlusFunds is in a liquidation posture, in the process of winding up, among other things, its investment management contract with the SPhinX Funds, which was expected to be completed by August 31, 2006. Stride Decl. ¶ 33. Most, if not all, of the account managers retained by PlusFunds**108** to provide services for the SPhinX Funds did so from the United States. Tr. at 35, 44.[FN4] Mr. Stride acknowledged that he did not know of any trading in securities or commodities in the Cayman Islands that was engaged in by or on behalf of the SPhinX Funds. *Id.* at 34.

> FN4. Mr. Stride's estimate that at least ninety percent of the SPhinX Funds' assets are located in the United States was based on his identification of the non-U.S. investment managers retained by PlusFunds and his understanding that they were responsible for

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

351 B.R. 103, 56 Collier Bankr.Cas.2d 1176, 47 Bankr.Ct.Dec. 17
**(Cite as: 351 B.R. 103)**

managing approximately $40 million of the SPhinX Funds' approximately $500 million of assets. Tr. at 21, 44. He did not determine whether any of the assets managed by those advisors actually are located outside of the United States, simply assuming that they were located abroad. *Id.* The JOLs' counsel stated, however, that it was more efficient for the Debtors to maintain their accounts in the U.S., although they were free, under Cayman Islands law, to remove them from the United States, and the SPhinX Funds' asset custodian was identified as Deutsche Bank Trust Company Americas, which is located in New York City (Offering Memorandum at 14), which suggests that even more of the Debtors' assets are located in the United States than the at least ninety percent acknowledged by the JOLs to be located here.

The JOLs also identified two lawsuits pending in the United States District Court for the Southern District of New York, apparently the SPhinX Funds' only pending litigation claims; in addition, the SPhinX Funds filed proofs of claim in the PlusFunds and Refco chapter 11 cases pending in this Court. Stride Decl. ¶ 31.

As noted above, the SPhinX Funds' investment strategy was closely tied to a license with Standard & Poor's, a division of McGraw–Hill Companies, Inc., a U.S. company, which permitted the account managers to track certain S & P Hedge Fund Indexes. *Id.* at 35. Corporate administration of the SPhinX Funds, including net asset value calculation, also was conducted primarily in the United States, out of the Somerset, New Jersey office of Derivatives Portfolio Management, Ltd. ("DPM"), *id.* at 29–30, although investor subscriptions were received in the Cayman Islands for review by DPM personnel, apparently for purposes of compliance with Cayman Islands anti-money laundering requirements. *Id.* The SPhinX

Funds' auditors were PriceWaterhouseCoopers, an international accounting firm, with a Cayman Islands address listed in the Offering Memorandum, Stride Decl. ¶ 19, which apparently was a requirement of Cayman Islands law. Tr. at 37. It is not clear how much work the auditors actually performed in the Cayman Islands; PriceWaterhouseCoopers resigned effective July 31, 2006. Stride Decl. ¶ 19.

None of the Debtors' directors resided in the Cayman Islands, and Mr. Stride was not aware of any board meeting that took place there. Tr. at 31–32. The Debtors' boards consisted of Irish,[FN5] Bahamian and U.S. residents.

> [FN5.] Until recently, the stock of two of the Debtors was traded on the Irish stock exchange.

The investors in the SPhinX Funds are located throughout the world; by dollar amount only approximately fourteen percent are located in the U.S. Stride Decl. ¶ 25. The JOLs do not state the percentage of the SPhinX Funds' Cayman Islands investors. Four of the nine members of the Debtors' Liquidation Committee, elected under the Companies Law, are U.S. based; one is Cayman Islands based. Stride Decl. ¶ 26.

With the exception of RCM, whose preference claim, discussed below, would apparently make it the SPhinX Funds' largest creditor (assuming that the prior settlement of that claim were unwound), there appear to be few other material creditors. It is far from clear whether, under U.S. law, the investors in the SPhinX Funds would be viewed, in such **\*109** capacity, as creditors, and whether claims that they might assert arising from the purchase or sale of their interests in the Debtors would be treated on the same priority as creditors' claims. *See* 11 U.S.C. § 510(b). Counsel for the JOLs stated at the hearing on the Petition, however, that the investors in the SPhinX Funds

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

351 B.R. 103, 56 Collier Bankr.Cas.2d 1176, 47 Bankr.Ct.Dec. 17
**(Cite as: 351 B.R. 103)**

could qualify as creditors for purposes of the Cayman Islands winding up proceedings. The Refco Committee and the RCM Trustee's joint objection to the Petition asserted that the SPhinX Funds may be solvent; the JOLs disagree, but, as addressed below, the Court determined that it was unnecessary to address the issue at this time.

**B. Background of the Cayman Islands Proceedings and the Petition.** RCM and affiliates that did business under the name "Refco" filed chapter 11 petitions in this Court on October 17, 2005. RCM is a Bermuda company that provided its client/account holders, generally institutional investors, banks, hedge funds and wealthy individuals, with foreign exchange and securities trading and execution services. RCM also is in liquidation, the RCM Trustee having been appointed on April 13, 2006. Before that appointment, the Refco Committee, on behalf of RCM's estate, commenced an adversary proceeding against certain of the SPhinX Funds, alleging that on the eve of RCM's chapter 11 filing PlusFunds obtained an approximately $312 million preference from RCM on the SPhinX Funds' behalf. The Refco Committee also sought an attachment of SPhinX Funds assets under New York CPLR § 6201, which the Court granted and on a modified basis maintained over several weeks pending the expedited trial of the preference proceeding. On the first day of trial, the parties announced a settlement in open court, which was subsequently memorialized in a stipulation and proposed order executed by the SPhinX Funds (the "RCM Settlement"), and the settlement funds were paid into escrow.

Under sections 102(1) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019, RCM's entry into the RCM Settlement was subject to the requirement of notice to parties in interest in RCM's chapter 11 case and the opportunity for a hearing. The Refco Committee filed such a motion, and certain investors in the SPhinX Funds objected to it on the basis that the RCM Settlement was *too favorable* to RCM.

Perhaps not trusting entirely in the merits of this objection,[FN6] not long before the hearing on RCM's motion a subset of those investors caused involuntary winding up proceedings under the Companies Law to be commenced in the Cayman Islands against two of the SPhinX Funds—SMFF and SPhinX Strategy Fund Ltd. Then, on the morning of the hearing on the merits of RCM's entry into the settlement, the Joint Provisional Liquidators who had been proposed by the investors and appointed in the Cayman Islands proceedings (the "JPLs") notified the Court of the existence of the foreign proceedings, as well as the fact that they had commenced chapter 15 cases in this Court, and sought an adjournment of the hearing to permit them to evaluate the RCM Settlement.

> FN6. The Court had previously limited extensive discovery sought by SPhinX Fund investor-objectors, to the extent that such discovery concerned the merits of the RCM Settlement from the viewpoint of the SPhinX Funds as opposed to RCM's estate and creditors.

This Court denied the request, however, on the basis that the hearing was not for the purpose of considering the RCM Settlement from the perspective of the SPhinX Funds but, rather, from the perspective of RCM's estate and creditors, and that the Court lacked jurisdiction to **\*110** weigh the merits of the settlement from the perspective of, and potentially unwind or preclude the performance by, non-debtor parties such as the SPhinX Funds. *See* Transcript of June 8, 2006 hearing ("RCM Settlement Hearing Tr.") at 31–35; *see also In re Adelphia Commc'ns. Corp.,* 327 B.R. 143, 174 (Bankr.S.D.N.Y.2005) ("The stated objection by the class action plaintiffs urges not that the settlement is too expensive for [the debtor], but rather that it is too favorable. An objection of that character does not address the needs and concerns of the [debtor's] estate, nor does it involve any legally cognizable rights over which I have jurisdiction."), *aff'd* 337 B.R.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

351 B.R. 103, 56 Collier Bankr.Cas.2d 1176, 47 Bankr.Ct.Dec. 17
**(Cite as: 351 B.R. 103)**

475 (S.D.N.Y.2006). (Of course the JPLs were free to take appropriate action in the proper forum if they believed that either of the two SPhinX Funds' entry into the RCM Settlement had been avoidable or gave rise to any causes of action against third parties, such as those in control of SMFF or SPhinX Strategy Fund Ltd. RCM Settlement Hearing Tr. at 32, 34.) The Court then approved RCM's entry into the RCM Settlement as being in the best interests of RCM's estate and creditors and fair and equitable from the perspective of those holding claims against and interests in RCM.

The Cayman Islands winding up petition against SPhinX Strategy Fund Ltd. was then dismissed and the winding up petition against SMFF was "adjourned generally." Stride Decl. ¶ 8. Also, the JPLs withdrew their chapter 15 petitions, no activity having taken place in those cases after the Court's approval of the RCM Settlement.

Certain of the SPhinX Fund investors appealed the Court's June 9, 2006 order approving RCM's entry into and performance of the RCM Settlement. It is important to recognize that the pendancy of such appeals, regardless of their merits, effectively postpones the date that the RCM Settlement becomes effective, notwithstanding the SPhinX Funds' prior payment of the settlement proceeds into escrow. This is because the RCM Settlement provides that "[i]f this Stipulation and Order, or any portion thereof, is not approved by the Bankruptcy Court or if it is overturned or modified on appeal, this Stipulation and Order shall be of no further force and effect...." RCM Settlement ¶ 6. As a result, delay of the appeals effectively constitutes success on appeal *without consideration of the merits.* Moreover, the RCM Trustee and the Refco Committee have persuasively asserted that delay of the effectiveness of the RCM Settlement materially adversely affects their ability to reach a global resolution of the Refco chapter 11 cases, thus conferring significant strategic leverage on the party causing delay.

Certain investors apparently having obtained control of the SPhinX Funds, on June 30, 2006 the SPhinX Funds were put into voluntary liquidation, and the shareholders appointed Messrs. Krys and Stride as joint voluntary liquidators. Stride Decl. ¶ 6. On July 4, 2006, the SPhinX Funds, with the exception of SMFF, filed voluntary winding up petitions in the present Cayman Islands proceedings. *Id.* ¶ 7. Although the Cayman Court did not enter winding up orders officially appointing the JOLs until July 28, 2006 (and on August 8 with respect to SMFF), Messrs. Krys and Stride appeared through counsel in their capacity as joint voluntary liquidators at a July 18, 2006 scheduling conference before the District Court on the RCM Settlement appeals and agreed to file the SPhinX Funds' appellee brief by August 23, 2006. [FN7] *See* **\*111** Letter from counsel for the Refco Committee and the RCM Trustee to Hon. Richard M. Berman (August 4, 2006), and endorsed by District Judge Berman on August 9, 2006 ("August 9 Mem. Endorsement"). Judge Berman, at the SPhinX investor-appellants' request, extended the briefing schedule, with the result that appellees' briefs would be due on September 11, 2006; however, he also required Messrs. Krys and Stride to inform him no later than July 24, 2006, which was later extended to August 2, 2006, whether they would file their brief jointly with the Refco Committee and the other appellees or seek permission to file a separate brief. *Id.*

> FN7. None of the SPhinX Funds is a party to the appellate litigation, with the exception that certain of the SPhinX Funds are appellees in connection with a related appeal by the SPhinX investors of the Court's partial grant of SMFF's motion to quash discovery under Fed.R.Civ.P. 45(c)(3).

Nevertheless, on July 31, 2006, the JOLs also sought from this Court a temporary restraining order under section 1519(a) of the Bankruptcy Code that would enjoin further activity in the appeals.[FN8] They made essentially the same argument that the JPLs had

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

351 B.R. 103, 56 Collier Bankr.Cas.2d 1176, 47 Bankr.Ct.Dec. 17
**(Cite as: 351 B.R. 103)**

made at the RCM Settlement hearing, asserting that they needed to investigate whether the RCM Settlement was improper from the SPhinX Funds' perspective, *see* Transcript of hearing on Application for Temporary Restraining Order dated July 31, 2006 ("TRO Tr.") at 7–10, 27–31, with the same result. Chief Bankruptcy Judge Bernstein denied the motion, stating as follows:

> FN8. Section 1519 of the Code provides that the bankruptcy court may grant provisional relief, under the standards, procedures and limitations applicable to an injunction, where relief is urgently needed to protect the assets of the debtor or the interests of creditors, pending determination of a foreign representative's petition for recognition of the foreign proceeding under section 1515 of the Bankruptcy Code. 11 U.S.C. §§ 1519(a), (e).

The only issue that has really been raised [FN9] ... is this appeal ... which is subject to Judge Berman's scheduling order, and the proceeds of that settlement and, as I understand it, nothing is going to happen before August 16th [FN10] with respect to that anyway.

> FN9. The JOLs had also sought a temporary restraining order either compelling the turnover to them of the SPhinX Funds' accounts in the United States or prohibiting any action against those accounts; however, Judge Bernstein found that the JOLs had not shown any possible danger to those funds, such as a creditor's attempt to seize assets, and therefore that they had not met their burden of showing irreparable harm. TRO Tr. at 33.

> FN10. The date of the hearing on the Petition.

It's not so clear to me that these debtors have anything to do with this appeal at this point or that the automatic stay which would be triggered by an order of [main proceeding] recognition would affect that appeal. As I understand it the [SPhinX Funds] were parties to and proponents of the settlement. The appeal was being prosecuted or is being prosecuted by certain investors and the [SPhinX Funds] never themselves appealed from the order, nor could they, I suppose....

But really it sounds to me like this is an end run around Judge Drain's order of settlement and also Judge Berman's scheduling order. With respect to the former, it sounds to me like your problem is with the settlement and the allegation that whoever entered into the settlement or authorized the settlement on behalf of SphinX breached their fiduciary duties. And that's an entirely separate question, I think, as to whether the settlement is fair and reasonable to [RCM's] estate. Everything you've told me convinces me it is fair and reasonable and I disagree with you that the bankruptcy court is supposed to determine the capacity of the non-debtor party**112** that entered into the settlement or whether it's fair and reasonable from the non-debtor's point of view. That's precisely what it's not supposed to determine, I think....

If you have a problem with a scheduling order, that should really be referred to the district court judge that entered the order and say exactly what you said to me, that you've just been appointed on Friday, you have to take a position, there are questions about whether or not you even, at this point can take a position. It sounds to me like you oppose the settlement, so you don't have to convince me that you can't take a position that you oppose the settlement and support the appeal at this point, but I'll leave that up to you. But for the reasons I've stated, I will deny the TRO.

TRO Tr. at 34–35.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

351 B.R. 103, 56 Collier Bankr.Cas.2d 1176, 47 Bankr.Ct.Dec. 17
**(Cite as: 351 B.R. 103)**

The JOLs later requested District Judge Berman to stay the pending appeals, but he directed in the August 9 Mem. Endorsement that there would be "no suspension of the briefing schedule at this time."

### *Discussion*

**A. Jurisdiction and Venue.** This Court has jurisdiction over the Petition under 28 U.S.C. §§ 157(a) and 1334(b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(P). Venue is proper in this district under 28 U.S.C. § 1410.

### B. Recognition of the Foreign Proceedings.

**1. Guiding Principles.** Congress enacted chapter 15 of the Bankruptcy Code as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. No. 109–8, 119 Stat. 23. Unique to the Bankruptcy Code, it contains a statement of purpose: "[t]he purpose of this chapter is to incorporate the Model Law on Cross–Border Insolvency [FN11] so as to provide effective mechanisms for dealing with cases of cross-border insolvency," with the express objectives of cooperation between United States courts, trustees, examiners, debtors and debtors in possession and the courts and other competent authorities of foreign countries; greater legal certainty for trade and investment; fair and efficient administration of cross-border insolvencies that protects the interests of all creditors and other interested entities, including the debtor; the protection and maximization of the debtor's assets; and the facilitation of the rescue of financially troubled businesses. 11 U.S.C. § 1501(a)(1)-(5).

> FN11. This is a reference to the Model Law promulgated by the United Nations Commission on International Trade Law at its Thirtieth Session on May 12–30, 1997, UN Sales No. E.99V.3 (the "Model Law"). H.R. Rep. 109–31, pt. 1, 109th Cong., 1st Sess., U.S.Code Cong. & Admin.News 2005, pp.88, 105–107 (2005).

Although chapter 15 replaced section 304 of the Bankruptcy Code, which previously governed cases ancillary to foreign proceedings, chapter 15 maintains—and in some respects enhances—the "maximum flexibility," *In re Brierley,* 145 B.R. 151, 160 (Bankr.S.D.N.Y.1992); *In re Culmer,* 25 B.R. 621, 628 (Bankr.S.D.N.Y.1982), that section 304 provided bankruptcy courts in handling ancillary cases in light of principles of international comity and respect for the laws and judgments of other nations.

This flexibility is evident not only in the policy statement in section 1501(a) but also in Bankruptcy Code section 1522, which provides that the Court may grant or modify interim relief under section 1519 or additional relief under section 1521, "only if the interests of creditors and other interested entities, including the debtor, are sufficiently protected." **\*113** 11 U.S.C. § 1522(a). Two aspects of section 1522(a) are notable. First, Congress directed the court to focus on the interests of *all* creditors and other interested parties, not just those of U.S. parties.[FN12] Second, section 1522(a) implements and harmonizes with section 1501(a)'s policy statement: in light of section 1501(a), the Court shall protect the parties' interests by implementing fair, efficient and, it is hoped, cooperative procedures designed to maximize the value of the debtor's assets for distribution.

> FN12. Other provisions of chapter 15 do require the court to consider, among other factors, the interests of U.S. creditors in certain circumstances. *See* 11 U.S.C. §§ 1507(b)(2) (protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in the foreign proceeding); 1521(b) (providing that court must be satisfied that the interests of creditors in the United States are sufficiently protected before entrusting the distribution of all or part of the debtor's assets located in the United States to the foreign representative).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

351 B.R. 103, 56 Collier Bankr.Cas.2d 1176, 47 Bankr.Ct.Dec. 17
**(Cite as: 351 B.R. 103)**

Flexibility also is inherent in the various forms of relief that the court may grant, upon a proper showing, to a foreign representative. *See, e.g.,* 11 U.S.C. §§ 1519 (providing for interim relief that may be granted upon filing of a petition for recognition of foreign proceeding), 1521 (providing for relief that may be granted upon recognition of the foreign proceeding, whether as a main or nonmain proceeding), and 1507 (providing for "additional assistance" upon recognition, whether "main" or "nonmain," essentially tracking former Code section 304), each of which enables the court to fashion and condition relief, such as a stay of execution against assets, entrusting to the foreign representative, or another person authorized by the court, the administration or realization of all or a part of the debtor's assets located in the United States, and providing for the examination of witnesses and the delivery of information, as appropriate.

[1] Chapter 15 also provides flexibility by acknowledging the possibility of a concurrent plenary case under other chapters of the Bankruptcy Code while a foreign proceeding is pending, permitting a foreign representative in a recognized foreign proceeding to commence (11 U.S.C. § 1511) or participate in (11 U.S.C. §§ 1512, 1523) such a case, and providing for cooperation and direct communication between the bankruptcy court and foreign courts or foreign representatives and bankruptcy trustees and foreign courts or foreign representatives. 11 U.S.C. §§ 1525–1530. The Bankruptcy Code also permits a case to be filed by or against a foreign debtor without a concurrent case having been filed abroad, if the debtor satisfies the Code's jurisdictional requirements. *See In re Aerovias Nacionales de Colombia S.A.,* 303 B.R. 1, 9, 15 (Bankr.S.D.N.Y.2003); *In re Global Ocean Carriers Ltd.,* 251 B.R. 31, 37 (Bankr.D.Del.2000).

Finally, chapter 15 demonstrates its flexibility in provisions that permit the court to condition relief (11 U.S.C. § 1522(b)) or modify previously granted relief in light of changed circumstances.[FN13] *See* 11 U.S.C.

§§ 1522(c) (court may modify relief previously granted under sections 1519 or 1521); 1517(d) (court may modify or terminate recognition itself, with due regard, however, to possible prejudice to parties who relied on a prior order granting recognition).

FN13. Bankruptcy Code section 1518 requires a foreign representative to file with a court prompt notice of any substantial change in the status of the foreign proceeding or of the foreign representative's appointment and concerning any other foreign proceeding that becomes known to the foreign representative. 11 U.S.C. § 1518.

**\*114** The key to harmonizing this pervasive flexibility with section 1501(a)(2)'s objective of "greater legal certainty for trade and investment" must be, again, the directive of sections 1501(a)(3)-(5) and 1522(a) to protect the interests of the parties in interest pursuant to fair and efficient procedures that maximize value. It would be hard for any court, U.S. or foreign, to quarrel with that goal, and, of course, the remaining objective of section 1501(a)(1)—facilitating cooperation among courts—requires such shared fundamental expectations.

[2] Therefore, in cases where the court is asked under chapter 15 to reconcile conflicting claims to primacy between or among proceedings, including the matter presently before the Court, the interests of the debtor's estate, creditors and other parties, absent evidence that they support a "primary" proceeding for an improper purpose, should generally be a significant and perhaps deciding factor. See generally *In re Aerovias Nacionales de Colombia S.A.,* 303 B.R. 1 (Bankr.S.D.N.Y.2003), which, although pre-dating chapter 15's enactment, is instructive in light of the flexibility that pervades chapter 15 and the chapter's stated purposes. In *Aerovias,* the court decided not to dismiss the chapter 11 case of a foreign airline where, as here, no other insolvency case had been filed in a

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

351 B.R. 103, 56 Collier Bankr.Cas.2d 1176, 47 Bankr.Ct.Dec. 17
**(Cite as: 351 B.R. 103)**

different jurisdiction. *Id.* at 18. The court did so notwithstanding that the debtor's registered office and principal place of business were outside the United States. *Id.* at 4. Having examined numerous decisions in which bankruptcy courts had either dismissed chapter 11 cases in deference to foreign proceedings or, to the contrary, maintained chapter 11 cases involving foreign debtors, the *Aerovias* court concluded that "the most obvious principle at work was a thorough pragmatism as to what relief would best suit the needs of the foreign debtor" and protect creditors. *Id.* at 15. Because the debtor and the great bulk of the debtor's creditors would be well served by and protected in a chapter 11 case, *id.* at 10, a view that was, importantly, evidenced by general creditor consensus, *id.* at 13, the *Aerovias* court held that the case was appropriately lodged under chapter 11. *Id.* at 14–15.[FN14]

> FN14. Among factors pragmatically considered by the court were that (a) key assets and contract parties were subject only to U.S. jurisdiction, and a U.S. proceeding would likely have been necessary under any circumstances, (b) the foreign jurisdiction's reorganization statute had certain features that under the circumstances would have made a reorganization extremely difficult, and (c) the foreign creditors had generally accepted the U.S. court's jurisdiction. *Id.* at 10–14.

[3] This is not to say, of course, that chapter 15 will eliminate all conflicts between the domestic court and foreign jurisdictions. As noted in *Underwood v. Hilliard (In re Rimsat, Ltd.),* 98 F.3d 956, 963 (7th Cir.1996), "Comity is a doctrine of adjustment, not a mandate for inaction. In the case of parallel inconsistent proceedings in domestic and foreign courts, one must yield; there is no [blanket] presumption that it is the domestic...." *See also GMAM Investment Funds Trust I v. Globo Comunicacoes E Participacoes S.A. (In re Globo Comunicacoes E Participacoes S.A.),* 317 B.R. 235, 253–54 (S.D.N.Y.2004). Chapter

15 does, however, provide the court with flexibility and a directive to minimize such conflicts if possible in the interests of the debtor and its creditors. Significantly for purposes of the present matter before the Court, chapter 15 does so in part by minimizing the practical differences between the recognition of a foreign proceeding as "main" or "nonmain" under sections 1517(b)(1) or (2), enabling **\*115** the court to focus only on conflicts over primacy that truly cannot be avoided.

[4] **2. Recognition.** The first step to obtaining relief under chapter 15 (with the exception of interim relief under section 1519) is receiving "recognition" of the foreign proceeding under sections 1515 and 1517(a) of the Bankruptcy Code. Chapter 15 pertains to a case ancillary to a foreign proceeding that is "recognized" by the Court, whether the foreign proceeding is a "foreign main proceeding" or a "foreign nonmain proceeding." *See* 11 U.S.C. §§ 1504 ("Commencement of ancillary case. A case under this chapter is commenced by the filing of a petition for recognition of a foreign proceeding under section 1515"); 1502(7) (" 'recognition' means the entry of an order granting recognition of a foreign main proceeding or foreign nonmain proceeding under this chapter"); 1517(a)(1) ("Subject to section 1506,[FN15] after notice and a hearing, an order recognizing a foreign proceeding shall be entered if such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502"). Thus, in Bankruptcy Code sections 1502(7), 1504, and 1517(a)(1) Congress separated the concept of "recognition" from the concept of "recognition as a foreign main (or nonmain) proceeding" under section 1517(b).[FN16]

> FN15. Section 1506 of the Bankruptcy Code provides that "[n]othing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

351 B.R. 103, 56 Collier Bankr.Cas.2d 1176, 47 Bankr.Ct.Dec. 17
**(Cite as: 351 B.R. 103)**

policy of the United States." 11 U.S.C. § 1506. According to the legislative history, this provision in similar Model Law contexts "has been narrowly interpreted on a consistent basis in courts around the world. The word 'manifestly' in international usage restricts the public policy exception to the most fundamental policies of the United States." H.R. Rep. 109–31, pt. 1, 109th Cong. 1st Sess. at 109 (2005). *See also In re RSM Richter v. Aguilar* ( *In re Ephedra Prods. Liab. Litigation* ), 349 B.R. 333 (S.D.N.Y.2006).

FN16. *See also* 11 U.S.C. § 1517(c), which provides that "[a] petition for recognition of a foreign proceeding"—note, not a petition for recognition as a foreign main proceeding—"shall be decided upon at the earliest possible time. Entry of an order recognizing a foreign proceeding constitutes recognition under this chapter."

Although the court has the power to grant, under appropriate circumstances, extensive relief whether the foreign proceeding is recognized as "main" or "nonmain," recognition of the proceeding as a "foreign main proceeding" under section 1517(b)(1) does trigger some additional relief under section 1520(a) of the Bankruptcy Code. That is, upon recognition of the foreign proceeding as a "foreign main proceeding," (a) the automatic stay under Bankruptcy Code section 362 (as well as the creditors' right to adequate protection and relief from the automatic stay under sections 361 and 362(d) of the Bankruptcy Code) applies with respect to the debtor and its property within the territorial jurisdiction of the United States, (b) sections 363, 549 and 552 of the Bankruptcy Code apply to restrict the ability to transfer such property absent court approval, and (c) unless the court orders otherwise, the foreign representative may operate the debtor's business and exercise the rights and powers of a trustee under Bankruptcy Code sections 363 and

552. 11 U.S.C. § 1520(a)(1)-(3).

[5][6][7] In addition to this relief and perhaps a surprisingly small number of other distinctions between foreign main and nonmain proceedings specifically set forth in chapter 15,[FN17] recognition of a foreign main **116** proceeding may also serve to indicate that the reasonable interests of creditors and the maximization of value, as well as considerations of international comity, generally support the bankruptcy court's deference to such proceeding. On the other hand, it is equally important to note that the Bankruptcy Code does not expressly mandate such across-the-board deference, nor would recognition of a foreign main proceeding necessarily be binding on choice of law determinations. Thus, while the decision to recognize a foreign proceeding as "main" may be viewed by some as significant, it has limited specified consequences under chapter 15 (particularly since the chapter gives the bankruptcy court the ability to grant substantially the same types of relief in assistance of foreign nonmain proceedings as main proceedings and to condition the foreign representative's ability to operate the business and dispose of the debtor's assets under section 1520(a)(3)), and, moreover, recognition itself is subject to review and modification under Bankruptcy Code section 1517(d).

FN17. For example, after recognition of a foreign main proceeding, the effects of a case under another chapter of the Bankruptcy Code are restricted to the assets of the debtor located within the territorial jurisdiction of the United States and, to the extent necessary to implement cooperation and coordination with the foreign court, to other assets of the debtor that are within the bankruptcy court's extraterritorial jurisdiction, to the extent not within the jurisdiction of a previously recognized foreign proceeding. 11 U.S.C. § 1528. That is, the concurrent case under the Bankruptcy Code should generally serve the interests of the foreign main proceed-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

351 B.R. 103, 56 Collier Bankr.Cas.2d 1176, 47 Bankr.Ct.Dec. 17
**(Cite as: 351 B.R. 103)**

ing—subject, of course, to the court's duty to condition or modify relief to protect creditors as discussed above.

[8][9] The Refco Committee and the RCM Trustee do not invest much energy disputing the JOLs satisfaction of chapter 15's requirements for recognition under section 1517(a)(1).[FN18] In any event, the Cayman Islands proceedings, under which the SPhinX Funds are being wound up subject to the supervision of the Cayman Court in collective proceedings under the Companies Law, are "foreign proceedings" under Bankruptcy Code section 101(23). *Compare Hoffman v. Bullmore ( In re Nat'l Warranty Ins. Risk Retention Group),* 306 B.R. 614, 620–21 (BAP 8th Cir.2004), *aff'd* 384 F.3d 959 (8th Cir.2004); *In re Gee,* 53 B.R. 891, 904 (Bankr.S.D.N.Y.1985) (each recognizing, for purposes of Bankruptcy Code section 304, court-supervised Cayman Islands winding up proceedings) *with In re Tam,* 170 B.R. 838, 844–46 (Bankr.S.D.N.Y.1994) (not recognizing, for purposes of section 304, a voluntary Cayman Islands winding up proceeding that was not subject to supervision by the Cayman Court).[FN19] The JOLs have also provided a certified copy of the Cayman Court's order appointing them to administer the Debtors' winding up under the Companies Law and authorizing their commencement of these chapter 15 cases, thereby satisfying Bankruptcy Code sections 101(24) and 1515(b); and they also have satisfied Bankruptcy Code section 1515(c) by stating that they do not know of **\*117** any other foreign proceedings with respect to the SPhinX Funds. Consequently, the Cayman Islands proceedings are entitled to recognition. 11 U.S.C. § 1517(a)(1)-(3).

FN18. As noted above the RCM Trustee contends that the SPhinX Funds are solvent and have no need to be wound up; however, neither the RCM Trustee nor any other party-in-interest contends that liquidation is inimical to the Debtors. Thus it does not appear that the commencement of Cayman Is-

lands winding up proceedings for these admittedly liquidating entities, all of which are registered in the Cayman Islands and several of which, as SPCs, are subject to additional Cayman Islands regulation, would be "manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506.

FN19. The JOLs also asserted, without opposition by any investor, that the Debtors are not stockbrokers, their investors being shareholders in, rather than customers of, the SPhinX Funds. The Debtors therefore are not ineligible for chapter 15 relief under section 1501(c)(3) of the Code.

The real dispute concerns whether the Cayman Islands proceedings should be recognized as foreign main proceedings under Bankruptcy Code section 1517(b)(1), although, as noted above, the statutory and practical effects of this decision are not as important as the parties may believe.

[10] On the issue of recognition of foreign proceedings as "main" or "nonmain," the Bankruptcy Code provides considerable but not complete direction. "A 'foreign main proceeding' means a foreign proceeding pending in the country where the debtor has its center of main interests" ("COMI"). 11 U.S.C. § 1502(4). And, "[i]n the absence of evidence to the contrary, the debtor's registered office ... is presumed to be the [COMI]." 11 U.S.C. § 1516(c). Therefore, because the SPhinX Funds' COMI is presumed to be the Cayman Islands, where each Debtor is registered, the Cayman Islands proceedings are presumed to be foreign main proceedings.

[11] Pursuant to the introductory clause to Bankruptcy Code 1516(c), however, that presumption may be rebutted. The legislative history makes it clear, moreover, that "[t]he ultimate burden as to each element [of recognition] is on the foreign representative,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

351 B.R. 103, 56 Collier Bankr.Cas.2d 1176, 47 Bankr.Ct.Dec. 17
**(Cite as: 351 B.R. 103)**

although the court is entitled to shift the burden to the extent indicated in section 1516." H.R. Rep. 109–31, pt. 1, 109th Cong. 1st Sess. at 112–113 (2005). The legislative history also indicates that the statutory presumption of section 1516(c) may be of less weight in the event of a serious dispute: "[t]he presumption that the place of the registered office is also the center of the debtor's main interest is included for speed and convenience of proof where there is no serious controversy." *Id.*

[12] The Bankruptcy Code does not state the type of evidence required to rebut the presumption that the COMI is the debtor's place of registration or incorporation. Various factors, singly or combined, could be relevant to such a determination: the location of the debtor's headquarters; the location of those who actually manage the debtor (which, conceivably could be the headquarters of a holding company); the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes.

[13] As discussed above, the flexibility inherent in chapter 15 strongly suggests, however, that the Court should not apply such factors mechanically. Instead, they should be viewed in light of chapter 15's emphasis on protecting the reasonable interests of parties in interest pursuant to fair procedures and the maximization of the debtor's value. Because their money is ultimately at stake, one generally should defer, therefore, to the creditors' acquiescence in or support of a proposed COMI. It is reasonable to assume that the debtor and its creditors (and shareholders, if they have an economic stake in the proceeding) can, absent an improper purpose, best determine how to maximize the efficiency of a liquidation or reorganization and, ultimately, the value of the debtor, assuming also, of course, that chapter 15 requires the court to protect the legitimate interests of dissenters (even to the extent of enabling the modification of a

recognition order under Bankruptcy Code section 1517(d)), particularly where other objective factors point to a different COMI. Relatedly, if the parties in interest are in a legitimate**\*118** dispute over the debtor's COMI, it is probably safe to assume that promoting cooperation among courts and the parties will play a greater role than artificially choosing one proceeding as a "primary" proceeding. At least this is what the Court takes away from the stated objectives and structure of the statute.

There appear to be no published cases involving a dispute over COMI under chapter 15. But that is not the end of the inquiry; in keeping with its international context, chapter 15 directs courts also to obtain guidance from the application of similar statutes by foreign jurisdictions: "[i]n interpreting this chapter, the court shall consider its international origin, and the need to promote an application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions." 11 U.S.C. § 1508. *See also* 11 U.S.C. § 1501(a) (noting chapter 15's incorporation of the Model Law). Unfortunately, foreign case law under analogous statutes also is not sufficiently established to provide much more guidance on what must be shown to rebut the COMI presumption, with the exception of the only foreign decision that the parties have cited, a recent ruling by the European Court of Justice, which stated that the scope of the COMI concept

is highlighted by the 13th recital of the [EC] Regulation,[FN20] which states that the 'centre of main interests' should correspond to *the place where the debtor conducts the administration of his interests on a regular basis and is therefore ascertainable by third parties.*'

> FN20. Council Regulation 1346/2000 of 29 May 2000 on Insolvency Proceedings, 2000 O.J. (L.160), 1, 2, *available at* http:// 147. 67. 4.    5/    eur-    lex/    pr i/en/oj/dat/2000/1_160/1_1602    0000630en

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

351 B.R. 103, 56 Collier Bankr.Cas.2d 1176, 47 Bankr.Ct.Dec. 17
**(Cite as: 351 B.R. 103)**

00010018.pdf.

The definition shows that the center of main interests must be identified by reference to criteria that are both objective and ascertainable by third parties....

It follows that, in determining the center of the main interests of a debtor company, the simple presumption laid down by the [European] Community legislature in favour of the registered office of that company can be rebutted *only if factors which are both objective and ascertainable by third parties enable it to be established that an actual situation exists which is different from that which locating it at that registered office is deemed to reflect.*

*That could be so in particular in the case of a 'letterbox' company not carrying out any business in the territory of the Member State in which its registered office is situated.*

*Bondi v. Bank of America, N.A. ( In re Eurofood IFSC Ltd.),* Case 341/04, slip op. at 6, 2006 E.C.R. ——, 2006 WL 1142304 (E.C.J. May 2, 2006) (emphasis added).

In the *Eurofood* case, however, the European Court of Justice, based on the question certified to it, assumed that the only evidence offered to rebut the place-of-reregistered-office presumption was that management for the holding company that owned the debtor made decisions on the debtor's behalf in the alternative proposed COMI. The court assumed that the debtor was not a mere "letterbox" company that was not carrying out any real business in the location of its registered office; instead, it assumed that the debtor "regularly administered its interests, in a manner ascertainable by third parties and in respect of its own corporate identity, in the Member State where its registered office is situated." *Id.,* slip op. at 5–6. The COMI registered office presumption therefore

was not rebutted on the facts of the question certified. *Id.,* slip op. at 6. *Eurofood\*119* therefore left open whether the presumption may be rebutted in respect of a debtor that conducts some business in the location where it is registered (even if, as in the case of the SPhinX Funds, most, if not all, of that business pertains to maintaining its status as an entity registered in that location), although the ECJ strongly indicated that if third parties would objectively locate the administration of such a debtor's interests elsewhere, the presumption would be rebutted. [FN21]

> FN21. One other recent foreign decision also is relevant, although it applies common law principles of international comity rather than interprets the Model Law. In *Cambridge Gas Transport Corp. v. Official Committee of Unsecured Creditors (of Navigator Holdings PLC et al.),* [2006] UKPC (Lords of the Judicial Committee of the Privy Counsel) 26 (U.K.) [2006], 3 All E.R. 829, the Privy Council considered whether a request to transfer shares in a Manx company in order to implement a plan of reorganization previously confirmed under chapter 11 of the Bankruptcy Code should be recognized. It was argued on appeal that because the U.S. bankruptcy court did not have jurisdiction over the Manx shareholder, the Manx court should not have provided assistance to implement the chapter 11 plan. Lord Hoffman's statement of the ruling recognized, however, (a) that the Manx court at least had the power to assist the implementation of the chapter 11 plan to the extent that domestic insolvency law permitted and (b) it should do so in light of the economic reality that any interest in an insolvent Manx company was effectively reorganized by a chapter 11 plan that bound the company in which the shares were issued. *Id.* at 22, 26. To rule otherwise would delay and frustrate those with the real economic stake. Without discussing COMI at all, the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

351 B.R. 103, 56 Collier Bankr.Cas.2d 1176, 47 Bankr.Ct.Dec. 17
**(Cite as: 351 B.R. 103)**

decision made clear that a court can provide material assistance to a foreign court based on economic reality under principles of comity, as can this Court under chapter 15, whether or not the foreign jurisdiction is the COMI or the foreign proceedings are treated as main or nonmain. *See also In re Aerovias Nacionales De Colombia S.A. Avianca & Avianca, Inc.,* 345 B.R. 120 (S.D.N.Y.2006) (court entered order providing for, and upheld resolution of, Colombian labor-related claims in Colombian dispute resolution procedures, notwithstanding debtor's pending chapter 11 case).

In light of the foregoing principles, important objective factors point to the SPhinX Funds' COMI being located outside of the Cayman Islands. As far as the administration of the Debtors' interests is concerned, the SPhinX Funds' hedge fund business was conducted by PlusFunds outside of the Cayman Islands, as were most of the SPhinX Funds' back-office operations, by DPM. The only business done in the Cayman Islands apparently was limited to those steps necessary to maintain the SPhinX Funds in good standing as registered Cayman Islands companies and certain SPhinX Funds as SPCs. There were no employees or managers in the Cayman Islands, and the Debtors' boards, which contained no Cayman Islands residents, never met in the Cayman Islands.

[14][15] Pragmatic considerations affecting the Debtors' cases also point to a COMI outside of the Cayman Islands. With the exception of corporate minute books and similar records, the JOLs have not identified any assets located in the Cayman Islands; thus the JOLs and the Cayman Court would have to seek assistance from other courts (primarily this Court because most of the assets are in the U.S.) to realize on the SPhinX Funds' assets that will go to pay creditors and investors. *See In re Rimsat, Ltd.,* 98 F.3d at 961–62 (efficacy of a bankruptcy largely depends on court's ability to control and marshal assets). In addi-

tion, most, if not all, of the creditors and investors are located outside of the Cayman Islands; absent their consent or another undisclosed basis for jurisdiction over them, the Cayman Court would have to rely on orders of other courts to bind them. *In re Aerovias Nacionales de Colombia S.A.,* 303 B.R. at 13 ("Today, especially in a reorganization, the presence of creditors in a jurisdiction, **\*120** the power of a court to exert judicial power over them, and the willingness of other creditors to submit to the jurisdiction of the court, is often a more important factor than the presence of assets...."). Perhaps for these reasons, the JOLs did not seek a determination from the Cayman Court that the Cayman Islands was the SPhinX Funds' COMI.[FN22] In any event, there has been no such determination, nor have the JOLs yet sought the assistance of this Court to enforce any order of the Cayman Court intended to have extraterritorial effect.

> FN22. While acknowledging this fact, the JOLs' Cayman Islands counsel nevertheless asserted that the Cayman Court's authorization of the JOLs "to commence foreign ancillary insolvency proceedings in furtherance of the winding up of the [Debtors] (including commencing a Chapter 15 proceeding under the United States Bankruptcy Code)" indicated the Cayman Court's view that the Cayman Islands proceedings should be primary. Tr. at 51. This overlooks, however, that cases under chapter 15 are ancillary *regardless* whether the foreign proceeding is main or nonmain. 11 U.S.C. § 1504. Moreover, notwithstanding the respect that this Court has for the Cayman Court, even if the Cayman Court had made such a determination it would not be binding on this Court.

On the other hand, the JOLs note that no party in interest besides the Refco Committee and the RCM Trustee has objected to the Petition, which clearly sought recognition of the Cayman Islands proceedings as foreign main proceedings. Further, they point out

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

351 B.R. 103, 56 Collier Bankr.Cas.2d 1176, 47 Bankr.Ct.Dec. 17
**(Cite as: 351 B.R. 103)**

that those proceedings are voluntary, and that no one else has been appointed to wind up the Debtors' affairs. The objectors criticized the circularity of this logic—*i.e.,* the Cayman Islands must be the Debtors' COMI because that is where the JOLs were appointed—but, given the disarray and immanent liquidation of the Debtors' manager, PlusFunds, and the fact that the SPhinX Funds are not continuing in business, *someone* needs to manage the Debtors' winding up. And the Court notes that no one, including the objectors, has questioned the JOLs' ability to wind up the Debtors or that the Cayman Court would supervise the foreign proceedings fairly. See *In re Nat'l Warranty Ins. Risk Retention Group v. Bullmore,* 384 F.3d 959, 964 (8th Cir.2004), in which the Eighth Circuit upheld recognition of, and a broad injunction assisting, a Cayman Islands winding up proceeding under Bankruptcy Code section 304, notwithstanding that the debtor's headquarters and all of its business were located in the U.S. As here, in *In re Nat'l Warranty,* there were no other pending insolvency proceedings involving the debtor, the proffered alternative to the Cayman Islands proceedings being a class action or other piecemeal enforcement litigation. *Id.* at 963.

In addition, the JOLs have argued that Cayman Islands law has specific winding up requirements at least with respect to the SPCs, Tr. at 51, although the JOLs' Cayman Islands counsel also acknowledged that she was not aware of any prohibition on any Debtor being the subject of insolvency proceedings outside of the Cayman Islands. Tr. at 57–8. The JOLs also point out that the SPhinX Funds clearly held themselves out in their Offering Memorandum as offshore, Cayman Islands entities. As with the prior argument regarding Cayman Islands' regulatory interests, however, this point has force primarily in relation to the legitimate interests of the SPhinX Funds' investors, not creditors whose claims may not have been incurred with a focus on the Debtors' offshore status.

But for one additional consideration, discussed below, upon the assumption that the Cayman Islands proceedings will primarily involve the investors, who, again, **\*121** have not objected to the Petition, in balancing all of the foregoing factors the Court might be inclined to find the Debtors' COMI in the Cayman Islands and recognize the proceedings as foreign main proceedings (noting, however, the limited practical effect of such recognition and the Court's ongoing duty to protect parties in interest). Concededly, a simple "location of administration of the debtor's interests test," could well result in a different outcome, particularly if there was a possibility of reorganization. But because these are liquidation cases in which competent JOLs under the supervision of the Cayman Court are the only parties ready to perform the winding up function, and, importantly, the vast majority of the parties in interest tacitly support that approach, normally the Court would recognize the Cayman Islands proceedings as main proceedings.

However, a primary basis for the Petition, and the investors' tacit consent to the Cayman Islands proceedings as foreign main proceedings, is improper: that is, it has the purpose of frustrating the RCM Settlement by obtaining a stay of the appeals upon the invocation of Bankruptcy Code section 362(a) that would go into effect under section 1520(a)(1) upon such recognition. *See* Tr. at 87, at which counsel for the JOLs reluctantly admitted this strategy, after considerable efforts by Mr. Stride and counsel to obfuscate it. *Id.* at 41–4, 47, 84. As noted above, staying the appeal would have the same effect as overturning the RCM settlement *without addressing or prevailing on the merits.* (It is this sidestepping of consideration of the merits, or, at a minimum, obtaining strategic leverage without addressing the merits, rather than the JOLs' taking a position contrary to the settlement, that is the problem.) Indeed, given that the JOLs did not articulate a proper basis, or even actively pursue a request, for any other relief under chapter 15—for example, an injunction or turnover of property—with the exception of a request for further discovery primarily relating to the appeals, Tr. at 88–89, [FN23] this

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

351 B.R. 103, 56 Collier Bankr.Cas.2d 1176, 47 Bankr.Ct.Dec. 17
**(Cite as: 351 B.R. 103)**

litigation strategy appears to be the only reason for their request for recognition of the Cayman Islands proceedings as foreign main proceedings.

> FN23. It became clear at oral argument that the JOLs were seeking a blanket ruling that privileges, such as the attorney-client privilege, would not apply in connection with such discovery, although the Petition had not addressed this point. *Id.* The Court permitted general discovery of the Debtors' affairs, subject, however, to further determination, on notice, of any issues pertaining to the assertion of an applicable privilege.

In any event, the strategy taints the JOLs' request and the investors' consent to it, giving the clear appearance of improper forum shopping. *In re Rimsat, Ltd.,* 98 F.3d at 962 (noting similar "strategic conduct that is not to be encouraged" by deferral to foreign proceeding). Moreover, the JOLs were not prepared to agree to conditions to protect the Refco Committee and the RCM Trustee against their litigation strategy, Tr. at 106–107, and, based upon the plain language of Bankruptcy Code sections 1520(a)(1) and 1522,FN24 the Court has doubts about its ability to condition its ruling on immediate sua sponte relief from the automatic stay—even though there also is substantial doubt whether the automatic stay would apply to the appeals and it is even less likely that **\*122** the stay should continue to apply after a motion for relief under Bankruptcy Code section 362(d)(1).

> FN24. Although section 1522 gives the Court ample flexibility to protect the legitimate interests of creditors, such as RCM, in most situations, it does not appear to do so with regard to the invocation of the automatic stay under section 1520(a)(1) of the Bankruptcy Code upon recognition of a foreign main proceeding, except under section 362(d).

[16] This leaves whether, in light of the foregoing, the Court should, after having granted recognition under Bankruptcy Code sections 1515 and 1517(a), simply deny or defer the JOLs' request to recognize the Cayman Islands proceedings as foreign main proceedings, or, on the other hand, recognized them now as foreign nonmain proceedings, subject, of course to later modification under section 1517(d)?

Under either approach, the Court would be able to grant the JOLs the same significant relief upon a proper showing, given the Court's view that Congress separated the concept of "recognition" under Bankruptcy Code section 1517(a) from the concept of "recognition as a foreign nonmain proceeding" under section 1517(b)(2). (Indeed, as noted above, except for the applicability of the automatic stay, the potential relief available to the JOLs under chapter 15 in almost all respects does not depend on whether the Cayman Islands proceedings are recognized as "main" or "nonmain.") In light of the foregoing, in some circumstances it may be appropriate to defer consideration of the issue, to permit the facts to develop further. However, here, where so many objective factors point to the Cayman Islands not being the Debtors' COMI, and no negative consequences would appear to result from recognizing the Cayman Islands proceedings as nonmain proceedings, that is the better choice. FN25

> FN25. One may also read Bankruptcy Code sections 1502(7) and 1517(a)(1) as directing the court to determine whether the foreign proceeding is "main" or "nonmain," although, consistent with the other provisions of chapter 15, the statute does not appear to set a deadline for this determination.

[17] This raises a second question: can there be a foreign nonmain proceeding when there is no other pending proceeding? (There is now, of course, no other plenary proceeding for these Debtors, and there never may be one.) However, nothing in chapter 15 provides that there cannot be a "nonmain" proceeding

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

351 B.R. 103, 56 Collier Bankr.Cas.2d 1176, 47 Bankr.Ct.Dec. 17
**(Cite as: 351 B.R. 103)**

unless there is a "main" proceeding. Moreover, given all of the SPhinX Funds' contacts elsewhere, a plenary proceeding could easily be filed outside of the Cayman Islands, by or against the Debtors. Such a proceeding—although now just a hypothetical or "shadow" proceeding—would quite conceivably qualify as a main proceeding given the Debtors' lack of contacts with the Cayman Islands. Indeed, it is only in the absence of such an alternative proceeding that it would make sense, with the exception of the JOLs' litigation strategy discussed above, to treat the Cayman Islands proceedings as main proceedings. Thus it would run contrary to logic as well as the statute's plain language and purpose to force the court to recognize a foreign proceeding as a "main" proceeding simply because it was the only proceeding currently pending.

Given all of the reasons for not finding the SPhinX Funds' COMI in the Cayman Islands—and the lack of legitimate prejudice to the JOLs, given their access to broad relief upon recognition of the Cayman Islands proceedings as foreign nonmain proceedings—the JOLs' Petition for recognition of the Cayman Islands proceedings as foreign main proceedings is denied. The proceedings are recognized as foreign nonmain proceedings, subject to later modification under section 1517(d) of the Bankruptcy Code. An order to that effect will be entered.

Bkrtcy.S.D.N.Y.,2006.
In re SPhinX, Ltd.
351 B.R. 103, 56 Collier Bankr.Cas.2d 1176, 47 Bankr.Ct.Dec. 17

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

4106

# Tab 73

520 B.R. 399
United States Bankruptcy Court, S.D. New York.

IN RE: SUNTECH POWER HOLDINGS CO., LTD., Debtor in Foreign Proceeding.

Case No.: 14-10383(SMB)
|
Signed November 17, 2014

**Synopsis**

**Background:** Joint Provisional Liquidators (JPLs) of foreign debtor, an entity that oversaw a multi-national group of corporations engaged in the solar energy business, filed Chapter 15 petition, seeking recognition of provisional liquidation proceeding pending in the Cayman Islands as a foreign main proceeding or, alternatively, as a foreign non-main proceeding. Litigant, which had brought antitrust litigation against debtor and others, opposed recognition and filed cross-motion to transfer venue of case to the Northern District of California. Trial was held.

**Holdings:** The Bankruptcy Court, Stuart M. Bernstein, J., held that:

[1] under New York law, titleholder of New York bank account held title as agent for debtor, such that debtor owned the account and was eligible to be a debtor under the Bankruptcy Code;

[2] debtor did not conduct business in the Northern District of California, and there was no basis to place venue in that jurisdiction;

[3] debtor's center of main interests (COMI) on the date of commencement of the Chapter 15 case was the Cayman Islands;

[4] the statute governing transfer of a case or proceeding under title 11 applies to Chapter 15 cases; and

[5] transfer of venue was not warranted.

Petition for recognition granted; cross-motion to change venue denied.

West Headnotes (33)

**[1]** **Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

Requirement that an entity seeking to be a debtor under the Bankruptcy Code resides or has a domicile, a place of business, or property in the United States applies to foreign debtors seeking relief under Chapter 15. 11 U.S.C.A. § 109(a).

2 Cases that cite this headnote

**[2]** **Finance, Banking, and Credit** 🔑 Deposits and accounts

**Property** 🔑 Ownership, title, and possession in general

Under New York law, the party who possesses property is presumed to own it, and one who holds funds in a bank account possesses that account and the presumption of ownership follows.

4 Cases that cite this headnote

**[3]** **Property** 🔑 Ownership, title, and possession in general

Under New York law, the presumption of ownership may be rebutted by evidence that another person actually owns the property, either by showing that he effectively exercises control over the property or that the ostensible owner holds the property for his benefit.

3 Cases that cite this headnote

**[4]** **Principal and Agent** 🔑 Agreements for appointment

**Principal and Agent** 🔑 Parol appointment or authority

**Principal and Agent** 🔑 Conduct of parties in general

Under New York law, an agency relationship may be established by written or oral contract or by conduct of the principal, which reasonably

4108

causes the agent to believe that the principal wishes the agent to act on the principal's account.

**[5]    Principal and Agent** 👈 Presumptions and burden of proof

Under New York law, the party asserting the existence of an agency relationship bears the burden of establishing its existence.

**[6]    Bankruptcy** 👈 Cases Ancillary to Foreign Proceedings

**Finance, Banking, and Credit** 👈 Funds of person other than depositor

Under New York law, titleholder of New York bank account held title as agent for foreign debtor, such that debtor owned account and, as owner of property in the United States, was eligible to be a debtor under the Bankruptcy Code; before account was established, debtor had no presence, business, or assets in the country and sought to establish bank account to satisfy Code's eligibility requirements, debtor's Joint Provisional Liquidators (JPLs) were facing a deadline for filing a Chapter 15 petition and, because a traditional bank could not complete due diligence in time to open an account in debtor's name, titleholder stepped in and agreed to hold debtor's deposit for debtor's benefit, both parties understood that titleholder was acting as JPLs' agent notwithstanding title of account and titleholder's failure to sign disbursement letter, and account was ultimately set up as "FBO" account for the benefit of debtor, with titleholder holding the segregated funds as disbursing agent. 11 U.S.C.A. § 109(a).

2 Cases that cite this headnote

**[7]    Bankruptcy** 👈 Who May Be a Debtor

Section of the Bankruptcy Code governing who may be a debtor says nothing about the amount of property that an entity must own to be a debtor, nor does it direct that there be any inquiry into the circumstances surrounding the debtor's acquisition of the property, and is thus consistent with other provisions of the Code that

reject lengthy and contentious examination of the grounds for a bankruptcy filing. 11 U.S.C.A. § 109(a).

1 Case that cites this headnote

**[8]    Bankruptcy** 👈 Cases Ancillary to Foreign Proceedings

Interpreting the Bankruptcy Code to prevent an ineligible foreign debtor from establishing eligibility to support needed Chapter 15 relief would contravene the purposes of the statute to provide legal certainty, maximize value, protect creditors and other parties in interest, and rescue financially troubled businesses. 11 U.S.C.A. §§ 109(a), 1501(a).

1 Case that cites this headnote

**[9]    Bankruptcy** 👈 Cases Ancillary to Foreign Proceedings

Statute governing venue of a Chapter 15 proceeding establishes a "hierarchy of choices"; if the debtor maintains its principal place of business or principal assets in the United States in a particular district, venue must be placed in that district, but if not, courts turn to subparagraph two of statute, and if there is no litigation pending against the debtor in a district, subparagraph three then applies. 28 U.S.C.A. § 1410.

2 Cases that cite this headnote

**[10]    Bankruptcy** 👈 Cases Ancillary to Foreign Proceedings

Foreign debtor, a holding company for a group of direct and indirect subsidiaries that operated worldwide, did not conduct business in the Northern District of California, and there was no basis to place venue of Chapter 15 proceeding in that jurisdiction; although debtor's indirect subsidiary operated in California, its assets were not the assets of debtor, there was no evidence that debtor was authorized to conduct, or actually conducted, any business in California, despite the presence of its general counsel there, and the

4109

only asset of debtor in the United States was a bank account in New York. 28 U.S.C.A. § 1410.

1 Case that cites this headnote

**[11]    Corporations and Business Organizations** 👉 Title and rights in general

Assets of a subsidiary are not the assets of the parent, nor are the assets of an indirect subsidiary the assets of a more distant ancestor.

**[12]    Corporations and Business Organizations** 👉 Domicile or Place of Business

Corporation's "principal place of business" refers to the place where a corporations officers direct, control, and coordinate the corporations activities, and the same rule applies to a holding company.

**[13]    Corporations and Business Organizations** 👉 Obtaining License or Certificate to Do Business

Foreign corporation cannot conduct business in California without obtaining a certificate of qualification from the California Secretary of State. Cal. Corp. Code § 2105(a).

1 Case that cites this headnote

**[14]    Bankruptcy** 👉 Cases Ancillary to Foreign Proceedings

Foreign debtor's center of main interests (COMI) is determined as of the time of the filing of the Chapter 15 petition, but, to offset a debtor's ability to manipulate its COMI, a court may also look at the time period between the initiation of the foreign liquidation proceeding and the filing of the Chapter 15 petition. 11 U.S.C.A. §§ 1502(4), 1516(c).

4 Cases that cite this headnote

**[15]    Bankruptcy** 👉 Cases Ancillary to Foreign Proceedings

Analysis of a foreign debtor's center of main interests (COMI) permits consideration of any relevant activities, including liquidation activities and administrative functions. 11 U.S.C.A. §§ 1502(4), 1516(c).

**[16]    Bankruptcy** 👉 Cases Ancillary to Foreign Proceedings

In determining a foreign debtor's center of main interests (COMI), the following non-exclusive group of factors guides the analysis, but consideration of these specific factors is neither required nor dispositive: location of debtor's headquarters, location of those who actually manage debtor, location of debtor's primary assets, location of the majority of debtor's creditors or of a majority of the creditors who would be affected by the case, the jurisdiction whose law would apply to most disputes, and/or location of debtor's "nerve center," including from where debtor's activities are directed and controlled. 11 U.S.C.A. §§ 1502(4), 1516(c).

9 Cases that cite this headnote

**[17]    Bankruptcy** 👉 Cases Ancillary to Foreign Proceedings

Center of main interests (COMI) of foreign debtor, an entity that oversaw a multi-national group of corporations engaged in the solar energy business, was the Cayman Islands; debtor's presumptive COMI was the Cayman Islands, where it was incorporated, and although China, and not the Cayman Islands, was its actual COMI when its provisional liquidation proceeding in the Cayman Islands was commenced, commencement of that proceeding, together with the subsequent activities of debtor's Joint Provisional Liquidators (JPLs), had the effect of shifting the duties and responsibilities of running the business, and hence transferring the COMI, from China to the Cayman Islands by the time the Chapter 15 case was commenced. 11 U.S.C.A. §§ 1502(4), 1516(c).

7 Cases that cite this headnote

4110

**[18]    Bankruptcy** 🗝 Cases Ancillary to Foreign Proceedings

Foreign debtor's Joint Provisional Liquidators (JPLs) did not manipulate debtor's center of main interests (COMI) in bad faith but, instead, the activities they undertook that had the effect of establishing debtor's COMI in the Cayman Islands, including transferring stock certificates, shareholder registries, and statutory records, were consistent with their duties as provisional liquidators in the foreign proceeding. 11 U.S.C.A. §§ 1502(4), 1516(c).

6 Cases that cite this headnote

**[19]    Bankruptcy** 🗝 Factors, grounds, and objections in general

**Bankruptcy** 🗝 Convenience, fairness, and interest of justice

District court may transfer a case or proceeding under title 11 to a district court in another district in the interest of justice or for the convenience of the parties. 28 U.S.C.A. § 1412; Fed. R. Bankr. P. 1014(a)(1).

**[20]    Bankruptcy** 🗝 Factors, grounds, and objections in general

**Bankruptcy** 🗝 Convenience, fairness, and interest of justice

Decision to transfer venue of a case or proceeding under title 11 lies within the sound discretion of the court and is based on an individualized, case-by-case consideration of convenience and fairness. 28 U.S.C.A. § 1412.

**[21]    Bankruptcy** 🗝 Weight and sufficiency

**Bankruptcy** 🗝 Weight and sufficiency

Party seeking to change venue of a case or proceeding under title 11 bears the burden of proof by a preponderance of the evidence. 28 U.S.C.A. § 1412.

**[22]    Bankruptcy** 🗝 Factors, grounds, and objections in general

When a case is initially brought in a proper venue, the debtor's choice of forum is entitled to great weight. 28 U.S.C.A. § 1412.

2 Cases that cite this headnote

**[23]    Bankruptcy** 🗝 Factors, grounds, and objections in general

**Bankruptcy** 🗝 Convenience, fairness, and interest of justice

If transfer of venue of a case or proceeding under title 11 would merely shift the inconvenience from one party to another, the debtor's choice of forum should not be disturbed. 28 U.S.C.A. § 1412.

1 Case that cites this headnote

**[24]    Bankruptcy** 🗝 Cases Ancillary to Foreign Proceedings

Statute governing transfer of a case or proceeding under title 11 applies to Chapter 15 cases. 11 U.S.C.A. § 1504; 28 U.S.C.A. §§ 1410, 1412; Fed. R. Bankr. P. 1014(a)(1).

**[25]    Bankruptcy** 🗝 Cases Ancillary to Foreign Proceedings

In determining whether to transfer the venue of a properly venued Chapter 15 case, the bankruptcy court should consider the nature of the case and what it will entail, including the relief sought by the foreign representative, when contemplating the interests of justice or the convenience of the parties. 28 U.S.C.A. § 1412.

**[26]    Bankruptcy** 🗝 Factors, grounds, and objections in general

**Bankruptcy** 🗝 Convenience, fairness, and interest of justice

Under the statute governing transfer of a case or proceeding under title 11, the "interest of justice" and the "convenience of the parties" are written

4111

in the disjunctive, and considered separately. 28 U.S.C.A. § 1412.

**[27]    Bankruptcy**  👉 Factors, grounds, and objections in general

**Bankruptcy**  👉 Convenience, fairness, and interest of justice

As used in the statute governing transfer of a case or proceeding under title 11, pursuant to which a district court may transfer such a case or proceeding to a district court in another district in the interest of justice or for the convenience of the parties, the "interest of justice" is a broad and flexible standard that must be applied on a case-by-case basis. 28 U.S.C.A. § 1412.

**[28]    Bankruptcy**  👉 Factors, grounds, and objections in general

**Bankruptcy**  👉 Convenience, fairness, and interest of justice

Under the statute governing transfer of a case or proceeding under title 11, when determining where the interest of justice would be best served, courts may consider whether (1) transfer would promote the economic and efficient administration of the bankruptcy estate, (2) the interests of judicial economy would be served by the transfer, (3) the parties would be able to receive a fair trial in each of the possible venues, (4) either forum has an interest in having the controversy decided within its borders, (5) the enforceability of any judgment would be affected by the transfer, and (6) the plaintiff's original choice of forum should be disturbed. 28 U.S.C.A. § 1412.

2 Cases that cite this headnote

**[29]    Bankruptcy**  👉 Factors, grounds, and objections in general

**Bankruptcy**  👉 Convenience, fairness, and interest of justice

In determining, for purposes of the statute governing transfer of a case or proceeding under title 11, where the interest of justice would

be best served, the most important factor is whether transfer would promote the economic and efficient administration of the bankruptcy estate. 28 U.S.C.A. § 1412.

2 Cases that cite this headnote

**[30]    Bankruptcy**  👉 Factors, grounds, and objections in general

**Bankruptcy**  👉 Factors and Grounds Considered

When it is alleged that a debtor has manipulated venue, courts deciding a transfer motion will consider the debtor's purposeful acts to manufacture technical compliance with the venue statute. 28 U.S.C.A. § 1412.

**[31]    Bankruptcy**  👉 Cases Ancillary to Foreign Proceedings

Transfer of venue of Chapter 15 proceeding in which Joint Provisional Liquidators (JPLs) of foreign debtor sought recognition of provisional liquidation proceeding pending in the Cayman Islands as a foreign main proceeding, which was properly venued in the Southern District of New York, was not warranted; the interest of justice would be best served in New York, where debtor's bank account was located, as the JPLs did not manipulate venue or establish the New York account for an improper business purpose, debtor did not do business in the Northern District of California and so establishment of the New York account did not deprive the case of a proper California venue, the JPLs had retained lawyers in New York and the Cayman Islands, not California, and New York district had the greater interest in the proceeding, given existence of involuntary case in that court, and convenience of the parties did not weigh in favor of transferring venue to California. 28 U.S.C.A. § 1412.

5 Cases that cite this headnote

**[32]    Bankruptcy**  👉 Factors, grounds, and objections in general

**Bankruptcy** 🔑 Convenience, fairness, and interest of justice

For purposes of the statute governing transfer of a case or proceeding under title 11, pursuant to which a district court may transfer such a case or proceeding to a district court in another district in the interest of justice or for the convenience of the parties, "convenience of the parties" generally involves consideration of the location of the parties and their counsel, the location of the proof, and the ability to compel otherwise unwilling witnesses to testify. 28 U.S.C.A. § 1412.

[33]    **Bankruptcy** 🔑 Factors, grounds, and objections in general

**Bankruptcy** 🔑 Convenience, fairness, and interest of justice

Convenience of the witnesses does not have to be taken into account under the statute governing transfer of a case or proceeding under title 11, although it is part of any discussion to change venue. 28 U.S.C.A. § 1412.

**Attorneys and Law Firms**

 *403  O'Melveny & Myers LLP, Times Square Tower, 7 Times Square, New York, NY 10036, Peter Friedman, Esq., Daniel Shamah, Esq., Matthew Kremer, Esq., Suzanne Uhland, Esq., Jennifer Taylor, Esq., Of Counsel, Attorneys for Petitioner

Pachulski Stang Ziehl & Jones LLP, 780 Third Avenue, 34th Floor, New York, New York 10017, John A. Morris, Esq., Debra I. Grassgreen, Esq., Jason H. Rosell, Esq., Of Counsel, Winston & Strawn LLP, 333 S. Grand Avenue, Los Angeles, California 90071, W. Gordon Dobie, Esq., Eric E. Sagerman, Esq., Justin E. Rawlins, Esq., William C. O'Neil, Esq., Of Counsel, Attorneys for the Solyndra Residual Trust

Chapter 15

**FINDINGS OF FACT AND CONCLUSIONS OF LAW GRANTING PETITION FOR RECOGNITION AS FOREIGN MAIN PROCEEDING AND DENYING CROSS-MOTION TO CHANGE VENUE**

STUART M. BERNSTEIN UNITED STATES BANKRUPTCY JUDGE:

Suntech Power Holdings Co. Ltd. (the "Debtor") is a debtor in a provisional liquidation pending in the Cayman Islands (the "Foreign Proceeding"). David Walker and Ian Stokoe, the Joint Provisional Liquidators, or JPLs, filed a petition under chapter 15 of the Bankruptcy Code seeking recognition of the Foreign Proceeding as a foreign main proceeding. *See* 11 U.S.C. § 1502(4), or alternatively, as a foreign nonmain proceeding. *See* 11 U.S.C. § 1502(5). Solyndra Residual Trust ("Solyndra")  **\*404**  opposes recognition, and has filed a cross-motion to transfer the venue of the chapter 15 case to the Northern District of California. The dispute regarding recognition centers on three issues: (1) is the Debtor eligible to be a debtor under Bankruptcy Code § 109(a); (2) is venue proper in this district under 28 U.S.C. § 1410; and (3) is the Cayman Islands the Debtor's center of main interests ("COMI")? Depending on the answers to these questions, Solyndra seeks to transfer venue in the interests of justice or for the convenience of the parties. *See* 28 U.S.C. § 1412.

Solyndra's opposition to recognition as well as the support for its cross-motion are based on a mistaken assumption and allegations involving bad faith manipulation of the case. It maintains that the Debtor did business in San Francisco at the time the JPLs filed the chapter 15 case and the JPLs should have filed it there. Solyndra charges that the JPLs manipulated the venue of the case by establishing a New York bank account in order to file the case in New York. It also charges that the JPLs manipulated the Debtor's COMI, implying that the Debtor should have sought reorganization in the People's Republic of China ("China").

The Court conducted a trial of the disputed factual issues on July 17, 2014. Having heard Walker's testimony and reviewed the extensive documentary record, the Court is satisfied that (1) the Debtor does not conduct business in the Northern District of California and there was no basis to place venue in that jurisdiction, (2) while the JPLs established a bank account in New York, in part, to satisfy the eligibility requirements for being a Debtor, they did not intend and their actions did not wrest the venue of the case from California, and (3) they

did not manipulate the Debtor's COMI; the activities they undertook that had the effect of establishing the Debtor's COMI in the Cayman Islands were consistent with their duties as provisional liquidators in the Foreign Proceeding.

Accordingly, the petition for recognition is granted and the cross-motion to change venue is denied.

## BACKGROUND[1]

### A. The Debtor's Business Operations

The Debtor is a Cayman Islands exempted company formed on August 8, 2005. (PX 2.) Its registered office is P.O. Box 309 GT, Ugland House, South Church Street, George Town, Grand Cayman. (PX 3 at SPH000008542.) It is a holding company and ultimate parent for a group of direct and indirect subsidiaries (the "Suntech Group") that are engaged in the business of developing, manufacturing and marketing photovoltaic ("PV") modules and cells and providing PV integration services worldwide for residential, commercial and industrial use. (SX 1 at ¶¶ 10–11.) The Debtor's principal American indirect subsidiary is Suntech America, Inc. ("Suntech America"). Suntech America was incorporated in Delaware in 2006, has been registered to do business in California since its incorporation and is based in San Francisco. (PX 44; PX 16 at § 9.5.1.)

Aside from the Debtor, none of the Suntech Group is incorporated in the Cayman Islands, (see PX 11), and none of the Suntech Group conducts business in the Cayman Islands. Moreover, it is undisputed that prior to the commencement of the Foreign Proceeding on November 5, 2013, **\*405** the Debtor did not conduct business in the Cayman Islands and regularly listed the location of its principal executive offices as R & D Mansion, 9 Xinhua Road, New District, Wuxi, Jiangsu Province, 214028 in China. (*E.g.,* SX 83–97.)[2]

The Debtor's principal debt arises from a United States debt offering evidenced by notes in the amount of $575 million issued in 2008 and due on March 15, 2013 (the "Notes"). (PX 31 at SPH00008884; Tr. at 44:2–10.) Its other debts include approximately $50 million owed to the International Finance Corporation ("IFC") on account of a convertible loan, (PX 15 at SPH00007102), and a substantial amount owed to affiliates. (*See* PX 43 at 1, 2.) Finally, the Debtor is a defendant in several pending litigations. In particular, Solyndra has brought antitrust litigation against the Debtor and others seeking to recover at least $1.5 billion in damages.

(SX 76 at ¶ 7.) The lawsuit is pending in the Northern District of California.

The Debtor's assets as of November 30, 2013 (roughly three weeks after the commencement of the Foreign Proceeding) consisted of $2.6 million in cash, (PX 15 at § 9.1.1), and $1.46 billion in receivables, the majority of which were due from four subsidiaries. (*Id.* § 9.1.2 at SPH00007100.) Their collectability was questionable as a result of the financial position of the subsidiaries. (*Id.*) The Debtor had another $40 million in a bank account, but the cash was collateral and had been seized. (*Id.* § 9.1.2 at SPH00007101). Finally, the Debtor held investments in certain subsidiaries and a non-affiliate. (*Id.*)

### B. The Foreign Proceeding

The Debtor defaulted when the Notes matured on March 15, 2013. (Tr. at 44:2–6.) On September 23, 2013, the Debtor and funds managed by Clearwater Capital Partners, LLC ("Clearwater") and Spinnaker Capital LLC ("Spinnaker"), collectively holding approximately 50% of the Notes, (Transcript of Deposition of Edward Cairns held July 3, 2014 ("Cairns Tr."), at 10:25–11:11), executed a Restructuring Framework Agreement (the "RFA"). (PX 32.) The RFA contemplated that the Notes and the IFC loan would be restructured through a scheme of arrangement implemented in the Cayman Islands, and if necessary, a chapter 15 filing. (*Id.* at § 2.5(c).)

Clearwater's representative, Edward Cairns, testified at his deposition that the Cayman Islands was specified because it was the most logical and appropriate jurisdiction in which to restructure the Debtor's financial affairs. The Debtor was a Cayman Islands corporation, and the scheme of arrangement was a "flexible" and "cost effective" method for dealing with the Debtor's financial problems. (Cairns Tr. at 23:9–24.)[3] The chapter 11 alternative was rejected due to concerns about costs and the ability of management to maintain control of the Debtor. (Cairns Tr. at 24:8–25:10.)[4] Finally, Clearwater flatly rejected the possibility of a restructuring in China. The Chinese court's jurisdiction **\*406** was in doubt, and China has different concepts of the rules of law and creditors' rights compared to those found in the Cayman Islands and the United States; it is the last place that one would go. (Cairns Tr. at 27:18–28:17.)[5]

On November 5, 2013, Christopher Michael Nacson, a director of the Debtor owed $16,666 in board fees, filed a

winding up petition in the Grand Court of the Cayman Islands (the "Cayman Court"). The petition asked the Cayman Court to place the Debtor into a provisional liquidation proceeding and appoint Walker and Stokoe, both of PwC Corporate Finance and Recovery (Cayman) in the Cayman Islands, as JPLs. (PX 24 at 2.) Two days later, the Cayman Court entered an order commencing the Foreign Proceeding and appointing Walker and Stokoe as JPLs pursuant to section 86 of the Cayman Islands Companies Law. (PX 1 (the "Appointment Order").)

### C. The JPLs' Management and Control of the Debtor

The Appointment Order authorized the JPLs to propose a compromise or arrangement with the Debtor's creditors, (PX 1 at ¶ 2), and seek relief under chapter 15 of the United States Bankruptcy Code. (*Id.* at ¶ 3.) Their authority included numerous specifically delineated powers, (*id.* at ¶ 4), detailed later in this opinion. Among other things, the JPLs could take possession of the Debtor's assets, borrow money, open and close bank accounts, employ attorneys and staff, and exercise the Debtor's rights as a shareholder of its subsidiaries. The Board retained control to manage the day-to-day affairs of the Debtor subject, however, to the JPLs' monitoring, oversight and supervision. (*Id.* at ¶¶ 4(a), 8.) The management of matters outside of the ordinary course of business required the JPLs' approval. (*Id.* at ¶ 8.)

Although the Appointment Order retained some authority for the Board, its role following the JPLs' appointment substantially decreased.[6] Walker assumed primary control, and managed the Debtor's affairs from the Cayman Islands. The JPLs published notices of their appointment in several newspapers, including two newspapers in China, a newspaper in the Cayman Islands, and the international edition of the Wall Street Journal (which is also published in the United States), (PX 36, 37, 38, 39; Tr. at 56:14–57:5), directing interested parties to contact a Cayman Islands-based member of Walker's staff. (Tr. at 57:6–15.) They also changed the address of the Debtor's principal offices in its SEC filings from Wuxi, China to the Ugland House in the Cayman Islands, (*compare* SX 104, dated Jan. 10, 2014 *with* SX 105, dated Jan. 17, 2014), and Walker's office at Strathvale House in the Cayman Islands (SX 106, dated Jan. 27, 2014; SX 81, dated Feb. 6, 2014). On January 20, 2014, Kim Liou, the Debtor's General Counsel and Secretary at the time, sent letters to the IFC and Wilmington Trust Company notifying them that subsequent notices and communications should be sent to Strathvale House in the Cayman Islands. (PX 29; PX 30.)

Among the many pressing problems, Walker addressed the Debtor's cash needs **\*407** as well as the cash needs of the provisional liquidation. According to the *First Report to Grand Court of the Cayman Islands by the Joint Provisional Liquidators,* dated Dec. 20, 2013, (PX 15), the Debtor did not have enough cash reserves to meet the costs likely to be incurred during the next thirteen weeks. (*Id.* at § 9.1.1.) The Debtor's funds were controlled by certain authorized signatories, and all but two of the Debtor's accounts were inaccessible because the funds were subject to liens in favor of certain guarantee creditors. (Tr. at 74:5–15, 90:5–14.) One of the other accounts in Wuxi was used pay the expenses of the Debtor's limited support staff in Wuxi, (Tr. at 72:6–73:7), and funds held in China were subject to numerous withdrawal restrictions. (Tr. at 78:3–18.)

The JPLs worked with the Board and management to fund the looming shortfall. (PX 15 at §§ 3.3, 9.1.1.) They opened an account at HSBC in the Cayman Islands, and on December 5, 2013, Walker asked the Board to transfer $2 million to the account. (PX 58.) The HSBC account was eventually funded in the approximate sum of $3.85 million in early February 2014 primarily through a transfer of funds held by the Debtor in Standard Chartered Bank (Hong Kong) Limited. (*See* PX 16 at § 11.1.1; PX 35 at SPH00008810.) In addition, Walker obtained a $7 million loan on the Debtor's behalf from Suntech America in order to finance the restructuring efforts. (PX 18.) Michael Nacson, Chairman of the Board, apprised the Board of the proposed loan during a January 23, 2014 telephonic meeting, told the Board he intended to sign the loan agreement (but did not seek the Board's approval)[7] and informed the Board that the JPLs would control the loan proceeds and make the final determinations with respect to payment of post-petition legal fees. (SX 7 at SPH00000111–12.) Lastly, in March 2014, Walker authorized an agreement on behalf of the Debtor with Wuxi Suntech under which it agreed to pay $750,000 to the Debtor in exchange for the right to use the Debtor's export license (the "Cooperation Agreement"). (*See* PX 7; Tr. at 60:23–61:2.) Walker advised the Board of the proposed transaction but did not seek the Board's approval. (Tr. at 60:14–61:6.)

Walker also had to deal with the financial problems of the subsidiaries. He chaired a November 14, 2013 "extraordinary general meeting" of PSS, the Debtor's direct subsidiary, at which he exercised the Debtor's powers as sole shareholder

to place PSS into a voluntary liquidation in the British Virgin Islands and appoint John Ayres as voluntary liquidator. (PX 21.) The Debtor filed a claim in the PSS proceeding in the amount of $737.6 million, but PSS had only $100,000 in its bank account. The potential value of PSS lies in the successful prosecution of claims against Suntech Singapore, Suntech Japan and Wuxi Suntech. (PX 16 at § 9.4.) On February 17, 2014, Walker arranged on behalf of the Debtor to loan $150,000 to PSS, (PX 50), to defray the legal fees incurred in pursuing these claims. (Tr. at 78:19–79:8.)

One of PSS's indirect subsidiaries, Suntech Power International Ltd. ("SPI"), is a Swiss company that indirectly owns and operates the Debtor's European and American operations, including Suntech America. SPI is insolvent, and a debtor in a Swiss administrative proceeding. (PX 16 § 9.1.1 at SPH00008765.) Walker met with the Swiss administrator in the SPI **\*408** insolvency proceeding, and supported SPI's entry into a dividend agreement with its creditors, (*id.* § 9.1.1 at SPH00008766), to be funded by Suntech America. (*Id.* § 9.5.1 at SPH00008773.) The dividend was proposed to avoid an official liquidation and concomitant loss of value of both SPI and Suntech America to the Suntech Group. (*Id.*)

Walker acted as the Debtor's "point man" when dealing with its creditors. On February 12, 2014, he chaired the First Creditors Meeting held in the Cayman Islands, *inter alia,* to provide an update of the provisional liquidation. (PX 17.) A Liquidation Committee was elected consisting of China Development Bank, Clearwater, Spinnaker, SPI, and Wilmington Trust Company, (*id.* at § 8.3), and held its first meeting in the Cayman Islands on February 20, 2014. (PX 57 at SPH00006537R.) The members appeared telephonically, while Walker and others attended in person. (*Id.*)

After his appointment, Walker led the efforts to appeal the New York Stock Exchange's decision to delist the Debtor's American Depositary Shares ("ADS"). (Tr. at 59:19–60:9; *see* PX 15 at §§ 4.1, 4.2; PX 16 at § 10.) Prior to the delisting, the Board had played a role in scheduling meetings regarding a potential $150 million investment by Guolian, the investment arm of the Wuxi local government. (Tr. at 69:17–70:18, 81:18–25.) When the Debtors' appeal of its delisting was denied in early February 2014, the Guolian investment fell through, (Tr. at 59:19–60:5, 69:17–70:18), the Debtor's CEO resigned and has yet to be replaced, (Tr. at 49:25–50:13), and the Board's responsibilities diminished even further. (Tr. at 69:2–9.)

Finally, the JPLs took steps to obtain possession of the stock certificates in the Debtor's two wholly-owned subsidiaries, PSS and Suntech Power (Hong Kong) Co. ("Suntech Hong Kong"). The PSS stock certificates arrived on February 19, 2014, and the Suntech Hong Kong stock certificates arrived during the week commencing February 24, 2014. (PX 6.) The Debtor's shareholder registry and statutory records were also transferred to the Cayman Islands at the JPLs' request, but Walker did not recall when. (Tr. at 103:7–15.)

### D. New York Proceedings

#### 1. The Involuntary Bankruptcy Case

Following the Debtor's default on the Notes in March 2013, certain Noteholders commenced lawsuits against the Debtor in the United States District Court for the Southern District of New York to enforce the Notes. (*See Trondheim Capital Partners, L.P. and Michael Meixler v. The Debtor Co., Ltd.,* Case No. 13–CV–4668 (S.D.N.Y.); *Marcus and Jessica Dugaw, Husband and Wife, and the Marital Community Composed Thereof v. The Debtor Co., Ltd.,* Case No. 13–CV–5608 (S.D.N.Y.)). On September 20, 2013, they obtained judgments in the aggregate sum of $578,230.88, plus post-judgment interest. (PX 23 at SPH00001933R–34R; *see also* PX 41; PX 42.) On October 14, 2013, the Noteholders, now Judgment Creditors, together with a fourth creditor (collectively, the "Petitioning Creditors"), commenced an involuntary chapter 7 bankruptcy case (the "Involuntary Case") against the Debtor in the United States Bankruptcy Court for the Southern District of New York.

Up to this point, the Debtor's connections with New York were admittedly thin. Its ADS had been listed on and eventually delisted by the New York Stock Exchange. The Notes were issued pursuant to an Indenture governed by New York law, (PX 31 at § 12.09), and required the Debtor to maintain a Paying Agent and Registrar in **\*409** New York. (*Id.* at §§ 2.03, 4.02.) The parties to the Indenture submitted to the non-exclusive jurisdiction of any state or federal court located in the borough of Manhattan, and the Debtor irrevocably waived any objection to venue in the New York Supreme Court or the United States District Court for the Southern District of New York. (*Id.* at § 12.10.) This provision presumably formed the basis for the Judgment Creditors' New York federal actions. Finally, the Debtor designated CT Corp. in New York City to act as agent for service of process under the Indenture. (*Id.*)

The Debtor moved to dismiss the Involuntary Case on November 5, 2013, the same day that the petition commencing the Foreign Proceeding was filed. Given the dearth of New York connections, the Debtor argued, *inter alia,* that venue in the Southern District of New York was improper. The Debtor's General Counsel submitted a declaration attesting that the Debtor had no employees, operations, bank accounts or other significant assets in the Southern District of New York. (SX 78 at ¶ 5.) The Debtor's supporting memorandum stated that "Suntech [Power Holdings] neither resides nor is domiciled in New York, and does not have its 'principal place of business in the United States' or 'principal assets in the United States' in New York." (SX 77 at 2.) (*See Suntech Holdings Power Co., Ltd.'s Memorandum of Law in Support of Motion to Dismiss the Amended Involuntary Chapter 7 Petition,* dated Dec. 9, 2013 (ECF Case No. 13–13350 Doc. # 32).)

On January 27, 2014, the Debtor, the JPLs, the Petitioning Creditors and certain Noteholders entered into a Restructuring Support Agreement ("RSA") to resolve the Involuntary Case.[8] (PX 23.) The RSA included the following provisions:

1. The JPLs agreed to commence a chapter 15 case in this Court on or before February 21, 2014, (*id.* at § 2(a));

2. The parties agreed to sign a stipulation of dismissal of the Involuntary Case with prejudice upon execution of the RSA, (*id.* at § 2(c)), and with certain exceptions, file it upon approval of the recognition order, (*id.* at § 4);

3. The failure to obtain recognition of the Foreign Proceeding by May 31, 2014 constituted a termination event, (*id.* at § 9.1(b)), but Walker testified that deadline had been extended to mid-August, (Tr. at 56:2–8);[9] and

4. The parties agreed to seek the dismissal of the Debtor's appeal of the New York federal judgments once the RSA was signed, (*id.* at § 2(d)), and those appeals were dismissed on March 3 and 4, 2014. (*See* PX 62; PX 63.)

**2. The Chapter 15 Case**

The RSA gave the JPLs less than four weeks to commence a chapter 15 case in the Southern District of New York, but the Debtor had no ostensible property or business in New York or anywhere else in the United States. Consequently, the JPLs took steps to establish a New York bank account, but the task proved daunting. On February 17, 2014, counsel to

certain Noteholders contacted Morgan Stanley on **\*410** the Debtor's behalf to establish a bank account in New York. (SX 20.) The following day, representatives of Morgan Stanley reported that the bank could not complete its due diligence within the proposed time frame. (SX 20 at SPH00007229R.)

The same day, the Debtor's bankruptcy counsel contacted Francine Gordon of Kurtzman Carson Consultants LLC ("KCC") asking whether KCC could act as an escrow agent for the Debtor's funds because it "need[ed] the actual account to be in NY" by the end of the week (*i.e.,* February 21, 2014). (SX 31 at KCC000096.) KCC had performed this service for other clients in the past. (Transcript of Deposition of Drake Foster held May 6, 2014 ("Foster Tr."), at 57:4–21, 78:4–25.) On February 19, 2014, KCC notified the Debtor's counsel that there were "two bank accounts at Bank of New York Mellon ready to receive the cash." (SX 30 at KCC 000112.) The Bank of New York Mellon ("BONY") account was not an escrow account, and the holder of the account was Computershare, Inc.[10] (*See* SX 33.)

On February 20, 2014, one day before the RSA deadline, the JPLs sent a letter to KCC/Computershare, Inc. establishing procedures for disbursing funds from the BONY account (the "Disbursement Letter"). (PX 8.) The letter stated that upon receipt of written instructions from the JPLs, KCC would instruct the BONY to issue the checks or wire transfers as requested. The letter was signed by both JPLs, but neither KCC nor Computershare signed it. (*See* PX 8.) Still on February 20, 2014, the JPLs transferred $500,000 from the Debtor's Cayman Islands account to the BONY account. (PX 35 at SPH00008812 (transfer out of Cayman account); PX 45 at SPH00008896 (transfer into BONY account).)

The chapter 15 case was commenced the next day, on February 21, 2014. (*Chapter 15 Petition for Recognition of Foreign Proceeding,* filed February 21, 2014, (ECF Doc. # 1).) Solyndra opposed recognition and cross-moved to change venue.

**DISCUSSION**

Under Bankruptcy Code § 1517(a), and subject to exceptions that are not relevant in this case, a Court must recognize a foreign proceeding if

4117

(1) such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502;

(2) the foreign representative applying for recognition is a person or body; and

(3) the petition meets the requirements of section 1515.

Solyndra does not dispute that the JPLs have satisfied the second and third requirements. (*Solyndra Residual Trust's Proposed Findings of Fact and Conclusions of Law on Chapter 15 Petition*, dated Aug. 15, 2014, at *Conclusions of Law* ¶ 25, (ECF Doc. # 66).) Instead, Solyndra contends that the JPLs have failed to establish that the Foreign Proceeding qualifies as a main or nonmain proceeding. (*Id.*) Before reaching this issue, two preliminary questions must be answered: is the Debtor eligible to be a debtor under the United States Bankruptcy Code, and if so, is venue proper in the Southern District of New York? We start with these.

**\*411  A. Eligibility to be a Debtor**

 **[1]**   "[O]nly a person that resides or has a domicile, a place of business, or property in the United States ... may be a debtor under" the Bankruptcy Code. 11 U.S.C. § 109(a). This requirement applies to foreign debtors seeking relief under chapter 15. *Drawbridge Special Opportunities Fund LP v. Barnet* (*In re Barnet* ), 737 F.3d 238, 247 (2d Cir.2013). The Debtor does not have a residence or domicile in the United States. Although Solyndra contends that the Debtor has a place of business in the Northern District of California, and hence, is eligible to be a debtor on that basis, the JPLs disagree. Instead, they contend that the Debtor owns the BONY account, and rely on that account as the basis for its eligibility.

 **[2]      [3]**   As the BONY account is located in New York, New York law governs the question of ownership.[11] *Neto v. Thorner,* 718 F.Supp. 1222, 1225 (S.D.N.Y.1989) ("[U]nder New York law, the title to a bank account held in a New York bank is governed by the law of New York.") Under New York law, the party who possesses property is presumed to own it, and one who holds funds in a bank account possesses that account and the presumption of ownership follows. *Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,* 313 F.3d 70, 86 (2d Cir.2002); *LFD Operating Inc. v. Ames Dep't Stores, Inc.* (*In re Ames Dep't Stores, Inc.*), 274 B.R. 600, 617 (Bankr.S.D.N.Y.2002), *aff'd,*

2004 WL 1948754 (S.D.N.Y. Sept. 1, 2004), *aff'd,* 144 Fed.Appx. 900 (2d Cir.2005). The presumption of ownership may be rebutted by evidence that another person actually owns the property, either by showing that he effectively exercises control over the property or that the ostensible owner holds the property for his benefit. *Karaha Bodas,* 313 F.3d at 86; *see also Ames Dep't Stores,* 274 B.R. at 614 (stating that where debtor holds property as a trustee or an agent, the property or proceeds of the property would not become property of the debtor's bankruptcy estate).

 **[4]      [5]**   As the titleholder of the BONY account, Computershare is its presumptive owner. The Debtor seeks to rebut the presumption by showing that Computershare held the funds in the BONY account as its agent. *See Heine v. Colton, Hartnick, Yamin & Sheresky,* 786 F.Supp. 360, 375 (S.D.N.Y.1992) ("It is presumed that title to a principals property in the possession of his agent remains in the principal.") (quoting *Lalor v. Duff,* 28 A.D.2d 66, 281 N.Y.S.2d 614, 617 (1967)); *Baker v. New York Nat'l Exch. Bank,* 100 N.Y. 31, 2 N.E. 452, 452 (1885) (noting the "well established" principle that title of goods in possession of an agent remains with the principal). An agency relationship may be established by written or oral contract or by conduct of the principal, which reasonably causes the agent to believe that the principal wishes the agent to act on the principal's account. *Amusement Indus., Inc. v. Stern,* 693 F.Supp.2d 327, 343 (S.D.N.Y.2010). The party asserting the existence of an agency relationship bears the burden of establishing its existence. *Nippon Yusen Kaisha v. FIL Lines USA Inc.,* 977 F.Supp.2d 343, 350 (S.D.N.Y.2013).

 **[6]**   I find from the evidence that Computershare held title to the BONY account as agent for the Debtor, and conclude that it is the Debtor's property. The RSA required the JPLs to file the chapter 15 by February 21, 2014. As the JPLs saw it, **\*412**  the Debtor had no presence, business or assets in the United States and had to establish a bank account in the United States to satisfy the requirements for eligibility. Walker admitted as much. (Tr. at 53:12–17.) The RSA deadline was rapidly approaching, and the JPLs could not open a bank account in the Debtor's name because Morgan Stanley could not complete due diligence in time. Computershare stepped in and agreed to hold the Debtor's deposit for the Debtor's benefit just as a traditional bank would have done if time had permitted.

Notwithstanding the title of the account and Computershare's failure to sign the Disbursement Letter, both parties

understood that Computershare was acting as the JPLs' agent, and the account was subject to the JPLs control. Walker testified that it was his understanding that the funds in the account belonged to the Debtor and the JPLs had complete and unfettered control over the funds. (Tr. at 53:25–55:19.) Foster, KCC's General Counsel, (*see* Foster Tr. at 21:24–22:4), concurred. He testified at his deposition that Computershare had no interest in the funds and held them as an escrow agent or in an administrative capacity for the benefit of its client. (Foster Tr. at 58:1–23.)[12] The account was ultimately set up as an FBO account for the benefit of the Debtor; Computershare held the funds as a disbursing agent, (*id.* at 61:6–12)[13] and segregated the Debtor's from its own funds and the funds of its other clients. (Foster Tr. at 67:24–68:5.) Foster added that funds would only be released when KCC received proper instructions in accordance with the document that contained the parameters governing distribution. (Foster Tr. at 54:5–21.)[14] Finally, Computershare's internal records reflected that the name of the account was "Computershare, Inc. as agent for Suntech." (SX 70–74.)

The parties' subsequent conduct confirmed their understanding. On June 19 and June 20, 2014, Walker signed disbursement authorization forms instructing KCC to wire funds from the BONY account to professionals in the United States, including KCC, O'Melveny & Myers LLP, and Teitelbaum & Baskin LLC.[15] (PX 46.) The funds were transferred per Walker's instructions, (PX 45 at SPH00008900), and Walker never encountered difficulties accessing those funds. (Tr. at 55:14–16.) Accordingly, the Debtor rebutted the presumption of ownership and demonstrated at trial that the BONY account was the property of the Debtor.

The establishment of the BONY account in New York prior to the commencement of the chapter 15 proceeding was sufficient to render the Debtor eligible under 11 U.S.C. § 109(a). *In re Octaviar Admin. Pty Ltd.,* 511 B.R. 361, 372–73 (Bankr.S.D.N.Y.2014); *In re Yukos Oil Co.,* 321 B.R. 396, 407 (Bankr.S.D.Tex.2005). Focusing on venue rather than eligibility, Solyndra nevertheless contends that the **\*413** JPLs opened the BONY account to manipulate the placement of the case in this Court rather than in the Northern District of California where the Debtor allegedly had its principal place of business in the United States at the time the JPLs filed the chapter 15 petition.

**[7]** Section 109(a) "says nothing about the amount of such property nor does it direct that there be any inquiry into the circumstances surrounding the debtors acquisition of the property, and is thus consistent with other provisions of the Code that reject lengthy and contentious examination of the grounds for a bankruptcy filing." *Octaviar,* 511 B.R. at 373 (footnotes omitted). The Debtor had to establish its eligibility through a domicile, residence, property or a place of business in the United States. The Debtor did not maintain a residence or domicile in the United States, and the JPLs never entertained the belief that the Debtor maintained a place of business in California. Furthermore, the Debtor did not and could not conduct business in California for the reasons discussed in the next section. The BONY account satisfied the express requirements for eligibility under § 109(a) to permit the JPLs to file the chapter 15 contemplated by the RSA as necessary to restructure the Debtor.

**[8]** Solyndra argues that the JPLs' conduct was somehow improper, but I disagree. Interpreting the Bankruptcy Code to prevent an ineligible foreign debtor from establishing eligibility to support needed chapter 15 relief will contravene the purposes of the statute to provide legal certainty, maximize value, protect creditors and other parties in interests and rescue financially troubled businesses. *See* 11 U.S.C. § 1501(a). The Debtor oversees a multi-national group of corporations engaged in the solar energy business. Despite the lack of a United States presence, it owes a substantial amount of United States debt and requires recognition as a condition to the enforcement of the scheme of arrangement in the United States that the JPLs hope to achieve in the Foreign Proceeding. Absent the enforcement of the scheme, which will presumably include a form of discharge or injunction restraining the collection of some or all of the pre-scheme debts, the Debtor will be hindered from ever establishing a United States presence or conducting future business in the United States for fear that creditors will seize its United States assets. Shutting the door on the Debtor, where it has no other access, will hinder the restructuring of this multi-national business as contemplated by chapter 15.

**B. Venue**

Title 28, section 1410 governs venue of a chapter 15 proceeding. It provides:

> A case under chapter 15 of title 11 may be commenced in the district court of the United States for the district—

4119

(1) in which the debtor has its principal place of business or principal assets in the United States;

(2) if the debtor does not have a place of business or assets in the United States, in which there is pending against the debtor an action or proceeding in a Federal or State court; or

(3) in a case other than those specified in paragraph (1) or (2), in which venue will be consistent with the interests of justice and the convenience of the parties, having regard to the relief sought by the foreign representative.

 **[9]** Section 1410 establishes a "hierarchy of choices." 1 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 4.04[1] (16th ed. 2014) ("Collier") (quoting H.R. Rep. No. 109–31, at 119 (2005)). **\*414** If the debtor maintains its principal place of business or principal assets in the United States in a particular district, venue must be placed in that district;[16] if not, we turn to subparagraph two. If there is no litigation pending against the debtor in a district, subparagraph three then applies.

 **[10]    [11]** The Court has concluded that the BONY account is an asset of the Debtor. No evidence was proffered showing that the Debtor had any other assets in the United States. Its indirect subsidiary, Suntech America, operates in California, but the assets of a subsidiary are not the assets of the parent. *Dole Food Co. v. Patrickson,* 538 U.S. 468, 474–75, 123 S.Ct. 1655, 155 L.Ed.2d 643 (2003); *In re Touch Am. Holdings, Inc.,* 401 B.R. 107, 126 (Bankr.D.Del.2009); *Regency Holdings (Cayman), Inc. v. Microcap Fund, Inc.* (*In re Regency Holdings (Cayman), Inc.*), 216 B.R. 371, 375 (Bankr.S.D.N.Y.1998) ("parent's ownership of all of the shares of the subsidiary does not make the subsidiary's assets the parent's"). *A fortiori,* the assets of an indirect subsidiary are not the assets of a more distant ancestor. Accordingly, the BONY account represented the Debtor's principal United States assets at the time the JPLs filed the chapter 15 petition.

Solyndra argues that the Debtor maintained its principal United States place of business in San Francisco at the time the chapter 15 petition was filed and the JPLs manipulated the venue of the case by establishing the BONY account. Solyndra points to two items of evidence in support of its contention. First, the Debtor's Secretary and General Counsel, Kim Liou, was employed in California—presumably in San Francisco. (Tr. at 48:4–6.) Even after the JPLs' appointment, Mr. Liou continued to sign SEC filings at least through late January 2014, (SX 106), provided advice to the Debtor's

Board, (*see* SX 9), and attended Board meetings. (*See* SX 12.) Second, the Debtor filed a Form 20–F with the SEC for the fiscal year ended December 31, 2011 in which it stated that "we" built "regional headquarters" in "San Francisco for the United States." (SX 80 at 14.)

 **[12]** This evidence does not support the finding that that the Debtor, as opposed to Suntech America, maintained its principal place of business in the United States in San Francisco. The Debtor is a holding company for a group of direct and indirect subsidiaries that operate worldwide. A corporation's principal place of business refers "to the place where a corporations officers direct, control, and coordinate the corporations activities," *Hertz Corp. v. Friend,* 559 U.S. 77, 92–93, 130 S.Ct. 1181, 175 L.Ed.2d 1029 (2010) (construing f "principal place of business" in federal diversity jurisdiction statute); *accord* 17 Daniel R. Coquillette, et al., Moore's Federal Practice 110.43[2][a], at 110–91 (3d ed. 2014) (The "principal place of business" for bankruptcy venue purposes "is the most important, consequential or influential place where the entity conducts business. This is likely to be the place where the entity's management decisions are made, but in some cases may be where day-to-day-operations are conducted."), and the same rule applies to a holding company. *See Johnson v. SmithKline Beecham Corp.,* 853 F.Supp.2d 487, 495 (E.D.Pa.2012), *aff'd,* 724 F.3d 337 (3d Cir.2013).

 **[13]** The record does not support a finding that the Debtor conducted any **\*415** business in California. A foreign corporation cannot conduct business in California without obtaining a certificate of qualification from the California Secretary of State, Cal. Corp.Code § 2105(a) (West 2014) (amended 2014), and there is no evidence that the Debtor was authorized to conduct business in California or that it conducted business in California. No member of the Debtor's management other than Mr. Liou was present in California, and even his official address was listed with the SEC as "c/o Suntech Power Holdings Co., Ltd., 9 Xinhua Road, New District, Wuxi, Jiangsu Province 214028, People's Republic of China." (SX 80 at 92.) Furthermore, to the extent he attended in-person Board meetings, those meetings were held in the Cayman Islands after the appointment of the JPLs, and he attended telephonically. (*See* SX 12.) Similarly, he provided legal advice to the Debtor's management who were located in the Cayman Islands and elsewhere. (*See* SX 9.)

Nor did Mr. Liou have authority to conduct the business of the Debtor in his capacity as Secretary or General Counsel.[17]

Pursuant to the Debtor's Second Amended and Restated Memorandum & Articles of Association, adopted Oct. 26, 2005 (the "Articles") (PX 3), the management of the Debtor was vested in the Directors subject, however, to the provisions of the Articles, the Cayman Islands Companies Law and any resolutions made at a general meeting. (PX 3 at § 86.) The Directors were empowered to appoint officers, including a Secretary, "to perform such duties ... as the Directors from time to time decide," (*id.* at § 127), and "with such powers and duties as the Directors may think fit." (*Id.* at § 87.) The Articles do not specify any duties imposed on the Secretary or the General Counsel to conduct the Debtor's business, the Companies Law (2013 Revision), (PX 40), is also silent, and there is no evidence of any resolutions empowering the Secretary or General Counsel to conduct the Debtor's business. Moreover, to the extent that Mr. Liou had been granted any authority to act for the Debtor, he had no authority to act on behalf of the Debtor once the JPLs were appointed except at the JPLs' direction. (Tr. at 48:7–14.) Furthermore, he resigned effective May 26, 2014. (PX 33 at 3.) Mr. Liou did sign the Debtor's SEC filings as might be expected in his capacity as General Counsel. But the execution of the SEC filings, while incident to the Debtor's solar energy business, did not involve the conduct of the Debtor's solar energy business or place Mr. Liou at its "nerve center."

Finally, the statement in the 2011 Form 20–F that "we" built regional headquarters in San Francisco does not imply what Solyndra contends. According to the definitional section in the form, references to " 'Suntech,' 'we,' 'us,' 'our company' and 'our' are to Suntech Power Holdings Co., Ltd., its predecessor entities and its consolidated subsidiaries." (SX 80 at 3.) In other words, "we" included Suntech America. The statement does not mean that the Debtor built its own headquarters in San Francisco. The more plausible interpretation is that the regional headquarters in San Francisco housed Suntech America, the only member of the Suntech Group actually located there.

In summary, the Debtor did not have any place of business or assets in the United States immediately prior to the commencement of the chapter 15 case. The place of business and assets of Suntech America were not the Debtor's place of business or assets, and did not make the Debtor eligible to be a debtor or provide a **\*416** basis for venue. The JPLs established the BONY account to solve the eligibility problem, and the BONY account also had the effect of establishing a basis for venue in this district under 28 U.S.C. § 1410(1). The JPLs did not manipulate venue by grabbing it

from the Northern District of California because the Debtor was ineligible to be a debtor in the Northern District of California or anywhere else until it established the BONY account. Accordingly, *In re Patriot Coal Corp.,* 482 B.R. 718 (Bankr.S.D.N.Y.2012) and similar decisions discussed by Solyndra are distinguishable.

### C. COMI

 [14] The Debtor seeks recognition of the Foreign Proceeding as a foreign main proceeding.[18] A " 'foreign main proceeding' means a 'foreign proceeding pending in the country where the debtor has the center of its main interests,' " 11 U.S.C. § 1502(4), or COMI. "In the absence of evidence to the contrary, the debtor's registered office ... is presumed to be the center of the debtor's main interests." 11 U.S.C. § 1516(c). "[A] debtor's COMI is determined as of the time of the filing of the Chapter 15 petition," but, "[t]o offset a debtor's ability to manipulate its COMI, a court may also look at the time period between the initiation of the foreign liquidation proceeding and the filing of the Chapter 15 petition." *Morning Mist Holdings Ltd. v. Krys* (*In re Fairfield Sentry Ltd.*), 714 F.3d 127, 133, 137 (2d Cir.2013).

 [15]    [16] The COMI analysis permits consideration of any relevant activities, including liquidation activities and administrative functions. *Fairfield Sentry,* 714 F.3d at 137. The following non-exclusive group of factors guides the analysis, "but consideration of these specific factors is neither required nor dispositive," *id.:*

> Various factors, singly or combined, could be relevant to such a determination: the location of the debtor's headquarters; the location of those who actually manage the debtor (which, conceivably could be the headquarters of a holding company); the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes.

*Id.* (quoting *In re SPhinX, Ltd.,* 351 B.R. 103, 117 (Bankr.S.D.N.Y.2006), *aff'd,* 371 B.R. 10 (S.D.N.Y.2007).) In addition, the court may consider the location of the debtor's "nerve center," "including from where the debtor's activities are directed and controlled, in determining a debtor's COMI." *Fairfield Sentry,* 714 F.3d at 138 n. 10. Finally, international sources of law that the court may look to "underscore[ ] the importance of factors that indicate regularity and ascertainability." *Id.* at 138.

 **[17]**   The Debtor's presumptive COMI is the Cayman Islands where it was incorporated. However, the Cayman Islands was not its actual COMI when the Foreign Proceeding was commenced. Up to that point, the Debtor did not conduct any activities in the Cayman Islands, and maintained its principal executive offices in Wuxi, China from where it managed the Suntech Group. The issue to be decided, however, is the Debtor's COMI at the time of the commencement of the chapter 15 case. This comes down to whether the commencement of the provisional liquidation and the activities of the JPLs had  **\*417**  the effect of transferring the COMI from Wuxi, China to the Cayman Islands.

The answer is not obvious in a case like this. Unlike *Fairfield Sentry,* which involved the straight foreign liquidation of a Madoff feeder fund akin to a chapter 7 case, the Foreign Proceeding is a provisional liquidation more like a chapter 11 case in which a trustee has been appointed but the debtor continues to operate subject to the trustee's supervision and control. Nevertheless, the commencement of a provisional liquidation may have a profound effect on the business of the debtor. It triggers a restructuring process on which the survival of the debtor's traditional business may depend, and it may shift the duties and responsibilities of running the business from the debtor's management to the provisional liquidators.

Here, that shift is initially reflected in the Appointment Order. The JPLs were authorized to develop and propose a compromise or arrangement with the Debtor's creditors, (PX 1 at § 2), and if necessary, file a chapter 15 case in the United States Bankruptcy Court or seek recognition of the Foreign Proceeding in any other appropriate jurisdiction. (*Id.* at §§ 3, 4(q).) Toward that end, the Appointment Order authorized the JPLs to exercise a host of additional powers. Among other things, the JPLs were empowered to do all acts on behalf of the Debtor, take possession of its property and collect all debts, deal with all questions relating to or affecting the assets or the restructuring, supervise the Debtor's bank accounts, open bank accounts to pay the expenses of the provisional liquidation, hire staff and attorneys, borrow money, make the required filings with the regulatory bodies and pay, and if necessary, prefer creditors as needed to minimize the disruption to the day-to-day activities of the Debtor. (*See id.* at § 4(b)-(m), (o), (p), (r).) In addition, the JPLs assumed control of legal proceedings involving the Debtor, including the antitrust litigation brought by Solyndra. (*Id.* at § 4(n).)

Importantly, the JPLs' authority extended to the operating subsidiaries. They were granted the power to exercise the rights of the Debtor, including its voting rights, as shareholder of its subsidiaries or any entities in which it invested, (*id.* at § 4(e)), protect the assets of the subsidiaries, (*id.* at § 4(g)), and pay and possibly prefer the creditors to the extent necessary to minimize the interruption to the day-to-day activities of the subsidiaries. (*Id.* at § 4(*l* ).)

As noted earlier, the Appointment Order left the day-to-day management of the Debtor's business to the Board subject to the JPLs' supervision and control. (*Id.* at § 8; *see id.* at § 4(a).) In practice, however, it exercised little day-to-day authority, and the record does not indicate what the Board did beyond what the meeting minutes report. Furthermore, the Debtor's CEO resigned in February 2014, and the record does not show what, if anything, the Debtor's management did on a day-to-day basis. In fact, Clearwater and Spinnaker had insisted on a Cayman Islands restructuring rather than a United States chapter 11, in part, because management would maintain control of the Debtor in a chapter 11 case. Furthermore, the Board could not engage in transactions outside the ordinary course of business without the JPLs' approval, (*id.* at § 8), and could not open or close bank accounts on behalf of the Debtor without the JPLs' prior approval. (*Id.* at § 8(c).)

The Appointment Order directed the JPLs to seek to agree on a protocol regarding the management of the Debtor and its subsidiaries. (*Id.* at § 11.) There is no evidence that this occurred, and in practice, the JPLs, especially  **\*418**  Walker, assumed control of the Debtor's affairs pursuant to the powers granted in the Appointment Order. They met with employees and creditors, opened a bank account in the Cayman Islands funded with transfers from one of the Debtor's other accounts, voted the Debtor's shares to place PSS in voluntary liquidation in the British Virgin Islands and appoint John Ayres as voluntary liquidator, filed a claim in the PSS proceeding in the amount of $737.6 million, and loaned $150,000 to PSS to fund litigation. The JPLs also worked to preserve the value of SPI and Suntech America through the agreement with SPI's administrator to pay a dividend to creditors, obtained a $7 million loan from Suntech America to finance the Debtor's restructuring, spearheaded the Debtor's challenge to the New York Stock Exchange's decision to delist its ADS, and entered into the Cooperation Agreement with Wuxi Suntech pursuant to which the latter paid $750,000 to the Debtor in exchange for its right to use the Debtor' export license. Finally, they entered into the RSA and took steps to recover, and ultimately recovered, the physical shares in the

Debtor's direct subsidiaries as well as the shareholder registry and statutory records.

Centered in the Cayman Islands, the JPLs took the necessary steps to centralize the administration of the Foreign Proceeding there. They published notices of the Foreign Proceeding directing interested parties to contact members of Walker's staff in the Cayman Islands. They changed the Debtor's address on SEC filings and informed the Debtor's lenders to send future notices to their offices in the Cayman Islands. They conducted Board meetings and creditor meetings, largely through telephonic participation, from the Cayman Islands and appointed a Caymans Island director. Cairns testified that the JPLs are the primary Debtor representatives with whom he communicates since the commencement of the Foreign Proceeding, and it is Cairns' understanding that they are running Suntech Group on a daily basis. (Cairns Tr. at 33:9–20.)

In opposing the recognition of the Foreign Proceeding, Solyndra contends that the Debtor's COMI was not located in the Cayman Islands. First, the Debtor represented to the world that it was headquartered in Wuxi, China, and that is where creditors and other stakeholders would have expected it to reorganize elsewhere, presumably in China. While the Debtor represented that its principal offices were located in Wuxi prior to the commencement of the Foreign Proceeding, the JPLs changed the location of the principal offices to the Cayman Islands on the Debtor's SEC filings and notified their lenders to send future communications to the Cayman Islands. The JPLs also centralized the administration of the Debtor's affairs and its restructuring in the Cayman Islands following their appointment and prior to the commencement of the chapter 15 case.

Nor does the evidence support a finding that the Debtor's creditors would have expected it to restructure its businesses in China. The Debtor's largest creditor group was the Noteholders. The Indenture, (PX 31), was governed by New York law and the parties to the Indenture submitted to the non-exclusive jurisdiction of the New York state and federal courts. In addition, when the representatives of Clearwater and Spinnaker, who held approximately 50% of the debt, met with the Debtor's representatives, they urged the Cayman Islands as the most logical restructuring venue. The Debtor was incorporated in the Cayman Islands and the Cayman Islands employed a predictable, flexible and cost effective method for dealing with restructuring. They rejected a **\*419** chapter 11 proceeding for reasons of cost and management

control, and according to Cairns, summarily dismissed China due to uncertainties regarding jurisdiction and creditor's rights, calling it the last place that one would want to go.

Second, Solyndra argues that all of the Debtor's directors, decision makers and employees resided outside of the Cayman Islands. Again, this was true prior to the appointment of the JPLs. But once they were appointed, they took over the management of the Debtor, employed their own staff and attorneys in the Cayman Islands, and through the exercise of the Debtor's rights as shareholder, assumed the Debtor's control over the Suntech Group.

Third, Solyndra maintains that the Debtor's primary assets its bank accounts and intercompany receivables—are located outside of the Cayman Islands. The Debtor is a holding company. As such, it does not have operating assets, and its assets consist of cash and non-cash assets, including intercompany receivables, and investments. (PX 15 at § 9.1.) Solyndra points to the intercompany receivables as the principal asset, states that the principal intercompany debtors are PSS, Vantury Ltd. and Bright Path Holdings, all located in the British Virgin Islands, and Suntech Singapore, located in Singapore, and argues that the intercompany receivables are located where these debtors are found. (*See Solyndra Residual Trusts Proposed Findings of Fact & Conclusions of Law on Motion to Transfer Venue*, dated Aug. 1, 2014 ("*Solyndra Venue* "), at ¶¶ 9, 51 (ECF Doc. # 63).) The JPLs have concluded, however, that there is "significant uncertainty" regarding the Debtor's ability to collect these receivables as a result of the financial condition of the subsidiaries. (PX 15 § 9.1.2 at SPH00007101.) In fact, the largest receivable in the sum of $917 million is owed by PSS; PSS is in liquidation and the receivable is presently worthless. As a consequence, the JPLs concluded that the Debtor was insolvent as of November 30, 2013. (*Id.* § 9.1.2 at SPH00007100.)

 **[18]**   In summary, the Court concludes for the reasons stated that the Debtor's COMI on the date of the commencement of the chapter 15 case was the Cayman Islands. Solyndra next argues that even if this is so, the JPLs manipulated the COMI in bad faith. Specifically, they (a) transferred stock certificates, shareholder registries, and statutory records to the Cayman Islands, (b) opened the Debtor's only Cayman Islands bank account (solely for the payment of professional fees), (c) appointed a director who resides in the Cayman Islands, and (d) held one Board meeting in the Cayman Islands. Moreover, one of the reasons they opened the Cayman Islands bank account and arranged the appointment of a Cayman Islands

director was to improve the prospects for obtaining chapter 15 relief.

The transfer of the stock certificates, shareholder registries and statutory records were consistent with the JPLs' duties under the Appointment Order as was the conduct of the Board meeting in PwC's offices in the Cayman Islands.[19] (*See* SX 12.) The same was true of the Cayman Islands bank account. The JPLs required the account to pay the restructuring expenses. The account served a legitimate business purpose and was convenient to the JPLs. It would not have made sense to open the account in another jurisdiction simply because a Cayman Islands bank account offered the additional benefit of **\*420** improving the prospects for chapter 15 relief. In short, these were steps that the JPLs took consistent with the Appointment Order and their roles in the Foreign Proceeding and they would have taken these actions even if they had never intended to file a chapter 15 case.

Solyndra's last point concerns Pearson's appointment as a director of the Debtor and the only Cayman Islands director—in February 2014. Walker had suggested adding a Cayman Islands director at the January 23, 2014 Board meeting, (SX 7 at SPH00000117), and recommended Pearson, with whom he had worked on a committee of the Cayman Islands Insolvency Practitioners Association. (Tr. at 59:1–18.) He contacted Pearson the same day, informed him of the restructuring efforts, and apparently told him that a resident Cayman Islands Board member might be beneficial in securing chapter 15 recognition. (SX 8 at SPH00000405.)

No one has questioned Pearson's credentials or qualifications, but it seems that his selection was motivated, at least in part, to bolster the contention that the Cayman Islands was the Debtor's COMI. However, even if the Court discounts the selection of Pearson, the evidence supports the finding that the Debtor's COMI at the time of the commencement of the chapter 15 case was the Cayman Islands, and all of the other actions criticized by Solyndra were taken in furtherance of the JPLs duties under the Appointment Order and were not intended to transfer the Debtor's COMI from China or anywhere else even if they had that effect. As a result, the Court concludes that the JPLs did not manipulate the Debtor's COMI in bad faith.

**D. Cross–Motion to Change Venue**

[19] [20] [21] [22] [23] Under 28 U.S.C. § 1412, a district court may transfer a case or proceeding under title

11 to a district court in another district "in the interest of justice or for the convenience of the parties." *Accord* Fed. R. Bankr.P. 1014(a)(1). Bankruptcy Courts in this district are authorized to transfer a case under § 1412 by virtue of 28 U.S.C. §§ 157(a) and 1334(b) and the District Court's order of reference. *Amended Standing Order of Reference,* General Order M–431, dated Jan. 31, 2012 (Preska, C.J.); *Enron Corp. v. Arora* (*In re Enron Corp.*), 317 B.R. 629, 638 (Bankr.S.D.N.Y.2004). The decision to transfer venue lies within the sound discretion of the court and is based on "an individualized, case-by-case consideration of convenience and fairness." *Gulf States Exploration Co. v. Manville Forest Prods. Corp.*, (*In re Manville Forest Prods. Corp.*), 896 F.2d 1384, 1391 (2d Cir.1990) (quoting *Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 29, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988)). The party seeking to change venue bears the burden of proof by a preponderance of the evidence. *Manville,* 896 F.2d at 1390. Where the case is initially brought in a proper venue, the debtor's choice of forum is entitled to great weight. *In re Enron Corp.,* 274 B.R. 327, 342 (Bankr.S.D.N.Y.2002). Finally, if transfer of venue would merely shift the inconvenience from one party to another, the debtor's choice of forum should not be disturbed. *Id.* at 342–43 (citing *In re Garden Manor Assocs., L.P.,* 99 B.R. 551, 555 (Bankr.S.D.N.Y.1988)).

**1. The Applicability of 28 U.S.C. § 1412**

[24] The Debtor first argues that § 1412 does not apply to chapter 15 cases. Section 1410 of title 28, quoted *supra,* provides a hierarchy of venue choices in a chapter 15 case. If the debtor does not have its principal United States place of business or principal United States assets **\*421** in a district, and there is no pending action or proceeding against the debtor in a district, then and only then can the debtor select a venue that is "consistent with the interests of justice and the convenience of the parties, having due regard to the relief sought by the foreign representative." 28 U.S.C. § 1410(3). The Debtor maintains that allowing the Court to consider the interests of justice or the convenience of the parties on a motion to change venue upsets the hierarchy created by § 1410, and renders superfluous the direction to consider "the relief sought by the foreign representative," a requirement under § 1410(3) but not under § 1412.

The present version of § 1410 was added by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. No. 109–8, § 802(c)(4), 119 Stat. 23, 146 (2005), as part of the same legislation that enacted chapter 15. *Id.* at § 801, 119 Stat. at 134–145. The prior version of § 1410 that

4124

applied to ancillary proceedings under repealed Bankruptcy Code § 304 did not include a provision permitting venue based upon interests of justice or the convenience of the parties. A court could, however, transfer the venue of a § 304 case pursuant to 11 U.S.C. § 1412. *See In re Emerson Radio Corp.,* 52 F.3d 50, 55 (3d Cir.1995). When Congress repealed § 304 and adopted chapter 15 and the current version of § 1410, it did not amend § 1412.

The Court concludes that 28 U.S.C. § 1412 and Federal Bankruptcy Rule 1014(a)(1) permit a Bankruptcy Court to transfer the venue of a properly venued chapter 15 case. First, § 1412 applies to a "case ... under title 11," and filing a petition for recognition commences a case under chapter 15 of title 11. *See* 11 U.S.C. § 1504. Hence, the express terms of § 1412 authorize the transfer. *Accord* Fed. R. Bankr.P. 1014(a)(1). Second, §§ 1412 and 1410 are not inconsistent and can be read in harmony. The foreign representative gets the first crack at selecting venue. His selection, whether based on the location of the debtor's assets, place of business, pending litigation or the foreign representative's own notions of interests and convenience should not prevent a party-in-interest from seeking to transfer the venue of the case to another venue where the interest of justice or the convenience of the parties dictates that the transfer is appropriate. 1 Collier ¶ 4.04[5], at 4–29 to 4–30 ("If a party in interest contends that a chapter 15 case has been filed in an improper venue or, even if in a proper venue, that venue should be changed, there seems no reason why a motion to change venue would not be proper. Any such motion would be determined pursuant to section 1412.").

 [25]   Third, § 1412 does not eviscerate the language of § 1410(c), or preclude a court from "having regard to the relief sought by the foreign representative" when considering the interest of justice or the convenience of the parties. As discussed below, a chapter 15 case unfolds far differently than a plenary chapter 11 case. There are few proceedings; the assets and claims are administered in the foreign proceeding by the foreign court. A Bankruptcy Court should consider the nature of the case and what it will entail, including the relief sought by the foreign representative, when contemplating the interests of justice or the convenience of the parties.

### 2. Interests of Justice

 [26]   [27]   [28]   [29]   [30]   The interests of justice and the convenience of the parties are written in the disjunctive, and considered separately. The "interest of justice" is a "broad and flexible standard" that must be applied on a case by case

basis. *Manville,* 896 F.2d at 1391. When determining where the **\*422** interest of justice would be best served, courts may consider whether:

> (i) transfer would promote the economic and efficient administration of the bankruptcy estate; (ii) the interests of judicial economy would be served by the transfer; (iii) the parties would be able to receive a fair trial in each of the possible venues; (iv) either forum has an interest in having the controversy decided within its borders; (v) the enforceability of any judgment would be affected by the transfer; and (vi) the plaintiff's original choice of forum should be disturbed.

*In re Dunmore Homes,* 380 B.R. 663, 671–72 (Bankr.S.D.N.Y.2008). The most important factor is the first: the economic and efficient administration of the estate. *See Landmark Capital Co. v. N. Cent. Dev. Co.* (*In re Landmark Capital Co.*), 20 B.R. 220, 224 (S.D.N.Y.1982). When it is alleged that a debtor has manipulated venue, courts will consider the debtor's purposeful acts to manufacture technical compliance with the venue statute. *See, e.g., Patriot Coal Corp.,* 482 B.R. at 743.

 [31]   Relying primarily on *Patriot Coal* and *Dunmore Homes,* Solyndra argues that the Debtor manipulated venue by establishing the BONY account in New York, an account that had no legitimate purpose. (*See Solyndra Venue* at ¶ 49.) In addition, the efficient and economic administration of the estate would be served by transferring venue to the Northern District of California because the Debtor obtained post-petition financing from Suntech America, which is located in San Francisco as is the office of the Debtor's General Counsel. (*Id.* at ¶ 51.) Finally, the Northern District of California has the greater interest in the chapter 15 petition and its recognition because Solyndra may be the largest creditor if it succeeds in its antitrust lawsuit. (*Id.* at ¶ 53.)

For reasons already discussed, the JPLs did not manipulate venue or establish the BONY account for an improper business purpose. Furthermore, Solyndra's position is based on the incorrect view that Debtor does business in the Northern District of California, and the establishment of the BONY account deprived the case of a proper California venue.

Solyndra's arguments regarding efficiency and economy are also misplaced. The Debtor borrowed money from Suntech America in the Foreign Proceeding and not in any case pending in this Court. The parties stipulated to Cayman Islands governing law, (PX 18 at ¶ 15(a)), submitted to

the exclusive jurisdiction of the Cayman Islands courts on all matters relating to the loan agreement, (*id.* at ¶ 15(b)), and the loan agreement was approved by the Cayman Court on January 31, 2014. (PX 52.) The loan was not part of any financing approved by this Court, there will not be any proceedings in this Court regarding that loan, and any dispute arising out of the loan agreement will be resolved by the Cayman Court. In addition, Mr. Liou, the Debtor's former General Counsel, resigned in May 2014, and there is no evidence that the Debtor even has a General Counsel. Moreover, the JPLs, who run the Debtor, have retained lawyers located in New York and the Cayman Islands.

Finally, this district has the greater interest in the chapter 15 proceedings. The Debtor is currently the subject of the Involuntary Case in this Court. The RSA temporarily halted the Involuntary Case, but the Petitioning Creditors recently advised the Court that the RSA has terminated, and requested the entry of an order for relief. *See* fn. 9, *supra.* The pending Involuntary Case is intertwined with the chapter 15 case, and the administration of the two cases overlaps. First, so long as the Involuntary Case remains pending, **\*423** any party seeking relief from the stay will have to move in both the Involuntary Case and in the chapter 15 case because recognition as a foreign main proceeding also triggers the automatic stay with respect to the debtor and property of the debtor within the territorial jurisdiction of the United States. *See* 11 U.S.C. § 1520(a)(1). It is more efficient for the same movant to file both motions in the same court to be heard by the same judge at the same time. Second, the parties have already created an extensive record on the pending motions that is also relevant in deciding whether the Debtor was eligible to be a debtor in the Involuntary Case and whether venue was proper at the time the Involuntary Case was commenced. Third, the JPLs may argue that the Court should dismiss or suspend the Involuntary Case pursuant to 11 U.S.C. § 305 based on the pendency of the Foreign Proceeding and the chapter 15. *See In re Compania de Alimentos Fargo, S.A.,* 376 B.R. 427, 441 (Bankr.S.D.N.Y.2007) (dismissing involuntary case under 11 U.S.C. § 305 in deference to pending foreign proceeding).

The Northern District of California, on the other hand, does not have a significant interest in the chapter 15 case. The pendency of the California litigation has little impact on the chapter 15 proceeding. The litigation was stayed as against the Debtor by the filing of the Involuntary Case, and will remain stayed whether or not the Court grants recognition or transfers venue to the Northern District of California. Even if

the stay is lifted for the purpose of liquidating the claim and Solyndra recovers a judgment, it must still seek payment of its judgment in the Foreign Proceeding. And as Solyndra argues, the Debtor does not have any assets in the United States to which it could look to satisfy a judgment.

### 3. Convenience of the Parties

**[32]    [33]** Convenience of the parties generally involves consideration of the location of the parties and their counsel, the location of the proof, and the ability to compel otherwise unwilling witnesses to testify. *Official Committee of Unsecured Creditors v. McConnell* (*In re Grumman Olson Indus., Inc.*), 329 B.R. 411, 435 (Bankr.S.D.N.Y.2005). Unlike 1404(a), the convenience of the witnesses does not have to be taken into account under 1412, although it is part of any discussion to change venue. 1 Collier 4.05[3][a], at 433. In a chapter 15 case like this one, any inconvenience to the parties will be minimal regardless of where it ends up. The Court acts in aid of the Cayman Court where claims will be proved and paid, disputes will be heard, and a scheme of arrangement may be sanctioned. The Debtor owns no property in the United States other than the BONY account, and does not conduct any business that might give rise to a need for judicial intervention.

The Court foresees few proceedings in the chapter 15 case after recognition is granted. The Debtor is the subject of several lawsuits pending in California and elsewhere, but these suits have been stayed since the filing of the Involuntary Case, and no party, including Solyndra, has sought relief from the automatic stay to prosecute their claims. Aside from the possible stay relief motions, if the Cayman Islands court sanctions a scheme, the JPLs will seek an order enforcing the scheme within the territorial jurisdiction of the United States.

The Southern District of New York is equally convenient if not more convenient to the parties to those proceedings. The applications described, including possible motions for stay relief, raise primarily legal questions that do not involve witnesses or proof of contested facts. The parties that have participated in the chapter 15 **\*424** case already employ New York counsel. Furthermore, while Solyndra points out that five of the six creditors that signed the RSA reside substantially closer to California than New York, (*Solyndra Venue* at 59), those creditors opted for a New York venue when they signed the RSA and are the best judges of their own convenience. Finally, Solyndras predecessor in interest filed its own chapter 11 case in Delaware, (PX 13), rejecting a more convenient venue nearer its world headquarters in Fremont,

California. (PX 14 at ¶ 4.) On balance, the Court concludes that the relevant factors do not weigh in favor of transferring venue to the Northern District of California, and Solyndra's cross-motion is denied.

The foregoing constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure made applicable to this contested chapter 15 petition by Rules 7052 and 1018 of the Federal Rules of Bankruptcy Procedure.

Settle order on notice.

**All Citations**

520 B.R. 399, 60 Bankr.Ct.Dec. 90

Footnotes

1 In this opinion, "Tr." refers to the trial transcript (ECF Doc. # 62), "PX" refers to the Petitioners' exhibits received in evidence, and "SX" refers to Solyndra's exhibits received in evidence.

2 As an exempted company, the Debtor could "not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands." (PX 3, at SPH00008543.)

3 Solyndra's counsel objected to the form of the question that elicited this information. (*See* Cairns Tr. at 23:8.) The objection is overruled.

4 Solyndra's counsel objected to the form of the question that elicited this information. (*See* Cairns Tr. at 24:12.) The objection is overruled.

5 Solyndra's counsel objected to the form of the question that elicited this information. (*See* Cairns Tr. at 27:22–23.) The objection is overruled.

6 The Board had decided not to pursue directors' and officers' liability insurance because it was too costly. (PX 17 at SPH00007560R.) The lack of insurance may have contributed to the Board's reluctance to make decisions and defer to Walker. (Tr. at 63:4–19.)

7 The loan agreement was executed by Kurt Metzger, a director of both the Debtor and Suntech America. (PX 18 at 15.)

8 The Board authorized the RSA, although it acknowledged that the JPLs "have the power and authority to execute the [RSA]." (SX 7 at SPH00000121.) In addition, the JPLs expressly represented in the RSA that they had the authority to bind the Debtor to the agreement. (PX 23 § 13(a) at SPH00001949R.)

9 By letter dated October 29, 2014, the Petitioning Creditors advised the Court that the RSA had terminated automatically on August 14, 2014, and requested that the Court order relief under chapter 7 of the Bankruptcy Code. (ECF Case No. 13–13350, Doc. # 48.)

10 Computershare is the parent of KCC. (Foster Tr. at 57:5–7.) Computershare and KCC have been used interchangeably by the witnesses and the parties, and will be used interchangeably in this opinion.

11 Even if the law of the Cayman Islands or some other jurisdiction governed the question of ownership, neither side has identified an actual conflict with New York law.

12 The Debtor's counsel objected to the question that elicited this information on the grounds that it misstated testimony and lacked foundation. (*See* Foster Tr. at 57:24–25.) The objection is overruled.

13 The Debtor's counsel objected to the question that elicited this information on the grounds that it lacked foundation, called for a legal conclusion and was vague and ambiguous. (*See* Foster Tr. at 61:23.) The objection is overruled.

14 The Debtor's counsel objected to the question that elicited this information on the grounds that it lacked foundation and the document spoke for itself. (*See* Foster Tr. at 53:21–22, 54:8.) The objection is overruled.

4127

15    O'Melveny & Myers LLP represents the Debtor and Teitelbaum & Baskin LLC represents the Petitioning Creditors in the Involuntary Case.

16    If the debtor has its principal United States assets in one district and its principal United States place of business in another district, it can place venue in either district under 28 U.S.C. § 1410(1).

17    Mr. Liou was also General Counsel of Suntech Arizona, Inc. (SX 107.)

18    In the alternative, the Debtor seeks recognition of the Foreign Proceeding as a foreign non-main proceeding. In light of the disposition of the Debtor's principal request, it is unnecessary to reach the alternative request.

19    The Board also held two telephonic meetings during this period. (*See* SX 7, 47.) Walker and other PwC personnel participated in both.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 74

2022 WL 2498751
Only the Westlaw citation is currently available.
United States Bankruptcy Court, D. Delaware.

IN RE: TPC GROUP INC., et al., Debtors.

Bayside Capital Inc. and Cerberus

Capital Management, L.P.,

Plaintiffs/Counterclaim Defendants,

v.

TPC Group Inc., Defendant/

Counterclaim Plaintiff,

and

The Ad Hoc Noteholder

Group, Intervenor Defendant.

Case No. 22-10493 (CTG)

|

Adv. Proc. No. 22-50372 (CTG)

|

Signed 07/06/2022

**Attorneys and Law Firms**

Timothy P. Cairns, Pachulski Stang Ziehl & Jones LLP, 919 N. Market St., 17th Floor, Wilmington, DE 19801, Andrew R. Dunlap, Selendy Gay Elsberg PLLC, 1290 Avenue of the Americas, New York, NY 10104, Laura Davis Jones, Pachulski Stang Ziehl & Jones LLP, 919 N. Market Street, 17th Floor, Wilmington, DE 19801, Jennifer Selendy, Selendy Gay Elsberg PLLC, 1290 Avenue of the Americas, New York, NY 10104, Oscar Shine, Selendy Gay Elsberg PLLC, 1290 Avenue of the Americas, New York, NY 10104, Max H. Siegel, Selendy Gay Elsberg PLLC, 1290 Avenue of the Americas, New York, NY 10104, for Plaintiff Bayside Capital, Inc. and Cerberus Capital Management, L.P.

Brian Loughnane, Morris, Nichols, Arsht & Tunnell LLP, 1201 Market Street, Wilmington, DE 19899, for Defendant TPC Group Inc.

Robert J. Dehney, Morris, Nichols, Arsht & Tunnell, 1201 N. Market Street, P O. Box 1347, Wilmington, DE 19, for Defendant TPC Group Inc.

Chapter 11

**Related Docket Nos. 4, 16, 18, 43, 48, 49**

<u>**MEMORANDUM OPINION**</u>

CRAIG T. GOLDBLATT, UNITED STATES BANKRUPTCY JUDGE

**\*1** There has been a flurry of litigation in recent years over transactions that seem to take advantage of technical constructions of loan documents in ways that some view as breaking with commercial norms.[1] One example of such a transaction is sometimes described as an "uptier" transaction. In its most aggressive form, such a transaction is one in which the debtor and a majority (but not all) holders of a syndicated debt issuance agree to enter into a new loan that is supported by a superior lien in the same collateral that secured the original debt. Thereafter, the debtor repurchases the participating lenders' share in the prior (now junior) loan – effectively leaving behind the minority holders in a tranche of debt that is now junior to that held by the majority lenders. While such a transaction would typically require an amendment to the original credit agreement or indenture, those documents are typically drafted to permit a majority (or, in some cases, a supermajority) of the holders to amend the agreement without the consent of the minority.

1    *See*, *e.g.*, Diane L. Dick, *Hostile Restructurings*, 96 Wash. L. Rev. 1333 (2021). Materials from a recent symposium devoted to this topic can be found at: https://creditorcoalition.org/upcoming-symposium-intra-creditor-class-warfare/.

The transaction at issue in the motions now before the Court is somewhat less aggressive than the paradigmatic "uptier" transaction described above. While the transaction at issue did involve the issuance of new debt that would be senior to the old, unlike the more aggressive "uptier" transactions, the majority holders here retained their positions in the old (now junior) loan, rather than selling those loans back to the debtors and thus exiting the junior tranche.[2]

2    In view of this distinction, the parties dispute whether the transaction at issue here is properly characterized as an "uptier" transaction. But because that label has no

2022 WL 2498751

particular legal significance, that is not an issue that the Court is properly called upon to resolve.

The pending motions for summary judgment raise the question whether the transactions at issue comported with the terms of the applicable loan documents. If they did not, the minority holders contend, the consequence would be that the new loans would be subject to the prior liens, making the new debt junior rather than senior to the old debt. For the reasons described below, the Court concludes that the original loan documents did permit the majority holders to amend the loan documents to provide for the subordination of the old debt to the new. As a result, the debt now held by the majority holders is senior to that of the minority lenders.

**Factual and Procedural Background**

Debtor TPC Group is a Texas-based petrochemical company. Because this dispute turns primarily on the language of various agreements related to TPC's financing, the applicable contractual provisions of the relevant agreements are set forth in some detail, below.

**1. The 2019 10.5 Percent Notes**

**\*2**  In August 2019, TPC raised $930 million by issuing senior secured notes that matured in 2024, bearing interest at 10.5 percent.[3] Bayside Capital and Cerberus collectively hold approximately 10 percent of the 10.5% Notes.[4] The Notes are governed by New York law.[5] They are secured by a first lien on substantially all of the debtors' assets (but excluding assets held by certain bankruptcy-remote non-debtor subsidiaries) and a second lien on the assets (such as inventory and receivables) on which various asset-based lenders hold a first lien.

[3]    These notes will be referred to as the "10.5% Notes." The indenture for these notes, referred to as the "2019 Indenture," can be found in the record at D.I. 5 Ex. A. Items docketed in this adversary proceeding are cited as "D.I. __." Items docketed in the main bankruptcy case, *In re TPC Group, Inc.*, No. 22-10493 (CTG) (Bankr. D. Del.), are cited as "Main Bankruptcy D.I. __." U.S. Bank National Association serves as trustee and collateral agent under the 2019 Indenture.

[4]    *See* Main Bankruptcy D.I. 74-1. Bayside Capital, Inc. is referred to as "Bayside Capital." Cerberus Capital Management, L.P. is referred to as "Cerberus." Bayside

Capital and Cerberus are referred to, collectively, as the "objecting noteholders."

[5]    2019 Indenture § 14.08.

Syndicated loan agreements are commonly structured to permit a majority of the holders to make decisions designed to maximize the lenders' recoveries on the loans, and thus prohibit individual holders from insisting on strict compliance with the loan terms in circumstances in which a majority believes it more appropriate to afford the borrower greater flexibility. The 2019 Indenture is no exception.

Accordingly, § 6.05 of the indenture states that the holders "of a majority in aggregate principal amount of the then outstanding Notes may direct the time, place and method of conducting any proceeding for exercising any remedy available to the Trustee or exercising any trust or power conferred on it."[6] And perhaps more importantly for present purposes, § 9.02(a) allows, subject to specified exceptions described below, a majority of the holders to amend the indenture itself. Subject to those exceptions (about which more will be said below), "the Issuer, the Guarantors and the Trustee ... may amend or supplement this Indenture ... and the Notes ... with the consent of the Holders of at least a majority in the aggregate principal amount of the then outstanding Notes voting as a single class."[7] In addition, again subject to certain exceptions, "any existing Default or Event of Default ... or compliance with any provision of this Indenture ... may be waived with the consent of the Holders of a majority in aggregate principal amount of the then outstanding Notes voting as a single class."[8]

[6]    *Id.* § 6.05.

[7]    *Id.* § 9.02(a).

[8]    *Id.*

As noted, however, the indenture sets out certain exceptions to the right of the majority of holders to agree to an amendment. Section 9.02(e), for example, states that any "amendment to, or waiver of, the provisions of this Indenture ... that has the effect of releasing all or substantially all of the Collateral from the Liens securing the Notes ... will require the consent of the holders of at least 66-2/3% in aggregate principal amount of the Notes."[9] (The necessary implication, then, is that releasing collateral that is less than "all or substantially all" can be accomplished by an ordinary majority.) Similarly, an amendment that "otherwise modifies the Intercreditor Agreement [described below] or other Security Document in

any manner adverse in any material respect to the Holders" also requires the 66-2/3 percent supermajority.[10]

[9]    Id. § 9.02(e).

[10]    Id.

**\*3** The indenture also specifies, however, certain amendments that cannot be made "without the consent of each Holder affected thereby."[11] Section 9.02(d) thus sets forth certain rights, described by the parties and the caselaw as "sacred rights" (and sometimes referred to as "consent rights"), that may not be vitiated without the consent of each affected party. The "sacred right" at issue here is set forth in Section 9.02(d)(10), which provides that without such consent "an amendment, supplement or waiver under this Section 9.02 may not ... (10) make any change in the provisions in the Intercreditor Agreement or this Indenture dealing with the application of proceeds of Collateral that would adversely affect the Holders."[12]

[11]    Id. § 9.02(d)(10).

[12]    Because, under the principle of *ejusdem generis*, the meaning of the relevant provision can be informed by the context provided by the other provisions, the full enumeration of "sacred rights" – those changes that cannot be made without the consent of every affected party – is set out below:

(1) reduce the principal amount of Notes whose Holders must consent to an amendment, supplement or waiver;

(2) reduce the principal of or extend the fixed maturity of any Note or alter the provisions with respect to the redemption of the Notes (for the avoidance of doubt, repurchases of the Notes by the Issuer pursuant to Sections 4.08 and 4.12 hereof are not redemptions of the Notes);

(3) reduce the rate of or extend the time for payment of interest, including default interest, or premium on any Note;

(4) waive a Default or Event of Default in the payment of principal of, or premium, if any, or interest on, the Notes (except a rescission of acceleration of the Notes by the Holders of at least a majority in aggregate principal amount of the then outstanding Notes and a waiver of the payment default that resulted from such acceleration);

(5) make any Note payable in money other than that stated in the Notes;

(6) make any change in the provisions of this Indenture relating to waivers of past Defaults or impair the rights

of Holders of Notes to receive payments of principal of, or interest of premium, if any, on the Notes;

(7) waive a redemption payment with respect to any Note (for the avoidance of doubt, any payment required by Sections 4.08 or 4.12 hereof is not a redemption payment);

(8) release any Guarantor that is a Significant Subsidiary of the Issuer from any of its obligations under its Note Guarantee or this Indenture, except in accordance with the terms of this Indenture;

(9) make any change in the preceding amendment and waiver provisions; or

(10) make any change in the provisions in the Intercreditor Agreement or this Indenture dealing with the application of proceeds of Collateral that would adversely affect the Holders.

Id. § 9.02(d).

While the intercreditor agreement is described further below, the provision of the indenture that, on its face, most directly "deal[s] with the application of proceeds of Collateral" is § 6.10(a), which sets out the "waterfall" for the trustee to pay out the funds it collects under the indenture. Those funds shall be paid out, *first*, to pay the fees of the trustee or the collateral agent; *second*, "to Holders for amounts due and unpaid on the Notes for principal, premium and interest, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal, premium and interest, respectively"; and *third* to the "Issuer or to such party as a court of competent jurisdiction shall direct in writing."[13] At the very least, any change to this provision of the indenture (such as a change to the requirement that any proceeds of collateral recovered by the trustee be paid to the holders on a "ratable" basis, meaning "in equal proportion to one's holdings") would require the consent of every adversely affected holder.

[13]    Id. § 6.10.

**\*4** Finally, § 6.06 of the indenture, commonly referred to as a "no-action clause," imposes limitations on the ability of an individual holder to bring suit to enforce the indenture's terms. While the full text of the no-action clause is set forth in the margin,[14] the most critical provision for current purposes is § 6.06(a)(2), which on its face would preclude any lawsuit in the absence of a decision by the holders of 25 percent of the outstanding notes to pursue the claim. As noted above, the plaintiffs who have initiated this action collectively hold approximately 10 percent of the applicable notes.

[14]    The no-action clause reads as follows:

4132

Section 6.06 <u>Limitation on Suits</u>.

(a) A Holder may pursue a remedy with respect to this Indenture or the Notes only if:

(1) such Holder has previously given the Trustee written notice that an Event of Default is continuing;

(2) Holders of at least 25% in aggregate principal amount of the then outstanding Notes have requested the Trustee in writing to pursue the remedy;

(3) such Holder or Holders offer and, if requested, provide to the Trustee security or indemnity satisfactory to the Trustee against any loss, liability or expense;

(4) the Trustee does not comply with the request within 60 days after receipt of the request and the offer of security or indemnity; and

(5) during such 60-day period, Holders of a majority in aggregate principal amount of the then outstanding Notes do not give the Trustee a written direction inconsistent with such request.

*Id.* § 6.06.

### 2. The 2019 Intercreditor Agreement

At the same time that TPC issued the 10.5% Notes, it also entered into an asset-based revolving loan facility (referred to as the "ABL facility") with an availability of up to $200 million (subject to a borrowing base), under which Bank of America served as administrative agent and collateral agent.[15] This facility was secured by a first lien on the debtors' accounts receivable, deposit accounts, inventory, and other assets, and a second lien on those assets that secure the 10.5% Notes.[16] Because the holders of the 10.5% Notes also took a security interest in the same collateral – though, with respect to the accounts receivable, deposit accounts, etc., one that was junior to that held by the lenders under the ABL facility – the parties also entered into an intercreditor agreement setting forth the parties' respective rights.[17]

[15]    Main Bankruptcy D.I. 27 ¶ 33.

[16]    *Id.* ¶ 34.

[17]    D.I. 5 Ex. B. This agreement is referred to as the "2019 Intercreditor Agreement."

Section 4.1(a) of the 2019 Intercreditor Agreement thus explains that the holders of the 10.5% Notes are paid first out of the proceeds of the collateral as to which those holders have a senior lien, with the lenders of the ABL facility being paid second. The priority of payment is reversed with respect to accounts receivable, deposit accounts, inventory, and other

assets as to which the lenders under the ABL facility have a first lien. For that collateral, the proceeds are paid first to the lenders under the ABL facility, with the holders of the 10.5% Notes being paid second.

### 3. The 2021 10.875 Percent Notes

As the first-day declaration explains, after the issuance of the 2019 Notes, the debtors' financial condition deteriorated. Many factors contributed to this, including an explosion at a TPC chemical plant in Port Neches, Texas, which caused the evacuation of tens of thousands of nearby residents; a decrease in the demand of the debtors' products at the outset of the pandemic; and outages in the company's boilers following Winter Storm Uri that curtailed the debtors' manufacturing capacity.[18]

[18]    Main Bankruptcy D.I. 27 ¶¶ 53-59.

**\*5**  To address its need for greater liquidity, in February 2021, TPC issued $153 million in new notes, maturing in 2024 and bearing interest at 10.875 percent.[19] The 10.875% Notes are governed by New York law.[20] In 2022, TPC issued an additional tranche of $51.5 million in 10.875 percent notes, on substantially the same term as those issued in 2021.[21] The parties intended for these tranches of 10.875% Notes to be secured by the same collateral as the 10.5% Notes, but with a lien that would become senior to the lien securing the 10.5% Notes, thus necessitating various amendments to the 2019 Indenture and the 2019 Intercreditor Agreement.[22] Because, however, at the time of the 2021 transactions, the holders under the 10.875% Notes also held a majority (indeed, a super-majority of more than 67 percent) of the then-outstanding 10.5% Notes, they had the authority to amend the 2019 Indenture in any way that did not violate a holder's "sacred rights" set out in § 9.02(d) of that indenture.[23]

[19]    These notes will be referred to as the "10.875% Notes." The indenture for these notes, referred to herein as the "2021 Indenture," can be found in the record at D.I. 5 Ex. C. As with the 10.5% Notes, U.S. Bank National Association serves as trustee and collateral agent under the indenture for the 10.875% Notes.

[20]    2021 Indenture § 14.08.

[21]    Main Bankruptcy D.I. 27 ¶ 36.

[22]    By its terms, the 10.5% Notes contemplated that TPC might incur certain additional indebtedness. *See*

26-11268-mg    Doc 23-4    Filed 06/24/26    Entered 06/24/26 13:13:49    Exhibit D    Pg 590 of 697

10.5% Notes § 4.07. The document amending the 2019 Indenture so as to authorize the issuance of the 10.875% Notes is referred to as the "Supplemental Indenture," and can be found in the record at D.I. 5 Ex. D.

[23]    See D.I. 5 Ex. G (attaching consents from holders of a supermajority of the 10.5% Notes to 2021 transactions). See also D.I. 41 ¶¶ 10, 40 (asserting that TPC obtained consents from the holders of 66.72% – $620.487 million of a total issuance of $930 million – of the outstanding 10.5% Notes).

### 4. The Supplemental Indenture and 2021 Intercreditor Agreement

The Supplemental Indenture contains amendments to the 2019 Indenture intended to permit the issuance of the 10.875% Notes.[24] The parties also entered into a new intercreditor agreement.[25] That agreement operates to subordinate the 10.5% Notes to the 10.875% Notes with respect to the common collateral securing both sets of notes.[26] The consents executed by more than 67% of the holders of the 10.5% Notes expressly authorized the entry into both the Supplemental Indenture and the 2021 Intercreditor Agreement.[27]

[24]    Among other things, the Supplemental Indenture operated to ensure that (a) the 2019 Indenture would be subject not only to the original 2019 Intercreditor Agreement, but also the 2021 Intercreditor Agreement; and (b) alters the definition of permitted liens to except certain of the new notes from the limitations on such liens contained in the 2019 Indenture. See Supplemental Indenture §§ 4.07(d); 12.01(c).

[25]    This agreement is referred to as the "2021 Intercreditor Agreement" and can be found in the record at D.I. 5 Ex. F.

[26]    2021 Intercreditor Agreement §§ 2.1, 4.1.

[27]    See D.I. 5 Ex. G.

### 5. TPC Group's bankruptcy filing and the initiation of this adversary proceeding

TPC Group and various of its affiliates filed voluntary chapter 11 petitions in this Court on June 1, 2022. The debtors seek to enter into a debtor-in-possession loan with the same ad hoc group of noteholders that are the holders of the 10.875% Notes. That DIP Loan would provide $85 million in new money but would also roll up $238 million that was outstanding on the petition date under 10.875% Notes. The economic impact of that rollup depends heavily on whether

the 10.875% Notes are truly senior to the now almost $1.1 billion due under the 10.5% Notes. To the extent the 10.875% Notes are senior and thus sit at the "top" of the debtors' "capital stack," then rolling up that debt (and thereby granting it administrative claim status in the bankruptcy case) has relatively little effect on other creditors. If the value of the collateral would, in any event, go first to pay the 10.875% Notes, then as long as the value of the collateral exceeds the outstanding amount under those notes, granting those holders administrative claim status should operate only as "belt-and-suspenders" assurance that the holders of that debt are entitled to be paid in full under a plan.

**\*6** On the other hand, if (as the objecting noteholders contend) the legal consequences of the 2021 transaction was that the 10.875% Notes come in as junior to the 10.5% Notes, then rolling up $238 million of debt that might (depending on the ultimate value of the collateral) otherwise be treated as unsecured would make the DIP loan very expensive money indeed. Accordingly, the Court agreed to consider the present summary judgment motions on an expedited basis such that the priority issue can be resolved before the Court considers whether to grant final approval to the DIP loan, a matter that is scheduled to be heard on July 15, 2022.[28] The Court thus entered a scheduling order providing for this summary judgment motion to be fully briefed by June 28, 2022 and set argument for the next day, June 29, 2022, with a view towards issuing this decision as promptly as possible thereafter to permit the parties to prepare for the July 15 hearing on final approval of the DIP loan.

[28]    While the Court granted interim authority for the debtors to borrow on a postpetition basis, that order expressly reserves the authority of the court to fashion any appropriate remedy in the event that final approval of the DIP is not granted. See Main Bankruptcy D.I. 147 ¶ 2(d).

### 6. Procedural posture of this adversary proceeding

This adversary proceeding was initiated by the filing of a complaint by the objecting creditors seeking a declaratory judgment that, in effect, the 10.875% Notes would be junior to the 10.5% Notes.[29] Along with the complaint, the objecting noteholders filed a motion seeking the entry of summary judgment.[30]

[29]    D.I. 1, 3.

[30]    D.I. 4.

4134

Debtor responded to this with a flurry of pleadings.[31] *First*, it filed a counterclaim against the objecting noteholders seeking a declaration that the lawsuit is barred by the no-action clause.[32] *Second*, the debtor sought summary judgment with respect to that counterclaim.[33] *Third*, the debtor moved to dismiss the objecting noteholders' lawsuit, also on the ground that it violated the no-action clause.[34] *Fourth*, the debtor opposed the objecting noteholders' motion for summary judgment.[35] And *fifth*, the debtor answered the objecting noteholders' complaint, which answer it combined with a counterclaim that was materially identical to the stand-alone counterclaim it filed previously.[36]

[31]     While TPC Group, Inc. and various of its affiliates are debtors in the jointly administered bankruptcy cases, only the lead debtor, TPC Group, Inc., is named as a defendant in this adversary proceeding.

[32]     D.I. 15.

[33]     D.I. 16.

[34]     D.I. 18.

[35]     D.I. 40.

[36]     D.I. 47.

In addition, the ad hoc group of noteholders who are the holders of a supermajority of both the 10.5% Notes and the 10.875% Notes moved to intervene as a defendant.[37] After that motion was granted on a consensual basis,[38] the ad hoc group answered the complaint[39] and filed an opposition to the objecting noteholders' motion for summary judgment that they combined with their own cross-motion for summary judgment on the claim as to which they intervened as defendants.[40]

[37]     D.I. 28. This group of intervening defendants is described as the "ad hoc group of noteholders."

[38]     D.I. 38.

[39]     D.I. 42.

[40]     D.I. 43.

The objecting noteholders then moved to strike TPC's initial counterclaim[41] on the ground that it needed to be filed along with an answer rather than on a standalone basis. The objecting noteholders also moved to dismiss the counterclaim that the debtor subsequently filed along with its answer on the ground that the counterclaim fails on the merits.[42]

[41]     D.I. 48.

[42]     D.I. 49.

All of these motions have now been fully briefed. As the Court noted at the June 29 argument, it is by no means clear that this plethora of motions was entirely necessary. The Court intends, in this Memorandum Opinion, to resolve the merits of the various summary judgment motions before it regarding the construction of the applicable agreements (D.I. 4, 16 and 43) – which all parties agree are now properly before the Court for disposition on a summary judgment record. The Court believes that the entry of summary judgment, consistent with this Memorandum Opinion, should largely, if not entirely, moot the remaining procedural disputes among the parties.

**Jurisdiction**

**\*7** This Court has jurisdiction over this matter under 28 U.S.C. § 1334(b), as a dispute falling within the district court's "related to" jurisdiction, which has been referred to this Court under 28 U.S.C. § 157(a) and the district court's standing order of February 29, 2012. This action, which relates to the relative priority of various creditors' claims against the bankruptcy estate, is a core matter under 28 U.S.C. § 157(b).

**Analysis**

The parties' motions for summary judgment are brought under Rule 56 of the Federal Rules of Civil Procedure, as made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7056. A party seeking summary judgment is entitled to the entry of judgment if the movant can show "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."[43] A moving party may rely on any material included in the summary judgment record, including documents, declarations, and other material.[44] A party opposing a summary judgment motion on the ground that a material fact is genuinely disputed may point to the same kinds of record evidence in its opposition.[45]

[43]     Fed. R. Civ. P. 56(a).

4135

44    Fed. R. Civ. P. 56(c)(1) (identifying the types of "materials in the record" that may be cited in support of a motion for summary judgment).

45    Fed. R. Civ. P. 56(c)(1) (noting that the identified materials may be cited by a "party asserting that a fact cannot be or is genuinely disputed").

Here, no party contends that there is a disputed question of fact requiring a trial. Indeed, all parties agree that the question before the Court is a pure question of contractual interpretation that can be resolved on the undisputed factual record before the Court.

All of the various agreements are governed by New York law. Under New York law, a contract's "words should be given the meanings ordinarily ascribed to them."[46] Contractual language "should be examined in light of the business purposes sought to be achieved by the parties and the plain meaning of the words chosen by them to effect those purposes."[47] Moreover, New York law is clear that "especially in the context of a commercial contract negotiated at arm's length by [ ] sophisticated [parties]," the role of the court, when confronted with a written contract that is "clear" and "complete," is simply to "enforce[ ] [the writing] according to its terms."[48]

46    In re DPH Holdings Corp., 553 B.R. 20, 27-28 (Bankr. S.D.N.Y. 2016).

47    Id. (internal ellipses and citations omitted). See also Mastrovincenzo v. City of New York, 435 F.3d 78, 104 (2d Cir. 2006) ("The cardinal principle for construction and interpretation of ... all contracts ... is that the intentions of the parties should control. Unless otherwise indicated, words should be given the meanings ordinarily ascribed to them.").

48    MLB Const. Servs. v. Dormitory Auth., 149 N.Y.S.3d 271, 276 (2021) (citations omitted).

The Court accordingly does not credit the various assertions that the objecting noteholders acquired their interests after the 2021 transaction and therefore should not be heard to complain that the transaction was an unlawful one. New York law is clear that "an assignee stands in the shoes of its assignor."[49] The objecting creditors thus have the same legal rights – the right to insist that the 2019 Indenture be enforced according to its plain terms – as did the original holder. The current dispute therefore does not turn at all on whether one or another party might be cast as sympathetic or opportunistic.

It simply calls for the Court to read and enforce the parties' agreements in accordance with their terms. Indeed, the robust secondary market for distressed syndicated debt, one that benefits buyers and sellers alike, depends on courts respecting the fact that the buyer of such debt acquires the same bundle of legal rights as were held by its predecessor.

49    Septembertide Pub., B.V. v. Stein & Day, Inc., 884 F.2d 675, 682 (2d Cir. 1989); see also In re KB Toys Inc., 736 F.3d 247, 254 (3d Cir. 2013) (a claim that would be subject to disallowance under § 502(d) in the hands of the original creditor is equally subject to disallowance after the claim is sold to a buyer).

**I. The no-action clause does not bar the objecting noteholders' challenge.**

**\*8**  The debtor argues that the objecting noteholders' lawsuit for declaratory judgment fails on account of their failure to comply with the no-action clause contained in the 10.5% Notes.[50] In response, the objecting noteholders contend that New York law will enforce a no-action clause against an effort by an individual holder to enforce rights held by holders generally, but that a no-action clause should not be construed, under New York law, to apply to efforts to enforce rights afforded to an individual holder (such as an alleged violations of a holder's "sacred rights").

50    See D.I. 17 at 6-12; D.I. 19 at 5-7; D.I. 40 at 12-15; D.I. 61 at 4-7.

No one disputes that, as a general matter, no-action clauses serve a salutary purpose and are properly enforceable. The New York Court of Appeals decision in *Beal Savings Bank*,[51] for example, pointed to the reasons parties might agree that any action to enforce the collective rights of holders generally be enforceable only by a trustee or other agent of the collective group. Such a provision would permit the majority to decide whether to waive a default or otherwise make an accommodation to the borrower with a view towards maximizing the holders' ultimate recoveries. A contractual provision mandating collective rather than individual action "is meant to protect all Lenders in the consortium from a disaffected Lender seeking financial benefit perhaps at the expense of other debtholders."[52]

51    Beal Sav. Bank v. Sommer, 865 N.E.2d 1210 (N.Y. 2007).

52    Id. at 1219. See also Quadrant Structured Prods. Co. v. Vertin, 16 N.E.3d 1165 (N.Y. 2013) (holding

2022 WL 2498751

that no-action clause applies only to claims under indenture agreement and does not bar individual suits to enforce common-law or statutory rights); *Cortland Street Recovery v. Bonderman*, 96 N.E.3d 191, 201 (N.Y. 2018) (explaining that no-action clause may prohibit individual holders, but not the indenture trustee, from bringing fraudulent conveyance claim).

But the caselaw expresses a strong skepticism towards reading a no-action clause to preclude the enforcement of rights that an agreement expressly grants to individual holders. A decision by the Delaware Court of Chancery construing Utah law, *Cypress Associates, LLC v. Sunnyside Cogeneration Associates Project*,[53] pointed out the obvious "lack of fit" between a contractual provision that expressly granted a right to a minority group of holders and a separate provision that required the consent of the majority to enforce that right. "A provision ... that is designed to limit suits on behalf of all holders unless a majority supports the suit arguably does not speak at all to claims under provisions ... which are brought only for the benefit of the dissenting minority."[54]

[53]     No. Civ. A. 1607-N (LES), 2006 WL 668441 (Del. Ch. Mar. 8, 2006).

[54]     *Id.* at *6.

New York courts, applying New York law, have expressly adopted the *Cypress Associates* analysis. For example, the court in *Eaton Vance*[55] relied on *Cypress* (although in a passage that may not have been necessary to the court's holding) for the proposition that "a no-action clause does not bar a claim by a minority lender to enforce its consent rights."[56] Indeed, the court went on to explain that "it is undisputed that the plaintiffs in this action do not lack standing to sue [by virtue of the no-action clause] for the alleged violation of their consent rights."[57]

[55]     *Eaton Vance Management v. Wilmington Savings Fund Society, FSB*, No. 654397/2017 (SWK), 2018 WL 1947405 (N.Y. Sup. Ct. Apr. 25, 2018).

[56]     *Id.* at *8.

[57]     *Id.* at *9.

 **\*9**  That construction of the no-action clause makes sense. *Cypress* and some of the other cases to which the parties cite[58] draw on an analogy to the doctrine of demand-futility as applicable to shareholder derivative suits. Whether or not

one views that analogy as instructive, those courts' reading of the no-action clause is well grounded in ordinary principles of contract construction. In *Beal*, the New York Court of Appeals pointed to the familiar proposition that in cases involving the construction of commercial agreements, courts "should construe the agreements so as to give full meaning and effect to the material provisions"[59] and avoid constructions that would "render any portion meaningless."[60]

[58]     *See*, *e.g.*, *Feldbaum v. McCrory Corp.*, Civ. A. No. 11866 (LA), 1992 WL 119095 (Del. Ch. June 2, 1992).

[59]     865 N.E.2d at 1213 (internal citations and quotations omitted).

[60]     *Id.*

That principle is sufficient to resolve this question. The 2019 Indenture contains, in § 9.02(d), an express grant of "sacred rights" to every individual holder. The obvious purpose of this provision is to ensure that these rights of individual holders cannot be taken away by an amendment to the indenture, regardless of how large or small those individual holders' share of the total outstanding indebtedness may be. Such a provision would be rendered meaningless, however, if any action to enforce the right were subject to the provisions of the no-action clause, which (under § 6.06) would require 25 percent of the holders to demand that the trustee initiate such a lawsuit and even then could be defeated if the holders of a majority so instructed the trustee. This is what *Eaton Vance* presumably means when it states that the no-action clause should not be construed to apply to an effort by a minority holder to enforce its consent rights.

In the end, counsel for the debtor acknowledges this much. At argument on the motion, counsel recognized that to the extent the amendments to the indenture violated the rights of the objecting noteholders under § 9.02(d)(10) – which is the objecting noteholders' principal merits argument – then "the no action clause would not bar it."[61] Accordingly, it does not appear that any party contends that the no-action clause operates to preclude the objecting noteholders from advancing their principal argument – that the amendments to the 2019 Indenture effected by the Supplemental Indenture and the 2021 Intercreditor Agreement violated their rights under § 9.02(d)(10). The Court will accordingly turn to that argument.

[61]     June 29, 2022 Hearing Tr. at 34. *See also id.* at 35 (acknowledging that the no-action clause does not

4137

preclude objecting noteholders from bringing suit to enforce their right under the indenture to object to an amendment that "dealt with the application of the proceeds of collateral" which is one of the indenture's "sacred rights".).

## II. The challenged transactions comport with the language of the applicable agreements.

**A. Section 9.02(d)(10) does not prohibit subordination.** The central merits question is whether the adoption of the Supplemental Indenture or the 2021 Intercreditor agreement violates § 9.02(d)(10) of the 2019 Indenture, which provides that "an amendment, supplement or waiver under this Section 9.02 may not (with respect to any Notes held by a non-consenting Holder) ... make any change in the provisions of the Intercreditor Agreement or this Indenture dealing with the application of proceeds of Collateral that would adversely affect the Holders."

The basic dispute between the parties is over how broadly or narrowly to read the term "dealing with the application of the proceeds of Collateral," and whether the amendments to the 2019 Indenture made by the Supplemental Indenture (including subjecting the 2019 Indenture to the 2021 Intercreditor Agreement) were covered by that language. The objecting noteholders read the language fairly broadly, saying that a change that would put new debt ahead of them with respect to the right to recover out of the collateral "deals with the application of proceeds of Collateral."[62]

62    *See* D.I. 4 at 14-15.

 **\*10**  The debtor and the ad hoc group of noteholders read the applicable language more narrowly. As the ad hoc group of noteholders explain, the only provision of the 2019 Indenture that "deals with the application of proceeds of collateral" is § 6.10, which addresses the waterfall for how the trustee should distribute monies it receives under the indenture (including the distribution of proceeds of collateral).[63] That provision states that, after the payment of the trustee's fees, such funds are to be distributed "ratably" among holders.[64] The ad hoc group of noteholders explains that if the agreement were amended so that certain holders would be paid ahead of others out of the proceeds of collateral, such an amendment could not be effective, under § 9.02(d)(10), as against an adversely affected objecting holder. But the ad hoc group of noteholders argues that so long as the proceeds of the collateral that comes into the hands of the trustee are to be distributed ratably among the noteholders, as remains the case after the adoption

of the Supplemental Indenture, then the indenture has not been amended in any way that deals with the application of the proceeds of collateral.[65]

63    D.I. 44 at 17.

64    2019 Indenture § 6.10(a).

65    With respect to the 2019 Intercreditor Agreement, the ad hoc group of noteholders argues that the provision of the agreement that deals "with the application of proceeds of collateral" is 4.1(a), which is captioned "Application of Proceeds" and addresses the relative rights of the holders of the ABL facility and the holders of the 10.5% Notes with respect to the collateral in which both groups of holders assert liens.

If one were simply looking at the words in isolation, reasonable arguments could be made on either side. Consider the following directive: "[1] Amy will deliver four ice cream cones to Bob; [2] Bob will distribute the ice cream cones he receives equally to Charlie and Diane." Would an amendment to the directive so that it instead provides "[1] Amy will deliver two ice cream cones to Bob," but otherwise left directive [2] unchanged be one that "deals with the allocation of ice cream"? Again, if all one had to go on were the snippet of language itself, it seems that plausible arguments could be advanced on both sides. Perhaps any change that affects how much ice cream either Charlie or Diane receives from Bob is one that "deals with the allocation of ice cream." Alternatively, one might read the language "deals with the allocation of ice cream" to cover only the rules governing how Bob is to divide the ice cream he receives between Charlie and Diane.

On the objecting noteholders' side of this argument, the court in *Trimark*[66] expressed an openness to the former reading of such a clause. That case involved a paradigmatic "uptier" transaction that was challenged by the holders who were "left behind." They contended that the amendments to the agreement to authorize that transaction required their consent, under a clause that provided that an amendment could not revise certain provisions of the agreement "in a manner that would by its terms alter the application of proceeds" without "the written consent of each Lender directly and adversely affected thereby."[67]

66    *Audax Credit Opportunities Offshore Ltd. v. TMK Hawk Parent, Corp.*, No. 565123/2020 (JMC), 2021 WL 3671541 (N.Y. Sup. Ct. Aug. 16, 2021) ("*Trimark*").

67      *Id.* at **11.

The court noted that one "reasonable way" to read the provision is as a prohibition on subordination – to prohibit the parties "from placing any tranche of debt above Plaintiffs' place in the waterfall, even if the order of distribution" is not affected.[68] After the uptier transaction, the objecting holders "do not have the right to receive a dollar of collateral upon default until $427 million is paid back to the new cadre of super-senior lenders."[69] Even if the objectors' rights were not affected vis-à-vis the other holders in their same tranche, the objectors still "have a plausible argument that the [transaction] required their consent ... because it altered the application of proceeds by subordinating Plaintiffs' priority interest to the new Super-Priority Intercreditor Agreement."[70]

68      *Id.* at **12.

69      *Id.*

70      *Id.* (internal quotation marks omitted).

**\*11**  On the other hand, the *Trimark* court noted that an argument could also be made that "application of proceeds" refers "only to the Administrative Agent's application of proceeds among the categories covered by the agreement."[71] The court explained that on this view, "the Administrative Agent's task remains the same before and after the amendment – it still applies the 'proceeds' (whatever is left of them) in the order specified" in the agreement.[72]

71      *Id.*

72      *Id.*

Because the court found that the objectors' reading to be a plausible one, it denied a motion to dismiss the objectors' complaint and allowed the litigation to proceed.[73] The case ultimately settled, such that the Court did not reach a definitive construction of the language.

73      *Id.*

The *Trimark* court was certainly right that both constructions of the language at issue there were plausible based on the language in isolation. But there are perhaps tools of construction, beyond the words themselves, that could provide guidance in choosing between them. Specifically, New York law provides that contractual language must be understood through the lens of "the customs, practices, usages and terminology as generally understood in the particular trade or business."[74]

74      *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.,* 830 F.3d 152, 156-157 (2d Cir. 2016).

In the context of an indenture, the Court believes that the inclusion of express anti-subordination clauses are sufficiently commonplace that, under the customs and usages that are common in the trade, a provision providing for ratable distribution (in the absence of an express anti-subordination clause) would more naturally apply to distributions *within* a class, and not prohibit subordination of an entire class to another, different class.[75] Indeed, it is telling that when the parties here adopted the Supplemental Indenture, they included such a standard clause. "Notwithstanding the foregoing in this Section 9.02, no amendment, supplement or waiver to the Indenture or any other Note Document shall subordinate the Lien securing the Notes Obligations to any other Lien (and the Trustee shall not enter into any intercreditor agreement providing for such subordination) without the consent of the holders of at least 66-2/3% in aggregate principal amount of the Notes then outstanding."[76]

75      The U.S. District Court for the Southern District of New York reached a similar conclusion in *LCM XXII Ltd. v. Serta Simmons Bedding, LLC,* No. 21 Civ. 3987 (KPF), 2022 WL 953109, at *10 (S.D.N.Y. Mar. 29, 2022) ("[T]he court is unmoved by Plaintiffs' proffered interpretation of their sacred rights to *pro rata* payments. The plain terms of Section 2.18 of the Agreement make clear that the first-lien lenders' rights to *pro rata* payments apply only to debt within the same 'Class,' *viz.,* among first-lien lenders.").

76      Supplemental Indenture § 9.02(f).

In the circumstances of this case, however, even more telling context is provided by the other terms of the 2019 Indenture itself. As described above, that agreement created a hierarchy of consents needed for particular amendments. It generally provided for control by the majority; stated that a super-majority of two-thirds was required to release all or substantially all of the collateral; and then identified ten "sacred rights" that required unanimous consent (of affected holders).

The logic of that hierarchy would suggest that the matters included among the ten sacred rights would be actions that – at least from the perspective of an individual holder – would

4139

be more problematic or potentially prejudicial than the kinds of actions that can be taken simply with the approval of a simple or two-thirds majority. Reading § 9.02(d)(10) to be limited to protecting the right to pro rata distributions would be consistent with this structure. Surely an individual holder would be severely prejudiced if the other holders all agreed that they would be paid in full out of the distribution of the proceeds of collateral before that individual holder received any distribution.

**\*12** Reading § 9.02(d)(10) to treat any subordination as violating a "sacred right," however, would be inconsistent with this hierarchy. Subordination of a lien to that of another lender is a *less* drastic intrusion on the rights of an individual holder than simply releasing all of the collateral. It would therefore create an anomaly to read the 2019 Indenture to permit a two-thirds majority to release all of the collateral but not to subordinate a lien to that of another lender.

As a commercial matter, there are ample reasons why a lender might agree to subordinate its lien to one in favor of a new lender. In circumstances in which a borrower is facing a liquidity constraint, an old lender that is unwilling or unable to make a further loan might be very happy to subordinate its lien if that is the most cost-effective way for the borrower to attract new capital and thus avoid the greater threat to the lender's collateral that a default would precipitate. As a matter of ordinary logic, an agreement to subordinate thus seems far *less* drastic than releasing all of the collateral. It therefore would not make sense to read the document to permit a two-thirds majority to take a *more* drastic action but give every holder the right to block the *less* extreme measure.

While counsel for the objecting noteholders, at argument, vigorously disputed the contention that a release of collateral is a more drastic action than the subordination of a lien to that of another lender,[77] the Court is persuaded that it is more drastic. As such, the internal logic and hierarchy of the 2019 Indenture thus counsels strongly against reading § 9.02(d)(10) to provide that the subordination of a lien is a matter "dealing with application of the proceeds of Collateral" that would be treated as a "sacred right."

[77]     *See* June 29, 2022 Hearing Tr. at 40-41.

Nor does the fact that the Supplemental Indenture also made the 2019 Indenture subject to the 2021 Intercreditor Agreement alter the analysis. The provision of the 2019 Intercreditor Agreement that addressed the allocation of

proceeds (§ 4.1(a)) set forth the respective rights of the holders of the ABL facility and those of the holders of the 10.5% Notes. While the 2021 transaction put additional debt ahead of *both* the 10.5% Notes and the ABL facility, nothing in those transactions affected the *relative* rights of those holders vis-à-vis each other. As such, the change did not "deal with the allocation of proceeds of the Collateral" within the meaning of § 9.02(d)(10) of the 2019 Indenture.

In sum, contrary to the argument advanced by the objecting noteholders, the Court concludes that § 9.02(d)(10) of the 2019 Indenture is primarily directed at protecting the holders' rights to ratable treatment and should not be read as an anti-subordination provision in disguise. Indeed, simply as a commercial matter, the need to infuse a borrower with new money in order to protect the value of existing collateral might well provide a sound reason why lenders would agree that a majority (or, in the case of the Supplemental Indenture, a super-majority) may bind a class of holders to a decision to subordinate their lien.

As far as commercial norms go, to the extent that the objecting noteholders have anything to complain about from the 2021 transaction, that complaint is more with the fact that the objecting noteholders were not offered the opportunity to participate in the new loan than it is with the treatment of their old debt. But as counsel for the ad hoc group of noteholders indicated during the June 29 hearing, "there's nothing in the [2019 Indenture] that says I had the right to participate in some other financing."[78] And it is true that the debtors were free to make their own business decisions in deciding from whom to borrow new money. So while the various 2021 transactions may have violated what the *Trimark* court (perhaps aspirationally) called the "all for one, one for all" spirit of a syndicated loan,[79] the transactions did not violate the letter of the applicable agreements in a manner that gives rise to a claim by the objecting noteholders. There is nothing in the law that requires holders of syndicated debt to behave as Musketeers. To the extent such holders want to be protected against self-interested actions by borrowers and other holders, they must include such protections in the terms of their agreements.

[78]     *Id.* at 74.

[79]     *Trimark*, 2021 WL 3671541 at \*\*1.

**B. The consent letters received by TPC were effective to authorize the 2021 transactions.**

**\*13**  The objecting noteholders also argue that the transactions were ineffective because the 2019 Indenture requires the consent of "Holders," which is defined as the "Person in whose name a Note is registered in the register maintained by the Registrar."[80] But rather than obtaining consents from the "registered holders" of the notes, TPC obtained consents from the beneficial holders. Those consents contained signatures of the beneficial holder and/or investment advisor, a certification of the holdings, a stamp or seal certifying ownership of the notes, and/or a certified letter or account summary.[81]

[80]    2019 Indenture § 1.01.

[81]    *See* D.I. 5 Ex. G.

Section 9.02(b) of the 2019 Indenture, however, authorizes the Trustee to "join with the Issuer and the Guarantors in the execution of such amended or supplemental indenture" when the Trustee receives "evidence satisfactory to the Trustee of the consent of the Holders."[82] In the absence of an objection to the form of consent from the Trustee, the 2019 Indenture thus does not appear to authorize other holders to assert a claim that the form of authorization was improper. And even if it did, in circumstances (such as here) where the distinction between registered and beneficial holders would elevate form over substance, New York courts have declined to enforce it.[83] The Court accordingly will not invalidate the 2021 transactions on this basis.

[82]    2019 Indenture § 9.02(b).

[83]    *See Friedman v. Airlift Intern., Inc.,* 355 N.Y.S.2d 613, 615 (1974); *Allan Applestein TTEE FBO D.C.A. v. Province of Buenos Aires,* 415 F.3d 242, 245-246 (2d Cir. 2005).

**Conclusion**

For the reasons described above, the Court concludes that the Supplemental Indenture and the 2021 Intercreditor Agreement did not violate the rights of the objecting noteholders under the 2019 Indenture. The parties are directed to settle appropriate forms of order that resolve the outstanding motions and provide for the entry of judgment.

**All Citations**

Slip Copy, 2022 WL 2498751

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 75

Westlaw.

349 B.R. 627, 47 Bankr.Ct.Dec. 31
**(Cite as: 349 B.R. 627)**

**C**

United States Bankruptcy Court,
E.D. California.
In re TRI–CONTINENTAL EXCHANGE LTD., an
International Business Company formed under laws of
St. Vincent and the Grenadines
Combined Services Ltd., an International Business
Company formed under laws of St. Vincent and the
Grenadines
Alternative Market Exchange Ltd., an International
Business Company formed under laws of St. Vincent
and the Grenadines, Debtors in a Foreign Proceeding.
Petition of Malcolm Butterfield, Brian Glasgow and
Simon Whicker as Foreign Representatives of the St.
Vincent and the Grenadines Foreign Proceeding Re-
specting the St. Vincent and the Grenadines Interna-
tional Business Companies Known as Tri–Continental
Exchange Ltd., Combined Services Ltd., and Alter-
native Market Exchange Ltd.

Nos. 06–22652–C–15, 06–22655–C–15,
06–22657–C–15.
Sept. 11, 2006.

**Background:** Judgment creditor sought recognition
of Chapter 15 debtor-insurance companies' insolvency
proceedings in St. Vincent and the Grenadines (SVG)
as foreign "nonmain," as opposed to "main," pro-
ceedings, and sought the imposition of additional
restrictions on the ability of debtors' foreign repre-
sentatives to administer or realize debtors' assets
within the territorial jurisdiction of the United States.

**Holdings:** The Bankruptcy Court, Christopher M.
Klein, J., held that:
(1) SVG was debtors' "center of main interests," even
though debtors perpetrated an insurance scam pri-
marily in the United States and Canada, and so the

SVG winding-up proceedings were foreign main
proceedings;
(2) for purposes of Chapter 15, an entity's "center of
main interests" is that entity's "principal place of
business" in United States jurisprudence; and
(3) the provisions set forth in the Bankruptcy Code
were sufficient to protect the interests of creditors in
the United States, so that the imposition of additional
restrictions was not warranted.

Ordered accordingly.

West Headnotes

**[1] Bankruptcy 51 🗝2341**

51 Bankruptcy
　51III The Case
　　51III(H) Cases Ancillary to Foreign Proceed-
ings
　　　51k2341 k. In General. Most Cited Cases

St. Vincent and the Grenadines (SVG) was
Chapter 15 debtor-insurance companies' "center of
main interests," even though debtors perpetrated an
insurance scam primarily in the United States and
Canada, and so SVG winding-up proceedings would
be recognized in the United States as "foreign main
proceedings," where debtors, which were organized as
international business companies under SVG law,
conducted regular business operations at their regis-
tered offices in Kingstown, St. Vincent, in a manner
that equated with a "principal place of business" under
concepts of United States law. 11 U.S.C.A. § 1502(4,
5).

**[2] Bankruptcy 51 🗝2341**

51 Bankruptcy

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

349 B.R. 627, 47 Bankr.Ct.Dec. 31
**(Cite as: 349 B.R. 627)**

51III The Case

    51III(H) Cases Ancillary to Foreign Proceedings

        51k2341 k. In General. Most Cited Cases

Debtor's status as a foreign insurance company that was ineligible to be a debtor under the Bankruptcy Code did not affect the availability of Chapter 15 relief. 11 U.S.C.A. §§ 109(b)(3), 1501(c)(1).

**[3] Bankruptcy 51 🔑2341**

51 Bankruptcy

    51III The Case

      51III(H) Cases Ancillary to Foreign Proceedings

        51k2341 k. In General. Most Cited Cases

Entity's "principal place of business" in United States jurisprudence is that entity's "center of main interests" for purposes of the definition of "foreign main proceeding" contained in the section of the Bankruptcy Code governing ancillary and other cross-border cases. 11 U.S.C.A. § 1502(4).

**[4] Bankruptcy 51 🔑2341**

51 Bankruptcy

    51III The Case

      51III(H) Cases Ancillary to Foreign Proceedings

        51k2341 k. In General. Most Cited Cases

For purposes of determining whether a foreign insolvency proceeding is a "foreign main proceeding" within the meaning of the section of the Bankruptcy Code governing ancillary and other cross-border cases, an entity's registered office or place of incorporation is evidence that is probative of, and that may in the absence of other evidence be accepted as a proxy for, "center of main interests." 11 U.S.C.A. § 1502(4).

**[5] Bankruptcy 51 🔑2341**

51 Bankruptcy

    51III The Case

      51III(H) Cases Ancillary to Foreign Proceedings

        51k2341 k. In General. Most Cited Cases

In determining whether an entity's foreign insolvency proceeding is a "foreign main proceeding" within the meaning of the section of the Bankruptcy Code governing ancillary and other cross-border cases, if the foreign insolvency proceeding is not in the country of the entity's registered office, then the foreign representative has the burden of proof on the question of "center of main interests." 11 U.S.C.A. § 1502(4).

**[6] Bankruptcy 51 🔑2341**

51 Bankruptcy

    51III The Case

      51III(H) Cases Ancillary to Foreign Proceedings

        51k2341 k. In General. Most Cited Cases

In determining whether an entity's foreign insolvency proceeding is a "foreign main proceeding" within the meaning of the section of the Bankruptcy Code governing ancillary and other cross-border cases, if the foreign insolvency proceeding is in the country of the entity's registered office, and if there is evidence that the center of main interests might be elsewhere, then the foreign representative must prove that the center of main interests is in the same country as the registered office. 11 U.S.C.A. § 1502(4).

**[7] Bankruptcy 51 🔑2341**

51 Bankruptcy

    51III The Case

      51III(H) Cases Ancillary to Foreign Proceed-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

349 B.R. 627, 47 Bankr.Ct.Dec. 31
**(Cite as: 349 B.R. 627)**

ings

51k2341 k. In General. Most Cited Cases

In determining whether a foreign insolvency proceeding is a "foreign main proceeding" for purposes of Chapter 15 of the Bankruptcy Code, governing ancillary and other cross-border cases, the burden of proof as to the "center of main interests" is never on the party opposing "main" status; rather, such an opponent has only a burden of going forward to adduce some evidence inconsistent with the registered office warranting a conclusion of "main" status. 11 U.S.C.A. § 1502(4); Fed.Rules Evid.Rule 301, 28 U.S.C.A.

**[8] Bankruptcy 51 ⌬2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In General. Most Cited Cases

Chapter 15 debtors' judgment creditor, which claimed to have a lien on those of debtors' funds that were tied up in an asset forfeiture proceeding but were expected to be turned over to debtors' foreign representatives following recognition of foreign proceeding, was not entitled to the imposition of additional restrictions on the ability of the foreign representatives to administer or realize debtors' assets within the territorial jurisdiction of the United States; the funds to be released would be maintained in a deposit account within the jurisdiction of the bankruptcy court, the foreign representatives were not asking to be entrusted with distribution of the assets, the court did not wish to impede the progress of the foreign main proceeding, and the provisions set forth in the Bankruptcy Code were sufficient to protect the interests of creditors in the United States. 11 U.S.C.A. §§ 1521(a)(5), 1522(b).

**[9] Bankruptcy 51 ⌬2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In General. Most Cited Cases

Public policy exception set forth in Chapter 15 of the Bankruptcy Code, governing ancillary and other cross-border cases, which exception permits the bankruptcy court to refuse to take an action governed by Chapter 15 if the action would be manifestly contrary to the public policy of the United States, is to be narrowly construed. 11 U.S.C.A. § 1506.

**[10] Bankruptcy 51 ⌬2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In General. Most Cited Cases

Automatic consequence of recognition of a foreign main proceeding is the applicability of the section of the Bankruptcy Code governing use, sale, or lease of property. 11 U.S.C.A. §§ 363, 1502(a).

**\*629** Forrest B. Lammiman, Lord Bissell & Brook LLP, Chicago, IL, and Joshua D. Wayser, Lord Bissell & Brook LLP, Los Angeles, CA, for foreign representatives.

Thomas R. Phinney, Parkinson Phinney, Sacramento, CA, for Bennett Truck Transport, LLC.

**MEMORANDUM DECISION REGARDING RECOGNITION OF FOREIGN MAIN PROCEEDING**

CHRISTOPHER M. KLEIN, Bankruptcy Judge.

This memorandum decision supplements and revises this court's rulings that were made orally on the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

349 B.R. 627, 47 Bankr.Ct.Dec. 31
**(Cite as: 349 B.R. 627)**

record at the time of hearing.

A creditor contends these joint liquidations under the laws of St. Vincent and the Grenadines ("SVG") should be recognized as foreign "nonmain," as opposed to "main," proceedings under 11 U.S.C. §§ 1502(4)-(5). The answer turns on the situs of the chapter 15 debtors' "center of main interests," which term is not defined and requires a fact-based inquiry in which the default position focuses on the registered office.

[1] Here, the chapter 15 debtors conducted regular business operations at their registered offices in Kingstown, St. Vincent, in a manner that equates with a "principal place of business" under concepts of United States law. This suffices to qualify SVG as the "center of main interests" even though the enterprise perpetrated an insurance scam primarily in the United States and Canada. Hence, the three winding-up proceedings in SVG will be recognized in the United States as "foreign main proceedings."

The second issue presented is whether, in the name of "protecting" United States creditors, to impose restrictions beyond those prescribed in chapter 15 on the ability of the foreign representatives, and of the foreign court, to administer or realize the debtor's assets within the territorial jurisdiction of the United States. The answer is in the negative because all creditors in this instance will be better served by, as contemplated by 11 U.S.C. § 1521(a)(5), entrusting administration and realization of assets to the foreign representatives without imposing a superfluous, and potentially inconsistent, tranche of judicial supervision.

*Facts*
The debtors, Tri–Continental Exchange Ltd. ("TCE"), Combined Services Ltd. ("CSL"), and Alternative Exchange Ltd. ("AME"), are insurance companies organized as international business companies under the laws of the nation of St. Vincent and the Grenadines ("SVG") and are the subject of winding-up proceedings in the Eastern Caribbean Supreme Court, High Court of Justice, under the SVG Companies Act, No. 8 of 1994 and related statutes, that were filed by the International Financial Services Authority ("IFSA") of SVG as claim nos. 541–543 of 2004. The Eastern Caribbean Supreme Court appointed Malcolm Butterfield, Brian Glasgow,**\*630** and Simon Whicker as joint provisional liquidators on December 14, 2004, and as joint liquidators on June 14, 2005.

The debtors' only offices were located at Marcole Plaza, Halifax Street, Kingstown, St. Vincent, where there were approximately twenty employees. There presently are no employees and no business being conducted.

Between 1995 and 2004, the debtors sold approximately 5,800 insurance policies in the United States and Canada, with estimated gross premiums of about $45,000,000. The liquidators speculate (the books and records are not yet in their hands) that liabilities on the policies could be 130–140% of premiums.

The debtors, who lacked required insurance licenses and who falsely represented that their coverage was backed by licensed and rated insurers, advertised greatly reduced rates to industries that are difficult to insure, such as taxi drivers, truckers, roofers, bars, restaurants, and clubs.

The debtors' lead underwriter, Lloyd Thomson, worked in the debtors' registered offices in Kingstown, SVG. He typically received completed applications via facsimile transmission from customers or "consultants." He would prepare and fax a quote for the insurance from the offices in SVG. If the client accepted, he would send confirmation of the security and policy number, and other information, from those offices.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

349 B.R. 627, 47 Bankr.Ct.Dec. 31
**(Cite as: 349 B.R. 627)**

Checks for premium payments were mailed to drop boxes in the United States, then forwarded in bundles to the debtors' office in SVG, where they were endorsed for deposit and then sent back to the United States and deposited into accounts maintained by the debtors, from which wire transfers were made to accounts in Jersey (Channel Islands), Ireland, Gibraltar, and elsewhere.

Although some small claims were paid, most claims went unpaid, often on theories of large deductibles and restrictive conditions barring coverage.

The impresario of this insurance scam was an individual who assumed the identity "Robert Lewis Brown" (and obtained a United States passport) in 1994 but who was really Matthew Wallace Schachter, a United States citizen who relocated from New Hampshire to Nevada in 1984 when New Hampshire authorities issued a warrant for his arrest on check-kiting charges. He worked in the barter industry and eventually was indicted in Nevada for federal tax evasion, which indictment was dismissed in 1996 because he had not been found. As "Brown," he had relocated to SVG by late 1994 and was establishing TCE, CSL, and AME.

The debtors' activities attracted the attention of various insurance regulators in the United States and Canada, resulting in cease and desist orders in at least nine jurisdictions against one or more of the debtors and "Brown." In 2001, "Brown" was twice convicted in absentia in Canada for violating cease and desist orders. In 2003, a Canadian arrest warrant was issued for "Brown's" arrest for insurance fraud relating to TCE.

In March 2004, as a result of pressure from SVG's IFSA to require the debtors to comply with SVG's International Insurance Act of 1998, the IFSA issued a statutory insurance manager's license to TCE to act as insurance manager for CSL and a Class II insurance license to CSL, which provided the IFSA with a $100,000 deposit for the benefit of policyholders. Another condition of the licenses was that "Brown" relinquish control of the debtors, with which he complied only in form (and complied with an order to leave SVG for immigration violations, relocating to Barbados).

**\*631** On August 9, 2004, a criminal complaint alleging mail fraud, money laundering, and related crimes was filed against "Brown" in the United States District Court for the Eastern District of California. The record indicates that the federal investigation was assisted by the California Commissioner of Insurance.

"Brown" was arrested in Canada on September 3, 2004, six days before the debtors' offices in Kingstown were searched by SVG law enforcement agents, accompanied by United States counterparts, pursuant to a request under the Mutual Legal Assistance Treaty between the United States and SVG. Most of the debtors' books and records were seized, inventoried as evidence, and turned over to United States law enforcement authorities.

The United States seized a total of $1,603,653.95 from two bank accounts and a law firm during September 2004 and filed an in rem civil forfeiture action in 2005. *United States v. Approx. $1,200,000.00 in U.S. Currency Seized from First Cal. Bank Acct. No. 2005638, et al.,* No. Civ. 05–149–DFL–KJM.

"Brown" died while in pretrial custody. His spouse has since entered into a cooperation agreement with the United States Department of Justice ("USDOJ") undertaking to assist USDOJ and the joint liquidators in the recovery and transfer of "Brown's" estate to the joint liquidators, whose SVG winding-up proceeding has been, in effect, stayed in deference to the coordinated international criminal law enforcement effort.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

349 B.R. 627, 47 Bankr.Ct.Dec. 31
**(Cite as: 349 B.R. 627)**

The joint liquidators believe that they have identified up to $7,000,000 in assets that could be collected from various international locations and distributed to creditors. In addition to $75,000 in SVG, they have identified cash assets of at least $3,500,000 at the Allied Irish Bank, which have been frozen by Irish authorities. There is also real property in Ireland, Barbados, and (possibly) Spain. In the United States, $1,603,653.95 is tied up in the asset forfeiture proceeding, a portion of which funds USDOJ is stipulating to release to the joint liquidators if this court recognizes a foreign proceeding.

At the hearing on recognition of the proceeding as a foreign proceeding, creditor Bennett Truck Transport LLC ("Bennett Truck"), which has a judgment against the debtors, contended that the "center of main interests" should be regarded as the United States because most of the creditors are insureds located in the United States. In addition, claiming lien status, Bennett Truck opposed permitting any funds from a United States source to be used to pay such items as professional fees and expenses without approval from this court pursuant to the Bankruptcy Code.

### Jurisdiction

Federal subject-matter jurisdiction over a case under chapter 15 of title 11 is founded upon 28 U.S.C. § 1334(a). The recognition of foreign proceedings and other matters under chapter 15 of title 11 are core proceedings that a bankruptcy judge may hear and determine, entering appropriate orders and judgments. 28 U.S.C. § 157(b)(2)(P).

### Discussion

Since this is the sole instance in which the Bankruptcy Code can be used to liquidate an insurance company, a brief review of basics is warranted before turning to the issues of "center of main interests" and of whether to impose restrictions on the foreign rep-

resentatives.

### I

Chapter 15 of the Bankruptcy Code was enacted in 2005 as an implementation of the Model Law on Cross–Border Insolvency**632** promulgated by the United Nations Commission on International Trade Law ("UNCITRAL" and "Model Law") in 1997 based on a process in which the United States was an active participant. H.R.Rep. No. 109–31, at 105–07 (2005), U.S.Code Cong. & Admin.News 2005, p. 88; Jay Lawrence Westbrook, *Chapter 15 at Last,* 79 AM. BANKR.L.J. 713, 719–20 (2005) ("Westbrook"); *see generally* SAMUEL L. BUFFORD ET AL., INT'L INSOLVENCY (Fed. Judicial Ctr.2001) at 55–68 ("FJC INT'L INSOLVENCY").

The language of chapter 15 tracks the Model Law, with adaptations designed to mesh with United States law. H.R.Rep. No. 109–31, at 105–07; Westbrook, 79 AM. BANKR.L.J. at 719. Congress prescribed a rule of interpretation that expressly requires United States courts to take into account the statute's international origin and to promote applications of chapter 15 that are consistent with versions of the Model Law adopted in other jurisdictions. 11 U.S.C. § 1508; H.R.Rep. No. 109–31, at 109–10. [FN1]

FN1. The House Report elaborates:

Interpretation of this chapter on a uniform basis will be aided by reference to the Guide [to Enactment of the UNCITRAL Model Law on Cross–Border Insolvency, U.N. Doc. A/CN.9/442 (1997) ] and the Reports cited therein, which explain the reasons for the terms used and often cite their origins as well. Uniform interpretation will also be aided by reference to CLOUT, the UNCITRAL Case Law On Uniform Texts, which is a service of UNCITRAL. CLOUT receives reports from

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

349 B.R. 627, 47 Bankr.Ct.Dec. 31
**(Cite as: 349 B.R. 627)**

national reporters all over the world concerning court decisions interpreting treaties, model laws, and other text promulgated by UNCITRAL. Not only are these sources persuasive, but they advance the crucial goal of uniformity of interpretation. To the extent that the United States courts rely on these sources, their decisions will more likely be regarded as persuasive elsewhere.

H.R.Rep. No. 109–31, at 109–10, U.S.Code Cong. & Admin.News 2005, pp. 88, 172–73.

II

The SVG winding-up proceeding is a "foreign proceeding," as defined by 11 U.S.C. § 101(23), because it is a collective judicial or administrative proceeding in a foreign country under a law relating to insolvency in which the assets and affairs of the debtors are subject to control or supervision by a foreign court for the purpose of liquidation. SVG's Companies Act is modeled on the English Companies Act of 1948 and provides for insolvency proceedings in which the assets and affairs of debtors control by the Eastern Caribbean Supreme Court.

Similarly, the joint liquidators have been authorized by the Eastern Caribbean Supreme Court to administer the liquidation of the debtors' assets and affairs in the SVG proceeding and, thus, are "foreign representatives," within the meaning of 11 U.S.C. § 101(24).

[2] The status of a debtor in this case as a foreign insurance company that is ineligible to be a debtor under the Bankruptcy Code by virtue of 11 U.S.C. § 109(b)(3) does not affect the availability of chapter 15 relief. Foreign insurance companies are eligible for chapter 15 relief because § 1501(c)(1) provides that chapter 15 does not apply to "a proceeding concerning

an entity, other than a foreign insurance company, identified by exclusion in section 109(b)." 11 U.S.C. § 1501(c)(1).

The possibility that an entity that is ineligible to be a debtor under the Bankruptcy Code could be the subject of a chapter 15 proceeding necessitated a special definition of "debtor": "For the purposes of this chapter [15], ... 'debtor' means an entity that is the subject of a foreign proceeding." 11 U.S.C. § 1502(1).

**\*633** III

As to the objection by creditor Bennett Truck that the case should only be recognized as a "foreign nonmain proceeding," the battle is over whether the foreign representatives will have the benefits of the effects of recognition of a "foreign main proceeding," as detailed at 11 U.S.C. § 1520, including the triggering of the automatic stay and the authorization to operate the debtors' business and exercise trustee rights and powers under 11 U.S.C. §§ 363 and 552.

A "foreign main proceeding" is a foreign proceeding that is pending in the country in which the debtor has its "center of main interests." 11 U.S.C. § 1502(4).

[3] The term "center of main interests" is taken from the UNCITRAL Model Law and is not further defined. It is a term that has not heretofore been used in United States jurisprudence but is described as a "critically important new concept." FJC INT'L INSOLVENCY at 58.

Professor Westbrook has explained that the adoption of the term in chapter 15 was intentionally designed to promote international uniformity:

Chapter 15 was drafted to follow the Model Law as closely as possible, with the idea of encouraging other countries to do the same. One example is use of the phrase "center of main interests," which could

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

349 B.R. 627, 47 Bankr.Ct.Dec. 31
**(Cite as: 349 B.R. 627)**

have been replaced by "principal place of business" as a phrase more familiar to American judges and lawyers. The drafters of Chapter 15 believed, however, that such a crucial jurisdictional test should be uniform around the world and hoped that its adoption by the United States would encourage other countries to use it as well.

Westbrook, 79 AM. BANKR.L.J. at 719–20.

Although not defined, several other chapter 15 provisions inform the analysis of what constitutes a "center of main interests," as does an examination of the source from which the drafters of the Model Law borrowed the concept.

First, the rule of interpretation prescribed ("the court shall consider") by § 1508 requires that the term "center of main interests" be interpreted in a manner consistent with the application of similar statutes adopted by foreign jurisdictions. 11 U.S.C. § 1508.[FN2] In furtherance of what it described in the previously-quoted passage as "the crucial goal of uniformity of interpretation," Congress also focused the attention of United States courts to various international sources when construing chapter 15, which sources Congress described as "persuasive." House Rep. No. 109–31 at 109–10.

FN2. The statute provides:

In interpreting this chapter, the court shall consider its international origin, and the need to promote an application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions.

11 U.S.C. § 1508.

One of the sources that a United States court is obliged to treat as persuasive is the Guide to Enact-

ment of the UNCITRAL Model Law Insolvency that was promulgated in connection with the approval of the Model Law. GUIDE TO ENACTMENT OF THE UNCITRAL MODEL LAW ON CROSS–BORDER INSOLVENCY, U.N. Gen. Ass., UNCITRAL 30th Sess., U.N. Doc. A/CN.9/442 (1997) ("Guide")

The Guide explains that the use of the concept "where the debtor has the centre of its main interests" as the determinant that a foreign proceeding is a "main" proceeding was modeled on the use of that concept in the European Union Convention on Insolvency Proceedings ("EU Convention")**\*634** that was already in the process of being adopted when UNCITRAL drafted the Model Law. [FN3]

FN3. The Guide addresses this point twice:

31. A foreign proceeding is deemed to be the "main" proceeding if it has been commenced in the State where "the debtor has the centre of its main interests". This corresponds to the formulation in article 3 of the European Union Convention on Insolvency Proceedings, thus building on the emerging harmonization as regards the notion of a "main" proceeding.

GUIDE at ¶ 31.

72. The expression "centre of ... main interests", used in subparagraph *(b)* to define a foreign main proceeding, is used also in the [EU] Convention on Insolvency Proceedings.

*Id.,* at ¶ 72 (ellipsis in original).

In the European Union, the broadest grant of jurisdiction is to the courts of the Member State where "the centre of a debtor's main interests is situated." [FN4] In the regulation adopting the EU Convention, the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

349 B.R. 627, 47 Bankr.Ct.Dec. 31
**(Cite as: 349 B.R. 627)**

concept is elaborated upon as "the place where the debtor conducts the administration of his interests on a regular basis and is therefore ascertainable by third parties." Council Reg. (EC) No. 1346/2000, ¶ 13.[FN5] This generally equates with the concept of a "principal place of business" in United States law.

> FN4. The first sentence of the first paragraph of Article 3 is:
>
> The courts of the Member State within the territory of which the centre of a debtor's main interests is situated shall have jurisdiction to open insolvency proceedings.
>
> EU Convention on Insolvency, art. 3, ¶ 1, O.J. L 160/1 (June 30, 2000).
>
> FN5. The preambular portion of the regulation explains:
>
> (13) The "centre of main interests" should correspond to the place where the debtor conducts the administration of his interests on a regular basis and is therefore ascertainable by third parties.
>
> Council Reg. (EC) No. 1346/2000 of 29 May 2000 on insolvency proceedings, ¶ 13.

The statutory presumption created by § 1516(3), on close examination, confirms that an entity's "principal place of business" in United States jurisprudence is that entity's "center of main interests" for purposes of § 1502(4):

> In the absence of *evidence* to the contrary, the debtor's registered office, or habitual residence in the case of an individual, is presumed to be the center of the debtor's main interests.

11 U.S.C. § 1516(3) (emphasis supplied).

In contrast to "*evidence* to the contrary," both the Model Law and the EU convention use the phrase "in the absence of *proof* to the contrary." [FN6] The Guide, however, explains that the concept is one of a default rule to be applied in the absence of evidence that the debtor's main interests are centered in some place different from the registered office. GUIDE ¶ 122. [FN7] Similarly, under the EU Convention, the key question is the situs of the conduct of the administration of the debtor's**635** business on a regular basis that is known to third parties. Council Reg. (EC) No. 1346/2000, ¶ 13.

> FN6. The Model Law provides:
>
> In the absence of *proof* to the contrary, the debtor's registered office, or habitual residence in the case of an individual, is presumed to be the centre of the debtor's main interests.
>
> Model Law, art. 16(3) (emphasis supplied).
>
> The EU Convention provides, in the second sentence of the first paragraph of article 3:
>
> In the case of a company or legal person, the place of the registered office shall be presumed to be the centre of its main interests in the absence of *proof* to the contrary.
>
> EU Convention, art. 3 (emphasis supplied).
>
> FN7. The Guide explains:
>
> Article 16 establishes presumptions that

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

349 B.R. 627, 47 Bankr.Ct.Dec. 31
**(Cite as: 349 B.R. 627)**

allow the court to expedite the evidentiary process; at the same time they do not prevent, in accordance with the applicable procedural law, calling for or assessing other evidence if the conclusion suggested by the presumption is called into question by the court or an interested party.

GUIDE ¶ 122.

Congress chose to substitute "evidence" for "proof" and otherwise to adopt the Model Law provision word-for-word. The explanation was that the substitution conformed to United States terminology and made clear that the burden of proof of "center of main interests" is on the foreign representative who is applying for recognition of a foreign proceeding as a main proceeding.[FN8] This comports with the concept of a rebuttable presumption for purposes of Federal Rule of Evidence 301. FED.R.EVID. 301.[FN9]

FN8. The explained:

Although sections 1515 and 1516 are designed to make recognition as simple and expedient as possible, the court may hear proof on any element stated. The ultimate burden as to each element is on the foreign representative, although the court is entitled to shift the burden to the extent indicated in section 1516. The word "proof" in subsection (3) has been changed to "evidence" to make it clearer using United States terminology that the ultimate burden is on the foreign representative. "Registered office" is the term used in the Model Law to refer to the place of incorporation or the equivalent for an entity that is not a natural person. The presumption that the place of the registered office is also the center of the debtor's main interest is included for speed and convenience of proof

where there is no serious controversy.

H.R.Rep. No. 109–31, at 112–13, U.S.Code Cong. & Admin.News 2005, pp. 88, 175.

FN9. That rule provides:

*Presumptions in General in Civil Actions and Proceedings.* In all civil actions and proceedings not otherwise provided for by Act of Congress or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast.

FED.R.EVID. 301.

[4] In effect, the registered office (or place of incorporation) is evidence that is probative of, and that may in the absence of other evidence be accepted as a proxy for, "center of main interests." The registered office, however, does not otherwise have special evidentiary value and does not shift the risk of nonpersuasion, i.e. the burden of proof, away from the foreign representative seeking recognition as a main proceeding.

[5][6] Thus, if the foreign proceeding is not in the country of the registered office, then the foreign representative has the burden of proof on the question of "center of main interests." Correlatively, if the foreign proceeding is in the country of the registered office, and if there is evidence that the center of main interests might be elsewhere, then the foreign representative must prove that the center of main interests is in the same country as the registered office.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

4152

349 B.R. 627, 47 Bankr.Ct.Dec. 31
**(Cite as: 349 B.R. 627)**

[7] It follows that the burden of proof as to the "center of main interests" is never on the party opposing "main" status and that such an opponent has only a burden of going forward to adduce some evidence inconsistent with the registered office warranting a conclusion of "main" status. FED.R.EVID. 301.

IV

[8] Finally, Bennett Truck, which claims to have a lien on all of the funds tied up in the in rem proceeding, urges that this court exercise its discretion under 11 U.S.C. § 1522(b) to impose additional conditions on the release of the portion of the seized $1,603,653.95 that USDOJ is prepared to dismiss from the in rem proceeding and turn over to the foreign representatives**636** once the foreign proceeding is recognized. Bennett Truck is particularly concerned that the funds entrusted to the foreign representatives might be used to pay expenses of administration.

There are two distinct forms of entrustment in § 1521. The foreign representatives ask that, under § 1521(a)(5), they be entrusted with "the administration or realization of" the debtors' assets within the territorial jurisdiction of the United States. 11 U.S.C. § 1521(a)(5). They do not ask that, under § 1521(b), they be entrusted with "the distribution of all or part of the debtor's assets located in the United States." 11 U.S.C. § 1521(b).

Although this court indicated at the time of the hearing that it was prepared to require that its specific permission be obtained for any use of the funds, more mature reflection upon the structure of chapter 15 and of the record reveals that the statutory structure is adequate to the task without the confusion of imposition of other provisions. Indeed, the additional level of judicial scrutiny could place this court in the position of having to review the rulings of the foreign court in a manner that might be dysfunctional and operate to diminish the overall value of recovery for all creditors.

A

To be sure, chapter 15 provides ample authority for this court to impose restrictions so as to protect United States creditors to a greater extent than otherwise provided in chapter 15 and in other applicable provisions of the Bankruptcy Code.

As noted, for the moment, all that is requested is a § 1521(a)(5) entrustment of administration and realization of assets without any entrustment of distribution.

If and when it comes to distribution, § 1521(b) authorizes the court, in its discretion, to entrust the distribution of assets located in the United States to the foreign representatives on the condition that the court be satisfied that the interests of creditors in the United States are "sufficiently protected." 11 U.S.C. § 1521(b).[FN10] This provision is based on Model Law article 21, with the substitution of "sufficiently protected" in lieu of the Model Law's "adequately protected" in order to avoid confusion with the Bankruptcy Code's defined term of art "adequate protection." H.R.Rep. No. 109–31, at 115.[FN11]

FN10. The text of the provision is:

(b) Upon recognition of a foreign proceeding, whether main or nonmain, the court may, at the request of the foreign representative, entrust the distribution of all or part of the debtor's assets located in the United States to the foreign representative or another person, including an examiner, authorized by the court, *provided that the court is satisfied that the interests of creditors in the United States are sufficiently protected.*

11 U.S.C. § 1521(b) (emphasis supplied).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

349 B.R. 627, 47 Bankr.Ct.Dec. 31
**(Cite as: 349 B.R. 627)**

FN11. The House Report explains:

> This section follows article 21 of the Model Law, with detailed changes to conform to United States law.... The word "adequately" in the Model Law, articles 21(2) and 22(1), has been changed to "sufficiently" in sections 1521(b) and 1522(a) to avoid confusion with a very specialized legal term in United States bankruptcy, "adequate protection."

> H.R.Rep. No. 109–31, at 115, U.S.Code Cong. & Admin.News 2005, pp. 88, 178.

In addition, § 1522 authorizes the court to assure that interests of creditors and interested parties are "sufficiently protected," to impose conditions on any discretionary relief, including both forms of entrustment under § 1521, and to modify or terminate discretionary relief.[FN12] Congress **\*637** explained that the section was based on Model Law article 22 and that the bankruptcy court was being given "broad latitude to mold relief to meet specific circumstances." H.R.Rep. No. 109–31, at 116, U.S.Code Cong. & Admin.News 2005, pp. 88, 178.[FN13]

FN12. The text of the statute is:

> (a) The court may grant relief under section 1519 or 1521, or may modify or terminate relief under subsection (c), only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected.

> (b) The court may subject relief granted under section 1519 or 1521, or the operation of the debtor's business under section 1520(a)(3), to conditions it considers appropriate, including the giving of security or the filing of a bond.

> (c) The court may, at the request of the foreign representative or an entity affected by relief granted under section 1519 or 1521, or at its own motion, modify or terminate such relief.

> (d) Section 1104(d) shall apply to the appointment of an examiner under this chapter. Any examiner shall comply with the qualification requirements imposed on a trustee by section 322.

11 U.S.C. § 1522.

FN13. 1. The House Report explains:

> This section follows article 22 of the Model Law with changes for United States usage and references to relevant Bankruptcy Code sections. [Footnote citing GUIDE at 47.] It gives the bankruptcy court broad latitude to mold relief to meet specific circumstances, including appropriate responses if it is shown that the foreign proceeding is seriously and unjustifiably injuring United States creditors. For a response to a showing that the conditions necessary to recognition did not actually exist or have ceased to exist, see section 1517. Concerning the change of "adequately" in the Model Law to "sufficiently" in this section, see section 1521. Subsection (d) is new and simply makes clear that Bankruptcy Code section 1104(d) shall apply to the appointment of an examiner appointed in a case under chapter 15 and such examiner shall be subject to certain duties and bonding requirements based on those imposed on trustees and examiners under other chapters of this title.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

349 B.R. 627, 47 Bankr.Ct.Dec. 31
**(Cite as: 349 B.R. 627)**

H.R.Rep. No. 109–31, at 116, U.S.Code Cong. & Admin.News 2005, pp. 88, 178.

The Model Law version of article 22 is:

1. In granting or denying relief under article 19 or 21, or in modifying or terminating relief under paragraph 3 of this article, the court must be satisfied that the interests of the creditors and other interested persons, including the debtor, are adequately protected.

2. The court may subject relief granted under article 19 or 21 to conditions it considers appropriate.

3. The court may, at the request of the foreign representative or a person affected by relief granted under article 19 or 21, or at its own motion, modify or terminate such relief.

Model Law, art. 22.

Section 1522(a) conditions any discretionary relief under § 1521 or § 1519 (pre-recognition relief) upon the interests of creditors and other interested entities, including the debtor, being "sufficiently protected." 11 U.S.C. § 1522(a).

Section 1522(b) permits the court to impose conditions on any discretionary relief that it grants, which permits it to achieve an appropriate balance. 11 U.S.C. § 1522(b).

If it later appears that conditions should be either imposed or relaxed, § 1522(c) authorizes a court, on its own motion or upon request, to modify or terminate any discretionary relief it has granted. 11 U.S.C. § 1522(c).

Standards that inform the analysis of § 1522 protective measures in connection with discretionary relief emphasize the need to tailor relief and conditions so as to balance the relief granted to the foreign representative and the interests of those affected by such relief, without unduly favoring one group of creditors over another. GUIDE at ¶¶ 161–63.[FN14]

FN14. The Guide elaborates:

161. The idea underlying article 22 is that there should be a balance between relief that may be granted to the foreign representative and the interests of the persons that may be affected by such relief. This balance is essential to achieve the objectives of cross-border insolvency legislation.

162. The reference to the interests of creditors, the debtor and other interested parties in article 22, paragraph 1, provides useful elements to guide the court in exercising its powers under article 19 or 21. In order to allow the court to tailor the relief better, the court is clearly authorized to subject the relief to conditions (paragraph 2) and to modify or terminate the relief granted (paragraph 3). An additional feature of paragraph 3 is that it expressly gives standing to the parties who may be affected by the consequences of articles 19 and 21 to petition the court to modify and terminate those consequences. Apart from that, article 22 is intended to operate in the context of the procedural system of the enacting State.

163. In many cases the affected creditors will be "local" creditors. Nevertheless, in enacting article 22, it is not advisable to attempt to limit it to local creditors. Any

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

349 B.R. 627, 47 Bankr.Ct.Dec. 31
**(Cite as: 349 B.R. 627)**

express reference to local creditors in paragraph 1 would require a definition of those creditors. An attempt to draft such a definition (and to establish criteria according to which a particular category of creditors might receive special treatment) would not only show the difficulty of crafting such a definition but would also reveal that *there is no justification for discriminating creditors on the basis of criteria such as place of business or nationality.*

GUIDE, ¶¶ 161–63 (emphasis supplied).

**\*638** [9] Additional protection is embodied in the § 1506 public policy exception, which permits the court to refuse to take an action governed by chapter 15 if the action would be manifestly contrary to the public policy of the United States. 11 U.S.C. § 1506.[FN15] Congress has indicated, with its use of the phrase "manifestly contrary," that this exception is to be narrowly construed, which view is consistent with the explication in the Guide. H.R.Rep. No. 109–31, at 109; GUIDE, ¶¶ 88–89. [FN16] Nevertheless, the public policy exception could be invoked as a rationale for imposing specific protections.

FN15. The text of the statute is:

Nothing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States.

11 U.S.C. § 1506.

FN16. The House Report explains:

This provision follows the Model Law article 5 exactly, is standard in UNCITRAL

texts, and has been narrowly interpreted on a consistent basis in courts around the world. The word "manifestly" in international usage restricts the public policy exception to the most fundamental policies of the United States.

H.R.Rep. No. 109–31, at 109, U.S.Code Cong. & Admin.News 2005, pp. 88, 172 (citing GUIDE in omitted footnote).

The Guide elaborates:

88. For the applicability of the public policy exception in the context of the Model Law it is important to note that a growing number of jurisdictions recognize a dichotomy between the notion of public policy as it applies to domestic affairs, as well as the notion of public policy as it is used in matters of international cooperation and the question of recognition of effects of foreign laws. It is especially in the latter situation that public policy is understood more restrictively than domestic public policy. This dichotomy reflects the realization that international cooperation would be unduly hampered if public policy would be understood in an extensive manner.

89. The purpose of the expression "manifestly", used also in many other international legal texts as a qualifier of the expression "public policy", is to emphasize that public policy exceptions should be interpreted restrictively and that article 6 is only intended to be invoked under exceptional circumstances concerning matters of fundamental importance for the enacting State.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

349 B.R. 627, 47 Bankr.Ct.Dec. 31
**(Cite as: 349 B.R. 627)**

GUIDE, ¶¶ 88–89.

In short, the court has ample tools for dealing with the manner in which a chapter 15 case is administered.

**\*639** B

The question becomes whether to impose additional restrictions in this instance at the request of a creditor who claims that it has a lien on all of the seized funds in the im rem proceeding.

There is no controversy that the funds to be released by agreement of USDOJ from the in rem proceeding would be maintained in a deposit account within the jurisdiction of this court. The foreign representatives do not ask to be entrusted with distribution of assets under § 1521(b), rather they merely ask to be entrusted to administer and realize assets under § 1521(a)(5).

Neither USDOJ, nor the California Commissioner of Insurance, nor any party in interest other than Bennett Truck has expressed any difficulty with the sufficiency of the protections inherent in requiring that funds delivered to the foreign representatives as a form of realization of assets under § 1521(a)(5) be maintained within the jurisdiction of the court.

It is not necessary to place an additional restriction on disbursements when the foreign representatives are not being entrusted to distribute assets that are being maintained within the jurisdiction of the court.

[10] An automatic consequence of recognition of a foreign main proceeding is that § 363 applies. 11 U.S.C. § 1520(a)(2). As a consequence, cash collateral cannot be used without permission. 11 U.S.C. § 363(c)(2).

The gravamen of Bennett Truck's position is that it contends that it has a lien on all the funds to be released by USDOJ from the in rem proceeding such that it is entitled to all of the seized funds. Whether Bennett Truck actually has an enforceable lien has been neither conceded nor definitively determined. If it does have an enforceable lien, then the funds are cash collateral that are subject to the protection of § 363(c)(2) that is already in effect by virtue of recognition of the foreign main proceeding. If Bennett Truck, however, does not have an enforceable lien, then it should not enjoy the quasi-lien status that would result from a specific restriction on the entrustment of administration and realization of assets to the foreign representatives.

Nor is the proposed restriction entirely innocuous. Although the foreign representatives are confident that they can realize up to $7,000,000 in assets from foreign sources, most of which would eventually be distributed to United States creditors, the use of some of the released funds may be required in order to achieve that result. Depriving the foreign representatives of resources needed to recover the $7,000,000 could frustrate the goal of chapter 15 to maximize the value of the cross-border estate that is available for distribution to creditors.

The fact that most of the creditors are United States entities means that shortfalls in recoveries necessarily will operate to their detriment regardless of whether one takes a "universalist" or a "territorialist" approach to cross-border insolvencies. *See* Westbrook, 79 AM. BANKR.L.J. at 715–16.

The court is mindful that reliance on the protections of § 363(c)(2) restricting the use of cash collateral exposes the estate to the credit risk of the foreign representatives in the event they act contrary to the Bankruptcy Code. In the circumstances of this case, where there has been substantial cross-border law enforcement cooperation and where the law governing the foreign proceeding is structured to protect an estate from depredation by professionals, this court predicts that the foreign representatives will be punctilious in

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

349 B.R. 627, 47 Bankr.Ct.Dec. 31
**(Cite as: 349 B.R. 627)**

their performance**\*640** of duty and, hence, is satisfied that the credit risk is an acceptable risk.

The procedural history of the winding-up proceedings indicate that the matter is well in hand. Chapter 15 provides sufficient procedures for cooperation and communication between this court and the Eastern Caribbean Supreme Court. 11 U.S.C. §§ 1525–27; INTERIM FED. R. BANKR.P. 5012; *see generally,* GUIDELINES APPLICABLE TO COURT–TO–COURT COMMUNICATIONS IN CROSS–BORDER CASES (Am. L. Inst. & Int'l Insolvency Inst.) (adopted 2000 & 2001); FJC INT'L INSOLVENCY at 93–94. The record does not warrant this court placing itself in a position in which it could impede the progress of the main SVG proceeding, which is the vehicle through which it is anticipated that the primary recovery for all creditors, including creditors in the United States, will be accomplished.

If it later transpires that there is reason for this court to have discomfort about its conclusion, § 1522(c) enables it to revise its position and exercise its § 1522(b) authority to impose conditions on the § 1521(b)(5) entrustment to the foreign representatives, such as the giving of security or the filing of a bond.

\* \* \*

The proceedings will be recognized as "foreign main proceedings" under § 1502(4). The discretionary relief requested by the foreign representatives will be granted without the previously-announced condition of requiring specific permission, beyond that required by applicable bankruptcy law, for use of funds. An appropriate order shall issue.

Bkrtcy.E.D.Cal.,2006.
In re Tri-Continental Exchange Ltd.
349 B.R. 627, 47 Bankr.Ct.Dec. 31

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Tab 76

846 F.3d 22
United States Court of Appeals, Second Circuit.

TRIKONA ADVISERS

LIMITED, Plaintiff–Appellant,

v.

Rakshitt CHUGH, individually, and as
Trustee of the RC Family Trust, Peak XV
Capital Advisers LLC, Peak XV Capital
LLC, Peak XV GP LLC, ARC Capital LLC,
Peak XC Fundamental Value Limited
Partnership, Defendants–Appellees.[*]

[*]   The Clerk of the Court is directed to amend the
caption as shown.

No. 14-975-cv
|
August Term, 2016
|
Argued: August 22, 2016
|
Decided: January 18, 2017

**Synopsis**
**Background:** Investment advisory company, which was
a Cayman Islands corporation, brought action for breach
of fiduciary duty against former owner/director and his
related corporate entities. The United States District Court
for the District of Connecticut, Stefan R. Underhill,
J., granted summary judgment to defendants and, 2015
WL 3581216, denied reconsideration. Investment advisory
company appealed.

**Holdings:** The Court of Appeals, John M. Walker, Jr., Circuit
Judge, held that:

[1] compliance with provision of Bankruptcy Code regarding
recognition of foreign liquidation proceeding was not
necessary for district court to give preclusive effect to
Cayman Islands wind-up proceeding for investment advisory
company;

[2] under Connecticut law, Cayman Islands wind-
up proceeding collaterally estopped investment advisory
company's action alleging breach of fiduciary duty against its
former owner/director;

[3] in rem nature of Cayman Islands wind-up proceeding did
not prevent its preclusive effect; and

[4] investment advisory company was in privity with 50%
shareholder that was respondent in Cayman Islands wind-up
proceeding.

Affirmed.

West Headnotes (23)

**[1]      Federal Courts**  🔑  Summary judgment
Court of Appeals reviews a district court's grant
of summary judgment de novo. Fed. R. Civ. P. 56.

6 Cases that cite this headnote

**[2]      Federal Courts**  🔑  Theory and Grounds of
Decision of Lower Court
District court's grant of summary judgment may
be affirmed on appeal on any ground fairly
supported by the record. Fed. R. Civ. P. 56.

5 Cases that cite this headnote

**[3]      Federal Courts**  🔑  Conclusiveness; res
judicata and collateral estoppel
Court of Appeals reviews a district court's
application of the doctrine of collateral estoppel
de novo, accepting all factual findings of the
district court unless clearly erroneous.

2 Cases that cite this headnote

**[4]      Federal Courts**  🔑  New Trial, Rehearing, or
Reconsideration
District court's denial of a motion for
reconsideration is reviewed on appeal for abuse
of discretion. Fed. R. Civ. P. 59(e).

Trikona Advisers Limited v. Chugh, 846 F.3d 22 (2017)

77 Collier Bankr.Cas.2d 266, 63 Bankr.Ct.Dec. 157

5 Cases that cite this headnote

**[5]    Judgment**  ⟜  Judgments of Courts of Foreign
Countries

Compliance with provision of Bankruptcy Code,
which required bankruptcy court in United States
to approve foreign representative's application
for recognition of foreign liquidation proceeding
before such proceeding could be recognized in
United States, was not necessary for federal
district court to give preclusive effect to Cayman
Islands wind-up proceeding for investment
advisory company, on motion for summary
judgment by company's former owner/director
on ground that Cayman Islands proceeding
collaterally estopped company's action against
him for breach of fiduciary duty; provision
allowed coordination of domestic and foreign
proceedings into single bankruptcy, but instant
action involved state law, it was unconnected
to any bankruptcy proceeding, and none of
the parties was a representative of foreign
proceeding. 11 U.S.C.A. §§ 101(23), 101(24),
1501(b), 1515; Fed. R. Civ. P. 56.

1 Cases that cite this headnote

**[6]    Bankruptcy**  ⟜  Cases Ancillary to Foreign
Proceedings

**Judgment**  ⟜  Judgments of Courts of Foreign
Countries

Provision of Bankruptcy Code, which requires a
bankruptcy court in the United States to approve
an application for recognition of a foreign
liquidation proceeding before such proceeding
may be recognized in United States courts, does
not apply when a court in the United States
simply gives preclusive effect to factual findings
from an otherwise unrelated foreign liquidation
proceeding. 11 U.S.C.A. §§ 1501(b), 1515.

1 Cases that cite this headnote

**[7]    International Law**  ⟜  Particular subjects

Parties' implied consent in their appellate briefs
was sufficient to establish the applicability
of Connecticut law to determination of

whether Cayman Islands wind-up proceeding
for investment advisory company collaterally
estopped company's action in federal district
court against its former owner/director for breach
of fiduciary duty, on company's appeal from
summary judgment in favor of former owner/
director.

17 Cases that cite this headnote

**[8]    Res Judicata**  ⟜  Collateral estoppel and issue
preclusion in general

Under Connecticut law, "collateral estoppel
doctrine" prohibits the relitigation of an issue
when that issue was actually litigated and
necessarily determined in a prior action between
the same parties upon a different claim.

8 Cases that cite this headnote

**[9]    Res Judicata**  ⟜  Collateral estoppel and issue
preclusion in general

Under Connecticut "collateral estoppel
doctrine," an issue decided against a party in a
prior proceeding may not be relitigated if: (1) it
was fully and fairly litigated in the first action;
(2) it was actually decided; and (3) the decision
was necessary to the judgment.

6 Cases that cite this headnote

**[10]    Res Judicata**  ⟜  Facts necessary to sustain
determination

Under Connecticut law, an issue is "necessarily
determined" in a prior proceeding, as required
for application of collateral estoppel, if in the
absence of a determination of the issue, the
judgment the prior proceeding could not have
been validly rendered.

4 Cases that cite this headnote

**[11]    Judgment**  ⟜  Judgments of Courts of Foreign
Countries

Under Connecticut law, Cayman Islands wind-
up proceeding for investment advisory company
collaterally estopped its action in federal district
court alleging breach of fiduciary duty against

4161

its former owner/director; company's affirmative defenses in wind-up proceeding were based in substance on same allegations it made against former owner/director in instant action, and those defenses were necessarily resolved against company in wind-up proceeding because if Cayman court found credible any assertions that former owner/director breached his fiduciary duty, Cayman court would have been required to dismiss wind-up petition.

1 Cases that cite this headnote

**[12]    Judgment**  Judgments of Courts of Foreign Countries

Under Connecticut law, Cayman Islands wind-up proceeding for investment advisory company could have preclusive collateral estoppel effect on company's action in federal district court against former officer/director for breach of fiduciary duty, although wind-up proceeding was in rem and federal action was in personam.

**[13]    Res Judicata**  Persons Represented by Other Persons or Parties

Under Connecticut collateral estoppel doctrine, party can be estopped from relitigating an issue that was decided adversely to him in a prior litigation only if the issue was litigated by that party, or by a party with substantially similar legal interests; this requirement ensures that the interests of the party against whom collateral estoppel is being asserted have been adequately represented at the initial proceeding.

2 Cases that cite this headnote

**[14]    Res Judicata**  Who are privies; what constitutes privity

Under Connecticut law, in determining whether there exists the requisite privity between a party against whom collateral estoppel is asserted and a party in a prior action, there is no prevailing definition of privity to be followed automatically in every case, rather, court focuses on the functional relationships of the parties.

1 Cases that cite this headnote

**[15]    Res Judicata**  Persons Represented by Other Persons or Parties

Under Connecticut law, only the party against whom collateral estoppel is asserted must have been represented in both the prior and current proceedings.

**[16]    Judgment**  Judgments of Courts of Foreign Countries

Cayman Islands investment advisory company was in privity with 50% shareholder that was respondent in Cayman Islands proceeding to wind up company, as required under Connecticut law for Cayman Islands wind-up proceeding to collaterally estop company's action in federal district court against former director for breach of fiduciary duty; company did not dispute it was in privity with shareholder, moreover, defenses asserted in wind-up proceeding by shareholder were based entirely on alleged violations of company's rights, and those same purported violations now formed the basis of company's action against former director.

1 Cases that cite this headnote

**[17]    Federal Courts**  Conclusiveness; res judicata and collateral estoppel

In a diversity action, state substantive law governs a federal court's application of comity principles.

3 Cases that cite this headnote

**[18]    Judgment**  Judgments of Courts of Foreign Countries

Connecticut common-law comity principles compel a rule of deference to foreign judgments in most cases.

**[19]    Federal Courts**  Conclusiveness; res judicata and collateral estoppel

**Judgment** 🔑 Judgments of Courts of Foreign Countries

Under Connecticut law, comity was afforded to Cayman Islands wind-up proceeding for investment advisory company, absent contrary public policy or federal preemption of state law doctrine of comity, and thus wind-up proceeding could have preclusive collateral estoppel effect on company's action in federal district court against former owner/director for breach of fiduciary duty.

[20]    **States** 🔑 Preemption in general

Federal statute may preempt state law either expressly or by implication.

1 Cases that cite this headnote

[21]    **States** 🔑 Preemption in general

Express preemption of state law occurs when Congress withdraws specified powers from the States by enacting a statute containing an express preemption provision.

1 Cases that cite this headnote

[22]    **States** 🔑 Conflicting or conforming laws or regulations

**States** 🔑 Occupation of field

Federal statute preempts state law by implication when Congress intends to occupy the field and when the challenged state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress.

[23]    **Bankruptcy** 🔑 Cases Ancillary to Foreign Proceedings

**Judgment** 🔑 Judgments of Courts of Foreign Countries

**States** 🔑 International relations; aliens

Provision of Bankruptcy Code, which required bankruptcy court in United States to approve foreign representative's application for recognition of foreign liquidation proceeding before such proceeding could be recognized

in United States, did not impliedly preempt application of Connecticut common-law doctrine of comity to Cayman Islands wind-up proceeding for investment advisory company, and thus bankruptcy provision did not prevent wind-up proceeding from having collateral estoppel effect on company's action in federal district court against former owner/director for breach of fiduciary duty; given the very narrow purpose of bankruptcy provision, which was to allow coordination of domestic and foreign proceedings into single bankruptcy, Congress clearly did not intend to completely preempt state law regarding comity. 11 U.S.C.A. §§ 1501(b), 1515.

1 Cases that cite this headnote

**\*26** Appeal from the United States District Court for the District of Connecticut. No. 11 Civ. 2015—Stefan R. Underhill, *Judge*.

**Attorneys and Law Firms**

Andrew B. Bowman, Westport, CT, for Plaintiff–Appellant.

John G. Balestriere (Stefan Savic, on the brief), Balestriere Fariello LLP, New York, NY, for Defendants–Appellants.

Before: Walker, Chin, and Lohier, Circuit Judges.

**Opinion**

John M. Walker, Jr., Circuit Judge:

Plaintiff Trikona Advisers, Ltd. ("TAL") appeals from a decision of the district court for the District of Connecticut (Stefan R. Underhill, *J.*) granting summary judgment in favor of defendants Rakshitt Chugh, ARC Capital LLC, and other related corporate entities (the "Chugh Defendants"). TAL's complaint alleged breaches of fiduciary duty by Chugh, a former partner and fifty-percent owner of TAL, and the other defendants. The district court held that TAL's claims had previously been determined in Chugh's favor in a proceeding in the Cayman Islands, and that TAL was collaterally estopped from asserting them in the Connecticut action. On appeal, TAL argues that the district court incorrectly applied the doctrine of collateral estoppel and further argues that Chapter 15 of the United States Bankruptcy Code prevents

the district court from giving preclusive effect to the Cayman court's factual findings. We find TAL's arguments meritless and therefore AFFIRM the judgment of the district court.

## BACKGROUND

### I. Factual Background

TAL is an investment advisory company. Its two beneficial owners, Chugh and Aashish Kalra, formed the company in 2006 as a vehicle for helping foreign investors invest in Indian real estate and infrastructure. Each man held a fifty percent equity stake in TAL through entities controlled by them. Chugh's shares were owned by ARC Capital LLC ("ARC") and Haida Investments ("Haida"), and Kalra's shares were owned by Asia Pacific Investments, Ltd. ("Asia Pacific"). At the same time, the two men formed Trinity Capital Plc., a closed-end fund listed on the London Stock Exchange, through which they solicited investments. Kalra and Chugh managed Trinity through TAL. Trinity paid TAL a fee for its management services, calculated at two percent of Trinity's net asset value plus a performance fee.

The 2008 economic crisis took its toll on TAL and soured the relationship between Chugh and Kalra. Trinity's shareholders began pressuring the Trinity board to sell the company's assets and distribute capital which, while it might benefit the shareholders, would reduce TAL's management fees by lowering Trinity's net asset value. Chugh and Kalra differed on how to respond to the Trinity board's proposed asset sale: Kalra opposed the move, while Chugh wanted to be more conciliatory to the shareholders. TAL tried to prevent the sell-off by acquiring the shares of QVT, one of Trinity's main shareholders, but the **\*27** deal collapsed when TAL could not secure the necessary financing. Frustrated, Kalra advocated taking legal action against QVT for breach of contract, but was ultimately dissuaded from that course by Chugh and outside legal counsel.

At the same time that the QVT deal collapsed, TAL also engaged in a series of ill-fated transactions with a German fund manager called SachsenFonds Holdings GmbH. At Kalra's behest, SachsenFonds agreed to invest £45 million in three of Trinity's existing real estate investments, and to co-invest a further £45 million with Trinity in five additional real estate acquisitions. The latter agreement failed to gain the approval of Trinity's second-largest shareholder, which was still pressing Trinity to sell assets and did not want the company investing in new property acquisitions. To further

this goal, Trinity ousted Chugh and another TAL-affiliated director from Trinity's board and replaced them with directors who favored the selloff. Trinity then began liquidating its assets, resulting in a decline in its net asset value and a corresponding reduction in TAL's fees. In early 2009, SachsenFonds itself became a victim of the global credit crunch and was unable to perform its remaining contractual obligations to Trinity. In an attempt to avoid liability for its default, SachsenFonds brought suit against Trinity and TAL, as well as Chugh and Kalra individually, alleging that they had fraudulently induced it to invest in Trinity.

The wide-ranging financial and legal fallout from TAL's unsuccessful deal with SachsenFonds further soured the relationship between TAL and Trinity. In December of 2009, Trinity cited the failed transaction as a breach of TAL's management agreement and terminated its contractual relationship with TAL. TAL responded by commencing an arbitration with Trinity, which the parties settled.

With the collapse of the SachsenFonds deal, TAL essentially ceased to function as a going concern and made no serious attempts to enter into any new business or investment relationships. Kalra and Chugh blamed each other for the collapse of TAL's business, and by 2009 their relationship had deteriorated to the point that they could no longer work together. They each used portions of TAL's assets, along with customer information, to establish new, separate companies, Peak XV (Chugh) and Duranta (Kalra), so that each could attempt to build new real estate investment businesses. The souring of Kalra and Chugh's relationship culminated on January 11, 2012, when, with no notice to Chugh, TAL's board of directors voted to remove him as a director. This left Kalra exclusively in charge of TAL. Thereafter, Kalra proceeded to treat TAL and its assets as his own and Chugh was excluded from further involvement in the business.

### II. Procedural History

TAL's collapse spawned a number of legal proceedings in the United States and abroad, two of which are relevant here: a wind-up proceeding in the Cayman Islands and the federal civil suit in Connecticut that is the subject of this appeal.

#### A. The Wind–Up Proceeding

On February 13, 2012, ARC and Haida, which held Chugh's TAL shares and were controlled by Chugh, filed a petition in the Grand Court of the Cayman Islands, seeking to "wind up" TAL, a Cayman corporation. The suit sought to liquidate the

4164

business and divide its assets between Chugh and Kalra. Asia Pacific, which held Kalra's TAL shares and was controlled by Kalra, opposed Chugh's petition. Under Cayman Islands law, a court may order a company to be wound up if it is "of opinion that it is just and equitable" to do so. Cayman Islands **\*28** Companies Law V.92 (2013 Revision). Chugh argued to the Cayman court that it would be just and equitable to liquidate the company because: (1) TAL had experienced a "loss of substratum," *i.e.* a loss of its ability to "carry on the business for which it was established," due to its dire financial condition and the complete breakdown in trust between Kalra and Chugh; (2) Kalra had wrongfully caused Chugh to be removed from TAL's board and thereby deprived Chugh of his "legitimate expectation of being involved in [TAL's] management"; and (3) after he had removed Chugh from the board, Kalra proceeded to misuse TAL's assets for his sole benefit.

Kalra opposed the wind-up by asserting the affirmative defense that Chugh had breached his fiduciary duty to TAL in several ways, and that his removal from the board was therefore justified. Specifically, Kalra argued that: (1) Chugh intentionally sabotaged TAL's attempt to acquire QVC's shares in Trinity and had "caused" TAL to pay QVT £2 million for covenants of "extremely limited value"; (2) Chugh had later "prevented" TAL from bringing suit against QVT for breach of contract, over Kalra's objections; (3) Chugh "forced" Kalra to agree to an unfavorable settlement with Trinity in the breach of contract arbitration arising out of the failed SachsenFonds deal; and (4) Chugh "stole" TAL's assets and customer information for use in establishing Peak XV and interfered in the distribution of payments due to Kalra. Kalra framed these arguments as jurisdictional defenses, arguing that if any one of these allegations were true, Chugh would be precluded from invoking the Cayman court's equitable jurisdiction under the doctrine of unclean hands.

The Cayman court tried the wind-up proceeding over seven days in January of 2013. At the trial's conclusion, the court granted Chugh's petition. It found that "each of" Chugh's allegations was supported by evidence, and that these allegations "taken together" supported a finding that it was just and equitable to wind up TAL. It also rejected each of Kalra's affirmative defenses, concluding that there was "no merit whatsoever in the allegations made against Mr. Chugh." Kalra appealed this judgment, first to the Court of Appeal of the Cayman Islands, and then to the Judicial Committee of the Privy Council in London. Both tribunals affirmed the judgment.

### B. The District Court Proceeding

On December 28, 2011, two months before the commencement of the wind-up proceeding in the Caymans, Kalra, through Asia Pacific, sued the Chugh Defendants in the district court in Connecticut. After TAL's board removed Chugh, TAL was substituted as plaintiff. TAL's Third Amended Complaint, the operative complaint in the district court proceeding, asserts eleven causes of action against the Chugh Defendants sounding in breach of fiduciary duty, aiding and abetting breach of fiduciary duty, unfair competition, theft of trade secrets, civil conspiracy, conversion, statutory theft, unjust enrichment, and abuse of process. TAL alleged that Chugh breached his fiduciary duty by: (1) undermining TAL's negotiating positions in the QVT and SachsenFonds deals; (2) causing TAL to enter into an unfavorable settlement of its claims against Trinity; (3) interfering with payments due to Kalra; and (4) misappropriating TAL's customer information and assets in the course of founding Peak XV to unfairly compete with TAL. These claims substantially reprised the allegations Kalra asserted as affirmative defenses to Chugh's wind-up petition in the Caymans.

**\*29** Following the ruling of the Cayman court in the wind-up proceeding in January of 2013, the Chugh Defendants moved for summary judgment in the district court based on collateral estoppel. They argued that in deciding the petition the Cayman court had already made findings of fact in Chugh's favor on all of Chugh's assertions regarding TAL's collapse, and that Kalra was therefore collaterally estopped from relitigating those factual disputes. The district court agreed, and on March 6, 2014 granted the Chugh Defendants' motion for summary judgment.

On April 3, 2014, TAL moved for reconsideration pursuant to Federal Rule of Civil Procedure 59(e). TAL argued that the district court improperly gave preclusive effect to the Cayman court's findings because each finding of fact on which the Cayman court had relied constituted an independent ground for granting Chugh's petition for winding up. As a result, no single finding of fact was "essential" to the Cayman court's holding in the wind-up proceeding as required by Connecticut law. *See Lyon v. Jones*, 291 Conn. 384, 406, 968 A.2d 416 (2009).

In its Rule 59(e) ruling, the district court agreed with TAL that the Cayman court's findings of fact regarding Chugh's arguments for winding up could not be preclusive,

because each argument constituted an independent ground for granting the petition, and thus none alone was essential to the judgment. The district court nevertheless denied the motion to reconsider. It held that while the arguments that Chugh made to the Cayman court *in favor* of winding up TAL could not support collateral estoppel, the arguments that Kalra had advanced *against* winding up TAL could perform that function. Because Kalra had framed his assertions against Chugh as a jurisdictional defense based on unclean hands, he had effectively argued that the Cayman court was required to dismiss Chugh's petition for lack of jurisdiction if that court accepted *any* of his claims as true. Because success on any single claim of fiduciary breach by Chugh would necessitate a finding of unclean hands and thus bar the petition, the Cayman court's findings on these claims were "essential" to the outcome of the petition. The district court concluded that because the factual assertions Kalra made in defending the petition were fundamentally the same as the factual assertions that TAL made in its Third Amended Complaint, collateral estoppel still applied under Connecticut law and summary judgment was thus appropriate.

TAL now timely appeals both the district court's grant of summary judgment and its denial of TAL's motion for reconsideration.

## DISCUSSION

 **[1]**    **[2]**    **[3]**    **[4]**   We review a district court's grant of summary judgment *de novo*. *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 465 (2d Cir. 2001). The district court's judgment may be affirmed "on any ground fairly supported by the record." *Id.* at 466. We also review a district court's application of the doctrine of collateral estoppel "*de novo,* accepting all factual findings of the district court unless clearly erroneous." *Chartier v. Marlin Mgmt., LLC*, 202 F.3d 89, 93 (2d Cir. 2000). A district court's denial of a motion for reconsideration, however, is reviewed for abuse of discretion. *RJE Corp. v. Northville Indus. Corp.,* 329 F.3d 310, 316 (2d Cir. 2003) (per curiam).

TAL makes five separate arguments on appeal: 1) that the district court was precluded by Chapter 15 of the United States Bankruptcy Code from applying collateral estoppel to the findings of fact from the wind-up proceeding; 2) that the district **\*30** court incorrectly gave preclusive effect to the Cayman court's findings of fact because those findings were not "essential" to its judgment; 3) that the Cayman court's findings of fact cannot have preclusive effect in the district court because the wind-up proceeding was an *in rem* proceeding, while the district court proceeding is *in personam*; 4) that TAL and the respondents in the wind-up proceeding are not in privity with each other; and 5) that the district court erred in granting comity to the judgment of the Cayman court because doing so was contrary to United States national policy. We address each of these arguments in turn.

## I. Chapter 15 of the United States Bankruptcy Code

Chapter 15 of the United States Bankruptcy Code, 11 U.S.C. § 1501 *et seq.*, requires that under certain circumstances, before foreign liquidation proceedings may be recognized in United States courts, a bankruptcy court in the United States must approve an application for recognition from a "foreign representative" appointed in connection with that foreign proceeding. 11 U.S.C. § 1515. TAL argues that because no application for recognition was ever made in connection with the Cayman Island wind-up proceeding, that judgment cannot be recognized in the district court. As a result, TAL argues that the findings of fact made by the Cayman court in the wind-up proceeding cannot be given preclusive effect and therefore cannot support the district court's granting of summary judgment in favor of the defendants on collateral estoppel grounds.

 **[5]**   We agree with the district court that the requirements of Chapter 15 do not apply here. Chapter 15, enacted by Congress in 2005, incorporated into United States law the Model Law on Cross-Border Insolvency drafted by the United Nations Commission on International Trade. 11 U.S.C. § 1501. The statute's primary purpose was to facilitate the consolidation of multinational bankruptcies into one single proceeding. *In re ABC Learning Centres Ltd.*, 728 F.3d 301, 305–06 (3d Cir. 2013). Chapter 15 addressed a persistent problem in cross-border liquidations: creditors would initiate multiple bankruptcy proceedings to recover assets from a debtor in jurisdictions other than the site of the principal liquidation. *Id.* at 305. This caused administrative inefficiency and also allowed creditors to bypass the priority restraints of the main bankruptcy proceeding and attempt to recover more than their fair share of the debtor's assets. *Id.* In the interests of uniformity and efficiency, Chapter 15 provides for the coordination of domestic and foreign proceedings into a single bankruptcy and, with specific relevance to the issue raised by TAL, allows foreign representatives appointed in connection with foreign proceedings to seek recognition of those proceedings in United States courts as a means of

4166

requesting United States assistance in administering the main liquidation. *Id*. at 306.

Consistent with its limited purpose, 11 U.S.C. § 1501(b) specifies four circumstances in which Chapter 15 applies. These are cases in which:

> (1) assistance is sought in the United States by a foreign court or a foreign representative in connection with a foreign proceeding;

> (2) assistance is sought in a foreign country in connection with a case under this title;

> (3) a foreign proceeding and a case under this title with respect to the same debtor are pending concurrently; or

> (4) creditors or other interested persons in a foreign country have an interest in requesting the commencement of, or **\*31** participating in, a case or proceeding under this title.

11 U.S.C. § 1501(b). These scenarios assume that (1) a United States court is being asked either to assist in the administration of a foreign liquidation proceeding or to administer a liquidation proceeding itself, or (2) a foreign court is being asked to assist in administering a liquidation proceeding in the United States.

Moreover, 11 U.S.C. § 1515 does not apply generally to parties, but, by its terms, requires only "foreign representatives" to apply for recognition of a foreign judgment in bankruptcy. A "foreign representative" is defined in 11 U.S.C. § 101(24) as "a person or body... authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding."[1]

[1]    The same section defines "foreign proceeding" as "a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation." 11 U.S.C. § 101(23).

 **[6]** No party to the district court proceeding is a "representative" of a "foreign proceeding," as those terms are defined in 11 U.S.C. §§ 101(24) and (23). And no party to the district court proceeding is seeking the assistance of the district court in enforcing or administering a foreign liquidation proceeding, 11 U.S.C. § 1501(b)(1); nor is any

party seeking the assistance of a foreign country, 11 U.S.C. § 1501(b)(2); nor does the case involve a proceeding under the Bankruptcy Code pending concurrently with a foreign liquidation proceeding, 11 U.S.C. § 1501(b)(3); nor are foreign creditors seeking to commence an action under the Bankruptcy Code, 11 U.S.C. § 1501(b)(4). The instant non-bankruptcy action, brought in the District of Connecticut and governed by Connecticut law, is unconnected to any foreign or United States bankruptcy proceeding. Even assuming, *arguendo*, that the wind-up proceeding is the type of case that Chapter 15 would ordinarily cover, Chapter 15 does not apply when a court in the United States simply gives preclusive effect to factual findings from an otherwise unrelated foreign liquidation proceeding, as was done here.[2]

[2]    In a Rule 28(j) letter, TAL provided a copy of an order of the Superior Court of Connecticut, Judicial District of Hartford, dated May 31, 2016, holding that a complaint by ARC against Asia Pacific could only be enforced through Chapter 15. *See ARC Capital LLC v. Asia Pacific Ltd., et al*., No. HHD–CV–15–5040236–S (Conn. Super. Ct. May 31, 2016). Even assuming, *arguendo*, that the Superior Court's order was correctly decided, the facts here are distinguishable. In the state court proceeding, ARC sought the assistance of the Superior Court of Connecticut in enforcing an order that the Cayman court issued in connection with the wind-up proceeding, which awarded attorneys' fees to ARC and Haida Investments, Ltd. Because ARC requested the direct assistance of a court within the United States in enforcing an order issued in connection with a foreign liquidation proceeding, this is a scenario that arguably falls within the scope of Chapter 15. Here, by contrast, the Chugh Defendants argue only that the findings of fact made in the wind-up proceeding should be given preclusive effect. They do not seek the assistance of the District of Connecticut in enforcing any judgment of the Cayman court.

### II. Collateral Estoppel

 **[7]**    **[8]**    **[9]**    **[10]**    Next we turn to TAL's contention that the district court misapplied Connecticut's doctrine of collateral estoppel. The parties' briefs assume that Connecticut state law governs this case, "and such implied consent is ... sufficient to establish the applicable choice of law." **\*32** *Arch Ins. Co. v. Precision Stone, Inc*., 584 F.3d 33, 39 (2d Cir. 2009) (quotation marks and citations omitted). Collateral estoppel is a doctrine that "prohibits the relitigation of an issue when that issue was actually litigated and necessarily determined in a prior action between the same parties upon a different

4167

claim." *Lighthouse Landings, Inc. v. Conn. Light & Power Co.,* 300 Conn. 325, 343, 15 A.3d 601 (2011). An issue decided against a party in a prior proceeding may not be relitigated if: (1) it was "fully and fairly litigated in the first action"; (2) it was "actually decided"; and (3) the decision was "necessary to the judgment." *Id.* at 344, 15 A.3d 601 (quoting *Lyon v. Jones,* 291 Conn. 384, 406, 968 A.2d 416 (2009)). An issue is "necessarily determined" if "in the absence of a determination of the issue, the judgment could not have been validly rendered." *Id.* Connecticut adheres to the rule of collateral estoppel articulated in the Second Restatement of Judgments, Restatement (Second) of Judgments § 27 (1982), which, in addition to setting forth the above rule, also provides that "[i]f an issue has been determined, but the judgment is not dependent on the determination of the issue, the parties may relitigate the issue in a subsequent action. Findings on nonessential issues usually have the characteristics of dicta." *Lyon,* 291 Conn. at 406, 968 A.2d 416 (quotation marks and citations omitted).

 **[11]**   As the district court noted in its ruling on Asia Pacific's motion for reconsideration, TAL's affirmative defenses to Chugh's arguments to the Cayman court would have been dispositive of the wind-up proceeding. Had the Cayman court found to be credible any one of Kalra's several assertions that Chugh breached his fiduciary duty, it would have been required to dismiss the petition. Thus, the Cayman court was required to resolve each of Kalra's arguments in Chugh's favor before it could proceed to the merits of Chugh's petition.

TAL does not dispute that Kalra's affirmative defenses in the wind-up proceeding are based in substance on the same allegations made in its Third Amended Complaint. Because those defenses were necessarily resolved against TAL in the wind-up proceeding, and because they substantially correspond to the allegations contained in the operative complaint in this case, the district court properly applied the doctrine of collateral estoppel.

### III. Preclusive Effect of *In Rem* Proceedings

 **[12]**   TAL next contends that findings of fact made by the Cayman court cannot have preclusive effect in the district court proceeding because the wind-up proceeding was an *in rem* action, while the district court proceeding is an *in personam* action. This argument is meritless.

The Restatement (Second) of Judgments specifies that *in rem* proceedings do have preclusive effect in subsequent *in personam* suits where parties to the subsequent suits were

represented in the prior *in rem* proceeding.[3] We previously addressed this question in *Johnston v. Arbitrium (Cayman Islands) Handels AG,* 198 F.3d 342, 348 (2d Cir. 1999), where we held that  **\*33**  factual findings in an *in rem* suit in Delaware Chancery Court had preclusive effect under Delaware law on a subsequent *in personam* suit in federal district court.

[3]     *See* Restatement (Second) of Judgments § 30, cmt. d (1982) ("A valid judgment based only on jurisdiction over a thing is conclusive as to interests in the thing, even as to nonappearing parties (see Comment *a*). Such a judgment has no further conclusive effect except in accordance with the rules of issue preclusion set forth in §§ 27, 28. Under those rules, parties who have appeared in the action and litigated an issue as adversaries will normally be precluded from relitigating that issue if its determination was essential to the judgment.").

The cases TAL cites in its briefing do not support its position. TAL argues that the United States Supreme Court's decision in *Myers v. International Trust Co.,* 263 U.S. 64, 44 S.Ct. 86, 68 L.Ed. 165 (1923) holds that *in rem* proceedings cannot have a preclusive effect on subsequent *in personam* suits. But *Myers* actually stands for the opposite proposition. TAL quotes the following language from *Myers*: "An adjudication of bankruptcy, or a discharge therefrom, is a judgment in rem and is binding on, and res judicata as to, all the world, only in respect of the status of the bankrupt, and is not conclusive as to the findings of fact or subsidiary questions of law on which it is based ...," but omits the rest of the sentence: "*except as between parties to the proceedings or privies thereto.*" 263 U.S. at 73, 44 S.Ct. 86 (emphasis added).[4]

[4]     TAL argues that the exception in *Myers* only applies when the parties to the prior *in rem* suit were also parties to an "actual, distinct, and separate *in personam* suit" connected to the liquidation proceeding. **BB 43**. However, the opinion in *Myers* does not state such a limitation. *See* 263 U.S. at 73–74, 44 S.Ct. 86. In any event, it is the Connecticut law of collateral estoppel that governs this suit, and TAL has not cited any Connecticut case in support of this proposition.

The only Connecticut case that TAL cites is *Wood v. Watkinson,* 17 Conn. 500 (1846), from which it extracts the following quotation:

> So, if a judgment operates in the state where it was rendered only *in rem*, it will not elsewhere be enforced *in personam*. It results conclusively from this principle, or is rather

involved in it, that if a judgment in a state where it is recovered, has not the effect of binding personally the defendants ... in the suit in which it was rendered, no greater effect will be given to it in any other state where it is endeavoured to be enforced.

*Id.* at 506. But *Wood* simply holds that if a judgment rendered in one state is only binding *in rem*, then the Full Faith and Credit Clause, U.S. Const., art. IV, sec. 1, does not require other state courts to enforce that judgment *in personam*, since the Constitution does not require a state to give "greater effect" to an out-of-state judgment "than [that judgment] would have in the state where it was rendered." *Wood*, 17 Conn. at 504–05. *Wood* does not hold that *in rem* proceedings can never have preclusive effect in a subsequent *in personam* suit, and indeed does not address the question of issue preclusion at all.

## IV. Privity

[13]    [14]    TAL also argues that the factual findings of the Cayman court should not be given preclusive effect because the parties to the district court proceeding were not the same as, or in privity with, the parties in the wind-up proceeding. A party can be estopped from relitigating an issue that was decided adversely to him in a prior litigation only if the issue was litigated by that party, or by a party with substantially similar legal interests. *Mazziotti v. Allstate Ins. Co.*, 240 Conn. 799, 814, 695 A.2d 1010 (1997). This requirement ensures "that the interests of the party against whom collateral estoppel ... is being asserted have been adequately represented ... at the initial proceeding." *Id.* at 813, 695 A.2d 1010 (quoting *Aetna Cas. & Sur. Co. v. Jones,* 220 Conn. 285, 304, 596 A.2d 414 (1991)). Under Connecticut law, "[t]here is no prevailing definition **\*34** of privity to be followed automatically in every case." *Id.* A court "focuses on the functional relationships of the parties." *Id.* at 814, 695 A.2d 1010 (noting that privity is, "in essence, a shorthand statement for the principle that collateral estoppel should be applied only when there exists such an identification in interest of one person with another as to represent the same legal rights so as to justify preclusion.").

[15]    TAL's arguments are unpersuasive. First, TAL suggests that the Chugh Defendants are not "entitled to the benefit" of the windup proceeding because they are not in privity with the parties who filed the wind-up petition in the Cayman court. This argument is irrelevant. Connecticut has followed most other jurisdictions in abandoning the "mutuality of parties" rule, which held that both parties in a subsequent litigation needed to be the same as, or in privity with, the parties in

a prior litigation in order for collateral estoppel to apply. Under current Connecticut law, only the party against whom collateral estoppel is asserted (in this case, TAL) must have been represented in both proceedings. *Aetna Cas. & Sur. Co.*, 220 Conn. at 302, 596 A.2d 414.

[16]    TAL does not make any specific argument to the effect that its interests were not adequately represented in the wind-up proceeding. Indeed, TAL has not disputed that it is in privity with Asia Pacific, which was a party to the wind-up proceeding. This concession alone defeats TAL's privity argument. *See id.* at 303, 596 A.2d 414 ("Collateral estoppel may be invoked against a party to a prior adverse proceeding *or against those in privity with that party*.") (emphasis added). Moreover, Asia Pacific's defenses asserted in the wind-up proceeding were based entirely on alleged violations of TAL's rights, and those same purported violations now form the basis of TAL's Third Amended Complaint. While the parties in the wind-up proceeding and the district court proceeding are not identical, they are nearly so, and TAL has made no effort in this case to show that its interests were not identical to those of Asia Pacific. We therefore agree with the district court that TAL is sufficiently aligned with the respondents in the wind-up proceeding for collateral estoppel to apply.

## V. Comity

[17]    [18]    Finally, we address TAL's argument that the district court erred in granting comity to the judgment of the Cayman court because doing so was contrary to United States "national policy." In a diversity action, state substantive law governs a court's application of comity principles. *See, e.g.*, *Drexel Burnham Lambert Grp. Inc. v. Galadari*, 777 F.2d 877, 880 (2d Cir. 1985). Connecticut adheres to "common-law comity principles," which "compel" a "rule of deference" to foreign judgments in most cases. *Turner v. Frowein*, 253 Conn. 312, 352, 752 A.2d 955 (2000). Judgments "of courts of foreign countries are recognized in the United States because of the comity due to the courts and judgments of one nation from another." *Id.* at 352, 752 A.2d 955 (quoting *Litvaitis v. Litvaitis,* 162 Conn. 540, 544, 295 A.2d 519 (1972)).

[19]    TAL is correct that a court is not required to grant comity to a foreign judgment where doing so would be contrary to the public policy of the state or nation called upon to give it effect. *See Litvaitis,* 162 Conn. at 544, 295 A.2d 519; *cf. Cunard S.S. Co., Ltd. v. Salen Reefer Servs. AB*, 773 F.2d 452, 457 (2d Cir. 1985). However, TAL's brief provides no argument, in law or policy, for its contention that comity would be inappropriate here. Other courts have granted

comity to Cayman Island judgments. *See, e.g.,* **\*35** *In re Nat'l Warranty Ins. Risk Retention Grp.*, 384 F.3d 959, 963 (8th Cir. 2004) (affirming bankruptcy court's recognition of comity with Cayman Islands court administering liquidation proceedings); *Cybernaut Capital Mgmt. Ltd. v. Partners Grp. Access Secondary 2008, L.P.*, No. 13 CIV. 5380 WHP, 2013 WL 4413754, at \*3 (S.D.N.Y. Aug. 7, 2013) (affording comity to Cayman Islands judgment as not inconsistent with United States public policy). Given the strong presumption in favor of granting comity to foreign judgments, TAL's threadbare arguments on this point are unavailing.

 **[20]**    **[21]**   Lastly, TAL unpersuasively argues that Chapter 15 of the Bankruptcy Code preempts the state law doctrine of comity. A federal statute may preempt state law either expressly or by implication. Express preemption occurs when "Congress ... withdraw[s] specified powers from the States by enacting a statute containing an express preemption provision." *Wurtz v. Rawlings Co., LLC*, 761 F.3d 232, 238 (2d Cir. 2014), *cert. denied*, ––– U.S. ––––, 135 S.Ct. 1400, 191 L.Ed.2d 360 (2015) (quoting *Arizona v. United States*, 567 U.S. 387, 132 S.Ct. 2492, 2500–01, 183 L.Ed.2d 351 (2012)). TAL fails to cite any provision of Chapter 15 that expressly preempts the state law of comity. The one statute TAL does cite, 28 U.S.C. § 1334(c)(1), concerns the discretionary right of district courts to abstain from hearing core claims under Title 11 in the interest of comity with state courts and is inapposite here. *See, e.g.,* *In re Petrie Retail, Inc.*, 304 F.3d 223, 232 (2d Cir. 2002).

 **[22]**    **[23]**   A federal statute preempts state law by implication when Congress intends to "occupy the field" and when "the challenged state law stands as an obstacle to the accomplishment ... of the full purposes and objectives of Congress." *Crosby v. NFTC*, 530 U.S. 363, 372–73, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000) (quotation mark and internal citations omitted). TAL does not make any specific arguments regarding implied preemption, but such an argument would be unavailing in any case. Given the very narrow purpose of Chapter 15, it is clear that Congress did not intend to completely preempt state law regarding the application of the common law of comity. Such a result would do nothing to advance the stated objectives of the statute.

## CONCLUSION

We have considered TAL's remaining arguments, and we find them meritless. We therefore AFFIRM the judgment of the district court.

## All Citations

846 F.3d 22, 77 Collier Bankr.Cas.2d 266, 63 Bankr.Ct.Dec. 157

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 77

Page 1

701 F.3d 1031, 57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386
**(Cite as: 701 F.3d 1031)**

▷

United States Court of Appeals,
Fifth Circuit.
In the Matter of VITRO S.A.B. DE C.V., Debtor.
Ad Hoc Group of Vitro Noteholders, Appellant,
v.
Vitro S.A.B. de C.V., Appellee.
In the Matter of Vitro S.A.B. de CV, Debtor.
Vitro S.A.B. de C.V., Appellant,
v.
Ad Hoc Group of Vitro Noteholders; Wilmington Trust, National Association, solely in its capacity as indenture trustee; U.S. Bank National Association, Appellees.
In the Matter of Vitro S.A.B. de C.V., Debtor.
Fintech Investments, Limited, Appellant,
v.
Ad Hoc Group of Vitro Noteholders; Wilmington Trust, National Association, solely in its capacity as indenture trustee; U.S. Bank National Association, Appellees.

Nos. 12–10542, 12–10689 and 12–10750.
Nov. 28, 2012.

**Background:** Mexican holding company filed Chapter 15 petition for recognition of its Mexican bankruptcy proceeding as foreign main proceeding. Ad hoc group of noteholders objected to petition. The United States Bankruptcy Court for the Northern District of Texas, Harlin DeWayne Hale, J., granted petition, and noteholders appealed. The District Court, A. Joe Fish, Senior District Judge, 470 B.R. 408, affirmed, and noteholders appealed. In separate proceeding, foreign representatives moved for post-recognition relief in nature of enforcement of judgment entered by Mexican court, which not only modified debts owed by foreign debtor, but novated and extinguished guarantees of foreign debtor's indebtedness by its nondebtor subsidiaries. The Bankruptcy Court, Harlin DeWayne Hale, J., 473 B.R. 117, denied motion, and foreign representatives appealed directly to the Court of Appeals, where appeal was consolidated with prior appeal by noteholders.

**Holdings:** The Court of Appeals, King, Circuit Judge, held that:

(1) individuals were not disqualified from serving as "foreign representatives" of company that was the subject of Mexican reorganization proceeding merely because they were designated as representatives by company's board of directors, and not officially appointed by Mexican court;

(2) as matter of apparent first impression, court had to consider availability of post-recognition relief first under provision of Chapter 15 authorizing "any appropriate relief," before employing provision authorizing "additional assistance";

(3) unavailability of non-debtor releases in reorganization cases under United States bankruptcy law did not necessarily mean that foreign representatives of debtor that was reorganizing under Mexican law could not obtain enforcement of such releases; but

(4) bankruptcy court did not abuse its discretion in denying enforcement motion.

Affirmed.

West Headnotes

**[1] Bankruptcy 51 ⚷3782**

51 Bankruptcy
  51XIX Review
    51XIX(B) Review of Bankruptcy Court
      51k3782 k. Conclusions of law; de novo review. Most Cited Cases

**Bankruptcy 51 ⚷3786**

51 Bankruptcy
  51XIX Review
    51XIX(B) Review of Bankruptcy Court
      51k3785 Findings of Fact
        51k3786 k. Clear error. Most Cited Cases

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

4172

701 F.3d 1031, 57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386
**(Cite as: 701 F.3d 1031)**

Court of Appeals reviews district court's affirmance of bankruptcy court decision by applying same standard of review that district court applied, and reviews bankruptcy court's findings of fact for clear error and its conclusions of law, and determinations on mixed questions of law and fact, de novo. Fed.Rules Bankr.Proc.Rule 8013, 11 U.S.C.A.

**[2] Bankruptcy 51 ⟵3782**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3782 k. Conclusions of law; de novo review. Most Cited Cases

**Bankruptcy 51 ⟵3786**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3785 Findings of Fact
                51k3786 k. Clear error. Most Cited Cases

On direct appeal from bankruptcy court, the Court of Appeals reviews bankruptcy court's findings of fact for clear error and its conclusions of law, and determinations on mixed questions of law and fact, de novo. Fed.Rules Bankr.Proc.Rule 8013, 11 U.S.C.A.

**[3] Bankruptcy 51 ⟵3784**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3784 k. Discretion. Most Cited Cases

On appeal in bankruptcy case, the Court of Appeals reviews denial of declaratory or injunctive relief for abuse of discretion.

**[4] Bankruptcy 51 ⟵3784**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court

51k3784 k. Discretion. Most Cited Cases

Bankruptcy court's decision whether to grant comity to foreign proceedings is reviewed for abuse of discretion.

**[5] Bankruptcy 51 ⟵2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

Central to Chapter 15 is concept of comity.

**[6] Courts 106 ⟵512**

106 Courts
    106VII Concurrent and Conflicting Jurisdiction
        106VII(C) Courts of Different States or Countries
            106k512 k. Comity between courts of different countries. Most Cited Cases

**International Law 221 ⟵10.1**

221 International Law
    221k10.1 k. Public policy and comity in general. Most Cited Cases

"Comity" is the recognition which one nation allows within its territory to legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to rights of its own citizens, or of other persons who are under protections of its laws.

**[7] International Law 221 ⟵10.1**

221 International Law
    221k10.1 k. Public policy and comity in general. Most Cited Cases

Comity is not rule of law, but one of practice, convenience, and expediency.

**[8] Bankruptcy 51 ⟵2341**

51 Bankruptcy
    51III The Case

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.3d 1031, 57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386
**(Cite as: 701 F.3d 1031)**

51III(H) Cases Ancillary to Foreign Proceedings

51k2341 k. In general. Most Cited Cases

Chapter 15 provides for broad range of relief, including ability to sue and be sued in United States courts, to apply directly to United States court for relief, to commence non-Chapter 15 case, and to intervene in any United States case to which foreign debtor is party.

**[9] Bankruptcy 51 ⟨⟩2341**

51 Bankruptcy
51III The Case
51III(H) Cases Ancillary to Foreign Proceedings

51k2341 k. In general. Most Cited Cases

It is not necessary that the result achieved in foreign bankruptcy proceeding be identical to that which would be had in the United States in order for court to grant relief in Chapter 15 case ancillary to foreign bankruptcy proceeding; it is sufficient if the result is comparable. 11 U.S.C.A. §§ 1507(a), 1521(a).

**[10] Bankruptcy 51 ⟨⟩2341**

51 Bankruptcy
51III The Case
51III(H) Cases Ancillary to Foreign Proceedings

51k2341 k. In general. Most Cited Cases

In order for court to grant relief in Chapter 15 case ancillary to foreign bankruptcy proceeding, foreign laws need not be identical to their counterparts under laws of the United States; it is enough that they are not repugnant to United States laws and policies. 11 U.S.C.A. §§ 1507(a), 1521(a).

**[11] Bankruptcy 51 ⟨⟩2341**

51 Bankruptcy
51III The Case
51III(H) Cases Ancillary to Foreign Proceedings

51k2341 k. In general. Most Cited Cases

Whether any relief should be granted under Chapter 15 is separate question from whether foreign proceeding will be recognized by United States bankruptcy court.

**[12] Bankruptcy 51 ⟨⟩2341**

51 Bankruptcy
51III The Case
51III(H) Cases Ancillary to Foreign Proceedings

51k2341 k. In general. Most Cited Cases

Federal court's recognition of representatives appointed in course of foreign bankruptcy or liquidation proceeding is matter of comity; it is an acknowledgment of validity of foreign proceeding.

**[13] Bankruptcy 51 ⟨⟩2341**

51 Bankruptcy
51III The Case
51III(H) Cases Ancillary to Foreign Proceedings

51k2341 k. In general. Most Cited Cases

Duly recognized foreign representative has capacity to sue and be sued in the United States and to apply directly to United States court for relief, and is entitled to the comity and cooperation of all United States courts. 11 U.S.C.A. § 1509.

**[14] Bankruptcy 51 ⟨⟩2341**

51 Bankruptcy
51III The Case
51III(H) Cases Ancillary to Foreign Proceedings

51k2341 k. In general. Most Cited Cases

Statutory requirements for recognition of foreign insolvency proceeding as either a foreign main, or foreign nonmain, proceeding are to be strictly construed in keeping with fact that recognition is not rubber stamp exercise, and even in absence of objection, courts must undertake their own jurisdictional analysis and grant or deny recognition under Chapter 15 as the facts of each case warrant. 11 U.S.C.A. § 1517.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.3d 1031, 57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386
**(Cite as: 701 F.3d 1031)**

**[15] Bankruptcy 51 ☞2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

Individuals were not disqualified from serving as "foreign representatives" of company that was the subject of Mexican reorganization proceeding merely because they were designated as representatives by company's board of directors, and not officially appointed by Mexican court, especially where Mexican court had power to enjoin these individuals from acting as foreign representatives but chose not to do so and thereby gave the representatives its tacit approval. 11 U.S.C.A. § 101(24).

**[16] Statutes 361 ☞1091**

361 Statutes
    361III Construction
        361III(B) Plain Language; Plain, Ordinary, or Common Meaning
            361k1091 k. In general. Most Cited Cases
    (Formerly 361k188)

Courts interpret statutes according to their plain meaning.

**[17] Bankruptcy 51 ☞2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

Representatives appointed by company that was in process of reorganizing its business in concurso proceeding brought under Mexican law, as representatives of foreign debtor that retained broad control over its affairs pursuant to provisions of Mexican law, had requisite administrative power over reorganization of debtor's business, as required for them to qualify as "foreign representatives," regardless of whether company possessed all the powers accorded to Chapter 11 debtor-

in-possession under United States bankruptcy law. 11 U.S.C.A. § 101(24).

**[18] International Law 221 ☞10.1**

221 International Law
    221k10.1 k. Public policy and comity in general. Most Cited Cases

In applying principles of comity, court takes into account the interests of United States, interests of the foreign state or states involved, and mutual interests of family of nations in just and efficiently functioning rules of international law.

**[19] Bankruptcy 51 ☞2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

Chapter 15 provides courts with broad, flexible rules to fashion relief appropriate for effectuating its objectives in accordance with comity.

**[20] Bankruptcy 51 ☞2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

Mere fact that foreign representative requests relief that would be available under law of the foreign proceeding, but not in the United States, is not grounds for denying comity.

**[21] Bankruptcy 51 ☞2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

In deciding whether to grant post-recognition relief to foreign representatives of debtor that is subject of foreign main, or of foreign nonmain, pro-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.3d 1031, 57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386
**(Cite as: 701 F.3d 1031)**

ceeding pending in another country, when relief requested is not a type of relief specifically identified as being among types of "any appropriate relief" available upon recognition, bankruptcy court should first consider whether relief requested comes within scope of broad statutory phrase "any appropriate relief" by interpreting that phrase as referring to relief available under Chapter 15's predecessor, § 304; it is only if court determines that requested relief was not formerly available under § 304 and not currently provided for under United States law that it should consider whether the relief would be appropriate as "additional assistance" under separate provision of Chapter 15. 11 U.S.C.A. §§ 1507, 1521(a); 11 U.S.C.(2000 Ed.) § 304.

**[22] Bankruptcy 51 ⟿2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases
   Relief under section of Chapter 15 authorizing "additional assistance" to foreign representative if recognition is granted is of nature more extraordinary than that provided under separate section of Chapter 15 authorizing court to grant "any appropriate" post-recognition relief, including seven specifically identified categories of relief, and as result, test for obtaining "additional assistance" under this earlier section of Chapter 15 is more rigorous. 11 U.S.C.A. §§ 1507, 1521.

**[23] Bankruptcy 51 ⟿2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases
   While section of Chapter 15 authorizing "additional assistance" to foreign representative if recognition is granted is intended to be "catchall" provision, it cannot be used to circumvent restrictions present in other parts of Chapter 15, nor to

provide relief otherwise available under other provisions. 11 U.S.C.A. § 1507.

**[24] Bankruptcy 51 ⟿2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases
   Foreign representatives, in seeking enforcement of plan of reorganization that was previously approved in concurso proceeding under Mexican law, which provided for discharge of its non-debtor subsidiaries' obligations on their guarantees of foreign debtor's indebtedness to noteholders, were not merely seeking to "stay the commencement or continuation" of "proceeding concerning the debtor's assets, rights, obligations or liabilities," or to "entrust the distribution of all or part of the debtor's assets," but were seeking to permanently enjoin lawsuits against subsidiaries and to affect their assets, so that relief was not among that specifically identified as being included in the "any appropriate relief" available to foreign representatives following recognition of Mexican proceeding. 11 U.S.C.A. § 1521(a)(1), (b).

**[25] Bankruptcy 51 ⟿2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases
   Foreign representatives, in seeking enforcement of plan of reorganization that was previously approved in concurso proceeding under Mexican law, which provided for discharge of its non-debtor subsidiaries' obligations on their guarantees of foreign debtor's indebtedness to noteholders, were not seeking relief which was previously available under predecessor law to Chapter 15, or which was currently provided for under United States law, as being in nature of non-consensual, non-debtor release through bankruptcy; accordingly, relief was avail-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.3d 1031, 57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386
**(Cite as: 701 F.3d 1031)**

able, if at all, only under section of Chapter 15 authorizing "additional assistance" to foreign representatives. 11 U.S.C.A. §§ 1507, 1521(a).

**[26] Bankruptcy 51 ⚷2341**

51 Bankruptcy
 51III The Case
  51III(H) Cases Ancillary to Foreign Proceedings
   51k2341 k. In general. Most Cited Cases

Even assuming that relief sought by foreign representatives of debtor that was reorganizing its business in concurso proceeding under Mexican law, being in nature of non-consensual release of subsidiaries that had not filed for bankruptcy on their guarantees of debtor's indebtedness, was available under section of Chapter 15 authorizing court to grant "any appropriate" post-recognition relief, bankruptcy court did not abuse its discretion in denying such relief, upon determination that concurso plan did not provide for appropriate balance among interests of debtor, its creditors, and its subsidiaries/guarantors. 11 U.S.C.A. §§ 1521(a), 1522.

**[27] Bankruptcy 51 ⚷2341**

51 Bankruptcy
 51III The Case
  51III(H) Cases Ancillary to Foreign Proceedings
   51k2341 k. In general. Most Cited Cases

Unavailability of non-debtor releases in reorganization cases under United States bankruptcy law did not necessarily mean that foreign representatives of debtor that was reorganizing under Mexican law could not obtain enforcement of such releases, which were included in its concurso plan, under section of Chapter 15 authorizing "additional assistance" to foreign representative, which was intended to provide relief not otherwise available under the Bankruptcy Code or United States law. 11 U.S.C.A. § 1507.

**[28] Bankruptcy 51 ⚷2341**

51 Bankruptcy
 51III The Case
  51III(H) Cases Ancillary to Foreign Proceedings
   51k2341 k. In general. Most Cited Cases

Bankruptcy court did not abuse its discretion in denying, as form of "additional assistance" allegedly available following recognition of reorganization proceedings that were pending in Mexico, foreign representatives' request for entry of order enforcing the concurso plan previously approved by Mexican court, which purported to release debtor's subsidiaries of any liability that they otherwise had on their guarantees of debtor's indebtedness, despite fact that subsidiaries had not themselves filed for bankruptcy, that affected creditors had not consented to plan, and that affected creditors were not given any alternative means to recover and would receive only tiny fraction of what was owed to them. 11 U.S.C.A. § 1507(b)(4).

**[29] Bankruptcy 51 ⚷2341**

51 Bankruptcy
 51III The Case
  51III(H) Cases Ancillary to Foreign Proceedings
   51k2341 k. In general. Most Cited Cases

Chapter 15's "public policy" exception is narrow provision, that is intended to be invoked only under exceptional circumstances concerning matters of fundamental importance for the United States. 11 U.S.C.A. § 1506.

**[30] Bankruptcy 51 ⚷2341**

51 Bankruptcy
 51III The Case
  51III(H) Cases Ancillary to Foreign Proceedings
   51k2341 k. In general. Most Cited Cases

Key determination required of court to decide whether relief under Chapter 15 is barred on "public policy" grounds is whether the procedures used in foreign proceeding meet fundamental standards of fairness applicable in the United States. 11

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.3d 1031, 57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386

**(Cite as: 701 F.3d 1031)**

U.S.C.A. § 1506.

**[31] Bankruptcy 51 ⟲2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

In deciding whether Chapter 15's narrow "public policy" exception applies as bar to relief, bankruptcy court need not engage in independent determination on propriety of individual acts of foreign court. 11 U.S.C.A. § 1506.

**[32] Bankruptcy 51 ⟲2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

Even the absence of certain procedural or constitutional rights in foreign proceeding will not itself be a bar to grant of relief in a Chapter 15 case ancillary to foreign proceeding under Chapter 15's narrow "public policy" exception. 11 U.S.C.A. § 1506.

**\*1036** Jeff Philipp Prostok, Forshey & Prostok, L.L.P., Fort Worth, TX, Allan S. Brilliant, Dechert, L.L.P., New York City, G. Eric Brunstad, Jr. (argued), Matthew Joseph Delude, Collin O'Connor Udell, Dechert, L.L.P., Hartford, CT, for Ad Hoc Group of Vitro Noteholders.

Andrew M. Leblanc (argued), Milbank, Tweed, Hadley & McCloy, L.L.P., Washington, DC, David Mark Bennett, Katharine Battaia Clark, Cassandra Ann Sepanik, Thompson & Knight, L.L.P., Dallas, TX, Alan J. Stone, Jeremy C. Hollembeak, Milbank, Tweed, Hadley & McCloy, L.L.P., New York City, for Vitro S.A.B. de CV.

Kevin K. Russell, Goldstein & Russell, P.C., Washington, DC, for Government of the United Mexican States, Amicus Curiae.

Jeff Philipp Prostok, Forshey & Prostok, L.L.P., Fort Worth, TX, Sanford M. Litvack, Hogan Lovells US, L.L.P., New York City, for Wilmington Trust, Nat. Ass'n.

Jason S. Brookner, Cameron Phair Pope, Andrews Kurth, L.L.P., Houston, TX, Jeanne P. Darcey, Kevin M. Colmey, Richard Hiersteiner, Amy A. Zuccarello, Sullivan & Worcester, Boston, MA, Jeff Philipp Prostok, Forshey & Prostok, L.L.P., Fort Worth, TX, for U.S. Bank Nat. Ass'n.

Lindsee P. Granfield (argued), Cleary, Gottlieb, Steen & Hamilton, L.L.P., New York City, Briana Leigh Cioni, Sander L. Esserman, Stutzman, Bromberg, Esserman & Plifka, P.C., Dallas, TX, for Fintech Investments, Limited.

Appeals from the United States Bankruptcy Court for the Northern District of Texas.

Before KING, SMITH and BARKSDALE, Circuit Judges.

KING, Circuit Judge:

Consolidated before us are three cases relating to the Mexican reorganization proceeding of Vitro S.A.B. de C.V., a corporation organized under the laws of Mexico. The Ad Hoc Group of Vitro Noteholders, a group of creditors holding a substantial amount of Vitro's debt, appeal from the district court's decision affirming the bankruptcy court's recognition of the Mexican reorganization proceeding and Vitro's appointed foreign representatives under Chapter 15 of the Bankruptcy Code. Vitro and one of its largest third-party creditors, Fintech Investments, Ltd., each appeals directly to this court the bankruptcy court's decision denying enforcement of the Mexican reorganization plan because the plan would extinguish the obligations of non-debtor guarantors. For the following reasons, we affirm the district court's judgment recognizing the Mexican reorganization proceeding and the appointment of the foreign representatives. We also affirm the bankruptcy court's order denying enforcement of

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.3d 1031, 57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386
**(Cite as: 701 F.3d 1031)**

the Mexican reorganization plan.

### I. FACTUAL AND PROCEDURAL BACK-GROUND

**A. Vitro S.A.B. de C.V. and the 2008 Financial Crisis**

Vitro S.A.B. de C.V. ("Vitro") is a holding company that, together with its subsidiaries, constitutes the largest glass manufacturer in Mexico. Originally incorporated**\*1037** in 1909, Vitro operates manufacturing facilities in seven countries, as well as distribution centers throughout the Americas and Europe, and exports its products to more than 50 countries worldwide. Vitro employs approximately 17,000 workers, the majority of whom work in Mexico. Between February 2003 and February 2007, Vitro borrowed a total of approximately $1.216 billion, predominately from United States investors. Vitro's indebtedness is evidenced by three series of unsecured notes. The first series was issued on October 22, 2003 and consisted of $225 million aggregate principal amount of 11.75% notes due 2013; the second and third series were issued on February 1, 2007, and consisted of $300 million of 8.625% notes due 2012 and $700 million of 9.125% notes due 2017 (collectively the "Old Notes").

Payment in full of the Old Notes was guaranteed by substantially all of Vitro's subsidiaries (the "Guarantors"). The guaranties provide that the obligations of the Guarantors will not be released, discharged, or otherwise affected by any settlement or release as a result of any insolvency, reorganization, or bankruptcy proceeding affecting Vitro. The guaranties further provide that they are to be governed and construed under New York law and include the Guarantors' consent to litigate any disputes in New York state courts. The guaranties state that "any rights and privileges that [Guarantors] might otherwise have under the laws of Mexico shall not be applicable to th[e] Guarant[ies]."

In the latter half of 2008, Vitro's fortunes took a turn for the worse when the global financial crisis significantly reduced demand for its products. Vitro's operating income declined by 36.8% from 2007 to 2008, and an additional 22.3% from 2008 to 2009. In February of 2009, Vitro announced its intention to restructure its debt and stopped making scheduled interest payments on the Old Notes.

**B. Vitro Restructures Its Obligations**

After Vitro stopped making payments on the Old Notes, it entered into a series of transactions restructuring its debt obligations. On December 15, 2009, Vitro entered into a sale leaseback transaction with Fintech Investments Ltd. ("Fintech"), one of its largest third-party creditors, holding approximately $600 million in claims (including $400 million in Old Notes). Under the terms of this agreement, Fintech paid $75 million in exchange for the creation, in its favor, of a Mexican trust composed of real estate contributed by Vitro's subsidiaries. This real estate was then leased to one of Vitro's subsidiaries to continue normal operations. The agreement also gave Fintech the right to acquire 24% of Vitro's outstanding capital or shares of a sub-holding company owned by Vitro in exchange for transferring Fintech's interest in the trust back to Vitro or its subsidiaries.

Partly as a result of these transactions, Vitro generated a large quantity of intercompany debt. Previously, certain of Vitro's operating subsidiaries directly and indirectly owed Vitro an aggregate of approximately $1.2 billion in intercompany debt. As a result of a series of financial transactions in December of 2009, that debt was wiped out and, in a reversal of roles, Vitro's subsidiaries became creditors to which Vitro owed an aggregate of approximately $1.5 billion in intercompany debt. Despite requests by holders of Old Notes, Vitro did not disclose these transactions. In August of 2010, Fintech purchased claims by five banks holding claims against Vitro and its subsidiaries and extended the maturity of various promissory notes issued by Vitro's subsidiaries. Pursuant**\*1038** to a "Lock-up Agreement" completed between Fintech and Vitro, Fintech also agreed not to transfer any debt it held in Vitro unless such transfer was in line

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.3d 1031, 57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386
**(Cite as: 701 F.3d 1031)**

with the terms of that agreement.

Only in October of 2010, approximately 300 days after completing the transactions with its subsidiaries, did Vitro disclose the existence of the subsidiary creditors. This took the transactions outside Mexico's 270–day "suspicion period," during which such transactions would be subject to additional scrutiny before a business enters bankruptcy.

**C. Vitro Commences a *Concurso* Proceeding in Mexican Court**

Between August 2009 and July 2010, Vitro engaged in negotiations with its creditors and submitted three proposals for reorganization. Each was rejected by creditors. After the last proposal, the Ad Hoc Group of Vitro Noteholders (the "Noteholders"), a group of creditors holding approximately 60% of the Old Notes, issued a press release "strongly recommend[ing]" that all holders of the Old Notes deny consent to any reorganization plan that the Noteholders had not approved. On November 1, 2010, Vitro disclosed its intention to commence a voluntary reorganization proceeding in Mexico, together with a pre-packaged plan of reorganization. On December 13, 2010, Vitro initiated in a Mexican court a *concurso* proceeding under the Mexican Business Reorganization Act, or *Ley de Concursos Mercantiles* ("LCM").[FN1]

> [FN1.] A *concurso* proceeding is the Mexican equivalent of a voluntary judicial reorganization proceeding under United States law.

The Mexican court initially rejected Vitro's filing on January 7, 2011, because Vitro could not reach the 40% creditor approval threshold necessary to file a *concurso* petition without relying on intercompany claims held by its subsidiaries. On April 8, 2011, that decision was overruled on appeal and Vitro was then declared to be in bankruptcy, or *concurso mercantil.* Pursuant to Mexican law, Javier Luis Navarro Velasco was appointed as *conciliador.*[FN2]

> [FN2.] A *conciliador* is an individual appointed by the *Instituto Federal de Especialistas de Concursos Mercantiles* —the Federal Institute of Specialists of Insolvency Procedures—to serve as a quasi-judicial officer with certain responsibilities in a *concurso* proceeding, including filing an initial list of recognized claims, mediating a plan, and, if necessary to protect the debtor's estate, managing the debtor's business. A *conciliador's* pay is based on the number of recognized claims in a *concurso* proceeding, a fact the Noteholders argue encouraged him to recognize intercompany claims. The Noteholders also point out that, in this case, the *conciliador's* law firm provided legal services to Vitro since 2001, and that the *conciliador* retained, as his financial advisor, a firm that also acted as Vitro's internal auditor.

The *conciliador* was tasked with filing an initial list of recognized claims and mediating the creation of a reorganization plan. The *conciliador* did so, and on August 5, 2011, filed a proposed final list of recognized creditors, which included those subsidiaries holding intercompany debt. The *conciliador* then negotiated terms of a reorganization plan between Vitro and the recognized creditors to submit to the Mexican court for approval. Throughout this process, the parties were apparently in frequent contact with the Mexican court on an ex parte basis.

**1. Terms of the *Concurso* Plan**

On December 5, 2011 the *conciliador* submitted to the Mexican court a proposed restructuring plan (the "*Concurso* plan" or "Plan") substantially identical to the one Vitro had originally proposed. Under the **\*1039** terms of the Plan, the Old Notes would be extinguished and the obligations owed by the Guarantors would be discharged. Specifically, the Plan provides that:

> [O]nce this Agreement is approved by the Court ... this Agreement ... will substitute, pay, replace

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.3d 1031, 57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386
**(Cite as: 701 F.3d 1031)**

and terminate the above obligations, instruments, securities, agreements and warranties in which were agreed upon Approved Credits and, therefore ... will terminate personal guarantees granted a third and/or direct and indirect subsidiaries [sic] of Vitro with regards to the obligations, instruments, securities and agreements that gave rise to the Approved Credits.

The Plan further provides that Vitro would issue new notes payable in 2019 (the "New 2019 Notes"), with a total principal amount of $814,650,000. The New 2019 Notes would be issued to Vitro's third-party creditors (not including those subsidiaries holding intercompany debt, who would forgo their *pro rata* share of the Plan's consideration and instead receive other promissory notes). The New 2019 Notes would bear a fixed annual interest rate of 8.0%, but would "not have ... payments of principal during the first 4 (years) years [sic] ... and from the fifth year of operation and until the seventh year ... will have repayments or payments of [a] total principal amount of $23,960,000.00 USD ... payable semiannually on June 30 and December 31 of each year and the remaining balance upon due date." The New 2019 Notes would also "be unconditionally and supportively guaranteed for each of the Guarantors." Payment under the New 2019 Notes would go into a third-party payment trust, which would deliver payment to those creditors who had consented to the Plan. A second trust would be created to pay non-consenting creditors upon their written agreement to the terms of the Plan. In addition to the New 2019 Notes, Vitro would also provide to the holders of the Old Notes $95,840,000 aggregate principal amount of new mandatory convertible debt obligations ("MCDs") due in 2015 with an interest rate of 12%, convertible into 20% equity in Vitro if not paid at full maturity. Finally, the Plan also provided cash consideration of approximately $50 per $1000 of principal of Old Notes.

**2. The *Concurso* Plan is Approved**

Under Mexican law, approval of a reorganization plan requires votes by creditors holding at least 50% in aggregate principal amount of unsecured debt. As distinguished from United States law, Mexico does not divide unsecured creditors into interest-aligned classes, but instead counts the votes of all unsecured creditors, including insiders, as a single class. As a result, although creditors holding 74.67% in aggregate principal amount of recognized claims voted in favor of the plan, over 50% of all voting claims were held by Vitro's subsidiaries in the form of intercompany debt. The 50% approval threshold could not have been met without the subsidiaries' votes. After the initial approval, the LCM provides a period during which objecting creditors can veto the plan. A veto requires agreement by recognized creditors holding a minimum of 50% in aggregate principal amount of debt or by recognized creditors numbering at least 50% of all unsecured creditors. As only 26 of the 886 recognized creditors sought to veto the *Concurso* plan, and as those creditors held less than 50% of the aggregate recognized debt, the veto failed.[FN3]

> **FN3.** Of the creditors resisting veto of the Plan, approximately 360 were Vitro employees to each of whom Vitro had issued a note in the amount of $1,000 prior to the Plan's filing.

The Mexican court approved the *Concurso* plan on February 3, 2012. On February 23, 2012, the Plan went into effect, **\*1040** and Vitro issued New 2019 Notes and MCDs and paid restructuring cash into two third-party payment trusts, one for consenting creditors and the other for non-consenting creditors. The *Concurso* plan approval order has been appealed, and such appeal has been accepted by, and is currently pending in, the Mexican judicial appellate system; no stay of effectiveness of the *Concurso* plan was entered.[FN4]

> **FN4.** Letters submitted to this court demonstrate that substantially all of the issues relating to enforcement of the Plan before us are also being appealed in Mexican courts.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.3d 1031, 57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386
**(Cite as: 701 F.3d 1031)**

**D. Objecting Creditors Resist Enforcement**

While objecting to the *concurso* proceeding in Mexico, creditors dissatisfied with Vitro's reorganization efforts attempted to collect on the Old Notes and guaranties in a variety of ways. By April 2010, Vitro had received acceleration notices for all the Old Notes. On November 17, 2010, involuntary Chapter 11 petitions were filed against fifteen Guarantors domiciled in the United States.[FN5] Various holders of Old Notes also commenced two substantially identical lawsuits in New York state court against Vitro and 49 Guarantors, resulting in orders of attachment with respect to any property located in New York.

> [FN5.] This matter proceeded to trial on March 31, 2011. As a result of this proceeding, four of Vitro's subsidiaries requested permission to sell substantially all their assets. Vitro's subsidiaries continued resisting the Noteholders' efforts and, initially, received favorable judgments that they were generally paying their debts as they became due or that no demand for payment had been made at the time the involuntary proceedings were commenced. That decision was appealed and, on August 28, 2012, the United States District Court for the Northern District of Texas held that the bankruptcy court erred in its findings and vacated that court's order.

Parallel to the *concurso* proceeding, in August 2011, Wilmington Trust, National Association ("Wilmington"), the indenture trustee for the Old Notes due in 2012 and 2017, filed suit in New York state court against various of the Guarantors, seeking a declaratory judgment confirming the Guarantors' obligations under the related indentures. The state court granted partial summary judgment in Wilmington's favor on December 5, 2011. The court held that New York law applied to the dispute and that under the unambiguous terms of the relevant Old Notes, "any non-consensual release, discharge or modification of the obligations of the Guarantors ... is prohibited." *Wilmington Trust v. Vitro Automotriz, S.A. De C.V.,* 33 Misc.3d 1231, 943 N.Y.S.2d 795 (table), 2011 WL 6141025, at *6 (N.Y.Sup.Ct. Dec. 5, 2011). The court went on to find, however, that "whether such prohibitive provisions may be modified or eliminated by applicable Mexican laws is not at issue here." *Id.* at *5. [FN6] A separate suit brought by U.S. Bank National Association ("U.S. Bank"), the indenture trustee for the Old Notes due in 2013, achieved the same outcome.

> [FN6.] Wilmington and other creditors then sought a temporary restraining order directing the Guarantors to withdraw their consent to the *Concurso* plan. The state court granted the TRO, but that order was stayed by the bankruptcy court on the basis that the TRO interfered with Vitro's rights in a lockup agreement between it and its subsidiaries, and the *concurso* proceeding. That order was separately appealed and is before another panel of this court, Case No. 11–11239.

> Objecting creditors also took further legal action to resist Vitro's reorganization efforts, including involuntary *concurso* proceedings in Mexico.

**E. Vitro Commences a Chapter 15 Proceeding in the United States**

On October 29, 2010, Vitro's Board of Directors appointed Alejandro Sanchez–Mujica to act as Vitro's foreign representative.**\*1041** On April 14, 2011, Sanchez–Mujica commenced a Chapter 15 proceeding in United States bankruptcy court by filing a petition for recognition of the Mexican *concurso* proceeding.[FN7] The petition was originally filed in the United States Bankruptcy Court for the Southern District of New York, but, on May 13, 2011, by motion of objecting creditors, venue was transferred to the United States Bankruptcy Court for the Northern District of Texas. Because Sanchez–Mujica could not leave Mexico—a result of certain travel restrictions imposed by the Mexican

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.3d 1031, 57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386
**(Cite as: 701 F.3d 1031)**

court because of his role in Vitro's restructuring—Vitro filed a supplemental petition to recognize Javier Arechavaleta–Santos, another appointee of Vitro's Board of Directors, as "co-foreign representative."[FN8] The bankruptcy court, over objections, held that the Mexican reorganization proceeding was a "foreign main proceeding" and approved the petition confirming Sanchez–Mujica and Arechavaleta–Santos as foreign representatives pursuant to 11 U.S.C. § 1515 and § 1517.[FN9] The United States District Court for the Northern District of Texas affirmed the bankruptcy court's order. *In re Vitro, S.A.B. de C.V.,* 470 B.R. 408 (N.D.Tex.2012) *(Vitro I).* That decision has been appealed, Case No. 12–10542, and is one of the cases consolidated in this appeal.

> FN7. This filing actually constituted Vitro's second filing of a petition for recognition under Chapter 15. Vitro first filed such a petition on December 14, 2010, but, by agreement of the parties, withdrew that petition after the Mexican court initially denied Vitro's entry into *concurso mercantil.*

> FN8. The travel restrictions on Sanchez–Mujica were later lifted, permitting him to travel to the United States and testify at trial.

> FN9. A "foreign main proceeding" is "a foreign proceeding pending in the country where the debtor has the center of its main interests," 11 U.S.C. § 1502(4), and is to be distinguished from a foreign nonmain proceeding, which is "a foreign proceeding ... pending in a country where the debtor has an establishment," *id.* § 1502(5). Depending on whether a proceeding is a foreign main or a foreign nonmain, certain Chapter 15 relief will be automatic or discretionary. *See In re Ran,* 607 F.3d 1017, 1026 (5th Cir.2010).

On March 2, 2012, Vitro's foreign representat-

ives filed a motion in bankruptcy court entitled "Motion of Foreign Representatives of Vitro S.A.B. de C.V. for an Order Pursuant to 11 U.S.C. §§ 105(a), 1507 and 1521 to (I) Enforce the Mexican Plan of Reorganization of Vitro S.A.B. de C.V., (II) Grant a Permanent Injunction, and (III) Grant Related Relief" (the "Enforcement Motion"). The Noteholders, Wilmington, and U.S. Bank (collectively, the "Objecting Creditors") objected, and the matter proceeded to trial on June 4, 2012. Following a four-day trial, in which hundreds of exhibits were presented and several witnesses testified, the bankruptcy court denied the Enforcement Motion. *In re Vitro, S.A.B. de C.V.,* 473 B.R. 117 (Bankr.N.D.Tex.2012) *(Vitro II).* As part of that ruling, the court also denied Vitro's motion to enjoin the Objecting Creditors from initiating litigation against the Guarantors.[FN10] To permit Vitro time to appeal, the bankruptcy court did, however, extend a previously issued temporary restraining order. Vitro and Fintech have appealed the bankruptcy court's decision, which has been certified for direct appeal, and Case Nos. 12–10689 (Vitro's appeal) and 12–10750 (Fintech's appeal) were subsequently consolidated with the other case before us.[FN11] Vitro subsequently sought, and was **\*1042** granted on June 28, 2012, an order by this court staying the expiration of the bankruptcy court's temporary restraining order.

> FN10. Previously, on June 24, 2011, the bankruptcy court had issued a preliminary injunction in Vitro's favor to protect its assets, but denied such relief as to the guarantors.

> FN11. Although brought under separate case numbers, the only substantive difference between the cases is that Vitro is the appellant in Case No. 12–10689, while Fintech is the appellant in Case No. 12–10750.

## II. STANDARD OF REVIEW

[1][2][3][4] We review a district court's affirmance of a bankruptcy court's decision by applying

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.3d 1031, 57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386
**(Cite as: 701 F.3d 1031)**

the same standard of review that the district court applied. *In re Martinez,* 564 F.3d 719, 725–26 (5th Cir.2009). Accordingly, questions of fact are reviewed for clear error and conclusions of law are reviewed de novo. *Id.* at 726. Mixed questions of law and fact are reviewed de novo. *In re McLain,* 516 F.3d 301, 307 (5th Cir.2008). We review a bankruptcy court's decision on direct appeal under the same standards. By contrast, "[w]e review a denial of declaratory or injunctive relief for abuse of discretion." *In re Schimmelpenninck,* 183 F.3d 347, 353 (5th Cir.1999). A court's decision to grant comity is also reviewed for abuse of discretion. *Int'l Transactions, Ltd. v. Embotelladora Agral Regiomontana, SA de CV,* 347 F.3d 589, 593 (5th Cir.2003) (applying abuse of discretion standard to review district court's grant of comity to Mexican bankruptcy court's ex parte order); *see also In re Qimonda AG Bankr. Litig.,* 433 B.R. 547, 556 (E.D.Va.2010).

### III. CHAPTER 15

The dispute before us arises under Chapter 15 of the Bankruptcy Code and broadly involves two issues: recognition of the foreign representatives and enforcement of the *Concurso* plan. As to the first, on April 14, 2011, Sanchez–Mujica and Arechavaleta–Santos, as co-foreign representatives, filed a petition seeking recognition of the *concurso* proceeding under Chapter 15. The Noteholders objected that Sanchez–Mujica and Arechavaleta–Santos were not properly appointed as foreign representatives because they were not appointed by the Mexican court and because Vitro did not have the powers of a debtor in possession. The bankruptcy court granted recognition of the *concurso* proceeding as a foreign main proceeding under 11 U.S.C. § 1517. On appeal, the district court affirmed, holding that it was sufficient that Sanchez–Mujica and Arechavaleta–Santos were authorized as co-foreign representatives in the context of a foreign bankruptcy proceeding and that Vitro retained sufficient control over its business to be a debtor in possession. The Noteholders appeal, raising substantially the same arguments before us that

they raised in the lower courts.

Because recognition of a proceeding under Chapter 15 is a precondition for the more substantive relief Vitro seeks in the Enforcement Motion, we will resolve the recognition issue first. We hold that the bankruptcy court and the district court correctly interpreted Chapter 15 as not requiring official court appointment. We further find that the term "foreign representatives" was intended to include debtors in possession, including those that may not meet Chapter 11's definition of debtors in possession, and that Vitro retained enough authority over its affairs to be a debtor in possession and could thus appoint Sanchez–Mujica and Arechavaleta–Santos as foreign representatives. Accordingly, we affirm the district court's ruling affirming the bankruptcy court's order.

We then address the Enforcement Motion. On March 2, 2012, Vitro's co-foreign representatives filed a motion seeking "to 1) give full force and effect in the United States to the *Concurso* Approval Order, 2) **\*1043** grant a permanent injunction prohibiting certain actions in the United States against Vitro SAB, as well as its non-debtor subsidiaries, and 3) grant certain related relief." *Vitro II,* 473 B.R. at 120–21 (quotation marks omitted). The bankruptcy court denied relief under 11 U.S.C. §§ 1507, 1521, and 1506 because approval of the Plan would extinguish claims held by the Objecting Creditors against the subsidiaries. *Id.* at 131. Vitro and Fintech appeal this decision solely on the issue of whether the bankruptcy court erred as a matter of law in refusing to enforce the *Concurso* plan because the Plan novated guaranty obligations of nondebtor parties. While the relief available under Chapter 15 may, in exceptional circumstances, include enforcing a foreign court's order extinguishing the obligations of non-debtor guarantors, Vitro has failed to demonstrate that comparable circumstances were present here. Because Vitro has not done so, we affirm the bankruptcy court's decision denying the Enforcement Motion.

**A. Chapter 15 of the United States Bankruptcy**

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.3d 1031, 57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386
**(Cite as: 701 F.3d 1031)**

**Code**

This case concerns a foreign bankruptcy proceeding for which recognition and enforcement are sought under Chapter 15 of the United States Bankruptcy Code. Chapter 15 was enacted in 2005 to implement the Model Law on Cross–Border Insolvency ("Model Law") formulated by the United Nations Commission on International Trade Law ("UNCITRAL"), and replaced former 11 U.S.C. § 304. FN12 *See In re Ran,* 607 F.3d at 1020; *In re Iida,* 377 B.R. 243, 256 (B.A.P. 9th Cir.2007). FN13 It was intended "to provide effective mechanisms for dealing with cases of cross-border insolvency," 11 U.S.C. § 1501(a), as well as to be "the exclusive door to ancillary assistance to foreign proceedings," thus "concentrat[ing] control of these questions in one court." H.R.Rep. No. 109–31, pt. 1, at 110 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 178. It was also intended to increase legal certainty, promote fairness and efficiency, protect and maximize value, and facilitate the rescue of financially troubled businesses. 11 U.S.C. § 1501(a).

> FN12. As Professor Jay Lawrence Westbrook has previously explained, the Model Law, along with the European Union Insolvency Regulation ("EU Regulation"), and the American Law Institute's Principles of Cooperation in Transnational Insolvency Cases Among Members of the North American Free Trade Agreement ("ALI Principles"), was a response to international trade and "the growth of multinational enterprise," as well as "the increased incidence of multinational financial failure." Jay Lawrence Westbrook, *Multinational Enterprises in General Default: Chapter 15, the ALI Principles, and the EU Insolvency Regulation,* 76 Am. Bankr. L.J. 1, 1–2 (2002). Of the three, the EU Regulation "served as the source of some of the key concepts adopted in both the Model Law and the ALI Principles." *Id.* at 2. The ALI Principles, by contrast, were the last to be approved, and thus "in

some important respects represent the next generation of reform." *Id.*

> FN13. While § 304 has been replaced by Chapter 15, caselaw applying that section remains relevant to evaluating requests for relief. *See In re Atlas Shipping A/S,* 404 B.R. 726, 738 (Bankr.S.D.N.Y.2009); Leif M. Clark & Karen Goldstein, *Sacred Cows: How to Care for Secured Creditors' Rights in Cross–Border Bankruptcies,* 46 Tex. Int'l L.J. 513, 524 (2011) ("Not surprisingly, the case law under former § 304 is still relevant to the interpretation of Chapter 15, especially as it concerns the remedies available to a foreign representative once recognition has been granted.").

[5][6][7] Central to Chapter 15 is comity. Comity is the "recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons **\*1044** who are under the protections of its laws." *Hilton v. Guyot,* 159 U.S. 113, 164, 16 S.Ct. 139, 40 L.Ed. 95 (1895). "It is not a rule of law, but one of practice, convenience, and expediency." *Overseas Inns S.A. P.A. v. United States,* 911 F.2d 1146, 1148 (5th Cir.1990) (quotation marks and citation omitted). Within the context of Chapter 15, however, it is raised to a principal objective. Section 1501(a) begins by listing, as one of Chapter 15's goals, the furtherance of cooperation between domestic and foreign courts in cross-border insolvency cases. Section 1508 goes on to provide that Chapter 15's provisions shall be interpreted by considering "its international origin, and the need to promote an application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions." 11 U.S.C. § 1508. Comity considerations are explicitly included in the introduction to § 1507, and § 1509(b)(3) further provides that our courts "shall grant comity or cooperation to the foreign representative" of a foreign

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.3d 1031, 57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386
**(Cite as: 701 F.3d 1031)**

proceeding.

Such a foreign representative must first petition a United States bankruptcy court for recognition of a foreign proceeding. 11 U.S.C. §§ 1504, 1515. Chapter 15 defines such a foreign proceeding as:

[A] collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

11 U.S.C. § 101(23).

Only after a United States court recognizes a proceeding can "the foreign representative ... apply directly to a court in the United States for appropriate relief in that court." 11 U.S.C. § 1509(b)(2); *see also United States v. J.A. Jones Constr. Grp., LLC,* 333 B.R. 637, 638 (E.D.N.Y.2005).

[8] Chapter 15 provides for a broad range of relief. This includes the ability to sue and be sued in United States courts, to apply directly to a United States court for relief, to commence a non-Chapter 15 case, and to intervene in any United States case to which the debtor is a party. *In re Condor Ins. Ltd.,* 601 F.3d 319, 324 (5th Cir.2010). Section 1520 also provides for certain automatic relief upon recognition of a foreign main proceeding, like the one here, including an automatic stay and the power to prevent transfers of the debtor's property. A bankruptcy court is also empowered under § 1521(a) to "grant any appropriate relief" necessary to "effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of the creditors." Finally, § 1507(a) gives a court authority to provide "additional assistance," subject to certain restrictions imposed by Chapter 15 and § 1507(b).

[9][10] In considering whether to grant relief, it is not necessary that the result achieved in the for-

eign bankruptcy proceeding be identical to that which would be had in the United States. It is sufficient if the result is "comparable." *In re Schimmelpenninck,* 183 F.3d at 364; *Overseas Inns,* 911 F.2d at 1149; *see also In re Sivec SRL,* 476 B.R. 310, 324 (Bankr.E.D.Okla.2012) ("The fact that priority rules and treatment of claims may not be identical is insufficient to deny a request for comity."); *In re Qimonda AG,* 462 B.R. 165, 184 n. 17 (Bankr.E.D.Va.2011); *In re Petition of Garcia Avila,* 296 B.R. 95, 112 (Bankr.S.D.N.Y.2003). "[T]he foreign laws need not be identical to their counterparts under the laws of the United States; they merely must not be repugnant to our laws and policies." *In re Schimmelpenninck,* 183 F.3d at 365.

**\*1045** [11] But as discussed, whether any relief under Chapter 15 will be granted is a separate question from whether a foreign proceeding will be recognized by a United States bankruptcy court. The consolidated cases before us arise from decisions addressing each of these issues. We first turn to whether Vitro's co-foreign representatives were properly recognized.

**B. Recognition of Foreign Representatives**

[12][13] After initiation of a foreign bankruptcy proceeding, a "foreign representative" may petition a United States court to recognize the proceeding under Chapter 15. Chapter 15 defines a "foreign representative" as "a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." 11 U.S.C. § 101(24). "A federal court's recognition of representatives appointed in the course of a foreign bankruptcy or liquidation proceeding is a matter of comity—it is an acknowledgment of the validity of the foreign proceeding." *Reserve Int'l Liquidity Fund, Ltd. v. Caxton Int'l Ltd.,* No. 09 Civ. 9021(PGG), 2010 WL 1779282, at \*5 (S.D.N.Y. Apr. 29, 2010) (citing *Finanz AG Zurich v. Banco Economico S.A.,* 192 F.3d 240, 246 (2d Cir.1999)). A duly recognized

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.3d 1031, 57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386
**(Cite as: 701 F.3d 1031)**

foreign representative has the capacity to sue and be sued in the United States and to apply directly to a United States court for relief, and a foreign representative is entitled to the comity and cooperation of all United States courts. 11 U.S.C. § 1509.

Three requirements, contained in § 1517, must be met before a foreign proceeding will be recognized:

(a) Subject to section 1506, after notice and a hearing, an order recognizing a foreign proceeding shall be entered if—

(1) such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502;

(2) the foreign representative applying for recognition is a person or body; and

(3) the petition meets the requirements of section 1515.

11 U.S.C. § 1517.

Section 1515, in turn, provides the following procedural requirements:

(a) A foreign representative applies to the court for recognition of a foreign proceeding in which the foreign representative has been appointed by filing a petition for recognition.

(b) A petition for recognition shall be accompanied by—

(1) a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;

(2) a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or

(3) in the absence of evidence referred to in paragraphs (1) and (2), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative.

(c) A petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative.

(d) The documents referred to in paragraphs (1) and (2) of subsection (b) shall be translated into English. The **\*1046** court may require a translation into English of additional documents.

11 U.S.C. § 1515.

[14] These requirements are to be strictly construed in line with our holding that the requisite analysis is not a "rubber stamp exercise," and that "[e]ven in the absence of an objection, courts must undertake their own jurisdictional analysis and grant or deny recognition under Chapter 15 as the facts of each case warrant." *In re Ran,* 607 F.3d at 1021.

Neither Sanchez–Mujica nor Arechavaleta–Santos, the recognized foreign representatives in this case, was appointed by a foreign court or tribunal. Both were voted into their positions by Vitro's Board of Directors. The bankruptcy court recognized the *concurso* proceeding under Chapter 15 and the district court affirmed, holding that whether a given individual could act as a foreign representative was a matter of United States law, and that it was unnecessary for a foreign representative to be appointed by a court. The court's holding rested on its analysis of § 101(24)'s language and cases applying that subsection, which showed that it was sufficient for a foreign representative to be authorized in the context of a foreign bankruptcy proceeding. *Vitro I,* 470 B.R. at 411–13. The district court further determined that Vitro was the Mexican equivalent of a "debtor in possession," able to administer its own reorganization, and was thus able to appoint a foreign representative under

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.3d 1031, 57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386
**(Cite as: 701 F.3d 1031)**

Chapter 15. *Id.* at 412.[FN14]

> [FN14.] The district court was skeptical of whether Sanchez–Mujica and Arechavaleta–Santos, as co-foreign representatives, could properly constitute a person or body under 11 U.S.C. § 101(24) and § 1517(a)(2). *Vitro I,* 470 B.R. at 410 n. *. The source for this skepticism is unclear, and neither the parties nor the district court explores the matter further. Because § 101(41) provides that "[t]he term 'person' includes individual, partnership, and corporation," there is little doubt that Sanchez–Mujica and Arechavaleta–Santos, both natural persons, qualify as a "person or body." This is especially so because the Bankruptcy Code utilizes the word "includes" in a non-limiting capacity. 11 U.S.C. § 102(3). This means that § 101(41) potentially includes an even broader range of entities. *See In re Oversight & Control Comm'n of Avanzit, S.A.,* 385 B.R. 525, 540 (Bankr.S.D.N.Y.2008) (holding oversight commission was person or body within meaning of § 1517(a)).

On appeal, the Noteholders argue that the individuals appointed here do not satisfy Chapter 15's definition of "foreign representatives" for two reasons. First, neither was "authorized in a foreign proceeding," because neither was appointed by a foreign court or administrative tribunal. 11 U.S.C. § 101(24). In support, the Noteholders rely on § 101(23)'s definition of "foreign proceeding," as well as 11 U.S.C. §§ 1515(a), 1515(b)(1)-(2), and 1509(b)(2). Second, the Noteholders argue that even if Chapter 15 did not require such an appointment, the foreign representatives still did not qualify for their positions because they did not have the authority "to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." 11 U.S.C. § 101(24).

Vitro responds that the plain language of § 101(24) does not require court appointment and that this conclusion is support by both Chapter 15's legislative history and UNCITRAL's Model Law. Vitro further argues that § 101(24) was intended to apply to a "debtor in possession," like Vitro, and thus it had the power to appoint individuals as foreign representatives of the *concurso* proceeding.

Because the district court correctly interpreted § 101(24), defining foreign representatives**\*1047** as having been appointed in the context of a foreign proceeding, and because Vitro, as a debtor in possession, met the requirements of that subsection, we affirm the district court's decision. We address each of these points in turn.

**1. Authorized in a Foreign Proceeding**

[15] The Noteholders point to numerous parts of Chapter 15 that allegedly show that a foreign court must explicitly authorize individuals or bodies to act as representatives. Contrary to the Noteholders' interpretation, we do not find that any of Chapter 15's provisions requires action by a foreign tribunal.

[16] We interpret statutes according to their plain meaning. *Gaddis v. United States,* 381 F.3d 444, 472 (5th Cir.2004). Section 101(24)—defining the term "foreign representative"—is wholly devoid of any statement that a foreign representative must be judicially appointed. The definition's requirement that a representative be "authorized in a foreign proceeding" is certainly compatible with appointment by a foreign court, but it is hardly necessary. As the district court observed, it would be equally compatible with a requirement that an individual be appointed "in the context of" a foreign proceeding. *Vitro I,* 470 B.R. at 411. It could also mean during, or in the course of, a foreign proceeding.

The other provisions the Noteholders identify suffer from the same defect. Section 1515(a) provides that "[a] foreign representative applies to the court for recognition of a foreign proceeding in which the foreign representative has been appoin-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.3d 1031, 57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386
**(Cite as: 701 F.3d 1031)**

ted" and requires that a petition for recognition be accompanied by either, 1) "a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative," 2) "a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative," or 3) other evidence "of such foreign proceeding and of the appointment of the foreign representative." 11 U.S.C. § 1515. None of these provisions states who has the official authority to appoint a foreign representative. At best, they provide the context in which a foreign representative should be appointed. By comparison, § 1509(b)(2) states that if a court grants recognition to a foreign proceeding, it shall grant "comity or cooperation" to the foreign representative. Although use of the word "comity" connotes recognition of another judicial proceeding, the word "cooperation" suggests a much broader meaning.

Caselaw supports our interpretation. To be sure, foreign representatives have been appointed by foreign tribunals in many cases. One such case was *In re Grand Prix Associates, Inc.,* where the court specifically held that § 1517(a) was satisfied where the purported foreign representative was able to present an order by the foreign court appointing it as the foreign representative of the business entities in question. No. 09–16545(DHS), 2009 WL 1410519, at *5 (Bankr.D.N.J. May 18, 2009); *see also In re Innua Canada Ltd.,* No. 09–16362(DHS), 2009 WL 1025090, at *4–5 (Bankr.D.N.J. Apr. 15, 2009) (receivership order entered by Canadian court stated foreign representative had capacity to commence Chapter 15 proceeding); *In re Oversight,* 385 B.R. at 534 (Spanish insolvency court had power to appoint foreign representative for Chapter 15 purposes); *In re Basis Yield Alpha Fund (Master),* 381 B.R. 37, 46 n. 30 (Bankr.S.D.N.Y.2008); *In re Tri–Cont'l Exch. Ltd.,* 349 B.R. 627, 632 (Bankr.E.D.Cal.2006). But the district court identified numerous cases cited by the bankruptcy **\*1048** court that, although not binding, demonstrate that recognition is routinely granted to petitioners appointed by Mexican debtors to serve

as foreign representatives. *Vitro I,* 470 B.R. at 412 (listing cases).[FN15]

> FN15. The Noteholders point out that none of these decisions entailed a challenge to the foreign representatives' appointment. While correct, in the context of the issue above, this fact does not diminish their persuasive value. Assuming the Noteholders' interpretation was correct, and a foreign representative had to show it was appointed by a foreign tribunal to receive Chapter 15 relief, it would be irrelevant whether another party objected because the court would still need to determine whether the appointment was correct as a threshold matter prior to granting recognition. *See In re Ran,* 607 F.3d at 1021.

The Mexican court's actions make it equally apparent that Sanchez–Mujica and Arechavaleta–Santos were properly appointed. It is undisputed that the Mexican court had the power to enjoin Sanchez–Mujica and Arechavaleta–Santos from acting as foreign representatives. Yet, when presented with a motion requesting such an order, the Mexican court denied it in full. The Mexican court also refused to declare the *conciliador* to be the only person authorized to act as foreign representative. In deciding not to enjoin the foreign representatives' conduct, the Mexican court gave the representatives its tacit approval.[FN16]

> FN16. The *conciliador* also submitted a letter to the bankruptcy court, as a party in interest, to the effect that he agreed with the appointment of Sanchez–Mujica and Arechavaleta–Santos.

Finally, our decision is informed by consideration of the Model Law, and reports by the UNCITRAL Working Group on Insolvency Law ("Working Group"). 11 U.S.C. § 1501(a) (purpose of Chapter 15 is to incorporate the Model Law); *see also In re Tri–Cont'l Exch. Ltd.,* 349 B.R. at 633 (treating as persuasive authority the Guide to En-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.3d 1031, 57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386
**(Cite as: 701 F.3d 1031)**

actment of the UNCITRAL Model Law on Cross–Border Insolvency); *In re Condor,* 601 F.3d at 326–27 & nn. 37–40 (discussing and citing Working Group).

The definition of foreign representatives in § 101(24) closely follows the language of Model Law Article 2(d).[FN17] In drafting this definition, the Working Group expressly rejected the requirement that a foreign representative be "[specifically] authorized by statute or other order of court (administrative body) to act in connection with a foreign proceeding." UNCITRAL Rep. of the Working Group on Insolvency Law on the Work of the Eighteenth Session, ¶ 111, U.N. Doc. A/CN.9/419 (Dec. 1, 1995), *available at* http:// www. uncitral. org/ uncitral/ en/ commission/ working_ groups/ 5 Insolvency. html (Dec. 1995 Rep.) (alteration in original). That definition was rejected because of concerns that "the expressions would be unfamiliar and might have the unintended effect of being unduly restrictive, since the list would inevitably be incomplete." *Id.* ¶ 112. The Working Group also declined to include the word "specifically" because "it would be unusual for a State to appoint an insolvency representative specifically to act abroad." *Id.* ¶ 113. This supports our conclusion that the Noteholders' proposed interpretation**\*1049** —which would require exactly such an appointment—is wrong.[FN18]

> FN17. Article 2(d) provides that a foreign representative is "a person or body, including one appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of the foreign proceeding." UNCITRAL, UNCITRAL Model Law on Cross–Border Insolvency with Guide to Enactment, art. 2(d) (1997), *available at* http:// www. uncitral. org/ pdf/ english/ texts/ insolven/ insolvency- e. pdf (Model Law Guide). The only change in 11 U.S.C. § 101(24) is the addition of the words "including a person or body appointed," in lieu of the original "including one appointed."

> FN18. For the same reason, we are not persuaded by the Noteholders' argument that their interpretation would result in a more objective and predictable appointment process.

Accordingly, we conclude that Sanchez–Mujica and Arechavaleta–Santos are not disqualified from serving as foreign representatives merely because they were not the subject of an official court appointment.

**2. Power to Administer the Reorganization or Liquidation of a Debtor's Assets or Affairs**

[17] Having determined that Chapter 15 does not require a foreign representative to be appointed by court order, we still must address whether Sanchez–Mujica's and Arechavaleta–Santos' appointments comport with the remainder of § 101(24). In particular, § 101(24) requires that a foreign representative have the authority "to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." 11 U.S.C. § 101(24). Vitro does not argue that Sanchez–Mujica and Arechavaleta–Santos have the authority to represent the *concurso* proceeding, and we therefore do not address that prong of § 101(24).[FN19] The only remaining question is whether they had administrative power over the reorganization of Vitro's business.

> FN19. The Noteholders argue that our understanding of § 101(24) would allow parties to appoint competing foreign representatives, but that concern is invalid. The number of parties who are authorized to "administer the reorganization of a debtor's assets" is necessarily limited. As we have said, we do not opine on the limits of authorization to "act as a representative," because that issue is not pertinent here.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.3d 1031, 57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386
**(Cite as: 701 F.3d 1031)**

The district court held that Vitro could appoint its own foreign representatives because, under Mexican law, a debtor continues to manage its business during a *concurso* proceeding, making it akin to a "debtor in possession." *Vitro I,* 470 B.R. at 412.[FN20] The Working Group clearly intended to include foreign representatives of proceedings in which a debtor in possession remains in control of its assets. Dec. 1995 Rep. ¶ 115. The National Bankruptcy Review Commission, created by Congress in 1994 to make recommendations on improving bankruptcy law and procedure, in its review of the Model Law, reached the same conclusion. Nat'l Bankr.Rev. Comm'n, *Bankruptcy: The Next Twenty Years, Nat'l Bankr. Rev. Comm'n Final Rep.,* (1997), *available at* http:// govinfo. library. unt. edu/ nbrc/ reportcont. html (Nat'l Bankr. Comm'n).

> FN20. Under Chapter 11, the term "debtor in possession" refers to the debtor itself, unless an entity is serving as the debtor's trustee pursuant to 11 U.S.C. § 322. "A debtor in possession stands in the shoes of the bankruptcy trustee, generally having the same rights, powers, duties and functions, with certain exceptions." *Soto–Rios v. Banco Popular de Puerto Rico,* 662 F.3d 112, 115 n. 2 (1st Cir.2011) (citing 11 U.S.C. § 1107(a)).

The Noteholders, however, challenge whether Vitro can be classified as a debtor in possession, and argue that such power is reserved for the *conciliador* in a *concurso* proceeding. The Noteholders also point out that under Chapter 11, a debtor in possession has the rights, powers, and duties of a Chapter 11 trustee, which include the right to negotiate, file, and seek confirmation of a plan of reorganization, and that Vitro lacked this authority. FN21

> FN21. The Noteholders raise a number of additional arguments that are ultimately unavailing. The Noteholders argue that, assuming Vitro could act as its own foreign representative, it could not appoint others

to that role. The Noteholders also argue that Vitro's appointment fails because it occurred prior to the *concurso* filing and because the appointment creates a conflict of interest between Vitro and its creditors. Finally, they repeatedly point out that the foreign representatives lacked the expertise necessary to serve in that role, and that they abdicated their responsibilities by ceding decision-making authority to United States counsel. The Noteholders cite no pertinent authority in support of these contentions.

**\*1050** The Noteholders' argument fails for relying exclusively on Chapter 11's definition of a debtor in possession. The Working Group's decision to include debtors in possession was not made on the basis of how United States law defined the term. Rather, the Working Group understood debtors in possession to include those cases "in which the debtor remained in control of its assets and could technically be regarded as exercising administration type of functions, although under the supervision of a judicial or administrative authority." Dec. 1995 Rep. ¶ 115. The UNCITRAL Practice Guide on Cross–Border Insolvency Cooperation similarly defines debtor in possession to mean "a debtor in reorganization proceedings, which retains full control over the business, with the consequence that the court does not appoint an insolvency representative." UNCITRAL, Practice Guide on Cross–Border Insolvency Cooperation 5 (July 1, 2009), *available at* http:// www. uncitral. org/ pdf/ english/ texts/ insolven/ Practice_ Guide_ Ebook_ eng. pdf. At least one court has understood foreign representatives to include debtors in possession, including those in "debtor-in-possession reorganization proceedings in Latin American countries." *In re Cenargo Int'l, PLC,* 294 B.R. 571, 598 n. 31 (Bankr.S.D.N.Y.2003) (internal quotation marks and citation omitted). We likewise hold that under Chapter 15 the correct analogy is not to whether a debtor meets Chapter 11's definition of a "debtor in possession," but whether it meets that definition

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.3d 1031, 57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386
**(Cite as: 701 F.3d 1031)**

originally envisioned by the drafters of the Model Law and incorporated into § 101(24). *See* 11 U.S.C. § 1508 (Chapter 15 to be interpreted by consideration of its international origin, and consistent with application of similar foreign statutes); Nat'l Bankr. Comm'n, *supra,* at 357 (definitions in Model Law are "carefully constructed to include the United States Chapter 11 proceeding (and similar debtor in possession reorganization proceedings in Latin America and elsewhere)").

Here, there is little doubt that Vitro met that definition. Vitro has presented extensive evidence that it retained broad control over its affairs, pursuant to various provisions of the LCM. *See* Ley de Concursos Mercantiles [LCM] [Bankruptcy Law], Diario Oficial de la Federación [DO], *as amended,* 12 de mayo de 2000, art. 74 (debtor will be entrusted with enterprise's management throughout conciliation stage unless court grants *conciliador's* request to remove debtor to protect the estate); *id.* art. 84 (debtor retains ability to litigate pending claims under *conciliador's* supervision). Commentary on the LCM agrees that a board of directors generally remains in control and possession of its business during a *concurso* proceeding. *See* Jonathan Graham–Canedo, *Comparative Analysis of Bankruptcy Legal Provisions from Mexico and the United States: Which Legal System is More Attractive?,* 6 DePaul Bus. & Com. L.J. 19, 27 (Fall 2007).

We further observe that if Vitro were not permitted to proceed as a debtor in possession, with the power to appoint foreign representatives, it is unclear who would. Any other potential candidate would be susceptible to the same attacks raised by the Noteholders. For example, in a *concurso* proceeding the *conciliador* **\*1051** acts as mediator between the debtor and creditors. A *visitador* only inspects the debtor's accounting books and records and determines whether the debtor meets the LCM's liquidity standard. The *sindico* is a receiver charged with liquidating the business and selling its assets if a plan is not reached within a specific period of time. None of these individuals possesses the full

authority the Noteholders argue is required under § 101(24).

Accordingly, we conclude that Vitro had the powers of a debtor in possession for purposes of § 101(24) and affirm the district court's decision affirming the bankruptcy court's order that Sanchez–Mujica and Arechavaleta–Santos are properly appointed foreign representatives under Chapter 15.

**C. Enforcement of the Plan**

**1. Vitro's Request for Relief**

In the Enforcement Motion, Vitro sought broad relief pursuant to 11 U.S.C. §§ 105(a), 1507, and 1521. Specifically, Vitro sought an order giving full force and effect in the United States to the Mexican court's order approving the *Concurso* plan. Vitro further sought a permanent injunction prohibiting certain actions in the United States against itself and its non-debtor subsidiaries, specifically:

> [A] permanent injunction enjoining all persons from initiating or continuing any suit, action, extra-judicial proceeding or other proceeding (including [already commenced actions in New York state court]) or any enforcement or collection process (including pursuant to any judgment, notices of attachment or [levies, restraining notices, or similar documentation]) in any jurisdiction within the United States or its territories ... against Vitro SAB and/or the Old Guarantors ... or their Property ... except as permitted under the *Concurso* Plan or the *Concurso* Approval Order ....

If Vitro were to succeed in obtaining all the relief that it requested, actions, executions, attachments, or other collection or enforcement processes currently pending against Vitro or its subsidiaries would be "permanently stayed, suspended, discharged, and dismissed." Judgments already rendered against it or its subsidiaries would be declared "null and void and of no further force or effect." Moreover, any entity having withheld pay-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.3d 1031, 57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386

**(Cite as: 701 F.3d 1031)**

ment to Vitro or its subsidiaries as a result of Vitro's default would immediately remit such payments to the applicable party. Finally, Vitro and its subsidiaries would be released from all liabilities with respect to any claims discharged under the *Concurso* plan. Of course, the bankruptcy court could grant some, but not all, of the relief requested.

The bankruptcy court held that the *Concurso* plan "which extinguishes the guarantee claims of the Objecting Creditors that were given under an indenture issued in the United States against non-debtor entities that are subsidiaries of Vitro, should not be accorded comity to the extent it provides for the extinguishment of the non-debtor guarantees of the indentures." *Vitro II,* 473 B.R. at 132. The bankruptcy court specifically denied enforcement under §§ 1507, 1521, and 1506. It denied relief under § 1507 because the Mexican court's approval order did "not provide for the distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by Title 11 [of the Bankruptcy Code]." *Id.* "The *Concurso* plan provides drastically different treatment in that the noteholders receive a fraction of the amounts owed under the indentures from Vitro SAB and their rights against the other obligors are cut off." *Id.* Relief under § 1521 was inappropriate**\*1052** because the Mexican court's approval order "neither sufficiently protects the interests of creditors in the United States, nor does it provide an appropriate balance between the interests of creditors and Vitro SAB and its non-debtor subsidiaries." *Id.* Finally, the relief sought would not be allowed under Chapter 15 because "the protection of third party claims in a bankruptcy case is a fundamental policy of the United States" and "the *Concurso* plan does not recognize and protect such rights." *Id.*

The circumstances under which the Plan was approved and the treatment creditors received raise many questions that are not before us about whether such a plan could be enforced under Chapter 15. The bankruptcy court explicitly dealt with some of these questions, while flagging others for our consideration without itself reaching them. Thus, for example, the bankruptcy court considered whether, as alleged by the Objecting Creditors, the Mexican judicial system and the *concurso* proceeding were corrupt, and should not be granted comity for this reason. Addressing the Objecting Creditors' expert—Dr. Stephen D. Morris—who testified to a series of "suspicious circumstances" and "red flags" in the *concurso* proceeding, the bankruptcy court held that, although the witness was knowledgeable and qualified to speak on corruption in Mexico generally, his analysis of what impact such corruption had on this proceeding was unpersuasive. The bankruptcy court therefore concluded that it "ha[d] not seen evidence that the Mexican Proceeding [was] the product of corruption, or that the LCM itself is a corrupt process," and rejected the Objecting Creditors' argument. *Id.* at 130. The bankruptcy court reached a similar conclusion as to whether, as argued by the Objecting Creditors, enforcement would have an adverse impact on credit markets. The court ultimately concluded that, while testimony by Dr. Elaine Buckberg, a former economist at the International Monetary Fund, was credible, her testimony did not quantify the negative effects of enforcing the Plan, and thus the court could not conclude that enforcement would adversely affect credit markets. *Id.* The bankruptcy court also considered, but rejected, the argument that relief should not be granted because the Mexican proceeding was "unfair." *Id.* at 130–31. The bankruptcy court observed that although there had been ex parte meetings, such meetings were had by both sides and were, in fact, common in Mexico. *Id.* at 131. Responding to the Objecting Creditors' allegations that they were not permitted to raise certain arguments in the Mexican court and that the *conciliador* was biased, the bankruptcy court held that such arguments were better left for the Mexican court system.[FN22] *Id.*

> FN22. The Objecting Creditors' briefs reiterate many of the factual allegations they made in the bankruptcy court, without ad-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.3d 1031, 57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386
**(Cite as: 701 F.3d 1031)**

dressing the bankruptcy court's holdings on those allegations. Because we affirm the bankruptcy court's ultimate holding denying enforcement to the Plan, we do not address those allegations further.

The bankruptcy court did not reach two other arguments it described as "[p]ossibl[y] [m]eritorious [o]bjections." *Id.* at 132. These were that insiders were allowed to vote in favor of the Plan, and that the *Concurso* plan violates the absolute priority rule. Other arguments the bankruptcy court did not explicitly address, but which might be subsumed under its other holdings, are that the *Concurso* plan imposed a kind of "death trap" provision that precluded non-consenting creditors from recovering anything. Another such argument is that Mexico's single-class voting made no distinctions between creditors with adverse interests. Finally, a third **\*1053** such argument challenges the propriety of Vitro's orchestrating a balance transfer of several billion dollars between itself and its subsidiaries, turning those subsidiaries into creditors, prior to entering into the *concurso* proceeding and failing promptly to disclose the existence of these newly minted insider creditors.

We need not concern ourselves with the vast majority of these issues, as Vitro and Fintech have framed their appeal in terms of only one:

Whether the Bankruptcy Court erred as a matter of law when, after it concluded that the *Concurso* Approval Order was the product of a process that was not corrupt or unfair to the Appellees, it refused to enforce the *Concurso* Approval Order solely because the *Concurso* plan novated guarantee obligations of non-debtor parties and replaced them with new obligations of substantially the same parties?

The issue Vitro and Fintech identify underpins the bankruptcy court's entire opinion. As that court summarized, "the *Concurso* plan approved in this instance ... extinguishes the guarantee claims of the Objecting Creditors that were given under an inden-

ture issued in the United States against non-debtor entities that are subsidiaries of Vitro .... Such order manifestly contravenes the public policy of the United States and is also precluded from enforcement under §§ 1507, 1521 and 1522 of the Bankruptcy Code," and would not be accorded comity. *Id.* at 133.

**2. Chapter 15's Framework for Granting Relief**

[18][19] As already discussed, "[a] central tenet of Chapter 15 is the importance of comity in cross-border insolvency proceedings." *In re Cozumel Caribe, S.A. de C.V.,* 482 B.R. 96 (Bankr.S.D.N.Y.2012). "The extent to which the law of one nation, as put in force within its territory, whether by executive order, by legislative act, or by judicial decree, shall be allowed to operate within the dominion of another nation, depends upon what our greatest jurists have been content to call the comity of nations." *Hilton,* 159 U.S. at 164, 16 S.Ct. 139. In applying the principles of comity, we "take[ ] into account the interests of the United States, the interests of the foreign state or states involved, and the mutual interests of the family of nations in just and efficiently functioning rules of international law." *In re Artimm, S.r.L.,* 335 B.R. 149, 161 (Bankr.C.D.Cal.2005). Accordingly, Chapter 15 provides courts with broad, flexible rules to fashion relief appropriate for effectuating its objectives in accordance with comity. *See In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.,* 389 B.R. 325, 333–34 (S.D.N.Y.2008); *In re SPhinX, Ltd.,* 351 B.R. 103, 112 (Bankr.S.D.N.Y.2006) ("[C]hapter 15 maintains—and in some respects enhances—the 'maximum flexibility,' that section 304 provided bankruptcy courts ... in light of principles of international comity and respect for the laws and judgments of other nations." (citation omitted)).

[20] Given Chapter 15's heavy emphasis on comity, it is not necessary, nor to be expected, that the relief requested by a foreign representative be identical to, or available under, United States law. *In re Metcalfe & Mansfield Alternative Investments,*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.3d 1031, 57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386
**(Cite as: 701 F.3d 1031)**

421 B.R. 685, 697 (Bankr.S.D.N.Y.2010) ("The relief granted in the foreign proceeding and the relief available in a U.S. proceeding need not be identical."); *see also Artimm,* 335 B.R. at 160 n. 11. We have previously cautioned that the mere fact that a foreign representative requests relief that would be available under the law of the foreign proceeding, but not in the United States, is not grounds for denying**\*1054** comity. *See In re Condor,* 601 F.3d at 327.

Nevertheless, Chapter 15 does impose certain requirements and considerations that act as a brake or limitation on comity, and preclude granting the relief requested by a foreign representative. In this case, the bankruptcy court rested on three of Chapter 15's sections, §§ 1521, 1507, and 1506, each of which it found precluded the relief Vitro sought. *Vitro II,* 473 B.R. at 133. Vitro's appeal predominantly rests on finding relief under § 1507 and, only in the alternative, under § 1521. Vitro argues that it would be inappropriate to deny its request for comity under § 1507, simply because the relief might not meet the requirements of § 1521. The Objecting Creditors, in turn, argue extensively that the relief Vitro requests, to the extent it is available at all, must fall under § 1521(a)(1) and (b), and that the bankruptcy court was correct to deny enforcement because of the limitations imposed by § 1522.

Thus, while comity should be an important factor in determining whether relief will be granted, we are compelled by the bankruptcy court's decision and the parties' arguments to get into the weeds of Chapter 15 to determine whether a foreign representative may independently seek relief under either § 1521 or § 1507, and whether a court may itself determine under which of Chapter 15's provision such relief would fall. Both appear to be questions of first impression.

[21] We conclude that a court confronted by this situation should first consider the specific relief enumerated under § 1521(a) and (b). If the relief is not explicitly provided for there, a court should

then consider whether the requested relief falls more generally under § 1521's grant of any appropriate relief. We understand "appropriate relief" to be relief previously available under Chapter 15's predecessor, § 304. Only if a court determines that the requested relief was not formerly available under § 304 should a court consider whether relief would be appropriate as "additional assistance" under § 1507.[FN23]

> FN23. Although this approach—first considering relief under § 1521(a) and (b) and then proceeding to § 1507—has not been explicitly mandated in this circuit, this three-step approach, as we explain below, finds support in the statutory language and in Congress's express intent in crafting § 1507.

We start by acknowledging that "[t]he relationship between § 1507 and § 1521 is not entirely clear." *In re Toft,* 453 B.R. at 190; *see also In re Atlas Shipping A/S,* 404 B.R. at 741.[FN24] This leaves litigants uncertain as to which provision they should rely on for relief. Indeed, Vitro itself acknowledges that its decision to seek relief under § 1507 and, only in the alternative, § 1521 was motivated, in part, by the fact that every other foreign representative requesting enforcement of a *concurso* plan under Chapter 15 has cited both § 1507 and § 1521.

> FN24. *See generally* Alesia Ranney–Marinelli, *Overview of Chapter 15 Ancillary and Other Cross–Border Cases,* 82 Am. Bankr. L.J. 269, 317 (2008) ("What is not clear is whether a foreign representative can pick and choose which section to proceed under in order to take advantage of different standards for affording relief or burdens of proof."); George W. Shuster, Jr., *The Trust Indenture Act and International Debt Restructurings,* 14 Am. Bankr. Inst. L.Rev. 431, 455 ("Because it is unclear where section 1521 ends and where section 1507 begins, it is

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.3d 1031, 57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386
**(Cite as: 701 F.3d 1031)**

also unclear which of these paths the court will follow—whether it will consider entry of an order enforcing a foreign discharge as 'appropriate relief' under section 1521 or as 'additional assistance' under section 1507.").

**\*1055** Section 1521(a) empowers a court to "grant any appropriate relief" at the request of the foreign representative when necessary to "effectuate the purpose of [Chapter 15] and to protect the assets of the debtor or the interests of the creditors." 11 U.S.C. § 1521(a). In addition, § 1521 lists a series of non-exclusive forms of relief. These include:

(1) staying the commencement or continuation of an individual action or proceeding concerning the debtor's assets, rights, obligations or liabilities to the extent they have not been stayed under section 1520(a);

(2) staying execution against the debtor's assets to the extent it has not been stayed under section 1520(a);

(3) suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520(a);

(4) providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities;

(5) entrusting the administration or realization of all or part of the debtor's assets within the territorial jurisdiction of the United States to the foreign representative or another person, including an examiner, authorized by the court;

(6) extending relief granted under section 1519(a); and

(7) granting any additional relief that may be available to a trustee, except for relief available

under sections 522, 544, 545, 547, 548, 550, and 724(a).

11 U.S.C. § 1521(a).

Additionally, under § 1521(b), "the court may, at the request of the foreign representative, entrust the distribution of all or part of the debtor's assets located in the United States to the foreign representative ... provided that the court is satisfied that the interests of creditors in the United States are sufficiently protected." Section 1522 provides an important limiting factor: relief under § 1521 may be granted "only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected," and a court may impose appropriate conditions on relief. 11 U.S.C. § 1522(a)-(b).

Unlike § 1521's "any appropriate relief" language, § 1507 gives courts the authority to provide "additional assistance." Section 1507 "was added to the Bankruptcy Code because Congress recognized that Chapter 15 may not anticipate all of the types of relief that a foreign representative may require and which would otherwise be available to such foreign representative." 8 Collier on Bankruptcy ¶ 1507.01 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2012) (Collier).[FN25] A court determining whether to provide additional assistance under § 1507 considers the factors listed under subsection (b),[FN26] which provides that:

FN25. The Model Law's analog to § 1507 "was designed to insure access to relief that might be available under law other than the insolvency law." 8 Collier, *supra,* ¶ 1507.01.

FN26. These factors are identical to those formerly found under § 304(c), with the exception that comity has been elevated from a factor to the introductory text.

(b) In determining whether to provide additional assistance under this title or under other laws of

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.3d 1031, 57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386
**(Cite as: 701 F.3d 1031)**

the United States, the court shall consider whether such additional assistance, consistent with principles of comity, will reasonably assure

**\*1056** 1) just treatment of all holders of claims against or interests in the debtor's property;

2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

3) prevention of preferential or fraudulent dispositions of property of the debtor;

4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and

5) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

11 U.S.C. § 1507(b).FN27

> FN27. Because of § 1521's broad reach, § 1507's scope is uncertain. *See* Lesley Salafia, *Cross–Border Insolvency Law in the United States and Its Application to Multinational Corporate Groups,* 21 Conn. J. Int'l L. 297, 322 (2006) (section 1507 "might not have been necessary," given expansive relief available under other parts of Chapter 15); 8 Collier, *supra,* ¶ 1507.01 ("In light of this display of [ § 1521's] weaponry, it is not clear what section 1507 adds to the arsenal."). Scholarly commentary has speculated that § 1507 was merely intended to incorporate § 304's jurisprudence. 8 Collier, *supra,* ¶ 1507.01. Further muddying § 1507's role is that, although § 304(c)'s factors are included under § 1507, a court may nevertheless consider those factors under § 1521. "It would be anomalous to suggest that in determining whether creditor interests are sufficiently protected for purposes of ... [§] 1521, a court could

not consider evidence of procedural or substantive prejudice to non-domestic creditors in the foreign proceeding or a significant deviation between the distribution scheme in the foreign proceeding and the distribution scheme prescribed by the Code." Paul L. Lee, *Ancillary Proceedings under Section 304 and Proposed Chapter 15 of the Bankruptcy Code,* 76 Am. Bankr. L.J. 115, 193 (2002).

We are thus faced with two statutory provisions that each provide expansive relief, but under different standards. To clarify our resolution of requests for relief under Chapter 15 we adopt the following framework for analyzing such requests.

First, because § 1521 lists specific forms of relief, a court should initially consider whether the relief requested falls under one of these explicit provisions. *In re Read,* 692 F.3d 1185, 1191 (11th Cir.2012) (specific terms prevail over the general (quoting *D. Ginsberg & Sons, Inc. v. Popkin,* 285 U.S. 204, 208, 52 S.Ct. 322, 76 L.Ed. 704 (1932))); *see also* 1 Collier, *supra,* ¶ 13.07[2]; Ranney–Marinelli, *Overview, supra,* at 317 (arguable that foreign representatives should be bound by those provisions specifically providing the relief sought). Other courts have held that, where the requested relief is explicitly provided for under § 1521, it is unnecessary to consider § 1507. *In re Atlas Shipping A/S,* 404 B.R. at 740 ("Whatever the outer bounds of discretionary relief chapter 15 allows, this case does not push the boundaries. The relief sought by the foreign representative is expressly provided for in §§ 1521(a)(5) and 1521(b). The Court need not venture into the area of 'additional assistance,' 'consistent with principles of comity' under § 1507."); *In re Int'l Banking Corp. B.S.C.,* 439 B.R. 614, 626 n. 10 (Bankr.S.D.N.Y.2010).

Second, if § 1521(a)(1)-(7) and (b) does not list the requested relief, a court should decide whether it can be considered "appropriate relief" under § 1521(a). This, in turn, requires consideration of

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.3d 1031, 57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386
**(Cite as: 701 F.3d 1031)**

whether such relief has previously been provided under § 304. *See In re Condor,* 601 F.3d at 329 (observing that avoidance actions under foreign law were permitted under § 304 and reading § 1521(a)(7) to permit such relief). This latter consideration aligns with Congress's intent that § 1521 was not intended to "expand or reduce the **\*1057** scope of relief" previously available under other provisions, including § 304. H.R.Rep. No. 109–31, pt. 1, at 116. A court should also consider whether the requested relief would otherwise be available in the United States. *Cf. Artimm,* 335 B.R. at 160 n. 11 (section 1507 authorizes relief beyond that provided for in Bankruptcy Code or United States law).

[22][23] Third, only if the requested relief appears to go beyond the relief previously available under § 304 or currently provided for under United States law, *Artimm,* 335 B.R. at 160 n. 11, should a court consider § 1507. *See* H.R.Rep. No. 109–31, pt. 1, at 109 ("Subsection (2) [of § 1507] makes the authority for additional relief (*beyond that permitted under section*[ ] *... 1521,* below) subject to the conditions for relief heretofore specified in United States law under section 304 ...." (emphasis added)). This approach recognizes that relief under § 1507 "is in nature more extraordinary" than that provided under § 1521, as a result of which "the test for granting that relief is more rigorous." Leif M. Clark, *Chapter 15 Bankruptcy Strategies: Leading Bankruptcy Experts on Understanding the Filing Process and Achieving Successful Outcomes in Cross–Border Insolvency Cases—Advice for Handling Cross–Border Bankruptcy Cases Effectively* (Aspatore Sept. 2012), *available at* 2012 WL 3279175, at \*10. It also acknowledges that, while § 1507's broad grant of assistance is intended to be a "catch-all," it cannot be used to circumvent restrictions present in other parts of Chapter 15, nor to provide relief otherwise available under other provisions. *In re Int'l Banking Corp. B.S.C.,* 439 B.R. at 626 n. 10; 1 Collier, *supra,* ¶ 13.07[2] n. 34 (section 1507 should not be used "to eviscerate limitations placed within chapter 15 itself").

We believe this framework provides foreign representatives with the clearest path by which to seek Chapter 15 relief. *See* Clark, *supra,* at \*10 (advising attorneys to consult § 1507 if the relief under § 1521 is insufficiently broad). This framework also conforms to Congress's intent that courts should not deny Chapter 15 relief for failure to meet the requirements of § 1507, which, in any case, "is not to be the basis for denying or limiting relief otherwise available under this chapter." H.R.Rep. No. 109–31, pt. 1, at 109; *see also* Ranney–Marinelli, *Overview, supra,* at 316 n. 267. Under this framework, courts will also "not construe the range of relief under § 1507 to be bound by the same limitations that apply in § 1521," with the exception of those limitations specifically provided for. Clark & Goldstein, *Sacred Cows, supra,* at 529.

At the same time, this approach means that, by first considering § 1521 relief—which we deem coextensive with that previously available under § 304—courts begin their analysis in familiar territory. Ranney–Marinelli, *Overview, supra,* at 317 n. 274 (noting that, compared to other sections, § 1507's standard of proof is unclear). This prevents all-encompassing applications of § 1507 and avoids prematurely expanding the reach of Chapter 15 beyond current international insolvency law. H.R.Rep. No. 109–31, pt. 1, at 109 (purpose of § 1507 is "to permit the further development of international cooperation begun under section 304 "); Clark & Goldstein, *Sacred Cows, supra,* at 529 (whether a "court [would] ever dare to employ § 1507 as a substitute for (or worse, an end-around of) § 1521" is an open question).

**3. Availability of Relief under § 1521 and § 1507**

Applying our analytic framework to Vitro's request for relief, the bankruptcy **\*1058** court did not err in denying relief. Sections 1521(a)(1)-(7) and (b) do not provide for discharging obligations held by non-debtor guarantors. Section 1521(a)'s general grant of "any appropriate relief" also does not provide the necessary relief because our precedent has interpreted the Bankruptcy Code to foreclose

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.3d 1031, 57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386
**(Cite as: 701 F.3d 1031)**

such a release, and because when such relief has been granted, it has been granted under § 1507, not § 1521. Even if the relief sought were theoretically available under § 1521, the facts of this case run afoul of the limitations in § 1522. Finally, although we believe the relief requested may theoretically be available under § 1507 generally, Vitro has not demonstrated circumstances comparable to those that would make possible such a release in the United States, as contemplated by § 1507(b)(4).

(a) Step 1: Section 1521's enumerated provisions

[24] The bankruptcy court denied relief under § 1521(b) and § 1522(a), observing that "[o]ne could argue that Vitro SAB, as a holding company, is trying to achieve, through its *Concurso* plan, an entrustment of the distribution of the assets of its non-debtor U.S. subsidiaries without sufficiently protecting the Objecting Creditors." *Vitro II,* 473 B.R. at 132. Vitro concedes that § 1507, on which it primarily relies, does not explicitly provide for a "discharge" of non-debtors, and thus injunctive relief is a necessary by-product of granting enforcement, but Vitro argues that this fact alone does not mean that it must satisfy the requirements of § 1522 .[FN28] The Objecting Creditors respond that the relief Vitro seeks is addressed by § 1521(a)(1) and (b), and thus Vitro is bound by the limitations in § 1521 and § 1522 that any relief must ensure that the interests of creditors and other interested parties are sufficiently protected.

> FN28. Vitro also argues that § 1521 only applies during the pendency of a foreign insolvency proceeding, and not after the foreign court approves a reorganization plan, and Vitro cites in support *In re Daewoo Logistics Corp.,* 461 B.R. 175, 179–80 (Bankr.S.D.N.Y.2011). That case only states that "relief may be available after close of the foreign proceeding under section 1507." *Id.* at 180. It does not create a categorical rule and § 1521 does not include such a limitation.

Contrary to the Objecting Creditors' assertion

and the bankruptcy court's finding, the requested relief is not available under any of § 1521's specific provisions because none of the types of relief enumerated under § 1521(a) or § 1521(b) matches the type of relief Vitro seeks. The closest provision is § 1521(a)(1), which provides for "staying the commencement or continuation of an individual action or proceeding *concerning* the debtor's assets, rights, obligations or liabilities." 11 U.S.C. § 1521(a)(1) (emphasis added).[FN29] But Vitro is not merely seeking a stay. Rather, Vitro seeks to permanently enjoin actions brought against its subsidiaries and, moreover, to discharge obligations and liabilities owed by those subsidiaries. We reject the bankruptcy court's suggestion to treat the assets of Vitro's subsidiaries as Vitro's **\*1059** "assets" for this purpose. *In re Guyana Dev. Corp.,* 168 B.R. 892, 905 (Bankr.S.D.Tex.1994) ("As a general rule, property of the estate includes the debtor's stock in a subsidiary but not the assets of the subsidiary."). As the Objecting Creditors repeatedly remind us, most of Vitro's subsidiaries have not gone into bankruptcy. Vitro's subsidiaries are also its creditors. Thus, there is no basis to conclude that § 1521(a)(1) adequately responds to the type of relief Vitro seeks.[FN30]

> FN29. Scholarly commentary has suggested that § 1521(a)(1)'s use of the word "concerns" "indicates that a stay of actions against someone other than the debtor or the debtor's assets is a possibility," including "a stay of litigation against a third party with indemnification rights against the debtor, or with shared liability ... on the theory that the litigation so stayed *concerns* the debtor's rights, obligations or liabilities." 1 Collier, *supra,* ¶ 13.07[2] & n. 37 (emphasis in original). However, the situation in this case is different. The worry is not that Vitro will be harmed by creditors collecting from the subsidiaries who will in turn come looking for Vitro. Instead, Vitro's subsidiaries are guarantors, and thus it was Vitro's defaulting on its ob-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.3d 1031, 57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386
**(Cite as: 701 F.3d 1031)**

ligations which now endangers the subsidiaries by triggering the guaranties.

FN30. We are aware that under the older § 304(b)(1) a bankruptcy court could "enjoin actions against the debtor with regard to property *involved in* such foreign proceeding" and that "against the debtor" has been understood to include non-debtors "when failure to enjoin the action would jeopardize the success of the bankruptcy process or cause irreparable harm to the debtor's estate and its creditors." *In re Schimmelpenninck,* 183 F.3d at 362 (internal quotation marks and citation omitted). However, under 11 U.S.C. § 362(a)(1), which includes the same "against the debtor" language as § 304(b), stays against non-debtors were reserved for "very limited situations." *Matter of S.I. Acquisition, Inc.,* 817 F.2d 1142, 1147 (5th Cir.1987). Moreover, unlike in a case such as *In re Schimmelpenninck,* we are not dealing with creditors attempting to recover on a debt under an alter ego and single business enterprise theory. 183 F.3d at 363. Instead, the Objecting Creditors are trying to recover from the subsidiaries under guaranties that were triggered only as a result of Vitro's default. Vitro is not seeking a temporary injunction, but a permanent discharge of the Guarantors' obligations. Vitro itself points out that injunctive relief is only incidental to the broader relief it seeks.

For substantially the same reason, we reject the bankruptcy court's suggestion that § 1521(b) applies. Section 1521(b) provides that "the court may, at the request of the foreign representative, entrust the distribution of all or part of the debtor's assets located in the United States to the foreign representative ... provided that the court is satisfied that the interests of creditors in the United States are sufficiently protected." Because the subsidiaries'

assets are not Vitro's, § 1521(b) does not apply. FN31

FN31. We also note that the Enforcement Motion does not seek relief under § 1521(b). Instead, the Enforcement Motion refers to § 1521(a)(1), (a)(2), (a)(5), and (a)(7). Neither Vitro's nor Fintech's brief argues how these other provisions would apply and they actually appear to present reasons for why the requested relief might not be available under § 1521.

(b) Step 2: Section 1521(a)'s grant of "any appropriate relief"

[25] Having determined that none of the enumerated forms of relief listed under § 1521 provides the range of relief Vitro seeks, we proceed to consider whether the relief sought fits into the court's more general power to grant "any appropriate relief." We conclude that the requested relief falls outside § 1521(a)'s grant of authority for two reasons.

First, the relief Vitro seeks, a non-consensual, non-debtor release through a bankruptcy proceeding, is generally not available under United States law. Indeed, this court has explicitly prohibited such relief. *In re Pac. Lumber Co.,* 584 F.3d 229, 251–52 (5th Cir.2009) (discharge of debtor's debt does not affect liability of other entities on such debt and denying non-debtor release and permanent injunction); *In re Zale Corp.,* 62 F.3d 746, 760 (5th Cir.1995) ("Section 524 prohibits the discharge of debts of nondebtors."). Because our law prohibits the requested discharge, a request for such relief more properly falls under § 1507, which was included to address such circumstances.

Second, our conclusion is bolstered by the fact that in the one case where a foreign proceeding's non-debtor discharge **\*1060** was approved by a United States court, it was under § 1507, not § 1521. In *Metcalfe,* the court recognized that "a third-party non-debtor release 'is proper only in rare cases.' " 421 B.R. 685, 694 (Bankr.S.D.N.Y.2010)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.3d 1031, 57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386
**(Cite as: 701 F.3d 1031)**

(quoting *In re Metromedia Fiber Network, Inc.,* 416 F.3d 136, 141 (2d Cir.2005)). The court nevertheless found that approval was not precluded under § 1507. *Id.* at 697.[FN32]

> FN32. While we agree with the bankruptcy court that *Metcalfe* is ultimately distinguishable, *Vitro II,* 473 B.R. at 131, we nevertheless find it instructive in determining which part of Chapter 15 would provide the requested relief.

[26] Finally, we note that the bankruptcy court's decision was proper under § 1522, which requires that the relief contemplated under § 1521 balance the interests of the creditors and debtors. *See In re Tri–Cont'l Exch. Ltd.,* 349 B.R. at 637 (analysis of § 1522 "emphasize[s] the need to tailor relief and conditions so as to balance the relief granted to the foreign representative and the interests of those affected by such relief, without unduly favoring one group of creditors over another"). Because the bankruptcy court also found that the *Concurso* plan did not provide for an appropriate balance among the interests of Vitro, its creditors, and the Guarantors under § 1521 and § 1522, we observe that even were we to agree that the requested relief is provided for under § 1521, the bankruptcy court did not abuse its discretion in denying it. Because the reasons for which the bankruptcy court denied relief under § 1521 are largely identical, however, we jointly address those reasons under our discussion of § 1507. We proceed to consider whether, as Vitro and Fintech argue, the relief was available under § 1507, and whether the bankruptcy court properly denied it.

(c) Step Three: Section 1507's "additional assistance"

The bankruptcy court denied relief under § 1507 because the Plan "does not provide for the distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by Title 11," contrary to § 1507(b)(4). *Vitro II,* 473 B.R. at 132.

Under a Chapter 11 plan, the noteholders would receive their distribution from the debtor and would be free to pursue their other obligors, in this case the non-debtor guarantors. The *Concurso* plan provides drastically different treatment in that the noteholders receive a fraction of the amounts owed under the indentures from Vitro SAB and their rights against the other obligors are cut off.

> *Id.*

Vitro challenges the bankruptcy court's holding predominantly on the ground that it accorded insufficient weight to comity. The Objecting Creditors point to disparities between the *Concurso* plan and a similar proceeding in United States bankruptcy court. They also assert that the Mexican court's disregard for a relevant decision in New York state court precludes extending comity to its decision.

We conclude that § 1507 theoretically provides for the relief Vitro seeks because it was intended to provide relief not otherwise available under United States law. But the devil is in the details, and in this case, the bankruptcy court correctly determined that relief was precluded by § 1507(b)(4). Under that provision, the bankruptcy court had to consider whether the relief requested was comparable to that available under the Bankruptcy Code. We conclude below that, although a non-consensual, non-debtor discharge would not be available in this circuit, it could be available in other circuits. We also hold **\*1061** that because Vitro has failed to show the presence of the kind of comparable extraordinary circumstances that would make enforcement of such a plan possible in the United States, the bankruptcy court did not abuse its discretion in denying relief.

*i. Availability of non-consensual, non-debtor discharges under § 1507*

This court has previously foreclosed the type of relief sought here in the context of a United States bankruptcy proceeding. We acknowledge, however, that our view on this subject is not universally

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.3d 1031, 57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386
**(Cite as: 701 F.3d 1031)**

shared by our sister circuits. Although § 1521 relief is precluded by our prior holdings, relief may nevertheless be appropriate under § 1507 which, as discussed above, was included under Chapter 15 to permit the expansion of relief previously available under § 304. We begin by analyzing release of nondebtors under United States bankruptcy law.

In re Pacific Lumber Co. concerned a proposed plan that would "release [ ] [owners and guarantors] from liability ... related to proposing, implementing, and administering the [reorganization] plan." 584 F.3d at 251. Quoting 11 U.S.C. § 524(e)'s language that the "discharge of a debt of the debtor does not affect the liability of any other entity on ... such debt," we went on to reject the guarantors' argument that "the release clause is part of their bargain because without the clause neither company would have been willing to provide the plan's financing." Id. at 251–52 (quotation marks omitted). This conclusion was consistent with prior rulings from this circuit that "seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions." Id. at 252; see also In re Bigler LP, 442 B.R. 537, 546 (Bankr.S.D.Tex.2010); In re Pilgrim's Pride Corp., No. 08–45664–DML–11, 2010 WL 200000, at *5 (Bankr.N.D.Tex. Jan. 14, 2010).

Other circuits agree. See In re Lowenschuss, 67 F.3d 1394, 1401 (9th Cir.1995) ("This court has repeatedly held, without exception, that § 524(e) precludes bankruptcy courts from discharging the liabilities of non-debtors."); In re W. Real Estate Fund, Inc., 922 F.2d 592, 600–02 (10th Cir.1990); In re Jet Fla. Sys., Inc., 883 F.2d 970, 972–73 (11th Cir.1989). Those circuits not in agreement nevertheless prohibit such releases in all but the rarest of cases.

In Metromedia, for example, the court expressed great reluctance in approving non-debtor releases. 416 F.3d at 141. It observed that the Bankruptcy Code expressly authorizes such releases only under 11 U.S.C. § 524(g), a provision authorizing such release upon satisfaction of specific conditions in the context of asbestos cases. Id. at 142. That court also noted that the release of non-debtors "is a device that lends itself to abuse" because it "may operate as a bankruptcy discharge arranged without a filing and without the safeguards of the [Bankruptcy] Code." Id. "No case has tolerated nondebtor releases absent the finding of circumstances that may be characterized as unique," and such releases have been appropriate only in "rare cases." Id. at 141–42. The Metromedia court elaborated that "[a] nondebtor release in a plan of reorganization should not be approved absent the finding that truly unusual circumstances render the release terms important to success of the plan," focusing on considerations such as whether: "the estate received substantial consideration ...; the enjoined claims were channeled to a settlement fund rather than extinguished ...; the enjoined claims would indirectly impact the debtor's reorganization by way of indemnity or contribution .... and the plan otherwise provided**\*1062** for the full payment of the enjoined claims .... [or] the affected creditors consent[ed]." Id. at 142–43 (internal citations and quotation marks omitted).

Similarly, in In re Dow Corning Corp., the court observed that enjoining a non-consenting creditor's claim against a non-debtor is a "dramatic measure" and instructed courts to approve such a release only when the following seven factors are present:

(1) There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate; (2) The non-debtor has contributed substantial assets to the reorganization; (3) The injunction is essential to reorganization, namely the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor; (4) The impacted class, or classes, has overwhelmingly voted to accept the plan; (5) The plan provides a mechanism to pay for all, or substantially all, of

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.3d 1031, 57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386
**(Cite as: 701 F.3d 1031)**

the class or classes affected by the injunction; (6) The plan provides an opportunity for those claimants who choose not to settle to recover in full and; (7) The bankruptcy court made a record of specific factual findings that support its conclusions.

280 F.3d 648, 658–61 (6th Cir.2002).

Other courts have imposed similar restrictions on enjoining third-party claims against non-debtors. *See In re Specialty Equip. Cos.,* 3 F.3d 1043, 1044–49 (7th Cir.1993) (section 524(e) does not bar granting release to third parties where release is consensual and non-coercive and would bind only those creditors voting in favor of the plan); *In re A.H. Robins Co., Inc.,* 880 F.2d 694, 701–02 (4th Cir.1989) (enjoining suits where plan was overwhelmingly approved, late claimants were given opportunity to recover, reorganization hinged on debtor being free from claims against parties with indemnity or contribution claims against it, and creditors who opted out would have had their claims fully satisfied by staying within settlement agreement).

[27] The decisions of these courts demonstrate disagreement among the circuits as to when, if ever, a non-debtor discharge is appropriate. We conclude that, although our court has firmly pronounced its opposition to such releases, relief is not thereby precluded under § 1507, which was intended to provide relief not otherwise available under the Bankruptcy Code or United States law. *See Artimm,* 335 B.R. at 160 n. 11.

### ii. Appropriateness of non-consensual, non-debtor discharges under § 1507

[28] Having determined that the relief Vitro seeks is theoretically available under § 1507, we turn to whether the bankruptcy court abused its discretion in determining that such relief was not appropriate in this case. The bankruptcy court held a four-day trial, involving hundreds of exhibits and testimony by witnesses from both sides. It concluded that the requested relief did not substantially

conform to the order of distribution under Title 11 because the *Concurso* plan provided creditors with a substantially reduced recovery, while cutting off their ability to pursue relief against the Guarantors.

Vitro contends that the bankruptcy court incorrectly denied enforcement because the *Concurso* plan did not provide creditors with exactly what they would **\*1063** have received under Chapter 11. FN33 Vitro further challenges the applicability of § 1507(b)(4) because the bankruptcy court based its decision on the discharge of non-debtors' obligations, and not the distribution of Vitro's property. Finally, Vitro argues that whatever concerns this case implicates, the bankruptcy court erred in concluding that they outweighed the interests of comity. FN34 FN35,

> FN33. Vitro also argues that the bankruptcy court erred in treating § 1507(b)'s subsections as prongs of a test, as opposed to mere considerations, and did not consider the totality of the circumstances. Although it is not necessary for a plan to meet all § 1507(b) factors, *see In re Bd. of Dirs. of Telecom Arg. S.A.,* 528 F.3d 162, 169 n. 7 (2d Cir.2008) (noting that "Chapter 15 dispenses with the explicit requirement that courts consider the five factors listed in § 304(c) [now § 1507(b)] as part of an application for recognition of foreign insolvency proceedings"), failure to meet any one of these can suffice to deny enforcement, *see In re Treco,* 240 F.3d at 158–61 (denying enforcement because of violation of § 304(c)(4) (now § 1507(b)(4)).
>
> FN34. Fintech also argues that failure to enforce the Plan would encourage investors to resort to litigation, instead of negotiating compromises with a debtor in bankruptcy. Given our very limited holding on the facts of this case we find this to be a slight risk. Even were it otherwise, we are bound to apply the statutory provisions

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.3d 1031, 57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386
**(Cite as: 701 F.3d 1031)**

of Chapter 15 faithfully irrespective of whether the effect will be to spur further litigation.

> FN35. The parties dispute whether we need to consider the traditional factors of comity. In *International Transactions, Ltd.* we enumerated five requirements that would make a foreign court's judgment on a matter conclusive in federal court. 347 F.3d at 594. Section 1507 explicitly incorporates comity, however, and thus, given our reasoning above, we assume that comity would be granted were the Plan to also reasonably address the concerns enumerated in § 1507(b)(1)-(4). *See In re Treco,* 240 F.3d at 158 (observing that § 304(c) (now § 1507(b)) supplants federal common law analysis).

The Objecting Creditors respond that the evidence presented at trial demonstrated that, under the *Concurso* plan, they would recover only around 40% of the Old Notes' value, while Vitro's shareholders would retain equity interests worth $500 million.[FN36] They also point to various **\*1064** parts of the Plan that do not conform with Chapter 11. These include that guarantor obligations cannot be discharged over the objections of creditors, creditors would not have been grouped for voting purposes into a single class together with parties having adverse interests, and insider votes would not count towards the Plan's approval. The Objecting Creditors further argue that comity does not weigh in favor of enforcement of this plan because the Mexican court, which approved it, ignored a ruling by a New York state court holding that the indentures expressly prohibited modification of the Guarantors' obligations.

> FN36. The Objecting Creditors' briefs largely omit any discussion of how the distributions under the *Concurso* plan, including the New 2019 Notes, the MCDs, and the cash consideration, resulted in this amount. The Objecting Creditors' witness,

Dan Gropper, a managing director of one of the Noteholders, testified as a fact witness on this issue. Gropper was uncertain of what worth, for example, the MCDs, which convert into 20% equity in Vitro upon Vitro's default, would have, given the questionable value of equity in a defaulting company. The bankruptcy court made no specific factual findings in his regard, and thus we are left with the court's more general observation that creditors would, under the Plan, receive a fraction of what they would have received under the Old Notes.

The Objecting Creditors also make much of testimony by their expert witness, Dr. Joseph W. Doherty, that there was only a 10,000 to 1 chance that Vitro would have received a distribution in United States bankruptcy court like that resulting from the *concurso* proceeding. But this calculation was not based on any case-by-case comparison between Vitro and other bankruptcies. Instead, it was based on a sample of cases drawn from an incomplete database of bankruptcy proceedings, which, at the time, contained 108 relevant cases, of which 37 involved any distributions of equity. Doherty himself admitted that the database was still in the process of being compiled and presently contained only cases with information easily available on the Public Access to Court Electronic Records database ("PACER"). Statistical evidence of this variety is, to say the least, of limited value when considering the complexities of bankruptcy proceedings of this scale. The bankruptcy court acknowledged that Doherty testified as to "[t]he wide variance in return to creditors from what would be expected in a Chapter 11 plan," but only found that testimony "credible," without making

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.3d 1031, 57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386
**(Cite as: 701 F.3d 1031)**

any specific factual findings, and only made his credibility finding within the scope of arguments the court did not reach.

We conclude that the evidence Vitro presented at trial does not support the presence of circumstances comparable to those necessary for effectuating the release of non-debtor guarantors in those of our sister circuits that allow such a release. *See In re Schimmelpenninck,* 183 F.3d at 364.

We begin our analysis, as we must, by considering comity. 11 U.S.C. § 1507 (court may grant "additional assistance ... consistent with principles of comity"). In revising Chapter 15's predecessor, § 304, Congress elevated comity from a factor under § 304(c) to the introductory text of § 1507 "to make it clear that it is the central concept to be addressed." H.R.Rep. No. 109–31, pt. 1, at 109. Vitro is thus correct to focus its argument on comity, and we agree with Vitro that comity is the rule under Chapter 15, not the exception. It is thus necessary to first address the Objecting Creditors' most direct challenge to that principle, namely that the Mexican court failed to extend comity to the decision of a New York state court on issues central to this case. *See United States ex rel. Saroop v. Garcia,* 109 F.3d 165, 170 (3d Cir.1997) (reciprocity is condition for honoring foreign country's judicial decrees); *Remington Rand Corp.–Del. v. Bus. Sys. Inc.,* 830 F.2d 1260, 1273 (3d Cir.1987) (describing comity as a "two-way street").[FN37]

> FN37. We found the discussion on this issue in the amicus curiae brief filed by the United Mexican States of assistance.

The New York state court addressed a declaratory judgment action brought by Wilmington, which sought a confirmation of Vitro's obligations under the indentures. *Wilmington Trust,* 2011 WL 6141025, at *1. The state court carefully parsed the issues before it and determined that "any declaratory relief in this court can only be in the context of determining the rights and obligation of the parties under the Indentures." *Id.* at *5. The court next determined that the indentures were governed by New York law and that "pursuant to the relevant provisions of the Indentures ... any non-consensual ... release, discharge or modification of the Guarantors' obligations is prohibited." *Id.* The court was clear, however, that its authority went no further. "Whether such rights and obligations can or cannot be novated, substituted, released or modified under the Mexican bankruptcy law is an issue for the Mexican Court." *Id.* To remove all doubt, the court explicitly stated that "granting a declaratory judgment in favor of [the Objecting Creditors], to the extent stated herein, will not interfere with the Mexican Court proceeding, which is the proper jurisdiction to determine the issues that may arise in connection with the approval of the Concurso Plan, pursuant to applicable Mexican law." *Id.* The court concluded by stating that "whether any Concurso Plan that is ultimately approved by the Mexican Court may be enforced in the United States is an issue for the federal**1065** courts, including the Bankruptcy Court." *Id.*

The Mexican court was presented with the opportunity to consider the New York decision and its impact on the *concurso* proceeding. Although the Mexican court does not appear to have provided specific reasons, we infer from its decision that it did not find that the indentures precluded Mexican law from novating the obligations contained therein. Because the New York court explicitly set aside this issue for the Mexican court, reciprocity was not offended by the Mexican court's subsequent decision of that very issue. We thus do not view this as a ground for denying comity. Our decision comports with the approach adopted by the court in *Metcalfe,* which, while recognizing that a third-party non-debtor release might be inappropriate under United States law, left it to the Canadian courts to determine whether they had the jurisdiction to grant such relief. 421 B.R. at 697–700.

We next consider whether the bankruptcy court erred in basing its decision on § 1507(b)(4).[FN38]

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.3d 1031, 57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386
**(Cite as: 701 F.3d 1031)**

Section 1507(b)(4) provides that a court should consider whether to grant additional assistance to a foreign representative by considering the "distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title." Vitro asserts that the bankruptcy court's opinion was based on the distribution of non-debtor's property, that of Vitro's subsidiaries, and thus § 1507(b)(4) is inapplicable. But the focus of § 1507(b)(4) is on the plan of distribution, and Vitro ignores that the Plan it seeks to enforce premises distribution of its assets on the discharge of obligations owed by non-debtors who are also Vitro's creditors. The respective amounts that Vitro pays under the Plan to the Objecting Creditors and to its subsidiaries are inescapably dependent on the discharge of the non-debtor Guarantors. That the detriment of this distribution falls on the Objecting Creditors, whose rights are extinguished in exchange for their distribution under the Plan, in no way subtracts from the fact that the release affects how the proceeds of Vitro's property are distributed.

> FN38. Because the bankruptcy court did not discuss whether § 1507(b)(1)-(3) weighed in favor of, or against, granting relief, and because we find that relief was properly denied on other grounds, we do not reach the Objecting Creditors' argument that the *Concurso* plan violated § 1507(b)'s other subsections.

We turn finally to whether the evidence Vitro has presented in favor of comity and enforcement so outweighed the bankruptcy court's concerns under § 1507(b)(4) that it was an abuse of discretion for the bankruptcy court to deny relief. Vitro's primary witness was its foreign representative, Sanchez–Mujica. He testified that the *conciliador* persuaded Vitro to offer more favorable terms to third-party creditors in the *Concurso* plan. These included a 5% increase—from 15% to 20%—of the equity available on default under the MCDs, and that consent payments, previously made to only

some of the creditors, be extended to all consenting creditors. But this hardly shows that the result of the *concurso* proceeding is in line with what would be available under Chapter 11, much less that this case features the unique circumstances that would warrant a general release of the non-debtor subsidiaries. Sanchez–Mujica also testified that over 74% of recognized creditors approved the plan. But this ignores that recognized creditors holding over 50% of all unsecured debt who voted in favor of the Plan were Vitro subsidiaries.

Vitro's second witness, Luis Mejan—an expert in Mexican bankruptcy law—was **\*1066** cross-examined at trial, and his expert report and expert rebuttal were introduced in lieu of direct examination. Mejan's expert report provides a comprehensive breakdown of the LCM and how it operates in the *concurso* context. This merely establishes, however, that the LCM is a process comparable to that of the United States, a fact which no party seriously disputes. The bankruptcy court also had to consider whether the results yielded under the LCM, on the facts of this case, were comparable to the result likely in the United States. *See In re Treco,* 240 F.3d at 159 ("A court must consider the effect of the difference in the law on the creditor in light of the particular facts presented."); *In re Sivec SRL,* 476 B.R. at 324 ("The fact that priority rules and treatment of claims may not be identical is insufficient to deny a request for comity. What this Court must consider is the effect of that difference on the creditor in light of the existing facts."). Mejan's expert report extensively describes Mexican law, but does not explain how the results achieved in this case would compare to those in a United States bankruptcy proceeding. When asked if he had considered "whether other plans that had been approved or enforced in the United States were comparable to Vitro in terms of what happened in the Mexican proceedings," Mejan conceded that he "did not conduct a specific search in order to make [that] comparison."FN39 This failure is especially troubling given Vitro's request for relief which, under United States law, would not be available in

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.3d 1031, 57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386
**(Cite as: 701 F.3d 1031)**

this circuit, and would only be available under the narrowest of circumstances in some of our sister circuits.[FN40]

> FN39. Mejan's rebuttal report also seeks to undermine the Objecting Creditors' claim that there is a debate in the Mexican legal community as to whether insiders are allowed to vote. Regardless of whether such a debate exists, or whether the LCM permits it or not, it is surely the case that in the United States insider voters cannot themselves push through a plan where there is a class of dissenting creditors. *See CIBC Bank & Trust Co. (Cayman) Ltd. v. Banco Cent. do Brasil,* 886 F.Supp. 1105, 1114 (S.D.N.Y.1995) (citing 11 U.S.C. § 1129(a)(10)) (Bankruptcy Code "prevents 'insiders' from voting on whether a reorganization plan will be accepted by a class of impaired creditors"). As we have explained previously, the Bankruptcy Code requires that at least one impaired class of creditors approve a plan, where the class is made up of claims that are substantially similar or share the impaired creditors' interests. *In re Save Our Springs (S.O.S.) Alliance, Inc.,* 632 F.3d 168, 174 (5th Cir.2011).

> FN40. Vitro also called as a rebuttal witness Claudio Del Valle, Vitro's chief financial and restructuring officer. That witness testified as to the amount of default interest recognized in the *concurso* proceeding.

In summary, although extensive testimony was taken before the bankruptcy court that the LCM's legal framework is substantially in accordance with our own, this does not end the analysis of whether to grant comity. *See In re Treco,* 240 F.3d at 158–61 (bankruptcy court abused its discretion by affording comity to Bahamian bankruptcy proceeding without considering effects on creditor's claim). The bankruptcy court correctly observed that we

have "largely foreclosed non-consensual non-debtor releases and permanent injunctions outside of the context of mass tort claims being channeled toward a specific pool of assets." *Vitro II,* 473 B.R. at 131. There appears little dispute that, under United States law, non-debtor releases, while possible in other circuits, are only appropriate in extraordinary circumstances. To that end, Vitro was required to show that something comparable to such circumstances was present here. The mere fact that the *concurso* proceeding complied with the relevant provisions of the LCM is not, in itself, sufficient. **\*1067** Were it otherwise, we would be treating the extraordinary relief available under § 1507 with the casual indifference we have already rejected in the context of recognition determinations under Chapter 15. *See In re Ran,* 607 F.3d at 1021 (recognition determination is not a "rubber stamp exercise"). We would also be disregarding the considerations and safeguards Congress included in § 1507(b).

To that end, we observe that many of the factors that might sway us in favor of granting comity and reversing the bankruptcy court to that end are absent here. Vitro has not shown that there existed truly unusual circumstances necessitating the release. To the contrary, the evidence shows that equity retained substantial value. The creditors also did not receive a distribution close to what they were originally owed. Moreover, the affected creditors did not consent to the Plan, but were grouped together into a class with insider voters who only existed by virtue of Vitro reshuffling its financial obligations between it and its subsidiaries. It is also not the case that the majority of the impacted group of creditors, consisting predominantly of the Objecting Creditors, voted in favor of the Plan. Nor were non-consenting creditors given an alternative to recover what they were owed in full.[FN41]

> FN41. Vitro stresses that the Objecting Creditors are sophisticated parties, and that many noteholders did not purchase notes

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.3d 1031, 57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386
**(Cite as: 701 F.3d 1031)**

until after Vitro had defaulted, the implication being that creditors knew what they were getting into. As a preliminary matter, it appears to us that all the parties involved are "sophisticated." We also do not understand why an investor's background should excuse a plan's failure to substantially adhere to our law's order of distribution.

We similarly reject the argument that because the Objecting Creditors participated in the *concurso* proceeding they are now estopped from resisting Vitro's Chapter 15 action. Chapter 15's protections address a separate set of concerns beyond what may have been litigated in a foreign proceeding.

Vitro cannot rely on the fact that a substantial majority of unsecured creditors voted in favor of the Plan. Vitro's majority depends on votes by insiders. To allow it to use this as a ground to support enforcement would amount to letting one discrepancy between our law and that of Mexico (approval of a reorganization plan by insider votes over the objections of creditors) make up for another (the discharge of non-debtor guarantors). *Cf. CIBC Bank & Trust Co. (Cayman) Ltd.,* 886 F.Supp. at 1114. FN42

FN42. For the same reasons we conclude that, even if § 1521 did provide the broad relief Vitro seeks, enforcement of this Plan would be precluded under § 1522 for failing to provide an adequate "balance between relief that may be granted to the foreign representative and the interests of the persons that may be affected by such relief." *In re Int'l Banking Corp. B.S.C.,* 439 B.R. at 626 (quoting Model Law Guide, *supra,* ¶ 161); *see also In re Sivec SRL,* 476 B.R. at 323.

Vitro argues that there would be financial chaos as a result of the Plan not being enforced. We are aware of the adverse consequences that may en-

sue from the decision not to enforce the Plan. But Vitro's reasoning seeks to justify a prior bad decision on the basis that not enforcing it now would lead to further negative consequences.FN43 Worse, the harm from those consequences would predominantly affect Vitro, the party responsible for bringing about this state of affairs in the first place. Vitro cannot propose a plan that fails to substantially comply with our order of distribution and then defend such a plan by **\*1068** arguing that it would suffer were it not enforced. Vitro's two-wrongs-make-a-right reasoning is unpersuasive.

FN43. Sanchez–Mujica's declaration only states that "Vitro's business, as well as those who have an interest in seeing Vitro's business succeed, such as its customers and creditors, will continue to suffer immense harm" if the Plan is not enforced.

Those cases Vitro points to in which a similar discharge of non-debtor obligations was allowed are inapposite. The closest factual analog to this case is the bankruptcy court's decision in *Metcalfe.* As here, the central issue in *Metcalfe* was "[t]he enforceability of the non-debtor release and injunction on private civil actions in the United States" contained in a Canadian court order approving a restructuring plan. 421 B.R. at 687–88 n. 1. Recognizing that "a third-party non-debtor release 'is proper only in rare cases,' " *id.* at 694 (quoting *Metromedia,* 416 F.3d at 141), the court nevertheless found that approval was not precluded under § 1507, *id.* at 697. The only explanation the court provided was that the non-debtor release and injunction provisions "treat[ed] all claimants in the Canadian Proceedings similarly" and that "[n]o objections ha[d] been lodged that inclusion of these provisions adversely affects any claimant's treatment against any of the debtors' property." *Id.* The bankruptcy court distinguished *Metcalfe* because, in that case, "there was near unanimous approval of the plan by the creditors, who were not insiders of the debtor .... the plan was negotiated between the parties and there appears not to have been a timely

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.3d 1031, 57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386
**(Cite as: 701 F.3d 1031)**

objection .... [and] the release was not complete like the one in the present case." *Vitro II,* 473 B.R. at 131.

We agree that *Metcalfe* is distinguishable. The fact that the Plan approved here was the result of votes by insiders holding intercompany debt means that, although under *Metcalfe* non-debtor releases may be enforced in the United States under Chapter 15, the facts of this case exceed the scope of that decision. We further observe that in that case the Canadian court's decision to approve the non-debtor release "reflect[ed] similar sensitivity to the circumstances justifying approving such provisions," a sensitivity we find absent in the Mexican court's approval of the Plan. 421 B.R. at 698. The Canadian court's decision was also the result of "near-cataclysmic turmoil in the Canadian commercial paper market following the onset of the global financial crisis." *Id.* at 700. As already discussed, Vitro's evidence on this point largely emphasizes the turmoil only Vitro would be exposed to.

Vitro also relies on our decision in *Republic Supply Co. v. Shoaf,* 815 F.2d 1046 (5th Cir.1987). In that case, "we address[ed] the question whether [the] bankruptcy court's confirmation order which, beyond the statutory grant of the [Bankruptcy] Code, expressly released a third-party guarantor, [was] to be given *res judicata* effect." *Id.* at 1047. We held that once a reorganization plan passed the appeal stage it could not be challenged even though it violated the Bankruptcy Code's prohibition on such discharges. *Id.* at 1050. Aside from the fact that *Republic Supply Co.* was a case about the effects of res judicata and has been distinguished for not addressing the legality of non-debtor releases, *see In re Pacific Lumber Co.,* 584 F.3d at 252 n. 27, we have also emphasized the "limited nature" of that decision, *In re Applewood Chair Co.,* 203 F.3d 914, 918 (5th Cir.2000). For example, *Republic Supply Co.* involved a reorganization plan in which a third-party guarantor and creditor were specifically discharged. 815 F.2d at 1051–54. We have distinguished other cases for including general, as op-

posed to specific, releases. *Applewood Chair,* 203 F.3d at 919. As a result, *Republic Supply Co.* provides no guidance where, as here, we are confronted not by a specific release, but by a general release of all the non-**\*1069** debtor subsidiaries. *See id.* [FN44] [FN45],

> FN44. Presumably, Vitro is arguing that the Mexican court's decision is the prior action and, thus, the bankruptcy court and this court are required to recognize that foreign court's holding and confer it res judicata effect. Such reasoning conflates the difference between a foreign ruling and the bankruptcy court's decision to grant relief pursuant to Chapter 15, and is rejected.

> FN45. The other cases Vitro and Fintech cite in support appear to have involved consensual agreements between the parties and are thus inapposite.

On the basis of the foregoing analysis, we hold that Vitro has not met its burden of showing that the relief requested under the Plan—a non-consensual discharge of non-debtor guarantors—is substantially in accordance with the circumstances that would warrant such relief in the United States. In so holding, we stress the deferential standard under which we review the bankruptcy court's determination. It is not our role to determine whether the above-summarized evidence would lead us to the same conclusion. Our only task is to determine whether the bankruptcy court's decision was reasonable. *See Friends for Am. Free Enter. Ass'n v. Wal–Mart Stores, Inc.,* 284 F.3d 575, 578 (5th Cir.2002) (" 'Generally, an abuse of discretion only occurs where no reasonable person could take the view adopted by the trial court.' " (quoting *Dawson v. United States,* 68 F.3d 886, 896 (5th Cir.1995))); *Bear Stearns,* 389 B.R. at 333 (relief under § 1521 and § 1507 is largely discretionary). Having reviewed the record and relevant caselaw, we conclude that the bankruptcy court's decision was reasonable.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

701 F.3d 1031, 57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386
**(Cite as: 701 F.3d 1031)**

#### 4. Section 1506's Bar to Relief

The bankruptcy court concluded that "the protection of third party claims in a bankruptcy case is a fundamental policy of the United States" and held that even if Chapter 15 relief were appropriate, it would be barred under § 1506 because "the *Concurso* plan does not recognize and protect such rights." *Vitro II,* 473 B.R. at 132.

[29][30][31][32] Section 1506 provides that "[n]othing in [Chapter 15] prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506. The narrow public policy exception contained in § 1506 "is intended to be invoked only under exceptional circumstances concerning matters of fundamental importance for the United States." *In re Ran,* 607 F.3d at 1021. "The key determination required by this Court is whether the procedures used in [the foreign proceeding] meet our fundamental standards of fairness." *Metcalfe,* 421 B.R. at 697. A court need not engage in an "independent determination about the propriety of individual acts of a foreign court." *Id.* Furthermore, even the absence of certain procedural or constitutional rights will not itself be a bar under § 1506. *See In re Ephedra Prods. Liab. Litig.,* 349 B.R. 333, 336 (S.D.N.Y.2006) ("Federal courts have enforced against U.S. citizens foreign judgments rendered by foreign courts for whom the very idea of a jury trial is foreign.").

As already discussed, this court holds that the Bankruptcy Code precludes non-consensual, non-debtor releases. *In re Pac. Lumber Co.,* 584 F.3d at 252. Nevertheless, not all our sister circuits agree, and we recognize that the relief potentially available under § 1507 was intended to be expansive. At the same time, § 1506 was intended to be read narrowly, a fact that does not sit well with the bankruptcy court's broad description of the fundamental **\*1070** policy at stake as "the protection of third party claims in a bankruptcy case." *Vitro II,* 473 B.R. at 132. Because we conclude that relief is not

warranted under § 1507, however, and would also not be available under § 1521, we do not reach whether the *Concurso* plan would be manifestly contrary to a fundamental public policy of the United States.[FN46]

> FN46. For the same reason, we do not reach the Objecting Creditors' arguments that the Plan violates a fundamental public policy for infringing on the absolute priority rule, the Contract Clause of the United States Constitution, U.S. Const. art. I, § 10, cl. 1, the Trust Indenture Act of 1939, 15 U.S.C. §§ 77aaa, *et seq.,* or the interests of the United States in protecting creditors from so called "bad faith schemes."

### IV. CONCLUSION

For the aforementioned reasons, we AFFIRM in all respects the judgment of the district court affirming the order of the bankruptcy court in No. 12–10542, and we AFFIRM the order of the bankruptcy court in Nos. 12–10689 and 12–10750. The temporary restraining order originally entered by the bankruptcy court, the expiration of which was stayed by this court, is VACATED, effective December 14, 2012. Each party shall bear its own costs.

C.A.5 (Tex.),2012.
In re Vitro S.A.B. de CV
701 F.3d 1031, 57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Tab 78

473 B.R. 117, 56 Bankr.Ct.Dec. 183
**(Cite as: 473 B.R. 117)**

▷

United States Bankruptcy Court,
N.D. Texas,
Dallas Division.
In re VITRO, S.A.B. DE C.V., Debtor in a Foreign
Proceeding.
Vitro, S.A.B. de C.V., Plaintiff,
v.
ACP Master, Ltd.; AD Hoc Group of Vitro Note-
holders; Aurelius Capital Master, Ltd.; Aurelius
Convergence Master, Ltd.; Elliott International
L.P.; The Liverpool Limited Partnership; and Does
1–1000, Defendants.

Bankruptcy No. 11–33335–HDH–15.
Adversary No. 12–03027.
June 13, 2012.

**Background:** Foreign representatives in proceed-
ing ancillary to foreign main case sought enforce-
ment of judgment entered by Mexican court, which
not only modified debts owed by foreign debtor but
novated and extinguished guarantees of foreign
debtor's indebtedness by its nondebtor subsidiaries.

**Holding:** The Bankruptcy Court, Harlin Dewayne
Hale, J., held that judgment could not be enforced,
so as to permanently enjoin suits in the United
States against debtor's nondebtor subsidiaries, as
manifestly contrary to United States public policy.

Motion denied.

West Headnotes

**[1] Bankruptcy 51 🗝2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceed-
ings
         51k2341 k. In general. Most Cited Cases
Comity should be bankruptcy court's primary
consideration in deciding whether to provide addi-
tional assistance to foreign representative, beyond
the mandatory effects of recognition of foreign
main proceeding. 11 U.S.C.A. § 1507(a).

**[2] Bankruptcy 51 🗝2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceed-
ings
         51k2341 k. In general. Most Cited Cases
Granting comity to judgments in foreign bank-
ruptcy proceedings is appropriate as long as United
States parties are provided same fundamental pro-
tections that litigants in the United States would re-
ceive.

**[3] Bankruptcy 51 🗝2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceed-
ings
         51k2341 k. In general. Most Cited Cases
Principle of comity, as primary consideration
in deciding whether to grant additional assistance to
foreign representative following recognition of for-
eign main proceeding, has never meant categorical
deference to foreign proceedings; it is implicit in
concept that deference should be withheld where
appropriate to avoid violating the laws, public
policies, or rights of citizens of the United States.
11 U.S.C.A. § 1507(a).

**[4] Bankruptcy 51 🗝2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceed-
ings
         51k2341 k. In general. Most Cited Cases
Provision of Chapter 15 permitting court, in
proceeding ancillary to foreign case, to refuse to
take certain action if that action would be
"manifestly contrary to the public policy of the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

473 B.R. 117, 56 Bankr.Ct.Dec. 183
**(Cite as: 473 B.R. 117)**

United States" is to be construed narrowly. 11 U.S.C.A. § 1506.

**[5] Bankruptcy 51 ⚷2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

Provision of Chapter 15 permitting court, in proceeding ancillary to foreign case, to refuse to take certain action if that action would be "manifestly contrary to the public policy of the United States" should be invoked only under exceptional circumstances concerning matters of fundamental importance for the United States. 11 U.S.C.A. § 1506.

**[6] Bankruptcy 51 ⚷2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

Word "manifestly," in provision of Chapter 15 permitting court, in proceeding ancillary to foreign case, to refuse to take certain action if that action would be "manifestly contrary to the public policy of the United States" restricts application of this public policy exception to the most fundamental policies of the United States. 11 U.S.C.A. § 1506.

**[7] Bankruptcy 51 ⚷2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

In deciding whether to refrain from taking certain action in proceeding ancillary to foreign case on public policy grounds, bankruptcy courts focus on two factors: (1) whether foreign proceedings were procedurally unfair, and (2) whether applica-

tion of foreign law or recognition of a foreign main proceeding under Chapter 15 would severely impinge value and import of a United States statutory or constitutional right, such that granting comity would severely hinder the United States bankruptcy courts' abilities to carry out the most fundamental policies and purposes of these rights. 11 U.S.C.A. § 1506.

**[8] Bankruptcy 51 ⚷2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

Objectors failed to show that judgment entered in Mexican insolvency proceeding, which not only modified the debts owed by foreign debtor but novated and extinguished guarantees of foreign debtor's indebtedness by its nondebtor subsidiaries, should be denied enforcement in Chapter 15 proceeding ancillary to foreign case, either on ground that Mexican judicial process was corrupt and not worthy of respect, or on ground that enforcing foreign judgment, to enjoin actions in the United States against debtor's nondebtor subsidiaries, might have certain unquantified impacts on credit markets in the United States. 11 U.S.C.A. §§ 1506, 1507(a).

**[9] Bankruptcy 51 ⚷2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases

Whether the Mexican Conciliador was lacking in the requisite disinterestedness, or whether Mexican insolvency proceedings were conducted in manner that violated Mexican law and process, were arguments more appropriately raised in Mexican insolvency proceedings, not as ground for refusing to enforce judgment entered by Mexican court in Chapter 15 proceeding ancillary to foreign

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

473 B.R. 117, 56 Bankr.Ct.Dec. 183
**(Cite as: 473 B.R. 117)**

case. 11 U.S.C.A. §§ 1506, 1507(a).

**[10] Bankruptcy 51 ⚷2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

Judgment entered in Mexican insolvency proceeding, which not only modified debts owed by foreign debtor but novated and extinguished guarantees of foreign debtor's indebtedness by its nondebtor subsidiaries, could not be enforced in Chapter 15 proceeding ancillary to foreign case, so as to permanently enjoin suits in the United States against debtor's nondebtor subsidiaries; judgment, in limiting creditors that had obtained guarantees only to partial recovery from debtor, with no ability to pursue subsidiaries, drastically altered treatment which such creditors would receive, failed to sufficiently protect interests of creditors in the United States, and was manifestly contrary to United States public policy against discharge of debts for entities other than debtor. 11 U.S.C.A. §§ 1506, 1507(b)(4), 1521(b), 1522(a).

**[11] Bankruptcy 51 ⚷3343.1**

51 Bankruptcy
    51X Discharge
        51X(C) Debts and Liabilities Discharged
            51X(C)1 In General
                51k3343 Particular Debts or Liabilities
                    51k3343.1 k. In general. Most Cited Cases

Generally, policy of the United States is against discharge of debts for entities other than debtor in insolvency proceeding, absent extraordinary circumstances.

**\*118** Alan J. Stone, Jeremy C. Hollembeak, Michael Shepherd, Patrick Marecki, Risa M. Rosenberg, Thomas J. Matz, Milbank, Tweed, Hadley & McCloy LLP, New York, NY, Andrew M. Leblanc, Nicholas A. Bassett, Milbank, Tweed, Hadley &

McCloy LLP, Washington, DC, Cassandra Ann Sepanik, David M. Bennett, Katharine Battaia Clark, Thompson & Knight, Dallas,**\*119** TX, Delilah Vinzon, Samir Vora, Milbank, Tweed, Hadley and McCloy LLP, Los Angeles, CA, for Plaintiff.

Jeff P. Prostok, Forshey & Prostok, LLP, Ft. Worth, TX, Allan S. Brilliant, Benjamin E. Rosenberg, Craig P. Druehl, Dennis H. Hranitzky, James M. McGuire, Dechert, LLP, New York, NY, Jay L. Westbrook, Austin, TX, for Defendants.

Does 1–1000, pro se.

### *Memorandum Opinion*

HARLIN DEWAYNE HALE, Bankruptcy Judge.

On March 2, 2012, Alejandro Francisco Sanchez–Mujica and Javier Arechavaleta Santos, acting as Foreign Representatives of the above-captioned debtor, Vitro, S.A.B. de C.V. ("Vitro SAB"), filed a *Motion of Foreign Representatives of Vitro S.A.B. de C.V. for an Order Pursuant to 11 U.S.C. §§ 105(a), 1507 and 1521 to (I) Enforce the Mexican Plan of Reorganization of Vitro S.A.B. de C.V., (II) Grant a Permanent Injunction, and (III) Grant Related Relief* ("Enforcement Motion"). Wilmington Trust, National Association ("Wilmington"), U.S. Bank National Association, as Indenture Trustee ("U.S. Bank"), and the Ad Hoc Group of Vitro Noteholders ("Ad Hoc Group") (collectively, the "Objecting Parties"), who are claimants under various indentures issued by Vitro SAB in the United States and guaranteed by its subsidiaries, responded. On March 5, 2012, the Court heard the Enforcement Motion on an expedited basis.

In addition to the Enforcement Motion, on March 2, 2012, the Foreign Representatives filed, under seal, a *Motion for a Temporary Restraining Order and Preliminary Injunction* ("TRO Motion"), supported by 1) a *Verified Complaint for Temporary Restraining Order and Injunctive Relief,* 2) the Enforcement Motion and 3) Declarations of certain individuals. In response, the *Objection Of U.S. Bank National Association, As Indenture Trustee,*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

473 B.R. 117, 56 Bankr.Ct.Dec. 183
**(Cite as: 473 B.R. 117)**

*To Foreign Representatives' Motion For A Temporary Restraining Order And Preliminary Injunction* and the *Ad Hoc Group of Vitro Noteholders' Objection to Motion for Temporary Restraining Order* were timely filed with the Court. On March 7, 2012, also on an expedited basis, the Court heard arguments for and against the TRO Motion. On March 12, 2012, the Court entered an *Order Granting Limited Temporary Restraining Order to Maintain Status Quo* ("TRO"). The TRO was extended by the parties' agreement.

On May 25, 2012, the Objecting Parties each timely filed with the Court an objection ("Ad Hoc Noteholders Objection," "Wilmington Trust Objection," and "U.S. Bank Objection" respectively) to the Enforcement Motion. Beginning June 4, 2012, this Court held a four day trial on the Enforcement Motion, on a schedule agreed to by the parties. Vitro SAB and the Objecting Parties put on a number of witnesses and introduced hundreds of exhibits. The Court took the matter under advisement.

**I. Background Facts**

The events leading to the Debtor's commencement of this Chapter 15 case are generally described in this Court's memorandum opinion of June 24, 2011, denying the request of the foreign representatives of Vitro SAB to enjoin lawsuits filed against its non-debtor guarantors in New York state court.[FN1] As explained therein, at that time the proceedings in Mexico were in an early stage, and it was unclear **\*120** whether they would be successful.[FN2] This Court determined that the pre-recognition injunction should be granted in favor of Vitro SAB only, and did not find that the litigation by the noteholders against the subsidiary guarantors of Vitro SAB should be enjoined when the subsidiaries were not in an insolvency proceeding.

FN1. *In re Vitro S.A.B. de C.V.,* 455 B.R. 571 (Bankr.N.D.Tex. June 24, 2011).

FN2. *Id.* at 583.

Thereafter, in August 2011, a group of note-holders filed suit against Vitro SAB's subsidiaries in New York state court, seeking a money judgment on certain guarantees and declaratory relief. *Wilmington TRUST N.A. v. Vitro AUTOMOTRIZ S.A. De C.V.,* No. 652303–2011 (N.Y. Sup.Ct. filed Aug. 17, 2011). Specifically, in addition to a judgment on their guarantees, the noteholders wanted a declaratory judgment stating that Vitro SAB's reorganization attempts would not impact their guaranties from Vitro SAB's nondebtor subsidiaries. *Id.* In December 2011, the New York state court ruled in favor of the noteholders, finding that the indentures prevent non-consensual modification of the subsidiaries' guaranties. *Wilmington TRUST N.A. v. Vitro AUTOMOTRIZ S.A. De C.V.,* No. 652303–2011 (N.Y.Sup.Ct. Dec. 5, 2011).

In its decision, the New York state court noted that the subsidiaries had waived their rights under Mexican law. *Id.* On December 18, 2011, the noteholders obtained a temporary restraining order from the New York state court that enjoined the subsidiaries from giving their consent to the *Concurso* plan. *Wilmington Trust N.A. v. Vitro Automotriz S.A. de C.V.,* No. 653459–2011 (N.Y. Sup.Ct. filed Dec. 14, 2011). However, upon Vitro SAB's request, this Court, finding that the lockup agreement between Vitro SAB and its subsidiaries was an asset of Vitro SAB's estate, entered an order enforcing the automatic stay and enjoining the Noteholders' seeking injunctive relief in the New York State Court. Despite an appeal by the noteholders,[FN3] that order remained in effect and the subsidiaries were permitted to vote on the *Concurso* plan. The subsidiaries voted in favor of the plan and though they were insiders, their votes were counted to win approval of the plan.

FN3. *See In re Vitro S.A.B. de C.V.,* No. 11–CV–3554–F (N.D. Tex. filed Dec. 23, 2011).

On February 3, 2012, the Federal District Court for Civil and Labor Matters for the State of Nuevo León, the United Mexican States (the "District Court of Nuevo León") issued a *Concurso* Approv-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

473 B.R. 117, 56 Bankr.Ct.Dec. 183
**(Cite as: 473 B.R. 117)**

al Order under the *Ley de Concursos Mercantiles* (the "LCM") in Vitro SAB's voluntary judicial reorganization proceeding (the "Mexican Proceeding"). After the issuance of the *Concurso* Approval Order, the objecting Noteholders continued to take actions against Vitro SAB's non-debtor subsidiaries, attempting to collect debts owed to them under various guarantees to indentures issued by Vitro SAB. FN4 In response, Vitro SAB filed the Enforcement Motion and sought the TRO and permanent injunction, which led to the trial upon which this opinion is rendered.

> FN4. *See In re Vitro S.A.B. de C.V.,* 455 B.R. at 575–76.

The *Concurso* Approval Order not only modifies the debts owed by Vitro SAB to the noteholders under various indentures, it also novates and extinguishes the guarantees, effectively discharging the obligations of Vitro SAB's non-debtor subsidiary guarantors to the noteholders.

In the Enforcement Motion, the Foreign Representatives ask the Court to enforce the *Concurso* Approval Order, which approves Vitro SAB's *Concurso* Plan. Specifically, the Enforcement Motion asks the **\*121** Court to 1) give "full force and effect in the United States to the *Concurso* Approval Order," 2) "grant a permanent injunction prohibiting certain actions in the United States against Vitro SAB," as well as its non-debtor subsidiaries and 3) "grant certain related relief," all pursuant to §§ 105(a), 1507, and 1521 of Title 11 of the United States Bankruptcy Code.

**II. Issues**

There are two main issues that must be addressed in order to determine whether the Enforcement Motion should be granted: (1) whether the provisions of the *Concurso* Approval Order that grant a permanent injunction prohibiting certain actions in the United States against Vitro SAB's non-debtor subsidiaries may be extended to creditors in the United States by this Court through §§ 1521 or 1507 consistent with the principles of comity; and

(2) if so, does the § 1506 public policy exception, which limits the extension of comity where it would be "manifestly contrary" to the public policy of this country, prevent enforcement of the *Concurso* Approval Order.

**III. Analysis**

The Court has jurisdiction pursuant to 28 U.S.C. § 1334. The proceeding is core, pursuant to 28 U.S.C. § 157(b)(2)(P).

Beyond the mandatory effects of recognition of a foreign main proceeding FN5 found in 11 U.S.C. § 1520, additional relief "may" be granted to protect the assets of the debtor or the interests of creditors pursuant to § 1521, as well as additional assistance that may be provided to a foreign representative of the debtor consistent with the principles of comity, pursuant to § 1507.

> FN5. A "foreign main proceeding" is defined as "a foreign proceeding pending in the country where the debtor has the center of its main interests." 11 U.S.C. § 1502(4).

Under § 1521, a bankruptcy court may "grant any appropriate relief" in order to "effectuate the purpose of this chapter and to protect the assets of the debtors or the interests of the creditors." 11 U.S.C. § 1521(a). This includes, at the request of the foreign representative, entrusting "the distribution of all or part of the debtor's assets located in the United States to the foreign representative or another person, including an examiner, authorized by the court, provided that the court is satisfied that the interests of creditors in the United States are sufficiently protected." 11 U.S.C. § 1521(b).

Section 1522(b) permits the court to impose conditions on any discretionary relief that it grants either pre- or post-recognition, which permits the court to achieve an appropriate balance between the interests of creditors and other interested entities, including the debtor. *See In re Tri–Continental Exchange Ltd.,* 349 B.R. 627, 637

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

473 B.R. 117, 56 Bankr.Ct.Dec. 183
**(Cite as: 473 B.R. 117)**

(Bankr.E.D.Cal.2006); 11 U.S.C. § 1522(b).

[1][2] In addition to the relief enumerated in § 1521, § 1507(a) of the Bankruptcy Code provides that "the court, if recognition is granted, may provide additional assistance to a foreign representative." 11 U.S.C. § 1507(a). In determining whether to provide such additional assistance, courts must look to § 1507(b) for guidance, which provides that:

(b) In determining whether to provide additional assistance under this title or under other laws of the United States, the court shall consider whether such additional assistance, consistent with principles of comity, will reasonably assure:

**\*122** 1) just treatment of all holders of claims against or interests in the debtor's property;

2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

3) prevention of preferential or fraudulent dispositions of property of the debtor;

4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and

5) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

11 U.S.C. § 1507(b). Comity should be the Court's primary consideration when applying § 1507(b). See In re Petition of Garcia Avila, 296 B.R. 95, 108 n. 14 (Bankr.S.D.N.Y.2003). Comity has been defined as the "recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protections of its laws." Hilton v. Guyot, 159 U.S. 113, 163–64, 16 S.Ct. 139, 40 L.Ed. 95 (1895). Granting comity to

judgments in foreign bankruptcy proceedings is appropriate as long as U.S. parties are provided the same fundamental protections that litigants in the United States would receive. See id. at 202–03, 16 S.Ct. at 158–59.

[3] Vitro SAB urges the Court to defer in favor of the Enforcement Motion in the interests of comity. However, "The principle of comity has never meant categorical deference to foreign proceedings. It is implicit in the concept that deference should be withheld where appropriate to avoid the violation of the laws, public policies, or rights of the citizens of the United States." In re Treco, 240 F.3d 148, 157 (2d Cir.2001); see also, Overseas Inns S.A., P.A. v. United States, 911 F.2d 1146 (5th Cir.1990) (comity was not accorded to Luxembourg bankruptcy plan that treated IRS as general, rather than priority, creditor); In re Schimmelpenninck, 183 F.3d 347, 365 (5th Cir.1999) ("foreign laws ... must not be repugnant to our laws and policies").

*Public Policy Exception—§ 1506*

If the Court finds that the *Concurso* Approval Order should be enforced, pursuant to § 1507, then the Chapter 15 of the Bankruptcy Code provides a final hurdle for Vitro SAB to overcome in the public policy exception found in § 1506. Specifically, § 1506 provides that "[n]othing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506.

The parties spent much of their time on this issue. Unfortunately, the Bankruptcy Code does not define what should be considered "manifestly contrary to the public policy of the United States." Therefore, this Court must look to the legislative history and to relevant case law for guidance.

[4][5][6] Although few published opinions discuss the scope of section 1506, "it appears well settled that the exception is to be construed narrowly." In re British Am. Isle of Venice, Ltd., 441 B.R. 713, 717 (Bankr.S.D.Fla.2010) (citing In re

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

473 B.R. 117, 56 Bankr.Ct.Dec. 183

**(Cite as: 473 B.R. 117)**

*Qimonda AG Bankr. Litig.,* 433 B.R. 547, 567–70 (E.D.Va.2010)). Further, it should be "invoked only under exceptional circumstances concerning matters of fundamental importance for the United States." *In re Ran,* 607 F.3d 1017, 1021 (5th Cir.2010) (citing **\*123***In re Iida,* 377 B.R. 243 (9th Cir. BAP 2007)); *In re Atlas Shipping A/S,* 404 B.R. 726 (Bankr.S.D.N.Y.2009); *In re Ernst and Young, Inc.,* 383 B.R. 773, 781 (Bankr.D.Colo.2008)). "The word 'manifestly' in international usage restricts the public policy exception to the most fundamental policies of the United States." *In re Ephedra Prods. Liability Litig.,* 349 B.R. 333, 336 (S.D.N.Y.2006) (citing H.R. REP. NO. 109–31(I), at 109, as reprinted in 2005 U.S.C.C.A.N. 88, 172).

[7] Despite § 1506's limited scope, the statute has also been described as a "safety valve"[FN6] that offers "specific protections"[FN7] to creditors in Chapter 15 proceedings. When determining whether to apply § 1506,

> FN6. *In re Basis Yield Alpha Fund (Master),* 381 B.R. 37, 45 n. 27 (Bankr.S.D.N.Y.2008).
>
> FN7. *In re Tri–Cont'l Exch. Ltd.,* 349 B.R. 627, 638 (Bankr.E.D.Cal.2006).

courts have focused on two factors: (1) whether the foreign proceeding was procedurally unfair; and (2) whether the application of foreign law or the recognition of a foreign main proceeding under Chapter 15 would 'severely impinge the value and import' of a U.S. statutory or constitutional right, such that granting comity would 'severely hinder United States bankruptcy courts' abilities to carry out ... the most fundamental policies and purposes' of these rights.
*Id.* (quoting *In re Qimonda AG Bankr. Litig.,* 433 B.R. at 568–69) (citations omitted).

Although not much case law exists, several courts have recently considered the § 1506 public policy exception. Because Chapter 15 of the Bank-

ruptcy Code was not enacted until 2005, the scope of § 1506 has not yet been clearly defined. Therefore, a review of some of the more recent cases is helpful.

In *In re Ephedra Prods. Liability Litig.*, the bankruptcy court had to determine whether granting an order recognizing and enforcing an order of the Canadian insolvency tribunal would violate § 1506. 349 B.R. 333 (S.D.N.Y.2006). The Canadian order at issue approved a claims resolution procedure that provided for mandatory mediation, which could result in the liquidation of claims by creditors who never approved of the plan. *Id.* at 335. Some of the claimants argued that the foreign "procedure was manifestly contrary to U.S. policy because it deprived them of due process and a jury trial." *Id.* The bankruptcy court looked to the legislative history and found that the word "manifestly" is restrictive so that the public policy exception should be "narrowly interpreted." *Id.* at 336. Looking at an 1895 Supreme Court decision, *Hilton v. Guyot,* 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895), the *Ephedra* court added that foreign judgments should be recognized and enforced when the foreign " 'proceedings are according to the course of a civilized jurisprudence,' *i.e.,* fair and impartial." *In re Ephedra Prods. Liability Litig.,* 349 B.R. at 336 (quoting *Hilton,* 159 U.S. at 205–06, 16 S.Ct. 139).

With respect to the claimants' due process argument, the court acknowledged that there was at least some merit to the objection because the Claims Officer had originally refused to receive evidence and to liquidate claims without granting interested parties an opportunity to be heard. *Id.* at 335. However, the bankruptcy court ultimately rejected the due process argument because the Ontario Court adopted amendments to the Canadian order that cured the due process problems. *Id.* With respect to the claimants' second argument, based on deprivation of their right to a jury trial, the court held that "neither § 1506 nor any other law prevents a United**\*124** States court from giving recognition and enforcement ... simply because the procedure

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

alone does not include a right to jury." *Id.* at 335–36. Although the bankruptcy court recognized that the constitutional right to a jury trial is important to the American legal system, it did not find that a jury trial is absolutely necessary in order to have a fair and impartial verdict. *Id.* at 337 (citing *Evangelical Alliance Mission,* 930 F.2d 764, 768 (9th Cir.1991); *In re Union Carbide Corp. Gas Plant Disaster at Bhopal,* 809 F.2d 195, 199, 202 (2d Cir.1987)). Because the court found that the claimants' real complaint had to do with the loss of leverage during settlement negotiations, the court rejected the argument. *Id.* It explained that "[d]eprivation of such bargaining advantage hardly rises to the level of imposing on plaintiffs some fundamental unfairness." *Id.*

In *In re Qimonda AG Bankr. Litig.,* the United States District Court discussed the § 1506 public policy exception at length. 433 B.R. 547, 567–71 (E.D.Va.2010). Qimonda, a German company and producer of computer chips, claimed to hold approximately 12,000 patents, including at least 4,000 U.S. patents and over 1,000 pending U.S. patent applications. *Id.* at 552. Before the commencement of insolvency proceedings in Germany, Qimonda entered into various joint venture and patent cross-licensing agreements with international electronic companies. *Id.* In the foreign insolvency proceeding, Qimonda sought to terminate these patent cross-licensing agreements. The attorney appointed as Insolvency Administrator of Qimonda's estate filed a petition for recognition of the German insolvency proceeding in the U.S. Bankruptcy Court. *Id.*

The bankruptcy court below in *In re Qimonda AG,* had a hearing and issued two orders. *Id.* at 552 (discussing *In re Qimonda AG,* 2009 WL 4060083 (Bankr.E.D.Va.2009) (No. 09–14766–RGM), *aff'd in part, remanded in part sub nom. In re Qimonda AG Bankr. Litig.,* 433 B.R. 547 (E.D.Va.2010)). According to the United States District Court, "[t]he first order correctly recognized the insolvency proceeding as a 'foreign main proceeding.' "

*Id.* (citing 11 U.S.C. § 1517). The second order granted discretionary relief to Qimonda and the Insolvency Administrator, including a paragraph that made particular "provisions of the Bankruptcy Code applicable to Qimonda's Chapter 15 proceeding." *Id.* at 552–53. After the bankruptcy court issued the orders, the Insolvency Administrator sent letters to some of the international electronic companies in order to elect nonperformance of their patent cross-licensing agreements pursuant to German Insolvency Code Section 103. *Id.* at 553. In response to these letters sent on behalf of Qimonda, certain international electronic companies argued that election of these agreements was impermissible under § 365(n) of the U.S. Bankruptcy Code, which was made applicable by the bankruptcy court's second order. *Id.* In order to resolve the dispute, the Insolvency Administrator filed a motion with the bankruptcy court seeking to amend the second order. *Id.* The bankruptcy court granted the motion and issued a new order, stating that:

[t]he application of section 365 to the instant proceeding shall not in any way limit or restrict (i) the right of the Administrator to elect performance or nonperformance of agreements under § 103 German Insolvency Code or such other applicable rule of law in the Foreign Proceeding, or (ii) the legal consequence of such election; provided, however, if upon a motion by the Administrator under Section 365 of the Bankruptcy Code, the Court enters an Order providing for the assumption or rejection of an executory contract, then Section 365 shall apply**\*125** without limitation solely with respect to the contracts subject to such motion.

*In re Qimonda AG Bankr. Litig.,* at 553–54 (citation omitted). The bankruptcy court also revised the second order. Specifically, it added the following language to the paragraph making certain provisions of the U.S. Bankruptcy Code applicable: "provided, however, Section 365(n) applies only if the Foreign Representative rejects an executory contract pursuant to Section 365 (rather than simply

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

473 B.R. 117, 56 Bankr.Ct.Dec. 183
**(Cite as: 473 B.R. 117)**

exercising the rights granted to the Foreign Representative pursuant to the German Insolvency Code)." *Id.* at 554 (citation omitted).

On appeal, the international electronic companies argued that "the Bankruptcy Court erred in conditioning the applicability of § 365(n) on the Foreign Representative's formal rejection of the parties' cross-licensing agreements under the Bankruptcy Code." *Id.* at 554. The district court focused on "whether § 365(n) embodies the fundamental public policy of the United States, such that subordinating [it] to German Insolvency Code § 103 is an action 'manifestly contrary to the public policy of the United States.' " *Id.* at 565 (citing 11 U.S.C. § 1506). The district court reviewed applicable case law and found three guiding principles for analyzing whether an action taken in a Chapter 15 proceeding is manifestly contrary to the public policy of the United States:

1) The mere fact of conflict between foreign law and U.S. law, absent other considerations, is insufficient to support the invocation of the public policy exception.

2) Deference to a foreign proceeding should not be afforded in a Chapter 15 proceeding where the procedural fairness of the foreign proceeding is in doubt or cannot be cured by the adoption of additional protections.

3) An action should not be taken in a Chapter 15 proceeding where taking such action would frustrate a U.S. court's ability to administer the Chapter 15 proceeding and/or would impinge severely a U.S. constitutional or statutory right, particularly if a party continues to enjoy the benefits of the Chapter 15 proceeding.

*Id.* at 570. The district court found that, based on the record, it was unclear whether the three principles were applied to "the Bankruptcy Court's decision to condition the applicability of § 365(n) on the formal rejection of an executory contract under the Bankruptcy Code." *Id.* Instead, the bankruptcy

court merely held that U.S. courts administering Chapter 15 proceedings must "cooperate on an international basis and ... give precedence to the [foreign] main proceeding." *Id.* at 570–71 (citing *In re Qimonda AG,* 2009 WL 4060083, at *2). Therefore, the district court remanded the case to the bankruptcy court so that it could be determined whether there had been a violation of fundamental U.S. public policies under § 1506. *Id.* at 571.

Upon remand, the bankruptcy court held that deferring to German law, to the extent that it would allow for the cancellation of U.S. patent licenses, would be manifestly contrary to U.S. public policy. *In re Qimonda AG,* 462 B.R. 165, 185 (Bankr.E.D.Va.2011). Although the bankruptcy court acknowledged that terminating the licenses would result in greater value to the debtor's estate, it found that interest to be outweighed by the risk to substantial investments by the licensees in research and manufacturing facilities in reliance on the design freedom provided by cross-licensing agreements. *Id.* at 182–83 (considering § 1522(a) of the U.S. Bankruptcy Code). With respect to the § 1506 analysis, procedural fairness was not the issue. *Id.* at 183. In fact, the objecting parties **\*126** never argued that the German proceedings or German insolvency laws were procedurally unfair. *Id.* Instead, the analysis hinged on whether the application of German insolvency law would impinge on a "U.S. statutory or constitutional right such that deferring to German law would defeat the most fundamental policies and purposes of such rights." *Id.* at 184. The bankruptcy court expressed concern that terminating the licenses would result in uncertainty, which would lead to a slower pace of innovation to the detriment of the U.S. economy. *Id.* at 185. Specifically, the objecting parties argued that the uncertainty would discourage investments in research and development, as well as "construction of manufacturing facilities that are required in the ... industry." *Id.* In furtherance of that argument, all but one of the objecting parties offered Professor Jerry A. Hausman as an expert witness. *Id.* at 176, n. 9. He testified that eliminating the protection § 365(n)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

473 B.R. 117, 56 Bankr.Ct.Dec. 183
**(Cite as: 473 B.R. 117)**

provides to licensees if the licensor files bankruptcy would impair innovation by creating uncertainty, which would ultimately impact investment decisions. *Id.* at 176. In fact, Professor Hausman posited that if § 365(n) was inapplicable then many innovative products, such as the iPhone, might have reached the market later. *Id.* at 185. Despite conflicting evidence, the bankruptcy court was persuaded by Professor Hausman's position. *Id.* According to the bankruptcy court, failing to apply § 365(n) to the facts of this case would result in uncertainty, which would ultimately impinge on the important statutory protection provided to licensees of U.S. patents. *Id.* Therefore, a separate order was entered "denying the foreign administrator's motion to amend the Supplemental Order and confirming that § 365(n) applies." *Id.*

In *In re Gold & Honey, Ltd.,* a bankruptcy court applied § 1506 and determined that recognition of an Israeli receivership proceeding as a foreign proceeding would be manifestly contrary to the public policy of the United States. 410 B.R. 357, 371 (Bankr.E.D.N.Y.2009). Gold & Honey, Ltd. ("GH Ltd.") and Gold & Honey (1995) L.P. ("GH LP") were debtors in non-consolidated Chapter 15 cases, as well as in administratively consolidated Chapter 11 proceedings, which were pending with the bankruptcy court before the Chapter 15 cases were filed. *Id.* at 360. In fact, the debtors filed their petitions for the Chapter 11 cases on September 23, 2008,[FN8] at which time § 362 of the Bankruptcy Code automatically stayed all litigation against GH Ltd. and GH LP.[FN9] Despite the filing of the Chapter 11 cases, First International Bank of Israel ("FIBI") continued to pursue its pending application for the appointment of a temporary receiver before an Israeli Court.[FN10] Ultimately, this fact led to the bankruptcy court's finding that § 1506 applied and that recognition of the foreign proceeding would be manifestly contrary to the public policy of the United States. Specifically, the bankruptcy court refused to recognize the foreign proceeding "because such recognition would reward**\*127** and legitimize FIBI's violation of both

the automatic stay and [its] Orders regarding the stay." *Id.* at 371.

> FN8. *In re Gold & Honey, Ltd.,* 410 B.R. 357, 363 (Bankr.E.D.N.Y.2009).

> FN9. This Court, like the bankruptcy court in *In re Qimonda AG Bankr. Litig.,* acknowledges that courts and commentators have disagreed about whether the § 362 automatic stay may be applied extraterritorially, but finds, nevertheless, that resolution of this question would not impact the import of *In re Gold & Honey* to the facts of *In re Qimonda AG Bankr. Litig. See* 433 B.R. 547, 570 n. 43 (Bankr.E.D.Va.2010) (citing *French v. Liebmann (In re French),* 320 B.R. 78, 81–83 (E.D.Va.2004)).

> FN10. "In late July 2008, FIBI seized substantially all of GH Ltd. and GH LP's assets and accounts, and commenced the Israeli Receivership Proceeding." *In re Gold & Honey, Ltd.,* 410 B.R. at 362.

In *In re Gold & Honey, Ltd.,* the debtors applied to the U.S. bankruptcy court for an order stating that the automatic stay applied to the debtors' "property wherever located and by whomever held" on October 3, 2008. *Id.* at 363. Agreeing with the debtors, on October 6, 2008, the bankruptcy court entered an Order stating the same. *Id.* Furthermore, the bankruptcy court "advised FIBI that if it proceeded before the Israeli Court in the Israeli Receivership Proceeding, it did so at its own peril." *Id.* (citation omitted). Nevertheless, FIBI continued its actions in the Israeli Receivership Proceeding. *Id.* at 364. Thereafter, the U.S. bankruptcy court's Order and the record of the October 6 Hearing were presented to the Israeli Court. *Id.* In the Israeli Court's decision, dated October 30, 2008, it determined that neither the automatic stay nor the U.S. bankruptcy court's Order should be given effect and that the Israeli Receivership Proceeding could continue irrespective of the debtors' chapter 11 cases. *Id.* On November 30, 2008, pursuant to FIBI's ap-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

473 B.R. 117, 56 Bankr.Ct.Dec. 183
**(Cite as: 473 B.R. 117)**

plication in the Israeli Receivership Proceeding, the Israeli Court appointed receivers for GH Ltd. and GH LP. *Id.* The receivers filed petitions, in the Chapter 15 cases, for recognition of the Israeli Receivership Proceeding as foreign main proceedings of GH Ltd. and GH LP. *Id.* at 365.

The bankruptcy court denied the receivers' petitions for recognition of the Israeli Receivership Proceeding as a foreign proceeding, based on the public policy exception in § 1506. *Id.* at 371–73. First, it recognized, as does this Court, that "the legislative history of Section 1506 demonstrates that this exception should be applied narrowly" so that it is "invoked only when fundamental policies of the United States are at risk." *Id.* at 372 (citing *In re Iida,* 377 B.R. 243 (9th Cir. BAP 2007); *In re Atlas Shipping A/S,* 404 B.R. 726 (Bankr.S.D.N.Y.2009); *In re Ernst & Young, Inc.,* 383 B.R. 773, 781 (Bankr.D.Colo.2008) (citing H.R.REP. NO. 109–31(I) at 109 (2005), reprinted in U.S.C.C.A.N. 88, 172)). Next, it examined the cases relied upon by the receivers seeking recognition and distinguished them from the facts in *In re Gold & Honey, Ltd. Id.* For example, the bankruptcy court discussed *In re Ephedra Prods. Liab. Litig.*, and pointed out that the "United States District Court only approved the Ontario claims resolution procedure after the Ontario court adopted certain procedural changes requested by the United States court 'to assure greater clarity and procedural fairness.' " *In re Gold & Honey, Ltd.,* 410 B.R. at 371 (quoting *In re Ephedra Prods. Liab. Litig.,* 349 B.R. 333, 334 (S.D.N.Y.2006)). Also, the *Gold & Honey* court noted that "jury trials in bankruptcy courts are quite rare and not typically invoked in a claims allowance process" whereas "allowing the offensive use of an automatic stay violation ... would severely impinge the value and import of the automatic stay." *Id.* The bankruptcy court reasoned that recognition of a "foreign seizure of a debtor's assets post-petition would severely hinder [our] bankruptcy courts' abilities to carry out two of the most fundamental policies and purposes of the automatic stay." *Id.* Additionally, "condoning FIBI's conduct

... would limit a federal court's jurisdiction over all of the debtors' property ... as any future creditor could follow FIBI's lead and violate the stay in order to procure assets that were outside the United States, yet still under the United States court's jurisdiction." *Id.* (citing 28 U.S.C. § 1334(e)).

**\*128** *In re Toft* is another published opinion where relief sought is denied based on the public policy exception in § 1506. 453 B.R. 186, 189 (Bankr.S.D.N.Y.2011). In *Toft* the bankruptcy court refused to recognize and enforce foreign orders, which would have permitted the foreign representative to access the debtor's email accounts stored on servers within the United States. *Id.* at 188–89. In the foreign proceeding, the foreign representative was granted a "Mail Interception Order" [FN11] in a German Court, and that order was later recognized and enforced by an *ex parte* order issued in an English Court. *Id.* at 188. The foreign representative argued that the U.S. bankruptcy court should "grant comity" based on §§ 1521, 1507 and 1519(a) of the Bankruptcy Code. Reviewing these statutes, among others,[FN12] the bankruptcy court found that "there is no doubt that the relief available under Chapter 15 ... should be consistent with the principle of comity." *Id.* at 189–90 (citing *In re Metcalfe & Mansfield Alt. Invs.,* 421 B.R. 685, 697 (Bankr.S.D.N.Y.2010)). In fact, it added that § 1507 expressly provides so "with respect to 'additional assistance,' and more broadly, § 1509(b)(3) directs that once a foreign representative obtains recognition, 'a court in the United States shall grant comity or cooperation to the foreign representative.' " *Id.* at 190. However, the bankruptcy court also found that "all relief under Chapter 15 is subject to the caveat in § 1506, providing the court with authority to deny the relief requested where such relief would be 'manifestly contrary to the public policy of the United States.' " *Id.* at 191 (citing 11 U.S.C. § 1506; *In re Ephedra Prods. Liability Litig.,* 349 B.R. 333 (S.D.N.Y.2006)). In other words, the foreign representative could not force the bankruptcy court to apply foreign laws in the U.S. proceeding by merely "making an impas-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

473 B.R. 117, 56 Bankr.Ct.Dec. 183
**(Cite as: 473 B.R. 117)**

sioned appeal to comity." *Id.*

> FN11. The Mail Interception Order permitted the foreign representative and administrator of the German estate, Prager, to intercept Toft's postal and electronic mail. *In re Toft,* 453 B.R. at 188.

> FN12. The Court addressed the Wiretap Act and the Stored Communications Act, which are both subparts of the Electronic Communications Privacy Act (the "Privacy Act"). 18 U.S.C. § 2511, *et seq.*

In the *Toft* opinion, Judge Gropper provides a detailed discussion of the applicable case law before concluding that an order of recognition as requested would violate § 1506, including the cases discussed previously in this opinion.<sup>FN13</sup> Additionally, Judge Gropper analyzed *In re Metcalfe & Mansfield Alt. Invs.,* 421 B.R. 685, 697 (Bankr.S.D.N.Y.2010), in which a bankruptcy court determined that § 1506 did not bar enforcement of third-party releases that were part of a Canadian plan. *In re Toft,* 453 B.R. at 193–95. As does this Court, Judge Gropper recognized that "those courts that have considered the public policy exception codified in § 1506 have uniformly read it narrowly and applied it sparingly." *Id.* at 195. And that "foreign law need not be identical to U.S. law" in order to avoid violating § 1506, so it was not dispositive that U.S. law differed from German law. *Id.* at 198 (citations omitted). Ultimately, however, the court determined that "this is one of the rare cases that calls for its application" because "any *ex parte* recognition and enforcement of the Mail Interception Order would directly contravene the U.S. laws and public policies." *Id.* at 196. According to Judge Gropper, the question to be asked was **\*129** "whether the German procedures [were] in accord with U.S. public policy," addressing:

> FN13. *In re Qimonda AG Bankr. Litig.,* 433 B.R. 547 (E.D.Va.2010); *In re Ephedra Prods. Liability Litig.,* 349 B.R. 333 (S.D.N.Y.2006); *In re Gold & Honey,*

*Ltd.,* 410 B.R. 357 (Bankr.E.D.N.Y.2009).

i. the manner in which an order of recognition would be entered—without notice to the debtor—and

ii. the relief sought—that German procedures be given effect in this country regardless of the fact that they exceed traditional limits on the powers of a trustee in bankruptcy under U.S. law and constitute relief that is banned by statute in this country and might subject those who carried it out to criminal prosecution.

*Id.* Judge Gropper rejected the foreign representative's arguments because providing the relief sought "would directly compromise privacy rights subject to a comprehensive scheme of statutory protection, available to aliens, built on constitutional safeguards incorporated in the Fourth Amendment as well as the constitutions of many States." *Id.* Said differently, these particular German procedures were not in accordance with U.S. public policy; therefore, such relief "would impinge severely a U.S. constitutional or statutory right." *Id.* at 198 (citing *In re Qimonda AG Bankr. Litig.,* 433 B.R. at 570).

### Objecting Parties' Arguments

The Objecting Parties have raised multiple objections to Vitro SAB's Enforcement Motion. The Objecting Parties contend the *Concurso* plan should not be enforced in the United States because (1) Vitro cannot meet its burden under section 1507(b); (2) enforcing the plan would violate the manifest public policy of the United States; and (3) Vitro has not met the requirements for issuing an injunction.

### Section 1507(b)

The Objecting Parties assert that Vitro SAB cannot meet any of the section 1507(b) requirements to enforce the plan. The Objecting Parties contend the plan violates: (1) subsection (b)(1) by discriminating between foreign and non-foreign creditors; (2) subsection (b)(2) by protecting creditors from the inconvenience in the processing of

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

473 B.R. 117, 56 Bankr.Ct.Dec. 183
**(Cite as: 473 B.R. 117)**

claims in the foreign proceeding; (3) subsection (b)(3) by failing to reasonably assure the prevention of fraudulent transfers; and (4) violates subsection 1507(b)(4) by failing to distribute the proceeds of the estate in substantial accordance with the Bankruptcy Code.

Specifically, the Objecting Parties assert that the *Concurso* plan discriminates between foreign and non-foreign creditors by giving creditors with guaranties the same treatment as other unsecured creditors, by the "death trap" provision of the plan which penalizes the Objecting Parties, and by the allocation of value to creditors' claims in accordance with the face amount, not the total amount, of their claim. The Objecting Parties assert that the *Concurso* plan violates subsection 1507(b)(2) by treating the nondebtor guarantors as debtors, and by not providing an opportunity for creditors of the non-debtor guarantors to vote. The Objecting Parties also assert that the *Concurso* plan encourages fraudulent transfers; and that the *Concurso* plan does not distribute proceeds of the estate in accordance with Title 11 because the plan fails to follow the absolute priority rule under 11 U.S.C. § 1129, and because it grants equity interests substantially more than they would likely receive in a Chapter 11 bankruptcy.

In addition, the Objecting Parties urge the Court to invoke the § 1506 "public policy exception" by refusing to grant any action that is manifestly contrary to the public policy of the United States. The Objecting Parties contend enforcing the *Concurso* plan violates the public policies of (1) the absolute priority rule; (2) discharging**\*130** nondebtor debts; (3) good faith dealing; (4) enforcement of negotiated instruments; (5) the prohibition of vote buying; and (6) violated many, if not all, of the protections afforded creditors under Title 11.

As part of their public policy argument, the Objecting Parties assert that enforcing the *Concurso* plan will erode the status of the United States as a financial center, harming the United States and other nations. The Objecting Parties argue refusing

to protect creditors bargained for protections from foreign courts will signal to bond markets U.S. law does not protect creditor rights, harming banks. Finally, the Objecting Parties contend the plan will harm the Mexican economy by raising interest rates on Mexican companies.

The Objecting Parties further argue the Mexican process violated United States notions of an impartial and disinterested tribunal, based on the *Conciliador's* alleged financial interest and the *Conciliador's* accounting firm's relationship with Vitro SAB. The Objecting Parties also believe a lack of transparency in the Mexican Proceeding violated due process. Additionally, the Objecting Parties contend several standing issues prevented them from receiving due process. The Objecting Parties allege the systemic corruption of the Mexican judiciary undermines confidence in the judiciary as a whole. In support of this corruption argument, the Objecting Parties cite reports by, among others, the U.S. State Department, United Nations, World Bank, Transparency International.

### Conclusions by the Court

Having reviewed the evidence and considered the testimony of witnesses over four days, this Court believes that a portion of the *Concurso* plan should not be enforced as presented. However, the Court will first address certain of the Objecting Parties' arguments that must be overruled.

### Overruled Objections
#### Corruption Argument

[8] The Objecting Parties have argued that the judicial system in Mexico is corrupt and its rulings should not be respected by this Court. Their expert, Dr. Stephen D. Morris, who testified for the Objecting Parties on this point appeared to be a knowledgeable and qualified witness on corruption in Mexico generally, but the application of his studies to the Vitro proceedings was not persuasive. Further, the Objecting Parties' own Mexican counsel testified that in his forty years of practice he had not bribed an official. To date, this Court has not seen evidence that the Mexican Proceeding is the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

473 B.R. 117, 56 Bankr.Ct.Dec. 183
**(Cite as: 473 B.R. 117)**

product of corruption, or that the LCM itself is a corrupt process.

*Impact on the Credit Markets*

The Objecting Parties offered the expert testimony of Dr. Elaine Buckberg, a former economist at the International Monetary Fund, who testified that confirmation of the *Concurso* plan will have an adverse impact on the financial markets in the United States. She testified credibly that approval of the *Concurso* plan in the United States will adversely impact the attractiveness of the United States to foreign issuers. Although Dr. Buckberg was a good witness and credible, she was unable to quantify the effect. For example, she could not testify as to the amount of any increase in rates for indentures for Mexican companies if the *Concurso* plan was enforced. For these reasons, the Court is unable to conclude that approval would have an adverse impact on credit markets.

*Unfairness Argument*

[9] A number of the objections raised by the Objecting Parties fall under the **\*131** category of general unfairness. For example, they emphasize that Vitro SAB had many *ex parte* meetings with the presiding judges. *Ex parte* contact with judges is apparently common in Mexico; in fact, the Objecting Parties' counsel had *ex parte* meetings of their own. And they say that the Mexican courts did not consider their objections. However, the changes made to the *Concurso* plan suggest that at least some of their concerns were addressed. In any event, such a complaint is better raised in Mexico in the appeal that has been filed. Finally, they complain that the *Conciliador* was not disinterested. Such argument is for the Mexican court system.

On the whole, this Court cannot conclude that the *Concurso* proceeding was unfair to the Objecting Parties.

*Violations of Mexican Law and Process*

The Objecting Parties have raised a number of objections concerning the process in Mexico. Those issues of Mexican law will have to be decided by the Mexican courts.

*Meritorious Objections—Arguments That Preclude Enforcement*

*Third Party Releases*

[10] For the past year, this Court has expressed concerns regarding the most problematical part of the Mexican Proceeding, the extinguishment of claims held by the Objecting Parties against non-debtor subsidiaries, entities which did not avail themselves of protection in the Mexican Proceeding. *In re Vitro S.A.B. de C.V.,* 455 B.R. 571 (Bankr.N.D.Tex.2011). This Court expressed its views at that time that it had grave concerns about any plan in Mexico that would protect non-filing subsidiaries that guaranteed United States indentures. However, Vitro SAB proceeded with such a plan anyway.

[11] Generally speaking, the policy of the United States is against discharge of claims for entities other than a debtor in an insolvency proceeding, absent extraordinary circumstances not present in this case. Such policy was expressed by Congress in Bankruptcy Code Section 524, and in numerous cases in this circuit. *See, e.g., Matter of Zale Corp.,* 62 F.3d 746 (5th Cir.1995). This protection of third party claims is described both in terms of jurisdiction and also as a policy. *See id.* at p. 102, n. 28.

The Fifth Circuit has largely foreclosed non-consensual non-debtor releases and permanent injunctions outside of the context of mass tort claims being channeled toward a specific pool of assets. *See In re Pacific Lumber Co.,* 584 F.3d 229, 252 (5th Cir.2009), rev'd on other grounds, *RadLAX Gateway Hotel, LLC v. Amalgamated Bank,* 566 U.S. ——, 132 S.Ct. 2065, 182 L.Ed.2d 967 (2012).

In its argument, Vitro SAB points to the *Metcalfe & Mansfield Alt. Invs.,* decision discussed above that enforced a Canadian Order that allowed for a limited third party release. 421 B.R. 685, 688. However, in *Metcalfe,* there was no question that

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

473 B.R. 117, 56 Bankr.Ct.Dec. 183
**(Cite as: 473 B.R. 117)**

the Canadian Proceedings should be recognized as a foreign main proceeding. Instead, the issue arose in enforcement of the Canadian Orders which contained a third-party nondebtor release and an injunction. *Id.*

The facts in *Metcalfe* differ from the facts in the present case. In *Metcalfe,* there was near unanimous approval of the plan by the creditors, who were not insiders of the debtor. Also, the plan was negotiated between the parties and there appears not to have been a timely objection to the order. Finally, the language of the opinion indicates that the release was not complete like the one in the present case.

**\*132** For three reasons the Enforcement Motion must be denied.

*Section 1507*

The *Concurso* Approval Order does not provide for the distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by Title 11. *See* 11 U.S.C. § 1507(b)(4). Under a Chapter 11 plan, the noteholders would receive their distribution from the debtor and would be free to pursue their other obligors, in this case the non-debtor guarantors. The *Concurso* plan provides drastically different treatment in that the noteholders receive a fraction of the amounts owed under the indentures from Vitro SAB and their rights against the other obligors are cut off.

*Section 1521*

Second, the *Concurso* Approval Order neither sufficiently protects the interests of creditors in the United States, nor does it provide an appropriate balance between the interests of creditors and Vitro SAB and its non-debtor subsidiaries. One could argue that Vitro SAB, as a holding company, is trying to achieve, through its *Concurso* plan, an entrustment of the distribution of the assets of its non-debtor U.S. subsidiaries without sufficiently protecting the Objecting Creditors, pursuant to §§ 1521(b) and 1522(a).

*Public Policy*

The expression by Congress in § 524, paired with the case law in this Circuit, lead this Court to conclude that the protection of third party claims in a bankruptcy case is a fundamental policy of the United States. The *Concurso* Approval Order does not simply modify such claims against non-debtors, they are extinguished. As the *Concurso* plan does not recognize and protect such rights, the *Concurso* plan is manifestly contrary to such policy of the United States and cannot be enforced here.

*Possible Meritorious Objections*

As noted above, this Court sustains the Objecting Parties' primary objection, that the *Concurso* plan improperly released claims against non-debtors in violation of § 1507, 1521 and the public policy of the United States. However, there are two other strong objections that this Court notes for the appellate court, but does not reach, because the Court has sustained the objection to the release of the third party claims against the nondebtor subsidiaries.

*Voting Irregularities*

The noteholders have raised and submitted evidence of at least suspect voting on the *Concurso* plan. The Mexican court allowed insiders to vote and counted such votes, which swamped the noteholders' votes. *See* Testimony of Mr. Claudio del Valle. In fact, it is undisputed that Vitro issued bonds to insiders as a defense shortly before the *Concurso* plan was filed, and such votes were cast and counted. *Id.* Allowing insiders to vote, including the subsidiaries who voted to extinguish their own guarantees to the Objecting Parties, gives the Court pause. This argument, however, may be one of Mexican law, which should be decided by a court in Mexico.

*Absolute Priority Rule*

Under the *Concurso* plan, equity retains a value of approximately $500 million. Creditors, such as the Objecting Parties, are not paid in full. Such a plan would violate the absolute priority rule in the United States. By allowing the retention of equity,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

473 B.R. 117, 56 Bankr.Ct.Dec. 183
**(Cite as: 473 B.R. 117)**

and, at the same time, not paying the Objecting Parties in full, the *Concurso* plan arguably runs afoul of § 1507 because the result is demonstrably different than would occur in Chapter 11.

The wide variance in return to creditors from what would be expected in a Chapter **\*133** 11 plan in this country was the subject of testimony by Dr. Joseph W. Doherty, an expert put forth by the Objecting Creditors. His testimony was credible.

**IV. Conclusion**

Accordingly, this Court concludes that the *Concurso* plan approved in this instance, which extinguishes the guarantee claims of the Objecting Creditors that were given under an indenture issued in the United States against non-debtor entities that are subsidiaries of Vitro, should not be accorded comity to the extent it provides for the extinguishment of the non-debtor guarantees of the indentures. Such order manifestly contravenes the public policy of the United States and is also precluded from enforcement under §§ 1507, 1521 and 1522 of the Bankruptcy Code.

Generally, reorganization pursuant to the LCM is found to be a fair process, worthy of respect. In other and subsequent cases this Court would expect that *Concurso* decisions would be enforced in this country. However, if approved for enforcement, the present order would create precedent without any seeming bounds. The *Concurso* plan presently before the Court discharges the unsecured debt of non-debtor subsidiaries. What is to prevent this type of plan from eventually giving non-consensual releases to discharge the liabilities of officers, directors, and any other person?

Because of the importance of this case to the financial and legal community, the Court will stay its decision until June 29, 2012, at 5:00 p.m. Central Daylight Time, and will maintain the TRO for fourteen days to allow Vitro time to appeal and to seek a stay on appeal. Any further stay or extension of the TRO should be sought from the district court or court of appeals.

The Objecting Parties shall submit an order consistent with this decision within ten days from the date of entry of this opinion.

Bkrtcy.N.D.Tex.,2012.
In re Vitro, S.A.B. de C.V.
473 B.R. 117, 56 Bankr.Ct.Dec. 183

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Tab 79

2026 WL 592250
Only the Westlaw citation is currently available.
United States Bankruptcy Court, S.D. New York.

IN RE: XINYUAN REAL ESTATE
COMPANY LTD., Debtor.

Case No. 25-10745 (PB)
|
Signed March 3, 2026

**Attorneys and Law Firms**

Windels Marx Lane & Mittendorf, LLP Counsel for the Debtor 156 W. 56th Street New York, New York 10019 By: Gabriel Altman Eloy A. Peral

Wollmuth Maher & Deutsch LLP Counsel for the Petitioning Creditors 500 Fifth Avenue New York, NY 10110 By: Paul R. DeFilippo Nicholas Servider Ryan Kane James N. Lawlor

United States Department of Justice Counsel for the Office of the United States Trustee One Bowling Green New York, NY 10104 By: Tara Tiantian

**DECISION DENYING DEBTOR'S MOTION TO DISMISS INVOLUNTARY PETITION**

Honorable Philip Bentley, United States Bankruptcy Judge

### Introduction

 **\*1**  Xinyuan Real Estate Company Limited (the "Debtor") is the parent company of a corporate group (the "Group" or "Xinyuan") that operates a large property development company in the People's Republic of China. The Debtor is incorporated in the Cayman Islands, but its management lives and works in China, where the bulk of the Group's operations and assets are located. Since the downturn in China's real estate market that began in late 2020, Xinyuan has been struggling to pay its billions of dollars of funded debt. In 2022 and 2023, Xinyuan restructured some of that debt, but that restructuring proved insufficient. In January 2025, unable to pay $170 million of senior notes that came due that month, the Debtor commenced restructuring negotiations with the holders of those notes.

In April 2025, three investment funds holding about $65 million of the Debtor's senior notes filed an involuntary chapter 11 petition in this Court. The following month, shortly before its deadline to respond to that petition, the Debtor announced its plan to restructure in the Cayman Islands. In June 2025, the Debtor filed a judicial proceeding in the Cayman Islands to restructure about $600 million of U.S.-dollar denominated debt, including the senior notes held by the petitioning creditors, through a scheme of arrangement (the "Scheme"). The Debtor has now moved to dismiss the involuntary petition on a number of grounds, principally abstention under Bankruptcy Code § 305(a). The Debtor also seeks dismissal for cause under Code § 1112(b) or, alternatively, on *forum non conveniens* grounds.

Abstention by a bankruptcy court in favor of a competing foreign insolvency proceeding is often warranted to avoid the disruption and additional expense that dueling proceedings can cause. If the Debtor were making progress in its Cayman Islands proceeding and could show a reasonable likelihood of successfully reorganizing there, the Court would be inclined to dismiss the involuntary petition on abstention grounds. However, over the past half year, there has been no activity in the Cayman case, nor does the Debtor appear to have made any progress behind the scenes. Despite repeated representations that it would soon obtain additional creditor support, the Debtor still only has the support of creditors holding 31% of the Scheme debt—the same level of support it had last July. The Debtor's restructuring appears to have reached an impasse.

Moreover, even if the Debtor were somehow able to obtain the 75% level of creditor support that Cayman Islands law requires for approval of the Scheme, its Cayman restructuring would still face additional hurdles. The Cayman court would need to approve the Debtor's decision to put all Scheme creditors in a single class, despite the varying interest rates (ranging from 3% to 14.5%) and varying maturities of the four tranches of Scheme debt. In addition, the Debtor would need to obtain a U.S. bankruptcy court's recognition of its Cayman restructuring as a foreign proceeding—an essential step, since all Scheme debt is U.S.-dollar denominated and subject to New York choice of law and forum selection clauses. This could prove challenging, given the Debtor's lack of any business operations in the Cayman Islands, plus the fact that the Group's business and the Debtor's restructuring are being managed from Beijing. Existing precedent in this District would support a finding that the Debtor's center of main interests is in the Cayman Islands if, but only if, the

4229

Debtor first obtained overwhelming creditor support *and* no objections to recognition were filed.

**\*2** In these circumstances, the Debtor has not met its burden of demonstrating that abstention would be in the best interests of its creditors. To the contrary, it appears that creditor interests would be better served by allowing this involuntary case to proceed. Most important, chapter 11 gives the Court the power to ensure that the restructuring will not continue to stall. If the Debtor fails to make progress within a reasonable time, its exclusive right to file a chapter 11 plan may lapse or be terminated, giving creditors the ability to file and confirm a plan of their own—something they cannot do in the Cayman Islands without the Debtor's support. Moreover, the mere possibility of an eventual creditor plan in this case could potentially break the impasse in the Cayman case, in which event the Court might be receptive to a motion to suspend further proceedings in this case on abstention grounds.

At present, however, the Debtor has not shown that abstention would benefit creditors. Even more clearly, the Debtor has not shown cause to dismiss under Bankruptcy Code § 1112(b) or on *forum non conveniens* grounds. The Court therefore will deny the Debtor's motion to dismiss in its entirety.

**Factual & Procedural Background**[1]

**A. The Debtor and the Xinyuan Group**

The Debtor is a Cayman Islands exempted company, which was formed in 2007. It is a pure holding company, with no material operations of its own. It serves as the ultimate corporate parent of a group of direct and indirect subsidiaries engaged in the business of real estate development and property management, which operate primarily in the People's Republic of China (the "PRC" or "China"). For its operations in the PRC and the U.S., the Group operates through local holding companies, which own the operating entities; the Group has established a separate subsidiary for each of its development projects.[2] The Debtor's shares are listed on the New York Stock Exchange ("NYSE").

The Debtor's revenues, which derive principally from the sale of residential units in its properties, have declined in recent years—from $950 million in 2022 to $805 million in 2023 and $515 million in 2024—due to a decline in the sales of its units in China and elsewhere. Although the Debtor had a net income of $30 million in 2023, it suffered net losses of $259 million and $46 million in 2022 and 2024, respectively. *See*

Xinyuan Real Estate Co., Ltd, Annual Report (Form 20-F), at 55 (April 29, 2025).

The Group's assets are primarily real-estate related, consisting of properties completed and under development and properties held for lease, as well as some property, plant and equipment and long-term investments. As of December 31, 2024, the Group reported total assets of approximately US $5.02 billion and liabilities of US$4.9 billion; the Debtor reported total assets of approximately US$1.03 billion and liabilities of US$1.13 billion.

**B. The Location of the Debtor's and the Group's Management**

The operations of the Debtor and the Xinyuan Group are directed and overseen principally from the Group's headquarters in Beijing. The chairman, chief executive officer and chief financial officer of the Debtor, as well as all other the members of the Debtor's board, live and work in mainland China. *See* Xinyuan Real Estate Co., Ltd, Annual Report (Form 20-F), at Exhibit 135 (April 29, 2025). At the January 13, 2025 hearing, Debtor's counsel stated that he was not aware of any members of the Debtor's senior management who live or work outside of the PRC.

**\*3** Although the Debtor is incorporated in the Cayman Islands, it appears to have only a "mail drop" presence there. The Debtor does not have any employees in the Cayman Islands, nor any actual physical office, but just a registered office located at the offices of Maples Corporate Services Limited in George Town, Grand Cayman. Moreover, the Debtor is registered in the Cayman Islands as an exempted company, which means it cannot conduct business in the Cayman Islands except to the extent needed to support its international operations.[3] At the hearing on its motion to dismiss, the Debtor's counsel admitted that he was not aware of the Debtor having any meaningful business operations or assets in the Cayman Islands, except to the extent the stock the Debtor holds in its Cayman-incorporated subsidiaries could be deemed located there. Debtor's counsel also admitted that the key decisions concerning the restructuring have been made in the PRC.

The Debtor's principal connection to the Cayman Islands, other than being incorporated there, is that it filed its restructuring petition there. As a result of that forum choice, some of the professionals working on the restructuring, though perhaps not a majority, are based in the Cayman

Islands. Each of the principal firms engaged by the Debtor to assist with the Scheme—its law firm, financial advisor and information agent—is an international firm with a Cayman Islands presence. It is unclear from the record how much of the work performed by these firms has been done in the Cayman Islands.

The presence of the Debtor and the Xinyuan Group in the United States is more substantial. All of the Scheme debt is U.S. dollar-denominated debt, governed by New York choice of law and forum selection clauses. In addition, although the Debtor itself does not have any direct operations or employees in the United States, the Xinyuan Group has significant U.S. operations through the 11 direct or indirect subsidiaries of the Debtor that are incorporated in the U.S. Through those subsidiaries, the Xinyuan Group operates three projects in the U.S., all in New York City; it leases an office in New York City and employs a small number of U.S. professionals to oversee project development.[4] The Debtor itself does not employ any of these individuals, nor does it directly own any material tangible assets in the U.S. Its principal U.S. assets are intangibles—namely, the stock of its U.S. subsidiaries and the intercompany debt owed by some of its U.S. subsidiaries.[5]

### C. Events Leading to the Debtor's Restructuring

**\*4** For the past five years, Xinyuan has been struggling to pay its debts. In 2020, the Group commenced efforts to refinance its maturing offshore notes, but those efforts were impeded by a contraction in the offshore debt capital markets and tightening conditions in the PRC real estate sector. Regulatory measures, including the PRC's new "Three Red Lines" policy, constrained borrowing capacity, while declining property sales and reduced buyer confidence adversely affected cash flow and liquidity. These developments materially weakened the Group's financial position, eventually leading to a series of non-payment defaults on its offshore notes between 2022 and 2025.

In 2022 and 2023, the Group restructured a total of US$880 million of onshore and offshore debt. Those restructurings included the rollover of certain onshore corporate bonds and an exchange offer for more than $300 million of the Debtor's senior notes. *See* Xinyuan Real Estate Co., Ltd, Annual Report (Form 20-F), at 14, 128 (April 29, 2025). However, the Group was not able to reach agreements concerning more than $2 billion of other funded debt, including the debt that it now seeks to restructure—namely, the $731 million, consisting of $601 million in principal plus $130 million of interest, that

the Debtor owes to holders of U.S. dollar-denominated senior notes (the "Existing Notes"). All of the Existing Notes are in default.

The Group has not restructured, and does not now seek to restructure, its other funded debt. That other debt consists of (i) US$71 million owed by the Debtor to holders of RMB-denominated senior notes; (ii) US$299 million in other financial indebtedness of the Debtor; and (iii) about US$1.16 billion of financial indebtedness of the Debtor's subsidiaries, including onshore bank loans and onshore bonds.

### D. The Involuntary Chapter 11 Petition and the Debtor's Cayman Scheme of Arrangement

In January 2025, the Debtor was unable to pay $170 million of Existing Notes that came due that month. The Debtor commenced negotiations with the holders of those notes, including the Petitioning Creditors, over the terms of a potential Cayman Islands scheme of arrangement.

On April 14, 2025, three Hong Kong-based investment funds (the "Petitioning Creditors") filed an involuntary chapter 11 petition (the "Involuntary Petition" or "Petition") against the Debtor. The Petitioning Creditors hold $65.8 million of one tranche of the Existing Notes—namely, the Debtor's 14.0% senior notes due 2024 (the "2024 Notes"). The Petition alleged that (i) each Petitioning Creditor was eligible to file an involuntary petition under Bankruptcy Code § 303(b), (ii) the Debtor was eligible to be a debtor under Code § 303(a), and (iii) the Debtor was not paying its debts as they become due —in particular, it had failed to pay approximately $66 million in principal and interest owed to holders of the 2024 Notes. Each Petitioning Creditor also alleged that its claim against the Debtor under the 2024 Notes was not contingent or the subject of a bona fide dispute.

On May 27, shortly before its deadline to answer the Involuntary Petition, the Debtor announced that it had executed a restructuring support agreement (the "RSA") with creditors holding 25% of the outstanding principal amount of the Existing Notes, under which those creditors agreed to support the Debtor's proposed restructuring of the Existing Notes through a scheme of arrangement in the Cayman Islands—i.e., the Scheme. On June 25, 2025, the Debtor filed a petition in the Cayman Islands seeking approval of the Scheme pursuant to section 86 of the Cayman Islands Companies Act (2025 Revision).

4231

Under Cayman Islands law, a scheme of arrangement is a court-supervised restructuring process that allows a company to compromise or reorganize its liabilities with the approval of its creditors. The process typically begins with the company filing a petition before the Grand Court for a so-called convening order. The court then holds a convening hearing, at which the court reviews the proposed scheme and determines whether its classification of the company's debt is proper. *See, e.g.*, *In the Matter of Kaisa Group Holdings Ltd.* [2025] CIGC (FSD) 9, ¶ 7 (rights of creditors in each class must not be "so dissimilar as to make it impossible for them to consult together with a view to their common interest."). If the court enters the convening order, one or more creditors meetings, at which creditors vote on the scheme, are then convened. Each class of creditors must vote to approve the scheme by a majority in number, holding at least 75% in value, of creditors that vote. *See* Companies Act (2025 Revision) § 86(2) (Cayman Is.). If the requisite approvals are obtained, the Grand Court then fixes a date for the sanction hearing, at which the court considers a number of issues, including the scheme's fairness and its compliance with statutory requirements. Once sanctioned and delivered for registration, the scheme becomes binding on all affected creditors. There is no statutorily imposed minimum or maximum timeframe for a scheme of arrangement. The Debtor's RSA contains a "long-stop" date of April 30, 2026, which the Debtor may extend with the consent of certain consenting Scheme creditors. *See* Restructuring Support Agreement [ECF No. 20-5] at 47.

**\*5** Under the Scheme, the Debtor seeks to exchange the Existing Notes for a combination of new senior notes, perpetual securities and shares issued by Xinyuan. The Existing Notes consist of four series of senior notes: (1) the 14.5% senior notes due 2023, (2) the 14.2% senior notes due 2023, (3) the 14.0% senior notes due January 2024 (i.e., the 2024 Notes), and (4) the 3.0% senior notes due 2027. All four series of notes are subject to New York choice of law and forum selection provisions, and all are guaranteed by a number of the Debtor's subsidiaries (the "Subsidiary Guarantors"). Despite the varying maturities and interest rates of the four tranches of notes, the Scheme puts all four tranches in a single class and provides the same treatment for all tranches. Creditors are required to release all claims against Xinyuan and the Subsidiary Guarantors in exchange for the Scheme consideration.

There has been no activity in the Cayman Islands case since the Debtor filed the Scheme in late June 2025. The first step in the prosecution of any scheme—a convening hearing—has not yet occurred, nor has a date for such a hearing even been set. *See* Declaration of Paul Matthew Smith [ECF 37] at ¶ 23; Declaration of Nicholas Lee Herrod [ECF 38] at ¶ 11. The reason for this lack of activity appears to be that, as discussed in the next section, creditor support for the Scheme is still far below the 75% level required under Cayman Islands law.

**E. The Multiple Extensions of the Debtor's Time to Respond to the Involuntary Petition**

The Debtor has not answered the Involuntary Petition.[6] Instead, on May 30, 2025, the Debtor moved for an extension of its time to answer or move. After a number of extensions agreed to by the Petitioning Creditors, the Court on November 20, 2025 heard argument on the Debtor's motion for a further extension. The Court denied the motion, finding that the Debtor had not shown cause for an extension under Bankruptcy Rule 9006(b)(1), because it had offered no evidence that it was making any progress in its Cayman restructuring or that it was likely to make progress if given additional time.

As the Court observed in its November 20 bench ruling, the Debtor had represented almost six months earlier that it expected to obtain additional creditor support in the near term, but that expected support had not materialized. Specifically, in its May 30, 2025 papers in support of its extension motion, the Debtor had stated that, in addition to the creditors holding 25% of the Scheme debt that had already executed the RSA, it expected that creditors holding an additional 30% of that debt would sign the RSA "very soon." However, by the time of the November 20 hearing on the extension motion, creditor support for the Scheme had grown slightly, from 25% to 31.48%. In addition, the Debtor no longer reported that it expected to obtain the additional 30% support "very soon," but merely that it expected to do so at some unspecified future time.

**F. The Motion to Dismiss**

On November 26, 2025, the Debtor moved to dismiss the involuntary bankruptcy case, seeking dismissal on three alternate grounds: for cause pursuant to § 1112(b), on *forum non conveniens* grounds, or on abstention grounds pursuant to § 305(a)(1). The Petitioning Creditors filed an opposition to the motion, and the Debtor filed a reply in support. Two declarations were initially filed in connection with the motion: the declaration of Yong Zhang, chairman of the Debtor's board of directors, in support of the motion, and the

declaration of the Petitioning Creditors' counsel in opposition to the motion.

On January 13, 2026, the Court held a hearing on the motion to dismiss, at which the Court heard argument from counsel for the Debtor and the Petitioning Creditors. Neither the Debtor nor the Petitioning Creditors presented live testimony; instead, each side rested on the declarations and exhibits it had filed, along with the prior filings in this case.

**\*6** At the hearing, the Court questioned counsel extensively about the status and prospects of the Cayman Islands restructuring, including the degree of creditor support for the proposed scheme and the anticipated timeline for completion. Counsel for the Debtor represented that, although the level of creditor support for the Scheme was still only 31.48%, the Debtor was "fairly confident" it would receive the support "at some point soon" of a single creditor holding over 30% of the Scheme Notes. Once again, counsel provided no details, let alone any evidence, to back up this this expectation, nor did counsel say anything about the timeframe within which the Debtor expected to reach the statutorily-required 75% support level.

The Court also questioned counsel about what basis the Debtor had to expect that the Scheme, if sanctioned, could ultimately be recognized and enforced in the United States —a *sine qua non* for the restructuring, because all of the Scheme notes are U.S. dollar-denominated and governed by New York choice of law and forum selection clauses. As discussed further below, counsel's responses gave the Court no confidence that the Scheme would meet the legal requirements for recognition, except in the unlikely event the Debtor ultimately obtained overwhelming creditor support and no creditors objected to recognition.

At the conclusion of the hearing, the Court requested supplemental declarations by Cayman Islands counsel for the Debtor and the Petitioning Creditors on two issues: (i) whether Cayman Islands law permits creditors to file a competing scheme of their own; and (ii) whether, if such a filing is permitted, creditors would face legal or practical impediments to their ability to file and prosecute a scheme of their own. The Court also invited Debtor's counsel to file a supplemental declaration in the event of any material new developments in the Cayman Islands proceeding.

On January 23, Cayman Islands counsel for the Debtor and the Petitioning Creditors each submitted a supplemental declaration addressing the issues raised by the Court. Counsel for both sides agreed that, although Cayman Islands law does not specifically bar the filing of a scheme of arrangement by creditors, Cayman law makes it impossible for creditors to do so without the support of the debtor. As counsel for the Debtor stated, "there is a strong line of authority which states that the Cayman Islands Court will only have discretion to sanction such a scheme of arrangement if it has the scheme company's support." Declaration of Nicholas Lee Herrod [ECF No. 38] at ¶ 26 (citing *Re Savoy Hotel Ltd* [1981] Ch 351) at 366; *see also id.* at ¶ 32 ("[T]he Cayman Islands court will not sanction a scheme of arrangement proposed by a creditor unless that scheme is supported by the company."). An independent obstacle, both counsel agreed, is that without the debtor's cooperation, creditors are unlikely to be able to obtain the information about the company's current finances and operations that they need to prepare and prosecute a scheme. *Id.* at ¶¶ 28-29; *see also* Declaration of Paul Matthew Smith [ECF No. 37] at ¶¶ 17-19. As a result of these impediments, counsel acknowledged, creditor-proposed schemes of arrangement are almost unheard of in the Cayman Islands.[7]

The Debtor filed no additional declarations following the January 13 hearing. On January 29, one day before the hearing scheduled for the Court to deliver its bench ruling, two affiliated holders of senior notes—Greatime Limited and Techfull Properties Corp.—filed short declarations in support of the Debtor's motion to dismiss. The two declarations were signed by the same individual, in his capacity as a director of each company, and are identical except for the name, address and holdings of each creditor. Apart from providing undisputed background information and stating that each creditor signed the RSA in late May 2025, the substance of each declaration consists of only two sentences: "The Creditor supports dismissal of the U.S. Involuntary Case. The Creditor fears that forcing Xinyuan into Chapter 11 proceedings may jeopardize the Cayman Restructuring and harm the interests of the Creditor."

**\*7** At a hearing on January 30, the Court issued a preliminary bench ruling denying the Debtor's motion to dismiss. The Court gave a short summary of its reasons for denying the motion and stated that it would issue a written decision fully setting forth the basis for its ruling. This is that decision.

4233

## Discussion

### I. Dismissal Under Bankruptcy Code § 305(a)(1) is Not Warranted

#### A. Governing Legal Standards

Section 305 of the Bankruptcy Court provides in pertinent part:

> (a) The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if—
>
> (1) the interests of creditors and the debtor would be better served by such dismissal or suspension ....

11 U.S.C. § 305(a)(1).

It is widely recognized that "abstention in a properly filed bankruptcy case is an extraordinary remedy, and that dismissal is appropriate under § 305(a)(1) only in the situation where the court finds that both creditors and the debtor would be better served by a dismissal." *In re Nogin Com. LLC*, 670 B.R. 711, 726 (Bankr. S.D.N.Y. 2025) (internal quotation marks omitted); *accord In re Globo Comunicacoes E Participacoes S.A.*, 317 B.R. 235, 255 (S.D.N.Y. 2004); *In re Genger*, 2023 WL 4311219, at *18 (Bankr. S.D.N.Y. 2023); *In re Schur Mgmt. Co., Ltd.*, 323 B.R. 123, 129 (Bankr. S.D.N.Y. 2005). The movant bears the burden of proof to show that dismissal would benefit both the debtor and its creditors. *See In re Genger*, 2023 WL 4311219, at *18; *accord In re Monitor Single Lift I, Ltd.*, 381 B.R. 455, 462-63 (Bankr. S.D.N.Y. 2008).

A court's determination whether to abstain pursuant to section 305(a)(1) is "a fact-intensive inquiry that entails consideration of the totality of the circumstances." *In re Wythe Berry Fee Owner LLC*, 2023 WL 1786407, at *6 (Bankr. S.D.N.Y. 2023). This decision "should be made on a case-by-case basis." *In re TPG Troy, LLC*, 492 B.R. 150, 160 (Bankr. S.D.N.Y. 2013) (internal quotation marks omitted), *aff'd*, 793 F.3d 228 (2d Cir. 2015). Courts in this district have considered seven factors:

> (1) the economy and efficiency of administration; (2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court; (3) whether federal proceedings are necessary to reach a just and equitable solution; (4) whether there is an alternative means of achieving an equitable distribution of assets; (5) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case; (6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and (7) the purpose for which bankruptcy jurisdiction has been sought.

*In re Monitor Single Lift,* 381 B.R. at 464-65 (Bankr. S.D.N.Y. 2008) (internal quotation marks omitted); *accord In re Genger*, 2023 WL 4311219, at *18; *In re Navient Sols., LLC,* 625 B.R. 801, 819-20 (Bankr. S.D.N.Y. 2021), *aff'd*, 2022 WL 863409 (S.D.N.Y. 2022), *aff'd*, 2023 WL 3487051 (2d Cir. 2023); *In re Newbury Operating LLC,* 2021 WL 1157977, at *10 (Bankr. S.D.N.Y. 2021). The parties agree that these are the governing factors.

Courts apply these factors flexibly, as aids to assist the court's determination of whether dismissal would benefit both the debtor and its creditors. *See In re Globo Comunicacoes,* 317 B.R. at 255 (abstention "requires that both creditors and debtors benefit from the dismissal, rather than applying a simple balancing test to determine whether dismissal is appropriate."). "While all factors are considered, not all are given equal weight in every case." *In re Monitor Single Lift,* 381 B.R. at 465; *accord In re Navient Sols.*, 625 B.R. at 820. Factors # 1 through 6 are sometimes considered together, to help the court determine whether abstention would facilitate a successful resolution in another forum. *See In re Navient Sols.*, 625 B.R. at 820 (considering factors # 1-6 together "because th[o]se factors touch upon the availability of an alternate forum to efficiently achieve an equitable distribution.").

**\*8** Factor # 7—the purpose for which the bankruptcy petition was filed—can be entitled to substantial weight, particularly "when the involuntary petition appears to be a debt collection tool in a two-party dispute." *In re Newbury Operating LLC,* 2021 WL 1157977, at *11 (Bankr. S.D.N.Y. 2021) (internal quotation marks omitted). The 1978 Senate Report for section 305 specifically noted the appropriateness of abstention in circumstances of that sort:

> The court may dismiss or suspend under the first paragraph [section 305(a)], for example, if an arrangement is being worked out by creditors and the debtor out of court, there is no prejudice to the results of creditors in that arrangement, and an involuntary case has been commenced by a few recalcitrant creditors to provide a basis for future threats to extract full payment. The less expensive out-of-court workout may better serve the interests in the case.

4234

S. Rep. No. 95-989, at 36 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5822; *see also In re Navient Sols.*, 625 B.R. at 820 (" '[T]he prototypical fact pattern under section 305(a)(1)' as noted by Congress involves out-of-court workouts and efforts by recalcitrant creditors to commence an involuntary case to gain leverage") (quoting 2 Collier on Bankruptcy ¶ 305.02[2][a] (16th ed. 2021)); *In re Stillwater Asset Backed Offshore Fund Ltd.*, 485 B.R. 498, 509 (Bankr. S.D.N.Y. 2013) ("There is no question that § 305(a)(1) was designed to be utilized where, for example, a few recalcitrant creditors attempted to interfere with an out-of-court restructuring that had the support of a significant percentage of the debtor's creditors.") (internal quotation marks omitted).

When the court is asked to abstain in favor of a foreign proceeding, comity considerations can be entitled to significant weight, depending on the circumstances. For example, in *In re Compania de Alimentos Fargo, S.A.*, 376 B.R. 427 (Bankr. S.D.N.Y. 2007), Judge Bernstein gave substantial weight to comity in dismissing an involuntary chapter 11 petition in favor of an Argentine insolvency proceeding for an Argentine debtor with limited U.S. ties:

> Although abstention under § 305 is considered an extraordinary remedy, ... the pendency of a foreign proceeding alters the balance by introducing considerations of comity into the mix. The Second Circuit, in this regard, has frequently underscored the importance of judicial deference to foreign bankruptcy proceedings.

*Id.* at 434. As Judge Bernstein noted, deference to the Argentine restructuring was warranted because the debtor was an Argentine company, and all of its business operations, customers and employees were located in that country. In addition, the debtor's insolvency proceeding had been pending in Argentina for years before the U.S. involuntary case was filed. *See id.*

The Debtor contends that this case is governed by the Second Circuit's observation, in *Argo Fund Ltd. v. Bd. of Dirs. of Telecom Arg., S.A. (In re Bd. of Dirs. of Telecom Arg., S.A.)*, 528 F.3d 162, 171-72 (2d Cir. 2008) (Sotomayor, J.), that "[c]omity is generally appropriate where the foreign proceedings do not violate the laws or public policy of the United States and if the foreign court abides by fundamental standards of procedural fairness." However, this observation had nothing to do with the standards governing abstention motions under section 305. Instead, the court of appeals was referring to the central role comity can play in decisions under section 304, the since-repealed section of the Bankruptcy

Code that addressed recognition of foreign restructurings. That Code section, which Congress replaced with chapter 15 in 2005, expressly directed courts to consider comity when deciding whether to recognize or give assistance to foreign proceedings. *See* 11 U.S.C. § 304(c)(5) (repealed 2005).

**\*9** The Debtor's reliance on *JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418 (2d Cir. 2005), is similarly misplaced. The Debtor cites that decision for the proposition that "U.S. courts should ordinarily decline to adjudicate creditor claims that are the subject of a foreign bankruptcy proceeding ... so long as the foreign proceedings are procedurally fair and ... do not contravene the laws or public policy of the United States." *Id.* at 424. However, the Court here is not being asked to adjudicate creditor claims; instead, it is ruling on a motion to dismiss a chapter 11 bankruptcy pursuant to Bankruptcy Code § 305(a)(1). Neither that Code section nor the case law construing it creates a presumption in favor of abstention. To the contrary, the courts have uniformly held that abstention under section 305(a)(1) is an "extraordinary remedy," appropriate only if the movant shows that abstention would benefit the debtor and its creditors. *In re Genger*, 2023 WL 4311219, at \*18.

**B. The Debtor Has Not Shown That Dismissal on Abstention Grounds is Warranted**

The Debtor contends that dismissal of the involuntary chapter 11 case will enhance the prospects for a successful restructuring of its Existing Notes: "The Cayman Proceedings, coupled with Chapter 15 proceedings seeking recognition of the Scheme ..., will offer a vastly more efficient, economical, and expedited means to resolve the liability under the Scheme Notes." Debtor Br. at 10-11, 15. The Debtor further contends that the Involuntary Petition serves no legitimate rehabilitative purpose, but instead was filed as a litigation tactic to enhance the petitioning creditors' negotiating leverage.

If these claims were true, the Court would grant the Debtor's motion. But the Debtor has provided only minimal support for its sweeping assertions, and the evidence in the record undercuts these allegations more than it supports them. The Debtor therefore has failed to satisfy its burden of showing that dismissal would further the interests of its creditors, or that the Involuntary Petition was filed for an improper purpose. The motion to dismiss the Petition on abstention grounds lacks merit, and the Court will deny it.

**1. The Debtor has not shown that dismissal will benefit creditors**

If the Debtor's Cayman Islands restructuring case appeared to be headed toward a successful conclusion, the Court would be reluctant to allow a concurrent chapter 11 case to proceed. But as far as can be told from the record, the Debtor's Cayman proceeding appears to be on a path to failure. For that restructuring to succeed, the Debtor would need to surmount three high hurdles, and the Debtor has failed to show that it is likely to clear any, let alone all, of these barriers.

*First*, under Cayman law, a threshold requirement for approval of the Scheme is that it be approved by creditors holding at least 75% of the Scheme debt. The Debtor has made no showing that it is likely to obtain this level of approval. To the contrary, the Debtor still has only the 31% level of creditor support that it had last July, and it has given the Court no reason to expect it will get additional support any time soon, if ever.[8]

*Second*, even if the Debtor were somehow to obtain the support of 75% of the Scheme creditors, it is still far from clear that it could obtain the Cayman court's approval of the Scheme. The Scheme puts the holders of all four tranches of Scheme notes into a single class and gives them all the same treatment, even though the four tranches have widely varying interest rates (ranging from 3% to 14.5%) and maturity dates (ranging from 2023 to 2027). Under the Bankruptcy Code, a chapter 11 plan of this sort, which gives identical treatment to multiple tranches of debt with materially different terms, would be unconfirmable absent creditor consent. *See* 11 U.S.C. § 1122(a) ("[A] plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.").

 **\*10**  Of course, Cayman law may differ from U.S. law on this issue. But the Debtor has made only a brief, and in the Court's view unpersuasive, attempt to show that, under Cayman law, it is proper to put all Scheme debt in a single class. *See* Declaration of Ben Hobden [ECF 20-2] at ¶¶ 47-50. Moreover, in the more than seven months since it commenced its Cayman Islands proceeding, the Debtor has chosen not to schedule a convening hearing. As a result, the Cayman court has not yet had occasion to rule on propriety of the Scheme's classification, and significant uncertainty therefore remains as to whether the Debtor will prevail on that issue.

*Third*, if the Debtor somehow surmounted both of these hurdles, its restructuring would then face a third hurdle, which could prove even more daunting than the first two. The Debtor's counsel has admitted that the Debtor would "likely" need to file a chapter 15 case and obtain a U.S. bankruptcy court's recognition of its Cayman restructuring as a foreign main proceeding.[9] This seems clearly correct, since all of the debt subject to the Scheme is U.S. dollar-denominated and subject to New York forum selection and governing law clauses. Without a U.S. court's recognition of the Cayman restructuring, holders of Existing Notes would be free to sue the Debtor in the U.S. and to seek to collect the full amount of that debt, notwithstanding the Scheme's restructuring of that debt

The issue of whether to recognize the Cayman restructuring as a foreign main proceeding is not now before the Court. Nonetheless, the current record indicates that the Debtor would face significant challenges in obtaining the central ruling required for such recognition—a finding that the Cayman Islands is its "center of main interests," or COMI.

The standards governing determination of a chapter 15 debtor's COMI were set forth by the Second Circuit in *Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127 (2d Cir. 2013). The Court of Appeals noted that a debtor's country of incorporation is statutorily presumed to be its COMI, *id.* at 133, 137 (citing Code § 1516(c)), and added that bankruptcy courts have broad discretion to determine a debtor's COMI, *id.* at 138. At the same time, the Second Circuit emphasized that a court's COMI determination should be guided by a core principle: "COMI lies where the debtor conducts its regular business, so that the place is ascertainable by third parties." *Id.* at 130; *see also id.* at 136, 138 (reviewing European sources of COMI concept, to which House Report pointed for guidance); *id.* at 138 n.10 (noting importance of "debtor's nerve center, including from where the debtor's activities are directed and controlled") (citation and internal quotation marks omitted).

 **\*11**  It is undisputed that the Debtor's "nerve center"— the place from which its management directs the company's operations and makes its key decisions—is in the PRC, not the Cayman Islands. Other than having incorporated in the Cayman Islands and having chosen to restructure there, the Debtor has only minimal Cayman connections. Consequently, a finding that the Debtor's COMI is in the Cayman Islands would be in tension with the notion that "COMI lies where the debtor conducts its regular business,"

4236

*Fairfield Sentry*, 714 F.3d at 130. Nevertheless, precedent in this District would support a Cayman Islands COMI finding if two conditions were met—specifically, if (i) the Debtor obtained the overwhelming support of its Scheme creditors, and (ii) no party objected to recognition.

If those two conditions were met, the facts of this case would be strikingly similar to those in *In re Modern Land (China) Co., Ltd.*, 641 B.R. 768 (Bankr. S.D.N.Y. 2022), a case decided four years ago by Chief Judge Glenn. In *Modern Land*, as here, the debtor was a PRC-based company that was incorporated in the Cayman Islands and chose to restructure in the Caymans. There, as here, the debtor had only minimal other connections to the Cayman Islands. Judge Glenn nevertheless found the Cayman Islands to be the debtor's center of main interests, based on a "totality of the circumstances" test that gave substantial weight to the two facts just noted (that the debtor was incorporated in the Caymans and carried out its restructuring there), as well as the additional facts that creditors had voted overwhelmingly to approve the debtor's Cayman restructuring and that no party had objected to recognition. *See Modern Land,* 641 B.R. at 786-93.[10]

Thus, if the Debtor were eventually to obtain the overwhelming support of its Scheme creditors and if no party objected to recognition, *Modern Land* would provide strong precedential support for recognition of the Cayman Restructuring as a foreign main proceeding. But those are big "ifs." At present, the Debtor is very far from obtaining overwhelming creditor support or from coming to terms with the petitioning creditors.

Because the Debtor has not shown that it is likely to surmount any, let alone all, of the main hurdles its Cayman Islands restructuring faces, the prospects for the success of that restructuring appear to be remote, at least if the case continues on its current trajectory. A ruling allowing this chapter 11 case to proceed is not likely to reduce the already-low chances of a successful restructuring. To the contrary, it seems more likely that such a ruling would increase those chances—either by leading to confirmation of a chapter 11 plan in this case or, alternatively, by jump-starting the stalled negotiations in the Debtor's Cayman Islands case.

 **\*12**  As the Debtor has conceded, Cayman Islands law gives creditors no ability to file a scheme of their own without the Debtor's support. To quote the Debtor's counsel, "the Cayman Islands court will not sanction a scheme of arrangement proposed by a creditor unless that scheme is supported by the company." Herrod Dec. [ECF No. 38] at ¶ 32. As a result, there appear to be few, if any, restrictions on the Debtor's ability to use delay as a tactic to wear down creditor opposition to its Scheme. It appears that the Debtor may be using delay for precisely that reason, and that if the Court were to dismiss this chapter 11 case, no meaningful check would remain on the Debtor's ability to continue doing so.[11]

In contrast, chapter 11 is well designed to limit a debtor's ability to delay. Most notably, the Debtor's exclusive right to file a plan expires if it fails to file a plan within 120 days and to obtain acceptances within 180 days, and the Court has the power to either extend or shorten these periods. *See* 11 U.S.C. § 1121(b)-(d). These provisions effectively put pressure on debtors to reorganize without undue delay, and the mere possibility of an eventual creditor plan can affect the negotiating dynamics from day one of the case. In this case, a ruling denying the motion to dismiss—and thereby giving creditors the potential right to file a chapter 11 plan if the Debtor continues to delay—could similarly have an immediate impact on the negotiating dynamics. In the best of all possible worlds, this change in the rules of the game might even break the current impasse in Scheme negotiations and lead to progress in the Cayman Islands case.

Of course, no scenario is without risk, and the Court is well aware that allowing this chapter 11 case to proceed will have costs and risks of its own. Most obviously, it will add an additional layer of expense, which could be substantial. It also could potentially lead to duplication of effort and disruption if the two cases are not properly coordinated and managed. These are serious concerns, and the Court does not take them lightly.

At present, however, the prospect of two competing cases marching forward on parallel tracks is more hypothetical than real. In the eight months since the Debtor commenced its Cayman Islands case last June, there has been no activity in that case, and the Debtor has given the Court no reason to expect this is likely to change any time soon. If this were to change—for example, if this Court's denial of the motion to dismiss were to break the current impasse and lead to real progress in the Cayman Islands case—the Court would consider pausing further proceedings in this case. Specifically, the Court in that event would be receptive to a renewed abstention motion requesting a suspension of further proceedings in this case while the Debtor sought to obtain approval of the Scheme by its creditors and the Cayman

4237

Islands court. *See* 11 U.S.C. § 305(a) (court "may suspend all proceedings in a case under this title" on abstention grounds). In this way, the disruption that could result from two competing cases moving forward simultaneously could be minimized.

The Debtor asks the Court to give decisive weight to comity, but as discussed above, the case law does not support that. Moreover, in the circumstances of this case, comity appears to be a distinctly secondary consideration. This case is nothing like *Compania de Alimentos Fargo*, 376 B.R. at 434, where Judge Bernstein gave substantial deference to an Argentine debtor's decision to restructure in its own country. This Debtor, by contrast, has only minimal connections with the Cayman Islands—fewer than its connections to the United States. In addition, the Debtor only commenced its Cayman case *after* this chapter 11 case had been filed, and it has made no progress in its Cayman case over the past seven months. Any interest the Cayman Islands may have in allowing the Debtor's restructuring to continue to languish in its courts is modest at best.

 **\*13** The Debtor contends that allowing this chapter 11 case to proceed could cause it to suffer irreparable harm, but it has offered no evidence and few details to back up this conclusory assertion. The only possible harm the Debtor has identified is that it might lose its listing on the New York Stock Exchange. However, the Debtor has offered no persuasive explanation of how a denial of the motion to dismiss would have that effect, or of how a loss of its NYSE listing during this bankruptcy would cause significant harm to its creditors.

Finally, the Debtor contends that a chapter 11 case might face practical impediments because most of the Debtor's assets and operations are in the PRC, making any U.S. judgment potentially difficult to enforce in the PRC. But the Debtor has provided no reason to expect that this would be any more of an issue for a U.S. reorganization than for a Cayman Islands restructuring. Either way, Debtor's counsel has acknowledged, the Debtor would honor the terms of its restructuring. And while counsel has argued that other parties affected by the bankruptcy, such as contract counterparties, might be unwilling to comply with the terms of a chapter 11 plan, counsel has not shown that non-compliance of that sort is likely to be a genuine problem, or that it would be more of a problem for a chapter 11 reorganization than for a Cayman Islands restructuring.

For all of these reasons, the Debtor has not met its burden of showing that abstention would benefit its creditors.

### 2. The Debtor has not shown that the involuntary petition was filed for an improper purpose

The Debtor asks the Court to dismiss the involuntary petition on the ground that it was filed for an improper purpose—to gain a tactical advantage in restructuring negotiations—and serves no legitimate rehabilitative purpose. This contention lacks merit.

In the first place, the Debtor has failed to show that the Petitioning Creditors' reasons for filing the Involuntary Petition were in any way improper. The Debtor has presented no direct evidence of the Petitioning Creditors' motivations; instead, it asks the Court to infer improper motives from the circumstances. But the circumstances of this case are very different from those in the prototypical fact pattern identified by section 305's legislative history—namely, when

> an arrangement is being worked out by creditors and the debtor out of court, there is no prejudice to the results of creditors in that arrangement, and an involuntary case has been commenced by a few recalcitrant creditors to provide a basis for future threats to extract full payment.

S. Rep. No. 95-989, at 36 (1978). The Scheme is not an out-of-court arrangement, nor has the Debtor shown that its terms would cause "no prejudice" to creditors. To the contrary, the Debtor's inability to obtain more than 30% creditor support suggests that many, perhaps most, creditors consider the Scheme to be detrimental—prejudicial—to their interests. Nor was the Involuntary Petition filed by "a few recalcitrant creditors to provide a basis for future threats to extract full payment." *Id.* Far from seeking to extract preferential payments, the Petitioning Creditors filed under chapter 11, the confirmation requirements of which ensure that all members of any given class receive uniform treatment.

The Debtor's contention that the Involuntary Petition serves no legitimate rehabilitative purpose is also unfounded. It is undisputed that the Debtor is financially distressed and needs to restructure its debts; it filed the Scheme after being unable to pay the $170 million of senior notes that came due last January. The only question is in what forum, and under what rules, the Debtor's restructuring should take place. The filing of the Involuntary Petition served the legitimate purpose of commencing a chapter 11 case, which may well increase the prospects for a successful restructuring.

4238

**\*14** Finally, while some courts have dismissed involuntary petitions based on a finding that the petition was filed for an improper purpose, it is important to put this ground for dismissal in context. Section 305(a)(1) expressly authorizes dismissal if, but only if, "the interests of creditors and the debtor would be better served" by dismissal. 11 U.S.C. § 305(a)(1); *see also Globo Comunicacoes*, 317 B.R. at 255 (abstention "requires that both creditors and debtors benefit from the dismissal"); *id.* at 255-56 (finding not only that the petition was filed for an improper purpose but also that the debtor's and its creditors' interests "would very likely be furthered by dismissal"). In the Court's view, a finding of improper purpose is best seen not as an independent ground for dismissal, but instead as an element in the court's assessment of whether dismissal would benefit creditors. And in this case, as just discussed, the Debtor has failed to meet its burden of showing that dismissal would benefit creditors.

## II. No Basis Exists to Dismiss This Case Under Bankruptcy Code § 1112(b)

Bankruptcy Code § 1112(b)(1) requires a bankruptcy court to dismiss a chapter 11 case, or alternatively to convert it to a case under chapter 7 or to appoint a trustee or examiner, "for cause." Code § 1112(b)(4) sets forth a non-exclusive list of circumstances that constitute cause. *See* 11 U.S.C. § 1112(b)(1), (4). Although all of the illustrative types of cause enumerated in subsection (4) involve post-petition developments, the Second Circuit has held that the filing of a bankruptcy petition—including an involuntary petition —for improper purposes also can constitute cause. *See In re Murray*, 900 F.3d 53 (2d Cir. 2018) (affirming dismissal of involuntary chapter 7 petition for cause under Code § 707(a)); *see also In re Taberna Preferred Funding IV, Ltd.*, 594 B.R. 576, 602-08 (Bankr. S.D.N.Y. 2018) (holding that filing of involuntary chapter 11 petition for improper purposes constituted cause for dismissal under Code § 1112(b)). A bankruptcy court has broad discretion to determine whether the circumstances of any given case constitute cause to dismiss. *See Taberna*, 594 B.R. at 600.

The Debtor's claim that cause exists to dismiss this case rests on the very same contentions addressed in section I.B.2 of this decision: that the Involuntary Petition was filed for an improper purpose and serves no legitimate rehabilitative purpose. As just discussed, those contentions are unfounded. Consequently, no basis exists to dismiss this case under Code § 1112(b)(1).

## III. No Basis Exists to Dismiss This Case on *Forum Non Conveniens* Grounds

A party seeking dismissal of a case on *forum non conveniens* grounds bears a heavy burden. In addition to showing that an adequate alternative forum exists, movant must show that "the pertinent factors tilt[ ] strongly in favor of trial in the foreign forum." *In re Dewey & LeBoeuf LLP*, 522 B.R. 464, 476 (Bankr. S.D.N.Y 2014) (citing the private and public interest factors set forth in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947)). When, as here, movant has agreed to a New York forum selection clause— one that expressly waives any objection to suit being brought in any federal or state court in New York—the burden is even heavier. An agreement of that sort "counsels strongly against dismissal of [the] action based on *forum non conveniens." United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F. Supp. 2d 198, 206-07 (S.D.N.Y. 2002).

The Debtor contends that the usual burden of proof should be reversed—that is, that its choice to commence a restructuring proceeding in the Cayman Islands, rather than in New York, is entitled to deference. But this ignores that the Petitioning Creditors commenced this case first, before the Debtor filed its Cayman Islands case. Moreover, the Petitioning Creditors filed in a forum—New York—to which the Debtor had given its advance consent. In these circumstances, there is no legal basis to flip the burden of proof and require the Petitioning Creditors to show that the relevant private and public interest factors favor their chosen forum. Rather, the burden is on the Debtor to show the opposite.

**\*15** The Debtor makes only a token attempt to show that the relevant private and public interest factors tilt in favor of the Cayman Islands. It does not argue that any potential witnesses live in the Caymans, nor does it identify any practical considerations or any public interest factors that might favor the Cayman Islands over New York. Instead, the Debtor argues only that its witnesses live in China, halfway around the globe from New York. But of course, this does nothing to tip the scales in favor of the Cayman Islands, which are equally far from China. The Debtor has shown no basis whatsoever to dismiss this case on *forum non conveniens* grounds.

## Conclusion

For these reasons, the Court will deny the Debtor's motion to dismiss the Involuntary Petition, without prejudice to the Debtor's right to seek dismissal of this case, or a suspension of further proceedings in the case, pursuant to 11 U.S.C. § 305(a)(1) at a later date if warranted by subsequent developments.

**All Citations**

--- B.R. ----, 2026 WL 592250

Footnotes

1 The facts summarized below, which for the most part are undisputed, are taken from the parties' declarations and other filings in connection with the motion to dismiss or otherwise in this bankruptcy. No testimony was offered in connection with the motion to dismiss; instead, the parties rested on their papers.

2 As of December 31, 2024, Xinyuan had 115 direct and indirect subsidiaries. Of those subsidiaries, 95 were located in China, 11 in the U.S., 3 in the Cayman Islands, 3 in Hong Kong, 2 in Malaysia, and 1 in the BVI. *See* Xinyuan Real Estate Co., Ltd, Annual Report (Form 20-F), at Exhibit 8-1 (April 29, 2025).

3 A company may register as an "exempted company" if its business is "carried out mainly outside the [Cayman] Islands." Companies Act (2025 Revision) § 163 (Cayman Is.). An exempted company "shall not carry on a trade or business in the [Cayman] Islands with any person, except in furtherance of the business of the exempted company carried on outside of the [Cayman] Islands," but nothing prevents the exempted company from "effecting and concluding contracts in the [Cayman] Islands and exercising in the [Cayman] Islands all its powers necessary for the carrying on of its business outside the [Cayman] Islands." *Id.* § 174(1) and (2).

4 Two of the Group's U.S. projects (one in Manhattan, the other in Brooklyn's Williamsburg neighborhood) are completed; the third (in Flushing, Queens) is in the early stages. *See* Xinyuan Real Estate Co., Ltd, Annual Report (Form 20-F) (April 29, 2025), at 24; *see also id.* at 74 (U.S. employees); *id.* at 96 (New York City office); *id.* at 56-57, 73-74 (listing all of Xinyuan Group's projects outside of China).

  The Group previously operated a fourth U.S. project through two of the Debtor's U.S. subsidiaries, but those subsidiaries filed chapter 11 petitions in 2024 and, in that reorganization, transferred ownership of their assets to creditors.. *See In re Hudson 888 Owner LLC*, Case No. 24-10021-mew (Bankr. S.D.N.Y. Dec. 5, 2024); *In re Hudson 888 Holdco LLC*, Case No. 24-10022-mew (Bankr. S.D.N.Y. Dec. 5, 2024).

5 The Debtor does not claim that it lacks sufficient assets in the U.S. to satisfy the requirement of Bankruptcy Code § 109(a) that a debtor have at least some property in the U.S. *See* 11 U.S.C. § 109(a); *see also In re B.C.I. Finances Pty Ltd.*, 671 B.R. 669 (Bankr. S.D.N.Y. 2025) (construing § 109(a)'s requirement that a debtor have "property in the United States").

6 At the January 13, 2026 hearing on the motion to dismiss, Debtor's counsel stated that the Debtor has not yet decided whether to dispute that the Petition satisfies the requirements for an involuntary petition set forth in Bankruptcy Code § 303.

7 Cayman Islands counsel for the Petitioning Creditors was aware of no Cayman Islands case in which a creditor filed a scheme of arrangement after the company filed a plan of its own. [ECF No. 37 at ¶ 14] Debtor's counsel was aware of only one such case, and in that case, "the creditor had the full support and cooperation of the company." [ECF No. 38 at ¶ 31 & n.21 (citing *In the Matter of Schahin II Fin. Co. (SPV) Ltd.*)]

8 The two affiliated creditors that filed declarations in support of the motion to dismiss in late January 2026 each stated in its declaration that it had signed the RSA in late May 2025. In other words, these creditors are part of the minority of creditors, collectively holding 31% of the Scheme debt, that have supported the Scheme since last July. Their declarations provide no reason to expect that creditor support for the Scheme is likely to increase above that 31% level.

9 Recognition of the Cayman Islands restructuring as a foreign *non-main* proceeding would almost certainly not be possible, because the Debtor conducts no significant business operations in the Cayman Islands. Bankruptcy Code § 1502(5) defines a "foreign nonmain proceeding" as "a foreign proceeding, other than the foreign main proceeding, pending in a country where the debtor has an establishment"; § 1502(2) in turn defines an "[e]stablishment" as "any place of operations

where the debtor carries out a nontransitory economic activity." 11 U.S.C. § 1502(2), (5). It is settled that, "[t]o have an establishment in a country, the debtor must conduct business in that country." *In re Creative Fin. Ltd.*, 543 B.R. 498, 520 (Bankr. S.D.N.Y. 2016); *see also In re Modern Land (China) Co., Ltd.*, 641 B.R. 768, 784 (Bankr. S.D.N.Y. 2022) (courts require "proof of more than a mail-drop presence to satisfy the establishment requirement") (internal quotation marks omitted).

10    As the court noted, deference to the forum chosen by the debtor and supported by its creditors furthered chapter 15's stated goals, including "maximizing the value of the debtor's assets" and "promot[ing] cooperation between the American and [foreign] courts, by helping facilitate the [foreign proceeding] and maximizing the chances of a successful reorganization." *Modern Land,* 641 B.R. at 787. Moreover, the absence of any objection to recognition supported the conclusion that no party's interests were thereby impaired. *See In re Sunac China Holdings Ltd.*, 656 B.R. 715, 732-33 (Bankr. S.D.N.Y. 2024) ("creditor support for a restructuring can be entitled to significant weight, particularly if no creditor objects to the debtor's choice of restructuring forum."); *In re SphinX, Ltd.,* 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006) ("Because their money is ultimately at stake, one generally should defer ... to the creditors' acquiescence in or support of a proposed COMI").

11    The Debtor argues that further delays in its Cayman Islands case will be modest, because its RSA contains an April 30, 2026 "long-stop" date by which the Scheme is required to become effective. However, the RSA expressly permits that date to be extended indefinitely, so long as "Significant Initial Consenting Creditors" agree to the extension.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

4241