SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Ron E. Meisler
Christopher M. Dressel (admitted *pro hac vice*)
Bryan V. Uelk
Jennifer Madden (admitted *pro hac vice*)
320 S. Canal Street
Chicago, Illinois 60606
Telephone: (312) 407-0700
Fax: (312) 407-0411

– and –

SKADDEN, ARPS, SLATE, MEAGHER & FLOM (UK) LLP
Peter K. Newman
Nicole Stephansen
22 Bishopsgate
London EC2N 4BQ
Telephone: +44 20 7519 7000
Fax: +44 20 7519 7070

*Counsel to the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | **Chapter 15** |
| **NFE Global Holdings Limited, *et al.*,** | **Case No. 26-11268 (MG)** |
| **Debtors in a Foreign Proceeding.[1]** | **(Jointly Administered)** |

---

[1]   The Debtors and the last four digits of their respective foreign identification numbers are NFE Global Holdings Limited (9588) and NFE Brazil Newco Limited (1053).  The address of NFE Global Holdings Limited's registered office is Suite 1, 7th Floor, 50 Broadway, London SW1H 0BL, United Kingdom, and the address of NFE Brazil Newco Limited's registered office is Suite 1, 7th Floor, 50 Broadway, London SW1H 0DB, United Kingdom.

**<u>NOTICE OF FILING OF RELEVANT ALTERNATIVE REPORT</u>**

**PLEASE TAKE NOTICE** that on May 28, 2026, Christopher Boas, in his capacity as the authorized foreign representative (the "**Foreign Representative**") of the above-captioned foreign debtors (the "**Debtors**") that are the subject of proceedings (the "**English Proceedings**") currently pending before the High Court of Justice of England and Wales (the "**English Court**") concerning two restructuring plans proposed pursuant to Part 26A of the Companies Act of 2006 (as amended), filed voluntary petitions for relief under chapter 15 of title 11 of the United States Code for the Debtors with the United States Bankruptcy Court for the Southern District of New York (the "**Court**") and the *Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* [Docket No. 3] (the "**Verified Petition**").

**PLEASE TAKE FURTHER NOTICE** that the Court held a recognition and enforcement hearing on June 26, 2026 (the "**Hearing**"), to consider the relief requested in the Verified Petition.

**PLEASE TAKE FURTHER NOTICE** that, at the Hearing, the Court directed counsel to the Foreign Representative to file on the docket the Expert Report: Relevant Alternative (the "**Relevant Alternative Report**"), which was submitted to the English Court in connection with the English Proceedings.

**PLEASE TAKE FURTHER NOTICE** that the Foreign Representative hereby files the Relevant Alternative Report attached hereto as **<u>Exhibit A</u>**.

*[Remainder of Page Intentionally Left Blank]*

Dated:  June 26, 2026
         Chicago, Illinois

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP

/s/ *Ron E. Meisler*
Ron E. Meisler
Christopher M. Dressel (admitted *pro hac vice*)
Bryan V. Uelk
Jennifer Madden (admitted *pro hac vice*)
320 S. Canal Street
Chicago, Illinois 60606
Telephone: (312) 407-0700
Fax: (312) 407-0411

– and –

SKADDEN, ARPS, SLATE, MEAGHER
    & FLOM (UK) LLP

Peter K. Newman
Nicole Stephansen
22 Bishopsgate
London EC2N 4BQ
Telephone: +44 20 7519 7000
Fax: +44 20 7519 7070

*Counsel to the Foreign Representative*

**EXHIBIT A**

**Relevant Alternative Report**



# In the matter of:
# (1) NFE Global Holdings Limited
# (2) NFE Brazil Newco Limited
# (3) The Companies Act 2006

**8 MAY 2026**

# Expert Report:
# Relevant Alternative

ALVAREZ & MARSAL

**Confidential**

# Disclaimer

This report should be read in conjunction with, and is governed by, the terms of the engagement letter addressed to New Fortress Energy Inc. and its subsidiaries ("**NFE**", the "**Group**", "**Client**", or "**you**") dated 30 April 2026 (the "**Engagement Letter**") and any subsequent amendment letters (together, the "**Agreement**").

Alvarez & Marsal Europe LLP ("**A&M**", "**we**" or "**our**") and I accept no duty nor responsibility to any person other than the Court in accordance with the duties owed by independent experts under relevant English law and procedure, and the Group in accordance with the terms of the Agreement.

This report is confidential and has been prepared solely to support an application to Court in relation to a proposed restructuring plan and may be appended to the explanatory statement, but this report should not be provided to anyone other than the Court, the relevant parties (including plan creditors) and their advisers / expert witnesses.  No other party is entitled to rely on this report for any purpose whatsoever and neither I nor A&M accept any duty of care or liability to any other party who is shown or gains access to this report.

This report shall not be copied, referred to or disclosed, in whole or in part, without our prior written consent.   No party should refer to or use my or A&M's name or this report for any other purpose, disclose or refer to it in any prospectus or other document, or make it available or communicate it to any other party.

This report must not be construed as expressing opinions on matters of law, which are for the Court to determine.

**ALVAREZ & MARSAL**
LEADERSHIP. **ACTION. RESULTS.**℠



# Table of Contents

| 1 | Introduction | 4 |
|---|---|---|
| 2 | The Relevant Alternative | 10 |
| 3 | Recovery analysis | 15 |
| 4 | Valuation methodology | 21 |
| 5 | RA methodology | 25 |
| 6 | Cash and funding | 37 |
| 7 | Distress discounts / adjustments | 46 |
| 8 | Fee analysis | 52 |
| 9 | Appendix 1: Glossary | 54 |
| 10 | Appendix 2: CPR35 Instruction Letter | 57 |

ALVAREZ & MARSAL

# Introduction

ALVAREZ & MARSAL

# Introduction

# Instructions

**Please see page 58 for a Letter of Instruction for my role as an independent expert witness in accordance with Part 35 of the Civil Procedure Rules 1998 ("CPR35").**

## CPR35 instructions and scope of work

The Group is proposing a comprehensive financial restructuring, which is to be implemented via two inter-conditional UK Restructuring Plans under Part 26A of the Companies Act 2006 (the "**Plans**" or the "**RPs**", together the "**Restructuring**").

I am instructed by the Group's counsel Skadden, Arps, Slate, Meagher & Flom (UK) LLP ("**Skadden UK**") to prepare a report for the High Court covering:

- An assessment of the most likely scenario if the RPs are not approved (the relevant alternative).
- Estimating the likely outcomes for creditors subject to the RP ("**Plan Creditors**") and existing shareholders under the relevant alternative.
- Estimating the outcome for Plan Creditors and shareholders under the RPs and comparing this against the recoveries under the relevant alternative (often referred to as the "**No Worse Off Test**").
- Estimating the value that is being preserved or generated under the RPs and commenting on how the value is being allocated.

In accordance with my CPR35 instructions, I have presented information in a manner that is consistent with the Group's public disclosures made in compliance with applicable securities laws and regulations. Accordingly, valuations of certain business units have been aggregated whilst still providing sufficient detail to understand the methodology and support my conclusions.

## Other Services to the Group

Separate teams at A&M are currently providing ancillary services to the Group in connection with the proposed Restructuring:

- Estimating the going concern enterprise value of the Group based on the post-Restructuring business plan. *Note: my colleague, Richard Bibby, has been separately instructed by Skadden UK to prepare a report for the High Court on this topic.*
- General support in connection with the Restructuring (coordinating responses to information requests, assisting the Group with preparing common information packs, etc.).
- Contingency planning (detailed contingency plans have been developed which support to the relevant alternative analysis).
- Tax advice (primarily concerning cancellation of indebtedness income ("**CODI**")).
- Liquidity monitoring and support.
- Contracts and claims support.

**ALVAREZ & MARSAL**
LEADERSHIP. ACTION. RESULTS.℠

## Introduction

# My CV

**I am head of A&M's Restructuring practice in EMEA with 40 years of restructuring experience acting as principal and/or lead advisor for numerous high-profile restructuring and insolvency situations.**

### Experience

I, Richard Fleming, am a Licensed Insolvency Practitioner with extensive experience in multiple industries including energy, mining, retail, leisure, financial services, healthcare, pharmaceuticals, energy, manufacturing, property, and construction.

I am experienced in preparing complex relevant alternative analysis having been involved in several restructuring plans, including Virgin Atlantic (first case under the new legislation), DeepOcean (first example of cross-class cram down), and Atento (first case of changing governing law from New York to English).  I was also involved in the successful challenge against Petrofac in the Court of Appeal, which focused on the fair allocation of value.

I am also highly experienced in preparing counter-factual and estimated outcome analysis having been involved with 150+ CVAs.

Prior to joining A&M, I led KPMG's UK restructuring practice and I served on the UK and global advisory boards.

I am a member of the Institute of Chartered Accountants in England and Wales, a member of the Institute of Chartered Accountants in Australia and New Zealand, and a member of R3.

I have a bachelor's degree in commerce from the University of Tasmania.

### Credentials

- Administrator to Green Network UK Plc, the market facing arm of the wider Green Network which was active across European power and gas markets.
- Administrator of NMC Health PLC, an operator of circa 200 private hospitals in the UAE and a global IVF business, and of 36 subsidiaries in the UAE pursuant to the Abu Dhabi Global Market.
- Administrator of the holding companies of Four Seasons Healthcare Group, a large care home group in the UK.
- Administrator to Lexi Holdings Plc, a case involving substantial complex mortgage fraud, asset-tracing and recovery across 15 jurisdictions.
- Liquidator of Joannou & Paraskevvaides, a $2 billion turnover construction group operating across the Middle East and North Africa.
- Administrator of MF Global.
- Administrator of Leeds United FC.
- Administrator to Threshers.
- Administrator to Peacocks.
- Administrator to La Senza.
- Restructuring adviser to Energia Group (formerly Viridian Group) (an Irish energy company).
- Restructuring adviser to JJB Sports Plc and Blacks Leisure Plc, breaking new ground by taking these listed companies through CVAs.
- Restructuring adviser to Homebase.
- Restructuring adviser to Fitness First.
- Restructuring adviser to Travelodge.
- Restructuring adviser to All Saints.

**ALVAREZ & MARSAL**
LEADERSHIP. **ACTION. RESULTS.**℠

# Introduction
# My team

**The Group is listed, regulated, and operating in multiple jurisdictions.  Assessing the relevant alternative for such a complex situation requires multiple factors to be considered and I have consulted with a team of A&M experts.**

**Relevant Alternative Expert Evidence**

**Richard Fleming**
Head of EMEA Restructuring

I have drawn on the expertise of A&M professionals, each a leader in their field, to help inform my conclusions and I have been assisted in the preparation of this report by members of my team working under my supervision.  I have made clear which facts and matters referred to in this report are within my own knowledge and which are not.

| Outcome analysis | US bankruptcy | Brazil restructuring | LNG | Valuation | Tax |
|---|---|---|---|---|---|
| **James Holley** Managing Director UK | **John Walsh** Managing Director North America | **Eduardo Gallardo** Managing Director Brazil | **Renee Klimczak** Managing Director North America | **Richard Bibby** Managing Director UK | **Andrey Ulyanenko** Managing Director North America |

- **Outcome analysis** — James Holley:
  - James has 17 years of restructuring and insolvency experience and coordinates A&M's European Restructuring Plan mandates.
  - He specialises in complex outcome analysis including counterfactual assessment and waterfall modelling.
  - James recently led a successful challenge against Petrofac in the Court of Appeal which focused on the fair allocation of value.
  - James has valuable insights from his involvement in various complex restructuring plans including McDermott, Virgin Active, Waldorf, Thames Water, Atento, Chaptre Finance, Cineworld, Superdry, Fitness First, and Royal IHC.

- **US bankruptcy** — John Walsh:
  - John has 13 years experience leading companies and businesses through financial restructurings and organisational changes.
  - He specialises in company-side US Chapter 11 as a tool to implement complex financial and operational restructurings.
  - John has valuable insights in the use of Chapter 11 for energy companies having been involved in Global Clean Energy, Vertex Energy, Talen Energy, Superior Energy, Weatherford International, Parker Drilling, Castex Energy, and Azure Midstream, among others

- **Brazil restructuring** — Eduardo Gallardo:
  - Eduardo has 15 years of financial restructuring experience, having led some of the largest financial restructurings in Brazil over the past decade.
  - He has successfully restructured more than BRL 100 billion in debt through both judicial and out-of-court processes (VCP airport, Grupo Petropolis, Americanas, Samarco and Casas Bahia).
  - Recently, Eduardo has overseen cross border restructuring cases such as Ambipar (BRL 12 billion debt) and Raizen (BRL 70 billion debt).
  - Eduardo has valuable insights into Brazilian restructuring (including strategy, processes, and stakeholder attitudes).

- **LNG** — Renee Klimczak:
  - Renee has 30 years of experience in energy executive roles and leads A&M's performance improvement practice for energy midstream / LNG.
  - She specialises in corporate transformations, strategic planning, capital and operational performance improvement, and transaction advisory services.
  - She brings deep end-to-end LNG experience, covering project development, permitting, operations, and global LNG shipping.
  - Renee has valuable insights across the LNG value chain including SPAs, gas supply, tolling, capacity, shipping, and cost and risk allocation mechanisms.

- **Valuation** — Richard Bibby:
  - Richard has 25 years of experience and is head of A&M's EMEA Valuation Services.
  - He has experience across all sectors and industries and specialises in court approved processes; fairness opinions, and expert witness roles.
  - Richard's broader experience includes enterprise valuations for private or financial restructuring purposes.
  - Richard has valuable insights having provided valuation services for numerous large, complex, and/or contentious situations including Petrofac, Thames Water, Atento, Officine Maccaferri WOM, Inter Milan FC, among others.

- **Tax** — Andrey Ulyanenko:
  - Andrey has 20 years of tax expertise, specialising in tax structuring for complex restructurings, bankruptcies, and distressed transactions.
  - He has provided expert tax advice on several large cap restructurings in the energy and energy infrastructure sectors, including Weatherford International, Sanchez Energy Corp., Superior Energy Services, Vertex Energy, and Global Clean Energy.
  - Andrey has valuable insights into in-court and out-of-court restructurings, particularly mitigating cash tax exposure through CODI / Insolvency analysis, Section 363 sales, and creative planning around tax attribute preservation.

**ALVAREZ & MARSAL**
LEADERSHIP. ACTION. RESULTS.℠

## Introduction
# Sources of information

**This report is based on management information which is available to all Plan Creditors and shareholders via a Virtual Data Room ("VDR").**

### Sources of information

I have relied upon the following key sources of information which should be read in in conjunction with this report:

- Puerto Rico Binder (VDR 1.1.1.1).
- Nicaragua Binder (VDR 1.1.2.1).
- Mexico Binder (VDR 1.1.3.1).
- CoreCo Binder (VDR 1.1.4).
- BrazilCo Binder (VDR 1.2.1).
- CoreCo Business Plan dated 13 March 2026 (VDR 2.1.1.8).
- BrazilCo Business Plan dated 6 May 2026 (2.2.7).
- NFE Organisational Chart (VDR 4.1.2).
- Consolidated entity level trial balances at 31 December 2025 (VDR 4.7.4.1).
- Houlihan Lokey, Claims Calculation, 30 June (VDR 10.29.1).
- Litigation Summary (VDR 10.30.1 and 10.30.2).
- Charter Summary (VDR 10.31.1).
- NFE SGA Allocations (10.32.1).

### Discussions with management

My team and I have held several discussions with the NFE management team, to develop a comprehensive understanding of the Group, its stakeholders, the options available if the RPs are not sanctioned, and the steps the management team would likely take in response.

The key individuals we have spoken with are:

- Randal Nardone – Board of Directors.
- Christopher Guinta – Chief Financial Officer.
- Kevin Sullivan – Co-General Counsel.
- Matt Reinhard – Co-General Counsel / Chief Compliance Officer.
- Michael Lowe – Chief Accounting Officer.

### Limitations

The analyses and conclusions in this report are based on the information available at the time of writing and expectations of events which are yet to occur.  If material new developments arise, my conclusions may require revision.

Ongoing hostilities and geopolitical instability in the Middle East, including risks of shipping disruption, energy supply volatility, regulatory measures and insurance market constraints, may materially affect underlying assumptions, valuations and forward-looking assessments in ways not fully captured herein.  Such circumstances can trigger contractual and legal consequences (including force majeure or similar relief, depending on governing law and strict notice/causation requirements) and may alter supply-chain costs, timing, or feasibility in a manner that is uncertain and fast-evolving.  Accordingly, opinions I have expressed are based on the information available at the time of writing and should be read subject to these external risk factors.

**ALVAREZ & MARSAL**
LEADERSHIP. ACTION. RESULTS.℠

Introduction

# Declarations

## I understand that my overriding duty is to the Court, and I confirm that I have complied with that duty and will continue to comply with it.

**Statement of Independence**

I am not involved in the provision of any other services to the Group. Services have been provided by other A&M teams led by other A&M professionals.

Due to the complexity of the situation, I have, where appropriate, leveraged A&M professionals with a wide range of expertise to support me with the various financial and operational considerations (see page 7). Some of the A&M professionals I have consulted with have provided services to the Group (see page 5). Any such consultation has been subject to A&M's standard ethical principles ensuring integrity, objectivity, and transparency.

I do not consider that any interest which has been disclosed affects my suitability to give independent expert evidence on any of the matters I have been instructed to consider. I would express the same opinions had I been given instructions by any other party.

**Statement of Truth**

I understand that in producing this report, my overriding duty is to the Court, and I confirm that I have complied with that duty and will continue to comply with it.

I confirm that I have made clear which facts and matters referred to in this report are within my own knowledge and which are not. Those that are within my own knowledge I confirm to be true. The opinions I have expressed represent my true and complete professional opinions on the matters to which they refer.

