**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>NFE Global Holdings Limited, *et al.*,<br><br>Debtors in a Foreign Proceeding. | **FOR PUBLICATION**<br><br>Case No. 26-11268 (MG)<br><br>(Jointly Administered) |

### MEMORANDUM OPINION RECOGNIZING THE ENGLISH PROCEEDINGS AS FOREIGN MAIN PROCEEDINGS AND GRANTING RELATED RELIEF

*A P P E A R A N C E S:*

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
320 S. Canal St.
Ste 47th Floor
Chicago, IL 60606
By:    Ron Meisler, Esq
        Christopher Dressel, Esq.
        Bryan Uelk, Esq.


                -and-

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
22 Bishopsgate
London EC2N 4BQ
By:    Peter Newman, Esq.
        Nicole Stephansen, Esq.
                -and-

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Rodney Square
920 N. King St.
Wilmington, DE 19801
By:    Joseph Larkin, Esq.
        Stephen Della Penna, Esq.


                -and-

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Ave.
Palo Alto, CA 94301
By:    Jennifer Madden, Esq.

HERBERT SMITH FREEHILLS KRAMER LLP
*Attorneys for Ad Hoc Group of GLP Preferred Unit Holders*
1177 Avenue of the Americas
New York, New York 10036
By:   Kyle Ortiz, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

The two foreign debtors in this chapter 15 case—NFE Global Holdings Limited, incorporated in 2021 in the U.K., and NFE Brazil Newco Ltd., incorporated in April 2026 in the U.K., are affiliates of New York-based New Fortress Energy Inc., a Delaware corporation. The two foreign debtors filed cases in the U.K. in March and April 2026 under Part 26A of the U.K. Companies Act 2006 seeking to implement debt swap plans designed to cut substantial debt from the New Fortress balance sheet while preserving a portion of existing equity holdings. Having succeeded in gaining approval of the plans in the U.K., the foreign debtors now seek recognition and enforcement of the Part 26A plans in the U.S. in this chapter 15 case. No objections were filed to the requested relief in this chapter 15 case. The Court has already entered an order granting the requested relief. In doing so the Court nevertheless indicated that it intended to issue an opinion explaining its reasoning.

Companies are increasingly seeking to take advantage of a foreign restructuring mechanism by which the companies seek to gain approval in the courts in the U.K. for plans under Part 26 (schemes of arrangement) or Part 26A (restructuring plans) and then to obtain recognition and enforcement of the plans in U.S. chapter 15 cases, particularly where the plans include modifications of New York-law-governed debt.[1] The U.K.-

---

[1]     Where companies believe they need only a balance sheet restructuring rather than an operational restructuring, in which chapter 11 proceedings excel, the time and costs involved in pursuing the foreign court solution followed by a chapter 15 case is allegedly less.

2

approved plans—as is true in this case—often include releases of non-debtor affiliate guarantees of the original debt, as well as broad exculpation protection for the parties involved in the restructuring proceedings.  The releases and exculpation provisions permissible under U.K.-law push the boundaries of available relief in a chapter 11 case.  While at least one of the foreign debtors in this case was incorporated in the U.K. in 2021, the other foreign debtor was incorporated in the U.K. in April 2026 shortly before the U.K. proceedings were filed.  Is "COMI tourism"—where a foreign debtor that is an affiliate of a U.S.-based (or other non-U.K.-based debtor) corporation was established specifically for the purpose of pursuing a foreign restructuring solution followed by a chapter 15 case—a basis to deny recognition and enforcement in a chapter 15 case?  The Court has already entered its order recognizing and enforcing these foreign debtors' plans in this case.  The Court obviously concluded that the foreign debtors in this case were entitled to the requested relief.  While there is nothing in the text of chapter 15 that precludes recognition and enforcement in cases such as this, there are some cautionary principles that a chapter 15 court should consider before approving the requested relief.

The particular risk is that by establishing a U.K. debtor to file under Part 26 or Part 26A., a debtor may circumvent the requirements of the U.S. Bankruptcy Code to disadvantage some creditors.  While not the case here, the Court discusses the issue in the context of these proceedings to describe the analytical framework that the Court applied before granting its approval.

## I.   BACKGROUND

Pending before the Court are the *Chapter 15 Petition for Recognition of a Foreign Proceeding* (ECF Doc. # 1) and the *Verified Petition for (I) Recognition of Foreign Main*

*Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief under*

*Chapter 15 of the Bankruptcy Code* (the "Verified Petition" or "VP," ECF Doc. # 3) filed

in the above-captioned chapter 15 cases (the "Chapter 15 Cases") by Christopher Boas as

the authorized foreign representative (the "Foreign Representative") of the above-

captioned foreign debtors (the "Debtors[2]") that are the subject of proceedings (the

"English Proceedings") pending before the High Court of Justice of England and Wales

(the "English Court") concerning two restructuring plans (collectively, the "Restructuring

Plans") proposed pursuant to Part 26A of the Companies Act of 2006 (as amended, the

"Companies Act") seeking recognition of the English Proceedings as "foreign main

proceedings."

In support of the Verified Petition, the Debtors submitted (a) the *Declaration of*

*Nicole Stephansen in Support of the Verified Petition for (I) Recognition of the Foreign*

*Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief*

*under Chapter 15 of the Bankruptcy Code* (the "Stephansen Declaration, ECF Doc. # 4);

(b) the *Declaration of Christopher Boas in Support of the Verified Petition for (I)*

*Recognition of the Foreign Main Proceeding, (II) Recognition of Foreign Representative,*

*and (III) Related Relief under Chapter 15 of the Bankruptcy Code* (the "Boas

Declaration," ECF Doc. # 5); and (c) the *Supplemental Declaration of Nicole Stephansen*

*in Support of the Verified Petition for (I) Recognition of the Foreign Main Proceeding,*

*(II) Recognition of Foreign Representative, and (III) Related Relief under Chapter 15 of*

---

[2] The Debtors and the last four digits of their foreign identification numbers are NFE Global Holdings Limited (9588) and NFE Brazil Newco Limited (1053). The address of NFE Global Holdings Limited's registered office is Suite 1, 7th Floor, 50 Broadway, London SW1H 0BL, United Kingdom, and the address of NFE Brazil Newco Limited's registered office is Suite 1, 7th Floor, 50 Broadway, London SW1H 0DB, United Kingdom.

*the Bankruptcy Code* (the "Supplemental Stephansen Declaration," ECF Doc. # 17).  On June 19, 2026, the Debtors filed a revised proposed order (the "Proposed Order," ECF Doc. # 18).

No objections were filed.  The Debtors filed a *Certificate of No Objection* (ECF Doc. # 19) on June 22, 2026.

Additionally, in response to the Court's *Order for Production of Expert Report* (ECF Doc. # 22) requesting that "the Foreign Representative shall file on the docket . . . any expert affidavits or reports submitted to the U.K. Court in connection with sanction of the Part 26A Plan regarding recognition of the Part 26A Plan in the Chapter 15 case," the Foreign Representative filed the *Notice of Filing of Expert Opinion* (ECF Doc. # 23). Attached as Exhibit A is the *Expert Opinion of Daniel M. Glosband* (the "Expert Report"), which is "the only expert opinion submitted to the English Court that addresses recognition of the Restructuring Plans in the Chapter 15 Cases."

The Foreign Representative also filed the *Notice of Filing of Relevant Alternative Report* (ECF Doc. # 27).  Attached as Exhibit A is the *Relevant Alternative Report* (the "RAR") prepared by Alvarez and Marsal ("A and M").

For the following reasons, the Court **GRANTED** the Requested Relief and (i) recognized the English Proceedings as "foreign main proceedings"; (ii) recognized the Foreign Representative as the "foreign representative" of the Debtors; (iii) found that the Verified Petition meets the requirements of section 1515 of the Bankruptcy Code; and (iv) recognized the English Court's Sanction Order, giving full force to the Sanction Order and the Restructuring Plans, including the Plan Releases.

### A. General Background

New Fortress Energy Inc. ("NFE" or the "Parent") is the ultimate parent of other direct and indirect subsidiaries (collectively the "Group") including the Debtors, NFE Global Holdings Limited ("NFE Global") and NFE Brazil Newco Limited ("NFE Brazil"). (VP ¶ 15.) The Group is an integrated gas-to-power energy infrastructure company that owns and operates natural gas and liquefied natural gas ("LNG") infrastructure, along with an integrated fleet of ships. (*Id.* ¶ 11.) Additionally, it builds modular LNG manufacturing facilities which can be deployed around the world and used to liquify natural gas. (*Id.*)

The Group's principal business activities are divided among two operating segments: (i) Terminals and Infrastructure and (ii) Ships. (*Id.* ¶ 12.) The Terminals and Infrastructure segment includes the entire production and delivery chain for LNG, spanning natural gas procurement and liquefaction to logistics, facilities, and conversion or development of natural gas-fired power generation. (*Id.*) The Group's Ships segment charters the Group's vessels under long-term or spot (short-term) arrangements with third parties in the LNG logistics industry. (*Id.*) In recent years, the Group has experienced financial headwinds brought on by an unfavorable pricing environment for LNG and significant capital expenditures for projects that have not come online within expected timeframes and budgets. (*Id.* ¶ 1.)

### B. Corporate Structure

The Parent is a Delaware corporation with stock listed on the Nasdaq Global Select Market ("Nasdaq"). (Stephansen Decl. Ex. D ¶ 4.9.) Both Debtors are private companies limited by shares and incorporated under the laws of England and Wales. (VP

¶ 3.)  The registered office of both NFE Global and NFE Brazil is Suite 1, 7th Floor, 50 Broadway, London SW1H 0BL, United Kingdom.  (*Id.* ¶ 16.)

NFE Brazil was formed specifically for the purpose of promoting the restructuring of BrazilCo.  (*Id.*)  In furtherance of that purpose, NFE Brazil became a guarantor in respect of the obligations under the New 2029 Notes (as defined herein) on April 9, 2026.  (*Id.*)  The boards of both Debtors are comprised of four directors, one of whom is the Foreign Representative and a U.K. resident that does not sit on the board of any other Group entity.  (*Id.*)  In addition, the Debtors' books and records are maintained in the U.K., each Debtor maintains a bank account in the U.K., and Vistra Cosec Limited, a U.K. company, serves as the corporate secretary for both Debtors.  (*Id.*)

### C.  Capital Structure

The Debtors have guaranteed external funded debt in a total outstanding principal amount of approximately $5.7 billion.  (Boas Decl. ¶ 9.)  NFE Global is an obligor on intercompany obligations with a total outstanding principal amount of $2.4 billion.  (*Id.*)  All of the below mentioned external funded debt and intercompany obligations (collectively, the "Plan Debt" and the holders of the debt, the "Plan Creditors") is in U.S. dollars and addressed by the Restructuring Plans, outlined below.  (*Id.*)  NFE Brazil is a guarantor on the New 2029 Notes (the "BrazilCo Plan Debt") and NFE Global is a guarantor on all other Plan Debt (the "CoreCo Plan Debt").  (*Id.*)  The following table summarizes the Debtors' external funded debt:

7

| Obligation | Principal Amount Outstanding | Collateral and Priority | Maturity Date |
|---|---|---|---|
| **CoreCo Plan Debt** | | | |
| 2026 Legacy Notes | $510,879,63 | Common Collateral (*Pari passu* first lien claim) | September 30, 2026 |
| 2029 Legacy Notes | $236,728,231 | Common Collateral (*Pari passu* first lien claim) | March 15, 2029 |
| R-1 Revolving Credit Facility | $100,000,000 | Common Collateral<br>FLNG 1 Collateral<br>FLNG 2 Collateral<br>Account Collateral<br>(*Pari passu* first lien claims)<br>Brazil Collateral<br>(*Pari passu* second lien claim) | April 15, 2026 |
| R-2 Revolving Credit Facility | $560,400,000 | Common Collateral<br>FLNG 1 Collateral<br>FLNG 2 Collateral<br>Account Collateral<br>Brazil Collateral<br>(*Pari passu* first lien claim)<br>Brazil Collateral<br>(*Pari passu* second lien claim) | October 15, 2027 |
| Term Loan A | $294,999,563 | Common Collateral<br>FLNG 2 Collateral<br>Account Collateral<br>Brazil Collateral<br>(*Pari passu* first lien claim)<br>Brazil Collateral<br>(*Pari passu* second lien claim) | July 19, 2027 |
| Term Loan B | $1,266,077,800 | Common Collateral<br>FLNG 1 Collateral<br>FLNG 2 Collateral<br>Account Collateral<br>(*Pari passu* first lien claim) | October 30, 2028 |
| **BrazilCo Plan Debt** | | | |
| New 2029 Notes | $2,730,126,770 | Brazil Collateral<br>(*Pari passu* first lien claim) | November 15, 2029 |
| **Total** | $5,699,211,827 | | |

(*Id.*)

## D. The Debtors' U.S. Assets

The Debtors have property in the U.S. in the form of a retainer (the "Retainer")

held in an account maintained in New York by Skadden, Arps, Slate, Meagher & Flom

LLP ("Skadden"). (*Id.* ¶ 20.) Additionally, the Debtors are obligators on U.S. dollar-denominated debt that is governed by New York law, including the instruments related to the Legacy Notes, the Term Loan A Facility, the Term Loan B Facility, the Revolving Credit Facility, the Series I Intercompany Loan Facility, the Series II Intercompany Loan Facility, and the New 2029 Notes. (*Id.*)

### E. Events Leading to the English Proceedings

#### 1. Challenges Facing the Debtors' Business

The Group's liquidity position and ability to generate revenue from projects and customer contracts have been adversely impacted by permitting and construction delays and denials, the early termination of a FEMA contract in Puerto Rico, delays to certain scheduled power auctions in Brazil, fluctuations in natural gas feedstock, increases in cost of construction materials, swings in the shipping and freight markets, and environmental activist opposition. (VP ¶ 31.)