I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

**Richard Fleming**

ALVAREZ & MARSAL
LEADERSHIP. **ACTION. RESULTS.**℠

# The Relevant Alternative

ALVAREZ & MARSAL

ALVAREZ & MARSAL

The Relevant Alternative
# Relevant Alternative considerations

**The relevant alternative is whatever the UK Court considers to be most likely to occur if the RPs are not sanctioned. This will depend on the circumstances at the time and the options available to stakeholders.**

### Overview

The relevant alternative is a hypothetical assessment of the most realistic counterfactual – it is not the theoretical worst case, nor does it favour certain stakeholders.

In determining the relevant alternative, I have assumed that stakeholders would behave rationally in pursuit of their own economic interests, not emotionally, tactically, or self-destructively.

### The likely circumstances

The Group is cashflow insolvent and reliant upon ongoing forbearance from its secured lenders (the Plan Creditors). If the RPs are not sanctioned, the Restructuring Support Agreement ("**RSA**") will likely terminate so the Group will face defaults under its corporate debt and there is no prospect of being able to repay the secured loans. The Group would also face increasing supplier pressure and difficulty winning / delivering new contracts (and face other potential risks discussed later).

Against this backdrop, the directors of CoreCo legal entities (being the business comprising all operations excluding Brazil) would be forced to consider (and likely support) a Chapter 11 bankruptcy under the United States Bankruptcy Code ("**Ch.11**") for legal and operational protections (where available).

Consequently, BrazilCo legal entities (being the business comprising the Brazil operations) would face increased legal and operational risks and there is material uncertainty whether the Brazil legal entities could avoid filing for Ch.11 (e.g. unilateral enforcement action from material creditors would leave the directors of the Brazil legal entities with no alternative but to also file for Ch.11 for legal and operational protections).

There are potential mitigating actions for the risks facing Brazil (see page 14), which if successful, and assuming key stakeholders behave rationally, could avoid the Brazil legal entities having to file for Ch.11.

I have assumed that the Brazil legal entities do not file for Ch.11. However, I reiterate the material uncertainty and that the risk of filing for Ch.11 cannot be eliminated, particularly as the ability to fully mitigate the risks is not completely within the Group's control.

### Value maximising strategy in Ch.11

Notwithstanding the Ch.11 legal protections for debtors, the Group would still face material risks, including (among others):

- Termination of customer and supply contracts.
- Vessel arrests.
- Asset expropriation.
- Loss of key personnel.

It is plausible that one or more of these risks would materialise, which could result in BrazilCo being forced to file for Ch.11 and could result in larger distressed discounts (for both CoreCo and BrazilCo) ("**Plausible Downside Case**").

The options available to mitigate these risks include proactive communication, settling pre-petition balances, personnel incentive packages, etc., but effective mitigation would require significant coordination, cooperation from existing lenders, and considerable funding.

I have assumed that these risks can be effectively mitigated, and I note that detailed contingency plans have been developed.

**ALVAREZ & MARSAL**
LEADERSHIP. **ACTION. RESULTS.**℠

## The Relevant Alternative
# Ch.11 Plan of Reorganisation

**I do not consider a Plan of Reorganisation to be the most likely relevant alternative.  Even if a Plan of Reorganisation on similar terms to the RPs was possible, the RPs would still provide for a better outcome.**

### Overview

Following failed RPs, the Group would explore all options, but delivering a Plan of Reorganisation – encompassing a holistic debt recapitalisation and orderly business separation with multilateral credit support, as per the RPs – in what would be a second attempt at a court sanctioned restructuring, would be highly challenging (particularly, given the RSA does not provide for continued consenting stakeholder support if the RPs are unsuccessful).

Therefore, I do not consider a Plan of Reorganisation to be the most likely relevant alternative, but even if a Plan of Reorganisation on similar terms to the RPs was possible, the RPs would still provide for a better outcome for the reasons set out opposite.

### Plan of Reorganisation vs. RP

Even if a Plan of Reorganisation on similar terms to the RP was possible, the RP would still provide for a better outcome for the following reasons:

1. Ch.11 process costs would be considerable (e.g. paydowns / advance payments, credit support, professional fees, statutory committee fees, etc.). Substantial Debtor-in-Possession ("**DIP**") funding would therefore be required, and this would materially subordinate the Lenders vs. the RPs where this is not required.

2. Section 556 of the U.S. Bankruptcy Code preserves a counterparty's contractual right to liquidate, terminate, or accelerate commodity and forward contracts notwithstanding the automatic stay in Ch.11.  Counterparties under certain contracts with the Group would likely leverage this exemption to terminate the contracts, which would result in significant value erosion compared to the RP where these contract would not be impacted.

3. Ch.11 involves unquantifiable risks which could significantly erode value, including:

   – Public stigma and reputational damage (including loss of personnel).

   – Loss of several key contracts either due to section 556 safe harbour treatment, or otherwise an inability to enforce the automatic stay in foreign jurisdictions.

   – Disputes over ability to continue operations with, largely government related, foreign counterparties.

   – Operational disruption and delays can erode customer confidence and supplier terms.

   – Reduced autonomy with increased oversight from statutory committees and the US Trustee.

   – Extensive disclosure requirements gives visibility to competitors.

**ALVAREZ & MARSAL**
LEADERSHIP. ACTION. RESULTS.℠

## The Relevant Alternative
# Illustrative Decision Tree

Following failed RPs, the Group would explore all options, with global liquidation being a plausible downside case.



¹ See page 27 for an overview of s363 of the U.S. Bankruptcy Code

Expert Report: Relevant Alternative (8 May 2026)
Confidential

13

**ALVAREZ & MARSAL**
LEADERSHIP. ACTION. RESULTS.℠

## The Relevant Alternative
# The Relevant Alternative ("RA")

**I have concluded that CoreCo would file for Ch.11 whereas BrazilCo would not (subject to the assumptions and mitigating actions described herein). All the BUs are assumed to be sold via going concern M&A transactions to maximise value.**

### CoreCo RA

A Ch.11 with various M&A transactions for the operating BUs appears to be the most likely counterfactual if the RPs are not sanctioned. The M&A transactions are expected to be implemented via s363 of the US Bankruptcy Code (see page 27 for an overview of s363), taking the form of stock / share sale (rather than asset transactions), the key rationale being:

1. Preserving the BU as a going concern has value to a purchaser (maintaining permits/licenses and relationships, less disruption to operations, etc.).
2. There does not appear to be any material value creation by rejecting contracts within the BU perimeters.

Separately, there are assets not directly related to the operating BUs that would be liquidated in the Ch.11 (see page 35).

*Note: contrary to the risks facing BrazilCo which are assumed to be manageable (see opposite), CoreCo would be cashflow insolvent, facing defaults under its secured lending facilities, and experiencing various other financial and operational fallout following a failed RP which would likely be unmanageable (absent funding and a holistic debt recapitalisation), which would leave the directors of the CoreCo legal entities with no alternative but to file for Ch.11.*

### BrazilCo RA

BrazilCo would face increased legal and operational risks if CoreCo filed for Ch.11, but the risks could be manageable, given:

1. There are contingency plans and active discussions between key stakeholders to avoid BrazilCo filing for Ch.11 (except as a last resort).
2. BrazilCo has been actively separating itself from CoreCo.
3. NFE has provided various guarantees in relation to PortoCem and CELBA 2 (term loans and Letter of Credit ("**LC**") facilities). While NFE filing for Ch.11 would breach certain key agreements, I am informed that BrazilCo management and the New 2029 Notes ("**New29s**") have engaged with several counterparties on contingency planning efforts, including discussions regarding potential alternative credit support should replacement of existing guarantees be required as part of the separation process or in a potential CoreCo Ch.11.
4. I understand that the local secured debt could immediately accelerate if NFE filed for Ch.11, but I have been informed that the New29s have engaged with the relevant lenders and discussed the proposed Restructuring as it relates to BrazilCo. In addition, the New29s have engaged with the Group regarding contingency plans, and certain members of the New29s are expected to provide $885m in funding in May 2026 which will be used to refinance certain local secured debt, among other purposes.
5. Further, I am informed that the New29s have evaluated contingency plans including stakeholder communication strategies for proactive dialogue and information sharing. This would provide transparency, streamlined escalation of issues / concerns, and rapid resolution, which should help manage relationships and reduce concerns over any potential contagion from the CoreCo Ch.11, notwithstanding it may be difficult to accurately predict the actions of all relevant counterparties.

These considerations lead me to conclude that BrazilCo would avoid filing for Ch.11. Instead, the BU would be sold as a going concern independently from the CoreCo s363 sales processes.

Alternatively, given the value breaks in the debt, the New29s may consider a share pledge enforcement, but I have not reflected this in my analysis, given a distressed sale with New29s consent (reflecting their existing claims and share pledge security) is more likely than a hostile enforcement which would bring execution risk.

**ALVAREZ & MARSAL**
LEADERSHIP. ACTION. RESULTS.℠

# Recovery analysis

Recovery analysis
# No Worse Off Test

Under the RPs, Plan Creditors are being equitised, with certain Plan Creditors receiving new debt depending on their claims against Collateral Pools.  All creditors receive a better outcome under each RP compared to the RA.

## Plan Creditors and Collateral

The Plan Creditors are summarised below, together with details of their existing recourse to various collateral pools (the "**Collateral Pools**"):

- Common Collateral: guarantees provided by substantially all wholly-owned direct and indirect subsidiaries of NFE Inc. other than when relating to the other Collateral Pools below.  The Common Collateral is largely comprised of the Puerto Rico, Mexico, and Nicaragua BUs, and certain Other Assets.
- F1 Collateral: guaranteed by the subsidiaries owning the F1 liquefaction assets.
- F2 Collateral: guaranteed by the subsidiaries owning the F2 liquefaction assets.
- DACA Collateral: Deposit Account Control Agreement ("**DACA**") providing security over certain cash collateral (see page 38 for further information).
- Brazil Collateral: benefits from a first lien over certain assets of the Brazil BU.  The LCF, RCF2, and TLA benefit from a $200m first lien where they rank *pari passu* as between themselves, and in turn, with the New29s.

### Plan Creditors including Debt and Collateral at 30 June 2026

| $m | Claim | Common | F1 | F2 | DACA | Brazil |
|---|---|---|---|---|---|---|
| | | **CoreCo** | | | | **BrazilCo** |
| | | | | **Other** | | |
| Letter of Credit Facility ("**LCF**") | 148 | ✓ | ✓ | ✓ | ✓ | ✓ |
| R-1 Revolving Facility ("**RCF1**") | 106 | ✓ | ✓ | ✓ | ✓ | |
| R-2 Revolving Facility ("**RCF2**") | 596 | ✓ | ✓ | ✓ | ✓ | ✓ |
| Term Loan A Facility ("**TLA**") | 318 | ✓ | | ✓ | ✓ | ✓ |
| Term Loan B Facility ("**TLB**") | 1,363 | ✓ | ✓ | ✓ | | |
| Legacy 2026 Notes ("**26s**") | 536 | ✓ | | | | |
| Legacy 2029 Notes ("**29s**") | 253 | ✓ | | | | |
| Series I I/C Loan ("**S1**") | 1,248 | ✓ | | | | |
| Series II I/C Loan ("**S2**") | 1,836 | ✓ | | | | |
| New29s ("**New29s**") | 3,339 | | | | | ✓ |
| **Total corporate debt** | **9,742** | | | | | |

*Source: Houlihan Lokey, Claims Calculation (30 June Transaction).*
*Claim amounts include forecast accrued interest to 30 June (being the assumed RA / RP date).*
*Claims includes "make whole" entitlements for the New29s, S1, and S2 which each have a contractual basis for the assertion of make whole claims in the RA.  If make whole entitlements were ignored, the impact to recoveries would be 1 - 2 percentage points.*

## No worse off analysis

All Plan Creditors receive a better outcome under each RP compared to the RA (see subsequent pages for more detailed analysis):

### Plan 1 CoreCo - RA vs. RP

| $m | LCF | RCF1 | RCF2 | TLA | TLB | 26s | 29s | S1 | S2 |
|---|---|---|---|---|---|---|---|---|---|
| RA | 85 | 57 | 342 | 102 | 687 | 68 | 32 | 157 | 231 |
| RP | Excl. | 91 | 561 | 184 | 1,109 | 137 | 65 | 320 | 471 |
| **Variance** | **Excl.** | **34** | **219** | **82** | **422** | **70** | **33** | **163** | **240** |
| RA | 57% | 54% | 57% | 32% | 50% | 13% | 13% | 13% | 13% |
| RP | Excl. | 86% | 94% | 58% | 81% | 26% | 26% | 26% | 26% |
| **Variance (%pt)** | **Excl.** | **32%** | **37%** | **26%** | **31%** | **13%** | **13%** | **13%** | **13%** |

### Plan 2 BrazilCo - RA vs. RP

| $m | New29s |
|---|---|
| RA | 593 |
| RP | 1,177 |
| **Variance** | **584** |
| RA | 18% |
| RP | 35% |
| **Variance (%pt)** | **18%** |

## Fees payable to Plan Creditors

Certain fees are being offered to Plan Creditors, which will be paid in the form of new CoreCo term loans ("**New CoreCo Term Loans**") and CoreCo preferred stock ("**CoreCo Preferred Stock**") as follows:

- ICA Standstill Fee:  2% of debt payable to each RCF Lender in consideration for forbearance until the RPs become effective (or are unsuccessful).  The ICA Standstill Fee is payable in the form of additional New CoreCo Term Loans or shall become a payment obligation of NFE Inc. on termination of the RSA.
- Early Consent Fee:  0.75% of debt payable to each eligible Plan Creditor who becomes a party to the RSA.  The Early Consent Fee is payable in the form of additional CoreCo Preferred Stock.

The no worse off analysis above is inclusive of the ICA Standstill and Early Consent fees but see page 53 for the same analysis net of fees (which also shows that Plan Creditors are no worse off under each RP).

Recovery analysis
# Illustrative Outcome – RA

The RA proceeds are allocated based on the respective claims and / or interests against each of the Collateral Pools, which are based on the existing collateral / intercreditor arrangements.

**CoreCo - Initial Value**

| $m | LCF | RCF1 | RCF2 | TLA | TLB | 26s | 29s | S1 | S2 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Common | 19 | 13 | 75 | 40 | 172 | 68 | 32 | 157 | 231 | 807 |
| Other | 61 | 44 | 247 | 52 | 515 | - | - | - | - | 919 |
| Total | 80 | 57 | 322 | 92 | 687 | 68 | 32 | 157 | 231 | 1,726 |
| Claim | 148 | 106 | 596 | 318 | 1,363 | 536 | 253 | 1,248 | 1,836 | 6,403 |
| Recovery % | 54% | 54% | 54% | 29% | 50% | 13% | 13% | 13% | 13% | 27% |

**BrazilCo - Initial Value**

| $m | LCF | RCF2 | TLA | New29s | Total |
|---|---|---|---|---|---|
| Equity | 2 | 7 | 4 | 226 | 239 |
| S1 | 1 | 5 | 3 | 148 | 157 |
| S2 | 2 | 7 | 4 | 218 | 231 |
| Total | 5 | 19 | 10 | 593 | 627 |
| Claim | 28 | 112 | 60 | 3,339 | 3,539 |
| Recovery | 17% | 17% | 17% | 18% | 18% |

**CoreCo - Total Recoveries**

| $m | LCF | RCF1 | RCF2 | TLA | TLB | 26s | 29s | S1 | S2 |
|---|---|---|---|---|---|---|---|---|---|
| Initial Value | 80 | 57 | 322 | 92 | 687 | 68 | 32 | 157 | 231 |
| Equity | 2 | - | 7 | 4 | - | - | - | - | - |
| S1 | 1 | - | 5 | 3 | - | - | - | - | - |
| S2 | 2 | - | 7 | 4 | - | - | - | - | - |
| BrazilCo Adj. | 5 | - | 19 | 10 | - | - | - | - | - |
| Total | 85 | 57 | 342 | 102 | 687 | 68 | 32 | 157 | 231 |
| Claim | 148 | 106 | 596 | 318 | 1,363 | 536 | 253 | 1,248 | 1,836 |
| Recovery | 57% | 54% | 57% | 32% | 50% | 13% | 13% | 13% | 13% |

**BrazilCo - Total Recoveries**

| $m | New29s |
|---|---|
| Equity | 226 |
| S1 | 148 |
| S2 | 218 |
| Total | 593 |
| Claim | 3,339 |
| Recovery | 18% |

**Notes**

1. Recoveries under the S1 and S2 InterCo Loans initially flow to Brazil (NFE Financing LLC and NFE Brazil Investments LLC as lenders under the S1 and S2 InterCo Loans respectively). Value is then allocated between the New29s and up to $200m pari passu between the LCF / RCF2 / TLA.

2. For ease of comparison with the RP (next page), the LCF / RCF2 / TLA recoveries from Brazil are added to CoreCo to produce an overall recovery for these creditors.

- See page 26 for a breakdown of the RA sources of value (CoreCo Other reflects the aggregation of F1, F2, and DACA due to commercial sensitivity – see page 38 for further information about DACA).

- If BrazilCo filed for Ch.11 (e.g. in a plausible downside case), BrazilCo Plan Creditors are estimated to recover $186m less. This is driven by (i) BrazilCo being subject to the same minimum 10% distressed discount as the CoreCo BUs compared to only 2.5% reflected here (see page 47 for further information); and (ii) DIP repayment is allocated pro-rata based on gross realisations, which would result in BrazilCo being liable for a substantial portion of the DIP funding.