#### 2. The 2024 Refinancing

On November 6, 2024, the Group entered into an exchange and subscription agreement with certain holders of its outstanding 2026 Legacy Notes and 2029 Legacy Notes, which related to a series of transactions intended to extend the maturity profile of the Group's indebtedness and enhance liquidity. (*Id.* ¶ 33.) Pursuant to this agreement, NFE Financing (i) sold approximately $1.21 billion in aggregate principal amount of New 2029 Notes and (ii) issued approximately $1.52 billion in aggregate principal amount of New 2029 Notes in a dollar-for-dollar exchange for a portion of the Group's 2026 Legacy Notes and 2029 Legacy Notes. (*Id.*) The collateral provided in connection with securing the New 2029 Notes consisted of NFE Financing's interest in (i)

9

approximately 45% of the Group's Brazilian business; (ii) proceeds of NFE Financing's interest in the Series II Intercompany Loan Facility; (iii) the Brazilian Intercompany Loan Facility (which in turn is secured by the Brazilian Parent's approximately 55% equity interest in the Group's Brazil business and its interest in the proceeds of the Series I Intercompany Loan Facility); and (iv) land in Wyalusing, Pennsylvania owned by Bradford Partners, guarantor for the New 2029 Notes (the "PA Land"). (*Id.*)  The Group utilized proceeds from the subscription transactions to redeem in full the outstanding aggregate principal amount of such notes. (*Id.*)

> 3.   The Restructuring Support Agreement

In June and July 2025, the Group engaged restructuring professionals, including Skadden and Houlihan Lokey Capital, Inc., to explore possible restructuring transactions. (Boas Decl. ¶ 21.)   In October 2025 the Group's advisors presented the Group's key creditors with the terms of a proposed restructuring that spun off the Group's Brazilian business. (*Id.*)  After lengthy negotiations, on March 17, 2026, the Parent, NFE Global, certain other members of the Group, and members of an ad hoc group of New 2029 Noteholders, certain TLA Lenders, members of an ad hoc group of TLB Lenders, members of an ad hoc group of RCF Lenders, and members of an ad hoc group of 2026 Legacy Noteholders and 2029 Legacy Noteholders (collectively, the "RSA Parties") entered  into the RSA which sets forth the terms of a restructuring of the groups principal funded debt obligations. (*Id.* ¶ 22.)  The RSA was agreed to by 100% of the RCF lenders and TLA lenders and approximately 97% of the TLB lenders, 85% of the 2026 Legacy Noteholders, 87% of the 2029 Legacy Noteholders, and 99% of the new 2029 Noteholders. (*Id.*)  NFE Brazil acceded to the RSA on April 9, 2026. (*Id.*)  Pursuant to

10

the RSA, the RSA Parties have agreed to support the Restructuring Plans and forbear from exercising remedies while the RSA is in effect.  (*Id.*)

### F.  The Restructuring Plans

The Restructuring will (i) reduce the Group's funded debt owed to creditors outside the Group from $5.7 billion to less than $1 billion, (ii) exchange existing debt obligations for a combination of new debt and preferred and common equity (the "Plan Consideration"), and (iii) separate the Group into two independent companies: one company comprising the Group's Brazilian operations and the PA Land ("BrazilCo"), which will be owned by certain of the Group's creditors, and another company comprising the Group's remaining operations ("CoreCo"), which will become 65% owned by the Group's creditors, while existing shareholders retain 35% (pre-dilution from the MIP and the convertible preferred equity being issued as Plan Consideration). (VP ¶ 2.)  The Restructuring Plans will bind all Plan Creditors and release the obligations of the Group under the instruments governing the debt being restructured by the Restructuring Plans.  (*Id.*)

The Debtors seek to effectuate the restructuring plan pursuant to Part 26A of the Companies Act.  (Boas Decl. ¶ 24.)  The key terms of the Restructuring Plans are described below:

11

| Key Terms of the Restructuring Plans | |
| --- | --- |
| Overview | The Restructuring Plans will provide for the following:<br><br>- The Group will separate into two independent companies: (i) New BrazilCo Parent and its direct and indirect subsidiaries ( "BrazilCo Group"), and (ii) NFE and its direct and indirect subsidiaries other than BrazilCo Group (collectively, "CoreCo Group").<br><br>- Obligations under the 2026 Legacy Notes, 2029 Legacy Notes, Term Loan A Agreement, Term Loan B Agreement, Revolving Credit Facility Agreement, New 2029 Notes, and Intercompany Credit Agreements will be exchanged (in each case on a ratable basis), as applicable, for BrazilCo Common Equity, New CoreCo Term Loans, CoreCo Preferred Stock, CoreCo Common Stock, the FLNG 2 Term Loans, and/or the FLNG 2 Preferred Equity.<br><br>- NFE, as borrower, and each other CoreCo Group entity, as a guarantor shall enter into a senior secured, first-priority term loan credit facility for CoreCo Group in accordance with the New CoreCo Credit Facility Term Sheet. All letters of credit issued under the existing Letter of Credit Facility or Revolving Credit Facility will be backstopped, rolled into, or replaced by letters of credit issued under separate new fully committed letter of credit facilities for each of CoreCo Group and BrazilCo Group (or, in the case of CoreCo Group, remain outstanding under an amended, amended and restated, or otherwise modified Letter of Credit Facility Agreement).<br><br>- BrazilCo Group shall enter into one or more financing arrangements to provide liquidity for New BrazilCo on or prior to the date on which the conditions precedent to the Restructuring are satisfied or duly waived and the Restructuring has been fully implemented (the "Restructuring Effective Date"). Local Brazilian Debt Facilities shall, at the election of the Company Parties and with the consent of the majority of the ad hoc group of certain unaffiliated holders of New 2029 Notes represented by Paul Weiss, Rifkind, Wharton & Garrison LLP and Perella Weinberg Partners LP, be refinanced in full or remain outstanding on their existing terms (subject to the elimination of the NFE corporate guarantee and any other obligations tied to CoreCo).<br><br>- Existing NFE Stockholders shall retain shares of NFE's common stock representing 35 percent of the CoreCo Common Stock issued and outstanding as of the Restructuring Effective Date, immediately before giving effect to the CoreCo MIP or any conversion of the CoreCo Preferred Stock into CoreCo Common Stock. |

| Plan Consideration | Pursuant to the Restructuring Plans, the Plan Creditors will release their existing Plan Debt claims against the Group in return for Plan Consideration as set forth below. | |
|---|---|---|
| | Legacy Notes | CoreCo Common Stock CoreCo Preferred Stock |
| | New 2029 Notes | BrazilCo Common Equity |
| | Series I Intercompany Loan Facility | CoreCo Common Stock CoreCo Preferred Stock |
| | Series II Intercompany Loan Facility | CoreCo Common Stock CoreCo Preferred Stock |
| | R-1 Revolving Credit Facility | CoreCo Common Stock CoreCo Preferred Stock New CoreCo Term Loans FLNG 2 Term Loans FLNG 2 Preferred Equity |
| | R-2 Revolving Credit Facility | CoreCo Common Stock CoreCo Preferred Stock New CoreCo Term Loans FLNG 2 Term Loans FLNG 2 Preferred Equity RCF-2 / TLA BrazilCo Equity Pool |
| | Term Loan A | CoreCo Common Stock CoreCo Preferred Stock New CoreCo Term Loans FLNG 2 Term Loans FLNG 2 Preferred Equity RCF-2 / TLA BrazilCo Equity Pool |
| | Term Loan B | CoreCo Common Stock CoreCo Preferred Stock New CoreCo Term Loans FLNG 2 Term Loans FLNG 2 Preferred Equity |
| Certain Shareholder Approvals | The Company shall, in accordance with the Restructuring Milestones and the other provisions of the RSA, obtain the approval of holders of a majority of its existing common stock to, among such other matters as the Company and the Majority Supporting Creditors may determine advisable, (a) issue greater than 20% of its existing common stock, (b) amend its organizational documents to, among other things, authorize additional shares of common stock, (c) grant NFE's board of directors authority to effect a reverse stock split, and (d) approve the issuance of shares in respect of the CoreCo MIP, in each case, as required by applicable securities laws and exchange rules. | |
| Releases | The Restructuring Plans and the Transaction Implementation Deed provide for the Plan Releases. With effect on and from the Restructuring Effective Date, each "Plan Party" (defined as each of the Plan Companies, each Undertaking Party6 and each Plan Creditor) irrevocably, unconditionally, fully and absolutely waives, releases and forever discharges (i) any and all actions, proceedings, claims, damages, counterclaims, complaints, liabilities, liens, rights, demands and set-offs against each Released Party, whether | |

present or future, prospective or contingent, of whatsoever nature and howsoever arising, whether in law or in equity, in contract (including, but not limited to, breaches or non-performance of contract), in statute or in tort (including, but not limited to, negligence and misrepresentation) or in any other manner whatsoever, breaches of statutory duty, for contribution, or for interest and/or costs and/or disbursements, whether or not for a fixed or unliquidated amount, whether filed or unfiled, whether asserted or unasserted, whether or not presently known to the parties or to the law, in each case, that it ever had, may have or hereafter can, shall or may have, arising out of actions, omissions or circumstances on or prior to the Restructuring Effective Date against each and any Released Party (as defined below) whatsoever or howsoever arising (and notwithstanding any subsequent facts or information becoming known following the Restructuring Effective Date), in relation to or arising directly or indirectly out of or in connection with (a) the negotiation, preparation, sanction or implementation of the Plans and/or the Restructuring or (b) the Plan Claims (including the negotiation, preparation, sanction, execution or implementation of any Implementation Documents); and (ii) all rights, title and interest it has in the Plan Claims, and all Liabilities owed by a Group Company to any Plan Party in relation to such Plan Claims.

- Released parties (the "Released Parties" each individually a "Released Party") include: (a) each of the Plan Companies and each member of the Group, and their respective direct and indirect subsidiaries from time to time; (b) the Plan Creditors party to or bound by the Plans and each Nominee (as applicable); (c) each Undertaking Party; (d) the Released Advisors,8 each Advisor Released Person,9 and any person acting on the instructions of the foregoing in connection with the Plans or the Restructuring; (e) each Affiliate of the persons listed in (a)-(d) above; and (f) each of the respective officers, directors, employees, partners, executives and agents of the persons listed in (a)- (e) above.

- The Plan Releases are subject to customary carve-outs, including for: (i) the Excluded Liabilities (as defined below); (ii) rights arising under or in connection with the Implementation Documents; and (iii) claims which may arise or accrue in relation to acts, omissions or circumstances occurring after the Restructuring Effective Date.