ALVAREZ & MARSAL
LEADERSHIP. ACTION. RESULTS.℠

Recovery analysis
# Illustrative Outcome – RP

The value available to Plan Creditors is based on the estimated post-restructuring value of the Group ("**Reorganisation Value**").  Value is allocated through a combination of debt and equity, anchored to existing collateral arrangements.

**CoreCo - Initial Value**

| $m | RCF1 | RCF2 | TLA | TLB | 26s | 29s | S1 | S2 | Total |
|---|---|---|---|---|---|---|---|---|---|
| New Debt | 47 | 267 | 71 | 542 | - | - | - | - | 928 |
| Preferred Stock | 44 | 248 | 89 | 567 | 137 | 65 | 320 | 471 | 1,940 |
| **Total** | **91** | **515** | **159** | **1,109** | **137** | **65** ① | **320** | **471** | **2,868** |
| Claim | 106 | 596 | 318 | 1,363 | 536 | 253 | 1,248 | 1,836 | 6,255 |
| **Recovery** | **86%** | **86%** | **50%** | **81%** | **26%** | **26%** | **26%** | **26%** | **46%** |

**BrazilCo - Initial Value**

| $m | | RCF2 | TLA | New29s | Total |
|---|---|---|---|---|---|
| Equity | ② | 17 | 9 | 431 | 457 |
| S1 | ① | 12 | 6 | 302 | 320 |
| S2 | | 17 | 9 | 444 | 471 |
| **Total** | | **46** | **25** | **1,177** | **1,248** |
| Claim | | 130 | 70 | 3,339 | 3,539 |
| **Recovery** | | **35%** | **35%** | **35%** | **35%** |

**Plan 1 CoreCo - Total Consideration**

| $m | RCF1 | RCF2 | TLA | TLB | 26s | 29s | S1 | S2 |
|---|---|---|---|---|---|---|---|---|
| **Initial Value** | **91** | **515** | **159** | **1,109** | **137** | **65** | **320** | **471** |
| Equity | - | ② 17 | 9 | - | - | - | - | - |
| S1 | - | 12 | 6 | - | - | - | - | - |
| S2 | - | 17 | 9 | - | - | - | - | - |
| **BrazilCo Adj.** | **-** | **46** | **25** | **-** | **-** | **-** | **-** | **-** |
| **Total** | **91** | **561** | **184** | **1,109** | **137** | **65** | **320** | **471** |
| Claim | 106 | 596 | 318 | 1,363 | 536 | 253 | 1,248 | 1,836 |
| **Recovery** | **86%** | **94%** | **58%** | **81%** | **26%** | **26%** | **26%** | **26%** |

**Plan 2 BrazilCo - Total Consideration**

| $m | New29s |
|---|---|
| Equity | 431 |
| S1 | 302 |
| S2 | 444 |
| **Total** | **1,177** |
| Claim | 3,339 |
| **Recovery** | **35%** |

**Notes**

① Recoveries under S1 and S2 InterCo loans allocated between the New29s and RCF2 / TLA (capped at $200m as per the existing collateral / intercreditor arrangements).

② RCF2 and TLA are releasing their claims against BrazilCo in exchange for consideration in Plan 1.  The consideration is derived from their nominal interest in BrazilCo.

▪ Lenders secured by the F1 Collateral ("**F1 Lenders**") receive $475m of New CoreCo Term Loans and 15% of CoreCo Preferred Stock.

▪ Lenders secured by the F2 Collateral ("**F2 Lenders**") receive $400m of term loans (non-recourse) and $200m preferred stock in F2, capped at day-1 value.

▪ RCF and TLA lenders receive incremental make whole debt ($35m to RCF (prorated RCF1 and RCF2) and $17.5m to TLA) on account of their interest in cash settlements from the Federal Emergency Management Agency ("**FEMA**") and cash held in DACA accounts.

▪ CoreCo Preferred Stock is allocated 85% / 15% between Common Collateral and F1 Lenders, respectively.  Preferred Stock valued at $1,888m on day-1 (see page 22).

▪ Based on the day-1 Reorganisation Value, no value is ascribed to CoreCo Common Stock.

▪ This outcome analysis is inclusive of the ICA Standstill and Early Consent fees but see page 53 for the same outcome analysis net of fees.

ALVAREZ & MARSAL
LEADERSHIP. ACTION. RESULTS.℠

Recovery analysis
# Recovery by Collateral Pool

The consideration allocated for each Collateral Pool reflects the restructured value of the assets in that pool and consideration is allocated pro rata between the Plan Creditors with recourse to those pools.

**Restructuring Surplus - Plan 1 CoreCo**

| | Claim / Contribution (%) | | | Value allocation (%) | | | Recovery (%) | | |
|---|---|---|---|---|---|---|---|---|---|
| | RA | RP | Var. | RA | RP | Var. | RA | RP | Var. |
| LCF | 6.7% | - | Excl. | 6.7% | - | Excl. | 25.2% | - | Excl. |
| RCF1 | 4.8% | 5.1% | 0.3% | 4.8% | 5.1% | 0.3% | 25.2% | 36.7% | 11.5% |
| RCF2 | 26.9% | 28.9% | 1.9% | 26.9% | 28.9% | 1.9% | 25.2% | 36.7% | 11.5% |
| TLB | 61.6% | 66.0% | 4.4% | 61.6% | 66.0% | 4.4% | 25.2% | 36.7% | 11.5% |
| **F1** | **100.0%** | **100.0%** | **6.7%** | **100.0%** | **100.0%** | **6.7%** | **25.2%** | **36.7%** | **11.5%** |
| LCF | 5.9% | - | Excl. | 5.9% | - | Excl. | 12.6% | Excl. | Excl. |
| RCF1 | 4.2% | 4.4% | 0.3% | 4.2% | 4.4% | 0.3% | 12.6% | 19.0% | 6.4% |
| RCF2 | 23.6% | 25.0% | 1.5% | 23.6% | 25.0% | 1.5% | 12.6% | 19.0% | 6.4% |
| TLA | 12.6% | 13.3% | 0.8% | 12.6% | 13.3% | 0.8% | 12.6% | 19.0% | 6.4% |
| TLB | 53.8% | 57.2% | 3.4% | 53.8% | 57.2% | 3.4% | 12.6% | 19.0% | 6.4% |
| **F2** | **100.0%** | **100.0%** | **5.9%** | **100.0%** | **100.0%** | **5.9%** | **12.6%** | **19.0%** | **6.4%** |
| LCF | 12.7% | - | Excl. | 12.7% | - | Excl. | 3.6% | - | Excl. |
| RCF1 | 9.0% | 10.4% | 1.3% | 9.0% | 10.0% | 1.0% | 3.6% | 5.0% | 1.4% |
| RCF2 | 51.1% | 58.5% | 7.4% | 51.1% | 56.6% | 5.6% | 3.6% | 5.0% | 1.4% |
| TLA | 27.2% | 31.2% | 4.0% | 27.2% | 33.3% | 6.1% | 3.6% | 5.5% | 1.9% |
| **DACA** | **100.0%** | **100.0%** | **12.7%** | **100.0%** | **100.0%** | **12.7%** | **3.6%** | **5.1%** | **1.5%** |
| LCF | 14.0% | - | Excl. | 14.0% | - | Excl. | 17.2% | - | Excl. |
| RCF2 | 56.1% | 65.2% | 9.1% | 56.1% | 65.2% | 9.1% | 17.2% | 35.3% | 18.0% |
| TLA | 29.9% | 34.8% | 4.9% | 29.9% | 34.8% | 4.9% | 17.2% | 35.3% | 18.0% |
| **Brazil** | **100.0%** | **100.0%** | **14.0%** | **100.0%** | **100.0%** | **14.0%** | **17.2%** | **35.3%** | **18.0%** |
| LCF | 2.3% | - | Excl. | 2.3% | - | Excl. | 12.6% | - | Excl. |
| RCF1 | 1.6% | 1.7% | 0.0% | 1.6% | 1.7% | 0.0% | 12.6% | 25.7% | 13.1% |
| RCF2 | 9.3% | 9.5% | 0.2% | 9.3% | 9.5% | 0.2% | 12.6% | 25.7% | 13.1% |
| TLA | 5.0% | 5.1% | 0.1% | 5.0% | 5.1% | 0.1% | 12.6% | 25.7% | 13.1% |
| TLB | 21.3% | 21.8% | 0.5% | 21.3% | 21.8% | 0.5% | 12.6% | 25.7% | 13.1% |
| 26s | 8.4% | 8.6% | 0.2% | 8.4% | 8.6% | 0.2% | 12.6% | 25.7% | 13.1% |
| 29s | 4.0% | 4.0% | 0.1% | 4.0% | 4.0% | 0.1% | 12.6% | 25.7% | 13.1% |
| S1 | 19.5% | 20.0% | 0.5% | 19.5% | 20.0% | 0.5% | 12.6% | 25.7% | 13.1% |
| S2 | 28.7% | 29.3% | 0.7% | 28.7% | 29.3% | 0.7% | 12.6% | 25.7% | 13.1% |
| **Common** | **100.0%** | **100.0%** | **2.3%** | **100.0%** | **100.0%** | **2.3%** | **12.6%** | **25.7%** | **13.1%** |

**Restructuring Surplus - Plan 2 BrazilCo**

| | Claim / Contribution (%) | | | Value allocation (%) | | | Recovery (%) | | |
|---|---|---|---|---|---|---|---|---|---|
| | RA | RP | Var. | RA | RP | Var. | RA | RP | Var. |
| New29s | 100.0% | 100.0% | - | 100.0% | 100.0% | - | 17.8% | 35.3% | 17.5% |
| **Brazil** | **100.0%** | **100.0%** | **-** | **100.0%** | **100.0%** | **-** | **17.8%** | **35.3%** | **17.5%** |

**Notes**

In the RA and RP, pursuant to existing intercreditor arrangements, the proceeds / consideration for each Collateral Pool are shared *pro rata* between Plan Creditors with recourse to those Collateral Pools. The only exception is the FEMA make whole debt (the contractual terms for the FEMA make whole specify a $35m / $17.5m split between the RCF / TLA respectively whereas the round numbers being used are close to, but do not exactly match, the outcome from a rateable approach).

The variance in the value allocation % columns is driven by the LCF which is entitled to recoveries under the RA but is not compromised (refinanced) under the RP and therefore not relevant for allocating value under the RP (including between the LCF / RCF2 / TLA in connection with the $200m *pari passu* claim in Brazil). For example, LCF is 6.7% of the F1 value allocation in the RA, with the 6.7% reallocated *pro rata* between Plan Creditors in the RP.

All CoreCo Plan Creditors have a claim against Common Collateral and share equally. However, claims against F1, F2, cash in DACA accounts, and Brazil are structurally or otherwise senior to claims against Common Collateral. Therefore, Plan Creditors with recourse to additional Collateral Pools receive higher aggregate recoveries / consideration than Plan Creditors who only have claims against Common Collateral.

Whilst existing equity are retaining 35% of the Common Stock, this does not hold any value on day 1 based on the CoreCo Reorganisation Value of $2,101m, which is insufficient to satisfy the $2,500m Preferred Stock (i.e. value breaks in the Preferred Stock on day 1).

ALVAREZ & MARSAL
LEADERSHIP. ACTION. RESULTS.℠

Recovery analysis
# Restructuring Surplus

The value allocated to Plan Creditors closely matches their interest in the value of each Collateral Pool, except F1 where some of the value is shared with the Common Collateral.

**Common**

| | RCF1 | RCF2 | TLA | TLB | 26s | 29s | S1 | S2 | New29s | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Claim ($m) | 106 | 596 | 318 | 1,363 | 536 | 253 | 1,248 | 1,836 | - | 6,255 |
| % of total claims | 2% | 10% | 5% | 22% | 9% | 4% | 20% | 29% | - | 100% |
| % of total consideration | 2% | 10% | 5% | 22% | 9% | 4% | 20% | 29% | - | 100% |
| Consideration vs. notional restructured value ($m) | | | | | | | | | | 95 |

**F1**

| | RCF1 | RCF2 | TLA | TLB | 26s | 29s | S1 | S2 | New29s | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Claim ($m) | 106 | 596 | - | 1,363 | - | - | - | - | - | 2,065 |
| % of total claims | 5% | 29% | - | 66% | - | - | - | - | - | 100% |
| % of total consideration | 5% | 29% | - | 66% | - | - | - | - | - | 100% |
| Consideration vs. notional restructured value ($m) | | | | | | | | | | (95) |

**F2**

| | RCF1 | RCF2 | TLA | TLB | 26s | 29s | S1 | S2 | New29s | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Claim ($m) | 106 | 596 | 318 | 1,363 | - | - | - | - | - | 2,382 |
| % of total claims | 4% | 25% | 13% | 57% | - | - | - | - | - | 100% |
| % of total consideration | 4% | 25% | 13% | 57% | - | - | - | - | - | 100% |
| Consideration vs. notional restructured value ($m) | | | | | | | | | | - |

**DACA**

| | RCF1 | RCF2 | TLA | TLB | 26s | 29s | S1 | S2 | New29s | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Claim ($m) | 106 | 596 | 318 | - | - | - | - | - | - | 1,020 |
| % of total claims | 10% | 58% | 31% | - | - | - | - | - | - | 100% |
| % of total consideration | 10% | 57% | 33% | | | | | | | 100% |
| Consideration vs. notional restructured value ($m) | | | | | | | | | | - |

**Brazil**

| | RCF1 | RCF2 | TLA | TLB | 26s | 29s | S1 | S2 | New29s | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Claim ($m) | - | 60 | 200 | - | - | - | - | - | 3,339 | 3,598 |
| % of total claims | - | 2% | 6% | - | - | - | - | - | 93% | 100% |
| % of total consideration | - | 2% | 6% | - | - | - | - | - | 93% | 100% |
| Consideration vs. notional restructured value ($m) | | | | | | | | | | - |

F1 is the only Collateral Pool where consideration appears less than the notional restructured value. This is a function of the negotiations and reflects 99% of the Plan Creditors with an interest in the Collateral Pool having signed up to the RSA at the time of writing. The surplus notional value of F1 not directly allocated as F1 consideration flows to Common Collateral / preferred stock where the F1 Plan Creditors will receive 33% of the value (the F1 Lenders are allocated their rateable claim of 85% of preferred stock in addition to the 15% of preferred stock allocated as F1 consideration).

Expert Report: Relevant Alternative (8 May 2026)
Confidential

ALVAREZ & MARSAL
LEADERSHIP. ACTION. RESULTS.℠

# Valuation methodology

Valuation methodology
# Equity Value adjustments *(1 of 3)*

After adjusting for debt-like and cash-items, the RP results in approx. $3.3bn of value available for Plan Creditors compared to approx. $2.0bn in the RA.  The sources of value and RA / RP adjustments are summarised below.

**EqV adjustments**

| $m | Note | RA CoreCo | RA BrazilCo | RA Total | RP CoreCo | RP BrazilCo | RP Total |
|---|---|---|---|---|---|---|---|
| Operating BUs | | 2,316 | 2,804 | 5,120 | 2,316 | 2,804 | 5,120 |
| Other assets | | 589 | 17 | 606 | 589 | 17 | 606 |
| Other income / expenses | | 135 | - | 135 | 371 | - | 371 |
| (-) Distress discounts | | (814) | (71) | (885) | - | - | - |
| (-) Tax | | (29) | - | (29) | - | - | - |
| **Total Enterprise Value** | 1 | **2,196** | **2,751** | **4,947** | **3,276** | **2,821** | **6,097** |
| (-) New CoreCo Term Loans | 2 | - | - | - | (475) | - | (475) |
| (-) F2 take back | 2 | - | - | - | (400) | - | (400) |
| (-) FEMA make whole | 3 | - | - | - | (53) | - | (53) |
| (-) Macquarie Debt | 4 | - | - | - | (35) | - | (35) |
| (-) Zero Parks take back | 5 | - | - | - | (23) | - | (23) |
| (-) DIP | 6 | (655) | - | (655) | - | - | - |
| **New debt adjustments** | | **(655)** | **-** | **(655)** | **(985)** | **-** | **(985)** |
| (-) Local secured debt | 7 | - | (1,417) | (1,417) | - | (1,417) | (1,417) |
| (-) Brazil New Money | 8 | - | (986) | (986) | - | (986) | (986) |
| (-) AP which is debt-like | 9 | - | - | - | (339) | - | (339) |
| (-) Litigation exposure | 10 | - | (95) | (95) | (20) | (95) | (115) |
| (-/+) IC settlements | 11 | 142 | (142) | - | 102 | (102) | - |
| **Existing debt and debt-like items** | | **142** | **(2,640)** | **(2,498)** | **(257)** | **(2,600)** | **(2,857)** |
| (+) Cash at RA / RP date | 12 | 45 | 284 | 329 | 45 | 284 | 329 |
| (+) LCF cash collateral | 13 | - | - | - | 39 | - | 39 |
| (-) RP closing costs | 14 | - | - | - | (16) | (49) | (65) |
| (-) RA cash outflow | 15 | (2) | (156) | (158) | - | - | - |
| **Cash adjustments** | | **43** | **128** | **171** | **68** | **235** | **303** |
| **Reorganisation Value** | | **N/A** | **N/A** | **-** | **2,101** | **457** | **2,557** |
| (+) Take-back debt | 2 | - | - | - | 475 | - | 475 |
| (+) F2 Take Back | 2 | - | - | - | 400 | - | 400 |
| (+) FEMA Make Whole | 3 | - | - | - | 53 | - | 53 |
| (-) MIP | 16 | - | - | - | (160) | - | (160) |
| **Value available to Lenders** | | **1,726** | **239** | **1,965** | **2,868** | **457** | **3,324** |

*Source:  Supplemental Expert Report: Enterprise Valuation (dated 8 May 2026).*

### Overview

Richard Bibby of Alvarez & Marsal Valuation Services LLP ("**A&MVS**") has prepared independent expert evidence regarding the Total Enterprise Valuation as at 30 June (i.e. day-1 post Restructuring).