- Excluded liabilities ("Excluded Liabilities") include liabilities: (i) arising from criminal acts, fraud, gross negligence or willful misconduct, as determined by a judgment issued by a court of competent jurisdiction; (ii) arising from a Released Advisor's duty of care to its client; (iii) of accounting, restructuring, or tax advisors subject to reliance letters; (iv) of outstanding professional advisor fees and costs properly incurred in connection with the Restructuring; (v) created by the Implementation Documents, the Restructuring Plans, or ancillary documents; (vi) indemnity or reimbursement obligations owed by lenders to their respective agents under the relevant facility agreements; (vii) in the case of a Group Company, liabilities of directors or Group Advisors arising from

14

|  | negligence, default, or breach of duty, or that would be available upon the insolvency of such Group Company; and (viii) of one Group Company to another Group Company that is expressly not released under the terms of the Separation Agreement or any other Implementation Document. |
|  | - Each Plan Party also undertakes not to commence or continue any proceedings against any Released Party in respect of the released claims. Pursuant to the Restructuring Plans, NFE Global Holdings Limited shall, on behalf of itself and the CoreCo Plan Creditors, and NFE Brazil Newco Limited shall, on behalf of itself and the BrazilCo Plan Creditors, enter into the releases on the terms set out in the Transaction Implementation Deed. |

(*Id.* ¶ 23.)

## G. The English Proceedings

On March 24, 2026 and April 10, 2026, respectively, NFE Global and NFE Brazil each formally commenced the English Proceedings.  (VP ¶ 37.)  On April 17, 2026, the board of directors of each of the Debtors adopted resolutions appointing Christopher Boas as the Foreign Representative.  (*Id.* ¶ 47.)  The convening hearing in respect of the Restructuring Plans (the "Convening Hearing") was held on May 14, 2026.  (*Id.*)

While certain creditors had previously threatened to object to the Restructuring Plan and make a disclosure application at the Convening Hearing, at the Convening Hearing they did not pursue either an objection or disclosure application.  (*Id.* ¶ 41.)  On May 14, 2026, the English Court made an order (the "Convening Order"), among other things, confirming the Foreign Representative's appointment, convening meetings of Plan Creditors to consider approval of the Restructuring Plans (the "Plan Meetings"), and scheduling a hearing to consider sanctioning of the Restructuring Plans for June 18, 2026 (the "Sanction Hearing").  (*Id.* ¶ 3.)  In accordance with the terms of the Convening Order, the Debtors made available to all Plan Creditors a notice of the Plan Meetings and

15

the Explanatory Statement on the Information Agent's website, and notices of the same were distributed to Plan Creditors.  (*Id.* ¶ 42.)

At the Sanction Hearing, the Debtors walked the English Court through the Plan Releases and the English Court considered whether they were appropriate.  (Supp. Stephansen Decl. ¶ 10.)  No Plan Creditor appeared to object to the Plan Releases or otherwise oppose sanction of the Restructuring Plans.  (*Id.*)  The English Court sanctioned the Restructuring Plans including the Plan Releases as proposed.  (*Id.*)

### H.  The Relevant Alternative Report

The Foreign Representative filed the Relevant Alternative Report prepared by A and M outlining the projected recovery under the relevant alternative (the "RA") to obtaining chapter 15 recognition in this Court.  (RAR at 14.)  A and M indicates that under the RA, CoreCo would file for chapter 11 whereas BrazilCo would not and that business units ("BUs") are assumed to be sold via merger and acquisition transactions to maximize value.  (*Id.*)  A and M compared creditor recovery under the Restructuring Plans (RPs) against the RA, as outlined below:

| Plan 1 CoreCo – RA vs. RP | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| $m | LCF | RCF1 | RCF2 | TLA | TLB | 26s | 29s | S1 | S2 |
| RA | 85 | 57 | 342 | 102 | 687 | 68 | 32 | 157 | 231 |
| RP | Excl. | 91 | 561 | 184 | 1,109 | 137 | 65 | 320 | 471 |
| Variance | Excl. | 34 | 219 | 82 | 422 | 70 | 33 | 163 | 240 |
| RA | 57% | 54% | 57% | 32% | 50% | 13% | 13% | 13% | 13% |
| RP | Excl. | 86% | 94% | 58% | 81% | 26% | 26% | 26% | 26% |
| Variance | Excl. | 32% | 37% | 26% | 31% | 13% | 13% | 13% | 13% |

16

| Plan 2 BrazilCo – RA vs. RP | |
|---|---|
| $m | New 29s |
| RA | 593 |
| RP | 1,177 |
| Variance | 584 |
| RA | 18% |
| RP | 35% |
| Variance | 18% |

(RAR at 16.)  All Plan Creditors receive a better outcome under each Restructuring Plan compared to the RA.  (*Id.*)

## I.  Plan Voting

The Debtors held Plan Meetings on June 15, 2026 and the Restructuring Plans were approved with nearly unanimous consent, with unanimous votes in favor obtained in six out of the seven classes.  (Supp. Stephansen Decl. ¶ 8.)  The remaining class received a near-unanimous 99.84% vote in favor.  (*Id.*)  Only one Plan Creditor (holding less than 0.1% of the total Plan Debt) voted against one of the Restructuring Plans.  (*Id.*) The turnout in each class was very high (99% to 100% by value across all classes, save for a single class where the turnout was 89.69% by value).  (*Id.*)  See below:

| Class | % turnout (by value) | % voting in favor (of those who cast a vote, by value) |
|---|---|---|
| CoreCo Plan | | |
| R-1 Lenders | 100% | 100% |
| R-2 Lenders | 99.89% | 100% |
| TLB Lenders | 99.89% | 100% |

| TLA Lenders | 100% | 100% |
|---|---|---|
| Legacy Noteholders | 89.69% | 99.89% |
| Series I and II Lenders | 100% | 100% |
| **BrazilCo Plan** | | |
| 2029 New Noteholders | 99.67% | 100% |

(*Id.*)

The Plan Creditors were afforded extensive notice of, and multiple opportunities to review, consider, and object to, the Restructuring Plans and the Plan Releases. (*Id.* ¶ 9.) In particular, Plan Creditors were entitled to be heard with respect to the Restructuring Plans at both the Convening Hearing and the Sanction Hearing. (*Id.*) Plan Creditors received formal notice of the Plan Releases through multiple documents and proceedings and were provided with contact information for the Information Agent and the Debtors' advisors to direct any questions regarding the Restructuring Plans, including the Plan Releases. (*Id.* ¶ 10.) These materials and proceedings include the RSA, the Convening Hearing, the Explanatory Statement which serves a function comparable to that of a disclosure statement required under section 1125 of the Bankruptcy Code, the Plan Meetings, and the Sanction Hearing. (*Id.*) Further, the Restructuring is the result of a months-long, hard fought negotiation between the Debtors and the Plan Creditors, with creditors organizing into groups and retaining sophisticated advisors before ultimately accepting the terms of Plan Releases. (*Id.* ¶ 13.) The Foreign Representative characterizes the supporting creditors (the "Supporting Creditors") subject to the Plan Releases as "sophisticated investors who have had ample notice and opportunity to

18

review and understand the terms of the Restructuring Plans, including the Plan Releases,
and who have independently determined to support the Restructuring." (*Id.* ¶ 15.)

## II.    LEGAL ARGUMENT

Recognition of the English Proceedings in these chapter 15 Cases is a condition
precedent to the effectiveness of the Restructuring, and failure to obtain an order
approving recognition is a termination event under the RSA. (VP ¶ 46.) The Foreign
Representative commenced these chapter 15 cases to obtain recognition of the English
Proceedings and to give full force and effect to the Sanction Order and the Restructuring
Plans, including the Plan Releases. (*Id.* ¶ 49.) The Foreign Representative argues that
the Debtors satisfy the requirements, outlined below.

### A.    The Debtors Meet the General Eligibility Requirements of Section 109(a) of the Bankruptcy Code

The Foreign Representative notes that the Debtors have an interest in funds
deposited with Skadden as a retainer for services held in a client trust account in New
York. (*Id.* ¶ 55.) Furthermore, the Debtors are obligors on U.S. dollar denominated debt,
governed by New York law and containing New York law forum selection clauses. (*Id.*)
The retainer and the New York law-governed indebtedness are independent bases for
jurisdiction and satisfy the "property" requirement of section 109(a) of the Bankruptcy
Code. (*Id.*)

### B.    The Requirements of Section 1517(a) of the Bankruptcy Code are Satisfied

1. The English Proceedings are foreign main proceedings or, in the alternative, foreign nonmain proceedings, within the meaning of Section 1502 of the Bankruptcy Code.

The Foreign Representative argues that the English Proceedings meet the
definition of "foreign proceedings" because (i) the Debtors commenced the English

19

Proceedings pursuant to Part 26A of the Companies Act, (ii) the English Proceedings are being overseen by the English Court in England and are being conducted pursuant to laws relating to insolvency or the adjustment of debts, (iii) the English Proceedings are collective in nature as they take into account the rights of all Plan Creditors, and (iv) the English Proceedings will facilitate the Restructuring of the Debtors as the implementation of the Restructuring Plans will address the Group's liquidity and operational challenges, while providing runway for the Group's portfolio of development projects and opportunities that are expected to generate significant revenue and liquidity in the future. (Boas Decl. ¶ 29.)

The Foreign Representative argues that because the Debtors' registered office is in England, there is a presumption that England is the COMI for the Debtors. Additional factors supporting the COMI analysis include: the Debtors are private companies limited by shares incorporated under the laws of England and Wales; the Debtors' books and records are maintained in England; each Debtor maintains bank accounts in England; a U.K. company (Vistra Cosec Limited) serves as the corporate secretary for both Debtors; and the Foreign Representative is an English citizen and resident and serves as a director of both Debtors. (*Id.* ¶ 31.)

Creditor expectation is also considered when making a COMI determination. (*Id.* ¶ 32.) The Debtors' COMI in England has been consistently ascertainable to third parties, and Plan creditors have supported the Restructuring Plans with 97% of the holders of the groups funded debt signing the RSA. (*Id.*) The Plan Creditors were aware they were entering into a restructuring with U.K. incorporated Debtors that would propose the restructuring plans in England, and that English law governed several key

20

agreements. (*Id.* ¶¶ 33-34.) The English Court held a Convening hearing and Sanction Hearing and has exclusive jurisdiction to hear and determine any proceeding and to settle any dispute in connection with the Restructuring Plans. (*Id.* ¶ 38.)

The Debtors engaged a U.K. based information agent located in London named Kroll Issuer Services Limited to serve as the information agent for the English Proceedings (the "Information Agent"). (*Id.* ¶ 40.) The Information Agent is responsible for communicating with plan creditors, distributing restructuring documentation, and fielding queries from plan creditors.

The Foreign Representative argues that because Recognition is a condition precedent to the effectiveness of the RSA, failure to recognize the English Proceedings would (i) jeopardize the overall transaction contemplated by the RSA (ii) lead to an alternative that destroys value (iii) upset creditor expectations and (iv) undermine these highly consensual restructuring transactions designed to de lever the group and facilitate corporate renewal. (*Id.* ¶ 41.)

The Foreign Representative argues in the alternative that the English Proceedings are considered foreign nonmain proceedings. (*Id.* ¶ 42.)

> 2. <u>The Chapter 15 Cases were commenced by a duly authorized foreign representative</u>

The Foreign Representative in this case is an individual who has been duly appointed by each of the Debtors' governing bodies to act as the foreign representative on behalf of the Debtors in connection with the English Proceedings and, pursuant to the Convening Order, the Foreign Representative was recognized as such by the English Court. (VP ¶ 90.) Accordingly, the Foreign Representative argues that he is a "foreign representative" within the meaning of section 101(24) of the Bankruptcy Code. (*Id.*)

21

**C. Enforcement of the Restructuring Plans, Including the Plan Releases, and the Sanction Order is Proper**

The Foreign Representative argues that recognition of the English Proceedings, enforcement of the Restructuring Plans (including the Plan Releases) and Sanction Order, and the issuance of an injunction enforcing the terms thereof in the United States is necessary to ensure that the Restructuring Plans, which have the support of the vast majority of the Plan Creditors, can be implemented without disruption or adverse actions being brought within this Court's jurisdiction. (Boas Decl. ¶ 47.) Otherwise, certain Plan Creditors could thwart the purpose of the Restructuring by commencing action in the United States for issues that have already been litigated. (*Id.* ¶ 48.)