A sum-of-the-parts approach has been used where the Enterprise Value ("**EV**") for each geographic / operational business unit has been assessed separately based on a going concern, cash-free, debt-free basis, assuming that the proposed restructuring is implemented.

The EVs are based on the income and market approaches.  The income approach (discounted cash flow) is applied to the unlevered free cash flows in each of the CoreCo and BrazilCo BP (excluding potential upsides).  The market approach applies a selected range of EBITDA multiples to projected FY2027 EBITDA.

Certain non-operational assets have been valued on a desktop basis by A&MVS.

Low / Mid / High reflects value ranges coming from different valuation approaches, with Mid being used in both the RA and RP analysis.

The following pages provide a summary of relevant EV adjustments and differential treatment in the RA vs. RP.

### General RA assumptions

- All transactions occur simultaneously, six months post-filing for Ch.11 (this has been chosen as a reasonable period to implement transactions of this size and complexity, particularly in a Ch.11 scenario).
- Puerto Rico and F1 are assumed to be purchased together as F1 is value accretive to Puerto Rico and *visa versa*.  Mexico, Nicaragua, and Brazil are assumed to be sold independently from the other BUs.
- The BUs rely on shared group services including IT, infrastructure, HR, finance, legal support, supply chain management, and logistics.  It is expected that a sale of individual BUs would require ongoing support under a Transition Services Agreement ("**TSA**").  For simplicity, the TSAs are assumed be provided at cost to each of the BU purchasers.

ALVAREZ & MARSAL
LEADERSHIP. ACTION. RESULTS.℠

## Valuation methodology
# Equity Value adjustments *(2 of 3)*

After adjusting for debt-like and cash-items, the RP results in approx. $3.3bn of value available for Plan Creditors compared to approx. $2.0bn in the RA.  The sources of value and RA / RP adjustments are summarised below.

### EqV adjustments

| $m | Note | RA | | | RP | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | CoreCo | BrazilCo | Total | CoreCo | BrazilCo | Total |
| Operating BUs | | 2,316 | 2,804 | 5,120 | 2,316 | 2,804 | 5,120 |
| Other assets | | 589 | 17 | 606 | 589 | 17 | 606 |
| Other income / expenses | | 135 | - | 135 | 371 | - | 371 |
| (-) Distress discounts | | (814) | (71) | (885) | - | - | - |
| (-) Tax | | (29) | - | (29) | - | - | - |
| **Total Enterprise Value** | *1* | **2,196** | **2,751** | **4,947** | **3,276** | **2,821** | **6,097** |
| (-) New CoreCo Term Loans | 2 | - | - | - | (475) | - | (475) |
| (-) F2 take back | 2 | - | - | - | (400) | - | (400) |
| (-) FEMA make whole | 3 | - | - | - | (53) | - | (53) |
| (-) Macquarie Debt | 4 | - | - | - | (35) | - | (35) |
| (-) Zero Parks take back | 5 | - | - | - | (23) | - | (23) |
| (-) DIP | 6 | (655) | - | (655) | - | - | - |
| **New debt adjustments** | | **(655)** | **-** | **(655)** | **(985)** | **-** | **(985)** |
| (-) Local secured debt | 7 | - | (1,417) | (1,417) | - | (1,417) | (1,417) |
| (-) Brazil New Money | 8 | - | (986) | (986) | - | (986) | (986) |
| (-) AP which is debt-like | 9 | - | - | - | (339) | - | (339) |
| (-) Litigation exposure | 10 | - | (95) | (95) | (20) | (95) | (115) |
| (-/+) IC settlements | 11 | 142 | (142) | - | 102 | (102) | - |
| **Existing debt and debt-like items** | | **142** | **(2,640)** | **(2,498)** | **(257)** | **(2,600)** | **(2,857)** |
| (+) Cash at RA / RP date | 12 | 45 | 284 | 329 | 45 | 284 | 329 |
| (+) LCF cash collateral | 13 | - | - | - | 39 | - | 39 |
| (-) RP closing costs | 14 | - | - | - | (16) | (49) | (65) |
| (-) RA cash outflow | 15 | (2) | (156) | (158) | - | - | - |
| **Cash adjustments** | | **43** | **128** | **171** | **68** | **235** | **303** |
| **Reorganisation Value** | | **N/A** | **N/A** | **-** | **2,101** | **457** | **2,557** |
| (+) Take-back debt | 2 | - | - | - | 475 | - | 475 |
| (+) F2 Take Back | 2 | - | - | - | 400 | - | 400 |
| (+) FEMA Make Whole | 3 | - | - | - | 53 | - | 53 |
| (-) MIP | 16 | - | - | - | (160) | - | (160) |
| **Value available to Lenders** | | **1,726** | **239** | **1,965** | **2,868** | **457** | **3,324** |

*Source:  Supplemental Expert Report: Enterprise Valuation (dated 8 May 2026).*

### Notes

1. See previous page.

2. Takeback debt issued under the RP which reduces the Reorganisation Value, so this is added back to quantify the value available to Lenders.

3. RCF and TLA lenders receive incremental make whole debt on account of their interest in cash settlements from FEMA and cash held in DACA accounts (see page 38).  The make whole debt reduces the Reorganisation Value, so this is added back to quantify the value available for lenders.

4. Macquarie interim financing during the RP process for up to $35m (up to $200m post-RP) alongside a sale-leaseback transaction for the turbines and pay down of outstanding obligations under the existing Macquarie facility (approx. $75m).

5. The existing Zero Parks Term Loan is to be replaced with a new unsecured $22.5m instrument and $7.5m cash payment.

6. See page 40 and 43 for further information about DIP funding and new money. It is not certain who at this stage who would provide the DIP financing.  It is possible that existing creditors may seek to provide DIP financing and may seek Court approval to roll-up their existing pre-petition claims.  This would be subject to US bankruptcy court approval, which is uncertain.  This analysis assumes no roll-up of existing claims.

7. Local secured debt in Brazil is structurally senior to the Plan Creditors and would be a debt-like item in a going-concern sale.

8. Certain members of the New29s are expected to provide $885m in funding in May 2026 which will be used to fund operations, CAPEX, and to refinance certain local secured debt.  The $986m is inclusive of fees and interest to 30 June.

9. In the RA, accounts payable which are debt-like are repaid from DIP funding (see page 41 for further information) after adjusting for drawn LCs where applicable (see page 39 for further information).  For the Reorganisation Value, this is fully adjusted for as debt-like.

*Continued on next page.*

**ALVAREZ & MARSAL**
LEADERSHIP. ACTION. RESULTS.℠

## Valuation methodology
# Equity Value adjustments *(3 of 3)*

After adjusting for debt-like and cash-items, the RP results in approx. $3.3bn of value available for Plan Creditors compared to approx. $2.0bn in the RA.  The sources of value and RA / RP adjustments are summarised below.

**EqV adjustments**

| $m | Note | RA CoreCo | RA BrazilCo | RA Total | RP CoreCo | RP BrazilCo | RP Total |
|---|---|---|---|---|---|---|---|
| Operating BUs | | 2,316 | 2,804 | 5,120 | 2,316 | 2,804 | 5,120 |
| Other assets | | 589 | 17 | 606 | 589 | 17 | 606 |
| Other income / expenses | | 135 | - | 135 | 371 | - | 371 |
| (-) Distress discounts | | (814) | (71) | (885) | - | - | - |
| (-) Tax | | (29) | - | (29) | - | - | - |
| **Total Enterprise Value** | *1* | **2,196** | **2,751** | **4,947** | **3,276** | **2,821** | **6,097** |
| (-) New CoreCo Term Loans | *2* | - | - | - | (475) | - | (475) |
| (-) F2 take back | *2* | - | - | - | (400) | - | (400) |
| (-) FEMA make whole | *3* | - | - | - | (53) | - | (53) |
| (-) Macquarie Debt | *4* | - | - | - | (35) | - | (35) |
| (-) Zero Parks take back | *5* | - | - | - | (23) | - | (23) |
| (-) DIP | *6* | (655) | - | (655) | - | - | - |
| **New debt adjustments** | | **(655)** | **-** | **(655)** | **(985)** | **-** | **(985)** |
| (-) Local secured debt | *7* | - | (1,417) | (1,417) | - | (1,417) | (1,417) |
| (-) Brazil New Money | *8* | - | (986) | (986) | - | (986) | (986) |
| (-) AP which is debt-like | *9* | - | - | - | (339) | - | (339) |
| (-) Litigation exposure | *10* | - | (95) | (95) | (20) | (95) | (115) |
| (-/+) IC settlements | *11* | 142 | (142) | - | 102 | (102) | - |
| **Existing debt and debt-like items** | | **142** | **(2,640)** | **(2,498)** | **(257)** | **(2,600)** | **(2,857)** |
| (+) Cash at RA / RP date | *12* | 45 | 284 | 329 | 45 | 284 | 329 |
| (+) LCF cash collateral | *13* | - | - | - | 39 | - | 39 |
| (-) RP closing costs | *14* | - | - | - | (16) | (49) | (65) |
| (-) RA cash outflow | *15* | (2) | (156) | (158) | - | - | - |
| **Cash adjustments** | | **43** | **128** | **171** | **68** | **235** | **303** |
| **Reorganisation Value** | | **N/A** | **N/A** | **-** | **2,101** | **457** | **2,557** |
| (+) Take-back debt | *2* | - | - | - | 475 | - | 475 |
| (+) F2 Take Back | *2* | - | - | - | 400 | - | 400 |
| (+) FEMA Make Whole | *3* | - | - | - | 53 | - | 53 |
| (-) MIP | *16* | - | - | - | (160) | - | (160) |
| **Value available to Lenders** | | **1,726** | **239** | **1,965** | **2,868** | **457** | **3,324** |

*Source:  Supplemental Expert Report: Enterprise Valuation (dated 8 May 2026).*

**Notes (continued)**

10. The Group's legal counsel has provided a list of pending claims and an estimate of the likely outcome (net of counterclaims).  The amount reflected here is the risk adjusted net exposures at the time of writing.  In the RA, claims against CoreCo would be subject to automatic stay in Ch.11 (and unsecured claims outside out of the BU perimeters), whereas BrazilCo is not expected to file for Ch.11 so adjusted as debt-like items.

11. In the RP, the Reorganisation Value is on a consolidated basis so only adjusts for InterCo balances between CoreCo and BrazilCo.  In the RA, the only adjustments are for InterCo balances between different Collateral Pools (see page 28 for further information).  The Group does not ordinarily forecast InterCo balances, but the balances are unlikely to change during the RA period.  The exception is for trade balances between BrazilCo and CoreCo which is paid in the liquidity forecast and reflected in the balance opposite.

12. There is an estimated cash balance of $329m at 30 June (being the estimated date of the RA).  This is adjusted for RA / RP specific impacts described below.

13. In the RA, most LCs are expected to be drawn (see page 39 for further information) whereas in the RP, all LCs are refinanced with cash collateral released in exchange for facility upsize to $250m with super-senior security.

14. RP closing costs are comprised of professional fees to be paid at RP closing (including BrazilCo reimbursement to CoreCo for allocated portion of fees) and the Zero Parks cash payment (see Note 5).

15. See page 40 and 43 for further information about RA outflows which are reflected in the DIP funding and new money assumptions.

16. As part of the Restructuring, the Group will adopt a management incentive plan for certain directors, officers, and other employees.

**ALVAREZ & MARSAL**
LEADERSHIP. **ACTION.** RESULTS.

# RA methodology

# RA methodology
# Waterfall

The RA proceeds are primarily the going concern sale of BUs together with certain asset sales.  The proceeds are adjusted to reflect the impact of Ch.11 and allocated based on the respective claims against each of the Collateral Pools.

**Sources of value**

| $m | Note | Common | Other | CoreCo | BrazilCo | Total |
|---|---|---|---|---|---|---|
| Enterprise Value | 1 | 1,402 | 914 | 2,316 | 2,804 | 5,120 |
| (+) Other assets | 1 | 257 | 466 | 723 | 17 | 741 |
| (+) Cash | 2 | - | 43 | 43 | 128 | 171 |
| **Gross Realisations** | | **1,659** | **1,423** | **3,082** | **2,949** | **6,031** |
| (-) Distress discount | 3 | (608) | (206) | (814) | (71) | (885) |
| (-) Local secured debt | 4 | - | - | - | (1,417) | (1,417) |
| (-) Brazil New Money | 5 | - | - | - | (986) | (986) |
| (-) Litigation exposure | 6 | - | - | - | (95) | (95) |
| (-/+) IC adjustment | 7 | 142 | (0) | 142 | (142) | - |
| (-) Tax | 8 | (29) | - | (29) | - | (29) |
| **RA Value** | | **1,164** | **1,217** | **2,381** | **239** | **2,620** |
| (-) DIP | 9 | (336) | (319) | (655) | - | (655) |
| (-) DACA replacement lien | 10 | (22) | (21) | (42) | - | (42) |
| **Net Realisations** | | **807** | **877** | **1,684** | **239** | **1,923** |
| (+) DACA replacement lien | 10 | - | - | 42 | - | 42 |
| **Value to Lenders** | | **807** | **877** | **1,726** | **239** | **1,965** |

*Source: Expert Report: Enterprise Valuation.*

**Notes**

1. The RA reflects the disposal of BUs and certain other assets as going concern M&A transactions (via Ch.11 for CoreCo but with BrazilCo avoiding filing) (see page 11 for the RA counterfactual considerations).  F1 is assumed to be sold with Puerto Rico but as separate collateral pools, the enterprise value has been allocated between the Collateral Pools based on a "with-and-without" method.

2. Cash is forecast at 30 December (six months post CoreCo filing for Ch.11) (see pages 40 to 43 for further information).

3. Various distress discounts / adjustments have been applied to estimate the impact of a Ch.11 sale (see page 49 for further information).

4. Local secured debt in Brazil is structurally senior to the Plan Creditors and would be a debt-like item in a going-concern sale.

5. Certain members of the New29s are expected to provide $885m in funding in May 2026 which will be used to fund operations, CAPEX, and to refinance certain local secured debt.  The $986m is inclusive of fees and interest to 30 June.

6. Claims against CoreCo would be stayed under Ch.11 whereas BrazilCo is not expected to file for Ch.11 and these claims are treated as debt-like adjustments.

7. Certain InterCo balances are adjusted as debt or cash like items as applicable (see page 28 for further information).

8. Alvarez & Marsal Tax LLP has considered the tax impact of the hypothetical transactions and concluded there could be a $29m liability for certain CoreCo BUs / assets.

9. CoreCo DIP funding estimated $655m (see page 40 for further information).  CoreCo DIP repayment is allocated pro-rata based on gross realisations notwithstanding there are BU / collateral specific funding requirements.  Cash is first applied to paying down the super-priority claims (*pari passu* between the DIP funding and post-petition replacement liens – see note below).

10. Various bank accounts are subject to a DACA in favour of the LCF / RCF / TLA with post-petition replacement liens granted to enable the cash to be used in the Ch.11 (see page 38 for further information).  Payments in respect of the DACA replacement liens are added back to show the total value to lenders as per the illustrative outcome analysis on page 17.

ALVAREZ & MARSAL
LEADERSHIP. ACTION. RESULTS.℠

RA methodology
# Section 363 Overview

Section 363 of the United States Bankruptcy Code ("**s363**") is a court-approved sales process designed to maximise value for the estate.

### Overview

S363 permits a debtor to sell assets outside the ordinary course of business during bankruptcy proceedings, enabling assets to be sold 'free and clear' of liens, claims, and interests, subject to certain limited exceptions.

The process includes the following key features:

- Debtors must maximise value for the estate, not favour any bidder.
- Sales typically complete within months of filing for Ch.11.
- Enables the purchaser to acquire assets with clean title, free and clear of claims, liens, and encumbrances, pursuant to a bankruptcy court order.
- Once approved, a sale to a good-faith purchaser is afforded protection under s363, which limits the ability to unwind the transaction.

### Other considerations

- An accelerated sale limits time to evaluate risks and may reduce value.
- The public auction process can expose confidential information.
- Secured creditors may 'credit bid' up to the amount of their allowed secured claim, which may affect bidder participation.
- Creditors may challenge the sale if alternative offers are believed to present higher value to the estate.

### The process

1. **Pre-petition marketing**: Prior to filing for Ch.11, debtors often market assets to gauge interest and establish value. A debtor may negotiate an Asset Purchase Agreement with an initial bidder, known as the "stalking horse bidder" which sets a baseline for competing offers. To incentivise this bidder, the debtor may agree to provide certain bid protections.

2. **Bidding procedures**: Shortly after the bankruptcy filing, the debtor seeks court approval for:
   - Qualification requirements for bidders.
   - Bidding timelines and deadlines.
   - Auction procedures (if necessary).
   - Notice provisions.
   - Any protections granted to a stalking horse bidder.

3. **Due diligence and bid submission**: Following court approval, qualified bidders are granted access to a data room to conduct diligence. Bidders must submit conforming bids by a specified deadline.

4. **Auction (if necessary)**: If competing bids are received, the debtor will conduct an auction in accordance with the approved procedures. Bidding takes place in rounds, with the debtor selecting the offer that maximises value for all stakeholders. If no competing bids are received, the debtor may proceed directly to court approval of the stalking horse bid.

5. **Court approval**: Upon completion of the auction, there is a hearing for the court to evaluate the process (i.e. to ensure the process was compliant, fair, conducted in good faith, and designed to maximise the value for the estate). If satisfied, the court makes an order for the sale to be finalised.