The Foreign Representative states that the implementation of the Restructuring Plans will result in the Plan Creditors receiving the Plan Consideration, which is preferable to liquidation because liquidation would likely result in a substantially lower return to Plan Creditors as compared to the Plan Consideration. (*Id.* ¶ 49.) The Restructuring Plans will result in the same compromise or arrangement between the Debtors and each Plan Creditor as other similarly situated Plan Creditors. (*Id.*)

As to the Plan Releases, the Foreign Representative argues that they are more narrowly tailored than releases approved in other chapter 15 cases. (*Id.* ¶ 51.) The Plan Releases comprise only (i) an exculpation of acts taken in connection with the negotiation, preparation, sanction or implementation of the Restructuring Plans and/or the Restructuring and (ii) releases of Group entities and related parties from claims arising from or related to the Plan Debt. (*Id.*) Such releases are also subject to customary carve-outs, including for: (i) the Excluded Liabilities; (ii) rights arising under the Implementation Documents; and (iii) claims which may arise or accrue in relation to acts,

22

omissions or circumstances occurring after the Restructuring Effective Date.  (*Id.*)  The

Foreign Representative argues the Plan Releases are "necessary and fundamental" to the

Restructuring Plans because they provide a mechanism for the Plan Creditors to release

their claims against the Parent, the Debtors, and the other Released Parties in exchange

for the Plan Creditors receiving their Plan Consideration.  (*Id.* ¶ 52.)

### III.   <u>LEGAL STANDARD: FOREIGN PROCEEDING RECOGNITION</u>

#### A.  Eligibility to File under Chapter 15

"Foreign debtors seeking relief under chapter 15 must satisfy the debtor eligibility

requirements set forth in section 109(a) of the Bankruptcy Code."  *In re Servicos de*

*Petroleo Constellation S.A.*, 600 B.R. 237, 268 (Bankr. S.D.N.Y. 2019).  Section 109(a)

provides that "only a person that resides or has a domicile, a place of business, or

property in the United States, or a municipality, may be a debtor" under the Code.  11

U.S.C. § 109(a).  Where a foreign debtor does not have a place of business in the United

States, the question often arises whether the foreign debtor has "property in the United

States" as a condition precedent to eligibility under section 1517.  *See In re Cell C*

*Proprietary Ltd.*, 571 B.R. 542, 550–52 (Bankr. S.D.N.Y. July 27, 2017).  Section 109(a)

does not address how much property must be present or when or how long property must

have a situs in the United States.  As this Court explained in *In re U.S. Steel Canada Inc.*,

571 B.R. 600 (Bankr. S.D.N.Y. July 31, 2017):

> Some courts, including this one, have held that an undrawn retainer in a
> United States bank account qualifies as property in satisfaction of section
> 109(a).  *See, e.g.*, *In re Octaviar Admin. Pty Ltd.*, 511 B.R. 361, 372–73
> (Bankr. S.D.N.Y. 2014) ("There is a line of authority that supports the fact
> that prepetition deposits or retainers can supply 'property' sufficient to
> make a foreign debtor eligible to file in the United States.") (citing *In re
> Cenargo Int'l PLC*, 294 B.R. 571, 603 (Bankr. S.D.N.Y. 2003)); *see also In
> re Berau Capital Resources Pte Ltd.*, 540 B.R. 80, 82 (Bankr. S.D.N.Y.

2015) ("The Court is satisfied that the retainer provides a sufficient basis for eligibility in this case."); *In re Global Ocean Carriers Ltd.*, 251 B.R. 31, 39 (Bankr. D. Del. 2000) (holding that a $400,000 retainer paid on behalf of the debtors to bankruptcy counsel in that case qualifies as sufficient property in the United States under section 109(a)).

Further, "[c]ontracts create property rights for the parties to the contract. A debtor's contract rights are intangible property of the debtor." *Berau Capital*, 540 B.R. at 83 (citing *U.S. Bank N.A. v. Am. Airlines, Inc.*, 485 B.R. 279, 295 (Bankr. S.D.N.Y. 2013), *aff'd*, 730 F.3d 88 (2d Cir. 2013)). Those property rights can be and typically are tied to the location of the governing law of the contract. *See id.* at 84 (holding that the situs of intangible property rights governed by New York law was New York). Accordingly, debt subject to a New York governing law clause and a New York forum selection clause constitutes property in the United States. *See In re Inversora Eléctrica de Buenos Aires S.A.*, 560 B.R. 650, 655 (Bankr. S.D.N.Y. 2016) ("[D]ollar-denominated debt subject to New York governing law and a New York forum selection clause is independently sufficient to form the basis for jurisdiction.") (citation omitted); *Berau Capital*, 540 B.R. at 84 ("The Court concludes that the presence of the New York choice of law and forum selection clauses in the Berau indenture satisfies the section 109(a) 'property in the United States' eligibility requirement.") (footnote omitted).

*Id*. at 610; *see also Servicos de Petroleo Constellation S.A.*, 600 B.R.at 269 ("This Court has previously held that a debtor's contract rights, including rights pursuant to debt that is governed by New York law and contains a forum-selection clause, constitute intangible property of the debtor in New York for purposes of section 109(a)."); *Berau Capital*, 540 B.R. at 84 ("The Court concludes that the presence of the New York choice of law and forum-selection clauses in the *Berau* indenture satisfies the section 109(a) 'property in the United States' eligibility requirement."); *In re Suntech Power Holdings Co.*, 520 B.R. 399, 412-13 (Bankr. S.D.N.Y. 2014) (concluding that establishment of a bank account in New York prior to commencement of the chapter 15 proceeding was sufficient to satisfy section 109(a)); *In re Paper I Partners, L.P.*, 283 B.R. 661, 674 (Bankr. S.D.N.Y. 2002) (finding that debtors' maintenance of original business documents in the United States constituted "property in the United States" under section 109); *Wallach v. Nowak (In re*

24

*Sherlock Homes of W.N.Y., Inc.)*, 246 B.R. 19, 23-24 (Bankr. W.D.N.Y. 2000) (stating that listing contracts between the debtor/broker dealer and prospective sellers bestowed contractual rights upon the parties and the contract rights were assets of the debtor); *Slater v. Town of Albion (In re Albion Disposal, Inc.)*, 217 B.R. 394, 407-08 (W.D.N.Y. 1997) (noting that "it is well-established . . . that a debtor's contractual rights—including rights arising under post-petition contracts—are included in the property of the estate").

### B. Proper Venue for Chapter 15

28 U.S.C. § 1410 governs venue for cases under chapter 15, and provides that chapter 15 proceedings may be

> commenced in the district court of the United States for the district—(1) in which the debtor has its principal place of business or principal assets in the United States; (2) if the debtor does not have a place of business or assets in the United States, in which there is pending against the debtor an action or proceeding in a Federal or State court; or (3) in a case other than those specified in paragraph (1) or (2), in which venue will be consistent with the interests of justice and the convenience of the parties, having regard to the relief sought by the foreign representative.

28 U.S.C. § 1410.  Section 1410 establishes a "hierarchy of choices."  1 ALAN N. RESNICK & HENRY J. SOMMER, COLLIER ON BANKRUPTCY ¶ 4.04[1] (16th ed. 2014) ("Collier") (quoting H.R. REP. NO. 109–31, at 119 (2005)).  "If the debtor maintains its principal place of business or principal assets in the United States in a particular district, venue must be placed in that district; if not, we turn to subparagraph two.  If there is no litigation pending against the debtor in a district, subparagraph three then applies." *Suntech Power Holdings*, 520 B.R. at 414.

### C. Recognition of a Foreign Proceeding under Section 1517

In seeking recognition of a foreign proceeding under 11 U.S.C. § 1517, a party must make a showing that:

(1) The foreign proceeding constitutes a foreign proceeding (either main or nonmain) as are defined under section 1502;
(2) The foreign representative applying for recognition is a person or body; and
(3) the petition meets the requirements of section 1515.

11 U.S.C. § 1517(a)(2)-(3).

1. 1517(a)(1): Foreign Main Proceeding Recognition

Section 1517(a) distinguishes between "foreign main" and "foreign nonmain" proceedings. Section 1517(b) establishes conditions for recognition of each. In relevant part, section 1517(b)(1) states that a foreign proceeding shall be recognized "as a foreign main proceeding if it is pending in the country where the debtor has the center of its main interests." 11 U.S.C. § 1517(b)(1).

a. "Foreign Proceeding"

Section 101(23) defines a "foreign proceeding" as:

[A] collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

11 U.S.C. § 101(23).

Based on this definition, courts have held that a "foreign proceeding" requires:

(i) [the existence of] a proceeding;
(ii) that is either judicial or administrative;
(iii) that is collective in nature;
(iv) that is in a foreign country;
(v) that is authorized or conducted under a law related to insolvency or the adjustment of debts;
(vi) in which the debtor's assets and affairs are subject to the control or supervision of a foreign court; and
(vii) which proceeding is for the purpose of reorganization or liquidation.

26

*See Armada (Singapore) Pte Ltd. v. Shah* (*In re Ashapura Minechem Ltd.*), 480 B.R. 129,

136 (S.D.N.Y. 2012) (*citing In re Betcorp Ltd.*, 400 B.R. 266, 277 (Bankr. D. Nev.

2009)); *see also In re Overnight & Control Com'n of Avánzit, S.A.*, 385 B.R. 525, 532–36

(Bankr. S.D.N.Y 2008) (discussing factors).

### b.   *Center of Main Interest ("COMI")*

While not defined by the Bankruptcy Code, the Code does presume "the debtor's

registered office . . . to be the [debtor's COMI]." *Id.* § 1516(c); *see also In re Bear*

*Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 130

(Bankr. S.D.N.Y. 2007), *aff'd,* 389 B.R. 325 (S.D.N.Y. 2008).  The presumption can be

overcome when making this determination.  *See, e.g.*, *id.* (stating that "the COMI

presumption may be overcome particularly in the case of a 'letterbox' company not

carrying out any business" in the country where its registered office is located) (internal

citation omitted).  A debtor's COMI is determined based on the location of the debtor at

the time of *filing* of the chapter 15 petition, not the historic operational activity of the

debtor.  *Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127,

137 (2d Cir. 2013).

In order to determine if the registered office presumption has been overcome,

courts within this district have applied a list of non-exclusive factors (the "*SPhinX*

factors") to determine a debtor's COMI.  Those factors are: (i) the location of the debtor's

headquarters; (ii) the location of those who actually manage the debtor; (iii) the location

of the debtor's primary assets; (iv) the location of the majority of the debtor's creditors or

a majority of the creditors who would be affected by the case; and (v) the jurisdiction

whose law would apply to most disputes.  *In re Fairfield Sentry Ltd.*, 714 F.3d at 137

27

(citing *In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006)).  The Court in

*SPhinX*, however, was clear to say that the factors should not be applied "mechanically":

rather, "they should be viewed in light of chapter 15's emphasis on protecting the

reasonable interests of parties in interest pursuant to fair procedures and the maximization

of the debtor's value."  *SphinX*, 351 B.R. at 117.

When determining the "location of those who actually manage the debtor," courts

consider more than the location of the board of directors of the debtor in isolation, and

their analysis of the location of management is somewhat flexible to reflect the realities

of the management of a particular business.  For example,

> The headquarters of a corporate entity is more than the location of its board
> of directors.  The term headquarters, or head office, contemplates the place
> where the primary management of an entity's business is undertaken.
> Management of a corporate entity includes all relevant business functions,
> such as the financial, administrative, marketing, information technology,
> investment, and legal functions.  Other functions may be relevant depending
> on the nature of the debtor's business.  Here, because [the debtor] operated
> as an insurance company, actuarial tasks, underwriting, and claims
> adjustment should be considered.

*In re British Am. Ins. Co. Ltd.*, 425 B.R. 884, 911 (Bankr. S.D. Fla. 2010).

In addition to these factors, courts can also examine what the reasonable

expectation of third parties and creditors, and whether there is any "objective evidence

that could provide interested parties with notice that a debtor's COMI was in a particular

jurisdiction other than the place of its registered office."  *In re Olinda Star Ltd.*, 614 B.R.

28, 44 (Bankr. S.D.N.Y. 2020) (citing *Servicos de Petroleo Constellation*, 600 B.R. at

274).  While creditor support can also be considered, it "only goes so far . . . the

bankruptcy court still has the duty to make its own COMI determination."  *In re Sunac*

*China Holdings Ltd.*, 656 B.R. 715, 733 (Bankr. S.D.N.Y. 2024); *see also In re Suntech*

28

*Power Holdings Co., Ltd.*, 520 B.R. 399, 420 (Bankr. S.D.N.Y. 2014) (finding a COMI despite creditor objections).