**ALVAREZ & MARSAL**
LEADERSHIP. ACTION. RESULTS.℠

## RA methodology
# Intercompany adjustments

Collateral Pools have been adjusted for relevant intercompany balances (treated like other debt or cash items).  Based on the proposed transaction perimeters, the only material adjustment is between BrazilCo and Common Collateral.

### Overview

In a breakup of the Group, purchasers for each BU would consider net intercompany liabilities as debt-like and discount the EV to account for the liability transferring (or require an undertaking that the liability will be settled from the proceeds).  The net InterCo balances owed to and from each of the Collateral Pools are summarised opposite.

The Group does not ordinarily forecast intercompany balances, so the analysis is based on InterCo positions at 31 December 2025 (the most recent information available).  The exception is for trade balances between BrazilCo and CoreCo due to separate reporting, where existing balances are expected to be paid in the RA period and reflected in the liquidity forecast.

For simplicity, InterCo balances between Common Collateral BUs or between Common Collateral legal entities are not adjusted for, as there is a net-zero impact for recoveries to Common Collateral creditors.

Where there are net InterCo balances owed to a BU, these have also not been adjusted for as in all cases, the amounts are owed from Ch.11 debtors and there would be no value available for unsecured creditors (either limited assets at non-guarantor entities or the value is captured by Common Collateral security).



ALVAREZ & MARSAL
LEADERSHIP. ACTION. RESULTS.

RA methodology
# Puerto Rico

The Puerto Rico BU centres around the San Juan LNG import terminal with a second revenue stream from an Operation and Management contract.



**Notes**

The terminal is owned by NFEnergia LLC with support services from its subsidiaries.

The BU also provides Operation and Management services to certain third-party owned power plants via Genera PR LLC.

NFE PR Management LLC is not critical to operations and therefore not included in the transaction perimeter.

Atlantic Energy Holdings LLC would be the vendor for the proposed transaction with all proceeds flowing to Common Collateral Plan Creditors.



**Key**

- Holdco / subsidiary
- AssetCo / OpCo
- Vendor
- Transaction Perimeter
- **C** Common Collateral guarantor
- ◆ EmployerCo
- Terminal / Power Plant
- United States of America
- Puerto Rico
- Bermuda

ALVAREZ & MARSAL
LEADERSHIP. ACTION. RESULTS.℠

# RA methodology

# F1

## The key legal entities of the F1 BU are owned by different Collateral Pool interests which requires proceeds to be allocated between the vendors.



**Transaction perimeter**

**InterCo receivables**
*N/A*

**InterCo payables**

F2

<$1m

**Key**

Holdco / subsidiary  ▪ AssetCo / OpCo  ▪ JV Partner  ▢ Vendor  ⬚ Transaction Perimeter

**C** Common Collateral guarantor  **F1** F1 Collateral guarantor  ⛴ Liquefaction Rigs

🇬🇧 United Kingdom  🇲🇽 Mexico  🇺🇸 United States of America  🇧🇲 Bermuda

### Notes

The critical legal entities consist of NFE Pioneer 1, 2 and 3 (owners of the liquefaction rigs), NFE Altamira Pipeco (owner of the pipeline assets), and NFE Altamira FLNG (counterparty to the supply contract).

Mexico FLNG S. holds permits and licenses for F1 operations, provided by . Based on discussions with management, a purchaser would likely replace the permits and licences in a new clean structure.   is expected to be cooperative and supportive in facilitating new permits and licenses on the basis  is being fully repaid in the RA via the CoreCo DIP (see page 41).

The Pioneer entities are captured by F1 Collateral whereas the Altamira entities would ultimately be captured by Common Collateral interests (via multiple dividends passing up through the ownership chain to NFE International Holdings 1 with no secured or unsecured claims at the interim legal entities.

Based on guidance from A&MVS, we have allocated proceeds between the vendors based on the respective value of Property, Plant and Equipment (**"PPE"**) of the Pioneer and Altamira legal entities.  This results in 8.3% of the proceeds being allocated to Common Collateral (summarised in the table below).

There is a small net InterCo balance owed to F2 which is adjusted for.  There are other net InterCo balances which are not adjusted for (see page 28).  There are also net InterCo balances owed between the two transaction perimeters but on basis there would be a new common owner, these would not be debt-like items requiring adjustment.

### F1 value allocation

| $m | PPE (30-Dec) | Allocation (%) |
|---|---|---|
| NFE Pioneer 1 LLC | 1,946 | 56.5% |
| NFE Pioneer 2 LLC | 1,216 | 35.3% |
| NFE Pioneer 3 LLC | - | - |
| **F1 Collateral** | **3,163** | **91.7%** |
| NFE Altamira PipeCo S de RL de CV | 285 | 8.3% |
| **Common Collateral** | **285** | **8.3%** |
| **Total** | **3,447** | **100.0%** |

**ALVAREZ & MARSAL**
LEADERSHIP. ACTION. RESULTS.℠

## RA methodology
# Mexico

## The BU owns and operates the La Paz LNG import terminal and the Pichilingue Power Plant.



**Notes**

The Pichilingue Power Plant and the La Paz Terminal are in two separate holding structures but each with common ownership under NFE UK Holdings Limited, which would be the vendor for the proposed transaction.

The proceeds would flow directly to the Common Collateral Plan Creditors.

There are no adjustments for net InterCo balances (see page 47).

**Key**

Holdco / subsidiary    AssetCo / OpCo    JV counterparty    Vendor    Transaction Perimeter

**C** Common Collateral guarantor    ◆ EmployerCo    Terminal / Power Plant    ⚓ Vessel Entity

United Kingdom    Mexico    Luxembourg



RA methodology
# Nicaragua

The BU is constructing an integrated power plant and offshore terminal currently which is expected to be operational by January 2027.



| Transaction perimeter |
|---|
| **InterCo receivables** *N/A* ... **InterCo payables** *N/A* |

Key
- ☐ Holdco / subsidiary
- ■ AssetCo / OpCo
- ☐ Vendor
- ⬚ Transaction Perimeter
- **C** Common Collateral guarantor
- ◆ EmployerCo
- 🏭 Terminal / Power Plant
- ⚓ Vessel Entity
- 🇬🇧 United Kingdom
- 🇺🇸 United States of America
- 🇳🇮 Nicaragua

**Notes**

All operations sit under NFE UK Holdings Limited, which would be the vendor for the proposed transaction.

The proceeds would flow directly to the Common Collateral Plan Creditors.

There are no adjustments for net InterCo balances (see page 28).

ALVAREZ & MARSAL
LEADERSHIP. **ACTION. RESULTS.**℠

## RA methodology
# Brazil

**The BU owns two terminals (Barcarena and Santa Catarina), with two power plants under development (Barcarena and PortoCem).**



### Notes

The Brazil BU is a large corporate structure, which includes local debt used to fund developments:

- **PortoCem debentures:** limited recourse loan from BNDES taken out by Portocem Geração de Energia S.A. to support the construction of, and secured against, the PortoCem power plant ("**PortoCem**").

- **CELBA 2 term loan:** limited recourse loan to CELBA 2 – Centrais Elétricas Barcarena S.A. from BNDES to support the construction of, and secured against, the NFE power plant in Barcarena ("**Barcarena**"). Also benefits from a letter of credit facility underwritten by five financial institutions.

- **Lumina Notes:** loan facility from Lumina Capital Management secured against the Barcarena Terminal and TGS Terminals.

The proceeds from the proposed transaction are adjusted for the local debt (which is structurally senior). There are also net InterCo payables to certain Common Collateral legal entities which have been adjusted for (with the value recognised in CoreCo for modelling purposes).

The net proceeds flow to the New 2029 Notes (LCF, RCF2, and TLA see below) via (i) 45% equity held by NFE Financing LLC where there is direct security and (ii) 55% equity held by NFE Brazil Investments LLC where there is also direct security via the Brazil Parent I/C Loan.

As part of the New 2029 Notes transaction, the LCF, RCF2, and TLA were granted a collateral interest in Brazil capped at $200m, which ranks *pari passu* with the New 2029 Notes.

RA methodology
# Preferential liabilities

## The Plan Creditors have a broad security package which is designed to cover the material entities, but to validate this, an EPM has been used to flow value around the group to account for leakage to other creditors (e.g. preferential creditors).

### Overview

The RA analysis is based on the statutory waterfalls for the legal entities in each of the relevant jurisdictions (excluding entities included in transaction perimeters which transfer as a going concern and are therefore not relevant for entity-level modelling).  The remaining legal entities are primarily US-based together with a small number of entities in the UK, Marshall Islands, Ireland, Bermuda, Singapore, Barbados, Jamaica, Bahamas, South Africa, Honduras, and Angola.

Depending on the jurisdiction, there can be preferential claims for employee related liabilities and/or tax.

All employees are assumed to be retained during the Ch.11 period, including central staff, with salaries and accrued entitlements paid in full (included in the DIP funding assumptions).

Employees within the BUs are assumed to transfer as part of the transaction and therefore not relevant for modelling purposes.  Entities outside of the transaction perimeters are non-trading so any preferential claims are likely to be *deminimis* and therefore disregarded for modelling purposes.

After the sale of the BUs, central staff would be dismissed as part of the winding-up of the remaining Group which would trigger severance entitlements, etc. which are generally treated as administrative claims (i.e. super priority).  These costs are accounted for in the wind-down (included in the DIP funding assumptions).

| Emloyees by jurisdiction (excl. BUs) | |
|---|---|
| **Jurisdiction** | **Employees** |
| US | 152 |
| Ireland | 3 |
| Singapore | 1 |
| Bermuda | 1 |

*Source: October 2025 Census.*

ALVAREZ & MARSAL
LEADERSHIP. ACTION. RESULTS.℠

RA methodology
# Non-core legal entities

Legal entities which are not included in the transaction perimeters (e.g. non-core or corporate) would need to be liquidated as part of the Ch.11.  There is not expected to be any liquidation value from these legal entities.

**Overview**

All legal entities outside of the transaction perimeters are assumed to be liquidated. At 30 December, these entities held the following material assets on their balance sheets (summarised in the table opposite):

- **Inventories:** comprised of LNG stock which is assumed to convert to cash during the RA period to 30 December 2026 and therefore reflected in the DIP funding assumptions.

- **Other assets:** includes a non-refundable deposit for construction rights for the land owned by the Group in Ireland ("**Ireland Land**"),  and a minority investment in H2Pro Limited (both of which are reflected in the Total Enterprise Value on page 22).  There are also adviser retainer fees and capitalised internal-use software costs, neither of which would be recoverable in Ch.11.

- **Intangible assets:** certain intangible permits and licenses etc. relating to the Ireland Land which are included in the Total Enterprise Value on page 22.

- **Deposits / Prepaid expenses** Not expected to be recoverable in Ch.11.

- **Trade AR: / Other AR / Unbilled revenue:** assumed to convert to cash during the RA period to 30 December 2026 and therefore reflected in the DIP funding assumptions.

**Non-core assets to be liquidated**

| $m | NBV | Liquidation value |
|---|---|---|
| Inventories | 61 | - |
| Other assets | 39 | - |
| Intangible assets | 37 | - |
| Deposits | 11 | - |
| Prepaid expenses | 8 | - |
| Trade AR | 7 | - |
| Other AR | 2 | - |
| Unbilled revenue | 0 | - |
| **Total** | **165** | **-** |

ALVAREZ & MARSAL
LEADERSHIP. ACTION. RESULTS.℠

# RA methodology

# Tax

## Alvarez & Marsal Tax LLP ("**A&Mtax**") has considered the tax impact of the hypothetical transactions and concluded there could be a $29m liability.

### Overview

A&Mtax has assessed the following tax considerations:

1. **US Tax Liabilities:**  Potential taxable gains or losses arising from each of the BU transactions and whether US federal cash tax liabilities might arise. A&Mtax has concluded that there should not be any US federal cash tax liabilities in the RA.

2. **Non-US tax liabilities:**  Potential tax liabilities arising from the relevant BU and/or assets transactions.  A&Mtax has concluded that there could be a $29m liability in the RA (summarised opposite).

3. **CODI:**  Cancellation of Debt Income arising from the proposed restructuring (only relevant for the RP analysis).  A&Mtax has concluded that CODI is fully excludable from taxable income (primarily through reducing net operating losses, capital losses and tax basis in PP&E under the requisite attribute reduction waterfall) resulting in no adjustment for equity value.

| Tax liabilities | |
|---|---|
| **Asset** | **$m** |
| Nicaragua BU + owned vessels | 18 |
| Ireland Land | 11 |
| Vessel Zero | 1 |
| **Total** | **29** |

### Notes

- **Nicaragua BU + owned vessels:** the transfer of foreign shares where value derives (directly or indirectly) from Nicaraguan assets is taxable as capital gains in Nicaragua, even when the transaction occurs abroad.  For indirect transfers, the taxable base is the difference between the price (or market value) of the shares and their acquisition cost.  If no reliable documentation is available, the tax authority may apply the deemed net income method which has been assumed for the RA (60% of the gross value, taxed at 15%, resulting in an effective 9% rate applied to the RA Value, generating a $16m tax liability).  In addition, the Nicaragua BU would be expected to dispose of its owned vessels Clean Energy and Sustainability, the disposals would generate a $2m tax liability.

- **Ireland Land:** companies are taxed for capital gains tax arising on the disposal of capital assets.  The taxable gain is the difference between the sales proceeds and the acquisition costs.  The gain is taxable at 33% in Ireland, resulting in an $11m tax liability.

- **Vessel Zero**: A&Mtax have deemed that there would be no capital gain on the sale of an owned vessel (Vessel Zero).  However, Mexican sales tax would be payable on the higher of the price agreed or an independent valuation.  The rate varies by location, but A&Mtax have assumed 6% leading to a tax liability of $1m.

ALVAREZ & MARSAL
LEADERSHIP. ACTION. RESULTS.℠

# Cash and funding

Cash and funding
# Cash Collateral

At 31 March 2026, 95% of CoreCo cash was held in DACA accounts in favour of the LCF / RCF / TLA.  We have used this as a proxy for quantifying cash collateral subject to lien at 30 June 2026.

### Overview

The DIP funding assumptions (see subsequent pages) are based on forecast opening cash at 30 June (being the assumed date of the RA / RP).  This cash is assumed to be available to partially fund the Ch.11 as it will be critical to have continued access to liquidity from day 1.

Most of the cash is projected to be in DACA accounts in favour of the LCF / RCF / TLA.  In Ch.11, cash subject to a lien can be accessed with the prior consent of the relevant secured creditors or if the debtors can demonstrate that the lenders are adequately protected.

I have assumed that the LCF / RCF / TLA would consent to use of cash collateral in the Ch.11 subject to there being customary forms of adequate protection (e.g. in the form of post-petition replacement liens).  The post-petition replacement liens would be granted alongside the super-priority DIP funding claim pursuant to a DIP order.

The Group does not maintain a liquidity forecast by bank account.  To estimate the cash balances in the DACA accounts at 30 June (which would be subject to the post-petition replacement liens), I have used the following proxy:

1. At 31 March 2026, 95% of relevant cash is held in DACA accounts in favour of the LCF / RCF / TLA.  There is $50m of restricted cash not available for general operating purposes which is excluded from this analysis on the basis it is assumed to be swept in the RA and therefore excluded from opening cash at 30 June.

2. At 30 June 2026, the CoreCo cash forecast is $45m so using the 95% proxy above, this equates to $42m which is expected to be held in DACA accounts in favour of the LCF / RCF / TLA.  At 30 December (the end of the RA), the CoreCo cash forecast is $43m which would first pay down the super-priority claims (*pari passu* between the DIP funding and post-petition replacement liens granted to the LCF / RCF / TLA).

**CoreCo cash at 31 March**

|  | | % | $m |
|---|---|---|---|
| LCF / RCF / TLA cash collateral | ① | 95% | 62 |
| Unrestricted | | 5% | 4 |
| **Subtotal** | | **100%** | **66** |
| LC cash collateral (Natixis) | | | 39 |
| Charter cash collateral (Energos) | | | 2 |
| Other cash collateral (various) | | | 8 |
| **Excluded** | | | **50** |
| **Total** | | | **116** |

*Source: Bank Account Balances at 31 March 2026.*

**CoreCo RA cash at 30 June (start of RA)**

|  | | | | $m |
|---|---|---|---|---|
| LCF / RCF / TLA cash collateral (proxy) | ① | 95% | ② | 42 |
| Common cash collateral (assumed) | | 5% | | 2 |
| **Total** | | | | **45** |

ALVAREZ & MARSAL
LEADERSHIP. **ACTION. RESULTS.**

## Cash and funding
# Letters of Credit

**Management has considered how each of the LC beneficiaries would likely react to a Ch.11 filing and whether the LCs would be drawn.  All LCs provided under the LCF would likely be drawn for the reasons below.**

**Overview**

Details of the existing LCs are summarised in the table opposite.

The LCs for BNDES and Excelerate Energy, which are issued under the RCF, are not expected to be drawn in the RA on the basis there should be no obligations / losses at the time (see notes opposite).

All remaining LCs (provided exclusively by the LCF) are expected to be drawn in the RA due to near terms expiration / non- renewal, or unpaid contractual obligations.

The LCF benefits from 20 percent cash collateral for all outstanding LCs, which is assumed to be swept in full, resulting in a residual claim for $156m in the RA.