### 2. Foreign Nonmain Proceeding

If the requirements for a foreign main proceeding are not met, a foreign proceeding can still be recognized as a nonmain proceeding if the debtor has an "establishment" in the country, defined as "any place of operations where the debtor carries out a nontransitory economic activity." 11 U.S.C. § 1502. This requires a showing that the location constitutes "a seat for local business activity of the debtor . . . more than mere incorporation and record-keeping and more than just the maintenance of property." *In re Creative Fin. Ltd.*, 543 B.R. 498, 520 (Bankr. S.D.N.Y. 2016) (quoting *In re Bear Stearns*, 374 B.R. at 131).

### 3. 1517(a)(2): Foreign Representative Recognition

The term "foreign representative" is defined in section 101(24) of the Bankruptcy Code as follows:

> [A] person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24).

### 4. 1517(a)(3): Section 1515 Requirements

Per the Bankruptcy Code, an order of recognition shall be entered if the foreign representative meets the requirements of section 1515 in applying for recognition. 11 U.S.C. § 1517(a)(2)–(3). The requirements provided by section 1515 include presentation of:

29

(1) a certified copy of the decision commencing the foreign proceeding and appointing the foreign representative;
(2) a certificate from the foreign court affirming the existence of the proceeding and appointment of the representative; or
(3) in the absence of (1) or (2), evidence which the court deems sufficient to confirm the existence of the foreign proceeding and appointment of the foreign representative.

*Id.* § 1515(b). The petition must also be accompanied by a statement identifying all known foreign proceedings with respect to the debtor, *id.* § 1515(c), and if applicable, a translation of the evidentiary materials into English, *id.* § 1515(d). The Court is entitled to presume the authenticity of such documents filed in connection with a chapter 15 petition. *Id.* § 1516(b).

### D.  Automatic Relief Under Section 1520

Section 1520(a) of the Bankruptcy Code sets forth a series of statutory protections that automatically result from the recognition of a foreign main proceeding, including the application of the protection afforded by the automatic stay under section 362(a) of the Bankruptcy Code to the Debtor and its property located within the territorial jurisdiction of the United States. *See* 11 U.S.C. § 1520(a).

### E.  Application of Section 1521 Stay to Debtor and Non-Debtors

There is not a reciprocal automatic stay placed on non-debtors in interest. Courts may grant relief under section 1521 of the Bankruptcy Code, which allows a court to grant a foreign representative "any appropriate relief" where necessary to effectuate the purpose of chapter 15 and to protect the debtor's assets or creditors' interests. 11 U.S.C. § 1521. This includes section 1521(a)(7), which allows a court to "grant[] any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a)." *Id.* Courts have in turn utilized section 105(a) of

30

the Bankruptcy Code, which allows for the court to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [title 11]," 11 U.S.C. § 105(a), to apply the stay to third parties when "a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate." *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287 (2d Cir. 2003).

### F.  Section 1522(a) May Limit Relief Available Under Section 1521

In granting relief under section 1521, the court must also adhere to section 1522(a), which permits the Court to grant relief only if the interests of creditors are "sufficiently protected."  "Sufficient protection" embodies "three basic principles: 'the just treatment of all holders of claims against the bankruptcy estate, the protection of U.S. claimants against prejudice and inconvenience in the processing of claims in the [foreign] proceeding, and the distribution of proceeds of the [foreign] estate substantially in accordance with the order prescribed by U.S. law.'" *In re Odebrecht Engenharia e Construcao S.A. - Em Recuperacao Jud.*, 669 B.R. 457, 474 (Bankr. S.D.N.Y. 2025) (citing *In re Atlas Shipping A/S*, 404 B.R. 726, 741 (Bankr. S.D.N.Y. 2009)); *see also In re Asbestos Corp. Ltd.*, 674 B.R. 855, 874–76(Bankr. S.D.N.Y. 2025).

Section 1522(a) is particularly relevant in cases in which a foreign sanctioned plan allegedly discriminates as to some creditors.  For example, in *In re Mega Newco Ltd.,* No. 24-1203 (MEW), 2025 WL 601463, * 1 (Bankr. S.D.N.Y. Feb. 24, 2025), in concluding that the U.K. Scheme of Arrangement that modified the New York law-governed debt of the newly-created English affiliate of a Mexican company should be recognized and enforced in a chapter 15 case, my colleague, Judge Michael Wiles explained:

31

Clearly, the structure before me could be used in another case as a way of frustrating and thwarting the legitimate expectations of creditors. This case, however, involves no such frustration or thwarting of creditor rights. Mega Newco was formed, and the English Scheme Proceeding was pursued, for laudable objectives. The Scheme of Arrangement will enable a broader restructuring to be accomplished efficiently and thereby will enhance all parties' recoveries. It will also maximize the value of the underlying businesses. In these respects, the enforcement of the Scheme of Arrangement is fully consistent with the stated purposes of Chapter 15.

In addition, the procedures that the parties have followed were not implemented in any way that took unfair advantage of the holders of the U.S. Notes. The whole process was worked out with the involvement and consent of the affected creditors, and not for the purpose of harming them or of thwarting their expectations. The Noteholders and their Indenture Trustee are aware of the basis on which U.K. jurisdiction has been asserted and have not objected to it. There similarly is not a single objection to the recognition of the U.K. proceeding or the enforcement of the U.K. order.

If COMI manipulation is a matter of concern because of the risk that creditors' rights and expectations might be thwarted, then one of the main factors I ought to consider, in deciding whether such a manipulation has occurred, is whether the affected creditors have asserted any objection. *See In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006) (holding that COMI determinations should not be made "mechanically," that COMI should be assessed "in light of chapter 15's emphasis on protecting the reasonable interests of parties in interest pursuant to fair procedures and the maximization of the debtor's value," that creditors presumably are in the best position to determine whether their own expectations are being thwarted, and therefore that "one generally should defer . . . to the creditors' acquiescence in or support of a proposed COMI"). Ironically, the only thing that would thwart creditor expectations in the case before me would be if I were to decline to enforce the English Court Order. It would be absurd for me to thwart the creditors' constructive desires and expectations in the guise of supposedly protecting them.

Judge Wiles echoed what I had explained earlier in Transcript of Hearing at 21–22 of 25, *In re Codere Fin. 2 (UK) Ltd.*, (No. 20-12151 (MG), ECF Doc. # 13), (Bankr. S.D.N.Y. Oct. 9, 2020), in recognizing and enforcing a U.K. Scheme of Arrangement for a Spanish gaming company that created a new English affiliate to promote the scheme:

In order to obtain relief under Section 1521(a), and as in prior opinions of mine, recognizing and enforcing a scheme of arrangement is quite common under 1521(a) and 1507. But such relief can only be granted "only if the

32

interests of creditors and other interested entities, including the debtor, are sufficiently protected." That's the test set out in Section 1522(a).

On the record here I conclude that the requirement of 1522(a) has been satisfied, and for that reason and the others that I've described I'm going to go ahead and approve recognition of this as a foreign main proceeding and approve the recognition enforcement of the English scheme of arrangement.

I made clear on the record . . . I've only done this in light of what I've described as the lack of objections and overwhelming support, . . . that the interest of creditors and other interested entities are sufficiently protected here. If faced with another case where an entity newly created in the U.K. solely for the purposes of accomplishing a scheme of arrangement, I would view it as essential to review all of the other factors that I've considered here.

I've already addressed the issue about . . . the presumption is that the COMI of this entity is in the U.K., but Collier certainly raises the question whether the Court should look at how a group of companies is managed in order to determine the COMI. That's at 1 Collier, paragraph 13.04.

And so, while the presumption may be established that the COMI of this entity is in the U.K., it doesn't necessarily automatically follow that that should be recognized as the COMI, and I would only note that if the COMI of this entity wasn't in the U.K. I don't think the Court could determine that it—that the U.K. proceeding is a non-main proceeding.

Section 1522(a) has also been applied to bar relief where a foreign plan expressly conflicts with relief under the Bankruptcy Code. In *Jaffe v. Samsung Electronics Co.*, 737 F.3d 14 (4th Cir. 2013), the court addressed a German court-approved plan, consistent with applicable German law, which terminated a patent license granted by the German debtor for a U.S. patent to a U.S. licensee. The German debtor then sought recognition and enforcement of the German plan in the U.S., including the patent license termination, in a chapter 15 case. *Id.* at 19-20. The Fourth Circuit invalidated the license termination, applying sections 1522(a) and 365(n) of the Code. *Id.* at 31. Section 365(n)(1)(B) provides that if a debtor terminates an executory contract that licenses intellectual property, the licensee retains the right to enforce the license (subject to certain

33

limitations).  The court held that U.S. licensee was not sufficiently protected under section 1522(a).  *Id.* at 30.  "The bankruptcy court, however, may only grant discretionary relief under § 1521 if it determines that 'the interest of the creditors and other interested entities, including the debtor, are sufficiently protected."  *Id.* at 24

The point here is that a chapter 15 court, before enforcing provisions of a foreign plan, must carefully scrutinize the plan, and determine whether any foreign plan provisions conflict with applicable provisions of U.S. or state law.  As already stated, no objections were raised in this case, and the Court's scrutiny of the Plans has not found any provisions of the Restructuring Plans that appear problematic.

### G.      Section 1506 Requirements

Any relief that is appropriate under sections 1507, 1517, 1520, or 1521 still must not run afoul of section 1506.  Section 1506 precludes any relief requested under the provisions in chapter 15 that is "manifestly contrary to the public policy of the United States."  11 U.S.C. § 1506.  S*ee, e.g., In re Ephedra Prods. Liab. Litig.*, 349 B.R. 333, 336 (S.D.N.Y. 2006) (stating that the public policy exception embodied in section 1506 should be "narrowly interpreted, as the word 'manifestly' in international usage restricts the public policy exception to the most fundamental policies of the United States") (citing H.R.Rep. No. 109–31(I), at 109, *reprinted in* 2005 U.S.C.C.A.N. 88, 172) (grammatical changes omitted).  The public policy exception should only be invoked "under exceptional circumstances concerning matters of fundamental importance for the United States."  *In re Black Gold S.A.R.L.*, 635 B.R. 517, 528 (B.A.P. 9th Cir. 2022) (collecting cases).  In evaluating this "narrow" exception, courts consider whether the foreign

"insolvency laws or procedural protections for creditors" are "repugnant" to U.S. law, not the "misconduct or bad faith" of petitioners.  *Id.* at 530.

Congress provided courts additional instructions when interpreting the phrase "manifestly" in the context of section 1506, noting "[t]he word 'manifestly' in international usage restricts the public policy exception to the most fundamental policies of the United States," which is the standard meaning ascribed to the term "manifestly" in international law when describing a nation's public policy.  H.R.Rep. No. 109–31(I), at 109, *as reprinted in* 2005 U.S.C.C.A.N. 88, 172; *Ephedra Prods. Liab. Litig.*, 349 B.R. at 336.  Moreover, the official Guide to the Enactment of the Model Law on Cross–Border Insolvency expressly states that

> [t]he purpose of the expression "manifestly," used also in many other international legal texts as a qualifier of the expression "public policy," is to emphasize that public policy exceptions should be interpreted restrictively and that article 6 is only intended to be invoked under exceptional circumstances concerning matters of fundamental importance for the enacting State.

GUIDE TO ENACTMENT OF THE UNCITRAL MODEL LAW ON CROSS–BORDER INSOLVENCY, ¶ 89, U.N. Doc A/CN.9/442 (1997).  The House Judiciary Committee noted that the Guide "should be consulted for guidance as to the meaning and purpose of chapter 15's provisions."  H.R.Rep. No. 109–31(I), at 106 n. 101, *as reprinted in* 2005 U.S.C.C.A.N. 169 n. 101; *see also Ephedra Prods. Liab. Litig.*, 349 B.R. at 336.

In order to determine if foreign proceedings are "manifestly contrary to the public policy of the United States," federal courts have considered whether a foreign proceeding lacked certain common elements of American practice.  *In re ARD Fin., S.A.*, No. 25-12794 (MG), 2026 WL 817458, at *17 (Bankr. S.D.N.Y. Mar. 25, 2026).  "As Judge Rakoff noted in *Ephedra.*, as early as 1895, the Supreme Court held that a foreign

35

judgment should generally be accorded comity if 'its proceedings are according to the course of a civilized jurisprudence,' *i.e.*, fair and impartial." *Id.* at 336 (quoting *Hilton v. Guyot,* 159 U.S. 113, 205-06 (1895)); *see also In re Asbestos Corp. Ltd.*, 2025 WL 3023332, at *7. The Second Circuit reaffirmed this approach in *Ackermann v. Levine*, 788 F.2d 830 (2d Cir. 1986), noting the "narrowness of the public policy exception to enforcement . . . of foreign judgments," adding that, "[a]s Judge Cardozo so lucidly observed: 'We are not so provincial as to say that every solution of a problem is wrong because we deal with it otherwise at home.'" *Ackermann*, 788 F.2d at 842 (quoting *Loucks v. Standard Oil Co. of New York*, 224 N.Y. 99, 111 (1918)).