**LC Summary**

| Beneficiary | Usage | Expiry | Note | LCs ($m) RCF | LCs ($m) LCF | Claim ($m) RCF | Claim ($m) LCF |
|---|---|---|---|---|---|---|---|
| BNDES | Portocem ECA | Jul 2026 | 1 | 50 | - | - | - |
| Excelerate Energy | Project Marlin | May 2026 | 2 | 20 | - | - | - |
| **Not Drawn** | | | | **70** | **-** | **-** | **-** |
| CFEnergia | F1 Feed Gas | Jan 2027 | 3 | - | 44 | - | 35 |
| CFEnergia | F1 Feed Gas | Nov 2026 | 3 | - | 9 | - | 7 |
| CFEnergia | CFE GSA | Jan 2027 | 3 | - | 13 | - | 10 |
| PREPA | GSA | Dec 2026 | 4 | - | 10 | - | 8 |
| Kinder Morgan | F1, TGP, Pipeline | Feb 2027 | 5 | - | 58 | - | 47 |
| Open Cargo LC | Cargo | TBC | 6 | - | 30 | - | 24 |
| TotalEnergies | Cargo | Jun 2026 | 7 | - | 31 | - | 25 |
| **Drawn** | | | | **-** | **196** | **-** | **156** |
| **Total LCs** | | | | **70** | **196** | **-** | **156** |

**Notes**

1. The LC is in relation to equity support for the project.  Assuming BrazilCo can avoid filing for Ch.11, and with the enhanced credit support included in the Brazil new money assumptions, the LC should remain undrawn.

2. LC is assumed to be renewed, remain undrawn during Ch.11 through ongoing performance, and replaced by the purchasers of the PR BU.

3. CFE exposure would be satisfied by combination of drawing the LC and repayments via DIP funding.

4. LC expires inside of anticipated Ch.11 timeline and is expected to be drawn (a new LC would likely be secured by the new owner post sale of the PR BU).

5. The Kinder Morgan contract would be rejected in Ch.11 and the counterparty would draw the LC.

6. The LC has been renewed for additional cargo sales in the liquidity forecast.  It is expected that the LC would be drawn for non-payment of the pre-petition cargo obligation.

7. The LC has been renewed for additional cargo sales in the liquidity forecast.  It is expected that the LC would be drawn for non-payment of the pre-petition cargo obligation.

ALVAREZ & MARSAL
LEADERSHIP. ACTION. RESULTS.℠

# Cash and funding
# CoreCo DIP funding *(1 of 3)*

In the RA, CoreCo is estimated to require $655.0m of DIP funding to bridge to the s363 sales and wind down the Group. Key assumptions which have a material impact are detailed below.



| Assumption | Detail |
|---|---|
| **1 Opening cash (30 June 2026)** | ▪ Reflects an adjusted liquidity forecast per latest BP dated 13 March 2026. <br> ▪ Includes proceeds from strategic actions including $87.0m of FEMA proceeds, and $165.1m net proceeds from the sale of turbines ($270.0m gross proceeds before settlement of asset-level debt). <br> ▪ At 28 February 2026, 95% of relevant cash is held in DACA accounts in favour of the LCF / RCF / TLA. The LCF / RCF / TLA are assumed to consent to use of cash collateral in the Ch.11 subject to adequate protection in the form of post-petition replacement liens. The post-petition replacement liens would be granted alongside the super-priority DIP funding claim pursuant to a DIP order. See page 38 for further information. |
| **2 EBITDA** | ▪ Based on the Group's BP over the course of the RA period from 1 July 2026 through 31 December 2026. <br> ▪ Any adjustments to the business plan EBITDA have been reflected in the relevant adjustment categories. |
| **3 TSA** | ▪ Costs associated with the separation of CoreCo and BrazilCo during Ch.11 and estimated at approximately $1.0m for the period to 30 December. This is inclusive of central function costs which are currently located within CoreCo (i.e. IT, HR, accounting, etc). <br> ▪ It is expected that BrazilCo will reimburse CoreCo for these costs. |

ALVAREZ & MARSAL
LEADERSHIP. ACTION. RESULTS.℠

Cash and funding
# CoreCo DIP funding *(2 of 3)*

In the RA, CoreCo is estimated to require $655.0m of DIP funding to bridge to the s363 sales and wind down the Group. Key assumptions which have a material impact are detailed below.

| Assumption | Detail |
|---|---|
| 4 **Professional Fees** | ■ **Professional fees**: $179.9m for adviser fees (NFE and lenders) during the Ch.11 together with transaction fees for the s363 sales.  I understand that it is commonplace for debtors to cover the fees of the lenders' adviser to facilitate a consensual process.  Professional fee assumptions are dependent on myriad factors, including, but not limited to, complexity and collateral packages within the capital structure, geographic location of legal entities and operations, sophistication of commercial counterparties, and level of regulatory oversight.  While no Ch.11 process is directly comparable, we have reviewed several recent Ch.11 cases with similar attributes to the RA, resulting in the professional fee estimates included here. <br> ■ **Wind-down fees**: $50.0m high-level estimate to cover the costs of winding-down the Group following the s363 sales (i.e. the corporate group, holding entities, and other legal entities not included in the s363 transaction perimeters).  The estimated costs include trustee fees, associated court filing fees (where applicable), local administrator / liquidator fees, local counsel & agent fees (where rockpile assets remain), and employment costs of the limited key staff who need to be retained across central functions. |
| 5 **AP which is debt-like** | ■ A large supplier is also a customer to CoreCo and it is therefore critical to maintain continued supply and retain terms (where possible). <br> ■ The supplier is paid in full during the Ch.11 to avoid it taking action against the Group.  The liability is $339.0m at 30 June (rolled forward and including interest) which is adjusted for: <br>   – **LC adjustment**:  The supplier is expected to draw existing letters of credit. <br>   – **Prepayment:** The supplier is expected to require adjusted payment terms, and we assume a 30-day working capital adjustment. <br>   – **Monthly payment**:  CoreCo has agreed to pay $20.0m per month resulting in $120m being paid in the six months to December 2026. |
| 6 **Working capital** | ■ **One-Time & Working Capital**:  $65.7m of one-time payments for working capital commitments to maintain stability during the Ch.11 period and preserve value for the s363 sales process. <br> ■ **Benefit from Automatic Stay**:  $18.3m estimated working capital benefit available to CoreCo from not paying non-critical vendors. <br> ■ **Macquarie Facility Upsize**:  $165.0m adjustment to reflect the upsized facility not being drawn / funded in full. <br> ■ **Utilities Deposit**:  Utility providers are expected to demand payment of outstanding balances ($2.1m) and require pre-payment going forward. <br> ■ **Kinder Payment reversal:**  The Kinder Morgan LC is expected to roll-off during the Ch.11 period leaving a $17.2m working capital adjustment but offset by $1.5m per month in costs no longer required. <br> ■ **Letter of credit release**: $35.5m LCF which is released as part of the restructuring will not be available in the RA. |
| 7 **CAPEX** | ■ CAPEX limited to critical spend for maintenance of the operating facilities (to preserve value and avoid disruption, health & safety issues, etc.) and to finalise commissioning for Nicaragua (to maximise value compared to selling the BU with construction having been paused). |

**ALVAREZ & MARSAL**
LEADERSHIP. ACTION. RESULTS.℠

## Cash and funding
# CoreCo DIP funding *(3 of 3)*

In the RA, CoreCo is estimated to require $655.0m of DIP funding to bridge to the s363 sales and wind down the Group. Key assumptions which have a material impact are detailed below.

| Assumption | Detail |
|---|---|
| 8 **Turbines** | ▪ The business plan includes revenue from sub-leasing the turbines which is not expected in the Ch.11 but this is partially offset by the financing costs associated with the sale and leaseback of the turbines. |
| 9 **Tax** | ▪ A mix of income, sales, and withholding taxes during the Ch.11 period to 30 December 2026. |
| 10 **DIP funding costs** | ▪ The forecast servicing of the DIP finance through the RA period is $102m comprised of $46m upfront fees, $20m exit fees, $5.00m per month servicing charges for July and August, and $6.55m per month for September to December (following an additional draw down). <br> ▪ The DIP assumptions include a monthly interest rate of 1% (made up of 4% SOFR and 8% spread), 7% upfront fee, and 3% exit fee. <br> ▪ The DIP funding requirement is a function of the project cashflows over the period so a change in assumptions (e.g. lower opening cash) will impact the level of requirement DIP funding. |
| 11 **Closing cash (30 December 2026)** | ▪ The closing cash would first pay down the super-priority claims (*pari passu* between the DIP funding and post-petition replacement liens granted to the LCF / RCF / TLA – see page 38 for further information). |

**ALVAREZ & MARSAL**
LEADERSHIP. ACTION. RESULTS.℠

## Cash and funding
# BrazilCo funding

Certain members of the New29s are expected to provide $885.0m in funding in May 2026.  This is reflected in the opening cash at 30 June and avoids the requirement for any additional funding in the RA period.



| Assumption | Detail |
|---|---|
| ① **Opening cash (30 June 2026)** | ▪ Reflects an adjusted liquidity forecast per latest BP delivered in May 2026.<br>▪ The opening cash is inclusive of $885.0m expected to be provided by certain members of the New29s in May 2026 which will be used to fund operations, CAPEX, refinancing certain local secured debt, posting cash collateral for auction expenses, and performance bonds for new projects. |
| ② **Operating cashflow** | ▪ BrazilCo is expected to be loss-making until Barcarena comes online in July.<br>▪ PortoCem is forecast to reach COD in October which generates further cash EBITDA. |
| ③ **CAPEX** | ▪ Reflects critical spend for maintenance of the operating facilities (to preserve value and avoid disruption, health & safety issues, etc.) and to finalise commissioning for the Barcarena and PortoCem (to maximise value compared to selling the BU with construction having been paused). |
| ④ **Working capital** | ▪ Working capital movements related to payment terms on LNG purchases. |
| ⑤ **Arbitration payments** | ▪ Related to arbitration payments for certain ongoing matters. |
| ⑥ **Debt service** | ▪ BrazilCo would be unlikely to secure a waiver from the local secured debt, so ongoing debt service is reflected during the period. |
| ⑦ **Professional fees** | ▪ Additional legal fees following the failed RP (i.e. increased legal and operational risks to be managed to avoid having to file for Ch.11). |
| ⑧ **TSA** | ▪ Costs associated with the separation of CoreCo and BrazilCo during Ch.11 and estimated at approximately $1.0m for the period to 30 December. This is inclusive of central function costs which are currently located within CoreCo (i.e. IT, HR, accounting, etc). |

**ALVAREZ & MARSAL**
LEADERSHIP. ACTION. RESULTS.℠

## Cash and funding
# DIP funding comparables

## The estimated CoreCo DIP funding is consistent with DIP financings in other Ch.11 cases involving groups with similarly large and complex capital structures.

**Overview**

There is $2,381m of value estimated to be able available in the CoreCo Ch.11 (including discounts and other adjustments – see page 26).  This is 3.6x the estimated DIP funding ($655m) which is comparable with other recent Ch.11 cases (summarised opposite).

While DIP financing needs vary greatly from case to case in Ch.11 and depends on a variety of factors, DIP financings of $1 billion or more are not uncommon.

Having consulted with A&M's Ch.11 experts, and the Group's other US-based advisers, it is reasonable to conclude that the estimated DIP funding would be supported by the existing lenders, who acting commercially and rationally, would be motivated to maximise value in the Ch.11 and to avoid the risk of a global liquidation scenario.

It is not certain who at this stage who would provide the DIP funding in the RA.  It is possible that existing creditors may seek to provide DIP financing and may seek Court approval to roll-up their existing pre-petition claims (as part of commercial negotiations for the restructuring, certain Plan Creditors provided term sheets for DIP funding should the Group file for Ch.11).

Any DIP funding would be subject to US bankruptcy court approval, which is uncertain, but if approved may affect overall recoveries for Plan Creditors.  This analysis assumes no roll-up of existing claims.

| DIP funding in other Ch.11 cases | | | | |
|---|---|---|---|---|
| **$m** | **DIP** | **TEV** | **TEV / DIP** | **Notes** |
| EFH (2014) | 9,875 | 14,200 | 1.4x | Disclosure Statement (page 218/243). |
| PG&E (2019) | 5,500 | N/A | N/A | No definitive TEV. |
| First Brands (2025) | 4,400 | N/A | N/A | No disclosure statement (live case). |
| McDermott (2020) | 2,810 | 2,250 | 0.8x | Disclosure Statement (page 300/304). |
| Marelli (2025) | 2,207 | N/A | N/A | No disclosure statement (live case). |
| Chesapeake (2020) | 2,104 | 5,129 | 2.4x | Confirmation Hearing (01/08/2021). |
| Talen Energy (2022) | 1,758 | 4,500 | 2.6x | Cleansing Materials (page 15/42). |
| Weatherford (2019) | 1,750 | 5,800 | 3.3x | Disclosure Statement (page 330/476). |
| Azul (2025) | 1,571 | 1,680 | 1.1x | Disclosure Statement (page 31/548). |
| Intelsat (2020) | 1,500 | 11,000 | 7.3x | Disclosure Statement (page 211/595). |
| **"CoreCo"** | **655** | **2,381** | **3.6x** | **-** |
| Enviva, Inc. (2024) | 500 | 1,500 | 3.0x | Disclosure Statement (page 428/432). |
| Valaris (2020) | 500 | 2,475 | 5.0x | Disclosure Statement (pages 389 - 392/670). |

**ALVAREZ & MARSAL**
LEADERSHIP. ACTION. RESULTS.℠

# Distress Discounts / Adjustments

Distress discounts / adjustments
# Summary

I have assessed the potential Ch.11 adjustments and / or distress discount for each BU based on common risks for all BUs plus incremental specific adjustments.  This results in a discount range for each BU, with the midpoint being used.

### Overview

The EV of each BU is based on the going concern market value (see page 22 for further information).  However, CoreCo would file for Ch.11 with the BUs sold via s363 of the US Bankruptcy Code, taking the form of stock/share sales.  As a result, there are various discounts that buyers might apply to the going concern EVs to reflect actual or perceived distress arising from a Ch.11 scenario.

There are also specific adjustments which need to be applied as a direct result of a Ch.11 filing (e.g. likely loss of contracts with quantifiable impacts).

I have concluded that there would be a minimum discount applicable for each BU ("**Baseline Discount**") together with other incremental risks specific to each BU which could result in further discounts ("**Upper Discount**").  For the purposes of my analysis, I have used the midpoint of the Baseline and Upper Discount ("**Median Discount**") which is summarised opposite.

Whilst I have used the Median Discount in my analysis, depending on the events that transpire in the Ch.11, the Upper Discount could be materially higher than shown here.  For example, there are certain plausible downside risks which are assumed to be mitigated in this analysis but if those risks materialised, it could be catastrophic for the relevant BUs, leaving asset liquidation as the only option (which would significantly erode value compared to the distressed enterprise values used for the RA analysis).

The following pages provide further information on each of the discounts.

| Distress discount - summary | | | | | | |
|---|---|---|---|---|---|---|
| | PR. | F1 | Mex. | Nica. | Brazil | Other |
| Common discount | 10.0% | 10.0% | 10.0% | 10.0% | - | 10.0% |
| Loss of VG Contract | - | - | 25.7% | 40.8% | - | - |
| **Baseline** | **10.0%** | **10.0%** | **33.1%** | **46.7%** | **-** | **10.0%** |
| (+) Loss of volumes | 71.1% | 13.7% | - | - | - | - |
| (+) Vessel day rates | 3.3% | 3.3% | - | - | - | - |
| (+) Under construction | - | - | - | 10.0% | - | - |
| (+) Geopolitical risk | - | - | - | 10.0% | - | - |
| (+) Risk of contagion | - | - | - | - | 5.0% | - |
| **Upper** | **74.8%** | **24.8%** | **33.1%** | **56.8%** | **5.0%** | **10.0%** |
| **Median** | **42.4%** | **17.4%** | **33.1%** | **51.8%** | **2.5%** | **10.0%** |

*Note: Each discount cannot be directly aggregated as each discount is applied to the residual amount after other discounts. The calculation is on a compounded basis being 1 minus the product of the remaining proportions after each individual discount.*

ALVAREZ & MARSAL
LEADERSHIP. ACTION. RESULTS.