## IV.    LEGAL STANDARD: PLAN RECOGNITION

### A.  Relief Under Sections 1521 & 1507 of the Code

Courts in this district have previously noted that chapter 15 of the Bankruptcy Code adopted the substance and most of the text of the United Nations Commission on International Trade Law ("*UNCITRAL* ") Model Law on Cross–Border Insolvency and provides a framework for recognizing and giving effect to foreign insolvency proceedings. *Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d at 132; *In re Rede Energia S.A.*, 515 B.R. 69, 89–90 (Bankr. S.D.N.Y. 2014). A central tenet of chapter 15 is the importance of comity in cross-border insolvency proceedings. *In re Cozumel Caribe S.A. de C.V.*, 482 B.R. 96, 114–15 (Bankr.S.D.N.Y.2012). If a foreign case is recognized as a foreign main proceeding, as it was here, certain relief automatically goes into effect pursuant to section 1520, and, under section 1521, a bankruptcy court may grant "any appropriate relief" in order to "effectuate the purpose of

36

this chapter [15] and to protect the assets of the debtor or the interests of the creditors."

11 U.S.C. § 1521(a).

Relief under section 1521(a) is discretionary. "The discretion that is granted is

'exceedingly broad,' since a court may grant 'any appropriate relief' that would further

the purposes of chapter 15 and protect the Debtor's assets and the interests of creditors,"

provided that the interests of creditors and other interested entities are sufficiently

protected. *In re Olinda Star Ltd.*, 614 B.R. at 46 (quoting *In re Atlas Shipping A/S*, 404

B.R. at 740). This Court has held that "sufficient protection" is embodied by three basic

principles: "the just treatment of all holders of claims against the bankruptcy estate, the

protection of U.S. claimants against prejudice and inconvenience in the processing of

claims in the [foreign] proceeding, and the distribution of proceeds of the [foreign] estate

substantially in accordance with the order prescribed by U.S. law." *In re Olinda Star*

*Ltd.*, 614 B.R. at 46 (quoting *In re Atlas Shipping A/S*, 404 B.R. at 740).

The Court may also grant relief under section 1507(a) of the Code in addition to

the types of relief enumerated in section 1521. Section 1507 authorizes the Court to grant

any "additional assistance" available under the Bankruptcy Code or under "other laws of

the United States," provided that such assistance is consistent with the principles of

comity and satisfies the fairness considerations set forth in section 1507(b). *In re Toft*,

453 B.R. 186, 190 (Bankr. S.D.N.Y. 2011). *See also In re Agrokor d.d.*, 591 B.R. 163,

188–89 (Bankr. S.D.N.Y. 2018) (holding that relief under section 1507 may only be

granted when "such assistance is consistent with the principles of comity and satisfies the

fairness considerations set forth in section 1507(b)") (quoting *In re Rede Energia S.A.*,

515 B.R. at 90.

37

Additionally, this Court has repeatedly noted that "[t]he interplay between the relief available under sections 1507 and 1521 is far from clear." *In re Avanti Comm'n Grp. PLC*, 582 B.R. 603, 615–16 (Bankr. S.D.N.Y. 2018). The Fifth Circuit in *Ad Hoc Grp. of Vitro Noteholders v. Vitro SAB De CV (In re Vitro S.A.B. de CV)*, 701 F.3d 1031, 1054 (5th Cir. 2012), instructed courts to

> first consider the specific relief enumerated under § 1521(a) and (b). If the relief is not explicitly provided for there, a court should then consider . . . § 1521's grant of any appropriate relief . . . [which is] relief previously available under Chapter 15's predecessor, § 304. Only if a court determines that the requested relief was not formerly available under § 304 should a court consider whether relief would be appropriate as "additional assistance" under § 1507.

701 F.3d at 1054.

### B. Third Party Releases and Exculpations in Chapter 15

> 1. Third-Party Releases of Affiliate Non-Debtor Guaranties in Chapter 15 Cases Are Enforceable

It is commonplace for Part 26 schemes and Part 26 plans to include releases of affiliate guarantees of the debt that is being restructured. For any creditors that have voted in favor of the plan, the releases are wholly consensual. But for creditors who have voted against the approved plan or who have not voted, the releases are nevertheless effective. If so-called 'ricochet" claims against affiliate guarantors remained possible, the schemes or plans would fail. *See, e.g., In re Avanti Comm'n Group PLC*, 682 B.R. at 615–19; *see also In re Ocean Rig UDW Inc.*, 570 B.R. 687 (Bankr. S.D.N.Y. 2017) (recognizing and enforcing scheme of arrangement that released affiliate guarantees); *In re Towergate Fin. plc*, Case No. 15–10509–SMB (Bankr. S.D.N.Y. Mar. 27, 2015) (ECF Doc. # 16); *In re New World Res. N.V.*, Case No. 14-12226-SMB (Bankr. S.D.N.Y. Sept. 9, 2014) (ECF Doc. # 20); *In re Sino–Forest Corp.*, 501 B.R. 655, 665 (Bankr. S.D.N.Y.

2013) (enforcing foreign plan containing third-party releases); *In re Magyar Telecom B.V.*, Case No. 13-13508-SHL, 2013 WL 10399944 (Bankr. S.D.N.Y. Dec. 11, 2013) (ECF Doc. # 26); *In re Metcalfe & Mansfield Alt. Inv.*, 421 B.R. 685, 696 (Bankr. S.D.N.Y. 2010) (concluding that "principles of enforcement of foreign judgments and comity in chapter 15 cases strongly counsel approval of enforcement in the United States of the third-party non-debtor release and injunction provisions included in the Canadian Orders, even if those provisions could not be entered in a plenary chapter 11 case.")

2.  Exculpation Provisions in Chapter 15 Cases Are Enforceable

"Exculpation provisions are designed to 'insulate court-supervised fiduciaries and some other parties from claims that are based on actions that relate to the restructuring.'" *In re Genesis Glob. HoldCo, LLC*, 660 B.R. 439, 527 (Bankr. S.D.N.Y. 2024) (quoting *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 720 (Bankr. S.D.N.Y. 2019)). Most of the law in this district regarding exculpation clauses has developed in chapter 11 cases but is equally applicable in chapter 15 cases where the issue is whether to enforce exculpation provisions included in plans sanctioned by foreign courts. The plans sanctioned in this case by the U.K. court include exculpation provisions which carve-out from protection acts involving fraud or gross negligence.

"It is well settled that an exculpation clause approved at confirmation may exculpate estate fiduciaries like a committee, its members, and estate professionals for their actions in the bankruptcy case except where those actions amount to willful misconduct or gross negligence." *In re LATAM Airlines Grp. S.A.*, No. 20-11254 (JLG), 2022 WL 2206829, at *50 (Bankr. S.D.N.Y. June 18, 2022) (citations omitted). Such provisions in chapter 11 plans are "not uncommon" and are generally permissible "so

long as they are properly limited and not overly broad." *Id*. at \*49 (quoting *In re Nat'l Heritage Found., Inc.*, 478 B.R. 216, 233 (Bankr. E.D. Va. 2012)).

Generally, it has been recognized that:

> [A] proper exculpation provision is a protection not only of court-supervised fiduciaries, but also of court-supervised and court-approved transactions. If this Court has approved a transaction as being in the best interests of the estate and has authorized the transaction to proceed, then the parties to those transactions should not be subject to claims that effectively seek to undermine or second-guess this Court's determinations. In the absence of gross negligence or intentional wrongdoing, parties should not be liable for doing things that the Court authorized them to do and that the Court decided were reasonable things to do.

*Aegean Marine Petroleum Network*, 599 B.R. at 721.

In the chapter 11 context, "in general, exculpated parties who are not estate fiduciaries are entitled to benefit from a broad exculpation provision where they have been actively involved in all aspects of the Chapter 11 Cases and have made significant contributions to the success of the cases." *In re Wythe Berry Fee Owner LLC*, No. 22-11340 (MG), 2024 WL 2767121, at \*13 (Bankr. S.D.N.Y. May 29, 2024) (cleaned up). This Court in *Wythe Berry* exculpated a creditor group, among others, because its participation "was instrumental to the Debtor formulating a plan on an expedited basis, and their support was essential to the successful negotiation of the Plan" and related agreements. *Id.* (cleaned up). And while the exculpation reached beyond the set of estate fiduciaries, it still was limited just to "court-supervised and court-approved transactions." *Aegean Marine Petroleum Network*, 599 B.R. at 721. *See KG Winddown, LLC,* Case No. 20-11723 (MG) (Bankr. S.D.N.Y. 2020) (ECF Doc. # 494) (permitting exculpation of purchaser as non-estate fiduciary); *Genco Shipping & Trading Ltd.*, Case No. 14-11108 (SHL) (Bankr. S.D.N.Y. July 2, 2014) (ECF Doc. # 322) (approving exculpation provision in plan providing exculpation for non-estate fiduciaries); *In re Residential Cap.*

40

*LLC*, Case No. 12-12020 (MG), 2013 WL 12161584, at *13 (Bankr. S.D.N.Y. Dec. 11, 2013) (order confirming plan that contained exculpations for parties "instrumental to the successful prosecution of the Chapter 11 Cases or their resolution pursuant to the Plan, and/or provided a substantial contribution to the Debtors")

"In determining whether to approve exculpation provisions, courts also consider whether the beneficiaries of the exculpation participated in good faith in negotiating the plan and bringing it to fruition, and whether the provision is integral to the plan . . . . Courts in this and other districts have approved exculpation provisions . . . for estate fiduciaries and non- estate fiduciaries." *In re: Klaynberg*, No. 22-10165 (MG), 2023 WL 5426748, at *17–18 (Bankr. S.D.N.Y. Aug. 22, 2023).  Finally, courts in the Second Circuit allow exculpation provisions so long as they apply to post-petition conduct and explicitly exclude gross negligence and willful misconduct.  *Id*. ("Courts in the Second Circuit have held that [exculpation provisions] . . . are appropriate when confined to postpetition activity and explicitly exclude gross negligence and willful misconduct.").

Additionally, courts in this district have exculpated behavior that occurred after the effective date of a plan of reorganization when that behavior was "authorized by bankruptcy courts to carry out the bankruptcy process." *See In re Ditech Holding Corp*., No. 19-10412 (JLG), 2021 WL 3716398, at *9 (Bankr. S.D.N.Y. Aug. 20, 2021); *In re Aegean Marine Petroleum Network Inc*., 599 B.R. at 721 ("I think that a proper exculpation provision is a protection not only of court-supervised fiduciaries, but also of court supervised and court-approved transactions . . . .  In the absence of gross negligence or intentional wrongdoing, parties should not be liable for doing things that the Court authorized them to do and that the Court decided were reasonable things to do."); *In re*

*Granite Broad. Corp.*, 369 B.R. 120, 139 (Bankr. S.D.N.Y. 2007) (approving exculpation clause "for actions in connection, related to, or arising out of the Reorganization Cases," noting that the language "generally follows the text that has become standard in this district and is sufficiently narrow to be unexceptional" and that "the Plan provides exculpation only for acts or omissions in connection with the Plan and the bankruptcy cases. It requires, in effect, that any claims in connection with the bankruptcy case be raised in the case and not be saved for future litigation."); *In re Flushing Hosp. & Med. Ctr.*, 395 B.R. 229, 235 (Bankr. E.D.N.Y. 2008) ("It is apparent that the exculpation provisions quoted above are not limited to pre-effective date claims. By their terms, these provisions apply to 'any act or omission in connection with, or arising out of . . . the administration of the Plan.' Adopting [the objector's] interpretation would render the 'administration of the Plan' clause meaningless, because conduct during the administration of the Plan necessarily occurs after the effective date of the Plan.").