Distress discounts / adjustments
# Methodology *(1 of 4)*

I have assessed the potential Ch.11 adjustments and / or distress discount for each BU based on common risks for all BUs plus incremental specific adjustments.  This results in a discount range for each BU, with the midpoint being used.

| Common Discount | PR: 10%<br>F1: 10%<br>Mex: 10%<br>Nica: 10%<br>F2: 10%<br>Other: 10% | Purchasers could apply a minimum 10% discount to reflect:<br><br>- **Accelerated timetable:**  The RA reflects all BU transactions occurring simultaneously, 6 months post-filing.  Whilst this is not a highly compressed timetable, it is still an accelerated timeline for a Group of this size and complexity, particularly in a Ch.11 scenario.  The s363 sales process will also compress the timetable as this requires the court to approve the process in advance and accommodate a period for an open bidding process.<br>- **Limited buyer population:**  The Group is highly complex and there would be a limited number of buyers with the experience and capital required to complete transactions of this nature.  In addition, general strategic purchasers may be unprepared for the risks and constraints of Ch.11 / distressed M&A resulting in a smaller universe of purchasers with restructuring experience.<br>- **Perception of distress:**  Ch.11 comes with public stigma and increased risk of reputational damage (e.g. risk of NASDAQ suspension and delisting potentially damaging the brand).<br>- **Disclosure:**  The Ch.11 process is transparent which means that competitors, customers, and suppliers will have access to potentially sensitive information about the business.<br>- **Licenses and Permits:**  Strict approval is required for both terminal access and downstream distribution, so any loss of these critical licenses and permits (e.g. withdrawal, non-renewal, etc.) could suspend cargo movements, restrict regasification, or block sales.<br>- **Warranties and indemnities:**  Other than the protections from the s363 sales process itself, or specialist insurance obtained by the purchaser, there would be very limited warranties and indemnities which increases the risk for a purchaser compared to a normal M&A transaction.<br>- **Loss of Key Personnel:**  There is increased risk of losing key personnel due to uncertainty, restructuring fatigue, or low morale.<br>- **Vessel Arrests:**  Creditors may seek to enforce their rights through vessel arrests under maritime law.  While DIP financing can be used to settle pre-petition balances, there remains a risk that creditors take unilateral action, particularly if outside of the US and the Ch.11 legal protections.  If any of the operating vessels were arrested, this would cause significant operational issues for the Group. |

**ALVAREZ & MARSAL**
LEADERSHIP. ACTION. RESULTS.℠

Distress discounts / adjustments
# Methodology *(2 of 4)*

I have assessed the potential Ch.11 adjustments and / or distress discount for each BU based on common risks for all BUs plus incremental specific adjustments.  This results in a discount range for each BU, with the midpoint being used.

| Loss of VGP Contract | Mex: 25.7%<br>Nica: 40.8% | There is a risk of losing the supply agreement with Venture Global Plaquemines LNG LLC in Ch.11.  From discussions with management, I understand that the counterparty would likely assert safe harbour provisions and attempt to terminate the contract under its existing termination provisions.  Whilst the outcome of this cannot be uncertain, I have asked A&MVS to run a sensitivity to reflect the loss of the contract which is summarised in the tables below and reflects: |
|---|---|---|

- For 2026 to 2029, volumes are purchased at a spot rate from the Gulf coast for Mexico and Nicaragua (2026: $9.45/Metric Million British Thermal Units ("**MMBtu**"); 2027: $8.08/MMBtu; 2028-29: $7.94/MMBtu).
- From 2030, volumes are based on an assumed longer-term contract being secured for Mexico and Nicaragua (HH*115% + an additional cost for liquefaction / transport per MMBtu ("**Adder**") ranging from $2.6 to $3.0, midpoint $6.96/MMBtu).
- The table below shows the annual impact of the midpoint pricing assumptions, which A&MVS use to calculate a discount range (e.g. Mexico implied range 21.4% to 30.0%, midpoint 25.7%).

**VGP discount build - Mexico**

| $m | | H2 FY26E | FY27E | FY28E | FY29E | FY30E |
|---|---|---|---|---|---|---|
| VGP price ($/MMBtu) | | 6.23 | 6.23 | 6.23 | 6.24 | 6.38 |
| Alternative price ($/MMBtu) | | 9.45 | 8.08 | 7.94 | 7.94 | 6.96 |
| **Price difference** | A | (3.23) | (1.85) | (1.71) | (1.70) | (0.58) |
| VGP volumes incl. boiloff and transfer losses (TBtu) | B | - | 13.37 | 13.40 | 13.37 | 13.37 |
| **Undiscounted annual impact (pre tax) ($m)** | A * B | - | (24.77) | (22.91) | (22.77) | (7.72) |

**VGP discount build - Nicaragua**

| $m | | H2 FY26E | FY27E | FY28E | FY29E | FY30E |
|---|---|---|---|---|---|---|
| VGP price ($/MMBtu) | | 6.23 | 6.23 | 6.23 | 6.24 | 6.38 |
| Alternative price ($/MMBtu) | | 9.45 | 8.08 | 7.94 | 7.94 | 6.96 |
| **Price difference** | A | (3.23) | (1.85) | (1.71) | (1.70) | (0.58) |
| VGP volumes incl. boiloff and transfer losses (TBtu) | B | - | 22.62 | 22.68 | 22.62 | 22.62 |
| **Undiscounted annual impact (pre tax) ($m)** | A * B | - | (41.89) | (38.80) | (38.52) | (13.05) |

**ALVAREZ & MARSAL**
LEADERSHIP. ACTION. RESULTS.℠

## Distress discounts / adjustments
# Methodology *(3 of 4)*

I have assessed the potential Ch.11 adjustments and / or distress discount for each BU based on common risks for all BUs plus incremental specific adjustments.  This results in a discount range for each BU, with the midpoint being used.

| Loss of Volumes | *PR: 71.1%*<br>*F1: 13.7%* | There is a risk of losing the Island-Wide contract in Ch.11.  From discussions with management, I understand that the counterparty would likely assert safe harbour provisions and attempt to terminate the contract under its existing termination provisions. Whilst the outcome of this cannot be uncertain, I have asked A&MVS to run a sensitivity to reflect the loss of volumes which is summarised in the table below and reflects: |
|---|---|---|

- Losing Cambalache and Megagens volumes (2026: 14.8 TBtu; 2027-onwards: 23 TBtu/year) which are instead sold on the open market by F1 at the Dutch TTF price.
- The FSU vessel will deliver the volumes with shipping costs unchanged and vessels Maria and Princess will still be required to deliver the remaining volumes notwithstanding the overall volumes decreasing.
- Whilst PREPA Temp Palo Seco and PREPA Temp SJ were added to the Islandwide contract, pricing is assumed to revert to pre-Islandwide status (HH*115% + $7.95 + $250 per ISO).
- Terminal OPEX reduced for the costs related to Cambalache and Megagen.
- The table below shows the annual impact of the midpoint pricing assumptions, which A&MVS use to calculate a discount range.

| Loss of volumes discount build - Puerto Rico and F1 | | | | | | |
|---|---|---|---|---|---|---|
| **$m** | | **H2 FY26E** | **FY27E** | **FY28E** | **FY29E** | **FY29E** |
| Megagens volumes (Tbtu) | | 1.2 | 8.0 | 8.0 | 8.0 | 8.0 |
| Cambalache volumes (Tbtu) | | - | 15.0 | 15.0 | 15.0 | 15.0 |
| **Total volumes (Tbtu)** | A | 1.2 | 23.0 | 23.0 | 23.0 | 23.0 |
| Islandwide price ($/MMBtu) | | 12.3 | 12.3 | 12.3 | 12.3 | 12.4 |
| Alternative price ($/MMBtu) | | 11.0 | 9.6 | 8.3 | 7.7 | 7.9 |
| **Price difference ($/MMBtu)** | B | (1.3) | (2.7) | (4.0) | (4.5) | (4.5) |
| **Subtotal ($m)** | A * B | (1.6) | (61.6) | (91.5) | (104.5) | (102.8) |
| Terminal opex difference ($m) | | - | (3.4) | (3.4) | (3.4) | (3.5) |
| **Total EBITDA loss ($m)** | | (1.6) | (58.2) | (88.1) | (101.1) | (99.3) |

ALVAREZ & MARSAL
LEADERSHIP. ACTION. RESULTS.℠

## Distress discounts / adjustments
# Methodology *(4 of 4)*

I have assessed the potential Ch.11 adjustments and / or distress discount for each BU based on common risks for all BUs plus incremental specific adjustments.  This results in a discount range for each BU, with the midpoint being used.

| | | |
|---|---|---|
| **Vessel day rates** | *PR: 3.3%*<br>*F1: 3.3%* | The Group has negotiated reduced day rates for the vessels Maria and Princess which are contingent upon the RP being sanctioned. The negotiated pricing has been used for the relevant EVs with the distress adjustment reflecting the existing higher day rates:<br><ul><li>Vessel Maria: existing fixed hire $29,000/day; negotiated to $19,000/day.</li><li>Vessel Princess: existing fixed hire $24,000/day; reduction to $14,000/day.</li></ul> |
| **Under Construction** | *Nica: 10.0%* | The EVs are based on normalised cashflows from 2027, which assumes all assets under construction are complete.<br>However, schedule slippage, cost overruns, contractor disruption, etc. could delay the Commercial Operations Date ("**COD**").  Until COD, the assets generate no / limited revenue, creating a disconnect between the EV assumptions and the current operating status.  Risks remain post-COD, including technical issues, underperformance, etc. which means the future cashflows may not materialise.<br>Opportunistic purchasers could price these risks into their offer (not only for the cost and uncertainty of reaching COD, but also for the risk that the assets do not transition smoothly to stable operations).<br>It is not possible to quantitatively assess the precise level of discount that buyers may apply, given the inherent uncertainty surrounding COD, but an upper discount of 10% is reasonable. |
| **Geopolitical Risk** | *Nica: 10.0%* | The EVs adjust for country-specific risks however, the adjustments do not consider the implications of Ch.11.<br>Nicaragua is exposed to increased geo-political risk, including potential asset expropriation and sanctions.  Whilst there are potential mitigating actions (e.g. proactive stakeholder management, insurance, etc.), a purchaser could price in a 10% discount for the risk. |
| **Risk of contagion** | *Brazil: 5.0%* | Whilst BrazilCo is assumed to avoid filing for Ch.11, there is still a risk of contagion from the CoreCo Ch.11 which could impact value.<br>Like the common discount applied to each of the CoreCo BUs, BrazilCo could face loss of key personnel and perception of distress, all of which might result in a purchasers negotiating a distress discount.<br>I have applied an illustrative 5% discount. |

**ALVAREZ & MARSAL**
LEADERSHIP. **ACTION. RESULTS.**℠

—

# Fee analysis

Fee analysis
# Illustrative Outcome – RP (CoreCo only)

Certain fees are being offered to Plan Creditors, which will be paid from New CoreCo Term Loans and CoreCo Preferred Stock as applicable.  The analysis below reflects adjustment for these fees.

**CoreCo - Initial Value (Fee analysis)**

| $m | RCF1 | RCF2 | TLA | TLB | 26s | 29s | S1 | S2 | Total | Fees | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Initial Value | 88 | 499 | 157 | 1,099 | 133 | 63 | 311 | 457 | 2,807 | 61 | 2,868 |
| Claim | 106 | 596 | 318 | 1,363 | 536 | 253 | 1,248 | 1,836 | 6,255 | - | - |
| Recovery | 84% | 84% | 49% | 81% | 25% | 25% | 25% | 25% | 45% | - | - |

**Plan 1 CoreCo - Total Consideration (Fee analysis)**

| $m | RCF1 | RCF2 | TLA | TLB | 26s | 29s | S1 | S2 |
|---|---|---|---|---|---|---|---|---|
| Initial Value | 88 | 499 | 157 | 1,099 | 133 | 63 | 311 | 457 |
| Equity | - | 17 | 9 | - | - | - | - | - |
| S1 | - | 11 | 6 | - | - | - | - | - |
| S2 | - | 17 | 9 | - | - | - | - | - |
| BrazilCo Adj. | - | 45 | 24 | - | - | - | - | - |
| Total | 88 | 544 | 181 | 1,099 | 133 | 63 | 311 | 457 |
| Claim | 106 | 596 | 318 | 1,363 | 536 | 253 | 1,248 | 1,836 |
| Recovery | 84% | 91% | 57% | 81% | 25% | 25% | 25% | 25% |

**Plan 1 CoreCo - RA vs. RP (Fee analysis)**

| $m | LCF | RCF1 | RCF2 | TLA | TLB | 26s | 29s | S1 | S2 |
|---|---|---|---|---|---|---|---|---|---|
| RA | 85 | 57 | 342 | 102 | 687 | 68 | 32 | 157 | 231 |
| RP | Excl. | 88 | 544 | 181 | 1,099 | 133 | 63 | 311 | 457 |
| Var. | Excl. | 31 | 202 | 79 | 412 | 66 | 31 | 154 | 226 |
| RA | 57% | 54% | 57% | 32% | 50% | 13% | 13% | 13% | 13% |
| RP | Excl. | 84% | 91% | 57% | 81% | 25% | 25% | 25% | 25% |
| Var. (%pt) | Excl. | 30% | 34% | 25% | 30% | 12% | 12% | 12% | 12% |

**Fees payable to Plan Creditors**

Certain fees are being offered to Plan Creditors in the form of New CoreCo Term Loans and CoreCo Preferred Stock as follows:

- ICA Standstill Fee:  2% of debt payable to each RCF Lender in consideration for forbearance until the RPs become effective (or are unsuccessful).  The ICA Standstill Fee is payable in the form of additional New CoreCo Term Loans or shall become a payment obligation of NFE Inc. on termination of the RSA.

- Early Consent Fee:  0.75% of debt payable to each eligible Plan Creditor who becomes a party to the RSA.  The Early Consent Fee is payable in the form of additional CoreCo Preferred Stock.

This results in variances for Plan Creditor recoveries depending on whether allocations / recoveries are reflected gross or net of fees.  The analysis opposite reflects the allocations / recoveries after adjusting for fees.

After adjusting for the ICA Standstill and Early Consent fees, all Plan Creditors continue to receive a better outcome under each RP compared to the RA.

ALVAREZ & MARSAL
LEADERSHIP. ACTION. RESULTS.℠

—

# Appendix 1
# Glossary

# Appendix 1
# Glossary *(1 of 2)*

| | |
|---|---|
| 26s | $1.5bn 6.5% Legacy 2026 Notes issued 12 April 2021 |
| 29s | $750m 8.75% Legacy 2029 Notes issued 8 March 2024 |
| A&M | Alvarez & Marsal Europe LLP and its subsidiaries and affiliates (to exclude Alvarez & Marsal Capital, LLC and its subsidiaries) |
| A&Mtax | Alvarez & Marsal Tax LLP |
| A&MVS | Alvarez & Marsal Valuation Services LLP |
| Adder | Additional costs beyond base commodity cost of LNG/NG for services provided such as liquefaction, shipping or regasification. Provided per MMBtu |
| Agreement | The original Engagement Letter between NFE and A&M and any subsequent amendment letters |
| Barcarena | 624MW power plant owned by CELBA 2 – Centrais Elétricas Barcarena S.A. |
| Baseline Discount | Minimum discount applicable for each Business Unit |
| BNDES | Banco Nacional de Desenvolvimento Econômico e Social, also known as the Brazil National Bank for Economic and Social Development |
| Brazil Collateral | Guarantees provided by a first lien over certain assets of the Brazil business unit |
| BrazilCo | The business comprising of the Group's Brazilian operations |
| BU | Business unit |
| BP | Business plans prepared by NFE for both CoreCo (13 March 2026) and BrazilCo (6 May 2026) |
| CFE | CFEnergía, S.A. de C.V., a subsidiary of Comisión Federal de Electricidad, Mexico's state-owned electric utility |
| Ch.11 | Chapter 11 of the United States Bankruptcy Code |
| COD | Commercial Operations Date |
| CODI | Cancellation of indebtedness income |
| Collateral Pools | Specific pools of assets securing claims of Plan Creditors |
| Common Collateral | Guarantees provided by pari passu first lien claims held by the 26s, 29s, RCF, LCF, TLA, TLB, and New29s notes over substantially all the Group's assets other than the Brazil BU |
| CoreCo | The business comprising of NFE and its direct and indirect subsidiaries other than BrazilCo |
| CPR35 | Part 35 of the Civil Procedure Rules 1998, governing the provision of expert evidence |
| DACA | Deposit Account Control Agreement |
| DIP | Debtor-in-Possession |
| Early Consent Fee | Additional debt payable to each Plan Creditor who becomes a party to the RSA |
| Engagement Letter | Engagement letter between NFE and A&M dated 30 April 2026 |
| EV | Enterprise Value |
| F1 | FLNG 1, a liquefaction facility installed in Mexico in 2021 in partnership with CFE |
| F1 Collateral | Guarantees provided by pari passu first lien claims held by LCF, RCF, and TLB, over F1 assets |
| F1 Lenders | Lenders secured by the F1 Collateral |
| F2 | Fast LNG 2, a second liquefaction facility planned in Altamira, Mexico, in partnership with CFE |
| F2 Collateral | Guarantees provided by pari passu first lien claims held by LCF, RCF, TLA, and TLB, over F2 assets |
| F2 Lenders | Lenders secured by the F2 Collateral |
| FEMA | Federal Emergency Management Agency, an agency of the United States Department of Homeland Security |
| FLNG | Fast liquefied natural gas |
| Group / NFE | Refers to New Fortress Energy Inc. and any of its subsidiaries and affiliates |

ALVAREZ & MARSAL
LEADERSHIP. ACTION. RESULTS.℠

# Appendix 1
# Glossary *(2 of 2)*

| | |
|---|---|
| ICA Standstill Fee | Debt payable to the RCF lenders in consideration for forbearance until the RPs become effective, or are unsuccessful |
| InterCo | Intercompany |
| Ireland Land | 603-acre plot in Ireland owned by the Group in Ireland on the Shannon Estuary |
| Lenders | Existing lenders to the Group, including but not limited to noteholders, RCF providers, and intercompany lenders |
| LC | Letter of Credit |
| LCF | Letter of Credit Facility; a New York law-governed uncommitted letter of credit and reimbursement agreement dated 16 July 2021 |
| LNG | Liquefied Natural Gas |
| Lumina | Lumina Capital Management |
| M&A | Merger and Acquisition |
| Median Discount | Midpoint between Baseline and Upper Discount |
| MMBtu | Metric Million British Thermal Units, a thermal unit of measurement for natural gas |
| NASDAQ | National Association of Securities Dealers Automated Quotations |
| New29s | $2.73bn 12% New 2029 Notes issued 6 November 2024 |
| No Worse Off Test | Comparison of outcomes for Plan Creditors and shareholders under the RP to outcomes under the RA |
| Plan Creditors | Creditors subject to the RP |
| Plausible Downside Case | Global liquidation of the Group and/or BrazilCo filing for Ch.11 |
| PortoCem | Power plant owned by Portocem Geração de Energia S.A. |
| PPE | Property, Plant, & Equipment |
| PREPA | Puerto Rico Electric Power Authority |
| RA | The Relevant Alternative: CoreCo file for Ch.11, BrazilCo does not, followed by a sale of BUs via going concern M&A transactions |
| RCF1 | R-1 Revolving credit facility agreement dated 15 April 2021 |
| RCF2 | R-2 Revolving credit facility agreement dated 15 April 2021 |
| Reorganisation Value | The post-restructuring value of the Group assuming the RP is sanctioned |
| Restructuring | The comprehensive financial and operational restructuring of the Group being implemented via the two proposed inter-conditional RPs |
| RP(s) / Plan(s) | The two proposed inter-conditional restructuring plans being proposed under Part 26A of the Companies Act 2006 |
| RSA | Restructuring Support Agreement |
| S1 | Series I Intercompany Loan |
| S2 | Series II Intercompany Loan |
| S363 | Section 363 of the US bankruptcy code allowing transfer of title "free and clear" of claims |
| Skadden UK | Skadden, Arps, Slate, Meagher & Flom (UK) LLP, the Group's counsel |
| TLA | Term Loan A facility dated 19 July 2024, for an initial aggregate principal amount of up to $700m |
| TLB | Term Loan B facility dated 30 October 2023, for an initial aggregate principal amount of $856m |
| TSA | Transition Services Agreement |
| Upper Discount | Maximum discount applicable for each Business Unit |
| VDR | Virtual data room available to Plan creditors and Shareholders |
| VGP | Venture Global Plaquemines LNG LLC |
| VGP Contract | Long-term LNG supply agreement with VGP |
| Zero Parks Term Loan | An existing loan to the Zero Park business (now discontinued) which is to be replaced by a new instrument and a cash payment |