## V.  DISCUSSION: FOREIGN PROCEEDING RECOGNITION

### A. Eligibility Under Section 109(a) of the Code

Courts have consistently held that section 109(a) is a low bar for chapter 15 eligibility and a retainer held in a client trust fund is sufficient to establish eligibility. *In re B.C.I. Finances Pty Ltd.*, 671 B.R. 669, 676 (Bankr. S.D.N.Y. 2025); *see also In re Iovate Health Scis. Int' Inc.*, 673 B.R. 516, 526-27 (Bankr. S.D.N.Y. 2025); *ARD Fin., S.A.*, 2026 WL 817458, at *18. The Debtors must have an interest in the funds to qualify under section 109(a), but "[i]t is not relevant who paid the retainer, so long as the retainer is meant to cover the fees of the attorneys for all the Debtors." *Glob. Ocean Carriers*

*Ltd.*, 251 B.R. at 39; *see also In re JPA No. 111 Co., Ltd.*, No. 21-12075 (DSJ), 2022 WL

298428, at *6 (Bankr. S.D.N.Y. Feb. 1, 2022).

The Debtors have property in the United States in the form of a Retainer held in

an account maintained in New York by Skadden.  (Boac Decl. ¶ 20.)  Additionally, the

Debtors are obligators on U.S. dollar-denominated debt that is governed by New York

law, including the instruments related to the Legacy Notes, the Term Loan A Facility, the

Term Loan B Facility, the Revolving Credit Facility, the Series I Intercompany Loan

Facility, the Series II Intercompany Loan Facility, and the New 2029 Notes.  (*Id.*)  These

satisfy the "property in the United States" requirement for eligibility under section

109(a).  *See In re Avanti Comm'n Grp. PLC*, 582 B.R. at 619 (holding that a foreign

debtor was eligible to be a debtor under section 109(a) of the Bankruptcy Code because

of (a) an interest in the U.S. counsel's retainer account and (b) an instrument government

by New York law).  Accordingly, section 109(a) of the Code is satisfied.

**B.  The English Proceedings are Foreign Main Proceedings**

1.  The English Proceedings are "Foreign Main Proceedings" under
     section 1517(a)(1)

The Foreign Representative has sufficiently demonstrated that the English

Proceedings are "foreign main proceedings" within the meaning of section 1517 of the

Code.  Section 1517 provides that "(1) such foreign proceeding . . . is a foreign main

proceeding or foreign nonmain proceeding within the meaning of section 1502; (2) the

foreign representative applying for recognition is a person or body; and (3) the petition

meets the requirements of section 1515."  11 U.S.C. § 1517(a).

Section 101(23) of the Code defines "foreign proceeding" as follows:

> a collective judicial or administrative proceeding in a foreign country,
> including an interim proceeding, under a law relating to insolvency or

43

adjustment of debt in which proceeding the assets and affairs of the debtor
are subject to control or supervision by a foreign court, for the purpose of
reorganization or liquidation.

11 U.S.C. § 101(23).

The Foreign Representative contends that the English Proceedings meet this criteria because (i) the Debtors commenced the English Proceedings pursuant to Part 26A of the Companies Act, (ii) the English Proceedings are being overseen by the English Court in England and are being conducted pursuant to laws relating to insolvency or the adjustment of debts, (iii) the English Proceedings are collective in nature as they take into account the rights of all Plan Creditors, and (iv) the English Proceedings will facilitate the Restructuring of the Debtors as the implementation of the Restructuring Plans will address the Group's liquidity and operational challenges, while providing runway for the Group's portfolio of development projects and opportunities that are expected to generate significant revenue and liquidity in the future.  (Boas Decl. ¶ 29.)  Accordingly, the English Proceedings qualify as "foreign proceedings."

2.   The Debtors' COMI is England

The Debtors' COMI is located in England.  Both Debtors are private companies limited by shares and incorporated under the laws of England and Wales.  (VP ¶ 3.)  Both NFE Global and NFE Brazil have their registered office at Suite 1, 7th Floor, 50 Broadway, London SW1H 0BL, United Kingdom.  (*Id.* ¶ 16.)  The Foreign Representative has demonstrated that each of the Debtors has a registered office located in England and each is entitled to the presumption under section 1516(c) that the location of their registered office is also its center of main interest.

There appears to be nothing in the record to refute the COMI presumption. Additional supporting factors include that the Debtors' books and records are maintained

in England; each Debtor maintains bank accounts in England; a U.K. company (Vistra Cosec Limited) serves as the corporate secretary for both Debtors; and the Foreign Representative is an English citizen and resident and serves as a director of both Debtors. (Boas Decl. ¶ 31.)

Therefore, the Debtors' COMI is in England, and the Court recognized the English Proceedings as "foreign main proceedings" pursuant to section 1502(4) and 1517(b)(1) of the Code.

### C.  The Public Policy Exception Does Not Bar Recognition

The English Proceedings are not fundamentally contrary to U.S. public policy. Succeeding on a public policy argument in an attempt to deny recognition is a high bar. Courts have noted that "even the absence of certain procedural or constitutional rights will not itself be a bar under [Section] 1506." *In re PT Bakrie Telecom Tbk*, 628 B.R. 859, 871 (Bankr. S.D.N.Y. 2021) (quoting *In re OAS S.A.*, 533 B.R. 83, 104 (Bankr. S.D.N.Y. 2015)).

On April 17, 2026, the board of directors of each of the Debtors adopted resolutions appointing Christopher Boas as the Foreign Representative.  (VP ¶ 47.)  The Convening Hearing was held on May 14, 2026.  (*Id.*)  While certain creditors had previously threatened to object to the Restructuring Plan and make a disclosure application at the Convening Hearing, at the Convening Hearing they did not pursue either an objection or disclosure application.  (*Id.* ¶ 41.)  On May 14, 2026, the English Court made the "Convening Order, among other things, confirming the Foreign Representative's appointment and convening the Plan Meetings.  (*Id.* ¶ 3.)  In accordance with the terms of the Convening Order, the Debtors made available to all Plan

45

Creditors a notice of the Plan Meetings and the Explanatory Statement on the Information Agent's website, and notices of the same were distributed to Plan Creditors.  (*Id.* ¶ 42.)

Additionally, the RSA was agreed to after lengthy negotiations by 100% of the RCF lenders and TLA lenders and approximately 97% of the TLB lenders, 85% of the 2026 Legacy Noteholders, 87% of the 2029 Legacy Noteholders, and 99% of the new 2029 Noteholders.  (Boas Decl. ¶ 22.)

In light of the lack of objections, opportunity for creditors to be heard, notice process, and overwhelming creditor support after a lengthy negotiation process, the English Proceedings provided for a fundamentally fair process that accords with due process standards in the United States.

### D.  The Debtors Have Satisfied the Additional Requirements of Section 1517 and Rule 1007

The Debtors have satisfied section 1517(a) of the Code, which requires the foreign representative that seeks recognition to be a "person or body."  *See* 11 U.S.C. § 1517(a)(2).  The foreign representative is a "person" as defined by section 101(41) of the Code.

On April 17, 2026, the board of directors of each of the Debtors adopted resolutions appointing Christopher Boas as the Foreign Representative.  (VP ¶ 47.)  On May 14, 2026, the English Court made the Convening Order, among other things, confirming the Foreign Representative's appointment.  (*Id.* ¶ 3.)

As such, the Foreign Representative in this case is an individual who has been (1) duly appointed by each of the Debtors' governing bodies to act as the foreign representative on behalf of the Debtors in connection with the English Proceedings and, (2) pursuant to the Convening Order, the Foreign Representative was recognized as such

by the English Court. (*Id.* ¶ 90.)  Accordingly, Christopher Boas is a "foreign representative" as defined under the Bankruptcy Code.

### E. The Court Need Not Consider Recognition as a Foreign Nonmain Proceeding

Because the Court has concluded that the COMI of each chapter 15 Debtor is England and therefore that the English Proceeding constitutes a foreign main proceeding, the Court need not assess whether to grant recognition of the English Proceeding as a foreign nonmain proceeding pursuant to section 1517(b)(2) of the Code.

## VI.    DISCUSSION: PLAN RECOGNITION

U.S.-based companies are increasingly seeking to accomplish a financial restructuring by establishing U.K.-based affiliates that file proceedings under Part 26 or Part 26A in the U.K., and if the U.K. plans are sanctioned, then filing a chapter 15 in the U.S.  *See, e.g.*, Order Granting Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief under Chapter 15 of the Bankruptcy Code at 8 of 9, *In re Fossil (UK) Glob. Servs. Ltd.*, (No. 25-90525 (CML), ECF Doc. # 39) (Bankr. S.D. Tex. Nov. 12, 2025) (granting recognition and enforcement of the Part 26A plan of the recently established U.K. affiliate of Fossil Group International, a company incorporated and based in the U.S.)  *See also In re Mega Newco Ltd.*, , 2025 WL 601463, at * 4 (recognizing and enforcing an English scheme of arrangement of a Mexican company that created an English "scheme" company that modified the Mexican company's debt governed by New York law); Tr. Hr'g at 21–22, *In re Codere Fin.*, (No. 20-12151, ECF Doc. # 13) (recognizing and enforcing the scheme of arrangement that modified New York-law governed debt for a Spanish gaming company that established a new U.K. company as the scheme company).

47

While the Court does not disagree with the outcomes in *Fossil*, *Mega Newco*, or *Codere,* the Court is particularly sensitive to "bankruptcy tourism" and concerned by the opportunity for its abuse via COMI manipulation.

### A.  Risks of COMI Manipulation

Part 26 of the U.K. law (dealing with schemes of arrangement) and Part 26A (dealing with restructuring plans permitting cross-class cramdown) allow companies to restructure tranches of debt within a capital structure without putting an entire company into a costly and time-consuming chapter 11 case.  Both approaches require approval of 75% in value of voting classes to obtain approval of the schemes or plans.  To the credit of U.K. courts, they have carefully scrutinized the schemes and plans.  The risk, however, is that by establishing an affiliate in the U.K. to file under Part 26 or Part 26A., a Debtor may circumvent the requirements of the U.S. Bankruptcy Code to disadvantage some creditors.

Eligibility to file a Part 26 or Part 26A proceeding in the U.K. is not based on COMI, but rather on "sufficient connection" of the plan company.  COMI is the only basis for recognition and enforcement for cross border cases under chapter 15.  "Sufficient connection" and "COMI" are not the same standards.  In *In re Fossil*, the sufficient connection test was satisfied in the U.K. by changing the governing law of the debt from New York law to English law.  If the U.S. court then declined to recognize the COMI in the U.K. of the plan company, the restructuring would fail.

In *In re Fossil*, the order entered by the Houston Bankruptcy Court does not analyze the issue of COMI.  *See* Order, *In re Fossil (UK) Glob. Servs. Ltd.*, (No. 25-90525, ECF Doc. # 39) (entering an order concluding without analysis that "The U.K.

48

Proceeding is pending in England, where the Foreign Debtor has its 'center of main interests' as referred to in section 1517(b)(1) of the Bankruptcy Code"). In *In re Mega Newco Ltd.*, the court cautioned against allowing this structure in all cases, because the "ordinary predicate for chapter 15 relief could be stripped of meaning." *In re Mega Newco Ltd.*, 2025 WL 601463, at *3. Judge Wiles explained:

> Any debtor company could restructure its obligations anywhere it chose without even subjecting itself to a foreign proceeding. All that a debtor would need to do is to form a new subsidiary in a jurisdiction of its choice and then cause that new subsidiary to assume the parent company's obligations. The parent company's COMI would no longer be relevant to the parent's restructuring of its debts. The laws of the chosen jurisdiction would govern a restructuring, no matter how those laws might affect the legitimate expectations of creditors and regardless of whether the debtor had chosen a particular jurisdiction for the purpose of favoring insiders or for other improper reasons.

*Id.*

### B. Assessing COMI Manipulation

In a case where a Part 26 Scheme or a Part 26A Plan is used to restructure debt of a non-U.K. company, a chapter 15 court should scrutinize COMI closely to be sure the Scheme or Plan has not been used unfairly to favor one group of creditors over others to achieve a result that could not be achieved in a chapter 11 case. *In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006) (holding that COMI determinations should not be made "mechanically," and that COMI should be assessed "in light of chapter 15's emphasis on protecting the reasonable interests of parties in interest pursuant to fair procedures and the maximization of the debtor's value").