**ALVAREZ & MARSAL**
LEADERSHIP. ACTION. RESULTS.℠

# Appendix 2
# CPR35 Instruction Letter

# Appendix 2
# CPR35 Instruction Letter *(1 of 5)*

**SKADDEN, ARPS, SLATE, MEAGHER & FLOM (UK) LLP**

22 BISHOPSGATE
LONDON EC2N 4BQ

TEL: (020) 7519-7000
FAX: (020) 7519-7070
www.skadden.com

AFFILIATE OFFICES

BOSTON
CHICAGO
HOUSTON
LOS ANGELES
NEW YORK
PALO ALTO
WASHINGTON, D.C.
WILMINGTON

ABU DHABI
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
MUNICH
PARIS
SÃO PAULO
SEOUL
SINGAPORE
TOKYO
TORONTO

29 April 2026

Alvarez & Marsal Europe LLP
Park House
16 - 18 Finsbury Circus
London, EC2M 7EB

Attention: Richard Fleming

**BY EMAIL**: rfleming@alvarezandmarsal.com

Dear Mr Fleming,

**NFE Global Holdings Limited ("NFE Global") and NFE Brazil Newco Limited ("NFE Brazil Newco") – Independent Expert Witness Letter of Instruction – Relevant Alternative Report**

**I.    Introduction**

1.    Thank you for agreeing to act as an independent expert witness in relation to the proposed restructuring of the liabilities of NFE Global and NFE Brazil Newco (the "**Plan Companies**"), to be implemented by two English law restructuring plans under Part 26A of the Companies Act 2006 (the "**Act**"):

   (a)    NFE Global as the applicant in the "**CoreCo Plan**"; and

   (b)    NFE Brazil Newco as the applicant in the "**BrazilCo Plan**" (together, the "**Plans**").

2.    We act for New Fortress Energy Inc., a Delaware corporation (the "**Parent**") and its direct and indirect subsidiaries (the "**Group**") in relation to the Plans.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM (UK) LLP, A LIMITED LIABILITY PARTNERSHIP REGISTERED UNDER THE LAWS OF THE STATE OF DELAWARE, IS AUTHORISED AND REGULATED BY THE SOLICITORS REGULATION AUTHORITY UNDER REFERENCE NUMBER 88014.
A LIST OF THE FIRMS PARTNERS IS OPEN TO INSPECTION AT THE ABOVE ADDRESS.

---

29 April 2026
Alvarez & Marsal Europe LLP

3.    As detailed in **Section VI** below, your role as an expert witness will primarily involve the production of an expert report (the "**Report**"), to be filed at the High Court in connection with NFE Global and NFE Brazil Newco's applications to convene and hold meetings of certain of their creditors (referred to as the "**Plan Creditors**") for the purpose of considering and, if thought fit, approving the Plans, as well as other duties appropriate to the role of an expert witness, as directed by the Court or instructed by us (the "**Engagement**").

4.    The purpose of this letter is to confirm your instructions as an independent expert witness in relation to the Plans and to ensure that the Report is prepared in accordance with Part 35 of the Civil Procedure Rules 1998 (the "**CPR**").

5.    In relation to the Engagement, you will only take instructions from Skadden, Arps, Slate, Meagher & Flom (UK) LLP ("**Skadden**" or "**we**" or "**us**", as the context requires).

6.    For the avoidance of doubt, to the extent that there is any inconsistency between the terms of this letter of instruction and the terms of any engagement letter agreed between you and/or Alvarez & Marsal and/or the Parent and/or the Plan Companies or any of their affiliates, the terms of this letter of instruction shall prevail.

**II.    Background**

*NFE Global*

7.    NFE Global is a private company limited by shares incorporated in England and Wales under registered number 13679588 and with its registered office address at Suite 1, 7th Floor, 50 Broadway, London SW1H 0BL, United Kingdom.  NFE Global was incorporated on 14 October 2021.  NFE Global is a member of the Group, a direct wholly-owned subsidiary of NFE International Holdings Limited (a Bermudian company) and an indirect wholly-owned subsidiary of the Parent. NFE Global has no material assets.

*NFE Brazil Newco*

8.    NFE Brazil Newco is a private company limited by shares incorporated in England and Wales under registered number 17141053 and with its registered office address at Suite 1, 7th Floor, 50 Broadway, London SW1H 0DB, United Kingdom. NFE Brazil Newco was incorporated on 7 April 2026. NFE Brazil Newco is a member of the Group, a direct wholly-owned subsidiary of NFE Financing LLC (a Delaware limited liability company) and an indirect wholly-owned subsidiary of the Parent.

*NFE Group*

2

ALVAREZ & MARSAL
LEADERSHIP. ACTION. RESULTS.℠

# CPR35 Instruction Letter *(2 of 5)*

29 April 2026
Alvarez & Marsal Europe LLP

9. The Group is a global energy infrastructure business. The Group's business model spans the entire production and delivery chain from natural gas procurement and liquefaction to shipping, logistics, facilities and conversion or development of natural gas-fired power generation.

10. The Group delivers targeted energy solutions by employing an integrated liquefied natural gas ("**LNG**") supply and delivery model summarised as follows:

   (a) *LNG and Natural Gas Supply and Liquefaction*: the Group supplies LNG and natural gas regasified from LNG to its own power plants and to its customers. The Group's first floating liquefaction unit, FLNG 1, began producing LNG in July 2024, and the Group sources a significant portion of its LNG needs from this facility. Currently, demand for LNG above FLNG 1's capacity is acquired from third-party suppliers in open market purchases.

   (b) *Shipping*: the Group leases, owns or operates a fleet of two floating storage and regasification units and five liquefied natural gas carriers, two of which operate as additional floating storage units. Six vessels are owned by Energos Infrastructure, and the Group also charters vessels to and from third parties.

   (c) *Facilities*: through its network of current and planned downstream facilities and logistics assets, the Group is strategically positioned to deliver gas and power solutions to its customers seeking either to transition from environmentally dirtier distillate fuels such as automotive diesel oil and heavy fuel oil, or to purchase natural gas to meet their current fuel needs.

11. Additionally, the Group builds modular LNG manufacturing production facilities that can be deployed in various locations globally to liquify natural gas cheaply and efficiently.

The Parent

12. The Parent is a Delaware corporation and is the ultimate holding company of the Group. As of 31 March 2026, the Parent had 285,634,650 shares of Class A common stock outstanding. The Class A common stock is listed on the Nasdaq Global Select Market and carries voting rights.

III. **The Plan Debt**

13. The CoreCo Plan relates to rights, liabilities and obligations arising under the following debt instruments (as defined and explained in Section 5 of the Practice Statement Letter dated 20 April 2026, referred to as the "**PSL**"):

   (a) the 2026 Legacy Notes Debt;

3

---

29 April 2026
Alvarez & Marsal Europe LLP

   (b) the 2029 Legacy Notes Debt;

   (c) the R-1 Revolving Credit Facility Debt;

   (d) the R-2 Revolving Credit Facility Debt;

   (e) the Term Loan B Debt;

   (f) the Term Loan A Debt;

   (g) the Series I Loan Debt; and

   (h) the Series II Loan Debt,

   (together, the "**CoreCo Plan Debt**" and together with the Letter of Credit Facility, the "**Corporate Debt**").

14. The BrazilCo Plan relates to rights, liabilities and obligations arising under the 2029 New Notes Debt, (the 2029 New Notes Debt together with the CoreCo Plan Debt, being the "**Plan Debt**"). NFE Brazil Newco became a guarantor in respect of the 2029 New Notes on 9 April 2026.

15. The Group's current collateral and priority arrangements are described in Section 5(H) of the PSL.

IV. **The Plans and the Restructuring**

The Plans

16. The purposes and objectives of the Plans are to:

   (a) restructure the Plan Companies' and the Group's balance sheets;

   (b) address approaching maturities under the Plan Debt and replace existing debt with new debt and preferred equity finance arrangements that provide the Group and the Plan Companies with a sustainable capital structure;

   (c) enable access to new money financing to address each of the CoreCo Group's and the BrazilCo Group's near-to medium-term liquidity needs, to the extent required; and

   (d) facilitate the holistic restructuring of the Group, including the BrazilCo Separation (described in further detail in paragraph 20 below), pursuant to the Restructuring.

17. Further details of the Plans are set out in Section 9 of the PSL.

4

**ALVAREZ & MARSAL**
LEADERSHIP. **ACTION. RESULTS.**℠

# CPR35 Instruction Letter *(3 of 5)*

29 April 2026
Alvarez & Marsal Europe LLP

18. Pursuant to the Plans, the Plan Creditors will release their existing claims against the Group in return for a mix of debt, preferred equity and common equity (the "**Plan Consideration**"). The Plan Consideration is allocated in accordance with the Plan Creditors' existing rights against various Collateral Pools. The respective Plan Classes, Collateral Pool interests and Plan Consideration are summarised in paragraph 1.8 of the PSL.

The Restructuring

19. The Group is expected to carry out other processes in parallel with the Plans in order to implement a holistic restructuring of the Group's corporate and capital structure. These processes are collectively referred to as the "**Restructuring**". Details about the Restructuring are set out in the Restructuring Term Sheet and in Section 8 of the PSL.

20. The Restructuring will include, among other things, the separation of the Group into two standalone businesses:

(a) a business comprising New BrazilCo Parent and its direct and indirect subsidiaries, comprising the Group's Brazilian business and PA Land, ("**BrazilCo Group**"); and

(b) a business comprising the Parent and its direct and indirect subsidiaries other than the BrazilCo Group ("**CoreCo Group**").

21. Please refer to the PSL and the Restructuring Term Sheet, enclosed with this letter, for further background on the Plans and the Restructuring.

**V.    Hearing Dates**

22. The Convening Hearing has been listed for 14 May 2026.

23. The Sanction Hearing has been listed for 18 June 2026.

**VI.    Instructions and Issues to be Covered**

24. You are instructed to prepare your Report for the Court, and by reference to the requirements as set out in **Sections VII** and **VIII** below. The scope of your Report should include the following:

(a) identifying and assessing the most likely scenario in the event that the Plans are not sanctioned by the Court (the "**Relevant Alternative**"), including a reasoned analysis of the various alternative options that have been considered and the basis on which the Relevant Alternative has been selected;

5

29 April 2026
Alvarez & Marsal Europe LLP

(b) explaining the key analysis undertaken and estimating the likely outcomes for the Plan Creditors, lenders under the Letter of Credit Facility and the existing shareholders in the Relevant Alternative;

(c) estimating the expected aggregate outcomes and recoveries for the relevant creditors and shareholders under the Plans and comparing these outcomes against the aggregate recoveries under the Relevant Alternative;

(d) providing your assessment of whether any class of Plan Creditors would be worse off under the Plans than in the Relevant Alternative; and

(e) estimating the value preserved and/or generated under the Plans and commenting on the allocation of value between the relevant creditors and shareholders.

25. The Report should present information at a level of detail that is consistent with the Group's public disclosures made in accordance with applicable securities laws and regulations, including, where appropriate, the aggregation of values, and should provide sufficient detail to enable the reader to understand the methodology adopted and the conclusions reached in your Report.

26. During the course of your Engagement, we may give you instructions on legal points upon which you should conduct your analysis. Where those instructions are material to the opinions expressed in your Report, your Report should record those instructions.

27. In addition to the production of the Report, you may also be asked to provide supplementary expert evidence and/or carry out any other duties appropriate to the role of an expert witness, as directed by the Court or instructed by us. Please note that the CPR requirements applicable to your role as independent expert (as detailed in **Section VII** below) will apply for the duration of this Engagement, including in the event that you are called to give evidence on the content of the Report (and any subsequent reports) in any future hearing in relation to the Plans.

28. In the event that your further assistance is required, we shall update you as and when the issue arises.

**VII.    Expert's Duties**

29. Your duties as an expert witness are set out in the following documents, which are enclosed with this letter. By signing a copy of this letter, you agree to comply with the duties and requirements as set out therein:

(a) CPR, Part 35 and its accompanying Practice Direction ("**PD35**");

6

ALVAREZ & MARSAL
LEADERSHIP. ACTION. RESULTS.℠

# Appendix 2
# CPR35 Instruction Letter *(4 of 5)*

29 April 2026
Alvarez & Marsal Europe LLP

(b)    The Civil Justice Council's Guidance for the Instruction of Experts in Civil Claims 2014 (the "**Guidance 2014**"); and

(c)    Chancery Guide 2022 (Chapter 9).

30.    In particular:

(a)    Your overriding duty as an expert witness is to the Court. Your primary function is to assist the Court and, in this capacity, you must provide objective, unbiased opinions on matters within your expertise, and should not assume the role of an advocate.

(b)    Your evidence will be an independent product uninfluenced by the pressures of litigation (meaning that you would express the same opinion if you were given the same instructions by another party).

(c)    You should consider all material facts, including those which might detract from your opinions.

(d)    You should make it clear (a) when a question or issue falls outside your expertise; and (b) when you are not able to reach a definite opinion, for example because you have insufficient information.

(e)    If, after producing a report, your view changes on any material matter, such change of view should be communicated to all the parties without delay, and when appropriate to the court.

(f)    You have a duty to exercise reasonable skill and care in carrying out your instructions and should comply with any relevant professional code of practice.

**VIII.    Structure of your Report**

31.    Your Report should:

(a)    be addressed to the Court and not the Plan Companies or the Parent;

(b)    give details of your qualifications, including a detailed curriculum vitae;

(c)    provide a list of the documents upon which you relied for the purposes of preparing it;

(d)    contain a list of those that you spoke to for the purposes of preparing it (whether employees of the Group or otherwise);

(e)    give details of who at Alvarez & Marsal assisted with the preparation of it;

7

29 April 2026
Alvarez & Marsal Europe LLP

(f)    contain a statement setting out the substance of all facts and instructions which are material to the opinions expressed therein or upon which those opinions are based;

(g)    make clear which facts stated are within your own knowledge;

(h)    where there is a range of opinion on the matters dealt with: (i) summarise the range of opinions; and (ii) give reasons for your own opinion;

(i)    contain a summary of the conclusions reached;

(j)    contain any qualifications of your opinion (if any);

(k)    contain a statement that you: (i) understand your duty to the court, and have complied with that duty; and (ii) are aware of the requirements of CPR Part 35, PD 35 and the Guidance 2014; and

(l)    be verified by a statement of truth in the following form:

*I confirm that I have made clear which facts and matters referred to in this report are within my own knowledge and which are not. Those that are within my own knowledge I confirm to be true. The opinions I have expressed represent my true and complete professional opinions on the matters to which they refer.*

*I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.*

32.    Your Report should be provided as a searchable PDF file, preceded by a hyperlinked table of contents.

**IX.    Confidentiality**

33.    We understand that you have agreed confidentiality terms with the Parent and its subsidiaries as part of your engagement. This duty of confidentiality extends to the contents of your Report and any drafts, and any discussions in relation to your role as an expert witness.

34.    Please also note that during the course of your Engagement you may be shown and/or receive documents which are of a privileged nature, some of which may have been received by us from the Group, its financial and/or legal advisors. Please note that provision of such documents or information to you is not intended to, and does not waive privilege therein. Privileged information should not be referred to or relied upon in your Report unless otherwise agreed.

8

ALVAREZ & MARSAL
LEADERSHIP. ACTION. RESULTS.℠

# CPR35 Instruction Letter *(5 of 5)*

29 April 2026
Alvarez & Marsal Europe LLP

35.     For completeness, we note that your Report may be appended to the Explanatory Statement and/or supporting evidence submitted to the High Court of Justice England and Wales as part of the Plan Companies' applications for an order to convene and hold meetings of the Plan Creditors for the purpose of considering and, if thought fit, approving the Plans.

**X.    Confirmation**

36.     Please confirm your acceptance of the terms contained in this letter by returning a signed copy of it.

Yours sincerely,

*Skadden, Arps, Slate, Meagher & Flom (UK) LLP*

**Skadden, Arps, Slate, Meagher & Flom (UK) LLP**

Agreed by: .......................................... (Signature)

Name: ...... RICHARD FLEMING ........... (Print Name)

Date: ...... 29 APRIL 2026 ..........

9

ALVAREZ & MARSAL
LEADERSHIP. ACTION. RESULTS.℠



LEADERSHIP.**ACTION.RESULTS.**℠

Alvarez & Marsal

Alvarez & Marsal Holdings, LLC. All rights reserved. ALVAREZ & MARSAL®, ® and A&M® are trademarks of Alvarez & Marsal Holdings, LLC.

© Copyright 2026