Insider exploitation, untoward manipulation, and overt thwarting of third-party expectations may result in a refusal to recognize and enforce the foreign scheme or plan for bad faith COMI manipulation. Tr. Hr'g at 21, *In re Codere Fin.*, (No. 20-12151, ECF

Doc. # 13) ("Those sorts of things could evidence bad faith COMI manipulation . . . . I want to be clear that if there were objections that established exploitation or untoward manipulation or thwarting of third-party expectations, it is doubtful that this Court would recognize and enforce this scheme of arrangement.").

A lack of objections and support for a scheme of arrangement or plan weigh in favor of recognition. Tr. Hr'g at 21-22, *In re Codere Fin.*, (No. 20-12151, ECF Doc. # 13); *In re Mega Newco Ltd.*, 2025 WL 601463, at *4 ("If COMI manipulation is a matter of concern because of the risk that creditors' rights and expectations might be thwarted, then one of the main factors I ought to consider, in deciding whether such a manipulation has occurred, is whether the affected creditors have asserted any objection.").

The court in *In re Mega Newco Ltd.* highlighted that the scheme of arrangement was the product of negotiations with and consent of the affected creditors and that it enabled a broader restructuring with increased recoveries for all parties. *In re Mega Newco Ltd.*, 2025 WL 601463, at *4. The court deferred to the creditors in determining whether their expectations were thwarted. *Id.* (citing *In re SPhinX, Ltd.*, 351 B.R. at 117 (stating that "creditors presumably are in the bast position to determine whether their own expectations are being thwarted, and therefore that 'one generally should defer . . . to the creditors' acquiescence in or support of a proposed COMI'")).

After carefully reviewing the record in this case, the Court found no evidence that the Plans that were sanctioned by the U.K. court were the result of exploitation or untoward manipulation that would lead the Court to deny recognition and enforcement of the Plans.

50

### C.  11 U.S.C. § 1522(a) as a Guardrail

Notably, the Bankruptcy Code does not expressly prevent domestic entity from establishing a foreign affiliate to act as plan or scheme company and if a plan or scheme is sanctioned by a foreign court, seeking to have the foreign plan or scheme recognized and enforced in a chapter 15 case.  However, U.S. courts should look closely at recognition requests, with particular attention to the requirements of section 1522(a).  The "sufficiently protected" requirement of section 1522(a) provides a helpful guardrail to protect creditor interests.  Tr. Hr'g at 21, *In re Codere Fin.*, (No. 20-12151, ECF Doc. # 13) (stating that "such relief can be granted only if the interests of creditors and other interested entities, including the debtor, are sufficiently protected").  The requirements and application of section 1522(a) are discussed in more detail below.

### D.  Enforcing the Plan, Including the Releases, as Discretionary Relief under Sections 1507 and 1521 is Proper

Again, section 1521(a) of the Code authorizes this Court to grant enumerated forms of relief in addition to "any appropriate relief" necessary to effectuate the purposes of chapter 15 and to protect a debtor's assets and the interest of creditors.  11 U.S.C. § 1521.  Further, section 1522(a) provides that the court may only grant discretionary relief under section 1521 if the interests of creditors are sufficiently protected.  11 U.S.C. § 1522(a).  "Sufficient protection" has been interpreted as requiring "the just treatment of all holders of claims against the bankruptcy estate, the protection of U.S. claimants against prejudice and inconvenience in the processing of claims in the [foreign] proceeding, and the distribution of proceeds of the [foreign] estate substantially in accordance with the order prescribed by U.S. law." *In re Atlas Shipping A/S*, 404 B.R. at 740 (internal citation and quotation marks omitted) (alteration in the original).

51

Given the lack of objections in this case, and overwhelming creditor support, the Court found that the interests of creditors are sufficiently protected.

1. Just Treatment of Creditors

First, the Code requires the Court to inquire whether the additional assistance will reasonably assure just treatment of all holders of claims against or interests in the debtor's property. Just treatment is satisfied upon a showing that the applicable law "provides for a comprehensive procedure for the orderly and equitable distribution of [the debtor]'s assets among all of its creditors." *In re Rede Energia S.A.*, 515 B.R. at 95 (quoting *In re Bd. of Directors of Telecom Argentina, S.A.*, 528 F.3d 162, 170 (2d Cir. 2008)) (alterations in the original); *In re Oi S.A.*, 587 B.R. 253, 267 (Bankr. S.D.N.Y. 2018).

The record reflects that creditors were treated fairly in the English Proceedings. The Foreign Representative has made a sufficient showing that the English Proceedings constituted a "comprehensive procedure" for the purposes of section 1521. Pursuant to the RSA, there is overwhelming support for the Restructuring Plans from Plan Creditors. (VP ¶ 99.) Under the Restructuring Plans, Plan Creditors will receive the Plan Consideration, which is preferable to liquidation because liquidation would likely result in a substantially lower return to Plan Creditors as compared to the Plan Consideration. (*Id.*) The Foreign Representative states that the Restructuring Plans will result in the same compromise or arrangement between the Debtors and each Plan Creditor as other similarly situated Plan Creditor. (*Id.*) Under the RAR, all Plan Creditors receive a better outcome under the Restructuring Plans compared to the Relevant Alternative. (RAR at 16.)

52

The Debtors held Plan Meetings on June 15, 2026 and the Restructuring Plans were approved with nearly unanimous consent, with unanimous votes in favor obtained in six out of the seven classes. (Supp. Stephansen Decl. ¶ 8.) Notably, the Legacy Noteholders, the only class where creditors voted against the Plans, has recovery of 13% under the Relevant Alternative compared with 26% under the Restructuring Plans. (RAR at 16.)

The terms of the Restructuring Plans require approval of the English Court in the form of orders sanctioning the Restructuring Plans. (VP ¶ 99.) The Plan Creditors were afforded extensive notice of, and multiple opportunities to review, consider, and object to, the Restructuring Plans and the Plan Releases. (Supp. Stephansen Decl. ¶ 9.) Plan Creditors were entitled to be heard with respect to the Restructuring Plans at both the Convening Hearing and the Sanction Hearing. (*Id.*) Plan Creditors received formal notice of the Plan Releases through multiple documents and proceedings and were provided with contact information for the Information Agent and the Debtors' advisors to direct any questions regarding the Restructuring Plans, including the Plan Releases. (*Id.* ¶ 10.) These materials and proceedings include the RSA, the Convening Hearing, the Explanatory Statement which serves a function comparable to that of a disclosure statement required under section 1125 of the Bankruptcy Code, the Plan Meetings, and the Sanction Hearing. (*Id.*)

Further, the Restructuring is the result of a months-long, hard fought negotiation between the Debtors and the Plan Creditors, with creditors organizing into groups and retaining sophisticated advisors before ultimately accepting the terms of Plan Releases. (*Id.* ¶ 13.) The Foreign Representative characterizes the Supporting Creditors subject to

the Plan Releases as "sophisticated investors who have had ample notice and opportunity

to review and understand the terms of the Restructuring Plans, including the Plan

Releases, and who have independently determined to support the Restructuring." (*Id.* ¶

15.)

At the Sanction Hearing, the Debtors walked the English Court through the Plan

Releases and the English Court considered whether they were appropriate. (*Id.* ¶ 10.) No

Plan Creditor appeared to object to the Plan Releases or otherwise oppose sanction of the

Restructuring Plans. (*Id.*)

Accordingly, the English Proceedings constitute a comprehensive procedure for

the distribution of estate property, and the first factor is satisfied.

### 2.  Protection of U.S. Claimants

Next, this Court has found that U.S. creditors must be protected against "prejudice

and inconvenience in the processing of claims" in the foreign proceeding. *Atlas

Shipping*, 404 B.R. at 740 (internal citation omitted). This prong is clearly met. The

Restructuring Plans address and restructure only the claims of the Plan Creditors (who

are the only affected creditors) and do not contemplate any other class of creditors other

than the Plan Creditors being affected. (VP ¶ 100.) All of the Plan Creditors have been

given adequate notice of the Restructuring Plans, and the process for participating in or

objecting to the Restructuring Plans is the same for United States creditors as all other

creditors. (*Id.* ¶ 99.) This is sufficient to satisfy this factor of the analysis.

Furthermore, no party has objected to the Motion or otherwise represented to the

Court that the English Proceedings prejudiced the rights of U.S. Creditors. Accordingly,

the Court found that the second factor is satisfied.

54

3.   Distribution of Estate Proceeds

Section 1521(b), provides that the foreign representative may be entrusted with "the distribution of all or part of the debtor's assets located in the United States."  11 U.S.C. § 1521(b).  Again, this Court has previously described the third element of "sufficient protection" as requiring that "the distribution of proceeds of the [foreign] estate substantially in accordance with the order prescribed by U.S. law." *In re Atlas Shipping A/S*, 404 B.R. at 740 (internal citation and quotation marks omitted) (alteration in the original).

Here, the Debtors seek to restructure the Debtors' and the Group's funded debt obligations, and the contractual terms of other classes of creditors or of other non-Plan Creditors are not the subject of the English Proceedings.  (*Id.* ¶ 102.)  Accordingly, the Foreign Representative submits that recognition and enforcement of the Restructuring Plans is necessary and appropriate and that the interests of creditors and other interested entities, including the Debtors, are sufficiently protected.  (*Id.*)

4.   Balancing of Interests

It is clear that that the balance of interests weighs in favor of grating the Requested Relief.  The Requested Relief is necessary for the Restructuring and to carry out the provisions of the Restructuring Plans, which will benefit both the Debtors and their creditors.

Accordingly, the Court found that the balance of interests weighs in favor of granting the Requested Relief.

55

5.    Additional Factors Considered

Relief is also appropriate under section 1507 of the Code.  The analysis for

section 1507 is broadly similar to that of section 1521, and having determined that the

first, second and fourth factors have been met, which are identical to the section 1521

analysis, this Court found that these factors are also met for purposes of section 1507.

Section 1507(b)(3), the third factor, provides that the foreign proceeding must

reasonably prevent "preferential or fraudulent dispositions of property of the debtor"  11

U.S.C. § 1507(b)(3).  The English Proceedings are adequately protective, the third factor

of section 1507 is also satisfied, and the Requested Relief is appropriate under section

1507 of the Code.

6.    Enforcement of the Restructuring Plans are Not Manifestly Contrary to
      U.S. Public Policy

This Court has noted that the public-policy exception is an "exacting standard,"

*ARD Fin., S.A.*, 2026 WL 817458, at \*19, and an objecting party must demonstrate the

existence of "exceptional circumstances concerning matters of fundamental importance

for the United States."  *Id.* (quoting *Black Gold S.A.R.L.*, 635 B.R. at 528).

According to Daniel Glosband (the "Expert"), the author of the Expert Report, the

Restructuring Plans should not raise public policy concerns because U.S. courts have

previously recognized and given full force and effect to numerous schemes of

arrangement and restructuring plans that included Non-Debtor Effects including third-

party releases.  (Expert Report ¶ 111.)  Additionally, the Expert points out that the

process required by the Companies Act 2006 is "broadly analogous to the disclosure,

voting and confirmation framework applicable to chapter 11 plans under the US

Bankruptcy Code."  (*Id.* ¶ 115.)  The Expert asserts that because similar relief could be

56

granted in a domestic proceeding, recognition and enforcement of the Plans would not be manifestly contrary to public policy.  (*Id.*)

The Expert additionally argues that *Purdue* was limited to statutory interpretation under the provisions of chapter 11 and that the Supreme Court expressly acknowledged that "Congress may authorize" such releases, indicating that such releases are not "manifestly contrary to fundamental U.S. policy."  (*Id.* ¶ 118; citing  *In re Crédito Real, S.A.B. de C.V., SOFOM, E.N.R.*, 670 B.R. 150, 164–72,(Bankr. D. Del. 2025).

As such, enforcement of the Restructuring Plans, including the Plan Releases, and the Sanction Order is not manifestly contrary to U.S. public policy.

## VII.   CONCLUSION

For the reasons discussed above, the Court **GRANTED** the Requested Relief and (i) recognized the English Proceedings as "foreign main proceedings"; (ii) recognized the Foreign Representative as the "foreign representative" of the Debtors; (iii) found that the Verified Petition meets the requirements of section 1515 of the Bankruptcy Code; and (iv) recognized the English Court's Sanction Order, giving full force to the Sanction Order and the Restructuring Plans, including the Plan Releases.

A separate Order has already been entered to reflect the Court's rulings.

Dated:    July 14, 2026
    New York, New York

*Martin Glenn*

MARTIN GLENN
Chief United States Bankruptcy Judge